UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>        Plaintiff,<br><br>        -against-<br><br>NOMURA HOLDING AMERICA, INC.; NOMURA ASSET ACCEPTANCE CORPORATION; NOMURA HOME EQUITY LOAN, INC.; NOMURA CREDIT & CAPITAL, INC.; NOMURA SECURITIES INTERNATIONAL, INC.; RBS SECURITIES INC. (f/k/a GREENWICH CAPITAL MARKETS, INC.); DAVID FINDLAY; JOHN MCCARTHY; JOHN P. GRAHAM; NATHAN GORIN; and DANTE LAROCCA,<br><br>        Defendants. | No. 11 Civ. 6201 (DLC) |

## PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSES TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

# TABLE OF CONTENTS

PART I: FACTS THAT DEFENDANTS IMPROPERLY "DISPUTE" SHOULD BE
DEEMED ADMITTED FOR PURPOSES OF FHFA'S MOTION ..................................6

    A.    Defendants Cannot Create A Genuine Dispute By Presenting Argument,
Narrative, Or "Spin" ..............................................................................7

    B.    Defendants Cannot Create A Genuine Dispute By Making Conclusory
Assertions Unsupported By Evidence ....................................................8

    C.    Defendants Cannot Create A Genuine Dispute By Citing Materials
Irrelevant To The Asserted Fact They Purportedly Contravene .............9

    D.    Defendants Cannot Create A Genuine Dispute By Speculating That Other
Evidence Might Exist .............................................................................9

    E.    Defendants Cannot Create A Genuine Dispute Without Citing To
Particular Parts Of Materials In The Record .......................................10

    F.    Defendants Cannot Create A Genuine Dispute By Disputing Facts It Has
Admitted ..............................................................................................11

    G.    Defendants Cannot Create A Genuine Dispute By Relying On Speculative
And Conclusory Expert Opinions .........................................................12

PART II: FHFA'S REPLY TO DEFENDANTS' RESPONSE TO FHFA'S LOCAL
RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS .............................13

I.    THE SECURITIZATIONS AT ISSUE .......................................................13

    A.    The Nomura Securitizations .................................................................20

    B.    The RBS Securitizations .......................................................................21

    C.    The Lehman Securitization ...................................................................22

II.    CORPORATE DEFENDANTS' ROLES .....................................................23

    A.    Nomura Holding America Inc. ..............................................................23

    B.    Nomura Credit & Capital, Inc. .............................................................25

    C.    Nomura Asset Acceptance Corporation .................................................29

    D.    Nomura Home Equity Loan, Inc. ..........................................................31

    E.    Nomura Securities .................................................................................33

F.      RBS Securities, Inc. ...............................................................34

III.      NOMURA'S ISSUERS WERE, AS A PRACTICAL MATTER, CONTROLLED BY NOMURA'S UNDERWRITER...............................37

IV.      NOMURA DEFENDANTS' RESIDENTIAL MORTGAGE BUSINESS......................52

     A.      The Trading Desk ....................................................52

         1.      The Trading Desk's Role ...................................52

         2.      The Trading Desk's Personnel ...........................58

     B.      The Residential Finance Group ....................................67

         1.      The Residential Finance Group's Role ....................67

         2.      The Residential Finance Group's Personnel .............71

     C.      The Diligence Group.....................................................73

         1.      The Diligence Group's Role ..................................73

         2.      The Diligence Group's Personnel ..........................76

V.      NOMURA'S DILIGENCE AND REVIEWS .................................84

     A.      Credit Diligence ..........................................................86

     B.      Compliance Diligence ..................................................87

     C.      Valuation Diligence .....................................................88

     D.      Data Integrity Review ..................................................88

     E.      Collateral Review.........................................................97

VI.      NOMURA SECURITIES CONDUCTED INADEQUATE DILIGENCE ON ITS WHOLE LOAN PURCHASES AND NO DILIGENCE ON THE THREE SECURITIZATIONS IT UNDERWROTE.......................100

     A.      Sampling Process ........................................................100

         1.      Sampling By Channel ..........................................100

     B.      Nomura Securities Relied On Statistically Unsound Sampling..........................108

         1.      Nomura Securities' Traders Selected Samples Based Strictly On Business Considerations ..........................108

2. There Is No Evidence That Nomura Securities Randomly Selected Diligence Samples Of Loans From Acquisition Pools ...........................129

3. Nomura Securities Selected Samples Of Loans For Credit And Compliance Diligence Primarily Using A "Black Box" That Did Not Identify Improperly Underwritten Loans.........................................149

4. Nomura Securities Excluded Loans From Valuation Diligence Without Any Basis To Conclude That The Underlying Appraisals Were Incorrect ......................................................................................169

C. Nomura Securities Did Not Respond To High Defect Rates In Its Diligence Samples By Performing Additional Diligence ....................................187

D. Nomura Securities' Diligence Did Not Perform Securitization Diligence And Did Not Test The Accuracy Of The Representations In The Prospectus Supplements.........................................................................................206

1. Review Of Offering Materials ................................................................206

2. Nomura Securities Never Tested The Rate Of Defective Loans In The SLGs ................................................................................................221

3. There Is No Evidence That Nomura Securities Randomly Selected Loans From Acquisition Pools To Populate The SLGs...........................247

4. Nomura Securities Did Not Extrapolate The Results Of Its Diligence To Either The Full Acquisition Pools Or The SLGs..............257

E. Nomura Securities' Diligence Process Had Other Substantial Defects..............272

1. Nomura's Relationship With Its Vendors................................................272

2. Nomura Securities Performed No Meaningful Quality Control Of Its Third-Party Vendors .........................................................................282

3. Nomura Securities Performed No Additional Diligence On Loans It Acquired From Originators About Which It Had Concerns ................328

4. Nomura Securities Determined That The Actual Values Of Many Mortgage Properties Were Lower Than It Reported To Investors ..........346

VII. RBSSI CONDUCTED INADEQUATE DILIGENCE ON THE FOUR SECURITIZATIONS IT UNDERWROTE...................................................................368

A. RBS Entities..........................................................................................368

B. RBSSI's Residential Mortgage Business .............................................385

      1.      Asset Backed Finance Group ...................................................385

      2.      Credit And Loan Underwriting Group .....................................409

      3.      RBS Greenwich Capital Underwriting Committee ...................417

C.      RBSSI Conducted Diligence On Securitizations From Third-Party Issuers Like Nomura Based On RBS's "Exposure To The Transaction" ........................420

      1.      NHELI 2006-HE3: "Do We Have The Complete List? No." ..................440

      2.      NHELI 2006-FM2: "I Took The Liberty To Bulls[**]t Them" ..............455

D.      RBSSI Performed Inadequate Diligence On The NHELI 2007-1 And NHELI 2007-2 Securitizations ............................................................470

      1.      RBSSI Drew Statistically Unsound Samples In Conducting Diligence On The NHELI 2007-1 And NHELI 2007-2 Securitizations ...........................................................................470

      2.      RBSSI Did Not Perform Additional Diligence After Encountering High Percentages Of Defective Loans In Its Samples For The NHELI 2007-1 ...........................................................................528

      3.      RBSSI's Diligence Did Not Test The Accuracy Of The Representations In The Prospectus Supplements For The NHELI 2007-1 And NHELI 2007-2 Securitizations At The Time Of Securitization ...........................................................................545

      4.      RBSSI Failed To Provide Meaningful Oversight Of Its Third-Party Diligence Vendors ...................................................................614

      5.      RBSSI Failed To Conduct Additional Diligence On Loans Made By Originators About Which It Had Concerns ........................680

PART III: FHFA'S LOCAL RULE 56.1 COUNTERSTATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS ............................................................740

Pursuant to Civil Rule 56.1 of the Local Rules of Civil Procedure for the Southern District of New York, Plaintiff Federal Housing Finance Agency ("FHFA"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and, together with Fannie Mae, the "GSEs"), respectfully submits the following Reply to Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts in support of its Motion for Partial Summary Judgment on Defendants' Due Diligence and Reasonable Care Defenses.

To the extent FHFA states below that a statement of material fact proffered by Defendants is disputed or undisputed, FHFA does so for purposes of this Motion only. FHFA preserves all potential evidentiary objections and does not agree that any fact proffered by Defendants or evidence offered by them in support of a fact is either admissible or may properly be considered by the Court. *See O'Brien v. Wisniewski*, 2012 WL 1118076, at *3 (D. Conn. Apr. 3, 2012) ("[F]ailure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.") (quoting Advisory Committee's Note to Fed. R. Civ. P. 56(c)).

In Part I below, FHFA explains why many of the Defendants' "disputes" in its Responses to FHFA's 56.1 Statement are not genuine and are impermissible under Local Rule 56.1. For the reasons explained in Part I, FHFA requests that each asserted fact that Defendants "disputes" only in one or more of the ways shown to be impermissible below "be deemed admitted" for purposes of this motion. In Part II, FHFA provides its paragraph-by-paragraph reply to Defendants' Responses to Plaintiffs' 56.1 Statement. In Part III, FHFA provides its Local Rule 56.1 Counterstatement of Additional Undisputed Material Facts.

## PART I: FACTS THAT DEFENDANTS IMPROPERLY "DISPUTE" SHOULD BE DEEMED ADMITTED FOR PURPOSES OF FHFA'S MOTION

While Defendants claim that almost all of FHFA's asserted facts are "disputed" in one way or another, none of these disputes is genuine: Defendants either cite to evidence consistent with the asserted fact, or offer irrelevant "facts" and assertions that do nothing to controvert FHFA's 56.1. Defendants' responses are also replete with mischaracterizations of the record, omissions of dispositive facts, legal argument, refusals to admit matters authoritatively established, and other inappropriate assertions.

Local Rule 56.1 requires the responding party to *specifically* controvert the asserted facts set forth in an opposing party's statement with citations to evidence which would be admissible. Local Rule 56.1(b)-(d). A response pursuant to Local Rule 56.1(b)-(d) should not contain legal arguments, disputes as to the 'implications' of the evidence presented, efforts to 'spin' the evidence presented by the movant, or lengthy digressions inapposite to the asserted fact. *Graves v. Deutsche Bank Sec., Inc.*, 548 F. App'x 654, 657 n.2 (2d Cir. 2013) ("Local Civil Rule 56.1[] [] requires a 'short and concise,' non-argumentative response."); *Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (Local Rule 56.1 was violated where party "added argumentative and often lengthy narrative in almost every case[,] the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make"); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 2006 WL 2136249, at *3 (S.D.N.Y. Aug. 1, 2006) ("*Rule 56.1 statements are not argument*. They should contain factual assertions with citation to the record. They should not contain conclusions …' [P]laintiffs cannot evade the impact of accepting a fact by adding legal argument to their counterstatements.") (quotation marks and citations omitted).

Whether under the Federal or Local Rules, "[a] genuine issue [is not] created merely by the presentation of assertions that are conclusory." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004). Such responses merely serve to distract from the real issues in the litigation, and "should be disregarded." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001) ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently."); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 314 (2d Cir. 2008) (responses that use the word "disputed" but do not demonstrate that the dispute is genuine cannot defeat summary judgment); *Whitehurst v. 230 Fifth, Inc.*, --- F. Supp. 2d ---, 2014 WL 684826, at *9 (S.D.N.Y. Feb. 21, 2014) (when a party opposing summary judgment "den[ies] a statement without a citation to any evidence at all," "submit[s] only that [it] 'lack[s] knowledge or information sufficient to form a belief as to' the statement in question[,]" or "cite[s] evidence[] [that] … has no bearing whatsoever on the statement it purportedly refutes[,]" it has "effectively admitted the fact at issue.").

FHFA respectfully requests that each asserted fact that Defendants "dispute" only in one or more of the ways shown to be impermissible below "be deemed admitted" for purposes of this motion. *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party [] fails to controvert a fact [properly] set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

### A.    Defendants Cannot Create A Genuine Dispute By Presenting Argument, Narrative, Or "Spin"

As set forth above, "Local Civil Rule 56.1[] [] requires a 'short and concise,' non-argumentative response[,]" *Graves*, 548 F. App'x at 657 n.2. Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts egregiously violates this requirement, as it contains hundreds of legal arguments directed at undisputed facts asserted by FHFA. As an example:

**5.    FHFA Statement:**  There is no evidence that Nomura ever exercised this right to audit Clayton or any other of its third party due diligence vendors. *See, e.g.*, Ex. 46 (Deposition of Neil Spagna) at 237:10-17 ("Q. Did you do any quality control of Clayton's work of its due diligence assistance for Nomura? … A. I don't recall. Q. Did you do any type of verification that Clayton was doing it right? A. I don't recall."); id. at 301:24-302:3 ("Q. Did you do any quality control – did Nomura do any quality control at all of the broker price opinion work? A. I don't recall.").

**Nomura Response:**  Disputed. … Furthermore, Clayton and AMC performed their own rigorous quality control reviews before sending results to Nomura. Ex. 229 (Kempf Tr.) at 45:7-46:9, 262:21-263:13; Ex. 230 (Beal 30(b)(6) Tr.) at 79:21-83:12. See also ¶ 459, *infra*, which is incorporated by reference herein.

**FHFA Reply**:  … Furthermore, Defendants' assertion that "Clayton and AMC performed their own rigorous quality control reviews before sending results to Nomura" is an argument that cannot be considered as a genuine dispute of material fact. Part I.A, *supra*.

Legal arguments of the sort set forth above cannot create a genuine dispute of material fact. *Goldstick*, 2002 WL 1906029, at *1 ("argumentative and often lengthy narrative" is inappropriate in a 56.1 Statement); *U.S. Info. Sys., Inc.*, 2006 WL 2136249, at *3 (same). FHFA requests that the Court discount such improper arguments, and deem the facts they dispute "undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2); Local Civ. R. 56.1(c) (asserted fact not "specifically controverted" by proper counterstatement of facts "will be deemed admitted for purposes of the motion").

**B.      Defendants Cannot Create A Genuine Dispute By Making Conclusory Assertions Unsupported By Evidence**

Throughout its Rule 56.1 Reply, Defendants "dispute" facts asserted by FHFA in its 56.1 through conclusory assertions that lack a citation to any evidence. As an example:

**553.      FHFA Statement:** When asked whether value part of the "LTV information that was disclosed in a prospectus supplement … was based on an appraisal that Nomura had done itself," Mr. Graham responded: "Not for any of the deals closed while I was there." Ex. 24 (Deposition of John Graham) at 66:8-66:19 ("Q. Okay. And so was there ever a time that the LTV information that would be included in a prosupp would refer to any reappraisal that was done by Nomura itself? A. Repeat the question. Q. Yeah. Was there ever a time that the LTV information that was disclosed in a prospectus supplement, that the value part of that was based on an appraisal that Nomura had done itself? A. Not for any of the deals closed while I was there.").

**Nomura Response:** Disputed. Although defendants do not dispute that the "value part" of the LTV ratios disclosed in prospectus supplements was not based on appraisals or "reappraisals" performed by Nomura, there is no evidence that Nomura or any other RMBS issuer performed appraisals or "reappraisals" for loans it securitized, nor is there any evidence that Nomura represented that LTV ratios in prospectus supplements were based on such "reappraisals."

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants dispute the asserted fact, they identify no evidence that contradicts it. Nomura's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*.

Because "[a] genuine issue [is not] created merely by the presentation of assertions that are conclusory[,]" *Patterson*, 375 F.3d at 219, FHFA requests that these and other facts in its 56.1 statement that are 'disputed' only by conclusory assertions be deemed admitted for purposes of this motion. *Whitehurst*, 2014 WL 684826, at *9 (when a party opposing a motion for summary judgment "den[ies] a statement without a citation to any evidence at all," it has "effectively admitted the fact at issue.").

### C. Defendants Cannot Create A Genuine Dispute By Citing Materials Irrelevant To The Asserted Fact They Purportedly Contravene

Defendants also "dispute" facts asserted by FHFA in its response to Plaintiff's 56.1 statement through assertions of fact that cited to evidence that is not inconsistent with the fact asserted by FHFA. As an example:

**61.** **FHFA Statement:** Nomura's corporate representative did not know whether NHELI and NAAC had separate balance sheets. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 214:3-8 ("Q. Okay. Did each of these subsidiaries have their own balance sheets? A. I don't know whether NAAC and NHELI had balance sheets since they only ever had assets momentarily.").

**Nomura Response:** Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, that testimony is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the testimony. For example, Ms. Prahofer explained that both NAAC and NHELI, as special purpose entities, "serve only to do a transaction" and that there was "really no financial effect of NAAC and NHELI" on Nomura Holding America Inc.'s consolidated financial reporting. Ex. 15 (Prahofer Tr.) at 216:10-217:2.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants admit that Ms. Prahofer gave the testimony cited by Plaintiff. That Ms. Prahofer testified that NAAC and NHELI "serve only to do a transaction" and that there was "really no financial effect" is irrelevant to, and does not directly contravene, the asserted fact. Part I.C, *supra*.

Because "[a] genuine issue [is not] created merely by the presentation of assertions that are conclusory[,]" *Patterson*, 375 F.3d at 219, FHFA requests that these and other facts in its 56.1 statement that are 'disputed' only by non-germane evidence be deemed admitted for purposes of this motion. *Whitehurst*, 2014 WL 684826, at *9 (when a party opposing a motion for summary judgment "cite[s] evidence[] [that] … has no bearing whatsoever on the statement it purportedly refutes[,]" it has "effectively admitted the fact at issue.").

### D. Defendants Cannot Create A Genuine Dispute By Speculating That Other Evidence Might Exist

To defeat FHFA's summary judgment motion, Defendants "must come forward with specific facts showing that there is a genuine issue of material fact for trial[,]" *Shannon v. N.Y. City Transit Auth.,* 332 F.3d 95, 99 (2d Cir. 2003), and they cannot meet this burden with "unsupported speculation[,]" *Kearins v. Panalpina, Inc.*, --- F. App'x ---, 2014 WL 1705090, at *2 (2d Cir. May 1, 2014). Despite bearing this burden, Defendants' reply to Plaintiff's Local Rule 56.1 Statement repeatedly "disputes" facts by speculating that other evidence might exist. As an example:

**110.** **FHFA Statement:** The second step was "[s]tructuring the potential deal," which involved "[t]aking the rating agencies and creating a bond structure and assigning bond

spreads on those." Ex. 30 (Deposition of Steven Katz) at 58:18-21 ("Q. . . . What's the second step in securitization?  A. Structuring the potential deal. "); id. at 59:11-16 ("Q. Okay, structuring a potential deal.  And what does that very generally involve?  A. Taking the rating agencies and creating a bond structure and assigning bond spreads on those.").

**Nomura Response:**  Disputed. Although Mr. Katz gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. Katz, that must be evaluated in order to fully understand the quoted excerpt. For example, Nomura performed many forms of due diligence in connection with the acquisition and securitization of loans, none of which are mentioned by plaintiff.  See ¶ 109, *supra*, which is incorporated by reference herein.

**FHFA Reply:**  …[W]hile Nomura argues that other documents, including documents authored by Mr. Katz, "must be evaluated in order to fully understand the quoted concept,"  they identify no documents that specifically contradict the asserted fact.  Nomura's speculation that evidence might exist calling the asserted fact into question does not create a genuine dispute of material fact.  Part I.D, *supra*.

Particularly in this posture, where FHFA is moving for summary judgment on a affirmative defense for which Defendants would bear the burden of proof at trial, Defendants' peculation that there *might* be evidence calling facts asserted by FHFA into question is insufficient to create a genuine dispute of material fact.  *See, e.g.*, *CILP Associates, L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (  "[W]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence … on an essential element of the nonmovant's claim[;] [and] … the nonmoving party must [then] come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."   FHFA asks that facts in its 56.1 Statement that are "disputed" only by speculation be deemed admitted for purposes of this motion.  Local Civ. R. 56.1(c) (asserted fact not "specifically controverted" by proper counterstatement of facts "will be deemed admitted for purposes of the motion").

### E.      Defendants Cannot Create A Genuine Dispute Without Citing To Particular Parts Of Materials In The Record

Throughout their reply to Plaintiff's Local Rule 56.1 Statement, Defendants generally 'dispute' specific facts asserted by FHFA—*e.g.*, by asserting that a full transcript provides needed context for testimony introduced by FHFA or by citing to the entirety of one or more voluminous exhibits without any specific reference within the exhibits, such as a page number— but does not identify any particular part of the record bringing the fact asserted by FHFA into question.  As an example:

**549.     FHFA Statement:**  Mr. Sabo agreed that even if the AVM was out of tolerance or the F score was "bad," "[i]f the valuation information was reconciled at the BPO provider and ultimately was reconciled to within the tolerance established, then a loan could have been

included in the pool." Ex. 49 (Deposition of Mendy Sabo) at 321:15-322:3 ("Q. Okay. So is it possible to accept in a pool if an AVM comes out with a valuation below by more than 15 percent and an F score comes out as a bad F score, and yet the BPO reconciliation that has access to the appraisal and that information comes out within tolerance? … A. If the valuation information was reconciled at the BPO provider and ultimately was reconciled to within the tolerance established, then a loan could have been included in the pool.").

**Nomura Response:** Disputed. Although Mr. Sabo gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Sabo gave the proffered testimony, and Nomura's assertion that additional testimony is required for context fails to cite to any additional testimony or documents. Therefore, Nomura's alleged dispute does not create a genuine dispute of material fact. Part I.E, *supra*.

Because a party opposing summary judgment must to cite to "particular parts" of the record to genuinely dispute an issue of fact, and may not generally cite to voluminous records without specific references, FHFA respectfully requests that all facts "disputed" in this manner be deemed admitted for purposes of this motion. Local Civ. R. 56.1(c) (unless statement of fact is "*specifically controverted*" by counterstatement of facts, it "will be deemed admitted for purposes of the motion") (emphasis added); *Stein v. N. Assur. Co. of Am.*, 2012 WL 1605365, at *2 (E.D.N.Y. May 7, 2012) (fact deemed admitted under Local Civ. R. 56.1 where defendants denied statements of fact "by denying the statements and generally refer[ring] the Court to [exhibit] … contain[ing] myriad documents and measure[ing] at least one inch thick[,] [because] [m]ere reference to the exhibit[] … does not specifically controvert anything."); *Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, 2013 WL 4409434, at *22 n.38 (E.D.N.Y. Aug. 2, 2013) (holding that it is a "clear violation of … Fed R. Civ. P. 56(c)(1)(A)[]" for party to oppose summary judgment motion and "not cite any evidence in the record, but instead require the Court to comb through voluminous documents and exhibits to substantiate [its] assertions."); *see also id.* ("If [] counsel expects the Court to 'scour the record' to document the facts posited in their legal arguments, "that is simply not our job[.]'") (quoting *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002)).

### F.     Defendants Cannot Create A Genuine Dispute By Disputing Facts It Has Admitted

Defendants attempt to 'dispute' facts that it has conclusively admitted, either in documents filed with the Court by its counsel—such as its Answer or 56.1 Statement—or in documents filed with the SEC. As an example, see paragraph 303 below, in which Defendants 'dispute' facts it has admitted in its response to Plaintiff's 56.1 Statement.

Plainly, Defendants cannot create a genuine issue of fact by 'disputing' facts it has already admitted to the Court. *See Setevage v. Dep't of Homeland Sec.*, 539 F. App'x 11, 13 (2d

Cir. 2013) (facts "specifically admitted" in "counter-statement of material facts[] … submitted through counsel. … constitute judicial admissions to which [a party] remains bound[]") (citing *Bergerson v. New York State Office of Mental Health*, 652 F.3d 277, 289 (2d Cir. 2011) ("[A]ll litigants are bound by the concessions of freely retained counsel."); *UBS AG, Stamford Branch v. HealthSouth Corp.*, 645 F. Supp. 2d 135, 145 (S.D.N.Y. 2008) ("Just as a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony, so too [it] cannot [] take a position of convenience contrary to its prior statements to the SEC[.]") (quotation marks omitted); *In re Magnesium Corp. of Am.*, 460 B.R. 360, 377 n.67 (Bankr. S.D.N.Y. 2011) ("SEC filings may be introduced by an opponent as admissions of the party that filed them[.]"); *Crawford v. Franklin Credit Mgmt. Corp.*, --- F.3d ---, 2014 WL 3377175, at *16 (2d Cir. July 11, 2014) ("Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout th[e] litigation.") (quoting *Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006)). Facts opposed only by such "disputes" should also be deemed admitted.

G. **Defendants Cannot Create A Genuine Dispute By Relying On Speculative And Conclusory Expert Opinions**

Finally, Defendants "dispute" certain facts based on the opinion of its experts. For example, in paragraph 57, RBSSI quotes its expert, Charles Grice, for his conclusory assertions that "Nomura Securities was the lead left underwriter for NHELI 2006-HE3, meaning that RBS's role can best be described as that of a non-lead underwriter" and that "[d]espite the use of terms such as 'co-lead' or –co-manager' to describe the role of underwriters, typically only one underwriter serves as the true lead underwriter." FHFA Ex. 60 at ¶ 109 n.130, ¶ 35 n.15. Expert opinions that are based solely on speculation cannot create a genuine dispute of material fact as to the assertions made by FHFA in its 56.1 Statement. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("An expert's opinions that are without factual basis and are based on speculation or conjecture are [] inappropriate material for consideration on a motion for summary judgment[,]" and "[a]n expert's conclusory opinions are similarly inappropriate."). Moreover, expert opinions as to legal conclusions are not appropriately considered at the summary judgment stage. *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 2014 WL 2534833, at *13 (E.D.N.Y. June 5, 2014) (an expert's opinion as to any "ultimate legal conclusion that is for [the] Court to decide" "should not [be] consider[ed] . . . on summary judgment or at trial."); *see also Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 510-12 (2d Cir. 1977) ("[We] think care must be taken lest, in the field of securities law, [experts] be allowed to usurp the function of the judge. In our view, the practice of using experts in securities cases must not be permitted to expand to such a point"); *Feinberg v. Katz*, 2007 WL 4562930, at *11 (S.D.N.Y. Dec. 21, 2007) ("It is for the jury to find, and not for an expert to opine, whether an objectively reasonable creditor would have loaned money to I. Apel if the creditor had known the omitted information."). Any facts "disputed" solely on the basis of such expert opinions should also be deemed admitted for purposes of this motion.[1]

---

[1] As further explained in FHFA's evidentiary objections, the proffered expert opinions are also inadmissible because, *inter alia*, (1) the underlying evidence is hearsay, *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (affirming exclusion of expert report that was "by and large undergirded by hearsay statements[]. . . concerning [] general practices . . . during the relevant time period."); (2) the expert report are unsworn, *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) ("[U]nsworn

## I.    THE SECURITIZATIONS AT ISSUE[3]

1.    **FHFA Statement:**  NAAC and NHELI issued a total of seven Securitizations pursuant to
      Shelf Registration Statements and Prospectus Supplements. *FHFA v. Nomura Holding
      Am. Inc. et al.*, Nomura Defendants' Answer and Defenses to Plaintiff's Amended
      Complaint ("Answer"), Dkt. No. 201, ¶ 2-3; *FHFA v. Nomura Holding Am. Inc. et al.*,
      Amended Complaint ("Am. Compl."), Dkt. No. 60, ¶ 3, 4 & tbls. 2-3; Ex. 1 (*FHFA v.
      Nomura Holding America, Inc., et al.*, Responses to Defendants' Sixth Set of
      Interrogatories (December 20, 2013)) at 7-9.

      **Nomura Response:**  Defendants do not dispute that NAAC and NHELI issued seven
      Securitizations pursuant to shelf registration statements and prospectus supplements.

      **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses
      to paragraph 1.

      **FHFA Reply:**  Defendants do not dispute the asserted fact.

2.    **FHFA Statement:**  The GSEs purchased seven Certificates from these seven
      Securitizations. *FHFA v. Nomura Holding Am. Inc. et al.*, Nomura Defendants' Local
      Rule 56.1 Counterstatement of Material Facts in Support of Nomura Defendants' in

---

letters from [experts] generally are inadmissible hearsay that are an insufficient basis for opposing a
motion for summary judgment."); and (3) the proffered opinions are not based on personal knowledge.
*King v. Livent, Inc.*, 161 F. App'x 116, 117-18 (2d Cir. 2005) (affirming exclusion of affidavit
"unsupported by facts to show firsthand knowledge as to either the [underwriter's] diligence procedures
or Defendants' state-of-mind.").

    [2]   As used herein (1)"Mem." or the "opening brief" refers to FHFA's Memorandum of Law in
Support of its Motion for Partial Summary Judgment on Defendants' Due Diligence and Reasonable Care
Defenses, (2) "Nom. Opp." refers to Nomura Defendants' Memorandum in Opposition to Plaintiff's
Motion for Summary Judgment on Due Diligence and Reasonable Care Defenses; (3) "RBS Opp." refers
to RBS Securities Inc.'s Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment
on Due Diligence and Reasonable Care Defenses; (4) "RSUF" refers to FHFA's Reply to Nomura
Defendants' Reply to Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts and to RBS
Securities Inc.'s Response to FHFA's Statement of Facts and Plaintiff's Local Rule 56.1 Reply Statement
of Undisputed Material Facts; (5) "Nom. SUF" refers to FHFA's Responses To Nomura Defendants'
Local Rule 56.1 Counterstatement of Material Facts; and (6) "RBS SUF" refers to FHFA's Responses To
RBS Securities Inc.'s Local Rule 56.1 Counterstatement of Material Facts. For the convenience of the
Court, the Nom. SUF and RBS SUF also contain Defendants' original counterstatements of material
fact.  Unless otherwise noted, all abbreviations and capitalized terms have the same meanings as in
FHFA's opening brief.

    [3]   For the convenience of the Court and to avoid ambiguity, most footnotes and tables included in
FHFA's assertions have been omitted.  Unless otherwise indicated, the footnotes provided by Defendants
contained arguments or assertions that were not supported by citations to any evidence.

Opposition to Plaintiff's Motion for Partial Summary Judgment on the GSEs' Knowledge, Dkt. No. 689, at ¶ 1.

**Nomura Response:** Defendants do not dispute that Freddie Mac and Fannie Mae purchased seven Certificates from these seven Securitizations.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 2.

**FHFA Reply:** Defendants do not dispute the asserted fact.

3.     **FHFA Statement:** Five Securitizations were backed by subprime mortgage loans, and the remaining two Securitizations were backed by Alt-A mortgage loans as indicated by Table 1 below. *See* Ex. 2 (NOM-FHFA_04868979, Standard & Poor's Securitization Review) at NOM-FHFA_04868988 ("NHELI Shelf – primarily subprime loans, although we closed one [of] our recent deals which is an Alt-A ARM and Fixed Deal (*i.e.*, NHELI 2007-1) off this shelf. NAAC Shelf – Alt-A loans (ARM, Fixed, Seconds)"); *id.* at NOM-FHFA_04868981 ("Nomura securitizes the acquired loans via two distinct shelves. We use the 'Nomura Asset Acceptance Corp' ('NAAC') shelf for first and second-lien Alt-A deals and we use the 'Nomura Home Equity Loans Inc' ('NHELI') shelf primarily for sub prime deals."); *see also* Exs. 5-11.

**Nomura Response:** Defendants do not dispute that five of the Securitizations—NHELI 2006-FMI, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-2, and NHELI 2007-3— were backed by subprime mortgage loans and that the remaining two securitizations— NAA 2005-AR6 and NHELI 2007-1—were backed by Alt-A mortgage loans.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 3.

**FHFA Reply:** Defendants do not dispute the asserted fact.

4.     **FHFA Statement:** Each of these Securitizations was sold to the GSEs and other investors pursuant to a shelf registration statement that included a prospectus supplement (a "Prospectus Supplement"). Ex. 3 (Deposition of N. Dante LaRocca) at 115:14-116:6 ("Q. You mentioned a shelf. What's a – what's a shelf? A. A shelf is a type of Registration Statement that you do under Form S-3 which is what this is where the issuer registers with the SEC a – a total number of – or not a total number, but a larger number of securitizations it expects to do so that the SEC can review and comment on the general form of what those specific transactions will look like. And once the shelf is approved, the issuer is able to do an individual transaction without further SEC review of the Prospectus Supplement by filing the Prospectus Supplement in the form – or generally in the form that conforms to the shelf filing, the previous shelf filing."); *id.* at 117:22- 118:10 ("Q. Is that consistent with your understanding that Prospectus Supplements follow from a registration of this type? A. They – they usually follow the shelf registration in terms of timing, although you could conceivably do one transaction at the time when you filed the shelf, but they don't – they're delivered together with the base, so the – this material that we're looking at would be provided each time you did one of

the takedowns with the Prospectus Supplements."); *see also* Ex. 4 (Deposition of David Findlay) at 56:8-19 ("Q. Would you explain the process for securitizing the loans? A. You file a shelf offering which is not populated with data. You then filed some form of update for which you have to pay a fee. The fee is calculated by whatever the offering is. And then there's some additional legal document, I think a prospectus or something like that, that is populated with specific information for professional investors to analyze what – what's in that document."); *see, e.g.*, Exs. 5-11.

**Nomura Response:** Disputed. Freddie Mac and Fannie Mae purchased a certificate from each of the seven Securitizations before the relevant prospectus supplement was created. Ex. 7 (NOM- FHFA_05783828) at NOM-FHFA_05783828; Ex. 8 (FHFA00001131) at FHFA00001131; Ex. 9 (FHFA00002480) at FHFA00002480; Ex. 10 (FHFA01001981) at FHFA01001981; Ex. 11 (FHFA01003626) at FHFA01003626; Ex. 12 (FHFA16863753) at FHFA16863753; Ex. 13 (FHFA01002820). Defendants do not dispute that the seven Securitizations were issued pursuant to shelf registration statements and, later, prospectus supplements.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 4.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact that the Securitizations were issued pursuant to shelf registration statements and prospectus supplements.

5. **FHFA Statement:** Each of the Prospectus Supplements contained representations concerning the Securitization to which it pertains, the groups of loans supporting the Certificates (the "Supporting Loan Groups" or "SLGs"), and the mortgage loans collateralizing the SLGs. See, e.g., Ex. 5 (NOM-FHFA_04811802, Prospectus Supplement for NAA 2005-AR6) at NOM- FHFA_04811949; *see also* Exs. 5-11.

**Nomura Response:** Defendants do not dispute that the prospectus supplements contained representations concerning the Securitization to which it pertains, the supporting loan groups, and the mortgage loans collateralizing the supporting loan groups. Defendants respectfully refer the Court to the prospectus supplements as a whole, Exs. 19-25, for all disclosures concerning the Securitizations to which the prospectus supplement pertains. Individual representations made in the prospectus supplements cannot be viewed in isolation, but must be evaluated with the prospectus supplements "as a whole" to determine whether the "representations taken together and in context, would have misled a reasonable investor about the nature of the securities." DeMaria v. Andersen, 318 F.3d 170, 180 (2d Cir. 2003) (citation and alterations omitted).

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 5.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants'

argument that those representations should be viewed in the context of other

representations does not create a genuine factual dispute. *See* Part I.A, *supra*.

6.    **FHFA Statement:** The Nomura Defendants made representations in the Prospectus
      Supplements that the mortgage loans were generally or substantially underwritten in
      accordance with an originator's underwriting guidelines, as indicated in Table 2 below
      (Exs. 5-11).

      **Nomura Response:** Disputed. Although Paragraph 6, Table 2 cites selected pages
      containing disclosures concerning underwriting criteria from the prospectus supplements
      for NAA 2005- AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI
      2007-1, NHELI 2007-2 and NHELI 2007-3, defendants respectfully refer the Court to the
      prospectus supplements as a whole, Exs. 19-25, including their additional disclosures
      concerning the nature of the underwriting criteria used to originate the relevant loans, as
      shown in Table A, below. For example, the prospectus supplements include disclosures
      concerning differences between the guidelines applicable to the loans backing the
      Securitizations and those applicable to loans purchased by Freddie Mac and Fannie Mae,
      about exceptions to the guidelines made by originators, about the risks attendant to the
      use of relevant guidelines, about underwriting criteria for loans from originators whose
      guidelines were not disclosed in the prospectus supplements, and about modified
      underwriting criteria that apply to some relevant loans. See Table A.  See also Appendix
      A.  Individual representations made in the prospectus supplements cannot be viewed in
      isolation, but must be evaluated with the prospectus supplements "as a whole" to
      determine whether the "'representations taken together and in context, would have misled
      a reasonable investor about the nature of the securities.'" DeMaria v. Andersen, 318 F.3d
      170, 180 (2d Cir. 2003) (citation and alterations omitted).

      Further, defendants dispute that the prospectus supplement for 2007-3 represents that the
      mortgage loans were generally or substantially underwritten in accordance with
      ResMAE's underwriting guidelines. Defendants aver that this prospectus supplement
      specifically discloses that loans originated by ResMAE—and any other originator in
      financial distress—may not be underwritten in substantial compliance with applicable
      guidelines. Ex. 25 at NOM-FHFA_04732664.

      **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses
      to paragraph 6.

      **FHFA Reply:** Defendants do not genuinely dispute the asserted fact.  Defendants do not

dispute that the Nomura Defendants made the representations listed in Table 2.

Defendants' argument that those representations should be viewed in the context of other

representations does not create a genuine factual dispute. *See* Part I.A *supra*. Defendants "dispute" that "the prospectus supplement for 2007-3 represents that the mortgage loans were generally or substantially underwritten in accordance with ResMAE's underwriting guidelines," but that prospectus supplement states that "[a]ll of the Mortgage Loans … were originated generally in accordance with the underwriting criteria described in this section.," FHFA Ex. 11 at NOM-FHFA_04732712, which includes a description of ResMAE's underwriting guidelines, *id.* at NOM-FHFA_04732707-12. The separate portion of the prospectus supplement regarding ResMAE's bankruptcy, cited by Defendants, does not state that loans originated by ResMAE "may not be underwritten in substantial compliance with applicable guidelines" as Defendants assert—the relevant language states that "[a]ny originator whose financial condition was weak or deteriorating at the time of origination may have experienced personnel changes that adversely affected its ability to originate mortgage loans in accordance with its customary standards," and "may also have experienced reduced management oversight or controls with respect to its underwriting standards." *Id.* at NOM-FHFA_04732664. Defendants' arguments and inaccurate citation of this irrelevant statement do not create a genuine factual dispute. *See* Parts I.A, I.C, *supra*.

7.     **FHFA Statement:** The Nomura Defendants made representations in the Prospectus Supplements concerning the loan-to-value ratios ("LTV") and/or combined loan-to-value ratio ("CLTV") of the Mortgage Loans backing the SLGs, as indicated in Table 3 below (Exs. 5-11).

**Nomura Response:** Disputed. Although Paragraph 7, Table 3 cites selected pages from the prospectus supplements containing disclosures concerning loan-to-value ("LTV") and combined loan-to- value ("CLTV") ratios, defendants respectfully refer the Court to the prospectus supplements as a whole, Exs. 19-25, including their additional disclosures concerning LTV and CLTV ratios and valuation, as shown in Table B, below. For example, the prospectus supplements include disclosures concerning how the ratios are calculated and the sources used. See Table B. See also Appendix A. Individual representations made in the prospectus supplements cannot be viewed in isolation, but

must be evaluated with the prospectus supplements "as a whole" to determine whether the "representations taken together and in context, would have misled a reasonable investor about the nature of the securities." DeMaria v. Andersen, 318 F.3d 170, 180 (2d Cir. 2003) (citation and alterations omitted). Further, Defendants dispute that the prospectus supplement for 2005 AR6 made representations concerning CLTV ratios. Ex. 19 at NOM-FHFA_04811856, NOM-FHFA_04811861.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 7.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not

dispute that the Nomura Defendants made the representations listed in Table 3.

Defendants' argument that those representations should be viewed in the context of other

representations does not create a genuine factual dispute. *See* Part I.A, *supra*.

Defendants assert that "the prospectus supplement for 2005-AR6 made representations

concerning CLTV ratios," but they do not dispute that it made representations containing

LTV ratios, hence there is no genuine dispute that the Nomura Defendants made

representations "concerning the loan-to-value rations ('LTV') *and/or* combined loan-to-

value ratios ('CLTV')" for 2005-AR6 (emphasis added).

8.     **FHFA Statement:** The Nomura Defendants made representations in the Prospectus Supplements concerning the number and percentage of Mortgage Loan secured by owner-occupied properties backing the SLGs, as indicated in Table 4 below (Exs. 5-11).

**Nomura Response:** Disputed. The prospectus supplements do not contain representations "concerning the number and percentage of the Mortgage Loans secured by owner-occupied properties." At the pages cited in Paragraph 8, Table 4, the prospectus supplements report "occupancy status" for loan applications, which concerns information supplied by borrowers to originators about their intentions to occupy the properties securing the mortgage loans. Further, the individual representations made in the prospectus supplements cannot be viewed in isolation, but must be evaluated with the prospectus supplements "as a whole" to determine whether the "representations taken together and in context, would have misled a reasonable investor about the nature of the securities," DeMaria v. Andersen, 318 F.3d 170, 180 (2d Cir. 2003) (citation and alterations omitted), and defendants therefore respectfully refer the Court to the prospectus supplements as a whole. Exs. 19-25. See also Appendix A.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 8.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not dispute that the Nomura Defendants made the representations cited in Table 4.  The pages of the prospectus supplements Defendants cite—the pages cited in ¶ 8, Table 4—do not state that the representations concern "'occupancy status' for *loan applications*," as Defendants assert (emphasis added).  Defendants characterization of the representations is inappropriate argument, *see* Part I.A, and their argument that those representations should be viewed in the context of other representations does not create a genuine factual dispute, *see* Part I.A, *supra*.

9.     **FHFA Statement:**  The Nomura Defendants made representations in the Prospectus Supplements concerning the credit ratings for each tranche of the Securitizations, as indicated in Table 5 below (Exs. 5-11).

**Nomura Response:**  Disputed. Although Paragraph 9, Table 5 cites selected pages from the prospectus supplements containing disclosures concerning the then-current credit ratings for each tranche of the Securitizations assigned by the credit rating agencies, individual representations made in the prospectus supplements cannot be viewed in isolation, but must be evaluated with the prospectus supplements "as a whole" to determine whether the "representations taken together and in context, would have misled a reasonable investor about the nature of the securities." DeMaria v. Andersen, 318 F.3d 170, 180 (2d Cir. 2003) (citation and alterations omitted), and defendants therefore respectfully refer the Court to the prospectus supplements as a whole. Exs. 19-25. See also Appendix A.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 9.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not dispute that the Nomura Defendants made the representations cited in Table 5.

Defendants' argument that those representations should be viewed in the context of other representations does not create a genuine factual dispute.  *See* Part I.A, *supra*.

### A. The Nomura Securitizations

10. **FHFA Statement:** For each of the three Securitizations in which Nomura served as the lead underwriter (the "Nomura Securitizations"), Table 6 identifies: (1) the tranche; (2) the sponsor; (3) the depositor; (4) the Lead Underwriter; (5) the date of issuance, and; (6) the supporting loan group ("SLG"). Answer ¶¶ 18, 35; Am. Compl. ¶ 18, 35 & tbl. 1.

**Nomura Response:** Disputed to the extent disputed in RBS's Reply to Plaintiff's 56.1 Statement of Undisputed Facts, which is incorporated herein by reference.

**RBSSI Response:** RBSSI disputes the assertion in ¶ 10 insofar as it concerns RBSSI and the NHELI 2006-HE3 Securitization. RBSSI was not a lead or co-lead underwriter for that securitization. *See* FHFA Ex. 60 (Expert Report of Charles Grice for RBSSI ("Grice RBSSI Report")) at ¶ 109 n.130 ("Nomura Securities was the lead left underwriter for NHELI 2006-HE3, meaning that RBS[SI]'s role can best be described as that of a non-lead underwriter."); *id.* at ¶ 35 n.15 ("Despite the use of terms such as "co-lead" or "co-manager" to describe the role of underwriters, typically only one underwriter serves as the true lead underwriter."). RBSSI further disputes the assertion in ¶ 10 to the extent it states or implies that only the Group I mortgage loans supported the class IA1 certificates that Freddie Mac purchased in the NHELI 2006-HE3 Securitization. Other mortgage loans in the NHELI 2006-HE3 trust supported and/or benefited the class IA1 certificates through overcollateralization. FHFA Ex. 8 (NHELI 2006-HE3 Prospectus Supplement) at NOM-FHFA-4620895 ("We expect the Mortgage Loans to generate more interest than is needed to pay interest on the Offered Certificates and Class B Certificates because we expect the weighted average net mortgage rate of the Mortgage Loans to be higher than the weighted average pass-through rate on the Offered Certificates and Class B Certificates.... On each distribution date, interest payments received in respect of the Mortgage Loans in excess of the amount that is needed to pay interest on the Offered Certificates, the Class B Certificates and related trust expenses may be used to reduce the total certificate principal balance of the Offered Certificates and Class B Certificates to the extent necessary to maintain or restore the required level of overcollateralization."). RBSSI refers to and incorporates by reference as if restated herein the Nomura Defendants' response to the remaining assertions in ¶ 10.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While RBSSI asserts that its proffered expert Charles Grice explained that RBSSI was not a co-lead underwriter on NHELI 2006-HE3, the conclusory assertions of the an expert to not create a genuine dispute of fact. *See* Part I.G, *supra*. Furthermore, while RBSSI "disputes" that "only the Group I mortgage loans supported the class IA1 certificates that Freddie Mac purchased in the NHELI 2006-HE3 Securitization," the cited documents relating to

overcollateralization do not specifically contradict the asserted fact and are irrelevant. *See*

Parts I.B, I.C, *supra*.

11.    **FHFA Statement:** For each of the Nomura Securitizations, Table 7 identifies: (1) the Shelf Registration Statements and amendments thereto; and (2) the Prospectus Supplements for each Securitization. Answer ¶ 41; Am. Compl. ¶ 41 & tbl. 2.

**Nomura Response:** Defendants do not dispute that Table 7 identifies the registration statement, amended registration statements, and prospectus supplement for the securitizations for which Nomura Securities served as the lead underwriter.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 11.

**FHFA Reply:** Defendants do not dispute the asserted fact.

**B.    The RBS Securitizations**

12.    **FHFA Statement:** For each of the three Securitizations in which RBS Securities served as the lead underwriter (the "RBS Securitizations"), Table 8 identifies: (1) the tranche; (2) the sponsor; (3) the depositor; (4) the Lead Underwriter; (5) the date of issuance, and; (6) the SLG. Answer ¶¶ 18, 35; Am. Compl. ¶ 18, 35 & tbl. 1.

**Nomura Response:** Disputed to the extent disputed in RBS's Reply to Plaintiff's 56.1 Statement of Undisputed Facts, which is incorporated herein by reference.

**RBSSI Response:** RBSSI disputes the assertion in ¶ 12 insofar as it states or implies that only the mortgage loan groups identified in table 8 supported the class of certificates that Freddie Mac purchased in the NHELI 2006-FM2, NHELI 2007-1, and NHELI 2007-2 Securitizations. Other mortgage loans in those securitizations supported and/or benefited the certificates Freddie Mac purchased through overcollateralization and, in some instances, cross-collateralization. FHFA Ex. 7 (NHELI 2006-FM2 Prospectus Supplement) at NOM-FHFA_04638325 (discussing overcollateralization credit enhancement); FHFA Ex. 9 (NHELI 2007-1 Prospectus Supplement) at NOM-FHFA_05141929-30 (discussing overcollateralization), NOM-FHFA_05142064-069 (discussing distribution of principal regarding Group II certificates, including cross-collateralization features); FHFA Ex. 10 (NHELI 2007-2 Prospectus Supplement) at NOM-FHFA_05591336 (discussing overcollateralization), NOM-FHFA_05591438-42 (discussing distribution of principal, including cross-collateralization features). RBSSI further disputes the assertion in ¶ 12 insofar as it identifies the NHELI 2007-2 Prospectus Supplement "date of issuance" as January 31, 2007. The prospectus supplement for that securitization is dated January 30, 2007. FHFA Ex. 10 (NHELI 2007-2 Prospectus Supplement) at NOM-FHFA_05591325.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While RBSSI "disputes" that "only the mortgage loan groups identified in table 8 supported the class of certificates that Freddie Mac purchased in the NHELI 2006-FM2, NHELI 2007-1, and NHELI 2007-2 Securitizations," the cited documents relating to overcollateralization and cross-collateralization do not specifically contradict the asserted fact and are irrelevant. *See* Parts I.B, I.C, *supra*. Undisputed that the date of NHELI 2007-2 Prospectus Supplement is January 30, 2007.

13. **FHFA Statement:** For each of the RBS Securitizations, Table 9 identifies: (1) the Shelf Registration Statements and amendments thereto; and (2) the Prospectus Supplements for each Securitization. Answer ¶ 41; Am. Compl. ¶ 41 & tbl. 2. .

   **Nomura Response:** Defendants do not dispute that Table 9 identifies the registration statement, amended registration statements, and prospectus supplement for the securitizations for which RBS served as the lead underwriter.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 13.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

   **C.    The Lehman Securitization**

14. **FHFA Statement:** For the one Securitization in which Lehman Brothers, Inc. served as lead underwriter (the "Lehman Securitization"), Table 10 identifies: (1) the tranche; (2) the sponsor; (3) the depositor; (4) the Lead Underwriter; (5) the date of issuance, and; (6) the SLG.  Answer ¶¶ 18, 35; Am. Compl. ¶ 18, 35 & tbl. 1.

   **Nomura Response:** Undisputed.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 14.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

15. **FHFA Statement:** For the Lehman Securitization, Table 11 identifies: (1) the Shelf Registration Statements and amendments thereto; and (2) the Prospectus Supplement for the Securitization. Answer ¶ 41; Am. Compl. ¶ 41 & tbl. 2.

**Nomura Response:**  Defendants do not dispute that Table 11 identifies the registration statement, amended registration statements, and prospectus supplement for the Securitization for which Lehman Brothers served as the lead underwriter.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 15.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

## II.    CORPORATE DEFENDANTS' ROLES

### A.    Nomura Holding America Inc.

16.    **FHFA Statement:**  Defendant Nomura Holding America Inc. ("Nomura Holding") is a Delaware corporation. Answer ¶ 14; Am. Compl. ¶ 14.

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 16.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

17.    **FHFA Statement:**  Nomura Holding's principal place of business is 2 World Financial Center, New York, New York 10281.

**Nomura Response:**  Disputed. Nomura Holding's principal place of business is Worldwide Plaza, 309 West 49th Street, New York, New York 10019.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 17.

**FHFA Reply:**  Nomura does not genuinely dispute the asserted fact.  Its response

provides no support for the location of its principal place of business.  In its Answer, it

admitted that the principal place of business of Nomura Holding was 2 World Financial

Center, New York, New York 10281.  Answer ¶ 14.  Nomura's corporate representative

testified that Nomura Holding's headquarters were located at 2 World Financial Center.

Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 243:14-20 ("Q.  Okay.

Where physically from 2004 to 2007 was Nomura Holding America Inc. located?... A.

Its headquarters were at Two World Financial Center.").  Moreover, the present location

of the principal place of business of Nomura Holding, to the extent that it has changed

since Nomura filed its Answer, is not material to FHFA's motion. *See Quarles v.*

*General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) ("[I]t must be remembered that

the mere existence of factual issues—where those issues are not material to the claims

before the court—will not suffice to defeat a motion for summary judgment").

18. **FHFA Statement:** Nomura Holding is a subsidiary of the Japanese financial holding company Nomura Holdings, Inc. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 209:2-9 ("Q. Okay. And – and whom did Nomura Holding America Inc. report to? . . . [W]ho is its parent? A. It parents was Nomura Holdings, Inc. of Tokyo.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 18.

**FHFA Reply:** Defendants do not dispute the asserted fact.

19. **FHFA Statement:** Nomura Holding's wholly owned subsidiaries include Defendants Nomura Credit & Capital, Inc. ("Nomura Credit" or "NCCI"), Nomura Asset Acceptance Corporation ("NAAC" or "NAA"), Nomura Home Equity Loan, Inc. ("NHELI"), and Nomura Securities International, Inc. ("Nomura Securities" or "NSI"). Answer ¶ 14; Am. Compl. ¶ 14; Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 208:19-25 ("Q. Is it fair to say that all of the Nomura entities who operated between 2004 and 2007 in RMBS were subsidiaries . . . of Nomura Holding America Inc.? A. Yes.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 19.

**FHFA Reply:** Defendants do not dispute the asserted fact.

20. **FHFA Statement:** Nomura Holding was "a holding company for operating companies." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 209:22-210:3 ("Q. . . . [A]nd what generally in the 2004 to 2007 time period was the business that Nomura Holding America Inc. did? A. Was a holding company for operating companies."); *id.* at 210:4-12 ("Q. Well, can you explain to me the distinction between a holding company and an operating company? A. I guess that it's most . . . basic an operating company does things and a holding company is passive, it holds the stock."); *id.* at 213:5-14 ("Q. Maybe explain to me a little bit more when you said that Nomura Holding America Inc. earns revenue through its holdings, can you just describe a little bit more operationally what that means? A. It owns all of the interests in the operating subsidiaries and it – the value of those increase and it owns those.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 20.

**FHFA Reply:** Defendants do not dispute the asserted fact.

### B.      Nomura Credit & Capital, Inc.

21.     **FHFA Statement:** Defendant Nomura Credit & Capital, Inc. ("Nomura Credit" or "NCCI") is a Delaware corporation. Answer ¶ 15; Am. Comp. ¶ 15.

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 21.

**FHFA Reply:** Defendants do not dispute the asserted fact.

22.     **FHFA Statement:** NCCI's principal place of business was 2 World Financial Center, New York, New York 10281. Answer ¶ 15; Am. Comp. ¶ 15; Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 243:14-243:24 ("Q. Okay. Where physically from 2004 to 2007 was Nomura Holding America Inc. located? . . . A. Its headquarters were at Two World Financial Center. Q. How about Nomura Credit & Capital, Inc.? A. Its headquarters were there as well.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 22.

**FHFA Reply:** Defendants do not dispute the asserted fact.

23.     **FHFA Statement:** NCCI is a wholly owned subsidiary of Nomura Holding. Answer ¶ 15; Am. Compl. ¶ 15; Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 207:19-24 ("Q. Okay. And what's the relationship and – between 2004 and 2007 between Nomura Credit Capital, Inc. and Nomura Holding America Inc.? A. It's a wholly owned subsidiary.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 23.

**FHFA Reply:** Defendants do not dispute the asserted fact.

24.     **FHFA Statement:** NCCI was the sponsor of each of the seven Securitizations at issue in this action. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 256:8-16 ("Q. . . . [D]id NCCI act as a sponsor with the issuance of the securitizations? A. Yes. Q. As

sponsor, what was NCCI's function with respect to the securitizations ? A. It was the seller of the loans to the depositor."); *see, e.g.*, Ex. 20 (NOM-FHFA_04785147, Prospectus Supplement for NAA 2005- AR6) at NOM-FHFA_04785152 (listing NCCI as seller); Ex. 6 (NOM-FHFA_04729474, Prospectus Supplement for NHELI 2006-FM1) at NOM-FHFA_04729479 (listing NCCI as seller); Ex. 7 (NOM-FHFA_04638315, Prospectus Supplement for NHELI 2006-FM2) at NOM- FHFA_04638320 (listing NCCI as sponsor); Ex. 8 (NOM-FHFA_04620885, Prospectus Supplement for NHELI 2006-HE3) at NOM-FHFA_04621036 (same); Ex. 9 (NOM- FHFA_05141912, Prospectus Supplement for NHELI 2007-1) at NOM-FHFA_05141912 (same); Ex. 10 (NOM-FHFA_05591325, Prospectus Supplement for NHELI 2007-2) at NOM-FHFA_05591325 (same); Ex. 11 (NOM-FHFA_04732621, Prospectus Supplement for NHELI 2007-3) at NOM-FHFA_04732621 (same).

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 24.

**FHFA Reply:** Defendants do not dispute the asserted fact.

25. **FHFA Statement:** As the sponsor for the Securitizations, NCCI "was the seller of the loans to the depositor." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 256:8-24 ("Q. Okay. Did it act as – did NCCI act as a sponsor with the issuance of the securitizations? A. Yes. Q. As sponsor, what was NCCI's function with respect to the securitizations? A. It was the seller of the loans to the depositor. Q. In the process of issuing the securitizations, did NCCI purchase or sell pools of residential mortgage loans? A. Yes. Q. From whom? A. Originators or intermediaries of originators.").

**Nomura Response:** Defendants do not dispute that NCCI sold loans to the depositor.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 25.

**FHFA Reply:** Defendants do not dispute the asserted fact.

26. **FHFA Statement:** NCCI "decided whether to purchase loans for Nomura to securitize," and whether to securitize the loans it purchased.       Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 284:3-12 ("Q. And then is it fair to say that NCCI was the official entity who ultimately decided whether to purchase loans for Nomura to securitize? . . . A. They decided whether to purchase loans and then the securitization decision was made at a later time.").

**Nomura Response:** Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, plaintiff mischaracterizes that testimony. Ms. Prahofer stated that NCCI "decided whether to purchase loans and then the securitization decision was made at a later time." Ex. 15 (Prahofer Tr.) at 284:9-12. Ms. Prahofer did not state that "NCCI 'decided whether to purchase loans for Nomura to securitize'" as plaintiff indicates in Paragraph 26. *Id.*

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 26.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Contrary to

Defendants' assertion, Plaintiff did not indicate that Ms. Prahofer stated that that "NCCI

'decided whether to purchase loans for Nomura to securitize.'" As Defendants admit,

Ms. Prahofer gave the testimony quoted by plaintiff in Paragraph 26. Therefore,

Nomura's response does not create a dispute of material fact.

27.    **FHFA Statement:** NCCI also "made the decision whether to securitize those loans" that it had purchased. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 284:13-16 ("Q. And do you know which entity made the decision whether to securitize those loans? A. NCCI.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 27.

**FHFA Reply:** Defendants do not dispute the asserted fact.

28.    **FHFA Statement:** NCCI "was involved in selecting the loans that went through loan level acquisition due diligence." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 282:6-13 ("Q. . . . Which of the Nomura entities was involved in selecting the loans that went through loan level acquisition due diligence? A. NCCI.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 28.

**FHFA Reply:** Defendants do not dispute the asserted fact.

29.    **FHFA Statement:** NCCI also "responded to repurchase demands to repurchase residential mortgage loans out of securitization trusts" and "made demands for the repurchase of residential mortgage loans by originator counterparties." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 269:15-19 ("Q. Which Nomura entity responded to repurchase demands to repurchase residential mortgage loans out of securitization trusts? A. Substantively NCCI."); *id.* at 270:2-6 ("Q. Okay. Which Nomura entity made demands for the repurchase of residential mortgage loans by originator counterparties? A. NCCI.").

**Nomura Response:** Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 29.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

30.　　**FHFA Statement:**  All of NCCI's officers were employed by Nomura Securities.  Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 222:14-223:10 ("Q.  What about as Officers, did – did the Officers of Nomura Credit & Capital, Inc., did any of them serve as Officers for any other Nomura entity?  A.  They were probably Officers of NSI.  Q.  That one's Nomura Securities International, Inc.?  A.  Yes.  Q.  And what makes you think that probably the Officers of Nomura Credit & Capital, Inc. were also Officers of Nomura Securities International, Inc.?  A.  They were employees of Nomura Securities International, Inc. and typically when one gets an Officer title, it extends to the company by which one is employed and then any other companies that one is assigned to operationally."); *see also id.* at 257:24-258:9 ("Q.  Were all of NCCI's Officers employed by Nomura Credit & Capital, Inc. or Nomura Holding America Inc.?  A.  No.  Q.  Yeah, were they also employed by Nomura Securities International, Inc.? . . .  A. Yes.").

**Nomura Response:**  Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, plaintiff mischaracterizes the testimony. Ms. Prahofer did not state that "all of NCCI's officers were employed by Nomura Securities." *See* Ex. 15 (Prahofer Tr.) at 222:14-223:10; 257:24-258:9. In fact, Ms. Prahofer disagreed with this assertion. Ex. 15 (Prahofer Tr.) at 229:13-22 ("Q: Okay.  So up to October 2006, is it fair to say that of all the U.S. Nomura entities who had any role in RMBS, they would all have been employed by Nomura Securities International, Inc.? A: I don't know about all. The majority.").

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 30.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact, as they admit that Ms. Prahofer gave the testimony quoted by FHFA, including that "They [the Officers of NCCI] were employees of Nomura Securities International, Inc."  Moreover, Defendants do not dispute a material fact.  While Defendants apparently dispute that "all" NCCI Officers were employed by Nomura Securities (rather than a majority of the officers), any such dispute is not material to FHFA's motion.  *Quarles*, 758 F.2d at 840 ("[I]t must be remembered that the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment").

31.     **FHFA Statement:** NCCI did not have any employees until October 2006. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 229:9-12 ("Q. Okay. So before October of 2006 did Nomura Credit & Capital, Inc. have any employees itself? A. I believe not." ); *id.* at 230:5-9 ("Q. Okay. And then after October 2006, does Nomura Credit & Capital, Inc. begin having its own employees? A. Yes.").

        **Nomura Response:** Defendants do not dispute that NCCI did not have any employees until October 2006, although Ms. Prahofer testified that NCCI had employees "after October of 2006" and that "[p]rior to October of 2006 it had only Officers." Ex. 15 (Prahofer Tr.) at 221:14-19.

        **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 31.

        **FHFA Reply:** Defendants do not dispute the asserted fact. Defendants' citation of Ms.

        Prahofer's testimony that NCCI had employees "after October of 2006" and prior to

        October of 2006 "it had only officers" is immaterial. Part I.C, *supra*.

32.     **FHFA Statement:** After October 2006, "some of the people that used to work for Nomura Securities International, Inc. . . . [became] employees of Nomura credit & Capital, Inc." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 230:13-25 ("Q. And did some of the people that used to work for Nomura Securities International, Inc. in October 2006 become employees of Nomura Credit & Capital, Inc.? A. Yes. Q. Do you know if there was a substantive change in any person's function as a result of changing employment from Nomura Securities International, Inc. to Nomura Credit & Capital, Inc. in October 2006. A. I believe not.").

        **Nomura Response:** Undisputed.

        **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 32.

        **FHFA Reply:** Defendants do not dispute the asserted fact.

        **C.      Nomura Asset Acceptance Corporation**

33.     **FHFA Statement:** Defendant Nomura Asset Acceptance Corporation ("NAAC") is a Delaware corporation. Answer ¶ 16; Am. Compl. ¶ 16.

        **Nomura Response:** Undisputed.

        **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 33.

        **FHFA Reply:** Defendants do not dispute the asserted fact.

34.   **FHFA Statement:** NAAC's principal place of business was 2 World Financial Center, New York, New York 10281. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 243:14-244:7 (Q. Okay. Where physically from 2004 to 2007 was Nomura Holding America Inc. located? . . . A. Its headquarters were at Two World Financial Center. . . . Q. Nomura Asset Acceptance Corporation? A. It was there.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 34.

**FHFA Reply:** Defendants do not dispute the asserted fact.

35.   **FHFA Statement:** NAAC was formed by Nomura Asset Capital Corporation. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 219:4-14 ("Q. . . . [W]ho created Nomura Asset Acceptance Corporation? . . . A. . . . Nomura Asset Capital Corporation").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 35.

**FHFA Reply:** Defendants do not dispute the asserted fact.

36.   **FHFA Statement:** NAAC was an indirect wholly owned subsidiary of Nomura Holding. Answer ¶ 16; Am. Compl. ¶ 16; Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 246:7-12 ("Q. . . . Was NAAC directly or indirectly wholly-owned by Nomura Holding America Inc.? A. Yes, indirectly.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 36.

**FHFA Reply:** Defendants do not dispute the asserted fact.

37.   **FHFA Statement:** NAAC was a special purpose entity, the function of which was to serve as a depositor for securitizations. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 216:20-217:6 ("A. . . . There's really no financial effect of NAAC and NHELI. Q. And why is that? A. They're special purpose entities. They serve only to do a transaction. Q. And -- and what transaction was NAAC created to do? A. Was created to act as a depositor for RMBS.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 37.

**FHFA Reply:** Defendants do not dispute the asserted fact.

38. **FHFA Statement:** NAAC was the depositor for one Nomura Securitization—NAA 2005-AR6. Answer ¶ 16; Am. Compl. ¶ 16; Ex. 5 (NOM-FHFA_04811802, Prospectus Supplement for NAA 2005-AR6) at NOM-FHFA_04811802 (listing NAAC as depositor).

   **Nomura Response:** Undisputed.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 38.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

39. **FHFA Statement:** As depositor, NAAC was responsible for registering the Certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934. See, e.g., Ex. 21 (Dep. Ex. 8503, 7/22/05 NAAC Form S-3) at NOM-FHFA_19038702.

   **Nomura Response:** Undisputed.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 39.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

40. **FHFA Statement:** Defendant Nomura Home Equity Loan, Inc. ("NHELI") is a Delaware corporation. Answer ¶ 17; Am. Compl. ¶ 17.

   **Nomura Response:** Undisputed.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 40.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

**D.     Nomura Home Equity Loan, Inc.**

41. **FHFA Statement:** NHELI's principal place of business was 2 World Financial Center, New York, New York 10281. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 243:14-244:10 ("Q. Okay. Where physically from 2004 to 2007 was Nomura Holding America Inc. located? . . . A. Its headquarters were at Two World Financial Center. . . . Q. And Nomura Home Equity Loan, Inc.? A. It was there.").

   **Nomura Response:** Undisputed.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 41.

**FHFA Reply:** Defendants do not dispute the asserted fact.

42. **FHFA Statement:** NHELI was formed by Nomura Asset Capital Corporation. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 228:25-229:4 ("Q. Who formed Nomura Home Equity Loan, Inc.? A. Nomura Asset Capital Corporation.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 42.

**FHFA Reply:** Defendants do not dispute the asserted fact.

43. **FHFA Statement:** NHELI was an indirect wholly owned subsidiary of Nomura Holding. Answer ¶ 17; Am. Compl. ¶ 17; Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 207:11-18 ("Q. Okay. And does Home Equity Loan – Nomura Home Equity Loan, Inc. have any relationship with Nomura Holding America Inc.? . . . A. It's an indirect wholly owned subsidiary.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 43.

**FHFA Reply:** Defendants do not dispute the asserted fact.

44. **FHFA Statement:** NHELI was a special purpose entity, the function of which was to serve as a depositor for securitizations. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 216:21-217:2 ("A. . . . There's really no financial effect of NAAC and NHELI. Q. And why is that? A. They're special purpose entities. They serve only to do a transaction."); id at 217:12-16 ("Q. Okay. And – and what was the –the special purpose that Nomura Home Equity Loan, Inc. was created for? A. To act as a depositor in RMBS transactions.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 44.

**FHFA Reply:** Defendants do not dispute the asserted fact.

45. **FHFA Statement:** NHELI was the depositor for six Securitizations—NHELI 2006-FM1, NHELI 2006-FM2, NHELI-2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3. Answer ¶ 17; Am. Compl. ¶ 17; Ex. 6 (NOM-FHFA_04729474, Prospectus Supplement for NHELI 2006- FM1) at NOM-FHFA_04729479 (listing NHELI as depositor); Ex. 7 (NOM-FHFA_04638315, Prospectus Supplement for NHELI 2006-FM2) at NOM-FHFA_04638315 (same); Ex. 8 (NOM- FHFA_04620885, Prospectus Supplement for NHELI 2006-HE3) at NOM-FHFA_04621037 (same); Ex. 9

(NOM-FHFA_05141912, Prospectus Supplement for NHELI 2007-1) at NOM-FHFA_05141912 (same); Ex. 10 (NOM-FHFA_05591325, Prospectus Supplement for NHELI 2007-2) at NOM-FHFA_05591325 (same); Ex. 11 (NOM-FHFA_04732621, Prospectus Supplement for NHELI 2007-3) at NOM-FHFA_04732621 (same).

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 45.

**FHFA Reply:** Defendants do not dispute the asserted fact.

46. **FHFA Statement:** As depositor, NHELI was responsible for registering the Certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934. Ex. 16 (Dep. Ex. 7503, 2/28/06 NHELI Form S-3) at NOM-FHFA_19039405.

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 46.

**FHFA Reply:** Defendants do not dispute the asserted fact.

### E. Nomura Securities

47. **FHFA Statement:** Defendant Nomura Securities is a New York corporation with its principal place of business at 2 World Financial Center, New York, New York 10281. Answer ¶ 18; Am. Compl. ¶ 18.

**Nomura Response:** Disputed. Nomura Securities' principal place of business is Worldwide Plaza, 309 West 49th Street, New York, New York 10019.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 47.

**FHFA Reply:** Nomura does not genuinely dispute the asserted fact. Its response

provides no support for the location of its principal place of business. In its Answer, it

admitted that the principal place of business of Nomura Securities was 2 World Financial

Center, New York, New York 10281. Answer ¶ 18. Nomura's corporate representative

testified that Nomura Securities' headquarters were located at 2 World Financial Center.

FHFA Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 243:25-244:4 ("Q.

How about Nomura Securities International, Inc.? A. Its headquarters were there [2

33

World Financial Center] as well.").  Moreover, the present location of the principal place of business of Nomura Securities, to the extent that it has changed since Nomura filed its Answer, is not material to FHFA's motion.  *See Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) ("[I]t must be remembered that the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment").

48.     **FHFA Statement:**  Nomura Securities is registered with the SEC as a broker-dealer. Answer ¶ 18; Am. Compl. ¶ 18.

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 48.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

49.     **FHFA Statement:**  Nomura Securities is a wholly owned subsidiary of Nomura Holding and an affiliate of NAAC and NHELI.  Answer ¶ 18; Am. Compl. ¶ 18.

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 49.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

50.     **FHFA Statement:**  Nomura Securities was the lead or co-lead underwriter for three Securitizations (NAA 2005-AR6, NHELI 2006-FM1, and NHELI 2006-HE3).  Answer ¶¶ 18, 56; Am. Compl. ¶¶ 18, 56.

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 50.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

**F.     RBS Securities, Inc.**

51.     **FHFA Statement:**  Defendant RBS Securities Inc. ("RBSSI") is a Delaware corporation with its principal place of business at 600 Washington Boulevard, Stamford, Connecticut 06901.  *FHFA v. Nomura Holding Am. Inc. et al.*, Defendants RBS Securities Inc.'s

Answer and Defenses to Plaintiff's Amended Complaint ("RBSSI Answer"), Dkt. No. 202, ¶ 19; Am. Compl. ¶ 19.

**Nomura Response:** Disputed to the extent disputed in RBS's Reply to Plaintiff's 56.1 Statement of Undisputed Facts, which is incorporated herein by reference.

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 51.

**FHFA Reply:** Defendants do not dispute the asserted fact.

52. **FHFA Statement:** It is registered with the SEC as a broker-dealer. RBSSI Answer ¶ 19; Am. Compl. ¶ 19.

**Nomura Response:** Disputed to the extent disputed in RBS's Reply to Plaintiff's 56.1 Statement of Undisputed Facts, which is incorporated herein by reference.

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 52.

**FHFA Reply:** Defendants do not dispute the asserted fact.

53. **FHFA Statement:** Prior to April 2009, RBS Securities was known as Greenwich Capital Markets, Inc. ("Greenwich"). RBSSI Answer ¶ 19; Am. Compl. ¶ 19.

**Nomura Response:** Disputed to the extent disputed in RBS's Reply to Plaintiff's 56.1 Statement of Undisputed Facts, which is incorporated herein by reference.

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 53.

**FHFA Reply:** Defendants do not dispute the asserted fact.

54. **FHFA Statement:** RBS Securities, operating as Greenwich Capital Markets, Inc. at the time of the Securitizations, was the lead underwriter for the NHELI 2006-FM2 Securitization. RBSSI Answer ¶¶ 19, 35; Am. Compl. ¶ 19, 35; Ex. 7 (NOM-FHFA_04638315 (Prospectus Supplement for NHELI 2006-FM2) at NOM-FHFA_04638315 (stating that Greenwich Capital Markets, Inc., Citigroup Global Markets Inc., and Goldman, Sachs & Co. are the underwriters for the NHELI 2006-FM2 transaction); *see also* Ex. 60 (Grice RBSSI Report) at ¶ 15.

**Nomura Response:** Disputed to the extent disputed in RBS's Reply to Plaintiff's 56.1 Statement of Undisputed Facts, which is incorporated herein by reference.

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 54.

**FHFA Reply:** Defendants do not dispute the asserted fact.

55. **FHFA Statement:** RBS Securities was the lead underwriter for the NHELI 2007-1 Securitization. RBSSI Answer ¶¶ 19, 35; Am. Compl. ¶ 19, 35; Ex. 9 (NOM-FHFA_05141912, Prospectus Supplement for NHELI 2007-1) at NOM-FHFA_05141912 (stating that Greenwich Capital Markets, Inc. and Bear, Stearns & Co. are the

underwriters for the NHELI 2007-1 transaction); *see also* Ex. 60 (Grice RBSSI Report) at ¶ 15.

**Nomura Response:** Disputed to the extent disputed in RBS's Reply to Plaintiff's 56.1 Statement of Undisputed Facts, which is incorporated herein by reference.

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 55.

**FHFA Reply:** Defendants do not dispute the asserted fact.

56. **FHFA Statement:** RBS Securities was the lead underwriter for the NHELI 2007-2 Securitization. RBSSI Answer ¶¶ 19, 35; Am. Compl. ¶ 19, 35; Ex. 10 (NOM-FHFA_05591325, Prospectus Supplement for NHELI 2007-2) at NOM-FHFA_05591325 (stating that Greenwich Capital Markets, Inc., Citigroup Global Markets Inc., and UBS Securities LLC are the underwriters for the NHELI 2007-2 transaction); *see also* Ex. 60 (Grice RBSSI Report) at ¶ 15.

**Nomura Response:** Disputed to the extent disputed in RBS's Reply to Plaintiff's 56.1 Statement of Undisputed Facts, which is incorporated herein by reference.

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 56.

**FHFA Reply:** Defendants do not dispute the asserted fact.

57. **FHFA Statement:** RBS Securities, along with Nomura Securities, was the co-lead underwriter for the NHELI 2006-HE3 Securitization. RBSSI Answer ¶¶ 19, 35; Am. Compl. ¶ 19, 35; Ex. 8 (NOM- FHFA_04620885, Prospectus Supplement for NHELI 2006-HE3) at NOM-FHFA_04620885 (stating that Nomura Securities International, Inc. and Greenwich Capital Markets, Inc. are the underwriters for the NHELI 2006-HE3 transaction).

**Nomura Response:** Disputed to the extent disputed in RBS's Reply to Plaintiff's 56.1 Statement of Undisputed Facts, which is incorporated herein by reference.

**RBSSI Response:** RBSSI disputes the assertion in ¶ 57. While RBSSI admits it was an underwriter for that securitization, none of the evidence FHFA cites supports that RBSSI was a "co-lead" underwriter. FHFA Ex. 60 (Grice RBSSI Report) at ¶ 109 n.130 ("Nomura Securities was the lead left underwriter for NHELI 2006-HE3, meaning that RBS's role can best be described as that of a non-lead underwriter."); *id*. at ¶ 35 n.15 ("Despite the use of terms such as "co-lead" or "co-manager" to describe the role of underwriters, typically only one underwriter serves as the true lead underwriter.").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

assert that their expert, Charles Grice, explained that "RBS's role can best be described as

that of a non-lead underwriter," the conclusory assertions of an expert do not create a

genuine dispute of fact. Part I.G, *supra*. Moreover, RBSSI's own "Deal Summary" for the deal refer to it as the "Co-Lead" underwriter, FHFA Ex. 538 (RBS-FHFA-SDNY-0156524) at RBS-FHFA-SDNY-0156525.

### III. NOMURA'S ISSUERS WERE, AS A PRACTICAL MATTER, CONTROLLED BY NOMURA'S UNDERWRITER

58. **FHFA Statement:** NAAC and NHELI engaged in no other business operations other than serving as depositors for RMBS. Ex. 23 (Deposition of John McCarthy) at 60:14-61:3 ("Q. What was your understanding of the limited authorized activities that [NAAC and NHELI] were engaged in during the time that you were an independent director? . . . A. Well, all bankruptcy remote special purpose entities have to remain clear of anything that can get them into bankruptcy. So they have none of their own assets and they don't have activities, they don't get involved in things that would make them potentially subject to bankruptcy.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 58.

**FHFA Reply:** Defendants do not dispute the asserted fact.

59. **FHFA Statement:** NAAC had no employees. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 224:17-20 ("Q. Were there any employees of Nomura Asset Acceptance Corporation between 2004 and 2007? A. No."); *id.* at 232:22-233:2 ("Q. Did there ever come a time that Nomura Asset Acceptance Corporation and Nomura Home Equity Loan, Inc. have employees? A. No.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 59.

**FHFA Reply:** Defendants do not dispute the asserted fact.

60. **FHFA Statement:** NHELI had no employees. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 227:22-25 ("Q. . . . Did Nomura Home Equity Loan, Inc. ever have employees? A. No."); *id.* at 232:22-233:2 ("Q. Did there ever come a time that Nomura Asset Acceptance Corporation and Nomura Home Equity Loan, Inc. have employees? A. No.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 60.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

61.     **FHFA Statement:**  Nomura's corporate representative did not know whether NHELI and NAAC had separate balance sheets.  Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 214:3-8 ("Q.  Okay.  Did each of these subsidiaries have their own balance sheets?  A.  I don't know whether NAAC and NHELI had balance sheets since they only ever had assets momentarily.").

   **Nomura Response:**  Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, that testimony is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the testimony. For example, Ms. Prahofer explained that both NAAC and NHELI, as special purpose entities, "serve only to do a transaction" and that there was "really no financial effect of NAAC and NHELI" on Nomura Holding America Inc.'s consolidated financial reporting. Ex. 15 (Prahofer Tr.) at 216:10-217:2.

   **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 61.

   **FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants admit

   that Ms. Prahofer gave the testimony cited by Plaintiff.  That Ms. Prahofer testified that

   NAAC and NHELI "serve only to do a transaction" and that there was "really no

   financial effect" is irrelevant to, and does not directly contravene, the asserted fact.  Part

   I.C, *supra*.

62.     **FHFA Statement:**  NAAC and NHELI were owned by Nomura Asset Capital Corporation until 2006, and thereafter by Nomura America Mortgage Finance, which were both wholly owned subsidiaries of Nomura Holding.  Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 206:19-207:7 ("A.  Until October of 2006, [NAAC's] parent was Nomura Asset Capital Corporation.  After that its parent was Nomura America Mortgage Finance.  Q.  Okay.  And who was the parent of Nomura Asset Capital at the time that Nomura Asset and Acceptance Corporation was a subsidiary to it?  A.  Nomura Holding America Inc.  Q.  And how about Nomura Mortgage Finance, who was the parent of that?  A.  Nomura Holding America."); *id.* at 295:14-17 ("[NHELI's] directors would have been elected by its owner, which as we've gone over was first NACC and then NAMF.").

   **Nomura Response:**  Undisputed.

   **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 62.

   **FHFA Reply:**  Defendants do not dispute the asserted fact.

63.  **FHFA Statement:**  NAAC's directors were appointed by Nomura Asset Capital Corporation and Nomura America Mortgage Finance.  Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 295:10-295:22 ("Q.  Who was in charge of appointing officers and directors, let's start at NHELI in 2004 to 2007?  A.  Its directors would have appointed its officers.  Its directors would have been elected by its owner, which as we've gone over was first NACC and then NAMF.  Q.  Okay.  And is that also – is that true both of Nomura Asset Acceptance Corporation and Nomura Home Equity Loan, Inc.?  A. Yes.").

**Nomura Response:**  Defendants do not dispute that NAAC's directors were appointed by Nomura Asset Capital Corporation and then Nomura America Mortgage Finance.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 63.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

64.  **FHFA Statement:**  NHELI's directors were appointed by Nomura Asset Capital Corporation and Nomura America Mortgage Finance.  Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 295:10-295:17 ("Q.  Who was in charge of appointing officers and directors, let's start at NHELI in 2004 to 2007?  A.  Its directors would have appointed its officers.  Its directors would have been elected by its owner, which as we've gone over was first NACC and then NAMF.")

**Nomura Response:**  Defendants do not dispute that NHELI's directors were appointed by Nomura Asset Capital Corporation and then Nomura American Mortgage Finance.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 64.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

65.  **FHFA Statement:**  NAAC's directors appointed its officers.  Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 295:10-295:22 ("Q.  Who was in charge of appointing officers and directors, let's start at NHELI in 2004 to 2007?  A.  Its directors would have appointed its officers.  Its directors would have been elected by its owner, which as we've gone over was first NACC and then NAMF. Q.  Okay.  And is that also – is that true both of Nomura Asset Acceptance Corporation and Nomura Home Equity Loan, Inc.?  A. Yes.").

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 65.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

66.     **FHFA Statement:** NHELI's directors appointed its officers. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 295:10-295:14 ("Q. Who was in charge of appointing officers and directors, let's start at NHELI in 2004 to 2007? A. Its directors would have appointed its officers.").

        **Nomura Response:** Undisputed.

        **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 66.

        **FHFA Reply:** Defendants do not dispute the asserted fact.

67.     **FHFA Statement:** The directors of NAAC and NHELI were David Findlay, Shunichi Ito, and John McCarthy. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 252:22-253:19 ("Q. . . . Who are the Directors of Nomura Home Equity Loan, Inc.? A. They were David Findlay, Shunichi Ito and John McCarthy. . . . NAAC had the same Directors actually."); *id.* at 253:10-253:19 ("Q. Okay. Who were the Directors of Nomura Asset Acceptance Corporation? . . . A. Okay. NAAC had the same Directors actually.")

        **Nomura Response:** Defendants do not dispute that David Findlay, Shunichi Ito, and John McCarthy were directors of NAAC and NHELI during the 2004-2007 time period.

        **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 67.

        **FHFA Reply:** Defendants do not dispute the asserted fact.

68.     **FHFA Statement:** David Findlay also served as a director and Chief Legal Officer of Nomura Securities and Nomura Holding at the same time he served as a director of NAAC and NHELI. Ex. 4 (Deposition of David Findlay) at 25:21-26:23 ("Q. From 2005 to 2007 at Nomura Holdings, what position did you hold? . . . A. I would be Chief Legal Officer and I would be a Director. Q. Were you Chief Legal Officer and Director at the same time through that entire period? A. I believe so. Q. Nomura Securities from 2005 to 2007, what positions did you hold? A. I think it would have mirrored – with a high degree of confidence, I think it would have mirrored Holding, Inc. as I just answered. Q. And that would be Chief Legal Officer and Director – A. Correct.").

        **Nomura Response:** Undisputed.

        **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 68.

        **FHFA Reply:** Defendants do not dispute the asserted fact.

69.     **FHFA Statement:** David Findlay did not remember that he had been a director at NHELI and NAAC. Ex. 4 (Deposition of David Findlay) at 25:6-20 ("Q. From 2005 to 2007 what was your role at Nomura Asset Acceptance Corporation? A. I just said I

don't really remember, but . . .  Q.  Were you a Director of that company at the time?  A. I'm sorry.  But not remembering incorporates the fact that I don't remember whether I would have been a Director.  Q. . . .  Nomura Home Equity Loan, Incorporated, from 2005 to 2007 what position did you hold with that company?  A.  I don't remember.").

**Nomura Response:**  Disputed.  Although Mr. Findlay gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt.  For example, Mr. Findlay explained that his "role at the company up to about 2011 was, from becoming Chief Legal Officer, was as a lawyer.  From 2011 my role has been primarily as a business person, so -- so titles and Board seats have changed and do change over that time period." Ex. 176 (Findlay Tr.) at 24:20-25:2.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 69.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Nomura admits

that Mr. Findlay gave the testimony quoted by Plaintiff, and the additional testimony that

Nomura cites is irrelevant to the asserted fact and does not create a genuine dispute of

material fact.  Part I.C, *supra*.

70.　　**FHFA Statement:**  John McCarthy, a director at NHELI and NAAC, could not recall speaking to or corresponding with the other directors of NHELI and NAAC.  Ex. 23 (Deposition of John McCarthy) at 66:4-16 ("Q. . . .  Do you recall participating in any telephone conversations with the other directors of NAAC and NHELI?  A.  No.  Q.  Do you recall ever speaking with any of the other directors of NAAC and NHELI?  A.  No.  Q.  Do you recall ever corresponding with any of the other directors of NAAC and NHELI?  A.  No."); *id.* at 160:6-14 ("Q.  And is it fair to say you don't recall any conversations or communications with anyone, including the other directors, regarding authorization of the company, either NAAC or NHELI, to proceed with carrying out the securitization; is that correct? . . .  A.  That is correct.").

**Nomura Response:**  Disputed.  Although Mr. McCarthy gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt.  For example, Mr. McCarthy testified that he "understood exactly what it was" he was agreeing to by accepting responsibility as an independent director for NAAC and NHELI. Ex. 553 (McCarthy Tr.) at 57:20-58:3.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 70.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Mr. McCarthy gave the testimony quoted by Plaintiff, and the additional testimony that Nomura cites is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

71. **FHFA Statement:** The officers of NAAC included John Graham, Nathan Gorin, Juliet Buck, and Sam Herbstman. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 224:21-225:8 ("Q. Any officers [at NAAC]? A. Yes. . . . Q. Do you know any of their names? A. John Graham I believe was the Chief Executive Officer of NAAC. Nathan Gorin, Juliet Buck, Sam Herbstman. Those are the ones I can think of offhand.").

    **Nomura Response:** Defendants do not dispute that John Graham, Nathan Gorin, Juliet Buck and Sam Herbstman were officers of NAAC during the 2004-2007 period.

    **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 71.

    **FHFA Reply:** Defendants do not dispute the asserted fact.

72. **FHFA Statement:** Three officers of NAAC, John Graham, Nathan Gorin, and Sam Herbstman, were also employed by Nomura Securities at the same time that they served as officers of NAAC. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 226:8-25 ("Q. Okay. Who employed the four Officers that were Officers of Nomura . . . Asset Acceptance Corporation from 2004 to 2007? . . . A. For Graham, first NSI then in Oc- – from and after October of 2006 NCCI. . . . Herbstman I believe was employed by NSI until 2007 and then was employed by NHA. And Gorin was always employed by NSI.").

    **Nomura Response:** Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. For example, the time period plaintiff inquired about was limited to 2004 to 2007, and Ms. Prahofer explained that John Graham was employed by Nomura Securities only until October 2006 and that Sam Herbstman was "employed by [Nomura Securities] until 2007 and then was employed by [Nomura Holding]." Ex. 15 (Prahofer Tr.) at 226:8-25; 270:19-24.

    **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 72.

    **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Ms. Prahofer gave the testimony quoted by Plaintiff, and the additional testimony

that Nomura cites does not directly contravene Plaintiff's asserted fact and does not

create a genuine dispute of material fact. Part I.C, *supra*.

73. **FHFA Statement:** The fourth officer of NAAC, Juliet Buck, was employed by Nomura Holding. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 234:18-20 ("I believe that Ms. Buck on and after January 1, 2007 was employed by NHA[.]").

**Nomura Response:** Disputed. Ms. Prahofer stated that Juliet Buck was employed by Nomura Holding "on and after January 1, 2007." See Pl. Ex. 19 at 234:18-24. Further, prior in Ms. Prahofer's testimony, when asked about Ms. Buck's employment from 2004 to 2007, Ms. Prahofer did not specify Ms. Buck's employer. Ex. 15 (Prahofer Tr.) at 226:8-25.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 73.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The additional

testimony that Nomura cites does not directly contravene Plaintiff's asserted fact and

does not create a genuine dispute of material fact. Part I.C, *supra*.

74. **FHFA Statement:** The officers of NHELI included Dante LaRocca, Nathan Gorin, Juliet Buck, and Sam Herbstman. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 228:2-17 ("Q. Did Nomura Home Equity Loan, Inc. ever have Officers? A. Yes. . . . Q. Okay. Do you know any of who they were? . . . A. So its Chief Executive was Dante LaRocca and it also had Nathan Gorin as its Financial Officer and also had Juliet Buck as its Legal Officer and also had Mr. Herbstman as its Tax Officer.").

**Nomura Response:** Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. For example, the time period asked about was limited to 2004 to 2007. Ex. 15 (Prahofer Tr.) at 228:8-17.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 74.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits

that Ms. Prahofer gave the testimony quoted by Plaintiff, and the additional testimony

that Nomura cites does not directly contravene Plaintiff's asserted fact and does not

create a genuine dispute of material fact. Part I.C, *supra*.

75. **FHFA Statement:** Three officers of NHELI, Dante LaRocca, Nathan Gorin, and Sam Herbstman, were also employed by Nomura Securities at the same time that they served as officers of NHELI. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 226:21-25 ("A. . . . Herbstman I believe was employed by NSI until 2007 and then was employed by NHA. And Gorin was always employed by NSI."); *id.* at 271:4-7 ("Q. Which Nomura entity employed Dante LaRocca? A. Prior to October of 2006 NSI and thereafter NCCI.").

   **Nomura Response:** Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. For example, Ms. Prahofer also testified that Dante LaRocca was employed by Nomura Securities "prior to October of 2006 and thereafter NCCI." Ex. 15 (Prahofer Tr.) at 271:4-7.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 75.

   **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Ms. Prahofer gave the testimony quoted by Plaintiff, and the additional testimony that Nomura cites does not directly contravene Plaintiff's asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

76. **FHFA Statement:** The fourth officer of NHELI, Juliet Buck, was employed by Nomura Holding. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 234:18-20 ("I believe that Ms. Buck on and after January 1, 2007 was employed by NHA[.]").

   **Nomura Response:** Disputed. Ms. Prahofer stated that Juliet Buck was employed by Nomura Holding "on and after January 1, 2007." See Pl. Ex. 19 at 234:18-24. Further, prior in Ms. Prahofer's testimony, when asked about Ms. Buck's employment from 2004 to 2007, Ms. Prahofer did not specify who was Ms. Buck's employer. Ex. 15 (Prahofer Tr.) at 226:8-25.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 76.

   **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The additional testimony that Nomura cites does not directly contravene Plaintiff's asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

77. **FHFA Statement:** Nomura's corporate representative did not know whether the officers of NAAC ever held meetings. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer)

at 227:2-6 ("Q.  Okay.  Did the officers have – of Nomura Asset Acceptance Corporation have meetings from 2004 to 2007?  A.  I don't know.").

**Nomura Response:**  Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. For example, Ms. Prahofer testified as to the roles of each of NAAC's officers. Ex. 15 (Prahofer Tr.) at 227:7-21.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 77.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Nomura admits

that Ms. Prahofer gave the testimony quoted by Plaintiff, and the additional testimony

that Nomura cites does not directly contravene Plaintiff's asserted fact and does not

create a genuine dispute of material fact.  Part I.C, *supra*.

78.     **FHFA Statement:**  Nomura's corporate representative did not know whether the officers of NHELI ever held meetings.  Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 229:5-8 ("Q. . . . Did the Officers of Nomura Home Equity Loan, Inc. hold any meetings?  A.  I don't know.").

**Nomura Response:**  Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. For example, Ms. Prahofer testified as to the roles of each of NHELI's officers. Ex. 15 (Prahofer Tr.) at 228:8-17.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 78.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Nomura admits

that Ms. Prahofer gave the testimony quoted by Plaintiff, and the additional testimony

that Nomura cites is irrelevant to Plaintiff's asserted fact and does not create a genuine

dispute of material fact.  Part I.C, *supra*.

79.     **FHFA Statement:**  John Graham, Chief Executive Officer of NAAC, was employed by Nomura Securities, but did not know who appointed him to be an officer at NAAC. Ex. 24 (Deposition of John Graham) at 20:2-20:9 ("Q.  Do you know which Nomura entities in particular you were working for?  A.  They changed over time.  Initially I was hired into Nomura Securities International as a Managing Director.  I was also given the

title of Managing Director shortly thereafter of Nomura Credit & Capital, Inc."); *id.* at 21:9-22 ("Q. Okay. How were you selected to be President and CEO of Nomura Asset [Acceptance] Corporation? . . . Q. How were you selected? For example, I'm wondering whether somebody appointed you or whether you were voted in? A. It was I made that – that position, so I was appointed. Q. Do you know who appointed you? A. I don't.").

**Nomura Response:** Disputed. Although Mr. Graham gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, Mr. Graham stated that the Nomura entities that he worked for "changed over time" and that he was "initially . . . hired" by Nomura Securities. Ex. 35 (Graham Tr.) at 19:19-20:25; see also Ex. 39 (Dep. Ex. 8500 Deposition Background Questionnaire) at A-2 (identifying NSI and later NCCI as his employer from April 2005 to October 2007). Ms. Prahofer also testified that the directors of NAAC and NHELI were elected by Nomura Asset Capital Corporation and Nomura America Mortgage Finance. See Ex. 15 (Prahofer Tr.) at 295:10-22. The directors then selected NAAC's and NHELI's officers. *Id.*

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 79.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits

that Mr. Graham gave the testimony quoted by Plaintiff, and the additional testimony that

Nomura cites does not directly contravene Plaintiff's asserted fact and does not create a

genuine dispute of material fact. Part I.C, *supra*.

80.  **FHFA Statement:** Dante LaRocca, Chief Executive Officer of NHELI, was employed by Nomura Securities, but not by NHELI. Ex. 3 (Deposition of N. Dante LaRocca) at 120:5-17 ("Q. . . . I think we just spoke about Nomura Securities and Nomura Credit Capital. Did -- did you work at Nomura Home Equity Loan, Inc.? A. There were multiple corporate – Nomura corporate entities that were involved in these transactions, so I was an officer of some of those, but my employment contract or agreement and my paycheck were from the entities we talked about earlier [Nomura Securities and Nomura Credit Capital]. So there were other Nomura entities that I was an officer and acted on behalf of, but not that I was employed by.").

**Nomura Response:** Undisputed that Mr. LaRocca was never employed by NHELI.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 80.

**FHFA Reply:** Defendants do not dispute the asserted fact.

81.   **FHFA Statement:**  Nathan Gorin served as Chief Financial Officer at NAAC, NHELI, NCCI, and Nomura Securities.  Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 248:14-25 ("Q. . . . What individual or entity maintained the responsibility of managing NAAC's financial accounts.  A.  Its Chief Financial Officer was Nathan Gorin. Q. And did Nathan Gorin serve as Chief Financial Officer of any of the other Nomura entities at the time?  A.  Yes.  Q.  Which ones?  A. NSI, NCCI, NHELI.").

      **Nomura Response:**  Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, Mr. Gorin in his Deposition Background Questionnaire stated that he was the Controller for Nomura Securities from July 2004 to May 27, 2007 and the Chief Financial Officer for Nomura Securities from May 28, 2007 to January 1, 2010. Ex. 555 (Dep. Ex. 11100, Deposition Background Questionnaire) at A-2.

      **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 81.

      **FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Nomura admits that Ms. Prahofer gave the testimony quoted by Plaintiff, and the additional evidence that Nomura cites does not directly contravene Plaintiff's asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

82.   **FHFA Statement:**  Nathan Gorin was an employed by Nomura Securities International, Inc.  Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 226:2-25 ("A.  Nathan Gorin was an Officer in numerous entities serving as a Financial Officer and Treasurer. . . .  And Gorin was always employed by NSI."); Ex. 25 (Dep. Ex. 11100, Nathan Gorin Deposition Background Questionnaire) at A-2 (identifying Nomura Securities International as the entity for which he worked from July 2004 to January 1, 2010).

      **Nomura Response:**  Undisputed.

      **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 82.

      **FHFA Reply:**  Defendants do not dispute the asserted fact.

83.   **FHFA Statement:**  Nathan Gorin could not recall having had any involvement with either NAAC or NHELI, or ever meeting John Graham, the chief executive at NAAC. Ex. 26 (Deposition of Nathan Gorin) at 43:6-18 ("Q. . . .  Are you aware of -- whether you were also employed or involved with Nomura Asset Acceptance Corporation?  A. Not that I recollect.  Q.  Do you recall being employed or involved in Nomura Home Equity Loan Incorporated?  A.  Not that I recollect.  Q.  Do those entities sound familiar to you, at all?  A.  At this time, the word Nomura sounds familiar."); *id.* at 110:7-11 ("Q.

Any other names you recall? A. Again, the name John Graham, I know that name now. But I don't recollect if I knew him, or ever met him back when I was at Nomura.").

**Nomura Response:** Disputed. Although Mr. Gorin gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. Mr. Gorin's primary function was serving as the controller and later Chief Financial Officer for Nomura's Accounting Group in the United States, including Nomura entities not involved in RMBS. See Ex. 15 (Prahofer Tr.) at 293:19-294:3; Ex. 556 (Gorin Tr.) at 12:6-14. The fact that Mr. Gorin did not recall his specific involvement with two entities, NAAC and NHELI, or his interactions with John Graham, seven to nine years after the fact, does not imply, as plaintiff suggests, that Mr. Gorin (i) did not have any involvement with either NAAC or NHELI, or (ii) did not meet John Graham, the chief executive at NAAC.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 83.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Mr. Gorin gave the testimony quoted by Plaintiff, and the additional testimony pertaining to Mr. Gorin's "primary function" that Nomura cites does not directly contravene Plaintiff's asserted fact and does not create a genuine dispute of material fact. Moreover, Nomura's statement—that Plaintiff's asserted fact "does not imply, as plaintiff suggests, that Mr. Gorin (i) did not have any involvement with either NAAC or NHELI, or (ii) did not meet John Graham, the chief executive at NAAC"—is unsupported argument, does not directly contravene Plaintiff's asserted fact, and does not create a genuine dispute of material fact. Part I.C, *supra*.

84.     **FHFA Statement:** Sam Herbstman was employed by Nomura Securities International, Inc. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 226:8-23 ("Q. Okay. Who employed the four Officers that were Officers of Nomura Acceptance – sorry, Nomura Asset Acceptance Corporation from 2004 to 2007? . . . A. Herbstman I believe was employed by NSI until 2007 and then was employed by NHA.").

**Nomura Response:** Disputed. Ms. Prahofer stated that Mr. Herbstman "was employed by [Nomura Securities] until 2007 and then employed by [Nomura Holding]." See Pl. Ex. 19 at 226:8-23.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 84.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  The additional testimony that Nomura cites does not directly contravene Plaintiff's asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

85.    **FHFA Statement:**  Sam Herbstman was an tax officer in numerous Nomura entities.  Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 225:16-226:7 ("Q.  And what are the other roles that the Officers of Nomura Asset Corporation played in – as Officers in other Nomura entities from 2004 to 2007? . . .  A.  And Herbstman was an Officer of numerous entities serving as a Tax Officer.").

**Nomura Response:**  Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. For example, Ms. Prahofer's answer was specifically limited to the time period of 2004 to 2007.  Ex. 15 (Prahofer Tr.) at 225:16-226:7.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 85.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Nomura admits that Ms. Prahofer gave the testimony quoted by Plaintiff, and the additional testimony that Nomura cites does not directly contravene Plaintiff's asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

86.    **FHFA Statement:**  Herbstman served as a tax officer for Nomura Home Equity Loan, Inc. from 2004 to 2007.  Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 228:8-17 ("Q.  Okay.  Do you know any of who they were?  And, again, now we're at Nomura Home Equity Loan, Inc. from 2004 to 2007.  A. . . . [Nomura Home Equity Loan, Inc.] also had Mr. Herbstman as its Tax Officer.").

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 86.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

87.    **FHFA Statement:**  Herbstman as an officer of Nomura Asset Acceptance Corporation was responsible for "making sure that the tax status was properly documented and maintained." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 227:7-21 ("Q.

Okay. Do you know of any official Officer business that the four Officers of Nomura Asset Acceptance Corporation did? . . . A. . . . And Mr. Herbstman's responsibility was making sure that the tax status was properly documented and maintained.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 87.

**FHFA Reply:** Defendants do not dispute the asserted fact.

88. **FHFA Statement:** Julie Buck served as a chief legal officer of NHELI and NAAC. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 225:16-25 ("Q. And what are the other roles that the Officers of Nomura Asset Acceptance Corporation played in -- as Officers in other Nomura entities from 2004 to 2007? A. . . . Juliet Buck was an Officer in the Legal Department and served several different entities."); *id.* at 228:8-15 ("Q. Okay. Do you know any of who they were? And, again, now we're at Nomura Home Equity Loan, Inc. from 2004 to 2007. A. So its Chief Executive was Dante LaRocca and it also had Nathan Gorin as its Financial Officer and also had Juliet Buck as its Legal Officer . . . .").

**Nomura Response:** Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. For example, Ms. Prahofer's answer was specifically limited to the time period of 2004 to 2007 and did not use the term "Chief Legal Officer." Ex. 15 (Prahofer Tr.) at 225:16-228:25.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 88.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits

that Ms. Prahofer gave the testimony quoted by Plaintiff, and do not dispute that she was

a legal officer for NHELI and NAAC. Any dispute over whether her title was "Chief

Legal Officer" is not material to FHFA's motion. *Quarles*, 758 F.2d at 840.

89. **FHFA Statement:** Nomura Securities, NAAC, and NHELI were all headquartered in the same office. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 245:15-22 ("Q. Okay. Is it fair to say that from 2004 to 2007 all of the Nomura holding and operating companies with any responsibility for residential mortgage-backed securities were located at Two World Financial Center? A. Their headquarters were there, yes.").

**Nomura Response:** Disputed. Although defendants do not dispute that Nomura Securities, NAAC, and NHELI were headquartered at the same address, Ms. Prahofer

testified that the headquarters was divided up by business groups and subsidiaries. Ex. 15 (Prahofer Tr.) at 243:14-245:22.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 89.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Ms. Prahofer gave the testimony quoted by Plaintiff, and the additional testimony that Nomura cites does not directly contravene Plaintiff's asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

90. **FHFA Statement:** Revenues and expenses associated with NAAC and NHELI regarding Nomura's RMBS business in the United States were "roll[ed] up into" one financial document along with similar revenue and expenses for Nomura Holding America Inc., Nomura Credit & Capital, and Nomura Securities International, Inc. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 275:1-22 (re: Dep. Ex. 51303, Nomura Holdings, Inc. Form 20-F) ("Q. Is it your understanding that this includes revenues and expenses associated with Nomura's RMBS business in the United States? A. To the extent that there are any, yes. Q. Okay. And to the extent that there would be any revenues or expenses associated with Nomura Holding America Inc., Nomura Credit & Capital, Nomura Securities International, Inc., Nomura Asset Acceptance Corporation, and Nomura Home Equity Loan Inc., in relation to RMBS in the United States, would it be your expectation that it would be reported in the financial information in Exhibit 51303? . . . A. It should roll up into here, yes.").

**Nomura Response:** Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, plaintiff's paraphrase of that quote is misleading. Ms. Prahofer testified that the revenues and expenses associated with NAAC and NHELI regarding Nomura's RMBS business in the United States "should roll up into" a particular document, Exhibit 51303, which is the Form 20-F for all of Nomura Holdings Inc. Ex. 15 (Prahofer Tr.) at 275:1-22.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 90.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Ms. Prahofer gave the testimony quoted by Plaintiff, and the additional testimony that Nomura cites does not directly contravene Plaintiff's asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

# IV.   NOMURA DEFENDANTS' RESIDENTIAL MORTGAGE BUSINESS

## A.   The Trading Desk

### 1.   The Trading Desk's Role

91.   **FHFA Statement:**  The Trading Desk purchased subprime, prime, and Alt-A residential mortgage loans.  Ex. 3 (Deposition of N. Dante LaRocca) at 43:11-24 ("Q.  And when -- when you were purchasing loans, what types of loans did you purchase?  What type of residential loans did you purchase? . . .  A.  They're residential, one- to four-family loans generally.  Some were first lien.  Some were second liens.  Q.  Did you purchase alt-A loans?  A.  Yes.  Q.  Did you purchase prime loans?  A.  Yes.  Q.  Purchase subprime loans?  A.  Yes."); Ex. 28 (Dep. Ex. 25303, email regarding Presentation for ASF Conference) at NOM-FHFA_04923058 ("Yearly Production Volume: Subprime, 2nds, Fixed and ARMS").

**Nomura Response:**  Defendants do not dispute that traders purchased subprime, prime and Alt-A residential mortgage loans.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 91.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

92.   **FHFA Statement:**  The Trading Desk was responsible for determining which loans would be put into a securitization.  Ex. 32 (Deposition of Donald McCabe) at 136:15-21 ("Q.  Who was responsible for determining whether or not a loan could be put into a security? . . .  A.  I mean, it was a trading desk decision to put the pool of loans together."); *see also* Ex. 29 (Deposition of Timothy Crowley) at 165:10-18 ("Q.  Did you have a role in determining which loans of those that were purchased would be put in the securitization?  A.  No.  Q.  Would that task have been in the structuring group that you referred to earlier?  A.  Structuring and trading."); *see also id.* at 165:10-18 ("Q.  Did you have a role in determining which loans of those that were purchased would be put in the securitization?  A.  No.  Q.  Would that task have been in the structuring group that you referred to earlier?  A.  Structuring and trading.").

**Nomura Response:**  Disputed. Although Messrs. McCabe and Crowley gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the context. For example, Mr. Katz testified that Joe [Kohout] and his team," i.e., the Due Diligence Group, handled "negotiations with originators regarding kick-outs," and that he had no involvement in deciding which loans were entitled to an "exception," again stating that those decisions were made by "Joe's group," the Due Diligence Group. See Ex. 182 (Katz Tr.) at 205:21-206:2, 210:16-22. N. Dante LaRocca testified that the traders alone did not "have authority to make an exception" and purchase a loan that, e.g., did not comply with underwriting guidelines or Nomura overlays. *See* Ex. 16 (LaRocca Tr.) at 177:24-178:3. Because the Nomura Due Diligence Group determined which loans

Nomura would purchase and which loans it would not, it played a role in determining which loans would go into a securitization.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 92.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Nomura admits that Mr. Crowley and Mr. McCabe gave the testimony quoted by Plaintiff, and the additional testimony that Nomura cites is irrelevant to Plaintiff's asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.  Defendants provide no citation for their argument that the Diligence Group "played a role in determining which loans would go into a securitization."  Part I.B, *supra*.

93.  **FHFA Statement:**  The "way the business operated" was for the trading desk to purchase these loans and then securitize them after it had aggregated enough loans.  Ex. 3 (Deposition of N. Dante LaRocca) at 44:10-16 ("Q.  And you would purchase these loans and what did you do with them? . . .  A.  The way the business operated was to purchase the loans and then securitize them and…sell the interest in those loans in the securitization."); *id.* at 47:3-20 ("Q.  How did you decide which loans to put in which security? . . .  A.  Generally, as we bought loans, we securitized them, you know, on a regular basis after we bought them.  So there—it was basically a flow, purchase and securitization, whatever we bought in we securitized.  Q.  So when you had enough loans you could close a pool and structure that in to a security and then with a series of different assumptions and perhaps some give and take on the composition of that, you had a security; is that fair to say? . . .  A. . . .  I would say as we aggregated enough loans, we securitized them.").

**Nomura Response:**  Disputed. Although Mr. LaRocca gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the context. The business operations included many more steps aside from purchase and securitization, including due diligence and retaining the most risky securities in each securitization. C. Stmt. at ¶¶ 46-61.  Defendants do not dispute that Nomura securitized loans that it had purchased (after subjecting them to diligence) and undertaking other steps.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 93.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Nomura admits that Mr. LaRocca gave the testimony quoted by Plaintiff, and the additional evidence that

Nomura cites does not directly contravene Plaintiff's asserted fact and does not create a

genuine dispute of material fact. Part I.C, *supra*.

94. **FHFA Statement:** The trading desk priced the loans as well as the securitizations. Ex. 30 (Deposition of Steven Katz) 82:17-25 ("Q. What was your role in the P&L? A. I was the trader on the book. Q. What does that mean? A. That means for the subprime business and the Alt-A fixed rate business, I was responsible for pricing the loans, the securities, and tying the P&L out with corporate accounting, or my team was, I should say.").

   **Nomura Response:** Disputed. Although Mr. Katz gave the testimony quoted by plaintiff, that quote refers only to Mr. Katz's role in the pricing process and ignores evidence indicating that other corporate functions, including product control and risk management, played a role in pricing loans and securitizations. Ex. 15 (Prahofer Tr.) at 237:11-25, 287:25-288:10; Ex. 182 (Katz Tr.) at 134:9-12; Ex. 576 (NOM-FHFA_04876627) at NOM-FHFA_04876627; Ex. 577 (NOM- FHFA_04876433) at NOM-FHFA_04876433.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 94.

   **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits

   that Mr. Katz gave the testimony quoted by Plaintiff, and the additional evidence that

   Nomura cites does not directly contravene Plaintiff's asserted fact and does not create a

   genuine dispute of material fact. Part I.C, *supra*.

95. **FHFA Statement:** Nomura acquired residential mortgage loans through three "channels": (1) through bulk purchases; (2) through "mini-bulk" purchases, which were not as large as bulk purchases, but were "something more than one loan at a time"; and (3) on a "loan-by-loan basis" through its "conduit" program. Ex. 31 (Deposition of Brett Marvin) at 48:22-50-6 ("Q. . . . [T]o the extent you can remember those seven or so deals that we have a list of, do you recall the sort of various channels in which Nomura bought the loans that would go into a securitization? THE WITNESS: Well, there were three channels in general. BY MR. WILLIAMS: Q. Uh-huh. A. Now I -- three channels in general that Nomura acquired loans. Starting at the smallest, we acquired through a loan-by-loan conduit -- Q. Uh-huh. A. -- which was Nomura's web-based conduit. Q. Uh-huh. A. None of those loans, by the way, went into a subprime securitization. Q. Okay, none of those. A. Then we acquired loans through what we called mini-bulk. I forget what the determination, when mini-bulk stopped and bulk began, but essentially something more than one loan at a time. Q. Yeah. A. That came through a bid and com process, so that did not come through our conduit -- our online conduit. Q. Uh-huh. A. And then there was the bulk purchases, which did larger purchases."); *see also* Ex. 28 (Dep. Ex. 25303, email regarding Presentation for ASF Conference) at NOM-

FHFA_04923028 ("Origination Channels & Acquisition Strategy, Loan By Loan. . . , Mini Bulk. . . , Bulk. . . .")

**Nomura Response:** Defendants do not dispute that Nomura acquired loans through three channels—bulk, mini-bulk, and loan-by-loan.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 95.

**FHFA Reply:** Defendants do not dispute the asserted fact.

96. **FHFA Statement:** Bulk and mini-bulk pool purchases were underwritten to the guidelines of the originators selling the loans. Ex. 32 (Deposition of Donald McCabe) at 92:18-93:5 ("Q. Who at Nomura was responsible for making that type of comparison? A. . . . In the mini bulk and bulk world, there were guides that the seller produced and we approved the guides with stips and we purchased to their guides. . . .").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 96.

**FHFA Reply:** Defendants do not dispute the asserted fact.

97. **FHFA Statement:** Nomura did not have its own set of guidelines in bulk and mini-bulk purchases and these pools were purchased to the originators guidelines. Ex. 33 (Deposition of Jeffrey Hartnagel) at 54:20-55:4 ("Q. Okay. Did you -- did Nomura have its own set of underwriting guidelines when you were working for Nomura? A. Not in bulk and mini-bulk. Q. Okay. So what do you mean by 'not in bulk and mini-bulk'? A. We purchased to the originator's guidelines.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 97.

**FHFA Reply:** Defendants do not dispute the asserted fact.

98. **FHFA Statement:** Of the 15,806 loans in the SLGs backing the Certificates, 15,684 loans were drawn from 194 pools of loans that Nomura purchased from originators or other loan sellers (the "Acquisition Pools"). Ex. 1 to the Cipione Decl. (Rows 6-199, 201 "Loan by Loan Channel," Column M "Total") (accounting for 15,806 loans in the SLGs, with 122 loans purchased through the "Loan by Loan Channel").

**Nomura Response:** Disputed that the Cipione Declaration accurately reflects the due diligence performed by Nomura on the referenced trade pools. *See* Mishol Decl. Ex. 8. Defendants do not dispute that 15,684 loans in the supporting loan groups were drawn from 194 pools of loans.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 98.

**FHFA Reply:** Defendants do not dispute the asserted facts. While Defendants dispute that the Cipione Declaration accurately reflects the due diligence performed by Nomura, Nomura's assertion that Mishol Decl. Ex. 8 calls the Cipione Declaration into question fails to cite particular portions of that exhibit, and therefore does not create a genuine dispute of material fact. Part I.E, *supra*.

99. **FHFA Statement:** The purpose of the conduit program was "to acquire loans and to securitize them," not to "accumulat[e] whole loan portfolios." Ex. 24 (Deposition of John Graham) at 70:7-70:12 ("Q. And -- and why is that? Why is that given the business of the Nomura conduit? A. Well, the conduit's business was to acquire loans and to securitize them, so it was not in the business of accumulating whole loan portfolios."); Ex. 31 (Deposition of Brett Marvin) at 50:22-51:10 ("Q. Yeah, all right, okay. So how would that loan-by-loan conduit work? You said it was done through a website. A. Yeah, we had -- we built a platform by which small lenders could essentially lock loans with us pending a series of stipulations in conformance to underwriting guidelines, and then ultimately fund to close loans with us as they were closing and we would put them on our balance sheet. Q. Uh-huh. Was it with the intent of securitizing them? A. Yes.").

**Nomura Response:** Disputed. Although Mr. Graham and Mr. Marvin gave the testimony quoted by plaintiff, the quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand Nomura's residential mortgage loan conduit program. For example, the purpose of Nomura's RMBS program included retaining the most risky securities in each securitization. Ex. 177 (Lee Tr.) at 149:18-150:12 (when it structured securitizations, Nomura "develop[ed] a first loss piece to be retained by our group . . . referred to as the residual"; with respect to the Securitizations, "[t]hey all had a residual" and it was Nomura's "intention to co-invest with the investors believing that our due diligence was superior to other firms and, therefore, we wanted to have a position along side our investors that could provide us with profits."). *See also* C. Stmt. at ¶¶ 47-50.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 99.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Mr. Graham and Mr. Marvin gave the testimony quoted by Plaintiff, and the

additional evidence that Nomura cites is irrelevant to Plaintiff's asserted fact and does not

create a genuine dispute of material fact. Part I.C, *supra*.

100. **FHFA Statement:** Nomura had its own Conduit Guidelines for mortgage loans purchased through the Conduit. Ex. 2 (NOM-FHFA_04868979, Standard & Poor's Securitization Review) at NOM- FHFA_04868992 ("The loans in the Nomura loan-by-loan conduit are 100% underwritten to NCCI loan-by-loan guidelines."); Ex. 34 (NOM-FHFA_05491675, Nomura Securities International, Inc. Residential Whole Loan Securitization Platform) at NOM-FHFA_05491697 ("Smaller correspondent lenders originate loans to Nomura's Underwriting Guidelines and 'Lock In' sales one loan at a time via our risk-based pricing portal on our website."); *see also* Ex. 35 (Dep. Ex. 37101, email regarding Nomura Underwriting Guidelines) at NOM-FHFA_05133320 (attaching Nomura's recent guidelines dated February 1, 2005).

**Nomura Response:** Disputed. Loans were purchased through the loan-by-loan channel pursuant to "Nomura Correspondent Underwriting Guidelines," which contained requirements for purchase. *See, e.g.*, Ex. 557 (NOM-FHFA_05063720) at NOM-FHFA_05063720 ("Nomura Correspondent Underwriting Guidelines").

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 100.

**FHFA Reply:** Defendants do not dispute a material fact. While Defendants refer to their

conduit guidelines as "Nomura Correspondent Underwriting Guidelines," any dispute as

to the proper name of the document is not material to FHFA's motion. *Quarles*, 758 F.2d

at 840.

101. **FHFA Statement:** Of the 15,806 loans in the SLGs backing the Certificates, 122 loans were individual loans that Nomura bought on a loan-by-loan basis through its conduit channel. Ex. 1 to the Cipione Decl. (Row 201 "Loan by Loan Channel," Column M "Total") (attributing 122 loans to the "Loan by Loan Channel").

**Nomura Response:** Defendants do not dispute that 122 loans in the supporting loan groups for the Securitizations were purchased on a loan-by-loan basis through Nomura's conduit loan channel.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 101.

**FHFA Reply:** Defendants do not dispute the asserted fact.

## 2. The Trading Desk's Personnel

102. **FHFA Statement:** Brett Marvin was Nomura's Head of Trading and "over[saw] the trading desk operation." Ex. 30 (Deposition of Steven Katz) at 144:24-145:4 ("Q. What roles, general roles and responsibilities did Brett Marvin have? A. Brett Marvin, his primary responsibility was to oversee the trading desk operation."); *see also* Ex. 36 (Dep. Ex. 4518, email regarding Nomura standard investor presentation) at NOM-FHFA_05190744 (indicating Marvin's position).

     **Nomura Response:** Defendants do not dispute that Brett Marvin was head of Nomura's trading desk during the relevant time period.

     **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 102.

     **FHFA Reply:** Defendants do not dispute the asserted fact.

103. **FHFA Statement:** Mr. Marvin reported to Don MacKinnon, Head of Structured Credit Trading and Asset Finance. Ex. 37 (Dep. Ex. 35300, Brett Marvin Deposition Background Questionnaire) at A-2 (stating that Don MacKinnon supervised Brett Marvin); Ex. 38 (Dep. Ex. 8501, email regarding Nomura standard investor presentation) at NOM-FHFA_05491753 (listing MacKinnon's title).

     **Nomura Response:** Defendants do not dispute that Brett Marvin reported to Don MacKinnon during the relevant time period.

     **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 103.

     **FHFA Reply:** Defendants do not dispute the asserted fact.

104. **FHFA Statement:** Mr. Marvin hired three traders to work under him: "Steve Katz who ran subprime and fixed rate product[,] . . . Brian Murphy to run the adjustable rate business[,] . . . [and] Rob Gartner to run the second lien business." Ex. 31 (Deposition of Brett Marvin) at 16:3-12 ("Q. Okay, and who did you hire? A. I hired three, essentially three traders that worked under me -- Q. Uh-huh. A. -- who were responsible for their own product lines. I hired Steve Katz who ran subprime and fixed rate product. I hired Brian Murphy to run the adjustable rate business. And then I hired Rob Gartner to run the second lien business.").

     **Nomura Response:** Defendants do not dispute that Mr. Marvin gave the testimony quoted by plaintiff.

     **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 104.

     **FHFA Reply:** Defendants do not dispute the asserted fact.

105. **FHFA Statement:** Mr. Marvin, Mr. Katz, and Mr. Murphy were employed by Nomura Securities. Ex. 37 (Dep. Ex. 35300, Brett Marvin Deposition Background Questionnaire) at A-2 (identifying B. Marvin's employers from April 2004 to May 2007 as Nomura Securities International and Nomura Credit & Capital, Inc.); Ex. 39 (Dep. Ex. 21900, Steven Katz Deposition Background Questionnaire) at A-2 (identifying S. Katz's employer from June 2004 to December 2007 as Nomura Securities International); Ex. 40 (Dep. 25300, Brian Murphy Deposition Background Questionnaire) at A-2 (identifying B. Murphy's employers from May 2004 to December 2007 as Nomura Securities International and Nomura Credit & Capital Corp.).

**Nomura Response:** Disputed. Although plaintiff's Exhibit 37, 39 and 40 include the text cited by plaintiff, those references are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the employment of Mr. Marvin, Mr. Katz, and Mr. Murphy. For example, when Mr. Katz was asked whether he worked for Nomura Securities, Mr. Katz testified that "I don't know if that's accurate. . . . Sometime in 2006 we moved entities. That's why I'm questioning it. So I may have started at Nomura Securities International and then moved into another entity which I don't remember the name." Ex. 182 (Katz Tr.) at 53:9-23. Further, plaintiff's citations to Exhibits 37, 39 and 40 fail to include that both Mr. Marvin's and Mr. Murphy's Background Questionnaires identify Nomura Credit & Capital, Inc. as an employer. See Ex. 558 (Marvin Background Questionnaire) at A-2; Ex. 559 (Murphy Background Questionnaire) at A-2; Ex. 183 (Marvin Tr.) at 23:21-24:19.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 105.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Plaintiff's Exhibits 37, 39 and 40 include the text cited by Plaintiff, and the additional evidence that Nomura cites does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

106. **FHFA Statement:** The structuring group, which included Randall Lee, Timothy McLaughlin, and Brian Lin, reported to Mr. Katz, Mr. Murphy, and Mr. Gartner. Ex. 41 (Dep. Ex. 4500, Background Questionnaire of Randall Lee) at A-2 (reporting to Steven Katz); Ex. 42 (Dep. Ex. 34700, Background Questionnaire of Timothy McLaughlin) at A-2 (reporting to Steven Katz and Brett Marvin); Ex. 29 (Deposition of Timothy Crowley) at 69:17-70:15 ("Q. Who did you work with in the structuring group at Nomura? A. . . . The trading desk and the structuring were -- there is a bit of overlap in between the two as I recall. The structurers would have been Randy Lee, Tim McLoughlin and Brian Lin. . . . They worked for the senior traders, the senior traders being Brian Murphy, Steve Katz and Rob Gardner. Q. You said there was overlap between the traders and the structurers. Can you explain what you meant by that? A. I call them groups. These are not formal designations and so the folks on the trading desk

were traders and structurers is how I viewed them. So when I call them -- when I said trading group and now I am thinking structurers, there is -- the person, the individuals are somewhat some of the same.").

**Nomura Response:** Defendants do not dispute that Mr. Lee, Mr. McLaughlin, and Mr. Lin reported to Mr. Katz, Mr. Murphy, and Mr. Gartner.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 106.

**FHFA Reply:** Defendants do not dispute the asserted fact.

107. **FHFA Statement:** The structuring group employees were employed by Nomura Securities. See, e.g., Ex. 42 (Dep. Ex. 34700, Background Questionnaire of Timothy McLaughlin) at A-2 (indicating that he was employed by Nomura Securities International, Inc. and Nomura Credit & Capital, Inc.).

**Nomura Response:** Disputed. Although plaintiff's Exhibit 42 includes the text quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. Plaintiff's conclusion that "the structuring group employees were employed by Nomura Securities" fails to include that Mr. McLaughlin indicated he was also employed by Nomura Credit & Capital, Inc. Ex. 560 (McLaughlin Background Questionnaire) at A-2; Ex. 561 (McLaughlin Tr.) at 11:3-17. Moreover, plaintiff's citation to the Background Questionnaire of Mr. McLaughlin does not support the conclusion that all of the individuals in the structuring group were employees of Nomura Securities. See *id. See also*, e.g., Ex. 578 (Lee Background Questionnaire) at A-2; Ex. 177 (Lee Tr.) at 11:19-12:7.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 107.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Plaintiff's Exhibit 42 includes the text Plaintiff cites, and the additional evidence that Nomura cites does not directly contravene Plaintiff's asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. It is undisputed that NCCI had no employees prior to October 2006, RSUF ¶ 31, and that neither NAAC nor NHELI had employees, SUF ¶¶ 59-60. Nomura's corporate representative also could not name any Nomura employees who worked on RMBS in the United States who were not employed by Nomura Securities. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at

229:23-230:4 ("Q….[C]an you think of any employees that delved in the U.S. for Nomura in RMBS that were not employed by Nomura Securities International, Inc.? A. I can't think of any.").

108. **FHFA Statement:** The structuring group structured the cash flows of the securitizations issued by Nomura. Ex. 29 (Deposition of Timothy Crowley) at 70:16-71:2 ("Q. What are the unique responsibilities for a trader versus a structure? . . . A. A trader is somebody who trades securities. A structure is someone who is involved in the structuring of the securities that are going to be issued by a securitization transaction. So they would structure the cash flows."); Ex. 43 (Deposition of Randall Lee) at 148:22-149:16 ("Q. And tell me what -- first of all, you said you worked with loans on position. What do loans on position mean? A. Whole loans that are owned on a balance sheet of one of Nomura entities. Q. So, would this mean that after Nomura had decided to purchase loans from an originator? A. Correct. Q. But before they've been securitized? A. Correct. Q. Okay. And you develop structures to securitize. What -- what was involved in your development of structures? A. We would create bond classes backed by the mortgages that we would determine to securitize for the sale to investors.").

**Nomura Response:** Defendants do not dispute that structuring cash flows was one role of the structuring group.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 108.

**FHFA Reply:** Defendants do not dispute the asserted fact.

109. **FHFA Statement:** The first step in the securitization process was to prepare "a rating agency tape submission," which consisted of selecting a pool of loans to be securitized and putting the loan- level date for those loans into the formed required by the rating agencies. Ex. 30 (Deposition of Steven Katz) at 57:11-21 ("Q. . . . So please tell me, and to the extent it differs at Nomura, what are the general steps in the mortgage loan securitization process? A. I would start with a rating agency tape submission. Q. What is a tape submission? A. S&P, Moody's, Fitch, they all had a form that they liked to receive data in. They required, they didn't like it, they required it."); *id.* at 58:24-59:10 ("Q. . . . When you say that there is a form that they receive data, meaning the rating agency data, what type of data? A. Loan-level. Q. So when you get to the point where Nomura is submitting a tape to a rating agency, is it already determined what loans are being described in the data that's being submitted? A. There is a pool that we would select, yes. It would be 1A and 1B.").

**Nomura Response:** Disputed. Although Mr. Katz gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. For instance, immediately preceding the excerpt of Mr. Katz's testimony quoted by plaintiff, Mr. Katz was asked to explain the steps in the securitization process "very generally."

Ex. 182 (Katz Tr.) at 56:20-57:21 ("Q. . . . Can you describe to me, take me very generally through the step involved in a mortgage loan securitization process?"). The quoted testimony of Mr. Katz is therefore not entirely representative of the securitization process and does not include every step of the process. In fact, before a rating agency tape was prepared and thereafter, Nomura performed many forms of due diligence in connection with the acquisition and securitization of loans. C. Stmt. at ¶¶ 62-63.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 109.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Mr. Katz gave the testimony quoted by Plaintiff, and the additional evidence that Nomura cites does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

110. **FHFA Statement:** The second step was "[s]tructuring the potential deal," which involved "[t]aking the rating agencies and creating a bond structure and assigning bond spreads on those." Ex. 30 (Deposition of Steven Katz) at 58:18-21 ("Q. . . . What's the second step in securitization? A. Structuring the potential deal. "); *id.* at 59:11-16 ("Q. Okay, structuring a potential deal. And what does that very generally involve? A. Taking the rating agencies and creating a bond structure and assigning bond spreads on those.").

**Nomura Response:** Disputed. Although Mr. Katz gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. Katz, that must be evaluated in order to fully understand the quoted excerpt. For example, Nomura performed many forms of due diligence in connection with the acquisition and securitization of loans, none of which are mentioned by plaintiff. *See* ¶ 109, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 110.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Mr. Katz gave the testimony quoted by Plaintiff, and the additional testimony that Nomura cites by reference does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Moreover, while Nomura argues that other documents, including documents authored by Mr. Katz, "must be

evaluated in order to fully understand the quoted concept," they identify no documents that specifically contradict the asserted fact. Nomura's speculation that evidence might exist calling the asserted fact into question does not create a genuine dispute of material fact. Part I.D, *supra*.

111. **FHFA Statement:** The third step was "finalizing the structure," which involved "committing to the pool that's going in that particular transaction and committing to the levels from the rating agencies." Ex. 30 (Deposition of Steven Katz) at 59:17-24 ("Q. Okay. What's the next step? A. The next step would be finalizing the structure. Q. What's involved in that? A. That would be committing to the pool that's going in that particular transaction and committing to the levels from the rating agencies.").

**Nomura Response:** Disputed. Although Mr. Katz gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, Nomura performed many forms of due diligence in connection with the acquisition and securitization of loans, none of which are mentioned by plaintiff. See ¶ 109, *supra*, which is incorporated by reference herein. In addition, for certain of the supporting loan groups, the evidence in the record shows that Freddie Mac selected the loans that would be included in the supporting loan group. *See* Ex. 562 (NOM-FHFA_05265884-885) at NOM-FHFA_05265884-885; Ex. 563 (NOM-FHFA_05496486-488) at NOM-FHFA_05496486-488; Ex. 564 (NOM-FHFA_05783870-871) at NOM-FHFA_05783870-871; Ex. 565 (NOM-FHFA_05487917) at NOM-FHFA_05487917; Ex. 566 (FHFA02144903) at FHFA02144903. Timothy Crowley testified that, for the Nomura certificates it purchased, "Freddie would ultimately make the selection of loans." Ex. 40 (Crowley Tr.) at 248:9-14.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 111.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Mr. Katz gave the testimony quoted by Plaintiff, and the additional evidence that Nomura cites is irrelevant, does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Defendants assert that "Freddie Mac and Fannie Mae selected the loan pools they wished to include in supporting loan groups for securities they purchased." However, this assertion fails to directly contradict

the asserted fact and is incorrect. Neither Freddie Mac nor Fannie Mae "selected the loan

pools they wished to include in supporting loan groups for securities they purchased."

Freddie Mac declined loans in its SLGs that failed to meet Freddie Mac's requirements as

to, among other things, conforming balance, and Fannie Mae made various stipulations

relating to loans to be included in its SLGS. See FHFA Ex. 533 (NOM-

FHFA_05500478, Freddie Mac Investment Requirements) and FHFA Ex. 534

(FHFA01628693, Fannie Mae Stips for Subprime and Alt-A Transactions) Neither GSE

selected individual loans for inclusion in its SLGs, and Defendants cite no evidence to the

contrary. Defendants' conclusory assertions do not create a genuine dispute of material

fact. Part I.B, *supra*.

112. **FHFA Statement:** The next step was "preparation of offering materials to potential
investors," which included a "term-sheet" and "[o]ccasionally, a data tape." Ex. 30
(Deposition of Steven Katz) at 59:25-60:13 ("Q. Okay. And what's next? A. Then
there would be preparation of offering materials to potential investors. Q. What offering
materials were prepared for potential investors? A. A term sheet. Q. Anything else? A.
Occasionally a data tape. Q. And what was the data that was prepared as part of the
offering materials for potential investors? A. Well, it was loan-level data.").

**Nomura Response:** Disputed. Although Mr. Katz gave the testimony quoted by
plaintiff, that quote is removed from the context in which it appears, and omits other
testimony and documents, that must be evaluated in order to fully understand the quoted
excerpt. For example, Nomura performed many forms of due diligence in connection
with the acquisition and securitization of loans, none of which are mentioned by plaintiff.
See ¶ 109, *supra*, which is incorporated by reference herein. The record also reflects that
collateral analysts would run a series of tests on the loan tape upon receipt in order to
ensure that the information therein was accurate. C. Stmt. at ¶¶ 96-108. As is clear from
testimony of employees actually responsible for preparation of offering materials, a free
writing prospectus could also be prepared, Ex. 177 (Lee Tr.) at 75:25-77:7; Ex. 35
(Graham Tr.) at 78:22-79:6, and in addition, the record shows that Fannie Mae and
Freddie Mac received loan tapes for at least six of the Securitizations: Ex. 568 at NOM-
FHFA_05710061 (NAA 2005-AR6); Ex. 569 at FHFA04318757 (NHELI 2006-FM1);
Ex. 570 at NOM-FHFA_04637460 (NHELI 2006-HE3); Ex. 570 at NOM-
FHFA_04637459 (NHELI 2006-FM2); Ex. 571 at NOM-FHFA_04692902 (NHELI
2007-2); Ex. 572 at NOM- FHFA_05532383 (NHELI 2007-3).

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 112.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits

that Mr. Katz gave the testimony quoted by Plaintiff, and the additional evidence that

Nomura cites is irrelevant, does not directly contravene the asserted fact and does not

create a genuine dispute of material fact. Part I.C, *supra*.

113.    **FHFA Statement:** Collateral Analysts at Nomura examined data but were not charged
with making the decisions about offered loan pools. Ex. 44 (Deposition of Joseph
Carlucci) at 32:2-13 ("Q. Now, would every e-mail that you got from an originator
offering a pool of loans be analyzed by a collateral analyst or would you decide which
deals kind of to pass on to the next step? … A. No, I had no say in it. It was really up to
the appetite of the Due Diligence and Trading Group. So they would decide whether or
not we wanted those."); Ex. 43 (Deposition of Randall Lee) at 39:21-40:7 ("Q. Okay.
So, am I right, as the collateral analyst part, your work came in analyzing the collateral
on the -- according to the loan tape, that was offered by originators to determine whether
Nomura wanted to buy it, those loans? A. As a collateral analyst, it was not my job to
determine if we would like to buy it or not buy it. It was my job to rearrange the data in a
way that was preferred by the trading desk.").

        **Nomura Response:** Defendants do not dispute that the collateral analysts did not make
the ultimate determination of whether to purchase a loan pool, but dispute that the
collateral analysts had no substantive involvement with respect to the loan pools. For
example, the collateral analysts were involved in various stages of the loan acquisition
and securitization process. Nomura's collateral analysts would run "edit checks" to
verify that the data in the loan tape was internally consistent, and complied with
Nomura's bid stipulations, as well as ensuring that the data contained in Nomura's
internal loan information database matched what was on the loan tape. Ex. 177 (Lee Tr.)
at 26:10-27:12; Ex. 26 (Kohout Tr.) at 225:4-225:18; Ex. 37 (Kim Tr.) at 87:6-88:5;
Ex. 178 (Williams Tr.) at 71:14-19; Ex. 36 (Orfe Tr.) at 98:16-99:8. Randall Lee, who
worked at Nomura as a collateral analyst and then as a structurer on the trading desk,
testified that the collateral analysts provided information that aided in Nomura's decision
to buy loans. Ex. 177 (Lee Tr.) at 40:8-16 ("Q: Okay. Was it your understanding that
your work as a collateral analyst informed people at Nomura who were deciding whether
to buy loans from originators? A: It provided information about the collateral, yes. Q:
For that purpose: to [help] Nomura to decide whether to buy those loans? A: Yes.").
Later in the process, the collateral analysts would also work to ensure that the
information provided in the prospectus supplements and other Offering Documents
matched the data in Nomura's internal loan information database. Ex. 36 (Orfe Tr.) at
72:3-14; Ex. 177 (Lee Tr.) at 47:3-25; Ex. 37 (Kim Tr.) at 193:16-23; Ex. 40 (Crowley
Tr.) at 36:17-24. In addition, Mr. Spagna in the Due Diligence Group testified that the
"Collateral Analysts . . . would help us . . . with various analytics." Ex. 27 (Spagna Tr.) at
170:10-19.

        **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 113.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  The additional

testimony that Nomura cites regarding the supporting role of collateral analysts does not

directly contravene Plaintiff's asserted fact and does not create a genuine dispute of

material fact.  Part I.C, *supra*.

114.    **FHFA Statement:**  Mr. Marvin specified these functions as clearing up data and format errors of loan data and to ultimately escalate it to the trading desk.  Ex. 31 (Deposition of Brett Marvin) at 187:13-188:7 ("Q.  Okay.  Does it -- was it also the job of collateral analyst to make sure that – to check and make sure that stipulations that Nomura had required were actually applied in the tapes that were given to Nomura?  A.  Well, it was the collateral analyst's job to do what they could to do that, to get what they -- what we deemed necessary, but it wasn't necessarily their job to -- well, I shouldn't -- let me qualify that.  Q.  Okay.  A.  It was their job to -- they were the first line of defense to get the information, clear up data errors, format errors, things of that nature, and then to the extent they couldn't, escalate it.  Q.  Okay.  Escalate it to the trading desk?  A.  Uh-huh.").

>    **Nomura Response:**  Disputed. Although Mr. Marvin gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. The collateral analysts performed other functions, in addition to reviewing loan tapes for data and formatting errors.  *See* ¶ 113, *supra*, which is incorporated by reference herein.

>    **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 114.

>    **FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Nomura admits

that Mr. Marvin gave the testimony quoted by Plaintiff, and the additional evidence that

Nomura cites is irrelevant to Plaintiff's asserted fact and does not create a genuine

dispute of material fact.  Part I.C, *supra*.

115.    **FHFA Statement:**  Collateral Analysts reported to the Trading Desk.  Ex. 528 (Dep. Ex. 6500, Deposition Background Questionnaire for Michael Orfe) at A-2 (listing supervisor as Steven Katz); Ex. 529 (Dep. Ex. 26900, Deposition Background Questionnaire for Su Young Kim) at A-2 (listing supervisor as Brian Murphy); Ex. 44 (Deposition of Joseph Carlucci) at 33:17-20 ("Q.  Did the collateral analysts typically support the trading desk, is that accurate?  A.  Yes."); *see also* Ex. 45 (Deposition of Su Kim) at 20:4-11 ("Q.  Okay.  What were your responsibilities when you started at Nomura as an Analyst?  A.  I was -- my specific title was Collateral Analyst, so I would

prepare reports for the traders on the collateral that originators had sent to Nomura for potential bids or analysis.").

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 115.

**FHFA Reply:**  Defendants do not dispute this asserted fact.

**B.  The Residential Finance Group**

1.  The Residential Finance Group's Role

116.  **FHFA Statement:**  Nomura's Mortgage Finance Group included the Residential Mortgage Finance Group and the Commercial Mortgage Finance Group.  Ex. 24 (Deposition of John Graham) at 22:3-13 ("Q. And what was Dante LaRocca's title?  A. Managing Director.  Q.  Okay.  And what generally did Dante LaRocca's roles and responsibilities -- A.  He was -- Q.  -- encompass?  A.  -- responsible for the – the general group of Mortgage Finance which included both Residential Mortgage Finance and Commercial Mortgage Finance.").

**Nomura Response:**  Defendants do not dispute that the Mortgage Finance Group included Residential Mortgage Finance and Commercial Mortgage Finance.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 116.

**FHFA Reply:**  Defendants do not dispute this asserted fact.

117.  **FHFA Statement:**  The Residential Mortgage Finance Group was sometimes referred to as the Contract Finance Group as well as the Transaction Management Group.  See Ex. 46 (Deposition of Neil Spagna) at 168:4-14 ("Q.  So let – let's see if we can sketch out what the -- the folks working on due diligence were.  Are -- are -- are you at the -- let's see.  I see you report to John Graham.  Was he also supervising due diligence?  A. Due diligence fell under – under him, but his role was, you know, head of Contract Finance.  Q.  Okay.  So there's Graham is head of Contract Finance."); Ex. 47 (Deposition of Timothy McLaughlin) at 217:13-16 ("Q.  And Mr. Graham?  A.  I would also describe John as a member of the Transaction Management Group.").

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 117.

**FHFA Reply:**  Defendants do not dispute this asserted fact.

118. **FHFA Statement:** The Residential Finance Group was responsible for "overseeing all the contracts involved with . . . different counterparties[,]" vendors, sellers, trustees, and custodians. Ex. 46 (Deposition of Neil Spagna) at 168:14-169:2 ("Q. What is Contract Finance? A. It's a term that describes, you know, all the contracts involved, overseeing all the contracts involved with, you know, all the different counterparties, whether it be a vendor, you know, a -- a seller, also the securitizations, the, you know, the trustees, the custodians, everything, every aspect of the business. Q. Okay. A. It was the legal part of the business."); *see also* Ex. 48 (Deposition of Michael Orfe) at 141:21-142:7 ("Q. John Graham? A. He was part of the transaction management team. Q. What does that mean? A. What does that mean? It's a group of people that when securitizations were being done kind of helped did -- worked on that process coordinating different parties and it -- coordinating the creation of some of the documents. That's the best of my recollection.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 118.

**FHFA Reply:** Defendants do not dispute this asserted fact.

119. **FHFA Statement:** The Residential Mortgage Finance Group was also "responsible for the papering of the acquisition of the whole loans, the due diligence, the collateral analysis through to the securitization." Ex. 24 (Deposition of John Graham) at 40:19-41:10 ("Q. Okay. And -- and -- and what role again do -- do you have related to this conduit? A. I was in charge of the Mortgage Finance Group that would be responsible for the papering of the acquisition of the whole loans, the due diligence, the collateral analysis through to the securitization. Q. So you would be part of that group? Would that be fair to say? You were -- you were part of the Residential Whole Loan Securitization Platform? . . . A. I was part of the conduit business, yes.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 119.

**FHFA Reply:** Defendants do not dispute this asserted fact.

120. **FHFA Statement:** The Residential Mortgage Finance Group oversaw the Due Diligence Group. Ex. 24 (Deposition of John Graham) at 24:9-15 ("Q. Okay. Were there – were there specific groups that you were in charge of? A. Yes. Q. And what were the groups? A. Groups included Due Diligence, Acquisition, Whole Loan Acquisition, Servicing and Collateral Analysis.").

**Nomura Response:** Disputed. Although Mr. Graham gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, that must be evaluated in order to fully understand the quoted excerpt. The testimony of Mr. Graham indicates only that Mr. Graham was in charge of

several groups, including Due Diligence. See Pl. Ex. 24 at 24:9-15. The quoted testimony does not support plaintiff's conclusion that the "Residential Mortgage Finance Group oversaw the Due Diligence Group." Mr. Graham testified that he did not "consider [him]self the head of the Due Diligence Department." Ex. 35 (Graham Tr.) at 142:11-16 ("Q: Did -- did you personally when you took over for -- I -- I want to get the right word here. Do -- did you consider yourself the head of the Due Diligence Department?" A: No."); see also Plaintiff's Ex. 46 (Deposition of Neil Spagna) at 168:4-12 ("Q. So let -- let's see if we can sketch out what the -- the folks working on due diligence were. Are -- are -- are you at the --let's see. I see you report to John Graham. Was he also supervising due diligence? A. Due diligence fell under -- under him, but his role was, you know, head of Contract Finance."). Further, the record reflects that there were several lines of reporting between employees in the Diligence Group and Mr. Graham. *See, e.g.*, Ex. 573 (Background Questionnaire of Menachem Sabo) at A-2; Ex. 30 (Sabo Tr.) at 10:18-11:5; Ex. 574 (Background Questionnaire of Jeffrey Hartnagel) at A-2; Ex. 29 (Hartnagel Tr.) at 12:3-19.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 120.

**FHFA Reply:**  The testimony Nomura cites does not directly contravene Plaintiff's asserted fact.  Moreover, Nomura admits that Mr. Graham was in charge of the Diligence Group, and that Mr. Graham was head of the Residential Finance Group, *see* RSUF ¶ 126. There can therefore be no genuine dispute as to the asserted fact.  Part I.F, *supra*. Finally, Nomura asserts that there were "several lines of reporting between employees in the Diligence Group and Mr. Graham" but this assertion is not supported by Nom. Ex. 573; Nom. Ex. 30 at 10:18-11:5; Nom. Ex. 574; and Nom. Ex. 29 at 12:3-19.  The cited evidence indicates only, in relevant part, that there was a reporting structure within the Diligence Group.

121.  **FHFA Statement:**  The Residential Finance Group reviewed securitization-related documents drafted by outside counsel and provided comments.  Ex. 3 (Deposition of N. Dante LaRocca) at 41:2-42:6 ("A.  Nomura was more the business side of the transaction, so the documents continued to be drafted by outside counsel, Thacher Proffitt or others, and my role was more to review – review the documents, comment from the Nomura perspective. . . .  Q.  Did you review Registration Statements?  A.  Yes.  Did you review Prospectuses?  A.  Yes.  Q.  Amended Registration Statements?  A.  Yes.  Prospectus Supplements?  A.  Yes.  Term sheets?  Yes.  Q.  What other types of documents did you review?  A.  Purchase agreements, legal opinions, custodial agreements, servicing agreements, corporate documents associated with the securitization or closing, probably

others too."); Ex. 24 (Deposition of John Graham) at 29:9-13 ("Q. Okay. And what do you mean by an operational role? A. Working on a transaction to the extent I reviewed a document or provided comments to counsel.").

**Nomura Response:** Defendants do not dispute that the Residential Finance Group reviewed securitization related documents drafted by outside counsel and provided comments, but note that other groups and individuals at Nomura also were involved in reviewing the offering documents for securitizations. *See, e.g.*, Ex. 40 (Crowley Tr.) at 26:12-21, 40:6-14, 72:7-73:6 (discussing the involvement of various groups inside and outside of Nomura, including the Nomura collateral analysts, the Nomura structurers, and Deloitte & Touche).

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 121.

**FHFA Reply:** Defendants do not dispute the asserted fact. The other testimony that

Nomura cites is irrelevant and does not create a disputed issue of material fact.

122.    **FHFA Statement:** The Residential Finance Group participated in purchasing loans and structuring the securitizations. Ex. 3 (Deposition of N. Dante LaRocca) at 42:20-24 ("Q. Okay. To what extent while you were at Nomura were you involved in the purchasing of loans that would be securitized for sale? A. I was involved in that."); *id.* at 44:17-45:9 ("Q. Were you involved in the securitization process? And by that I mean structuring the security. A. Yes, I was involved in that. . . . [I]t wasn't my primary role. There were structurers who ran cash flows or numbers, but I participated in structuring in determining the classes that would be involved in the securitization, the classes that would be sold or distributed and, again, reading the related documentation to make sure that whatever the structurers had structured was reflected in the – in the document that we were using to close – close the securitization.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 122.

**FHFA Reply:** Defendants do not dispute the asserted fact.

123.    **FHFA Statement:** The Residential Finance Group was also involved in the logistics of loan repurchases. Ex. 24 (Deposition of John Graham) at 248:19-249:6 ("Q. Who at Nomura was involved in deciding whether loans should be repurchased? . . . A. It would be the Trading Desk and Mortgage Finance. Us, me. Q. And -- and were -- did you, in fact -- were -- were you involved in making decisions whether to repurchase loans? A. The -- the decision-making part was more on the Trading Desk. My involvement would be to the extent there was a decision to do so, logistically how did that happen."); *see also* Ex. 49 (Deposition of Mendy Sabo) at 104:3-8 ("Q. Who dealt with the repurchase requests? A. Transaction management.").

**Nomura Response:** Defendants do not dispute that the Residential Finance Group was involved in the logistics of loan repurchases until it ceased to exist in mid-to-late 2007.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 123.

**FHFA Reply:** Defendants do not dispute the asserted fact.

124. **FHFA Statement:** N. Dante LaRocca was head of the Mortgage Finance Group. Ex. 24 (Deposition of John Graham) at 22:3-13 ("Q. And what was Dante LaRocca's title? A. Managing Director. Q. Okay. And what generally did Dante LaRocca's roles and responsibilities -- A. He was -- Q. -- encompass? A. -- responsible for the – the general group of Mortgage Finance which included both Residential Mortgage Finance and Commercial Mortgage Finance.").

**Nomura Response:** Undisputed that Mr. Larocca was a managing director of the Mortgage Finance Group, also called the Real Estate Finance Group, at Nomura Securities International from 2001 to 2007, and a managing director at Nomura Credit & Capital ("NCCI") from 2007 to 2008. See Ex. 35 (Graham Tr.) at 22:3-13; Ex. 16 (LaRocca Tr.) at 36:25-37:10; Ex. 186 (NOM- FHFA_05491674) at NOM-FHFA_05491757; Ex. 554 (Background Questionnaire of N. Dante LaRocca.) at A-2.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 124.

**FHFA Reply:** Defendants do not dispute the asserted fact.

2. The Residential Finance Group's Personnel

125. **FHFA Statement:** N. Dante LaRocca was employed by Nomura Securities and later NCCI. Ex. 50 (Dep. Ex. 26100, N. Dante LaRocca Deposition Background Questionnaire) at A-2 (indicating that he was employed by Nomura Securities International, Inc. and then Nomura Credit & Capital, Inc.); Ex. 3 (Deposition of N. Dante LaRocca) at 33:16-34:5 ("Q. . . . Could you talk about your time first at Nomura Securities? A. We started at Nomura Securities when we arrived, so 2001. Q. How long were you at Nomura Securities? A. The – the whole time during my employment there I was involved with both of these companies, but part way through our official employment, where the paycheck came from, switched from Nomura Securities to Nomura Credit & Capital.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 125.

**FHFA Reply:** Defendants do not dispute the asserted fact.

126. **FHFA Statement:** John Graham was the head of the Residential Finance Group and reported to N. Dante LaRocca. Ex. 24 (Deposition of John Graham) at 142:11-22 ("Q. Did -- did you personally when you took over for -- I -- I want to get the right word here. Do -- did you consider yourself the head of the Due Diligence Department? A. No. Q. Did you -- A. I was -- I was the head of Mortgage Finance. Q. Okay. Did -- did you – do you -- A. Residential Mortgage Finance."); Ex. 51 (Dep. Ex. 8500, John Graham Deposition Background Questionnaire) at A-2 (reporting to LaRocca).

**Nomura Response:** Undisputed.

**RBSSI Response:** RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 126.

**FHFA Reply:** Defendants do not dispute the asserted fact.

127. **FHFA Statement:** John Graham was employed by Nomura Securities, and later NCCI. Ex. 51 (Dep. Ex. 8500, John Graham Deposition Background Questionnaire) at A-2 (indicating that he was employed by Nomura Securities International, Inc. and then Nomura Credit & Capital, Inc.); Ex. 24 (Deposition of John Graham) at 25:20-26:5 ("Q. Okay. So let's flip to the second page. . . . [I]s it correct that you had worked at Nomura Securities International RMBS New York, New York and later Nomura Credit & Capital, Inc., New York, New York? A. Yes. Q. And your – your title throughout there was Managing Director? A. Yes.").

**Nomura Response:** Undisputed.

**RBSSI Response:** RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 127.

**FHFA Reply:** Defendants do not dispute the asserted fact.

128. **FHFA Statement:** The Residential Finance Group personnel who handled repurchase requests included John Graham, Tim Crowley, and Jeane Leschak. Ex. 46 (Deposition of Neil Spagna) at 352:16-20 ("A. As I stated earlier, on repurchases those would be directed to the Contract Finance Group, typically, you know, John Graham, Tim Crowley and perhaps Dante LaRocca."); Ex. 52 (Deposition of Brian Murphy) at 214:11-17 ("Q. Okay. So this is a multipage e-mail, and the top e-mail is from Jeane Les -- Leschak to Brian Lin, Su Kim and you. Who's Jeane Leschak? A. She was a Transaction Manager in the Mortgage Finance/Contract Finance Group that reported to John Graham.").

**Nomura Response:** Disputed to the extent that plaintiff suggests that the "Residential Finance Group" employees handled repurchase requests after September 2007. Ex. 391 (April 23, 2014 Davidoff Decl.) at ¶¶ 5-6.

**RBSSI Response:** RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 128.

**FHFA Reply:** Defendants do not dispute the asserted fact.

## C.    The Diligence Group

### 1.    The Diligence Group's Role

129.    **FHFA Statement:** Nomura's Due Diligence Group was sometimes referred to as the "Credit" group, "Residential Credit," the "Diligence Group" or "Due Diligence." Ex. 53 (Deposition of Joseph Kohout) at 22:23-25 ("Q. Okay. And did you ever refer to it as a due diligence group? A. I may have. We may have."); *id.* at 221:18-222:5 ("Q. Okay. Is it there any difference between the credit department and the due diligence department? A. No, it's semantics. Q. You, who lead the due diligence department, were considered part of credit? A. Yes. I mean due diligence was just a catch phrase that we used for – I was head of residential credit. There was no official due diligence department. It was residential credit.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 129.

**FHFA Reply:** Defendants do not dispute the asserted fact.

130.    **FHFA Statement:** The Diligence Group reviewed and approved originators' underwriting guidelines as a part of Nomura's counterparty approval process. Ex. 24 (Deposition of John Graham) at 53:11-24 ("Q. Do you know if there was any checking of the originators before Nomura would buy loans from them? A. Yes. Q. Okay. And how do you know that? A. Through interaction with sales coverage which would initiate the relationship with a new seller, they would need to fill out a form, counterparty form. There was a need to approve their underwriting guidelines by the Due Diligence Group. There were reviews done of the management, and the Credit Committee would conduct an analysis in some form of the counterparty.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 130.

**FHFA Reply:** Defendants do not dispute the asserted fact.

131.    **FHFA Statement:** The Diligence Group was also involved in "competitive analysis" when Nomura changed its own underwriting guidelines. Ex. 53 (Deposition of Joseph Kohout) at 168:10-14 ("Q. Was the due diligence group at all involved in changing the underwriting guidelines for Nomura? A. Yeah, we had an involvement in terms of doing competitive analysis.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 131.

**FHFA Reply:** Defendants do not dispute the asserted fact.

132.    **FHFA Statement:** The Diligence Group was also "in charge of the due diligence of mortgage loans at Nomura that were being acquired for the purpose of securitization." Ex. 53 (Deposition of Joseph Kohout) at 21:21-22:22 ("Q. And what were the general functions that were done by the mortgage group at Nomura; what fell under that? A. Acquisition of loan pools, securitization. That was generally the business. . . . Q. Is it fair to say that your group was in charge of the due diligence of mortgage loans at Nomura that were being acquired for the purpose of securitization? A. Yes.").

   **Nomura Response:** Undisputed.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 132.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

133.    **FHFA Statement:** The Diligence Group "managed the aspect of the due diligence process from the setup of the due diligence, the coordination of the various firm or firms involved in the due diligence process, the valuation process, the collateral review with the custodian, the review of the findings based on that due diligence review, and ultimately the tie-out with the seller of the final loan pool." Ex. 49 (Deposition of Mendy Sabo) at 97:16- 98:7 ("Q. Okay why don't we get the general functions that the three-person due diligence group was doing at Nomura. So just name general but all the different things that the due diligence group was in charge of at Nomura. . . . A. We were -- we managed the aspect of the due diligence process from the setup of the due diligence, the coordination of the various firm or firms involved in the due diligence process, the valuation process, the collateral review with the custodian, the review of the findings based on that due diligence review, and ultimately the tie-out with the seller of the final loan pool.").

   **Nomura Response:** Undisputed.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 133.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

134.    **FHFA Statement:** It was the Diligence Group's responsibility to ensure that loans Nomura purchased complied with underwriting guidelines. Ex. 49 (Deposition of Mendy Sabo) at 65:20-22 ("Q. Okay. And when you were doing due diligence at Nomura, did you expect that the main part of the due diligence process was supposed to determine whether the loans complied with underwriting guidelines? . . . A. Yes."); *see also* Ex. 46 (Deposition of Neil Spagna) at 28:3-10 ("Q. Let me try a little bit more. I – certainly I understand you– you – one of your functions at Nomura in due diligence was to see whether a loan complied with an underwriting guideline, right? It was definitely something that you did? A. Yes."); Ex. 54 (Deposition of Gareth Williams) at 149:2-10 ("Q. Did you ever compare underwriting guidelines to loan files? A. No. That's not my

responsibility. Q. Was that the responsibility of someone at Nomura? A. Yes. Q. Who was that? A. The due diligence group.").

**Nomura Response:** Defendants do not dispute that the Diligence Group was responsible for ensuring that loans Nomura purchased complied with underwriting guidelines, including by overseeing the many individuals and entities involved in the due diligence process. See ¶¶ 160, 166, 169, 171, *infra*, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 134.

**FHFA Reply:** Defendants do not dispute the asserted fact.

135. **FHFA Statement:** The Diligence Group managed the diligence performed on 15,000 to 20,000 loans annually. Ex. 49 (Deposition of Mendy Sabo) at 97:4-12 ("Q. Do you know the number of loans, just an approximation, that were – that your due diligence group was managing the process for at Nomura on an annual basis? . . . A. I believe we, I don't know, managed anywhere from 15 to 20,000 loans, perhaps more, perhaps less. I don't recall exactly."); *id.* at 101:17-25 ("Q. Okay. Let me see if I can say this right. Is it true that, at Nomura in the 2005 to 2006 time frame, there was a three-person group that was overseeing the due diligence process for 15 – approximately 15 to 20,000 loans annually? I'll just stop there. Is that right so far? . . . A. In general, yes.").

**Nomura Response:** Disputed. Although Mr. Sabo gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. Sabo, that must be evaluated in order to fully understand the quoted excerpt. For example, the due diligence process involved many individuals and entities. See ¶¶ 160, 166, 169, 171, *infra*, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 135.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits

that Mr. Sabo gave the testimony quoted by Plaintiff, and the additional evidence that

Nomura cites is irrelevant to Plaintiff's asserted fact and does not create a genuine

dispute of material fact. Part I.C, *supra*.

136. **FHFA Statement:** At one point, the Diligence Group settled over forty deals in one week. Ex. 55 (Dep. Ex. 39721, email regarding Audit – Seconds and SubPrimes) at NOM-FHFA_05500005 ("Elizabeth – I will send when I can – we are in the middle of trying to settle 40 plus deals this week – please bear that in mind[.]").

**Nomura Response:** Disputed. Although plaintiff's Exhibit 55 includes the text quoted by plaintiff, that quoted language does not confirm that the Diligence Group actually

settled over forty deals in one week. Further, the due diligence process involved many individuals and entities in addition to the "Diligence Group." See ¶¶ 160, 166, 169, 171, *infra*, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 136.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits

that the Plaintiff's Exhibit 55 contains the text quoted by Plaintiff, and the additional

evidence that Nomura cites is irrelevant to Plaintiff's asserted fact and does not create a

genuine dispute of material fact. Part I.C, *supra*.

2.    The Diligence Group's Personnel

137.    **FHFA Statement:** The members of the Diligence Group were either employed directly by Nomura Securities or reported to others employed directly by Nomura Securities. Ex. 56 (Dep. Ex. 37100, Joseph Kohout Deposition Background Questionnaire) at A-2 (indicating that he was employed by Nomura Securities International, Inc.); Ex. 57 (Dep. Ex. 32700, Neil Spagna Deposition Background Questionnaire) at A-2 (also indicating that Christopher Scampoli reported to Spagna); Ex. 58 (Dep. Ex. 37900, Jeffrey Hartnagel Deposition Background Questionnaire) at A-2 (indicating that he was employed by Nomura Securities International, Inc.); Ex. 59 (Dep. Ex. 40900, Menachem Sabo Deposition Background Questionnaire) at A-1-2 (indicating that he was employed by Nomura Securities International, Inc. as a consultant from May 2005-May 2006 and then directly by Nomura from May 2006-October 2007); Ex. 49 (Deposition of Mendy Sabo) at 90:13-19 ("Q. What did you do as a consultant for NSI from 2005 to 2006? A. I assisted in the overseeing of the due diligence in the loan-by-loan bulk and mini bulk purchases of mortgage loans. Q. Whom did you report to? A. Joe Kohout."); Ex. 46 (Deposition of Neil Spagna) at 169:6-13 ("Q. . . . And so would it be fair to say you oversaw the due diligence at Nomura from July 2006 to November 2007? A. Correct. Q. Okay. And then directly under you are Mendy Sabo and Chris Scampoli; is that right? A. That's correct.").

**Nomura Response:** Disputed. Although plaintiff's Exhibits 56, 57, 58, 59, 49 and 46 include the information referenced by plaintiff, and Mr. Sabo and Mr. Spagna gave the testimony quoted by plaintiff, those quotes and references are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts and information. Regarding plaintiff's Exhibit 56, plaintiff failed to include that Mr. Kohout's Background Questionnaire also indicated that Mr. Kohout worked for Nomura Credit & Capital, Inc. ("NCCI"). Regarding plaintiff's Exhibit 57, Mr. Spagna's Background Questionnaire indicates that Mr. Spagna worked for both Nomura Securities and NCCI. Regarding plaintiff's Exhibit 59, Mr. Sabo's Background Questionnaire indicates that Mr. Sabo worked for both Nomura Securities and NCCI. Further, Nomura's Initial Disclosures and Mr. Spagna's

Deposition Background Questionnaire disclose that Mr. Kohout, Mr. Spagna, and Mr. Sabo were employed by NCCI in 2007. Ex. 38 (Initial Disclosures of Nomura Defendants Pursuant to Federal Rule of Civil Procedure 26(a)(1)) at 5; Ex. 28 (Background Questionnaire of Neil Spagna) at A-2.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 137.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Mr. Sabo and Mr. Spagna gave the testimony quoted by Plaintiff and that the exhibits plaintiff cites include the information referenced. Moreover, the additional evidence that Nomura cites does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

138. **FHFA Statement:** Ultimately, the Diligence Group reported to John Graham. Ex. 24 (Deposition of John Graham) at 24:9-23 ("Q. Okay. Were there -- were there specific groups that you were in charge of? A. Yes. Q. And what were the groups? A. Groups included Due Diligence, Acquisition, Whole Loan Acquisition, Servicing and Collateral Analysis.").

     **Nomura Response:** Undisputed.

     **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 138.

     **FHFA Reply:** Defendants do not dispute the asserted fact.

139. **FHFA Statement:** According to Nomura's proffered expert, Nomura's Diligence Group was "relatively small compared to others in the industry." Ex. 22 (Grice Nomura Report) at ¶ 96 ("Nomura's Credit Group was relatively small compared to others in the industry, composed of only a few individuals who worked closely together.").

     **Nomura Response:** Disputed. Although Mr. Grice's expert report contains the text quoted by plaintiff, that text is removed from the context in which it appears, and omits other text that must be evaluated in order to fully understand the quoted excerpt. Mr. Grice also stated that the size of the Due Diligence Group "was due in large part to the fact that Nomura purchased a smaller volume of loans than its peers in the industry during the 2005-2007 time period." See Ex. 32 (July 9 Grice Report) at ¶ 96 ("Nomura's Credit Group was relatively small compared to others in the industry, composed of only a few individuals who worked closely together. This was due in large part to the fact that Nomura purchased a smaller volume of loans than its peers in the industry during the 2005-2007 time period."). *See also id.* at ¶ 96 n.108 (noting that Nomura was the 40th largest RMBS issuer in the United States).

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 139.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Plaintiff accurately quoted the report of Nomura's proffered expert, and the additional evidence that Nomura cites does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

140. **FHFA Statement:** The Due Diligence Group was comprised of three people at all times between 2005 and 2007. Ex. 53 (Deposition of Joseph Kohout) at 25:4-16 ("Q. Fair to say it was – Nomura had a three-person due diligence team in 2005 and 2006? A. That would be fair."); Ex. 46 (Deposition of Neil Spagna) at 170:20-25 ("Q. Okay. So the -- functionally the Due Diligence Team at Nomura from July 2006 to November 2007 and maybe more was the – the three of you, Mendy Sabo, Chris Scampoli and yourself? A. Correct.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 140.

**FHFA Reply:** Defendants do not dispute the asserted fact.

141. **FHFA Statement:** From 2005 to mid-2006, the Diligence Group consisted of Joseph Kohout, Jeffrey Hartnagel, and Menachem "Mendy" Sabo. Ex. 53 (Deposition of Joseph Kohout) at 24:10-22 ("Q. Okay. Who was part of the due diligence group that you led at Nomura from 2002 to approximately mid-2006? A. Well, when I started, it was me. I subsequently hired Jeff Hartnagel as a vice president. And after Jeff Hartnagel, I hired Mendy Sabo. Q. At any time from 2002 to 2006, was there anyone else that was working at Nomura itself doing due diligence of mortgage loans besides yourself, Mr. Hartnagel and Mr. Sabo? A. Not on a full-time basis.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 141.

**FHFA Reply:** Defendants do not dispute the asserted fact.

142. **FHFA Statement:** Joseph Kohout was head of the Diligence Group from 2005 to mid-2006. Ex. 53 (Deposition of Joseph Kohout) at 23:2-22 ("Q. So is it fair to say that you were head of the due diligence group at Nomura from 2002 to approximately 2007? A. Yeah, up to the time I left and moved to sales [June or July 2006] that would be correct.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 142.

**FHFA Reply:** Defendants do not dispute the asserted fact.

143. **FHFA Statement:** During his time with the Diligence Group, Mr. Kohout reported to Rob Leeds and later to N. Dante LaRocca and John Graham. Ex. 53 (Deposition of Joseph Kohout) at 22:3-11 ("Q. So there was a head of the mortgage group, which was Rob Leeds and Brett Marvin. And then did you report directly to them? A. Initially, I reported to Rob Leeds. And then, when Rob Leeds left, I actually reported to John -- well, Dante Larocca and then John Graham.").

   **Nomura Response:** Undisputed.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 143.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

144. **FHFA Statement:** Mr. Kohout focused primarily on diligence on loans acquired through Nomura's conduit or loan-by-loan program. Ex. 53 (Deposition of Joseph Kohout) at 88:5-15 ("Q. And what was it? A. Jeff Hartnagel was primarily responsible for overseeing bulk and mini-bulk transactions. And Mendy Sabo, as the junior man on the team, was a generalist that assisted both Jeff and myself. Q. And what did you see your role? A. I oversaw the entire operation, but also focused primarily on the loan-by-loan flow conduit business.").

   **Nomura Response:** Disputed. Although plaintiff's Exhibit 53 includes the text quoted by plaintiff, the quoted language also makes clear that Mr. Kohout "oversaw the entire [diligence] operation," and did not only focus on the loan-by-loan or conduit business. See Pl. Exhibit 53.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 144.

   **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits

   that Mr. Kohout gave the testimony Plaintiff cited, and the additional evidence that

   Nomura cites does not directly contravene the asserted fact and does not create a genuine

   dispute of material fact. Part I.C, *supra*.

145. **FHFA Statement:** Joseph Kohout left the Diligence Group in approximately mid-2006 to become a salesman on the Trading Desk. Ex. 53 (Deposition of Joseph Kohout) at 22:17-23:19 ("Q. Is it fair to say that your group was in charge of the due diligence of

mortgage loans at Nomura that were being acquired for the purpose of securitization? A. Yes. Q. Okay. And did you ever refer to it as a due diligence group? A. I may have. We may have. Q. So is it fair to say that you were head of the due diligence group at Nomura from 2002 to approximately 2007? A. Yeah, up to the time I left and moved to sales, that would be correct. . . . MS. TAGGART: Counsel, would you be willing to say when that actually happened; do you know the date of the change? MR. CLARK When he moved to sales? MS. TAGGART: Yes. MR. CLARK: I think it's about the middle of 2006, I want to say June or July.").

**Nomura Response:** Disputed. Mr. Kohout moved to a sales role in mid-2006; he was never on a "Trading Desk." Ex. 26 (Kohout Tr.) at 20:17-20, 21:2-9, 23:2-6, 167:24-168:9.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 145.

**FHFA Reply:** Defendants do not dispute that Mr. Kohout moved left  the Diligence

Group in approximately mid-2006 to become a salesman.  While Defendants dispute that

Mr. Kohout worked on the Trading Desk in his sales role, this dispute is not material to

FHFA's motion. *See Quarles*, 758 F.2d at 840.

146. **FHFA Statement:** Mr. Hartnagel was a Vice-President in the Diligence Group. Ex. 53 (Deposition of Joseph Kohout) at 24:10-16 ("Q. Okay. Who was part of the due diligence group that you led at Nomura from 2002 to approximately mid-2006? A. Well, when I started, it was me. I subsequently hired Jeff Hartnagel as a vice president. And after Jeff Hartnagel, I hired Mendy Sabo.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 146.

**FHFA Reply:** Defendants do not dispute the asserted fact.

147. **FHFA Statement:** Mr. Hartnagel was responsible for diligence on loans acquired through "bulk" and "mini-bulk" transactions. Ex. 53 (Deposition of Joseph Kohout) at 88:5-15 ("Q. And what was it? A. Jeff Hartnagel was primarily responsible for overseeing bulk and mini-bulk transactions.  And Mendy Sabo, as the junior man on the team, was a generalist that assisted both Jeff and myself.  Q. And what did you see your role? A. I oversaw the entire operation, but also focused primarily on the loan-by-loan flow conduit business.").

**Nomura Response:** Disputed. Although defendants do not dispute that Mr. Hartnagel was primarily responsible for overseeing loans acquired through "bulk" and "mini-bulk" transactions, defendants dispute Paragraph 147 to the extent it implies that Mr. Hartnagel

was the only person responsible for all bulk and mini-bulk transactions during the relevant time period. Mr. Hartnagel testified that Joseph Kohout could have also been involved in bulk and mini-bulk trades, as was Mendy Sabo. See Ex. 29 (Hartnagel Tr.) at 768:15-25 ("Q: Who else was ever in charge of mini bulk and/or bulk trades? A: I believe Joe may have, and Mendy of course. Q: Mendy was under you; correct? A: Correct. Q: You would have been in charge of the trade? A: Mendy at times would have had his own trades; yes.").

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 147.

**FHFA Reply:**  Defendants do not dispute the asserted fact.  Indeed, Defendants now assert that Mr. Hartnagel was "primarily" responsible for overseeing loans acquired through bulk and mini-bulk transactions.  The additional testimony Nomura cites does not directly contravene Plaintiff's asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

148.  **FHFA Statement:**  Mr. Sabo was a consultant to the Diligence Group from 2005 to 2006.  Ex. 49 (Deposition of Mendy Sabo) at 90:4-17 ("Q.  Okay.  So where were you working first?  A.  NSI, Nomura Securities.  Q.  Okay.  And when did you work for NSI?  A.  2005 through I believe 2006.  Q.  What were you doing at NSI?  A.  I was a consultant in the due diligence department.  Q.  What did you do as a consultant for NSI from 2005 to 2006?  A.  I assisted in the overseeing of the due diligence in the loan-by-loan bulk and mini bulk purchases of mortgage loans."); *id.* at 92:11-23 ("Q.  And let's just get your work history.  First, what was your name -- sorry, title, title when you were, from 2005 to 2006, at NSI?  A.  I believe it was consultant.  Q.  Do you know what 'consultant' meant?  A.  I was hired via an outside third-party staffing firm.").

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 148.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

149.  **FHFA Statement:**  From 2005 to 2006, Mr. Sabo "assisted in the overseeing of the due diligence in the loan-by-loan[,] bulk[,] and mini bulk purchases[.]"  Ex. 49 (Deposition of Mendy Sabo) at 90:4-17 ("Q.  Okay.  So where were you working first?  A.  NSI, Nomura Securities.  Q.  Okay.  And when did you work for NSI?  A.  2005 through I believe 2006.  Q.  What were you doing at NSI?  A.  I was a consultant in the due diligence department.  Q.  What did you do as a consultant for NSI from 2005 to 2006?  A.  I assisted in the overseeing of the due diligence in the loan-by-loan bulk and mini bulk purchases of mortgage loans.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 149.

**FHFA Reply:** Defendants do not dispute the asserted fact.

150. **FHFA Statement:** From mid-2006 to 2007, the Diligence Group consisted of Neil Spagna, Mr. Sabo, and Christopher Scampoli. Ex. 53 (Deposition of Joseph Kohout) at 440:5-17 ("Q. . . . We spoke about it at your last day -- was there a time that the Nomura due diligence department changed personnel in approximately mid-2006? A. Correct. Q. And I believe the team went from a three person team, yourself, Mr. Hartnagel and Mr. Sabo, and then switched to a team led by Mr. Spagna and including Mr. Scampoli and still Mr. Sabo; is that right? A. That's correct.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 150.

**FHFA Reply:** Defendants do not dispute the asserted fact.

151. **FHFA Statement:** Neil Spagna was the Director of the Diligence Group from mid-2006 to November 2007. Ex. 46 (Deposition of Neil Spagna) at 169:6-9 ("Q. … [S]o would it be fair to say you oversaw the due diligence at Nomura from July 2006 to November 2007? A. Correct.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 151.

**FHFA Reply:** Defendants do not dispute the asserted fact.

152. **FHFA Statement:** Mr. Spagna reported to John Graham. Ex. 46 (Deposition of Neil Spagna) at 168:4-12 ("Q. So let -- let's see if we can sketch out what the -- the folks working on due diligence were. Are -- are -- are you at the --let's see. I see you report to John Graham. Was he also supervising due diligence? A. Due diligence fell under – under him, but his role was, you know, head of Contract Finance.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 152.

**FHFA Reply:** Defendants do not dispute the asserted fact.

153. **FHFA Statement:** Mr. Scampoli was a consultant or contractor that worked in Nomura's Due Diligence Group. Ex. 61 (Deposition of Christopher Scampoli) at 101:21-102:7 ("Q. You were not an employee of Nomura; is that correct? A. I was not an employee of Nomura. That is correct. … Q. When – now, you were – you were a contractor for Nomura? A. I was a consultant.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 153.

**FHFA Reply:** Defendants do not dispute the asserted fact.

154. **FHFA Statement:** Mr. Scampoli worked primarily on diligence of loans acquired through "bulk" and "mini-bulk" deals. Ex. 46 (Deposition of Neil Spagna) at 169:19-170:2 ("Q. And -- and what generally then were Mendy Sabo and Chris Scampoli's jobs? A. Chris Scampoli primarily managed the -- the bulk and mini-bulk due diligence projects. Q. Okay. And Mendy Sabo? A. Mendy primarily managed the loan-by-loan program.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 154.

**FHFA Reply:** Defendants do not dispute the asserted fact.

155. **FHFA Statement:** Mr. Sabo became a full-time employee of Nomura in mid-2006. Ex. 49 (Deposition of Mendy Sabo) at 186:10-187:11 ("Q. . . .So am I right that at some point in mid-2006, the three- person team changed from Mr. Kohout, Hartnagel and yourself to Spagna, Scampoli and yourself? A. That's correct….Q. As part of it, you received a promotion from a consultant to a full-time employee, right? A. If it was a promotion, I don't know….Q. Okay. You just – instead of being hired by your third-party service, you were hired directly by Nomura at that point, right? A. That is correct.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 155.

**FHFA Reply:** Defendants do not dispute the asserted fact.

156. **FHFA Statement:** From 2006 to 2007, Mr. Sabo primarily managed diligence for the loan-by-loan channel. Ex. 46 (Deposition of Neil Spagna) at 169:19-170:2 ("Q. And -- and what generally then were Mendy Sabo and Chris Scampoli's jobs? A. Chris Scampoli primarily managed the -- the bulk and mini-bulk due diligence projects. Q. Okay. And Mendy Sabo? A. Mendy primarily managed the loan-by-loan program.").

**Nomura Response:** Disputed. While Mr. Spagna gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For instance, Mr. Kohout testified that Mr. Sabo served in a support role for all types of loan purchases in 2006. Ex. 26 (Kohout Tr.) at 87:23-88:15. Mr. Sabo testified that he "assisted in the overseeing of the due diligence in the loan-by-loan bulk and mini bulk purchases of mortgage loans." Ex. 30 (Sabo Tr.) at 90:4-17.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 156.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura admits that Mr. Spagna gave the testimony Plaintiff cited, and the additional evidence that Nomura cites does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

## V.     NOMURA'S DILIGENCE AND REVIEWS

157.    **FHFA Statement:** There is no evidence that Nomura had any written policies or procedures pertaining to due diligence.

**Nomura Response:** Disputed. Nomura's 30(b)(6) designee testified that Nomura had a "policy and practice" not to use sample sizes below 20%. Ex. 15 (Prahofer Tr.) at 28:8-15. Nomura also had a policy that would not permit originators to cap the number of kick-outs as a result of due diligence performed on a trade pool. *Id.* at 31:20-32:7. Nomura also provided written overlays and bid stipulations to due diligence vendors. See *id.* at 33:4-21; see also, e.g., Ex. 232 (NOM- FHFA_05066340) at NOM-FHFA_05066340; see also Ex. 233 (NOM-FHFA_05066349) at NOM-FHFA_05066349; Ex. 234 (NOM-FHFA_05266731) at NOM-FHFA_05266731; Ex. 235 (NOM-FHFA_05324872) at NOM-FHFA_05324872; Ex. 236 (NOM-FHFA_05338819) at NOM-FHFA_05338819; Ex. 237 (NOM-FHFA_05361051) at NOM-FHFA_05361051; Ex. 238 (NOM-FHFA_05368895) at NOM-FHFA_05368895; Ex. 239 (NOM-FHFA_05516995) at NOM-FHFA_05516995; Ex. 240 (NOM-FHFA_05787706) at NOM-FHFA_05787706-7729; Ex. 241 (NOM-FHFA_05787730) at NOM-FHFA_05787730-7736; Ex. 242 (NOM- FHFA_05787737) at NOM-FHFA_05787737-7740; Ex. 243 (NOM-FHFA_05787741) at NOM- FHFA_05787741-7744; Ex. 244 (NOM-FHFA_05787745) at NOM-FHFA_05787745-7750. As a result, Nomura had "firm policies for . . . flagging [a loan] as an EV3" if it did not meet Nomura's overlays or bid stipulations. Ex. 15 (Prahofer Tr.) at 38:22-39:4. Nomura also provided the due diligence vendors with oral and e-mail instructions. See *id.* at 48:23- 49:16; 51:14-52:6. Nomura's policies also provided that its due diligence personnel should review all loans graded 2 or 3 by the credit and compliance due diligence vendors. See *id.* at 139:19-140:23, 175:12-177:6. Nomura also had a practice of upsizing sample sizes based on the results of due diligence, if warranted. See *id.* at 146:10-18. Nomura's diligence practices

also were reflected in written investor presentations dated March 6, 2006 and July 14, 2006. Ex. 575 (NOM-FHFA_05500234) at NOM-FHFA_05500234; Ex. 186 (NOM-FHFA_05491674) at NOM-FHFA_05491674.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 157.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited testimony from Nomura's corporate representative, along with the cited documents relating to bid stipulations and investor presentations, are irrelevant to the asserted fact that Nomura did not have any internal *written* policies and procedures and do not create a genuine dispute of material fact. Part I.C, *supra*. In fact, Defendants cite to the Nomura 30(b)(6) Deposition of Nancy Prahofer in which she states that "there was  practice. I'm not under the impression that there was any written policy or written procedure for [upsizing a sample]." Nom. Ex. 15 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 146:10-18. Furthermore, while Defendants "dispute" the asserted fact on the basis that Nomura provided bid stipulations and overlays to its due diligence vendors, citing Nom. Exs. 232-244, Defendants assertion is not supported by Nom. Exs. 234 and 238. Nom. Ex. 234 is an email to Freddie Mac while Nom. Ex. 238 is an internal Nomura email.

158.    **FHFA Statement:** The Diligence Group primarily conducted credit diligence, compliance diligence, and valuation diligence. Ex. 53 (Deposition of Joseph Kohout) at 17:10-22 ("Q. Let's get a definition of what you understand due diligence to mean in the residential mortgage loan business. A. Due diligence means evaluating loans and loan portfolios for purchase. Depending on the type of trade, you know, the review is different. On a performing loan trade, you would be reviewing credit compliance and property value. Those are the big three. For nonperforming trades, you would be reviewing servicing and collateral value.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 158.

**FHFA Reply:** Defendants do not dispute the asserted fact.

159. **FHFA Statement:** The Diligence Group also conducted data integrity and collateral reviews. Ex. 24 (Deposition of John Graham) at 165:23-167:15 ("Q. But what – what tests, additional due diligence checks or tests were run on loans in the sample that were not run on loans outside of the sample? A. … And the last piece of – of the process for due diligence would be a data integrity check. So that would involve taking the physical loan file and comparing it to the information that was available on the collateral tape, the portion of which was on the sample that was provided to Clayton or Lydian to check that for accuracy."); *id.* at 209:4-21 ("Q. … What role did Wells Fargo play in the due diligence process? A. Wells Fargo is the collateral custodian. They were the ones that would be checking in all of the mortgage loan files to all of the collateral files to make sure that the mortgage, the note, any related assignments, al[l]onges, title policy, whatever the – the required documents were to settle with the seller were – Q. Okay. A. – in possession and correct. They would look at them and verify that they were signed and accurate and tied to the – the collateral tape.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 159.

**FHFA Reply:** Defendants do not dispute the asserted fact.

## A. Credit Diligence

160. **FHFA Statement:** Credit diligence, which involved a loan file review, was supposed to evaluate whether the mortgage loans were originated in accordance with the credit requirements of the originator's underwriting guidelines. Ex. 24 (Deposition of John Graham) at 203:21-204:2 ("Q. …. 'Credit,' what – what – what generally came under the heading of credit test for due diligence? A. That – that is the comparison to underwriting guidelines."); *see also* Ex. 62 (Dep. Ex. 37905, email regarding Nomura Collateral Presentation attaching Presentation entitled "Residential Mortgage Initiatives") at NOM-FHFA_05122109 (indicating that the credit review includes underwriting, credit reporting scores, and corporate credit).

**Nomura Response:** Disputed. Although Mr. Graham gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. Graham, that must be evaluated in order to fully understand the quoted excerpt. Credit diligence involved not only review of the loan file in order to determine whether it was originated in accordance with the originator's underwriting guidelines, but also to assess additional criteria specific to Nomura—bid stipulations and overlays. C. Stmt. ¶¶ 81-88.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 160.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

state that Mr. Graham's testimony is "removed from the context in which it appears, and

omits other testimony and documents, including documents authored by Mr. Graham,

that must be evaluated in order to fully understand the quoted excerpt, Nomura fails to

cite any evidence and therefore does not create a genuine dispute of material fact. *See*

Parts I.B, I.E, *supra*. While Defendants state that credit diligence also involved assessing

additional criteria, this assertion does not specifically contradict the asserted fact. *See* Part

I.B, *supra*.

161. **FHFA Statement:** Mendy Sabo agreed that a "main part of the due diligence process was supposed to determine whether the loans complied with underwriting guidelines." Ex. 49 (Deposition of Mendy Sabo) at 65:20-66:2 ("Okay. And when you were doing due diligence at Nomura, did you expect that the main part of the due diligence process was supposed to determine whether the loans complied with underwriting guidelines? … A. Yes.").

   **Nomura Response:** Defendants do not dispute that a main part of the due diligence process was determining whether the loans complied with underwriting guidelines.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 161.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

   **B.      Compliance Diligence**

162. **FHFA Statement:** Compliance diligence, which involved a loan file review, was supposed to "determine compliance to Federal, State, City and County regulations." Ex. 62 (Dep. Ex. 37905, email regarding Nomura Collateral Presentation attaching Presentation entitled "Residential Mortgage Initiatives") at NOM-FHFA_05122109 ("Regulatory compliance. Nomura's primary due diligence vendors utilize an automated review tool, which will capture loan level data, calculate the APR, and determine compliance to Federal, State, City and County regulations."); *see also* Ex. 53 (Deposition of Joseph Kohout) at 180:21-181:7 ("Q. Okay. Can you list, to the extent you remember, the actual checks that were done by compliance, due diligence, and ones where you would not waive, loans had to absolutely comply with these things? … A. There were a myriad of them, absolutely. There were both federal, State and local. So certain areas had specific checks that had to be done.").

   **Nomura Response:** Defendants do not dispute that compliance diligence involved a review of a loan's adherence to federal, state, and local laws and regulations. See C. Stmt. ¶ 82.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 162.

**FHFA Reply:** Defendants do not dispute the asserted fact.

### C.    Valuation Diligence

163.  **FHFA Statement:** Valuation diligence was supposed to "assess the reasonableness of appraisals" in order to make "a reasonable basis to make accurate disclosures regarding adherence to originators' underwriting guidelines and collateral characteristics." Ex. 22 (Grice Nomura Report) at ¶ 112.

   **Nomura Response:** Defendants do not dispute that valuation diligence was used to assess the reasonableness of appraisals and provided Nomura with a reasonable basis to make accurate disclosures regarding adherence to originators' underwriting guidelines and collateral characteristics.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 163.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

### D.    Data Integrity Review

164.  **FHFA Statement:** Nomura input sellers' bid tapes into a system called CAS that "[p]rocessed the information to create stratifications and rep lines[] and acted as a check for the quality of the data provided in the bid tape." Ex. 54 (Deposition of Gareth Williams) at 70:12-71:19 ("Q. Can you explain what the CAS system did – from taking mortgage information obtained in loan tapes, what did the CAS system do with that information? . . . A. Processed the information to create stratifications and rep lines; and act as a check for the quality of the data provided in the bid tape. .. . Q. So what does processing the information mean? A. Processing the information is taking the bid tape and analyzing it through the CAS system and producing the reports. I would consider that to be processing. Q. What does 'checking the loan tapes' mean to you? A. Running different error checks within CAS to check[] the quality of the data with some fields that can be calculated within CAS; and also looking for, just, exogenous data errors.").

   **Nomura Response:** Defendants do not dispute that Mr. Williams gave the testimony quoted by plaintiff.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 164.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

165.  **FHFA Statement:** Timothy McLaughlin referred to this process as "scrubbing" the tape. Ex. 47 (Deposition of Timothy McLaughlin) at 177:8-178:11 ("Q. . . .Was there any diligence done on the collateral prior to bidding on it? . . . A. Are you referring to a

formal due diligence process? Q. Yes. A. With Clayton? Q. Either with third-party due diligence firms or in-house. A. I would not consider this diligence, but there was some level of what's considered scrubbing or tape cleaning that was performed before bid to identify any potential issues, inconsistencies in data. And to the extent that that could be identified prior to a bid, it would frequently be relayed to the seller in an attempt to determine what the correct information is so that when we bid on the pool, we would have the most accurate information so it would not be recovered or discovered post-bid during the diligence process and begin a process of repricing. We are trying to catch that up front.").

**Nomura Response:** Defendants do not dispute that Mr. McLaughlin gave the testimony quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 165.

**FHFA Reply:** Defendants do not dispute the asserted fact.

166. **FHFA Statement:** Timothy McLaughlin did "not consider this [process] diligence" but rather viewed it as "a completely separate non-due diligence process." Ex. 47 (Deposition of Timothy McLaughlin) at 177:8-178:11 ("Q. . . .Was there any diligence done on the collateral prior to bidding on it? . . . A. Are you referring to a formal due diligence process? Q. Yes. A. With Clayton? Q. Either with third-party due diligence firms or in-house. A. I would not consider this diligence, but there was some level of what's considered scrubbing or tape cleaning that was performed before bid to identify any potential issues, inconsistencies in data. And to the extent that that could be identified prior to a bid, it would frequently be relayed to the seller in an attempt to determine what the correct information is so that when we bid on the pool, we would have the most accurate information so it would not be recovered or discovered post-bid during the diligence process and begin a process of repricing. We are trying to catch that up front. Q. So with some of the – A. And I'm describing a process that was – that occurred in the Collateral Group rather than the Due Diligence Group. I view that was a completely separate non-due diligence process.").

**Nomura Response:** Disputed. Although Mr. McLaughlin gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. McLaughlin, that must be evaluated in order to fully understand the quoted excerpt. Mr. McLaughlin testified that he was "not familiar with the operational aspect of the due diligence process," Ex. 561 (McLaughlin Tr.) at 180:23-25, and was "not necessarily involved in the due diligence process." *Id.* at 165:21-24. Further, the quoted language makes clear that Mr. McLaughlin was answering questions only about a "formal due diligence process." See Pl. Exhibit 47 at 177:8-178:11. In addition, Nomura's collateral analysts ran "edit checks" to verify that the data in the loan tape was internally consistent, and complied with Nomura's bid stipulations, as well as ensuring that the data contained in Nomura's internal loan information database matched what was on the loan tape. Ex. 177 (Lee Tr.) at 26:10-27:12; Ex. 26 (Kohout Tr.) at 224:2-225:11; Ex. 37 (Kim Tr.) at 87:12-88:5;

Ex. 178 (Williams Tr.) at 71:14-19; Ex. 36 (Orfe Tr.) at 98:16-99:8. Additionally, the collateral analysts worked to ensure that the information provided in the prospectus supplements and other Offering Documents matched the data in Nomura's internal loan information database. Ex. 36 (Orfe Tr.) at 72:3-14; Ex. 177 (Lee Tr.) at 47:3-25; Ex. 37 (Kim Tr.) at 193:16-23; Ex. 40 (Crowley Tr.) at 36:17-24.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 166.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The testimony that Defendants reference in Nom Exs. 177, 26, 37, 178, 36, and 40 is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*. Defendants' reference to additional excerpts from Mr. McLaughlin's testimony also does not create a genuine dispute of material fact because the testimony does not directly contravene the asserted fact. Part I.C, *supra*. Finally, Defendants' claim that the asserted fact requires context from omitted documents, such as "documents authored by Mr. McLaughlin," they identify no evidence that specifically contradicts the asserted fact. Nomura's speculation that evidence might exist calling the asserted fact into question does not create a genuine dispute of material fact. Part I.D, *supra*.

167.   **FHFA Statement:** Randall Lee, as a collateral analyst who worked on six of the seven Securitizations, did not verify the sales contract price, the accuracy of the appraisal, occupancy status, or FICO score on the loan tapes; and did not recall if anyone else did. Ex. 43 (Deposition of Randall Lee) at 31:15-34:13 ("Q. . . . But as collateral analyst, when you were – you yourself were doing edit checks on the loan tape, did you yourself do any checks of the accuracy of the sales contract price? A. No. Q. Did you yourself, as collateral analyst do anything to verify the accuracy of the appraisal that went into the LTV calculation on the loan tape? A. No. Q. Okay. Do you know if anyone else did at Nomura? A. I don't know. Q. So, what did you do to check the accuracy of the LTV? A. We ran a series of edit checks, and the edit checks would recalculate the LTV based on the information given on the tape and compare that to the LTV given on the tape. . . . Q. What, if anything, did you do, as collateral analyst, to verify the accuracy of the occupancy status as provided on the loan tape? A. I don't recall. Q. What, if anything, did you, as collateral analyst at Nomura, do to verify the – that FICO was in an appropriate range? A. I don't recall. . . . Q. Do you recall any other specific checks that you did, as collateral analyst at Nomura, to verify the accuracy of the information on the loan tapes? A. No."); *see also* Ex. 63 (NOM-FHFA_00000010, Working Party List for

NAAC 2005-AR6) at NOM-FHFA_00000010 (listing Randall Lee); Ex. 64 (NOM-FHFA_00000027, Working Party List for NHEL 2006-FM1) at NOM-FHFA_00000028 (same); Ex. 65 (NOM-FHFA_00000045, Working Party List for NHEL 2006-FM2) at NOM- FHFA_00000045 (same); Ex. 66 (NOM-FHFA_00000060, Working Party List for NHEL 2006- HE3) at NOM-FHFA_00000060 (same); Ex. 67 (NOM-FHFA_00000097, Working Party List for NHEL 2007-2) at NOM-FHFA_00000097 (same); Ex. 68 (NOM-FHFA_00000117, Working Party List for NHEL 2007-3) at NOM-FHFA_00000117 (same).

**Nomura Response:** Disputed. Although Mr. Lee gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. Lee, that must be evaluated in order to fully understand the quoted excerpt. Mr. Lee testified that he did not recall what he did to verify the accuracy of information on the loan tape—not that this verification was not performed, as plaintiff suggests. Mr. Lee testified that a loan tape "would be a capture of a database" and "the database would be updated for the findings of any due diligence process." Ex. 177 (Lee Tr.) at 130:20-131:10. Further, Mr. Lee testified that it was the function of the Due Diligence Group to check the accuracy of appraisals and "all of the new and latest appraisals would be included in any tape that would be used for securitization. *Id.* at 131:25-132:21. *See also* ¶ 166, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 167.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants dispute that the quoted excerpt from Mr. Lee's transcript fully and accurately supports the testimony, the additional passages that Defendants reference from Mr. Lee's testimony do not create a genuine dispute of material fact because the testimony does not directly contravene the asserted fact. Part I.C, *supra*. While Defendants argue that the asserted fact requires context from omitted documents, such as "documents authored by Mr. Lee," they identify no evidence that specifically contradicts the asserted fact. Nomura's speculation that evidence might exist calling the asserted fact into question does not create a genuine dispute of material fact. Part I.D, *supra*. The testimony that Defendants reference in ¶ 166, *supra*, is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

168. **FHFA Statement:** According to Michael Orfe, another Nomura collateral analyst, "it wasn't in the purview of us, the collateral analyst[s], to ensure accuracy [of the information in the collateral tables in the Prospectus Supplements] relative to loan files or any other document that might be available." Ex. 48 (Deposition of Michael Orfe) at 146:4-147:14 ("Q. Before you put in the information in the collateral tables in the prospectus supplements, did you make any attempt to determine if any due diligence or checking had been done to the loans that were not categorized with a yes flag relating to due diligence? . . . [A.] Again, as a collateral analyst, the role and what we did was organize that data in the database so that it was presentable in the form of the tables that you saw in the prospectus. And we did that, the accuracy that we ensured was that the tables reflected the data that we had. And that – we did that and we worked with Deloitte to ensure the accuracy in that respect as well working from the data set that we had to ensure that the tables were accurate. But, again, it wasn't in the purview of us, the collateral analyst, to ensure accuracy relative to loan files or any other document that might be available.").

**Nomura Response:** Disputed. Mr. Orfe testified that there was a due diligence team that had a process for "making sure the tape reflected what was reality." Ex. 36 (Orfe Tr.) at 128:23-129:9. Mr. Orfe testified that the primary source of information the collateral analyst used to prepare the collateral tables in prospectus supplements was information in Nomura's database derived from the loan tapes, and "the due diligence team, through their work, had information that they added to that database. And then it was from that database where we retrieved the data to make and create the tables in the pro supps." *Id.* 130:8-25. *See also* ¶¶ 166-167, *supra*, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 168.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The additional testimony that Defendants reference in Mr. Orfe's transcript is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. The testimony that Defendants reference in ¶ 166-167, *supra*, is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

169. **FHFA Statement:** Third-party vendors conducted a "data integrity check" for the loans in diligence samples, a process that "involve[d] taking the physical loan file and comparing it to the information that was available on the collateral tape." Ex. 24 (Deposition of John Graham) at 165:23-167:19 ("Q. But what – what tests, additional due diligence checks or tests were run on loans in the sample that were not run on loans outside of the sample? A. . . . And the last piece of – of the process for due diligence would be a data integrity check. So that would involve taking the physical loan file and comparing it to the information that was available on the collateral tape, the portion of

which was on the sample that was provided to Clayton or Lydian to check that for accuracy."); Ex. 53 (Deposition of Joseph Kohout) at 224:18-225:25 ("Q. Okay. We mentioned that the loan file to guideline comparison was done on a sample basis. What about, was the comparison of what was on the data tape to the guidelines also done on the sample basis? . . . A. And again, it was done on a sample basis, if that was how the trade was dictated. . . . So we would get the tape. They would only have the ability, meaning our third-party vendors, to perform data integrity checks on the sample that was done, with the exception of during the custodial review, 100 percent of the collateral files were reviewed.").

**Nomura Response:** Defendants do not dispute that third-party vendors conducted a data integrity check of data contained in loan tapes. The vendors regularly produced reports on data discrepancies, which Nomura's due diligence team would review. Ex. 31 (Scampoli Tr.) at 300:6-302:23. The collateral custodians hired by Nomura also analyzed the loan tapes to validate the integrity of key data fields. E.g., Ex. 272 (NOM-FHFA_05070693) at NOM- FHFA_05070693; Ex. 273 (NOM-FHFA_05363370) at NOM- FHFA_05363370.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 169.

**FHFA Reply:** Defendants do not dispute the asserted fact. The testimony and exhibits

that Defendants reference do not directly contravene the asserted fact and do not create a

genuine dispute of material fact. Part I.C, *supra*.

170. **FHFA Statement:** In performing this data integrity check, the third-party vendors checked whether the information in the loan tape matched the information that was actually in the loan files, but they did not verify whether the information in the loan files was accurate. Ex. 69 (Clayton 30(b)(6) Deposition of Vicki Beal) at 204:5-205:10 ("Q. You also mentioned the data integrity review. Can you tell us if Clayton took any steps to determine if – well, let me take a step back. With regard to the data integrity review, was Clayton's process to compare the information in the loan tape with the loan file? A. Yes, that was the process.…Q. And did Clayton take any steps to verify the accuracy of the information in the loan file? A. Not if it was not part of this, included in the scope of the review. We just relied on the documents in the loan file. Q. And are you aware – well, to the extent it was part of the scope of the review, that would have been dictated to you by the client, right? A. That's correct. Q. Do you know of any clients who asked Clayton to verify the information in the loan file when doing the data integrity review? A. During that time frame, I don't recall any."); Ex. 53 (Deposition of Joseph Kohout) at 229:4-19 ("Q. But things in the guidelines itself, like you need to verify employment by doing such and such or check for seasoning, those sort of things were only done on the sample basis? A. There was no basis for review on the data tape for that. There was no way you could do that type of review. Q. Okay. And also, the data integrity check, meaning, seeing if the loan tape matches what's actually in the loan file, was that done, to

the extent there was a sample, on a sample basis? A. Absent the validation of eligibility criteria, yes. And the note and – and the custodial review, yes.").

**Nomura Response:** Disputed. Although defendants do not dispute that the third party vendors did not verify the information in the loan files during the data integrity review, the accuracy of the information in the loan files was checked during the valuation and credit and compliance stages of due diligence. See ¶ 169, *supra*, and C. Stmt. at ¶¶ 91-95, 121-122, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 170.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Whether "the accuracy of the information in the loan files was checked during the valuation and credit and compliance stages of due diligence" is irrelevant to the asserted fact, as are the testimony and documents Defendants cite in ¶ 169, *supra* and Counterstatement ¶¶ 91-95, which therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

171.    **FHFA Statement:** Nomura also retained external accounting firms, including Deloitte & Touche LLP ("Deloitte"), "to verify the accuracy of the description in the ProSupps related to the distribution of mortgage loans" with various collateral characteristics. Ex. 43 (Deposition of Randall Lee) at 95:3-16 ("Q. Do you know what, if anything, anyone at Nomura did to verify the accuracy of the description in the ProSupps related to the distribution of mortgage loans with different loan-to- value ratios similar to what we see in Exhibit 4501 at page 5247? . . . A. We would hire an accountant, Deloitte, to verify that all the information was correct specifically relating to these numbers. Q. Anything else? A. I don't recall if we did anything else."); Ex. 30 (Deposition of Steven Katz) at 334:12-21 ("Q. And did Deloitte have any role in the due diligence process at Nomura? A. Deloitte performed the function of tying out the numbers that were in our offering memos as well as the prospectus supplements, I believe, although I don't know if we exclusively used Deloitte. Q. If it wasn't Deloitte, it was another accounting firm? A. Correct.").

**Nomura Response:** Defendants do not dispute that Nomura retained external accounting firms, including Deloitte & Touche LLP ("Deloitte"), to verify the accuracy of the data in the Offering Documents, including various collateral characteristics.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 171.

**FHFA Reply:** Defendants do not dispute the asserted fact.

172. **FHFA Statement:** Deloitte's review included comparing data in the collateral tables in the Prospectus Supplements to data in the loan tapes; ensuring that certain aggregated loan figures in the Prospectus Supplements were accurately calculated based on loan tape information; and comparing certain loan tape data to certain documents in loan files provided by Nomura for a sample of 150 or 200 loans from the loan pool. Ex. 30 (Deposition of Steven Katz) at 337:20-338:2 ("Q. What about Deloitte, what was the type of due diligence that Deloitte did? A. Deloitte would basically tick and tie and reproduce the numbers that we used in our offering memos and our prospectus supplement."); *see, e.g.*, Ex. 70 (DT-FHFA 000001, Nov. 29, 2005 Deloitte Independent Accountants' Report on Applying Agreed-Upon Procedures) at DT-FHFA 000004-006 (listing loan tape characteristics that Deloitte compared to information in the loan file and setting forth aggregate data figures in the prospectus supplement that Deloitte recalculated); Ex. 71 (DT-FHFA 000018, Jan. 27, 2006 Deloitte Independent Accountants' Report on Applying Agreed-Upon Procedures) at DT-FHFA 000021 (reporting data review conducted for 150 mortgage loans); Ex. 72 (DT-FHFA 000041, Oct. 30, 2006 Deloitte Independent Accountants' Report on Applying Agreed-Upon Procedures) at DT-FHFA 000044 (reporting data review conducted on 200 loans).

**Nomura Response:** Defendants do not dispute that Nomura retained external accounting firms, including Deloitte, to compare data in the collateral tables in the prospectus supplements to data in the loan tapes; ensure that certain aggregated loan figures in the prospectus supplements were accurately calculated based on loan tape information; and compare certain loan tape data to certain documents in loan files provided by Nomura. Deloitte carried out what it called "Mortgage Loan Procedures," where it compared the loan tape data for a set of sample loans to the actual loan files in order to ensure that the information on the loan tape matched what was in the loan files. *See, e.g.*, Ex. 278 (DT-FHFA 000018) at DT-FHFA 000021-0023. Deloitte would check more than 20 different loan characteristics during this review, including occupancy status, the FICO score, the original LTV ratio, and the combined LTV ratio. See *id.* at DT-FHFA 000021. The firm would then send Nomura an exception report, noting the inconsistencies Deloitte had identified. E.g., Ex. 279 (NOM-FHFA_04261106) at NOM-FHFA_04261106. Deloitte would also compare the information in the loan tape to the information contained in the Offering Documents. Deloitte checked many different pieces of data disclosed in the Offering Documents, including "[t]he percentage [of loans] with loan-to-value ratios at origination in excess of 80%" and "[t]he number [of loans] that were originated by the indicated entity," as well as "[t]he numerical and date information . . . set forth in the tables" for each loan group in the securitization. See Ex. 278 (DT-FHFA 000018) at DT-FHFA 000023, DT-FHFA 000026. *See also* Ex. 280 (DT-FHFA 000001) at DT-FHFA 000001-0017; Ex. 281 (DT-FHFA 000033) at DT-FHFA 000033-000040; Ex. 282 (DT-FHFA 000041) at DT-FHFA 000041-000055; Ex. 283 (DT-FHFA 000056) at DT-FHFA 000056-000063; Ex. 284 (DT-FHFA 000064) at DT- FHFA 000064-000080; Ex. 285 (DT-FHFA 000081) at DT-FHFA 000081-000089. In certain instances, Deloitte would verify the accuracy of data requested by individual investors, including requests from Freddie Mac and Fannie Mae. See Ex. 37 (Kim Depo Tr.) at 190:5-23; e.g., Ex. 286 (NOM-FHFA_05138293) at NOM-FHFA_05138293-294.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 172.

**FHFA Reply:**  Defendants do not dispute the asserted fact.  The additional testimony that Nomura cites does not specifically contradict the asserted fact and so does not create a genuine dispute of material fact.  Part I.C, *supra*.

173.  **FHFA Statement:**  The accounting firms made "no representations as to … the accuracy of the information" in the Offering Materials.  Ex. 71 (DT-FHFA 000018, Jan. 27, 2006 Deloitte Independent Accountants' Report on Applying Agreed-Upon Procedures for NHELI 2006-FM1) at DT-FHFA 000024 ("We make no representations as to (i) the accuracy of the information set forth on the Sample Data File or Data File, (ii) the actual characteristics or existence of the underlying documents or data comprising the mortgage loans underlying the Sample Data File or Data File (other than with respect to the Characteristics of the Sample Loans as described herein) or the conformity of their respective characteristics with those assumed for purposes of the procedures described herein or (iii) the existence or ownership of the Mortgage Loans.");  Ex. 70 (DT-FHFA 000001, Nov. 29, 2005 Deloitte Independent Accountants' Report on Applying Agreed-Upon Procedures for NHELI 2005-AR6) at DT-FHFA 000006-007 ("We have addressed ourselves solely to the foregoing data as set forth in the Prospectus Supplement and make no representations as to the adequacy of disclosure or as to whether any material facts have been omitted.");  Ex. 73 (NOM-FHFA_00000139, Nov. 29, 2005 PricewaterhouseCoopers LLP Independent Accountants' Report on Applying Agreed-Upon Procedures for NHELI 2005-AR6) at NOM-FHFA_00001159 ("We should not be regarded as having in any way warranted or given any assurance as to the accuracy, completeness or integrity of the information to which the procedure was applied, or as having in any way substantiated the accuracy, completeness or integrity of any information obtained or derived from the Company or from the Servicer, or of any analyses, presentations, tabulations or reports based thereon or derived therefrom.");  Ex. 74 (Deloitte 30(b)(6) Deposition of Guy Sindle) at 119:23-120:10 ("Q.  Under any circumstances in the agreed-upon procedures process that we've been describing, would Deloitte ever do anything to confirm the accuracy of any of the information being provided to it by the specified user? . . . A.  Other than the procedures that we are performing in our work, but we would not confirm the accuracy or the validity of the information.").

**Nomura Response:**  Disputed. The testimony and excerpts quoted by plaintiff are removed from the context in which they appear, and omits other testimony and documents that must be evaluated in order to fully understand the quoted testimony and excerpts. *See also* ¶ 172, *supra*, which is incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 173.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. FHFA

incorporates its response to ¶ 172 as if fully stated herein. The testimony and documents

that Defendants cite in ¶ 172, *supra*, do not directly contravene the asserted fact and do

not create a genuine dispute of material fact. Part I.C, *supra*.

### E. Collateral Review

174. **FHFA Statement:** A collateral file consisted of documents such as the mortgage note, security instrument, title policy, allonges, and assignments, among other documents. Ex. 75 (NOM- FHFA_05710890, Correspondent's Settlement Guide) at NOM-FHFA_05710936 ("The collateral documents are as follows: Original Endorsed Note[;] Original/Certified Copy of Security Instrument/Riders (original to follow if not back from recording)[;]; Original Assignment of Security Instrument in blank[;] Original Title Policy or Copy of Title Commitment or attorney's opinion of title[;] Originals of any Assumption, Extension of Modification Agreements[;] Original/Certified Copy of any Intervening Assignments, if applicable (original(s) to follow if not back from recording)[.]").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 174.

**FHFA Reply:** Defendants do not dispute the asserted fact.

175. **FHFA Statement:** Nomura engaged Wells Fargo as a third-party collateral custodian to "make sure that the required documents to settle with the seller" were in its possession and to "verif[y] the information [in] those documents against the collateral loan tapes[.] Ex. 24 (Deposition of John Graham) at 219:4-18 ("Q. Was there any part of the due diligence process that tested the completeness of loan files to make sure they had all the requisite documents? A. I – Wells Fargo was responsible for checking in the collateral documents, the note, the mortgage, the al[l]onge, the assignment, title policy, whatever their – their instructions were and verified the information on those documents against the collateral loan tapes as well as looking for not only completeness of file, but actual, you know, good form, no whiteouts, no non-initialed changes, no rips, that everything was whole."); *id.* at 209:4-21 ("Q. . . . What role did Wells Fargo play in the due diligence process? A. Wells Fargo is the collateral custodian. They were the ones that would be checking in all of the mortgage loan files to all of the collateral files to make sure that the mortgage, the note, any related assignments, al[l]onges, title policy, whatever the – the required documents were to settle with the seller were – Q. Okay. A. – in possession and correct. They would look at them and verify that they were signed and accurate and tied to the – the collateral tape.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 175.

**FHFA Reply:** Defendants do not dispute the asserted fact.

176. **FHFA Statement:** In conducting a collateral review, Wells Fargo did not "verify the accuracy of the information on the loan tape, including LTV, DTI or owner occupancy" included in the collateral files. Ex. 30 (Deposition of Steven Katz) at 336:24-337:19 ("Q. Did Wells Fargo, to your knowledge, have the underwriting guidelines? A. It is independent of underwriting. It is specific to all mortgage files, a mortgage, a note, an assignment, an endorsement, title policies, stuff like that. Q. To your knowledge, did Wells Fargo participate, though, in any comparison of the loan file of the underwriting guidelines to determine whether the loans complied with underwriting guidelines? A. They did not. Q. And to your knowledge, did they do anything to verify the accuracy of the information on the loan tape, including LTV, DTI or owner occupancy? A. Not to my knowledge.").

**Nomura Response:** Disputed. There is no evidence that information concerning LTV, DTI, or owner occupancy is "included in the collateral files."

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 176.

**FHFA Reply:** Defendants do not genuinely dispute a material fact. Defendants do not

dispute that Wells Fargo did not "verify the accuracy of the information on the loan tape,

including LTV, DTI or owner occupancy." Defendants also do not dispute that Wells

Fargo did not verify the accuracy of any information in the collateral files. Any dispute

about whether specific information was located in the collateral files is immaterial.

*Quarles*, 758 F.2d at 840.

177. **FHFA Statement:** According to Jeffrey Hartnagel, a collateral review took place after due diligence was done, and the collateral review process was "independent of due diligence." Ex. 33 (Deposition of Jeffrey Hartnagel) at 335:23-338:11 ("Q. Well, in your experience as someone who was involved in the transfer of collateral, is that how it worked? A. I'm trying to remember exactly how collateral was done then and for the specific time frame. Now, collateral is not shipped till after the due diligence is finalized. Back then it could have been shipped prior to. So they would have checked it against due diligence to find out what should stay, what should be sent back. . . . So that's

independent of due diligence. Q. Uh-huh. A. So due diligence could be done – Q. – and then collateral would take over.").

**Nomura Response:** Disputed. Although Mr. Hartnagel gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. Hartnagel, that must be evaluated in order to fully understand the quoted excerpt. See C. Stmt. at ¶¶ 91-93, 127, 174, 224, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 177.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Hartnagel gave the cited testimony. While Defendants dispute that the quoted excerpt from Mr. Hartnagel's transcript fully and accurately supports the testimony, the documents and testimony they cite fail to directly contravene the asserted fact and so do not create a genuine dispute of material fact. Part I. C, *supra*.

178.    **FHFA Statement:** According to Mr. Hartnagel, collateral review was "not due diligence." Ex. 33 (Deposition of Jeffrey Hartnagel) at 330:11-25 ("Q. Lets go to the next page. Okay. It says 'Collateral,' and then under the first bullet point it's written, 'Documents are inventoried and categorized.' What does that mean as part of Nomura's, you know, diligence process? A. Nothing. … Q. Okay, what do you mean nothing? A. This is collateral. It's not due diligence.").

**Nomura Response:** Disputed. The testimony of Mr. Hartnagel quoted by plaintiff does not support the conclusion that Mr. Hartnagel thought "collateral review was 'not due diligence.'" Mr. Hartnagel's testimony was about "[d]ocuments [being] inventoried and categorized," which does not refer to "collateral review," a process that involved several different aspects. See ¶ 166, *supra*, which is incorporated by reference herein. *See also* C. Stmt. at ¶¶ 91-93, 127, 175, 224, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 178.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Hartnagel gave the cited testimony. Defendants also concede that Mr. Hartnagel's testimony extends, at a minimum, to the inventory and categorization of documents, which do not dispute was an aspect of collateral review. While Defendants

assert that "collateral review" included other aspects, they cite in support ¶ 166, which refers to "edit checks" performed by collateral analysts, not to the collateral review performed by Wells Fargo discussed in ¶¶ 174-78, hence Defendants' assertion does not specifically contradict the asserted fact and so does not create a genuine dispute of material fact. Part I.C, *supra*. The documents and testimony cited in Counterstatement ¶¶ 91-93, 127, 166, 175, and 224, also do not directly contravene the asserted fact and so do not create a genuine dispute of material fact. Part I.C, *supra*.

## VI. NOMURA SECURITIES CONDUCTED INADEQUATE DILIGENCE ON ITS WHOLE LOAN PURCHASES AND NO DILIGENCE ON THE THREE SECURITIZATIONS IT UNDERWROTE

### A. Sampling Process

1. Sampling By Channel

(a) *Loan-By-Loan Conduit Acquisitions*

179. **FHFA Statement:** Nomura's practice was to perform credit and compliance diligence on 100% of loans that it purchased through its loan-by-loan channel. Ex. 76 (Dep. Ex. 37103, email regarding due diligence attaching presentation entitled "TIAA") at NOM-FHFA_05812544 showing that the loan-by-loan sample size was 100%); Ex. 32 (Deposition of Donald McCabe) 271:21-272:8 ("Q. I just want to go back to something we talked about earlier. I think there were certain types of loans or certain types of loan channels where a hundred percent credit due diligence was performed. Do you recall what channels those were? A. As a normal course of business, we performed a hundred percent due diligence on mini bulk and on loan by loan."). There is no evidence that the 122 specific loans at issue acquired through the loan-by-loan channel received a diligence review, and the available evidence indicates no such diligence was performed on at least some of those loans. For example, Defendants produced a spreadsheet that appears to include information for loans in the NAAC 2005-AR6 Securitization. Ex. 530 (NOM-FHFA_04259048 (Oct. 31, 2005 "2381 Ins NAAC 2005-AR6 Prelim Pool Serv Etc" Due Diligence Spreadsheet) at NOM-FHFA_04259048. Filtering column G of this sheet o select "blanks," and then filtering column AR to select "LBL," identifies 117 loans that were apparently purchased through the loan- by-loan channel, *id.*, 36 of which appear in the relevant SLG of the NAAC 2005-AR6 deal. Cipione Decl. Ex. 4. These 36 loans contain no entries in columns AO or AP, which respectively identify Nomura Securities' due diligence providers and diligence results for other loans—indicating that no diligence was performed on these 36 loans. Ex. 530 (NOM- FHFA_04259048, Oct. 31, 2005

"2381 Ins NAAC 2005-AR6 Prelim Pool Serv Etc" Due Diligence Spreadsheet) at NOM-FHFA_04259048.

**Nomura Response:** Defendants do not dispute that Nomura's practice was to perform credit and compliance diligence on 100% of loans that it purchased through its loan-by-loan channel. Defendants dispute that the Cipione Declaration accurately reflects the diligence performed by Nomura. In particular, defendants dispute that 36 loans acquired through the loan-by-loan channel included in the NAAC 2005-AR6 securitization did not receive a due diligence review. Ex. 35 (Graham Tr.) at 168:8-18 ("[T]o the extent loans came in by way of loan-by-loan . . . they would have 100 percent due diligence."); Ex. 183 (Marvin Tr.) at 242:10-243:4 ("Loan-by-loan was, by defin[ition], 100 percent."); Ex. 30 (Sabo Tr.) at 229:20-230:11 ("[t]he nature of the process was 100 percent due diligence in the loan-by-loan channel.").

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 179.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not dispute that Nomura's practice was to perform credit and compliance diligence on 100% of loans that it purchased through its loan-by-loan channel.  Defendants also do not dispute that there is no evidence that 86 loans purchased through the loan-by-loan channel did not receive diligence.  While Defendants assert that the remaining 36 loans purchased through the loan-by-loan channel received a due diligence review, the testimony they cite consists only of general statements about Nomura Securities' loan-by-loan process that does not address the specific evidence cited by FHFA, and so does not create a genuine dispute of material fact.  Part I.C, *supra*.  Otherwise, Defendants provide no basis for their purported "dispute that the Cipione Declaration accurately reflects the diligence performed by Nomura."  Furthermore, any dispute about whether these 36 loans were reviewed is not material to FHFA's motion.  *Quarles*, 758 F.2d at 840.

(b)     *Mini-Bulk Acquisitions*

180.   **FHFA Statement:**  Generally, Nomura performed credit and compliance diligence on 100% of loans it bought through "mini-bulk" transactions. Ex. 33 (Deposition of Jeffrey Hartnagel) 223:6-11 ("Q. Okay.  Do you recall with -- so just to be clear on the record, so

did Nomura do a hundred percent due diligence for credit reviews on mini-bulk purchases? A. Yes."); Ex. 76 (Dep. Ex. 37103, email regarding due diligence attaching presentation entitled "TIAA" at N0M- FHFA_05612544(showing that mini-bulk trade sample sizes were 100%); Ex. 32 (Deposition of Donald McCabe) 271:21-272:8 ("Q. I just want to go back to something we talked about earlier. I think there were certain types of loans or certain types of loan channels where a hundred percent credit due diligence was performed. Do you recall what channels those were? A. As a normal course of business, we performed a hundred percent due diligence on mini bulk and on loan by loan.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 180.

**FHFA Reply:** Defendants do not dispute the asserted fact.

181. **FHFA Statement:** In general, pools over $50 million in principal balance were deemed "bulk," and those below $25 million were deemed "mini-bulk. Ex. 53 (Deposition of Joseph Kohout) at 485:21-25 ("Q. What constituted large bulks? A. Again, there is no defined definition for large bulks, but generally speaking, it would start at the 50 million dollar range."); Ex. 76 (Dep. Ex. 37103, email regarding due diligence attaching presentation entitled "TIAA" at NOM- FHFA_05612568 (showing that large bulk trades were trades greater than $30 million); Ex. 34 (NOM-FHFA_05491675, presentation entitled "Nomura Securities International, Inc. Residential Whole Loan Securitization Platform") at NOM-FHFA_05491697 (stating that mini-bulk was less than "$50mm" and bulk was "$50mm and greater"); *id.* at NOM-FHFA_05491711 (stating that mini-bulk was "$25mm or less").

**Nomura Response:** Disputed. There was not an official dividing line between mini-bulk and bulk pools, as shown by the various dollar amounts in the testimony and Exhibits quoted by plaintiff. In practice, Nomura generally defined mini-bulk purchases as trade pools with a balance of $25 million or below, Ex. 186 (NOM-FHFA_05491674) at NOM-FHFA_05491711; Ex. 34 (NOM- FHFA_05500235) at NOM-FHFA_05500269, and bulk purchases were trade pools of balances above $25 million. *Id.*

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 181.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

assert that "there was no official dividing line" between mini-bulk and bulk pools, that

assertion does not contradict the asserted fact. Moreover, Nom. Ex. 186, which is also

cited by FHFA, FHFA Ex. 34, contradicts Defendants' assertion that bulk purchases were

trade pools of balances above $25 million, FHFA Ex. 34 (NOM-FHFA_05491675, presentation entitled "Nomura Securities International, Inc. Residential Whole Loan Securitization Platform") at NOM-FHFA_05491697 (stating that mini-bulk was "less than $50mm" and bulk was "$50mm and greater"), and the other cited documents do not establish what the "practice" was for defining bulk and mini-bulk pools, and so do not create a genuine dispute of material fact. Part I.C, *supra*. Finally, any dispute over the dividing line between bulk and mini-bulk pools is not material to FHFA's motion. *See Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) ("[I]t must be remembered that the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment").

182. **FHFA Statement:** But there was no "magic" or "special break point" between the size of bulk and mini-bulk acquisition pools, and "the definition of bulk and mini-bulk sometimes crossed." Ex. 3 (Deposition of N. Dante LaRocca) 72:9-20 ("Q. Do you remember the break points -- a break point between bulk and mini-bulk? … A. No, I don't. Q. How much bigger was bulk than mini- bulk? … A. I -- I don't -- I couldn't tell you. There -- there's no magic to that either. It -- there wasn't a specific break point, so I don't know."); Ex. 53 (Deposition of Joseph Kohout) 114:7-23 ("Q. Okay. Do you remember, what is the highest percentage of a sample that was ever used for a bulk purchase for doing due diligence?… A. Occasionally, if it was a new relationship, we might -- I mean, again, the definition of bulk and mini-bulk sometimes crossed.").

**Nomura Response:** Disputed. Although there was not an official dividing line between mini-bulk and bulk pools, in practice Nomura generally defined mini-bulk purchases as trade pools with a balance of $25 million or below, and bulk purchases were trade pools of balances above $25 million. See ¶ 181, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 182.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. FHFA incorporates its response to ¶ 181 as if set forth fully herein. Defendants' assertion that

there was not an official dividing line between mini-bulk and bulk pools does not

contradict the asserted fact. Finally, any such dispute is not material to FHFA's Motion.

*Quarles*, 758 F.2d at 840.


(c)     *Bulk Acquisitions*

183.     **FHFA Statement:** Generally, for loans that it acquired in bulk transactions, Nomura
performed credit and compliance diligence on a sample of the loans in the acquisition
pool. Ex. 30 (Deposition of Steven Katz) 197:8-12 ("Q. You do understand that there
was a sample that was used for the credit and compliance aspect of due diligence at
Nomura? A. There was."); Ex. 76 (Dep. Ex. 37103, email regarding due diligence
attaching presentation entitled "TIAA") at N0M- FHFA_05612568 showing that the bulk
credit sample size was 20%).

**Nomura Response:** Disputed. Nomura often conducted 100% credit and compliance
due diligence on loans it purchased in bulk, especially in the case of a new originator
relationship. Ex. 177 (Lee Tr.) at 158:3-159:7; Ex. 36 (Orfe Tr.) at 174:4-19; Ex. 35
(Graham Tr.) at 250:9-251:21, 258:15-259:25; Ex. 26 (Kohout Tr.) at 114:7-23; Ex. 29
(Hartnagel Tr.) at 231:8-13. In some instances, Nomura conducted credit and compliance
diligence on a sample of loans in a bulk trade loan pool, employing a sample size that
was "generally never less than 20" percent of the loans in a pool. Ex. 26 (Kohout Tr.) at
114:7-23; Ex 34 (NOM-FHFA_05500235) at NOM- FHFA_05500269. In practice,
Nomura often did more than a 20% sample on the bulk trade pools. For example,
Mr. Graham testified that the samples on bulk trade pools were often "approximately 30
percent." Ex. 35 (Graham Tr.) at 140:20-25. Nomura employees testified that the firm
often reviewed 100% of the loans or used a higher sample size than the minimum,
including sample sizes higher than those used by Nomura's competitors. Ex. 177 (Lee
Tr.) at 158:3-159:7; Ex. 36 (Orfe Tr.) at 174:4-19; Ex. 35 (Graham Tr.) at 250:9-251:21,
258:15-259:25; Ex. 26 (Kohout Tr.) at 114:7-23; Ex. 29 (Hartnagel Tr.) at 231:8-13.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 183.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

assert that Nomura often conducted 100% credit and compliance diligence on loans it

purchased in bulk, Defendants also agree that in other instances Nomura performed

diligence on samples of loans in bulk pools. Therefore, Defendants' additional testimony

and documents do not contradict the asserted fact and do not create a genuine dispute of

material fact. Part I.C, *supra*. Moreover, any dispute over the proper classification of

pools as "bulk" pools is not material to FHFA's motion. *Quarles*, 758 F.2d at

840. Similarly, any dispute over whether Nomura employed a sample size that was

generally never less than 20% of the loans in a pool or whether Nomura often used a

higher sample size, including a higher sample size than its competitors, is not material to

FHFA's motion. *Quarles*, 758 F.2d at 840. To the extent Defendants rely on the

testimony of Mr. Hartnagel, Defendants elsewhere have admitted that Mr. Hartnagel's

testimony regarding Nomura's sampling practices speculative and not

admissible. *See* ¶ 233, 259.

184. **FHFA Statement:** As a matter of general practice, Nomura did not have any credit
diligence performed on unsampled loans. Ex. 30 (Deposition of Jeffrey Hartnagel) at
794:7-794:17 ("Q. Okay. So as a general practice, for loans that weren't in the sample,
what happened in terms of credit due diligence for loans that weren't in the sample? …A.
Nothing. They weren't in the sample. Q. So they didn't receive credit due diligence? A.
That is why they are not in the sample, yes."); *see also id.* at 411:8-13 ("Q. Okay. Okay.
And then it says, 'Not sampled,' 1,080. What does that mean? A. Not sampled. Q.
Okay. A. Not reviewed.").

**Nomura Response:** Disputed. Although Mr. Hartnagel gave the testimony quoted by
plaintiff, that quote is removed from the context in which it appears, and omits other
testimony and documents, including documents authored by Mr. Hartnagel, that must be
evaluated in order to fully understand the quoted excerpt. Nomura's diligence
professionals and other employees made inferences about loans not included in the credit
and compliance samples based on the results of the credit and compliance due diligence.
Spagna Decl. at ¶¶ 6, 10; see Graham Decl. at ¶¶ 6-9. Furthermore, Nomura's valuation
diligence, which was performed on all loans, served to review the appraised values for
each loan. *See* C. Stmt. at ¶¶ 64-80.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 184.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

assert that additional context is required in order to fully understand the quoted excerpt,

Defendants cite only the self-serving declarations of Mr. Spagna and Mr. Graham that

Nomura employees made inferences about loans not included in the credit and

compliance samples, which does not contradict the fact that Nomura did not perform any compliance samples, which does not contradict the fact that Nomura did not perform any credit diligence on unsampled loans. Similarly, Defendants' assertion that it performed valuation diligence on all loans does not contradict the fact that Nomura did not perform credit diligence on unsampled loans. Therefore, Defendants' assertions do not create a genuine dispute of material fact. Part I.C, *supra*.

185. **FHFA Statement:** As a general matter, Nomura did not have any credit diligence performed on unsampled loans that involved looking at the loan files. See, e.g., Ex. 53 (Deposition of Joseph Kohout) -121:14-22 ("Q. So for example, if there was a sample size of 20 percent, is it fair to say that the other 80 percent of the loans, Nomura did not give any due diligence of the credit kind that would include a look at the loan file itself? …A. Relative to a credit review, that would generally be correct."); Ex. 33 (Deposition of Jeffrey Hartnagel) at 411:8-13 ("Q. Okay. Okay. And then it says, 'Not sampled,' 1,080. What does that mean? A. Not sampled. Q. Okay. A. Not reviewed."); *see also* Ex. 24 (Deposition of John Graham) at 167:16-20 ("Q. For loans that were not in the due diligence sample, was there any check to see if those loans were in conformity with the underwriting guidelines? A. No.").

**Nomura Response:** Disputed. Although Mr. Kohout, Mr. Hartnagel, and Mr. Graham gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony and documents, including documents authored by Mr. Kohout and Mr. Hartnagel, that must be evaluated in order to fully understand the quoted excerpts. See ¶ 184, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 185.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that additional context is required in order to fully understand the quoted excerpts, Nomura fails to cite a particular portion of any transcript or cite any document, and therefore does not create a genuine dispute of material fact. Part I.E, *supra*. To the extent Nomura incorporates its response to ¶ 184, they fail to create a genuine issue of material fact for the same reasons cited in FHFA's reply to ¶ 184.

186. **FHFA Statement:** Nomura conducted a review on a sample of the loans in the following 31 Acquisition Pools (the "sampled Acquisition Pools"): Alliance CA 04,

Cameron SP04, Equifirst SP01, Equifirst SP02, Equifirst SP03, First NLC SP02, First NLC SP03, FNBN 21, Fremont SP02, Fremont SP03, Fremont SP04, Gateway 17A, Gateway 24A, Impac SP04, Mandalay SP03, Metro 10, Novastar SP02, Ownit SP02, People's Choice SP01, People's Choice SP02, Pinnacle Financial 07, Resmae SP01, Resmae SP02, Silver State 62, Silver State 63, Silver State 65, Silver State 66, SSM 58, SSM 60, Wells SP01 and WMC SP01. Cipione Decl. Ex. 2 (showing Nomura conducted credit and compliance review on less than 89% of the total loan population for 31 loan pools).

**Nomura Response:** Disputed. The Cipione Declaration does not accurately reflect the diligence performed by Nomura on the referenced Acquisition Pools. The correct sampling rates for these pools are set forth at Ex. 303 (July 9 Grice Report Revised Exhibit 3A) at 1-2; Ex. 500 (July 9 Grice Report Revised Exhibit 3B) at 1; Mishol Decl. Ex. 6.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 186.

**FHFA Reply:** Nomura does not genuinely dispute the asserted fact. The exhibit to the Mishol declaration cited by Nomura shows that each of the 31 acquisition pools cited by FHFA had sample sizes of less than 89%. *See* Mishol Decl. Ex. 6. Therefore the cited exhibit supports the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. In addition, that exhibit shows that one additional pool, SSM 57, was a sampled Pool, *id.*, which only bolsters FHFA's argument. Therefore, any dispute over the accuracy of Cipione Decl. Ex. 2 is not material to FHFA's motion. *Quarles*, 758 F.2d at 840.

187. **FHFA Statement:** The percentage of loans per securitization that came from sampled pools, unsampled pools, and the conduit channel are summarized in Ex. 54 to the Cipione Decl.

**Nomura Response:** Disputed. The Cipione Declaration does not accurately reflect the diligence performed by Nomura on the referenced Acquisition Pools. The correct credit and compliance due diligence rates for these pools are set forth at Ex. 303 (July 9 Grice Report Revised Exhibit 3A) at 1-2; Ex. 500 (July 9 Grice Report Revised Exhibit 3B) at 1; Mishol Decl. Ex. 6A at 1-2; Mishol Decl. Ex. 6B at 1. Furthermore, the rate of credit and compliance due diligence performed on the SLGs is set forth at Ex. 302 (July 9 Grice Report Revised Exhibit 4) at 1 and Mishol Decl. Ex. 7 at 1.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 187.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants assert that the correct sample sizes for the Acquisition Pools and the overall rate of credit and compliance diligence for the SLGs are set forth in exhibits to the Mishol Declaration, those sample sizes do not contradict the percentage of mortgage loans in the SLGs that came from the sampled, unsampled, and conduit channel, and therefore do not create a genuine issue of material fact. Part I.C, *supra*.  Moreover, to the extent that there is any dispute regarding differences between the exhibits to the Mishol declaration and exhibits to the Cipione declaration, those disputes are not material to FHFA's motion. *Quarles*, 758 F.2d at 840.

### B.  Nomura Securities Relied On Statistically Unsound Sampling

1.  <u>Nomura Securities' Traders Selected Samples Based Strictly On Business Considerations</u>

(a)  *No Standard Sample Size*

188.  **FHFA Statement:**  "[T]he sample sizes of due diligence changed all the time.  There was no sort of standard." Ex. 44 (Deposition of Joseph Carlucci) 242:14-242:25 ("Q. 'It would behoove us to increase the DD just based on that alone.' Do you remember, other than in this email, other times when Nomura occasionally increased due diligence percentages that it was performing? … A.  I think I might have said this earlier, each one of these trades and pools was different and the sample sizes of due diligence changed all the time.  There was no sort of standard.").

**Nomura Response:**  Disputed. Although Mr. Carlucci gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including evidence from persons actually involved in due diligence, that must be evaluated in order to fully understand the quoted excerpt. Nomura generally conducted 100% credit and compliance diligence on all loans being purchased through its conduit, or loan-by-loan, channel. Ex. 33 (NOM-FHFA_05491675) at NOM-FHFA_05491711; Ex. 35 (Graham Tr.) at 168:8-18; Ex. 183 (Marvin Tr.) at 242:10-243:4. Similarly, when Nomura purchased loans through its mini-bulk channel, Nomura generally conducted 100% credit and compliance due diligence. See *id.* In instances where it conducted credit and compliance diligence on a sample of loans in a bulk trade

loan pool, Nomura employed a sample size that was "generally never less than 20" percent of the loans in a pool, and often performed credit and compliance due diligence on 100% of the loans, especially in the case of a new originator relationship. Ex. 26 (Kohout Tr.) at 114:7-23; Ex. 34 (NOM-FHFA_05500235) at NOM-FHFA_05500269. In practice, Nomura often did more than a 20% sample on the bulk trade pools. For example, Mr. Graham testified that the samples on bulk trade pools were often "approximately 30 percent." Ex. 35 (Graham Tr.) at 140:20-25. This is demonstrated by the documents produced in this action, which show sample rates on bulk trade pools that contributed loans to the securitizations frequently far exceeded 20%, as summarized in Ex. 500 (July 9 Grice Report Revised Exhibit 3B) at 1 and Mishol Decl. Ex. 6 at 3. In addition, Nomura's Due Diligence team used its professional judgment and expertise in selecting the sample. *See* C. Stmt. at ¶¶ 129-150.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 188.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.   While Defendants assert that additional context is required in order to fully understand the quoted excerpt, Defendants' citation of additional evidence showing that sample sizes vary from 20% to 100% does not contradict Mr. Carlucci's testimony that sample sizes "changed all the time."  FHFA Ex. 44 (Deposition of Joseph Carlucci) 242:14-242:25. Therefore, the additional documents and testimony does not contradict the asserted fact and does not create a genuine issue of material fact.  Part I.C, *supra*. Any dispute over whether Nomura employed a sample size that was generally never less than 20% of the loans in a pool or whether Nomura often used a higher sample size is not material to FHFA's motion.  *Quarles*, 758 F.2d at 840.   Defendants' assertion that Nomura's diligence team "used its professional judgment and expertise in selecting the sample" is irrelevant to the sample size of the loan pools and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

189.  **FHFA Statement:**  Sample size was a "deal-by-deal decision" that "would vary." Ex. 3 (Deposition of N. Dante LaRocca) 67:3-67:7 ("Q.  From your recollection, what -- what size -- sample size was agreeable?… A.  It was a deal-by-deal decision, so it would vary.").

**Nomura Response:** Disputed. Although Mr. LaRocca gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. LaRocca, that must be evaluated in order to fully understand the quoted excerpt. See ¶ 188, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 189.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. LaRocca's testimony is accurately quoted. While Defendants assert that additional context is required in order to fully understand the quoted excerpt, Defendants fail to cite a particular portion of any transcript or documents, and therefore does not create a genuine dispute of material fact. Part I.E, *supra*. To the extent Defendants incorporate their response to ¶ 188, their response does not contain any evidence contradicting the asserted fact and Defendants fail to create a genuine issue of material fact for the same reasons cited in FHFA's reply to ¶ 188.

190. **FHFA Statement:** The sample sizes were "always different" and could range from a "hundred to teens." Ex. 49 (Deposition of Mendy Sabo) 170:4-8 ("Q. How big were the samples? … A. Again, always different. Q. What was the range? A. A hundred to teens.").

**Nomura Response:** Disputed. Although Mr. Sabo gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. Sabo, that must be evaluated in order to fully understand the quoted excerpt. See ¶ 188, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 190.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Sabo's testimony is accurately quoted. While Defendants assert that additional context is required in order to fully understand the quoted excerpt, Defendants fail to cite a particular portion of any transcript or documents, and therefore does not

create a genuine dispute of material fact. Part I.E, *supra*. To the extent Nomura

incorporates its response to ¶ 188, they fail to create a genuine issue of material fact for

the same reasons cited in FHFA's reply.

191.  **FHFA Statement:** Joseph Kohout stated that Nomura had no "firm policy" regarding sample sizes for bulk purchases and that it was "deal specific." Ex. 53 (Deposition of Joseph Kohout) at 116:12-117:9 ("Q. Okay. So according to this, is that the credit due diligence for bulk that had greater than 30 million dollars, the sample size was 20 percent? A. Again, these are very – this is very general, but what we were trying to do is wrap this around our experience. But generally speaking, that was what we were representing here, correct. Q. And when you say 'very general,' does that mean that this wasn't really a firm policy, but it varied on – A. It was deal specific – in many instances, it was deal specific, but we were trying to give general levels of due diligence. Q. And meaning, it's deal specific, in part, because it's what the sellers were allowing? … A. Correct.").

**Nomura Response:** Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. Kohout, that must be evaluated in order to fully understand the quoted excerpt. See ¶ 188, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 191.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not

dispute that Mr. Kohout's testimony is accurately quoted. While Defendants assert that

additional context is required in order to fully understand the quoted excerpt, Defendants

fail to cite a particular portion of any transcript or documents, and therefore does not

create a genuine dispute of material fact. Part I.E, *supra*. To the extent Nomura

incorporates its response to ¶ 188, they fail to create a genuine issue of material fact for

the same reasons cited in FHFA's reply.

(b)  *Sample Sizes Dictated By Sellers, Agreed To By The Trading Desk*

192.  **FHFA Statement:** Mr. Carlucci referred to originators that sold loans to Nomura as "clients." See Ex. 44 (Deposition of Joseph Carlucci) at 20:20-21:5 ("Q. Can you kind

of generally describe to me your contact with originators during your time at Nomura? A. Yes, of course. My contact with originators was generally from a relationship perspective. My role there was really to help develop relationships of clients or accounts where Nomura would have the ability to purchase assets or whole loans from them.").

**Nomura Response:** Disputed. Although defendants do not dispute that Mr. Carlucci, who was a sales representative, at some times referred to originators as "clients," he also referred to them as "sellers" or "accounts." *See, e.g.*, Ex. 579 (Carlucci Tr.) at 20:20-21:5 (referring to an originator as an account), 221:15-222:14 (referring to an originator as a seller). Further, Nomura's diligence sampling processes were not dictated by originators, and Nomura reserved the right to upsize all diligence samples. *See, e.g.*, Ex. 15 (Prahofer Tr.) at 31:20-32:7. Randall Lee, who worked on Nomura's RMBS trading desk, testified that Nomura "often heard from originators that we were doing more due diligence than others." Ex. 177 (Lee Tr.) at 156:12-20. He recalled that the Nomura "sales force [was] complaining that our due diligence was - - we did too much due diligence, and originators didn't like that." *Id.* at 157:4-12.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 192.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Carlucci's testimony is accurately quoted. While Defendants assert that Mr. Carlucci also referred to clients as "sellers" or "accounts," that fact does not contradict the asserted fact, and therefore does not create a genuine issue of material fact. Part I.C, *supra*. Defendants' assertions that Nomura's diligence sampling processes were not dictated by originators, and Nomura reserved the right to upsize all diligence samples, do not contradict the asserted fact and therefore do not create a genuine dispute of material fact. Part I.C, *supra*.

193. **FHFA Statement:** Mr. Kohout referred to originators that sold loans to Nomura as "client[s]." Ex. 53 (Deposition of Joseph Kohout) at 324:9-25 ("Q. And tell me again the total amount of data that the real estate professional has in rendering its broker price opinion? A. . . . So the client, the seller, would send the appraisal to Ocwen.").

**Nomura Response:** Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. Kohout, that must be evaluated in order to fully understand the quoted excerpt. For example, Mr. Kohout's

testimony quoted by plaintiff indicates that Mr. Kohout also referred to originators as "seller[s]." *See also* ¶ 192, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 193.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Kohout's testimony is accurately quoted. Defendants' assertion that Mr. Kohout also referred to clients as "sellers" does not contradict the asserted fact, and therefore does not create a genuine issue of material fact. Part I.C, *supra*. Defendants' assertion that the additional context is required in order to fully understand the quoted excerpt, fails to cite a particular portion of any other transcript or documents, and therefore does not create a genuine dispute of material fact. Part I.E, *supra*. To the extent Defendants incorporate its response to ¶ 192, they fail to create a genuine issue of material fact for the same reasons cited in FHFA's reply to ¶ 192.

194.   **FHFA Statement:** Mr. Marvin referred to originators that sold loans to Nomura as "client[s]." Ex. 31 (Deposition of Brett Marvin) at 303:8-24 ("Q. . . . [H]ow might a timing issue require or lead Nomura to purchase a loan that had a critical exception or a missing document? . . . A. . . . [W]e would not have done that given the size, given the track record or whatever, but given a client of, you know, significant size and/or track record, we would do a funding, money would change hands knowing there were still open items to be reconciled because we know there was going to be a reconciliation.").

**Nomura Response:** Disputed. Although defendants do not dispute that Mr. Marvin at some times referred to originators as "clients," he also used other terms, including "sellers" and "accounts." *See, e.g.*, Ex. 183 (Marvin Tr.) at 159:7-15 (referring to originators as accounts), at 303:12-24 (referring to originators as sellers). *See also* ¶ 192, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 194.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Marvin's testimony is accurately quoted. Nomura's assertion that Mr. Marvin also referred to clients as "sellers" and "accounts" does not contradict the

asserted fact, and therefore does not create a genuine issue of material fact. Part I.C, *supra*. Defendants' assertion that the additional context is required in order to fully understand the quoted excerpt, fails to cite a particular portion of any other transcript or documents, and therefore does not create a genuine dispute of material fact. Part I.E, *supra*. To the extent Defendants incorporate its response to ¶ 192, they fail to create a genuine issue of material fact for the same reasons cited in FHFA's reply to ¶ 192.

195. **FHFA Statement:** Mr. Marvin also referred to originators that sold loans to Nomura as "customer[s.]" See, e.g., Ex. 31 (Deposition of Brett Marvin) at 203:15-204:2 ("Q. . . . Well – okay, and then would sales have relayed that desire from the originator internally and the decision be made internally? . . . [A.] Sales coverage would relay the request of the customer to buy certain – buy as many loans as possible out of their package to the trading desk. The trading desk/credit would review and go through their normal processes.").

**Nomura Response:** Disputed. Although defendants do not dispute that Mr. Marvin at some times referred to originators as "customers," he also referred to them using other terms, including "sellers" and "accounts." See ¶¶ 192, 194, *supra*, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 195.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Marvin's testimony is accurately quoted. Nomura's assertion that Mr. Marvin also referred to customers as "sellers" and "accounts" does not contradict the asserted fact, and therefore does not create a genuine issue of material fact. Part I.C, *supra*. Defendants' assertion that the additional context is required in order to fully understand the quoted excerpt, fails to cite a particular portion of any other transcript or documents, and therefore does not create a genuine dispute of material fact. Part I.E, *supra*. To the extent Defendants incorporate its response to ¶¶ 192, 194, they fail to

create a genuine issue of material fact for the same reasons cited in FHFA's reply to ¶¶ 192, 194.

196. **FHFA Statement:** Mr. Carlucci was hired to be "sort of a client relationship person" with originators that sold loans to Nomura, and to "mak[e] sure the client [was] happy, mak[e] sure that we ha[d] access to what they were selling[.]" Ex. 44 (Deposition of Joseph Carlucci) at 22:7-23:5 ("Q. Kind of like a what you were hired to do and what you did on a daily basis. A. Sure. I was hired to come on and be sort of a client relationship person, initially working with Don McCabe on servicing accounts that he had where he didn't have the time day to day to focus on, as he was running the group, managing the group, and then build new relationships of my own for a client base of originators that could sell loans to Nomura. That's I guess what I was brought on to do. My day to day was really focused on, again, dealing with these clients, traditional sort of client management stuff, making sure the client is happy, making sure that we have access to what they were selling and be the conduit between the trading desk and the client who was actually sort of pricing and buying the loans.").

**Nomura Response:** Disputed. The testimony cited by plaintiff shows that Mr. Carlucci testified that he was hired to be a "client relationship person." Pl. Exhibit 44 (Deposition of Joseph Carlucci) at 22:7-23:5.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 196.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants agree that Mr. Carlucci was hired to be a "client relationship" person, and do not otherwise provide a basis to disagree with the asserted fact or otherwise indicate Mr. Carlucci's testimony was inaccurately quoted.

197. **FHFA Statement:** Mr. Marvin was concerned that "if Nomura denied … an originator request, to refuse to purchase a loan, that the originator may not shop loans to Nomura again in the future." Ex. 31 (Deposition of Brett Marvin) at 205:21-206:2 ("Q. Okay, but was there concern that if, you know, Nomura denied an investor – or excuse me, an originator request, to refuse to purchase a loan, that the originator may not shop loans to Nomura again in the future? A. Absolutely.").

**Nomura Response:** Disputed. Although Mr. Marvin gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. Marvin, that must be evaluated in order to fully understand the quoted excerpt. See ¶192, *supra*, which is incorporated by reference herein. There is no evidence that Nomura succumbed to

pressure from originators to purchase loans. Instead, the record reflects that Nomura refused to purchase loans where it deemed appropriate. See C. Stmt. at ¶¶ 195-196, 222-252; Mishol Decl. Ex. 14.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 197.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that additional context is required in order to fully understand the quoted excerpt, Defendants cite to ¶ 192, which does not address whether an originator would refuse to shop loans to Nomura if Nomura denied the originator's request to purchase a loan. Although Defendants assert that there is no evidence that Nomura succumbed to pressure from originators to purchase loans, that assertion is also irrelevant to whether Mr. Marvin was concerned that originators might not do so. Therefore, Defendants have not created a genuine dispute of material fact. Part I.C, *supra*.

198. **FHFA Statement:** John Graham recognized that larger sample sizes or not sampling at all was "operationally more onerous" for the seller. Ex. 24 (Deposition of John Graham) at 143:25-144:18 ("Q. Let me – just hold on. I – I want to understand really the 'operationally more onerous.' What – what was onerous about it? Meaning what – what were really what it took in terms of people and money and costs? What – what--what made doing due diligence onerous? … A. What made doing 100 percent diligence on a bulk pool onerous? Any number of things the sampling was intended to mitigate or alleviate. To the extent, as an example, a seller is – a seller's staff is working with directly or indirectly through a third-party due diligence firm, the review of mortgage loans, to the exclusion of doing anything else, that is operationally onerous for the seller.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 198.

**FHFA Reply:** Defendants do not dispute the asserted fact.

199. **FHFA Statement:** Randall Lee acknowledged that "[t]he originator would be enticed not to have loans fail due diligence." Ex. 43 (Deposition of Randall Lee) at 199:4-25 ("Q. So it would be fair to say originators had a strong, a strong incentive to not have their loans go through and then fail the due diligence? … A. That's correct. The originator

would be enticed not to have loans fail due diligence. Q. And do you think that's one of the reasons why originators preferred that sponsors had less of a sample of due diligence, because they knew that any loans that failed that due diligence would be removed from what was being purchased? … A. As I said, I'm not sure exactly how an originator would balance all of the different parts of a bid to determine what they favored the most and what they favored the least.").

**Nomura Response:** Disputed. While defendants do not dispute that originators had an incentive to originate loans that would pass due diligence review, plaintiff's citation includes only a portion of Mr. Lee's testimony and therefore lacks the context needed to understand it fully. Mr. Lee also testified that originators have "a strong incentive" to originate loans that pass due diligence review. Pl. Exhibit 43 (Deposition of Randall Lee) at 199:4-25. *See also* ¶ 192, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 199.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura agrees that "originators had an incentive to originate loans that would pass due diligence review," which is entirely consistent with the asserted fact. Similarly, although Nomura asserts that the "citation includes only a portion of Mr. Lee's testimony and therefore lacks the context needed to understand it fully," Defendants cite only to the exact same testimony and quote the exact same language. To the extent Nomura incorporates its response to ¶ 192, they fail to create a genuine issue of material fact for the same reasons cited in FHFA's reply to ¶ 192. Furthermore, ¶ 192 is irrelevant to whether originators had an incentive to not have loans fail diligence, and to the extent Defendants' response to ¶ 192 asserts originators complained about too much due diligence, is entirely consistent with the asserted fact.

200. **FHFA Statement:** Sellers "always would push for [Nomura] to buy as much as [it] would"—this was "a common occurrence." Ex. 33 (Deposition of Jeffrey Hartnagel) at 358:4-11 ("Q. Okay. Was that a common thing where originators would come back and suggest that loans that you had recommended for denial, that Nomura would, actually, would in – instead accept? A. They always would push for us to buy as much as we would."); Ex. 31 (Deposition of Brett Marvin) at 202:18-203:5 ("Q. . . . Do you recall instances of pressure for – from originators to buy – for Nomura to purchase loans that

Nomura was considering rejecting? . . . [A.] Yes. Q. Was that – okay. Was that a common occurrence? A. I'd say yes.").

**Nomura Response:** Disputed. Although Mr. Hartnagel gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. Hartnagel, that must be evaluated in order to fully understand the quoted excerpt. For example, there is no evidence that Nomura succumbed to pressure from originators to purchase loans that did not satisfy Nomura's standards. To the contrary, Nomura made a decision about whether to include or exclude loans from acquisition pools based on due diligence results. See Ex. 26 (Kohout Tr.) at 231:12-18, 233:7-14, 240:2-243:22, 274:12-20; Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-653:24. Sellers then objected to the denial of properly underwritten loans that did not meet Nomura's own standards. *See, e.g.*, Ex. 321 (NOM-FHFA_05340340) at NOM-FHFA_05340340; Ex. 324 (NOM-FHFA_05107658) at NOM-FHFA_05107658; Ex. 320 (NOM-FHFA_05276757) at NOM-FHFA_05276757-6758.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 200.

**FHFA Reply:** Defendants do not genuinely contradict the asserted fact. Defendants do not dispute that Mr. Hartnagel's and Mr. Marvin's testimony was accurately quoted. While Defendants assert additional context is required in order to fully understand the quoted excerpt, Defendants do not point to any evidence that contradicts the asserted fact. Although Defendants' assert that Nomura made a decision about whether to include or exclude loans from acquisition pools based on due diligence results, that assertion does not contradict Mr. Hartnagel or Mr. Marvin's testimony about the actions of the sellers. Furthermore, Nomura's assertion that "[s]ellers then objected to the denial of properly underwritten loans that did not meet Nomura's own standards," supports the asserted fact that sellers would push Nomura to buy as much as it would. Therefore the cited documents and testimony do not contradict the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Moreover, any dispute about whether Nomura succumbed to pressure from originators to purchase loans, or whether Nomura made its decisions to include or exclude loans based on the diligence results, or whether Nomura

denied any loans that were properly underwritten but did meet Nomura's own standards, in not material to FHFA's motion. *Quarles*, 758 F.2d at 840. Furthermore, contrary to Defendants assertion, Nom. Ex. 321 indicates that Mr. Hartnagel was "trying to research a rationale" for rejecting loans for the originator, and that Mr. Hartnagel "recommend[ed] that on future trades we use our other Due Dili vendor (AMC) to verify if we have the same issues we are currently having with Clayton." Nom. Ex. 321 (NOM-FHFA_05340340) at NOM-FHFA_05340340.

201. **FHFA Statement:** The Diligence Group was "consulted" regarding whether a sample should be used for due diligence. Ex. 49 (Deposition of Mendy Sabo) at 168:11-168:22 ("Q. Okay. To your knowledge, was the due diligence people involved in determining whether a sample would be used for due diligence for any purchase of loans? A. Yes. Q. Okay. What were the circumstances when that happened? A. It depended on the particular seller, the experience that due diligence had with the seller. It was from our perspective, from a due diligence perspective, when they consulted with us.").

**Nomura Response:** Disputed. Although Mr. Sabo gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. Sabo, that must be evaluated in order to fully understand the quoted excerpt. Mr. Sabo testified that the Due Diligence Group was "in charge of picking the sample that would be used for due diligence." Ex. 30 (Sabo Tr.) at 100:9-12. Joseph Kohout testified that "[f]or [some] trades, my credit team determined the adverse nature of the samples." Ex. 26 (Kohout Tr.) at 98:10-24. *See also* Ex. 182 (Katz Tr.) at 205:21-206:2, 210:16-22; Ex. 314 (Murphy Tr.) at 200:17-202:6.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 201.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that additional context is required in order to fully understand the quoted excerpt, Defendants' citation to evidence regarding the Diligence Group's role in picking a sample does not contradict the asserted fact that the Diligence Group would be "consulted" about whether a sample should be used for due diligence. Therefore, the cited evidence does not create a genuine issue of material fact. Part I.C, *supra*. Moreover, Defendants have

conclusively admitted in their response to ¶ 202 that the Diligence Group was involved in

determining whether a sample would be used.  There can therefore be no genuine dispute

as to the asserted fact. Part I.F, *supra*.

202.  **FHFA Statement:**  Whether a purchase was sampled  "was determined at bid" by "[s]ales and trading." Ex. 49 (Deposition of Mendy Sabo) at 167:21-168:10 ("Q.  For some loan purchases, is it the case that due diligence or at least some part of it must be done on a sample basis? A.  Yes. Q.  Okay. Which purchases went through sampling? A.  That was determined at bid. Q.  By whom? A.  Sales and trading. Q.  So sales and trading were the ones to determine whether due diligence would be done on a sample basis for some group of loans? A.  Generally speaking.")

**Nomura Response:**  Disputed. Although Mr. Sabo gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. Sabo, that must be evaluated in order to fully understand the quoted excerpt. For example, the Due Diligence Group was involved in determining whether a sample would be used, and how large a sample, for due diligence for any purchase of loans.  *See* ¶ 201, *supra*, which is incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 202.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants'

assertion that the Diligence Group "was involved in determining whether a sample would

be used," does not contradict the asserted fact and is in accord with the asserted fact in ¶

201, which Defendants purportedly disputed.  Defendants' assertion that the Diligence

Group was involved in determining how large a sample was is unsupported by any of the

evidence cited in Defendants response to ¶ 201.

203.  **FHFA Statement:**  The Diligence Group "wasn't part of th[e] process" for selecting the sample size, and "sales and trading" would communicate the sample size when they entered into a bid or trade. Ex. 49 (Deposition of Mendy Sabo) at 169:16-170:3 ("Q. And is it true that the sellers, when they would solicit bids, would provide a maximum amount of sample for which due diligence could be done?  … A. I don't know.  I wasn't part of that process.  Q. So where did you find out whether there was going to be a sample?  A.  Sales and trading communicated an incoming bid or an incoming trade that they have entered into.").

**Nomura Response:** Disputed. Although Mr. Sabo gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents, including documents authored by Mr. Sabo, that must be evaluated in order to fully understand the quoted excerpt. For example, the testimony of Mr. Sabo quoted by plaintiff indicates that Mr. Sabo was testifying about his personal involvement in the bidding process, not about the Due Diligence Group as a whole. Ex. 30 (Sabo Tr.) at 169:16-170:3 ("A. I don't know, I wasn't part of that process."). The testimony of Mr. Sabo quoted by plaintiff therefore does not support plaintiff's conclusion that "[t]he Diligence Group 'wasn't part of the process' for selecting the sample size." Furthermore, the Due Diligence Group was involved in determining whether a sample would be used, and how large a sample, for due diligence for any purchase of loans. *See* ¶ 201, *supra*, which is incorporated by reference herein. Additionally, Nomura reserved the right to increase, or "upsize," the level of due diligence performed beyond any term that was included in the bid process on an as needed based on initial findings of the Due Diligence Group. Ex. 35 (Graham Tr.) at 149:4-19, 174:18-176:5; Ex. 15 (Prahofer Tr.) at 26:15-28:7. For example, the sample size might have been expanded because the originator was an unfamiliar counterparty, because a loan pool included a certain type of loan product, or because initial due diligence revealed a concerning trend. Ex. 35 (Graham Tr.) at 149:4-19, 174:18-176:5; Ex. 177 (Lee Tr.) at 169:16-170:12; Ex. 183 (Marvin Tr.) at 248:3-17; Ex. 26 (Kohout Tr.) at 99:19-102:24.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 203.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Sabo's testimony was accurately quoted. Defendants do not offer any evidence or argument disputing that sales and trading communicated the sample size when they entered into a bid or trade. While Defendants assert that Mr. Sabo's testimony refers only to himself, he was part of the Diligence Group and therefore would have been involved in the process for setting sample sizes if the Diligence Group was involved, and any dispute regarding whether Mr. Sabo was referring to just himself or the Diligence Group is not material to FHFA's motion. *Quarles*, 758 F.2d at 840. To the extent Defendants rely on their response to ¶ 201, that response does not create a genuine issue of material fact for the reasons stated in FHFA's reply to ¶ 201. Furthermore, Defendants' assertion that the Diligence Group was involved in determining how large a

sample was is unsupported by any of the evidence cited in Defendants' response to ¶ 201.

Defendants' argument and assertions regarding Nomura's process for upsizing samples,

including whether it reserved the right to upsize and the circumstances in which it would

upsize, does not contradict the asserted fact, which pertains to the initial sample size, and

therefore cannot create a genuine issue of material fact. Part I.C, *supra*.

204. **FHFA Statement:** The sample selection for the ResMAE SP02 Pool was "desk driven." Ex. 77 (NOM-FHFA_05112103, email regarding nheli-2007-3_tape_termsheet_v3) at NOM- FHFA_05112103 (summary of diligence performed on the ResMAE SP02 Acquisition Pool referring to sample as "desk driven.")

    **Nomura Response:** Disputed. Although defendants do not dispute that plaintiff's Exhibit 77 contains this statement, the statement omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, the Due Diligence Group was involved in determining whether a sample would be used, and how large a sample, for due diligence for any purchase of loans. See ¶¶ 201, 203, *supra*, which are incorporated by reference herein.

    **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 204.

    **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not

dispute that the document was accurately quoted. Defendants' argument that the

Diligence Group was involved in determining whether a sample was used and how large

the sample was does not contradict how the sample for the ResMAE SP02 Pool was

selected. Moreover, the evidence cited in ¶¶ 201, 203 is generally testimony and

documentary evidence, which does not address the ResMAE SP02 Pool or how samples

are selected, and therefore cannot create a genuine issue of material fact.

205. **FHFA Statement:** The Trading Desk had the "final decision" on the sample size that Nomura would agree to with the seller for any given Acquisition Pool. Ex. 46 (Deposition of Neil Spagna) at 219:6-220:12 ("Q. … So you continue working there, Nomura, until November 2007. Any time after February 9th until November 2007 that you direct Nomura to stop sampling and just due diligence every single loan? … A. You know, that, again, that wasn't my -- that wasn't my job to make that decision. It was my

job to, you know, report, you know, what -- what we were seeing in the deals that we were underwriting as it related to samples, as it related to just overall risk. And it-- and -- and it was also, I felt, my job to report on, you know, essentially what was a, you know, a membership drive for a bond association and the information that I found there because I thought it was important. Q. Whose job was it to decide whether Nomura felt that it was no longer appropriate to sample but it should actually due diligence every loan? A. You know, that -- that final decision would come from -- from the Trading Desk who would -- you know, who was in charge of, you know, overall, you know, what we -- what we acquired.").

**Nomura Response:** Disputed. Although defendants do not dispute that the Trading Desk played a role in determining original sample size as one of the terms of its bid, the Due Diligence Group was involved in determining whether a sample would be used, and how large a sample, for due diligence for any purchase of loans. See ¶ 201, *supra*, which is incorporated by reference herein. Furthermore, the testimony of Mr. Spagna quoted by plaintiff was given in response to the introduction of a specific email from Mr. Spagna sent on February 9, 2007 regarding a meeting with various market participants. See Ex. 580 (NOM-FHFA_05504096) at 05504096-097. Furthermore, the testimony quoted by plaintiff is in response to a general question about the general policy of sampling and does not address the sample size for "any given Acquisition Pool," as suggested by plaintiff. Additionally, the excerpts quoted by plaintiff omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. See ¶¶ 201, 203, *supra*, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 205.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not present any evidence contradicting the fact that the Trading Desk made the final determination as to the sample size, asserting only that the Diligence Group was also involved in determining whether a sample would be used and how large a sample was, which does not contradict the asserted fact. Part I.C, *supra*. To the extent Defendants rely on their response to ¶¶ 201, 203, their response does not create a genuine dispute of material fact for the reasons stated in FHFA's replies. Defendants provide no reason why the fact that Mr. Spagna's response was in the context of a specific email exchange contradicts the asserted fact. Defendants' assertion that a general policy does not address "any given Acquisition Pool" does not create a genuine issue of material fact. Part I.C,

*supra*.  Any dispute over whether Mr. Spagna's testimony applies to any given

Acquisition Pool is not material to FHFA's motion.  *Quarles*, 758 F.2d at 840.

206.    **FHFA Statement:**  In April of 2005, Steven Katz, Head of Subprime and Fixed trading on the Trading Desk, wrote to Joseph Kohout: "After the sample is selected, a spreadsheet should be prepared by credit and sent to me and Dave Haynie for sign-off. … The sample is NOT FINALIZED until the desk signs off and therefore should NOT be sent out." Ex. 78 (Dep. Ex. 21909, email dated April 21, 2005 from Steven Katz to Joseph Kohout, et. al, regarding Fremont/Nomura Trade - Settlement 5/20/05) at NOM-FHFA_05500892.

**Nomura Response:**  Disputed. Although defendants do not dispute that Mr. Katz sought to approve samples in order to ensure their adequacy, his quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. Mr. Marvin explained that the email exchange in plaintiff's Exhibit 78 reflects a "spat between essentially Joe Kohout and Steve Katz that unfortunately made it into email because none of those things actually reflect what was actually – what the resolution was." Ex. 183 (Marvin Tr.) at 269:16-24. Furthermore, the Due Diligence Group was involved in determining whether a sample would be used, and how large a sample, for due diligence for any purchase of loans. See ¶ 201, *supra*, which is incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 206.

**FHFA Reply:**  Defendants do not genuinely dispute the disputed fact.  Defendants do not

dispute that the document is accurately quoted, nor that Mr. Katz sought to approve

samples.  Defendants' assertion that the Diligence Group was involved in determining

whether there was a sample size and how large the sample was does not address whether

Mr. Katz required the sample selection to be approved by himself, nor does the fact that

the Diligence Group was involved in the sample contradict the asserted fact that Mr. Katz

was required to approve the sample selection.  While Defendants assert that additional

context is needed in order to fully understand the quoted excerpt, they cite only testimony

of Mr. Marvin that does not contradict the asserted fact as it states only that the email did

not reflect the resolution of the "spat" between Mr. Kohout and Mr. Katz, and so does not

contradict the cited document.  Part. I.C, I.F, *supra*.  Indeed, Nomura has conclusively

admitted in C. Stmt. ¶ 138 that Nomura's collateral analysts sometimes worked with the

Diligence Group in selecting samples.  Therefore Defendants' assertion does not

contradict the cited document.  Part. I.C, I.F, *supra*.  To the extent there is a dispute over

whether the Trading Desk was required to signoff before a sample was finalized, that

dispute is not material to FHFA's motion.  *Quarles*, 758 F.2d at 840.  To the extent

Defendants rely on their response to ¶ 201, their response does not create a genuine

dispute of material fact for the reasons stated in FHFA's reply to ¶ 201.

207. **FHFA Statement:**  In May 2006, Mendy Sabo wrote to Mr. Katz and Randall Lee on the Trading Desk:  "Steve/Randy, Attached is the sample pulled for the Fremont trade for you review and approval. On the Sample tab there is the breakout of how we chose it. Please approve ASAP so Fremont can start pulling the files for DD. Let me know if you have any questions." Ex. 79 (Dep. Ex. 37906, email dated May 24, 2006 from Mendy Sabo to Steven Katz and Randall Lee, regarding Fremont SP03 Sample) at NOM-FHFA_05270680.

**Nomura Response:**  Disputed. Although defendants do not dispute that Mr. Sabo sought approval from the trader responsible for purchasing the pool before sending out the due diligence sample, as plaintiff's Exhibit 79 shows, the Due Diligence Group was involved in determining the due diligence sample for that pool. See ¶ 201, *supra*, which is incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 207.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not

dispute that Mr. Sabo sought approval from the trader responsible for purchasing the pool

before sending out the due diligence sample.  Defendants' assertion that the Diligence

Group was involved in determining the sample does not contradict the asserted fact.

208. **FHFA Statement:**  In August 2006, Christopher Scampoli emailed Brian Murphy at the Trading Desk: "Attached is the sample I selected for the FNBN 21 trade.  Are [you] the right person to approve the sample for these ARM loans? . . . Let me know your thoughts. . . . Or if you would direct me to the right person." Ex. 80 (Dep. Ex. 38518, email from

Christopher Scampoli to Brian Murphy dated Aug. 31, 2006, regarding "FNBN 21") at NOM-FHFA_05032287.

**Nomura Response:** Disputed. Although defendants do not dispute that Mr. Scampoli sought approval from the trader responsible for purchasing the pool before sending out the due diligence sample, as plaintiff's Exhibit 80 shows, the Due Diligence Group was involved in determining the due diligence sample for that pool. See ¶ 201, *supra*, which is incorporated by reference herein. Furthermore, in Exhibit 80, Mr. Scampoli also emails Neil Spagna and Mendy Sabo in the Due Diligence Group: "Neil--- If you want to look it over and let me know your thoughts . . . that would be terrific." *See also* ¶¶ 202, 203, *supra*, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 208.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Scampoli sought approval from the trader responsible for purchasing the pool before sending out the due diligence sample. Defendants' assertion that the Diligence Group was involved in determining the sample and that Mr. Spagna also sought feedback from Mr. Spagna does not contradict the asserted fact.

<br>

(c)     *Sample Sizes Set By Stipulation For The Acquisition Pools*

209.   **FHFA Statement:** For individual Acquisition Pools, the stipulations governing the trade "were agreed to by the Trading Desk." Ex. 46 (Deposition of Neil Spagna) at 175:15-176:6 ("Q. Were you part of setting stipulations? . . . A. The individual stipulations that were agreed – agreed upon for each deal were agreed to by the Trading Desk. Q. Was the Due Diligence Team, the – the three of you, involved at all in crafting or negotiating those stipulations? A. The stipulations would be we had a general list of stipulations to – to our trade and – and that's what the Trading Desk would and the Sales Team would say this is – 'Our bid is contingent upon these stips.' And then from there it is possible that those stips could be – could be negotiated.").

**Nomura Response:** Disputed. Although defendants do not dispute the Trading Desk agreed to the terms of the trades for Acquisition Pools, the Due Diligence Group was involved in determining whether a sample would be used, and how large a sample, for due diligence for any purchase of loans. See ¶¶ 201, *supra*, which is incorporated by reference herein. Furthermore, Nomura reserved the right to increase, or "upsize," the level of due diligence performed beyond any term that was included in the bid process on an as needed based on initial findings of the Due Diligence Group. See ¶¶ 203, *supra*, which is incorporated by reference herein. In addition, Nomura's general trade stipulations contained no restriction on the size of the diligence sample. *See, e.g.*, Ex. 232

(NOM-FHFA_05066340) at NOM-FHFA_05066340; see also Ex. 233 (NOM-FHFA_05066349) at NOM-FHFA_05066349; Ex. 234 (NOM-FHFA_05266731) at NOM- FHFA_05266731; Ex. 235 (NOM-FHFA_05324872) at NOM-FHFA_05324872; Ex. 236 (NOM-FHFA_05338819) at NOM-FHFA_05338819; Ex. 237 (NOM-FHFA_05361051) at NOM-FHFA_05361051; Ex. 238 (NOM-FHFA_05368895) at NOM-FHFA_05368895; Ex. 239 (NOM-FHFA_05516995) at NOM-FHFA_05516995.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 209.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the Trading Desk agreed to the terms of the trades for Acquisition Pools. Defendants' assertions that the Due Diligence Group was involved in determining whether a sample would be used, and how large a sample was, does not contradict the asserted fact. Whether or not Nomura reserved the right to upsize and whether the general trade stipulations restricted the sample size also does not contradict the asserted fact. Moreover, Nom. Exs. 232-239 are bid stipulations sent to diligence vendors or general bid stipulations not specifically applicable to any particular trade, and contain no information as to whether Nomura had limited its diligence sample size.

210. **FHFA Statement:** Of the 31 sampled Acquisition Pools feeding into the SLGs at issue, these 16 Acquisition Pools had sample sizes that were capped by stipulation between Nomura and the Seller: Equifirst SP01 (50%), Equifirst SP02 (50%), Equifirst SP03 (50%), First NLC SP02 (403 loans), First NLC SP03 (181 loans), Fremont SP02 (25%), Gateway 17A (41 loans), Gateway 24A (48 loans), Impac SP04 (100 loans), NovaStar SP02 (50%), Ownit SP02 (25%), Peoples Choice SP01 (25%), Peoples Choice SP02 (300 loans), Pinnacle Financial 07 (40%), Silver State 62 (30%), Silver State 66 (30%). Ex. 81 (NOM-FHFA_04464662, Fremont SP02 Trade Confirmation) at NOM-FHFA 04464663 (25%); (NOM-FHFA 04479131, Ownit SP02 Trade Confirmation) at NOM-FHFA 04479134 (25%); (NOM-FHFA_04475031, First NLC SP02 Trade Confirmation) at NOM-FHFA_04475032 (403 loans); (NOM-FHFA_04473240, Equifirst SP01 Trade Confirmation) at NOM-FHFA_04473244 (50%); Ex. 85 (NOM-FHFA_04474103, Peoples Choice SP01 Trade Confirmation) at NOM-FHFA_04474106 (25%); Ex. 86 (NOM- FHFA_04475599, Equifirst SP02 Trade Confirmation) at NOM-FHFA_04475603 (50%); Ex. 87 (NOM-FHFA_05086538, Peoples Choice SP02 Trade Confirmation) at NOM-FHFA_05086539 (300 loans); Ex. 88 (NOM-FHFA_05203220, Impac SP04 Trade Confirmation) at NOM- FHFA_05203221 (100 loans); Ex. 89 (NOM-FHFA_05207741, Silver State 62 Trade Confirmation) at NOM-FHFA_05207744 (30%);

Ex. 90 (NOM-FHFA_05235602, First NLC SP03 Trade Confirmation) at NOM-FHFA_05235603 (181 loans); Ex. 91 (NOM- FHFA_05238392, NovaStar SP02 Trade Confirmation) at NOM-FHFA_05238393 (50%); Ex. 92 (NOM-FHFA_05240103, Equifirst SP03 Trade Confirmation) at NOM-FHFA_05240106 (50%); Ex. 93 (NOM-FHFA_05706486, Gateway 24A Trade Confirmation) at NOM-FHFA_05706486 (48 loans); Ex. 94 (NOM-FHFA_05706515, Gateway 17A Trade Confirmation) at NOM-FHFA_05706515 (41 loans); Ex. 95 (NOM-FHFA_05819958, Silver State 66 Trade Confirmation) at NOM-FHFA_05819961 (30%); Ex. 96 (NOM-FHFA_05894075, Pinnacle Financial 07 Trade Confirmation) at NOM-FHFA_05894076 (40%).

**Nomura Response:** Disputed. The sample size for several of the referenced acquisition pools exceeded the allegedly "capped" sample size, including Gateway 17A, People's Choice SP01, People's Choice SP02, Silver 62, and Silver State 66, which is evidence that the supposed "caps" were not limitations on sample size where Nomura judged a larger sample appropriate. *See* Ex. 500 (July 9 Grice Report Revised Exhibit 3B) at 1; Mishol Decl. Ex. 6 at 3. Table 1 summarizes this information:

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 210.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited trade stipulations provided for limits on the due diligence sample size for 11 of the 16 cited Acquisition Pools. For the remaining five Acquisition Pools, Nomura does not dispute that the trade stipulations for those pools contained caps for the due diligence sample size. Nomura also does not present any evidence as to why the sample sizes for these five Pools exceeded the caps set in the trade stipulations; specifically, Nomura presents no evidence that these sample sizes were increased as a result of Nomura's initial due diligence on these Pools. Furthermore, the differences in sample sizes are slight: for Gateway 17A, 41 loans (23.9%) stipulated versus 45 loans (26.3%) reviewed; for People's Choice SP01, 25% stipulated versus 26.5% reviewed; for People's Choice SP02, 300 loans (26.4%) stipulated versus 319 loans (28.1%) reviewed; for Silver State 62, 30% stipulated versus 32.4% reviewed; and for Silver State 66, 30% stipulated versus 40.3% reviewed. These slight differences do not create a dispute material to FHFA's motion. *Quarles*, 758 F.2d at 840.

2.     <u>There Is No Evidence That Nomura Securities Randomly Selected</u>
<u>Diligence Samples Of Loans From Acquisition Pools</u>

211.   **FHFA Statement:**  The percentage of loans sampled from Acquisition Pools that back the SLGs is summarized in Ex. 2 to the Cipione Decl.

      **Nomura Response:**  Disputed. The Cipione Declaration does not accurately reflect the diligence performed by Nomura on the referenced Acquisition Pools.  The correct figures can be found at Ex. 303 (July 9 Grice Report Revised Exhibit 3A) at 1-2; Ex. 500 (July 9 Grice Report Revised Exhibit 3B) at 1; Mishol Decl. Ex. 6.

      **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 211.

      **FHFA Reply:**  Defendants do not genuinely dispute a material fact.  Any dispute

regarding the difference between Mishol Decl. Ex. 6 and Cipione Decl. Ex. 2 is not

material to FHFA's motion.  *Quarles*, 758 F.2d at 840.

212.   **FHFA Statement:**  Of these 194 Acquisition Pools, these 31 Acquisition Pools were bulk or mini-bulk pools, from which Nomura drew samples to conduct diligence: Alliance CA 04, Cameron Financial SP04, Equifirst SP01, Equifirst SP02, Equifirst SP03, FNBN 21, First NLC SP02, First NLC SP03, Fremont SP02, Fremont SP03, Fremont SP04, Gateway 17A, Gateway 24A, Impac SP04, Mandalay SP03, Metro 10, Novastar SP02, Ownit SP02, Peoples Choice SP01, Peoples Choice SP02, Pinnacle Financial 07, Resmae SP01, Resmae SP02, SSM 58, SSM 60, Silver State 62, Silver State 65, Silver State 63, Silver State 66, WMC SP01, and Wells SP01.  Ex. 2 to the Cipione Decl. (showing Nomura conducted credit and compliance review on less than 89% of the total loan population for 31 loan pools).****FOOTNOTE The sampled Acquisition Pools are those Pools for which Nomura's proffered expert Mr. Grice concedes Nomura conducted a credit and compliance review on less than 89% of the loans.

      **Nomura Response:**  Disputed. Although the 31 Acquisition Pools listed by plaintiff were subject to sampling, the Cipione Declaration does not accurately reflect the diligence performed by Nomura on the referenced Acquisition Pools.  The correct figures can be found at Ex. 303 (July 9 Grice Report Revised Exhibit 3A) at 1-2; Ex. 500 (July 9 Grice Report Revised Exhibit 3B) at 1; Mishol Decl. Ex. 6.

      **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 212.

      **FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants

concede that for the 31 Acquisition Pools identified by FHFA, Nomura drew samples to

conduct diligence.  Any dispute regarding the difference between Mishol Decl. Ex. 6 and

Cipione Decl. Ex. 2 is not material to FHFA's motion.  *Quarles*, 758 F.2d at 840.

213.   **FHFA Statement:**  Of these 31 sampled Acquisition Pools, for the following 8
       Acquisition Pools, Nomura drew its diligence samples using only adverse criteria—it
       drew no loan at random: FNBN 21, Fremont SP01, Fremont SP02, Fremont SP03, Ownit
       SP02, Resmae SP01, Resmae SP02, and Wells SP01.  Ex. 97 (NOM-FHFA_05295340,
       email dated May 31, 2006 from Mendy Sabo to Jeffrey Hartnagel and Randall Lee
       regarding Fremont Sample chooser …) at NOM-FHFA_05295340 (requesting approval
       on the sample for the Fremont SP04 Acquisition Pool that is a "75% 1st Lien LEVELS
       sample" and a "25% 2nd Lien LEVELS sample"); Ex. 98 (Dep. Ex. 25311, email dated
       September 1, 2006 from Brian Murphy to Neil Spagna re FNBN 21) at NOM-
       FHFA_05032403 (email from Scampoli notes the majority of the loans in the sample—
       170 out of 194—had been selected using a blend of Nomura risk scores and S&P Levels,
       and the remaining 24 loans had been selected based on high loan balance and state
       compliance, plus Nomura risk score and S&P LEVELS).NOM-FHFA_05070216 at
       NOM FHFA_05070216  (spreadsheet titled "Seller Trade Breakout" for the Fremont
       SP02, SP03, and SP04 Acquisition Pools.  Notes that "DD Sample Method = Weighted
       avg. of 1st & 2nd liens with highest AAA LEVELS + High Risk Characteristics +
       Compliance "Issue" States (100% Adverse Sampling)"); Ex. 100 (NOM-
       FHFA_05133643) at NOM-FHFA_05133643 (email from Joseph Kohout to Randall Lee
       regarding DDtape_FremontSP02.xls & Sample) (email from Kohout notes the sample for
       Fremont SP02 Acquisition Pool was chosen using "AAA levels" and the adverse criteria
       he lists); Ex. 77 (NOM-FHFA_05112103) at NOM-FHFA_05112103 (email dated March
       22, 2007 from Mendy Sabo to Randall Lee regarding nheli-2007-3_tape_termsheet_v3)
       (chart provided by Mendy Sabo notes that for the ResMAE SP01 Acquisition Pool
       included 1,052 loans selected using LEVELS and 451 loans selected adversely, and the
       entire 1,099 loan sample for the ResMAE SP02 Acquisition Pool was a "desk-driven"
       selection); Ex. 101 (NOM-FHFA_05811428) at NOM- FHFA_05811428 (email from
       Neil Spagna to Randall Lee regarding u still there?) ("Yes … we want to select 100% of
       the seconds and fill out the rest of the 30% sample via an adverse selection of S and P
       Levels single Bs …"); Ex. 102 (NOM-FHFA_05074066) at NOM-FHFA_05074066
       (dividing the loan sample selection (Tab "Sample", rows 2, 153, 240, 436) )(spreadsheet
       listing sample selection for Ownit SP02 Acquisition Pool provides reasons for each
       selection under "2nd lien LC," "DTI>55%," "Single 'B's," and "OrigBal >$500k");
       Ex. 103 (NOM-FHFA_05074062) at NOM-FHFA_05074062 (email dated November 14,
       2006 from Mendy Sabo to Christopher Scampoli regarding
       p7774.DD.AMCAMC.Order3071.xls) ("There is a file called 'Ownit SP02 Sample
       Chooser' (also is attached) – I choose 497 of 610 files (on the 2nd tab called sample).  I
       also broke down the sample into sections of why I choose them."); Ex. 104 (NOM-
       FHFA_05230742) at NOM-FHFA_05230742 (email dated November 14, 2006 from
       Christopher Scampoli to Steven Katz regarding Ownit SP02 Sample) (noting that "The
       attachment contains 497 loans for the Ownit sample. The breakdown is as follows: 150 -
       2nd lien LC 85 – DTI>55% 195 - Single Bs 69 ->500k"); Ex. 105 (NOM-
       FHFA_05191125) at NOM-FHFA_05191127 (email dated June 20, 2006 from Joseph

Kohout to Venkat Veerubhotla (Citigroup) regarding nheli 2006- WF1) (Stating that "Credit and compliance samples are determined using a combination of the following: S&P Single B Subordination Levels and indicative credit factors: DTI/Credit Score/LTV & CLTV/Doc Type." The specific pool being discussed is the Wells Fargo SP01 Acquisition Pool.).

**Nomura Response:** Undisputed that the only available evidence suggests that adverse sampling was used for these pools, but disputed to the extent this paragraph suggests Nomura relied solely on adverse sampling. Nomura often employed random sampling for a portion of the credit and compliance sample, depending on the circumstances. Ex. 30 (Sabo Tr.) at 175:2-16; Ex. 29 (Hartnagel Tr.) at 250:13-19. In some instances, the adverse portion may have accounted for 50% of the sample, with the remaining 50% chosen at random. Ex. 35 (Graham Tr.) at 218:18-219:3. Other testimony and documents in this action suggest that Nomura also employed a two- thirds adverse and one-third random sample on some occasions. Ex. 15 (Prahofer Tr.) at 156:10-25; Ex. 33 (NOM-FHFA_05491675) at NOM-FHFA_05491711.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 213.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants

concede that for the eight cited Acquisition Pools, the only available evidence shows that

adverse sampling was used for these Pools, and they cite no evidence to the contrary.

Defendants assertions' that Nomura may have employed random sampling in other

"circumstances" does not specifically contradict the asserted fact, and so does not create a

genuine dispute of material fact. Parts I.D, I.B, *supra.*

214. **FHFA Statement:** The NHELI 2006-FM1 and NHELI 2006-FM2 SLGs were drawn entirely from the Fremont SP02, SP03, and SP04 Acquisition Pools. Ex. 1 to the Cipione Decl. (Rows 60-62, Columns F "NHELI 2006-FM1" and G "NHELI 2006-FM2").

**Nomura Response:** Disputed that the Cipione Declaration accurately reflects the diligence performed by Nomura on the referenced Acquisition Pools. The correct figures can be found at Ex. 300 (July 9 Grice Report Revised Exhibit 2) at 1-3 and Mishol Decl. Ex. 8. Defendants do not dispute that the NHELI 2006-FM1 and NHELI 2006-FM2 supporting loan groups were drawn entirely from the Fremont SP02, SP03, and SP04 trade pools.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 214.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants

concede that the NHELI 2006-FM1 and NHELI 2006-FM2 supporting loan groups were

drawn entirely from the Fremont SP02, SP03, and SP04 trade pools. Defendants'

assertions regarding the amount of diligence performed on the referenced Acquisition

Pools is irrelevant to the asserted fact and does not create a genuine dispute of material

fact. Part I.C, *supra*. Moreover, Defendants' citation to the Mishol Ex. 8 and Nom. Ex.

300, both of which reference the number of loans from each Acquisition Pool, is

irrelevant to the amount of diligence performed on the Acquisition Pools.

215.     **FHFA Statement:** 47.9% of the loans in the NHELI 2007-2 SLG were drawn from the Ownit SP02 Acquisition Pool. Ex. 1 to the Cipione Decl. (dividing the total number of loans in the SLG (3,001) by the total number of loans that Ownit SP02 contributed (1,438)).

   **Nomura Response:** Disputed that the Cipione Declaration accurately reflects the diligence performed by Nomura on the referenced Acquisition Pools. Undisputed that OwnIt SP02 contributed 1,438 loans to the supporting loan groups for NHELI 2007-2. Mishol Decl. Ex. 8 at 3.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 215.

   **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants

concede that OwnIt SP02 contributed 1,438 loans to the supporting loan groups for

NHELI 2007-2, nor that this comprised 47.9% of the loans in that SLG

216.     **FHFA Statement:** 77.5% of the loans in the NHELI 2007-3 SLG were drawn the ResMAE SP01 and SP02 Acquisition Pools. Ex. 1 to the Cipione Decl. (dividing the total number of loans in the SLG (1,914) by the total number of loans that ResMAE SP01 and SP02 contributed (1483)).

   **Nomura Response:** Disputed that the Cipione Declaration accurately reflects the diligence performed by Nomura on the referenced Acquisition Pools. Undisputed that ResMAE SP01 and ResMAE SP02 contributed 1,438 loans to the supporting loan groups for NHELI 2007-2. Mishol Decl. Ex. 8 at 3.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 216.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants concede that 1,438 loans in the NHELI 2007-3 SLG were drawn from the ResMAE SP01 and SP02 Acquisition Pools, and do not dispute either the total number of loans in the NHELI 2007-3 SLG nor the asserted fact that 47.9% of the loans in the NHELI 2007-2 SLG were drawn from the ResMAE SP01 and SP02 Acquisition Pools. Defendants' assertions regarding the amount of diligence performed on the referenced Acquisition Pools is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

217. **FHFA Statement:** The percentage of loans drawn from sampled Acquisition pools, and in the SLGs, from which no random diligence sample was drawn is summarized in Ex. 54 to the Cipione Decl.

**Nomura Response:** Disputed. The Cipione Declaration does not accurately reflect the diligence performed by Nomura on the referenced Acquisition Pools. The correct figures regarding diligence performed on these trade pools can be found in Mishol Decl. Ex. 11 and Mishol Decl. Ex. 12.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 217.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that the correct figures regarding diligence performed on these trade pools can be found in Mishol Exs. 11 and 12, neither provide a calculation for the percentage of loans drawn from sampled Acquisition pools, and in the SLGs, from which no random diligence sample was drawn. Furthermore, with respect to Mishol Ex. 11 and Cipione Ex. 1, there is no difference in the number of loans in the SLGs from these Acquisition Pools. Therefore, Defendants' assertion does not create a genuine dispute of material

fact.  Part I.C, *supra*.  Moreover, any difference between the Cipione Ex. 54 and Mishol

Exs. 11 and 12 is not material to FHFA's motion. *Quarles*, 758 F.2d at 840.

218.　**FHFA Statement:**  Out of the remaining 23 sampled Acquisition Pools, 12 of the
sampled Acquisition Pools for which Nomura has not produced specific sample-selection
information were subprime Pools that fed into the subprime Securitizations:  Cameron
SP04, Equifirst SP01, Equifirst SP02, Equifirst SP03, First NLC SP02, First NLC SP03,
Impac SP04, Mandalay SP03, Novastar SP02, People's Choice SP01, People's Choice
SP02, and WMC SP01.  Ex. 1 to the Cipione Decl. (showing each of these pools feeding
into the NHELI 2006-HE3, NHELI 2007-2, and/or NHELI 2007-3 SLGs).

**Nomura Response:**  Disputed. Plaintiff's reference to "specific sample-selection
information" is unclear, as voluminous sample selection information has been produced
in this case. Furthermore, defendants dispute that the Cipione Declaration accurately
reflects the diligence performed by Nomura on the referenced Acquisition Pools.  The
correct sample sizes for these pools can be found at Ex. 303 (July 9 Grice Report Revised
Exhibit 3A) at 1-2; Ex. 500 (July 9 Grice Report Revised Exhibit 3B) at 1; Mishol Decl.
Ex. 6; and Mishol Decl. 11.  Defendants do not dispute that loans from the trade pools
listed by plaintiff were included in NHELI 2006-HE3, NHELI 2007-2 and/or NHELI
2007-3.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 218.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not

dispute that the 12 Acquisition Pools were subprime Pools.  While Defendants assert that

"specific sample-selection information" is unclear, the text of the asserted makes clear

that "specific sample-selection information" refers to sample-selection information

specific to the 12 Acquisition Pools identified. While Defendants assert that voluminous

sample selection information has been produced in this case, they identify no evidence

that contradicts the asserted fact.  Nomura's conclusory assertions do not create a genuine

dispute of material fact.  Part I.B, *supra*.  Defendants' assertions regarding the amount of

diligence performed on the referenced Acquisition Pools is irrelevant to the asserted fact

and does not create a genuine dispute of material fact.  Part I.C, *supra*.  Moreover, while

Defendants dispute that the Cipione Declaration accurately reflects the diligence

performed by Nomura on the referenced Acquisition Pools, they identify no evidence that contradicts the asserted fact. Nomura's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*.


219. **FHFA Statement:** The remaining 11 of the sampled Acquisition Pools for which Nomura has not produced specific sample-selection information were Alt-A Pools that fed into the Alt-A Securitizations: Alliance CA 04, Gateway 17A, Gateway 24A, Pinnacle Financial 07, FNBN 21, Metro 10, SSM 58, SSM 60, Silver State 62, Silver State 63, Silver State 65, and Silver State 66. Cipione Decl. Ex. 1 (showing each of these pools feeding into the NAA 2005-AR6 and/or NHELI 2007-1 SLGs).

**Nomura Response:** Disputed. The Cipione Declaration does not accurately reflect the diligence performed by Nomura on the referenced Acquisition Pools. The correct sample sizes for these pools can be found at Ex. 303 (July 9 Grice Report Revised Exhibit 3A) at 1-2; Ex. 500 (July 9 Grice Report Revised Exhibit 3B) at 1; Mishol Decl. Ex. 6; Mishol Decl. Ex. 11. Defendants also do not dispute that loans from these trade pools were included in NAA 2005-AR6 and/or NHEL 2007-1.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 219.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants' assertions regarding the amount of diligence performed on the referenced Acquisition Pools is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Moreover, while Defendants dispute that the Cipione Declaration accurately reflects the diligence performed by Nomura on the referenced Acquisition Pools, they identify no evidence that contradicts the asserted fact. Nomura's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*.


220. **FHFA Statement:** Timothy McLaughlin testified: "I'm not necessarily involved in the due diligence process, but I believe we used some combination of [random and adverse] methods." Ex. 47 (Deposition of Timothy McLaughlin) at 165:14-24 ("Q. As far as sampling for due diligence went when purchasing whole loans, do you know whether you used random or adverse sampling on the deals that you worked on? … A. Again, I'm not necessarily involved in the due diligence process, but I believe we used some combination of those methods.").

**Nomura Response:** Disputed. Although Mr. McLaughlin gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. As plaintiff's quote indicates, Mr. McLaughlin was not a member of the Due Diligence Group. Further, Nomura conducted 100% credit and compliance diligence on all loans being purchased through its conduit, or loan-by-loan channel, and generally conducted 100% credit and compliance due diligence on all mini-bulk channel purchases as well. Ex. 33 (NOM-FHFA_05491675) at NOM- FHFA_05491711; Ex. 35 (Graham Tr.) at 168:8-18; Ex. 183 (Marvin Tr.) at 242:10-243:4. Defendants do not dispute that with respect to credit and compliance due diligence for bulk purchases, when sampling was employed, the sampling generally included both adverse and random selection.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 220.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that additional context is required in order to fully understand the quoted excerpt, Defendants concede that Mr. McLaughlin was not involved in the due diligence process and do not dispute that Mr. McLaughlin only believed Nomura used some combination of random and adverse sampling. Defendants' additional assertions regarding Nomura's generally conducting 100% credit and compliance diligence on loans purchased through the loan-by-loan and mini-bulk channels is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*. Furthermore, to the extent Defendants additionally assert that for bulk purchases the sampling "generally" included both adverse and random selection, Defendants identify no evidence in support of that assertion. Nomura's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*.

221. **FHFA Statement:** Donald McCabe testified that Nomura's selection process was an "adverse selection on I believe two-thirds of the assets and a random selection on a third." Ex. 32 (Deposition of Donald McCabe) at 209:11-23 ("Q. And for due diligence review what percentage – prior to your e-mail, what was your understanding as to how the samples for due diligence review were selected for a bulk originator such as Alliance California? … A. So our policy on bulk was to do a minimum of twenty-five percent due

diligence, as I best recall, and it was a, you know, adverse selection on I believe two-thirds of the assets and a random selection on a third.").

**Nomura Response:** Defendants do not dispute that Mr. McCabe gave the testimony quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 221.

**FHFA Reply:** Defendants do not dispute the asserted fact.

222. **FHFA Statement:** In a presentation provided to RBS, Nomura Securities stated that it drew a one-third random sample for bulk transactions. Ex. 106 (NOM-FHFA_04877710, Nomura Securities International Residential Whole Loan Securitization Platform – Presentation for Standard & Poors dated June 8, 2006) at NOM-FHFA_04877746 ("A 'Random (1/3) vs. Adverse (2/3)' sampling methodology is used."); Ex. 107 (NOM_FHFA_04877707, email dated August 31, 2006 from Adam Smith to Randall Lee and Steven Katz regarding FW: NHELI 2006-HE3 Due diligence Summary) at NOM_FHFA_04877707 (attaching this presentation in an email to RBS Securities).

**Nomura Response:** Defendants do not dispute that in the specific document cited by plaintiff, plaintiff's Exhibit 106, Nomura Securities stated that it drew a one-third random sample for bulk transactions. However, other evidence reflects that, in some instances, the random sample may have accounted for as much as 50% of the sample. Ex. 35 (Graham Tr.) at 218:18-219:3.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 222.

**FHFA Reply:** Defendants do not dispute the asserted fact. Defendants provision of

additional evidence is irrelevant to the asserted fact and does not create a genuine issue of

material fact. Part I.C, *supra*.

223. **FHFA Statement:** Joseph Kohout testified that the samples were "always adverse in nature." Ex. 53 (Deposition of Joseph Kohout) at 98:3-9 ("Q. Okay. Were there some that were not done adversely, but were done randomly, meaning samples? A. The samples were always adverse in nature. It was just the tool that was utilized to determine which loans were adversely selected").

**Nomura Response:** Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, multiple other Nomura employees testified that random sampling was used alongside adverse sampling. Ex. 30 (Sabo Tr.) at 175:2-16; Ex. 29 (Hartnagel Tr.) at 250:13-19. In some instances, the adverse portion may have accounted for 50% of

the sample, with the remaining 50% chosen at random. Ex. 35 (Graham Tr.) at 218:18-219:3. Other testimony and documents in this action suggest that Nomura also employed a two-thirds adverse and one-third random sample on some occasions. Ex. 15 (Prahofer Tr.) at 156:10-25; Ex. 33 (NOM-FHFA_05491675) at NOM- FHFA_05491711.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 223.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Kohout's testimony was accurately quoted. While Defendants cite to additional documents and testimony to provide additional context in order to fully understand the quoted excerpt, they provide no evidence that contradicts the asserted fact that Mr. Kohout testified that the samples were "always adverse in nature." Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*. Moreover, Defendants' do not provide evidence that a random sample was selected for any Acquisition Pool, merely citing testimony and a presentation stating that on some unspecified pools, Nomura might have selected some random loans. Moreover, the testimony of Ms. Prahofer regarding random selection of loans is specific to the time period before April 2005. Nom. Ex. 15 (Deposition of Nancy Prahofer) 155:21-156:25 ("Q. Okay. So is it true that S&P LEVELS® was, in fact, used for picking an adverse sample for fixed rate mortgages? A. A portion of the adverse sample, yes -- Q. Okay. A. -- after this discussion. Prior to this discussion, the Due Diligence people had selected it based on their discretion using their own judgment as to how to best find an adverse sample. Q. Okay. And when -- before the discussion that said use S&P models, do you know what portion of the sample was adversely selected? A. It depends. There's no strict policy. It depends on what the pool is like. For example, in certain of the alt-A trades, if you put your entire adverse pull in and you had any left, that would obviously be random. And sometimes there was a two-thirds adverse, one-third

138

random as a matter of practice to try and get at least some random to see if the -- the description of the pool was representative."). To the extent Defendants rely on the testimony of Mr. Hartnagel, Defendants elsewhere have admitted that Mr. Hartnagel's testimony regarding Nomura's sampling practices speculative and not admissible. *See* ¶ 233, 259.

224. **FHFA Statement:** In an email from September of 2006, Mendy Sabo stated:"we always choose adverse- no random." Ex. 108 (Dep. Ex. 40913, email dated September 29, 2006 from Mendy Sabo to Brian Farrell (RBS) and Neil Spagna regarding Fremont DD Reports) at NOM- FHFA_04982973. Mr. Sabo testified: "[i[t was an adverse selection." Ex. 49 (Deposition of Mendy Sabo) at 173:7-11 ("Q. Do you know who was determining, then -- or let me ask: How, then, was it decided, based on the percentage, which actual loans would be sampled? A. It was an adverse selection.").

**Nomura Response:** Disputed. Although Mr. Sabo gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, Mr. Sabo testified that Nomura would also employ random sampling for a portion of the credit and compliance sample, depending on the circumstances. Ex. 30 (Sabo Tr.) at 175:2-16. Mr. Sabo also testified that Nomura's sample sizes for credit and compliance were typically higher than those employed by others in the industry. He explained that "in general," the sampling rates of Nomura's peers were "much lower than what we were doing." Ex. 30 (Sabo Tr.) at 196:10-15. Other testimony and documents in this action suggest Nomura utilized random sampling in addition to adverse sampling. Ex. 29 (Hartnagel Tr.) at 250:13-19; Ex. 35 (Graham Tr.) at 218:18-219:3; Ex. 15 (Prahofer Tr.) at 156:10-25; Ex. 33 (NOM-FHFA_05491675) at NOM- FHFA_05491711.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 224.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that an email from September of 2006, Mendy Sabo stated:"we always choose adverse- no random." FHFA Ex. 108 (Dep. Ex. 40913, email dated September 29, 2006 from Mendy Sabo to Brian Farrell (RBS) and Neil Spagna regarding Fremont DD Reports) at NOM- FHFA_04982973. Defendants also do not dispute that Mr. Sabo's testimony was accurately quoted. The additional evidence that Defendants cite does not

specifically contradict the asserted fact and so does not create a genuine issue of material facts. Part I.C, *supra*. Defendants' assertions regarding whether Nomura's sampling rates were higher than others in the industry is irrelevant to the asserted fact, and does not create a genuine dispute of material fact. Part I.C, *supra*. In addition, Mr. Sabo specifically stated that he did not "have specific information as to numbers" for the diligence sample sizes of others in the industry. Nom. Ex. 30 (Kohout Tr.) 196:13-14.

225. **FHFA Statement:** In an email on August 31, 2006, Brian Murphy asked Christopher Scampoli if the sample for FNBN 21 was "random or adverse." Mr. Scampoli responded: "Adverse. 1. The majority (170 loans) using a blending of the Nomura risk score and S&P rating. 2. Additional 24 were based on high loan balance, state compliance plus Nomura risk score and S&P rating." On September 1, 2006, Brian Murphy forwarded the email to Neil Spagna stating: "I also think we should revisit the with the desk how we pick samples. Should they be entirely adverse or do we learn more about a pool by reviewing at least some random loans?" Ex. 98 (Dep. Ex. 25311, email dated September 1, 2006 from Brian Murphy to Neil Spagna re FNBN 21) at NOM- FHFA_05032403 (Scampoli noted that all the loans in the sample were chosen adversely. Murphy then asked Spagna if they should "revisit" their sample selection, particularly whether the sample "[s]hould … be entirely adverse or do we learn more about a pool by reviewing at least some random loans"); *see also* Ex. 52 (Deposition of Brian Murphy) at 186:22-187:11 ("Q. So if you look at the postscript of your prior e-mail, let's just go up, you say, "I also think we should revisit with the desk how we pick samples. Should they be entirely adverse or do we learn more about a pool by reviewing at least some random loans?" What did you -- what were you referring to there? A. I'm basic -- basically -- I can't say what I was referring to, but sitting here today I'm basically saying is it more telling, do we learn more about a pool by reviewing at least some random loans as opposed to picking an adverse sample.")

**Nomura Response:** Defendants do not dispute that plaintiff's Exhibit 98 includes the text quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 225.

**FHFA Reply:** Defendants do not dispute the asserted fact.

226. **FHFA Statement:** Randall Lee testified: "[P]art of [deciding which loans to send for the sample] would be a random sampling, and part of it would be a determination as to what the due diligence desk -- what the due diligence and the trading desk deemed as the riskiest loans." Ex. 43 (Deposition of Randall Lee) at 162:5-11. ("Q. Do you know how they decided which loans to send? A. There would be -- part of it would be a random

sampling, and part of it would be a determination as to what the due diligence desk --
what the due diligence and the trading desk deemed as the riskiest loans.").

**Nomura Response:**  Defendants do not dispute that Mr. Lee gave the testimony quoted
by plaintiff.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 226.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

227.  **FHFA Statement:**  Mr. Lee testified: "I wasn't as familiar with that [diligence] process
because that was the Due Diligence Department.  … I vaguely remember that pools of
loans would be sent to a due diligence provider and the due diligence provider would
send back results specifying any changes in any field related to a mortgage loan." Ex. 43
(Deposition of Randall Lee) at 161:3-15 ("Q.  Okay. Tell me what, if anything, you know
about what was the diligence process that was used for RMBS securitizations at Nomura
when you were there?  A.  I wasn't as familiar with that process because that was the Due
Diligence Department.  Q.  What do you know?  A.  I vaguely remember that pools of
loans would be sent to a due diligence provider and the due diligence provider would
send back results specifying any changes in any field related to a mortgage loan.").

**Nomura Response:**  Defendants do not dispute that Mr. Lee gave the testimony quoted
by plaintiff.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 227.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

228.  **FHFA Statement:**  Mr. Lee testified: "I don't remember exactly [whether any testing
was done on loans not sent to the due diligence firms].  But I'm pretty sure that an AVM
was run on every single loan that we purchased." Ex. 443 (Deposition of Randall Lee) at
162:12-18. ("Q.  For loans that were not sent to the due diligence firms, was any testing
done on them? … A.  I don't remember exactly. But I'm pretty sure that an AVM was run
on every single loan that we purchased.").

**Nomura Response:**  Defendants do not dispute that Mr. Lee gave the testimony quoted
by plaintiff.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 228.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

229.  **FHFA Statement:**  When asked "before the discussion that said use S&P models, do you
know what portion of the sample was adversely selected?" Nancy Prahofer testified: "It
depends.  There's no strict policy.  It depends on what the pool is like.  For example, in

certain of the alt-A trades, if you put your entire adverse pull in and you had any left, that would obviously be random. And sometimes there was a two-thirds adverse, one-third random as a matter of practice to try and get at least some random to see if the – the description of the pool was representative." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 155:21-157:22 ("Q. Okay. So is it true that S&P LEVELS® was, in fact, used for picking an adverse sample for fixed rate mortgages? A. A portion of the adverse sample, yes -- Q. Okay. A. -- after this discussion. Prior to this discussion, the Due Diligence people had selected it based on their discretion using their own judgment as to how to best find an adverse sample. Q. Okay. And when -- before the discussion that said use S&P models, do you know what portion of the sample was adversely selected? A. It depends. There's no strict policy. It depends on what the pool is like. For example, in certain of the alt-A trades, if you put your entire adverse pull in and you had any left, that would obviously be random. And sometimes there was a two-thirds adverse, one-third random as a matter of practice to try and get at least some random to see if the -- the description of the pool was representative. Q. And let me ask then really broadly. Were there any written instructions, policies, procedures, regarding what portion of the sample for due diligence should be done adversely? A. Not that I'm aware of. Q. Okay. But are you aware of in terms of practice that over time varying portions of the sample were decided to be selected adversely? A. There was a move toward doing as much of it adverse -- adversely as could be done. Q. Okay. And when we're talking about adversely, describe what you mean by that. A. You were trying to select the loans that you believe pose the greatest risk").

**Nomura Response:** Defendants do not dispute that Ms. Prahofer gave the testimony quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 229.

**FHFA Reply:** Defendants do not dispute the asserted fact.

230. **FHFA Statement:** Ms. Prahofer recognized that it was necessary to "get at least some random to see if the – the description of the pool was representative." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 156:10-25 ("Q. Okay. And when – before the discussion that said use S&P models, do you know what portion of the sample was adversely selected? A. It depends. There's no strict policy. It depends on what the pool is like. For example, in certain of the alt-A trades, if you put your entire adverse pull in and you had any left, that would obviously be random. And sometimes there was a two-thirds adverse, one-third random as a matter of practice to try and get at least some random to see if the – the description of the pool was representative."). FOOTNOTE Ex. 22 (Grice Nomura Report) at ¶ 141 (a random selection "should represent the pool as a whole"); *id.* at ¶ 143 ("[T]he results of an adverse sample could not be extrapolated to the remainder of the pool.").

**Nomura Response:** Disputed. Nowhere in the testimony quoted by plaintiff does Ms. Prahofer say that random sampling was "necessary."

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 230.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants' assertion that Ms. Prahofer did not herself use the term "necessary" does not change the clear inference that Mr. Prahofer recognized that random sampling was necessary to "see if … the description of the pools was representative," and Defendants do not suggest an alternative inference.  Accordingly, Defendants' assertion does not create a disputed issue of material fact. Part I.C, *supra*.

231.  **FHFA Statement:**  Mr. Graham testified: "Those [loans] that were not chosen adversely through one of those methods, the remaining portion, typically the other 50 percent of the portion that were being sampled, were selected randomly." Ex. 24 (Deposition of John Graham) at 218:18-219:3. ("Q. Was any part of due diligence sample for the whole loan - - A.  Okay.  Q.  -- acquisitions that went into RMBS securitizations chosen randomly? A. Yes. Those that were not chosen adversely through one of those methods, the remaining portion, typically the other 50 percent of the portion that were being sampled, were selected randomly.").

  **Nomura Response:**  Defendants do not dispute that Mr. Graham gave the testimony quoted by plaintiff.

  **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 231.

  **FHFA Reply:**  Defendants do not dispute the asserted fact.

232.  **FHFA Statement:**  Mr. Sabo "believe[d] some [sampling] was done random[ly]" when selecting loans, but "the initial sample was almost always adverse." Ex. 49 (Deposition of Mendy Sabo) at 175:2-176:2 ("Q.  And would you use those factors for every part of the loan selection? … Q.  Or was some done completely randomly?  A.  I believe some was done random, yes.  Q.  And do you know who was determining whether this was going to be done random or this was going to be done on LTV, DTI, credit scores and other things?  A.  I believe that was determined by due diligence.  Q.  Who, you?  A.  Myself included, yes.  Q.  Okay.  So how did you decide whether this was -- this is a good one to do random and this is a good one to look first at LTV, DTI and others?  A.  Well, I think the initial sample was almost always adverse, so you're always looking at -- and depending on the size of the sample, if it's 100 percent, then there's no adverse selection because by default you're choosing the entire sample.").

**Nomura Response:** Defendants do not dispute that Mr. Sabo gave the testimony quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 232.

**FHFA Reply:** Defendants do not dispute the asserted fact.

233. **FHFA Statement:** Mr. Hartnagel "d[id]n't recall exactly the method used" to select random loans. Ex. 33 (Deposition of Jeffrey Hartnagel) at 250:13-25 ("Q. Okay. Did Nomura also choose a random sample of loans? A. Yes, they d*id.* Q. Okay. How did you go about choosing that sample? A. It's random. You just pluck loans. Q. Okay. So – well, I mean specifically mechanically did you have a spreadsheet and you just pick loans from that spreadsheet? A. Probably. I don't recall exactly the method used.").

**Nomura Response:** Defendants do not dispute that Mr. Hartnagel gave the testimony quoted by plaintiff. However, defendants object, pursuant to Rule 56.1(c)(2) of the Federal Rules of Civil Procedure, that Mr. Hartnagel's testimony quoted by plaintiff concerning the method used to select random loans cannot be presented in a form that would be admissible in evidence. Mr. Hartnagel testified that he did not "recall exactly the method used" to select random samples; as a result, his testimony is speculative and not based on personal knowledge. *See Nora Beverages v. Perrier Grp. of Am.*, 269 F. 3d 114, 124 (2d Cir. 2001).

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 233.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue Mr. Hartnagel's testimony is not based on personal knowledge, they do not explain how Mr. Hartnagel lacked personal knowledge of his own failure to recall the method used to select random sampling.

234. **FHFA Statement:** Mr. Hartnagel was not familiar with the term "statistical significance" during the time he worked for Nomura. Ex. 33 (Deposition of Jeffrey Hartnagel) at 249:14-19 ("Q. Are you -- are you familiar with the statistics term, you know, 'statistical significance'? A. I am now. Q. Okay. Were you at Nomura? A. No.").

**Nomura Response:** Disputed. While defendants do not dispute that Mr. Hartnagel gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, statistical sampling was neither industry practice nor required during the relevant time period. Furthermore, during the relevant time period, Freddie Mac and Fannie Mae were aware of, and approved,

Nomura's sampling practices. See Ex. 212 (FHFA13253477) at FHFA13253478; Ex. 211 (FHFA19172000) at FHFA19172001. Additionally, the use of samples that were not statistically valid random samples in conducting due diligence was similarly known and accepted by the industry. The Securities and Exchange Commission ("SEC") has never required that diligence samples used by issuers of asset-backed securities be statistically valid. In fact, in January 2011, the SEC declined to adopt recommendations that it require diligence samples to be statistically valid, even though it was amending Regulation AB in 2011 to require issuers to provide certain due diligence-related disclosures. Ex. 312 (SEC Release Nos. 33-9176, 34-63742, dated Jan. 25, 2011) at 4234-35.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 234.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Hartnagel was not familiar with the term statistical significance when he worked at Nomura. Defendants' assertions and cited evidence do not specifically contradict the asserted fact and so do not create a genuine issue of material fact. Part I.C, *supra*.

235. **FHFA Statement:** Mr. Hartnagel could not recall if "anyone at Nomura [had] a role in determining whether samples [they] selected was statistically significant." Ex. 33 (Deposition of Jeffrey Hartnagel) at 249:20-250:2 ("Q. Okay. So did anyone at Nomura have a role in determining whether samples you selected was statistically significant? … A. I don't recall.").

**Nomura Response:** Disputed. While defendants do not dispute that Mr. Hartnagel gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, statistical sampling was neither industry practice nor required during the relevant time period. See ¶ 234, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 235.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Hartnagel's testimony was accurately quoted. While Defendants argue that additional context is needed in order to fully understand the quoted text, they cite

solely their response to ¶ 234, which does not create a genuine dispute of material fact for

the reasons cited in FHFA's reply to ¶ 234.

236. **FHFA Statement:** Mr. Scampoli did not "go to a book or a reference on statistics to determine if the sampling methodology was statistically appropriate" because he was "not a statistician." Ex. 61 (Deposition of Christopher Scampoli) at 478:23-479:6 ("Q. Did you ever go to a book or a reference on statistics to determine if the sampling methodology was statistically appropriate? … A. I don't -- I'm not a statistician.").

**Nomura Response:** Disputed. While defendants do not dispute that Mr. Scampoli gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, statistical sampling was neither industry practice nor required during the relevant time period. See ¶ 234, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 236.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not

dispute that Mr. Scampoli's testimony was accurately quoted. While Defendants argue

that additional context is needed in order to fully understand the quoted text, they cite

solely their response to ¶ 234, which does not create a genuine dispute of material fact for

the reasons cited in FHFA's reply to ¶ 234.

237. **FHFA Statement:** Mr. Spagna did not "have any training in statistics related to sampling for due diligence." Ex. 46 (Deposition of Neil Spagna) at 67:13-16 ("Q. Uh-huh. Did you ever have any training in statistics related to sampling for due diligence? A. I didn't.");

**Nomura Response:** Disputed. While defendants do not dispute that Mr. Spagna gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, statistical sampling was neither industry practice nor required during the relevant time period. See ¶ 234, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 237.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Spagna's testimony was accurately quoted. While Defendants argue that additional context is needed in order to fully understand the quoted text, they cite solely their response to ¶ 234, which does not create a genuine dispute of material fact for the reasons cited in FHFA's reply to ¶ 234.

238.   **FHFA Statement:** Mr. Spagna did not know if "anyone who was preparing samples at Nomura had any statistics training." Ex. 46 (Deposition of Neil Spagna) at 68:3- 7 ("Q. Do you know if anyone who was preparing samples at Nomura had any statistics training? … A. I don't know the answer to that.").

**Nomura Response:** Disputed. While defendants do not dispute that Mr. Spagna gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, statistical sampling was neither industry practice nor required during the relevant time period. See ¶ 234, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 238.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Spagna's testimony was accurately quoted. While Defendants argue that additional context is needed in order to fully understand the quoted text, they cite solely their response to ¶ 234, which does not create a genuine dispute of material fact for the reasons cited in FHFA's reply to ¶ 234.

239.   **FHFA Statement:** Mr. Kohout did not know if "the people who, at the trading desk who were determining which loans would be in the sample, … had a statistical background or training." Ex. 53 (Deposition of Joseph Kohout) at 99:5-11 ("Q. Do you know if the people who, at the trading desk who were determining which loans would be in the sample, whether any had a statistical background or training? A. Not specifically, to my knowledge.").

**Nomura Response:** Disputed. While defendants do not dispute that Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to

fully understand the quoted excerpt. For example, statistical sampling was neither industry practice nor required during the relevant time period. See ¶ 234, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 239.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Kohout's testimony was accurately quoted. While Defendants argue that additional context is needed in order to fully understand the quoted text, they cite solely their response to ¶ 234, which does not create a genuine dispute of material fact for the reasons cited in FHFA's reply to ¶ 234.

240. **FHFA Statement:** Mr. Marvin did not believe that anyone at Nomura had "any kind of statistics background used in picking samples, representative samples." Ex. 31 (Deposition of Brett Marvin) at 277:20-24 ("Q. Okay, okay. Was there anyone at – in Nomura who was trained, had like any kind of statistics background used in picking samples, representative samples? A. Statistics, no, I don't believe so.").

**Nomura Response:** Disputed. While defendants do not dispute that Mr. Marvin gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, statistical sampling was neither industry practice nor required during the relevant time period. See ¶ 234, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 240.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Marvin's testimony was accurately quoted. While Defendants argue that additional context is needed in order to fully understand the quoted text, they cite solely their response to ¶ 234, which does not create a genuine dispute of material fact for the reasons cited in FHFA's reply to ¶ 234.

241. **FHFA Statement:** Mr. Graham could not recall any people in Due Diligence Group that had the "background in statistics sufficient to do the correlation that you thought was

important to determine whether the sample size was sufficient." Ex. 24 (Deposition of John Graham) at 152:15-163:11 ("Q. I think I'm confused.  You said before you do not have sufficient loan underwriting experience and background in statistics to be able to correlate the results and find out whether a due diligence sample was sufficient.  Do you know any single person at Nomura who has the sufficient loan underwriting experience and background in statistics that you mentioned you were lacking? … A. I do not.  Q. Let's take one at a time then. Who among all the people that you supervised in the Due Diligence Department had the background in statistics sufficient to do the correlation that you thought was important to determine whether the sample size was sufficient?  A.  I don't recall any.").

**Nomura Response:**  Disputed. While defendants do not dispute that Mr. Graham gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, statistical sampling was neither industry practice nor required during the relevant time period. See ¶ 234, *supra*, which is incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 241.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not dispute that Mr. Graham's testimony was accurately quoted.  While Defendants argue that additional context is needed in order to fully understand the quoted text, they cite solely their response to ¶ 234, which does not create a genuine dispute of material fact for the reasons cited in FHFA's reply to ¶ 234.

      3.      <u>Nomura Securities Selected Samples Of Loans For Credit And Compliance Diligence Primarily Using A "Black Box" That Did Not Identify Improperly Underwritten Loans</u>

242.  **FHFA Statement:**  Nomura did not maintain written policies or procedures as to what portion of the sample should be drawn adversely.  Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 157:2-9 ("Q. And let me ask then really broadly.  Were there any written instructions, policies, procedures, regarding what portion of the sample for due diligence should be done adversely?  A. Not that I'm aware of.").

**Nomura Response:**  Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, there is extensive evidence concerning Nomura's policies and procedures for selecting adverse and random samples. Testimony of other Nomura

employees shows that all or part of the adverse sample selection was performed manually by the Due Diligence Group; professionals in the Due Diligence Group used their experience and judgment and selected loans based on certain characteristics, including high LTV or CLTV ratio, low borrower credit score, high DTI ratios, certain geographic areas that had been hit by a "a recent storm" or were considered "soft markets," loans with large balances, loans with high initial interest rates, loans subject to specific state or local compliance requirements, and loans with a particular document type, e.g., low documentation loans. Ex. 30 (Sabo Tr.) at 173:7-174:3; Ex. 26 (Kohout Tr.) at 475:3-18; Ex. 308 (NOM-FHFA_04982973) at NOM-FHFA_04982973. Nomura also utilized Standard & Poor's LEVELS model to select potentially riskier loans for certain loan pools. Ex. 26 (Kohout Tr.) at 97:5-99:18, 464:8-466:8. Nomura also used CoreLogic's HistoryPro and AVMSelect products to select part of the adverse sample in certain instances. Ex. 35 (Graham Tr.) at 216:22-217:10; see Ex. 32 (July 9 Grice Report) at 109, 116, 121, 127. Nomura also utilized random sampling in addition to adverse sampling. Ex. 30 (Sabo Tr.) at 175:2-16; Ex. 29 (Hartnagel Tr.) at 250:13-19; Ex. 35 (Graham Tr.) at 218:18-219:3; Ex. 15 (Prahofer Tr.) at 156:10-25; Ex. 33 (NOM-FHFA_05491675) at NOM-FHFA_05491711. *See also* ¶ 157, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 242.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Ms. Prahofer's testimony is accurately quoted. While Defendants assert that additional information is necessary in order to understand the quoted testimony, the evidence cited does not contradict the asserted fact that Nomura did not maintain written policies and procedures as to what portion of the sample should be selected adversely, and so does not create a genuine issue of material fact. Part, I.C, *supra*. To the extent Defendants rely on the testimony of Mr. Hartnagel, Defendants elsewhere have admitted that Mr. Hartnagel's testimony regarding Nomura's sampling practices speculative and not admissible. *See* ¶ 233, 259.

243.    **FHFA Statement:** Mr. Kohout testified that there was "[p]robably not" "a formal document" that described the process of generating the adverse sample. Ex. 53 (Deposition of Joseph Kohout) at 475:19-476:9 ("Q. Was there any document that described the process of generating the adverse sample? A. There may have been criteria that we alluded to. Was there a formal document? Probably not.").

**Nomura Response:** Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. *See* ¶¶ 157, 242, *supra*, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 243.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Kohout's testimony was accurately quoted. While Defendants argue that additional context is needed in order to fully understand the quoted text, they cite solely their response to ¶¶ 157, 242, which does not create a genuine dispute of material fact for the reasons cited in FHFA's replies to ¶¶ 157, 242.

244. **FHFA Statement:** Loans chosen "adversely" were selected because Nomura believed they "pose[d] the greatest risk." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 157:17-22 ("Q. Okay. And when we're talking about adversely, describe what you mean by that. A. You were trying to select the loans that you believe pose the greatest risk.").

**Nomura Response:** Defendants do not dispute that loans chosen "adversely" were selected because Nomura believed they posed the greatest risk, including the greatest risk that the loans did not adhere to underwriting guidelines. See C. Stmt. at ¶¶ 138-46, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 244.

**FHFA Reply:** Defendants do not dispute the asserted fact. Defendants additional statement that these loans were selected for reasons including that Nomura believed they posed the greatest risk that the loans did not adhere to underwriting guidelines is irrelevant to the disputed fact and therefore does not create a genuine issue of material fact. Part I.C, *supra*. To the extent Defendants rely on their assertions in Nom. SUF ¶¶ 138-46, Defendants do not cite a particular portion of those documents, and therefore this does not create a genuine dispute of material fact. Part I.E, *supra*. Furthermore,

Defendants' assertions in Nom. SUF ¶¶ 138-46 are flawed for the reasons stated in

FHFA's responses to those paragraphs.

245.    **FHFA Statement:**  Before April 2005, "there[ was] no strict policy" regarding "what portion of the sample was adversely selected." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) 156:10-25 ("Q.  Okay.  And when – before the discussion that said use S&P models, do you know what portion of the sample was adversely selected?  A.  It depends.  There's no strict policy.  It depends on what the pool is like.  For example, in certain of the alt-A trades, if you put your entire adverse pull in and you had any left, that would obviously be random. And sometimes there was a two- thirds adverse, one-third random as a matter of practice to try and get at least some random to see if the – the description of the pool was representative.").

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 245.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

(a)    *Traders Required Diligence Group To Use Standard & Poors' LEVELS To Draw The Vast Majority Of The Adverse Samples*

246.    **FHFA Statement:**  S&P LEVELS was a proprietary model created by Standard & Poors. Ex. 53 (Deposition of Joseph Kohout) at 464:25-465:10 ("Q.  Let's talk about the ones, subprime, fixed rate bulk where 90 percent of the sample was S&P levels.  What is S&P levels?  A.  S&P levels is a proprietary black box model that was developed and managed by Standard & Poor's that was utilized to determine what the AAA subordination levels would be on a loan level basis.").

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 246.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

247.    **FHFA Statement:**  The LEVELS Technical Manual from 2005 states that the LEVELS program "determines the loan-by-loan credit risk associated with an individual loan or given pool of loans.  Credit risk consists of two major elements: Risk of Default (Foreclosure) and Risk of Loss at Liquidation (Severity)."  Ex. 109 (Standard & Poor's LEVELS Version 5.6  Technical User Guide (2005)) at 1 (assigned Bates number SP-FHFA-0043050-65).

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 247.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

248.    **FHFA Statement:**  In April 2005, Mr. Katz wrote in an email: "The sample will be picked by Credit utilizing the S&P levels model. 90% of the sample will be the worst loans by required AAA loss coverage.  The other 10% can be selected by credit or pulled from levels.  After the sample is selected, a spreadsheet should be prepared by credit and sent to me and Dave Haynie for sign-off. Credit's selections should be explained by size and reason.  (*i.e.* 2% of loans were Maryland prepay loans or Cook County loans).  The 90/10 split can be adjusted if credit has strong reasoning." Ex. 78 (Dep. Ex. 21909, email dated April 21, 2005 from Joseph Kohout to Steven Katz, et. al., regarding Fremont/Nomura Trade - Settlement 5/20/05) at NOM-FHFA_05500892.

**Nomura Response:**  Disputed. Although plaintiff's Exhibit 78 contains the testimony quoted by plaintiff, the quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. For example, Nomura trader Brett Marvin, also a recipient of the document cited by plaintiff, testified that the document did not "actually reflect" the sampling process conducted by Nomura. Ex. 183 (Marvin Tr.) at 269:16-24. Nomura did not only use S&P LEVELS to help select adverse samples. Nomura also used CoreLogic's HistoryPro and AVMSelect. Ex. 35 (Graham Tr.) at 216:22-217:10; see Ex. 32 (July 9 Grice Report) at 109, 116, 121, 127.  The final selection of a sample was performed manually by Nomura's diligence group.  See ¶¶ 242-245, *supra*, which are incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 248.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not dispute that the document is accurately quoted.  While Defendants assert that additional context is needed in order to fully understand the quoted excerpts, Defendants' additional assertions do not contradict the asserted fact.  While Defendants cite the testimony of Mr. Marvin, that testimony does not contradict the asserted fact.  Mr. Marvin did not testify that the cited email "did not 'actually reflect' the sampling process conducted by Nomura," as Defendants assert—only that the email did not "actually reflect" the resolution of the "spat" between Mr. Kohout and Mr. Katz, Nom. Ex. 183 at 269:16-2— and so does not contradict the cited document.  Part. I.C, I.F, *supra*.  Indeed, Nomura has

conclusively admitted in C. Stmt. ¶ 140 that for bulk subprime and fixed rate trades, 90%

of the adverse sample was often identified using LEVELS.  And while Defendants assert

Nomura did not only use S&P LEVELS to select adverse samples, the cited documents

indicate that 10% of the sample could be "selected by credit." FHFA Ex. 78 (Dep.

Ex. 21909, email dated April 21, 2005 from Joseph Kohout to Steven Katz, et. al.,

regarding Fremont/Nomura Trade - Settlement 5/20/05) at NOM-

FHFA_05500892.  Therefore Defendants' assertion does not contradict the cited

document.  Part. I.C, I.F, *supra*.  To the extent there may have been variations in the

percentages of loans selected via LEVELS and loans adversely selected by other means,

that variation is not material to FHFA's motion.  *Quarles*, 758 F.2d at 840.  Moreover, to

the extent Defendants rely on their responses to ¶¶ 242-245 to establish that the final

selection of a sample was performed manually by Nomura's diligence group, nothing

cited in those sections supports Defendants' contention. To the extent there is any dispute

over Defendants' assertion that Nomura's Diligence Group performed the final sample

selection manually, that dispute is not material to FHFA's motion. *Quarles*, 758 F.2d at

840.  Defendants' assertion that Nomura used CoreLogic's HistoryPro and AVMSelect

products to select part of the adverse sample in certain instances appears to relate to the

selection of sample loans for AVM review, as stated by Mr. Grice.  *See* Nom. Ex. 32

(July 9 Grice Report) at 109, 116, 121, 127.  Any dispute over whether CoreLogic's

HistoryPro and AVMSelect  were used to select adverse samples for credit diligence is

not material to FHFA's motion. *Quarles*, 758 F.2d at 840.

249.    **FHFA Statement:**  Nomura's corporate representative agreed that for Mr. Katz's
        purchases, "S&P LEVELS® output was used to select the sample adversely." Ex. 19
        (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 153:16-154:14 ("Q.  Okay.  And
        what about in terms of practice, do you know if S&P LEVELS® output was used to

select the sample adversely?  A.  Well, I believe for Mr. Katz's business, yes, and for Mr. Murphy's business, no. … Q.  Okay.  And so was a -- was a sample used for adjustable rate mortgage due diligence?  A.  There was and it was chosen by the Due Diligence people.  Q.  Okay.  And that was based on S&P LEVELS®?  A.  It was not.")

**Nomura Response:**  Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. Nomura used methods in addition to S&P LEVELS to select adverse samples. For example, professionals in the Due Diligence Group exercised their experience and judgment and selected loans based on certain characteristics, including high LTV or CLTV ratio, low borrower credit score, high DTI ratios, certain geographic areas that had been hit by a "a recent storm" or were considered "soft markets," loans with large balances, loans with high initial interest rates, loans subject to specific state or local compliance requirements, and loans with a particular document type, e.g., low documentation loans. Ex. 30 (Sabo Tr.) at 173:7-174:3; Ex. 26 (Kohout Tr.) at 475:3-18; Ex. 308 (NOM-FHFA_04982973) at NOM-FHFA_04982973; see also Ex. 35 (Graham Tr.) at 216:22-217:10; see Ex. 32 (July 9 Grice Report) at 109, 116, 121, 127; Ex. 30 (Sabo Depo Tr.) at 175:2-16; Ex. 29 (Hartnagel Depo Tr.) at 250:13-19; Ex. 35 (Graham Tr.) at 218:18-219:3; Ex. 15 (Prahofer Tr.) at 156:10-25; Ex. 33 (NOM-FHFA_05491675) at NOM-FHFA_05491711 *See also* ¶ 242, *supra*, which is incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 249.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not dispute that Ms. Prahofer's testimony was accurately quoted.  While defendants cite to additional evidence showing that other methods were also used to select adverse samples, that evidence does not contradict that S&P LEVELS was used when selecting loans for Mr. Katz's samples. Therefore, Defendants additional evidence is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. To the extent Defendants rely on their response to ¶ 242, Defendants do not create a genuine dispute of material fact for the reasons stated in FHFA's reply to ¶ 242.

250.  **FHFA Statement:**  Mr. Katz understood that LEVELS would identify the loans "most likely to have losses." Ex. 30 (Deposition of Steven Katz) at 190:4-9 ("Q.  I guess what do you mean by adverse sample in the context of coming out of the S&P LEVELS

model?  A.  It would be -- the model is indicating that they were the worst loans as defined by most likely to have losses.").

**Nomura Response:**  Disputed. Although Mr. Katz gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. Nomura used methods in addition to S&P LEVELS to help select adverse samples, and LEVELS did more than identify the loans most likely to have losses. See ¶¶ 247, 249, *supra*, which are incorporated by reference herein; see also C. Stmt. at ¶¶ 138-150.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 250.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not dispute that Mr. Katz testimony is accurately quoted.  While Defendants assert that additional context is needed in order to fully understand the quoted excerpt, Defendants cite to the fact that Nomura used methods in addition to S&P LEVELS to select adverse samples, which does not contradict the asserted fact and therefore does not create a genuine dispute of material fact.  Part I.C, *supra*.  Moreover, Defendants also assert that S&P LEVELS did more than identify the loans most likely to have losses, which does not contradict the asserted fact which relates to Mr. Katz's understanding of LEVELS. Therefore, Defendants additional evidence is irrelevant to the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.  Moreover, Defendants fail to cite a particular portion of ¶¶ 247, 249, or C. Stmt. ¶¶ 138-150 that supports that LEVELS did more than identify the loans most likely to have losses, and therefore do not create a genuine dispute of material fact.  Part I.E, *supra*.

251.    **FHFA Statement:**  Mr. Kohout, who was then the head of the Credit Group, responded to Mr. Katz's email: "This is a non industry standard approach. I know for a fact that 3 of the largest Wall St. Conduits (Lehman, Morgan Stanley & CSFB) do not employ S&P levels in any meaningful way re: adverse sample selection for Alt-A or Sub Prime Pools." Ex. 78 (Dep. Ex. 21909, email dated April 21, 2005 from Joseph Kohout to Steven Katz, et. al, regarding Fremont/Nomura Trade - Settlement 5/20/05) at NOM-FHFA_05500892.

**Nomura Response:** Disputed. Although the document cited contains the statement quoted by plaintiff, the quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. Nomura used methods in addition to S&P LEVELS to help select adverse samples. *See* ¶ 249, *supra*, which is incorporated by reference herein. Further, Nomura trader Brett Marvin, a recipient of the document cited by plaintiff, testified that the document did not "actually reflect" the sampling process conducted by Nomura. Ex. 183 (Marvin Tr.) at 269:16-24.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 251.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the document is accurately quoted. While Defendants assert additional context is needed in order to fully understand the quoted excerpt, Defendants cite to the fact that Nomura used methods in addition to S&P LEVELS to help select adverse samples, but that assertion does not contradict the asserted fact. Therefore, Defendants additional evidence is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. And while Defendants cite the testimony of Mr. Marvin, that testimony does not contradict the asserted fact. Mr. Marvin did not testify that the cited email "did not 'actually reflect' the sampling process conducted by Nomura," as Defendants assert—only that the email did not "actually reflect" the resolution of the "spat" between Mr. Kohout and Mr. Katz, Nom. Ex. 183 at 269:16-2— and so does not contradict the cited document. Part. I.C, I.F, *supra*. Indeed, Nomura has conclusively admitted in C. Stmt. ¶ 140 that for bulk subprime and fixed rate trades, 90% of the adverse sample was often identified using LEVELS. Therefore Defendants' assertion regarding Mr. Marvin's testimony does not contradict the cited document. Part. I.C, I.F, *supra*. To the extent there may have been variations in the percentages of loans selected via LEVELS and loans adversely selected by other means, that variation is not material to FHFA's motion. *Quarles*, 758 F.2d at 840.

252. **FHFA Statement:** Mr. Kohout further stated: "From a macro credit perspective when presenting our process to both internal and external parties, it will have to be made clear that Credit's role in both the sample selection and management of risk on bulk transactions has been diminished to the point of that of a non effective entity pursuant to our limited role in the process. It will also have to be made clear that our process does not conform to what is generally deemed to be effective by industry standards." Ex. 78 (Dep. Ex. 21909, email dated April 21, 2005 from Joseph Kohout to Steven Katz, et. al, regarding Fremont/Nomura Trade - Settlement 5/20/05) at NOM- FHFA_05500892.

**Nomura Response:** Disputed. Although the document cited contains the statements quoted by plaintiff, the quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. Nomura trader Brett Marvin, a recipient of the document cited by plaintiff, testified that the document did not "actually reflect" the sampling process conducted by Nomura. Ex. 183 (Marvin Tr.) at 269:16-24. Mr. Marvin further testified that the email exchange reflects a "spat between Joe Kohout and Steve Katz" and the email does not actually reflect the resolution of the disagreement *Id.* at 269:16-24. *See* ¶ 249, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 252.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the document is accurately quoted. Nomura has conclusively admitted in that for bulk subprime and fixed rate trades, 90% of the adverse sample was often identified using LEVELS. See ¶ 140. While Defendants assert that additional context is needed in order to fully understand the quoted excerpt, they cite only testimony of Mr. Marvin that does not contradict the asserted fact. Mr. Marvin did not testify that the cited email "did not 'actually reflect' the sampling process conducted by Nomura, as Defendants assert— only that the email did not "actually reflect" the resolution of the "spat" between Mr. Kohout and Mr. Katz, Nom. Ex. 183 at 269:16-2—and so does not contradict the cited document. Part. I.C, I.F, *supra*.

253. **FHFA Statement:** All of the subprime Acquisition Pools at issue here were purchased after Mr. Katz's email in April 2005. Ex. 4 to the Cipione Decl. (Column D "Settlement Date," showing earliest settlement date of June 14, 2005).

**Nomura Response:** Defendants do not dispute that the subprime loan pools at issue here were purchased after April 2005. However, defendants dispute that the Cipione Declaration accurately reflects the diligence performed by Nomura on the referenced Acquisition Pools. The correct description of that diligence can be found at Mishol Decl. Ex. 4; Mishol Decl. Ex. 5.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 253.

**FHFA Reply:** Defendants do not dispute the asserted fact. Any dispute regarding

differences between Cipione Decl. Ex. 4 and Mishol Decl. Exs. 4-5 is not material to

FHFA's motion. *Quarles*, 758 F.2d at 840.

254. **FHFA Statement:** In a September 2006 email to RBS, Mendy Sabo noted that "60- 90% [of Nomura's sample is] Top levels," *i.e.* the highest S&P Levels ratings and "40 - 10% [was the] Due Dili sample" "[c]onsisting of: 1) DTI => 50%[,] 2) FICO <540[,] 3) Compliance hotspots (aka Chicago II)[,] 4) Largest loan $$[,] 5) Highest initial interest rates[,] 6) Origination date ('seasoning')[,] 7) Doc types." Ex. 108 (Dep. Ex. 40913, email dated September 29, 2006 from Mendy Sabo to Brian Farrell (RBS) and Neil Spagna regarding Fremont DD Reports) at NOM- FHFA_04982973 (noting that "60- 90% [of the sample is] Top levels," *i.e.* the highest S&P Levels ratings and "40 - 10% [was the] Due Dili sample.").

**Nomura Response:** Defendants do not dispute that Mr. Sabo sent the email referenced by plaintiff, which indicates that a portion of an adverse sample was generally selected using S&P LEVELS and a portion was manually selected by the Due Diligence Group.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 254.

**FHFA Reply:** Defendants do not dispute the asserted fact.

255. **FHFA Statement:** Mr. Sabo's September 2006 email stated that "[w]hile [Nomura] will look at "High Risk characteristics" loans (like SISA, 4 Unit, Cash-out, 50% DTI, 540 FICO) but since LEVELS weighs most of these loans as high risk (high subordination #'s) they are included already in our (LEVEL) sample." Ex. 108 (Dep. Ex. 40913, email dated September 29, 2006 from Mendy Sabo to Brian Farrell (RBS) and Neil Spagna regarding Fremont DD Reports) at NOM- FHFA_04982973 (noting that "[w]hile [Nomura] will look at "High Risk characteristics" loans (like SISA, 4 Unit, Cash-out, 50% DTI, 540 FICO) but since LEVELS weighs most of these loans as high risk (high subordination #'s) they are included already in our (LEVEL) sample. For that reason we break-out the above process. Of course these numbers can change based on the individual trades and loans noted within.").

**Nomura Response:** Defendants do not dispute that Mr. Sabo's email contains the statements quoted by plaintiff, and that the email explains that many loans identified as having higher risk characteristics by professionals in the Due Diligence Group based on experience and judgment, are also identified as higher risk through S&P LEVELS.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 255.

**FHFA Reply:** Defendants do not dispute the asserted fact. Defendants additional

statements and characterizations are irrelevant and to the extent they suggest that the

document states that loans are selected based on the Diligence Group's "experience and

judgment," unsupported by the document, which does not discuss the Diligence Group's

experience or judgment.

256. **FHFA Statement:** Mr. Kohout considered LEVELS to be a "black box." Ex. 53 (Deposition of Joseph Kohout) at 464:25-465:10 ("Q. Let's talk about the ones, subprime, fixed rate bulk where 90 percent of the sample was S&P levels. What is S&P levels? A. S&P levels is a proprietary black box model that was developed and managed by Standard & Poor's that was utilized to determine what the AAA subordination levels would be on a loan level basis.").

**Nomura Response:** Disputed. Although defendants do not dispute that Mr. Kohout gave the testimony quoted by plaintiff, or that the operation of LEVELS is proprietary to S&P, other testimony and documents make plain that Mr. Kohout understood that various factors disclosed on the loan tape were used in the LEVELS model. Ex. 26 (Kohout Tr.) at 468:7-469:7 ("generally speaking, yes, you would get LTV, you would get DTI, you would get loan amount, you would get FICO, you would get property type, you would get loan purpose. You would have borrower name and address. You know, property location."). *See also* ¶ 249 *supra* & C. Stmt. ¶¶ 133-141, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 256.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not

dispute that Mr. Kohout's testimony is accurately quoted. While Defendants assert that

Mr. Kohout understood that various factors disclosed on the loan tape were used in the

LEVELS model, that assertion does not contradict the asserted fact. Furthermore, Mr.

Kohout's testimony is that "[he] could only assume" that LEVELS used the "characteristics on the loan tape including LTV and DTI," Ex. 53 (Deposition of Joseph Kohout) at 468:11-16, which does not create a genuine dispute of material fact. Part I.C, *supra*. To the extent Defendants rely on Nom SUF ¶¶ 133-141, Defendants fail to cite a particular portion of those paragraphs, and therefore do not create a genuine dispute of material fact. Part I.E, *supra*.

257. **FHFA Statement:** Joseph Kohout testified that RBSSI used LEVELS "to determine what the AAA subordination levels would be on a loan level basis." Ex. 53 (Deposition of Joseph Kohout) at 464:25-465:10 ("Q. Let's talk about the ones, subprime, fixed rate bulk where 90 percent of the sample was S&P levels. What is S&P levels? A. S&P levels is a proprietary black box model that was developed and managed by Standard & Poor's that was utilized to determine what the AAA subordination levels would be on a loan level basis.").

   **Nomura Response:** Disputed. Mr. Kohout did not offer any testimony regarding RBSSI.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 257.

   **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants note that FHFA inadvertently referred to RBSSI instead of Standard & Poors, Defendants do not dispute that Mr. Kohout's testimony was accurately quoted or otherwise call into question the accuracy of the asserted fact.

258. **FHFA Statement:** Mr. Kohout knew that LEVELS used the information on loan tapes, but did not know which criteria LEVELS used to determine the level of subordination. Ex. 53 (Deposition of Joseph Kohout) at 467:23-468:16 ("Q. Fair enough. So what are the criteria that went into S&P levels to determine what you call the level of subordination? … A. That is what makes levels a black box. Q. But do you know at least, even if you don't know what they used, it's the information from the loan tape? A. That would be correct. Q. And so would it be fair to say that it would include the characteristics on the loan tape including LTV and DTI? … A. Again, I could only assume."); *id.* at 469:19-470:6 ("Q. Okay. But when you say -- generally, did you understand you're trying, when you say to adversely select, you're getting the loans that, based on the LTV, DTI, FICO and others, end up as, that the levels model would indicate

were riskier loans? … A. Again, you know, I don't know what went into the black box. It seems reasonable.")

**Nomura Response:** Disputed. Although defendants do not dispute that the operation of LEVELS is proprietary to S&P, testimony and documents make plain that Mr. Kohout understood that various factors disclosed on the loan tape were used in the LEVELS model. Ex. 26 (Kohout Tr.) at 468:7-469:7 ("generally speaking, yes, you would get LTV, you would get DTI, you would get loan amount, you would get FICO, you would get property type, you would get loan purpose. You would have borrower name and address. You know, property location."). *See also* ¶ 249 *supra* & C. Stmt. ¶¶ 133-141, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 258.

**FHFA Reply:** Defendants do note genuinely dispute the asserted fact. While

Defendants' assert that Mr. Kohout understood that various factors disclosed on the loan

tape were used in the LEVELS model, that assertion does not contradict the asserted fact.

Part I.C, *supra*.

259. **FHFA Statement:** Mr. Hartnagel did not know the criteria used by LEVELS. Ex. 33 (Deposition of Jeffrey Hartnagel) at 664:7-12 ("Q. Is there some kind of problem with using S&P levels? … A. Unless I know the criteria behind how things are being pulled, I can't answer that."); *id.* at 665:15-666:5 ("Q. Regarding that point about potential anti-predatory and regulatory risk, does what is written here suggest that the levels model didn't take into account things like high cost like you are discussing? … A. Again, without knowing the criteria behind levels at the time, I can't answer that. Q. Do you know what the criteria is behind levels? A. I would say Monday we went through this. And I do now, yes. At that time I did not know.").

**Nomura Response:** Disputed. Mr. Hartnagel testified that he did not recall using LEVELS as a way to select an adverse sample, Ex. 29 (Hartnagel Tr.) at 658:2-4, 661:6-8, 663:10-664:2, and thus, could not answer plaintiff's question about specific statements about LEVELS in a document introduced by plaintiff. Further, defendants object pursuant to Rule 56.1(c)(2) of the Federal Rules of Civil Procedure that Mr. Hartnagel's testimony quoted by plaintiff concerning LEVELS cannot be presented in a form that would be admissible in evidence. Mr. Hartnagel testified that he did not recall using LEVELS to select an adverse sample; as a result, his testimony about his understanding of LEVELS is speculative and not based on personal knowledge. *See Nora Beverages*, 269 F. 3d at 124.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 259.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not

dispute that the cited testimony is accurately quoted. While Defendants point out that

Mr. Hartnagel testified that he did not recall using LEVELS to select the adverse sample,

that testimony does not contradict the asserted fact that Mr. Hartnagel did not know the

criteria used by LEVELS. Part I.C, *supra*. While Defendants argue that the cited

testimony is not admissible because Mr. Hartnagel not answer specific question about

LEVELS, they do not explain why his testimony that he did not know the criteria that

LEVELS at the time used could be inadmissible. Part I.A, *supra*.

> (b)    *The Diligence Group Used Ad-Hoc Criteria To Draw The Remainder Of The Adverse Samples*

260.    **FHFA Statement:** The Diligence Group selected the loans in the adverse samples "for the 10 percent of the subprime and fixed rate bulk trades that were not selected … using S&P levels, and it would be for 100 percent of the ARM trades and Alt-A trades where we were not doing 100 percent due diligence." Ex. 53 (Deposition of Joseph Kohout) at 473:20-474:9 ("Q. And then, at times the credit team would make the adverse selection; is that right? A. That is correct. Q. And I am sorry, describe the situations where the credit team did that. A. It would be for the 10 percent of the subprime and fixed rate bulk trades that were not selected – that were not selected using S&P levels, and it would be for 100 percent of the ARM trades and Alt-A trades where we were not doing 100 percent due diligence.").

   **Nomura Response:** Defendants do not dispute that the due diligence team selected loans for adverse samples based on their experience and judgment. *See also* ¶ 249, *supra*, which is incorporated by reference herein.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 260.

   **FHFA Reply:** Defendants do not dispute the asserted fact. Defendants additional

commentary that the diligence team selected loans for adverse samples based on their

experience and judgment is unsupported.

261.    **FHFA Statement:** For the portion of the adverse samples that were selected by the Diligence Group, the Group would "look at high risk factors." Ex. 49 (Deposition of

Mendy Sabo) at 173:17-21 ("Q. So what did you do when it was going to be -- when you were deciding how to translate a percentage into actual loans? A. We would look at high risk factors.").

**Nomura Response**: Defendants do not dispute that Mr. Sabo gave the testimony quoted by plaintiff. Mr. Sabo also testified that there were a variety of high-risk factors considered by the Due Diligence Group in selecting the adverse sample, including "[l]oan-to-value ratios, DTIs, credit scores" and high-risk areas. Ex. 30 (Sabo Tr.) at 173:17-174:3. These were "just a few" of the factors the group considered. *Id.* Adverse sampling allowed Nomura to select the loans with the greatest credit risk or highest risk of default, which also had a greater risk of noncompliance with underwriting guidelines. *See* Ex. 32 (July 9 Grice Report) at 32-33, 67-69. *See also* ¶ 242, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 261.

**FHFA Reply:** Defendants do not dispute the asserted fact. Defendants do not characterize their additional assertions regarding which high-risk factors Mr. Sabo is describing are consistent with the asserted fact and Defendants do not characterize this as a disputes, and therefore it do not constitute a dispute of material fact. *See* I.C, *supra*. Defendants also do not characterize their additional assertion that adverse sampling allowed Nomura to select the loans with the greatest credit risk or highest risk of default, which also had a greater risk of noncompliance with underwriting guidelines, as a dispute, and it also therefore does not create a genuine dispute of material fact. Moreover, Defendants cite only to the report of Mr. Grice in support of this additional assertion, however the conclusory assertions of an expert do not create a genuine dispute of fact. Part I.G, *supra*.

262. **FHFA Statement:** There was "not a specific list" of these factors, and the adverse criteria varied "depending on the makeup of the pool." Ex. 49 (Deposition of Mendy Sabo) at 176:21-177:5 ("Q. Okay. Let me then make sure what the ones -- the high risk factors you believed were LTV, DTI, credit score. And anything else you remember? A. Those are some of the factors. There could have been more depending on the makeup of the pool. Again, I -- it's not a specific list and not necessarily in that order either."); *see also* Ex. 108 (Dep. Ex. 40913, email dated September 29, 2006 from Mendy Sabo to

Brian Farrell (RBS) and Neil Spagna regarding Fremont DD Reports) at NOM-FHFA_04982973 (noting that (1) "60- 90% [of the sample is] Top levels," *i.e.* the highest S&P Levels ratings, and "40 - 10% Due Dili sample," that (2) "A & B [*i.e.* the split between S&P Levels and due diligence samples] depends on what the desk dictates based on Seller loan ratings, value, pricing, etc," and that (3) "While we will look at "High Risk characteristics' loans (like SISA, 4 Unit, Cash-out, 50% DTI, 540 FICO) but since LEVELS weighs most of these loans as high risk (high subordination #'s) they are included already in our (LEVEL) sample. For that reason we break-out the above process. Of course these numbers can change based on the individual trades and loans noted within.").

**Nomura Response:** Disputed. Although defendants do not dispute that Mr. Kohout gave the testimony quoted by plaintiff, that testimony identified some, but not all of the factors considered in selecting an adverse sample. In other testimony, members of the Due Diligence Group also identified "credit scores" and "high-risk areas" as factors considered in choosing the adverse sample. Ex. 30 (Sabo Tr.) at 173:17-174:3. Nomura also utilized random sampling in addition to adverse sampling. Ex. 30 (Sabo Tr.) at 175:2-16; Ex. 29 (Hartnagel Tr.) at 250:13-19. *See also* ¶ 242 *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 262.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants identify additional factors considered in selecting adverse samples, Defendants' assertion does not contradict the asserted fact that there was not a specific list of adverse criteria and that the adverse criteria varied depending on the make up of the pool, and therefore do not create a genuine dispute of material fact. Part I.C, *supra*. Defendants' citation to testimony regarding the potential use of random sampling on other pools is irrelevant to the asserted fact regarding the adverse criteria used by Nomura and does not create a genuine dispute of material fact. Part I.C, *supra*. Moreover, Defendants' do not provide evidence that a random sample was selected for any Acquisition Pool, merely citing testimony and a presentation stating that on some unspecified pools, Nomura might have selected some random loans. To the extent Defendants rely on the testimony of Mr. Hartnagel, Defendants elsewhere have admitted that Mr. Hartnagel's testimony regarding

Nomura's sampling practices speculative and not admissible. *See* ¶ 233, 259. To the

extent Defendants rely on Mr. Sabo's testimony, Mr. Sabo also testified: "[i]t was an

adverse selection." Nom. Ex. 30 (Deposition of Mendy Sabo) at 173:7-11 ("Q. Do you

know who was determining, then -- or let me ask: How, then, was it decided, based on

the percentage, which actual loans would be sampled? A. It was an adverse selection.").

To the extent Defendants rely on their response to ¶ 242, they do not create a genuine

dispute of material fact for the reasons stated in FHFA's reply to ¶ 242.

263. **FHFA Statement:** The Diligence Group's adverse criteria included: "[h]igh DTI, high LTV -- high DTI, high LTV, soft markets, geographic soft markets, doc type." Ex. 53 (Deposition of Joseph Kohout) at 113:20-114:6 ("Q. Okay. Do you recall what were the adverse factors -- so what are the characteristics of loans that would come up for, when you were doing an adverse sample, what are those adverse factors? … A. High DTI, high LTV -- high DTI, high LTV, soft markets, geographic soft markets, doc type. Those were primary adverse strats that we would use. There were others, but. . .").

**Nomura Response:** Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For instance, in addition to the testimony cited by plaintiff, Mr. Sabo testified that "credit scores" and "high-risk areas" were among the factors considered in choosing the adverse sample. Ex. 30 (Sabo Tr.) at 173:17-174:3. Nomura also utilized random sampling in addition to adverse sampling. Ex. 30 (Sabo Tr.) at 175:2-16; Ex. 29 (Hartnagel Tr.) at 250:13-19. *See also* ¶ 242, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 263.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

identify additional factors considered in selecting adverse samples, Defendants' assertion

does not contradict the asserted fact that adverse criteria included: high DTI, high LTV --

high DTI, high LTV, soft markets, geographic soft markets, doc type. Part I.C, *supra*.

Defendants' citation to testimony regarding the potential use of random sampling on other

pools is irrelevant to the asserted fact regarding the adverse criteria used by Nomura and

does not create a genuine dispute of material fact. Part I.C, *supra*. Moreover, Defendants'

do not provide evidence that a random sample was selected for any Acquisition Pool,

merely citing testimony and a presentation stating that on some unspecified pools,

Nomura might have selected some random loans. To the extent Defendants rely on the

testimony of Mr. Hartnagel, Defendants elsewhere have admitted that Mr. Hartnagel's

testimony regarding Nomura's sampling practices speculative and not

admissible. *See* ¶ 233, 259. To the extent Defendants rely on Mr. Sabo's testimony,

Mr. Sabo also testified: "[i]t was an adverse selection." Nom. Ex. 30 (Deposition of

Mendy Sabo) at 173:7-11 ("Q. Do you know who was determining, then -- or let me ask:

How, then, was it decided, based on the percentage, which actual loans would be

sampled? A. It was an adverse selection."). To the extent Defendants rely on their

response to ¶ 242, they do not create a genuine dispute of material fact for the reasons

stated in FHFA's reply to ¶ 242.

264. **FHFA Statement:** To select loans using these adverse criteria, the Diligence Group would run "several macros that included canned stratifications" on an "Excel spreadsheet with loan characteristics" and then conduct an "eyeball analysis of the loan level detail … [to] determine an adverse sample selection based on what we perceived to be adverse criteria embedded within the loan level … portfolio." Ex. 53 (Deposition of Joseph Kohout) at 112:9-23 ("Q. What detail and time and resources were needed to properly select the loans that would be in a due diligence sample? A. It would start with, generally, with an Excel spreadsheet with loan characteristics. We had several macros that included canned stratifications that we would run. And then there would be an eyeball analysis of the loan level detail in which case we would determine an adverse sample selection based on what we perceived to be adverse criteria embedded within the loan level, you know, the loan level portfolio."); *id.* at 481:25-483:11 ("Q. Was the adverse selection sample figured out manually or was there some computer program that was being used? A. We would generally work in Excel. Q. And in Excel, you mean you would have loans, and then you would have different collateral characteristics in columns? A. Right. We would have sorts, correct. Q. Sorts. And so try, to the best of your recollection, to describe how you would literally use sort functions to come up with the adverse selection? A. I mean, fairly literally. You would sort by various criteria. You would look at the loans as a whole. You would sort by various criteria to those factors that I illuminated on earlier. Q. And again, do you think that you would sort for

the highest DTI and pick those loans, or was there some formula that weighed and balanced all of the criteria? … A. No -- again, I can't recall specifically, but I am sure that we had canned sorts where we looked at layered risk, as well as individual risk items on loans. And then based on what the allowable due diligence percentage was, we tried to -- our goal was to select the most adverse.").

**Nomura Response:** Disputed. Although defendants do not dispute that Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, the testimony cited by plaintiff makes clear that for adverse samples for credit and compliance due diligence chosen by the Due Diligence Group, the professionals looked at both layered risk and individual risk items in making selections. See Pl. Ex. 53 (Deposition of Joseph Kohout) at 112:9-23. *See also* ¶¶ 242, 249, *supra*, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 264.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert additional context is required in order to fully understand the quoted excerpt, Defendants only excerpt testimony from the quoted language clarifying that the stratifications, also called sorts, referred to in FHFA's asserted fact looked at layered risk and individual risk items, which does not contradict the asserted fact. Therefore Defendants' assertion does not create a genuine dispute of material fact. Part I.C, *supra*. To the extent Defendants rely on their responses to ¶¶ 242, 249, those responses do not create a genuine issue of material fact for the reasons stated in FHFA's replies to ¶¶ 242, 249.

265. **FHFA Statement:** For the FNBN 21 Alt-A adjustable rate Acquisition Pool, 170 loans in the sample were chosen "using a blending of the Nomura risk score and S&P rating" and 24 loans were chosen "based on high loan balance, state compliance plus Nomura risk score and S&P rating." Ex. 98 (Dep. Ex. 25311 (email dated September 1, 2006 from Brian Murphy to Neil Spagna regarding FNBN 21) at NOM-FHFA_05032403 ("1. The majority (170 loans) using a blending of the Nomura risk score and S&P rating. 2. Additional 24 were based on high loan balance, state compliance plus Nomura risk score and S&P rating.").

**Nomura Response:** Undisputed.

168

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 265.

**FHFA Reply:**  Nomura does not dispute the asserted fact.

266.  **FHFA Statement:**  There is no evidence of the sample selection criteria for any Alt-A or adjustable rate Acquisition Pool besides the FNBN 21 Acquisition Pool.

**Nomura Response:**  Disputed. Evidence in this action shows that Nomura considered a variety of factors in selecting adverse samples for all pools. *See* ¶¶ 242, 249, *supra*, which are incorporated by reference herein. Joseph Kohout testified that for "[a]nything other than subprime bulk and fixed rate loans," which would include, among other things, Alt-A pools, "the credit team determin[ed] the sample." Ex. 26 (Kohout Tr.) at 98:21-99:4.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 266.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  FHFA's asserted fact related to the sample-selection criteria specific to a particular Alt-A or adjustable rate Acquisition Pool.  Defendants do not cite any additional evidence of the sample-selection criteria specific to a particular Alt-A or adjustable rate Acquisition Pool.  The additional testimony and documents cited by Defendants, including those in ¶¶ 242, 249, relate to testimony regarding general adverse selection criteria and do not cite any evidence of the sample-selection criteria specific to a particular Alt-A or adjustable rate Acquisition Pool.  Therefore they do not create a genuine issue of material fact.

4.  Nomura Securities Excluded Loans From Valuation Diligence Without Any Basis To Conclude That The Underlying Appraisals Were Incorrect

267.  **FHFA Statement:**  During the initial screening process for valuation diligence, Nomura would use HistoryPro, which "assign[ed] a risk score to a property based on various factors including location." Ex. 53 (Deposition of Joseph Kohout) at 311:9-13 ("Q.  And what else was the screening process? A.  There was a time that we used a CoreLogic product called HistoryPro. That would generate a score."); *id.* at 312:5-12 ("Q.  So some of the time, first there was a CoreLogic HistoryPro was the first screen? A.  Correct. Q.  And what is that? A.  It assigns a risk score to a property based on various factors including location.").

**Nomura Response:** Disputed. Although defendants do not dispute that Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, CoreLogic's HistoryPro was a "Collateral Valuation" tool. Pl. Ex. 112 (NOM-FHFA_05369154), at NOM-FHFA_05369156 ("C&S = $4/Collateral Valuation/Pre AVM screening tool (product is known as 'History Pro')"); Ex. 215 (NOM-FHFA_05369213) at NOM-FHFA_05369213 (HistoryPro considered various factors including "pricing and appraisal attributes," as well as "subject property characteristics and sales history detail, comparable values, nearby property sales information, [and] market data"). In addition, for some loans, initial valuation review was performed using Hansen and its PREVIEW valuation product, an AVM model. Ex. 33 (NOM-FHFA_05491675) at NOM-FHFA_05491715; Ex. 30 (Sabo Depo Tr.) at 234:17-20; Ex. 213 (NOM-FHFA_05054890) at NOM-FHFA_05054890; Ex. 26 (Kohout Tr.) at 315:21-316:16; Ex. 214 (NOM-FHFA_05369158) at NOM-FHFA_05369159-171. Defendants do not dispute that 100% of the loans submitted to CoreLogic were submitted for evaluation by CoreLogic's HistoryPro product. See Ex. 186 (NOM-FHFA_05491674) at NOM-FHFA_05491674; Ex. 33 (NOM-FHFA_05491675) at NOM-FHFA_05491715; Ex. 212 (FHFA13253477) at FHFA13253479. In addition, some loans submitted for evaluation by CoreLogic's HistoryPro program also received a CoreLogic AVM. Ex. 179 (NOM-FHFA_05435583) at NOM-FHFA_05435583; Ex. 32 (July 9 Grice Report) at ¶¶ 116, 232, 246, 264.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 267.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Nomura screened loans through CoreLogic's HistoryPro nor that the cited testimony is accurate. Nomura instead asserts that a lack of context calls the asserted fact into question, but Nomura fails to cite a particular portion of the transcript providing such context and therefore does not create a genuine dispute of material fact. Part I.E, *supra*. Additionally, Nomura's citation to additional documents and processes do not speak to the disputed fact, but rather serve as irrelevant and improper replies to arguments in FHFA's opening brief. These irrelevant documents do not create a genuine dispute of material fact as to the fact allegedly disputed. Part I.C, *supra*.

268.    **FHFA Statement:** According to CoreLogic's marketing materials, the HistoryPro product "grades collateral risk by analyzing factors most predictive of the types of fraud

that contribute to early payment default and loan loss. HistoryPro's industry-pioneering F-Score – tested and proven by mortgage originators and investors nationwide—offers unmatched accuracy at spotting potential fraud." Ex. 110 (NOM-FHFA_05369213, HistoryPro Advertisement) at NOM-FHFA_05369214 ("In a recent head-to-head comparison against another widely used collateral scoring tool … HistoryPro's F-Score … detected a greater percentage of loss-producing fraud[.]"); *id.* at NOM-FHFA_05369213 ("A recent study of more than 2,000,000 loans demonstrates the power of the HistoryPro F-Score to predict early payment default (EPD). An F-Score of 25 is 9 times as likely to go into EPD than an F-Score of 0.").

**Nomura Response:** Defendants do not dispute that plaintiff's Exhibit 110 includes the text quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 268.

**FHFA Reply:** Defendants do not dispute the asserted fact.

269. **FHFA Statement:** Nomura generally sent large loan pools to CoreLogic for F-Scores through the HistoryPro tool. Ex. 105 (NOM-FHFA_05191125, email regarding nheli 2006-wf1) at NOM- FHFA_05191127 ("[Nomura] ran the entire pool through HistoryPro (a Core Logic Product). Pursuant to the score we either upgraded to an AVM product or directly to a BPO.").

**Nomura Response:** Disputed. The evidence cited by plaintiff does not show that "Nomura generally sent large loan pools to CoreLogic." Defendants do not dispute that Nomura conducted 100% valuation diligence on loan pools and that all of the loans sent to CoreLogic were submitted for evaluation by HistoryPro, but large loan pools were also sent to Hansen for evaluation using Hansen Preview. *See also* ¶ 267, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 269.

**FHFA Reply:** Defendants do not dispute a material fact. While Defendants dispute whether it had a general practice of sending larger loan pools to CoreLogic, any such dispute is not material to FHFA's motion. *See Quarles*, 758 F.2d at 840.

270. **FHFA Statement:** The price per loan to utilize HistoryPro was less than the price per loan to utilize an AVM or BPO. Ex. 111 (NOM-FHFA_05500943, email regarding "Weekly Meeting Nomura/FARES") at NOM-FHFA_05500943 ("**Note that our costs are $4 per loan for History Pro and an additional $10 per loan should we upgrade to an AVM or Hansen Preview"); Ex. 112 (NOM-FHFA_05369154, email regarding "licensing agreements") at NOM-FHFA_05369156 (listing approximate vendor prices as

"Ocwen = $125/Collateral Valuation/BPO", "Hansen = $12.50/Collateral Valuation/AVM (product is known as' Preview')", and "C&S = $4/Collateral Valuation/Pre AVM screening tool (product is known as 'History Pro')").

**Nomura Response:** Disputed. Although the documents cited contain the statements quoted by plaintiff, the quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. *See* ¶ 267, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 270.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants dispute that the price per loan to run HistoryPro was less than running either a full AVM or BPO, Nomura's assertion that additional documents provide context that call the asserted fact into question fails to cite to any document related to pricing, and therefore does not create a genuine dispute of material fact. Part I.E, *supra*. Additionally, the referenced documents regarding alternate processes Nomura may have employed are irrelevant to the asserted fact, which is simply about the cost of one specific process, and therefore do not create a genuine dispute of material fact. Part I.C, *supra*.

271. **FHFA Statement:** In a February 2006 email regarding the role of F-Scores in the appraisal review process, Mr. Kohout stated that Nomura's "ultimate goal is and has always been to manage collateral risk while balancing cost." Ex. 113 (Dep. Ex. 40915, email regarding "Wells SP01 Due Dilli Sample") at NOM-FHFA_05320550 (discussing internal process regarding F-Scores).

**Nomura Response:** Disputed. Although the document contains the statement quoted by plaintiff, that quote is removed from the context in which it appears, and omits other statements that must be evaluated in order to fully understand the quoted excerpt. For instance, Mr. Kohout also testified that "[w]hat we did for property valuation surpassed what anyone did." Ex. 26 (Kohout Tr.) at 334:25-335:19. Mr. Kohout noted that others in the industry only performed valuation diligence on a sample of loans, in contrast to Nomura's practice of submitting 100% of loans in each trade pool for valuation diligence. *Id.* at 335:20-337:5, 337:17-338:21. *See also* ¶ 267, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 271.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not

dispute that Nomura sought to balance cost and risk nor that the quoted language is

accurate. Nomura's assertion that additional documents provide context that call the

asserted fact into question fails to cite to any document actually refuting the asserted fact

and therefore does not create a genuine dispute of material fact. Part I.E, *supra*.

Additionally, the referenced documents and testimony regarding the scope of Nomura's

review are irrelevant to the asserted fact, which is simply sought cost-effect methods, and

therefore do not create a genuine dispute of material fact. Part I.C, *supra*.

272. **FHFA Statement:** The Diligence Group used HistoryPro as a "[p]re AVM screening tool[.]" Ex. 112 (NOM-FHFA_05369154, email regarding "licensing agreements") at NOM-FHFA_05369156 ("C&S = $4/Collateral Valuation/Pre AVM screening tool (product is known as 'History Pro')"); Ex. 53 (Deposition of Joseph Kohout) at 491:25-492:10 ("Q. Okay. And how were F scores used during due diligence, if at all? A. Again, I would have to see the breakdown, but to the best of my knowledge, if we used an F score, there would be a certain numerical value that would be assigned and applied as a screening tool of some sort. I would have to actually see. I can't recall what the logic was behind F scores.").

**Nomura Response:** Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, CoreLogic's HistoryPro was a "Collateral Valuation" tool. Pl. Ex. 112 (NOM-FHFA_05369154), at NOM-FHFA_05369156 ("C&S = $4/Collateral Valuation/Pre AVM screening tool (product is known as 'History Pro')"); Ex. 215 (NOM-FHFA_05369213) at NOM-FHFA_05369213 (HistoryPro considered various factors including "pricing and appraisal attributes," as well as "subject property characteristics and sales history detail, comparable values, nearby property sales information, [and] market data"). Furthermore, Nomura conducted further valuation diligence on every loan submitted for evaluation by HistoryPro except those that received an F-Score of 0, the lowest possible risk. Ex. 219 (NOM-FHFA_05500943) at NOM-FHFA_05500943; Ex. 212 (FHFA13253477) at FHFA13253479 (Freddie Mac review of Nomura stating an F-Score of 0 indicated "no risk, no additional review is required."); Ex. 32 (July 9 Grice Report) at ¶¶ 116, 232, 246, 264. Nomura also utilized Hansen and its PREVIEW valuation product, an AVM model, to conduct valuation due diligence. Ex. 26 (Kohout Tr.) at 315:21-316:16; Ex. 214 (NOM-FHFA_05369158) at NOM-FHFA_05369159, NOM- FHFA_05369171; see Ex. 32 (July 9 Grice Report) at 109. *See also* ¶ 267, *supra*, which is incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 272.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not

dispute that Nomura used HistoryPro as a pre-AVM screening tool nor that the cited

testimony and documents are accurate.  Nomura's assertion that additional documents

provide context that call the asserted fact into question fails to cite to any document

actually refuting the asserted fact and therefore does not create a genuine dispute of

material fact.  Part I.E, *supra*.  Additionally, the referenced documents and testimony

regarding post-screening review are irrelevant to the asserted fact, which is limited to pre-

AVM screening, and therefore do not create a genuine dispute of material fact.  Part I.C,

*supra*.

273.    **FHFA Statement:**  The Diligence Group used the F Score to make the "determination
        for escalation to the next level of the screening process." Ex. 53 (Deposition of Joseph
        Kohout) at 312:5-313:7 ("Q.  So some of the time, first there was a CoreLogic HistoryPro
        was the first screen?  A.  Correct.  Q.  And what is that?  A.  It assigns a risk score to a
        property based on various factors including location. . . . And then we applied an
        escalation based on what that score meant. . . . Q. And what would you look at?  A. We
        would look at the actual score that was assigned on a loan level basis as a determination
        for escalation to the next level of the screening process.").

        **Nomura Response:**  Defendants do not dispute that, for loans submitted to History Pro,
        the Due Diligence Group used the F Score to help determine whether further valuation
        diligence was necessary. CoreLogic's HistoryPro was a "Collateral Valuation" tool. Pl.
        Ex. 112 (NOM- FHFA_05369154), at NOM-FHFA_05369156 ("C&S = $4/Collateral
        Valuation/Pre AVM screening tool (product is known as 'History Pro')"); Ex. 215
        (NOM-FHFA_05369213) at NOM-FHFA_05369213 (HistoryPro considered various
        factors including "pricing and appraisal attributes," as well as "subject property
        characteristics and sales history detail, comparable values, nearby property sales
        information, [and] market data"). Nomura conducted further valuation diligence on every
        loan except those that received an F-Score of 0, the lowest possible risk.  Ex. 219 (NOM-
        FHFA_05500943) at NOM-FHFA_05500943; Ex. 212 (FHFA13253477) at
        FHFA13253479 (Freddie Mac review of Nomura stating an F-Score of 0 indicated "no
        risk, no additional review is required."); Ex. 32 (July 9 Grice Report) at ¶¶  116, 232,
        246, 264.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 273.

**FHFA Reply:**  Defendants do not dispute the asserted fact.  Additionally, the cited documents are irrelevant to the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

274.    **FHFA Statement:**  "F scores were used primarily to determine property valuation samples." Ex. 53 (Deposition of Joseph Kohout) at 492:11-18 ("Q.  To your knowledge, did due diligence ever reject a loan based on an F score?  A.  To the best of my knowledge, F scores were used primarily to determine property valuation samples. Although, again, I would have to see what the logic behind the F score is."); *id.* at 493:3-12 ("Q.  Okay.  So the best of your recollection, the F score was used to screen which of the loans would go through more rigorous property valuation analysis?  A.  I can't specifically recall, but that seems right.  I would actually have to see what the F score was, and what the logic was behind the F score.").

**Nomura Response:**  Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, he specifically testified that he did not at his 2013 deposition recall the precise use of the F-score in the 2005-2006 period. Other testimony and documents establish that CoreLogic's HistoryPro was a "Collateral Valuation" tool, and that if the F-score indicated any issue with collateral valuation there was an escalation of that loan for additional valuation diligence procedures. Pl. Ex. 112 (NOM-FHFA_05369154), at NOM-FHFA_05369156 ("C&S = $4/Collateral Valuation/Pre AVM screening tool (product is known as 'History Pro')"); Ex. 215 (NOM- FHFA_05369213) at NOM-FHFA_05369213 (HistoryPro considered various factors including "pricing and appraisal attributes," as well as "subject property characteristics and sales history detail, comparable values, nearby property sales information, [and] market data"). See ¶¶ 267, 272, *supra*, which are incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 274.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do cite any portion of Mr. Kohout's testimony that contradicts the asserted fact, which does not create a genuine dispute of material fact.  Part I.E, *supra*.  Additionally, the cited documents are irrelevant to the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

275. **FHFA Statement:** CoreLogic advertized HistoryPro as utilizing a "proprietary risk assessment engine" to produce an F-Score. Ex. 110 (NOM-FHFA_05369213, HistoryPro Advertisement) at NOM- FHFA_05369213 ("HistoryPro's proprietary risk assessment engine evaluates numerous elements to determine its innovative F-score.").

**Nomura Response:** Defendants do not dispute that HistoryPro used a proprietary risk assessment engine to produce an F-Score. Additionally, HistoryPro considered various factors including "pricing and appraisal attributes," as well as "subject property characteristics and sales history detail, comparable values, nearby property sales information, [and] market data." Ex. 215 (NOM-FHFA_05369213) at NOM-FHFA_05369213. Thus, CoreLogic's HistoryPro was a "Collateral Valuation" tool. Pl. Ex. 112 (NOM-FHFA_05369154), at NOM-FHFA_05369156 ("C&S = $4/Collateral Valuation/Pre AVM screening tool (product is known as 'History Pro')"); Ex. 215 (NOM-FHFA_05369213) at NOM-FHFA_05369213 (HistoryPro considered various factors including "pricing and appraisal attributes," as well as "subject property characteristics and sales history detail, comparable values, nearby property sales information, [and] market data").

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 275.

**FHFA Reply:** Defendants do not dispute the asserted fact. Additionally, the cited documents are irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

276. **FHFA Statement:** History Pro issued F-Scores in a scale of 0 to 25. Ex. 110 (NOM-FHFA_05369213, HistoryPro Advertisement) at NOM-FHFA_05369213 ("An F-Score of 25 is 9 times as likely to go into EPD than an F-Score of 0"); Ex. 111 (NOM-FHFA_05500943, email regarding "Weekly Meeting Nomura/FARES") at NOM-FHFA_05500943 (indicating that F-Scores could range from 0 to 25 and that Nomura escalated loans to AVM or BPO review based on the F-Score).

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 276.

**FHFA Reply:** Defendants do not dispute the asserted fact.

277. **FHFA Statement:** The Diligence Group sent loans to AVM or BPO review based on their F-Scores. Ex. 113 (Dep. Ex. 40915, email regarding "Wells SP01 Due Dilli Sample") at NOM- FHFA_05320550 ("We will utilize the [F-Scores] as one of several tools at our disposal to determine those loans that we wish to upgrade to a BPO."); Ex. 105 (NOM-FHFA_05191125, email regarding "nheli 2006-wf1") at NOM-

FHFA_05191127 ("[Nomura] ran the entire pool through HistoryPro (a Core Logic Product). Pursuant to the score we either upgraded to an AVM product or directly to a BPO.").

**Nomura Response:** Disputed. Although the Nomura Due Diligence Group escalated loans receiving an F-score greater than 0 for further valuation diligence procedures including AVMs and/or BPOs, all loans submitted to Hansen received an AVM. See ¶ 272 *supra* & C. Stmt. at ¶¶ 72-76, 66-68, which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 277.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Whether or not Nomura also submitted loans to AVM review through Hansen is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

278. **FHFA Statement:** Loans rated an F-score of 10 through 25 were submitted for BPO review. Ex. 111 (NOM-FHFA_05500943, email regarding" Weekly Meeting Nomura/FARES") at NOM- FHFA_05500943 ("History Pro 'F-Score' = 10-25 (upgrade to a BPO)"); Ex. 105 (NOM- FHFA_05191125, email regarding "nheli 2006-wf1") at NOM-FHFA_05191126 ("Score = 10-25 upgrade directly to a BPO"); Ex. 113 (Dep. Ex. 40915, email regarding "Wells SP01 Due Dilli Sample") at NOM-FHFA_05320550 ("We will utilize the [F-Scores] as one of several tools at our disposal to determine those loans that we wish to upgrade to a BPO.")

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 278.

**FHFA Reply:** Defendants do not dispute the asserted fact.

279. **FHFA Statement:** Loans rated an F-Score of 1 through 9 were submitted for AVM review. Ex. 111 (NOM-FHFA_05500943, email. regarding "Weekly Meeting Nomura/FARES") at NOM- FHFA_05500943 ("History Pro 'F-Score' = 1-9 (upgrade to an *AVM)"); Ex. 105 (NOM- FHFA_05191125, email regarding "nheli 2006-wf1") at NOM-FHFA_05191126 ("Score = 1-9 upgrade to AVM or AVM Product"); Ex. 114 (NOM-FHFA_04529084, spreadsheet detailing HistoryPro scores and AVM valuation results for Silver State 63) at NOM-FHFA_04529084 (Columns Y through AC show "AVM Value" and other AVM results generated for loans with an F-Score between 1 and 9); Ex. 115 (NOM-FHFA_05729702, spreadsheet with file name, "AVM- Order-CNSCNS-AEGIS MORTGAGE-ALTA-sd-20050926-AG5829AXL-AEGIS0829-2252," detailing HistoryPro scores and AVM valuation results for Aegis 03A) at NOM-FHFA_05729702 (Columns Y through AC show "AVM Value" and other AVM results

generated for loans with an F-Score between 1 and 9); Ex. 116 (NOM-FHFA_05070322, spreadsheet detailing HistoryPro scores and AVM valuation results for ResMAE SP01) at NOM-FHFA_05070322 (Columns Y through AC show "AVM Value" and other AVM results generated for loans with an F-Score between 1 and 9); see Ex. 117 (NOM-FHFA_05122146, email regarding "DDtape_FremontSP02.xls") at NOM-FHFA_05122146 (indicating that loans were "upgrade[d] to AVM's based on the scores falling into the 1 - 9 (F Score) bucket"); *see also* Ex. 357 (NOM- FHFA_04529081, email regarding "Package SILVER STATE MTG\ALTA-sd-20061130- SS6N02AXL - Silver State 63: AVM.CNSCNS.Order3018") at NOM-FHFA_04529081 (attaching NOM-FHFA_04529084, spreadsheet detailing HistoryPro scores and AVM valuation results for Silver State 63); Ex. 358 (NOM-FHFA_05070319, email regarding "Package RESMAE MORTGAGE CORP\SUBPRIME-sd-20061027-RA6810PXL - Resmae SP01: AVM.CNSCNS.Order285") at NOM-FHFA_05070319 (attaching NOM-FHFA_05070322, spreadsheet detailing HistoryPro scores and AVM valuation results for ResMAE SP01).

**Nomura Response:** Defendants do not dispute that CoreLogic automatically generated an AVM for loans with an F-Score between 1 and 9. See C. Stmt. at ¶¶ 69-75.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 279.

**FHFA Reply:** Defendants do not dispute the asserted fact.

280. **FHFA Statement:** Loans rated an F-Score of 0 almost always did not receive additional valuation diligence review. Ex. 111 (NOM-FHFA_05500943, email regarding "Weekly Meeting Nomura/FARES") at NOM-FHFA_05500943 ("History Pro 'F-Score' = 0 (no additional valuations ordered)"); Ex. 53 (Deposition of Joseph Kohout) at 313:8-23 ("Q. And do you know then which of the ones that were run through CoreLogic HistoryPro, when that was used, went on to another step? A. Yeah, I would have to see -- there was a protocol relative to the score. So I would have to look and see, because I can't remember. There was a defined protocol where, if there was a certain score range in place, we would upgrade to the next step of the screening process. Q. And generally, if it passed CoreLogic HistoryPro, was it cleared for valuation purposes? A. Correct."); Ex. 114 (NOM-FHFA_04529084, spreadsheet detailing HistoryPro scores and AVM valuation results for Silver State 63) at NOM-FHFA_04529084 (Columns Y through AC show no AVM results were generated for loans with an F-Score of zero.); Ex. 115 (NOM-FHFA_05729702, spreadsheet with file name, "AVM-Order-CNSCNS-AEGIS MORTGAGE-ALTA-sd-20050926-AG5829AXL-AEGIS0829-2252," detailing HistoryPro scores and AVM valuation results for Aegis 03A) at NOM-FHFA_05729702 (Columns Y through AC show no AVM results were generated for loans with an F-Score of zero.); Ex. 116 (NOM- FHFA_05070322, spreadsheet detailing HistoryPro scores and AVM valuation results for ResMAE SP01) at NOM-FHFA_05070322 (Columns Y through AC show no AVM results were generated for loans with an F-Score of zero.); *see also* Ex. 357 (NOM-FHFA_04529081, email regarding "Package SILVER STATE MTG\ALTA-sd-20061130-SS6N02AXL - Silver State 63: AVM.CNSCNS.Order3018")

at NOM-FHFA_04529081 (attaching Ex. 114 (NOM- FHFA_04529084, spreadsheet detailing HistoryPro scores and AVM valuation results for Silver State 63)); Ex. 358 (NOM-FHFA_05070319, email regarding "Package RESMAE MORTGAGE CORP\SUBPRIME-sd-20061027-RA6810PXL - Resmae SP01: AVM.CNSCNS.Order285") at NOM-FHFA_05070319 (attaching Ex. 116 (NOM-FHFA_05070322, spreadsheet detailing HistoryPro scores and AVM valuation results for ResMAE SP01)).

**Nomura Response:**  Disputed. Although defendants do not dispute that if a loan received an F-Score of 0, Nomura typically conducted no "additional valuation diligence," plaintiff's statement omits the fact that an F-Score of 0 indicated the lowest possible risk so that no "additional valuation diligence" was needed or appropriate. See C. Stmt. at ¶¶ 66-72.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 280.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants dispute the asserted fact, they identify no evidence that contradicts it. Nomura's conclusory assertions do not create a genuine dispute of material fact.  Part I.B, *supra*.

281.  **FHFA Statement:**  "[G]enerally, if [a loan] passed CoreLogic HistoryPro, [it was] cleared for valuation purposes." Ex. 53 (Deposition of Joseph Kohout) at 313:20-23 ("Q. And generally, if it passed CoreLogic HistoryPro, was it cleared for valuation purposes? A.  Correct."); *see also* Ex. 359 (12/12/2013 Letter from A. Davidoff to E. Taggart) (adopting testimony as that of a Rule 30(b)(6) witness).

**Nomura Response:**  Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, plaintiff's statement omits the fact that only a loan with an F-score of 0, indicating the lowest risk, was considered to have "passed" CoreLogic HistoryPro so that no further valuation diligence was needed or appropriate. C. Stmt. at ¶ 72.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 281.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Nomura does not dispute that the veracity of the cited testimony nor that it was properly cited.  While Defendants purport to dispute the asserted fact, they identify no evidence that contradicts

179

it. Nomura's conclusory assertions regarding the self-defined implication of HistoryPro

scores do not create a genuine dispute of material fact. Part I.B, *supra*.

282. **FHFA Statement:** Mr. Kohout testified that he would assume "less than half" the loans screened through HistoryPro received additional screening or valuation review. Ex. 53 (Deposition of Joseph Kohout) at 313:24-314:10 ("Q. And do you remember approximately, what percentage, when CoreLogic HistoryPro was in use, would go on through further screening after that? A. I don't, off the top of my head. Q. Do you know if it was more than half of them? A. I can't remember. I would assume it was less than half, but I can't state that definitively.").

**Nomura Response:** Disputed. Although defendants do not dispute that Mr. Kohout did not recall, 7 years after he left the Due Diligence Group, how many loans screened through History Pro received scores greater than 0, defendants object pursuant to Rule 56.1(c)(2) of the Federal Rules of Civil Procedure that Mr. Kohout's testimony quoted by plaintiff concerning the percentage of loans screened through HistoryPro that received further valuation diligence cannot be presented in a form that would be admissible in evidence. Mr. Kohout testified that "I can't remember" that percentage and could only "assume" an approximate percentage; as a result, his testimony is speculative and not based on personal knowledge. *See Nora Beverages*, 269 F. 3d at 124.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 282.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura does not

dispute that the veracity of the cited testimony nor that it was properly cited. While

Defendants argue that the testimony underlying the asserted fact may not be admissible

as evidence, Nomura's argument does not create a genuine dispute of material fact. Part

I.A, *supra*.

283. **FHFA Statement:** Of the 194 Acquisition Pools that contributed 15,682 loans to the SLGs at issue, 13,783 loans—or 87.9%—were in pools sent to CoreLogic for F Scores. Ex. 23 to the Cipione Decl.

**Nomura Response:** Disputed. The Cipione Declaration does not accurately reflect the results of diligence performed on Acquisition Pools. The correct figures can be found in Mishol Decl. Ex. 2, which shows that 13,513 loans in the supporting loan groups were sent to CoreLogic for F-Scores.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 283.

**FHFA Reply:** Defendants do not dispute a material fact. Based on Mr. Mishol's

declaration, Defendants concede that of the 194 Acquisition Pools that contributed

15,682 loans to the SLGs at issue, 13,513 loans—or 86.2%—were in pools sent to

CoreLogic for F Scores. The difference between these numbers and the asserted numbers

is less than 2% and thus is not material to FHFA's motion. *See Quarles*, 758 F.2d at 840.

284. **FHFA Statement:** Of the 194 Acquisition Pools that contributed 15,682 loans to the SLGs at issue, 1,899 loans—or 12.1%—were in pools sent only to Hansen for AVM review. Ex. 23 to the Cipione Decl.

**Nomura Response:** Disputed. The Cipione Declaration does not accurately reflect the results of diligence performed on Acquisition Pools. The correct figures can be found in Mishol Decl. Ex. 2, which shows that 1,914 loans in the supporting loan groups were sent to Hansen for AVMs.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 284.

**FHFA Reply:** Defendants do not dispute a material fact. Based on Mr. Mishol's

declaration, Defendants concede that of the 194 Acquisition Pools that contributed

15,682 loans to the SLGs at issue, 1,194 loans—or 7.6%—were in pools sent only to

Hansen for AVM review. The difference between these numbers and the asserted

numbers is less than 1% and thus is not material to FHFA's motion. *See Quarles*, 758

F.2d at 840.

285. **FHFA Statement:** Of the 13,783 loans sent to CoreLogic for a HistoryPro review, 8,204 loans—59.5% of the loans sent to CoreLogic, or 51.9% of the 15,806 total loans in the SLGs— received an F Score of 0, and hence did not receive any valuation review. Ex. 25 to the Cipione Decl.

**Nomura Response:** Disputed. The Cipione Declaration does not accurately reflect the results of diligence performed on Acquisition Pools. The correct figures can be found in Mishol Decl. Ex. 2, which shows that 8,244 loans in the supporting loan groups received

F-Scores of zero. Furthermore, all 8,244 of the loans that received an F-score of zero received valuation review in the form of CoreLogic's HistoryPro evaluation, because CoreLogic's HistoryPro was a "Collateral Valuation" tool. Pl. Ex. 112 (NOM-FHFA_05369154), at NOM-FHFA_05369156 ("C&S = $4/Collateral Valuation/Pre AVM screening tool (product is known as 'History Pro')"); Ex. 215 (NOM-FHFA_05369213) at NOM-FHFA_05369213 (HistoryPro considered various factors including "pricing and appraisal attributes," as well as "subject property characteristics and sales history detail, comparable values, nearby property sales information, [and] market data").

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 285.

**FHFA Reply:**  Defendants dispute as to the exact number of loans that received HistoryPro F-Scores is not a dispute of a material fact.  While Defendants dispute whether the court should accept Mr. Cipione's count of 8,204 or Mr. Mishol's count of 8,244, such dispute involves a difference of less than 1% and is not material to FHFA's motion. *See Quarles*, 758 F.2d at 840.  Additionally, defendants dispute as to the characterization of the HistoryPro product as a "Collateral Valuation" tool is argument that does not create a genuine issue of material fact.  Nomura does not dispute that an F-Score does not produce an estimation of value, RSUF ¶ 289, that an F-Score does not provide a variance of any estimated value from appraisal value, RSUF ¶ 287, or that over half of all loans received only an F-Score and no further valuation review.

286.  **FHFA Statement:**  Based on the data produced by Nomura and its proffered expert, out of 8,204 loans in the relevant SLGs that received an F Score of 0, a total of 21 loans—or about one quarter of one percent—received a BPO.  Ex. 6 to the Cipione Decl. (filter Column Q for "0" and Column "AD" to exclude "(Blanks)").

**Nomura Response:**  Disputed. The Cipione Declaration does not accurately reflect the results of diligence performed on any Acquisition Pools.  The correct figures can be found in Mishol Decl. Ex. 2, which shows that 18 of the supporting loan group loans with an F-Score of zero received a BPO.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 286.

**FHFA Reply:** Defendants do not dispute a material fact. Based on Mr. Mishol's

declaration, Defendants concede out of 8,204 loans in the relevant SLGs that received an

F Score of 0, a total of 18 loans—or 0.219%—received a BPO. The difference between

these numbers and the asserted numbers—which produce a percentage of 0.255%—is

less than 0.036% and thus is not material to FHFA's motion. *See Quarles*, 758 F.2d at

840.

287. **FHFA Statement:** When asked "What does the F score have to do with the variance on appraisals value?" Defendants' proffered appraisal expert, Lee Kennedy, acknowledged: "It doesn't." Ex. 118 (Deposition of Lee Kennedy) at 197:21-198:9 ("Q. What does the F score have to do with the variance on appraisals value? A. It doesn't. At least depending on the history pro product itself had some valuation components to it. So depending on how you purchased that product, and how you utilized the product, it could have a valuation variance tolerance built into it. But they are specifically talking about the F score here, which spoke to things outside of specific property valuation.").

**Nomura Response:** Disputed. Although Mr. Kennedy gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, Mr. Kennedy explained that HistoryPro was one of many available valuation tools that could be used "to assess the appraisal value for the loans." Ex. 217 (Aug. 14 Kennedy Report) at 28. Mr. Kennedy also testified that HistoryPro F-Scores "would indicate . . . a problematic valuation." Ex. 218 (Kennedy Tr.) at 198:10-20. In addition, HistoryPro looked at various factors including "pricing and appraisal attributes," as well as "subject property characteristics and sales history detail, comparable values, nearby property sales information, [and] market data." Ex. 215 (NOM-FHFA_05369213) at NOM-FHFA_05369213. As such, HistoryPro examined the appraisal value for potential fraud and was a "Collateral Valuation" tool. See *id.*; Pl. Ex. 112 (NOM-FHFA_05369154), at NOM-FHFA_05369156. *See also* C. Stmt. at ¶¶ 66-75.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 287.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants not

dispute that the veracity of the cited testimony nor that it was properly cited. Whether or

not Mr. Kennedy stated that F Score could relate to a problematic valuation, such a

statement is irrelevant to the asserted fact – which is that F Score as used by Nomura Due

Diligence Team has nothing to do with the variance between the original appraisal value and the actual value of the property – and does not create a genuine dispute of material fact. Part I.C, *supra*. Further, while Defendants assert that Nomura's expert Lee Kennedy explained that HistoryPro could be used "to assess the appraisal value for the loans," they failed to acknowledge that the quoted language is from Mr. Kennedy's summary of his understanding of Mr. Grice's report, not a statement of Mr. Kennedy's own opinion. The conclusory and second-hand assertions of an expert do not create a genuine dispute of fact. Part I.G, *supra*.

288. **FHFA Statement:** While HistoryPro "had some valuation components to it," Mr. Kennedy testified, the F Scores it generated "spoke to things outside of specific property valuation." *Id.*

**Nomura Response:** Disputed. Although Mr. Kennedy gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 287 *supra*, which is incorporated by reference herein. Furthermore, Mr. Kennedy's complete testimony makes clear that HistoryPro provided information in addition to valuation components—not instead of valuation components. Pl. Ex. 118, at 197:21-198:9.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 288.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura does not dispute that the veracity of the cited testimony nor that it was properly cited. Whether or not Mr. Kennedy stated that F Score could relate to a problematic valuation, such a statement is irrelevant to the asserted fact – which is that F Score as used by Nomura Due Diligence Team has nothing to do with the variance between the original appraisal value and the actual value of the property – and does not create a genuine dispute of material fact. Part I.C, *supra*. Further, while Defendants assert that Nomura's expert Lee Kennedy explained that HistoryPro could be used "to assess the appraisal value for the

loans," they failed to acknowledge that the quoted language is merely from Mr.

Kennedy's summary of his understanding of Mr. Grice's report. The conclusory and

second-hand assertions of an expert do not create a genuine dispute of fact. Part I.G,

*supra*.

289. **FHFA Statement:** The results generated by HistoryPro did not produce an estimated property value. See, e.g., Ex. 114 (NOM-FHFA_04529084, CoreLogic HistoryPro and AVM Results for Silver State 63) at NOM-FHFA_04529084 (providing AVM values for those loans processed through AVMSelect (column Y) but showing only F Scores and no AVM values generated by HistoryPro); Ex. 115 (NOM-FHFA_05729702, CoreLogic HistoryPro and AVM Results for Aegis 03A) at NOM-FHFA_05729702 (same); Ex. 116 (NOM-FHFA_05070322, CoreLogic HistoryPro and AVM Results for ResMAE SP01) at NOM-FHFA_05070322 (same); Ex. 119 (NOM- FHFA_04529051, CoreLogic HistoryPro and AVM Results for Fremont SP03) at NOM- FHFA_04529051 (same); Ex. 120 (NOM-FHFA_04529204, CoreLogic HistoryPro and AVM Results for People's Choice SP01) at NOM-FHFA_04529204 (same).

**Nomura Response:** Disputed. Although defendants do not dispute that the HistoryPro results produced in this action did not identify new estimated property values, those results assessed risk related to appraisal values by using various factors including "pricing and appraisal attributes," as well as "subject property characteristics and sales history detail, comparable values, nearby property sales information, [and] market data." Ex. 215 (NOM-FHFA_05369213) at NOM- FHFA_05369213. *See also* ¶ 287 *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 289.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura does not

dispute that the fact nor that it was properly cited. Whether or not HistoryPro used the

valuation of the home as part of its analysis is irrelevant to the fact that it did not produce

an estimate of value and does not create a genuine dispute of material fact. Part I.C,

*supra*.

290. **FHFA Statement:** Mr. Kohout testified that the F-Score was probably "some form of risk scoring" that Nomura used as a screening tool but that he could not recall "off the top of [his] head." Ex. 53 (Deposition of Joseph Kohout) at 491:14-20 ("Q. . . . Do you know what an F score is? A. Vaguely. I believe it has to do with some form of risk

scoring that we may have used as a screening tool from some automated system. Maybe CoreLogic. I can't recall, off the top of my head.").

**Nomura Response:** Disputed. Defendants do not dispute that Mr. Kohout testified that he could not recall the specifics of the F-score 7 to 9 years after the relevant time period—but that he "believed [the F-Score] [had] to do with" "some form of risk scoring." See Pl. Ex. 53. However, defendants' expert Lee Kennedy stated that HistoryPro was one of many available valuation tools that could be used "to assess the appraisal value for the loans." Ex. 217 (Aug. 14 Kennedy Report) at 28. Defendants object pursuant to Rule 56.1(c)(2) of the Federal Rules of Civil Procedure that Mr. Kohout's testimony quoted by plaintiff concerning F-scores cannot be presented in a form that would be admissible in evidence. Mr. Kohout testified that "I can't recall" what an F-score was; as a result, his testimony is speculative and not based on personal knowledge. *See Nora Beverages*, 269 F. 3d at 124.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 290.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura does not dispute that the fact nor that it was properly cited. Mr. Kennedy's opinions regarding HistoryPro are irrelevant to Mr. Kohout's recollection and do not create a genuine dispute of material fact. Part I.C, *supra*. Further, while Defendants argue that Mr. Kohout's testimony would be inadmissible as evidence, Nomura's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

291. **FHFA Statement:** However, Mr. Sabo could not recall the "criteria that were used to determine an F score" or "which of the things [CoreLogic] looked at that they believed were high risk in the valuation." Ex. 49 (Deposition of Mendy Sabo) at 317:17-318:16 ("Q. What were the criteria that were used to determine an F score? A. I can't remember. Q. What was the purpose of running some tests through CoreLogic that resulted in F scores? A. I don't know what CoreLogic's process was, but I know that the F score was some kind of composite score with regards to valuation-related risk, I believe. Q. And do you remember which of the things they looked at that they believed were high risk in the valuation? . . . A. I can't recall. Q. Do you know what 'F' stands for? A. No. Q. Do you know if it's fraud scores? A. It's possible. Q. Did Nomura use F scores? A. It certainly seems that we d*id*. I remember using it for something. I can't recall what.").

**Nomura Response:** Disputed. Defendants do not dispute that Mr. Sabo testified that he could not recall the criteria used to determine an F-score 7 to 9 years after the relevant time period. However, defendants' expert Lee Kennedy stated that HistoryPro was one of

186

many available valuation tools that could be used "to assess the appraisal value for the loans." Ex. 217 (Aug. 14 Kennedy Report) at 28. Defendants object pursuant to Rule 56.1(c)(2) of the Federal Rules of Civil Procedure that Mr. Sabo's testimony quoted by plaintiff concerning F-scores cannot be presented in a form that would be admissible in evidence. Mr. Sabo testified that "I can't recall" the criteria used to determine an F-score; as a result, his testimony is speculative and not based on personal knowledge. *See Nora Beverages*, 269 F. 3d at 124.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 291.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura does not dispute that the fact nor that it was properly cited. Mr. Kennedy's opinions regarding HistoryPro are irrelevant to Mr. Sabo's recollection and do not create a genuine dispute of material fact. Part I.C, *supra*. Further, while Defendants argue that Mr. Sabo's testimony would be inadmissible as evidence, Nomura's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

### C. Nomura Securities Did Not Respond To High Defect Rates In Its Diligence Samples By Performing Additional Diligence

292. **FHFA Statement:** It was "industry standard" to request that a diligence sample be increased or "upsized" if one "found a trend that could reveal some particular issue in the origination, either from credit or from a compliance side[.]" Ex. 24 (Deposition of John Graham) at 149:4-19 ("Q. Okay. Now, you said the thing about the sample is if there was a problem you could just always increase the sample size. Is that true? A. It was -- it was an understanding or a -- a industry standard that you could increase the sample size -- certainly request to increase the sample size if you found a trend that could reveal some particular issue in the origination, either from credit or from a compliance side or -- or what have you. It doesn't guarantee the seller will agree, but certainly you don't have to buy the pool because the pool -- purchase of the pool is predicated on satisfactory completion of due diligence.").

**Nomura Response:** Defendants do not dispute that, with respect to a sample size previously agreed with the seller, it was industry standard that the sample would be upsized if the due diligence revealed any concerning trend. If the seller refused to upsize, the trade would not happen. Ex. 27 (Spagna Tr.) at 211:13-212:17; Ex. 26 (Kohout Tr.) at 106:15-107:18. The initial size of the sample would be determined based on many factors including whether the originator was an unfamiliar counterparty or based on the type of product included in a loan pool, or because loans previously purchased from that originator did not perform as expected. Ex. 177 (Lee Tr.) at 175:9-18; Ex. 183 (Marvin

Tr.) at 167:18-168:12. *See also* Ex. 229 (Kempf Tr.) at 67:10-68:18. Nomura reserved the right to increase, or "upsize," the level of due diligence performed as needed based on initial findings. Ex. 35 (Graham Tr.) at 149:4-19, 174:18-176:5; Ex. 15 (Prahofer Tr.) at 26:15-28:7.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 292.

**FHFA Reply:** Defendants do not dispute the asserted fact. Defendants' additional assertion that, if the seller refused to upsize, the trade would not happen, does not contradict the asserted fact, and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. That assertion is also not supported by the cited evidence— Mr. Kohout's and Mr. Spagna's testimony supports only that there was the "option" or "possibility" that if the diligence results were poor, Nomura could refuse to purchase the loans, and do not establish that if the seller refused to upsize, the trade would not happen. Nom. Ex. 26 (Deposition of Joseph Kohout) 106:15-18 ("Q. Okay. Was one of the options if the results of the sample came out poorly, to not do the trade at all? A. That was always an option."); Nom. Ex. 27 (Deposition of Neil Spagna) 212:10-17 ("A. There -- there wasn't – there wasn't a specific hurdle, but, you know, you could, you know, as you got these results and the seller found out, you know, how many kickouts you had, you know, it -- it would certainly raise the question that there was a possibility that a deal could get killed entirely."). Nomura presents no evidence that they it ever made an upsize request nor an upsize request that was refused. Defendants' additional assertion regarding how the initial sample size was determined also does not contradict the asserted fact, and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Moreover, the testimony cited by Defendants does not support that the initial sample size was determined based on whether the originator was an unfamiliar counterparty, the type of product included in a loan pool, or whether loans previously purchased from that

188

originator did not perform as expected, as instead both Mr. Lee's and Mr. Marvin's cited

testimony refers to Nomura's "prior due diligence experiences." Nom. Ex. 177

(Deposition of Randall Lee) 174:9-175:18 ("Q. What do you mean by 'prior due

diligence experiences'? A. If we were to do a trade with an originator and we went

through the due diligence process and they were a number of kicks or discrepancies, it

would forewarn us that we should in -- that -- it would forewarn us that we should

possibly do more due diligence to protect our residual interest and the investor interest.");

Nom. Ex. 183 (Deposition of Brett Marvin) 167:18-168:12 (". . . [T]he credit folks would

say our experience through other purchases from them, through due diligence, yielded

these issues . . ."). Any dispute as to the criteria for how the initial sample size was

determined is not material to FHFA's motion. *Quarles*, 758 F.2d at 840. Finally,

Defendants' additional assertion that Nomura reserved the right to upsize the sample also

does not contradict the asserted fact, and therefore does not create a genuine dispute of

material fact. Part I.C, *supra*. Moreover, the cited testimony of Ms. Prahofer does not

relate to whether Nomura reserved the right to upsize, and the cited testimony of Mr.

Graham provides only that Nomura "could request to increase the sample size," but it

"doesn't guarantee the seller will agree," and that there was the "option[]" to upsize.

Nom. Ex. 35 (Deposition of John Graham) 149:4-19, 174:18-175:21. Any dispute

regarding whether Nomura reserved the right to upsize is not material to FHFA's

motion. *Quarles*, 758 F.2d at 840.

293.    **FHFA Statement:** "[I]f there's a high level of kickouts," "there's obviously problems
with the loans" and "it was something that everyone needed to be alerted to." Ex. 46
(Deposition of Neil Spagna) at 386:6-387:20 ("Q. And here am I right that coming out of
due diligence, this sample 55 percent approximately passed and approximately 44 percent
failed? A. Uh-huh. … Q. Is that a yes? A. Yes. I'm sorry. Q. Do you know whether
anything was done in – as a result of learning about this result from the sample? A. I –

again, I don't – I don't recall what happened from this, but this is very similar to the last situation in which, you know, we were starting to find these issues. And as we're finding them, we're alerting, you know, alerting people as to, look, there's a high amount of kickouts in this particular deal. Q. Uh-huh. And – and – and why were you alerting people that there, as you said I think, there started to be a situation? A. Because if there's a high – if there's a high level of kickouts, there's obviously problems with the loans. If there's problems with the loans and our due diligence people are doing their job, they're letting the – they're letting the seller know. If they're letting the seller know, there's probably going to be issues related to other people, you know, within Nomura. And essentially just generally speaking, and I don't recall Columbia, you know, I don't – I don't recall the people or the program or the company really, but many instances – and if you saw this kind of high – a high rate of kickouts with someone you're doing not a lot of business with, it was something that everyone needed to be alerted to.").

**Nomura Response:** Disputed. Although Mr. Spagna gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, Mr. Spagna also testified that in some cases, Nomura walked away from a deal entirely if the sample results indicated that the loans were too risky for Nomura. Ex. 27 (Spagna Tr.) at 211:13-212:17. Joseph Kohout testified to this as well. Ex. 26 (Kohout Tr.) at 106:15-107:18. Furthermore, Mr. Spagna did not testify about what constituted a "high level" of kickouts, nor did he testify that a high level of kickouts indicates a "problem" with loans that were not diligenced. *See also* ¶ 292, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 293.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that the quote requires additional context in order to fully understand the quoted excerpt, Defendants' assertion that Mr. Spagna and Mr. Kohout testified that, in some case, Nomura walked away from a deal entirely if the sample results indicated that the loans were too risky, does not contradict the asserted fact that a high-level of kickouts indicates there are problems with the loans—to the contrary, the assertion supports the asserted fact—and thus does not create a genuine dispute of material fact. Part I.C, *supra*. Defendants' assertion that Mr. Spagna did not testify about what constituted a high level of kickout and did not testify that a high level of kickouts indicates a problem with loans

190

that were not diligenced also does not contradict the asserted fact and therefore does not

create a genuine dispute of material fact. Part I.C, *supra*.

294. **FHFA Statement:** The typical kick out rate was 7-8% for subprime acquisitions. Ex. 121 (Dep. Ex. 26106, email dated November 20, 2006, regarding Fremont DD Report) at NOM- FHFA_05368892 (Mr. Spagna wrote: "I found some reports on Fremont 2, 3, and 4. The good news is that our kickout rate on some of these deals are much higher than our typical 7-8% for most subprime deals.").

**Nomura Response:** Disputed. Although the document contains the statement quoted by plaintiff, that quote is removed from the context in which it appears, and omits other statements that must be evaluated in order to fully understand the quoted excerpt. See ¶ 292, *supra*, which is incorporated by reference herein. For example, Mr. Spagna does not provide a basis for his estimate. Furthermore, an analysis of Nomura's due diligence results indicates that 15.2% of loans in the loan pools that contributed to the supporting loan groups were kicked out by Nomura; that the implied maximum kick-out rate for those loan pools was 10.7%; and that the implied maximum kick-out rate for the supporting loan groups was 10.8%. See Mishol Decl. Ex. 14; Mishol Decl. Ex. 15.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 294.

**FHFA Reply:** Defendants do not create a genuine issue of material fact. To the extent

Defendants rely on their response to ¶ 292, that paragraph is irrelevant to what Nomura's

typical kickout rate was, and therefore does not create a genuine dispute of material fact.

Part I.C, *supra*. Furthermore, while Defendants argue that Mr. Spagna does not provide a

basis for his estimate, that argument does not create a genuine dispute of material

fact. Part I.A, I.F, *supra*. To the extent Defendants cite their maximum implied kickout

rate, that analysis has been excluded by the Court and cannot create a genuine issue of

material fact. *See FHFA v. Nomura Holding Am. Inc. et al*., Order to Strike Portions of

the December 2, 2014 Declaration of David N. Mishol, Dkt. No. 201.

295. **FHFA Statement:** Mr. Spagna also described the 6.48%, 11.22%, and 12.12% kickout rate from the Fremont SP02, SP03, and SP04 Acquisition Pools, respectively, as being "much higher" than Nomura's typical rates. Ex. 121 (Dep. Ex. 26106, email dated November 20, 2006, regarding Fremont DD Report) at NOM-FHFA_05368892

(Mr. Spagna wrote: "I found some reports on Fremont 2, 3, and 4. The good news is that our kickout rate on some of these deals are much higher than our typical 7-8% for most subprime deals."); Ex. 52 to the Cipione Decl. ("Deal" worksheet: Rows 10-12, Column D).

**Nomura Response:** Disputed. Mr. Spagna stated only that Nomura's kickout rates on "some of these deals" were higher than typical rates for subprime deals. Furthermore, although the document contains the statement quoted by plaintiff, that quote is removed from the context in which it appears, and omits other statements that must be evaluated in order to fully understand the quoted excerpt. See ¶ 292, *supra*, which is incorporated by reference herein. Further, the Cipione Declaration does not accurately reflect the results of Nomura's due diligence process. An analysis of Nomura's due diligence results indicates that 15.2% of loans in the loan pools that contributed to the supporting loan groups were kicked out by Nomura; that the implied maximum kick-out rate for those loan pools was 10.7%; and that the implied maximum kick-out rate for the supporting loan groups was 10.8%. See Mishol Decl. Ex. 14; Mishol Decl. Ex. 15.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 295.

**FHFA Reply:** Defendants do not create a genuine issue of material fact. Defendants do not dispute the asserted kickout rates for the Fremont SP02, SP03, and SP04 Pools. While Defendants point out that Mr. Spagna stated that "kickout rates on some of these deals are much higher than typical," FHFA Ex. 121 (Dep. Ex. 26106, email dated November 20, 2006, regarding Fremont DD Report) at NOM-FHFA_05368892, they do not dispute that the "deal" he was referring to included the Fremont SP03, and SP04 Acquisition Pools. To the extent that Defendants rely on their response to ¶ 292, that paragraph is irrelevant to what Nomura's typical kickout rate was or which kickouts were much higher than the typical kickout rate, and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. To the extent Defendants rely on their maximum implied kickout rate, that analysis has been excluded by the Court and cannot create a genuine issue of material fact. *See FHFA v. Nomura Holding Am. Inc. et al*., Order to Strike Portions of the December 2, 2014 Declaration of David N. Mishol, Dkt. No. 201. And although Defendants state that the Cipione Declaration does not accurately reflect

the results of Nomura's due diligence process, Defendants identify no evidence that

contradicts the asserted fact, and therefore their conclusory assertions regarding the

Cipione Declaration does not create a genuine dispute of material fact.  Part I.B, *supra*.

296.    **FHFA Statement:**  The SSM 58 Pool had a kickout rate of 66.42%.  Ex. 52 to the
Cipione Decl. ("Deal" worksheet:  Row 29, Column D).

**Nomura Response:**  Disputed. The Cipione Declaration does not accurately reflect the
results of diligence performed on Acquisition Pools.  Defendants do not dispute that the
SSM 58 Pool had a kickout rate of 66.42%.  However, plaintiff omits additional
information needed to understand the context of this kick-out rate. Two loans were
kicked out due to missing loan files, five were dropped due to the results of credit and
compliance due diligence, and three were dropped due to BPO results. Ex. 585 (NOM-
FHFA_05797461) at NOM-FHFA_05797461.  The other 81 kick- out loans (89% of the
91 kick-out loans) were due to a "lookback" clause issue.  *Id.* This "lookback" issue
related to a defective clause in the notes or mortgages of certain loan files. Ex. 31
(Scampoli Tr.) at 383:11-25. Plaintiff has not made any allegations regarding defective
"lookback" clauses. See Ex. 6 (Am. Compl.). In addition, paragraph 296 omits the fact
that Nomura performed higher levels of credit and compliance due diligence on
subsequent Silver State trade pools that contributed to the supporting loan groups—
33.7% for SSM 60 and 100% for SSM 61.  Mishol Decl. Ex. 6.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 296.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not

dispute that the kickout rate for SSM 58 is 66.42%.  While Defendants assert that

additional information is need to understand the context of the kickout rate for the SSM

58 Pool, the assertions regarding the reasons for the loans being dropped do not

contradict the asserted fact and therefore do not create a genuine issue of material fact.

*See* Part I.C, *supra*.  Defendants' assertion that Plaintiff has not made any allegations

regarding lookback clauses is irrelevant to the asserted fact, and therefore does not create

a genuine dispute of material fact.  Part I.C, *supra*. Defendants' assertion that Nomura

performed higher levels of credit diligence on the SSM 60 and SSM 61 Pools is irrelevant

to the kickout rate for the SSM 58 pool, and therefore does not create a genuine dispute

of material fact.  Part I.C, *supra*.

297.  **FHFA Statement:**  This SSM 58 Pool fed into the NHELI 2007-1 Securitization.  Ex. 1 to the Cipione Decl. (Row 168 "SSM 58," Column I "NHELI 2007-1").

**Nomura Response:**  Disputed. The Cipione Declaration does not accurately reflect the results of diligence performed on Acquisition Pools.  Defendants do not dispute that certain loans from the SSM 58 Pool were included in the NHELI 2007-1 Securitization.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 297.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants'

concede that certain loans from the SSM 58 Pool were included in the NHELI 2007-1

Securitization.

298.  **FHFA Statement:**  The information regarding the drop rates for sampled Acquisition Pools can be found in Ex. 52 to the Cipione Decl.  ("Deal" worksheet).

**Nomura Response:**  Disputed. The Cipione Declaration does not accurately reflect the results of diligence performed on Acquisition Pools.  The correct kick-out rates for the 194 loan pools that contributed loans to the supporting loan groups are reflected in Mishol Decl. Ex. 14.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 298.

**FHFA Reply:**  Defendants do not dispute a material fact. Any dispute or difference

between Ex. 52 to the Cipione Declaration and Ex. 14 to the Mishol Declaration

regarding specific drop rates for any particular Acquisition Pool is not material to

FHFA's motion.  *Quarles*, 758 F.2d at 840. Moreover, to the extent Mishol Decl. Ex. 14

relates to Nomura's maximum implied kickout rate calculations, the Court has struck that

analysis.  *See FHFA v. Nomura Holding Am. Inc. et al*., Order to Strike Portions of the

December 2, 2014 Declaration of David N. Mishol, Dkt. No. 201.

299. **FHFA Statement:** In some trade stipulations, Nomura did not reserve the right to increase its diligence sample sizes based on the results of its diligence. E.g., Ex. 81 (NOM-FHFA_04464662, Pool Summary and Trade Confirmation for Fremont SP02) at NOM-FHFA_04464662-NOM- FHFA_04464666; Ex. 82 (NOM-FHFA_04479131, Pool Summary and Trade Confirmation for Ownit SP02) at NOM-FHFA 04479131-NOM-FHFA 04479136; Ex. 83 (NOM-FHFA_04475031, Pool Summary and Trade Confirmation for First NLC SP02) at NOM-FHFA_04475031-NOM- FHFA_04475036; Ex. 84 (NOM-FHFA_04473240, Pool Summary and Trade Confirmation for Equifirst SP01) at NOM-FHFA_04473240-NOM-FHFA_04473252.

**Nomura Response:** Disputed. The absence of an explicit statement that Nomura reserved the right to increase its diligence sample size in a Pool and Trade Confirmation does not show that Nomura "did not reserve" that right. Nomura always had the right to refuse to go forward with the purchase if it was not satisfied with the due diligence, including if a request to upsize was not agreed to by the seller. See ¶ 292, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 299.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue that the absence of an explicit statement that Nomura reserved the right to increase its diligence sample size in a Pool and Trade Confirmation does not show that Nomura "did not reserve" that right, Defendants' argument does not create a genuine dispute of material fact. Part I.A, *supra*. Furthermore, while Defendants assert that Nomura always had the right to refuse to go forward with the purchase if it was not satisfied with the due diligence, including if a request to upsize was not agreed to by the seller, that assertion does not contradict the asserted fact. Indeed, that assertion embraces the asserted fact by conceding that Nomura did not have the right to upsize in those circumstances.

Therefore Defendants' assertion does not create a genuine issue of material fact. *See* Part I.C, *supra*.

300. **FHFA Statement:** In other trade stipulations, Nomura did reserve the right to increase its diligence sample sizes based on the results of its diligence. E.g., Ex. 87 (NOM-FHFA_05086538, Pool Summary and Trade Confirmation for People's Choice SP02) at NOM-FHFA_05086539 ("AMC will perform due diligence on a 300 loan sample

(upgraded to more if necessary)"); Ex. 89 (NOM- FHFA_05207741, Pool Summary and Trade Confirmation for Silver State 62) at NOM- FHFA_05207744 ("30% due diligence with option to upsize"); Ex. 85 (NOM-FHFA_04474103, People's Choice SP01 Pool Summary and Trade Confirmation dated March 3, 2006) at NOM- FHFA_04474106 ("25% credit compliance DD, upsize if problems.").

**Nomura Response:**  Defendants do not dispute that Nomura reserved the right to increase its diligence sample sizes based on the results of its diligence.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 300.

**FHFA Reply:**  Defendants' do not dispute the asserted fact.  Defendants' additional

characterizations are irrelevant to the asserted fact and do not create a genuine dispute of

material fact. Part I.C, *supra*.

301.    **FHFA Statement:**  The Diligence Group did not have the authority to upsize a sample. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 148:16-149:7 ("Q.  Okay. And is your best understanding of the practice that was used for when a sample would be upsized that Due Diligence employees were not empowered to unilaterally upsize a sample?  A.  That's correct.").

**Nomura Response:**  Disputed. Defendants do not dispute that the Due Diligence Group did not have the authority to unilaterally upsize a sample without consultation with the trading desk.  Ex. 15 (Prahofer Tr.) at 150:19-151:3 ("decision would be made jointly with Due Diligence" and the trading desk whether to upsize a sample). Joseph Kohout testified that Nomura had the "ability to increase the sample beyond what the seller . . . allowed," and explained that these decisions were based on the Due Diligence Group "report[ing] the [diligence] results back to the trading desk.  We would have a meeting, if there was a determination made uniformly that we felt we needed to pursue an additional sample, that would be discussed." Ex. 26 (Kohout Tr.) at 99:19-100:24. While Mr. Kohout testified that the trading desk would make the ultimate decision, those decisions would be based on the Due Diligence Group's recommendations. *Id.* at 101:14-25.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 301.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants

concede that the Due Diligence Group did not have the authority to unilaterally upsize a

sample without consultation with the trading desk and cite additional testimony

demonstrating that the Diligence Group would report back to the Trading Desk, which

Defendants concede would make the ultimate decision. This additional testimony does

not contradict, but rather supports, the asserted fact, and therefore does not create a

genuine dispute of material fact. Part I.C, *supra*.

302. **FHFA Statement:** If the Diligence Group believed that a sample should be upsized, they were required to submit a request to the Trading Desk. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 148:16-149:7 ("Q. That if Due Diligence based on their own subjective judgment felt dissatisfied with a sample, then the procedure was for them to raise it with Trading? … A. So that Trading could raise it with the counterparty.").

**Nomura Response:** Disputed. Ms. Prahofer's testimony nowhere uses the term "required to submit." Defendants do not dispute that requests to upsize a sample were discussed with the Trading Desk and such requests were raised with the counterparty by the Trading Desk. See ¶ 301, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 302.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

assert that Ms. Prahofer's testimony did not use the term "required to submit,"

Defendants concede that such requests were discussed with the Trading Desk and such

requests were raised with the counterparty by the Trading Desk. Defendants further

conceded that the Diligence Group did not have the authority to unilaterally upsize a

sample without consultation with the trading desk and the Trading Desk would make the

ultimate decision. *See* ¶ 301, *supra*. Thus the testimony cited by Defendants does not

contradict the asserted fact and does not create a genuine dispute of material fact. Part

I.C, *supra*.

303. **FHFA Statement:** "Ultimately," the "decision" of "whether to increase the sample size based on poor results" lay with the Trading Desk. Ex. 53 (Deposition of Joseph Kohout) at 100:25-102:8 ("Q. And whose subjective judgment would it be of whether to increase the sample size based on poor results? A. I mean, ultimately, that decision, that decision

sat with the trading desk."); Ex. 32 (Deposition of Donald McCabe) at 211:22-212:4 ("Q. … My question is who would have been responsible for making the decision as to whether or not the due diligence size should be increased? A. It would be a trading desk decision."); Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 151:16-151:25 ("Q. Was there people or persons that had the ability to make a decision at Nomura to request from sellers that there be an upsized sample? … A. Ultimately -- ultimately the trader would either agree or disagree with Due Diligence and make the request.").

**Nomura Response:** Disputed. Although defendants do not dispute that the Trading Desk made decisions about whether to increase sample size, those decisions were based on the Due Diligence Group's recommendations. See ¶ 301, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 303.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura has conclusively admitted the Trading Desk would make the ultimate decision of whether to upsize a sample. *See* ¶ 301, *supra*. There can therefore be no genuine dispute as to the asserted fact. Part I.F, *supra*. Whether or not the Trading Desk's decision was based on the Diligence Group's recommendation is irrelevant to the asserted fact, and therefore does not create a genuine dispute of material fact. *See* Part I.C, *supra*.

304.  **FHFA Statement:** If the Trading Desk agreed to make an upsizing request, Nomura would not actually upsize its diligence sample unless the seller agreed. Ex. 18 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 148:23-149:14 ("Q. And who was empowered to decide when, if ever, a sample would be upsized? A. Well, you can't unilaterally upsize a sample if the counterparty won't agree, so I'm not understanding your question within that framework."); Ex. 53 (Deposition of Joseph Kohout) at 99:24-100:10 ("Q. And under what circumstances could Nomura increase the size of the sample based on, you know, poor performance from the sample? A. We would have to relay the results of the sample to the trading desk. The trading desk would contact the counterparty, and, you know, determine whether, you know, they wanted to proceed with the trade under the auspices of an additional sampling being pulled.").

**Nomura Response:** Disputed. None of the testimony cited by plaintiff states that "Nomura would not actually upsize its diligence sample unless the seller agreed." Defendants do not dispute that it was not possible for Nomura, with respect to an agreed trade, to unilaterally upsize diligence samples—because only the seller had possession of the loan files needed to upsize such samples. Pl. Ex. 18 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 148:23-149:14. However, if a seller refused such a request, Nomura

198

could walk away from the trade. Pl. Ex. 53 (Deposition of Joseph Kohout) at 99:24-100:10 ("Q. And under what circumstances could Nomura increase the size of the sample based on, you know, poor performance from the sample? A. We would have to relay the results of the sample to the trading desk. The trading desk would contact the counterparty, and, you know, determine whether, you know, they wanted to proceed with the trade under the auspices of an additional sampling being pulled."). *See also* Ex. 27 (Spagna Tr.) at 211:13-212:17; Ex. 26 (Kohout Tr.) at 106:15-107:18.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 304.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not

dispute that it was not possible for Nomura, with respect to an agreed trade, to

unilaterally upsize diligence samples.  Defendants further assertion that Nomura could

walk away from a trade if a seller refused such a request does not contradict the asserted

fact, and therefore does not create a genuine issue of material fact. *See* Part I.C, *supra*.


305.    **FHFA Statement:**  Mr. Graham testified that he believed that Nomura "[had] to have buy in from the seller" to upsize a diligence sample because "[t]he seller [had] the loan files." Ex. 24 (Deposition of John Graham) at 150:4-151:10 ("Q.  Was it possible if Nomura sampled the stipulated sample size for Nomura to unilaterally without consultation with the seller upsize its sample and due diligence more loans than had been specified in the bid? …  A.  They would have to have buy in from the seller.  The seller has the loan files.  And in your sequence I'm not hearing that any due diligence has been performed that would reveal a trend that perhaps necessitate increasing the sample size. …  Q.  Was Nomura free to request more loans from the seller to increase its sample size without any further permission from the seller to explicitly say that Nomura could due diligence more loans? …  A.  To there -- to increase the sample size, there would have to be a – a meeting of the minds and agreement between the two parties that it was necessary and that the seller would agree to do it.  The seller is the keeper of the files.").

**Nomura Response:**  Disputed. Although defendants do not dispute that it was not possible for Nomura, with respect to an agreed trade, to unilaterally upsize diligence samples—because only the seller had possession of the loan files needed to upsize such samples, Pl. Ex. 18 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 148:23-149:14, if a seller refused such a request, Nomura could walk away from the trade. See ¶ 304, *supra*, which is incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 305.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not

dispute that it was not possible for Nomura, with respect to an agreed trade, to

unilaterally upsize diligence samples—because only the seller had possession of the loan

files needed to upsize such samples. Defendants further assertion that Nomura could

walk away from a trade if a seller refused such a request does not contradict the asserted

fact, and therefore does not create a genuine issue of material fact. *See* Part I.C, *supra.*

306. **FHFA Statement:** There is no evidence that Nomura actually upsized the diligence
samples for any of the Acquisition Pools at issue based on the results of credit diligence
or requested that an originator agree to do so.

**Nomura Response:** Disputed. There is evidence that the diligence for at least five trade
pools that contributed loans to the SLGs exceeded the percentage of diligence specified
in the applicable stipulation. See ¶ 210, *supra*, which is incorporated by reference herein.
Additionally, defendants dispute that there is any evidence that upsizing any of the
samples was necessary or appropriate.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 306.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

point to 5 Acquisition Pools for which the sample size slightly exceeded the amount set

in the Trade Stipulations, they cite no evidence that these sample sizes resulted from an

upsizing based on the results of credit diligence, and so do not create a genuine dispute of

material fact. Part I.B, *supra.* In addition, while Defendants' argue that there is no

evidence that upsizing any of the samples was necessary or appropriate, Defendants'

argument does not contradict the asserted fact and does not create a genuine dispute of

material fact. Part I.A, *supra.*

307. **FHFA Statement:** On September 27, 2006, Mendy Sabo wrote to Randall Lee: "Please
remember that #'s are skewed (because of the Compliance drops) because we found an
issue with the payment stream on all '3000' series loans (all ARM loans with '3000' loan
ID) which we performed a 100% DD on. This applied to both SP03 and SP04 trades."

Ex. 360 (Dep. Ex. 26917, email dated September 28, 2006 from Brian Farrell (RBS) to Neil Spagna and Mendy Sabo regarding Fremont DD Reports) at NOM-FHFA_04982995.

**Nomura Response:** Disputed. Although the document contains the statement quoted by plaintiff, that quote is removed from the context in which it appears, and omits other statements that must be evaluated in order to fully understand the quoted excerpt. For example, Nomura performed 24.7% credit and compliance due diligence on Fremont SP02 and Fremont SP03, and 24.8% credit and compliance diligence on Fremont SP04, more than the 20% minimum Nomura used for bulk pools. Ex. 500 (July 9 Grice Report Revised Exhibit 3B) at 1; Mishol Decl. Ex. 6 at 3. Furthermore, the document makes clear that Nomura performed 100% diligence on the subset of loans it considered problematic. Pl. Ex. 360 (Dep. Ex. 26917, email dated September 28, 2006 from Brian Farrell (RBS) to Neil Spagna and Mendy Sabo regarding Fremont DD Reports) at NOM-FHFA_04982995 ("we performed a 100% DD on" the "3000" series loans).

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 360 contains the language quoted by FHFA. RBSSI refers the Court to the Nomura Defendants' response to ¶ 307.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that additional context is needed in order to fully understand the quoted excerpt, Defendants' assertions regarding the sample size for the Fremont SP03 and SP04 Pools and that the documents states that 100% diligence was performed on all "3000" series loans, do not contradict the asserted fact. They therefore do not create a genuine dispute of material fact. Part I.C, *supra*.

308. **FHFA Statement:** Adam Smith forwarded the email within RBS: "Attached are Nomura's due diligence results for a transaction that we are underwriting for them." Ex. 360 (Dep. Ex. 26917, email dated September 28, 2006 from Brian Farrell (RBS) to Neil Spagna and Mendy Sabo regarding Fremont DD Reports) at NOM-FHFA_04982995.

**Nomura Response:** Defendants do not dispute that Adam Smith forwarded plaintiff's Exhibit 360 within RBS.

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 308.

**FHFA Reply:** Defendants do not dispute the asserted fact.

309. **FHFA Statement:** Brian Farrell emailed Neil Spagna and Mendy Sabo: "As it relates to your due dili sampling criteria, could you elaborate more on high risk characteristics…high LTV, low FICO, high DTI, investment properties, [etc.]." Ex. 360

(Dep. Ex. 26917, email dated September 28, 2006 from Brian Farrell (RBS) to Neil Spagna and Mendy Sabo regarding Fremont DD Reports) at NOM-FHFA_04982995.

**Nomura Response:** Defendants do not dispute that plaintiff's Exhibit 360 includes the text quoted by plaintiff.

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 309.

**FHFA Reply:** Defendants do not dispute the asserted fact.

310. **FHFA Statement:** Mr. Graham recalled "an instance involving property valuation" and "an instance involving a compliance issue of some sort" that led Nomura to upsize its diligence samples, but did not recall any such instances related to credit or underwriting. Ex. 24 (Deposition of John Graham) at 151:14-152:3 ("Q. Did Nomura ever request from any of the originators to increase the sample size to do due diligence? A. I -- yes, I believe so. Q. Okay. Which -- which times do you remember there being a -- such a trend at -- of due diligence that caused enough concern that Nomura wanted to sample a bigger population? … A. I recall an instance involving property valuation and I recall an instance involving a compliance issue of some sort. I -- I don't recall the specifics."); *id.* at 197:23-198:7 ("Q. Okay. And for -- for which part? Do -- do you actually remember that coming out from guideline violations? A. It -- it was not credit. It was -- it was property valuation and the other one was compliance. So it was not underwriting -- Q. Okay. And -- A. -- that I recall.").

**Nomura Response:** Disputed. Although defendants do not dispute that at the time of his deposition in 2013, Mr. Graham was only able to recall two specific instances where samples were upsized, this does not imply that Nomura did not or could not upsize diligence samples for other reasons. The evidence shows that Nomura could and did upsize samples for a variety of reasons. Ex. 35 (Graham Tr.) at 149:4-19, 174:18-176:5; Ex. 15 (Prahofer Tr.) at 26:15-28:7. *See also* ¶306, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 310.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue that Mr. Graham's testimony does not imply that Nomura did not or could not upsize diligence samples for other reasons, they identify no evidence that specifically contradicts the asserted fact. Nomura cites additional testimony from Mr. Graham stating that "you could increase the sample size," Nom. Ex. 35 149:4-19, and that there were "options" if "the number of fails is so high," Nom. Ex. 35 174:18-25. The only specific

instances Mr. Graham could recall were, consistent with the asserted fact, one involving property valuation and one involving compliance. Nom. Ex. 25 175:9-21. Nomura also cites to the testimony of Ms. Prahofer, but nowhere in the cited testimony does Ms. Prahofer discuss upsizing. Therefore the additional testimony cited by Defendants do not contradict the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*. Furthermore, though Defendants speculate that evidence might exist of Nomura upsizing due diligence for other reasons, calling the asserted fact into question does not create a genuine dispute of material fact. Part I.D, *supra*. To the extent Defendants rely on their response to ¶ 306, Defendants do not create a dispute of material facts for the reasons stated in FHFA's reply to ¶ 306.

311. **FHFA Statement:** In a April 6, 2006 email, Mr. Hartnagel told Mr. Kohout that "[t]here were a number of valuation issues with" the Acquisition Pool People's Choice SP01. Ex. 122 (Dep. Ex. 21914, email from Steven Katz to Joseph Kohout dated April 6, 2006, regarding People's Choice) at NOM-FHFA_05496427-NOM-FHFA_05496428; *see also* Ex. 123 (NOM-FHFA_05241027, email dated April 6, 2006 from Jeffrey Hartnagel to Steven Katz, et. al, regarding People's Choice) at NOM-FHFA_05241027 (earlier email in same chain attaching "People's Choice SP 01 Trade summary.xls" and noting "[h]ere is the overall report on the trade.").

**Nomura Response:** Disputed. Although the document contains the statement quoted by plaintiff, that quote is removed from the context in which it appears, and omits other statements that must be evaluated in order to fully understand the quoted excerpt. For example, Nomura submitted 100% of the loans in People's Choice SP01 and 99% of the loans in People's Choice SP02 for valuation diligence, consistent with Nomura's practices for valuation diligence. See Mishol Decl. Ex. 16 at 3; see also C. Stmt. at ¶¶ 66-75. "Valuation issues" were the only issues raised concerning the People's Choice SP01 pool, and this valuation diligence fully addressed those issues. *Id.* Nomura also performed 26.5% credit and compliance diligence on People's Choice SP01 and 28.1% credit and compliance diligence on People's Choice SP02. Ex. 500 (July 9 Grice Report Revised Exhibit 3B) at 1; Mishol Decl. Ex. 6 at 3. Nomura kicked out 21.2% and 21.3% of the loans that were reviewed in these pools, respectively. Mishol Decl. Ex. 14 at 3. This was higher than the overall kick-out rate of 15.2% for reviewed loans. See *id.* at 5. In addition, Nomura kicked out 5.2% and 6.3%, respectively, of the loans due to BPO results. See Mishol Decl. Ex. 13.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 311.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants assert that additional context is required in order to fully understand the quoted excerpt, Defendants' assertion that it submitted 100% of loans in People's Choice SP01 and 99% of the loans in People's Choice SP02 for valuation diligence is irrelevant to the asserted fact, and does not create a genuine dispute of material fact.  Part I.C, *supra*.  Furthermore, Defendants assertion that valuation issues were the only issues raised concerning the People's Choice SP01 pool, and this valuation diligence fully addressed those issues, is not supported by either Mishol Decl. Ex. 16, which relates to the percentage of loans from each Pool sent for valuation review, or C. Stmt. ¶¶ 66-75, which generally describe Nomura's valuation diligence process.   Finally, Defendants' assertions regarding the percentage of loans from People's Choice SP01 and SP02 subject to credit and compliance diligence, the kickout percentage from these two Pools, the percentage of loans kicked out due to BPO results, and the overall kickout rate, do not contradict the asserted fact, and therefore do not create a genuine dispute of material fact.  Part I.C, *supra*.  To the extent Defendants rely on the maximum implied kickout rate described in Mishol Decl. Ex. 14, that analysis has been struck by the Court.  *See* Dkt. 961.

312.  **FHFA Statement:**  Mr. Kohout then forwarded this information to Mr. Katz.  Ex. 121 (Dep. Ex. 21914, email from Steven Katz to Joseph Kohout dated April 6, 2006, regarding People's Choice) at NOM-FHFA_05496427 (forwarding email from Hartnagel stating that there were "90 property denies in total (80 were initially agreed upon their appraiser review of the BPO)").

**Nomura Response:**  Defendants do not dispute that Mr. Kohout forwarded plaintiff's Exhibit 121 to Mr. Katz.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 312.

**FHFA Reply:** Defendants do not dispute the asserted fact.

313. **FHFA Statement:** Mr. Katz asked: "[S]hould we test more values?? [E]ven if they passed muster on the initial screen??" Ex. 122 (Dep. Ex. 21914, email from Steven Katz to Joseph Kohout dated April 6, 2006, regarding People's Choice) at NOM-FHFA_05496426.

**Nomura Response:** Defendants do not dispute that plaintiff's Exhibit 122 includes the text quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 313.

**FHFA Reply:** Defendants do not dispute the asserted fact.

314. **FHFA Statement:** Mr. Kohout responded: "Would not be a bad idea. . . . However, playing devil[']s advocate, doing so, would likely place Nomura in a position where we will not be given consideration on future trades. Do we care?" Ex. 122 (Dep. Ex. 21914, email from Steven Katz to Joseph Kohout dated April 6, 2006, regarding People's Choice) at NOM-FHFA_05496426.

**Nomura Response:** Defendants do not dispute that the document contains the statement quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 314.

**FHFA Reply:** Defendants do not dispute the asserted fact.

315. **FHFA Statement:** Mr. Katz responded: "[W]e care. . .. We can always run them if you think we are at risk. . .if there are large differences, we can hold onto them and present when they go down. . .. or if they go down[.]" Ex. 122 (Dep. Ex. 21914, email from Steven Katz to Joseph Kohout dated April 6, 2006, regarding People's Choice) at NOM-FHFA_05496426.

**Nomura Response:** Defendants do not dispute that the document contains the statement quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 315.

**FHFA Reply:** Defendants do not dispute the asserted fact.

316. **FHFA Statement:** There is no evidence that Nomura upsized its diligence sample for People's Choice SP01, or that it conducted additional credit, compliance, or valuation diligence on that Acquisition Pool.

**Nomura Response:**  Disputed. See ¶ 311, *supra*, which is incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 316.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact.  While Defendants make a conclusory reference to their response to ¶ 311, that paragraph does not address whether Nomura upsized its diligence sample or conducted additional credit, compliance or valuation diligence.

317.  **FHFA Statement:**  Nomura securitized loans from the People's Choice SP01 Acquisition Pool into the SLGs at issue in the NHELI 2006-HE3 and NHELI 2007-1 Securitizations.  Ex. 1 to the Cipione Decl. (Row 139 "Peoples Choice SP01", Columns H "NHELI 2006-HE3" and J "NHELI 2007-2").

**Nomura Response:**  Defendants do not dispute that Nomura securitized loans from the People's Choice SP01 Acquisition Pool into the supporting loan groups at issue in the NHELI 2006-HE3 and NHELI 2007-1 Securitizations. Disputed that the Cipione Declaration accurately reflects the loans placed into the supporting loan groups.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

    **D.**    **Nomura Securities' Diligence Did Not Perform Securitization Diligence And Did Not Test The Accuracy Of The Representations In The Prospectus Supplements**

        1.    <u>Review Of Offering Materials</u>

            (a)    *The Diligence Group's Review Of Offering Materials*

318.  **FHFA Statement:**  The Diligence Group did "not directly" "provide any input into prospectus supplements" other than providing data that was stored in the Group's central database.  Ex. 53 (Deposition of Joseph Kohout) at 201:10-15 ("Q.  Did you or anyone at the due diligence group provide any input into prospectus supplements?  A.  Other than data that is stored in our centralized database, not directly.").

**Nomura Response:**  Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. The Due Diligence Group confirmed the accuracy of information about loan characteristics that later would be incorporated into the Offering Documents. See C. Stmt. at ¶¶ 44-46, 100-108.  In addition, John Graham testified that he "or someone working on the transaction" would have run language in the prospectus supplements

"regarding the compliance with underwriting standards" by "the Due Diligence Group to verify" that the language in the prospectus supplement was accurate. Ex. 35 (Graham Tr.) at 112:3-17. Mr. Graham explained that he "would have had a conversation" with the Due Diligence Group "asking if this language reflected their understanding of the loans that they had performed due diligence on." *Id.* at 113:9-22. He further noted that he would speak to Joseph Kohout or Jeffrey Hartnagel to verify the accuracy of the disclosures. *Id.* at 114:3-17. Mr. Graham explained that he "relied on their knowledge and experience." *Id.* at 118:5-13. "To the extent that" the Due Diligence Group was "involved in the approval of underwriting guidelines, the review of due diligence samples, they would be in a position to say that this language is fine. And I felt comfortable relying on that." *Id.* at 118:14-21. More generally, Mr. Graham explained that there was a form of "indirect verification"—his "confidence in the processes and systems that were involved in the acquisition of mortgage loans. That process of acquisition would include due diligence. And I had confidence in what [they] were doing to be able to rely on them." *Id.* at 124:4-18. David Findlay, a member of the NAAC and NHELI boards and a signatory of the at-issue registration statements, testified that the "accuracy of the . . . representations in the prospectus supplement" was verified by the "process[es] we set up or methodology [which] would have entailed due diligence by the third-party companies . . . who would check a percentage of" the loans. Ex. 176 (Findlay Tr.) at 113:3-15. Mr. Findlay felt he could rely on this due diligence "[b]ecause it seemed, A, comprehensive; and secondly, our [due diligence and legal advisors] indicated that they thought it was robust." *Id.* at 114:25-115:5.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 318.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not dispute that the cited testimony is accurately quoted.  While Defendants assert that ¶ 318 does not fully and accurately describe the context of Mr. Kohout's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted language, Defendants fail to cite a particular portion of Mr. Kohout's testimony that would provide better context, and the material cited in ¶ 318 is irrelevant to the asserted fact and does not create a genuine dispute of material fact.  Parts I.C; I.E, *supra*.

319.  **FHFA Statement:**  As a general matter, there was no process that required someone from the Diligence Group to review draft Prospectus Supplements. Ex. 53 (Deposition of Joseph Kohout) at 202:12-16 ("Q.  Okay.  Was there any part of the process that, as a general rule, someone from due diligence would review the prospectus supplement?  A. Not specifically, no.").

**Nomura Response:** Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 318, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 319.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that ¶ 319 does not fully and accurately describe the context of Mr. Kohout's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted language, Defendants fail to cite a particular portion of Mr. Kohout's testimony that would provide better context, and the material cited in ¶ 318, *supra*, is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Parts I.C; I.E, *supra*.

320.    **FHFA Statement:** Mr. Spagna did not believe that the Diligence Group participated in creating "any of the content that went into the [Prospectus Supplements,]" and he did not recall the Diligence Group "[doing] anything to ensure that the disclosures made in the prospectus supplement were accurate[.]" Ex. 46 (Deposition of Neil Spagna) at 318:25-319:14 ("Q. Did you have any participation in – in any of the content that went into the prospectus supplement? A. I don't believe so, no. . . . Q. Okay. Did you or anyone else that was part of the Due Diligence Team do anything to ensure that the disclosures made in the prospectus supplement were accurate? A. Not that I recall.").

**Nomura Response:** Disputed. Although Mr. Spagna gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 318, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 320.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that ¶ 320 does not fully and accurately describe the context of Mr. Spagna's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted

language, Defendants fail to cite a particular portion of Mr. Spagna's testimony that would provide better context, and the material cited in ¶ 318, *supra*, is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Parts I.C; I.E, *supra.*

321. **FHFA Statement:** Mr. Hartnagel never received draft prospectus supplements and "never read them." Ex. 33 (Deposition of Jeffrey Hartnagel) at 841:11-16 ("Q. During your time at Nomura, did you ever receive draft prospectus supplements? A. No. Q. I take it you never read them? A. No.").

    **Nomura Response:** Disputed. Although Mr. Hartnagel gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 318, *supra*, which is incorporated by reference herein.

    **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 321.

    **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that ¶ 321 does not fully and accurately describe the context of Mr. Hartnagel's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted language, Defendants fail to cite a particular portion of Mr. Hartnagel's testimony that would provide better context, and the material cited in ¶ 318, *supra*, is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Parts I.C; I.E, *supra.*

322. **FHFA Statement:** Mr. Hartnagel was not told, and was not aware, that "representations about the occupancy status of the loans[,]" "representations about the underwriting guidelines and the underwriting of the loans[,]" or "representations about compensating factors and exceptions" would be shared with investors. Ex. 33 (Deposition of Jeffrey Hartnagel) at 844:13-846:6, 848:9-850:4 ("Q. So is it fair to say that when you were managing due diligence you didn't – you weren't told by your superiors to keep in mind that certain representations about these loans were going to be made to investors? A. I don't remember that. . . . Q. When you were managing due diligence on mortgage loans for Nomura, were you told by anyone that representations about the occupancy status of the loans would be made to investors? A. No. . . . Q. Did you – were you told or was it conveyed to you during the management of your due diligence that representations about the underwriting guidelines and the underwriting of the loans would be made to

investors? A. Not that I am aware of. . . . Q. This may seem repetitive but it is important. When you were managing due diligence on these Fremont purchases, were you told, were you aware, was it conveyed to you that representations about compensating factors and exceptions would be made to investors? A. No.").

**Nomura Response:** Disputed. Although Mr. Hartnagel gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 318, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 322.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that ¶ 322 does not fully and accurately describe the context of Mr. Hartnagel's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted language, Defendants fail to cite a particular portion of Mr. Hartnagel's testimony that would provide better context, and the material cited in ¶ 318, *supra*, is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Parts I.C; I.E, *supra*.

323. **FHFA Statement:** Clayton, a third party due diligence vendor, also did not review the loans for compliance with statements in the prospectus supplements. Ex. 69 (Clayton 30(b)(6) Deposition of Vicki Beal) at 203:13-204:4 ("Q. All right. And so is it fair to say that for the credit review, Clayton is comparing the loan file to guidelines of the seller and to the client overlays and tolerances, right? A. That's correct. Q. Was Clayton taking any steps to see if the loan complied with the statements in the prospectus supplements? A. No. Q. Okay. Would it be fair to say that Clayton did not even receive a copy of the prospectus supplement at the time it was conducting its credit reviews? . . . A. That's correct."); *see also* Ex. 124 (JCIII 30(b)(6) Deposition of Gary McNeil) at 84:7-11 ("Q. And are you taking any steps to compare the loan file with a -- with statements and offering materials, such as a registration statement or a prospectus supplement? A. No.").

**Nomura Response:** Disputed. Although due diligence vendors gave the testimony quoted by plaintiff, those quotes are removed from the context they which it appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. See ¶ 318, *supra*, which is incorporated by reference herein. Furthermore, the disclosures contained in the offering documents were prepared based on

the due diligence that was performed by third-party vendors, including Clayton—not the other way around. Ex. 176 (Findlay Tr.) at 113:3-15.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 323.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that ¶ 323 does not fully and accurately describe the context of Ms. Beal's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted language, Defendants fail to cite a particular portion of Ms. Beal's testimony that would provide better context, and the material cited in ¶ 318, *supra*, is irrelevant to the asserted fact and does not create a genuine dispute of material fact. In addition, Defendants' citation of Mr. Findlay's testimony does not support its assertion and does not create a genuine dispute of material fact. Parts I.C; I.E, *supra*.

(b) *The Trading Desk's Review Of Offering Materials*

324. **FHFA Statement:** Mr. Katz could not recall ever reviewing, commenting on, or offering revisions to a Prospectus Supplement. Ex. 30 (Deposition of Steven Katz) at 331:8-16 ("Q. When the draft prospectus supplements were circulated, did you ever review them? A. I don't recall. Q. Did you ever offer comments in response to those drafts? A. I don't recall. Q. Did you ever offer revisions? A. I don't recall.).

**Nomura Response:** Disputed. Although Mr. Katz testified only that he did not recall whether he commented on specific documents 7 to 9 years ago—not that he did not recall reviewing such documents. Pl. Ex. 30 (Deposition of Steven Katz) at 331:8-16. Additionally, Defendants object pursuant to Rule 56.1(c)(2) of the Federal Rules of Civil Procedure that Mr. Katz's testimony quoted by plaintiff cannot be presented in a form that would be admissible in evidence. Mr. Katz testified that "I don't recall" whether he reviewed or revised prospectus supplements; as a result, his testimony is speculative and not based on personal knowledge. *See Nora Beverages*, 269 F. 3d at 124.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 324.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants "dispute" that

Mr. Katz testified that he does not recall reviewing draft prospectus supplements, citing

Nomura Ex. 30, the cited language clearly shows that Mr. Katz indeed testified that he

does not recall reviewing such documents. While Defendants argue that the cited

testimony is not admissible evidence, Nomura's argument does not create a genuine

dispute of material fact. Part I.A, *supra*.

325. **FHFA Statement:** Mr. Katz did not conduct any investigation into the accuracy of aggregate data figures disclosed in the Prospectus Supplements. Ex. 30 (Deposition of Steven Katz) at 331:8-24 ("Q. You mentioned that the prospectus supplement might have – or they would have information such as the LTV ratios of the mortgage loans. Did you ever do any investigation as to whether the LTV ratios, for example, were correct? A. I did not.").

**Nomura Response:** Disputed. Although Mr. Katz gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 113, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 325.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not

dispute that the cited testimony is accurately quoted. While Defendants assert that ¶ 325

does not fully and accurately describe the context of Mr. Katz's testimony, and argue that

other testimony and documents must be evaluated to fully understand the quoted

language, Defendants fail to cite a particular portion of Mr. Katz's testimony that would

provide better context, and the material cited in ¶ 113, *supra*, is irrelevant to the asserted

fact and does not create a genuine dispute of material fact. Parts I.C; I.E, *supra*.

326. **FHFA Statement:** When Michael Orfe, a collateral analyst responsible for entering aggregated mortgage-loan data into collateral tables, "prepared collateral tables for the prospectus supplements for Nomura, [he] did not attempt to determine whether that data was actually accurate" because it was "not part of [his] responsibility." Ex. 48 (Deposition of Michael Orfe) at 71:9-72:2 ("Q. Okay. So let me have this right, when you prepared the collateral tables for the prospectus supplements for Nomura, you did not attempt to determine whether that data was actually accurate? . . . A. That was not part of my responsibility. Q. Was it somebody else's responsibility? A. I'm not sure. I don't

know. Q. Well, did you consult anybody else when you personally prepared data tables describing the collateral for Nomura at collateralizations to determine that the data you were putting was actually true? A. No, I don't recall."); *id.* at 19:4-11 ("Q. So let's just start just generally, what did you do at Nomura from 2005 to 2008 while you were working on the Alt-A/Subprime trading desk? A. I was a collateral analyst, so my primary responsibility was the aggregation of data regarding the mortgage loans that were purchased and securitized."), *id.* at 70:13-71:7 ("Q. Sure. Was it your understanding when you provided the collateral tables in prospectus supplements for Nomura securitizations, that you were only describing, based on the data that Nomura had at the time? A. Yes. Q. And were you describing that these LTV ratios were actually accurate? . . . A. No. I mean, I wasn't – this table – it wasn't my responsibility to say whether the LTVs were accurate. That wasn't part of my duty or what I did. I simply – I was synthesizing the data that we did have to create these tables, whether or not it was accurate is something I can't speak of that.").

**Nomura Response:** Disputed. Although Mr. Orfe gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 318, *supra*, which is incorporated by reference herein. In addition, the Nomura collateral analysts reviewed the collateral characteristics included in the Offering Documents to ensure that they matched the information Nomura had in its Loan Management System database, which stored loan-level data for all of the loans Nomura purchased. Ex. 36 (Orfe Tr.) at 72:3-14; Ex. 177 (Lee Tr.) at 47:3-25; Ex. 37 (Kim Tr.) at 193:16-23; Ex. 40 (Crowley Tr.) at 36:17-24.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 326.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that ¶ 326 does not fully and accurately describe the context of Mr. Orfe's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted language, Defendants fail to cite a particular portion of Mr. Orfe's testimony that would provide better context, and the material cited in ¶ 318, *supra*, is irrelevant to the asserted fact and does not create a genuine dispute of material fact. In addition, Defendants' citation of other testimony does not support its assertion, and in fact runs contrary to their assertions when given proper context (*e.g.,* Nom. Ex. 36 (Orfe Tr. at 72:16-24)), and does not create a genuine dispute of material fact. Parts I.C; I.E, *supra*.

327.   **FHFA Statement:**  John Graham, a Managing Director at Nomura and President and Chief Executive Officer of NAA, signed Registration Statement No. 333-126812 and the Amended Registration Statement, which cover NAA 2005-AR6.  Ex. 51 (Dep. Ex. 8500, Deposition Background Questionnaire for John Graham) at A-2; Ex. 24 (Deposition of John Graham) at 19:19-20:12 ("Q.  . . .  So was there a time that you worked for Nomura?  A.  Yes. . . .  Q.  Do you know which Nomura entities in particular you were working for?  A.  They changed over time.  Initially I was hired into Nomura Securities International as a Managing Director.  I was also given the title of Managing Director shortly thereafter of Nomura Credit & Capital, Inc.  And shortly thereafter I was also -- or on or around that time I was also made the President and CEO of Nomura Acceptance  -- Nomura Asset Acceptance Corporation."); Ex. 21 (Dep. Ex. 8503, Registration Statement No. 333-126812) at FHFA19038909 (showing the signature of John Graham in his capacity as President and Chief Executive Officer, signed July 11, 2005); Ex. 13 (Dep. Ex. 7509, Amendment No. 1 to Registration Statement No. 333-126812) at FHFA19039403 (showing the signature of John P. Graham in his capacity as President and Chief Executive Officer, signed July 29, 2005).

   **Nomura Response:**  Undisputed.

   **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 327.

   **FHFA Reply:**  Defendants do not dispute the asserted fact.

328.   **FHFA Statement:**  When asked what "specific documents besides the actual draft of the prospectus supplement that you remember in terms of process looking at before  you would attest to the accuracy of the description of the collateral in the prospectus supplements," John Graham stated that he "would have looked at the – the – the source information, the source reports that had been generated from our system and compared the numbers in addition to having external confirmation that a – a similar exercise – similar.  Deloitte's version of the exercise had been completed as well." Ex. 24 (Deposition of John Graham) at 102:14-103:5 ("Q.  What about documents, do you remember specific documents besides the actual draft of the prospectus supplement that you remember in terms of process looking at before you would attest to the accuracy of the description of the collateral in the prospectus supplements?  A.  I -- I would have looked at the -- the -- the source information, the source reports that had been generated from our system and compare the numbers in addition to having external confirmation that a – a similar exercise -- similar.  Deloitte's version of the exercise had been completed as well.").

   **Nomura Response:**  Disputed. Although Mr. Graham gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 318, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 328.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that ¶ 328 does not fully and accurately describe the context of Mr. Graham's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted language, Defendants fail to cite a particular portion of Mr. Graham's testimony that would provide better context, and the material cited in ¶ 318, *supra*, is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Parts I.C; I.E, *supra.*

329. **FHFA Statement:** When asked whether he would "look at any documents in order to ensure the accuracy of the description of the prospectus supplement regarding compliance with underwriting guidelines," Mr. Graham answered: "No." Ex. 24 (Deposition of John Graham) at 121:24-122:7 ("Q. In addition to speaking to either Mr. Kohout or Mr. Hartnagel, did you look at any documents in order to ensure the accuracy of the description of the prospectus supplement regarding compliance with underwriting standards? . . . A. No.").

**Nomura Response:** Disputed. Although Mr. Graham gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, Mr. Graham testified that he "or someone working on the transaction, would have at some point vetted [the Offering Documents] with someone in the Due Diligence Group to verify that it generally reflected the underwriting guidelines that were used to originate the loans." Ex. 35 (Graham Tr.) at 112:3-17. *See also* ¶ 318, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 329.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that ¶ 329 does not fully and accurately describe the context of Mr. Graham's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted language, the only citation provided does not dispute the asserted fact, and the material

cited in ¶ 318, *supra*, is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Parts I.C *supra*.

330. **FHFA Statement:** Mr. Graham may have "spoke[n] to somebody . . . before the prospectus supplement was issued to ensure that the description of compliance with underwriting guidelines was accurate" but could not "remember specifically when it would have been." Ex. 24 (Deposition of John Graham) at 114:3-14 ("Q. In fact, ones you remember, 'I spoke to somebody before I signed – before the prospectus supplement was issued to ensure that the description of compliance with underwriting guidelines was accurate'? A. I -- . . . A. I – I do not remember specifically when it would have been – or when. It would have been either of two people and likely it would have been Joe Kohout."); *id.* at 114:18-115:2 ("Q. Okay. And – and do you actually remember having discussions before a prospectus supplement that would go out where you would ask Joe Kohout and Jeff Hartnagel, 'Is this part about underwriting standards, is that true?' . . . A. Perhaps not for this deal. I remember having such a conversation.").

   **Nomura Response:** Disputed. Although Mr. Graham gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 329, *supra*, which is incorporated by reference herein.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 330.

   **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that ¶ 330 does not fully and accurately describe the context of Mr. Graham's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted language, the only material cited, in ¶ 329, *supra*, is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C *supra*.

331. **FHFA Statement:** Mr. Graham did not check with the Diligence Group "every time" whether the "underwriting disclosure" in the prospectus supplements were true. Ex. 24 (Deposition of John Graham) at 115:3-116:15 ("Q. Do you remember if you had such a conversation, meaning you checked with the -- either Joe Kohout or Jeff Hartnagel of Due Diligence and ask in sum or substance, "Is this underwriting disclosure true?" Did you do that every time for every prospectus supplement that you were in charge of? . . . A. I did not. Q. Okay. Do -- do you know what percentage of the prospectus supplements that were issued when you were in lead did you have such a conversation where you literally asked the Due Diligence people if the Underwriting Disclosure Compliance section in the prosupp is true? . . . A. I don't know because it would depend

on the type of transaction. Q. Okay. So which -- which types of transactions would you have double-checked? A. To the -- to the extent this is a general aggregation deal, to the extent the language changed, it would be black lined from a prior draft and would flag the change. If there was no change, there was no reason to ask the question. As far as other transactions, if there was a specific originator's underwriting guidelines being disclosed in the document, I, or someone running the transaction, would check with Joe Kohout or someone to verify. Again, to the -- to the extent there was a second or third transaction that had the same information in it with no change it may not -- the conversation may not have taken place."); *id.* at 115:8-12 ("Q. Did you do that every time for every prospectus supplement that you were in charge of? … A. I did not.").

**Nomura Response:** Disputed. Although Mr. Graham gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 329, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 331.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that ¶ 331 does not fully and accurately describe the context of Mr. Graham's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted language, Defendants fail to cite a particular portion of Mr. Graham's testimony that would provide better context, and the material cited in ¶ 329, *supra*, is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Parts I.C; I.E, *supra*.

332. **FHFA Statement:** Rather, he "relied on their knowledge and experience." Ex. 24 (Deposition of John Graham) at 118:5-13 ("Q. And if – even if you don't remember asking that question, let – let me ask you: How – how – do you know how they knew that the loans described in the prospectus supplements complied with the underwriting guidelines? . . . A. I relied on their knowledge and experience.").

**Nomura Response:** Disputed. Although Mr. Graham gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 329, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 332.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that ¶ 332 does not fully and accurately describe the context of Mr. Graham's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted language, Defendants fail to cite a particular portion of Mr. Graham's testimony that would provide better context, and the material cited in ¶ 329, *supra*, is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Parts I.C; I.E, *supra*.

333. **FHFA Statement:** When asked what he did to ensure the loans had been compared to underwriting guidelines, Mr. Graham stated that he "had confidence in the processes and systems that were involved in the acquisition of mortgage loans." Ex. 24 (Deposition of John Graham) at 124:4-18 ("Q. Did – did you – did you at least ensure that – that some – some loans had actually been compared against the originator loan – underwriting standards before attesting to this? . . . A. Returning to my earlier statement about the, kind of, the in – indirect verification, I had confidence in the processes and systems that were involved in the acquisition of mortgage loans. That process of acquisition would include due diligence. And I had confidence in what Joe and Jeff were doing to be able to rely on them."); *id.* at 100:10-101:15 ("Q. Let me ask generally what, if any, investigation did you do into the truth and accuracy of the disclosures that were in the prospectus supplement that's Exhibit 8504? . . . A. There would be two types of verification. One is direct and one is indirect. And I'll start with the indirect first. I had confidence in the processes and systems in our group that the whole loan acquisition and the sourcing of the collateral had been done properly. Similarly I also had confidence in the group of people involved in doing the transaction, both internally, which could include the Collateral Analysts, the Transaction Manager, the Structurer, as well as external parties which would include external counsel as well as Deloitte, that -- that was operating properly. In addition, as drafts of this document were circulated and more information was -- was included so there were less holes, there was more filled in, more robust, I would then go through and review portions of the document to satisfy my own need to verify numbers or text and could obtain the collateral table source information as well as the structure source information to go through the document and check things for myself"); *see also id.* at 117:7-19 ("Q. Okay. I mean, do -- do you know if they provided any reason why they believed that the prospectus supplement's disclosure about compliance with underwriting standards was true when you checked with them before letting a prospectus supplement be filed?. . . A. I don't recall them providing a reason. They were the members of the group that were closest to the collateral and the underwriting guidelines and I had confidence that they were knowledgeable in what they were saying.")

**Nomura Response:** Disputed. Although Mr. Graham gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other

testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 329, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 333.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that ¶ 333 does not fully and accurately describe the context of Mr. Graham's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted language, Defendants fail to cite a particular portion of Mr. Graham's testimony that would provide better context, and the material cited in ¶ 329, *supra*, is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Parts I.C; I.E, *supra.*

334. **FHFA Statement:** However, Mr. Graham did not know what anyone in the Due Diligence Group did to verify that the loans included in the Nomura securitizations were issued in compliance with underwriting guidelines. Ex. 24 (Deposition of John Graham) at 112:18-23 ("Q. Okay. Do you know what anyone in the Due Diligence Group did to verify that the loans included in the Nomura securitizations were issued in compliance with underwriting guidelines? A. Do I know? No.").

**Nomura Response:** Disputed. Although Mr. Graham gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 329, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 334.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that ¶ 334 does not fully and accurately describe the context of Mr. Graham's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted language, Defendants fail to cite a particular portion of Mr. Graham's testimony that would provide better context, and the material cited in ¶ 329,

*supra*, is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Parts I.C; I.E, *supra*.

335. **FHFA Statement:** There is also no evidence that that anyone else in the RFG investigated the veracity of the representations. See, e.g., Ex. 29 (Deposition of Timothy Crowley) at 216:3-216:11 ("Q. What was your role, then, in validating their work? A. I would make sure that they reviewed the document before it went to final print, to make sure that the document captured the data that they provided correctly and they would work with Deloitte & Touche to do the same.").

**Nomura Response:** Disputed. Although Mr. Crowley gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, Mr. Crowley testified that the Residential Finance Group engaged Deloitte "to check the data that was included in the book." Ex. 40 (Crowley Tr.) at 218:10-20. Mr. Crowley also testified that "the data would be pulled from [a] common data source, consolidated, rechecked, check[ed] with Deloitte & Touche, checked again when it was in the final form of the book before it went to print." *Id.* at 217:9-14. *See also* ¶ 329, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 335.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that ¶ 335 does not fully and accurately describe the context of Mr. Crowley's testimony, and argue that other testimony and documents must be evaluated to fully understand the quoted language, the cited testimony is irrelevant to the asserted fact and does not create a genuine dispute of material fact. In addition, Defendants fail to cite a particular portion of ¶ 329, *supra*, and therefore do not create a genuine dispute of material fact. Parts I.C; I.E, *supra*.

(d)    *Residential Mortgage Credit Committee*

336. **FHFA Statement:** Nomura maintained a "residential mortgage credit committee" in which "the individual members [could review] the conclusions of credit, legal and the residential group in the course of their respective Alt-A and sub-prime reviews." Ex. 125 (NOM-FHFA_05892056, NHA Corporate Credit Policies, dated Mar. 2005) at NOM-FHFA_05892088 ("Information required hereunder for approval will be distributed to a residential mortgage credit committee . . . Committee involvement will generally include

review by the individual members of the conclusions of credit, legal and the residential group in the course of their respective Alt-A and sub-prime reviews.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 336.

**FHFA Reply:** Defendants do not dispute the asserted fact.

337. **FHFA Statement:** Nomura's policies provided that "[m]eetings will only occur if any member reviewing distributed material discovers an issue he or she feels warrants discussion." Ex. 125 (NOM-FHFA_05892056, NHA Corporate Credit Policies, dated Mar. 2005) at NOM- FHFA_05892088 ("Meetings will only occur if any member reviewing distributed material discovers an issue he or she feels warrants discussion.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 337.

**FHFA Reply:** Defendants do not dispute the asserted fact.

338. **FHFA Statement:** There is no evidence that any such meeting every occurred.

**Nomura Response:** Disputed. The absence of affirmative evidence of meetings of a committee in existence at Nomura seven to nine years ago—which is no longer in existence—is not evidence that no such meetings ever occurred.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 338.

**FHFA Reply:** While Defendants dispute that these meetings did not occur, they identify

no evidence that contradicts the asserted fact. Nomura's conclusory assertions do not

create a genuine dispute of material fact. Part I.B, *supra*.

> 2. Nomura Securities Never Tested The Rate Of Defective Loans In The SLGs

339. **FHFA Statement:** When Nomura purchased a pool of loans, the Diligence Group performed diligence "after … the winning bid was awarded to Nomura and prior to finalizing the pool and purchasing the pool." Ex. 24 (Deposition of John Graham) at 164:5-17 ("Q. . . . When in terms of loan acquisition was due diligence done? A. Due diligence was undertaken after the bid was awarded, the – the winning bid was awarded to Nomura and prior to finalizing the pool and purchasing the pool. There are many

aspects to due diligence that are going to be going on during that – during that period of time.").

**Nomura Response:**  Defendants do not dispute that the Diligence Group performed diligence on pools of loans after winning a bid and before making the purchase.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 339.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

340.  **FHFA Statement:**  Nomura performed diligence only when acquiring loans.  Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 97:6-13 ("Q.  For all of the Nomura due diligence, was due diligence on loans only performed at the stage where Nomura was acquiring loans?  A.  By Nomura, that's right.  When our deals were underwritten by a different underwriter, they performed due diligence at a later stage. . . . .").

**Nomura Response:**  Disputed. Defendants do not dispute that Nomura performed acquisition level due diligence, a multi-stage diligence process that included valuation due diligence; credit and compliance due diligence; collateral due diligence; and data integrity review that met, and in some cases exceeded, the industry standard for the relevant time period. Ex. 32 (July 9 Grice Report) at ¶ 21.  Nomura relied on, and utilized, that due diligence at the securitization level. For example, because 100% of loans received valuation due diligence, that diligence was performed on 100% of loans included in the Securitizations. See C. Stmt. at ¶¶ 66-75, which are incorporated by reference herein. Additionally, David Findlay, a member of the NAAC and NHELI boards and a signatory of the at-issue registration statements, testified that the "accuracy of the . . . representations in the prospectus supplement" was verified by the "process[es] we set up or methodology [which] would have entailed due diligence by the third-party companies . . . who would check a percentage of" the loans. Ex. 176 (Findlay Tr.) at 113:3-15. Mr. Findlay felt he could rely on this due diligence "[b]ecause it seemed, A, comprehensive; and secondly, our [due diligence and legal advisors] indicated that they thought it was robust." *Id.* at 114:25-115:5. John Graham testified that he "or someone working on the transaction" would have run language in the prospectus supplements "regarding the compliance with underwriting standards" by "the Due Diligence Group to verify" that the language in the prospectus supplement was accurate. Ex. 35 (Graham Tr.) at 112:3-17. Mr. Graham explained that he "would have had a conversation [with the Due Diligence Group] asking if this language reflected their understanding of the loans that they had performed due diligence on." *Id.* at 113:9-22. He further noted that he would speak to Joseph Kohout or Jeffrey Hartnagel to verify the accuracy of the disclosures. *Id.* at 114:3-17. Mr. Graham explained that he "relied on their knowledge and experience." *Id.* at 118:5-13. Furthermore, Nomura performed additional collateral and data integrity diligence at the securitization level. See C. Stmt. at ¶¶ 96-108, which are incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 340.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The testimony and documents that Defendants cite in their response and in Counterstatement ¶¶ 66-75, 96-108, fail to directly contravene the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants argue that collateral and data integrity reviews conducted after loan acquisition constitute due diligence, Defendants' argument does not create a genuine dispute of material fact. Part I.A, *supra*.

341.  **FHFA Statement:** "The samples [weren't] tied to the securitizations. Samples [were] tied to whole loan transactions. We were buying whole loans. . . . [W]e weren't doing sampling for a security." Ex. 46 (Deposition of Neil Spagna) at 198:4-24 ("Q. Do you know what kinds of sample, whether it was representative, random, adverse, were used on the four securitizations that we talked about earlier, NHELI 06-FM2, 06-HE3, 07-1 and 07-3? A. The samples aren't tied to the securitizations. Samples are tied to whole loan transactions. We were buying whole loans. We weren't – we weren't – we weren't doing sampling for a security. We're underwriting whole loans. We took – we bought loans. We took the risk of those loans. Later on those loans were put into a security perhaps. Some were kept on the books of Nomura. Some didn't perform and Nomura took a total loss on them. A lot of things happened in the process. Again, you're – you're aggregating whole loans that eventually will become securitized, but our function was to first focus on acquiring pools of whole loans.").

**Nomura Response:** Disputed. Although Mr. Spagna gave the testimony quoted by the plaintiff, that testimony is removed from the context in which it appears, and omits other testimony that must be understood in order to fully evaluate the entirety of his testimony. For example, Nomura only used samples for credit and compliance diligence on its bulk loan purchases; Nomura conducted credit and compliance diligence on 100% of the loans it acquired through its conduit and mini- bulk channels and conducted valuation diligence on all loans it purchased. See C. Stmt. at ¶¶ 66-75, 126-128. The Due Diligence Group confirmed the accuracy of information about loan attributes that later would be incorporated into the Offering Documents. See C. Stmt. at ¶¶ 44-46, 100-108 . Thus, the diligence conducted on Acquisition Pools served as diligence for the securitizations, and additional diligence was conducted at the securitization stage. See ¶ 340, *supra*, which is incorporated herein by reference.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 341.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants dispute that the quoted excerpt from Mr. Spagna's transcript fully and accurately supports

the testimony, the evidence that Defendants cite in Counterstatement ¶¶ 66-75, 126-128, 44-46, 100-108, and 340, fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants argue in ¶ 340, *supra*, that collateral and data integrity reviews conducted after loan acquisition constitute due diligence, Defendants' argument does not create a genuine dispute of material fact. Part I.A, *supra*.

342. **FHFA Statement:** "Due diligence was performed at the time the mortgage loans were purchased. To the extent the loans were securitized and Nomura Securities International was the underwriter, no further due diligence was performed[.]" Ex. 24 (Deposition of John Graham) at 210:6-23 ("Q. Is it right that the only due diligence that was done that compared loan files to guidelines was the due diligence that was done by Clayton or AMC? . . . A. I'm finding it difficult to answer the question because it depends. Q. Okay. And what does it depend on? A. Due diligence was performed at the time the mortgage loans were purchased. To the extent the loans were securitized and Nomura Securities International was the underwriter, no further due diligence was performed because it was all the same people and nothing had changed about the loans since those people had purchased them."). The RFG did not allocate any time for due diligence when scheduling securitizations. Ex. 29 (Deposition of Timothy Crowley) at 165:2-9 ("Q. Would these deals have been completed more timely if no due diligence was performed? A. Due diligence was conducted before the loans [were] purchased, which is quite a bit before the securitization would occur. I don't think due diligence would impact my scheduling.").

**Nomura Response:** Disputed. Although Mr. Graham and Mr. Crowley gave the testimony quoted by the plaintiff, that testimony is removed from the context in which it appears, and omits other evidence that must be understood in order to fully evaluate the entirety of their respective testimony. Nomura employed a multi-stage diligence process that included valuation due diligence; credit and compliance due diligence; collateral due diligence; and data integrity review that met, and in some cases exceeded, the industry standard for the relevant time period. Ex. 32 (July 9 Grice Report) at ¶ 21. The Due Diligence Group confirmed the accuracy of information about loan attributes that later would be incorporated into the Offering Documents. C. Stmt. at ¶¶ 44-66. Thus, the diligence conducted on Acquisition Pools served as diligence for the securitizations, and additional diligence was conducted at the securitization stage. See ¶ 340, *supra*, which is incorporated herein by reference.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 342.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants dispute that the quoted excerpt from Mr. Graham's transcript fully and accurately supports the testimony, the evidence that Defendants cite in Exhibit 32 and Counterstatement ¶¶ 44-66, and 340, fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants argue in ¶ 340, *supra*, that collateral and data integrity reviews conducted after loan acquisition constitute due diligence, Defendants' argument does not create a genuine dispute of material fact. Part I.A, *supra*.

343. **FHFA Statement:** "There's no due diligence performed for the securitizations." Ex. 24 (Deposition of John Graham) at 218:13-17 ("Q. Was any part of the due diligence sample or the Nomura RMBS securitizations chosen randomly? A. There's no due diligence performed for the securitizations.").

**Nomura Response:** Disputed. Although Mr. Graham gave the testimony quoted by the plaintiff, because he was responding to a question about "the due diligence sample," his response did not signify that no due diligence was conducted for the securitizations. Further, the testimony is removed from the context in which it appears, and omits other evidence that must be understood in order to fully evaluate the entirety of his testimony. Mr. Graham testified that he "or someone working on the transaction" would have run language in the prospectus supplements "regarding the compliance with underwriting standards" by "the Due Diligence Group to verify" that the language in the prospectus supplement was accurate. Ex. 35 (Graham Tr.) at 112:5-17. Mr. Graham explained that he "would have had a conversation with the Due Diligence Group asking if this language reflected their understanding of the loans that they had performed due diligence on." *Id.* at 113:9-22. He further noted that he would speak to Joseph Kohout or Jeffrey Hartnagel to verify the accuracy of the disclosures. *Id.* at 114:3-17. Mr. Graham explained that he "relied on their knowledge and experience." *Id.* at 118:5-13. Further, Nomura employed a multi-stage diligence process that included valuation due diligence; credit and compliance due diligence; collateral due diligence; and data integrity review that met, and in some cases exceeded, the industry standard for the relevant time period. Ex. 32 (July 9 Grice Report) at ¶ 21. Some steps of this process occurred at the time of securitization. See C. Stmt. at ¶¶ 81-108. The Due Diligence Group confirmed the accuracy of information about loan attributes that later would be incorporated into the Offering Documents. See C. Stmt. at ¶¶ 44-46, 100-108. *See also* ¶ 340, *supra*, which is incorporated herein by reference.

**RBSSI Response:** RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 343.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants dispute that the quoted excerpt from Mr. Graham's transcript fully and accurately supports the testimony, the evidence that Defendants cite in Exhibits 32 and 35 and Counterstatement ¶¶ 44-46, 81-108, and 340, fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants argue in ¶ 340, *supra*, that collateral and data integrity reviews conducted after loan acquisition constitute due diligence, Defendants' argument does not create a genuine dispute of material fact. Part I.A, *supra*. While Defendants assert that Nomura's expert Charles Grice explained that "Nomura's due diligence met, and in some cases exceeded, the industry standard for the relevant time period," the conclusory assertions of an expert do not create a genuine dispute of fact. Part I.G, *supra*. Finally, while Defendants dispute whether Mr. Graham "signif[ied] that no due diligence was conducted for the securitizations," they identify no evidence that contradicts the asserted fact. Nomura's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*.

344. **FHFA Statement:** Mr. Graham speculated that there was no need for Diligence Group to conduct any post-acquisition diligence "because it was all the same people and nothing had changed about the loans since those people had purchased them." Ex. 24 (Deposition of John Graham) at 210:6-23 ("Q. Is it right that the only due diligence that wad done that compared loan files to guidelines was the due diligence that was done by Clayton or AMC? . . . A. I -- I – I'm finding it difficult to answer the question because it depends. Q. Okay. And what does it depend on? A. Due diligence was performed at the time the mortgage loans were purchased. To the extent he loans were securitized and Nomura Securities International was the underwriter, no further due diligence was performed because it was all the same people and nothing had changed about the loans since those people had purchased them.").

**Nomura Response:** Disputed. Mr. Graham did not "speculate" about anything. In response to a question that was specifically limited to due diligence that compared loan files to guidelines, he testified that "Due Diligence was performed at the time the mortgage loans were purchased. To the extent the loans were securitized and Nomura Securities International was the underwriter, no further due diligence was performed because it was all the same people and nothing had changed about the loans since those

people had purchased them." Pl. Ex. 24 (Graham Tr.) at 210:16-23. That diligence comparing loan files to guidelines conducted on Acquisition Pools served as diligence for the securitizations, and additional diligence was conducted at the securitization stage. See ¶ 340, *supra*, which is incorporated herein by reference.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 344.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue that "Mr. Graham did not 'speculate' about anything, Nomura's argument does not create a genuine dispute of material fact. Part I.A, *supra*. The testimony that Defendants reference from FHFA's Exhibit 24 and in ¶ 340, *supra*, fail to directly contravene the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*. Finally, while Defendants argue in ¶ 340, *supra*, that collateral and data integrity reviews conducted after loan acquisition constitute due diligence, Defendants' argument does not create a genuine dispute of material fact. Part I.A, *supra*.

345. **FHFA Statement:** After buying loans, NCCI held the loans on its balance sheet before the loans were securitized. Ex. 126 (Nomura 30(b)(6) Deposition of John Graham in Plumbers' Union Local No. 12 Pension Fund v. Nomura) at 38:19-39:3 ("Q. Is there some concern about holding the loans too long before you put them in a securitization? Is there some risk associated with – A. Certainly there is risk. They are on Nomura's balance sheet for the duration – well, for that matter, as long as they have the loan as a whole loan as well as if they retained the first piece from the securitization, that risk is on their books."); *see, e.g.*, Ex. 16 (Dep. Ex. 7503, Registration Statement for NHELI dated February 28, 2006) at FHFA19039476 (noting that the sponsor, NCCI, is "responsible for pooling the mortgage loans to be securitized by the Depositor, negotiating the principal securitization transaction documents and participating with the underwriter in the structuring of such transactions.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 345.

**FHFA Reply:** Defendants do not dispute the asserted fact.

346. **FHFA Statement:** Nomura accumulated loans until it had an adequate amount to issue a securitization. Ex. 43 (Deposition of Randall Lee) at 40:20-41:3 ("Q. Do you know what

was the next step in the securitization process after Nomura bought loans from originators? A. Yes. Q. What is it? A. They accumulate loans until they have adequate amount in order to issue a securitization.").

**Nomura Response:** Disputed. Defendants do not dispute that Mr. Lee gave the testimony cited in support of the statement, but it is missing the necessary context that specific types of loans are accumulated for specific kinds of securitizations. For instance, Nomura may have been accumulating fixed rate loans separately from adjustable rate loans. *See, e.g.*, Ex. 586 (July 9 Grice Report Exhibit 1) at 1.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 346.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The example that Defendants reference from Exhibit 586 fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Further, while Defendants argue that "Nomura may have been accumulating fixed rate loans separately from adjustable rate loans," Nomura's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

347. **FHFA Statement:** John Graham testified that "[p]ast experience would indicate" that Nomura held loans on its books for three to six months between acquisition and securitization. Ex. 126 (Nomura 30(b)(6) Deposition of John Graham in Plumbers' Union Local No. 12 Pension Fund v. Nomura) at 37:21-38:2 ("Q. The disposition of the loans, so at the time when Nomura acquired these FNBN-originated subject loans, did it have a plan as to how long it would hold those loans on its books? A. Past experience would indicate a range of three to six months, but ultimately it depended.").

**Nomura Response:** Defendants do not dispute that Mr. Graham gave the testimony quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 347.

**FHFA Reply:** Defendants do not dispute the asserted fact.

348. **FHFA Statement:** The time gap between acquisition and securitization for the loans backing the SLGs at issue here is summarized in Ex. 10 to the Cipione Dec.

**Nomura Response:** Disputed. The Cipione Declaration does not accurately reflect Nomura's securitization process. The correct figures, and a comparison to the figures set forth in the Cipione Declaration, appear in Mishol Decl. Ex. 4. The time gap between the

completion of due diligence and the cut-off date given in the prospectus supplements is set forth in Mishol Decl. Ex. 5.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 348.

**FHFA Reply:**  Defendants do not dispute a material fact.  Any discrepancy between data in Exhibit 10 to the Cipione Declaration and Exhibits 4 or 5 to the Mishol Declaration are due to information that FHFA did not possess at the time of filing the Cipione Declaration.  While Defendants dispute the accuracy of data included in Exhibit 10 to the Cipione Declaration, any such dispute is not material to FHFA's motion. *See Quarles*, 758 F.2d at 840.  Moreover, Nomura's time gap analysis shows that it held the loans on its books as long as or even *longer* than FHFA stated for 185 of the 193 Acquisition Pools that contributed to FHFA's analysis.  Any differences between the time gaps asserted by FHFA and those asserted by Nomura for these eight pools are immaterial.  Furthermore, three of these pools – Gateway 18A, Quick Loan 06SP, and Quick Loan SP10 – have a shorter acquisition/diligence time gap in Nomura's analysis because it performed "post-close" diligence.  *See* Cipione Ex. 10; Mishol Ex. 4. Table 13 below illustrates the differences in the time gaps reported by FHFA and by Nomura for 193 pools.  The far right column provides the difference in number of days, and a positive value indicates that Nomura's time gap was longer than that reported by FHFA.

| TABLE 13:  DIFFERENCES BETWEEN NOMURA TIME GAP AND FHFA TIME GAP | | | | | | |
|---|---|---|---|---|---|---|
| TRADE POOL | CLOSING DATE OF SECURITIZATION | CIPIONE EX. 10 DATE USED | CIPIONE EX. 10 TIME GAP (DAYS) | MISHOL EX. 4 DATE USED | MISHOL EX. 4 TIME GAP (DAYS) | DIFFERENCE IN TIME GAP (DAYS) |
| ABC18 | 01/31/07 | 11/30/06 | 62 | 11/29/06 | 63 | 1 |
| Aegis 03A | 11/30/05 | 09/30/05 | 61 | 09/28/05 | 63 | 2 |
| Aegis 04A | 11/30/05 | 10/12/05 | 49 | 10/12/05 | 49 | 0 |
| Alliance CA 04 | 11/30/05 | 09/09/05 | 82 | 09/02/05 | 89 | 7 |
| Alliance CA 17 | 01/31/07 | 10/31/06 | 92 | 10/30/06 | 93 | 1 |

| TABLE 13: DIFFERENCES BETWEEN NOMURA TIME GAP AND FHFA TIME GAP | | | | | | |
|---|---|---|---|---|---|---|
| TRADE POOL | CLOSING DATE OF SECURITIZATION | CIPIONE EX. 10 DATE USED | CIPIONE EX. 10 TIME GAP (DAYS) | MISHOL EX. 4 DATE USED | MISHOL EX. 4 TIME GAP (DAYS) | DIFFERENCE IN TIME GAP (DAYS) |
| Alliance CA SP01 | 08/31/06 | 08/25/05 | 371 | 08/26/05 | 370 | -1 |
| Alliance CA SP02 | 08/31/06 | 11/23/05 | 281 | 11/21/05 | 283 | 2 |
| Alliance CA SP03 | 08/31/06 | 11/23/05 | 281 | 11/21/05 | 283 | 2 |
| Alliance CA SP04 | 04/30/07 | 10/17/06 | 195 | 10/13/06 | 199 | 4 |
| Alliance CA SP05 | 04/30/07 | 01/12/07 | 108 | 01/11/07 | 109 | 1 |
| Alliance NY 10A | 11/30/05 | 09/09/05 | 82 | 09/08/05 | 83 | 1 |
| Alliance NY SP04 | 08/31/06 | 04/19/06 | 134 | 04/12/06 | 141 | 7 |
| Alliance NY SP05 | 01/31/07 | 07/10/06 | 205 | 07/06/06 | 209 | 4 |
| Allied 13A | 11/30/05 | 09/06/05 | 85 | 08/31/05 | 91 | 6 |
| Allied SP02 | 08/31/06 | 02/09/06 | 203 | 02/08/06 | 204 | 1 |
| Allied SP03 | 08/31/06 | 05/23/06 | 100 | 05/22/06 | 101 | 1 |
| Allied SP04 | 01/31/07 | 07/21/06 | 194 | 07/19/06 | 196 | 2 |
| Allstate 10A | 11/30/05 | 08/19/05 | 103 | 08/19/05 | 103 | 0 |
| Allstate 29 | 01/31/07 | 10/30/06 | 93 | 10/27/06 | 96 | 3 |
| Allstate SP07 | 08/31/06 | 01/25/06 | 218 | 01/23/06 | 220 | 2 |
| Allstate SP08 | 08/31/06 | 03/21/06 | 163 | 03/17/06 | 167 | 4 |
| Allstate SP09 | 08/31/06 | 04/05/06 | 148 | 04/03/06 | 150 | 2 |
| Allstate SP10 | 01/31/07 | 04/26/06 | 280 | 04/25/06 | 281 | 1 |
| Alterna SP04 | 08/31/06 | 03/31/06 | 153 | 03/29/06 | 155 | 2 |
| American Capital SP01 | 08/31/06 | 01/23/06 | 220 | 01/20/06 | 223 | 3 |
| Americorps SP01 | 08/31/06 | 01/19/06 | 224 | 01/18/06 | 225 | 1 |
| Amnet 05A | 11/30/05 | 09/28/05 | 63 | 09/26/05 | 65 | 2 |
| Baltimore 25A | 11/30/05 | 09/07/05 | 84 | 09/06/05 | 85 | 1 |
| Bam 53 | 01/31/07 | 10/31/06 | 92 | 10/23/06 | 100 | 8 |
| Cameron 08A | 11/30/05 | 06/24/05 | 159 | 06/23/05 | 160 | 1 |
| Cameron 10A | 11/30/05 | 09/07/05 | 84 | 09/07/05 | 84 | 0 |
| Cameron Financial SP03 | 08/31/06 | 02/27/06 | 185 | 02/16/06 | 196 | 11 |
| Cameron Financial SP04 | 01/31/07 | 06/16/06 | 229 | 06/15/06 | 230 | 1 |
| Chapel SP01 | 08/31/06 | 10/28/05 | 307 | 10/26/05 | 309 | 2 |
| Chapel SP02 | 08/31/06 | 01/09/06 | 234 | 01/06/06 | 237 | 3 |
| Coastal Capital SP01 | 08/31/06 | 04/07/06 | 146 | 04/05/06 | 148 | 2 |
| Coastal Capital SP02 | 01/31/07 | 06/23/06 | 222 | 06/22/06 | 223 | 1 |
| Columbia 8A | 11/30/05 | 08/31/05 | 91 | 08/29/05 | 93 | 2 |
| Columbia SP01 | 01/31/07 | 05/31/06 | 245 | 05/30/06 | 246 | 1 |
| Columbia SP02 | 04/30/07 | 02/26/07 | 63 | 02/23/07 | 66 | 3 |
| Entrust 04A | 11/30/05 | 09/12/05 | 79 | 09/09/05 | 82 | 3 |
| Equifirst SP01 | 08/31/06 | 03/29/06 | 155 | 03/28/06 | 156 | 1 |
| Equifirst SP02 | 01/31/07 | 06/28/06 | 217 | 06/27/06 | 218 | 1 |
| Equifirst SP03 | 01/31/07 | 09/27/06 | 126 | 09/26/06 | 127 | 1 |
| First Financial SP01 | 08/31/06 | 08/24/05 | 372 | 08/23/05 | 373 | 1 |
| First Financial SP02 | 01/31/07 | 08/30/06 | 154 | 08/30/06 | 154 | 0 |
| First NLC SP02 | 08/31/06 | 06/19/06 | 73 | 06/16/06 | 76 | 3 |
| First NLC SP03 | 01/31/07 | 08/15/06 | 169 | 08/14/06 | 170 | 1 |

| TABLE 13: DIFFERENCES BETWEEN NOMURA TIME GAP AND FHFA TIME GAP | | | | | | |
|---|---|---|---|---|---|---|
| TRADE POOL | CLOSING DATE OF SECURITIZATION | CIPIONE EX. 10 DATE USED | CIPIONE EX. 10 TIME GAP (DAYS) | MISHOL EX. 4 DATE USED | MISHOL EX. 4 TIME GAP (DAYS) | DIFFERENCE IN TIME GAP (DAYS) |
| First Street SP01 | 04/30/07 | 10/06/06 | 206 | 10/06/06 | 206 | 0 |
| First Street SP02 | 04/30/07 | 11/20/06 | 161 | 11/17/06 | 164 | 3 |
| Flick 08 | 01/31/07 | 12/06/06 | 56 | 12/05/06 | 57 | 1 |
| FNBN 21 | 01/31/07 | 09/25/06 | 128 | 09/22/06 | 131 | 3 |
| FNBN SP01 | 08/31/06 | 05/12/06 | 111 | 05/11/06 | 112 | 1 |
| FNLC SP01 | 08/31/06 | 04/27/06 | 126 | 04/26/06 | 127 | 1 |
| Fremont SP02 | 01/30/06 | 11/08/05 | 83 | 11/04/05 | 87 | 4 |
| Fremont SP03 | 10/31/06 | 06/29/06 | 124 | 06/27/06 | 126 | 2 |
| Fremont SP04 | 10/31/06 | 06/29/06 | 124 | 06/27/06 | 126 | 2 |
| Fund America SP02 | 08/31/06 | 12/14/05 | 260 | 12/09/05 | 265 | 5 |
| Fund America SP03 | 08/31/06 | 02/24/06 | 188 | 02/22/06 | 190 | 2 |
| Fund America SP04 | 01/31/07 | 07/31/06 | 184 | 07/31/06 | 184 | 0 |
| Fund America SP05 | 01/31/07 | 09/29/06 | 124 | 09/27/06 | 126 | 2 |
| Gateway 17A | 11/30/05 | 06/30/05 | 153 | 06/30/05 | 153 | 0 |
| Gateway 18A | 11/30/05 | 06/30/05 | 153 | 07/25/05 | 128 | -25 |
| Gateway 20A | 11/30/05 | 08/19/05 | 103 | 08/18/05 | 104 | 1 |
| Gateway 21A | 11/30/05 | 08/30/05 | 92 | 08/29/05 | 93 | 1 |
| Gateway 24A | 11/30/05 | 09/28/05 | 63 | 09/27/05 | 64 | 1 |
| Gateway SP03 | 08/31/06 | 12/15/05 | 259 | 12/12/05 | 262 | 3 |
| Gateway SP04 | 08/31/06 | 03/31/06 | 153 | 03/28/06 | 156 | 3 |
| Gateway SP05 | 01/31/07 | 05/30/06 | 246 | 05/25/06 | 251 | 5 |
| Harbourton SP01 | 08/31/06 | 04/06/06 | 147 | 04/04/06 | 149 | 2 |
| Home Loan SP01 | 04/30/07 | 12/01/06 | 150 | 11/30/06 | 151 | 1 |
| Horizon Direct SP04 | 01/31/07 | 04/20/06 | 286 | 04/18/06 | 288 | 2 |
| Horizon Direct SP05 | 01/31/07 | 05/08/06 | 268 | 05/03/06 | 273 | 5 |
| Horizon Direct SP12 | 04/30/07 | 02/08/07 | 81 | 02/07/07 | 82 | 1 |
| Horizon SP01 | 08/31/06 | 03/01/06 | 183 | 02/27/06 | 185 | 2 |
| Horizon SP02 | 08/31/06 | 03/01/06 | 183 | 03/06/06 | 178 | -5 |
| Horizon SP03 | 08/31/06 | 03/28/06 | 156 | 03/28/06 | 156 | 0 |
| Horizon SP07 | 01/31/07 | 07/14/06 | 201 | 07/05/06 | 210 | 9 |
| Horizon SP08 | 01/31/07 | 08/25/06 | 159 | 08/23/06 | 161 | 2 |
| Horizon SP09 | 04/30/07 | 11/08/06 | 173 | 11/03/06 | 178 | 5 |
| Horizon SP11 | 04/30/07 | 01/09/07 | 111 | 01/08/07 | 112 | 1 |
| Ideal MTG 02A | 11/30/05 | 09/26/05 | 65 | 09/23/05 | 68 | 3 |
| Impac SP04 | 01/31/07 | 07/27/06 | 188 | 07/26/06 | 189 | 1 |
| Innovative SP08 | 08/31/06 | 11/21/05 | 283 | 11/15/05 | 289 | 6 |
| Innovative SP10 | 08/31/06 | 03/02/06 | 182 | 02/28/06 | 184 | 2 |
| Innovative SP11 | 01/31/07 | 04/25/06 | 281 | 04/17/06 | 289 | 8 |
| Investaid SP01 | 04/30/07 | 12/22/06 | 129 | 12/20/06 | 131 | 2 |
| Investaid SP02 | 04/30/07 | 12/22/06 | 129 | 12/21/06 | 130 | 1 |
| Kay 06 | 01/31/07 | 12/14/06 | 48 | 12/11/06 | 51 | 3 |
| Lancaster 12 | 01/31/07 | 12/12/06 | 50 | 12/11/06 | 51 | 1 |
| Lend America SP04 | 08/31/06 | 01/12/06 | 231 | 01/09/06 | 234 | 3 |

| TABLE 13: DIFFERENCES BETWEEN NOMURA TIME GAP AND FHFA TIME GAP | | | | | | |
|---|---|---|---|---|---|---|
| TRADE POOL | CLOSING DATE OF SECURITIZATION | CIPIONE EX. 10 DATE USED | CIPIONE EX. 10 TIME GAP (DAYS) | MISHOL EX. 4 DATE USED | MISHOL EX. 4 TIME GAP (DAYS) | DIFFERENCE IN TIME GAP (DAYS) |
| Liberty American SP06 | 01/31/07 | 06/29/06 | 216 | 06/28/06 | 217 | 1 |
| Liberty American SP07 | 01/31/07 | 07/31/06 | 184 | 07/31/06 | 184 | 0 |
| Liberty American SP08 | 01/31/07 | 09/28/06 | 125 | 09/27/06 | 126 | 1 |
| Loan Center 30 | 01/31/07 | 10/26/06 | 97 | 10/25/06 | 98 | 1 |
| Loan Center 31 | 01/31/07 | 11/27/06 | 65 | 11/15/06 | 77 | 12 |
| Loan City 03 | 01/31/07 | 11/30/06 | 62 | 11/24/06 | 68 | 6 |
| Loan Link 03A | 11/30/05 | 08/30/05 | 92 | 08/29/05 | 93 | 1 |
| Mandalay SP03 | 08/31/06 | 05/24/06 | 99 | 06/02/06 | 90 | -9 |
| Master Financial SP01 | 01/31/07 | 08/16/06 | 168 | 08/15/06 | 169 | 1 |
| Maxim SP 01 | 08/31/06 | 02/27/06 | 185 | 02/24/06 | 188 | 3 |
| Maxim SP02 | 01/31/07 | 05/26/06 | 250 | 05/16/06 | 260 | 10 |
| Maxim SP03 | 01/31/07 | 06/28/06 | 217 | 06/26/06 | 219 | 2 |
| Meritage SP01 | 04/30/07 | 12/27/06 | 124 | 12/22/06 | 129 | 5 |
| Metro 10 | 01/31/07 | 12/14/06 | 48 | 12/11/06 | 51 | 3 |
| Metrocities SP01 | 04/30/07 | 01/31/07 | 89 | 01/30/07 | 90 | 1 |
| Mila 03 | 08/31/06 | 01/18/06 | 225 | 01/17/06 | 226 | 1 |
| Millennium Funding SP05 | 01/31/07 | 08/28/06 | 156 | 08/25/06 | 159 | 3 |
| Millennium Funding SP06 | 01/31/07 | 09/05/06 | 148 | 09/01/06 | 152 | 4 |
| Millennium Funding SP07 | 01/31/07 | 09/22/06 | 131 | 09/22/06 | 131 | 0 |
| Millennium Mortgage SP01 | 08/31/06 | 04/10/06 | 143 | 04/07/06 | 146 | 3 |
| Millennium SP01 | 08/31/06 | 05/25/06 | 98 | 05/23/06 | 100 | 2 |
| Millennium SP02 | 01/31/07 | 06/27/06 | 218 | 06/26/06 | 219 | 1 |
| Millennium SP03 | 01/31/07 | 07/31/06 | 184 | 07/27/06 | 188 | 4 |
| Millennium SP04 | 01/31/07 | 08/10/06 | 174 | 08/08/06 | 176 | 2 |
| MLSG SP03 | 04/30/07 | 01/09/07 | 111 | 01/08/07 | 112 | 1 |
| Moneyline SP01 | 08/31/06 | 08/26/05 | 370 | 08/25/05 | 371 | 1 |
| Mortgage It SP02 | 08/31/06 | 04/06/06 | 147 | 04/04/06 | 149 | 2 |
| Mortgage Network SP01 | 08/31/06 | 03/01/06 | 183 | 03/08/06 | 176 | -7 |
| MSTOR 01SP | 08/31/06 | 09/13/05 | 352 | 09/12/05 | 353 | 1 |
| MSTOR 10A | 11/30/05 | 09/06/05 | 85 | 09/12/05 | 79 | -6 |
| Mtg Store SP04 | 08/31/06 | 03/02/06 | 182 | 03/01/06 | 183 | 1 |
| Novastar SP02 | 08/31/06 | 03/31/06 | 153 | 03/31/06 | 153 | 0 |
| NTO 31A | 11/30/05 | 09/01/05 | 90 | 08/29/05 | 93 | 3 |
| NY MTG SP02 | 08/31/06 | 02/07/06 | 205 | 02/03/06 | 209 | 4 |
| NYM SP03 | 08/31/06 | 02/16/06 | 196 | 02/14/06 | 198 | 2 |
| NYMTG SP01 | 08/31/06 | 09/14/05 | 351 | 09/12/05 | 353 | 2 |
| Opteum SP01 | 08/31/06 | 03/13/06 | 171 | 03/10/06 | 174 | 3 |
| Ownit SP01 | 08/31/06 | 01/12/06 | 231 | 01/11/06 | 232 | 1 |
| Ownit SP02 | 01/31/07 | 12/30/06 | 32 | 11/30/06 | 62 | 30 |
| PDF12 | 01/31/07 | 11/13/06 | 79 | 10/30/06 | 93 | 14 |
| Peoples Choice SP01 | 08/31/06 | 03/29/06 | 155 | 03/28/06 | 156 | 1 |

| Trade Pool | Closing Date of Securitization | Cipione Ex. 10 Date Used | Cipione Ex. 10 Time Gap (Days) | Mishol Ex. 4 Date Used | Mishol Ex. 4 Time Gap (Days) | Difference in Time Gap (Days) |
|---|---|---|---|---|---|---|
| Peoples Choice SP02 | 08/31/06 | 05/30/06 | 93 | 05/26/06 | 97 | 4 |
| PFC 28 | 01/31/07 | 11/03/06 | 89 | 11/02/06 | 90 | 1 |
| Pinfin SP05 | 08/31/06 | 03/01/06 | 183 | 02/28/06 | 184 | 1 |
| Pinnacle Direct 10 | 01/31/07 | 10/27/06 | 96 | 10/26/06 | 97 | 1 |
| Pinnacle Direct SP02 | 01/31/07 | 07/24/06 | 191 | 07/21/06 | 194 | 3 |
| Pinnacle Direct SP03 | 01/31/07 | 08/28/06 | 156 | 08/28/06 | 156 | 0 |
| Pinnacle Financial 07 | 11/30/05 | 06/14/05 | 169 | 06/10/05 | 173 | 4 |
| Pinnacle Financial 29 | 01/31/07 | 12/08/06 | 54 | 11/10/06 | 82 | 28 |
| Pinnacle Financial SP01 | 08/31/06 | 12/23/05 | 251 | 12/21/05 | 253 | 2 |
| Pinnacle Financial SP02 | 08/31/06 | 02/15/06 | 197 | 02/15/06 | 197 | 0 |
| Pinnacle Financial SP03 | 08/31/06 | 02/15/06 | 197 | 02/14/06 | 198 | 1 |
| Pinnacle Financial SP04 | 08/31/06 | 02/15/06 | 197 | 02/15/06 | 197 | 0 |
| Pinnacle Financial SP06 | 01/31/07 | 08/10/06 | 174 | 08/08/06 | 176 | 2 |
| PinnFinn 26 | 01/31/07 | 11/02/06 | 90 | 10/31/06 | 92 | 2 |
| Platinum 18 | 01/31/07 | 10/20/06 | 103 | 10/19/06 | 104 | 1 |
| PMC 01 | 01/31/07 | 12/05/06 | 57 | 11/27/06 | 65 | 8 |
| Protofund SP01 | 08/31/06 | 02/21/06 | 191 | 02/16/06 | 196 | 5 |
| Protofund SP02 | 04/30/07 | 09/29/06 | 213 | 09/26/06 | 216 | 3 |
| Protofund SP03 | 04/30/07 | 12/19/06 | 132 | 12/12/06 | 139 | 7 |
| Quick Loan 06 SP | 08/31/06 | 08/19/05 | 377 | 09/09/05 | 356 | -21 |
| Quick Loan SP 08B | 08/31/06 | 11/23/05 | 281 | 11/17/05 | 287 | 6 |
| Quick Loan SP09 | 08/31/06 | 01/09/06 | 234 | 01/05/06 | 238 | 4 |
| Quick Loan SP10 | 08/31/06 | 01/18/06 | 225 | 02/23/06 | 189 | -36 |
| Quick Loan SP11 | 01/31/07 | 10/10/06 | 113 | 10/10/06 | 113 | 0 |
| Quicken SP01 | 08/31/06 | 04/06/06 | 147 | 04/04/06 | 149 | 2 |
| Quicken SP02 | 01/31/07 | 05/24/06 | 252 | 05/24/06 | 252 | 0 |
| Resmae SP01 | 01/31/07 | 10/27/06 | 96 | 10/26/06 | 97 | 1 |
| Resmae SP02 | 04/30/07 | 12/29/06 | 122 | 12/27/06 | 124 | 2 |
| SCME SP01 | 08/31/06 | 02/24/06 | 188 | 02/22/06 | 190 | 2 |
| Sea Breeze 05 | 01/31/07 | 10/19/06 | 104 | 10/18/06 | 105 | 1 |
| Secured Bankers 14 | 01/31/07 | 12/12/06 | 50 | 12/08/06 | 54 | 4 |
| Silver State 26A | 11/30/05 | 08/23/05 | 99 | 08/22/05 | 100 | 1 |
| Silver State 28A | 11/30/05 | 08/24/05 | 98 | 08/22/05 | 100 | 2 |
| Silver State 35A | 11/30/05 | 09/30/05 | 61 | 09/29/05 | 62 | 1 |
| Silver State 62 | 01/31/07 | 12/13/06 | 49 | 11/18/06 | 74 | 25 |
| Silver state 63 | 01/31/07 | 11/30/06 | 62 | 11/28/06 | 64 | 2 |
| Silver State 65 | 01/31/07 | 11/30/06 | 62 | 11/29/06 | 63 | 1 |
| Silver state 66 | 01/31/07 | 01/12/07 | 19 | 12/12/06 | 50 | 31 |
| Soma 16 | 01/31/07 | 10/31/06 | 92 | 10/31/06 | 92 | 0 |
| Soma Financial 01A | 11/30/05 | 09/16/05 | 75 | 09/15/05 | 76 | 1 |
| Soma SP01 | 04/30/07 | 11/14/06 | 167 | 11/13/06 | 168 | 1 |
| SSM 57 | 01/31/07 | 11/15/06 | 77 | 09/27/06 | 126 | 49 |
| SSM 58 | 01/31/07 | 11/20/06 | 72 | 10/05/06 | 118 | 46 |

| TABLE 13: DIFFERENCES BETWEEN NOMURA TIME GAP AND FHFA TIME GAP | | | | | | |
|---|---|---|---|---|---|---|
| TRADE POOL | CLOSING DATE OF SECURITIZATION | CIPIONE EX. 10 DATE USED | CIPIONE EX. 10 TIME GAP (DAYS) | MISHOL EX. 4 DATE USED | MISHOL EX. 4 TIME GAP (DAYS) | DIFFERENCE IN TIME GAP (DAYS) |
| SSM 60 | 01/31/07 | 11/20/06 | 72 | 11/18/06 | 74 | 2 |
| SSM 61 | 01/31/07 | 11/20/06 | 72 | 11/17/06 | 75 | 3 |
| STW 23A | 11/30/05 | 07/01/05 | 152 | 06/28/05 | 155 | 3 |
| STW 25A | 11/30/05 | 09/09/05 | 82 | 09/08/05 | 83 | 1 |
| STW 26A | 11/30/05 | 09/30/05 | 61 | 09/28/05 | 63 | 2 |
| Sunset 02P | 08/31/06 | 08/30/05 | 366 | 08/29/05 | 367 | 1 |
| Sunset SP03 | 08/31/06 | 09/29/05 | 336 | 09/28/05 | 337 | 1 |
| Superior SP04 | 08/31/06 | 12/12/05 | 262 | 12/09/05 | 265 | 3 |
| The Mortgage Store SP01 | 08/31/06 | | | 12/22/05 | 252 | |
| TLP Funding SP01 | 08/31/06 | 01/26/06 | 217 | 01/24/06 | 219 | 2 |
| UBS 04A | 11/30/05 | 08/12/05 | 110 | 08/11/05 | 111 | 1 |
| United SP01 | 08/31/06 | 03/29/06 | 155 | 03/28/06 | 156 | 1 |
| Weichert SP02 | 08/31/06 | 12/28/05 | 246 | 12/27/05 | 247 | 1 |
| Wells SP01 | 01/31/07 | 03/30/06 | 307 | 03/30/06 | 307 | 0 |
| Westar 04A | 11/30/05 | 09/01/05 | 90 | 08/31/05 | 91 | 1 |
| Westar SP02 | 08/31/06 | 12/02/05 | 272 | 11/30/05 | 274 | 2 |
| Westar SP03 | 01/31/07 | 06/12/06 | 233 | 06/08/06 | 237 | 4 |
| Westar SP04 | 01/31/07 | 07/27/06 | 188 | 07/25/06 | 190 | 2 |
| WMC SP01 | 04/30/07 | 12/27/06 | 124 | 12/26/06 | 125 | 1 |

349. **FHFA Statement:** Of the 15,679 loans in the relevant SLGs with settlement dates available, 14 loans were securitized within one month (30 days), 1,592 were securitized within two months (60 days), 3,281 were securitized within three months (90 days), 1,426 were securitized within four months (120 days), 5,702 were securitized within five months (150 days), 1,733 were securitized within six months (180 days), and 1,931 were securitized at least six months after they were subject to diligence. Ex. 10 to Cipione Decl.

**Nomura Response:** Disputed. The Cipione Declaration does not accurately reflect Nomura's securitization process. The correct figures, and a comparison to the figures set forth in the Cipione Declaration, appear in Mishol Decl. Ex. 4. The time gap between the completion of due diligence and the cut-off date given in the prospectus supplements is set forth in Mishol Decl. Ex. 5.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 349.

**FHFA Reply:** Defendants do not dispute a material fact. Any discrepancy between data in Exhibit 10 to the Cipione Declaration and Exhibits 4 or 5 to the Mishol Declaration are

due to information that FHFA did not possess at the time of filing the Cipione Declaration. While Defendants dispute the accuracy of data included in Exhibit 10 to the Cipione Declaration, any such dispute is not material to FHFA's motion. *See Quarles*, 758 F.2d at 840.

350. **FHFA Statement:** Based on these figures, 10,792 loans, or 68.8% of the loans in the SLGs, were securitized more than three months after they were subject to diligence. Of those, 9,366, or 59.7%, were securitized more than four months after they were subject to diligence, 3,664, or 23.4%, were securitized more than five months after they were subject to diligence, and 1,931, or 12.3%, were securitized more than six months after they were subject to diligence. At least one loan in all but one SLG was securitized more than four months after diligence. Ex. 10 to Cipione Decl.

**Nomura Response:** Disputed. The Cipione Declaration does not accurately reflect Nomura's securitization process. The correct figures, and a comparison to the figures set forth in the Cipione Declaration, appear in Mishol Decl. Ex. 4. The time gap between the completion of due diligence and the cut-off date given in the prospectus supplements is set forth in Mishol Decl. Ex. 5.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 350.

**FHFA Reply:** Defendants do not dispute a material fact. Any discrepancy between data in Exhibit 10 to the Cipione Declaration and Exhibits 4 or 5 to the Mishol Declaration are due to information that FHFA did not possess at the time of filing the Cipione Declaration. While Defendants dispute the accuracy of data included in Exhibit 10 to the Cipione Declaration, any such dispute is not material to FHFA's motion. *See Quarles*, 758 F.2d at 840.

351. **FHFA Statement:** In September 2006, ResMAE made a mortgage loan to a borrower with a debt-to- income ("DTI") ratio of ███ and a LTV ratio of ███ Ex. 127 (NOM-BRI-LF_00010415, hard copy loan files) at NOM-BRI-LF_00010631 (Uniform Underwriting and Transmittal Summary showing total obligations/income for Loan Number ████████ of ██████████ and LTV of ████████; *id.* at NOM-BRI-LF_00010642 (Adjustable Rate Note dated ██████████.

**Nomura Response:** Undisputed.

235

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 351.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

352. **FHFA Statement:**  According to Nomura, ResMAE's underwriting guidelines required that DTI ratios be less than 50% when an LTV ratio was greater than 85%.  Ex. 11 (NOM-FHFA_04732621, NHELI 2007-3 Prospectus Supplement ) at NOM-FHFA_04732712.

**Nomura Response:**  Disputed. Although Exhibit 11 reports that ResMAE's underwriting guidelines are that DTI ratios be less than 50% when an LTV ratio was greater than 85%, Exhibit 11 also reports that "[o]n a case by case basis, ResMAE may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. A substantial portion of the Mortgage Loans represent such underwriting exceptions." Pl. Ex. 11 at NOM-FHFA_04732709.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 352.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants dispute that the quoted text from FHFA's Exhibit 11 fully and accurately supports the testimony, the additional text that Defendants cite in FHFA's Exhibit 11 fails to directly contravene the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

353. **FHFA Statement:**  The loan was included in the SP01 acquisition pool that ResMAE offered for sale to Nomura on August 10, 2006.  Ex. 128 (NOM-FHFA_05499252, ResMAE SP01 Pool Summary and Trade Confirmation, dated Aug. 10, 2006) at NOM-FHFA_05499252.

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 353.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

354. **FHFA Statement:**  On October 26, 2006, after performing credit and compliance diligence for Nomura on the ResMAE SP01 acquisition pool, AMC assigned the loan

final credit and compliance grades of "1." Ex. 129 (NOM-FHFA_05097410, 10/26/2006 AMC Event Status Report, dated Oct. 26, 2006 ) at row 1,180 (loan no. ███████).

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 354.

**FHFA Reply:** Defendants do not dispute the asserted fact.

355. **FHFA Statement:** Nomura purchased the loan from ResMAE on October 27, 2006. Ex. 130 (NOM- FHFA_05663880, spreadsheet of Nomura Trade List, ) (row 615, column "SettleDt").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 355.

**FHFA Reply:** Defendants do not dispute the asserted fact.

356. **FHFA Statement:** In ███████████ following Nomura's purchase of the loan, a new credit report revealed that the borrower had taken out another mortgage ████████ that was not disclosed on the borrower's loan application. Ex. 131 (LF2UBS_00644975, CBCInnovis Credit Report ) at LF2UBS_00644977 (showing ████████ as creditor for debt first reported in ██████████.

**Nomura Response:** Disputed. Although Exhibit 131 is a credit report that was issued in November 2006, after Nomura purchased the loan referenced in Paragraph 356, that Exhibit does not suggest that information about the borrower's August 2006 mortgage was available as of September 2006 (when the loan was originated) or October 2006 (when AMC conducted diligence). Also disputed to the extent that plaintiff suggest that Nomura conducted inadequate due diligence. Information that was not available at the time a loan was underwritten is irrelevant to whether a loan was originated generally in accordance with applicable underwriting guidelines. Furthermore, the disclosures in the prospectus supplement for NHELI 2007-3 regarding compliance with underwriting guidelines were representations about the loans at the time of origination. Ex. 25 (NOM-FHFA_04732621) at NOM-FHFA_04732712.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 356.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The omissions in

FHFA's Exhibit 131 that Defendants reference, as well as the disclosures in Exhibit 25,

are irrelevant to the asserted fact and do not create a genuine dispute of material fact.

Part I.C, *supra*. While Defendants argue that information not available at the time a loan is underwritten is irrelevant, Nomura's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Finally, while Defendants dispute the asserted fact "to the extent that plaintiff suggest[s] that Nomura conducted inadequate due diligence," they identify no evidence that contradicts the asserted fact. Defendants' conclusory and irrelevant assertions do not create a genuine dispute of material fact. Parts I.B, I.C, *supra*.

357. **FHFA Statement:** According to MERS data, this second mortgage was on the borrower's primary residence. Compare Ex. 132 (LF2UBS_00644953, MERS data for ████████ at LF2UBS_00644961 (showing a list of ████ owned real estate) with Ex. 127 (NOM- BRI-LF_00010415, Loan File) at NOM-BRI-LF_00010504 (showing address registered with MERS is same as address listed by borrower as present address on loan application).

**Nomura Response:** Disputed. Although Exhibits 127 and 132 include the information provided by plaintiff, neither identifies the borrower's "primary address." Also disputed to the extent that plaintiff suggests that Nomura conducted inadequate due diligence. Information that was not available at the time a loan was underwritten is irrelevant to whether the loan was originated generally in accordance with applicable underwriting guidelines.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 357.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants dispute that FHFA's Exhibits 127 and 132 identify the borrower's "primary residence," the borrower listed one address as his "present address" in FHFA's Exhibit 127 (at NOM-BRI-LF_00010504), which matches the address registered with MERS (FHFA Ex. 132 at LF2UBS_00644961). The omission that Defendants reference fails to directly contravene the asserted fact, and whether plaintiff suggests that Nomura conducted inadequate diligence is irrelevant to the asserted fact. Thus, neither "dispute" creates a genuine dispute of material fact. Part I.C, *supra*. While Defendants argue that

information not available at the time a loan is underwritten is irrelevant, Nomura's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

358.  **FHFA Statement:** This second mortgage was for ███████ and required the borrower to make monthly payments of ███████ Compare Ex. 132 (LF2UBS_00644953, MERS data for ███████ at LF2UBS_00644961 (showing a list of ███████ ███████ owned real estate) with Ex. 127 (NOM-BRI-LF_00010415, Loan File) at NOM-BRI-LF_00010504 (showing address registered with MERS is same as address listed by borrower as present address on loan application).

    **Nomura Response:** Disputed. Neither Exhibit 127 nor 132 state that the borrower was "required" to make monthly payments of ███████ Also disputed to the extent that plaintiff suggests that Nomura conducted inadequate due diligence. Information that was not available at the time a loan was underwritten is irrelevant to whether the loan was originated generally in accordance with applicable underwriting guidelines.

    **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 358.

    **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants dispute that FHFA's Exhibits 127 and 132 state that the borrower was "required" to make monthly payments of $1,147, FHFA's Exhibit 131 (at LF2UBS_00644977) lists a mortgage in the amount of $162,350 issued to the at-issue borrower with monthly payments of $1,147. While Defendants argue that information not available at the time a loan is underwritten is irrelevant, Nomura's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Finally, while Defendants dispute the asserted fact "to the extent that plaintiff suggests that Nomura conducted inadequate due diligence," they identify no evidence that contradicts the asserted fact. Defendants' conclusory and irrelevant assertions do not create a genuine dispute of material fact. Parts I.B, I.C, *supra*.

359.  **FHFA Statement:** Accounting for this second mortgage raised the borrower's DTI ratio from ████ to ██████ Compare Ex. 127 (NOM-BRI-LF_00010415, Loan File) at NOM-BRI-LF_00010631 (showing total monthly income of ██████ and total monthly debt

of █████████ for a DTI ratio of ████ with Ex. 131 (LF2UBS_00644975, CBCInnovis Credit Report) at LF2UBS_00644977 (showing undisclosed mortgage with monthly payments of ████ which, when replacing the borrower's ████ primary housing expense on the Uniform Underwriting and Transmittal Summary, results in a recalculated total monthly debt of █████████.

**Nomura Response:** Disputed. Information that was not available at the time a loan was underwritten is irrelevant to whether the loan was originated generally in accordance with applicable underwriting guidelines. Also disputed to the extent that plaintiff suggests that Nomura conducted inadequate due diligence.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 359.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue that information not available at the time a loan is underwritten is irrelevant, Nomura's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Finally, while Defendants dispute the asserted fact "to the extent that plaintiff suggests that Nomura conducted inadequate due diligence," they identify no evidence that contradicts the asserted fact. Defendants' conclusory and irrelevant assertions do not create a genuine dispute of material fact. Parts I.B, I.C, *supra*.

360. **FHFA Statement:** There is no evidence that any Defendant, or any Defendant's third-party diligence vendor, reviewed the borrower's credit reports in or after November 2006.

**Nomura Response:** Disputed to the extent that plaintiff suggests that Nomura conducted inadequate due diligence. Information that was not available at the time the loan was underwritten is irrelevant to whether a loan was originated generally in accordance with applicable underwriting guidelines. Ex. 588 (Aug. 14 Forester Report) at 48-60. Undisputed that there is no evidence that defendants and/or their third-party diligence vendors reviewed the borrower's credit report in November 2006, months after the loan was underwritten.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 360.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue that information not available at the time a loan is underwritten is irrelevant,

Nomura's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

Finally, while Defendants dispute the asserted fact "to the extent that plaintiff suggests that Nomura conducted inadequate due diligence," they identify no evidence that contradicts the asserted fact. Defendants' conclusory and irrelevant assertions do not create a genuine dispute of material fact. Parts I.B, I.C, *supra*.

361.   **FHFA Statement:** On April 27, 2007, Nomura securitized the loan into the SLG in the NHELI 2007-3 Securitization. Ex. 4 to the Cipione Decl. (Loan No. ▓▓▓▓▓▓ Row 38378, Columns H "Deal Name" and K "In SLG?" ).

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 361.

**FHFA Reply:** Defendants do not dispute the asserted fact.

362.   **FHFA Statement:** The loan tape for NHELI 2007-3 continued to list the loan's DTI ratio as 49%. Ex. 133 (NOM-FHFA_00000006, NHELI 2007-3 Loan Tape) at NOM-FHFA_00000006 (listing the DTI (column AM) for loan no. ▓▓▓▓▓▓ (row 609) as ▓▓▓▓ Ex. 4 to the Cipione Decl. (linking the Global loan number to the LMS loan number).

**Nomura Response:** Undisputed that the loan tape for NHELI 2007-3 listed the loan's DTI ratio as ▓▓▓ Disputed to the extent that plaintiff suggests that the loan tape should have listed a different DTI ratio or that Nomura conducted inadequate due diligence. Information that was not available at the time a loan was underwritten is irrelevant to whether the loan was originated generally in accordance with applicable underwriting guidelines.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 362.

**FHFA Reply:** Defendants do not dispute the asserted fact. While Defendants argue that information not available at the time a loan is underwritten is irrelevant, Nomura's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Finally, while Defendants dispute the asserted fact "to the extent that plaintiff suggests that the loan tape should have listed a different DTI ratio or that Nomura conducted inadequate

241

due diligence," they identify no evidence that contradicts the asserted fact. Defendants'

conclusory and irrelevant assertions do not create a genuine dispute of material

fact. Parts I.B, I.C, *supra*.

363. **FHFA Statement:** In September 2006, ResMAE made a loan to borrowers who stated that the property would be owner-occupied. Ex. 134 (NOM-BRI-LF_00011669, servicing loan file for Loan no. ████████ at NOM-BRI-LF_00011805 (Uniform Residential Loan Application listing property as primary residence); *id.* at NOM-BRI-LF_00011720 (Occupancy Affidavit certifying borrowers' intent to occupy the property as primary residence); *id.* at NOM-BRI-LF_00011976 (Deed of Trust contains a covenant to occupy property as primary residence within 60 days of closing and for a least one year); *see also id.* at NOM-BRI-LF_00011966 (Adjustable Rate Note dated ████████

**Nomura Response:** Disputed. Borrowers state their intent to occupy the property, not that a property "would be" owner-occupied. Pl. Ex. 134 (NOM-BRI-LF_00011669) at NOM-BRI- LF_00011720 (Occupancy Affidavit stating borrower's "intentions for the property . . . are . . . to occupy as my primary residence"). Freddie Mac trader Michael Aneiro testified that owner occupancy statistics are based on the stated "intent [of] the owner to occupy the premises." Ex. 231 (Aneiro Tr.) at 306:22-307:10. Fannie Mae analyst Lin Cao agreed that owner occupancy statistics "referred to the percentage of borrowers who stated that they intended to occupy the home." Ex. 196 (Cao Tr.) at 645:2-6. Freddie Mac trader Perri Henderson testified that she couldn't "think of any other way, at that time, that you can verify" owner occupancy, other than the borrower's stated intent in the loan application. Ex. 501 (Henderson Tr.) at 185:8-16. Similarly, Fannie Mae trader Paul Norris agreed that owner occupancy statistics disclosed in offering documents were based on the borrower's stated intent in the loan application. *See* Ex. 195 (Norris Tr.) at 633:19-634:17. Plaintiff's due diligence expert, Leonard A. Blum, has made the same point: when asked "what his understanding of what this representation means" in the NHELI 2006-FM1 prospectus supplement, he testified that it meant "at the time of origination, the borrower truthfully filled out a Form 1003, the application statement that that borrower intended to occupy that property for more than half of the time following 365 days." Ex. 185 (Nov. 24 Blum Tr.) at 187:6-22.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 363.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

argue that borrowers to whom ResMAE made a loan in September 2006 stated their

"intent to occupy the property" rather than that the property "would be owner-occupied,"

Nomura's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

364. **FHFA Statement:** The loan was included in the SP01 acquisition pool that ResMAE offered for sale to Nomura on August 10, 2006. Ex. 128 (NOM-FHFA_05499252, ResMAE SP01 Pool Summary and Trade Confirmation) at NOM-FHFA_05499252 (listing the ResMAE SP01 trade date as August 10, 2006); Ex. 4 to the Cipione Decl. (Loan No. ██████ Row 39823, Columns C "Pool Name").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 364.

**FHFA Reply:** Defendants do not dispute the asserted fact.

365. **FHFA Statement:** Nomura purchased the loan pool from ResMAE on October 27, 2006. Ex. 130 (NOM-FHFA_05663880, Nomura Trade List) at NOM-FHFA_05663880 ("Trade List" tab lists ResMAE SP01 (row 615) settle date (column F) as 10/27/2006); Ex. 4 to the Cipione Decl. (Loan No. ██████ Row 39823, Columns C "Pool Name" and D "Settlement Date").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 365.

**FHFA Reply:** Defendants do not dispute the asserted fact.

366. **FHFA Statement:** In November 2006, ResMAE received a notice from the U.S. Postal Service that the borrowers had changed their address from the "old" address of the mortgaged property—which they had said would be owner-occupied—to a "new", different address. Ex. 134 (NOM-BRI- LF_00011669, servicing loan file for Loan no. ██████ at NOM-BRI-LF_00011713 (United States Postal Service change of address form).

**Nomura Response:** Disputed. Exhibit 134 does not give an "old" and "new" address. Also disputed to the extent plaintiff suggests that Exhibit 134 indicates actual occupancy at any point in time or is evidence of the borrower's prior intent as of September 2006 to occupy the subject property. Ex. 589 (Forester Exhibit 652) at 10-11.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 366.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue that FHFA's "Exhibit 134 does not give an 'old' and 'new' address," Exhibit 134 (at NOM-BRI-LF_00011713) prominently lists an "old" and "new" address for the at-issue borrowers. Nomura's argument does not create a genuine dispute of material

fact. Part I.A, *supra*. Defendants' "dispute" regarding whether FHFA "suggests that [FHFA's] Exhibit 134 indicates actual occupancy" or "prior intent as of September 2006 to occupy the subject property" is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

367. **FHFA Statement:** This change-of-address notice appears in ResMAE's servicing records for the loan. Ex. 134 (NOM-BRI-LF_00011669, servicing loan file for Loan no. ███████████ at NOM-BRI- LF_00011713 (United States Postal Service change of address form).

**Nomura Response:** Also disputed to the extent plaintiff suggests that Exhibit 134 indicates actual occupancy at any point in time or is evidence of the borrower's intent as of September 2006 to occupy the subject property. Ex. 589 (Forester Exhibit 652) at 10-11.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 367.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants' "dispute" regarding whether FHFA "suggests that [FHFA's] Exhibit 134 indicates actual occupancy" or "the borrower's intent as of September 2006 to occupy the subject property" is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

368. **FHFA Statement:** There is no evidence that any Defendant, or any Defendant's third-party diligence vendor, reviewed ResMAE's servicing records in or after November 2006.

**Nomura Response:** Undisputed that the record does not contain evidence that defendants and/or their third-party diligence vendors reviewed ResMAE's serving records after the loan was underwritten in September 2006. Disputed to the extent that plaintiff suggests that Nomura conducted inadequate due diligence absent a review of servicing files created after a loan was originated and purchased.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 368.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants dispute the asserted fact "to the extent that plaintiff suggests that Nomura conducted inadequate due diligence absent a review of servicing files created after a loan was originated and purchased," they identify no evidence that contradicts the asserted fact. Defendants' conclusory and irrelevant assertions do not create a genuine dispute of material fact. Parts I.B, I.C, *supra*.

369. **FHFA Statement:** Also in ███████████ this same new address appeared on the primary borrower's credit report. Ex. 135 (ACR1NOM_00000423, CBCInnovis Credit Report) at ACR1NOM_00000435 (listing the new address as ███████████' on ███████████).

   **Nomura Response:** Disputed. Although Exhibit 135 contains the information stated by plaintiff, there is no evidence that it is reporting a "new" address. Also disputed to the extent plaintiff suggests that Exhibit 135 indicates actual occupancy at any point in time or is evidence of the borrower's intent as of September 2006 to occupy the subject property.

   **RBSSI Response:** RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 369.

   **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue that "there is no evidence" that FHFA's Exhibit 135 reports a "new" address, Exhibit 134 (at NOM-BRI-LF_00011713) prominently lists the address as "new" for the at-issue borrowers. Nomura's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Defendants' "dispute" regarding whether FHFA "suggests that [FHFA's] Exhibit 135 indicates actual occupancy" or "the borrower's intent as of September 2006 to occupy the subject property" is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

370. **FHFA Statement:** There is no evidence that any Defendant, or any Defendant's third-party diligence vendor, reviewed the primary borrower's credit reports in or after November 2006.

**Nomura Response:** Disputed to the extent plaintiff suggests that Exhibit 135 indicates actual occupancy at any point in time or is evidence of the borrower's intent as of September 2006 to occupy the subject property. Also disputed to the extent that plaintiff suggests that Nomura conducted inadequate due diligence absent a review of post-origination borrower credit reports. Undisputed that the record does not contain evidence that defendants and/or their third-party diligence vendors reviewed the primary borrower's credit reports in or after November 2006, months after the loan was underwritten.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 370.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants' "dispute" regarding whether FHFA "suggests that [FHFA's] Exhibit 135 indicates actual occupancy" or "the borrower's intent as of September 2006 to occupy the subject property" is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants dispute the asserted fact "to the extent that plaintiff suggests that Nomura conducted inadequate due diligence absent a review of post-closing origination borrower credit reports," they identify no evidence that contradicts the asserted fact. Defendants' conclusory and irrelevant assertions do not create a genuine dispute of material fact. Parts I.B, I.C, *supra*.

371. **FHFA Statement:** On April 27, 2007, Nomura securitized the loan into the SLG in the NHELI 2007-3 Securitization. Ex. 4 to the Cipione Decl. (Loan No. ██████: Row 39823, Columns H "Deal Name" and K "In SLG?").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 371.

**FHFA Reply:** Defendants do not dispute the asserted fact.

372. **FHFA Statement:** The loan tape for NHELI 2007-3 listed this loan as owner-occupied. Ex. 133 (NOM-FHFA_00000006, NHELI 2007-3 Loan Tape) at NOM-FHFA_00000006 (listing the "Occupancy" (column AR) for loan no. ██████ (row 2,065) as ██████ ██████; Ex. 4 to the Cipione Decl. (linking the Global loan number to the LMS loan number).

**Nomura Response:** Disputed. The loan tape for NHELI 2007-3 indicated that the borrower had stated an intent to occupy the property at the time of origination. Pl. Ex. 133 (NOM-FHFA_00000006, NHELI 2007-3 Loan Tape) at NOM-FHFA_00000006 (listing the "Occupancy" (column AR) for loan no. ████████ (row 2,065) as "Owner Occupancy").

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 372.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants "dispute" the asserted fact on the basis that the loan tape "indicated that the borrower had stated an intent to occupy the property at the time of origination," citing FHFA's Exhibit 133, Defendants assertion is not supported by the cited Exhibit. The cited evidence lists the loan as "owner-occupied." Further, to the extent Defendants argue that "owner-occupancy" in the loan tape meant an "intent to occupy," Defendants' argument does not create a genuine dispute of material fact. Part I.A, *supra*.

> 3. There Is No Evidence That Nomura Securities Randomly Selected Loans From Acquisition Pools To Populate The SLGs

373. **FHFA Statement:** The Trading Desk was responsible for determining which loans would be put into a securitization. Ex. 32 (Deposition of Donald McCabe) at 136:15-21 ("Q. Who was responsible for determining whether or not a loan could be put into a security? … A. I mean, it was a trading desk decision to put the pool of loans together."); *see also* Ex. 29 (Deposition of Timothy Crowley) at 165:10-18 ("Q. Did you have a role in determining which loans of those that were purchased would be put in the securitization? A. No. Q. Would that task have been in the structuring group that you referred to earlier? A. Structuring and trading.").

**Nomura Response:** Disputed. The testimony quoted by plaintiff indicates that both the trading desk and the structuring group were responsible for determining which loans would be put into a securitization. *See also* C. Stmt. at ¶¶ 134-38, 168-70. Further, the loans which were placed into a securitization had been subject to due diligence by the Due Diligence Group and by third-party vendors. C. Stmt. at ¶¶ 57-63.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 373.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

assert that the trading desk and structuring were both responsible for determining which

loans that would be put into a securitization, Nomura has conclusively admitted in its

Response to FHFA's Statement of Undisputed Facts that the employees of the structuring

group reported to the Trading Desk employees. RSUF ¶ 106. There can therefore be no

genuine dispute as to the asserted fact. Part I.F, *supra*. Furthermore, while Defendants

assert that the loans that were placed into a securitization had been subject to due

diligence, this assertion is irrelevant to the asserted fact and does not create a genuine

dispute of material fact. See Part I.C, *supra*. Furthermore, only a sample of the loans that

were placed into a securitization were subjected to due diligence. *See* RSUF ¶¶ 92, 201.

374. **FHFA Statement:** According to Brian Murphy: "The art of selecting the loans was effectively mine if you will." Ex. 52 (Deposition of Brian Murphy) at 249:10-20 ("Q. So let me ask this question: Who was -- who's responsible for pooling the loans that were going to be put into a securitization? A. The art of selecting the loans was effectively mine if you will. I kind of tell my Collateral Analyst what I want, how I want it to, you know, look, what I think will suit the market, what's in demand, et cetera, and let's, you know, let's make it work, you know.").

**Nomura Response:** Disputed. Although Mr. Murphy gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 373, *supra*, which is incorporated by reference herein. Further, the loans which were placed into a securitization had been subject to due diligence by the Due Diligence Group and by third-party vendors. C. Stmt. at ¶¶ 57-63.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 374.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not

dispute that the cited testimony is accurately quoted. While Defendants state that Mr.

Murphy's testimony is "removed from the context in which it appears, and omits other

testimony and documents that must be evaluated in order to fully understand the quoted

excerpt," Nomura fails to cite any evidence and therefore does not create a genuine dispute of material fact.  *See* Parts I.B, I.E, *supra*.  Furthermore, while Defendants assert that the loans that were placed into a securitization had been subject to due diligence, this assertion is irrelevant to the asserted fact and does not create a genuine dispute of material fact.  See Part I.C, *supra*. Furthermore, only a sample of the loans that were placed into a securitization were subjected to due diligence.  *See* RSUF ¶¶ 92, 201.

375.   **FHFA Statement:**  The traders instructed the Collateral Analysts on the types of loans to include in a preliminary pool selected for securitization. Ex. 52 (Deposition of Brian Murphy) at 249:10-20 ("Q.  So let me ask this question:  Who was -- who's responsible for pooling the loans that were going to be put into a securitization? A.  The art of selecting the loans was effectively mine if you will.  I kind of tell my Collateral Analyst what I want, how I want it to, you know, look, what I think will suit the market, what's in demand, et cetera, and let's, you know, let's make it work, you know."); *id.* at 251:24-252:21 ("Q.  Uh-huh.  And -- and so you would give those types of parameters to -- A.  Yeah.  Q.  -- your Collateral Analyst and then how would you do that?  Would you -- would you send them an e-mail or -- or how would that communication take place? … A.  Verbally as well as an e-mail. …").

    **Nomura Response:**  Disputed. Although Mr. Murphy gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. See ¶ 373, *supra*, which is incorporated by reference herein. Further, the loans which were placed into a securitization had been subject to due diligence by the Due Diligence Group and by third-party vendors. C. Stmt. at ¶¶ 57-63.

    **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 375.

    **FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants state that Mr. Murphy's testimony is "removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt," Nomura fails to cite any evidence and therefore does not create a genuine dispute of material fact.  *See* Parts I.B, I.E, *supra*.  Furthermore, while Defendants assert that the loans that were placed into a securitization had been subject to

due diligence, this assertion is irrelevant to the asserted fact and does not create a genuine dispute of material fact. *See* Part I.C, *supra*. Furthermore, only a sample of the loans that were placed into a securitization were subjected to due diligence. *See* RSUF ¶¶ 183, 184.

376. **FHFA Statement:** Using the traders' instructions, the Collateral Analysts would select and send a preliminary securitization pool to the traders. Ex. 52 (Deposition of Brian Murphy) at 251:24-252:21 ("Q. Uh-huh. And -- and so you would give those types of parameters to -- A. Yeah. Q. -- your Collateral Analyst and then how would you do that? Would you -- would you send them an e-mail or -- or how would that communication take place? … A. Verbally as well as an e-mail. I'm sure there's plenty of e -- you know, he'd send me a tape, he'd take a crack at it, say I might look at it, you know, purvey it and say, ah, you know, let's -- this group has, you know, some -- some -- some groups might have been, I think, to the best of my recollu -- recollection be conforming balance -- Q. Uh-huh. A. -- you know, less than $417,000.00 and maybe Fannie or Freddie or someone would -- would fit their -- would fit their desires if you will or certain California percentage for other people."); *see also* Ex. 47 (Deposition of Timothy McLaughlin) at 222:3-12 ("Q. And who else would have been involved in that selection for your product type? A. I would be relying on information provided by the Collateral Analyst Group because they track the loan- level information. …").

**Nomura Response:** Disputed. Although Mr. Murphy and Mr. McLaughlin gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. See ¶ 373, *supra*, which is incorporated by reference herein. Further, the loans which were placed into a securitization had been subject to due diligence by the Due Diligence Group and by third-party vendors. C. Stmt. at ¶¶ 57-63.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 376.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants state that Mr. Murphy's and Mr. McLaughlin's testimony are "removed from the context in which they appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt," Nomura fails to cite any evidence and therefore does not create a genuine dispute of material fact. *See* Parts I.B, I.E, *supra*. Furthermore, while Defendants assert that the loans that were placed into a securitization had been subject to due diligence, this assertion is irrelevant to the asserted fact and does

not create a genuine dispute of material fact. *See* Part I.C, *supra*. Furthermore, only a sample of the loans that were placed into a securitization were subjected to due diligence. *See* RSUF ¶¶ 183, 184.

377. **FHFA Statement:** The Trading Desk selected the final pool of loans for securitization. Ex. 32 (Deposition of Donald McCabe) at 136:15-21 ("Q. Who was responsible for determining whether or not a loan could be put into a security? … A. I mean, it was a trading desk decision to put the pool of loans together."); *see also* Ex. 29 (Deposition of Timothy Crowley) at 165:10-18 ("Q. Did you have a role in determining which loans of those that were purchased would be put in the securitization? A. No. Q. Would that task have been in the structuring group that you referred to earlier? A. Structuring and trading.").

**Nomura Response:** Disputed. The testimony quoted by plaintiff indicates that both the trading desk and the structuring group were responsible for determining which loans would be put into a securitization. See ¶ 373, *supra*, which is incorporated by reference herein. Further, the loans which were placed into a securitization had been subject to due diligence by the Due Diligence Group and by third-party vendors. C. Stmt. at ¶¶ 57-63.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 377.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that the trading desk and structuring were both responsible for determining which loans that would be put into a securitization, Nomura has conclusively admitted in its Response to FHFA's Statement of Undisputed Facts that the employees of the structuring group reported to the Trading Desk employees. RSUF ¶ 106. There can therefore be no genuine dispute as to the asserted fact that the Trading Desk selected the final pool of loans for securitization. Part I.F, *supra*. Furthermore, while Defendants assert that the loans that were placed into a securitization had been subject to due diligence, this assertion is irrelevant to the asserted fact and does not create a genuine dispute of material fact. See Part I.C, *supra*. Furthermore, only a sample of the loans that were placed into a securitization were subjected to due diligence. *See* RSUF ¶¶ 183, 184.

378. **FHFA Statement:** In selecting loans to be placed into a securitization pool, traders considered collateral characteristics including "geographic concentrations," "weighted average FICO scores," "a limit on investor properties," "a limit on … cash-out properties," and "LTV weighted average." Ex. 52 (Deposition of Brian Murphy) at 250:18-251:23 ("Q. Okay. So we talked earlier today about how you would price these - - A. Yeah. Q. -- deals and -- and some of the factors that you used -- A. Yeah. Q. -- in -- in pricing them. In terms of the -- the -- the characteristics of the loans, what were some of the factors that you considered in terms of how you decided to pool them? A. Yeah. … A. Some of the factors would be geographic concentrations, what the number was I'm not sure, but like you wouldn't want a deal that was a hundred percent California because it would be just too much concentration risk. Q. Uh-huh. A. You might have, let's say, for the type of deals we were doing, my product, you know, you'd want, let's say, weighted average FICO scores of roughly 700. That would be, you know, considered liquid in the sector that I was trading in if you will. Maybe, you know, could be a limit on investor properties or cash-out properties or LTV weighted average bogey of X. Those sort of things.").

**Nomura Response:** Disputed. Although Mr. Murphy gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. See ¶ 373, *supra*, which is incorporated by reference herein. Further, the loans which were placed into a securitization had been subject to due diligence by the Due Diligence Group and by third-party vendors. C. Stmt. at ¶¶ 57-63. Furthermore, Freddie Mac and Fannie Mae selected the loan pools they wished to include in supporting loan groups for securities they purchased. Ex. 562 (NOM-FHFA_05265884-885) at NOM-FHFA_05265884-885; Ex. 563 (NOM-FHFA_05496486-488) at NOM-FHFA_05496486-488; Ex. 564 (NOM-FHFA_05783870-871) at NOM-FHFA_05783870-871; Ex. 565 (NOM-FHFA_05487917) at NOM-FHFA_05487917; Ex. 566 (FHFA02144903) at FHFA02144903. Timothy Crowley testified that, for the Nomura certificates it purchased, "Freddie would ultimately make the selection of loans." Ex. 40 (Crowley Tr.) at 248:9-14.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 378.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants state that Mr. Murphy's and Mr. McLaughlin's testimony are "removed from the context in which they appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt," Nomura fails to cite any evidence and therefore does not create a genuine dispute of material fact. *See* Parts I.B, I.E, *supra*. Furthermore, while Defendants assert that the loans that were placed into a securitization

had been subject to due diligence, this assertion is irrelevant to the asserted fact and does not create a genuine dispute of material fact.  *See* Part I.C, *supra*. Furthermore, only a sample of the loans that were placed into a securitization were subjected to due diligence. *See* RSUF ¶¶ 183, 184.   Defendants assert that "Freddie Mac and Fannie Mae selected the loan pools they wished to include in supporting loan groups for securities they purchased."  However, this assertion fails to directly contradict the asserted fact and is incorrect.  Neither Freddie Mac nor Fannie Mae "selected the loan pools they wished to include in supporting loan groups for securities they purchased."  Freddie Mac declined loans in its SLGs that failed to meet Freddie Mac's requirements as to, among other things, conforming balance, and Fannie Mae made various stipulations relating to loans to be included in its SLGS.  *See* FHFA Ex. 533 (NOM-FHFA_05500478, Freddie Mac Investment Requirements) and FHFA Ex. 534 (FHFA01628693, Fannie Mae Stips for Subprime and Alt-A Transactions)  Neither GSE selected individual loans for inclusion in its SLGs, and Defendants cite no evidence to the contrary. Defendants' conclusory assertions do not create a genuine dispute of material fact.  Part I.B, *supra*.

379.   **FHFA Statement:**  The information regarding the number of pools contributing loans to the SLGs is summarized in Ex. 12 to the Cipione Decl.

**Nomura Response:**  Disputed. Although the Cipione Declaration purports to contain information regarding the number of pools contributing loans to the SLGs, it also contains inaccurate information. The correct information appears in Mishol Decl. Ex. 8.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 379.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants dispute the asserted act, they identify no specific evidence of these alleged inaccuracies that contradicts it.  Nomura's conclusory assertions do not create a genuine dispute of

material fact.  Part I.B, *supra*. Furthermore, the information regarding the number of

pools contributing loans to the SLGs is exactly the same in Ex. 12 to the Cipione Decl.

and Ex. 8 to the Mishol Decl.

380.    **FHFA Statement:**  The information on loans from a single Acquisition Pool that were
fed into multiple SLGs is summarized in Ex. 1 to the Cipione Decl.

    **Nomura Response:**  Disputed. Although Exhibit 1 to the Cipione Declaration purports to
summarize information on loans from an acquisition pool that were put into multiple
SLGs, it also contains inaccurate information. The correct information appears in Mishol
Decl. Ex. 8.

    **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 380.

    **FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants

dispute the asserted act, they identify no specific evidence of these alleged inaccuracies

that contradicts it.  Nomura's conclusory assertions do not create a genuine dispute of

material fact.  Part I.B, *supra*.  Furthermore, any alleged inaccuracies are due to the

material being produced late to the Plaintiff.  Finally, while Defendants dispute that Ex. 1

to the Cipione Decl. is accurate, any such dispute is not material to FHFA's motion. *See*

*Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) ("[I]t must be

remembered that the mere existence of factual issues—where those issues are not

material to the claims before the court—will not suffice to defeat a motion for summary

judgment").

381.    **FHFA Statement:**  For example, Nomura Securities securitized only 2,532 of the 4,997
loans in the Fremont SP02 Acquisition Pool into the relevant NHELI 2006-FM1 SLG.
See Exs. 1-2 to the Cipione Decl.

    **Nomura Response:**  Disputed. The Cipione Declaration does not accurately reflect
Nomura's securitization process. Nomura Securities securitized 2,532 loans from the
Fremont SP02 Acquisition Pool into the NHELI 2006-FMI supporting loan groups of the

4,448 loans that were in NHELI 2006-FM1.  Ex. 588 (August 2014 Report of Michael Forester) at ¶ 79.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants assert that Nomura's expert Michael Forester explained that there were 4,448 loans in NHELI 2006-FM1, the conclusory assertions of an expert do not create  a genuine dispute of fact.  Part I.G, *supra*.  Furthermore, the total number of loans in the NHELI 2006-FM1 is irrelevant to the asserted fact regarding the number of loans from the Fremont SP02 Acquisition Pool that were securitized into the relevant NHELI 2006-FM1 SLG.  Therefore, this does not create  genuine dispute of material fact.  Part I.C, *supra*.

382.  **FHFA Statement:**  There is no evidence that Nomura ever selected the loans to be placed into an SLG by drawing them randomly from one or more Acquisition Pools.

**Nomura Response:**  Defendants do not dispute that Nomura did not select loans for a supporting loan group by drawing them randomly from Acquisition Pools, but defendants dispute that such random selection was desirable or required.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 382.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

383.  **FHFA Statement:**  Fannie Mae and Freddie Mac's publicly available charters published certain limitations on their purchases, including a prohibition on purchasing an interest in a single-family residence exceeding certain dollar thresholds.  See, e.g., 12 U.S.C. § 1454 (2005) (Freddie Mac); 12 U.S.C. § 1454 (2006) (Freddie Mac); 12 U.S.C. § 1454 (2007) (Freddie Mac); 12 U.S.C. § 1717 (2005) (Fannie Mae); 12 U.S.C. § 1717 (2006) (Fannie Mae); 12 U.S.C. § 1717 (2007) (Fannie Mae).

**Nomura Response:**  Defendants do not dispute that the statutes include the information cited by plaintiff. However, there are additional provisions that must be considered to understand the full scope of the limitations and requirements for Freddie Mac's and Fannie Mae's purchases. For example, one factor that influenced Freddie Mac's and Fannie Mae's substantial purchases of subprime RMBS was their efforts to meet goals to support low-income housing that were set by HUD beginning in 1993 to "support expanded access to housing and increased opportunities for homeownership." See Federal Housing Enterprises Financial Safety and Soundness Act of 1992, 12 U.S.C. §

4501. The HUD goals influenced Freddie Mac's and Fannie Mae's selection of mortgage loans that they would accept in supporting loan groups backing the private-label RMBS they purchased. Ex. 32 (July 9 Grice Report) at ¶ 44; *e.g.*, Ex. 45 (NOM-FHFA_05783855) at NOM-FHFA_05783855-857 (HUD goals analysis for NHELI 2006-FM2).

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 383.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that there were additional provisions that must be considered to understand the GSEs' purchases, this assertion is irrelevant to the asserted fact and does not create a genuine dispute of material fact. *See* Part I.C, *supra*. Furthermore, while Defendants cite Nomura's expert Charles Grice to support the assertion that HUD goals influence the GSEs' selection of mortgage loans, the conclusory assertions of an expert do not create a genuine dispute of fact. Part I.G, *supra*.

384. **FHFA Statement:** The Prospectus Supplements for the Securitizations represented that the Mortgage Loans in the SLGs purchased by the GSEs had principal balances at origination that conformed to the GSEs' loan limits. Ex. 5 (NOM-FHFA_04811802, Prospectus Supplement for NAA 2005- AR6) at NOM-FHFA_04811808 ("The Group III Mortgage Loans consist of mortgage loans with principal balances at origination that conformed to Fannie Mae loan limits."); Ex. 6 (NOM- FHFA_04729474, Prospectus Supplement for NHELI 2006-FM1) at NOM-FHFA_04729480 ("The Group I Mortgage Loans consist of one-to-four family, first and second lien fixed-rate and adjustable-rate mortgage loans with principal balances at origination that conformed to Freddie Mac loan limits."); Ex. 7 (NOM-FHFA_04638315, Prospectus Supplement for NHELI 2006-FM2) at NOM-FHFA_04638321 ("The Group I Mortgage Loans consist of one-to-four family, first and second lien fixed-rate and adjustable-rate mortgage loans with principal balances at origination that conformed to Freddie Mac loan limits."); Ex. 8 (NOM-FHFA_04620885, Prospectus Supplement for NHELI 2006-HE3) at NOM-FHFA_04620891 ("The Group I Mortgage Loans consist of one-to-four family, first and second lien fixed-rate and adjustable-rate mortgage loans with principal balances at origination that conformed to Freddie Mac loan limits."); Ex 9 (NOM- FHFA_05141912, NHELI 2007-1 Prospectus Supplement) at NOM-FHFA_05141920 ("The Group II-1 Mortgage Loans had principal balances at origination that conformed to Freddie Mac loan limits."); Ex. 10 (NOM-FHFA_05591325, Prospectus Supplement for NHELI 2007-2) at NOM-FHFA_05591331 ("The Group I Mortgage Loans consist of one-to-four family, first and second lien fixed-rate and adjustable-rate mortgage loans with principal balances at origination that conformed to Freddie Mac loan limits."); Ex. 11 (NOM-

FHFA_04732621, Prospectus Supplement for NHELI 2007-3) at NOM-FHFA_04732628 ("The Group I Mortgage Loans consist of one-to-four family, first and second lien, fixed-rate and adjustable-rate mortgage loans with principal balances at origination that conformed to Freddie Mac loan limits.").

**Nomura Response:** Undisputed that the prospectus supplements for the Securitizations represented that the loans in the supporting loan groups backing the securities purchased by Freddie Mac and Fannie Mae had principal balances at origination that conformed to Freddie Mac's and Fannie Mae's loan limits. As plaintiff's expert James Finkel explained in his report, "[i]t is important to note the distinction between 'origination' and 'issuance.' While origination refers to the act of creating a single mortgage, issuance refers to the securitization of a bond that is backed by numerous mortgages (which were all previously originated in the primary mortgage market)." Ex. 590 (Finkel July 9 Expert Report) at 17 n.16. Also disputed to the extent plaintiff suggests that the prospectus supplements for the Securitizations misrepresented the principal balances of the loans at issuance.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 384.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The testimony

cited by Defendants is irrelevant to the asserted fact and does not create a genuine dispute

of material fact. Part I.C, *supra*.

       4.     <u>Nomura Securities Did Not Extrapolate The Results Of Its Diligence To Either The Full Acquisition Pools Or The SLGs</u>

385.  **FHFA Statement:** It was not the "function" of the Diligence Group to extrapolate the results of diligence performed on a sample to the unsampled loans in a pool. Ex. 46 (Deposition of Neil Spagna) at 210:6-211:5 ("Q. Is there any attempt to extrapolate the results of the due diligence that is performed on the sample to the loans in the rest of the sample? … A. That wasn't our -- that wasn't our function. Our function was to, you know, get a sample and due -- due diligence it and report on what those results were.").

**Nomura Response:** Disputed. Nomura reviewed over 39% of the supporting loan group loans (and, for some individual supporting loan groups, much higher—over 80% of the 2005-AR6 supporting loan group and over 75% of the 2007-1 supporting loan group, for example). Ex. 302 (July 9 Grice Report Revised Exhibit 4); Mishol Decl. Exhibits 7 & 10. Because it was sampling the riskiest loans, Nomura could and did reasonably infer that the maximum percentage of underwriting defects in the unsampled portion was the same or significantly lower than the sample (i.e., the unsampled portion contained loans that were much less risky than the adversely sampled portion). See C. Stmt. ¶¶ 129-150. Mishol Decl. Ex. 15 shows that, at most, 10.8% of the unsampled loans in the supporting loan groups would have been "kick-outs" had they been reviewed. *Id.* Further, Nomura

257

only used samples on 31 of the 194 loan pools that contributed loans to the supporting loan groups. All loans purchased through the loan-by-loan channel and almost all loans purchased through the mini-bulk channel were subject to 100% credit and compliance diligence. *See* C. Stmt. ¶ 126-128. Nomura prepared diligence summaries for at least five of the Securitizations that were intended to serve as the basis for conclusions about the loans to be securitized. See ¶ 395, *infra*, which is incorporated herein by reference. Additionally, Freddie and Fannie reviewed numerous RMBS issuers during the time period and did not criticize a single one for not extrapolating sample results. *See, e.g.*, Ex. 290 (FHFA00519623) at FHFA00519624; Ex. 209 (FHFA03337751) at FHFA03337751-7752; Ex. 207 (FHFA12935980) at FHFA12935982-5983; Ex. 495 (FHFA19054466) at FHFA19054473; Ex. 307 (FHFA19054577) at FHFA19054584; Ex. 499 (FHFA19054612) at FHFA19054619. In an October 2007 review of Deutsche Bank, which employed a diligence process nearly identical to Nomura's, Freddie Mac stated,"[T]he DB credit review is standard for the industry with sample sizes ranging from 25-50% adversely selected from loan pools. Samples are selected through the Standard and Poor's Levels Model and critical analysis of the pool data by the due diligence manager." Ex. 205 (FHFA00371459) at FHFA00371461. Furthermore, there is no evidence in the record that Freddie Mac or Fannie Mae were themselves extrapolating diligence results for their own diligence reviews. Additionally, other types of diligence were performed on the SLG loans, including 100% valuation diligence. See ¶ 340, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 385.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute this assertion on the basis that Mr. Spagna was inaccurately quoted, and they cite no evidence showing that the Diligence Group's responsibilities included extrapolating the results of its diligence to unsampled loans, and thus do not create a genuine issue of material fact. *See* Part I.B, *supra*.

386. **FHFA Statement:** Mr. Sabo could not recall any instance in which Nomura extrapolated the results of diligence performed on a sample to the unsampled loans in a pool and stated: "I would have never made that extrapolation." Ex. 49 (Deposition of Mendy Sabo) at 177:21-178:23 ("Q. Do you recall ever making an extrapolation of the results from the sample to the broader population? A. I would have never made that extrapolation. Q. Who would have? A. I don't know. Q. So to your knowledge, you've never seen any extrapolation of the results of the sample to the rest of the population, right? A. I don't think it's a good extrapolation. Q. Well, good or bad, did you ever take anything that came from the sample and apply it in any way, shape or form to the unsampled loans? A. Perhaps. Q. Well, do you remember that happening? A. I don't remember. Q. Sitting here now, you don't remember that ever happening, meaning

you've never -- you can't remember any time you took results from a sample and in any way, shape or form applied that to the rest of the non-sampled population, right? A. Correct, I don't recall."); *id.* at 185:11-18 ("Q. Is it fair to say that you don't remember any overall look at the sample and trends and evaluation to see whether are the loans outside the sample okay to buy? You don't remember that being part of your process at all, right? … A. I don't recall.").

**Nomura Response:** Disputed. Although Mr. Sabo gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. See ¶ 385, *supra*, which is incorporated herein by reference.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 386.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that additional context is required in order to fully understand the quoted excerpts, they cite only to Defendants' reply to ¶ 385, which cannot create a genuine dispute of material fact for the reasons stated in FHFA's reply to ¶ 385.

387. **FHFA Statement:** Mr. Katz did not remember any instance in which Nomura extrapolated the results of diligence performed on a sample to the unsampled loans in a pool. Ex. 30 (Deposition of Steven Katz) at 198:18-23 ("Q. I guess what I'm asking is, was there ever a time that the results from the sample were extrapolated or applied in any way to the loans that were not sampled? A. I don't remember.").

**Nomura Response:** Disputed. Although Mr. Katz gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 385, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 387.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that additional context is required in order to fully understand the quoted excerpts, they cite only to Defendants' reply to ¶ 385, which cannot create a genuine dispute of material fact for the reasons stated in FHFA's reply to ¶ 385.

388. **FHFA Statement:** Mr. Kohout testified that it "would be difficult" to extrapolate the results of diligence performed on a sample to the unsampled loans because the sample was "adverse in nature." Ex. 53 (Deposition of Joseph Kohout) at 120:15-24 ("Q. Let me ask a couple of questions about the sample itself. Was there ever an attempt to extrapolate the results of the sample to the nonsampled loans? A. That would be difficult, because the sample was adverse in nature. Q. So when you say it's difficult, you mean it wasn't done? A. No."). When asked "if you had an adverse sample of the 20 percent, and … 25 percent of those get kicked out, what's just your gut feeling of how many of the remaining 80 percent should probably fail," Mr. Kohout stated: "There is no possible way I could answer that question." See also *id.* at 288:11-289:20 ("Q. Wouldn't it be fair to say that it is very likely, if not definite, that it must mean that some of the other 80 percent have loans that should have been kicked out? … A. I think what you're failing to acknowledge is the fact that this was an adverse sample. So I would dispute that claim. … Q. And have you actually done any study of how those extrapolate out to the remaining population? … A. Personally, no. Q. Okay. And just tell me, if you had an adverse sample of the 20 percent, and I am just going to give an example, let's say, 25 percent of those get kicked out, what's just your gut feeling of how many of the remaining 80 percent should probably fail? … A. There is no possible way I could answer that question.").

   **Nomura Response:** Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 385, *supra*, which is incorporated by reference herein.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 388.

   **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that additional context is required in order to fully understand the quoted excerpts, they cite only to Defendants' reply to ¶ 385, which cannot create a genuine dispute of material fact for the reasons stated in FHFA's reply to ¶ 385.

389. **FHFA Statement:** When asked if Nomura extrapolated the results of its diligence to the larger bulk pool, Brett Marvin stated, "No, because, again, it was an adverse selection gleaned by looking at what S&P and Moody's deemed as a lower tier of the higher risk loans as well as what our due diligence team, from an experiential standpoint, deemed to be higher risk. So a cross-section of those loans was not necessarily a, you know, pro rata or representative slice of the entire deal." Ex. 31 (Deposition of Brett Marvin) at 244:7-22 ("Q. Based on sample that Nomura chose and p[er]formed -- followed the due diligence on, did it extrapolate those results in any way to the larger bulk pool? A. No,

because, again, it was an adverse selection gleaned by looking at what S&P and Moody's deemed as a lower tier of the higher risk loans as well as what our due diligence team, from an experiential standpoint, deemed to be higher risk. So a cross-section of those loans was not necessarily a, you know, pro rata or representative slice of the entire deal. …").

**Nomura Response:** Disputed. Although Mr. Marvin gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 385, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 389.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants assert that additional context is required in order to fully understand the quoted excerpts, they cite only to Defendants' reply to ¶ 385, which cannot create a genuine dispute of material fact for the reasons stated in FHFA's reply to ¶ 385.

390. **FHFA Statement:** Nomura's proffered expert, Mr. Grice, stated: "[T]he results of an adverse sample could not be extrapolated to the remainder of the pool; the number of loans in the sample found to be non-compliant would not suggest the remainder of the pool had an equal proportion of non- compliant loans." Ex. 22 (Grice Nomura Report) at ¶ 143.

**Nomura Response:** Disputed. Although plaintiff's Exhibit 22 includes the text quoted by plaintiff, that statement clearly means that the number of loans in an adverse sample found to be non- compliant would be higher than the number of loans in the remainder of the pool expected to be non-compliant—not that no information about the unsampled portion of a pool could be gleaned from an adverse sample.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 390.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants concede that Mr. Grice made the quoted statement. Defendants' argument that Mr. Grice's statement does not mean "that no information about the unsampled portion of a pool could be gleaned from an adverse sample" does not contradict his statement that the

results of an adverse sample could not be extrapolated to the remainder of the pool," and so does not create a genuine dispute of material fact.  *See* Part I.C, *supra*.

391.  **FHFA Statement:**  There is no evidence that Nomura ever extrapolated the results of diligence performed on samples drawn from Acquisition Pools to the SLGs formed by loans drawn from those Acquisition Pools.

   **Nomura Response:**  Disputed. *See* ¶ 385, *supra*, which is incorporated by reference herein.

   **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 391.

   **FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants' cite only to their reply to ¶ 385, and provide no explanation as to the basis for their dispute. Therefore Defendants do not create a genuine dispute of material fact.  Furthermore, Defendants' reply to ¶ 385 cannot create a genuine dispute of material fact for the reasons stated in FHFA's reply to ¶ 385.

392.  **FHFA Statement:**  For the following five Securitizations, Nomura prepared summaries of the diligence performed on the acquisition pools contributing to the Securitizations: NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-2, and NHELI 2007-3.  Ex. 136 (NOM- FHFA_04783021, NHELI 2006-FM1 Due Diligence Summary) at NOM-FHFA_04783021; Ex. 137 (NOM-FHFA_04879929, NHELI 2006-FM2 Due Diligence Summary) at NOM- FHFA_04879929; Ex. 138 (NOM-FHFA_04878437, NHELI 2006-HE3 Due Diligence Summary) at NOM-FHFA_04878437; Ex. 139 (NOM-FHFA_04921689, NHELI 2007-2 Due Diligence Summary) ***FOOTNOTE See Ex. 356 (Letter from K. Stoller to J. Corey) at 1 ("NHELI 2007-2 was at one point referred to as NHELI 2007-HE1[.]"). at NOM-FHFA_04921689; Ex. 140 (Dep. Ex. 40902, email regarding NHELI2007-3 DD Summary with attached NHELI 2007-3 Due Diligence Summary) at NOM-FHFA_05010697.

   **Nomura Response:**  Undisputed.

   **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 392.

   **FHFA Reply:**  Defendants do not dispute the asserted fact.

393.     **FHFA Statement:** Nomura was "unable to locate" diligence summaries for the NAA 2005-AR6 and NHELI 2007-1 Securitizations. Ex. 141 (October 2, 2014 Letter from Davidoff to Ng) at 1.

         **Nomura Response:** Undisputed.

         **FHFA Reply:** Defendants do not dispute the asserted fact.

394.     **FHFA Statement:** These reports summarized all of the diligence that Nomura had performed at the acquisition stage on the pools of loans that were placed into the Securitizations. Ex. 48 (Deposition of Michael Orfe) at 162:19-24 ("Q. Is this what you characterize as the due diligence where you purchase the whole loans or before the securitization? A. This represents the due diligence that was done when we purchased the loans that are in the securitization.") (discussing Ex. 142 (Dep. Ex. 6509 (email regarding NHEL 2006-HE3 (Term Sheet) with attached NHELI 2006-HE3 Due Diligence Summary)); Ex. 48 (Deposition of Michael Orfe) at 163:23-164:20 ("Q. Do you know of any other due diligence that was done before a securitization? A. Let me explain. So purchased pools of loans. Those loans then get aggregate -- so let's say we do ten transactions where we purchased ten pools of loans. Those pools of loans then get put into a securitization. Due diligence happens when we buy them, some point down the road we put them into a securitization. At the point of securitization, we would then create a report that said what is the summary of all the due diligence we did on those ten pools of loans when we purchased them. And that's what this represents. Q. So when it talks about due diligence for the securitization, it's referring to the due diligence that was done at the purchase of the whole loan level. Right? A. Correct.") (discussing Ex. 142 (Dep. Ex. 6509 (email regarding NHEL 2006-HE3 (Term Sheet) with attached NHELI 2006-HE3 Due Diligence Summary)).

         **Nomura Response:** Disputed. Plaintiff's Exhibits 136 to 140 do not purport to summarize "all" of the due diligence that Nomura had performed at the acquisition stage on the pools of loans that were placed into the Securitizations. In fact, four of these due diligence summaries contain a disclaimer that expressly states, "Additional information is available upon request. The material contained herein is preliminary and based on sources which we believe to be reliable, but it is not complete, and we do not represent that it is accurate. It is not to be considered as an offer to sell or solicitation of an offer to buy any securities. All material set forth is subject to change without notice." Ex. 591 (NOM-FHFA_04783021) at NOM-FHFA_04783021; Ex. 592 (NOM- FHFA_04879929) at NOM-FHFA_04879929; Ex. 593 (NOM-FHFA_04921689) at NOM- FHFA_04921689; Ex. 594 (NOM-FHFA_04878437) at NOM-FHFA_04878437. The fifth due diligence summary contains a similar, but even more detailed disclaimer. Ex. 595 (NOM- FHFA_ 05010697) at NOM-FHFA_ 05010697. Further, although Mr. Orfe gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, Michael Orfe testified that "the amount of loans that Nomura did put through due diligence was probably, from what I understood, some of the highest amounts kind of relative to our peers in the business." Ex. 36 (Orfe Tr.) at 147:21-148:13. He also testified about his

understanding that "relative to whatever th[e] [average sample size] number might be[,] Nomura's was better. . . . [I]t was a concerted effort at Nomura to do a higher than industry standard level of due diligence to make the deals more appealing." *Id.* at 174:4-19. Additional diligence was performed in connection with the acquisition of loans included in the Securitizations and the Securitizations themselves. See ¶ 340, *supra*, which is incorporated herein by reference.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 394.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not dispute that the cited diligence summaries "summarized diligence that Nomura had performed at the acquisition stage on the pools of loans that were placed into the Securitizations."  Nomura asserts that the summaries did not summarize "all" of the relevant acquisition-stage diligence, and FHFA does not dispute this assertion.  This now-undisputed fact that the summaries summarized less than "all" of the relevant acquisition-stage diligence is material to FHFA's motion only in the sense that it is further evidence that Nomura's diligence procedures were inadequate.

395.   **FHFA Statement:**  These diligence summaries do not state that any extrapolation was done from the results of diligence performed on samples drawn from the Acquisition Pools to either the Pools as a whole or to the SLGs.  See Ex. 136 (NOM-FHFA_04783021, NHELI 2006-FM1 Due Diligence Summary) at NOM-FHFA_04783021; Ex. 137 (NOM-FHFA_04879929, NHELI 2006-FM2 Due Diligence Summary) at NOM-FHFA_04879929; Ex. 138 (NOM-FHFA_04878437, NHELI 2006-HE3 Due Diligence Summary) at NOM-FHFA_04878437; Ex. 139 (NOM-FHFA_04921689, NHELI 2007-2 Due Diligence Summary) at NOM-FHFA_04921689; Ex. 140 (Dep. Ex. 40902, email regarding NHELI2007-3 DD Summary with attached NHELI 2007-3 Due Diligence Summary) at NOM-FHFA_05010697.

**Nomura Response:**  Disputed. Plaintiff's Exhibits 136 to 140 provide summaries of due diligence results that were intended to serve as the basis for conclusions about the loans to be securitized. See C. Stmt. at ¶¶ 40-42.  Plaintiff's Exhibits 136 to 140 do not purport to summarize all of the due diligence that Nomura had performed at the acquisition stage on the pools of loans that were placed into the Securitizations. See ¶ 394, *supra*, which is incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 395.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

assert that the diligence summaries were intended to serve as the basis for conclusions

about the loans to be securitized, Defendants cite only to Nom. SUF ¶¶ 40-42, which

contain no assertions or evidence regarding whether these due diligence summaries were

intended to serve as the basis for conclusions about the loans to be securitized.

Moreover, Defendants' assertion that the diligence results were intended to serve as the

basis for conclusions about the loans to be securitized is unsupported and does not

specifically contradict the asserted fact, and so does not create a genuine dispute of

material fact. Part I.B, I.C *supra*.

396. **FHFA Statement:** None of the diligence summaries provide loan-level details, the grade the loans were assigned before Nomura issued overrides of those grades, or the amount of loans in the SLGs that received a diligence review. See Ex. 136 (NOM-FHFA_04783021, NHELI 2006-FM1 Due Diligence Summary) at NOM-FHFA_04783021; Ex. 137 (NOM-FHFA_04879929, NHELI 2006- FM2 Due Diligence Summary) at NOM-FHFA_04879929; Ex. 138 (NOM-FHFA_04878437, NHELI 2006-HE3 Due Diligence Summary) at NOM-FHFA_04878437; Ex. 139 (NOM-FHFA_04921689, NHELI 2007-2 Due Diligence Summary) at NOM-FHFA_04921689; Ex. 140 (Dep. Ex. 40902, email regarding NHELI2007-3 DD Summary with attached NHELI 2007-3 Due Diligence Summary) at NOM-FHFA_05010697.

**Nomura Response:** Disputed. The exhibits cited by plaintiff state that "Additional information is available upon request." Thus, plaintiff's Exhibits 136 to 140 do not purport to summarize all of the due diligence that Nomura had performed at the acquisition stage on the pools of loans that were placed into the Securitizations, but state that such information is available. *See supra*, ¶ 394, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 396.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants

assertion that additional information was available upon request does not contradict the

asserted fact that none of the diligence summaries provide loan-level details, the grade

the loans were assigned before Nomura issued overrides of those grades, or the amount of

loans in the SLGs that received a diligence review. Therefore, this assertion does not

create a genuine dispute of material fact. Part I.C, *supra*. Furthermore, speculation that

evidence might exist calling the asserted fact into question does not create a genuine

dispute of material fact. Part I.D, *supra*. To the extent that Defendants rely on their

response to ¶ 394, they do not create a genuine issue of material fact for the reasons

stated in FHFA's reply to ¶ 394.

397.  **FHFA Statement:** The diligence summaries for the NHELI 2006-FM1, NHELI-2006-FM2, and NHELI 2006-HE3 Securitizations do not provide information on the number of Mortgage Loans diligenced in the Securitizations. See Ex. 136 (NOM-FHFA_04783021, NHELI 2006-FM1 Due Diligence Summary) at NOM-FHFA_04783021; Ex. 137 (NOM-FHFA_04879929, NHELI 2006- FM2 Due Diligence Summary) at NOM-FHFA_04879929; Ex. 138 (NOM-FHFA_04878437, NHELI 2006-HE3 Due Diligence Summary) at NOM-FHFA_04878437.

**Nomura Response:** Disputed. Plaintiff's Exhibits 136 to 140 state that "Additional information is available upon request" and thus do not purport to summarize all of the due diligence that Nomura had performed at the acquisition stage on the pools of loans that were placed into the Securitizations, but state that such information is available. See ¶ 394, *supra*, which is incorporated by reference herein. In addition, the due diligence summaries for the NHELI 2006- FM1 and NHELI 2006-FM2 securitizations show the percentage of due diligence performed on all trade pools that contributed to those securitizations. Ex. 591 (NOM-FHFA_04783021) at NOM-FHFA_04783021; Ex. 592 (NOM-FHFA_04879929) at NOM-FHFA_04879929. The due diligence summary for NHELI 2006-HE3 provides the percentage of due diligence performed on trade pools from the two originators that contributed the most loans to the securitization. Ex. 594 (NOM-FHFA_04878437) at NOM-FHFA_04878437. In addition, all three due diligence summaries show the number of loans from the underlying trade pools that were kicked out as a result of Nomura's due diligence process. Ex. 591 (NOM-FHFA_04783021) at NOM-FHFA_04783021; Ex. 592 (NOM-FHFA_04879929) at NOM-FHFA_04879929; Ex. 594 (NOM-FHFA_04878437) at NOM-FHFA_04878437.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 397.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants

assertion that additional information was available upon request does not contradict the

asserted fact that the diligence summaries for the NHELI 2006-FM1, NHELI-2006-FM2,

and NHELI 2006-HE3 Securitizations do not provide information on the number of Mortgage Loans diligenced in the Securitizations. Furthermore, while Defendants cite additional statements from these diligence summaries, regarding the amount of diligence performed on all trade pools that contributed to those securitizations, the percentage of due diligence performed on trade pools from the two originators that contributed the most loans to the securitization, and the number of loans from the underlying trade pools that were kicked out as a result of Nomura's due diligence process, these assertions do not contradict the asserted fact. Therefore, Defendants' assertions do not create a genuine dispute of material fact. Part I.C, *supra*. Furthermore, speculation that evidence might exist calling the asserted fact into question does not create a genuine dispute of material fact. Part I.D, *supra*. To the extent that Defendants rely on their response to ¶ 394, they do not create a genuine issue of material fact for the reasons stated in FHFA's reply to ¶ 394.

398. **FHFA Statement:** The diligence summary for the NHELI 2007-2 Securitization represented that the percentage of diligence performed on all loans purchased by Nomura from Ownit was 55%. Ex. 139 (NOM-FHFA_04921689, NHELI 2007-2 Due Diligence Summary) at NOM- FHFA_04921689.

**Nomura Response:** Disputed. Plaintiff's Exhibit 139 does not purport to summarize all of the due diligence that Nomura had performed at the acquisition stage on the pools of loans that were placed into the Securitizations. *See* ¶ 394 *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 398.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that the diligence summary does purport to summarize all of the due diligence that Nomura had performed, that assertion does not contradict the asserted fact that the diligence summary for the NHELI 2007-2 Securitization represented that the percentage

of diligence performed on all loans purchased by Nomura from Ownit was 55%. Therefore, this assertion does not create a genuine dispute of material fact. Part I.C, *supra*. Furthermore, speculation that evidence might exist calling the asserted fact into question does not create a genuine dispute of material fact. Part I.D, *supra*. To the extent that Defendants rely on their response to ¶ 394, they do not create a genuine issue of material fact for the reasons stated in FHFA's reply to ¶ 394.

399. **FHFA Statement:** Ownit SP02 is the only Ownit Acquisition Pool from which Mortgage Loans backing the NHELI 2007-2 SLG were drawn. Ex. 1 to the Cipione Decl.

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 399.

**FHFA Reply:** Defendants do not dispute the asserted fact.

400. **FHFA Statement:** The percentage of loans from the Ownit SP02 Acquisition Pool that were subject to credit and compliance diligence was 26%. Ex. 2 to the Cipione Decl. (Row 129 "Ownit SP02").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 400.

**FHFA Reply:** Defendants do not dispute the asserted fact.

401. **FHFA Statement:** The information regarding (i) the number of loans drawn from a sampled Acquisition Pool to receive a diligence review and (ii) the number of loans separately drawn from that Pool and placed into the SLGs that had received a diligence review is summarized in Ex. 55 to the Cipione Decl.

**Nomura Response:** Disputed. Plaintiff's Exhibit 139 does not purport to summarize all of the due diligence that Nomura had performed at the acquisition stage on the pools of loans that were placed into the Securitizations. See ¶ 394, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 401.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited

document is irrelevant to the asserted fact and does not create a genuine dispute of

material fact. Part I.C, *supra*. To the extent that Defendants rely on their response to ¶

394, that paragraph is also irrelevant to the asserted fact and does not create a genuine

issue of material fact for the reasons stated in FHFA's reply to ¶ 394.

402. **FHFA Statement:** Mr. Spagna "couldn't say one way or another if the loans outside of the due diligence sample complied with underwriting criteria." Ex. 46 (Deposition of Neil Spagna) at 322:18-323:22 ("Q. Okay. And so you who did due diligence from July 2006 to November 2007, wouldn't it be fair to say that it was almost certainly inaccurate that from outside of the sample that all of those mortgage loans would comply with underwriting guidelines? … A. I -- I don't know. Q. If the results of all the sampled loans were representative of the non-sampled loans, isn't it true that most likely the loans outside the sample that were included in these large securitizations, at least some of them did not comply with underwriting criteria? … A. No, I don't know that. I mean, our role was to focus on the sampled loans on bulk deals. Q. So coming out of due diligence, you really couldn't say one way or another if the loans outside of the due diligence sample complied with underwriting criteria; right? … A. I don't know. Q. You can't say; right? A. Uh-huh. Q. Yes? A. Yes.").

**Nomura Response:** Disputed. Although Mr. Spagna gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. See ¶ 385, *supra*, & C. Stmt. ¶¶ 81-108, which are incorporated by reference herein. Furthermore, another Nomura witness, Steve Katz, explained that Nomura performed an "investigation" of "loans not sampled in the credit and compliance sample" by submitting loans to "a separate valuation diligence." Ex. 182 (Katz Tr.) at 198:4-9; see also *id.* at 198:24-199:21 (describing valuation diligence). Joseph Kohout, the head of Nomura's Due Diligence Group before Mr. Spagna, agreed, testifying that valuation diligence "was a way to actually sample additional loans by virtue of running property valuations on 100 percent of the loans. It de facto allowed us to increase our sample size, because we were testing, at least, a property value on 100 percent of the loans." Ex. 26 (Kohout Tr.) at 320:18-321:3. Mr. Kohout, in response to the question of "[w]ouldn't it be fair to say that it is very likely, if not definite, that it must mean that some of the other 80 percent [in the unsampled portion] have loans that should have been kicked out," also testified that "I would dispute that" because "this was an adverse sample." *Id.* at 288:11-20. Furthermore, Mr. Katz described other Nomura diligence processes, including the custodial loan file review and the review performed by accounting firm Deloitte & Touche, which involved the review of loan files and loan information for loans outside of the credit and compliance sample. Ex. 182 (Katz Tr.) at 333:25-334:18. In addition, Nomura only used samples on 31 of the 194 loan pools that contributed loans to the supporting loan groups. See Mishol Decl. Ex. 6. All loans purchased through the loan-by-loan channel and

almost all of the loans purchased through the mini-bulk channel were subject to 100% diligence. C. Stmt. ¶¶ 126-128. Finally, the prospectus supplements for the Securitizations stated, with respect to underwriting guidelines from disclosed originators, that "[t]he Mortgage Loans were generally originated . . . in accordance with the underwriting criteria described in this section"; that loans were "originated generally in accordance with the underwriting criteria described in this section"; or that "[a]ll of the mortgage loans were originated . . . generally in accordance with the underwriting criteria described in this section." Ex. 21 (NOM-FHFA_04620885) at NOM-FHFA_04620965; Ex. 19 (NOM- FHFA_04811802) at NOM-FHFA_04811894; Ex. 23 (NOM-FHFA_05141912) at NOM- FHFA_05142025; Ex. 24 (NOM-FHFA_05591325) at NOM-FHFA_05591415; Ex. 25 (NOM- FHFA_04732621) at NOM-FHFA_04732712; Ex. 20 (NOM-FHFA_04729474) at NOM- FHFA_04729543; Ex. 22 (NOM-FHFA_04638315) at NOM-FHFA_04638395 (emphasis added). All of the prospectus supplements except for the NHELI 2006-FM1 prospectus supplement, also contained a section on the general underwriting standards of the sponsor, and disclosed that the loans backing the Securitizations "were originated generally in accordance with the underwriting criteria described in this section." Ex. 19 (NOM-FHFA_04811802) at NOM-FHFA_04811894-1895; Ex. 22 (NOM-FHFA_04638315) at NOM-FHFA_04638399-8401; Ex. 21 (NOM-FHFA_04620885) at NOM-FHFA_04620972-0973; Ex. 23 (NOM- FHFA_05141912) at NOM-FHFA_05142025-2027; Ex. 24 (NOM-FHFA_05591325) at NOM- FHFA_05591415-1416; Ex. 25 (NOM-FHFA_04732621) at NOM-FHFA_04732712-2713; Ex. 24 (NOM-FHFA_05591325) at NOM-FHFA_05591415-1416.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 402.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants acknowledge that Mr. Spagna gave the disputed testimony.  While Defendants assert that additional context is required in order to fully understand the quoted excerpt, none of the cited documents and testimony relate to whether Mr. Spagna could say one way or another if the loans outside of the due diligence sample complied with underwriting criteria, and so do not create a genuine dispute of material fact.  Part I.C, *supra*.

403.  **FHFA Statement:**  Mr. Spagna did not know if  "there [was] any attempt at Nomura to verify the accuracy of statements in prospectus supplements that mortgage loans were originated generally in accordance with the underwriting criteria for the loans outside the due diligence sample."  Ex. 46 (Deposition of Neil Spagna) 320:23-321:5 ("Q. Was there any attempt at Nomura to verify the accuracy of statements in prospectus supplements that mortgage loans were originated generally in accordance with the underwriting

criteria for the loans outside the due diligence sample?  A.  I'm not sure.  I don't know that.").

**Nomura Response:**  Disputed. Although Mr. Spagna gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. See ¶¶ 385, 402, *supra*, which are incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 403.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants assert that additional context is required in order to fully understand the quoted excerpt, Defendants cite only to ¶¶ 385, 402.  Nothing in the cited paragraphs addresses whether Mr. Spagna knew if there was any attempt at Nomura to verify the accuracy of statements in prospectus supplements to which mortgage loans were originated generally and in accordance with the underwriting criteria for the loans outside of the due diligence sample, and therefore do not create a genuine dispute of material fact.  Part I.C, *supra*. Furthermore, to the extent Defendants rely on their responses to ¶¶ 385, 402, those responses do not create a genuine issue of material fact for the reasons stated in FHFA's replies to ¶¶ 385, 402.

404.  **FHFA Statement:**  Steven Katz also could not recall what Nomura did "for the loans that did not go through the sample….to ensure that the description of the collateral for those loans was accurate." Ex. 30 (Deposition of Steven Katz) 197:18-23 ("Q.  Generally for the loans that did not go through the sample what, if anything, did Nomura do to ensure that the description of the collateral for those loans was accurate?  A.  I don't recall.").

**Nomura Response:**  Disputed. Although Mr. Katz gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. See ¶¶ 385, 402, *supra*, which are incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 404.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that additional context is required in order to fully understand the quoted excerpt, Defendants cite only to ¶¶ 385, 402. Nothing in the cited paragraphs addresses whether Mr. Katz could recall what Nomura did for the loans that did not go through the sample to ensure that the description of the collateral for those loans was accurate, and therefore do not create a genuine dispute of material fact. Part I.C, *supra*. Furthermore, to the extent Defendants rely on their responses to ¶¶ 385, 402, those responses do not create a genuine issue of material fact for the reasons stated in FHFA's replies to ¶¶ 385, 402.

**E.      Nomura Securities' Diligence Process Had Other Substantial Defects**

   1.      Nomura's Relationship With Its Vendors

405.  **FHFA Statement:** After selecting a sample from an acquisition loan pool, the Diligence Group retained third-party diligence firms to conduct credit and compliance diligence on the mortgage loans. Ex. 46 (Deposition of Neil Spagna) at 227:3-228:12 ("Q. Okay. And what did the due diligence vendor do? A. The due dil – due diligence vendor would, you know, among other things, they would organize a team of underwriters to go out in the field if the deal was, in fact, in the field and – and then ship all the equipment and all the requirements to – to go out in to the – in to the field and get the people there by, you know, plane, whatever. They would also take the data for the due diligence sample and they would download it on to the CLAS system. And what that would do is that would populate certain fields within the CLAS system. And part of the – the due diligence would be to, you know, validate, you know, validate those fields. And then from there, the – depending on what the start date of that project was, you know, the lead underwriter and the QC'er would – and a team of underwriters would go in to the seller and would be given, you know, either an imaging system which had the – the loan files on them or actual hard copy loan files to review, and they would go into a conference room similar to this and start underwriting the files in to the CLAS system. As questions came up, as, you know, issues with loans or questions about documents came up, you know, you know, the lead underwriter would interface with the seller and, you know, communicate and try to get everything that they needed, that Clayton needed or AMC needed to complete the project.").

   **Nomura Response:** Undisputed, except that AMC did not use the CLAS system. See Ex. 229 (Kempf Tr.) at 213:25-214:5.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 405.

**FHFA Reply:** Defendants do not dispute the asserted fact.

406. **FHFA Statement:** The Diligence Group engaged The Clayton Group ("Clayton") and American Mortgage Consultants, Inc. ("AMC") to conduct credit and compliance diligence on bulk and mini bulk whole loan transactions. Ex. 61 (Deposition of Christopher Scampoli) at 127:22-128:8 ("Q. Did you work with each of these due diligence firms about equally or – A. Lydian was primarily on – on a different line of business, the – what we call the 'loan-by-loan' or 'conduit' business. And Clayton was all – was also on the loan-by-loan and conduit business, but also did mini-bulk and bulk. And AMC did mini-bulk and bulk due diligence."); Ex. 34 (NOM- FHFA_05491675, Presentation entitled "Nomura Securities International, Inc. Residential Whole Loan Securitization Platform") at NOM-FHFA_05491713 (listing AMC and Clayton as third-party due diligence vendors used for bulk and mini bulk channels).

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 406.

**FHFA Reply:** Defendants do not dispute the asserted fact.

407. **FHFA Statement:** The Diligence Group engaged Lydian and Clayton to conduct credit diligence on whole loan purchases through the loan-by-loan or conduit channel. Ex. 61 (Deposition of Christopher Scampoli) at 127:18-128:8 ("Q. Okay. Were there any other due diligence firms that you worked with? A. Lydian. Lydian. Q. Did you work with each of these due diligence firms about equally or – A. Lydian was primarily on – on a different line of business, the – what we call the 'loan-by-loan' or 'conduit' business. And Clayton was all – was also on the loan-by-loan and conduit business, but also did mini-bulk and bulk. And AMC did mini-bulk and bulk due diligence."); Ex. 34 (NOM-FHFA_05491675, Presentation entitled "Nomura Securities International, Inc. Residential Whole Loan Securitization Platform") at NOM-FHFA_05491713 (listing Lydian and Clayton as third-party due diligence vendors used for the loan-by-loan channel).

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 407.

**FHFA Reply:** Defendants do not dispute the asserted fact.

408. **FHFA Statement:** The Assignment and Conveyance Agreements between Nomura and an originator selling it loans provided that the seller "does hereby sell, transfer, assign, set over and convey to Nomura Credit & Capital, Inc. as Purchaser … the related Mortgage Files and all rights and obligations arising under the documents contained therein. Pursuant to Section 6.03 of the Agreement, the Seller has delivered to the Custodian the documents for each Mortgage Loan to be purchased as set forth in the Agreement. The ownership of each Mortgage Note, Mortgage, and the contents of the Mortgage File and

Servicing File is vested in the Purchaser and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or which come into the possession of the Seller shall immediately vest in the purchaser and shall be retained and maintained, in trust, by the Seller at the will of the Purchaser in such custodial capacity only." Ex. 143 (NOM-FHFA_04475240, Executed Assignment and Conveyance dated June 29, 2006 for Fremont SP03 and Fremont SP04) at NOM-FHFA_04475241; *see also*, *e.g*., Ex. 144 (NOM-FHFA_05238381, Executed Assignment and Conveyance dated January 12, 2006 for Ownit SP01) at NOM-FHFA_05238381 (same); Ex. 148 (NOM-FHFA_05240530, Executed Assignment and Conveyance dated December 29, 2006 for Resmae SP02) at NOM- FHFA_05240530 (same).

**Nomura Response:** Disputed. Plaintiff cites conveyance instruments for only four loan pools. Furthermore, Exhibit 148 is not an Assignment and Conveyance, and does not bear the beginning bates number NOM-FHFA_05240530.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 408.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that Plaintiff cites conveyance agreements for only four loan pools, Defendants provide no evidence that these conveyance agreements were not entered into with originators for all relevant loan pools. Nomura's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While Defendants are correct that FHFA incorrectly cited FHFA Ex. 148, the correct document appears in FHFA Ex. 145.

409. **FHFA Statement:** In Nomura "maintained control of the loan files during the diligence process." Ex. 34 (NOM-FHFA_05491675, Presentation entitled "Nomura Securities International, Inc. Residential Whole Loan Securitization Platform") at NOM-FHFA_05491713 ("Nomura has adopted a unique approach with all vendors to assure quality and consistency will be achieved by maintaining control of the loan files throughout the Due Diligence Process, while utilizing the same base underwriting personnel.").

**Nomura Response:** Disputed. Although plaintiff's Exhibit 34 includes the text quoted by plaintiff, it does not identify the "loan files" over which Nomura maintained control during the diligence process, and thus does not state that Nomura had control over loan files other than those in a diligence sample.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 409.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that FHFA Ex. 34 does not identify the loan files over which Nomura maintained control during the diligence process, they identify no evidence that contradicts the asserted fact. Nomura's conclusory assertions that do not create a genuine dispute of material fact. Part I.B, *supra*.

410. **FHFA Statement:** Nomura Securities' diligence vendors had "access" to the loan file to conduct their "credit due diligence of the sampled loans." Ex. 53 (Deposition of Joseph Kohout) at 205:14-19 ("Q. And what did the third-party vendors have access to in order to do their credit due diligence of the sampled loans? A. The loan file and the data tape that was referred to as the bid tape.").

   **Nomura Response:** Undisputed that the third-party due diligence vendors hired by Nomura to perform credit and compliance diligence used loans files to conduct due diligence.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 410.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

411. **FHFA Statement:** Jeffrey Hartnagel and Joseph Kohout would provide "criteria" to the third party due diligence firm which would form the basis of a "script." Ex. 33 (Deposition of Jeffrey Hartnagel) at 292:13-293:4 ("Q. Okay. Who decided what was on that script? A. It was based on the criteria given to them when we would – we'd start working with them. … Q. Who at Nomura decided what was on that script? A. Mostly likely Joe and I.").

   **Nomura Response:** Disputed. Defendants do not dispute that Nomura provided third party due diligence vendors additional criteria to be used in credit and compliance due diligence, but dispute that Nomura instructed due diligence vendors on how to conduct due diligence. Neil Spagna testified that Nomura did not tell Clayton "what in particular to do in order to do their due diligence." Ex. 27 (Spagna Tr.) at 237:4-9. Vicki Beal of Clayton testified that Clayton used "a standard credit and compliance review," referred to as the "script," and that Clayton's clients then provided additional criteria to be incorporated into that standard script. See Ex. 315 (Beal Fact Tr.) at 109:25-110:11. Similarly, AMC's corporate representative testified that the diligence firm employed "our standard . . . script. Some clients wanted additional information so we had to create additional fields to capture that information to report on to the client." Ex. 229 (Kempf Tr.) at 50:4-17.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 411.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited testimony regarding instructions to the vendors on how to conduct due diligence are irrelevant to the asserted fact that Mr. Hartnagel and Mr. Kohout would provide criteria to the third party due diligence firms and therefore do not create a genuine dispute of material fact. Part I.C, *supra*.

412. **FHFA Statement:** "Clayton's clients determined the scope of the credit review that was performed." Ex. 69 (Clayton 30(b)(6) Deposition of Vicki Beal) at 196:15-19 ("Q. Okay. Would it be fair to say that Clayton's clients determined the scope of the credit review that was performed? A. Yes.").

**Nomura Response:** Disputed. Although Ms. Beal gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. Ms. Beal testified that Clayton used "a standard credit and compliance review," referred to as the "script," and that Clayton's clients then provided additional criteria to be incorporated into that standard script. See Ex. 315 (Beal Fact Tr.) at 109:25-110:11. The compliance portion of the credit and compliance review was "a little more standard just because it was strictly based on regulations rather than guidelines." Ex. 230 (Beal 30(b)(6) Tr.) at 196:20-197:8. *See also* ¶ 411, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 412.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants provide a citation to Ms. Beal's fact testimony, this citation is irrelevant to the asserted fact regarding Ms. Beal's testimony as a corporate representative for Clayton and therefore does not create a genuine dispute of material fact. In addition, Defendants' assertions about the compliance review are also irrelevant to the asserted fact regarding the credit review and therefore do not create a genuine dispute of material fact. *See* Part I.C, *supra*.

413. **FHFA Statement:** The script provided to the third party due diligence vendors would include trade stipulations. Ex. 146 (Dep. Ex. 50703, email regarding Wells SP01 Due Dilli Sample) at NOM- FHFA_05324872 ("In an email to AMC, Mendy Sabo asked: "Please apply these trade stips to the script.").

    **Nomura Response:** Defendants do not dispute that Nomura provided trade stipulations to the diligence vendors. As noted above, the credit and compliance due diligence vendors had a standard diligence script, which Nomura then enhanced by providing additional review criteria. See ¶ 411, *supra*, which is incorporated by reference herein.

    **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph

    **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that the "credit and compliance due diligence vendors had a standard diligence script, which Nomura then enhanced by providing additional review criteria," this assertion is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

414. **FHFA Statement:** Nomura Securities provided the third-party diligence vendors the guidelines and matrices to use in its diligence. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 62:5-11 ("Q. So what documents, if any, were provided from Nomura to AMC regarding policies, practices, procedures, systems or instructions for AMC to do its due diligence? A. The bid stips and the applicable guidelines and matrices).

    **Nomura Response:** Disputed. Although Ms. Prahofer gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. For example, AMC's corporate representative testified that "[e]ither Nomura or the seller" would provide the underwriting guidelines to AMC. Ex. 229 (Kempf Tr.) at 104:4-8; *see also, e.g.*, Ex. 596 (NOM- FHFA_04460858); Ex. 597 (NOM-FHFA_05507130) at NOM-FHFA_05507130; Ex. 598 (NOM-FHFA_05507275) at NOM-FHFA_05507275. Furthermore, the evidence cited by plaintiff does not state that Nomura Securities, as opposed to another Nomura entity, provided underwriting guidelines to due diligence vendors.

    **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 414.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants state that Ms. Prahofer's testimony is "removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt," the cited documents do not specifically contradict the asserted fact. *See* Part I.C, *supra*. While the documents Nomura cites indicate that the seller forwarded the guidelines and matrices to the diligence vendor, it was at the instruction of Nomura. For example, in Nom. Ex. 596, Jeffrey Hartnagel instructs Christine Bogharian at Alliance Bancorp to "[p]lease forward Guidelines to Clayton prior to review dates." Nom. Ex. 596 at NOM-FHFA_04460859; *see also* Nom. Ex. 597 at NOM-FHFA_05507130-31 (Mendy Sabo writes to Quicken loans: "Also, please forward a copy of your current Guidelines and matrix's to them."); Ex. 598 at NOM-FHFA_05507275-76 (Mendy Sabo writes to Rate Price: "Also, please forward a copy of your current Guidelines and matrix's to them."). Furthermore, while Defendants dispute that the evidence does not state that Nomura Securities, as opposed to another Nomura entity, provided underwriting guidelines to due diligence vendors, they identify no evidence that contradicts the asserted fact. Nomura's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*.

415. **FHFA Statement:** Nomura set the timeline for conducting the loan reviews based on "when the trade was to settle." Ex. 33 (Deposition of Jeffrey Hartnagel) at 689:13-17 ("Q. …Who set those schedules? … A. The schedule is set up by us based on when the trade was to settle."); *see, e.g.*, Ex. 147 (NOM-FHFA_05568159, email regarding Package FIRST GUARANTY\ALTA-sd-20060725-FG6628FXL – First Guaranty 25: DD.CLAYGP.Order2359) at NOM-FHFA_05568159 (In an email to Clayton, Mendy Sabo wrote: "Due diligence has been scheduled to take place on 07/05/06 through 07/10/06….").

**Nomura Response:** Disputed. Although Mr. Hartnagel gave the testimony quoted by plaintiff, and the document cited by plaintiff contains the quoted statement, those quotes are removed from the context in which they appear, and omit other testimony that must

be evaluated in order to fully understand the quoted excerpts. Neil Spagna, head of due diligence at Nomura from mid-2006 through 2007, testified that the amount of time Nomura would set to complete due diligence "varied depending on the size of the deal" and that there was no average time due to the "multitude of variables" that would go into such decisions. Ex. 27 (Spagna Tr.) at 229:6-230:15.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 415.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. The cited testimony related to there being "no average time" Nomura would set to complete diligence are irrelevant to the asserted fact that the timeline was based on "when the trade was to settle" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

416.   **FHFA Statement:** Nomura would review the qualifications and resumes of employees at the third party due diligence firms. Ex. 33 (Deposition of Jeffrey Hartnagel) at 275:18-276:14 ("Q. Okay. So do you know that there were – do you know of underwriters who were consistently on Nomura's deals? A. That's why I saw we had our specific teams of underwriters, yes. Q. How did you know that those were the same people across deals? A. 'Cause that's who we'd allow – allow to be in our deal. We had reviewed their – their resumes. Q. Okay. Yeah. Did you – you recall reviewing resumes for contract underwriters? A. I think I just said that. Q. How much underwriting experience did you look for, for someone who was allowed to work on a Nomura deal? A. At the time I don't remember, but they had to be seasoned."); Ex. 53 (Deposition of Joseph Kohout) at 256:12-17 ("Q. Did you or anybody at Nomura look at resumes of the people who were going to be doing due diligence as part of the third-party vendors? A. For the leads, absolutely, we would look leads' resumes."); *see also* Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 144:23-145:8 ("Q. Are there any policies, procedures or instructions regarding the qualifications required for Clayton's underwriters? A. I believe Mr. Hartnagel and Mr. Kohout testified as to the experience level that they communicated to Clayton that they wanted the underwriters and the Team Leader and the QC people to have.").

**Nomura Response:** Defendants do not dispute that Nomura reviewed the qualifications and resumes of employees at third-party due diligence firms.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 416.

**FHFA Reply:** Defendants do not dispute the asserted fact.

417. **FHFA Statement:** According to a Nomura presentation, "Dedicated Teams have been established at our primary due diligence Vendors who only work on Nomura loans." Ex. 34 (NOM- FHFA_05491675, Presentation entitled "Nomura Securities International, Inc. Residential Whole Loan Securitization Platform") at NOM-FHFA_05491713 ("Nomura has adopted a unique approach with all vendors to assure quality and consistency will be achieved by maintaining control of the loan files throughout the Due Diligence Process, while utilizing the same base underwriting personnel. Dedicated Teams have been established at our primary due diligence Vendors who only work on Nomura loans."); *see also* Ex. 148 (NOM-FHFA_04881240, email discussion between Nomura and RBS regarding NHELI 2006-HE3 due diligence summary and responsibilities of third-party vendors) at NOM-FHFA_04881240-41 (RBS asked for confirmation that the following is Nomura general due diligence procedures: "Nomura has an internal due diligence team that works with designated Clayton team (same Clayton employees work on all Nomura deals).").

   **Nomura Response:** Defendants do not dispute that teams were established at Nomura's primary diligence vendors to work on Nomura loans.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 417.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

418. **FHFA Statement:** Clayton had its "own specific teams that would only work on [Nomura's] deals." Ex. 33 (Deposition of Jeffrey Hartnagel) at 273:16-274:17 ("Q. Okay. So did you consider yourself or people at Nomura consider yourself that you had a unique relationship with these third- party vendors? A. I would … I would say yes. Q. Okay. What's the basis for that? A. Basis for that is that we had our own specific teams that would only work on our deals. Q. Okay. Who were those people at Clayton? … A. Sorry. We would have specific underwriters that would go out to our deals."); *id.* at 643:5-14 ("Q. Did you tell Clayton, like, 'We always want your best people for Nomura jobs'? … A. We had an approved team. So when we would call, it would be our Nomura team would go out. But if we had too many jobs going or they were strapped otherwise with the other firms, they would alert us that we may not have only our team.").

   **Nomura Response:** Undisputed that an approved team from Clayton usually worked on Nomura's deals.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 418.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

419. **FHFA Statement:** Nomura "request[ed] which project leads would be assigned to work on their transactions." Ex. 69 (Clayton 30(b)(6) Deposition of Vicki Beal) at 186:8-22 ("Q. …Now, you mentioned before we left for the lunch break that it was Clayton's clients who would specify the scope of work, right? A. That's correct. Q. And was it also

true that Clayton's clients could request which project leads would be assigned to work on their transactions? A. Some of our clients did, yes. Q. And when you say some of our clients, which ones come to mind? A. I can think of Bear Stearns, Lehman Brothers, Nomura, Morgan Stanley those come to mind, right off the bat.").

**Nomura Response:** Defendants do not dispute that Nomura requested project leads for its diligence assignments.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 419.

**FHFA Reply:** Defendants do not dispute the asserted fact.

420.   **FHFA Statement:** In response to concerns from an originator, Clayton stated: "We have often felt that our hands are somewhat tied when it comes to these reviews, as the process that has been established for Nomura reviews is to leave all but the smallest judgment calls for Nomura's review." Ex. 149 (NOM-FHFA_05502065, email regarding Ownit SP01 (0512) Loan ████████ dated Jan. 05, 2006) at NOM-FHFA_05502065 (In response to concerns from an originator, Clayton stated, "We have often felt that our hands are somewhat tied when it comes to these reviews, as the process that has been established for Nomura reviews is to leave all but the smallest judgment calls for Nomura's review.").

**Nomura Response:** Disputed. Although the document contains the statement quoted by plaintiff, that quote is removed from the context in which it appears, and omits other statements that must be evaluated in order to fully understand the quoted excerpt. The "concerns" raised by the originator were that Nomura's diligence policies, as implemented by Clayton, were too strict. For example, the sentence of the Clayton email after that quoted by plaintiff reads "I understand the reasoning behind this and don't disagree with it (in fact, with the quality of paper out there, Nomura's approach seems the most sane)." Ex. 599 (NOM-FHFA_05502065) at NOM- FHFA_05502065. Clayton also noted in this e-mail that originators were not used to the type of rigor Nomura employed in its diligence reviews, stating that this approach "is contrary to how many of these sellers are used to doing business with some of the investors out there, many of which are reviewed by us." *Id.*

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not

dispute that the cited testimony is accurately quoted. While Defendants argue that the

cited document states that Nomura's diligence policies were "too strict" or that

"originators were not used to the type of rigor Nomura employed in its diligence

reviews," Nomura's argument does not create a genuine dispute of material fact. Part

I.A, *supra*.

        2.      <u>Nomura Securities Performed No Meaningful Quality Control Of Its</u>
<u>Third-Party Vendors</u>

421.    **FHFA Statement:**  In a presentation provided to investors, Nomura stated: "In addition to loan level quality of control, our vendors will be periodically reviewed as part of ongoing operational due diligence. Vendors' processes tested will include: adequacy of internal quality controls; error rate pursuant to loan level quality control findings; and competency of personnel." Ex. 62 (Dep. Ex. 37905, email regarding Nomura Collateral Presentation, attaching presentation entitled "Residential Mortgage Initiatives" dated January 28, 2006) at NOM-FHFA_05122113.

    **Nomura Response:**  Defendants do not dispute that plaintiff's Exhibit 64 contains the text quoted by plaintiff.

    **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 421.

    **FHFA Reply:**  Defendants do not dispute the asserted fact.

422.    **FHFA Statement:**  Furthermore, in a questionnaire provided to S&P, Nomura stated: "Though we think we have picked the best vendors in the industry, Nomura's Credit Management Team will periodically review all of our vendors. The review will consist of the adequacy of internal quality controls, error rate pursuant to loan level quality control functions, and the competency of personnel." Ex. 2 (NOM-FHFA_04868979, Standard & Poor's Securitization Review) at NOM- FHFA_04868982.

    **Nomura Response:**  Defendants do not dispute that plaintiff's Exhibit 2 contains the text quoted by plaintiff.

    **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 422.

    **FHFA Reply:**  Defendants do not dispute the asserted fact.

423.    **FHFA Statement:**  In Nomura's agreement with Clayton for services related to the loan-by-loan channel, Nomura reserved the "right on a quarterly basis upon reasonable notice…to enter Clayton's premises to audit its facilities, due diligence procedures and activities, books and records (using third party auditors and quality control personnel as needed), and the Conduit Program generally, in order to accurately audit Clayton's performance of the Services and compliance with the Service Levels and the terms of this Agreement." Ex. 150 (Dep. Ex. 42304, Conduit Services Agreement with Clayton) at NOM-FHFA_05568763.

**Nomura Response:** Defendants do not dispute that plaintiff's Exhibit 150 contains the text quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 423.

**FHFA Reply:** Defendants do not dispute the asserted fact.

424. **FHFA Statement:** There is no evidence that Nomura ever exercised this right to audit Clayton or any other of its third party due diligence vendors. *See, e.g.*, Ex. 46 (Deposition of Neil Spagna) at 237:10-17 ("Q. Did you do any quality control of Clayton's work of its due diligence assistance for Nomura? … A. I don't recall. Q. Did you do any type of verification that Clayton was doing it right? A. I don't recall."); *id.* at 301:24-302:3 ("Q. Did you do any quality control – did Nomura do any quality control at all of the broker price opinion work? A. I don't recall.").

**Nomura Response:** Disputed. Testimony by Mr. Spagna that he did not recall whether certain quality control or verification was performed by Nomura is not evidence that no such quality control or verification occurred. Furthermore, although Mr. Spagna gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. Testimony in this case indicates that Nomura did review Clayton's and AMC's work on a loan pool-by-loan pool basis. Ex. 26 (Kohout Tr.) at 240:2-243:22; Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-653:24; Ex. 30 (Sabo Tr.) at 105:22-107:18. Furthermore, Clayton and AMC performed their own rigorous quality control reviews before sending results to Nomura. Ex. 229 (Kempf Tr.) at 45:7-46:9, 262:21-263:13; Ex. 230 (Beal 30(b)(6) Tr.) at 79:21-83:12. *See also* ¶ 459, *infra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 424.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants cite evidence relating to Nomura's review of Clayton and AMC's work on a loan pool-by-loan pool basis and Clayton and AMC's internal quality control reviews, they provide no evidence that contradicts the asserted fact regarding exercising the right to audit its vendors. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*. Furthermore, Defendants' assertion that "Clayton and AMC performed their own rigorous quality control reviews before sending

results to Nomura" is an argument that cannot be considered as a genuine dispute of

material fact.  Part I.A, *supra*.

425.  **FHFA Statement:**  Neil Spagna, Director of the Diligence Group in 2006-2007, did not recall if Nomura did "any quality control of Clayton's work" or "any verification that Clayton was doing it right." Ex. 46 (Deposition of Neil Spagna) at 237:10-17 ("Q.  Did you do any quality control of Clayton's work of its due diligence assistance for Nomura? … A.  I don't recall.  Q.  Did you do any type of verification that Clayton was doing it right?  A.  I don't recall."); *id.* at 301:24-302:3 ("Q.  Did you do any quality control – did Nomura do any quality control at all of the broker price opinion work?  A.  I don't recall.").

**Nomura Response:**  Disputed. Although Mr. Spagna gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. Testimony in this case indicates that Nomura performed reviews of Clayton's and AMC's work on a loan pool-by-loan pool basis. Ex. 26 (Kohout Tr.) at 240:2-243:22; Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-653:24; Ex. 30 (Sabo Tr.) at 105:22-107:18. Furthermore, Clayton and AMC performed their own rigorous quality control reviews before sending results to Nomura. Ex. 229 (Kempf Tr.) at 45:7-46:9, 262:21-263:13; Ex. 230 (Beal 30(b)(6) Tr.) at 79:21-83:12. *See also* ¶ 459, *infra*, which is incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 425.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants

cite evidence relating to Nomura's review of Clayton and AMC's work on a loan pool-

by-loan pool basis and Clayton and AMC's internal quality control reviews, they provide

no evidence that contradicts the asserted fact regarding Mr. Spagna's testimony, this

additional evidence is irrelevant and does not create a genuine dispute of material fact.

Part I.C, *supra*.

426.  **FHFA Statement:**  When asked whether he ever spot-checked the due diligence firms' process, Christopher Scampoli responded:  "I did not do that." Ex. 61 (Deposition of Christopher Scampoli) at 313:7-15 ("Q.  Did you ever spot-check their work by looking at the loan file?  A. Spot-check?  Would I – would I – would I – would I re-underwrite a file that was underwritten by a firm that was hired to underwrite the file?  Q.  Yes.  Did you?  A.  I did not do that.").

**Nomura Response:** Disputed. Although Mr. Scampoli gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. Testimony in this case indicates that Nomura performed reviews of Clayton's and AMC's work on a loan pool-by-loan pool basis. Ex. 26 (Kohout Tr.) at 240:2-243:22; Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-653:24; Ex. 30 (Sabo Tr.) at 105:22-107:18. Furthermore, Clayton and AMC performed their own rigorous quality control reviews before sending results to Nomura. Ex. 229 (Kempf Tr.) at 45:7-46:9, 262:21-263:13; Ex. 230 (Beal 30(b)(6) Tr.) at 79:21-83:12. *See also* ¶ 459, *infra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 426.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants cite evidence relating to Nomura's review of Clayton and AMC's work on a loan pool-by-loan pool basis and Clayton and AMC's internal quality control reviews, they provide no evidence that contradicts the asserted fact regarding Mr. Scampoli's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

427. **FHFA Statement:** When further asked if there were any "quality checks in place in the due diligence review process," Mr. Scampoli responded: "My role was to send it out to the due diligence firm. The due diligence firm was to prove the results. … The – the results were provided to me. And that was part of – that was what my process was, was to receive the results, review the results." Ex. 61 (Deposition of Christopher Scampoli) at 313:16-315:5 ("Q. Did you – did you ever perform a cursory review to make sure that the due diligence firm is doing their work correctly? A. I don't understand cursory review. My – my job was to – I was – managed the process. Receive the results, hire, sent – sent the data out to the due diligence firm, ordered – ordered – ordered the due diligence, received the reports and worked with the seller. Q. Did you ever perform a focus review? For instance, today you're going to look at certain aspects of the due diligence review and you're going to look at that in, say, ten files to see – to see if it was done correctly. … A. I – I don't recall. Q. Did you have quality checks in place in the due diligence review process? A. My role was to send it out to the due diligence firm. The due diligence firm was to provide the results. Q. And how did you provide – how did you ensure they were providing quality results? … A. The – the results were provided to me. And that was part of – that was what my process was, was to receive the results, review the results.").

**Nomura Response:** Disputed. Although Mr. Scampoli gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. Testimony in this case indicates that Nomura performed reviews of Clayton's and AMC's work on a loan pool-by-loan pool basis. Ex. 26 (Kohout Tr.) at 240:2-243:22; Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-653:24; Ex. 30 (Sabo Tr.) at 105:22-107:18. Furthermore, Clayton and AMC performed their own rigorous quality control reviews before sending results to Nomura. Ex. 229 (Kempf Tr.) at 45:7-46:9, 262:21-263:13; Ex. 230 (Beal 30(b)(6) Tr.) at 79:21-83:12. *See also* ¶ 459, *infra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 427.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants cite evidence relating to Nomura's review of Clayton and AMC's work on a loan pool-by-loan pool basis and Clayton and AMC's internal quality control reviews, they provide no evidence that contradicts the asserted fact regarding Mr. Scampoli's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

428. **FHFA Statement:** Furthermore, when he was asked if his role included a "quality check of the due diligence work that was performed," Mr. Scampoli stated that his "role [was] to receive information." Ex. 61 (Deposition of Christopher Scampoli) at 317:6-12 ("Q. Did your role include a – a quality check of the due diligence work that was performed? … A. My role is to receive information.").

**Nomura Response:** Disputed. Although Mr. Scampoli gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. Testimony in this case indicates that Nomura performed reviews of Clayton's and AMC's work on a loan pool-by-loan pool basis. Ex. 26 (Kohout Tr.) at 240:2-243:22; Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-653:24; Ex. 30 (Sabo Tr.) at 105:22-107:18. Furthermore, Clayton and AMC performed their own rigorous quality control reviews before sending results to Nomura. Ex. 229 (Kempf Tr.) at 45:7-46:9, 262:21-263:13; Ex. 230 (Beal 30(b)(6) Tr.) at 79:21-83:12. *See also* ¶ 459, *infra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 428.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants cite evidence relating to Nomura's review of Clayton and AMC's work on a loan pool-by-loan pool basis and Clayton and AMC's internal quality control reviews, they provide no evidence that contradicts the asserted fact regarding Mr. Scampoli's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

429.   **FHFA Statement:** Jeffrey Hartnagel could not answer whether he recalled "participating in a – an audit that tested the adequacy of the internal quality controls of Clayton or AMC." Ex. 33 (Deposition of Jeffrey Hartnagel) at 370:15-371:9 ("Q. … Do you remember ever participating in an audit of Clayton or AMC concerning the adequacy of their internal controls? A. I remember many, not necessarily at Nomura. Q. Okay. At Nomura do you remember ever – A. I – Q. – participating in any – A. – I can't answer. Q. Can you let me finish? A. Sorry. Q. At Nomura do you remember participating in a – an audit that tested the adequacy of the internal quality controls of Clayton or AMC? A. I cannot honestly answer that yes or no."); *id.* at 373:9-374:7 ("Q. … Do you ever -- do you remember ever participating or seeing the results in -- of an audit of due diligence vendors concerning their error rate at Nomura? A. I can't remember if specifically it was at Nomura. Q. Do you ever remember participating in something like that? A. Many times. Q. Okay. But not at Nomura? A. I can't remember specifically if it was. Q. Okay. What other entities that you worked for did you participate in those sort of audits? A. Credit Suisse, Lehman Brothers, Merrill Lynch, my current position, S&P. Q. But you don't remember at Nomura? A. I'm assume -- I can't specifically remember any specific one.").

**Nomura Response:** Disputed. Although Mr. Hartnagel gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. Testimony in this case indicates that Nomura performed reviews of Clayton's and AMC's work on a loan pool-by-loan pool basis. Ex. 26 (Kohout Tr.) at 240:2-243:22; Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-653:24; Ex. 30 (Sabo Tr.) at 105:22-107:18. Furthermore, Clayton and AMC performed their own rigorous quality control reviews before sending results to Nomura. Ex. 229 (Kempf Tr.) at 45:7-46:9, 262:21-263:13; Ex. 230 (Beal 30(b)(6) Tr.) at 79:21-83:12. *See also* ¶ 459, *infra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 429.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants cite evidence relating to Nomura's review of Clayton and AMC's work on a loan pool-by-loan pool basis and Clayton and AMC's internal quality control reviews, they provide no evidence that contradicts the asserted fact regarding Mr. Hartnagel's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

430. **FHFA Statement:** In addition, Mr. Hartnagel could not recall if he "personally or directed anyone else at Nomura to look at the work that the third-party diligence firms had done specifically to determine whether they had investigated misrepresentation red flags." Ex. 33 (Deposition of Jeffrey Hartnagel) at 585:5-586:2 ("Q. Sure. At Nomura, did you ever undertake any review of the loan files that the due diligence firms underwrote or order somebody else to undertake such a review to determine whether the diligence firms has been invest – had been catching and investigating red flags of misrepresentation? … A. I don't recall if I did any specific re- underwriting. Q. I am asking specifically about this issue of misrepresentation red flags, not underwriting in general. Do you know if you ever – you personally or directed anyone else at Nomura to look at the work that the third-party diligence firms had done specifically to determine whether they had investigated misrepresentation red flags? … A. I don't recall.").

**Nomura Response:** Disputed. Although Mr. Hartnagel gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. Testimony in this case indicates that Nomura performed reviews of Clayton's and AMC's work on a loan pool-by-loan pool basis. Ex. 26 (Kohout Tr.) at 240:2-243:22; Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-653:24; Ex. 30 (Sabo Tr.) at 105:22-107:18. Furthermore, Clayton and AMC performed their own rigorous quality control reviews before sending results to Nomura. Ex. 229 (Kempf Tr.) at 45:7-46:9, 262:21-263:13; Ex. 230 (Beal 30(b)(6) Tr.) at 79:21-83:12. *See also* ¶ 459, *infra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 430.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants cite evidence relating to Nomura's review of Clayton and AMC's work on a loan pool-by-loan pool basis and Clayton and AMC's internal quality control reviews, they provide no evidence that contradicts the asserted fact regarding Mr. Hartnagel's testimony.

Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

431. **FHFA Statement:** Mendy Sabo also could not recall if he did "the QC as a general matter over the work of the vendors" or if Nomura had "any formal quality control process that was being employed to the third-party due diligence firms." Ex. 49 (Deposition of Mendy Sabo) at 154:21-155:9 ("Q. Did you do the QC as a general matter over the work of the vendors? … A. I don't recall. Q. Do you know one way or another whether there was any formal quality control process that was being employed to the third-party due diligence firms? A. By whom? Q. Nomura. A. I don't recall. The firms themselves had significant QC in place in their process.")

**Nomura Response:** Disputed. Although Mr. Sabo gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. Testimony in this case indicates that Nomura performed reviews of Clayton's and AMC's work on a loan pool-by-loan pool basis. Ex. 26 (Kohout Tr.) at 240:2-243:22; Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-655:23; Ex. 30 (Sabo Tr.) at 105:22-107:18. Furthermore, Clayton and AMC performed their own rigorous quality control reviews before sending results to Nomura. Ex. 229 (Kempf Tr.) at 45:7-46:9, 262:21-263:13; Ex. 230 (Beal 30(b)(6) Tr.) at 79:21-83:12. *See also* ¶ 459, *infra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 431.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants cite evidence relating to Nomura's review of Clayton and AMC's work on a loan pool-by-loan pool basis and Clayton and AMC's internal quality control reviews, they provide no evidence that contradicts the asserted fact regarding Mr. Sabo's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

432. **FHFA Statement:** Brett Marvin also did not recall if "Nomura ever perform[ed] any kind of audit or quality assurance review of … Clayton and/or AMC." Ex. 31 (Deposition of Brett Marvin) at 236:13-17 ("Q. Okay. Did Nomura ever perform any kind of audit or quality assurance review of the – of Clayton and/or AMC? … THE WITNESS: I don't recall.").

**Nomura Response:** Disputed. Although Mr. Marvin gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. Testimony in this case indicates that Nomura performed reviews of Clayton's and AMC's work on a loan pool-by-loan pool basis. Ex. 26 (Kohout Tr.) at 240:2-243:22; Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-655:23; Ex. 30 (Sabo Tr.) at 105:22-107:18. Furthermore, Clayton and AMC performed their own rigorous quality control reviews before sending results to Nomura. Ex. 229 (Kempf Tr.) at 45:7-46:9, 262:21-263:13; Ex. 230 (Beal 30(b)(6) Tr.) at 79:21-83:12. *See also* ¶ 459, *infra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 432.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants cite evidence relating to Nomura's review of Clayton and AMC's work on a loan pool-by-loan pool basis and Clayton and AMC's internal quality control reviews, they provide no evidence that contradicts the asserted fact regarding Mr. Marvin's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

433. **FHFA Statement:** John Graham could not recall whether "Nomura ever [did] any QC of the work of its third-party due diligence firms." Ex. 24 (Deposition of John Graham) at 216:17-21 ("Q. Did – did Nomura ever do any QC of the work of its third-party due diligence firms? … A. I don't recall.").

**Nomura Response:** Disputed. Although Mr. Graham gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. Testimony in this case indicates that Nomura performed reviews of Clayton's and AMC's work on a loan pool-by-loan pool basis. Ex. 26 (Kohout Tr.) at 240:2-243:22; Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-655:23; Ex. 30 (Sabo Tr.) at 105:22-107:18. Furthermore, Clayton and AMC performed their own rigorous quality control reviews before sending results to Nomura. Ex. 229 (Kempf Tr.) at 45:7-46:9, 262:21-263:13; Ex. 230 (Beal 30(b)(6) Tr.) at 79:21-83:12. *See also* ¶ 459, *infra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 433.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants cite evidence relating to Nomura's review of Clayton and AMC's work on a loan pool-by-loan pool basis and Clayton and AMC's internal quality control reviews, they provide no evidence that contradicts the asserted fact regarding Mr. Graham's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

434. **FHFA Statement:** When asked if Nomura had "any quality control or checks done on AMC and Clayton's due diligence work," John Graham testified that "Clayton had internal QC reviews of the loans that they underwrote." Ex. 24 (Deposition of John Graham) at 216:9-14 ("Q. Was there any quality control or checks done on AMC and Clayton's due diligence work? A. Clayton had internal QC reviews of the loans that they underwrote --").

**Nomura Response:** Disputed. Although Mr. Graham gave the testimony quoted by plaintiff, and the record shows that Clayton had internal quality control reviews, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. Testimony in this case indicates that Nomura performed reviews of Clayton's and AMC's work on a loan pool-by-loan pool basis. Ex. 26 (Kohout Tr.) at 240:2-243:22; Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-655:23; Ex. 30 (Sabo Tr.) at 105:22-107:18. Furthermore, Clayton and AMC performed their own rigorous quality control reviews before sending results to Nomura. Ex. 229 (Kempf Tr.) at 45:7-46:9, 262:21-263:13; Ex. 230 (Beal 30(b)(6) Tr.) at 79:21-83:12. *See also* ¶ 459, *infra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 434.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants cite evidence relating to Nomura's review of Clayton and AMC's work on a loan pool-by-loan pool basis and Clayton and AMC's internal quality control reviews, they provide no evidence that contradicts the asserted fact regarding Mr. Graham's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

435. **FHFA Statement:** Nancy Prahofer, Nomura's 30(b)(6) representative, testified: "We hired Lydian because it was a professional due diligence provider and had the experience and expertise to perform that service, so, no, that's what we were buying, their ability to re-underwrite and QC." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 59:21-60:6 ("Q. Was there any written document going from Nomura to Lydian regarding how Lydian should QC its work? A. We hired Lydian because it was a professional due diligence provider and had the experience and expertise to perform that service, so, no, that's what we were buying, their ability to re-underwrite and QC.").

**Nomura Response:** Defendants do not dispute that Ms. Prahofer gave the testimony quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 435.

**FHFA Reply:** Defendants do not dispute the asserted fact.

436. **FHFA Statement:** Nomura's corporate representative also testified regarding AMC: "There was not an attempt to instruct AMC how to quality control its own work." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 68:10-16 ("Q. Okay. And with regard to AMC, did Nomura provide any written direction regarding how AMC should quality control its work? A. There was not an attempt to instruct AMC how to quality control its own work." ).

**Nomura Response:** Defendants do not dispute that Ms. Prahofer gave the testimony quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 436.

**FHFA Reply:** Defendants do not dispute the asserted fact.

(a) *Post-Closing Quality Control Review By IngletBlair*

437. **FHFA Statement:** Nomura's production shows evidence of only one post-closing quality control audit performed by IngletBlair, LLC.

**Nomura Response:** Disputed. Although this is the only quality control audit of Nomura's credit and compliance results that Nomura was able to locate seven to nine years after the relevant time period, other documents in Nomura's production indicate that IngletBlair performed additional quality control reviews for Nomura. For example, the Nomura due diligence team reached out to IngletBlair in May 2005 to start working with the firm on "a new QC review, most likely starting right after the 4th of July with you." Ex. 600 (NOM-FHFA_05718443) at NOM- FHFA_05718443. There were also internal discussions at Nomura about an upcoming IngletBlair quality control review in November and December 2005. *See, e.g.*, Ex. 601 (NOM- FHFA_05499988) at NOM-FHFA_05499988-9889. IngletBlair also performed reviews of underwriting guidelines. *See, e.g.*, Ex. 192 (NOM-FHFA_05229879) at NOM- FHFA_05229879.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 437.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants dispute the asserted fact, they identify no evidence that contradicts it.  Part I.B, *supra*. The cited documents do not provide evidence that another post-closing quality control audit was actually conducted.  In addition, while Defendants "dispute" the asserted fact on the basis that there were discussions regarding an upcoming IngletBlair quality control review, citing Nom. Ex. 601, Defendants' assertion is not supported by the cited Exhibit. Nom. Ex. 601 explicitly states: "This is the firm that *will be* doing the quality control – though *this is not yet in operations*."  Nom. Ex. 601 at NOM-FHFA_05499989 (emphasis added).

438.  **FHFA Statement:**  The review, which was conducted between July and August of 2006, included 189 loans for review which were selected from a sampling of 6,815 loans of their top 15 sellers. Ex. 151 (NOM-FHFA_05368388, email regarding Inglet QC Sample file) at NOM-FHFA_05368388 (In an email to Sandy Inglet on July 6, 2006, Mendy Sabo wrote: "Attached is the sample file for Inglet Blair to review and perform QC for on our vendors and process. It consists of 189 files."); Ex. 361 (NOM-FHFA_05368854, email FW: Nomura 1st and 2nd Quarter PCQC Initial Documents) at  NOM-FHFA_05368854 (illustrating that the results were delivered on August 24, 2006).

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 438.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

439.  **FHFA Statement:**  The loans included 13 trade pools from at-issue securitizations: Allstate SP07 & SP08, Equifirst SP01, Fund America SP03, Opteum SP01, Ownit SP01, Peoples Choice SP01, Pinnacle Financial SP02, Quick Loan SP09 & SP10,  Novastar SP02, United SP01, and Wells SP01.  Ex. 152 (NOM-FHFA_05368390) (spreadsheet "Inglet Sample file.xls" Column H "deal name"); Ex. 16 to the Cipione Decl. (Column E "Deal Name").

**Nomura Response:**  Disputed. The documents cited by plaintiff show that loans reviewed by IngetBlair included loans from 13 trade pools that contributed loans to the

at-issue Securitizations. Thirty-nine of the 189 loans IngletBlair reviewed were SLG loans. Ex. 602 (NOM-FHFA_05368856) at NOM-FHFA_05368856.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 439.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The evidence regarding the number of reviewed loans that were SLG loans is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

440. **FHFA Statement:** Loans were rated by "event levels" from 1 to 4 as indicated below. Ex. 363 (NOM- FHFA_05718445, June 9, 2005, Nomura Post-Closing Quality Control Proposal) at NOM- FHFA_05718446 ( "Post Closing Risk grade using the following grading system").

• Level 1 – "The loan is eligible, its value is supported, and it adheres to guidelines. The underwriter accurately assessed the credit grade and there was no need for compensating factors in assigning the credit grade.

• Level 2 – "The loan is eligible, its value is supported, and it adheres to guidelines. Minor exceptions. Compensating factors played a role in assigning a credit grade. IngletBlair underwriters believe credit grade is reasonable in light of the compensating factors."

• Level 3 – "The loan falls outside of the originator guidelines and deemed to be a potential default risk. Risk factors exist even after compensating factors are taken into consideration. Property value not supported and/or BPO value variance exceeds minus fifteen percent (-15%). IngletBlair underwriters believe this loan should be rejected by the investor."

• Level 4 – "The loan is missing critical documentation to determine loan eligibility."

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 440.

**FHFA Reply:** Defendants do not dispute the asserted fact.

441. **FHFA Statement:** The results of the IngletBlair review were delivered on August 24, 2006. Ex. 154 (NOM-FHFA_05368856, "Nomura_Credit_&_Capital,_Inc._IntialResults_8.23.06.xls") at NOM-FHFA_05368856 (dated August 24, 2006, Column D "StatusDetailDD"); Ex. 361 (NOM- FHFA_05368854, email FW: Nomura 1st and 2nd Quarter PCQC Initial Documents) at NOM- FHFA_05368854 (illustrating that the results were delivered on August 24, 2006).

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 441.

**FHFA Reply:** Defendants do not dispute the asserted fact.

442. **FHFA Statement:** These results showed that 65 of the 189 loans had not been sampled for due diligence at the time of acquisition. Ex. 154 (NOM-FHFA_05368856, "Nomura_Credit_&_Capital,_Inc._IntialResults_8.23.06.xls") at NOM-FHFA_05368856 (Column D "StatusDetailDD").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 442.

**FHFA Reply:** Defendants do not dispute the asserted fact.

443. **FHFA Statement:** 120 loans had been assigned final grades of EV1 or EV2 by Nomura Securities vendors at the time of acquisition diligence. *id.*

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 443.

**FHFA Reply:** Defendants do not dispute the asserted fact.

444. **FHFA Statement:** Of these 120 loans, the IngletBlair review assigned an event "Level 4" to 29 loans. *id.* at NOM-FHFA_05368856 (Column A "Overall Event Level" and Column D "StatusDetailDD").

**Nomura Response:** Disputed. Although the IngletBlair review assigned an event "Level 4" to 29 loans, that grading does not signify that the due diligence vendors reviewing those 29 loans lacked critical documentation needed to underwrite those loans at the time they were reviewed. To the contrary, the record in this case shows that diligence vendors often sought and obtained additional documentation during the course of their underwriting reviews. Ex. 27 (Spagna Tr.) at 256:20-257:5; Ex. 229 (Kempf Tr.) at 83:2-85:3; Ex. 230 (Beal 30(b)(6) Tr.) at 50:15-22; Ex. 352 (Hunter Tr.) at 213:25-215:9. There is no evidence that such information was included in the loan files obtained by IngletBlair.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 444.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited documents relating to the vendors seeking additional documentation is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

445. **FHFA Statement:** Of these 120 loans, it assigned an event "Level 3" to 7 loans. *id.*

   **Nomura Response:** Undisputed.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 445.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

446. **FHFA Statement:** Of these 120 loans, it assigned an event "Level 2" to 18 loans. *id.*

   **Nomura Response:** Undisputed.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 446.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

447. **FHFA Statement:** Of these 120 loans, it assigned an event "Level 1" to 55 loans. *id.*

   **Nomura Response:** Undisputed.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 447.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

448. **FHFA Statement:** Of these 120 loans, the IngletBlair review assigned an event "level 0" to 11 loans whose files were not delivered. *id.* at NOM-FHFA_05368856 (Column A "Overall Event Level," Column C "Loan Status" and Column D "StatusDetailDD").

   **Nomura Response:** Undisputed.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 448

   **FHFA Reply:** Defendants do not dispute the asserted fact.

449. **FHFA Statement:** Thirty percent of the loans that were originally assigned a final grade of EV1 or EV2 were assigned Level 3 or 4. *id.* at NOM-FHFA_05368856 (Column A "Overall Event Level" and Column D "StatusDetailDD").

**Nomura Response:** Disputed. See ¶ 444, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 449.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. FHFA's reply to ¶ 444 is incorporated by reference as if fully state here in. The cited documents relating to the vendors seeking additional documentation in ¶ 444 is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

450. **FHFA Statement:** The information regarding the loans reviewed by Inglet Blair, the loans graded EV1 by Nomura, the loans not reviewed by Nomura, and the loans in the SLGs is summarized in Ex. 17 to the Cipione Decl.

**Nomura Response:** Disputed. Exhibit 17 to the Cipione Declaration does not accurately represent the results of the Inglet Blair review. Of the 65 loans reviewed by IngletBlair that were not previously reviewed by Clayton or AMC, 36 loans (55.4%) were graded 1 or 2, with only five loans graded 3 (7.7%), and an additional 24 where insufficient loan file documentation precluded a full review (36.9%). See Ex. 602 (NOM-FHFA_05368856) at NOM-FHFA_05368856. This is significantly lower than the 16.0% of loans graded "3" by Clayton and AMC in their review of 26,799 loans in the at-issue trade pools. See Mishol Decl. Ex. 9 at 3. Thirty-nine of the loans IngletBlair reviewed were supporting loan group loans. Of these loans, IngletBlair found that only five loans (12.8%) were 3s. See Ex. 602 (NOM-FHFA_05368856) at NOM- FHFA_05368856. Again, this is significantly lower than the 16.0% of loans graded "3" by Clayton and AMC in their review of 26,799 loans in the at-issue trade pools. See Mishol Decl. Ex. 9 at 3. Furthermore, there is no evidence that the 189 loans were selected randomly or pursuant to plaintiff's "statistically valid" sampling methodology—the report of plaintiff's due diligence expert, Leonard A. Blum, does not present evidence regarding the sampling methodology employed for this review. Ex. 603 (Nov. 10 Blum Report) at ¶¶ 255-264. Even though the sampling method for this review is unclear, Mr. Blum testified that even if the sample was not statistically valid, the results were still "strong evidence of a red flag. It absolutely is," Ex. 185 (Blum Tr.) at 301:4-23; Ex. 603 (Nov. 10 Blum Report) at ¶ 261 (IngletBlair's review of 189 loans in July 2006 constitutes "strong evidence" that "about one-third of the loans that Nomura never subjected to credit and compliance diligence review either deviated materially from underwriting guidelines or were missing critical documentation."), even though plaintiff and its expert claim that positive inferences cannot be drawn from the low defect rates found in Nomura's much-larger credit and compliance due diligence samples. Ex. 185 (Blum Tr.) at 270:15-271:17.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 450.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Exhibit 17 to the Cipione Declaration does indicate that 65 loans reviewed by IngletBlair were not previously reviewed, 36 loans were graded 1 or 2 that were not previously sampled, 20 loans were graded 3 or 4 that were not previously sampled, and 39 of the loans Inglet Blair reviewed were supporting loan group loans.  Defendants assertions that that five loans were graded a 3 that had not previously been sampled and five loans that were in the SLGs were graded as 3s is irrelevant to the asserted fact and therefore does not create genuine dispute of material fact.  Part I.C, *supra*.  While Defendants "dispute" the asserted fact on the basis that 24 loans that had not previously been sampled had "insufficient file documentation" to preclude a full review, citing Nomura Ex. 602, Defendants' assertion is not supported by the cited Exhibit.  Nom. Ex. 602 indicates that 9 loans received a grade of 0 because the file was not delivered while 15 loans received a grade of 4 which indicated that the loans were "fully underwritten"  and were determined to be "missing critical documentation."  Nom. Ex. 602 at NOM-FHFA_05368856 (column A indicating overall event level, column C indicating loan status, and column D indicating statusDetailDD).   Finally, Defendants' assertions regarding Clayton and AMC's review of the loans in the at-issue loan pools and the selection method for the loans in the IngletBlair quality control audit are irrelevant to the asserted fact and do not create a genuine dispute of material fact.  Part I.C, *supra*.

451.   **FHFA Statement:**  There is no evidence that Nomura conducted any additional diligence on the loans its vendors graded as EV1 or EV2.

**Nomura Response:**  Disputed. Joseph Kohout, Nomura's head of due diligence in 2005 through mid-2006, testified that Nomura diligence employees reviewed all EV2s and

298

EV3s, and 25 to 50 percent of the EV1s. Ex. 26 (Kohout Tr.) at 240:2-243:22. Jeffrey Hartnagel testified that Nomura's diligence employees reviewed all of the loans graded 2 or 3, and also attempted to review all of the loans graded 1 "[d]epending on the size of the trade, the number of loans reviewed." Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-653:24. Mendy Sabo testified that "[a]ll of the findings" received from Clayton or AMC "would be personally reviewed by somebody at Nomura." Ex. 30 (Sabo Tr.) at 105:22-107:18.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 451.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants dispute the asserted fact, they identify no evidence that contradicts it. Defendants' assertions regarding the review of EV1s and EV2s does not directly contravene the asserted fact. Nomura's conclusory assertions do not create a genuine dispute of material fact. Parts I.B, I.C, *supra*.

452. **FHFA Statement:** Of the 1,758 loans for which data is available that were securitized in the NHELI 2006-HE3 SLG, 1,448 of those loans received final grades of EV1 or EV2 for credit and compliance (82.366%). Ex. 5 to Cipione Decl. (filter Column W for "Yes" and Column V for "NHELI 2006-HE3" (1,758 loans); filter Column E for "1" and "2" and Column F for "1" and "2" (1,448 loans)).

**Nomura Response:** Disputed. Nomura performed credit and compliance diligence on 1,967 loans in NHELI 2006-HE3, a total of 54.4% of the loans in that supporting loan group. Mishol Decl. Ex. 7; Mishol Decl. Ex. 10. Of these loans, 89.2% were graded 1 or 2, and 10.8% were graded EV3. Mishol Decl. Ex. 10. Furthermore, some loans graded 3 by the vendors might have been purchased after additional documents were located or due to overlay waivers, but which would have resulted in a grade of 1 or 2 had the vendor been aware of those subsequent developments. *See, e.g.*, Ex. 229 (Kempf Tr.) at 265:23-266:14 (Nomura could have purchased loans graded as a 3 because "an originator . . . sent a document to Nomura after AMC's review had concluded" or because "Nomura . . . decided to waive one of its overlays.").

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 452.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants dispute the number of loans that received final grades of EV1 or EV2 for credit or compliance in the NHELI 2006-HE3 SLG, any such dispute is not material to FHFA's

motion. *See Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) ("[I]t

must be remembered that the mere existence of factual issues—where those issues are not

material to the claims before the court—will not suffice to defeat a motion for summary

judgment"). Furthermore, Ex. 5 to the Cipione Declaration accurately depicts the number

of loans that received final grades of EV1 or EV2 for credit or compliance in the NHELI

2006-HE3 SLG based on the "loans for which data [was] available" at the time of filing.

In addition, Ex. 10 the Mishol Declaration, which includes data that was not available at

the time of filing, indicates that the number of loans that received final grades of EV1 or

EV2 for credit and compliance is actually higher (89.2%) than depicted in Ex. 5 to the

Cipione Declaration (82.366%).

>    (b)    *Nomura Securitized All The Loans Its Vendors Graded As Suitable*
>           *For Acquisition Without Nomura Securities Reviewing Any Of The*
>           *Underlying Loan Files*

453.    **FHFA Statement:** The diligence firms conducting diligence would assign a "grade" to
each loan of an Event Level 1 ("EV1"), Event Level 2 ("EV2"), or Event Level 3
("EV3"). Ex. 69 (Clayton 30(b)(6) Deposition of Vicki Beal) at 59:5-11 ("Q. So let's
then talk about the actual grades that Clayton would assign. I understand that there was a
period of time that Clayton would assign grades of 1, 2 or 3 to a loan; is that correct? A.
That's correct.); Ex. 46 (Deposition of Neil Spagna) at 245:22-246:4 ("Q. -- but -- but
let's go over them again. Did Clayton and AMC use a number system in order to report
the results that they had done on the sample? A. The credit event grades and the
compliant event grades, yes.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 453.

**FHFA Reply:** Defendants do not dispute the asserted fact.

454.    **FHFA Statement:** A grade of EV1 indicated that the loan complied with the originator's
underwriting guidelines. Ex. 33 (Deposition of Jeffrey Hartnagel) at 309:18-20 ("Q.
What did EV1 mean? A. Everything – the loan met and was within the guidelines.");
Ex. 46 (Deposition of Neil Spagna) at 246:5-8 ("Q. Okay. And – and what do the
numbers mean? What's Number 1 mean? A. Credit Event 1 was a loan that met

guidelines."); *see also* Ex. 150 (Dep. Ex. 42304, Conduit Services Agreement with Clayton) at NOM-FHFA_05568766 (Defining Grade 1 as "[t]he loan is eligible, guidelines were adhered to, the underwriter accurately assessed the credit grade, and there was no need for compensating factors in assigning the credit grade.").

**Nomura Response:** Disputed. Although Mr. Spagna gave the testimony quoted by plaintiff, and the document cited by plaintiff contains the quoted statement, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. According to testimony given in this case, a grade of 1 typically indicated that a loan complied with both the underwriting guidelines and any Nomura overlays or bid stipulations applied to that transaction. Ex. 230 (Beal 30(b)(6) Tr.) at 59:12-25; Ex. 229 (Kempf Tr.) at 68:22-69:11.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 454.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. First, Defendants do not dispute that the definition of EV1 includes the language cited by Plaintiff. While Defendants "dispute" the asserted fact on the basis that a grade of 1 typically indicated that the loan complied with bid stipulations applied to that transaction, citing Nom. Exs. 229 and 230, Defendants' assertion is not supported by the cited Exhibits. Neither Exs. 229 or 230 include bid stipulations within the definition of an EV1. In addition, while Defendants "dispute" the asserted fact on the basis that a grade of 1 typically indicated that the loan complied with client overlays, citing Nom. Ex. 229, Defendants' assertion is not supported by the cited Exhibit. Ex. 229 does not include the term overlays in its definition of an EV1. Furthermore, Defendants cite additional testimony from Nom. Exs. 229 and 230 which fails to directly contradict the asserted fact. The general definition of an EV1 in Nom. Exs. 229 and 230 does not contradict the specific evidence of what the grade of EV1 meant in the context of reviews for Nomura. Finally, any such dispute is immaterial because Nomura does not provide any evidence that it meaningfully reviewed EV1s. *Quarles*, 758 F.2d at 840.

455. **FHFA Statement:** A grade of EV2 indicated that the loan "did not meet one or more specific criteria in the guidelines, but that there were compensating factors." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 82:17-83:5 ("Q. Okay. I'm going to try to get specific language, but do you generally understand that an EV2 meant that the loan does not meet guidelines, but the third-party due diligence provider believes there were sufficient compensating factors. A. It's my understanding that EV2 means that the loan did not meet one or more specific criteria in the guidelines, but that there were compensating factors that suggested that the loan substantially complied."); Ex. 33 (Deposition of Jeffrey Hartnagel) at 409:21-25 ("Q. Okay. And then 'Outside Seller Guidelines With Comp Factors,' that's 77. What does that refer to? A. That would be your EV2s.").

**Nomura Response:** Disputed. Although Ms. Prahofer and Mr. Hartnagel gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. According to testimony given in this case, a grade of 2 indicated that the due diligence vendor had identified at least one deviation from the guideline or overlay requirements, but also judged either that the deviations were immaterial or that an exception was warranted because the deviations were offset by sufficient compensating factors. Ex. 230 (Beal 30(b)(6) Tr.) at 60:10-61:24; Ex. 315 (Beal Fact Tr.) at 42:10-46:12; Ex. 229 (Kempf Tr.) at 77:11-81:12.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 455.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. First, Defendants do not dispute that the definition of EV2 includes the language cited by Plaintiff. While Defendants "dispute" the asserted fact on the basis that a grade of 2 indicated that the due diligence vendor had identified at least one deviation from the guideline or overlay requirements, citing Nom. Exs. 229, 230, and 315, Defendants' assertion regarding deviations from overlay requirements is not supported by the cited Exhibits. Nom. Ex. 229 does not state that an EV2 was a deviation from overlay requirements but instead states that "we would give an Event Level 2 if a loan was outside of guidelines but there were compensating factors to offset that variance from the guideline." Nom. Ex. 229 at 77:22-78:2. Nom. Ex. 230 indicates that "[a] grade 2 was that there was a minor deviation from the guidelines we were underwriting to. And we felt it was offset by

compensating factors." Nom. Ex. 330 at 60:12-15. Finally, in Nom. Ex. 315, Ms. Beal

agrees that "an Event Grade 2 could be either a nonmaterial exception or a material

exception with compensating factors." Nom. Ex. 315 at 44:13-25. Furthermore,

Defendants cite additional testimony from Nom. Exs. 229, 230, and 315 which fails to

directly contradict the asserted fact. The general definition of an EV2 in Nom. Exs. 229,

230, and 315 does not contradict the specific evidence of what the grade of EV2 meant in

the context of reviews for Nomura. Finally, any such dispute is immaterial because

Nomura does not provide any evidence that it meaningfully reviewed EV2s. *Quarles*,

758 F.2d at 840.

456. **FHFA Statement:** A grade of EV3 indicated that the loan was "outside of guidelines" and was "an unacceptable risk." Ex. 46 (Deposition of Neil Spagna) at 246:14-18 ("Q. And what's a Credit Event 3? A. Based on what was in the file, that loan is an unacceptable risk." Q. Okay. A. Outside of guidelines too."); *see also* Ex. 150 (Dep. Ex. 42304, Conduit Services Agreement with Clayton) at NOM-FHFA_05568766 (Defining Grade 3 as "[t]he loan falls outside the originator guidelines or the credit risk does not appear to be appropriate even when considering compensating factors. Warrants detailed review by investor to evaluate risk."); Ex. 61 (Deposition of Christopher Scampoli) at 352:14-353:10 ("Q. So how about an Event Level 3 report? … A. … [A] 3 would be a loan that was falling outside, was – the script was saying a loan was – a document was missing or it didn't fit the guidelines ….").

**Nomura Response:** Disputed. Although Mr. Spagna and Mr. Scampoli gave the testimony quoted by plaintiff, and the document cited by plaintiff contains the quoted statement, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. According to testimony taken in this case, a grade of 3 indicated one of three things: (i) the loan did not meet some aspect of the originator underwriting guidelines (which could result from, among other things, documents missing from the loan file); (ii) the loan could not be evaluated against the underwriting guidelines due to missing documents; or (iii) the loan was flagged in accordance with a Nomura overlay. Ex. 230 (Beal 30(b)(6) Tr.) at 66:20-67:18; Ex. 315 (Beal Fact Tr) at 41:17-42:9, 46:13-49:7; Ex. 229 (Kempf Tr.) at 81:14-82:15. The due diligence vendors testified that a grade of 3 did not indicate that a loan posed an unacceptable credit risk or that the loan would not perform, and third-party diligence providers did not purport to make such determinations. Ex. 315 (Beal Fact Tr.) at 48:18-49:7; Ex. 229 (Kempf Tr.) at 82:16-25.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 456.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the definition of EV3 includes the language cited by Plaintiff. Furthermore, Defendants cite additional testimony from Nom. Exs. 229, 230, and 315 which fails to directly contradict the asserted fact. The general definition of an EV3 in Nom. Exs. 229, 230, and 315 does not contradict the specific evidence of what the grade of EV3 meant in the context of reviews for Nomura. Finally, any such dispute is immaterial because Nomura does not provide any evidence of loans that received EV3 grades based on exceptions to Nomura overlays. *Quarles*, 758 F.2d at 840.

457. **FHFA Statement:** Jeffrey Hartnagel did not recall a policy or procedure governing the "process of deciding whether a compensating factor was sufficient." Ex. 33 (Deposition of Jeffrey Hartnagel) at 493:22-494:24 ("Q. Okay. So for you and Mendy and the Nomura diligence staff, was there ever kind of like any policy or written agreement about, you know, how that process of deciding whether and a compensating factor was sufficient would be made? . . . A. Was there any written? Q. Was there a policy or procedure governing that? A. Not that I recall. Q. Okay. So is it the case that you and Joe and Mendy would review these reports and, in your individual and collective experience, which was considerable, you would individually make the call based on your best judgment about whether a compensating factor was sufficient to compensate for the exception in the loan? A. Based on -- … A. Based on the information provided.").

**Nomura Response:** Disputed. Although Mr. Hartnagel gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. Vicki Beal, the 30(b)(6) deposition witness for Clayton, testified that review of compensating factors required discretion and judgment since these factors were "subjective" and reasonable people could differ as to whether a particular compensating factor offsets an exception. Ex. 230 (Beal 30(b)(6) Tr.) at 63:2-12. Joseph Kohout agreed that Nomura diligence employees and Nomura's vendors exercised their judgment in applying compensating factors, but that Nomura provided "some guidance [to vendors] . . . to kind of remove some of the subjectivity from that." Ex. 26 (Kohout Tr.) at 231:21-232:20. Mr. Kohout further testified that the ultimate decisions on compensating factors rested with the Nomura due diligence team. *Id.* at 233:7-14.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 457.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants cite evidence relating to the subjective nature of reviewing compensating factors, they provide no evidence that contradicts the asserted fact regarding Mr. Hartnagel's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

458. **FHFA Statement:** Nomura did not have a "a list of potential compensating factors that the third-party diligence firm could reference." Ex. 3 (Deposition of N. Dante LaRocca) at 83:15-85:7 ("Q. You mentioned there was compensating factors sometime that would cause you to not seek further review. What were those compensating factors? A. A compensating factor would be, you know, anything that the underwriter in the origination of the loan or our diligence guys thought offset the exception that was taken to guidelines or the -- or the thing -- the -- the fact that was raising the red flag. So it could be anything -- anything that they viewed as sufficient to offset. Q. Did you have a suggested list of compensating factors that -- A. No. Q. -- Nomura -- A. Oh, sorry. Q. Did -- did you have a -- a -- a list of potential compensating factors that the third-party diligence firm could reference? A. No. Q. Do you know, did they have a suggested list of compensating factors that they could reference? A. I don't know. Q. It was your understanding there was -- there was no pre-established list of compensating factors or -- well, I'll ask a follow-up question. But it was your understanding there was no pre-established list of compensating factors; is that correct? … A. Yeah, I'm not aware of any established list. The -- that process underwriting the loan is -- has some subjective factors, so compensating factors would probably fall within that. It's more subjective than a -- than a checklist kind of thing.").

**Nomura Response:** Disputed. Although Mr. LaRocca gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. Vicki Beal, the 30(b)(6) deposition witness for Clayton, testified that review of compensating factors required discretion and judgment since these factors were "subjective" and reasonable people could differ as to whether a particular compensating factor offsets an exception. Ex. 230 (Beal 30(b)(6) Tr.) at 63:2-12. Joseph Kohout agreed that Nomura diligence employees and Nomura's vendors would exercise their judgment in applying compensating factors, but that Nomura provided "some guidance [to vendors] . . . to kind of remove some of the subjectivity from that." Ex. 26 (Kohout Tr.) at 231:21-232:20. Mr. Kohout further testified that the ultimate decisions on compensating factors rested with the Nomura due diligence team. *Id.* at 233:7-14.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 458.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants

cite evidence relating to the subjective nature of reviewing compensating factors, they

provide no evidence that contradicts the asserted fact regarding Mr. LaRocca's testimony.

Therefore, this additional evidence is irrelevant and does not create a genuine dispute of

material fact.  Part I.C, *supra*.

459.  **FHFA Statement:**  Nomura did not have a "requirement" that loans rated as an EV1 be reviewed. Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 141:11-20 ("Q. Okay.  Do you know of any policy or practice ever at Nomura to review Clayton's work on Grade 1 loans that said that the loan is eligible, guidelines were adhered to?  A.  There is no policy.  I believe that some witnesses testified that there was as a matter of practice an occasional spot-check of Grade 1s, but there was no requirement to do so."); *see also* Ex. 46 (Deposition of Neil Spagna) at 261:9-13 ("… A.  …So, you know, we would go through – through the data, you know, we're specif – specifically looking at the 2s and 3s, pick out any ones that we thought we needed to look at further….").

**Nomura Response:**  Disputed. Although Ms. Prahofer and Mr. Hartnagel gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. Joseph Kohout, Nomura's head of due diligence in 2005 through mid-2006, testified that Nomura diligence employees reviewed all EV2s and EV3s, and 25 to 50 percent of the EV1s. Ex. 26 (Kohout Tr.) at 240:2-243:22. Jeffrey Hartnagel testified that Nomura's diligence employees reviewed all of the loans graded 2 or 3, and also attempted to review all of the loans graded 1 "[d]epending on the size of the trade, the number of loans reviewed." Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-653:24. Mendy Sabo testified that "[a]ll of the findings" received from Clayton or AMC "would be personally reviewed by somebody at Nomura." Ex. 30 (Sabo Tr.) at 105:22-107:18.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 459.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  The additional

cited testimony fails to specifically contradict the asserted fact and does not create a

genuine dispute of material fact.  Part I.C, *supra*.  For example, Mr. Kohout stated that

"[g]enerally speaking, we did not" look at the EV1s.  RSUF ¶ 460.  Mr. Hartnagel stated

that he would review the EV1s "if time allowed." RSUF ¶¶ 463-464.  While Mr. Sabo

stated that "[m]ost generally you'd look – you'd focus on the credit 3s which are the

exceptions[.] … That was the primary focus." FHFA Ex. 553 (Deposition of Mendy

Sabo) at 106:20-107:11.

460. **FHFA Statement:** When asked if the Due Diligence Group reviewed the EV1s, Joseph Kohout stated: "Generally speaking, we did not." Ex. 53 (Deposition of Joseph Kohout) at 240:25-241:3 ("Q. Did your due diligence team look at the ones that were called a 1? A. Generally speaking, we did not.").

**Nomura Response:** Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, the quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. Mr. Kohout testified that Nomura diligence employees reviewed all EV2s and EV3s, and 25 to 50 percent of the EV1s. Ex. 26 (Kohout Tr.) at 240:2-243:22. *See also* ¶ 459, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 460.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

cite evidence relating to the sample of EV1s Nomura may have reviewed, they provide

no evidence that contradicts the asserted fact regarding Mr. Kohout's testimony.

Therefore, this additional evidence is irrelevant and does not create a genuine dispute of

material fact. Part I.C, *supra*.

461. **FHFA Statement:** When asked why not, Mr. Kohout stated: "[W]e would do a random quality control on the 1s" but that the Diligence Group "didn't feel we needed to review every single one." Ex. 53 (Deposition of Joseph Kohout) at 241:4-11 ("Q. Why not [review the 1s]? A. I mean, they were deemed to be – I mean, we would do random – we would do a random quality control on the 1s. But, you know, our goal was to touch every 2 and to touch every 3, and to do a random sample of those loans that were deemed acceptable."); *id.* at 242:17-243:22 (" … A. … You know, for 2s, obviously, we want to review to make sure the compensating factors is accurate. And to do a random sample of the clean loans, or loans deemed acceptable for purchase was, you know, it was clearly evident that those loans had met guidelines. We did a random sample. We didn't feel we needed to review every single one. Q. How big was your random sample of the sample? A. Of the sample, I mean -- … A. I don't recall specific numbers. On the smaller trades, again, you know, when you're talking, when you're talking about sampling, it has to be understood that on, you know, the vast majority of non-subprime bulk trades, we did 100 percent due diligence. So if we're talking now in relation to the subprime trades, the large trades where it was mandated or stipulated that due diligence was 20 percent, you

know, we would, we would review 100 percent of the level 2s, 100 percent of the level 3s, and we would probably review anywhere from 25 to 50 percent of the 1s.").

**Nomura Response:** Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, the quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. See ¶ 459, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 461.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants refer to additional testimony regarding the regularity for reviewing EV1s, they provide no evidence that contradicts the asserted fact regarding Mr. Kohout's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

462. **FHFA Statement:** Mr. Kohout stated that this "random sample" would be "anywhere from 25 to 50 percent of the 1s." Ex. 53 (Deposition of Joseph Kohout) at 242:17-243:22.

**Nomura Response:** Undisputed that Nomura typically reviewed 25 to 50 percent of loans graded "1."

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 462.

**FHFA Reply:** Defendants do not dispute the asserted fact.

463. **FHFA Statement:** Jeffrey Hartnagel would review the EV1s "[i]f time allowed." Ex. 33 (Deposition of Jeffrey Hartnagel) at 652:25-653:4 ("Q. Did you, as part of the review leading up to the final, did you review the spreadsheets and IAS's for EV1s? A. If time allowed, yes.").

**Nomura Response:** Disputed. Although Mr. Hartnagel gave the testimony quoted by plaintiff, the quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. Mr. Hartnagel testified that Nomura's diligence employees reviewed all of the loans graded 2 or 3, and also attempted to review all of the loans graded 1 "[d]epending on the size of the trade, the number of loans reviewed." Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-653:24. *See also* ¶ 459, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 463.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants refer to additional testimony, they provide no evidence that contradicts the asserted fact regarding Mr. Hartnagel's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra.*

464. **FHFA Statement:** When asked why he would only review loans graded as EV1 only when "time allowed," Mr. Hartnagel responded: "EV1 means it is perfectly within guidelines, there is no issues found by the underwriters, everything is as it should be. There is nothing to look at, there is nothing questionable….It's a clean loan." Ex. 33 (Deposition of Jeffrey Hartnagel) at 653:13-24 ("Q. So 1's, when you say 'if time allowed,' why might you not have time to do the EV1's? A. Depending on the size of the trade, the number of loans reviewed. EV1 means it is perfectly within guidelines, there is no issues found by the underwriters, everything is as it should be. There is nothing to look at, there is nothing questionable. Q. Okay. A. It's a clean loan.").

**Nomura Response:** Disputed. Although Mr. Hartnagel gave the testimony quoted by plaintiff, the quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. Mr. Hartnagel testified that Nomura's diligence employees reviewed all of the loans graded 2 or 3, and also attempted to review all of the loans graded 1 "[d]epending on the size of the trade, the number of loans reviewed." Ex. 29 (Hartnagel Tr.) at 306:16-307:22, 652:6-655:23. *See also* ¶ 459, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 464.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants refer to additional testimony, they provide no evidence that contradicts the asserted fact regarding Mr. Hartnagel's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra.*

465. **FHFA Statement:** When asked if he reviewed the EV1s, Christopher Scampoli stated: "I managed the process. The process involved mainly looking at the exception 3s and discussing those with the -- with the seller." Ex. 61 (Deposition of Christopher Scampoli) at 425:21-426:5 ("Q. And did you ever go back and look at population of Event Level 1 loans to confirm that there were, in fact, no exceptions? A. Again, I managed the process. The process involved mainly looking at the exception 3s and discussing those with the -- with the seller.").

**Nomura Response:** Disputed. Although Mr. Scampoli gave the testimony quoted by plaintiff, the quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. See ¶ 459, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 465.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants refer to additional testimony regarding the regularity for reviewing EV1s, they provide no evidence that contradicts the asserted fact regarding Mr. Scampoli's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

466. **FHFA Statement:** According to Nomura's corporate representative, at "the beginning of the period as to which I'm prepared to testify, that Mr. Kohout instructed that every Grade 2 should be reviewed." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 140:7-23 ("Q. Okay. Was there a policy that Nomura required all Grade 2 designations to be reviewed? A. Do you have a specific time frame in mind? Q. 2004 to 2008. A. Well, I'm not prepared going back to 2004, so we can't do that. It's my understanding that the beginning of the period as to which I'm prepared to testify, that Mr. Kohout instructed that every Grade 2 should be reviewed. I believe at some time during the process, some practice was instituted whereby within certain tolerances not every Grade 2 would have to be reviewed.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 466.

**FHFA Reply:** Defendants do not dispute the asserted fact.

467. **FHFA Statement:** The Due Diligence Group "reviewed all the [EV]2s." Ex. 53 (Deposition of Joseph Kohout) at 239:19-25 ("Q. Which, if any, of these did you, your three-person team at Nomura look over before accepting the determination of the due diligence firm? … A. We reviewed all the 2s and all the 3s."); *id.* at 242:17-243:22 (" … A. … You know, for 2s, obviously, we want to review to make sure the compensating factors is accurate. And to do a random sample of the clean loans, or loans deemed acceptable for purchase was, you know, it was clearly evident that those loans had met guidelines. We did a random sample. We didn't feel we needed to review every single one. Q. How big was your random sample of the sample? A. Of the sample, I mean -- … A. I don't recall specific numbers. On the smaller trades, again, you know, when

you're talking, when you're talking about sampling, it has to be understood that on, you know, the vast majority of non-subprime bulk trades, we did 100 percent due diligence. So if we're talking now in relationship to the subprime trades, the large trades where it was mandated or stipulated that due diligence was 20 percent, you know, we would we would review 100 percent of the level 2s, 100 percent of the level 3s, and we would probably review anywhere from 25 to 50 percent of the 1s.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 467.

**FHFA Reply:** Defendants do not dispute the asserted fact.

468.   **FHFA Statement:** Neil Spagna stated that Nomura would "go through" the EV2s, and "[i]n one way, shape or form [Nomura was] looking at all of them." Ex. 46 (Deposition of Neil Spagna) at 246:24-247:17 ("Q. Okay. What about Number 2, is Number 2 where it's outside the guidelines and yet there's compensating factors, is that a pass or a fail? … A. Generally speaking that would be a pass, but it would be – we would go through those, Nomura would go through those. Q. You mean one of – of the people in your three-person department would actually re-look everything that had been marked a 2? A. We -- … A. We would go through the – through the 2s and 3s. Q. Every one of them? A. In – we would look at them in one way, shape or form, yes."); *id.* at 260:21-25 ("Q. How many of the Group 2 loans would be independently examined by one of your three-person team? A. In one way, shape or form we were looking at all of them. …").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 468.

**FHFA Reply:** Defendants do not dispute the asserted fact.

469.   **FHFA Statement:** The Diligence Group "[wasn't] reviewing every single loan. We were reviewing results or reviewing data, but we're, you know, we're not reviewing the loans." Ex. 46 (Deposition of Neil Spagna) at 247:18-248:17 ("Q. Okay. And – and did anyone other than the three people that you mention on your team, were – were part of the group that was independently reviewing every loan that was flagged as a 2 or 3? A. We weren't – again, we weren't reviewing every single loan. … We were reviewing results or reviewing data, but we're, you know, we're not reviewing the loans. The – that is done by AMC and by Nomura. That is one of the ways that we -- … A. Excuse me. And Clayton. I apologize. Clayton and AMC. That is one of the ways that a three-person team can leverage itself. When you look at it, depending on how many – how many projects we had and how many – how big those projects were and some other factors that I've talked about, we had many other people working for us. So that was – that was a – a business model that is not dissimilar to everyone who was in the market was doing.").

**Nomura Response:** Disputed. Although Mr. Spagna gave the testimony quoted by plaintiff, the quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. See ¶ 459, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 469.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. While Defendants "dispute" the asserted fact, citing ¶ 459, Defendants assertion is not supported by the cited paragraph. Defendants' response in ¶ 459 focuses on the review of EV1s and does not address whether the Diligence Group reviewed the loans.

470.    **FHFA Statement:** The Diligence Group did not look through the vendors' results with the loan file. Ex. 33 (Deposition of Jeffrey Hartnagel) at 306:16-307:3 ("Q. Okay. What about when the diligence firm provided you the results, the data, did you – was it your responsibility to look through their results? A. Yes. Q. Okay. Did you look through it with the loan file? A. No. Q. With the underwriting guidelines? A. Guidelines, yes.").

**Nomura Response:** Disputed. Although Mr. Hartnagel gave the testimony quoted by plaintiff, the quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. *See* ¶ 459, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 470.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants "dispute" the asserted fact, citing ¶ 459, Defendants assertion is not supported by the cited paragraph. Defendants' response in ¶ 459 focuses on the review of EV1s and does not address whether the Diligence Group looked through the vendors' results with the loan file.

471.    **FHFA Statement:** The Diligence Group would use the reports from the third party due diligence vendor to "take a quick look [to] see what the issues are very quickly without going through all the noise of the loan itself." Ex. 33 (Deposition of Jeffrey Hartnagel) at

597:14-598:20 ("Q. I understand that those factors are in the file, but is it the case that the underwriter reviews the file, sees these potential compensating factors and then puts them in this data field? A. Right. These are all free form. Q. Okay. A. So when we would hire a diligence firm there is a certain understanding of the level of diligence we would get to them. I would speak to them on a daily basis, whatever. Multiple firms, multiple deals, whatever. There is always a certain basic, you know what you are getting. This is the format that we wanted, this is how we want things to be done, which is also part of the script they have embedded, that they known how we want our reports to look. So this would be our basic formatting that we would like the reports back to us so we can take a quick look, see what the issues are very quickly without going through all the noise of the loan itself. We then would have more detail to go into, if necessary, based on what we are seeing here so that we can look up stuff. But all the stuff that happens between the beginning and the end is recorded in these spreadsheets."); *see also* Ex. 359 (12/12/2013 Letter from A. Davidoff to E. Taggart) (adopting testimony as that of a Rule 30(b)(6) witness).

**Nomura Response:** Disputed. Although Mr. Spagna gave the testimony quoted by plaintiff, the quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. See ¶ 459, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 471.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. First, Defendants do not address whether Mr. Hartnagel gave this testimony. Second, while Defendants "dispute" the asserted fact, citing ¶ 459, Defendants assertion is not supported by the cited paragraph. Defendants' response in ¶ 459 focuses on the review of EV1s and does not address whether the Diligence Group would review the loan itself.

472. **FHFA Statement:** To review the findings of the third party due diligence firm, the Due Diligence Group "would look at the exception detail report." Ex. 49 (Deposition of Mendy Sabo) at 109:15-21 ("Q. Okay. And look at this and let's start with: What would you look – what did you look – if you received findings like this and you were supposed to be the one to do a review, what would you look at? A. We probably would look at the exception detail report.").

**Nomura Response:** Disputed. Although Mr. Sabo gave the testimony quoted by plaintiff, the quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. Jeffrey

Hartnagel testified that Nomura employees would review both the exception detail report spreadsheets and "Individual Asset Summaries," which contained a "full report" on the loan and the diligence results, as part of their review of the Clayton and AMC due diligence results. *See* Ex. 29 (Hartnagel Tr.) at 593:16-21, 652:25-653:12. *See also* ¶ 459, *supra*, which is incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 472.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants cite to additional testimony from Mr. Hartnagel, this testimony does not specifically contradict the asserted fact that the Diligence Group would look at exception detail reports.  Part I.C, *supra*.

473.　**FHFA Statement:**  The exception details reports did not document any compensating factors for EV2s.  *See infra* ¶¶ 474-477.

**Nomura Response:**  Disputed. Exception detail reports routinely documented compensating factors for loans graded as a 2. *See, e.g.*, Ex. 387 (NOM-FHFA_04572874) at NOM-FHFA_04572874 (loan numbers ████████████████████); Ex. 604 (NOM-FHFA_05558938) at NOM-FHFA_05558938 (loan number ███████████); Ex. 605 (NOM- FHFA_05398556) at NOM- FHFA_05398556 (loan number ████████; Ex. 606 (NOM-FHFA_05802582) at NOM- FHFA_05802582 (loan number ██████████).

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 473.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants assert that exception detail reports "routinely" documented compensating factors for loans graded as a 2, it fails to cite any evidence for this assertion that it was routine. For example, Defendants cite Nom. Ex. 387 to support this assertion.  However, Nom. Ex. 387 contains three loans that were graded as credit EV2s and for which there are no compensating factors listed:  3000799226, 3000798212, 3000791720.  *See also infra* ¶¶ 474-477.

474.    **FHFA Statement:** For example, in the exception detail report for the Quicken SP01 pool, loan ▮▮▮▮▮▮▮▮ is graded as a credit grade 2. Ex. 155 (NOM-FHFA_05529634, Exception Detail Report for QUICK SP 01 0603) at NOM-FHFA_05529634 (listing credit event grade of 2 (Column F) for loan ▮▮▮▮▮▮▮▮ (Column A, Row 29)).

   **Nomura Response:** Undisputed.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 474.

   **FHFA Reply:** Defendants do not dispute the asserted fact.

475.    **FHFA Statement:** However, there are no compensating factors listed for this loan. Ex. 155 (NOM- FHFA_05529634, Exception Detail Report for QUICK SP 01 0603) at NOM-FHFA_05529634 (no credit compensating factor listed in Column K for loan ▮▮▮▮▮▮▮▮.

   **Nomura Response:** Disputed. Column P of the cited document lists compensating factors for this loan. Ex. 607 (NOM-FHFA_05529634) at NOM-FHFA_05529634.

   **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 475.

   **FHFA Reply:** Defendants do not dispute the asserted fact. The cited column P entitled

   "Comments – Nomura Credit" is irrelevant and does not specifically contradict the

   asserted fact that there are no compensating factors listed for this loan in Column O

   entitled "Compensating Factors." Therefore, this evidence does not create a genuine

   dispute of material fact. Part I.C, *supra*.

476.    **FHFA Statement:** Despite the fact that no compensating factors are provided, Nomura allegedly reviewed this finding, purchased the loan, and securitized it in NHELI 2006-HE3. *See also* Ex. 156 (NOM-FHFA_05524483, Exception Detail Report for Fund America SP 04 2006-07 – FUAM06) at NOM-FHFA_05524483 (loan numbers ▮▮▮▮▮▮▮▮ (Column A, Row 40) and ▮▮▮▮▮▮▮▮ (Column A, Row 46) are graded as credit EV2s (Column M) and do not have compensating factors indicated).

   **Nomura Response:** Disputed. Compensating factors were identified for Loan number ▮▮▮▮▮▮▮▮ in Quicken SP01, as explained in ¶ 475, *supra*, which is incorporated by reference herein. With respect to Fund America SP04, loan numbers ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ have compensating factors listed in columns R and S of the referenced document. See Ex. 608 (NOM- FHFA_05524483) at NOM-FHFA_05524483.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 476.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  In regards to loan number ███████████ Defendants cite column P entitled "Nomura Credit – comments" which is irrelevant and does not specifically contradict the asserted fact that there are no compensating factors listed for this loan in Column O entitled "Compensating Factors." With respect to loan numbers ██████████ and ███████████ Defendants cite columns R and S which are entitled "Comments – Nomura Credit" and "Comments – General" respectively.  These columns are irrelevant and do not specifically contradict the asserted fact that there are no compensating factors listed for these loans in column Q entitled "Compensating Factors."  Therefore, this evidence does not create a genuine dispute of material fact.  Part I.C, *supra*.

477.  **FHFA Statement:**  There are exception detail reports in which all of the credit or compliance EV2 loans do not have compensating factors listed. *See, e.g.*, Ex. 157 (NOM-FHFA_04537476, Exception Detail Report for OWN 01 0512) at NOM-FHFA_04537476 (All 46 loans that are graded as either credit or compliance EV2s do not have any compensating factors listed); Ex. 158 (NOM-FHFA_04554880, Exception Detail Report for PINFIN SP 03 0601) at NOM- FHFA_04554880 (The 2 credit or compliance EV2 loans in Pinnacle Financial SP03 pool do not have compensating factors listed).

  **Nomura Response:**  Disputed. With respect to OwnIt SP01, observation numbers 20099, 10927, 10909, 11247, 20055, 11619, 11374, 11604, 10438, 10336, 20134, 20126, 4604236, 11590, and 10444, 10983, 11576, 10460, 10872, 20311, 20210, 10417, 10595, 10882, 10765, 11585, 20040, 10459, 10998, 10426, 11433, 11680, 10888, 10416, 10880, 10086, 10407, 10560, 10932, 10393, 10745, 10883, 10038 all have compensating factors listed in Column N of the spreadsheet cited by plaintiff, and all of the loans graded as 2s for credit or compliance—including, but not limited to, the aforementioned loan numbers—have compensating factors listed in Columns O and/or P. *See* Ex. 609 (NOM-FHFA_04537476) at NOM-FHFA_04537476.  In addition, 61 loans were graded 2 for credit, and 29 loans were graded 2 for compliance, for a total of 90 loans graded 2, as opposed to the 46 listed by plaintiff. See *id.* With respect to Pinnacle Financial SP03, the loans graded 2 for credit and compliance all have compensating factors listed in Columns O and/or P of the spreadsheet cited by plaintiff. Ex. 610 (NOM-FHFA_04554880) at NOM-FHFA_04554880. In addition, loan numbers ████████████████████ have

compensating factors listed in Column N. *Id.* This spreadsheet contains one loan graded 2 for credit, and two loans graded 2W for compliance, rather than the "2 credit or compliance EV2 loans" referred to by plaintiff. *Id.*

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 477.

**FHFA Reply:** With respect to OwnIt SP01, Defendants cite columns O and P which are entitled "Comments – Nomura Credit" and "Comments – General" respectively. This citation is irrelevant and does not specifically contradict the asserted fact that there are no compensating factors listed for these loans in column N entitled "Compensating Factors." Therefore, this evidence does not create a genuine dispute of material fact. Part I.C, *supra*. Defendants state that observation numbers 4604236, 10595, 10765, 11680, 10888, 10407, and 10393 for the OwnIT SP01 pool have compensating factors listed. However, there is no observation number 4604236. Furthermore, there are no compensating factors listed for observation numbers 10595, 10765, 11680, 10888, 10407, and 10393 in Column N entitled "Compensating Factors." While there are compensating factors listed for some EV2 loans, this dispute is immaterial to FHFA's motion as there are some exception detail reports that fail to list compensating factors for all EV2 loans. *Quarles*, 758 F.2d at 840. For example, for the Ownit SP01 pool, there are still 46 loans that are graded as credit EV2s with no compensating factors listed and 7 loans graded as compliance EV2s with no compensating factors provided. FHFA Ex. 157 (column F, "credit event grade," filtered to "2" and column N, "compensating factors," filtered to "blanks"); id. (column G, "compliance event grade," filtered to "2" and column N, "compensating factors," filtered to "blanks" and "CFOT.02 : No Verified Compensating Factors"). For the Pinnacle Financial SP03 pool, the 1 credit EV2 loan has no

compensating factors listed. FHFA Ex. 158 (column F, "credit event grade," filtered to "2").

> (c) *Nomura Securitized Many Loans That Nomura Securities Vendors Graded As Not Suitable For Acquisition, Overriding Their Recommendations*

478.   **FHFA Statement:**  Nomura's Due Diligence Group's review of its vendors' work "involved mainly looking at the exception 3s." Ex. 61 (Deposition of Christopher Scampoli) at 425:21-426:5 ("Q. And did you ever go back and look at population of Event Level 1 loans to confirm that there were, in fact, no exceptions?  A.  Again, I managed the process. The process involved mainly looking at the exception 3s and discussing those with the – with the seller.").

   **Nomura Response:**  Disputed. Although Mr. Scampoli gave the testimony quoted by plaintiff, the quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. *See* ¶ 459, *supra*, which is incorporated by reference herein.

   **RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 478.

   **FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants "dispute" the asserted fact, citing ¶ 459, Defendants assertion is not supported by the cited paragraph.  Defendants' response in ¶ 459 focuses on the review of EV1s and does not address whether the Diligence Group looked primarily at EV3s.

479.   **FHFA Statement:**  Nomura Securities would "review 100 percent of the level 3s." Ex. 53 (Deposition of Joseph Kohout) at 242:17-243:22 (" … A.  … You know, for 2s, obviously, we want to review to make sure the compensating factors is accurate.  And to do a random sample of the clean loans, or loans deemed acceptable for purchase was, you know, it was clearly evident that those loans had met guidelines.  We did a random sample.  We didn't feel we needed to review every single one.  Q.  How big was your random sample of the sample?  A.  Of the sample, I mean -- … A.  I don't recall specific numbers.  On the smaller trades, again, you know, when you're talking, when you're talking about sampling, it has to be understood that on, you know, the vast majority of non- subprime bulk trades, we did 100 percent due diligence.  So if we're talking now in relation to the subprime trades, the large trades where it was mandated or stipulated that due diligence was 20 percent, you know, we would we would review 100 percent of the level 2s, 100 percent of the level 3s, and we would probably review anywhere from 25 to 50 percent of the 1s.").

**Nomura Response:** Undisputed that Nomura reviewed 100% of the "level 3s."

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 479.

**FHFA Reply:** Defendants do not dispute the asserted fact.

480. **FHFA Statement:** The Due Diligence Group would "go through" the EV3s. Ex. 46 (Deposition of Neil Spagna) at 246:24-247:17 ("Q. Okay. What about Number 2, is Number 2 where it's outside the guidelines and yet there's compensating factors, is that a pass or a fail? … A. Generally speaking that would be a pass, but it would be – we would go through those, Nomura would go through those. Q. You mean one of – of the people in your three-person department would actually re-look everything that had been marked a 2? A. We -- … A. We would go through the – through the 2s and 3s. Q. Every one of them? A. In – we would look at them in one way, shape or form, yes.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 480.

**FHFA Reply:** Defendants do not dispute the asserted fact.

481. **FHFA Statement:** Nomura's corporate representative confirmed that "all Grade 3 findings should be reviewed." Ex. 19 (Nomura 30(b)(6) Deposition of Nancy Prahofer) at 139:18-140:6 ("Q. Well, let's see. Well, was – okay. If I define the policy to be including somebody with power to direct all the people doing it to comply with that policy, was there a policy regarding whether all Grade 3 – Credit Event Grade 3 designations should be reviewed? A. I believe Mr. Kohout instructed that all Grade 3 event – all Grade 3 findings should be reviewed, yes.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 481.

**FHFA Reply:** Defendants do not dispute the asserted fact.

482. **FHFA Statement:** AMC's corporate representative stated that Nomura could change an EV3 to an EV2. Ex. 159 (AMC 30(b)(6) Deposition of Peter Kempf) at 157:20-158:23 ("Q. Is it the same that the client, Nomura, could ask people at AMC to make a loan rated EV3 EV2? … A. They could – yes, they could – they could say an EV-3 loan to be a – make it an Event Level 2. Q. Okay. Did they – did people at Nomura, whether it was diligence staff or traders, direct – at time was it common for individuals at Nomura to direct AMC personnel to make that change from 3 to a 2? … A. It did occur, yes.").

**Nomura Response:** Disputed. Although Mr. Kempf gave the testimony quoted by plaintiff, the quote is removed from the context in which it appears, and omits other

testimony that must be evaluated in order to fully understand the quoted excerpt. Mr. Kempf also testified that loans could initially be graded 3 due to "[m]issing documents" or based on "client overlays," even though the loan otherwise "fit the guideline perfectly." Ex. 229 (Kempf Tr.) at 81:14-82:15. Vicki Beal of Clayton testified that loans could initially be graded 3 due to client overlays, even though it "me[t] the originator guidelines." Ex. 230 (Beal 30(b)(6) Tr.) at 66:20-67:18. In her fact deposition, Ms. Beal further clarified that, in grading a loan a 3, Clayton was not taking the position that exceptions could not be offset by compensating factors; rather, "[t]hat could have been correct, yes. I would have to know, as I said, the specific client instructions for grading a loan a 3. Did they want loans escalated to them for review. Because many clients did. They wanted to make that decision." Ex. 315 (Beal Fact Tr.) at 48:18-49:7. In testimony before the Financial Crisis Inquiry Commission, Ms. Beal stated that a loan might be changed from 3 to a different grade for a variety of reasons: "Clayton clearly made a mistake" in assigning a particular grade; "[t]he seller provided missing documentation"; or Clayton (or Nomura) determined that "compensating factors were sufficient . . . thereby warranting a grade change." Ex. 331 (Beal FCIC Testimony) at 6.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 482.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants cite to additional testimony, they provide no evidence that contradicts the asserted fact regarding Mr. LaRocca's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

483. **FHFA Statement:** The Due Diligence Group had the ability to do a "client override." "[A] client override would simply be, you know, 'I, you know, I like – I – I looked at this loan, you had it graded as a, you know, as a – as a 3, but here's something. Did you look at this? Here's some things that – that we saw in the file." Ex. 46 (Deposition of Neil Spagna) at 254:25-256:5 ("Q. But whose discretion was it to decide that? A. There was – there was a process that was followed. The underwriter at Clayton could put – could put a Credit Event 2 and list a reason, list, you know, multiple reasons. That was checked by the Quality Control person that we spoke about earlier. That was also reviewed by the – the lead underwriter. Eventually that would become Clayton's or – or AMC's final credit event grade. Then part of the process was for a Nomura person to kind of go through, go through those as well. And if we saw something in the loan that – that was wrong or that we liked, we would change that and do what is called a client override. And a client override would simply be, you know, 'I, you know, I like – I – I looked at this loan, you had it graded as a, you know, as a – as a 3, but here's something. Did you look at this? Here's some things that – that we saw in the file. The borrower's been in the property for 25 years. They've worked for the government as Postal Inspector for 25 years,' whatever it is, there was always – there was always a process to kind of follow and – and do this."); *see also id.* at 259:23-260:20 ("Q. So when a vendor determined that there

was a loan outside of a guidelines, but they independently decided there was compensating factors, what, if any, oversight did your three- member team do of that decisions? A. When we got the results from – from Clayton, and these are the final results, so all the rebuttals with – between Clayton and the seller, that has happened, or AMC and the seller has happened, you know, we would take a look at, you know, primarily the 2s and 3s. And, you know, from – from that standpoint what we could do is both firms would provide you what was called an Individual Asset Summary. And if someone on the team saw something, you know, unusual within those asset summaries, you know, they can go – process to go to Clayton and say, you know, make changes to, you know, credit event grades, that would be a – called a client override.").

**Nomura Response:** Disputed. Although Mr. Spagna gave the testimony quoted by plaintiff, the quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. Mr. Spagna testified that Nomura might approve a loan for purchase that was graded as a 3 by the due diligence vendors in circumstances where compensating factors were present "in the [loan] file" or a previously missing document is found and "makes it over to our team." See Ex. 27 (Spagna Tr.) at 254:25-257:16. Joseph Kohout testified that Nomura made these decisions based on whether the loan "was acceptable with compensating factors." See Ex. 26 (Kohout Tr.) at 231:12-18. Freddie Mac and Fannie Mae engaged in similar practices as well. See C. Stmt. at ¶¶ 183-187.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 483.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants cite to additional testimony regarding the reasoning or process of approving a loan for purchase that was graded as a 3, they provide no evidence that contradicts the asserted fact regarding Mr. Spagna's testimony. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*. In addition, while Defendants "dispute" the asserted fact on the basis that Freddie Mac and Fannie Mae engaged in similar practices, citing C. Stmt. at ¶¶ 183-187, Defendants assertion is not supported by these cited paragraphs. These paragraphs do not address Freddie Mac and Fannie Mae's practices at all. Furthermore, the GSEs' practices are irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

484. **FHFA Statement:** Nomura had the "final decision" on whether the compensating factors were sufficient to overcome any exception or problem with the loan file. Ex. 149 (NOM- FHFA_05502065, email RE: "Ownit SP01 (0512) Loan ███████ ███████ ) at NOM- FHFA_05502065-66 ("Generally, the proper way to handle the situation is to advise the seller (which I would view as a secondary advisement in that we always will outline our process with the seller prior to the first transaction) that Nomura will make the final decision on all loans."); Ex. 53 (Deposition of Joseph Kohout) at 231:12-18 ("Q. And who would determine whether it was acceptable with compensating factors? A. At first pass, it would be, it would be the third-party vendor, but the 2s would all have to be affirmed by credit at Nomura.").

**Nomura Response:** Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, and the document cited by plaintiff contains the quoted statement, those quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. See ¶ 483, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 484.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Kohout gave the testimony quoted and the document cited contains the quoted statement. While Defendants cite to additional testimony in ¶ 483 regarding the reasoning or process of approving a loan for purchase that was graded as a 3, they provide no evidence that contradicts the asserted fact. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*. In addition, while Defendants "dispute" the asserted fact on the basis that Freddie Mac and Fannie Mae engaged in similar practices, citing C. Stmt. at ¶¶ 183-187, Defendants assertion is not supported by these cited paragraphs. These paragraphs do not address Freddie Mac and Fannie Mae's practices at all. Furthermore, the GSEs' practices are irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

485. **FHFA Statement:** Clayton confirmed that the "ultimate decision" belonged to Nomura. Ex. 69 (Clayton 30(b)(6) Deposition of Vicki Beal) at 233:4-11 ("Q. And at the end of

the day, whose decision was it whether or not to accept a loan on the basis that the compensating factor sufficiently offset the increased credit risk associated with the exception? A. The ultimate decision would have been our client.").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 485.

**FHFA Reply:** Defendants do not dispute the asserted fact.

486.    **FHFA Statement:** The Diligence Group was "empowered to make decisions relative to compensating factors for loans that were outside of seller underwriting guidelines." Ex. 53 (Deposition of Joseph Kohout) at 461:14-21 ("Q. I am talking about the due diligence group, the three-person team that you led. A. Okay. So, yes, we were empowered to make decisions relative to compensating factors for loans that were outside of seller underwriting guidelines."); *see also* Ex. 49 (Deposition of Mendy Sabo) at 151:3-12 ("Q. Is it fair to say that when the three-person Nomura team in the due diligence group was evaluating whether the compensating factors identified by the third-party vendors was strong enough to allow a loan that did not comply with guidelines, they relied upon their subjective judgment? … A. Yes, including other obvious documented compensating factors.").

**Nomura Response:** Disputed. Although Mr. Kohout and Mr. Sabo gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. *See* ¶ 483, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 486.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not

dispute that Mr. Kohout and Mr. Sabo gave the testimony quoted. While Defendants cite

to additional testimony in ¶ 483 regarding the reasoning or process of approving a loan

for purchase that was graded as a 3, they provide no evidence that contradicts the asserted

fact. Therefore, this additional evidence is irrelevant and does not create a genuine

dispute of material fact. Part I.C, *supra*. In addition, while Defendants "dispute" the

asserted fact on the basis that Freddie Mac and Fannie Mae engaged in similar practices,

citing C. Stmt. at ¶¶ 183-187, Defendants assertion is not supported by these cited

paragraphs. These paragraphs do not address Freddie Mac and Fannie Mae's practices at all. Furthermore, the GSEs' practices are irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

487. **FHFA Statement:** Mr. Spagna wrote to Clayton: "[T]he only people at Nomura who can make decisions on the creditworthiness of individual loans is myself or CHRIS SCAMPOLI or MENDY SABO. Please do not invite others to do what our credit team, and only our credit team, is responsible to do. Additionally, while it is an interesting anecdote to note that Chris Scampoli requested certain waivers, please consider these as 'Nomura' requested waivers. We work as a team. We consider you part of that team as well."). Ex. 160 (NOM-FHFA_05132904, email regarding "Mortgage Store 15 Report Updates") at NOM-FHFA_05132905 (discussing waivers requested based on a review of outstanding exceptions in the Mortgage Store 15 loan pool.).

**Nomura Response:** Disputed. Although the document cited by plaintiff contains the quoted statement, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. See ¶ 483, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 487.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the document cited contains the quoted statement. While Defendants cite to additional testimony in ¶ 483 regarding the reasoning or process of approving a loan for purchase that was graded as a 3, they provide no evidence that contradicts the asserted fact. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*. In addition, while Defendants "dispute" the asserted fact on the basis that Freddie Mac and Fannie Mae engaged in similar practices, citing C. Stmt. at ¶¶ 183-187, Defendants assertion is not supported by these cited paragraphs. These paragraphs do not address Freddie Mac and Fannie Mae's practices at all. Furthermore, the GSEs' practices are irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

488. **FHFA Statement:** Regarding a Fremont pool, Neil Spagna informed AMC regarding all EV3 loans, "Please mark these loans as client overrides Credit Event 2s for all 19 loans in question." Ex. 161 (NOM-FHFA_04625746, email regarding "NHEL 2006-FM2 (Due dili for Greenwich)") at NOM- FHFA_04625747 (The attached spreadsheet shows loans to be securitized in NHEL 2006-FM2 which AMC had graded EV3 and for which, Neil Spagna states, "Please mark these loans as client overrides Credit Event 2s for all 19 loans in question.").

**Nomura Response:** Disputed. Although the document cited by plaintiff contains the quoted statement, that quote is removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. *See* ¶ 483, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 488.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the document cited contains the quoted statement. While Defendants cite to additional testimony in ¶ 483 regarding the reasoning or process of approving a loan for purchase that was graded as a 3, they provide no evidence that contradicts the asserted fact. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*. In addition, while Defendants "dispute" the asserted fact on the basis that Freddie Mac and Fannie Mae engaged in similar practices, citing C. Stmt. at ¶¶ 183-187, Defendants assertion is not supported by these cited paragraphs. These paragraphs do not address Freddie Mac and Fannie Mae's practices at all. Furthermore, the GSEs' practices are irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

489. **FHFA Statement:** The Diligence Group would clear loans that "the due diligence provider says … is an unacceptable risk" without ever looking at the loan files. Ex. 46 (Deposition of Neil Spagna) at 263:18-264:3 ("Q. But I'm talking about the situations where the due diligence provider says this is an unacceptable risk, sometimes Nomura without the loan files would nevertheless clear that loan, right? . . . A. Yeah, it – it is – it is possible that you could do that, yes."); *see also* Ex. 33 (Deposition of Jeffrey Hartnagel) at 74:10-20 ("Q. Okay. So as a Due Diligence Underwriter to accept an exception loan, was it a requirement that the compensating factor making it justifiable to

approve that loan from a due diligence perspective, that the basis for that exception was written down somewhere in the loan file? . . . A. No."); *id.* at 79:7-21 ("Q. Okay. So let me re-ask. How – you're – how did – without a written explanation of the basis for the exception, how were you, as the due diligence Underwriter, able to assess whether there was a sufficient compensating factor to justify the exception loan? . . . A. I assessed the qualification of that loan based on the criteria – based on the documentation in that file once – at the time we were reviewing it.").

**Nomura Response:** Disputed. Although Mr. Spagna and Mr. Hartnagel gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. For example, Jeffrey Hartnagel testified that Nomura employees would review both the exception detail report spreadsheets and "Individual Asset Summaries," which contained a "full report" on the loan and the diligence results, as part of their review of the Clayton and AMC due diligence results. See Ex. 29 (Hartnagel Tr.) at 593:16-21, 652:25-653:12. These "Individual Asset Summaries" or "Individual Loan Summaries" contained a significant amount of detail for each loan, listing the origination date; the first payment date; the loan type; the occupancy status; the sales price; the borrower's occupation and time with that employer; documentation type; the Clayton or AMC credit and compliance grades and the reason for the grades; any compensating factors identified by Clayton or AMC; and hundreds of additional pieces of information about the loan. *See, e.g.*, Ex. 254 (NOM-FHFA_04572875) at NOM-FHFA_04572875-3050; Ex. 611 (NOM-FHFA_05399143) at NOM-FHFA_05399143-9185; Ex. 612 (NOM-FHFA_05329392) at NOM-FHFA_05329392-9792. *See also* ¶ 483, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 489.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. The additional testimony and documents are irrelevant to the asserted fact regarding failing to look at the loan files and therefore do not create a genuine dispute of material fact. Part I.C, *supra*. Furthermore, while Defendants cite to additional testimony in ¶ 483 regarding the reasoning or process of approving a loan for purchase that was graded as a 3, they provide no evidence that contradicts the asserted fact. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*.

490. **FHFA Statement:** Neil Spagna stated that he did in fact "clear [the] loan" without the loan file. Ex. 46 (Deposition of Neil Spagna) at 263:18-264:5 ("Q. But I'm talking about the situations where the due diligence provider says this is an unacceptable risk, sometimes Nomura without the loan files would nevertheless clear that loan, right? . . . A. Yeah, it – it is – it is possible that you could do that, yes. Q. And that you did do that? A. Yes.").

      **Nomura Response:** Disputed. Although Mr. Spagna gave the testimony quoted by plaintiff, those quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. See ¶¶ 483, 489, *supra*, which are incorporated by reference herein.

      **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 490.

      **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Spagna gave the testimony quoted. While Defendants cite to additional testimony in ¶ 483 regarding the reasoning or process of approving a loan for purchase that was graded as a 3, they provide no evidence that contradicts the asserted fact. Therefore, this additional evidence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*. In addition, while Defendants "dispute" the asserted fact on the basis that Freddie Mac and Fannie Mae engaged in similar practices, citing C. Stmt. at ¶¶ 183-187, Defendants assertion is not supported by these cited paragraphs. These paragraphs do not address Freddie Mac and Fannie Mae's practices at all. Furthermore, the GSEs' practices are irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Finally, the additional testimony and documents cited in ¶ 489 are irrelevant to the asserted fact regarding failing to look at the loan files and therefore do not create a genuine dispute of material fact. Part I.C, *supra*.

491. **FHFA Statement:** The information regarding Nomura overriding EV3s and re-grading them as EV2s can be found in Ex. 5 to the Cipione Decl.

      **Nomura Response:** Disputed. Exhibit 5 to the Cipione Declaration does not set forth information "regarding Nomura overriding EV3s and regarding them as EV2s." Exhibit 5

to the Cipione Declaration contains information regarding "Final Credit Grade," "Final Compliance Grade," "Standardized Final Credit Grade," "Standardized Final Compliance Grade," "Standardized Interim Credit Grade," "Interim Compliance Grade," "Interim Credit Grade," "Standardized Interim Compliance Grade," and "Standardized Interim Credit Grade." Cipione Decl., Ex. 5. Furthermore, defendants dispute that the Cipione Declaration accurately sets forth the results of Nomura's diligence. See Mishol Decl.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 491.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact. While Defendants dispute the asserted fact, they identify no specific evidence that contradicts it. Nomura's conclusory assertions do not create a genuine dispute of material fact.  Part I.B, *supra*.

       3.       <u>Nomura Securities Performed No Additional Diligence On Loans It Acquired From Originators About Which It Had Concerns</u>

492.  **FHFA Statement:**  Nomura purchased 7,090 loans from Fremont SP03, Fremont SP04, Ownit SP02, Peoples Choice SP01, Peoples Choice SP02, and Quick Loan SP11, which were securitized in the SLGs for the NHELI 2006-HE3, NHELI 2006-FM2, NHELI 2007-2, and NHELI 2007-3 deals.  Ex. 4 to the Cipione Decl. (filter Column C for each Acquisition Pool, Column H for each Securitization, and Column K for "Yes").

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 492.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

       (a)    *Fremont: "For Whatever Reason, We Decided Buy [EV3 Loans] From Fremont"*

493.  **FHFA Statement:**  On September 27, 2006, Neil Spagna wrote to Peter Kempf at AMC: "We are securitizing Fremont 3 and Fremont 4.  RBS Greenwich Capital is acting as co-underwriter on this deal and have requested our standard due diligence reports that we receive from AMC.  To be on the safe side, we compared the loans that are in our securitization to the last set of exception reports you provided us.  The attached excel report shows that there are 12 loans in Fremont 3 and 7 loans in Fremont 4 that AMC had marked as CE3s but, for whatever reason, we decided to buy from Fremont.  Please mark these loans as client overrides Credit Event 2s for all 19 loans in question.  Then please forward to me the updated set of reports for these two deals" Ex. 162 (Dep. Ex. 30505, 10/4/2006 email regarding "NHEL 2006-FM2 (Due dili for Greenwich)") at NOM-FHFA_04625747 (The attached spreadsheet shows loans to be securitized in NHEL

2006-FM2 which AMC had graded EV3 and for which, Neil Spagna requested a client overrides - Credit Event 2s.).

**Nomura Response:** Disputed. Although the document cited by plaintiff contains the quoted statement, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. The record indicates that the due diligence performed on these loan pools occurred prior to Neil Spagna's employment with Nomura, meaning that he was not aware of Nomura's rationale in approving the referenced loans for purchase. See Ex. 42 (NOM-FHFA_05261744) at NOM- FHFA_05261744; Ex. 43 (NOM-FHFA_05258086) at NOM-FHFA_05258086; Ex. 28 (Depo. Exhibit 32700, Spagna Background Questionnaire) at A-2. Disputed to the extent plaintiff suggests Nomura lacked justification for purchasing the 19 loans. *See also* ¶ 483, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 493.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that the cited testimony is accurately quoted. The cited documents relating to Neil Spagna's employment are irrelevant to the asserted fact and does not create a genuine dispute of material fact. Defendants' assertion that ¶ 483 calls the asserted fact into question fails to cite a particular portion of the testimony cited therein, and therefore does not create a genuine dispute of material fact. Parts I.C; I.E, *supra*.

494. **FHFA Statement:** Mr. Kempf responded: "Here you go. Let me know if you need anything else." Ex. 162 (Dep. Ex. 30505, 10/4/2006 email regarding "NHEL 2006-FM2 (Due dili for Greenwich)") at NOM-FHFA_04625746 (attached spreadsheet shows loans to be securitized in NHEL 2006-FM2 which AMC had graded EV3 and for which, Neil Spagna requested a client overrides - Credit Event 2s.).

**Nomura Response:** Disputed. Although the document cited by plaintiff contains the quoted statement, that quotes is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. *See* ¶ 493, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 494.

**FHFA Reply:** While Defendants assert that ¶ 494 does not fully and accurately describe the context of Mr. Kempf's testimony, Nomura fails to cite a particular document or

testimony that would provide context, and therefore does not create a genuine dispute of material fact. The documents related to Mr. Spagna's employment that Defendants cite from ¶ 493 are irrelevant to the asserted fact and does not create a genuine dispute of material fact. Parts I.C; I.E, *supra*.

495. **FHFA Statement:** On June 29, 2006, Nomura bought the Fremont SP03 Acquisition Pool from Fremont. Ex. 4 to the Cipione Decl. (Column C "Pool Name" and Column D "Settlement Date").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 495.

**FHFA Reply:** Defendants do not dispute the asserted fact.

496. **FHFA Statement:** On June 29, 2006, Nomura bought the Fremont SP04 Acquisition Pool from Fremont. Ex. 4 to the Cipione Decl. (Column C "Pool Name" and Column D "Settlement Date").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 496.

**FHFA Reply:** Defendants do not dispute the asserted fact.

497. **FHFA Statement:** 2,481 loans from the Fremont SP03 were securitized into the relevant SLG of NHELI 2006-FM2. Ex. 1 to the Cipione Decl. (Row 61 "Fremont SP03," Column G "NHELI 2006-FM2").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 497.

**FHFA Reply:** Defendants do not dispute the asserted fact.

498. **FHFA Statement:** 1,410 loans from the Fremont SP04 were securitized into the relevant SLG of NHELI 2006-FM2. Ex. 1 to the Cipione Decl. (Row 62 "Fremont SP04," Column G "NHELI 2006-FM2").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 498.

**FHFA Reply:** Defendants do not dispute the asserted fact.

       (b)    *Ownit: "What Crap"*

499.    **FHFA Statement:** On September 27, 2006, Nomura stipulated to a 25% sample size for the Ownit SP02 Pool. Ex. 82 (NOM-FHFA_04479131, Pool Summary and Trade Confirmation for Ownit SP02 dated September 27, 2006) at NOM-FHFA 04479134 ("25% due diligence").

    **Nomura Response:** Disputed. Although the document cited by plaintiff contains the quoted statements, those quotes are removed from the context in which they appear, and omit other testimony and documents that must be evaluated in order to fully understand the quoted excerpts. For its first review of an OwnIt subprime pool—OwnIt SP01, which contributed loans to the supporting loan groups—Nomura performed credit and compliance diligence on over 99% of the loans. See Ex. 500 (July 9 Grice Report Revised Exhibit 3B) at 1; Mishol Decl. Ex. 6 at 3. During that review, Nomura's vendors found that less than 10% of the loans should be graded as a 3, and Nomura ultimately declined to purchase 12% of the reviewed loans in that pool. See Mishol Decl. Ex. 9; Mishol Decl. Ex. 14. These results gave Nomura reason to believe that a smaller sample size would be sufficient for its next trade with OwnIt, OwnIt SP02. See Ex. 16 (LaRocca Tr.) at 68:11-69:2 ("[O]n a first-time issuer we might do more" credit and compliance diligence "[a]nd then unless we saw something, you know, unusual in - - in what we were - - the diligence results, we would go back down to the market sample."). Nomura reserved the right to increase the level of due diligence performed as needed based on initial findings. Ex. 35 (Graham Tr.) at 149:4-19; Ex. 15 (Prahofer Tr.) at 26:15-28:7. In some cases, Nomura walked away from a deal entirely if the sample results indicated that the loans were too risky for Nomura. Ex. 27 (Spagna Tr.) at 211:13-212:17; Ex. 26 (Kohout Tr.) at 106:15-107:18.

    **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 499.

    **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited

documents and testimony relating to the OwnIt pools are irrelevant to the asserted fact

and does not create a genuine dispute of material fact. Part I.C, *supra*.

500.    **FHFA Statement:** In an email dated November 15, 2006 regarding the Ownit SP02 sample, Neil Spagna stated: "We need to upsize the due diligence on the 2nds." Ex. 164 (NOM- FHFA_05811155, email regarding "Ownit Subprime Sample") at NOM-FHFA_05811156 (email dated November 15, 2006 from Christopher Scampoli to Neil Spagna and Mendy Sabo regarding Ownit Subprime Sample); *see also id.* at NOM-FHFA_05811155 (noting for the Ownit subprime sample being discussed that "[t]here is

still another 90M scheduled to be delivered to Nomura."); Ex. 515 (NOM-FHFA_05074069, email dated November 14, 2006 from Mendy Sabo to Christopher Scampoli regarding Ownit Subprime Sample) at NOM-FHFA_05074069 (noting that Nomura was "waiting on the balance (another 90M)" for the Ownit SP02 Pool).

**Nomura Response:**  Undisputed.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 500.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

501.  **FHFA Statement:**  Christopher Scampoli replied: "Most of the issues are with the full docs and low FICOs … in Ownit 03 Alt A (2nds) we're seeing a significant number of loans with recent bankruptcies and delinquencies after the bankruptcy.  We still have 198 ineligible out of a 330 loan sample.  The most concerning are: Any 2nd with an LTV >20% [and] Full doc loans with FICOs <640." Ex. 164 (NOM-FHFA_05811155, email regarding "Ownit 03") at NOM-FHFA_05811156 (email dated November 15, 2006 from Christopher Scampoli to Neil Spagna and Mendy Sabo regarding Ownit Subprime Sample). Christopher Scampoli later wrote:  "Ownit03 is in KMS as 'Alt A' product… the characteristics are more subprime.  100% CLTV on just about everything."  *Id.* at NOM-FHFA_05811155.

**Nomura Response:**  Defendants do not dispute that Mr. Scampoli's emails contain the quoted text, but those emails refer to a trade pool that did not contribute loans to the supporting loan groups at- issue in this Action. See Ex. 613 (July 9 Grice Report Revised Exhibit 2) at 3; Mishol Decl. Ex. 8.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 501.

**FHFA Reply:**  Defendants do not dispute the asserted fact.  The cited materials and

declaration are irrelevant to the asserted fact and does not create a genuine dispute of

material fact.  Part I.C, *supra*.

502.  **FHFA Statement:**  In January 2007, Nomura conducted a "review of the Ownit … 2nd liens not originally diligenced by AMC." Ex. 168 (NOM-FHFA_05073033, email regarding "Ownit SP02 DD results") at NOM-FHFA_05073033 (attaching final results of "review" of Ownit 2nd liens and listing waivers).

**Nomura Response:**  Disputed that this constitutes a material fact. The loans included in the Ownit SP02 Part 2 review were not part of any loan pools that contributed loans to the SLGs.  Compare Ex. 614 (NOM-FHFA_04671106) at NOM-FHFA_04671106, with Ex. 615 (NOM- FHFA_05072974) at NOM-FHFA_05072974.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 502.

**FHFA Reply:**  Defendants do not dispute the asserted fact.  While Defendants argue that

the cited document does not constitute a material fact, the fact is material to showing that

Nomura was aware of a red flag concerning Ownit but did not increase its diligence on

subsequent Ownit acquisition pools.

503.  **FHFA Statement:**  The review was called "Ownit SP02 Part 2." Ex. 168 (NOM-FHFA_05073033, email regarding "Ownit SP02 DD results") at NOM-FHFA_05073033 (attaching "Job #99819 Nomura Ownit SP02 Part 2 Event Level 3 Report Feb6.xls").

**Nomura Response:**  Disputed that this constitutes a material fact. The loans included in the Ownit SP02 Part 2 review were not part of any loan pools that contributed loans to the SLGs.  Compare Ex. 614 (NOM-FHFA_04671106) at NOM-FHFA_04671106, with Ex. 615 (NOM- FHFA_05072974) at NOM-FHFA_05072974.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 503.

**FHFA Reply:**  Defendants do not dispute the asserted fact.  While Defendants argue that

the cited document does not constitute a material fact, the fact is material to showing that

Nomura was aware of a red flag concerning Ownit but did not increase its diligence on

subsequent Ownit acquisition pools.

504.  **FHFA Statement:**  The number of loans in the review was 1,296.  Ex. 168 (NOM-FHFA_05073033, email regarding "Ownit SP02 DD results") at NOM-FHFA_05073033 (showing that the Total Sample was 1296 loans).

**Nomura Response:**  Disputed that this constitutes a material fact. The loans included in the Ownit SP02 Part 2 review were not part of any loan pools that contributed loans to the SLGs.  Compare Ex. 614 (NOM-FHFA_04671106) at NOM-FHFA_04671106, with Ex. 615 (NOM- FHFA_05072974) at NOM-FHFA_05072974.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 504.

**FHFA Reply:**  Defendants do not dispute the asserted fact.  While Defendants argue that

the cited document does not constitute a material fact, fact, fact, the fact is material to

showing that Nomura was aware of a red flag concerning Ownit but did not increase its

diligence on subsequent Ownit acquisition pools.

505.　**FHFA Statement:**　The review appears to have consisted of loans from the Ownit 01, Ownit 02, and Ownit 03 whole loan pools, and no loans were from the Ownit SP02 Acquisition Pool. Compare Ex. 169 (NOM-FHFA_04671106, spreadsheet entitled Nomura Complete Reconciliation) at NOM-FHFA_04671106 (showing list of loans in the Ownit SP01, SP02, 01, 02, and 03 loan pools) with Ex. 170 (NOM-FHFA_05072974, spreadsheet dated February 6, 2007 titled Nomura Extract) at NOM-FHFA_05072974 (listing all loans subject to diligence as part of the Ownit SP02 Part 2 pool).

　　**Nomura Response:**　Disputed that this constitutes a material fact. The loans included in the Ownit SP02 Part 2 review were not part of any loan pools that contributed loans to the SLGs.　Compare Ex. 614 (NOM-FHFA_04671106) at NOM-FHFA_04671106, with Ex. 615 (NOM- FHFA_05072974) at NOM-FHFA_05072974.

　　**RBSSI Response**:　RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 505.

　　**FHFA Reply:**　Defendants do not dispute the asserted fact.　While Defendants argue that

the cited document does not constitute a material fact, the fact is material to showing that

Nomura was aware of a red flag concerning Ownit but did not increase its diligence on

subsequent Ownit acquisition pools.

506.　**FHFA Statement:**　On January 31, 2007, Mr. Kempf of AMC sent Mr. Sabo and Mr. Spagna the "PRELIM Event Level 3 Report" for the Ownit SP02 Part 2 review, which "contain[ed] all loans QC'd (780) out of 870 reviewed as of 5:00 c.s.t. on Wednesday, 1/31." Ex. 171 (NOM- FHFA_05072690, 1/31/2007 email regarding "Ownit SP02 Part 2 – PRELIM Event level 3 Report") at NOM-FHFA_05072692 (discussing the "PRELIM Event level 3" report for Ownit SP02 Part 2).

　　**Nomura Response:**　Disputed that this constitutes a material fact. The loans included in the Ownit SP02 Part 2 review were not part of any loan pools that contributed loans to the SLGs.　Compare Ex. 616 (NOM-FHFA_05811137) at NOM-FHFA_05811137, with Ex. 425 (NOM- FHFA_05027871) at NOM-FHFA_05027871.

　　**RBSSI Response**:　RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 506.

　　**FHFA Reply:**　Defendants do not dispute the asserted fact.　While Defendants argue that

the cited document does not constitute a material fact, fact, the fact is material to showing

that Nomura was aware of a red flag concerning Ownit but did not increase its diligence on subsequent Ownit acquisition pools.

507. **FHFA Statement:** Mr. Sabo responded: "Is it getting worse or something?" Ex. 171 (NOM- FHFA_05072690, 1/31/2007 email regarding "Ownit SP02 Part 2 – PRELIM Event level 3 Report") at NOM-FHFA_05072690 (discussing the "PRELIM Event level 3" report for Ownit SP02 Part 2).

**Nomura Response:** Disputed that this constitutes a material fact. The loans included in the Ownit SP02 Part 2 review were not part of any loan pools that contributed loans to the SLGs. Compare Ex. 616 (NOM-FHFA_05811137) at NOM-FHFA_05811137, with Ex. 425 (NOM- FHFA_05027871) at NOM-FHFA_05027871.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 507.

**FHFA Reply:** Defendants do not dispute the asserted fact. While Defendants argue that the cited document does not constitute a material fact, the fact is material to showing that Nomura was aware of a red flag concerning Ownit but did not increase its diligence on subsequent Ownit acquisition pools.

508. **FHFA Statement:** Mr. Spagna asked: "These all seconds?" Ex. 171 (NOM-FHFA_05072690, 1/31/2007 email regarding "Ownit SP02 Part 2 – PRELIM Event level 3 Report") at NOM- FHFA_05072690 (discussing the "PRELIM Event level 3" report for Ownit SP02 Part 2).

**Nomura Response:** Disputed that this constitutes a material fact. The loans included in the Ownit SP02 Part 2 review were not part of any loan pools that contributed loans to the SLGs. Compare Ex. 616 (NOM-FHFA_05811137) at NOM-FHFA_05811137, with Ex. 425 (NOM- FHFA_05027871) at NOM-FHFA_05027871.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 508.

**FHFA Reply:** Defendants do not dispute the asserted fact. While Defendants argue that the cited document does not constitute a material fact, the fact is material to showing that Nomura was aware of a red flag concerning Ownit but did not increase its diligence on subsequent Ownit acquisition pools.

509. **FHFA Statement:** Mr. Sabo responded: "Yes." Ex. 171 (NOM-FHFA_05072690, 1/31/2007 email regarding "Ownit SP02 Part 2 – PRELIM Event level 3 Report") at NOM-FHFA_05072690 (discussing the "PRELIM Event level 3" report for Ownit SP02 Part 2).

    **Nomura Response:** Disputed that this constitutes a material fact. The loans included in the Ownit SP02 Part 2 review were not part of any loan pools that contributed loans to the SLGs. Compare Ex. 616 (NOM-FHFA_05811137) at NOM-FHFA_05811137, with Ex. 425 (NOM- FHFA_05027871) at NOM-FHFA_05027871.

    **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 509.

    **FHFA Reply:** Defendants do not dispute the asserted fact. While Defendants argue that the cited document does not constitute a material fact, the fact is material to showing that Nomura was aware of a red flag concerning Ownit but did not increase its diligence on subsequent Ownit acquisition pools.

510. **FHFA Statement:** Mr. Spagna wrote: "What crap." Ex. 171 (NOM-FHFA_05072690, 1/31/2007 email regarding "Ownit SP02 Part 2 – PRELIM Event level 3 Report") at NOM-FHFA_05072690 (discussing the "PRELIM Event level 3" report for Ownit SP02 Part 2).

    **Nomura Response:** Disputed that this constitutes a material fact. The loans included in the Ownit SP02 Part 2 review were not part of any loan pools that contributed loans to the SLGs. Compare Ex. 616 (NOM-FHFA_05811137) at NOM-FHFA_05811137, with Ex. 425 (NOM- FHFA_05027871) at NOM-FHFA_05027871.

    **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 510.

    **FHFA Reply:** Defendants do not dispute the asserted fact. While Defendants argue that the cited document does not constitute a material fact, fact, the fact is material to showing that Nomura was aware of a red flag concerning Ownit but did not increase its diligence on subsequent Ownit acquisition pools.

511. **FHFA Statement:** Mr. Sabo responded: "Yessir – you back yet?" Ex. 171 (NOM-FHFA_05072690, email regarding "Ownit SP02 Part 2 – PRELIM Event Level 3 Report") at NOM- FHFA_05072690.

**Nomura Response:** Disputed that this constitutes a material fact. The loans included in the Ownit SP02 Part 2 review were not part of any loan pools that contributed loans to the SLGs. Compare Ex. 616 (NOM-FHFA_05811137) at NOM-FHFA_05811137, with Ex. 425 (NOM- FHFA_05027871) at NOM-FHFA_05027871.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 511.

**FHFA Reply:** Defendants do not dispute the asserted fact. While Defendants argue that

the cited document does not constitute a material fact, the fact is material to showing that

Nomura was aware of a red flag concerning Ownit but did not increase its diligence on

subsequent Ownit acquisition pools.

512. **FHFA Statement:** 1,438 loans from the Ownit SP02 Acquisition Pool were securitized into the relevant SLG of the NHELI 2007-2 Securitization. Ex. 1 to the Cipione Dec. (Row 135 "Ownit SP02," Column J "NHELI 20072").

**Nomura Response:** Defendants do not dispute that 1,438 loans from the Ownit SP02 Acquisition Pool were securitized into the relevant SLG of the NHELI 2007-2 Securitization. However, the loans included in the Ownit SP02 Acquisition Pool were not part of the Ownit SP02 Part 2 review. Compare Ex. 614 (NOM-FHFA_04671106) at NOM-FHFA_04671106, with Ex. 615 (NOM- FHFA_05072974) at NOM-FHFA_05072974.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 512.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited

documents relating to the OwnIt acquisition pool and Part 2 review are irrelevant to the

asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*.

513. **FHFA Statement:** There is no evidence that Nomura alerted RBS or Lehman Brothers to its concerns or the results of the Ownit SP02 Part 2 review.

**Nomura Response:** Disputed. The trade pool at-issue in the OwnIt SP02 Part 2 review did not include any of the trade pools that contributed loans to the NHELI 2007-2 or NHELI 2007-3 SLGs (or any other at-issue SLGs). Compare Ex. 616 (NOM-FHFA_05811137) at NOM- FHFA_05811137, with Ex. 425 (NOM-FHFA_05027871) at NOM-FHFA_05027871. Furthermore, the OwnIt SP02 Part 2 review of trade pools not at-issue in this case post-dated the diligence on OwnIt SP02 by approximately two months. Compare Ex. 160 (NOM- FHFA_05231811) at NOM-FHFA_05231811 with Ex. 617 (NOM-FHFA_05811136) at NOM- FHFA_05811136. This review also post-

dated Freddie Mac's purchase of the NHELI 2007-2 securitization by approximately one month. See Ex. 12 (FHFA16863753) at FHFA16863753. And the review post-dated the cut-off date for the NHELI 2007-2 securitization by 30 days. Ex. 24 (NOM-FHFA_05591325) at NOM-FHFA_05591330 (cut-off date of January 1, 2007).

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 513.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited

documents relating to NHELI 2007-2 trade pool contribution and Freddie Mac purchase

dates are irrelevant to the asserted fact and do not create a genuine dispute of material

fact. Part I.C, *supra*.

514. **FHFA Statement:** Nomura issued the NHELI 2007-2 Securitization on January 31, 2007. *See supra* ¶ 12, Table 8.

**Nomura Response:** Defendants do not dispute that Nomura issued the NHELI 2007-2 Securitization on January 31, 2007. However, Freddie Mac purchased a certificate from this Securitization on December 27, 2006. Ex. 12 (FHFA16863753) at FHFA16863753.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 514.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited

documents relating to the Freddie Mac purchase date is irrelevant to the asserted fact and

does not create a genuine dispute of material fact. Part I.C, *supra*.

(c) *People's Choice: "Obviously A Faulty Process"*

515. **FHFA Statement:** On April 6, 2006, Mr. Katz emailed Mr. Kohout, Mr. Hartnagel, Mr. Graham, and Ms. Becka regarding a People's Choice trade: "People's would like to have a call today to discuss the fallout on our trade. [C]an the diligence team prepare a schedule of fallout…." Ex. 172 (Dep. Ex. 37123, email regarding "People's Choice") at NOM-FHFA_05496437.

**Nomura Response:** Undisputed that plaintiff's Exhibit 172 includes the text quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 515.

**FHFA Reply:** Defendants do not dispute the asserted fact.

516. **FHFA Statement:** Mr. Kohout asked: "There were a number of valuation issues with this trade, correct?" Ex. 172 (Dep. Ex. 37123, email regarding "People's Choice") at NOM- FHFA_05496437.

**Nomura Response:** Undisputed that plaintiff's Exhibit 172 includes the text quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 516.

**FHFA Reply:** Defendants do not dispute the asserted fact.

517. **FHFA Statement:** Mr. Hartnagel responded: "Yes—already sent the info over to Katz—90 property denies in total (80 were initially agreed upon their appraiser review of the BPO)[.]" Ex. 172 (Dep. Ex. 37123, email regarding "People's Choice") at NOM-FHFA_05496436.

**Nomura Response:** Undisputed that plaintiff's Exhibit 172 includes the text quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 517.

**FHFA Reply:** Defendants do not dispute the asserted fact.

518. **FHFA Statement:** Mr. Kohout emailed Mr. Katz: "This could either present an opportunity or a firm reason to pass on their next offering. Where a seller's in-house appraiser agrees with +-90% of the loans with value issues pursuant to mour [sic] BPO's, there is obviously an inherent flaw in their origination process." Ex. 172 (Dep. Ex. 37123, email regarding "People's Choice") at NOM- FHFA_05496436.

**Nomura Response:** Undisputed that plaintiff's Exhibit 172 includes the text quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 518.

**FHFA Reply:** Defendants do not dispute the asserted fact.

519. **FHFA Statement:** Mr. Katz responded: "[W]hat do you mean by oppty?" Ex. 172 (Dep. Ex. 37123, email regarding "People's Choice") at NOM-FHFA_05496436.

**Nomura Response:** Undisputed that plaintiff's Exhibit 172 includes the text quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 519.

**FHFA Reply:** Defendants do not dispute the asserted fact.

520. **FHFA Statement:** Mr. Kohout replied: "To help them re-engineer what is obviously a faulty process." Ex. 172 (Dep. Ex. 37123, email regarding "People's Choice") at NOM-FHFA_05496436.

**Nomura Response:** Undisputed that plaintiff's Exhibit 172 includes the text quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 520.

**FHFA Reply:** Defendants do not dispute the asserted fact.

521. **FHFA Statement:** In another version of the email chain, Mr. Kohout replied: "I took a closer look at the summary. While credit/compliance declines are in-line with what we typically might see in a similar type pool, property valuation declines are off the charts. Furthermore, the simple fact that only +-10% of the declines in this category were even disputed is further evidence of a systemic issue in this area on the origination side." Ex. 122 (Dep. Ex. 21914, email regarding "People's Choice") at NOM-FHFA_05496427.

**Nomura Response:** Undisputed that plaintiff's Exhibit 172 includes the text quoted by plaintiff.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 521.

**FHFA Reply:** Defendants do not dispute the asserted fact.

522. **FHFA Statement:** On March 29, 2006, Nomura bought the People's Choice SP01 Acquisition Pool from People's Choice. Ex. 4 to the Cipione Decl. (Column C "Pool Name" and Column D "Settlement Date").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 522.

**FHFA Reply:** Defendants do not dispute the asserted fact.

523. **FHFA Statement:** On May 30, 2006, Nomura bought the People's Choice SP02 Acquisition Pool from People's Choice. Ex. 4 to the Cipione Decl. (Column C "Pool Name" and Column D "Settlement Date").

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 523.

**FHFA Reply:** Defendants do not dispute the asserted fact.

524. **FHFA Statement:** Nomura securitized 932 loans from the People's Choice SP01 Acquisition Pool into the relevant SLG of the NHELI 2006-HE3 Securitization. Ex. 1 to the Cipione Decl. (Row 139 "Peoples Choice SP01," Column H "NHELI 2006-HE3").

    **Nomura Response:** Disputed. Nomura securitized 899 loans from the People's Choice SP01 loan pool into the relevant supporting loan group of the NHELI 2006-HE3 Securitization. Ex. 613 (July 9 Grice Report Revised Exhibit 2) at 3; Mishol Decl. Ex. 8.

    **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 524.

    **FHFA Reply:** Defendants do not dispute a material fact. While Defendants dispute whether 932 or 899 loans were securitized from the People's Choice SP01 pool, any such dispute is not material to FHFA's motion. *Quarles*, 758 F.2d at 840. Moreover, FHFA's number of 932 loans was derived based on reliance on Defendants' original July 9, 2014 Grice Report Exhibit 2, not Nomura Ex. 613 or Mishol Ex. 8, which are based on Grice's revised exhibit 2 which this Court excluded.

525. **FHFA Statement:** Nomura securitized 740 loans from the People's Choice SP02 Acquisition Pools into the relevant SLG of the NHELI 2006-HE3 Securitization. Ex. 1 to the Cipione Decl. (Row 140 "Peoples Choice SP02," Column H "NHELI 2006-HE3").

    **Nomura Response:** Disputed. Nomura securitized 899 loans from the People's Choice SP01 loan pool into the relevant supporting loan group of the NHELI 2006-HE3 Securitization. Ex. 613 (July 9 Grice Report Revised Exhibit 2) at 3; Mishol Decl. Ex. 8.

    **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 525.

    **FHFA Reply:** Defendants do not dispute a material fact. While it appears Defendants dispute whether 740 loans were securitized from the People's Choice SP02 pool (Defendants reference People's Choice SP01 seemingly by mistake) any such dispute is not material to FHFA's motion. *Quarles*, 758 F.2d at 840. Moreover, FHFA's number of 740 loans was derived based on reliance on Defendants' original July 9, 2014 Grice

Report Exhibit 2, not Nomura Ex. 613 or Mishol Ex. 8, which are based on Grice's

revised exhibit 2 which this Court excluded.

526. **FHFA Statement:** There is no evidence that Nomura performed additional diligence on loans drawn from the People's Choice SP01 and SP02 Acquisition Pools before purchasing or securitizing them.

**Nomura Response:** Disputed. Nomura's concerns about People's Choice related to valuation issues, not credit and compliance diligence issues. Plaintiff's Ex. 122 (Dep. Ex. 21914, email regarding "People's Choice") at NOM-FHFA_05496427 ("While credit/compliance declines are in-line with what we typically might see in a similar type pool, property valuation declines are off the charts."). Because Nomura performed 99% or more valuation diligence on all loans in People's Choice SP01 and SP02, there was no "additional diligence" to perform on loans from those pools. Mishol Decl. Ex. 16. Furthermore, for both pools, Nomura reviewed more than its minimum sample size for bulk pools—26.5% of the loans for People's Choice SP01 and 28.1% of the loans for People's Choice SP02. Ex. 500 (July 9 Grice Report Revised Exhibit 3B) at 1; Mishol Decl. Ex. 6 at 3. Nomura kicked out 21.2% and 21.3% of the loans reviewed for credit and compliance due diligence in these pools, respectively, eliminating the riskiest loans identified by the due diligence process. Mishol Decl. Ex. 14 at 3. 5.2% and 6.3% of the loans in these pools, respectively, were kicked out due to the results of valuation diligence, well above the 2.5% valuation kick-out rate for all 194 at-issue trade pools, reflecting the fact that Nomura identified "valuation issues" and kicked out loans where the appraisal values were not supported. Mishol Decl. Ex. 13 at 3.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 526.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited

documents relating to the People's Choice pools are irrelevant to the asserted fact and do

not create a genuine dispute of material fact. Part I.C, *supra*.

527. **FHFA Statement:** Nomura issued NHELI 2006-HE3 on August 31, 2006. See *supra* ¶ 10, Table 6.

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 527.

**FHFA Reply:** Defendants do not dispute the asserted fact.

528. **FHFA Statement:** Nomura issued NHELI 2007-2 on January 31, 2007. See *supra* ¶ 12, Table 8.

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 528.

**FHFA Reply:** Defendants do not dispute the asserted fact.

        (d)     *Quick Loan: "Def[ies] … Common Mortgage Underwriting Criteria"*

529.    **FHFA Statement:** On February 13, 2006, Mr. Hartnagel sent a report regarding Quick Loan: "This seller's trade include increasing files defy[ing] GL's [guidelines] and common Mortgage Underwriting criteria such as: DTI's over 55% (as high as 70% seen), Fico's under 500, LTV's over 100%, etc. … Performance in noted deals has been sub par at best. Recommend removing them from buy/approved list[.]" Ex. 174 (Dep. Ex. 39727, 2/13/2006 email regarding "DD report on sellers") at NOM-FHFA_05500992 .

**Nomura Response:** Disputed. Although plaintiff's Exhibit 174 includes the text quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, the email to which Mr. Hartnagel attached the document containing that text makes clear that the document is just a "rough draft" of "an initial report." Ex. 618 (NOM-FHFA_05500991) at NOM-FHFA_055000991. Furthermore, there are no "noted deals" in the report that Mr. Hartnagel sent, and there is no indication that the deals regarded by Mr. Hartnagel as "sub par at best" were Nomura deals. *Id.* at NOM-FHFA_05500992-0993.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 529.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited

document relating to the Quick Loan red flags does not contravene the asserted fact and

does not create a genuine dispute of material fact. Part I.C, *supra*.

530.    **FHFA Statement:** Mr. Hartnagel later explained that "[t]ypical DTI's were capped at 55 [percent,]" and that a DTI ratio as high as 70 percent was a "high ratio." Ex. 33 (Deposition of Jeffrey Hartnagel) at 811:13-812:2 ("Q. 'Common mortgage underwriting criteria such as DTI's over 55 percent.' What do you mean 55 percent as a common mortgage underwriting criteria? A. Typical DTI's were capped at 55. Q. 'As high as 70 percent seen.' Does that mean you saw DTI ratios as high as 70 percent? A. I would assume that is what that means. Q. Is that a high unusually -- extremely risky DTI ratio? … A. Yes, that is a high ratio.").

**Nomura Response:** Disputed. Although Mr. Hartnagel gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted

excerpt. For example, Mr. Graham of Nomura testified regarding DTIs that "there could be other attributes [besides DTI] about the loan that could offset" a high DTI ratio. Ex. 35 (Graham Tr.) at 85:24-86:8.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 530.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  The cited

testimony relating to high DTI does not contravene the asserted fact and does not create a

genuine dispute of material fact.  Part I.C, *supra*.

531.  **FHFA Statement:**  Mr. Hartnagel later explained that FICO scores of 500 were "typically [] the floor" for subprime loans in the industry.  Ex. 33 (Deposition of Jeffrey Hartnagel) at 812:10-18 ("Q.  'FICO's under 500.' What does this mean?  A.  Your FICO score was under 500.  Q.  What is the significance of 500 as the threshold?  A.  That typically was the floor.  Q.  Is that like an industry minimum floor?  A.  Subprime, yes.").

**Nomura Response:**  Disputed. Although Mr. Hartnagel gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, Mr. Hartnagel's testimony does not state that all subprime loans were required to have FICO scores of 500 or greater; to the contrary, his email concerning QuickLoan states that it permitted FICOs under 500. Ex. 618 (at NOM-FHFA_05500992) at NOM-FHFA_05500992.  Furthermore, Nomura generally required a minimum FICO score of 580.  E.g., Ex. 232 (NOM- FHFA_05066340) at NOM-FHFA_05066340; see also Ex. 233 (NOM-FHFA_05066349) at NOM-FHFA_05066349; Ex. 235 (NOM-FHFA_05324872) at NOM-FHFA_05324872; Ex. 236 (NOM-FHFA_05338819) at NOM-FHFA_05338820; Ex. 237 (NOM-FHFA_05361051) at NOM-FHFA_05361051; Ex. 238 (NOM-FHFA_05368895) at NOM-FHFA_05368895; Ex. 239 (NOM-FHFA_05516995) at NOM-FHFA_05516995.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 531.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  The cited

documents related to FICO scores are irrelevant to the asserted fact and do not create a

genuine dispute of material fact.  Part I.C, *supra*.

532.  **FHFA Statement:**  Mr. Hartnagel later explained that an LTV ratio over 100 percent was a "problem" because "the buyer is immediately underwater"—"he owes more than the house is worth"—hence "there is no equity built in[,]" and it is "an inherent risk." Ex. 33 (Deposition of Jeffrey Hartnagel) at 812:19-813:16. ("Q.  'LTV's over 100 percent,' what is the significance of 100 for LTV ratio?  A.  That means your loan is exactly at the value

of your property. Q. Is a loan with an LTV over 100 percent a problem? … A. Because the buyer is immediately under water. Q. What do you mean 'under water'? A. He owes more than the house is worth. Q. Why is that a risk? A. It is a problem. Q. Why? A. Because there is no equity built in. He owes more than the property is worth. Q. Does that just reduce the incentive to keep making payments? A. Not necessarily. It is just an inherent risk.").

**Nomura Response:** Disputed. Although Mr. Hartnagel gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, Mr. Graham of Nomura testified that he considered LTV ratios of "90 to 100" to be at the "higher" range and also testified that "LTV [itself] is a data point. So absent any other information about a loan, I don't know [in] and of itself if [a higher LTV] makes [a loan] riskier." Ex. 35 (Graham Tr.) at 58:7-22. Mr. Kohout agreed that "characteristics that were relevant to determining where in [an LTV] range the maximum LTV would be are loan amount, loan purpose, occupancy status, property type, citizenship, doc type, FICO, DTI and interest only." Ex. 26 (Kohout Tr.) at 50:8-15. Included in this list of characteristics are certain "compensating factors," which are "[i]tems or factors in a particular loan file that would lead you to believe that it's a good loan, that the borrower will pay or . . . will be able to recoup the value back from the collateral." Ex. 30 (Sabo Tr.) at 66:11-16.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 532.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited

testimony related to LTV ratios is irrelevant to the asserted fact and does not create a

genuine dispute of material fact. Part I.C, *supra*.

533. **FHFA Statement:** On October 10, 2006 Nomura bought the Quick Loan SP11 Acquisition Pool from Quick Loans. Ex. 4 to the Cipione Decl. (Column C "Pool Name" and Column D "Settlement Date").

**Nomura Response:** Disputed that the Cipione Declaration accurately reflects Nomura's purchase or securitization of loans. Undisputed that the settlement date for Quick Loan SP11 was October 10, 2006.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 533.

**FHFA Reply:** Defendants do not dispute the asserted fact.

534. **FHFA Statement:** Nomura securitized 38 loans from the Quick Loan SP 11 Acquisition Pool into the relevant SLG of the NHELI 2007-2 Securitization. Ex. 1 to the Cipione Decl. (Row 161 "Quick Loan SP11," Column J "NHELI 2007-2").

**Nomura Response:** Disputed that the Cipione Declaration accurately reflects Nomura's purchase or securitization of loans. Undisputed that 38 loans from Quick Loan SP11 were included in the supporting loan group for NHELI 2007-2. All 38 of these loans were included in the credit and compliance sample for Quick Loan SP11. See Mishol Decl. Ex. 1.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 534.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited

document does not contravene the asserted fact and does not create a genuine dispute of

material fact. Part I.C, *supra*.

535. **FHFA Statement:** Nomura issued NHELI 2007-2 on January 31, 2007. *See supra* ¶ 12, Table 8.

**Nomura Response:** Undisputed that Nomura issued the NHELI 2007-2 Securitization on January 31, 2007, but Freddie Mac purchased a certificate in that Securitization on December 27, 2006. Ex. 12 (FHFA16863753) at FHFA16863753.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 535.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited

documents relating to the Freddie Mac purchase date is irrelevant to the asserted fact and

does not create a genuine dispute of material fact. Part I.C, *supra*.

4. <u>Nomura Securities Determined That The Actual Values Of Many Mortgage Properties Were Lower Than It Reported To Investors</u>

536. **FHFA Statement:** Nomura used third-party valuation firms Hansen and CoreLogic to conduct AVMs. Ex. 24 (Deposition of John Graham) at 177:9-16 ("Q. Did Nomura have its own automated valuation model or use a third party's? A. They used a third party. I can think of two that they used. I don't know if they were in sequence or simultaneous, depending on volume, I don't know. Q. And what were the two? A. CoreLogic and Hansen."); Ex. 362 (NOM-FHFA_04923018, NCCI Residential Whole Loan Securitization Platform) at NOM-FHFA_04923046 ("Previews are performed by Hansen, CoreLogic, LoanIQ, or C+S Marketing. Each vendor has its own grading but each use multiple Automated Valuation Models (AVM's) to determine the most accurate property evaluation."); *see also* Ex. 148 (NOM-FHFA_04881240, email regarding "FW: NHELI 2006-HE3 Due Diligence Summary") at NOM-FHFA_048881241 ("AVMs are

performed on 100% of all loans. Nomura uses Hansen Pro and Loan IQ (Loan Performance product)[.]").

**Nomura Response:** Defendants do not dispute that Nomura used Hansen and CoreLogic to conduct AVMs.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 536.

**FHFA Reply:** Defendants do not dispute the asserted fact.

537. **FHFA Statement:** Nomura maintained an AVM tolerance or variance level of 10% for subprime loans and 15% for all other loan types. Ex. 177 (NOM-FHFA_05519907, Valuations Review) at NOM- FHFA_05519910 ("Prior to March 1, 2007, Nomura's valuation process allowed for up to a 15% variance for Alt-A loans and 10% for subprime loans."); Ex. 178 (NOM-FHFA_05520919, email regarding "FW: Fremont") at NOM-FHFA_05520919 ("We would like for OCWEN to change our in/out variance to -10% (instead of out -15%) on all Sub-Prime trades going forward."); Ex. 46 (Deposition of Neil Spagna) at 295:21-296:6 ("Q. … Do you know what the tolerance was? A. It was 10 percent on a subprime deal and it was a little higher on … an alt-A deal. Q. Okay. A. I think it was 15 percent on an alt-A deal."); *see also* Ex. 53 (Deposition of Joseph Kohout) at 321:20-24 ("Q. So as long as the AVM came within 15 percent of the appraisal, it was considered within tolerance? A. Relative to that portion of the valuation review, correct.").

**Nomura Response:** Undisputed that Nomura maintained a tolerance of 15% for Alt-A loans and 10% for subprime loans. See C. Stmt. ¶¶ 73-75.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 537.

**FHFA Reply:** Defendants do not dispute the asserted fact.

538. **FHFA Statement:** Nomura internal documents indicated that if the AVM did not return a value or the AVM value was below the original appraised value by more than the threshold variance, a broker price opinion ("BPO") was conducted. Ex. 362 (NOM-FHFA_04923018, Nomura Credit & Capital, Inc. Residential Whole Loan Securitization Platform Presentation for ASF Conference dated January, 2007) at NOM-FHFA_04923046 ("If the property is graded 'High Risk' a further review will be initiated in the form of a Broker Price Opinion (BPO)"); Ex. 175 (NOM- FHFA_04923017, email dated January 26, 2007 from Michael Orfe to Randall Lee FW: afs_20070125.ppt) at NOM-FHFA_04923017 (email attaching this presentation ); Ex. 148 (NOM-FHFA_04881240, email dated October 05, 2006 from Adam Smith to Steven Katz FW: NHELI 2006-HE3 Due Diligence Summary) at NOM-FHFA_04881241 (listing general due diligence procedures for Nomura, including when BPOs are performed); Ex. 176 (NOM-FHFA_05122071, Nomura Residential Mortgage Initiatives) at NOM-

FHFA_05122083 ("100% AVM with BPO follow up on high risk loans"); Ex. 516 (NOM-FHFA_05122070, email dated February 2, 2006 from Joseph Kohout to Kevin Quinn re: Nomura Collateral Presentation) at NOM- FHFA_05122070 (attaching presentation which outlines Nomura's collateral process); Ex. 177 (NOM-FHFA_05519907, Valuations Review performed at the request of Neil Spagna, Director of Credit for Nomura, dated May 25,2007) at NOM-FHFA_05519910 (flowchart noting that when AVM was not within tolerance the appraisal was sent for "Order BPO").

**Nomura Response:** Defendants do not dispute that Nomura obtained BPOs for loans if additional valuation diligence was warranted.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 538.

**FHFA Reply:** Defendants do not dispute the asserted fact.

539. **FHFA Statement:** "[I]f the AVM is outside of tolerance," then the loan went to a BPO review. Ex. 46 (Deposition of Neil Spagna) at 298:14-19 ("Q. So then if the AVM is outside of tolerance, showing that the valuation is under the appraised value at the amounts that we discussed, then it goes to a broker price opinion; is that right? A. Correct."); Ex. 49 (Deposition of Mendy Sabo) at 245:11-21 ("Q. Okay. Then if the AVM came more than 15 percent off, I guess meaning that the AVM predicted value for that property in that time was below the appraised value by more than 15 percent, then did it fail? A. It failed that process, yes. Q. And then was the loan kicked out? A. No. Q. Okay. Why not? A. The loan was then upgraded to a BPO.").

**Nomura Response:** Defendants do not dispute that Nomura would conduct BPOs on certain loans based on AVM results. See C. Stmt. ¶¶ 72-77.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 539.

**FHFA Reply:** Defendants do not dispute the asserted fact.

540. **FHFA Statement:** After an AVM, Nomura used third-party valuation firms Ocwen and Fiserv to conduct Broker Price Opinions ("BPOs"). Ex. 362 (NOM-FHFA_04923018, Nomura Credit & Capital, Inc. Residential Whole Loan Securitization Platform Presentation for ASF Conference dated January, 2007) at NOM-FHFA_04923046 ("BPO's are performed by Ocwen and FISERV."); *see, e.g.*, Ex. 180 (NOM-FHFA_05056477, spreadsheet from Ocwen of rebuttal results including BPOs) at NOM-FHFA_05056477; Ex. 179 (NOM-FHFA_05056476, email dated September 22, 2005, from Enia Douglas at Ocwen to Mendy Sabo, regarding Aegis rebuttals) at NOM-FHFA_05056476 (attaching spreadsheet with rebuttal results); Ex. 182 (NOM-FHFA_05798822, spreadsheet from Ocwen of rebuttal results including BPOs) at NOM-FHFA_05798822; Ex. 181 (NOM-FHFA_05798816, October 28, 2005, email from Enia Douglas at Ocwen to Mendy Sabo, regarding Fremont SP02 BPO Update) at NOM-FHFA_5798816 (attaching spreadsheet with BPOs); *see also* Ex. 46 (Deposition of Neil

348

Spagna) at 299:13-19 ("Q. Okay. And then what happens with the results -- oh, do you know who your -- did you have a BPO provider or who did you use to do the BPOs? A. We used two companies, one was Fiserv and I -- I can't recall the other one that was based in San Diego."); Ex. 53 (Deposition of Joseph Kohout) at 323:2-5 ("Q. Was there a company that was providing the broker price opinion? A. We used a few, but predominately, we used Ocwen.").

**Nomura Response:** Defendants do not dispute that Fiserv and Ocwen were two of the third-party vendors Nomura hired to provide BPOs. See C. Stmt. ¶¶ 113-114, 226-227, 240-241.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 540.

**FHFA Reply:** Defendants do not dispute the asserted fact.

541. **FHFA Statement:** A "drive-by BPO" would involve desktop review comparing the property to three current listings and three sales. Ex. 53 (Deposition of Joseph Kohout) at 328:23-329:4 ("Q. And the drive-by BPO has access to comparables that have to be at least three comps sold, three comps listed, the way it looks outside, their knowledge of the market, and public record? A. Yeah, yes.").

**Nomura Response:** Disputed. Mr. Kohout never referred to a drive-by BPO as a "desktop review." Furthermore, the testimony quoted by plaintiff makes clear that in addition to comparable property listings and sales, a broker providing a BPO relied on an external inspection, the broker's "inherent knowledge of the market," and public records. Ex. 26 (Kohout Tr.) at 328:23-329:7.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 541.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue that Mr. Kohout did not use specific words used by FHFA and provided additional information about BPO's, they identify no evidence that specifically contradicts the asserted fact.

542. **FHFA Statement:** A "drive-by" BPO would also consider a drive-by of the property, the broker's "knowledge of the market, and [the] public record." Ex. 53 (Deposition of Joseph Kohout) at 328:23-329:4 ("Q. And the drive-by BPO has access to comparables that have to be at least three comps sold, three comps listed, the way it looks outside, their knowledge of the market, and public record? A. Yeah, yes."); *see also* Ex. 46 (Deposition of Neil Spagna) at 299:20-300:16 ("Q. And do you know what information the brokers were using for their BPO? A. What basis? Q. Yes. For example, were they

looking at comparables? Did they do drive-bys? Do you know what they were looking at? A. Sure. A typical BPO would involve a realtor, you know, visiting the property, taking a photo of it. Not obviously being able to go on the grounds or get inside, so you would just, you know, you just get an outside view of it. And then additionally you would have information about both recent sold comparables and recent listing comparables. You know, from there, it's very similar to a BPO, in that, you know, adjustments were made both negatively and positively depending on the subject property and how it compared to those comparable properties and values.").

**Nomura Response:** Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 541, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 542.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue that that Mr. Kohout's testimony requires additional context, they do not dispute his testimony or that it is properly cited and identify no evidence that specifically contradicts the asserted fact.

543. **FHFA Statement:** Nomura maintained the same BPO tolerance or variance level as were applied to the AVM value: 10% for subprime loans and 15% for all other loan types. Ex. 46 (Deposition of Neil Spagna) at 302:17-24 ("Q. Okay. Then what happens next once you get the results from a BPO? A. Let me see here. Refresh my memory a little bit. Okay. Oh. Well, essentially we're doing the same type of tolerance analysis, 15 percent for an alt-A loan and 10 percent for subprime.").

**Nomura Response:** Undisputed that Nomura maintained a tolerance of 15% for Alt-A loans and 10% for subprime loans. See C. Stmt. ¶¶ 73-75.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 543.

**FHFA Reply:** Defendants do not dispute the asserted fact.

544. **FHFA Statement:** Mr. Spagna agreed that "if the BPO came in within tolerance, even if the AVM came out of tolerance then the loan would pass" valuation diligence. Ex. 46 (Deposition of Neil Spagna) at 302:25-303:11 ("Q. So if the BPO came in within tolerance, even if the AVM came out of tolerance then the loan would pass; right? A. If it came back within tolerance as I described earlier, the BPO this time, yes, it would pass.

Q.  Okay.  Even -- even if the AVM had been out of tolerance, as long as the BPO came back within tolerance that the loan would pass?  A.  Correct.").

**Nomura Response:**  Undisputed that if an appraisal value was determined to be supported by a BPO, the loan passed valuation diligence.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 544.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

545.  **FHFA Statement:**  After obtaining a BPO value, the BPO vendor would then conduct a reconciliation between the BPO value and the original appraisal. Ex. 63 (Deposition of Joseph Kohout) at 325:7-16 ("The broker price opinion would come in from the field.  It would be reconciled to the appraisal. And part of the reason for the reconciliation is that when you're doing a drive-by, you're not looking at the interior of the property.  So when you're -- you're making assumptions on value, you are sometimes relying on information in public records, which is not accurate. So the appraisal actually, the appraiser actually measures the rooms."); *id.* at 328:11-14 ("A. . . . And there was also, you know, a comparison in writing, as to the value conclusions reached by the BPO versus the value of the appraisal."); *see also id.* at 330:13-18 ("Q.  Okay.  So then somebody at Ocwen, or similar BPO provider, would take the appraisal and the BPO field review, and then come out with its own opinion of a reconciled valuation?  A.  Correct.").

**Nomura Response:**  Disputed. Although defendants do not dispute that the BPO and appraisal would be reconciled, there is no evidence that the reconciled valuation was intended to replace the original appraisal, rather than simply to assess whether that appraisal was supported. Ex. 29 (Hartnagel Tr.) at 84:11-25 (describing Nomura's valuation process as an attempt "support or deny," rather than replace, the appraisal value); Ex. 26 (Kohout Tr.) at 348:3-7 ("If the BPO came back and supported the appraised value . . . then the value would be accepted.").

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 545.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Nomura's argument regarding the use of the reconciled value is irrelevant to the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

546.  **FHFA Statement:**  The BPO vendor would use "all the valuation information" to "reconcile to a final value." Ex. 49 (Deposition of Mendy Sabo) at 247:25-248:6 ("A. Well, all that information, all -- you know, the broker would fill out the BPO and then the BPO provider would actually be in receipt of all the valuation information. They would actually put all that information together and reconcile to a final value."); *see also*

Ex. 362 (NOM-FHFA_04923018, NCCI Residential Whole Loan Securitization Platform) at NOM-FHFA_04923046 ("BPO's are performed by Ocwen and FISERV. They are reconciled to the appraisal by Certified Appraiser and Vendor…"); Ex. 148 (NOM-FHFA_04881240, email regarding "FW: NHELI 2006-HE3 Due Diligence Summary") at NOM-FHFA_04881241 ("All BPO variance with original appraisals is performed by Ocwen's internal appraisal department. Ocwen reconciles the BPO to the appraisal in the file and reconciliation is presented to Nomura and Originator."); *see also*, e.g. Ex. 183 (NOM- FHFA_05070686, email regarding "FSF BPO (1 property listed, 0 outside tolerance)") at NOM- FHFA_05070686 ("Attached are the final valuation results."); Ex. 364 (NOM-FHFA_05070687, attachment "Nomura Valuation Orders 11-13-06.xls") at NOM-FHFA_05070687 (Ocwen Valuation orders for 11 loan pools, various tabs provide low and high BPO values, seller values, variance percentages in values, seller's values etc.).

**Nomura Response:** Disputed. Although Mr. Sabo gave the testimony quoted by plaintiff, and the cited documents contain the text quoted by plaintiff, those quotes and excerpts are removed from the context in which they appear, and omit other testimony that must be evaluated in order to fully understand the quoted excerpts. For example, the BPO vendor relied on more information than the "valuation information" provided by the broker, including additional information provided by the loan's originator, which was sent to the BPO vendor and factored into the final reconciliation of value. See Ex. 26 (Kohout Tr.) at 331:4-14, 332:17-333:2; Ex. 30 (Sabo Tr.) at 247:8-18, 249:3-9; Ex. 226 (NOM-FHFA_05798816) at NOM-FHFA_05798816; Ex. 227 (NOM-FHFA_05056476) at NOM-FHFA_05056476. Furthermore, there is no evidence that the "final value" referred to by plaintiff was intended to replace the original appraisal, rather than simply to assess whether that appraisal was supported.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 546.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue that Mr. Sabo's testimony requires additional context, they do not dispute his testimony or that it is properly cited and identify no evidence that specifically contradicts the asserted fact.

547. **FHFA Statement:** The Diligence Group generally had a 15% tolerance for the reconciled value. Ex. 53 (Deposition of Joseph Kohout) at 330:13-24 ("Q. Okay. So then somebody at Ocwen, or similar BPO provider, would take the appraisal and the BPO field review, and then come out with its own opinion of a reconciled valuation? A. Correct. Q. Now, is that the one that was judged for tolerance? A. Correct. Q. And what was the tolerance on that? A. 15 percent, generally.").

**Nomura Response:** Disputed. Although defendants do not dispute that Nomura generally had a tolerance of 15% for Alt-A loans and 10% for subprime loans for the reconciled final loan value, there is no evidence that the "reconciled value" referred to by plaintiff was intended to replace the original appraisal, rather than simply to assess whether that appraisal was supported. See C. Stmt. ¶¶ 73-75.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 547.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura's argument regarding the use of the reconciled value is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

548. **FHFA Statement:** Third party valuation diligence results demonstrate that Nomura generally applied a 10% tolerance to subprime Acquisition Pools and a 15% tolerance to Alt-A Acquisition Pools as illustrated in Table 12. ***FOOTNOTE Plaintiff was unable to locate evidence regarding the variance threshold for Acquisition Pools in Table X marked "N/A". See Exs. 180, 184-352.

**Nomura Response:** Disputed. While plaintiff claims that they are "unable to locate evidence regarding the variance threshold for Acquisition Pools in Table X marked 'N/A,'" Nomura generally considered tolerance to be 15% from the original appraised values for Alt-A and 10% from the original appraised values for subprime loans. Ex. 26 (Kohout Tr.) at 310:11-311:19; Ex. 27 (Spagna Tr.) at 297:12-298:9.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 548.

**FHFA Reply:** Defendants do not dispute the asserted fact. While Defendants dispute FHFA's contention that there was no specific evidence as to certain pools in Table X, Nomura has conclusively admitted above in response to ¶ 547 that Nomura generally applied a 10% tolerance to subprime Acquisition Pools and a 15% tolerance to Alt-A Acquisition Pools. Defendants citation to testimony regarding general practices does not provide the evidence FHFA was unable to locate and further does not contradict the asserted fact. There can therefore be no genuine dispute as to the asserted fact. Part I.F, *supra*.

549. **FHFA Statement:** Mr. Sabo agreed that even if the AVM was out of tolerance or the F score was "bad," "[i]f the valuation information was reconciled at the BPO provider and ultimately was reconciled to within the tolerance established, then a loan could have been included in the pool." Ex. 49 (Deposition of Mendy Sabo) at 321:15-322:3 ("Q. Okay. So is it possible to accept in a pool if an AVM comes out with a valuation below by more than 15 percent and an F score comes out as a bad F score, and yet the BPO reconciliation that has access to the appraisal and that information comes out within tolerance? … A. If the valuation information was reconciled at the BPO provider and ultimately was reconciled to within the tolerance established, then a loan could have been included in the pool.").

**Nomura Response:** Disputed. Although Mr. Sabo gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 549.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants do not dispute that Mr. Sabo gave the proffered testimony, and Nomura's assertion that additional testimony is required for context fails to cite to any additional testimony or documents. Therefore, Nomura's alleged dispute does not create a genuine dispute of material fact. Part I.E, *supra*.

550. **FHFA Statement:** Even if the reconciled value was out of tolerance, the loan would be given "to the seller to opine" before being kicked from the pool. Ex. 53 (Deposition of Joseph Kohout) at 331:4-14 ("Q. Okay. And then if it's outside of 15 percent, is it kicked? A. Correct. Well, we first give -- we would give the seller to opine. […] [I]t would be presented to the seller independent of the third-party due diligence review as a kick for valuation."). Mr. Kohout agreed that for "each step in this process, if you passed, you passed for good. But if you failed, you just went to the next step of the process." *id.* at 339:18-24 ("Q. Fair to say that each step in this process, if you passed, you passed for good. But if you failed, you just went to the next step of the process? […] A. Relative to the valuation process."); *see also* Ex. 359 (12/12/2013 Letter from A. Davidoff to E. Taggart) (adopting testimony as that of a Rule 30(b)(6) witness).

**Nomura Response:** Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony that must be evaluated in order to fully understand the quoted excerpt. For example, Mr. Kohout did not agree that "if you passed, you passed for good. But if you failed, you just went to the next step of the process." He only agreed that this was true "[r]elative to the valuation process." Ex. 26 (Kohout Tr.) at 339:18-24. In addition,

Mr. Kohout testified that "[i]n reality, the sellers very rarely opined. The loans were generally kicked." *Id.* at 332:24-333:2.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 550.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Nomura's

additional statement that Mr. Kohout was referring specifically to the valuation process is

not contrary to the asserted fact and does not create a genuine dispute of material fact.

Part I.C, *supra*.

551.  **FHFA Statement:**  "[I]f the seller was able to produce some supporting documentation of value or some rebuttal appraisal or again some rebuttal information supporting a stated value," then the loan "could have been potentially been cured and brought back in." Ex. 49 (Deposition of Mendy Sabo) at 247:8-18 ("Q.  Now, was it kicked automatically, or did you have to go consult the seller? […]  A.  I can't recall.  But it probably was kicked automatically and if the seller was able to produce some supporting documentation of value or some rebuttal appraisal or again some rebuttal information supporting a stated value, then it was -- then it could have been potentially been cured and brought back in."); *see, e.g.*, Ex. 353 (NOM-FHFA_05502116, email regarding rebuttals and other issues) at NOM-FHFA_05502116 (outlining arguments from seller for waiving exceptions).

**Nomura Response:**  Disputed. Although Mr. Kohout gave the testimony quoted by plaintiff, that quote is removed from the context in which it appears, and omits other testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 550, *supra*, which is incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 551.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Defendants do not

dispute that Mr. Kohout gave the proffered testimony, and Nomura's assertion that

additional testimony is required for context fails to cite to any additional testimony or

documents contradicting the asserted fact,  Therefore, Nomura's alleged dispute does not

create a genuine dispute of material fact.  Part I.E, *supra*.

552. **FHFA Statement:** Mr. Graham agreed that that the "LTV information was always based on either the sales price or the appraisal that was done by an appraiser in connection with issuing the loan." Ex. 24 (Deposition of John Graham) at 65:17-66:7 ("Q. Would it -- would it be fair to say that when Nomura was describing the characteristics of loans, it was common to include a description of the LTV or CLTV of those loans? [...] A. The prospectus supplement had a table that disclosed LTV information. Q. And was it the case that the LTV information was always based on either the sales price or the appraisal that was done by an appraiser in connection with issuing the loan? [...] A. Yes.").

**Nomura Response:** Defendants do not dispute that the LTV information in the prospectus supplements was based upon the lesser of the selling price of the mortgaged property or its appraised value at the time of sale.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 552.

**FHFA Reply:** Defendants do not dispute the asserted fact.

553. **FHFA Statement:** When asked whether value part of the "LTV information that was disclosed in a prospectus supplement … was based on an appraisal that Nomura had done itself," Mr. Graham responded: "Not for any of the deals closed while I was there." Ex. 24 (Deposition of John Graham) at 66:8-66:19 ("Q. Okay. And so was there ever a time that the LTV information that would be included in a prosupp would refer to any reappraisal that was done by Nomura itself? A. Repeat the question. Q. Yeah. Was there ever a time that the LTV information that was disclosed in a prospectus supplement, that the value part of that was based on an appraisal that Nomura had done itself? A. Not for any of the deals closed while I was there.").

**Nomura Response:** Disputed. Although defendants do not dispute that the "value part" of the LTV ratios disclosed in prospectus supplements was not based on appraisals or "reappraisals" performed by Nomura, there is no evidence that Nomura or any other RMBS issuer performed appraisals or "reappraisals" for loans it securitized, nor is there any evidence that Nomura represented that LTV ratios in prospectus supplements were based on such "reappraisals."

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 553.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants dispute the asserted fact, they identify no evidence that contradicts it. Nomura's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*.

554. **FHFA Statement:** For example, Nomura's diligence on Loan No. ███████ shows that Hansen's AVM estimated a value of ████████ for the property. Ex. 354 (NOM-

FHFA_05567075, Hansen Quality PREVIEW – Collateral Risk Scoring System) at
NOM-FHFA_05567075 (listing the "HQ Automated Valuation" (column O) for Loan
No. ▮▮▮▮▮ (row 1369) as ▮▮▮▮▮ .

**Nomura Response:** Disputed to the extent plaintiff suggests that the value estimate
returned by the Hansen AVM for Loan No. ▮▮▮▮▮ is a better indicator of value than
an appraisal or a sale price or was intended to replace the appraised value or sale price as
a value estimate. Arm's- length transactions between willing buyers and sellers constitute
the best indicator of value, and in-person appraisals by licensed appraisers constitute the
next-best valuation method. *See* Ex. 217 (Kennedy Report) at 7, 9 ("It is a universally
accepted truth in economics and the appraisal industry that a fully informed, arm's-length
transaction provides a sales price that indicates fair market value . . . . In the absence of a
sales price, an appraiser's opinion of value provides a value range for the property").

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 554.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura's

argument regarding a suggestion not even contained in FHFA's statement is irrelevant to

the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

555. **FHFA Statement:** Ocwen returned a lower BPO value of ▮▮▮▮▮ and a higher BPO
value of ▮▮▮▮▮ Ex. 234 (NOM-FHFA_05056459, 11-02 Fremont SP 02A-B
complete list w- rebuttals) at NOM-FHFA_05056459 (listing the "BPO low value",
(Column L), and "BPO high value", (Column M), (Tab "BPO", row 25) as ▮▮▮▮▮ and
▮▮▮▮▮ respectively for Loan No. ▮▮▮▮▮ .

**Nomura Response:** Disputed to the extent plaintiff suggests that the estimate of value
returned by the Ocwen BPO is a better indicator of value than an appraisal or a sale price
or was intended to replace the appraised value or sale price as a value estimate. See
¶ 554, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 555.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura's

argument regarding a suggestion not even contained in FHFA's statement is irrelevant to

the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

556. **FHFA Statement:** Ocwen's final reconciled value estimate was only ▮▮▮▮▮ Ex. 234
(NOM- FHFA_05056459, 11-02 Fremont SP 02A-B complete list w- rebuttals) at NOM-

FHFA_05056459 (listing the "post reviewed" value (Tab "BPO", row 25, column K) as ▮▮▮▮▮ for Loan No. ▮▮▮▮▮▮▮▮

**Nomura Response:** Disputed to the extent plaintiff suggests that the final reconciled value estimate is a better indicator of value than an appraisal or a sale price or was intended to replace the appraised value or sale price as a value estimate. See ¶ 554, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 556.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura's argument regarding a suggestion not even contained in FHFA's statement is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

557. **FHFA Statement:** This final value was ▮▮▮▮▮ lower than the original appraisal value. Ex. 234 (NOM-FHFA_05056459, 11-02 Fremont SP 02A-B complete list w- rebuttals) at NOM- FHFA_05056459 (listing the "% variance" (Tab "BPO", row 25, column P) as ▮ ▮▮▮▮▮ for Loan No ▮▮▮▮▮▮▮.

**Nomura Response:** Disputed to the extent plaintiff suggests that this "final value" is a better indicator of value than an appraisal or a sale price or was intended to replace the appraised value or sale price as a value estimate. See ¶ 554, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 557.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura's argument regarding a suggestion not even contained in FHFA's statement is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

558. **FHFA Statement:** This resulted in an LTV ratio of ▮▮▮▮▮ Ex. 234 (NOM-FHFA_05056459, 11-02 Fremont SP 02A-B complete list w- rebuttals) at NOM-FHFA_05056459 (listing the "Revised LTV" (Tab "BPO", row 25, column S) as ▮▮▮▮▮ for Loan No. ▮▮▮▮▮▮.

**Nomura Response:** Disputed. The "[p]ost [r]eviewed [v]alue" of ▮▮▮▮▮ to calculate the LTV ratio cannot be used to calculate the LTV ratio. The prospectus supplements explained that LTV ratios for all loans other than refinance loans were determined based on the lesser of the appraised value of the home at origination or the sales price of the home. Specifically, the prospectuses stated that "[t]he 'Loan-to-Value Ratio' of a

358

mortgage loan at any particular time is the ratio (expressed as a percentage) of the then-outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of that loan and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in an appraisal obtained at the time of origination of the Refinance Loan. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market." Ex. 19 (NOM-FHFA_04811802) at NOM-FHFA_04811976; Ex. 20 (NOM- FHFA_04729474) at NOM-FHFA_04729664-9665; Ex. 21 (NOM-FHFA_04620885) at NOM- FHFA_04621112.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 558.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura's citation to the formula for how it calculated LTV for its prospectus supplements is irrelevant to the asserted fact, which specifically substitutes Nomura's valuation diligence results for the original appraisal value, and does not create a genuine dispute of material fact. Part I.C, *supra*.

559. **FHFA Statement:** Nomura securitized this loan in the relevant SLG of NHELI 2006-FM1 Securitization. Ex. 365 (NOM-FHFA_00000002, FM1_FinalPool) at NOM-FHFA_00000002 (listing loans in 2006-FM1 securitization (row 2834, column A) for Loan No ███████████

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 559.

**FHFA Reply:** Defendants do not dispute the asserted fact.

560. **FHFA Statement:** Nomura reported the original value in the NHELI 2006-FM1 loan tape. Ex. 365 (NOM-FHFA_00000002, FM1_FinalPool) at NOM-FHFA_00000002 (listing the "Property Value," and "Appraisal Value" (row 2834, column AD, Column AE) as ████████ for Loan No. ███████████

**Nomura Response:** Disputed. Plaintiff does not define "original value," and the meaning of that term is unclear. Nomura reported the appraised value of the property as determined in an appraisal obtained by the originator at origination of the loan in the NHELI 2006-FM1 loan tape. Pl. Ex. 365 (NOM-FHFA_00000002, FM1_FinalPool) at NOM-FHFA_00000002.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 560.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. It is clear that the term "original value" refers to the appraised value of the property contained in the appraisal made in connection with the loan. While Defendants purport to dispute the asserted fact, they cite the same document FHFA cited in support of its alleged rebuttal.

561. **FHFA Statement:** This original value yielded an original LTV ratio of ██████ Ex. 365 (NOM- FHFA_00000002, FM1_FinalPool) at NOM-FHFA_00000002 (listing the Orig. LTV (row 2834, column AF) as ███ for Loan No. ██████████

**Nomura Response:** Disputed. Plaintiff does not define "original value," and the meaning of that term is unclear. The LTV ratio for the property was ██████ based on the appraisal obtained by the originator at origination of the loan.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 561.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. It is clear that the term "original value" refers to the appraised value of the property contained in the appraisal made in connection with the loan. While Defendants purport to dispute the asserted fact, they cite the same LTV ration supported by the same document FHFA cited.

562. **FHFA Statement:** The original tape LTV of █████ was calculated as the original loan balance ████████ divided by the original appraised value ██████████ Ex. 365 (NOM-FHFA_00000002, FM1_FinalPool) at NOM-FHFA_00000002 (listing the "Orig. Balance" (row 2834, column H) as ████████ and listing the "Appraisal Value" (row 2834, column AE) as ████████ for Loan No. ██████████.

**Nomura Response:** Disputed. Plaintiff does not define "original appraised value," and the meaning of that term is unclear. The LTV for this loan was calculated by dividing the

loan balance by the appraised value of the property as determined in an appraisal obtained by the originator at origination of the loan. Defendants do not dispute that dividing ███████████████████████████.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 562.

**FHFA Reply:** Defendants do not genuinely dispute  the asserted fact. It is clear that the term "original appraised value" refers to the appraised value of the property contained in the appraisal made in connection with the loan.  While Defendants purport to dispute the asserted fact, they do not dispute that FHFA cited to the correct numbers nor that those figures yield an LTV of 85%.

563. **FHFA Statement:**  In another example, Loan No. ████████ was for a first lien purchase mortgage with an original balance of ████████. Ex. 366 (NOM-FHFA_00000004, FM1_FinalPool) at NOM- FHFA_00000004 (listing the "Orig. Balance" (row 2234, column F) as ███████ for Loan No. ████████.

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 563.

**FHFA Reply:** Defendants do not dispute the asserted fact.

564. **FHFA Statement:**  The property was appraised for ████████ Ex. 365 (NOM-FHFA_00000004, FM1_FinalPool) at NOM-FHFA_00000004 (listing the "Appraisal Value" (row 2234, column AC) as ███████ for Loan No. ████████

**Nomura Response:** Undisputed.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 564.

**FHFA Reply:** Defendants do not dispute the asserted fact.

565. **FHFA Statement:**  Nomura obtained an AVM valuation on the property, which reported a value of ███████ Ex. 355 (NOM-FHFA_05869747, Core Logic History Pro Avm Select) at NOM- FHFA_05869747 (listing the "AVM Value" (Column Y) for loan number ████████ (row 679) as ██████.

**Nomura Response:** Disputed to the extent plaintiff suggests that the value estimate returned by the Core Logic AVM for Loan No ▇▇▇▇▇ is a better indicator of value than an appraisal or a sale price or was intended to replace the appraised value or sale price as a value estimate. See ¶ 554, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 565.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura's argument regarding a suggestion not even contained in FHFA's statement is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

566.   **FHFA Statement:** This AVM value had a variance of ▇▇▇▇▇ from the appraisal. Ex. 7 to the Cipione Decl. (Loan No. ▇▇▇▇▇ Row 9449, Column Y "AVM Variance"); *see also* Ex. 4 to the Cipione Decl. (linking Alt LoanID ▇▇▇▇▇ with LMS Loan ID ▇▇▇▇▇.

**Nomura Response:** Disputed. Exhibit 7 to the Cipione Declaration does not contain a Row 9449, and purported evidence cited by plaintiff therefore cannot be verified. Furthermore, disputed to the extent plaintiff suggests that the value estimate returned by the Core Logic AVM for Loan No. ▇▇▇▇▇ is a better indicator of value than an appraisal or a sale price or was intended to replace the appraised value or sale price as a value estimate. See ¶ 554, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 566.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Although FHFA inadvertently cited to Exhibit 7 to the Cipione Declaration instead of Exhibit 6 in support of its asserted fact, Nomura nonetheless fails to provide any evidence contrary to FHFA's assertion. Nomura's argument regarding a suggestion not even contained in FHFA's statement is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

567.   **FHFA Statement:** Nomura next obtained a BPO from Ocwen, which was reported at a high value of ▇▇▇▇▇ and a low value of ▇▇▇▇▇ Ex. 300 (NOM-FHFA_05796086, Status of Valuation Orders) at NOM-FHFA_05796086 (listing the "BPO low value,"

362

(Column M), and "BPO high value," (column N) (Tab "BPO", row 13) as ███████ and ████████ respectively for Loan No. ████████ .

**Nomura Response:**  Disputed to the extent that plaintiff suggests that the estimate of value returned by the Ocwen BPO is a better indicator of value than an appraisal or a sale price or was intended to replace the appraised value or sale price as a value estimate. See ¶ 554, *supra*, which is incorporated by reference herein.

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 567.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Nomura's

argument regarding a suggestion not even contained in FHFA's statement is irrelevant to

the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

568.  **FHFA Statement:**  During reconciliation of the appraised value, AVM valuation, and BPO valuation, Ocwen determined that the appraisal relied on comparables "of superior design/style and condition," ultimately deciding that the "BPO appears to provide stronger support for value." Ex. 300 (NOM-FHFA_05796086, Status of Valuation Orders) at NOM-FHFA_05796086  (listing "Review Note" (Tab "BPO", row 13, Column Z) analyzing reasons for determining that "the BPO appears to provide stronger support for value" for Loan No. ████████ ).

**Nomura Response:**  Disputed. Although the language quoted by plaintiff does appear in the Ocwen document, that language is removed from the context in which it appears, and omits other language, testimony and documents that must be evaluated in order to fully understand the quoted excerpt. For example, a broker performing a BPO is not able to examine the interior of a property, and thus may not be able to determine the "design/style" of the home in comparison to comparable homes. Ex. 27 (Spagna Tr.) at 299:23-301:6 ("A typical BPO  would involve a realtor, you know, visiting the property, taking a photo of it . . . .  And then additionally you would have information about both recent sold comparables and recent listing comparables.")

**RBSSI Response**:  RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 568.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants

argue that that the cited document requires additional context, they do not dispute that it

contains the quoted language or is properly cited and identify no evidence that

specifically contradicts the asserted fact.

569.    **FHFA Statement:** Ocwen reported a final reconciled value of ████████ which was a
variance from the original appraisal of ████████ Ex. 300 (NOM-FHFA_05796086,
Status of Valuation Orders) at NOM-FHFA_05796086 (listing the "Post Reviewed
Value" (Column L), and "% Variance" (Column Q), (Tab "BPO", row 13) as ████████
and ████████ for Loan No. ████████.

**Nomura Response:** Disputed to the extent that plaintiff suggests that the final
reconciled value ("Post Reviewed Value") estimate is a better indicator of value than an
appraisal or a sale price or was intended to replace the appraised value or sale price as a
value estimate. See ¶ 554, *supra*, which is incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 569.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura's

argument regarding a suggestion not even contained in FHFA's statement is irrelevant to

the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

570.    **FHFA Statement:** This final reconciled value produced a LTV ratio of ████████ Ex 300
(NOM- FHFA_05796086, Status of Valuation Orders) at NOM-FHFA_05796086
(listing the "Revised LTV", (Tab "BPO", row 13, Column T) as ████████ for Loan No.
████████.

**Nomura Response:** The "[p]ost [r]eviewed [v]alue" of ████████ cannot be used to
calculate the LTV ratio. The prospectus supplements explained that LTV ratios for all
loans other than refinance loans were determined based on the lesser of the appraised
value of the home at origination or the sales price of the home. See ¶¶ 554, 558, *supra*,
which are incorporated by reference herein.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses
to paragraph 571.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Nomura's citation

to the formula for how it calculated LTV for its prospectus supplements is irrelevant to

the asserted fact, which specifically substitutes Nomura's valuation diligence results for

the original appraisal value, and does not create a genuine dispute of material fact. Part

I.C, *supra*.

571.     **FHFA Statement:** Nomura purchased Loan No. ███████ in the Peoples Choice SP01
         pool and securitized it in the relevant SLG of NHELI 2006-HE3. Ex. 4 to the Cipione
         Decl. (Loan No. ███████ Row 31887, Column H "Deal Name" and K "In SLG?").

         **Nomura Response:** Undisputed that Row 31887, Columns H and K, identify Loan No.
         ███████. However, disputed that the Cipione Declaration accurately reflects the
         purchase and securitization of loans.

         **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses
         to paragraph 571.

         **FHFA Reply:** Defendants do not dispute the asserted fact.


572.     **FHFA Statement:** Nomura reported the original value in the NHELI 2006-HE3 loan
         tape generating a LTV ratio of ███████ Ex. 366 (NOM-FHFA_00000004, nheli06-
         he3_Tape_prossup) at NOM- FHFA_00000004 (listing the Orig. LTV (row 2234,
         column AD) as ██████ for Loan No. ███████).

         **Nomura Response:** Undisputed.

         **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses
         to paragraph 572.

         **FHFA Reply:** Defendants do not dispute the asserted fact.


573.     **FHFA Statement:** Nomura informed investors in the Prospectus Supplements that
         "[m]ortgage loans with higher loan-to-value ratios may present a greater risk of loss than
         mortgage loans with loan- to-value ratios of 80% or below." Ex. 8 (NOM-
         FHFA_04620885, NHELI 2006-HE3 Prospectus Supplement) at NOM-FHFA_04620920
         ("Mortgage loans with higher loan-to-value ratios may present a greater risk of loss than
         mortgage loans with loan-to-value ratios of 80% or below.").

         **Nomura Response:** Disputed. Although the prospectus supplements contain the
         language quoted above, that language is removed from the context in which it appears,
         and omits other language, testimony and documents that must be evaluated in order to
         fully understand the quoted excerpt. See ¶ 532, *supra*.

         **RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses
         to paragraph 573.

         **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

         argue that that the cited document requires additional context, they do not dispute that it

contains the quoted language or is properly cited and identify no evidence that specifically contradicts the asserted fact.

574. **FHFA Statement:** The Prospectus Supplements for each of the Securitizations at issue listed no loans as having LTV ratios or CLTV ratios over 100% in the SLGs. Ex. 5 (NOM-FHFA_04811802, NAA 2005-AR6 Prospectus Supplement) at NOM-FHFA_04811861; Ex. 6 (NOM- FHFA_04729474, NHELI 2006-FM1 Prospectus Supplement) at NOM-FHFA_04729514; Ex. 7 (NOM-FHFA_04638315, NHELI 2006-FM2 Prospectus Supplement) at NOM-FHFA_04638363; Ex. 8 (NOM-FHFA_04620885, NHELI 2006-HE3 Prospectus Supplement) at NOM-FHFA_04620931; Ex. 9 (NOM-FHFA_05141912, NHELI 2007-1 Prospectus Supplement) at NOM-FHFA_05142002; Ex.10 (NOM-FHFA_05591325, NHELI 2007-2 Prospectus Supplement) at NOM-FHFA_05591375-76; Ex. 11 (NOM-FHFA_04732621, NHELI 2007-3 Prospectus Supplement) at NOM-FHFA_04732672. Dr. Kennedy, Nomura's proffered expert, testified: "I think that that's a piece of data [loans with LTV over 100] that would be important to the acquisition of any loan … [because] [l]oan to value ratio determines the risk to the lending institution. And it's got to be properly priced for that risk." Ex. 118 (Deposition of Lee Kennedy) at 191:22-192:17 ("Q. Based on your experience in running value due diligence programs, even not on subprime or Alt-A, if you were purchasing and securitizing loans with LTV over 100, is that something that you would let someone know? … Q. Is that something that you would let someone know? A. I think that that's a piece of data that would be important to the acquisition of any loan. Q. And why is that important? A. Loan to value ratio determines the risk to the lending institution. And it's got to be properly priced for that risk.").

**Nomura Response:** Disputed. Although the prospectus supplements contain the language quoted above, that language is removed from the context in which it appears, and omits other language, testimony and documents that must be evaluated in order to fully understand the quoted excerpt. See ¶ 532, *supra*. Additionally, although Mr. Kennedy gave the testimony quoted by plaintiff, that testimony in no way relates to the Nomura prospectus supplements' reporting of LTV ratios over 100%. As plaintiff recognizes, the prospectus supplements for the seven Securitizations listed no loans as having LTV ratios over 100%, and Mr. Kennedy's testimony does not dispute this fact. However, each prospectus or prospectus supplement disclosed that the values set forth in its collateral tables could vary by up to 5%. Ex. 19 (NOM-FHFA_04811802) at NOM-FHFA_04811977; Ex. 20 (NOM-FHFA_04729474) at NOM-FHFA_04729666; Ex. 21 (NOM- FHFA_04620885) at NOM-FHFA_04620924; Ex. 22 (NOM-FHFA_04638315) at NOM- FHFA_04638356; Ex. 23 (NOM-FHFA_05141912) at NOM-FHFA_05142028-029; Ex. 24 (NOM-FHFA_05591325) at NOM-FHFA_05591418; Ex. 25 (NOM-FHFA_04732621) at NOM- FHFA_04732715.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 574.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

argue that that the cited documents and testimony require additional context, they do not

dispute that they contain the quoted language or are properly cited and identify no

evidence that specifically contradicts the asserted fact.

575. **FHFA Statement:** The information on the final value of the loans contributing to the Securitizations at issue is summarized in Ex. 45 to the Cipione Decl.

**Nomura Response:** Disputed. Plaintiff does not define "final value" and the meaning of that term is unclear. Defendants further dispute that the Cipione Declaration accurately reflects the values of the loans "contributing to" the Securitizations. Mishol Decl. Ex. 2; Mishol Decl. Ex. 17; Mishol Ex. 18. In addition, the prospectuses for the Securitizations stated that the LTV ratios disclosed in the prospectus supplements were based on origination appraisals or, in some instances, the sale price of the home, not on a "final value" determined by Nomura's valuation due diligence process: "[t]he 'Loan-to-Value Ratio' of a mortgage loan at any particular time is the ratio (expressed as a percentage) of the then-outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property. The 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of that loan and (b) the sales price for that property. 'Refinance Loans' are loans made to refinance existing loans. Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in an appraisal obtained at the time of origination of the Refinance Loan. The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market." Ex. 19 (NOM-FHFA_04811802) at NOM-FHFA_04811976; Ex. 20 (NOM-FHFA_04729474) at NOM-FHFA_04729664-9665; Ex. 21 (NOM-FHFA_04620885) at NOM-FHFA_04621112.

**RBSSI Response**: RBSSI incorporates by reference the Nomura Defendants' responses to paragraph 575.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. It is clear from

FHFA's motion and statement of facts, as well as evident in Nomura's own filings in

opposition, that "final value" refers to the post-reviewed value Nomura obtained from its

BPO vendors after reconciliation of the BPO, AVM, and appraisal values. Defendants

further do not dispute that Cipione Exhibit 45 contains the results of his analysis of

Nomura's due diligence records, including a listing of the "final values" where obtained for the loans at issue.  To the extent Nomura merely disagrees that Mr. Cipione's analysis is correct, defendants do not dispute a material fact.  Any dispute about whether or not Nomura Mr. Cipione's or Mr. Mishol's analysis "accurately reflects the values of the loans" is not material to FHFA's motion.  *Quarles*, 758 F.2d at 840.  Indeed, should the court accept Mr. Mishol's analysis wholesale over Mr. Cipione's, the exhibits Nomura cited adequately support FHFA's arguments that depend upon Cipione Ex. 45 and actually reflect a higher incidence of "final values" leading to inflated LTV's at key thresholds than Mr. Cipione's analysis.  Mishol Ex. 17; Mishol Ex. 18.  Nomura's additional argument regarding the calculation of LTV values in its prospectus supplements is non-responsive to the asserted fact and therefore does not create a dispute of material fact.

## VII.    RBSSI CONDUCTED INADEQUATE DILIGENCE ON THE FOUR SECURITIZATIONS IT UNDERWROTE

### A.    RBS Entities

576.    **FHFA Statement:**  RBS Acceptance was an entity organized for the limited purpose of acquiring, owning and transferring mortgage assets and selling interests in those assets or bonds secured by those assets.  Ex. 410 (Greenwich Capital Acceptance, Inc. Form S-3/A, dated August 31, 2005) at 198 ("The depositor, [Greenwich Capital Acceptance, Inc.], is a Delaware corporation organized on [April 23, 1987] for the limited purpose of acquiring, owning and transferring certain mortgage-related assets and selling interests therein or bonds secured thereby.  It is a limited purpose finance subsidiary of Greenwich Capital Holdings, Inc. and an affiliate of Greenwich Capital Markets, Inc.").

**RBSSI Response:**  RBSSI states that RBS Acceptance Inc. (formerly known as Greenwich Capital Acceptance, Inc.) is not a party to this litigation and had no involvement; in the Nomura Securitizations.  The facts and/or circumstances regarding its organization, purpose, functions and activities are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required.  FHFA's attempt to raise or resolve factual issues that are in dispute in *Federal Housing Finance Agency v. The Royal Bank of Scotland, plc, et al.*, No. 11-cv-1383 (D. Conn.) (the "*Connecticut* litigation"), under the guise of the instant litigation, where such facts are

not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that FHFA Ex. 410 contains the language quoted by FHFA, but disputes that the quoted language, which is found in a draft prospectus supplement "Subject to Completion, dated August 31, 2005," *id.* at S-1, provides evidence of the purpose or function of RBS Acceptance Inc. or that it is admissible evidence of the corporate legal structure of RBS Acceptance Inc. *See also id.* at S-1 ("The information in this prospectus supplement is not complete and may be changed."). RBSSI refers the Court to FHFA Ex. 527 (RBSSI Whole Loan Acquisition Presentation, November 2006) at RBS-FHFA-SDNY-0498624, for a description of some of the functions RBS Acceptance Inc. performed.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the stated fact is not material to this action, this legal argument does not create a genuine dispute of fact. Part I.A, *supra*. While RBSSI "refers the Court"—without citing a particular part of the record—to FHFA Exhibit 527 for "a description of some of the functions RBS Acceptance Inc. performed," that Exhibit confirms the asserted fact. FHFA Ex. 527 (RBS-FHFA-SDNY-0498619, Presentation Regarding RBS Greenwich Capital Whole Loan Acquisition Business) at RBS-FHFA-SDNY-0498624 ("Greenwich Capital Acceptance, Inc. … [is a] limited purpose entit[y] that [is] used in the issuance of asset-backed securities and residential mortgage-backed securities[.]"). RBSSI also "disputes" that FHFA Exhibit 410 "provides evidence of the purpose or function of RBS Acceptance Inc.," because "it is draft prospectus supplement," that is "not bates stamped," but the asserted fact is stated in a final prospectus annexed to the draft prospectus supplement referenced by RBSSI, FHFA Ex. 410 at 30-31, and RBSSI does not dispute that this prospectus was filed with the Securities Exchange Commission. RBSSI's unsupported speculation therefore does not create a genuine as to the asserted fact, which was admitted through its filing with the Securities and Exchange Commission. Part I.F, *supra*.

577. **FHFA Statement:** RBS Acceptance was a subsidiary of RBS Holdings. Ex. 410 (Greenwich Capital Acceptance, Inc. Form S-3/A, dated August 31, 2005) at 198 ("The

depositor, [Greenwich Capital Acceptance, Inc.], is a ... subsidiary of Greenwich Capital Holdings, Inc. and an affiliate of Greenwich Capital Markets, Inc.").

**RBSSI Response:** RBSSI states that neither RBS Acceptance Inc. nor RBS Holdings USA Inc. (formerly known as Greenwich Capital Holdings, Inc.) is a party to this litigation, nor did either have any involvement with the Nomura Securitizations. The facts and/or circumstances regarding their relationship (whether factual or legal) are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that FHFA Ex. 410 contains the language quoted by FHFA, but disputes that the cited language, which is found in a draft prospectus supplement "Subject to Completion, dated August 31, 2005," *id.* at S-1, provides evidence of any relationship between RBS Acceptance Inc. and RBS Holdings USA Inc. or that it is admissible evidence of any such relationship. *See also id.* at S-1 ("The information in this prospectus supplement is not complete and may be changed."). RBSSI refers the Court to FHFA Ex. 527 (RBSSI Whole Loan Acquisition Presentation, November 2006) at RBS-FHFA-SDNY-0498623-24, for a description of some of the functions of RBS Acceptance Inc. and RBS Holdings USA Inc.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI "refers the Court"—without citing a particular part of the record—to FHFA Exhibit 527 for "a description of some of the functions RBS Acceptance Inc. performed," that Exhibit confirms the asserted fact. FHFA Ex. 527 (RBS-FHFA-SDNY-0498619, Presentation Regarding RBS Greenwich Capital Whole Loan Acquisition Business) at RBS-FHFA-SDNY-0498623 (organizational chart indicating that "Greenwich Capital Holdings" is the parent company of "Greenwich Capital Acceptance."). RBSSI also "disputes" that Exhibit 410 "provides evidence of any relationship between RBS Acceptance Inc. and RBS Holdings USA Inc.," because "it is draft prospectus supplement," that is "not bates stamped," but the asserted fact is stated in a final prospectus annexed to the draft prospectus supplement referenced by RBSSI, FHFA Ex. 410 at 30-31, and RBSSI does not dispute that this prospectus was filed with the Securities Exchange Commission. RBSSI's unsupported speculation therefore does not create a genuine issue as to the

asserted fact, which was admitted through its filing with the Securities and Exchange Commission.  Part I.F, *supra*.

578.  **FHFA Statement:**  Financial Assets Securities Corporation ("FAS Corp."), a limited purpose finance subsidiary of Greenwich Capital Holdings, Inc. and an affiliate of RBS Securities, was likewise not an operating company.  *See* Ex. 412 (Greenwich Capital Acceptance, Inc. Form S-3, dated January 29, 2007) at 60 ("The Depositors ...  Financial Asset Securities Corp. is a Delaware corporation organized on August 2, 1995 ...  for the limited purpose of acquiring, owning and transferring mortgage assets and selling interests in those assets or bonds secured by those assets.  Each of the depositors is a limited purpose finance subsidiary of Greenwich Capital Holdings, Inc. and an affiliate of Greenwich Capital Markets, Inc.").

**RBSSI Response:**  RBSSI states that neither Financial Assets Securities Corporation ("FAS Corp."), nor RBS Holdings USA Inc. is a party to this litigation, and neither had any involvement in the Nomura Securitizations.  The facts and/or circumstances regarding FAS Corp.'s organization, purpose, functions or activities, or the legal or factual relationship between FAS Corp. and RBS Holdings USA, Inc. are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required.  FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial.  To the extent a response is required, RBSSI does not dispute that FHFA Ex. 412 contains the language quoted by FHFA, but disputes that the cited language, which is found in a draft prospectus, provides evidence of any relationship (legal or factual) between FAS Corp. and RBS Holdings USA Inc. or that it is admissible evidence of any such relationship. RBSSI further disputes FHFA's characterization of the cited language as demonstrating that FAS Corp. was "a limited purpose finance subsidiary," and "not an operating company" as argumentative and an improper legal argument that should be stricken.  RBSSI refers the Court to FHFA Ex. 527 (RBSSI Whole Loan Acquisition Presentation, November 2006) at RBS-FHFA-SDNY-0498623-24, for a description of the relationship between FAS Corp. and RBS Holdings USA Inc., and of some of the functions of FAS Corp.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While RBSSI argues that the stated fact is not material to this action and argues that FAS Corp. was an operating company, these legal arguments do not create a genuine dispute of fact.  Part I.A, *supra*.  While RBSSI "refers the Court"—without citing a particular part of the record—to Exhibit 527 for "a description of some of the functions RBS Acceptance Inc. performed," that Exhibit confirms the asserted fact.  Ex. 527 (RBS-FHFA-SDNY-0498619, Presentation Regarding RBS Greenwich Capital Whole Loan Acquisition

Business) at RBS-FHFA-SDNY-0498624 ("Financial Assert Securities Corp. … [is a]

limited purpose entit[y] that [is] used in the issuance of asset-backed securities and

residential mortgage-backed securities[.]"); *id.* at RBS-FHFA-SDNY-0498624 (corporate

organizational chart indicating relationship between FAS Corp., Greenwich Capital

Holdings, Inc., and RBSSI). RBSSI also "disputes" that FHFA Ex. 412 "provides

evidence of the purpose or function of RBS Acceptance Inc.," because "it is draft

prospectus supplement," that is "not bates stamped," but the asserted fact is stated in a

final prospectus annexed to the draft prospectus supplement referenced by RBSSI, FHFA

Ex. 412 at 60, and RBSSI does not dispute that this prospectus was filed with the

Securities Exchange Commission. RBSSI's unsupported speculation therefore does not

create a genuine issue as to the asserted fact, which was admitted through its filing with

the Securities and Exchange Commission. Part I.F, *supra*.

579. **FHFA Statement:** FAS Corp. was a special purpose entity organized for the limited purpose of acquiring, owning and transferring mortgage assets and selling interests in those assets or bonds secured by those assets. *See* Ex. 412 (Greenwich Capital Acceptance, Inc. Form S-3, dated January 29, 2007) at 60 ("The Depositors ... Financial Asset Securities Corp. is a Delaware corporation organized on August 2, 1995 ... for the limited purpose of acquiring, owning and transferring mortgage assets and selling interests in those assets or bonds secured by those assets. Each of the depositors is a limited purpose finance subsidiary of Greenwich Capital Holdings, Inc. and an affiliate of Greenwich Capital Markets, Inc.").

**RBSSI Response:** RBSSI states that FAS Corp. is not a party to this litigation and had no involvement in the Nomura Securitizations. The facts and/or circumstances regarding its organization, purpose, functions or activities are not "material facts" at issue in this litigation or for purposes of FHFA's motion under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that FHFA Ex. 412 contains the language quoted by FHFA, but disputes that the cited language, which is found in a draft prospectus, provides evidence of any relationship (legal or factual) between FAS Corp. and RBS Holdings USA Inc. or that it is admissible evidence of any such relationship. RBSSI further disputes FHFA's characterization of the cited language as demonstrating that FAS Corp. was "a special purpose entity" as argumentative and an improper legal argument that should be stricken.

RBSSI refers the Court to FHFA Ex. 527 (RBSSI Whole Loan Acquisition Presentation, November 2006) at RBS-FHFA-SDNY-0498623-24, for a description of some of the functions of FAS Corp.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the stated fact is not material to this action and argues that FAS Corp. was an operating company, these legal arguments do not create a genuine dispute of fact. Part I.A, *supra*. RBSSI also "refers the Court"—without citing a particular part of the record—to Exhibit 527 for "a description of some of the functions RBS Acceptance Inc. performed," that Exhibit confirms the asserted fact. Ex. 527 (RBS-FHFA-SDNY-0498619, Presentation Regarding RBS Greenwich Capital Whole Loan Acquisition Business) at RBS-FHFA-SDNY-0498624 ("Greenwich Capital Acceptance, Inc. … [is a] limited purpose entit[y] that [is] used in the issuance of asset-backed securities and residential mortgage-backed securities[.]"). RBSSI also "disputes" that FHFA Ex. 412 "provides evidence of the purpose or function of RBS Acceptance Inc.," because "it is draft prospectus supplement," that is "not bates stamped," but the asserted fact is stated in a final prospectus annexed to the draft prospectus supplement referenced by RBSSI, FHFA Ex. 412 at 60, and RBSSI does not dispute that this prospectus was filed with the Securities Exchange Commission. RBSSI's unsupported speculation therefore does not create a genuine issue as to the asserted fact, which was admitted through its filing with the Securities and Exchange Commission. Part I.F, *supra*.

580. **FHFA Statement:** RBS Acceptance, FAS Corp., and RBS Financial were not "separate operating companies" but rather were "just legal entities where assets might have been housed." Ex. 411 (MBIA Insurance Corporation RBS 30(b)(6) Deposition of James Raezer, dated May 15, 2012 ("Raezer Dep.")) at 19:18-20:21 ("Q. Were you involved with RBS Financial Products, Inc. when it was a sponsor of securitizations? A. Yes. Q. What was your role in that capacity? A. We don't really, taking a step back, it wasn't really these were specific -- these were just legal entities where assets might have been housed, it is not like they were separate operating companies. So, loans might have been – if we bought loans from somebody they might have been held at the bank, they might

have been held at the broker/dealer, they might have been held at RBSFP depending on what they were and what legal decided where they would best fit. Ultimately were securitized, from any one of those entities. So RBSFP could have been a sponsor, but you have to understand it wasn't a separate operating company per se. If that makes sense. Q. Yes. So then the same would be said of Greenwich Capital Acceptance? A. Greenwich Capital Acceptance and FASCO are public shelves at the time.").

**RBSSI Response:** RBSSI states that RBS Acceptance Inc., FAS Corp. and RBS Financial Products Inc. are not parties to this litigation and had no involvement in the Nomura Securitizations. The facts and/or circumstances regarding their organization, purpose, functions, activities or relationships are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. RBSSI disputes the assertion in ¶ 580. FHFA relies on the testimony of James Raezer, who was designated as RBSSI's 30(b)(6) witness in *MBIA Insurance Corporation v. Bank of America Corporation*, Case No. BC417572 (Cal. Super.), an action regarding seven Countrywide-sponsored securitizations on which RBSSI acted as underwriter and which did not involve any other RBS entity. Mr. Raezer was neither offered as a witness nor prepared to speak on behalf of RBSSI with regards to the corporate organization or structure of other RBS entities. RBS Ex. 1 (MBIA Insurance Corporation's Notice of Deposition of Person Most Knowledgeable to Greenwich Capital Markets, Inc.); RBS Ex. 2 (*MBIA Insurance Corp.* 30(b)(6) Deposition of RBSSI, by James Raezer) at 8:17-9:7 (explaining that he is testifying on behalf of RBSSI only). RBS Financial Products Inc. is an operating company engaged in the purchase, sale and financing of residential mortgage loans and a direct commercial real estate lender. *See, e.g.*, FHFA Ex. 380 (RBS-FHFA-CT-0244230, January 2007 Presentation Regarding RBS Greenwich Capital Whole Loan Acquisition Business) at RBS-FHFA-CT-0244234. RBS Acceptance Inc. and FAS Corp. are also operating companies involved in the issuance of residential mortgage-backed securities. *Id.*

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the stated fact is not material to this action, this legal argument does not create a genuine dispute of fact. Part I.A, *supra*. RBSSI concedes that Mr. Raezer was testifying on its behalf, and offers no evidence controverting Mr. Raezer's testimony. RBSSI's contention that admissions binding on it made by Mr. Raezer's Rule in his Fed. R. Civ. P. 30(b)(6) testimony may not also be binding on other parties does not create a genuine dispute of fact, Parts I.B, I.F, *supra*, particularly as RBSSI has offered no evidence controverting the asserted fact.

581.    **FHFA Statement:**  Robert McGinnis was a senior manager at RBSSI and head of the
Asset-Backed Finance group.  *See* Ex. 416 ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

Ex. 417 (Dep. Ex. 5748, Robert McGinnis Deposition Questionnaire) at RBS-FHFA-CT-
6729122 (McGinnis states that from "2002-Oct.  2007" his title at RBSSI was Managing
Director); Ex. 418 (Dep. Ex. (Previously Marked) 3460, Greenwich Capital Acceptance
In.  Form S-3, dated January 29, 2007) at RBS-FHFA-CT-6707715 (signed by Robert
McGinnis as President of Greenwich Capital Acceptance [RBS Acceptance] and as
President of FAS Corp.); Ex. 393 (Deposition of Frank Skibo) at 43:1344:2 ("Q.  Before
we move over fully to trading, who did you report to when you were in asset-backed
finance? A.  At the time, Tom Capassi was running the group, that he hired me.  Q.  Tom
Capassi was running the group when you joined? A.  At the time.  And then he
subsequently left and Bob McGinnis was the head of the group.  Q.  And did you report
to him throughout the remainder of your tenure in asset-backed finance? A.  Yes.").

**RBSSI Response:**  RBSSI states that Robert McGinnis is not a party to this litigation and
had no involvement in the Nomura Securitizations.  Indeed, FHFA's counsel has
acknowledged this.  *See* RBS Ex. 3 (Deposition of Robert McGinnis) at 9:4-19.  The facts
and/or circumstances regarding his employment or positions at RBSSI are not "material
facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is
required.  FHFA's attempt to raise or resolve factual issues that are in dispute in the
*Connecticut* litigation under the guise of the instant litigation, where such facts are not at
issue, is improper and prejudicial.  To the extent a response is required, RBSSI disputes
that the deposition testimony of either Frank Skibo, found in FHFA Ex. 393, or William
Gallagher, found in FHFA Ex. 413 (incorrectly cited as FHFA Ex. 416), supports the
assertion that Robert McGinnis was a "senior manager at RBSSI" or "head of the Asset-
Backed Finance group," terms which are vague and ambiguous, or that he had any
management role in asset-backed finance for RBSSI at any relevant time.  According to
FHFA Ex. 414 (Dep. Ex. 5748, Robert McGinnis Deposition Questionnaire) (incorrectly
cited as FHFA Ex. 417), Robert McGinnis was a Managing Director at RBSSI between
2002 and 2007.  Mr. McGinnis testified that he "ceased having anything to do with the
MBS business from a management perspective in March 2006." FHFA Ex. 370
(*Massachusetts Mutual Life Insurance Company v. RBS Securities Inc.* ("*MassMutual*")
Deposition of Robert McGinnis) at 48:24-49:7.  RBSSI further disputes that FHFA Ex.
418 is the document FHFA purports it to be or that it contains Mr. McGinnis's signature
or reflects that he is "President of Greenwich Capital Acceptance" or "President of FAS
Corp.," or suggests any position or title Mr. McGinnis may have held at RBSSI.  FHFA
Ex. 418 is a Form S-3/A registration statement dated June 18, 2010 that does not mention
Mr. McGinnis at all.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While RBSSI argues

that the stated fact is not material to this action, this legal argument does not create a

genuine dispute of fact.  Part I.A, *supra*.  RBSSI asserts that Messrs. Skibo and

Gallagher's testimony regarding Mr. McGinnis's role are "vague and ambiguous," but they identify no evidence that contradicts this testimony, which directly supports the asserted fact, and RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*.

582. **FHFA Statement:** Mr. McGinnis ceased having anything to do with the mortgage-backed securities business of ABF in March of 2006. Ex. 370 (Massachusetts Mutual Deposition of Robert McGinnis) at 46:3-47:17 ("Q. So, if I understand correctly, Structured Products reported to you over two periods of time, 2002 to 2004 and 2006 to 2007? A. Right. Q. And so my understanding from that is that you did something different between those two periods; is that right? A. No. Well ... would it be better if I just went through a chronology? Q. That's totally fine with me ... A. So, so 2002 – so I ran the mortgage and asset-backed business at Greenwich capital ... Then in March of 2006, we had an organization change, and Joe Walsh too over the mortgage and asset-backed business from me, and I got the Structured Product group back."); *id.* At 48:24¬49:7 ("A. You know, again ... up until March of 2006, the MBS business reported to me, even when I added – even when the other businesses were added to – to – to me, the MBS business was always there. The MBS – I ceased having anything to do with the MBS business from a management perspective in March of 2006.").

   **RBSSI Response:** RBSSI states that Robert McGinnis is not a party to this litigation and had no involvement in the Nomura Securitizations. Indeed, FHFA's counsel has acknowledged this. *See* RBS Ex. 3 (Deposition of Robert McGinnis) at 9:4-19. The facts and/or circumstances regarding Mr. McGinnis' employment, positions and responsibilities at RBSSI are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI disputes the assertion in ¶ 582. Mr. McGinnis testified that he "ceased having anything to do with the MBS business from a management perspective in March 2006." FHFA Ex. 370 (*MassMutual* Deposition of Robert McGinnis) at 48:24-49:7.

   **FHFA Reply:** RBSSI admits that Mr. McGinnis "ceased having anything to do with the MBS business from a management perspective in March 2006." RBSSI's argument that this fact is not material to this action does not create a genuine dispute of fact. Part I.A, *supra*.

583. **FHFA Statement:** Mr. McGinnis was also Principal Executive Officer at RBS Acceptance and FAS Corp. *See* Ex. 416

Ex. 417 (Dep. Ex. 5748, Robert McGinnis Deposition Questionnaire) at RBS-FHFA-CT-6729122 (McGinnis states that from "2002-Oct. 2007" his title at RBSSI was Managing Director); Ex. 418 (Dep. Ex. (Previously Marked) 3460, Greenwich Capital Acceptance Inc. Form S-3, dated January 29, 2007) at RBS-FHFA-CT-6705515 (signed by Robert McGinnis as President of Greenwich Capital Acceptance [RBS Acceptance] and as President of FAS Corp.); Ex. 393 (Deposition of Frank Skibo) at 43:13-44:2 ("Q. Before we move over fully to trading, who did you report to when you were in asset-backed finance? A. At the time, Tom Capassi was running the group, that he hired me. Q. Tom Capassi was running the group when you joined? A. At the time. And then he subsequently left and Bob McGinnis was the head of the group. Q. And did you report to him throughout the remainder of your tenure in asset-backed finance? A. Yes.").

**RBSSI Response:** RBSSI states that Robert McGinnis is not a party to this litigation and had no involvement in the Nomura Securitizations. Indeed, FHFA's counsel has acknowledged this. *See* RBS Ex. 3 (Deposition of Robert McGinnis) at 9:4-19. The facts and/or circumstances regarding his employment and positions at RBS Acceptance Inc. and FAS Corp. are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that the document cited in FHFA Ex. 417 states that Mr. McGinnis was a Managing Director at RBSSI. RBSSI disputes that FHFA Ex. 418 is the document FHFA purports it to be or that it is evidence of Mr. McGinnis's roles or titles at RBS Acceptance Inc. or FAS Corp. FHFA Ex. 418 is not a Greenwich Capital Acceptance Inc. Form S-3, dated January 29, 2007, but a Form S-3/A filed by non-party RBS Acceptance Inc., dated June 18, 2010, which does not bear any signature of, or refer to, Mr. McGinnis. RBSSI does not dispute that FHFA Ex. 412, which is a Greenwich Capital Acceptance Inc. Form S-3, dated January 29, 2007, identifies Mr. McGinnis as "Director and President (Principal Executive Officer)" of both Greenwich Capital Acceptance Inc. and FAS Corp. as of the particular date FHFA Ex. 412 was filed; however, that document is not evidence of Mr. McGinnis' position(s) at Greenwich Capital Acceptance Inc. and/or FAS Corp. at any other time.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI's argument that this fact is not material to this action does not create a genuine dispute of fact. Part I.A, *supra*. While RBSSI dispute the time period over which FHFA's evidence establishes the asserted fact, they identify no evidence that contradicts the asserted fact, Part I.B, *supra*, and therefore this dispute is not genuine.

584. **FHFA Statement:** Carol Mathis was Chief Financial Officer at RBSSI. *See* Ex. 416 (Dep. Ex. 8203, Carol Mathis Deposition Questionnaire) at RBS-FHFA-CT-6711868 (Mathis states that from December 2000 through April 2013 her title was "Chief

Financial Officer and Managing Director" at RBSSI); Ex. 417 (Dep. Ex. 8214, Greenwich Capital Acceptance, Inc. Form S-3, dated January 29, 2007 at RBS-FHFA-CT-6712973 (signed by Carol Mathis as "Managing Director and Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer" of both Greenwich Capital Acceptance [RBS Acceptance] and FAS Corp.).

**RBSSI Response:** RBSSI states that Carol Mathis is not a party to this litigation and had no involvement in the Nomura Securitizations. The facts and/or circumstances regarding her employment and positions at RBSSI are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that Carol Mathis was Chief Financial Officer at RBSSI during the time period of the Nomura Securitizations. *See* FHFA Ex. 416 (Dep. Ex. 8203, Carol Mathis Deposition Questionnaire). RBSSI disputes that FHFA Ex. 417 is the document FHFA purports it to be. FHFA Ex. 417 is not a Greenwich Capital Acceptance, Inc. Form S-3, dated January 29, 2007, but a Greenwich Capital Acceptance Inc. Form S-3/A, dated March 23, 2007. The Greenwich Capital Acceptance, Inc. Form S-3, dated January 29, 2007, is found at FHFA Ex. 412.

**FHFA Reply:** RBSSI admits that "Carol Mathis was Chief Financial Officer at RBSSI during the time period of the Nomura Securitizations." RBSSI's argument that this fact is not material to this action does not create a genuine dispute of fact. Part I.A, *supra*.

585. **FHFA Statement:** Ms. Mathis held the same title at both RBS Acceptance and FAS Corp. *See* Ex. 416 (Dep. Ex. 8203, Carol Mathis Deposition Questionnaire ) at RBS-FHFA-CT-6711868 (Mathis states that from December 2000 through April 2013 her title was "Chief Financial Officer and Managing Director" at RBSSI); Ex. 417 (Dep. Ex. 8214, Greenwich Capital Acceptance, Inc. Form S-3, dated January 29, 2007) at RBS-FHFA-CT-6712973-4 (signed by Carol Mathis as "Managing Director and Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer)" of both Greenwich Capital Acceptance [RBS Acceptance] and FAS Corp.).

**RBSSI Response:** RBSSI states that Carol Mathis is not a party to this litigation and had no involvement in the Nomura Securitizations. The facts and/or circumstances regarding her employment and positions at RBS Acceptance Inc. and FAS Corp. are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that Carol Mathis at one was a Managing Director and Chief Financial Officer of RBS Acceptance Inc. and FAS Corp., but disputes that FHFA Ex. 417 is the document FHFA purports it to be. FHFA Ex. 417 is not a Greenwich Capital Acceptance, Inc. Form S-3, dated January 29, 2007, but a Greenwich Capital Acceptance Inc. Form S-3/A,

dated March 23, 2007. The Greenwich Capital Acceptance, Inc. Form S-3, dated January 29, 2007, is found at FHFA Ex. 412.

**FHFA Reply:** RBSSI admits that "Carol Mathis … was a Managing Director and Chief Financial Officer of RBS Acceptance Inc. and FAS Corp." RBSSI's argument that this fact is not material to this action does not create a genuine dispute of fact. Part I.A, *supra*.

586. **FHFA Statement:** James Raezer was an officer at RBS FP, RBS Acceptance, and FAS Corp, and a managing director and credit officer at RBSSI. See Ex. 411 (MBIA Insurance Corp. Deposition of James Raezer) at 14:25-18:25 ("Q. What was your role at Greenwich Capital Markets? A. From 1993 to 1998 I was in the credit department as a credit officer.... Q. What happened after the credit officer? A. I was moved to the asset backed finance department which is the front office function I am in now.... Q. In 1998 you joined the asset backed finance department what was your role there? A. I was Vice President at the time and was a transaction manager. Q. How long were you in those roles? A. I think, I don't recall specifically, but from 1998 until probably 2003, 2004 then I became Managing Director or Director than Managing Director. Then I became head of the department in 2009.... Q. Were you ever...President, Co-President or Director of RBS Financial Products, Inc.? A. Oh, yes, I'm sorry. Those are, I was taking a step back, those are figurehead titles really. I don't really have any operational approval or role other than having my name on the on RBS Financial Products and I think there should be RPAC there too, Random Properties Acquisition Corp. but those are really not functions, those are more just titles. Q. Why did you receive those titles, what was the purpose? A. The purpose was because the previous people who held those positions no longer were going to hold those titles and therefore since I was still in the mortgage finance business, they decided that I would be the appropriate person to be titled Because of personal liability associated with those entities."); Ex. 418 (RBS Acceptance Inc., Form S-3/A, dated June 18, 2010) (signed by James Raezer as "Principal Financial Officer and Principal Accounting Officer"); Ex. 419 (RBS Financial Products, Inc. Form ABS-15G, dated February 14, 2012) at 3 (signed on behalf of RBS FP by James Raezer as President).

**RBSSI Response:** RBSSI states that James Raezer is not a party to this litigation and had no involvement in the Nomura Securitizations. The facts and/or circumstances regarding his employment and positions at RBS Financial Products, RBS Acceptance Inc., FAS Corp. or RBSSI are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI disputes the assertion in ¶ 586 insofar as it states or implies that Mr. Raezer held all such titles or positions at the same time. According to the testimony quoted in FHFA Ex. 411, Mr. Raezer was a credit officer in RBSSI's Credit and Loan Underwriting Group (the "Due Diligence group") "[f]rom 1993 to 1998." He

then moved to RBSSI's Asset-Backed Finance group as a Vice President "until probably 2003, 2004." Thereafter, he became a Director and then Managing Director. RBSSI also does not dispute that Mr. Raezer was an officer at RBS Financial Products Inc. and RBS Acceptance Inc. at the points in time specified in FHFA Exs. 418 and 419. RBS disputes that FHFA Ex. 418 or the deposition testimony cited in FHFA Ex. 411 provides any evidence that Mr. Raezer was an officer of FAS Corp.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI's argument that FHFA has "implie[d]" that Mr. Raezer "held all such titles or positions at the same time" is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Nor does its argument that this fact is not material to this action.

*Id.*

587. **FHFA Statement:** Mr. Walsh, head of RBSSI's Mortgage and Asset-Backed Financial Group, was a director at RBS Acceptance and FAS Corp. Ex. 517 (RBS-FHFA-CT-6002063, Greenwich Capital Holdings, Inc. Supervisory Manual) at RBS-FHFA-CT-6002125-26 (listing Mr. Walsh as director of Greenwich Capital Acceptance, Inc. and FAS Corp).

**RBSSI Response:** RBSSI states that Joseph Walsh is not a party to this litigation and had no involvement in the Nomura Securitizations. The facts and/or circumstances regarding his employment and positions at RBSSI, RBS Acceptance Inc. and FAS Corp. are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI disputes the assertion in ¶ 587 insofar as the statement "head of RBSSI's Mortgage and Asset-Backed Financial Group" is vague and ambiguous. RBSSI does not dispute that FHFA Ex. 517 lists Joseph N. Walsh III as a member of the "board of directors (President)" of RBS Acceptance Inc. and FAS Corp. at the particular point in time that FHFA Ex. 517 is dated or that FHFA Ex. 381 identifies Mr. Walsh as head of RBSSI's Asset-Backed Finance group between 2006 and 2008. Mr. Walsh testified that he was co-head of RBSSI's Asset-Backed Finance group until late 2006, and then was its sole head until he left RBSSI in 2008. RBS Ex. 4 (*MassMutual* Deposition of Joseph Walsh) at 49:13-51:16.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI argues that the asserted fact is "vague and ambiguous" and cavils as to time period, but presents no evidence controverting the asserted fact, and therefore does not create a genuine dispute

of fact.  Part I.C, *supra*.  RBSSI's argument that this fact is not material to this action

does not create a genuine dispute of fact.  Part I.A, *supra*.

588.    **FHFA Statement:**  James Esposito was a managing director and in-house counsel at
RBSSI and also served as General counsel and Secretary at RBS Acceptance and FAS
Corp. See Ex. 386 (Deposition of Adam Smith) at 300:15-20 ("Q.  Okay.  And then you
write a follow-up email to Brian Farrell, James Whittemore and James Esposito.
Esposito was in-house counsel [at RBSSI], correct? A.  James Esposito is in-house
counsel, correct."); Ex. 412 (Greenwich Capital Acceptance, Inc. Form S-3, dated
January 29, 2007) (Signed by James Esposito as "Director, Managing Director, General
Counsel, and Secretary " of both Greenwich Capital Acceptance [RBS Acceptance] and
FAS Corp.).

   **RBSSI Response:**  RBSSI states that James Esposito is not a party to this litigation and
that the facts and/or circumstances regarding his employment and positions at RBSSI,
RBS Acceptance Inc. and FAS Corp. are not "material facts" at issue in this litigation
under Local Rule 56.1 or otherwise to which a response is required.  FHFA's attempt to
raise or resolve factual issues that are in dispute between Mr. Esposito and FHFA in the
*Connecticut* litigation under the guise of the instant litigation, where such facts are not at
issue, is improper and prejudicial.  To the extent a response is required, RBSSI does not
dispute that Mr. Esposito was in-house counsel at RBSSI or that FHFA Ex. 412 identifies
Mr. Esposito as "Director, Managing Director, General Counsel, and Secretary" of both
Greenwich Capital Acceptance, Inc. and FAS Corp. as of the date specified in FHFA Ex.
412.  RBSSI disputes that FHFA Exs. 412 and 386 provide any evidence that Mr.
Esposito was a Managing Director at RBSSI.

   **FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  RBSSI's argument

that this fact is not material to this action does not create a genuine dispute of fact.  Part

I.A, *supra*.  RBSSI contends that FHFA has presented no evidence that Mr. Esposito was

a Managing Director at RBSSI, but it does not present evidence controverting this fact.

Mr. Esposito was a Managing Director of RBSSI.  FHFA Ex. 535 (James Esposito

Deposition Questionnaire) at 2 (stating that Mr. Esposito held title of Managing Director

at RBSSI from 2002 through the present).

589.    **FHFA Statement:**  Frank Skibo was a managing director in at RBSSI, on the trading
desk in the Asset Backed Finance group, and was managing director at FAS Corp. and
Co-President of RBS FP.  *See* Ex. 373 (Deposition of William Gallagher) at 197:2-6 ("Q.
Who is Mr. -- who is Frank Skibo? A.  Frank Skibo worked in asset-backed finance.  He
was on the trading desk."); Ex. 420 (Frank Skibo Deposition Questionnaire) at RBS-
FHFA-CT-6716692 (showing date of employment: 1997-Present); Ex. 421 (Financial

Asset Securities Corp. Form 8-K, October 24, 2005) at 7 (signed by Frank Skibo, as Managing Director, on behalf of FAS Corp.); Ex. 422 (RBS Financial Products, Inc. Form ABS-15G, dated August 11, 2014) at 4 (signed on behalf of RBS FP by Frank Skibo as Co-President).

**RBSSI Response:** RBSSI states that Frank Skibo is not a party to this litigation and had no involvement in the Nomura Securitizations. The facts and/or circumstances regarding his employment and positions at RBSSI, FAS Corp. or RBS Financial Products Inc. are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that Frank Skibo was at one point a Managing Director at RBSSI or that prior to 2001 that he worked in the Asset-Backed Finance group. RBSSI also does not dispute that FHFA Ex. 421 identifies Mr. Skibo as a Managing Director of FAS Corp. as of October 24, 2005, or that FHFA Ex. 422 identifies Mr. Skibo as a Co-President of RBS Financial Products as of August 11, 2014. FHFA cites no other evidence in ¶ 589 of Mr. Skibo's titles or positions at FAS Corp. or RBS Financial Products Inc. at any other points in time.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI's argument that this fact is not material to this action does not create a genuine dispute of fact. Part I.A, *supra*. RBSSI otherwise admits the asserted fact.

590. **FHFA Statement:** Skibo's duties at RBS included the purchase of loans and determining the criteria used in selecting due diligence samples of those loans. *See* Ex. 393 (Deposition of Frank Skibo) at 427:12-21 ("Q. No reason to doubt that you did from time to time suggest the sampling criteria that should be used; correct? A. It would appear so, yes. Q. And no recollection of the credit group overruling your suggestions and going with a different sample selection criteria; correct? ... A. Not that I recall."); *see also id.* at 445:16-448:9 (" Q. And so is this typical for you to identify the sample selection criteria for diligence reviews? ... A. It appears I suggest and ask Jim if he agrees. Q. Yeah. First you suggest that there would be a focus on the S&P risk grades and Mr. Whittemore attempts to confirm with you if that's what you want to do. Correct? ... A. Yes. In the email from October 2nd at 8:17? Q.... And then in response to Mr. Whittemore's request that you verify what you want, you respond with the categories of adverse loans that Mr. Whittemore ultimately uses for this diligence review; correct? ... A. It appears he took my suggestion, yes. Q. And, in fact, he sought your verification of what he wanted to do on this particular transaction; correct? ... A. With regard to AVM sampling. Q. And with regard to how the adverse samples would be selected as well; correct? A. From the email on October 2nd? Q. Yes. A. At 8:17? Q. Yes. "I'm getting ready to pick the sample for First NLC and want to reverify what you said below." Do you see that? A. Yes. Q. So in this transaction he's asking you to verify what sampling approach you want to have used; correct?... A. He appears to be asking me to verify what I wrote below. I don't know what he wants me to verify. Q. And in response, you

identify the categories you want to have selected for this transaction and he utilizes those categories; correct? ... A. I list out criteria, and ask him if there is anything he would like to add. Q. And he uses your criteria without making any changes; correct? ... A. If that was, in fact, the sample that he used for his diligence, they appear to be the same. Q. You don't recall him using a different sample, I take it? A. I do not. Q. Any reason to believe he used a different sample? A. I do not."); *see* Ex. 393 (Deposition of Frank Skibo) at 45:6-10 ("Q. And what were your responsibilities when you joined the trading desk in 2001? A. To coordinate the purchase of whole loans.").

**RBSSI Response:** RBSSI states that Frank Skibo is not a party to this litigation and had no involvement in the Nomura Securitizations. The facts and/or circumstances regarding his involvement in transactions not at issue in this case are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required. RBSSI does not dispute that Mr. Skibo was involved in the purchase of certain loans, but disputes the assertion in ¶ 590 that it was one of Mr. Skibo's "duties" to "determin[e] the criteria used in selecting due diligence samples." FHFA mischaracterizes the testimony of Mr. Skibo, who stated only that he would "suggest" adverse sampling criteria to personnel in RBSSI's Due Diligence group, and that RBSSI credit personnel exercised their own judgment in selecting the adverse portion of any particular sample. FHFA Ex. 393 (Deposition of Frank Skibo) at 427:12-21. Mr. Skibo's testimony is consistent with the testimony of other RBSSI personnel, who stated that it was the role of the Due Diligence group to determine the loan-level due diligence sample criteria, *see* RBS Ex. 5 (Deposition of Brian Farrell) at 536:16-21 ("Q. Different question. Let me see if I can ask it a little differently. You selected adverse samples from time to time in your work in 2006 and 2007, correct? A. That is correct."); *id.* at 550:8-555:2 (stating that Mr. Farrell would determine the adverse selection criteria for the sample); *id.* at 605:3-24 ("Q. Did you think it was important that diligence serve as an independent check to ensure that the decisions traders were making were appropriate? ... A. I think that's exactly what was being done. So what I said was it would not be uncommon for perhaps trading sending their sampling ideas to then be approved by credit, and then credit, the due diligence folks, were actually – they were managing that on behalf of the bank. So I think it would be independent. Q. So is it your view that someone in credit must have approved the sample that Mr. Skibo selected with respect to this transaction? ... A. I feel confident saying yes."); RBS Ex. 6 (Deposition of James Whittemore) at 282:15-284:4 (stating that while traders may have suggested adverse criteria, his "picking of the sample would not have been based on what the traders said" and that "the credit department ended up making the decision of should we modify our due diligence."); RBS Ex. 7 (Deposition of William Gallagher) at 178:15-179:16 ("Q. And who else at RBS was involved in determining the size and parameters of a sample? ... A. It was – it was predominantly the underwriters and on occasion they may have gotten some input from other people within the firm."). It was the Due Diligence group that in fact determined the criteria for the loan-level due diligence samples that were pulled for the NHELI 2007-1 and NHELI 2007-2 Securitizations at issue in this litigation. RBS Ex. 8 (RBS-FHFA-SDNY-0484875, January 8, 2007 email from Brian Farrell to Dana Pasternak) at RBS-FHFA-

SDNY-0484875 (identifying sampling criteria for NHELI 2007-AF1 pool); RBS Ex. 9 (RBS-FHFA-SDNY-0485155, January 11, 2007 email from Brian Farrell to Dana Pasternak) at RBS-FHFA-SDNY-0485155 (identifying sampling criteria for NAAC 2007-AR1 pool); RBS Ex. 10 (RBS-FHFA-SDNY-0487282, January 12, 2007 email from Brian Farrell to Dana Pasternak) at RBS-FHFA-SDNY-0487283 identifying sampling criteria for NHEL 2007-HE1 pool).

**FHFA Reply:** RBSSI disputes the asserted fact in that it presents evidence suggesting that, as a trader, it was not Mr. Skibo's "duty" while employed as a Mortgage-Backed Trader to "determin[e] the criteria used in selecting due diligence samples of those loans." Whatever Mr. Skibo's formal duties may have been, RBSSI has offered no evidence controverting the proposition that Mr. Skibo often exerted influence over the sampling criteria that RBSSI's Credit personnel used, though this may not have been Mr. Skibo's formal "duty" as a Trader. *E.g.*, FHFA Ex. 536 (Deposition of Stephen Bisaillon) at 347:2-348:14 ("Q. Before we get to this document, let me step back a bit. You testified that you had a role in generating a sample report based on direction provided by others; right? A. Yes. Q. Who at RBS would give you that direction? A. It would either be a deal manager or credit, would send me the email, with the diligence request. Q. So from time to time it could be a deal manager who is sending you the sample criteria for your sample selection; right? A. It's possible. Q. Could it also be a trader? A. Well, I think you sent me -- this includes one where it was sent by Frank Skibo. Q. So make sure I understand your testimony. From time to time a deal manager in the banking group or Mr. Skibo in the trading group would tell you how to generate a sample report; right? A. I don't know who determined which loans would be sampled or what the sample should be comprised of. Q. Understood. But sometimes you would receive instructions on how to pull the sample from a deal manager or Mr. Skibo; right? A. It's possible. Q. And does this document reflect one of those instances? A. Yes.");

FHFA Ex. 537 (Dep. Ex. 45018, October 2, 2006, email re: Loan File Diligence

selection Criteria) (email from Mr. Whittemore to Mr. Skibo asking to "verify" that

sample selection criteria "is what [Mr. Skibo] want[s]."). RBSSI's argument that this fact

is not material to this action does not create a genuine dispute of fact. Part I.A, *supra*.

RBSSI otherwise admits the asserted fact.

### B.   RBSSI's Residential Mortgage Business

591.   **FHFA Statement:**  RBS engaged in both securitizing whole loan acquisitions and
underwriting and marketing new-issue securitizations for third-party issuers. Ex. 367
(RBS-FHFA-CT-6713722, February 15, 2007 Memorandum re: "Sub Prime Business")
at RBS-FHFA-CT-6713722 ("This business is a sub-set of the wider RBSGC [RBS
Securities] asset backed business....  Sub prime mortgage assets that are either financed or
acquired are done so with the objective of the creation of securities for sales to third party
investors."); *id.* at RBS-FHFA-CT-6713724 ("New Issue Securitization Underwriting on
Behalf of Third Party Mortgage Originators....This is a fee based activity and there are no
positions in inventory associated with this area although the ability to win underwriting
mandates is often closely linked to the ability to provide warehouse finance and also
provide a secondary market in the securities created.").

   **RBSSI Response:**  RBSSI states that the term "RBS" as used in ¶ 591 is vague and
ambiguous.  To the extent the term "RBS" is intended to include entities other than
RBSSI, RBSSI states that the facts and/or circumstances regarding the activities or
functions of those entities are not "material facts" at issue in this litigation under Local
Rule 56.1 or otherwise to which a response is required.  FHFA's attempt to raise or
resolve factual issues that are in dispute in the Connecticut litigation under the guise of
the instant litigation, where such facts are not at issue, is improper and prejudicial.  To
the extent "RBS" refers to "RBSSI," RBSSI does not dispute the assertions in ¶ 591.

   **FHFA Reply:**  RBSSI does not dispute the asserted fact.  RBSSI's argument that this fact

is not material to this action does not create a genuine dispute of fact.  Part I.A, *supra*.

### 1.   Asset Backed Finance Group

592.   **FHFA Statement:**  The Asset-Backed Finance Group (the "ABF Group" or "ABF") was
RBS's banking group. Ex. 368 (Deposition of Scott Gimpel) at 68:18– 69:13 ("Q. What
was the -- let me just back up to asset-backed finance.  Setting aside your role which
we've talked about a little bit, and we will return to, what other functions did the asset-
backed finance perform, as you understood it? And again for these questions I am
focusing on '05 to '07.  A.  Asset-backed finance was a, what they considered a banking
group.  They worked with clients putting together securitizations of clients' whole loans,
and securitizations of clients' whole loans, and within the group you had bankers, you had

business people, you had -- you had a modeling group, a structuring group, and I believe you had some entity that was in charge of some of the whole loan acquisitions. And the collateral analyst group was within the banking group.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 592 insofar as the term "banking group" is vague and ambiguous. RBSSI further disputes that FHFA Ex. 368 provides a complete description of the functions and/or activities of RBSSI's Asset-Backed Finance group. RBSSI refers the Court to FHFA Ex. 369 (RBSSI's September 2006 Asset-Backed Finance, Sales & Trading Groups Policies and Procedures Manual) at RBS-FHFA-SDNY-0498399-401, as well as to RBSSI's Counterstatement of Facts ¶¶ 11-13 for a description of the various roles and responsibilities of RBSSI's Asset-Backed Finance group.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI's argument that "the term banking group is vague and ambiguous[ ]" is not evidence controverting the evidence FHFA has presented tending to prove the asserted fact. Part I.A, *supra*. The additional materials RBSSI cites relating to the ABF Group are irrelevant to the asserted fact and thus do not create a genuine dispute of material fact. Part I.C, *supra*.

593. **FHFA Statement:** RBS's Asset-Backed Finance, Sales & Trading Groups Policies and Procedures Manual stated that the ABF Group's role was to "assist[ ] ... clients with their origination and aggregation of assets pending their sale into the securitization market to institutional investors." Ex. 369 (RBS-FHFA-SDNY-0498390, Asset-Backed Finance, Sales & Trading Groups Policies and Procedures Manual) at RBS-FHFA-SDNY-0498393 ("The ABF Group assists these clients with their origination and aggregation of assets pending their sale into the securitization market to institutional investors").

**RBSSI Response:** RBSSI states that the general facts and/or circumstances regarding RBSSI's activities or functions in assisting clients "with their origination and aggregation of assets pending their sale into the securitization market" are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the Connecticut litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that the September 2006 Asset-Backed Finance, Sales & Trading Groups Policies and Procedures Manual (FHFA Ex. 369) contains the language quoted in ¶ 593. RBSSI refers the Court to ¶¶ 11-13 of RBSSI's Counterstatement of Facts for a further description of the Asset-Backed Finance group's roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI admits "that the September 2006 Asset-Backed Finance, Sales & Trading Groups Policies and

386

Procedures Manual (FHFA Ex. 369) contains the language quoted" by FHFA. RBSSI's

argument that this fact is not material to this action does not create a genuine dispute of

fact. Part I.A, *supra*. The additional materials RBSSI cites are irrelevant to the asserted

fact and thus do not create a genuine dispute of material fact. Part I.C, *supra*.

594. **FHFA Statement:** With respect to third-party securitizations, the ABF Group was responsible for securing underwriting mandates for RBSSI. Ex. 370 (Massachusetts Mutual Life Insurance Company Deposition of Robert McGinnis) at 82:8-83:3 ("Q. Let's talk about Asset-Backed Finance's role in the whole loan acquisition process. If I heard you correctly, they were responsible for developing business with sellers of whole loans; is that right? A. They were responsible for developing or going out and securing mandates for underwritten transactions. Q. That's right. Thank you for clarifying that. And so, really, the people that they would develop business with would be with issuers of securitizations, is that more accurate? A. That's correct. Q. And they had responsibility for managing the relationship with those issuers? A. They were the primary - they would have been, generally speaking, the primary contact for those relationships with issuers.").

RBSSI Response: RBSSI states that the general facts and/or circumstances regarding RBSSI's activities or functions in "securing underwriting mandates" are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI disputes the assertion in ¶ 594 insofar as the phrases "responsible" and "securing underwriting mandates" are vague and ambiguous. RBSSI does not dispute that employees within the Asset-Backed Finance group would, among other things, develop and/or maintain business relationships with various third-parties, including issuers of RMBS securitizations. *See* FHFA Ex. 370 (*MassMutual* Deposition of Robert McGinnis) at 82:8-83:3 (stating that employees in the Asset-Backed Finance group were "the primary contact for [ ] relationships with issuers."). RBSSI refers to the Court to ¶¶ 11-13 of RBSSI's Counterstatement of Facts for a further description of the Asset-Backed Finance group's roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

FHFA Reply: RBSSI does not genuinely dispute the asserted fact. Neither RBSSI's

argument that the asserted fact is not relevant to this action, nor its contention that

portions of the asserted fact are "vague and ambiguous," controvert the asserted fact.

Part I.A, *supra*. The additional materials RBSSI cites are irrelevant to the asserted fact

and thus do not create a genuine dispute of material fact. Part I.C, *supra*.

595. **FHFA Statement:** The ABF Group was also responsible for managing relationship with third-party issuers. Ex. 370 (Massachusetts Mutual Life Insurance Company Deposition of Robert McGinnis) at 82:8-83:3 ("Q. Let's talk about Asset-Backed Finance's role in

the whole loan acquisition process. If I heard you correctly, they were responsible for developing business with sellers of whole loans; is that right? A. They were responsible for developing or going out and securing mandates for underwritten transactions. Q. That's right. Thank you for clarifying that. And so, really, the people that they would develop business with would be with issuers of securitizations, is that more accurate? A. That's correct. Q. And they had responsibility for managing the relationship with those issuers? A. They were the primary - they would have been, generally speaking, the primary contact for those relationships with issuers.").

**RBSSI Response:** RBSSI states that the general facts and/or circumstances regarding RBSSI's activities in "managing relationship[s] with third-party issuers" are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI disputes the assertion in ¶ 595 insofar as FHFA mischaracterizes or improperly paraphrases the cited deposition testimony. Mr. McGinnis stated that employees in the Asset-Backed Finance group "were the primary – they would have been, generally speaking, the primary contact for those relationships with issuers." FHFA Ex. 370 (*MassMutual* Deposition of Robert McGinnis) at 82:8-83:3. RBSSI further states that personnel in other groups within RBSSI, including personnel in the Credit and legal groups, also communicated with third-party issuers. RBSSI refers to the Court to ¶¶ 11-13 of RBSSI's Counterstatement of Facts for a further description of the Asset-Backed Finance group's roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. Neither RBSSI's argument that the asserted fact is not relevant to this action, nor its contention that portions of the asserted fact are "vague and ambiguous," controvert the asserted fact. Part I.A, *supra*. RBSSI's statement that other groups also communicated with third-party issuers is irrelevant to the asserted fact and thus does not create a genuine dispute of material fact. Part I.C, *supra*.

596. **FHFA Statement:** The tasks the ABF Group performed in the context of RMBS offering included structuring, preparing term sheets, working with rating agencies to obtain ratings for ABS, and generating transaction documents. Ex. 371 (Massachusetts Mutual Life Insurance Company Deposition of James Esposito) at 175:8 176:18 ("Q. What are the functions of the asset-backed finance department? ... A. In the context of a specific RMBS offering, the asset-backed finance group would be involved in a number of aspects of the transaction, including preparation of term sheets, helping to develop a structure for a given transaction, working with the rating agencies that were potentially going to rate the securities to be issued, and also working on transaction documents for the given transaction.").

**RBSSI Response:** RBSSI states that the general facts and/or circumstances regarding the Asset-Backed Finance group's "tasks ... in the context of RMBS offering[s]" are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI does not dispute that some of the functions performed by the Asset-Backed Finance group included those described in ¶ 596, but disputes that the quoted testimony provides a complete description of all of the functions performed by the Asset-Backed Finance group, including functions relating to loan- or transaction-level due diligence. RBSSI also disputes that the Asset Backed Finance group "generated" "transaction documents;" while employees in the Asset Backed Finance group performed certain work on prospectus supplements and, at times, other offering materials, the primary responsibility for creating such documents was with RBSSI's outside and inside counsel. RBS Ex. 11 (Deposition of Vinu Phillips) at 85:7-86:2, 243:18-246:14. RBSSI refers the Court to ¶¶ 11-13 of RBSSI's Counterstatement of Facts for a further description of the Asset-Backed Finance group's roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that there is a distinction between "working on transaction documents" and "generating transaction documents," this distinction is not material to FHFA's motion, *Quarles*, 758 F.2d at 840, and unsupported by evidence. Accordingly, it does not create a genuine dispute of fact, Part I.B, *supra*.

597.   **FHFA Statement:** The head of the ABF Group from 2006 to 2008 was Joseph Walsh, a managing director at RBSSI who also led RBSSI's Mortgage Trading Group. Ex. 380 (RBS-FHFA-CT-0244230, Jan. 2007 Presentation Regarding RBS Greenwich Capital Whole Loan Acquisition Business) at RBS-FHFA-CT-0244237 (identifying Mr. Walsh as a managing director in the ABF Group), at RBS-FHFA-CT-0244258 (stating that Mr. Walsh is a "Managing Director and Head of Mortgage Trading and Asset-Backed Finance."); Ex. 381 (RBS-FHFA-CT-6706196, Mr. Walsh's Deposition Background Questionnaire in the Massachusetts Mutual action) at RBS-FHFA-CT-6706197 (identifying Mr. Walsh as the head of the ABF Group from 2006 to 2008).

**RBSSI Response:** RBSSI states that Joseph Walsh is not a party to this litigation and had no involvement in the Nomura Securitizations. The facts and/or circumstances regarding his employment and positions at RBSSI are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that Mr. Walsh was co-head of the Mortgage and Asset-Backed Finance until late 2006 when he became sole head of Asset-Backed Finance and also at that time became responsible for

Mortgage Trading, which positions he held until he left RBSSI in 2008. RBS Ex. 4 (*MassMutual* Deposition of Joseph Walsh) at 50:13-51:16.

**FHFA Reply:** RBSSI does not dispute the asserted fact  RBSSI's argument that the

asserted fact is not relevant to this action does not create a genuine dispute of fact. Part

I.A, *supra*.

598. **FHFA Statement:** Adam Smith was a member of the Asset-Backed Finance Group from 2005 to 2008. Ex. 386 (Deposition of Adam Smith) at 28:4-8 ("Q. Mr. Smith, throughout the entire period from 2005 to 2008, you were in the asset-backed finance group at RBS, correct? A. Correct.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 598.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

599. **FHFA Statement:** Ms. Radhakishun was another member of RBS's Asset-Backed Finance Group. Ex. 470 (CMFG Life Insurance Company Deposition of Shakti Radhakishun) at 17:3-5 ("Q. How long did you remain employed with Greenwich Capital Markets? A. Through the end of February of 2009."); *id.* at 18:6-10 ("Q. Now, when you started at RBS in 1997 what was your position? A. I was an analyst. Q. What group were you an analyst in? A. The Asset-Backed Finance Group."); *id.* at 24:3-9 ("Q. Were you promoted from the associate position? A. I was. Q. And what was your next position? A. Vice president. Q. Was that also in the Asset-Backed Finance division? A. It was.").

**RBSSI Response:** RBSSI states that Shakti Radhakishun is not a party to this litigation and had no involvement in the Nomura Securitizations. The facts/and or circumstances regarding her roles or positions at RBSSI are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute the assertion in ¶ 599, except insofar as it vague as to time period. RBSSI does not dispute that Ms. Radhakishun was a member of RBSSI's Asset-Backed Finance group from at least 2006 through February 2009. FHFA Ex. 470 (*CMFG Life Insurance Company* ("*CUNA*") Deposition of Shakti Radhakishun) at 17:3-18:10.

**FHFA Reply:** RBSSI does not dispute the asserted fact. Neither RBSSI's argument that

the asserted fact is not relevant to this action, nor its contention that portions of the

asserted fact are "vague and ambiguous," controvert the asserted fact. Part I.A, *supra*.

600. **FHFA Statement:** Frank Skibo was once a member of the Asset-Backed Finance Group. Ex. 420 (Dep. Ex. 46004, Frank Skibo Deposition Background Questionnaire) at A-1 (showing department at RBS Securities Inc. as "Asset-Backed Finance" and "Asset-Backed Trading").

**RBSSI Response:** RBSSI states that Frank Skibo is not a party to this litigation and had no involvement in the Nomura Securitizations. The facts and/or circumstances regarding his roles or positions at RBSSI are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI disputes the assertion in ¶ 600 insofar as it is vague as to time period. Mr. Skibo testified that he was a member of the Asset-Backed Finance group until 2001 when he joined the trading desk in the Asset-Backed Trading group. RBS Ex 12 (Deposition of Frank Skibo) 45:11-17 ("Q. And when you joined the trading desk, were you a managing director or was that a position you took later? ... A. To the best of my memory, it was probably around that time I was a managing director."); *id.* at 46:11-16 ("Q. When did you join the trading desk? A. I don't specifically recall, but that's probably the approximate time frame. Q. Approximately 2001? A. Yes.").

**FHFA Reply:** RBSSI does not dispute the asserted fact. Neither RBSSI's argument that the asserted fact is not relevant to this action, nor its contention that portions of the asserted fact are "vague and ambiguous," controvert the asserted fact. Part I.A, *supra*.

601. **FHFA Statement:** The ABF Group contained various subgroups. Ex. 372 (CMFG Life Insurance Company Deposition of Adam Smith) at 17:18-18:8 ("Q. What division did Mr. Gargiulo work in compared to the asset-backed finance division that you worked in? A. So I worked in asset-backed finance. Rob worked in that, but he was sort of -- a subset of that would be sort of the banking group, which I was in. Rob was in the collateral group, which is fundamentally focused on data, collateral tapes and data. And there was also a different group, the modeling group, which would be focused on modeling and cash flow engineering all of which was separate from Don Lawson, who was in credit. So credit headed by Bill Gallagher and by Paul Goudie. And in that group was Don Lawson. So distinct groups at Greenwich Capital / RBS.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 601 insofar as there were no formal subgroups within the Asset-Backed Finance group. Different personnel within the Asset-Backed Finance group performed different functions, and groups of individuals performing the same or similar functions may have been collectively and informally identified as a "group" or "subgroup" within the Asset-Backed Finance group. RBSSI further refers the Court to ¶¶ 11-13 of RBSSI's Counterstatement of Facts for a further description of the Asset-Backed Finance group's role as it regards third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. Both RBSSI's

clarification that there were no "formal" subgroups within the ABF Group, and the

additional materials it cites, are irrelevant to the asserted fact, and therefore do not create

a genuine dispute. Part I.C, *supra*.

(a)     *Modeling Group Or Structuring Group*

602.    **FHFA Statement:** Within the ABF Group there was a modeling group, which modeled cash flows for new-issue securities. Ex. 373 (Deposition of William Gallagher) at 332:10-24 ("Q. Okay. Who at RBS was responsible for -- who was responsible for modeling the cash flows from a securitization -- with respect to a securitization? ... A. There was a modeling group within asset-backed finance and that team would have reviewed the, or they would have built models or had models to take cash flows from loans and then use those to I think determine what cash flows would be going to different securities and use that as part of the structuring process.").

**RBSSI Response:** RBSSI states that the general facts and/or circumstances regarding the Asset-Backed Finance group's tasks in terms of modeling "cash flows for new-issue securitizations" are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI does not dispute that the Asset-Backed Finance group modeled cash flows for third-party securitizations. RBS Ex. 13 (Deposition of Scott Gimpel) at 71:16-72:15. RBSSI refers the Court to ¶¶ 11-13 of RBSSI's Counterstatement of Facts for a further description of the Asset-Backed Finance group's roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not dispute the asserted fact. RBSSI's argument that the

asserted fact is not relevant does not create a dispute of fact. Part I.A, *supra*.

603.    **FHFA Statement:** Modeling Group employees were sometimes referred to as "structurers" or "modelers." Ex. 374 (Massachusetts Mutual Life Insurance Company Deposition of Ara Balabanian) at 179:24-180:6 ("Q. If you could look at the e-mail right in the middle of the page from Patrick Macolino, first of all, who is Patrick Macolino, if you know? A. I believe he was one of the – I think we have been referring to them as structurers or modelers."); *see also* Ex. 375 (Massachusetts Mutual Life Insurance Company Deposition of Joseph Walsh) at 70:10-23 ("Q. And what was that team? A. I'm not sure they had a name, but the modelers is probably -- Q. Modelers? A. - - what we called them. Q. Okay. And where were those people in the organization? A. Asset-Backed Finance. Q. Okay. And did you have oversight of that process? A. A gentleman by the name of Pat Macolino managed that group.").

**RBSSI Response:** RBSSI states that the general facts and/or circumstances regarding what "Modeling Group employees were sometimes referred to as" are not "material

facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI does not dispute that certain employees within the Asset-Backed Finance group were sometimes informally referred to as "structurers" or "modelers." RBSSI refers the Court to ¶¶ 11-13 of RBSSI's Counterstatement of Facts for a further description of the Asset-Backed Finance group's roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not dispute the asserted fact. RBSSI's argument that the asserted fact is not relevant does not create a dispute of fact. Part I.A, *supra*.

604. **FHFA Statement:** The AFB Group's Structurers Group worked with other RBSSI personnel to divide asset-backed securitizations—whether issued by RBS or by a third-party—into tranches. Ex. 374 (Massachusetts Mutual Life Insurance Company Deposition of Ara Balabanian) at 38:18-40:22 ("Q. Sorry, let me ask a better question. When I am talking about structuring, I'm talking about the various classes or the tranches that collateral would be divided into, so, what I am asking, with that definition in mind, is: Did you have any responsibility with the structuring of the securitizations? A. I would be a conversation with various members of the, you know, team -- is this in regards to an agent deal or proprietary deal? Q. Well, let's start with a proprietary deal. A. So, in that case, the deal team in banking would work with -- generally would work with the trading group, work with structurers who would model the transaction, and it would be a dialogue. Q. And is that something that you were involved with personally? A. I was part of that team, generally. Q. What about for non-proprietary deals, was the process any different? A. Just that it would be a similar team of banking, structurers; however it would -- you know, part of the team would be the client. Q. And by "client," are you referring to the sponsor of the securitization? A. Generally, the -- whoever owned the assets. Q. So in the context of non-proprietary deals, was it typically the client that was handling the structuring of the securitizations? ... A. It was a case-by-case basis. However, generally clients could ask for structurers, and the deal team at RBS would work with the client. Q. Did you work with rating agencies at all during 2005 to 2007? A. Generally, yes, rating agencies were involved with the transactions. Q. And did you work -- did you work with them personally? A. Generally, yes. Q. And was that -- did you work with them in the case of non-proprietary securitizations as well? A. Generally, yes.").

**RBSSI Response:** RBSSI states that the Asset-Backed Finance group's work in structuring asset-backed securitizations and "divid[ing] asset-backed securitizations" into tranches does not pertain to the Nomura Securitizations. The facts and/or circumstances regarding the Asset-Backed Finance group's structuring of asset-backed securitizations and "divid[ing] asset-backed securitizations" into tranches are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI disputes that the Asset-Backed Finance group "divid[ed] asset-backed securitizations" into tranches

393

regardless of whether those securitizations were "issued by RBS or a third party." RBSSI further disputes that the Asset-Backed Finance group was always involved in the structuring of asset-backed securitizations issued by third parties. RBSSI also disputes the assertion in ¶ 604 as it mischaracterizes or improperly paraphrases Mr. Balabanian's testimony. Mr. Balabanian testified that in the case of third party securitizations, it was decided on a "case-by-case" basis whether the sponsor or RBSSI was going to handle the structuring. FHFA Ex. 374 (*MassMutual* Deposition of Ara Balabanian) at 38:18-40:22. RBSSI states that FHFA has not cited any evidence supporting the assertion that RBSSI and not the sponsor handled the structuring of the Nomura Securitizations. RBSSI also disputes FHFA's reference to a "Structurers Group," to the extent that there was no such designated group, whether formal or informal, within the Asset-Backed Finance group. *See* FHFA Ex. 380 (RBS-FHFA-CT-0244230, January 2007 Presentation regarding RBS Greenwich Capital Whole Loan Acquisition Business) at RBS-FHFA-CT-0244236. RBSSI refers the Court to ¶¶ 11-13 of RBSSI's Counterstatement of Facts for a further description of the Asset-Backed Finance group's roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI's argument that the asserted fact is not relevant does not create a dispute of fact. Part I.A, *supra*.

RBSSI purports to dispute the asserted fact on the grounds that: (i) there was not a formal or informal "Structurers Group" within the ABF Group; and (ii) it was decided on a 'case-by-case' basis whether the sponsor or RBSSI was going to handle the structuring.

RBSSI's first dispute is immaterial, and therefore does not create a dispute of fact. *Quarles*, 758 F.2d at 840. Its second dispute is not responsive to the asserted fact, which is that "AFB Group's Structurers Group worked with other RBSSI personnel to divide asset-backed securitizations—whether issued by RBS or by a third-party—into tranches." Accordingly, it does not create a genuine dispute of fact. Part I.C, *supra*.

605. **FHFA Statement:** The ABF Group's structurers also worked with rating agencies in this process. Ex. 374 (Massachusetts Mutual Life Insurance Company Deposition of Ara Balabanian) at 38:18-40:22 ("Q. Sorry, let me ask a better question. When I am talking about structuring, I'm talking about the various classes or the tranches that collateral would be divided into, so, what I am asking, with that definition in mind, is: Did you have any responsibility with the structuring of the securitizations? A. I would be a conversation with various members of the, you know, team -- is this in regards to an agent deal or proprietary deal? Q. Well, let's start with a proprietary deal. A. So, in that case, the deal team in banking would work with -- generally would work with the trading group, work with structurers who would model the transaction, and it would be a

dialogue.  Q.  And is that something that you were involved with personally?  A.  I was part of that team, generally.  Q.  What about for non-proprietary deals, was the process any different?  A.  Just that it would be a similar team of banking, structurers; however it would -- you know, part of the team would be the client.  Q.  And by "client," are you referring to the sponsor of the securitization?  A.  Generally, the -- whoever owned the assets.  Q.  So in the context of non-proprietary deals, was it typically the client that was handling the structuring of the securitizations? ...  A.  It was a case-by-case basis.  However, generally clients could ask for structurers, and the deal team at RBS would work with the client.  Q.  Did you work with rating agencies at all during 2005 to 2007?  A.  Generally, yes, rating agencies were involved with the transactions.  Q.  And did you work -- did you work with them personally?  A.  Generally, yes.  Q.  And was that -- did you work with them in the case of non-proprietary securitizations as well?  A.  Generally, yes.").

**RBSSI Response:**  RBSSI states that the general facts and/or circumstances regarding the Asset-Backed Finance group's work with rating agencies in structuring asset-backed securitizations generally are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required.  FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial.  To the extent a response is required, RBSSI disputes the assertion in ¶ 605 insofar as it states that structurers in the Asset-Backed Finance group communicated or "worked with" the rating agencies, which is not supported by the cited testimony of Mr. Balabanian, who was not an RBSSI modeler.  *See* RBS Ex. 14 (*MassMutual* Deposition of Ara Balabanian) at 63:13-17 (explaining that he was in the banking group); *id.* at 177:13-22 ("Q.  And was it the trading group that contacted the rating agencies to obtain ratings for the bonds, or was it someone in your group?  A.  The direct interaction generally was with people in the banking group, but there was, again, more of a process internally, so there would be, you know, discussions amongst banking and trading throughout the process.").  RBSSI does not dispute that in certain third-party securitizations certain RBSSI employees within the Asset-Backed or Trading groups sought feedback from rating agencies regarding indicative loss coverage levels, and had communications with rating agencies before those agencies determined final loss coverage levels and the associated ratings for the securitization.  *See* RBS Ex. 15 (*Federal Home Loan Bank of Seattle v. RBS Securities Inc.* ("*FHLB-Seattle*") Deposition of Vinu Phillips) at 43:16-44:11, 55:13-57:11.  RBSSI modelers would take into consideration that feedback to the extent they were involved in structuring the securitization.  RBSSI refers the Court to¶¶ 11-13 of RBSSI's Counterstatement of Facts for a further description of the Asset-Backed Finance group's roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  RBSSI's argument

that the asserted fact is not relevant does not create a dispute of fact.  Part I.A, *supra*.

RBSSI speculates as to the quality of FHFA's evidence, but presents no evidence

controverting it, and therefore this speculation does not create a genuine dispute of fact. Part I.B, *supra*. Likewise, the additional materials RBSSI cites are irrelevant to the asserted fact, and therefore do not create a genuine dispute of fact. Part I.C, *supra*.

(b) *Banking Group*

606. **FHFA Statement:** ABF Group also had a banking group. Ex. 376 ███████

███████████████████████████████████████████████

**RBSSI Response:** RBSSI does not dispute that certain employees within the Asset-Backed Finance group were referred to as "bankers" and who, collectively, were informally referred to as the "banking group." RBSSI disputes FHFA's reference to a banking group, to the extent that there was no such formally designated group within Asset-Backed Finance group. See FHFA Ex. 380 (RBS-FHFA-CT-0244230, January 2007 Presentation regarding RBS Greenwich Capital Whole Loan Acquisition Business) at RBS-FHFA-CT-0244236. RBSSI refers the Court to ¶¶ 11-13 of RBSSI's Counterstatement of Facts for a further description of the Asset-Backed Finance group's roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not dispute the asserted fact, which is that the "ABF Group [ ] had a banking group." RBSSI's dispute over whether there was a formally designated banking group within the ABF Group is irrelevant to this fact, and in any event the Presentation it cites is not probative of RBSSI's internal organizational structure. *See* FHFA Ex. 368 (Deposition of Scott Gimpel) at 67:13-22 ("A. Yes. Q. And do you know why you're listed here under 'Asset-Backed Trading'? A. No. Q. You don't recall being part of the asset-backed trading group during your tenure? A. This surprises me, because Craig -- I believe Craig Eckes and myself reported to Joe Walsh at this time."). RBSSI's evidence therefore does not create a genuine dispute of fact. Part I.C, *supra*.

607. **FHFA Statement:** The ABF Group's bankers would "manage the process" of creating the marketing materials for new-issue securitizations and would "create the verbiage" in those materials, while "[t]he modelers and collateral analysts would largely fill in the numbers" in those materials. Ex. 377 (Moneygram Payment Systems Deposition of James Raezer) at 48:2-49:20 ("Q. So describe the process for creating the marketing

materials.  A.  So we, the bankers, would create the marketing materials, and we would work with our bond structurer, our collateral analyst, lawyers, and we would come up with the structure to -- that really created these marketing materials.  Q.  Okay.  A.  And we'd write the verbiage and we'd send them around.  Lawyers would comment on them. Accountants would comment on them.  And then once we were all signed off and ready to go, then we had the package delivered to a syndicate.  Q.  Was there any particular group within the RMBS group that was responsible for putting together the marketing materials? A.  It was just the banking function.  Everybody did it.  Q.  What about with respect to the offering -- withdrawn.  What about with respect to the prospectus, prospectus supplements? A.  Same group with one caveat, we didn't work much on the base prospectus.  That was more of a legal function.  So there was not much commenting or very rarely was there any involvement with the base prospectus.  But the pro supp, prospectus supplement was all commented on by bankers.  And we will take a step back. The really three groups of people in this process within the residential mortgage bank department, excluding trading, you had the banker, which would be the transaction manager, the associate, the analyst.  And then you had the modelers who would run the cash flows.  Then you had the collateral analysts, who would crack the tapes and run the stratifications.  So all three of those people were involved in creation of the marketing materials.  The banker and not the collateral analyst and not the modeler was really the transaction manager.  He might be what they would call the deal manager.  He would be the one, or she, as the case may be, would be the one that would manage the process and create the verbiage.  The modelers and collateral analysts would largely fill in the numbers, if that makes sense.").

**RBSSI Response:**  RBSSI disputes the assertion in ¶ 607 insofar as FHFA mischaracterizes or improperly paraphrases the quoted deposition testimony of Mr. Raezer.  Mr. Raezer testified that in the case of third-party securitizations "[t]he prospectus supplement was drafted by the issuer's counsel." RBS Ex. 16 (*Moneygram Payment Systems* Deposition of James Raezer) at 52:3-15.  RBSSI states that FHFA has not cited any evidence supporting the assertion that RBSSI and not the issuer drafted the marketing materials for the Nomura Securitizations.  RBSSI also disputes that ¶ 607 appropriately characterizes the modelers' and collateral analysts' role in creating the marketing materials.  Collateral analysts, not modelers, created the tables that went into the prospectus supplements.  *Id.*  at 61:17-62:5.  RBSSI refers the Court to ¶¶ 11-13 of RBSSI's Counterstatement of Facts for a further description of the Asset-Backed Finance group's roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  RBSSI asserts that

"FHFA has not cited any evidence supporting the assertion that RBSSI and not the issuer

drafted the marketing materials for the Nomura Securitizations," but the asserted fact is

that "ABF Group's bankers would 'manage the process' of creating the marketing

materials for new-issue securitizations," and FHFA presented evidence that ABF Group

Bankers would "create the verbiage" for those materials. FHFA Ex. 377 (Moneygram

Payment Systems Deposition of James Raezer) at 48:2-49:20. Similarly, RBSSI's

evidence regarding prospectus supplements does not controvert the asserted fact, which

relates to "marketing materials" not "prospectus supplements," and therefore it does not

create a genuine dispute of fact. Part I.C, *supra*. Likewise, the additional materials

RBSSI refers the Court to are irrelevant to the asserted fact, and therefore do not create a

genuine dispute as to the asserted fact. Part I.C, *supra*.

608. **FHFA Statement:** A banker within ABF who worked with internal and external parties to create and market a new-issue security was known as a "deal manager." Ex. 378 (Federal Home Loan Bank of Seattle Deposition of Vinu Phillips) at 42:12-17 ("Q. Do you recall what your responsibility is as a deal manager were on this deal? A. I believe it was to work with the associates and analysts in putting together and marketing the transaction."); Ex. 379 (CMFG Life Insurance Company Deposition of Peter McMullin) at 20:16-22:6 ("Q. I hear you mentioned that you may have had some responsibility for selecting the sample. Did you mean selecting which loans would be subject to a more detail loan level review? ... A. Yes. What I probably helped liaison was, whoever was responsible for doing the due diligence and the collateral group, which was part of mortgage finance, one of a deal manager's responsibilities would have been to coordinate those two constituencies. So when I said I was probably involved in helping select the sample, it was from a coordination perspective.").

**RBSSI Response:** RBSSI states that what RBSSI Asset-Backed Finance bankers were sometimes informally referred to as is not a "material fact" at issue in this litigation, which concerns the Nomura Securitizations, under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI disputes FHFA's assertion that any banker who worked with internal and external parties "to create and market a new issue security" was referred to as a "deal manager." RBSSI does not dispute that the deposition testimonies of Vinu Phillips and Peter McMullin cited in ¶ 608 includes the language quoted by FHFA, but disputes that their testimony supports FHFA's assertion that "deal managers" were Asset-Backed Finance personnel "who worked with internal and external parties to create and market a new-issue security" on the Nomura Securitizations. Adam Smith, the RBSSI Asset-Backed Finance banker who was primarily involved with those securitizations, explained that he was the "senior coverage banker" or "point person on the transaction[s]" and acted as liaison between internal and external parties. RBS Ex. 17 (Deposition of Adam Smith) at 15:3-16:7. RBSSI refers the Court to ¶¶ 11-13 of RBSSI's Counterstatement of Facts for a further description of the Asset-Backed Finance group's roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI's argument

that the asserted fact is not relevant does not create a dispute of fact. Part I.A, *supra*.

RBSSI's purported disputes are conclusory and unsupported by any contrary evidence.

In particular, the testimony of Adam Smith "that he was the 'senior coverage banker' or

'point person on the transaction[s]' and acted as liaison between internal and external

parties," RBS Ex. 17 (Deposition of Adam Smith) at 15:3-16:7, does not rebut, and

actually supports, the asserted fact, and therefore does not create a genuine dispute of

material fact. Part I.C, *supra*. Likewise, the additional materials that RBSSI cites do not

controvert the asserted fact, and thus do not create a genuine dispute of fact. *Id.*

       (c)    *Collateral Analytic Group*

609.    **FHFA Statement:** The Collateral Analytics Group was another group within the ABF
        Group. Ex. 368 (Deposition of Scott Gimpel) at 38:24-39:4 ("Q. What business unit did
        the collateral analytics group belong to during your tenure? A. It was referred to as asset-
        backed finance.").

        **RBSSI Response:** RBSSI does not dispute that certain employees within the Asset-
        Backed Finance group were referred to as collateral analysts and who, collectively, were
        informally referred to as the "Collateral Analytics Group". RBSSI refers the Court to¶¶
        11-13 of RBSSI's Counterstatement of Facts for a further description of the Asset-Backed
        Finance group's roles with regard to third-party securitizations that RBSSI underwrote,
        including the Nomura Securitizations.

        **FHFA Reply:** RBSSI does not dispute the asserted fact. The additional materials that

        RBSSI cites do not controvert the asserted fact, and thus do not create a genuine dispute

        of fact. Part I.C, *supra*.

610.    **FHFA Statement:** Scott Gimpel was the head of the Collateral Analytics Group. Ex.
        393 (Deposition of Frank Skibo) at 61:13-16 ("Q. Did Mr. Gimpel also have a role in the
        collateral group? A. Yes, he ran the collateral group.").

        **RBSSI Response:** RBSSI states that Scott Gimpel is not a party to this litigation and had
        no involvement in the Nomura Securitizations. The facts and/or circumstances regarding
        his roles or responsibilities at RBSSI are not "material facts" at issue in this litigation
        under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to
        raise or resolve factual issues that are in dispute in the Connecticut litigation under the

guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that between 2002 and 2008 Mr. Gimpel was a Managing Director in the Asset-Backed Finance group with management responsibility over collateral analysts within the Asset-Backed Finance group. RBS Ex. 13 (Deposition of Scott Gimpel) at 41:3-6.

**FHFA Reply:** RBSSI does not dispute the asserted fact. RBSSI's argument that the

asserted fact is not relevant to this action does not create a genuine dispute of fact. Part

I.A, *supra*.

611. **FHFA Statement:** The role of employees within the Collateral Analytics Group with respect to initiating a securitization was to take loan-level data describing the characteristics of the loans that were to be securitized, input that data into a database, and run reports describing and stratifying that data as people requested. Ex. 368 (Deposition of Scott Gimpel) at 42:20-43:22 (Q. You're referring to the pre-, I think, '99 period you talked about that you -- you worked on securitizations? A. Yes. Q. What do you mean by that? A. I was a collateral analyst within the securitization group, which dealt with loan-level data. Q. Can you describe generally what you mean by that? A. When a securitization was -- when it was begun, loan-level data was received on the loans that were going to be put in the deal and the collateral analyst will take that data, put it into a database and run reports for the -- for the group that actually describes what the data is, and the characteristics, and stratifies the data in different ways that people request.").

**RBSSI Response:** RBSSI states that the "role of the Collateral Analytics Group with respect to initiating a securitization" is not a "material fact" at issue in this litigation, which concerns Nomura Securitizations initiated by the Nomura Defendants, under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI disputes the assertion in ¶ 611. FHFA cites to portions of the deposition transcript of Scott Gimpel in which he describes the functions he performed as a collateral analyst at RBSSI in 1999 and earlier, which is irrelevant to this action. *See* FHFA Ex. 368 at 42:20-23 ("Q. You're referring to the pre-, I think, '99 period you talked about that you – worked on securitizations? A. Yes."). RBSSI also disputes the assertion to the extent it describes the role of the Collateral Analytics group with respect to all third-party securitizations, including those in which RBSSI was not lead underwriter. RBSSI states that FHFA has not cited any evidence showing otherwise. RBSSI refers the Court to ¶¶ 14 – 16 of RBSSI's Counterstatement of Facts and to the Declaration of Stephen W. Bisaillon (the "Bisaillon Decl."), RBS Ex. 18 at ¶¶ 2-13, for a further description of collateral analysts' roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI's argument

that the asserted fact is not relevant to this action does not create a genuine dispute of

fact. Part I.A, *supra*. The additional evidence cited by RBSSI regarding the role of the

Collateral Analytics Group in third-party securitizations for which RBSSI was not the lead underwriter is irrelevant to the asserted fact and thus do not create a genuine dispute of fact. Part I.C, *supra*.

612. **FHFA Statement:** In general, the Collateral Analytics Group was the "keeper of the loan-level data" within the ABF Group, and in that capacity supported the ABF Group's deal managers by performing tasks such as combining pools of loans into SLGs at the direction of deal managers, sending term sheets to accountants to be "scrubbed" during data integrity reviews, and generally providing "information on the loan level data or a summary form of the loan level data" to anyone who needed it. Ex. 382 (CMFG Life Insurance Company Deposition of Scott Gimpel) at 48:14-17 ("A. So the deal management team would funnel all different requests and the collateral analyst is really the keeper of the loan level data.").

   **RBSSI Response:** RBSSI does not dispute that the deposition testimonies of Scott Gimpel cited in ¶ 612 includes the language quoted by FHFA, but disputes that this testimony describes the role of the Collateral Analytics group in the context of third-party securitizations, including those in which RBSSI was not lead underwriter. RBSSI disputes that the Collateral Analytics group "combin[ed] pools of loans into SLGs" for third-party securitizations. Mr. Gimpel testified that the Collateral Analytics group "would take different whole loan packages *that they purchased*, [and] combine them up." RBS Ex. 19 (*CUNA* Deposition of Scott Gimpel) at 47:12-15. RBSSI refers the Court to ¶¶ 14 – 16 of RBSSI's Counterstatement of Facts and RBS Ex. 18 (Bisaillon Decl.) at ¶¶ 2-13, for a further description of collateral analysts' roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

   **FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The additional evidence cited by RBSSI regarding the role of the Collateral Analytics Group in third-party securitizations for which RBSSI was not the lead underwriter is irrelevant to the asserted fact and thus do not create a genuine dispute of fact. Part I.C, *supra*.

613. **FHFA Statement:** In that capacity, the Collateral Analytics Group supported ABF deal managers by combining pools of loans into SLGs at the direction of deal managers, sending term sheets to accountants to be "scrubbed" during data integrity reviews, and generally providing "information on the loan level data or a summary form of the loan level data" to anyone who needed it. Ex. 382 (CMFG Life Insurance Company Deposition of Scott Gimpel) at 45:10-48:17 ("Q. So employees of ABF would provide specific instructions to the collateral analytics group in terms of what they wanted generated. A. Correct. Q. And in the context of securitization, walk me through the process of creating a term sheet. A. Securitization started with whole loan purchases, so to a collateral analyst, any data that comes in basically is the same thing. If we have a pool of loans, it gets loaded into our database, a series of edit checks gets on to make sure

there's no data inconsistencies and a term sheet will get generated from that particular pool. In a securitization, a securitization can be a combination of many of those pools, so let me get water before ... Q. Of course. A. So in the case of a securitization, a collateral analyst would be combining multiple pools and creating one pool from multiple pools where then a term sheet gets generated off of that and gets distributed to the deal management team. The deal management team then uses that term sheet for very different purposes, whether --but there's another part. The collateral analyst will also provide data files. Once they combine those pools, those data files go to rating agencies. Those data files will go to accountants. Those data files can go to lawyers. So different people will take in those data files. There'd be a data file which would be more of a summary file that would go to the modeling team. The modeling team was responsible for generating the cash flows and the tranching of the pool. So anybody that required any information about those pool of loans, whether they wanted the summary form or they wanted loan level data they would then load into their own system, would then come through the collateral analyst. So the collateral analyst controlled all the loan level data and the loan level data came in, they scrubbed it, they brought in - - there were additional pools brought in. They would on orders of the deal management team, they would take different whole loan packages that they purchased, combine them up. On the direction of underwriters, they would pick samples based on what the underwriters. On the direction of the deal management team, they would remove loans, put loans in. Basically they controlled the loan level data, so whoever acquired any information on the loan level data or a summary form of the loan level data would come to the collateral analyst. Many of the requests just came through the deal management team, so if there was a request from a trading desk, there could have been -- the request could have been through a deal manager. If there was a request from the rating agencies, I don't remember any cases where we interact -- where the request from a rating agency came direct to a collateral analyst. It basically came from deal management. So the deal management team would funnel all different requests and the collateral analyst is really the keeper of the loan level data.").

**RBSSI Response:** RBSSI states that ¶ 613 seeks to establish some of the same facts as in ¶ 612 and for that reason objects to ¶ 613 as duplicative. To the extent a response is required, RBSSI does not dispute that RBSSI collateral analysts performed a variety of tasks and functions with regard to third-party securitizations underwritten by RBSSI. RBSSI disputes the assertion to the extent it describes the role of the Collateral Analytics group with respect to all third-party securitizations, including those in which RBSSI was not lead underwriter. RBSSI states that FHFA has not cited any evidence showing otherwise. RBSSI refers the Court to ¶¶ 14 – 16 of RBSSI's Counterstatement of Facts and RBS Ex. 18 (Bisaillon Decl.) at ¶¶ 2-13, for a further description of collateral analysts' roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The additional

evidence cited by RBSSI regarding the role of the Collateral Analytics Group in third-

party securitizations for which RBSSI was not the lead underwriter is irrelevant to the

asserted fact and thus do not create a genuine dispute of fact. Part I.C, *supra*.

614. **FHFA Statement:** They would then send term sheets to accountants to be "scrubbed" during data integrity reviews. Ex. 382 (CMFG Life Insurance Company Deposition of Scott Gimpel) at 47:815 ("A. So the collateral analyst controlled all the loan level data and the loan level data came in, they scrubbed it, they brought in -- there were additional pools brought in. They would on orders of the deal management team, they would take different whole loan packages that they purchased, combine them up.").

   **RBSSI Response:** RBSSI states that ¶ 614 seeks to establish some of the same facts as in ¶¶ 612-613 and for that reason objects to ¶ 614 as duplicative. To the extent a response is required, RBSSI does not dispute that RBSSI collateral analysts performed a variety of tasks and functions with regard to third-party securitizations underwritten by RBSSI. RBSSI disputes the assertion to the extent it describes the role of the Collateral Analytics group with respect to all third-party securitizations, including those in which RBSSI was not lead underwriter. RBSSI states that FHFA has not cited any evidence showing otherwise. RBSSI refers the Court to ¶¶ 14 – 16 of RBSSI's Counterstatement of Facts and RBS Ex. 18 (Bisaillon Decl.) at ¶¶ 2-13, for a further description of collateral analysts' roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

   **FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The additional

   evidence cited by RBSSI regarding the role of the Collateral Analytics Group in third-

   party securitizations for which RBSSI was not the lead underwriter is irrelevant to the

   asserted fact and thus do not create a genuine dispute of fact. Part I.C, *supra*.

615. **FHFA Statement:** Finally, they would provide "information on the loan level data or a summary form of the loan level data" to anyone who needed it. Ex. 382 (CMFG Life Insurance Company Deposition of Scott Gimpel) at 47:22-48:2 ("A. Basically they controlled the loan level data, so whoever [re]quired any information on the loan level data or a summary form of the loan level data would come to the collateral analyst.").

   **RBSSI Response:** RBSSI states that ¶ 615 seeks to establish some of the same facts as in ¶¶ 612-613 and for that reason objects to ¶ 615 as duplicative. To the extent a response is required, RBSSI does not dispute that RBSSI collateral analysts performed a variety of tasks and functions with regard to third-party securitizations underwritten by RBSSI. RBSSI disputes the assertion to the extent it describes the role of the Collateral Analytics group with respect to all third-party securitizations, including those in which RBSSI was not lead underwriter. RBSSI states that FHFA has not cited any evidence showing otherwise. RBSSI refers the Court to ¶¶ 14 – 16 of RBSSI's Counterstatement of Facts and RBS Ex. 18 (Bisaillon Decl.) at ¶¶ 2-13, for a further description of

collateral analysts' roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The additional

information provided by RBSSI is irrelevant and does not create a genuine dispute of

material fact. Part I.C, *supra*.

616. **FHFA Statement:** The Collateral Analytics Group was responsible for selecting the loans that would be subject to sampling diligence for diligence reviews at the direction of personnel within RBS's Credit Group. Ex. 383 (Deposition of Brian Farrell) at 550:16-551:12 ("A. Like I said, the majority of my stuff was a hundred percent, but from what I can recall, when I pulled samples, I would analyze the data, I would come up with my sampling criteria, and then I would then send that to someone in the collateral analytics group. Q. When you refer to your sampling criteria, are you talking about the random sample or the adverse sample, or both? A. Depending on how my sample was selected, it would be -- if I had an adverse and a random, they would, the collateral analytics group would select it. If I pulled just a random, they would pull it. If I pulled just an adverse, they would pull it. So however I determined my, my sample, my criteria would be sent to the collateral analytics group[.]").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 616 as it mischaracterizes or improperly paraphrases Mr. Farrell's testimony. RBSSI's Due Diligence group was responsible for determining the size and criteria for the sample of loans on which RBSSI would perform loan-level due diligence and in some cases selecting the loans themselves. *See* RBS Ex. 7 (Deposition of William Gallagher) at 178:15-179:16 ("Q. And who else at RBS was involved in determining the size and parameters of a sample? ... A. It was – it was predominantly the underwriters and on occasion they may have gotten some input from other people within the firm."); RBS Ex. 5 (Deposition of Brian Farrell) at 550:8-555:2 (stating that Mr. Farrell would determine the adverse selection criteria for the sample); RBS Ex. 8 (RBS-FHFA-SDNY-0484875, January 8, 2007 email from Brian Farrell) at RBS-FHFA-SDNY-0484875 (instructing Dana Pasternak to include as part of NHEL 2007-AF1 sample all Kentucky, New Mexico, Arizona, Illinois and Indiana loans); RBS Ex. 9 (RBS-FHFA-SDNY-0485155, January 11, 2007 email from Brian Farrell) at RBS-FHFA-SDNY-0485155 (instructing Dana Pasternak to include as part of NAAC 2007-AR1 sample "All loans with an original balance of $1,000,001 and higher" among others); RBS Ex. 10 (RBS-FHFA-SDNY-0487282, January 12, 2007 email from Brian Farrell) RBS-FHFA-SDNY-0487283 (instructing Dana Pasternak to include as part of NHEL 2007-HE1 sample "All No Ratio and No Doc loans"). RBSSI does not dispute that collateral analysts performed, at the direction of RBSSI Due Diligence group personnel, the function of randomly or adversely selecting loans using the criteria provided by RBSSI Due Diligence group personnel. RBS Ex. 6 (Deposition of James Whittemore) at 146:25¬147:13 ("Q. Okay, So the asset-backed department would actually choose the sample based on the number of loans that you identified with respect to the semi-random sample? A. The word pick I'm un – a little unsure of or I'm not sure that I want to say pick because I don't believe – it was my understanding it was a

404

computer that picked them. It wasn't the – they would input the number and then use the word a computer, a software is going to pick it, not an asset banker."); RBS Ex. 18 (Bisaillon Decl.) at ¶ 4 ("I did not determine the size of the sample or the methodology or criteria by which it was selected. My role, and the role of other collateral analysts, was to receive instructions as to the size, criteria, and selection methodology for the sample, and then to implement the instructions and identify specific loans in the pool that met those criteria, thereby creating the specific sample."). *See also* RBSSI's responses to ¶ 618 and ¶¶ 14 – 16 of RBSSI's Counterstatement of Facts for a further description of collateral analysts' roles with regard to third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence does not directly contravene or place in dispute the asserted fact that the "Collateral Analytics Group was responsible for selecting the loans that would be subject to sampling diligence for diligence reviews at the direction of personnel within RBS's Credit Group." Part I.C, *supra*. RBSSI argues that "RBSSI's Due Diligence group was responsible for determining the size and criteria for the sample of loans on which RBSSI would perform loan-level due diligence and in some cases selecting the loans themselves," but this argument does not contravene the asserted fact in ¶ 616, *infra,* that the Collateral Analytics Group was generally responsible for selecting the loans that would be subject to sampling diligence.

617. **FHFA Statement:** Collateral analysts within the ABF Group took day-to-day direction from deal managers bankers within the ABF Group. Ex. 382 (CMFG Life Insurance Company Deposition of Scott Gimpel) at 38:16-39:15 (Q. And as part of being head of the collateral analytics department, would it be fair to say you understood what the entire department was doing? ... A. I understood what projects everybody was working on. A collateral analyst was part of the deal management team. The deal manager had responsibility for the collateral analyst's day-to-day duty. My role as the head of collateral analyst was to manage their careers, was to make sure that their time was spent correctly, was to manage workflow to make sure not one collateral analyst had too much work on his plate, to manage any disputes or controversies or help out if there was questions. But generally the collateral analysts took direction from the deal manager and the deal management team, and if I knew what projects they worked on, there was no -- I was not -- I did not have the ability to know every conversation and every request that came in.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 617.

**FHFA Reply:**  RBSSI does not dispute the asserted fact.

618.  **FHFA Statement:**  When Mr. Farrell instructed collateral analysts within the ABF Group to pull a random sample, the only criterion he provided to them was the number of loans that were to comprise that random sample. Ex. 383 (Deposition of Brian Farrell) at 551:13-20 ("Q.  Did you give them criteria for random samples?  A.  There's no criteria other than I say pull X amount of random loans.  Q.  So the only criteria you'd give on a random sample is the size; is that right?  A.  That sounds right.").

**RBSSI** Response:  RBSSI disputes the assertion in ¶ 618 as it mischaracterizes or improperly paraphrases the testimony cited in FHFA Ex. 383.  Mr. Farrell testified that when instructing collateral analysts to pull a random sample that "[t]here's no criteria other than" the number of loans to select randomly.  FHFA Ex. 383 (Deposition of Brian Farrell) at 551:13-20.  RBSSI disputes the assertion in ¶ 618 to the extent FHFA states or implies that other criteria existed or should have been used to select a random sample of loans as argumentative and without factual support.  RBSSI refers the Court to ¶¶ 73– 83 of RBSSI's Counterstatement of Facts and RBS Ex. 18 (Bisaillon Decl.) at ¶¶ 2-13, for a further description of the manner in which loans were selected for loan-level due diligence for third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While RBSSI argues that it "disputes the assertion in ¶ 618 to the extent FHFA states or implies that other criteria existed or should have been used to select a random sample of loans as argumentative and without factual support," RBSSI's argument does not create a genuine dispute of material fact.  Part I.A, *supra*.  The testimony of Brian Farrell cited by RBSSI confirms rather than contradicts the asserted fact that the "only criterion" Mr. Farrell provided to collateral analysts was "the number of loans that were to comprise that sample," as Mr. Farrell confirmed in FHFA Ex. 383 at 551:13-20 that there *were* "no criteria other than" the number of loans to select randomly.  Thus, RBSSI fails to create a genuine dispute of material fact.  Part I.B, *supra*.

619.  **FHFA Statement:**  Mr. Farrell did not know how collateral analysts within the ABF Group actually identified loans to include in diligence samples. Ex. 383 (Deposition of Brian Farrell) at 552:3-12 ("Q.  Do you know who at collateral analytics would actually identify the loans to include in samples?  A.  Which specific person? It was, it was a large group.  There was quite a few people who worked in that department who could provide that service.  Q.  Do you know how they did it?  A.  No, I don't.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 619 as it mischaracterizes or improperly paraphrases Mr. Farrell's testimony. Part of Mr. Farrell's responsibility was to determine the size and criteria for the loan-level due diligence sample, which included instructing collateral analysts as to the number of loans to include in any random sample, and the number of loans and criteria to be used to select any adverse sample, at which point it was the responsibility of the collateral analyst to identify specific loans based on the criteria determined by and communicated by Mr. Farrell. RBS Ex. 5 (Deposition of Brian Farrell) at 550:8-553:10 (stating that Mr. Farrell would determine the random and adverse selection criteria for the sample and provide the sampling criteria to the collateral analytics group for loan selection); RBS Ex. 18 (Bisaillon Decl.) at ¶¶ 2-13. This occurred with regard to the loan-level due diligence samples pulled for the NHELI 2007-1 and NHELI 2007-2 Securitizations. RBS Ex. 8 (RBS-FHFA-SDNY-0484875, January 8, 2007 email from Brian Farrell) at RBS-FHFA-SDNY-0484875 (instructing Dana Pasternak to include as part of NHEL 2007-AF1 sample all Kentucky, New Mexico, Arizona, Illinois and Indiana loans); RBS Ex. 9 (RBS-FHFA-SDNY-0485155, January 11, 2007 email from Brian Farrell) at RBS-FHFA-SDNY-0485155 (instructing Dana Pasternak to include as part of NAAC 2007-AR1 sample "All loans with an original balance of $1,000,001 and higher" among others); RBS Ex. 10 (RBS-FHFA-SDNY-0487282, January 12, 2007 email from Brian Farrell) at RBS-FHFA-SDNY-0487283 (instructing Dana Pasternak to include as part of NHEL 2007-HE1 sample "All No Ratio and No Doc loans"). Mr. Farrell testified that to the extent part of the sample included randomly selected loans (whether for the adverse or random portion of the sample) he was not specifically aware of how those analysts performed the manual function of randomly selecting those loans, not that he was unaware of how the analysts' selected the loans generally. *See* RBS Ex. 5 (Deposition of Brian Farrell) at 552:3-12. Other witnesses testified that RBSSI collateral analysts used a computer program and that those analysts' function was merely to input the number of loans for the sample. RBS Ex. 6 (Deposition of James Whittemore) at 146:25-147:13 ("Q. Okay, So the asset-backed department would actually choose the sample based on the number of loans that you identified with respect to the semi-random sample? A. The word pick I'm un – a little unsure of or I'm not sure that I want to say pick because I don't believe – it was my understanding it was a computer that picked them. It wasn't the – they would input the number and then use the word a computer, a software is going to pick it, not an asset banker."). RBS Ex. 18 (Bisaillon Decl.) at ¶ 7 ("As a general matter, the 'semi random' method involved stratifying the relevant loan pool according to the unpaid principal loan balance, in bands of $50,000 or $100,000. Then, once stratified, we would use a random number generator program to select loans within each stratification band.") ¶ 11 ("When I had to randomly select loans for a specific adverse criterion, I selected them by running a random number generator program across the loan population that had that specific characteristic."). RBSSI refers the Court to ¶¶ 73 – 83 of RBSSI's Counterstatement of Facts for a further description of the manner in which loans were selected for loan-level due diligence for third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The evidence cited by RBSSI does not specifically contravene the asserted fact. Part I.B, *supra.* RBSSI's

response affirms, rather than contradicts the asserted fact that Mr. Farrell did not know

how analysts selected individual loans after selection criteria had been applied.

620. **FHFA Statement:** Mr. Farrell did not know whether the collateral analysts that were asked to select a sample of loans for diligence took statistical significance into account. Ex. 383 (Deposition of Brian Farrell) at 552:13-25 ("Q. Do you know whether [collateral analysts within the ABF Group whom he asked to select a sample of loans for diligence] took into consideration statistical significance? ... A. I'm not sure if they did or not. Q. Do you know if they took into consideration margins of error? ... A. I don't know if they did or if they didn't.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 620 as it states or implies that it was the responsibility or function of collateral analysts to "t[ake] statistical significance into account." RBSSI's Due Diligence group determined the size and criteria for selecting loan-level due diligence samples. RBS Ex. 7 (Deposition of William Gallagher) at 176:12-178:22 (explaining that RBSSI's former chief underwriting officer Don Lawson developed RBSSI's sampling techniques that were then employed and used by the Due Diligence group to select samples, sometimes with "input" from others outside the group). To the extent that any sample included randomly selected loans, RBSSI credit personnel determined the size of any loan-level sample, including samples that were intended to achieve statistical significance. *Id.* at 233:20-234:6 ("Q. How did RBS ensure that its sample was statistically significant? ... A. My recollection is that when Don [Lawson] was developing his tables to determine what sample sizes should be, he got some tables from statistical manuals that basically gave you a, a sample size requirement for varying population sizes and effectively we followed that."); RBS Ex. 20 (RBS-FHFA-CT-7017291, email from Don Lawson to James Whittemore) at RBS-FHFA-CT-7017292 (attaching sample size spreadsheet); RBS Ex. 6 (Deposition of James Whittemore) at 108:16-109:14 ("Q. What factors would you consider in determining the sample size for a given population of loans that you were asked to review? A. My sample – my – I would take data given to me from a credit analyst which reviewed or had a, what's called a term sheet that gave me loan information on the loan pool. I would use that to pick a sample of the loans, semi-random sample was done, and then any – and then adverse selections were made after that. Q. What do you mean by semi-random sample? A. It was a, for lack of proper terminology, it was a spreadsheet that I was able to, that I was given that told me if I used this formula it would give me a statistically random sample and it would give me the number of loans that I could – that I should look at given the size of the loan pool."). RBSSI refers the Court to ¶¶ 73-83 of RBSSI's Counterstatement of Facts and RBS Ex. 18 (Bisaillon Decl.) at ¶¶ 2-13, for a further description of the manner in which loans were selected for loan-level due diligence for third-party securitizations that RBSSI underwrote, including the Nomura Securitizations.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The evidence cited

by RBSSI does not specifically contravene the asserted fact, Part I.B, *supra*, and FHFA

neither stated nor implied in ¶ 620 that "the responsibility or function of collateral analysts to 't[ake] statistical significance into account.'"

2. <u>Credit And Loan Underwriting Group</u>

621. **FHFA Statement:** RBSSI's Credit and Loan Underwriting Group (the "Credit Group") was responsible for loan file due diligence for ABS securitizations underwritten by RBSSI, including both first and third-party securitizations. Ex. 413 █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 470 (CMFG Life Insurance Company Deposition of Shakti Radhakishun) at 86:2-14 ("Q. No, you heard me correctly. Let's split them up. Let's talk specifically with respect to the loan level due diligence. If you discovered in your loan level due diligence that some of the information in the draft prospectus supplement was inaccurate, would you seek to correct that information before finalizing the prospectus supplement? A. This information, the discovery of this information with respect to what you are addressing now would not be something that I would be responsible for, and so I would leave that to the departments that were. Q. A. What departments were responsible for that? The credit department."); Ex. 460 █████ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *see also* Ex. 385 (RBS-FHFA-CT-6723374, RBS Greenwich Capital Credit Risk Management Overview) at RBS-FHFA-CT-6723379 (noting "significant focus on loan level due diligence" as a bullet point under the section on "Asset Backed Finance" pertaining to RBSGC).

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 621. RBSSI refers the Court to ¶¶ 6 – 19 of its Counterstatement of Facts for a description of the roles and functions performed by various groups with RBSSI with regard to due diligence, including with respect to the Nomura Securitizations.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

622. **FHFA Statement:** It "was the credit department's responsibility" to determine "whether the random sample methodology [employed by RBSSI] was intended to arrive at any particular statistical significance. Ex. 368 (Deposition of Scott Gimpel) at 94:8-15 ("Q.

And did you have any understanding as to whether the random sample methodology was intended to arrive at any particular statistical significance? ... A. No, that was the credit department's responsibility.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 622 as it states or implies that RBSSI's Due Diligence group had a "responsibility" to select statistically significant random samples when selecting loans for loan-level due diligence. FHFA relies on the testimony of Scott Gimpel, who was not a member of the Credit group. RBSSI does not dispute that the Due Diligence group employed a methodology for selecting a semi-random sample for loan-level due diligence that was a part of their effort to obtain an appropriate level of understanding about the broader pool of loans. RBS Ex. 7 (Deposition of William Gallagher) at 228:17-234:6 ("Q. And is the random sample that's being discussed in this, in this manual, supposed to be a statistically significant random sample? ... A. The random samples that we, we tried to utilize, we were trying to have a statistically significant sample size for each of the pools, and again, even the numbers to a degree are, are guidelines. And the basic or one of the basic goals or guidelines was to look at a statistically significant number of assets in any particular pool."); RBS Ex. 6 (Deposition of James Whittemore) at 108:16-109:14 (testifying same); RBS Ex. 20 (RBS-FHFA-CT-7017291, email from Don Lawson to James Whittemore) at RBS-FHFA-CT-7017292 (attaching sample size spreadsheet). Credit personnel also selected samples in whole or in part using other criteria that allowed them to get a better understanding about the broader pool from which the sample was selected regardless of statistical significance. RBS Ex. 5 (Deposition of Brian Farrell) at 521:9-522:14 ("What is the purpose of sampling in diligence? ... A. I mean generally to get a snapshot of what the pool looks like, the total loan pool. Q. Is the idea then that you would look at a subset of loans but you'd be able to draw conclusions about the remainder? ... A. It's possible. It's going to depend on the way the sample is pulled. Q. For a sample to be useful, should it be pulled in such a way that it would permit one to draw conclusions about the remainder of the pool? ... A. I don't – I don't think you can make definitive conclusions about the rest of the pool. I think it's to give you a better understanding of what that unsampled population may look at. Again, it's going to depend on the way the sample is pulled and it's going to depend on the results of your sample diligence."); *id.* at 523:21-524:5 ("Q. Do you know whether an adverse sample permits someone to draw conclusions about loans not in the sample? ... A. I think it, I think it's possible, yes."); *id.* at 565:7-23 ("Q. I'll ask the question again. Do you know whether or not the random, the semi-random samples that were being pulled according to that methodology permitted someone to draw conclusions about the larger loan populations from which they were drawn? ... A. All right. So I think I answered that. So part of the sampling was to get a better understanding of the pool to assist you in making possible conclusions. Semi-random, adverse, random, however it may be pulled, would be one of the tools to assist you in that process.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The evidence cited

by RBSSI does not specifically contravene the asserted fact, Part I.B, *supra*, and FHFA

neither stated nor implied in ¶ 622 that RBSSI's Due Diligence group "had a

'responsibility' to select statistically significant random samples when selecting loans for

loan-level due diligence."

623. **FHFA Statement:** The Credit Group reported to William Gallagher, RBS's Chief Credit Officer. Ex. 385 (RBS-FHFA-CT-6723374, RBS Greenwich Capital Credit Risk Management Overview) at RBS-FHFA-CT-6723377 (June 2005 Capital Credit Department Organizational Chart).

**RBSSI Response:** RBSSI does not dispute that the members of RBSSI's Credit group reported to William Gallagher during the 2006-2007 period of the Nomura Securitizations.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

624. **FHFA Statement:** Mr. Gallagher did not perform loan file due diligence or regularly review the results of such diligence. Ex. 373 (Deposition of William Gallagher) at 71:21-23 ("Q. And did you ever yourself review any loan files? A. I did not."); *id.* at 153:9-15 ("Q. And do you recall at any time during, at any time during your time at RBS a review about the adequacy of RBS's due diligence procedures? A. I don't recall any reviews about the adequacy of due diligence procedures."); *id.* at 316:4-317:7 ("Q. So is that your – my question to you is were you ultimately responsible for the quality of the loan level diligence, or RBS's loan level diligence when it was looking to acquire loans? Can you answer that yes or no? ... A. And I said I'm not sure I can answer that question. Q. So if you weren't responsible for the quality of RBS's loan level diligence, who was? ... A. I think as I tried to say, that I was, I managed the group, I was responsible for the work they did, we had a process that we, we followed and, you know, we were responsible for carrying out that process. Q. Was there any person or persons who were responsible for the quality of the loan level diligence RBS performed? ... A. I'm not sure."); Ex. 518 (Massachusetts Mutual Life Insurance Company Deposition of William Gallagher) at 165:19166:6 ("Q. Would you ever see the preliminary results of how loans were graded prior to the RBS lead reviewing them? A. No. Q. So you don't know how often, if ever, the RBS leads changed a loan from a 1 or 2 to a 3? A. That's what I said. Q. And you also don't know how often they changed a loan from a 3 to a 2 or a 1, right? A. Correct.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 624 as it mischaracterizes or improperly paraphrases the quoted testimony of Mr. Gallagher and because it does not relate to the specific Nomura Securitizations at issue. Mr. Gallagher was the head of the Credit group, and in that capacity supervised the work of employees that reported to him, including those who were directly responsible for coordinating loan-level due diligence, reviewing the results of that due diligence, and making decisions on issues identified in that due diligence. RBS Ex. 7 (Deposition of William Gallagher) at 22:9-23:13; *id.* at 66:19-73:16. Mr. Gallagher testified that he did not review any loan files, *id.* at 71:21-23, or "see the preliminary results of how loans were graded prior to the RBS lead reviewing them" RBS Ex. 21 (*MassMutual* Deposition of William Gallagher) at 165:19-166:6, not that he "did not perform loan file diligence or regularly review the results of

411

such diligence." In fact, Mr. Gallagher was often involved in aspects of RBSSI's loan-level due diligence, including receiving loan-level due diligence results and being copied on emails discussing those results including, for example, on the NHELI 2006-FM2 Securitization. *See* RBS Ex. 22 (RBS-FHFA-SDNY-0311236-40, September 28, 2006 email from Adam Smith copying Mr. Gallagher and attaching Nomura loan-level due diligence on the pool of loans from which loans were sourced into NHELI 2006-FM2); RBS Ex. 23 (RBS-FHFA-SDNY-0622262, September 28, 2006 email chain among various RBSSI credit, legal and asset-backed finance employees, including Mr. Gallagher, discussing Nomura's loan-level due diligence results on same pools); RBS Ex. 24 (RBS-FHFA-SDNY-0622268, same).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI's citation to additional testimony in ¶ 624, does not challenge the assertion that Mr. Gallagher's supervisory role did not lead him in to actually perform loan file diligence himself by reviewing loan files, or that Mr. Gallagher did not regularly review the results of others' diligence work. Part I.B, *supra*. RBSSI's legal argument as to the relevance of Mr. Gallagher's testimony does not create a dispute of material fact. Part I.A, *supra*.

625. **FHFA Statement:** James Whittemore was a Vice President and Credit Officer at RBS from 2003 to 2006. Ex. 459 (RBS-FHFA-CT-6717248, Massachusetts Mutual James Whittemore Deposition Background Questionnaire) at RBS-FHFA-CT-6717249 (indicating Mr. Whittemore served as Vice President and Credit Officer at RBS from 2003 to 2006).

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 625 that Mr. Whittemore was a vice president and credit officer at RBSSI from 2003 to 2006. To the extent the assertion in ¶ 625 is intended to state or imply that Mr. Whittemore held positions at other RBS entities, RBSSI disputes that assertion. FHFA cites no evidence that this is true.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

626. **FHFA Statement:** Mr. Whittemore was a Senior Vice President at RBS from 2006 to 2009, and held the position of Chief Underwriter. Ex. 459 (RBS-FHFA-CT-6717248, Massachusetts Mutual James Whittemore Deposition Background Questionnaire) at RBS-FHFA-CT-6717249 (indicating Mr. Whittemore served as RBS's Senior Vice President and Chief Underwriter from 2006 to 2009).

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 626 that Mr. Whittemore was a senior vice president at RBSSI who became in mid-2006 the chief underwriter in the Due Diligence group. RBS Ex. 25 (*MassMutual* Deposition of James Whittemore) at

25:20-26:17; RBS Ex. 26 (RBS-FHFA-CT-6353168, June 2006 RBS Greenwich Capital Credit Department Organizational Chart).

**FHFA Reply:** RBSSI does not dispute the asserted fact.

627. **FHFA Statement:** Mr. Whittemore reported to Mr. Gallagher during the relevant period. Ex. 384 (Deposition of James Whittemore) at 34:9-16 ("Q. As chief underwriter who did you report to? A. In 2006 I reported to Bill Gallagher.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 627 insofar as the term "relevant period" pertains to the July 2006-2007 time period in which the Nomura Securitizations occurred.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

628. **FHFA Statement:** As Chief Underwriter, Mr. Whittemore managed RBS's loan file due diligence from 2006 to 2009. Ex. 384 (Deposition of James Whittemore) at 28:11-14 ("Q. And from June 2006 until January 2009, were you RBS's chief underwriter? A. That was my title."); *id.* at 29:513 ("Q. How would you describe your responsibilities as credit officer, first? A. My responsibility was to work with a third-party vendor in reviewing a number of loans in a specific pool, doing the due diligence to determine if the lender/originator originated a loan in their underwriting guidelines.").

**RBSSI Response:** RBSSI does not dispute that Mr. Whittemore held the position of chief underwriter at RBSSI from June 2006 to January 2009. To the extent the assertion in ¶ 628 is intended to state or imply that Mr. Whittemore held positions at other RBS entities, RBSSI disputes that assertion. FHFA cites no evidence that this is true. RBSSI disputes the assertion that Mr. Whittemore "managed RBS's loan file due diligence from 2006 to 2009" if that is meant to suggest that Mr. Whittemore was the only employee in the Due Diligence group who performed that function. Various personnel within RBSSI's Due Diligence group managed the process of loan underwriting and loan-level due diligence for any given loan review or loan-reunderwriting project, including, during the relevant time period, Mr. Whittemore, Mr. Farrell, Mr. Camacho, and Ms. Shera. RBS Ex. 5 (Deposition of Brian Farrell) at 49:7-15 ("Q. When you say managing jobs, what sort of jobs? A. Due diligence projects. Q. So within Greenwich you would be managing due diligence projects? A. Right."); *id.* at 55:6-11 ("Q. Well, the question is what were your responsibilities at RBS in 2006/2007? A. Managing due diligence projects on behalf of the credit risk department."); RBS Ex. 27 (Deposition of Frank Camacho) at 31:25-32-3 ("Q. Okay, What were your job responsibilities? A. My primary responsibilities were – were managing ongoing – ongoing loan reviews for prospective deals that RBS was working on."); *id.* at 33:2-9 ("Q. Were there others who had similar responsibilities in terms of diligence for mortgage loans to what you had? A. Yes. Q. Who are those people? Craig Timmons. Jim Whittemore did before Don Lawson's retirement. Anne Shera, and Brian Farrell.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The evidence cited

by RBSSI does not specifically controvert the asserted fact, Part I.B, *supra*, and FHFA

neither stated nor implied in ¶ 624 that "Mr. Whittemore held positions at other RBS

entities."

629. **FHFA Statement:** Frank Camacho was a Credit Officer within RBS's Credit Group
     under Mr. Whittemore. Ex. 449 (Deposition of Frank Camacho) at 31:8-23 ("Q. What
     department did you work in at RBS? A. I worked in the credit department. Q. And did
     that department have a formal name or it was just called credit? A. I believe – I believe it
     was the credit risk department. Q. Okay. What was your role in that department? A.
     I'm sorry. I'm not sure what you mean by "role" there. Q. Well, why don't we start with,
     did you have a formal title in that department? A. My title was vice president. Q. Okay.
     Did your title ever change while you were in that department? A. No, it did not."); *id.* at
     32:4-20 ("Q. And who supervised you in the performance of this role? A. Over my time
     at RBS, I had two separate – two separate supervisors. Q. Okay. Who was the first one?
     A. When I began, I reported to Don Lawson. Q. Okay. And when did that change? A.
     Sometime in 2006. A. And who did you then report to? A. Jim Whittemore. Q. And
     what was Don Lawson's position at the time you reported to him? A. I believe his title
     was senior vice president chief underwriter. Q. And at the point that you began reporting
     to Mr. Whittemore, what was his position at RBS? A. I believe it was the same."). Anne
     Shera was also a Credit Officer in RBS's Credit Group under Mr. Whittemore. Ex. 384
     (Deposition of James Whittemore) at 32:14-25 ("Q. Who else was also a credit officer?
     ... during the period from 2003 to mid-June 2006. A. Some came and left, so hopefully
     I will remember. Craig Timmins was one, Craig Timmins, Frank Camacho, Anne Shera,
     and myself were credit officers."); *id.* at 33:6-15 ("Q. How did your responsibilities
     change when you were promoted to chief underwriter? A. I was given the title, I was
     then, it became my responsibility to pull samples for future – for the reviews that were
     going to be accomplished by the credit officers. At the time Frank Camacho and Anne
     Shera then reported to me and I guided them in which projects I wanted them to be at.");
     Ex. 468 (Massachusetts Mutual Life Insurance Company Deposition of Anne Shera) at
     31:15-19 ("Q. Who did you report to while you were at RBS? A. Originally I reported to
     Don Lawson, and when Don semiretired, I reported to Jim Whittemore.").

**RBSSI Response:** RBSSI states that Mr. Camacho is not a party to this litigation and
had no involvement in any of the Nomura Securitizations. The facts and/or
circumstances regarding Mr. Camacho's role and/or positions at RBSSI are therefore not
"material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a
response is required. FHFA's attempt to raise or resolve factual issues that are in dispute
in the *Connecticut* litigation under the guise of the instant litigation, where such facts are
not at issue, is improper and prejudicial. To the extent a response is required, RBSSI
does not dispute the assertion in ¶ 629 that Mr. Camacho was a credit officer in the
RBSSI Due Diligence group or that, starting in June 2006 and continuing until he left
RBSSI in November 2007, Mr. Camacho reported to Mr. Whittemore. RBS Ex. 27
(Deposition of Frank Camacho) at 32:4-13, 43:24-25. To the extent the assertion in ¶ 629

is intended to state or imply that Mr. Camacho held positions at other RBS entities, RBSSI disputes that assertion. FHFA cites no evidence that this is true.

**FHFA Reply:** RBSSI does not dispute the asserted fact that Mr. Camacho was a Credit Officer within RBS's Credit Group and reported to Mr. Whittemore. RBSSI's legal argument as to the relevance of Mr. Camacho's role and/or positions at RBSSI does not create a dispute of material fact. Part I.A, *supra*. RBSSI failed to address the asserted fact that Ms. Anne Shera also held the position of Credit Officer within RBSSI's Credit Group and reported to Mr. Whittemore. Accordingly, that fact is taken as undisputed.

630. **FHFA Statement:** Like Mr. Camacho, Brian Farrell was a Credit Officer within RBS's Credit Group under Mr. Whittemore. Ex. 519 (RBS-FHFA-CT-6353169, RBS Greenwich Capital Credit Department Organizational Chart, June 2006) at RBS-FHFA-CT-6353169 (listing Brian Farrell as reporting to Jim Whittemore).

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 630 that Mr. Farrell was a credit officer in RBSSI's Due Diligence group, except insofar as it is vague and ambiguous as to a time period. Mr. Farrell testified that he joined RBSSI in July 2006 and reported to Mr. Whittemore from that time until Mr. Whittemore left RBS in January 2009. RBS Ex. 5 (Deposition of Brian Farrell) at 65:20-66:2, 53:14-22. To the extent the assertion in ¶ 630 is intended to state or imply that Mr. Farrell held positions at other RBS entities, RBSSI disputes that assertion. FHFA cites no evidence that this is true.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

631. **FHFA Statement:** Mr. Farrell believed that Mr. Whittemore had the most knowledge of sample selection at RBS. Ex. 383 (Deposition of Brian Farrell) at 553:18¬554:5 ("Q. In your experience, who had the most knowledge about sample selection at RBS? ... A. The most knowledge? Q. Correct. A. About sample selection? Q. Right? A. My guess would be probably Jim Whittemore, since I'm the one who asked him to train me on how he pulled samples.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 631 as it mischaracterizes or improperly paraphrases Mr. Farrell's testimony. Mr. Farrell testified that his "guess" was "probably" that Mr. Whittemore had the most knowledge "since I'm the one who asked him to train me on how he pulled samples." FHFA Ex. 383 (Deposition of Brian Farrell) at 553:18¬554:5. Both Mr. Whittemore and Mr. Gallagher, RBSSI's chief credit risk officer, testified that Don Lawson, who was RBSSI's chief underwriter until his semi-retirement in mid-2006, developed RBSSI's sampling methodology for loan-level due diligence and was the most knowledgeable about it. RBS Ex. 7 (Deposition of William Gallagher) at 176:22-177:6 ("Q. And were you responsible for what sampling techniques were used to diligence a pool? A. Don Lawson developed the sampling techniques that

415

were used by RBS for the most part, although in, again, in looking at emails in preparation for this I think you see that it evolved over time as well."); RBS Ex. 6 (Deposition of James Whittemore) at 37:18-24 ("Q. Did you have any training relating to your responsibilities regarding sampling while you were at RBS? A. My training was involved with Don Lawson and his, using his philosophy on how to, and his way of how a sample should be picked."); RBS Ex. 20 (RBS-FHFA-CT-7017291, email from Don Lawson to James Whittemore) at RBS-FHFA-CT-7017292 (attaching sample size spreadsheet); *see also* RBS Ex. 18 (Bisaillon Decl.) at ¶ 5 ("My understanding is that RBS[SI]'s general sampling methodology used during the period 2005 through 2008 was developed by Donald Lawson"). Mr. Farrell also testified that he was aware that Mr. Lawson had developed RBSSI's semi-random sampling methodology. RBS Ex. 5 (Deposition of Brian Farrell) at 564:3-14 ("Q. Did you know what made a sample semi-random as opposed to random? A. No, I do not. Q. Who made that determination? ... A. I believe it was created by Don Lawson prior to my employment. Q. When you say it was created, what are you referring it? A. That he was responsible for creating the semi-random methodology.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI's citation to

additional testimony in ¶ 631 does not challenge the assertion that Mr. Whittemore had

the most knowledge of sample selection at RBS. Part I.B, *supra*. The degree of Mr.

Lawson's knowledge does not controvert the asserted fact that Mr. Farrell affirmatively

stated that Mr. Whittemore had the most knowledge of sample selection at RBS.

632. **FHFA Statement:** Mr. Whittemore did not have any statistical training of any kind. Ex. 384 (Deposition of James Whittemore) at 110:22-24 ("Q. And you didn't have any statistical training of any kind? A. I did not.").

**RBSSI Response:** RBSSI does not dispute that the testimony of Mr. Whittemore cited in ¶ 632 includes the language quoted by FHFA, but states that other portions of Mr. Whittemore's testimony contains additional information that provides necessary context for Mr. Whittemore's statement. Mr. Whittemore testified that he was trained by Mr. Lawson with regard to Mr. Lawson's sampling philosophy and methodology, including the process of picking statistically significant random samples. RBS Ex. 6 (Deposition of James Whittemore) at 37:18¬24 ("Q. Did you have any training relating to your responsibilities regarding sampling while you were at RBS? A. My training was involved with Don Lawson and his, using his philosophy on how to, and his way of how a sample should be picked."); *see also* RBS Ex. 20 (RBS-FHFA-CT-7017291, email from Don Lawson to James Whittemore) at RBS-FHFA-CT-7017292 (attaching sample size spreadsheet). RBSSI further disputes ¶ 632 to the extent it states or implies that Mr. Whittemore should have had statistical training or that such statistical training was necessary as part of his responsibilities at RBSSI. Mr. Gallagher, RBSSI's chief credit risk officer during the time of the Nomura Securitizations, testified that he was not concerned that Mr. Whittemore did not have formal statistical training, that selecting

statistically-valid random samples was not necessarily the purpose of sampling for loan-level due diligence, and that, in any event, Mr. Whittemore's lack of formal statistical training did not impact his ability to select samples using the methodology developed by Mr. Lawson. RBS Ex. 7 (Deposition of William Gallagher) at 380:13-381:9 ("Q. As the head of credit, does reading this give you any concern that Mr. Whittemore was not qualified to be drawing random samples for purposes of diligencing loans? A. No. Q. Did you consider Mr., including based upon your review of this testimony, Mr. Whittemore to be competent to pull a random sample and to determine whether that sample was actually representative? ... A. He didn't – he didn't need to be competent. He was given a statistics table that told him how many loans to sample for different samples and that was something that Don had pulled together years before and I'm confident that it was reasonable and fit the purpose.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI's citation to

additional testimony in ¶ 633 does not controvert the assertion that Mr. Whittemore did

not have any statistical training of any kind. Part I.B, *supra*. Whether Mr. Whittemore

had informal training while on the job is not material to FHFA's motion. *Quarles*, 758

F.2d at 840.

### 3. RBS Greenwich Capital Underwriting Committee

633. **FHFA Statement:** The RBS Greenwich Capital Underwriting Committee's role was to approve "first time underwritings." Ex. 399 (Deposition of Paul Goudie) at 233:5-11 ("Q. And can you tell me what the underwriting committee was? A. My recollection was the underwriting committee was there to approve -- this looks like a time share, actually, time share example. First time underwritings."); *see also* Ex. 371 (Massachusetts Mutual Life Insurance Company Deposition of James Esposito) at 140:11-21 ("Q. What sort of work does the Underwriting Committee do? A. The Underwriting Committee is involved in evaluating transactions where RBS Securities is proposed to act as an underwriter for that given transaction. Q. Would that include acting as an underwriter on RMBS offerings? A. In certain cases it could include RBS acting as an underwriter for RMBS cases -- excuse me, RMBS transactions."); *see also* Ex. 400 (Dep. Ex. 44818, Feb. 15, 2007 memorandum regarding Sub Prime Business) at RBS-FHFA-CT-6713724 ("Issuers are also subject to RBSGC Underwriting Committee approval for the first time they issue.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 633. Approval of first-time underwritings for issuers from a management perspective rested with RBSSI's Credit and Commitments Committee. FHFA Ex. 369 (RBS-FHFA-SDNY-0498390, RBSSI's September 2006 Asset-Backed Finance, Sales & Trading Groups Policies and Procedures Manual) at RBS-FHFA-SDNY-0498402 ("Many of [RBSSI's] transactions require approval from the RBSGC Credit and Commitments Committee. The RBSGC Credit and Commitments Committee will:... Approve all lead and sole underwriting and private

placement agreements, and mandates for first-time issuers (first-time from RBSGC's perspective)").  FHFA relies on the testimony of Mr. Esposito who clarified his initial statement that the Underwriting Committee approved first-time underwritings (cited by FHFA), explaining that "[I]n 2005, I don't believe the committee that looked after potential underwriting transactions was called the Underwriting Committee.  It may have gone by a different name.  That committee name may have been the Credit and Commitments Committee or an alternative name." RBS Ex. 28 (*MassMutual* Deposition of James Esposito) at 283:6-284:22.  Mr. Goudie testified that he believed the Underwriting Committee was just a "subset" of the Credit and Commitments Committee, not its own stand-alone committee.  RBS Ex. 29 (*MassMutual* Deposition of Paul Goudie) at 39:23-41:5.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  RBSSI does not dispute that there was a committee that approved first-time underwritings.  Any dispute about the precise name of the Underwriting Committee or whether it was a "subset" of the Credit and Commitments Committee—which RBSSI does not dispute—is not material to FHFA's motion, *Quarles*, 758 F.2d at 840.  Moreover, RBSSI ignores evidence that Mr. Smith, the executive who managed the relationship with Nomura, *see* ¶ 646, *supra*, acknowledged in a January 12, 2007 memorandum that the "underwriting relationship with Nomura started in August 2006" even "though approval was mistakenly not obtained from the RBSGC Underwriting Committee."  FHFA Ex. 387 at RBS-FHFA-SDNY-0485184.  Mr. Smith's memorandum concluded with his recommendation that the RBSGC Underwriting Committee "[a]pprove RBSGC as a lead manager underwriter on NHELI 2007-AF1, 2007-HE1 and NAAC 2007-S1 and future transactions from Nomura."  *Id.* at RBS-FHFA-SDNY-0485185.

634.  **FHFA Statement:**  Paul Goudie believed that the role of the Underwriting Committee was to determine whether RBS "wanted to be associated with a particular issuer." Ex. 399 (Deposition of Paul Goudie) at 233:5-234:19 ("Q.  And can you tell me what the underwriting committee was? A.  My recollection was the underwriting committee was there to approve ...  [f]irst time underwritings....  Q.  The question was why was there a separate committee for first time underwriting transactions? ...  A.  I believe the purpose of that was to determine whether we wanted to be associated with a particular issuer.  Q. And were you part of this underwriting committee between '05 and '07? A.  Yes, that's my recollection.").

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 399 contains the language quoted by FHFA, but disputes the assertion to the extent it is intended to state or imply that it was the Underwriting Committee's responsibility to approve first time underwriting transactions. As discussed in RBSSI's response to ¶ 633, the Underwriting Committee was a subset of the RBSSI Credit and Commitments Committee, which was responsible for approving "mandates for first-time issuers" from a management perspective. FHFA Ex. 369 (RBS-FHFA-SDNY-0498390, RBSSI's September 2006 Asset-Backed Finance, Sales & Trading Groups Policies and Procedures Manual) at RBS-FHFA-SDNY-0498402 ("Many of [RBSSI's] transactions require approval from the RBSGC Credit and Commitments Committee. The RBSGC Credit and Commitments Committee will:... Approve all lead and sole underwriting and private placement agreements, and mandates for first-time issuers (first-time from RBSGC's perspective)"). Mr. Goudie testified that he believed the Underwriting Committee was just a "subset" of the Credit and Commitments Committee, not its own stand-alone committee. RBS Ex. 29 (*MassMutual* Deposition of Paul Goudie) at 39:23-41:5.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI disputes "the assertion to the extent it is intended to state or imply that it was the Underwriting Committee's responsibility to approve first time underwriting transactions," RBSSI's reliance on testimony and Polices & Procedures Manual do not specifically controvert the asserted fact and therefore do not create a factual dispute that would preclude the Court from granting FHFA's motion. Part I.C, *supra*.

635. **FHFA Statement:** As of November 2006, the Underwriting Committee's members were William Gallagher (Chief Credit Officer); Bruce Jin (Managing Director and Head of Market Risk); James Esposito (Managing Director, Legal); Paul Goudie (Managing Director, Credit Risk); and Ann Marie Petrovcik (Senior Vice President, Credit Risk Management). Ex. 401 (RBS-FHFA-CT-6718971 (Nov. 13, 2006 Minutes of RBSGC Underwriting Committee) at RBS-FHFA-CT-6718971 (listing Gallagher, Jin, Esposito, Goudie, and Petrovcik as Underwriting Committee Members, and naming their positions within RBS).

**RBSSI Response:** RBSSI does not dispute that as of November 2006, William Gallagher, Bruce Jin, James Esposito, and Paul Goudie sat for the meeting noted as members of the underwriting subcommittee of the RBSSI Credit and Commitments Committee. FHFA Ex. 401 (Nov. 13, 2006 Minutes of the RBSGC Underwriting Committee). However, RBSSI otherwise disputes the assertion in ¶ 635, as the minute relied on shows that Ms. Petrovcik was simply in attendance at the meeting, and not a committee member. *Id.*

**FHFA Reply:** RBSSI does not dispute a material fact. Any dispute about whether Ms.

Petrovcik is a committee member is not material to FHFA's motion. *Quarles*, 758 F.2d

at 840.

### C. RBSSI Conducted Diligence On Securitizations From Third-Party Issuers Like Nomura Based On RBS's "Exposure To The Transaction"

636.   **FHFA Statement:** RBS's Capital Credit Procedures Manual (the "Credit Manual") governed RBS's diligence procedures. Ex. 388 (Dep. Ex. 44407, RBS Greenwich Capital Credit Procedures Manual) at RBS-FHFA-SDNY-0615277-82 (section entitled "Due Diligence Procedures for Asset Backed/Commercial Asset Products Including Loan Underwriting").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 636. While RBSSI's Credit Procedures Manual ("Credit Manual") contains the language quoted by FHFA, FHFA mischaracterizes the Credit Manual as "govern[ing] RBS's diligence procedures." RBSSI's Credit Manual was only a "manual" of recommended procedures, not a formal policy that was required to be followed in all instances. RBS Ex. 7 (Deposition of William Gallagher) at 216:5¬218:5 ("Q. Is it your understanding that this manual was followed by RBS employees? A. I think we would generally try to follow it, but I can't tell you it was followed verbatim on everything we did. But it's a procedures manual, not a policy manual. Q. And how do you understand – what distinction do you understand that to indicate? A. Procedures to me are what you do in, in your exercising your business. It's more process. Q. And how does it differ from policy? A. Policy can be more the guidelines that you try to follow, it could be guidelines, maybe they're rules that you're trying to follow in a particular business. Q. So the procedure is more actually what occurs in practice, is that what you mean? ... A. The procedures would be more of the process itself of what people do to, you know, exercise their, their duties, would describe the work that they're trying to do. But often in general terms. And it's at a point in time and, you know, things, things can evolve."). As Mr. Gallagher and other RBSSI credit personnel testified, loan-level due diligence practices, particularly sampling practices, evolved over time, and while the undated manual cited in FHFA Ex. 388 provided some guidance on how it should be conducted, RBSSI Due Diligence group personnel also relied on, among other things, their experience and judgment, prior history with the counterparty and/or originator, and familiarity with the particular loan product, to inform their procedures on any given loan-level due diligence project. RBS Ex. 7 (Deposition of William Gallagher) at 217:18-218:5 (stating that loan-level due diligence practices evolved); *id.* at 219:22-220:19 (discussing how loan-level due diligence sizes could vary "based on the characteristics of the collateral, the client, including seasoning of the assets, past performance of seasoned assets, Greenwich's past experience with this client and product and the financial strength of the client and the presence of third party credit enhancement" and that the "process evolved over time and I don't – I don't know what the date of this manual might have been, but over time things did, did evolve in different ways."); RBS. Ex. 5 (Deposition of Brian Farrell) at 611:25-:615:4 (discussing

how due diligence sampling practices "are constantly being evaluated and modified as needed," and would be informed by, among other things, "[c]ollateral, data, experience with counterparty, [and] previous diligence results"). RBSSI further disputes ¶ 636 insofar as it states or implies that the Credit Manual was the only manual or document that informed or concerned RBSSI's due diligence procedures. Other documents, such as RBSSI's September 2006 Asset-Backed Finance, Sales & Trading Groups Policies and Procedures Manual (FHFA Ex. 369), also provided guidance on securitization due diligence.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited testimony relating to the Credit Manual is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. RBSSI's argument that the Credit Manual was only a "manual" and "not a formal policy that was required to be followed in all instances" does not contravene the asserted fact. Part I.C, *supra*.

637. **FHFA Statement:** The Credit Manual provides that, for each transaction type (that includes "Securitization"), where "significant material exceptions are found ... the sample size should be expanded and may consist of additional random selections and/or discretionary samples focusing on the issues raised by the original random sample." Ex. 388 (Dep. Ex. 44407, RBS Greenwich Capital Credit Procedures Manual) at RBS-FHFA-SDNY-0615280.

**RBSSI Response:** RBSSI does not dispute that the undated Credit Manual contains the language that is partially quoted by FHFA, but disputes the assertion in ¶ 637 to the extent it states or implies that the manual or the quoted language was RBSSI's "policy" or was required to be followed in all instances. As discussed in RBSSI's response to ¶ 636, the manual provided guidance regarding loan-level due diligence but did not govern all situations. When specifically questioned about the quoted language, RBSSI's chief credit officer, William Gallagher, explained that upsizing the sample based on material exceptions was a context-specific inquiry and would depend on a number of factors, not just the number of exceptions itself. RBS Ex. 7 (Deposition of William Gallagher) at 249:21-250:5 ("Q. Why don't we continue. Again, if there is a statistically significant random sample or purportedly statistically significant random sample that identifies 30 percent significant material exceptions, do you agree with me that under this policy RBS would typically be required to expand the size of that sample? ... A. Again, it's, it's not a policy, it's a procedures manual. So under the procedures manual the suggestion is that that is what you would likely do, but, but there's other facts that could weigh in on it and it's trying to give a general overview of the process.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI's argument that the Credit Manual was only a "manual" and "not a formal policy that was required to be followed in all instances" does not contravene the asserted fact. Part I.C, *supra*.

638. **FHFA Statement:** The Credit Manual defines "significant material exceptions" as "typically greater than 20%." Ex. 388 (Dep. Ex. 44407, RBS Greenwich Capital Credit Procedures Manual) at RBS-FHFA-SDNY-0615280.

**RBSSI Response:** RBSSI disputes the assertion in ¶ 638. The undated Credit Manual does not provide a definition for "significant material exceptions;" rather, it states: "For each transaction type, when significant material exceptions are found (typically greater than 20%), the sample size should be expanded and may consist of additional random selections and/or discretionary samples focusing on the issues raised by the original random sample." FHFA Ex. 388 (Dep. Ex. 44407, RBS Greenwich Capital Credit Procedures Manual) at RBS-FHFA-SDNY-0615280. When specifically questioned about this provision and the claimed 20% material exception threshold in the manual, Mr. Gallagher explained that it was "not a hard number" to be followed in all cases and that there could be instances where upsizing would not be required despite more than 20 percent exceptions in a sample pool. RBS Ex. 7 (Deposition of William Gallagher) at 225:25-226:22 ("Q. Did you play any role in setting this 20 percent threshold that's stated in the, in the sentence we just read? A. My recollection is that this is something that Don Lawson had, had written and it's something that, that he and I had, had discussed at least somewhere around the time that he had written this particular document or part of the document. Q. Any reason to think that you disagreed with Don Lawson's conclusion that this was an appropriate threshold to include in this manual? ... A. No, although, again, it says typically, so it's not a – it's not a hard number so as a – as a general area I'd say no, I have no reason to, to disagree with what Don might have come up with."); *id.* at 239:7-240:18 (explaining that even where there was "greater than 20 percent [exceptions] in a sample" that upsizing "wouldn't have necessarily occurred all the time because there could have been other facts and circumstances," and that the rationale for upsizing "would have been that if you saw a level of exception that you thought was larger than there should be"). Other RBSSI credit personnel reiterated Mr. Gallagher's testimony that the decision to upsize a sample pool was context-specific and depended on a number of factors, not just the number of exceptions. RBS Ex. 5 (Deposition of Brian Farrell) at 657:18-658:14 ("Q. Were there any specific guidelines you had as to how many exceptions you would need to see before upsizing? A. No. I think it would vary on the pool, I think it would vary on the sampling, things like that."); RBS Ex. 25 (*MassMutual* Deposition of James Whittemore) at 87:23-88:13 ("Q. What would be a high exception rate sufficient to increase the sample size? A ... [D]epending on the loan pool credit grade there are a lot of variables that [would] go into making th[e] determination of what percentage is appropriate. Q. There wasn't any set percentage that would trigger a[n] increase in the sample size? A. Again, it would depend on the pool itself.").

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While RBSSI argues that the "Credit Manual does not provide a definition for "significant material exceptions[,]" they identify no evidence that contradicts the asserted fact.  RBSSI's conclusory assertions do not create a genuine dispute of material fact.  Part I.B, *supra*.

RBSSI's argument that "Mr. Gallagher explained that [the 20% threshold] was 'not a hard number' to be followed in all cases and that there could be instances where upsizing would not be required despite more than 20 percent exceptions in a sample pool[,]" is irrelevant to the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

639.  **FHFA Statement:**  RBSSI determined "[t]he number of files selected for review and the manner of selection" based on "a number of factors, the most important of which is [RBS's] exposure to the transaction." Ex. 388 (Dep. Ex. 44407, RBS's Greenwich Capital Credit Procedures Manual) at RBS-FHFA-SDNY-0615280 ("The number of files selected for review and the manner of selection may vary due to a number of factors, the most important of which, is Greenwich's exposure to the transaction.").

**RBSSI** Response:  RBSSI disputes the assertion in ¶ 639.  FHFA misstates or mischaracterizes RBSSI's policy, procedures or practices regarding the basis on which loan-level due diligence samples were to be selected and is, in any event, ambiguous as to what is meant by the phrase "exposure to the transaction." William Gallagher, head of RBSSI's Credit group, testified, for example, that RBSSI applied the same due diligence procedures regardless of whether the due diligence was done in support of a whole loan purchase by RBSSI or a third-party securitization, such as those at issue in this case. RBS Ex. 7 (Deposition of William Gallagher) at 667:5-18 ("Q.  In what ways, if any, did the diligence that RBS performed when it was an underwriter differ from the diligence RBS performed when it was acquiring whole loans intending to securitize them? ...  A. My understanding is it was the same basic diligence done for either type of transaction. Q.  And to be clear, sir, is your answer the same whether we're referring to credit diligence or compliance diligence? A.  That is my understanding."). James Whittemore, who was chief underwriter at the time of the Nomura Securitizations, said the same thing. RBS Ex. 6 (Deposition of James Whittemore) at 69:10-18 ("Q.  Do you know whether RBS's due diligence process varied depending upon whether it was the sponsor of the transaction as opposed to the underwriter of a transaction sponsored by other banks? A. I'm not – I don't believe that I was aware there was any difference."); *see also id.* at 107:19-110:15 ("Q.  In the next paragraph it states, 'The number of files selected for review and the manner of selection may vary due to a number of factors, the most important of which is Greenwich's exposure to the transaction.' Do you see that? A.  Yes, I do....  Q.  Did you ever consider RBS's financial exposure to a transaction in

determining the size of the sample that you would draw for a given population? . . . A. I don't remember that I did."). And so did Brian Farrell, who was responsible for the loan-level due diligence by RBSSI at issue in this case. RBS Ex. 5 (Deposition of Brian Farrell) at 665:11-666:14 ("Q. When RBS performed diligence in connection with third party deals, third party securitizations by other banks, was there anything different in the way it went about its diligence function? ... A. In respect to what? Q. In any respect? ... A. I think the way that a loan was reviewed would not change regardless of securitization or whole loan or finance. Q. Would the decision on sample size change depending on whether RBS was diligencing a third party securitization as opposed to its own whole loan purchase? ... A. Not that I can recall. Like I said earlier, sample sizes varied in general depending on, on the transaction."); *see also id.* at 773:5-20 ("Q. "And just above it there's a paragraph, it starts 'The number of files selected for review and the manner of selection may vary due to a number of factors, the most important of which is Greenwich's exposure to the transaction.' Do you see what I'm referring to? A. I do.... Q. Were you aware in 2006/2007 that was RBS's policy? ... A. No.").

The language quoted in ¶ 639 is from RBSSI's Credit Manual which, as discussed in RBSSI's responses to ¶¶ 636-638, did not set forth a formal policy regarding the scope or processes for loan file diligence. Further, FHFA selectively quotes the manual, which showed essentially equivalent levels of loan-level due diligence whether the due diligence was for a securitization such as those at issue here, or for a whole loan purchase, and further stated that "[s]ample sizes can further vary based on the characteristics of the collateral and the client, including the seasoning of the assets, the past performance of seasoned assets, [RBSSI's] past experience with the client and product, the financial strength of the client, and the presence of third party credit enhancement." FHFA Ex. 388 (Dep. Ex. 44407, RBS's Greenwich Capital Credit Procedures Manual) at RBS-FHFA-SDNY-0615280. RBSSI credit personnel, including Brian Farrell, who was the credit officer involved in the Nomura Securitizations, testified that loan-level due diligence sample sizes were influenced primarily by these latter criteria rather than by RBSSI's "exposure to the transaction." RBS Ex. 5 (Deposition of Brian Farrell) at 774:20-775:12 ("I would like to point out from B, second paragraph down, that it says sample sizes can further vary based on characteristics of the collateral and the client, including the seasoning, past performance, experience with the client and the product. I just want to point that out because that's what I've been saying I've been basing [my criteria] off of."); *id.* at 665:11¬666:14 ("Q. When RBS performed diligence in connection with third party deals, third party securitizations by other banks, was there anything different in the way it went about its diligence function? ... A. In respect to what? Q. In any respect? ... A. I think they way that a loan was reviewed would not change regardless of securitization or whole loan or finance. Q. Would the decision on sample size change depending on whether RBS was diligencing a third party securitization as opposed to its own whole loan purchase? ... A. Not that I can recall. Like I said earlier, sample sizes varied in general depending on, on the transaction."). Further, RBSSI's "exposure" in a securitization transaction was determined by, *inter alia*, its (potentially substantial) legal and reputational exposure and not solely its financial exposure to the collateral. FHFA Ex. 425 (Dep. Ex. 45201, Asset-Backed Finance Sales & Trading Groups Policies and Procedures Manual dated July 2005) at RBS-FHFA-SDNY-0497496-97 ("RBSGC's exposure in a securitization is not to the credit of the

assets or the originator, but rather legal and reputational exposure to our securities customers" therefore "[t]he principal focus of a due diligence review" in "Securitization Transactions ... is to confirm the offering document is complete and accurate in all material respects.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. Mr. Gallagher's "understanding" that "the same basic diligence" was "done for either type of transaction" does not specifically controvert the asserted fact. Part I.C, *supra*. Mr. Whittemore could not "remember" whether he considered RBS's financial exposure to a transaction in determining the size of the sample that he would draw for a given population of loans. Last, Mr. Farrell could "not recall" whether a decision on sample size change depended on whether RBS was diligencing a third party securitization as opposed to its own whole loan purchases. Mr. Farrell testified that the sample size varied "in general depending on, on the transaction." While RBSSI argues that the asserted fact mischaracterizes "RBSSI's policy, procedures or practices regarding the basis on which loan-level due diligence samples were to be selected," this argument does not directly contravene the asserted fact and does not create a genuine dispute of material fact because the Asset-Backed Finance, Sales & Trading Groups Policies And Procedures Manual cited by RBSSI refers the reader to the RBS Credit Policy Manual, the very exhibit RBSSI is attempting to rebut, for details on selecting samples for Third-Party Securitizations. Part I.A, *supra*. RBSSI's argument that the Credit Manual was only a "manual" and "not a formal policy that was required to be followed in all instances" does not controvert the asserted fact. Part I.C, *supra*.

640. **FHFA Statement:** Vinu Phillips was a deal manager and banker in the ABF Group during the relevant period. Ex. 373 (Deposition of William Gallagher) at 180:18-21 ("Q. What was Vinu Phillips' position? A. He was a deal manager and a banker in asset-backed finance."); *see also* Ex. 389 (Dep. Ex. 47005, Vinu Phillips Deposition Questionnaire) at A-2.

**RBSSI Response:** RBSSI states that Mr. Phillips had no involvement in the Nomura Securitizations and that the facts and/or circumstances regarding Mr. Phillips's titles, roles or responsibilities at RBSSI are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI does not dispute the assertion in ¶ 640 except insofar as it is vague and ambiguous as to a time period.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

641. **FHFA Statement:** In an email written in August 2007, Mr. Phillips drew a distinction between "limited" "security dili[gence]" and "whole loan dili[gence]." Ex. 390 (Dep. Ex. 46048, email dated August 23, 2007 from Vinu Phillips to Frank Skibo, et al., regarding Option One - Sview OPT Structure) at RBS-FHFA-CT-1733380 ("Right now there is no EPD rep and limited diligence (security dili not whole loan dili).").

**RBSSI Response:** RBSSI states that FHFA Ex. 390 concerns loans, originators, and securitizations not at issue in this case and RBSSI personnel who had no involvement in the Nomura Securitizations. The facts and/or circumstances regarding those loans, originators and securitizations (all of which post-date the Nomura Securitizations by several months) are therefore not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that Mr. Phillips sent an email in August 2007 cited in FHFA Ex. 390, but disputes FHFA's characterization that Mr. Phillips "drew a distinction" between "'limited' 'security dili[gence]' and 'whole loan dili[gence]'" as argumentative and an improper legal argument, and states that the document speaks for itself. To the extent ¶ 641 states or implies that RBSSI selected loan-level samples or conducted loan-level due diligence differently depending on whether it was a whole loan purchase or third-party securitization (*see* ¶ 645), RBSSI disputes that assertion for the reasons set forth in its response to ¶ 639. RBSSI refers the Court to the evidence it adduced in response to ¶ 639, and additionally to RBS Exs. 30 – 33 for examples of loan-level due diligence sample sizes on third-party securitizations that exceeded many whole loan purchase loan-level due diligence sample sizes. RBS Ex. 30 (RBS-FHFA-CT-0274777, Argent Securities Trust 2006-W5 due diligence review event status spreadsheet) (reflecting complete reunderwriting of 656 loans for RBS underwritten third party securitization); RBS Ex. 31 (RBS-FHFA-CT-0147898, Argent Securities Trust 2006-W5 Prospectus Supplement) at RBS-FHFA-CT-0147898 (identifying Ameriquest Mortgage Company as Sponsor and RBS as underwriter); RBS Ex. 32 (RBS-FHFA-CT-0075232, American Home Loan 2007-3 Security event status spreadsheet) (identifying 505 loans as having been fully underwritten by Clayton on behalf of RBS); RBS Ex. 33 (RBS-FHFA-CT-0334066, American Home Mortgage Assets Trust 2007-3 Prospectus Supplement) at RBS-FHFA-CT-0334066 (identifying American Home Mortgage Corp. as Sponsor).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues

that "FHFA Ex. 390 concerns loans, originators, and securitizations not at issue in this

case and RBSSI personnel who had no involvement in the Nomura Securitizations" and

are not material facts, RBSSI's argument does not create a genuine dispute of material

fact. Part I.A, *supra*. The cited documents relating to loan-level samples and loan-level

due diligence are irrelevant to and do not directly contravene the asserted fact and does

not create a genuine dispute of material fact. Part I.C, *supra*

642. **FHFA Statement:** Referring to a Fremont securitization, Mr. Lawson wrote that "[a]s ... a security"— not a "whole loan deal" purchased by RBS—"we will not be as tough on appraisal and underwriting issues." Ex. 394 (RBS-FHFA-SDNY-0397454, email from Donald Lawson to Anne Shera dated January 31, 2006 regarding Report of Findings) at RBS-FHFA-SDNY-0397454 ("As this is a security rather than a whole loan deal ... we will not be as tough on appraisal and underwriting issues, but ROR, understated finance charges, the MA issues, etc. will definitely [sic] need to be removed from the pools.").

**RBSSI Response:** RBSSI states that FHFA Ex. 394 concerns loans and a securitization not at issue in this case and RBSSI personnel who had no involvement in the Nomura Securitizations. The facts and/or circumstances regarding those loans and securitization are therefore not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that FHFA Ex. 394 is an email from Mr. Lawson to Anne Shera, but disputes FHFA's paraphrasing of the document, which speaks for itself. To the extent ¶ 642 states or implies that RBSSI selected loan-level samples or conducted its loan-level due diligence differently depending on whether it was a whole loan purpose or third-party securitization (*see* ¶ 645), RBSSI disputes that assertion for the reasons set for in its response to ¶¶ 639 and 641 and RBSSI refers the Court to the evidence it adduced in response to those paragraphs.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues

that "FHFA Ex. 394 concerns loans and a securitization not at issue in this case and

RBSSI personnel who had no involvement in the Nomura Securitizations" and are not

material facts, RBSSI's argument does not create a genuine dispute of material fact. Part

I.A, *supra*. The cited documents relating to loan-level samples and loan-level due

diligence are irrelevant to and do not directly contravene the asserted fact and does not

create a genuine dispute of material fact. Part I.C, *supra*.

643. **FHFA Statement:** On January 27, 2006, Donald Lawson wrote to Anne Shera: "OK for one loan and we're securitizing off their shelf. We would not buy this loan. Let them know that because we just agreed to buy a $1Billion pool from them which closes in March." Ex. 395 (RBS-FHFA-SDNY-0397437, email from Donald Lawson to Anne Shera dated January 27, 2006 regarding ███████████████) at RBS-FHFA-SDNY-0397437 ("OK for one loan and we're securitizing off their shelf. We would not buy this loan. Let them know that because we just agreed to buy a $1Billion pool from them which closes in March.").

**RBSSI Response:** RBSSI states that FHFA Ex. 395 concerns a loan and a securitization not at issue in this case and RBSSI personnel who had no involvement in the Nomura Securitizations. The facts and/or circumstances regarding that loan and securitization are therefore not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that FHFA Ex. 395 is an email from Don Lawson to Anne Shera on January 27, 2006 regarding the loan ███████████████" which is not at issue in this litigation. According to FHFA Ex. 395, the issue identified with respect to the loan was that it fell outside RBSSI's overlays, not that it did not meet the originator's guidelines. FHFA Ex. 395 (RBS-FHFA-SDNY-0397437, email from Donald Lawson to Anne Shera dated January 27, 2006 regarding ██████████████ ("Clayton's system shows it as a high cost loan (exceeding 5%). Fremont is claiming their exemption on this loan and says that they can go up to 7.36% in fees (loan is at ██████ in fees). I understand from Frank that we look at this as a high cost loan."). To the extent ¶ 643 states or implies that RBSSI selected loan-level samples or conducted loan-level due diligence differently depending on whether it was a whole loan purpose or third-party securitization (*see* ¶ 645), RBSSI disputes that assertion for the reasons set forth in its response to ¶¶ 639 and 641 and RBSSI refers the Court to the evidence it adduced in response to those paragraphs.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues

that "FHFA Ex. 395 concerns a loan and a securitization not at issue in this case and

RBSSI personnel who had no involvement in the Nomura Securitizations" and are not

material facts, RBSSI's argument does not create a genuine dispute of material fact. Part

I.A, *supra*. The cited documents relating to loan-level samples and loan-level due

diligence are irrelevant to and do not directly contravene the asserted fact and does not

create a genuine dispute of material fact.  Part I.C, *supra*.

644.  **FHFA Statement:**  In response to a June 2007 email in which Wells Fargo requested
information from RBSSI on its due diligence practices and asked if RBSSI "[w]ould []
agree to restricted due diligence if the deal [was] off our shelf[,]" Mr. Farrell responded:
"Yes, we currently pull a 5-10% sample on these types of reviews." Ex. 396 (Dep. Ex.
45829, email regarding Wells - Due Diligence Discussion) at RBS-FHFA-CT-6726085
("Would you agree to restricted due diligence if the deal is off our shelf? Yes, we
currently pull a 5-10% sample on these types of reviews.  We also pull a small random
sample for drive-by appraisals.").

**RBSSI Response:**  RBSSI states that FHFA Ex. 396 post-dates the Nomura
Securitizations, and concerns an inquiry by a counterparty, Wells Fargo, regarding a
potential securitization not at issue in this case.  The facts and/or circumstances regarding
Wells Fargo's inquiry are therefore not "material facts" at issue in this litigation under
Local Rule 56.1 or otherwise to which a response is required.  FHFA's attempt to raise or
resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of
the instant litigation, where such facts are not at issue, is improper and prejudicial.  To
the extent a response is required, RBSSI does not dispute that FHFA Ex. 396 is an email
chain from June 2007 between individuals at Wells Fargo and various employees at
RBSSI regarding potential securitization activities, but disputes that FHFA provides a full
or accurate quotation of Mr. Farrell's statements in the email.  Immediately after the
language quoted by FHFA, Mr. Farrell stated that "We also pull a small random sample
for drive-by appraisals.  If there was something out of the ordinary or data looks suspect,
we may want to look at more, or add to our standard review...pay histories, collection
comments, compliance only, etc." FHFA Ex. 396 (Dep. Ex. 45829, email regarding
Wells - Due Diligence Discussion) at RBS-FHFA-CT-6726085.  Mr. Farrell further noted
with an asterisk that "given the dili[gence] restrictions, we always reserve the right to
increase our samples if we discover an excess number of material exceptions or exception
trending occurs." *Id.*  To the extent ¶ 644 states or implies that RBSSI selected loan-level
samples or conducted loan-level due diligence differently depending on whether it was a
whole loan purchase or third-party securitization (*see* ¶ 645), RBSSI disputes that
assertion for the reasons set forth in its response to ¶¶ 639 and 641 and RBSSI refers the
Court to the evidence it adduced in response to those paragraphs.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While RBSSI argues

that "FHFA Ex. 396 post-dates the Nomura Securitizations, and concerns an inquiry by a

counterparty, Wells Fargo, regarding a potential securitization not at issue in this case"

and are not material facts, RBSSI's argument does not create a genuine dispute of

material fact.  Part I.A, *supra*.  The cited documents relating to loan-level samples and

loan-level due diligence are irrelevant to and do not directly contravene the asserted fact

and does not create a genuine dispute of material fact.  Part I.C, *supra*.

645.  **FHFA Statement:**  RBSSI did not exercise the same level of diligence on deals where it did not own the collateral.  Ex. 397 (RBS-FHFA-CT-6302465, email regarding Subprime Due Diligence Discussion) at RBS-FHFA-CT-6302465 ("Would you agree to restricted due diligence if the deal is off our [as in Wells Fargo's] shelf? Yes, we currently pull a 5-10% sample on these types of reviews."); Ex 394 (RBS-FHFA-SDNY-0397454, email regarding Report of Findings) at RBS-FHFA-SDNY-0397454 ("As this is a security, we will not be as tough on appraisal and underwriting issues."); Ex. 424 (RBS-FHFA-SDNY-0399441, email regarding Your message) at RBS-FHFA-SDNY-0399441 ("The other deals we were co-manager on the deals, so I would not expect us to have done due diligence on those deals."); Ex. 395 (RBS-FHFA-SDNY-0397437, email regarding ▮▮▮▮▮▮▮▮ at RBS-FHFA-SDNY-0397437 ("OK for one loan and we're securitizing off their shelf.  We would not buy this loan."); Ex. 398 (RBS-FHFA-SDNY-0398850, email FW: Fremont DD Reports) at RBS-FHFA-SDNY-0398850 ("Please review the results and sampling methods so that we can discuss the extent of our required due diligence as an underwriter."); Ex. 458 (RBS-FHFA-SDNY-0487343, email regarding nheli07-he1_Greenwich_termsheet.csv) at RBS-FHFA-SDNY-0487343 ("I would like to review 25% of the loan population" "We don't own the pool.  Call me.").

**RBSSI Response:**  RBSSI disputes the assertion in ¶ 645 for the reasons stated in its responses to ¶¶ 639-44.  As previously stated, RBSSI credit personnel, including Brian Farrell who managed the loan-level due diligence on the Nomura Securitizations, have testified in this case that they did not vary or change their diligence based on whether RBSSI owned the collateral.  RBS Ex. 5 (Deposition of Brian Farrell) at 665:11-666:14 ("Q.  When RBS performed diligence in connection with third party deals, third party securitizations by other banks, was there anything different in the way it went about its diligence function? ...  A.  In respect to what? Q.  In any respect? ...  A.  I think they way that a loan was reviewed would not change regardless of securitization or whole loan or finance.  Q.  Would the decision on sample size change depending on whether RBS was diligencing a third party securitization as opposed to its own whole loan purchase? ...  A.  Not that I can recall.  Like I said earlier, sample sizes varied in general depending on, on the transaction."); RBS Ex. 7 (Deposition of William Gallagher) at 667:5-18 ("Q.  In what ways, if any, did the diligence that RBS performed when it was an underwriter differ from the diligence RBS performed when it was acquiring whole loans intending to securitize them? ...  A.  My understanding is it was the same basic diligence done for either type of transaction.  Q.  And to be clear, sir, is your answer the same whether we're referring to credit diligence or compliance diligence? A.  That is my understanding."); RBS Ex. 6 (Deposition of James Whittemore) at 69:10-18 ("Q.  Do you know whether RBS's due diligence process varied depending upon whether it was the sponsor of the transaction as opposed to the underwriter of a transaction sponsored by other banks? A. I'm not – I don't believe that I was aware there was any difference.").

FHFA Exs. 394-397 either post-date the Nomura Securitizations, involve loans and securitizations not at issue, and/or RBSSI credit personnel who had no involvement

in the Nomura Securitizations and do not contradict or refute the testimony of Messrs. Gallagher, Whittemore and Farrell cited by RBSSI above.  Neither does FHFA Ex. 398, which is an email attaching Nomura's loan-level due diligence results regarding pools of loans relevant to the NHELI 2006-FM2 Securitization.  In that email, Mr. Smith asks Mr. Farrell and Mr. Whittemore to review the due diligence results "so that we can discuss the extent of our required due diligence as an underwriter."  RBSSI disputes that anything in that statement suggests that loan-level due diligence would vary depending on whether RBSSI owned the collateral.  RBSSI further disputes that FHFA Ex. 458 supports the assertion in ¶ 645.  Mr. Smith told Mr. Farrell to "do what you feel comfortable with" in selecting the sample size for the NHELI 2007-HE1 pool, FHFA Ex. 458, and testified that "he wasn't on ...  the whole loan mortgage trading team where if they did 5 percent diligence or a hundred percent diligence on purchases".  RBS Ex. 17(Deposition of Adam Smith) at 454:22-455:13.  RBSSI refers the Court to RBS Exs. 30 – 33 for examples of loan file diligence sample sizes on third-party securitizations that exceeded many whole loan purchase loan file diligence sample sizes.  RBS Ex. 30 (RBS-FHFA-CT-0274777, Argent Securities Trust 2006-W5 due diligence review event status spreadsheet) at RBS-FHFA-CT-0274777 (reflecting complete underwriting of 656 loans for RBSSI underwritten third party securitization); RBS Ex. 31 (RBS-FHFA-CT-0147898, Argent Securities Trust 2006-W5 Prospectus Supplement) at RBS-FHFA-CT-0147898 (identifying Ameriquest Mortgage Company as Sponsor and RBS as underwriter); RBS Ex. 32 (RBS-FHFA-CT-0075232, American Home Loan 2007-3 Security event status spreadsheet) at RBS-FHFA-CT-0075232 (identifying 505 loans as having been fully underwritten by Clayton on behalf of RBSSI); RBS Ex. 33 (RBS-FHFA-CT-0334066, American Home Mortgage Assets Trust 2007-3 Prospectus Supplement) at RBS-FHFA-CT-0334066 (identifying American Home Mortgage Corp. as Sponsor).

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact that RBSSI did not exercise the same level of diligence on deals where it did not own the collateral.  While RBSSI argues that they "did not vary or change their diligence based on whether RBSSI owned the collateral," the cited testimony fails to directly contravene the asserted fact and does not create a genuine dispute of material fact.  Part I.A, *supra*.  While RBSSI argues that "FHFA Exs. 394-397 either post-date the Nomura Securitizations, involve loans and securitizations not at issue, and/or RBSSI credit personnel who had no involvement in the Nomura Securitizations[,]" this argument does not create a genuine dispute of material fact.  Part I.A, *supra*.  While RBSSI further "disputes" that the documents cited by FHFA suggest "that loan-level due diligence would vary depending on whether RBSSI owned the collateral[,]" the documents cited in support of this assertion do not directly

431

contravene the asserted fact and thus do not create a genuine dispute of material fact.

Part I.C, *supra*.

646. **FHFA Statement:** Adam Smith was an employee of the ABF Group throughout the relevant period, and the Nomura relationship manager for RBSSI. Ex. 386 (Deposition of Adam Smith) at 28:4-8 ("Q. Mr. Smith, throughout the entire period from 2005 to 2008 you were in the asset-backed finance group at RBS, correct? A. Correct.").

   **RBSSI Response:** RBSSI does not dispute that Adam Smith was part of the Asset-Backed Finance group between 2005 through 2008. RBSSI disputes the assertion that Mr. Smith was the "Nomura relationship manager for RBSSI" insofar as the term "relationship manager" is vague and ambiguous. Mr. Smith testified that "Nomura was principally my ... relationship ... as far as day-to-day coverage." FHFA Ex. 386 (Deposition of Adam Smith) at 19:8-20:6.

   **FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the cited testimony is vague and ambiguous, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

647. **FHFA Statement:** From its inception, Mr. Smith managed the Nomura relationship. Ex. 386 (Deposition of Adam Smith) at 19:8-20:6 ("Q. Fair enough. We'll come back to that. And what was your role on the NHELI 2006-HE3 transaction? A. Nomura was principally my, you know, relationship, you know, as far as the day-to-day coverage. So I knew the team at Nomura that was, you know, buying collateral and securitizing the assets. Q. How did you develop that relationship? A. So I've met Steve Katz, you know, via being in the industry for awhile, his girlfriend knew my wife. You know, I think, as you know, like in your, your field, you just know people that do the same thing that you do. So he'd worked on the Street and went to Nomura. Nomura was looking for, you know, third party distribution, you know, in the form of a securities firm. So he went out and reached out to a few people and I was one of them.").

   **RBSSI Response:** RBSSI disputes the assertion that "Mr. Smith managed the Nomura relationship" "[f]rom its inception," as vague and ambiguous. Mr. Smith testified that "Nomura was principally my ... relationship ... as far as day to day coverage." FHFA Ex. 386 (Deposition of Adam Smith) at 19:8-20:6

   **FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the cited testimony is vague and ambiguous, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

648. **FHFA Statement:** Underwriting Committee approval for RBSSI's underwriting of Nomura-issued securitizations was not sought until January 2007. Ex. 402 (RBS-FHFA-

SDNY-0488761, Jan. 16, 2007 email from Ann Marie Petrovcik to Bruce Jin regarding Nomura - Underwriting Committee) at RBS-FHFA-SDNY-0488761 ("Earlier today we had an RBSGC Underwriting Committee for Nomura - see attached memo. I was hoping that you can have a quick review since we need your approval in order to have a quorum.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 648 that RBSSI's internal approval for RBSSI to act as an underwriter for a Nomura-sponsored securitization is relevant to any issue regarding the reasonableness of RBSSI's due diligence on the four securities at issue. FHFA cites FHFA Ex. 402, which is an email from Ann Marie Petrovcik to Bruce Jin purporting to attach an unsigned memorandum from Mr. Smith (found at FHFA Ex. 387) seeking approval from the Underwriting Committee (*see* RBSSI's responses to ¶¶ 633-634 *supra* for a discussion of this "committee") for RBSSI to participate as "lead manager underwriter on 3 upcoming mortgage loan securitizations for Nomura Home Equity Loan Trust" and further stating that "the underwriting relationship with Nomura started in August 2006 when [RBSSI] was the co-manager on its first Nomura securitization though approval was mistakenly not obtained from the [RBSSI] Underwriting Committee." FHFA Ex. 387 (Memorandum from Adam Smith to RBSGC Underwriting Committee dated January 12, 2007 regarding Nomura America Mortgage Finance) at RBS-FHFA-SDNY-0485184. When questioned about this memorandum, Mr. Smith testified that he had no specific recollection of it, and stated that "there were many people involved doing the transactions, you know, the legal department, the trading desk, senior management in the asset-backed finance group and the credit department. Whether there was a formal underwriting committee on it, on those two transactions or what-not, I'm not certain of what it was. I don't think that counterparties didn't under- -- or groups in RBS didn't know that we were doing the deals." RBS Ex. 17 (Deposition of Adam Smith) at 338:23-340:15. Further to Mr. Smith's testimony, three of the four members of RBSSI's Underwriting Committee were made aware of RBSSI's involvement in Nomura-issued securitizations at least as early as September 28, 2006. On that date, Mr. Smith sent an email to Mr. Whittemore and Mr. Farrell, copying Underwriting Committee members James Esposito, Paul Goudie and William Gallagher, asking Messrs. Farrell and Whittemore to review Nomura's loan-level diligence on the pools of loans relevant to the NHELI 2006-FM2 Securitization so that they could participate in a call with the rest of the group regarding RBSSI's obligations as underwriter for that deal. RBS Ex. 23 (RBS-FHFA-SDNY-0622262) at RBS-FHFA-SDNY-0622263; *see also* RBS Ex. 24 (RBS-FHFA-SDNY-0622268, subsequent email in chain) at RBS-FHFA-SDNY-0622268; RBS Ex. 34 (RBS-FHFA-SDNY-0622281, October 4, 2006 email from Brian Farrell to Adam Smith, James Whittemore and James Esposito) at RBS-FHFA-SDNY-0622281 (stating that "Credit was ok with results and sampling methodol[og]y"). The memorandum itself evaluates RBSSI's underwriting engagement with Nomura from a credit perspective, providing an account of RBSSI's business relationship with Nomura and a high level description of the scheduled Nomura issued securitizations. *See* FHFA Ex. 387, at RBS-FHFA-SDNY-0485184-185. There is no evidence that Messrs. Esposito, Gallagher and Goudie disapproved or voiced any concern over the transaction, or that RBSSI had not approved Nomura as an issuer.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI

"disputes the assertion in ¶ 648 that RBSSI's internal approval for RBSSI to act as an

underwriter for a Nomura-sponsored securitization is relevant to any issue regarding the

reasonableness of RBSSI's due diligence on the four securities at issue[,]" RBSSI's

argument does not create a genuine dispute of material fact. Part I.A, *supra*.

649.  **FHFA Statement:** There is no evidence that that RBSSI's Credit Group attended any
diligence calls related to RBSSI's third-party underwritings. Ex. 403 (RBS-FHFA-CT-
1058496, Sep. 22, 2005 email from Greg McSweeney to Kirk Meyers, et al., regarding
Option One 2005-4 Underwriters' Due Dili Call 10AM EST Friday) at RBS-FHFA-CT-
1058496 (attaching list of questions for Option One 2005-4 due diligence call); Ex. 404
(RBS-FHFA-CT-5791254, Due Diligence Teleconference questions for Popular ABS
Mortgage Pass-Through Trust 2005-5) at RBS-FHFA-CT-5791254 list of due diligence
questions for the Popular ABS Mortgage Pass-Through Trust 2005-5 Due Diligence
Teleconference, dated Oct. 12, 2005); Ex. 405 (RBS-FHFA-CT-0380324, Jan. 18, 2006
email from Greg McSweeney to Bob Fulton, et al., regarding Option One 2006¬1 Due
Diligence Call Wed. 4PM EST) at RBS-FHFA-CT-0380324 (scheduling the Option One
2006-1 underwriters' due diligence call for Jan. 17, 2006); Ex. 406 (RBS-FHFA-CT-
0549583, Oct. 18, 2006 email from Greg McSweeney to Bob Fulton, et al., regarding
OOMLT 06-3 Underwriter due diligence call questions) at RBS-FHFA-CT-0549583
(attaching list of questions for the OOMLT 06-3 underwriters' due diligence call
scheduled for the next day); Ex. 407 (RBS-FHFA-CT-1071949, Option One Mortgage
Corporation Underwriters' Legal Due Diligence Questions, dated Feb. 2007 regarding
Series 2007-CP1) at RBS-FHFA-CT-1071949 (list of due diligence questions for Series
2007-CP1); Ex. 408 (RBS-FHFA-CT-0666520, Mar. 21, 2007 email from Greg
McSweeney to Bob Fulton, et al., regarding Option One 2007-FXD2 Underwriters' Due
Diligence call 3/22 12PM EST) at RBS-FHFA-CT-0666520 (attaching list of questions
for the Option One 2007-FXD2 underwriters' due diligence call scheduled for the next
day); Ex. 409 (RBS-FHFA-CT-0686593, Mar. 30, 2007 email from Greg McSweeney to
Bob Fulton, et al., regarding Option One 2007-3 Underwriters' Due Diligence Call 3/30
11AM EST) at RBS-FHFA-CT-0686593 (rescheduling the Option One 2007-3
underwriters' due diligence call).

**RBSSI Response:** RBSSI states that FHFA Exs. 403-409 concern loans and
securitizations not at issue in this case and RBSSI personnel who had no involvement in
the Nomura Securitizations. The facts and/or circumstances regarding those loans and
securitizations are therefore not "material facts" at issue in this litigation under Local
Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or
resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of
the instant litigation, where such facts are not at issue, is improper and prejudicial. To
the extent a response is required, RBSSI disputes the assertion in ¶ 649. Members of
RBSSI's Credit group frequently participated in phone calls concerning loan-level due
diligence on third-party securitizations, including for the Nomura Securitizations at issue.

RBS Ex. 23 (RBS-FHFA-SDNY-0622262) at RBS-FHFA-SDNY-0622262 (setting up call among RBSSI credit, asset-backed finance and legal personnel regarding Nomura's loan file diligence results for pools of loans relevant to NHELI 2006-FM2); RBS Ex. 35 (RBS-FHFA-SDNY-0304153) at RBS-FHFA-SDNY-0304153 (requesting call among Brian Farrell, Nomura diligence personnel and Clayton regarding preliminary loan-file due diligence results on NHELI 2007-HE1 sample); RBS Ex. 36 (RBS-FHFA-CT-4509243) at RBS-FHFA-CT-4509243 (February 3, 2006 email re: call concerning due diligence conducted on Fremont-issued securitization to be attended by Fremont personnel, RBS Asset-Backed Finance Group personnel, RBS Credit Department personnel, and RBS Legal personnel). RBSSI does not dispute that no members of RBSSI's Credit group are listed on the agendas cited in FHFA Exs. 403-409, which relate to securitizations and originators that are neither relevant to, nor have anything to do with this case, but disputes FHFA's assertion that those documents in fact demonstrate that those conversations took place or that personnel performing credit functions at RBSSI did not participate in them, or that any conversations related to aspects of RBSSI's loan-level due diligence, such as reunderwriting, with which members of RBSSI's Credit group would have been involved. For example, Adam Smith testified that a "due diligence call" could refer to an additional measure of due diligence principally conducted by RBSSI's outside counsel and Legal department, and that was distinct from the loan-level reunderwriting conducted by RBSSI's Due Diligence group. RBS Ex. 37 (*CUNA* Deposition of Adam Smith) at 41:22-42:17 ("Q. And then a few entries down, it says U/W due diligence and then two lines below that AMC due diligence call. What do those due diligence references mean? A. Underwriting due diligence ... is basically the underwriters doing loan file diligence. And then [the] due diligence call is, is the call with [an issuer] prior to pricing transaction that, you know, has a questionnaire about them issuing notes and if there is any, you know, any current updates in the company, et cetera.... Typically, underwriter diligence calls were led by the underwriter counsel. So the underwriter counsel would draft the questionnaire with review from our legal department and they would typically ask the questions on the call.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that "that FHFA Exs. 403-409 concern loans and securitizations not at issue in this case and RBSSI personnel who had no involvement in the Nomura Securitizations" and are not material facts, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. RBSSI disputes the assertion that the agendas cited in FHFA Statement ¶ 649 do not "demonstrate that those conversations took place or that personnel performing credit functions at RBSSI did not participate in them, or that any conversations related to aspects of RBSSI's loan-level due diligence, such as reunderwriting, with which members of RBSSI's Credit group would have been

involved." RBSSI does not cite any evidence that directly contravenes the asserted fact

that RBSSI's Credit Group attended any diligence calls related to RBSSI's third-party

underwritings, as Adam Smith's testimony does not support the contention that a "due

diligence call" was "distinct" from the loan-level reunderwriting conducted by RBSSI's

Due Diligence Group.

650.	**FHFA Statement:** Mr. Farrell was not familiar with the term "underwriting due diligence call." Ex. 383 (Deposition of Brian Farrell) at 720:2-4 ("Q. Have you ever heard of the term underwriter due diligence call? A. It doesn't sound familiar.").

**RBSSI Response:** RBSSI does not dispute that Mr. Farrell testified that the "term" "underwriter due diligence call" did not sound familiar to him. To the extent ¶ 650 states or implies that Mr. Farrell did not participate in calls regarding loan-level due diligence, RBSSI disputes that assertion for the reasons set forth in its response to ¶ 649.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues

that the asserted fact "implies that Mr. Farrell did not participate in calls regarding loan-

level due diligence," this argument is irrelevant to the asserted fact and thus does not

create a genuine dispute of material fact. Part I.C, *supra*.

651.	**FHFA Statement:** Mr. Smith acknowledged in a January 12, 2007 memorandum: "[T]he underwriting relationship with Nomura started in August 2006 when [RBSSI] was the co-manager on its first Nomura securitization though approval was mistakenly not obtained from the [RBSSI] Underwriting Committee ([RBSSI] was the underwriter on a total of 6 Nomura securitizations in 2006 and 3 NIM transactions)." Ex. 387 (RBS-FHFA-SDNY-0485184, Jan. 12, 2007 memo from Adam Smith to RBSGC Underwriting Committee regarding Nomura America Mortgage Finance) at RBS-FHFA-SDNY-0485184.

**RBSSI Response:** RBSSI disputes the assertion in ¶ 651 that RBSSI's internal approval for RBSSI to act as an underwriter for a Nomura-sponsored securitization is relevant to any issue regarding the reasonableness of RBSSI's due diligence on the four securities at issue. RBSSI further disputes the assertion in ¶ 651 as it mischaracterizes the memorandum cited in FHFA Ex. 387 and Mr. Smith's testimony. That memorandum does not contain any "acknowledg[ment]" from Mr. Smith, nor is it signed by him, and RBSSI states that the document speaks for itself. When questioned about that memorandum, Mr. Smith testified that he had no specific recollection of it, and that "there were many people involved doing the transactions, you know, the legal department, the trading desk, senior management in the asset-backed finance group and the credit department. Whether there was a formal underwriting committee on it, on

those two transactions or what-not, I'm not certain of what it was. I don't think that counterparties didn't under- -- or groups in RBS didn't know that we were doing the deals." RBS Ex. 17 (Deposition of Adam Smith) at 338:23-340:15. Further to Mr. Smith's testimony, three of the four members of RBSSI's Underwriting Committee (*see* RBSSI's responses to ¶¶ 633-635, *supra*, for a discussion of this "committee") were made aware of RBSSI's involvement in Nomura-issued securitizations at least as early as September 28, 2006, if not earlier. On that date, Mr. Smith sent an email to Mr. Whittemore and Mr. Farrell, copying Underwriting Committee members James Esposito, Paul Goudie and William Gallagher, asking Messrs. Farrell and Whittemore to review Nomura's loan file diligence on the pools of loans relevant to NHELI 2006-FM2 so that they could participate in a call with the rest of the group regarding RBSSI's obligations as underwriter for that deal. RBS Ex. 23 (RBS-FHFA-SDNY-0622262) at RBS-FHFA-SDNY-0622263; *see also* RBS Ex. 24 (RBS-FHFA-SDNY-0622268, subsequent email in chain) at RBS-FHFA-SDNY-0622268; RBS Ex. 34 (RBS-FHFA-SDNY-0622281, October 4, 2006 email from Brian Farrell to Adam Smith, James Whittemore and James Esposito) at RBS-FHFA-SDNY-0622281 (stating that "Credit was ok with results and sampling methodol[og]y"). The memorandum itself evaluates RBSSI's underwriting engagement with Nomura from a credit perspective, providing an account of RBSSI's business relationship with Nomura and a high level description of the scheduled Nomura issued securitizations. *See* FHFA Ex. 387, at RBS-FHFA-SDNY-0485184-185. There is no evidence that Messrs. Esposito, Gallagher and Goudie disapproved or voiced any concern over the transaction, or that RBSSI had not approved Nomura as an issuer.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the asserted fact does not properly characterize the testimony and disputes that "RBSSI's internal approval for RBSSI to act as an underwriter for a Nomura-sponsored securitization is relevant to any issue regarding the reasonableness of RBSSI's due diligence on the four securities at issue[,]" RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. The evidence cited by RBSSI to purportedly establish that "three of the four members of RBSSI's Underwriting Committee … were made aware of RBSSI's involvement in Nomura-issued securitizations at least as early as September 28, 2006, if not earlier," does not directly controvert the asserted fact that approval from the Underwriting Committee had mistakenly not been obtained prior to January 12, 2007. Part I.C, *supra*.

652.   **FHFA Statement:** In 2006, RBS served as a co-lead underwriter for NHELI 2006-HE3 and as lead underwriter for NHELI 2006-FM2. Ex. 8 (NOM-FHFA_04620885,

Prospectus Supplement for NHELI 2006-HE3) at NOM-FHFA_04620885 (listing RBS Greenwich Capital as underwriter); Ex. 60 (Grice RBSSI Report) ¶ 110 ("For NHELI 2006-HE3, Nomura Securities functioned as the lead underwriter."); Ex. 7 (NOM-FHFA_04638315, Prospectus Supplement for NHELI 2006-FM2) at NOM-FHFA_04638315 (listing RBS Greenwich Capital as underwriter); *see also* Ex. 60 (Grice RBSSI Report) ¶ 108 ("[RBS was] lead underwriter for NHELI 2006[-]FM2....").

**RBSSI Response:** RBSSI does not dispute that it served as lead underwriter for the NHELI 2006-FM2 Securitization. RBSSI does not dispute that it was not a lead underwriter on the NHELI 2006-HE3 Securitization, but disputes FHFA's characterization that it was a "co-lead underwriter." None of the evidence FHFA cites supports that assertion. FHFA Ex. 60 (Grice RBSSI Report) at ¶ 109 n.130 ("Nomura Securities was the lead left underwriter for NHELI 2006-HE3, meaning that RBS's role can best be described as that of a non-lead underwriter."); *id.* at ¶ 35 n.15 ("Despite the use of terms such as "co-lead" or "co-manager" to describe the role of underwriters, typically only one underwriter serves as the true lead underwriter.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that it served as lead underwriter for the NHELI 2006-FM2 Securitization. While RBSSI asserts that it was a "non-lead underwriter" for the NHELI 2006-HE3 Securitization, RBSSI has admitted in its Answer that it was a "co-underwriter." RBS Securities' Answer ¶ 35 ("RBS Securities Inc. admits that it was co-underwriter for the RBS Underwritten Offerings"). RBSSI relies only on the conclusory statement of its expert, Charles Grice, and the conclusory assertions of an expert do not create a genuine dispute of fact. Part I.G, *supra*. While RBSSI asserts that "[n]one of the evidence FHFA cites supports" the assertion, Ex. 8 at NOM-FHFA_04620885 that RBSSI was an underwriter for the NHELI 2006-HE3 Securitization, and there is ample additional record evidence showing that RBSSI believed itself to be a co-lead underwriter on the NHELI 2006-HE3 securitization. FHFA Ex. 538 (RBS-FHFA-SDNY-0156524, RBSSI email attaching RBS-FHFA-SDNY-0156525 Deal Summary listing RBS Greenwich Capital Markets Inc. as the "Co-Lead"); FHFA Ex. 539 (FHFA00002480, NHELI 2006-HE3 Trade Ticket) (listing "Greenwich Capital markets" as the broker); RBS Securities'

Answer ¶ 35 ("RBS Securities Inc. admits that it was co-underwriter for the RBS

Underwritten Offerings").

653. **FHFA Statement:** NHELI 2006-HE3 and NHELI 2006-FM2 predated approval of Nomura by the RBSGC Underwriting Committee. *See* Ex. 387 (RBS-FHFA-SDNY-0485184, Memorandum from Adam Smith to RBSGC Underwriting Committee dated January 12, 2007 regarding Nomura America Mortgage Finance) at RBS-FHFA-SDNY-0485184 ("It should be noted that the underwriting relationship with Nomura started in August 2006 when RBSGC was the co-manager on its first Nomura securitization though approval was mistakenly not obtained from the RBSGC Underwriting Committee (RBSGC was the underwriter on a total of 6 Nomura securitizations in 2006 and 3 NIM transactions).

**RBSSI Response:** RBSSI disputes the assertion in ¶ 653 that RBSSI's internal approval for RBSSI to act as an underwriter for a Nomura-sponsored securitization is relevant to any issue regarding the reasonableness of RBSSI's due diligence on the four securities at issue. FHFA cites FHFA Ex. 387, which is an unsigned January 12, 2007 memorandum from Adam Smith seeking approval from the Underwriting Committee (*see* RBSSI's responses to ¶¶ 633¬635, *supra*, for a discussion of this "committee") for RBSSI to participate as "lead manager underwriter on 3 upcoming mortgage loan securitizations for Nomura Home Equity Loan Trust" and further stating that "the underwriting relationship with Nomura started in August 2006 when [RBSSI] was the co-manager on its first Nomura securitization though approval was mistakenly not obtained from the [RBSSI] Underwriting Committee." FHFA cites no evidence that Mr. Smith signed the memorandum. When questioned about this memorandum, Mr. Smith testified that he had no specific recollection of it, and that "there were many people involved doing the transactions, you know, the legal department, the trading desk, senior management in the asset-backed finance group and the credit department. Whether there was a formal underwriting committee on it, on those two transactions or what-not, I'm not certain of what it was. I don't think that counterparties didn't under- -- or groups in RBS didn't know that we were doing the deals." RBS Ex. 17 (Deposition of Adam Smith) at 338:23-340:15. Further to Mr. Smith's testimony, three of the four members of RBSSI's Underwriting Committee were made aware of RBSSI's involvement in Nomura-issued securitizations at least as early as September 28, 2006, which predates the NHELI 2006-FM2 Securitization. On that date, Mr. Smith sent an email to Mr. Whittemore and Mr. Farrell, copying Underwriting Committee members James Esposito, Paul Goudie and William Gallagher, asking Messrs. Farrell and Whittemore to review Nomura's loan file diligence on the pools of loans relevant to NHELI 2006-FM2 securitization so that they could participate in a call with the rest of the group regarding RBSSI's obligations as underwriter for that deal. RBS Ex. 23 (RBS-FHFA-SDNY-0622262) at RBS-FHFA-SDNY-0622263; *see also* RBS Ex. 24 (RBS-FHFA-SDNY-0622268, subsequent email in chain) at RBS-FHFA-SDNY-0622268; RBS Ex. 34 (RBS-FHFA-SDNY-0622281, October 4, 2006 email from Brian Farrell to Adam Smith, James Whittemore and James Esposito) at RBS-FHFA-SDNY-0622281 (stating that "Credit was ok with results and sampling methodol[og]y"). The memorandum itself evaluates RBSSI's underwriting engagement with Nomura from a credit perspective, providing an account of RBSSI's

business relationship with Nomura and a high level description of the scheduled Nomura issued securitizations. *See* FHFA Ex. 387, at RBS-FHFA-SDNY-0485184-185. There is no evidence that Messrs. Esposito, Gallagher and Goudie disapproved or voiced any concern over the transaction, or that RBSSI had not approved Nomura as an issuer.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While RBSSI

"disputes the assertion in ¶ 653 that RBSSI's internal approval for RBSSI to act as an

underwriter for a Nomura-sponsored securitization is relevant to any issue regarding the

reasonableness of RBSSI's due diligence on the four securities at issue[,]" RBSSI's

argument does not create a genuine dispute of material fact. Part I.A, *supra*.

1.       NHELI 2006-HE3: "Do We Have The Complete List? No."

654.    **FHFA Statement:** RBSSI served as co-lead underwriter for the NHELI 2006-HE3 Securitization. *Supra* ¶ 652.

**RBSSI Response:** RBSSI does not dispute that it was not a lead underwriter on the NHELI 2006-HE3 Securitization, but disputes FHFA's characterization that it was a "co-lead underwriter." None of the evidence FHFA cites supports that assertion. FHFA Ex. 60 (Grice RBSSI Report) at ¶ 109 n.130 ("Nomura Securities was the lead left underwriter for NHELI 2006-HE3, meaning that RBS's role can best be described as that of a non-lead underwriter."); *id*. at ¶ 35 n.15 ("Despite the use of terms such as "co-lead" or "co-manager" to describe the role of underwriters, typically only one underwriter serves as the true lead underwriter.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not

dispute that it served as lead underwriter for the NHELI 2006-FM2 Securitization. While

RBSSI asserts that it was a "non-lead underwriter" for the NHELI 2006-HE3

Securitization, RBSSI has admitted in its Answer that it was a "co-underwriter." RBS

Securities' Answer ¶ 35 ("RBS Securities Inc. admits that it was co-underwriter for the

RBS Underwritten Offerings"). RBSSI relies only on the conclusory statement of its

expert, Charles Grice, and the conclusory assertions of an expert do not create a genuine

dispute of fact. Part I.G, *supra*. While RBSSI asserts that "[n]one of the evidence FHFA

cites supports" the assertion, Ex. 8 at NOM-FHFA_04620885 that RBSSI was an

underwriter for the NHELI 2006-HE3 Securitization, and there is ample additional record evidence showing that RBSSI believed itself to be a co-lead underwriter on the NHELI 2006-HE3 securitization. FHFA Ex. 538 (RBS-FHFA-SDNY-0156524, RBSSI email attaching RBS-FHFA-SDNY-0156525 Deal Summary listing RBS Greenwich Capital Markets Inc. as the "Co-Lead"); FHFA Ex. 539 (FHFA00002480, NHELI 2006-HE3 Trade Ticket listing "Greenwich Capital markets" as the broker); RBS Securities' Answer ¶ 35 ("RBS Securities Inc. admits that it was co-underwriter for the RBS Underwritten Offerings").

655. **FHFA Statement:** RBSSI did not perform any due diligence on the collateral underlying the NHELI 2006-HE3 Securitization. Ex. 60 (Grice RBSSI Report) ¶ 17 ("For this security, RBS followed the industry practice and relied on the due diligence work conducted by others.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 655. RBSSI took numerous measures to evaluate and assess Nomura's loan-level due diligence and ultimately determine that there was a reasonable basis for relying on that diligence. RBSSI received Nomura's due diligence results on all loan acquisition pools from which loans were sourced into the deal. RBS Ex. 38 (RBS-FHFA-SDNY-0164304, August 8, 2006 email from Nomura to Adam Smith) at RBS-FHFA-SDNY-016309 (attaching the due diligence summary for NHELI 2006-HE3). Those results included, among other things, the total balance of the loan pools, the number of loans declined for credit, compliance and property reasons, and further detail on the diligence results for originators People's Choice and First NLC. *Id.* at RBS-FHFA-SDNY 0164309. Those results were then forwarded to RBSSI credit officer Brian Farrell, who analyzed them, requested more detail from Nomura regarding loan-to-value and debt-to-income ratios, FICO scores, property types and pre-payment penalty rates, RBS Ex. 39 (RBS-FHFA-SDNY-0164310), and ultimately concluded that the "overall snapshot of [the diligence] looks ok." RBS Ex. 40 (RBS-FHFA-SDNY-0161933). RBSSI collateral analysts also reviewed and analyzed the loan tapes, and found and corrected several errors regarding incorrect purchase prices on certain properties. RBS Ex. 41 (RBS-FHFA-SDNY-0163010, email from Adam Smith to Nomura) at RBS-FHFA-SDNY-0163010-12 (attaching "some questions from my collateral analyst on the [loan] tape."); RBS Ex. 42 (RBS-FHFA-SDNY-0162408; 0489321, email from Dana Pasternak to Nomura) at RBS-FHFA-SDNY-0162408 (attaching "a couple of edits/additional questions for this tape."). Additionally, RBSSI obtained and verified Nomura's due diligence procedures to gain further assurances regarding the accuracy and quality of Nomura's loan-level due diligence. RBS Ex. 43 (RBS-FHFA-SDNY-0171295, email from Nomura to Adam Smith) at RBS-FHFA-SDNY-0171295-341 (describing Nomura's due diligence process and attaching a presentation regarding Nomura's Whole Loan Securitization Platform

dated June 8, 2006).  As RBSSI's expert, Charles Grice, opined based on his review of the record, including the documents cited above, and his knowledge and expertise, "it would be inaccurate to describe RBS[SI]'s role as passive" and that RBSSI "appears to have participated throughout the due diligence process" for the offering.  FHFA Ex. 60 (Grice RBSSI Report) at ¶¶ 111, 116.  Ultimately, Mr. Grice concluded that RBSSI's practices and conduct with regard to this securitization "were consistent with industry practices and gave RBS[SI] reasonable grounds to believe, at the time the Offering Materials were issued, that the relevant disclosures contained no material misstatements or omissions." *Id.* at ¶ 116.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  The cited documents relating to the evaluation and assessment of Nomura's loan-level due diligence are irrelevant to the asserted fact and do not create a genuine dispute of material fact.  Part I.C, *supra*.  To the extent that RBSSI relies on the conclusory assertions of its expert, Charles Grice, those are incapable of creating a genuine dispute of fact.  Part I.G, *supra*.

656.  **FHFA Statement:**  Acquisition stage due diligence was performed by the lead underwriter, Nomura.  Ex. 60 (Grice RBSSI Report) ¶ 109 n. 130 ("Nomura Securities was the lead underwriter for NHELI 2006-HE-3"); *id*. ¶ 110 ("For NHELI 2006-HE3, Nomura Securities functioned as the lead underwriter.  As was typical in the industry, when the lead underwriter is affiliated with the deal sponsor (in this case, Nomura Capital), additional loan-level due diligence beyond that performed at the time loans were acquired by the sponsor is typically not performed.").

**RBSSI Response:**  RBSSI disputes the assertion in ¶ 656 insofar as "[a]cquisition stage due diligence" is vague and ambiguous.  RBSSI does not dispute that Nomura performed loan-level due diligence at the time the loans at issue were purchased, but RBSSI disputes that assertion in ¶ 656 that RBSSI or Nomura did not conduct additional loan-level due diligence beyond that performed at the time loans were acquired.  RBSSI refers the Court to its response to ¶ 655 for a description of the additional loan-level due diligence it conducted.  RBSSI also states that Nomura monitored the performance of the loans in the loan pools prior to placing them in securitizations, putting back early payment default loans and delinquent loans to originators where applicable.  Nomura's Counterstatement of Material Facts, ¶ 40.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  RBSSI does not dispute that Nomura performed the acquisition stage due diligence.  The cited paragraphs relating to "additional loan-level due diligence" are irrelevant to the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

657. **FHFA Statement:** It was RBSSI's standard practice to allow the "left side" manager of a deal with co-lead underwriters do the "majority of the heavy lifting on the transaction." Ex. 423 (FHLB Chicago Deposition of Patrick Leo) at 139:20-140:18 ("Q. Okay. So then what's – the case is that a third-party due diligence provider, such as the one that you hired for LBMLT 2006-8, provided due diligence with respect to the entire pool of loans underlying the securitization? A.... The WaMu Capital Corp. acting as the left manager - - if you look at the prospectus, they are on the left side -- would have been doing the majority of the heavy lifting on the transaction. We split costs with regards to lawyers, accountants, whatever vendors were needed on the transaction. As the left lead, WaMu Capital Corp. would have selected the applicable diligence that they felt was appropriate. I don't know what their internal processes were."); *see also id.* at 152:22-153:5 (Q. And so in co-underwriting, RBS relied on WCC's review of the due diligence results? ... A. We definitely reviewed – I mean, we definitely relied upon WCC as the left-side lead manager. I don't know or don't recall whether someone else at RBS looked at them during that time period. Ex. 373 (Deposition of William Gallagher) at 681:15-682:14 ("Q. Is it correct, sir, that when RBS was a co-underwriter rather than a lead it relied on the diligence performed by the lead underwriter as a typical matter? ... A. That is my understanding of, of what was done. Q. With respect to deals that were issued by Nomura, do you have any reason to believe that RBS followed a different process than the one that you just spoke about? ... A. I don't know what was done specifically on the Nomura transactions. Q. Do you recall supervising the diligence with respect to any Nomura sponsored securitization where RBS was an underwriter? ... A. I do not know what was done specifically with respect to any of the Nomura transactions."); Ex. 423 (FHLB Chicago Deposition of Patrick Leo) at 151:1-153:5 ("Q. When you co-underwrote 2006-8, the third-party due diligence provider, Bohan, performed due diligence. Did you review the results of that due diligence? A. I don't recall. Q. Okay. Would the results of that due diligence have been important to you? A. It would have been important to the syndicate group and the syndicate group would have reviewed them. Q. Would RBS have delegated that task to WCC? A. As the lead manager – as the left-side lead manager on the transaction, they would have been doing the heavy lifting on the transaction. They would have been in charge of quarterbacking and monitoring the results in that process. Q. And so in co-underwriting, RBS relied on WCC's review of the due diligence results? A. We definitely reviewed – I mean, we definitely relied upon WCC as the left-side lead manager. I don't know or don't recall whether someone else at RBS looked at them during that time period.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 657 as it mischaracterizes the cited testimony and omits other relevant testimony which explains or clarifies the statements made, and is vague and ambiguous as to the use of the phrase "heavy lifting on the transaction." Mr. Leo's testimony concerned his specific recollection of the LBMLT 2006-8 Securitization, which is not at issue in this action, and does not purport to describe RBSSI's "standard practice" in any regard. That said, RBSSI does not dispute that when it acted as a co-manager in an underwriting, RBSSI would often rely on the due diligence of the lead underwriter when it was reasonable to do so. RBSSI's expert Charles Grice further opined that the practice of non-lead underwriters to analyze, review and ultimately rely on the due diligence conducted by the syndicate lead underwriter was

common practice and reasonable for the time period.  FHFA Ex. 60 (Grice RBSSI Report) at ¶¶ 108-110.

FHFA Reply:  Defendants do not genuinely dispute the asserted fact.  While Defendants argue that the cited testimony is not properly characterized and vague and ambiguous, RBSSI's argument does not create a genuine dispute of material fact.  Part I.A, *supra*.

658.    **FHFA Statement:**  On February 7, 2007, Grace-Ann Didato wrote to Brian Farrell: "The other deals we were co-manager on the deals, so I would not expect [RBS] to have done due diligence on those deals." Ex. 424 (RBS-FHFA-SDNY-0399441, email regarding "Your message") at RBS-FHFA-SDNY-0399441.

RBSSI Response:  RBSSI does not dispute that FHFA Ex. 424 contains the language quoted by FHFA.

FHFA Reply:  RBSSI does not dispute the asserted fact.

659.    **FHFA Statement:**  RBSSI 's policies and procedures noted that "[e]ach underwriter in an offering has the same potential liability as the lead underwriter and therefore must be able to show that it has performed a reasonable level of due diligence.  A co-manager may rely on the due diligence of the lead manager if such reliance is reasonable.  Whether it is reasonable for a co-manager to rely on the due diligence performed by the lead manager depends on the level of experience and expertise of the lead underwriter and the experience and quality of the individuals working on the transaction." Ex. 425 (Dep. Ex. 45201, Asset-Backed Finance Sales & Trading Groups Policies and Procedures Manual dated July 2005) at RBS-FHFA-SDNY-0497497.

RBSSI Response:  RBSSI does not dispute that the Asset-Backed Finance Sales & Trading Groups Policies and Procedures Manual dated July 2005 contains the quoted language.

FHFA Reply:  RBSSI does not dispute the asserted fact.

660.    **FHFA Statement:**  NHELI 2006-HE3 was the second Nomura-sponsored RMBS deal for which RBS served as an underwriter. Ex. 387 (RBS-FHFA-SDNY-0485184, Memorandum from Adam Smith to RBSGC Underwriting Committee dated January 12, 2007 regarding Nomura America Mortgage Finance) at RBS-FHFA-SDNY-0485184 ("It should be noted that the underwriting relationship with Nomura started in August 2006 when RBSGC was the co-manager on its first Nomura securitization though approval was mistakenly not obtained from the RBSGC Underwriting Committee (RBSGC was the underwriter on a total of 6 Nomura securitizations in 2006 and 3 NIM transactions)."); Ex. 426 (NOM-FHFA_05143128 Prospectus Supplement for NAAC 2006-AF2) at NOM-FHFA_05143133 ("Closing Date[:] On or about July 28, 2006."); Ex. 8 NOM-FHFA_04620885 (Prospectus Supplement for NHELI 2006-HE3) at NOM-FHFA_04620890 ("Closing Date[:] On or about August 31, 2006.").

**RBSSI Response:**  RBSSI states that whether or not the NHELI 2006-HE3 Securitization "was the second Nomura-sponsored RMBS deal for which RBS served as underwriter" is not a "material fact" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required.  To the extent a response is required, RBSSI does not dispute the assertion in ¶ 660, but disputes that FHFA Ex. 387 provides evidence of the order or sequence of RBSSI-underwritten Nomura Securitizations.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  RBSSI does not

"dispute the assertion in ¶ 660."  RBSSI's argument that the "NHELI 2006-HE3

Securitization 'was the second Nomura-sponsored RMBS deal for which RBS served as

underwriter' is not a 'material fact'" does not create a genuine dispute of material fact.

Part I.A, *supra*.  RBSSI's further unsupported and conclusory statement that it "disputes

that FHFA Ex. 387 provides evidence of the order or sequence of RBSSI-underwritten

Nomura Securitizations" does not create a genuine dispute of material fact.  Part I.C,

*supra*.

661.  **FHFA Statement:**  On August 10, 2006, Adam Smith of RBSSI wrote to Steven Katz of Nomura requesting information about its diligence processes.  Ex. 107 (NOM-FHFA_04877707, email regarding FW: NHELI 2006-HE3 Due diligence Summary) at NOM-FHFA_04877708.

**RBSSI Response:**  RBSSI disputes the assertion in ¶ 661.  Mr. Smith asked Mr. Katz to confirm a stated description of Nomura's credit, compliance and valuation due diligence practices.  FHFA Ex. 107 (email regarding "FW: NHELI 2006-HE3 Due Diligence Summary") at NOM-FHFA 04877708.  This email request was part of a broader process whereby RBSSI reasonably relied on Nomura's due diligence, given its position as a "highly rated global bank" and given that Nomura had a "senior management team that was known in the industry for a long time, they [had written] reps and warranties into the transaction, [and] [t]hey performed a fair amount of diligence when they acquired loans." RBS Ex. 17 (Deposition of Adam Smith) at 62:20-63:2.  RBSSI took numerous measures to determine that there was a reasonable basis for relying on Nomura's due diligence.  In that process, RBS frequently communicated with Nomura and "receiv[ed] updates regarding the due diligence being performed as well as draft offering materials." FHFA Ex. 60 (Grice RBSSI Report) at ¶¶ 111.  RBSSI received Nomura's due diligence results on all loan acquisition pools from which loans were sourced into the deal.  RBS Ex. 38 (RBS-FHFA-SDNY-0164304, August 6, 2008 email from Nomura to Adam Smith) at RBS-FHFA-SDNY-0164309 (attaching the due diligence summary for NHELI 2006-HE3).  Those results included, among other things, the total balance of the loan pools, the number of loans declined for credit, compliance and property reasons, and further detail on the diligence results.  *Id.* at RBS-FHFA-SDNY-0164309.  Those results were then

forwarded to RBSSI credit officer Brian Farrell, who analyzed them, requested more detail from Nomura regarding loan-to-value and debt-to-income ratios, FICO scores, property types and pre-payment penalty rates, RBS Ex. 34 (RBS-FHFA-SDNY-0164310), and ultimately concluded that the "overall snapshot of [the diligence] looks ok." RBS Ex. 40 (RBS-FHFA-SDNY-0161933). RBSSI collateral analysts also reviewed and analyzed the loan tapes, and found and corrected several errors regarding incorrect purchase prices on certain properties. RBS Ex. 41 (RBS-FHFA-SDNY-0163010, email from Adam Smith to Nomura) at RBS-FHFA-SDNY-0163010-12 (attaching "some questions from my collateral analyst on the [loan] tape."); RBS Ex. 42 (RBS-FHFA-SDNY-0162408; 0489321, email from Dana Pasternak to Nomura) at RBS-FHFA-SDNY-0162408 (attaching "a couple of edits/additional questions for this tape."). Additionally, RBSSI obtained and verified Nomura's due diligence procedures to gain further assurances regarding the accuracy and quality of Nomura's loan file diligence. RBS Ex. 43 (RBS-FHFA-SDNY-0171295, email from Nomura to Adam Smith) at RBS-FHFA-SDNY-0171295-341 (describing Nomura's due diligence process and attaching a presentation regarding Nomura's Whole Loan Securitization Platform dated June 8, 2006). RBSSI's expert, Charles Grice, opined based on his review of the record and his knowledge and expertise, "it would be inaccurate to describe RBS[SI]'s role as passive," and that RBSSI "appears to have participated throughout the due diligence process" for the offering. FHFA Ex. 60 (Grice RBSSI Report) at ¶¶ 111, 116. Ultimately, Mr. Grice concluded that RBSSI's practices and conduct with regard to this securitization "were consistent with industry practices and gave RBS[SI] reasonable grounds to believe, at the time the Offering Materials were issued, that the relevant disclosures contained no material misstatements or omissions." *Id.* at ¶ 116.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited documents relating to RBSSI's reliance on Nomura's due diligence are irrelevant to the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI asserts that RBSSI's expert Charles Grice explained that "it would be inaccurate to describe RBS[SI]'s role as passive" and that RBSSI "'appears to have participated throughout the due diligence process' for the offering[,]" these statements are irrelevant to the asserted fact and the conclusory assertions of an expert do not create a genuine dispute of fact. Part I.G, *supra*.

662. **FHFA Statement:** In response, Mr. Katz provided additional information: "Hansen and Loan IQ have fraud components. Additional... We perform full review of originators credit, appraisal, compliance, and fraud detection policies with first diligence....sometimes pre-bid. Nomura negotiates the BPO kickouts...not ocwen. Nomura ut[i]lizes the Hansen Preview as AVM and fraud. [W]e do not use Pro." Ex. 107 (NOM_FHFA_04877707, email regarding FW: NHELI 2006-HE3 Due diligence

Summary) at NOM_FHFA_04877708 ("Hansen and Loan IQ have fraud components. Additional... We perform full review of originators credit, appraisal, compliance, and fraud detection policies with first diligence....sometimes pre-bid. Nomura negotiates the BPO kickouts...not ocwen. Nomura utuilizes [sic] the Hansen Preview as AVM and fraud. we do not use Pro.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 662, and refers the Court to FHFA Ex. 662 for an accurate and complete statement of its contents. This email request was part of a broader process whereby RBSSI reasonably relied on Nomura's due diligence, given its position as a "highly rated global bank" and given that Nomura had a "senior management team that was known in the industry for a long time, they [had written] reps and warranties into the transaction, [and] [t]hey performed a fair amount of diligence when they acquired loans." RBS Ex. 17 (Deposition of Adam Smith) at 62:20-63:2. As RBSSI's expert, Charles Grice, opined based on his review of the record and his knowledge and expertise, "it would be inaccurate to describe RBS[SI]'s role as passive," and that RBSSI "appears to have participated throughout the due diligence process" for the offering." FHFA Ex. 60 (Grice RBSSI Report) at ¶¶ 111, 116. Ultimately, Mr. Grice concluded that RBSSI's practices and conduct with regard to this securitization "were consistent with industry practices and gave RBS[SI] reasonable grounds to believe, at the time the Offering Materials were issued, that the relevant disclosures contained no material misstatements or omissions." *Id.* at ¶ 116.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI "does not dispute the assertion in ¶ 662." While RBSSI asserts that "[t]his email request was part of a broader process whereby RBSSI reasonably relied on Nomura's due diligence[,]" that assertion does not specifically controvert the asserted fact, is irrelevant to the asserted fact, and does not create a genuine dispute of material fact. Part I.C, *supra*. Further, the assertions of Charles Grice with regard to RBSSI's "practices and conduct" are merely the conclusory assertions of an expert and do not create a genuine dispute of fact. Part I.G, *supra*.

663. **FHFA Statement:** Nomura provided RBS with a summary that displayed the number of due diligence kicks for at least 71 acquisition pools that contributed at least one loan to NHELI 2006-HE3. Ex. 427 (NOM-FHFA_04998535, NHELI06-HE3 Due Diligence Summary) at NOM-FHFA_04998535 (providing "Statistics on All Trades Contributing to NHELI06-HE3).

**RBSSI Response:** RBSSI disputes the assertion in ¶ 663 insofar as it mischaracterizes or improperly paraphrases the contents of the cited document. FHFA Ex. 427 is a chart titled "NHELI06-HE3 Due Diligence Summary" that RBSSI obtained and that contains

information regarding, among other things, the number of loans and balances for all whole loan pools, the number of loans declined for credit, compliance, and property reasons, and further detail on originators People's Choice and First NLC. RBSSI disputes that FHFA Ex. 427 identifies "at least 71 acquisition pools." This was one of the measures RBSSI took to determine that there was a reasonable basis for relying on Nomura's due diligence, as discussed in RBSSI's responses to ¶¶ 661-662 (which RBSSI incorporates by reference as if restated herein).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI's description of FHFA Ex. 427 fails to controvert the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While FHFA Ex. 427 itself does not show that it contains the results for over 71 acquisition pools, this information is available in Exhibit 1 to the Declaration of Charles Cipione. In Exhibit 1, AlixPartners replicated Grice Exhibit 2, which shows that 71 acquisition pools contributed loans to the NHELI 2006-HE3 securitization. *See* Ex. 1 to the Cipione Decl. (filter Column H to exclude "0").

664. **FHFA Statement:** Mr. Smith described these results: "The $4 billion is correct. This number represents the total balance of any trade that a loan in this pool was part of. So it is the case that there may be one loan in this pool that came from a trade of $100mm, and that $100mm is included in the $4 billion. The idea is to give an overall picture of our DD process." Ex. 428 (RBS-FHFA-SDNY-0164310, email regarding NHEL 2006-HE3 (Term Sheet)) at RBS-FHFA-SDNY-0164310-311 ("The $4 billion is correct. This number represents the total balance of any trade that a loan in this pool was part of. So it is the case that there may be one loan in this pool that came from a trade of $100mm, and that $100mm is included in the $4 billion. The idea is to give an overall picture of our DD process."); *see also* Ex. 386 (Deposition of Adam Smith) at 303:14-20 ("Q. Right. So that first box with the balance of all trades and the total loans declined and the reasons for various loans being declined relates to the entire 4 billion pool that contributed to HE3, correct? A. Correct."); Ex. 12 to the Cipione Decl.

**RBSSI Response:** RBSSI disputes the assertion in ¶ 664 as it mischaracterizes or improperly paraphrases the cited document. The language quoted in ¶ 664 is from Michael Orfe at Nomura, not Adam Smith at RBSSI. That email chain shows that RBSSI requested and received a summary of the lead manager's loan-level due diligence on the loans that went into the NHELI 2006-HE3 Securitization and that Adam Smith, the RBSSI banker on the deal, and Brian Farrell, a credit officer in RBSSI's Due Diligence group, reviewed and asked questions about Nomura's summary and the due diligence that it summarized. FHFA Ex. 428 (email regarding NHELI 2006-HE3) at RBS-FHFA-SDNY-0164319 (Farrell: "Adam, Who can I get more detail from." Smith: "What do you

need?" Farrell: LTV, FICO, DTI, PPP, Property Types ...."); *see also* RBS Ex. 43 (RBS-SDNY-FHFA-0171295, email exchange between Adam Smith and Mr. Katz (Nomura) regarding Nomura's general due diligence procedures for NHELI 2006-HE3) at RBS-SDNY-FHFA-0171295-96.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The fact that the statement attributed to Mr. Smith was made by Mr. Orfe is immaterial to FHFA's motion, and shows that a member of Nomura—not of RBSSI—was able to interpret the significance of the results as set forth in ¶ 663. RBSSI does not dispute that FHFA Ex. 428 was accurately quoted. The documents cited by RBSSI regarding the "summary of the lead manager's loan-level due diligence on the loans that went into the NHELI 2006-HE3 Securitization[,]" fail to directly controvert the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*.

665. **FHFA Statement:** Nomura also provided limited due diligence results at the pool level. Ex. 427 (NOM-FHFA_04998535, NHELI06-HE3 Due Diligence Summary) at NOM-FHFA_04998535 (providing statistics for Peoples Choice MTG and First NLC Financial Services LLC pools). The results included percentage of loans subject to review, but only for the top two sellers by volume. Ex. 427 (NOM-FHFA_04998535, NHELI06-HE3 Due Diligence Summary) at NOM-FHFA_04998535 (showing "Due Diligence Levels on All Loans Purchased from Top 2 Sellers").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 665 as it mischaracterizes or improperly paraphrases the cited document. RBSSI does not dispute that FHFA Ex. 427 provides due diligence results both at the pool level as well as for originators People's Choice and First NLC. RBSSI disputes FHFA's statement that these results are "limited" as argumentative and an improper legal conclusion that should be stricken. FHFA Ex. 427 demonstrates one of the measures RBSSI took to determine that there was a reasonable basis for relying on Nomura's due diligence, as discussed in RBSSI's responses to ¶¶ 661-662 (which RBSSI incorporates by reference as if restated herein).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that FHFA's statement is argumentative and asserts an improper legal conclusion, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Furthermore, RBSSI's assertion that there "was a reasonable basis for relying on

Nomura's due diligence" does not directly contravene the asserted fact and does not

create a genuine dispute of material fact. Part I.C, *supra*.

666. **FHFA Statement:** These top two sellers' loans made up 66% of the relevant SLG. *See* Ex. 1 to the Cipione Decl.

**RBSSI Response:** RBSSI disputes that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure. FHFA did not timely designate Mr. Cipione as a fact or expert witness in this case, and RBSSI has not been given sufficient opportunity or time to examine Mr. Cipione concerning his work, which contains numerous errors as discussed in the Declaration of David N. Mishol submitted by the Nomura Defendants. To the extent a response is required, RBSSI does not dispute that of the 3,618 loans in Group I of the NHELI 2006-HE3 Securitization, 396 loans are attributed to FNLC SP01, 304 to First NLC SP02, 932 to People's Choice SP01, and 740 to People's Choice SP02.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not

dispute that "of the 3,618 loans in Group I of the NHELI 2006-HE3 Securitization, 396

loans are attributed to FNLC SP01, 304 to First NLC SP02, 932 to People's Choice SP01,

and 740 to People's Choice SP02." While RBSSI argues that the cited declaration is not

admissible and does not provide competent evidence of any material fact for purposes of

FHFA's motion, RBSSI's argument does not create a genuine dispute of material

fact. Part I.A, *supra*.

667. **FHFA Statement:** Loans from a total of 47 originators were securitized in NHELI 2006-HE3. *See* Ex. 1 to the Cipione Decl.

**RBSSI Response:** RBSSI disputes that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure. FHFA did not timely designate Mr. Cipione as a fact or expert witness in this case, and RBSSI has not been given sufficient opportunity or time to examine Mr. Cipione concerning his work, which contains numerous errors as discussed in the Declaration of David N. Mishol submitted by the Nomura Defendants. To the extent a response is required, RBSSI disputes the assertion in ¶ 677. RBS. Ex. 44 (RBS-FHFA-SDNY-0158734, email attaching originator information); RBS Ex. 45 (RBS-FHFA-SDNY-0158736, spreadsheet identifying 52 separate originators).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues

that the cited declaration is not admissible and does not provide competent evidence of

any material fact for purposes of FHFA's motion, RBSSI's argument does not create a

genuine dispute of material fact. Part I.A, *supra*.

668. **FHFA Statement:** There is no evidence that RBS requested or received any additional results for these 45 other originators. *See* Ex. 427 (NOM-FHFA_04998535, NHELI06-HE3 Due Diligence Summary) at NOM-FHFA_04998535 (providing statistical breakdown of "All Trades Contributing to NHELI06-HE3); Ex. 428 (RBS-FHFA-SDNY-0164310, email regarding "NHEL 2006-HE3 (Term Sheet)") at RBS-FHFA-SDNY-0164310-311 ("The $4 billion is correct. This number represents the total balance of any trade that a loan in this pool was part of. So it is the case that there may be one loan in this pool that came from a trade of $100mm, and that $100mm is included in the $4 billion. The idea is to give an overall picture of our DD process."); Ex. 386 (Deposition of Adam Smith) at 303:14-20 ("Q. Right. So that first box with the balance of all trades and the total loans declined and the reasons for various loans being declined relates to the entire 4 billion pool that contributed to HE3, correct? A. Correct."); Cipione Decl. Ex. 1.

**RBSSI Response:** RBSSI disputes that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure. FHFA did not timely designate Mr. Cipione as a fact or expert witness in this case, and RBSSI has not been given sufficient opportunity or time to examine Mr. Cipione concerning his work, which contains numerous errors as discussed in the Declaration of David N. Mishol submitted by the Nomura Defendants. To the extent a response is required, RBSSI states that FHFA cites no evidence that demonstrates that RBSSI did not requested or received any additional results. RBSSI received due diligence results on all the pools that were securitized in NHELI 2006-HE3. RBS Ex. 38 (RBS-FHFA-SDNY-0164304, August 8, 2006 email from Nomura to Adam Smith) at RBS-FHFA-SDNY-0164309 (attaching due diligence summary for NHELI 2006-HE3). Those diligence results were supportive of the representations of general compliance with guidelines and of the reasonableness of RBSSI's reliance on Nomura's due diligence. Further, in its capacity as non-lead underwriter, in determining the reasonableness of Nomura's due diligence, RBSSI took into consideration that the remaining originators originated a small portion of the total loans, disclosing, "The remainder of the Mortgage Loans were originated by various originators, none of which originated 10% or more of the Mortgage Loans." FHFA Ex. 8 (NHELI 2006-HE3 Prospectus Supplement) at NOM-FHFA 04620891.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues

that the cited declaration is not admissible and does not provide competent evidence of

any material fact for purposes of FHFA's motion, RBSSI's argument does not create a

genuine dispute of material fact. Part I.A, *supra*. RBSSI's argument regarding the "reasonableness of RBSSI's reliance on Nomura's due diligence" and the document cited in support of the same do not directly contravene the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*. Specifically, RBS Ex. 38 does not contain any due diligence results; rather, it sets forth the number of loans declined for credit, compliance, and property reasons, and the number and percentage of loans subject to due diligence for the top two sellers.

669. **FHFA Statement:** Nomura provided RBS with a summary of high-level collateral underlying the NHELI 2006-HE3 Securitizations, which did not include diligence results. Ex. 429 (RBS-FHFA-SDNY-0161933, email regarding Nomura 06-HE3) at RBS-FHFA-SDNY-0161933 ("Overall snapshot of this looks ok."); Ex. 430 (RBS-FHFA-SDNY-0395903, email regarding the Nomura originators) at RBS-FHFA-SDNY-0395903 (Stavros wrote "[n]ot to be a pain in the ass but that still leaves over 20% of the pool. My accts are gonna ask... Do we have the complete list?" Mr. Leo responded: "No. Nomura will only disclose those originators that comprise over 5% of the pool.").

**RBSSI Response:** RBSSI disputes FHFA's characterization that the collateral summary provided to Brian Farrell by Adam Smith constitutes "a summary of high-level collateral" for the NHELI 2006-HE3 securitization as argumentative and an improper legal conclusion that should be stricken. The information provided by Adam Smith to Brian Farrell contained detailed statistical information including 45 collateral characteristics broken out over more than 180 stratifications. RBS Ex. 46 (RBS-FHFA-SDNY-0161927, August 9, 2006 email from Adam Smith attaching NHELI 2006-HE3 collateral statistical information); RBS Ex. 47 (RBS-FHFA-SDNY-0161932, Nomura 2006-HE3 – 8/1/06 spreadsheet). This information was only one piece of information that RBSSI received from Nomura. As early as July 31, 2006, Randall Lee sent the complete loan tape to Adam Smith. RBS Ex. 48 (RBS-FHFA-SDNY-0162967-78, e-mail from Randall Lee with loan tape and collateral strats attached). This email was part of a broader process whereby RBSSI reasonably relied on Nomura's due diligence, given its position as a "highly rated global bank" and given that Nomura had a "senior management team that was known in the industry for a long time, they [had written] reps and warranties into the transaction, [and] [t]hey performed a fair amount of diligence when they acquired loans." RBS Ex. 17 (Deposition of Adam Smith) at 62:20-63:2. RBSSI took numerous measures to determine that there was a reasonable basis for relying on Nomura's due diligence. In that process, RBSSI frequently communicated with Nomura and "receiving updates regarding the due diligence being performed as well as draft offering materials." FHFA Ex. 60 (Grice RBSSI Report) at ¶¶ 111. RBSSI received Nomura's due diligence results on all loan acquisition pools from which loans were sourced into the deal. RBS Ex. 38 (RBS-FHFA-SDNY-0164304, August 8, 2006 email from Nomura to Adam Smith) at RBS-FHFA-SDNY-0164309 (attaching the due diligence summary for NHELI

2006-HE3). Those results included, among other things, the total balance of the loan pools, the number of loans declined for credit, compliance and property reasons, and further detail on the diligence results. *Id.* at RBS-FHFA-SDNY-0164309. Those results were then forwarded to RBSSI credit officer Brian Farrell, who analyzed them, requested more detail from Nomura regarding loan-to-value and debt-to-income ratios, FICO scores, property types and pre-payment penalty rates, RBS Ex. 39 (RBS-FHFA-SDNY-0164310), and ultimately concluded that the "overall snapshot of [the diligence] looks ok." RBS Ex. 40 (RBS-FHFA-SDNY-0161933). RBSSI collateral analysts also reviewed and analyzed the loan tapes, and found and corrected several errors regarding incorrect purchase prices on certain properties. RBS Ex. 41 (RBS-FHFA-SDNY-0163010, email from Adam Smith to Nomura) at RBS-FHFA-SDNY-0163010-12 (attaching "some questions from my collateral analyst on the [loan] tape."); RBS Ex. 42 (RBS-FHFA-SDNY-0162408; 0489321, email from Dana Pasternak to Nomura) at RBS-FHFA-SDNY-0162408 (attaching "a couple of edits/additional questions for this tape."). Additionally, RBSSI obtained and verified Nomura's due diligence procedures to gain further assurances regarding the accuracy and quality of Nomura's loan-level due diligence. RBS Ex. 43 (RBS-FHFA-SDNY-0171295, email from Nomura to Adam Smith) at RBS-FHFA-SDNY-0171295-341 (describing Nomura's due diligence process and attaching a presentation regarding Nomura's Whole Loan Securitization Platform dated June 8, 2006). RBSSI's expert, Charles Grice, opined based on his review of the record and his knowledge and expertise, "it would be inaccurate to describe RBS[SI]'s role as passive," and that RBSSI "appears to have participated throughout the due diligence process" for the offering." FHFA Ex. 60 (Grice RBSSI Report) at ¶¶ 111, 116. Ultimately, Mr. Grice concluded that RBSSI's practices and conduct with regard to this securitization "were consistent with industry practices and gave RBS[SI] reasonable grounds to believe, at the time the Offering Materials were issued, that the relevant disclosures contained no material misstatements or omissions." *Id.* at ¶ 116.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI argues that

the cited testimony is argumentative and an improper legal conclusion, however,

RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

RBSSI asserts that "RBSSI reasonably relied on Nomura's due diligence." However,

this assertion does not specifically controvert the asserted fact that Nomura provided RBS

with a summary of high-level collateral underlying the NHELI 2006-HE3 Securitization,

which did not include diligence results. Therefore, it does not create a genuine dispute of

material fact. Part I.C, *supra*. RBS Ex. 38 does not contain any due diligence results;

rather, it sets forth the number of loans declined for credit, compliance, and property

reasons, and the number and percentage of loans subject to due diligence for the top two

sellers.  While RBSSI's proffered expert Charles Grice opined that "'it would be inaccurate to describe RBS[SI]'s role as passive,' and that RBSSI 'appears to have participated throughout the due diligence process' for the offering[,]" the conclusory assertions of an expert do not create a genuine dispute of fact.  Part I.G, *supra*.

670.  **FHFA Statement:**  Nomura did not disclose the identity of all originators whose loans comprised less than 5% of the pool underlying NHELI 2006-HE3.  Ex. 430 (RBS-FHFA-SDNY-0395903, email from Patrick Leo to Michael Stavros dated August 9, 2006) at RBS-FHFA-SDNY-0395903 (Mr. Stavros wrote: "Not to be a pain in the ass but that still leaves over 20% of the pool.  My accts are gonna ask....  Do we have the complete list?"  Mr. Leo responded: "No.  Nomura will only disclose those originators that comprise over 5% of the pool.").

    **RBSSI Response:**  RBSSI disputes the assertion in ¶ 670.  First, RBSSI did receive a list of all originators for that deal.  RBS.  Ex. 44 (RBS-FHFA-SDNY-0158734, email attaching originator information); RBS Ex. 45 (RBS-FHFA-SDNY-0158736, spreadsheet identifying all originators).  Second, under Regulation AB, 17 C.F.R.  § 229.1110, RBSSI was only required to disclose, and the offering materials for the Nomura Securitizations only disclosed, the origination guidelines of those originators whose loans comprised 20% or more of the trust.

    **FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While RBSSI argues that "under Regulation AB, 17 C.F.R.  § 229.1110, RBSSI was only required to disclose, and the offering materials for the Nomura Securitizations only disclosed, the origination guidelines of those originators whose loans comprised 20% or more of the trust[,]" RBSSI's argument does not create a genuine dispute of material fact.  Part I.A, *supra*.  Furthermore, RBSSI offers no evidence that the information in the cited document was provided to RBSSI prior to the closing date of the NHELI 2006-HE3 Securitization.  Thus, RBSSI fails to directly controvert the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

671.  **FHFA Statement:**  By the end of February 2007, NHELI 2006-HE3 was the "worst performing deal" on RBS's books.  Ex. 431 (RBS-FHFA-SDNY-0481220, email from Peter McMullin to Adam Smith dated February 28, 2007) at RBS-FHFA-SDNY-0481220 ("NHELI 06-HE3 is now the worst performing deal we have in our books at 7.5% 90+

DLQs by Deal month 6. What is Katz/Nomura doing about this deal. Are the[y] buying out Fraud? We will start to target this deal for putback/fraud soon.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 671 insofar as it states or implies that the adequacy of due diligence can be properly evaluated with the benefit of hindsight. RBSSI further disputes that the evidence offered by FHFA supports its statement that the NHELI 2006-HE3 Securitization in fact "was the 'worst performing deal' on RBS's books" by the end of February 2007. RBS Ex. 49 (RBS-FHFA-CT-3139529, February 28, 2007 email from Peter McMullin attaching 2006_Subprime_Risk_Retention spreadsheet); RBS Ex. 50 (RBS-FHFA-CT-3139530, Subprime '06 Risk Report Spreadsheet) at RBS-FHFA-CT-3139530-31 (showing NHELI 2006-HE3 with lower 90+ day delinquency rate than securitizations closing in same period; compare cell U19 with cell U32, and identifying various, separate RBS "Books").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the adequacy of due diligence cannot be properly evaluated with the benefit of hindsight, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. The document cited by RBSSI relating to the 90+ delinquency rate of securitizations fails to directly controvert the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

2. <u>NHELI 2006-FM2: "I Took The Liberty To Bulls[**]t Them"</u>

672. **FHFA Statement:** RBSSI performed no diligence on the loans collateralizing the NHELI 2006-FM2 Securitization. Ex. 60 (Grice RBSSI Report) ¶ 86 ("RBS, as lead underwriter, reasonably determined that this due diligence commissioned by Nomura and conducted by AMC on over 30% of the loans in the pool was sufficient to support the accuracy of the information in the offering documents.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 672. FHFA Ex. 60 does not support the inference that RBSSI performed no due diligence on the loans collateralizing the NHELI 2006-FM2 Securitization. Members of RBSSI's Credit, Legal and Asset-Backed Finance groups obtained, reviewed and analyzed the loan-level diligence commissioned originally by Nomura and undertaken by an independent third-party diligence firm, American Mortgage Consultants ("AMC") in connection with the loans collateralizing the NHELI 2006-FM2 Securitization, assessed Nomura's loan-level diligence practices (including sampling practices) and actual results to confirm that they met RBSSI's own standards, asked questions of Nomura regarding exceptions and other diligence issues identified in the results, and based on that assessment became satisfied that it would be reasonable to receive as directly addressed to RBSSI and rely on the report of AMC as its (RBSSI's) loan-level due diligence. *See* FHFA Ex. 60 (Grice

RBSSI Report) at ¶¶ 86-89 (opining, based on review of evidence, that RBSSI "conducted an independent and thorough review of the credit and compliance due diligence performed by AMC-and the valuation due diligence performed by CoreLogic-which gave RBSSI reasonable ground to believe, at the time the Offering Materials were issued, that the relevant disclosures contained no material misstatements or omissions."); RBS Ex. 23 (RBS-FHFA-SDNY-0622262, internally discussing Nomura's diligence results, including payment stream exceptions); RBS Ex. 51 (RBS-FHFA-SDNY-0400561, Nomura responding to RBSSI request for information on seasoning of loans in order to understand payment stream issue); RBS Ex. 52 (RBS-FHFA-SDNY-0468395, obtaining Nomura's sampling criteria for specific pools at issue); RBS Ex. 24 (RBS-FHFA-SDNY-0622268, discussing and approving Nomura's sampling methodology as consistent with what RBSSI would have done). In addition, RBSSI conducted substantial additional due diligence. RBSSI participated in an underwriters' due diligence call and posed questions to Nomura regarding the loan- and transaction-level due diligence processes. *See* RBS Ex. 53 (NOM-FHFA_04983017) at NOM-FHFA_04983025. In addition, RBSSI retained Deloitte to compare the information in a subset of the loan files against information found in the loan tape and identify any material or systematic errors. RBS Ex. 54 (SF1FHFA04478508, Deloitte Comfort Letter); RBS Ex. 55 (RBS-FHFA-SDNY-0145677-78, email attaching Deloitte's tape to file diligence results). On behalf of RBSSI, Deloitte also undertook to compare and re-calculate the loan-level data contained in the loan tape against the information set forth in the Prospectus Supplement as part of RBSSI's due diligence. *See id*.

**FHFA Reply:** : RBSSI does not genuinely dispute the asserted fact. The documents cited by RBSSI do not controvert the asserted fact that RBSSI performed no diligence on the collateral underlying the NHELI 2006-FM2 securitization and does not create a genuine dispute of material fact. Part I.C, *supra*. Mr. Farrell, who was responsible for reviewing Nomura's acquisition-level due diligence results, *see* ¶¶ 675-77, *infra*, commented in 2007 that NHELI 2006-FM2 had been "the only review" in which he had been involved where "dd results were reviewed and a new diligence was not ordered." Ex. 432 (RBS-FHFA-SDNY-0399452, email regarding Nomura Home Equity Loan Trust 2006-FM2) at RBS-FHFA-SDNY-0399452 ("Since being employed, this is the only review type I was involved in w[h]ere dd results were reviewed and a new diligence was not ordered."). While RBSSI asserts that RBSSI's expert Charles Grice opined "that RBSSI 'conducted an independent and thorough review of the credit and compliance due

diligence performed by AMC-and the valuation due diligence performed by CoreLogic-

which gave RBSSI reasonable ground to believe, at the time the Offering Materials were

issued, that the relevant disclosures contained no material misstatements or omissions[,]'"

the conclusory assertions of an expert do not create a genuine dispute of fact.  Part I.G,

*supra*.

673.   **FHFA Statement:**  NHELI 2006-FM2 was the first ever Nomura-sponsored RMBS
issuance for which RBSSI served as lead underwriter.  Ex. 426 (NOM-FHFA_05143128
Prospectus Supplement for NAAC 2006-AF2) at NOM-FHFA_05143128 (showing
Nomura as left-side underwriter); *id*.  at NOM-FHFA_05143133 ("Closing Date[:] On or
about July 28, 2006."); Ex. 8 NOM-FHFA_04620885 (Prospectus Supplement for
NHELI 2006-HE3) at NOM-FHFA_04620885 (showing Nomura as left-side
underwriter); *id*.  at NOM-FHFA_04620890 ("Closing Date[:] On or about August 31,
2006.").

**RBSSI Response:**  RBSSI does not dispute that it was the lead underwriter for the
NHELI 2006-FM2 transaction.  RBSSI states that the issue of whether the NHELI 2006-
FM2 securitization "was the first ever Nomura-sponsored RMBS issuance for which
RBSSI served as a lead underwriter" is not a "material fact" at issue in this litigation
under Local Rule 56.1 or otherwise to which a response is required.  To the extent a
response is required, RBSSI disputes that the portions of the documents cited by FHFA
state that the NHELI 2006-FM2 Securitization was the first Nomura transaction where
RBSSI served as the lead underwriter.  RBSSI does not dispute that FHFA Exs. 426 and
8, prospectus supplements dated April 24, 2006 and August 29, 2006, respectively, pre-
date the NHELI 2006-FM2 prospectus supplement and list Nomura Securities as the lead
underwriter.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While RBSSI argues

that "the issue of whether the NHELI 2006-FM2 securitization 'was the first ever

Nomura-sponsored RMBS issuance for which RBSSI served as a lead underwriter' is not

a 'material fact' at issue in this litigation under Local Rule 56.1[,]"  RBSSI's argument

does not create a genuine dispute of material fact.  Part I.A, *supra*.  RBSSI disputes that

"portions of the documents cited by FHFA state that the NHELI 2006-FM2 Securitization

was the first Nomura transaction where RBSSI served as the lead underwriter,"  however,

RBSSI identifies no evidence that contradicts the asserted fact and its conclusory

assertions do not create a genuine dispute of material fact.  Part I.B, *supra*.

674.    **FHFA Statement:**  Approval for Nomura as a third-party issuer had been "mistakenly not obtained from the RBSGC Underwriting Committee" when RBS first began underwriting Nomura deals in August 2006.  *See* Ex. 520 (RBS-FHFA-CT-6036585, email regarding Initial Requests for the Underwriting Audit attaching spreadsheet listing NHELI 2006-FM2 under Lead deal heading) at RBS-FHFA-CT-6036585 ("Regarding Nomura, it appears that the deal did not go to the Underwriting Committee.  Credit was unaware of Greenwich underwriting this deal.").

**RBSSI Response:**  RBSSI's internal approval for RBSSI to act as an underwriter for a Nomura-sponsored securitization is relevant to any issue regarding the reasonableness of RBSSI's due diligence on the four securities at issue.  FHFA cites FHFA Ex. 520, which is an email from Anne-Marie Petrovcik, but which does not contain the quoted language about approval being "mistakenly not obtained from the RBSGC Underwriting Committee."  That quote comes from an unsigned January 12, 2007 memorandum from Adam Smith (FHFA Ex. 387) seeking approval from the Underwriting Committee (*see* RBSSI's responses to ¶¶ 633-635, *supra*, for a discussion of that "committee") for RBSSI to participate as "lead manager underwriter on 3 upcoming mortgage loan securitizations for Nomura Home Equity Loan Trust" and further stating that "the underwriting relationship with Nomura started in August 2006 when [RBSSI] was the co-manager on its first Nomura securitization though approval was mistakenly not obtained from the [RBSSI] Underwriting Committee."  FHFA Ex. 387.  FHFA cites no evidence that Mr. Smith signed the memorandum.  When questioned about this memorandum, Mr. Smith testified that he had no specific recollection of it, and that "there were many people involved doing the transactions, you know, the legal department, the trading desk, senior management in the asset-backed finance group and the credit department.  Whether there was a formal underwriting committee on it, on those two transactions or what-not, I'm not certain of what it was.  I don't think that counterparties didn't under- -- or groups in RBS didn't know that we were doing the deals."  RBS Ex. 17 (Deposition of Adam Smith) at 338:23-340:15.  Further to Mr. Smith's testimony, three of the four members of RBSSI's Underwriting Committee were made aware of RBSSI's involvement in Nomura-issued securitizations at least as early as September 28, 2006, which predates the NHELI 2006-FM2 Securitization.  On that date, Mr. Smith sent an email to Mr. Whittemore and Mr. Farrell, copying Underwriting Committee members James Esposito, Paul Goudie and William Gallagher, asking Messrs. Farrell and Whittemore to review Nomura's loan file diligence on the pools of loans relevant to NHELI 2006-FM2 so that they could participate in a call with the rest of the group regarding RBSSI's obligations as underwriter for that deal.  RBS Ex. 23 (RBS-FHFA-SDNY-0622262) at RBS-FHFA-SDNY-0622263; *see also* RBS Ex. 24 (RBS-FHFA-SDNY-0622268, subsequent email in chain) at RBS-FHFA-SDNY-0622268; RBS Ex. 34 (RBS-FHFA-SDNY-0622281, October 4, 2006 email from Brian Farrell to Adam Smith, James Whittemore and James Esposito) at RBS-FHFA-SDNY-0622281 (stating that "Credit was ok with results and sampling methodol[og]y").  The memorandum itself evaluates RBSSI's underwriting engagement with Nomura from a credit perspective, providing an account of RBSSI's

business relationship with Nomura and a high level description of the scheduled Nomura issued securitizations. *See* FHFA Ex. 387 at RBS-FHFA-SDNY-0485184-185. There is no evidence that Messrs. Esposito, Gallagher and Goudie disapproved or voiced any concern over the transaction, or that RBSSI had not approved Nomura as an issuer.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The documents cited by RBSSI fail to directly controvert the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*. Further, RBSSI argues that "[t]here is no evidence that Messrs. Esposito, Gallagher and Goudie disapproved or voiced any concern over the transaction, or that RBSSI had not approved Nomura as an issuer[,]" however, this does not directly contravene the asserted fact that approval for Nomura as a third-party issuer was mistakenly not obtained and therefore does not create a genuine dispute of material fact. Parts I.A & C, *supra*. The asserted fact that "[a]pproval for Nomura as a third-party issuer had been 'mistakenly not obtained from the RBSGC Underwriting Committee' when RBS first began underwriting Nomura deals in August 2006" is supported by the plain language of FHFA Ex. 387, Mr. Smith's January 12, 2007 memorandum to the Underwriting Committee.

675. **FHFA Statement:** Rather, at some point, RBS provided Nomura with a due diligence "waiver." Ex. 432 (RBS-FHFA-SDNY-0399452, email regarding Nomura Home Equity Loan Trust 2006-FM2) at RBS-FHFA-SDNY-0399452 ("Since being employed, this is the only review I was involved in. The DD waiver was approved by credit.").

**RBSSI Response:** RBSSI's disputes the assertion in ¶ 675. As phrased, ¶ 675 appears to state or imply that the "waiver" referenced in FHFA Ex. 432 is related to due diligence or obtaining approval from the Underwriting Committee (*see* RBSSI's responses to ¶¶ 633-635, *supra*, for a discussion of this "committee") to serve as an underwriter on Nomura-sponsored securitizations. FHFA cites no evidence that this is the case. The "waiver" referenced by Mr. Farrell in the email contained in FHFA Ex. 432 was not in reality a waiver at all but refers to the circumstances whereby RBSSI analyzed, reviewed and ultimately approved and endorsed use of the AMC loan-level reunderwriting in connection with the NHELI 2006-FM2 Securitization. *See* RBS Ex. 56 (RBS-FHFA-SDNY-0130648, email from Adam Smith to Erica Sugai and Tim Crowley of Nomura, requesting that Crowley have AMC direct the results of the NHELI 2006-FM2 due diligence to RBS's attention, noting that "the sample pulled should be significant enough for [RBSSI's] internal review"). RBS Ex. 23 (RBS-FHFA-SDNY-0622262, email from

Adam Smith to James Whittemore, Brian Farrell, and James Esposito) at RBS-FHFA-SDNY-0622263 (attaching Nomura's due diligence results and stating, "AMC will deliver all of the results directly to us.... Please review the results and sampling methods so that we can discuss the extent of our required due diligence as an underwriter..."); RBS Ex. 24 (RBS-FHFA-SDNY-0622268, subsequent email in chain) at RBS-FHFA-SDNY-0622268; RBS Ex. 34 (RBS-FHFA-SDNY-0622281, October 4, 2006 email from Brian Farrell to Adam Smith, James Whittemore and James Esposito) at RBS-FHFA-SDNY-0622281 (stating that "Credit was ok with results and sampling methodol[og]y"). When questioned about the email in FHFA Ex. 432, Mr. Farrell testified that this "scenario" of relying on a counterparty's loan file due diligence, after fully reviewing and vetting the procedures that were employed and the diligence results, was not unusual. RBS Ex. 5 (Deposition of Brian Farrell) at 714:21-715:24 ("Q. At the very top of this chain you write to Ms. Didato, 'Since being employed, this is the only review type I was involved in where due diligence results were reviewed and a new diligence was not ordered.' Do you see what I'm referring to? A. I do. Q. Did this scenario strike you as unusual in February of 2007? ... A. I can't say that it did."). Mr. Farrell further testified that it would have been his role to evaluate and determine whether RBSSI would accept the diligence that was done by a third-party issuer and would have "treat[ed] it the same way that as if I engaged the diligence company myself. I'd look at the sampling and I'd look at the results." *Id.* at 702:7-24.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI

"disputes" the assertion arguing that the assertion improperly implies that the "'waiver'

referenced in FHFA Ex. 432 is related to due diligence or obtaining approval from the

Underwriting Committee…to serve as an underwriter on Nomura-sponsored

securitizations[,]" citing their responses to ¶¶ 633-635, that argument does not create a

genuine dispute of material fact, Part I.A, *supra*. The documents cited by RBSSI fail to

directly controvert the asserted fact and do not create a genuine dispute of material fact.

Part I.C, *supra*.

676.    **FHFA Statement:** RBSSI received a "quick ad hoc" email from a member of Nomura's diligence team, which began with "we always choose adverse – no random." Ex. 433 (NOM-FHFA_04983000, email regarding Fremont DD Reports ) at NOM-FHFA_04983000 (Farrell accepting a "quick ad hoc" email outlining Nomura's due diligence sampling procedures, which began with "we always choose adverse – no random.").

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 433 is an email chain between Neil Spagna and Mendy Sabo of Nomura and Brian Farrell and Adam Smith of RBSSI regarding, among other things, the results of Nomura's loan-level due diligence on certain

Fremont loans and regarding Nomura's due diligence practices. RBSSI disputes that "RBSSI received a 'quick ad hoc' email" from Nomura as a mischaracterization or improper paraphrasing of the cited document. On September 28, 2006, Mr. Farrell emailed Mr. Spagna and Mr. Sabo asking, "[a]s it relates to your due dili[gence] sampling criteria, could you elaborate more on high risk characteristics...high LTV, low FICO, high DTI, investment properties, etc.," to which Mr. Sabo responded "I'll put something together for you." FHFA Ex. 433 (email regarding Fremont DD Reports) at NOM-FHFA 04983002. The following day, Mr. Farrell replied "[w]hat are the odds I'll see this today?" to which Mr. Sabo responded "Something formal – Pretty bad... If you want a quick ad hoc, I can put it into an email." *Id.* at NOM-FHFA 04983001. RBSSI does not dispute that Mr. Sabo sent to RBSSI a description of Nomura's loan-level due diligence practices, and that Nomura supplemented that description in a subsequent email to Adam Smith of RBSSI in which it further described the scope of its diligence as being "very similar to our Clayton scope. Full re-underwrite to Fremont's guides with our standard stips (did you receive these last week as well?) overlayed. Full compliance is completed as well. In the case of these deals, we looked at every loan in one way, shape, or form." *Id.* at NOM-FHFA 04983000. RBSSI further states that this email chain was sent less than two months after Nomura provided to RBSSI a similar description of its due diligence guidelines as well as an investor presentation detailing its whole loan acquisition and due diligence operations. RBS Ex. 57 (RBS-FHFA-SDNY-0167955, Adam Smith email regarding NHELI 2006-HE3 due diligence summary) at RBS-FHFA-SDNY-0167955-56.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI disputes that ¶ 676 appropriately characterizes that "'RBSSI received a 'quick ad hoc' email from Nomura[,]'" the documents cited by RBSSI do not support the assertion or provide a basis on which to specifically controvert FHFA's statement in ¶ 676. Part I.C, *supra*.

677. **FHFA Statement:** In this email, Nomura Securities provided brief response to RBSSI's request for detail on "high risk characteristics" pertaining to Nomura's "due dili[gence] sampling criteria." Ex. 433 (NOM-FHFA_04983000, email regarding Fremont DD Reports ) at NOM-FHFA_04983002 ("As it relates to your due dili sampling criteria, could you elaborate more on high risk characteristics...high LTV, low FICO, high DTI, investment properties, etc.").

**RBSSI Response:** RBSSI does not dispute that the quoted language is found in FHFA Ex. 433. RBSSI disputes FHFA's characterization of the cited email as a "brief response" to RBSSI's request for additional detail on Nomura's loan-level due diligence practices as argumentative and an improper legal conclusion which should be stricken. RBSSI refers the Court to RBSSI's response to ¶¶ 672 and 676 for a description of the steps RBSSI took to review and affirm Nomura's loan-level due diligence results.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI

disputes that ¶ 677 appropriately characterizes that Nomura Securities provided a "'brief

response'" to RBSSI's request and is argumentative and an improper legal conclusion

which should be stricken, citing to ¶¶ 672 and 676, that argument does not create a

genuine dispute of material fact. Part I.A, *supra*.

678. **FHFA Statement:** The review RBS performed on NHELI 2006-FM2 had been "the
only review" that Brian Farrell had been involved in where "dd results were reviewed and
a new diligence was not ordered." Ex. 432 (RBS-FHFA-SDNY-0399452, email
regarding Nomura Home Equity Loan Trust 2006-FM2) at RBS-FHFA-SDNY-0399452
("Since being employed, this is the only review type I was involved in w[h]ere dd results
were reviewed and a new diligence was not ordered.").

**RBSSI Response:** RBSSI's disputes the assertion in ¶ 678. Mr. Farrell had only been
working at RBSSI for approximately seven months when he sent the email referenced in
FHFA Ex. 432, RBS Ex. 5 (Deposition of Brian Farrell) at 53:14-22, and during that time
he was primarily involved in due diligence on "mini-bulk" pools that RBSSI intended to
acquire, not third-party securitizations. RBS Ex. 58 (Declaration of Brian Farrell
("Farrell Decl.")) at ¶ 4 ("During the July 2006 to 2007 time period, I primarily managed
due diligence projects on whole loan purchases consisting of several hundred or fewer
Alt-A or prime loans."). As discussed in RBSSI's response to ¶ 675, FHFA misconstrues
FHFA Ex. 432 to mean that RBSSI performed no loan-level due diligence with regard to
the NHELI 2006-FM2 Securitization, which is not correct. RBSSI analyzed, reviewed
and ultimately approved and endorsed the loan-level due diligence methodology and
results of Nomura relating to the NHEL 2006-FM2 Securitization. *See* RBS Ex. 56
(RBS-FHFA-SDNY-0130648) (Adam Smith email to Erica Sugai and Tim Crowley of
Nomura, requesting that Mr. Crowley have AMC direct the results of the NHELI 2006-
FM2 due diligence to RBS's attention, noting that "the sample pulled should be
significant enough for [RBSSI's] internal review"); FHFA Ex 434 (email regarding
Fremont 3 and 4) at RBS-FHFA-SDNY-0399020 ("On a rush basis, please forward our
standard due diligence reports to Adam Smith of RBS Greenwich Capital[.]"). Ex. 23
(RBS-FHFA-SDNY-0622262, email from Smith to Whittemore, Farrell, and Esposito) at
RBS-FHFA-SDNY-0622263 (attaching Nomura's due diligence results and stating,
"AMC will deliver all of the results directly to us.... Please review the results and
sampling methods so that we can discuss the extent of our required due diligence as an
underwriter..."); RBS Ex. 24 (RBS-FHFA-SDNY-0622268, subsequent email in chain) at
RBS-FHFA-SDNY-0622268; RBS Ex. 34 (RBS-FHFA-SDNY-0622281, October 4,
2006 email from Brian Farrell to Adam Smith, James Whittemore and James Esposito) at
RBS-FHFA-SDNY-0622281 (stating that "Credit was ok with results and sampling
methodol[og]y"). When questioned about the email in FHFA Ex. 432, Mr. Farrell
testified that this "scenario" of relying on a counterparty's loan file due diligence, after
fully reviewing and vetting the procedures that were employed and the diligence results,
was not unusual. RBS Ex. 5 (Deposition of Brian Farrell) at 714:21-715:24 ("Q. At the

very top of this chain you write to Ms. Didato, 'Since being employed, this is the only review type I was involved in where due diligence results were reviewed and a new diligence was not ordered.' Do you see what I'm referring to? A. I do. Q. Did this scenario strike you as unusual in February of 2007? ... A. I can't say that it did."). Mr. Farrell further testified that it would have been his role to evaluate and determine whether RBSSI would accept the diligence that was done by a third-party issuer and would have "treat[ed] it the same way that as if I engaged the diligence company myself. I'd look at the sampling and I'd look at the results." *Id.* at 702:7-24.

**FHFA Reply**: RBSSI does not genuinely dispute the asserted fact. The cited documents relating to RBSSI's acceptance of due diligence done by third parties fail to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

679. **FHFA Statement:** On October 4, 2006, Neil Spagna of Nomura asked Peter Kempf of AMC to send the "standard due diligence reports" to RBS. Ex 434 (RBS-FHFA-SDNY-0399019, email regarding Fremont 3 and 4) at RBS-FHFA-SDNY-0399020 ("On a rush basis, please forward our standard due diligence reports to Adam Smith of RBS Greenwich Capital[.]").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 679.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

680. **FHFA Statement:** Two days earlier, Mr. Spagna requested that Mr. Kempf make retroactive changes to the due diligence reporting for the loan pools, "Fremont 3 and Fremont 4," that would become the supporting loan groups for NHELI 2006-FM2. Ex. 435 (NOM-FHFA_05787814, email regarding Huge Favor--Fremont ASAP) at NOM-FHFA_05787814 ("We are securitizing Fremont 3 and Fremont 4. RBS Greenwich Capital is acting as a co-underwriter on this deal and have requested our standard due diligence reports that we receive from AMC.... The attached excel report shows that there are 12 loans in Fremont 3 and 7 loans in Fremont 4 [pools underlying NHELI 2006-FM2] that AMC had marked as CE3s but, for what ever reason, we decided to buy from Fremont. Please mark these loans as client overrides Credit Event 2s for all 19 loans in question. Then please forward to me the updated set of reports for these two deals.").

**RBSSI Response:** RBSSI does not dispute that loans in the Fremont SP03 and Fremont SP04 pools were securitized in the NHELI 2006-FM2 Securitization. RBSSI also does not dispute that Nomura requested that AMC, the third-party due diligence firm that conducted diligence on these two pools, send RBSSI the diligence reports for those reviews. RBSSI does not dispute that FHFA Ex. 435 cited in ¶ 680 contains the language quoted by FHFA, except that other documents or testimony contradict or provide necessary context for the quoted language. For example, Mr. Kempf testified that

Nomura might override a due diligence firm's final event grade where, for example, the seller was able to provide missing documents, which would mean diligence results "could change." Nomura Stmt. at ¶ 183, 186. Further, Mr. Spagna was not an employee at Nomura at the time any of those loans were graded by Nomura's vendor. Nomura Stmt. ¶ 27, 31. Thus, Mr. Spagna's comment that "for what ever reason" Nomura decided to purchase those loans reflects only his lack of knowledge rather than reflecting any belief that those loans should not have been purchased. Finally, the email on its face pertains to 12 of 4616 loans that comprised the Fremont 3 purchase, and 7 of the 2666 loans that comprised the Fremont 4 purchase, or approximately .25% and .26%, respectively, of those pools. And though FHFA does not claim that the 19 loans were included in the SLG for NHELI 2006-FM2, even if they were, 19 loans would represent less than 0.5% of the 3,891 loans in the SLG. RBS Ex. 59 (RBS-FHFA-SDNY-0311238, "Seller Trade Breakout" Excel file).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that Mr. Spagna was not an employee at Nomura at the time the loans were graded by Nomura's vendor and that this "reflects only his lack of knowledge rather than reflecting any belief that those loans should not have been purchased[,]" RBSSI's spin does not create a genuine dispute of material fact. Part I.A, *supra*. RBSSI's assertion that the "19 loans would represent less than 0.5% of the 3,891 loans in the SLG" does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

681. **FHFA Statement:** Specifically, Mr. Spagna noted that the due diligence reports reflected nineteen loans that "AMC had marked as CE3s but, for what[]ever reason, [Nomura] decided to buy from Fremont." Ex. 435 (NOM-FHFA_05787814, email regarding Huge Favor--Fremont ASAP) at NOM-FHFA_05787814 ("We are securitizing Fremont 3 and Fremont 4. RBS Greenwich Capital is acting as a co-underwriter on this deal and have requested our standard due diligence reports that we receive from AMC. The attached excel report shows that there are 12 loans in Fremont 3 and 7 loans in Fremont 4 [pools underlying NHELI 2006-FM2] that AMC had marked as CE3s but, for what ever reason, we decided to buy from Fremont. Please mark these loans as client overrides Credit Event 2s for all 19 loans in question. Then please forward to me the updated set of reports for these two deals.").

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 435 cited in ¶ 681 contains the language quoted by FHFA, except that other documents or testimony contradict or provide necessary context for, the quoted language. For example, Peter Kempf testified that Nomura might override a due diligence firm's final event grade where, for example, the seller was able to provide missing documents, which would mean diligence results

"could change." Nomura Stmt. at ¶ 183, 186.  Further, FHFA ignores that Neil Spagna was not an employee at Nomura at the time any of those loans were graded by Nomura's vendor.  Nomura Stmt. ¶ 183, 186.  Thus, Mr. Spagna's comment that "for what ever reason" Nomura decided to purchase those loans reflects only his lack of knowledge rather than reflecting any belief that those loans should not have been purchased.  Second, the email on its face pertains to 12 of 4616 loans that comprised the Fremont 3 purchase, and 7 of the 2666 loans that comprised the Fremont 4 purchase, or approximately .25% and .26%, respectively, of those pools.  And though FHFA does not claim that the 19 loans were included in the SLG for NHELI 2006-FM2, even if they were, 19 loans would represent less than 0.5% of the 3,891 loans in the SLG.  RBS Ex. 59 (RBS-FHFA-SDNY-0311238, "Seller Trade Breakout" Excel file).

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  RBSSI "does not dispute that  FHFA Ex. 435…contains the language quoted by FHFA."  While RBSSI argues that Mr. Spagna was not an employee at Nomura at the time the loans were graded by Nomura's vendor and that Mr. Spagna's comment "reflects only his lack of knowledge rather than reflecting any belief that those loans should not have been purchased[,]" RBSSI's spin does not create a genuine dispute of material fact.  Part I.A, *supra*.  RBSSI's assertion that the "19 loans would represent less than 0.5% of the 3,891 loans in the SLG" does not directly contravene the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

682. **FHFA Statement:**  Mr. Spagna directed Mr. Kempf to execute a waiver of all nineteen loans.  Ex. 435 (NOM-FHFA_05787814, email regarding Huge Favor-¬Fremont ASAP) at NOM-FHFA_05787814 ("The attached excel report shows that there are 12 loans in Fremont 3 and 7 loans in Fremont 4 [pools underlying NHELI 2006-FM2] that AMC had marked as CE3s but, for what ever reason, we decided to buy from Fremont.  Please mark these loans as client overrides Credit Event 2s for all 19 loans in question.  Then please forward to me the updated set of reports for these two deals.").

**RBSSI Response:**  RBSSI does not dispute that FHFA Ex. 435 cited in ¶ 682 contains the language quoted by FHFA, except that other documents or testimony contradict or provide necessary context for, the quoted language.  For example, Peter Kempf testified that Nomura might override a due diligence firm's final event grade where, for example, the seller was able to provide missing documents, which would mean diligence results "could change." Nomura Stmt. at ¶ 183, 186.  Further, FHFA ignores that Neil Spagna was not an employee at Nomura at the time any of those loans were graded by Nomura's vendor.  Nomura Stmt. ¶ 27, 31.  Thus, Mr. Spagna's comment that "for what ever reason" Nomura decided to purchase those loans reflects only his lack of knowledge

465

rather than reflecting any belief that those loans should not have been purchased. Second, the email on its face pertains to 12 of 4616 loans that comprised the Fremont 3 purchase, and 7 of the 2666 loans that comprised the Fremont 4 purchase, or approximately .25% and .26%, respectively, of those pools. And though FHFA does not claim that the 19 loans were included in the SLG for NHELI 2006-FM2, even if they were, 19 loans would represent less than 0.5% of the 3,891 loans in the SLG. RBS Ex. 59 (RBS-FHFA-SDNY-0311238, "Seller Trade Breakout" Excel file).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that Mr. Spagna was not an employee at Nomura at the time the loans were graded by Nomura's vendor and that Mr. Spagna's comment "reflects only his lack of knowledge rather than reflecting any belief that those loans should not have been purchased[,]" RBSSI's spin does not create a genuine dispute of material fact. Part I.A, *supra*.

RBSSI's assertion that the "19 loans would represent less than 0.5% of the 3,891 loans in the SLG" does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*

683.  **FHFA Statement:** Nomura and the underwriters held a "due diligence teleconference" call for NHELI 2006-FM2. Ex. 436 (RBS-FHFA-SDNY-0130683, Due Diligence Teleconference Agenda for NHEL 2006-FM2) at RBS-FHFA-SDNY-0130683 (listing fourteen points of discussion for NHEL 2006-FM2).

**RBSSI Response:** RBSSI does not dispute that Nomura and representatives for the underwriters, including RBSSI employees, participated in a conference call on or about October 12, 2006 to discuss a list of due diligence topics in connection with the NHELI 2006-FM2 Securitization. *See* FHFA Ex. 437 (email regarding NHELI 2006-FM2 Underwriter Due Diligence Call).

**FHFA Reply:** RBSSI does not dispute the asserted fact.

684.  **FHFA Statement:** No RBSSI due diligence personnel attended the call. *See* Ex. 436 (RBS-FHFA-SDNY-0130683, Due Diligence Teleconference Agenda) at RBS-FHFA-SDNY-0130683 (showing attendees from Greenwich [RBS] as Adam Smith, Pat Leo, and Sean Curran); Ex. 386 (Deposition of Adam Smith) at 52:8-18 ("Q. During the period 2005 to 2008 did you have expertise that would allow you to determine what a statistically significant sample was on any particular loan transaction? A. Yeah, I -- I -¬well. Do I have expertise? I was not in the diligence group and I wasn't picking the diligence samples."); *id*. at 384:16-385:3 ("Q. Who is Sean Curran? A. Sean is -- was an analyst or associate in the group at that point. I'm not sure what. Q. In the asset-backed finance group? A. In the asset-backed finance group, yes. Q. And who was

Patrick Leo? A. Patrick Leo was an associate or a vice president in the group at that time. I'm not sure which one.").

**RBSSI Response:** RBSSI disputes FHFA's characterization of the conference call as having "[n]o RBSSI due diligence personnel" in attendance. First, members of the Asset-Backed Finance group—Mr. Smith, Mr. Curran, and Mr. Leo—attended this conference call. Coordinating due diligence among the various parties to the securitization process is one of Asset-Backed Finance group's responsibilities. FHFA Ex. 369 (RBS-FHFA-SDNY-0498390, September 2006 Asset Backed Finance, Sales & Trading Groups Policies and Procedures Manual) at RBS-FHFA-SDNY-0498399 ("Due diligence procedures are performed by the ABF Group, in conjunction with the Credit, Legal and Operations Departments for all new ABF Group clients and transactions."); *see* RBS Ex. 17 (Deposition of Adam Smith) at 45:18-46:15 (explaining, "So basically the way a transaction would work in general would be that the potential counterparty would send a loan tape, we would show that collateral to the credit department..."); RBS Ex. 60 (*Federal Home Loan Bank of Chicago* Deposition of Patrick Leo) at 45:22-47:1 (explaining, "Generally, my role, non-transaction specific, was to connect party A to party B, i.e., here's the credit contact at Greenwich Capital..."). Second, to the extent that the assertion in ¶ 684 is intended to state that no members of RBSSI's Credit group were in attendance, the record demonstrates that the Credit group had already made substantial inquiries into Nomura's loan reunderwriting process, as discussed in RBSSI's responses to ¶¶ 675 and 678. For example, RBSSI obtained and verified Nomura's due diligence procedures to gain further assurances regarding the accuracy and quality of Nomura's loan-level due diligence. RBS Ex. 43 (RBS-FHFA-SDNY-0171295, Due Diligence Process email from Nomura to Adam Smith) at RBS-FHFA-SDNY-0171295-341 (describing Nomura's due diligence process and attaching a presentation regarding Nomura's Whole Loan Securitization Platform dated June 8, 2006). Additionally, as reflected in FHFA Ex. 437, the primary purpose of the call was to discuss corporate (i.e., transaction-level) due diligence. *See also* RBS Ex. 17 (Deposition of Adam Smith) at 392:22-395:2 (characterizing the call as "a corporate underwriting due diligence call" which "was part of the process of determining" whether Nomura was a "good counterpart[y] to do transactions with or not."); RBS Ex. 37 (*CUNA* Deposition of Adam Smith) at 41:22-42:17 ("Q. And then a few entries down, it says U/W due diligence and then two lines below that AMC due diligence call. What do those due diligence references mean? A. Underwriting due diligence ... is basically the underwriters doing loan file diligence. And then [the] due diligence call is, is the call with [an issuer] prior to pricing transaction that, you know, has a questionnaire about them issuing notes and if there is any, you know, any current updates in the company, et cetera.... Typically, underwriter diligence calls were led by the underwriter counsel. So the underwriter counsel would draft the questionnaire with review from our legal department and they would typically ask the questions on the call."). Finally, RBSSI disputes the assertion in ¶ 684 to the extent that FHFA asserts that neither Mr. Smith, Mr. Curran, nor Mr. Leo were qualified to pose additional questions about loan-level due diligence. Mr. Smith in particular was an experienced banker who had already received information about Nomura's loan level due diligence process in NHELI 2006-FM2 and NHELI 2006-HE3. RBS Ex. 43 (RBS-FHFA-SDNY-0171295, Due Diligence Process email from Nomura to Adam Smith) at RBS-FHFA-SDNY-0171295-96; RBS Ex. 23 (RBS-FHFA-SDNY-

0622262, email from James Whittemore regarding NHELI 2006-FM2 due diligence) at RBS-FHFA-SDNY-0622263-64.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited documents relating to RBSSI making "substantial inquiries into Nomura's loan and reunderwriting process[,]" citing ¶¶ 675 and 678, are irrelevant to the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*. Further, RBSSI's argument that "Mr. Smith, Mr. Curran, []or Mr. Leo were qualified to pose additional questions about loan-level due diligence" does not directly contravene the asserted fact. Part I.A, *supra*.

685. **FHFA Statement:** Mr. Sabo was on the call "for the last 5 minutes," and wrote that the call "seem[ed] like it was more 'corporate' than anything pertaining to us [the due diligence group]." Ex. 437 (NOM-FHFA_04983027, email regarding NHELI 2006-FM2 Underwriter Due Diligence Call) at NOM-FHFA_04983027.

**RBSSI Response:** RBSSI disputes FHFA's characterization of the conference call as not relating to due diligence. *See* RBSSI's response to ¶ 684. *See also* RBS Ex. 17 (Deposition of Adam Smith) at 392:22-395:2 (characterizing the call as "a corporate underwriting due diligence call" which "was part of the process of determining" whether Nomura was a "good counterpart[y] to do transactions with or not.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI's cited documents relating to the conference call fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

686. **FHFA Statement:** During the call, only "two questions" were posed to Nomura Securities' diligence personnel. *Id.*

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 437 contains the language quoted by FHFA. In the email, Neil Spagna tells Mendy Sabo that "[w]e had 2 questions." FHFA Ex. 437 (Nomura email regarding due diligence conference call) at NOM-FHFA 04983027. RBSSI disputes FHFA's unsupported characterization of "[w]e" as referring to the Nomura diligence personnel and to the extent it suggests that Nomura's loan-level due diligence processes were not adequately covered during the conference call or otherwise. *See* FHFA Ex. 436 (RBS-FHFA-SDNY-0130683, NHELI 2006-FM2 Due Diligence Call agenda) at RBS-FHFA-SDNY-0130683 (listing topics including "the due diligence Nomura has conducted to confirm that the loans in the mortgage pool have been originated in accordance with Fremont's underwriting guidelines and compliance with applicable law."). RBSSI also disputes that the purpose of this conference call referenced in FHFA Ex. 437 was primarily loan-level due diligence instead of corporate

(i.e., transaction-level) due diligence.  FHFA Ex. 437 (agenda items relating to topics other than loan-level due diligence); RBS Ex. 17 (Deposition of Adam Smith) at 392:22-395:2 (characterizing the call as "a corporate underwriting due diligence call" which "was part of the process of determining" whether Nomura was a "good counterpart[y] to do transactions with or not."); RBS Ex. 37 (*CUNA* Deposition of Adam Smith) at 41:22-42:17 ("Q.  And then a few entries down, it says U/W due diligence and then two lines below that AMC due diligence call.  What do those due diligence references mean? A. Underwriting due diligence ...  is basically the underwriters doing loan file diligence. And then [the] due diligence call is, is the call with [an issuer] prior to pricing transaction that, you know, has a questionnaire about them issuing notes and if there is any, you know, any current updates in the company, et cetera....  Typically, underwriter diligence calls were led by the underwriter counsel.  So the underwriter counsel would draft the questionnaire with review from our legal department and they would typically ask the questions on the call.").  RBSSI had already inquired into Nomura's loan-level due diligence procedures to gain further assurances regarding the accuracy and quality of Nomura's loan file diligence, as discussed in RBSSI's responses to ¶¶ 675 and 678.  RBS Ex. 38 (RBS-FHFA-SDNY-0164304, email from Adam Smith to Brian Farrell and James Whittemore) at RBS-FHFA-SDNY-0164304; RBS Ex. 43 (RBS-FHFA-SDNY-0171295, email from Nomura to Adam Smith) at RBS-FHFA-SDNY-0171295-341 (describing Nomura's due diligence process and attaching a presentation regarding Nomura's Whole Loan Securitization Platform dated June 8, 2006).

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  RBSSI's argument

that it disputes "FHFA's unsupported characterization of '[w]e' as referring to the

Nomura diligence personnel and to the extent it suggests that Nomura's loan-level due

diligence processes were not adequately covered during the conference call or

otherwise[,]" is irrelevant to the asserted fact and does not create a genuine dispute of

material fact.  Part I.C, *supra*.

687.  **FHFA Statement:**  In response to those questions, Mr. Spagna wrote to Mendy Sabo: "I took the liberty to bullshit them.  I think it worked." *Id.*

**RBSSI Response:**  RBSSI does not dispute that FHFA Ex. 437 contains the language quoted by FHFA.  RBSSI refers the Court to FHFA Ex. 437 for an accurate and complete statement of its contents.  RBSSI disputes the assertion in ¶ 687 to the extent it is intended to state or imply that the purpose of the call was to discuss loan-level due diligence results for the particular transaction or that RBSSI was not familiar with Nomura's general loan-level due diligence practices or the loan-level due diligence results for the NHELI 2006-FM2 Securitization.  RBSSI refers to its responses to ¶¶ 675, 678, 684-686 for a summary of the steps RBSSI took to review, analyze and confirm the loan-level due diligence conducted by Nomura.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI's argument that it disputes the assertion "to the extent it is intended to state or imply that the purpose of the call was to discuss loan-level due diligence results for the particular transaction or that RBSSI was not familiar with Nomura's general loan-level due diligence practices or the loan-level due diligence results for the NHELI 2006-FM2 Securitization[,]" is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

> ### D. RBSSI Performed Inadequate Diligence On The NHELI 2007-1 And NHELI 2007-2 Securitizations
>
> > #### 1. RBSSI Drew Statistically Unsound Samples In Conducting Diligence On The NHELI 2007-1 And NHELI 2007-2 Securitizations
> >
> > > ##### (a) *RBSSI Selected Samples Of Loans That Received Credit And Compliance Using Sampling That "Skewed" Its Results, And It Did Not Draw Those Samples From The SLGs*

688. **FHFA Statement:** James Whittemore, had "the most knowledge about sample selection at RBS." Ex. 383 (Deposition of Brian Farrell) at 553:18-554:21 ("Q. In your experience, who had the most knowledge about sample selection at RBS? ... A. The most knowledge? Q. Correct. A. About sample selection? Q. Right? A. My guess would be probably Jim Whittemore, since I'm the one who asked him to train me on how he pulled samples.... Q. Did you consider him to be knowledgeable about the manner in which samples should be drawn? ... A. I think that he was knowledgeable, that's why I asked him to teach me how he pulled samples.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 688 as it mischaracterizes or improperly paraphrases the cited testimony. Mr. Farrell, who was testifying in his individual capacity and not on RBSSI's behalf, stated that his "guess" was "probably" that Mr. Whittemore had the most knowledge "since I'm the one who asked him to train me on how he pulled samples." Both Mr. Whittemore and Mr. Gallagher, RBSSI's chief credit risk officer, testified that Don Lawson, who was RBSSI's chief underwriter until his semi-retirement in mid-2006, developed RBSSI's loan-level due diligence sampling methodology and was the most knowledgeable about it. RBS Ex. 7 (Deposition of William Gallagher) at 176:22-177:6 ("Q. And were you responsible for what sampling techniques were used to diligence a pool? A. Don Lawson developed the sampling techniques that were used by RBS for the most part, although in, again, in looking at emails in preparation for this I think you see that it evolved over time as well."); RBS Ex. 6 (Deposition of James Whittemore) at 37:18-24 ("Q. Did you have any training relating

to your responsibilities regarding sampling while you were at RBS? A. My training was involved with Don Lawson and his, using his philosophy on how to and, and his way of how a sample should be picked."); *see also* RBS Ex. 18 (Bisaillon Decl.) at ¶ 5 ("My understanding is that RBS[SI]'s general sampling methodology used during the period 2005 through 2008 was developed by Donald Lawson"). Mr. Farrell also testified that he was aware that Mr. Lawson had developed RBSSI's semi-random sampling methodology. RBS Ex. 5 (Deposition of Brian Farrell) at 564:3-14 ("Q. Did you know what made a sample semi-random as opposed to random? A. No, I do not. Q. Who made that determination? ... A. I believe it was created by Don Lawson prior to my employment. Q. When you say it was created, what are you referring it? A. That he was responsible for creating the semi-random methodology.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. RBSSI asserts that "[b]oth Mr. Whittemore and Mr. Gallagher, RBSSI's chief credit risk officer, testified that Don Lawson, who was RBSSI's chief underwriter until his semi-retirement in mid-2006, developed RBSSI's loan-level due diligence sampling methodology and was the most knowledgeable about it," but this assertion is not supported by RBS Exs. 7 at 176:22-177:6; 6 at 37:18-24; or 18 at ¶ 5. The cited evidence indicates only that Mr. Lawson developed RBSSI's loan-level due diligence sampling methodology and trained Mr. Whittemore on how to pick a due diligence sample, not that Mr. Lawson "was the most knowledgeable about" sampling methodology. The cited evidence, as well as RBSSI's assertion that Mr. Farrell testified that Mr. Lawson developed RBSSI's semi-random sampling methodology, fails to directly contravene the asserted fact that Mr. Whittemore had the most knowledge about sample selection at RBS and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

689. **FHFA Statement:** Mr. Whittemore was unable to explain what basic statistical terms like "95 percent confidence level" or "10 percent error" meant. Ex. 384 (Deposition of James Whittemore) at 144:5-15 ("Q. Okay. At the bottom of that same column it says 95 percent confidence, or conf, Co-n-f. Does that refer to a 95 percent confidence level? A. It would suggest that is does.... Q. At the bottom it says 10 percent error, do you know what that is? A. No, I do not.").

**RBSSI Response:** RBSSI does not dispute that the testimony of Mr. Whittemore cited in ¶ 689 includes the language quoted by FHFA, but states that other portions of Mr. Whittemore's testimony contains additional information that provides necessary context for Mr. Whittemore's statement. Mr. Whittemore testified that he was trained by Mr. Lawson with regard to Mr. Lawson's sampling philosophy and methodology, including being provided by Mr. Lawson with a spreadsheet tool that enabled Mr. Whittemore to identify the number of loans required to be sampled, depending on the pool size, to obtain statistically significant results. RBS Ex. 6 (Deposition of James Whittemore) at 37:18-24 ("Q. Did you have any training relating to your responsibilities regarding sampling while you were at RBS? A. My training was involved with Don Lawson and his, using his philosophy on how to, and his way of how a sample should be picked."); RBS Ex. 20 (RBS-FHFA-CT-7017291, email from Don Lawson to James Whittemore) at RBS-FHFA-CT-7017291-92 (attaching sample size spreadsheet); *see also* RBS Ex. 18 (Bisaillon Decl.) at ¶¶ 2-13 (discussing how loans were randomly selected). RBSSI further disputes ¶ 689 to the extent it states or implies that Mr. Whittemore should have had statistical training or that such statistical training was necessary as part of his responsibilities at RBSSI. Mr. Gallagher, RBSSI's chief credit risk officer during the time of the Nomura Securitizations, testified that he was not concerned that Mr. Whittemore did not have formal statistical training and that it did not impact his ability to select a statistically random sample using the methodology developed by Mr. Lawson. RBS Ex. 7 (Deposition of William Gallagher) at 380:13-381:9 ("Q. As the head of credit, does reading this give you any concern that Mr. Whittemore was not qualified to be drawing random samples for purposes of diligencing loans? A. No. Q. Did you consider ... Mr. Whittemore to be competent to pull a random sample and to determine whether that sample was actually representative? ... A. He didn't – he didn't need to be competent. He was a given statistics table that told him how many loans to sample for different samples and that was something that Don had pulled together years before and I'm confident that it was reasonable and fit the purpose.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. The cited evidence relating to Mr. Whittemore's training with Mr. Lawson, RBSSI's sampling methodology, and Mr. Gallagher's lack of concern regarding Mr. Whittemore's competence to pull due diligence samples fails to directly contravene the asserted fact that Mr. Whittemore was unable to explain basic statistical terms and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Furthermore, RBSSI asserts that "Mr. Whittemore testified that he was trained by Mr. Lawson with regard to Mr. Lawson's sampling philosophy and methodology, including being provided by Mr. Lawson with a

472

spreadsheet tool that enabled Mr. Whittemore to identify the number of loans required to

be sampled, depending on the pool size, to obtain statistically significant results," but this

assertion is not supported by RBS Exs. 6 at 37:18-24; 20 at RBS-FHFA-CT-7017291-92;

or 18 at ¶¶ 2-13. The cited evidence indicates only that Mr. Whittemore testified that he

was trained by Mr. Lawson on how to pick a due diligence sample, that Mr. Lawson sent

Mr. Whittemore a spreadsheet about a semi-random sample in May 2006, and that RBSSI

had various policies regarding sampling size, not that Mr. Whittemore testified that Mr.

Lawson provided "a spreadsheet tool that enabled Mr. Whittemore to identify the number

of loans required to be sampled, depending on the pool size, to obtain statistically

significant results." Additionally, while RBSSI disputes ¶ 689 "to the extent it states or

implies that Mr. Whittemore should have had statistical training or that such statistical

training was necessary as part of his responsibilities at RBSSI," RBSSI's argument does

not create a genuine dispute of material fact. Part I.A, *supra*.

690. **FHFA Statement:** Mr. Whittemore was unaware of any testing to ensure that semi-random samples were representative of the SLG, of any testing for rate of defective loans in the SLGs, or how to determine the quality of the loans in the SLGs. Ex. 384 (Deposition of James Whittemore) at 300:13-304:15 ("Q. Let me ask you, Mr. Whittemore. Are you familiar with the use of representativeness testing in order to verify that a randomly drawn sample is in fact representative of the population? ... A. No, I am not. ...Q. Do you know whether RMBS ever tried to ensure that its samples were representative of supporting loan groups for a particular RMBS securitization? ... A. I do not know. Q. Is it correct that you never tested the rate of defective loans or exception loans in supporting loans groups for RMBS deals? ... A. I personally did not.... Q. Let me just restate that so it's clear. Isn't it necessary for RBS to track how the deals were put together and how the populations related to your samples in order to determine the quality of the loans in a particular supporting loan group for a particular RMBS transaction? ... A. I do not know as it was not my, part of my responsibility."

**RBSSI Response:** RBSSI does not dispute that the testimony of Mr. Whittemore cited in ¶ 690 includes the language quoted by FHFA, but states that other portions of Mr. Whittemore's testimony contains additional information that provides necessary context for Mr. Whittemore's statement. Mr. Whittemore testified that he was trained by Mr. Lawson with regard to Mr. Lawson's sampling philosophy and methodology, including being provided by Mr. Lawson with a spreadsheet tool that enabled Mr. Whittemore to

identify the number of loans required to be sampled, depending on the pool size, to obtain statistically significant results.  RBS Ex. 6 (Deposition of James Whittemore) at 37:18-24 ("Q.  Did you have any training relating to your responsibilities regarding sampling while you were at RBS? A.  My training was involved with Don Lawson and his, using his philosophy on how to, and his way of how a sample should be picked."); RBS Ex. 20 (RBS-FHFA-CT-7017291, email from Don Lawson to James Whittemore) at RBS-FHFA-CT 7017291-92 (attaching sample size spreadsheet); *see also* RBS Ex. 18 (Bisaillon Decl.) at ¶¶ 2-13 (discussing how loans were randomly selected).  RBSSI further disputes ¶ 690 to the extent it states or implies that Mr. Whittemore should have been aware of statistical concepts such as representativeness testing or that awareness of such concepts was necessary as part of his responsibilities at RBSSI or necessary to conduct loan file due diligence.  Mr. Gallagher, RBSSI's chief credit risk officer during the time of the Nomura Securitizations, testified that he was not concerned that Mr. Whittemore did not have formal statistical training and that it did not impact his ability to select a statistically random sample using the methodology developed by Mr. Lawson.  RBS Ex. 6 (Deposition of William Gallagher) at 380:13-381:9 ("Q.  As the head of credit, does reading this give you any concern that Mr. Whittemore was not qualified to be drawing random samples for purposes of diligencing loans? A.  No.  Q.  Did you consider ...  Mr. Whittemore to be competent to pull a random sample and to determine whether that sample was actually representative? ...  A.  He didn't – he didn't need to be competent.  He was given a statistics table that told him how many loans to sample for different samples and that was something that Don had pulled together years before and I'm confident that it was reasonable and fit the purpose.").

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  The cited evidence relating to Mr. Whittemore's training with Mr. Lawson, RBSSI's sampling methodology, and Mr. Gallagher's lack of concern regarding Mr. Whittemore's competence to pull due diligence samples fails to directly contravene the asserted fact that "Mr. Whittemore was unaware of any testing to ensure that semi-random samples were representative of the SLG, of any testing for rate of defective loans in the SLGs, or how to determine the quality of the loans in the SLGs" and therefore does not create a genuine dispute of material fact.  Part I.C, *supra*.  Furthermore, Defendants assert that "Mr. Whittemore testified that he was trained by Mr. Lawson with regard to Mr. Lawson's sampling philosophy and methodology, including being provided by Mr. Lawson with a spreadsheet tool that enabled Mr. Whittemore to identify the number of loans required to be sampled, depending on the pool size, to obtain statistically significant results," but this

assertion is not supported by RBS Exs. 6 at 37:18-24; 20 at RBS-FHFA-CT-7017291-92; or 18 at ¶¶ 2-13. The cited evidence indicates only that Mr. Whittemore testified that he was trained by Mr. Lawson on how to pick a due diligence sample, that Mr. Lawson sent Mr. Whittemore a spreadsheet about a semi-random sample in May 2006, and that RBSSI had various policies regarding sampling size, not that Mr. Whittemore testified that Mr. Lawson provided "a spreadsheet tool that enabled Mr. Whittemore to identify the number of loans required to be sampled, depending on the pool size, to obtain statistically significant results." Additionally, while RBSSI disputes ¶ 690 "to the extent it states or implies that Mr. Whittemore should have been aware of statistical concepts such as representativeness testing or that awareness of such concepts was necessary as part of his responsibilities at RBSSI or necessary to conduct loan file due diligence," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

(i)    NHELI 2007-1

691.   **FHFA Statement:** There is no evidence that RBSSI received or reviewed the results of the diligence that Nomura Securities performed on the Acquisition Pools that contributed loans to the SLGs of the NHELI 2007-1 Securitization.

**RBSSI Response:** RBSSI disputes the assertion in ¶ 691. On or about January 19, 2007, RBSSI received from Nomura a due diligence summary transaction spreadsheet for the loans underlying the NHELI 2007-AF1 loan group. RBS Ex. 61 (RBS-FHFA-SDNY-0488802, DD Summary NHELI 07AF1 Email) at RBS-FHFA-SDNY-0488802-03 (attaching a spreadsheet summarizing Nomura's whole loan acquisition due diligence for the Collateral underlying the NHELI 2007-AF1 loan group in NHELI 2007-1). RBSSI was also aware and familiar with Nomura's diligence practices based on RBSSI's role as underwriter for the NHELI 2006-HE3 and NHELI 2006-FM2 Securitizations. *See* RBSSI's responses to ¶¶ 669, 675 and 678. *See also* RBS Ex. 62 (RBS-FHFA-SDNY-0162569, email from Nomura to Adam Smith) at RBS-FHFA-SDNY-0162569-72 (RBSSI received diligence summary for NHELI 2006-HE3); RBS Ex. 63 (RBS-FHFA-SDNY-0162593, email chain between Nomura and Adam Smith) at RBS-FHFA-SDNY-0162593 ("The idea [of the summary] is to give an overall picture of [Nomura's] DD process."); RBS Ex. 43 (RBS-FHFA-SDNY-0171295, email From Nomura to Adam Smith) at RBS-FHFA-SDNY-0171295-341 (providing information on Nomura's diligence process); RBS Ex. 23 (RBS-FHFA-SDNY-0622262, email chain discussing

NHELI 2006-FM2 due diligence) at RBS-FHFA-SDNY-0622262-63 (discussing Nomura's loan-level due diligence on NHELI 2006-FM2).  Additionally, in conducting its own loan-level due diligence, it would not be customary for RBSSI to seek the issuer's "acquisition diligence" results.  See FHFA Ex. 60 (Grice RBSSI Report) at ¶ 66 ("RBS[SI] performed and/or reviewed reasonable and sufficient due diligence . . . commensurate with its role as the lead underwriter and consistent with prevailing industry practices during the Relevant Period.").

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  The cited evidence relating to Nomura sending RBSSI a summary spreadsheet of the due diligence performed on the loans underlying the NHELI 2007-AF1 loan group is irrelevant to the asserted fact because the NHELI 2007-AF1 loan group was not the relevant SLG of the NHELI 2007-1 Securitization, *see* FHFA Ex. 60 (Grice RBSSI Report) at n. 51 ("The fixed rate group was diligenced under the project name NHELI 2007-AF1 and the adjustable rate group was diligenced separately under the project name NAAC 2007-AR1. The adjustable rate loans ultimately became the Group 2 loans underlying NHELI 2007-1. Freddie Mac purchased certificates backed by Group 2 loans."), and therefore does not create a genuine dispute of material fact.  Part I.C, *supra*.  The cited evidence relating to RBSSI's familiarity with Nomura's due diligence practices related to other Securitizations is irrelevant to the asserted fact that "[t]here is no evidence that RBSSI received or reviewed the results of the diligence that Nomura Securities performed on the Acquisition Pools that contributed loans to the SLGs of the NHELI 2007-1 Securitization" and therefore does not create a genuine dispute of material fact.  Part I.C, *supra*.  While Defendants assert that RBS's expert Charles Grice described RBSSI's due diligence as "commensurate with its role as the lead underwriter and consistent with prevailing industry practices during the Relevant Period," the conclusory assertions of an expert do not create a genuine dispute of fact, Part I.G, *supra*, and Mr. Grice's conclusory

assertions fail to directly contravene the asserted fact and therefore do not create a

genuine dispute of material fact.  Part I.C, *supra*.

692. **FHFA Statement:**  Nomura itself was not able to locate any diligence summary for that deal.  *See* Ex. 141 (10/2/2014 Letter from Davidoff to Ng) at 1 ("You asked that Nomura produce due diligence summaries similar to NOM-FHFA_04878436 for NAA 2005-AR6 and NHELI 2007-1.  We have been unable to locate any such summaries for those Securitizations.").

**RBSSI Response:**  RBSSI disputes the assertion in ¶ 692 as it mischaracterizes the letter cited in FHFA Ex. 141.  That letter stated: "[y]ou asked that Nomura produce due diligence summaries similar to NOM-FHFA_04878436 for NAA 2005-AR6 and NHELI 2007-1.  We have been unable to locate any such summaries for those Securitizations." RBSSI does not dispute that Nomura stated that it could not locate those types of summaries, but disputes the assertion to the extent it states or implies that Nomura did not conduct loan-level due diligence on the pools of loans from which loans were sourced into that deal.  *See* Nomura Stmt. at ¶¶ 124-125, 247¬253.  Additionally, RBSSI did receive such a summary from Nomura on January 19, 2007, for the NHELI 2007-AF1 loan group collateral.  RBS Ex. 61 (RBS-FHFA-SDNY-0488802, DD Summary NHELI 07AF1 Email) at RBS-FHFA-SDNY-0488802-03 (attaching a spreadsheet summarizing Nomura's whole loan acquisition due diligence for the collateral underlying the NHELI 2007-AF1 loan group in NHELI 2007-1).  RBSSI also disputes the assertion in ¶ 692 to the extent it states or implies that RBSSI was not familiar with Nomura's loan-level due diligence practices.  As discussed in RBSSI's response to ¶ 691, RBSSI was knowledgeable about Nomura's diligence practices based on RBSSI's role as underwriter for the NHELI 2006-HE3 and NHELI 2006-FM2 Securitizations.  See RBSSI's responses to ¶¶ 669, 675 and 678.  *See also* RBS Ex. 62 (RBS-FHFA-SDNY-0162569, email from Nomura to Adam Smith) at RBS-FHFA-SDNY-0162569-72 (RBSSI received diligence summary for NHELI 2006-HE3); RBS Ex. 63 (RBS-FHFA-SDNY-0162593, email chain between Nomura and Adam Smith) at RBS-FHFA-SDNY-0162593 ("The idea [of the summary] is to give an overall picture of [Nomura's] DD process."); RBS Ex. 43 (RBS-FHFA-SDNY-0171295, email from Nomura to Adam Smith) at RBS-FHFA-SDNY-0171295-341 (providing information on Nomura's diligence process); RBS Ex. 23 (RBS-FHFA-SDNY-0622262, email Chain Discussing NHELI 2006-FM2 Due Diligence,) at RBS-FHFA-SDNY-0622262-63 (discussing Nomura's loan-level due diligence on NHELI 2006-FM2).  Additionally, in conducting its own loan-level due diligence, it would not be customary for RBSSI to seek the issuer's "acquisition diligence" results.  *See* FHFA Ex. 60 (Grice RBSSI Report) at ¶ 66 ("RBS[SI] performed and/or reviewed reasonable and sufficient due diligence .  .  .  commensurate with its role as the lead underwriter and consistent with prevailing industry practices during the Relevant Period.").

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  The cited evidence

relating to Nomura's due diligence on the loan pools that contributed to NHELI 2007-1

fails to directly contravene the asserted fact that Nomura was unable to locate a due diligence summary for the NHELI 2007-1 Securitization and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to Nomura sending RBSSI a summary spreadsheet of the due diligence performed on the loans underlying the NHELI 2007-AF1 loan group is irrelevant to the asserted fact because the NHELI 2007-AF1 loan group was did not underlie the relevant SLG of the NHELI 2007-1 Securitization, *see* FHFA Ex. 60 (Grice RBSSI Report) at n. 51 ("The fixed rate group was diligenced under the project name NHELI 2007-AF1 and the adjustable rate group was diligenced separately under the project name NAAC 2007-AR1. The adjustable rate loans ultimately became the Group 2 loans underlying NHELI 2007-1. Freddie Mac purchased certificates backed by Group 2 loans."), and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to RBSSI's familiarity with Nomura's due diligence practices related to other Securitizations is irrelevant to the asserted fact that Nomura was unable to locate a due diligence summary for the NHELI 2007-1 Securitization and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI asserts that RBS's expert Charles Grice described RBSSI's due diligence as "commensurate with its role as the lead underwriter and consistent with prevailing industry practices during the Relevant Period," the conclusory assertions of an expert do not create a genuine dispute of fact, Part I.G, *supra*, and Mr. Grice's conclusory assertions fail to directly contravene the asserted fact and therefore do not create a genuine dispute of material fact. Part I.C, *supra*.

693. **FHFA Statement:** For the NHELI 2007-1 Securitization, RBSSI selected a sample from a pool of 1751 loans that would later be designated as "Group II." Group II was subsequently divided into two different SLGs including the Group II-1 SLG that backed the Certificate purchased by Freddie Mac. Ex. 60 (Grice RBSSI Report) ¶ 70; *id*. at n.

51; Ex. 9 (NOM-FHFA_05141912, Prospectus Supplement for NHELI 2007-1) at NOM-FHFA_05141920 ("The Group II Mortgage Loans are comprised of adjustable-rate Mortgage Loans. The Group II Mortgage Loans have been further divided into two loan subgroups, referred to herein as the 'Group II-1 Mortgage Loans' and the 'Group II-2 Mortgage Loans.'"); Ex 9 (NOM-FHFA_05141912, Prospectus Supplement for NHELI 2007-1) at NOM-FHFA_05141938 ("SUMMARY OF THE GROUP II MORTGAGE LOANS ... Mortgage Loan Count[:] 1,751"); *see also* Am. Compl. ¶ 35 (demonstrating that that Freddie Mac purchased the Group II-1 SLG).

**RBSSI Response:** RBSSI does not dispute that RBSSI selected a sample from the "NAAC 2007-AR1" pool of adjustable rate loans. RBSSI does not dispute that adjustable rate loans from this pool ultimately became the Group II loans underlying NHELI 2007-1. *See* FHFA Ex. 60 (Grice RBSSI Report) at ¶ 70 & n.51. RBSSI disputes that the preliminary "NAAC 2007-AR1" pool contained 1751 loans. *See* RBS Ex. 64 (RBS-FHFA-SDNY-0484894) (preliminary "NAA 2007-AR1" tape, listing 1750 loans). RBSSI does not dispute that Freddie Mac purchased a certificate in the II-1-A tranche of NHELI 2007-1, though RBSSI disputes that FHFA's Amended Complaint in this action is admissible or competent evidence to demonstrate Freddie Mac's actual purchase of any certificate. RBSSI does not dispute that 1,751 mortgage loans ultimately went into Group II of the NHELI 2007-1 Securitization. *See* FHFA Ex. 9 (NHELI 2007-1 Prospectus Supplement) at NOM-FHFA_05141938. RBSSI does not dispute that Group II mortgage loans were further divided into two loan subgroups, "Group II-1 Mortgage Loans" and "Group II-2 Mortgage Loans," with the only difference between the two subgroups being that the Group II-1 Mortgage Loans had principal balances at origination that conformed to Freddie Mac loan limits and the Group II-2 Mortgage Loans had principal balances at origination that may or may not have conformed to Freddie Mac loan limits. *See id.* at NOM-FHFA_05141920. RBSSI does not dispute that Class II-A-1 was supported by Group II-1 mortgage loans, but states that other groups of loans supported the Class II-A-1 certificates as well through cross-collateralization. FHFA Ex. 9 (NHELI 2007-1 Prospectus Supplement) at NOM-FHFA_05142064-069 (discussing distribution of principal regarding Group II certificates, including cross-collateralization features). In addition, RBSSI selected a sample from the "NHEL 2007-AF1" pool of fixed rate loans; certain fixed rate loans from this pool ultimately became part of the Group I loans underlying NHELI 2007-1. *See* FHFA Ex. 60 (Grice RBSSI Report) at ¶ 70 & n.51.

**FHFA Reply:** RBSSI does not dispute the asserted facts that RBSSI selected a sample from the NAAC 2007-AR1 pool of adjustable rate loans, that adjustable rate loans from this pool ultimately became the Group II loans underlying NHELI 2007-1, that Freddie Mac purchased a certificate in the II-1-A tranche of NHELI 2007-1, that 1,751 mortgage loans ultimately went into Group II of the NHELI 2007-1 Securitization, that Group II mortgage loans were further divided into two loan subgroups, "Group II-1 Mortgage

479

Loans" and "Group II-2 Mortgage Loans," or that Class II-A-1 was supported by Group

II-1 mortgage loans.  While Defendants dispute that the preliminary NAAC 2007-AR1

pool contained 1,751 loans, any dispute about whether the preliminary pool contained

1,751 loans or 1,750 loans is not material to FHFA's motion.  *Quarles*, 758 F.2d at 840.

The cited evidence relating to the NHELI 2007-AF1 pool that ultimately became part of

the Group I loans underlying NHELI 2007-1 is irrelevant to the asserted facts regarding

the NAAC 2007-AR1 pool that ultimately became the Group II loans underlying NHELI

2007-1 and therefore does not create a genuine dispute of material fact.  Part I.C, *supra*.

While it is undisputed that "other groups of loans supported the Class II-A-1 [*sic*]

certificates as well through cross-collateralization," the Class II-1-A certificates were

primarily backed by Group II-1 mortgage loans.  *See* FHFA Ex. 9 (NHELI 2007-1

Prospectus Supplement) at NOM-FHFA_05141921 ("The Class II-1-A Certificates

(sometimes referred to herein as the 'Group II-1 Senior Certificates'), will represent

senior interests in the Group II-1 Mortgage Loans").  The cited evidence relating to cross-

collateralization therefore fails to directly contravene the asserted fact that "the Group II-

1 SLG … backed the Certificate purchased by Freddie Mac" and does not create a

genuine dispute of material fact.  Part I.C, *supra*.  While Defendants "dispute[] that

FHFA's Amended Complaint in this action is admissible or competent evidence,"

RBSSI's argument does not create a genuine dispute of material fact.  Part I.A, *supra*.

694.    **FHFA Statement:**  RBSSI drew a 25.8% sample from a whole loan pool it acquired
        from FirstNLC in September 2006.  *Compare* Ex. 441 (RBS-FHFA-SDNY- _0420392,
        FirstNLC Financial Services Whole Loan Purchase September 2006) at RBS-FHFA-
        SDNY-0420392 (showing that the review consisted of 571 loans) *with* Ex. 521 (RBS-
        FHFA-CT-4490775, FNLC 9/28/2006 settlement) at RBS-FHFA-CT-4490775 (showing
        of a total of 2213 loans in the pool).  RBSSI drew a 28.1% sample from another
        FirstNLC pool it bought in October 2006.  *Compare* Ex. 522 (RBS-FHFA-SDNY-
        0396016, email re FirstNLC Whole Loan Trade October 2006) at RBS-FHFA-SDNY-

0396016-17 (credit and compliance diligence performed on 594 loans) *with* Ex. 523 (RBS-FHFA-SDNY-0398918, RBC Greenwich Capital FNLC October buy balances) at RBS-FHFA-SDNY-0398918 (showing a total of 2112 loans in the pool).

**RBSSI Response:** RBSSI states that the First NLC pool referenced in ¶ 694 is not at issue in this litigation, and that the facts and/or circumstances regarding the sample pulled from that pool is not a "material fact" in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that FHFA Ex. 441 indicates that the sample selected for First NLC Financial Services Whole Loan Purchase September 2006 consisted of 575 loans, 571 of which were ultimately reviewed. FHFA Ex. 441 also states the review of First NLC loans found "1 exception (.2%) in the semi-random sample and 9 exceptions (1.7%) across all adverse samples. This percentage is better than [RBSSI] normally see[s] for sub-prime originations." FHFA Ex. 441 (FirstNLC Financial Services Whole Loan Purchase September 2006) at RBS-FHFA-SDNY-0420392. RBSSI does not dispute that FHFA Ex. 521 lists 2213 loans. RBSSI does not dispute that FHFA Ex. 522 indicates that the sample selected for the First NLC Whole Loan Trade October 2006 review consisted of 600 loans. FHFA Ex. 552 also states the review of First NLC loans resulted in just "1 exception (.2%) in the semi-random sample and 26 exceptions (4.4%) across all samples. This percentage is better than [RBS] normally see[s] for sub-prime originations." FHFA Ex. 552 (FirstNLC Financial Services Whole Loan Purchase October 2006) at RBS- FHFA-SDNY-0396016. RBSSI does not dispute that FHFA Ex. 523 describes a pool of 2112 loans.

**FHFA Reply:** RBSSI does not dispute the asserted fact. The cited evidence relating to the exception rate of each First NLC loan pool is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants argue that "the First NLC pool referenced in ¶ 694 is not at issue in this litigation, and that the facts and/or circumstances regarding the sample pulled from that pool is not a 'material fact' in this litigation under Local Rule 56.1 or otherwise to which a response is required," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

695. **FHFA Statement:** RBS drew a 27.7% sample from an Equifirst pool in July 2006. Ex. 443 (RBS-FHFA-SDNY-0396864, Equifirst 2006-1 Diligence Summary of July Delivery) at RBS-FHFA-SDNY-0396864 (showing RBS reviewed 1831 loans out of a total pool of 6512 loans).

481

**RBSSI Response:** RBSSI states that the Equifirst pool referenced in ¶ 695 is not at issue in this litigation, and that the facts and/or circumstances regarding the sample pulled from that pool are not "material facts" in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that FHFA Ex. 443 cited in ¶ 695 indicates that Clayton "[r]eviewed a total of 1831 loans from the total pool of 6512 loans" from the Equifirst 2006-1 July delivery, except notes that the second tab of the spreadsheet, which is "the full list of loans that Clayton performed diligence on" lists 1798 loans. FHFA Ex. 443 (Equifirst 2006-06 – Event Status – Detail) at RBS-FHFA-SDNY-0396864, Tab 2. Additionally, RBSSI states that FHFA Ex. 443 provides that this Equifirst pool had just 1.3% in value kicks (44 loans kicked out of 3318 loans), 1.1% in credit kicks (21 loans kicked out of 1831 loans reviewed), and 2.3% in compliance kicks (43 loans kicked out of 1831 loans reviewed). *Id.* at Tab 1 (Summary of Diligence).

**FHFA Reply:** RBSSI does not dispute the asserted fact. The cited evidence relating to the exception rates of the Equifirst loan pool is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Undisputed that the second tab of FHFA Ex. 443 lists only 1,798 loans as having actually been reviewed by Clayton. While Defendants argue that "the Equifirst pool referenced in ¶ 695 is not at issue in this litigation, and that the facts and/or circumstances regarding the sample pulled from that pool are not 'material facts' in this litigation under Local Rule 56.1 or otherwise to which a response is required," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

696. **FHFA Statement:** Mr. Farrell did not know what it meant to extrapolate the results of a sample to a larger population. Ex. 383 (Deposition of Brian Farrell) at 548:12-549:13 ("Q. Do you know what it means to extrapolate the results of a sample to a larger population? ... A. Not specifically, no. Q. Did you in your work ever seek to extrapolate the results of diligence on a sample to a larger population? ... A. What I would do is I would take a look at the way my loans were sampled and what exceptions may have fell into those categories and then I would have analyze[d] those specific exceptions. Q. Does that mean that you did not endeavor to extrapolate the results of the diligence that you performed to the larger populations? ... A. I think I told you that I wasn't a hundred percent sure what extrapolate the sample meant. So how can I answer that any other way?").

**RBSSI Response:** RBSSI does not dispute that the testimony of Mr. Farrell cited in FHFA Ex. 383 includes the language quoted by FHFA, but states that other portions of Mr. Farrell's testimony, and the testimony of other deponents, contain additional information that provides necessary context for his statement. Mr. Farrell testified that while he was not familiar with the word "extrapolate", it was his practice and purpose to select loan file diligence samples in a manner that would allow him to "get a better understanding" of the broader pool from which the sample was selected. RBS Ex. 5 (Deposition of Brian Farrell) at 565:7-23 ("Q. I'll ask the question again. Do you know whether or not the random, the semi-random samples that were being pulled according to that methodology permitted someone to draw conclusions about the larger loan populations from which they were drawn? ... A. All right. So I think I just answered that. So part of the sampling was to get a better understanding of the pool to assist you in making possible conclusions. Semi-random, adverse, random, however it may be pulled, would be one of the tools to assist you in that process."); *id.* at 521:9-522:14 ("Q. What is the purpose of sampling in diligence? ... A. I mean generally to get a snapshot of what the pool looks like, the total loan pool. Q. Is the idea then that you would look at a subset of loans but you'd be able to draw conclusions about the remainder? ... A. It's possible. It's going to depend on the way the sample is pulled. Q. For a sample to be useful, should it be pulled in such a way that it would permit one to draw conclusions about the remainder of the pool? ... A. I don't – I don't think you can make definitive conclusions about the rest of the pool. I think it's to give you a better understanding of what that unsampled population may look at. Again, it's going to depend on the way the sample is pulled and it's going to depend on the results of your sample diligence."). Further, Mr. Farrell testified that Mr. Whittemore "pulled a lot of [random] samples" for him, *id.* at 541:21-24, which would have been using the spreadsheet tool provided by Don Lawson that was designed to achieve a statistically significant result. RBS Ex. 6 (Deposition of James Whittemore) at 109:5-110:5. RBSSI further disputes the assertion in ¶ 696 insofar as it states or implies that it was one of Mr. Farrell's responsibilities to know "what it means to extrapolate the results of a sample to a larger population." Mr. Gallagher, RBSSI chief credit risk officer, while also not a statistician, plainly understood what extrapolation is. RBS Ex. 7 (Deposition of William Gallagher) at 230:17-232:13 ("Q. Are you familiar with a term called extrapolation? A. Generally, yes. Q. What's your understanding about what that term means? A. So extrapolation I think is trying to, you know, apply results from, you know, one, one thing or one set of data to a broader population.... Among other things. I mean you can extrapolate numbers, you can extrapolate plenty of things in mathematics, I believe. Q. So in the context here of what we're talking about, extrapolation, is it fair – would you agree that if you have a properly drawn statistically significant random sample and say half the loans had material exceptions in the sample, you could extrapolate the results to the pool and assume that half the loans in the pool from which the sample was drawn would have comparable results, is that fair? ... A. My view and understanding would be that, hypothetically speaking, that if you had 50 percent of an occurrence in a statistically significant sample, that you would expect to have that plus or minus whatever your variance or margin for error, you know, probably be plus or minus 10 percent, would be what you'd expect to see in your broader population."); *id.* at 263:3-10 ("I think the, the point of the random sample was to determine what the, you know, incidence of, or an exception rate might be

in a pool and whether or not that was something that the, you could tolerate within, within the pool and that it, it wouldn't be material to the overall pool.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence relating to Mr. Farrell's understanding of the purpose of sampling fails to directly contravene the asserted fact that "Mr. Farrell did not know what it meant to extrapolate the results of a sample to a larger population" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to Mr. Whittemore pulling random samples and Mr. Gallagher's knowledge of extrapolation is irrelevant to the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Additionally, while RBSSI disputes ¶ 696 "insofar as it states or implies that it was one of Mr. Farrell's responsibilities to know 'what it means to extrapolate the results of a sample to a larger population'," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

697.     **FHFA Statement:** When asked how a sample should be selected statistically "in order to permit you to draw conclusions about a larger population," Mr. Farrell responded, "it wasn't something I applied." Ex. 383 (Deposition of Brian Farrell) at 547:5-14 ("Q. Do you know as a matter of statistics how a sample ought to be selected in order to permit you to draw conclusions about a larger population? A. Statistically? Q. Yes. A. No, I already explained I don't -- it wasn't something I applied.").

          **RBSSI Response:** RBSSI does not dispute that the testimony of Mr. Farrell cited in FHFA Ex. 383 includes the language quoted by FHFA, but states that other portions of Mr. Farrell's testimony, and the testimony of other deponents, contains additional information that provides necessary context for his statement. As stated in RBSSI's response to ¶ 696, Mr. Farrell utilized a variety of techniques to draw loan-level due diligence samples in such a way that would allow him to "get a better understanding" of the pool of loans from which the sample was selected. RBS Ex. 5 (Deposition of Brian Farrell) at 565:7-23. The sample itself was drawn by collateral analysts and, as shown in the Declaration of Steven Bisaillon, was done randomly stratified by amount. RBS Ex. 18 (Bisaillon Decl.) at ¶¶ 6-8. This is similar to the method used by FHFA's sampling expert in this case, Dr. Charles Cowan. RBS Ex. 65 (Cowan sampling report) ¶¶ 57-60 (describing Cowan's use of stratification as part of his semi-random sampling approach). RBSSI further disputes ¶ 697 to the extent it states or implies that random samples "should be selected statistically" or that this was necessary when performing loan-level

due diligence on less than all of the population of a particular loan pool. FHFA cites no evidence that this was necessary or required.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence relating to Mr. Farrell's sampling techniques fails to directly contravene the asserted fact that Mr. Farrell testified that he did not select samples statistically in order to draw conclusions about the broader pool and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to Mr. Bisaillon's sampling techniques also fails to directly contravene the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to Dr. Cowan's sampling approach is irrelevant to the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Furthermore, RBSSI asserts that Dr. Cowan's sampling approach was "similar" to RBSSI's approach, but the cited evidence does not support the this assertion. RBS Ex. 65 at ¶¶ 57-60 shows that while Dr. Cowan stratified the loan pools before picking his sample, he stratified the pools based only on FICO score, not unpaid principal loan balance, which is how RBSSI stratified loan pools in its "semi-random" sampling approach, as reflected in RBS Ex. 18 at ¶¶ 7-8. RBSSI's statement that it "further disputes ¶ 697 to the extent it states or implies that random samples 'should be selected statistically' or that this was necessary when performing loan-level due diligence on less than all of the population of a particular loan pool" is an argument that does not create a genuine dispute of material fact. Part I.A, *supra*.

698. **FHFA Statement:** Mr. Whittemore was unaware of any testing to ensure that semi-random samples were representative of the SLGs, of any testing for the rate of defective loans in the SLGs, or of any testing to determine the quality of the loans in the SLGs. Ex. 384 (Deposition of James Whittemore) at 300:13-304:15 ("Q. Let me ask you, Mr. Whittemore. Are you familiar with the use of representativeness testing in order to verify that a randomly drawn sample is in fact representative of the population? A. No, I am not. Q. So I take it you're not aware of any testing that RBS did to ensure that its semi-random samples were in fact representative of the loan population? A. No, I am not. Q.

Do you know whether RBS ever sought to ensure that its samples were representative of the loans actually included in a given RMBS transaction? A. I do not know. Q. Do you know whether [RBS] ever tried to ensure that its samples were representative of supporting loan groups for a particular RMBS securitization? A. I do not know. Q. Is it correct that you never tested the rate of defective loans or exception loans in supporting loan groups for RMBS deals? A. I personally did not. Q. Are you aware of anyone who tested the rate of defective loans in supporting loan groups? A. I do not know. Q. If we were to look at a particular supporting loan group for an RMBS deal that closed in, say, 2007, how would we know whether any of the loans in that group were part of your adverse or random samples of acquisition pools, loan acquisition pools? A. I do not know. Q. Did RBS make any effort to track which acquisition pools would go into particular RMBS securitizations? A. I do not know. Q. If RBS didn't track how the deals were put together and how the populations related to your samples, how could you know the quality of the deals in a particular RMBS transaction? ... Of the loans in a particular RMBS transaction? Q. Let me just restate that so it's clear. Isn't it necessary for RBS to track how the deals were put together and how the populations related to your samples in order to determine the quality of the loans in a particular supporting loan group for a particular RMBS transaction? A. I do not know as it was not my, part of my responsibility. Q. You didn't regard that as part of your job? A. [I] was not told that it was. Q. Did RBS require a certain confidence level for its random samples of loans? A. I'm going to – I believe they may have because earlier today you were given the spreadsheet and I believe down at the bottom it had some, so that would be my answer is yes, I believe that they would have. Q. That's based on your review today of the spreadsheet that I handed you from Don Lawson's model? A. Yes. Q. Other than your review of the document today, do you have any other knowledge or understanding as to whether RBS required a certain confidence level with respect to its random samples? A. No, I do not.").

**RBSSI Response:** RBSSI states that ¶ 698 is entirely duplicative of ¶ 690. RBSSI incorporates by reference response to ¶ 690 as if restated herein.

**FHFA Reply:** FHFA incorporates by reference reply to ¶ 690 as if restated herein.

699. **FHFA Statement:** The two Securitizations, NHELI 2007-1 and NHELI 2007-2, included First NLC and Equifirst loans. Exs. 1 to the Cipione Decl.

**RBSSI Response:** RBSSI disputes that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure. FHFA did not timely designate Mr. Cipione as a fact or expert witness in this case, and RBSSI has not been given sufficient opportunity or time to examine Mr. Cipione concerning his work, which contains numerous errors as discussed in the Declaration of David N. Mishol submitted by the Nomura Defendants. To the extent a response is required, RBSSI does not dispute that the NHELI 2007-2 Securitization included loans from originators First NLC and Equifirst. RBSSI disputes that the NHELI 2007-1 Securitization contains loans from either originator. *See* Cipione Decl. Ex. 1 (column F, not listing First NLC or Equifirst as having originated loans for deal). RBSSI states that the at-issue supporting loan

groups underlying the NHELI 2007-2 Securitization contain 8% of Equifirst loans and 10.3% of First NLC loans. RBS Ex. 66 (Ex. 2 to FHFA Ex. 22 Grice Nomura Report). The prospectus supplements for the NHELI 2007-1 and NHELI 2007-2 Securitizations make no representations about the guidelines pursuant to which the Equifirst or First NLC loans were originated, nor do they represent compliance with those guidelines. See FHFA Exs. 9 (NHELI 2007-1 Prospectus Supplement) at NOM-FHFA_05142020-29 and 10 (NHELI 2007-2 Prospectus Supplement) at NOM-FHFA_05591412-18.

**FHFA Reply:** RBSSI does not dispute that the NHELI 2007-2 Securitization included

First NLC and Equifirst loans. Undisputed that the NHELI 2007-1 Securitization did not

include any First NLC or Equifirst loans. Undisputed that 8% of the loans in the at-issue

supporting loan groups underlying the NHELI 2007-2 Securitization were Equifirst loans,

though it is not supported by RBS Ex. 66, which shows due diligence performed on loan

pools contributing to various other Securitizations. *See* Ex. 1 to the Cipione Decl.

(showing that 241 out of 3,001 loans, or 8.03% of the NHELI 2007-2 SLG, were from

Equifirst) (filter Column A for "Equifirst SP01," "Equifirst SP02" and "Equifirst SP03"

and see results in Column G ("4," "96," and "141," respectively). RBS Ex. 66 also does

not support Defendants' statement that 10.3% of the loans in the at-issue supporting loan

groups underlying the NHELI 2007-2 Securitization were First NLC loans. FHFA states

that 10.4% of the loans in the at-issue supporting loan groups underlying the NHELI

2007-2 Securitization were First NLC loans, *see* Ex. 1 to the Cipione Decl. (showing that

312 loans out of 3,001 loans, or 10.40% of the NHELI 2007-2 SLG, were from First

NLC) (filter column A for "FNLC SP01," "First NLC SP02," and "First NLC SP03" and

see results in Column G "2," "1," and "309," respectively), but any such dispute is not

material to FHFA's motion, *Quarles*, 758 F.2d at 840. The cited evidence relating to

Prospectus Supplement representations regarding Equifirst and First NLC underwriting

guidelines is irrelevant to the asserted fact and does not create a genuine dispute of

material fact. Part I.C, *supra*. While Defendants "dispute[] that the Declaration of

Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

700. **FHFA Statement:** Mr. Farrell selected the due diligence samples for the fixed and adjustable rate pools underlying NHELI 2007-1. Ex. 444 (RBS-FHFA-SDNY-0468384, email FW: Nomura January 2007 Transactions) at RBS-FHFA-SDNY-0468384 ("Take a look at the attached. I pulled samples of 250 loans each for the first 2 trades. This one is crap.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 700.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

701. **FHFA Statement:** Mr. Farrell initially selected 250 loans as the sample for NAAC 2007-AR1. Ex. 444 (RBS-FHFA-SDNY-0468384, email FW: Nomura January 2007 Transactions) at RBS-FHFA-SDNY-0468384 ("Take a look at the attached. I pulled samples of 250 loans each for the first 2 trades. This one is crap.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 701.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

702. **FHFA Statement:** Following a discussion with Adam Smith, this sample was reduced to 102 loans "because Nomura did not have imaged files for all the loans in [the] original samples" chosen by RBS. Ex. 445 (RBS-FHFA-SDNY-0462953, email from Dana Pasternak to Brian Farrell regarding Greenwich/Nomura Reviews) at RBS-FHFA-SDNY-0462953 ("Ok, here are revised files for Nomura HE1, AF1 fixed rate, and AF1 adjustable rate (aka AR1). Because Nomura did not have imaged files for all the loans in my original samples, the samples have been reduced to 308 HE1 loans, 234 AF1 loans, and 102 AR1 loans."); Ex. 446 (RBS-FHFA-SDNY-0400473, email from Timothy Crowley to Dana Pasternak regarding NHEL 2007-HE1 (pull list) at RBS-FHFA-SDNY-0400473 ("Please note, and as we discussed with Adam, files for which images are not available have been removed from your diligence sample.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 702 to the extent it states or implies that RBSSI determined to reduce the size of the sample from the NAAC 2007-AR1 pool. FHFA Ex. 446 states that loans were removed from the sample "for which images are not available." Mr. Farrell testified that it was not "uncommon" for sample sizes to be reduced "if you have regular practice with a specific lender, there's been no changes to product, etc., and you have a good experience with the counterparty." RBS Ex. 5 (Deposition of Brian Farrell) at 616:19-618:16. RBSSI also conducted loan-level due diligence on 233 other loans from another pool backing the NHELI 2007-1 Securitization. FHFA Ex. 60 (Grice RBSSI Report) at ¶ 70. The loan-level due diligence results for the NHELI 2007-AF1 sample underlying the NHELI 2007-1 Securitization

showed "an exception rate of .8% with compliance issues and no credit issues." RBS Ex. 67 (RBS-FHFA-SDNY-0487366, NHEL 2007-AF1 Clayton Due Diligence Summary) at RBS-FHFA-SDNY-0487366-67. The diligence results for the NAAC 2007-AR1 sample also showed "an exception rate of .8% with compliance issues and no credit issues." FHFA Ex. 448 (NAAC 2007-AR1 Clayton Due Diligence Summary) at RBS-FHFA-CT-0487363-64. Clayton reported that the few number of exceptions in both samples "d[id] not suggest a pattern of imprudent lending practices." *Id.*

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence relating to due diligence performed on the NHEL 2007-AF1 pool, which did not contribute loans to the at-issue SLG; the cited evidence relating to whether and why it was not uncommon to reduce sample size; and the cited evidence relating to the diligences results for the NAAC 2007-AR1 pool is irrelevant to the asserted fact that RBSSI reduced the sample size of the NAAC 2007-AR1 pool and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Defendants state that they dispute the asserted fact "to the extent it states or implies that RBSSI determined to reduce the size of the sample from the NAAC 2007-AR1 pool," but they do not dispute the asserted fact in ¶ 701 that RBSSI initially chose a sample size of 250 loans from that loan pool, and they do not dispute that RBSSI reduced that sample size to 102 loans.

703. **FHFA Statement:** The final loan sample for NHELI 2007-1 consisted of 102 loans. Ex. 447 (RBS-FHFA-SDNY-0485153, Clayton Event Status – Detail Report for NAAC 2007-AR1) at RBS-FHFA-SDNY-0485153 (showing 102 total loans reviewed); *see also* Ex. 60 (Grice RBSSI Report) at n. 51 ("The fixed rate group was diligenced under the project name NHELI 2007-AF1 and the adjustable rate group was diligenced separately under the project name NAAC 2007-AR1. The adjustable rate loans ultimately became the Group 2 loans underlying NHELI 2007-1. Freddie Mac purchased certificates backed by Group 2 loans.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 703. The final loan-level due diligence sample for the NAAC 2007-AR1 pool was 102 loans. A second diligence sample was selected for a pool of loans known as "NHEL 2007-AF1." The final loan-level sample for that pool was 233 loans. FHFA Ex. 60 (Grice RBSSI Report) at ¶ 70. The diligence results for the NHELI 2007-AF1 sample underlying the NHELI 2007-1 securitization showed "an exception rate of .8% with compliance issues and no credit issues." RBS Ex. 67 (RBS-FHFA-SDNY-0487366, NHEL 2007-AF1 Clayton Due Diligence Summary) at RBS-FHFA-SDNY-0487366-67. The diligence results for the

NAAC 2007-AR1 sample also showed "an exception rate of .8% with compliance issues and no credit issues." FHFA Ex. 448 (NAAC 2007-AR1 Clayton Due Diligence Summary) at RBS-FHFA-SDNY-0487363-64. Clayton reported that the few number of exceptions in both samples "d[id] not suggest a pattern of imprudent lending practices." *Id.*

**FHFA Reply:** RBSSI does not genuinely dispute that the final loan-level due diligence sample for the NAAC 2007-AR1 pool, which later became the Group II loans underlying the at-issue SLG in NHELI 2007-1, consisted of 102 loans. The cited evidence relating to the exception rate of the NHEL 2007-AF1 pool—which did not contribute loans to the at-issue SLG—and the exception rate for the NAAC 2007-AR1 pool is irrelevant to the asserted fact regarding the at-issue SLG and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

704. **FHFA Statement:** The final sample for NHELI 2007-1 included less than 6% of the total number of loans securitized in Group II in NHELI 2007-1. Ex. 9 (NOM-FHFA_05141912, Prospectus Supplement for NHELI 2007-1) at NOM-FHFA_05141938 (showing total number of loans in Group II as 1,751). For the relevant SLG, Group II-1, only 19 loans out of 474 loans, or 4% of the total number of loans in Group II-1, were subject to credit and compliance due diligence. See Ex. 7 of the Cipione Decl.

**RBSSI Response:** RBSSI disputes that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure. FHFA did not timely designate Mr. Cipione as a fact or expert witness in this case, and RBSSI has not been given sufficient opportunity or time to examine Mr. Cipione concerning his work, which contains numerous errors as discussed in the Declaration of David N. Mishol submitted by the Nomura Defendants. To the extent a response is required, RBSSI states that combined, its diligence sample for the entire securitization of 335 loans accounted for approximately 9.6% of the ultimate loan pool. FHFA Ex. 60 (Grice RBSSI Report) at ¶ 70.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence relating to the diligence sample size for the entire securitization fails to directly contravene the asserted fact that less than 6% of the loans securitized in Group II and 4% of the loans securitized in Group II-1 were subject to credit and compliance due diligence and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While

Defendants "dispute[] that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

705. **FHFA Statement:** For the NHELI 2007-1 Securitization, 174 loans were selected adversely and 76 loans were selected on a semi-random basis. Ex. 524 (RBS-FHFA-SDNY-0197500) at RBS-FHFA-SDNY-0197502 (column BQ listing sample with reason for selection as SR for semi-random); *see also* Ex. 525 (RBS-FHFA-SDNY-0487282, email regarding nheli07-he1_Greenwich_termsheet) at RBS-FHFA-SDNY-0487282 ("For the due diligence file, samples are labeled separately in the second to last column as follows:... Semi-random: SR").

    **RBSSI Response:** RBSSI disputes the assertion in ¶ 705. The initial sample selected from the NAAC 2007-AR1 pool contained 174 adversely selected loans and 76 randomly selected loans. The initial sample selected from the NHEL 2007-AF1 pool, which also contained loans that were securitized in the NHELI 2007-1 Securitization, contained at least 82 randomly selected loans and 151 adversely selected loans. FHFA Ex. 60 (Grice RBSSI Report) at ¶ 70.

    **FHFA Reply:** RBSSI does not genuinely dispute the asserted fact that 174 loans in the NAAC 2007-AR1 pool, which later became the Group II loans underlying the at-issue SLG in NHELI 2007-1 were selected adversely; and 76 loans in the NAAC 2007-AR1 pool, which later became the Group II loans underlying the at-issue SLG in NHELI 2007-1 in the NHELI 2007-1 were selected on a semi-random basis. The cited evidence relating to the exception rates of the NHEL 2007-AF1 pool, which did not contribute loans to the at-issue SLG, is irrelevant to the at-issue SLG and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

706. **FHFA Statement:** RBSSI's "semi-random" sampling would "skew [the] random sample to a higher balanced loan." Ex. 384 (Deposition of James Whittemore) at 148:14-23 ("Q. Why was it called semi-random instead of just random? A. As verbally explained to me from Don [Lawson] was that after these random was given, there were additional, and I can't -- I don't know how -- what word to use, that said we want to skew this random sample to a higher balanced loan. That's all I can tell you about why semi-random versus random.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 706 as it mischaracterizes the cited evidence. Mr. Whittemore, who testified in his individual capacity and not on RBSSI's behalf, stated that he was using the term "skewed" because he "d[id]n't know how – what word to use," and that the semi-random methodology was developed by Don Lawson and "verbally explained to me." RBS Ex. 6 (Deposition of James Whittemore) at 148:14-23. Under RBSSI's semi-random methodology, RBSSI credit personnel would select a sample size that would allow them, in their professional judgment, to get a better understanding of the pool from which the sample was taken. RBS Ex. 5 (Deposition of Brian Farrell) at 565:7-23. To populate the actual sample, the population of loans in the pool would be stratified according to unpaid loan balance. RBS Ex. 18 (Bisaillon Decl.) at ¶ 7; FHFA Ex. 413 ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████ The number of loans selected from each stratification band to populate the sample was based on each stratification band's unpaid principal balance as a percentage of the total pool's unpaid principal balance. RBS Ex. 18 (Bisaillon Decl.) at ¶ 8. Within each stratification band, loans would be selected randomly. *Id.* at ¶ 7. The actual stratification of the loans and performing the manual function of randomly selected loans from each stratification band was done by RBSSI's collateral analysts at the instruction of RBSSI credit personnel. *Id.* at ¶¶ 4, 6; RBS Ex. 16 (*Harborview* Deposition of Brian Farrell) at 229:6-231:5 (explaining that after the size of the sample was determined that he would instruct collateral analysts to populate the sample using the semi-random methodology). Rather than "skewing" the loan-level due diligence sample, this methodology ensured the review of an adequate number of large balance loans to give RBSSI a better sense of the pool characteristics and risks. RBS Ex. 18 (Bisaillon Decl.) at ¶ 9; FHFA Ex. 413 ██████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████ FHFA Ex. 449 (Deposition of Frank Camacho) at 212:5-10 ("The way the -the way the semi-random sample was -- was explained to me was that there was a modification to it that -- that kept, yeah, it's very -- very large loan amounts and very slow -- a very low loan amounts from distorting the sample."). Notably, the stratification methods used by RBS are similar to the stratification methodology employed by Plaintiff's expert Dr. Cowan, a methodology for which the Court rejected a *Daubert* challenge by RBS and other Defendants. RBS Ex. 65 (Cowan sampling report) at ¶¶ 57-60 (describing Cowan's use of stratification as part of his semi-random sampling approach).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. The cited evidence relating to RBSSI's semi-random sampling methodology fails to directly contravene the asserted

fact—in fact, it supports the stated fact that the semi-random methodology skewed due

diligence towards higher balance loans—and therefore does not create a genuine dispute

of material fact. Part I.C, *supra*. The cited evidence relating to FHFA's expert Dr.

Cowan misrepresents his sampling methodology, *see* FHFA Reply to ¶ 697, *supra*, and is

irrelevant to the asserted fact, and therefore does not create a genuine dispute of material

fact. Part I.C, *supra*. Additionally, RBSSI asserts that "[u]nder RBSSI's semi-random

methodology, RBSSI credit personnel would select a sample size that would allow them,

in their professional judgment, to get a better understanding of the pool from which the

sample was taken," but this assertion is not supported by RBS Ex. 5 at 565:7-23, which

relates to sampling generally, not RBSSI's semi-random methodology in particular.

707. **FHFA Statement:** Semi-random sampling was explained to Mr. Camacho as a "modification" of the pool based on loan balance. Ex. 449 (Deposition of Frank Camacho) at 212:5-10 ("The way the --the way the semi-random sample was -- was explained to me was that there was a modification to it that -- that kept, yeah, it's very --¬very large loan amounts and very slow -- a very low loan amounts from distorting the sample.").

**RBSSI Response:** RBSSI states that Mr. Camacho had no involvement in the Nomura Securitizations and the facts and/or circumstances regarding what some unidentified person or entity told him about "semi-random sampling" is not a "material fact" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI does not dispute that the testimony of Mr. Camacho cited in FHFA Ex. 449 includes the language quoted by FHFA, but states that other portions of Mr. Camacho's testimony, and the testimony of other deponents, contains additional information that provides necessary context for his statement. As stated in RBSSI's response to ¶ 706, RBSSI's semi-random sampling methodology was developed over several years based on the experience and judgment of RBSSI credit personnel, including RBSSI chief underwriter Don Lawson, to select samples that allowed RBSSI to focus on those loans which represented the greater portion of the pool by loan balance, so as to get a better picture of the pool characteristics and risks. RBS Ex. 18 (Bisaillon Decl.) at ¶¶ 4-9.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. FHFA incorporates

by reference its reply to ¶ 706 as if restated herein. The cited evidence relating to

RBSSI's semi-random sampling methodology fails to directly contravene the asserted

fact and therefore does not create a genuine dispute of material fact.  Part I.C, *supra*.

While Defendants argue that **"**Mr. Camacho had no involvement in the Nomura

Securitizations and the facts and/or circumstances regarding what some unidentified

person or entity told him about 'semi-random sampling' is not a 'material fact' at issue in

this litigation under Local Rule 56.1 or otherwise to which a response is required," RBS's

argument does not create a genuine dispute of material fact.  Part I.A, *supra*.  Further,

RBSSI identifies no evidence in support of the argument that Mr. Camacho did not work

on the Nomura Securitizations (and in fact cites to Mr. Camacho's testimony in its

Counterstatement of Material Facts), RBSSI's conclusory assertions do not create a

genuine dispute of material fact.  Part I.B, *supra*.

708.    **FHFA Statement:**  Mr. Gallagher believed that semi-random sampling was a

                        between large and small balance loans.  Ex. 413

**RBSSI Response:**  RBSSI states that what Mr. Gallagher "believed" RBSSI's sampling methodology to be does not constitute a "material fact" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required.  To the extent a response is required, RBSSI does not dispute that the testimony of Mr. Gallagher cited in FHFA Ex. 413 includes the language quoted by FHFA, but states that other portions of Mr. Gallagher's testimony, and the testimony of other deponents, contains additional information that provides necessary context for his statement.  As stated in RBSSI's response to ¶¶ 706 and 707, RBSSI's semi-random sampling methodology, developed over several years and based on the experience and judgment of RBSSI credit personnel, was designed to select samples that allowed RBSSI to focus on those loans which represented the greater portion of the pool by loan balance, so as to get a better picture of the pool characteristics and risks.  RBS Ex. 18 (Bisaillon Decl.) at ¶¶ 4-9.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  The cited evidence

relating to RBSSI's semi-random sampling methodology fails to directly contravene the

asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants argue that **"what Mr. Gallagher 'believed' RBSSI's sampling methodology to be does not constitute a 'material fact' at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

709. **FHFA Statement:** Within Group II of the NHELI 2007-1 Securitization, 19 loans from the SLG were part of the diligence sample. Of those, 7 were part of the semi-random sample. Ex. 8 to the Cipione Decl.

**RBSSI Response:** RBSSI disputes that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure. FHFA did not timely designate Mr. Cipione as a fact or expert witness in this case, and RBSSI has not been given sufficient opportunity or time to examine Mr. Cipione concerning his work, which contains numerous errors as discussed in the Declaration of David N. Mishol submitted by the Nomura Defendants. To the extent a response is required, RBSSI states that combined, its due diligence sample for the entire securitization of 335 loans accounted for approximately 9.6% of the ultimate loan pool. FHFA Ex. 60 (Grice RBSSI Report) at ¶ 70.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence relating to the due diligence sample for the entire securitization fails to directly contravene the asserted fact relating to the at-issue SLG and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants "dispute[] that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

710. **FHFA Statement:** Mr. Camacho did not extrapolate results of semi-random sampling and was not aware of any such analysis being done. Ex. 449 (Deposition of Frank Camacho) at 211:15-24 ("Q. Based upon your review of a semi random [sample of] loans in a pool, would you extrapolate those results to the rest of the pool? A. I would not. Q. Is there anyone at RBS that you're aware of that would extrapolate from your

semirandom sample, the due diligence results, would extrapolate it to the rest of the pool? A. I'm not aware of that sort of analysis being done.").

**RBSSI Response:** RBSSI states that Mr. Camacho had no involvement in any of the Nomura Securitizations and the facts and/or circumstances regarding Mr. Camacho's beliefs regarding extrapolation in loan pools not at issue in this case are not a "material fact" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI does not dispute that the testimony of Mr. Camacho cited in FHFA Ex. 449 includes the language quoted by FHFA, but states that other portions of Mr. Camacho's testimony, and the testimony of other deponents, contains additional information that provides necessary context for his statement. Mr. Camacho and others at RBSSI wrote reports summarizing the loan-level due diligence results on particular samples and, drawing on those results, often included comments regarding the entire pool. *See* RBS Ex. 69 (RBS-FHFA-CT-0449949, April 26, 2006 due diligence report regarding an Option One whole loan sale) at RBS-FHFA-CT-0449951 (noting under "Conclusions" that "we found pool-level risk to be commensurate with the subprime market, and expect the pool to perform similar to prior Option One pools"); RBS Ex. 70 (RBS-FHFA-CT-2676664, September 27, 2005 due diligence report regarding an Option One Securitization).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence relating to due diligence reports on loan pools that are not at issue in this litigation fails to directly contravene the asserted fact that Mr. Camacho did not extrapolate the results of the semi-random sampling and was not aware of anyone else doing so and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Defendants assertion that Mr. Camacho and others at RBSSI wrote reports summarizing the loan-level due diligence results on particular samples, and "drawing on those results, often included comments regarding the entire pool" is irrelevant to the asserted fact regarding extrapolation as the cited evidence reflects broad statements about the quality of a loan pool overall, rather than an extrapolation and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants argue that "the facts and/or circumstances regarding Mr. Camacho's beliefs regarding extrapolation in loan pools not at issue in this case are not a 'material fact' at issue in this litigation under Local Rule

496

56.1," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

(ii)  NHELI 2007-2

711.  **FHFA Statement:** During due diligence and prior to closing, NHELI 2007-2 was known as the "NHEL 2007-HE1." Ex. 60 (Grice RBSSI Report) ¶ 75 n.67.

**RBSSI Response:** RBSSI does not dispute that the NHELI 2007-2 Securitization was at one point referred to as the NHELI 2007-HE1 securitization. RBSSI partially disputes FHFA's statement that NHELI 2007-2 was known as NHEL 2007-HE1 "[d]uring due diligence," a time period which FHFA does not define.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI

"partially disputes" that NHELI 2007-2 was known as NHEL 2007-HE1 during due

diligence, RBS's own expert, Mr. Grice notes, in due diligence updates from Clayton,

NHELI 2007-2 was "then known as 'NHEL[ 2007]-HE1.'" FHFA Ex. 60 (Grice RBSSI

Report) ¶ 75 n.67.

712.  **FHFA Statement:** For the NHELI 2007 2 Securitization, Nomura Securities sent RBSSI only a high-level diligence summary which listed (i) the aggregated diligence results from all the Acquisition Pools that contributed loans to the deal; and (ii) the number of loans kicked out of those Pools for the top two originators to the deal—First NLC and Ownit. Ex. 139 (NOM-FHFA_04921689, NHELI 2007-HE1 Due Diligence Summary) at NOM-FHFA_04921689 ("Statistics on All Trades Contributing to NHELI 2007-HE1").

**RBSSI Response:** RBSSI does not dispute that RBSSI received the document identified in FHFA Ex. 139. *See* RBS Ex. 71 (RBS-FHFA-SDNY-0622574, cover email to FHFA Ex. 139). RBSSI also does not dispute that FHFA Ex. 139 includes certain loan-level due diligence information on all loan pools from which loans were sourced into the NHELI 2007-2 Securitization, including pools of loans from originators First NLC and Ownit. RBSSI states that FHFA's characterization that FHFA Ex. 139 presents "only a high-level diligence summary" is argumentative and is an improper legal conclusion that should be stricken. To the extent a response is required, RBSSI disputes FHFA's characterization of FHFA Ex. 139 and states that the document speaks for itself. RBSSI further states that on its face, FHFA Ex. 139 provided significant information regarding the due diligence that had been conducted by Nomura Securities and reflected that overall, the pools of loans that went into the NHELI 2007-2 Securitization were generally originated in accordance with applicable guidelines from a credit, compliance, and valuation perspective. FHFA Ex. 139 (NHELI 2007-HE1 due diligence summary) at NOM-FHFA

04921689 (providing detailed information regarding what loans had been declined in the First NLC and Ownit pools, and for what specific reason, *e.g.*, "Credit," "Compliance," or "Property"). In addition to the purchase-related due diligence information provided by Nomura Securities in FHFA Ex. 139, RBSSI also had knowledge from prior transactions as to Nomura Securities' mortgage loan securitization practices, including but not limited to how Nomura Securities conducted its due diligence. *See* RBSSI's responses to ¶ 669, 675, and 678 (which RBSSI incorporates by reference as if restated herein). *See also* FHFA Ex. 60 (Grice RBSSI Report) at ¶¶ 100-07 (explaining that RBSSI's diligence was informed by Nomura's due diligence and Nomura as a credit-worthy counterparty).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence relating to the quality of the loan pools that contributed to NHELI 2007-2 and RBSSI's knowledge of Nomura's due diligence practices is irrelevant to the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI argues that "FHFA's characterization that FHFA Ex. 139 presents 'only a high-level diligence summary' is argumentative and is an improper legal conclusion that should be stricken," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

713. **FHFA Statement:** The summary charts do not contain (i) the diligence results for the loans in the NHELI 2007-1 Securitization or its SLGs; (ii) the number of kicked out loans for the originators that made the 43% of loans in the Pool not made by First NLC or Ownit; (iii) which loans had been graded EV1, EV2, or EV3; or (iv) the compensating factors for any loans graded as EV2. Ex. 139 (NOM-FHFA_04921689, NHELI 2007-HE1 Due Diligence Summary) at NOM-FHFA_04921689 ("Statistics on All Trades Contributing to NHELI 2007-HE1"). There is no evidence that RBSSI ever received or reviewed the results of the diligence that Nomura Securities performed on the Acquisition Pools that contributed loans to the SLGs of the NHELI 2007-1 Securitization.

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 139, which on its face relates to pools of loans from which loans were sourced into the NHELI 2007-2 Securitization, does not contain information on other loan pools. FHFA cites no evidence in ¶ 713 that the acquisition pools referred to in Ex. 139 do not contain loans that were sourced into the NHELI 2007-1 Securitization and its assertion to the contrary is argumentative and an improper legal conclusion that should be stricken. RBSSI disputes FHFA's statement that FHFA Ex. 139 does not contain "the number of kicked out loans for the originators that made the 43% of loans in the Pool not made by First NLC or Ownit." FHFA Ex. 139 identifies the number of loans kicked out from all pools for "Credit," "Compliance," and "Property" reasons and, therefore, necessarily includes "the number of kicked out loans for the originators that made the 43% of loans in the Pool not made by First NLC or

Ownit." RBSSI does not dispute that Ex. 139 does not identify which loans had been graded EV1, EV2 or EV3, however, RBSSI disputes FHFA's statement that Ex. 139 does not contain "the compensating factors for any loans graded as EV2" as argumentative and without proper factual support. Loans that were graded EV2 by Clayton and other due diligence vendors included loans that had immaterial exceptions and were within originators' stated guidelines, which contemplated such exceptions. RBS Ex. 5 (Deposition of Brian Farrell) at 44:12-44:23 ("An event 2 is an loan that may have had a minor or informational issue, but was deemed nonmaterial. It could be due to compensating factors why it was graded an event 2. Perhaps it's not. It could be just an event 2 because it's an event 2.").

RBSSI further states that on its face, FHFA Ex. 139 provided significant information regarding the due diligence that had been conducted by Nomura Securities and reflected that overall, the pools of loans that went into the NHELI 2007-2 Securitization were generally originated in accordance with applicable guidelines from a credit, compliance, and valuation perspective. FHFA Ex. 139 (NHELI 2007-HE1 due diligence summary) at NOM-FHFA_04921689 (providing detailed information regarding what loans had been declined in the First NLC and Ownit pools, and for what specific reason, e.g., "Credit," "Compliance," or "Property"). In addition to the purchase-related diligence information provided by Nomura Securities in FHFA Ex. 139, RBSSI also had knowledge from prior transactions as to Nomura Securities' mortgage loan securitization practices, including but not limited to how Nomura Securities conducted its due diligence. *See* RBSSI's responses to ¶ 669, 675, and 678 (which RBSSI incorporates by reference as if restated herein). *See also* FHFA Ex. 60 (Grice RBSSI Report) at ¶¶ 100-07 (explaining that RBSSI's diligence was informed by Nomura's due diligence and Nomura as a credit-worthy counterparty).

**FHFA Reply:** RBSSI does not genuinely dispute a material fact. Undisputed that FHFA Ex. 139 relates the pools of loans sourced into the NHELI 2007-2 Securitization. RBSSI does not genuinely dispute the asserted facts that "[t]he summary charts do not contain (i) the diligence results for the loans in the NHELI 2007-1 Securitization or its SLGs; (ii) the number of kicked out loans for the originators that made the 43% of loans in the Pool not made by First NLC or Ownit; (iii) which loans had been graded EV1, EV2, or EV3; or (iv) the compensating factors for any loans graded as EV2." The cited evidence relating to the definition of an Event 2 loan, the quality of the loan pools that contributed to NHELI 2007-2, and RBSSI's knowledge of Nomura's due diligence practices is irrelevant to the asserted fact and therefore does not create a genuine dispute of material

fact.  Part I.C, *supra*.  While RBSSI argues that the asserted facts that the summary charts

do not contain the diligence results for the loans in NHELI 2007-1 or the compensating

factors for loans graded as EV2 are "argumentative" and/or constitute an "improper legal

conclusion that should be stricken," their argument does not create a genuine dispute of

material fact, Part I.A, *supra*, and they identify no evidence that contradicts the asserted

fact.  RBSSI's conclusory assertions do not create a genuine dispute of material fact.  Part

I.B, *supra*.  Undisputed that the aggregated due diligence results in FHFA Ex. 139

include the number of drops for all trades contributing to NHELI 2007-2, including loan

pools acquired from originators other than First NLC and Ownit.  The document does

not, however, break out the drops by originator or list the amount of drops from all trades

with those originators, as it does for First NLC and Ownit, and therefore RBSSI's

assertion does not create a genuine dispute of material fact.  *See* FHFA Ex. 139.

714.  **FHFA Statement:**  There is no evidence that RBSSI ever received or reviewed the results of the diligence that Nomura Securities performed on the Acquisition Pools that contributed loans to the SLGs of the NHELI 2007-1 Securitization.

**RBSSI Response:**  RBSSI states that the assertion in ¶ 714 is entirely duplicative of the assertion in ¶ 691.  RBSSI incorporates by reference its response to ¶ 691 as if restated herein.

**FHFA Reply:**  FHFA incorporates by reference its reply to ¶ 691 as if restated herein.

715.  **FHFA Statement:**  Nomura was not able to locate any diligence summary for that deal. *See* Ex. 141 (10/2/2014 Letter from A. Davidoff to A. Ng) at 1 ("You asked that Nomura produce due diligence summaries similar to NOM-FHFA_04878436 for NAA 2005-AR6 and NHELI 2007-1.  We have been unable to locate any such summaries for those Securitizations.").

**RBSSI Response:**  RBSSI states that the assertion in ¶ 715 is entirely duplicative of the assertion in ¶ 692.  RBSSI incorporates by reference its response to ¶ 692 as if restated herein.

**FHFA Reply:**  FHFA incorporates by reference its reply to ¶ 692 as if restated herein.

716. **FHFA Statement:** RBS selected a due diligence sample from all loans in NHEL 2007-HE1. Ex. 450 (RBS-FHFA-SDNY-0487360, Clayton Report for Nomura NHEL 2007-HE1 for RBS Greenwich Capital dated January 29, 2007) at RBS-FHFA-SDNY-0487361 (showing 368 loans as sampled and 306 loans as reviewed).

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 716.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

717. **FHFA Statement:** NHEL 2007-HE1 was later subdivided into the two supporting loan groups backing NHELI 2007-2. Ex. 10 (NOM-FHFA_05591325, Prospectus Supplement for NHELI 2007-2) at NOM-FHFA_05591368 ("The Mortgage Loans have been divided into two loan groups, designated as the 'Group I Mortgage Loans' and the 'Group II Mortgage Loans.'").

**RBSSI Response:** RBSSI does not dispute that the NHELI 2007-2 Securitization contained two loan groups. RBSSI does not dispute that a pool of loans referred to as "NHEL 2007-HE1 was later subdivided into the two supporting loan groups backing NHEL 2007-2." RBSSI states that the prospectus supplement for the NHELI 2007-2 Securitization noted that the only difference between the two loan groups was whether the principal balances of the loans conformed to Freddie Mac loan limits. FHFA Ex. 10 (NHEL 2007-2 Prospectus Supplement) at NOM-FHFA 05591331 ("The Group I Mortgage Loans consist of one-to-four family, first and second lien fixed-rate and adjustable-rate mortgage loans with principal balances at origination that conformed to Freddie Mac loan limits. The Group II Mortgage Loans consist of one-to-four-family, first and second lien fixed-rate and adjustable-rate mortgage loans with principal balances at origination that may or may not have conformed to Freddie Mac loan limits."). RBSSI disputes the assertion in ¶ 717 that loans other than those in Group I did not in part support the certificates purchased by Freddie Mac, as Group II loans cross-collateralized the payment of the certificates purchased by Freddie Mac. FHFA Ex. 10 (NHELI 2007-2 Prospectus Supplement) at NOM-FHFA_05591438-42 (discussing distribution of principal, including cross-collateralization features).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence relating to the difference between the two loan groups and cross-collateralization is irrelevant to the asserted fact that **"NHEL 2007-HE1 was later subdivided into the two supporting loan groups backing NHELI 2007-2"** and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

718. **FHFA Statement:** The NHELI 2007-2 SLG at issue is Group I. *See supra* ¶ 8, Table 4.

**RBSSI Response:** RBSSI does not dispute that the certificates purchased by Freddie Mac in the NHELI 2007-2 Securitization "will represent senior interests principally in the

Group I Mortgage Loans." FHFA Ex. 10 (NHELI 2007-2 Prospectus Supplement) at NOM-FHFA_05591332. RBSSI disputes the assertion in ¶ 718 that loans other than those in Group I did not in part support or concern the certificates purchased by Freddie Mac. *Id.* at NOM-FHFA 05591438-42 (discussing distribution of principal, including cross-collateralization features).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence relating to cross-collateralization fails to directly contravene the asserted fact that "[t]he NHELI 2007-2 SLG at issue is Group I" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

719. **FHFA Statement:** Brian Farrell selected the due diligence sample for NHELI 2007-HE1. Ex. 444 (RBS-FHFA-SDNY-0468384, email regarding "FW: Nomura January 2007 Transactions") at RBS-FHFA-SDNY-0468384 ("Take a look at the attached. I pulled samples of 250 loans each for the first 2 trades. This one is crap.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 719.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

720. **FHFA Statement:** Mr. Farrell described NHELI 2007-HE1 as "crap." *Id.*

RBSSI Response: RBSSI disputes the assertion in ¶ 720 as it mischaracterizes the cited document. Mr. Farrell stated, "[t]ake a look at the attached. I pulled samples of 250 loans each for the first two trades. This one is crap. I'm looking for a suggestion." FHFA Ex. 444 (email regarding Nomura January 2007 transactions) at RBS-FHFA-SDNY-0468384. FHFA's characterization that Mr. Farrell "described NHEL 2007-HE1 as 'crap,' is argumentative and should be stricken. Moreover, the email pre-dates the performance of loan-level due diligence on the loan files selected by RBSSI for review in the NHEL 2007-HE1 pool, and as such cannot have been referring to the results of such due diligence on the loans. *Compare* FHFA Ex. 444 (e-mail from Jan. 12, 2007) at RBS-FHFA-SDNY-0468384 *with* FHFA Ex. 445 (email from January 16, 2007 regarding the selection of an initial sample of loans for NHELI 2007-HE1) at RBS-FHFA-SDNY-0462953. In fact, the attached document to which Mr. Farrell was referring was a term sheet that neither identified individual loans nor the applicable underwriting guidelines. RBS Ex. 72 (RBS-FHFA-SDNY-0468385, attachment to FHFA Ex. 444) at RBS-FHFA-SDNY-0468385.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence relating to the timing of due diligence and whether Mr. Farrell was relying on due diligence results or a term sheet is irrelevant to the asserted fact that **"Mr. Farrell**

described NHELI 2007-HE1 as "'crap'" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. RBSSI argues that the asserted fact "mischaracterizes the cited document," but this is not supported by FHFA Ex. 444 at RBS-FHFA-SDNY-0468384. The cited evidence shows that Mr. Farrell was referring to NHELI 2007-HE1, for which he attached a term sheet, when he wrote "Take a look at the attached. … This one is crap." FHFA Ex. 444 at RBS-FHFA-SDNY-0468384. While Defendants argue that the asserted fact is "argumentative and should be stricken," RBSSI's argument does not create a genuine dispute of material fact, Part I.A, *supra*, nor is it explained or supported.

721.  **FHFA Statement:** RBS selected an initial sample of 368 loans for NHELI 2007-HE1. Ex. 445 (RBS-FHFA-SDNY-0462953 email regarding Greenwich/Nomura Reviews) at RBS-FHFA-SDNY-0462953 ("Ok, here are revised files for Nomura HE1, AF1 fixed rate, and AF1 adjustable rate (aka AR1). Because Nomura did not have imaged files for all the loans in my original samples, the samples have been reduced to 308 HE1 loans, 234 AF1 loans, and 102 AR1 loans."); Ex. 450 (RBS-FHFA-SDNY-0487360, Clayton Report for Nomura NHEL 2007-HE1 for RBS Greenwich Capital dated January 29, 2007) at RBS-FHFA-SDNY-0487361 (showing 368 loans as sampled and 306 loans as reviewed).

   **RBSSI Response:** RBSSI does not dispute that Clayton conducted a due diligence review on a pool of loans referred to as NHELI 2007-HE1 securitization. RBSSI also does not dispute that RBSSI selected an initial sample of 368 loans.

   **FHFA Reply:** RBSSI does not dispute the asserted fact.

722.  **FHFA Statement:** Adam Smith wrote to Brian Farrell, "[w]e don't own the pool. Call me." Ex. 461 (RBS-FHFA-SDNY-0487343, email regarding Emailing: nheli07-he1_Greenwich_termsheet.csv) at RBS-FHFA-SDNY-0487343 ("We don't own the pool. Call me.").

   **RBSSI Response:** RBSSI disputes the assertion in ¶ 722 insofar as FHFA omits relevant facts and testimony regarding the cited email (incorrectly cited as FHFA Ex. 461 instead of FHFA Ex. 458). Prior to sending that email, Mr. Smith wrote to Mr. Farrell that he should "[d]o what you feel comfortable with" regarding sample size. FHFA Ex. 458 (email chain regarding nheli07-he1_Greenwich_termsheet) at RBS-FHFA-SDNY-0487343. Mr. Farrell testified that it was his understanding that Mr. Smith wanted to talk on the phone because "[i]t may just be quicker to have a conversation than go back and forth on email." RBS Ex. 5 (Deposition of Brian Farrell) at 731:22-732:5. Further, Mr.

Farrell testified that his diligence practices, including practices regarding sample size, did not change or vary depending on whether or not RBSSI was purchasing whole loans or acting as an underwriter on a third-party securitization. *Id.* at 665:11-666:14. When questioned about this email, Mr. Smith also testified that "I don't think that I dictate in the email or in the process what sample size is selected. So if the diligence group wanted to do a higher sample, you know, we would have a discussion about it and in the – so I don't think that I'm the – I don't think that I set diligence samples. Can we talk, can I talk to the diligence and credit team and legal team about what's the appropriate size of diligence samples? But in the end – and the diligence function, the review of the loans and the sample size was dictated by the credit department." RBS Ex. 17 (Deposition of Adam Smith) at 457:21-458:11.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence relating to Mr. Smith's earlier instructions to Mr. Farrell, Mr. Farrell's understanding of why Mr. Smith wanted to talk on the phone, RBSSI's due diligence practices, and Mr. Smith's interpretation of the email is irrelevant to the asserted fact that Mr. Smith **"**wrote to Brian Farrell, '[w]e don't own the pool. Call me.'" It therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

723. **FHFA Statement:** This sample was reduced to 308 loans. Ex. 448 (RBS-FHFA-SDNY-0462953, email regarding Greenwich/Nomura Reviews) at RBS-FHFA-SDNY-0462953 ("Ok, here are revised files for Nomura HE1, AF1 fixed rate, and AF1 adjustable rate (aka AR1). Because Nomura did not have imaged files for all the loans in my original samples, the samples have been reduced to 308 HE1 loans, 234 AF1 loans, and 102 AR1 loans.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 723 insofar as FHFA omits relevant information and testimony regarding the cited email (incorrectly cited as FHFA Ex. 448 instead of FHFA Ex. 445). In response to Mr. Farrell's initial question about sample size, Mr. Smith told Mr. Farrell to "[d]o what you feel comfortable with." FHFA Ex. 458 (email chain regarding nheli07-he1_Greenwich_termsheet) at RBS-FHFA-SDNY-0487343. Further, Mr. Farrell testified that his diligence practices, including practices regarding sample size, did not change or vary depending on whether or not RBSSI was purchasing whole loans or acting as an underwriter on a third-party securitization. RBS Ex. 5 (Deposition of Brian Farrell) at 665:11-666:14. When questioned about this email, Mr. Smith also testified that "I don't think that I dictate in the email or in the process what sample size is selected. So if the diligence group wanted to do a higher sample, you know, we would have a discussion about it and in the – so I don't think that I'm the – I don't think that I set diligence samples. Can we talk, can I talk to the diligence and credit team and legal team about what's the appropriate size of diligence samples? But in the end – and the diligence function, the review of the loans and the sample size was dictated by the credit department." RBS Ex. 17 (Deposition of Adam Smith) at 457:21-458:11.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence relating to Mr. Smith's instructions to Mr. Farrell, RBSSI's due diligence practices, and Mr. Smith's interpretation of the email is irrelevant to the asserted fact that the "sample was reduced to 308 loans" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

724. **FHFA Statement:** RBSSI's final sample for NHELI 2007-HE1 was 306 loans. Ex. 448 (RBS-FHFA-SDNY-0462953, email regarding "Greenwich/Nomura Reviews") at RBS-FHFA-SDNY-0462953 ("Ok, here are revised files for Nomura HE1, AF1 fixed rate, and AF1 adjustable rate (aka AR1). Because Nomura did not have imaged files for all the loans in my original samples, the samples have been reduced to 308 HE1 loans, 234 AF1 loans, and 102 AR1 loans."); Ex. 450 (RBS-FHFA-SDNY-0487360, Clayton Report for Nomura NHEL 2007-HE1 for RBS Greenwich Capital) at RBS-FHFA-SDNY-0487361 (showing 368 loans as sampled and 306 loans as reviewed). Of the 306 loans on which diligence was performed, 138 were selected according to RBS's semi-random method and 168 loans were selected according to adverse selection criteria. *Id.* at RBS-FHFA-SDNY-0487360; see also Ex. 60 (Grice RBSSI Report) at ¶ 71; Ex. 7 to the Cipione Decl.

   **RBSSI Response:** RBSSI does not dispute the assertion in ¶ 724.

   **FHFA Reply:** RBSSI does not dispute the asserted fact.

725. **FHFA Statement:** The loans reviewed for NHELI 2007-HE1 include less than 6% of the total number of loans securitized into NHELI 2007-2. The total number of loans reviewed in Group I of NHELI 2007-2 was 194, or 6.5% of 3,001 loans. Ex. 13 (NOM-FHFA_05591325, Prospectus Supplement for NHELI 2007-2) at NOM-FHFA_05591331 (defining the "Mortgage Loans" as "approximately 5,136 conventional, one-to-four family fixed-rate and adjustable-rate mortgage loans secured by first or second liens on residential real properties."); *id.* at NOM-FHFA_05591342 ("Summary of Group I Mortgage Loans ... Number of Mortgage Loans: 3,001"); Ex. 7 to the Cipione Decl.

   **RBSSI Response:** RBSSI disputes that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure. FHFA did not timely designate Mr. Cipione as a fact or expert witness in this case, and RBSSI has not been given sufficient opportunity or time to examine Mr. Cipione concerning his work, which contains numerous errors as discussed in the Declaration of David N. Mishol submitted by the Nomura Defendants. To the extent a response is required, RBSSI does not dispute the assertion in ¶ 725.

**FHFA Reply:** RBSSI does not dispute the asserted fact. While Defendants **"**dispute[]

that the Declaration of Charles Cipione is admissible or provides competent evidence of

any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of

Civil Procedure," RBSSI's argument does not create a genuine dispute of material fact.

Part I.A, *supra*.

726.    **FHFA Statement:** By January 24, 2007, Clayton had completed its review of the 306
sample loans. Ex. 455 (RBS-FHFA-SDNY-0303666, email regarding
"Greenwich/NHEL 2007-HE1") at RBS-FHFA-SDNY-0303666 (Daniel Pinero sends
Brian Farrell, on January 24, 2007, the "Final reports" for NHEL 2007-HE1.).

**RBSSI Response:** RBSSI disputes the assertion in ¶ 726 as it mischaracterizes or
improperly paraphrases the cited document. RBSSI and Clayton continued to review the
loans for, among other things, compliance with guidelines, compensating factors and the
existence of exceptions, up through and including January 31, 2007, when Clayton sent a
"first corrected [due diligence] Narrative" to RBSSI, finding an exception rate of ".8%
with compliance issues and no credit issues," and concluding that "the nature and overall
level of credit and compliance exceptions to be what we typically find in the industry,
which does not suggest a pattern of imprudent lending practices." RBS Ex. 73 (RBS-
FHFA-SDNY-0487359, email attaching corrected NHEL 2007-HE1 narrative) at RBS-
FHFA-SDNY-0487361 (attachment (FHFA Ex. 450)). As Mr. Farrell testified, even
after Clayton sent a report, there would be ongoing communication between RBSSI,
Clayton and the originator and/or owner of the loan to discuss the issues flagged by
Clayton and to address and/or resolve them. RBS Ex. 5 (Deposition of Brian Farrell) at
507:11-21 (describing that after Clayton provided its grades, including exceptions, "the
lender can provide a rebuttal, therefore, [the exception] is curable and able to go away.");
*id.* at 509:5-510:7 (explaining that after receiving a Clayton report "RBS has the
opportunity to review the exceptions that have been, that have been flagged."); *id.* at
740:5-20 (explaining that the Clayton review process and the "due diligence process in
general typically always included a rebuttal process. Whether there's missing docs,
there's exceptions, etc., Clayton provides those reports to the counterparty so they have a
chance to review and respond to those issues."); *see also* RBS Ex. 58 (Farrell Decl.) at ¶¶
9-11 (discussing rebuttal process).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence

relating to the exception rate and quality of the loans is irrelevant to the asserted fact and

therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited

evidence relating to ongoing discussions and the rebuttal process between Clayton,

RBSSI and the originator fails to directly contravene the asserted fact that Clayton had

finished its own review of the loans when it sent its final reports for NHELI 2007-HE1 to RBSSI on January 24, 2007 and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants assert that **"RBSSI and Clayton continued to** review the loans for, among other things, compliance with guidelines, compensating factors and the existence of exceptions, up through and including January 31, 2007," the cited evidence does not support this assertion. RBS Ex. 73 does not mention any review of loans after January 24, 2007 and, in fact, expressly states that due diligence was conducted "January 22nd to January 24th." RBS Ex. 73 at RBS-FHFA-SDNY-0487360.

727. **FHFA Statement:** Those loans graded "EV3" by Clayton had credit issues including a 100-point credit score exception, a 15-point LTV exception, a debt-to-income ratio exception of over 20%, and mortgage and rental late payments that exceeded the guidelines. Ex. 456 (RBS-FHFA-SDNY-0303869, Clayton NHEL 2007-HE1 Exception Detail Report dated January 24, 2007) at RBS-FHFA-SDNY-0303869 (showing Loan Number 171502830 as having an outstanding material credit exception of "[c]redit score below minimum required for program/grade [--] [m]inimum credit score is 620[][,] review reflects 520."); *id.* at RBS-FHFA-SDNY-0303869 (showing Loan Number 171979577 as having "LTV Exception => 10% [-]- 95% LTV exceeds 80% LTV Max"); id. at RBS-FHFA-SDNY-0303869 (showing Loan Number 171978170 as having "Debt Ratio > 55% [-]- 75.7% Debt Ratio. Review included entire $1,262.62/mo. [i]nvestment property payment into back debt[.]"); *id.* at RBS-FHFA-SDNY-0303869 (showing Loan Number 171978163 as having "Mortgage/Rental lates [that] exceed grade limits" and "a 37 point credit score exception," in addition to several missing income documents).

**RBSSI Response:** RBSSI disputes the assertion in ¶ 727. FHFA cites a preliminary Clayton Exception Detail report (incorrectly cited as FHFA Ex. 456 instead of FHFA Ex. 453), which identifies compensating factors for each of the loans identified by FHFA and/or explains the reason for the issue flagged by Clayton. For example, with regard to the loan with the claimed "███████████████████ (Loan ████████ the Clayton report states that ██████████████████████████████████████████ ████████████ However, there is a letter in the file from the mortgage company stating all payments have been received on time and the corrections have been submitted to all the credit report agencies." FHFA Ex. 453 (Clayton Exception Detail Report dated January 24, 2007) at RBS-FHFA-SDNY-0303869. The Clayton report also identifies several "compensating factors" for that loan, as well as the other loans FHFA identifies (Loans ██████████████████████ FHFA ignores that information, as well as the final Clayton narrative for this due diligence project, which reports "*no credit issues*" with the sample and further states that "[w]e found the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, *which does not suggest a pattern of imprudent lending practices.*" FHFA Ex. 450 at RBS-FHFA-SDNY-

507

0487360-61 (emphases added).  FHFA has no response to this evidence nor does it cite to any evidence demonstrating that "credit issues" in fact existed as to any of the loans listed in FHFA Ex. 453.

More generally, RBSSI disputes the assertion in ¶ 727 as FHFA incorrectly asserts that loans preliminarily graded "3" or "3C" or "3D" by Clayton in fact "had credit issues." Clayton's purpose in reviewing loans and assigning those grades was to flag issues for RBSSI, including potential exceptions from guidelines, not to reach a final opinion about any loan.  RBS Ex. 58 (Farrell Decl.) at ¶ 9 ("Loans assigned an initial grade of "3" were identified for my review.  Clayton's initial grading of a loan as a "3" was not a final assessment, but rather a flag for me, as the RBSSI credit officer managing the due diligence project, to apply my professional judgment and make the final determination as to whether to accept the loan.").  It was not unusual for RBSSI Due Diligence group personnel, following review of Clayton's initial grade of "3" or "3C" or "3D", to determine that the loan should not be assigned a final "3" grade, based on the RBSSI Due Diligence group employee's review of the relevant characteristics of the loan, review of loan documents as necessary, and consideration of any rebuttal and/or curing documents or information provided by the originator.  *Id.* at ¶¶ 9-11 (discussing the preliminary nature of Clayton's grades and that RBSSI made the final determination regarding material exceptions); RBS Ex. 5 (Deposition of Brian Farrell) at 509:5-513:5 ("Q.  So do I understand correctly that if a credit officer were ultimately of the opinion that a loan was a 3, that is a loan that would not be eligible for purchase? ...  A.  In what stage, of what Clayton has? Because this is, this is just a Clayton grade, right.  Q.  I'm talking about – A.  Hold on, please let me finish.  This isn't, this isn't an RBS grade.  These are grades Clayton that is assigning.  We spoke about yesterday about looking at certain grades, 2s, 3s, etc.  So these are Clayton grades.  These are flagged in a certain way so RBS has the opportunity to review exceptions that have been, that have been flagged.  This isn't an RBS grade.  This is, this is a Clayton grade.  This was set up to determine flags of what should be looked at and what shouldn't be.  So I don't want to get hung up on the 3 grade by itself because it's Clayton's grade, it's not an RBS grade....  Q.  Do you know whether loans that were 3s but nevertheless purchased were ever included in securitizations sold to investors? ...  A.  It's possible.  Again, I want to be very clear here that a loan could have been graded a 3 by Clayton, so it could still be a 3, but I can still deem it to be acceptable.  I don't want to get hung up on the actual grade.  It's a Clayton grade that they're sending over, right, so you're saying it's a 3.  That grade may never be changed.  I may be – the loan itself, an exception may be acceptable to me.  So am I changing the grade myself? No.  I've reviewed the loan, I deem it to be acceptable.  It still may be a Clayton 3, they may never change it, but in my mind the loan is acceptable.").  Indeed, a Clayton grade of "3C" and "3D" signaled that the alleged "material" issue was either curable or concerned a missing document that could and generally would be fixed by the originator.  RBS Ex. 58 (Farrell Decl.) at ¶ 17 ("In circumstances where Clayton identified exceptions that were based on missing documentation, I would typically accept the loan if the missing documents were provided by the originator and that resulted in the identified exception being cleared, or if the originator represented that the missing documents would be provided, or if I determined that the missing documentation was unimportant or was offset by sufficient compensating factors to justify acceptance of the loan.").

508

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence

relating to comments about or possible compensating factors for the loans in question,

Clayton's final narrative, and the finality of Clayton's grades fails to directly contravene

the asserted fact that several credit issues were cited in the Exception Detail Report and

therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited

evidence relating to "3C" and "3D" loans is irrelevant to the asserted fact since none of

the four loans cited in ¶ 727 were graded "3C" or "3D" and therefore does not create a

genuine dispute of material fact. Part I.C, *supra*; *see* FHFA Ex. 453 at RBS-FHFA-

SDNY-0303869. While Defendants argue that FHFA Ex. 453 is a "preliminary Clayton

Exception Detail report," they identify no evidence that contradicts the asserted fact.

RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B,

*supra*. While Defendants argue that FHFA incorrectly asserts that loans graded "3" or

"3C" or "3D" by Clayton had "credit issues," RBSSI's argument ignores the plain

language of FHFA. Ex. 453, which specifically identifies the cited loans as having

"material credit exceptions" and identifies relevant "issues" for each exception.

Additionally, Defendants' argument regarding "credit issues" does not create a genuine

dispute of material fact. Part I.A, *supra*.

728. **FHFA Statement:** When Clayton completed its review on January 24, 2007, RBS had already waived the material exceptions for 25 loans that Clayton had graded as EV3s. Ex. 455 (RBS-FHFA-SDNY-0303666, email regarding "Greenwich/NHEL 2007-HE1") at RBS-FHFA-SDNY-0303666 ("Attached are the Final reports, we have two missing files.... All loans you requested to be waived have been done."); Ex. 526 (RBS-FHFA-SDNY-0303870, Clayton Event Status – Detail Report for NHEL 2007-HE1 dated January 24, 2007) at RBS-FHFA-SDNY-0303870 (showing 25 loans with "Final Credit Event" as "2W: Material exceptions waived").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 728. First, as stated in RBSSI's response to ¶ 726, Clayton continued its review of the sampled loans beyond January 24, 2007 and worked with RBSSI and Nomura to address and clear all outstanding material exceptions through January 31, 2007. RBS Ex. 73 (RBS-FHFA-SDNY-0487359, email

attaching corrected NHEL 2007-HE1 narrative) at RBS-FHFA-SDNY-0487361 (attachment (FHFA Ex. 450)).

Second, as discussed in RBSSI's response to ¶ 727 (which RBSSI incorporates by reference as if restated herein), FHFA cites no evidence that any of the loans listed in FHFA Ex. 526 (which is a Clayton Event Status report that contains only Clayton grades and no loan-level information) in fact "had material exceptions." The preliminary Clayton Exception Detail report for this project, dated January 24, 2007, identifies numerous compensating factors for many of the loans and provides explanations for certain flagged exceptions. FHFA Ex. 453 (RBS-FHFA-SDNY-0303869, Clayton Exception Detail Report dated January 24, 2007) at RBS-FHFA-SDNY-0303869. Following that report, Clayton issued a final due diligence narrative on January 31, 2007, in which it reported "no credit issues" and further stated that "[w]e found the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, which does not suggest a pattern of imprudent lending practices." FHFA Ex. 450 at RBS-FHFA-SDNY-0487360-61. FHFA has no response to this evidence nor does it cite to any evidence demonstrating that "credit issues" in fact existed as to any of the loans listed in FHFA Exs. 453 or 526.

Moreover, FHFA cites no evidence that a loan with a preliminary Clayton grade of "3" or "3C" or "3D" or "2W" in fact "had credit issues." In fact, the evidence demonstrates just the opposite. The purpose of Clayton in reviewing loans and assigning those grades was to flag issues for RBSSI, including potential exceptions from guidelines, not to reach a final opinion about any loan. RBS Ex. 58 (Farrell Decl.) at ¶ 9 ("Loans assigned an initial grade of "3" were identified for my review. Clayton's initial grading of a loan as a "3" was not a final assessment, but rather a flag for me, as the RBSSI credit officer managing the due diligence project, to apply my professional judgment and make the final determination as to whether to accept the loan."). It was not unusual for RBSSI Due Diligence group personnel, following review of Clayton's initial grade of "3" or "3C" or "3D", to determine that the loan should not be assigned a final "3" grade, based on the RBSSI Due Diligence group employee's review of the relevant characteristics of the loan, review of loan documents as necessary, and consideration of any rebuttal and/or curing documents or information provided by the originator. *Id.* at ¶¶ 9-11 (discussing the preliminary nature of Clayton's grades and that RBSSI made the final determination regarding material exceptions); RBS Ex. 5 (Deposition of Brian Farrell) at 509:5¬513:5 ("Q. So do I understand correctly that if a credit officer were ultimately of the opinion that a loan was a 3, that is a loan that would not be eligible for purchase? ... A. In what stage, of what Clayton has? Because this is, this is just a Clayton grade, right. Q. I'm talking about – A. Hold on, please let me finish. This isn't, this isn't an RBS grade. These are grades Clayton that is assigning. We spoke about yesterday about looking at certain grades, 2s, 3s, etc. So these are Clayton grades. These are flagged in a certain way so RBS has the opportunity to review exceptions that have been, that have been flagged. This isn't an RBS grade. This is, this is a Clayton grade. This was set up to determine flags of what should be looked at and what shouldn't be. So I don't want to get hung up on the 3 grade by itself because it's Clayton's grade, it's not an RBS grade.... Q. Do you know whether loans that were 3s but nevertheless purchased were ever included in securitizations sold to investors? ... A. It's possible. Again, I want to be very clear

here that a loan could have been graded a 3 by Clayton, so it could still be a 3, but I can still deem it to be acceptable. I don't want to get hung up on the actual grade. It's a Clayton grade that they're sending over, right, so you're saying it's a 3. That grade may never be changed. I may be – the loan itself, an exception may be acceptable to me. So am I changing the grade myself? No. I've reviewed the loan, I deem it to be acceptable. It still may be a Clayton 3, they may never change it, but in my mind the loan is acceptable."). Indeed, a Clayton grade of "3C" and "3D" signaled that the alleged "material" issue was either curable or concerned a missing document that could and generally would be fixed by the originator. RBS Ex. 58 (Farrell Decl.) at ¶ 17 ("In circumstances where Clayton identified exceptions that were based on missing documentation, I would typically accept the loan if the missing documents were provided by the originator and that resulted in the identified exception being cleared, or if the originator represented that the missing documents would be provided, or if I determined that the missing documentation was unimportant or was offset by sufficient compensating factors to justify acceptance of the loan."). Similarly, a Clayton grade of "2W" did not mean that a material exception or issue had been "waived," as FHFA incorrectly assumes, but was often the result of a flagged issue having been cured. RBS Ex. 5 (Deposition of Brian Farrell) at 455:19¬24 ("Q. What is EV2W? A. That is a loan that could have been, the exception has been cured or the exception was deemed acceptable. Q. Deemed by whom? A. Either by Clayton or RBS."); 736:11-737:8 ("Q. Do you see that entries 8 running all the way through 81 are all graded 2W? A. Yes. Q. Based on your testimony before, does that mean that those were loans that at one time or another were scored as EV3? A. Yes. Q. Are these loans that RBS waived from the 3 status? ... A. I think I testified earlier that a 2W can be any sort of combination of events. One being that a loan was deemed acceptable by RBS. The second was is that there was an exception and it was cured, such as a missing doc. And the third being that there was an exception and a rebuttal was provided and then the grade was changed.").

Third, even assuming FHFA's faulty premise that a loan graded as "3" or "3C" or "3D" or "2W" in fact had material credit issues (which is wrong both generally and with regard to the specific loans listed in FHFA Ex. 526, as discussed above), FHFA cites no evidence that RBSSI "had already waived the material exceptions for 25 loans that Clayton had graded as EV3s." FHFA relies on the number of loans listed as "2W" by Clayton in the Clayton Status Report (incorrectly cited as FHFA Ex. 526 instead of FHFA Ex. 447) as well as Mr. Pinero's email to Brian Farrell stating that "[a]ll [the] loans you requested to be waived have been done" (incorrectly cited as FHFA Ex. 455 instead of FHFA Ex. 452), but which do not identify the loans that were allegedly "waived in." Brian Farrell, who principally managed the loan-level due diligence on this sample, explained that loans could be re-graded from a "3" to a "2W" by Clayton on its own initiative. RBS Ex. 5 (Deposition of Brian Farrell) at 460:4-11 ("Q. Would Clayton ever on its own initiative change an EV3 to an EV2W, or was that a determination that RBS would make? ... A. Yeah, I think they could definitely make it into a 2W without RBS telling them to."). The grading change could also reflect provision of curing documentation and/or a rebuttal explanation by Nomura, the loans' owner. *Id.* at 738:6-739:9 ("Q. And would the counterparty rebut Clayton's opinions as to whether loans had sufficient compensating factors or would they rebut the existence of missing documents, for instance? ... A. I think it would be, it could be anything. It could be compensating

factors weren't, weren't considered. It could be the fact that they are at disagreement with Clayton's analysis, such as throughout their review perhaps Clayton missed something, they missed something in a document, their calculation may be wrong, something like that. Q. Was the rebuttal process between Clayton and the seller of the loan or was RBS involved in that? ... A. I think during most of the review it would be between the counterparty and Clayton, but it could be with RBS as well."); id. at 742:20-743:11 (explaining one reason why a loan might be changed from an "EV3" to an "EV2W" was "that a rebuttal was provided").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. FHFA incorporates

by reference its reply to ¶¶ 726 and 727 as if restated herein. The cited evidence relating

to the meaning of "2W" fails to directly contravene the asserted statement and therefore

does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants

argue that "FHFA cites no evidence that any of the loans listed in FHFA Ex. 526 … in

fact 'had material exceptions,'" they ignore the plain language of the Exhibit, as quoted

in ¶ 728: "2W: Material exceptions waived." FHFA Ex. 526 at RBS-FHFA-SDNY-

0303870. While Defendants suggest that Clayton or Nomura may have waived some of

the 25 loans in question, they identify no evidence indicating that was the case here.

RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B,

*supra*.

(b) *RBSSI Haphazardly Selected Loans That Received Valuation Diligence From Its Credit And Compliance Sample And Then Ignored The Results*

729. **FHFA Statement:** RBS stated in a November 2006 Investor Presentation regarding its Whole Loan Acquisition Business that the Credit Group would perform reconciliations on BPOs received with a "variance of -20% or greater" from the original appraisal. Ex. 527 (RBS-FHFA-SDNY-0498619, Presentation Regarding RBS Greenwich Capital Whole Loan Acquisition Business) at RBS-FHFA-SDNY-0498641 ("If BPO receives a variance of -20% or greater the appraisal is requested and a reconciliation of the valuation documents is performed.").

**RBSSI Response:** RBSSI states that the facts and/or circumstances regarding the Due Diligence group "perform[ing] reconciliations on BPOs" with a "variance of -20% or greater" from the original appraisal in the context of its Whole Loan Acquisition

Business are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempt to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. RBSSI states that in the context of its Whole Loan Acquisition Business, RBSSI sometimes conducted additional reviews around valuations that sometimes included AVMs and, where there were variances from the original appraisal values, BPOs. FHFA Ex. 527 (Presentation Regarding RBS Greenwich Capital Whole Loan Acquisition Business) at RBS-FHFA-SDNY-0498641 ("If BPO receives a variance of -20% or greater the appraisal is requested and a reconciliation of the valuation documents is performed."). The purpose of RBSSI conducting these additional valuation reviews was to potentially receive credit from the rating agencies; the practice was not driven by the Credit group's belief that such additional valuation diligence was necessary. RBS Ex. 74 (RBS-FHFA-SDNY-0398938, email from Frank Skibo regarding Loan File Diligence selection criteria) at RBS-FHFA-CT-0398939-40 (discussing due diligence criteria targeting high risk rating agency grades); RBS Ex. 75 (RBS-FHFA-CT-4438947, email from William Gallagher to James Whittemore) at RBS-FHFA-CT-4438947 (stating that Gallagher approves running AVMs and BPOs on loans with a variance greater than 20% under or over the appraised value, and that the additional valuation diligence is "additive" to RBSSI's other due diligence processes).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While Defendants argue that the asserted facts "are not 'material facts' at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. The cited evidence relating to other appraisal reviews and the rationale behind valuation reviews is irrelevant to the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Moreover, while Defendants argue that additional appraisal reviews were performed to receive credit from the Credit Ratings Agencies, not out of necessity, this assertion is not supported by RBS Exs. 74 at RBS-FHFA-CT-0398939-40 or 75 at RBS-FHFA-CT-4438947. The cited documents do not provide any rationale for the appraisal reviews.

730. **FHFA Statement:** A drive-by appraisal is performed by a licensed appraiser, and conforms to form 2055, but is performed only on the exterior of a property. Ex. 463 ███

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 730. RBSSI notes that Nomura's AVM expert explained that a full appraisal that involves the actual inspection of the interior of the property is the most reliable form of appraisal. RBS Ex. 76 (Expert Report of Lee Kennedy) at ¶¶ 21-23 (explaining that a "full appraisal" that involves an inspection of both the internal and exterior of the home, is "the highest and most reliable form of valuation"). Brian Farrell, the RBSSI credit officer that managed the loan-level due diligence on the Nomura Securitizations, further explained that the purpose of a drive-by appraisal in the context of loan-level due diligence is as a tool to help determine the reasonableness of the original appraisal. RBS Ex. 58 (Farrell Decl.) at ¶ 14 ("In my opinion, drive-by appraisals are a tool to check the reasonableness of the appraised values of loans in a loan pool; drive-by appraisals are not conducted in order to establish new values that will replace the appraised values of loans in a loan pool.").

**FHFA Reply:** RBSSI does not dispute the asserted fact. The cited evidence relating to full appraisals and the purpose of drive-by appraisals is irrelevant to the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

731. **FHFA Statement:** A broker price opinion is a valuation opinion given by a local real estate broker, not a licensed real estate agent, and not subject to any professional standards. Ex. 449 (Deposition of Frank Camacho) at 430:22-431:4 ("Q. Did you consider it important for RBS's due diligence vendor to have an appraiser licensed under USPAP? .... [A.] Generally speaking, for the third-party valuation diligence, drive-by appraisals would be performed by a licensed appraiser and generally those forms would certify that it was performed subject to USPAP. BPOs that were being provided by -- by area realtors were not subject to that, that I recall.").

**RBSSI Response:** RBSSI states that the facts and/or circumstances regarding the standards governing BPOs are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempts to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that the deposition testimony of Frank Camacho cited in ¶ 731 includes the language quoted by FHFA. RBSSI states that

514

this testimony solely amounts to lay testimony that BPOs are not governed by the Uniform Standards of Professional Appraisal Practices. RBSSI states that FHFA cites no basis for its legal assertion that BPOs are "not subject to any professional standards."

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While Defendants argue that **"the facts and/or circumstances regarding the standards governing BPOs are not 'material facts' at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required"** and that Mr. Camacho's "lay testimony" is not a "basis for [FHFA's] legal assertion that BPOs are 'not subject to any professional standards,'" RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

732. **FHFA Statement:** In conducting his valuation diligence reviews, Mr. Camacho "want[ed] to see drivebys with over a 20% variance." Ex. 455 (RBS-FHFA-CT-1612872, email regarding Option One 5-24.xls) at RBS-FHFA-CT-1612874 ("For the appraisals I'm comparing an original appraisal done by a guy that's been in the property to a driveby done by god knows who. There are going to be differences of opinion, appraisals aren't any science at all, much less an exact one. I want to see the drivebys with over a 20% variance.").

**RBSSI Response:** RBSSI states that Mr. Camacho had no involvement in any of the Nomura Securitizations and the facts and/or circumstances regarding what Mr. Camacho "wanted to see" when reviewing drive-by appraisals for Option One loans as discussed in FHFA Ex. 455 are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempts to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that FHFA Ex. 455 contains the language quoted by FHFA, including that "appraisals aren't any science at all, much less an exact one," and that an original appraisal is "done by a guy that's been in the property" while a drive-by appraisal is "done by god knows who". FHFA Ex. 455 (RBS-FHFA-CT-1612872, email regarding Option One 5-24.xls) at RBS-FHFA-CT-1612874.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While Defendants argue that Mr. Camacho's instructions on drive-by appraisals for Option One loans **"are not 'material facts' at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required,"** RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

733. **FHFA Statement:** Mr. Camacho wanted to "figure out" whether the driveby appraiser or original appraiser was incorrect. Ex. 455 (RBS-FHFA-CT-1612872, email regarding Option One 5-24.xls) at RBS-FHFA-CT-1612874 ("I'll pull the original appraisal, look at them both, and figure out who's on crack. If the appraiser's right, fine, if the driveby's right I'll kick the loan out of the trade and the lender will have to sell the loan to someone else.").

**RBSSI Response:** RBSSI states that Mr. Camacho had no involvement in any of the Nomura Securitizations and the facts and/or circumstances regarding what Mr. Camacho "wanted to 'figure out'" when reviewing drive-by appraisals on Option One loans as discussed in FHFA Ex. 455 are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. FHFA's attempts to raise or resolve factual issues that are in dispute in the *Connecticut* litigation under the guise of the instant litigation, where such facts are not at issue, is improper and prejudicial. To the extent a response is required, RBSSI does not dispute that FHFA Ex. 455 contains the language quoted by FHFA.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While Defendants argue that "the facts and/or circumstances regarding what Mr. Camacho 'wanted to 'figure out'" when reviewing drive-by appraisals on Option One loans **...** are not 'material facts' at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

734. **FHFA Statement:** There is no evidence that RBS had a licensed appraiser on its staff during the relevant period. *See* Ex. 511 (Massachusetts Mutual Deposition of James Whittemore) at 151:1416 ("Q. Did RBS have any licensed appraiser on staff while you there? A. I do not know.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 734. RBSSI states that its Due Diligence group employees were experienced in reviewing appraisals and other forms of valuation as part of their reunderwriting work. RBS Ex. 27 (Deposition of Frank Camacho) at 268:24-269:6 ("Q. Were you concerned that the values for the subject properties that were being reported by the originators were inaccurate? ... A. Gaining a comfort level with the accuracy of the appraisal is part of the – part of the underwriting function.").

**FHFA Reply:** RBSSI does not dispute the asserted fact. The cited evidence relating to the experience of RBSSI's Due Diligence group employees is irrelevant to the asserted fact that "[t]here is no evidence that RBS had a licensed appraiser on its staff during the

relevant period" and therefore does not create a genuine dispute of material fact. Part I.C,

*supra*.

735. **FHFA Statement:** RBS commissioned Nationwide to perform drive by appraisals on 40 loans in NAAC 2007-AR1. *See* Ex. 457 (RBS-FHFA-SDNY-0487358, final Nationwide drive by appraisal results for NAAC 2007-AR1) at RBS-FHFA-SDNY-0487358 (showing 40 "Total Drive by's," row 63, column G); *see also* Ex. 60 (Grice RBSSI Report) at n. 51 ("The fixed rate group was diligenced under the project name NHELI 2007-AF1 and the adjustable rate group was diligenced separately under the project name NAAC 2007-AR1. The adjustable rate loans ultimately became the Group 2 loans underlying NHELI 2007-1. Freddie Mac purchased certificates backed by Group 2 loans."); *cf.* Ex. 423 (FHLB Chicago RBS 30(b)(b) Deposition of Patrick Leo) at 125:17¬22 ("Q. And what are drive-bys? .... A. You engage a third-party vendor to literally drive by the house to make sure it's really there.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 735. First, FHFA incorrectly cites FHFA Ex. 457 (RBSSI's Credit Manual) instead of FHFA Ex. 454. Second, RBSSI asked Nationwide to perform drive-by appraisals on 50 properties, selected randomly from RBSSI's semi-random sample of loans selected for loan-level due diligence. RBS Ex. 9 (RBS-FHFA-SDNY-0485155, email regarding NAAC 2007-AR1 sample) at RBS-FHFA-SDNY-0485155 ("Please randomly select 50 from the random pool loans after eliminating any 2 to 4 family properties."); RBS Ex. 58 (Farrell Decl.) at ¶ 14. According to FHFA Ex. 454, Nationwide completed drive-by appraisals on 41 properties. FHFA Ex. 454 (final Nationwide drive by appraisal results for NAAC 2007-AR1) at RBS-FHFA-SDNY-0487358 (listing "cancelled" for 9 properties). Further, aside from drive-by appraisals, RBSSI's due diligence vendor Clayton conducted its own valuation diligence that included a review of each loan's appraisal or other valuation for reasonableness and completeness. RBS Ex. 77 (30(b)(6) Deposition of Clayton Holdings LLC, by Vicki Beal) at 29:21-31:15; *see also* RBS Ex. 78 (CLAY_FHFA-E_000579403, January 18, 2007 Clayton Individual Asset Summary Report for NAAC 2007-AR1) at CLAY_FHFA-E_000579404 (noting appraisal quality to be "[a]cceptable"). RBSSI also disputes ¶ 735 insofar as FHFA cites or relies on FHFA Ex. 423, which does not concern nor support the stated assertion.

**FHFA Reply:** RBSSI does not dispute a material fact. Undisputed that FHFA incorrectly cited FHFA Ex. 457 instead of FHFA Ex. 454. It is undisputed that FHFA Ex. 454 shows Nationwide drive-by values for 41 loans, though it also lists 40 "Total Drive-by's" in row 63, column G. FHFA Ex. 454 at RBS-FHFA-SDNY-0487358. Any dispute regarding whether RBSSI commissioned Nationwide to perform drive by appraisals on 40 or 41 loans in NAAC 2007-AR1 is not material to FHFA's motion. *See*

*Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) ("[I]t must be remembered that the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment"). Defendants assert that "RBSSI asked Nationwide to perform drive-by appraisals on 50 properties," but this assertion is not supported by RBS Ex. 9 at RBS-FHFA-SDNY-0485155. The cited evidence indicates that Mr. Farrell sent an email to Dana Pasternak and Adam Smith, both RBS employees, requesting that they select 50 loans from the random pool. No Nationwide employees were included in this email chain. *See* RBS Ex. 9 at RBS-FHFA-SDNY-0485155. Furthermore, even if accurate, the assertion that RBSSI "asked Nationwide to perform drive-by appraisals on 50 properties" does not directly controvert the asserted fact that Nationwide performed drive by appraisals on 40 loans in the NAAC 2007-AR1. Part I.C, *supra*. The cited evidence relating to Clayton's review of appraisals is irrelevant to the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Moreover, Defendants misrepresent Clayton's review. While Defendants argue that Clayton "conducted its own valuation diligence that included a review of each loan's appraisal or other valuation for reasonableness and completeness," this assertion is not supported by RBS Ex. 77 at 29:21-31:15, which only indicates that Clayton reviewed existing appraisals as part of its credit due diligence, not that it "conducted its own valuation diligence" that included such a review, or RBS Ex. 78 at CLAY_FHFA-E_000579404, which reflects Clayton's review of an existing appraisal.

736. **FHFA Statement:** In total, six of the 40 loans subject to drive by appraisals by Nationwide in NHELI 2007-1 had a negative variance exceeding 20%. *See* Ex. 457 (RBS-FHFA-SDNY-0487358, final Nationwide drive by appraisal results for NAAC 2007-AR1) at RBS-FHFA-SDNY-0487358 (identifying Loan Numbers ████████

████████████████████████████████████████████████████████ as having a negative
variance exceeding 20%).

**RBSSI Response:** RBSSI disputes the assertion in ¶ 736. FHFA Ex. 454 (incorrectly
cited by FHFA as FHFA Ex. 457) identifies 41 loans on which Nationwide actually
performed drive-by appraisals, not 40 loans, six of which Nationwide reported a negative
variance in excess of 20%. FHFA further omits that the average variance of all 41 loans
as reported by Nationwide was -6.31% and the weighted average variance was -9.03%.
RBSSI further disputes ¶ 736 to the extent it states or implies that Nationwide's drive-by
appraisal results are in fact evidence of the actual value of any given property. Nomura's
AVM expert explained that full appraisals that involve an actual inspection of the interior
of the property are the most reliable form of appraisals. RBS Ex. 76 (Expert Report of
Lee Kennedy) at ¶¶ 21-23 (explaining that a "full appraisal" that involves an inspection
of both the internal and exterior of the home, is "the highest and most reliable form of
valuation"). Brian Farrell, the RBSSI credit officer that managed the loan-level due
diligence on the Nomura Securitizations, further explained that the purpose of a drive-by
appraisal in the context of loan-level due diligence is as a tool to help determine the
reasonableness of the original appraisal. RBS Ex. 58 (Farrell Decl.) at ¶ 14 ("In my
opinion, drive-by appraisals are a tool to check the reasonableness of the appraised values
of loans in a loan pool; drive-by appraisals are not conducted in order to establish new
values that will replace the appraised values of loans in a loan pool."). To the extent a
drive-by appraisal value differed from the original appraised value, a reconciliation could
occur to determine whether the original appraisal was reasonably supported, taking into
account the original appraisal, the drive-by appraisal, and any other relevant available
information. RBS Ex. 5 (Deposition of Brian Farrell) at 258:18-259:15 ("Q. Would you
draw your own conclusion as to what the correct value is if you thought the initial
appraisal wasn't supported? ... A. I don't know if I'd give a specific value. Maybe a
range. Again, I want to see if it's supported. An appraisal is something that is, is
provided by the appraiser, it's his subjective estimate of the property. So I may not be
dollar for dollar, let's say, if I'm reconciling it, but as long as I feel that the value is
supported, I would deem that loan acceptable. If I felt that the other documents that were
provided supported more, then I may deem it nonacceptable and I may have the lender
take a look at it and provide a rebuttal.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. FHFA incorporates

by reference its reply to ¶ 735 regarding the amount of drive-by appraisals completed by

Nationwide as if restated herein. The cited evidence relating to the average and weighted

average variance, the reliability of drive-by appraisals compared to full appraisals, and

the purpose of reconciliation is irrelevant to the asserted statement that six properties

"had a negative variance exceeding 20%" and therefore does not create a genuine dispute

of material fact. Part I.C, *supra*.

737. **FHFA Statement:** Loan Number ▮▮▮▮▮▮ had a negative variance over ▮▮▮▮ Ex. 457 (RBS-FHFA-SDNY-0487358, final Nationwide drive by appraisal results for NAAC 2007-AR1) at RBS-FHFA-SDNY-0487358 (listing Loan Number ▮▮▮▮▮▮ as having a negative variance of ▮▮▮▮▮ row 10, column L).

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 454 (incorrectly cited by FHFA as FHFA Ex. 457) identifies Loan Number 171856992 as having a negative variance as reported by Nationwide. FHFA omits that the average variance of all 41 loans as reported by Nationwide was -6.31% and the weighted average variance was -9.03%. Ex. 454 (RBS-FHFA-SDNY-0487358, final Nationwide drive-by appraisal results for NAAC 2007-AR1) at RBS-FHFA-SDNY-0487358. RBSSI disputes the assertion in ¶ 737 to the extent it states or implies that Nationwide's drive-by appraisal results are in fact evidence of the actual value of any given property, for the reasons set forth in RBSSI's responses to ¶ 736. RBSSI further states that Clayton reviewed some of the loans with reported negative variances by Nationwide and found the appraisal quality to be "acceptable." *See* RBS Ex. 78 (CLAY_FHFA-E_000579403, January 18, 2007 Clayton Individual Asset Summary Report for NAAC 2007-AR1) at CLAY_FHFA-E_000579419 (noting appraisal quality to be "[a]cceptable" for loan 171710404, which Nationwide reported a negative variance of 23.94%).

**FHFA Reply:** RBSSI does not dispute the asserted fact. The cited evidence relating to

the average and weighted average variance, the reliability of drive-by appraisals

compared to full appraisals, and Clayton's review of an appraisal for another loan is

irrelevant to the asserted statement that "Loan Number ▮▮▮▮▮▮ had a

▮▮▮▮▮▮▮▮▮▮ and therefore does not create a genuine dispute of material fact. Part

I.C, *supra*.

738. **FHFA Statement:** Loan Number ▮▮▮▮▮▮ had a negative variance over ▮▮▮▮ Ex. 457 (RBS-FHFA-SDNY-0487358, final Nationwide drive by appraisal results for NAAC 2007-AR1) at RBS-FHFA-SDNY-0487358 (listing Loan Number ▮▮▮▮▮▮ as having a negative variance of ▮▮▮▮▮ row 9, column L).

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 454 (incorrectly cited by FHFA as FHFA Ex. 457) identifies Loan Number 171897437 as having a negative variance as reported by Nationwide. FHFA omits that the average variance of all 41 loans as reported by Nationwide was -6.31% and the weighted average variance was -9.03%. Ex. 454 (RBS-FHFA-SDNY-0487358). RBSSI disputes ¶ 738 to the extent it states or implies that Nationwide's drive-by appraisal results are in fact evidence of the actual value of any given property, for the reasons set forth in RBSSI's responses to ¶ 736. RBSSI further states that Clayton reviewed some of the loans with reported negative variances by Nationwide and found the appraisal quality to be "acceptable." *See* RBS Ex. 78 (CLAY_FHFA-E_000579403, January 18, 2007 Clayton Individual Asset

Summary Report for NAAC 2007-AR1) at CLAY_FHFA-E_000579419 (noting appraisal quality to be "[███████████] for loan [██████████], which Nationwide reported a negative variance of [███████]).

**FHFA Reply:** RBSSI does not dispute the asserted fact. The cited evidence relating to the average and weighted average variance, the reliability of drive-by appraisals compared to full appraisals, and Clayton's review of an appraisal for another loan is irrelevant to the asserted statement that "Loan Number [███████████] had a [███████]

[█████████████████] and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

739. **FHFA Statement:** RBS also commissioned Nationwide to perform drive by appraisals on a sample of 92 loans in NHELI 2007-2. *See* Ex. 459 (RBS-FHFA-SDNY-0487543, final Nationwide drive by appraisal results for NHELI 2007-HE1) at RBS-FHFA-SDNY-0487543 (showing 92 "Total Drive bys," row 112, column H).

**RBSSI Response:** RBSSI disputes the assertion in ¶ 739. RBSSI asked Nationwide to perform drive-by appraisals on 100 properties, selected from RBSSI's semi-random sample of loans selected for loan-level due diligence. RBS Ex. 10 (RBS-FHFA-SDNY-0487282, January 12, 2007 email from Brian Farrell to Dana Pasternak) at RBS-FHFA-SDNY-0487283 ("Drive By: 100 loans from the random sample after eliminating any 2-4 families."). According to FHFA Ex. 456 (incorrectly cited by FHFA as FHFA Ex. 459), Nationwide completed drive-by appraisals on 92 properties. FHFA Ex. 456 (listing "cancelled" for 6 properties). Further, aside from drive-by appraisals, RBSSI's due diligence vendor would conduct additional valuation diligence that included a review of each loan's appraisal or other valuation for reasonableness and completeness. RBS Ex. 77 (30(b)(6) Deposition of Clayton Holdings, LLC by of Vicki Beal) at 29:21-31:15; RBS Ex. 79 (RBS-FHFA-SDNY-0303667, January 24, 2007 Clayton Individual Asset Summary Report for NHEL 2007-HE1).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. Defendants assert that "RBSSI asked Nationwide to perform drive-by appraisals on 100 properties," but this assertion is not supported by RBS Ex. 10 at RBS-FHFA-SDNY-0487283. The cited evidence indicates that Mr. Farrell sent an email to Dana Pasternak, Adam Smith, and James Whittemore, all RBS employees, requesting that they select 100 loans from the random sample. No Nationwide employees were included in this email chain. *See* RBS

Ex. 10 at RBS-FHFA-SDNY-0487283. The cited evidence relating to a diligence vendor review of appraisals is irrelevant to the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Moreover, Defendants misrepresent the review. While Defendants argue that vendors conducted "additional valuation diligence that included a review of each loan's appraisal or other valuation for reasonableness and completeness," this assertion is not supported by RBS Ex. 77 at 29:21-31:15, which only indicates that Clayton reviewed existing appraisals as part of its credit due diligence, not that it conducted "additional valuation diligence that included" such a review, or RBS Ex. 79, which reflects in part Clayton's review of existing appraisals.

740. **FHFA Statement:** In total, 14 of 92 loans subject to drive by appraisals by Nationwide had a negative variance exceeding 20%. *See* Ex. 459 (RBS-FHFA-SDNY-0487543, final Nationwide drive by appraisal results for NHELI 2007-HE1) at RBS-FHFA-SDNY-0487543 (identifying Loan Numbers ████████████████████████████████████████████████████████████████████ as having a negative variance exceeding 20%).

**RBSSI Response:** RBSSI does not dispute that in FHFA Ex. 456 (incorrectly cited by FHFA as FHFA Ex. 457) Nationwide identifies fourteen loans as having a negative variance greater than 20%. FHFA omits that the average variance of all 92 loans as reported by Nationwide was -6.63% and the weighted average was -8.83%. FHFA Ex. 456 (Nationwide drive by appraisal results for NHELI 2007-HE1) at RBS-FHFA-SDNY-0487543. RBSSI disputes ¶ 740 to the extent it states or implies that Nationwide's drive-by appraisal results are in fact evidence of the actual value of any given property, for the reasons set forth in RBSSI's responses to ¶ 736. Clayton reviewed some of the loans with reported negative variances by Nationwide and found the appraisal quality to be "acceptable." RBS Ex. 77 (RBS-FHFA-SDNY-0303667, January 24, 2007 Clayton Individual Asset Summary Report for NHEL 2007-HE1) at RBS-FHFA-SDNY-0303701 (noting appraisal quality to be ██████████ for loan ██████████ which Nationwide reported a negative variance of ██████.

**FHFA Reply:** RBSSI does not dispute the asserted fact. The cited evidence relating to the average and weighted average variance, the reliability of drive-by appraisals compared to full appraisals, and Clayton's review of an appraisal is irrelevant to the asserted statement that "14 of 92 loans subject to drive by appraisals by Nationwide had a

negative variance exceeding 20%" and therefore does not create a genuine dispute of material fact.  Part I.C, *supra*.

741.  **FHFA Statement:**  Loan Number ████████ had a negative variance over ████ Ex. 459 (RBS-FHFA-SDNY-0487543, final Nationwide drive by appraisal results for NHELI 2007-HE1) at RBS-FHFA-SDNY-0487543 (listing Loan Number ████████ as having a negative variance of ████ row 8, column M).

   **RBSSI Response:**  RBSSI does not dispute that FHFA Ex. 456 (incorrectly cited by FHFA as FHFA Ex. 459) identifies Loan Number ████████ as having a negative variance as reported by Nationwide.  FHFA omits that the average variance of all 92 loans as reported by Nationwide was -6.63% and the weighted average was -8.83%.  FHFA Ex. 456 (final Nationwide drive by appraisal results for NHELI 2007-HE1) at RBS-FHFA-SDNY-0487543.  RBSSI disputes ¶ 741 to the extent it states or implies that Nationwide's drive-by appraisal results are in fact evidence of the actual value of any given property, for the reasons set forth in RBSSI's responses to ¶ 736.  RBSSI further states that Clayton reviewed some of the loans with reported negative variances by Nationwide and found the appraisal quality to be "acceptable." RBS Ex. 79 (RBS-FHFA-SDNY-0303667, January 24, 2007 Clayton Individual Asset Summary Report for NHEL 2007-HE1) at RBS-FHFA-SDNY-0303701 (noting appraisal quality to be ████████████ for loan ████████ which Nationwide reported a negative variance of ████████.

   **FHFA Reply:**  RBSSI does not dispute the asserted fact.  The cited evidence relating to the average and weighted average variance, the reliability of drive-by appraisals compared to full appraisals, and Clayton's review of an appraisal for another loan is irrelevant to the asserted statement that "Loan Number ████████ had a ████████ ████████████████ and therefore does not create a genuine dispute of material fact.  Part I.C, *supra*.

742.  **FHFA Statement:**  The property underlying Loan Number ████████ was in the relevant SLG of the NHELI 2007-1 Securitization.  Ex. 4 to the Cipione Decl.  (listing Loan Number ████████ row 45348, column K).

   **RBSSI Response:**  RBSSI does not dispute that the loan identified by number ████████ was in the Group II mortgage loans for the NHELI 2007-1 Securitization.

   **FHFA Reply:**  RBSSI does not dispute the asserted fact.

743.  **FHFA Statement:**  Loan Number ████████ was originally appraised at ████████ Ex. 9 to the Cipione Decl.  (listing Loan Number ████████ as originally appraised at ████████ row 7, column F).

**RBSSI Response:** RBSSI does not dispute that Loan Number ███████ was originally appraised at ███████ according to the loan tape produced in this action.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

744. **FHFA Statement:** The value identified by RBSSI's drive-by review was ███████ Ex. 9 to the Cipione Decl. (listing Loan Number ███████ drive-by review value as ███████ row 7, column I).

**RBSSI Response:** RBSSI disputes that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure. FHFA did not timely designate Mr. Cipione as a fact or expert witness in this case, and RBSSI has not been given sufficient opportunity or time to examine Mr. Cipione concerning his work, which contains numerous errors as discussed in the Declaration of David N. Mishol submitted by the Nomura Defendants. To the extent a response is required, RBSSI disputes the assertion in ¶ 744 as it incorrectly states that the "value" for loan number ███████ was determined by RBSSI or the result of a drive-by review conducted by RBSSI. The "value" found in FHFA Ex. 454 was reported by Nationwide, not RBSSI. RBSSI also disputes ¶ 744 as it mischaracterizes or misstates that the purpose of a drive-by appraisal in the context of loan-level due diligence. As discussed in RBSSI's response to ¶ 736, the purpose of a drive-by appraisal in the context of loan-level due diligence is a tool to help determine the reasonableness of the original appraisal.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While Defendants "dispute[] that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. The cited evidence relating to the purpose of a drive-by appraisal is irrelevant to the stated fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants dispute the characterization of the review as "RBSSI's drive-by review," the Nationwide appraisal review was ordered by RBSSI. *See* ¶ 735, *supra*. Further, Defendants argument regarding the characterization does not create a genuine dispute of material fact. Part I.A, *supra*.

745. **FHFA Statement:** Nomura reported the original value in the NHELI 2007-1 loan tape, yielding a LTV ratio of ███. Ex. 9 to the Cipione Decl. (listing the LTV ratio for Loan Number ███████ as ███, row 7, column H).

524

**RBSSI Response:** RBSSI does not dispute that the Original LTV of Loan ███████ is reported as ███.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

746. **FHFA Statement:** Had RBSSI's drive-by value been used, the LTV ratio would have been ██████ Ex. 9 to the Cipione Decl. (listing the LTV ratio for Loan Number ████████████ when using the drive-by review value, row 7, column L).

**RBSSI Response:** RBSSI disputes that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure. FHFA did not timely designate Mr. Cipione as a fact or expert witness in this case, and RBSSI has not been given sufficient opportunity or time to examine Mr. Cipione concerning his work, which contains numerous errors as discussed in the Declaration of David N. Mishol submitted by the Nomura Defendants. To the extent a response is required, RBSSI disputes the assertion in ¶ 746 as it misstates or mischaracterizes the purpose of drive-by appraisals and misstates that the drive-by value should have been used to determine any loan-to-value ratio. As discussed in RBSSI's response to ¶ 736, the purpose of a drive-by appraisal in the context of loan-level due diligence is a tool to help determine the reasonableness of the original appraisal.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While Defendants "dispute[] that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. The cited evidence relating to the purpose of a drive-by appraisal is irrelevant to the stated fact that "[h]ad RBSSI's drive-by value been used, the LTV ratio would have been 90.57%" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Defendants also misrepresent ¶ 746 as stating that "the drive-by value *should* have been used to determine any loan-to-value ratio" (emphasis added).

747. **FHFA Statement:** The original appraisal value of Loan Number ████████ was in the relevant SLG of the NHELI 2007-2 Securitization.

**RBSSI Response:** RBSSI disputes the assertion in ¶ 747 insofar as FHFA cites no evidence in support of that assertion.

**FHFA Reply:** RBSSI does not dispute the asserted fact that the original appraisal value

of Loan Number  was relevant to the SLG of the NHELI 2007-2

Securitization. *See* RBSSI's Response ¶¶ 748-751.

748. **FHFA Statement:** Loan Number ████████ had an original appraised value of
████████. Ex. 9 to the Cipione Decl. (listing Loan Number ████████ as originally
appraised at ████████, row 109, column F).



    **RBSSI Response:** RBSSI does not dispute that the original appraisal value of Loan
████████ is reported as ████████.

    **FHFA Reply:** RBSSI does not dispute the asserted fact.

749. **FHFA Statement:** The value identified by RBSSI's drive-by review was ████████. Ex. 9
to the Cipione Decl. (listing Loan Number ████████ drive-by-review value as ████████,
row 109, column I).

    **RBSSI Response:** RBSSI disputes that the Declaration of Charles Cipione is admissible
or provides competent evidence of any material fact for purposes of FHFA's motion
under Rule 56(d) of the Federal Rules of Civil Procedure. FHFA did not timely designate
Mr. Cipione as a fact or expert witness in this case, and RBSSI has not been given
sufficient opportunity or time to examine Mr. Cipione concerning his work, which
contains numerous errors as discussed in the Declaration of David N. Mishol submitted
by the Nomura Defendants. To the extent a response is required, RBSSI disputes the
assertion in ¶ 749 as it incorrectly states that the "value" for loan number ████████ was
determined by RBSSI or the result of a drive-by review conducted by RBSSI. The
"value" found in FHFA Ex. 456 was reported by Nationwide, not RBSSI. RBSSI also
disputes ¶ 749 as it mischaracterizes or misstates the purpose of a drive-by appraisal. As
discussed in RBSSI's response to ¶ 736, the purpose of a drive-by appraisal in the context
of loan-level due diligence is a tool to help determine the reasonableness of the original
appraisal.

    **FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While Defendants

"dispute[] that the Declaration of Charles Cipione is admissible or provides competent

evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the

Federal Rules of Civil Procedure," RBSSI's argument does not create a genuine dispute

of material fact. Part I.A, *supra*. The cited evidence relating to the purpose of a drive-by

appraisal is irrelevant to the stated fact and therefore does not create a genuine dispute of

material fact. Part I.C, *supra*. While Defendants dispute the characterization of the

review as "RBSSI's drive-by review," the Nationwide appraisal review was ordered by

RBSSI.  *See* ¶ 739, *supra*.  Further, Defendants argument regarding the characterization

does not create a genuine dispute of material fact.  Part I.A, *supra*.

750.    **FHFA Statement:**  Nomura reported the original value in the NHELI 2007-1 loan tape, yielding a LTV ratio of ▉▉▉  Ex. 9 to the Cipione Decl.  (listing the LTV for Loan Number ▉▉▉▉▉▉ as ▉▉ when using the original loan tape value, row 109, column H).



   **RBSSI Response:**  RBSSI disputes that "Nomura reported the original value in the NHELI 2007-1 loan tape" inasmuch as Exhibit 9 to the Cipione Declaration identifies the loan identified by number ▉▉▉▉▉▉▉ as being part of the NHELI 2007-2 securitization.  Ex. 9 to the Cipione Decl.  (row 109, column A).  RBSSI does not dispute that the Original LTV for Loan ▉▉▉▉▉▉ is reported as ▉▉▉

   **FHFA Reply:**  RBSSI does not dispute that the original LTV for Loan ▉▉▉▉▉▉ was

   reported as ▉▉▉  Undisputed that Loan Number ▉▉▉▉▉ was part of the NHELI

   2007-2 Securitization, not NHELI 2007-1.

751.    **FHFA Statement:**  Based on the drive-by review, the LTV for Loan Number ▉▉▉▉ was ▉▉▉  Ex. 9 to the Cipione Decl.  (listing the LTV for Loan Number ▉▉▉▉▉ when using the drive-by-review value, row 109, column L).

   **RBSSI Response:**  RBSSI disputes that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure.  FHFA did not timely designate Mr. Cipione as a fact or expert witness in this case, and RBSSI has not been given sufficient opportunity or time to examine Mr. Cipione concerning his work, which contains numerous errors as discussed in the Declaration of David N.  Mishol submitted by the Nomura Defendants.  To the extent a response is required, RBSSI disputes the assertion in ¶ 751 as it misstates or mischaracterizes the purpose of drive-by appraisals in the context of loan-level due diligence.  As discussed in RBSSI's response to ¶ 736, the purpose of a drive-by appraisal in the context of loan-level due diligence is a tool to help determine the reasonableness of the original appraisal.

   **FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While Defendants

   "dispute[] that the Declaration of Charles Cipione is admissible or provides competent

   evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the

   Federal Rules of Civil Procedure," RBSSI's argument does not create a genuine dispute

of material fact. Part I.A, *supra*. The cited evidence relating to the purpose of a drive-by appraisal is irrelevant to the stated fact that "[h]ad RBSSI's drive-by value been used, the LTV ratio would have been 90.57%" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

        2.       RBSSI Did Not Perform Additional Diligence After Encountering High Percentages Of Defective Loans In Its Samples For The NHELI 2007-1

752.    **FHFA Statement:** RBSSI had a policy that "[f]or each transaction type, when significant material exceptions are found (typically greater than 20%), the sample size should be expanded and may consist of additional random selections and/or discretionary samples focusing on the issues raised by the original random sample." Ex. 457 (RBS-FHFA-SDNY-0498493, RBS Greenwich Capital Credit Procedures Manual) at RBS-FHFA-SDNY-0498529 ("For each transaction type, when significant material exceptions are found (typically greater that 20%), the sample size should be expanded and may consist of additional random selections and/or discretionary samples focusing on the issues raised by the original random sample.").

    **RBSSI Response:** RBSSI disputes the assertion in ¶ 752. As RBSSI stated in its responses to ¶¶ 636-639 (which are incorporated by reference as if fully stated herein), RBSSI's Credit Manual was a procedures "manual" and not policy that was required to be followed in all instances. The "typically" 20% "material exceptions" threshold was simply a recommendation that could be deviated from based on several factors unrelated to the number of actual material exceptions. RBS Ex. 7 (Deposition of William Gallagher) at 249:11-250:5 ("Q. Why don't we continue. Again, if there is a statistically significant random sample or purportedly statistically significant random sample that identifies 30 percent significant material exceptions, do you agree with me that under this policy RBS would typically be required to expand the size of that sample? ... A. Again, it's, it's not a policy, it's a procedures manual. So under the procedures manual the suggestion is that that is what you would likely do, but, but there's other facts that could weigh in on it and it's trying to give a general overview of the process."); *id.* at 216:21¬218:5 ("Q. Is it your understanding that this manual was followed by RBS employees? A. I think we would generally try to follow it, but I can't tell you it was followed verbatim on everything we did. But it's a procedures manual not a policy manual. Q. And how do you understand – what distinction do you understand that to indicate? A. Procedures to me are what you do in, in your exercising your business. It's more process. Q. And how does it differ from policy? A. Policy can be more the guidelines that you try to follow, it could be guidelines, maybe they're rules that you're trying to follow in a particular business. Q. So the procedure is more actually what occurs in practice, is that what you mean? ... A. The procedures would be more of the process itself of what people do to, you know, exercise their, their duties, would describe the work that they're trying to do. But often in general terms. And it's at a point in time and, you know, things, things can evolve."); *id.* at 219:22-220:19 (discussing how loan-

level due diligence sample sizes could vary "based on the characteristics of the collateral, the client, including seasoning of the assets, past performance of seasoned assets, Greenwich's past experience with this client and product and the financial strength of the client and the presence of third party credit enhancement" and that the "process evolved over time and I don't – I don't know what the date of this manual might have been, but over time things did, did evolve in different ways."); RBS. Ex. 5 (Deposition of Brian Farrell) at 611:25-:612:12 (discussing how diligence sampling practices "are constantly being evaluated and modified as needed"); *id.* at 614:615:3 (sampling practices would be informed by, among other things, "[c]ollateral, data, experience with counterparty, [and] previous diligence results").

RBSSI further disputes the assertion in ¶ 752 to the extent it states or implies that RBSSI should have upsized the loan-level due diligence samples for any of the Nomura Securitizations. As stated in FHFA Exs. 448 and 450, Clayton found "no credit issues" for either the NAAC 2007-AR1 or NHEL 2007-HE1 samples, and in fact concluded that there was no evidence of imprudent lending practices. FHFA Ex. 448 (Clayton Report on NAAC 2007-AR1) at RBS-FHFA-SDNY-0487364; FHFA Ex. 450 (Clayton Report on NHEL 2007-HE1) at RBS-FHFA-SDNY-0487361. Further, the number of "exceptions" in the pools of loans that were sourced into the NHELI 2006-HE3 and NHELI 2006-FM2 Securitizations were also under 20% (even assuming that was the threshold above which RBSSI was required to upsize its sample, which it was not). FHFA Ex. 427 (NHELI 2006-HE3 Due Diligence Summary) at NOM-FHFA_04998535; FHFA Ex. 137 (NHELI 2006-FM2 Due Diligence Summary) at NOM-FHFA 04879929.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the manual includes the quoted language. While RBSSI cites deposition testimony and argues that "RBSSI's Credit Manual was a procedures 'manual' and not policy that was required to be followed in all instances" and that the 20% "threshold was simply a recommendation that could be deviated from based on several factors unrelated to the number of actual material exceptions," RBSSI's spin and the evidence it cites in support thereof fails to directly controvert the asserted fact and thus is incapable of creating a genuine dispute of material fact. Part I.C, *supra*. RBSSI disputes "the assertion in ¶ 752 to the extent it states or implies that RBSSI should have upsized the loan-level due diligence samples for any of the Nomura Securitizations[;]" however, this assertion is irrelevant to the fact asserted by FHFA in ¶ 752 and does not create a genuine dispute of material fact. Part I.C, *supra*..

753. **FHFA Statement:** Mr. Farrell testified that he was unaware of RBS's policy that a sample should be upsized when significant material exceptions (typically of greater than 20%) were found by an initial review. Ex. 383 (Deposition of Brian Farrell) at 776:3-23 ("Q. It says 'When significant material exceptions are found, typically greater than 20 percent, the sample size should be expanded.' Do you see what I'm referring to? A. I do. Q. Was it your practice to expand sample size where you had material exceptions at a rate of 20 percent or higher in '06/'07? A. It would vary. Q. Were you aware that there was guidance within RBS indicating that sample size should be increased where there were material exceptions at a rate of 20 percent or higher? ... A. I wasn't familiar with this policy."). Mr. Camacho was "not aware of this policy while [he] was at RBS." Ex. 449 (Deposition of Frank Camacho) at 317:17-319:11 ("Q. All right. Do you see where it says: 'For each transaction type, when significant material exceptions are found, typically greater than 20 percent, the sample size should be expanded and may consist of additional random selections and are discretionary samples focusing on the issues raised by the original random sample.' Do you see that? A. I do see that.... Q. Is this a policy that you followed? ... Q. While at RBS? A. I was not aware of this policy while I was at RBS. Q. Understood. Slightly different question, though, which is, did you follow this as a – in terms of your practices ... Q. I'll even ask it a slightly different way. Is this what you did? A. My recommendations regarding expanding the size of the sample were not tied to any sort of threshold amount.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 753 as it incorrectly states or mischaracterizes RBSSI's policy with regard to RBSSI's sampling criteria and upsizing sample size based on material exceptions. As RBSSI stated in its responses to ¶¶ 636-639 and 752 (which RBSSI incorporates by reference as if fully restated herein), it was not RBSSI's "policy" that a sample should be upsized "whenever significant material exceptions (typically of greater than 20%) were found by an initial review." RBSSI's practices and procedures encouraged credit personnel to use their experience and judgment when assessing whether material credit exceptions existed and whether additional diligence on other loans from the pool was required. FHFA additionally omits that RBSSI's Credit Manual expressly provided that sample sizes "can further vary based on the characteristics of the collateral and the client, including the seasoning of the assets, the past performance of seasoned assets, [RBSSI's] past experience with the client and product, the financial strength of the client, and the presence of third party credit enhancements." FHFA Ex. 388 (RBSSI Credit Manual) at RBS-FHFA-SDNY-0615280. Mr. Farrell testified that his analysis of whether a sample should be upsized was informed by these factors. RBS. Ex. 5 (Deposition of Brian Farrell) at 611:25-:612:12 (discussing how diligence sampling practices "are constantly being evaluated and modified as needed," and would be informed by, among other things, "[c]ollateral, data, experience with counterparty, [and] previous diligence results"); *id.* at 775:2-12 ("I would like to point out from B, second paragraph down, that it says sample sizes can further vary based on characteristics of the collateral and the client, including the seasoning, past performance, experience with the client and the product. I just want to point that out because that's what I've been saying I've been basing [my criteria] off of.").

RBSSI further disputes the assertion in ¶ 753 to the extent it states or implies that RBSSI should have upsized the loan-level due diligence samples for any of the Nomura

Securitizations. As stated in FHFA Exs. 448 and 450, Clayton found "no credit issues" for either the NAAC 2007-AR1 or NHEL 2007-HE1 samples, and in fact concluded that there was no evidence of imprudent lending practices. FHFA Ex. 448 (Clayton Report on NAAC 2007-AR1) at RBS-FHFA-SDNY-0487364; FHFA Ex. 450 (Clayton Report on NHEL 2007-HE1) at RBS-FHFA-SDNY-0487361. Further, the number of "exceptions" in the pools of loans that were sourced into the NHELI 2006-HE3 and NHELI 2006-FM2 Securitizations were also under 20% (even assuming that was the threshold above which RBSSI was required to upsize its sample, which it was not). FHFA Ex. 427 (NHELI 2006-HE3 Due Diligence Summary) at NOM-FHFA_04998535; FHFA Ex. 137 (NHELI 2006-FM2 Due Diligence Summary) at NOM-FHFA 04879929.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI cites additional evidence and argues that "RBSSI's practices and procedures encouraged credit personnel to use their experience and judgment when assessing whether material credit exceptions existed and whether additional diligence on other loans from the pool was required[,]" the evidence cited by RBSSI and its argument fail to directly contravene the asserted fact. Part I.C, *supra*. RBSSI disputes "the assertion in ¶ 753 to the extent it states or implies that RBSSI should have upsized the loan-level due diligence samples for any of the Nomura Securitizations[;]" however, this assertion is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

754. **FHFA Statement:** Mr. Whittemore "[did] not know" whether RBS's policy was to draw an expanded sample when significant material exceptions typically greater than 20% were found. Ex. 511 (Massachusetts Mutual Deposition of James Whittemore) at 261:5-18 ("Q. If you turn to the next page with the Bates number ending 552. The second paragraph says 'For each transaction type, when significant material exceptions are found typically greater than 20 percent, the sample size should be expanded and may consist of additional random selection and/or discretionary samples focusing on the issues raised by the original random sample.' Do you see that? A. Yes. Q. Do you know if that was an accurate statement of RBS's policies at the time? A. I do not know."); *cf.* Ex. 384 (Deposition of James Whittemore) at 123:10-19 ("Q. If we turn back to the page ending on 3984, in the sentence that states, for each transaction type, when significant material exceptions are found, typically greater than 20 percent, the sample size should be expanded, do you recall ever expanding the sample size when you had a material exception rate of greater than 20 percent? A. I don't remember that I did.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 754 as it incorrectly states or mischaracterizes RBSSI's policy with regard to RBSSI's sampling criteria and upsizing sample size based on material exceptions. As RBSSI stated in its responses to ¶¶ 636-

639 and 752-753 (which RBSSI incorporates by reference as if fully restated herein), it was not RBSSI's "policy" "draw an expanded sample when significant material exceptions typically greater than 20% were found." RBSSI's practices and procedures encouraged credit personnel to use their experience and judgment when assessing whether material credit exceptions existed and whether additional diligence on other loans from the pool was required. FHFA omits that RBSSI's Credit Manual expressly provided that sample sizes "can further vary based on the characteristics of the collateral and the client, including the seasoning of the assets, the past performance of seasoned assets, [RBSSI's] past experience with the client and product, the financial strength of the client, and the presence of third party credit enhancements." FHFA Ex. 388 (RBSSI Credit Manual) at RBS-FHFA-SDNY-0615280. Mr. Whittemore testified that the determination of whether to upsize a sample "would be determined on a lot of other data" other than purely the number or percentage of exceptions. FHFA Ex. 511 (*MassMutual* Deposition of James Whittemore) at 261:24-262:6 ("Q. Would you agree that a 20 percent rate is a significant rate of material exceptions? ... A. I don't think you can set a number of 20 percent. I think, again, it would be determined on a lot of other data that you might need – have within that loan file to make that determination.").

RBSSI further disputes the assertion in ¶ 754 to the extent it states or implies that RBSSI should have upsized the loan-level due diligence samples for any of the Nomura Securitizations. As stated in FHFA Exs. 448 and 450, Clayton found "no credit issues" for either the NAAC 2007-AR1 or NHEL 2007-HE1 samples, and in fact concluded that there was no evidence of imprudent lending practices. FHFA Ex. 448 (Clayton Report on NAAC 2007-AR1) at RBS-FHFA-SDNY-0487364; FHFA Ex. 450 (Clayton Report on NHEL 2007-HE1) at RBS-FHFA-SDNY-0487361. Further, the number of "exceptions" in the pools of loans that were sourced into the NHELI 2006-HE3 and NHELI 2006-FM2 Securitizations were also under 20% (even assuming that was the threshold above which RBSSI was required to upsize its sample, which was it not). FHFA Ex. 427 (NHELI 2006-HE3 Due Diligence Summary) at NOM-FHFA_04998535; FHFA Ex. 137 (NHELI 2006-FM2 Due Diligence Summary) at NOM-FHFA 04879929.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues

that "RBSSI's practices and procedures encouraged credit personnel to use their

experience and judgment when assessing whether material credit exceptions existed and

whether additional diligence on other loans from the pool was required[,]" this argument

fails to directly contravene the asserted facts. Part I.C, *supra*. While RBSSI disputes

"the assertion in ¶ 754 to the extent it states or implies that RBSSI should have upsized

the loan-level due diligence samples for any of the Nomura Securitizations[,]" this is

irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part

I.C, *supra*.

755. **FHFA Statement:** Mr. Whittemore did not know if RBS's credit department was concerned with finding significant material exceptions of greater than 20%, but testified that, "in my realm, that would be brought to someone's attention." Ex. 384 (Deposition of James Whittemore) at 115:16116:9 ("Q. Do you see in the sentence it states, for each transaction type, when significant material exceptions are found, parenthesis, typically greater than 20 percent, close parenthesis, the sample size should be expanded? Do you see that? A. Yes, I do. Q. And do you agree that as far as RBS's credit department was concerned it would be significant if material exceptions were found greater than 20 percent? .... A. I can't answer for RBS. In my -- in my realm that would be brought to someone's attention, yes.").

**RBSSI Response:** RBSSI states that the facts and/or circumstances regarding what Mr. Whittemore believed "in his realm" about reporting of significant material exceptions is not a "material fact" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI disputes the assertion in ¶ 755 as it mischaracterizes or improperly paraphrases the cited testimony. Mr. Whittemore, who was testifying in his individual capacity and not on RBSSI's behalf, stated that he could not "answer for RBS" whether it would be "significant if material exceptions were found greater than 20 percent," not that he did not know if RBSSI's Credit group was or was not concerned with finding material exceptions. FHFA Ex. 384 (Deposition of James Whittemore) at 115:16-116:9.

RBSSI further disputes the assertion in ¶ 755 to the extent it states or implies that RBSSI should have upsized the loan-level due diligence samples for any of the Nomura Securitizations. As stated in FHFA Exs. 448 and 450, Clayton found "no credit issues" for either the NAAC 2007-AR1 or NHEL 2007-HE1 samples, and in fact concluded that there was no evidence of imprudent lending practices. FHFA Ex. 448 (Clayton Report on NAAC 2007-AR1) at RBS-FHFA-SDNY-0487364; FHFA Ex. 450 (Clayton Report on NHEL 2007-HE1) at RBS-FHFA-SDNY-0487361. Further, the number of "exceptions" in the pools of loans that were sourced into the NHELI 2006-HE3 and NHELI 2006-FM2 Securitizations were also under 20% (even assuming that was the threshold above which RBSSI was required to upsize its sample, which it was not). FHFA Ex. 427 (NHELI 2006-HE3 Due Diligence Summary) at NOM-FHFA_04998535; FHFA Ex. 137 (NHELI 2006-FM2 Due Diligence Summary) at NOM-FHFA 04879929.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues

"that the facts and/or circumstances regarding what Mr. Whittemore believed 'in his

realm' about reporting of significant material exceptions is not a 'material fact' at issue in

this litigation under Local Rule 56.1," RBSSI's argument does not create a genuine

dispute of material fact. Part I.A, *supra*. RBSSI disputes "the assertion in ¶ 755 to the

extent it states or implies that RBSSI should have upsized the loan-level due diligence

samples for any of the Nomura Securitizations[;]" however, this assertion is irrelevant to

the fact asserted by FHFA and does not create a genuine dispute of material fact. Part

I.C, *supra*.

756. **FHFA Statement:** RBS did not effect any upsize of the due diligence sample of NAAC
2007-AR1, the relevant due diligence sample for NHELI 2007-1, after encountering a
material exception rate of 32% (33 of 102 loans). Ex. 447 (RBS-FHFA-SDNY-0485153,
Clayton Event Status – Detail Report for NAAC 2007-AR1 dated January 24, 2007) at
RBS-FHFA-SDNY-0485153 (showing 33 loans with "Final Credit Event" as "2W:
Material exceptions waived").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 756 as it mischaracterizes the cited
document, misstates RBSSI's practices regarding upsizing loan-level due diligence
samples, and misstates the Clayton grades as reported in the January 24, 2007 Clayton
Event Status report found in FHFA Ex. 447. As an initial matter, FHFA cites no
evidence that any of the loans listed in FHFA Ex. 447 in fact had material credit
exceptions. The Clayton Event Status report FHFA cites contains no information
regarding the loans except for their Clayton grades as of January 24, 2007, and certainly
contains no information regarding any "material exceptions" they may have, contrary to
FHFA's assertion. In fact, the accompanying preliminary Clayton Exception detail
report, FHFA Ex. 484, lists numerous compensating factors for many of those loans, and
Clayton itself reported in the final due diligence narrative for this project that there were
"no credit issues" with the sample and that "[w]e found the nature and overall level of
credit and compliance exceptions to be what we typically find in the industry, which does
not suggest a pattern of imprudent lending practices." FHFA Ex. 448 at RBS-FHFA-
SDNY-0487363-64 (emphasis added). FHFA has no response to this evidence.

Moreover, Brian Farrell, RBSSI's credit officer that managed the loan-level diligence on
the NHELI 2007-1 Securitization, reviewed the Clayton individual assessment summary
reports for six of the loans identified as "2W" in FHFA Ex. 447, and concluded that none
had material credit issues that were not offset by sufficient compensating factors,
contrary to FHFA's assertion. RBS Ex. 58 (Farrell Decl.) at ¶¶ 12, 19-25. Nomura's
reunderwriting expert, Michael Forester, also reunderwrote (as part of the sample of loans
he reviewed) one of the loans (Loan ███████ Clayton graded as "2W" that FHFA
alleges had "outstanding issues" and which FHFA asserts RBSSI "waived," and opined
that the loan generally complied with the originator's guidelines. Nomura Ex. 80
(Forester Report) at Exhibit 470. Further FHFA's own reunderwriting expert, Robert
Hunter, also reviewed and reunderwrote that loan, and opined that any alleged
underwriting defects in this loan "did not substantially increase the credit risk associated
with the loan." RBS Ex. 81 (Hunter Report) at Exhibit 2. Again, FHFA has no response
to this evidence.

FHFA also cites no evidence to establish generally that loans preliminarily graded as "2W" by Clayton had material credit issues. As Mr. Farrell testified, loans that Clayton re-graded "2W" in almost all instances were loans for which either (i) the issue identified by Clayton was "cured," (ii) a rebuttal was provided that RBSSI and/or Clayton agreed with, or (iii) RBSSI determined in its judgment that compensating factors offset a particular exception identified by Clayton, and on that basis RBSSI deemed the loan to be acceptable—in other words, the loans had no "material" credit issues. RBS Ex. 5 (Deposition of Brian Farrell) at 455:12-24 ("Q. We talked earlier about the grading that Clayton did on loans EV1, 2 and 3. Are you familiar with the term EV4? A. No. Q. What about EV2W? A. That is a loan that could have been, the exception was deemed acceptable. Q. Deemed by whom? A. Either Clayton or RBS."); id. at 502:2-7 ("Q. Would a cured loan register a 2 or 2W or some other designation? . . . A. I think that it could go either way."); id. at 504:5-506:13 ("Q. And do you recall that in the 2006/2007 time frame only RBS could assign a grade as 2W? ... A. Again, I can recall situations where loans were graded 2Ws based on items that were received for a cure or a rebuttal. Q. Different question, Do you recall that in the 2006/2007 time frame, only RBS itself could assign a grade of 2W? ... A. That was one of the items that could happen, that Greenwich could give them instruction that it was acceptable. The other were perhaps a loan was a 3 and a cure doc was received, and it could receive that grade. The other is that there was an exception and the lender provided a rebuttal and Clayton agreed with the rebuttal, it could also receive that grade for that reason."). Mr. Farrell further testified that "loans were just not waived" by RBSSI; they "were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade." *Id.* at 745:11-746:13 ("Q. How about across all of 2006 into the first quarter of 2007, would it surprise you if across all of RBS's diligence its waive-in rate was over 50 percent? ... A. Again, waive-in rate, I – are we speaking about 2W or you're just stating waiving? Because it's two different things. Q. Are you able to answer the question as I've asked it? ... A. Are you talking about specific the loan grading of 2W, or you're asking about a waiver practice in general? Q. Waivers by RBS? ... A. I don't know – I think I previously testified that loans were not just waived. Loans were, were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade."); RBS Ex. 82 (*MassMutual* Deposition of Brian Farrell) at 406:22-407:8 ("Q. Did RBS waive EV3s in the credit context from time to time? ... A. I don't agree with 'waive.' I don't agree with 'waive.' I think in general, as I previously said, the issues at hand that were flagged by Clayton or any other diligence firm were thoroughly reviewed and assessed, and based on that analysis performed, a determination would be made whether the loan is acceptable or not."). FHFA cites no evidence to rebut these statements.

RBSSI also disputes the assertion in ¶ 756 insofar as FHFA completely misunderstands Clayton's purpose in reviewing loans and assigning grades, which was not to identify "good" or "bad" loans, but to flag issues for RBSSI for further review. RBS Ex. 58 (Farrell Decl.) at ¶ 9 ("Loans assigned an initial grade of "3" were identified for my review. Clayton's initial grading of a loan as a "3" was not a final assessment, but rather a flag for me, as the RBSSI credit officer managing the due diligence project, to apply my professional judgment and make the final determination as to whether to accept the loan."). It was not unusual for RBSSI Credit group personnel, following review of

Clayton's initial grade of "3" or "3C" or "3D", to determine that the loan should not be assigned a final "3" grade, based on the RBSSI Credit group employee's review of the relevant characteristics of the loan, review of loan documents as necessary, and consideration of any rebuttal and/or curing documents or information provided by the originator. *Id.* at ¶¶ 9-11 (discussing the preliminary nature of Clayton's grades and that RBSSI made the final determination regarding material exceptions); RBS Ex. 5 (Deposition of Brian Farrell) at 509:5-513:5 ("Q. So do I understand correctly that if a credit officer were ultimately of the opinion that a loan was a 3, that is a loan that would not be eligible for purchase? ... A. In what stage, of what Clayton has? Because this is, this is just a Clayton grade, right. Q. I'm talking about – A. Hold on, please let me finish. This isn't, this isn't an RBS grade. These are grades Clayton that is assigning. We spoke about yesterday about looking at certain grades, 2s, 3s, etc. So these are Clayton grades. These are flagged in a certain way so RBS has the opportunity to review exceptions that have been, that have been flagged. This isn't an RBS grade. This is, this is a Clayton grade. This was set up to determine flags of what should be looked at and what shouldn't be. So I don't want to get hung up on the 3 grade by itself because it's Clayton's grade, it's not an RBS grade.... Q. Do you know whether loans that were 3s but nevertheless purchased were ever included in securitizations sold to investors? . .. A. It's possible. Again, I want to be very clear here that a loan could have been graded a 3 by Clayton, so it could still be a 3, but I can still deem it to be acceptable. I don't want to get hung up on the actual grade. It's a Clayton grade that they're sending over, right, so you're saying it's a 3. That grade may never be changed. I may be – the loan itself, an exception may be acceptable to me. So am I changing the grade myself? No. I've reviewed the loan, I deem it to be acceptable. It still may be a Clayton 3, they may never change it, but in my mind the loan is acceptable."). Indeed, this was particularly true for loans given a preliminary grade "3C" or "3D," which signaled that the alleged "material" issue was either curable ("3C") or concerned a missing document ("3D") that could and generally would be fixed by the originator. RBS Ex. 58 (Farrell Decl.) at ¶ 17 ("In circumstances where Clayton identified exceptions that were based on missing documentation, I would typically accept the loan if the missing documents were provided by the originator and that resulted in the identified exception being cleared, or if the originator represented that the missing documents would be provided, or if I determined that the missing documentation was unimportant or was offset by sufficient compensating factors to justify acceptance of the loan."). RBSSI notes that of the 33 loans FHFA asserts represented "material exceptions" for credit, 16 were graded as "3C" for credit reasons, three were graded "3D" for credit reasons, and five were graded 3 for compliance issues not credit issues. Only nine loans (or 9% of the sample) were initially graded as "3" for potentially disqualifying credit issues. FHFA Ex. 484 (Clayton Exception Detail Report for NAAC 2007-AR1) at CLAY-FHFA-E_000579503

Finally, RBSSI disputes the assertion ¶ 756 in that it misstates or mischaracterizes RBSSI's policy regarding sampling criteria and upsizing sample size based on material exceptions. As stated in RBSSI's responses to ¶¶ 636-639 and 752-754 (which are incorporated by reference as if stated fully herein), RBSSI's practices and procedures encouraged credit personnel to use their experience and judgment when assessing whether material credit exceptions existed and whether additional diligence on other loans from the pool was required. Factors other than the number of loans initially

assigned a Clayton grade of "3," "3C," "3D" or "2W" (which was not necessarily evidence of a material exception), affected whether a sample should be upsized. To the extent FHFA states or implies that RBSSI should have "effect[ed] an[] upsize of the due diligence sample of NAAC 2007-AR1" RBSSI disputes that assertion for the reasons stated herein. There is no evidence that any material exceptions existed, let alone in 20% of the sample. Thus, there is no evidence that RBSSI should have "upsized" its due diligence sample.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that "misstates the Clayton grades as reported in the January 24, 2007 Clayton Event Status report found in FHFA Ex. 447," it ignores the plain language of the Exhibit, as quoted in ¶ 756: "2W: Material exceptions waived." While RBSSI argues that the assertion in ¶ 756 does not properly characterize the cited document, "misstat[ing] RBSSI's practices regarding upsizing loan-level due diligence samples[,]" RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. While RBSSI asserts that "Brian Farrell, RBSSI's credit officer that managed the loan-level diligence on the NHELI 2007-1 Securitization, reviewed the Clayton individual assessment summary reports…and concluded that none had material credit issues that were not offset by sufficient compensating factors[,]" this assertion does not specifically controvert the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. RBSSI asserts that Nomura's expert "reunderwrote (as part of the sample of loans he reviewed) one of the loans (Loan 171710475) Clayton graded as '2W' … and opined that the loan generally complied with the originator's guidelines[,]" but the conclusory assertions of an expert do not create a genuine dispute of fact. Part I.G, *supra*. While RBSSI argues that "FHFA also cites no evidence to establish generally that loans preliminarily graded as '2W' by Clayton had material credit issues[,]" its argument and the testimony it cites do not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI argues that "FHFA

completely misunderstands Clayton's purpose in reviewing loans and assigning grades, which was not to identify 'good' or 'bad' loans, but to flag issues for RBSSI for further review[,]" this argument does not create a genuine dispute of material fact. Part I.A, *supra*. RBSSI disputes "the assertion ¶ 756 in that it misstates or mischaracterizes RBSSI's policy regarding sampling criteria and upsizing sample size based on material exceptions[;]" however, this is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

757. **FHFA Statement:** The exception detail report had material credit exceptions including unsupported values, payment shock of ▉▉▉ income documents that did not meet the applicable guidelines, and insufficient cash reserves. Ex. 484 (CLAY_FHFA-E-000579503, Clayton Exception Detail Report for NAAC 2007-AR1, dated January 18, 2007) at CLAY_FHFA-E-000579503 (showing Loan ▉▉▉ as having a payment shock of ▉▉▉ Loan ▉▉▉ as having income documents that did not meet the applicable guidelines, and Loan ▉▉▉ as having insufficient cash reserves).

**RBSSI Response:** RBSSI disputes the assertion in ¶ 757. As stated in RBSSI's response to ¶ 756 (which RBSSI incorporates by reference as if restated herein), there is substantial evidence in the record demonstrating that none of the loans "had material credit exceptions," contrary to FHFA's assertion. This includes (i) the final Clayton due diligence narrative for this project, which reported "no credit issues" and that there was no evidence of "imprudent lending practices," FHFA Ex. 448 (Clayton report for NAAC 2007-AR1) at RBS-FHFA-SDNY-0487363-64; (ii) the Clayton exception detail report (FHFA Ex. 484), which lists compensating factors for many of the loans, including those flagged by FHFA, such as verified cash reserves and a FICO score more than 20 points higher than the stated guideline (Loans ▉▉▉ ▉▉▉), and a combined loan-to-value ratio 25 percentage points lower than the guideline maximum (Loan ▉▉▉, FHFA Ex. 484 (Clayton Exception Detail Report for NAAC 2007-AR1) at CLAY-FHFA-E_000579503; (iii) the Declaration of Brian Farrell, RBSSI's credit officer that managed the diligence on the NHELI 2007-1 Securitization, who concluded that none of the loans he reviewed, including the three flagged by FHFA above, contained material credit exceptions that were not offset by sufficient compensating factors, RBS Ex. 58 (Farrell Decl.) at ¶¶ 12, 19-25; and (iv) the expert reports of both Nomura and FHFA's reunderwriting experts, who both reviewed and reunderwrote one of the loans Clayton initially graded as "2W" (Loan ▉▉▉) and concluded either that the loan generally met the guidelines, RBS Ex. 80 (Forester Report) at Exhibit 470, or that any identified exception did not materially increase the credit risk of the loan, RBS Ex. 81 (Hunter Report) at Exhibit 2.

Moreover, RBSSI disputes FHFA's general misconception that a preliminary Clayton grade of "3" or "3C" or "3D" signaled a material exception. RBS Ex. 58 (Farrell Decl.)

at ¶ 9 ("Loans assigned an initial grade of "3" were identified for my review. Clayton's initial grading of a loan as a "3" was not a final assessment, but rather a flag for me, as the RBSSI credit officer managing the due diligence project, to apply my professional judgment and make the final determination as to whether to accept the loan."). It was not unusual for RBSSI Credit group personnel, following review of Clayton's initial grade of "3" or "3C" or "3D", to determine that the loan should not be assigned a final "3" grade, based on the RBSSI Credit group employee's review of the relevant characteristics of the loan, review of loan documents as necessary, and consideration of any rebuttal and/or curing documents or information provided by the originator. *Id.* at ¶¶ 9-11 (discussing the preliminary nature of Clayton's grades and that RBSSI made the final determination regarding material exceptions); RBS Ex. 5 (Deposition of Brian Farrell) at 509:5-513:5 ("Q. So do I understand correctly that if a credit officer were ultimately of the opinion that a loan was a 3, that is a loan that would not be eligible for purchase? ... A. In what stage, of what Clayton has? Because this is, this is just a Clayton grade, right. Q. I'm talking about – A. Hold on, please let me finish. This isn't, this isn't an RBS grade. These are grades Clayton that is assigning. We spoke about yesterday about looking at certain grades, 2s, 3s, etc. So these are Clayton grades. These are flagged in a certain way so RBS has the opportunity to review exceptions that have been, that have been flagged. This isn't an RBS grade. This is, this is a Clayton grade. This was set up to determine flags of what should be looked at and what shouldn't be. So I don't want to get hung up on the 3 grade by itself because it's Clayton's grade, it's not an RBS grade.... Q. Do you know whether loans that were 3s but nevertheless purchased were ever included in securitizations sold to investors? . .. A. It's possible. Again, I want to be very clear here that a loan could have been graded a 3 by Clayton, so it could still be a 3, but I can still deem it to be acceptable. I don't want to get hung up on the actual grade. It's a Clayton grade that they're sending over, right, so you're saying it's a 3. That grade may never be changed. I may be – the loan itself, an exception may be acceptable to me. So am I changing the grade myself? No. I've reviewed the loan, I deem it to be acceptable. It still may be a Clayton 3, they may never change it, but in my mind the loan is acceptable."). Indeed, this was particularly true for loans given a preliminary grade "3C" or "3D," which signaled that the alleged "material" issue was either curable ("3C") or concerned a missing document ("3D") that could and generally would be fixed by the originator. RBS Ex. 58 (Farrell Decl.) at ¶ 17 ("In circumstances where Clayton identified exceptions that were based on missing documentation, I would typically accept the loan if the missing documents were provided by the originator and that resulted in the identified exception being cleared, or if the originator represented that the missing documents would be provided, or if I determined that the missing documentation was unimportant or was offset by sufficient compensating factors to justify acceptance of the loan."). RBSSI notes that of the 33 loans FHFA asserts represented "material exceptions" for credit, 16 were graded as "3C" for credit reasons, three were graded "3D" for credit reasons, and five were graded 3 for compliance issues not credit issues. Only nine loans (or 9% of the sample) were initially graded as "3" for potentially disqualifying credit issues. FHFA Ex. 484 (Clayton Exception Detail Report for NAAC 2007-AR1) at CLAY-FHFA-E 000579503.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence relating to comments about or possible compensating factors for the loans in question, Clayton's final narrative, and the finality of Clayton's grades fails to directly contravene the asserted fact that several credit issues were cited in the Exception Detail Report and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to "3D" loans is irrelevant to the asserted fact since none of the three loans cited in ¶ 757 were graded "3D" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*; *see* FHFA Ex. 484 at CLAY_FHFA-E-000579503. While RBSSI argues that "none of the loans 'had material credit exceptions,'" the evidence cited by RBSSI in support of this argument does not controvert the plain language of FHFA Ex. 484 indicating that the three loans in question were flagged by Clayton as having "Outstanding Material Credit Exceptions," and thus RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

758. **FHFA Statement:** During its credit and compliance review of the NHELI 2007-2 sample, Clayton flagged 74 loans for material credit exceptions, including a 100-point credit score exception, a fifteen point LTV exception, a debt-to-income ratio exception of over 20%, and mortgage and rental late payments that exceeded the guidelines. Ex. 453 (RBS-FHFA-SDNY-0303869, Clayton Exception Detail Report dated January 24, 2007) at RBS-FHFA-SDNY-0303869 (showing Loan ███████████ as having an outstanding material credit exception of "████████████████████████████████████████████ ██████████████████████████████████████); *id.* at RBS-FHFA-SDNY-0303869 (showing Loan ███████████ as having ██████████████ RBS-FHFA-SDNY-0303869 (showing Loan ████████ as having ████████████████████████████); Cipione Decl. Ex. 7 (74 loans ever graded "3: Material Exceptions Noted").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 758. As discussed in RBSSI's responses to ¶¶ 727-28 and 756-57 (which RBSSI incorporates by reference as if restated herein), the preliminary Clayton grades on which FHFA relies is not evidence of actual "material credit exceptions" either are a general matter or with regard to the specific loans identified in FHFA Ex. 453. Indeed, FHFA Ex. 453 itself identifies numerous compensating factors for many of the loans, justifying their inclusion in the final loan pool. FHFA Ex. 453 (RBS-FHFA-SDNY-0303869, Clayton Exception Detail Report dated January 24, 2007) at RBS-FHFA-SDNY-0303869. Further, following the issuance

of that report, Clayton issued a final due diligence narrative on January 31, 2007, in which it reported "no credit issues" and further stated that "[w]e found the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, which does not suggest a pattern of imprudent lending practices." FHFA Ex. 450 at RBS-FHFA-SDNY-0487360-61. FHFA has no response to this evidence nor does it cite to any evidence demonstrating that "credit issues" in fact existed as to any of the loans listed in FHFA Exs. 453 or 526. Moreover, Nomura's reunderwriting expert, Michael Forester, also reunderwrote (as part of the sample of loans he reviewed) two of the loans (Loan ███████ and Loan ███████) Clayton graded as "3" that FHFA alleges had "material credit exceptions," and opined that both loans generally complied with the originators' guidelines. Nomura Ex. 80 (Forester Report) at ¶ Exhibits 524 and 550. FHFA's own reunderwriting expert Robert Hunter, also concluded that any alleged underwriting defects in Loan ██████ "did not substantially increase the credit risk associated with the loan." RBS Ex. 81 (Hunter Report) at Exhibit 2. Again, FHFA has no response to this evidence.

Moreover, RBSSI disputes FHFA's general misconception that a preliminary Clayton grade of "3" or "3C" or "3D" signaled a material exception. RBS Ex. 58 (Farrell Decl.) at ¶ 9 ("Loans assigned an initial grade of "3" were identified for my review. Clayton's initial grading of a loan as a "3" was not a final assessment, but rather a flag for me, as the RBSSI credit officer managing the due diligence project, to apply my professional judgment and make the final determination as to whether to accept the loan."). It was not unusual for RBSSI Credit group personnel, following review of Clayton's initial grade of "3" or "3C" or "3D", to determine that the loan should not be assigned a final "3" grade, based on the RBSSI Credit group employee's review of the relevant characteristics of the loan, review of loan documents as necessary, and consideration of any rebuttal and/or curing documents or information provided by the originator. *Id.* at ¶¶ 9-11 (discussing the preliminary nature of Clayton's grades and that RBSSI made the final determination regarding material exceptions); RBS Ex. 5 (Deposition of Brian Farrell) at 509:5-513:5 ("Q. So do I understand correctly that if a credit officer were ultimately of the opinion that a loan was a 3, that is a loan that would not be eligible for purchase? ... A. In what stage, of what Clayton has? Because this is, this is just a Clayton grade, right. Q. I'm talking about – A. Hold on, please let me finish. This isn't, this isn't an RBS grade. These are grades Clayton that is assigning. We spoke about yesterday about looking at certain grades, 2s, 3s, etc. So these are Clayton grades. These are flagged in a certain way so RBS has the opportunity to review exceptions that have been, that have been flagged. This isn't an RBS grade. This is, this is a Clayton grade. This was set up to determine flags of what should be looked at and what shouldn't be. So I don't want to get hung up on the 3 grade by itself because it's Clayton's grade, it's not an RBS grade.... Q. Do you know whether loans that were 3s but nevertheless purchased were ever included in securitizations sold to investors? . .. A. It's possible. Again, I want to be very clear here that a loan could have been graded a 3 by Clayton, so it could still be a 3, but I can still deem it to be acceptable. I don't want to get hung up on the actual grade. It's a Clayton grade that they're sending over, right, so you're saying it's a 3. That grade may never be changed. I may be – the loan itself, an exception may be acceptable to me. So am I changing the grade myself? No. I've reviewed the loan, I deem it to be acceptable. It still may be a Clayton 3, they may never change it, but in my mind the loan is

acceptable.").  Indeed, this was particularly true for loans given a preliminary grade "3C" or "3D," which signaled that the alleged "material" issue was either curable ("3C") or concerned a missing document ("3D") that could and generally would be fixed by the originator.  RBS Ex. 58 (Farrell Decl.) at ¶ 17 ("In circumstances where Clayton identified exceptions that were based on missing documentation, I would typically accept the loan if the missing documents were provided by the originator and that resulted in the identified exception being cleared, or if the originator represented that the missing documents would be provided, or if I determined that the missing documentation was unimportant or was offset by sufficient compensating factors to justify acceptance of the loan.").  RBSSI notes that of the 50 loans from the sample with supposedly "material exceptions" for credit (not 74 as FHFA incorrectly states), eight were graded as "3C" and seven were graded "3D;" in other words, only 35 loans (or 11.4% of the sample) were initially graded as "3" for potentially disqualifying credit issues.  FHFA Ex. 453 (Clayton Exception Detail Report for NAAC 2007-HE1 dated January 24, 2007) at RBS-FHFA-SDNY-0303869.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  The cited evidence relating to comments about or possible compensating factors for the loans in question, Clayton's final narrative, and the finality of Clayton's grades fails to directly contravene the asserted fact that several credit issues were cited in the Exception Detail Report and therefore does not create a genuine dispute of material fact.  Part I.C, *supra*.  The cited evidence relating to "3C" and "3D" loans is irrelevant to the asserted fact since none of the three loans cited in ¶ 758 were graded "3C" or "3D" and therefore the evidence does not create a genuine dispute of material fact.  Part I.C, *supra*; *see* FHFA Ex. 453 at RBS-FHFA-SDNY-0303869.  While RBSSI argues that none of "the loans 'had material credit exceptions,'" RBSSI ignores the plain language of FHFA Ex. 453 as quoted in ¶ 758, where 74 of the loans were accompanied by the description: "2W: Material exceptions waived."  While RBSSI asserts that Nomura's expert "Michael Forester, also reunderwrote (as part of the sample of loans he reviewed) two of the loans (Loan ███████ and Loan ██████) Clayton graded as '3'… and opined that both loans generally complied with the originators' guidelines[,]" the conclusory assertions of an expert do not create a genuine dispute of fact.  Part I.G, *supra*.

542

759. **FHFA Statement:** Through a January 12, 2007, email to Mr. Smith, Mr. Farrell sought to sample 25% of the loans intended for the NHELI 2007-2 Securitization. Ex. 458 (RBS-FHFA-SDNY-0487343, email regarding NHELI07-HE1 Term Sheet) at RBS-FHFA-SDNY-0487343 (Farrell requesting "to review 25% of the total loan population," because the pool was "crap".).

**RBSSI Response:** RBSSI does not dispute that in the email referenced in ¶ 759 Mr. Farrell stated that he "would like to review 25% of the total loan population."

**FHFA Reply:** RBSSI does not dispute the asserted fact.

760. **FHFA Statement:** Mr. Farrell stated that these loans were "crap" based on his review of the loan tape. Ex. 458 (RBS-FHFA-SDNY-0487343, email regarding NHELI-07-HE1 Term Sheet) at RBS-FHFA-SDNY-0487343 (Farrell stating that the loan pool was "crap".).

**RBSSI Response:** RBSSI disputes the assertion in ¶ 760 as it mischaracterizes the document and is argumentative. According to FHFA Ex. 458, Mr. Farrell sent an email to Mr. Smith with the subject "FW: Emailing: nheli07-he1_Greenwich_termsheet.csv" and stated "This will be larger than 250," to which Mr. Smith responded, "Why?" and Mr. Farrell stated "Because it's crap." The attached document was a term sheet not a "loan tape," and provided only high-level information regarding the characteristics of the entire loan pool rather than any particular loan. Nothing in that attachment contained information about underwriting guidelines or appraisal standards or the originators' compliance with such standards. RBS Ex. 83 (RBS-FHFA-SDNY-0487332, attachment to FHFA Ex. 458) at RBS-FHFA-SDNY-0487332. When specifically questioned about this correspondence, Mr. Smith testified that while he did not know what Mr. Farrell meant in using that term, he thought it could have meant any number of things. RBS Ex. 17 (Deposition of Adam Smith) at 449:10-451:3 ("What he's inferring as crap I have – I don't know what the answer is. If it's there's a lot of loans in Indiana and I don't like Indiana. The whole thing, I don't like the whole thing. If there's a bunch of loans that have 200 FICO scores or 400 FICO scores."). Mr. Farrell testified that he did not recall this email or what he meant in using the term "crap." RBS Ex. 5 (Deposition of Brian Farrell) at 727:23-728:20. FHFA also omits Mr. Smith's email in response that Mr. Farrell should "[d]o what you feel comfortable with." FHFA Ex. 458 (email regarding NHELI-07-HE1 Term Sheet) at RBS-FHFA-SDNY-0487343.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the "assertion in ¶ 760 as it mischaracterizes the document and is argumentative," its argument does not create a genuine dispute of material fact, Part I.A, *supra*, and it identifies no evidence that contradicts the asserted fact. RBS's conclusory assertions do

not create a genuine dispute of material fact. Part I.B, *supra*. The cited testimony of Mr. Smith is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. RBSSI does not dispute a material fact. Any dispute about whether the attachment could be characterized as a "loan tape" and contains information as to the entire loan pool rather than any particular loan is not material to FHFA's motion. *Quarles*, 758 F.2d at 840.

761. **FHFA Statement:** That same day, Mr. Farrell wrote an email to Mr. Whittemore regarding NHELI 2007-2 explaining that "[t]his one is crap. I'm looking for a suggestion." Ex. 444 (RBS-FHFA-SDNY-0468384, email FW: Nomura January 2007 Transactions) at RBS-FHFA-SDNY-0468384 (Farrell wrote to Whittemore with respect to NHELI 2007-HE1 stating "[t]his one is crap. I'm looking for a suggestion.").

   **RBSSI Response:** RBSSI does not dispute that FHFA Ex. 444 contains the language quoted by FHFA. RBSSI disputes the assertion in ¶ 761 to the extent it is meant to state or imply that Mr. Farrell's views regarding the lending standards that were applied to those loans. The attached document to which Mr. Farrell referred to was a term sheet provided only high-level information regarding the characteristics of the entire loan pool rather than any particular loan, and contained no information about underwriting guidelines or appraisal standards. RBS Ex. 72 (RBS-FHFA-SDNY-0468385, attachment to FHFA Ex. 444) at RBS-FHFA-SDNY-0468385.

   **FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited document relating to the term sheet is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Any dispute about whether the attachment could be characterized as a "loan tape" and contains information as to the entire loan pool rather than any particular loan is not material to FHFA's motion. *Quarles*, 758 F.2d at 840.

762. **FHFA Statement:** Mr. Farrell wrote to Mr. Smith: I would like to review 25% of the total loan population. Mr. Smith responded: "[w]e don't own the pool. Call me." Ex. 458 (RBS-FHFA-SDNY-0487343, email regarding NHELI07-HE1 Term Sheet) at RBS-FHFA-SDNY-0487343 (Smith responding to Farrell's statement that "I would like to review 25% of the total loan population," with "[w]e don't own the pool. Call me.").

   **RBSSI Response:** RBSSI does not dispute the assertion in ¶ 762.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

763. **FHFA Statement:** Mr. Farrell did not know why Mr. Smith would want to "take the conversation offline." Ex. 383 (Deposition of Brian Farrell) at 731:22-732:5 ("Q. Do you have any idea why Mr. Smith would want to take this conversation off line? ... A. No. It may just be quicker to have a conversation than go back and forth on email.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 763. Mr. Farrell testified that he thought "[i]t may have been quicker to have a conversation than go back and forth on email." RBS Ex. 5 (Deposition of Brian Farrell) at 731:22-732:5.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited testimony

relating to Mr. Farrell's response does not directly contravene the asserted fact and does

not create a genuine dispute of material fact. Part I.C, *supra*.

    3.    <u>RBSSI's Diligence Did Not Test The Accuracy Of The Representations In The Prospectus Supplements For The NHELI 2007-1 And NHELI 2007-2 Securitizations At The Time Of Securitization</u>

    (a)    *Review By The Credit Group*

764. **FHFA Statement:** When asked whether, as RBS's Chief Underwriter, he ran RBS's diligence operations from his home, Mr. Whittemore clarified that he was on the road 42 to 46 weeks out of the year, and that he only ran his sampling and responsibilities as a Credit Officer on the road. Ex. 384 (Deposition of James Whittemore) at 41:4-42:21 ("Q. And in the six years you were at RBS, you only went to the office in Greenwich, Connecticut, very rarely, correct? A. Yes, that is correct. Q. So in effect, you, when you were chief underwriter you ran RBS's due diligence operations out of your home, right? ... A. As chief underwriter, no, I don't believe I ran the operation out of my home. I was involved with other credit people in Greenwich. Q. Okay. You, however, were based in your home when you were running RBS's due diligence operations? ... A. I don't -- I'm not quite sure how to answer this other than because I was on the road 42 to 46 weeks out of the year, that I wasn't home very much, so I would not say that I ran it out of my home. Q. Okay, just to clarify then, while you were chief underwriter at RBS, you oversaw the operations of its due diligence either out of your home or while you were on the road outside of the RBS offices, correct? ... A. My responsibilities, yes. Other responsibilities within the credit department that I needed, then I would say no. There were other people that I needed to rely on, so I would have to rely on them. So no, I can't say I ran the whole operation. I ran my sampling and my, my responsibilities of credit officer on the road.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 764 as it mischaracterizes or improperly paraphrases the cited testimony. When questioned about whether he "ran RBS's due diligence operations out of [his] home," Mr. Whittemore stated "[a]s chief underwriter, no, I don't believe I ran the operation out of my home. I was involved with

other credit people in Greenwich." RBS Ex. 6 (Deposition of James Whittemore) at 41:9-18. Mr. Whittemore further testified that he "can't say I ran the whole operation" and "would never say I was autonomous" and had specific individuals he reported to. *Id.* at 34:9-36:10, 42:6-19. When asked who had responsibility for "defining RBS's due diligence process," Whittemore explained "it was the credit department itself, we would be working together." *Id.* at 43:14-23.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues

that the cited testimony is not properly characterized, RBSSI's argument does not create a

genuine dispute of material fact. Part I.A, *supra*. The cited testimony relating to Mr.

Whittemore's response does not directly contravene the asserted fact that "Mr.

Whittemore clarified that he was on the road 42 to 46 weeks out of the year, and that he

only ran his sampling and responsibilities as a Credit Officer on the road" and therefore

does not create a genuine dispute of material fact. Part I.C, *supra*.

765. **FHFA Statement:** In his capacity as chief underwriter of RBS Mr. Whittemore did not feel that he had any responsibility for ensuring that representations made by RBS in its offering memoranda for RMBS transactions were true. Ex. 384 (Deposition of James Whittemore) at 62:16-63:13 ("Q. As chief underwriter at RBS, did you regard yourself as having any responsibility to ensure that representations made by RBS in its offering memoranda for RMBS transactions were true? ... A. No, I don't feel that I was responsible for that. Q. Do you agree that RBS itself was responsible for the truth of statements made in offering materials for RMBS transactions that RBS underwrite - - underwrote? ... A. I cannot answer for RBS.").

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 384 contains the language cited by FHFA, but disputes the assertion in ¶ 765 insofar as it misstates, misunderstands or mischaracterizes the roles and responsibilities of Mr. Whittemore and the Credit group more generally with regard to third-party securitizations such as the Nomura Securitizations. The role of RBSSI's Credit group, to which Mr. Whittemore belonged, was to perform loan-level due diligence and then report any issues in the results to employees in the Asset-Backed Finance group, who managed the process of ensuring that the prospectus supplement was free of material misstatements. FHFA Ex. 388 (RBSSI Credit Manual) at RBS-FHFA-SDNY-0615277 ("In its role of assisting the Asset Backed Finance and Trading areas, the Credit Risk Management Department performs due diligence on the assets themselves and on those portions of the organizational and operational structures of the asset originators and servicers which directly impact the quality and servicing of the assets."). The Credit group was separate from the Asset-Backed Finance group to better ensure its objectivity and independence in conducting due diligence on loans RBSSI was securitizing and underwriting. RBS Ex. 84 (Deposition of Joseph Walsh) at 307:10-22 ("Q. Do you ever recall having convinced credit to go

forward even though they were giving you a lot of grief? ... A. I don't really recall that. Credit was a very independent body, they had an independent reporting line. Many times I was consulted and weighed in, but the ultimate arbiter of credit related decisions was the credit department and that was very clear.").

While the nature of the Credit group's assistance varied depending on "the transaction ... , the Firm's experience with the client and the transaction type, the risks involved, the size of the transaction and other factors," FHFA Ex. 369 (2006 Asset-Backed Finance Manual) at RBS-FHFA-SDNY-0498399, the work of the Credit group in conducting loan-level due diligence was to ensure that the loans generally were originated in accordance with lenders' guidelines, not to review or confirm statements in RMBS offering materials. RBS Ex. 6 (Deposition of James Whittemore) at 29:5-13 ("Q. How would you describe your responsibilities as credit officer, first? A. My responsibility was to work with a third-party vendor in reviewing a number of loans in a specific pool, doing the due diligence to determine if the lender/originator originated a loan to their underwriting guidelines."); RBS Ex. 7 (Deposition of William Gallagher) at 65:2-66:24 ("Q. What was the role of – within credit was there a department called or a group called consumer loan underwriting? A. Yes, there was. Q. What was the role of that group? A. The loan underwriting group was generally responsible for reviewing individual loan files for different types of transactions .... If we were securitizing loans that were not related to a prior purchase of loans, there was review work on loans that was generally done as well that that group was responsible for. ... Q. What was the reason for that practice? ... A. The general reason was to make sure that the loans that were being securitized met the guidelines that were being put forward by both the firm securitizing the loans and the finance group who was doing the underwriting."); RBS Ex. 17 (Deposition of Adam Smith) at 184:8-22 ("Q. Just to short-circuit it, on any of the eight deals that I identified for you at the beginning of the deposition, do you know who, if anyone, in the diligence department was responsible for confirming that the collateral strats tied to the diligence results? ... A. I think the diligence process was to evaluate the underwriting of the collateral in the aggregate. I'm not certain that the role of the diligence provider was to check the document.").

Employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results. RBS Ex. 17 (Deposition of Adam Smith) at 121:4-122:16 ("Q. Okay. Did you personally believe during the period 2005 to 2007 that the information provided to investors in prospectus supplements needed to be accurate? ... A. We in the asset-backed group in conjunction with the lawyers, internal, external, the accountants, credit department, drafted the doc. Me personally? I tried to make it as accurate as possible given the information that I had. I tried to make it as accurate as possible. Q. And you understood that investors were relying on the accuracy of the information in ProSupps, correct? ... A. I think I just answered the question. I tried, I tried to make it as accurate as possible. Q. Do you have a recollection of anything you did specifically on this transaction to ensure the accuracy of this document? A. Again, you know, we worked on many transactions on a monthly

basis. We had a team of people on it and that team would include lawyers, accountants, internal collateral analysts, internal structuring people, other vice presidents, analysts, associates, reading the document, you know, some working on particular sections, and trying to make it as accurate as possible."); *see also* RBS Ex. 11 (Deposition of Vinu Phillips) at 245:5-246:14 ("We had an extensive deal team consisting of myself and a vice president an associate and possibly an analyst. We would all review the document. We would work with the - - with the originator and the seller and ask them to thoroughly review their particular sections of the prospectus supplement. We would get representations and warranties from the originator of the collateral with respect to the, certain information in the prospectus, including the underwriting guidelines and the originator and the servicer sections. We would review the structure with the trading desk and try to ensure that the cash flow waterfall was written properly in the document. We would ask internal and external counsel to review the document to get their take on things. We would have accountants look at the numbers as well as some of the text within the prospectus supplement. We would have -- you know, like I said, we would try to review the entire prospectus supplement and we utilized the trustee, the external counsel, the internal counsel, the underwriter counsel, the rating agencies and all these various other deal participants to review the prospectus and make sure that they believed it would be factual and correct."); RBS Ex. 84 (Deposition of Joseph Walsh) at 126:22-130:17 (discussing steps taken and individuals and entities involved in ensuring that the offering materials contained no material misstatements).

Adam Smith, the lead banker in the Asset-Backed Finance group for the Nomura Securitizations, testified, that it was his job to make the prospectus supplement "as accurate as possible," RBS Ex. 17 (Deposition of Adam Smith) at 121:11-122:16, and further explained that to carry out that job he worked with and "relied" on the credit department to make the appropriate decisions with respect to sampling [and] diligence results" and would discuss those results with the Credit group "if there were specific, you know, exceptions or issues." *Id.* at 57:22-58:10. Indeed, to facilitate that process, RBSSI Credit personnel were tasked with reporting their loan-level due diligence findings to members of the Asset-Backed Finance group, among others, to the extent there were any issues. *See* FHFA Ex. 388 (RBSSI Credit Manual) at RBS-FHFA-SDNY-0615281-82 ("At the conclusion of the due diligence process, the lead Credit underwriter or Credit analyst assigned to a project will prepare a memo summarizing the procedures followed and the information obtained from the reviews" and, "[f]or existing client relationships, the memo should be distributed to the Chief Credit Officer, senior Asset Backed personnel, and the specifically assigned deal manager, relationship manager, and operations person."); RBS Ex. 85 (RBS-FHFA-CT-6730793, RBS Greenwich Capital, Asset-Backed Finance Manual) at RBS-FHFA-CT-6730804 (discussing how for "Lead managed securitizations" the Credit group "will coordinate an asset-level review" and "[a]ny material issues will be brought to the attention of the relevant ABF and Legal personnel" and the "ABF Group personnel and outside legal counsel will review the transaction documents to assure themselves that the offering documents properly reflect the terms of the securities provided in the transaction documents."); RBS Ex. 5 (Deposition of Brian Farrell) at 68:14-23 ("Q. Do you know whether any of the results from the diligence you were overseeing was ever reported to any committees? ... A. I mean results were reported to numerous people. Whoever may have been part of

committee, I'm not really sure."); FHFA Ex. 463 ███████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████. In fact, Credit personnel did so for the Nomura Securitizations at issue. RBS Ex. 38 (RBS-FHFA-SDNY-0164304, email from Adam Smith to Brian Farrell and James Whittemore) at RBS-FHFA-SDNY-0164304 (attaching Nomura's due diligence results for pools of loans relating to the NHELI 2006-HE3 Securitization and asking them to "confirm that you are ok with the results."); RBS Ex. 40 (RBS-FHFA-SDNY-0161933, email from Brian Farrell to Adam Smith) at RBS-FHFA-SDNY-0161933 (stating that the "[o]verall snapshot [of the Nomura 2006-HE3 pool] looks OK."); RBS Ex. 23 (RBS-FHFA-SDNY-0622262, email from Adam Smith to Brian Farrell, James Whittemore and James Esposito) at RBS-FHFA-SDNY-0622263 (asking Mr. Farrell and Mr. Whittemore to review the attached due diligence results from Nomura on the Nomura 2006-FM2 pool); *id.* at RBS-FHFA-SDNY-0622262 (response email from James Whittemore stating that "[i]t appears the due diligence sample was sufficient for the size of the pool. Their sample methodology and AVM/BPO process appear to be sound"); RBS Ex. 34 (RBS-FHFA-SDNY-0622281, response from Mr. Farrell) at RBS-FHFA-SDNY-0622281 (stating that "Credit was ok with results and sampling methodoly [sic]" on the Nomura 2006-FM2 pool).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI argues that the cited testimony is not properly characterized, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. The cited testimony relating to the nature of the Credit group's assistance, does not directly contravene the asserted fact that "Mr. Whittemore did not feel that he had any responsibility for ensuring that representations made by RBS in its offering memoranda for RMBS transactions were true" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI argues that "[e]mployees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and

549

other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results[,]" this argument does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Further, the documents cited relating to RBSSI Credit personnel reporting their loan-level due diligence findings to members of the Asset-Backed Finance group, do not directly contravene the asserted fact with regard to Mr. Whittemore's belief and/or understanding that he had any responsibility for ensuring that representations made by RBS in its offering memoranda for RMBS transactions were true, and therefore do not create a genuine dispute of material fact. Part I.C, *supra*. In addition, RBSSI's assertion that "Credit personnel [reported their loan-level due diligence findings to members of the Asset-Backed Finance group] for the Nomura Securitizations at issue" is not supported by the documents cited, which relate only to NHELI 2006-HE3 and NHELI 2006-FM2, the two securitizations in which RBSSI performed no loan-level diligence. *See* RSUF ¶¶ 646-687.

766. **FHFA Statement:** When asked whether, as a Credit Officer and the Chief Underwriter of RBS, he understood that the goal of due diligence was to ensure the truth of RBS's representations to investors, Mr. Whittemore replied that he "did not know." Ex. 384 (Deposition of James Whittemore) at 67:20-68:5 ("Q. Is it fair to say that while you were a credit officer and chief underwriter at RBS, you did not understand that the goal of due diligence was to ensure the truth of RBS's representations to investors? ... A. I don't know if I -- I do not know.").

**RBSSI Response:** RBS does not dispute that FHFA Ex. 384 contains the language quoted by FHFA, but disputes the assertion in ¶ 766 to the extent it states or implies that Mr. Whittemore should have known "that the goal of due diligence was to ensure the truth of RBS's representations to investors" or that RBSSI did not make efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions. As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results. The

Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group. Indeed, when specifically questioned what he understood his responsibility to RMBS investors to be, Mr. Whittemore testified "underwriting and doing due diligence on pools, on sample pools, samples of pools" and to "do due diligence on loans, [and] present results" to others at RBSSI. RBS Ex. 6 (Deposition of James Whittemore) at 411:20-413:2.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI makes assertions about the review of due diligence results, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. The cited testimony relating to Mr. Whittemore is irrelevant to the asserted fact and does not create a genuine dispute of material fact.

Part I.C, *supra*.

767. **FHFA Statement:** In Mr. Whittemore's view, his "duties were to do due diligence on loans, [and] present results." Ex. 384 (Deposition of James Whittemore) at 411:20-412:10 ("Q. Did you regard yourself, as RBS's chief underwriter, as owing any duties to the investors that bought residential mortgage-backed securities transactions structured, sponsored by RBS? ... A. I'm not sure. My duties were to do due diligence on loans, present results. At some point, I don't know what RBS's -- I would assume that they had some responsibilities. I was doing my position which I didn't consider the securitization side of it, that far down the line.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 767, except to the extent that it is intended to state or imply that Mr. Whittemore had or should have had additional duties or responsibilities with regard to the accuracy of RMBS transactional documents, or that RBSSI did not make efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions. As stated in RBSSI's response to ¶ 765, as a member of the Credit group, Mr. Whittemore's duties involved performing loan-level due diligence and reporting any issues to members of the Asset-Backed Finance group, who would determine whether any changes or revisions to the pertinent offering materials were necessary. Mr. Whittemore testified that he understood his duties to RMBS investors to assess whether the loans reviewed complied with originators' guidelines and to report any issues to those directly involved in the drafting and preparation of the offering documents sent to investors. RBS Ex. 6 (Deposition of James Whittemore) at 412:11-413:2.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI makes assertions

about Mr. Whittemore's duties or responsibilities with regard to the accuracy of RMBS

transactional documents or ensuring the accuracy of offering documents, RBSSI's

argument does not create a genuine dispute of material fact. Part I.A, *supra*. The cited

testimony relating to Mr. Whittemore is irrelevant to the asserted fact and does not create

a genuine dispute of material fact. Part I.C, *supra*. Additionally, RBSSI asserts that Mr.

Whittemore testified that "he understood his duties to RMBS investors to be to assess

whether the loans generally complied with originators' guidelines and to report any issues

to those directly involved in the drafting and preparation of the offering documents sent

to investors[,]" but this assertion is not supported by RBS Ex. 6 at 412:11-413:2. The

cited testimony indicates only, in relevant part, that his duties included underwriting and

doing due diligence on pools.

768. **FHFA Statement:** Mr. Whittemore did "not know what [his] responsibilities were to the investors as that was handled by somebody else." Ex. 384 (Deposition of James Whittemore) at 65:2-12 ("Q. Did you regard yourself as having any responsibility in your capacity as RBS's chief underwriter to the investors in RBS's residential mortgage-backed securities transactions? ... A. I'm not sure -- I don't know what my responsibilities were to the investors as that was handled by somebody else. My responsibility included doing due diligence on the loans.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 768 as it mischaracterizes the cited testimony. When questioned whether it was "fair to say that you did not regard yourself as owing any duties to the investors that bought RMBS securities from RBS," Mr. Whittemore clarified that "No, I don't think I meant that or said that," and explained that his "duties included underwriting and doing due diligence on pools, on sample pools, samples of pools." RBS Ex. 6 (Deposition of James Whittemore) at 412:11-413:2. RBSSI further disputes the assertion in ¶ 768 to the extent it states or implies that RBSSI did not make efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions for the reasons stated in RBSSI's response to ¶ 765.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not

dispute that the cited testimony is accurately quoted. While RBSSI cites testimony

relating to Mr. Whittemore's underwriting and due diligence duties, the cited testimony

fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI disputes the assertion "to the extent it states or implies that RBSSI did not make efforts to ensure that representations in offering documents were accurate[,]" RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

769.   **FHFA Statement:** Mr. Whittemore could not recall anyone telling him that ███ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ and that he could not recall any discussions to that effect. Ex. 460 ████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████

**RBSSI Response:** RBS disputes the assertion in ¶ 769 as it states or is meant to imply that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions, or that the loan-reunderwriting work done by the Credit group was not a part of those efforts. As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results. The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group. Mr. Whittemore testified that he understood his duties to RMBS investors to be to assess whether the loans generally complied with originators' guidelines and to report any issues to those directly involved in the drafting and preparation of the offering documents sent to investors. RBS Ex. 6 (Deposition of James Whittemore) at 412:11-413:2.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI disputes the assertion "as it states or is meant to imply that RBSSI did not make adequate efforts to ensure that

representations in offering documents were accurate as part of the due diligence it

conducted for RMBS transactions, or that the loan-reunderwriting work done by the

Credit group was not a part of those efforts[,]" RBSSI's argument does not create a

genuine dispute of material fact.  Part I.A, *supra*.  While RBSSI argues that employees in

"RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel,

managed and coordinated preparation and review of the prospectus supplement for

accuracy[,]" this argument does not directly contravene the asserted fact and does not

create a genuine dispute of material fact.  Part I.C, *supra*.  While RBSSI cites testimony

relating to Mr. Whittemore's underwriting and due diligence duties, the cited testimony

fails to directly contravene the asserted fact and does not create a genuine dispute of

material fact.  Part I.C, *supra*.

770.  **FHFA Statement:**  Mr. Whittemore was ▮▮▮▮▮▮▮▮ that one of the goals of doing due diligence was to ensure the truth of the disclosures in a prospectus.  Ex. 460 ▮▮



**RBSSI Response:**  RBS disputes the assertion in ¶ 770 as it states or implies that Mr. Whittemore should have been instructed that "one of the goals of doing due diligence was to ensure the truth of the disclosures in a prospectus" or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions.  As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results.  The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issue to the Asset-Backed Finance group.  Mr. Whittemore testified that he understood his duties to RMBS investors to be to assess whether the loans complied with originators' guidelines and to report any issues to those directly involved in the drafting and preparation of the offering documents sent to investors.  RBS Ex. 6 (Deposition of James Whittemore) at 412:11-413:2.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI disputes the assertion "as it states or implies that Mr. Whittemore should have been instructed that 'one of the goals of doing due diligence was to ensure the truth of the disclosures in a prospectus' or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions[,]" RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy[,]" this argument does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Further, while RBSSI cites testimony relating to Mr. Whittemore's underwriting and due diligence duties, the cited testimony fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

771. **FHFA Statement:** As RBS's Chief Underwriter, Mr. Whittemore, "[did] not know what my responsibilities were to the investors." Ex. 384 (Deposition of James Whittemore) at 412:19-413:11 ("Q. What duties did you regard yourself as owing to investors that bought RMBS securities from RBS? ... A. My duties included underwriting and doing due diligence on pools, sample pools, samples of pools. Q. In your view, was it important to RMBS investors that originators of loans in the RMBS trusts sold by RBS complied with their underwriting guidelines? ... A. I don't remember that it was my responsibility.")

**RBSSI Response:** RBSSI disputes the assertion in ¶ 771 as it mischaracterizes the cited testimony. When questioned whether it was "fair to say that you did not regard yourself as owing any duties to the investors that bought RMBS securities from RBS," Mr. Whittemore clarified that "No, I don't think I meant that or said that," and explained that his "duties included underwriting and doing due diligence on pools, on sample pools, samples of pools." RBS Ex. 6 (Deposition of James Whittemore) at 412:11-413:2. RBSSI further disputes the assertion in ¶ 771 to the extent it states or implies that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions for the reasons stated in RBSSI's response to ¶ 765.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI argues that the cited testimony is not properly characterized, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. While RBSSI cites testimony relating to Mr. Whittemore's underwriting and due diligence duties, the cited testimony fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Furthermore, RBSSI "disputes" ¶ 771 to the extent it states or implies that "RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions[,]" RBSSI's conclusory arguments are irrelevant. Part I.A, *supra*.

772. **FHFA Statement:** Mr. Whittemore had no "responsibility to ensure that representations made by RBS in its offering memoranda for RMBS transactions were true." Ex. 384 (Deposition of James Whittemore) at 62:16-63:5 ("Q. As chief underwriter at RBS, did you regard yourself as having any responsibility to ensure that representations made by RBS in its offering memoranda for RMBS transactions were true? ... A. No, I don't feel that I was responsible for that.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 772 as it states or implies that Mr. Whittemore should have had responsibility "to ensure that representations made by RBS in its offering memoranda for RMBS transactions were true," or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions. As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results. The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group. Mr. Whittemore testified that he understood his duties to RMBS investors to be to assess whether the loans generally complied with originators' guidelines and to report any issues to those directly involved in the drafting and preparation of the offering documents sent to investors. RBS Ex. 6 (Deposition of James Whittemore) at 412:11-413:2.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. RBSSI "disputes" ¶ 772 to the extent it states or implies that "Mr. Whittemore should have had responsibility 'to ensure that representations made by RBS in its offering memoranda for RMBS transactions were true,'" but they identify no evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy[,]" this argument is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. RBSSI asserts that Mr. Whittemore testified that "he understood his duties to RMBS investors to be to assess whether the loans generally complied with originators' guidelines and to report any issues to those directly involved in the drafting and preparation of the offering documents sent to investors[,]" but this assertion is not supported by RBS Ex. 6 at 412:11-413:2. The cited testimony indicates only, in relevant part, that his duties included underwriting and doing due diligence on pools.

773. **FHFA Statement:** During the relevant period, Mr. Farrell did not know what a prospectus supplement was. Ex. 383 (Deposition of Brian Farrell) at 80:19-81:5 ("Q. I think you testified that you're familiar today with the practice of issuing prospectus supplements in connection with RMBS securitizations, do I have that right? A. Today, not through '06/'07 period. Q. In that time frame were you even aware what prospectus supplements were? A. No.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 773 as it states or implies that one of Mr. Farrell's responsibilities was to review prospectus supplements during the relevant time period or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions. As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working

with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results. The Credit group assisted that function by performing loan-level due diligence and determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines. To that end, Mr. Farrell testified that he understood his responsibilities during the relevant time period of the Nomura Securitizations to be "manag[ing] due diligence projects on behalf of the credit department," RBS Ex. 5 (Deposition of Brian Farrell) at 19:21-20:8, ensuring that loans complied with lenders' stated guidelines, *id.* at 206:7¬15, and reporting any issues "to numerous people," *id.* at 68:14-23. Mr. Farrell further testified that he took his job "extremely seriously" and agreed that "it was important within RBS that [loan-level due] diligence was performed properly." *Id.* at 70:23-71:7.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI "disputes"

¶ 773 to the extent it states or implies that "that one of Mr. Farrell's responsibilities was

to review prospectus supplements during the relevant time period[,]'" but they identify no

evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a

genuine dispute of material fact. Part I.B, *supra*. While RBSSI argues that employees in

"RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel,

managed and coordinated preparation and review of the prospectus supplement for

accuracy[,]" this argument is irrelevant to the asserted fact and does not create a genuine

dispute of material fact. Part I.C, *supra*. While RBSSI cites testimony relating to Mr.

Farrell's understanding of his responsibilities, the cited testimony is irrelevant to the

asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

774.  **FHFA Statement:** "[I]t wasn't a part of [Mr. Farrell's] responsibility" to review prospectus supplements or offering materials for accuracy. Ex. 383 (Deposition of Brian Farrell) at 89:1990:4 ("Q. During the '06/'07 time frame, do you know if there was anyone else at RBS that was reviewing prospectus supplements or offering materials for accuracy? A. Again, it wasn't a part of my responsibility. I wasn't really concerned as, so much what other people were doing as much as I was concerned about my job and my responsibilities.").

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 383 contains the language quoted by FHFA, but disputes the assertion in ¶ 774 to the extent it states or implies that one of Mr. Farrell's responsibilities was to review prospectus supplements during the relevant time period or that RBSSI did not make adequate efforts to ensure that

representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions. As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results. The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group. To that end, Mr. Farrell testified that he understood his responsibilities during the relevant time period of the Nomura Securitizations included "manag[ing] due diligence projects on behalf of the credit department," RBS Ex. 5 (Deposition of Brian Farrell) at 19:21-20:8, ensuring that loans complied with lenders' stated guidelines, *id.* at 206:7-15, and reporting any issues "to numerous people," *id.* at 68:14-23. Mr. Farrell further testified that he took his job "extremely serious[ly]" and agreed that "it was important within RBS that [loan-level due] diligence was performed properly." *Id.* at 70:23-71:7.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI "disputes" ¶ 774 to the extent it states or implies that "one of Mr. Farrell's responsibilities was to review prospectus supplements during the relevant time period [,]" they identify no evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy[,]" this argument is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI cites testimony relating to Mr. Farrell's understanding of his responsibilities, the cited testimony does not contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

775. **FHFA Statement:** Mr. Farrell also was not aware if anyone else had the responsibility of reviewing prospectus supplements or offering materials for accuracy. Ex. 383 (Deposition of Brian Farrell) at 90:5-20 ("Q. Does that mean that you don't know whether anybody else had that responsibility in the '06/'07 time frame? A. That means I don't know what other people were doing. Q. Do you know whether anyone in the

'06/'07 time frame was reviewing your diligence results and comparing them to representations being made to investors in any format? .... A. Again, I'm not sure what other people are doing. I would complete my job and report it and then I would have my next review.").

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 383 contains the language quoted by FHFA, but disputes the assertion in ¶ 775 to the extent it states or implies that one of Mr. Farrell's responsibilities was to know who at RBSSI was responsible for ensuring the accuracy of the prospectus supplements during the relevant time period or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions. As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results. The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issue to the Asset-Backed Finance group. To that end, Mr. Farrell testified that he understood his responsibilities during the relevant time period of the Nomura Securitizations included "manag[ing] due diligence projects on behalf of the credit department," RBS Ex. 5 (Deposition of Brian Farrell) at 19:21-20:8, ensuring that loans complied with lenders' stated guidelines, *id.* at 206:7-15, and reporting any issues "to numerous people," *id.* at 68:14-23. Mr. Farrell further testified that he took his job "extremely serious[ly]" and agreed that "it was important within RBS that [loan-level due] diligence was performed properly." *Id.* at 70:23-71:7.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. RBSSI "disputes" ¶ 775 to the extent it states or implies that "one of Mr. Farrell's responsibilities was to know who at RBSSI was responsible for ensuring the accuracy of the prospectus supplements during the relevant time period[,]" they identify no evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy[,]" this argument is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

While RBSSI cites testimony relating to Mr. Farrell's understanding of his responsibilities, the cited testimony is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

776. **FHFA Statement:** When asked whether he had "any understanding as to whether your job affected the interests of RMBS investors" during the 2006-2007 time period, Mr. Farrell stated: "No." Ex. 383 (Deposition of Brian Farrell) at 84:23-85:5 ("Q. In '06/'07, did you have any understanding as to whether your job affected the interests of RMBS investors? ... A. Did I have an understanding of that in '06/'07? No.").

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 383 contains the language quoted by FHFA, but disputes the assertion ¶ 776 to the extent it states or implies that one of Mr. Farrell's responsibilities was to know who at RBSSI was responsible for ensuring the accuracy of the prospectus supplements during the relevant time period or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions. As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results. The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group. To that end, Mr. Farrell testified that he understood his responsibilities during the relevant time period of the Nomura Securitizations included "manag[ing] due diligence projects on behalf of the credit department," RBS Ex. 5 (Deposition of Brian Farrell) at 19:21-20:8, ensuring that loans complied with lenders' stated guidelines, *id.* at 206:7-15, and reporting any issues "to numerous people," *id.* at 68:14-23. Mr. Farrell further testified that he took his job "extremely serious[ly]" and agreed that "it was important within RBS that [loan-level due] diligence was performed properly." *Id.* at 70:23-71:7.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI "disputes" ¶ 776 to the extent it states or implies that "one of Mr. Farrell's responsibilities was to know who at RBSSI was responsible for ensuring the accuracy of the prospectus supplements during the relevant time period[,]" they identify no evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B,

*supra.* While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group,

in conjunction with internal and external counsel, managed and coordinated preparation

and review of the prospectus supplement for accuracy[,]" this argument is irrelevant to

the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra.*

While RBSSI cites testimony relating to Mr. Farrell's understanding of his

responsibilities, the cited testimony is irrelevant to the asserted fact and does not create a

genuine dispute of material fact. Part I.C, *supra.*

777.  **FHFA Statement:** Frank Camacho's main responsibilities as a Credit Officer included reviewing loans graded "EV3" and making final grading determinations. Ex. 449 (Deposition of Frank Camacho) at 240:10-241:7 ("Q. And am I correct that you would review all EV3s and determine whether they should remain EV3s or should be reclassified in some way? A. That was the goal, time permitting, yes. Q. And what was the mechanism by which you were provided the loans to review? A. That would vary based on the -- based on the mechanics of the review. Q. What different types of form could it take? A. In '05 and '06, the typical -- the typical deal that I worked on would be at the site of the -- at the site of the originator, everybody in one conference room with -¬with actual loan files in front of them. In that instance, the loan would be underwritten, go through Clayton's internal QC process, the lead would be comfortable with it, and the lead would give me a stack of loans that had a final EV3 grade on them. Q. And would you take that stack and look at it yourself and make your own determination. Is that correct? A. Correct.").

**RBSSI Response:** RBSSI states that Mr. Camacho did not work on the Nomura Securitizations and thus the facts and/or circumstances regarding his "main responsibilities as a Credit Officer" are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI disputes the assertion in ¶ 777 as it mischaracterizes or improperly paraphrases the cited testimony. Mr. Camacho testified that his "primary responsibilities" were "managing ongoing -- ongoing loan reviews for prospective deals that RBS was working on" FHFA Ex. 449 (Deposition of Frank Camacho) at 31:24-32:3, not that his "main responsibilities ... included reviewing loans graded 'EV3' and making final grading determinations."

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues

that Mr. Camacho's responsibilities are not material facts, RBSSI's argument does not

create a genuine dispute of material fact. Part I.A, *supra.* While RBSSI argues that ¶ 777

does not properly characterize Mr. Camacho's testimony, the cited testimony fails to

directly contravene the asserted fact that his main responsibilities as Credit Officer included reviewing loans graded "EV3" and making final grading determination, and in fact supports FHFA's assertion and therefore does not create a genuine dispute of material fact.  Part I.C, *supra*.

778.    **FHFA Statement:**  Mr. Camacho did not know that the purpose of residential mortgage-backed securities due diligence was "to ensure that all of the loans underlying those securities conform to representations made by RBS." Ex. 462 (CMFG Deposition of Frank Camacho) at 124:11-18 ("Q.  It's a fact that a purpose of residential mortgage-backed securities due diligence is to ensure that all of the loans underlying those securities conform to representations made by RBS to its investor clients; correct? .  ..  A. I don't know."); *id.*  at 129:10-16 ("Q.  Were you aware at your time at RBS that the principal focus of due diligence review was to confirm that the offering documents were complete and accurate in all material respects? ...  A.  No.").

**RBSSI Response:**  RBSSI states that Mr. Camacho did not work on the Nomura Securitizations and, thus, the facts and/or circumstances regarding his knowledge of the claimed purpose of securities due diligence are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required.  To the extent a response is required, RBSSI does not dispute that FHFA Ex. 462 contains the language quoted by FHFA, but disputes the assertion ¶ 778 to the extent it states or implies that Mr. Camacho should have known the claimed purpose of residential mortgage-backed securities due diligence or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions.  As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results.  The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group. Indeed, Mr. Camacho testified that he would discuss with members of the Asset-Backed Finance group the "final results of the diligence" and "which loans were going to remain in the deal, which loans weren't, for – for generally securitizations." RBS Ex. 27 (Deposition of Frank Camacho) at 92:14-93:11 ("Q.  Do you know who Patrick Leo worked with? A.  I know that – that Greg McSweeney would have been in that group. There's one other person, the name is escaping me.  Q.  And when you say, 'that group,' what group are we referring to? A.  As far as my involvement with – with Pat Leo and potentially McSweeney, my general recollection is that I would deal with – with those guys regarding the – the final results of the diligence, which loans were going to remain in the deal, which loans weren't, for –for generally securitizations.  Q.  And when you say you deal with them for the results of the diligence, does that mean you would report back

to them the results of diligence reviews you supervised, or does that mean something else? A. Yes, I would keep them informed of where we were in the diligence process, when we thought the population was going to get finalized, what loans were staying in, which loans were getting removed.")

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not

dispute that the cited testimony is accurately quoted. While RBSSI argues that the facts

and/or circumstances regarding Mr. Camacho's knowledge of the purpose of due

diligence are not material facts, RBSSI's argument does not create a genuine dispute of

material fact. Part I.A, *supra*. Further, RBSSI identifies no evidence in support of the

argument that Mr. Camacho did not work on the Nomura Securitizations (and in fact cites

to Mr. Camacho's testimony in its Counterstatement of Material Facts), and conclusory

assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While RBSSI

"disputes" ¶ 778 to the extent it states or implies that "Mr. Camacho should have known

the claimed purpose of residential mortgage-backed securities due diligence or that

RBSSI did not make adequate efforts to ensure that representations in offering documents

were accurate as part of the due diligence it conducted for RMBS transactions[,]"

RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in

conjunction with internal and external counsel, managed and coordinated preparation and

review of the prospectus supplement for accuracy[,]" this argument is irrelevant to the

asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

While RBSSI cites testimony relating to Mr. Camacho's interactions with Patrick Leo

and Greg McSweeney regarding due diligence, the cited testimony is irrelevant to the

asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

779. **FHFA Statement:** Nobody ever told Mr. Farrell that one of his jobs was to ensure that representations being made to investors were accurate. Ex. 463 ██████████

**RBSSI Response:**  RBSSI does not dispute that FHFA Ex. 463 contains the language quoted by FHFA, but disputes the assertion ¶ 779 to the extent it states or implies that one of Mr. Farrell's responsibilities was to ensure the accuracy of the representations in prospectus supplements during the relevant time period or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions.  As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results.  The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group.  To that end, Mr. Farrell testified that he understood his responsibilities during the relevant time period of the Nomura Securitizations included "manag[ing] due diligence projects on behalf of the credit department," RBS Ex. 5 (Deposition of Brian Farrell) at 19:21-20:8, ensuring that loans complied with lenders' stated guidelines, *id.* at 206:7-15, and reporting any issues "to numerous people," *id.* at 68:14-23.  Mr. Farrell further testified that he took his job "extremely serious[ly]" and agreed that "it was important within RBS that [loan-level due] diligence was performed properly." *Id.* at 70:23-71:7.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  RBSSI does not dispute the cited testimony.  While RBSSI "disputes" ¶ 779 to the extent it states or implies that "one of Mr. Farrell's responsibilities was to ensure the accuracy of the representations in prospectus supplements during the relevant time period[,]" they identify no evidence that contradicts the asserted fact.  RBSSI's conclusory assertions do not create a genuine dispute of material fact.  Part I.B, *supra*.  While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy[,]" this argument is irrelevant to the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.  While RBSSI cites testimony relating to Mr. Farrell's understanding of his responsibilities, the cited testimony fails to

directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

780. **FHFA Statement:** Mr. Farrell could not recall any circumstances where RBS changed its disclosures to investors or third parties on the basis of its due diligence results. Ex. 463



**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 463 contains the language quoted by FHFA, but disputes the assertion ¶ 780 to the extent it states or implies that Mr. Farrell should have known whether changes were made to prospectus supplements based on loan-level due diligence findings during the relevant time period or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions. As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results. The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group. To that end, Mr. Farrell testified that he understood his responsibilities during the relevant time period of the Nomura Securitizations included "manag[ing] due diligence projects on behalf of the credit department," RBS Ex. 5 (Deposition of Brian Farrell) at 19:21¬20:8, ensuring that loans complied with lenders' stated guidelines, *id.* at 206:7-15, and reporting any issues "to numerous people," *id.* at 68:14-23. Mr. Farrell further testified that he took his job "extremely serious[ly]" and agreed that "it was important within RBS that [loan-level due] diligence was performed properly." *Id.* at 70:23-71:7.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute the cited testimony. While RBSSI "disputes" ¶ 780 to the extent it states or

implies that "Mr. Farrell should have known whether changes were made to prospectus supplements based on loan-level due diligence findings during the relevant time period[,]" they identify no evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*.

While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy[,]" this argument is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

While RBSSI cites testimony relating to Mr. Farrell's understanding of his responsibilities, the cited testimony fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

781. **FHFA Statement:** Frank Camacho did not review any prospectus supplements. Ex. 449 (Deposition of Frank Camacho) at 472:22–473:15 ("Q. During your time at RBS, did you review any prospectus supplements? A. Not to my recollection ... Q. Were you ever asked to provide any comments or edits on any such prospectus supplements while at RBS? A. Not to my recollection. Q. Did you have any involvement while at RBS in drafting or reviewing or checking for quality control or accuracy or verifying any statements in any prospectus supplements while at RBS? ... A. Not that I recall.").

**RBSSI Response:** RBSSI states that Mr. Camacho did not work on the Nomura Securitizations and thus the facts and/or circumstances regarding what he did or did not review are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI disputes the assertion ¶ 781 as it states or implies that Mr. Camacho should have reviewed RMBS offering materials or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions. As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results. The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group. Indeed, Mr. Camacho testified that he would discuss with members of the Asset-Backed

Finance group the "final results of the diligence" and "which loans were going to remain in the deal, which loans weren't, for – for generally securitizations." RBS Ex. 27 (Deposition of Frank Camacho) at 92:14-93:11 ("Q. Do you know who Patrick Leo worked with? A. I know that – that Greg McSweeney would have been in that group. There's one other person, the name is escaping me. Q. And when you say, 'that group,' what group are we referring to? A. As far as my involvement with – with Pat Leo and potentially McSweeney, my general recollection is that I would deal with – with those guys regarding the – the final results of the diligence, which loans were going to remain in the deal, which loans weren't, for – for generally securitizations. Q. And when you say you deal with them for the results of the diligence, does that mean you would report back to them the results of diligence reviews you supervised, or does that mean something else? A. Yes, I would keep them informed of where we were in the diligence process, when we thought the population was going to get finalized, what loans were staying in, which loans were getting removed.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the facts and/or circumstances regarding what Mr. Camacho did or did not review are not material facts, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Further, RBSSI identifies no evidence in support of the argument that Mr. Camacho did not work on the Nomura Securitizations (and in fact cites to Mr. Camacho's testimony in its Counterstatement of Material Facts), and conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While RBSSI "disputes" ¶ 781 to the extent it states or implies that "Mr. Camacho should have reviewed RMBS offering materials[,]" they identify no evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy[,]" this argument is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI cites testimony relating to Mr. Camacho's due diligence discussions with members of the Asset-Backed Finance group, the cited

testimony is wholly irrelevant to the asserted fact and does not create a genuine dispute of

material fact.  Part I.C, *supra*.

782.    **FHFA Statement:**  Mr. Camacho did not know in what way, if any, his diligence
impacted the statements in the prospectus supplements.  Ex. 449 (Deposition of Frank
Camacho) at 473:24474:3 ("Q.  Do you know in what way, if any, your diligence work
impacted the offering materials? ...  A.  I do not know.").

**RBSSI Response:**  RBSSI states that Mr. Camacho did not work on the Nomura
Securitizations and thus the facts and/or circumstances regarding his knowledge of "in
what way, if any, his diligence impacted the statements in the prospectus supplements"
are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to
which a response is required.  To the extent a response is required, RBSSI disputes the
assertion ¶ 782.  As discussed in RBSSI's response to ¶ 765, employees in RBSSI's
Asset-Backed Finance group, in conjunction with internal and external counsel, managed
and coordinated preparation and review of the prospectus supplement for accuracy,
working with collateral analysts, external accountants, and other individuals, as well as
communicating and liaising with the Credit group to discuss issues, to the extent there
were any, regarding loan-level due diligence results.  The Credit group assisted that
function by performing loan-level due diligence, determining, among other things,
whether the loans reviewed generally complied with originators' stated guidelines and
communicating any issues to the Asset-Backed Finance group.  Indeed, Mr. Camacho
testified that he would discuss with members of the Asset-Backed Finance group the
"final results of the diligence" and "which loans were going to remain in the deal, which
loans weren't, for – for generally securitizations." RBS Ex. 27 (Deposition of Frank
Camacho) at 92:14-93:11 ("Q.  Do you know who Patrick Leo worked with? A.  I know
that – that Greg McSweeney would have been in that group.  There's one other person,
the name is escaping me.  Q.  And when you say, 'that group,' what group are we
referring to? A.  As far as my involvement with – with Pat Leo and potentially
McSweeney, my general recollection is that I would deal with – with those guys
regarding the – the final results of the diligence, which loans were going to remain in the
deal, which loans weren't, for – for generally securitizations.  Q.  And when you say you
deal with them for the results of the diligence, does that mean you would report back to
them the results of diligence reviews you supervised, or does that mean something else?
A.  Yes, I would keep them informed of where we were in the diligence process, when
we thought the population was going to get finalized, what loans were staying in, which
loans were getting removed.").

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While RBSSI argues

that the facts and/or circumstances regarding Mr. Camacho's knowledge of how his

diligence impacted the statements in prospectus supplements are not material facts,

RBSSI's argument does not create a genuine dispute of material fact.  Part I.A, *supra*.

Further, RBSSI identifies no evidence in support of the argument that Mr. Camacho did not work on the Nomura Securitizations (and in fact cites to Mr. Camacho's testimony in its Counterstatement of Material Facts), and conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy[,]" this argument fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI cites testimony relating to Mr. Camacho's due diligence discussions with members of the Asset-Backed Finance group, the cited testimony is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

783.    **FHFA Statement:**  Mr. Whittemore never reviewed the prospectus supplements for the transactions whose diligence he oversaw.  Ex. 384 (Deposition of James Whittemore) at 63:14-19 ("Q.  When you and your team did due diligence on loans that went into RMBS transactions, did you ever actually review the prospectus supplements for those transactions?  A.  No, I did not.").

**RBSSI Response:**  RBSSI disputes the assertion in ¶ 783 as it states or implies that Mr. Whittemore should have reviewed prospectus supplements or should have "ensure[d] that representations made by RBS in its offering memoranda for RMBS transactions were true," or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions.  As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results.  The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group.  Mr. Whittemore testified that he understood his duties to RMBS investors to be to assess whether the loans complied with originators' guidelines and to report any issues to those directly involved in the drafting and preparation of the offering documents sent to investors.  RBS Ex. 6 (Deposition of James Whittemore) at 412:11-413:2.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI "disputes" ¶ 783 to the extent it states or implies that "Mr. Whittemore should have reviewed prospectus supplements or should have 'ensure[d] that representations made by RBS in its offering memoranda for RMBS transactions were true,'" they identify no evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy[,]" this argument is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI cites testimony relating to Mr. Whittemore's duties, the cited testimony is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

784. **FHFA Statement:** In fact, Whittemore did not even know what statements RBS made in its offering materials regarding RMBS transactions. Ex. 384 (Deposition of James Whittemore) at 64:8-13 ("Q. Is it fair to say that you don't know one way or the other what statements RBS made in its offering materials for RMBS transactions? A. Yes, that would be a fair statement.").

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 384 contains the language quoted by FHFA, but disputes the assertion in ¶ 784 to the extent it states or implies that Mr. Whittemore should have known what statements were made in RMBS offering documents or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions. As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results. The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group. Mr. Whittemore testified that he understood his duties to RMBS investors to be to assess whether the loans complied with originators' guidelines and to report his findings to those directly involved

571

in the drafting and preparation of the offering documents sent to investors.  RBS Ex. 6 (Deposition of James Whittemore) at 29:5-29:13, 116:25-117:4, 412:11-413:2.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While RBSSI "disputes" ¶ 784 to the extent it states or implies that "Mr. Whittemore should have known what statements were made in RMBS offering documents[,]" they identify no evidence that contradicts the asserted fact.  RBSSI's conclusory assertions do not create a genuine dispute of material fact.  Part I.B, *supra*.   While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy[,]" this argument is irrelevant to the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.  While RBSSI cites testimony relating to Mr. Whittemore's duties, the cited testimony is irrelevant to the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

785.  **FHFA Statement:**  Similarly, Bill Gallagher, never reviewed the prospectus supplements for accuracy.  Ex. 373 (Deposition of William Gallagher) at 38:5¬9 ("Q.  As part of your job at RBS, and again here I'm including predecessor entities, did you ever review any prospectus supplements for accuracy?  A.  No."); *id.*  at 38:5-15 ("Q.  As part of your job at RBS, and again here I'm including any predecessor entities, did you ever review any prospectus supplements for accuracy?  A.  No.  Q.  Did you ever review any prospectus supplements for accuracy for any other reason? ...  A.  No."); *id.*  at 676:4-16 ("Q.  So when this manual is stating that one of the principal goals of the asset due diligence function is disclosing in a prospectus or other offering document material risk issues, do you agree that that is not a goal that you were focused on during your time as the head of credit at RBS? ...  A.  That is not an area that the credit department was focused on or involved in.").

**RBSSI Response:**  RBSSI does not dispute that FHFA Ex. 373 contains the language quoted by FHFA, but disputes the assertion in ¶ 785 to the extent it states or implies that it was Mr. Gallagher's role or responsibility to review prospectus supplements for accuracy or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions.  As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as

communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results.  The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group.  Mr. Gallagher testified that the goal of loan-level due diligence that the Credit group he oversaw performed was to "confirm that the loans were consistent with the guidelines that were in place and that we were either buying against or that were being provided to us as the guidelines relevant to an underwriting or securitization," RBS Ex. 7 (Deposition of William Gallagher) at 73:17-74:16, and further explained that this was "relevant" to RBSSI's business because it allowed RBSSI to "confirm that the loans met the guidelines for the type of security that was being issued or, in our case, placed or underwritten" *id.*  at 77:11-78:5, and "because people were buying pools of loans not – they weren't buying loan by loan by loan, they'd want to confirm that the pool of loans generally conformed to the guidelines and that way they would have some level of comfort that the loans would be worth what they were paying for them and that the pool would perform in a way that was consistent with an expectation that they had," *id.*  at 81:21-82:22 ("Q.  So I guess, I apologize, I'm still not sure I understand.  In what way does whether or not a loan was originated consistent with underwriting guidelines affect the value of that loan or of a security collateralized by that loan? ...  A.  Again, from a general perspective, if an investor was looking to buy a specific type of loan they would want to confirm that the loan conformed and was, was originated and was to a borrower that, that fit that general program and they'd want to confirm more specifically that the pool of loans, because people were buying pools of loans not – they weren't buying loan by loan by loan, they'd want to confirm that the pool of loans generally conformed to the guidelines and that way they would have some level of comfort that the loans would be worth what they were paying for them and that the pool would perform in a way that was consistent with an expectation that they had.").

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While RBSSI "disputes" ¶ 785 to the extent it states or implies that "it was Mr. Gallagher's role or responsibility to review prospectus supplements for accuracy[,]" they identify no evidence that contradicts the asserted fact.  RBSSI's conclusory assertions do not create a genuine dispute of material fact.  Part I.B, *supra*.  While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy[,]" this argument is irrelevant to the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.  While RBSSI cites testimony relating to the

purpose of the due diligence that was done by the Credit group Mr. Gallagher oversaw, the cited testimony fails to directly contravene the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

786.  **FHFA Statement:**  Mr. Camacho did not recall reviewing prospectus supplements during his time at RBS.  Ex. 449 (Deposition of Frank Camacho) at 472:13¬473:23 ("Q. Are you familiar with something called the prospectus supplement? A.  Yes.  Q.  What is that? A.  My understanding of it at the time of when I was at RBS was that it -¬was that it contained some level of information regarding the -- regarding the loans that were going to be included in the securitization.  Q.  During your time at RBS, did you ever review any prospectus supplements? A.  Not to my recollection.  Q.  And to be clear, I'm referring to prospectus supplements for residential mortgage-backed securities that RBS either issued or underwrote.  Did you ever review any of those? A.  Not to my recollection.  Q.  Were you ever asked to provide any comments or edits on any such prospectus supplements while at RBS? A.  Not to my recollection.  Q.  Did you have any involvement while at RBS in drafting or reviewing or checking for quality control or accuracy or verifying any statements in any prospectus supplements at RBS? ...  A. Not that I recall.  Q.  After you conducted your diligence and made your recommendations for a pool-of-loans acquisition, did you have any involvement in the preparation of offering materials for those -- any residential mortgage-backed securities that were collateralized by those loans? A.  Not that I recall."); *see also* Ex. 464 (Massachusetts Mutual Deposition of Frank Camacho) at 49:16-50:14 ("Q....  Did you ever review any marketing materials in connection with mortgage backed securities that RBS was selling? A.  No.....  Q.  During your time at RBS did you ever see a prospectus for a mortgage-backed security? A.  Not that I can recall.  Q.  During your time at RBS did you ever *see* a prospectus supplement for a mortgage-backed security? A.  I don't believe so.  Q.  During your time at RBS did you ever see a term sheet for a mortgage-backed security? A.  I saw documents at RBS that were – that were called term sheets.  I don't know whether they were the term sheet that was included in the final security or not.  Q.  They may have just been internal term sheets? A.  Correct.").

**RBSSI Response:**  RBSSI states that Mr. Camacho did not work on the Nomura Securitizations and thus the facts and/or circumstances regarding his recollection of whether he reviewed prospectus supplements are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required.  To the extent a response is required, RBSSI does not dispute that FHFA Ex. 449 contains the language quoted by FHFA, but disputes the assertion ¶ 786 to the extent it states or implies that Mr. Camacho should have reviewed prospectus supplements or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions.  As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due

diligence results.  The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group.  Indeed, Mr. Camacho testified that he would discuss with members of the Asset-Backed Finance group the "final results of the diligence" and "which loans were going to remain in the deal, which loans weren't, for – for generally securitizations." RBS Ex. 27 (Deposition of Frank Camacho) at 92:14-93:11 ("Q.  Do you know who Patrick Leo worked with? A.  I know that – that Greg McSweeney would have been in that group.  There's one other person, the name is escaping me.  Q.  And when you say, 'that group,' what group are we referring to? A.  As far as my involvement with – with Pat Leo and potentially McSweeney, my general recollection is that I would deal with – with those guys regarding the – the final results of the diligence, which loans were going to remain in the deal, which loans weren't, for – for generally securitizations.  Q.  And when you say you deal with them for the results of the diligence, does that mean you would report back to them the results of diligence reviews you supervised, or does that mean something else? A.  Yes, I would keep them informed of where we were in the diligence process, when we thought the population was going to get finalized, what loans were staying in, which loans were getting removed.").

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While RBSSI argues that the facts and/or circumstances regarding Mr. Camacho's recollection of reviewing prospectus supplements are not material facts, RBSSI's argument does not create a genuine dispute of material fact.  Part I.A, *supra*.  Further, RBSSI identifies no evidence in support of the argument that Mr. Camacho did not work on the Nomura Securitizations (and in fact cites to Mr. Camacho's testimony in its Counterstatement of Material Facts), and conclusory assertions do not create a genuine dispute of material fact.  Part I.B, *supra*. While RBSSI "disputes" ¶786 to the extent that it states or implies that "that Mr. Camacho should have reviewed prospectus supplements[,]" they identify no evidence that contradicts the asserted fact.  RBSSI's conclusory assertions do not create a genuine dispute of material fact.  Part I.B, *supra*.  While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy[,]" this argument fails to directly contravene the asserted fact and does not

create a genuine dispute of material fact.  Part I.C, *supra*.  While RBSSI cites testimony relating to Mr. Camacho's due diligence discussions with members of the Asset-Backed Finance group, the cited testimony is wholly irrelevant to the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

787.  **FHFA Statement:**  Reviewing prospectus supplements was ███████████
███████ Ex. 463 ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

**RBSSI Response:**  RBSSI does not dispute that FHFA Ex. 463 contains the language quoted by FHFA, but disputes the assertion ¶ 787 to the extent it states or implies that one of Mr. Farrell's responsibilities should have been to review prospectus supplements or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions.  As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results.  The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group.  To that end, Mr. Farrell testified that he understood his responsibilities during the relevant time period of the Nomura Securitizations included "manag[ing] due diligence projects on behalf of the credit department," RBS Ex. 5 (Deposition of Brian Farrell) at 19:21-20:8, ensuring that loans complied with lenders' stated guidelines, *id.* at 206:7-15, and reporting any issues "to numerous people," *id.* at 68:14-23.  Mr. Farrell further testified that he took his job "extremely serious[ly]" and agreed that "it was important within RBS that [loan-level] diligence was performed properly." *Id.* at 70:23-71:7.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  RBSSI does not dispute that the cited testimony is accurately quoted.  While RBSSI "disputes" ¶ 787 to the extent it states or implies that "one of Mr. Farrell's responsibilities was to ensure the accuracy of the representations in prospectus supplements during the relevant time period[,]" they identify no evidence that contradicts the asserted fact.  RBSSI's conclusory assertions do not create a genuine dispute of material fact.  Part I.B, *supra*.

While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy[,]" this argument is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI cites testimony relating to Mr. Farrell's understanding of his responsibilities, the cited testimony fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

788. **FHFA Statement:** Mr. Farrell did not consider "any part of [his] job to ensure that investors had accurate information about the loans underlying their RMBS investments." Ex 383 (Deposition of Brian Farrell) at 20:9-15 ("Did you consider it any part of your job to ensure that investors had accurate information about the loans underlying their RMBS investments? A. It wasn't a part of my job.").

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 463 contains the language quoted by FHFA, but disputes the assertion in ¶ 788 to the extent it states or implies that Mr. Farrell should have been charged with responsibility for disclosures to investors during the relevant time period or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions. As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results. The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group. To that end, Mr. Farrell testified that he understood his responsibilities during the relevant time period of the Nomura Securitizations included "manag[ing] due diligence projects on behalf of the credit department," RBS Ex. 5 (Deposition of Brian Farrell) at 19:21-20:8, ensuring that loans complied with lenders' stated guidelines, *id.* at 206:7-15, and reporting any issues "to numerous people," *id.* at 68:14-23. Mr. Farrell further testified that he took his job "extremely serious[ly]" and agreed that "it was important within RBS that [loan-level] diligence was performed properly." *Id.* at 70:23-71:7.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI "disputes" ¶ 788 to the extent it states or implies that "Mr. Farrell should have been charged with

responsibility for disclosures to investors during the relevant time period[,]" they identify no evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy[,]" this argument is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI cites testimony relating to Mr. Farrell's understanding of his responsibilities, the cited testimony fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

789. **FHFA Statement:** Mr. Whittemore did not "actually review the prospectus supplements" for RMBS transactions. Ex. 384 (Deposition of James Whittemore) at 63:14-64:16 ("Q. When you and your team did due diligence on loans that went into RMBS transactions, did you ever actually review the prospectus supplements for those transactions? A. No, I did not. Q. Did you ever review any offering documents for RBS's residential mortgage-backed securities transactions other than in your depositions? A. Could you ask that question one more time, please. Q. Other than in your prior depositions, did you ever review any offering documents for any residential mortgage-backed securities transaction underwritten by RBS? A. I don't remember that I did. Q. Is it fair to say that you don't know one way or the other what statements RBS made in its offering materials for RMBS transactions? A. Yes, that would be a fair statement. Q. And that's because you never looked at the offering materials? A. Yes, that would be why.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 789, except to the extent that it is intended to state or imply that Mr. Whittemore should have reviewed prospectus supplements or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions. As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results. The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group. Mr. Whittemore testified

that he understood his duties to RMBS investors to be to assess whether the loans complied with originators' guidelines and to report any issues to those directly involved in the drafting and preparation of the offering documents sent to investors. RBS Ex. 6 (Deposition of James Whittemore) at 29:5-29:13, 116:25-117:4, 412:11-413:2.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not

dispute that the cited testimony is accurately quoted. While RBSSI "disputes" ¶ 789 to

the extent it states or implies that "Mr. Whittemore should have reviewed prospectus

supplements[,]" they identify no evidence that contradicts the asserted fact. RBSSI's

conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*.

While RBSSI argues that employees in "RBSSI's Asset-Backed Finance group, in

conjunction with internal and external counsel, managed and coordinated preparation and

review of the prospectus supplement for accuracy[,]" this argument is irrelevant to the

asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

While RBSSI cites testimony relating to Mr. Whittemore's understanding of his duties to

investors, the cited testimony fails to directly contravene the asserted fact and does not

create a genuine dispute of material fact. Part I.C, *supra*.

790. **FHFA Statement:** Mr. Farrell did not ever review prospectuses as part of his job during the 2005 to 2007 time period. Ex. 383 (Deposition of Brian Farrell) at 22:6-14 ("Q. When did you become involved in doing that? A. 2010 maybe. Q. Prior to that time, did you have any role reviewing any portion of the disclosures and prospectus supplements issued by RBS in connection with RMBS? A. No."); Ex. 463 ▮▮▮▮▮▮▮▮▮▮

[REDACTED]

Ex. 465 (CMFG Deposition of Brian Farrell) at 99:9¬16 ("Q. Did you ever in your career at either Clayton or RBS look at an offering document? ... A. Not that I can recall, no. Q. Did you ever speak to anybody about what may be stated in an offering document relating to RMBS? A. Not that I can recall,

no."); Ex. 466 (Federal Home Loan Bank of Seattle Deposition of Brian Farrell) at 27:13-28:6 ("A. In 2010 I can remember looking at some marketing material that was going to go out to investors, specifically the diligence disclosure. Q. In other words, what type of diligence process RBS used? A. I can't say a hundred percent, but probably some type of scope and results. Q. Did you ever review any prospectus supplements for mortgage-backed securities while you were at RBS? A. Are you going to use 2010 as -- Q. Let's use 2010 as a cutoff again. A. I would say yes, I'm thinking of the 3 same deal in 2010. Q. But nothing earlier in time than that? A. Not that I can recall, no."); Ex. 466 (Federal Home Loan Bank of Seattle Deposition of Brian Farrell) at 131:5-10 ("Q. Were you ever asked to review prospectus supplements for accuracy or completeness after joining RBS? A. My entire employment history? Q. Let's say up until 2008. A. Not that I recall."); Ex. 467 (In re Countrywide Deposition of Brian Farrell) at 43:23-44:12 ("Q. In 2006, as part of your employment, were you responsible for reviewing prospectus supplements? A. No, I wasn't. Q. Had you been responsible for that at Clayton? A. Never. Q. Do -- Are you now responsible for reviewing prospectus supplements. A. At this time? Q. At this time. A. I am involved now. Q. When did you first get involved? A. My estimate is 2009.").

**RBSSI Response:** RBSSI does not dispute that FHFA Exs. 383, 463, 465, and 466 contain the language quoted by FHFA, but disputes the assertion ¶ 790 to the extent it states or implies that Mr. Farrell's responsibilities should have included reviewing prospectus supplements or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it conducted for RMBS transactions. As discussed in RBSSI's response to ¶ 765, employees in RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel, managed and coordinated preparation and review of the prospectus supplement for accuracy, working with collateral analysts, external accountants, and other individuals, as well as communicating and liaising with the Credit group to discuss issues, to the extent there were any, regarding loan-level due diligence results. The Credit group assisted that function by performing loan-level due diligence, determining, among other things, whether the loans reviewed generally complied with originators' stated guidelines and communicating any issues to the Asset-Backed Finance group. To that end, Mr. Farrell testified that he understood his responsibilities during the relevant time period of the Nomura Securitizations included "manag[ing] due diligence projects on behalf of the credit department," RBS Ex. 5 (Deposition of Brian Farrell) at 19:21-20:8, ensuring that loans complied with lenders' stated guidelines, *id.* at 206:7-15, and reporting any issues "to numerous people," *id.* at 68:14-23. Mr. Farrell further testified that he took his job "extremely serious[ly]" and agreed that "it was important within RBS that [loan-level] diligence was performed properly." *Id.* at 70:23-71:7.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI

"disputes" ¶ 790 to the extent it states or implies that "Mr. Farrell's responsibilities should have included reviewing prospectus supplements[,]" they identify no evidence that

contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine

dispute of material fact.  Part I.B, *supra*.   While RBSSI argues that employees in

"RBSSI's Asset-Backed Finance group, in conjunction with internal and external counsel,

managed and coordinated preparation and review of the prospectus supplement for

accuracy[,]" this argument is irrelevant to the asserted fact and does not create a genuine

dispute of material fact.  Part I.C, *supra*.   While RBSSI cites testimony relating to Mr.

Farrell's understanding of his responsibilities, the cited testimony fails to directly

contravene the asserted fact and does not create a genuine dispute of material fact.  Part

I.C, *supra*.

(b)     *Review By The ABF Group*

791.    **FHFA Statement:**  The Asset Backed Finance Group was tasked with ensuring "that
information contained in the [deal] document was accurate." Ex. 469 (CMFG 5/15/13
Deposition of Sean Curran) at 77:13-24 ("Q.  Was it the responsibility of the asset-
backed finance group to ensure that everything in the deal documents was true and
accurate? A.  Generally the responsibility of the asset-backed finance department was to
ensure that the information contained in the document was accurate.  There were FHFA
Reply:  certain parts of the prospectus supplement that were provided by other parties and
we relied on working with third-party accountants to ensure accuracy."); *id.*  at 78:2479:5
("Q.  Is it a fair statement that the ABF department undertook efforts to ensure that the
description of the collateral underlying the RMBS securities in the offering documents
were fully accurate? A.  Yes, that's my understanding."); Ex. 370 (Mass Mutual
Deposition of Robert McGinnis) at 106:19-107:6 ("Q.  Other than issuer's counsel,
underwriter's counsel, and accounting firms, was anyone within RBS responsible to
ensure that the contents of offering materials were accurate? ...  A.  The Asset-Backed
Finance bankers would review the offering materials or would review the offering
materials in conjunction with issuer's counsel, underwriter's counsel, and the accounting
firm.  Q.  Anyone else? A.  Not to my recollection.").

RBSSI Response:  RBSSI does not dispute the assertion in ¶ 791.  RBSSI refers the
Court to ¶¶ 11 – 13 of its Counterstatement of Facts for a further description of the roles
and responsibilities of the Asset-Backed Finance group with respect to third-party
securitizations, including the Nomura Securitizations.

FHFA Reply:  RBSSI does not dispute the asserted fact.

792.    **FHFA Statement:**  RBSSI's Asset Backed Finance Group relied on the Credit Group to
ensure that the representations in Prospectus Supplements were accurate.  Ex. 386
(Deposition of Adam Smith) at 57:9-58:10 ("Q....  On the transactions that you worked

on, whether for Ameriquest, Indymac or Nomura where RBS acted as the lead underwriter, was it your understanding that the principal focus of diligence was to make sure that the documents were complete and accurate in all material respects? A. Yeah. Well, I think that's correct, yes. Q. And you endeavored to do that to the extent that you were involved in each of those transactions? A. Again, I think this -- sorry. The prospectus supplement and the transaction really was broken into a lot of different parts at Greenwich Capital, and I think the diligence was focused in the credit department, you know, with legal overview of the documentation process. So I relied on the credit department to make the appropriate decisions with respect to sampling, diligence results and, you know, if there were specific, you know, exceptions or issues we would -- we would discuss them."); Ex. 470 (CMFG Deposition of Shakti Radhakishun) at 86:2-14 ("Q. Let's talk specifically with respect to the loan level due diligence. If you discovered in your loan level due diligence that some of the information in the draft prospectus supplement was inaccurate, would you seek to correct that information before finalizing the prospectus supplement? A. This information, the discovery of this information with respect to what you are addressing now would not be something that I would be responsible for, and so I would leave that to the departments that were. Q. What departments were responsible for that? A. The credit department.")

**RBSSI Response:** RBSSI disputes the assertion in ¶ 792. FHFA mischaracterizes the cited testimony, which does not state that RBSSI's Asset-Backed Finance group "relied on the Credit Group to ensure that the representations in the Prospectus Supplements were accurate." Rather, Adam Smith, who was the banker in the Asset-Backed Finance group with primary responsibility with regard to the Nomura Securitizations, testified that he "relied on the credit department to make the appropriate decisions" regarding *loan-level* due diligence, and "would discuss" with the Credit group any issues they identified with respect to the loan pool. RBS Ex. 17 (Deposition of Adam Smith) at 57:9-58:10. As stated in RBSSI's response to ¶ 765, Mr. Smith further testified that it was his responsibility, and those in the Asset-Backed Finance group more generally, to manage the process to ensure that the statements in RMBS offering materials were "as accurate as possible". *Id.* at 121:4-122:16 ("Q. Okay. Did you personally believe during the period 2005 to 2007 that the information provided to investors in prospectus supplements needed to be accurate? . . . .A. We in the asset-backed group in conjunction with the lawyers, internal, external, the accountants, credit department, drafted the doc. Me personally? I tried to make it as accurate as possible given the information that I had. I tried to make it as accurate as possible. Q. And you understood that investors were relying on the accuracy of the information in ProSupps, correct? A. I think I just answered the question. I tried, I tried to make it as accurate as possible. Q. Do you have a recollection of anything you did specifically on this transaction to ensure the accuracy of this document? A. Again, you know, we worked on many transactions on a monthly basis. We had a team of people on it and that team would include lawyers, accountants, internal collateral analysts, internal structuring people, other vice presidents, analysts, associates, reading the document, you know, some working on particular sections, and trying to make it as accurate as possible."); *see also* RBS Ex. 11 (Deposition of Vinu Phillips) at 244:18-246:14 ("We had an extensive deal team consisting of myself and a vice president an associate and possibly an analyst. We would all review the document. We would work with the -- with the originator and the seller and ask them to thoroughly

review their particular sections of the prospectus supplement. We would get representations and warranties from the originator of the collateral with respect to the, certain information in the prospectus, including the underwriting guidelines and the originator and the servicer sections. We would review the structure with the trading desk and try to ensure that the cash flow waterfall was written properly in the document. We would ask internal and external counsel to review the document to get their take on things. We would have accountants look at the numbers as well as some of the text within the prospectus supplement. We would have -- you know, like I said, we would try to review the entire prospectus supplement and we utilized the trustee, the external counsel, the internal counsel, the underwriter counsel, the rating agencies and all these various other deal participants to review the prospectus and make sure that they believed it would be factual and correct."); RBS Ex. 84 (Deposition of Joseph Walsh) at 126:22¬130:17 (discussing steps taken and individuals and entities involved in ensuring that the offering materials contained no material misstatements).

Personnel in the Credit group facilitated this effort by performing loan-level due diligence, reporting any issues to members of the Asset-Backed Finance group, and discussing those findings and results. RBS Ex. 5 (Deposition of Brian Farrell) at 68:14-23 ("Q. Do you know whether any of the results from the diligence you were overseeing was ever reported to any committees? ... A. I mean results were reported to numerous people. Whoever may have been part of committee, I'm not really sure."); FHFA Ex. 463

█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████ RBS Ex. 27 (Deposition of Frank Camacho) at 92:14-93:11 ("Q. Do you know who Patrick Leo worked with? A. I know that – that Greg McSweeney would have been in that group. There's one other person, the name is escaping me. Q. And when you say, 'that group,' what group are we referring to? A. As far as my involvement with – with Pat Leo and potentially McSweeney, my general recollection is that I would deal with – with those guys regarding the – the final results of the diligence, which loans were going to remain in the deal, which loans weren't, for – for generally securitizations. Q. And when you say you deal with them for the results of the diligence, does that mean you would report back to them the results of diligence reviews you supervised, or does that mean something else? A. Yes, I would keep them informed of where we were in the diligence process, when we thought the population was going to get finalized, what loans were staying in, which loans were getting removed."). *See also* RBS Ex. 38 (RBS-FHFA-SDNY-0164304, August 9, 2006 email chain) at RBS-FHFA-SDNY-0164304 (email from Adam Smith to Brian Farrell and James Whittemore attaching Nomura's due diligence results for pools of loans relating to the NHELI 2006-HE3 Securitization and asking them to "confirm you are ok with the results."); RBS Ex. 40 (RBS-FHFA-SDNY-0161933, August 9, 2006 email chain) at RBS-FHFA-SDNY-0161933 (email from Brian Farrell to Adam Smith stating that the [o]verall snapshot [of the NHELI 2006-HE3 pool] looks OK."); RBS Ex. 23 (RBS-FHFA-SDNY-0622262,

September 28, 2006 email chain) at RBS-FHFA-SDNY-0622263 (email from Adam Smith to Brian Farrell, James Whittemore and James Esposito, asking Mr. Farrell and Mr. Whittemore to review the attached due diligence results from Nomura on the NHELI 2006-FM2 pool); *id.* at RBS-FHFA-SDNY-0622262 (response email from James Whittemore stating that "It appears the due diligence sample was sufficient for the size of the pool. Their sample methodology and AVM/BPO process appear to be sound"); RBS Ex. 34 (RBS-FHFA-SDNY-0622281, October 4, 2006 email chain) at RBS-FHFA-SDNY 0622281 (response from Mr. Farrell stating that "Credit was ok with results and sampling methodology" on the NHELI 2006-FM2 pool).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI disputes that ¶ 792 appropriately characterizes the cited testimony, the testimony cited by RBSSI do not support the assertion. RBS Ex. 17 at 121:4-122:16 states that the "[w]e in the asset-backed group in conjunction with the lawyers, internal, external, the accountants, credit department, drafted the doc…We had a team of people on it and that team would include lawyers, accountants, internal collateral analysts, internal structuring people, other vice presidents, analysts, associates, reading the document, you know, some working on particular sections, and trying to make it as accurate as possible." RBS Ex. 17 (Deposition of Adam Smith). This testimony cited does not directly contravene, and in fact supports, the asserted fact that the Asset-Backed Finance Group relied on the Credit Group to ensure that representations in the Prospectus Supplement were accurate. Part I.C, *supra*. Similarly, RBS Ex. 11 at 244:18-246:14 regarding Mr. Philipp's testimony regarding RBS's reliance on other entities or groups in preparation of Prospectus Supplements, including testimony that it relied on originators' representations and warranties; "review[ed] the structure with the trading desk;" "ask[ed] internal and external counsel to review the document to get their take on things;" and asked accountants "look at the numbers," does not directly contravene the asserted fact that the Asset-Backed Finance Group relied on the Credit Group. RBS Ex. 11 (Deposition of

Vinu Phillips). Further, RBSSI's assertion that "[p]ersonnel in the Credit group facilitated this effort by performing loan-level due diligence, reporting any issues to members of the Asset-Backed Finance group, and discussing those findings and results[,]" does not directly contravene the fact that the Asset Backed Finance Group relied on the Credit Group to ensure that the representations in Prospectus Supplements were accurate and instead shows the reliance of the Asset Backed Finance Group on the Credit Group. Therefore RBSSI's assertion does not create a genuine dispute of material fact. Part I.C, *supra*.

793. **FHFA Statement:** Mr. Smith testified that "[i]n general, the diligence process was done out of the credit department." Ex. 386 (Deposition of Adam Smith) at 45:18-46:19 ("Q. What involvement did you have, if any, on the due diligence that was done on the AMSI 2005-R9 transaction? ...A. So, again, hard to specifically remember my role on that particular transaction. In general, the diligence process was done out of the credit department. So basically the way a transaction would work in general would be that the potential counterparty would send a loan tape, we would show that collateral to the credit department, specifically someone like Don Lawson or Jim Whittemore, Brian Farrell, etc., they would pick a sample for due diligence based on whatever metric they deemed to be appropriate at that point in time, and they would work with the third party diligence firms to review the diligence results of the transactions. Q. Was it the credit department's responsibility to determine the appropriate size of the sample? A. Yes."); *id.* at 56: 25-58:10 ("Q. The first sentence of section 4.3.2 reads 'The principal focus of a due diligence review for a mandate to act as lead securities underwriter for an originator or owner of assets is to confirm that the offering document is complete and accurate in all material respects.' On the transactions that you worked on, whether for Ameriquest, Indymac or Nomura where RBS acted as the lead underwriter, was it your understanding that the principal focus of diligence was to make sure that the documents were complete and accurate in all material respects? A. Yeah. Well, I think that that's correct, yes. Q. And you endeavored to do that to the extent that you were involved in each of those transactions? A. Again, I think this -- sorry. The prospectus supplement and the transaction really was broken into a lot of different parts at Greenwich Capital, and I think the diligence was focused in the credit department, you know, with legal overview of the documentation process. So I relied on the credit department to make the appropriate decisions with respect to sampling, diligence results and, you know, if there were specific, you know, exceptions or issues we would -- we would discuss them."); Ex. 372 (CMFG Deposition of Adam Smith) at 98:11-99:8 ("Q. What is your understanding of exceptions? A. Whether or not it complies with either the underwriting guidelines or related state laws for originating loans. Q. At the time you approached the closing of a mortgage-backed securitization for RBS, did you have an understanding that the loans

that were being securitized generally complied with the originator's underwriting guidelines? ...THE WITNESS: So there would be a diligence process. And credit would do the diligence sample as we sort of talked about previously. And if there were so they would do due diligence. And if there were material things that we would have to talk about on this deal, we would talk about it. But I'm not -- I mean, in general that function was a credit function. So a good part of the process for doing a transaction was going to get approval for doing the transaction from credit, i.e., who is the counterparty and what does the file diligence look like.").

**RBSSI Response:** RBSSI does not dispute that loan-level due diligence was conducted primarily by RBSSI's Credit group, but RBSSI disputes the assertion in ¶ 793 to the extent it states or implies that the Credit group was responsible for reviewing the offering documents or performing *transaction-level* due diligence as FHFA mischaracterizes or improperly paraphrases the cited testimony. As Mr. Smith testified, and as stated in RBSSI's responses to ¶¶ 765 and 792, the Asset-Backed Finance group managed the process of ensuring the accuracy of the prospectus supplement. That group worked and communicated with the Credit group to review and understand the results of the loan-level due diligence that the Credit group had performed in order to ensure that the offering materials were materially accurate.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI "disputes" ¶ 793 to the extent it states or implies that "the Credit group was responsible for reviewing the offering documents or performing *transaction-level* due diligence[,]" they identify no evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While RBSSI argues that "the Asset-Backed Finance group managed the process of ensuring the accuracy of the prospectus supplement[,]" this argument does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

794. **FHFA Statement:** Mr. Smith testified that he read prospectus supplements to make sure that "the numbers reflected the loan tape, the structure was reflected and documented correctly, that the term sheet reflected the prospectus." Ex. 386 (Deposition of Adam Smith) at 39:24-40:22 ("Q. Did you personally review any of the offering materials on the AMSI 2005-R9 transaction? A. I reviewed the deal, yes. Well, I reviewed in general the deals that I worked on, I would review the documents. I would say they're a hundred pages plus, so at different points in my career I did more review as far a reading every word versus reading sort of the content, but I did review documents over my course at RBS Greenwich Capital. Q. And what was your purpose in reviewing those documents? A. To make sure that the numbers reflected the loan tape, the structure was reflected and documented correctly, that the term sheet reflected the prospectus, things of that nature.

Q. Did you personally consider it important that the information in the offering documents be accurate? A. I did."); *id.* at 45:18-46:19 ("Q. What involvement did you have, if any, on the due diligence that was done on the AMSI 2005-R9 transaction? ... A. So, again, hard to specifically remember my role on that particular transaction. In general, the diligence process was done out of the credit department. So basically the way a transaction would work in general would be that the potential counterparty would send a loan tape, we would show that collateral to the credit department, specifically someone like Don Lawson or Jim Whittemore, Brian Farrell, etc., they would pick a sample for due diligence based on whatever metric they deemed to be appropriate at that point in time, and they would work with the third party diligence firms to review the diligence results of the transactions. Q. Was it the credit department's responsibility to determine the appropriate size of the sample? A. Yes.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 794 insofar as the cited testimony specifically relates to Mr. Smith's review of the AMSI 2005-R9 transaction, which is not at issue in this case. RBSSI further disputes the assertion in ¶ 794 insofar as it quotes only some of the responsibilities and tasks Mr. Smith testified that he performed in order to ensure that the offering materials contained no material misstatements. RBSSI refers the Court to its responses to ¶¶ 765 and 792 for a more complete description of the tasks Mr. Smith and others in the Asset-Backed Finance group performed.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI "disputes" ¶ 794 insofar as Mr. Smith's testimony relates to the review of AMSI 2005-R9, RBSSI's argument ignores Mr. Smith's testimony, in which he stated that it was "hard to specifically remember [his] role on that particular transaction" and that "in general the deals that I worked on, I would review the documents" for the purpose of "mak[ing] sure that the numbers reflected the loan tape, the structure was reflected and documented correctly, that the term sheet reflected the prospectus." FHFA Ex. 386 (Deposition of Adam Smith) at 39:24-40:22  Further, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Further, RBSSI's assertion that ¶ 794 only quotes some of Mr. Smith's responsibilities and tasks, does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

795. **FHFA Statement:** Ms. Radhakishun testified that it was not her responsibility "to insure that those representations [in the prospectus, prospectus supplement, and term sheets]

were accurate." Ex. 470 (CMFG Deposition of Shakti Radhakishun) at 30:13-31:15 ("Q. Yeah. Do you understand that in the offering documents there's statements regarding the collateral characteristics of the loans that are securitized in a RMBS transaction? .... A. Which offering documents are you referring to? Q. Prospectus, supplement, term sheets, prospectuses..... A. Can you be more specific regarding statements? Q. Do you understand, for instance, that there are statements such as what the LTV ratios are of the loans that collateralize a RMBS transaction? A. It is my recollection that the documents you refer to include information regarding collateral in the transaction. Q. And with respect to those representations was it part of your responsibility to insure that those representations were accurate? ... A. It was not. Q. At any time when you were at RBS was it your responsibility to insure that those types of representations were accurate? ... A. It was not.").

**RBSSI Response:** RBSSI states that Ms. Radhakishun did not work on the Nomura Securitizations, and thus the facts and/or circumstances regarding what she believed her responsibilities to be while at RBSSI are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI disputes the assertion in ¶ 795 as it mischaracterizes and improperly paraphrases the cited testimony. Ms. Radhakishun was specifically questioned about whether it was her responsibility to ensure that the tables showing the "collateral characteristics" of the loans in RMBS offering documents and, specifically "LTV ratios," were accurate, not representations in the "prospectus, prospectus supplement, and term sheets" generally, as FHFA incorrectly paraphrases. Ms. Radhakishun testified that as a Senior Vice-President during the relevant time period she relied on others within the Asset-Backed Finance group to ensure that such collateral information was accurate because she did not have "the ability of re – recreating the collateral tables ... exactly as they were shown". RBS Ex. 86 (*MassMutual* Deposition of Shakti Radhakishun) at 84:22-85:21. When specifically asked the question of whether she "h[ad] any responsibility to ensure that the contents of [the offering documents] were accurate," Ms. Radhakishun stated "yes" and explained that she and her team "would review the documents with respect to the information we provided and would similarly ask all third parties involved in – in their responsibilities within the various documents to review and – and sign off on and – and that's basically the process." *Id.* at 83:20-21; *see also id.* at 80:23-82:18 (explaining the process for both proprietary and third-party securitizations as "reviewing and commenting on and coordinating with counsel and other third parties who had responsibilities to various sections within the prospectus supplement and to get everybody who was involved and responsible for different sections their sign-off that they were comfortable that we had done everything in our ability to accurately reflect that information as it was provided in the prospectus supplement as a whole.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI argues that the facts and/or circumstances regarding what Ms. Radhakishun believed her responsibilities to be

while at RBSSI are not material facts, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Further, RBSSI's assertion that Ms. Radhakishun was questioned about ensuring that the tables showing collateral characteristics and "LTV ratios" in offering documents were accurate fails to directly controvert the asserted fact that Ms. Radhakishun testified that it was not part of her responsibility to ensure that certain representations in the prospectus supplements and other offering documents were true. FHFA Ex. 470 (CMFG Deposition of Shakti Radhakishun) at 30:13-31:15.

796. **FHFA Statement:** When Mr. Skibo was in the Asset-Backed Finance Group prior to 2001 and throughout his time in the group at RBS, he was not responsible for ensuring the accuracy of the information in prospectus supplements; he believed that outside counsel and accountants were responsible for verifying the information in the prospectus supplements. Ex. 393 (Deposition of Frank Skibo) at 36:2-38:5 ("Q. And what was your first position at RBS when you began in 1997? A. It was a, I believe an associate in the asset-backed finance group. Q. And what were your responsibilities there? A. Primarily transaction management, working on securitizations. Q. What do you mean by "transaction management"? A. Coordinating the closing of transactions, securitizations. Q. And could you give some examples of what those activities would involve? A. Coordinating with accountants and internal and external counsel to finalize prospectus, prospectus supplements and coordinate the closing with counterparties, internal and external. Q. And did your responsibilities remain generally the same through your time period in the asset-backed finance group? A. Generally. . . Q. And in connection with that, did you have a role or responsibility for determining whether the information that was included in offering materials was accurate? A. No, I did not. Q. And that would apply both to marketing term sheets and prospectus supplements? A. I did not. Did you have an understanding as to who was responsible for determining whether the information in prospectus supplements was accurate? A. Yes. Q. Who was that? A. It would be external counsel and external accountants."); *id.* at 41:21-42:6 ("Q. With respect to marketing term sheets, did you have an understanding as to who was responsible for determining the accuracy of information contained in those documents? A. External accountants and attorneys. Q. So it would be the same as with respect to prospectus supplements? A. Yes."); Ex. 472 (Massachusetts Mutual Deposition of Frank Skibo) at 134:8-25 ("Q. You said you reviewed prospectus supplements; correct? A. When I was in the banking group, yes. Q. And you said you were involved in drafting term sheets in the banking group? A. Yes. Q. When you were involved in drafting the term sheets, did you endeavor to insure that the information in the term sheets was accurate? A. Yes. Q. And when you reviewed prospectuses and prospectus supplements

in the banking group, did you insure that the information that you reviewed was accurate? A. Yes. We engaged outside counsel and accountants to verify that information.").

**RBSSI Response:** RBSSI states that Mr. Skibo was not involved in the Nomura Securitizations, and the facts and/or circumstances regarding his responsibilities as a junior associate in the Asset-Backed Finance group prior to 2001 are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI disputes the assertion in ¶ 796 as it mischaracterizes the cited testimony. FHFA itself relies on FHFA Ex. 472, which is an excerpt of deposition testimony of Mr. Skibo in which he expressly agreed that when he reviewed prospectuses and prospectus supplements in the Asset-Backed Finance group that he would "insure that the information that [he] reviewed was accurate" and that he "engaged outside counsel and accountants to verify that information," not that he thought the outside accountants and counsel were solely "responsible for verifying information in the prospectus supplements."

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the facts and/or circumstances regarding Mr. Skibo's responsibilities in the Asset-Backed Finance group prior to 2001 are not material facts at issue in this litigation, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. While RBSSI asserts that ¶ 796 does not fully and accurately describe the contents of FHFA Ex. 472, RBSSI's assertion fails to cite a particular portion of the document, and therefore does not create a genuine dispute of material fact. Part I.E, *supra*. Further, the testimony cited by RBSSI do not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

797. **FHFA Statement:** The Collateral Analytics Group was tasked with preparing data tables for inclusion in offering materials. Ex. 368 (Deposition of Scott Gimpel) at 82:2-8 ("Q. So with respect to the preparation of marketing materials or prospectus supplements your group would provide data tables to the asset-backed finance group? A. When it regarded collateral, yes.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 797 insofar as it is vague and ambiguous. RBSSI does not dispute that for certain third-party securitizations where it acted as lead underwriter, RBSSI collateral analysts prepared data tables regarding collateral characteristics for inclusion in RMBS offering materials. RBSSI disputes the assertion in ¶ 797 to the extent it states or implies that RBSSI's collateral analysts were responsible or "tasked with" preparing data tables for all third-party securitizations as speculative and without factual support. FHFA cites to an excerpt of Mr. Gimpel's

testimony where he was discussing collateral analysts' role in RBSSI's whole loan acquisition business, which included proprietary, not third-party securitizations. RBS Ex. 13 (Deposition of Scott Gimpel) at 65:17-82:8 (discussing RBSSI's whole loan acquisition business).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the assertion is vague, ambiguous and speculative without factual support, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Further, the excerpted testimony of Mr. Gimpel is does not contravene the asserted fact and therefore does not create a genuine dispute of material fact. Part. I.C, *supra*.

798. **FHFA Statement:** In preparing the data tables for inclusion in offering materials, the Collateral Analytics group "would only be able to do logical checks to make sure that numbers fit within certain ranges, that different types and purposes were consistent with what was logical, and that anything that could be calculated was recalculated, only check[ing] the data as it was presented to them." Ex. 368 (Deposition of Scott Gimpel) at 168:2-169:16 ("Q. What steps, if any, would the collateral analytics group take to confirm the accuracy of the data that would be included in these tables? A. Just, the collateral analytics group would only be able to do logical checks to make sure that numbers fit within certain ranges, that different types and purposes were consistent with what was logical, and that anything that could be calculated was recalculated. That's basically the extent of how they determined accuracy. Q. What do you mean by would only do "logical checks"? Can you elaborate on what you mean by "logical checks"? A. The collateral analytics group could only check the data as it was presented to them. It was a check of data, so a check of numbers. So any value that could be recalculated based on any other values within the data tape, they would recalculate. If a -- if you knew that the interest rate -- if they were presented an interest rate of 50 percent, they would realize that that was not within valid ranges. So any numeric -numeric value would be checked to be within certain ranges. Any non-numeric value would be checked to make sure that those are legitimate descriptions, such as property types. Q. So, for example, that what was -- the property type that was described would be consistent with the categories that were typically ascribed to a property? ..A. Yes. You wouldn't have a horse stable in property type, and that would be an exception.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 798 except insofar as it omits relevant testimony. Mr. Gimpel further testified that it was the Credit group's responsibility "for checking the accuracy of the underlying data" in the loan tapes that the collateral analysts used to create the collateral tables in the offering materials, RBS Ex. 13 (Deposition of Scott Gimpel) at 173:8-14 ("Q. And did you have an understanding as to what group or groups was responsible for checking the accuracy of the underlying data that you would be using to create these reports? A. That would be the credit and underwriting department."), and that outside accountants would "check[ ] the validity of the calculations" of the collateral analysts in performing the manual function of

converting the loan tape data into tables in the offering materials; *id*. at 170:11-172:15 ("Q. And that loan tape, the compilation of the loans to be pooled to support a security, that would be the source of the data that you would be utilizing? ... A. The data that the collateral analytics group would be utilizing, that would be it, yes. Q. Did the collateral analytics group, was it responsible for that process of taking the data from the acquisition pool loan tapes and compiling it into separate collections of data to include only the loans that would support securitizations? ... A. When I was a collateral analyst accounting firms would re-check our numbers and, yes, they would then take those results and correct them. Q. What was your understanding of what review would be conducted by the accounting firms? I believe in my view the accounting firms were just checking the validity of the calculations. Again, it was a very similar check, a numeric check. A check of values."). In addition, RBSSI employed Clayton and Deloitte to conduct a data integrity review to ensure that the data captured in the physical loan files was consistent with the loan tape data. Clayton and Deloitte would inform RBSSI of any differences between the loan tape and the loan files, so that any identified discrepancies could be resolved as needed. RBS Ex. 87 (RBS-FHFA-SDNY-0487363, Clayton Due Diligence Summary for Nomura NAAC 2007-AR1); RBS Ex 88 (RBS-FHFA-SDNY-0487360) (Clayton Due Diligence Summary for Nomura NHEL 2007-HE1); RBS Ex. 89 (SF1FHFA04486213) (Deloitte Comfort Letter for NHELI 2007-1); RBS Ex. 54 (SF1FHFA04478508) (Deloitte Comfort Letter for NHELI 2006- FM2).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI argues that the assertion omits relevant testimony, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Further, the excerpted testimony of Mr. Gimpel does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. The cited documents relating to Clayton's Due Diligence Summary and Deloitte Comfort Letters are irrelevant to the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*.

799. **FHFA Statement:** The Collateral Analytics Group did not "verify the accuracy of the underlying data that was included on [the] loan tapes" as it was "not their responsibility." Ex. 368 (Deposition of Scott Gimpel) at 169:23-171:8 ("Q. And the source of the data that's being utilized by the collateral analytics group to generate these tables, is that the loan tape received from the originator? A. That is correct. Q. And then when loans were pooled into a security, that subset of loans would be put together into a separate loan tape? ..A. Yes. Q. And that loan tape, the compilation of the loans to be pooled to support a security, that would be the source of the data that you would be utilizing? ..A. The data that the collateral analytics group would be utilizing, that would be it, yes. Q. Did the collateral analytics group, was it responsible for that process of taking the data

from the acquisition pool loan tapes and compiling it into separate collections of data to include only the loans that would support securitizations? A. Yes. Q. And did the collateral analytics group, did it undertake any steps to verify the accuracy of the underlying data that was included on those loan tapes? A. That was not their responsibility, no."); *id.* at 173:8-18 ("Q. And did you have an understanding as to what group or groups was responsible for checking the accuracy of the underlying data that you would be using to create these reports? A. That would be the credit and underwriting department. Q. And that's through the due diligence process that we talked about earlier? A. Correct.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 799 except insofar as it omits relevant testimony. Mr. Gimpel further testified that it was the Credit group's responsibility "for checking the accuracy of the underlying data" in the loan tapes that the collateral analysts used to create the collateral tables in the offering materials, RBS Ex. 13 (Deposition of Scott Gimpel) at 173:8-14 ("Q. And did you have an understanding as to what group or groups was responsible for checking the accuracy of the underlying data that you would be using to create these reports? A. That would be the credit and underwriting department."), and that outside accountants would "check[ ] the validity of the calculations" of the collateral analysts in performing the manual function of converting the loan tape data into tables in the offering materials; *id.* at 170:11-172:15 ("Q. And that loan tape, the compilation of the loans to be pooled to support a security, that would be the source of the data that you would be utilizing? ... A. The data that the collateral analytics group would be utilizing, that would be it, yes. Q. Did the collateral analytics group, was it responsible for that process of taking the data from the acquisition pool loan tapes and compiling it into separate collections of data to include only the loans that would support securitizations? ... A. When I was a collateral analyst accounting firms would re-check our numbers and, yes, they would then take those results and correct them. Q. What was your understanding of what review would be conducted by the accounting firms? I believe in my view the accounting firms were just checking the validity of the calculations. Again, it was a very similar check, a numeric check. A check of values."). In addition, RBSSI employed Clayton and Deloitte to conduct a data integrity review to ensure that the data captured in the physical loan files was consistent with the loan tape data. Clayton and Deloitte would inform RBSSI of any differences between the loan tape and the loan files, so that any identified discrepancies could be resolved as needed. RBS Ex. 87 (RBS-FHFA-SDNY-0487363, Clayton Due Diligence Summary for Nomura NAAC 2007-AR1); RBS Ex 88 (RBS-FHFA-SDNY-0487360) (Clayton Due Diligence Summary for Nomura NHEL 2007-HE1); RBS Ex. 89 (SF1FHFA04486213) (Deloitte Comfort Letter for NHELI 2007-1); RBS Ex. 54 (SF1FHFA04478508) (Deloitte Comfort Letter for NHELI 2006- FM2).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI argues that the assertion omits relevant testimony, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Further, the excerpted testimony of Mr. Gimpel does

not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part. I.C, *supra.* The cited documents relating to Clayton's Due Diligence Summary and Deloitte Comfort Letters are irrelevant to the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra.*

(c) *RBS Recognized The Important Of Up To Date Information In Assessing Borrower Fraud, But Did Not Consider Available Information At The Time The Nomura Securitizations Were Issued*

800. **FHFA Statement:** Information relevant to identifying borrower fraud became available after the origination of the mortgage. Ex. 449 (Deposition of Frank Camacho) at 106:3-14 ("Q. You mentioned earlier that you were – you did do some work on repurchases and putbacks while at RBS. How did the review that you performed for repurchases and putbacks, did it differ at all from the review you performed when RBS was deciding whether to acquire a loan? A. Yes, it did. Q. In what way did it differ? A. It differed in that – in a putback review, the loan has been made. There is – there is additional information available that's not available at origination."); id. at 107:4-110:4 ("Q. Okay. So in what way did the review that you performed when reviewing a loan to acquire differ from the review you performed with respect to repurchases or putbacks? A. While a loan has already closed in a prepurchase environment, it's closed extremely recently. In many cases, in most cases, we're looking at the loan within 30, 45 days of origination. At that point, frequently a payment hasn't even been collected yet. In a putback review where you're looking at an asset that's three, six months, a year, a year-and-a-half old, there is a – there's a servicing history that you can look at, there are collection comments that you can look at, there are databases that you can pull that gives you some sort of information about what – what else the borrower was doing with respect to borrowing at the time of the loan. Q. And when you say, "databases," what sort of databases are you talking about? A. I believe in that review, in some instances, we were doing a search of MERS records. Q. And what is MERS? ...A. It is a – for the purposes of my review, it contains a repository of all mortgages that had been registered on its system. That's a database that you could search by borrower name, or, I believe, by Social Security number and get an indication of what mortgages had been taken out that were registered on the MERS system in and around the time of the subject loan. Q. And what sort of relevant – why would that be relevant to a decision in terms of whether to seek a repurchase of a loan? A. That would give you an indication of whether the borrower owned properties that weren't disclosed on the application, had taken out mortgages that weren't disclosed on the application. Had mortgage debt that was not disclosed. Q. And why would any of those things that you just listed, undisclosed properties, undisclosed debts be relevant to a decision about whether or not to repurchase a loan? A. Any additional debt affects the borrower's ability to pay the debt in question. Q. Okay. And so if there was any additional debt, that would be relevant to whether or not you would seek a repurchase. Is that correct? ...THE WITNESS. If there were additional mortgages that were not disclosed by the borrower that were not part of the original underwriting

594

decision, yes, that could be part of a – a putback request. ...Q. If there are additional mortgages that weren't disclosed by the borrower, would that be an indication of borrower fraud? ...THE WITNESS: I'd say it's definitely a misrepresentation by the borrower.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 800. FHFA cites the testimony of Mr. Camacho, who was specifically testifying about his work on repurchases and putbacks, not loan-file due diligence pre-securitization. Mr. Farrell, who was the credit officer that managed the loan-level due diligence on the Nomura Securitizations, testified that information that FHFA states was "relevant to identify borrower fraud," such as borrower credit reports and tax forms, would often not have been "available" to RBSSI publicly or otherwise, particularly when acting as a third-party underwriter where it did not own the loans in question. RBS Ex. 5 (Deposition of Brian Farrell) at 408:14-410:15 ("Q. Is it fair to say then that at least fraud falling into those two categories were in some instances getting past the diligence underwriting in the 2006/2007 time frame? . . . A. I think it's possible because again, the underwriter, the due diligence firm reviewing the files would not have that information. It would be very difficult for them to find it. Q. And the reason they would not have that information is because they would not go outside the loan file; is that right? ... A. No, I think, I don't think you're understanding me. So we'll use an example of where we're buying new originations and the loans closed in September, they're reviewing the loans in October. There's no way of knowing based on that credit report that that stuff is now in public records. Additionally, I don't think that it would be legal for RBS to then pull new credit reports on borrowers of loans that they didn't own. I believe that would be illegal....given the timeline that I spoke about perhaps a month after from closing to diligence, I think it would be highly unlikely that information would ever be there based on my experience."); *id.* at 351:23-353:16 ("Q. Now this article refers to IRS Form 4506-T. Do you see what I'm referring to? A. Yes, I do. Q. Are you familiar with that form? A. Yes. ... Q. So could that at least theoretically be used as a tool for assessing whether a stated income is accurate? ... A. I don't think that, that was something that could be done because you need to ask the borrower to fill that out, you need to get their permission to pull that information. I think that if, for example, we were buying loans from X mortgage company and they closed the loans, and then an independent party separate from their mortgage transaction was asking them for the documents, I don't think that's something that we would be successful in doing and I'm not sure if we would have the legal right to do.").

Mr. Farrell and Mr. Camacho further testified that even if information such as servicing files, property records, and bankruptcy records did eventually become publicly available, it would not necessary have been available between the time the loan was originated and the time when loan-level due diligence was performed. RBS Ex. 27 (Deposition of Frank Camacho) at 115:7-23 ("Q. Where a loan was seasoned, would you have access to more information about the loan than where it had been recently originated? A. The -- the review I specifically remember I wouldn't characterize as having -- as having more information. I would characterize as having a separate set of information.... The distinction I'm making for this particular review was, these loans were seasoned, I believe, two years at the minimum and as much as ten to 15 years. So you didn't have -- a lot of the credit files were very, very thin. You were looking at a lot less credit

information than you would be for new originations. But conversely, you had much more servicing and collection information available."); RBS Ex. 5 (Deposition of Brian Farrell) at 404:17-405:20 ("Q. Did you feel like there was any other form of diligence that was going on during this period that did provide satisfactory results specifically on the question of fraud detection? ... A. I think that, you know, it's during the origination. I think it's important to note that detecting fraud during origination is extremely difficult based on my experience. Detecting fraud after the fact that the loan has closed after much time is usually much, much easier than when you are actually reviewing the file right after closing. The reason why I say that is because a lot of these fraud engines are based on public and proprietary databases. There's obviously a lag of information being fed into those. So at the time it's going to be much difficult for these engines to pick up stuff based on our testing, which is why we were looking to provide some of these sanity checks when they're – when they're performing the actual review of the loan file."); *id.* at 760:21-761:23 ("Q. Do you have any idea whether SiteX would have been a useful means to evaluate those loans as of the time they were securitized? ... A. I think what I've testified is I worked specifically on new originations. I think I've also testified that there's a lag when it came to using some of the, some these tools with public information. It's been my experience that if I'm looking at a new origination, I don't think that info would be reflected at the time, because it has to go through a process before it would get reflected. It would obviously need to go through whatever state and local clerks and databases before getting released to a company like SitEx. Q. To be sure I understand, you're saying that the loans you diligenced had been originated a short time before you performed due diligence, correct? A. That's the majority of what happened."); *id.* at 749:21-750:4 ("Q. Did you look at payment histories as part of the diligence process for whole loan purchases? A. It's possible, but most of the reviews that I worked on were new originations, so there wouldn't be essentially a pay history available because it's a new origination."); *id.* at 833:17-834:11 ("Q. Do you know if, and I think you've testified that there are tools available after a loan has been seasoned for some time that might permit someone to determine if those type frauds you just identified had occurred at origination; am I right? A. I think it's possible, but I think I also testified that the timing will vary by, by state, county, etc., that it may be a long time before any of that information may be available."). FHFA cites no evidence that such information or "fraud-detection tools," which it does not define, were available to RBSSI at the time it performed due diligence on the Nomura Securitizations, which was often within two to three months after the loans' origination, and less than a month before securitization. *Compare* FHFA Ex. 448 (Clayton Nomura NAAC 2007-AR1 due diligence summary) at RBS-FHFA-SDNY-0487363 (discussing "a due diligence [that] was conducted" by Clayton between "January 17th to January 18th," 2007) *with* FHFA Br. 26 (identifying 323 loans in SLG for the NHEL 2007-1 Securitization, or 80.15%, as having been seasoned 90 days or less) *and* FHFA Ex. 9 (NHELI 2007-1 prospectus supplement) at NOM-FHFA 05141919 (identifying January 29, 2007 as the date of the prospectus supplement and January 1, 2007 as the "Cut-off Date" for many disclosures); *compare also* FHFA Ex. 450 (Clayton Nomura NHEL 2007-HE1 due diligence summary) at RBS-FHFA-SDNY-0487360 (discussing "a due diligence [that] was conducted" by Clayton between "January 22nd to January 24th," 2007) *with* FHFA Br. 26 (identifying 1438 loans in SLG for the NHEL 2007-2 Securitization, or 47.92%, as having been seasoned

90 days or less) *and* FHFA Ex. 10 (NHELI 2007-2 prospectus supplement) at NOM-FHFA 05591330 (identifying January 30, 2007 as the date of the prospectus supplement and January 1, 2007 as the "Cut-off Date" for many disclosures).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While Defendants argue that "FHFA cites the testimony of Mr. Camacho, who was specifically testifying about his work on repurchases and putbacks, not loan-file due diligence pre-securitization," this is irrelevant to the asserted fact that "[i]nformation relevant to identifying borrower fraud became available after the origination of the mortgage." Similarly, the cited evidence relating to the availability of certain forms during loan-level due diligence and the timing of RBSSI's due diligence on the Nomura Securitizations fails to directly contravene the asserted fact that "[i]nformation relevant to identifying borrower fraud became available after the origination of the mortgage" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

RBSSI's assertion that information relevant to identify borrower fraud "would often not have been available to RBSSI publicly or otherwise" is not supported by the cited testimony, in which Mr. Farrell speculates that (i) it would have been "difficult" for third-party diligence vendors—not RBSSI—to find that information, RBS Ex. 5 at 408:14-409:3, and it would not be legal "for RBS to … pull new credit reports," which does not speak to other fraud-related information at all and does not show that RBSSI could not have requested updated credit reports from Nomura, which owned the loans. RBSSI's assertion that "servicing files, property records, and bankruptcy records" would *not necessarily* have been available at the time loan-level diligence was performed is a conclusory and speculative assertion that may not be considered a statement of material fact. Part 1.B, *supra*. Moreover, RBSSI cites no evidence or argument that such information was not available at the relevant time—the time of securitization—and

indeed, testimony of Mr. Farrell and Camacho reflects that servicing files, property

records, MERS database records, and bankruptcy records were available following

origination.  Mr. Farrell testified that fraud engines based on public databases were useful

to identify fraud following origination.  RBS Ex. 5 (Deposition of Brian Farrell) at

404:17-405:20.  Mr. Camacho similarly testified that servicing and collection information

was available for seasoned loans three months or more following origination.  FHFA Ex.

449 at 107:4-110:4 ("Q.  Okay.  So in what way did the review that you performed when

reviewing a loan to acquire differ from the review you performed with respect to

repurchases or putbacks? A.  While a loan has already closed in a prepurchase

environment, it's closed extremely recently.  In many cases, in most cases, we're looking

at the loan within 30, 45 days of origination.  At that point, frequently a payment hasn't

even been collected yet.  *In a putback review where you're looking at an asset that's*

*three, six months, a year, a year-and-a-half old, there is a – there's a servicing history*

*that you can look at, there are collection comments that you can look at, there are*

*databases that you can pull that gives you some sort of information about what – what*

*else the borrower was doing with respect to borrowing at the time of the loan*.) (emphasis

added).  In particular, Mr. Farrell's testimony about "Site X" does not appear in RBS Ex.

5 at 760:21-761:23; RBSSI cites a question asked at RBS Ex. 5 at 760:21-24 and then

quote Mr. Farrell's answer to a different question found at RBS Ex. 758:10-759:23.  *See*

FHFA Ex. 383 (Deposition of Brian Farrell) at 758:10-759:23 ("Q.  Would SiteX reflect

if a borrower had taken out multiple mortgages in a short period? … A.  I think SiteX

would have that capability if you searched by borrower name.  It obviously wouldn't

work if you searched just by property address.  Q.  Is that information something that

would be useful in performing diligence on a whole loan purchase? … A. I think what I've testified is I worked specifically on new originations. I think I've also testified that there's a lag when it came to using some of the, some of these tools with public information. It's been my experience that if I'm looking at a new origination, I don't think that info would be reflected at the time, because it has to go through a process before it would get reflected. It would obviously need to go through whatever state and local clerks and databases before getting released to a company like SiteX. Q. To be sure I understand, you're saying that the loans you diligenced had been originated a short time before you performed due diligence, correct? A. That's the majority of what happened."); *id.* at 760:21-761:11 ("Q. Do you have any idea whether SiteX would have been a useful means to evaluate those loans as of the time they were securitized? … A. I can't really say. I wasn't involved in it. Q. Do you have any idea whether anyone at RBS used SiteX to evaluate loans before they were securitized? … A. It's not something that was my responsibility."). Finally, RBSSI's speculation that fraud-detection tools may not have been available is a conclusory argument that may not be considered a statement of material fact. Part I.B, *supra*.

801. **FHFA Statement:** When reviewing loans post-securitization for the purpose of identifying loans that were eligible for repurchase by an originator, RBS looked for evidence of fraud "by the borrower of either his income, occupancy." Ex. 449 (Deposition of Frank Camacho) at 97:20-99:20 ("Q. Are you aware of RBS being involved in any repurchases or putbacks of loans that they acquired between 2005 and 2007? A. Yes. Q. Were you involved in any repurchases or putbacks of loans while at RBS? A. From time to time, I would perform reviews of loans that had been in prior deals that we'd worked on and rereview them, looking for -- pardon me -- some sort of evidence of -- some sort of evidence of a breach in a warranty of a representation that would lead to a putback request.... Q. Among the representations and warranties at issue, would compliance with underwriting guidelines be one of those? ... As a general matter? A. As a general matter, I recall that the reviews that I did were more targeted at finding evidence of -- of borrower fraud. Q. And when you say, 'borrower fraud,' can you elaborate on what you mean by that? A. By that, I mean a misrepresentation of -- by

the borrower of either his income, occupancy. Those two primarily. Q. And when you say, 'income,' I assume you're referring to the amount of their -- how much income they -¬how much money they make. Is that right? A. Correct. Q. And when you say, 'occupancy,' are you referring to whether or not they would occupy a property as a primary residence versus as a secondary home or investment property? A. Correct.").

**RBSSI Response:** RBSSI states that the facts and/or circumstances regarding what post-securitization reviews RBSSI conducted are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI does not dispute the assertion in ¶ 801, except to the extent it states or implies that RBSSI or its due diligence vendors did not adequately conduct loan-level due diligence on the Nomura Securitizations. As discussed in RBSSI's response to ¶ 800 (which RBSSI incorporates by reference as if restated herein), many of the tools used to detect, or evidence demonstrating, borrower fraud were not available to RBSSI or its due diligence vendors at the time loan-level due diligence was performed, which was typically within a few weeks or months of the loans' origination. Further, RBSSI employees testified that RBSSI and its due diligence vendors would look for potential indicators of fraud as part of their loan-level due diligence process. RBS Ex. 5 (Deposition of Brian Farrell) at 59:12-25 ("Q. Were you trained in detecting fraud in mortgage loans? ... A. Was I trained by RBS? Q. Yes. A. Perhaps. I think that when I got hired there was ongoing training. Like I said, there was a lot of Q&A. I think that a lot of the knowledge that I possess I got over time at Clayton working through – with my supervisors, additionally, working directly with RBS, they were one of my primary clients."); *id.* at 396:14-397:4 ("Q. And the fraud checklist ... says 'this is intended to be a useful guide for possible misrepresentations.' Do you see what I'm referring to? A. I do. Q. So you intended this as a tool to assist the diligence underwriters to identify possible misrepresentations on a loan, correct? A. I mean looking at this, I think this is, this is a guide to possibly assist in identifying fraud in the origination file."); *id.* at 404:17-405:20 ("Q. Did you feel like there was any other form of diligence that was going on during this period that did provide satisfactory results specifically on the question of fraud detection? ... A. I think that, you know, it's during the origination. I think it's important to note that detecting fraud during origination is extremely difficult based on my experience. Detecting fraud after the fact that the loan has closed after much time is usually much, much easier than when you are actually reviewing the file right after closing. The reason why I say that is because a lot of these fraud engines are based on public and proprietary databases. There's obviously a lag of information being fed into those. So at the time it's going to be much difficult for these engines to pick up stuff based on our testing, which is why we were looking to provide some of these sanity checks when they're – when they're performing the actual review of the loan file."); RBS Ex. 27 (Deposition of Frank Camacho) at 418:21-419:3 ("Q. How did you expect your third-party due diligence firms who were working for RBS to identify instances of borrower fraud? A. I expected the reunderwriters to perform a thorough analysis of all the information available on a loan file and indicate any areas where they felt there was inconsistent or conflicting information."). FHFA cites no evidence that such information was available to RBSSI at the time it performed due diligence on the Nomura Securitizations.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. FHFA incorporates by reference its reply to ¶ 800 as if fully stated herein. While RBSSI argues that "the facts and/or circumstances regarding what post-securitization reviews RBSSI conducted are not 'material facts' at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required," and while it disputes that "RBSSI or its due diligence vendors did not adequately conduct loan-level due diligence on the Nomura Securitizations," these arguments do not create a genuine dispute of material fact. Part I.A, *supra*. The cited evidence relating to the availability of fraud-detection tools and RBSSI's loan-level due diligence is irrelevant to the asserted fact relating to repurchase reviews and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Furthermore, while Defendants imply that loan-level due diligence on the Nomura Securities "was typically [performed] within a few weeks or months of the loans' origination," the cited evidence does not support this assertion. The evidence cited in ¶ 800 shows that 80.15% of the loans in the SLG for NHELI 2007-1 and 47.92% of the loans in the SLG for NHELI 2007-2 were seasoned 90 days or less as of securitization, which occurred one to two weeks after due diligence, not that due diligence "typically" occurred "within a few weeks or months of the loans' origination."

802. **FHFA Statement:** There is no evidence that RBSSI used any fraud-detection tools or consulted any post-acquisition information in connection with conducting diligence. Ex. 383 (Deposition of Brian Farrell) at 413:20-414:4 ("Q. Do you know whether anyone within RBS even considered performing a round of diligence shortly before securitization in which public records and other outside materials would be taken into account? ... A. I'm not aware of that."); id. at 833:17-834:11 ("Q. Do you know if, and I think you've testified that there are tools available after a loan has been seasoned for some time that might permit someone to determine if those type frauds you just identified had occurred at origination; am I right? A. I think it's possible, but I think I also testified that the timing will vary by, by state, county, etc., that it may be a long time before any of that information may be available. Q. Do you know whether anyone at RBS applied those tools with respect to any loan before it was securitized? A. I don't recall.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 802 as it mischaracterizes or improperly paraphrases the cited testimony. First, FHFA does not specify what it means by "post-acquisition information" in this context, where RBSSI did not acquire any loans but acted as a third-party underwriter, nor does it provide examples demonstrating what that phrase is intended to mean. As discussed in RBSSI's response to ¶ 800 (which RBSSI incorporates by reference as if restated herein), many of the so-called "fraud-detection tools" FHFA identifies were unavailable to RBSSI at the time loan-file due diligence was performed. Further, as discussed in RBSSI's response to ¶ 801 (which RBSSI incorporates by reference as if restated herein), Brian Farrell and other RBSSI credit officers testified that they and RBSSI's third-party due diligence vendors did look for fraud as part of their pre-securitization loan-level due diligence reviews. FHFA cites no evidence that such information or "fraud-detection tools," which it does not define, were available to RBSSI at the time it performed due diligence on the Nomura Securitizations, which was often within two to three months after the loans' origination, and less than a month before securitization. *Compare* FHFA Ex. 448 (Clayton Nomura NAAC 2007-AR1 due diligence summary) at RBS-FHFA-SDNY-0487363 (discussing "a due diligence [that] was conducted" by Clayton between "January 17th to January 18th," 2007) *with* FHFA Br. 26 (identifying 323 loans in SLG for the NHEL 2007-1 Securitization, or 80.15%, as having been seasoned 90 days or less) *and* FHFA Ex. 9 (NHEL 2007-1 prospectus supplement) at NOM-FHFA_05141919 (identifying January 29, 2007 as the date of the prospectus supplement and January 1, 2007 as the "Cut-off Date" for many disclosures); *compare also* FHFA Ex. 450 (Clayton Nomura NHEL 2007-HE1 due diligence summary) at RBS-FHFA-SDNY-0487360 (discussing "a due diligence [that] was conducted" by Clayton between "January 22nd to January 24th," 2007) *with* FHFA Br. 26 (identifying 1438 loans in SLG for the NHELI 2007-2 Securitization, or 47.92%, as having been seasoned 90 days or less) *and* FHFA Ex. 10 (NHELI 2007-2 prospectus supplement) at NOM-FHFA_05591330 (identifying January 30, 2007 as the date of the prospectus supplement and January 1, 2007 as the "Cut-off Date" for many disclosures).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. The cited evidence relating to the availability of fraud-detection tools, RBSSI's loan file due diligence, and the timing of diligence on the Nomura Securitizations fails to directly contravene the asserted fact that "[t]here is no evidence that RBSSI used any fraud-detection tools or consulted any post-acquisition information in connection with conducting diligence" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants argue that "post-acquisition information" and "fraud-detection tools" are undefined, it is clear from the context that "post-acquisition information" refers to the information arising after loans were acquired of the type that is cited in ¶¶ 800, 803, and

804, and that "fraud-detection tools" refers to the methods of detecting fraud of the type

cited in ¶¶ 805-806 and cited by Defendants themselves their response to ¶ 800 and again

here; in any event, RBSSI's argument does not create a genuine dispute of material fact.

Part 1.A, *supra*. Additionally, RBSSI's assertion that RBSSI employees testified that

RBSSI and its due diligence vendors would look for potential indicators of fraud as part

of their loan-level due diligence process does not directly contradict the asserted fact that

neither RBSSI nor its vendors consulted post-acquisition evidence in performance of due

diligence; and the cited testimony of Mr. Farrell and Mr. Camacho in ¶ 801 supports the

assertion that RBSSI did not consider information outside the loan file. RBS Ex. 27 at

418:21-419:3 ("Q. How did you expect your third-party due diligence firms who were

working for RBS to identify instances of borrower fraud? A. I expected the

reunderwriters to perform a thorough analysis of *all the information available on a loan*

*file* and indicate any areas where they felt there was inconsistent or conflicting

information.") (emphasis added); RBS Ex. 5 at 396:14-397:4 ("Q. And the fraud

checklist ... says 'this is intended to be a useful guide for possible misrepresentations.' Do

you see what I'm referring to? A. I do. Q. So you intended this as a tool to assist the

diligence underwriters to identify possible misrepresentations on a loan, correct? A. *I*

*mean looking at this, I think this is, this is a guide to possibly assist in identifying fraud in*

*the origination file*.") (emphasis added).

803. **FHFA Statement:** The Credit Group did not consider post-acquisition surveillance data such as owner bankruptcy or owner occupancy information in performing its diligence. Ex. 384 (Deposition of James Whittemore ) at 408:21-409:19 ("Q. Do you know whether RBS monitored the loans that it acquired? A. I don't remember. Q. Do you know whether there was any department within RBS that conducted post-acquisition surveillance on loans? A. No, I don't remember. Q. Do you know whether RBS ever obtained post-acquisition data on issues such as owner bankruptcy or owner occupancy? A. Could you please ask that again just to make sure I understand. Q. Yes. Do you

know whether RBS ever obtained post-acquisition data on issues such as owner bankruptcy or owner occupancy? A. I don't remember. Q. Did any group or individual within RBS ever present you with data reflecting post acquisition monitoring on loans that you had diligenced? A. I don't remember.").

**RBSSI Response:** RBSSI states that the issue of whether RBSSI considered "post-acquisition surveillance data" is not a "material fact" at issue in this litigation—which concerns third-party securitizations that RBSSI underwrote not loans which RBSSI acquired—to which a response is required. FHFA does not specify what it means by "post-acquisition surveillance data," other than providing examples of "owner bankruptcy" and "owner occupancy information," and inaccurately conflates the concept of "surveillance," which typically refers to the monitoring of loan performance and securitization performance after the closing of a securitization, with an assertion that such "surveillance" should have extended to investigating bankruptcy filings and whether a borrower physically resided in a subject property. To the extent a response is required, RBSSI disputes the assertion in ¶ 803 for the reasons set forth in RBSSI's responses to ¶¶ 800-801 (which RBSSI incorporates by reference as if restated herein). FHFA cites no evidence that such information was available to RBSSI at the time it performed due diligence on the Nomura Securitizations, which was often within two to three months after the loans' origination, and less than a month before securitization. *Compare* FHFA Ex. 448 (Clayton Nomura NAAC 2007-AR1 due diligence summary) at RBS-FHFA-SDNY-0487363 (discussing "a due diligence [that] was conducted" by Clayton between "January 17th to January 18th" 2007) *with* FHFA Br. 26 (identifying 323 loans in SLG for the NHEL 2007-1 Securitization, or 80.15%, as having been seasoned 90 days or less) *and* FHFA Ex. 9 (NHEL 2007-1 prospectus supplement) at NOM-FHFA_05141912, 919 (identifying January 29, 2007 as the date of the prospectus supplement and January 1, 2007 as the "Cut-off Date" for many disclosures); *compare also* FHFA Ex. 450 (Clayton Nomura NHELI 2007-HE1 due diligence summary) at RBS-FHFA-SDNY-0487360 (discussing "a due diligence [that] was conducted" by Clayton between "January 22nd to January 24th" 2007) *with* FHFA Br. 26 (identifying 1438 loans in SLG for the NHEL 2007-2 Securitization, or 47.92%, as having been seasoned 90 days or less) *and* FHFA Ex. 10 (NHEL 2007-2 prospectus supplement) at NOM-FHFA_05591325, 330 (identifying January 30, 2007 as the date of the prospectus supplement and January 1, 2007 as the "Cut-off Date" for many disclosures).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. FHFA incorporates by reference its replies to ¶¶ 800-802 as if restated herein. While Defendants argue that "the issue of whether RBSSI considered 'post-acquisition surveillance data' is not a 'material fact' at issue in this litigation … to which a response is required," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. The cited evidence relating to the availability of fraud-detection tools, RBSSI's loan file due

diligence, and the timing of diligence on the Nomura Securitizations fails to directly

contravene the asserted fact that "[t]he Credit Group did not consider post-acquisition

surveillance data such as owner bankruptcy or owner occupancy information in

performing its diligence" and therefore does not create a genuine dispute of material fact.

Part I.C, *supra*. While RBSSI argues that FHFA does not specify what it means by

"post-acquisition surveillance data," it is clear from the context that that "post-acquisition

surveillance data" refers to the information arising after loans were acquired of the type

that is cited in ¶¶ 800, 804-806, and cited by RBSSI itself in their response to ¶ 800; in

any event, RBSSI's argument does not create a genuine dispute of material fact. Part I.A,

*supra*. Furthermore, while Defendants argues that ¶ 803 "inaccurately conflates the

concept of 'surveillance,' which typically refers to the monitoring of loan performance

and securitization performance after the closing of a securitization, with an assertion that

such 'surveillance' should have extended to investigating bankruptcy filings and whether

a borrower physically resided in a subject property," this argument misconstrues the

meaning of ¶ 803, which states that the type of information reviewed during

"surveillance" was not reviewed by the Credit Group during due diligence, and does not

create a genuine dispute of material fact.

804. **FHFA Statement:** With the exception of a single deal, Mr. Camacho did not recall
receiving information received from servicers and trustees concerning loan performance
during diligence reviews. Ex. 449 (Deposition of Frank Camacho) at 543:22-544:17 ("Q.
Sure. For any pools of loans that RBS diligenced, whether for acquisition or as part of a
securitization perhaps by a third party, did RBS receive information from servicers and
trustees or trustees concerning loan performance? A. I believe on a couple of occasions, I
mentioned a deal that I'd reviewed that consisted of seasoned loans. I recall on that deal
that information, collection comments, servicing history was made available. Q. Except
for that one deal, do you recall any? A. No, I do not. Q. And for the deal that you have
referenced a couple times including just now, do you recall whether that's a securitization
and/or a securitization that was RBS issued or a third –party? A. My recollection is that

it was a securitization. I don't recall whether it was a third-party securitization as we've defined it or a – or an RBS securitization.").

**RBSSI Response:** RBSSI states that Mr. Camacho had no involvement in the Nomura Securitizations, and thus the facts and/or circumstances regarding which "deals" Mr. Camacho did or did not receive trustee or servicing records for purposes of due diligence reviews are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI disputes the assertion in ¶ 804, insofar as it mischaracterizes or improperly paraphrases Mr. Camacho's testimony, who stated that it was his belief that "on a couple of occasions" that he reviewed servicing and/or trustee information, and referred back to his prior testimony about a particular deal "consist[ing] of seasoned loans" where such information was obtained. RBS Ex. 27 (Deposition of Frank Camacho) at 543:22-544:17; *id.* at 115:7-116:14 (discussing review of seasoned loans, which Mr. Camacho variously described as "over six months" old or "two years at the minimum and as much as ten to 15 years," where there was "a separate set of information" about the loans consisting of "servicing and collection information"). RBSSI further disputes the assertion in ¶ 804 to the extent it is intended to state or imply that post-securitization fraud tools were available to RBSSI for the reasons set forth in RBSSI's responses to ¶¶ 800-801. FHFA cites no evidence that such information was available to RBSSI at the time it performed due diligence on the Nomura Securitizations, which was often within two to three months after the loans' origination, and less than a month before securitization. *Compare* FHFA Ex. 448 (Clayton Nomura NAAC 2007-AR1 due diligence summary) at RBS-FHFA-SDNY-0487363 (discussing "a due diligence [that] was conducted" by Clayton between "January 17th to January 18th" 2007) *with* FHFA Br. 26 (identifying 323 loans in SLG for the NHEL 2007-1 Securitization, or 80.15%, as having been seasoned 90 days or less) *and* FHFA Ex. 9 (NHEL 2007-1 prospectus supplement) at NOM-FHFA_05141912, 919 (identifying January 29, 2007 as the date of the prospectus supplement and January 1, 2007 as the "Cut-off Date" for many disclosures); *compare also* FHFA Ex. 450 (Clayton Nomura NHEL 2007-HE1 due diligence summary) at RBS-FHFA-SDNY-0487360 (discussing "a due diligence [that] was conducted" by Clayton between "January 22nd to January 24th" 2007) *with* FHFA Br. 26 (identifying 1438 loans in SLG for the NHEL 2007-2 Securitization, or 47.92%, as having been seasoned 90 days or less) *and* FHFA Ex. 10 (NHEL 2007-2 prospectus supplement) at NOM-FHFA_05591325, 330 (identifying January 30, 2007 as the date of the prospectus supplement and January 1, 2007 as the "Cut-off Date" for many disclosures).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. FHFA incorporates by reference its replies to ¶¶ 800-802 as if restated herein. While Defendants argue that "the facts and/or circumstances regarding which 'deals' Mr. Camacho did or did not receive trustee or servicing records for purposes of due diligence reviews are not 'material facts' at issue in this litigation under Local Rule 56.1 or otherwise to which a

response is required," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Furthermore, Defendants' assertions are irrelevant and do not specifically contradict the asserted fact. Part I.C, *supra*.

805. **FHFA Statement:** There were tools and public information available that would enable RBS to check for fraud some time after origination that would help "verify certain data." Ex. 383 (Deposition of Brian Farrell) at 414:19-415:3 ("Q. But it was your opinion during that time that public records at least some time after origination could be useful in helping to detect fraud, at least certain types, correct? ... A. I think it could be used in -- to verify certain data in question."); id. at 758:20¬760:20 ("Q. Is that information something that would be useful in performing diligence on a whole loan purchase? ... A. I think what I've testified is I worked specifically on new originations. I think I've also testified that there's a lag when it came to using some of the, some these tools with public information. It's been my experience that if I'm looking at a new origination, I don't think that info would be reflected at the time, because it has to go through a process before it would get reflected. It would obviously need to go through whatever state and local clerks and databases before getting released to a company like SitEx. Q. To be sure I understand, you're saying that the loans you diligenced had been originated a short time before you performed due diligence, correct? A. That's the majority of what happened.... Q. Is it correct that you don't know how long it took RBS after you performed your diligence to incorporate the loans into securitizations? A. That is correct, I didn't know when they did it."); id. at 405:21-408:15 ("Q. Let me try and break this down little bit. You testified it's extremely difficult to detect fraud during origination, correct? A. Based on my experience over, over the last few years, the majority of fraud claims that have been found that I'm aware of, had to do a lot with two major categories, one being undisclosed debt, the other had to do with occupancy. At the time that a loan file is originated, using the undisclosed debt as the example, it's going to be very difficult to find that undisclosed debt on the credit report that you're finding because there's an undisclosed debt, the borrower is applying and closing loans almost simultaneously, could be a day or two apart. That information has not yet been registered with public records, whether it's the county court, whatever the case may be, with the state, whatever. That would not be found at the time that you're, you're looking at your credit report that's in file at origination. That would be very difficult to find because it's not going to be reflected. The other example that I can give you that I've seen has to do with occupancy. It's very difficult to determine the exact intent to occupy when a borrower is applying for the loan. That being if they're purchasing a loan, a new home and they say that they are selling the other home, there's no way of finding out if they ever actually occupied that other property. Those two examples have been two of the major reasons for, for fraud, which are very difficult to find during the loan file review."); Ex. 393 (Deposition of Frank Skibo) at 487:22-488:22 (Q. The first item you identify is 'Review collection screens.' What's a collection screen? A. That would be from the servicer, their notes on a particular loan. Q. And what sort of information might appear there that would be relevant to a reunderwriting review and fraud research project? A. It's primarily the contact with the borrower, I believe. Q. Would those potentially include notes

memorializing communications with a borrow that might indicate fraud? A. It would be, you know, any conversations that the servicer had with the borrower that were noted by the servicing counterparty. Q. And how might that assist in a reunderwriting or fraud review? A. I guess it would have information pertaining to the borrower's situation currently, if they were making payments or not.); Ex. 461 (RBS-FHFA-CT-5646352, email regarding Fremont 06-1 reunderwriting) at RBS-FHFA-CT-5646352 (Frank Skibo writes "See below my original thoughts for the scope of this review - review collection screens, - bankruptcy filings after the loan closed, and - run Site X to see if the borrowers own multiple properties. – The other major thing to check is employment (note, Clayton will not be helpful with this). Frank and Anne will know to check Secretary of State for existence of corps, licensing in states (such as CPA, real estate, etc).").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 805 as the phrase "some time after origination" is vague and ambiguous and because FHFA mischaracterizes or improperly paraphrases the cited testimony. As stated in RBSSI's responses to ¶¶ 800-801 (which RBSSI incorporates by reference as if restated herein), fraud-detection tools and "public information" were frequently unavailable to RBSSI, particularly at the time due diligence was performed, including things like servicing files, updated credit reports, property records and bankruptcy records. FHFA cites no evidence that such information or "fraud-detection tools," which it does not define, were available to RBSSI at the time it performed due diligence on the Nomura Securitizations, which was often within two to three months after the loans' origination, and less than a month before securitization. *Compare* FHFA Ex. 448 (Clayton Nomura NAAC 2007-AR1 due diligence summary) at RBS-FHFA-SDNY-0487363 (discussing "a due diligence [that] was conducted" by Clayton between "January 17th to January 18th" 2007) *with* FHFA Br. 26 (identifying 323 loans in SLG for the NHEL 2007-1 Securitization, or 80.15%, as having been seasoned 90 days or less) *and* FHFA Ex. 9 (NHEL 2007-1 prospectus supplement) at NOM-FHFA_05141912, 919 (identifying January 29, 2007 as the date of the prospectus supplement and January 1, 2007 as the "Cut-off Date" for many disclosures); *compare also* FHFA Ex. 450 (Clayton Nomura NHEL 2007-HE1 due diligence summary) at RBS-FHFA-SDNY-0487360 (discussing "a due diligence [that] was conducted" by Clayton between "January 22nd to January 24th" 2007) *with* FHFA Br. 26 (identifying 1438 loans in SLG for the NHEL 2007-2 Securitization, or 47.92%, as having been seasoned 90 days or less) *and* FHFA Ex. 10 (NHEL 2007-2 prospectus supplement) at NOM-FHFA_05591325, 330 (identifying January 30, 2007 as the date of the prospectus supplement and January 1, 2007 as the "Cut-off Date" for many disclosures).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. FHFA incorporates by reference its replies to ¶¶ 800-802 as if restated herein. While Defendants assert that "the phrase 'some time after origination' is vague and ambiguous," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Defendants further assert that "FHFA mischaracterizes or improperly paraphrases the cited testimony," but

608

fail to explain that assertion or identify any evidence that contradicts the asserted fact.

RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. The cited evidence relating to the timing of due diligence on the Nomura Securitizations fails to directly contravene the asserted fact that "[t]here were tools and public information available that would enable RBS to check for fraud some time after origination that would help 'verify certain data'" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

806. **FHFA Statement:** RBS used tools and information unavailable at origination for internal fraud reviews. Ex. 449 (Deposition of Frank Camacho) at 97:20¬99:20 ("Q. Are you aware of RBS being involved in any repurchases or putbacks of loans that they acquired between 2005 and 2007? A. Yes. Q. Were you involved in any repurchases or putbacks of loans while at RBS? A. From time to time, I would perform reviews of loans that had been in prior deals that we'd worked on and rereview them, looking for -- pardon me -- some sort of evidence of -- some sort of evidence of a breach in a warranty of a representation that would lead to a putback request.... Q. Among the representations and warranties at issue, would compliance with underwriting guidelines be one of those? ... As a general matter? A. As a general matter, I recall that the reviews that I did were more targeted at finding evidence of -- of borrower fraud. Q. And when you say, 'borrower fraud,' can you elaborate on what you mean by that? A. By that, I mean a misrepresentation of --by the borrower of either his income, occupancy. Those two primarily. Q. And when you say, 'income,' I assume you're referring to the amount of their -- how much income they -- how much money they make. Is that right? A. Correct. Q. And when you say, 'occupancy,' are you referring to whether or not they would occupy a property as a primary residence versus as a secondary home or investment property? A. Correct."); id. at 107:4-110:4 ("Q. Okay. So in what way did the review that you performed when reviewing a loan to acquire differ from the review you performed with respect to repurchases or putbacks? A. While a loan has already closed in a prepurchase environment, it's closed extremely recently. In many cases, or in most cases, we're looking at the loan within 30, 45 days of origination. At that point, frequently a payment hasn't even been collected yet. In a putback review where you're looking at an asset that's three, six months, a year, a year-and-a-half old, there is a -- there's a servicing history that you can look at, there are collection comments that you can look at, there are databases that you can pull that gives you some sort of information about what -- what else the borrower was doing with respect to borrowing at the time of the loan. Q. And when you say, 'databases,' what sort of databases are you talking about? A. I believe in that review, in some instances, we were doing a search of MERS records. Q. And what is MERS? .... A. It is a -- for the purposes of my review, it contains a repository of all mortgages that had been registered on its system. That's a database that you could search by borrower name, or, I believe, by Social Security

number and get an indication of what mortgages had been taken out that were registered on the MERS system in and around the time of the subject loan.  Q.  And what sort of relevant -- why would that be relevant to a decision in terms of whether to seek a repurchase of a loan? A.  That would give you an indication of whether the borrower owned properties that weren't disclosed on the application, had taken out mortgages that was not disclosed.  Q.  And why would any of those things that you just listed, undisclosed properties, undisclosed debts be relevant to a decision about whether or not to repurchase a loan? A.  Any additional debt affects the borrower's ability to pay the debt in question.  Q.  Okay.  And so if there was any additional debt, that would be relevant to whether or not you would seek a repurchase.  Is that correct? ...  [A.] If there were additional mortgages that were not disclosed by the borrower that were not part of the original underwriting decision, yes, that could be part of a -- a putback request....  Q.  If there are additional mortgages that weren't disclosed by the borrower, would that be an indication of borrower fraud? . . .  [A.] I'd say it's definitely a misrepresentation by the borrower."); Ex. 461 (RBS-FHFA-CT-5646352, email regarding Fremont 06-1 reunderwriting) at RBS-FHFA-CT-5646352 (Skibo wrote "See below my original thoughts for the scope of this review - review collection screens, bankruptcy filings after the loan closed, and run Site X to see if the borrowers own multiple properties.  The other major thing to check is employment (note, Clayton will not be helpful with this).  Frank and Anne will know to check Secretary of State for existence of corps, licensing in states (such as CPA, real estate, etc.).").

**RBSSI Response:**  RBSSI states that what tools and information it used for internal post-securitization fraud reviews for purposes of identifying loans for potential repurchase by a seller is not a "material fact" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required.  To the extent a response is required, RBSSI disputes the assertion in ¶ 806 insofar as it is vague and ambiguous as to a time period and because FHFA mischaracterizes or improperly paraphrases the cited testimony.  As stated in RBSSI's responses to ¶¶ 800-801 (which RBSSI incorporates by reference as if restated herein), fraud-detection tools and "information" were frequently unavailable to RBSSI, particularly at the time due diligence was performed, including things like servicing files, updated credit reports, property records and bankruptcy records.  FHFA cites no evidence that such information or "tools," which it does not define, were available to RBSSI at the time it performed due diligence on the Nomura Securitizations, which was often within two to three months after the loans' origination, and less than a month before securitization.  *Compare* FHFA Ex. 448 (Clayton Nomura NAAC 2007-AR1 due diligence summary) at RBS-FHFA-SDNY-0487363 (discussing "a due diligence [that] was conducted" by Clayton between "January 17th to January 18th" 2007) *with* FHFA Br.  26 (identifying 323 loans in SLG for the NHEL 2007-1 Securitization, or 80.15%, as having been seasoned 90 days or less) *and* FHFA Ex. 9 (NHEL 2007-1 prospectus supplement) at NOM-FHFA_05141912, 919 (identifying January 29, 2007 as the date of the prospectus supplement and January 1, 2007 as the "Cut-off Date" for many disclosures); *compare also* FHFA Ex. 450 (Clayton Nomura NHEL 2007-HE1 due diligence summary) at RBS-FHFA-SDNY-0487360 (discussing "a due diligence [that] was conducted" by Clayton between "January 22nd to January 24th" 2007) *with* FHFA Br.  26 (identifying 1438 loans in SLG for the NHEL 2007-2 Securitization, or 47.92%, as having been seasoned 90 days or less) *and* FHFA Ex. 10

(NHEL 2007-2 prospectus supplement) at NOM-FHFA_05591325, 330 (identifying January 30, 2007 as the date of the prospectus supplement and January 1, 2007 as the "Cut-off Date" for many disclosures).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. FHFA incorporates by reference its replies to ¶¶ 800-802 as if restated herein. While Defendants argue that "what tools and information it used for internal post-securitization fraud reviews for purposes of identifying loans for potential repurchase by a seller is not a 'material fact' at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. While Defendants argue that ¶ 806 " is vague and ambiguous as to a time period," this argument is not supported by FHFA Ex. 449 at 97:20-99:20, which immediately identifies a time period. *See* FHFA Ex. 449 at 97:20-22 ("Q. Are you aware of RBS being involved in any repurchases or putbacks of loans that they acquired between 2005 and 2007?"). Furthermore, this argument does not create a genuine dispute of material fact. Part I.A, *supra*. While Defendants further assert that "FHFA mischaracterizes or improperly paraphrases the cited testimony," they fail to identify evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. The cited evidence relating to the timing of due diligence on the Nomura Securitizations fails to contravene the asserted fact that "RBS used tools and information unavailable at origination for internal fraud reviews" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

807. **FHFA Statement:** There is no evidence that RBSSI used any fraud-detection tools or consulted any post-acquisition information in connection with conducting diligence. Ex. 383 (Deposition of Brian Farrell) at 413:20-414:4 ("Q. Do you know whether anyone within RBS even considered performing a round of diligence shortly before securitization in which public records and other outside materials would be taken into account? ... A. I'm not aware of that."); id. at 833:17-834:11 ("Q. Do you know if, and I think you've testified that there are tools available after a loan has been seasoned for some time that

might permit someone to determine if those type frauds you just identified had occurred at origination; am I right? A. I think it's possible, but I think I also testified that the timing will vary by, by state, county, etc., that it may be a long time before any of that information may be available. Q. Do you know whether anyone at RBS applied those tools with respect to any loan before it was securitized? A. I don't recall.").

**RBSSI Response:** RBSSI states that the assertion in ¶ 807 is entirely duplicative of the assertion in ¶ 802. RBSSI incorporates by reference its response to that paragraph as if restated herein.

**FHFA Reply:** FHFA incorporates by reference its response to ¶ 802 as if restated herein..

> (d) *Deloitte's Data Integrity Reviews Were Rote Data-Checks That Did Not Verify The Accuracy Of The Underlying Loan Information*

808.  **FHFA Statement:** According to RBS's manual on credit procedures, loan-file due diligence included a data integrity review. Ex. 473 (RBS-FHFA-CT-4425539, RBS Greenwich Capital Credit Procedures Manual (the "Credit Manual")) at RBS-FHFA-CT-4425576 ("This review can be performed ... by third party accounting firms (typically hired by the issuer to prepare a comfort letter).").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 808.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

809.  **FHFA Statement:** The data integrity review did not involve looking outside of the loan file to verify the accuracy of the information. See, e.g., Ex. 386 (Deposition of Adam Smith), at 181:6-11 ("Q. Do you know whether Deloitte is doing any independent verification of the accuracy of the appraisal? ... A. Not to my understanding."); Ex. 474 (DT-FHFA 000056 , Deloitte & Touche LLP Independent Accountants' Report for NHELI 2007-2 Securitization) at DT-FHFA 000059 ("We were not requested to perform and we did not perform any procedures with respect to the preparation or verification of any of the information set forth on the Loan Documents and make no representations concerning the accuracy or completeness of any of the information contained therein."); Ex. 368 (Deposition of Scott Gimpel) at 172:19 – 173:7 ("[Q.] Did you understand the accounting firms to take any further steps to check the underlying accuracy of the data beyond what your group would do?... A. I don't recall. Q. You don't recall them taking any additional steps beyond the collateral – what the collateral analytics group undertook?... A. That is correct.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 809 insofar as it states or implies that the accountants employed to conduct data integrity reviews were the only persons to perform any work to ensure that the information contained in the prospectus supplements were materially accurate or that RBSSI did not make adequate efforts to ensure that representations in offering documents were accurate as part of the due diligence it

conducted for RMBS transactions.  *See* RBSSI's responses to ¶¶ 765 and 792, which RBSSI incorporates by reference as if restated herein.

In relation to data integrity reviews, as RBSSI stated in ¶¶ 766-794, its Credit group performed loan-level due diligence reviews designed, among other things, not only to confirm that the loans backing securitizations underwritten by RBSSI were generally originated in accordance with applicable guidelines and that the loans were supported by evidence of the value of the relevant property, such as an appraisal report, but also to verify that the information in the loan files was properly reflected in the loan tapes that were used to prepare the prospectus supplements pursuant to which RMBS were offered to the public.  *See also* RBS Ex. 13 (Deposition of Scott Gimpel) at 173:8-14 ("Q.  And did you have an understanding as to what group or groups was responsible for checking the accuracy of the underlying data that you would be using to create these reports? A. That would be the credit and underwriting department.").  As RBSSI stated in its response to ¶¶ 798 and 799 (which RBSSI incorporates by reference as if restated herein), RBSSI collateral analysts reviewed and analyzed the loan tapes and collateral tables for accuracy.  As added protection, RBSSI hired outside accountants to check and verify the collateral analysts' work.

The accountant reviews, such as the review reflected in FHFA Ex. 474, were additional procedures by which an independent accounting firm (a) reverified that the relevant loan tape accurately reflected the information contained in the loan files, by conducting a file-to-tape check on a sample of loans in the pool, see FHFA Ex. 474 (Deloitte Comfort Letter for NHELI 2007-2) at DT-FHFA-000057-59 (Mortgage Loan Procedures), and (b) that the information in the loan files that was summarized in the loan tape was accurate reflected in the prospectus supplement, *see id.*  at DT-FHFA-000059-60 (Prospectus Supplement Procedures); RBS Ex. 13 (Deposition of Scott Gimpel) at 170:11-172:15 ("Q.  And that loan tape, the compilation of the loans to be pooled to support a security, that would be the source of the data that you would be utilizing? ...  A.  The data that the collateral analytics group would be utilizing, that would be it, yes.  Q.  Did the collateral analytics group, was it responsible for that process of taking the data from the acquisition pool loan tapes and compiling it into separate collections of data to include only the loans that would support securitizations? ...  A.  When I was a collateral analyst accounting firms would re-check our numbers and, yes, they would then take those results and correct them.  Q.  What was your understanding of what review would be conducted by the accounting firms? I believe in my view the accounting firms were just checking the validity of the calculations.  Again, it was a very similar check, a numeric check.  A check of values."); FHFA Ex. 60 (Grice RBSSI Report) at ¶¶ 93-96 (discussing steps taken by RBSSI's outside accountants to verify and ensure the accuracy of the loan-level information in the loan tapes and prospectus supplements and opining that "RBS[SI] appropriately relied on [accountants'] work as part of the due diligence process, to confirm the accuracy, to the best of its ability, of the data contained in the Prospectus Supplement.").

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  The cited evidence

relating to ensuring the accuracy of offering materials by other entities in other types of

reviews is irrelevant to the asserted fact that "[t]he data integrity review did not involve looking outside of the loan file to verify the accuracy of the information" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to the data integrity review fails to contravene – and in fact supports – the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

4.    RBSSI Failed To Provide Meaningful Oversight Of Its Third-Party Diligence Vendors

810.    **FHFA Statement:** RBSSI "delegated its due diligence to be completed by" its third-party diligence vendors, including both credit and compliance due diligence. Ex. 384 (Deposition of James Whittemore) at 177:19-179:5 ("Q. Yes. In general, with respect to the residential mortgage loan pools that you oversaw, what part of due diligence did RBS delegate to the third-party vendors? A. We delegated the due diligence to be completed by them. So it would be the underwriting of the loans that were picked to be reviewed. Q. And would you include within that both credit and compliance due diligence? A. Yes. Q. How about valuation assessments? A. Yes, they could do some. Q. And how about data integrity reviews? A. I can't answer to that if they -- if that was completed or not. Q.... What part of the due diligence did RBS do in-house as opposed to delegating to third-party vendors? A. We reserved our -- we did order some appraisal reviews from time to time on certain loan products. Q. Anything else? A. I can't think of anything else at this time").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 810. First, the testimony above refers only to loan-level reunderwriting due diligence and not to the substantial other due diligence conducted by RBSSI in connection with a RMBS offering. *See* RBSSI's responses to ¶¶ 765 and 791, which RBSSI incorporates by reference as if restated herein. Additionally, FHFA mischaracterizes the testimony of Mr. Whittemore, who stated that RBSSI's Credit group, like Freddie Mac, hired outside due diligence vendors to assist it with reviewing loan files, not that RBSSI wholesale delegated its loan-level due diligence function to those vendors. RBS Ex. 6 (Deposition of James Whittemore) at 59:5-13 (explaining that RBSSI's Credit group retained third party due diligence vendors "[t]o help and review the files, yes. They received the data, so therefore, they would be the ones reviewing that data, yes."). Mr. Whittemore further explained that it was the credit officer's "responsibility [ ] to work with a third-party vendor in reviewing a number of loans in a specific pool, [and] doing the due diligence to determine if the lender/originator originated a loan to their underlying guidelines." *Id.* at 29:5-13; *see also id.* at 131:19-134:2 (explaining that "[a]ny exceptions by the third-party vendor would be brought to the attention of the credit officer at RBS, which normally would include a review process within their group. If it was a noted exception, whether it was

an exception 1, exception 2 or exception 3. It would be reviewed by a QC person and then by the lead, and if an exception was still, if it still had an exception that they thought RBS should review it was given to credit officer and/or if a credit officer was not on site, it would be forwarded to them so they could review it. At that point the credit officer would review the strengths of the loan, would review the loan itself, determine if there could be exception – an exception made based on compensating factors in the loan itself."). Brian Farrell, the RBSSI credit officer who managed the loan-level due diligence on the Nomura Securitizations, similarly testified that RBSSI's Credit group made all final loan-level due diligence decisions and that RBSSI's third-party due diligence vendors played a limited and "specific" role in reviewing the loan files and flagging issues for RBSSI's Credit group to review. RBS Ex. 5 (Deposition of Brian Farrell) at 208:19-209:24 ("Q. And would the diligence firm make an assessment where a loan did not comply whether it was a material or nonmaterial deviation from a guideline? A. I think that they would – they would make an initial judgment, that's what we hire them for.... Q. Well, after they made an assessment as to whether a loan was a material deviation or not from a guideline, would you make your own assessment as to whether they got it right? ... A. So the way the process worked was, we would engage them, the review would take place, they would send reports, those reports would be analyzed, and then at the end of the day, myself or the credit officer would make the final determination of whether the loan was acceptable or not."); *id.* at 209:25-211:3 (explaining that "[w]e hire the company to go in, and when I say the company, I mean the due diligence company, to go in and perform an analysis and then report that analysis back to us. Based on their analysis, and the information that they sent over, myself or another credit officer would then review all of that information and perform an independent analysis."); *id.* at 458:9-24 ("Q. And it's looking to its diligence provider to determine whether the loans it's reviewing satisfy RBS's purchase criteria, correct? . .. A. No, not necessarily. Again, they're not involved in the purchase decisions. A scope is set out for them to review loans and report that data back to us. Based on, based on that data and those reports, the RBS personnel would then make the decision whether a loan is acceptable for purchase or not."); RBS Ex. 82 (*MassMutual* Deposition of Brian Farrell) at 248:3-249:14 (explaining that "Clayton does not make the final determination for RBS of what RBS would deem acceptable for purchase, securitization or for warehouse financing, or for any of the other examples we spoke about earlier. They are going in and performing that one specific function.... What they are doing here, based on the scope that is provided, is that they are flagging loans with a certain grade for the RBS personnel managing that job to then take the final look and assess whether that loan should be purchased, securitized or financed."). Further, FHFA itself states that it is undisputed that "RBS[SI] employees were frequently on site during loan-level diligence and supervised the work of third-party reviewers in conducting loan-level diligence." FHFA ¶ 812.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited evidence

relating to the respective roles of the Credit Group and the Asset-Backed Finance Group

in verifying the representations in offering memoranda (RBSSI's responses to ¶¶ 765 and

791) fails to directly contravene the asserted fact that RBSSI delegated due diligence, including credit and compliance due diligence, to third-party vendors and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants' response to ¶ 765 contains some general statements about the Credit Group's role in conducting loan-level due diligence, none of it contravenes the statement here by Mr. Whittemore, RBS's Chief Underwriter, that the Credit Group delegated the loan-level review to third-party vendors. The role of the Asset-Backed Finance Group (¶¶ 765 and 791) is irrelevant, as Defendants themselves admit that loan-level due diligence was conducted by the Credit Group, which reported its findings to the Asset-Backed Finance Group. *See* RBSSI's response to ¶ 765 ("The role of RBSSI's Credit group, to which Mr. Whittemore belonged, was to perform loan-level due diligence and then report any issues in the results to employees in the Asset-Backed Finance group, who managed the process of ensuring that the prospectus supplement was free of material misstatements."). Undisputed that RBSSI's Credit Group made final decisions about whether to purchase, securitize, or finance a loan, and that RBSSI employees were frequently on site during loan-level due diligence and supervised the work of third-party vendors, but that does not contravene the fact that RBSSI delegated the actual loan-level review to third-party vendors, as indicated in much of the evidence Defendants cite here. *See* RBS Ex. 6 (Deposition of James Whittemore) at 59:5-13 ("Q. All right. So RBS delegated its due diligence to the third-party vendors, that's what you're saying? … A. To help and review the files, yes. They received the data, so therefore, they would be the ones reviewing that data, yes."); *id.* at 132:16-20 ("The loan would -- the review would be scheduled with the third-party vendor. The loan would be reviewed with one of the credit officers on site

as much as possible"); RBS Ex. 5 (Deposition of Brian Farrell) at 209:17-24 ("A.  So the way the process worked was, we would engage them, the review would take place, they would send reports, those reports would be analyzed, and then at the end of the day, myself or the credit officer would make the final determination of whether the loan was acceptable or not."); *id.* at 210:17-20 ("We hire the company to go in, and when I say the company, I mean the due diligence company, to go in and perform an analysis and then report that analysis back to us."); *id.* at 458:19-21 ("A scope is set out for them to review loans and report that data back to us."); RBS Ex. 82 (*MassMutual* Deposition of Brian Farrell) at 248:17-20 ("They are going in, they are reviewing loan documents.  They are gathering data, they're performing calculations, and then they are reporting that data.").

811.   **FHFA Statement:**  RBSSI did no diligence in-house except "order[ing] some appraisal reviews from time to time on certain loan products." Ex. 384 (Deposition of James Whittemore) at 177:19-179:5 ("Q.....  In general, with respect to the residential mortgage loan pools that you oversaw, what part of due diligence did RBS delegate to the third-party vendors? A.  We delegated the due diligence to be completed by them.  So it would be the underwriting of the loans that were picked to be reviewed.  Q.  And would you include within that both credit and compliance due diligence? A.  Yes.  Q.  How about valuation assessments? A.  Yes, they could do some....  Q.  Let me rephrase the question.  What part of the due diligence did RBS do in-house as opposed to delegating to third-party vendors? A.  We reserved our -- we did order some appraisal reviews from time to time on certain loan products.  Q.  Anything else? A.  I can't think of anything else at this time.").

**RBSSI Response:**  RBSSI disputes the assertion in ¶ 811 as it mischaracterizes the cited testimony.  As discussed in RBSSI's response to ¶ 810 (which RBSSI incorporates by reference as if restated herein), both Mr. Whittemore and Mr. Farrell explained that RBSSI hired third-party due diligence vendors to assist with reviewing the loan files and flagging issues for RBSSI to review, not that RBSSI delegated the diligence function to its vendors and performed no "in-house" diligence.  Indeed, Mr. Farrell repeatedly stated that after Clayton provided its initial results, he would review those results and make an independent determination or assessment of the quality of the loans and whether they were acceptable to RBSSI.  RBS Ex. 5 (Deposition of Brian Farrell) at 208:19-209:24 ("Q.  And would the diligence firm make an assessment where a loan did not comply whether it was a material or nonmaterial deviation from a guideline? A.  I think that they would – they would make an initial judgment, that's what we hire them for....  Q.  Well, after they made an assessment as to whether a loan was a material deviation or not from a guideline, would you make your own assessment as to whether they got it right? ...  A.

So the way the process worked was, we would engage them, the review would take place, they would send reports, those reports would be analyzed, and then at the end of the day, myself or the credit officer would make the final determination of whether the loan was acceptable or not."); *id.* at 209:25-211:3 (explaining that "[w]e hire the company to go in, and when I say the company, I mean the due diligence company, to go in and perform an analysis and then report that analysis back to us. Based on their analysis, and the information that they sent over, myself or another credit officer would then review all of that information and perform an independent analysis."); *id.* at 458:9-24 ("Q. And [RBSSI is] looking to its diligence provider to determine whether the loans it's reviewing satisfy RBS's purchase criteria, correct? ... A. No, not necessarily. Again, they're not involved in the purchase decisions. A scope is set out for them to review loans and report that data back to us. Based on, based on that data and those reports, the RBS personnel would then make the decision whether a loan is acceptable for purchase or not."); RBS Ex. 6 (Deposition of James Whittemore) at 29:5-13 ("Q. How would you describe your responsibilities as credit officer, first? A. My responsibility was to work with a third-party vendor in reviewing a number of loans in a specific pool, [and] doing the due diligence to determine if the lender/originator originated a loan to their underlying guidelines.").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited evidence relating to RBSSI's review and supervision of the work performed by third-party vendors fails to directly contravene the asserted fact that RBSSI did no in-house due diligence except to occasionally order appraisal reviews and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. FHFA incorporates by reference its reply to ¶ 810 as if restated herein.

812. **FHFA Statement:** RBS employees were frequently on site during loan-level diligence and supervised the work of third-party reviewers in conducting loan-level diligence. Ex. 475 (RBS-FHFA-SDNY-0606011, RBS Greenwich Capital Deal Memo) at RBS-FHFA-SDNY-0606014 ("In a typical Greenwich project scenario, a client representative is present on-site during the review and all event and status reporting is direct between the project lead and the client.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 812.

**FHFA Reply:** Defendants do not dispute the asserted fact.

813. **FHFA Statement:** RBSSI provided "generally oral" instructions to its due diligence vendors, including Clayton, and did not typically provide any written instruction. Ex. 449 (Deposition of Frank Camacho) at 356:24-357:7 ("Q. In terms of instructions that were provided by RBS, including by yourself, to third-party due diligence firms, were those generally provided in writing or orally? A. Any instructions that I provided to the

618

Clayton lead was generally oral.  Q.  Generally oral, you said?  A.  Yes.  Q.  And so does that mean typically you do not provide any written instructions to the Clayton lead?  A. That's correct.").

**RBSSI Response:**  RBSSI does not dispute the assertion in ¶ 813 that it provided oral instructions to its due diligence vendors, including Clayton.  RBSSI disputes that it "did not typically provide any written instructions" to its vendors.  FHFA relies on the testimony of Mr. Camacho, who had no involvement in the Nomura Securitizations, and who answered only about what instructions he himself provided to Clayton.  FHFA Ex. 449 (Deposition of Frank Camacho) at 356:24-357:7 (testifying that "[a]ny instructions that I provided to the Clayton lead was generally oral.").  Further, FHFA asserts in ¶ 815 that RBSSI provided written instructions to "third-party reviewers," which RBSSI does not dispute, and such instruction would generally apply to reviews conducted by the vendor.  *See* FHFA Ex. 475 (RBS Greenwich Capital Deal Memo); RBS Ex. 5 (Deposition of Brian Farrell) at 291:8-292:6 ("Q.  What is the function of an underwriting deal memo? ...  A.  Again, this is something at the time, you could see that I work at Clayton at this time, so this is, you take a – there's a bunch of different sections here, there's a review process, a report and narrative, client specs, things like that.  This is basically a document that would be created by Clayton and then adding in the client specs, that's something that would be rolled in that was provided from Greenwich Capital.  Something like this would be provided to the underwriting team working on a project."); *id.*  at 297:10-298:22 (discussing same).

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  The evidence showing that "third-party reviewers did *at times* receive certain instructions in writing from RBS" (¶ 815, emphasis added) fails to directly contravene the asserted fact that RBSSI "did not typically provide any written instruction" and therefore does not create a genuine dispute of material fact.  Part I.C, *supra*.  Defendants fail to cite evidence of any written instructions provided to the third-party vendors other than the August 2004 memo cited in ¶ 815 and a document whose authorship Mr. Farrell was unable to confirm.  *See* FHFA Ex. 475 (RBS Greenwich Capital Deal Memo dated August 27, 2004); RBS Ex. 5 (Deposition of Brian Farrell) at 291:17-19 ("A.  Again, this is something at the time, you could see that I work at Clayton at this time…"); *id.*  at 296:8-20 ("Q.  If you flip further down into this document or set of documents, and I'm referring now to the page ending Bates 507, this is the one labeled hot points for Greenwich?  A.  Yes.  Q.  Is that a

document that would have been generated by Clayton or by RBS? A. I can't say for sure. I think it would probably be in conjunction of both. I think it would be Clayton and Greenwich Capital working together to come up with this."). While Defendants argue that the cited statement of Mr. Camacho is not material to this action, this argument does not create a genuine dispute of material fact. Part I.A, *supra*.

814. **FHFA Statement:** In addition, instructions were generally provided only to the project leads at the third-party diligence firms, and not to individual underwriters. Ex. 449 (Deposition of Frank Camacho) at 238:19-25 ("Q. And whether with one lead or with two leads in the situation you just described, were your communications generally only through the lead? A. Generally yes. Q. As a general matter, am I correct that you would not speak with the individual underwriters? A. That's correct.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 814. FHFA relies on the testimony of Mr. Camacho, who had no involvement in the Nomura Securitizations, and who answered only about what instructions he himself provided to Clayton. FHFA Ex. 449 (Deposition of Frank Camacho) at 238:19-25 ("Q. And whether with one lead or with two leads in the situation you just described, were your communications generally only through the lead? A. Generally yes. Q. As a general matter, am I correct that you would not speak with the individual underwriters? A. That's correct."). Further, FHFA asserts in ¶ 815 that RBSSI provided written instructions to "third-party reviewers," which RBSSI does not dispute, and such instruction would generally be provided to the actual underwriters. *See* FHFA Ex. 475 (RBS Greenwich Capital Deal Memo); RBS Ex. 5 (Deposition of Brian Farrell) at 291:8-292:6 ("Q. What is the function of an underwriting deal memo? ... A. Again, this is something at the time, you could see that I work at Clayton at this time, so this is, you take a – there's a bunch of different sections here, there's a review process, a report and narrative, client specs, things like that. This is basically a document that would be created by Clayton and then adding in the client specs, that's something that would be rolled in that was provided from Greenwich Capital. Something like this would be provided to the underwriting team working on a project."); *id.* at 297:10-298:22 (discussing same). In any event, Mr. Farrell and other RBSSI Credit personnel testified that it was their understanding and expectation that such instructions, even if only provided to "project leads at the third-party diligence firms" would have communicated those instructions to individual underwriters. RBS Ex. 90 (*CUNA* Deposition of Brian Farrell) at 197:18-199:23 (explaining that it was his understanding that certain client or underwriting memos were "handed out" to individual underwriters, but also explaining that he thought the project lead may also "verbally instruct" the quality control underwriters).

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited evidence relating to written instructions is irrelevant to the asserted fact that instructions "were generally provided only to the project leads at the third-party diligence firms, and not to individual underwriters" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants assert that "such instruction would generally be provided to the actual underwriters," the cited evidence does not support this assertion. RBS Ex. 5 (Deposition of Brian Farrell) at 291:8-292:6 indicates only that instructions like the deal memo (FHFA Ex. 475) "would be provided to the underwriting team," not to all the individual members of that team. Likewise RBS Ex. 5 (Deposition of Brian Farrell) at 297:10-298:22 says nothing about who at the third-party vendors received instructions from RBSSI. Similarly, the cited evidence relating to Mr. Farrell's "understanding and expectations" about third-party leads forwarding the instructions to other members of the underwriting team fails to directly contravene the asserted fact that "instructions were generally provided only to the project leads at the third-party diligence firms" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Furthermore, while Defendants assert that "Mr. Farrell and other RBSSI Credit personnel testified that it was their understanding and expectation that such instructions" would be communicated to "individual underwriters," the cited evidence does not support this assertion. First, Defendants fail to provide any evidence relating to "other RBSSI Credit personnel." Second, RBS Ex. 90 (*CUNA* Deposition of Brian Farrell) at 197:18-199:23 shows that Mr. Farrell was uncertain about who received instructions and thought it was important to communicate instructions only to client service managers and lead underwriters and perhaps unwise to disseminate instructions to the entire team. *See id.* at

197:24-199:18 ("Q.  Well, for example, if all of us were in here reviewing loan files, would each of us receive what you're calling these overlays?  A.  Now you're saying us, so are we working for Clayton or are we the RBS people working on the deal?  Q. Clayton.  A.  You know, that I'm not sure.  I can't tell you who got it. … The client service manager got it.  The lead underwriter would get it. … I can assume that it was, it was handed out, but I can't be for sure.  I can't be for sure. … I'm not sure if you want Greenwich Capital handing out some internal document to every Tom, Dick and Harry looking at loans.  Who knows if that's going to disappear.  Instead you give it to the lead and perhaps some of the QC'ers.  That's my assumption. … Me personally, I don't know if I would be comfortable with having 25 copies of my doc there, plus then maybe it gets out to the counterparties, someone else shares it with another.").  While Defendants argue that the cited statement of Mr. Camacho is not material to this action, this argument does not create a genuine dispute of material fact.  Part I.A, *supra*.

815.  **FHFA Statement:**  However, third-party reviewers did at times receive certain instructions in writing from RBS.  See Ex. 475 (RBS-FHFA-SDNY-0606011, RBS Greenwich Capital Deal Memo) at RBS-FHFA-SDNY-0606015-17 (list of "Client Specifics" noting compliance, legal, appraisal, and credit issues specific to RBS); see also id.  at RBS-FHFA-SDNY-0606011-12 (discussing changes to certain RBS-specific policies so that underwriters grade fewer loans as Event Level 3).

**RBSSI Response:**  RBSSI does not dispute that third-party underwriters received written instructions from RBSSI, including the Greenwich Capital Deal Memo cited in FHFA Ex. 475.  RBSSI disputes the assertion that such written instructions were only provided "at times" to third-party reviewers as vague, ambiguous, argumentative and without factual support.  *See* RBS Ex. 5 (Deposition of Brian Farrell) at 291:8-292:6 ("Q.  What is the function of an underwriting deal memo? ...  A.  Again, this is something at the time, you could see that I work at Clayton at this time, so this is, you take a – there's a bunch of different sections here, there's a review process, a report and narrative, client specs, things like that.  This is basically a document that would be created by Clayton and then adding in the client specs, that's something that would be rolled in that was provided from Greenwich Capital.  Something like this would be provided to the underwriting team working on a project.").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited evidence relating to one underwriting deal memo, the same one cited here as an instance where "third-party reviewers did at times receive certain instructions in writing from RBS," fails to contravene – and in fact supports – the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants argue that the phrase "at times" is "vague, ambiguous, argumentative and without factual support," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. FHFA incorporates by reference its reply to ¶ 813 as if restated herein.

816. **FHFA Statement:** There is no evidence that RBSSI actually conducted any quality-control review of Clayton's work apart from reviewing its summary diligence reports. Ex. 384 (Deposition of James Whittemore) at 235:19-236:9 ("Q. As chief underwriter, were you responsible to review the quality of RBS's third-party vendors with respect to the delegated due diligence that you assigned to them? A. I was not aware that there was any documents or any direction that was given. However, I think it was inherent that in my being on site and reviewing files and reviewing exceptions or loans that I looked at would potentially constitute doing some QC. However, there was not a -¬that I'm aware of there was nothing internal that said that must be done."); see also id. at 252:2-5 ("Q. Did RBS ever run tests to determine if its outside vendors would reach the same results on the same loans? A. I do not know if they did."); Ex. 449 (Deposition of Frank Camacho) at 239:5-10 ("Q. Did you ever independently QC [third party vendors'] work? A. In most cases, all loans that were recommended for exclusion by Clayton, I would review. Depending on how many of those there were, I would review other loans they'd looked at that weren't -- that weren't recommended for exclusion.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 816 as it mischaracterizes or improperly paraphrases the cited testimony. Mr. Whittemore testified that it was "inherent that in my being on site and reviewing exceptions or loans that I looked at would potentially constitute doing some QC." FHFA Ex. 384 (Deposition of James Whittemore) at 235:19-236:9. Similarly, when questioned about whether he "ever independently QC [third party vendors'] work," Mr. Camacho responded that "[i]n most cases" he would review "all loans that were recommended for exclusion by Clayton" and that he "would review other loans they'd looked at that weren't – that weren't recommended for exclusion." FHFA Ex. 449 (Deposition of Frank Camacho) at 239:5-10. Mr. Farrell also testified about a specific instance where he was "QC'ing the work that [Clayton representative Derick Greene was] sending over, right, it's part of my job to analyze the data and the reports that are coming over" for accuracy. RBS Ex. 5 (Deposition of Brian Farrell) at 448:15-449:25.

Moreover, RBSSI Credit personnel closely managed and supervised the third-party due diligence vendor project leaders to ensure "quality-control" of the vendors' work. Brian Farrell, who managed the loan-level due diligence on the Nomura Securitizations, was a former Clayton employee and testified that RBSSI vetted and approved specific project leaders to "manage our jobs at the third party providers that we worked with regularly." RBS Ex. 5 (Deposition of Brian Farrell) at 212:7-20 (stating that "[t]here were specific leads who would manage our jobs at the third party provides that we worked with regularly. They were essentially approved leads."); RBS Ex. 58 (Farrell Decl.) at ¶ 13 ("The RBSSI Credit Risk Department worked closely with Clayton on due diligence review projects, including sending RBSSI Credit Risk Department members to the locations where Clayton underwriters performed their review. Based on past experience, RBSSI regularly requested specific project leads on Clayton reviews.

When I managed a due diligence review, I would be in frequent contact with Clayton throughout the course of a review, discussing and reviewing Clayton's results on a rolling basis."); RBS Ex. 82 (*MassMutual* Deposition of Brian Farrell) at 68:21-69:10 (stating that "I know that when I worked at Clayton, there was a large group of sellers – or, sellers, I'm sorry – of leads that were preferred by [RBSSI], specifically Don Lawson, that either worked directly for Don Lawson at his due diligence company or had been working with Don for a long time. So, I think over that time Don was training, essentially, those leads."). Mr. Camacho similarly testified that RBSSI maintained a "small set" of project leaders at third-party due diligence vendors, RBS Ex. 27 (Deposition of Frank Camacho) at 219:14-23, whom he "had a fairly good impression of," *id.* at 235:25-236:11 ("Q. Do you feel that the competence of the leads was typical of the competence of the on-the-ground Clayton people doing the reunderwriting? ... A. In general, I don't recall being – judging the work of individual Clayton underwriters. I would say my – I couldn't really compare my – I don't really have an impression of them individually. I'd say I had a fairly good – I had a fairly good impression of the Clayton leads that I worked with.").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Defendants fail to cite any evidence that RBSSI "conducted any quality-control review of Clayton's work apart from reviewing its summary diligence reports." While Mr. Whittemore testified that he believed his on-site work during due diligence reviews "potentially constitute[d] doing some QC," his testimony is vague and does not cite any evidence of an actual quality-control review, nor does it specify that Mr. Whittemore reviewed Clayton in particular. The cited evidence relating to Mr. Camacho's review of Clayton's due diligence results fails to directly contravene the asserted fact since Defendants fail to provide any evidence that Mr. Camacho reviewed any of Clayton's results other than its

"summary diligence reports." This therefore does not create a genuine dispute of material fact. Part I.C, *supra*. RBS Ex. 5 (Deposition of Brian Farrell) at 448:15-449:25 similarly fails to directly contravene the asserted fact because it does not specify that the "data and the reports that are coming over" were separate from Clayton's "summary diligence reports" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to RBSSI's preferred project leaders at third-party due diligence vendors is irrelevant to whether RBSSI conducted quality-control reviews of third-party vendors and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

> (a)  *RBSSI Securitized All The Loans Its Vendors Graded As Suitable For Without Reviewing The Underlying Loan Files*

817.  **FHFA Statement:**  Loans graded Event Level 1 are loans that had passed the scope of Clayton's review without any issues. Ex. 383 (Deposition of Brian Farrell) at 43:16-44:23 ("Q.  Are you familiar with EV1s, 2s and 3s? A.  Yes.  Q.  And what do each of those indicate? ...  A.  Essentially an event 1 is a loan that has passed the scope of the review with no issues.  An event 2 is a loan that may have had a minor or informational issue, but was deemed nonmaterial.  It could be due to compensating factors why it was graded an event 2.  Perhaps it's not.  It could just be an event 2 because it's an event 2. An event 3 would be some type of issue could have been found with the loan, perhaps a missing doc or a guideline exception or a compliance issue, etc.").

**RBSSI Response:**  RBSSI does not dispute the assertion in ¶ 817.

**FHFA Reply:**  Defendants do not dispute the asserted fact.

818.  **FHFA Statement:**  Loans graded Event Level 2 are loans that do not conform to guidelines, but the exceptions are non-material and compensating factors are present. Ex. 512 (CLAY-FHFADEF-E-0682878, email regarding Grading) at CLAY-FHFADEF-E-0682878 (Clayton defines an "EV2" loan as one that "does not conform fully to the subject guidelines, [but] in the opinion of the Clayton Representative, the deficiencies noted were either immaterial or factors existed that would compensate for the deficiency.").

**RBSSI Response:**  RBSSI disputes the assertion in ¶ 818.  FHFA relies on FHFA Ex. 512, which is an email from August 10, 2009 from Daniel Pinero of Clayton to Brian Farrell at RBSSI purporting to describe Clayton's grading system as of that date.  FHFA Ex. 512 provides no evidence of Clayton's grading system at the time of the Nomura

Securitizations. Further, FHFA mischaracterizes what is stated in that email. An "Event Grade 2" is described as follows: "While the loan does not conform fully to the subject guidelines, in the opinion of the Clayton Representative, the deficiencies noted were either immaterial or factors existed that would compensate for the deficiency," FHFA Ex. 512, not that "the exceptions are non-material and compensating factors are present" as FHFA improperly paraphrases. Further, Brian Farrell, a former Clayton employee, testified that a Clayton grade of Event 2 "is a loan that may have had a minor or informational issue, but was deemed nonmaterial. It could just be due to compensating factors why it was graded an event 2. Perhaps it's not. It could just be an event 2 because it's an event 2." RBS Ex. 5 (Deposition of Brian Farrell) at 43:16-44:23; *id.* at 211:10¬24 (explaining that a non-material exception that warranted a grade of "EV2" "could go beyond guidelines. It could perhaps be a missing document, it could be perhaps a compliance violation."). RBSSI also disputes the assertion in ¶ 818 to the extent it states or implies that a loan graded as "Event Level 2" by a third-party due diligence vendor in fact "do[es] not conform to guidelines." As stated in RBSSI's responses to ¶¶ 726-728 and 756-58 (which RBSSI incorporates by reference as if restated herein), the loan grading system was used by RBSSI's third-party due diligence vendors to flag potential issues for RBSSI's Credit group and was not a determination by RBSSI that such issues in fact existed or were "material." RBS Ex. 5 (Deposition of Brian Farrell) at 509:5-514:12 ("Q. So do I understand correctly that if a credit officer were ultimately of the opinion that a loan was a 3, that is a loan that would not be eligible for purchase? .. A. In what stage, of what Clayton has? Because this is, this is just a Clayton grade right? Q. I'm talking about – A. Hold on, please let me finish. This isn't, this isn't an RBS grade. These are grades Clayton is assigning. We spoke about yesterday about looking at certain grades, 2s, 3s, etc. So these are Clayton grades. These are flagged in a certain way so RBS has the opportunity to review exceptions that have been, that have been flagged. This isn't an RBS grade. This is, this is a Clayton grade. This was set up to determine flags of what should be looked at and what shouldn't be. So I don't want to get hung up on the 3 grade by itself because it's Clayton's grade, it's not an RBS grade.... Q. Do you know whether loans that were 3s but nevertheless purchased were ever included in securitizations sold to investors? ... A. It's possible. Again, I want to be very clear here that a loan could have been graded a 3 by Clayton, so it could still be a 3, but I can still deem it to be acceptable. I don't want to get hung up on the actual grade. It's a Clayton grade that they're sending over, right, so you're saying it's a 3. That grade may never be changed. I may be – the loan itself, an exception may be acceptable to me. So am I changing the grade myself? No. I've reviewed the loan, I deem it to be acceptable. It still may be a Clayton 3, they may never change it, but in my mind the loan is acceptable.").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. Undisputed that Event Level 2 loans are defined as loans that do not conform to guidelines but whose exceptions are non-material *or* (not *and*) compensating factors are present, but that distinction is not material to FHFA's motion. *Quarles*, 758 F.2d at 840. The cited

evidence relating to the finality of third-party vendor grades is irrelevant to the asserted

fact concerning the definition of third-party vendor grades and therefore does not create a

genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to

compliance issues fails to directly contravene the asserted fact since Defendants provide

no evidence that a compliance issue that results in an EV2 grade is not a guideline

exception; it therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

While Defendants argue that FHFA Ex. 512 is not material to this action, RBSSI has

conclusively admitted in RBS SUF ¶ 86 that "[a] credit grade of 2 indicated that the due

diligence vendor had identified at least one deviation from the guideline requirements

and/or RBSSI's additional requirements, but also judged that the exceptions were either

immaterial or offset by sufficient compensating factors." There can therefore be no

genuine dispute as to the asserted fact. Part I.F, *supra*.

819. **FHFA Statement**: Loans graded Event Level 3 are loans containing material exceptions and without sufficient compensating factors. Ex. 462 (CMFG Deposition of Frank Camacho) at 161:14-22 ("Q. What was an Event 3 loan? A. An Event 3 loan was an exception without sufficient compensating factors and it was a recommendation to exclude the loan from the trade."); see also Ex. 384 (Deposition of James Whittemore) at 115:3-9 ("Q. To put it differently, if the final grade on a loan after your review is EV3, that signifies that the loan is a material exception loan, correct? A. Yes.") Ex. 383 (Deposition of Brian Farrell) at 44:19-23 ("An event 3 would be some kind of issue could have been found with the loan, perhaps a missing doc or a guideline exception or a compliance issue, etc."); id. at 459:11-23 ("Q. And an EV3 is a score that at least in some circumstances would indicate a finding by Clayton that a loan failed guidelines and had no compensating factors, or insufficient compensating factors to justify a waiver, correct? A. I think that's one possible issue.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 819. First, the term "exceptions" as used in ¶ 819 is vague and ambiguous. It is not clear whether "exceptions" as used in ¶ 819 is intended to mean things other than the failure to generally follow origination guidelines, which are not at issue in or relevant to this litigation. Second, FHFA's description of an "Event Level 3" loan is materially incomplete. Mr. Farrell, a former Clayton employee, testified that an Event Level 3 could be a sign of a number of issues, including "some type of issue could have been found with the loan, perhaps a missing doc or a guideline exception or a compliance issue, etc." RBS Ex. 5 (Deposition of Brian

Farrell) at 43:16-44:23; *see also id.* at 46:6-15 ("Q. What other aspects of the review might warrant an EV3? A. A missing doc. Q. Would you view missing docs in itself to be a violation of the guideline? A. Perhaps. Maybe not. A missing doc can be event 3 because I don't have enough information to complete the review perhaps."); *id.* at 456:5-19 ("Q. And I think you testified earlier that an EV3 is a loan that was not originated by guideline where there was no sufficient compensating factor, right? ... A. No, I said that was one of the, the possible issues that could be generating a 3. We also spoke about compliance, missing docs, just numerous things of why a loan should be graded a 3."). RBSSI also disputes the assertion in ¶ 819 to the extent it states or implies that a loan graded as "Event Level 3" by a third-party due diligence vendor in fact "contain[ed] material exceptions and without sufficient compensating factors." As stated in RBSSI's responses to ¶¶ 726-728 and 756-758 (which RBSSI incorporates by reference as if restated herein), the loan grading system was used by RBSSI's third-party due diligence vendors to flag potential issues with the loan for RBSSI's Credit group, and was not a determination by RBSSI that such issues in fact existed or were "material." RBS Ex. 5 (Deposition of Brian Farrell) at 508:2-514:12 ("Q. So do I understand correctly that if a credit officer were ultimately of the opinion that a loan was a 3, that is a loan that would not be eligible for purchase? .. A. In what stage, of what Clayton has? Because this is, this is just a Clayton grade right? Q. I'm talking about – A. Hold on, please let me finish. This isn't, this isn't an RBS grade. These are grades Clayton is assigning. We spoke about yesterday about looking at certain grades, 2s, 3s, etc. So these are Clayton grades. These are flagged in a certain way so RBS has the opportunity to review exceptions that have been, that have been flagged. This isn't an RBS grade. This is, this is a Clayton grade. This was set up to determine flags of what should be looked at and what shouldn't be. So I don't want to get hung up on the 3 grade by itself because it's Clayton's grade, it's not an RBS grade.... Q. Do you know whether loans that were 3s but nevertheless purchased were ever included in securitizations sold to investors? ... A. It's possible. Again, I want to be very clear here that a loan could have been graded a 3 by Clayton, so it could still be a 3, but I can still deem it to be acceptable. I don't want to get hung up on the actual grade. It's a Clayton grade that they're sending over, right, so you're saying it's a 3. That grade may never be changed. I may be – the loan itself, an exception may be acceptable to me. So am I changing the grade myself? No. I've reviewed the loan, I deem it to be acceptable. It still may be a Clayton 3, they may never change it, but in my mind the loan is acceptable.").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue that "'exceptions' as used in ¶ 819 is vague and ambiguous," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. The cited evidence relating to missing documents fails to directly contravene the asserted fact since Defendants' fail to provide any evidence that insufficient documentation that results in an EV3 grade is not a "material exception"; it therefore does not create a genuine dispute of

material fact. Part I.C, *supra*. Similarly, the cited evidence related to compliance issues fails to directly contravene the asserted fact since Defendants fail to provide any evidence that a compliance issue that results in an EV3 grade is not a "material exception." This therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to the finality of third-party vendor grades is irrelevant to the asserted fact concerning the definition of third-party vendor grades and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited language at 46:6-15 is not contained in RBS Ex. 5, but FHFA does not dispute that this language does appear in the full deposition transcript.

820.    **FHFA Statement:** RBSSI Credit Group employees who oversaw third – party diligence vendors generally only reviewed loans graded as EV3s. See Ex. 475 (RBS-FHFA-SDNY-0606011 RBS Greenwich Capital Deal Memo, attached to email from Brian Farrell to Donald Lawson, dated Aug. 27, 2004, regarding "Greenwich Deal memo") at RBS-FHFA-SDNY-0606014, ("Present site contact with event 3 loans twice daily... Email [client representative] with a preliminary event 3 IAS report and an event 3 exception report at end of day."); id. at RBS-FHFA-SDNY-0606015 "Send Don Lawson or Greenwich rep final event 3 IAS and exception report."); id. at RBS-FHFA-SDNY-0606017 ("Don Lawson or Greenwich rep will review event 3s and override when applicable"); Ex. 478 (RBS-FHFA-CT-6279213, Hot Points for Greenwich) at RBS-FHFA-CT-6279213 (instructing reviewers to "be conservative and kick [loans with layered risk] so we can review it."); Ex. 480 (RBS-FHFA-CT-0201307, email from Frank Camacho to James Whittemore, dated Feb. 13, 2007, regarding "Option One MLT 07 FXD 2") at RBS-FHFA-CT-0201307 (Whittemore directing "Greenwich/Frank" to "review all event 3's.").

        **RBSSI Response:** RBSSI disputes the assertion in ¶ 820. The documents FHFA cites do not demonstrate or show that RBSSI Credit group employees "generally only reviewed loans graded EV3." FHFA relies on two RBSSI deal memos to Clayton, the first (FHFA Ex. 475) which simply state that Clayton should flag and identify loans graded "event 3" to RBSSI "twice daily," and the second (FHFA Ex. 478) which says absolutely nothing about RBSSI not reviewing loans graded as something other than Event Level 3. FHFA also relies on an email (FHFA Ex. 480) which post-dates the Nomura Securitizations and regards an unrelated diligence project concerning "Option One MLT 07 FXD 2" which is not at issue in this action, and which provides that RBSSI will "review all event 3's." Brian Farrell, the RBSSI credit officer who managed the loan-level due diligence on the Nomura Securitizations, testified that it was his standard practice to review "on a regular basis" loans graded as Event Level 2 by third-party due diligence vendors, and that he would also review loans graded as Event Level 1, although

on a "less regular basis" than loans graded as Event Level 2 or 3. RBS Ex. 5 (Deposition of Brian Farrell) at 294:22-295:5 ("Q. Was it standard practice to review all EV2s? A. I don't know if I could say all 2s, no. Reviewing 2s on a regular basis, yes. Q. What about EV1s? A. My own personal experience was less regular than both 3s and 2s."). Because of Mr. Farrell's experience working at, and later for, Clayton, and frequent communication with Clayton during due diligence projects, he was "generally comfortable accepting loans that Clayton assigned a grade of '1.'" RBS Ex. 58 (Farrell Decl.) at ¶ 13 ("In my opinion and from my experience as an employee of both Clayton and RBSSI, Clayton provided quality loan-level due diligence. The RBSSI Credit Risk Department worked closely with Clayton on due diligence review projects, including sending RBSSI Credit Risk Department members to the locations where Clayton underwriters performed their review. Based on past experience, RBSSI regularly requested specific project leads on Clayton reviews. When I managed a due diligence review, I would be in frequent contact with Clayton throughout the course of a review, discussing and reviewing Clayton's results on a rolling basis. As a result of my experience and working relationship with Clayton, I was generally comfortable accepting loans that Clayton assigned a grade of '1.'"). Other RBSSI credit officers, similarly testified that they would look at loans graded as Event Levels 1 and 2 by RBSSI's due diligence vendors "when time permitted" and "depending on how many [ ] there were." FHFA Ex. 449 (Deposition of Frank Camacho) at 239:5-10, 241:24-242:4 (testifying that he would look at EV1 and EV2 loans "when time permitted" and "depending on how many [ ] there were."); RBS Ex. 91 (MassMutual Deposition of Anne Shera) at 142:21-143:25 ("Q. Did the underwriters themselves make determinations about whether compensating factors sufficiently offset exceptions to the guidelines? A. Any exception came to me.... Q. And you would be the one to judge whether there were sufficient compensating to allow a loan with exceptions into the pool? A. Correct.... A. When you were reviewing a loan with an exception, how did you decide if the compensating factors sufficiently offset the exceptions such that you would allow the loan to be included? A. I re-underwrote the whole loan. I looked at every part of the loan to determine if there were enough strengths or compensating factors to offset ... the exception.").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited evidence relating to Mr. Farrell's comfort level with Clayton's EV1 grades is irrelevant to the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to Mr. Camacho's review of some EV1 and EV2 loans "when time permitted" and "[d]epending on how many [ ] there were" fails to directly contravene the asserted fact that RBSSI Credit Group employees generally only reviewed loans graded as EV3s and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to Ms. Shera's review of

"exceptions" fails to contravene the asserted fact since it does not mention EV1 or EV2 loans at all and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While Mr. Farrell claims to have reviewed EV2 loans "on a regular basis" in RBS Ex. 5 (Deposition of Brian Farrell) at 294:22-295:5, Defendants fail to produce any evidence whatsoever showing that Mr. Farrell actually did review EV2 loans regularly and also ignore contradictory statements made by Mr. Farrell indicating that he typically only reviewed EV3 loans. *See* RBS Ex. 58 (Declaration of Brian Farrell) at ¶ 9 ("Loans assigned an initial grade of '3' were identified for my review."); *id.* at ¶ 12 ("I believe that these examples show the type of analysis I applied in 2006 and 2007 when I reviewed loans initially classified as '3' (or 3C or 3D) in Clayton Individual Asset Summary Reports."). Regardless, whether Mr. Farrell reviewed EV2 loans regularly or not is not material to FHFA's motion since Defendants can provide no evidence showing that Mr. Farrell or any other RBSSI employee reviewed the loans graded EV2 by Clayton in the Nomura Securitizations. *Quarles*, 758 F.2d at 840; *see* RBS Ex. 58 (Declaration of Brian Farrell) at ¶ 12 ("I have reviewed the January 18, 2007 Individual Asset Summary Report for NAAC 2007-AR1 that was prepared by Clayton ('NAAC 2007-AR1 Report'), Ex. B (CLAY_FHFA-E_000579403-502) …. I believe that these examples show the type of analysis I applied in 2006 and 2007 when I reviewed loans initially classified as a '3' (or 3C or 3D) in Clayton Individual Asset Summary Reports."); *id.* at ¶ 16 ("In reviewing the report today, I used the same approach as was my practice in 2006 and 2007."); *id.* at ¶ 18 ("Upon reviewing various documents, it appears that I was able to report decisions to Clayton for a majority of the thirty-one loans identified in the NAAC 2007-AR1 Report in a relatively short amount of time."); *see also* FHFA Ex. 513 (NAAC

2007-AR1 Individual Asset Report cited by Mr. Farrell in RBS Ex. 58) at CLAY_FHFA-

E_000579403-502 (listing only loans graded 3 in credit or compliance). The cited

language at 294:22-25 is not contained in RBS Ex. 5, but FHFA does not dispute that this

language does appear in the full deposition transcript.

821. **FHFA Statement:** Mr. Whittemore's review of loans graded EV1 or EV2 was
"sporadic." Ex. 384 (Deposition of James Whittemore) at 267:5-17 ("Q... When you
were reviewing the reports that came back from your third-party due diligence providers,
was it your priority to look at event 3 loans as opposed to event 1s or 2s? ... A. The
report that I received back from the vendor normally would be the event 3s that I would
make sure that I looked at. In the course of being on site I would, could and did review
other loans."); id. at 270:19 – 271:6 ("Q. So is it fair to say that you testified under oath
to the SEC you only looked at event 2s on a sporadic basis? ... A. At the time of this
deposition, yes, that would – it appears to have been my opinion at the time. Q. Well
was it truthful testimony that you offered to the SEC? A. It was – to the best of my
knowledge, it was.").

**RBSSI Response:** RBSSI states that Mr. Whittemore was not involved in reviewing
loan files or reunderwriting loans for any of the Nomura Securitizations, and thus the
facts and/or circumstances regarding how often Mr. Whittemore reviewed loans not
graded "EV3" are not "material facts" at issue in this litigation under Local Rule 56.1 or
otherwise to which a response is required. To extent a response is required, RBSSI
disputes the assertion in ¶ 821 as it mischaracterizes the cited testimony. When
specifically asked if he "would only sporadically review event 2 loans," Mr. Whittemore
testified: "No. Sporadic, I don't know what sporadic means." FHFA incorrectly
paraphrases Mr. Whittemore's testimony in the ████████████████████████████
████████████████████████████████████████████████████████
"Randomly, I would. I would not say that it was a great percentage, but randomly."
FHFA Ex. 384 (Deposition of James Whittemore) at 266:20-270:16. Mr. Whittemore
was then asked the question of whether he would review loans graded EV2 "on every
deal, do a random pick or two or just sporadically some deals you looked at 2s and some
deals you didn't?" to which Mr. Whittemore answered: "Sporadically, I would do that,
probably more towards if we were doing any whole loan purchases of Alt-A or subprime
pool. I would probably be more apt to do that than I would on a prime pool." *Id.*

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

argue that "the facts and/or circumstances regarding how often Mr. Whittemore reviewed

loans not graded 'EV3' are not 'material facts' at issue in this litigation under Local Rule

56.1 or otherwise to which a response is required," RBSSI's argument does not create a

genuine dispute of material fact. Part I.A, *supra*. Defendants' explication of Mr.

632

Whittemore's testimony in the *In re Certain RBS RMBS Offerings* matter fails to

contravene the asserted fact and therefore does not create a genuine dispute of material

fact. Part I.C, *supra*. While Defendants assert that "FHFA incorrectly paraphrases Mr.

Whittemore's testimony," the cited evidence does not support that assertion. FHFA Ex.

384 (Deposition of James Whittemore) at 270:2-16 (reading from Mr. Whittemore's

deposition testimony in the *In re Certain RBS RMBS Offerings* matter) shows that Mr.

Whittemore initially testified that he would "randomly" review EV2 loans and "would

not say that it was a great percentage" and then clarified that he would only do such a

random review "sporadically." In any event, whether Mr. Whittemore reviewed EV2

loans "sporadically" or "sporadically" reviewed EV2 loans "randomly" is not material to

FHFA's motion. *Quarles*, 758 F.2d at 840.

822.   **FHFA Statement:** Mr. Farrell, who worked on the NHELI 2007-1 and 2007-2
       Securitizations, reviewed findings on loans graded EV1 "very rarely." Ex. 383
       (Deposition of Brian Farrell) at 808:20-809:5 ("Q. Well you ask for these reports of 2s
       and 3s so that you can review all loan nonevent 1s. Do I understand correctly that you
       were planning that you wanted to review the 2s and the 3s. A. Yes. Q. And not the 1s?
       . . . A. I think I testified yesterday that I very rarely looked at event 1s.").

       **RBSSI Response:** RBSSI does not dispute the assertion in ¶ 822, except insofar as it
       omits other relevant testimony from Mr. Farrell, a former Clayton employee, who
       explained that he reviewed loans graded as Event 1 on a "less regular" basis than loans
       graded Event Level 2 or 3, RBS Ex. 5 (Deposition of Brian Farrell) at 294:22-295:5, and
       who further testified that Clayton was very conservative in its grading—hence the reason
       to look more closely at the loans graded as Event Level 2 and 3. FHFA Ex. 481
       (*MassMutual* Deposition of Brian Farrell) at 258:14-259:16 ("Q. So, if it's your job to
       ultimately make the determination of what loan is a three versus what is a two versus
       what is a one, why is it that you had a common practice of reviewing threes but not
       reviewing ones? A. I think I just answered you. Q. If you could answer it again, I'd
       appreciate it.... A So, we have a scope that is set up with Clayton. We have documents
       like this. They have guidelines. They -- a company like that is hired because we deem
       them to be qualified in underwriting. We have them take a conservative approach. So, I
       don't see where they would go the other way, where they would be aggressive rather than
       conservative. Again, based on my practice, it was, you are reviewing threes, you are
       reviewing twos. If you have an opportunity to review ones, you review them, but again,
       based on the scope of what has been set up with Clayton, and the conservative approach
       that they would take, I would be more focused on possible issues that may have been

identified rather than issues in general that were not."); *see also* FHFA Ex. 478 (Hot Points for Greenwich) at RBS-FHFA-CT-6279213 (instructing reviewers to "be conservative and kick [loans with layered risk] so we can review it."). Furthermore, because of Mr. Farrell's experience working at, and later for, Clayton, and frequent communication with Clayton during due diligence projects, he was "generally comfortable accepting loans that Clayton assigned a grade of '1.'" RBS Ex. 58 (Farrell Decl.) at ¶ 13 ("In my opinion and from my experience as an employee of both Clayton and RBSSI, Clayton provided quality loan-level due diligence. The RBSSI Credit Risk Department worked closely with Clayton on due diligence review projects, including sending RBSSI Credit Risk Department members to the locations where Clayton underwriters performed their review. Based on past experience, RBSSI regularly requested specific project leads on Clayton reviews.

When I managed a due diligence review, I would be in frequent contact with Clayton throughout the course of a review, discussing and reviewing Clayton's results on a rolling basis. As a result of my experience and working relationship with Clayton, I was generally comfortable accepting loans that Clayton assigned a grade of '1.'").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. The cited evidence relating to Mr. Farrell's reasons for not reviewing EV1 loans is irrelevant to the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Mr. Farrell's testimony that he reviewed EV1 loans on a "less regular" basis than EV2 and EV3 loans fails to contravene the asserted fact that he did so "very rarely" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited language at 294:22-25 is not contained in RBS Ex. 5, but FHFA does not dispute that this language does appear in the full deposition transcript.

823. **FHFA Statement:** Mr. Farrell would occasionally check "random loan files." Ex. 482 (NJ Carpenters Deposition of Brian Farrell) at 131:5-132:7 ("Q. When you came to Greenwich Capital, did you have any responsibility for checking the accuracy of any of the Clayton reports that you were sent? ... Whether the reports accurately stated the minimum FICO score, whether the reports accurately -- well, let's just take that one at a time. A. So while I was at Greenwich capital, did I ever review the IAS reports to ensure that the FICO score conformed with the guidelines? Q. Right. A. No, I wouldn't do that. That was Clayton's job. Q. Did Greenwich Capital have any system in place to check the accuracy of Clayton's work....A. I mean assist them per se? No, I don't think so. I mean I think looking at random loan files, reviewing loans, things like that, yes, but I'm not

aware of a system where we were reviewing and checking random data points versus the guidelines.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 823 as it mischaracterizes the cited testimony. Mr. Farrell testified that he would "look[] at random loan files[] [and] review[] loans" to check the accuracy of Clayton's work. FHFA cites no evidence or testimony that Mr. Farrell did so "occasionally." *See* RBS Ex. 5 (Deposition of Brian Farrell) at 823:17-20 ("Q. You had a diligence function, right? A. My diligence function was to review loan files."); RBS Ex. 58 (Farrell Decl.) at ¶ 9 (Based on the reports received from Clayton, and where necessary a review of part or all of the loan file for any particular loan, I would assess the reviewed loans, including reviewing and discussing with Clayton the information learned in its loan-level due diligence and the classification number initially assigned to the loan in Clayton's review."); RBS Ex. 90 (*CUNA* Deposition of Brian Farrell) at 80:17-82:17 ("Q. Okay. Let me ask you a question when it comes – back to this Clayton issue. Let's just say hypothetically Clayton provides you with a report that it has a few EV3s, okay? Would RBS ever endeavor to actually go get that loan file for that EV3 and look at the loan file? ... Or was there a different process? ... A. I mean when we spoke about this before. I think you'd have to go into the type of Event 3 that you're talking about. Q. Did you ever – did RBS, as far as you know, ever actually go in the loan file? A. I can't speak for others. I can tell you that I looked at loan files. Q. While you were at RBS. A. Yes, sir. Q. Okay. So when you're doing due diligence, was that in the context of a Clayton review? A. That's in any review. Q. Okay. So sometimes RBS would look at the entire loan file to deal with an EV3. A. Looking at an exception may not necessarily require looking at the entire loan file. If the loan file has an exception, that's what you want to look at. Q. Fair enough. I'm just asking, sometimes RBS would actually look at some portions of the loan file to deal with an EV3. Is that fair? A. That's a fair statement. Q. And why is it that you would want to look in the file to deal with an EV3? A. You know, there could be, there could be numerous reasons. There really could. You know, it could be that maybe Clayton, and we'll use Clayton here as this example, Clayton and the counterparty perhaps aren't in agreement for some reason, so then using myself here, I'd want to look at the file so then I'd be able to make an opinion on the exception.")

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited evidence relating to Mr. Farrell "sometimes" or "where necessary" reviewing loan files fails to directly contravene the asserted fact that "Mr. Farrell would occasionally check 'random loan files'" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Whether Mr. Farrell checked loan files "occasionally," "sometimes," or "where necessary" is not material to FHFA's motion. *Quarles*, 758 F.2d at 840. While FHFA does not dispute that the quoted language appears in RBS Ex. 5 (Deposition of Brian

Farrell) at 823:17-20, it is unclear what Mr. Farrell meant by "My diligence function was to review loan files" since this is contradicted by numerous other statements, much of them cited in Defendants' response, where he described his due diligence role at RBSSI as supervising the third-party vendors who reviewed loan files and only "sometimes" or "where necessary" reviewing loan files himself. *See, e.g.,* RBS Ex. 58 (Declaration of Brian Farrell.) at ¶ 8 ("For the projects that I managed while at RBSSI in the July 2006 to 2007 time period, following RBSSI's selection of the loans to be reviewed, the Clayton team would review the corresponding loan files under my direction and supervision."); *id.* at ¶ 9 ("Based on the reports received from Clayton, and where necessary a review of part or all of the loan files for a particular loan, I would assess the reviewed loans…"); FHFA Ex. 540 (CMFG Deposition of Brian Farrell) at 81:25-82:6 ("Q. Fair enough. I'm just asking, sometimes RBS would actually look at some portions of the loan file to deal with an EV3. Is that fair? A. That's a fair statement."). The cited language is not contained in RBS Ex. 90, but FHFA does not dispute that this language does appear in the full deposition transcript.

824. **FHFA Statement:** Mr. Farrell would only review the loan file "[o]n an as-needed basis." Ex. 383 (Deposition of Brian Farrell) at 34:6-35:3 ("Q. So under what circumstances would you review a loan file? A. On an as-needed basis. Q. When you say as needed ... would it be because someone had some question as to what the result of the underwriting ought to be? A. Possibly ... I can recall circumstances where I was just required to underwrite a loan. Q. What kinds of circumstances? A. My boss asked me to underwrite some loans. A. Did you have an understanding as to why your boss needed for you to do that? A. No.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 824. FHFA cites to a portion of Mr. Farrell's testimony in which he was discussing what he did while employed by Clayton, not while at RBSSI, and omits Mr. Farrell's testimony that other Clayton employees were primarily responsible for loan file reviews. RBS Ex. 5 (Deposition of Brian Farrell) at 33:4-34:8 ("Q. At the time you were working at Clayton, did you have an understanding as to what RMBS was? A. I think probably the same definition I gave earlier, nothing more than that. Q. You said that you were involved in underwriting? A. Yes. Q. Did you personally review loan files? A. Yes. Q. How large a part of your job

was that?  A.  I can't really say.  On an as-needed basis.  Q.  Did you have primary responsibility to perform re-underwriting on behalf of your clients? ...  A.  It wasn't a primary responsibility, no.  Q.  Were there separate personnel at Clayton who had that as a primary responsibility? A.  Yes.  Q.  So under what circumstances would you review a loan file? A.  On an as-needed basis.").  As stated in RBSSI's response to ¶ 823 (which RBSSI incorporates by reference as if restated herein), during the course of a loan-level due diligence review when he was employed by RBSSI, Mr. Farrell would review loan files to the extent necessary to understand, analyze and address issues flagged by RBSSI's third-party due diligence vendors.

**FHFA Reply:**  Undisputed that Mr. Farrell was testifying about his employment at Clayton in FHFA Ex. 383 (Deposition of Brian Farrell) at 34:6-35:3.  Regarding Mr. Farrell's review of loan files when he was employed by RBSSI, FHFA incorporates by reference its reply to ¶ 823 as if restated herein.

825.   **FHFA Statement:**  Mr. Farrell could recall "numerous situations" where he did not agree with Clayton's assessment that a loan warranted an EV3 rating.  Ex. 383 (Deposition of Brian Farrell) at 810:6-14 ("Q.  And in your experience working through that process, did you with some regularity disagree with Clayton's assessment as to what warranted a 3? ....  A.  With some regularity? I can recall numerous situations where I didn't agree with their final outcome.").

**RBSSI Response:**  RBSSI does not dispute the assertion in ¶ 825.  RBSSI encouraged Clayton and other due diligence vendors to be "conservative" in their grading, and mark loans "EV3" rather than "EV2" in close situations.  FHFA Ex. 478 (Hot Points for Greenwich) at RBS-FHFA-CT-6279213 (instructing reviewers to "be conservative and kick [loans with layered risk] so we can review it."); FHFA Ex. 481 (*MassMutual* Deposition of Brian Farrell) at 258:14-259:16 (explaining that RBSSI had its due diligence vendors "take a conservative approach.  So, I don't see where they would go the other way, where they would be aggressive rather than conservative.  Again, based on my practice, it was, you are reviewing threes, you are reviewing twos.  If you have an opportunity to review ones, you review them, but again, based on the scope of what has been set up with Clayton, and the conservative approach that they would take, I would be more focused on possible issues that may have been identified rather than issues in general that were not.").  The purpose of doing so was to allow RBSSI Credit personnel to immediately review and analyze those loans flagged by RBSSI's due diligence vendors as containing, in their opinion, the most significant issues.  FHFA Ex. 481 (*MassMutual* Deposition of Brian Farrell) at 258:14-259:16 (explaining that Clayton's "conservative approach" would allow RBSSI to "be more focused on possible issues that may have been identified rather than issues in general that were not."); *id.* at 255:7-25 ("Q.  And why review each EV3 rather than deferring to the third-party diligence firm who you had hired to make that determination? A.  Again, [the due diligence vendors] are performing just a certain job.  I think I used the word before we want them to be conservative.  They are not making purchase decisions.  They are going in using a document very closely to

637

this to set up the scope. They are then taking a conservative approach on reviewing the loans, and then presenting those to both RBS and to the counterparty. Through that process, things are cured, satisfied, rebutted, and then at the end, you have the final population, and it's not their job to assess the final risk of what that loan is. Their job is to identify any actual risk they think that may be present in the loan."); *see also* RBS Ex. 58 (Farrell Decl.) at ¶ 9 ("Clayton generally took a conservative approach to the assignment of numeric classifications and loans assigned an initial grade of '3' were identified for my review.")

**FHFA Reply:** Defendants do not dispute the asserted fact. The cited evidence relating to Mr. Farrell's assessment of Clayton's approach to due diligence is irrelevant and does not create a genuine dispute of material fact. Part I.C, *supra*. The cited language at 255:7-25 is not contained in FHFA Ex. 481, but FHFA does not dispute that this language does appear in the full deposition transcript.

826. **FHFA Statement:** Mr. Farrell thought it was "highly unlikely" that he would have disagreed when Clayton assigned an EV1 grade to a loan. Ex. 383 (Deposition of Brian Farrell) at 810:15-25 ("Q. Is it possible if you had reviewed event grade 1s that you would have disagreed with Clayton there as well -- ... Q. -- from time to time? ... A. I mean anything's possible. I would think it would be highly unlikely.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 826, except insofar as it omits relevant testimony from Mr. Farrell, a former Clayton employee, who explained that Clayton was conservative in its grading, and that he therefore "had less concern[ ] with event ones, based on [RBSSI's] setup with Clayton." FHFA Ex. 481 (*MassMutual* Deposition of Brian Farrell) at 258:2-13 ("Q. Was it common practice for you to review EV1s? A. I wouldn't say it was common, no. I may do a random review of looking at stuff. Again, given the scope that we are setting up with Clayton, for them to be conservative initially, where we are coming into situations where we are going to make a final determination of what we deem a three and what should maybe be a two, I may have been less concerned with event ones, based on our setup with Clayton."); *id.* at 259:23-260:13 ("Q. Is it fair to say that you were less concerned that Clayton would mistakenly rate a loan an EV1 as opposed to an EV3? ... A. I don't think that I was – I don't think the concern part is there. Again, I think we are going off topic here, is what I am considering ones, twos and threes and who is making the final decision. I want Clayton to be conservative and they are following a rules-based doc like this, I would expect to see something that may be flagged that I would deem not an issue rather than the other way around."); RBS Ex. 58 (Farrell Decl.) at ¶ 13 ("In my opinion and from my experience as an employee of both Clayton and RBSSI, Clayton provided quality loan-level due diligence. The RBSSI Credit Risk Department worked closely with Clayton on due diligence review projects, including sending RBSSI Credit Risk Department members to the locations where Clayton underwriters performed their review. Based on past experience, RBSSI regularly requested specific project leads on Clayton reviews.

When I managed a due diligence review, I would be in frequent contact with Clayton throughout the course of a review, discussing and reviewing Clayton's results on a rolling basis. As a result of my experience and working relationship with Clayton, I was generally comfortable accepting loans that Clayton assigned a grade of '1.'"); FHFA Ex. 478 (Hot Points for Greenwich) at RBS-FHFA-CT-6279213 (instructing reviewers to "be conservative and kick [loans with layered risk] so we can review it.").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited evidence relating to Mr. Farrell's assessment of Clayton's approach and his comfort level with Clayton fails to contravene – and in fact supports – the asserted fact that "Mr. Farrell thought it was 'highly unlikely' that he would have disagreed when Clayton assigned an EV1 grade to a loan" and therefore does not create a genuine dispute of material fact. Part I.C, *supra*.

827. **FHFA Statement:** Mr. Farrell could not recall performing an audit to determine whether he would have agreed with Clayton's findings with respect to loans that Clayton graded EV1 had he reviewed those loans. Ex. 383 (Deposition of Brian Farrell) at 811:2-7 ("Q. Did you ever perform an audit of 1s in order to determine how unlikely it was? .... A. I don't recall performing an audit.").

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 383 contains the language quoted by FHFA, but disputes the assertion in ¶ 827 to the extent it states or implies that Mr. Farrell did not review or analyze loans graded "EV1" by Clayton. When questioned about "what, if any, steps did you take to insure that Clayton's grading of a loan as an EV1 was not mistaken," Mr. Farrell testified that "I think I responded to that already. I think I told you on occasion I would review event ones." FHFA Ex. 481 (*MassMutual* Deposition of Brian Farrell) at 260:20-25. While Mr. Farrell may have focused more on reviewing loans graded as "EV3" by Clayton that was a result of RBSSI's broader strategy to have its credit officers analyze those loans deemed by Clayton to have the most significant issues. *See* RBSSI's responses to ¶¶ 825¬826 (which RBSSI incorporates by reference as if restated herein). Mr. Farrell had high regard for Clayton, and its project leads and contract underwriters, and, based on his occasional review of loans graded "EV1," had no reason to perform any "audit" of those loans, nor does FHFA cite to any evidence demonstrating otherwise. RBS Ex. 90 (*CUNA* Deposition of Brian Farrell) at 55:17-57:7 (stating his opinion that "Clayton had a very good reputation at that time for being a sound due diligence provider."); RBS Ex. 58 (Farrell Decl.) at ¶ 13 ("In my opinion and from my experience as an employee of both Clayton and RBSSI, Clayton provided quality loan-level due diligence."); RBS Ex. 82 (*MassMutual* Deposition of Brian Farrell) at 68:20-69:10 (stating that "I know that when I worked at Clayton, there was a large group of sellers – or, sellers, I'm sorry – of leads that were preferred by [RBSSI], specifically Don Lawson, that either worked directly for Don Lawson at his due

diligence company or had been working with Don for a long time. So, I think over that time Don was training, essentially, those leads.").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited evidence

relating to Mr. Farrell's review of EV1 loans, the reasons he only did so occasionally, and

his "high regard" for Clayton fails to contravene the asserted fact that he could not recall

performing an audit on Clayton's findings with respect to its review of EV1 loans and

therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited

language is not contained in RBS Ex. 90, but FHFA does not dispute that this language

does appear in the full deposition transcript. However, Mr. Farrell is clearly discussing

Clayton's reputation when he was employed there between 2002 and 2006, not its

reputation when he was at RBSSI. *See* FHFA Ex. 540 (CMFG Deposition of Brian

Farrell) at 55:12-57:7 ("Q. … When you worked for Clayton from 2002 to 2006, you

worked with or for RBS, however you want to put it; is that right? A. For Greenwich

Capital.").

828.  **FHFA Statement:** Mr. Camacho reviewed loans graded EV1 or EV2 only "when time permitted." Ex. 449 (Deposition of Frank Camacho) at 241:24-242:4 ("Q. And then you also said that you would -am I correct? -- that you would not limit your review to the EV3s, you would also look at other loans? A. When -- when time permitted, I would take a look at some of the EV2s, some of the EV1s.").

  **RBSSI Response:** RBSSI states that Mr. Camacho did not have any involvement in the Nomura Securitizations. The facts and/or circumstances regarding Mr. Camacho's review of loans Clayton graded as EV1 or EV2 are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI does not dispute that Mr. Camacho testified that "when time permitted, [he] would look at some of the EV2s, some of the EV1s."

  **FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

argue that "[t]he facts and/or circumstances regarding Mr. Camacho's review of loans

Clayton graded as EV1 or EV2 are not 'material facts' at issue in this litigation under

Local Rule 56.1 or otherwise to which a response is required," RBSSI's argument does

not create a genuine dispute of material fact. Part I.A, *supra*.

829.  **FHFA Statement:**  Mr. Camacho's review of EV1 and EV2 loans depended on "how many of those there were." Ex. 449 (Deposition of Frank Camacho) at 239:5-10 ("Q.  Did you ever independently QC their work? A.  In most cases, all loans that were recommended for exclusion by Clayton, I would review.  Depending on how many of those there were, I would review other loans they'd looked at that weren't -- that weren't recommended for exclusion.").

    **RBSSI Response:**  RBSSI states that Mr. Camacho did not have any involvement in the Nomura Securitizations.  The facts and/or circumstances regarding Mr. Camacho's review of loans Clayton graded as EV1 or EV2 are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required.  To the extent a response is required, RBSSI does not dispute that Mr. Camacho testified that "[d]epending on how many of those there were, I would review other loans [Clayton] looked at that weren't -- that weren't recommended for exclusion."

    **FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  While Defendants

argue that "[t]he facts and/or circumstances regarding Mr. Camacho's review of loans

Clayton graded as EV1 or EV2 are not 'material facts' at issue in this litigation under

Local Rule 56.1 or otherwise to which a response is required," RBSSI's argument does

not create a genuine dispute of material fact. Part I.A, *supra*.

830.  **FHFA Statement:**  Mr. Camacho's goal, time permitting, was to determine whether loans graded EV3 should be "reclassified." Ex. 462 (CMFG Deposition of Frank Camacho) at 159:4-159:9 ("Q.  Was your role as the on-site representative to determine whether loans should be graded Event 1, Event 2 or Event 3? A.  It was my role to determine whether loans were graded Event 3."); Ex. 449 (Deposition of Frank Camacho) at 240:10-13 ("Q.  And am I correct that you would review all EV3s and determine whether they should remain EV3s or should be reclassified in some way? A.  That was the goal, time permitting, yes.").

    **RBSSI Response:**  RBSSI states that Mr. Camacho did not have any involvement in the Nomura Securitizations.  The facts and/or circumstances regarding Mr. Camacho's review of loans Clayton graded as EV1 or EV2 are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required.  To the extent a response is required, RBSSI does not dispute that Mr. Camacho testified that it was his goal, "time permitting," to "review all EV3s and determine whether they should remain EV3s or should be reclassified in some way." FHFA Ex. 449 (*CUNA* Deposition of Frank Camacho) at 240:10-13.  As discussed in RBSSI's responses to ¶¶ 825-827 (which RBSSI incorporates by reference as if restated herein), RBSSI encouraged and

instructed its due diligence vendors to be "conservative" and grade loans as "EV3" in close situations so that RBSSI could focus on analyzing, reviewing and addressing those alleged issues that its due diligence vendors deemed most significant. FHFA Ex. 478 (Hot Points for Greenwich) at RBS-FHFA-CT-6279213 (instructing reviewers to "be conservative and kick [loans with layered risk] so we can review it."); FHFA Ex. 481 (*MassMutual* Deposition of Brian Farrell) at 258:14-259:16 (explaining that RBSSI had its due diligence vendors "take a conservative approach. So, I don't see where they would go the other way, where they would be aggressive rather than conservative. Again, based on my practice, it was, you are reviewing threes, you are reviewing twos. If you have an opportunity to review ones, you review them, but again, based on the scope of what has been set up with Clayton, and the conservative approach that they would take, I would be more focused on possible issues that may have been identified rather than issues in general that were not."); *id.* at 255:7-25 ("Q. And why review each EV3 rather than deferring to the third-party diligence firm who you had hired to make that determination? A. Again, [the due diligence vendors] are performing just a certain job. I think I used the word before we want them to be conservative. They are not making purchase decisions. They are going in using a document very closely to this to set up the scope. They are then taking a conservative approach on reviewing the loans, and then presenting those to both RBS and to the counterparty. Through that process, things are cured, satisfied, rebutted, and then at the end, you have the final population, and it's not their job to assess the final risk of what that loan is. Their job is to identify any actual risk they think that may be present in the loan."); *see also* RBS Ex. 58 (Farrell Decl.) at ¶ 9 ("Clayton generally took a conservative approach to the assignment of numeric classifications and loans assigned an initial grade of '3' were identified for my review.").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue that "[t]he facts and/or circumstances regarding Mr. Camacho's review of loans Clayton graded as EV1 or EV2 are not 'material facts' at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. The cited evidence relating to RBSSI's encouragement and instructions to third-party vendors fails to contravene the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited language at 255:7-25 is not contained in FHFA Ex. 481, but FHFA does not dispute that this language does appear in the full deposition transcript.

831. **FHFA Statement:** It was RBS's "standard practice" to review all loans graded EV3 by RBS's third-party diligence vendors "rather than review loans that were not so classified." Ex. 383 (Deposition of Brian Farrell) at 294:7-21 ("Q. When you came to RBS, was it standard practice at RBS to review all EV3s? .... Was it Mr. Farrell's standard practice

you mean? Q. Was it standard practice at RBS to review all EV3s? ... A. I could say that was my standard practice. I mean I feel very comfortable with stating that's what the rest of the due diligence officers did as well."); *see also* Ex. 481 (Massachusetts Mutual Deposition of Brian Farrell) at 258:14-259:16 ("Q. So, if it's your job to ultimately make the determination of what loan is a three versus what is a two versus what is a one, why is it that you had a common practice of reviewing threes but not reviewing ones? A. I think I just answered you. Q. If you could answer it again, I'd appreciate it.... A So, we have a scope that is set up with Clayton. We have documents like this. They have guidelines. They -- a company like that is hired because we deem them to be qualified in underwriting. We have them take a conservative approach. So, I don't see where they would go the other way, where they would be aggressive rather than conservative. Again, based on my practice, it was, you are reviewing threes, you are reviewing twos. If you have an opportunity to review ones, you review them, but again, based on the scope of what has been set up with Clayton, and the conservative approach that they would take, we would be more focused on possible issues that may have been identified rather than issues in general that were not.").

**RBSSI Response:** RBSSI does not dispute that it was RBSSI's "standard practice to review all loans graded EV3" but disputes that it did not "review loans that were not so classified" as ¶ 831 states. FHFA mischaracterizes or improperly paraphrases the cited testimony of Mr. Farrell, who testified that he reviewed "on a regular basis" loans graded Event Level 2 by RBSSI's due diligence vendors. RBS Ex. 5 (Deposition of Brian Farrell) at 294:22-295:5 ("Q. Was it standard practice to review all EV2s? A. I don't know if I could say all 2s, no. Reviewing 2s on a regular basis, yes. Q. What about EV1s? A. My own personal experience was less regular than both 3s and 2s."). Mr. Camacho similarly testified that he would look at loans graded as Event Levels 1 and 2 by RBSSI's due diligence vendors "when time permitted" and "depending on how many [ ] there were." FHFA Ex. 449 (Deposition of Frank Camacho) at 239:5-10, 241:24-242:4.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. FHFA

incorporates by reference its reply to ¶ 820 regarding Mr. Farrell's review of loans graded

EV2 as if fully restated herein. FHFA reiterates that whether Mr. Farrell reviewed EV2

loans regularly or not is not material to FHFA's motion since Defendants can provide no

evidence showing that Mr. Farrell or any other RBSSI employee reviewed the loans

graded EV2 by Clayton in the Nomura Securitizations. *Quarles*, 758 F.2d at 840; *see*

RBS Ex. 58 (Declaration of Brian Farrell) at ¶ 12 ("I have reviewed the January 18, 2007

Individual Asset Summary Report for NAAC 2007-AR1 that was prepared by Clayton

('NAAC 2007-AR1 Report'), Ex. B (CLAY_FHFA-E_000579403-502) …. I believe

that these examples show the type of analysis I applied in 2006 and 2007 when I reviewed loans initially classified as a '3' (or 3C or 3D) in Clayton Individual Asset Summary Reports."); *id.* at ¶ 16 ("In reviewing the report today, I used the same approach as was my practice in 2006 and 2007."); *id.* at ¶ 18 ("Upon reviewing various documents, it appears that I was able to report decisions to Clayton for a majority of the thirty-one loans identified in the NAAC 2007-AR1 Report in a relatively short amount of time."); *see also* FHFA Ex. 513 (NAAC 2007-AR1 Individual Asset Report cited by Mr. Farrell in his Declaration, RBS Ex. 58) at CLAY_FHFA-E_000579403-502 (listing only loans graded 3 in credit or compliance).

832. **FHFA Statement:** If Mr. Camacho determined that a loan a third-party diligence vendor had graded as unsuitable for purchase should not be excluded from the deal, he would inform the project lead at the third-party diligence firm that RBS is "okay with this one." Ex. 449 (Deposition of Frank Camacho) at 241:8-14 ("Q. And in the event that a loan... should not be excluded from the deal, would it be – would it receive a different rating? A. If I – if I believed that the loan was overall acceptable, I would just give the loan back to – to the Clayton lead, and say I'm okay with this one.").

**RBSSI Response:** RBSSI states that Mr. Camacho did not have any involvement in the Nomura Securitizations. The facts and/or circumstances regarding Mr. Camacho's determinations about particular loans or what he communicated to Clayton are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI disputes the assertion in ¶ 832. The stated assertion concerns loans "graded unsuitable for purchase," which is irrelevant to this action, which concerns four securitizations that RBSSI underwrote and not loans that RBSSI considered purchasing. To the event a loan "graded unsuitable for purchase" is meant to mean a loan that a due diligence vendor grades as an "EV3," RBSSI disputes that assertion, as it mischaracterizes or improperly paraphrases what Mr. Camacho actually stated, which is that if he "believed that the loan was overall acceptable, I would just give the loan back to – to the Clayton lead, and say I'm okay with this one." FHFA Ex. 449 (Deposition of Frank Camacho) at 241:8-14.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue that "[t]he facts and/or circumstances regarding Mr. Camacho's determinations about particular loans or what he communicated to Clayton are not 'material facts' at issue in this litigation under Local Rule 56.1 or otherwise to which a response is

required" and that loans "graded unsuitable for purchase" are irrelevant to this action, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. While Defendants dispute the assertion "[t]o the [extent] a loan 'graded unsuitable for purchase' is meant to mean a loan that a due diligence vendor grades as an 'EV3,'" the cited evidence shows that Mr. Camacho was indeed testifying about overturning EV3 loans. *See* FHFA Ex. 449 (Deposition of Frank Camacho) at 240:10-241:14 ("Q. And am I correct that you would review all EV3s and determine whether they should remain EV3s or should be reclassified in some way? A. That was the goal, time permitting, yes. Q. And what was the mechanism by which you were provided the loans to review? A. That would vary based on the -- based on the mechanics of the review. Q. What different types of form could it take? A. In '05 and '06, the typical -- the typical deal that I worked on would be at the site of the -- at the site of the originator, everybody in one conference room with -- with actual loan files in front of them. In that instance, the loan would be underwritten, go through Clayton's internal QC process, the lead would be comfortable with it, and the lead would give me a stack of loans that had a final EV3 grade on them. Q. And would you take that stack and look at it yourself and make your own determination. Is that correct? A. Correct. Q. And in the event that a loan should be -- should not be excluded from the deal, would it be -- would it receive a different rating? A. If I -- if I believed that the loan was overall acceptable, I would just give the loan back to -- to the Clayton lead, and say I'm okay with this one.").

833.    **FHFA Statement:** Loans that the RBS employee agreed should be graded Event Level 3 were forwarded back to the originator's team to allow the originator to provide a rebuttal or additional documentation to RBS's concerns. Ex. 449 (Deposition of Frank Camacho) at 242:22-243:5 ("As a couple of questions back, we were talking about what I would do with the stack of EV3s. Some of them were loans that I was comfortable with, and I gave them back to the Clayton lead. The ones that I still believed should be classified EV3

were then forwarded on to the – to the originator, and their team would look at it, provide additional documentation, provide a rebuttal to our concerns.").

**RBSSI Response:** RBSSI states that Mr. Camacho did not have any involvement in the Nomura Securitizations. The facts and/or circumstances regarding what Mr. Camacho did after determining that a loan that was being considered for purchase by an originator should be classified as an Event Level 3 are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI does not dispute that loan-file due diligence was an iterative process where RBSSI and the originator and/or owner of the loan (and, frequently, the due diligence vendor) would be in communication regarding issues flagged by the third-party due diligence vendor and discussing whether and how those issues could be resolved. RBS Ex. 5 (Deposition of Brian Farrell) at 738:6-740:20 (explaining that "[t]he review process, the due diligence process in general typically always included a rebuttal process. Whether there's missing docs, there's exceptions, etc., Clayton provides those reports to the counterparty so they have a chance to review and respond to those issues.").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants argue that "The facts and/or circumstances regarding what Mr. Camacho did after determining that a loan that was being considered for purchase by an originator should be classified as an Event Level 3 are not 'material facts' at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

834.  **FHFA Statement:** Clayton graded 60 of 102 (59%) loans in the NHELI 2007-1 diligence sample as EV1 and 191 of 306 (62%) loans as EV1 in the NHELI 2007¬2 diligence sample. Ex. 7 to the Cipione Decl. (filter Column A for "NHELI 2007-1" and Column E for "1" (60 loans); filter Column A for "NHELI 2007-2" and Column E for "1" (191 loans)).

**RBSSI Response:** RBSSI disputes that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion. To the extent a response is required, RBSSI does not dispute that Clayton initially graded 191 of 306 loans as EV1 for credit, and [ ] of 306 loans as EV1 for compliance in the NHELI 2007-2 diligence sample. RBSSI disputes the assertion that Clayton initially graded 60 of 102 loans "in the NHEL 2007-1 diligence sample as EV1." Clayton initially graded 60 of 102 loans (59%) as EV1 for credit and 90 of 102 loans (88%) as EV1 for compliance in the NAAC 2007-AR1 diligence sample. Further, with regard to the NHEL 2007-AF1 sample, which also sourced loans into the NHEL 2007-1 Securitization, Clayton initially graded 148 of 233 loans (or 63.5%) as EV1 for credit and 167 of 233 loans (72%) as EV1 for compliance. RBS Ex. 92 (RBS-FHFA-SDNY-0000096, RBS Greenwich Capital / NHEL 2007-AF1 Event Status report) at RBS-FHFA-SDNY-

0000096. Collectively, RBSSI diligenced 335 loans from the NAAC 2007-AR1 and NHEL 2007-AF1 samples, of which 208 loans (62%) received an initial credit grade of EV1 and 257 loans (77%) received an initial compliance grade of EV1 by Clayton.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants

"dispute[] that the Declaration of Charles Cipione is admissible or provides competent

evidence of any material fact for purposes of FHFA's motion," RBSSI's argument does

not create a genuine dispute of material fact. Part I.A, *supra*. The cited evidence relating

to the diligence of the NHEL 2007-AF1 pool is irrelevant, and is not material to FHFA's

motion, *Quarles*, 758 F.2d at 840, since that pool did not contribute loans to the at-issue

SLG for NHELI 2007-1 and therefore does not create a genuine dispute of material fact.

Part I.C, *supra*. While Defendants dispute the asserted fact in part because Clayton

separately graded the loans for compliance issues, the grade Clayton assigned certain

loans in its compliance review is not material to the asserted fact, which deals with the

loans graded EV1 for credit. *Quarles*, 758 F.2d at 840; *see* Ex. 7 to the Cipione Decl.

(Column E labeled "Standardized Final Credit Grade").

> (b) *RBS Approved Many Loans That Clayton Graded As Not Suitable, Overriding Its Recommendations*

835. **FHFA Statement:** If Mr. Camacho determined that a loan a third-party diligence vendor had graded as unsuitable for purchase should not be excluded from the deal, he would inform the project lead at the third-party diligence firm that RBS is "okay with this one." Ex. 449 (Deposition of Frank Camacho) at 241:8-14 ("Q. And in the event that a loan... should not be excluded from the deal, would it be – would it receive a different rating? A. If I – if I believed that the loan was overall acceptable, I would just give the loan back to – to the Clayton lead, and say I'm okay with this one.").

**RBSSI Response:** RBSSI states that the assertion in this paragraph is entirely duplicative of the assertion in ¶ 832. To the extent a response is required, RBSSI incorporates by reference its response to ¶ 832 as if fully restated herein.

**FHFA Reply:** Undisputed. FHFA incorporates by reference its reply to ¶ 832 as if fully

restated herein.

836. **FHFA Statement:** The exception detail reports that Clayton provided to RBSSI did not include any loans that had not received a grade of EV3. *See, e.g.*, Ex. 484 (CLAY_FHFA-E-000579503, Clayton Exception Detail Report for NAAC 2007-AR1, dated January 18, 2007) at CLAY_FHFA-E-000579503 (showing 33 loans graded EV3 for credit or compliance reasons); Ex. 513 (CLAY_FHFA-E_000579403, RBS Greenwich Capital NAAC 2007-AR1 Individual Asset Summary Report prepared by Clayton dated January 18, 2007) at CLAY_FHFA-E_000579403 ("IAS Cred or Comp Event 3s/Missing Loan Count = 33"); Ex. 453 (RBS-FHFA-SDNY-0303869, Clayton Exception Detail Report for NHEL 2007-HE1 dated January 24, 2007) at RBS-FHFA-SDNY-0303869 (showing 68 loans graded EV3 for credit or compliance reasons); Ex. 514 (RBS-FHFA-SDNY-0303667, RBS Greenwich Capital NHEL 2007-HE1 Individual Asset Summary Report prepared by Clayton dated January 24, 2007) at RBS-FHFA-SDNY-0303667 ("IAS Cred or Comp Event 3s/Missing Loan Count = 67").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 836. The purpose of Clayton's Exception Detail reports was to identify those loans with current Clayton grades of Event Level 3 so that RBSSI could review the identified exceptions. RBS Ex. 90 (*CUNA* Deposition of Brian Farrell) at 176:18-178:12 ("Q. Can you help me understand what the difference would be between the exception detail report and the IAS report? A. Yes, yes, absolutely. So the exception detail report, from what I can remember if we're talking about 2006, there was some basic information on it. You know, you essentially had, you know, loan number, balance, and then whatever exceptions were found during that time on the review.... Q. And can you tell me the exception detail report, what does an exception mean? A. You know, you brought up Events 3s before? That's your Event 3s. Q. Oh, okay, so does it have Event 2s? A. It would not. Q. Okay. So the exception detail report would only contain things that Clayton, for example, had graded as an EV3. A. That is a fair statement.").

**FHFA Reply:** Defendants do not dispute the asserted fact. The cited evidence relating to the purpose of Exception Detail Reports fails to contravene the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited language is not contained in RBS Ex. 90, but FHFA does not dispute that this language does appear in the full deposition transcript.

837. **FHFA Statement:** On January 17, 2007, at RBS's request, Clayton sent a preliminary credit and compliance report for the 102 sampled loans in NAAC 2007-AR1. *See* Ex. 483 (RBS-FHFA-SDNY-0485096, email regarding Greenwich/NAAC 2007-AR1 2007-01B) at RBS-FHFA-SDNY-0485096 (describing Clayton's preliminary report on missing documents and credit issues); Ex. 447 (RBS-FHFA-SDNY-0485153, Clayton Event Status – Detail Report for NAAC 2007-AR1) at RBS-FHFA-SDNY-0485153 (showing 102 total loans reviewed).

**RBSSI Response:** RBSSI disputes the assertion in ¶ 837. On January 17, 2007, Brian Farrell received an email from Daniel Pinero at Clayton attaching certain "preliminary reports," and noting that "so far the majority of the loans are kicked for missing documents. The credit issues we have found were due to Foreign National Borrower's on No Doc programs which is not allowed per [guidelines]." Attached to that email were several Clayton reports, none of which are the report found in FHFA Ex. 447, which is a Clayton Event Status report dated January 24, 2007. The actual Clayton Event Status report attached to Mr. Pinero's January 17, 2007 email, RBS Ex. 93 (RBS-FHFA-SDNY-0485126, Event Status report for NAAC 2007-AR1, dated January 17, 2007) at RBS-FHFA-SDNY-0485126, shows that Clayton had reviewed 15 loans at that time.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants dispute that FHFA Ex. 447 is the Clayton Event Status report attached to Mr. Pinero's January 17, 2007 email, any such dispute is not material to FHFA's motion. *Quarles*, 758 F.2d at 840. Undisputed that RBS Ex. 93 is the correct Clayton Event Status report.

838. **FHFA Statement:** The exception detail report attached to Mr. Pinero's email revealed material guideline issues, including unsupported values, payment shock of ███████ income documents that did not meet the applicable guidelines, and insufficient cash reserves. *See* Ex. 484 (CLAY_FHFA-E-000579503, Exception Detail Report, dated January 18, 2007) at CLAY_FHFA-E-000579503 (showing Loans ███████ (Row 27), ███████ (Row 29), and ███████ (Row 34) as having unsupported values used by the mortgage lender (Outstanding Material Credit Exceptions, Column Q)); *see also* Ex. 484 (CLAY_FHFA-E-000579503, Exception Detail Report, dated January 18, 2007) at CLAY_FHFA-E-000579503 (showing Loan ███████ as having a payment shock of ███████ (Row 32, Column Q)); *see also* Ex. 484 (CLAY_FHFA-E-000579503, Exception Detail Report, dated January 18, 2007) at CLAY_FHFA-E-000579503 (showing Loan ███████ as having income documents that did not meet the applicable guidelines, (Row 35, Column Q)); *see also* Ex. 484 (CLAY_FHFA-E-000579503, Exception Detail Report, dated January 18, 2007) at CLAY_FHFA-E-000579503 (showing Loan ███████ as having insufficient cash reserves, (Row 28, Column Q)).

**RBSSI Response:** RBSSI disputes the assertion in ¶ 838. First, FHFA cites the wrong Clayton Exception Detail report. FHFA Ex. 484 is a Clayton Exception Detail report dated January 18, 2007 and was not "attached" to Mr. Pinero's January 17, 2007 email. Second, the Clayton Exception Detail report that was attached to Mr. Pinero's January 17, 2007 email, RBS Ex. 94 (RBS-FHFA-SDNY-0485097, Clayton Exception Detail report dated January 17, 2007), did not "reveal material guideline issues" that FHFA states; instead it showed certain loans with missing documents and loans to "Foreign National Borrower's on No Doc programs which is not allowed per [guidelines]," as Mr. Pinero explained in his cover email. Subsequent emails between RBSSI and Clayton the following day show that Clayton and RBSSI determined that the relevant originators' guidelines did in some instances permit loans to foreign national borrowers, and certain loans were re-graded to reflect this fact. RBS Ex. 95 (RBS-FHFA-SDNY-0487436,

"FW: Greenwich/NAAC 2007-AR1 2007-01B") at RBS-FHFA-SDNY-0487436 (email from Clayton explaining that "there were about 6 or 7 Foreign Nationals total, all were Alliance except one Pinnacle. We went into each file and pulled the Lender approval to see which program they were using. Depending on which program, some were allowed for No Doc, some weren't. We made the proper kick though in the ones that should have been kicked."). Third, to the extent FHFA states or implies that the January 18, 2007 Clayton Exception Detail report (FHFA Ex. 484) "revealed material guideline issues," that assertion is entirely duplicative of the assertion set forth in ¶¶ 756-58. RBSSI incorporates by reference its response to those paragraphs (as well as its responses to ¶¶ 726-728).

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants assert that FHFA Ex. 484 was not attached to Mr. Pinero's January 17, 2007 email but was instead dated January 18, 2007, any such dispute is not material to FHFA's motion. *Quarles*, 758 F.2d at 840. Undisputed that FHFA Ex. 484 is a Clayton Exception Detail Report dated January 18, 2007. It was attached to a January 18, 2007 email from Daniel Pinero to Brian Farrell. *See* RBS Ex. 96 (Jan. 18, 2007 email from Daniel Pinero to Brian Farrell regarding Greenwich//NAAC 2007-AR1) at CLAY_FHFA-E_000579402. The cited evidence relating to the January 17 Exception Detail Report is irrelevant to the asserted fact relating to the January 18 Exception Detail Report and does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to foreign national borrowers fails to contravene the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to the due diligence of NHEL 2007-HE1 (¶¶ 726-728) is irrelevant to the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While FHFA disputes that the asserted fact is entirely duplicative of the assertion set forth in ¶¶ 756-58, FHFA incorporates by reference its replies to those paragraphs regarding material exceptions. To the extent Defendants dispute FHFA's use of the term "material credit exceptions" in their response to ¶ 757, which is indeed similar to, though

650

not entirely duplicative of, the asserted fact, FHFA notes that Defendants ignore the plain language of the Exception Detail Report: all of the exceptions noted in the asserted fact are listed in Column Q, which is labeled "Outstanding Material Credit Exceptions." FHFA Ex. 484 (CLAY_FHFA-E-000579503, Clayton Exception Detail Report for NAAC 2007-AR1, dated January 18, 2007).

839.    **FHFA Statement:**  The accompanying "Event Status" report shows that RBS waived all outstanding issues, and that every loan that had been previously graded a "3" by Clayton became a "2W: Material Exceptions Waived" except one loan that was graded as an EV 3D for missing material documentation. Ex. 485 (CLAY_FHFA-E_000579528, Event Status – Detail, dated January 18, 2007 at 6:41 PM) at CLAY_FHFA-E_000579528 (showing one loan graded as a "3" (Row 2, Column D) and thirty-two loans graded as "2W: Material exceptions waived").

    **RBSSI Response:**  RBSSI disputes the assertion in ¶ 839.  First, neither FHFA Ex. 485 nor FHFA Ex. 486 is "[t]he accompanying 'Event Status' report" to Mr. Pinero's January 17, 2007, contrary to what FHFA incorrectly states (FHFA Ex. 486 is a Clayton Event Status report that Clayton sent to Brian Farrell at RBSSI on January 18, 2007, RBS Ex. 96 (CLAY_FHFA-E_000579402); FHFA Ex. 485 is a Clayton Event Status report produced by Clayton and purports to be dated January 18, 2007 as well).  The Clayton Event Status report that did accompany Mr. Pinero's January 17, 2007 email (RBS. Ex. 93 (RBS-FHFA-SDNY-0485126, Event Status report for NAAC 2007-AR1, dated January 17, 2007)) at RBS-FHFA-SDNY-0485126), shows 15 loans reviewed, and does not include any information about any purported waiver by RBSSI.

    Second, FHFA cites no evidence that any loan (whether identified in FHFA Exs. 485 and 486 or otherwise) had an "outstanding issue[]" that was "waived" by RBSSI.  The two Clayton Event Status reports on which FHFA relies do not contain any information about the loans other than their Clayton grades.  FHFA appears to rely on the fact that in one report (FHFA Ex. 486) a certain number of loans are graded by Clayton as "3" or "3D" or "3C" for credit or compliance reasons, and in the other report (FHFA Ex. 485) many of those same loans are graded by Clayton as "2W," but FHFA cites no evidence that the change from a "3" to a "2W" constituted a "waiver" or that such waiver was made by RBSSI.  To the contrary, Brian Farrell testified that Clayton could "definitely" change a loan from an EV3 to an EV2W "without RBS telling them to." RBS Ex. 5 (Deposition of Brian Farrell) at 460:5-11 ("Q.  Would Clayton ever on its own initiative change an EV3 to an EV2W, or was that a determination that RBS would make? ...  A.  Yeah, I think they could definitely make it into a 2W without RBS telling them to.").  Consistent with RBSSI's and Clayton's normal practices for such grading changes, the grading changes here could reflect provision of curing documentation and/or a rebuttal explanation by Nomura, with which Clayton and/or RBSSI agreed.  *Id.*  at 738:6-739:9 ("Q.  And would the counterparty rebut Clayton's opinions as to whether loans had sufficient compensating factors or would they rebut the existence of missing documents, for instance? ...  A.  I

think it would be, it could be anything. It could be compensating factors weren't, weren't considered. It could be the fact that they are at disagreement with Clayton's analysis, such as throughout their review perhaps Clayton missed something, they missed something in a document, their calculation may be wrong, something like that. Q. Was the rebuttal process between Clayton and the seller of the loan or was RBS involved in that? ... A. I think during most of the review it would be between the counterparty and Clayton, but it could be with RBS as well."); *id.* at 742:20-743:11 (explaining one reason why a loan might be changed from an "EV3" to an "EV2W" was "that a rebuttal was provided").

Moreover, As discussed in RBSSI's responses to ¶¶ 726-728 and 756-757 (which RBSSI incorporates by reference as if restated herein), FHFA has not established (nor can it) that a loan that Clayton initially graded a "3" or "3C" or "3D" or "2W" in fact had an "outstanding issue." First, the interim Clayton Exception Detail report for this project (FHFA Ex. 484) identifies numerous compensating factors for nearly all of the loans FHFA incorrectly states that RBSSI "waived," and which provide evidence that the loans in fact did not have material credit exceptions. Further, Clayton itself stated in the due diligence narrative for the NAAC 2007-AR1 review that "[b]ased on our review we found an exception rate of .8% with compliance issues and no credit issues. This percentage appears to be in-line with what we would normally expect from Alt-A originators." FHFA Ex. 448 (Clayton due diligence narrative for NAAC 2007-AR1) at RBS-FHFA-SDNY-0487363 (emphasis added). That narrative further concluded that "the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, which does not suggest a pattern of imprudent lending practices." *Id.* (emphasis added). FHFA has no response to this evidence.

Moreover, Brian Farrell, RBSSI's credit officer that managed the loan-level diligence on the NHELI 2007-1 Securitization, reviewed the Clayton individual assessment summary reports for six of the loans identified as "2W," and concluded that none had material credit issues that were not offset by sufficient compensating factors, contrary to FHFA's assertion. RBS Ex. 58 (Farrell Decl.) at ¶¶ 12, 19-25. Nomura's reunderwriting expert, Michael Forester, also reunderwrote (as part of the sample of loans he reviewed) one of the loans (Loan ▮▮▮▮▮▮▮) Clayton graded as "2W" that FHFA alleges had outstanding issues and which RBSSI "waived," and opined that the loan generally complied with the originator's guidelines. RBS Ex. 80 (Forester Report) at Exhibit 470. Further FHFA's own reunderwriting expert, Robert Hunter, also reviewed and reunderwrote that loan, and opined that any alleged underwriting defects in this loan "did not substantially increase the credit risk associated with the loan." RBS Ex. 81 (Hunter Report) at Exhibit 2. Again, FHFA has no response to this evidence.

FHFA also cites no evidence to establish generally that loans preliminarily graded as "2W" by Clayton had material credit issues. As Mr. Farrell testified, loans that Clayton re-graded "2W" in almost all instances were loans for which either (i) the issue identified by Clayton was "cured," (ii) a rebuttal was provided that RBSSI and/or Clayton agreed with, or (iii) RBSSI determined in its judgment that compensating factors offset a particular exception identified by Clayton, and on that basis RBSSI deemed the loan to be acceptable—in other words, the loans had no "material" credit issues. RBS Ex. 5

(Deposition of Brian Farrell) at 455:12-24 ("Q. We talked earlier about the grading that Clayton did on loans EV1, 2 and 3. Are you familiar with the term EV4? A. No. Q. What about EV2W? A. That is a loan that could have been, the exception was deemed acceptable. Q. Deemed by whom? A. Either Clayton or RBS."); id. at 502:2-7 ("Q. Would a cured loan register a 2 or 2W or some other designation? ... A. I think that it could go either way."); id. at 504:5-506:13 ("Q. And do you recall that in the 2006/2007 time frame only RBS could assign a grade as 2W? ... A. Again, I can recall situations where loans were graded 2Ws based on items that were received for a cure or a rebuttal. Q. Different question, Do you recall that in the 2006/2007 time frame, only RBS itself could assign a grade of 2W? ... A. That was one of the items that could happen, that Greenwich could give them instruction that it was acceptable. The other were perhaps a loan was a 3 and a cure doc was received, and it could receive that grade. The other is that there was an exception and the lender provided a rebuttal and Clayton agreed with the rebuttal, it could also receive that grade for that reason."). Mr. Farrell further testified that "loans were just not waived" by RBSSI; they "were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade." Id. at 745:11-746:13 ("Q. How about across all of 2006 into the first quarter of 2007, would it surprise you if across all of RBS's diligence its waive-in rate was over 50 percent? ... A. Again, waive-in rate, I – are we speaking about 2W or you're just stating waiving? Because it's two different things. Q. Are you able to answer the question as I've asked it? ... A. Are you talking about specific the loan grading of 2W, or you're asking about a waiver practice in general? Q. Waivers by RBS? ... A. I don't know – I think I previously testified that loans were not just waived. Loans were, were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade."); RBS Ex. 82 (MassMutual Deposition of Brian Farrell) at 406:22-407:8 ("Q. Did RBS waive EV3s in the credit context from time to time? . .. A. I don't agree with 'waive.' I don't agree with 'waive.' I think in general, as I previously said, the issues at hand that were flagged by Clayton or any other diligence firm were thoroughly reviewed and assessed, and based on that analysis performed, a determination would be made whether the loan is acceptable or not."). FHFA cites no evidence to rebut these statements.

RBSSI also disputes the assertion in ¶ 839 insofar as FHFA completely misunderstands Clayton's purpose in reviewing loans and assigning grades, which was not to identify "good" or "bad" loans, but to flag issues for RBSSI for further review. RBS Ex. 58 (Farrell Decl.) at ¶ 9 ("Loans assigned an initial grade of "3" were identified for my review. Clayton's initial grading of a loan as a "3" was not a final assessment, but rather a flag for me, as the RBSSI credit officer managing the due diligence project, to apply my professional judgment and make the final determination as to whether to accept the loan."). It was not unusual for RBSSI Credit group personnel, following review of Clayton's initial grade of "3" or "3C" or "3D", to determine that the loan should not be assigned a final "3" grade, based on the RBSSI Credit group employee's review of the relevant characteristics of the loan, review of loan documents as necessary, and consideration of any rebuttal and/or curing documents or information provided by the originator. Id. at ¶¶ 9-11 (discussing the preliminary nature of Clayton's grades and that RBSSI made the final determination regarding material exceptions); RBS Ex. 5 (Deposition of Brian Farrell) at 509:5-513:5 ("Q. So do I understand correctly that if a

credit officer were ultimately of the opinion that a loan was a 3, that is a loan that would not be eligible for purchase? . .. A. In what stage, of what Clayton has? Because this is, this is just a Clayton grade, right. Q. I'm talking about – A. Hold on, please let me finish. This isn't, this isn't an RBS grade. These are grades Clayton that is assigning. We spoke about yesterday about looking at certain grades, 2s, 3s, etc. So these are Clayton grades. These are flagged in a certain way so RBS has the opportunity to review exceptions that have been, that have been flagged. This isn't an RBS grade. This is, this is a Clayton grade. This was set up to determine flags of what should be looked at and what shouldn't be. So I don't want to get hung up on the 3 grade by itself because it's Clayton's grade, it's not an RBS grade.... Q. Do you know whether loans that were 3s but nevertheless purchased were ever included in securitizations sold to investors? ... A. It's possible. Again, I want to be very clear here that a loan could have been graded a 3 by Clayton, so it could still be a 3, but I can still deem it to be acceptable. I don't want to get hung up on the actual grade. It's a Clayton grade that they're sending over, right, so you're saying it's a 3. That grade may never be changed. I may be – the loan itself, an exception may be acceptable to me. So am I changing the grade myself? No. I've reviewed the loan, I deem it to be acceptable. It still may be a Clayton 3, they may never change it, but in my mind the loan is acceptable."). Indeed, this was particularly true for loans given a preliminary grade "3C" or "3D," which signaled that the alleged "material" issue was either curable ("3C") or concerned a missing document ("3D") that could and generally would be fixed by the originator. RBS Ex. 58 (Farrell Decl.) at ¶ 17 ("In circumstances where Clayton identified exceptions that were based on missing documentation, I would typically accept the loan if the missing documents were provided by the originator and that resulted in the identified exception being cleared, or if the originator represented that the missing documents would be provided, or if I determined that the missing documentation was unimportant or was offset by sufficient compensating factors to justify acceptance of the loan."). RBSSI notes that of the 33 loans FHFA asserts represented "material exceptions" for credit, 16 were graded as "3C" for credit reasons, three were graded "3D" for credit reasons, and five were graded 3 for compliance issues not credit issues. Only nine loans (or 9% of the sample) were initially graded as "3" for potentially disqualifying credit issues. FHFA Ex. 484 (Clayton Exception Detail Report for NAAC 2007-AR1) at CLAY-FHFA-E_000579503

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. The cited evidence relating to FHFA Ex. 486, which was not cited by FHFA in ¶ 839, is irrelevant to the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants assert that FHFA Ex. 485 was not attached to Mr. Pinero's January 17, 2007 email but was instead dated January 18, 2007, any such dispute is not material to FHFA's motion. *Quarles*, 758 F.2d at 840. Undisputed that FHFA Ex. 485 is a Clayton Event Status Report dated January 18, 2007; it was attached to a January 18,

2007 email from Daniel Pinero to Brian Farrell. *See* FHFA Ex. 541 (CLAY_FHFA-E_000579516, email from Daniel Pinero to Brian Farrell regarding Greenwich//NAAC-0701- AR1) at CLAY_FHFA-E_000579516 (Mr. Pinero wrote, "Attached are the Final reports."). While Defendants argue that a "2W" grade does not necessarily constitute a "waiver" of an "outstanding issue" or a "material credit issue," they ignore the plain language of the Event Status Report: the loans graded 2W are labeled "2W: Material exceptions waived." FHFA Ex. 485 (CLAY_FHFA-E_000579528, Event Status – Detail, dated January 18, 2007 at 6:41 PM) at CLAY_FHFA-E_000579528 . Moreover, the 33 loans listed on the earlier Exception Detail Report all list issues or violations under "Outstanding Material Credit Exceptions" (Column Q) or "Outstanding Material Compliance Exceptions" (Column R). *See* FHFA Ex. 484 (CLAY_FHFA-E-000579503, Exception Detail Report, dated January 18, 2007) at CLAY_FHFA-E-000579503. The cited evidence relating to compensating factors and Mr. Farrell's testimony relating to loans graded 2W fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Likewise, Clayton's final narrative summary, which was issued after the loans had been waived, *compare* FHFA Ex. 485 (Event Status Detail Report for NAAC 2007-AR1, dated January 18, 2007) *with* FHFA Ex. 448 (RBS-FHFA-SDNY-0487363, Clayton due diligence narrative for NAAC 2007-AR1, dated January 29, 2007), fails to directly contravene earlier Clayton reports labeling the loans "material exceptions" and does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to Mr. Farrell's review, which found that none of the six 2W loans he reviewed "had material credit issues that were not offset by sufficient compensating factors" fails to directly contravene the asserted fact, which does

not make any representation as to whether the loans had compensating factors, and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to Nomura expert Michael Forester's finding that one loan "generally complied with originator's guidelines" and Mr. Hunter's opinion that underwriting defects in that loan "did not substantially increase the credit risk associated with the loan" fails to directly contravene the asserted fact relating to RBS waiving all outstanding issues and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants assert that Mr. Farrell testified that loans graded 2W "had no 'material' credit issues," the cited evidence does not support this assertion. RBS Ex. 5 (Deposition of Brian Farrell) at 504:5-506:13 instead shows that Mr. Farrell testified that a loan might be graded 2W because the initial issue had been cured, but might also be graded 2W because "Greenwich could give [the third-party vendor] instruction that it was acceptable," *id.* at 505:6-8, or because "there was an exception and the lender provided a rebuttal and Clayton agreed with the rebuttal." *Id.* at 505:6-16. Defendants cite no evidence that any of these reasons for a loan receiving a 2W grade indicate that a loan "had no 'material' credit issues." Similarly, while Defendants assert that only nine of the 33 loans listed in FHFA Ex. 484 were graded EV3 for "potentially disqualifying credit issues," they cite no evidence to support this assertion. Undisputed that only nine of the loans received a credit grade of 3, rather than 3C or 3D, but Defendants fail to cite any evidence that credit issues resulting in a 3C or 3D grade were neither "material" nor "potentially disqualifying." Indeed, the plain language of the Exception Detail Report contradicts Defendants' argument: the loans graded 3C are labeled "3C: Only curable material exceptions noted" and those graded 3D are labeled "3D: Missing material

documentation." FHFA Ex. 484 (see Columns K, "Credit Event Grade," and L, "Compliance Event Grade") at CLAY_FHFA-E-000579503. Moreover, all of the "curable" exceptions and exceptions pertaining to missing documentation are listed in either Column Q, "Outstanding Material Credit Exceptions," or Column R, "Outstanding Material Compliance Exceptions," despite the existence of Column S, "Non-Material Exceptions." *Id.* The cited documents relating to Mr. Farrell's testimony that Clayton or Nomura could change a loan grade from EV3 to EV2W fails to contravene the asserted fact since Defendants fail to provide any evidence that Clayton or Nomura did so here: it therefore does not create a genuine dispute of material fact. Part I.C, *supra*. Defendants also ignore evidence that contradicts their assertion that Clayton or Nomura may have waived the loans. *See* RBS Ex. 58 (Declaration of Brian Farrell) at ¶ 16 ("While I do not recall reviewing the NAAC 2007-AR1 Report back in 2007, as RBSSI's due diligence manager on that deal I believe I would have reviewed it at the time. In reviewing the report today, I used the same approach as was my practice in 2006 and 2007. … Based on my review of the exceptions, loan characteristics, and compensating factors, I would have made a determination as to whether RBSSI should accept the loan notwithstanding the exceptions identified by Clayton."); *id.* at ¶ 18 ("Upon reviewing various documents, it appears that I was able to report decisions to Clayton for a majority of the thirty-one [*sic*] loans identified in the NAAC 2007-AR1 Report in a relatively short amount of time."); *compare* FHFA Ex. 513 (NAAC 2007-AR1 Individual Asset Report cited by Mr. Farrell in RBS Ex. 58) at CLAY_FHFA-E_000579403-502 *with* FHFA Ex. 484 (Exception Detail Report) at CLAY_FHFA-E_000579503 (the two documents list the same loans, and both were attached to Mr. Pinero's email in RBS Ex. 96). Furthermore, Defendants

have repeatedly stressed that final event level grades were the responsibility of RBSSI. *See* RBSSI's responses to ¶¶ 818-819. Indeed, Defendants repeat such an assertion here when discussing the purpose of Clayton's grades: "FHFA completely misunderstands Clayton's purpose in reviewing loans and assigning grades, which was not to identify 'good' or 'bad' loans, but to flag issues for RBSSI for further review. … It was not unusual for RBSSI Credit group personnel, following review of Clayton's initial grade of '3' or '3C' or '3D', to determine that the loan should not be assigned a final '3' grade, based on the RBSSI Credit group employee's review of the relevant characteristics of the loan, review of loan documents as necessary, and consideration of any rebuttal and/or curing documents or information provided by the originator." Whether the loans graded 2W were waived by RBSSI itself or waived by Clayton and/or Nomura and then approved by RBSSI is not material to FHFA's motion. *Quarles*, 758 F.2d at 840.

840. **FHFA Statement:** RBS waived the material exceptions for these 33 loans—32% of all loans reviewed for NAAC 2007-AR1—and cleared all for securitization in NHELI 2007-1. Ex. 447 (RBS-FHFA-SDNY-0485153 (Event Status – Detail Report for NAAC 2007-AR1, Prepared by Clayton Services, dated January 24, 2007) at RBS-FHFA-SDNY-0485153 (showing 33 loans with "Final Credit Event" (Column D) as "2W: Material exceptions waived"); *see* Ex. 7 to the Cipione Decl. (filter Column A for "NHELI 2007-1" and Column E for "2W" (33 loans)).

**RBSSI Response:** RBSSI disputes that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure. FHFA did not timely designate Mr. Cipione as a fact or expert witness in this case, and RBSSI has not been given sufficient opportunity or time to examine Mr. Cipione concerning his work, which contains numerous errors as discussed in the Declaration of David N. Mishol submitted by the Nomura Defendants. To the extent a response is required, RBSSI disputes the assertion in ¶ 840.

As an initial matter, FHFA cites no evidence that any of the loans listed in FHFA Ex. 447 in fact had material credit exceptions. The Clayton Event Status report FHFA cites contains no information regarding the loan except for their Clayton grades as of January 24, 2007, and certainly contains no information regarding any "material exceptions" they may have, contrary to FHFA's assertion. In fact, the accompanying preliminary Clayton Exception detail report, FHFA Ex. 484, lists numerous compensating factors for many of

those loans, and Clayton itself reported in the final due diligence narrative for this project that there were "no credit issues" with the sample and that "[w]e found the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, which does not suggest a pattern of imprudent lending practices." FHFA Ex. 448 at RBS-FHFA-SDNY-0487363-64 (emphasis added). FHFA has no response to this evidence.

Moreover, Brian Farrell, RBSSI's credit officer that managed the loan-level diligence on the NHELI 2007-1 Securitization, reviewed the Clayton individual assessment summary reports for six of the loans identified as "2W" in FHFA Ex. 447, and concluded that none had material credit issues that were not offset by sufficient compensating factors, contrary to FHFA's assertion. RBS Ex. 58 (Farrell Decl.) at ¶¶ 12, 19-25. Nomura's reunderwriting expert, Michael Forester, also reunderwrote (as part of the sample of loans he reviewed) one of the loans (Loan ███████████) Clayton graded as "2W" that FHFA alleges had "outstanding issues" and which FHFA asserts RBSSI "waived," and opined that the loan generally complied with the originator's guidelines. Nomura Ex. 80 (Forester Report) at Exhibit 470. Further FHFA's own reunderwriting expert, Robert Hunter, also reviewed and reunderwrote that loan, and opined that any alleged underwriting defects in this loan "did not substantially increase the credit risk associated with the loan." RBS Ex. 81 (Hunter Report) at Exhibit 2. Again, FHFA has no response to this evidence.

FHFA also cites no evidence to establish generally that loans preliminarily graded as "2W" by Clayton had material credit issues. As Mr. Farrell testified, loans that Clayton re-graded "2W" in almost all instances were loans for which either (i) the issue identified by Clayton was "cured," (ii) a rebuttal was provided that RBSSI and/or Clayton agreed with, or (iii) RBSSI determined in its judgment that compensating factors offset a particular exception identified by Clayton, and on that basis RBSSI deemed the loan to be acceptable—in other words, the loans had no "material" credit issues. RBS Ex. 5 (Deposition of Brian Farrell) at 455:12-24 ("Q. We talked earlier about the grading that Clayton did on loans EV1, 2 and 3. Are you familiar with the term EV4? A. No. Q. What about EV2W? A. That is a loan that could have been, the exception was deemed acceptable. Q. Deemed by whom? A. Either Clayton or RBS."); id. at 502:2-7 ("Q. Would a cured loan register a 2 or 2W or some other designation? . . . A. I think that it could go either way."); id. at 504:5-506:13 ("Q. And do you recall that in the 2006/2007 time frame only RBS could assign a grade as 2W? ... A. Again, I can recall situations where loans were graded 2Ws based on items that were received for a cure or a rebuttal. Q. Different question, Do you recall that in the 2006/2007 time frame, only RBS itself could assign a grade of 2W? ... A. That was one of the items that could happen, that Greenwich could give them instruction that it was acceptable. The other were perhaps a loan was a 3 and a cure doc was received, and it could receive that grade. The other is that there was an exception and the lender provided a rebuttal and Clayton agreed with the rebuttal, it could also receive that grade for that reason."). Mr. Farrell further testified that "loans were just not waived" by RBSSI; they "were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade." Id. at 745:11-746:13 ("Q. How about across all of 2006 into the first quarter of 2007, would it surprise you if across all of RBS's diligence its waive-in rate was over 50

percent? ... A. Again, waive-in rate, I – are we speaking about 2W or you're just stating waiving? Because it's two different things. Q. Are you able to answer the question as I've asked it? ... A. Are you talking about specific the loan grading of 2W, or you're asking about a waiver practice in general? Q. Waivers by RBS? ... A. I don't know – I think I previously testified that loans were not just waived. Loans were, were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade."); RBS Ex. 82 (*MassMutual* Deposition of Brian Farrell) at 406:22-407:8 ("Q. Did RBS waive EV3s in the credit context from time to time? ... A. I don't agree with 'waive.' I don't agree with 'waive.' I think in general, as I previously said, the issues at hand that were flagged by Clayton or any other diligence firm were thoroughly reviewed and assessed, and based on that analysis performed, a determination would be made whether the loan is acceptable or not."). FHFA cites no evidence to rebut these statements.

RBSSI also disputes the assertion in ¶ 840 insofar as FHFA completely misunderstands Clayton's purpose in reviewing loans and assigning grades, which was not to identify "good" or "bad" loans, but to flag issues for RBSSI for further review. RBS Ex. 58 (Farrell Decl.) at ¶ 9 ("Loans assigned an initial grade of "3" were identified for my review. Clayton's initial grading of a loan as a "3" was not a final assessment, but rather a flag for me, as the RBSSI credit officer managing the due diligence project, to apply my professional judgment and make the final determination as to whether to accept the loan."). It was not unusual for RBSSI Credit group personnel, following review of Clayton's initial grade of "3" or "3C" or "3D", to determine that the loan should not be assigned a final "3" grade, based on the RBSSI Credit group employee's review of the relevant characteristics of the loan, review of loan documents as necessary, and consideration of any rebuttal and/or curing documents or information provided by the originator. *Id.* at ¶¶ 9-11 (discussing the preliminary nature of Clayton's grades and that RBSSI made the final determination regarding material exceptions); RBS Ex. 5 (Deposition of Brian Farrell) at 509:5-513:5 ("Q. So do I understand correctly that if a credit officer were ultimately of the opinion that a loan was a 3, that is a loan that would not be eligible for purchase? ... A. In what stage, of what Clayton has? Because this is, this is just a Clayton grade, right. Q. I'm talking about – A. Hold on, please let me finish. This isn't, this isn't an RBS grade. These are grades Clayton that is assigning. We spoke about yesterday about looking at certain grades, 2s, 3s, etc. So these are Clayton grades. These are flagged in a certain way so RBS has the opportunity to review exceptions that have been, that have been flagged. This isn't an RBS grade. This is, this is a Clayton grade. This was set up to determine flags of what should be looked at and what shouldn't be. So I don't want to get hung up on the 3 grade by itself because it's Clayton's grade, it's not an RBS grade.... Q. Do you know whether loans that were 3s but nevertheless purchased were ever included in securitizations sold to investors? . .. A. It's possible. Again, I want to be very clear here that a loan could have been graded a 3 by Clayton, so it could still be a 3, but I can still deem it to be acceptable. I don't want to get hung up on the actual grade. It's a Clayton grade that they're sending over, right, so you're saying it's a 3. That grade may never be changed. I may be – the loan itself, an exception may be acceptable to me. So am I changing the grade myself? No. I've reviewed the loan, I deem it to be acceptable. It still may be a Clayton 3, they may never change it, but in my mind the loan is acceptable."). Indeed, this was particularly true for

loans given a preliminary grade "3C" or "3D," which signaled that the alleged "material" issue was either curable ("3C") or concerned a missing document ("3D") that could and generally would be fixed by the originator. RBS Ex. 58 (Farrell Decl.) at ¶ 17 ("In circumstances where Clayton identified exceptions that were based on missing documentation, I would typically accept the loan if the missing documents were provided by the originator and that resulted in the identified exception being cleared, or if the originator represented that the missing documents would be provided, or if I determined that the missing documentation was unimportant or was offset by sufficient compensating factors to justify acceptance of the loan."). RBSSI notes that of the 33 loans with supposedly "material exceptions" for credit, 16 were graded as "3C" and three were graded "3D;" in other words, only nine loans (or 9% of the sample) were initially graded as "3" for potentially disqualifying credit issues. FHFA Ex. 484 (Clayton Exception Detail Report for NAAC 2007-AR1) at CLAY-FHFA-E 000579503.

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants "dispute[ ] that the Declaration of Charles Cipione is admissible or provides competent evidence of any material fact for purposes of FHFA's motion under Rule 56(d) of the Federal Rules of Civil Procedure," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. While Defendants argue that "FHFA cites no evidence that any of the loans listed in FHFA Ex. 447 in fact had material credit exceptions," they ignore the plain language of the Event Status Report: the loans graded 2W are labeled "2W: Material exceptions waived." *See* FHFA Ex. 447 (RBS-FHFA-SDNY-0485153, Event Status – Detail Report for NAAC 2007-AR1, Prepared by Clayton Services, dated January 24, 2007) at RBS-FHFA-SDNY-0485153 . Moreover, the 33 loans listed on the earlier Exception Detail Report all list issues or violations under "Outstanding Material Credit Exceptions" (Column Q) or "Outstanding Material Compliance Exceptions" (Column R). FHFA Ex. 484 (CLAY_FHFA-E-000579503, Exception Detail Report, dated January 18, 2007) at CLAY_FHFA-E-000579503. The cited evidence relating to compensating factors and Mr. Farrell's testimony relating to loans graded 2W fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Likewise, Clayton's final narrative summary, which was issued

after the loans had been waived, *compare* FHFA Ex. 485 (Event Status Detail Report for NAAC 2007-AR1, dated January 18, 2007) *with* FHFA Ex. 448 (Clayton due diligence narrative for NAAC 2007-AR1, dated January 29, 2007), fails to directly contravene earlier Clayton reports labeling the loans "material exceptions" and does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to Mr. Farrell's review, which found that none of the six 2W loans he reviewed "had material credit issues that were not offset by sufficient compensating factors" fails to directly contravene the asserted fact, which does not make any representation as to whether the loans had compensating factors, and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to Nomura expert Michael Forester's finding that one loan "generally complied with originator's guidelines" and Mr. Hunter's opinion that underwriting defects in that loan "did not substantially increase the credit risk associated with the loan" fails to directly contravene the asserted fact relating to RBS waiving material exceptions and therefore does not create a genuine dispute of material fact. Part I.C, *supra*. While Defendants assert that Mr. Farrell testified that loans graded 2W "had no 'material' credit issues," the cited evidence does not support this assertion. RBS Ex. 5 (Deposition of Brian Farrell) at 504:5-506:13 instead shows that Mr. Farrell testified that a loan might be graded 2W because the initial issue had been cured, but might also be graded 2W because "Greenwich could give [the third-party vendor] instruction that it was acceptable," *id.* at 505:6-8, or because "there was an exception and the lender provided a rebuttal and Clayton agreed with the rebuttal." *Id.* at 505:6-16. Defendants cite no evidence that any of these reasons for a loan receiving a 2W grade indicate that a loan "had no 'material' credit issues."

Similarly, while Defendants assert that only nine of the 33 loans graded EV3 were graded EV3 for "potentially disqualifying credit issues," they cite no evidence to support this assertion. Undisputed that only nine of the loans received a credit grade of 3, rather than 3C or 3D, but Defendants fail to cite any evidence that credit issues resulting in a 3C or 3D grade were neither "material" nor "potentially disqualifying." Indeed, the plain language of the Exception Detail Report listing all 33 loans contradicts Defendants' argument: the loans graded 3C are labeled "3C: Only curable material exceptions noted" and those graded 3D are labeled "3D: Missing material documentation." FHFA Ex. 484 (see Columns K, "Credit Event Grade," and L, "Compliance Event Grade") at CLAY_FHFA-E-000579503. Moreover, all of the "curable" exceptions and exceptions pertaining to missing documentation are listed in either Column Q, "Outstanding Material Credit Exceptions," or Column R, "Outstanding Material Compliance Exceptions," despite the existence of Column S, "Non-Material Exceptions." See *id.* The cited evidence relating to the purpose of Clayton's grades is irrelevant to the asserted fact and therefore does not create a genuine dispute of material fact. Part I.C, *supra.*

841. **FHFA Statement:** Although it took between 20 minutes and three hours to review a loan file, RBSSI issued over thirty overrides in the space of approximately one hour for the NHELI 2007-1 diligence sample. Ex. 384 (Deposition of James Whittemore) at 265:12-266:5 ("Q. If you did review a loan file to see if there were compensating factors for exceptions, how long would you typically take in reviewing the loan file? A. A lot would depend on what the exception was that I was reviewing or the loan file that I was reviewing, the thickness of the file, what was all in the file, did it take me 20 minutes to flip through the pages and review, did it take me three hours. You know, it would depend on the file itself. Q. Did you actually have time to spend three hours on a given loan file when you were chief underwriter at RBS? A. If I thought it was important, yes."); *compare* Ex. 486 (CLAY_FHFA-E_000579505, Event Status – Detail for NAAC 2007-AR1, Prepared by Clayton Services, dated January 18, 2007 at 5:35 PM) at CLAY_FHFA-E_000579505 (showing twenty-eight loans graded as 3, 3C, or 3D and one loan graded as 2W (Column D).) *with* Ex. 485 (CLAY_FHFA-E_000579528, Event Status – Detail for NAAC 2007-AR1, Prepared by Clayton Services, dated January 18,

2007 at 6:41 PM) at CLAY_FHFA-E_000579528 (showing one loan graded as a "3" and thirty-two loans graded as "2W: Material exceptions waived" (Column D).).

**RBSSI Response:** RBSSI disputes the assertion in ¶ 841. As an initial matter, and as stated in RBSSI's responses to ¶¶ 839 and 840 (which RBSSI incorporates by reference as if restated herein), FHFA cites no evidence that any of the loans identified in FHFA Exs. 485 and 486, which are Clayton Event Status reports and which do not contain any information other than the Clayton grade, contained "material exceptions" or that RBSSI "waived" those purported exceptions. Clayton itself concluded that the loans it reviewed had "no credit issues" and that the nature of the exceptions identified "does not suggest a pattern of imprudent lending practices." FHFA Ex. 448. The Clayton Exception Detail report concerning those loans lists numerous compensating factors that would warrant inclusion of the loans in the securitization notwithstanding Clayton's initial identification of an exception, FHFA Ex. 484 (Column U: "Compensating Factors"). Moreover, Mr. Farrell, reviewed the purported "material exceptions" for six of the loans graded as "2W," and concluded that they either had no exceptions or sufficient offsetting compensating factors (or both) such that they would have been acceptable to RBSSI. RBS Ex. 290 (Farrell Decl.) at ¶¶ 19-25. Further, Nomura's reunderwriting expert, Michael Forester, reunderwrote (as part of the sample of loans he reviewed) one of the loans (Loan ██████) Clayton graded as "2W" that FHFA alleges had "outstanding issues" and which FHFA asserts RBSSI "waived," and opined that the loan generally complied with the originator's guidelines. Nomura Ex. 80 (Forester Report) at Exhibit 470. FHFA's own reunderwriting expert, Robert Hunter, also reviewed and reunderwrote that loan, and opined that any alleged underwriting defects in this loan "did not substantially increase the credit risk associated with the loan." RBS Ex. 81 (Hunter Report) at Exhibit 2.

FHFA cites no evidence that RBSSI "issued over thirty overrides in the space of approximately one hour." In support of its assertion, FHFA relies on FHFA Exs. 486 and 485. FHFA Ex. 486 is a Clayton Event Status report that was attached to an email sent to Brian Farrell on January 18, 2007 at 5:38 pm and was described by Daniel Pinero in his cover email as "Prelim[inary]". RBS Ex. 96 (CLAY_FHFA-E_000579402-505). FHFA then points to FHFA Ex. 485, which is another Clayton Exception report that is time-stamped approximately one hour later and which identifies 31 loans (not 33 as FHFA incorrectly states) whose grades are listed as "2W" whereas they are listed as "3" or "3C" or "3D" in Ex. 486. FHFA provides no evidence, however, that RBSSI changed those grades, *contra* RBS Ex. 5 (Deposition of Brian Farrell) at 460:5-11 ("Q. Would Clayton ever on its own initiative change an EV3 to an EV2W, or was that a determination that RBS would make? ... A. Yeah, I think they could definitely make it into a 2W without RBS telling them to."), and, in any event, FHFA is wrong that there is no evidence that such waivers (even if done by RBSSI) necessarily occurred within the space of an hour based simply on the time stamp of the two Event Status reports. As Mr. Farrell explained, it was normal and routine for him to be "in frequent contact with Clayton employees, typically by telephone, discussing the types of exceptions the Clayton underwriters were identifying and informing the Clayton Client Service Manager which loans I determined had sufficient compensating factors based on [his] professional judgment," RBS Ex. 58 (Farrell Decl.) at ¶ 11, and, in fact, the record demonstrates that

throughout the day of January 18, 2007, Mr. Farrell and Clayton were in constant communication about issues with the loans and how to resolve them.  *See* RBS Ex. 95 (RBS-FHFA-SDNY-0487436, "FW: Greenwich/NAAC 2007-AR1 2007-01B") at RBS-FHFA-SDNY-0487436 (email chain between Brian Farrell and Clayton regarding issues with loans to foreign national borrowers and non-arm's length loans).  Indeed, upon receipt of Mr. Pinero's 5:38 pm email attached the first Clayton Event Status report (FHFA Ex. 486), Mr. Farrell responded "you told me 19 3s," demonstrating that the two had earlier communicated about the number of loans initially grades as 3's by Clayton, and suggests that the identification of 31 3's in Ex. 486 may have been a Clayton reporting error.  RBS Ex. 97 (RBS-FHFA-SDNY-0487463, "RE: Greenwich/NAAC 2007-AR1") at RBS-FHFA-SDNY-0487463.

Further, FHFA cites no evidence that the EV3's noted by Clayton on FHFA Ex. 486 could not have been resolved within the span of one hour.  FHFA mischaracterizes the testimony of Mr. Whittemore, who had no involvement in the NHEL 2007-1 Securitization, and who was specifically questioned about how long it would take him to review a loan file "[i]f you did review a loan file to see if there were compensating factors for exceptions." FHFA Ex. 384 (Deposition of James Whittemore) at 265:12-266:5.  Mr. Whittemore never testified that a review of the loan file was necessary in all instances to review and assess any exceptions flagged by third-party due diligence vendors in their reports, contrary to FHFA's assertion.  Mr. Farrell, who managed the loan-file due diligence on the NAAC 2007-AR1 sample, testified that he did not necessarily need to look at the loan file when reviewing the Clayton reports and addressing the issues therein.  RBS Ex. 90 (*CUNA* Deposition of Brian Farrell) at 74:15-75:14 ("Q.  Is it fair to say with respect to the due diligence that – the process that was going on, and let's talk about when you were at RBS, when RBS received due diligence results back from Clayton, okay, certain results come to you, did RBS then undertake to look at the actual loan file to resolve certain issues? A.  I can only speak to what I was doing.  Q.  Let's hear.  A.  So I don't think you can put all of this underneath one umbrella.  You know, and I'll give you an example.  I'll give you a hypothetical situation, that if a loan came to me with an exception, okay, so a loan report came to me with an exception of a missing appraisal, I don't think that it would serve me any purpose to look at the loan file."); *id.*  at 81:18-22 ("Q.  Okay.  So sometimes RBS would look at the entire loan file to deal with an EV3.  A.  Looking at an exception may not necessarily require looking at an entire loan file.  If the loan file has an exception, that's what you want to look at.").  In fact, Mr. Farrell testified that depending on the type of exception, he could go through the exception detail reports "very easily" to identify and resolve the stated issues.  RBS Ex. 68 (*Harborview* Deposition of Brian Farrell) at 170:22-172:11 ("Q.  About how much time would you spend with these IAS reports and exception detail reports that you received from Clayton during the time that you worked for Greenwich Capital? ... A.  How much time? Q.  Yes, did you spend hours, minutes, days? A.  I mean it would depend on what I got.  You know.  I mean I can very easily go through loans, go through a report, and if it is marking an exception that states, you know, we spoke about a missing HUD, it stated there is a missing HUD and Clayton didn't flag any other exceptions, that is probably not something that I would spend a lot of time on.  It is going to vary, number one, on the size of the attachments that we get and any of the exceptions that is associated with it.  Q.  Where there any instances that you recall that you went

back to the guidelines of Countrywide or the guidelines of American Home in connection with your review of Clayton reports? ...  A.  I think that there are definitely cases where I could reference guidelines.  I think that if there was an exception, I think that that question, or I'm sorry, if I had a question about a loan, that question would go directly to Clayton.  So in this case, Daniel Pinero is the project lead here, if I saw something on a loan that he marked on this IAS report I may pick up the phone and call Dan and say Dan, can you explain this or can you give me more information.").  Many of the loans in Clayton's January 18, 2007 Exception Detail report were flagged for the same types of issues.  FHFA Ex. 484 (Column Q); RBS Ex. 58 (Farrell Decl.) at ¶ 18 (identifying "substantial recurrence of the types of issues causing Clayton to flag the loans").

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Regarding Defendant's response relating to whether the loans contained "material exceptions" or whether RBSSI waived the exceptions, FHFA incorporates by reference its replies to ¶¶ 839 and 840.  While Defendants dispute that RBSSI "issued over thirty overrides in the space of approximately one hour," they cite no evidence to suggest that RBSSI did not issue the overrides in that time span.  The cited evidence relating to whether Clayton could waive loans on its own accord fails to contravene the asserted fact since Defendants cite no evidence to show that they did so here; it therefore fails to create a genuine dispute of material fact.  Part I.C, *supra*.  Indeed, Mr. Farrell's own statements indicate that he did approve of the waivers in that time span.  *See* RBS Ex. 58 (Declaration of Brian Farrell) at ¶ 16 ("While I do not recall reviewing the NAAC 2007-AR1 Report back in 2007, as RBSSI's due diligence manager on that deal I believe I would have reviewed it at the time.  In reviewing the report today, I used the same approach as was my practice in 2006 and 2007. … Based on my review of the exceptions, loan characteristics, and compensating factors, I would have made a determination as to whether RBSSI should accept the loan notwithstanding the exceptions identified by Clayton."); *id.* at ¶ 18 ("Upon reviewing various documents, it appears that I was able to report decisions to Clayton for a majority of the thirty-one [*sic*] loans identified in the

666

NAAC 2007-AR1 Report in a relatively short amount of time."); *compare* FHFA Ex. 513

(NAAC 2007-AR1 Individual Asset Report cited by Mr. Farrell in RBS Ex. 58) at

CLAY_FHFA-E_000579403-502 *with* FHFA Ex. 484 (Exception Detail Report) at

CLAY_FHFA-E_000579503 (the two documents list the same loans, and both, along

with FHFA Ex. 486, were attached to Mr. Pinero's email in RBS Ex. 96 at

CLAY_FHFA-E_000579402). The cited evidence relating to communication between

Mr. Farrell and Clayton fails to contravene the asserted fact and does not create a genuine

dispute of material fact. Part I.C, *supra*. The cited evidence relating to the time it takes

to resolve EV3 issues fails to directly contravene the asserted fact, which makes no

representations about how long it should take to resolve EV3 grades, and therefore does

not create a genuine dispute of material fact. Part I.C, *supra*. The cited language is not

contained in RBS Ex. 90, but FHFA does not dispute that this language does appear in

the full deposition transcript. While Defendants assert that FHFA Ex. 485 identifies 31

loans graded 2W, "not 33 as FHFA incorrectly states," this assertion is unsupported by

the evidence. ¶ 841 asserts that FHFA Ex. 485 lists "thirty-two loans graded as '2W:

Material exceptions waived' (Column D)," which is supported by the cited evidence. *See*

FHFA Ex. 485 (CLAY_FHFA-E_000579528, Event Status – Detail, dated January 18,

2007 at 6:41 PM) at CLAY_FHFA-E_000579528.

842.    **FHFA Statement:** There is no record of the reasons why the material exceptions on
these loans were waived by RBS. *See* Ex. 383 (Deposition of Brian Farrell) at 724:23-
725:7 ("Q. Do you know anything about two other Nomura deals, NHELI 2007-1 and
2007-2? A. I don't recall Nomura deals. Q. Do you have any idea if RBS performed
diligence on its own selected samples for those deals? A. I don't recall any Nomura
deals.").

        **RBSSI Response:** RBSSI disputes the assertion in ¶ 842. As stated in RBSSI's
responses to ¶¶ 839-841 (which RBSSI incorporates by reference as if restated herein),
there is substantial evidence in the record contradicting FHFA's assertion that the loans
had "material exceptions" or that RBSSI "waived" them. FHFA relies on Mr. Farrell's

testimony that he did not recall working on the Nomura Securitizations, but that statement, standing alone, does not even remotely support the assertion that there is "no record" of the reasons why the purported "material exceptions" were "waived by RBS."

First, there is substantial evidence refuting FHFA's basic assumption that a Clayton "2W' grade in fact demonstrates a "waiver" of a "material exception[]." To start, Clayton itself concluded, "[b]ased on [its] review" of the loans in the NAAC 2007-AR1 sample, that there were "*no credit issues. This percentage appears to be in-line with what we would normally expect from Alt-A originators*," despite the purported existed of loans graded "2W". FHFA Ex. 448 (Clayton due diligence narrative for NAAC 2007-AR1) at RBS-FHFA-SDNY-0487363 (emphasis added). Clayton further concluded that "the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, *which does not suggest a pattern of imprudent lending practices.*" *Id.* (emphasis added). Clayton's Exception Detail report (FHFA Ex. 484), further identifies numerous compensating factors for many of the loans, which is a reason to grade a loan a "2" or "2W" notwithstanding the purported existence of a material exception (which FHFA has not shown). Moreover, there is also substantial deposition testimony demonstrating that a loan graded "2W" by Clayton did not necessarily mean that it had a "material exception[ ]" or that such exception had been waived. RBS Ex. 5 (Deposition of Brian Farrell) at 455:12-24 ("Q. We talked earlier about the grading that Clayton did on loans EV1, 2 and 3. Are you familiar with the term EV4? A. No. Q. What about EV2W? A. That is a loan that could have been, the exception was deemed acceptable. Q. Deemed by whom? A. Either Clayton or RBS."); *id.* at 502:2-7 ("Q. Would a cured loan register a 2 or 2W or some other designation? ... A. I think that it could go either way."); *id.* at 504:5-506:13 ("Q. And do you recall that in the 2006/2007 time frame only RBS could assign a grade as 2W? ... A. Again, I can recall situations where loans were graded 2Ws based on items that were received for a cure or a rebuttal. Q. Different question, Do you recall that in the 2006/2007 time frame, only RBS itself could assign a grade of 2W? ... A. That was one of the items that could happen, that Greenwich could give them instruction that it was acceptable. The other were perhaps a loan was a 3 and a cure doc was received, and it could receive that grade. The other is that there was an exception and the lender provided a rebuttal and Clayton agreed with the rebuttal, it could also receive that grade for that reason."). Mr. Farrell further testified that "loans were just not waived" by RBSSI; they "were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade." *Id.* at 745:11-746:13 ("Q. How about across all of 2006 into the first quarter of 2007, would it surprise you if across all of RBS's diligence its waive-in rate was over 50 percent? ... A. Again, waive-in rate, I – are we speaking about 2W or you're just stating waiving? Because it's two different things. Q. Are you able to answer the question as I've asked it? ... A. Are you talking about specific the loan grading of 2W, or you're asking about a waiver practice in general? Q. Waivers by RBS? ... A. I don't know – I think I previously testified that loans were not just waived. Loans were, were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade."); RBS Ex. 82 (*MassMutual* Deposition of Brian Farrell) at 406:22-407:8 ("Q. Did RBS waive EV3s in the credit context from time to time? ... A. I don't agree with 'waive.' I don't agree with 'waive.' I think in general, as I previously said, the issues at hand that were flagged by Clayton or any other diligence firm were

thoroughly reviewed and assessed, and based on that analysis performed, a determination would be made whether the loan is acceptable or not."). Further, Mr. Farrell reviewed the Individual Asset Summary reports for six of the loans graded as "2W" in the NAAC 2007-AR1 sample that FHFA identifies as allegedly having material exceptions and, using the same approach as was his practice at the time the due diligence on the NAAC 2007-AR1 pool was conducted, concluded for each of those six loans that the loan either had no exceptions or sufficient compensating factors (or both) such that they would have been acceptable to RBSSI. RBS Ex. 58 (Farrell Decl.) at ¶¶ 19-25. Nomura's reunderwriting expert, Michael Forester, reunderwrote (as part of the sample of loans he reviewed) one of the loans (Loan 171710475) Clayton graded as "2W" that FHFA alleges had "outstanding issues" and which FHFA asserts RBSSI "waived," and opined that the loan generally complied with the originator's guidelines. Nomura Ex. 80 (Forester Report) at Exhibit 470. FHFA's own reunderwriting expert, Robert Hunter, also reviewed and reunderwrote that loan, and opined that any alleged underwriting defects in this loan "did not substantially increase the credit risk associated with the loan." RBS Ex. 81 (Hunter Report) at Exhibit 2.

Second, FHFA has not shown evidence that RBSSI in fact "waived" any material exception. To the contrary, Brian Farrell testified that Clayton could "definitely" change a loan from an EV3 to an EV2W "without RBS telling them to," RBS Ex. 5 (Deposition of Brian Farrell) at 460:5-11 ("Q. Would Clayton ever on its own initiative change an EV3 to an EV2W, or was that a determination that RBS would make? ... A. Yeah, I think they could definitely make it into a 2W without RBS telling them to."). The grading change could also reflect provision of curing documentation and/or a rebuttal explanation by Nomura, the loans' owner. *Id.* at 738:6-739:9 ("Q. And would the counterparty rebut Clayton's opinions as to whether loans had sufficient compensating factors or would they rebut the existence of missing documents, for instance? ... A. I think it would be, it could be anything. It could be compensating factors weren't, weren't considered. It could be the fact that they are at disagreement with Clayton's analysis, such as throughout their review perhaps Clayton missed something, they missed something in a document, their calculation may be wrong, something like that. Q. Was the rebuttal process between Clayton and the seller of the loan or was RBS involved in that? ... A. I think during most of the review it would be between the counterparty and Clayton, but it could be with RBS as well."); *id.* at 742:20-743:11 (explaining one reason why a loan might be changed from an "EV3" to an "EV2W" was "that a rebuttal was provided").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. While Defendants dispute the assertion that there is "no record" of why the exceptions were waived, they do not attempt to provide any evidence of such a record. All of Defendants' further objections were already laid out in ¶¶ 839-841. FHFA incorporates by reference its replies to those paragraphs as if restated herein.

843.    **FHFA Statement:** RBS also waived exceptions on 74, or 24% of the loans that were diligenced for NHELI 2007-2. Ex. 487 (RBS-FHFA-SDNY-0304403, Event Status – Detail Report for NHEL 2007-HE1, dated January 26, 2007) at RBS-FHFA-SDNY-0304403 (showing 74 loans with "Final Credit Event" (Column D) as "2W: Material exceptions waived").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 843. As stated in RBSSI's response to ¶ 839-842 (which RBSSI incorporates by reference as if fully restated herein), FHFA provides no evidence that any of the loans identified in FHFA Ex. 487, which is a January 26, 2007 Clayton Event Status report and which does not contain any information other than the Clayton grade, contained "material exceptions" or that RBSSI "waived" those purported exceptions. In fact, when questioned about the number of loans graded as "2W" in the Event Status report found in FHFA Ex. 487, Brian Farrell disputed FHFA's assertion that RBSSI "waived in" any of those loans and explained that the number of loans graded as 2W in that report was "not unusual" given how the review and rebuttal process worked. RBS Ex. 5 (Deposition of Brian Farrell) at 742:20-743:11 ("Q. So does that mean that every single loan that had at any time been graded a 3 on credit in this deal was ultimately waived in? ... A. No, I wouldn't say that it was waived in. I gave scenarios of why loans would be graded 2Ws when they may have initially been 3s, that perhaps there was a missing doc that was provided and that exception was cured, that a rebuttal was provided and/or a loan was deemed acceptable by RBS."); *id.* at 741:4-22 ("Q. Returning to this long list of 2Ws, am I right that at one point in the process they all would have been graded 3? ... A. It's possible, yes.... Q. Is it unusual to see this many 2Ws in an exception report? ... A. I don't think so, no.").

Further, Clayton itself stated in the due diligence narrative for the NAAC 2007-HE1 review that "[b]ased on [its] review we found an exception rate of .8% with compliance issues *and no credit issues. This percentage appears to be in-line with what we would normally expect from Alt-A originators.*" FHFA Ex. 450 (Clayton due diligence narrative for NHEL 2007-AR1) at RBS-FHFA-SDNY-0303869 (emphasis added). That narrative further contained the conclusion that "the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, *which does not suggest a pattern of imprudent lending practices.*" *Id.* (emphasis added).

Further, Nomura's reunderwriting expert, Michael Forester, reunderwrote two of the loans (Loan ███████ and Loan ███████ Clayton graded as "2W" that FHFA alleges had "outstanding issues" and which FHFA asserts RBSSI "waived," and opined that the loan generally complied with the originator's guidelines. RBS Ex. 80 (Forester Report) at Exhibits 524 and 550. FHFA's own reunderwriting expert, Robert Hunter, also opined that any alleged underwriting defects in Loan ███████ "did not substantially increase the credit risk associated with the loan." RBS Ex. 81 (Hunter Report) at Exhibit 2.

More fundamentally, FHFA also cites no evidence to establish generally that loans preliminarily graded as "2W" by Clayton had material credit issues. As Mr. Farrell testified, loans that Clayton re-graded "2W" in almost all instances were loans for which either (i) the issue identified by Clayton was "cured," (ii) a rebuttal was provided that

RBSSI and/or Clayton agreed with, or (iii) RBSSI determined in its judgment that compensating factors offset a particular exception identified by Clayton, and on that basis RBSSI deemed the loan to be acceptable—in other words, the loans had no "material" credit issues. RBS Ex. 5 (Deposition of Brian Farrell) at 455:12-24 ("Q. We talked earlier about the grading that Clayton did on loans EV1, 2 and 3. Are you familiar with the term EV4? A. No. Q. What about EV2W? A. That is a loan that could have been, the exception was deemed acceptable. Q. Deemed by whom? A. Either Clayton or RBS."); id. at 502:2-7 ("Q. Would a cured loan register a 2 or 2W or some other designation? ... A. I think that it could go either way."); id. at 504:5-506:13 ("Q. And do you recall that in the 2006/2007 time frame only RBS could assign a grade as 2W? ... A. Again, I can recall situations where loans were graded 2Ws based on items that were received for a cure or a rebuttal. Q. Different question, Do you recall that in the 2006/2007 time frame, only RBS itself could assign a grade of 2W? ... A. That was one of the items that could happen, that Greenwich could give them instruction that it was acceptable. The other were perhaps a loan was a 3 and a cure doc was received, and it could receive that grade. The other is that there was an exception and the lender provided a rebuttal and Clayton agreed with the rebuttal, it could also receive that grade for that reason."). Mr. Farrell further testified that "loans were just not waived" by RBSSI; they "were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade." *Id.* at 745:11-746:13 ("Q. How about across all of 2006 into the first quarter of 2007, would it surprise you if across all of RBS's diligence its waive-in rate was over 50 percent? ... A. Again, waive-in rate, I – are we speaking about 2W or you're just stating waiving? Because it's two different things. Q. Are you able to answer the question as I've asked it? ... A. Are you talking about specific the loan grading of 2W, or you're asking about a waiver practice in general? Q. Waivers by RBS? ... A. I don't know – I think I previously testified that loans were not just waived. Loans were, were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade."); RBS Ex. 82 (MassMutual Deposition of Brian Farrell) at 406:22-407:8 ("Q. Did RBS waive EV3s in the credit context from time to time? ... A. I don't agree with 'waive.' I don't agree with 'waive.' I think in general, as I previously said, the issues at hand that were flagged by Clayton or any other diligence firm were thoroughly reviewed and assessed, and based on that analysis performed, a determination would be made whether the loan is acceptable or not."). FHFA cites no evidence to rebut these statements.

RBSSI also disputes the assertion in ¶ 843 insofar as FHFA completely misunderstands Clayton's purpose in reviewing loans and assigning grades, which was not to identify "good" or "bad" loans, but to flag issues for RBSSI for further review. RBS Ex. 58 (Farrell Decl.) at ¶ 9 ("Loans assigned an initial grade of "3" were identified for my review. Clayton's initial grading of a loan as a "3" was not a final assessment, but rather a flag for me, as the RBSSI credit officer managing the due diligence project, to apply my professional judgment and make the final determination as to whether to accept the loan."). It was not unusual for RBSSI Credit group personnel, following review of Clayton's initial grade of "3" or "3C" or "3D", to determine that the loan should not be assigned a final "3" grade, based on the RBSSI Credit group employee's review of the relevant characteristics of the loan, review of loan documents as necessary, and consideration of any rebuttal and/or curing documents or information provided by the

originator. *Id.* at ¶¶ 9-11 (discussing the preliminary nature of Clayton's grades and that RBSSI made the final determination regarding material exceptions); RBS Ex. 5 (Deposition of Brian Farrell) at 509:5-513:5 ("Q.  So do I understand correctly that if a credit officer were ultimately of the opinion that a loan was a 3, that is a loan that would not be eligible for purchase?  .  ..  A.  In what stage, of what Clayton has? Because this is, this is just a Clayton grade, right.  Q.  I'm talking about – A.  Hold on, please let me finish.  This isn't, this isn't an RBS grade.  These are grades Clayton that is assigning. We spoke about yesterday about looking at certain grades, 2s, 3s, etc.  So these are Clayton grades.  These are flagged in a certain way so RBS has the opportunity to review exceptions that have been, that have been flagged.  This isn't an RBS grade.  This is, this is a Clayton grade.  This was set up to determine flags of what should be looked at and what shouldn't be.  So I don't want to get hung up on the 3 grade by itself because it's Clayton's grade, it's not an RBS grade....  Q.  Do you know whether loans that were 3s but nevertheless purchased were ever included in securitizations sold to investors? ...  A. It's possible.  Again, I want to be very clear here that a loan could have been graded a 3 by Clayton, so it could still be a 3, but I can still deem it to be acceptable.  I don't want to get hung up on the actual grade.  It's a Clayton grade that they're sending over, right, so you're saying it's a 3.  That grade may never be changed.  I may be – the loan itself, an exception may be acceptable to me.  So am I changing the grade myself? No.  I've reviewed the loan, I deem it to be acceptable.  It still may be a Clayton 3, they may never change it, but in my mind the loan is acceptable.").  Indeed, this was particularly true for loans given a preliminary grade "3C" or "3D," which signaled that the alleged "material" issue was either curable ("3C") or concerned a missing document ("3D") that could and generally would be fixed by the originator.  RBS Ex. 58 (Farrell Decl.) at ¶ 17 ("In circumstances where Clayton identified exceptions that were based on missing documentation, I would typically accept the loan if the missing documents were provided by the originator and that resulted in the identified exception being cleared, or if the originator represented that the missing documents would be provided, or if I determined that the missing documentation was unimportant or was offset by sufficient compensating factors to justify acceptance of the loan.").  RBSSI notes that of the 50 loans with supposedly "material exceptions" for credit (not 74 as FHFA mistakenly identifies), eight were graded as "3C" and seven were graded "3D;" in other words, only 35 loans (or 11.4% of the sample) were initially graded as "3" for potentially disqualifying credit issues.  FHFA Ex. 453 (Clayton Exception Detail Report for NAAC 2007-HE1) at RBS-FHFA-SDNY-0303869.

**FHFA Reply:**  Defendants do not genuinely dispute the asserted fact.  Regarding

Defendant's response relating to whether the loans contained "material exceptions" and

whether RBSSI waived the exceptions, FHFA incorporates by reference its replies to ¶¶

839 and 840.  Like FHFA Ex. 485, FHFA Ex. 487 labels loans graded 2W as "2W:

Material exceptions waived" (Column D, "Final Credit Event").  As was the case with

NAAC 2007-AR1, Clayton's final narrative summary was issued after the loans had been

waived. *Compare* FHFA Ex. 487 (Event Status Detail Report for NHEL 2007-HE1, dated January 26, 2007) *with* FHFA Ex. 450 (Clayton due diligence narrative for NHEL 2007-HE1, dated January 29, 2007). It therefore fails to directly contravene earlier Clayton reports labeling the loans "material exceptions" and does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to Mr. Farrell's opinion about whether 2W loans were always "waived in" or not fails to directly contravene the asserted fact since Defendants can point to no evidence that the loans here, labeled "2W: Material exceptions waived," were not waived in; it therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited evidence relating to Nomura expert Michael Forester's finding that two loans "generally complied with originator's guidelines" and Mr. Hunter's opinion that underwriting defects in one of those loans "did not substantially increase the credit risk associated with the loan" fails to directly contravene the asserted fact relating to RBS waiving 74 of the loans that were diligence for NHELI 2007-2 therefore does not create a genuine dispute of material fact. Part I.C, *supra*. The cited language at 742:20-25 is not contained in RBS Ex. 5, but FHFA does not dispute that this language does appear in the full deposition transcript.

844.    **FHFA Statement:**  There is no evidence of RBSSI's rationale for waiving the credit exceptions in the NHELI 2007-1 and NHELI 2007-2 diligence samples, and specifically no information on whether adequate compensating factors were present for the 107 loans. *See* Ex. 383 (Deposition of Brian Farrell) at 724:23-725:7 ("Q.  Do you know anything about two other Nomura deals, NHELI 20071 and 2007-2?  A.  I don't recall Nomura deals.  Q.  Do you have any idea if RBS performed diligence on its own selected samples for those deals?  A.  I don't recall any Nomura deals.").

**RBSSI Response:**  RBSSI disputes the assertion in ¶ 844.  As stated in RBSSI's response to ¶ 839-843 (which RBSSI incorporates by reference as if fully restated herein), FHFA provides no evidence that any of the loans graded by Clayton as "2W" in fact contained "material exceptions" or that RBSSI "waived" those purported exceptions.  FHFA relies on Mr. Farrell's testimony that he did not recall working on the Nomura Securitizations, but that statement, standing alone, does not even remotely support the assertion that there

is "no record" of the reasons why the purported "material exceptions" were "waived by RBS."

First, there is substantial evidence refuting FHFA's basic assumption that a Clayton "2W' grade in fact demonstrates a "waiver" of a "material exception[]." To start, Clayton itself concluded, "[b]ased on [its] review" of the loans in the NAAC 2007-AR1 and NHEL 2007-HE1 (and NHEL 2007-AF1) samples, that there were "*no credit issues. This percentage appears to be in-line with what we would normally expect from Alt-A originators*," despite the purported existence of loans graded "2W". FHFA Ex. 448 (Clayton due diligence narrative for NAAC 2007-AR1) at RBS-FHFA-SDNY-0487363 (emphasis added); FHFA Ex. 450 (Clayton due diligence narrative for NHEL 2007-AR1) at RBS-FHFA-SDNY-0303861 (emphasis added). Clayton further concluded that "the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, *which does not suggest a pattern of imprudent lending practices*." *Id.* Clayton's Exception Detail reports (FHFA Ex. 484 (NAAC 2007-AR1 Exception Detail Report spreadsheet) at CLAY_FHFA-E_000589503, RBS Ex. 98 (RBS-FHFA-SDNY-0303869, NHEL 2007-HE1 Exception Detail report) at RBS-FHFA-SDNY-0303869), further identify numerous compensating factors for many of the loans, which is a reason to grade a loan a "2" or "2W" notwithstanding the purported existence of a material exception (which FHFA has not shown). Further, Mr. Farrell reviewed the Individual Asset Summary reports for six of the loans graded as "2W" in the NAAC 2007-AR1 sample that FHFA identifies as allegedly having material exceptions and, using the same approach as was his practice at the time the due diligence on the NAAC 2007-AR1 pool was conducted, concluded for each of those six loans that the loan either had no exceptions or sufficient compensating factors (or both) such that they would have been acceptable to RBSSI. RBS Ex. 58 (Farrell Decl.) at ¶¶ 19-256. Nomura's reunderwriting expert, Michael Forester, reunderwrote (as part of the sample of loans he reviewed) three of the loans (Loan ▮▮▮▮▮, Loan ▮▮▮▮▮ and Loan ▮▮▮▮▮) Clayton graded as "2W" that FHFA alleges had "outstanding issues" and which FHFA asserts RBSSI "waived," and opined that the loan generally complied with the originator's guidelines. RBS Ex. 80 (Forester Report) at ¶ 19. FHFA's own reunderwriting expert, Robert Hunter, also opined that any alleged underwriting defects in Loans ▮▮▮▮▮ and ▮▮▮▮▮ "did not substantially increase the credit risk associated with the loan." RBS Ex. 81 (Hunter Report) at 102.

Moreover, there is also substantial deposition testimony demonstrating that a loan graded "2W" by Clayton did not necessarily mean that it had a "material exception[ ]" or that such exception had been waived. RBS Ex. 5 (Deposition of Brian Farrell) at 455:12-24 ("Q. We talked earlier about the grading that Clayton did on loans EV1, 2 and 3. Are you familiar with the term EV4? A. No. Q. What about EV2W? A. That is a loan that could have been, the exception was deemed acceptable. Q. Deemed by whom? A. Either Clayton or RBS."); *id.* at 502:2-7 ("Q. Would a cured loan register a 2 or 2W or some other designation? ... A. I think that it could go either way."); *id.* at 504:5-506:13 ("Q. And do you recall that in the 2006/2007 time frame only RBS could assign a grade as 2W? ... A. Again, I can recall situations where loans were graded 2Ws based on items that were received for a cure or a rebuttal. Q. Different question, Do you recall that in the 2006/2007 time frame, only RBS itself could assign a grade of 2W? ... A. That was

one of the items that could happen, that Greenwich could give them instruction that it was acceptable. The other were perhaps a loan was a 3 and a cure doc was received, and it could receive that grade. The other is that there was an exception and the lender provided a rebuttal and Clayton agreed with the rebuttal, it could also receive that grade for that reason."). Mr. Farrell further testified that "loans were just not waived" by RBSSI; they "were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade. *Id.* at 745:11-746:13 ("Q. How about across all of 2006 into the first quarter of 2007, would it surprise you if across all of RBS's diligence its waive-in rate was over 50 percent? ... A. Again, waive-in rate, I – are we speaking about 2W or you're just stating waiving? Because it's two different things. Q. Are you able to answer the question as I've asked it? ... A. Are you talking about specific the loan grading of 2W, or you're asking about a waiver practice in general? Q. Waivers by RBS? ... A. I don't know – I think I previously testified that loans were not just waived. Loans were, were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade."); RBS Ex. 82 (*MassMutual* Deposition of Brian Farrell) at 406:22-407:8 ("Q. Did RBS waive EV3s in the credit context from time to time? ... A. I don't agree with 'waive.' I don't agree with 'waive.' I think in general, as I previously said, the issues at hand that were flagged by Clayton or any other diligence firm were thoroughly reviewed and assessed, and based on that analysis performed, a determination would be made whether the loan is acceptable or not.").

Finally, FHFA has not shown evidence that RBSSI in fact "waived" any material exception. To the contrary, Brian Farrell testified that Clayton could "definitely" change a loan from an EV3 to an EV2W "without RBS telling them to," RBS Ex. 5 (Deposition of Brian Farrell) at 460:4-11 ("Q. Would Clayton ever on its own initiative change an EV3 to an EV2W, or was that a determination that RBS would make? ... A. Yeah, I think they could definitely make it into a 2W without RBS telling them to."). The grading change could also reflect provision of curing documentation and/or a rebuttal explanation by Nomura, the loans' owner. *Id.* at 738:6-739:9 ("Q. And would the counterparty rebut Clayton's opinions as to whether loans had sufficient compensating factors or would they rebut the existence of missing documents, for instance? ... A. I think it would be, it could be anything. It could be compensating factors weren't, weren't considered. It could be the fact that they are at disagreement with Clayton's analysis, such as throughout their review perhaps Clayton missed something, they missed something in a document, their calculation may be wrong, something like that. Q. Was the rebuttal process between Clayton and the seller of the loan or was RBS involved in that? ... A. I think during most of the review it would be between the counterparty and Clayton, but it could be with RBS as well."); *id.* at 742:20-743:11 (explaining one reason why a loan might be changed from an "EV3" to an "EV2W" was "that a rebuttal was provided").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. All of Defendants' objections were already laid out in ¶¶ 839-843. FHFA incorporates by reference its replies to those paragraphs as if restated herein.

845.  **FHFA Statement:**  Ultimately, all loans in NHEL 2007-HE1 that Clayton flagged as having material credit exceptions were waived. Ex. 487 (RBS-FHFA-SDNY-0304403, Event Status – Detail Report for NHEL 2007-HE1, dated January 26, 2007) at RBS-FHFA-SDNY-0304403 (showing 74 loans with "Final Credit Event" (Column D) as "2W: Material exceptions waived").

**RBSSI Response:**  RBSSI disputes the assertion in ¶ 845.  As stated in RBSSI's response to ¶ 839-844 (which RBSSI incorporates by reference as if fully restated herein), FHFA provides no evidence that any of the loans identified in FHFA Ex. 487, which is a January 26, 2007 Clayton Event Status report and which does not contain any information other than the Clayton grade, contained "material exceptions" or that RBSSI "waived" those purported exceptions.  In fact, when questioned about the number of loans graded as "2W" in the Event Status report found in FHFA Ex. 487, Brian Farrell disputed FHFA's assertion that RBSSI "waived in" any of those loans and explained that the number of loans graded as 2W in that report was "not unusual" given how the review and rebuttal process worked.  RBS Ex. 5 (Deposition of Brian Farrell) at 742:20-743:11 ("Q.  So does that mean that every single loan that had at any time been graded a 3 on credit in this deal was ultimately waived in? ...  A.  No, I wouldn't say that it was waived in.  I gave scenarios of why loans would be graded 2Ws when they may have initially been 3s, that perhaps there was a missing doc that was provided and that exception was cured, that a rebuttal was provided and/or a loan was deemed acceptable by RBS."); *id.* at 741:4-22 ("Q.  Returning to this long list of 2Ws, am I right that at one point in the process they all would have been graded 3? ...  A.  It's possible, yes....  Q.  Is it unusual to see this many 2Ws in an exception report? ...  A.  I don't think so, no.").

Further, Clayton itself concluded that the loans it reviewed had "no credit issues" and that the nature of the exceptions identified "does not suggest a pattern of imprudent lending practices." FHFA Ex. 450.  Nomura's reunderwriting expert, Michael Forester, reunderwrote (as part of the sample of loans he reviewed) two of the loans (Loan ▮▮▮▮▮▮▮ and Loan ▮▮▮▮▮▮▮) Clayton graded as "2W" that FHFA alleges had outstanding issues which RBSSI "waived," and opined that the loan generally complied with the originator's guidelines.  RBS Ex. 80 (Forester Report) at Exhibits 524 and 550.  FHFA's own reunderwriting expert, Robert Hunter, also opined that any alleged underwriting defects in Loan ▮▮▮▮▮▮ "did not substantially increase the credit risk associated with the loan." RBS Ex. 81 (Hunter Report) at Exhibit 2.

Moreover, there is also substantial deposition testimony demonstrating that a loan graded "2W" by Clayton did not necessarily mean that it had a "material exception[ ]" or that such exception had been waived.  RBS Ex. 5 (Deposition of Brian Farrell) at 455:12-24 ("Q.  We talked earlier about the grading that Clayton did on loans EV1, 2 and 3.  Are you familiar with the term EV4? A.  No.  Q.  What about EV2W? A.  That is a loan that could have been, the exception was deemed acceptable.  Q.  Deemed by whom? A. Either Clayton or RBS."); id.  at 502:2-7 ("Q.  Would a cured loan register a 2 or 2W or some other designation? ...  A.  I think that it could go either way."); id. at 504:5-506:13 ("Q.  And do you recall that in the 2006/2007 time frame only RBS could assign a grade as 2W? ...  A.  Again, I can recall situations where loans were graded 2Ws based on items that were received for a cure or a rebuttal.  Q.  Different question, Do you recall that in

the 2006/2007 time frame, only RBS itself could assign a grade of 2W? ... A. That was one of the items that could happen, that Greenwich could give them instruction that it was acceptable. The other were perhaps a loan was a 3 and a cure doc was received, and it could receive that grade. The other is that there was an exception and the lender provided a rebuttal and Clayton agreed with the rebuttal, it could also receive that grade for that reason."). Mr. Farrell further testified that "loans were just not waived" by RBSSI; they "were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade." *Id.* at 745:11-746:13 ("Q. How about across all of 2006 into the first quarter of 2007, would it surprise you if across all of RBS's diligence its waive-in rate was over 50 percent? ... A. Again, waive-in rate, I – are we speaking about 2W or you're just stating waiving? Because it's two different things. Q. Are you able to answer the question as I've asked it? ... A. Are you talking about specific the loan grading of 2W, or you're asking about a waiver practice in general? Q. Waivers by RBS? ... A. I don't know – I think I previously testified that loans were not just waived. Loans were, were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade."); RBS Ex. 82 (MassMutual Deposition of Brian Farrell) at 406:22-407:8 ("Q. Did RBS waive EV3s in the credit context from time to time? ... A. I don't agree with 'waive.' I don't agree with 'waive.' I think in general, as I previously said, the issues at hand that were flagged by Clayton or any other diligence firm were thoroughly reviewed and assessed, and based on that analysis performed, a determination would be made whether the loan is acceptable or not.").

Finally, FHFA has not shown evidence that RBSSI in fact "waived" any material exception. To the contrary, Brian Farrell testified that Clayton could "definitely" change a loan from an EV3 to an EV2W "without RBS telling them to," RBS Ex. 5 (Deposition of Brian Farrell) at 460:4-11 ("Q. Would Clayton ever on its own initiative change an EV3 to an EV2W, or was that a determination that RBS would make? ... A. Yeah, I think they could definitely make it into a 2W without RBS telling them to."). The grading change could also reflect provision of curing documentation and/or a rebuttal explanation by Nomura, the loans' owner. *Id.* at 738:6-739:9 ("Q. And would the counterparty rebut Clayton's opinions as to whether loans had sufficient compensating factors or would they rebut the existence of missing documents, for instance? ... A. I think it would be, it could be anything. It could be compensating factors weren't, weren't considered. It could be the fact that they are at disagreement with Clayton's analysis, such as throughout their review perhaps Clayton missed something, they missed something in a document, their calculation may be wrong, something like that. Q. Was the rebuttal process between Clayton and the seller of the loan or was RBS involved in that? ... A. I think during most of the review it would be between the counterparty and Clayton, but it could be with RBS as well."); id. at 742:20-743:11 (explaining one reason why a loan might be changed from an "EV3" to an "EV2W" was "that a rebuttal was provided").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. All of Defendants'

objections were already laid out in ¶¶ 839-844. FHFA incorporates by reference its

replies to those paragraphs as if restated herein.

846.    **FHFA Statement:** There is no record of the reasons why the material exceptions on
these loans were waived by RBS. Ex. 487 (RBS-FHFA-SDNY-0304403, Event Status –
Detail Report for NHEL 2007-HE1, dated January 26, 2007) at RBS-FHFA-SDNY-
0304403 (showing 74 loans with "Final Credit Event" (Column D) as "2W: Material
exceptions waived").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 846. As stated in RBSSI's
responses to ¶¶ 839-845 (which RBSSI incorporates by reference as if restated herein),
there is substantial evidence in the record that disputes FHFA's assertions that the loans
graded as "2W" in FHFA Ex. 487 or otherwise had "material exceptions" or that RBSSI
"waived" them. FHFA relies on Mr. Farrell's testimony that he did not recall working on
the Nomura Securitizations, but that statement, standing alone, does not even remotely
support the assertion that there is "no record" of the reasons why the purported "material
exceptions" were "waived by RBS."

First, there is substantial evidence refuting FHFA's basic assumption that a Clayton "2W'
grade in fact demonstrates a "waiver" of a "material exception[]." To start, Clayton itself
concluded, "[b]ased on [its] review" of the loans in the NHEL 2007-HE1 sample, that
there were "*no credit issues. This percentage appears to be in-line with what we would
normally expect from Alt-A originators,*" despite the purported existed of loans graded
"2W". FHFA Ex. 450 (Clayton due diligence narrative for NHEL 2007-HE1) at RBS-
FHFA-SDNY-0303869 (emphasis added). Clayton further concluded that "the nature
and overall level of credit and compliance exceptions to be what we typically find in the
industry, *which does not suggest a pattern of imprudent lending practices.*" *Id.*; FHFA
Ex. 448 (Clayton due diligence narrative for NAAC 2007-AR1) at RBS-FHFA-SDNY-
0487363 (emphasis added). Clayton's Exception Detail report (RBS Ex. 98 (RBS-FHFA-
SDNY-0303869, NHEL 2007-HE1 Exception Detail report) at RBS-FHFA-SDNY-
0303869), further identify numerous compensating factors for many of the loans, which
is a reason to grade a loan a "2" or "2W" notwithstanding the purported existence of a
material exception (which FHFA has not shown). Further, Mr. Farrell reviewed the
Individual Asset Summary reports for six of the loans graded as "2W" in the NAAC
2007-AR1 sample that FHFA identifies as allegedly having material exceptions and,
using the same approach as was his practice at the time the due diligence on the NAAC
2007-AR1 pool was conducted, concluded for each of those six loans that the loan either
had no exceptions or sufficient compensating factors (or both) such that they would have
been acceptable to RBSSI. RBS Ex. 58 (Farrell Decl.) at ¶¶ 19¬256. Nomura's
reunderwriting expert, Michael Forester, reunderwrote (as part of the sample of loans he
reviewed) two of the loans (Loan ▆▆▆▆▆ and Loan ▆▆▆▆▆) Clayton graded as
"2W" that FHFA alleges had outstanding issues, and opined that the loan generally
complied with the originator's guidelines. RBS Ex. 80 (Forester Report) at Exhibits 524
and 550. FHFA's own reunderwriting expert, Robert Hunter, also opined that any alleged

underwriting defects in Loan ████████ "did not substantially increase the credit risk associated with the loan." RBS Ex. 81 (Hunter Report) at Exhibit 2.

Moreover, there is also substantial deposition testimony demonstrating that a loan graded "2W" by Clayton did not necessarily mean that it had a "material exception[ ]" or that such exception had been waived. RBS Ex. 5 (Deposition of Brian Farrell) at 455:12-24 ("Q. We talked earlier about the grading that Clayton did on loans EV1, 2 and 3. Are you familiar with the term EV4? A. No. Q. What about EV2W? A. That is a loan that could have been, the exception was deemed acceptable. Q. Deemed by whom? A. Either Clayton or RBS."); *id.* at 502:2-7 ("Q. Would a cured loan register a 2 or 2W or some other designation? ... A. I think that it could go either way."); *id.* at 504:5-506:13 ("Q. And do you recall that in the 2006/2007 time frame only RBS could assign a grade as 2W? ... A. Again, I can recall situations where loans were graded 2Ws based on items that were received for a cure or a rebuttal. Q. Different question, Do you recall that in the 2006/2007 time frame, only RBS itself could assign a grade of 2W? ... A. That was one of the items that could happen, that Greenwich could give them instruction that it was acceptable. The other were perhaps a loan was a 3 and a cure doc was received, and it could receive that grade. The other is that there was an exception and the lender provided a rebuttal and Clayton agreed with the rebuttal, it could also receive that grade for that reason."). Mr. Farrell further testified that "loans were not just waived" by RBSSI; they "were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade." *Id.* at 745:11-746:13 ("Q. How about across all of 2006 into the first quarter of 2007, would it surprise you if across all of RBS's diligence its waive-in rate was over 50 percent? ... A. Again, waive-in rate, I – are we speaking about 2W or you're just stating waiving? Because it's two different things. Q. Are you able to answer the question as I've asked it? ... A. Are you talking about specific the loan grading of 2W, or you're asking about a waiver practice in general? Q. Waivers by RBS? ... A. I don't know – I think I previously testified that loans were not just waived. Loans were, were reviewed and analyzed and if they were deemed acceptable, then they, there is a chance that they could receive the 2W grade."); RBS Ex. 82 (*MassMutual* Deposition of Brian Farrell) at 406:22-407:8 ("Q. Did RBS waive EV3s in the credit context from time to time? ... A. I don't agree with 'waive.' I don't agree with 'waive.' I think in general, as I previously said, the issues at hand that were flagged by Clayton or any other diligence firm were thoroughly reviewed and assessed, and based on that analysis performed, a determination would be made whether the loan is acceptable or not.").

Finally, FHFA has not shown evidence that RBSSI in fact "waived" any material exception. To the contrary, Brian Farrell testified that Clayton could "definitely" change a loan from an EV3 to an EV2W "without RBS telling them to," RBS Ex. 5 (Deposition of Brian Farrell) ("Q. Would Clayton ever on its own initiative change an EV3 to an EV2W, or was that a determination that RBS would make? ... A. Yeah, I think they could definitely make it into a 2W without RBS telling them to."). The grading change could also reflect provision of curing documentation and/or a rebuttal explanation by Nomura, the loans' owner. *Id.* at 738:6-739:9 ("Q. And would the counterparty rebut Clayton's opinions as to whether loans had sufficient compensating factors or would they rebut the existence of missing documents, for instance? ... A. I think it would be, it

could be anything. It could be compensating factors weren't, weren't considered. It could be the fact that they are at disagreement with Clayton's analysis, such as throughout their review perhaps Clayton missed something, they missed something in a document, their calculation may be wrong, something like that. Q. Was the rebuttal process between Clayton and the seller of the loan or was RBS involved in that? ... A. I think during most of the review it would be between the counterparty and Clayton, but it could be with RBS as well."); *id.* at 742:20-743:11 (explaining one reason why a loan might be changed from an "EV3" to an "EV2W" was "that a rebuttal was provided").

**FHFA Reply:** Defendants do not genuinely dispute the asserted fact. All of Defendants' objections were already laid out in ¶¶ 839-845. FHFA incorporates by reference its replies to those paragraphs as if restated herein. While Defendants dispute the assertion that there is "no record" of why the exceptions were waived, they do not attempt to provide any evidence of such a record.

     5.     <u>RBSSI Failed To Conduct Additional Diligence On Loans Made By Originators About Which It Had Concerns</u>

     (a)     *Fremont: "FraudMont"*

847.    **FHFA Statement:** The relevant SLG of NHELI 2006-FM2 Securitization contained 3,891 loans originated by Fremont. Cipione Decl. Ex. 1 to the Cipione Decl. (Tab "Grice": Row 204, Column G).

**RBSSI Response:** RBSSI does not dispute the assertion that the "Group I" mortgage loans in the NHELI 2006-FM2 trust initially consisted of 3,891 loans originated by Fremont. RBSSI disputes the assertion in ¶ 847 to the extent it states or implies that the "Group II" loans did not also support Freddie Mac's certifications through overcollateralization. FHFA Ex. 7 (NHELI 2006-FM2 Prospectus Supplement) at NOM-FHFA_04638450-53.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that NHELI 2006-FM2 contained the 3,891 loans originated by Fremont. While RBSSI then makes an assertion regarding the "'Group II'" loans, this assertion is irrelevant to the asserted fact and therefore do not create a genuine dispute of material fact. Part I.C, *supra*.

848. **FHFA Statement:** In a "whole loan color" update circulated to RBSSI personnel on January 6, 2007 Frank Skibo, an RBS trader, called Fremont "the king of EPDs." Ex. 488 (RBS-FHFA-CT-3935754, email regarding Last weeks whole loan color – NOT FOR DISTRIBUTION, INTERNAL USE ONLY) at RBS-FHFA-CT-3935755 ("Fremont (the king of EPDs) - one begins to question how long can they stand to buy back all of these EPDs. I spoke to Koch about this and he tells me that they still have not see any improvement.").

**RBSSI Response:** The email cited in ¶ 848 post-dates the NHELI 2006-FM2 Securitization by several months and thus the facts and/or circumstances regarding the "'whole loan color' update" in FHFA Ex. 488 are not "material facts" in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI disputes the assertion in ¶ 848 insofar as FHFA mischaracterizes the document and omits material information. FHFA quotes a single sentence from FHFA Ex. 488, which is a nine-page email chain spanning over two months, and which specifically concerns "Last weeks whole loan color," *i.e.*, the week of December 31, 2006. Immediately after the quoted language, Mr. Skibo writes: "[Fremont] continue[s] to tighten underwriting guidelines: - no stated income loans over 95% LTV, - using the lower of purchase price or appraisal for refis less than 12mos and - 80/20 combo minimum FICO is increasing." FHFA Ex. 488 (email regarding Last weeks whole loan color – NOT FOR DISTRIBUTION, INTERNAL USE ONLY) at RBS-FHFA-CT-3935755. RBSSI further disputes ¶ 848 to the extent it states or implies that RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at the time of the NHEL 2006-FM2 Securitization. *See* RBS Ex. 99 (Memorandum regarding Fremont Investment & Loan 2006-3 dated September 20, 2006) at RBS-FHFA-CT-6943517-18 ("From September 5th to September 20th a due diligence review was conducted at the corporate offices of Fremont Investment and Loan.... 1020 loans were reviewed in connection an upcoming whole loan transaction....2764 loans had AVMs run by CoreLogic and 392 of those had BPOs completed. . .. There are one hundred (100) loans or 9.84% of the pool with exceptions. This is in line with findings from other Alt A lenders and with our previous reviews at Fremont."); RBS Ex. 100 (RBS-FHFA-CT-4072104, RBS Greenwich Capital Credit Risk Department Monthly Management Report, dated September 2006) at RBS-FHFA-CT-4072251 ("The loans originated by [Fremont] can be regarded as generic sub prime mortgages that are well underwritten and are at the upper end of the subprime universe[.]"); *id.* at RBS-FHFA-CT-4072252 ("The risk profile of Fremont's mortgage loans is representative of the industry. Positive credit characteristics include high average loan balances (in excess of $200,000) and FICO scores above 620 are in the mid to upper range for sub prime borrowers. There is a good correlation between larger loan balances and improved loss severity levels. One can also see that Fremont has significantly increased coupons over the last 12 months from 7.10% in 2005 to 8.35% for the first half of 2006 and 8.58% for loans in the pending securitization.... [M]any of the stated income programs have been modified or curtailed and the level of full documented loans has increased[.]"); *id.* at RBS-FHFA-CT-4072255 ("During the week of September 5th, RBSGC conducted loan level due diligence on site at Fremont's offices in connection with a pending whole loan purchase/securitization. A statistically significant sample of 99 loans were selected . . . . "Overall, no major credit or compliance issues were identified. The loans were

considered to be of average quality and eligible for a secondary market transaction."). RBSSI further disputes ¶ 848 to the extent that it states or implies that the cause of early payment defaults stemmed from the failure to follow originators' guidelines. Rather, early payment defaults resulted from originators' guidelines becoming more permissive. *See, e.g.,* RBS Ex. 101 (Deposition of Paul Goudie) at 284:12-25 ("Q. So it looks like there's been an increase in early payment defaults. Right? Sorry, for subprime originations...And it looks like the reason for those increased EPDs has been a greater influx of loans with lower FICOs, higher LTVs; right?" ... A. Yeah, I think that's driven by the more permissive loan programs we talked about earlier on."); RBS Ex. 7 (Deposition of William Gallagher) at 711:11-22 (Q. Why did RBS reevaluate its due diligence process in mid-2006? ... A. I think over the period of time certainly the markets were more difficult. We – we'd experienced a, an increased rate of, of early payment defaults. I think originators' guidelines had become more lenient in the time period. And it was our view that we needed to try and do more to improve the process.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the "whole loan color" update post-dates the NHELI 2006-FM2 deal and that the statements made within that document are not "'material facts,'" Fremont loans, however, were, in fact, included in the NHELI 2007-2 Securitization and RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. While RBSSI argues that ¶ 848 does not properly characterize the document and omits "material information," citing to statements regarding Fremont continuing to tighten underwriting guidelines, these statements are irrelevant to the asserted fact that Mr. Skibo referred to Fremont as "the king of EPDs" and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI "disputes" ¶ 848 to the extent that it states or implies that "RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at the time of the NHEL 2006-FM2 Securitization[,]" citing RBS. Exs. 99 and 100, RBSSI's assertion is not supported by the cited exhibits. RBS. Ex. 100 also indicates that "The increased level of loan repurchase activity is an issue that should be monitored closely and represent the principal risk issue to emerge since the last review. Although an industry-wide issue, the level of repurchases by

Fremont is relatively large with management asserting that it is largely loan program

specific… While the company has modified its underwriting guidelines in an effort to

address this issue, the impact of these changes will most likely not been seen until the

fourth quarter of 2006 and the first quarter of 2007."  RBS Ex. 100 at RBS-FHFA-CT-

4072251.  Finally, while RBSSI "disputes" the asserted fact to the extent it states or

implies "that the cause of early payment defaults stemmed from the failure to follow

originators' guidelines[,]" this assertion is irrelevant to the asserted fact and fails to

directly contravene the asserted fact that Mr. Skibo referred to Fremont as "the king of

EPDs."  In fact the testimony cited in RBS Ex. 101 fails to mention Fremont at all.

Therefore, RBSSI's assertion does not create a genuine dispute of material fact.  Part I.C,

*supra*.

849.   **FHFA Statement:**  One month earlier, Peter McMullin, another RBSSI trader, referred
to Fremont as "FraudMont." Ex. 489 (RBS-FHFA-CT-5957592, December 6, 2006 email
from Peter McMullin to Frank Skibo) at RBS-FHFA-CT-5957592 ("See if FraudMont
wants to buy back the resid[ual] on FHLT 06-2"); Ex. 490 (RBS-FHFA-CT-6037018,
March 6, 2007 email regarding Fremont Fraud Thoughts) at RBS-FHFA-CT-6037018
("Who knows how long Fremont will be around so lets make Fraudmont a priority.").

**RBSSI Response:**  The email cited in FHFA Ex. 489 post-dates the NHELI 2006-FM2
Securitization (the only Nomura Securitization with more than an insignificant amount of
Fremont loans) by several months and thus the facts and/or circumstances regarding the
content of that email are not "material facts" at issue in this litigation under Local Rule
56.1 or otherwise to which a response is required.  To the extent a response is required,
RBSSI does not dispute that FHFA Ex. 849 contains the language quoted by FHFA, but
disputes the assertion to the extent it states or implies that RBSSI had concerns regarding
whether Fremont generally originated loans in accordance with its guidelines at the time
of the NHEL 2006-FM2 Securitization.  *See* RBS Ex. 99 (Memorandum regarding
Fremont Investment & Loan 2006-3 dated September 20, 2006) at RBS-FHFA-CT-
6943517-18 ("From September 5th to September 20th a due diligence review was
conducted at the corporate offices of Fremont Investment and Loan....  1020 loans were
reviewed in connection an upcoming whole loan transaction....2764 loans had AVMs run
by CoreLogic and 392 of those had BPOs completed....  There are one hundred (100)
loans or 9.84% of the pool with exceptions.  This is in line with findings from other Alt A
lenders and with our previous reviews at Fremont."); RBS Ex. 100 (RBS-FHFA-CT-
4072104, RBS Greenwich Capital Credit Risk Department Monthly Management Report,
dated September 2006) at RBS-FHFA-CT-4072251 ("The loans originated by [Fremont]

can be regarded as generic sub prime mortgages that are well underwritten and are at the upper end of the subprime universe[.]"); *id.* at RBS-FHFA-CT-4072252 ("The risk profile of Fremont's mortgage loans is representative of the industry. Positive credit characteristics include high average loan balances (in excess of $200,000) and FICO scores above 620 are in the mid to upper range for sub prime borrowers. There is a good correlation between larger loan balances and improved loss severity levels. One can also see that Fremont has significantly increased coupons over the last 12 months from 7.10% in 2005 to 8.35% for the first half of 2006 and 8.58% for loans in the pending securitization.... [M]any of the stated income programs have been modified or curtailed and the level of full documented loans has increased[.]"); *id.* at RBS-FHFA-CT-4072255 ("During the week of September 5th, RBSGC conducted loan level due diligence on site at Fremont's offices in connection with a pending whole loan purchase/securitization. A statistically significant sample of 99 loans were selected . . . . "Overall, no major credit or compliance issues were identified. The loans were considered to be of average quality and eligible for a secondary market transaction."). RBSSI further disputes ¶ 849 to the extent that it states or implies that the cause of early payment defaults stemmed from the failure to follow originators' guidelines. Rather, early payment defaults resulted from originators' guidelines becoming more permissive. *See, e.g.*, RBS Ex. 101 (Deposition of Paul Goudie) at 284:12-25 ("Q. So it looks like there's been an increase in early payment defaults. Right? Sorry, for subprime originations...And it looks like the reason for those increased EPDs has been a greater influx of loans with lower FICOs, higher LTVs; right?" ... A. Yeah, I think that's driven by the more permissive loan programs we talked about earlier on."); RBS Ex. 7 (Deposition of William Gallagher) at 711:11-22 (Q. Why did RBS reevaluate its due diligence process in mid-2006? ... A. I think over the period of time certainly the markets were more difficult. We – we'd experienced a, an increased rate of, of early payment defaults. I think originators' guidelines had become more lenient in the time period. And it was our view that we needed to try and do more to improve the process.").

RBSSI further disputes the assertion in ¶ 849 insofar as it relies on statements made by Peter McMullin, who is not a defendant in this action, and has not been deposed. Mr. McMullin is on the schedule to be deposed and therefore RBSSI reserves the right to submit additional evidence regarding FHFA Ex. 489. F.R.C.P. 56(d).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not

dispute the testimony cited in ¶ 849. While RBSSI argues that the email cited post-dates

the NHELI 2006-FM2 Securitization, Fremont loans were, in fact, included in NHELI

2007-2 and RBSSI's argument does not create a genuine dispute of material fact. Part

I.A, *supra*. While RBSSI "disputes" ¶ 849 to the extent that it states or implies that

"RBSSI had concerns regarding whether Fremont generally originated loans in

accordance with its guidelines at the time of the NHEL 2006-FM2 Securitization[,]"

citing RBS. Exs. 99 and 100, RBSSI's assertion is not supported by the cited exhibits. RBS Ex. 99 is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. RBS. Ex. 100 also indicates that "The increased level of loan repurchase activity is an issue that should be monitored closely and represent the principal risk issue to emerge since the last review. Although an industry-wide issue, the level of repurchases by Fremont is relatively large with management asserting that it is largely loan program specific… While the company has modified its underwriting guidelines in an effort to address this issue, the impact of these changes will most likely not been seen until the fourth quarter of 2006 and the first quarter of 2007." RBS Ex. 100 at RBS-FHFA-CT-4072251. While RBSSI "disputes" the asserted fact to the extent it states or implies "that the cause of early payment defaults stemmed from the failure to follow originators' guidelines[,]" this assertion is irrelevant to the asserted fact and fails to directly contravene the asserted fact that Mr. McMullin referred to Fremont as "Fraudmont." In fact the testimony cited in RBS Ex. 101 fails to mention Fremont at all. Therefore, RBSSI's assertion does not create a genuine dispute of material fact. Part I.C, *supra*. Finally, while RBSSI "disputes" ¶849 insofar as it relies on statements made by Peter McMullin who has not been deposed, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Furthermore, any dispute about whether Mr. McMullin has been deposed is not material to FHFA's motion and does not entitle RBS to submit additional evidence. *Quarles*, 758 F.2d at 840.

850. **FHFA Statement:** On August 22, 2006, RBSSI noted that Fremont "has had a very big spike in repurchase activity for the quarter...". *See, e.g.*, Ex. 491 (RBS-FHFA-SDNY-0398202, email regarding Fremont – Re Purchase Activity) at RBS-FHFA-SDNY-0398202 ("Fremont has had a very big spike in repurchase activity for the quarter with $238m in loans re-purchased.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 850 insofar as FHFA mischaracterizes the document and omits material information. As clearly shown in Goudie's August 22, 2006 email in FHFA Ex. 491, Fremont disclosed this information about increased repurchase activity in its Form 10Q. This e-mail merely discusses information that was publicly disclosed by Fremont and available to all market participants. Additionally, immediately after the quoted language, the email goes on to explain that Fremont "ha[s] also announced the curtailment of some of the lower FICO, higher LTV loan programs. As we are doing the review at present I'd like to try and have a call with them some time either this week ... or next week to get some more color. It is hard to glean that much from the disclosure in the 10Q other than it is a big jump." FHFA Ex. 491 (email regarding Fremont – Re Purchase Activity) at RBS-FHFA-SDNY-0398202. RBSSI further disputes the assertion in ¶ 850 disputes to the extent it states or implies that RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at the time of the NHEL 2006-FM2 Securitization. *See* RBS Ex. 99 (Memorandum regarding Fremont Investment & Loan 2006-3 dated September 20, 2006) at RBS-FHFA-CT-6943517-18 ("From September 5th to September 20th a due diligence review was conducted at the corporate offices of Fremont Investment and Loan.... 1020 loans were reviewed in connection an upcoming whole loan transaction....2764 loans had AVMs run by CoreLogic and 392 of those had BPOs completed.... There are one hundred (100) loans or 9.84% of the pool with exceptions. This is in line with findings from other Alt A lenders and with our previous reviews at Fremont."); RBS Ex. 100 (RBS-FHFA-CT-4072104, RBS Greenwich Capital Credit Risk Department Monthly Management Report, dated September 2006) at RBS-FHFA-CT-4072251 ("The loans originated by [Fremont] can be regarded as generic sub prime mortgages that are well underwritten and are at the upper end of the subprime universe[.]"); *id.* at RBS-FHFA-CT-4072252 ("The risk profile of Fremont's mortgage loans is representative of the industry. Positive credit characteristics include high average loan balances (in excess of $200,000) and FICO scores above 620 are in the mid to upper range for sub prime borrowers. There is a good correlation between larger loan balances and improved loss severity levels. One can also see that Fremont has significantly increased coupons over the last 12 months from 7.10% in 2005 to 8.35% for the first half of 2006 and 8.58% for loans in the pending securitization. . . . [M]any of the stated income programs have been modified or curtailed and the level of full documented loans has increased[.]"); *id.* at RBS-FHFA-CT-4072255 ("During the week of September 5th, RBSGC conducted loan level due diligence on site at Fremont's offices in connection with a pending whole loan purchase/securitization. A statistically significant sample of 99 loans were selected .... "Overall, no major credit or compliance issues were identified. The loans were considered to be of average quality and eligible for a secondary market transaction.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI argues that ¶ 850 does not properly characterize the document and omits "material information," citing to statements regarding Fremont's curtailment of some of the lower FICO, higher LTV programs and RBSSI's review of them; these statements are irrelevant to the asserted fact

that Fremont "has had a very big spike in repurchase activity for the quarter…," are contravened by Ex. 100 which states that "the impact of these changes will most likely not been seen until the fourth quarter of 2006 and the first quarter of 2007," RBS Ex. 100 at RBS-FHFA-CT-4072251, and do not create a genuine dispute of material fact. Part I.C, *supra*. Further as RBSSI itself points out, Mr. Goudie stated (in regards to the spike in repurchase activity) "it is a big jump." FHFA Ex. 491 at RBS-FHFA-SDNY-0398202. While RBSSI "disputes" ¶ 850 to the extent that it states or implies that "RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at the time of the NHEL 2006-FM2 Securitization[,]" citing RBS. Exs. 99 and 100, RBSSI's assertion is not supported by the cited exhibits. RBS Exs. 99 and 100 are irrelevant to the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*.

851.    **FHFA Statement:**  On August 23, James Whittemore suggested that RBSSI "try and hold [Fremont] more to their published guidelines rather than guidelines plus exceptions." *See, e.g.*, Ex. 491 (RBS-FHFA-SDNY-0398202, email regarding Fremont – Re Purchase Activity) at RBS-FHFA-SDNY-0398202 ("As a group, I'm thinking we may want to try and hold the client more to their published guidelines rather than guidelines plus exceptions. (this would be for all clients not only sub-prime lenders).").

   **RBSSI Response:**  RBSSI disputes the assertion in ¶ 851 as it mischaracterizes or improperly paraphrases the cited document. The cited language is from an email in response to the one discussed in ¶ 850 regarding Fremont tightening its guidelines. Mr. Whittemore's comments about "hold[ing] the client more to their published guidelines rather than guidelines plus exceptions," was not aimed at Fremont directly, but expressly stated to include "all clients, not just subprime lenders." FHFA Ex. 491 (email regarding Fremont – Re Purchase Activity) at RBS-FHFA-SDNY-0398202. RBSSI further disputes the assertion in ¶ 851 to the extent it states or implies that RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at or around the time of the NHEL 2006-FM2 Securitization. *See* RBS Ex. 102 (Fremont Investment and Loan Seconds Pool Purchase Review from Frank Camacho dated September 7, 2005) at RBS-FHFA-CT-6163687-89 ("A review was conducted at Fremont Investment and Loan the week of August 29, 2005 .... The purpose of the review was a pre-purchase evaluation of recent production consisting primarily of 100% second mortgages. . .. All 333 loans were to receive a full legal, compliance, credit and property review.... The overall level of material credit, compliance, and property

exceptions is average for a subprime lender and overall we would expect this pool to perform similar to [a] comparable subprime transaction."); RBS Ex. 99 (RBS-FHFA-CT-6943517, Memorandum regarding Fremont Investment & Loan 2006-3 dated September 20, 2006) at RBS-FHFA-CT-6943517-18 ("From September 5th to September 20th a due diligence review was conducted at the corporate offices of Fremont Investment and Loan.... 1020 loans were reviewed in connection an upcoming whole loan transaction....2764 loans had AVMs run by CoreLogic and 392 of those had BPOs completed.... There are one hundred (100) loans or 9.84% of the pool with exceptions. This is in line with findings from other Alt A lenders and with our previous reviews at Fremont."); RBS Ex. 100 (RBS-FHFA-CT-4072104, RBS Greenwich Capital Credit Risk Department Monthly Management Report, dated September 2006) at RBS-FHFA-CT-4072255 ("During the week of September 5th, RBSGC conducted loan level due diligence on site at Fremont's offices in connection with a pending whole loan purchase/securitization. A statistically significant sample of 99 loans were selected .... "Overall, no major credit or compliance issues were identified. The loans were considered to be of average quality and eligible for a secondary market transaction."). RBSSI further disputes ¶ 851 to the extent that it states or implies that the cause of early payment defaults stemmed from the failure to follow guidelines. Rather, early payment defaults resulted from originators' guidelines becoming more permissive. *See, e.g.*, Ex. 101 (Deposition of Paul Goudie) at 284:12-25 ("Q. So it looks like there's been an increase in early payment defaults. Right? Sorry, for subprime originations...And it looks like the reason for those increased EPDs has been a greater influx of loans with lower FICOs, higher LTVs; right?" ... A. Yeah, I think that's driven by the more permissive loan programs we talked about earlier on."); Ex. 7 (Deposition of William Gallagher) at 711:11-22 (Q. Why did RBS reevaluate its due diligence process in mid-2006? ... A. I think over the period of time certainly the markets were more difficult. We – we'd experienced a, an increased rate of, of early payment defaults. I think originators' guidelines had become more lenient in the time period. And it was our view that we needed to try and do more to improve the process.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI argues that ¶ 851 does not properly characterize the cited document, asserting that Mr. Whittemore was referring to "'all clients, not just subprime lenders[,]'" however, RBSSI's assertion fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI "disputes" ¶ 851 to the extent that it states or implies that "RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at the time of the NHEL 2006-FM2 Securitization[,]" citing RBS. Exs. 99, 100 and 102, RBSSI's assertion is not supported by the cited exhibits. Also noted in RBS Ex. 102: "[a]ll loans in both samples were

evaluated on Clayton's CLAS system for their adherence to Fremont's published underwriting guidelines. Nine loans were found to exhibit underwriting exceptions, and eight additional loans were missing information critical to the final analysis. RBS Ex. 102 at RBS-FHFA-CT-6163688. RBS Ex. 100 also indicates that "The increased level of loan repurchase activity is an issue that should be monitored closely and represent the principal risk issue to emerge since the last review. Although an industry-wide issue, the level of repurchases by Fremont is relatively large with management asserting that it is largely loan program specific… While the company has modified its underwriting guidelines in an effort to address this issue, the impact of these changes will most likely not been seen until the fourth quarter of 2006 and the first quarter of 2007." RBS Ex. 100 at RBS-FHFA-CT-4072251. Finally, while RBSSI "disputes" ¶ 851 "to the extent that it states or implies that the cause of early payment defaults stemmed from the failure to follow guidelines[,]" RBSSI's assertion is not fully supported by the cited testimony of Mr. Goudie and Mr. Gallagher. In fact, Mr. Goudie testified that a loan didn't necessarily have to meet the underwriting guidelines. Deposition of Paul Goudie at 158:18-159:13 ("Q. Okay. Is it your understanding that in order for a loan to be securitizable, it would have had to meet underwriting guidelines? … A. I don't know. Q. Well, why was the loan underwriting group reviewing those loans to see if they met guidelines?... A. So my general understanding is that one could have loans that did not meet guidelines but had exceptions with compensating factors. Q. Okay. A. So one could have an instance where you could have a loan that didn't necessarily meet the guidelines, but had other compensating factors associated with it."). And, Mr. Gallagher testified that "in general there would have been some number of exceptions in every pool and that would have

been standard and normal."  Deposition of William Gallagher at 136:10-137:5 ("Q.  …In a typical securitization, that was issued by RBS, did all the loans typically comply with the underwriting  guidelines? … A.  I'm not sure.  Q.  Do you have any awareness about whether or not all the loans in most RBS sponsored securitizations complied with underwriting guidelines or would that have been unusual? … A.  I think that in general there would have been some number of exceptions in every pool and that would have been standard and normal.").

852.  **FHFA Statement:**  RBSSI rejected 33 loans from a Fremont pool that settled on January 28, 2005 greater than 10% of the 316 loans reviewed from that pool.  Ex. 492 (RBS-FHFA-CT-4355792, Open Trade Spreadsheet) at RBS-FHFA-CT-4355792.  Overall, RBSSI rejected 227 loans from that pool, almost 10% of the 2,451 loans in the original pool.  *Id.*

**RBSSI Response:**  RBSSI disputes the assertion in ¶ 852.  FHFA relies on Ex. 492, which is an "open trades" spreadsheet that RBSSI witnesses have testified was "backfilled" and not completely "accurate."  RBS Ex. 103 (*Harborview* Deposition of Joan Poccia) at 29:6¬48:16 ("Q.  Under column P there is a reference to underwriting kicks.  Do you have an understanding of what that reflects or refers to? A.  I believe it would refer to the removal of loans that had underwriting exceptions.  Q.  And that would reflect the work that the due diligence firm either, for example.  Clayton or Capital would have done, is that correct? A.  That's correct.  Could I? Q.  Yes.  A.  I do remember that this report was very manual and sometimes we backfilled the information.  I guess I have concerns that there is some inaccuracies.  Q.  Okay.  When you say backfill, what do you mean by that?  That it was done after the completion of the purchase? A.  Yes.  I recall like sifting through e-mails to get these number of kicks and I don't know if it is entirely – Q.  Accurate? A.  accurate.  Q.  Okay.  Did someone as best you can recall direct that you maintain this document or the information in this document? ...  A.  No, I don't think so.  I think it was just something that our team tried to keep track of.").  *See* RBS Ex. 104 (CLAY-FHFADEF-E-2126065, January 28, 2005 Event Status – Detail spreadsheet prepared by Clayton for FREMONT 2NDS 0501) at CLAY-FHFADEF-E-2126065 (showing results for complete pool of 316 "fully underwritten loans" identifying no more than 36 loans with credit or compliance issues).

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While RBSSI calls into question the accuracy of the cited document, it relies on testimony from the *Harborview* deposition of Joan Poccia that fails to support its assertion.  RBS Ex. 103 contains testimony that is vague and ambiguous as to the exhibit introduced; Ms. Poccia's

responded to questions regarding "Poccia Exhibit 3" which is identified merely as "Document bearing Bates numbers RBSHV 0639753 through 54[.]" RBS Ex. 103 at 29:6-11. When Ms. Poccia was questioned whether "this is a document that you prepared or assembled on or about April 30, 2007[,]" she responded that she didn't "know if I prepared it then, but I think I remember that we as a team kept this spreadsheet or tried to keep up with the spreadsheet." *Id.* at 29:16-21. It is not clear from this testimony that the document Ms. Poccia testified to is the same document as FHFA Ex. 492, which is dated September 21, 2007. Further, given that RBS has not established that Ms. Poccia prepared FHFA Ex. 492, the information relied upon in RSUF ¶ 852 is based on Hearsay. Finally, while RBSSI cites to Ex. 104 to further support its assertion, this document fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. In fact, the percentage of loans with credit or compliance issues or missing documentation is 11.7%. RBS Ex. 104 at CLAY-FHFADEF-E-2126065 at Columns D and E.

853. **FHFA Statement:** In a February 2, 2005 memorandum summarizing the results of a due diligence review of a Fremont whole loan pool, Craig Timmons called "[t]he overall exception rate for the random selection" of the pool "quite high." Ex. 493 (RBS-FHFA-CT-4376437, Memorandum regarding Fremont Investment & Loan –Whole Loan Purchase – January 2005) at RBS-FHFA-CT-4376440 ("Conclusion [-] The overall exception rate for the random selection (21 loans for 14.09%) is quite high.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 853 as it mischaracterizes or improperly paraphrases the cited document. According to the memorandum, only 2.5% of the due diligence sample (consisting of second lien mortgages) was shown to have credit or underwriting exceptions, and no reviewed loans were shown to have property valuation exceptions. FHFA Ex. 493 (Memorandum from Craig Timmins re: Fremont) at RBS-FHFA-SDNY-4376439 (identifying underwriting exceptions); *id*. ("50 files were selected for a drive-by appraisal.... All files with variances over 10% were reviewed. In each case, it was determined that the value was reasonably supported. As a result, no loans were noted in any of the selections with property/appraisal exception."). RBSSI determined that, as of the writing of the report, the overall exception rate was due primarily to curable compliance issues that would likely be resolved by the originator. *Id.* at RBS-FHFA-SDNY-4376440 ("[T]he main driver of [the exception] rate is the fact

that several loans were out of compliance.... Fremont has agreed to fix many of the loans."). RBSSI further disputes the assertion in ¶ 853 to the extent it states or implies that RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at or around the time of the NHELI 2006-FM2 Securitization. Among other things, more recent reunderwriting results were indicated that loans were originated generally in accordance with Fremont's guidelines. *See* RBS Ex. 102 (Fremont Investment and Loan Seconds Pool Purchase Review from Frank Camacho dated September 7, 2005) at RBS-FHFA-CT-6163687-89 ("A review was conducted at Fremont Investment and Loan the week of August 29, 2005 . . . . The purpose of the review was a pre-purchase evaluation of recent production consisting primarily of 100% second mortgages.... All 333 loans were to receive a full legal, compliance, credit and property review.... The overall level of material credit, compliance, and property exceptions is average for a subprime lender and overall we would expect this pool to perform similar to [a] comparable subprime transaction."); RBS Ex. 99 (Memorandum regarding Fremont Investment & Loan 2006-3 dated September 20, 2006) at RBS-FHFA-CT-6943517-18 ("From September 5th to September 20th a due diligence review was conducted at the corporate offices of Fremont Investment and Loan.... 1020 loans were reviewed in connection an upcoming whole loan transaction....2764 loans had AVMs run by CoreLogic and 392 of those had BPOs completed.... There are one hundred (100) loans or 9.84% of the pool with exceptions. This is in line with findings from other Alt A lenders and with our previous reviews at Fremont."); RBS Ex. 100 (RBS-FHFA-CT-4072104, RBS Greenwich Capital Credit Risk Department Monthly Management Report, dated September 2006) at RBS-FHFA-CT-4072255 ("During the week of September 5th, RBSGC conducted loan level due diligence on site at Fremont's offices in connection with a pending whole loan purchase/securitization. A statistically significant sample of 99 loans were selected . . . . "Overall, no major credit or compliance issues were identified. The loans were considered to be of average quality and eligible for a secondary market transaction.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI argues that ¶ 853 does not properly characterize the cited document, citing to the percentage of credit or underwriting exceptions listed in FHFA Ex. 493. However, RBSSI fails to accurately summarize the exceptions, improperly listing the credit or underwriting exception percentage as "2.5%" while the document shows that the percentage for these exceptions was actually "4.03%." FHFA Ex. 493 at RBS-FHFA-CT-4376439. Nevertheless, RBSSI's argument is irrelevant to and fails to directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI cites to a statement that Fremont agreed to "fix many of the loans[,]" this statement fails to

directly contravene the asserted fact that Mr. Timmons called "[t]he overall exception rate for the random selection" of the pool "quite high" and does not create a genuine dispute of material fact. Part I.C, *supra*. Further, any such dispute based upon this statement is immaterial because RBSSI does not provide any evidence that compliance issues were actually resolved by Fremont. *Quarles*, 758 F.2d at 840. While RBSSI "disputes" ¶ 853 to the extent that it states or implies that "RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at the time of the NHEL 2006-FM2 Securitization[,]" citing RBS. Exs. 99, 100 and 102, RBSSI's assertion is not supported by the cited exhibits. Also noted in RBS Ex. 102: "[a]ll loans in both samples were evaluated on Clayton's CLAS system for their adherence to Fremont's published underwriting guidelines. Nine loans were found to exhibit underwriting exceptions, and eight additional loans were missing information critical to the final analysis. RBS Ex. 102 at RBS-FHFA-CT-6163688. RBS. Ex. 100 also indicates that "The increased level of loan repurchase activity is an issue that should be monitored closely and represent the principal risk issue to emerge since the last review. Although an industry-wide issue, the level of repurchases by Fremont is relatively large with management asserting that it is largely loan program specific… While the company has modified its underwriting guidelines in an effort to address this issue, the impact of these changes will most likely not been seen until the fourth quarter of 2006 and the first quarter of 2007." RBS Ex. 100 at RBS-FHFA-CT-4072251.

854. **FHFA Statement:** RBSSI rejected 325 loans of the 333 loans it reviewed, or 97.6%, from a Fremont loan pool acquisition in September 2005. Ex. 492 (RBS-FHFA-CT-4355792, Open Trade Spreadsheet) at RBS-FHFA-CT-4355792 (spreadsheet listing the September 14, 2005 Fremont purchase as having 325 kicks out of 333 reviewed loans). RBSSI noted that 286 of those were "fico kicks" where the "[r]efico's dropped significantly." *Id.* at RBS-FHFA-CT-4355792 (Worksheet tab: Closed Actual Funding

Amount 05; filter Column B for Fremont and Freemont (7000+); Column O, Row 285: hover over 323; Pop-up window: "286. fico kicks. Refico's dropped significantly.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 854. FHFA relies on Ex. 492, which is an "open trades" spreadsheet that RBSSI witnesses have testified was "backfilled" and not completely "accurate". RBS Ex. 103 (*Harborview* Deposition of Joan Poccia) at 29:6¬48:16 ("Q. Under column P there is a reference to underwriting kicks. Do you have an understanding of what that reflects or refers to? A. I believe it would refer to the removal of loans that had underwriting exceptions. Q. And that would reflect the work that the due diligence firm either, for example. Clayton or Capital would have done, is that correct? A. That's correct. Could I? Q. Yes. A. I do remember that this report was very manual and sometimes we backfilled the information. I guess I have concerns that there is some inaccuracies. Q. Okay. When you say backfill, what do you mean by that? That it was done after the completion of the purchase? A. Yes. I recall like sifting through e-mails to get these number of kicks and I don't know if it is entirely – Q. Accurate? A. accurate. Q. Okay. Did someone as best you can recall direct that you maintain this document or the information in this document? ... A. No, I don't think so. I think it was just something that our team tried to keep track of.").

RBSSI disputes that it "rejected 325 loans of the 333 loans it reviewed, or 97.6%" in connection with the transaction referenced in ¶ 854. FHFA adduces no evidence suggesting that the 325 loans purportedly "rejected" were part of the 333 loan credit and compliance due diligence sample. Rather, the documentary evidence indicates a substantial number of loans were rejected from a re-evaluation of FICO scores conducted on the entire whole loan purchase pool and that was unrelated to RBSSI's review of the 333 loan sample. The actual credit and compliance diligence results for this sample show that Clayton's initial review indicated that the pool was of acceptable quality and contained far fewer loans with exceptions than alleged by FHFA. RBS Ex. 102 (Fremont Investment and Loan Seconds Pool Purchase Review from Frank Camacho dated September 7, 2005) at RBS-FHFA-CT-6163687-89 ("A review was conducted at Fremont Investment and Loan the week of August 29, 2005 .... The purpose of the review was a pre-purchase evaluation of recent production consisting primarily of 100% second mortgages. ... All 333 loans were to receive a full legal, compliance, credit and property review.... The overall level of material credit, compliance, and property exceptions is average for a subprime lender and overall we would expect this pool to perform similar to [a] comparable subprime transaction."). As an additional measure of diligence, RBSSI subsequently conducted an independent re-evaluation of the FICO scores for all loans in the entire whole loan pool (not the 333 loan sample also subjected to full legal, compliance, credit and property review); as a result of this additional diligence—which does not go to whether the loans were originated in accordance with Fremont's guidelines—RBSSI requested that additional loans be excluded from the purchase. RBS Ex. 105 (September 7, 2005 email from John Barbera to Fremont re: RICO Analysis) at RBS-FHFA-CT-4382013 ("Attached is re FICO analysis on the loans we are scheduled to purchase on 9.14.... We had the 3 credit agencies each provide a new FICO, then we took the middle of the 3 or the lower of the 3 and compared it [to] the original score provided on your data file. We found 253 loans (yellow) that dropped more than 50 points from the original score, 123 loans (green) that dropped below 550

694

and 18 loans (red) that we could not get a score or only had 1 available. We would like to reject these loans from the purchase.").

RBSSI further disputes the assertion in ¶ 854 to the extent it states or implies that RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at or around the time of the NHEL 2006-FM2 Securitization. RBS Ex. 99 (Memorandum regarding Fremont Investment & Loan 2006-3 dated September 20, 2006) at RBS-FHFA-CT-6943517-18 ("From September 5th to September 20th a due diligence review was conducted at the corporate offices of Fremont Investment and Loan.... 1020 loans were reviewed in connection an upcoming whole loan transaction....2764 loans had AVMs run by CoreLogic and 392 of those had BPOs completed.... There are one hundred (100) loans or 9.84% of the pool with exceptions. This is in line with findings from other Alt A lenders and with our previous reviews at Fremont."); RBS Ex. 100 (RBS-FHFA-CT-4072104, RBS Greenwich Capital Credit Risk Department Monthly Management Report, dated September 2006) at RBS-FHFA-CT-4072255 ("During the week of September 5th, RBSGC conducted loan level due diligence on site at Fremont's offices in connection with a pending whole loan purchase/securitization. A statistically significant sample of 99 loans were selected . . . . "Overall, no major credit or compliance issues were identified. The loans were considered to be of average quality and eligible for a secondary market transaction.")

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI calls into question the accuracy of the document cited in ¶ 854, it relies on testimony from the *Harborview* deposition of Joan Poccia that fails to support its assertion. RBS Ex. 103 contains testimony that is vague and ambiguous as to the exhibit introduced; Ms. Poccia's responded to questions regarding "Poccia Exhibit 3" which is identified merely as "Document bearing Bates numbers RBSHV 0639753 through 54[.]" RBS Ex. 103 at 29:6-11. When Ms. Poccia was questioned whether "this is a document that you prepared or assembled on or about April 30, 2007[,]" she responded that she didn't "know if I prepared it then, but I think I remember that we as a team kept this spreadsheet or tried to keep up with the spreadsheet." *Id.* at 29:16-21. It is not clear from this testimony that the document Ms. Poccia testified to is the same document as FHFA Ex. 492, which is dated September 21, 2007. Further, because RBS has not established that Ms. Poccia was the author of FHFA Ex. 492, the information relied upon in RSUF ¶ 852 is based on Hearsay.

While RBSSI argues that FHFA adduces no evidence that 325 loans were rejected, RBSSI cites no documents that support this argument. While RBSSI cites to RBS Exs. 102 and 105, neither of these documents directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI "disputes" ¶ 850 to the extent that it states or implies that "RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at the time of the NHEL 2006-FM2 Securitization[,]" citing RBS Exs. 99 and 100, RBSSI's assertion is not supported by the cited exhibits. RBS Ex. 100 also indicates that "The increased level of loan repurchase activity is an issue that should be monitored closely and represent the principal risk issue to emerge since the last review. Although an industry-wide issue, the level of repurchases by Fremont is relatively large with management asserting that it is largely loan program specific… While the company has modified its underwriting guidelines in an effort to address this issue, the impact of these changes will most likely not been seen until the fourth quarter of 2006 and the first quarter of 2007." RBS Ex. 100 at RBS-FHFA-CT-4072251.

855. **FHFA Statement:** In January 2006, an RBSSI memorandum summarizing the due diligence results on a Fremont whole loan pool noted a "27.53% exception rate." Ex. 494 (RBS-FHFA-CT-1700226, Memorandum regarding Fremont Investment & Loan 2006-A) at RBS-FHFA-CT-1700226 ("We ran into a chronic issue on 40/30 ARM notes. In section 4 of the note regarding interest rate and payment changes the language states that the new payment at a Change Date will be calculated based on a recast to the maturity date, when in fact it recasts to month 480 with a 360 month balloon. Our attorney's are making a determination of how this issue can be cured. This is the overwhelming cause for the 27.53% exception rate.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 855 insofar as it mischaracterizes or improperly paraphrases the cited document. As the memorandum states, the 27.53% exception rate was due to a "chronic issue on 40/30 ARM notes" and, more specifically, that "[i]n section 4 of the note regarding interest rate and payment changes the language states that the new payment at a Change Date will be calculated based on a recast to the maturity date, when in fact it recasts to month 480 with a 360 month balloon. Our attorney's [*sic*] are making a determination of how this issue can be cured." That

memorandum further stated that "[t]he tape characteristics and underwriting guidelines are similar to those of other sub-prime originators that we have reviewed for financing and/or securitizations." FHFA Ex. 494 (Memorandum from Anne Shera re: Fremont) at RBS-FHFA-SDNY-1700228. The "chronic issue" regarding the "40/30 ARM notes" was subsequently "cured" by Fremont, bringing the exception rate down to 8.01%, and causing RBSSI to conclude that there were "[n]o other major credit or compliance issues[.]" *See* FHFA Ex. 495 (Memorandum from Anne Shera re: Fremont) at RBS-FHFA-CT-1727734 (update to FHFA Ex. 494 explaining that a "chronic [compliance] issue on 40/30 ARM notes" was "cured" by Fremont, and that the overall exception rate was actually 8.01%). In a separate e-mail chain discussing this payment stream issue on 40/30 ARM notes from Fremont, Whittemore noted that Nomura had already identified this issue, and Fremont had resolved it, based on RBSSI's previous due diligence results. *See* RBS Ex. 23 (RBS-FHFA-SDNY-0622262, Emails regarding "Fremont DD Reports") at RBS-FHFA-SDNY-0622262 ("That would explain the payment stream issue as we had the same issues at that time. As our last diligences shows, the issue appears to have been corrected."). RBSSI's familiarity with this issue and Fremont's solution confirms the quality of Nomura's due diligence, which identified the same issue.

RBSSI further disputes the assertion in ¶ 855 to the extent it states or implies that RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at or around the time of the NHEL 2006-FM2 Securitization. *See* RBS Ex. 102 (Fremont Investment and Loan Seconds Pool Purchase Review from Frank Camacho dated September 7, 2005) at RBS-FHFA-CT-6163687-89 ("A review was conducted at Fremont Investment and Loan the week of August 29, 2005 .... The purpose of the review was a pre-purchase evaluation of recent production consisting primarily of 100% second mortgages.... All 333 loans were to receive a full legal, compliance, credit and property review.... The overall level of material credit, compliance, and property exceptions is average for a subprime lender and overall we would expect this pool to perform similar to [a] comparable subprime transaction."); RBS Ex. 99 (Memorandum regarding Fremont Investment & Loan 2006-3 dated September 20, 2006) at RBS-FHFA-CT-6943517-18 ("From September 5th to September 20th a due diligence review was conducted at the corporate offices of Fremont Investment and Loan... . 1020 loans were reviewed in connection an upcoming whole loan transaction....2764 loans had AVMs run by CoreLogic and 392 of those had BPOs completed.... There are one hundred (100) loans or 9.84% of the pool with exceptions. This is in line with findings from other Alt A lenders and with our previous reviews at Fremont."); RBS Ex. 100 (RBS-FHFA-CT-4072104, RBS Greenwich Capital Credit Risk Department Monthly Management Report, dated September 2006) at RBS-FHFA-CT-4072255 ("During the week of September 5th, RBSGC conducted loan level due diligence on site at Fremont's offices in connection with a pending whole loan purchase/securitization. A statistically significant sample of 99 loans were selected . . . . "Overall, no major credit or compliance issues were identified. The loans were considered to be of average quality and eligible for a secondary market transaction.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues

that ¶ 855 does not properly characterize the cited document, RBSSI offers no evidence

that contradicts the asserted fact. RBSSI instead cites to the same portion of the document that FHFA itself cites. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While RBSSI asserts that "[t]he 'chronic issue' regarding the '40/30 ARM notes' was subsequently 'cured' by Fremont, the cited document actually states that "[o]ur attorneys have made a determination of how this issue can be cured and Fremont has moved forward with this rectification." Therefore, this document does not support the assertion that Fremont in fact cured the issue and does not directly contravene the asserted fact that in January 2006, a RBSSI memorandum summarizing the due diligence results on a Fremont whole loan pool noted a "27.53% exception rate," and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI goes on to cite RBS Ex. 23 in support of this same assertion that Fremont had cured the issue, RBS Ex. 23 is dated September 28, 2006, nine months after the memorandum cited by FHFA and therefore this document is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI "disputes" ¶ 855 to the extent that it states or implies that "RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at the time of the NHEL 2006-FM2 Securitization[,]" citing RBS. Exs. 102, 99 and 100, RBSSI's assertion is not supported by the cited exhibits. RBSSI cites text from RBS Ex. 102 that is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. RBS. Ex. 100 also indicates that "The increased level of loan repurchase activity is an issue that should be monitored closely and represent the principal risk issue to emerge since the last review. Although an industry-wide issue, the level of repurchases by Fremont is relatively large with management asserting that it is largely

loan program specific… While the company has modified its underwriting guidelines in

an effort to address this issue, the impact of these changes will most likely not been seen

until the fourth quarter of 2006 and the first quarter of 2007." RBS Ex. 100 at RBS-

FHFA-CT-4072251.

856. **FHFA Statement:** 12% of the appraisal sample from that pool "ha[d] variances of over 20%." Ex. 494 (RBS-FHFA-CT-1700226, Memorandum regarding Fremont Investment & Loan 2006-A) at RBS-FHFA-CT-1700227 ("The appraisals in the pool were reviewed by Clayton at the time of underwriting. When warranted, eNeighborhoods, SiteX or HistoryPro data were used to ensure that the value of the properties appeared reasonable. Picked randomly from our semi-random sample, after removing all 2 to 4 family dwellings, 50 drive-by appraisals were ordered and 49 were completed. Six have variances of over 20%, which is typical for other sub-prime originators that we have done drive-bys on. There were six (6) outstanding appraisals issues; four with value issues.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 856 as it mischaracterizes or improperly paraphrases the cited document. RBSSI conducted valuation due diligence on the mortgage loan pool referenced in ¶ 855 and concluded that mortgage appraisals and property valuations were acceptable. FHFA Ex. 494 (Memorandum from Anne Shera re: Fremont Investment & Loan 2006-A) at RBS-FHFA-CT-1700227 ("The appraisals in the pool were reviewed by Clayton at the time of underwriting. When warranted, eNeighborhoods, SiteX or HistoryPro data were used to ensure that the value of the properties appeared reasonable.... Six have variances of over 20%, which is typical for other sub-prime originators[.]"). RBSSI's valuation diligence identified only 4 loans with valuation issues based on drive-by appraisals, and only two other loans with other appraisal-related issues related to missing or unsigned appraisals. *Id.* at RBS-FHFA-CT-1700231-32.

RBSSI further disputes the assertion in ¶ 856 to the extent it states or implies that RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at or around the time of the NHEL 2006-FM2 Securitization. *See* RBS Ex. 102 (Fremont Investment and Loan Seconds Pool Purchase Review from Frank Camacho dated September 7, 2005) at RBS-FHFA-CT-6163687-89 ("A review was conducted at Fremont Investment and Loan the week of August 29, 2005 .... The purpose of the review was a pre-purchase evaluation of recent production consisting primarily of 100% second mortgages.... All 333 loans were to receive a full legal, compliance, credit and property review.... The overall level of material credit, compliance, and property exceptions is average for a subprime lender and overall we would expect this pool to perform similar to [a] comparable subprime transaction."); RBS Ex. 99 (Memorandum regarding Fremont Investment & Loan 2006-3 dated September 20, 2006) at RBS-FHFA-CT-6943517-18 ("From September 5th to September 20th a due diligence review was conducted at the corporate offices of Fremont Investment and Loan... . 1020 loans were reviewed in connection an upcoming whole loan transaction....2764 loans had AVMs run by CoreLogic and 392 of those had BPOs completed.... There are one hundred (100)

loans or 9.84% of the pool with exceptions. This is in line with findings from other Alt A lenders and with our previous reviews at Fremont."); RBS Ex. 100 (RBS-FHFA-CT-4072104, RBS Greenwich Capital Credit Risk Department Monthly Management Report, dated September 2006) at RBS-FHFA-CT-4072255 ("During the week of September 5th, RBSGC conducted loan level due diligence on site at Fremont's offices in connection with a pending whole loan purchase/securitization. A statistically significant sample of 99 loans were selected . . . . "Overall, no major credit or compliance issues were identified. The loans were considered to be of average quality and eligible for a secondary market transaction.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that ¶ 856 does not properly characterize the cited document, RBSSI offers no evidence that contradicts the asserted fact. RBSSI instead cites to the same portion of the document that FHFA itself cites. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While RBSSI "disputes" ¶ 856 to the extent that it states or implies that "RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at the time of the NHEL 2006-FM2 Securitization[,]" citing RBS. Exs. 102, 99 and 100, RBSSI's assertion is not supported by the cited exhibits. RBSSI cites text from RBS Exs. 100 and 102 that is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

857. **FHFA Statement:** The exception rate in RBSSI's random sample draw from that loan pool was still above 10% in March 2006, despite RBS attorneys having "made a determination of how" to resolve a compliance issue. Ex. 495 (RBS-FHFA-CT-1727734, Memorandum regarding Fremont Investment & Loan 2006-A) at RBS-FHFA-CT-1727734 ("Our attorneys have made a determination of how this issue can be cured and Fremont has moved forward with this rectification. The percentages with the current exceptions fall more into the parameters of our normal findings. The exception rate in the Semi-Random sample went from 36.39% to 10.37%...").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 857 insofar as it omits material information from the cited document and other relevant documents. First, FHFA omits that the "overall exception rate for the pool went from 27.53% to 8.01%." FHFA Ex. 495 at RBS-FHFA-SDNY-1727734. Second, FHFA omits that this pool had "[n]o other major credit or compliance issues" and "[t]he tape characteristics and underwriting guidelines [were] similar to those of other sub-prime originators that [RBSSI had] reviewed for financing and/or securitizations." FHFA Ex. 494 at RBS-FHFA-CT-1700228.

RBSSI further disputes the assertion in ¶ 857 to the extent it states or implies that RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at or around the time of the NHEL 2006-FM2 Securitization. *See* RBS Ex. 102 (Fremont Investment and Loan Seconds Pool Purchase Review from Frank Camacho dated September 7, 2005) at RBS-FHFA-CT-6163687-89 ("A review was conducted at Fremont Investment and Loan the week of August 29, 2005 ....  The purpose of the review was a pre-purchase evaluation of recent production consisting primarily of 100% second mortgages....

All 333 loans were to receive a full legal, compliance, credit and property review....  The overall level of material credit, compliance, and property exceptions is average for a subprime lender and overall we would expect this pool to perform similar to [a] comparable subprime transaction."); RBS Ex. 99 (RBS-FHFA-CT-694351, Memorandum regarding Fremont Investment & Loan 2006-3 dated September 20, 2006) at RBS-FHFA-CT-694351-18 ("From September 5th to September 20th a due diligence review was conducted at the corporate offices of Fremont Investment and Loan....  1020 loans were reviewed in connection an upcoming whole loan transaction....2764 loans had AVMs run by CoreLogic and 392 of those had BPOs completed....  There are one hundred (100) loans or 9.84% of the pool with exceptions.  This is in line with findings from other Alt A lenders and with our previous reviews at Fremont."); RBS Ex. 100 (RBS-FHFA-CT-4072104, RBS Greenwich Capital Credit Risk Department Monthly Management Report, dated September 2006) at RBS-FHFA-CT-4072255 ("During the week of September 5th, RBSGC conducted loan level due diligence on site at Fremont's offices in connection with a pending whole loan purchase/securitization.  A statistically significant sample of 99 loans were selected ....  "Overall, no major credit or compliance issues were identified.  The loans were considered to be of average quality and eligible for a secondary market transaction.").

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While RBSSI argues that ¶ 857 omits material information from the cited document, referencing the overall exception rate for the pool, the credit or compliance issues and characteristics and underwriting guidelines, these are irrelevant to the asserted fact that the exception rate in the random sample drawn from the loan pool was still over 10%.  Therefore, RBSSI's argument does not create a genuine dispute of material fact.  Part I.C, *supra*.   While RBSSI "disputes" ¶ 857 to the extent that it states or implies that "RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at the time of the NHEL 2006-FM2 Securitization[,]" citing RBS. Ex. 102, RBSSI's assertion is not supported by the cited exhibits.  RBS. Ex. 102 also indicates that "The

overall initial exception rates on both the pool at large and the semi random sample were approximately 12-13%."  RBS Ex. 102 at RBS-FHFA-CT-6163689.

858.  **FHFA Statement:**  In April 2006, an RBS due diligence review of Fremont loans found that "[t]he exception percentage for the semi-random pool [13.33%] ... and the overall exception rate[,] 21.05%[,]" were both "a bit higher than normal." Ex. 496 (RBS-FHFA-CT-1705116, memorandum regarding Fremont Investment & Loan 2006-A) at RBS-FHFA-CT-1705118 ("The exception percentage for the semi-random pool is a bit higher than normal at 13.33% and the overall exception rate 21.05% also comes in a bit higher than normal.").

**RBSSI Response:**  RBSSI disputes the assertion in ¶ 858 as it mischaracterizes, improperly paraphrases or omits material information from the cited document.  FHFA's quoted "exception rates" are overstated because they include curable exceptions for missing documentation, which would bring the exception rates down to "11.85% in the semi-random pool and 17.67% for the overall exception rate." FHFA Ex. 496 (Memorandum from Anne Shera regarding Fremont Investment and Loan 2006-A) at RBS-FHFA-CT-1705118.  Further, FHFA Ex. 496 notes that only 4.5% of the due diligence sample was shown to have "underwriting issues." *Id.*  ("All [266] loans in the sample were evaluated on Clayton's CLAS system for adherence to Fremont Investment & Loan's published underwriting guidelines.  Twelve loans had underwriting issues.")....  "No files were missing from the sample" and "[n]o significant data discrepancies were identified" after "data was captured by The Clayton Group and compared to data from the original tape provided by Fremont[.]" *Id.*  at RBS-FHFA-CT-1705117.  FHFA Ex. 496 concludes that "[t]he tape characteristics and underwriting guidelines are similar to those of other sub-prime originators that [RBSSI has] reviewed for financing and/or securitizations." *Id.*  at RBS-FHFA-CT-1705118.

RBSSI further disputes the assertion in ¶ 858 to the extent it states or implies that RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at or around the time of the NHEL 2006-FM2 Securitization.  *See* RBS Ex. 102 (Fremont Investment and Loan Seconds Pool Purchase Review from Frank Camacho dated September 7, 2005) at RBS-FHFA-CT-6163687-89 ("A review was conducted at Fremont Investment and Loan the week of August 29, 2005 ....  The purpose of the review was a pre-purchase evaluation of recent production consisting primarily of 100% second mortgages....  All 333 loans were to receive a full legal, compliance, credit and property review....  The overall level of material credit, compliance, and property exceptions is average for a subprime lender and overall we would expect this pool to perform similar to [a] comparable subprime transaction."); RBS Ex. 99 (Memorandum regarding Fremont Investment & Loan 2006-3 dated September 20, 2006) at RBS-FHFA-CT-6943517-18 ("From September 5th to September 20th a due diligence review was conducted at the corporate offices of Fremont Investment and Loan... .  1020 loans were reviewed in connection an upcoming whole loan transaction....2764 loans had AVMs run by CoreLogic and 392 of those had BPOs completed....  There are one hundred (100) loans or 9.84% of the pool with exceptions.  This is in line with findings from other Alt A lenders and with our previous reviews at Fremont."); RBS Ex. 100 (RBS-FHFA-CT-

4072104, RBS Greenwich Capital Credit Risk Department Monthly Management Report, dated September 2006) at RBS-FHFA-CT-4072255 ("During the week of September 5th, RBSGC conducted loan level due diligence on site at Fremont's offices in connection with a pending whole loan purchase/securitization. A statistically significant sample of 99 loans were selected . . . . "Overall, no major credit or compliance issues were identified. The loans were considered to be of average quality and eligible for a secondary market transaction.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that ¶ 857 does not properly characterize and omits material information from the cited document, referencing lower percentages after missing documentation is subtracted, RBSSI fails to mention a crucial statement after those percentages which states: "[w]hile we may receive some of the missing documentation, it will be a *small* amount and probably *won't affect the overall percentages*." FHFA Ex. 496 at RBS-FHFA-CT-1705118 (emphasis added). Therefore, RBSSI's argument does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI "disputes" ¶ 857 to the extent that it states or implies that "RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at the time of the NHEL 2006-FM2 Securitization[,]" citing RBS. Exs. 100 and 102, RBSSI's assertion is not supported by the cited exhibits. RBSSI cites text from RBS Exs. 100 and 102 that is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

859. **FHFA Statement:** Ms. Shera noted that "[v]alue issues appear to dominate." Ex. 496 (RBS-FHFA-CT-1705116, memorandum regarding Fremont Investment & Loan 2006-A) at RBS-FHFA-CT-1705118 ("Conclusions ...Value issues appear to dominate, with various assorted compliance issues and MA loans with no benefit to the borrower coming in a close second.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 859 insofar as it mischaracterizes or improperly paraphrases the cited document and omits material information. RBSSI conducted valuation diligence on the mortgage loan pool referenced in ¶ 858 and identified only 13 loans with appraisal issues and, as FHFA recognizes in assertion ¶ 860, only 4 loans, or 9%, had a variance of over 20% which was "typical for other sub-prime

originators[.]"). FHFA Ex. 496 (April 24, 2006 memorandum regarding Fremont Investment & Loan 2006-A) at RBS-FHFA-CT-1705117.

RBSSI further disputes the assertion in ¶ 859 to the extent it states or implies that RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at or around the time of the NHEL 2006-FM2 Securitization. *See* RBS Ex. 102 (RBS-FHFA-CT-6163687, September 7, 2005 memorandum regarding Fremont Investment and Loan Seconds Pool Purchase Review) at RBS-FHFA-CT-6163687-89 ("A review was conducted at Fremont Investment and Loan the week of August 29, 2005 ....  The purpose of the review was a pre-purchase evaluation of recent production consisting primarily of 100% second mortgages....  All 333 loans were to receive a full legal, compliance, credit and property review....  The overall level of material credit, compliance, and property exceptions is average for a subprime lender and overall we would expect this pool to perform similar to comparable subprime transactions."); RBS Ex. 99 (RBS-FHFA-CT-6943517, September 20, 2006 memorandum regarding Fremont Investment & Loan 2006-3) at RBS-FHFA-CT-6943517-18 ("From September 5th to September 20th[] a due diligence review was conducted at the corporate offices of Fremont Investment and Loan.. ..  1020 loans were reviewed in connection an upcoming whole loan transaction....2764 loans had AVMs run by CoreLogic and 392 of those had BPOs completed.  .  .  .  There are one hundred (100) loans or 9.84% of the pool with exceptions.  This is in line with findings from other Alt A lenders and with our previous reviews at Fremont."); RBS Ex. 100 (RBS-FHFA-CT-4072104, RBS Greenwich Capital Credit Risk Department Monthly Management Report, dated September 2006) at RBS-FHFA-CT-4072255 ("During the week of September 5th, RBSGC conducted loan level due diligence on site at Fremont's offices in connection with a pending whole loan purchase/securitization.  A statistically significant sample of 99 loans were selected ....  Overall, no major credit or compliance issues were identified.  The loans were considered to be of average quality and eligible for a secondary market transaction.").

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  RBSSI argues that ¶ 859 does not properly characterize the cited document and omits material information, citing to the loans with appraisal issues listed in ¶ 858.  However, the values that RBSSI refers to fail to directly contravene the asserted fact and do not create a genuine dispute of material fact.  Part I.C, *supra*.  While RBSSI "disputes" ¶ 859 to the extent that it states or implies that "RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at the time of the NHEL 2006-FM2 Securitization[,]" citing RBS. Exs. 102 and 100, RBSSI's assertion is not supported by

the cited exhibits.  RBSSI cites text from RBS Exs. 99, 100 and 102 that is irrelevant to the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.

860.  **FHFA Statement:**  Additionally, 9% of the properties in the appraisal diligence sample "ha[d] variances of over 20%."  Ex. 496 (RBS-FHFA-CT-1705116, memorandum regarding Fremont Investment & Loan 2006-A) at RBS-FHFA-CT-1705117 ("Property/Appraisal ...Four (4) loans or 9% have variances of over 20%, which is typical for other sub-prime originators that we have done drive-bys on.").

**RBSSI Response:**  RBSSI disputes the assertion in ¶ 860 insofar as it mischaracterizes, improperly paraphrases or omits material information.  RBSSI conducted valuation diligence on the mortgage loan pool referenced in ¶ 858 and identified only 13 loans with appraisal issues and only 4 loans, or 9%, with a variance of over 20%.  FHFA Ex. 496 (April 24, 2006 memorandum regarding Fremont Investment & Loan 2006-A) at RBS-FHFA-CT-1705117.  The amount of loans with appraisal variances of over 20% noted in FHFA's statement was "typical for other sub-prime originators that [RBSSI has] done drive-bys on." *Id.*

RBSSI further disputes the assertion in ¶ 860 to the extent it states or implies that RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at or around the time of the NHEL 2006-FM2 Securitization.  *See* RBS Ex. 102 (RBS-FHFA-CT-6163687, September 7, 2005 memorandum regarding Fremont Investment and Loan Seconds Pool Purchase Review) at RBS-FHFA-CT-6163687-89 ("A review was conducted at Fremont Investment and Loan the week of August 29, 2005 ....  The purpose of the review was a pre-purchase evaluation of recent production consisting primarily of 100% second mortgages....  All 333 loans were to receive a full legal, compliance, credit and property review....  The overall level of material credit, compliance, and property exceptions is average for a subprime lender and overall we would expect this pool to perform similar to comparable subprime transactions."); RBS Ex. 99 (RBS-FHFA-CT-6943517, September 20, 2006 memorandum regarding Fremont Investment & Loan 2006-3) at RBS-FHFA-CT-6943517-18 ("From September 5th to September 20th[] a due diligence review was conducted at the corporate offices of Fremont Investment and Loan.. .. 1020 loans were reviewed in connection an upcoming whole loan transaction....2764 loans had AVMs run by CoreLogic and 392 of those had BPOs completed.  .  .  .  There are one hundred (100) loans or 9.84% of the pool with exceptions.  This is in line with findings from other Alt A lenders and with our previous reviews at Fremont."); RBS Ex. 100 (RBS-FHFA-CT-4072104, RBS Greenwich Capital Credit Risk Department Monthly Management Report, dated September 2006) at RBS-FHFA-CT-4072255 ("During the week of September 5th, RBSGC conducted loan level due diligence on site at Fremont's offices in connection with a pending whole loan purchase/securitization.  A statistically significant sample of 99 loans were selected ....  Overall, no major credit or compliance issues were identified.  The loans were considered to be of average quality and eligible for a secondary market transaction.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues

that ¶ 860 does not properly characterize the cited document, RBSSI offers no evidence

that contradicts the asserted fact. RBSSI instead cites to the same portion of the

document that FHFA itself cites and adds that the appraisal variances are typical for other

sub-prime originators, which is wholly irrelevant to the asserted fact. RBSSI's

conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*.

While RBSSI "disputes" ¶ 860 to the extent that it states or implies that "RBSSI had

concerns regarding whether Fremont generally originated loans in accordance with its

guidelines at the time of the NHEL 2006-FM2 Securitization[,]" citing RBS. Exs. 102, 99

and 100, RBSSI's assertion is not supported by the cited exhibits. RBSSI cites text from

RBS Exs. 100 and 102 that is irrelevant to the asserted fact and does not create a genuine

dispute of material fact. Part I.C, *supra*.

861. **FHFA Statement:** From January 23 to January 27, 2006, RBS conducted a diligence review of Fremont whole loans in connection with a pending Fremont securitization. Ex. 494 (RBS-FHFA-CT-1700226, January 30, 2006 Memorandum regarding Fremont Investment & Loan 2006-A) at RBS-FHFA-CT-1700226 ("From January 23rd to January 27th, a due diligence review was conducted at the corporate offices of Fremont Investment & Loan in Anaheim, CA.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 861 that FHFA Ex. 494 is a January 30, 2006 memorandum from Anne Shera summarizing a due diligence review of Fremont loans from January 23 to January 27, 2006. RBSSI also does not dispute that "[t]he review was done in connection with a pending Fremont Investment & Loan securitization." FHFA Ex. 494 (January 30, 2006 memorandum regarding Fremont Investment & Loan 2006-A) at RBS-FHFA-CT-1700226. RBSSI disputes FHFA's characterization of FHFA Ex. 494 to the extent it suggests or implies any concern by RBSSI regarding whether Fremont generally originated loans in accordance with its guidelines.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not

dispute that the document cited in ¶ 861 is a due diligence review of Fremont nor does it

dispute that the review as done in connection with a pending Fremont securitization.

While RBSSI disputes any concern by RBSSI regarding whether Fremont generally originated loans in accordance with its guidelines, it identifies no evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*.

862. **FHFA Statement:** Ms. Shera's January 30, 2006 report on the results of that due diligence review noted that RBS "ran into a chronic issue on 40/30 ARM notes[ ]" and identified a "27.53% exception rate." Ex. 494 (RBS-FHFA-CT-1700226, January 30, 2006 Memorandum regarding Fremont Investment & Loan 2006-A) at RBS-FHFA-CT-1700226 ("We ran into a chronic issue on 40/30 ARM notes. In section 4 of the note regarding interest rate and payment changes the language states that the new payment at a Change Date will be calculated based on a recast to the maturity date, when in fact it recasts to month 480 with a 360 month balloon. Our attorney's are making a determination of how this issue can be cured. This is the overwhelming cause for the 27.53% exception rate.").

**RBSSI Response:** RBSSI states that the assertion in ¶ 862 is entirely duplicative of the assertion in ¶ 855. To the extent a response is required, RBSSI incorporates by reference its response to ¶ 855 as if fully set forth herein.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the assertion in ¶ 862 is duplicative of the assertion in ¶ 855, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra.* In addition, FHFA incorporates by reference its Reply to ¶ 855.

863. **FHFA Statement:** In August 2006, Paul Goudie, in the Credit Risk Management Department, wrote that Fremont originations were experiencing "a very big spike in repurchase activity." Ex. 491 (RBS-FHFA-SDNY-0398202, August 23, 2006 email regarding Fremont – Re Purchase Activity) at RBS-FHFA-SDNY-0398202 ("Fremont has had a very big spike in repurchase activity for the quarter with $238m in loans re-purchased.").

**RBSSI Response:** RBSSI states that the assertion in ¶ 863 is entirely duplicative of the assertion in ¶ 850. To the extent a response is required, RBSSI incorporates by reference its response to ¶ 850 as if fully set forth herein.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the assertion in ¶ 863 is duplicative of the assertion in ¶ 850, RBSSI's argument does

not create a genuine dispute of material fact.  Part I.A, *supra*.  In addition, FHFA

incorporates by reference its Reply to ¶ 850.

864.    **FHFA Statement:**   In response to Mr. Goudie's concerns, Mr. Whittemore wrote that
        RBSSI's acquisition due diligence sample for Fremont loan pools would "be much
        larger" and "more adverse in nature" than for past due diligence reviews.  Ex. 491 (RBS-
        FHFA-SDNY-0398202, August 23, 2006 email regarding Fremont – Re Purchase
        Activity) at RBS-FHFA-SDNY-0398202 ("I will be getting the term sheet to start the
        sample process for the September deal; is there anything I can sample that would help? I
        can't think of anything except our DD will be much larger this time (25%) and more
        adverse in nature from what we used to do.").

        **RBSSI Response:**   RBSSI disputes the assertion in ¶ 864 as it improperly paraphrases or
        omits material information from the cited document.  The cited language is from an email
        in response to the one discussed in ¶ 850 (and repeated in ¶ 863) regarding Fremont's
        recent high EPD rates and the tightening of its stated guidelines to try and lower such
        rates in future originations.  FHFA Ex. 491 (August 22 and 23, 2006 email chain) at
        RBS-FHFA-SDNY-0398202.  RBSSI also disputes ¶ 864 to the extent that it states or
        implies that the cause of early payment defaults stemmed from the failure to follow
        originators' guidelines.  Rather, early payment defaults resulted from originators'
        guidelines becoming more permissive.  *See, e.g.*, RBS Ex. 101 (Deposition of Paul
        Goudie) at 284:12-25 ("Q.  So it looks like there's been an increase in early payment
        defaults.  Right? Sorry, for subprime originations ...  And it looks like the reason for
        those increased EPDs has been a greater influx of loans with lower FICOs, higher LTVs;
        right? ...  A.  Yeah, I think that's driven by the more permissive loan programs we talked
        about earlier on."); Ex. 7 (Deposition of William Gallagher) at 711:11-22 ("Q.  Why did
        RBS reevaluate its due diligence process in mid-2006? ...  A.  I think over the period of
        time certainly the markets were more difficult.  We – we'd experienced a, an increased
        rate of, of early payment defaults.  I think originators' guidelines had become more
        lenient in the time period.  And it was our view that we needed to try and do more to
        improve the process.").

        RBSSI further disputes the assertion in ¶ 864 to the extent it states or implies that RBSSI
        had concerns regarding whether Fremont generally originated loans in accordance with
        its guidelines at or around the time of the NHEL 2006-FM2 Securitization.  *See* RBS Ex.
        102 (RBS-FHFA-CT-6163687, September 7, 2005 memorandum regarding Fremont
        Investment and Loan Seconds Pool Purchase Review) at RBS-FHFA-CT-6163687-89
        ("A review was conducted at Fremont Investment and Loan the week of August 29, 2005
        ....  The purpose of the review was a pre-purchase evaluation of recent production
        consisting primarily of 100% second mortgages....  All 333 loans were to receive a full
        legal, compliance, credit and property review....  The overall level of material credit,
        compliance, and property exceptions is average for a subprime lender and overall we
        would expect this pool to perform similar to comparable subprime transactions."); RBS
        Ex. 99 (RBS-FHFA-CT-6943517, September 20, 2006 memorandum regarding Fremont
        Investment & Loan 2006-3 dated September 20, 2006) at RBS-FHFA-CT-6943517-18
        ("From September 5th to September 20th[] a due diligence review was conducted at the

corporate offices of Fremont Investment and Loan.. .. 1020 loans were reviewed in connection an upcoming whole loan transaction....2764 loans had AVMs run by CoreLogic and 392 of those had BPOs completed.... There are one hundred (100) loans or 9.84% of the pool with exceptions. This is in line with findings from other Alt A lenders and with our previous reviews at Fremont."); RBS Ex. 100 (RBS-FHFA-CT-4072104, RBS Greenwich Capital Credit Risk Department Monthly Management Report, dated September 2006) at RBS-FHFA-CT-4072255 ("During the week of September 5th, RBSGC conducted loan level due diligence on site at Fremont's offices in connection with a pending whole loan purchase/securitization. A statistically significant sample of 99 loans were selected . . . . Overall, no major credit or compliance issues were identified. The loans were considered to be of average quality and eligible for a secondary market transaction.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that ¶ 864 is not properly phrased and omits material information from the cited document, it identifies no evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While RBSSI "disputes" ¶ 864 to the extent that it implies that the cause of early payment defaults stemmed from the failure to follow originators' guidelines and argues that "[r]ather, early payment defaults resulted from originators' guidelines becoming more permissive[,]" by citing RBS Exs. 7 and 101, this testimony is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI "disputes" ¶ 864 to the extent that it states or implies that "RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at the time of the NHEL 2006-FM2 Securitization[,]" citing RBS. Exs. 102, 99 and 100, RBSSI's assertion is not supported by the cited exhibits. RBSSI cites text from RBS Exs. 99, 100 and 102 that is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

865. **FHFA Statement:** In October 2006, RBS bought a Fremont loan pool in October 2006, which included 4,542 loans. Ex. 492 (RBS-FHFA-CT-4355792, Open Trade Spreadsheet) at RBS-FHFA-CT-4355792.

**RBSSI Response:** RBSSI disputes the assertion in ¶ 865. FHFA cites no evidence other than FHFA Ex. 492, which is an "Open Trades" spreadsheet which an RBSSI witness has testified may not be accurate. RBS Ex. 103 (*Harborview* Deposition of Joan Poccia) at 38:21-40:14 ("Q. Under column P there is a reference to underwriting kicks. Do you have an understanding of what that reflects or refers to? A. I believe it would refer to the removal of loans that had underwriting exceptions. Q. And that would reflect the work that the due diligence firm either, for example. Clayton or Capital would have done, is that correct? A. That's correct. Could I? Q. Yes. A. I do remember that this report was very manual and sometimes we backfilled the information. I guess I have concerns that there is some inaccuracies in here.... Q. Okay. When you say backfill, what do you mean by that? That it was done after the completion of the purchase? A. Yes. I recall like sifting through e-mails to get these number of kicks and I don't know if it is entirely – Q. Accurate? A. – accurate. Q. Okay. Did someone as best you can recall direct that you maintain this document or the information in this document? ... A. No, I don't think so. I think it was just something that our team tried to keep track of.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI calls into question the accuracy of the document cited in ¶ 865, it relies on testimony from the *Harborview* deposition of Joan Poccia that fails to support this assertion. RBS Ex. 103 contains testimony that is vague and ambiguous as to the exhibit introduced; Ms. Poccia's responded to questions regarding "Poccia Exhibit 3" which is identified merely as "Document bearing 9 Bates numbers RBSHV 0639753 through 54[.]" RBS Ex. 103 at 29:6-11. When Ms. Poccia was questioned whether "this is a document that you prepared or assembled on or about April 30, 2007[,]" she responded that she didn't "know if I prepared it then, but I think I remember that we as a team kept this spreadsheet or tried to keep up with the spreadsheet." *Id.* at 29:16-21. It is not clear from this testimony that the document Ms. Poccia testified to is the same document as FHFA Ex. 492, which was dated September 21, 2007. Further, given the RBS has not established that Ms. Poccia was the author of FHFA Ex. 492, her testimony from the *Harborview* deposition regarding the document introduced therein does not create a genuine dispute of material fact because it cannot be confirmed to be the same document as FHFA Ex. 492 and therefore it is inadmissible hearsay.

866. **FHFA Statement:** After conducting due diligence RBS purchased just 2,114 loans, rejecting over 53% of the original pool. Ex. 492 (RBS-FHFA-CT-4355792, Open Trade Spreadsheet) at RBS-FHFA-CT-4355792.

**RBSSI Response:** RBSSI disputes the assertion in ¶ 866. FHFA cites no evidence other than FHFA Ex. 492, which is an "Open Trades" spreadsheet which an RBSSI witness testified may not be accurate. RBS Ex. 103 (*Harborview* Deposition of Joan Poccia) at 38:21-40:14 ("Q. Under column P there is a reference to underwriting kicks. Do you have an understanding of what that reflects or refers to? A. I believe it would refer to the removal of loans that had underwriting exceptions. Q. And that would reflect the work that the due diligence firm either, for example. Clayton or Capital would have done, is that correct? A. That's correct. Could I? Q. Yes. A. I do remember that this report was very manual and sometimes we backfilled the information. I guess I have concerns that there is some inaccuracies in here.... Q. Okay. When you say backfill, what do you mean by that? That it was done after the completion of the purchase? A. Yes. I recall like sifting through e-mails to get these number of kicks and I don't know if it is entirely – Q. Accurate? A. – accurate. Q. Okay. Did someone as best you can recall direct that you maintain this document or the information in this document? ... A. No, I don't think so. I think it was just something that our team tried to keep track of.").

Further, FHFA cites no evidence that any loans were dropped from the pool as a result of RBSSI's due diligence. In October 2006, RBSSI purchased a Fremont loan pool of approximately $500 million, which included 2,119 loans. RBS Ex. 106 (RBS-FHFA-CT-1709330, September 15, 2006 email regarding FIL $549MM Greenwich Oct06 Settle Pool) at RBS-FHFA-CT-1709330 ("Attached please find [documents] for the FIL $549MM loan pool scheduled for 10/30/2006 settlement."); RBS Ex. 107 (RBS-FHFA-CT-1724638, September 20, 2006 email regarding Fremont October Whole Loan Trade) at RBS-FHFA-CT-1724640 ("The term shows 2219 loans so 555 loans will be in the DD sample."). Subsequently, as part of its due diligence conducted on this pool, RBSSI fully underwrote 555 loans, of which only 7.2% received a grade of "3". *Id.* at RBS-FHFA-CT-1724638, 40 (Jim Whittemore confirmed: "we should pick our sample the same as last month (25%) along with a 100% AVM/BPO sample ... . The term show 2219 loans so 555 loans will be in the DD sample. Dana Pasternak responded: "attached is the due diligence data sample and pull list. There are 555 loans in the total sample[.]"); RBS Ex. 108 (RBS-FHFA-CT-1724642, Mortgage loan spreadsheet attachment) at RBS-FHFA-CT-1724642 (identifying 555 mortgage loans in due diligence sample); RBS Ex. 109 (RBS-FHFA-CT-5611197, Spreadsheet identifying fully underwritten loans in Fremont 2006-10 pool) at RBS-FHFA-CT-5611197). RBSSI disputes the assertion in ¶ 866 to the extent FHFA Ex. 492 states or implies that the transaction designated "FRMNTWL13" contained 4,542 loans. *Compare* FHFA Ex. 492 (RBS-FHFA-CT-4355792, trade information spreadsheet) at RBS-FHFA-CT-4355792 ("FRMNTWL13" at spreadsheet "Closed Actual Funding Amount 06" cell D277) *with* RBS Ex. 110 (RBS-FHFA-CT-6537281, mortgage loan tape spreadsheet for CUSIP FRMNTWL13) at RBS-FHFA-CT-6537281 (identifying at columns A and BS 2,215 loans with corresponding FRMNTWL13 designation).

RBSSI also disputes the assertion in ¶ 866 to the extent it states or implies that RBSSI had concerns regarding whether Fremont generally originated loans in accordance with its guidelines at or around the time of the NHEL 2006-FM2 Securitization. *See* RBS Ex. 102 (RBS-FHFA-CT-6163687, September 7, 2005 memorandum regarding Fremont Investment and Loan Seconds Pool Purchase Review) at RBS-FHFA-CT-6163687-89 ("A review was conducted at Fremont Investment and Loan the week of August 29, 2005 .... The purpose of the review was a pre-purchase evaluation of recent production consisting primarily of 100% second mortgages.... All 333 loans were to receive a full legal, compliance, credit and property review.... The overall level of material credit, compliance, and property exceptions is average for a subprime lender and overall we would expect this pool to perform similar to comparable subprime transactions."); RBS Ex. 99 (RBS-FHFA-CT-6943517, September 20, 2006 memorandum regarding Fremont Investment & Loan 2006-3 dated September 20, 2006) at RBS-FHFA-CT-6943517-18 ("From September 5th to September 20th[] a due diligence review was conducted at the corporate offices of Fremont Investment and Loan.. .. 1020 loans were reviewed in connection an upcoming whole loan transaction.... 2764 loans had AVMs run by CoreLogic and 392 of those had BPOs completed.... There are one hundred (100) loans or 9.84% of the pool with exceptions. This is in line with findings from other Alt A lenders and with our previous reviews at Fremont."); RBS Ex. 100 (RBS-FHFA-CT-4072104, RBS Greenwich Capital Credit Risk Department Monthly Management Report, dated September 2006) at RBS-FHFA-CT-4072255 ("During the week of September 5th, RBSGC conducted loan level due diligence on site at Fremont's offices in connection with a pending whole loan purchase/securitization. A statistically significant sample of 99 loans were selected . . . . Overall, no major credit or compliance issues were identified. The loans were considered to be of average quality and eligible for a secondary market transaction.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI calls into question the accuracy of the document cited in ¶ 866, it relies on testimony from the *Harborview* deposition of Joan Poccia that fails to support this assertion. RBS Ex. 103 contains testimony that is vague and ambiguous as to the exhibit introduced; Ms. Poccia's responded to questions regarding "Poccia Exhibit 3" which is identified merely as "Document bearing Bates numbers RBSHV 0639753 through 54[.]" RBS Ex. 103 at 29:6-11. When Ms. Poccia was questioned whether "this is a document that you prepared or assembled on or about April 30, 2007[,]" she responded that she didn't "know if I prepared it then, but I think I remember that we as a team kept this spreadsheet or tried to keep up with the spreadsheet." *Id.* at 29:16-21. It is not clear from this testimony that the

document Ms. Poccia testified to is the same document as FHFA Ex. 492, which was dated September 21, 2007. Further, Ms. Poccia's testimony in the *Harborview* deposition regarding the document introduced therein does not create a genuine dispute of material fact because it cannot be confirmed to be the same document as FHFA Ex. 492 and therefore it is inadmissible hearsay. While RBSSI argues that FHFA cites no evidence that loans were dropped as a result of RBSSI's due diligence, this argument does not create a genuine dispute of material fact. Part I.A, *supra*. RBSSI also cites RBS Exs. 107 and 109 in support of its argument, however, RBS Exs. 107 and 109 are irrelevant to the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*. RBSSI's contention, based on RBS Ex. 110, that the original loan pool only contained 2,215 loans is not supported by the document, which according to the exhibit's cover email is a loan tape, or "settlement schedule," for the loans still being considered for purchase, as opposed to those that were originally offered. FHFA Ex. 542 (RBS-FHFA-CT-06537276) at RBS-FHFA-CT-06537277.

(b)     *First NLC:  "Need To Buy First NLC Hedges"*

867.   **FHFA Statement:**  RBS reviewed 102 First NLC loans "in connection with the possibility of purchasing First NLC sub-prime loan production on a whole loan basis" in early May 2006, three months before first underwriting a securitization with First NLC loans. Ex. 498 (RBS-FHFA-SDNY-0398687, May 8, 2006 Memorandum regarding First NLC Financial Sub Prime Loan File Review) at RBS-FHFA-SDNY-0398687 ("May 3rd to May 5th, contract underwriters and I reviewed 102 loans at First NLC offices in Deerfield Beach, FL. The review was done in connection with the possibility of purchasing First NLC's sub prime loan production on a whole loan basis.").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 867.

**FHFA Reply:**  RBSSI does not dispute the asserted fact.

868.   **FHFA Statement:**  The memorandum summarizing the results of that review called First NLC's underwriting guidelines "outside [of] normal parameters." Ex. 498 (RBS-FHFA-SDNY-0398687, May 8, 2006 Memorandum regarding First NLC Financial Sub Prime Loan File Review) at RBS-FHFA-SDNY-0398689 ("Conclusion/Recommendations:

...For high LTV lending, both of these guidelines appear to be outside normal parameters. I would recommend that our sample percentage remain high until we are comfortable with the performance of this product.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 868 insofar as it mischaracterizes or improperly paraphrases the cited document. The memorandum cited in FHFA Ex. 498 does not state that "underwriting guidelines" are outside of "normal parameters; rather it states that "[t]he product we reviewed appears to be in line with other sub prime lenders who originate a credit scored high LTV product, except for the 575 credit score requirement at a 100% LTV and the requirement of needing only 1 trade line with no minimum balance to qualify. For high LTV lending, both of these guidelines appear to be outside normal parameters." FHFA Ex. 498 (May 8, 2006 memorandum regarding First NLC Financial Sub Prime Loan File Review) at RBS-FHFA-SDNY-0398689. Further, the document indicates that there were "no credit issues" in either the random or adverse sample and that "[o]verall, it appears the guidelines are followed." *Id.* RBSSI also disputes the assertion in ¶ 868 to the extent it states or implies any concern RBSSI had regarding whether First NLC generally originated loans in accordance with its guidelines at or around the time of the Nomura Securitizations. RBS Ex. 111 (RBS-FHFA-SDNY-0397989, July 28, 2006 email regarding Subprime Bulk Pool Flow Business) at RBS-FHFA-SDNY-0397989-90 (email from Adam Smith, responding to the email cited in FHFA Ex. 499, explaining why RBSSI should buy First NLC whole loans and stating that "[d]ue diligence seems to be average or above average for subprime collateral."); RBS Ex. 112 (RBS-FHFA-SDNY-0395973, July 28, 2006 email regarding Subprime Bulk Pool Flow Business) at RBS-FHFA-SDNY-0395973 (email from Johan Eveland responding to Adam Smith's email (RBS Ex. 111), stating that Mr. Eveland feels "[m]uch better" about First NLC). FHFA itself relies on two reviews RBSSI conducted in September and October 2006 on 1,175 First NLC loans, both reviews which found very few credit or compliance exceptions (under 5% for both reviews), "very good" data integrity controls, and "better than [ ] normal[ ]" exception rates for sub-prime originators. FHFA Exs. 441 memorandum regarding First NLC September whole loan purchase) at RBS-FHFA-SDNY-0420392, 522 (October 21, 2006 email regarding First NLC Whole Loan Trade October 2006) at RBS-FHFA-SDNY-0396016. RBSSI concluded in both those reviews that "[it] found the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, which does not suggest a pattern of imprudent lending practices." *Id.* at RBS-FHFA-SDNY-0420393, RBS-FHFA-SDNY-0396017.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that ¶ 868 does not properly characterize and phrase the cited document, citing to FHFA Ex. 498, RBSSI's assertion is not supported by the quoted language. In fact, RBSSI quotes the same language as appears in ¶ 868, anything additional that RBSSI includes in their quote does not directly contravene the asserted fact and does not create a genuine

dispute of material fact.  Part I.C, *supra*.  While RBSSI "disputes" ¶ 868 to the extent that

it states or implies "any concern RBSSI had regarding whether First NLC generally

originated loans in accordance with its guidelines at or around the time of the Nomura

Securitizations[,]" citing to RBS Exs. 111 and 112, RBSSI's assertion is not supported by

these Exhibits.  In fact, the due diligence review of First NLC within that document

states: "The product we reviewed is similar to other subprime lenders except for First

NLC's high LTV (100%), low FICO score (575) and only one tradeline requirement.

These appear to be outside of normal parameters. I would recommend that our sample

percentage remain high until we are comfortable with the performance of this product."

RBS Ex. 111 at RBS-FHFA-SDNY-0397991.  RBS Ex. 112 is mischaracterized in that

the response from Mr. Eveland that he feels "much better" about First NLC was in

response to Mr. Smith's email stating: "First NLC is interested in originating POAs.

How do you feel about them?" and Mr. Eveland's response is directed at First NLC's

interest in originating POAs.  RBS Ex. 112 at RBS-FHFA-SDNY-0395973.  RBSSI also

argues that FHFA Exs. 441 and 522 which found "very few credit or compliance

exceptions (under 5% for both reviews), 'very good' data integrity controls, and 'better

than [ ] normal[ ]" exception rates for sub-prime originators;'" however, neither FHFA

Ex 441 nor FHFA Ex. 522 support RBSSI's position, as neither exhibit found that First

NLC's valuation reviews, and therefore First NLC's loans generally, were adequate.

Indeed, FHFA Ex. 522 explicitly notes, that the "final exclusion number and percentage

may change prior to funding this deal" because the BPO results were not yet finalized.

Ex. 522 at RBS-FHFA-SDNY-0396017.  FHFA Ex. 501, which was written after the

BPO results for this pool were finalized, states that RBSSI "noticed a large number of

kicks (BPOs [sic] related)...the percentage was higher then [sic] normal" and asks "do we

think First NLC has an appraisal problem?"

869. **FHFA Statement:** In the memorandum, Mr. Whittemore, a Senior Credit Risk Analyst and a Vice President in the Credit Group, "recommend[ed] that [RBS's] sample percentage remain high until we are comfortable with the performance of" First NLC collateral. Ex. 498 (RBS-FHFA-SDNY-0398687, May 8, 2006 Memorandum regarding First NLC Financial Sub Prime Loan File Review) at RBS-FHFA-SDNY-0398689 ("Conclusion/Recommendations: ...I would recommend that our sample percentage remain high until we are comfortable with the performance of this product.").

**RBSSI Response:** RBSSI does not dispute that Mr. Whittemore was a Vice President in the Credit Group. RBSSI disputes that Mr. Whittemore was a Senior Credit Risk Analyst at RBSSI. Mr. Whittemore's positions at RBSSI were "Vice President, Credit Officer" and "Senior Vice President, Chief Underwriter." *See* FHFA Ex. 459 (*MassMutual* James Whittemore Deposition Background Questionnaire) at RBS-FHFA-CT-6717249. RBSSI disputes FHFA's characterization that Mr. Whittemore "'recommend[ed] that [RBS's] sample percentage remain high until we are comfortable with the performance of' *First NLC collateral*," as argumentative. FHFA Ex. 498 provides that Mr. Whittemore recommended that "the sample percentage remain high until we are comfortable with the performance *of this product*" *i.e.*, First NLC's "credit scored high LTV product" that Mr. Whittemore referenced in his memorandum. FHFA Ex. 498 (May 8, 2006 memorandum regarding First NLC Financial Sub Prime Loan File Review) at RBS-FHFA-SDNY-0398689 (emphasis added).

RBSSI also disputes the assertion in ¶ 869 to the extent it states or implies any concern RBSSI had regarding whether First NLC generally originated loans in accordance with its guidelines at or around the time of the Nomura Securitizations. RBS Ex. 111 (RBS-FHFA-SDNY-0397989, July 28, 2006 email regarding Subprime Bulk Pool Flow Business) at RBS-FHFA-SDNY-0397989-90 (email from Adam Smith, responding to the email cited in FHFA Ex. 499, explaining why RBSSI should buy First NLC whole loans and stating that "[d]ue diligence seems to be average or above average for subprime collateral."); RBS Ex. 112 (RBS-FHFA-SDNY-0395973, July 28, 2006 email regarding Subprime Bulk Pool Flow Business) at RBS-FHFA-SDNY-0395973 (email from Johan Eveland responding to Adam Smith's email (RBS Ex. 111), stating that Mr. Eveland feels "[m]uch better" about First NLC). FHFA itself relies on two reviews RBSSI conducted in September and October 2006 on 1,175 First NLC loans, both reviews which found very few credit or compliance exceptions (under 5% for both reviews), "very good" data integrity controls, and "better than [ ] normal[ ]" exception rates for sub-prime originators. FHFA Exs. 441 (memorandum regarding First NLC September whole loan purchase) at RBS-FHFA-SDNY-0420392, 552522 (October 21, 2006 email regarding First NLC Whole Loan Trade October 2006) at RBS-FHFA-SDNY-0396016. RBSSI concluded in both those reviews that "[it] found the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, which does not suggest a pattern of imprudent lending practices." *Id.* at RBS-FHFA-SDNY-0420393, RBS-FHFA-SDNY-0396017.

716

**FHFA Reply:** RBSSI does not dispute a material fact. Any dispute about whether Mr. Whittemore was a Senior Credit Risk Analyst is not material to FHFA's motion. *Quarles*, 758 F.2d at 840. RBSSI does not genuinely dispute the asserted fact. While RBSSI "disputes" ¶ 869 as "argumentative," RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. Further, RBSSI's interpretation of FHFA Ex. 498 does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI "disputes" ¶ 869 to the extent that it states or implies "any concern RBSSI had regarding whether First NLC generally originated loans in accordance with its guidelines at or around the time of the Nomura Securitizations[,]" citing to RBS Exs. 111 and 112, RBSSI's assertion is not supported by these Exhibits. In fact, the due diligence review of First NLC within that document states: "The product we reviewed is similar to other subprime lenders except for First NLC's high LTV (100%), low FICO score (575) and only one tradeline requirement. These appear to be outside of normal parameters. I would recommend that our sample percentage remain high until we are comfortable with the performance of this product." RBS Ex. 111 at RBS-FHFA-SDNY-0397991. RBS Ex. 112 is mischaracterized in that the response from Mr. Eveland that he feels "much better" about First NLC was in response to Mr. Smith's email stating: "First NLC is interested in originating POAs. How do you feel about them?" and Mr. Eveland's response is directed at First NLC's interest in originating POAs. RBS Ex. 112 at RBS-FHFA-SDNY-0395973. Finally, the documents cited relating to RBSSI's review of First NLC are irrelevant to the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*. RBSSI also argues that FHFA Exs. 441 and 522 which found "very few credit

or compliance exceptions (under 5% for both reviews), 'very good' data integrity controls, and 'better than [ ] normal[ ]' exception rates for sub-prime originators;'" however, neither FHFA Ex 441 nor FHFA Ex. 522 support RBSSI's position, as neither exhibit found that First NLC's valuation reviews, and therefore First NLC's loans generally, were adequate. Indeed, FHFA Ex. 522 explicitly notes, that the "final exclusion number and percentage may change prior to funding this deal" because the BPO results were not yet finalized. Ex. 522 at RBS-FHFA-SDNY-0396017. FHFA Ex. 501, which was written after the BPO results for this pool were finalized, states that RBSSI "noticed a large number of kicks (BPOs [sic] related)...the percentage was higher then [sic] normal" and asks "do we think First NLC has an appraisal problem?"

870. **FHFA Statement:** In July 2006, RBS conducted due diligence on a First NLC whole loan acquisition and reviewed 364 of 1,457 loans, or 25% of the pool. Ex. 499 (RBS-FHFA-SDNY-0398638, July 27, 2006 memorandum regarding First NLC Financial Services) at RBS-FHFA-SDNY-0398638 ("From July 17th to July 21st a due diligence review was conducted at First NLC Financial Services, LLC offices in Deerfield Beach, FL. The review was done in connection with a whole loan purchase. The sample consisted of 364 loans chosen as follows: 130 loans selected in our normal semi-random method from a pool of 1457 loans...").

**RBSSI Response:** RBSSI does not dispute the assertion in ¶ 870.

**FHFA Reply:** RBSSI does not dispute the asserted fact.

871. **FHFA Statement:** In the due diligence summary for the pool, Ms. Shera repeated Mr. Whittemore's recommendation that the diligence "sample percentage remain high" for First NLC collateral. Ex. 499 (RBS-FHFA-SDNY-0398638, July 27, 2006 memorandum regarding First NLC Financial Services) at RBS-FHFA-SDNY-0398638 ("I would recommend that our sample percentage remain high until we are comfortable with the performance of this product.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 871 as it mischaracterizes or improperly paraphrases the cited document. The memorandum cited in FHFA Ex. 499 does not state that the sample percentage should remain high "*for First NLC*," rather it states that it should remain high "until we are comfortable with the performance of this *product*," *i.e.*, "First NLC's high LTV (100%), low FICO score (575) and only one tradeline requirement" product that is mentioned in the same paragraph. FHFA Ex. 499

(July 27 2006 email regarding First NLC Financial Services) at RBS-FHFA-SDNY-0398638 (emphasis added).

RBSSI also disputes the assertion in ¶ 871 to the extent it states or implies any concern RBSSI had regarding whether First NLC generally originated loans in accordance with its guidelines at or around the time of the Nomura Securitizations. RBS Ex. 111 (RBS-FHFA-SDNY-0397989, July 28, 2006 email regarding Subprime Bulk Pool Flow Business) at RBS-FHFA-SDNY-0397989-90 (email from Adam Smith, responding to the email cited in FHFA Ex. 499, explaining why RBSSI should buy First NLC whole loans and stating that "[d]ue diligence seems to be average or above average for subprime collateral."); RBS Ex. 112 (RBS-FHFA-SDNY-0395973, July 28, 2006 email regarding Subprime Bulk Pool Flow Business) at RBS-FHFA-SDNY-0395973 (email from Johan Eveland responding to Adam Smith's email (RBS Ex. 111), stating that Mr. Eveland feels "[m]uch better" about First NLC). FHFA itself relies on two reviews RBSSI conducted in September and October 2006 on 1,175 First NLC loans, both reviews which found very few credit or compliance exceptions (under 5% for both reviews), "very good" data integrity controls, and "better than [ ] normal[ ]" exception rates for sub-prime originators. FHFA Exs. 441 (memorandum regarding First NLC September whole loan purchase) at RBS-FHFA-SDNY-0420392, 522 (October 21, 2006 email regarding First NLC Whole Loan Trade October 2006) at RBS-FHFA-SDNY-039601. RBSSI concluded in both those reviews that "[it] found the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, which does not suggest a pattern of imprudent lending practices." *Id.* at RBS-FHFA-SDNY-0420393, RBS-FHFA-SDNY-0396017.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that ¶ 871 does not properly characterize and phrase the cited document, citing to FHFA Ex. 499, RBSSI's assertion is not supported by the quoted language. RBSSI asserts that Ms. Shera's statement was referring to First NLC's high LTV, low FICO product in particular, this distinction does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI "disputes" ¶ 871 to the extent that it states or implies "any concern RBSSI had regarding whether First NLC generally originated loans in accordance with its guidelines at or around the time of the Nomura Securitizations[,]" citing to RBS Exs. 111 and 112, RBSSI's assertion is not supported by these Exhibits. In fact, the due diligence review of First NLC within that document states: "The product we reviewed is similar to other subprime lenders except

for First NLC's high LTV (100%), low FICO score (575) and only one tradeline

requirement. These appear to be outside of normal parameters. I would recommend that

our sample percentage remain high until we are comfortable with the performance of this

product." RBS Ex. 111 at RBS-FHFA-SDNY-0397991. RBS Ex. 112 is

mischaracterized in that the response from Mr. Eveland that he feels "much better" about

First NLC was in response to Mr. Smith's email stating: "First NLC is interested in

originating POAs. How do you feel about them?" and Mr. Eveland's response is directed

at First NLC's interest in originating POAs. RBS Ex. 112 at RBS-FHFA-SDNY-

0395973. Finally, the documents cited relating to RBSSI's review of First NLC are

irrelevant to the asserted fact and do not create a genuine dispute of material fact. Part

I.C, *supra*.

872. **FHFA Statement:** In October 2006, while discussing increasing early payment defaults ("EPDs") in Option One originations with Anthony Constantine, Vice President in the Whole Loan Settlement Group, Mr. Whittemore asked whether other originators were "having the same type of issues" with rising EPDs, and Mr. Constantine replied that they "should talk about" First NLC. Ex. 500 (RBS-FHFA-CT-0873199, October 13, 2006 email regarding Option One repurchase) at RBS-FHFA-CT-0873199 (discussion of Option One EPDs).

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 500 includes the language quoted by FHFA. RBSSI also does not dispute that the emails identified in FHFA Ex. 500 were exchanged between Anthony Constantine and James Whittemore on October 13, 2006. RBSSI states that FHFA's characterization that Mr. Constantine's statement that he and Mr. Whittemore "should talk about" First NLC states or implies that they should talk about First NLC due to rising EPDs is argumentative, assumes facts, and is an improper legal conclusion that should be stricken. RBSSI also disputes ¶ 872 to the extent that it states or implies that the cause of early payment defaults stemmed from the failure to follow originators' guidelines. Rather, early payment defaults resulted from originators' guidelines becoming more permissive. *See, e.g.*, RBS Ex. 101 (Deposition of Paul Goudie) at 284:12-25 ("Q. So it looks like there's been an increase in early payment defaults. Right? Sorry, for subprime originations ... And it looks like the reason for those increased EPDs has been a greater influx of loans with lower FICOs, higher LTVs; right? ... A. Yeah, I think that's driven by the more permissive loan programs we talked about earlier on."); RBS Ex. 7 (Deposition of William Gallagher) at 711:11-22 ("Q. Why did RBS reevaluate its due diligence process in mid-2006? ... A. I think over the period of time certainly the markets were more difficult. We – we'd experienced a, an increased

rate of, of early payment defaults. I think originators' guidelines had become more lenient in the time period. And it was our view that we needed to try and do more to improve the process.").

RBSSI further disputes the assertion in ¶ 872 to the extent it states or implies any concern RBSSI had regarding whether First NLC generally originated loans in accordance with its guidelines at or around the time of the Nomura Securitizations. RBS Ex. 111 (RBS-FHFA-SDNY-0397989, July 28, 2006 email regarding Subprime Bulk Pool Flow Business) at RBS-FHFA-SDNY-0397989-90 (email from Adam Smith, responding to the email cited in FHFA Ex. 499, explaining why RBSSI should buy First NLC whole loans and stating that "[d]ue diligence seems to be average or above average for subprime collateral."); RBS Ex. 112 (RBS-FHFA-SDNY-0395973, July 28, 2006 email regarding Subprime Bulk Pool Flow Business) at RBS-FHFA-SDNY-0395973 (email from Johan Eveland responding to Adam Smith's email (RBS Ex. 111), stating that Mr. Eveland feels "[m]uch better" about First NLC). FHFA itself relies on two reviews RBSSI conducted in September and October 2006 on 1,175 First NLC loans, both reviews which found very few credit or compliance exceptions (under 5% for both reviews), "very good" data integrity controls, and "better than [ ] normal[ ]" exception rates for sub-prime originators. FHFA Exs. 441 (memorandum regarding First NLC September whole loan purchase) at RBS-FHFA-SDNY-0420392, 522 (October 21, 2006 email regarding First NLC Whole Loan Trade October 2006) at RBS-FHFA-SDNY-0396016. RBSSI concluded in both those reviews that "[it] found the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, which does not suggest a pattern of imprudent lending practices." *Id.* at RBS-FHFA-SDNY-0420393, RBS-FHFA-SDNY-0396017.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI "disputes" ¶ 872 as "argumentative, assumes facts, and is an improper legal conclusion that should be stricken[,]" RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. While RBSSI "disputes" ¶ 872 to the extent that it implies that the cause of early payment defaults stemmed from the failure to follow originators' guidelines and argues that "[r]ather, early payment defaults resulted from originators' guidelines becoming more permissive[,]" by citing RBS Exs. 7 and 101, these documents are irrelevant to the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI "disputes" ¶ 872 to the extent that it states or implies "any concern RBSSI had regarding whether First NLC generally originated loans in accordance with its guidelines at or around the time of the Nomura Securitizations[,]"

citing to RBS Exs. 111 and 112, RBSSI's assertion is not supported by these Exhibits. In fact, the due diligence review of First NLC within that document states: "The product we reviewed is similar to other subprime lenders except for First NLC's high LTV (100%), low FICO score (575) and only one tradeline requirement. These appear to be outside of normal parameters. I would recommend that our sample percentage remain high until we are comfortable with the performance of this product." RBS Ex. 111 at RBS-FHFA-SDNY-0397991. RBS Ex. 112 is mischaracterized in that the response from Mr. Eveland that he feels "much better" about First NLC was in response to Mr. Smith's email stating: "First NLC is interested in originating POAs. How do you feel about them?" and Mr. Eveland's response is directed at First NLC's interest in originating POAs. RBS Ex. 112 at RBS-FHFA-SDNY-0395973. Finally, the documents cited relating to RBSSI's review of First NLC are irrelevant to the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*.

873. **FHFA Statement:** When discussing repurchase requests for First NLC EPDs two weeks later, Mr. Constantine noted that BPOs ordered on the loans "came back with large value issues." Ex. 501 (RBS-FHFA-SDNY-0399119, October 30, 2006 email regarding First NLC purchases) at RBS-FHFA-SDNY-0399119 ("On a side note: I thought it was important to mention First NLC wanted a Truman bid on the first set of repurchases(24 loans). As you will see in the second attachment the BPOS came back with large value issues.").

**RBSSI Response:** RBSSI disputes the assertion in ¶ 873 as it mischaracterizes or improperly paraphrases the cited document. Mr. Constantine noted that certain unidentified BPOs "came back with large value issues" on "Truman" BPOs and not RBSSI BPOs or First NLC appraisals. *See* FHFA Ex. 501 (October 30 to November 13, 2006 email chain) at RBS-FHFA-SDNY-0399119. To the contrary, in the same email chain that FHFA relies upon, RBSSI's Frank Skibo comments on Mr. Constantine's email and states that, regarding appraisals, there were "no issues noted in the attached emails and our own [*i.e.,* RBSSI's] bpo review" and that RBSSI "should find out what type of bpo truman does versus [RBSSI]" on November 13, 2006. *Id.* Moreover, while FHFA has adduced no evidence identifying "Truman" as referenced in ¶ 873, Frank Skibo testified that Truman was a purchaser of non-performing "scratch and dent" loans. RBS Ex. 12 (Deposition of Frank Skibo) at 698:5-6 ("Truman was a buyer of nonperforming scratch and dent type loans."). To the extent the BPOs referenced in ¶ 873 were

conducted in connection with a purchase bid by Truman, the accuracy of those loans may have been affected by Truman's objective to obtain a lower purchase price for the First NLC loans referenced in ¶ 873.

RBSSI also disputes the assertion in ¶ 873 to the extent it states or implies any concern RBSSI had regarding whether First NLC generally originated loans in accordance with its guidelines at or around the time of the Nomura Securitizations. RBS Ex. 111 (RBS-FHFA-SDNY-0397989, July 28, 2006 email regarding Subprime Bulk Pool Flow Business) at RBS-FHFA-SDNY-0397989-90 (email from Adam Smith, responding to the email cited in FHFA Ex. 499, explaining why RBSSI should buy First NLC loans and stating that "[d]ue diligence seems to be average or above average for subprime collateral."); RBS Ex. 112 (RBS-FHFA-SDNY-0395973, July 28, 2006 email regarding Subprime Bulk Pool Flow Business) at RBS-FHFA-SDNY-0395973 (email from Johan Eveland responding to Adam Smith's email (RBS Ex. 111), stating that Mr. Eveland feels "[m]uch better" about First NLC). FHFA itself relies on two reviews RBSSI conducted in September and October 2006 on 1,175 First NLC loans, both reviews which found very few credit or compliance exceptions (under 5% for both reviews), "very good" data integrity controls, and "better than [ ] normal[ ]" exception rates for sub-prime originators. FHFA Exs. 441 (memorandum regarding First NLC September whole loan purchase) at RBS-FHFA-SDNY-0420392, 522 (October 21, 2006 email regarding First NLC Whole Loan Trade October 2006) at RBS-FHFA-SDNY-0396016. RBSSI concluded in both those reviews that "[it] found the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, which does not suggest a pattern of imprudent lending practices." *Id.* at RBS-FHFA-SDNY-0420393, RBS-FHFA-SDNY-0396017.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI argues that ¶ 873 does not properly characterize and phrase the cited document, citing to FHFA Ex. 501, RBSSI's assertion is not supported by the quoted language. RBSSI asserts that the large issues related only to the "'Truman'" BPOs or that the accuracy of those loans may have been affected by "Truman's objective to obtain a lower purchase price" is unsupported and does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI "disputes" ¶ 873 to the extent that it states or implies "any concern RBSSI had regarding whether First NLC generally originated loans in accordance with its guidelines at or around the time of the Nomura Securitizations[,]" citing to RBS Exs. 111 and 112, RBSSI's assertion is not supported by

these Exhibits. In fact, the due diligence review of First NLC within that document states: "The product we reviewed is similar to other subprime lenders except for First NLC's high LTV (100%), low FICO score (575) and only one tradeline requirement. These appear to be outside of normal parameters. I would recommend that our sample percentage remain high until we are comfortable with the performance of this product." RBS Ex. 111 at RBS-FHFA-SDNY-0397991. RBS Ex. 112 is mischaracterized in that the response from Mr. Eveland that he feels "much better" about First NLC was in response to Mr. Smith's email stating: "First NLC is interested in originating POAs. How do you feel about them?" and Mr. Eveland's response is directed at First NLC's interest in originating POAs. RBS Ex. 112 at RBS-FHFA-SDNY-0395973. Finally, the documents cited relating to RBSSI's review of First NLC are irrelevant to the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*.

874. **FHFA Statement:** Just a week later, RBS decided that it "need[ed] to buy first nlc [sic] hedges." Ex. 502 (RBS-FHFA-CT-0948296, November 8, 2006 email regarding FFML 06-FF16 **PRICED**) at RBS-FHFA-CT-0948296 ("Frank, We also need to buy first nlc hedges....").

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 502 includes the language quoted by FHFA in an email dated November 8, 2006 from Patrick Macolino. RBS disputes ¶ 874 to the extent that it suggests or implies that Mr. Macolino's statement "to buy first nlc hedges" is in any way related to FHFA Exs. 499-501 or to any concern by RBSSI whether First NLC generally originated loans in accordance with its guidelines. The email correspondence reflected in ¶ 874 facially refers to the First Franklin Mortgage Loan Trust 2006-FF16 securitization which was wholly collateralized by mortgage loans originated by First Franklin. RBS Ex. 113 (First Franklin Mortgage Loan Trust 2006-FF16 Prospectus Supplement, dated November 16, 2006). RBSSI states FHFA's characterization that FHFA Ex. 502's mention of "hedges" is related to the statements in FHFA Exs. 499-501 is argumentative and an improper legal conclusion that should be stricken. To the extent a response is required to this statement, RBSSI disputes FHFA's characterization of FHFA Ex. 502 and states that the document speaks for itself.

RBSSI also disputes the assertion in ¶ 874 to the extent it states or implies any concern RBSSI had regarding whether First NLC generally originated loans in accordance with its guidelines at or around the time of the Nomura Securitizations. RBS Ex. 111 (RBS-FHFA-SDNY-0397989, July 28, 2006 email regarding Subprime Bulk Pool Flow

Business) at RBS-FHFA-SDNY-0397989-90 (email from Adam Smith, responding to the email cited in FHFA Ex. 499, explaining why RBSSI should buy First NLC whole loans and stating that "[d]ue diligence seems to be average or above average for subprime collateral."); RBS Ex. 112 (RBS-FHFA-SDNY-0395973, July 28, 2006 email regarding Subprime Bulk Pool Flow Business) at RBS-FHFA-SDNY-0395973 (email from Johan Eveland responding to Adam Smith's email (RBS Ex. 111), stating that Mr. Eveland feels "[m]uch better" about First NLC). FHFA itself relies on two reviews RBSSI conducted in September and October 2006 on 1,175 First NLC loans, both reviews which found very few credit or compliance exceptions (under 5% for both reviews), "very good" data integrity controls, and "better than [ ] normal[ ]" exception rates for sub-prime originators. FHFA Exs. 441 (memorandum regarding First NLC September whole loan purchase) at RBS-FHFA-SDNY-0420392, 522 (October 21, 2006 email regarding First NLC Whole Loan Trade October 2006) at RBS-FHFA-SDNY-0396016. RBSSI concluded in both those reviews that "[it] found the nature and overall level of credit and compliance exceptions to be what we typically find in the industry, which does not suggest a pattern of imprudent lending practices." *Id.* at RBS-FHFA-SDNY-0420393, RBS-FHFA-SDNY-0396017.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not dispute that the cited testimony is accurately quoted. While RBSSI "disputes" ¶ 874 to the extent that it states or implies that "Mr. Macolino's statement "to buy first nlc hedges" is in any way related to FHFA Exs. 499-501 or to any concern by RBSSI whether First NLC generally originated loans in accordance with its guidelines[,]" RBSSI identifies no evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. Further, RBSSI cites to the subject line of the email which is irrelevant to and does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI "disputes" ¶ 874 as "argumentative and an improper legal conclusion that should be stricken[,]" RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. While RBSSI "disputes" ¶ 874 to the extent that it states or implies "any concern RBSSI had regarding whether First NLC generally originated loans in accordance with its guidelines at or around the time of the Nomura Securitizations[,]" citing to RBS Exs. 111 and 112, RBSSI's assertion is not supported by these Exhibits. In

fact, the due diligence review of First NLC within that document states: "The product we reviewed is similar to other subprime lenders except for First NLC's high LTV (100%), low FICO score (575) and only one tradeline requirement. These appear to be outside of normal parameters. I would recommend that our sample percentage remain high until we are comfortable with the performance of this product." RBS Ex. 111 at RBS-FHFA-SDNY-0397991. RBS Ex. 112 is mischaracterized in that the response from Mr. Eveland that he feels "much better" about First NLC was in response to Mr. Smith's email stating: "First NLC is interested in originating POAs. How do you feel about them?" and Mr. Eveland's response is directed at First NLC's interest in originating POAs. RBS Ex. 112 at RBS-FHFA-SDNY-0395973. Finally, the documents cited relating to RBSSI's review of First NLC are irrelevant to the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*.

(c)     <em>Equifirst: "Particularly Troublesome"</em>

875. **FHFA Statement:** In May 2003, RBS "fully reviewed" a credit and compliance due diligence sample of 297 Equifirst loans. Ex. 503 (RBS-FHFA-SDNY-0401116, May 23, 2003 memorandum regarding EQUIFIRST – Loan File Due Diligence – 4 WHOLE LOAN TRADES) at RBS-FHFA-SDNY-0401117 ("All of the exceptions were from fully reviewed loans (297)").

**RBSSI Response:** RBSSI states that the facts and/or circumstances regarding the May 2003 review of Equifirst loans discussed in ¶ 875 and FHFA Ex. 503, which pre-date any Nomura Securitization by over three years, are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI does not dispute the assertion in ¶ 875.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the review cited in ¶ 875 pre-dates any Nomura securitization and is not a material fact, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*.

876. **FHFA Statement:** The memorandum summarizing the due diligence results noted that "10% ha[d] significant issues." Ex. 503 (RBS-FHFA-SDNY-0401116, May 23, 2003 memorandum regarding EQUIFIRST – Loan File Due Diligence – 4 WHOLE LOAN TRADES) at RBS-FHFA-SDNY-0401117 ("Of the 297 loans, 29 or 10% have significant issues.").

**RBSSI Response:** RBSSI states that the facts and/or circumstances regarding the May 2003 review of Equifirst loans discussed in ¶ 876 and FHFA Ex. 503, which pre-date any Nomura Securitization by over three years, are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI disputes the assertion in ¶ 876 as it omits material information. The memorandum states that only one loan was flagged for any credit issue, and that the data integrity was "very good." *See* FHFA Ex. 503 (May 23, 2003 memorandum regarding EQUIFIRST – Loan File Due Diligence – 4 WHOLE LOAN TRADES) at RBS-FHFA-SDNY-0401117-118. RBSSI disputes the assertion in ¶ 876 to the extent it states or implies any concern by RBSSI regarding whether Equifirst generally originated loans in accordance with its guidelines. In July 2006, RBSSI performed a full credit, compliance, legal, and property review on 1,831 Equifirst loans out of a total pool of 6,512 loans. FHFA Ex. 443 (Spreadsheet regarding Equifirst 2006-1 loan-level due diligence) at RBS-FHFA-SDNY-0396864 (Spreadsheet "Summary of Diligence," cell B6). Of the 1,803 loans fully underwritten by RBSSI, only 68 (less than 3.8%) were found to have material credit or compliance issues. *Id.* (spreadsheet "Event Status" showing review status at column G and credit and compliance exception status at columns D and E, respectively); *see also* RBS Ex. 114 (RBS-FHFA-CT-4511574, July 26, 2006 email regarding Equifirst Whole Loan Trade July 2006) at RBS-FHFA-CT-4511574-75 ("July 10th to July 21st, a due diligence was conducted at Equifirst's office in Charlotte, North Carolina. The purpose of the review was a due diligence of approximately $1B of recent sub-prime originations.... All 1831 loans received a full legal, compliance, credit and property review.... Data Integrity: Based on a comparison of the data captured by Clayton's CLAS system versus the data supplied by Centex, the data integrity appears to be very good... . All loans were underwritten by the Clayton Group's CLAS system using Equifirst guidelines ... . Based on this review we found an exception rate of 6.7% in the semi-random sample, and 5.6% across all adverse samples. This percentage is what we normally see for sub-prime originations. . .. We found the nature and overall level of credit and compliance exceptions to be typical of the industry, and as well we expect that after final BPO arbitration the overall level of valuation exceptions should be approximately 6-8%, a level which does not suggest a pattern of imprudent lending practice. We believe that the loans should perform similar to a typical sub prime pool.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the review cited in ¶ 876 pre-dates any Nomura securitization and is not a material fact, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. While RBSSI "disputes" ¶ 876, arguing that it omits material information

727

regarding data integrity and credit issues, this information is irrelevant to and does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. While RBSSI "disputes" ¶ 876, to the extent that it states or implies "any concern by RBSSI regarding whether Equifirst generally originated loans in accordance with its guidelines[,]" citing FHFA Ex. 443 and RBS Ex. 114, these documents to not support RBSSI's assertion. FHFA Ex. 443 is a summary for one Equifirst deal and does not directly contravene the due diligence summary cited in ¶ 876. Further, RBS Ex. 114 actually shows that of the 592 BPOs that were ordered, 122 were out of variance. RBS Ex. 114 at RBS-FHFA-CT-4511575. Therefore, these documents do not directly contravene the asserted fact and do not create a genuine dispute of material fact. Part I.C, *supra*.

877. **FHFA Statement:** Mr. Lawson noted that this 10% defect rate was "similar to our last three reviews." Ex. 503 (RBS-FHFA-SDNY-0401116, May 23, 2003 memorandum regarding EQUIFIRST – Loan File Due Diligence – 4 WHOLE LOAN TRADES) at RBS-FHFA-SDNY-0401118 ("The level of exceptions (10%) is similar to our last three reviews (9%, 13%, and 11%).").

**RBSSI Response:** RBSSI states that the facts and/or circumstances regarding the May 2003 review of Equifirst loans discussed in ¶ 877 and FHFA Ex. 503, which pre-date any Nomura Securitization by over three years, are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI does not dispute that FHFA Ex. 503 includes the language quoted by FHFA, but disputes FHFA's characterization of the document as identifying a "defect rate," which is a term that does not appear in the document, as argumentative and an improper legal characterization which should be stricken. FHFA Ex. 503 discusses "exceptions" for 29 loans, including 13 loans with "Federal Compliance" issues, 11 loans for "Value/Property" issues and 1 loan for "Credit" issues, among others. FHFA Ex. 503 (May 23, 2003 memorandum regarding EQUIFIRST – Loan File Due Diligence – 4 WHOLE LOAN TRADES) at RBS-FHFA-SDNY-0401117-118. RBSSI refers the Court to FHFA Ex. 503 for additional information that contradicts, or provides necessary context for, FHFA's characterization of the quotation and an explanation of the reasons the loans were flagged for exceptions. RBSSI disputes the assertion in ¶ 877 to the extent it states or implies any concern by RBSSI regarding whether Equifirst generally originated loans in accordance with its guidelines.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues

that the review cited in ¶ 877 pre-dates any Nomura securitization and is not a material

fact, RBSSI's argument does not create a genuine dispute of material fact. Part I.A,

*supra*. While RBSSI "disputes" ¶ 877, asserting that it does not properly characterize the

cited document and that the use of the term "defect rate" is "argumentative," RBSSI's

argument does not create a genuine dispute of material fact. Part I.A, *supra*. It is clear

that the "level of exceptions" represents defects present within the loans. Finally, while

RBSSI "disputes" ¶ 877 to the extent it states or implies concern by RBSSI regarding

whether Equifirst originated loans in accordance with its guidelines, it identifies no

evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a

genuine dispute of material fact. Part I.B, *supra*.

878. **FHFA Statement:** The memorandum reflected an even higher appraisal review defect
rate: "21% ha[d] a variance of greater than 20% from the origination appraisal." Ex. 503
(RBS-FHFA-SDNY-0401116, May 23, 2003 memorandum regarding EQUIFIRST –
Loan File Due Diligence – 4 WHOLE LOAN TRADES) at RBS-FHFA-SDNY-0401118
("Of the 47 received, 10 or 21% have a variance greater than 20% from the origination
appraisal.").

**RBSSI Response:** RBSSI states that the facts and/or circumstances regarding the May
2003 review of Equifirst loans discussed in ¶ 878 and FHFA Ex. 503, which pre-date any
Nomura Securitization by over three years, are not "material facts" at issue in this
litigation under Local Rule 56.1 or otherwise to which a response is required. To the
extent a response is required, RBSSI disputes FHFA's characterization of the document
as identifying a "defect rate," which is a term that does not appear in the document, as
argumentative and an improper legal characterization which should be stricken. The
memorandum found in FHFA Ex. 503 discusses "exceptions" and "appraisal variances."
FHFA Ex. 503 (May 23, 2003 memorandum regarding EQUIFIRST – Loan File Due
Diligence – 4 WHOLE LOAN TRADES) at RBS-FHFA-SDNY-0401118. RBSSI refers
the Court to FHFA Ex. 503 for additional information that contradicts, or provides
necessary context for, FHFA's characterization of the quotation and an explanation of the
reasons for the appraisal variances, including because a "substantial amount of lending is
done in rural, semi rural, or small town areas where the real estate markets are very thin
and realistic comparable sales are few or non existent." *Id.* RBSSI disputes the assertion
in ¶ 878 to the extent it states or implies any concern by RBSSI regarding whether
Equifirst generally originated loans in accordance with its guidelines.

**FHFA Reply:**  RBSSI does not genuinely dispute the asserted fact.  While RBSSI argues that the review cited in ¶ 878 pre-dates any Nomura securitization and is not a material fact, RBSSI's argument does not create a genuine dispute of material fact.  Part I.A, *supra*.  While RBSSI "disputes" ¶ 878, asserting that it does not properly characterize the cited document and that the use of the term "defect rate" is "argumentative," RBSSI's argument does not create a genuine dispute of material fact.  Part I.A, *supra*.  It is clear that the "level of exceptions" represents defects present within the loans.  Further, while RBSSI points to the explanation of the reasons for appraisal variances, this does not directly contravene the asserted fact and does not create a genuine dispute of material fact.  Part I.C, *supra*.  Finally, while RBSSI "disputes" ¶ 878 to the extent it states or implies concern by RBSSI regarding whether Equifirst originated loans in accordance with its guidelines, it identifies no evidence that contradicts the asserted fact.  RBSSI's conclusory assertions do not create a genuine dispute of material fact.  Part I.B, *supra*.

879.  **FHFA Statement:**  Mr. Lawson noted that Equifirst's "level of variances is high versus other sub prime originators with which we deal and particularly troublesome given the high LTV nature of Equifirst's lending." Ex. 503 (RBS-FHFA-SDNY-0401116, May 23, 2003 memorandum regarding EQUIFIRST – Loan File Due Diligence – 4 WHOLE LOAN TRADES) at RBS-FHFA-SDNY-0401118.

**RBSSI Response:**  RBSSI states that the facts and/or circumstances regarding the May 2003 review of Equifirst loans discussed in ¶ 879 and FHFA Ex. 503, which pre-date any Nomura Securitization by over three years, are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required.  To the extent a response is required, RBSSI disputes the assertion in ¶ 879 insofar as it omits material information from the cited document.  The memorandum in FHFA Ex. 503 states that one cause of for the "high level of appraisal variances" is that a "substantial amount of lending is done in rural, semi rural, or small town areas where the real estate markets are very thin and realistic comparable sales are few or non existent." FHFA Ex. 503 (May 23, 2003 memorandum regarding EQUIFIRST – Loan File Due Diligence – 4 WHOLE LOAN TRADES) at RBS-FHFA-SDNY-0401118.  RBSSI disputes the assertion in ¶ 879 to the extent it states or implies any concern by RBSSI regarding whether Equifirst generally originated loans in accordance with its guidelines.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the review cited in ¶ 879 pre-dates any Nomura securitization and is not a material fact, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. While RBSSI asserts that ¶ 879 omits material information from the cited document, this argument does not create a genuine dispute of material fact. Part I.A, *supra*. While RBSSI points to the "cause" for the "high level of appraisal variances," this does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. Finally, while RBSSI "disputes" ¶ 879 to the extent it states or implies concern by RBSSI regarding whether Equifirst originated loans in accordance with its guidelines, it identifies no evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. And, such an argument is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Parts I.B-C, *supra*.

880. **FHFA Statement:** Mr. Lawson concluded that "due to [these] valuation issues," RBS should consider additional random sampling of Equifirst loan pools. Ex. 503 (RBS-FHFA-SDNY-0401116, May 23, 2003 memorandum regarding EQUIFIRST – Loan File Due Diligence – 4 WHOLE LOAN TRADES) at RBS-FHFA-SDNY-0401118 ("I recommend that we consider random sampling of Equifirst pools we purchase in the future due to valuation issues.").

**RBSSI Response:** RBSSI states that the facts and/or circumstances regarding the May 2003 review of Equifirst loans discussed in ¶ 880 and FHFA Ex. 503, which pre-date any Nomura Securitization by over three years, are not "material facts" at issue in this litigation under Local Rule 56.1 or otherwise to which a response is required. To the extent a response is required, RBSSI disputes the assertion in ¶ 880 insofar as it omits material information from the cited document. The memorandum in FHFA Ex. 503 states that one cause of for the "high level of appraisal variances" is that a "substantial amount of lending is done in rural, semi rural, or small town areas where the real estate markets are very thin and realistic comparable sales are few or non existent." FHFA Ex. 503 (May 23, 2003 memorandum regarding EQUIFIRST – Loan File Due Diligence – 4 WHOLE LOAN TRADES) at RBS-FHFA-SDNY-0401118.

RBSSI disputes the assertion in ¶ 880 to the extent it states or implies any concern by RBSSI regarding whether Equifirst generally originated loans in accordance with its guidelines.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI argues that the review cited in ¶ 880 pre-dates any Nomura securitization and is not a material fact, RBSSI's argument does not create a genuine dispute of material fact. Part I.A, *supra*. While RBSSI asserts that ¶ 880 omits material information from the cited document, this argument does not create a genuine dispute of material fact. Part I.A, *supra*. While RBSSI points to the "cause" for the "'high level of appraisal variances,'" this does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Further, the cause for the high level of variances is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Parts I.B-C, *supra*.

881. **FHFA Statement:** RBS also rejected more than 27% of the loans in the diligence sample of an Equifirst pool that closed in February 2005. Ex. 492 (RBS-FHFA-CT-4355792, Open Trade Spreadsheet) at RBS-FHFA-CT-4355792.

**RBSSI Response:** RBSSI disputes the assertion in ¶ 881. FHFA cites no evidence other than FHFA Ex. 492, which is an "Open Trades" spreadsheet which an RBSSI witness has testified may not be accurate. RBS Ex. 103 (*Harborview* Deposition of Joan Poccia) at 38:21-40:14 ("Q. Under column P there is a reference to underwriting kicks. Do you have an understanding of what that reflects or refers to? A. I believe it would refer to the removal of loans that had underwriting exceptions. Q. And that would reflect the work that the due diligence firm either, for example. Clayton or Capital would have done, is that correct? A. That's correct. Could I? Q. Yes. A. I do remember that this report was very manual and sometimes we backfilled the information. I guess I have concerns that there is some inaccuracies in here.... Q. Okay. When you say backfill, what do you mean by that? That it was done after the completion of the purchase? A. Yes. I recall like sifting through e-mails to get these number of kicks and I don't know if it is entirely – Q. Accurate? A. – accurate. Q. Okay. Did someone as best you can recall direct that you maintain this document or the information in this document? ... A. No, I don't think so. I think it was just something that our team tried to keep track of."). Documents produced by Clayton demonstrate that, at most, 47 mortgage loans (13.6% of the 344 loan sample) were identified as having credit or compliance issues in the course of Clayton's sample reunderwriting. RBS Ex. 115 (CLAY-FHFADEF-E-2127087, Individual Asset Summary Report for Equifirst Whole Loans (0502), dated February 25,

2005) at CLAY-FHFADEF-E-2127087 (identifying "Event Level 3" loans for February 2005 Equifirst transaction).

RBSSI further disputes the assertion in ¶ 881 to the extent it states or implies any concern by RBSSI regarding whether Equifirst generally originated loans in accordance with its guidelines. *See* RBS Ex. 114 (RBS-FHFA-CT-4511574, July 26, 2006 email regarding Equifirst Whole Loan Trade July 2006) at RBS-FHFA-CT-4511574-75 ("July 10th to July 21st, a due diligence was conducted at Equifirst's office in Charlotte, North Carolina. The purpose of the review was a due diligence of approximately $1B of recent sub-prime originations.... All 1831 loans received a full legal, compliance, credit and property review.... Data Integrity: Based on a comparison of the data captured by Clayton's CLAS system versus the data supplied by Centex, the data integrity appears to be very good.... All loans were underwritten by the Clayton Group's CLAS system using Equifirst guidelines .... Based on this review we found an exception rate of 6.7% in the semi-random sample, and 5.6% across all adverse samples. This percentage is what we normally see for sub-prime originations.... We found the nature and overall level of credit and compliance exceptions to be typical of the industry, and as well we expect that after final BPO arbitration the overall level of valuation exceptions should be approximately 6-8%, a level which does not suggest a pattern of imprudent lending practice. We believe that the loans should perform similar to a typical sub prime pool.").

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI calls into question the accuracy of the document cited in ¶ 881, it relies on testimony from the *Harborview* deposition of Joan Poccia that fails to support this assertion. RBS Ex. 103 contains testimony that is vague and ambiguous as to the exhibit introduced; Ms. Poccia's responded to questions regarding "Poccia Exhibit 3" which is identified merely as "Document bearing Bates numbers RBSHV 0639753 through 54[.]" RBS Ex. 103 at 29:6-11. When Ms. Poccia was questioned whether "this is a document that you prepared or assembled on or about April 30, 2007[,]" she responded that she didn't "know if I prepared it then, but I think I remember that we as a team kept this spreadsheet or tried to keep up with the spreadsheet." *Id.* at 29:16-21. It is not clear from this testimony that the document Ms. Poccia testified to is the same document as FHFA Ex. 492. Further, Ms. Poccia's testimony in the *Harborview* deposition regarding the document introduced therein does not create a genuine dispute of material fact because it cannot be confirmed

to be the same document as FHFA Ex. 492 and therefore it is inadmissible hearsay.

While RBSSI "disputes" ¶ 881, to the extent that it states or implies "any concern by RBSSI regarding whether Equifirst generally originated loans in accordance with its guidelines[,]" citing RBS Ex. 114, this document does not support RBSSI's assertion. RBS Ex. 114 actually shows that of the 592 BPOs that were ordered, 122 were out of variance. RBS Ex. 114 at RBS-FHFA-CT-4511575. Therefore, this document does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. RBSSI argues that RBS Ex. 115 "demonstrates that, at most, 47 mortgage loans," or 13.6%, of the loans in the February 2005 Equifirst purchase had "credit or compliance issues;" however, RBSSI fails to create a genuine dispute of material fact as it offers no evidence that RBS Ex. 115 is the final Clayton report concerning this purchase. Furthermore, RBS Ex. 115 is not material to FHFA's motion, *Quarles*, 758 F.2d at 840, because a 13.6% defect rate would still be a red flag.

882. **FHFA Statement:** In August 2006, RBS did not purchase over 93% of the loans from the original pool of another Equifirst acquisition, EQUIFST24. Ex. 492 (RBS-FHFA-CT-4355792, Open Trade Spreadsheet) at RBS-FHFA-CT-4355792.

**RBSSI Response:** RBSSI disputes the assertion in ¶ 882. FHFA cites no evidence other than FHFA Ex. 492, which is an "Open Trades" spreadsheet which an RBSSI witness has testified may not be accurate. RBS Ex. 103 (*Harborview* Deposition of Joan Poccia) at 38:21-40:14 ("Q. Under column P there is a reference to underwriting kicks. Do you have an understanding of what that reflects or refers to? A. I believe it would refer to the removal of loans that had underwriting exceptions. Q. And that would reflect the work that the due diligence firm either, for example. Clayton or Capital would have done, is that correct? A. That's correct. Could I? Q. Yes. A. I do remember that this report was very manual and sometimes we backfilled the information. I guess I have concerns that there is some inaccuracies in here.... Q. Okay. When you say backfill, what do you mean by that? That it was done after the completion of the purchase? A. Yes. I recall like sifting through e-mails to get these number of kicks and I don't know if it is entirely – Q. Accurate? A. – accurate. Q. Okay. Did someone as best you can recall direct that you maintain this document or the information in this document? ... A. No, I don't think so. I think it was just something that our team tried to keep track of.").

RBSSI further disputes the assertion in ¶ 882 insofar as FHFA misunderstands or mischaracterizes the cited spreadsheet. The EQUIFST24 acquisition was a related tail funding to a July 2006 Equifirst acquisition, EQUIFST22, which is apparent by the trades' identical "Qty on Conformation," "Commitment Numbers," "T/D [Trade Date]," and "Projected S/D [Settlement Date]." *See* FHFA Ex. 492 (Trade information spreadsheet) at RBS-FHFA-CT-4355792 (Spreadsheet "Closed Actual Funding Amount 06" rows 168 and 175); *see also* RBS Ex. 114 (RBS-FHFA-CT-4511574, July 26, 2006 email regarding Equifirst Whole Loan Trade July 2006) at RBS-FHFA-CT-4511575 ("If needed a subsequent tail funding may need to occur."). Accordingly, FHFA Ex. 492 does not contain the information necessary to even calculate the number of loans RBSSI did not purchase from EQUIFST24.

RBSSI further disputes the assertion in ¶ 882 to the extent it states or implies any concern by RBSSI regarding whether Equifirst generally originated loans in accordance with its guidelines. RBS Ex. 114 (RBS-FHFA-CT-4511574, July 26, 2006 email regarding Equifirst Whole Loan Trade July 2006) at RBS-FHFA-CT-4511574-75 ("July 10th to July 21st, a due diligence was conducted at Equifirst's office in Charlotte, North Carolina. The purpose of the review was a due diligence of approximately $1B of recent sub-prime originations.... All 1831 loans received a full legal, compliance, credit and property review.... Data Integrity: Based on a comparison of the data captured by Clayton's CLAS system versus the data supplied by Centex, the data integrity appears to be very good.... All loans were underwritten by the Clayton Group's CLAS system using Equifirst guidelines .... Based on this review we found an exception rate of 6.7% in the semi-random sample, and 5.6% across all adverse samples. This percentage is what we normally see for sub-prime originations.... We found the nature and overall level of credit and compliance exceptions to be typical of the industry, and as well we expect that after final BPO arbitration the overall level of valuation exceptions should be approximately 6-8%, a level which does not suggest a pattern of imprudent lending practice. We believe that the loans should perform similar to a typical sub prime pool."); FHFA Ex. 443 (Spreadsheet regarding Equifirst 2006-1 loan-level due diligence) at RBS-FHFA-SDNY-0396864 (Spreadsheet "Event Status" showing that, of the 1,804 loans fully underwritten by RBSSI, only 68 or less than 3.8% were found to have material credit or compliance issues.).

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI calls into question the accuracy of the document cited in ¶ 882, it relies on testimony from the *Harborview* deposition of Joan Poccia that fails to support this assertion. RBS Ex. 103 contains testimony that is vague and ambiguous as to the exhibit introduced; Ms. Poccia's responded to questions regarding "Poccia Exhibit 3" which is identified merely as "Document bearing Bates numbers RBSHV 0639753 through 54[.]" RBS Ex. 103 at 29:6-11. When Ms. Poccia was questioned whether "this is a document that you prepared

or assembled on or about April 30, 2007[,]" she responded that she didn't "know if I prepared it then, but I think I remember that we as a team kept this spreadsheet or tried to keep up with the spreadsheet." *Id.* at 29:16-21. It is not clear from this testimony that the document Ms. Poccia testified to is the same document as FHFA Ex. 492. Further, Ms. Poccia's testimony in the *Harborview* deposition regarding the document introduced therein does not create a genuine dispute of material fact because it cannot be confirmed to be the same document as FHFA Ex. 492 and therefore it is inadmissible hearsay. While RBSSI asserts that ¶ 882 does not properly characterize the spreadsheet, RBSSI only states that the spreadsheet does not contain necessary information. RBSSI identifies no evidence that contradicts the asserted fact. RBSSI's conclusory assertions do not create a genuine dispute of material fact. Part I.B, *supra*. While RBSSI "disputes" ¶ 882, to the extent that it states or implies "any concern by RBSSI regarding whether Equifirst generally originated loans in accordance with its guidelines[,]" citing RBS Ex. 114, this document does not support RBSSI's assertion. RBS Ex. 114 actually shows that of the 592 BPOs that were ordered, 122 were out of variance. RBS Ex. 114 at RBS-FHFA-CT-4511575. Therefore, this document does not directly contravene the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*. RBSSI also contends, that the EQUIFST24 transaction "was a related tail funding to a July 2006 Equifirst acquisition, EQUIFST22," though RBS does not genuinely dispute the asserted fact, and identifies no evidence that contradicts it. RBSSI's conclusory assertions, based on the "Qty on Conformation," "Commitment Numbers," "T/D," and "Projected S/D" columns of FHFA Ex. 492 are conclusory assertions that do not create a genuine dispute of material fact. Part I.B, *supra*. Indeed, two other Equifirst purchases, EQUIFST23 and

EQUIFST25, also share the same "Qty on Confirmation" as EQUIFST22 and

EQUIFIRST24, but have different entries in the "t/d" and "Projected S/D" columns.

Furthermore, the "Actual Amount Funded" column for EQUIFST22 reveals that nearly

$890 million in loans were funded on a $850 million purchase – if RBS was correct, that

the $53 million EQUIFST24 pool was a tail funding connected to EQUIFST22, then the

EQUIFST22 purchase would have had less than $800 million as the "Actual Amount

Funded." RBSSI also points to RBS Ex. 114, a July 2006 email, which states that "a

subsequent tail funding may need to occur," this email from July as to what "may" occur

at a later date fails to create a genuine dispute of fact as to what did happen in October.

RBSSI does not genuinely dispute the asserted fact, identifies no evidence that

contradicts the asserted fact, and instead makes conclusory assertions regarding what

"may" have happened. RBSSI's conclusory assertions do not create a genuine dispute of

material fact. Part I.B, *supra*.

> (d) *People's Choice: "Only Big Whole Loan Seller We Are Not Talking To"*

883. **FHFA Statement:** Mr. Skibo wrote in July 2005 that the "only big whole loan seller [RBS is] not talking to is Peoples Choice." Ex. 505 (RBS-FHFA-CT-4652737, July 27, 2005 email regarding July whole loan market color) at RBS-FHFA-CT-4652747 ("The only big whole loan seller we are not talking to is Peoples Choice.").

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 505 includes the language quoted by FHFA, except the document contains additional information that contradicts, or provides necessary context for, FHFA's characterization of the quotation. FHFA quotes one sentence from FHFA Ex. 505, which is a twelve-page email chain spanning a five-month period. RBSSI refers the Court to FHFA Ex. 505 for an accurate and complete statement of its content. RBSSI disputes FHFA's characterization of FHFA Ex. 505 to the extent it suggests or implies any concern by RBSSI regarding whether People's Choice generally originated loans in accordance with its guidelines. FHFA adduces no evidence suggesting why, in July 2005, RBSSI purportedly did not purchase loans originated by People's Choice Home Loans.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. RBSSI does not

dispute the language quoted in ¶ 883. While RBSSI asserts that FHFA Ex. 505 contains

additional information that contradicts or provides context for ¶ 883, stating that the

document is twelve pages and spans a five-month period. This assertion is irrelevant to

the asserted fact and does not create a genuine dispute of material fact. Part I.C, *supra*.

Finally, while RBSSI "disputes" ¶ 883 to the extent that it suggests or implies any

concern by RBSSI regarding whether People's Choice originated loans in accordance

with its guidelines, they identify no evidence that contradicts the asserted fact. RBSSI's

conclusory assertion does not create a genuine dispute of material fact. Further, RBSSI's

argument is irrelevant to the asserted fact and does not create a genuine dispute of

material fact. Parts I.B-C, *supra*.

884. **FHFA Statement:** When he distributed an email with "whole loan color" in late March 2006, Mr. Skibo wrote "pass" next to the entry for "Peoples Choice." Ex. 506 (RBS-FHFA-CT-3930142, March 28, 2006 regarding Last Weeks whole loan color - NOT FOR DISTRIBUTION, INTERNAL USE ONLY) at RBS-FHFA-CT-3930143 ("Peoples Choice - pass").

**RBSSI Response:** RBSSI does not dispute that FHFA Ex. 506 includes the language quoted by FHFA, except the document contains additional information that contradicts, or provides necessary context for, FHFA's characterization of the quotation. FHFA quotes three words from FHFA Ex. 506, which is a four-page email chain spanning an eight-day period. RBSSI refers the Court to FHFA Ex. 506 for an accurate and complete statement of its content. RBSSI disputes FHFA's statement to the extent that FHFA Ex. 506 represents "whole loan color" for any period other than the week of March 21, 2006. *See* FHFA Ex. 506 (March 21 to 29, 2006 email chain) at RBS-FHFA-SDNY-3930142-143 ("Subject: Last weeks whole loan color"). RBSSI further disputes FHFA's characterization of FHFA Ex. 506 to the extent it suggests or implies any concern by RBSSI regarding whether People's Choice generally originated loans in accordance with its guidelines.

**FHFA Reply:** RBSSI does not genuinely dispute the asserted fact. While RBSSI asserts

that FHFA Ex. 506 contains additional information that contradicts or provides context

for ¶ 884, the cited text does not support this assertion. RBSSI argues that the quoted text

does not represent "'whole loan color' for any period other than the week of March 21, 2006[,]" however they identify no evidence that contradicts the fact that the text cited in ¶ 884 comes from the March 28, 2006 email representing whole loan color for that time period. RBSSI's conclusory assertion does not create a genuine dispute of material fact. Part I.B, *supra*. Finally, while RBSSI "disputes" ¶ 884 to the extent that it suggests or implies any concern by RBSSI regarding whether People's Choice originated loans in accordance with its guidelines, they identify no evidence that contradicts the asserted fact. RBSSI's conclusory assertion does not create a genuine dispute of material fact. Further, RBSSI's argument is irrelevant to the asserted fact and does not create a genuine dispute of material fact. Parts I.B-C, *supra*.

**PART III: FHFA'S LOCAL RULE 56.1 COUNTERSTATEMENT OF ADDITIONAL
UNDISPUTED MATERIAL FACTS**

885. On October 30, 2006, Nomura sold a 50% interest in the residual cashflows from NHELI

2006-HE3 to for $18,817,362.63. FHFA Ex. 610 (NOM-FHFA_04631338, Oct. 26,

2006 Side letter to 2006-HE3 Pooling Agreement between Greenwich Capital Markets

and Nomura (signed by Nomura)) at NOM-FHFA_04631338-39 ("The Certificate

Principal Balance of the 2006-HE3 Class X Certificates and 2006-HE3 Class P

Certificates on the Closing Date is expected to be approximately $31,717.098 and

$100.00, respectively. . . . The purchase price for the 2006-HE3 Class X Certificates shall

be $18,817,312.63 and the purchase price of the 2006-HE3 Class P Certificates shall be

$50.00.").

886. Nomura "monetized" its residual positions by issuing net interest margin ("NIM")

securities. FHFA Ex. 611 (Deposition of James DePalma) at 171:18-172:2 ("Q. What's

your understanding of the residual interest in NIMs that Nomura would keep on a deal? . .

. A. The residual would be Nomura's net investment in a security. The NIM was just a

methodology for monetizing that investment and selling out sequential components of the

residual itself."); FHFA Ex. 544 (Deposition of Brett Marvin) at 63:25-64:7 ("Q. . . . So

the NIM is . . . from the same class of cash flows as the residual -- A. Uh-huh. . . . Just

carved out the first -- earlier couple of years."); FHFA Ex. 543 (Deposition of Steven

Katz) at 112:10-113:5 ("Q. . . . Then you see NIM? A. Yes. Q. And what does that refer

to? A. That's the NIM. Q. And is that the expected revenue from sales of part of the

residual interest? A. Correct. . . . Q. And then what's resid? A. That's the residual

expected to be behind the NIM.").

887.   On November 17, 2006, Nomura issued NHEL 2006-FM2 NIM certificates, and it then sold the N1 certificates on November 20, 2006, for $29.5 million.  FHFA Ex. 612 (NOM-FHFA_04626075, Private Placement Memorandum for NHELI 2007-2, dated Nov. 17, 2006) at NOM-FHFA_04626076; FHFA Ex. 613 (NOM-FHFA_04925695, email dated Nov. 6, 2006 from Randall Lee to , regarding "NHELN 06-FM2 NIM **** N1 Pricing ****") at NOM-FHFA_04925695 ("For the NHELI 2006-FM2 X&P class, we sold 29.500mm to Greenwich due to settle Nov. 20th.").

888.   On February 21, 2007, Nomura issued NHEL 2007-2 NIM certificates, and it then sold the N1 certificates on February 22, 2007, for $23,877,722.40.  FHFA Ex. 614 (NOM-FHFA_05464797, Private Placement Memorandum for NHELI 2007-2, dated Feb. 21, 2007) at NOM-FHFA_05464798; FHFA Ex. 615 (NOM-FHFA_04925421, Spreadsheet dated Feb. 21, 2007) (row 17) (showing N1 "Sold Value").

889.   Nomura sold its inventory of residual interests in September 2007.  FHFA Ex. 635 (NOM-FHFA_05769344, Residual Sales Spreadsheet dated Sept. 17, 2007) (reflecting sale proceeds received for its residual positions); FHFA Ex. 616 (NOM-FHFA_05476998, Spreadsheet of Residual Positions (As of 9/7/2007)) (showing bids received from various market participants on Nomura's residual holdings); FHFA Ex. 554 (Deposition of Donald McCabe) at 306:10-19 ("Q.  Were there any residual pieces that Nomura held that were not listed or offered for sale?  A.  Not to my recollection.  Q.  With regards to the liquidation strategy, was it your intention to sell all of the residuals that Nomura held at this time?  A.  It was my attention [sic] but ultimately it was Nomura's say.").

890.    Nomura received "much" of the residual cashflow in the year after an RMBS

issuance.  FHFA Ex. 616 (NOM-FHFA_05737603, Presentation titled, "RMBS Residual

Analysis") at NOM-FHFA_05737631 ("Losses [on residuals] are realized in years 2-4

and much of the cash flow has already been received in year 1."); FHFA Ex. 544

(Deposition of Brett Marvin) at 62:21-24 ("Q.  Okay.  Now is that – what is [the NIM]? .

. . A.  So we stood in the first loss position.  Subsequent to that, we would sometimes

carve out the first year or two's worth of expected cash flow of that residual, which had a

high probability of coming in given that it was early in the deal –").

891.    Nomura hedged its residual interests using cap contracts and short positions on the

ABX.  FHFA Ex. 543 (Deposition of Steven Katz) at 105:24-106:17 ("Q.  What were the

hedges related to the residuals?  A.  They were a cap contract and ABX. . . . Q.  And did

you go long or short on the ABX?  A.  The hedge would be all shorts.")); FHFA Ex. 544

(Deposition of Brett Marvin) at 83:5-19 ("Q. . . . [S]o, if you have a set of residuals on

your books or on Nomura's books and out of the concern, and I don't mean that in a

loaded sense, but just out of the – you know, sort of hedging a risk, that cash flows are –

on those residuals are going to drop, you buy the index or you go short on a drop in the

index, is that right? . . . [A.]  You would essentially sell one of the tranches, some dollar

amount of one of the tranches on one of the indices with the idea that that afforded some

kind of protection against a general market movement on your book.")).

892.    Brett Marvin testified that, as Nomura's "[residual] positions grew, it became more

significant and more worthy of a hedge."  FHFA Ex. 544 (Deposition of Brett Marvin) at

85:20-25 ("Q.  So how did you know that this position was hedging the residual

holdings?  A.  It was – as the position grew, it became more significant and worthy of a hedge, and it was part and parcel of a bigger, again, a macro picture.")).

893.    The certificates that the GSEs purchased matured over 30 years.  FHFA Ex. 20 (NOM-FHFA_04785147, Prospectus Supplement for NAA 2005-AR6) at NOM-FHFA_04785154 (listing the last scheduled distribution date as approximately 30 years after the initial distribution); FHFA Ex. 6 (NOM-FHFA_04729474, Prospectus Supplement for NHELI 2006-FM1) at NOM-FHFA_04729481 (same); FHFA Ex. 7 (NOM-FHFA_04638315, Prospectus Supplement for NHELI 2006-FM2) at NOM-FHFA_04638323 (same); FHFA Ex. 8 (NOM-FHFA_04620885, NHELI 2006-HE3 Prospectus Supplement) at NOM-FHFA_04620893 (same); FHFA Ex. 9 (NOM-FHFA_05141912, Prospectus Supplement for NHELI 2007-1) at NOM-FHFA_05141923 (same); FHFA Ex. 10 (NOM-FHFA_05591325, Prospectus Supplement for NHELI 2007-2) at NOM-FHFA_05591333 (same); FHFA Ex. 11 (NOM-FHFA_04732621, Prospectus Supplement for NHELI 2007-3) at NOM-FHFA_04732630 (same).

894.    Nomura assigned "[t]he bulk of the approval process" to the Sales Group.  FHFA Ex. 619 (NOM-FHFA_05892056, NHA Corporate Credit Policies, dated Mar. 2005) at NOM-FHFA_05892092 ("The bulk of the approval process will be the responsibility of Residential Sales.").

895.    Joseph Carlucci, a member of Nomura's Sales group, testified that his "day to day" responsibilities focused on "dealing with these clients" and "making sure the client is happy, making sure that we have access to what they were selling."  FHFA Ex. 620 (Deposition of Joseph Carlucci) at 22:7-23:5 ("Q. Kind of like a what you were hired to

do and what you did on a daily basis. A. Sure. I was hired to come on and be sort of a client relationship person, initially working with Don McCabe on servicing accounts that he had where he didn't have the time day to day to focus on, as he was running the group, managing the group, and then build new relationships of my own for a client base of originators that could sell loans to Nomura. That's I guess what I was brought on to do. My day to day was really focused on, again, dealing with these clients, traditional sort of client management stuff, making sure the client is happy, making sure that we have access to what they were selling and be the conduit between the trading desk and the client who was actually sort of pricing and buying the loans.").

896. Nomura "aggressively expand[ed]" its approved counterparties from approximately 75 in 2004 to over 250 in 2006. FHFA Ex. 36 (Dep. Ex. 4518, email from J. Graham dated July 13, 2006, regarding "presentation to merrill sales force (07/17/06) for naac 2006-s3 and naac 2006-af2 (arms pools)") at NOM-FHFA_05190652 (presentation slide titled "RMBS Counterparty Analysis" stating, "The Origination Group continues to aggressively expand its new account base while forging strategic partnerships with existing accounts," and illustrating approved counterparties between 2003 and 2006).

897. Clayton reported internally that "Nomura appears to be digging up sellers they haven't gone to in a while for business as well as adding some newer sellers to their pool," and that ["t]he quality of all of them continues to be poor with high kick rates." FHFA Ex. 621 (CLAY_FHFA-E_000485365, Clayton "CSM Updates: Wk of 3/13-3/17/06") at CLAY_FHFA-E_000485367 ("Nomura appears to be digging up sellers they haven't gone to in a while for business as well as adding some newer sellers to their pool. The quality of all of them continues to be poor with high kick rates.").

898. Each of the Prospectus Supplements represented that none of the Mortgage Loans were subject to the requirements of the Home Ownership and Equity Protection Act of 1994 ("HOEPA") nor classified and/or defined as high-cost, covered, or predatory loan under any other federal, state or local law or ordinance or regulation.  FHFA Ex. 5 (NOM-FHFA_04811802, NAA 2005-AR6 Prospectus Supplement) at NOM-FHFA_04811949; FHFA Ex. 6 (NOM-FHFA_04729474, NHELI 2006-FM1 Prospectus Supplement) at NOM-FHFA_04729612; FHFA Ex. 7 (NOM-FHFA_04638315, NHELI 2006-FM2 Prospectus Supplement) at NOM-FHFA_04638485; FHFA Ex. 8 (NOM-FHFA_04620885, NHELI 2006-HE3 Prospectus Supplement) at NOM-FHFA_04621053; FHFA Ex. 9 (NOM-FHFA_05141912, NHELI 2007-1 Prospectus Supplement) at NOM-FHFA_05142149; FHFA Ex. 10 (NOM-FHFA_05591325, NHELI 2007-2 Prospectus Supplement) at NOM-FHFA_05591520; FHFA Ex. 11 (NOM-FHFA_04732621, NHELI 2007-3 Prospectus Supplement) at NOM-FHFA_04732807.

899. Each of the Prospectus Supplements represented that each Mortgage Loan complied in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws.  FHFA Ex. 5 (NOM-FHFA_04811802, NAA 2005-AR6 Prospectus Supplement) at NOM-FHFA_04811949; FHFA Ex. 6 (NOM-FHFA_04729474, NHELI 2006-FM1 Prospectus Supplement) at NOM-FHFA_04729612; FHFA Ex. 7 (NOM-FHFA_04638315, NHELI 2006-FM2 Prospectus Supplement) at NOM-FHFA_04638485; FHFA Ex. 8 (NOM-FHFA_04620885, NHELI 2006-HE3 Prospectus Supplement) at NOM-FHFA_04621053; FHFA Ex. 9 (NOM-FHFA_05141912, NHELI 2007-1 Prospectus Supplement) at NOM-FHFA_05142149; FHFA Ex. 10 (NOM-FHFA_05591325, NHELI 2007-2 Prospectus Supplement) at

NOM-FHFA_05591520; FHFA Ex. 11 (NOM-FHFA_04732621, NHELI 2007-3 Prospectus Supplement) at NOM-FHFA_04732807.

900.    The NAA 2005-AR6, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 Prospectus Supplements each represented that "[a]ll appraisals conform to the Uniform Standards of Professional Appraisal Practice."  FHFA Ex. 5 (NOM-FHFA_04811802, NAA 2005-AR6 Prospectus Supplement) at NOM-FHFA_04811895; FHFA Ex. 7 (NOM-FHFA_04638315, NHELI 2006-FM2 Prospectus Supplement) at NOM-FHFA_04638401; FHFA Ex. 8 (NOM-FHFA_04620885, NHELI 2006-HE3 Prospectus Supplement) at NOM-FHFA_04620973; FHFA Ex. 9 (NOM-FHFA_05141912, NHELI 2007-1 Prospectus Supplement) at NOM-FHFA_05142027; FHFA Ex. 10 (NOM-FHFA_05591325, NHELI 2007-2 Prospectus Supplement) at NOM-FHFA_05591416; FHFA Ex. 11 (NOM-FHFA_04732621, NHELI 2007-3 Prospectus Supplement) at NOM-FHFA_04732713.

901.    The NHELI 2006-FM1 and NHELI 2006-FM2 Prospectus Supplements represented that the appraisals "are provided" by appraisers who use "uniform residential appraisal report[s]" that included USPAP certification. FHFA Ex. 6 (NOM-FHFA_04729474, NHELI 2006-FM1 Prospectus Supplement) at NOM-FHFA_04729545 ; FHFA Ex. 7 (NOM-FHFA_04638315, NHELI 2006-FM2 Prospectus Supplement) at NOM-FHFA_04638397.

902.    The Prospectus Supplements for NAA 2005-AR6 and NHELI 2007-1 represented that none of the Mortgage Loans in the relevant SLG had credit scores below 580.  FHFA Ex. 5 (NOM-FHFA_04811802, NAA 2005-AR6 Prospectus Supplement) at NOM-

FHFA_04811861; FHFA Ex. 9 (NOM-FHFA_05141912, NHELI 2007-1 Prospectus

Supplement) at NOM-FHFA_05142001.

903.     The Prospectus Supplements for NHELI 2006-FM2, NHELI 2006-HE3, , and NHELI

2007-3 represented that none of the Mortgage Loans in the relevant SLG had credit

scores below 500. FHFA Ex. 7 (NOM-FHFA_04638315, NHELI 2006-FM2 Prospectus

Supplement) at NOM-FHFA_04638364; FHFA Ex. 8 (NOM-FHFA_04620885, NHELI

2006-HE3 Prospectus Supplement) at NOM-FHFA_04620932; FHFA Ex. 11 (NOM-

FHFA_04732621, NHELI 2007-3 Prospectus Supplement) at NOM-FHFA_04732673.

904.     The NHELI 2006-FM1 Prospectus Supplements represented that there were 6 loans with

FICO scores below 500 in the relevant SLG and the NHELI 2007-2 Prospectus

Supplement represented there were 7 loans with FICO scores below 500 in the relevant

SLG.  FHFA Ex. 6 (NOM-FHFA_04729474, NHELI 2006-FM1 Prospectus Supplement)

at NOM-FHFA_0472951; FHFA Ex. 10 (NOM-FHFA_05591325, NHELI 2007-2

Prospectus Supplement) at NOM-FHFA_05591377.

905.     Generally, underwriting guidelines for the originators of the Mortgage Loans set a

minimum FICO score of 500 or greater for subprime borrowers. *See, e.g.,* FHFA Ex. 598

(UBS-FHFA-00291155, Wells Fargo Home Credit Solutions Underwriting Standards) at

UBS-FHFA-00291163 (setting a minimum credit score of 500 for all borrowers); FHFA

Ex. 599 (NOM-FHFA_05509582, Allied Capital Mortgage Loan Amount and Loan-to-

Value Maximums Matrix) at NOM-FHFA_05509582 (setting minimum credit score of

500); FHFA Ex. 583 (LF1UBS_00051222, Fremont Underwriting Guidelines) at

LF1UBS_00051249-250 (setting minimum credit score of 500).

906.    Generally, underwriting guidelines for the originators of the Mortgage Loans set a

        minimum FICO score of 580 or greater for Alt-A borrowers. *See, e.g.*, FHFA Ex. 600

        (JPMC-UWG-BEAR-000297411, Silver State Expanded Alt-A Underwriting Guidelines

        & Matrix) at JPMC-UWG-BEAR-000297411 (setting minimum FICO score of 620);

        FHFA Ex. 601 (JPMC-UWG-WAM U-000736544, Alliance Mortgage Conduit Alt-A

        Underwriting Guidelines and Product Matrix) at JPMC-UWG-WAMU-000736598

        (setting minimum FICO score of 620); FHFA Ex. 602 (JPMC-UWG-BEAR-000155222,

        Pinnacle Financial Expanded Solutions – Fixed and Adjustable Rate Product Matrix) at

        JPMC-UWG-BEAR-000155222 (setting minimum FICO score of 580).

907.    Generally, underwriting guidelines for the originators of the Mortgage Loans set a

        maximum LTV and/or CLTV ratio of 100%. *See, e.g.,* FHFA Ex. 603

        (CSFHFA008378954, Wells Fargo Retail Non-prime Global Credit Grade Matrix) at

        CSFHFA008378954-955 (setting a maximum LTV of 100%); FHFA Ex. 604

        (CSFHFA009310554, Equifirst CORE Program Matrix) at CSFHFA009310554 (setting a

        maximum LTV of 100%); FHFA Ex. 587 (ML FHFA 6097303, Ownit The Right Loan

        Underwriting Guidelines) at ML_FHFA 6097384-ML_FHFA 6097399 (setting a

        maximum LTV/CLTV ratio of 100%).

908.    Often, underwriting guidelines for the originators of the Mortgage Loans set a maximum

        LTV and/or CLTV ratio of 95% for first-time homebuyers or for reduced documentation

        loans. *See, e.g.*, FHFA Ex. 584 (JPMC-UWG-BEAR-000154567, People's Choice) at

        JPMC-UWG-BEAR-000154567-570 (setting maximum LTV/CLTV for first-time

        homebuyers of 95%); FHFA Ex. 605 (BARC-EF 000000144, Equifirst Underwriting

Practices Manual) at BARC-EF_000000207 (setting maximum CLTV for stated-income loans of 95%).

909.    Often, underwriting guidelines for the originators of the Mortgage Loans did not allow log homes and other unique homes. *See, e.g.*, FHFA Ex. 601 (JPMC-UWG-WAM U-000736544, Alliance Mortgage Conduit Alt-A Underwriting Guidelines and Product Matrix) at JPMC-UWG-WAMU-000736552 (listing log homes as an ineligible property); FHFA Ex. 584 (JPMC-UWG-BEAR-000154567, People's Choice Core Underwriting Matrix) at JPMC-UWG-BEAR-000154570 ("no unique homes"); FHFA Ex. 606 (JPMC-UWG-BEAR-000005665, Aegis Mortgage Signature Alternative A Matrices and Guidelines) at JPMC-UWG-BEAR-000005725 (listing "[l]og homes" as a "unique propert[y]" that would only be considered "on an exception basis at reduced LTV").

910.    The underwriting guidelines required compliance with applicable laws, including applicable high-cost lending laws, such as HOEPA, and applicable anti-predatory lending laws. FHFA Ex. 587 (ML FHFA 6097303, Ownit The Right Loan Underwriting Guidelines) at ML_FHFA 6097314 ("Ownit does not originate loans that are subject to the Home Ownership Equity Protection Act (also known as Section 32 loans) or any State specific legislation enacted to restrict Predatory Lending practices."); FHFA Ex. 605 (BARC-EF 000000144, Equifirst Underwriting Practices Manual) at BARC-EF_000000152 ("Equifirst does not handle … Section 32 loans or any loans considered 'high cost' by the state or municipality"); FHFA Ex. 583 (LF1UBS_00051222, Fremont Underwriting Guidelines) at LF1UBS_00051232 ("Fremont does not originate or purchase "high cost" loans. Fremont adheres to all applicable Federal, State or Local

restrictions. … Effective 5/1/00 Fremont will no longer originate or purchase loans subject to Section 32.").

911.    Often, underwriting guidelines set points and fees maximums of 5%. FHFA Ex. 579 (NOM-FHFA_05508268, Alliance Sub-Prime Underwriting Manual) at NOM-FHFA_05508270 (maximum points and fees of 5%); FHFA Ex. 587 (ML FHFA 6097303, Ownit The Right Loan Underwriting Guidelines) at ML_FHFA 6097314 (maximum points and fees of 5%); FHFA Ex. 607 (JPMC-UWG-BEAR-000211324, People's Choice Underwriting Policy & Guidelines) at JPMC-UWG-BEAR-000211362 (setting points and fees maximum of 5%).

912.    According to Mr. Marvin, "One of [Mr. Kohout's] favorite lines was we are not staffed for this, we are not staffed for this…. They could be ordering lunch, I think he was understaffed for that…." FHFA Ex. 544 (Deposition of Brett Marvin) at 270:3-275:3.

913.    IngletBlair's website indicates that it could "help[] the mortgage industry manage risk" to "uncover the red flags." FHFA Ex. 545 (IngletBlair Website) at 1.

914.    Nomura Exhibit 254 provides Individual Asset Summaries for 58 loans graded EV3 in the Aegis 03 Pool, or 21% of the total loans in the Pool. Nom. Ex. 254 at NOM-FHFA_04572875; Cipione Decl. Ex. 2.

915.    Nomura Exhibit 611 provides Individual Asset Summaries for 21 loans graded EV3 in the First NLC SP02 Pool, or 4.4% of the total loans in the Pool. Nom. Ex. 611; Cipione Decl. Ex. 2.

916.  Nomura Exhibit 612 provides Individual Asset Summaries for 133 loans graded EV3 in the Fremont SP02 Pool, or 2.6% of the total loans in the Pool.  Nom. Ex. 612 at NOM-FHFA_05329392; Cipione Decl. Ex. 2.

917.  When asked if the Individual Asset Summary was what he "would look at when [he] would determine whether a compensating factor was compensating enough," Mendy Sabo responded: "Occasionally." FHFA Ex. 553 (Deposition of Mendy Sabo) at 134:17-135:3 ("Q.  So first let's get a little context.  This is an individual asset summary report.  What is it?  A.  This is the output by the due diligence firm by Clayton on the particular loan file, a summary of the details within the loan file.  Q.  Okay.  And is this what you would look at when you would determine whether a compensating factor was compensating enough?  A.  Occasionally.").

918.  Vicki Beal testified that "Clayton had a list of compensating factors in the CLAS system which underwriters could select from" after Clayton "rolled out [its] Exception Tracking System" in 2005.  FHFA Ex. 589 (Clayton 30(b)(6) Deposition of Vicki Beal) at 229:13-20 ("Q. Okay. And is it fair to say that Clayton had a list of compensating factors in the CLAS system which underwriters could select from?  A. We did when we rolled out our Exception Tracking System.  Q. Okay. And that was in 2005?  A. Yes, 2005.")

919.  The GSEs used "statistical sampling to enable [a] reliable estimate of [the] total exposure to ineligible loans."  FHFA Ex. 631 (FHFA01488778, May 23, 2007 Fannie Mae Presentation, "Due Diligence for Subprime Business") at FHFA01488781.

920.  The remittance report for NHELI 2005-AR6 reports that, in the first month after issuance, Nomura received cashflows from its residual interest equal to 24% (or $841,554) of the X

tranche beginning balance ($3,496,464).  FHFA Ex. 622 (Certificate Distribution Summary for Dec. 27, 2005 distribution, showing distributions from Class X and Class P certificates equal to $841,554).

921.    The remittance report for NHELI 2006-FM1 reports that, in the first month after issuance, Nomura received cashflows from its residual interest equal to 10% (or $2,348,043) of the X tranche beginning balance ($24,283,934).  FHFA Ex. 623 (Certificate Distribution Summary for Feb. 27, 2006 distribution, showing distributions from Class X and Class P certificates equal to $2,348,043).

922.    The remittance report for NHELI 2006-FM2 reports that, in the first month after issuance, Nomura received cashflows from its residual interest equal to 13% (or $3,486,818) of the X tranche beginning balance ($27,638,345).  FHFA Ex. 624 (Certificate Distribution Summary for Nov. 27, 2006 distribution, showing distributions from Class X and Class P certificates equal to $3,486,818).

923.    The remittance report for NHELI 2006-HE3 reports that, in the first month after issuance, Nomura received cashflows from its residual interest equal to 10% (or $3,128,349) of the X tranche beginning balance ($31,717,098).  FHFA Ex. 625 (Certificate Distribution Summary for Sept. 25, 2005 distribution, showing distributions from Class X and Class P certificates equal to $3,128,349).

924.    The remittance report for NHELI 2007-1 reports that, in the first month after issuance, Nomura received cashflows from its residual interest equal to 24% (or $1,092,354) of the X tranche beginning balance ($4,504,298).  FHFA Ex. 626 (Certificate Distribution

Summary for Feb. 26, 2007 distribution, showing distributions from Class X and Class P certificates equal to $1,092,354).

925.    The remittance report for NHELI 2007-2 reports that, in the first month after issuance, Nomura received cashflows from its residual interest equal to 7% (or $2,506,325) of the X tranche beginning balance ($34,904,229).  FHFA Ex. 627 (Certificate Distribution Summary for Feb. 26, 2007 distribution, showing distributions from Class X and Class P certificates equal to $2,506,325).

926.    The remittance report for NHELI 2007-3 reports that, in the first month after issuance, Nomura received cashflows from its residual interest equal to 6% (or $3,155,030) of the X tranche beginning balance ($54,951,765).  FHFA Ex. 628 (Certificate Distribution Summary for May 25, 2007 distribution, showing distributions from Class X and Class P certificates equal to $3,155,030).

927.    The remittance report for NHELI 2005-AR6 reports an X tranche beginning balance equal to 0.5% (or $3,496,464) of the total certificate balance ($655,477,564).  FHFA Ex. 622 (Certificate Distribution Summary for Dec. 27, 2005 distribution).

928.    The remittance report for NHELI 2006-FM1 reports an X tranche beginning balance equal to 2.6% (or $24,283,934) of the total certificate balance ($933,772,034).  FHFA Ex. 623  (Certificate Distribution Summary for Feb. 27, 2006 distribution).

929.    The remittance report for NHELI 2006-FM2 reports an X tranche beginning balance equal to 2.3% (or $27,638,345) of the total certificate balance ($1,228,042,445).  FHFA Ex. 624 (Certificate Distribution Summary for Nov. 27, 2006 distribution).

930. The remittance report for NHELI 2006-HE3 reports an X tranche beginning balance equal to 3.0% (or $31,717,098) of the total certificate balance ($1,074,928,198). FHFA Ex. 625 (Certificate Distribution Summary for Sept. 25, 2005 distribution).

931. The remittance report for NHELI 2007-1 reports an X tranche beginning balance equal to 0.4% (or $4,504,298) of the total certificate balance ($1,023,112,398). FHFA Ex. 626 (Certificate Distribution Summary for Feb. 26, 2007 distribution).

932. The remittance report for NHELI 2007-2 reports an X tranche beginning balance equal to 3.8% (or $34,904,229) of the total certificate balance ($930,628,329). FHFA Ex. 627 (Certificate Distribution Summary for Feb. 26, 2007 distribution).

933. The remittance report for NHELI 2007-3 reporting an X tranche beginning balance equal to 4.8% (or $54,951,765) of the total certificate balance ($1,144,802,865). FHFA Ex. 628 (Certificate Distribution Summary for May 25, 2007 distribution).

934. In the sampling loan tape from which RBS drew the relevant sample for the NHELI 2007-1 Securitization, 33% of the loans to single family residences had current unpaid principal balance over $417,000. *See* FHFA Ex. 629 (RBS-FHFA-SDNY-0489561, sampling spreadsheet for NHELI 2007-1, dated Jan. 11, 2007) (filtering column AP (property type) for "Single Family" and column I (current balance) to greater than 417000). For the semi-random sample, 52% of loans to the single family residences had current unpaid principal balance over $417,000. *See id.* (filtering column AP (property type) for "Single Family"; column I (current balance) to greater than 417000; column BQ (sample_uw) for SR).

935.    In the sampling loan tape for the NHELI 2007-2 Securitization, 6% of the loans to single

family residences had current unpaid principal balance over $417,000.  *See* FHFA Ex.

630 (RBS-FHFA-SDNY-0490139, sampling spreadsheet for NHELI 2007-2, Jan.

12,2007) (filtering column AO (property type) for "Single Family Detached" and "Single

Family Attached" and column I (current balance) to greater than 417000).  For the semi-

random sample, 18% of loans to the single family residences had current unpaid principal

balance over $417,000.  *See id.* (filtering column AO (property type) for "Single Family

Detached" and "Single Family Attached"; column I (current balance) to greater than

417000; column BW (sample_uw) for SR)).

936.    In March of 2006, Ellington Management Group asked RMG Global to conduct a quality

control review of a pool of loans that RBS had purchased from Meritage Mortgage

Corporation.  FHFA Ex. 546 (RBS-FHFA-SDNY-0617248, email regarding Meritage 05-

3) at RBS-FHFA-SDNY-0617248.  At the time that RBS purchased the loans from

Meritage, RBS ordered due diligence from Clayton.  *Id.*  The "due diligence reviews

[Clayton] did for" RBS at Meritage were run by Brian Farrell who was a Clayton

employee at the time.  *Id.*  RMG Global's QC review determined that 40% "of the loans

that Clayton had scored as [EV]1's" should have been graded EV3s.  *Id.*  Bruce Gehrlein

of RBS described the 40% "discrepanc[y]" as being "excessive."  *Id.*

937.    Clayton graded 116 of the 408 combined loans in the NHELI 2007-1 and NHELI 2007-2

diligence samples as EV3 for credit reasons. Ex 7 to the Cipione Decl. (filter Column J

for "3").  Indeed, 107 of these 116 loans were regarded on the final report as "EV2W:

*Material exceptions waived*." Ex 7 to the Cipione Decl. (filter Column C for "2W:

Material exceptions waived").

938.	On November 15, 2010, in response to the SEC's request for comments relating to the implementation of Section 945 (Due Diligence Analysis and Disclosure in Asset-backed Securities Issues) of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act"), Clayton Holdings LLC ("Clayton") submitted a letter commenting on the implementing rules proposed by the SEC.  FHFA Ex. 547 (11/15/10 Clayton Letter ) at 1.  The letter states that "third party due diligence providers like us" do not "fit within the scope of the Securities Act provisions that establish expert liability," *id.* at 2, because Clayton's profession does not "involve[] the exercise of independent judgment in the application to a specific context of a body of knowledge… as opposed to being determined solely by … the client," *id.* at 3.  The letter also states that "[w]e do not exercise professional judgment as to the scope or sufficiency of such review, but rather perform only the specific tasks dictated to us by our clients on the loans chosen by them," and expresses concern that Clayton might be held liable for following the instructions of aggregators, *id.* at 6.

939.	The Prospectus Supplements all provide that the mortgage loans would have the characteristics set forth in the tables therein "as of the Cut-off Date."  *See* Nom. Ex. 19 at NOM-FHFA_04811808 (NAA 2005-AR6); Nom. Ex. 20 at NOM-FHFA_04811808 (NHELI 2006-FM1); Nom. Ex. 21 at NOM-FHFA_04620891 (NHELI 2006-HE3); Nom. Ex. 22 at NOM-FHFA_04638321 (NHELI 2006-FM2); Nom. Ex. 23 at NOM-FHFA_05141920 (NHELI 2007-1); Nom. Ex. 24 at NOM-FHFA_05591331-32 (NHELI 2007-2); Nom Ex. 25 at NOM-FHFA_04732628 (NHELI 2007-3).

940.	The Prospectus Supplements also all provide that the information stated on these tables would not vary by more than five percent after the cut-off date as the result of changes of

composition to the final composition of the pool.  *See* Nom. Ex. 19 at NOM-

FHFA_04811977 (NAA 2005-AR6); Nom. Ex. 20 at NOM-FHFA_04729666 (NHELI

2006-FM1); Nom. Ex. 21 at NOM-FHFA_04620924 (NHELI 2006-HE3); Nom. Ex. 22

at NOM-FHFA_04638356 (NHELI 2006-FM2); Nom. Ex. 23 at NOM-

FHFA_05142028-29 (NHELI 2007-1); Nom. Ex. 24 at NOM-FHFA_05591468 (NHELI

2007-2); Nom Ex. 25 at NOM-FHFA_04732715 (NHELI 2007-3).

941.   Mr. Bisaillon, a collateral analyst, testified that he did not perform any statistical

representativeness testing to ensure that the random sample was of a size that would

enable RBS to make determinations about the pool as a whole.  FHFA Ex. 536

(Deposition of Stephen Bisaillon) at 131:16-22 ("Did you perform any statistical

representativeness testing to ensure that the random sample was of a size that would

enable them to see the attributes of the entire pool? A. No, that – no, that wasn't my

job.").

942.   For the NHELI 2006-FM2 securitization, Nomura only supplied RBSSI with valuation

diligence results for loans that Nomura chose not to purchase from Fremont because of a

negative BPO result.  RBS Ex. 197 (RBSFHFA-SDNY-0622194, due diligence report for

Fremont SP03) at RBS-FHFA-SDNY-0622194 (listing 113 loans as "Denied BPO");

RBS Ex. 198 (RBS-FHFA-SDNY-0622195, due diligence report for Fremont SP04) at

RBS-FHFA-SDNY-0622195 (listing 38 loans as "Denied BPO"); *see also* RBS SUF  ¶

121 ("The other two reports were even more detailed analyses that contained the results

of the credit, compliance, and valuation reviews for each loan in the relevant pools.").

943.    In November 2006, RBS Credit employees months discussed over email that loans with

adverse characteristics such as loans with low FICO scores are "not where we [RBSSI]

find all the fraud." FHFA Ex. 636 (Dep. Ex. 46029, email from Scott Gimpel to Frank

Skibo dated November 28, 2006) at RBS-FHFA-CT-3816143 ("I'm just thinking that we

target lots of low fico type loans but the low fico type loans are not where we find all the

fraud. How can we find these fraud loans during reunderwrite and not buy them on the

front end?").

944.    Mr. Grice testified that conducting a "reasonable investigation into the truth of

representations made in RMBS offering materials" was not "the standard that's in the

market." FHFA Ex. 632 (Deposition of Charles Grice) at 50:23-51:17 ("Q. I take it you

agree at least underwriters must conduct a reasonable investigation into the truth of

representations made in RMBS offering materials? … A. I have been asked this

reasonable investigation question by your colleagues before. I don't think investigation is

the proper way to frame it, I think it is a reasonable inquiry to establish that the

representations are accurate. To me investigation is more akin to a revalidation of all the

facts and circumstances with respect to both an individual loan file and securitization. I

don't think that's the standard that's in the market.").

945.    Mr. Grice testified that the standard of "independently investigating" the representations

made by affiliates and counterparties "is not one in the RMBS world." FHFA Ex. 632

(Deposition of Charles Grice) at 53:25-55:10 ("Q. Is it your view that RMBS

underwriters can rely without investigation upon the data that loan originators present to

them? …. A. I think it totally depends on the circumstances and context. If you and I

have been business partners and done deals together, there is in effect a reliance upon the

representation you're making today based on my knowledge of you in the past. So reputation counts, prior experience counts, there is not this requirement that Mr. Blum imagines of reperforming, reconsidering, independently investigating; this requisite diligence standard is not one in the RMBS world. Q. . . . it is your view in the RMBS world that underwriters can often rely without investigation upon the data that loan originators present to them based upon relationship or other considerations? …. Q. Is that fair? A. I would say I'm almost comfortable with that; I think they can reasonably rely upon representations made by affiliates or by counterparties where they've had a relationship and they have an understanding of the quality of the data or information that comes from that best partner or that affiliate.").

946.   Mr. Grice testified that he does not share the view that "all the facts must be independently verified or validated or investigated" in connection with an underwriter's responsibility for a securities offering.  FHFA Ex. 632 (Deposition of Charles Grice) at 58:21-60:14 ("Q. So going to your point of market practice again, with respect to the transactions at issue in this case, is it fair to say that your testimony is that based on what people actually did, you think that it would be reasonable for Nomura and RMBS to have relied without investigation upon the loan originators in this case? … A. As you have phrased it, I can't answer it. This word investigation is not my standard, that's Mr. Blum's standard, so I am not acknowledging that. I am trying to characterize a reasonable reliance, not a blind reliance as you earlier characterized it, where there is an effort made to establish the accuracy of the statements in the offering materials. Q. I haven't actually referred to Mr. Blum's opinion once in the course of my questions of you. I am using the term investigation; are you not familiar with the term investigation in connection with an

underwriter's responsibilities relating to securities transactions? A. I don't share the view of other experts that all the facts must be independently verified or validated or investigated, so I think there are other experts in this context who take a very bright line view that underwriters cannot reasonably rely upon anything. And so this is where your expert and I are at loggerheads, one of the many areas. There is a reasonable reliance and, again, it is not a blind reliance, it is a reasonable reliance.").

947. Mr. Grice testified that he would not agree that a "systematic and searching" inquiry was the standard required for an underwriter in performing diligence into the truth of statements made in offering materials. FHFA Ex. 632 (Deposition of Charles Grice) at 64:22-65:22 ("Q. Would you agree that an underwriter's duty of reasonable due diligence into the truth of statements made in offering materials requires a systematic and searching inquiry? … A. That's not my terminology; I recognize that terminology, certainly not my terminology. So this is back to investigation, I don't see this as an investigative or validation standard, I see this as a reasonable inquiry. Q. I didn't use the term investigational, I will repeat the question and you can tell me whether you agree or disagree with that formulation. Would you agree that an underwriter's duty of reasonable due diligence into the truth of statements made in offering materials requires a systematic and searching inquiry? … A. I would not agree that systematic and searching is a standard.").

948. Mr. Grice testified that when he gave advice as to how banks should conduct due diligence, the prudent person standard that "the standard of care for an underwriter's due diligence is the same [as] that a prudent person would show in the management of his or her own property" was "not the north star he was looking to." FHFA Ex. 632

(Deposition of Charles Grice) at 65:23-67:4 ("Q. Do you agree that the standard of care for an underwriter's due diligence is the same that a prudent person would show in the management of his or her own property? … A. I recognize that standard, I think this is asking me for a legal opinion. I have never offered an opinion on how to interpret either reasonable standard of care, duty of care, or how to interpret the reasonable person, reasonable idea, it is just not my expertise. Q. When you gave advice as to how banks should conduct due diligence, did you not try and ensure that your advice corresponded to the prudent person's standard of care? … A. That was not the north star I was looking to as I gave my advice. I was getting instruction from counsel and from the bank partly reflecting risk appetite, prior experience, their experience with the originator, the year, the place, the nature of the product, that's why I say it depends.").

949.    Mr. Grice testified that he advised dozens of banks and 31 of the top 50 mortgage originators who were clients as of 2008. FHFA Ex. 632 (Deposition of Charles Grice) at 19:19-20:4 ("Q. Do you have any actual experience diligencing RMBS transactions? … A. I have, yes, I have never been an employee of a broker/dealer or a bank engaged in securitization, but I have advised dozens of banks engaged in that business, so I've got – I'm all over that piece of the market as a consultant, never as an employee."); FHFA Ex. 632 (Deposition of Charles Grice) at 20:5-17 ("Q. When you say you have advised dozens of banks as a consultant, in what respect did you give advice? A. On my CV it actually says, this was written in 2008, 31 of the top 50 mortgage originators were clients as of 2008; I get brought in primarily by outside counsel or the bank regulatory agencies to assist in either effecting corrective action ordered by the agencies or in doing preemptive testing and analysis for institutions that want to avoid enforcement actions.").

950.    Mr. Grice testified that he did not understand the purpose of diligence was to "perform an

investigation or validation of data."  FHFA Ex. 632 (Deposition of Charles Grice) at

81:20-84:16 ("Q. We can do it slowly. Put differently, do you disagree that underwriters

must exercise a high degree of care in the investigation and independent verification of

representations made in RMBS offering materials? …. Q. Do you agree or disagree with

that? A. I don't see – I want to be careful here, I'm not practicing law without a license.

My understanding of the purpose of diligence is to establish the reasonable accuracy of

the materials in the offering statement, it is not to perform an investigation or validation

of data. … Q. Do you agree or disagree with the following proposition; underwriters must

exercise a high degree of care in the investigation and independent verification of

representations made in RMBS offering materials? … A. I think you've got me now

trying to interpret the legal standard, that's not my characterization of the standard.

Again, either I'm not qualified to offer a legal standard in the place of the one I offered or

I just can't answer that question. Q. Are there any words you don't understand in the

question? A. I have told you earlier I can't accept the word investigation, I interpret

investigation to be very different. You're using the word, is it verification, independent –

Q. I am using both investigation and independent verification. A. I do not see those words

in the conduct of diligence in securitizations, that's not – in no way am I connoting or

suggesting support for blindness or willful blindness or otherwise; the objective is to

establish with reasonable accuracy that the statements being made are correct. It is an

inquiry, it is not an investigation.").

951.    Mr. Grice testified, "I've tried to convey my standard, my understanding of the purpose

of diligence and how it was performed.  It does not include independent verification of

the [loan] file as a whole or an investigation." FHFA Ex. 632 (Deposition of Charles Grice) at 86:23-90:10 ("Do you think there is any role for an underwriter to independently verify representations made in the offering materials? A. Again, it depends on the terms and the context. Inside the loan file are some facts, those make it to a data tape, those make it to a diligence write-up, a loan level summary. I think the underwriter has an obligation to understand what's being represented, to have a view as to the general accuracy, reliability of those facts and documents. I don't think it is practical or reasonable to independently, independent verification, independently reverify all the facts and circumstances in the loan file. … Q. Yes. Is it your view that an underwriter does not have a duty to independently verify the facts in the offering materials for an RMBS transaction? … A. I've tried to convey my standard, my understanding, of the purpose of diligence and how it is performed. It does not include independent verification of the file as a whole or an investigation.").

952.    Mr. Grice testified that he was not an expert on RMBS investors and did not have an understanding of what types of representations matter to RMBS investors. FHFA Ex. 632 (Deposition of Charles Grice) at 102:23-103:7 ("Q. Do you have any understanding of what types of representations matter to RMBS investors? … A. I am certainly not an expert on RMBS investors, so it would be just conjecture. I have not studied that, I have not thought about it.").

953.    Mr. Grice admitted that a missing note or information suggesting noncompliance with guidelines are two examples of red flags warranting further inquiry. FHFA Ex. 632 (Deposition of Charles Grice) at 135:2-21 ("Q. What kinds of facts and circumstances would you consider to be red flags warranting further inquiry in the course of an

underwriter's due diligence for RMBS transactions? … A. I think an underwriter upon reviewing data either from a valuation process or from a credit and compliance review or from the collateral custodian who is informed that the note is missing or this loan in no way complies with guidelines, I think it would be reasonable to do what Nomura did, which is to evaluate and analyze it. Q. So the two examples you gave me were a missing note or information suggesting noncompliance with guidelines as red flags. A. Yes.").

954.    Mr. Grice testified that loans should not be purchased if the files could not be found; he stated, "[T]hey would not be purchased because they cannot be found or they would not be purchased because they didn't pass our various screens and filters and diligence controls."  FHFA Ex. 632 (Deposition of Charles Grice) at 316:4-317:8 ("Q. Let's suppose the samples requested was three months after origination of the loans and the originator says in response to the request for 200 loans, look, I can only give you 100; would that in your view raise a red flag? … A. Obviously we're not going to purchase loans we can't see, loans that can't be found. … Q. So why would loans not be purchased if the files can't be found? A. Why would loans not be – they would not be purchased because they cannot be found or they would not be purchased because they didn't pass our various screens and filters and diligence controls.").

955.    Mr. Grice agreed that "if an RMBS underwriter came across evidence of fraud, that would constitute a red flag of problems that warrant further investigation."  FHFA Ex. 632 (Deposition of Charles Grice) at 136:23-137:5 ("Q. Would you agree that if an RMBS underwriter came across evidence of fraud, that would constitute a red flag of problems that warrant further investigation? A. I think as a general matter, yes.").

956. Mr. Grice agreed that the data integrity review performed by Deloitte & Touche was a only a "verif[ication of] the correspondence between the loan tape and the loan file" and was not a "reunderwriting" or "revalidation." FHFA Ex. 632 (Deposition of Charles Grice) at 161:13-164:9 ("Q. What exactly did Deloitte & Touche do in their evaluation, as you put it, of the sample? A. They pulled 50 or 60 data elements out of the loan file to reconcile against the collateral tables to ensure that, again, those data tables are accurate. Q. Their only object was to verify the correspondence between the loan tape and the loan file, right? A. That's correct, but it is 60 elements is my point, or 58, I don't know the exact number in this case. … Q. And the accountant is specifically not testing whether statements made in the loan file are truthful or accurate, correct? A. No, it is a data integrity, it is not a revalidation, it is not a reunderwriting, but it is to ensure that the facts that ultimately are reflected in the collateral table tie to the contents of the file and match to the loan tape.").

957. Mr. Grice testified that a collateral custodian's job was "not to test the truthfulness of statements in the loan file." FHFA Ex. 632 (Deposition of Charles Grice) at 166:8-167:2 ("Q. Again, the job of the collateral custodian is not to test the truthfulness of statements in the loan file, right? A. No, it is no ensure that the contents of that loan file match the representations of the seller and, again, enable ultimately the investor to benefit and ability to enforce either repurchase claim or other disposition of the loan file. Q. The collateral custodian's job is to make sure the loan file is complete, is that fair? A. In an elementary sense; not complete, to make sure every document is there, but make sure constitutional elements are there, to help ensure enforceability.").

958. Mr. Grice testified that "whether the purpose of diligence is to get to the truth" was a "metaphysical" question. FHFA Ex. 632 (Deposition of Charles Grice) at 171:15-172:19 ("Q. You understand that the purpose of due diligence is to get to the truth, right? … A. That could be a definition, of course. Q. Could be a definition; do you agree that the purpose of due diligence is to get to the truth? … A. That's such a metaphysical kind of question. I see the purpose of diligence is to understand my asset, my transaction, and to ensure that these offering materials are accurate. Q. Do you think the truth is a metaphysical concept to you? … A. This is like your moral question earlier; I don't know what you mean by truth. What I mean by truth is the transaction, what I think it is, are the facts and circumstances of these loan files what I think they are and are the representations made in the offering materials accurate, to the best of my knowledge.").

959. Mr. Grice testified that "after the acquisition date and before the securitization date," "[c]ertainly there are kinds of information that become available" including whether a borrower "is either paying or not paying." FHFA Ex. 632 (Deposition of Charles Grice) at 179:5-25 ("Q. A bank may get relevant information after the acquisition date and before the securitization date that bears on statements in the offering materials, right? A. Certainly there are kinds of information that become available. I know in the fifth or sixth month that my loan is either paying or not paying, so I know my borrower is either complying with the agreement or not. So in that sense my information has improved and I have a track record, I can look at Charles's mortgage in the first, second, third, fourth, fifth, sixth month, I know it is not in default, so that's an example of the kind of information that arrives after origination. I think that's relevant to the offering materials certainly.").

960. Mr. Grice admitted that if an underwriter identifies borrower fraud between acquisition and securitization, the defective loan should be excluded from the securitization. FHFA Ex. 632 (Deposition of Charles Grice) at 182:14-184:6 ("But what I am saying is let's accept your point, A-C-C-E-P-T, that facts can be complex; take a scenario where a bank acquires a pool of loans and expects to close on a securitization three months later. If that bank determines that there was borrower fraud in between the point of acquisition and the point of securitization, shouldn't that lead to an adjustment of statements made in the offering materials? … A. I have never seen that set of facts; what I have seen is loans excluded. So we have taken action to maybe file suspicious activity reports with the Treasury Department. We don't want that loan file, so that's now a bad loan under your hypothetical, the bank has made a determination of fraud, I think that's a serious circumstance, I would not ignore that, I think that's significant. Q. So there can be an obligation to update diligence between the point of purchase and the point of securitization of a loan, right? … A. In that very unusual circumstance, where we actually make the determination, again, I think the remedy is to exclude the loan file from the securitization. I have never seen the offering materials modified, I have not seen that circumstance. Q. What you should do is take the materially defective loan out of the loan population altogether you're saying? A. In that circumstance, yes.").

961. Mr. Grice testified that it was "not [his] practice, understanding, or recommendation" that the "due diligence burden for the underwriter bank runs up until the point the deal is closed" and that he was "in no way suggesting [the] due diligence obligation runs continuously." FHFA Ex. 632 (Deposition of Charles Grice) at 184:7-22 ("Q. And that suggests, doesn't it, that the due diligence burden for the underwriter bank runs up until

the point the deal is closed, right? … A. That's not my practice, understanding, or recommendation. Your example is a determination is reached somehow between acquisition and the securitization; I told you, I don't see that, and if that does occur, it means we exclude the loan from the deal. I am in no way suggesting due diligence obligation runs continuously. Your example is quite exquisite.").

962. Mr. Grice agreed that "evidence of fraud may arise after the sponsor's original acquisition of the loans" and testified that "evidence of fraud can arise at any point." FHFA Ex. 632 (Deposition of Charles Grice) at 197:1-19 ("Q. We also talked about fraud before and you agree evidence of fraud may arise after the sponsor's original acquisition of the loans, right? … A. I certainly acknowledge that evidence of fraud can arise at any point. What has to happen is somebody has to be aware of it, so the difficulty always, as I said a few moments ago, is what is the evidence and who has it. Nobody wants fraud, again, I think those are dealt with contractually as well, we want to cull out any potential fraud cases, but in my experience and certainly in the record here I did not find examples of fraud determined or seen by the bank heading into a securitization.").

963. Mr. Grice agreed that "[c]redit reports after the date of acquisition may show that there were misrepresentations in the loan file as to debts or income or owner-occupancy." FHFA Ex. 632 (Deposition of Charles Grice) at 197:20-198:10 ("Q. Credit reports after the date of acquisition may show that there were misrepresentations in the loan file as to debts or income or owner-occupancy, correct? … A. I am aware that that theoretically could occur; I did not see that in my analysis here and I guess I have to leave that to Mr. Forrester and Mr. Hunter to dispute. I am not looking at the files, but I am obviously familiar with that kind of allegation, I just didn't see it, that was not my analysis.").

964. Mr. Grice testified that "[m]ost borrower fraud is detected early in the life cycle of the loan." FHFA Ex. 632 (Deposition of Charles Grice) at 200:15-201:3 ("Q. Do you agree in general that borrower fraud becomes easier to detect as time passes? A. I can't agree with that categorically. Most borrower fraud is detected early in the life cycle of the loan because the fraudster doesn't want to pay the mortgage right away. It is the unusual fraudster who pays three or four payments and then reveals their fraud, so I think it depends.").

965. In response to the question, "The fact that many banks may have engaged in the same practice doesn't mean that the practice is reasonable or adequate, does it?" Mr. Grice testified "I acknowledge the point that common does not mean sufficient. But by the same token, this was and is a competitive business, banks are trying hard to get an information advantage in the interest of the bank and investors." FHFA Ex. 632 (Deposition of Charles Grice) at 218:8-24 ("Q. The fact that many banks may have engaged in the same practice doesn't mean that the practice is reasonable or adequate, does it? … A. I acknowledge the point that common does not mean sufficient. But by the same token, this was and is a competitive business, banks are trying hard to get an information advantage in the interest of the bank and investors. So I guess I would see this as another aspect of competitive – the competitive marketplace. I didn't see a race to the bottom or a conspiracy to do less.").

966. Mr. Grice testified that S&P Levels is a default predictor, and he agreed that S&P Levels was "not actually testing for noncompliance with guidelines." FHFA Ex. 632 (Deposition of Charles Grice) at 251:21-259:5 ("Q. The criteria in S&P Levels is based on performance risk, not guideline violation risk, correct? A. It is a default predictor. …

Q. That wasn't the purpose of S&P Levels, was it, sir? A. It is a default predictor. Q. It is

a predictor as to performance, not as to noncompliance with guidelines, correct? … A. As

I said, it is a default predictor. Q. What do you mean by default predictor? A. It is trying

to predict based on its own proprietary historical database the probability of default by

the borrower. Q. And so when you say that it is a default predictor, you are

acknowledging that it is not actually testing for noncompliance with guidelines, it is

instead looking at criteria relevant to the expected performance of the loan over time,

right? … A. Of course, but keep in mind the purpose of this is to then present these files

to Clayton or AMC for the purpose of their analysis against guidelines. So it is a filter

before the exercise of underwriting the files against guidelines. I can't think of a superior

methodology for employing these third-party reviewers than to give them the most

potentially problematic loans that we can identify with the available information and

letting them render their judgment and then subsequently letting Mr. Sabo or Hartnagel or

Kohout reach their determination of which loans to keep and which to exclude.").

967.  Mr. Grice testified that "[b]anks perform diligence on pools" and "it is just not the

practice to sample supporting loan groups."  FHFA Ex. 632 (Deposition of Charles

Grice) at 244:15-245:2 ("Q.  Did either Nomura or RBS take samples from the relevant

supporting loan groups? … A.  Not to my knowledge, nor did or do banks today, it is just

not the practice to sample supporting loan groups.  Banks perform diligence on pools, the

pools become eligible for SLGs and securitization, so the effective screening stage is as

the loan is acquired through the loan pool."); id. at 275:5-21 ("is it correct that Nomura

sampled only prior to the acquisition of loan pools rather than at the point of

securitization? A. Yes, sir, for the purpose of credit and compliance reviews, yes. Q.

Nomura never took samples specific to the supporting loan groups that backed the RMBS certificates sold to Fannie Mae and Freddie Mac, correct? … A. I believe you asked that earlier and I said that was not and is not done. Loan pools are the basis for evaluation and not SLGs, but that's correct.").

968.    Mr. Grice agreed that Nomura did not take samples from the SLGs.  FHFA Ex. 632 (Deposition of Charles Grice) at 275:5-21 ("is it correct that Nomura sampled only prior to the acquisition of loan pools rather than at the point of securitization? A. Yes, sir, for the purpose of credit and compliance reviews, yes. Q. Nomura never took samples specific to the supporting loan groups that backed the RMBS certificates sold to Fannie Mae and Freddie Mac, correct? … A. I believe you asked that earlier and I said that was not and is not done. Loan pools are the basis for evaluation and not SLGs, but that's correct.").

969.    Mr. Grice admitted that "one cannot reliably extrapolate from adversely selected loan samples to loan populations;" while one could draw reasonable inferences from adverse samples, "that is not the same as drawing a statistically valid, statistically valid, extrapolation."  FHFA Ex. 632 (Deposition of Charles Grice) at 277:3-22 ("Is it fair to say that on the one hand your opinion is that one can draw reasonable inferences from acquisition stage samples of entire loan pools to supporting loan groups in securitizations, while on the other hand you acknowledge that one cannot reliablly (sic) extrapolate from adversely selected loan samples to loan populations? …. A. That's correct, I'm saying that you can draw reasonable inferences with primarily adverse sampling at this very high rate and I acknowledge that that is not the same as drawing a statistically valid, statistically

valid, extrapolation. These are similar but not the same and, again, the differences, in the adverse methodology you're also identifying loans for exclusion.").

970.    Mr. Grice did not recall seeing any evidence that Nomura selected random samples for any of the at-issue loan pools.  FHFA Ex. 632 (Deposition of Charles Grice) at 288:11-21 ("Q. And you were not able to find any written evidence as to credit and compliance loan reunderwriting conducted either by third-party vendors or by Nomura itself on a random sample basis, correct? A. I don't recall seeing that. We have the 169 trade pools, 130 of which were at a hundred percent, so what I can't do is identify the loans that were reviewed by Clayton and AMC and were selected randomly.").

971.    Mr. Grice testified that he did not find any evidence that Nomura upsized its samples with regard to the at-issue pools.  FHFA Ex. 632 (Deposition of Charles Grice) at 295:12-296:12 ("Q. Shouldn't an underwriter upsize a sample if it finds high levels of material defects in the loans in the sample? A. That certainly is one scenario. Again, this is entirely dependent upon what constitutes that defect, what kind of defect that is. Q. If the sample shows problems of many different kinds, shouldn't the underwriter look at the pool outside the sample? … A. That would not be unreasonable depending again on the facts and circumstances. Q. You've not been able to identify any instance in which Nomura upsized any sample in the RMBS transactions at issue, right? A. That's correct, I did not find evidence in these pools, but I did find consistent testimony across the record that the right existed and nobody would have prevented it.").

972.    Mr. Grice did not reach the opinion that RBS's so-called semi-random samples were statistically valid.  FHFA Ex. 632 (Deposition of Charles Grice) at 303:18-304:5 ("Q. Mr.

Grice, is it your opinion that RBS's so-called semi-random samples are statistically significant? A. I don't reach that opinion, so the answer is no. Q. So do you have any – strike that. Have you conducted any analysis to test the degree to which RBS's semi-random samples may be statistically significant? A. I have not.").

973. Mr. Grice did not recall seeing any evidence in the record that RBS extrapolated from its samples in a statistical sense. FHFA Ex. 632 (Deposition of Charles Grice) at 304:6-11 ("Q. And you know that RBS itself never extrapolated from its own samples in a statistical sense, correct? … A. I don't recall seeing that from the record.").

974. Mr. Grice testified that he was not aware that RBS upsized its samples for any of the at-issue securitizations. FHFA Ex. 632 (Deposition of Charles Grice) at 306:11-17 ("Q. Are you aware of any instance in which RBS upsized its samples after reviewing initial free underwriting results for any of the transactions at issue? A. Not for the seven deals that I looked at here.").

975. Mr. Grice testified that he has "never seen a bank" calculate defect rates as to the loans in the supporting loan groups; and "a formal statistical extrapolation for any purpose" was "just not the way securitizations are formed." FHFA Ex. 632 (Deposition of Charles Grice) at 307:9-308:21 ("Q. Did you see any evidence that either RBS or Nomura attempted to calculate the defect rates as to the loans in the supporting loan groups at issue? … A. What do you mean calculate the defect rates. Q. Calculate the rate at which the loans materially breached representations made by the underwriter and sponsor. … A. Just to be clear, I have never seen a bank do that; again, banks meet loan pools, they don't meet supporting loan groups. So any kind of practical inference or insight into the pool or

the supporting loan group is just that, it is not a formal statistical extrapolation for any purpose, that's just not the way securitizations are formed. Q. So you saw no evidence that either RBS or Nomura attempted to calculate the defect rates for the loans in the supporting loan groups? … Q. Right? A. That's correct. My understanding from the declarations is that people reached a reasonable understanding, again, of this upper limit, based on, in the case of Nomura, the adverse sampling, in the case of RBS, the combined results of their random and adverse, their getting insight into the pool in reaching reasonable inferences and nothing further.").

976.    Mr. Grice also testified that he did not see any evidence that either RBS or Nomura attempted to calculate the defect rates for the loans in the supporting loan groups. FHFA Ex. 632 (Deposition of Charles Grice) at 307:9-308:21 ("Q. Did you see any evidence that either RBS or Nomura attempted to calculate the defect rates as to the loans in the supporting loan groups at issue? … A. What do you mean calculate the defect rates. Q. Calculate the rate at which the loans materially breached representations made by the underwriter and sponsor. … A. Just to be clear, I have never seen a bank do that; again, banks meet loan pools, they don't meet supporting loan groups. So any kind of practical inference or insight into the pool or the supporting loan group is just that, it is not a formal statistical extrapolation for any purpose, that's just not the way securitizations are formed. Q. So you saw no evidence that either RBS or Nomura attempted to calculate the defect rates for the loans in the supporting loan groups? … Q. Right? A. That's correct. My understanding from the declarations is that people reached a reasonable understanding, again, of this upper limit, based on, in the case of Nomura, the adverse

sampling, in the case of RBS, the combined results of their random and adverse, their getting insight into the pool in reaching reasonable inferences and nothing further.").

977. Mr. Grice agreed that "[e]xtrapolation from a true random sample is an important component of any sampling program because it can provide reliable estimates about the characteristics of the loan pool." FHFA Ex. 632 (Deposition of Charles Grice) at 313:20-314:3 ("Q. Extrapolation from a true random sample is an important component of any sampling program because it can provide reliable estimates about the characteristics of the entire loan pool. A. I don't disagree with that as a statement of statistically significant random sampling").

978. Mr. Grice agreed that Nomura did not have written procedures. FHFA Ex. 632 (Deposition of Charles Grice) at 344:17-345:13 ("I was asking you how did Nomura document its due diligence procedures? A. Oh, the procedures, forgive me, I didn't hear the word. These are not written procedures, these are oral procedures, these were practices of the bank. There is that document that I reference in the report, which is an overview of Nomura's processes for RMBS including diligence, there are a few slides and a PowerPoint that describe this as a high level, but it is a description, it is not a procedure. Q. That overview was intended for parties outside the bank, right? A. I don't know for a fact, it appears to be an investor presentation, but there are multiple versions of it, I just don't have any way of knowing its ultimate use.").

979. Mr. Grice testified that he did not recall seeing any record of either Nomura or RBS instructing third-party vendors to re-verify borrower income or borrower employment. FHFA Ex. 632 (Deposition of Charles Grice) at 355:20-356:7 ("Q. Turning back to the

third-party vendor issue, did you find any records of either Nomura or RBS ever instructing the third-party vendors to reverify borrower income or borrower employment? … A. I don't recall seeing that in the production here or in any case relative to this period, I am just not familiar with anyone who instructed their third-party vendors to do those work steps.").

980.    Mr. Grice testified that he had never seen evidence of any banks "asking the third-party vendors to do anything with respect to the offering materials."  FHFA Ex. 632 Grice Dep. at 356:8-17 ("Q. Is it fair to say Nomura and RBS also never instructed the outside vendors to try and verify the information in the prospectus supplements? … A. I have seen no evidence of that again; I have never seen evidence of anybody asking the third-party vendors to do anything with respect to the offering materials.").

981.    Mr. Grice admitted that credit reports and servicing records are "data streams that are available to banks."  FHFA Ex. 632 (Deposition of Charles Grice) at 356:18-357:15 ("Q. Is it fair to say that Nomura, RBS and the outside vendors, for that matter, could have accessed credit reports and servicing reports during the period between acquisition and securitization? A. I don't know the mechanics of how the third-party vendors would in all cases be able to do that. I think as a general statement, those are data streams that are available to banks, they are not, absent some reason to do it, they are not commonly pulled or reviewed. Q. You are aware that certain banks, such as HSBC, did obtain refreshed FICO scores and other credit reports during due diligence before securitization, right? A. I am familiar with that, yes. Q. And RBS and Nomura did not? A. I saw no evidence of reFICO by Nomura or RBS.").

982. Mr. Grice admitted that credit reports and servicing records were not "commonly pulled or reviewed" by banks. FHFA Ex. 632 (Deposition of Charles Grice) at 356:18-357:15 ("Q. Is it fair to say that Nomura, RBS and the outside vendors, for that matter, could have accessed credit reports and servicing reports during the period between acquisition and securitization? A. I don't know the mechanics of how the third-party vendors would in all cases be able to do that. I think as a general statement, those are data streams that are available to banks, they are not, absent some reason to do it, they are not commonly pulled or reviewed. Q. You are aware that certain banks, such as HSBC, did obtain refreshed FICO scores and other credit reports during due diligence before securitization, right? A. I am familiar with that, yes. Q. And RBS and Nomura did not? A. I saw no evidence of reFICO by Nomura or RBS.").

983. Mr. Grice agreed that banks have the same purpose and implementation in the approach to diligence today as they did during the housing crisis. FHFA Ex. 632 (Deposition of Charles Grice) at 46:8-47:5 ("Q. To summarize your view, then, fundamentally your perception is that the banks have the same approach to due diligence today intellectually as they did during the housing crisis, is that right? . . . A. My opinion is that the purpose is unchanged. The way that purpose is pursued remains relatively constant. The difference is the underlying information set inside the loan. So the guidelines themselves that created the mortgage file, the level of documentation inside the file, so there is more to analyze now than there was in '07 and there is a different sensitivity to certain questions than there was in 2007, but I don't think the purpose or the implementation has really done more than evolve.").

DATED:    New York, New York
          December 12, 2014


By: /s/ Philippe Z. Selendy

Philippe Z. Selendy
Andrew R. Dunlap
David B. Schwartz
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000


*Attorneys for Plaintiff Federal Housing
Finance Agency, as Conservator for Fannie
Mae and Freddie Mac*