UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,

Plaintiff,

-against-

NOMURA HOLDING AMERICA, INC.; NOMURA ASSET ACCEPTANCE CORPORATION; NOMURA HOME EQUITY LOAN, INC.; NOMURA CREDIT & CAPITAL, INC.; NOMURA SECURITIES INTERNATIONAL, INC.; RBS SECURITIES INC. (f/k/a GREENWICH CAPITAL MARKETS, INC.); DAVID FINDLAY; JOHN MCCARTHY; JOHN P. GRAHAM; NATHAN GORIN; and DANTE LAROCCA,

Defendants.

**No. 11 Civ. 6201 (DLC)**

**PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

I. LEGAL FRAMEWORK OF SECTION 12 AND BLUE SKY CLAIMS ..........................1

A. Legal Standards Of Falsity..........................................................................4

B. Legal Standards Of Materiality....................................................................5

II. NOMURA SECURITIES, RBSSI, NAAC, AND NHELI ARE LIABLE FOR MATERIALLY FALSE STATEMENTS IN THE PROSPECTUS SUPPLEMENTS..........................................................................................8

A. The Statements Regarding Compliance With Guidelines Were False .....................9

1. Dr. Cowan's Statistical Method Provides A Sound Basis For Extrapolating Mr. Hunter's And Dr. Kilpatrick's Results To The SLGS..........................................................................................11

2. Mr. Hunter's Re-underwriting Findings, As Extrapolated By Dr. Cowan, Provide Direct, Compelling Evidence That A Large Percentage Of Each SLG Contained Material Underwriting Defects ..........................................................................................13

3. The Reliability Of Mr. Hunter's Findings Is Bolstered By Direct Evidence Of Underwriting Defects Uncovered By Nomura's And RBSSI's Securitization Processes..............................................................17

4. The Credibility Of Mr. Hunter's Testimony Is Further Bolstered By Evidence Of Systematic Origination Defects And Systematic Diligence Defects..........................................................................19

B. The Statements Regarding LTV Ratios Were False ..............................................24

1. The Statements Regarding LTV Ratios Were Objectively False, As The Original Appraisals Of Nearly One Third Of the Sample Loans Were Inflated..........................................................................28

2. The Statements Regarding LTV Ratios Were Subjectively False, As The Inflated Values For The Sample Loans Were Not Believed By Those Loans' Appraisers.........................................................30

3. The Objectively And Subjectively False LTV Ratios Reported In The Prospectus Supplements Crossed Key LTV Thresholds ....................33

4. The Statements Regarding LTV Ratios Were Misleading In Light Of Information Nomura Acquired Prior To Securitization........................36

C. The Statements Regarding Owner Occupancy Status Were False ........................38

D. The Statements Regarding Credit Ratings Were False ..... 49

E. The False Statements And Omissions Were Material ..... 51

III. NOMURA HOLDING, NCCI, AND THE INDIVIDUAL DEFENDANTS ARE LIABLE AS CONTROL PERSONS FOR THE MISINFORMATION IN THE PROSPECTUS SUPPLEMENTS ..... 54

A. Nomura Holding, NCCI, And The Individual Defendants All Controlled The Primary Violators ..... 57

1. Nomura Holding Controlled The Primary Violators ..... 59

2. NCCI Controlled The Primary Violators ..... 61

3. The Individual Defendants Controlled The Primary Violators ..... 65

B. Nomura Holding, NCCI, And The Individual Defendants Have Failed To Prove An Affirmative Defense To Section 15 Liability ..... 66

IV. FHFA IS ENTITLED TO RECEIVE ITS FULL STATUTORY REMEDIES, APPLYING THE IRS UNDERPAYMENT RATE OF INTEREST ..... 68

A. "Consideration Paid" ..... 69

B. "With Interest Thereon" ..... 71

C. "Less The Amount Of Any Income Received" ..... 71

D. "Reasonable Attorney's Fees" And "Costs" ..... 72

E. Total Remedies ..... 74

V. DEFENDANTS HAVE NOT PROVEN THAT FHFA'S REMEDIES SHOULD BE REDUCED BASED ON NEGATIVE LOSS CAUSATION ..... 74

VI. CONCLUSION ..... 80

# TABLE OF AUTHORITIES

**Page**

## Cases

*AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*,
646 F. Supp. 2d 385 (S.D.N.Y. 2009) ....................80

*Akerman v. Oryx Commc'ns, Inc.*,
810 F.2d 336 (2d Cir. 1987)....................74

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)....................59, 60

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013)....................5

*Amorosa v. AOL Time Warner, Inc.*,
409 F. App'x 412 (2d Cir. 2011) ....................75

*Arabian v. Bowen*,
966 F.2d 1441 (4th Cir. 1992) ....................72

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
920 F. Supp. 2d 475 (S.D.N.Y. 2013)....................20

*Assured Guar. Mun. Corp. v. UBS Real Estate Sec., Inc.*,
2012 WL 3525613 (S.D.N.Y. Aug. 15, 2012)....................36

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................6

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012)....................24

*Borden, Inc v. Spoor Behrins Campbell & Young, Inc.*,
735 F. Supp. 587 (S.D.N.Y. 1990) ....................52, 54

*In re CINAR Corp. Sec. Litig.*,
186 F. Supp. 2d 279 (S.D.N.Y. 2002)....................54

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002)....................31

*Colon v. Diaz-Gonzalez*,
2009 WL 3571974 (D.P.R. Oct. 26, 2009) ....................67

*Colotti v. United States*,
2011 WL 6778475 (S.D.N.Y. Dec. 21, 2011) ....................23

*Commercial Union Assur. Co., PLC v. Milken*,
17 F.3d 608 (2d Cir. 1994)....................68

*Cotton v. Slone*,
4 F.3d 176 (2d Cir. 1993)....................72

*Cromer Fin. Ltd. v. Berger*,
137 F. Supp. 2d 452 (S.D.N.Y. 2001).................... *passim*

*DNJ Logistic Grp., Inc. v. DHL Express (USA), Inc.*,
2010 WL 625364 (E.D.N.Y. Feb. 19, 2010)....................2

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)....................78

*DeMaria v. Andersen*,
318 F.3d 170 (2d Cir. 2003)....................4, 5, 33

*Deng v. 278 Gramercy Park Grp. LLC*,
2014 WL 1016853 (S.D.N.Y. Mar. 14, 2014) ....................75

*Diaz Vicente v. Obenauer*,
736 F. Supp. 679 (E.D. Va. 1990) ....................72

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....................75

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009).................... *passim*

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)....................49, 71

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011)....................1, 7, 20

*FHFA v. Bank of Am. Corp.*,
2012 WL 6592251 (S.D.N.Y. Dec. 18, 2012) ....................1, 3

*FHFA v. HSBC N. Am. Holdings Inc.*,
33 F. Supp. 3d 455 (S.D.N.Y. 2014)....................4, 8, 49

*FHFA v. HSBC N. Am. Holdings Inc.*,
988 F. Supp. 2d 363 (S.D.N.Y. 2013)....................65, 72, 74

*FHFA v. JPMorgan Chase & Co.*,
902 F. Supp. 2d 476 (S.D.N.Y. 2012)....................18, 19

*FHFA v. JPMorgan Chase & Co.*,
2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012) ....................8, 11

*FHFA v. Merrill Lynch & Co.*,
903 F. Supp. 2d 274 (S.D.N.Y. 2012)....................36

*FHFA v. Nomura Holding Am., Inc.*,
2014 WL 7229361 (S.D.N.Y. Dec. 18, 2014) ....................5, 6

*FHFA v. Nomura Holding Am. Inc.*,
--- F. Supp. 3d ---, 2014 WL 7232443 (S.D.N.Y. Dec. 18, 2014) ..................................... *passim*

*FHFA v. Nomura Holding Am. Inc.*,
--- F. Supp. 3d ---, 2014 WL 7232590 (S.D.N.Y. Dec. 18, 2014) .............................................71

*FHFA v. Nomura Holding Am., Inc.*,
2015 WL 353929 (S.D.N.Y. Jan. 28, 2015) ...................................................................... *passim*

*FHFA v. Nomura Holding Am., Inc.*,
2015 WL 568788 (S.D.N.Y. Feb. 11, 2015) ..................................................................... *passim*

*FHFA v. SG Ams., Inc.*,
2012 WL 5931878 (S.D.N.Y. Nov. 27, 2012) .........................................................................9, 19

*FHFA v. UBS Ams., Inc.*,
858 F. Supp. 2d 306 (S.D.N.Y. 2012) ............................................................................... *passim*

*FHFA v. UBS Ams., Inc.*,
712 F.3d 136 (2d Cir. 2013) .................................................................................................1, 69

*FHFA v. UBS Ams., Inc.*,
2013 WL 3284118 (S.D.N.Y. June 28, 2013) ...................................................................................5

*Folger Adam Co. v. PMI Indus., Inc.*,
938 F.2d 1529 (2d Cir. 1991) ............................................................................................................6

*Food & Allied Serv. Trades Dep't, AFL-CIO v. Millfeld Trading Co.*,
841 F. Supp. 1386 (S.D.N.Y. 1994) ................................................................................................60

*Franklin Sav. Bank of New York v. Levy*,
551 F.2d 521 (2d Cir. 1977) ...............................................................................................................1

*Freidus v. Barclays Bank PLC*,
734 F.3d 132 (2d Cir. 2013) ...............................................................................................................5

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000) .........................................................................................................7, 8

*In re Gap Stores Sec. Litig.*,
79 F.R.D. 283 (N.D. Cal. 1978) ..................................................................................................73, 82

*Geiger v. Solomon-Page Grp., Ltd.*,
933 F. Supp. 1180 (S.D.N.Y. 1996) ................................................................................................39

*Glazer v. Formica Corp.*,
964 F.2d 149 (2d Cir. 1992) ............................................................................................................31

*In re Global Crossing, Ltd. Sec. Litig.*,
2005 WL 1875445 (S.D.N.Y. Aug. 5, 2005) ....................................................................................53

*Goldkrantz v. Griffin*,
1999 WL 191540 (S.D.N.Y. Apr. 6, 1999) .................................................................................67, 76

*Greenhouse v. MCG Capital Corp.*,
392 F.3d 650 (4th Cir. 2004) ....................................................................................8

*Gustafson v. Alloyd Co., Inc.*,
513 U.S. 561 (1995)..................................................................................................74

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)...............................................................................................4, 70

*Hollinger v. Titan Capital Corp.*,
914 F.2d 1564 (9th Cir. 1990) ..............................................................................51, 56

*Hutchison v. Deutsche Bank Sec. Inc.*,
647 F.3d 479 (2d Cir. 2011)..........................................................................................7

*In re Initial Public Offering Sec. Litig.*,
241 F. Supp. 281 (S.D.N.Y. 2003) ...............................................................................51

*Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*,
620 F.3d 137 (2d Cir. 2010)........................................................................................45

*Jones v. UNUM Life Ins. Co. of Am.*,
223 F.3d 130 (2d Cir. 2000)........................................................................................68

*Kalin v. Xanboo, Inc.*,
526 F. Supp. 2d 392 (S.D.N.Y. 2007)..........................................................................52

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
708 F. Supp. 2d 334 (S.D.N.Y. 2010)..........................................................................78

*Kleinman v. Elan Corp., PLC*,
706 F.3d 145 (2d Cir. 2013)..........................................................................................5

*Knox v. Cnty. of Putnam*,
2012 WL 4462011 (S.D.N.Y. Sept. 27, 2012)...............................................................15

*Landesbank Baden-Württemberg v. RBS Holdings USA Inc.*,
14 F. Supp. 3d 488 (S.D.N.Y. 2014)............................................................................36

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
650 F.3d 167 (2d Cir. 2011).......................................................................50, 51, 54

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)...................................................................................75, 79

*Lintz v. Carey Manor Ltd.*,
613 F. Supp. 543 (W.D. Va. 1985) .................................................................................2

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011)................................................................................. *passim*

*In re Livent, Inc.*,
360 F. Supp. 2d 568 (S.D.N.Y. 2005)..........................................................................71

*In re Livent, Inc. Sec. Litig.*,
78 F. Supp. 2d 194 (S.D.N.Y. 1999)....59

*In re McDermott Int'l., Inc. Sec. Litig.*,
2009 WL 1010039 (S.D.N.Y. Apr. 13, 2009)....76

*McKenna v. Smart Techs. Inc.*,
2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012)....54

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
65 F.3d 1044 (2d Cir. 1995)....74

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
900 F.2d 576 (2d Cir. 1990)....5

*Miller v. Thane Int'l, Inc.*,
615 F.3d 1095 (9th Cir. 2010)....79

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010).... *passim*

*NCUA v. UBS Sec., LLC*,
2014 WL 2600133 (S.D.N.Y. June 10, 2014)....17, 18

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012)....19, 76

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
709 F.3d 109 (2d Cir. 2013)....40

*Nemec v. Shrader*,
2010 WL 3958655 (S.D.N.Y. Sept. 27, 2010)....72

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)....45

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013)....76

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
98 F.3d 2 (2d Cir. 1996)....4

*In re Omnicom Grp., Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008)....76

*PHL Variable Ins. Co. v. P. Bowie 2008 Irrevocable Trust ex rel. Baldi*,
718 F.3d 1 (1st Cir. 2013)....68

*P. Stolz Family P'ship L.P. v. Daum*,
355 F.3d 92 (2d Cir. 2004)....44

*In re Parmalat Sec. Litig.*,
375 F. Supp. 2d 278 (S.D.N.Y. 2005).... *passim*

*Pinter v. Dahl*,
486 U.S. 642 (1988)....3

*Pollack v. Laidlaw Holdings, Inc.*,
1995 WL 261518 (S.D.N.Y. May 3, 1995)....52

*In re ProShares Trust Sec. Litig.*,
728 F.3d 96 (2d Cir. 2013)....38

*Randall v. Loftsgaarden*,
478 U.S. 647 (1986)....65, 66, 67

*In re Refco Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007)....53, 56

*Republic Tech. Fund, Inc. v. Lionel Corp.*,
483 F.2d 540 (2d Cir. 1973)....5

*Rodney v. KPMG Peat Marwick*,
143 F.3d 1140 (8th Cir. 1998)....45

*S.E.C. v. Boock*,
2012 WL 3133638 (S.D.N.Y. Aug. 2, 2012)....69, 70

*S.E.C. v. Colonial Inv. Mgmt. LLC*,
659 F. Supp. 2d 467 (S.D.N.Y. 2009)....68

*S.E.C. v. First Jersey Sec., Inc.*,
101 F.3d 1450 (2d Cir. 1996).... *passim*

*S.E.C. v. Martino*,
255 F. Supp. 2d 268 (S.D.N.Y. 2003)....69

*S.E.C. v. Mattera*,
2013 WL 6485949 (S.D.N.Y. Dec. 9, 2013)....66

*S.E.C. v. Mgmt. Dynamics, Inc.*,
515 F.2d 801 (2d Cir. 1975).... *passim*

*S.E.C. v. Moran*,
922 F. Supp. 867 (S.D.N.Y. 1996)....4

*S.E.C. v. Rosenfeld*,
2001 WL 118612 (S.D.N.Y. Jan. 9, 2001)....69

*S.E.C. v. Steadman*,
798 F. Supp. 733 (D.D.C. 1991)....2

*In re SLM Corp. Sec. Litig.*,
2012 WL 209095 (S.D.N.Y. Jan. 24, 2012)....7

*STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*,
648 F.3d 68 (2d Cir. 2011)....82

*STMicroelectronics v. Credit Suisse Grp.*,
775 F. Supp. 2d 525 (E.D.N.Y. 2011) .................................................................... *passim*

*Siciliano v. Nw. Mut. Life Ins. Co.*,
1998 WL 213704 (N.D.N.Y. Apr. 24, 1998) ..............................................................................2

*In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*,
774 F. Supp. 2d 584 (S.D.N.Y. 2011).....................................................................................75

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)..................................................................................................................55

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993)................................................................................................ *passim*

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991)...............................................................................................40, 43

*United States v. Ferguson*,
545 F. Supp. 2d 238 (D. Conn. 2008).........................................................................................8

*United States v. Perez*,
387 F.3d 201 (2d Cir. 2004)......................................................................................................24

*United States v. Riddle*,
103 F.3d 423 (5th Cir. 1997) ....................................................................................................79

*United States v. Rudaj*,
2006 WL 1876664 (S.D.N.Y. July 5, 2006) ..............................................................................24

*Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*,
955 F.2d 831 (2d Cir. 1992)......................................................................................................68

*Wigand v. Flo–Tek, Inc.*,
609 F.2d 1028 (2d Cir. 1980)........................................................................................... *passim*

*Wilson v. Saintine Exploration & Drilling Corp.*,
872 F.2d 1124 (2d Cir. 1989)....................................................................................................13

*In re WorldCom, Inc. Sec. Litig.*,
294 F. Supp. 2d 392 (S.D.N.Y. 2003)...................................................................................57, 58

*In re WorldCom, Inc. Sec. Litig.*,
346 F. Supp. 2d 628 (S.D.N.Y. 2004)........................................................................................62

*In re WorldCom, Inc. Sec. Litig.*,
2004 WL 1097786 (S.D.N.Y. 2004)...........................................................................................62

*In re WorldCom, Inc. Sec. Litig.*,
2005 WL 375314 (S.D.N.Y. Feb. 17, 2005)...............................................................................75

*In re WorldCom, Inc. Sec. Litig.*,
2005 WL 638268 (S.D.N.Y. Mar. 21, 2005) ..................................................................... *passim*

## Statutes

Financial Institutions Reform, Recovery, and Enforcement Act, Pub. L. No. 101-73, 103 Stat. 183 (1989) .....41

15 U.S.C. § 77*l*(a)(2) ..... *passim*

15 U.S.C. § 77*l*(b) ..... *passim*

15 U.S.C. § 77*o* ..... *passim*

28 U.S.C. § 1961 .....82

Conn. Gen. Stat. Ann. § 36b-2 .....72

D.C. Code § 28-3302(a) .....65, 68

D.C. Code § 31-5606.05(a)(1)(B) ..... *passim*

D.C. Code § 31-5606.05(b)(1)(A) ..... *passim*

D.C. Code § 31-5606.05(c) ..... *passim*

Va. Code § 13.1-522(A) ..... *passim*

## Regulations

17 C.F.R. § 229.10(c) .....43

17 C.F.R. § 229.1111(a) .....39

17 C.F.R. § 230.159A .....3

17 C.F.R. § 240.12b-2 .....51

170 C.F.R. § 230.191 .....3

Asset-Backed Securities, SEC Release No. 8518, 2004 WL 2964659 ..... *passim*

Staff Accounting Bulletin No. 99, SEC Release No. SAB-99, 1999 WL 1123073 ..... *passim*

## Other Authorities

Joseph C. Long, 12A Blue Sky Law .....2, 72

Black's Law Dictionary (3d. ed. 1933) .....57

Pursuant to the Court's January 21, 2015 Stipulation and Pretrial Scheduling Order, Dkt. 1119, and Section 5(A) of the Court's Individual Practices, FHFA submits its Proposed Findings Of Fact And Conclusions Of Law.[1]

## I. LEGAL FRAMEWORK OF SECTION 12 AND BLUE SKY CLAIMS

1. Section 12(a)(2) of the Securities Act provides:

> any person who[ ]… offers or sells a security … by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading … shall be liable[ ] … to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security,"

15 U.S.C. § 77*l*(a)(2). The Blue Sky laws of the District of Columbia and Virginia contain similar provisions (D.C. Code § 31-5606.05(a)(1)(B); Va. Code § 13.1-522(A)(ii)), and, except where expressly different (*e.g.*, with respect to the lack of a loss causation defense), "are generally interpreted in accordance with Section 12(a)(2)." *FHFA v. Bank of Am. Corp.*, 2012 WL 6592251, at *7 n.8 (S.D.N.Y. Dec. 18, 2012). A plaintiff is not required to prove scienter, reliance, or loss causation under either Section 12(a)(2) or these Blue Sky laws. *FHFA v. UBS Ams., Inc.* ("*UBS I*"), 858 F. Supp. 2d 306, 323 (S.D.N.Y. 2012) (citing *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 109 (2d Cir. 2011)), *aff'd*, 712 F.3d 136 (2d Cir. 2013).

2. Section 12(a)(2) has a jurisdictional requirement; it requires that the sale or offer of the subject securities (here, the Certificates) occur "by the use of any means or instruments of transportation or communication in interstate commerce or of the mails." This requirement is not onerous—it can be satisfied by the mailing of a "letter which simply confirms a prior sale," *Franklin Sav. Bank of New York v. Levy*, 551 F.2d 521, 524 & n.8 (2d Cir. 1977), a single

[1] All defined terms bear the same meaning as used herein as they do in FHFA's Proposed Findings of Fact ("FOF").

intrastate phone call, *Siciliano v. Nw. Mut. Life Ins. Co.*, 1998 WL 213704, at *2 (N.D.N.Y. Apr. 24, 1998), or any use of the internet, *DNJ Logistic Grp., Inc. v. DHL Express (USA), Inc.*, 2010 WL 625364, at *6 n.4 (E.D.N.Y. Feb. 19, 2010). In this case, there were emails regarding the offer and sale of the Certificates between Nomura Securities traders in New York and RBSSI traders in Connecticut, on the one hand, and Fannie Mae PLS traders in Washington, D.C. and Freddie Mac PLS traders in Virginia on the other, for each of the Certificates. FOF Part III.B. These communications satisfy Section 12(a)(2)'s jurisdictional requirement.

3. The Blue Sky laws also have a jurisdictional requirement: that the sale of the NAA 2006-AR6 Certificate to Fannie Mae took place, at least in part, in the District of Columbia, *S.E.C. v. Steadman*, 798 F. Supp. 733, 739 (D.D.C. 1991), *rev'd on other*, 967 F.2d 636 (D.C. Cir. 1992); *see also* Joseph C. Long, 12A Blue Sky Law § 9:39 ("The transaction must take place, at least in part, within the state."), and that the sales of the remaining Certificates to Freddie Mac took place, at least in part, in Virginia, *id.*; *see Lintz v. Carey Manor Ltd.*, 613 F. Supp. 543 (W.D. Va. 1985). Nomura Securities, on behalf of NAAC, sent offering materials and collateral information to Fannie Mae PLS traders located in the District of Columbia, FOF Part III.B.1, and RBSSI, on behalf of NHELI, sent offering materials and collateral information to Freddie Mac PLS traders located in Virginia, FOF Part III.B.2-7. These facts satisfy the statutes' jurisdictional requirements. *Steadman*, 798 F. Supp. at 739 ("By sending prospectuses and applications, whether solicited or unsolicited, to residents of various states, defendants solicited offers to buy, and therefore made 'offers' under the Uniform Securities Act, regardless of any statement to the contrary in the Funds' prospectuses.").

