UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>　　　　　　　Plaintiff,<br><br>　　　　　-against-<br><br>NOMURA HOLDING AMERICA, INC.; NOMURA ASSET ACCEPTANCE CORPORATION; NOMURA HOME EQUITY LOAN, INC.; NOMURA CREDIT & CAPITAL, INC.; NOMURA SECURITIES INTERNATIONAL, INC.; RBS SECURITIES INC. (F/K/A GREENWICH CAPITAL MARKETS, INC.); DAVID FINDLAY; JOHN MCCARTHY; JOHN P. GRAHAM; NATHAN GORIN; AND DANTE LAROCCA,<br><br>　　　　　　　Defendants. | No. 11 Civ. 6201 (DLC) |

**PLAINTIFF FHFA'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN EXPERT TESTIMONY AND OPINIONS OF KERRY D. VANDELL AND TIMOTHY J. RIDDIOUGH**

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Philippe Z. Selendy
Sascha N. Rand
Wing F. (Alex) Ng

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing Finance Agency, as Conservator for Fannie Mae and Freddie Mac*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...................................................................................................................................2

    A.    Dr. Vandell Has Not Established That His Purported Industry And GSE "Benchmarks" Are Reliable.......................................................................................2

        1.    Defendants Concede That the Industry and GSE Benchmarks Are Not Free of Underwriting Defects. ............................................................3

        2.    Defendants Cannot Escape Their Burden of the Negative Loss Causation Analysis by Disagreeing with Dr. Saunders' Well-Supported Opinions. ................................................................................5

        3.    Defendants Made Their Own Bed by Choosing Not to Reunderwrite an Alternative Set of Loans....................................................8

    B.    The Reunderwriting Benchmark Should Also Be Excluded. .................................9

    C.    Dr. Riddiough's Loss Causation Damages Calculation Has No Basis Separate From Dr. Vandell's Flawed Benchmarking Analysis. ...........................10

CONCLUSION..............................................................................................................................10

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Akerman v. Oryx Commc'ns, Inc.*,
  810 F.2d 336 (2d Cir. 1987)..................................................................................................2

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)..................................................................................................8

*J.T. Colby & Co. v. Apple, Inc.*,
  2013 WL 1903883 (S.D.N.Y. May 8, 2013) .........................................................................3

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*,
  2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007).......................................................................10

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004)...................................................................................9

*United States v. Williams*,
  506 F.3d 151 (2d Cir. 2007)..................................................................................................2

## Statutes

Fed. R. Evid. 403 .........................................................................................................................3

Fed. R. Evid. 702 ......................................................................................................................3, 5

## Other Authorities

Tomasz Piskorski, Amit Seru and James Witkin, "*Asset Quality Misrepresentation by Financial Intermediaries: Evidence from RMBS Market*," Columbia Business School Research Paper No. 13-7 (February 12, 2013) ..........................................................6, 8

John M. Griffin and Gonzalo Maturana, "*Who Facilitated Misreporting in Securitized Loans?*" (December 20, 2013)...............................................................................................6, 8

Gene Amromin & Anna L. Paulson, "Comparing patterns of fault among prime and subprime mortgages," 33 Economic Perspectives (2009) .........................................................6

Yuliya Demyanyk & Otto Van Hemert, "Understanding the Subprime Mortgage Crisis," 24 The Review of Financial Studies (2011) ...................................................................6

Paul Calem, Christopher Henderson & Jonathan Liles, "'Cherry picking' in subprime mortgage securitizations: Which subprime mortgage loans were sold by depository institutions prior to the crisis of 2007?" 20 Journal of Housing Economics (2011) .............................................................................................................6

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator for the Federal National Mortgage Association ("Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie" and, collectively with Fannie Mae, the "GSEs") respectfully submits this reply memorandum in support of its Motion to Exclude Certain Expert Testimony and Opinions of Kerry D. Vandell and Timothy J. Riddiough.

