UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE
AGENCY, AS CONSERVATOR FOR THE
FEDERAL NATIONAL MORTGAGE
ASSOCIATION AND THE FEDERAL
HOME LOAN MORTGAGE
CORPORATION,

               Plaintiff,

        v.

NOMURA HOLDING AMERICA, INC.;
NOMURA ASSET ACCEPTANCE
CORPORATION; NOMURA HOME
EQUITY LOAN, INC.; NOMURA
CREDIT & CAPITAL, INC.; NOMURA
SECURITIES INTERNATIONAL, INC.;
RBS SECURITIES INC. (f/k/a
GREENWICH CAPITAL
MARKETS, INC.); DAVID FINDLAY;
JOHN MCCARTHY; JOHN P. GRAHAM;
NATHAN GORIN; and DANTE
LAROCCA,

               Defendants.

**11 Civ. 6201 (DLC)**

---

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO EXCLUDE THE
<u>TESTIMONY OF DEFENDANTS' EXPERT JOHN J. RICHARD</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................1

BACKGROUND .........................................................................................................3

ARGUMENT ..............................................................................................................5

I.  THE COURT SHOULD EXCLUDE MR. RICHARD'S OPINIONS REGARDING
    FANNIE MAE AND FREDDIE MAC ...................................................................6

    A.  Mr. Richard Is Not Qualified to Opine Regarding Fannie Mae or Freddie
        Mac's Purchase of the Seven Certificates at Issue or HUD Housing Goals.............6

    B.  Mr. Richard's Opinions Regarding the GSEs Are Irrelevant ....................................7

        1.  Mr. Richard's Opinions Regarding Housing Goals Are Inadmissible ..........7

        2.  Mr. Richard's Opinions Regarding the GSEs' PLS Purchase
            Processes and Comparison to Other Investors Processes Are
            Irrelevant ....................................................................................................8

        3.  GSE Post-Settlement Purchase Processes Are Irrelevant .............................9

    C.  Mr. Richard's Opinions Would Inject Into the Trial the Issue of Reliance
        and May Lead the Jury to Blame the GSEs for Their Losses ..................................10

II. MR. RICHARD'S OPINIONS REGARDING ALL PLS INVESTORS AND THE
    PLS MARKET SHOULD BE EXCLUDED ......................................................................11

    A.  Mr. Richard Is Not Qualified to Render Any General PLS Investor Opinion..........11

        1.  Mr. Richard's Narrow Experience Does Not Qualify Him to Opine
            What All PLS Investors Considered When Purchasing PLS .......................11

        2.  Mr. Richard Has No Knowledge About Other PLS Investors.....................13

    B.  No Facts Or Data Support Mr. Richard's PLS Investor Opinions............................14

    C.  Mr. Richard's Generalizations About PLS Investors Are Not Reliable ..................15

    D.  Mr. Richard's Opinion That Each Investor's PLS Purchase Considerations
        Were Subjective Will Not Help the Jury Determine Whether Defendants'
        Misrepresentations Were Material ..........................................................................19

III. MR. RICHARD'S CRITICISMS OF FHFA EXPERTS RUBINSTEIN, BLUM,
     AND SCHWERT ARE NEITHER RELEVANT NOR PROPER ......................................21

i

CONCLUSION ........................................................................................................................22

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013) ................................................................................... 8, 9

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*,
    480 F.2d 341 (2d Cir. 1973) ............................................................................. 19

*Daubert v. Merrell Dow Pharm.*,
    509 U.S. 579 (1993) ..................................................................................... 6, 14

*Falcon v. State Farm Lloyds*,
    12-cv-491, 2014 WL 2711849, at *6-10 (W.D. Tex. June 16, 2014) ................................. 13

*FHFA v. HSBC Holdings. Am., Inc.*,
    --- F. Supp. 3d ---, 2014 WL 32702587, at *20 (S.D.N.Y. July 25, 2014) ......................... 10

*FHFA v. JPMorgan Chase & Co.*,
    No. 11-Civ-6188, 2012 WL 6000885, at *6 (S.D.N.Y. Dec. 3, 2012) ..................... 6, 14, 15

*FHFA v. Nomura Holding Am., Inc.*,
    2014 WL 7229361, at *3 (S.D.N.Y. Dec. 18, 2014) ................................................. passim

*FHFA v. UBS Ams. Inc.*,
    2013 WL 3284118, at *13, *23 (S.D.N.Y. June 28, 2013) ........................................... 8, 22

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ............................................................................. 10

*Gen. Elec. Co. v Joiner*,
    522 U.S. 136 (1997) ....................................................................................... 15

*Gray v. Briggs*,
    45 F. Supp. 2d 316 (S.D.N.Y. 1999) ..................................................................... 7

*Highland Capital Mgmt., L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005) ............................................................... 7, 19

*In re Brittania Bulk Holdings*,
    665 F. Supp. 2d at 413 ................................................................................. 19, 22

*In re Elec. Books Antitrust Litig.*,
    No. 11 MD 2293, 2014 WL 1282298, at *7 (S.D.N.Y. Mar. 28, 2014) ........................... 10

*In re ICN/Viratek Sec. Litig.*,
    No. 87 Civ. 4296, 1996 WL 34448146, at *3-4 (S.D.N.Y. July 15, 1996) ..................... 8, 19

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 593 F. Supp. 2d 549, 564 (S.D.N.Y. 2008) ............................................................................................................................. 22

*In re Puda Coal Litig.*,
    --- F. Supp. 2d ---, 2014 WL 2915880, at *15 (S.D.N.Y. June 26, 2014) ................. 6, 7, 19

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02 Civ. 3288, 2005 WL 408137, at *5 (S.D.N.Y. Feb. 22, 2005) ................................. 8

*Int'l Brotherhood of Teamsters v. United States*,
    431 U.S. 324 (1970) ................................................................................................................. 15

*Krause v. CSX Transp.*,
    984 F. Supp. 2d 62 (S.D.N.Y. 2013) ................................................................................ 7, 19

*Kumho Tire Co.  Carmichael*,
    526 U.S. 137, 152 (1999) ....................................................................................................... 15

*McIntire v. China MediaExpress Holdings, Inc.*,
    --- F. Supp. 2d ---, 2014 WL 4049896, at *7 (S.D.N.Y. Aug. 15, 2014) ........................... 14

*N.J. Carpenters Health Fund v. RBS*,
    709 F.3d 109 (2d Cir. 2013) .......................................................................................... 3, 8, 19

*Riegel v. Medtronic, Inc.*,
    451 F.3d 104 (2d Cir. 2006) .................................................................................................. 15

*SEC v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) .......................................................................... 6, 12, 13

*United States v. Jacques*,
    784 F. Supp. 2d 59 (D. Mass. 2011) ..................................................................................... 13

*United States v. Williams*,
    506 F.3d  151 (2d Cir. 2007) ................................................................................................. 15

## **STATUTES**

15 U.S.C. § 77k ............................................................................................................................. 10

Fed. R. Evid. 402 ...................................................................................................................... 7, 19

Fed. R. Evid. 403 .......................................................................................................................... 10

Fed. R. Evid. 702 ........................................................................................................... 5, 6, 11, 13

Fed. R. Evid. 702(a) ................................................................................................................... 7, 19

Fed. R. Evid. 702(b) ..................................................................................................................... 14

Fed. R. Evid. 702(c) ................................................................................................................ 15, 19

**OTHER AUTHORITIES**

Adam Ashcraft, Paul Goldsmith-Pinkham & James Vickery, *MBS Ratings and the Mortgage Credit Boom* 8 (Fed. Reserve of N.Y., Staff Report no. 449, May 2010)........... 17

