UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,

Plaintiff,

-against-

NOMURA HOLDING AMERICA, INC.; NOMURA ASSET ACCEPTANCE CORPORATION; NOMURA HOME EQUITY LOAN, INC.; NOMURA CREDIT & CAPITAL, INC.; NOMURA SECURITIES INTERNATIONAL, INC.; RBS SECURITIES INC. (f/k/a GREENWICH CAPITAL MARKETS, INC.); DAVID FINDLAY; JOHN MCCARTHY; JOHN P. GRAHAM; NATHAN GORIN; and DANTE LAROCCA,

Defendants.

**No. 11 CIV. 6201 (DLC)**

**PLAINTIFF FHFA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MICHAEL HEDDEN**

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Philippe Z. Selendy
Sascha N. Rand
Jonathan C. Eser
M. Eva Markowski

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing Finance Agency, as Conservator for Fannie Mae and Freddie Mac*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....... 1

FACTUAL BACKGROUND ....... 2

A. Dr. Kilpatrick's Credibility Review ....... 2

B. Mr. Hedden's Rebuttal Analysis ....... 3

1. Mr. Hedden's Opinions ....... 3

2. Mr. Hedden Had No Oversight of or Involvement in the Preparation of the iMS Opinion Letters ....... 5

ARGUMENT ....... 7

I. MR. HEDDEN CANNOT SERVE AS A MOUTHPIECE FOR THE ANONYMOUS APPRAISERS ENGAGED BY IMS ....... 8

A. The iMS Letters Set Forth Their Appraisers' Own Subjective Opinions ....... 8

B. Mr. Hedden Cannot Blindly Rely On the Opinions Set Forth in the iMS Letters ....... 9

CONCLUSION ....... 11

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Auther v. Oshkosh Corp.*,
No. 09-CV-00527(A)(M), 2013 WL 5272959, at *3-*5 (W.D.N.Y. Sept. 16, 2013) ........ 11

*Daubert v. Merrell Dow Pharm.*,
509 U.S. 579 (1993) ........ 7, 8, 9

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) ........ 8, 11

*Faulkner v. Arista Records LLC*,
No. 07 CIV. 2318 LAP, 2014 WL 4547824, at *18-19 (S.D.N.Y. Sept. 15, 2014) ..... 2, 11

*Hutchinson v. Groskin*,
927 F.2d 722 (2d Cir. 1991) ........ 11

*Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) ........ 2, 8

*Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*,
993 F.2d 1201 (5th Cir. 1993) ........ 9

*Quiles v. Bradford-White Corp.*,
No. 10-CV-747, 2012 WL 1355262, at *7 (N.D.N.Y. Apr. 18, 2012) ........ 8, 9

*Riegel v. Medtronic, Inc.*,
451 F.3d 104 (2d Cir. 2006) ........ 7

*Ruggiero v. Warner–Lambert Co.*,
424 F.3d 249 (2d Cir. 2005) ........ 8

*United States v. Mejia*,
545 F.3d 179 (2d Cir. 2008) ........ 8, 9

## STATUTES

Fed. R. Civ. P. 26 ........ 9

Fed. R. Civ. P. 26(a)(2)(A)-(B) ........ 9

Fed. R. Evid. 702 ........ 2, 7, 8, 9

Fed. R. Evid. 802 ........ 8

Plaintiff Federal Housing Finance Agency ("FHFA"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and, together with Fannie Mae, the "GSEs"), respectfully submits this memorandum of law in support of its Motion to Exclude the Expert Testimony of Michael Hedden.

