# Exhibit 2

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
### CASE #: 11 Civ. 6201 (DLC)

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE HOME LOAN
MORTGAGE CORPORATION,

          Plaintiff,

     -against-

NOMURA HOLDING AMERICA INC.,
NOMURA ASSET ACCEPTANCE
CORPORATION, NOMURA HOME
EQUITY LOAN, INC., NOMURA CREDIT
& CAPITAL, INC., NOMURA SECURITIES
INTERNATIONAL, INC., RBS
SECURITIES INC. (f/k/a GREENWICH
CAPITAL MARKETS, INC.) , DAVID
FINDLAY, JOHN MCCARTHY, JOHN P.
GRAHAM, NATHAN GORIN, and N.
DANTE LAROCCA,

          Defendants.

EXPERT REPORT OF MICHAEL P. HEDDEN

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al
## Table of Contents

I.   Background ................................................................................................ 4

    A.   Qualifications ................................................................................... 4

    B.   Assignment ...................................................................................... 5

II.   Introduction .............................................................................................. 6

    A.   Summary of Opinions Put Forth by Dr. Kilpatrick, Dr. Epley, and Mr. Hunter ......... 6

    B.   Work Undertaken to Respond to Plaintiffs' Experts' Opinions .................................. 8

    C.   Structure of Report ........................................................................ 10

III.   Summary of Opinions ............................................................................. 11

IV.   Standards and Requirements Applicable to Residential Real Estate Appraisals ........... 12

    A.   Appraisals in Connection with Residential Mortgages ........................................... 13

    B.   Appraisers Are Held To Strict Ethical and Competency Standards.......................... 16

    C.   Evaluating Appraisals Retrospectively ................................................................ 17

V.   The CAM Is an Invalid and Unreliable Tool for Evaluating the Credibility of an Appraisal, and Was Used in an Unreliable Manner.................................................................. 19

    A.   Overview of the CAM ................................................................... 19

    B.   The CAM's Design Makes It Invalid And Unreliable As A Tool to Distinguish Between Credible and Non-Credible Appraisals.................................................. 22

    C.   In Addition to the CAM's Design Flaws, Dr. Kilpatrick's Team Has Also Implemented and Applied It In An Unreliable Manner That Renders His Findings Useless.   26

VI.   Analysis of the CAM's 31 Questions .......................................................... 32

VII.   Recovco's Review Is an Unreliable Method for Evaluating the Credibility of Appraisals, And the Review Was Conducted in an Unreliable Manner ................................ 109

    A.   Overview of Recovco's Review and Methodology ................................................ 109

    B.   Many of Recovco's Finding Categories Have No Bearing on the Credibility of an Appraisal .......................................................................................110

    C.   Even If Recovco's Reviews Were a Valid Method to Assess Appraisals, Recovco Conducted the Reviews in an Unreliable Manner that Makes Them Useless....................112

    D.   Analysis of the Top Ten Recovco Findings by Category Demonstrates the Invalidity of Recovco's Methods and the Unreliable Manner in Which They Conducted the Reviews   113

    E.   Recovco Comment Category: Highest & Best Use.................................................115

    F.   Recovco Comment Category: Gross Living Area Variance .......................................117

    G.   Recovco Comment Category: Item not Bracketed by Comparables ......................119

    H.   Recovco Comment Category: Site Size Difference................................................ 120

    I.   Recovco Comment Category: Zoning....................................................... 122

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

J.    Recovco Comment Category: Comparables Greater Than 6 Months ........................ 123

K.    Recovco Comment Category: Adjustments ............................................................ 125

L.    Recovco Comment Category: Market Trend Absorption ....................................... 127

M.    Recovco Comment Category: Predominant Neighborhood Price Variance ............ 130

N.    Recovco Comment Category: Prior Sale ............................................................... 133

VIII.   The appraisal-related findings in Mr. Hunter's Report are inaccurate and do not discredit the original appraisals. ............................................................................................ 135

A.    Mr. Hunter's Claims That Appraisals Did Not Support the Property Value Conclusion 135

B.    Mr. Hunter's Claims That Appraisals Were Not "Qualified Appraisals" ............... 138

IX.    Dr. Epley's review of the cam failed to validate its methodology or results .............. 140

A.    Dr. Epley Did Not Justify the CAM's Methodological Failings Described Above And, Indeed, Appears Not to Have Analyzed Many of Them At All .................................. 142

B.    Because He Did Not Test the CAM, Dr. Epley Offered No Opinion About Whether It Yielded Reliable Results or Was Applied Correctly in the *Nomura* Case ........................... 144

X.    Certification .................................................................................................. 145

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

## I.   BACKGROUND

### A.   Qualifications

1.     I am a Managing Director at FTI Consulting, Inc. ("FTI"). I have 41 years of experience in residential real estate, including 33 years in the field of real estate appraisals. I hold the designations of New York Certified General Real Estate Appraiser (ID No. ███████), Member of the Appraisal Institute (MAI), Counselor of Real Estate (CRE), and Fellow of the Royal Institute of Chartered Surveyors (FRICS). I hold Appraisal Certifications in 13 states, including New York and New Jersey. In addition, I have held a New Jersey real estate brokerage license for 36 years. A true copy of my curriculum vitae is attached as **Appendix A**.

2.     My expertise includes the preparation and quality review of residential appraisals and management of appraisal business operations. Over the course of my career, I conservatively estimate that I have conducted or supervised over 400 residential appraisals, 3,000 commercial appraisals, 400 land appraisals, and 300 appraisal reviews.

3.     I have been active in the Appraisal Institute for over 30 years and was a member of the Standards and Ethics Committee review panel from approximately 1987 through 1992. I was on the Board of Directors of the Metro New Jersey Chapter of the Appraisal Institute from 2005 through 2010 and was President from 2009 through 2010. I have taught several appraisal related courses for the Appraisal Institute, including real estate finance and statistics, income capitalization, market analysis and highest and best use,[1] and have also spoken at Continuing Legal Education Seminars in New Jersey. A representative list of my teaching and instructional presentations is set forth in **Appendix A**.

4.     I am the author or co-author of several publications relating to real estate, including appraisals and valuation, as set forth in **Appendix A**.

5.     I have been admitted as an expert and testified before a number of U.S. District Courts, State Courts, a Legislative Committee, and various condemnation and zoning boards

---

[1] The highest and best use of a property is an appraisal term of art that means: "the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value." Appraisal Institute, The Dictionary of Real Estate Appraisal, (Chicago: Appraisal Institute, 5th ed. 2010), p. 92.

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

on matters related to real estate valuation. A list of all cases in which I testified at trial or in deposition in the last four years is set forth in **Appendix A**.

> ### B.     Assignment

6.      I have been retained by Sullivan & Cromwell LLP ("Counsel"), counsel for Nomura Holding America, Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital Inc., and Nomura Securities International, Inc., (collectively, "Nomura") and David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca (collectively, the "Individual Defendants," and with Nomura, "Defendants") in connection with the case captioned *Federal Housing Finance Agency* v. *Nomura Holding America Inc., et al.,* 11 Civ. 6201 (S.D.N.Y.) (DLC).

7.      Plaintiff, the Federal Housing Finance Agency ("FHFA"), as conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, "the GSEs"), alleges that Defendants sold certain residential mortgage-backed securities ("RMBS") pursuant to Registration Statements, Prospectuses, and Prospectus Supplements (the "Offering Documents") that contained materially false or misleading statements and omissions.[2] In particular, Plaintiff alleges that statements about the "characteristics and credit quality of the mortgage loans underlying the Securitizations" were "materially false" due to "significant percentages of the underlying mortgage loans [ ] not [being] originated in accordance with the represented underwriting standards and origination practices."[3]  Plaintiff further alleges that LTV ratios disclosed in the Prospectus Supplements "were materially false and understated at the time of the loans' origination"[4] and that "[t]hese systematic inaccuracies with respect to reported LTV ratios also indicate that the representations and warranties in the Registration Statements relating to appraisal practices were false" and that appraisers "routinely furnished appraisals that the appraisers understood were inaccurate."[5]

8.      I have been asked by Counsel to review and respond to aspects of Plaintiff's experts' opinions concerning appraisals, which include the May 15, 2014 Expert Report of

---

[2] Amended Complaint, *FHFA* v. *Nomura Holding America Inc.*, *et al.*, 11 Civ. 6201 (S.D.N.Y.) (DLC), ¶ 1.
[3] *Id.* ¶ 5
[4] *Id.* ¶ 106
[5] *Id.* ¶ 111

John A. Kilpatrick, Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practices ("Kilpatrick Adherence Report"), the May 15, 2014 Expert Report of Donald Epley, Ph.D., MAI, CCIM Concerning the Credibility Assessment Model ("Epley Report"), and the May 15, 2014 Expert Report of Robert W. Hunter Regarding the Underwriting of Mortgage Loans Underlying the Nomura Securitizations ("Hunter Report").. In preparing this report, I reviewed the Kilpatrick Adherence Report, the Epley Report and the Hunter Report, and associated supporting documentation. I have also requested and reviewed other documents and communications produced in this matter that were necessary for me to formulate the opinions set forth in this report. In addition, along with my staff working to assist me, I have researched publicly available information. I have also engaged a third party firm to research a sample of Dr. Kilpatrick's adverse findings as described in more detail below. A full listing of the information that I have relied upon for this expert report is attached hereto as **Appendix B**. I reserve the right to revise my opinions and supplement this report as additional information becomes available.

9.   FTI is being compensated for my services in this matter at an hourly rate of $675. This compensation is not contingent on the nature of my findings or the outcome of this litigation. My opinions are based on information available to me and the analyses completed to date. I may revise this report to the extent that new documents and information are provided to me.

## II.   INTRODUCTION

### A.   Summary of Opinions Put Forth by Dr. Kilpatrick, Dr. Epley, and Mr. Hunter

10.   Dr. Kilpatrick has submitted three reports in this matter.[6] In the May 15, 2014 Expert Report of John A. Kilpatrick, Ph.D Concerning Accuracy of Appraisals ("Kilpatrick Accuracy Report"), Dr. Kilpatrick uses a model ("the Greenfield AVM") that he created for his assignments in this litigation and other matters to purportedly calculate more "accurate"

---

[6] In addition to the Kilpatrick Adherence Report, which I respond to at length in this report, Dr. Kilpatrick also submitted two other reports in this matter:  the Expert Report of John A. Kilpatrick, Ph.D. Concerning Accuracy of Appraisals, May 15, 2014 ("Kilpatrick Accuracy Report"), and the Supplement to the Expert Report of John A. Kilpatrick, Ph.D. Concerning Extrapolation for Accuracy of Appraisals and Adherence of Appraisals to Appraisal Standards and Practice, July 9, 2014 ("Kilpatrick Extrapolation Report"). While I discuss the Kilpatrick Accuracy Report briefly, this report is discussed at length—and refuted—in the expert reports of Lee Kennedy, Dr. Jerry Hausman and Dr. Hans Isakson. I do not address the Kilpatrick Extrapolation Report.

values at origination for homes collateralizing a sample of the loans at issue in this case.
Using these values, he concludes that the "original appraised values of 208 of the 672 sample
Nomura properties valued by the Greenfield AVM were significantly higher than their true,
credible appraised values." Dr. Kilpatrick further concludes that because the original
appraised values of these properties are overstated, the loan-to-value ("LTV") ratios of these
properties were overstated in Prospectus Supplements for their respective securitizations.[7]

11.     In the Kilpatrick Adherence Report, Dr. Kilpatrick purports to assess the
"credibility" of 205 of the 208 sample properties the Greenfield AVM found to be overvalued,
using what he terms a Credibility Assessment Model ("CAM").[8] The CAM is based on 31
"yes" or "no" questions that Dr. Kilpatrick fashioned into a checklist that he used to score
each of the appraisals.[9] Applying the CAM, Dr. Kilpatrick determined that for 92.20% of the
205 sample properties assessed "no reasonable appraiser adhering to the appraisal standards
and practices applicable at the time could have believed the appraisals were credible."[10] Dr.
Kilpatrick also retained a separate firm, Recovco, to review and grade these 205 appraisals.[11]

12.     In the Epley Report, Dr. Epley purportedly applied an analysis rooted in six
criteria that he claims enabled him to assess the CAM's methodology, application, priorities
and weightings, and its consistency with and reflection of USPAP.[12,13] Dr. Epley opines that
the CAM achieves its objectives as a "scoring model" and ultimately concludes that the CAM
is able to "differentiat[e] the credible appraisals from non-credible appraisals."[14] Dr. Epley
further concludes that the CAM "addresses critical elements of USPAP credibility";
"incorporates the key and important concepts of the FNMA URAR 1004 form"[15]; assigns

---

[7] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 2
[8] *Id.*, p.2-3
[9] *Id.*, p.40-44
[10] *Id.*, p. 101
[11] *Id.*, p. 4
[12] Expert Report of Donald Epley, Ph.D., MAI, CCIM Concerning the Credibility Assessment Model, May 15, 2014, pp. 3-4
[13] The Uniform Standards of Professional Appraisal Practice (USPAP), which are updated periodically, represents the generally accepted and recognized standards of appraisal practice in the United States, as developed by the Appraisal Standards Board of the Appraisal Foundation. See The Appraisal Foundation, USPAP 2005 and 2006 Editions, Origin and History of USPAP
[14] Expert Report of Donald Epley, Ph.D., MAI, CCIM Concerning the Credibility Assessment Model, May 15, 2014, pp. 2, 19
[15] A Uniform Residential Appraisal Report (URAR) is a commonly used and widely accepted form in the appraisal of single-family dwellings that can also be used in the appraisal of a planned unit development. The

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

priorities "to appraisal standard aspects and categories within aspects . . . consistent with USPAP and related appraisal guidance and practice"; assigns weights in a manner consistent with appraisal standards and practice; and "appropriately utilizes a credibility threshold in a manner that is reasonable and consistent with appraisal standards and practice."[16]

13.     In the Hunter Report, Mr. Hunter conducted a re-underwriting of a sample of 723 Nomura mortgage loans. As part of that re-underwriting review, Mr. Hunter and his team performed "a collateral review to determine whether the mortgaged property was appraised in accordance with the underwriting guidelines and minimum industry standards."[17]

14.     Mr. Hunter does not draw specific appraisal-related conclusions in the text of his report. Instead, he claims that "appraisal-related defects" are one category underlying "underwriting defects."[18] Mr. Hunter's specific appraisal-related claims appear in Exhibit 2 to his May 15, 2014 report, and there are 16 claims which I have determined are based on real estate appraisal standards or practices and to which I respond in this Report.

**B.     Work Undertaken to Respond to Plaintiffs' Experts' Opinions**

15.     To respond to Plaintiff's experts' opinions, I assembled a team of experienced real estate professionals.  The team consisted of certified real estate appraisers and holders of related academic and professional credentials and memberships, qualifying them to perform the tasks I required of them, which consisted primarily of reviewing appraisals. My team also consisted of managers who supervised the team's day-to-day research. I communicated with my team on a regular basis to review their work product and provide direction.

