UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>                    Plaintiff,<br><br>          -against-<br><br>NOMURA HOLDING AMERICA, INC.; NOMURA ASSET ACCEPTANCE CORPORATION; NOMURA HOME EQUITY LOAN, INC.; NOMURA CREDIT & CAPITAL, INC.; NOMURA SECURITIES INTERNATIONAL, INC.; RBS SECURITIES INC. (F/K/A GREENWICH CAPITAL MARKETS, INC.); DAVID FINDLAY; JOHN MCCARTHY; JOHN P. GRAHAM; NATHAN GORIN; AND DANTE LAROCCA,<br><br>                    Defendants. | No. 11 CIV. 6201 (DLC) |

**PLAINTIFF FHFA'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DR. ANTHONY SAUNDERS**

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Philippe Z. Selendy
Sascha N. Rand
Wing F. (Alex) Ng

51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

*Attorneys for Plaintiff Federal Housing Finance Agency, as Conservator for Fannie Mae and Freddie Mac*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND .........................................................................................................3

ARGUMENT ...................................................................................................................................7

    A.    Dr. Saunders' Testimony About Litigation Settlements Is Directly Relevant To The Reliability Of Dr. Vandell's Benchmarks. ...................................7

    B.    Dr. Saunders' Testimony Appropriately Relies On The Five Peer-Reviewed Articles. ...................................................................................................9

    C.    The Five Articles Relied On By Dr. Saunders Provide Direct And Indirect Evidence That Dr. Vandell's Benchmarks Are Tainted With Underwriting Defects. ...............................................................................................................10

    D.    Dr. Saunders Relied On Three Articles That Provide Indirect Evidence That Undercut The Reliability Of Dr. Vandell's Benchmarks. .............................12

CONCLUSION ..............................................................................................................................13

# TABLE OF AUTHORITIES

**Page**

### Cases

*Akerman v. Oryx Commc'ns, Inc.*,
   810 F.2d 336 (2d Cir. 1987) .................................................................................10

*Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*,
   No. 11CV6201 DLC, -- F. Supp. 3d --, 2014 WL 7232443 (S.D.N.Y. Dec. 18, 2014) ......7, 11

*Katt v. City of New York*,
   151 F. Supp. 2d 313 (S.D.N.Y. 2001), *aff'd sub nom. Krohn v. New York City Police Dep't*, 372 F.3d 83 (2d Cir. 2004) ........................................................................9

*McCullock v. H.B. Fuller Co.*,
   61 F.3d 1038 (2d Cir. 1995) ..................................................................10, 12, 13

*U.S. Football League v. Nat'l Football League*,
   634 F. Supp. 1155 (S.D.N.Y. 1986), *aff'd* 842 F.2d 1335 (2d Cir. 1988) ................8

### Rules / Statutes

Federal Rules of Evidence 403 ..............................................................................8

Federal Rules of Evidence 702 ..............................................................................8

### Other Authorities

Gene Amromin & Anna L. Paulson, "Comparing patterns of default among prime and subprime mortgages," 33 Economic Perspectives (2009) ...................................6, 11

Paul Calem, Christopher Henderson & Jonathan Liles, "'Cherry picking' in subprime mortgage securitizations: Which subprime mortgage loans were sold by depository institutions prior to the crisis of 2007?" 20 Journal of Housing Economics (2011)............6, 11

Yuliya Demyanyk & Otto Van Hemert, "Understanding the Subprime Mortgage Crisis," 24 The Review of Financial Studies (2011) ........................................................6, 11

John M. Griffin and Gonzalo Maturana, "Who Facilitated Misreporting in Securitized Loans?" (December 20, 2013) ...............................................................................6, 11

Tomasz Piskorski, Amit Seru and James Witkin, "Asset Quality Misrepresentation by Financial Intermediaries: Evidence from RMBS Market," Columbia Business School Research Paper No. 13-7 (February 12, 2013) ..................................................5, 11

**PRELIMINARY STATEMENT**

Defendants' motion to exclude the testimony of Dr. Anthony Saunders ("Motion") is an irrelevant sideshow designed to deflect focus from the fundamental flaws in the loss causation methodology of its proffered expert, Dr. Kerry Vandell. As discussed in FHFA's motion to exclude certain expert testimony and opinions of Kerry D. Vandell and Timothy J. Riddiough, filed on January 8, 2015 ("Vandell Motion"), the purportedly neutral "Industry" and "GSE" benchmarks that Dr. Vandell pieced together contain the same types of underwriting defects and appraisal inflation as the deals he seeks to test. Because Dr. Vandell did not establish his benchmarks were "clean," he has no valid basis for a reliable comparison and measurement of the impact of the alleged misrepresentations on the performance of loans in the at issue SLGs.

