February 9, 2014

**VIA ELECTRONIC MAIL**
The Honorable Denise L. Cote
United States District Judge
500 Pearl Street, Room 1610
New York, NY 10007-1312

Re:   *FHFA v. Nomura Holding America, Inc., et al.*, No 11 Civ. 6201 (S.D.N.Y.) (DLC)

Dear Judge Cote:

      FHFA respectfully requests that the Court deny Defendants' Motion *in Limine* No. 7 ("Mot."), which seeks to exclude evidence or argument that Defendants characterize as related to (i) whether Defendants had a duty to conduct due diligence; (ii) Defendants' due diligence practices relating to transactions other than the Nomura securitizations; (iii) diligence re-underwriting results relating to loans from mortgage lenders that did not originate any loans backing the securitizations at issue in this case; and (iv) the amounts or methods of compensation of Defendants' employees who were not involved with the securitizations at issue. Mot. 1.[1] Each of these categories of documents is relevant to whether Nomura's representations regarding the Mortgage Loans collateralizing the securitizations at issue were materially false and/or the reliability of the methodology used by the parties' expert witnesses.

      Nomura conducted forms of credit, compliance, and valuation diligence when acquiring the mortgage loans at issue for securitization, as did RBSSI when underwriting two of the securitizations at issue. The Court has already held, considering Defendants' diligence processes "as a whole," that no reasonable jury could conclude that either Nomura or RBSSI had conducted a reasonable investigation or had exercised reasonable care in verifying the representations in the Prospectus Supplements. *FHFA v. Nomura Holding Am., Inc.*, --- F. Supp. 3d ----, 2014 WL 7232443, at *36 & n.61, 38, 40 (S.D.N.Y. Dec. 18, 2014). Defendants now seek to exclude certain evidence that is tied to diligence conducted by Nomura and RBSSI on loans other than loans in the SLGs.

I.   **The Evidence At Issue Is Generally Probative Of Falsity And Materiality**

      Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Evidence of a fact at issue can be either direct or circumstantial, and "circumstantial evidence … can be just as probative as direct evidence." *FHFA v. HSBC N. Am. Holdings, Inc.*, 2014 WL 3702587, at *21 (S.D.N.Y. July 25, 2014). At trial, FHFA will present direct evidence that the relevant representations in the Prospectus Supplements were materially false, including through the testimony of its re-underwriting expert, Robert Hunter, and its valuation expert, Dr. John Kilpatrick, and the results of Nomura's and RBSSI's diligence review on the loans included in the SLGs. These diligence results reflect, among other things, (i) the

---

[1] FHFA notes that, as general matter, these categories are vague and do not provide either the Court or FHFA with sufficient notice of any particular document that, for reasons specific to that document, might not be relevant for the reasons articulated by FHFA in this opposition.

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

hundreds of loans in the SLGs that were graded EV3 by the diligence firms retained by Defendants, (ii) the even larger number of loans that were requested by Defendants to be changed from EV3 to EV1 or EV2 without proper justification, and (iii) the high percentage of loans graded EV1 and EV2 by the diligence firms retained by Defendants but later found to be defective by Defendants' own quality control reviews.  Such diligence results are also circumstantial evidence that there were a high number of defective loans in the SLGs that were not reviewed as part of the diligence samples.  Moreover, this evidence illustrates the defect categories and numerical thresholds that Defendants and the third party diligence firms they retained considered to be sufficiently material to warrant an EV3 grade.

FHFA also intends to present circumstantial evidence that materially defective loans were included in the SLGs, including by showing that (i) originators of SLG loans (the "Originators") were systematically originating loans that did not comply with underwriting guidelines or had inaccurate appraisals, and (ii) Nomura's and RBSSI's securitization and diligence procedures were not designed to identify and prevent such loans from being securitized into the SLGs.