4. As part of its *prima facie* case under Section 12(a)(2), FHFA must prove that the Defendants against which those claims are brought (Nomura Securities, RBSSI, NAAC, and NHELI) "offer[ed] or s[old]" the Certificates in a primary offering "by means of" a prospectus or oral communication. 15 U.S.C. § 77*l*(a)(2). The Court has previously held that "[t]he sales of the seven Certificates at issue here were made 'by means of' the seven Prospectus Supplements filed with the SEC." *FHFA v. Nomura Holding Am., Inc.* ("Hunter-Forester Guidelines Op."),

2015 WL 568788, at *7 (S.D.N.Y. Feb. 11, 2015); *accord Bank of Am.*, 2012 WL 6592251, at *5.

5. As for the "offer[ed] or s[old]" requirement, an individual is a "statutory seller" under Section 12(a)(2) if he (a) "passed title, or other interest in the security, to the buyer for value," or (b) "successfully solicit[ed] the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner," *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988) (discussing Section 12(a)(1)); *see Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1125 (2d Cir. 1989) (adopting *Pinter* test for Section 12(a)(2)); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d, 347, 359 (2d Cir. 2010). Nomura Securities and RBSSI, as underwriters, offered and sold the Certificates to the GSEs in exchange for the purchase prices. FOF Part III.B. Nomura Securities and RBSSI also solicited the GSEs' purchase of the Certificates by, among other things, providing them with collateral information and preliminary offering materials, FOF Part III.B., in the course of underwriting initial public offerings through which each of the Certificates was sold. Accordingly, Nomura Securities and RBSSI are "statutory sellers." *Pinter*, 486 U.S. at 647. NAAC and NHELI, as depositors of Securitizations that were structured as investment trusts, FOF Part II.B.3-4, were "issuers" of the Certificates backed by those trusts, *UBS I*, 858 F. Supp. 2d at 333-34 (citing 15 U.S.C. § 77b(a)(4)), and thus are also statutory sellers, "regardless of the underwriting method used to sell the issuer's securities," *id.* (quoting 17 C.F.R. § 230.159A); *see also* 17 C.F.R. § 230.191(a)) ("The depositor for the asset-backed securities acting solely in its capacity as depositor to the issuing entity is the 'issuer' for purposes of the asset-backed securities of that issuing entity."). Accordingly, the "offer[ed] or s[old]" requirement of Section 12(a)(2) has been met.

6. Section 12(a)(2) and the Blue Sky laws require a plaintiff to show that, at the time of purchase, "the purchaser [did] not know[ ] of the untruth or omission" at issue. 15 U.S.C. § 77*l*(a)(2); *see* D.C. Code § 31-5606.05(a)(1)(B); Va. Code § 13.1-522(A)(ii)). As the Court has held that the GSEs did not know of the misrepresentations and omissions at issue, *FHFA v.*

*HSBC N. Am. Holdings Inc.* ("Knowledge MSJ Op."), 33 F. Supp. 3d 455, 460-61 (S.D.N.Y. 2014), this element of FHFA's claims is not at issue in this trial.

7. All that remains for FHFA to establish liability for its Section 12(a)(2) and Blue Sky claims is to show that each Prospectus Supplement "include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading," 15 U.S.C. § 77*l*(a)(2); *see FHFA v. Merrill Lynch & Co.*, 903 F. Supp. 2d 274, 279-80 (S.D.N.Y. 2012) (same requirements for Blue Sky statutes). FHFA must make this showing by a preponderance of the evidence. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91 (1983) (reversing appellate court ruling that clear and convincing standard should be applied to civil securities actions); *SEC v. Moran*, 922 F. Supp. 867, 887 (S.D.N.Y. 1996) ("There is no doubt that in a private securities action, the correct standard of proof is preponderance of the evidence."); *Feinberg v. Leighton*, 1987 WL 6147, at *13 (S.D.N.Y. Jan. 30, 1987) (applying preponderance of the evidence standard to Section 12(a)(2) claims in bench trial).

8. The legal standards governing these elements of FHFA's claims are set forth below.[2]

**A. Legal Standards Of Falsity**

9. In determining whether a Prospectus Supplement contained false or misleading statements, the Court reads it "as a whole." *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (quoting *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996)); *see also In re Morgan Stanley*, 592 F.3d at 365-66 ("When analyzing offering materials for compliance with the securities laws, we review the documents holistically and in their entirety."). Because even "[s]tatements of literal truth can become, through their context and manner of presentation, devices which mislead investors," the "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers."

[2] The legal framework of FHFA's "control person" claims under Section 15 of the Securities Act and the parallel provisions of the Blue Sky laws is discussed in Part III, *infra*.

*Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (quotation marks and citations omitted). Thus, the Court does not "focus on whether particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities." *DeMaria*, 318 F.3d at 180 (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)).

10. While the misstatements at issue are about existing or historical facts, Part II.B-E, *infra*, under Rules 401 and 402 of the Federal Rules of Evidence, "a party may rely on evidence gleaned from any point in time to prove the truth or falsity of a representation of fact about a past event." Hunter-Forester Guidelines Op., 2015 WL 568788, at *9.

**B. Legal Standards Of Materiality**

11. "The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976). As the Second Circuit has held, "[t]he materiality of statements and omissions under … [Section] 12(a)(2) is a fact-specific, context-specific inquiry," *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 140 (2d Cir. 2013).

12. Because "only … a prototype reasonable investor" matters under this test, *Republic Tech. Fund, Inc. v. Lionel Corp.*, 483 F.2d 540, 551 (2d Cir. 1973), "[i]n no event will the individual circumstances of [a] particular [plaintiff] … bear on the inquiry," *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013). In this case, materiality is "determined with reference to a reasonable 'PLS trader'—not a reasonable GSE, or a reasonable PLS trader with plaintiff's idiosyncratic regulatory restrictions and purchasing goals." *FHFA v. Nomura Holding Am., Inc.* ("Housing Goals Op."), 2014 WL 7229361, at *3 (S.D.N.Y. Dec. 18, 2014) (citing *FHFA v. UBS Ams. Inc.* ("*UBS III*"), 2013 WL 3284118, at *13, *23 (S.D.N.Y. June 28, 2013) *reconsideration denied sub nom. FHFA v. JPMorgan Chase & Co.*, 2013 WL 5354212 (S.D.N.Y. Sept. 25, 2013)). The finder of fact "need not know much about the GSEs in order to apply" this "objective standard[,]" and so evidence of the importance that the GSEs

ascribed to Defendants' representations is of, at best, limited relevance. Housing Goals Op., 2014 WL 7229361, at *4.

13. "[I]t is well-established that a material fact need not be outcome-determinative." *Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1533 (2d Cir. 1991). Rather, a false statement of fact is material if "there is a *substantial likelihood* that a reasonable investor would consider it important" in deciding whether to purchase a security. *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (emphasis added) (quotation marks and citation omitted). Similarly, an omission is material if there is "a *substantial likelihood* that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (emphasis added) (quotation marks omitted). The inaccurate or omitted information need only be important enough that it "would have assumed actual significance in the deliberations of the reasonable shareholder." *Folger Adam*, 938 F.2d at 1533 (citation omitted).

14. The Second Circuit instructs that "a court must consider both quantitative and qualitative factors in assessing an item's materiality … and that consideration should be undertaken in an integrative manner." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011) (quotation marks and citation omitted). This holding is consistent with, and in part based upon, the SEC's views as set forth in SEC Staff Accounting Bulletin No. 99 ("SAB 99"), which provides general guidance with respect to assessing materiality in the context of financial statements. SEC Release No. SAB-99, 1999 WL 1123073, at *3 ("The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality.")

15. Quantitatively, the Second Circuit has endorsed as "a good starting place" the 5% numerical threshold that SAB 99 suggests as "'the basis for a preliminary assumption' regarding materiality" in the context of financial statements. *ECA & Local 134*, 553 F.3d at 204 (quoting SAB 99, 1999 WL 1123073, at *2). In applying this quantitative measure, it is

appropriate to aggregate all relevant misstatements and judge their impact as a whole. SAB 99, 1999 WL 1123073, at *5.

16. This "preliminary inquiry under the quantitative factor must [then] be supplemented[ ] … [with] qualitative factors that might contribute to a finding of materiality." *ECA & Local 134*, 553 F.3d at 204 (internal citation omitted). This analysis must be undertaken because "[m]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment," *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting FASB, Statement of Financial Accounting Concepts No. 2, ¶ 125 (1980)); *see id.* (Second Circuit has "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation."); *Basic*, 485 U.S. at 236 (Supreme Court likewise eschews "bright-line rule[s]" in assessing materiality, as "standard [ ] requires the exercise of judgment in the light of all the circumstances.").

17. Because "qualitative factors may cause misstatements of quantitatively small amounts to be material," *Litwin*, 634 F.3d at 718 (citing SAB 99 at *3), "there are numerous circumstances in which misstatements below 5% could well be material," SAB 99, 1999 WL 1123073, at *3; *see also In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *7 (S.D.N.Y. Jan. 24, 2012) (applying SAB 99 qualitative factors and collecting like authorities). For example, the Second Circuit in *Litwin* used a "5% threshold" as the starting point for its analysis of whether the defendant asset-management company was required to disclose its CDO exposure, but ultimately determined that CDO exposure threatening less than 5% of defendant's assets might be material because it threatened a "flagship segment" of the defendant's business, *id.* at 720; *see also Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 488 (2d Cir. 2011) (quantitatively small misstatement or omission can be material if it relates to a "critical role in the overall enterprise").

18. Further, even though *scienter* is not an element of FHFA's claims, *Fait*, 655 F.3d at 109, a defendant's involvement with a misrepresentation, *United States v. Ferguson*,

545 F. Supp. 2d 238, 240 (D. Conn. 2008) (citing *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 659 (4th Cir.2004)), and the fact that a misstatement was made intentionally both constitute "significant evidence of materiality," SAB 99, 1999 WL 1123073, at *4.  Also relevant is whether the misstatement reveals "material weaknesses in the registrant's system of internal accounting control designed to detect and deter improper accounting and financial reporting," because "if the tone set by management is lax, fraudulent financial reporting is more likely to occur."  SAB 99, 1999 WL 1123073, at *8.

19.     Finally, "[m]ateriality is determined in light of the circumstances existing at the time the alleged misstatement occurred."  *Ganino*, 228 F.3d at 165.  However, evidence from a later time period may be probative of the circumstances that existed when the misstatements FHFA alleges were made.  *See* Hunter-Forester Guidelines Op., 2015 WL 568788, at *9.

## II.   NOMURA SECURITIES, RBSSI, NAAC, AND NHELI ARE LIABLE FOR MATERIALLY FALSE STATEMENTS IN THE PROSPECTUS SUPPLEMENTS

20.     FHFA seeks rescission of the seven Certificates under Section 12(a)(2) based on materially false or misleading statements made in the corresponding Prospectus Supplements. "[E]ach certificate is a separate security, and as such, to the extent the plaintiff seeks to recover on the basis of the GSEs' purchase of multiple Certificates in a securitization, it must show a misstatement of fact that was material in the context of each transaction."  *FHFA v. JPMorgan Chase & Co.* ("Cowan *Daubert* Op."), 2012 WL 6000885, at *9 (S.D.N.Y. Dec. 3, 2012).  But FHFA need not show that *all* of the statements at issue in a given Prospectus Supplement were materially false or misleading—a showing that *any* of those statements were materially false or misleading will establish Defendants' liability for the Certificate.  *See* Knowledge MSJ Op., 33 F. Supp. 3d at 479-80 ("to make out a prima facie case under Section 12(a)(2), a plaintiff must prove: … the prospectus or oral communication 'include[d] *an* untrue statement of a material fact or omit[ted] to state *a* material fact'") (emphases added) (alterations in original) (quoting 15 U.S.C. § 77*l*(a)(2)) (further quotation marks and citation omitted).

21. FHFA asserts that each of the Prospectus Supplements contained materially false or misleading statements, concerning: (1) compliance with underwriting guidelines; (2) LTV ratios; (3) owner occupancy; and (4) credit ratings. *See* FOF Part III.C; June 28, 2012, Am. Cmplt. (Dkt. 60) ¶¶ 76-129. For the reasons stated below, FHFA has established the falsity of each category of statement for every Certificate, and that each false or misleading statement was material, whether considered individually or collectively with the other false or misleading statements. Accordingly, FHFA has established liability for its claims under Section 12(a)(2) and for its claims of primary violations of the Blue Sky laws.

**A. The Statements Regarding Compliance With Guidelines Were False**

22. The Prospectus Supplement for each Certificate represented that the Mortgage Loans were originated "generally in accordance" with the applicable "underwriting guidelines," FOF Part III.C.1, and contain numerous other representations about the underwriting processes and criteria supposedly used in originating those loans to ensure that borrowers had the ability and willingness to repay their loans. FOF Part III.C.1. FHFA has shown by the preponderance of the evidence that these representations were false.

23. Each statement that the Mortgage Loans generally complied with guidelines "is a classic statement of fact," *FHFA v. SG Ams., Inc.*, 2012 WL 5931878, at *2 (S.D.N.Y. Nov. 27, 2012), hence FHFA need not present proof of originators' intent or subjective disbelief. *See id.*; Hunter-Forester Guidelines Op., 2015 WL 5687888, at *10 ("[T]he Prospectus Supplements represent that the loans within each SLG did in fact meet the criteria set forth in their Originators' guidelines. … is a representation of fact"). Further, the relevant date for determining if "the loans … me[t] the underwriting criteria contained in Originators' guidelines[ ]" is the date of origination, *id.* at *15, because each Prospectus Supplement states that the Mortgage Loans "were originated" in accordance with this underwriting process. Accordingly, in determining whether the representations were false, the Court examines whether the loans "did or did not—at the time of origination—meet the underwriting criteria contained in Originators' guidelines." *Id.*

24.     The Prospectus Supplements "describe a process followed by each borrower in applying for loans and by each Originator in reviewing and approving loan applications to ensure that the loan qualified under the Originators' guidelines and assert that the loans that are contained in the SLGs conformed to those guidelines." *Id.* at *9.  "[R]ead in context," the statements regarding process are "only high-level descriptions of a far more complex underwriting process undertaken by all Originators[.]"  *Id.*  They are not "a complete description of the origination process," as they "omit[ ] the specific benchmarks and criteria that are part of the customary underwriting process at origination."  *Id.* at *12.  Instead, "these passages are a statement by the defendants that they have reviewed the Originators' processes and guidelines and confirmed that the loans within the Securitization were all originated in compliance with their Originators' standards and processes, and that those standards and processes all contained the central elements summarized in the Supplement."  *Id.*

25.     The Prospectus Supplements also contain a substantive component, as "a representation about process without a concomitant representation about the quality of the loans would be an empty one[.]"  *Id.*  "For example, the[ ] [Prospectus Supplements] represented that 'the original lender' determined for certain loans that the borrower's monthly income 'will be sufficient to enable the borrower to meet their monthly obligations,'" meaning that "[i]f FHFA demonstrates that the actual income of [a] borrower was materially different than that used by the Originator in calculating DTI, such that the loan failed to meet the DTI threshold specified in the Originator's guidelines, then FHFA may rely on that showing in arguing that a material false statement exists," even if the originator followed its origination process.  *Id.*

26.     Because the guidelines described in the Prospectus Supplements contain both substantive and procedural components, FHFA may prove that a loan did not comply with guidelines by showing that, at the time of origination, either (a) the "Originator failed to follow its own guidelines or to respond appropriately to red flags that appeared in the application and review process," or (b) the loan "did not actually conform to the standards set out in the Originator's guidelines," regardless of the originator's actions.  *Id.* at *9; *see also id.* at *13

(rejecting Defendants' argument that the statements at issue "[do] not also include a representation that the loans actually did meet each of the criteria within an Originator's underwriting guidelines").

27. Each Prospectus Supplement also stated that the originators might grant exceptions for loans that otherwise did not comply with guidelines if they were offset by compensating factors. FOF Part III.C.1. Thus, if FHFA shows that a loan did not comply with guidelines, then the Court must consider "evidence that an exception was given and justified within the framework established by an Originator." Hunter-Forester Guidelines Op., 2015 WL 568788, at *9 n.22.

28. In short, FHFA may prove that the representations regarding compliance with guidelines were false through evidence that the loans did not comply with guidelines and lacked adequate compensating factors as of the origination date. In making this showing, "[d]irect or circumstantial evidence, regardless of when that evidence first became available, [is] [ ] relevant if it help[s] to demonstrate that an Originator did or did not follow its own underwriting guidelines or that the loan did or did not qualify under the Originator's guidelines." *Id.* at *10. In particular, "post-origination evidence" may be "probative of a relevant characteristic of the loan at" origination, and so FHFA is not limited to "information that was actually available to Originators at th[e] historical moment" that loans were originated. *Id.*

29. As described below, FHFA has proved by a preponderance of the evidence that the Prospectus Supplements' representations that the Mortgage Loans generally complied with guidelines were false, both through the findings of its experts, and through documentary evidence and testimony consistent with those findings.

### 1. Dr. Cowan's Statistical Method Provides A Sound Basis For Extrapolating Mr. Hunter's And Dr. Kilpatrick's Results To The SLGS

30. This case involves 15,806 loans across seven SLGs; re-underwriting all of those loans would be impracticable, if not impossible. The Court therefore permitted FHFA to submit proof of falsity through statistical sampling, and the parties have litigated this Action with the

understanding that such proof would be accepted at trial. *See FHFA v. JPMorgan Chase & Co.* ("Cowan *Daubert* Op."), 2012 WL 6000885, at *1 (S.D.N.Y. Dec. 3, 2012).

31. FHFA's statistical expert, Dr. Cowan, used a statistically valid method to randomly select a representative sample of 100 loans from each SLG (the "Sample Loans"), with supplementation for the NAA 2005-AR6 SLG, for which there were missing loan files. FOF Part IV.A.1(b). Dr. Cowan chose a sample size of 100 because such a sample is sufficient to determine, for each SLG, the proportion of defective loans to a 95% confidence level and with a maximum margin of error of ±10%. Dr. Cowan then stratified each sample by FICO score to further reduce the margin of error. FOF Part IV.A.1. The sampling methodology designed and implemented by Dr. Cowan in this case is reliable and persuasive, and Defendants have neither proposed an alternative sampling design nor challenged Dr. Cowan's qualifications. Part IV.A.1(b).

32. Dr. Cowan's sampling methodology is particularly well-suited to this RMBS action, where FHFA must establish material falsehood as to large pools of loans. *See Ace Sec. Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA, Nat. Ass'n v. DB Structured Products, Inc.*, 5 F. Supp. 3d 543, 560 n.9 (S.D.N.Y. 2014) ("[M]any courts have accepted statistical sampling as a means of demonstrating liability in RMBS cases[.]"). Further, the "[p]reponderance of the evidence does not anywhere near require 95% certainty." *United States v. Hatfield*, 795 F. Supp. 2d 219, 234 (E.D.N.Y. 2011). Consequently, Dr. Cowan's work is more that sufficient in establishing Defendants' liability in this civil action, and might even suffice in a criminal one. *United States v. Fatico*, 458 F. Supp. 388, 406 (E.D.N.Y. 1978) ("If quantified, the beyond a reasonable doubt standard might be in the range of 95% probable.") *aff'd,* 603 F.2d 1053 (2d Cir. 1979); *cf. M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 689 F.3d 263, 270 n.7 (2d Cir. 2012) ("95% statistical confidence, … mean[s] that there was a 95% probability that the [ ] results were not random, which makes it highly unlikely that they were the result of chance."); *id.* at 280 (affirming determination that civil rights plaintiffs carried burden of demonstrating disparate impact based on survey at 95% confidence level).

33.     For these reasons, the Court fully credits Dr. Cowan's testimony regarding his sampling methodology and extrapolations.

**2.      Mr. Hunter's Re-underwriting Findings, As Extrapolated By Dr. Cowan, Provide Direct, Compelling Evidence That A Large Percentage Of Each SLG Contained Material Underwriting Defects**

34.     Consistent with the showing FHFA must make to prove that the representations as regarding compliance with guidelines were false, Hunter-Forester Guidelines Op., 2015 WL 568788, at *12, Mr. Hunter re-underwrote the 732 Sample Loans to determine if the originator of each Sample Loan followed its guidelines and if each Sample Loan actually complied with those guidelines, FOF Part IV.A.2(a).   In doing so, Mr. Hunter consulted a wide variety of information of the sort commonly used by mortgage loan underwriters (including post-origination information) such as borrower audit credit  reports, verifications of employment, servicing records, and bankruptcy filings.  FOF Part IV.A.2(c).

35.     Mr. Hunter found that, on average, 86.45% of the Sample Loans had not been originated in accordance with guidelines or minimum industry standards, and lacked adequate compensating factors.  FOF IV.A.2.  For each of these loans, Mr. Hunter evaluated whether the breach substantially increased the credit risk of the loan: he concluded that, on average, 66.39% of the SLG loans did not comply with guidelines or minimum industry standards of underwriting and as a result had a significantly increased credit risk.  FOF Part IV.A.2.

36.     Dr. Cowan extrapolated Mr. Hunter's above findings to the SLGs as a whole and found, at 95% confidence, a significant average breach rate of 68.30%, as follows:

| SLG | Breach Rate | 95% Lower Bound | 95% Upper Bound | Margin of Error |
|---|---|---|---|---|
| NAA 2005-AR6 | 60.92% | 53.71% | 67.72% | 7.01% |
| NHELI 2006-FM1 | 70.00% | 60.20% | 78.59% | 9.20% |
| NHELI 2006-FM2 | 72.00% | 62.24% | 80.41% | 9.09% |
| NHELI 2006-HE3 | 65.63% | 55.53% | 74.77% | 9.62% |
| NHELI 2007-1 | 65.38% | 56.18% | 73.74% | 8.78% |
| NHELI 2007-2 | 69.54% | 59.56% | 78.33% | 9.39% |
| NHELI 2007-3 | 63.83% | 53.69% | 73.12% | 9.71% |
| **Aggregate** | **68.30%** | **64.39%** | **72.22%** | **3.91%** |

Cowan Direct ¶ 59.