## PRELIMINARY STATEMENT

In its opening brief, FHFA showed that the benchmarking analysis of Defendants' proffered expert, Dr. Kerry Vandell, is fundamentally unreliable because he simply assumed—and never established—that the loans underlying the benchmarks were free from underwriting defects.  *See* Plaintiff FHFA's Memorandum of Law in Support of Its Motion to Exclude Certain Expert Testimony and Opinions of Kerry D. Vandell and Timothy J. Riddiough ("FHFA Br.") 1-3.  Without valid benchmarks, Dr. Vandell cannot reliably measure the impact of the alleged misrepresentations on loan performance.  *Id.*

Defendants' opposition brief concedes, as it must, that Dr. Vandell did nothing to ensure that his Industry and GSE Benchmarks were cleansed of defective loans.  *See* Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Exclude Certain Expert Testimony and Opinions of Dr. Kerry D. Vandell and Dr. Timothy J. Riddiough ("Opp.") 10.  And Defendants offer no basis for this Court to conclude, notwithstanding Dr. Vandell's critical, admitted failure to ensure clean "benchmarks," that Dr. Vandell's testimony might somehow still be reliable.  The make-weight arguments that Defendants instead advance are self-evidently inadequate:  for example, that the benchmarks do not have to be 100% free from defects, that Dr. Vandell did remove at least the loans at issue in the FHFA Actions, and that Dr. Vandell lacked the data to reunderwrite the loans in the GSE Benchmark.  Nor can Defendants deflect attention from Dr. Vandell's flawed methodology by attacking the well-supported opinions of

1

FHFA's expert, Dr. Anthony Saunders, who relied on his experience and economic evidence from academic studies, repurchases, and settlements to conclude that these "benchmarks" are likely replete with underwriting defects and unreliable for Dr. Vandell's comparative purpose.

Defendants' Reunderwriting Benchmark is similarly unreliable.  While experts may rely on inadmissible evidence "if experts in the field reasonably rely on such evidence in forming their opinions," as Defendant state (Opp. 21-22), an expert such as Dr. Vandell—who admittedly has no reunderwriting experience—may not "reasonably rely on" and interpret reunderwriting reports submitted in other cases by experts who did not testify in such matters and will not testify here.  Simply put, Dr. Vandell lacks the expert qualifications to testify at trial about the reliability of a patched-together "benchmark" built on his interpretation of the findings of non-testifying re-underwriting experts regarding loans not at issue in this Action.

Last, Defendants' proffered damages expert, Dr. Timothy Riddiough, relied on Dr. Vandell's Industry Benchmark to calculate purported loss causation damages.  If Dr. Vandell's purported benchmarks are unreliable, so too is Dr. Riddiough's loss causation damages calculation, and both should be excluded at trial.

## ARGUMENT

### A. Dr. Vandell Has Not Established That His Purported Industry And GSE "Benchmarks" Are Reliable.

Defendants bear the burden of establishing reliable benchmarks to attempt any non-speculative proof of their "heavy burden" of negative loss causation.  *See Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987); *see also United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (noting that the proponent of expert testimony bears the burden of establishing admissibility by a preponderance of the evidence).  Defendants' opposition brief concedes each of the points dictating preclusion.

### 1.  Defendants Concede That the Industry and GSE Benchmarks Are Not Free of Underwriting Defects.

Defendants concede that Dr. Vandell has no reliable basis upon which to assume that the Industry and GSE Benchmarks are free of underwriting defects.  Opp. 10.  Defendants contend that "[t]here is no requirement that the benchmarks be 100% 'free' from Alleged Defects," but they provide no support for this claim other than Dr. Vandell's say-so, and, more importantly, no quantification of the extent of the defects in the "benchmarks."  Opp. 10, 13 (citing Dr. Vandell).  Where an indeterminate part of a control group contains the very characteristics whose impact is being analyzed, the whole analysis is unreliable and subject to exclusion.  *See J.T. Colby & Co. v. Apple, Inc.*, 2013 WL 1903883, at *22-23 (S.D.N.Y. May 8, 2013) (Cote, J.) (excluding expert's consumer confusion report and survey under Rule 702 and 403 because the survey failed to "employ an adequate control" that would "account for or rule out confusion that is caused by factors other than the defendant's infringing conduct").

For his "Industry Benchmark," in an acknowledgment that loans with defects should be removed from control populations, Dr. Vandell did remove at least the loans at issue in the FHFA Actions.  Opp. 4.  Dr. Vandell, however, just stopped there.  He did nothing to test whether the rest of the Industry Benchmark loans also contain underwriting defects.  Defendants point to Dr. Vandell's use of "filters and adjustments" (Opp. 11), but that was intended to address an entirely separate problem:  the attempted selection of loans with comparable characteristics, such as FICO score and loan-to-value ratios, and *not* the removal of defective loans from the benchmarks.  Defendants misleadingly assert that "Dr. Vandell identified no evidence that loans of these types were not originated generally in accordance with originator underwriting guidelines."  Opp. 11.  This is a *non sequitur*.  Dr. Vandell could not have identified any such evidence because (despite the Court's invitation) neither Defendants nor