Allen Ferrel, Jennifer E. Bethel & Gang Hu, *Legal and Economic Issues in Litigation Arising from the 2007-2008 Financial Crisis* 14 (Harvard John M. Olin Ctr. for Law, Econ., and Bus., Discussion Paper, Nov. 2008), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1096582 ............................................. 12

Ambac Fin. Grp., Inc., Annual Report 30-31 (10-K) (Mar. 1, 2006), *available at* http://ir.ambac.com/sec.cfm?SortOrder=Type%20Ascending&DocType=&DocTyp eExclude=&Year=&FormatFilter=&CIK= ........................................................................ 18

Fabozzi, Frank J., ed., *The Handbook of Mortgage-Backed Securities* at 719-756.(6th ed. 2006) ........................................................................................................................... 18

Financial Crisis Inquiry Commission, *The Financial Crisis Inquiry Report* 228........................... 12

Securities Industry and Financial Markets Association (SIFMA), "US Non-agency CMBS and RMBS Outstanding," file sf-us-nonagency-outstanding-sifma.xls, *available at* http://www.sifma.org/research/statistics.aspx ..................................................................... 11

SIFMA, "MBS Fact Sheet" 3 (2001), *available at* http://www.sifma.org/issues/item.aspx?id=8589934849..................................................... 12

U.S. Dep't of Treasury, OFHEO, and the SEC, Task force on Mortgage-Backed Securities Disclosure, Staff Report, *Enhancing Disclosure in the Mortgage-Backed Securities Market* 7 (Jan. 2003), *available at* http://www.treasury.gov/resource-center/fin-mkts/Documents/disclosure.pdf ........................................................................................ 12

**PRELIMINARY STATEMENT**

Defense expert John J. Richard devotes most of his report to explaining what Defendants described as "the unique position of Fannie Mae and Freddie Mac and what factors drove their [PLS] purchases."  Defs.' Opp'n to Pl.'s Mot. in Limine No. 3 at 5; *see* Ex. 1 ¶¶ 18, 64-151 & App'x C.  Defendants want the jury to hear "the reasons Freddie Mac and Fannie Mae purchased" the Certificates as "background and context," and as proof relevant to materiality because "institutional goals or requirements that informed [the GSEs'] investment decisions . . . are relevant to what a 'reasonable investor' would have considered important in context."  *See* Defs.' Opp'n to Pl.'s Mot. in Limine No. 3 at 4, 5.  The Court rejected both lines of argument in its Order excluding housing goals evidence, ruling Defendants "have offered no reason the GSEs' motivations in purchasing the Certificates are relevant here," and that materiality is "an objective standard, determined with reference to a reasonable PLS trader—not a reasonable GSE." *FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7229361, at *3 (S.D.N.Y. Dec. 18, 2014) (internal citation omitted).  By this same reasoning, FHFA respectfully requests that the Court exclude Mr. Richard's GSE-specific opinions regarding the unique position of the GSEs and what factors drove their PLS purchases.

Independently, Mr. Richard is not qualified to offer GSE-specific opinions.  He admitted he was not a GSE or affordable housing policy expert.  His interaction with the GSEs before this case consisted of casual conversations (not recalled) at an industry conference (unidentified) with employees of Freddie Mac or Fannie Mae (whom he cannot recall) who may or may not have had PLS responsibilities, and inferences he claims to have drawn from observing GSE PLS purchases (again unidentified).  The GSE-specific portion of his report is an impermissible, defense-slanted factual narrative.  Most of that narrative focuses on the GSEs' conduct after each purchased their last Certificate.  If the Court permits these GSE-specific opinions, then Defendants will improperly introduce questions about the GSEs' reliance on Defendants' misrepresentations and invite error by leading the jury to blame the GSEs for their losses.

1

Additionally, Mr. Richard is not qualified to render general opinions regarding growth drivers of the PLS market (¶¶ 21-23); increasing PLS investor sophistication, specialization, segmentation, and structuring (¶¶ 24-33); or what all PLS investors considered when they purchased PLS between 2005 and 2007 (¶¶ 34-63).  His experience as a co-portfolio manager in Boston following a narrow, client-directed liquidity strategy in a handful of minor accounts (with less than 20% PLS) do not make him an expert in those topics.  He neither conducted nor relied upon post-2007 analysis or education regarding the PLS market between 2005 and 2007.  His only knowledge on these topics derives from his narrow experience and vague recollections of casual conversations with unnamed industry colleagues at unidentified conferences and roadshows.

The Court should exclude Mr. Richard's opinions about the PLS market and PLS investors because no facts support them.  He admitted a lack of knowledge about other PLS investors— "*I don't know specifically what they were doing*"—and disclaimed any obligation to support his opinions with facts—"I don't think I needed to go embark on a factfinding [sic] mission in terms of who was specifically doing what during 2007 or 2005."  Rather than rely on facts, Mr. Richard built his opinions on the unsupported and demonstrably false assumption that all PLS investors between 2005 and 2007 approached potential PLS purchases as he did.  Extrapolating to all PLS investors from a sample of one—his dated memories—is facially unreliable.

Mr. Richard's opinions, even if found reliable, would not assist the jury.  The jury must decide whether the misrepresentations were material to a reasonable PLS trader.  Mr. Richard ignores this objective measure, and he rejects the concept of the "reasonable investor."  According to him, no "reasonable investor" exists because all PLS investors were unique, with differing investment strategies and risk tolerances, and each held subjective views of the relative importance of criteria considered at purchase—including representations about the loans backing each Certificate—which shifted from day-to-day and deal-to-deal.  Because his general PLS

opinions have no connection to the question the jury must answer or the applicable law, FHFA respectfully requests that the Court exclude Mr. Richard's testimony.

Finally, Mr. Richard criticizes FHFA expert witnesses Peter Rubinstein, Leonard Blum, and G. William Schwert for failing to opine whether accurate representations of the loan pools backing the Certificates "would have caused Freddie Mac and Fannie Mae to make any different investment decisions" or would have "affected the investment decision-making process of Freddie Mac, Fannie Mae or other PLS investors." *See* Ex. 1 ¶ 18 at 10; *see id.* ¶¶ 101-04, 107, 108-10, 114. Any effect on the GSEs' investment decisions is irrelevant to materiality, so opinions addressing any such effect are likewise irrelevant. The Court should also exclude these criticisms because they rely on the wrong legal standard. Materiality does not require proof that an investor would have changed its conduct, the alleged omission Mr. Richard identified, but whether accurate representations "would have been viewed by a *reasonable investor* as having significantly altered the total mix of information made available." *N.J. Carpenters Health Fund v. RBS*, 709 F.3d 109, 126 (2d Cir. 2013). Generally, mere identification of opinions an opposing expert did not offer is pure advocacy, not proper opinion testimony.

## BACKGROUND

On November 10, 2014, Defendants served an expert report of John J. Richard ("Report").[1] Mr. Richard opines on "the pre-acquisition analyses typically conducted by residential mortgage backed securities ('RMBS') investors during the 2005 and 2007 time period and . . . how the analyses conducted by Freddie Mac and Fannie Mae prior to their RMBS acquisitions compared to those of a typical RMBS investor during this period." Ex. 1 ¶ 1.

---

[1] Mr. Richard was also retained by settled Defendant Goldman Sachs. He submitted a report on behalf of Goldman Sachs on June 10, 2014, and he was deposed in the *Goldman Sachs* and *Ally* actions on July 28, 2013. *See generally* Exs. 2, Ex. 3. Mr. Richard submitted a report in this action on November 10 and was deposed on November 20, 2014. *See generally* Exs. 1, 4. Consistent with the protective order governing the consolidated Actions, FHFA relies in part on opinions Mr. Richard offered in the *Goldman Sachs* and *Ally* actions in seeking his exclusion. *See* First Am. Protective Order ¶ 7.1, Nomura Dkt. 203. "Rubinstein Report" refers to the July 9, 2014 Confidential Report of Peter D. Rubinstein, Ph.D., Regarding Residential Mortgage-Backed Securitizations. Dr. Rubinstein's report is attached as Exhibit 5. "Blum Report" refers to the July 9, 2014 Expert Report of Leonard A. Blum. Mr. Blum's report is attached as Exhibit 6. "Schwert Report" refers to the July 9, 2014 Confidential Report of G. William Schwert. Mr. Schwert's report is attached as Exhibit 7.