## PRELIMINARY STATEMENT

It is black letter law that an expert's opinions must be their own. In violation of this basic tenet, Defendants'[1] appraisal expert, Michael Hedden, purports to offer opinions about the credibility of Normura appraisals at issue in this case based solely on the unverifiable opinions of forty or so anonymous appraisers engaged by a third-party consulting firm, iMortgage Services, LLC ("iMS"). As Mr. Hedden conceded at his deposition, he did not contribute in any way to the reviews performed by these third party appraisers, upon which he now purports to base many of his expert opinions in this case. Ex. 1 (Hedden Tr.) at 46:18-47:7 ("The review that those IMS appraisers performed on those 40 appraisals, those are their opinions, right? Under USPAP they're required to be their opinions, right, sir? A. That is correct. Q. All right. Those are not your opinions, right, sir? A. That's correct. Q. You did not do that work, right, sir? A. That's correct."). Indeed, as detailed below, Mr. Hedden did not (i) interview the appraisers iMS was contracting with, (ii) vet the qualifications of these appraisers, (iii) select any of the specific questions on which the iMS' appraisers were to opine on, (iv) provide iMS or its appraisers any instructions or guidance as to how to complete their appraisal reviews, (v) acquire any familiarity with iMS standard practices or procedures, or (vi) review the work product and opinions of the iMS appraisers for accuracy or credibility.[2]

---

[1] "Defendants" include Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, N. Dante LaRocca, and RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.).

[2] Though not a basis for preclusion that FHFA is raising on this motion, it t is a close question as to whether Mr. Hedden is even qualified to reliably perform the residential appraisal reviews of moderately priced single family homes at issue. Mr. Hedden's practice at FTI Consulting is focused almost exclusively on large scale

Mr. Hedden's admitted failure to perform any independent analysis of the appraisals at issue and to instead blindly rely on the unverifiable opinions of appraisers contracted by iMS renders Mr. Hedden's opinions unreliable under Fed. R. Evid. 702, inappropriate hearsay, and violative of the prohibition against experts parroting the opinions of others. *See Faulkner v. Arista Records LLC*, No. 07 CIV. 2318 LAP, 2014 WL 4547824, at *18-19 (S.D.N.Y. Sept. 15, 2014) (excluding expert testimony about an assistant's work where the assistant was inadequately supervised and "exercised far more discretionary judgment than an assistant gathering data"); *see also Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007).

Mr. Hedden should be precluded from providing any opinions or testimony that relies on the reviews performed and opinions provided by the anonymous and unsupervised iMS appraisers.[3]

## FACTUAL BACKGROUND

### A.   Dr. Kilpatrick's Credibility Review

In support of its claim that Defendants' disclosures concerning LTV ratios were false, FHFA submitted reports from real estate appraisal and finance expert John A. Kilpatrick, Ph.D. As more fully set forth in FHFA's opposition to Defendants' motion to preclude Dr. Kilpatrick's expert reports dated December 19, 2014, Dr. Kilpatrick's reports address (1) the accuracy of the appraisals underlying the LTV ratios of the sample loans selected by Dr. Cowan (the "Accuracy Report," as supplemented); and (2) if the appraisals for a subset of those loans violated the Uniform Standards of Professional Appraisal Practice ("USPAP") and were thus not "credible,"

---

commercial appraisal and valuation work and he has spent at most only 1% of his time in the last 12 years performing residential appraisals.

[3]   iMS reviews are provided in Appendix C to Mr. Hedden's August 14, 2014 Report and are cited throughout the body of the report as "third party research." Ex. 2 (Hedden Report) at n. 125, 139, 162, 164, 169, 175, 177, 179, 182, 190, 191, 196, 202, 267, 269, 270, 346, 355, 366, 372, 434, 443, 446, 482, 485, 507 and associated text.

as that term is defined by USPAP and other applicable standards of appraisal practice (the "Credibility Report").

For his Credibility Report, Dr. Kilpatrick analyzed 205 Nomura sample Appraisals with a Credibility Assessment Model ("CAM"). The CAM is a deterministic model that assessed the degree to which the original Nomura sample appraisals deviated from established appraisal standards and practices based on the answers to 31 yes or no questions. These questions were derived from USPAP, the Uniform Residential Appraisal Report form, and other appraisal standards and practices in place at the time the original appraisals were performed. Dr. Kilpatrick oversaw and monitored teams of appraiser-researchers and data analysts who, under his direction and control, collected data from each appraisal and the local markets for the respective properties. Every step of this data gathering process involved written instruction, training, and quality control performed under and at Dr. Kilpatrick's direction.[4]

Based upon his review, Dr. Kilpatrick concluded that a vast majority (189 of the 205 appraisals evaluated) of the adverse sample Nomura appraisals, which he had concluded were likely to evidence appraisal inflation based on his automated valuation methodology, either contained significant errors or a series of minor errors that were cumulatively significant such that a reasonable appraiser could not have considered the appraisal credible under USPAP. Ex. 3 (Credibility Report) at 101.