16.     To further assist me, I engaged a third party research firm called iMortgage Services, LLC ("IMS"), to answer certain questions specific to certain appraisals. IMS utilized licensed appraisers to answer my specific questions by examining the original appraisals and performing local research on subject properties.  I instructed IMS not to disclose to the appraisers the purpose of assignment, the intended use of their responses, or the identity of any end recipients of the appraisers' responses.

---

form allows for standard reporting and analysis and includes all three approaches to value, the cost, sales comparison and income capitalization approaches. The most current form is Fannie Mae form 1004 (March 2005), which is also identified as Freddie Mac Form 70.  [cite for this?]

[16] Expert Report of Donald Epley, Ph.D., MAI, CCIM Concerning the Credibility Assessment Model, May 15, 2014, pp. 20-21

[17] Expert Report of Robert W. Hunter, May 15, 2014, p. 98

[18] Expert Report of Robert W. Hunter, May 15, 2014, p. 102, n. 269

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

17.     As described in Section II(A), Dr. Kilpatrick relies on his CAM findings and Recovco's review to opine on the credibility of 205 of the 208 appraisals deemed inaccurate by the Greenfield AVM. My team and I inspected the inputs, methodologies, calculations, and conclusions of the CAM and Recovco that form the basis of Dr. Kilpatrick's conclusions regarding these 205 appraisals.

18.     For each of the 31 CAM questions, my team and I assessed Dr. Kilpatrick's methodology and findings in relation to contemporaneous real estate appraisal standards including USPAP and GSE guidelines. To further evaluate the CAM findings, I selected 40 geographically dispersed appraisals with high CAM scores, and developed research questions (submitted to IMS) that were designed to provide additional information on the specific issues and attributes for which Dr. Kilpatrick failed these appraisals in his CAM. My questions and the associated responses from IMS regarding these 40 loans can be found in **Appendix C**.

19.     My team and I also assessed each of Recovco's findings in detail, and rated each one as follows:

- Rating 1 -  Recovco's finding is clearly contradicted by evidence in the loan file (or supplemental research)[19]

- Rating 2 -  Recovco's finding is not required by USPAP and inconsistent with industry practice but the appraiser addresses the issue

- Rating 3 -  Recovco's finding does not materially impact the opinion of value

- Rating 4 -  Recovco's finding may be correct and may materially impact opinion of value

20.     Our assessment of Recovco's findings stopped with the first rating we found to be true, e.g. if we concluded that Recovco's finding fell into Rating 1 we performed no further review. My detailed analysis, including my conclusions on and ratings of each of Recovco's findings, is contained in **Appendix D**.

21.     As described in Section II(A), in connection with his re-underwriting review, Mr. Hunter has claimed that certain loans have appraisal-related defects. My team and I reviewed Mr. Hunter's findings and assessed them in relation to contemporaneous real estate

---

[19] Supplemental research was performed by IMS in response to my questions regarding a subset of loans that failed CAM questions as described above.

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

appraisal standards including USPAP and GSE guidelines, and, if available, in relation to
appraisal-specific information gathered from the IMS responses described above. My detailed
analysis of Mr. Hunter's findings is in **Appendix E**.

22.     As described in Section II(A), Dr. Epley has purportedly assessed the CAM's
methodology, application, priorities, weightings, and consistency with and reflection of
USPAP. To assess Dr. Epley's opinions, my team and I have reviewed Dr. Epley's criterion
and methodologies and the bases of his opinions.

**C.     Structure of Report**

23.     The remainder of my Report is structured as follows:

- Part III gives a summary of my opinions.

- Part IV provides an overview of standards applicable to residential
  real estate appraisal and addresses the retrospective evaluation of
  appraisals.

- Part V examines the CAM and describes the model's flaws in
  relation to its methodology, including, among other things, its
  inconsistency with USPAP's requirements, arbitrary credibility
  threshold, and lack of peer review and validation.

- Part VI analyzes each of the CAM's 31 questions and illustrates,
  through the use of examples, how the CAM's questions are either
  not based on USPAP's requirements or test requirements that are
  contrary to USPAP and how Dr. Kilpatrick arrives at unreliable and
  incorrect answers to certain CAM questions.

- Part VII provides an overview of Recovco's methodology and
  analyzes its findings to show the invalidity of its methods and the
  unreliable manner in which its representatives  conducted their
  reviews.

- Part VIII addresses the appraisal-related findings of Mr. Hunter,
  FHFA's re-underwriting expert, and explains why those findings are
  inaccurate and do not discredit the original appraisals.

- Part IX explains how Dr. Epley's review of the CAM fails to
  validate the CAM's methodology or results.

- Part X concludes my Report and offers a summary of my opinions.

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

### III. SUMMARY OF OPINIONS

24.     The CAM, developed by Dr. Kilpatrick for this litigation, is an invalid and unreliable tool for evaluating the credibility of an appraisal. There are numerous flaws in the CAM model:

- None of the 31 questions comprising the CAM are based on USPAP requirements.  Indeed, some of the CAM questions, as discussed below, are actually contrary to USPAP's principles.

- The weighting of the 31 questions that Dr. Kilpatrick created is arbitrary.

- Dr. Kilpatrick creates and utilizes an arbitrary threshold to decide what total CAM score indicates a non-credible appraisal.

- Each of the 31 questions comprising the CAM imposes a rigidity on the evaluation of appraisals that is not part of well-accepted appraisal review practices, which recognize the need for some flexibility in appraisal standards.

- The CAM is vastly dissimilar to a field review or desk review, two of the most commonly accepted methods of appraisal review.

- Dr. Kilpatrick provides no evidence that the CAM properly distinguishes between credible and non-credible appraisals.

- Dr. Kilpatrick presents no sensitivity analysis of the CAM.

- The CAM has been created for this litigation and has not been subject to peer review or any external validation.

- The CAM has a host of additional problems, which I discuss in greater detail below.

25.     Even if the CAM were a valid and reliable tool, Dr. Kilpatrick and his team have implemented and applied it in an unreliable manner that renders his findings unusable. In several instances, Dr. Kilpatrick's team answers the CAM's own questions incorrectly or applies the questions unreliably.

26.     Recovco's findings are likewise unreliable, inaccurate and do not discredit the original appraisals, and Dr. Kilpatrick's reliance on these findings contributes to the unreliability of his opinions and conclusions.

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

27.    Dr. Epley's analysis is incomplete, flawed, internally inconsistent, and reflects no substantive, independent analysis or evaluation of the CAM.  Dr. Epley neglects obvious problems with the structure of the CAM and fails to account for the numerous and obvious flaws in the results that the CAM provides.

28.    Lastly, with regard to appraisal standards and practices, Mr. Hunter's appraisal-related findings are unreliable and do not discredit the original appraisals.

## IV.    STANDARDS AND REQUIREMENTS APPLICABLE TO RESIDENTIAL REAL ESTATE APPRAISALS

29.    Real estate appraisals are commonly prepared in connection with the issuance of residential mortgages for the purposes of purchasing a home or refinancing (i.e., replacing) existing debt. In a purchase money transaction, after a seller lists the property and receives an offer from the buyer, the buyer and seller agree to the terms, including the purchase price, and enter into a purchase contract.  The buyer then begins the process of obtaining a mortgage to help finance the property.  As part of the process of securing a mortgage, a mortgage lender orders an appraisal of the property. The appraisal is conducted in advance of the closing of the mortgage transaction (and the purchase transaction), as the lender must ensure the subject property provides sufficient collateral for the mortgage in the event of default. In a refinance transaction, the appraisal also precedes the closing of the mortgage transaction, because again, the lender must ensure the mortgage is adequately collateralized.

30.    Appraisals are based on a comprehensive set of prescribed procedures performed by licensed and certified appraisers who meet educational, experience and testing requirements.[20] These procedures and requirements are developed and monitored by the leading professional organization of appraisers, the Appraisal Institute, and are encompassed in its Code of Professional Ethics and in the Uniform Standards of Professional Appraisal Practice ("USPAP"). USPAP represents the generally accepted and recognized standards of appraisal practice in the United States. These standards establish requirements for ethical and competent appraisal practice in order to promote and maintain a high level of public trust and confidence in Appraisal Institute Members[21] and the appraisal profession as a whole. Under

---

[20] Appraisal Institute, The Appraisal of Real Estate (14th ed. 2013), p. 2
[21] http://www.appraisalinstitute.org/professional-practice/ethics-and-standards/standard-of-professional-appraisal-practice

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

these standards, appraisers develop and communicate their analyses and opinions to intended users of their services in a manner that is meaningful and not misleading." [22]

31.    USPAP has been the generally recognized standard of practice in the appraisal profession since Congress enacted Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) and authorized "federal financial institutions regulatory agencies" to refer to USPAP in their regulations. [23] All licensed and certified real property appraisers in the United States are required to comply with USPAP.

32.    The Executive Branch and several federal agencies followed Congress by referring to USPAP in various laws and policies. [24] GSEs [25] that use appraisals, including Fannie Mae and Freddie Mac, also refer to USPAP and integrate USPAP standards into their policies. [26]

### A.    Appraisals in Connection with Residential Mortgages

33.    There are several different appraisal methods that an appraiser can use to value real estate; however, appraisals involving a physical inspection of the property and the development of one or more valuation methods, as appropriate, are the most common appraisal methods relied upon for residential mortgage transactions such as those at issue in this case.  In the case of residential properties, traditional appraisals, as previously described,

---

[22] The Appraisal Foundation, USPAP 2005 Edition, Preamble

[23] 12 U.S.C. § 3339 (amended in 2010)

[24] The Executive Branch recognized USPAP in the Uniform Relocation Assistance and Real Property Acquisition Policies Act. Furthermore, several other federal agencies recognized USPAP in accordance with the Office of Management and Budget Circular A-129, dated January 11, 1993.  See "The Appraisal Foundation: Requiring Adherence to Generally Recognized Valuation Standards Is Sound Public Policy," (The Appraisal Foundation, Washington, D.C.), p. 1-2,
https://netforum.avectra.com/eWeb/DynamicPage.aspx?Site=TAF&WebCode=History; Circular No. A-129: Policies for Federal Credit Programs and Non-Tax Receivables (Office of Management and Budget, January 2013), http://clinton2.nara.gov/omb/circulars/a129/a129 html

[25] Government Sponsored Enterprises, known as "GSEs", are federally chartered privately owned corporate entities created by Congress.  Congress established GSEs "to improve the efficiency of capital markets" and to overcome "statutory and other market imperfections which otherwise prevent funds from moving easily from suppliers of funds to areas of high loan demand." (CRS Report RS21663, updated April 23, 2007, p. 1, http://fas.org/sgp/crs/misc/RS21663.pdf) "The housing GSEs are the Federal National Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), and the Federal Home Loan Bank System (FHLBank System), which currently consists of 12 Federal Home Loan Banks (FHLBanks)." (FHFA OIG, History of the Government Sponsored Enterprises, http://fhfaoig.gov/LearnMore/History) "The economic rationale for GSEs is the belief that, without such government-sponsored institutions, a critical area of necessary debt financing would be underserved or served inefficiently." (CRS Report RS21663, p. 2)

[26] "The Appraisal Foundation: Requiring Adherence to Generally Recognized Valuation Standards Is Sound Public Policy," The Appraisal Foundation, Washington, D.C., p. 1-2
(https://netforum.avectra.com/eWeb/DynamicPage.aspx?Site=TAF&WebCode=History)

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

are typically "presented on a form, such as those required by financial institutions, insurance companies, and government agencies. The reporting requirements for form reports, which are the same as for other types of reports, are set forth in the Standards Rules relating to Standard 2 of the Uniform Standards of Professional Appraisal Practice and the Appraisal Institute's Guide Note 3." [27] The majority of the appraisals at issue in this case were prepared using Fannie Mae Form 1004,[28] which is widely accepted as the standard report format by the industry for single-family residential appraisal assignments.

34.     An appraisal for a property traditionally begins with identifying the appraisal question or issue that needs to be addressed. This step includes (i) identifying the client and intended users, (ii) identifying the intended use of the appraisal, (iii) identifying the type and definition of value, (iv) determining the effective date of the opinion, (v) identifying the relevant characteristics of the subject property, and (vi) determining whether there are any assignment conditions.[29] Next, the appraiser must determine the scope of work necessary to solve the appraisal question or issue.[30] After determining the scope of the work, the appraiser performs the scope of work, which typically includes collecting data and performing the analyses necessary to develop a credible opinion of value or assignment results.[31]

35.     In conducting a traditional complete appraisal, the appraiser takes gross living area measurements and performs a physical inspection of the property, including its interior, in order to assess the quality and condition of the property and its associated land.[32] During this step, the appraiser considers both positive and negative factors that may affect the value of the subject property, including the condition of the property and whether it is typical of the neighborhood or possesses any atypical features that can enhance or detract from value.[33] The appraiser also looks for other factors that may influence value, such as views, beach or water access, and proximity to either advantageous features (*e.g.*, parks, shopping, etc.) or disadvantageous features (*e.g.*, highway noise, industrial neighborhoods, etc.).[34] In addition,

---

[27] Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. (Chicago: Appraisal Institute, 2010)
[28] 2006 Fannie Mae Selling Guide - XI, 203.01: Manually Underwritten Mortgages (06/30/02)
[29] Appraisal Institute, Appraising Residential Properties, (4th ed. 2007), p. 5
[30] *Id.*, p. 6
[31] *Id.*, pp. 6-7
[32] *Id.*, p. 77
[33] *Id.*, pp. 76-77, 83
[34] *Id.*

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

the appraiser will take into account his or her knowledge of local market conditions and also the characteristics of the neighborhood in which the property is located.[35]

36.     The appraiser then values the property using one or more of the three principal approaches to value, which may include the cost, sales comparison, and/or income capitalization approach, to develop a credible opinion of value.[36]  As part of the sales comparison approach, the most common method for appraising residential properties, the appraiser selects the appropriate comparable properties, when available, from recently sold properties, examines each comparable and determines how it differs from the subject property. After the comparison process, the appraiser adjusts the sale prices of the comparables for observed differences between the comparable and the subject property.[37]  Finally, the appraiser performs a reconciliation of the value indications and issues a report describing the final opinion of value.[38]

37.     The appraisal report usually describes the key facts, appraisal methods and techniques the appraiser applied during the valuation process to reach a value opinion.[39]  The report typically includes a description of the subject property and its neighborhood, photographs of the subject property and the chosen comparable properties, a description of the comparables chosen and any adjustments made to the comparables, and the reasoning for the final value opinion.

38.     Appraisers carefully evaluate specific facts and circumstances of each subject property and exercise professional judgment in forming an opinion of value.  Therefore, an appraised value of a property is ultimately the opinion of an experienced professional.  While two competent appraisers may arrive at differing opinions of value, I would generally expect the relative difference in their opinions to be no more than ten percent.