This is a problem of Defendants' own making. Defendants deliberately chose not to create "clean" benchmarks by reunderwriting an "alternative set of loans," despite being afforded such an opportunity under the scheduling order issued by this Court.[1] Left with no valid basis for their attempted proof of negative loss causation, Defendants now file a frivolous motion to exclude the opinions and testimony of Dr. Saunders, an expert who conclusively rebuts Dr. Vandell based on this glaring flaw in his methodology.

Each of Defendants' arguments for exclusion is meritless. *First*, Defendants contend (at Mem. 10-15) that Dr. Saunders' testimony about litigation settlements affecting loans in the benchmarks is irrelevant and highly prejudicial. The litigation settlements, however, are directly relevant to establishing that that there is no basis for Dr. Vandell to assume, as he does, that his benchmarks are not infected with defective loans and therefore can serve as reliable, comparative

---

[1] *See* Supp. Expert Scheduling Order (Feb. 27, 2013) at ¶ 9 (specifying date for disclosure of "whether [Defendant] intends to make use of any alternative set of loans for purposes other than those set forth above" and precluding reliance on loans "not so disclosed to FHFA.") (Dkt. No. 271).

yardsticks. Indeed, Dr. Vandell already conceded the relevance of loans subject to litigation and settlements by excluding from the Industry Benchmark all securitizations at issue in the FHFA Actions. Defendants' further concern that Dr. Saunders' testimony may be "highly prejudicial and inflammatory" is similarly inapposite and has even less currency in a bench trial. The settlements identified by Dr. Saunders relate to the benchmarks that Dr. Vandell chose to utilize, not to Defendants or to the loans in the seven at issue SLGs.

*Second*, Defendants argue (at Mem. 15-16) that Dr. Saunders "simply repeats" the conclusions of five academic articles that he relied on. Putting aside the absurdity that, contrary to well-settled practice, Dr. Saunders would somehow be unable to rely on peer-reviewed academic articles to raise issue with Dr. Vandell's faulty methodology, Defendants misconstrue Dr. Saunders' report. Dr. Saunders does not merely "repeat" what is in the articles; he reviewed the peer-reviewed literature, which analyzed a broad swath of loans originated during the relevant time, and independently formed his opinion, supported by additional evidence, that Dr. Vandell's assumption that his benchmarks are "clean" and reliable is flawed and unsupportable.

*Third*, Defendants contend (at Mem. 17-21) that Dr. Saunders' testimony relating to the articles should be excluded because he "never explain[ed] or quantifie[d] the extent of the purported overlap" between the loans examined in the articles and the loans in the benchmarks. But Defendants, not FHFA, bear the burden of establishing valid benchmarks to attempt any non-speculative showing of negative loss causation. Based on his experience and review of the loan analysis in the articles, Dr. Saunders opined that the articles provide additional evidence that Dr. Vandell's benchmarks contain defective loans, even without quantifying the exact overlap, because the articles studied large populations of loans from the relevant time. Moreover,

2

evidence from the articles is corroborated by other evidence discussed in Dr. Saunders' report, including public information about settlement payments and data from the GSEs relating to repurchases and settlements, all of which support the conclusion that the benchmarks are tainted and unreliable.  Further, notwithstanding its lack of relevance, Defendants' criticism goes only to weight, not admissibility.

*Fourth*, Defendants argue (at Mem. 21-22) that Dr. Saunders' testimony based on three peer-reviewed articles is unreliable because these articles only provide "indirect evidence" of defective loans in the benchmarks.  The three articles show that the disclosed loan characteristics cannot explain the actual performance of the loans, which is consistent with the hypothesis that the disclosed characteristics were misstated.  As Dr. Saunders opined, the three articles undermine Dr. Vandell's flawed conclusion that the alleged misrepresentations played little to no role in the performance of the loans.  Moreover, this "indirect" approach is in fact a legitimate use of the same approach that Dr. Vandell misapplies in his own purported loss causation analysis: using differences in actual and expected performance based on benchmarks as a measure of the impact of alleged misrepresentations.