*First*, Nomura's and RBSSI's diligence on pools of loans originated by the Originators uncovered evidence that the Originators were systematically originating defective loans.  For example, RBS came to recognize that it needed to "try and hold [Fremont] more to their published guidelines rather than guidelines plus exceptions," Ex. 1 at RBS-FHFA-SDNY-0398202, and gave Fremont the nickname "FraudMont."   Ex. 2 at RBS-FHFA-CT-5957592.  Similarly, Nomura's review of a pool of People's Choice loans resulted in numerous valuation issues, which led Joseph Kohout, Nomura's head of due diligence, to conclude that the People's Choice appraisal process was "obviously a faulty process," Ex. 3 at NOM-FHFA_05496436, and "evidence of a systematic issue in this area on the origination side," Ex. 4 at NOM-FHFA_05496427.  These reviews tend to show that the Originators were systematically originating defective loans, which is true even if the review did not concern a loan pool that ultimately were included in the SLGs.  *See FHFA v. JPMorgan Chase & Co.,* 902 F. Supp. 2d 476, 488 (S.D.N.Y. 2012) (descriptions of government and private investigations not specific to the loans in the SLGs that revealed underwriting failures by originators "provide a basis to assert that there was a systematic failure by the defendants in their packaging and sale of RMBS").

*Second*, the evidence shows that Nomura's and RBSSI's diligence processes were not effective at identifying and excluding such defective loans from the SLGs.  For example, in July and August 2006, Nomura commissioned Inglet Blair to perform an audit of its third-party diligence vendors.  Ex. 5 at NOM-FHFA_05368388.  Inglet Blair's review found that 30% of the loans it reviewed that had been graded an EV1 or an EV2 by the original diligence vendor should not have been purchased or securitized.  Ex. 6 at NOM-FHFA_05368856.  Other evidence shows, for example, that Nomura's sampling process was inadequate.  As Mr. Kohout observed, in the specific context of a Fremont acquisition pool that is not at issue, Nomura's sample selection process, as a general matter, "d[id] not conform to what is generally deemed to be effective by industry standards." Ex. 7 at NOM-FHFA_05500893.  These documents  tend to show that Defendants' diligence processes—which were applied to SLG loans—were inadequate to keep defective loans from being securitized, which is true even if that specific review did not concern a loan pool that ultimately was included in the SLGs.  *See NCUA v. UBS Sec., LLC*, 2014 WL 2600133, at *5 (S.D.N.Y. June 10, 2014) (combination of "originator-specific allegations suggesting systemic disregard of the relevant underwriting guidelines" and allegations "that [defendant's] due diligence did not weed out loans that failed to comply with the relevant underwriting guidelines" was "'suggestive of' systemic disregard of the

underwriting guidelines"). In short, evidence of inadequacies in RBSSI's and Nomura's diligence process is relevant circumstantial evidence that the representations regarding the SLGs were materially false.

## II. The Specific Categories Of Evidence Referenced By Defendants Are Relevant

Each of the specific categories of evidence identified by Defendants goes to establishing that the Originators systematically originated defective loans and/or that Nomura's and RBSSI's diligence process was defective. Such evidence is also often relevant for additional reasons not even mentioned by Defendants, such as materiality or corroborating the reliability of the parties' expert witnesses.

*First,* both Dr. Peter Rubinstein's and Leonard Blum's testimony regarding diligence practices is relevant. Dr. Rubinstein provides important background testimony regarding the securitization process, including (i) the key participants in the securitization process, such as the originator(s), sponsor, depositor, trustee, and securities underwriter(s); (ii) the process of securitizing residential loans into residential mortgage backed securities, including the sourcing of mortgage loans, the structuring of the securitization, the transfer of loans to the trust, and the issuance, marketing and sale of the securities; and (iii) the financial incentives and functions of the participants in the process during the 2005 to 2007 time period. Mr. Blum provides important background information about Defendants' diligence and disclosure obligations. That testimony provides context for how Defendants' own diligence findings, such as those noted above, tend to show falsity. In addition, Mr. Blum offers an opinion that is relevant to assessing pool-level materiality, specifically, how, given Defendants' diligence and disclosure obligations, the securitization process would be impacted where the underlying collateral was inaccurately described or defectively originated (as found by other of FHFA's experts).[2]