37. Defendants present their own re-underwriting expert, Mr. Forester, who offered rebuttal re-underwriting of the Sample Loans for which Mr. Hunter found significant defects, as well as general rebuttal testimony. Hunter-Forester *Daubert* Op., 2015 WL 568788, at *1. Unlike Mr. Hunter, however, Mr. Forester examined only whether originators followed their stated process and procedures for originating loans; he did not also examine whether the loans actually complied with guidelines. *Id.* at *14. Mr. Forester also limited his review to information that he believed "would have been available" to the originator at the time of origination; he did not consider information arising afterwards that bore on whether the loan had been originated properly. *Id.*

38. As the Court held, Mr. Forester's flawed methodology leaves him unable to rebut vast swathes of Mr. Hunter's testimony. Because he considers no post-origination information, no matter how probative, Mr. Forester's opinions are inherently less persuasive than those of Mr. Hunter, who testified based on all relevant information. *Id.* at *10-11. Even more glaringly, because Mr. Forester considered only the procedural component of underwriting guidelines, and not their substantive component, his testimony leaves unaddressed half of the legal standard

under which the Court evaluates the guidelines representations. *See id.* at *13-14. "As a result, [Mr.] Forester's opinions have only limited relevance here." *Id.*

39. Mr. Forester's critiques of Mr. Hunter's methodology also carry little weight. *See* Hunter-Forester *Daubert* Op., 2015 WL 568788, at *14 & n.32. At bottom, Mr. Forester's critiques of Mr. Hunter rest on the speculation that the sources Mr. Hunter consulted, many of which Mr. Forester incorrectly regarded as irrelevant, *might* be inaccurate. But as Mr. Forester offers no proof that Mr. Forester's sources, which are typical of the industry, actually *were* inaccurate, these "conclusory assertions[ ] [and] speculation," *Knox v. Cnty. of Putnam*, 2012 WL 4462011, at *4 (S.D.N.Y. Sept. 27, 2012), do little to reduce the weight of Mr. Hunter's testimony.

40. Defendants also challenge Mr. Hunter's findings to the extent they are based on minimum industry standards for loan origination, a methodology that Mr. Hunter used when the applicable guidelines were unavailable, stale, or silent on a particular topic. FHFA has shown that the minimum industry standards reflect the most basic and fundamental steps in the underwriting process, and, as such, are part and parcel of underwriting any subprime or Alt-A residential mortgage loan. FOF Part IV.A.2(c)(1)b. Thus, it has shown that every subprime or Alt-A residential mortgage loan originated during the Relevant Period, at a minimum, should have complied with these standards. FOF Part IV.A.2(c)(1)b.

41. As the Court has explained, where guidelines are unavailable or stale, minimum industry standards "may provide circumstantial evidence of the content of the Originator's guidelines as of the time of origination." Jan. 29, 2015 Op. & Order re: Min. Indus. Stds. ("Min. Stds. Op."), Dkt. 1188, at 11-12. The minimum industry standards to which Mr. Hunter testifies are persuasive evidence of the content of missing or stale guidelines because they reflect the lowest common denominator across all underwriting guidelines applicable to subprime and Alt-A loans during the relevant period, FOF Part IV.A.2(c)(1)b. As such, the minimum standards Mr. Hunter has distilled constitute a viable method of evaluating an element of liability that would otherwise be, inequitably, unknowable. Consequently, the Court concludes that

minimum industry standards may be used as a reasonable substitute for those Sample Loans where the applicable guidelines are missing or stale.

42.      Where guidelines exist but are silent, minimum industry standards still may "provide relevant circumstantial evidence" that can "fill the gaps" in an Originator's guidelines, if doing so is warranted by an investigation of "the representations in the relevant Prospectus Supplement and the content of the Originator's guidelines[.]"  Min. Stds. Op., Dkt. 1188, at 12. Mr. Hunter's use of minimum industry standards for Sample Loans where the applicable guideline is silent on a particular step in the origination process is appropriate because those standards reflect the most fundamental practices that were expected to be followed by all loan underwriters, even those at the most lenient originators during the relevant period, and are inherent in the Originators' guidelines.  FOF Part IV.A.2(c)(1)b.  Moreover, the minimum industry standards are encompassed within representations in the Prospectus Supplements, including statements that (i) the Originator made a determination that the borrower had the ability to repay the loan; (ii) the Originator assessed the adequacy of the mortgaged property as collateral; and (iii) the Mortgage Loans complied with federal, state, and local laws.  FOF Part IV.A.2(c)(1)b.

43.      Defendants' only true criticism of the minimum industry standards is that Defendants have located a handful of guidelines with a threshold for a single criterion that is marginally more lax than one of the 59 minimum industry standards utilized by Mr. Hunter.  But FHFA does not need to show that there were absolutely no guidelines anywhere in the mortgage industry between 2005 and 2007 that were more lenient than the minimum industry standards. Rather, each requirement in the guidelines must be read in conjunction with other requirements to determine the true minimums.  Here, FHFA has shown that the minimum industry standards offer "circumstantial evidence of the content of the Originator's guidelines as of the time of origination" for guidelines that are missing or stale, and "relevant circumstantial evidence regarding the existence of a misrepresentation" regarding fundamental "step[s] in the origination process" in all remaining cases.  *See* Min. Stds. Op., Dkt. 1188, at 11-12.

44. Moreover, even if the Court were not to consider any defects that Mr. Hunter identified based on minimum industry standards, approximately 30 percent of the Sample Loans still had underwriting defects that substantially increased credit risk, more than enough to support a finding of material falsity. FOF Part IV.A.2(d).

45. In sum, the Court finds Defendants' criticisms of Mr. Hunter's methodology and challenges to his findings unpersuasive, and credits Mr. Hunter's testimony as to widespread underwriting breaches within the Sample Loans.

**3. The Reliability Of Mr. Hunter's Findings Is Bolstered By Direct Evidence Of Underwriting Defects Uncovered By Nomura's And RBSSI's Securitization Processes**

46. In conducting acquisition or securitization diligence on the SLG loans, Nomura's and RBSSI's third-party vendors graded substantial numbers of loans as EV3, meaning that those loans materially breached guidelines and adequate compensating factors did not exist. FOF Part IV.B.2. Defendants' own numbers show that 418 SLG loans received *final* diligence grades of EV3, meaning that Nomura agreed with the EV3 rating, but Nomura securitized the loans anyway, and Defendants present no evidence showing that this was proper. Diligence MSJ Op., 2014 WL 7232443 at *31; *see* FOF Part IV.B.2 (similar). Another 293 SLG loans received initial grades of EV3 from Nomura's vendors, but were waived into the Securitizations by Nomura without any identification of compensating factors or evidence that a Nomura employee reviewed the loan file. Cipione Direct ¶ 14. Perhaps more glaringly, when conducting diligence on the NHELI 2007-1 and NHELI 2007-2 Securitizations, RBSSI's waived in nearly all of the loans that its vendor graded as materially defective, including all 36 loans graded EV3 for credit reasons in its sample for 2007-1, and 55 of the 57 loans graded EV3 in its sample for 2007-2. FOF Part IV.B.2(e)-(f). This additional direct evidence that large numbers of SLG loans did not comply with guidelines, which FHFA has shown on Certificate-by-Certificate basis, bolsters the credibility of Mr. Hunter's findings.

### 4.    The Credibility Of Mr. Hunter's Testimony Is Further Bolstered By Evidence Of Systematic Origination Defects And Systematic Diligence Defects

47.    FHFA has put forward credible evidence that multiple SLG loan originators that contributed substantial numbers of loans to the Securitizations systematically originated loans that did not comply with their stated guidelines.  FOF Part IV.B.  In the face of such systemic origination failures, the only way for Nomura and RBSSI to avoid securitizing defective loans from these originators into the SLG would be to identify and remove such loans during acquisition or securitization diligence.  *NCUA v. UBS Sec., LLC*, 2014 WL 2600133, at *6 (S.D.N.Y. June 10, 2014) ("originator-specific allegations suggesting systemic disregard of the relevant underwriting guidelines" combined with allegations "that [defendant's] due diligence did not weed out loans that failed to comply with the relevant underwriting guidelines" was "'suggestive of' systemic disregard of the underwriting guidelines by the key originators responsible for the loans underlying the … Certificates"); *FHFA v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 488 (S.D.N.Y. 2012) (investigations revealing underwriting failures by originators "provide a basis to assert that there was a systematic failure by the defendants in their packaging and sale of RMBS").  But, as this Court has held, there is no evidence from which a reasonable factfinder could conclude that Defendants discharged their duty to exercise reasonable care to ensure the guidelines representations were true.  *See Nomura Holding Am., Inc.*, 2014 WL 7232443, at *2-3.

48.    Instead, the evidence shows that Defendants routinely securitized defective loans. Nomura conducted no review at all on 60% of the SLG loans when it acquired them, although the available information should have led it to suspect that the unreviewed loans might be materially defective.  FOF Part IV.B; Diligence MSJ Op., 2014 WL 7232443 at *31.  Nomura rarely reviewed loans graded by its vendors as EV1; looked only at summary results for loans graded EV2; and never changed a loan's grade from EV1 or EV2 to EV3, even after a quality control review showed that 30 percent of all loans graded EV1 or EV2 and securitized by Nomura breached guidelines.  FOF Part IV.B; 2014 WL 7232443 at *9.  Moreover, trending

reports issued by Clayton show that in 2006 and early 2007, RBS and Nomura "waived in" 58% and 53%, respectively, of the loans that Clayton identified as materially defective, supporting an "inference … that in securitizing loans [Defendants] did not diligently reject loans that failed their originators' underwriting guidelines, despite the above-recited statements in the Offering Documents." *UBS Sec.*, 2014 WL 2600133, at *5; *see also JPMorgan Chase & Co.*, 902 F. Supp. 2d at 492 (high waiver rate is probative of whether "underwriting guidelines information [ ] included in [ ] Offering Documents was false.").

49. Considered as a whole, evidence of systemic origination failures coupled with evidence of Nomura's and RBSSI's diligence failures demonstrates that the SLGs contained loans that did not comply with guidelines. *See id.* at 488; *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 163 (2d Cir. 2012) ("proof" that "particular originators … had in fact abandoned their guidelines" may "provide the necessary link between (1) the Offering Documents' representations in a vacuum and (2) the falsity of those representations."). This inference further bolsters the credibility of Mr. Hunter's findings that large numbers of SLG loans did not actually comply with guidelines.

50. For all of the reasons discussed above, the Court credits Mr. Hunter's findings in full, as well as Mr. Cowan's extrapolation of those findings, and concludes that the statements in the Prospectus Supplements regarding compliance with underwriting guidelines were false. FHFA has therefore proved by the preponderance of the evidence that the statements in the Prospectus Supplements regarding compliance with underwriting guidelines were false.

**B. The Statements Regarding LTV Ratios Were False**

51. Each Prospectus Supplement included statistics regarding the distribution of LTV ratios across the SLGs. FOF Part III.C.2; *accord FHFA v. Nomura Holding Am., Inc.*, ("Kilpatrick *Daubert* Op."), 2015 WL 353929, at *1 (S.D.N.Y. Jan. 28, 2015). "For any given mortgage, the LTV ratio is determined by computing the balance of the loan as a percentage of the value of the property that secures it, often determined on the basis of an appraisal." *Id.* LTV ratios are thus calculated by dividing the amount of the residential mortgage loan by the value of

the property that collateralized the loan—in particular, the lower of the appraised value and the sales price. FOF Part III.C.2.

52. The appraisal values of the properties used to calculate the LTV ratios of the Mortgage Loans are "the subjective judgments of the appraisers," as they depend on appraisers' estimates regarding the values of the underlying properties. *UBS I*, 858 F. Supp. 2d at 326; *see SG Ams.*, 2012 WL 5931878, at *3 (S.D.N.Y. Nov. 27, 2012). To establish a misrepresentation of the LTV ratios set forth in the Prospectus Supplements, FHFA therefore must establish both that: (a) the original value derived from an appraisal (and hence an LTV ratio based on that appraisal) was inflated; and (b) the original appraiser did not believe the original appraised value to be accurate. *UBS I*, 858 F. Supp. 2d at 325-26 (citing *Fait*, 655 F.3d at 113); *accord* Kilpatrick *Daubert* Op., 2015 WL 353929, at *1. While statements regarding LTV ratios are made as of the Cut-Off Date, because they refer to the original appraisals, FHFA must establish the original appraisals were inaccurate at the time they were completed. Hunter-Forester Guidelines Op., 2015 WL 568788, at *10.[3]

53. As described below, FHFA has proven by the preponderance of the evidence that the LTV ratios reported in the Prospectus Supplements were materially misstated.

#### 1. The Statements Regarding LTV Ratios Were Objectively False, As The Original Appraisals Of Nearly One Third Of the Sample Loans Were Inflated

54. To test the objective falsity of the original appraisals used to calculate the LTV ratios of the loans in the SLGs, Dr. Kilpatrick used an automated valuation model methodology he terms the Greenfield AVM to perform a retroactive analysis of the Sample Loans. FOF Part IV.A.3(a). The Court evaluated the reliability of the Greenfield AVM methodology, which was the subject of extensive briefing including the submission of various declarations submitted by other experts, and found the Greenfield AVM methodology sufficiently reliable under *Daubert*

[3] If FHFA shows that an original appraisal was objectively and subjectively false when made, because the LTV ratios reported in the Prospectus Supplements were based on those original appraisals, it necessarily follows that the reported LTV ratio for that loan is also false. *See* Kilpatrick Daubert Op., 2015 WL 353929, at *5-6.

and its progeny, and that it may provide competent circumstantial evidence of the subjective falsity of appraisals. Kilpatrick *Daubert* Op., 2015 WL 353929, at *6.

55. AVMs are well-accepted in the mortgage industry and are a reliable way of predicting the market value of a property, as they avoid the inconsistency inherent in a manual appraisal and, if designed and operated properly, produce results with a high degree of precision and accuracy. FOF Part IV.A.3(a); *see Assured Guar. Mun. Corp. v. Flagstar Bank, FSB,* 920 F. Supp. 2d 475, 505 (S.D.N.Y. 2013) (holding that AVMs may constitute reliable evidence of inflated appraisals). Dr. Kilpatrick's Greenfield AVM analyzed relevant characteristics of each subject property to select comparable properties and then predicted the property's true market value at the time it was appraised. FOF Part IV.A.3. Dr. Kilpatrick then compared the original appraised value for the sampled properties to the market values predicted by the Greenfield AVM to determine if the original appraised values were inflated. FOF Part IV.A.3.

56. Defendants' central criticism of Dr. Kilpatrick's AVM methodology is that it uses a cross validation ("CV") filter. Data filtering in general, and the CV filter in particular, are traditionally accepted tools in econometrics and the real estate industry. FOF Part IV.A.3.(a). Dr. Kilpatrick used his CV filter to remove observations from his analysis if the recent sales prices of the property were more than 25% different than the value predicted by the Greenfield AVM. The CV filter therefore excluded non-representative outliers, such as non-arm's length transactions and data entry errors, from the comparable sales properties used to value the Nomura subject properties. The CV filter did not, as Defendants argue, directly affect the value predictions from the Greenfield AVM. Moreover, the CV filter methodology used by Dr. Kilpatrick is stable, because the average predictions of the Greenfield AVM remain unchanged unless the CV filter is nearly entirely removed, and even when it is removed entirely, the effect is only to include outlier or erroneous data (such as multi-million dollar properties, including a property appraised at over a hundred million dollars ) and other properties with characteristics unrepresentative of the Nomura Sample properties. FOF Part IV.A.3. Also weakening Defendants' critiques of Dr. Kilpatrick is the fact that none of their *four* appraisal/valuation

experts evaluated whether the Sample Loans had inflated appraisals, nor offered testimony that the original appraisals of the Sample Loans were not systematically inflated.   FOF Part IV.A.3(a).

57.    Accordingly, the Court finds Dr. Kilpatrick's explanation and reasoning to be sound.  The Court also finds Dr. Kilpatrick's testimony regarding the results of his Greenfield AVM review to be reliable and credible.  The Court therefore accepts Dr. Kilpatrick's findings that the appraisals underlying the Sample Loans objectively overstated the market value of the subject properties by an average of 8.92%, and that 31.0% of the Sample Loans had inflated appraisals:

| SLG | Mean Inflation |
|---|---|
| NAA 2005-AR6 | 5.49% |
| NHELI 2006-FM1 | 7.58% |
| NHELI 2006-FM2 | 15.35% |
| NHELI 2006-HE3 | 11.40% |
| NHELI 2007-1 | 4.54% |
| NHELI 2007-2 | 12.27% |
| NHELI 2007-3 | 7.18% |

FOF Part IV.A.3.

58.    Even at a confidence level of 95%, a higher level of precision than that at which AVMs are typically reported (FOF Part IV.A.3(a)) and far higher than that necessary for FHFA to establish liability, *see In re Ephedra Products Liab. Litig.*, 393 F. Supp. 2d 181, 190 (S.D.N.Y. 2005) (discussing difference between preponderance and statistical significance), Dr. Kilpatrick concluded that 18.3% of the appraisals for the Nomura subject properties examined by the Greenfield AVM were less than the values Nomura represented in its Offering Materials. FOF Part IV.A.3(a).  In particular, Dr. Kilpatrick testified that at that high confidence level, 96.7% of the 123 Nomura subject properties had LTV ratios over 80, and 76.4% had LTV ratios

above 100%. These LTV ratios are in sharp contrast to the representations in the Prospectus Supplements that there were no loans with LTV ratios above 100%, and a total of 28.0% with LTV ratios over 80. FOF Part IV.A.3(a). Kilpatrick Direct ¶ 105.

59.     The Court also finds that Dr. Cowan's extrapolation of Dr. Kilpatrick's AVM results to the SLGs is reliable and accurate. Dr. Cowan accounted for both variability caused by the use of a sample and the variability caused by the use of the AVM model by using a Monte Carlo simulation. FOF Part IV.A.4. The use of Monte Carlo simulations is well-supported by statistical science and was a reliable method here of extrapolating Dr. Kilpatrick's results to the SLGs. FOF Part IV.A.4; *cf. FHFA v. Nomura Holding Am., Inc.* ("Limitations MSJ Op."), 2014 WL 6462239, at *14 n.29 (S.D.N.Y. Nov. 18, 2014) (describing Monte Carlo modeling).

60.     While Defendants insist that Dr. Cowan should have extrapolated the results of only a subset of the sampled loans, this criticism has no basis in statistical science and is unsupported by expert testimony. *FHFA v. Nomura Holding Am., Inc.*, 2015 WL 685231, at *1 (S.D.N.Y. Feb. 13, 2015) ("[D]efendants have advanced no expert opinion in support of their argument; rather, they have only produced expert calculations conducted at their behest. Their argument seeks to impose limitations on Cowan's statistical analysis that have no basis in statistics."). It is therefore entitled to no weight.

61.     Accordingly, the Court adopts the results of Dr. Cowan's extrapolations to the SLGs, and finds that 64.7% of the SLG loans had objectively false, inflated appraisals and that the overall average inflation rate for those loans was 11.1%. FOF Part IV.A.4. The Court also adopts Dr. Cowan's extrapolation of recalculated LTV ratios for each SLG based on Dr. Kilpatrick's Greenfield AVM findings. FOF Part IV.A.4.

62.     Having concluded that the appraisals underlying approximately two-thirds of the Sample Loans were objectively false, the Court turns to whether any of those objectively false appraisals were also subjectively false. *UBS I*, 858 F. Supp. 2d at 326.

**2. The Statements Regarding LTV Ratios Were Subjectively False, As The Inflated Values For The Sample Loans Were Not Believed By Those Loans' Appraisers**

63. To show that an appraisal was subjectively false, FHFA must offer evidence that sheds light on the appraiser's state of mind. Kilpatrick *Daubert* Op., 2015 WL 353929, at *5. FHFA need not provide direct evidence of this mental state, such as the appraiser's testimony, as "[f]act finders are routinely asked to determine the state of mind, intent, or subjective beliefs of an individual who does not testify because she is unavailable[.]" *Id.* at *5 (citing *United States v. Perez,* 387 F.3d 201, 204 (2d Cir. 2004); *United States v. Rudaj*, 2006 WL 1876664, at *6 (S.D.N.Y. July 5, 2006); *Colotti v. United States*, 2011 WL 6778475, at *8 (S.D.N.Y. Dec. 21, 2011)). Instead, FHFA can "provide circumstantial evidence" that the appraiser's belief was not honestly held by, among other things, showing that the appraisal did not conform to the Uniform Standards of Professional Appraisal Practice ("USPAP"). Kilpatrick *Daubert* Op., 2015 WL 353929, at *6.

64. FHFA has met its burden of proving subjective disbelief through evidence concerning the appraisals' compliance with USPAP, which provides an objective measure of the credibility of an appraisal. FOF Part IV.A.3(b). USPAP requires an appraiser to perform the research and analysis necessary to produce a credible appraisal. FOF Part IV.A.3(b). In 2006, the Appraisal Standards Board formally defined the term "credible" as "worthy of belief," Kilpatrick Direct ¶ 127 n.59, while making clear that credibility had been a central concept in USPAP long before it was formally defined, Appraisal Found., 2006 USPAP and Scope of Work 2.[4] As this Court explained, under USPAP, "'credibility' … reflects an objective assessment of an appraisal. It imposes on appraisers the obligation to support an appraisal by evidence and logic. Thus, credible appraisals are those that have complied with USPAP standards." Kilpatrick *Daubert* Op., 2015 WL 353929, at *6.

[4] *Available online at* http://www.ncua.gov/Legal/ Documents/Regulatory% 20Alerts/RA2006–04Encl2.pdf (last accessed Feb. 20, 2015).

65.     Each of the Prospectus Supplements represented that the Mortgage Loans complied with USPAP, FOF Part III.C, and a loan's compliance with USPAP is a question of objective fact.  *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 769-70 (S.D.N.Y. 2012).  The Prospectus Supplements' statements regarding USPAP compliance are therefore statements of objective, existing fact, and may be proven false using objective evidence from any time period.  *See* Hunter-Forester Guidelines Op., 2015 WL 568788, at *9 n.21 ("The assertion that those appraisals conform to USPAP is a statement made as of the Effective Date of the Supplement about those originating appraisals.").  Proof of USPAP violations is "circumstantial evidence" of subjective falsity, *id.* at *6, as well as direct evidence that the Prospectus Supplements' statements that the loans complied with USPAP were false, FOF Part III.C.

66.     To determine the degree to which the Sample Loans with inflated appraisals also deviated from USPAP and appraisal practice and standards, Dr. Kilpatrick used his CAM.  The CAM distilled USPAP and appraisal standards requirements into a series of 31 questions and generated a score for each question answered in the negative.  FOF Part IV.A.3(b).  Dr. Kilpatrick weighted each answer based on five "aspects" of appraisal standards, each of which he further sub-divided into one or more "categories" of appraisal practice.  FOF Part IV.A.3(b)(2) (describing CAM process).  Based on the relative importance of the questions, Dr. Kilpatrick determined that any appraisal with a CAM score over 14.13 contained a sufficient magnitude and frequency of errors to render the appraisal non-credible under USPAP.  *See* FOF Part IV.A.3(b)(3).  Dr. Kilpatrick applied a more conservative credibility threshold of 20, and testified that of the 205 Sample Loans that failed the Greenfield AVM and for which he could obtain factual appraisal data, 189 loans (92.2%) had CAM scores indicating the appraisals were not credible.  FOF Part IV.A.3(b)(3).