3

Dr. Vandell took *any* steps to reunderwrite loans in the benchmarks or otherwise to test the unwarranted assumption that the benchmarks were "clean."[1]

For the GSE Benchmark, Dr. Vandell did not remove any defective loans. Defendants argue that Dr. Vandell could not commission a reunderwriting of these loans due to the lack of information, and that the loans should be presumed reliable because of the GSEs' "industry experience, quality control processes, and written assurances as to loan quality." Opp. 12. These excuses and presumptions cannot cure Dr. Vandell's fundamental methodological failure. The fact is that, ignoring ample economic evidence to the contrary, Dr. Vandell assumed his "benchmark" was clean without ever doing anything to test this critical point. Yet, as reflected in the opinion of FHFA's expert, Dr. Anthony Saunders, a substantial number of loans purchased by the GSEs were repurchased or covered by settlements, *see* FHFA Br. 7-8, an inconvenient fact that undermines Dr. Vandell's premise that the benchmark is free of defective loans.

The declaration submitted by Dr. Vandell in support of Defendants' Opposition does not shore up his defective analysis. There, Dr. Vandell asserts that: "For my benchmarks to be appropriate baselines against which to measure whether the Alleged Defects caused any losses to Freddie Mac and Fannie Mae, it is not necessary that they be *100%* 'free from underwriting defects' or that I exclude the possibility that '*one* loan is defective.'" Declaration of Kerry D. Vandell, Ph.D. ("Vandell Decl.") ¶ 5 (emphasis added). This artfully worded statement again presumes what Dr. Vandell does not know: namely, the extent of the defects in his benchmarks. While a defect in "*one* loan" out of thousands may or may not be insurmountable, the problem is

---

[1] Realizing part of his error, Dr. Vandell subsequently removed the loans in the securitizations identified by Dr. Saunders that were subject to litigation settlements. Opp. 13. This belated step is insufficient to show that the Industry Benchmark is free of defective loans. As several peer-reviewed academic articles report – unrebutted by Defendants – there is evidence of widespread misrepresentations throughout the RMBS space. *See* FHFA Br. 7.

4

that neither Dr. Vandell nor this Court have any reliable estimate of the extent of the unmeasured and unquantified defects in Dr. Vandell's supposed "benchmarks." Accordingly, Dr. Vandell has no "control" population upon which to ground his analysis.

Dr. Vandell further states, without any academic or analytical support, that "if there were any remaining loans in these benchmarks with Alleged Defects, they would not have had any *appreciable impact* on the results of the regression models estimated using the benchmarks—and as a result, would have had no impact on my opinions." Vandell Decl. ¶ 6 (emphasis added). Yet despite the *ipse dixit*, Dr. Vandell cannot quantify the "impact" of *actual* defect rates on his regressions because he has no knowledge of the number of "remaining loans" that are defective. That is a direct consequence of Defendants' deliberate election not to reunderwrite or otherwise test the "benchmarks" for actual defect rates. Dr. Vandell's declaration, therefore, cannot salvage his Industry and GSE Benchmarks or his unreliable opinion.

### 2. Defendants Cannot Escape Their Burden of the Negative Loss Causation Analysis by Disagreeing with Dr. Saunders' Well-Supported Opinions.

In a transparent effort to deflect attention from Dr. Vandell's fatally flawed methodology, Defendants moved to exclude the testimony of Dr. Saunders on January 8, 2015. *See* Plaintiff FHFA's Memorandum in Opposition to Defendants' Motion to Exclude the Testimony of Dr. Anthony Saunders (filed January 23, 2015) ("Saunders Opp.") 1. Defendants attempt the same tactic here. But it is Defendants who bear the burden of proving negative loss causation and it is Defendants who must establish that Dr. Vandell's benchmarking analysis is reliable under Federal Rule of Evidence 702. Not only do Defendants' attacks on Dr. Saunders miss the mark, they do nothing to reverse this heavy burden.

*First*, Dr. Saunders relied on five academic articles that each provide evidence that Dr. Vandell's benchmarks are unreliable. *See* Saunders Opp. 5-7. Defendants fault these articles

5

because they allegedly "do not relate at all to whether loans were originated generally in accordance with originator underwriting guidelines." Opp. 14. But Defendants' criticism ignores the obvious: FHFA alleged owner-occupancy misrepresentation, in addition to the misrepresentations about compliance with underwriting guidelines and loan-to-value ratios. Thus, the Piskorski and Griffin Articles[2]—where the authors found evidence of misreporting of owner-occupancy as well as other misrepresentations—are directly relevant to the allegations in this Action. *See* Rebuttal Report of Anthony Saunders, dated November 10, 2014 ("Saunders Rpt.") 10-13 (Declaration of Wing F. Ng in Support of Plaintiff FHFA's Motion to Exclude Certain Expert Testimony and Opinions of Kerry D. Vandell and Timothy J. Riddiough ("Ng Decl.") Ex. 3).