Two-thirds of the Report is a narrative describing the GSEs' PLS purchase processes and the factors they purportedly relied upon to make their respective purchase decisions between 2005 and 2007.  Ex. 1 ¶¶ 18, 64-150 & App'x C.  Mr. Richard opines generally that the "GSEs' pre-acquisition analyses of RMBS reflected the processes of typical sophisticated RMBS investors," but he distinguished them from other PLS investors, calling them "unique" because "they sought AAA-rated non-agency MBS backed principally by loans eligible for [HUD] housing goals credit."  *Id.* ¶ 18 at 10.  He identified other factors he claimed made Fannie Mae and Freddie Mac "unique" among PLS investors, including (1) the GSEs "were among the most active and sophisticated participants in the mortgage industry" generally, (2) the GSEs were "among the most active, knowledgeable, and sophisticated participants in the non-agency MBS market," (3) the GSEs were "among the largest investors" in PLS, (4) the GSEs' "utilization of information concerning originators' underwriting and appraisal practices was among the most extensive in the investment industry," (5) the GSEs uniquely "worked with issuers to structure securities collateralized by loan pools that met their specific objectives," and could "specify the loan collateral underlying the securities they acquired," and (6) the GSEs had unique individual investment objectives "related to their shared mission to promote home ownership through affordable financing."  *Id.* ¶ 18 at 8-10; *see id.* ¶¶ 143-151.   In an appendix devoted to HUD housing goals, Mr. Richard opines "HUD-specified housing goals of Freddie Mac and Fannie Mae were both mandatory and difficult to attain."  *Id.* App'x C ¶ 5.  Mr. Richard's report does not address the factors Fannie Mae and Freddie Mac employees considered when purchasing the Certificates at issue, however, other than the HUD housing goals analysis for four Certificates, which the Court has excluded as irrelevant.  *See* Ex. 1 ¶ 149; *FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7229361, at *3.

Mr. Richard also opines on the expansion of the PLS market and the information and factors considered by "sophisticated non-agency RMBS investors" to evaluate PLS offerings between 2005 and 2007.  *See* Ex. 1 ¶ 18 at 6-8; *see id.* ¶¶ 21-63.  Mr. Richard identifies PLS investors as "a diverse group . . . including banks, insurance companies, mutual funds, pension

funds, and Freddie Mac and Fannie Mae," each with different risk tolerances and investment strategies. *Id.* ¶ 23.  He writes "[t]he performance of RMBS in large part depends on the performance of the underlying collateral and the corresponding mortgage default rates,"[2] *id.* ¶ 42, but he does not opine which factors PLS investors generally considered most or least important when they assessed loan performance and the associated credit risk.  He claims it is impossible to determine whether a reasonable PLS investor would consider collateral characteristics important or not important because, "[t]here might be differences in opinion across investors as to what's important and what's not important." Ex. 3 at 47:6-48:3.  PLS investors' weighed the factors subjectively, according to Richard, who claims "a multitude of variables as well as the potential interactions between these variables . . . varied for each security, and the factors considered to be important would vary by investor, as well as by security." Ex. 1 ¶ 41; *see* Ex. 3 at 37:23-38:4 (testifying PLS investors "would assess those pool level variables and evaluate them within the context of all the other pool level variables and what we thought their relationships were and how they would interact with one another.").  Mr. Richard does not opine whether changes or variances in any criteria could affect PLS investors' purchase considerations in isolation from other loan characteristics.  He does not address the allegedly false representations in the Certificates' offering materials or how PLS investors would have viewed accurate representations.

## ARGUMENT

Before a proffered expert may testify, he or she must be "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Even if qualified, the expert may only render opinion testimony if:

>   (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
>   (b)   the testimony is based on sufficient facts or data;

---

[2]   According to Mr. Richard, the loan-level factors considered by investors included "loan type, lien position, property type, mortgage rate, debt-to-income ("DTI") ratio, amortization feature, prepayment penalty, geographic location, loan purpose, documentation type, and FICO score."  Ex. 1 ¶ 51.

> (c)     the testimony is the product of reliable principles and methods; and
>
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

*Id.*; *see Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589-94 (1993).  Rule 702 and *Daubert* place the Court in the role of a "gatekeeper" for expert testimony.  *FHFA v. JPMorgan Chase & Co.*, 2012 WL 6000885, at \*6 (S.D.N.Y. Dec. 3, 2012).  The Court should exclude expert testimony if (1) the expert is not qualified to offer the proposed opinions, (2) the expert's opinions are not based on reliable data and methods, or (3) the proposed testimony will not be helpful to the trier of fact.  *See In re Puda Coal Litig.*, --- F. Supp. 2d ---, 2014 WL 2915880, at \*15 (S.D.N.Y. June 26, 2014).

## I.     THE COURT SHOULD EXCLUDE MR. RICHARD'S OPINIONS REGARDING FANNIE MAE AND FREDDIE MAC

### A.     Mr. Richard Is Not Qualified to Opine Regarding Fannie Mae or Freddie Mac's Purchase of the Seven Certificates at Issue or HUD Housing Goals

The Court must assess an expert's qualifications to determine "whether the proposed expert is, in fact, an expert in the area in which he or she intends to testify."  *SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013).  Even if Mr. Richard's opinions are relevant—they are not—Mr. Richard is not qualified to opine on any aspect of the GSEs' PLS purchase considerations and HUD housing goals.  *See* Ex. 1 ¶¶ 18, 64-150 & App'x C.  He never worked for or consulted with Fannie Mae, Freddie Mac, OFHEO or HUD.  Ex. 3 at 330:4-18, 338:2-16.  He is not an expert in affordable housing.  *Id.* at 328:25-337:25.  Mr. Richard's sole exposure to the GSEs between 2005 and 2007 was through a handful of conversations (unrecalled) with GSE personnel (unknown) at securitization conferences (unidentified).  *Id.* at 338:17-341:12.  He could not recall whether he spoke to Fannie Mae or Freddie Mac employee(s) or whether they had PLS responsibility.  *Id.* at 339:5-25.  He identified the Fannie Mae charter as a document he relied on, but he had no familiarity with its content or limitations.  *Id.* at 388:23-389:19; *see* Ex. 1 App'x C ¶ 2 n.10; Ex. 8; Ex. 3 at 390:5-394:11.  His sole, pre-engagement knowledge of the GSEs' PLS investment considerations were inferences he claimed to have drawn from contemporaneous observations of the GSEs' PLS purchases (unidentified).  Ex. 3 at 329:7-330:18.  Mr. Richard's

claimed knowledge of HUD housing goals is from "general common knowledge" conveyed by "the public media," from which Mr. Richard gleaned nothing more than "there were requirements" for the GSEs to meet affordable housing goals.  Ex. 3 at 336:11-337:3, 337:12-25.  He did not know whether Alt-A loans contributed to goals.  Ex. 4 at 208:16-210:5.