**B. Mr. Hedden's Rebuttal Analysis**

1. <u>Mr. Hedden's Opinions</u>

Defendants' proffered expert, Michael Hedden, is a commercial appraiser by practice.[5] During his 36-year career, Mr. Hedden has appraised roughly 3,000 commercial properties, but

---

[4] *See*, *e.g.*, Ex. 3 (Credibility Report) at 14 ("In addition to the Forsythe/Valocity Inspections, at my direction and under my supervision, my staff performed additional Inspections of each Nomura Appraisal."); *id*. at Appendix 4-2 (Greenfield Advisors Residential Data Form Protocol); *id*. at Appendix 4-4 (Welcome Letter to Residential Inspectors). .

[5] Most of Mr. Hedden's publications and presentations relate to the appraisal of commercial properties, Ex. 2 (Hedden Report) at Appendix A, and his Appraisal Institute member profile does not even list residential properties among his expertise, though it does list commercial, industrial, land, public, special purpose property

only 400 residential properties.  Ex. 2 (Hedden Report) at ¶ 1.  The vast majority of the residential appraisals Mr. Hedden performed or supervised occurred nearly 30 years ago, between 1987 and 1988.[6]  Indeed, Mr. Hedden recalled performing only *four* residential appraisals in the last twelve years, equating to less than 1% of his total appraisal experience over the period.[7]

In response to Dr. Kilpatrick's findings in the Credibility Report, Mr. Hedden submitted a rebuttal report on August 14, 2014 (the "Hedden Report").  In forming his opinions, Mr. Hedden relied on opinion letters prepared by anonymous appraisers employed by iMS, a valuation due diligence firm, for 40 Nomura sample appraisals that Dr. Kilpatrick found to lack credibility.  These opinion letters, which were prepared on iMS letterhead, included up to 12 questions, such as "Is the information on the subject property correctly stated?" and "Is the opinion of market rent reasonable and supported?," followed by brief conclusory opinion provided by the iMS appraiser concerning each question.  *See* Hedden Report, Appendix C.  Each letter is signed with the corporate logo of iMS.  *Id.*  The letters do not disclose the name of the appraiser who performed the actual review and issued the letter, their qualifications or experience, or how they went about formulating their opinions.  The questions answered in the iMS letters generally do not mirror the questions posed by Dr. Kilpatrick's CAM methodology.

Mr. Hedden purports to use these 40 opinion letters to "evaluate [Dr. Kilpatrick's] CAM findings [by] . . . provid[ing] additional information on the specific issues and attributes for which Dr. Kilpatrick failed [40 geographically dispersed] appraisals in his CAM."[8]  Ex. 2

---

appraisals, Ex. 4 (Profile, Appraisal Institute); Ex. 1 (Hedden Tr.) at 100:6-10 (" Q. And I assume that you tried to be accurate about your qualifications and expertise in connection with the bio you keep on the Appraisal Institute website?  A. Yes.").

[6] Ex. 1 (Hedden Tr.) at 88:3-20 ("All right. So when you say you did 300 appraisals, that you supervised, or you performed yourself as a line appraiser -- sorry, 400 residential appraisals, am I correct in understanding that the vast majority of those were when you were at Izenberg Appraisal Associates?  A. Yes.  Q. All right.  And that was from 1987 to 1988, right?  A. That is correct.").

[7] Notably, two of these four residential appraisals were of multi-million dollar properties.  Ex. 1 (Hedden Tr.) at 85:8-17, 97:9-98:2.