39.     As described above, a value conclusion derived in a traditional appraisal has the benefit of an appraiser's professional judgment informed by physical inspection of the property, direct knowledge of the neighborhood, relevant externalities, comparable property transactions, and local market trends and conditions. For this reason, a traditional appraisal is

---

[35] *Id.*, pp. 75-77
[36] *Id.*, pp. 6-7
[37] *Id.*, pp. 6, 82-83
[38] *Id.*, pp. 6-7, 82-83
[39] *Id.*, p. 381

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

widely regarded as the industry standard for performing a comprehensive valuation. Because AVMs and other formulaic methods of valuation do not share these same benefits, the traditional appraisal has persisted as a required method of valuation for most residential real estate transactions as it best emulates the behavior of buyers and sellers in the marketplace.

### B.    Appraisers Are Held To Strict Ethical and Competency Standards

40.    According to USPAP, an appraiser is "one who is expected to perform valuation services competently and in a manner that is independent, impartial, and objective."[40]  The Ethics Rule states, "[t]o promote and preserve the public trust inherent in professional appraisal practice, an appraiser must observe the highest standards of professional ethics."[41]  The Conduct section of this rules states that "[a]n appraiser must perform assignments ethically and competently, in accordance with USPAP and any supplemental standards agreed to by the appraiser in accepting the assignment.  An appraiser must not engage in criminal conduct."[42]  The majority of states stipulate that certified/licensed appraisers are required for any service where an opinion of value (evaluation or appraisal) for real property is developed.[43]

41.    The Competency Rule indicates that prior to accepting an appraisal assignment or entering into an agreement to perform any assignment, an appraiser must: (1) disclose any lack of knowledge and/or experience to the client; (2) take all steps necessary or appropriate to complete the assignment competently; and (3) if applicable, describe the lack of knowledge and/or experience and the steps taken to complete the assignment competently in the report.[44]  An appraiser must have the competency necessary to complete an appraisal assignment, which makes his or her experience and background critical to the formation of a credible opinion of value.

42.    These standards are important and, in my experience, appraisers take them seriously.  It is a serious allegation to claim that an appraiser developed an appraisal that resulted in a non-credible opinion of value.  Any such allegation requires substantial evidence, which, as I explain below, Dr. Kilpatrick has not provided.

---

[40] The Appraisal Foundation, USPAP 2006 Edition, p. 1
[41] *Id.*, p. 7
[42] *Id.*
[43] https://www.asc.gov/State-Appraiser-Regulatory-Programs/StateOperationsAndRequirements.aspx
[44] The Appraisal Foundation, USPAP 2006 Edition, p. 11

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

C.      **Evaluating Appraisals Retrospectively**

43.     According to USPAP, an Appraisal Review is "the act or process of developing and communicating an opinion about the quality of another appraiser's work that was performed as part of an appraisal or appraisal review assignment."[45]  To meet the defined objectives of an Appraisal Review, the reviewer examines the data, reasoning, analyses, and conclusions developed by the original appraiser.  Most Appraisal Reviews are performed to determine the credibility of the value conclusion and the adequacy of the supporting evidence provided.

44.     Appraisal Review assignments are generally described in colloquial terms as either "desk reviews" or "field reviews."  A desk review is completed without a field inspection and is often limited to a review of the data presented in the report.[46]

45.     A desk review is a generally accepted appraisal product that is expressly contemplated by USPAP.  Banks sometimes use a desk review to evaluate an appraisal provided to it by an appraiser.  A desk review is performed by a certified or licensed appraiser who evaluates an appraisal performed by another appraiser and develops and communicates an opinion about the quality of the appraisal, including the credibility of the value conclusion and the adequacy of the supporting evidence provided.  The desk reviewer may issue his or her own opinion of value and may rely on the data and evidence included within the original report or may consider additional evidence before forming his or her own opinion.

46.     A field review is an appraisal review for which the scope of work includes inspection of the exterior and sometimes the interior of the subject property and possibly inspection of the comparable properties to confirm the data provided in the report.  A field review is generally performed using a customized checklist that covers the items examined in a desk review and may also include confirmation of market data, research to gather additional data, and verification of the software used in preparing the report.[47]

47.     Commonly used as a quality-control procedure, the field review may be undertaken to augment the data reported by the appraiser or to resolve discrepancies between

---

[45] The Appraisal Foundation, USPAP 2014-2015 Edition, p. U-1
[46] The Dictionary of Real Estate Appraisal, 5th ed. (Chicago: Appraisal Institute, 2010) [page #?]
[47] *Id.*, p. 247

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

the facts or assumptions reported by two appraisers who have arrived at divergent market value conclusions for the same property.[48]

48.    USPAP Standard 3 requires that, "In performing an appraisal review assignment, an appraiser acting as a reviewer must develop and report a credible opinion as to the quality of another appraiser's work and must clearly disclose the scope of work performed."[49] In developing an appraisal review, Standard 3-1(g) requires that, "the reviewer must develop an opinion as to whether the analyses, opinions, and conclusions are appropriate and reasonable, given the scope of work applicable in the assignment, and develop the reasons for any disagreement."[50]

49.    The primary function of one who performs an Appraisal Review is to examine an appraisal report as a whole and form an opinion as to the report's adequacy.  While the reviewer identifies and assesses the reasoning and logic that underlie the work of another appraiser, the reviewer does not substitute his or her own judgment for that of the original appraiser.  Instead, under USPAP, the reviewer is charged with confirming the adequacy or correctness of the data, process and conclusion.[51]

50.    At the conclusion of an Appraisal Review, the reviewer may either: (a) accept the adequacy and reasonableness of the initial appraisal, or (b) challenge the adequacy and reasonableness of the initial appraisal.  In the latter instance, the reviewer may conduct further inquiry and request additional information from the initial appraiser to clarify assumptions and data that may result in the subsequent acceptance of the initial appraisal.[52]

51.    "It is often a reviewer's subjective decision that determines what is or is not acceptable.  Reviewers should recognize gray areas of interpretation and try to make their decisions as objectively as possible.  Their personal preferences should not be seen as doctrine to be imposed on others."[53]

---

[48] Appraising the Appraisal, The Art of Appraisal Review, 2d Ed., by Richard Sorenson, MAI (Appraisal Institute 2010), p. 16
[49] The Appraisal Foundation, USPAP 2005 Edition, Standard 3: Appraisal Review, Development and Reporting
[50] The Appraisal Foundation, USPAP 2005 Edition, Standard 3-1(g)
[51] The Appraisal Foundation, USPAP 2005 Edition, Standard 3: Appraisal Review, Development and Reporting
[52] The Appraisal Foundation, USPAP 2005 Edition, pp. 33-37
[53] Appraising the Appraisal, The Art of Appraisal Review, 2d Ed., by Richard Sorenson, MAI (Appraisal Institute 2010), p. 163

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

52.    Even though some of the noncritical elements of an appraisal may be omitted or presented inadequately or may not conform to stringent format requirements, the appraiser's value conclusion may still be reasonable and credible.[54]  An appraisal that contains a reasonable value conclusion should not be rejected because of nit-picking by an overzealous or inexperienced reviewer.  A report can be acceptable even if it includes minor errors.[55]

53.    Because appraisals are inherently subjective, the reviewer should try to give the appraiser the benefit of the doubt.  After all, the appraiser has inspected the property and, unless it is a field review, the reviewer probably has not.  Also, the appraiser has likely spent significant time performing appraisals and is more familiar with the market.  Of course, the reviewer should not hesitate to challenge the appraiser when warranted.[56]

## V.    THE CAM IS AN INVALID AND UNRELIABLE TOOL FOR EVALUATING THE CREDIBILITY OF AN APPRAISAL, AND WAS USED IN AN UNRELIABLE MANNER.

### A.    Overview of the CAM

54.    The Credibility Assessment Model ("CAM") is a "scoring model" designed by Dr. Kilpatrick, which, he claims, "assesses the degree to which the Nomura Appraisals deviated from the appraisal standards established by USPAP and other established appraisal guidance and practice."[57] The model itself is comprised of 31 yes-or-no "credibility assessment questions" that Dr. Kilpatrick asserts are "derived directly from USPAP and other professional guidance applicable to residential appraisals,"[58] a claim which is simply untrue, as I show below in section V.B.1. I address each of the 31 questions in section VI of this Report. The ultimate purpose of the CAM, according to Dr. Kilpatrick, is to "determine whether, in [his] opinion, a reasonable appraiser adhering to the appraisal standards and practices applicable at the time could have believed the original appraisals were accurate."[59] One potential reason Dr. Kilpatrick may have created this previously unheard of test is because he was not able to show, using ordinary appraisal review techniques, that the

---

[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 3
[58] *Id.*, p. 40
[59] *Id.*, p. 2

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

appraisers who rendered the original appraisal opinions *actually did not believe* those opinions at the time.

55.     In order to run the CAM, Dr. Kilpatrick collected and input data from a variety of sources, including loan tapes, loan files and what he terms "inspection research."[60] As part of this inspection research, Dr. Kilpatrick directed both members of his company's staff (the "Greenfield staff") and "independent appraisers" to collect 70 data elements, which in turn "form the basis of the answers to the 31 [CAM] questions."[61] The Greenfield staff collected 45 of the 70 underlying data elements and the "independent appraisers" collected the remaining 25 elements, under the direction of two appraisal firms hired by Dr. Kilpatrick, Forsythe Appraisals, LLC and Valocity, LLC.[62] Dr. Kilpatrick does not specify which of the data elements were gathered by his staff and which by the "independent appraisers."[63] Dr. Kilpatrick also directed the Greenfield staff to "perform[] additional Inspections of each Nomura Appraisal," and to "gather[] information from public sources, such as tax assessment data, maps, aerial and street-level photographs, and other data typically considered by an appraiser or an appraisal reviewer."[64]

56.     Dr. Kilpatrick then took these 70 data elements and, running the elements through the CAM, which is a computer program, used the elements "to provide a 'Yes' or 'No' answer for each [CAM] question," coding "'Yes'" answers as "'0'" and "'No'" answers as "'1'"[65] A "No" or "1" is indicative of Dr. Kilpatrick's opinion "that an appraisal process was not properly followed."[66] Dr. Kilpatrick then multiplied the value—0 or 1—for a given question by the "score" (which he assigned) of that particular question.[67] Dr. Kilpatrick then added together the scores for each individual question to arrive at the overall score for a given appraisal.[68] According to Dr. Kilpatrick, "[t]he CAM assigns scores to each credibility

---

[60] *Id.*, pp. 11-12
[61] *Id.*, pp. 12-13
[62] *Id.*, p. 13
[63] For a listing of the data elements gathered by Dr. Kilpatrick and his staff, see the Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, Appendix 2-1c – CAM Data Elements
[64] *Id.*, pp. 14-15
[65] *Id.*, p. 40, n.99
[66] *Id.*, p. 40
[67] *Id.*
[68] *Id.*, pp. 67-68

assessment question answered in the negative by evaluating how the deviations and deficiencies associated with the question affect the credibility of an appraisal."[69]

57.     As part of assigning a score to each of the CAM questions, Dr. Kilpatrick weighted five "aspects" and, within each aspect, anywhere from three to eight "categories" depending on "the order of their relative importance to the evaluation of whether or not an appraisal is credible" and, for categories, the "differential impact on the credibility of an appraisal."[70][71] Because the aspects are weighted on a 1 to 5 scale, "the total weight given to a category is in turn the product of the aspect weight times the category weight."[72] And because "each question is rated within all five aspects, the total score for each question is the sum of the contributory weights in all five aspects."[73]

58.     Dr. Kilpatrick then created a "credibility threshold" for the at-issue appraisals by taking "the mean score of [the] 6 major error questions," which totaled 8.80, "and the mean score of the 25 other CAM questions," which equaled 5.33, and adding them together to reach a credibility threshold of 14.13.[74] Dr. Kilpatrick claims, falsely, as I explain below, that this threshold is "consistent with the intent and letter of USPAP."[75] Dr. Kilpatrick asserts that "a score at or above 14.13 would, in [his] opinion, put the credibility of the appraisal in serious doubt."[76] However, Dr. Kilpatrick then applied what he termed a more "conservative, credibility threshold" of 20.  Applying this threshold, Dr. Kilpatrick claims that 189 of 205 appraisals run through the CAM "contain either at least two egregious errors or a combination of credibility assessment question errors such that, in [his] opinion, no reasonable appraiser adhering to the appraisal standards and practices applicable at the time could have believed the appraisals were credible."[77]

59.     Dr. Kilpatrick's development and use of the CAM is abnormal, given the fact that there are well-accepted, alternative methods of evaluating appraisals commonly used by

---

[69] *Id.*, pp. 43-44
[70] *Id.,* pp. 43-44
[71] See a weighting of aspects and categories at Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, Appendix 4-6 – Credibility Questions and Scoring
[72] *Id.*, p. 68
[73] *Id.*
[74] *Id.*, p. 99
[75] *Id.*
[76] *Id.*
[77] *Id.*, 101

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

industry practitioners.  These include field and desk reviews, described above in Section IV.
Field and desk reviews, unlike the CAM, are specifically identified and discussed in USPAP
as valid and acceptable appraisal evaluation tools.[78]  The CAM is vastly different from field
and desk reviews.  The CAM employs a rigid checklist of arbitrary and inappropriate
requirements that fails to capture the nuance and subjectivity that is naturally part of the
appraisal process.  Moreover, it applies requirements that are neither part of appraisal
standards (USPAP, Fannie Mae or otherwise) nor contained in any industry literature with
which I am familiar.  Field and desk reviews, on the other hand, allow for the nuances and
subjectivity that are necessarily inherent in appraisal reports and recognized by USPAP.  They
also must be performed by individuals who are required to comply with the professional
standards applicable to appraisers.

**B.      The CAM's Design Makes It Invalid And Unreliable As A Tool to
Distinguish Between Credible and Non-Credible Appraisals.**

**1.      The CAM Questions Either Are Not USPAP Requirements
or Test for Requirements Contrary to USPAP.**

60.     The 31 questions comprising the CAM are not derived from USPAP and
indeed, in many instances, are inconsistent with USPAP.  These questions appear nowhere in
any textbook, academic or industry literature with which I am familiar.  They were arbitrarily
chosen by Dr. Kilpatrick and arbitrarily evaluated.  In Section VI below, I analyze each of the
31 questions in detail, including their lack of support in USPAP.

**2.      The CAM Weightings Have No Basis At All and are
Illogical.**

61.     As I explain further below, the weightings and scores of the CAM questions
suffer from two fatal flaws. First, I have found no reference to them in any appraisal standard,
text, course or curriculum, nor am I aware of any other review appraiser who has ever used
these same weights. Second, and more importantly, the weightings and scores attributed to the
various questions by Dr. Kilpatrick are arbitrary and illogical.