Defendants' Motion should be denied.

## FACTUAL BACKGROUND

Dr. Vandell constructed the Industry and GSE Benchmarks without establishing that they are free of underwriting defects.  The Industry Benchmark "includes loans [purportedly] comparable to the At-Issue Loans from private label, or non-agency, securitizations that were issued between 2005 and 2007."  Expert Report of Kerry D. Vandell, Ph. D. ("Vandell Rpt.")

3

(Ex. 1) ¶ 180.[2]  Dr. Vandell removed all loans at issue in the FHFA Actions from this benchmark but did nothing further to cleanse it of defective loans.  Deposition of Kerry D. Vandell ("Vandell Dep.") (Ex. 2) 82:18-83:5; Vandell Rpt. ¶ 181 n.251.  The GSE Benchmark "includes [purportedly] comparable loans that were purchased as whole loans by Fannie Mae and Freddie Mac."  Vandell Rpt. ¶ 182.  Dr. Vandell similarly did nothing to cleanse the GSE Benchmarks of defective loans.  *Id.* ¶¶ 182-83 (describing selection of loans for GSE Benchmark but no process for excluding defective loans).  Despite not establishing that the benchmarks were clean, Dr. Vandell relied on the results generated from these benchmarks to conclude that the "alleged misstatements did not cause the defaults and serious delinquencies experienced by, at a minimum, six of the seven At-Issue SLGs[.]"  *Id.* ¶ 221; *see also id.* ¶¶ 185-86.

As part of its rebuttal to Dr. Vandell, FHFA proffered the opinions of Dr. Anthony Saunders.[3]  Dr. Saunders' report analyzed economic evidence that the Industry and GSE Benchmarks are tainted with loans that have underwriting defects.  The economic evidence includes:

**Litigations and settlements relating to loans in the Industry Benchmark.**  Based on a review of publicly available information, Dr. Saunders found that "a large fraction of the Industry Benchmark Securitizations have been the subject of either fraud litigation by investors, fraud litigation by insurers, or put-back litigation by trustees."  *See* Rebuttal Report of Anthony

---

[2]  "Ex." refers to exhibits attached to the Declaration of Wing F. Ng in support of FHFA's Opposition To Defendants' Motion To Exclude The Testimony Of Dr. Anthony Saunders, dated January 23, 2015.

[3]  Currently the John M. Schiff Professor of Finance at New York University, Dr. Saunders has over 25 years of experience in assessing the behavior of financial institutions and markets.  Saunders Rpt. ¶ 1.  His publications are voluminous, so much so that he was ranked as the "Most Prolific Author" in 16 core finance journals over 50 years.  *Id.* Ex. A.  Dr. Saunders has also authored or co-authored over a dozen books and monographs, including *Credit Risk Measurement* (2010).  *Id.*  In addition, he has served as editor of a number of academic journals.  *Id.*

Saunders ("Saunders Rpt.") (Ex. 3) ¶¶ 31-33.  Dr. Saunders further concluded that "at least 38.6 percent of the Industry Benchmark securitizations have been the subject of litigation that has resulted in monetary settlements."  *Id.* ¶ 33.

**Settlement data relating to loans in the GSE Benchmark.**  Data from Fannie Mae and Freddie Mac concerning repurchases and settlements for loans that the GSEs purchased establish that the GSE Benchmark also includes a substantial number of loans with defects.  *See* Saunders Rpt. ¶¶ 34-37.  For Fannie Mae, this data shows that "73.41 percent of the loans purchased by Fannie Mae are either (a) covered by settlement agreements entered into between Fannie Mae and various parties to resolve potential representation and warranty claims, or (b) were repurchased by the originators."  *Id.* ¶ 35; *id.* Ex. E.  For Freddie Mac, this data shows that "25.86 percent of the loans purchased by Freddie Mac are either (a) covered by settlement agreements entered into between Freddie Mac and various parties to resolve potential representation and warranty claims, or (b) were repurchased by the originators."  *Id.* ¶ 36; *id.* Ex. G.  In addition, public information shows that settling parties paid Fannie Mae $13.45 billion and Freddie Mac $3.97 billion to resolve representation and warranty claims concerning these and other loans covered by the settlements.  *Id.* ¶¶ 35-36.