*Second,* documents showing Defendants' due diligence procedures and practices in connection with securitizations not at issue, Mot. 2, is relevant circumstantial evidence both to show that Defendants' general diligence practices were not effective at identifying and removing defective loans and to show systematic problems with the loans originated by the Originators. Evidence of Defendants' general diligence practices is also relevant, among other reasons, to corroborating the re-underwriting methodology employed by FHFA's expert. These documents reflect (i) the specific defect categories and numerical thresholds that Defendants and the third party diligence firms they retained considered to be sufficiently material to warrant a grade of EV3; (ii) the compensating factors that were deemed sufficient to offset the increased credit risk of any underwriting defects; and (iii) the processes that was to be used in re-underwriting the loans as part of the credit and compliance reviews.[3]

---

[2] Defendants do not make clear if they seek to exclude all testimony from Dr. Rubinstein and Mr. Blum regarding Defendants' diligence, or just testimony that Defendants had a duty to perform due diligence. Regardless, as Defendants note, the accuracy and propriety of the substance of Dr. Rubinstein's and Mr. Blum's expected testimony is subject to a pending *Daubert* motion, Dkt. 1016, and is proper for the reasons stated in FHFA's opposition to that motion.

[3] For example, it is relevant that Mr. Kohout, "expect[ed] that as a component of due diligence that the reasonability of income is reviewed and if applicable, questioned," and that he directed Nomura's diligence vendors AMC and Clayton to use "tools available on the Internet" as part of that review. Ex. 11 at NOM-FHFA 05500889-90.

Within this same category of evidence, Defendants specifically single out testimony from RBSSI employees, like Frank Camacho, who did not work on the specific securitizations at issue, Mot. 2, but this testimony is relevant for the same reason: it shows the ineffectiveness of Defendants' general diligence procedures that were applicable to the securitizations at issue. *See, e.g.*, Ex. 8 (Camacho Dep.) 192:10-194:10 (discussing general RBS's sampling process). Such testimony is also often relevant for additional reasons, such the materiality of the misrepresentations. For example, Mr. Camacho testified that verifying the owner-occupancy status of a loan is "very important" when purchasing a loan, because "[a] borrower who is going to live inside the subject property … is probably going to have a higher likelihood of taking decent care of it, is probably going to prioritize that debt higher than a property he's not living in." *Id*. at 104:2-105:13.

*Third*, documents concerning diligence pertaining to lenders that did not originate mortgage loans in the SLGs, Mot. 2, are similarly relevant to the extent that they show the ineffectiveness of Defendants' general diligence procedures. For example, Defendants apparently dispute the relevance of an email sent by Mr. Camacho that is nominally about the review of a pool of loans from Option One, which did not originate any of the loans in the SLGs. Ex. 9 (email chain with subject line "Option One 5-24.xls"). In that email, however, Mr. Camacho is answering a question about how he evaluates diligence results as a general matter, stating that he is "trying to … figure out whether the loans in the deal are as good as the seller said they were," which is circumstantial evidence that often they are not as good as the seller said they were, and that he compares the original appraisal to a drive-by appraisal to "figure out who's on crack," which is circumstantial evidence that such appraisals were often objectively and subjectively false. *Id*. at RBS-FHFA-CT-1612874. That his answer is in the context of an Option One pool is irrelevant to these inferences.

*Fourth*, the compensation of RBSSI employees who were not directly involved with the securitizations at issue, Mot. 2, is relevant to the extent it shows the incentives of RBSSI's employees when conducting diligence. For example, Defendants cite the testimony of Robert McGinnis, who confirmed that "compensation in Greenwich Capital was a function of the performance of the individual, the department, and the firm," that his compensation was warranted by "adding new businesses," and that he could not recall post-issuance performance of RMBS issuances, including fraud, early payment defaults, or repurchases, being a factor in RBSSI's compensation. Ex. 10 (McGinnis Dep.) 48:10-49:4, 78:14-79:3, 99:22-101:16. This testimony confirms that RBSSI was financially incentivized to approve as many loans for securitization as possible without regard to whether such loans were defective.