67.     That Dr. Kilpatrick's approach was conservative is illustrated by the fact that even the 7.2% of loans found not to substantially violate USPAP still had grossly inflated appraisals.

The LTV ratios of those loans, as recalculated by Dr. Kilpatrick using the Greenfield AVM, were:

| SLG | LTV ≤ 80% | | LTV > 80% to LTV ≤ 100% | | LTV > 100% | | Pct. Not Credible of Loans Inflated >15.1% |
|---|---|---|---|---|---|---|---|
| | Original | Extrapolated | Original | Extrapolated | Original | Extrapolated | |
| NAA 2005-AR6 | 98.94% | 28.68% | 1.06% | 61.24% | 0.00% | 10.08% | 92.6% |
| NHELI 2006-FM1 | 72.16% | 30.85% | 27.84% | 56.38% | 0.00% | 12.77% | 92.9% |
| NHELI 2006-FM2 | 80.62% | 37.89% | 19.38% | 42.11% | 0.00% | 20.00% | 89.5% |
| NHELI 2006-HE3 | 62.91% | 30.68% | 37.09% | 47.73% | 0.00% | 21.59% | 93.1% |
| NHELI 2007-1 | 91.77% | 21.74% | 8.23% | 63.04% | 0.00% | 15.22% | 94.4% |
| NHELI 2007-2 | 60.78% | 27.27% | 39.22% | 40.91% | 0.00% | 31.82% | 91.2% |
| NHELI 2007-3 | 66.77% | 17.44% | 33.23% | 52.33% | 0.00% | 30.23% | 96.0% |
| **Total** | **70.5%** | **28.0%** | **29.5%** | **52.5%** | **0.0%** | **19.5%** | **92.2%** |

FOF Part IV.A.4.

68. The Court finds Dr. Kilpatrick's finding to be credible and persuasive. *First*, Dr. Kilpatrick and his team conducted extensive research, and engaged independent appraisers, to gather sufficient data that formed the basis of the answers to the CAM questions. FOF Part IV.A.3(b)(2). *Second*, Dr. Kilpatrick used a scoring methodology that is well accepted in the appraisal industry. By way of example, CoreLogic's LoanSafe Appraisal Manager offers a deterministic model that allows users to analyze appraisals for completeness, compliance, consistency, and comparables selection; and as early as 2004, FNC, Inc., released a statistical model called *Appraisal Score*, which assesses appraisal compliance with applicable federal housing guidelines. Kilpatrick Direct ¶ 147 n.70. The CAM is similar to these appraisal review products from industry leaders. *Third*, while Dr. Kilpatrick concluded that a CAM score of

14.13 indicated that an appraisal was not credible, he opted instead to use a far more conservative threshold of 20, which favors Defendants.

69. Notably, Defendants' experts did not attempt to evaluate the original appraisals' compliance with USPAP. While Defendants' appraisal exert, Mr. Hedden, asserts that the 31 CAM questions are unrelated to USPAP, his testimony belies that assertion; the CAM questions directly relate to matters that the original appraisers in this case were obligated to consider and analyze. FOF Part IV.A.3(b). Further, even if the Court accepted all of the errors Dr. Hedden purports to identify in Dr. Kilpatrick's CAM findings, it would not materially reduce the weight of Dr Kilpatrick's testimony concerning the substantial degree to which the sample appraisals deviated from USPAP. FOF Part IV.A.3(b)(3).

70. Nor do the criticisms that Defendants' statistical expert, Dr. Barnett, levels against the CAM detract from the credibility of Dr. Kilpatrick's testimony. Dr. Barnett asserts that the Greenfield AVM would incorrectly flag approximately 90 sample appraisals as inflated (results Dr. Barnett terms "false positives") even if the loan tape valuations were accurate, and on this basis he concludes that the CAM results based on that set of inflated appraisals are incorrect. FOF Part IV.A.4(b)(2). But Dr. Barnett cites nothing to support his conclusion that the concept of a false positive has any bearing on the CAM methodology. It does not. The CAM methodology does not act as a check on the AVM (and vice versa), but rather as an independent test of whether a given appraisal is credible. Dr. Barnett's criticism that the CAM does not agree with the Greenfield AVM, when the two measure different things, therefore misses the mark. Because Defendants have not offered a credible rebuttal, Dr. Kilpatrick's CAM findings constitute particularly powerful evidence of subjective falsity. Kilpatrick *Daubert* Op., 2015 WL 353929, at *6 ("Evidence of the extent to which the Nomura Appraisals conformed to industry standards … may provide circumstantial evidence" of whether those appraisals were honestly believed).

71. Additional evidence reinforces the conclusions that these appraisals were subjectively false. First, 11,000 appraisers, including several dozen who conducted appraisals

for SLG loans, signed a public petition complaining of pressure to inflate their appraisals, FOF Part IV.A.3(b)(5), which is circumstantial evidence that appraisers across the industry believed they were subject to such pressure. *See* Feb. 18, 2015 Order re: Various Mots. in *Limine*, Dkt. 1291, at 2 (ruling that the petition is admissible as evidence of "beliefs of the appraisers who signed it."). This pervasive perception of pressure to inflate appraisals supports a strong inference that many appraisers of the more than 15,000 Mortgage Loans rendered appraisals they did not believe. FOF Part IV.A.3(b)(5).

72. Even more compelling is the fact that for 71.66% of the purchase-money mortgage Sample Loans, the appraised values matched *to the penny* the sales price of the properties. FOF Part IV.A.3(b)(4). "[A]ccepting an assignment with the price in an agreement of sale, option, or listing or a sale price in a settled transaction as a predetermined value in the assignment violates USPAP," FOF Part IV.A.3(b)(4), and Defendants' own valuation expert, Dr. Hausman, acknowledged that a truly independent assessment would result in an appraised value that differed from the sales price. Kilpatrick Direct ¶ 22.

73. Based on this evidence, the Court concludes that the Sample Loans identified by Dr Kilpatrick as substantially deviating from USPAP (with a CAM score of 20 or higher) had appraisals that were subjectively false. As all of these Sample Loans' appraisals were also objectively false, Part II.B.1, *supra,* the Court concludes that the statements regarding LTV ratios based on these appraisals were false for purposes of the Securities Act and Blue Sky laws. *See UBS I*, 858 F. Supp. 2d at 326 (objective and subjective falsity is to prove statement of fact regarding inherently subjective topic such as valuation false); Part I.A, *supra*.

### 3. The Objectively And Subjective False LTV Ratios Reported In The Prospectus Supplements Crossed Key LTV Thresholds

74. Dr. Cowan extrapolated Dr. Kilpatrick's CAM findings to the SLGs as a whole, and found with a 95% confidence level and a margin of error of 4.16%, that 31.3% of the SLG loans both failed the Greenfield AVM and also had a CAM score above 20. FOF IV.A.4(b). Dr.

Cowan's extrapolations (which Defendants do not criticize) reliably estimate the percentage of such loans in the SLGs, and are thus credited by the Court:

| SLG | Value Objectively And Subjectively False[5] | 95% Lower Bound | 95% Upper Bound | Margin of Error |
|---|---|---|---|---|
| NAA 2005-AR6 | 19.4% | 14.2% | 25.8% | 5.8% |
| NHELI 2006-FM1 | 27.7% | 19.1% | 37.7% | 9.3% |
| NHELI 2006-FM2 | 35.8% | 26.3% | 46.2% | 9.9% |
| NHELI 2006-HE3 | 30.7% | 21.4% | 41.3% | 9.9% |
| NHELI 2007-1 | 18.5% | 11.9% | 27.0% | 7.5% |
| NHELI 2007-2 | 35.2% | 25.5% | 46.0% | 10.2% |
| NHELI 2007-3 | 27.9% | 19.0% | 38.4% | 9.7% |
| **Aggregate** | **31.3%** | **27.2%** | **35.5%** | **4.2%** |

FOF Part IV.A.4(b)(2).

75. Dr. Cowan also extrapolated the distribution of loans that failed both the Greenfield AVM and CAM reviews across the SLGs, FOF Part IV.A.4(b), and the Court credits this testimony. Dr. Cowan's compared the number of SLG loans that with LTV ratios above and below the critical 80% and 100% LTV ratio threshold, as stated in the Prospectus Supplements and as extrapolated from Dr. Kilpatrick's findings:

[5] This column reflects, on a pool level, loans where the value returned by the GAVM was less than the value reflected on the original appraisal by 15.1% or more, and the CAM score was 20.

| SLG | LTV ≤ 80% | | LTV > 80% to LTV ≤ 100% | | LTV > 100% | |
|---|---|---|---|---|---|---|
| | **Stated** | **Actual** | **Stated** | **Actual** | **Stated** | **Actual** |
| NAA 2005-AR6 | 100.0% | 82.2% | 0.0% | 8.5% | 0.0% | 9.3% |
| NHELI 2006-FM1 | 79.8% | 61.7% | 20.2% | 28.7% | 0.0% | 9.6% |
| NHELI 2006-FM2 | 80.0% | 62.1% | 20.0% | 25.3% | 0.0% | 12.6% |
| NHELI 2006-HE3 | 62.5% | 46.6% | 37.5% | 36.4% | 0.0% | 17.0% |
| NHELI 2007-1 | 89.1% | 73.9% | 10.9% | 16.3% | 0.0% | 9.8% |
| NHELI 2007-2 | 61.4% | 50.0% | 38.6% | 29.5% | 0.0% | 20.5% |
| NHELI 2007-3 | 66.3% | 51.2% | 33.7% | 33.7% | 0.0% | 15.1% |
| **Total** | **78.6%** | **62.5%** | **21.4%** | **24.4%** | **0.0%** | **13.1%** |

FOF Part IV.A.4(b).

76. In sum then, even at a 95% confidence level and crediting the full margin of error to Defendants, each SLG's reported LTV ratios were inflated by well above 10%. Even more glaringly, there are significantly more loans in each SLG with LTV ratios above 80% than were represented in the Prospectus Supplements, and at least 9% of each of the SLGs was comprised of loans with LTV ratios over 100%, despite the representation that no such loans would be included in any of the SLGs. Based on this overwhelming evidence, the Court concludes that the representation in the Prospectus Supplements regarding LTV ratios were false.

#### 4. The Statements Regarding LTV Ratios Were Misleading In Light Of Information Nomura Acquired Prior To Securitization

77. The Court must consider not only what the Prospectus Supplements' said about LTV ratios, but also what they omitted. "[W]hen an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be 'complete and accurate.'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)); *see also Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty is not ... a

defense to ... liability because upon choosing to speak, one must speak truthfully about material issues.  Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete.") (citation omitted).  Faced with information "which, if not disclosed, [would] render[ ] the prior statement false or misleading, the inquiries as to duty and materiality coalesce," *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993), because "it is difficult to imagine a circumstance where the prior statement would not be rendered misleading in the absence of the disclosure," *id.* at 268.

78.      When acquiring loans, Nomura ran most loan pools through CoreLogic's HistoryPro, and only those loans that received an "F-score" above 0 then received an AVM or BPO review.  FOF Part IV.B.1(b)(2).  Loans that scored above 0 were sent to AVM review, BPO review, or both, and some were then reconciled to produce a "final value."  FOF Part IV.B.1(b)(2).  If the final value was not less than 10% below (for subprime) or 15% below (for Alt-A) the value reported by the appraiser, Nomura bought the loan; if the variance was greater, Nomura could purchase the loan if the originator rebutted the valuation.  FOF Part IV.B.1(b)(2).  Of the 2,378 Mortgage Loans that received a final value, 1,360 (57.2%) had final values lower than the values used to compute LTV ratios in the Prospectus Supplements.  Despite this disparity, Nomura disclosed none of those results to investors.  A summary table comparing the values Nomura stated in the Prospectus Supplements to the values its vendors reported is set forth below:

| SLG | LTV ≤ 80% | | LTV > 80% to LTV ≤ 100% | | LTV > 100% | |
|---|---|---|---|---|---|---|
| | Percent Based on Original LTV | Percent Based on Greater LTV | Percent Based on Original LTV | Percent Based on Greater LTV | Percent Based on Original LTV | Percent Based on Greater LTV |
| NAA 2005-AR6 | 98.95% | 91.10% | 1.05% | 8.90% | 0.00% | 0.00% |
| NHELI 2006-FM1 | 71.34% | 65.84% | 28.66% | 33.30% | 0.00% | 0.86% |
| NHELI 2006-FM2 | 78.60% | 70.44% | 21.40% | 27.78% | 0.00% | 1.78% |
| NHELI 2006-HE3 | 61.27% | 54.51% | 38.73% | 42.92% | 0.00% | 2.57% |
| NHELI 2007-1 | 89.30% | 82.61% | 10.70% | 16.05% | 0.00% | 1.34% |
| NHELI 2007-2 | 56.37% | 49.93% | 43.63% | 46.78% | 0.00% | 3.29% |
| NHELI 2007-3 | 65.75% | 59.15% | 34.25% | 37.55% | 0.00% | 3.30% |
| **Totals** | **68.24%** | **61.41%** | **31.76%** | **36.32%** | **0.00%** | **2.26%** |

FOF Part IV.B.1(b)(2).

79. The fact that "a substantial number of th[e]se appraisals were fraudulent" renders the Prospectus Supplements' statements based on those fraudulent appraisals "misleading." Diligence MSJ Op., 2014 WL 7232443, at *40. Nomura did not run any type of AVM or BPO review (or any type of review that could produce an actual value estimate) on over 50% of the Mortgage Loans, FOF Part IV.B.1(b)(2), even though its valuation findings suggested that a large percentage of the untested Mortgage Loans were likely to have misstated LTV ratios. In these circumstances, the fact that Nomura did not "take corrective action to insure the Offering Documents were not misleading" (Diligence MSJ Op., 2014 WL 7232443, at *40) by, for example, disclosing the results of its valuation diligence to investors renders the statements regarding LTV ratios materially misleading. FOF Part IV.B.1(b).

80. Similarly, in conducting securitization diligence in connection with the NHELI 2007-1 and 2007-2 Securitizations, RBSSI conducted valuation diligence on a very small number of loans in the SLGs, but it found high levels of inflated appraisals, 8 out of 9 loans, and 31 out of 44 loans, respectively, including appraisals that pushed many loans LTV ratios over the

key 80% and 100% thresholds. FOF Part IV.B.2(f)-(g). These results should have given RBSSI "reason to doubt the accuracy" of statements of LTV ratios based on appraisals in the securitized pools (Diligence MSJ Op., 2014 WL 7232443, at *40; FOF Part IV.B.1(b), and therefore rendered the LTV ratios reported in NHELI 2007-1 and NHELI 2007-2 misleading, *Time Warner*, 9 F.3d at 267-68. In addition, the valuation diligence results that Nomura and RBSSI failed to disclose are further evidence that the appraisals backing the Mortgage Loans were objectively false, which further bolsters the credibility of Dr. Kilpatrick's Greenfield AVM results.

**C. The Statements Regarding Owner Occupancy Status Were False**

81. The Prospectus Supplements all included Collateral Tables that displayed the percentage of loans in the SLGs that were "owner occupied," "investment,' and "second home," and represent that those statistics are correct as of the Cut-Off Date. FOF Part III.C.3. FHFA has shown by a preponderance of the evidence that these statements were false.

82. Reading each Prospectus Supplement "in context," *DeMaria*, 318 F.3d at 180 (quotation marks and citation omitted), "the terms 'owner occupancy' and 'owner occupied' in the Offering Documents are representations of fact. They describe the percentage of the properties occupied by owners as of the Cut–Off Date for the Supplement." Hunter Occupancy Op., 2015 WL 394072, at *3 (citation omitted). Consequently, the Prospectus Supplements' representations about owner-occupancy status are "not mere statements of intention by borrowers at some earlier point in time," and do not merely "reflect information about borrowers' intentions at the time they apply for their mortgages." *Id.* ("At the time of securitization, a purchaser of a Certificate is entitled to understand that the owner-occupancy statistics are statements of fact by those issuing and underwriting the securitization[.]"). Moreover, unlike LTV ratios, which describe the accuracy of appraisals when made, owner-occupancy statistics "describe[ ] the occupancy status of the property as of the Cut–Off Date." *Id.* at *4 (rejecting Defendants' argument that the term should be construed based on contractual language, as "what is at stake here is not whether a borrower fulfilled a contractual commitment

to remain in a property for twelve months"). Accordingly, to show that the owner occupancy statistics reported in the Collateral Tables were misstated, FHFA must prove that they do not accurately represent the number of Mortgage Loans that were owner-occupied as of the relevant Cut-Off Date.

83.     Mr. Hunter testified that the owner occupancy rates reported in the Collateral Tables were misstated. For the reasons previously described, Mr. Hunter's testimony is admissible and generally reliable. *See* Part III.A.2, *supra*. Mr. Hunter's methodology of re-underwriting the Mortgage Loans to determine whether the properties were owner-occupied is also specifically reliable. Mr. Hunter looked at loan files for "red flags," consulted servicing records, and checked various third-party sources in researching a loan's occupancy status. Mr. Hunter's search was expansive, including consultation of material such as audit credit reports, which are reliable direct evidence that the borrower did not occupy the property as of the dates indicated and reliable circumstantial evidence that the borrower did not occupy the property prior to the Cut-Off Date. Hunter-Forester Guidelines Op., 2015 WL 568788, at *11. By contrast, Defendant's expert Mr. Forester did not examine whether the borrowers actually occupied the properties, and he did not look at any information arising after the loan's origination, hence "[his] opinions have only limited relevance here." *Id.* at *14. Consequently, the Court credits Mr. Hunter's testimony identifying owner occupancy breaches within the Sample Loans, as follows:

| Securitization | Number of Sample Loans Represented as Owner-Occupied on Closing Loan Tape | Number of Sample Loans Misrepresented as Owner-Occupied on Closing Loan Tape | Percentage of Sample Loans Misrepresented as Owner-Occupied on Closing Loan Tape |
|---|---|---|---|
| NAA 2005-AR6 | 63 | 7 | 11.11% |
| NHELI 2006-FM1 | 91 | 8 | 8.79% |
| NHELI 2006-FM2 | 93 | 8 | 8.60% |
| NHELI 2006-HE3 | 89 | 3 | 3.37% |
| NHELI 2007-1 | 49 | 2 | 4.08% |
| NHELI 2007-2 | 91 | 8 | 8.79% |
| NHELI 2007-3 | 91 | 6 | 6.59% |
| **Total** | **567** | **42** | **7.41%** |

FOF Part IV.A.2(f).

84.     Dr. Cowan extrapolated Mr. Hunter's findings to the SLGs.  FOF Part IV.A.  As Dr. Cowan's extrapolations of these statistics are reliable for the reasons previously described, *see* Part IV.A.1, *supra*, the Court credits them here:

| SLG | Breach Rate | 95% Lower Bound | 95% Upper Bound | Margin of Error |
|---|---|---|---|---|
| NAA 2005-AR6 | 11.09% | 5.62% | 19.83% | 7.11% |
| NHELI 2006-FM1 | 9.00% | 4.07% | 16.75% | 6.34% |
| NHELI 2006-FM2 | 8.5% | 3.71% | 16.25% | 6.27% |
| NHELI 2006-HE3 | 3.21% | 0.58% | 9.48% | 4.45% |
| NHELI 2007-1 | 4.18% | 0.94% | 13.01% | 6.04% |
| NHELI 2007-2 | 8.90% | 4.01% | 16.63% | 6.31% |
| NHELI 2007-3 | 6.65% | 2.59% | 13.71% | 5.56% |
| **Aggregate** | **7.19%** | **4.85%** | **9.52%** | **2.34%** |

Cowan Direct ¶ 57.

**D. The Statements Regarding Credit Ratings Were False**

85. Each of the Prospectus Supplements stated that Certificates would "not be offered unless they receive[d] ratings at least as high as" AAA or its equivalent from at least two rating agencies, FOF Part III.C.4, and each Certificate in fact received such rating, FOF Part III.C.4. The Prospectus Supplements also stated that "[i]n general, ratings address credit risk," FOF Part III.C.4, and that "[t]he ratings of each class of Offered Certificates will depend primarily on an assessment by the rating agencies of the related Mortgage Loans … and the subordination afforded by certain classes of certificates." FOF Part III.C.4. FHFA has shown by a preponderance of the evidence that these statements were false.

86. While Defendants have argued that a Certificate's *credit rating* might be considered an expression of the rating agencies' subjective opinion, Defendants' *statements* about that rating are representations of objective fact, specifically that the rating agencies had evaluated the collateral underlying the Certificate and issued ratings based on that information. *Merrill Lynch*, 903 F. Supp. 2d at 276 n.2 ("FHFA challenges representations in the Offering Materials that the reported credit rating related to the actual loan collateral for the securitization. The Amended Complaint alleges that the ratings were inflated and did not in fact apply to that collateral, since the defendants provided the ratings agencies incorrect data regarding the loan population."); *accord Assured Guar. Mun. Corp. v. UBS Real Estate Sec., Inc.*, 2012 WL 3525613, at *5 (S.D.N.Y. Aug. 15, 2012) ("[If] Defendant actually contends that it was proper to procure the ratings regardless of the material provided it rivals much of the immorality to which we have all been privy in recent days. It presages a win at any price society, with more than a dollop of cupidity.").

87. Under Section 12(a)(2) and the Blue Sky laws, FHFA can prove that these representations were false with evidence that"[D]efendants provided false descriptions of the loans within the supporting loan groups to the credit agencies," Blum-Rubinstein *Daubert* Op., 2015 WL 629316, at *3; *accord Landesbank Baden-Wurttemberg v. RBS Holdings USA Inc.*, 14 F. Supp. 3d 488, 509-10 (S.D.N.Y. 2014) (complaint adequately pleaded misstatements

regarding credit rating by alleging that Defendants procured ratings by supplying agencies with false information); *Assured Guar.*, 2012 WL 3525613, at *5 (denying motion to dismiss breach of contract claim where plaintiff alleged defendant secured AAA ratings "by providing false and misleading information to the agencies").