Defendants next question Dr. Saunders' reliance on three articles (the Amromin, Demyanyk, and Calem Articles) (Wolfe Decl. Exs. 18-20) that provide "indirect evidence" that Dr. Vandell's benchmarks are unreliable. Opp. 15. The three articles analyze the performance of distinct groups of loans, and each finds that the actual performance is worse than expected based on the reported characteristics—suggesting that the loan attributes were not as represented. Saunders Opp. 7-8. As Dr. Saunders testified, the results are "consistent with defects" in the underlying loans. Deposition of Anthony Saunders ("Saunders Dep.") 126:6-20 (Wolfe Decl. Ex. 21). This is a proper usage of the same approach that Dr. Vandell attempts in his own flawed analysis (using differences in actual and expected performance as a measure of the impact of

---

[2] Tomasz Piskorski, Amit Seru and James Witkin, "Asset Quality Misrepresentation by Financial Intermediaries: Evidence from RMBS Market," Columbia Business School Research Paper No. 13-7 (February 12, 2013) ("Piskorski Article") (Declaration of Owen R. Wolfe in Opposition to Plaintiff's Motion to Exclude Certain Expert Testimony and Opinions of Dr. Kerry D. Vandell and Dr. Timothy J. Riddiough ("Wolfe Decl.") Ex. 16); John M. Griffin and Gonzalo Maturana, "Who Facilitated Misreporting in Securitized Loans?" (December 20, 2013) ("Griffin Article") (Wolfe Decl. Ex. 17).

6

alleged misrepresentations).  The problem for Defendants is that (1) Dr. Saunders does not repeat Dr. Vandell's error of using faulty benchmarks, and (2) the actual data contradict Dr. Vandell's opinion that the alleged misrepresentations had little to no impact on the performance of the at-issue loans.  *See* Saunders Opp. 7-8.

*Second*, Defendants urge the Court to infer, from the absence of admissions of guilt in the litigation settlements, that in fact the loan populations in dispute must have been clean.  Opp. 16.  This specious argument has no basis in reality; as Defendants well know, defendants rarely admit to guilt or liability in civil settlements, and the incontrovertible fact of large payments suggests, at the least, the prospect of problems.  *See* Saunders Rpt. 19 (loans in Industry Benchmark involved in settlements have resulted in recoveries of more than $28.4 billion by plaintiffs).  Together with the academic articles showing widespread misrepresentations in the RMBS industry and Dr. Vandell's admitted failure to take real steps to ensure clean benchmarks, the litigation settlements further corroborate that the control "benchmarks" are likely littered with defective loans.

*Third*, Defendants' entire argument (Opp. 16-18) about repurchases of loans in the GSE Benchmark can be disregarded because it ignores the number of loans covered by settlements.  FHFA Br. 7-8.  As discussed in the Saunders Report, 73.41% and 25.86% of whole loans purchased by Fannie Mae and Freddie Mac, respectively, were either covered by settlement agreements or repurchased by originators.  Saunders Rpt. 20.  Thus, Defendants wholly fail to engage FHFA's showing that the GSE Benchmark likely included a significant number of defective loans.  *See* FHFA Br. 7-8.

### 3. Defendants Made Their Own Bed by Choosing Not to Reunderwrite an Alternative Set of Loans.

Defendants had the opportunity under the scheduling order issued by this Court to create a valid benchmark by reunderwriting an "alternative set of loans."[3] Defendants chose not to do so. To excuse this failure, Defendants now curiously argue that no one else did either. Specifically, Defendants contend that none of the academic articles relied on by Dr. Saunders and others that Defendants found (Opp. 18) use a reunderwriting sample. But the authors in these articles do not have the burden of proving negative loss causation, nor are they trying to isolate the effects of the alleged misrepresentations in this Action. Moreover, certain of these articles identify defects and measure their impact in ways that Dr. Vandell did not.[4]

Finally, Defendants argue that FHFA's criticisms of Dr. Vandell "at most" go to the weight, not admissibility, of his testimony. *See* Opp. 20-21. Not so. We are not dealing with minor flaws in an expert methodology. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (while a "minor flaw" in an expert's reasoning will not automatically result in exclusion, "if the flaw is *large enough* that the expert lacks 'good grounds' for his or her conclusions," exclusion is warranted) (emphasis added). The flaw in Dr. Vandell's benchmark methodology is not only "large enough" but fundamental: by failing to remove, quantify, or otherwise test for the defective loans in his benchmarks, Dr. Vandell utterly fails to establish "clean" control populations for his comparative tests. This flaw defeats the whole purpose of the

---

[3] *See* Supp. Expert Scheduling Order (Feb. 27, 2013) at ¶ 9 (specifying date for disclosure of "whether [Defendant] intends to make use of any alternative set of loans for purposes other than those set forth above" and precluding reliance on loans "not so disclosed to FHFA.") (Dkt. No. 271).