Mr. Richard claims to be qualified to render GSE-specific opinions because he "scan[ned] through" deposition transcripts of some GSE witnesses and reviewed a small set of FHFA-produced documents selected for him.  Ex. 4 at 102:10-105:24; *see* Ex. 1 App'x B.  From these, Mr. Richard created an improper, defense-slanted factual recitation from which he wishes to testify.  *See Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (prohibiting an expert from "constructing a factual narrative based upon record evidence").  Mr. Richard admitted GSE witnesses were more qualified to testify regarding PLS purchase processes and housing goals, and he could not identify the criteria for any GSE housing goal requirement.  Ex. 3 at 343:9-24, 337:4-25.  Because he lacks the knowledge or experience that would qualify him to render any GSE-specific opinion, the Court should exclude them.  *See Gray v. Briggs*, 45 F. Supp. 2d 316, 324 (S.D.N.Y. 1999) (excluding an expert who "had no education or even informal training" in the subject matter).

**B.      Mr. Richard's Opinions Regarding the GSEs Are Irrelevant**

Opinions that will not "help the trier of fact to understand the evidence or to determine a fact in issue" are inadmissible.  Fed. R. Evid. 702(a); *see Highland Capital Mgmt.*, 379 F. Supp. 2d at 467.  Irrelevant expert testimony will not help the trier of fact.  *Krause v. CSX Transp.*, 984 F. Supp. 2d 62, 74 (S.D.N.Y. 2013); *see* Fed. R. Evid. 402; *In re Puda Coal*, 2014 WL 2915880, at *17.

**1.      Mr. Richard's Opinions Regarding Housing Goals Are Inadmissible**

Appendix C and Paragraphs 147 through 150 of Mr. Richard's Report discuss the affordable housing goals HUD required of Fannie Mae and Freddie Mac.  In a December 18, 2014 Order, the Court "prohibit[ed] defendants from introducing evidence relating to Housing

Goals." *FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7229361, at *4. This Order applies to exclude Mr. Richard's opinions regarding housing goals.

> ## 2. Mr. Richard's Opinions Regarding the GSEs' PLS Purchase Processes and Comparison to Other Investors Processes Are Irrelevant

Proof of materiality is objective; it is not plaintiff-specific. *See FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7229361, at *3. Misrepresentations are material if they "would have been viewed by a *reasonable investor* as having significantly altered the total mix of information made available." *N.J. Carpenters Health Fund*, 709 F.3d at 126 (emphasis added). The test does not concern "whether the investment decision of a particular individual would have been affected." *In re Metlife Demutualization Litig.*, 229 F.R.D. 369, 380 (E.D.N.Y. 2005) (quotation marks omitted); *see also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013) ("In no event will the *individual* circumstances of [a] particular [plaintiff] bear on the inquiry."). Courts exclude evidence of a plaintiff's particular purchase considerations because it is irrelevant and will distract the jury from the "reasonable investor" standard. *See In re WorldCom, Inc. Sec. Litig.*, 2005 WL 408137, at *5 (S.D.N.Y. Feb. 22, 2005) (Cote, J.) (excluding evidence concerning the named plaintiffs' financial advisors on the ground that it was of "marginal relevance"); *In re ICN/Viratek Sec. Litig.*, 1996 WL 34448146, at *3-4 (S.D.N.Y. July 15, 1996) (finding, in class-certification context, plaintiff testimony regarding defendants' misstatements "entirely irrelevant" to the "reasonable investor" standard). The Court recognized this in its Order excluding evidence of housing goals, writing that materiality is "'an objective standard,' determined with reference to a reasonable 'PLS trader'—not a reasonable GSE, or a reasonable PLS trader with plaintiff's idiosyncratic regulatory restrictions and purchasing goals." *FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7229361, at *3 (quoting *FHFA v. UBS Ams. Inc.*, 2013 WL 3284118, at *13, *23 (S.D.N.Y. June 28, 2013)).

Defendants represented to the Court they want to present evidence of "the unique position of Freddie Mac and Fannie Mae and what factors drove their [PLS] purchases." Defs.' Opp'n to Pl.'s Mot. in Limine No. 3 at 5. They argued such evidence is relevant to materiality which

should "be assessed from the perspective of a reasonable investor in the plaintiff's position, *i.e.*, a government sponsored enterprise." *FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7229361, at *3.  Mr. Richard is Defendants' vehicle to summarize for the jury "the factors that drove their [PLS] purchases" and the GSEs' "unique position" among PLS investors.  *See supra* 3-5.

Mr. Richard's GSE-specific opinions will neither prove nor disprove the materiality of Defendants' representations.  He ignored the Certificate-specific representations at issue.  Ex. 3 at 97:3-98:12, 149:22-155:13; Ex. 4 at 37:7-38:2, 117:4-119:14.  Even if he had addressed them, as the Court observed, Defendants "have offered no reason the GSEs' motivations in purchasing the Certificates are relevant here."  *FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7229361, at *3.  Thus, Mr. Richard's opinions regarding the GSEs' general PLS purchase considerations are unconnected to the representations or offering materials the jury must consider.  These opinions will not help the jury determine whether a "reasonable PLS trader" would consider Defendants' specific misrepresentations material.  Admitting them would interfere with the jury's charge.[3]  *See Amgen*, 133 S. Ct. at 1191.

### 3.      GSE Post-Settlement Purchase Processes Are Irrelevant

Fannie Mae settled its only Certificate on November 30, 2005, a fact Mr. Richard testified that he did not know.  Ex. 9 (NAA 2005-AR6 Trade Confirmation) at NOM-FHFA_05783828; Ex. 4 (Nomura Dep. Tr.) at 156:5-16.  The Report's discussion of Fannie Mae's alleged practices describes its PLS purchase processes *after* November 29, 2005, relies on post-November 29, 2005 documents and relies on testimony from witnesses involved with PLS only after November 29, 2005.  All or substantial portions of paragraphs 70-73, 82-88, 91, 93-96, 112, 120-21, 124-26, 132, 139-42 and 150 and substantial portions of Appendix C of the Report are therefore irrelevant.[4]  By definition, opinions about what Fannie Mae may have done after it bought a

---

[3]  For these same reasons, the Court should not permit Mr. Richard to render any opinion regarding State Street-specific practices or considerations to prove materiality.  *See infra* § II.

[4]  Many of the Fannie Mae PLS personnel Mr. Richard cites—including Ashley Dyson, C.J. Zhao, David Gussmann, and Lin Cao—did not begin working in the PLS business until after Fannie Mae purchased NAA 2005-AR6, and Lesia Bates Moss's Single Family Counterparty Risk Management group did not review any of the originators whose loans backed the deal.  Ex. 10 at 33:7-10; Ex. 11 at 64:14-16; Ex. 12; Ex. 13; Ex. 14.  Even before this reliance upon irrelevant material to support a defense-slanted narrative is taken into consideration, Mr. Richard

Certificate cannot prove or disprove the materiality of representations regarding that Certificate. *See* 15 U.S.C. § 77k (establishing liability as of the date "such part [of the registration statement] became effective"); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 165 (2d Cir. 2000) ("Materiality is determined in light of the circumstances existing *at the time the alleged misstatement occurred*.") (emphasis added). Freddie Mac settled its final Certificate on April 30, 2007. *See* Ex. 15 at FHFA 04592866. Mr. Richard's report contains similarly irrelevant paragraphs for Freddie Mac. Ex. 1 ¶ 69; *id.* ¶ 121 at 55.