[8] Ex. 2 (Hedden Report) ¶ 18; *id*. at Appendix C (iMS Letters).  Mr. Hedden testified that he reviewed all of Dr. Kilpatrick's CAM credibility findings but opined based only on the subset of those findings for which iMS

(Hedden Report) ¶ 18. More specifically, Mr. Hedden expressly relied on the opinions of the anonymous iMS appraisers set forth in these letters to rebut Dr. Kilpatrick's CAM methodology findings.[9] Ex. 1 (Hedden Tr.) at 41:7-10 ("Q. And you would agree with me that the IMS letters set forth opinions, right, sir? Appraisal opinions? A. Yes."); *id*. 210:10-22 ("Q. And that's the basis you rely upon; illustratively, you say Dr. Kilpatrick's analysis and methodologies in those three questions were flawed, right, sir? A. His methodologies and opinions were contrary to those held by the local appraisers in that marketplace. Q. And your basis for saying that is because the IMS letters, from the IMS appraisers, based on the questions you asked them, indicate that he's wrong? A. Correct."). Specifically, each time Mr. Hedden challenges a CAM question or finding in his report, he cites an iMS opinion letter and asserts that Dr. Kilpatrick was wrong because "third party reviews . . . agree[] with the original appraisal."[10]

2. Mr. Hedden Had No Oversight of or Involvement in the Preparation of the iMS Opinion Letters

As Mr. Hedden confirmed at his deposition, the iMS opinion letters were prepared without his involvement or oversight. Indeed, Mr. Hedden had no prior relationship with iMS, Ex. 1 (Hedden Tr.) at 22:2-9, and had not seen the engagement agreement formalizing iMS' involvement in the review, *id*. at 37:16-23. Neither Mr. Hedden nor his staff set requirements for or examined the qualifications of the iMS appraisers who would be providing the opinions set forth in the iMS letters. *Id*. at 33:23-34:9; *id*. at 36:7-19. Neither Mr. Hedden nor his staff instructed iMS on how to undertake the reviews. *Id*. at 34:15-35:2 ("Did you leave it all to IMS

---

provided an opinion letter. Ex. 1 (Hedden Tr.) at 59:13-22 ("Q. What opinion, if any, are you offering in regard to the other 75 [appraisals] that you didn't discuss? […] A. I am not offering any opinion as to the other ones not used as illustrative examples.").

[9] Although confirming the letters constitute appraisal opinions, Ex. 1 (Hedden Tr.) at 41:7-10, Mr. Hedden conceded they are not compliant with USPAP Standards Rule 3, which governs appraisal reviews. *Id*. at 41:14-19. Indeed, Mr. Hedden's staff withheld information from iMS regarding the purpose of their reviews that USPAP requires. Ex. 2 (Hedden Report) at 8 ("I instructed IMS not to disclose to the appraisers the purpose of assignment, the intended use of their responses, or the identity of any end recipients of the appraisers' responses."); Ex. 1 (Hedden Tr.) at 42:11-23.

[10] Ex. 2 (Hedden Report) at n. 125, 139, 162, 164, 169, 175, 177, 179, 182, 190, 191, 196, 202, 267, 269, 270, 346, 355, 366, 372, 434, 443, 446, 482, 485, 507 and associated text.

to let their appraisers go about doing their work in the way they normally would do it, or they saw fit to do it, or did you impose some kind of protocols in IMS about how they would go about doing the appraisal research that you were asking them to do? A. We did not issue any protocol as to how they were to go about their work.”). Mr. Hedden did not know, inquire or evaluate how the appraisers iMS contracted with performed their reviews and prepared their opinions apart from presuming that iMS and the appraisers would adhere to their licensing obligations. *Id*. at 35:10-36:6 (“Q. Does anyone on your team, on the FTI team, have any knowledge about how the IMS appraisers went about their appraisal research work for this engagement? A. We do not have any intimate knowledge, no. Q. And when you say ‘intimate,’ I understand you to mean that you know what IMS told you, that they have local appraisers go do it, but you have no understanding about how actually the appraisers went about doing what they did? A. No, what I meant by the word ‘intimate’ was that they were licensed appraisers, so therefore they were under the obligations of ethics and competency to perform them in manners consistent with USPAP. However we have no intimate knowledge as to the day-to-day operation of how they went about their work.”).