62.     Dr. Kilpatrick claims throughout his report that the weighting and scores of the
CAM's aspects, categories and, ultimately, its questions, are rooted in USPAP and other

---

[78] The Appraisal Foundation, USPAP 2005 Edition, Advisory Opinion 20 (AO-20)

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

appraisal standards. For example, Dr. Kilpatrick asserts that "consistent with USPAP and appraisal guidance and practice, [he has] ranked and weighted [the] five aspects in the CAM in the order of their relative importance to the evaluation of whether or not an appraisal is credible."[79] And Dr. Kilpatrick claims that "[t]he score applied to the credibility assessment question by the CAM is a function of the degree to which the negative answer to the question implicates deviations from appraisal standards, guidance, and practice."[80] In contrast to Dr. Kilpatrick's claims, the five CAM "aspects" and their weights are found neither in USPAP nor related appraisal guidance. The same is true of the aspect "categories" and their "contributory weights." Above all, the scores for each of the 31 CAM questions are found nowhere in any appraisal guide or standard.  As Dr. Epley stated in discussing Dr. Kilpatrick's scoring regime, the CAM scores were "a matter of personal choice" by Dr. Kilpatrick. Dr. Epley thus confirms that the CAM's weighting and scores have no basis in appraisal guidance and practice.

63.     Just as important, the weightings and scores of the CAM's aspects, categories and questions are arbitrary and illogical for two principal reasons. First, the design and application of the CAM's scoring methodology fail to differentiate between minor and major errors, such that a minor error will yield the same "1"—and thus the same score on a given question—as a truly egregious error. Consider, for example, Question 20, which asks if the "appraiser correctly report[ed] comparable sale transaction data."[81] If an appraiser misreports the sale of a comparable by stating that the comparable sold for $500 more than it actually did, the CAM would assign that appraisal a "1" and it would receive a score of 6.63, more than a quarter of the total points needed for Dr. Kilpatrick to deem the appraisal not credible. If a different appraiser misreports the sale of a comparable by stating that the comparable sold for $500,000 more than it actually did, the CAM would assign the exact same score. Yet the $500 overstatement would not affect the appraiser's opinion of value. To assign the same score to minor and major errors overlooks the actual impact on value of a particular element of an appraisal, such as reporting comparable sale transaction data. It also disregards the Appraisal Institute's own guidance on appraisals, which states that an appraisal can still be

---

[79] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 43
[80] *Id.*, p. 40
[81] *Id.*, p. 42

acceptable even if it contains some minor errors.[82] Most importantly, this approach directly contravenes USPAP. Pursuant to Standard Rule 1-1, an appraiser must "not commit a *substantial* error of omissions or commission that *significantly* affects an appraisal."[83] Far from satisfying the dictates of USPAP, Dr. Kilpatrick's CAM and its scoring methodology depart dramatically from USPAP's requirements.

64.    Second, because several CAM questions, and consequently their scores, are interrelated, the CAM may fail an appraisal on multiple questions, even though the reason for those failures depends on the same data or an identical set of circumstances.  Consider, for example, the connection between CAM Questions 5 and 6. Question 5 asks "[i]f the appraisal was for a purchase, did the appraiser report receipt of [the] sales contract," and Question 6 asks "[i]f [the] appraiser reported a sales contract, did the appraiser analyze it?"[84] In a scenario where an appraiser mentions a sales contract but (1) does not report receipt of the contract and (2) does not analyze the contract, that single appraisal will fail both questions on account of the same exact action. In short, merely reporting the existence of the sales contract without reporting receipt *and* recording the appraiser's analysis of it yields two violations under the CAM, despite the fact that USPAP recognizes that sales contracts may not be available to an appraiser, and does not require an appraiser to record his or her analysis of a sales contract.[85]

65.    CAM Questions 10 and 17 are similarly interrelated. Question 17 asks if "the appraiser report[ed] external obsolescence correctly," and Question 10 asks if "the subject site description [is] correct."[86] Dr. Kilpatrick has designed the CAM so that any finding of a failure to report external obsolescence almost necessarily fails a related question on site description. Nor is this simply a theoretical element of design. In fact, of the 46 Nomura loans that failed Question 17, 45 of the 46 (97.8%) also failed Question 10. By failing Question 17 and consequently Question 10, a loan has already amassed a score of 12.24, more than 60% of the point total needed to be deemed non-credible under the allegedly "conservative" threshold.

---

[82] Appraising the Appraisal, The Art of Appraisal Review, 2d Ed., by Richard Sorenson, MAI (Appraisal Institute 2010), p. 163
[83] The Appraisal Foundation, USPAP 2005 Edition, Standard Rule 1-1, p. 16 (emphasis added)
[84] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 42
[85] The lack of support for these Questions in USPAP is explained below in my analysis of CAM Questions 5 and 6.
[86] *Id.*

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

Because of this feature, the CAM essentially double counts errors—even minor ones—and appears to be designed to inflate the number of appraisals found to be non-credible.

66.     In my opinion, this model was not an appropriate method by which to assess the credibility of the appraisals or their conformance with USPAP.

### 3.     The CAM Credibility Threshold Is Illogical and Unsupported by Appraisal Review Theory.

67.     After applying the weightings, the maximum score an appraisal can receive under the CAM is 186.11. Far below this maximum, Dr. Kilpatrick arbitrarily assumes that a cutoff score of 20 indicates an appraisal is non-credible. He justifies this "credibility threshold" based on the average of one "egregious" mistake plus two "minor" mistakes, but this lends no additional credibility to the analysis.[87] Furthermore, Dr. Kilpatrick attempts to lend credence to this 20 point threshold by labeling it "conservative." In fact, Dr. Kilpatrick claims that "a score of 14.13 would put the credibility of the appraisal in serious doubt."[88] Regardless of whether one considers the cutoff 14.13 or 20, both thresholds are frivolous.

68.     Dr. Kilpatrick has built this threshold on a foundation of arbitrary and unsupported weights, priorities and scores. First, none of the supposed mistakes he finds are considered mistakes by USPAP, so it is unreasonable to label them "egregious" or even "mistakes." Second, none of the scores of the CAM's 31 questions are rooted in USPAP or related appraisal guidance or practice. As such, the constituent elements of the final score find no support in industry practice. Finally, USPAP itself does not impose a rigid threshold in determining the credibility of an appraisal. Every element that factors into the CAM's credibility threshold is thus arbitrary, illogical and a departure from USPAP and related appraisal standards.

69.     Moreover, and as noted in Section V.B.2, several of the CAM questions are closely linked: if an appraisal fails one, it is likely to fail related, similar questions as well. Yet Dr. Kilpatrick does not adjust for the interrelatedness of the CAM in arriving at his cutoff threshold of 20 points. The effect of this is that Dr. Kilpatrick is able to deem an appraisal non-credible on account of a single purported  failing. Consider, for instance, Dr. Kilpatrick's reliance in Questions 27 through 31 on comparing the comparables chosen by the original

---

[87] *Id.*, p. 99
[88] *Id.*, pp. 99-100

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

appraiser to what Dr. Kilpatrick calls the "comps available in the market."[89]  Dr. Kilpatrick's use of a new set of comparables that he deems "better" than those selected by the appraiser could lead the original appraisal to fail all five of these Questions and accumulate a score of 28.53, well over the "conservative threshold" of 20. This highlights both the unacceptable interrelatedness of the CAM questions and, just as importantly, the arbitrariness of the CAM's threshold.

### 4. An Automated One-Size-Fits-All Approach to an Appraisal Review Is Not Acceptable Under USPAP

70.     There is no prescribed "one size fits all" approach to appraisal review, as the intent of the review process, under Standards Rule 3, is to develop and communicate "an opinion about the quality of all or part of the work of another appraiser that was performed as part of an appraisal, appraisal review or appraisal consulting assignment."[90] Dr. Kilpatrick developed a formulaic scoring process that is wholly reliant on the data collected and entered by multiple individuals (for each property) and completely sidestepped the application of professional judgment or the formation of actual opinions as to the credibility of the appraisals at issue. At no point did he employ any process or method that included his analysis of the data to ensure that the results would pass a test of reasonableness. Instead, he has relied on a formula to reflect his so-called opinions.

### C. In Addition to the CAM's Design Flaws, Dr. Kilpatrick's Team Has Also Implemented and Applied It In An Unreliable Manner That Renders His Findings Useless.

### 1. The CAM Uses Incomplete and Insufficient Data

71.      In carrying out Dr. Kilpatrick's inspection research instructions,[91] the teams of appraisers that he relied on to gather comparable data, specifically neighborhood sales, gathered poor, unreliable data. As I will show below, there are numerous instances in which the data included supposedly comparable sales with an extremely wide range of sale prices; such comparables would rarely be used by a competent appraiser in the valuation of the same property. In addition, in many cases, despite the availability of comparable data, Dr.

---

[89] *Id.*, pp. 92-97
[90] The Appraisal Foundation, USPAP 2005 Edition, Standards Rule 3, Comment
[91] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 14 and Appendix 4-2 - Greenfield Advisors Residential Data Form Protocol

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

Kilpatrick's team provided him with only one or two neighborhood sales; Fannie Mae requires that appraisers rely on no less than three comparable sales as part of the sales comparison approach.[92]

### 2.   In Numerous Instances, Dr. Kilpatrick's Team Answered the CAM's Own Questions Incorrectly.

72.   In my review of the underlying data gathered by Dr. Kilpatrick's team, I noted numerous instances where Dr. Kilpatrick erroneously fails appraisals that meet the criteria of his own CAM questions. In some instances, Dr. Kilpatrick's calculations contain simple mathematical errors such as the calculation of percentage thresholds[93] or the determination of whether a number is in between two other numbers.[94]  In other instances, Dr. Kilpatrick uses clearly invalid data resulting in a nonsensical conclusion.[95] In addition to these explicit errors, Dr. Kilpatrick also fails appraisals for containing purportedly inaccurate information in instances when the information is accurate.[96] Dr. Kilpatrick also fails appraisals for not containing information required by his CAM questions in instances when the requisite information does not exist (i.e., and the non-existence of this information was properly reported on the original appraisal).[97]

### 3.   The CAM Source Code Has Not Been Sufficiently Checked for Errors

73.   In my examination of the CAM source code produced by Dr. Kilpatrick, I noted that Questions 24 and 25 were reversed in this code, i.e. appraisals shown as failing

---

[92] 2002 Fannie Mae Selling Guide - XI, 406.02: Selection of Comparable Sales (06/30/02)

[93] See Section VI, CAM Question 4: "Was the appraised value of the subject less than or equal to 10% higher than the most recent listing within the last year?" in which Dr. Kilpatrick failed appraisal NHELI_2006_FM2_2002122939 even though the appraisal was only ▮% higher than the most recent listing price.

[94] See Section VI, CAM Question 22: "Is the appraised value of the subject within the range of the unadjusted comparable sales prices?" in which Dr. Kilpatrick failed appraisal NHELI_2006_HE3_2001846528 even though its conclusion of value was within the unadjusted range of comparable properties.

[95] See Section VI, CAM Question 21: "If a previous sale of a comparable exists, is the current unadjusted price of that comparable less than 10% higher than the prior sale price on an annualized basis?" in which Dr. Kilpatrick failed appraisal NHELI_2006_FM1_2002120572 based on a purportedly comparable sale of $▮

[96] See Section VI, CAM Question 10: "Is the subject site description correct?" in which Dr. Kilpatrick failed appraisal NAA_2005_AR6_1002235660 that contains an accurate and correct site description.

[97] See Section VI, CAM Question 2: "Did the appraiser report an accurate listing history for the subject?" in which Dr. Kilpatrick failed appraisal NAA_2005_AR6_1002171703 even though the property was accurately reported as not being listed in the year prior to the date of the original appraisal.

Question 24 in Kilpatrick's CAM results actually failed Question 25, and vice versa.[98] Both

questions were equally weighted, so this did not affect the final scoring,[99] but such a  basic

error indicates Dr. Kilpatrick and his team did not carefully review the CAM source code. Dr.

Kilpatrick's failure to perform sufficient quality control measures on the CAM further

supports my conclusion that the CAM is an invalid and unreliable tool for evaluating the

credibility of an appraisal.

### 4.       The CAM is Neither Peer Reviewed Nor Validated.

74.       The CAM was developed by Dr. Kilpatrick for FHFA's litigation against

Nomura and other defendants in related actions.  It has never been used by industry

practitioners and Dr. Kilpatrick confirms that he himself has never used it outside of this

litigation.[100]  The CAM has not been peer-reviewed or validated as an appropriate tool for Dr.

Kilpatrick's stated purpose.[101]  Nor in my opinion does Dr. Epley's report in this matter,

which purports to assess the validity of the CAM, legitimate the model, for reasons that I

discuss below in Section IX.

75.       Furthermore, Dr. Kilpatrick has performed no sensitivity testing of the CAM.

As Dr. Epley states regarding his own sensitivity testing on the CAM, a "sensitivity analysis is

where you go into the model and you change selected variables in various combinations . . .

and you look at the results. What you're looking for is wide variance in the results."[102] In

short, a sensitivity analysis asks how changing a "particular aspect's weight" or "a particular

category's weight" is "going to change the result" of the model.[103] Thus, as one of plaintiff's

own experts acknowledges, a simple way to see that the CAM does not return robust results is

to modify the model and see what results the CAM returns.

76.       In performing a simple sensitivity analysis of the CAM's scoring threshold (for

purportedly non-credible appraisals) and the number of CAM questions, I note that relatively

---

[98] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, Exhibit 4-1b CAM Supporting Materials, CAM_CalcQuestions.pdf
[99] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, Exhibit 4-6 Credibility Questions and Scoring.xlsx
[100] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 3
[101] The Recovco analyses, because they are so thoroughly flawed as I explain below, cannot reasonably be considered a validation of the CAM.
[102] Deposition of Donald Epley, July 8, 2014, p. 51:10-16
[103] *Id.*, p. 51:16-19

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

minor modifications result in dramatically different CAM findings. As one example, illustrated in the following table, if Dr. Kilpatrick were to increase the scoring threshold to 30 and eliminate 6 questions from his CAM, almost half of the 205 appraisals at issue would have been deemed credible.