**Peer-reviewed academic studies.**  Dr. Saunders identified and analyzed five academic studies that provide "both direct and indirect evidence that Professor Vandell's Industry and GSE Benchmarks contain loans with underwriting defects."  *See* Saunders Rpt. ¶¶ 16-30.

Two of the articles provide direct evidence by "compar[ing] actual data concerning loan and borrower characteristics (such as occupancy status and the existence of second liens) with the information that was reported to investors concerning these same characteristics and find that the information that was reported to investors was incorrect."  *Id.* ¶ 16.  For example, in "Asset

5

Quality Misrepresentation by Financial Intermediaries: Evidence from RMBS Market" ("Piskorski Article") (Ex. 4),[4] the authors reviewed a large number of loans originated between 2005 and 2007 that have sufficient data for analysis. *Id.* ¶ 17. The authors "analyze[d] whether loans were reported as being collateralized by owner-occupied properties when in fact those properties were owned by borrowers with a different primary residence." *Id.* ¶ 18. Based on their analysis, the authors found, among other things, that "more than 27% of loans obtained by non-owner occupants misreported their true purpose[.]" *Id.* ¶ 19.[5]

Three of the articles provide indirect evidence by "analyz[ing] the performance of loans based on their reported characteristics and find[ing] that the actual performance of the loans is worse than would have been expected, which is consistent with the hypothesis that the reported characteristics were misstated." *Id.* ¶ 16. For example, in "Understanding the Subprime Mortgage Crisis" ("Demyanyk Article") (Ex. 6),[6] the authors found that "the quality of loans deteriorated for six consecutive years before the crisis, and that while 'loan and borrower characteristics are very important in terms of explaining the cross-section of loan performance… these characteristics. . . cannot explain the unusually weak performance of vintage 2006 and

---

[4] Tomasz Piskorski, Amit Seru and James Witkin, "Asset Quality Misrepresentation by Financial Intermediaries: Evidence from RMBS Market," Columbia Business School Research Paper No. 13-7 (February 12, 2013). This article has been accepted by publication in the Journal of Finance, "which is a top peer-reviewed journal in the field[.]" *See* Saunders Dep. 20:15-21:3; *id.* at 110:14-23.

[5] Dr. Saunders also reviewed John M. Griffin and Gonzalo Maturana, "Who Facilitated Misreporting in Securitized Loans?" (December 20, 2013) ("Griffin Article") (Ex. 5). This article found that "13.4% of loans reported as having no second lien (10.2% of all loans) do have a second lien. Approximately 7.7% of loans marked as owner occupied (6.7% of all loans) may not be owner occupied. Additionally…17.8% of homes have appraisals that appear inflated." Griffin Article at 2.

[6] Yuliya Demyanyk & Otto Van Hemert, "Understanding the Subprime Mortgage Crisis," 24 The Review of Financial Studies (2011) 1848-1880.

2007 loans.'"[7]  Because of substantial overlap between the loans in Dr. Vandell's Industry Benchmark and the loans examined in the Demyanyk Article, Dr. Saunders concluded that "this study undercuts the validity of Professor Vandell's implicit assumption that his Industry Benchmark is free of underwriting defects and the reliability of his conclusions based on his analysis of the Industry Benchmark." *Id.* ¶ 24.

Based on this economic evidence and his vast expertise and experience, Dr. Saunders concluded that Dr. Vandell had no reliable basis upon which to assume that either his Industry or GSE Benchmarks were free of defective loans, rendering both benchmarks inappropriate and unreliable for use by Dr. Vandell in his negative loss causation analysis.[8]

## ARGUMENT

**A.   Dr. Saunders' Testimony About Litigation Settlements Is Directly Relevant To The Reliability Of Dr. Vandell's Benchmarks.**

Defendants argue that Dr. Saunders' testimony that loans in Dr. Vandell's benchmarks

---

[7]  Demyanyk Article at 1849.  Dr. Saunders relied on two additional articles that provide indirect evidence.  *See* Paul Calem, Christopher Henderson & Jonathan Liles, "'Cherry picking' in subprime mortgage securitizations: Which subprime mortgage loans were sold by depository institutions prior to the crisis of 2007?" 20 Journal of Housing Economics (2011), 120-40 ("results are consistent with anecdotal evidence concerning lack of awareness of risk within the mortgage securitization market during this period, such as facts alleged in recent lawsuits challenging the veracity of lender's claims regarding underwriting quality and corporate governance over credit policy.") ("Calem Article") (Ex. 7); Gene Amromin & Anna L. Paulson, "Comparing patterns of default among prime and subprime mortgages," 33 Economic Perspectives (2009), 18-36 (finding that "increased defaults cannot be accounted for by changes in [reported] loan characteristics alone.") ("Amromin Article") (Ex. 8).