*Finally*, the testimony of Brian Farrell, Mot. 2 n.2, is of core relevance, as Mr. Farrell was the principal RBSSI diligence contact for the only two securitizations where RBSSI conducted any diligence—NHELI 2007-1 and NHELI 2007-2. *See, e.g.*, Ex. 12 at RBS-FHFA-SDNY-0487343 (Mr. Farrell requesting "to review 25% of the total loan population" for NHELI 2007-2 because the pool was "crap"). Mr. Farrell's testimony regarding the diligence performed on those securitizations is direct evidence of whether the SLG loans were defective. The credibility of his failure to recall the details of that diligence is precisely the type of determination a finder of fact is entitled to make. *United States v. Lumpkin*, 192 F.3d 280, 289

(2d Cir. 1999) ("Fundamental to the role of … trier of fact is the task of assessing witness credibility.").[4]

### III. This Court's Prior Opinions Do Not Require Exclusion Of Evidence Of Defendants' Diligence Processes

Defendants' attempts to argue that the Court's prior rulings require exclusion of general diligence evidence are misguided. Defendants point to the Court's statement that "whether the challenged representations were or were not accurate has no bearing on whether defendants undertook a reasonable investigation," *Nomura Holding Am.*, 2014 WL 7232443, at *39, and argue that this statement means that diligence performed on transactions not at issue cannot be probative of falsity or materiality. Mot. 3-4. But Defendants' conclusion does not follow. That falsity is not probative of adequate diligence does not mean that inadequate diligence is not probative of falsity. To the contrary, the Court recognized that Nomura's diligence results could show that the loans it acquired and securitized were defective. *See Nomura Holding Am.*, 2014 WL 7232443, at *31 (based on its diligence, results "Nomura should have expected roughly 1 in 7 loans might be defective").

Defendants also argue that general diligence information is irrelevant because the Court held that "whatever the GSEs' knowledge of an Originator's general practices, the Offering Documents contained specific representations about particular sets of Mortgage Loans." *HSBC N. Am. Holdings*, 2014 WL 3702587, at *17. Defendants conflate their burden to prove that the GSEs knew the representations were false at the time they purchased the Certificates with FHFA's burden simply to prove that the representations are false. Crucially, the GSEs did not "ha[ve] access to the files or data that would give them knowledge that those detailed representations about the Mortgage Loans in a Supporting Loan Group were false," *id.*, and they were entitled to rely on the diligence Defendants were supposed to perform, *id.* at *22—neither of which can be said of Defendants here.[5]

Because FHFA's proposed evidence is relevant to the claims that remain to be tried, FHFA respectfully requests that Defendants' motion be denied.

---

[4] Given the relevance of FHFA's proposed evidence to the claims remaining to be tried, presentation of this evidence is not wasteful and its relevance outweighs whatever unexplained risk of confusion of the standard for liability and required proof defendants posit may exist. *See* Fed. R. Evid. 403.

[5] Similarly, it does not follow that if the Court grants FHFA's motion to preclude Defendants from introducing post-settlement information from the GSEs, then it should also preclude FHFA from introducing post-settlement evidence from Defendants. Mot. 3 n.3. Defendants once again "wrongly equate[ ] post-origination evidence demonstrating the falsity of the representations in the Prospectus Supplements at the time of issuance with the irrelevant *GSE* evidence FHFA seeks to exclude." FHFA Reply in Support of Its Mot. *in Limine* No. 6 at 1.

Respectfully submitted,

*/s/ Philippe Z. Selendy*
Philippe Z. Selendy

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*Attorney for Plaintiff Federal Housing Finance Agency*


cc: All Counsel of Record