88.   FHFA has sustained its burden of proving the credit ratings representations false.  Defendants provided pre-closing loan tapes to the rating agencies that contained collateral information about the Mortgage Loans underlying each Certificate.   FOF Part IV.B.2  As Mr. Rubinstein testified, these loan tapes contained approximately 50 to 80 data fields for each loan, including collateral characteristics such as FICO score, DTI ratio, LTV/CLTV ratio, owner occupancy status, and appraised value.  FOF Part III.A.3.  The ratings agencies required Defendants to provide this information, and informed Defendants that if it was inaccurate, then ratings could be withdrawn or withheld.  FOF Part IVB2.  In turn, the agencies relied on the accuracy of this data in rating the Certificates, but did not independently verify that data.  FOF Part III.A.3.

89.   Mr. Hunter testified that he investigated the pre-closing loan tapes that bore the closest statistical resemblance to the information contained in the Prospectus Supplements.  FOF Part IV.A.2; *see* FOF Part IV.A.1.  As Defendants did not provide sufficient information to identify the actual tapes provided to the agencies, *see* FOF Part IV.A.1, and offer no reason to doubt that Mr. Hunter selected the correct tapes, the Court finds that the tapes Mr. Hunter used approximated the tapes the agencies used closely enough to draw a conclusion about the credit ratings representations.

90.   In particular, Mr. Hunter compared the collateral characteristics reported in the pre-closing loan tapes to his Sample Loan findings regarding loan characteristics that weigh heavily in the agencies' evaluation of RMBS, including LTV ratios, owner occupancy, and FICO scores, FOF Part IV.A.2; *see* FOF Part III.A.3.  For the reasons previously described, Part IV.A.2, *supra*, Mr. Hunter's testimony regarding this investigation is credible, and his findings regarding the pre-closing loan tapes, as tabulated by Mr. Cowan, are adopted by the Court:

| SLG | Breach Rate | 95% Lower Bound | 95% Upper Bound | Margin of Error |
|---|---|---|---|---|
| NAA 2005-AR6 | 44.26% | 37.24% | 51.50% | 7.13% |
| NHELI 2006-FM1 | 47.00% | 37.13% | 57.07% | 9.97% |
| NHELI 2006-FM2 | 53.00% | 42.86% | 62.94% | 10.04% |
| NHELI 2006-HE3 | 51.38% | 41.24% | 61.44% | 10.10% |
| NHELI 2007-1 | 38.78% | 30.14% | 48.05% | 8.95% |
| NHELI 2007-2 | 52.13% | 41.94% | 62.19% | 10.12% |
| NHELI 2007-3 | 47.37% | 37.37% | 57.53% | 10.08% |
| **Aggregate** | **50.19%** | **45.92%** | **54.45%** | **4.26%** |

Cowan Direct ¶ 60.

**E. The False Statements And Omissions Were Material**

91. In assessing if the misstatements discussed above were material, the Court begins with the characteristics of the securities about which they were made. The SEC has explained that: "[a]sset-backed securities and ABS issuers differ from corporate securities and operating companies. In offering ABS, there is generally no business or management to describe. Instead, *information about the transaction structure and the characteristics and quality of the asset pool … is often what is most important to investors*." *Asset-Backed Sec.*, Release No. 8518, 2004 WL 2964659, at *5 (Dec. 22, 2004) (emphasis added).

92. Each of the false statements that FHFA has shown is directly related to the risk of the underlying assets that investors in the Certificates depended upon for repayment. Because the Prospectus Supplements must be evaluated "holistically and in their entirety," *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 105 (2d Cir. 2013) (citation omitted), the Court considers the aggregate of Defendants' misstatements. *Litwin*, 634 F.3d at 719 (citing SAB 99, 1999 WL 1123073, at *5 ("If the misstatement of an individual amount causes the financial statements as a whole to be materially misstated, that effect cannot be eliminated by other misstatements whose effect may be to diminish the impact of the misstatement on other financial

statement items."). Given the overwhelming magnitude of the falsehoods, the Court concludes that FHFA has demonstrated materiality as to the misstatements for each of the Prospectus Supplements. *See NECA-IBEW*, 693 F.3d at 166 ("[I]t is … obvious[ ] that mortgage-backed securities like the Certificates would suffer a decline in value as a result of (1) ratings downgrades and (2) less certain future cash flows").

93. In reaching this conclusion, the Court begins with a quantitative analysis, *Litwin*, 634 F.3d at 718-19, for which a 5% threshold is a "good start." *ECA, Local 134*, 553 F.3d at 204; *see also Litwin*, 634 F.3d at 719 (applying this analysis). Moreover, SEC regulations require that, for asset-backed securities like the Certificates:

> if any material pool characteristic of the actual asset pool at the time of issuance of the asset-backed securities differs by 5% or more … from the description of the asset pool in the prospectus … [the issuer must] disclose the information … regarding the characteristics of the actual asset pool.

Item 6.05 (Securities Act Updating Disclosure) to Form 8-K (emphasis added). The Prospectus Supplements acknowledged this requirement, stating that "[i]f as of the Closing Date, any material pool characteristic differs *by 5% or more* from the description in this prospectus supplement, revised disclosure will be made[.]" FOF Part III.C.2 (emphasis added).

94. SEC regulations further provide that material pool characteristics for RMBS include LTV ratios and occupancy status, and they similarly require detailed disclosures regarding deviations from underwriting guidelines. 17 C.F.R. § 229.1111(a) (Mar. 8, 2005) ("[i]f any assets in the pool deviate from the disclosed underwriting criteria … disclose how those assets deviate … and include data on the amount and characteristics of those assets that did not meet the disclosed standards"); *id.* § 229.1111(b)(7)(iii) ("material characteristics … may include … [l]oan-to-value (LTV) ratios"); *id.* (b)(7)(iv) (material characteristics … may include … occupancy type for residential mortgages"). These standards indicate that the level of misinformation here is certainly material; as the Second Circuit has instructed, the fact that the SEC requires the disclosure of such information is "evidence of its materiality," *United States v.*

*Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991); *accord Geiger v. Solomon-Page Grp., Ltd.*, 933 F. Supp. 1180, 1187 (S.D.N.Y. 1996).

95.     This "preliminary inquiry under the quantitative factor must [then] be supplemented[ ] … [with] qualitative factors that might contribute to a finding of materiality." *ECA, Local 134*, 553 F.3d at 204 (citation omitted).

96.     Regarding underwriting guidelines, there is abundant evidence that loans' compliance with guidelines are especially important to RMBS investors.  First, those underwriting criteria define the very assets being securitized.  *See Asset-Backed Securities*, 2004 WL 2964659, at *5.  Second, Mr. Hunter provided credible evidence that such compliance is important to the purchasers of individual loans, FOF Part V.A.1.  Third, Mr. Blum provided similarly credible testimony that guideline compliance is important to purchasers of RMBS and that, from a securities underwriter's perspective, the defects found by FHFA's experts were of a nature and magnitude that an underwriter should have disclosed them to investors or removed the loans from the securitization.  FOF Part III.A.3.  Fourth, Defendants and others across the RMBS industry reviewed loans that they intended to securitize to see if they complied with guidelines and, if not, if adequate compensating factors were present.  *See* FOF Part IV.B.1(b).

97.     Next, the ratings agencies required RMBS issuers to represent that pools of mortgage loans backing an RMBS would comply with the originator's guidelines.  FOF Part V.A.1(c).  Finally, because the loans at issue here were subprime and Alt-A, it was especially important that each loan comply with underwriting guidelines, as even slight departures from those guidelines could greatly increase a loan's credit risk.  *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127-28 (2d Cir. 2013) ("We think … that knowledge that the borrowers had low credit scores and that many of the mortgages had high loan-to-value ratios would make a reasonable investor more, rather than less, interested in whether NMI had adhered to its processes for evaluating the capacity and willingness of the borrower[s] to repay") (alterations in original) (quotation marks omitted).  Accordingly, the court concludes that underwriting defects would be of material interest to reasonable PLS investors.

98.     Regarding LTV ratios, as the Court explained: "LTV ratio is a measure of credit risk.  The higher the ratio, the less equity the homeowner has in the property, and the more likely she is to default."  *UBS I*, 858 F. Supp. 2d at 324.  The overwhelming evidence confirms that reasonable investors regarded LTV ratios as important: (a) Nomura, RBSSI, and banks across the industry retained Clayton to conduct diligence that involved examining the LTV ratios of loans, FOF Parts IV, IV.B.1.(b)(2), V.A.2(b); (b) experts proffered by both parties identified the LTV ratio as important to assessing the credit risk of a loan, FOF Part V.A.2; (c) Defendants' employees agreed that, all else being equal, a loan with a higher LTV ratio has a higher credit risk than a loan with a lower LTV ratio, FOF V.A.2(a); (d) the SEC, in adopting Regulation AB, cited "uniform[ ]" comments from investors indentifying "loan-to-value" as "an indicator of potential performance" of RMBS (*Asset-Backed Securities*, 2004 WL 2964659, at *73); (e) in connection with the enactment of FIRREA, Pub. L. No. 101-73, 103 Stat. 183 (1989), which mandated nationwide standards for real estate appraisals (*id.* §§ 1110, 1110(1)), the Senate Banking Committee identified "a reasonable ratio of loan to collateral value" as "provid[ing] important protection[ ] against loss."  S. Rep. No. 19, 101st Cong., 1st Sess. at 35; and (f) in rating RMBS, the credit rating agencies recognized that LTV ratios were one of the "primary indicators of default risk," FOF Part V.A.2(c).  In sum, LTV ratios are also material to reasonable investors.

99.     Importantly, the relationship of LTV ratios and credit risk is not linear.  As Defendants acknowledged in the Prospectus Supplements, "[m]ortgage loans with higher loan-to-value ratios may present a greater risk of loss than mortgage loans with loan-to-value ratios of 80% or below."  FOF Part IV.A.2(b).  Similarly, S&P estimated that the credit risk of loans began to increase significantly once LTV ratios crossed that threshold.  *See* FOF Part III.A.3.

100.     The Prospectus Supplements also represented that there were no loans in the SLGs with LTV ratios at or over 100%.  FOF Part III.C.2.  Any such loans would be "underwater" and pose severe credit risks.  Hunter-Forester Guidelines Op., 2015 WL 568788, at *2 n.5; FOF Part V.A.2(a).  S&P estimated that loans with an LTV of 100% "are assumed to be

*4.5x riskier* than loans with an LTV of 80%." FOF Part V.A.2(c). Accordingly, high concentrations of loans with a stated LTV ratio of below 80% or 100%, but a true LTV ratio above those thresholds, would be particularly material to RMBS investors. *See generally Litwin*, 634 F.3d at 719-20 (defendant's investment was material, although only a small portion of its overall investments, because it accounted for 9.4% of the assets under management of its Corporate Private Equity group, which it held out as its "flagship segment").

101. Investors would also find material the information regarding the Mortgage Loans' LTV ratios that Defendants' omitted to disclose, specifically that (a) that Nomura's own diligence had uncovered inflated appraisals that they did not disclose to investors; and (b), even more glaringly, the overwhelming number of instances appraisers were abandoning their independence in order to reach a predetermined value. *See generally* SAB 99, 1999 WL 1123073, at *4 (the fact that an issuer "under-state[s] earnings up to an amount just short of a percentage threshold[ ]" is evidence of materiality).

102. Regarding occupancy status, the Court received evidence that this characteristic is critical in determining the credit risk of a residual mortgage loans because, as Defendants' proffered re-underwriting expert put it, a borrower was "more likely to continue making payments on their primary residence as opposed to making payments on an investment property." FOF Part V.A.3(a). Industry participants, including Defendants, applied this concern in practice: (a) originators' guidelines were more forgiving of owner occupied properties, Part V.A.3; (b) the credit rating agencies used models that attempted to quantify owner occupancy as a driver of foreclosure frequency, *see* Hunter Direct ¶¶ 196, 203; (c) when purchasing owner-occupied loans, Nomura was more lax regarding other credit characteristics, *see* Hunter Direct ¶¶ 196, 203; and (d) both Nomura and RBSSI investigated representations as to owner occupancy in identifying loans to 'put back' to originators during fraud reviews, FOF Part V.A.3(a). Thus, occupancy status is also a core material concern of reasonable PLS investors.

103. Having shown that the AAA ratings for the Certificates issued on the basis of false information provided by Defendants, Part IV.A,2(f) *supra*, FHFA must show "that such

misrepresentations affected the ratings" to establish the materiality of this misrepresentation. Blum-Rubinstein *Daubert* Op., 2015 WL 629316, at *3. It is clear that such ratings were important to investors as a general matter: (a) the SEC has recognized "the importance of security ratings (ratings) to investors and the marketplace," 17 C.F.R. § 229.10(c); (b) the SEC required that securities like the Certificates, which are issued through a shelf registration under Form S-3, be rated "investment grade" by a credit rating agency, General Instruction I.B.5(a)(i) of Form S-3; *see generally Bilzerian*, 926 F.2d at 1298 (required disclosures evidence materiality); and (c) expert testimony confirms the importance of AAA ratings for RMBS, FOF Part V.C.1, as does the testimony of Nomura employees, FOF Part V.C.2, who sought such ratings to attract investors to Nomura securities, FOF V.C.3.

104. FHFA has met its burden of proving that these critical AAA ratings were affected by Defendants' misinformation by offering evidence that the ratings would not have been issued if Defendants had provided truthful data, absent material alterations to the Securitizations' structure or the Certificates' credit enhancement. As explained by FHFA's expert Dr. Schwert, there was a significant relationship between the reported characteristics of a loan pool and the level of subordination necessary for an RMBS certificate backed by that pool to receive an AAA (or equivalent) rating. FOF Part V.C.4. The Certificates were structured so that they were at the margin of the subordination required to receive this rating. FOF V.C.4. Consequently, if the credit characteristics were worse than represented, the AAA rating likely would not issue without, at a minimum, additional subordination. FOF V.C.4.

105. FHFA's expert, Dr. Blum, testified that the true nature of the collateral underlying the Certificates (as shown by Mr. Hunter and Drs. Kilpatrick and Cowan) was typical of "scratch-and-dent" securities, *i.e.*, RMBS backed by pools of loans that violated underwriting guidelines or program guidelines, had document deficiencies, or became delinquent. FOF Part V.D. Based on the actual characteristics of the Mortgage Loans, Defendants could not have issued the Certificates as they were originally structured and rated, but rather would have to have significantly altered the structure or increased the credit enhancement to obtain AAA ratings for

even a portion of the Certificates.  FOF Part V.D.  In fact, this evidence is sufficient to conclude that the credit rating agencies would not have issued ratings at all given the defects present, absent an accompanying disclosure that the securities were backed by collateral typical of a "scratch-and-dent" securitizations.  FOF Part V.D.

106.    Dr. Schwert and Mr. Blum's credible testimony is further bolstered by the fact that in 2008, the ratings agencies downgraded the Certificates from AAA to below investment grade.  FOF Part IV.B.2.  Defendants have not offered any credible contradictory evidence, expert or otherwise, arguing that the defects of the magnitude found by FHFA's experts, or any lesser magnitude, would not have mattered to the rating agencies (or would not have required disclosure to investors).  Accordingly, the Court finds that the ratings agencies would not have issued AAA ratings to the Certificates as structured and with the credit enhancement present at issuance had Defendants accurately disclosed the collateral information.  As the Prospectus Supplements represented that the Certificates would not be issued without such ratings, FOF Parts III.C.4,  IV.B.4, the Prospectus Supplements' statements regarding credit ratings were materially false, and contribute to the aggregate of materially false statements contained in those documents.

107.    The materiality of Defendants' credit ratings misstatement is further confirmed by the structure of the Securitizations.  The SEC in SAB 99 cautioned that a misrepresentation with even a small quantitative impact might be material if it (a) "concerns a segment or other portion of the registrant's business that has been identified as playing a significant role;" (b) "masks a change in earnings or other trends;" or if (c) "management has intentionally misstated items in the financial statements to 'manage' reported earnings," in which case the evidence is "particularly compelling."  1999 WL 1123073, at *3-4.  All of these concerns are implicated here: (a) the Certificates were "significant" portions of the Securitizations, as they were backed by senior tranches and held out to investors as safe investments; (b) by providing false information about the underlying collateral, Defendants camouflaged their securitization of patently defective loans, FOF Part V.C.2; V.C.4, as well as their inadequate diligence processes,

*see generally* Diligence MSJ Op., 2014 WL 7232443, at *32-40 ; and (c) constructed the SLGs to be on the margin of the subordination necessary for the Certificates to receive AAA ratings demanded by investors, and "managed" that subordination level by submitting false data to the ratings agencies. FOF Part V.C.4.

108. In sum, FHFA has offered overwhelming evidence establishing that the false and misleading statements at issue are material under Section 12 and the Blue Sky laws. Quantitatively, the evidence of aggregated defects in each SLG vastly exceeds the 5% threshold that the SEC has identified, and Defendants have acknowledged, as material. Qualitatively, the *types* of breaches that FHFA has proved are so critical to the credit quality of the PLS at issue that even minimal defects might be material.[6] Given the scope and severity of the defects FHFA has demonstrated, Part II.A-C, *supra*, the Court readily concludes that the Prospectus Supplement for each Certificate contained materially false and misleading statements. The Court's findings as to Defendants' materially false and misleading statements for each Certificate are summarized below (FOF ¶ 381):

[6] For this reason, Defendants cannot escape liability by arguing that the representations in the Prospectus Supplements "are too general to cause a reasonable investor to rely upon them[ ]" and therefore should be classified as mere "puffery," *ECA, Local 134*, 553 F.3d at 206. "[M]isrepresentations of existing facts[,]" like those FHFA alleges, do not constitute puffery, *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000), particularly where, as here, they are as specific as the representations in the Prospectus Supplements. *See Rodney v. KPMG Peat Marwick*, 143 F.3d 1140, 1144 (8th Cir. 1998) ("The Fund specifically said it could not buy illiquid securities, borrow money, or issue senior securities. These rules have nothing in common with the sort of puffing statements this court and others have held too general to be material."). Nor may Defendants avoid liability under the "bespeaks caution" doctrine, under which, "[a] defendant may not be liable under § 12(a)(2) for misrepresentations in a prospectus if the alleged misrepresentations were sufficiently balanced by cautionary language within the same prospectus such that no reasonable investor would be misled about the nature and risk of the offered security." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004) (citation omitted). That doctrine is inapplicable here, as it relates only to forward-looking statements, and the misstatements and omissions at issue relate to facts that existed as of the Effective or Cut-Off Dates of the Prospectus Supplements. *See id.* at 97 ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."); *Iowa Pub. Employees' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) ("It is settled that the bespeaks-caution doctrine applies only to statements that are forward-looking.").

| NAA 2005-AR6 | |
|---|---|
| **Representation** | **Actual SLG** |
| All loans originated generally in accordance with guidelines | 53.15% did not conform to guidelines and had significantly increased credit risk<br>60.92% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 98.94% of the loans had LTV ≤ 80% | 28.68% of the loans had LTV ≤ 80% |
| No loans had LTV > 100% | 10.08% of the loans had LTV > 100% |
| 50.00% of the loans were owner occupied | 11.09% of those were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's | AAA rating based on pre-closing loan tape where 42.04% of the loans did not match the actual credit characteristics; rating would not issue based on true data |

| NHELI 2006-FM1 | |
|---|---|
| **Representation** | **Actual SLG** |
| All loans originated generally in accordance with guidelines | 69.00% did not conform to guidelines and had significantly increased credit risk<br>70.00% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 54.98% of the loans had LTV ≤ 80% | 30.85% of the loans had LTV ≤ 80% |
| No loans had LTV > 100% | 12.77% of the loans had LTV > 100% |
| 88.78% of the loans were owner occupied | 9.00% of those loans were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's | AAA rating based on pre-closing loan tape where 47.00% of the loans did not match the actual credit characteristics; rating would not issue based on true data. |

| NHELI 2006-FM2 | |
|---|---|
| **Representation** | **Actual SLG** |
| All loans originated generally in accordance with guidelines | 71.00% did not conform to guidelines and had significantly increased credit risk<br>72.00% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 57.52% of the loans had LTV ≤ 80% | Only 37.89% of the loans had LTV ≤ 80% |
| No loans had LTV > 100% | 20.00% of the loans had LTV > 100% |
| 93.24% of the loans were owner occupied | 8.55% of those loans were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's | AAA rating based on pre-closing loan tape where 52.00% of the loans did not match the actual credit characteristics; rating would not issue based on true data |

| NHELI 2006-HE3 | |
|---|---|
| **Representation** | **Actual SLG** |
| All loans originated generally in accordance with guidelines | 61.63% did not conform to guidelines and had significantly increased credit risk<br>65.63% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 54.53% of the loans had LTV ≤ 80% | 30.68% of the loans had LTV ≤ 80% |
| No loans had LTV > 100% | 21.59% of the loans had LTV > 100% |
| 89.52% of the loans were owner occupied | 3.21% of those loans were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's. | AAA rating based on pre-closing loan tape where 47.30% of the loans did not match the actual credit characteristics; rating would not issue based on true data |

| NHELI 2007-1 | |
|---|---|
| **Representation** | **Actual SLG** |
| All loans originated generally in accordance with guidelines | 60.31% did not conform to guidelines and had significantly increased credit risk<br>65.38% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 91.77% of the loans had LTV ≤ 80% | 21.74% of the loans had LTV ≤80% |
| No loans had LTV>100% | 15.22% of the loans had LTV >100% |
| 45.78% of the loans were owner occupied | 4.18% of those loans were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's | AAA rating based on pre-closing loan tape where 35.79% of the loans did not match the actual credit characteristics; rating would not issue based on true data |

| NHELI 2007-2 | |
|---|---|
| **Representation** | **Actual SLG** |
| All loans originated generally in accordance with guidelines | 64.42% did not conform to guidelines and had significantly increased credit risk<br>69.54% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 52.78% of the loans had LTV ≤ 80% | 27.27% of the loans had LTV ≤80% |
| No Loans Had LTV>100% | 31.82% of the loans had LTV >100% |
| 91.00% of the loans were owner occupied | 8.90% of those loans were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's | AAA rating based on pre-closing loan tape where 47.04% of the loans did not match the actual credit characteristics; rating would not issue based on true data |

| NHELI 2007-3 | |
|---|---|
| **Representation** | **Actual SLG** |
| All loans originated generally in accordance with guidelines | 61.79% did not conform to guidelines and had significantly increased credit risk<br>63.83% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 58.49% of the loans had LTV ≤ 80% | 17.44% of the loans had LTV ≤80% |
| No loans had LTV>100% | 30.23% of the loans had LTV >100% |
| 90.03% of the loans were owner occupied | 6.65% of those loans were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's | AAA rating based on pre-closing loan tape where 41.21% of the loans did not match the actual credit characteristics; rating would not issue based on true data |

109. Because FHFA has shown that the Prospectus Supplements contained material untruths and omissions, it has proved all elements of its *prima facie* case under Section 12 and the Blue Sky laws. This Court has granted summary judgment to FHFA on knowledge issues (Knowledge MSJ Op., 33 F. Supp. 3d at 459), as well as Defendants' statute of limitations (Limitations MSJ Op., 2014 WL 6462239, at *3) and reasonable care (Diligence MSJ Op., 2014 WL 7232443, at *3) defenses, and Defendants have no affirmative defense to liability remaining. Consequently, judgment shall be entered against Nomura Securities, RBSSI, NAAC and NHELI on FHFA's Section 12 and primary Blue Sky claims. All that is left of those claims is to determine the scope of FHFA's remedies.