[4] For example, in the Piskorski Article, the authors compare the data represented to investors against data on consumer credit files from Equifax as a way to identify a sample of misrepresented loans. Piskorski Article at 2; *see also* Griffin Article at 1 (for example, "examin[ing] cases where loan-level MBS data indicates that a house is owner occupied, and yet county-level data shows that the tax records are sent to a different, non-business address.").

8

benchmarking analysis, and the results necessarily conflate (to an indeterminate degree) the effects of misrepresentations with that of other unrelated factors. Thus the entire analysis is unreliable, and the Industry and GSE Benchmarks should be precluded.

**B.     The Reunderwriting Benchmark Should Also Be Excluded.**

Dr. Vandell patched together the Reunderwriting Benchmark by drawing on loans from six FHFA Actions, based on the reports issued by three of FHFA's experts, two of whom are not experts in this Action, did not testify in the prior actions in which their reports were issued, and will not be testifying at trial in this Action. *See* FHFA Br. 11-13. Although expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably and routinely rely on such evidence (Opp. 21-22), there is no precedent for the proposition that an expert in one field (here, econometrics) may blindly rely on reports in other cases issued by other experts who did not testify. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 561-62 (S.D.N.Y. 2004) (expert's reliance on an unpublished report "does not comport with Rule 703" because the offering party failed to show that such a report was of a type reasonably relied upon by experts in the particular field). The unreliability of the Reunderwriting Benchmark is particularly glaring because Dr. Vandell has no reunderwriting experience and therefore lacks the relevant expertise to assess whether his selection of loans is appropriate and whether his interpretation is even logical. *See* FHFA Br. 6. As noted in FHFA's opening brief, Dr. Vandell's reliance on the reunderwriting reports of other experts in other cases, with no context of trial testimony, raises a host of questions that he is both unable and unqualified to answer, and will be unable to answer at trial. *See* FHFA Br. 12-13. To avoid unnecessary delay, prejudice and confusion, Dr. Vandell's unreliable Reunderwriting Benchmark should be precluded.

### C. Dr. Riddiough's Loss Causation Damages Calculation Has No Basis Separate From Dr. Vandell's Flawed Benchmarking Analysis.

Last, Defendants contend that Dr. Riddiough's opinions on loss causation damages are still admissible even if Dr. Vandell's opinions and testimony regarding the Industry Benchmark are excluded. Opp. 23-24. Defendants misread their own expert's report. Although Dr. Riddiough states in introductory paragraphs of his report that he "incorporate[s]" Dr. Vandell's loss causation analysis, *see* Rebuttal Expert Report of Timothy J. Riddiough, dated November 7, 2014 ("Riddiough Rpt.") 8 (Ng Decl. Ex. 6), Dr. Riddiough's actual loss causation damages calculation relies directly on the Industry Benchmark, *see id.* §VIII ("Calculation of Loss Causation Damages") (stating that he "obtained from Professor Vandell's backup the codes of his Industry Benchmark regression analysis" and "use[d] the estimated parameters of Professor Vandell's Industry Benchmark regression model to calculate the expected (or 'but-for') default and serious delinquency probability and prepayment probability"). Accordingly, if the Industry Benchmark is excluded, Dr. Riddiough has no valid basis to calculate his loss causation damages, and his opinion on the subject should be excluded. *See Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 WL 2258688, at *12-13 (S.D.N.Y. Aug. 6, 2007) (excluding damages expert reports as "irrelevant and thus inadmissible" because they were "predicated entirely" on the findings of an expert survey and testimony separately held inadmissible).

### CONCLUSION

For the reasons stated above, FHFA respectfully requests that the Court grant its motion to exclude certain expert testimony and opinions of Dr. Vandell and Dr. Riddiough.

DATED:  February 2, 2015
        New York, New York

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By: /s/ Philippe Z. Selendy
    Philippe Z. Selendy
    Sascha N. Rand
    Wing F. (Alex) Ng

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000