### C. Mr. Richard's Opinions Would Inject Into the Trial the Issue of Reliance and May Lead the Jury to Blame the GSEs for Their Losses

A court should exclude expert testimony when the flaws in the expert's analysis "are so fundamental that any probative value is substantially outweighed by the danger that it will confuse and mislead the jury and cause unfair prejudice to the plaintiff[]." *In re Elec. Books Antitrust Litig.*, 2014 WL 1282298, at *7 (S.D.N.Y. Mar. 28, 2014); *see* Fed. R. Evid. 403. While reliance is not an element of FHFA's Section 11, Section 12(a)(2) or state Blue-Sky claims, *FHFA v. HSBC Holdings Am., Inc.*, --- F. Supp. 3d ---, 2014 WL 32702587, at *20 (S.D.N.Y. July 25, 2014), Mr. Richard's report discusses the GSEs' lack of reliance on the misrepresented collateral characteristics explicitly and implicitly. He writes the GSEs "did not *rely* solely on the information in *preliminary* offering materials when making their investment decisions." Ex. 1 ¶ 18 at 8 (emphasis added); *id*. ¶ 18 at 10 (same). His use of the word "preliminary" is significant, because he later wrote the GSEs' could not have relied on Defendants' representations because "traders at Freddie Mac and Fannie Mae did not have available to them the *final* prospectus supplement for any of the Securitizations when they made the decisions to acquire those securities." Ex. 1 ¶ 68. The Court rejected that argument in its order "prohibit[ing] defendants from eliciting testimony and offering argument that the sale of a Certificate was consummated before the settlement date." *FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7229446, at *10 (S.D.N.Y. Dec. 18, 2014); *see* Fed. R. Evid. 403. Similarly, permitting opinions regarding what

---

routinely conflates Freddie Mac and Fannie Mae practices, even though he relies on documents or testimony applicable to only one of the two. Ex. 1 ¶¶ 97-98, 113.

the GSEs usually considered or had available to them when purchasing PLS, including their

sophistication generally (including from the Single Family business) and their unique investment

strategies and limitations, would create the impermissible risk that the jury would blame the GSEs

for the losses incurred. *See FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7229361, at *3-4;

*FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7229446, at *10.

## II.     MR. RICHARD'S OPINIONS REGARDING ALL PLS INVESTORS AND THE PLS MARKET SHOULD BE EXCLUDED

### A.     Mr. Richard Is Not Qualified to Render Any General PLS Investor Opinion

#### 1.     Mr. Richard's Narrow Experience Does Not Qualify Him to Opine What All PLS Investors Considered When Purchasing PLS

While experience can qualify a witness to offer expert opinions, Fed. R. Evid. 702,

Mr. Richard's experience is not sufficient to qualify him to opine on the development of the PLS

market or PLS investors practices between 2005 and 2007.  Between 2005 and 2007, Mr. Richard

was a Senior Portfolio Manager at only one investment firm, State Street Global Advisors in

Boston. Ex. 1 ¶ 8.  He was one of thousands in the financial services industry touching PLS.  He

co-managed about a dozen client accounts, a few pooled accounts, and one comingled account, all

fixed-income. Ex. 3 at 273:6-274:14, 276:8-12.  The accounts he helped manage had, at most,

$15 billion in assets; PLS never exceeded 18% percent of those assets. Ex. 1 ¶ 15.  At the

market's peak in 2007, $2.8139 trillion of PLS was outstanding; he co-managed less than 0.01

percent of the total.[5]  State Street's clients required Mr. Richard to follow one strategy—short and

intermediate investments aimed at "the preservation of capital while also providing liquidity and a

stable, competitive rate of return." *Id.* ¶ 9.  This liquidity or cash strategy required purchases of

seasoned bonds and below AAA bonds that had to be immediately salable. Ex. 3 at 279:17-

282:22.  At State Street, credit analysts, not portfolio managers like Mr. Richard, assessed the

collateral characteristics of potential PLS investments.[6] *Id.* at 16:22-20:24.

---

[5]   Securities Industry and Financial Markets Association (SIFMA), "US Non-agency CMBS and RMBS Outstanding" (Oct. 7, 2014), file sf-us-nonagency-outstanding-sifma.xls, *available at* http://www.sifma.org/research/statistics.aspx.

[6]   Ex. 16 ¶ 7 ("The portfolio management group [at State Street], of which I was a member, was responsible for the daily investment decisions made on behalf of client portfolios.  In this investment activity, I received assistance from the trading desk and credit analysts.  The traders provided valuable information related to securities

Mr. Richard concedes a diverse group of investors purchased PLS between 2005 and 2007, including pension funds, municipalities, hedge funds, foreign entities, investment banks and asset managers, as well as the GSEs.[7]  Ex. 1 ¶ 23; Ex. 4 at 214:17-215:22.  Their risk appetites were diverse (purchasing bonds rated from AAA to unrated), as were their investment strategies (holding, active trading, liquidity, re-purposing into CDOs), as were their analyses PLS offerings.[8]  Defendants want Mr. Richard to render an opinion that encompasses the conduct of all such investors, regardless of risk appetite or investment strategy.  Mr. Richard's co-management of small accounts for unidentified "pension plans" and "corporate cash accounts" following a narrow strategy does not qualify him to make broad generalizations about hedge funds, investment banks, insurers, municipalities, and foreign entities, all of whom he admits followed different strategies with different investment imperatives with different goals and different purchase considerations.  *See Tourre*, 950 F. Supp. 2d at 674 ("A court's inquiry into a proposed expert's qualifications . . . seeks to determine whether the proposed expert is, in fact, an expert in the area in which he or she intends to testify.").

---

valuation and recent trading activity.  Credit analysts offered opinions on the credit worthiness of new offerings and secondary positions in the market.").

[7]  Financial Crisis Inquiry Commission, *The Financial Crisis Inquiry Report* (Jan. 2011) at 228 (stating that "investment banks, commercial banks, . . . thrifts[,] . . . insurance companies, pension funds, the GSEs, and hedge funds" held non-agency RMBS and CDOs backed by RMBS bonds in fall 2008); Allen Ferrel, Jennifer E. Bethel & Gang Hu, *Legal and Economic Issues in Litigation Arising from the 2007-2008 Financial Crisis* (Nov. 2008) at 12 (Harvard John M. Olin Ctr. for Law, Econ., and Bus., Discussion Paper) ("Hedge funds, corporations, banks, life insurers, pension funds, mutual funds, and wealthy individuals buy RMBS and CDOs.), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1096582; SIFMA, "MBS Fact Sheet" 3 (2011) (listing distribution of non-agency RMBS holdings of insurance and pension funds, REITs, U.S. bank holding companies, savings institutions, the GSEs, the Federal Home Loan Banks, foreign investors, and mutual funds in 2011), *available at* http://www.sifma.org/issues/item.aspx?id=8589934849.

[8]  U.S. Dep't of Treasury, OFHEO, and the SEC, Task Force on Mortgage-Backed Securities Disclosure, Staff Report, *Enhancing Disclosure in the Mortgage-Backed Securities Market* (Jan. 2003) at 7 ("Investments in MBS are made for a variety of reasons.  Some investors purchase MBS to hold long-term in portfolios while others purchase for short term trading purposes.  MBS are also widely used for hedging purposes."), *available at* http://www.treasury.gov/resource-center/fin-mkts/Documents/disclosure.pdf; Ex. 17 at 66 (describing different non-agency RMBS investment criteria for banks, money managers, hedge funds, insurance companies, pension funds, and CDO managers); *see also* Ex. 3 at 68:11-69:9 (Mr. Richard testifying that "different investors subjectively assigned levels of importance to [relevant factors] depending upon the investment strategy at hand").