Though Mr. Hedden claims to have read the iMS opinion letters, he did not review the iMS appraisers’ underlying work product and did not even know whether iMS provided any such supporting documentation for its appraisers’ opinions. Ex. 1 (Hedden Tr.) at 39:9-40:14 (“Q. And do you understand them to provide any backup in regard to the information and views they express in their letters? A. They may have. Q. You don't know one way or the other, sitting here, right, sir? A. Again, they may have. I don’t have knowledge as to one way or the other, that's correct. Q. In connection with this engagement, and in connection with your preparation for the deposition, you have never seen any backup that IMS may have provided for the letters that they gave you, right? A. That's correct. Q. And you never asked anybody on your team, directed anyone on your team to look at their backup for their letters, did you, sir? A. No, I did not. Q. And to your knowledge no one has done that, no one on your team has looked at the backup that

IMS provided in connection with the letters that they gave, right, sir? A. I am not aware. Q. You didn't give that direction? A. That's correct.").

Further, neither Mr. Hedden nor anyone acting under his direction reviewed the iMS opinion letters for accuracy or credibility. Ex. 1 (Hedden Tr.) at 47:13-48:15 ("Q. Your team -- no one on your team looked at those IMS letters and performed any additional analysis on the information and opinions set forth in those letters to ensure that they were accurate and credible, as that term is used in USPAP, correct, sir? A. That's my understanding. Q. You didn't give the direction to anybody else for them to look over the letters and ensure they were accurate and credible, right, sir? A. That's correct. Q. And you didn't ask Mr. Shapiro to do that, right sir? A. That's right. Q. And to your knowledge Mr. Shapiro didn't do that, right sir? A. To my knowledge, that's correct.").[11]

**ARGUMENT**

Admissible expert testimony must be based on "sufficient facts or data [that] is the product of reliable principles and methods . . . reliably applied to the facts of the case. Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592-94 (1993). Demonstrating expert testimony's reliability "requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006). An explanation is necessary

---

[11] At deposition, Mr. Hedden further conceded that he delegated all responsibility for obtaining the iMS opinion letters to his colleague Marc Shapiro. Ex. 1 (Hedden Tr.) at 29:20-25 ("Q. So you are relying upon Mr. Shapiro's decisions and expertise in making those decisions [concerning iMS] in connection with providing your expert opinion here today, sir? A. Yes."); *id*. at 23:7-24:2 ( Mr. Hedden's sole instruction to Mr. Shapiro was to complete the iMS reviews). Mr. Shapiro—not Mr. Hedden—picked the appraisals and formulated the questions that iMS appraisers focused their review on. *Id*. at 24:11-25:4 ("[W]e crafted a couple of questions specifically addressing the issues, the language which, you know, [Mr. Shapiro] put together"); *id*. at 31:21-32:15 ("Q. And were you involved in determining what . . . 40 appraisals were the right appraisals, or did you delegate that to Mr. Shapiro, too? A. Mr. Shapiro administered that aspect for the team. Q. So you made no decisions, if I understand it, Mr. Hedden, at all about how many appraisals to put out to [iMS], correct? A. That is correct.); *see also id*. at 28:10-16 ("Q. Okay. And how did you, as the expert witness, select which questions were going to be put to [iMS] in regard to each particular appraisal? A. I delegated that to Marc Shapiro."). Indeed, Mr. Hedden advised at his deposition that Mr. Shapiro, not Mr. Hedden, would be the right person to answer questions about the reviews. *Id*. at 30:9-31:8 ("Q. So my question again is: If I need to understand how this part of your expert assignment was performed, I would need to go depose Mr. Shapiro, correct? Or talk to Mr. Shapiro? A. Mr. Shapiro would be the one that would answer those questions.").

because "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero v. Warner–Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) (citation omitted).

Expert opinion based entirely on the opinions of others is unreliable, because the expert "is no longer applying his extensive experience and a reliable methodology." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008). Such an opinion also "circumvent[s] the rules prohibiting hearsay," because the expert's opinion "simply transmit[s] that hearsay to the jury" and serves as "a conduit for the opinion of an unproduced expert. *Mejia*, 545 F.3d at 197 (citation omitted); *Dooney & Bourke*, 525 F. Supp. 2d at 661-664; *see also, e.g.*, *Quiles v. Bradford-White Corp.*, No. 10-CV-747, 2012 WL 1355262, at *7 (N.D.N.Y. Apr. 18, 2012) (An expert "must give his own opinion based upon his own expert analysis."). Thus, Rules 702 and 802 require the exclusion of an expert who acts as a "mouthpiece" for another person's conclusions. *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613-14 (7th Cir. 2002).