**Table 1: Sensitivity Analysis of CAM Findings**

Questions Removed From Standard 31 Question Credibility Assessment Model (1)

Credibility Threshold (Total Score)

| | 0 | 3 | 6 | 9 | 12 | 15 | 18 | 21 | 24 | 27 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 |
| 5 | 205 | 204 | 203 | 201 | 188 | 186 | 181 | 162 | 110 | 83 | 0 |
| 10 | 200 | 197 | 187 | 186 | 169 | 167 | 159 | 115 | 82 | 10 | 0 |
| 14.13 | 198 | 191 | 179 | 171 | 145 | 141 | 125 | 83 | 38 | 10 | 0 |
| 15 | 197 | 190 | 177 | 169 | 137 | 132 | 117 | 72 | 36 | 7 | 0 |
| 20 | 189 | 179 | 161 | 151 | 101 | 98 | 89 | 37 | 7 | 2 | 0 |
| 25 | 176 | 164 | 141 | 119 | 76 | 70 | 62 | 21 | 2 | 0 | 0 |
| 30 | 156 | 145 | 106 | 87 | 50 | 43 | 36 | 5 | 2 | 0 | 0 |
| 35 | 136 | 120 | 84 | 67 | 30 | 27 | 19 | 3 | 1 | 0 | 0 |
| 40 | 114 | 101 | 61 | 42 | 18 | 16 | 9 | 0 | 0 | 0 | 0 |
| 45 | 98 | 80 | 36 | 20 | 7 | 5 | 3 | 0 | 0 | 0 | 0 |
| 50 | 76 | 54 | 20 | 9 | 2 | 1 | 1 | 0 | 0 | 0 | 0 |
| 55 | 50 | 31 | 8 | 5 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| 60 | 38 | 19 | 5 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 65 | 18 | 13 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 70 | 11 | 9 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 75 | 8 | 6 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 80 | 5 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 85 | 4 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 90 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 95 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

77.     The CAM also fails a basic test of reliability: there is no evidence that it correctly distinguishes between credible and non-credible appraisals. Such evidence would consist of the results of testing the CAM on samples known to be credible and samples known to be non-credible. Without this validation, there is no reliable way to know if the CAM is biased. Indeed, as discussed below, there is evidence that the CAM is heavily biased towards finding appraisals non-credible. For example, the structure of Questions 29, 30 and 31, which reflect comparisons of the averages of the comparables relied on in the original appraisal versus the averages of the neighborhood sales developed by Dr. Kilpatrick, leads to biased results. Even if the original appraiser and Dr. Kilpatrick were to agree on the three best comparables, the introduction of a fourth comparable into Dr. Kilpatrick's data set would

skew the response to any of these questions by skewing the averages of the neighborhood sales above or below the averages of the best three comparables.

78.     As I also explain below, the Recovco findings cannot be considered a validation of the CAM.  The mistakes in the Recovco analyses are so pervasive that those results also cannot be relied upon.  The Recovco findings, like those of the CAM, appear to be significantly biased towards finding appraisals non-credible without any legitimate basis.

### 5.     The CAM Relied Upon the Work of Appraisers Who Were Subject To Significant Disciplinary Actions

79.     Dr. Kilpatrick described how "...data elements form the basis of the answers to the 31 questions that I used to evaluate the degree to which the Nomura Appraisals deviated from appraisal standards and practice."[104] And with regard to the 70 total data elements, "25 were gathered by the third party appraisers approved by me and my staff to perform Inspections."[105] Yet when we performed a cursory review of third party appraisers selected by Dr. Kilpatrick, I noted that some were subject to significant disciplinary actions resulting in fines, continuing education requirements, and other reprimands for violating USPAP and other appraisal standards:[106]

- The Michigan Department of Energy, Labor and Economic Growth, Bureau of Commercial Services, imposed a fine of $5,000 and ordered continuing education for Richard Annable, Michigan appraiser #308688, due to an unspecified violation of occupational code and/or rule violation.[107]

- The Oregon Appraiser Certification & Licensure Board imposed a fine of $4,350 and ordered continuing education totaling 120 hours for Aaron Becker, Oregon appraiser #CR00773, due to "Failure to provide true copies of records" and "Failure to disclose whether comparable sales analyzed were or were not confirmed by party to transaction et al" (9 USPAP violations involving 2 reports).[108]

---

[104] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, pp. 12-13

[105] *Id.*, p. 13

[106] Dr. Kilpatrick provided a list of researchers from Forsythe and Valocity in Appendix 8-1 of his Adherence report. I performed simple web searches on these individuals and have presented examples of my findings here. A more thorough review of these appraisers disciplinary history may yield further standards violations, all of which raise questions on the credibility of the work they performed for Dr. Kilpatrick, and thus the conclusions Dr. Kilpatrick has reached.

[107] Michigan Department of Energy, Labor & Economic Growth, Bureau of Commercial Services, Disciplinary Action Report, December 2009

[108] The Oregon Appraiser, Spring 2011 Edition, p 13 (parentheses added)

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

- The Nevada Appraisal Commission[109] ordered continuing education totaling 28 hours for Martin Biles, Nevada appraiser # A.0205814-cr, due to numerous errors in an appraisal report that caused the report to be misleading.[110]

- The Arizona Board of Appraisal found David Lewin, Arizona Certified General Appraiser #30380, to have violated USPAP A.R.S. §32-2635 Standards of Practice and SR2-2(b)(i) and (ii) through the omission of statements of intended use and intended user.[111]

- The Massachusetts Division of Professional Licensure issued a reprimand and verbal warning, and later, imposed probation, on Misty Patles, Massachusetts license #101803, due to undisclosed violations.[112]

- The Illinois Department of Financial & Professional Regulation imposed a $500 fine on and issued a reprimand to Roger Potokar, Illinois appraiser #553.000867, due to violating the Ethics Provision (Conduct Section) of the USPAP for advertising for or soliciting appraisal assignments in a manner that was false, misleading or exaggerated.[113]

- The Maryland Commission of Real Estate Appraisers, Appraisal Management Companies, and Home Inspectors imposed two civil penalties of $1,500 and required a continuing USPAP education course for Justin Robertson, Maryland appraiser #20589, due to violating BOP Art and USPAP Standards Rule 1-1(a)(1) and (b) and (c), 1-4(a) and (b), 2-1(a) and (b) and the Conduct Section of the Ethics Rule of USPAP "for failure to exercise reasonable diligence to develop, prepare or communicate an appraisal; and being negligent or incompetent in developing, preparing or communicating an appraisal."[114]

80.   Dr. Kilpatrick's reliance on the work of these appraisers to gather source data for his CAM model is yet another reason to question the reliability of the CAM findings.

---

[109] This Appraisal Commission is part of the Real Estate Division of the Department of Business & Industry for the State of Nevada. (http://red.state.nv.us/appraisal/ap_commission.htm)

[110] Nevada Appraisal Report, Volume 1, Issue 1, Winter 2011, p. 6

[111] Letter from Arizona Board of Appraisal to Mr. David A. Lewin, re: Appraisal Board Case Nos. 1335/1336, November 12, 2002

[112] Division of Professional Licensure (http://license.reg.state ma.us/pubLic/pubLicenseQ.asp?board_code=RA&type_class=CR&license_number=000 101803&color=red&lb=RA)

[113] Illinois Department of Financial & Professional Regulation, Appraiser Disciplines – 1999 (http://www.idfpr.com/dpr/RE/APPDISP/REAPDS99.asp)

[114] "Disciplinary Actions - Maryland Commission of Real Estate Appraisers, Appraisal Management Companies and Home Inspectors" (http://www.dllr.state.md.us/license/reahi/reahidisc.shtml)

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

## VI.   ANALYSIS OF THE CAM'S 31 QUESTIONS

81.     Under my direct supervision, my colleagues conducted a detailed examination of the basis for each of Dr. Kilpatrick's 31 CAM questions, which is presented below.  My analysis of the CAM's 31 questions demonstrates its invalidity and the unreliable manner in which it was applied.  As stated above, each of the CAM's questions are either not based on a USPAP requirement or test for requirements that are contrary to USPAP.  Additionally, Dr. Kilpatrick incorrectly answers or unreliably applies the CAM questions in numerous instances.

### 1.     CAM Question 1 - Are the legal address and parcel ID sufficient to identify the subject?

82.     Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard would have been given a score of 4.435.  Dr. Kilpatrick found that none of the appraisals at issue failed this question.  I analyze this question even though no appraisals failed it because it illustrates the CAM's flawed approach.

83.     CAM Question 1 is not based on a USPAP requirement.

84.     In discussing this question, Dr. Kilpatrick quotes Standards Rule 1-2(e) and USPAP's competency provision, but neither of those provisions specifies a requirement that the parcel ID be identified.

85.     In creating this question, therefore, Dr. Kilpatrick imposes a standard that is not contained in USPAP.  There are other USPAP standards, not cited by Dr. Kilpatrick, that pertain to the location of the property, but none of them requires that both the legal address and parcel ID be identified in the appraisal.  USPAP Standards Rule 2-2(b)(iii), which applies to summary reports, requires the appraiser to "summarize information sufficient to identify the real estate involved in the appraisal, including the physical and economic property characteristics relevant to the assignment."  The comment to this rule states:

> The real estate involved in the appraisal can be specified, for example, by a legal description, address, map reference, copy of a survey or map, property sketch and/or photographs or the like.  The information can include a property sketch and photographs in addition to written comments about the legal, physical, and economic attributes of the real

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

estate relevant to the type and definition of value and intended use of the appraisal.[115]

86.    Similarly, the Fannie Mae regulations also do not require a parcel ID.[116] Section XI, 401: The Subject Property (6/30/02) of the 2002 and 2006 Fannie Mae Single Family Selling Guides requires only that "the appraiser must identify the subject property by its complete property address and legal description."[117]

### 2.    CAM Question 2 - Did the appraiser report an accurate listing history for the subject?

87.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 4.535.  In total, Dr. Kilpatrick claims that 23 of the 205 appraisals at issue do not meet this criterion.

88.    CAM Question 2 is not based on a USPAP requirement.

89.    Dr. Kilpatrick claims that an appraiser's failure to report an accurate listing history of the subject property "may render a report misleading in violation of USPAP Standard 2."[118]  This is incorrect.  Standard 2 addresses the content and level of information required in a report that communicates the results of a real property appraisal, but it contains no requirements relating to listing history, nor does it indicate that failure to report a listing history should be construed as misleading on the part of the appraiser.[119]

90.    There is also no other USPAP requirement that an appraiser report a listing history.  Standard 1-5, which discusses listings, states:

> [A]n appraiser must, if such information is available to the appraiser in the normal course of business, (1) analyze all agreements of sale, options, and listings of the subject property current as of the effective date of the appraisal; and (2) analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal."[120]

---

[115] The Appraisal Foundation, USPAP 2006 Edition, Standards Rule 2-2(b)(iii) and accompanying comment
[116] Although I do not specifically reference Freddie Mac guidance, the Fannie Mae and Freddie Mac Selling Guides, applicable at the appraisals' respective effective dates, are similar. As a result, my conclusions with respect to the requirements based on each guide would also be similar.
[117] 2002 and 2006 Fannie Mae Selling Guides - XI, 401: The Subject Property (06/30/02)
[118] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 70
[119] The Appraisal Foundation, USPAP 2005 Edition, p. 22
[120] Id., p. 21

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

Thus, the requirement to analyze listings applies only to listings "current as of the effective date of sale," and there is no requirement concerning reporting of listing history, much less all such history.

91.     In the 2005 to 2006 timeframe, the Fannie Mae guidelines also did not require the reporting of a listing history, instead requiring only that appraisers analyze current listings.[121]  Fannie Mae only added a requirement pertaining to prior listings in 2014, and even this current standard only requires that an appraiser report listings of the subject property that are within one year of the valuation date:

> Fannie Mae's appraisal report forms require the appraiser to research and identify whether the subject property is currently for sale or if it has been offered for sale in the 12 months prior to the effective date of the appraisal by selecting either the 'Yes' or the 'No' checkbox.  If the answer is 'No,' the data source(s) used must be provided.  If the answer is 'Yes,' the appraiser must report on each occurrence or listing and provide the following information: offering price(s), offering date(s) and data source(s) used." [122]

92.     While not part of the USPAP standards, the Uniform Residential Appraisal Report and Small Residential Income Property Appraisal Report forms include a section for "[a]nalysis of any <u>current</u> agreement of sale, option or listing of subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal."[123]

93.     In sum, at the time the appraisals in question were completed (and today), there was (and is) no USPAP requirement at all concerning reporting of all prior listings, and the requirement to analyze prior listings applied only to listings during the prior year.

94.     Moreover, it is not possible to determine from current MLS data[124]—which is what Dr. Kilpatrick used—what data was actually available at the time of the original

---

[121] 2002 Fannie Mae Selling Guide - XI, 102.02: Unacceptable Appraisal Practices

[122] 2014 Fannie Mae Selling Guide - Section B4-1.3-02: Subject and Contract Sections of the Appraisal Report, p. 573

[123] Uniform Residential Appraisal Report Form (Freddie Mac Form 70 March 2005, Fannie Mae Form 1004 March 2005) and Small Residential Income Property Appraisal Report Form (Freddie Mac Form 72 March 2005, Fannie Mae Form 1025 March 2005) – Sales Comparison Section – "My research did or did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale."

[124] Multiple Listing Services (MLSs) are private databases that are created, maintained and paid for by real estate professionals to help their clients buy and sell property. In most cases, access to information from MLS listings is provided to the public free-of-charge by participating brokers. Data that is not publicly accessible includes information that would endanger sellers' privacy or safety, such as seller contact information and times

appraisal.  There are numerous, unrelated MLS systems around the country, and there can be lags between listing and other transaction dates and the availability of related data in MLS databases.  Conversely, many MLS databases delete older expired and withdrawn listings and listings in the MLS services are routinely changed to reflect updates or corrections.  As a result, it is it is extremely difficult to determine if it would have been possible 7 to 9 years ago for an appraiser to report additional listing history—or if such data was unavailable in the MLS database due to revision or deletion (or a time lag in reporting).

95.      Lastly, Dr. Kilpatrick's responses to Question 2 demonstrate that question's irrelevance to the credibility of an appraisal.  For example, Dr. Kilpatrick failed the appraisal for loan NHELI_2007_3_2002015215, even though third party research concluded that the sale/transfer history reported for the subject property was complete and accurate.[125]  As noted above, neither USPAP nor Fannie Mae required or requires appraisers to list or analyze listings older than one year.  For another example, Dr. Kilpatrick failed NHELI_2007_2_2002132009, where the original appraiser checked the box indicating a prior listing but did not identify the prior listing price.  A review of the appraisal shows that the appraiser made a typographical error; he had identified a prior sale of the subject property, not a listing—and reported the prior sale price and date ████████████████)—but simply checked the wrong box.[126]  This typographical error has no bearing on the opinion of value or the credibility of the appraisal.

### 3.      CAM Question 3 - If there was a prior subject listing, was appraised value lower than listing price?

96.      Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy Question 3 were given a score of 7.14.  In total, Dr. Kilpatrick found that 23 of the 205 appraisals evaluated did not meet this criterion.

97.      CAM Question 3 is not based on a USPAP requirement.

98.      This question is confusing on its face, but appears to ask whether the appraised value was lower than the *current* listing price (not any "prior subject listing," as it states).  Dr. Kilpatrick incorrectly states that "rendering an appraised value that was higher than the listing

---

the home is vacant for showings. (http://www.realtor.org/topics/nar-doj-settlement/multiple-listing-service-mls-what-is-it)
[125] IMS Letter: NHELI_2007_3_2002015215
[126] Appraisal Report: NHELI_2007_2_2002132009.

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

price" is an "untrustworthy analytical action."[127]   He cites no professional standard or guideline that requires appraisal values to be lower than subject listings; indeed, he provides no basis for his opinion whatsoever.

99.     In fact, there are no provisions in USPAP or the Fannie Mae Selling Guide that require an appraised value to be lower than the listing price.