[8]  Notably, as there are various reasons why defective loans would not be covered by settlements, solely removing the loans that were subject to the settlements identified by Dr. Saunders would not cleanse either the Industry or GSE benchmarks, especially in light of evidence of widespread misrepresentations in the RMBS industry during the relevant period.  *See* Saunders Rpt. ¶¶ 17-30; *cf. Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*, No. 11CV6201 DLC, -- F. Supp. 3d --, 2014 WL 7232443, at *29 (S.D.N.Y. Dec. 18, 2014) ("after studying RMBS securitizations during the period in question, the Financial Crisis Inquiry Commission concluded that 'firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. . . .  These problems appear to have been significant.'") (ellipses in original).

7

were involved in litigation settlements is irrelevant and highly prejudicial. Mem. 10-15. Defendants are wrong on both counts. Dr. Saunders' testimony is directly relevant to the reliability and appropriateness of Dr. Vandell's benchmarks. The fact that loans in Dr. Vandell's benchmarks were subject to litigation settlements or repurchases is economic evidence that the loans in these benchmarks (and the origination processes that created them) are defective. *See* Saunders Rpt. ¶ 33 (noting that at least 38.6% of the securitizations in the Industry Benchmark were subject to litigation relating to fraud or put-backs); *id.* ¶¶ 35-36 (showing 73.41% and 25.86% of whole loans purchased by Fannie Mae and Freddie Mac, respectively, were either covered by settlement agreements or repurchased by originators); Deposition of Anthony Saunders ("Saunders Dep.") (Ex. 9) 150:6-19 (testifying that settlements are "evidence that there were defects" in the Industry Benchmark); *id.* at 179:23-180:2 (same for GSE Benchmark). Tellingly, Dr. Vandell himself concedes that relevance of this economic evidence by removing all the loans in the securitizations at issue in the FHFA Actions from his Industry Benchmark. *See* Mem. 3-4. Far from being irrelevant, Dr. Saunders' opinions go to the heart of the central issue of whether Dr. Vandell's benchmarks are "clean" and reliable for the purpose of proving negative loss causation.[9]

Nor does Dr. Saunders' testimony regarding settlements create any risk of unfair prejudice under Federal Rule of Evidence 403.[10] The cases cited by Defendants all concern the admissibility of evidence of specific, prior settlements against one of the parties.[11] In contrast,

---

[9] As discussed in the Vandell Motion, none of the benchmarks used by Dr. Vandell are reliable and all should be excluded under Rule 702. *See generally* Vandell Motion.

[10] Defendants' argument relating to jury confusion (Mem. 12) is irrelevant as there is no jury trial. *See* Dkt. 1095.

[11] *See, e.g.*, Mem. 13 (citing *U.S. Football League v. Nat'l Football League*, 634 F. Supp. 1155, 1173 (S.D.N.Y. 1986), *aff'd* 842 F.2d 1335 (2d Cir. 1988), which excluded evidence

8

the settlements that Dr. Saunders reviewed relate to the *benchmarks* used by Defendants' expert, not to the conduct of Defendants themselves or to the loans or securitizations at issue in this Action.  Further, given that this action will now be tried to the Court, there is no risk of prejudice; the Court will, of course, understand that Dr. Saunders' testimony is a rebuttal of Dr. Vandell's benchmarking analysis and is not an opinion concerning Defendants' liability or prior conduct.

**B.     Dr. Saunders' Testimony Appropriately Relies On The Five Peer-Reviewed Articles.**

Defendants claim that Dr. Saunders "merely repeats" the conclusions of five academic articles and that such testimony would be inadmissible hearsay.  Mem. 16.  Defendants' argument is specious.  At the threshold, it is well settled that experts are able to rely on academic articles in forming their opinions.  *See Katt v. City of New York*, 151 F. Supp. 2d 313, 357 (S.D.N.Y. 2001), *aff'd sub nom. Krohn v. New York City Police Dep't*, 372 F.3d 83 (2d Cir. 2004) (permissible for expert to rely on "hundreds of commission reports, research articles, scholarly journals, books and newspaper reports" as "[s]uch data is of a type reasonably relied upon experts in various disciplines of social science").[12]  Indeed, Dr. Vandell himself, as would be expected, relied on a number of academic articles for his report.  *See* Vandell Rpt. App. B (listing research articles on which Dr. Vandell relied).