110. Before proceeding to a remedies determination, however, the Court must consider the liability of the "control person" Defendants under Section 15 of the Securities Act and the comparable provisions of the Blue Sky statutes.

## III. NOMURA HOLDING, NCCI, AND THE INDIVIDUAL DEFENDANTS ARE LIABLE AS CONTROL PERSONS FOR THE MISINFORMATION IN THE PROSPECTUS SUPPLEMENTS

111. Section 15 of the Securities Act was "enacted to expand, rather than restrict, the scope of liability under the securities laws," *S.E.C. v. Mgmt. Dynamics, Inc.*, 515 F.2d 801,

812 (2d Cir. 1975), by "allowing recovery for negligent conduct," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208-09 & n.27 (1976). Section 15 imposes joint and several liability on "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [Section 11] or [Section 12] of this title." 15 U.S.C. § 77*o*. Similarly, under the D.C. Code:

> [a] person who directly or indirectly controls a person liable under subsection (a) of this section; a partner, officer, or director of the person liable; a person occupying a similar status or performing similar functions; an employee of the person liable who materially aids in the conduct of giving rise to the liability; and a broker-dealer or agent who materially aids in the conduct shall be liable jointly and severally with, and to the same extent as the person liable.

D.C. Code § 31-5606.05(c). Under Section 15, to establish the control person liability of Nomura Holding, NCCI, or any of the Individual Defendants, FHFA must show (a) "a 'primary violation' of [Section 12]" and (b) "control of the primary violator by defendants." *In re Lehman Bros. Mort.-Backed Sec. Litig.*, 650 F.3d 167, 187 (2d Cir. 2011) (Section 15). The Blue Sky statutes require a comparable showing, except that the control element may be satisfied under the D.C. Code merely by showing that a defendant is "a partner, officer, or director of the person liable," D.C. Code § 31-5606.05(c).

112. FHFA has shown a primary violation of Section 12 and the D.C. Blue Sky law by showing that each of the following primary violators committed a predicate violation of that statute: (a) NAAC violated Section 12 and the D.C. Blue Sky statute as to NAA 2005-AR6; (b) NHELI violated Section 12 as to NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3; and (c) Nomura Securities violated Section 12 as to NAA 2005-AR6, NHELI 2006-FM1, and NHELI 2006-HE3. *See* Part II, *supra*. All that remains is for FHFA to show that each of Nomura Holding, NCCI, and the Individual Defendants controlled one of these primary violators with respect to each of these claims.

### A. Nomura Holding, NCCI, And The Individual Defendants All Controlled The Primary Violators

113. The Second Circuit has recognized that Section 15 imposes liability on "*every* person who controls a primary violator." *In re Lehman Bros.*, 650 F.3d at 186 (quotation marks and brackets omitted). Congress intended "control" under Section 15 to be "defined in a broad fashion, … to reach prospective wrongdoers, rather than to permit the escape of those who would otherwise be responsible for the acts of their employees." *Mgmt. Dynamics*, 515 F.2d at 812-13 (citing H.R. Rep. No. 1383, 73d Cong., 2d Sess. 26 (1934)).

114. Accordingly, "control" under Section 15 is broadly defined as "the power to direct or cause the direction of the management and policies of the primary violators, whether through the ownership of voting securities, by contract, or otherwise." *In re Lehman Bros.*, 650 F.3d at 185 (quotation marks and brackets omitted) (adopting definition of "control" set forth in 17 C.F.R. § 240.12b-2 for Section 15). As this broad definition suggests, a plaintiff can prove control through various different means. *See, e.g.*, *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001) (Cote, J.) (under parallel provision of Section 20(a) of the Exchange Act, control pled by alleging parent "exercis[ed] direct, daily supervision, oversight and control through common personnel and shared offices.") (quotation marks omitted); *STMicroelectronics v. Credit Suisse Grp.*, 775 F. Supp. 2d 525, 536 (E.D.N.Y. 2011) (under Section 20(a), control pled by "a mix of substantial stock ownership, shared officers and principals, and at least some direct involvement by [the control person] in the underlying events") (quotation marks omitted); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 294, 300-01 (S.D.N.Y. 2005) ("ultimate control" can be inferred where the controlled persons "sought direction and help from [the alleged control person]" and "the power to direct the policies and practices of" the controlled person can be inferred from the alleged control person's "ability to discipline" the controlled person). In particular, where a control person can deny the primary violator the ability to participate in the market, it possesses "control over the controlled person at the most basic level." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1573-74 (9th Cir. 1990) (for this reason, holding as matter

of law that broker-dealer controls its registered representatives for purposes of Section 20(a) of the Exchange Act).

115.    Under Section 15, "[a] plaintiff is required to prove actual control, not merely control person status." *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003) (citing *Cromer Fin.*, 137 F. Supp. 2d at 484).  A plaintiff can make this showing by pointing to a control person's sole ownership of a primary violator, as such "positions strongly suggest that they had the potential power to influence and direct the activities of [the primary violator]." *Borden, Inc v. Spoor Behrins Campbell & Young, Inc.*, 735 F. Supp. 587, 591 (S.D.N.Y. 1990) (plaintiffs adequately pled control under Section 15); *see also* 15 U.S.C. § 77*o* (control may arise "pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise"); 17 C.F.R. § 230.405 (listing "ownership of voting securities" as a means of control); *cf. In re WorldCom, Inc. Sec. Litig.*, 2004 WL 1097786, *3 (S.D.N.Y. May 18, 2004) (allegation of "a parent/subsidiary relationship is a[n] [in]sufficient basis from which to infer control," where plaintiff did not "allege any ownership of voting securities or other basis for asserting that the [control entities] have the power to direct or cause the direction of the management or policies of the [controlled entities].").

116.    Even more probative of control is evidence that a control person both wholly owns, *and* shares "common officers and directors" with, a primary violator.  *Pollack v. Laidlaw Holdings, Inc.*, 1995 WL 261518, *18 (S.D.N.Y. May 3, 1995) (Cote, J.) (such evidence is "prima facie evidence" of control under Section 15); *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 405 (S.D.N.Y. 2007) ("In cases involving parent-subsidiary relationships, courts have regularly based findings of control person liability on allegations of substantial stock ownership and common principals.") (collecting cases under both Section 15 and Exchange Act Section 20(a)); *In re Parmalat*, 375 F. Supp. 2d at 311 ("Plaintiffs' allegations that the top executives of [the alleged control person] held the top two positions at [the controlled entity] and that at least one of those executives was involved in the [primary violation] are sufficient to give rise to an

inference of control."); *accord In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1875445, at *4 (S.D.N.Y. Aug. 5, 2005) (plaintiffs' allegation that parent company "wholly-owned" subsidiary, "the directors of both corporations were interchangeable," and parent company "had direct involvement in the day-to-day operations" of the subsidiary sufficient alleged control).

117. Further, consistent with the purpose of Section 15, *Mgmt. Dynamics*, 515 F.2d at 812-13, "control" is read particularly broadly when applied to shell entities. *See id.* ("Section 15 had its genesis in the concern that directors would attempt to evade liability under the registration statement provisions by utilizing dummy directors to act in their stead."). Thus, a plaintiff can prove control under Section 15 by showing that two corporate entities operated internally and presented themselves externally as a single operating entity. *STMicroelectronics*, 775 F. Supp. 2d at 536 (control adequately pled under Section 20(a) by allegation that two corporate entities "operate internally and market themselves externally as a single entity, to the point where [a] managing director … allegedly testified … that he was unsure for which entity he ultimately worked"); *Cromer Fin.*, 137 F. Supp. 2d at 484 (control adequately pled under Section 20(a) by alleging parent used subsidiaries as "the corporate vehicles through which [parent] provided administrative services to its clients.") (quotation marks omitted).

118. In all of these approaches, a plaintiff can show that control was exercised through multiple layers of subsidiaries. *E.g., In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 638 (S.D.N.Y. 2007) (contrary argument "makes little sense" given structure and purpose of Section 15).

119. There is no requirement that FHFA prove that any control person was a culpable participant in the misstatements. *Compare In re Worldcom, Inc. Sec. Litig.*, 2005 WL 638268, at *16 n.20 (S.D.N.Y. Mar. 21, 2005) (argument that Section 15 includes culpable participation requirement is "unsupportable") *with SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (under Section 20(a), for which primary violation requires scienter, plaintiff must show "that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person" (brackets and quotation marks omitted)).

120. As this Court and others have recognized, although the control person provisions of Section 15 and Section 20 should be interpreted similarly as a general matter, a culpable participation requirement for a Section 15 claim makes cannot be reconciled with "the statutory language and the Supreme Court's acknowledgement, when considering Section 15 in conjunction with its affirmative defense, that the claim imposes a negligence standard only." *In re Worldcom*, 2005 WL 638268, at *16 n.20; *accord, e.g.*, *McKenna v. Smart Techs. Inc.*, 2012 WL 1131935, at *21 (S.D.N.Y. Apr. 3, 2012) (in light of Section 15's affirmative defense, imposing a culpable participation requirement "would turn the relative burdens imposed by the statute on their head"); *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 310 (S.D.N.Y. 2002) (because "Section 12(a)(2) of the Securities Act do[es] not contain an intent element (indeed, defendants need not even know about the misrepresentations) it would make little sense to compel plaintiffs to allege a culpable state of mind in order to state a claim under Section 15"); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 208 (E.D.N.Y. 2000) ("[C]laims under Sections 11 and 12 of the Securities Act sound in strict liability and do not require knowledge by the defendants of the misrepresentations. Thus, the concept of culpability would not apply."); *cf. In re Lehman Bros.*, 650 F.3d at 186 (noting district court split over culpable participation but declining to reach issue as complaint inadequately pled the "undisputed [Section 15] element of control.").

121. Applying these legal standards to the facts, FHFA has proved that each of Nomura Holding, NCCI, and the Individual Defendants controlled the primary violators Nomura Securities, NAAC, and NHELI for purposes of Section 15.

**1. Nomura Holding Controlled The Primary Violators**

122. FHFA has established Nomura Holding's control of Nomura Securities, NAAC, and NHELI in several ways. *First*, Nomura Holding wholly owned those entities: Nomura Securities directly, and NAAC and NHELI indirectly through ownership of NACC and NAMF. *See* FOF Part VI.A.1. These facts alone suffice to prove Nomura Holding controlled these primary violators. *Borden*, 735 F. Supp. at 591.

123.   *Second*, Nomura Holding controlled Nomura Securities, NAAC, and NHELI through overlapping officers and directors.   Nomura Holding directly appointed the directors of Nomura Securities.  FOF Part VI.A.3.   Every member of Nomura Securities' board of directors was a member of Nomura Holding's board of directors, giving Nomura Holding unimpeded control over the management and policies of Nomura Securities.  *See* FOF Part VI.B.1.  Nomura Holding indirectly appointed the directors of NAAC and NHELI by appointing the directors of NACC and NAMF, who in turn appointed the directors of NAAC and NHELI.  *See* FOF Part VI.A.3.  Two of the directors of NAAC and NHELI's directors were also officers and/or directors of Nomura Holding.  FOF Part VI.B.1.  NAAC and NHELI's directors choose the officers for those companies, who were responsible for the "management and operation" of NAAC and NHELI.  FOF Part VI.B.1.  Two of the NAAC and NHELI officers that they chose, Juliet Buck and Sam Herbstman, were also officers of Nomura Holding.   FOF Part VI.A.3.  This evidence that Nomura Holding shared directors and officers with, and selected the directors and officers of, Nomura Securities, NAAC, and NHELI also suffices to show that Nomura Holding controlled those primary violators.  *See In re Parmalat*, 375 F. Supp. 2d at 311; *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 721 (S.D.N.Y. 2013) ("[C]orporate officers usually are presumed to possess the ability to control the actions of their employees.").

124.   *Third*, Nomura Holding controlled NCCI, NAAC, and NHELI by creating them for its purposes and then directing their business activities.  Nomura Holding created those companies in order to sponsor and issue RMBS, and Mr. Findlay, acting as Nomura Holding's CLO, was intimately involved in designing the diligence policies for that business.  FOF Part VI.C.2.  This use of "corporate vehicles" to engage in primary violations is classic evidence of control.  *Cromer*, 137 F. Supp. 2d at 484.  Nomura Holding extended its domination further by directing the primary violators' credit policies.  FOF Part VI.A.2.  By deciding whether Nomura would extend warehouse lines of credit, Nomura Holding influenced NCCI's ability to purchase loans from originators.  FOF Part VI.A.2.b.  Even more directly, Nomura Holding determined the originators from which NCCI could purchase loans from through the Credit Department and

RCC, monitored NCCI's relationships with originators on an ongoing basis through the RMBS

Group, and terminated NCCI's client relationships with some originators it deemed problematic.

FOF VI.A.2.  Nomura Holding thus had the ability to halt NAAC and NHELI's issuance of the

Securitizations by denying NCCI permission to buy loans, and exercised control over NAAC and

NHELI's issuance of the Securitizations by deciding which loans NCCI could purchase.  The

fact that Nomura Holding held veto power over, and directly influenced, the primary conduct

giving rise to liability is strong evidence of control.  *See Hollinger*, 914 F.2d at 1573-74.

125.    Nomura Holding also set the position limits for Nomura's RMBS business,

including the amount of whole loans and RMBS residual positions Nomura could hold on its

books at any given time.  FOF Part VI.A.2(c).  By controlling the size of Nomura's whole-loan

holdings, Nomura Holding controlled how many loans NCCI could purchase that NAAC and

NHELI could then securitize.  By controlling the size of Nomura's residual holdings, Nomura

Holding further influenced the number of RMBS that Nomura Securities could underwrite, as it

was not possible as a practical matter for Nomura Securities to sell RMBS into the market

without initially retaining a residual interest.  FOF VI.A.2.c.  These facts confirm that Nomura

Holding had the ability to prevent Nomura Securities, NAAC, and NHELI from participating in

the RMBS market, but instead "enabled [their] participation in the" primary violations,

*Employees' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F.

Supp. 2d 141, 157 (S.D.N.Y. 2011), another hallmark of control.

126.    Nomura Holding also had the ability to audit Nomura Securities, NAAC, and

NHELI.  FOF Part VI.A.2(d).  The ability to audit these entities further shows "that the audit

committee had the practical ability to direct [the company's] accounting policies," which is

another strong indicia of control.  *In re Refco*, 503 F. Supp. 2d at 639.

127.    *Finally*, Nomura Holding controlled Nomura Securities, NAAC, and NHELI by

operating Nomura's RMBS business as if it were a single entity.  Internally, Nomura Holding

shared back office operations with all of its RMBS subsidiaries, FOF Part VI.A.2.e, showing that

Nomura viewed the entities as integrated.  Externally, Nomura Holding directed the public

relations of Nomura's RMBS business when faced with public criticism, FOF Part VI.A.2.f, showing that it "retained ultimate authority to decide how to respond to" complaints about that businesses, regardless of the other Nomura entities involved. *STMicroelectronics*, 775 F. Supp. 2d at 536 (quotation marks omitted). Moreover, Nomura Holding's officers (and Mr. Findlay, its director) signed the Registration Statements, authorized bringing the Securitizations to market as directors of NAAC and NHELI, and helped prepare the Offering Materials, including the Prospectus Supplements. FOF Part VI.C.2. Through these actions of its officers and director, Nomura Holding represented to the public that it was "willing and able to stand behind the information contained in" the Registration Statements, *In re Worldcom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003), as well as that contained in the Prospectus Supplements those Registration Statements enabled, 17 C.F.R. §§ 230.409, 230.415. *See City of Westland*, 928 F. Supp. 2d at 721 ("Directors and officers who sign registration statements or other SEC filings are presumed to control those who draft those documents.").

128. This evidence of control is particularly compelling as to NAAC and NHELI, as they were shell companies with no employees apart from their officers, no business operations other than issuing RMBS securities, and no meetings of the board whatsoever, FOF Part VI.B.3; *see also* Diligence MSJ Op., 2014 WL 7232443, at *21 (NAAC and NHELI were "corporate shells" with "no employees"); *Mgmt. Dynamics*, 515 F.2d at 812 (Section 15 read particularly broadly for shell entities). Accordingly, FHFA has proven its *prima facie* case of Nomura Holding's liability under Section 15 and D.C. Code § 31-5606.05(c).

**2. NCCI Controlled The Primary Violators**

129. FHFA has shown NCCI's control of Nomura Securities, NAAC, and NHELI in several ways. *First*, NCCI controlled those entities through overlapping officers and directors. Every officer of NCCI was also an officer of Nomura Securities, and, indeed, until October 2006—after the issuance of NHELI 2006-HE3—NCCI had no employees and Nomura Securities employed all of NCCI's officers. *See* FOF Part VI.A.1. Several of NAAC and NHELI's officers (including their CEOs) were also officers of NCCI, and were charged by NAAC and NHELI's

corporate by-laws with managing the day-to-day operations of NAAC and NHELI. FOF Part VI.A.2-3. Moreover, NAAC and NHELI were shell companies, without employees, for which there is no evidence the board of directors ever met, hence, practically speaking, their day-to-day management was ceded to these officers . FOF Part VI.B.3; Diligence MSJ Op., 2014 WL 7232443, at *21 (finding NAAC and NHELI were "corporate shells" with "no employees"); *Mgmt. Dynamics, Inc.*, 515 F.2d at 812 (shell entities were the "genesis" of Section 15). NCCI's sharing of officers and directors with Nomura Securities, NAAC, and NHELI is alone enough to show that Nomura Holding controlled these primary violators' RMBS activities. *See In re Parmalat*, 375 F. Supp. 2d at 311.

130. *Second*, NCCI controlled Nomura Securities, NAAC, and NHELI by directing their RMBS business activities. Crucially, NCCI was the disclosed sponsor of all the Securitizations. FOF Part II.B.2. Like the signature of an individual upon a Registration Statement, which is a "manifestation of the signer's responsibility for the information contained in the document, and, therefore, sufficient to confer 'control person' status," NCCI's disclosed position as sponsor manifested its responsibility for the content of the Prospectus Supplements, further confirming its control of the issuers of those documents, NAAC and NHELI. *UBS I*, 858 F. Supp. 2d at 333; *see also In re Worldcom*, 294 F. Supp. 2d at 420.

131. NCCI was actively involved in all of Nomura's essential RMBS operations: it decided which loans to purchase and which loans to securitize, it held the loans on its books before depositing them with NAAC or NHELI, and it was the entity responsible for conducting diligence on the loans before purchase. FOF Part VI.B.2. NCCI's intimate involvement with the business of Nomura Securities, NAAC, and NHELI shows its control of those entities. *Cromer Fin.*, 137 F. Supp. 2d at 484. Further demonstrating NCCI's fundamental power over NAAC and NHELI with respect to the conduct at issue is that it had the power to prevent those entities from issuing RMBS by refusing to purchase loans for securitization or, having bought loans, refusing to deposit them. FOF Part VI.B.2; *Gov't of the Virgin Islands*, 804 F. Supp. 2d at 157.

132. Further, NCCI's officers (and in the case of Mr. LaRocca, a director) signed the Registration Statements, and were responsible for putting together the offering materials and otherwise "papering" the entire transaction process, including the Prospectus Supplements. FOF Part VI.C. These facts show NCCI's intimate involvement in Nomura Securities' underwriting of the securitizations. *Cromer Finance*, 137 F. Supp. 2d at 484; *City of Westland*, 928 F. Supp. 2d at 721.

133. In light of the above evidence, FHFA has proven its *prima facie* case of NCCI's liability under Section 15 and D.C. Code § 31-5606.05(c).

**3. The Individual Defendants Controlled The Primary Violators**

134. "[T]he act of signing a registration statement, as the individual defendants in this case are alleged to have done, is a manifestation of the signer's responsibility for the information contained in the document and, therefore, [is] sufficient to establish 'control person' status." *UBS I*, 858 F. Supp. 2d at 333; *see also, e.g., In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 222 (S.D.N.Y. 1999) ("An outside director and audit committee member who signs off on the financials can be presumed to have the power to direct or cause the direction of the management and policies of the corporation" (internal quotation marks omitted)); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 494 (S.D.N.Y. 2005) ("It comports with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report." (internal quotation marks and brackets omitted)). Under the D.C. Blue Sky law, Mr. Graham's status as an officer of NAAC and Nomura Securities, Mr. Gorin's status as an officer of NAAC and Nomura Securities, Mr. McCarthy's status as a director of NAAC, and Mr. Findlay's status as a director of NAAC and an officer and director of Nomura Securities, FOF Part VI.C.2-5, are sufficient to establish that they are control persons. D.C. Code § 31-5606.05(c).

135. Under Section 15, although "[o]fficer and director status alone does not constitute control," *In re Livent*, 78 F. Supp. 2d at 221, such status is sufficient where it confers on the officer or director the authority to direct the management and policies of the corporation, *see*,

*e.g.*, *In re Alstom SA*, 406 F. Supp. 2d 433, 487-89 (control can be shown where officer signed financial statements or SEC filings), and is, at a minimum, strongly suggestive of control. *See Food & Allied Serv. Trades Dep't, AFL-CIO v. Millfeld Trading Co.*, 841 F. Supp. 1386, 1391 (S.D.N.Y. 1994) ("defendants' positions, as Treasurer, Chief Financial Officer, and Secretary of [the primary violator] throughout the relevant period, strongly suggest that each of them possessed the power to direct the management and policies of [the primary violator]" because "one could reasonably infer … that their corporate positions gave them responsibility over the day-to-day operations of [primary violator] and over the preparation or review of [the primary violator's] public statements").

136.    Each of the Individual Defendants signed certain of the Registration Statements, pursuant to which the following Securitizations were issued:  for David Findlay, each of the Securitizations; for Nathan Gorin, each of the Securitizations; for John McCarthy, each of the Securitizations; for John Graham, NAA 2005-AR6; and for Dante LaRocca, NHELI 2006-FM1, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3.  *See* FOF Parts VI.C, VII.B.4.  These facts are is sufficient to establish their control as to those Securitizations.  *UBS I*, 858 F. Supp. 2d at 333.