### 2.   Mr. Richard Has No Knowledge About Other PLS Investors

Knowledge can qualify a person to offer expert opinions.  Fed. R. Evid. 702.  Mr. Richard

has no actual knowledge about other PLS investors' purchase processes.  The sole source of his

qualifying "knowledge" is informal conversations with industry colleagues between 2005 and

2007 at "roadshows," "mini conferences that the various broker-dealers put on at a hotel,"

conversations with other non-agency RMBS market participants, and a couple job interviews

where he made presentations to "20 or 30 of their employees there to listen to [his] presentation

and then to ask questions."  Ex. 1 ¶ 17; Ex. 3 at 253:19-262:5.  He could not recall the specifics of

any such conversations, much less identify details regarding any competing investor's pre-

purchase analysis of PLS offerings.  *Id.* at 322:25-325:16.  It would be surprising if competitors

provided such details given his testimony PLS investors did not exchange investment procedure

manuals and that he had no contemporaneous exposure to other PLS investors' credit models.  *Id.*

at 256:23-257:6, 311:12-315:9.  Informal exposure to a subject cannot create expertise.  *See*

*United States v. Jacques*, 784 F. Supp. 2d 59, 61-62 (D. Mass. 2011) (disqualifying a false

confession expert found to be "simply an intelligent man, well read in the area, who has written a

bit on the general topic of false confessions and who holds an opinion on the topic"); *Falcon v.*

*State Farm Lloyds*, 12-cv-491, 2014 WL 2711849, at *6-10 (W.D. Tex. June 16, 2014)

(disqualifying a proposed expert on smoke contaminant sampling and testing whose experience

consisted of viewing unspecified written, video, and internet reference materials from a former

fire department official and a conversation with smoke contamination testing technician).  Since

2007, Mr. Richard has done nothing to obtain additional knowledge about PLS investor practices

during the relevant period.  No "factfinding [sic] mission" was necessary, he claimed.  Ex. 3 at

316:17-22.  Mr. Richard is not qualified to render any opinion regarding all PLS investors

between 2005 and 2007.[9]  *See Tourre*, 950 F. Supp. 2d at 674.

---

[9]   Education and training may also qualify an expert.  *See* Fed. R. Evid. 702.  Mr. Richard identified the
universe of his qualifying education and training to be (1) a single course in general real estate development and
finance from Babson College's night MBA program, and (2) pre-1999 testing and training administered by the CFA
Institute that included fixed income and equity securities analysis and portfolio management.  Ex. 1 ¶¶ 4-5; Ex. 3 at
119:15-120:16.  Pre-1999, unrecalled instruction from the CFA Institute cannot create expertise about PLS market
development or practices between 2005 and 2007.  *Id.* at 263:17-266:14.  A general real estate development and

**B.      No Facts Or Data Support Mr. Richard's PLS Investor Opinions**

To be admissible an opinion must be "based on sufficient facts or data."  Fed. R. Evid.

702(b).  The Court should not permit an opinion that does not "rest[] on a reliable foundation, or

is improperly based on 'subjective belief or unsupported speculation.'"  *McIntire v. China*

*MediaExpress Holdings, Inc.*, --- F. Supp. 2d ---, 2014 WL 4049896, at *7 (S.D.N.Y. Aug. 15,

2014) (quoting *Daubert*, 509 U.S. at 590).  No reliable facts support Mr. Richard's general PLS

investor opinions.  He spoke to no investors.  He neither sought nor reviewed investor-specific

documents governing PLS purchases from the time.  Ex. 3 at 279:17-280:3, 311:12-23, 315:9-22,

313:17-19; Ex. 4 at 153:16-154:8.  He did not ask Defendants (or State Street) for their respective

PLS policies and procedures.  Ex. 3 at 256:19-257:6, 313:6-314:9.  Rather, he relied exclusively

on (1) almost decade-old memories of his narrow experience co-managing accounts containing a

small percentage of PLS following a narrow, client-directed investment strategy and (2) casual

conversations with unidentified industry colleagues.  He made no effort to refresh his memory

and admitted he last saw the State Street PLS pre-acquisition policies and procedures in 2009.  *Id.*

at 311:12-312:10.  From his memory, he purported to draw broad generalizations about

investment practices, motivations and consideration of all PLS investors who bought any tranche,

of any size, at any credit rating, for any purpose, following any investment strategy, at any time

between 2005 and 2007.  Mr. Richard's opinion must be excluded not only because the facts he

relies on are "inadequate to support the conclusion reached," but because it is based on no facts at

all.  *FHFA v. JPMorgan Chase & Co.*, 2012 WL 6000885, at *6 (S.D.N.Y. Dec. 3,

2012).  Mr. Richard embraced the complete lack of factual support, insisting, "I don't think I

needed to go embark on a factfinding [sic] mission in terms of who was doing what during 2007

or 2005."  Ex. 3 at 320:17-22.  His whole opinion, however, is exactly "who was doing what"

between 2005 and 2007.

---

finance class (text unidentified) does not make one an expert in industry-standard non-agency RMBS pre-purchase
analyses.

### C.     Mr. Richard's Generalizations About PLS Investors Are Not Reliable

The Court must ensure the proposed expert "employs in the courtroom the same level of intellectual rigor that characterizes the practices of an expert in the relevant field." *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 152 (1999).  A district court has "broad latitude" in deciding both "how to determine reliability" and in reaching "its ultimate reliability determination." *JPMorgan Chase & Co.*, 2012 WL 6000885, at *7 (quoting *United States v. Williams*, 506 F.3d 151, 160-61 (2d Cir. 2007)).  Proposed testimony should be excluded if "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v Joiner*, 522 U.S. 136, 146 (1997).  An expert's opinion "requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *JPMorgan Chase & Co.*, 2012 WL 6000885, at *6 (quoting *Riegel v. Medtronic, Inc.,* 451 F.3d 104, 127 (2d Cir. 2006)).

Mr. Richard's "method" of extrapolating from a sample of "one"—the memory of his experience at State Street between 2005 and 2007—to all PLS investors is facially unreliable, constitutes "too great an analytical gap between the data and the opinion," and should be excluded on that ground alone.  *Joiner*, 522 U.S. at 146; *see* Fed. R. Evid. 702(c); *cf. Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977) (ruling, in a Title VII case, that a "small sample size may . . . detract from the value of such evidence").  Even if Mr. Richard's extrapolation of his foggy memories to an entire industry passed the straight-face test—it does not—the assumptions necessary to sustain that "method" are demonstrably false.  Mr. Richard necessarily assumes his State Street experience was like that of other PLS investors and other PLS investors' purchase analyses tracked Mr. Richard's recollection of the PLS purchase analysis at State Street.  He does not identify, support, or defend these assumptions, because they are both false and indefensible.

Mr. Richard admits PLS performance "depends on the performance of the underlying collateral and the corresponding mortgage default rates." Ex. 1 ¶ 42.  The risk of loss from

mortgage defaults of a particular supporting loan group is credit risk.[10]  Ex. 1 ¶¶ 47, 49.

Determining mortgage default risk in a supporting loan group, therefore, is integral to the PLS

purchase process.  From memory, Mr. Richard described State Street's pre-acquisition "credit

analysis" between 2005 and 2007.  It consisted of a visual—not analytical or statistical—side-by-

side comparison of (a) the pages of the offering materials describing the pool characteristics, and

(b) a spreadsheet showing the historical performance of a State Street-owned PLS certificate.

State Street chose the certificates to compare by subjectively, not analytically, deciding they had

collateral characteristics similar to those of the offered PLS.  Ex. 3 at 223:8-238:17.  State Street

"compared both the pricing and credit enhancement levels to other comparable RMBS

transactions and *subjectively* determine[d] which variables were more or less critical in the

evaluation."  *Id.* at 225:18-226:4 (emphasis added).  State Street used this "comparative analysis"

to assess the credit risk of a PLS offering, as Mr. Richard explained:

> If we were looking at a securitization in 2005, and were inputting in
> all the pool level characteristics associated with that securitization,
> we would evaluate it at the time.  We would evaluate it relative to
> what we liked or didn't like to see in a securitization.  In other
> words, perhaps we didn't like the California concentration, so we
> didn't buy.  Or, perhaps LTV ratio were too high relative to the
> California concentration, so we didn't buy it.  Or the FICO scores
> were too low relative to the DTI ratios.  Whatever the case is.