## I. MR. HEDDEN CANNOT SERVE AS A MOUTHPIECE FOR THE ANONYMOUS APPRAISERS ENGAGED BY IMS

Defendants seek to have Mr. Hedden offer opinions to the jury concerning the Nomura sample appraisals that are based entirely on unsupervised reviews performed by non-testifying third-party appraisers hired by iMS. Not only did Mr. Hedden and his staff fail to supervise iMS' reviews, neither he nor his staff even checked the accuracy, reliability and credibility of iMS' work or its appraisers' opinions. Mr. Hedden is not able to sidestep the reliability and disclosure requirements of the Federal Rules of Evidence by relying on the unverified opinions of so called "independent," anonymous, third parties.

### A. The iMS Letters Set Forth Their Appraisers' Own Subjective Opinions

The iMS opinion letters set forth the opinions of the individual appraisers that prepared each letter. These letters do far more than report objective factual information concerning the

properties or appraisals. To the contrary, the letters set forth the subjective, conclusory, opinions of the iMS appraisers concerning the specific issues raised by Dr. Kilpatrick in regard to an individual appraisal. *See* Ex. 2 (Hedden Report) at Appendix C. It is these subjective opinions, not a vetting and evaluation of objective facts set forth in the letters, which Mr. Hedden relies on wholesale to proffer his opinions. Ex. 1 (Hedden Tr.) at 35:10-36:6, 46:18-47:7 ("The review that those IMS appraisers performed on those 40 appraisals, those are their opinions, right? Under USPAP they're required to be their opinions, right, sir? A. That is correct. Q. All right. Those are not your opinions, right, sir? A. That's correct. Q. You did not do that work, right, sir? A. That's correct."); Ex. 1 (Hedden Tr.) at 35:17-37:15; Ex. 2 (Hedden Report) at 9.

As Defendants have not disclosed the names and qualifications of the iMS appraisers, much less proffered them as experts pursuant to FRCP 26 and FRE 702, their opinions cannot now be relied on or presented at trial. Fed. R. Civ. P. 26(a)(2)(A)-(B). The deadline for disclosing an expert has passed, and FHFA has had no opportunity to depose and question iMS and the actual appraisers about the reliability and accuracy of their opinions underlying Mr. Hedden's report. *Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1208 (5th Cir. 1993) (holding that the admission of portions of a non-testifying expert's report relied on by a testifying expert was erroneous where there was no "opportunity to cross-examine [non-testifying expert] regarding the methodology he employed, statistical discrepancies in his report, or any other matters which might illuminate shortcomings in his work").

**B. Mr. Hedden Cannot Blindly Rely On the Opinions Set Forth in the iMS Letters**

Mr. Hedden cannot adopt the opinions set forth in the iMS letters by "simply parrot[ing] the findings of" other experts. *Quiles*, 2012 WL 1355262, at *7; *Mejia*, 545 F.3d at 197 ("When an expert is no longer applying his extensive experience and a reliable methodology, *Daubert* teaches that the testimony should be excluded.").

Mr. Hedden admits he and his team did nothing to evaluate the reliability or accuracy of the opinions set forth in the iMS letters.[12] *See supra* at 7. Mr. Hedden did not supervise the iMS appraisers in the preparation of their reviews. Ex. 1 (Hedden Tr.) at 34:15-35:2 ("Did you leave it all to IMS to let their appraisers go about doing their work in the way they normally would do it, or they saw fit to do it, or did you impose some kind of protocols in IMS about how they would go about doing the appraisal research that you were asking them to do? A. We did not issue any protocol as to how they were to go about their work."). Mr. Hedden never communicated with the iMS appraisers, never verified any of the appraisers' qualifications, did not oversee iMS' work during the reviews, never reviewed the documentation supporting the iMS appraisers' opinions, and otherwise took no steps to ensure the reliability of the appraisers' opinions. Ex. 1 (Hedden Tr.) at 22:13-23:6; at 47:13-48:15 ("Q. Your team -- no one on your team looked at those IMS letters and performed any additional analysis on the information and opinions set forth in those letters to ensure that they were accurate and credible, as that term is used in USPAP, correct, sir? A. That's my understanding. Q. […] when you say it's 'my understanding,' since you're the head of the engagement I have a problem with asking you then: You didn't give the direction to anybody else for them to look over the letters and ensure they were accurate and credible, right, sir? A. That's correct. Q. And you didn't ask Mr. Shapiro to do that, right sir? A. That's right. Q. And to your knowledge Mr. Shapiro didn't do that, right sir? A. To my knowledge, that's correct."); *id*. at 22:2-9; *id*. at 36:7-19.