100.     Listing prices, which should be analyzed as a part of the appraisal process (Standard 1-5),[128] can justifiably be lower than market value, specifically in cases such as (1) when a property has been priced to attract heightened interest from prospective buyers and to stimulate a bidding war, (2) when a property is intentionally priced below market value to effect a quick sale, (3) when a homeowner makes improvements to the property after the listing has been placed, and (4) when a homeowner simply underestimates the demand for a home.  As a result, Question 3 is not a legitimate test of the credibility of an appraisal.

101.     Even if an appraised value higher than list price could indicate a lack of credibility in some circumstances (as explained above, it does not), Question 3 would not be a meaningful test because it contains no significance threshold.  Instead, Dr. Kilpatrick failed loans based on Question 3 where the appraised value differed insignificantly from the current listing price.  For example, Dr. Kilpatrick failed the appraisal for NHELI_2007_2_2002236011 in which the appraised value was $█████ a difference from the listing price of only $███ or ███%.[129]

102.     These examples show that when one applies Dr. Kilpatrick's rigid CAM criterion—instead of using the reasonable judgment called for under USPAP[130]—as a means to grade appraisals, it often produces unreasonable results.  In my experience, an appraiser would not judge these appraisals to be flawed on the basis that the appraised values of these properties were 0.47% (less than one-half of one percent) and 0.095% (less than one-tenth of one percent) more than the current listing prices.

---

[127] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 52
[128] The Appraisal Foundation, USPAP 2005 Edition, Standards Rule 1-5, p. 21
[129] Appraisal Report: NHELI_2007_2_2002236011
[130] The Appraisal Foundation, USPAP 2006 Edition, p. 12, "Appraisers have broad flexibility and significant responsibility in determining the appropriate scope of work for an appraisal, appraisal review, and appraisal consulting assignment. Credible assignment results require support by relevant evidence and logic. The credibility of assignment results is always measured in the context of the intended use."

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

4.    **CAM Question 4 - Was the appraised value of the subject less than or equal to 10% higher than the most recent listing within the last year?**

103.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 7.125.  In total, Dr. Kilpatrick found that 7 of the 205 appraisals at issue do not meet this criterion.

104.    CAM Question 4 is not based on a USPAP requirement.

105.    Dr. Kilpatrick states that, "a listing price can be construed as a form of a shadow comparable sale, setting a ceiling above which a property is unlikely to sell, unless there are substantial changes in the condition of the property, its presentation and promotion, or the market.  Therefore, if the property is appraised at a substantially higher level, for example more than 10% higher than a prior listing price, there is a clear question as to the reasonableness of such a value conclusion in the absence of justification."[131]  He further asserts that "a negative answer to this assessment question has a direct and high-magnitude impact on value, and it violates the objectivity and trustworthiness categories of the reasonable appraiser standard."[132]

106.    Dr. Kilpatrick claims that "this question is directly derived from violations of Standards Rule 1-5(a) and (b) and is typically linked to violations of Standards Rules 1-2(e), 1-3(a), and 2-2(a)(iii)."[133]  In fact, none of these standards requires analysis of prior listings, much less specify a 10% requirement.

107.    Standards Rule 1-5(a) and (b) require that the appraiser "analyze all agreements of sale, options, and listings of the subject property <u>current as of the effective date of the appraisal</u>" and "analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal." [134]

108.    Standards Rule 1-2(e) requires that the appraiser "identify the characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal."[135]  A prior listing price is not a characteristic of a property. Instead, the

---

[131] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 71
[132] *Id.*
[133] *Id.*
[134] The Appraisal Foundation, USPAP 2005 Edition, p. 21
[135] *Id.*, p. 17

characteristics listed in Standards Rule 1-2(e) include: location and physical, legal, and economic attributes; the real property interest to be valued; any personal property, trade fixtures, or intangible items that are not real property but are included in the appraisal; any known easements, restrictions, encumbrances, leases, reservations, covenants, contracts, declarations, special assessments, ordinances, or other items of a similar nature; and whether the subject property is a fractional interest, physical segment, or partial holding.[136]

109.    Standards Rule 1-3(a) requires that "when necessary for credible assignment results in developing a market value opinion, an appraiser must identify and analyze the effect on use and value of existing land use regulations, reasonably probable modifications of such land use regulations, economic supply and demand, the physical adaptability of the real estate, and market area trends." [137]   Again, this standard makes no mention of the property's prior listing price.

110.    Standards Rule 2-2(a)(iii), which applies to Self-Contained Appraisal Reports, not Summary Appraisal Reports, states that "the appraisal must, at a minimum, describe information sufficient to identify the real estate involved in the appraisal, including the physical and economic property characteristics relevant to the assignment."[138]  This standard neither applies to the appraisals that are at issue in this matter—which are Summary Appraisal Reports—nor does it mention anything related to listing prices.

111.    Dr. Kilpatrick cites no other professional standard or guideline that requires a property's appraised value to be less than 10% higher than the most recent listing within the last year, and I am not aware of any.  In short, there is no basis for the requirement that an appraised value be no more than 10% more than the listing price.

112.    It is not at all unusual for an appraisal to exceed a list price within the previous 12 months by more than 10%.  As noted above, sellers may list a home below market value for numerous reasons.  In addition, for example, a prior list price may reflect a distressed sale (such as a foreclosure), in which case an appraisal would likely be more than 10% greater.  A homeowner could also have made significant improvements to a property since the prior listing.  Most significantly, it is not unusual in certain markets for real estate values to

---

[136] *Id.* Standards Rule 1-2(e), p. 17
[137] *Id.*, p. 19
[138] *Id.*, p. 23

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

increase markedly (and by 10% or more within a given year), which would explain a difference between the appraisal and previous listing. This last factor was especially important between 2005 and 2007, when home prices were rising dramatically in many markets.

113.    In addition to all of these reasonable situations that would cause an appraisal to fail this question, Dr. Kilpatrick answered his own CAM question incorrectly for one of the seven appraisals that he claims failed Question 4. For NHELI_2006_FM2_2002122939, the appraised value of the subject was $▇▇▇▇, which was ▇▇% higher than the most recent listing price (▇▇▇▇ on ▇▇▇▇), as confirmed by third party research.[139] Thus, Dr. Kilpatrick incorrectly claims this appraisal does not satisfy Question 4 when it actually does.

### 5.    CAM Question 5 - If the appraisal was for a purchase, did the appraiser report receipt of sales contract?

114.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy Question 5 were given a score of 2.535. In total, Dr. Kilpatrick found that 1 of the 205 appraisals at issue did not meet this criterion.

115.    CAM Question 5 is not based on a USPAP requirement.

116.    Dr. Kilpatrick states that "a basic compliance element in a residential appraisal report where financing is associated with the purchase of a property is confirming receipt of the sales contract" and that "lack of the sales contract compromises the appraisal's completeness," which he asserts is a direct violation of Standards Rule 1-5.[140]

117.    But this is not what Standards Rule 1-5 says. Standards Rule 1-5 requires that, if such information "is available to the appraiser in the normal course of business,"[141] the appraiser must analyze all agreements of sale that were current as of the effective date of the appraisal. The USPAP standard, as written, allows for the possibility that the sales contract may not have been available to the appraiser; Kilpatrick's appraisal review process makes no allowance for the possibility that a sales contract may not always be available to the appraiser for reasons that are beyond the appraiser's control.

118.    At the time the appraisals at issue were performed, Fannie Mae likewise had no requirement that the sales contract be provided to the appraiser. Fannie Mae did not begin

---

[139] IMS Letter: NHELI_2006_FM2_2002122939

[140] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 72

[141] The Appraisal Foundation, USPAP 2005 Edition, Standards Rule 1-5

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

requiring lenders to provide sales contracts to appraisers until well after the dates on which these appraisals at issue were completed.[142]

119.    For the one appraisal that Dr. Kilpatrick found failed CAM Question 5, NHELI_2007_2_2002180362, that finding is meaningless with respect to credibility.  The appraiser indicated that he did not analyze the contract of sale for the subject purchase transaction, but provided the information he did have:  the date of the contract and the seller/owner of public record.  He then explained that the subject "is understood to be under a lease/purchase agreement since January 2004 for an undisclosed sale price and monthly income," noting that "no contract was submitted to the appraiser."[143]  Here then is a clear example of an appraiser seeking to review the sales contract, but simply being unable to do so. It is contrary to Standards Rule 1-5 to fault an appraisal under such circumstances.

### 6.    CAM Question 6 - If appraiser reported a sales contract, did the appraiser analyze it?

120.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 2.535.  In total, Dr. Kilpatrick found that 55 of the 205 appraisals at issue did not meet this criterion.

121.    CAM Question 6 is not based on a USPAP requirement.

122.    Dr. Kilpatrick states that, "If the appraiser does not appropriately, carefully, and thoroughly analyze the sales contract, information that may be pertinent to the valuation analysis may not be sufficiently considered.  As analysis of the sales contract is a required part of the appraisal of single-family residences, failure to report that the contract is analyzed, consistent with those standards, indicates a lack of conscientiousness, thoroughness, and attentiveness."[144]  A deficiency of this nature, according to Dr. Kilpatrick, "would violate the scope, data collection, and data analysis categories of the appraisal process."[145]  He further states that this question is linked to Question 5, but that it is separate "because an appraiser's failure to both report and analyze the sales contract would be significantly more egregious

---

[142] 2002 and 2006 Fannie Mae Selling Guides, XI, Chapter 2: Appraisal (or Property Inspection)
[143] Appraisal Report: NHELI_2007_2_2002180362
[144] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 72
[145] *Id.*, p. 73

than a simple failure to analyze."[146]  He writes that the same USPAP standard that he claims justifies Question 5—Standards Rule 1-5—are the basis for Question 6 as well.[147]

123.    USPAP contains no requirement that appraisers record their analysis of the sales contracts in the appraisal, and Dr. Kilpatrick identifies none.

124.    Moreover, as previously noted, Standards Rule 1-5 requires that the appraiser analyze all agreements of sale that were current as of the effective date of the appraisal if such information is available to the appraiser in the normal course of business.[148]  The USPAP Standards, unlike Dr. Kilpatrick, thus recognize that the sales contract might not be available for the appraiser to analyze.[149]

125.    Dr. Kilpatrick fails appraisals for this question if they mention a sales contract but do not analyze the contract in detail.  Because USPAP does not require appraisers to record their analysis of sales contracts, an interview is the only reliable way to determine whether this step was performed in connection with an appraisal that does not record it.  Dr. Kilpatrick did not interview the appraisers that performed the original appraisals, and he therefore did not have sufficient information to determine whether the appraisers did or did not analyze the reported sales contracts.

126.    Further, the fact that an appraisal mentions a sales contract does not indicate that the appraiser had access to the final sales contract.  For instance, an appraiser may have only a preliminary version of a sales contract; it is not uncommon for contracts to be revised and ultimately finalized after the appraisal has been completed. Or, the appraiser may have learned information about the contract's existence or terms during the course of his or her assignment without having access to the actual contract. Because there are acceptable reasons why a contract is unavailable, a fail on this Question is meaningless with respect to credibility.

127.    For example, in the appraisal for NHELI_2006_FM1_2001902485, the appraiser explained that at the time the appraisal was completed, the property was available for sale, but there was no signed purchase agreement, and the terms of the purchase were to be

---

[146] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, pp. 72-73
[147] *Id.*, p. 72
[148] The Appraisal Foundation, USPAP 2005 Edition, Standards Rule 1-5, p. 21
[149] *Id.*

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

determined after the appraisal was finished.[150]  Dr. Kilpatrick failed the appraisal on this
standard even though there was no sales contract for the appraiser to analyze.  Likewise, for
NHELI_2007_1_2002056810, the appraiser reported all available information about the
contract—the contract price and date of the contract, the property seller/owner of public
record, and the absence of financial assistance—but indicated that he did not analyze the
pending sales contract because he "was not provided with the contract at this time."[151]

128.    In addition, the work of Dr. Kilpatrick's team in responding to Question 6 was
unreliable in several instances, incorrectly failing appraisals that did analyze the sales
contract.  For example, in the appraisal for NAA_2005_AR6_1002171703, there is clear
evidence that the appraiser analyzed the contract.  The appraiser indicated the sale price, listed
the date of sale as pending, and noted concessions of ███████[152]  Similarly, for
NHELI_2007_1_2001865492, the appraiser indicated that she analyzed the sales contract,
noting: "████████████████████████████████████████████

████████████████████████████████████████████████

████████████████,"[153]  The appraiser also noted that, "██████████████████

████████████████"  Here, too, Dr. Kilpatrick inexplicably failed the appraisal on this
standard even though the sales contract had been analyzed.  Thus, despite clear evidence to the
contrary, Dr. Kilpatrick unaccountably failed appraisals on this Question.

### 7.    CAM Question 7 - Did the appraiser report supply/demand correctly?

129.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy
this Question were given a score of 5.24.  In total, Dr. Kilpatrick found that 51 of the 205
appraisals at issue did not meet this criterion.

130.    CAM Question 7 is not based on a USPAP requirement.

131.    Dr. Kilpatrick states that, "This question is derived directly from USPAP
Standards Rules 1-2(e)(iv), 1-3(a), and 2-2(b)(x)."[154]  But it is instructive to actually examine
these Standards.  Standards Rules 1-2(e)(iv) states, "In developing a real property appraisal,

---

[150] Appraisal Report: NHELI_2006_FM1_2001902485
[151] Appraisal Report: NHELI_2007_1_2002056810
[152] Appraisal Report: NAA_2005_AR6_1002171703
[153] Appraisal Report: NHELI_2007_1_2001865492
[154] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and
Practice, May 15, 2014, p. 73

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

an appraiser must identify the characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal, including any known easements, restrictions, encumbrances, leases, reservations, covenants, contracts, declarations, special assessments, ordinances, or other items of a similar nature."[155]   There is no element of this standard that relates to the correct reporting of supply and demand.

132.   The same is true of Standards Rules 2-2(b), which states, "The content of a Summary Appraisal Report must be consistent with the intended use of the appraisal and, at a minimum clearly and conspicuously state all extraordinary assumptions and hypothetical conditions; and state that their use might have affected the assignment results."[156]   This standard also has no connection to the correct reporting of supply and demand.

133.   Standards Rules 1-3(a) states, "When necessary for credible assignment results in developing a market value opinion, an appraiser must identify and analyze the effect on use and value of existing land use regulations, reasonably probable modifications of such land use regulations, economic supply and demand, the physical adaptability of the real estate, and market area trends."[157]   This is the only standard cited by Dr. Kilpatrick that addresses the identification and analysis of the effect on use and value of supply and demand.

134.   The appraiser's analysis and conclusions with respect to supply/demand are generally reported in the Neighborhood[158] section of the appraisal by checking one of three boxes, indicating that the market is either in shortage, balance or over-supply.[159]   This same section includes information with respect to property value trends and marketing times.   No further analysis is required by USPAP and this is generally accepted industry practice. Appraisers generally complete this section based on their knowledge of the local market at the appraisal date.   There is no other process that must be followed in order for an appraiser to have correctly reported supply and demand, as Dr. Kilpatrick erroneously indicates in his report.