Moreover, Defendants' argument completely misconstrues Dr. Saunders' analysis and reliance on the five academic articles.  Dr. Saunders does not "merely repeat[]" the conclusions of these articles; he "reviewed [the articles] as an academic" and relied on them to form his

---

of prior antitrust judgments against the NFL in case alleging antitrust violations against the same defendant).

[12]   By contrast, Defendants' expert Dr. Vandell built his Reunderwriting Benchmark by relying on an unusual source:  the findings of FHFA's other experts in other actions, who will not testify at trial in this Action.  *See* Vandell Motion 11-13.

independent opinion, supported by additional economic evidence and analysis, that Dr. Vandell had no basis to assert or presume that his benchmarks were free from loans with underwriting defects.  *See* Saunders Dep. 20:18-21:3; Saunders Rpt. ¶¶ 31-37.  Dr. Saunders does not parrot the conclusions in the five articles as his own or offer their conclusions as truth, thus rendering the hearsay rules inapplicable.  By extension, Defendants' complaint that they are deprived of the opportunity to cross-examine the authors is hollow.  Dr. Saunders' opinion is that the economic evidence, including the articles, establishes that Dr. Vandell is unable to presume his benchmarks are clean of defects.  Defendants' assertion that Dr. Saunders is unable to rely on these academic articles for this purpose without being able to depose the authors is absurd and contrary to decades of settled expert discovery practice.  Defendants had the full opportunity to depose Dr. Saunders about why he came to his conclusions and what role his analysis of the five articles had in those conclusions.  These are well established lines of cross examination that go to weight, not admissibility.  *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (holding that challenges to the weight and credibility of expert testimony are "properly explored on cross-examination" and do not concern admissibility).  Defendants' failure to establish any infirmity in Dr. Saunders' reliance on the articles at deposition does not, now, give them license to seek preclusion on the purported basis that Defendants were not afforded an opportunity to depose the articles' authors.

C.  **The Five Articles Relied On By Dr. Saunders Provide Direct And Indirect Evidence That Dr. Vandell's Benchmarks Are Tainted With Underwriting Defects.**

Defendants next attack Dr. Saunders' reliance on the five articles by asserting that Dr. Saunders has not "identified and quantified the extent of the overlap" between the benchmarks and the loans studied in the articles.  Mem. 17.  This argument, however, inverts Defendants' "heavy burden" of negative loss causation.  *See Akerman v. Oryx Commc'ns, Inc.*,

810 F.2d 336, 341 (2d Cir. 1987).  If Defendants wish to rely on the benchmarks to ground their negative loss causation defense, then it is Defendants' burden to establish that their "clean" benchmarks were not tainted with loans with underwriting defects.  Defendants failed to re-underwrite their benchmarks, as was envisioned by the schedule and procedure established by the Court and Dr. Vandell, in turn, adopted a fundamentally flawed and unreliable methodology.  Dr. Saunders' rebuttal opinion simply highlights this obvious methodological failure based on the economic evidence, including the five articles.  Dr. Saunders need not identify specific defective loans in the benchmarks, or quantify exact overlaps among loans, to undermine the reliability of a method that wrongly presumes the benchmarks are "clean."

Specifically, each article relied upon by Dr. Saunders makes use of very large databases to examine loans originated during the relevant time.  *See* Saunders Rpt. ¶ 17 (Piskorski Article: Blackbox Logic database, sample size of 1.9 million loans[13]); *id.* ¶ 20 (Griffin Article: ABSNet, sample size of 3.1 million loans[14]); *id.* ¶ 23 (Demyanyk Article: Corelogic, same database as one used by Dr. Vandell[15]); *id.* ¶ 25 (Calem Article: data from Home Mortgage Disclosure Act, sample size of 627,076 loans[16]); *id.* ¶ 28 (Amromin Article: LPS database, sample size of 130,000 loans[17]).  Given the "very high correlation across those loans . . . in the Piskorski database" and in Dr. Vandell's Industry Benchmark, for example, Dr. Saunders testified that there would be "a very high probability [of] an overlap."  Saunders Dep. 54:5-13; *see also id.* 96:4-6 ("As an economist I would infer there would be some overlap" between loans in the

---

[13] Saunders Dep. 78:10-12

[14] Saunders Dep. 72:8-18.