137.    The Individual Defendants' statuses as officers or directors of NAAC, NHELI, and/or Nomura Securities, together with their authority and actual direction over the management and policies of Nomura's RMBS business, are also sufficient to establish their control over the RMBS securitization activities of NAAC, NHELI and Nomura Securities.  *See Food & Allied Serv. Trades*, 841 F. Supp. at 1391; *In re Alstom SA*, 406 F. Supp. 2d 433, 487-89. Both Mr. Graham and Mr. LaRocca were actively involved in managing and overseeing day-to-day many aspects of the RMBS business, from loan acquisition to securitization, including preparing and reviewing the Prospectus Supplements and other Offering Documents.  FOF Part VI.C.1.  Mr. Findlay was required to approve, and did approve, each of the Securitizations, and his ability to direct the management and policies of Nomura Securities is further buttressed by his position as both a director and Chief Legal Officer of Nomura Securities.  FOF Part VI.C.2.

Mr. Gorin was responsible for maintaining the financial accounts of NAAC, NHELI, and NCCI. FOF Part VI.C.4. Accordingly, FHFA has proven its *prima facie* case of the Individual Defendants' liability under Section 15 and the liability of Mr. Findlay, Mr. Gorin, Mr. McCarthy, and Mr. Graham under D.C. Code § 31-5606.05(c).

### B. Nomura Holding, NCCI, And The Individual Defendants Have Failed To Prove An Affirmative Defense To Section 15 Liability

138. Nomura Holding, NCCI, and the Individual Defendants assert Section 15's reasonable belief affirmative defense (15 U.S.C. § 77*o*) to controlling-person liability for FHFA's Securities Act claims. Nomura Holding, NCCI, Mr. Findlay, and Mr. Graham assert the D.C. Code's reasonable care defense (D.C. Code § 31-5606.05(c)) to controlling-person liability for FHFA's D.C. Blue Sky claim arising from the NAA 2005-AR6 Certificate. Both of these defenses requires proof by a preponderance of the evidence. For the following reasons, no Defendant has established either defense.

139. The Section 15 affirmative defense requires a defendant to prove that he "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77*o*. To establish this defense, a defendant must therefore prove *both* that he (a) had no knowledge of, *and* (b) had no reasonable grounds to believe in the relevant facts. *In re Worldcom*, 2005 WL 638268, at *16.

140. The statutory language of this defense echoes the Section 11 non-expert's defense of reliance on expertised portions of a registration statement, which, like the Section 15 defense, turns on whether a defendant has "reasonable ground to believe" that statements are true. *Compare* 15 U.S.C. § 77*o* *with* 15 U.S.C. § 77k(b)(3)(C); *see In re Worldcom*, 2005 WL 638268, at *16 (construing 15 U.S.C. § 77*o* and 15 U.S.C. § 77k(b)(3)(C) alike due to their shared language). Because "it is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning," *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2004-05 (2012) (quotation marks and citation omitted), the Section 15 defense should therefore be construed in light of the Section 11 defense of reliance on

experts.  *In re Worldcom*, 2005 WL 638268, *16.  For the same reason, Section 11's mandate that "the standard of reasonableness shall be that required of a prudent man in the management of his own property," 15 U.S.C. § 77k(c), "lends guidance as to what 'reasonableness' means under Section 15."  *In re Worldcom, Inc. Secs. Litig.*, 2005 WL 638268, *16.

141.    Under the Section 11 expert reliance defense (15 U.S.C. § 77k(b)(3)(C)), "where 'red flags' regarding the reliability of a[] … statement emerge, mere reliance on an [expert] will not be sufficient to ward off liability," *In re Worldcom, Inc. Secs. Litig.*, 346 F. Supp. 2d 628, 672 (S.D.N.Y. 2004).  Red flags do not "arise[] only when there is clear and direct notice" of a problem," *id.* at 679, but rather exist whenever "a prudent man … in the management of his own property" would investigate further.  *Id.* (quotation marks and citation omitted).  These precedents apply with equal force to the standard of reasonableness under the Section 15 defense, as it shares the same standard of reasonableness.

142.    Applying this standard to the evidence here leads the Court to conclude that Nomura Holding, NCCI, and the Individual Defendants have not sustained their burden of proving that they had "no … reasonable ground to believe" (15 U.S.C. § 77*o*) in the material misstatements and omissions in the Prospectus Supplements.  The Court's summary judgment decision on Defendants' due diligence and reasonable care defenses is alone sufficient to reach this conclusion.  The Court there held that "there is no evidence from which a reasonable [factfinder] could find" (Diligence MSJ Op., 2014 WL 7232443, at *32) that "Nomura Securities, NCCI, or the [I]ndividual [D]efendants" (*id.*) discharged their obligations of due diligence under Section 11, 15 U.S.C. § 77k(b)(3)(A), as it was "unreasonable" to rely on Nomura's diligence processes to ensure that the statements in the Prospectus Supplements were true, Diligence MSJ Op., 2014 WL 7232443, at *32 n.49.  The Court likewise held that there was no genuine dispute that the Nomura defendants, including Nomura Holding and NCCI, did not "exercise[ ] reasonable care within the meaning of Section 12(a)(2)," *id.* at *32, because "Nomura never created a due diligence program to confirm the accuracy of the representations in the Offering Documents," *id.* at *30.  These holdings establish that Nomura Holding, NCCI, and

the Individual Defendants cannot sustain a Section 15 defense, as Nomura's deficient diligence process could not provide them with "reasonable ground to believe" (15 U.S.C. § 77*o*) that the representations were materially true and not misleading.

143.    The record here also leads to the conclusion that Nomura Holding, NCCI, and the Individual Defendants cannot sustain a Section 15 defense.  NCCI, Mr. Graham, and Mr. LaRocca were directly involved in the diligence that Nomura conducted in acquiring loans for securitization.  FOF Parts VI.A.2, VI.C.1(b), VI.C.3(b).  Mr. Findlay helped design Nomura's diligence process, FOF Part VI.C.2(a), and it is thus a reasonable inference that he too was or should have been aware of the flaws in that process from the outset.  Mr. Findlay was also involved with monitoring the risks of Nomura's RMBS business, FOF Part VI.C.2(b), including discussions about problems with originators, FOF Part VI.C.2(b).  Mr. Gorin, who did not form any belief about the accuracy of the representations, likewise became aware of red flags as to the quality of Nomura's RMBS in his role as Controller.  FOF Part VI.C.4.  Consequently, all of these defendants knew or reasonably should have known of: (a) the high kick-out rates that should have caused each of them to "question the accuracy of the [Prospectus Supplements]," Diligence MSJ Op., 2014 WL 7232443 at *28; (b) credit and compliance diligence results showing that 1 in 7 mortgage SLG loans might not be "in accordance with Nomura's representation in the Offering Documents," Diligence MSJ Op., 2014 WL 7232443 at *34; and (c) valuation diligence results that provided "reason to doubt the accuracy of those statements" regarding the LTV ratios, *id*. at *40.  These facts do not permit a Section 15 defense.

144.    Nomura Holding also cannot show that it had reasonable grounds to believe that the Mortgage Loans complied with the applicable underwriting guidelines, or had accurate disclosed LTV and occupancy statistics.  Mr. Findlay designed Nomura's diligence process on Nomura Holding's behalf.  FOF Part VI.C.2.  As early as November 25, 2005—before the earliest Certificate was issued—Nomura Holding knew that Nomura bought loans that its vendors had graded EV3 without any indication the loans' defects had been cured, FOF Part VI.A.2, and it then became or should have become aware of poor results of diligence performed

on loans made originators of SLG loans.  FOF Part VI.A.2.  Moreover, through various channels, Nomura Holding continuously monitored the problems and risks in Nomura's RMBS business. FOF Part VI.A.2.  This evidence leads to the conclusion that Nomura Holding, too, has not established the Section 15 defense by a preponderance of the evidence.

145.    Similar to the Section 15 defense, the conclusion that Nomura Holding, NCCI, Mr. Findlay, and Mr. Graham have not established a reasonable care defense to controlling person liability under the D.C. Blue Sky law, D.C. Code § 31-5606.05(c), naturally follows from the Court's summary judgment decision.  To establish that defense, a defendant must "sustain the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."  D.C. Code § 31-5606.05(c).  This language is materially identical to the reasonable care defense to primary liability under the D.C. Code, *see* D.C. Code § 31.5606.05(a)(1)(B) (providing affirmative defense for offerors or sellers if they "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission"), and should therefore be given the "same meaning," *Taniguchi*, 132 S. Ct. at 2004-05.  Accordingly, the Court's holding on summary judgment that, in light of Nomura's deficient diligence process, Defendants could not establish a reasonable care defense as to primary violations of the D.C. Code precludes Nomura Holding, NCCI, Mr. Findlay, and Mr. Graham from establishing a reasonable care defense to control-person liability under the D.C. Code.  Diligence MSJ Op., 2014 WL 7232443, at *32; *id.* at *30 n.47 (this holding applies to Blue Sky statutes).  The facts discussed in connection with the Section 15 defense lead to the same conclusion.

146.    In sum, the Court concludes that Nomura Holding, NCCI, and the Individual Defendants have not established a defense to controlling person liability under Section 15 or the D.C. Blue Sky laws.  Judgment shall be entered against these Defendants on FHFA's control person claims.

## IV.   FHFA IS ENTITLED TO RECEIVE ITS FULL STATUTORY REMEDIES, APPLYING THE IRS UNDERPAYMENT RATE OF INTEREST

147.    Having established liability for all of its claims, FHFA is entitled to receive its statutory remedies.  Because the GSEs owned the Certificates on the date that FHFA filed the complaint and have owned the Certificates continually from that time until today, FOF Part VII.A, FHFA's remedy for its Section 12 claims is rescission by tender.  *See Wigand v. Flo–Tek, Inc.*, 609 F.2d 1028, 1035 (2d Cir. 1980) (Section 12 "allow[s] the plaintiff no choice of remedy. If plaintiff owns the stock, he is entitled to rescission but not damages.  If plaintiff no longer owns the stock, he is entitled to damages but not rescission."); *Randall v. Loftsgaarden*, 478 U.S. 647, 655 (1986) (same).  For the same reason, rescission is FHFA's remedy under the Blue Sky statutes.  D.C. Code § 31-5606.05(b)(1)(A); Va. Code § 13.1-522(A).

148.    In providing for rescission, Section 12(a)(2) states that, "upon tender of [a] security," a prevailing plaintiff is entitled to recover (a) "the consideration paid for such security;" (b) "with interest thereon;" (c) "less the amount of any income received thereon." 15 U.S.C. § 77*l*(a)(2).  The Blue Sky statutes contain nearly identical requirements, D.C. Code § 31-5606.05(b)(1)(A); Va. Code § 13.1-522(A), except that (a) whereas Section 12 does not specify a rate of prejudgment interest, the Blue Sky statutes do, Va. Code § 13.1-522(A)), D.C. Code §§ 31-5606.05(b)(1)(A), 28-3302(a); (b) Section 12 does not expressly provide for recovery of costs and reasonable attorneys' fees, while the Blue Sky statutes do, Va. Code § 13.1-522(A); D.C. Code § 31-5606.05(b)(1)(A)); and (c) Section 12 provides for an affirmative loss causation defense, while the Blue Sky statutes, which were modeled on the pre-PSLRA version of Section 12(a)(2), do not.  *FHFA v. HSBC N. Am. Holdings Inc.* ("Loss Causation MSJ Op.") 988 F. Supp. 2d 363, 369-70 (S.D.N.Y. 2013).  Accordingly, the Court must determine (a) the consideration paid for each Certificate; (b) the appropriate rate of prejudgment interest; (c) the amount of income received on each Certificate; and (d) for Certificates that are subject to Blue Sky claims, costs and reasonable attorneys' fees.

### A. "Consideration Paid"

149. To determine the "consideration paid" by the GSEs, the Court begins with the amounts that they paid to acquire the Certificates. For five of the seven Certificates, the calculation of these amounts is undisputed. For the remaining two Certificates, NAA 2005-AR6 and NHELI 2006-FM1, Defendants at one point sought to exclude from the calculation of "consideration paid" the amounts of the GSEs' payments that represent "accrued interest." However, "[t]he defendants have conceded that [their expert, Dr.] Riddiough erred in failing to account for the accrued interest," *FHFA v. Nomura Holding Am., Inc.* ("Riddiough *Daubert* Op."), 2015 WL 640875, at *1 n.3 (S.D.N.Y. Feb. 16, 2015), and Section 12(a)(2) and the Blue Sky statutes make no provision for excluding accrued interest from "consideration paid" in any event.[7]

150. The amount of "consideration paid" does not necessarily end with the purchase price, however. Unlike stocks, the Certificates are subject to amortization, meaning that the GSEs received monthly payments of principal, and "[w]ith the return of principal each month, the consideration paid declined in a corresponding amount." Riddiough *Daubert* Op., 2015 WL 640875, at *2. Consequently, the "consideration paid" for a Certificate can be considered to be the amount paid by the relevant GSE for that Certificate less the amount of principal returned to that GSE through the date of tender. *See Randall v. Loftsgaarden*, 478 U.S. 647, 660 (1986) (given Section 12's "express offset for 'income received,' … any implicit offset for a return of consideration must be confined to the clear case in which such money or property is returned to the investor.").

151. As Section 12 and the Blue Sky statutes entitle a plaintiff to rescission "upon the tender of [a] security," 15 U.S.C. § 77*l*(a)(2), the calculation of the original purchase price less principal payments received must be made as of the date of tender. Under Second Circuit law,

[7] Moreover, Section 12 requires that FHFA's recovery be reduced by all "income received" on the Certificates, which includes accrued interest received by the GSEs after purchase. Defendants' approach would inappropriately reduce FHFA's recovery twice: once by excluding it from consideration paid and then again by including it as income received by the GSEs and returned to Defendants under the rescissory calculation.

"tender" of a security is accomplished by "an offer to tender contained in the complaint," and "a demand for rescission [in a complaint] contains an implicit offer to tender, sufficient to satisfy [Section 12]." *Wigand*, 609 F.2d at 1035; *accord Black's Law Dictionary* (3d. ed. 1933) (defining "tender" as "[a]n offer of money[ ] … without any stipulation or condition," and providing that "though usually used in connection with an offer to pay money, [tender] is properly used in connection with offer of property other than money.").

152. Because FHFA demanded rescission in its Complaint on September 2, 2011, Cmplt. (Dkt. 1) at 75, it constructively tendered the Certificates to Defendants as of that date, and the amount of consideration paid is calculated as of that date. *Goldkrantz v. Griffin*, 1999 WL 191540, at *6 (S.D.N.Y. Apr. 6, 1999) (Cote, J.), *aff'd*, 201 F.3d 431 (2d Cir. 1999) (under Section 12, recovery for class members who held shares was "the difference between the consideration they originally paid for the shares and the value of the shares *at the time of the filing of the complaint*, minus any income received") (emphasis added) (citing *Wigand*, 609 F.2d at 1035). Accordingly, for each Certificate, the GSEs' "consideration paid" is the purchase price less principal payments received as of September 2, 2011. *Id.*; *see also Colon v. Diaz-Gonzalez*, 2009 WL 3571974, at *4 (D.P.R. Oct. 26, 2009) ("[P]rior to filing this suit, Plaintiffs tendered the security to Defendants …. As a result, Defendants cannot argue that Plaintiffs' actions after the tendering of the security is the proximate cause of Plaintiffs' losses.").

153. Under this approach, FHFA's recovery will not be reduced by the amount of principal payments received by the GSEs after the lawsuit date. For the reasons discussed above, these amounts are outside of the statutory formulae, which require determination of consideration paid as of the date of constructive tender, not the date of judgment. This approach is also consistent with the purpose of Section 12. "[B]y enabling the victims of prospectus fraud to demand rescission upon tender of the security, Congress shifted the risk of an intervening decline in the value of the security to defendants, whether or not that decline was actually caused by the fraud." *Randall*, 478 U.S at 659 (Congress enacted the Securities Act not only compensate investors but also "in order to deter prospectus fraud and encourage full disclosure").

This approach is further consistent with the equitable principles of rescission, which do not require the return of payments made to an innocent party by those who induce another to contract through misrepresentations. *PHL Variable Ins. Co. v. P. Bowie 2008 Irrevocable Trust ex rel. Baldi*, 718 F.3d 1, 10 (1st Cir. 2013) (rescission entitled innocent insurer to retain premiums it had been paid on policy insuring irrevocable trust that was procured by material misrepresentations).

**B. "With Interest Thereon"**

154. Under the statutory formulae, the Court next applies prejudgment interest to the consideration paid. 15 U.S.C. § 77*l*(a)(2);, D.C. Code § 31-5606.05(b)(1)(A); Va. Code § 13.1-522(A). Under the Virginia Blue Sky law, the six percent interest rate is set by statute. Va. Code § 13.1-522(A) ("together with interest thereon at the annual rate of six percent"). Similarly, under the D.C. Blue Sky law, the interest rate is the "rate used in the Superior Court of the District of Columbia," D.C. Code § 31-5606.05, which is also six percent, D.C. Code § 28-3302(a) ("[t]he rate of interest in the District upon … things in action in the absence of expressed contract, is 6% per annum"); *see also In re Dawson*, 411 B.R. 1, 43-44, 49 (Bankr. D.D.C. 2008) (imposing 6 percent rate of interest on rescissory remedy, pursuant to D.C. Code § 28-3302(a)).

155. Under Section 12, "an award of prejudgment interest rests in the sound discretion of the trial court after careful consideration of the factors set forth in *Wickham Contracting Co.*," *Commercial Union Assur. Co., plc v. Milken*, 17 F.3d 608, 615 (2d Cir. 1994) (citing *Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 833-34 (2d Cir. 1992)). The *Wickham* factors are: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham*, 955 F.3d at 833-34; *cf. Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000) ("[T]he same considerations

that inform the court's decision whether or not to award interest at all should inform the court's choice of interest rate[.]").

156.     As the Second Circuit explained, "in an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance." *S.E.C. v. First Jersey Sec.*, 101 F.3d 1450, 1476 (2d Cir. 1996).  Consequently, it is appropriate to apply the IRS underpayment rate when the SEC seeks disgorgement, because the funds to be disgorged have in effect been withheld from the government, and the IRS underpayment rate "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud," *id.*; *see also S.E.C. v. Boock*, 2012 WL 3133638, at *5 & n.3 (S.D.N.Y. Aug. 2, 2012) (Cote, J.) (in enforcement action under Section 17(a) of the '33 Act, Section 10(b) of the '34 Act and Rule 10b-5, noting that "it is well established that when disgorgement is ordered in an SEC[ ]initiated proceeding, the IRS underpayment rate is appropriate.") (citation omitted); *S.E.C. v. Mattera*, 2013 WL 6485949, at *15 (S.D.N.Y. Dec. 9, 2013) (in enforcement action under Sections 5 and 17(a) of the '33 Act, Section 10(b) of the '34 Act, seeking disgorgement and civil penalties, prejudgment interest calculated at the IRS underpayment rate); *S.E.C. v. Colonial Inv. Mgmt. LLC*, 659 F. Supp. 2d 467, 501-02 (S.D.N.Y. 2009) (similar), *aff'd sub nom. S.E.C. v. Colonial Inv. Mgmt. LLC*, 381 F. App'x 27 (2d Cir. 2010); *S.E.C. v. Martino*, 255 F. Supp. 2d 268, 289-90 (S.D.N.Y. 2003) (similar, '33 Act claims); *S.E.C. v. Rosenfeld*, 2001 WL 118612, at *3 (S.D.N.Y. Jan. 9, 2001) (same, '33 Act claims).

157.     This same logic applies here.  As the Second Circuit recognized, "in response to the national housing and economic crisis," Congress created FHFA because it was concerned about the financial condition of Fannie Mae, Freddie Mac, and other government-sponsored entities ('GSEs')."  *FHFA v. UBS Americas Inc.*, 712 F.3d 136, 138 (2d Cir. 2013) (quotation marks and citations omitted).  Congress gave FHFA "broad power" to place the GSEs into conservatorship, "take such action as may be ... necessary to put the GSEs in a sound and solvent condition; and …  carry on the business of the [GSEs] and preserve and conserve [their] assets

and property. Congress specifically authorized FHFA, as conservator or receiver, to collect all obligations and money due the GSEs." *Id.* (quotation marks and citation omitted). In bringing this suit, then, FHFA is acting with a public purpose. *Cf. FHFA v. Royal Bank of Scotland Grp. plc*, 2012 WL 3580522, at *2–4 (D. Conn. Aug. 17, 2012) (analogizing FHFA to the SEC and holding that FHFA is not subject to the PSLRA stay of discovery for private actions).

158. Further, as in a disgorgement action, the funds at issue here effectively have been withheld from the public. The GSEs are publicly chartered entities to which Congress gave the ongoing public mandate to, among other things, "provide stability in the secondary market for residential mortgages" and "promote access to mortgage credit throughout the Nation … by increasing the liquidity of mortgage investments," 12 U.S.C. § 1716 (Fannie Mae); *see id.* § 1451 note (same for Freddie Mac). The GSEs purchased the Certificates in carrying out this mission. Consequently, funds related to the Certificates that Defendants withheld are funds that the GSEs have not been able to use to pursue this public mission. Moreover, it is a matter of public record that the funds recovered by FHFA in these actions will be routed to the public treasury.[8] The IRS underpayment rate fairly captures the benefit that Defendants received by withholding these funds from public use. *See First Jersey*, 101 F.3d at 1476.

159. Finally, application of the IRS underpayment rate is appropriate "to vindicate fully the remedial purposes of the securities laws." *Boock*, 2012 WL 3133638, at *5. The Securities Act serves the same "broad remedial purpose" as the other securities laws, *Huddleston*, 459 U.S. at 386, and should be judged in the context of that scheme, *see id.* at 386-87. In the present case, while creating purportedly AAA-rate Certificates for sale to the GSEs, despite credible indications that the originators of the loans underlying those bonds were systematically abandoning their underwriting guidelines, Nomura "took no steps at or near the time of its securitization of the Mortgage Loans to verify the accuracy of the representations

---

[8] *See* Third Amendment to [Freddie Mac] Amended and Restated Senior Preferred Stock Purchase Agreement, *available online at* http://www.treasury.gov/press-center/press-releases/Documents/Freddie.Mac.Amendment.pdf; Third Amendment to [Fannie Mae] Amended and Restated Senior Preferred Stock Purchase Agreement, *available online at* http://www.treasury.gov/press-center/press-releases/Documents/Fannie.Mae.Amendement.pdf.

about the characteristics of the SLGs in the Offering Documents," Diligence MSJ Op., 2014 WL 7232443, at *32, while RBSSI did not investigate two of the Securitizations it underwrote at all, *id.* at *36-37, and ignored its diligence vendors' findings for the ones it did purportedly investigate, *id.* at *38. In short, Defendants failed to maintain the "ethical standards of honesty and fair dealing" that the Securities Act was designed to uphold. *Hochfelder*, 425 U.S. at 195, making application of the IRS underpayment rate even more appropriate. *See In re Livent, Inc.*, 360 F. Supp. 2d 568, 573 (S.D.N.Y. 2005).