*Id.* at 232:24-233:13.  State Street's analysis was completely subjective.[11]  Mr. Richard identified

no analytical or statistical criteria State Street used to decide which of State Street's PLS were

---

[10]  Mr. Richard makes passing references to cash-flow calculations, expected yield, and return and the use of non-credit analytics, such as Intex and Bloomberg, in his Report.  He spends very little time discussing them or how they were used by PLS investors or by the GSEs.  For purposes of the issues in this case, his opinions on those points are irrelevant and will not be addressed.  The fact that fixed-income investors generally assess interest-rate risk, interest-rate exposure, and expected return on investment during the purchase process is not disputed, nor would having expert testimony on these points assist the trier of fact.  Credit risk is assessed differently, as Mr. Richard conceded.  Ex. 3 at 7:21-25 ("[T]he underlying performance, RMBS performance does depend on the performance of the underlying collateral as it leads to default rates and things like that.").  At State Street, he did not do credit analysis on PLS offerings; he left that to the credit analysts.  Ex. 3 at 16:22-17:18.

[11]  State Street's approach to "individual appraisers' opinions of value" illustrates the subjectivity of its analyses.  Ex. 1 (¶ 99.  Mr. Richard could not explain State Street's "method" for accounting for possible LTV ratio variance.  "[I]n our analysis and assessment process, if we felt the LTV ratios were susceptible to some prospective upward movement, based on whatever risk factor we felt was relevant or germane to that particular securitization, that thought would manifest itself, typically, in the default assumption we may use for that particular pool or the loss severity assumption.  That would be the quantifiable way that we would manifest that thought."  Ex. 4 at 94:18-95:6.

sufficiently similar to warrant comparison or whether comparison to one, five, or ten similar securities were sufficient. *Id.* at 223:8-231:10. State Street conducted no other type of credit analysis on any PLS offering between 2005 and 2007.[12]

After describing State Street's pre-purchase assessment of PLS credit risk, *id.* at 238:10-17, Mr. Richard was asked whether other PLS investors used State Street's method to assess PLS pre-purchase credit risk. *Id.* at 238:18-21. He admitted, "*I don't know specifically what they were doing.*" *Id.* at 240:3-5 (emphasis added). In other words, Mr. Richard has no idea whether his experience paralleled that of other PLS investors or companies that dealt with PLS credit risk between 2005 and 2007. In fact, Mr. Richard's experience at State Street was not reflective of other PLS investors between 2005 and 2007. PLS investors and those whose businesses often relied on assessing PLS credit risk used statistical models to project an offering's potential credit losses by analyzing supporting loan-group characteristics under different home price appreciation and interest-rate conditions.[13] Mr. Richard claimed not to comprehend the then-common practice of statistically correlating loan characteristics to potential default rates and using those results to develop credit risk models which projected mortgage default rates of a pool backing a particular PLS offering under a variety of economic conditions. *Id.* at 39:7-40:10. He rejected the concept as "foreign" to him, testifying that, "[a]s I sit here today, I can't . . . offer to you a way to do that."

---

Mr. Richard described this process "as a quantitative analytical process that had very subjective nature associated with it." *Id.* at 99:8-11. That is a nonsense explanation. The process was neither quantitative nor analytical. Mr. Richard could not name another investor that used the same subjective process to account for potential LTV ratio volatility. *Id.* at 99:5-8.

[12]   In a separate report and in deposition, Mr. Richard testified that credit analysts at State Street, not portfolio managers like him, performed the actual credit analysis. *See supra* n.6.

[13]   *See, e.g.*, Adam Ashcraft, Paul Goldsmith-Pinkham & James Vickery, *MBS Ratings and the Mortgage Credit Boom* 8 (Fed. Reserve of N.Y., Staff Report no. 449, May 2010) ("CRAs [credit rating agencies] maintain econometric prepayment and default models, which use as input macroeconomic variables, particularly home prices and interest rates, as well as loan characteristics. The CRA simulates paths of these macroeconomic variables, which are substituted into their econometric models to calculate a path of defaults and losses. These loss projections are then aggregated across paths to produce a distribution of losses."), *available at* http://www.newyorkfed.org/research/staff_reports/sr449.pdf; Ex. 18 at 84:18-24 (describing Moody's M3 as "a simulation model that runs the pool of mortgages through various scenarios, and then [projects] what the loss expectation would be on the pool of mortgages in the scenarios that were run within M3" to create loss distribution levels); Ex. 19 at 2 ("Quantifying the amount of loss that a mortgage pool will experience in all economic scenarios is the key to modeling credit risk. . . The basis for the stress scenario applied to each rating category can be found in the historical loss experience of the mortgage market.").

*Id.* at 40:3, 74:25-75:2.  He dismissed any attempt to correlate loan characteristics and default rates, criticizing a Standard & Poor's analysis as "neuter[ing]" the sample loans, "strip[ping]" the loans of their "relevance as it pertains to a particular securitization," and failing "to extrapolate [the results] to a particular securitization at issue."  *Id.* at 406:3-5, 407:5-7; *see* Ex. 20. Mr. Richard did not know PLS investors developed and used credit risk models in their pre-acquisition analytics or that rating agencies and monoline insurers used credit risk models to project a PLS offering's mortgage default rate.  Ex. 3 at 40:3, 58:2-59:2, 63:13-65:12, 353:19-358:5, 363:14-364:11.

The widespread use of statistical credit risk analysis credit risk models was no mystery in 2005, 2006 or 2007, much less in 2014.  Mr. Richard cited *The Handbook of Mortgage Backed Securities* (published 2006) as a source document; it has a section devoted to modeling and includes a chapter devoted to modeling non-agency RMBS default and delinquency.[14]  Vendors offered credit risk models publicly; investors touted them; the GSEs, ratings agencies, and monoline insurers disclosed them publicly; and the ratings agencies published the results of their credit risk model analytics.[15]  Mr. Richard conceded his lack of experience with then-common statistical analysis of credit risk and lack of knowledge regarding credit risk models commonly used by PLS investors between 2005 and 2007.  Ex. 3 at 40:3, 74:25-75:2.  These admissions— that his experience at State Street was not reflective of PLS investors generally between 2005 and 2007—are fatal to his general PLS investor opinions.  Mr. Richard's "method" of extrapolating

---

[14]   Fabozzi, Frank J., ed., *The Handbook of Mortgage-Backed Securities* at 719-756.(6th ed. 2006); *see* Ex. 1 App'x B.

[15]   *See e.g.,* Ex. 21 (S. Mahdavian S&P 30(b)(6) Dep. Tr.) 62:14-15 ("The LEVELS® was an externally licensed model."); Freddie Mac, Annual Report (10-K) at 56 (2006) ("In recent years, we have strengthened our processes to validate model assumptions, code, theory and the system applications that utilize our models."); *id.* at 106 ("We estimate credit losses on homogeneous pools of single-family loans using statistically-based models . . . based on common underlying characteristics, including year of origination, loan-to-value ratio, and geographic region."); *id.* ("We frequently validate and update the models and factors to capture changes in actual loss experience, as well as changes in underwriting practices and in our loss mitigation strategies."); Ambac Fin. Grp., Inc., Annual Report (10-K) (Mar. 13, 2006) at 30-31 ("[W]e have established underwriting policies and procedures . . . based in part on models reflecting historical factors, e.g., default rates and severity of loss experience."), *available at* http://ir.ambac.com/sec.cfm?SortOrder=Type%20Ascending&DocType=&DocTypeExclude=&Year=&FormatFilter=&CIK=; Ex. 19, Standard & Poor's, *U.S. Residential Subprime Mortgage Criteria: Credit Analysis for Subprime Loan* Transactions.

industry-wide generalizations from his State Street experience is not reliable and those opinions should be excluded.  Fed. R. Evid. 702(c).