Because the iMS appraisers rendered professional opinions and thus "exercised far more discretionary judgment than an assistant gathering data," and because Mr. Hedden made no

---

[12] While FHFA requested the names of the appraisers that iMS engaged to perform the reviews prior to Mr. Hedden's deposition, Defendants refused to provide this information. The absence of this disclosure prevented FHFA—similar to Mr. Hedden and his team—from even evaluating whether the iMS appraisers were actually licensed, geographically competent to review the subject appraisals, or subject to disciplinary action. Ex. 2 (Hedden Report) Appendix C; Ex. 1 (Hedden Tr.) at 124:12-20 ("Q. All right. Do you know whether you cite -- you don't know the identity of those appraisers, do you, sir? A. No, I do not. Q. Do you know if anybody on your team knows the identity of any of those appraisers? A. They may. I don't know. "); *id*. at 33:23-34:9 ("Did you or anybody on your team in any shape or form vet those local appraisers? […] A. Not that I am aware. Q. So in other words, at least from your point of view there was no direction to evaluate those local appraisers for competency or disciplinary action or any other kind of concern about them? A. That's correct.").

attempt to validate the appraisers' opinions, Mr. Hedden cannot now rely on those opinions as his own. *Faulkner v. Arista Records LLC*, No. 07 CIV. 2318 LAP, 2014 WL 4547824, at *18-19 (S.D.N.Y. 2014); *see also Auther v. Oshkosh Corp.*, No. 09-CV-00527(A)(M), 2013 WL 5272959, at *3-*5 (W.D.N.Y. Sept. 16, 2013) (excluding expert testimony where the expert did nothing to "validate the conclusions" in other reports).[13] *Hutchinson v. Groskin*, 927 F.2d 722, 725 (2d Cir. 1991) (holding that it is improper to use an expert "as a conduit for hearsay testimony"). Mr. Hedden may not rely on or testify about appraisal opinions provided by anonymous third parties that he did not direct, instruct, or supervise in any manner.

## CONCLUSION

For the reasons stated above, FHFA respectfully requests that the Court grant FHFA's Motion to Exclude the Expert Testimony of Michael Hedden to the extent any such testimony is reliant upon or makes reference to the work performed by iMS, including, but not limited to, Appendix C to Mr. Hedden's August 14, 2014 expert report and opinions supported therefrom within its text.

DATED: January 8, 2015
New York, New York

*/s/ Philippe Z. Selendy*

Philippe Z. Selendy
Sascha N. Rand
Jonathan C. Eser
M. Eva Markowski
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor

---

[13] Mr. Hedden performed no more oversight of Mr. Shapiro than directing him to engage iMS to obtain the opinion letters. Ex. 1 (Hedden Tr.) at 23:7-24:2 ("Q. And what -- what instructions, if any, did you give to Mr. Shapiro about how that was to occur; in other words, how [iMS] was to investigate the issues raised by the Kilpatrick CAM and/or Recovco? A. Nothing more than the delegation to Mr. Shapiro and I asked him to, you know, oversee that part of the team."); *id*. at 29:20-25 ("Q. So you are relying upon Mr. Shapiro's decisions and expertise in making those decisions in connection with providing your expert opinion here today, sir? A. Yes."). While an expert is entitled to rely on the work of assistants in gathering facts and preparing opinions, an expert must "supervise them carefully." *Dura Auto.*, 285 F.3d at 613.

New York, New York  10010-1601
(212) 849-7000

*Attorneys for Plaintiff Federal Housing Finance Agency,
as Conservator for Fannie Mae and Freddie Mac*