135.   It appears that Dr. Kilpatrick sought to test the original appraisers' supply/demand conclusions by having two vendors, Forsythe Appraisals LLC and Valocity

---

[155] The Appraisal Foundation, USPAP 2005 Edition, p. 215
[156] The Appraisal Foundation, USPAP 2005 Edition, Standards Rule 2-2(b), pp. 26-27
[157] The Appraisal Foundation, USPAP 2005 Edition, p. 19
[158] Fannie Mae Forms 1004 and 1025
[159] *Id.*

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

LLC, obtain information about "market conditions at the time of the subject properties' sales."[160] Dr. Kilpatrick failed an appraisal for this Question if his post-hoc review did not agree with the original appraiser's. I obtained third party reviews of some of the supply/demand conclusions found incorrect by Dr. Kilpatrick's reviewers. My reviews disagreed with Dr. Kilpatrick's and agreed with the original appraisal, calling into question the reliability of Dr. Kilpatrick's review. For example:

- **NHELI_2006_FM1_2002152239** - ███████  In the Neighborhood section of the appraisal, the appraiser selected demand/supply is in balance and further stated that "██████████████████████████████████████████████████████████████████████████████████████████████████ Third party research supports the supply/demand rating in the appraisal report.[162]

- **NHELI_2006_HE3_2002121884** – ██████  In the Neighborhood section of the appraisal, the appraiser selected demand/supply is in balance and further stated that ██████████████████████ Third party research supports the supply/demand rating in the appraisal report.[164]

### 8.    CAM Question 8 - Did the appraiser report property value trend correctly?

136.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy Question 8 were given a score of 5.24. In total, Dr. Kilpatrick found that 90 of the 205 appraisals at issue did not meet this criterion.

137.    CAM Question 8 is not based on a USPAP requirement.

138.    Dr. Kilpatrick indicates that this question has "much the same effect as Question 7," and indicates that "an appraiser's failure to understand or correctly analyze or report market value trends will inevitably lead to a failure to correctly analyze prior sales and listings, as required under Standards Rule 1-5,[165] as well as a failure to correctly analyze prior

---

[160] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, pp. 13-14
[161] Appraisal Report: NHELI_2006_FM1_2002152239
[162] IMS Letter: NHELI_2006_FM1_2002152239
[163] Appraisal Report: NHELI_2006_HE3_2002121884
[164] IMS Letter: NHELI_2006_HE3_2002121884
[165] USPAP Standards Rule 1-5 requires that "when the value opinion to be developed is market value, an appraiser must, if such information is available to the appraiser in the normal course of business: (a) analyze all

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

comparable sales as required on FNMA/FHLMC form appraisals."[166] But he cites no specific standard that requires the reporting of property value trends, or requires that reporting be done in a particular way.

139.   In fact, as indicated above (in the discussion for Question 7), the appraiser's analysis and conclusions with respect to property value trends are generally reported in the Neighborhood section of the appraisal by checking one of three boxes, indicating that the property values are increasing, stable or declining.  Again, no further analysis is required. Accordingly, appraisers report value trends based on their knowledge of the local market at the time of the appraisal.

140.   Dr. Kilpatrick employed a regression analysis based on four quarters (or fewer) of sales data for the calendar year preceding the effective date of the appraisal to analyze value trends.[167]  It is not standard practice for residential appraisers to rely on statistical models to report on property value trends.  Appraisers generally form their opinions based on data obtained from a number of sources, including their experience, MLS, conversations with market participants (*e.g.*, brokers, realtors, appraisers, etc.), prior appraisal reports and relevant newspaper reports, but not only on sophisticated statistical models. Furthermore, appraisers apply judgment, informed by their local market knowledge, in selecting the time periods to analyze – which may vary based on the specifics of each assignment.

141.   In the following example, third party research confirms that the original appraiser correctly reported property value trends. Dr. Kilpatrick, on the other hand, using his statistical model, failed this appraisal, directly contradicting the judgment of both an original appraiser with local market knowledge and a third party researcher.

- **NHELI_2006_FM1_2001979532 –** ▮▮▮▮▮▮▮  The appraiser indicates that property values are increasing.    Third party research concurs with the property value trend reported in the original appraisal.[169]

---

agreements of sale, options, and listings of the subject property current as of the effective date of the appraisal; and (b) analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal."  The Appraisal Foundation, USPAP 2005 Edition, p. 31

[166] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 75

[167] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 74, Exhibit 4-1b CAM Supporting Materials, CAM_CalcQuestions.pdf, pp. 4-5

[168] Appraisal Report: NHELI_2006_FM1_2001979532

[169] IMS Letter: NHELI_2006_FM1_2001979532

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

### 9. CAM Question 9 - Did the appraiser report marketing time correctly?

142. Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 5.24. In total, Dr. Kilpatrick found that 101 of the 205 appraisals at issue did not meet this criterion.

143. CAM Question 9 is not based on a USPAP requirement.

144. USPAP Advisory Opinion 7 defines marketing time as "an opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal."[170] According to USPAP, "The opinion may be a range and can be based on one or more of the following: statistical information about days on market, information gathered through sales verification, interviews of market participants, and anticipated changes in market conditions."[171]

145. Dr. Kilpatrick concludes that an appraisal that received a negative response to Question 9 "violates the data collection and data analysis categories of the appraisal process," but cites no specific standard.[172] USPAP does not define a data collection and analysis process with respect to marketing time.

146. The appraiser's analysis and conclusions with respect to marketing time are generally reported in the Neighborhood section of the appraisal—the same section of the appraisal addressed by Questions 7 and 8—by checking one of three boxes, indicating the marketing time to be either under 3 months, 3 to 6 months or over 6 months. No further analysis is required and the appraiser is not required to describe marketing time. Appraisers report marketing times based on their knowledge of the local market at the time of the appraisal.

147. Despite there being no USPAP standards or guidelines that define a correct method for calculating or reporting marketing time, Dr. Kilpatrick failed all appraisals that did not report an opinion of marketing time that was the same as the one he calculated. Dr. Kilpatrick's conclusions are retrospective and based on information in various MLS databases

---

[170] The Appraisal Foundation, USPAP 2005 Edition, p. 139
[171] The Appraisal Foundation, USPAP 2005 Edition, p. 139
[172] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, pp. 75-76

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

that was used to calculate average days on market. [173]   He fails to consider that the data

available to him may not have been consistent with the data available at the time the original

appraisal was completed because, as explained above, some MLS data may be updated with a

time lag. Dr. Kilpatrick also fails to consider that a statistically based analysis is only one of

the many ways an appraiser can form an opinion with respect to marketing time.

- **NHELI_2006_FM1_2001979532** - ███████████   The appraiser checked the box indicating that marketing time was ███████████ and stated that marketing time was ███████████ [174]  Dr. Kilpatrick disagrees, but third party research confirms the appraiser's opinion concerning marketing time. [175]

- **NHELI_2006_FM1_2001981699** - ███████████   The appraiser states that average marketing time for the subject is ███████ [176]  Third party research, which states that the market was stable to increasing and demand/supply was in balance with marketing time within 3 to 6 months in general (and under 6 months if priced correctly), confirms the appraiser's opinion concerning marketing time. [177]  Only Dr. Kilpatrick's review disagrees.

- **NHELI_2006_HE3_2001846452** - ███████████ :  The appraisal indicates marketing time of ███████ and states, " ███████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████ [178]  Third party research confirms the appraiser's opinion concerning marketing time. [179]

- **NHELI_2006_HE3_2002173834** - ███████████   The appraisal indicates marketing time is less than 3 months and states, " ███████████ ████████████████████████████████████ ████████████████████████████████████

---

[173] In order to calculate marketing time, Dr. Kilpatrick purportedly gave the following instruction to his researchers: "For the Subject Neighborhood, please provide the quarterly, median (or average) sales price, number of sales, and average days on market. The median is preferred but if your MLS only calculates average (mean), please provide that.", Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, Appendix 4-2 - Greenfield Advisors Residential Data Form Protocol, p. 2

[174] Appraisal Report: NHELI_2006_FM1_2001979532

[175] IMS Letter: NHELI_2006_FM1_2001979532

[176] Appraisal Report: NHELI_2006_FM1_2001981699

[177] IMS Letter: NHELI_2006_FM1_2001981699

[178] Appraisal Report: NHELI_2006_HE3_2001846452

[179] IMS Letter: NHELI_2006_HE3_2001846452

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

[180] ███████ Here the appraiser specifically cites contemporaneous MLS basis for his assessment of marketing time. Dr. Kilpatrick provides no basis to conclude that his regression analysis provides a superior result.

- **NHELI_2007_1_2001856683** - ███████ The appraiser indicates marketing time to be ███████ Third party research indicates that the information in the neighborhood section is complete and accurate, adding that ███████keting time for the effective date of the original appraisal is ███████[182] Thus, the evidence provided confirms the appraiser's opinion about marketing time.

### 10. CAM Question 10 - Is the subject site description correct?

148.   Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 4.615. In total, Dr. Kilpatrick found that 55 of the 205 appraisals at issue did not meet this criterion.

149.   CAM Question 10 is not based on a USPAP requirement.

150.   Dr. Kilpatrick states that "[i]f the appraiser's description of the real estate—specifically, the land on which the improvements are located—is incorrect, then the resulting appraiser's analysis of that real estate would be based on incorrect information and therefore likely to be incorrect as well."[183]  He continues by saying, "[t]he consequences of an appraiser's incorrect site description are pervasive and can severely compromise the selection and evaluation of sales comps, leading to a variety of analytical decisions that could impair the credibility of the appraisal."[184]  And he concludes that, "[i]t would be very difficult, if not impossible, to correctly analyze the cost approach or the various site adjustments (size, location, etc.) in the sales comparison approach with an incorrect description of the site."[185]  "This question," he says, "is specifically a violation of Standards Rules 1-2(e)(i), 2-2(b)(iii), potentially Standards Rule 1-2(e)(v), and for non-condominium properties, Standards Rule 1-4(b)(i)."[186]

---

[180] Appraisal Report: NHELI_2006_HE3_2002173834
[181] Appraisal Report: NHELI_2007_1_2001856683
[182] IMS Letter: NHELI_2007_1_2001856683
[183] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 76
[184] *Id.*
[185] *Id.,* pp. 76-77
[186] *Id.,* p. 76

151.    USPAP Standards Rule 1-2(e)(i) states that, "In developing a real property appraisal, an appraiser must identify the characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal, including its location and physical, legal, and economic attributes."[187]  The standard does not provide a basis by which to determine whether a site description is or is not correct.

152.    USPAP Standards Rule 2-2(b)(iii) states that the content of a Summary Appraisal Report must, "at a minimum summarize information sufficient to identify the real estate involved in the appraisal, including the physical and economic property characteristics relevant to the assignment."[188] This standard likewise makes no reference to the description of the subject property.

153.    In the Kilpatrick Adherence Report, Dr. Kilpatrick does not describe how he determined the correctness of the subject property's site description, nor have I seen any explanation of how he arrives at this determination in any of the information Dr. Kilpatrick has provided, including the CAM source code. To carry out his research methodology, Dr. Kilpatrick's staff "gathered data from both the original appraisal reports and loan files...[and] also gathered information from public sources, such as tax assessment data, maps, aerial and street-level photographs, and other data typically considered by an appraiser or an appraisal reviewer."[189] However, his research methodology did not include a physical inspection of the properties at issue. Dr. Kilpatrick has not provided any support that his conclusion about the correctness of the site description is more reliable than the information reported in the original appraisal (which did include a physical inspection of the property).

154.    Moreover, in instances where there are discrepancies related to factual data, it is incumbent upon the review appraiser to speak with the appraiser to ascertain the reason for the discrepancies or, at a minimum, to understand the source of the information presented in the appraisal.  There is no indication that Dr. Kilpatrick undertook this step for any appraisal.

155.    In addition, Dr. Kilpatrick's team incorrectly answered Question 10 in several instances, failing appraisals where the site description was in fact correct. For example, for NAA_2005_AR6_1002235660, third party research confirmed that the site description in the

---

[187] The Appraisal Foundation, USPAP 2005 Edition, p. 215
[188] The Appraisal Foundation, USPAP 2005 Edition, Standards Rule 2-2(b)(iii), p. 26
[189] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, pp. 14-15

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

original appraisal is correct.  "The subject is located on a 19.5' x 120' lot (2,340 sf) which is typical for the area.  The zoning is R-M (Medium Density Residential) and a legal use.  The flood map information in the original appraisal is correct, stating that it is not in a flood plain, based on the FEM A map dated 7/16/2004, on map 42077C0253F.  There are typical utility easements, and a public alley to the rear of the subject property.  No other adverse easements, encroachments, or adverse conditions were noted in the original appraisal, and none observed by this reviewer."[190]  Similarly, for NHELI_2006_FM1_2001981699, third party research confirmed that the information in the site improvement section of the original appraisal, such as utilities, off-site improvements, size, shape, zoning classification, FEMA flood zone, and map number are complete and accurate.[191]

### 11.   CAM Question 11 - Did the appraiser report the sales history correctly?

156.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 4.94.  In total, Dr. Kilpatrick found that 45 of the 205 appraisals at issue did not meet this criterion.

157.    CAM Question 11 is not based on a USPAP requirement.

158.    Dr. Kilpatrick states that, "The sales history of property represents evidence of the market's judgment of the value of that property at a particular point in time. If the appraiser incorrectly reports the sales history, any analysis of that sales history necessarily is similarly flawed, and conclusions that might be derived from it are correspondingly compromised." Dr. Kilpatrick incorrectly asserts that, "Correctly reporting sales history is required under Standards Rule 1-5(a) and (b)."[192] Standards Rule 1 addresses the development of an appraisal, not the reporting of an appraisal. The reporting of an appraisal is addressed by Standards Rule 2.[193]

159.    In contrast to Dr. Kilpatrick's assertion, Standards Rule 1-5(a) and (b) do not require reporting of sales history.  This rule states that, "When the value opinion to be developed is market value, an appraiser must, if such information is available to the appraiser

---

[190] IMS Letter: NAA_2005_AR6_1002235660
[191] IMS Letter: NHELI_2006_FM1_2001981699
[192] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 77
[193] The Appraisal Foundation, USPAP 2005 Edition, Standards Rule 2, pp. 22-32

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

in the normal course of business: (a) analyze all agreements of sale, options, and listings of

the subject property current as of the effective date of the appraisal; and (b) analyze all sales

of the subject property that occurred within the three (3) years prior to the effective date of the

appraisal."[194] USPAP does not detail a correct manner in which a sale history must be

reported, it only requires an analysis of the property's current and past sales history.