[15] Vandell Rpt. ¶¶ 180, 182.  Even Defendants are forced to begrudgingly concede that the "first-lien subprime loans in the Industry Benchmark likely overlap with some loans used in the Demyanyk Article."  Mem. 18 n.4.

[16] Mem. 20.

[17] Mem. 20.

11

Piskorski and Griffin articles and the Industry Benchmark).[18]

As for the GSE Benchmark, Dr. Saunders opined in his report that the Calem and Amromin Articles "necessarily include[] some of the loans that comprise the GSE Benchmark" because both studies examined loans sold to the GSEs during the relevant time. Saunders Rpt. ¶¶ 25, 28. That the Calem and Amromin Articles examined a *subset* of the loans in the GSE Benchmark does not, thus, establish absence of overlap. *See* Mem. 19-20. Further, Defendants' concerns about the exact degree of overlap go only to the weight, not admissibility, of Dr. Saunders' testimony relating to the five articles.[19] *See McCullock*, 61 F.3d at 1043.

## D. Dr. Saunders Relied On Three Articles That Provide Indirect Evidence That Undercut The Reliability Of Dr. Vandell's Benchmarks.

Defendants' last argument for exclusion is that Dr. Saunders relied on three articles that provide "indirect evidence" that the benchmarks are unclean. Mem. 21 (referring to the Amromin, Demyanyk, and Calem Articles). These articles analyzed the performance of groups of loans based on their reported characteristics and find that actual performance is worse than expected. Saunders Rpt. ¶ 16. The difference in actual and expected performance is consistent with the hypothesis that the reported characteristics were *misreported*. *Id.* This is a legitimate use of the same approach that Dr. Vandell misapplies in his own report, where he contends that the alleged misrepresentations had little to no effect on the performance of the loans because the actual and expected performance were not statistically significantly different. Vandell Rpt.

---

[18] Defendants' attempt to rely on this Court's decision on FHFA's motion for summary judgment on due diligence is misguided. *See* Mem. 19 (citing *FHFA v. Nomura Holding Am., Inc.*, 11 Civ. 6201, at *5-6, 81-82 (S.D.N.Y. Dec. 18, 2014) (Dkt. No. 991)). The Court reviewed Defendants' due diligence practices under the requirements of the Securities Act of 1933, which has no relevance to a determination of the reliability of Dr. Saunders' testimony under the Federal Rules of Evidence.

[19] As this Action will be tried to the Court, Defendants' meritless arguments (Mem. 20-21) about undue prejudice and jury confusion are also inapplicable.

¶ 178. Thus, Defendants complain about the very approach that their own expert adopts in his loss causation analysis – but without any showing of error by Dr. Saunders.

The true reason Defendants seek to exclude testimony relying on these three articles is, of course, that the articles undermine Dr. Vandell's conclusion that alleged misrepresentations had little to no impact on the performance of the at-issue SLGs.  All three articles found that the reported characteristics of the loans reviewed cannot explain the actual performance, meaning that something else was causing the loans to default.  *See* Saunders Rpt. ¶¶ 23-30.  As Dr. Saunders testified, the results in these three articles are "consistent with defects" in the underlying loans.  Saunders Dep. 121:8-22; *see also id.* at 126:9-20.  Thus, the articles in fact underscore that Dr. Vandell's testimony relating to the benchmarks should be excluded as unreliable.  *See generally* Vandell Motion.[20]

## CONCLUSION

For the reasons stated above, Plaintiff FHFA respectfully requests that the Court deny Defendants' motion to exclude the testimony of Dr. Saunders.

DATED:   January 23, 2015
         New York, New York

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By:  /s/ Philippe Z. Selendy
     Philippe Z. Selendy
     Sascha N. Rand
     Wing F. (Alex) Ng

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

---

[20]  Defendants tellingly cite no cases – nor can they – to support the proposition that testimony based on "indirect evidence" must be excluded.  *See* Mem. 21-22.