160. Accordingly, the Court will apply the IRS underpayment rate for large corporate underpayments, which is the Applicable Federal Rate ("AFR") plus 5% interest. 26 U.S.C. § 6621(a)(2), (c). The Court applies this rate to the "consideration paid," which, as discussed, is the purchase price less the principal paid back to the GSEs on a monthly basis from the date of purchase to the date of constructive tender when the complaint was filed on September 2, 2011. Part IV.A, *supra*. Because those principal payments were made on a monthly basis, the interest rate will be calculated on the unamortized principal balance of each Certificate as of each month from the purchase date through the date of constructive tender. *FHFA v. Nomura Holding Am. Inc.*, --- F. Supp. 3d ---, 2014 WL 7232590, at *9 (S.D.N.Y. Dec. 18, 2014) (Section 12(a)(2) formulae for rescission includes computation of interest, as do Blue Sky statutes).

**C. "Less The Amount Of Any Income Received"**

161. Finally, the relevant statutes require the Court to subtract from the total of consideration plus interest the amount of income received by the GSEs. 15 U.S.C. § 77*l*(a)(2); D.C. Code § 31-5606.05(b)(1)(A); Va. Code § 13.1-522(A). The Certificates entitle the GSEs to receive interest payments on a monthly basis, and FHFA agrees that the amount of these interest payments through the date of constructive tender may be deducted from its recovery as "income received" by the GSEs.

**D. "Reasonable Attorneys' Fees" And "Costs"**

162. The Blue Sky statutes provide for the recovery of "costs, and reasonable attorneys' fees," Va. Code § 13.1-522(A)(ii); D.C. Code. § 31-5606.05(a)(1)(B). Upon a

finding of liability, this award is mandatory. As the Second Circuit held in addressing fees under the Connecticut Uniform Securities Act, Conn. Gen. Stat. Ann. § 36b-2 *et. seq*., "[a]ttorney's fees mandated by state statute are available when a federal court sits in diversity," and "[t]he only issue is the reasonableness of the amount requested." *Cotton v. Slone*, 4 F.3d 176, 181 (2d Cir. 1993) (remanding case under Connecticut Uniform Securities Act "with instructions to reconsider Cotton's request in light of her entitlement to such fees under C.G.S. § 36-498, and to place on the record the district court's reasoning for whatever amount is awarded"); *compare* Loss Causation MSJ Op., 988 F. Supp. 2d at 370 ("the Virginia Blue Sky law[ ] [and] the D.C. Blue Sky law [are] based on the Uniform Securities Act"), *with Nemec v. Shrader*, 2010 WL 3958655, at *4 (S.D.N.Y. Sept. 27, 2010), *as corrected* (Oct. 21, 2010) (Connecticut Uniform Securities Act also based on Uniform Securities Act). Accordingly, FHFA is entitled to recover costs and attorneys' fees under the D.C. and Virginia Blue Sky laws, and the only question, to be determined in post-trial submissions, is the amount of its costs and reasonable attorneys' fees. *See Diaz Vicente v. Obenauer*, 736 F. Supp. 679, 694-95 (E.D. Va. 1990) (award of fees and costs follows from finding of liability under Virginia Securities Act); *Arabian v. Bowen*, 966 F.2d 1441, at 6 (4th Cir. 1992) (same); 12A Blue Sky Law § 9:151.31 ("The vast majority of cases hold that award of attorney's fees is *mandatory*[ ]" under the Blue Sky statutes) (emphasis in original).

**E. Total Remedies**

163. To determine FHFA's total recovery for each Certificate, one adds (a) the total consideration paid (including any accrued interest) by the GSE for the Certificate at the date of purchase; *plus* (b) prejudgment interest (at the IRS underpayment rate for FHFA's Section 12 claims, and at 6% interest for FHFA's Blue Sky claims), calculated on the unamortized principal balance of the Certificate as of each month, from the date of purchase to September 2, 2011; *less* (c) the sum of all principal and coupon payments received on that Certificate from the date of purchase to September 2, 2011; *plus* (d) costs and reasonable attorneys' fees.

164. Where a Section 12 recovery and a Blue Sky recovery is available on the same Certificate, FHFA may elect the remedy that produces the highest recovery. *See, e.g.*, *Paul J. Maton, P.C. v. Arthur Andersen & Co.*, No. 91 C 1885, 1991 WL 131184, at *5 (N.D. Ill. July 5, 1991) ("[P]laintiffs are not precluded from seeking damages under section 11 merely because they seek an alternative remedy of rescission under section 12(2)."); *Klein v. Computer Devices, Inc.*, 602 F. Supp. 837, 843 n.10 (S.D.N.Y. 1985) (plaintiff may elect between Section 11 and 12 remedies); *In re Gap Stores Sec. Litig.*, 79 F.R.D. 283, 307 (N.D. Cal. 1978) ("[I]t is reasonable to assume that the plaintiff may pursue both [Section 11 and 12] remedies to judgment, electing his choice at the last possible moment.").

165. For illustrative purposes, the maximum recovery to which FHFA is entitled under the Section 12(a)(2) and the Blue Sky laws (taking the higher of the two claims where both claims are presented for a given Certificate), calculated as of the date of constructive tender on September 2, 2011 and setting prejudgment interest at the IRS underpayment rate for FHFA's Section 12(a)(2) claims and at 6% for FHFA's Blue Sky claims (exclusive of attorneys' fees and costs), would be:

| Certificate | FHFA's Recovery |
|---|---|
| NAA 2005-AR6 | 35,570,778 |
| NHELI 2006-FM1 | 62,873,953 |
| NHELI 2006-FM2 | 270,636,023 |
| NHELI 2006-HE3 | 203,417,649 |
| NHELI 2007-1 | 79,033,190 |
| NHELI 2007-2 | 223,518,423 |
| NHELI 2007-3 | 178,361,904 |
| **Total** | **1,053,411,920** |

FOF Part VII.A.

## V. DEFENDANTS HAVE NOT PROVEN THAT FHFA'S REMEDIES SHOULD BE REDUCED BASED ON NEGATIVE LOSS CAUSATION

166. Having established FHFA's remedies, the next question is whether the amount of those remedies should be reduced, in whole or in part, based on a showing of "negative loss causation." Neither the D.C. nor Virginia Blue Sky laws provides a loss causation defense to the claims at issue, Loss Causation MSJ Op., 988 F. Supp. 2d at 368-70, but Section 12 does. Section 12(b) provides:

> In an action described in subsection (a)(2) of this section, if the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) of this section represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading, then such portion or amount, as the case may be, shall not be recoverable.

15 U.S.C. § 77*l*(b).

167. As this is an affirmative defense, it is Defendants that must prove its elements by a preponderance of the evidence. *See In re Morgan Stanley*, 592 F.3d at 360 n.7 ("defendants bear the burden of demonstrating the applicability of" the Section 12(b) "defense"). This is a "heavy burden." *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987).

168. Because the loss causation provision of Section 12(b) was explicitly based on the loss causation provision of Section 11(e), S. Rep. 104-98, 23, 1995 U.S.C.C.A.N. 679, 702, and because the provisions of the Securities Act should be read *in pari materia*, *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 569 (1995), the term "value" in Section 12(b) means what it does in Section 11(e): "the security's true value after the alleged misrepresentations are made public," *McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1048 (2d Cir. 1995) (Section 11(e)). Unlike Section 11, however, in which the "value" of a security supplies the measure of both damages and of loss causation, the value of a security under Section 12 is not relevant to the plaintiff's remedies, *Wigand*, 609 F.2d at 1036, but only to the defendants' affirmative loss causation defense.

169. Under Section 12(b), Defendants must identify a depreciation in the true value of each Certificate that is not one "resulting from" their material misrepresentations and omissions. 15 U.S.C. § 77*l*(b). In determining if Defendants have done so, the Court applies precedents addressing the affirmative loss causation element of Section 10(b) of the Securities Exchange Act (and of Rule 10b-5), which is a mirror image of Section 12(b)'s loss causation defense. *See In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 590 n.4 (S.D.N.Y. 2011) (collecting cases, *e.g.*, *Amorosa v. AOL Time Warner, Inc.*, 409 F. App'x 412, 416-17 (2d Cir. 2011); *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005)).

170. As the Second Circuit has explained, under Section 10(b), a misstatement or omission causes an investment loss "if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). Thus, "to establish loss causation, a plaintiff must allege [ ] that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Id.* (quotation marks and citations omitted). Where the relationship between the misinformation and the loss is "sufficiently direct," proving loss causation is "straightforward." *Deng v. 278 Gramercy Park Grp. LLC*, 2014 WL 1016853, at *8 (S.D.N.Y. Mar. 14, 2014) (citing *Lentell*, 396 F.3d at 174) *report and recommendation adopted,* 2014 WL 4996255 (S.D.N.Y. Oct. 7, 2014) (Cote, J.).

171. In proving a loss causation defense under Section 12(b), then, Defendants must show that some portion of the Certificates' losses was caused by something other than the "subject of" their misrepresentations or omissions; specifically, something other than the fact that the SLG loans had a greater credit risk than was represented in the Prospectus Supplements. *See, generally, Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (when buyer resells security at lower price, that price might reflect "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."). This burden is

especially great given the direct relationship between that misinformation and the Certificates'
losses; "the revelation that borrowers on loans backing the Certificates were less creditworthy
than the Offering Documents represented affected the Certificates' 'value' immediately, because
it increased the Certificates' credit risk profile." *NECA-IBEW Health & Welfare Fund v.
Goldman Sachs & Co.*, 693 F.3d 145, 166 (2d Cir. 2012) (reversing dismissal of Section 11
claim for failure to allege damages).

172.    To meet their burden, Defendants must offer evidence that disaggregates the
various factors affecting the value of the Certificates.  *See Goldkrantz*, 1999 WL 191540 at *5
(granting summary judgment to defendants on Section 12(b) loss causation defense due to
"failure of plaintiff to contest that the defendants' Event Study Analysis reliably isolates firm
specific price changes and that none of the statistically significant changes are explainable by the
release of information related to the licensing agreements."); *see also NECA-IBEW*, 693 F.3d
at 167 (under Section 11, heightened credit risk resulting from misinformation and lack of
liquidity may both depress a security's price, "but that does not prevent a damages expert from
isolating their respective contributions to a given price decline"); *cf. In re McDermott Int'l., Inc.
Sec. Litig.*, 2009 WL 1010039, *4 (S.D.N.Y. Apr. 13, 2009) (witnesses who "offered to show
loss causation … would have to qualify as experts") (collecting cases).  Moreover, Defendants
must *quantify* the depreciation in the Certificates' caused by factors other than Defendants'
misinformation.  *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730
F.3d 1111, 1120 n.2 (9th Cir. 2013) (under Section 10b, affirming exclusion of plaintiff's loss
causation expert, "not because [he] failed to perform a mathematical study, but because he did
not attempt to quantify the value of the telecom system either at issuance or at sale or relate how
any specific misrepresentations or revelations impacted the value of the system"); *In re
Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (under Section 10b,
"the law requires the disaggregation of confounding factors").

173.    Weighing these considerations, the Court observed that:

> It will be difficult (if not impossible) for the defendants to sustain their burden of showing loss causation without persuasive expert testimony. After all, to make out a successful defense a party must prove not the mere possibility that some other factor caused the plaintiff's loss but rather that all or an identified portion of plaintiff's loss was caused by that other factor.

Feb. 18, 2015 Op. & Order re: Post-Settlement Evidence, Dkt. 1289 ("Post-Settlement Op.") at 10.

174.     In an attempt to make an expert showing, Defendants retained Dr. Kerry Vandell to compare the performance of the loans backing the Certificates to "groups of benchmark loans," *FHFA v. Nomura Holding Am., Inc.* ("Vandell Op."), 2015 WL 539489, at *2 (S.D.N.Y. Feb. 10, 2015).  As the Court explained, one permissible way to conduct this analysis "would have been to re-underwrite a set of loans and to select compliant loans to use as comparators." *Id.* at *6.  Defendants were given an opportunity to take this approach, *id.*, but elected instead to submit Dr. Vandell's analysis, which compared the Mortgage Loans to three purported 'benchmarks' consisting of: (a) the general set of loans in the industry; (b) loans purchased by the GSEs; and (c) loans that FHFA's experts in other Actions, who are not testifying in this Action, did not identify as materially defective.  *Id.* at *2-3.

175.     Dr. Vandell's analysis ultimately foundered on the fact that there is no evidence that any of his three benchmarks "lack[ed] the problems—such as noncompliance with underwriting guidelines and inflated appraisals—that allegedly plagued the loans comprising the SLGs at issue here," *id.* at *2.  The 'industry' benchmark sampled from an industry ripe with fraud; there was no scientific or technical support for Dr. Vandell's theory that loans purchased by the GSEs would be free of material underwriting defects; and FHFA's experts from other cases had not opined that the loans within the re-underwriting benchmark were free of such defects—they merely did *not* opine the loans were infected by such defects, and in any event were not disclosed in this Action and so could not be relied upon by Dr. Vandell, *id.* at *6-8.

176.     Particularly given FHFA's affirmative evidence that none of Dr. Vandell's benchmarks were free of defects, as he assumed, there was no basis to consider Dr. Vandell's testimony based on those benchmarks.  *See id.* at *5 ("[I]t is axiomatic that, when designing an

experiment to test whether an observed result was caused by given variable, the control or benchmark group must lack that variable.").  Thus, Defendants' choice not to underwrite and identify a sample of clean loans for Dr. Vandell's analysis led the Court to exclude his testimony as unreliable under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), as no reliable conclusions could be drawn from his benchmarks contaminated by the variables being measured.  Vandell Op., 2015 WL 539489, at *3-4. Defendants offer no other expert evidence on the subject of loss causation.

177.    Because Defendants offer "no expert analysis," they are unable to sustain their burden of proving a loss causation defense.  *Adair v. Kaye Kotts Associates, Inc.*, 1998 WL 142353, at *6 (S.D.N.Y. Mar. 27, 1998) (Sotomayor, J.) (collecting authorities demonstrating that defense of negative loss causation can seldom be sustained absent expert evidence); *accord*, *e.g.*, *In re Omnicom Grp.*, 541 F. Supp. 2d at 554-55 (in Rule 10b-5 case, granting summary judgment to defendants where plaintiffs' proffered expert disaggregated only some loss factors and "there [was therefore] simply no way for a jury to determine whether the alleged fraud caused any portion of Plaintiff's loss"), *aff'd*, 597 F.3d 501 (2d Cir. 2010); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000) (in Rule 10b-5 case, granting summary judgment to defendants where plaintiff's proffered loss causation expert did not conduct event study or comparable analysis to substantiate plaintiff's allegation that alleged misrepresentations artificially maintained price of security).

178.    Evidence that the Certificates' values declined during the financial crisis of 2008 is insufficient.  Under Section 10(b), the existence of the credit crisis is not enough to defeat a plaintiff's affirmative pleading of loss causation, especially not when defendants' "alleged conduct plausibly caused at least some proportion of plaintiffs' losses." *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343-44 (S.D.N.Y. 2010).  Under Section 12(b), therefore, the mere fact of the financial crisis cannot constitute a showing of negative loss causation.

179. Moreover, Defendants have not disentangled the crisis from their own conduct as factors bearing on the Certificates' losses. Under Section 12(b), Defendants have the burden of showing that the financial crisis was outside of "the zone of risk *concealed* by the misrepresentations and omissions alleged," *Lentell*, 396 F.3d at 172-73, by showing that their conduct in creating and selling the Securitizations did not contribute at all to that crisis. In an unexcluded portion of his testimony, Dr. Vandell argues that factors leading to the housing crises were exogenous from the misrepresentations, FOF Part VII.B, but Dr. Barth presents a compelling counterargument, FOF Part VII.B, such that, absent a reliable means of divining the causes of the Certificates' value declines, Dr. Vandell's views are insufficient to carry Defendants' heavy burden. *See FHFA v. Nomura Holding Am., Inc.*, 2015 WL 629336, at *12 (S.D.N.Y. Feb. 13, 2015) (as Defendants' conduct in issuing the Securitizations was interrelated with the financial crisis, "in the particular factual context of this case, it may not have been an easy task to divide losses caused by the market and those caused by defects in the specific financial instruments.").

180. Finally Defendants cannot salvage a loss causation defense through lay witness testimony, because such testimony is inadmissible. "What ultimately matters for purposes of Section 12 loss causation is not the GSEs' *characterization* of what caused their losses, but rather, what *actually* caused them." *Id.* at *10 (original emphases) (citing *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1102 (9th Cir. 2010) ("[T]he loss causation inquiry assesses whether a particular misstatement actually resulted in loss. It is historical and context-dependent."). Because "no witness directly observed or experienced whatever caused any loss in the value of the Certificates[,]" lay witness testimony directed at the subject "is opinion testimony." Post-Settlement Op., Dkt. 1289, at 6; *accord, e.g.*, *United States v. Riddle*, 103 F.3d 423, 429 (5th Cir. 1997) (when bank examiner "asserted a causal relationship between Riddle's alleged wrongdoing and the ultimate failure of TNB-W …. [h]e did not offer testimony that a lay person would have been able to offer after conducting the examinations"). None of the lay witnesses relied on by Defendants conducted any type of analysis into the causes of the Certificates' value

declines in the course of "carrying out an investigation for his [or her] employer," Post-Settlement Op., Dkt. 1289, at 7, and none were disclosed as experts.  Defendants therefore have not made the "showing" the Court held would be necessary to introduce such testimony.  *Id.* at 9.

181.    Even assuming the lay witness testimony proffered by Defendants were admissible to show loss causation (and it is not), the fact remains that lay testimony on such a subject as complex as the causes of the Certificates' diminution in value is "not very probative," *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*, 646 F. Supp. 2d 385, 400 (S.D.N.Y. 2009) ("the lay opinion of various witnesses that First Union's servicing failure caused the plaintiffs' losses are not very probative.") *aff'd*, 386 F. App'x 5 (2d Cir. 2010).  Thus, even if the opinion testimony offered by Defendants were admissible, it would not sustain their defense.

182.    In sum, Defendants have failed to meet their burden of showing evidence of factors that caused the Certificates' losses other than the misinformation provided by Defendants in the Prospectus Supplements.

## VI.    CONCLUSION

183.    For the reasons set forth above, FHFA has established liability for all of its claims.  The Court's liability determinations as to FHFA's Securities Act claims for each Certificate are summarized below:

| Certificate | Section 12(a)(2) | Section 15 |
|---|---|---|
| **NAA 2005-AR6** | NAAC<br>Nomura Securities | Nomura Holding<br>NCCI<br>Individual Defendants |
| **NHELI 2006-FM1** | NHELI<br>Nomura Securities | Nomura Holding<br>NCCI<br>Individual Defendants |
| **NHELI 2006-FM2** | NHELI<br>RBSSI | Nomura Holding<br>NCCI<br>Individual Defendants |
| **NHELI 2006-HE3** | NHELI<br>RBSSI | Nomura Holding<br>NCCI<br>Individual Defendants |
| **NHELI 2007-1** | NHELI,<br>RBSSI | Nomura Holding<br>NCCI<br>Individual Defendants |
| **NHELI 2007-2** | NHELI<br>RBSSI | Nomura Holding<br>NCCI<br>Individual Defendants |
| **NHELI 2007-3** | NHELI | Nomura Holding<br>NCCI<br>Individual Defendants |

184.    The Court's liability determinations as to FHFA's Blue Sky claims for each

relevant Certificate are summarized below:

| Certificate | D.C. Code<br>§ 31-5606.05(a)(1)(B) | D.C. Code<br>§ 31-5606.05(c) | Va. Code<br>§ 13.1-522(A)(ii) |
|---|---|---|---|
| **NAA 2005-AR6** | NAAC<br>Nomura Securities | Nomura Holding<br>NCCI<br>Findlay<br>Graham<br>Gorin<br>McCarthy | -- |
| **NHELI 2006-FM2** | -- | -- | RBSSI |
| **NHELI 2007-1** | -- | -- | RBSSI |
| **NHELI 2007-2** | -- | -- | RBSSI |

185.    For each of FHFA's claims under Section 12(a)(2) (15 U.S.C. § 77*l*(a)(2)),

D.C. Code § 31-5606.05(a)(1)(B), and Va. Code § 13.1-522(A)(ii), each Defendant found liable

is individually responsible to FHFA for the whole of FHFA's damages.  For each of FHFA's

claims under Section 15 (15 U.S.C. § 77*o*) and D.C. Code § 31-5606.05(c), each Defendant is jointly and severally liable with the primary violator or violators to the same extent as the primary violator or violators.

186.    For each Certificate for which liability has been established under both a Blue Sky statute and the Securities Act, FHFA may elect between remedies. *E.g.*, *Gap Stores*, 79 F.R.D. at 307 ("[I]t is reasonable to assume that the plaintiff may pursue both remedies to judgment, electing his choice at the last possible moment."). FHFA's recovery for the Certificates shall be determined as of the date of constructive tender, September 2, 2011, and prejudgment interest shall be awarded at the IRS underpayment rate for large corporate underpayments for FHFA's Section 12(a)(2) claims and at 6% for FHFA's Blue Sky claims. Within seven days, FHFA shall submit a statement as to the election of its remedies as to each Certificate.

187.    Post-judgment interest shall be awarded to FHFA pursuant to 28 U.S.C. § 1961. *See STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC,* 648 F.3d 68, 83 (2d Cir. 2011).

188.    Within 14 days, the parties shall make post-trial submissions regarding the amount of costs and reasonable attorneys' fees arising from this Action. *See* Va. Code § 13.1-522(A)(ii); D.C. Code. § 31-5606.05(b)(1)(A).

DATED:  New York, New York
        February 20, 2015

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By:   /s/ Philippe Z. Selendy
      Philippe Z. Selendy
      Richard I. Werder, Jr.
      Jonathan B. Oblak
      Sascha N. Rand
      Manisha M. Sheth
      Andrew R. Dunlap
      51 Madison Avenue, 22nd Floor
      New York, New York 10010

      Richard A. Schirtzer
      865 South Figueroa Street, 10th Floor
      Los Angeles, California 90017

      Jon Corey
      777 6th Street NW, 11th Floor
      Washington, D.C. 20001

      *Attorneys for Plaintiff Federal Housing
      Finance Agency*