### D.     Mr. Richard's Opinion That Each Investor's PLS Purchase Considerations Were Subjective Will Not Help the Jury Determine Whether Defendants' Misrepresentations Were Material

Expert opinion that will not "help the trier of fact to understand the evidence or to determine a fact in issue" is inadmissible.  Fed. R. Evid. 702(a); *see Highland Capital Mgmt.*, 379 F. Supp. 2d at 467.  Irrelevant expert testimony will not help the trier of fact.  *Krause*, 984 F. Supp. 2d at 74; *see* Fed. R. Evid. 402; *In re Puda Coal*, 2014 WL 2915880, at *17.

FHFA expects Defendants to rely on Mr. Richard's opinions to negate FHFA's proof that Defendants' misrepresentations were material.  The misrepresentations are material if they "would have been viewed by a reasonable investor as having significantly altered the total mix of information made available."  *N.J. Carpenters Health Fund*, 709 F.3d at 126 (internal citation omitted).  "The test for … material[ity] is whether defendants' representations, taken together and in context, would have misled a reasonable investor."  *In re Brittania Bulk Holdings Sec. Litig.*, 665 F. Supp. 2d 404, 413 (S.D.N.Y. 2009) (S.D.N.Y. 2009) (internal citation omitted).  Because the "reasonable investor" is "a prototype reasonable investor," *In re Metlife Demutualization Litig.*, 229 F.R.D. at 380 (citing *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 363 (2d Cir. 1973)), which is "equivalent to the market itself," *In re ICN/Viratek Sec. Litig.*, 1996 WL 34448146, at *4, the materiality test is "obviously objective and general rather than subjective and individual."  *In re Metlife Demutualization Litig.*, 229 F.R.D. at 380.

Mr. Richard renders no opinion about the "market" or the "prototypical reasonable investor's" assessment of the alleged misrepresentations. Ex. 4 at 131:23-132:12.  He does not opine whether the representations at issue are true or false.  *Id.* at 188:2-190:17.  He was not asked to assume Defendants misrepresented collateral characteristics of the seven Certificates.  *Id.* His report is untethered to the materiality question jurors must answer and is therefore inadmissible.  *See* Fed. R. Evid. 702(a).

Mr. Richard's opinion denigrates the legally-required objective materiality analysis. Rather than identifying the "reasonable investor," Mr. Richard focuses on "investor specific" and "securitization specific" differences among the factors each PLS investor might have considered when purchasing PLS between 2005 and 2007:  "There might be differences in opinion across investors as to what's important and what's not important."  Ex. 3 at 47:6-48:3.  He rejects the very possibility of determining whether a loan characteristic misrepresentation could be material to a "reasonable investor," because PLS investors' analysis of "a multitude of variables as well as the potential interactions between these variables . . . varied for each security, and the factors considered to be important would vary by investor, as well as by security."  Ex. 1 ¶ 41.  He testified that determining the most important characteristic for pool performance was impossible, explaining that default projections were "very investor specific and . . . very pool level specific."[16] Ex. 3 at 73:20-22.

Even knowing the characteristics of the seven Certificates—both as misrepresented by Nomura and RBS, and as represented accurately by FHFA's re-underwriting and appraisal experts—Mr. Richard declined to opine whether accurately-disclosed collateral characteristics would have any impact on a reasonable PLS investor's purchase analysis or significantly alter the mix of information available to such an investor.  Ex. 4 at 143:8-144:6.  These opinions are completely disconnected from the legal standard that the jury must apply to answer the factual materiality question.  They not only are irrelevant to the jury's materiality decision; if permitted, they would hinder the jury's task because they are contrary to law.

---

[16]   As Mr. Richard testified, "I don't think investors were looking at a securitization and saying, ah, we've performed an analysis before and think that variable XYZ is the best predictor of default so we're going to zero in on that characteristic.  That's not what we  did. . . . [W]e would look at a particular securitization, we would look at the pool level variables, we would assess those pool level variables and evaluate them within the context of all the other pool level variables and what we *thought* their relationships were and how they would interact with one another.  Ex. 3 at 37:11-38:4 (emphasis added).

**III.   MR. RICHARD'S CRITICISMS OF FHFA EXPERTS RUBINSTEIN, BLUM, AND SCHWERT ARE NEITHER RELEVANT NOR PROPER**

Mr. Richard's criticism of the opinions of FHFA experts Peter Rubinstein, Leonard Blum, and William Schwert, Ex. 1 ¶¶ 18, 101-04, 107, 109-10, 114, are irrelevant to the issues to be tried and constitute improper expert advocacy.

Dr. Rubinstein addresses the securitization process.  He opines that loan-level data was "an important part of [the ratings agencies' determination of] the appropriate level of credit enhancement based on their estimation of projected loss severities and foreclosure frequencies." Ex. 5 ¶ 73.  Blum addresses the underwriter's responsibility to conduct a reasonable investigation into the representations in a security's disclosure documents.  He opines that, given the defects found by FHFA's re-underwriting and appraisal experts, Defendants were required to remove defective loans or revise the disclosure documents to accurately reflect the loans.  Ex. 6 ¶ 10. Professor Schwert opines that "there is a significant relation between AAA subordination levels and the reported characteristics underlying the collateral, including LTV ratios and occupancy status.  Ex. 7 ¶ 8.

Mr. Richard does not respond to these opinions nor does he opine that these experts are unqualified to offer them.  Mr. Richard opines instead that these experts failed to address "whether or how" upward bias of appraised property values, misstatements of owner occupancy rates, and misrepresentations of underwriting guideline compliance "would have caused Freddie Mac and Fannie Mae to make any different investment decisions" or "would have affected the investment decision-making process of Freddie Mac, Fannie Mae or other sophisticated investors." Ex. 1 ¶¶ 18, 101, 102, 104, 107, 109-10, 114.

Mr. Richard's opinions address directly FHFA's experts failure to opine on the effect accurate representations would have had on GSEs' PLS purchase decisions.  Materiality, however, is judged by a reasonable investor, not "a reasonable GSE, or a reasonable PLS trader with plaintiff's idiosyncratic regulatory restrictions and purchasing goals."  *FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7229361, at *3; *see supra* § I.B.2.  As the Court recognized, permitting opinions regarding effect on the GSEs' PLS investment process improperly "threatens

to insert consideration of the GSEs' reliance into this trial." *FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7229361, at *3.

Mr. Richard applies the wrong legal standard to frame his criticism of FHFA's experts.  A representation is material if an accurate disclosure would have "significantly altered the total mix of information made available" at the time the representations were made.  *In re Brittania Bulk Holdings Inc.*, 665 F. Supp. 2d at 413 (internal citation omitted); *see FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 335-36 (S.D.N.Y. 2012).  The standard is not whether accurate representations "would have altered Freddie Mac's and Fannie Mae's investment decision-making processes, or the decision-making processes of other investors."  Ex. 1 ¶ 101; *see id.* ¶ 102, 104, 107, 109-10, 114.  The Court should not permit Mr. Richard to criticize FHFA experts for their alleged failure to render opinions that did not comply with an incorrect legal standard.

Finally, identifying purported failures to opine by opposing party's experts is pure advocacy, not proper opinion testimony.  *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 593 F. Supp. 2d 549, 564 (S.D.N.Y. 2008) ("An expert's first and most important duty is to testify truthfully and accurately to the best of his ability and leave the advocacy to the lawyers.").  Counsel for Defendants is fully capable of pointing out these purported omissions.

## CONCLUSION

For the reasons state above, FHFA requests that the Court prohibit all testimony of Defendants' designated expert witness John J. Richard.

DATED:  January 8, 2015
          New York, New York


QUINN EMANUEL URQUHART &
     SULLIVAN, LLP


By:  /s/ Philippe Z. Selendy
     Philippe Z. Selendy
     Jon Corey
     Zachary Williams

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000