160.    USPAP Advisory Opinion 24 provides some additional guidance on what

Standards Rule 1-5 entails. It affords the appraiser more flexibility than does Dr. Kilpatrick:

> The analysis that is required in SR [Standards Rule] 1-5 and SR 7-5
> promotes a certain degree of due diligence on the part of the
> appraiser…The availability of the data necessary to comply with the
> requirements in SR 1-5 and SR 7-5 varies greatly. In some situations,
> this data is available from multiple sources. In other instances, sales and
> listing data is not readily available…The "normal course of business" is
> controlled to a large degree by the scope of work in a specific
> assignment…[and the] "normal course of business" for one assignment
> might not be the "normal course of business" for a seemingly similar
> assignment."[195]

161.    In addition, the assertion that incorrectly reporting any information pertaining

to a property's sales history automatically renders the analysis of that sale flawed is untrue.

This wide reaching assertion ignores the fact that a sale date could be off by a day or a sale

price off by $100 without impacting the analysis of the sales history. While it is incumbent

upon the appraiser to report accurate information, Dr. Kilpatrick judges appraisals as flawed

without any consideration for the degree of a potential error.

162.    Dr. Kilpatrick also ignores the possibility that, because MLS data is updated

over time and there are lags when data is reported, the data that is currently in MLS for the

time period in question may not have actually been available contemporaneously. This is a

well-known problem with MLS data, and Dr. Kilpatrick has made no attempt to account for it.

163.    In the examples below, Dr. Kilpatrick incorrectly applied his Question 11

criterion.

- **NAA_2005_AR6_1001904135 -** ███████████ Based on Dr.
  Kilpatrick's negative finding, he has claimed that the appraiser did not
  correctly report the sales history of the subject property. According to third

---

[194] The Appraisal Foundation, USPAP 2005 Edition, Standards Rule 1-5(a)(b), p. 21
[195] *Id., ADVISORY OPINION 24 (AO-24), p. 219*

HIGHLY CONFIDENTIAL

party research, the original appraiser correctl re orted the sales history of the subject (prior sales in ██████ for $████ and in ██████ for ████) and the comparable properties (no prior sales within 12 months).[196]

- **NHELI_2007_1_2002211714** - ████████████ Although Dr. Kilpatrick again claims that the property's sales history was not correctly reported, this statement is false. The appraiser details the subject's sales history, which includes an ██████ sale for ██████ and no listings within 12 months of the appraisal date, within the report.[197]

### 12. CAM Question 12 - Did the appraiser analyze all prior sales of the subject and comparables?

164.     Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 3.94. In total, Dr. Kilpatrick has found that 80 of the 205 appraisals at issue did not meet this criterion.

165.     CAM Question 12 is not based on a USPAP requirement.

166.     Dr. Kilpatrick derives Question 12 from Question 11 and indicates that "a core component of the property valuation process" is "[t]he analysis of prior transactions." He also states that, "[i]f the prior sales of both the subject and comparables are not fully, consistently, and appropriately analyzed, then conclusions drawn from incomparable analysis are susceptible to being less reliable."[198]

167.     Dr. Kilpatrick cites Standards Rule 1-5(a) and (b) and the FNMA/FHLMC appraisal form in support of his assertion, but neither requires what Question 12 requires. In fact, USPAP does not require the appraiser to analyze prior sales of comparables. USPAP 1-5(b) only requires that the appraiser "analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal" if such information is available to the appraiser "in the normal course of business."[199]

---

[196] IMS Letter: NAA_2005_AR6_1001904135
[197] Appraisal Report: NHELI_2007_1_2002211714
[198] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 78
[199] The Appraisal Foundation, USPAP 2005 Edition, Standards Rule 1-5(a)(b), p. 21

HIGHLY CONFIDENTIAL

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

168.    In 2006, Fannie Mae required the analysis of "recent" prior sales of
comparables used in the appraisal. There was no requirement to report or analyze all prior
sales of the comparables. [200]

169.    In addition, Dr. Kilpatrick incorrectly answered Question 12 in several
instances.  The original appraisers of the following properties correctly reported the sales
histories of the subject and comparable sale properties, yet the appraisals were nonetheless
failed by Dr. Kilpatrick.

- **NAA_2005          04135                          ** The appraiser
  reported an           sale for $       and an         sale for
  $       . The property was appraised for $        on
  There were no prior sales of the comparables within 12 months of their
  respective sale dates.[201] This sales history was confirmed by third party
  research.[202]

- **NHELI_2006_FM1_2002232920                     ** The appraiser
  reports that there was no sales activity related to the subject in the three
  years prior to the appraisal date and that only comparable 1 was sold within
  the last 12 months.[203]

### 13.    CAM Question 13 - On an annualized basis, was the appraised value of the subject less than 10% higher than the prior sales price of the subject?

170.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy
this standard were given a score of 8.125. In total, Dr. Kilpatrick found that 72 of the 205
appraisals at issue did not meet this criterion.

171.    CAM Question 13 is not based on a USPAP requirement.

172.    Dr. Kilpatrick asserts that, "[t]his is one of the most important assessment
questions. It captures violations of USPAP Standards Rule 1-5(b), which requires not just that
prior sales be reported but also that they be analyzed."[204] But Standards Rule 1-5(b) does not
have any 10% requirement. This standard specifically states that an appraiser must "analyze
all sales of the subject property that occurred within the three (3) years prior to the effective

---

[200] 2006 Fannie Mae Selling Guide - XI, 406.06: Appraiser's Comments and Indicated Value (11/08/04)
[201] Appraisal Report: NAA_2005_AR6_1001904135
[202] IMS Letter: NAA_2005_AR6_1001904135
[203] Appraisal Report: NHELI_2006_FM1_2002232920
[204] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and
Practice, May 15, 2014, p. 79

date of the appraisal."[205] The standard makes no reference to how an appraiser should specifically address changes in value between a prior sale date and a current valuation date. Fannie Mae similarly has no numerical requirement or percentage threshold. The 10% threshold has been created by Dr. Kilpatrick and is not, as he claims, rooted in USPAP.

173.     This requirement also fails to consider specific local market conditions or changes that may have taken place at the subject property between the date of its prior sale and the effective valuation date.  As such, it is an inappropriate basis by which to judge the credibility of an appraisal.  There are numerous reasons property values can increase more than 10% annually.

174.     One such reason is market appreciation, which regularly leads to home price appreciation of more than 10% per year, especially between 2005 to 2007.  Dr. Kilpatrick failed loans without investigating whether appreciation greater than 10% per year had occurred in a particular area.  For example, he failed NHELI_2006_FM2_2002174641, despite the appraiser's comments in the Addendum to the appraisal that the subject's market area had experienced rapid appreciation due to the limited number of re-sales on the market and the extended time period for the completion of new construction.[206] Dr. Kilpatrick presents no evidence to the contrary.

175.     The building of a new home, or a significant renovation, also would be expected to lead to home price appreciation of more than 10% per year.  For example, for NAA_2005_AR6_1001918593 and NHELI_2006_HE3_2002172851, the prior recorded sales of these properties took place before the development of the houses that were the subjects of the appraisals under his review. The fact that the prior sales occurred before construction of the respective homes could adequately explain a difference between the appraised values and prior sale prices of more than 10% on an annualized basis. Dr. Kilpatrick presents no evidence that he took this fact into account in applying the CAM to these properties or any others. Similarly, while the value of the property securing loan NAA_2005_AR6_1001833854 increased significantly prior to the sale at issue, the appraisal report states that the increase in

---

[205] The Appraisal Foundation, USPAP 2005 Edition, Standards Rule 1-5(a)(b), p. 21
[206] Appraisal Report: NHELI_2006_FM2_2002174641

value was attributable to the combined effect of market appreciation and renovations performed at the subject property.[207] Dr. Kilpatrick presents no evidence to the contrary.

176.    Property prices also may increase substantially from sale to sale when the prior sale is not a normal market transaction, or is not arm's length.  For example, while the appraised value for NHELI_2007_1_2001856666 is significantly higher than the prior sales price, the appraiser notes the context of the prior sales price by stating that ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████[208] It is not unusual for an appraisal to exceed the sale price in a distressed sale, a fact Dr. Kilpatrick failed to recognize.

### 14.    CAM Question 14 - Is the land value ratio greater than 20% and less than 30%?

177.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 8.6. In total, Dr. Kilpatrick has found that 135 of the 205 appraisals at issue did not meet this criterion.

178.    CAM Question 14 is not based on a USPAP requirement.

179.    Dr. Kilpatrick contends a land value ratio outside the range of 20-30% is abnormal and damages the credibility of an appraisal. He asserts that this requirement is "tied to the requirements under Standards Rule 1-4(b)(i) for all non-condominium properties."[209] Yet this is not what Standards Rule 1-4(b)(i) states. The Rule states: "When a cost approach is applicable, an appraiser must develop an opinion of site value by an appropriate appraisal method or technique." The rule makes no mention of land value ratios whatsoever.[210]

180.    Further, there is no other USPAP rule or standard that stipulates that the land-to-value ratio of a property should fall within a pre-determined range (including the range of 20% to 30%), nor is there any USPAP opinion that a land value that falls outside the range cited by Dr. Kilpatrick should be considered questionable. Nor does Fannie Mae or Freddie

---

[207] Appraisal Report: NAA_2005_AR6_1001833854
[208] Appraisal Report: NHELI_2007_1_2001856666
[209] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, p. 80
[210] The Appraisal Foundation, USPAP 2005 Edition, Standards Rule 1-4(b)(i), p. 19

Mac require that a property's land value fall within the range of 20% to 30% of the property's overall value.

181.    Dr. Kilpatrick's requirement of a predetermined result in an appraisal also conflicts with the Ethics Rule, which states that, "An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."[211]

182.    In my experience, I have often found land values to fall outside the range of 20% to 30% of a property's total value. The ratio of land value to the total value of a property is a function of the property's location and the specific market conditions impacting values in that location. As a result, land value ratios can vary greatly from location to location.

183.    Lot prices are driven by several factors, including home prices, the supply of existing lots available for development, the difficulty of obtaining entitlements and producing new lots, the construction costs, competition for available lots, and the availability of capital targeting land investment. Thus, "high-priced markets with artificial supply constraints such as coastal California, desired areas of Washington D.C., and higher priced markets near job centers in areas such as New Jersey and New York, experience wide fluctuations in land value ratios, which can reach 50% of home price. On the other hand, in locations where the supply of finished lots is plentiful or the ability to produce finished lots is quite easy and inexpensive, lot ratios are lower and less volatile."[212]

184.    Even where an  appraiser made the precise point that land value ratios in the subject property area typically exceeded 30%, Dr. Kilpatrick failed the appraisal for reflecting that trend.  Thus, for NAA_2005_AR6_1002235662, the appraiser stated that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[213] This is a reasonable conclusion, and Dr. Kilpatrick provides no evidence that contradicts the findings of this appraiser, yet he fails the appraisal on the basis of his invented standard.

185.    In addition, Dr. Kilpatrick does not address the fact that the sales comparison approach is the primary methodology used in the valuation of residential properties like the subject properties in this case. The contributing underlying land value is not a specific consideration in the sales comparison approach, as it is inherent in the overall value of the

---

[211] Id., p. 7
[212] Article – John Burns Real Estate "Lot Price Can Get Investors Into Trouble", September 2, 2011 (http://www.realestateconsulting.com/blog/don-walker/lot-price-can-get-investors-into-trouble)
[213] Appraisal Report: NAA_2005_AR6_1002235662

Expert Report of Michael P. Hedden
FHFA v. Nomura Holding America Inc., et al

subject and comparable sale properties considered in the valuation process. Thus, the
estimated land value, as a portion of the property's total value, would not impact the
conclusion of value unless the cost approach were specifically noted to have been given
significant weight in the development of an opinion of value.

186.    In addition, Dr. Kilpatrick incorrectly answers or unreliably applies Question
14 in several instances, as demonstrated in the following examples.

- **NAA_2005_AR6_1001831518** -                          Dr. Kilpatrick
  reported an adverse finding for this appraisal despite the fact that the land
  value is reported in the appraisal as representing ▮▮% of the property's
  total value, which is within the range that he considers acceptable and
  appropriate.[214]

- **NHELI_2006_FM1_2002230853**                      : The site value is ▮▮%
  of the appraised value and the appraisal states that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮

  ▮▮▮▮▮▮   This difference is minor even compared to the invented 20%
  threshold of Dr. Kilpatrick.

### 15.    CAM Question 15 - Did the appraiser use the cost approach for non-condominium properties?

187.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy
this Question were given a score of 4.415. In total, Dr. Kilpatrick has found that 15 of the 205
appraisals at issue did not meet this criterion.

188.    CAM Question 15 is not based on a USPAP requirement.

189.    Dr. Kilpatrick admits that "residential valuation assigns primary emphasis to
the sales comparison method," but then states that the "failure to use the cost approach [when
applicable] results in a limited appraisal even if the approach was not necessary." He further
states, "A value opinion reached absent consideration of all of the relevant information
necessarily is less informed than a value opinion taking into account all such information, as
required under Standards Rule 1-4(b)." Dr. Kilpatrick also asserts that "the appraiser is

---

[214] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and
Practice, May 15, 2014, p. 80
[215] Appraisal Report: NHELI_2006_FM1_2002230853

required to disclose the reasoning to support the decision to exclude the cost approach in the appraisal report."[216]

190.    But contrary to Dr. Kilpatrick's claims, Standards Rule 1-4(b) does not support a strict requirement that a cost approach be used.  Instead, for most of the timeframe at issue, USPAP Standard Rule 1-4(b) only required the completion of a cost approach when "applicable."[217] Furthermore, the Departure Rule, which was in effect through June 30, 2006, allowed the appraiser to forego using the cost approach even when applicable. This rule provides that, where the cost approach is applicable, but not necessary, "the appraiser must state in the report that he or she is invoking departure and then identify and explain the departure and the specific requirement involved—in this case, [Standards Rule] 1-4(b)."[218] Pursuant to the 2006 edition of USPAP, which was effective as of July 1, 2006, the Departure Rule was removed and replaced with the requirement stipulated by USPAP Standard Rule 1-4(b), which indicates that a cost approach should be performed when applicable.[219]

191.    USPAP does not specify when the cost approach is "applicable."  It therefore does not mandate the use of a cost approach under any specific conditions or for any properties; the decision to complete or not complete a cost approach is to be made at the discretion of the appraiser based on a determination of whether the cost approach applies, and there is no requirement to document that decision.[220]

192.    In my experience, the cost approach is often not applicable.  It is given little weight as an indicator of the value of residential properties because of difficulties in accurately estimating depreciation and the replacement cost of the improvements, and for this reason is often not used in the valuation of older properties. Further, it often does not reflect the behavior of market participants.

193.    Indeed, Fannie Mae, which does not require the cost approach and "will not accept appraisals that rely solely on the cost approach as an indicator of market value", states

---

[216] Expert Report of John Kilpatrick Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practice, May 15, 2014, pp. 80-81
[217] The Appraisal Foundation, USPAP 2005 Edition, p. 19
[218] *Id.* at p. 114
[219] The Appraisal Foundation, USPAP 2006 Edition
[220] The Appraisal Foundation, USPAP 2006 Edition, Standard Rule 1-4(b), p. 20