DX

4037

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION, | No. 11-cv-6201 (DLC) <br><br> ECF Case |
| Plaintiff, | |
| -against- | |
| NOMURA HOLDING AMERICA INC., *et al.*, | |
| Defendants. | |

**AFFIDAVIT OF MICHAEL P. HEDDEN**

STATE OF NEW YORK    )
                             ) ss:
COUNTY OF NEW YORK  )

      Michael P. Hedden, being duly sworn, deposes and says:

      1.     My name is Michael Hedden.  I am a Managing Director at FTI Consulting.

      2.     I provide this affidavit as my direct testimony at trial.  My testimony responds to the opinions of plaintiff's expert Dr. John A. Kilpatrick regarding adherence to professional standards of appraisals for loans underlying the seven Securitizations at issue in this Action, and to the opinions of plaintiff's expert Robert W. Hunter regarding the underwriting of mortgage loans at issue in this Action.

## <u>TABLE OF CONTENTS</u>

**Page**

I.   BACKGROUND AND QUALIFICATIONS ...................................................1

II.   ASSIGNMENT ........................................................................................2

III.   SUMMARY OF OPINIONS .........................................................................3

    A.   Summary of Opinions Put Forth by Dr. Kilpatrick and Mr. Hunter ......................3

    B.   Summary of My Opinions ........................................................................5

IV.   STANDARDS AND REQUIREMENTS APPLICABLE  TO RESIDENTIAL
REAL ESTATE APPRAISALS ....................................................................7

    A.   Appraisals in Connection with Residential Mortgages ...........................9

    B.   Appraisers Are Held to Strict Ethical and Competency Standards ........12

    C.   Evaluating Appraisals Retrospectively ...............................................13

V.   THE CAM IS AN INVALID AND UNRELIABLE TOOL FOR EVALUATING
THE CREDIBILITY OF AN APPRAISAL, AND WAS USED IN AN
UNRELIABLE MANNER ........................................................................16

    A.   Overview of the CAM ..........................................................................16

    B.   The CAM's Design Makes It Invalid and Unreliable as a Tool to
Distinguish between Credible and Non-Credible Appraisals. ................19

    C.   In Addition to the CAM's Design Flaws, Dr. Kilpatrick's Team Has Also
Implemented and Applied It in an Unreliable Manner That Renders His
Findings Useless. ...............................................................................23

**TABLE OF CONTENTS**
**(Continued)**

VI.   ANALYSIS OF THE CAM'S 31 QUESTIONS ............................................................25

VII.  THE APPRAISAL-RELATED FINDINGS IN MR. HUNTER'S REPORT ARE
      INACCURATE AND DO NOT DISCREDIT THE ORIGINAL APPRAISALS .........101

      A.   Mr. Hunter's Claims That Appraisals Did Not Support the Property Value
           Conclusion ......................................................................................................102

      B.   Mr. Hunter's Claims That Appraisals Were Not "Qualified Appraisals" ...........104

VIII. CONCLUSION...............................................................................................107

## I.    BACKGROUND AND QUALIFICATIONS

1.    I am a Managing Director at FTI Consulting, Inc. ("FTI").  I have 41 years of experience in residential real estate, including 33 years in the field of real estate appraisals.  I hold the designations of New York Certified General Real Estate Appraiser (ID No. ████████ Member of the Appraisal Institute (MAI), Counselor of Real Estate (CRE), and Fellow of the Royal Institute of Chartered Surveyors (FRICS).  I hold Appraisal Certifications in 13 states, including New York and New Jersey. In addition, I have held a New Jersey real estate brokerage license for 36 years.

2.    My expertise includes the preparation and quality review of residential appraisals and management of appraisal business operations. Over the course of my career, I conservatively estimate that I have conducted or supervised more than 400 residential appraisals, 3,000 commercial appraisals, 400 land appraisals, and 300 appraisal reviews.

3.    I have been active in the Appraisal Institute for more than 30 years and was a member of the Standards and Ethics Committee review panel from approximately 1987 through 1992. I was on the Board of Directors of the Metro New Jersey Chapter of the Appraisal Institute from 2005 through 2010 and was President from 2009 through 2010. I have taught several appraisal related courses for the Appraisal Institute, including real estate finance and statistics, income capitalization, and market analysis, and have also spoken at Continuing Legal Education Seminars in New Jersey. I am the author or co-author of several publications relating to real estate, including appraisals and valuation.

4.    I have been admitted as an expert and testified before a number of U.S. District Courts, State Courts, a Legislative Committee, and various condemnation and zoning boards on matters related to real estate valuation.

## II.    ASSIGNMENT

5.      I have been retained by counsel for Nomura Holding America, Inc., Nomura

Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital Inc.,

and Nomura Securities International, Inc., (collectively, "Nomura") and David Findlay, John

McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca (collectively, the "Individual

Defendants," and with Nomura, "Defendants") in connection with the case captioned *Federal

Housing Finance Agency* v. *Nomura Holding America Inc., et al.*, 11 Civ. 6201 (S.D.N.Y.)

(DLC).

6.      Plaintiff, the Federal Housing Finance Agency ("FHFA"), as conservator for the

Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage

Corporation ("Freddie Mac") (collectively, "the GSEs"), alleges that Defendants sold certain

residential mortgage-backed securities ("RMBS") pursuant to Registration Statements,

Prospectuses, and Prospectus Supplements (the "Offering Documents") that contained materially

false or misleading statements and omissions.[1]  In particular, plaintiff alleges that statements

about the "characteristics and credit quality of the mortgage loans underlying the Securitizations"

were "materially false" due to "significant percentages of the underlying mortgage loans [ ] not

[being] originated in accordance with the represented underwriting standards and origination

practices."[2]  Plaintiff further alleges that LTV ratios disclosed in the Prospectus Supplements

"were materially false and understated at the time of the loans' origination"[3] and that "[t]hese

systematic inaccuracies with respect to reported LTV ratios also indicate that the representations

---

[1] Amended Complaint, *FHFA* v. *Nomura Holding America Inc., et al.*, 11 Civ. 6201 (S.D.N.Y.) (DLC), ¶ 1.
[2] *Id*. ¶ 5.
[3] *Id*. ¶ 106.

and warranties in the Registration Statements relating to appraisal practices were false" and that appraisers "routinely furnished appraisals that the appraisers understood were inaccurate."[4]

7.      I have been asked by counsel for Nomura to review and respond to aspects of plaintiff's experts' opinions concerning appraisals, which include the opinions contained in the May 15, 2014 Expert Report of John A. Kilpatrick, Ph.D. Concerning Adherence of Appraisals to Appraisal Standards and Practices ("Kilpatrick Adherence Report"), the May 15, 2014 Expert Report of Robert W. Hunter Regarding the Underwriting of Mortgage Loans Underlying the Nomura Securitizations ("Hunter Report"), and the October 6, 2014 Supplemental Expert Report of Robert W. Hunter Regarding the Underwriting of Mortgage Loans Underlying the Nomura Securitizations ("Supplemental Hunter Report").  In preparing this affidavit, I reviewed the Kilpatrick Adherence Report, the Hunter Report, and the Supplemental Hunter Report and associated supporting documentation.  I have also requested and reviewed other documents and communications produced in this matter that were necessary for me to formulate the opinions set forth in this affidavit.  In addition, along with my staff working to assist me, I have researched publicly available information.

## III.    SUMMARY OF OPINIONS

### A.      Summary of Opinions Put Forth by Dr. Kilpatrick and Mr. Hunter

8.      Dr. Kilpatrick uses a model ("the Greenfield AVM") that he created for his assignments in this litigation and related matters to purportedly calculate more "accurate" values at origination for homes collateralizing a sample of the loans at issue in this case. Using these values, he concludes that the "original appraised values of 208 of the 672 sample Nomura properties valued by the Greenfield AVM were significantly higher than their true, credible

---

[4] *Id.* ¶ 111.

appraised values." Dr. Kilpatrick further concludes that because the original appraised values of these properties are overstated, the loan-to-value ("LTV") ratios of these properties were understated in Prospectus Supplements for their respective securitizations.[5]

9.    Dr. Kilpatrick purports to assess the "credibility" of 205 of the 208 sample properties the Greenfield AVM found to be overvalued, using what he terms a Credibility Assessment Model ("CAM").[6] The CAM is based on 31 "yes" or "no" questions that Dr. Kilpatrick created and fashioned into a checklist that he used to score each of the appraisals.[7] Applying the CAM, Dr. Kilpatrick determined that for 92.20% of the 205 sample properties assessed "no reasonable appraiser adhering to the appraisal standards and practices applicable at the time could have believed the appraisals were credible."[8]

10.    In the Hunter Report, Mr. Hunter conducted a re-underwriting of a sample of 723 Nomura mortgage loans. As part of that re-underwriting review, Mr. Hunter and his team performed "a collateral review to determine whether the mortgaged property was appraised in accordance with the underwriting guidelines and minimum industry standards."[9]  Mr. Hunter later revised his re-underwriting findings.[10]

11.    Mr. Hunter does not draw specific appraisal-related conclusions in the text of his report. Instead, he claims that "appraisal-related defects" are one category underlying "underwriting defects."[11] Mr. Hunter's specific appraisal-related claims appear in Exhibit 2A to his October 6, 2014 report, and there are 16 claims which I have determined are based on real

---

[5] Kilpatrick Adherence Report at 2.
[6] *Id.*, p. 2-3.
[7] *Id.*, p. 40-44.
[8] *Id.*, p. 101.
[9] Hunter Report at 98.
[10] Hunter Supplemental Report at 1.
[11] Hunter Report at 102, n.269.

estate appraisal standards or practices and to which I respond in this affidavit.[12]  Mr. Hunter did

not add any additional appraisal-related findings between his May 15 Report and October 6

Report.

        **B.**      **Summary of My Opinions**

      12.      To respond to plaintiff's experts' opinions, I assembled a team of experienced real

estate professionals. The team consisted of certified real estate appraisers and holders of related

academic and professional credentials and memberships, qualifying them to perform the tasks I

required of them, which consisted primarily of reviewing appraisals. My team also consisted of

managers who supervised the team's day-to-day research. I communicated with my team on a

regular basis to review their work product and provide direction.

      13.      To further assist me, I engaged iMortgage Services, LLC ("IMS"), to answer

certain questions specific to certain appraisals. IMS utilized licensed appraisers to answer my

specific questions by examining the original appraisals and performing local research on subject

properties. I instructed IMS not to disclose to the appraisers the purpose of assignment, the

intended use of their responses, or the identity of any end recipients of the appraisers' responses.

      14.      Dr. Kilpatrick relies on his CAM findings to opine on the credibility of 205 of the

208 appraisals deemed inaccurate by the Greenfield AVM. My team and I inspected the inputs,

methodologies, calculations, and conclusions of the CAM that form the basis of Dr. Kilpatrick's

conclusions regarding these 205 appraisals.

      15.      For each of the 31 CAM questions, my team and I assessed Dr. Kilpatrick's

methodology and findings in relation to contemporaneous real estate appraisal standards

including USPAP guidelines. To further evaluate the CAM findings, I selected 40 geographically

---

[12] Hunter Supplemental Report, Exhibit 2A.

dispersed appraisals with high CAM scores, and developed research questions (submitted to IMS) that were designed to provide additional information on the specific issues and attributes for which Dr. Kilpatrick failed these appraisals in his CAM.

16.     In connection with his re-underwriting review, Mr. Hunter has claimed that certain loans have appraisal-related defects.  My team and I reviewed Mr. Hunter's findings and assessed them in relation to contemporaneous real estate appraisal standards including USPAP guidelines, and, if available, in relation to appraisal-specific information gathered from the IMS responses described above.[13]

17.     The CAM, developed by Dr. Kilpatrick for this litigation, is an invalid and unreliable tool for evaluating the credibility of an appraisal.  There are numerous flaws in the CAM model:

- None of the 31 questions comprising the CAM are based on USPAP requirements.  Indeed, some of the CAM questions, as discussed below, are actually contrary to USPAP's principles.

- The weighting of the 31 questions that Dr. Kilpatrick created is arbitrary.

- Dr. Kilpatrick creates and utilizes an arbitrary threshold to decide what total CAM score indicates a non-credible appraisal.

- Each of the 31 questions comprising the CAM imposes rigidity on the evaluation of appraisals that is not part of well-accepted appraisal review practices, which recognize the need for some flexibility in appraisal standards.

- The CAM is vastly dissimilar to a field review or desk review, two of the most commonly accepted methods of appraisal review.

- Dr. Kilpatrick provides no evidence that the CAM properly distinguishes between credible and non-credible appraisals.

---

[13] My detailed analysis of Mr. Hunter's findings were provided in **Appendix E** to my August 14, 2014 Report, which was provided to plaintiff, and I incorporate by reference those materials, along with all Appendices and Exhibits to my August 14 Report.

- Dr. Kilpatrick presents no sensitivity analysis of the CAM.

- The CAM has been created for this litigation and has not been subject to peer review or any external validation.

- The CAM has a host of additional problems, which I discuss in greater detail below.

18.     Even if the CAM were a valid and reliable tool, Dr. Kilpatrick and his team have implemented and applied it in an unreliable manner that renders his findings unusable.  In several instances, Dr. Kilpatrick's team answers the CAM's own questions incorrectly or applies the questions unreliably.

19.     Lastly, with regard to appraisal standards and practices, Mr. Hunter's appraisal-related findings are unreliable and do not discredit the original appraisals.

## IV.     STANDARDS AND REQUIREMENTS APPLICABLE TO RESIDENTIAL REAL ESTATE APPRAISALS

20.     Real estate appraisals are commonly prepared in connection with the issuance of residential mortgages for the purposes of purchasing a home or refinancing (*i.e.*, replacing existing debt.  In a purchase money transaction, after a seller lists the property and receives an offer from the buyer, the buyer and seller agree to the terms, including the purchase price, and enter into a purchase contract.  The buyer then begins the process of obtaining a mortgage to help finance the property.  As part of the process of securing a mortgage, a mortgage lender orders an appraisal of the property.  The appraisal is conducted in advance of the closing of the mortgage transaction (and the purchase transaction), as the lender must ensure the subject property provides sufficient collateral for the mortgage in the event of default.  In a refinance transaction, the appraisal also precedes the closing of the mortgage transaction, because again, the lender must ensure the mortgage is adequately collateralized.

21.      Appraisals are based on a comprehensive set of prescribed procedures performed by licensed and certified appraisers who meet educational, experience and testing requirements.[14] These procedures and requirements are developed and monitored by the leading professional organization of appraisers, the Appraisal Institute, and are encompassed in its Code of Professional Ethics and in the Uniform Standards of Professional Appraisal Practice ("USPAP"). USPAP represents the generally accepted and recognized standards of appraisal practice in the United States.  Under these standards, appraisers develop and communicate their analyses and opinions to intended users of their services in a manner that is meaningful and not misleading."[15]

22.      USPAP has been the generally recognized standard of practice in the appraisal profession since Congress enacted Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) and authorized "federal financial institutions regulatory agencies" to refer to USPAP in their regulations.[16]  All licensed and certified real property appraisers in the United States are required to comply with USPAP.

23.      The Executive Branch and several federal agencies followed Congress by referring to USPAP in various laws and policies.[17]  GSEs[18] that use appraisals, including Fannie Mae and Freddie Mac, also refer to USPAP and integrate USPAP standards into their policies.[19]

---

[14] DX-2725 (Appraisal Institute, The Appraisal of Real Estate (14th ed. 2013)), p. 2.

[15] DX-2726 (The Appraisal Foundation, USPAP 2005 Edition) ("USPAP 2005"), Preamble.

[16] 12 U.S.C. § 3339 (amended in 2010).

[17] The Executive Branch recognized USPAP in the Uniform Relocation Assistance and Real Property Acquisition Policies Act. Furthermore, several other federal agencies recognized USPAP in accordance with the Office of Management and Budget Circular A-129, dated January 11, 1993. See "The Appraisal Foundation: Requiring Adherence to Generally Recognized Valuation Standards Is Sound Public Policy," (The Appraisal Foundation, Washington, D.C.), p. 1-2, https://netforum.avectra.com/eWeb/DynamicPage.aspx?Site=TAF&WebCode=History; Circular No. A-129: Policies for Federal Credit Programs and Non-Tax Receivables (Office of Management and Budget, January 2013), http://clinton2.nara.gov/omb/circulars/a129/a129.html.

[18] Government Sponsored Enterprises, known as "GSEs," are federally chartered privately owned corporate entities created by Congress. Congress established GSEs "to improve the efficiency of capital markets" and to overcome "statutory and other market imperfections which otherwise prevent funds from moving easily from suppliers of funds to areas of high loan demand." (CRS Report RS21663, updated April 23, 2007, p. 1, http://fas.org/sgp/crs/misc/RS21663.pdf).  "The housing GSEs are the Federal National Mortgage Association

### A.      Appraisals in Connection with Residential Mortgages

24.      There are several different appraisal methods that an appraiser can use to value real estate; however, appraisals involving a physical inspection of the property and the development of one or more valuation methods, as appropriate, are the most common appraisal methods relied upon for residential mortgage transactions such as those at issue in this case.  In the case of residential properties, traditional appraisals, as previously described, are typically "presented on a form, such as those required by financial institutions, insurance companies, and government agencies.  The reporting requirements for form reports, which are the same as for other types of reports, are set forth in the Standards Rules relating to Standard 2 of the Uniform Standards of Professional Appraisal Practice and the Appraisal Institute's Guide Note 3.[20]  The majority of the appraisals at issue in this case were prepared using Fannie Mae Form 1004, which is widely accepted as the standard report format by the industry for single-family residential appraisal assignments.

25.      An appraisal for a property traditionally begins with identifying the appraisal question or issue that needs to be addressed.  This step includes (i) identifying the client and intended users, (ii) identifying the intended use of the appraisal, (iii) identifying the type and definition of value, (iv) determining the effective date of the opinion, (v) identifying the relevant characteristics of the subject property, and (vi) determining whether there are any assignment

---

(Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), and the Federal Home Loan Bank System (FHLBank System), which currently consists of 12 Federal Home Loan Banks (FHLBanks)." (FHFA OIG, History of the Government Sponsored Enterprises, http://fhfaoig.gov/LearnMore/History) "The economic rationale for GSEs is the belief that, without such government-sponsored institutions, a critical area of necessary debt financing would be underserved or served inefficiently." (CRS Report RS21663, p. 2.)

[19] "The Appraisal Foundation: Requiring Adherence to Generally Recognized Valuation Standards Is Sound Public Policy," The Appraisal Foundation, Washington, D.C., p. 1-2 (https://netforum.avectra.com/eWeb/Dynamic Page.aspx?Site=TAF&WebCode=History).

[20] Appraisal Institute, Guide Note 3 (2012).

conditions.[21]  Next, the appraiser must determine the scope of work necessary to solve the

appraisal question or issue.[22]  After determining the scope of the work, the appraiser performs

the scope of work, which typically includes collecting data and performing the analyses

necessary to develop a credible opinion of value or assignment results.[23]

26.     In conducting a traditional complete appraisal, the appraiser takes gross living

area measurements and performs a physical inspection of the property, including its interior, in

order to assess the quality and condition of the property and its associated land.[24]  During this

step, the appraiser considers both positive and negative factors that may affect the value of the

subject property, including the condition of the property and whether it is typical of the

neighborhood or possesses any atypical features that can enhance or detract from value.[25]  The

appraiser also looks for other factors that may influence value, such as views, beach or water

access, and proximity to either advantageous features (*e.g.*, parks, shopping, etc.) or

disadvantageous features (*e.g.*, highway noise, industrial neighborhoods, etc.).[26]  In addition, the

appraiser will take into account his or her knowledge of local market conditions and also the

characteristics of the neighborhood in which the property is located.[27]

27.     The appraiser then values the property using one or more of the three principal

approaches to value, which may include the cost, sales comparison, and/or income capitalization

approach, to develop a credible opinion of value.[28]  As part of the sales comparison approach, the

most common method for appraising residential properties, the appraiser selects the appropriate

---

[21] Appraisal Institute, Appraising Residential Properties (4th ed. 2007)), p. 5.
[22] *Id.*, p. 6.
[23] *Id.*, pp. 6-7.
[24] *Id.*, p. 77.
[25] *Id.*, pp. 76-77, 83.
[26] *Id.*
[27] *Id.*, pp. 75-77.
[28] *Id.*, pp. 6-7.

comparable properties, when available, from recently sold properties, examines each comparable and determines how it differs from the subject property.  After the comparison process, the appraiser adjusts the sale prices of the comparables for observed differences between the comparable and the subject property.[29]  Finally, the appraiser performs a reconciliation of the value indications and issues a report describing the final opinion of value.[30]

28.    The appraisal report usually describes the key facts, appraisal methods and techniques the appraiser applied during the valuation process to reach a value opinion.[31]  The report typically includes a description of the subject property and its neighborhood, photographs of the subject property and the chosen comparable properties, a description of the comparables chosen and any adjustments made to the comparables, and the reasoning for the final value opinion.

29.    Appraisers carefully evaluate specific facts and circumstances of each subject property and exercise professional judgment in forming an opinion of value.  Therefore, an appraised value of a property is ultimately the opinion of an experienced professional.  While two competent appraisers may arrive at differing opinions of value, I would generally expect the relative difference in their opinions to be no more than ten percent.

30.    As described above, a value conclusion derived in a traditional appraisal has the benefit of an appraiser's professional judgment informed by physical inspection of the property, direct knowledge of the neighborhood, relevant externalities, comparable property transactions, and local market trends and conditions.  For this reason, a traditional appraisal is widely regarded as the industry standard for performing a comprehensive valuation.  Because AVMs and other

---

[29] *Id.*, pp. 6, 82-83.
[30] *Id.*, pp. 6-7, 82-83.
[31] *Id.*, p. 381.

formulaic methods of valuation do not share these same benefits, the traditional appraisal has

persisted as a required method of valuation for most residential real estate transactions as it best

emulates the behavior of buyers and sellers in the marketplace.

**B.    Appraisers Are Held to Strict Ethical and Competency Standards**

31.    According to USPAP, an appraiser is "one who is expected to perform valuation

services competently and in a manner that is independent, impartial, and objective."[32]  The

Ethics Rule states, "[t]o promote and preserve the public trust inherent in professional appraisal

practice, an appraiser must observe the highest standards of professional ethics."[33]  The Conduct

section of this rules states that "[a]n appraiser must perform assignments ethically and

competently, in accordance with USPAP and any supplemental standards agreed to by the

appraiser in accepting the assignment.  An appraiser must not engage in criminal conduct."[34]

The majority of states stipulate that certified/licensed appraisers are required for any service

where an opinion of value (evaluation or appraisal) for real property is developed.

32.    The Competency Rule indicates that prior to accepting an appraisal assignment or

entering into an agreement to perform any assignment, an appraiser must: (1) disclose any lack

of knowledge and/or experience to the client; (2) take all steps necessary or appropriate to

complete the assignment competently; and (3) if applicable, describe the lack of knowledge

and/or experience and the steps taken to complete the assignment competently in the report.[35]

An appraiser must have the competency necessary to complete an appraisal assignment, which

makes his or her experience and background critical to the formation of a credible opinion of

value.

---

[32] DX-2727 (The Appraisal Foundation, USPAP 2006 Edition) ("USPAP 2006"), p. 1.
[33] *Id.*, p. 7.
[34] *Id.*
[35] *Id.*, p. 11.

33.     These standards are important and, in my experience, appraisers take them seriously.  It is a serious allegation to claim that an appraiser developed an appraisal that resulted in a non-credible opinion of value.  Any such allegation requires substantial evidence, which, as I explain below, Dr. Kilpatrick has not provided.

### C.     Evaluating Appraisals Retrospectively

34.     According to USPAP, an Appraisal Review is "the act or process of developing and communicating an opinion about the quality of another appraiser's work that was performed as part of an appraisal or appraisal review assignment."[36]  To meet the defined objectives of an Appraisal Review, the reviewer examines the data, reasoning, analyses, and conclusions developed by the original appraiser.  Most Appraisal Reviews are performed to determine the credibility of the value conclusion and the adequacy of the supporting evidence provided.

35.     Appraisal Review assignments are generally described in colloquial terms as either "desk reviews" or "field reviews." A desk review is completed without a field inspection and is often limited to a review of the data presented in the report.

36.     A desk review is a generally accepted appraisal product that is expressly contemplated by USPAP.  Lenders sometimes use a desk review to evaluate an appraisal provided to it by an appraiser.  A desk review is performed by a certified or licensed appraiser who evaluates an appraisal performed by another appraiser and develops and communicates an opinion about the quality of the appraisal, including the credibility of the value conclusion and the adequacy of the supporting evidence provided.  The desk reviewer may issue his or her own opinion of value and may rely on the data and evidence included within the original report or may consider additional evidence before forming his or her own opinion.

---

[36] DX-2728 (The Appraisal Foundation, USPAP 2014-2015 Edition) p. U-1.

37.    A field review is an appraisal review that involves a physical inspection of the property, including in some circumstances inspection of the interior of the subject property, and even inspection of the comparable properties to confirm the data provided in the report.  A field review is generally performed using a customized checklist that covers the items examined in a desk review and may also include confirmation of market data, research to gather additional data, and verification of the software used in preparing the report.

38.    Commonly used as a quality-control procedure, the field review may be undertaken to augment the data reported by the appraiser or to resolve discrepancies between the facts or assumptions reported by two appraisers who have arrived at divergent market value conclusions for the same property.

39.    USPAP Standard 3 requires that, "In performing an appraisal review assignment, an appraiser acting as a reviewer must develop and report a credible opinion as to the quality of another appraiser's work and must clearly disclose the scope of work performed."[37] In developing an appraisal review, Standard 3-1(g) requires that, "the reviewer must develop an opinion as to whether the analyses, opinions, and conclusions are appropriate and reasonable, given the scope of work applicable in the assignment, and develop the reasons for any disagreement."[38]

40.    The primary function of an Appraisal Review is to provide an opinion as to the adequacy of the original appraisal.  While the reviewer identifies and assesses the reasoning and logic that underlie the work of another appraiser, the reviewer does not substitute his or her own

---

[37] DX-2726 (USPAP 2005), Standard 3: Appraisal Review, Development and Reporting.
[38] *Id.*, Standard 3-1(g).

judgment for that of the original appraiser.  Instead, under USPAP, the reviewer is charged with confirming the adequacy or correctness of the data, process and conclusion.[39]

41.     At the conclusion of an Appraisal Review, the reviewer may either: (a) accept the adequacy and reasonableness of the initial appraisal, or (b) challenge the adequacy and reasonableness of the initial appraisal.  In the latter instance, the reviewer may conduct further inquiry and request additional information from the initial appraiser to clarify assumptions and data that may result in the subsequent acceptance of the initial appraisal.[40]

42.     Even though some of the noncritical elements of an appraisal may be omitted or presented inadequately or may not conform to stringent format requirements, the appraiser's value conclusion may still be reasonable and credible.  An appraisal that contains a reasonable value conclusion should not be rejected because of shortcomings that do not affect value that are identified  by an overzealous or inexperienced reviewer.  A report can be acceptable even if it includes minor errors.

43.     Because appraisals are inherently subjective, the reviewer should try to give the appraiser the benefit of the doubt.  The original appraiser has inspected the property and, unless it is a field review, the reviewer has not.  Also, the appraiser has likely spent significant time performing appraisals and is more familiar with the market.  Of course, the reviewer should not hesitate to challenge the appraiser when warranted.[41]

---

[39] *Id.*, Standard 3: Appraisal Review, Development and Reporting.
[40] *Id.*, pp. 33-37.
[41] *Id.*

V.     **THE CAM IS AN INVALID AND UNRELIABLE TOOL FOR EVALUATING THE CREDIBILITY OF AN APPRAISAL, AND WAS USED IN AN UNRELIABLE MANNER.**

A.     **Overview of the CAM**

44.     The Credibility Assessment Model ("CAM") is a "scoring model" designed by Dr. Kilpatrick, which, he claims, "assesses the degree to which the Nomura Appraisals deviated from the appraisal standards established by USPAP and other established appraisal guidance and practice."[42]  The model itself is comprised of 31 yes-or-no "credibility assessment questions" and Dr. Kilpatrick asserts that "each one of these questions derives from a violation of USPAP,"[43] a claim which is simply untrue, as I discuss below.  The ultimate purpose of the CAM, according to Dr. Kilpatrick, is to "determine whether, in [his] opinion, a reasonable appraiser adhering to the appraisal standards and practices applicable at the time could have believed the original appraisals were accurate."[44]

45.     In order to run the CAM, Dr. Kilpatrick directed both members of his company's staff (the "Greenfield staff") and "independent appraisers" to collect 70 data elements, which in turn "form the basis of the answers to the 31 [CAM] questions."[45][46]  Dr. Kilpatrick then took these 70 data elements and, running the elements through the CAM, which is a computer program, used the elements "to provide a 'Yes' or 'No' answer for each [CAM] question," coding "'Yes'" answers as "'0'" and "'No'" answers as "'1'"[47] A "No" or "1" is indicative of Dr.

---

[42] Kilpatrick Adherence Report, p. 3.
[43] Deposition of John Kilpatrick, dated November 13, 2014 ("Kilpatrick Nov. 13 Tr.") at 212:9-11.
[44] Kilpatrick Adherence Report, p. 2.
[45] *Id.*, pp. 12-13.
[46] The Greenfield staff collected 45 of the 70 underlying data elements and the "independent appraisers" collected the remaining 25 elements, under the direction of two appraisal firms hired by Dr. Kilpatrick, Forsythe Appraisals, LLC and Valocity, LLC.  Dr. Kilpatrick does not specify which of the data elements were gathered by his staff and which by the "independent appraisers." Kilpatrick Adherence Report at 13-14.
[47] *Id.*, p. 40, n.99.

Kilpatrick's opinion "that an appraisal process was not properly followed."[48]  Dr. Kilpatrick then

multiplied the value—0 or 1—for a given question by the "score" he assigned to that particular

question.[49]  Dr. Kilpatrick then added together the scores for each individual question to arrive at

the overall score for a given appraisal.[50]  According to Dr. Kilpatrick, "[t]he CAM assigns scores

to each credibility assessment question answered in the negative by evaluating how the

deviations and deficiencies associated with the question affect the credibility of an appraisal."[51]

46.     As part of assigning a score to each of the CAM questions, Dr. Kilpatrick

weighted five "aspects" and, within each aspect, anywhere from three to eight "categories"

depending on "the order of their relative importance to the evaluation of whether or not an

appraisal is credible" and, for categories, the "differential impact on the credibility of an

appraisal."[52]  Because the aspects are weighted on a 1 to 5 scale, "the total weight given to a

category is in turn the product of the aspect weight times the category weight."[53]  And because

"each question is rated within all five aspects, the total score for each question is the sum of the

contributory weights in all five aspects."[54]

47.     Dr. Kilpatrick then created a "credibility threshold" for the at-issue appraisals by

taking "the mean score of [the] 6 major error questions," which totaled 8.80, "and the mean score

of the 25 other CAM questions," which equaled 5.33, and adding them together to reach a

credibility threshold of 14.13.[55]  Dr. Kilpatrick claims, falsely, as I explain below, that this

---

[48] *Id.*, p. 40.
[49] *Id.*
[50] *Id.*, pp. 67-68.
[51] *Id.*, pp. 43-44.
[52] *Id.,* pp. 43-44.
[53] *Id.*, p. 68.
[54] *Id.*
[55] *Id.*, p. 99.

threshold is "consistent with the intent and letter of USPAP."[56]  Dr. Kilpatrick asserts that "a

score at or above 14.13 would, in [his] opinion, put the credibility of the appraisal in serious

doubt."[57]  However, Dr. Kilpatrick then applied what he termed a more "conservative, credibility

threshold" of 20.  Applying this threshold, Dr. Kilpatrick claims that 189 of 205 appraisals run

through the CAM "contain either at least two egregious errors or a combination of credibility

assessment question errors such that, in [his] opinion, no reasonable appraiser adhering to the

appraisal standards and practices applicable at the time could have believed the appraisals were

credible."[58]

48.     Dr. Kilpatrick's development and use of the CAM is abnormal, given the fact that

there are well-accepted, alternative methods of evaluating appraisals commonly used by industry

practitioners.  These include field and desk reviews, described above.  Field and desk reviews,

unlike the CAM, are specifically identified and discussed in USPAP as valid and acceptable

appraisal evaluation tools.[59]  The CAM is vastly different from field and desk reviews.  The

CAM employs a rigid checklist of arbitrary and inappropriate requirements that fails to capture

the nuance and subjectivity that is naturally part of the appraisal process.  Moreover, it applies

requirements that are not part of USPAP nor contained in any industry literature with which I am

familiar.  Field and desk reviews, on the other hand, allow for the nuances and subjectivity that

are necessarily inherent in appraisal reports and recognized by USPAP.  They also must be

performed by individuals who are required to comply with the professional standards applicable

to appraisers.

---

[56] *Id.*
[57] *Id.*
[58] *Id.*, 101.
[59] DX-2726 (USPAP 2005), Advisory Opinion 20 (AO-20).

B.    **The CAM's Design Makes It Invalid and Unreliable as a Tool to Distinguish between Credible and Non-Credible Appraisals.**

1.    **The CAM Questions Either Are Not USPAP Requirements or Test for Requirements That Are Actually Contrary to USPAP.**

49.    The 31 questions comprising the CAM are not derived from USPAP and indeed, in many instances, are inconsistent with USPAP.  These questions appear nowhere in any textbook, academic or industry literature with which I am familiar.  They were arbitrarily chosen by Dr. Kilpatrick and arbitrarily evaluated.  In Section VI below, I analyze each of the 31 questions in detail, including their lack of support in USPAP.

2.    **The CAM Weightings Have No Basis At All and are Illogical.**

50.    As I explain further below, the weightings and scores of the CAM questions suffer from two fatal flaws.  First, I have found no reference to them in any appraisal standard, text, course or curriculum, nor am I aware of any other review appraiser who has ever used these same weights, and Dr. Kilpatrick has admitted as much.[60]  Second, and more importantly, the weightings and scores attributed to the various questions by Dr. Kilpatrick are arbitrary and illogical.

51.    Dr. Kilpatrick claims that the weighting and scores of the CAM's aspects, categories and, ultimately, its questions, are rooted in USPAP and other appraisal standards.  For example, Dr. Kilpatrick asserts that "consistent with USPAP and appraisal guidance and practice, [he has] ranked and weighted [the] five aspects in the CAM in the order of their relative importance to the evaluation of whether or not an appraisal is credible."[61]  And Dr. Kilpatrick claims that "[t]he score applied to the credibility assessment question by the CAM is a function of the degree to which the negative answer to the question implicates deviations from appraisal

---

[60] Kilpatrick Nov. 13 Tr. at 223:12-17.
[61] Kilpatrick Adherence Report, p. 43.

standards, guidance, and practice."[62]  In contrast to Dr. Kilpatrick's claims, the five CAM

"aspects" and their weights are found neither in USPAP nor related appraisal guidance. The

same is true of the aspect "categories" and their "contributory weights."  Above all, the scores

for each of the 31 CAM questions are found nowhere in any appraisal guide or standard.

    52.    Just as important, the weightings and scores of the CAM's aspects, categories and

questions are arbitrary and illogical for two principal reasons.  First, the design and application

of the CAM's scoring methodology fail to differentiate between minor and major errors, such

that a minor error will yield the same "1"—and thus the same score on a given question—as a

truly egregious error.  Consider, for example, Question 20, which asks if the "appraiser correctly

report[ed] comparable sale transaction data."[63]  If an appraiser misreports the sale of a

comparable by stating that the comparable sold for $500 more than it actually did, the CAM

would assign that appraisal a "1" and it would receive a score of 6.63, more than a quarter of the

total points needed for Dr. Kilpatrick to deem the appraisal not credible.  If a different appraiser

misreports the sale of a comparable by stating that the comparable sold for $500,000 more than it

actually did, the CAM would assign the exact same score.  Yet the $500 overstatement would not

significantly affect the appraiser's opinion of value.  This is not merely a hypothetical—as

discussed below, my review showed that Dr. Kilpatrick failed two loans for this question where

the appraiser misreported a comparable sale price by less than 1%.  To assign the same score to

minor and major errors overlooks the actual impact on value of a particular element of an

appraisal, such as reporting comparable sale transaction data.  It also disregards the Appraisal

Institute's own guidance on appraisals, which states that an appraisal can still be acceptable even

---

[62] *Id.*, p. 40.
[63] *Id.*, p. 42.

if it contains some minor errors.[64] Most importantly, this approach directly contravenes USPAP. Pursuant to Standard Rule 1-1, an appraiser must "not commit a *substantial* error of omission or commission that *significantly* affects an appraisal."[65] Far from satisfying the dictates of USPAP, Dr. Kilpatrick's CAM and its scoring methodology depart dramatically from USPAP's requirements.

53.     Second, because several CAM questions, and consequently their scores, are interrelated, the CAM may fail an appraisal on multiple questions, even though the reason for those failures depends on the same data or an identical set of circumstances.  Consider, for example, the connection between CAM Questions 5 and 6. Question 5 asks "[i]f the appraisal was for a purchase, did the appraiser report receipt of [the] sales contract," and Question 6 asks "[i]f [the] appraiser reported a sales contract, did the appraiser analyze it?"[66] In a scenario where an appraiser mentions a sales contract but (1) does not report receipt of the contract and (2) does not analyze the contract, that single appraisal will fail both questions on account of the same exact action.  In short, merely reporting the existence of the sales contract without reporting receipt *and* recording the appraiser's analysis of it yields two violations under the CAM, despite the fact that USPAP recognizes that sales contracts may not be available to an appraiser, and does not require an appraiser to record his or her analysis of a sales contract.[67]

54.     CAM Questions 10 and 17 are similarly interrelated. Question 17 asks if "the appraiser report[ed] external obsolescence correctly," and Question 10 asks if "the subject site

---

[64] DX-2722 (Appraising the Appraisal, The Art of Appraisal Review, 2d Ed., by Richard Sorenson, MAI (Appraisal Institute 2010)), p. 163.
[65] DX-2726 (USPAP 2005), Standard Rule 1-1, p. 16 (emphasis added).
[66] Kilpatrick Adherence Report, p. 42.
[67] The lack of support for these Questions in USPAP is explained below in my analysis of CAM Questions 5 and 6.

description [is] correct."[68]  Dr. Kilpatrick has designed the CAM so that any finding of a failure

to report external obsolescence almost necessarily fails a related question on site description.  Of

the 46 Nomura loans that failed Question 17, 45 of the 46 (97.8%) also failed Question 10. By

failing Question 17 and consequently Question 10, a loan has already amassed a score of 12.24,

more than 60% of the point total needed to be deemed non-credible under the allegedly

"conservative" threshold.  Because of this feature, the CAM essentially double counts errors—

even minor ones—and appears to be designed to inflate the number of appraisals found to be

non-credible.

55.      In my opinion, this model is not an appropriate method by which to assess the

credibility of the appraisals or their conformance with USPAP.

### 3.      The CAM Credibility Threshold Is Illogical and Unsupported by Appraisal Review Theory.

56.      After applying the weightings, the maximum score an appraisal can receive under

the CAM is 186.11.  Far below this maximum, Dr. Kilpatrick arbitrarily assumes that a cutoff

score of 20 indicates an appraisal is non-credible.  He justifies this "credibility threshold" based

on the average of one "egregious" mistake plus two "minor" mistakes, but this lends no

additional credibility to the analysis.[69]  Furthermore, Dr. Kilpatrick attempts to lend credence to

this 20 point threshold by labeling it "conservative."  In fact, Dr. Kilpatrick claims that "a score

of 14.13 would put the credibility of the appraisal in serious doubt."[70]  Regardless of whether one

considers the cutoff 14.13 or 20, both thresholds are frivolous.

57.      Dr. Kilpatrick has built this threshold on a foundation of arbitrary and

unsupported weights, priorities and scores. First, none of the supposed mistakes he finds are

---

[68] Kilpatrick Adherence Report, pp. 76, 82.
[69] Kilpatrick Nov. 13 Tr. at 206:7-18.
[70] *Id.*, pp. 99-100.

considered mistakes by USPAP, so it is unreasonable to label them "egregious" or even

"mistakes."  Second, none of the scores of the CAM's 31 questions are rooted in USPAP or

related appraisal guidance or practice.  As such, the constituent elements of the final score find

no support in industry practice.  Finally, USPAP itself does not impose a rigid threshold in

determining the credibility of an appraisal.  Each element that factors into the CAM's credibility

threshold is thus arbitrary, illogical and a departure from USPAP and related appraisal standards.

### 4. An Automated One-Size-Fits-All Approach to an Appraisal Review Is Not Acceptable Under USPAP

58.    There is no prescribed "one size fits all" approach to appraisal review, as the

intent of the review process, under Standards Rule 3, is to develop and communicate "an opinion

about the quality of all or part of the work of another appraiser that was performed as part of an

appraisal, appraisal review or appraisal consulting assignment."[71]  Dr. Kilpatrick developed a

formulaic scoring process that is wholly reliant on the data collected and entered by multiple

individuals (for each property) and completely sidestepped the application of professional

judgment or the formation of actual opinions as to the credibility of the appraisals at issue.  At no

point did he employ any process or method that included an analysis of the data to ensure that the

results would pass a test of reasonableness.  Instead, he has relied on a formula in lieu of

professional judgment.

### C. In Addition to the CAM's Design Flaws, Dr. Kilpatrick's Team Has Also Implemented and Applied It in an Unreliable Manner That Renders His Findings Useless.

### 1. The CAM Uses Incomplete and Insufficient Data

59.    In carrying out Dr. Kilpatrick's inspection research instructions, the teams of

appraisers that he relied on to gather comparable data, specifically neighborhood sales, gathered

---

[71] DX-2726 (USPAP 2005), Standards Rule 3, Comment.

poor, unreliable data.  As I show below, there are numerous instances in which the data included

supposedly comparable sales with an extremely wide range of sale prices; such comparables

would rarely be used by a competent appraiser in the valuation of the same property.

>    **2.    In Numerous Instances, Dr. Kilpatrick's Team Answered the**
>            **CAM's Own Questions Incorrectly.**

60.    In my review of the underlying data gathered by Dr. Kilpatrick's team, I noted

numerous instances where Dr. Kilpatrick erroneously fails appraisals that meet the criteria of his

own CAM questions. In some instances, Dr. Kilpatrick's calculations contain simple

mathematical errors such as the calculation of percentage thresholds[72] or the determination of

whether a number is in between two other numbers.[73]  In other instances, Dr. Kilpatrick uses

clearly invalid data resulting in a nonsensical conclusion.  In addition to these explicit errors, Dr.

Kilpatrick also fails appraisals for containing purportedly inaccurate information in instances

when the information is accurate.[74]  Dr. Kilpatrick also fails appraisals for not containing

information required by his CAM questions in instances when the requisite information does not

exist (*i.e.*, and the non-existence of this information was properly reported on the original

appraisal).[75]

---

[72] *See* ¶ 88, *infra*, CAM Question 4: "Was the appraised value of the subject less than or equal to 10% higher than the most recent listing within the last year?" in which Dr. Kilpatrick failed appraisal NHELI_2006_FM2_2002122939 even though the appraisal was only 9.3% higher than the most recent listing price.

[73] *See* ¶ 196, *infra*, CAM Question 22: "Is the appraised value of the subject within the range of the unadjusted comparable sales prices?" in which Dr. Kilpatrick failed appraisal NHELI_2006_HE3_2001846528 even though its conclusion of value was within the unadjusted range of comparable properties.

[74] *See* ¶ 122, *infra*, CAM Question 10: "Is the subject site description correct?" in which Dr. Kilpatrick failed appraisal NAA_2005_AR6_1002235660 that contains an accurate and correct site description.

[75] See ¶ 73 , CAM Question 2: "Did the appraiser report an accurate listing history for the subject?" in which Dr. Kilpatrick failed appraisal NHELI_2007_3_2002015215 even though the property was accurately reported as not being listed in the year prior to the date of the original appraisal.

### 3.     The CAM is Neither Peer Reviewed Nor Validated.

61.     The CAM was developed by Dr. Kilpatrick for FHFA's litigation against Nomura and other defendants in related actions.  It has never been used by industry practitioners and Dr. Kilpatrick confirms that he himself has never used it outside of this litigation.[76]  The CAM has not been peer-reviewed or validated as an appropriate tool for Dr. Kilpatrick's stated purpose.

62.     The CAM also fails a basic test of reliability: there is no evidence that it correctly distinguishes between credible and non-credible appraisals.  Such evidence would consist of the results of testing the CAM on samples known to be credible and samples known to be non-credible.  Without this validation, there is no reliable way to know if the CAM is biased.  Indeed, as discussed below, there is evidence that the CAM is heavily biased towards finding appraisals non-credible. For example, the structure of Questions 29, 30 and 31, which reflect comparisons of the averages of the comparables relied on in the original appraisal versus the averages of the neighborhood sales developed by Dr. Kilpatrick, leads to biased results. Even if the original appraiser and Dr. Kilpatrick were to agree on the three best comparables, the introduction of a fourth comparable into Dr. Kilpatrick's data set would skew the response to any of these questions by skewing the averages of the neighborhood sales above or below the averages of the best three comparables.

## VI.     ANALYSIS OF THE CAM'S 31 QUESTIONS

63.     Under my direct supervision, my colleagues conducted a detailed examination of the basis for each of Dr. Kilpatrick's 31 CAM questions, which is presented below.  My analysis of the CAM's 31 questions demonstrates its invalidity and the unreliable manner in which it was applied.  As stated above, each of the CAM's questions are either not based on a USPAP

---

[76] Kilpatrick Nov. 13 Tr. at 45:10-23.

requirement or test for requirements that are contrary to USPAP.  Additionally, Dr. Kilpatrick

incorrectly answers or unreliably applies the CAM questions in numerous instances.

       **1.**      **CAM Question 1 – Are the legal address and parcel ID**
                     **sufficient to identify the subject?**

64.      Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this

standard would have been given a score of 4.435.  Dr. Kilpatrick found that none of the

appraisals at issue failed this question.  I analyze this question even though no appraisals failed it

because it illustrates the CAM's flawed approach.

65.      CAM Question 1 is not based on a USPAP requirement.  In discussing this

question, Dr. Kilpatrick quotes Standards Rule 1-2(e) and USPAP's competency provision, but

neither of those provisions specifies a requirement that the parcel ID be identified.

66.      In creating this question, therefore, Dr. Kilpatrick imposes a standard that is not

contained in USPAP.  There are other USPAP standards, not cited by Dr. Kilpatrick, that pertain

to the location of the property, but none of them requires that both the legal address and parcel

ID be identified in the appraisal.  USPAP Standards Rule 2-2(b)(iii), which applies to summary

reports, requires the appraiser to "summarize information sufficient to identify the real estate

involved in the appraisal, including the physical and economic property characteristics relevant

to the assignment." The comment to this rule states:

> The real estate involved in the appraisal can be specified, for example, by
> a legal description, address, map reference, copy of a survey or map,
> property sketch and/or photographs or the like. The information can
> include a property sketch and photographs in addition to written comments
> about the legal, physical, and economic attributes of the real estate
> relevant to the type and definition of value and intended use of the
> appraisal.[77]

---

[77] DX-2727 (USPAP 2006), Standards Rule 2-2(b)(iii) and accompanying comment

### 2.   CAM Question 2 – Did the appraiser report an accurate listing history for the subject?

67.     Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 4.535.  In total, Dr. Kilpatrick claims that 23 of the 205 appraisals at issue do not meet this criterion.

68.     Dr. Kilpatrick claims that an appraiser's failure to report an accurate listing history of the subject property "may render a report misleading in violation of USPAP Standard 2."[78]  This is incorrect.  Standard 2 addresses the content and level of information required in a report that communicates the results of a real property appraisal, but it contains no requirements relating to listing history, nor does it indicate that failure to report a listing history should be construed as misleading on the part of the appraiser.[79]

69.     CAM Question 2 is not based on a USPAP requirement.  There is also no other USPAP requirement that an appraiser report a listing history.  Standard 1-5, which discusses listings, states:

> [A]n appraiser must, if such information is available to the appraiser in the normal course of business, (1) analyze all agreements of sale, options, and listings of the subject property current as of the effective date of the appraisal; and (2) analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal."[80]

Thus, the requirement to analyze listings applies only to listings "current as of the effective date of sale," and there is no requirement concerning reporting of listing history, much less all such history.

70.     While not part of the USPAP standards, the Uniform Residential Appraisal Report and Small Residential Income Property Appraisal Report forms include a section for "[a]nalysis

---

[78] Kilpatrick Adherence Report, p. 70
[79] DX-2726 (USPAP 2005), p. 22
[80] *Id.*, p. 21

of any <u>current</u> agreement of sale, option or listing of subject property and analysis of any prior

sales of subject and comparables within one year of the date of appraisal."[81]

71.     In sum, at the time the appraisals in question were completed (and today), there

was (and is) no USPAP requirement at all concerning reporting of all prior listings, and the

requirement to analyze prior listings applied only to listings during the prior year.

72.     Moreover, it is not possible to determine from current MLS data[82]—which is what

Dr. Kilpatrick used—what data was actually available at the time of the original appraisal.  There

are numerous, unrelated MLS systems around the country, and there can be lags between listing

and other transaction dates and the availability of related data in MLS databases.  Conversely,

many MLS databases delete older expired and withdrawn listings and listings in the MLS

services are routinely changed to reflect updates or corrections.  As a result, it is it is extremely

difficult to determine if it would have been possible 7 to 9 years ago for an appraiser to report

additional listing history—or if such data was unavailable in the MLS database due to revision or

deletion (or a time lag in reporting).

73.     Lastly, Dr. Kilpatrick's responses to Question 2 demonstrate that question's

irrelevance to the credibility of an appraisal.  For example, Dr. Kilpatrick failed the appraisal for

loan NHELI_2007_3_2002015215, even though IMS concluded that the sale/transfer history

---

[81] Uniform Residential Appraisal Report Form (Freddie Mac Form 70 March 2005, Fannie Mae Form 1004 March 2005) and Small Residential Income Property Appraisal Report Form (Freddie Mac Form 72 March 2005, Fannie Mae Form 1025 March 2005) – Sales Comparison Section – "My research did or did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale."

[82] Multiple Listing Services (MLSs) are private databases that are created, maintained and paid for by real estate professionals to help their clients buy and sell property. In most cases, access to information from MLS listings is provided to the public free-of-charge by participating brokers. Data that is not publicly accessible includes information that would endanger sellers' privacy or safety, such as seller contact information and times the home is vacant for showings. (http://www.realtor.org/topics/nar-doj-settlement/multiple-listing-service-mls-what-is-it)

reported for the subject property was complete and accurate.[83]   As noted above, USPAP does not require appraisers to list or analyze listings older than one year.  For another example, Dr. Kilpatrick failed NHELI_2007_2_2002132009, where the original appraiser checked the box indicating a prior listing but did not identify the prior listing price.  A review of the appraisal shows that the appraiser made a typographical error; he had identified a prior sale of the subject property, not a listing—and reported the prior sale price and date (███████ for $█████)—but simply checked the wrong box.[84]  This typographical error has no bearing on the opinion of value or the credibility of the appraisal.

### 3. CAM Question 3 – If there was a prior subject listing, was appraised value lower than listing price?

74.     Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy Question 3 were given a score of 7.14.  In total, Dr. Kilpatrick found that 23 of the 205 appraisals evaluated did not meet this criterion.

75.     This question is confusing on its face, but appears to ask whether the appraised value was lower than the *current* listing price (not any "prior subject listing," as it states).  Dr. Kilpatrick incorrectly states that "rendering an appraised value that was higher than the listing price" is an "untrustworthy analytical action."[85]  He cites no professional standard or guideline that requires appraisal values to be lower than subject listings; indeed, he provides no basis for his opinion whatsoever.

76.     CAM Question 3 is not based on a USPAP requirement.  In fact, there are no provisions in USPAP that require an appraised value to be lower than the listing price.

---

[83] IMS Letter: NHELI_2007_3_2002015215.  All IMS Letters referenced in this testimony were produced in Appendix C to my August 14, 2014 Expert Report.
[84] DX-2718 (Appraisal Report: NHELI_2007_2_2002132009).
[85] Kilpatrick Adherence Report, p. 52

77.     Listing prices, which should be analyzed as a part of the appraisal process (Standard 1-5),[86] can justifiably be lower than market value, specifically in cases such as (1) when a property has been priced to attract heightened interest from prospective buyers and to stimulate a bidding war, (2) when a property is intentionally priced below market value to effect a quick sale, (3) when a homeowner makes improvements to the property after the listing has been placed, and (4) when a homeowner simply underestimates the demand for a home.  As a result, Question 3 is not a legitimate test of the credibility of an appraisal.

78.     Even if an appraised value higher than list price could indicate a lack of credibility in some circumstances (as explained above, it does not), Question 3 would not be a meaningful test because it contains no significance threshold.  Instead, Dr. Kilpatrick failed loans based on Question 3 where the appraised value differed insignificantly from the current listing price.  For example, Dr. Kilpatrick failed the appraisal for NHELI_2007_2_2002236011 in which the appraised value was $██████, a difference from the listing price of only $███ or 0.095%.[87]

79.     These examples show that when one applies Dr. Kilpatrick's rigid CAM criterion—instead of using the reasonable judgment called for under USPAP[88]—as a means to grade appraisals, it often produces unreasonable results.  In my experience, an appraiser would not judge these appraisals to be flawed on the basis that the appraised values of these properties were 0.47% (less than one-half of one percent) and 0.095% (less than one-tenth of one percent) more than the current listing prices.

---

[86] DX-2726 (USPAP 2005), Standards Rule 1-5, p. 21
[87] DX-2720 (Appraisal Report: NHELI_2007_2_2002236011)
[88] DX-2726 (USPAP 2006), p. 12, "Appraisers have broad flexibility and significant responsibility in determining the appropriate scope of work for an appraisal, appraisal review, and appraisal consulting assignment. Credible assignment results require support by relevant evidence and logic. The credibility of assignment results is always measured in the context of the intended use."

      **4.**     **CAM Question 4 – Was the appraised value of the subject less than or equal to 10% higher than the most recent listing within the last year?**

80.     Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 7.125.  In total, Dr. Kilpatrick found that 7 of the 205 appraisals at issue do not meet this criterion.

81.     Dr. Kilpatrick states that, "a listing price can be construed as a form of a shadow comparable sale, setting a ceiling above which a property is unlikely to sell, unless there are substantial changes in the condition of the property, its presentation and promotion, or the market.  Therefore, if the property is appraised at a substantially higher level, for example more than 10% higher than a prior listing price, there is a clear question as to the reasonableness of such a value conclusion in the absence of justification."[89]  He further asserts that "a negative answer to this assessment question has a direct and high-magnitude impact on value, and it violates the objectivity and trustworthiness categories of the reasonable appraiser standard."[90]

82.     CAM Question 4 is not based on a USPAP requirement.  Dr. Kilpatrick claims that "this question is directly derived from violations of Standards Rule 1-5(a) and (b) and is typically linked to violations of Standards Rules 1-2(e), 1-3(a), and 2-2(a)(iii)."[91]  In fact, none of these standards requires analysis of prior listings, much less specify a 10% requirement.

83.     Standards Rule 1-5(a) and (b) require that the appraiser "analyze all agreements of sale, options, and listings of the subject property <u>current as of the effective date of the appraisal</u>"

---

[89] Kilpatrick Adherence Report, p. 71
[90] *Id.*
[91] *Id.*

and "analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal."[92]

84.     Standards Rule 1-2(e) requires that the appraiser "identify the characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal."[93]   A prior listing price is not a characteristic of a property. Instead, the characteristics listed in Standards Rule 1-2(e) include: location and physical, legal, and economic attributes; the real property interest to be valued; any personal property, trade fixtures, or intangible items that are not real property but are included in the appraisal; any known easements, restrictions, encumbrances, leases, reservations, covenants, contracts, declarations, special assessments, ordinances, or other items of a similar nature; and whether the subject property is a fractional interest, physical segment, or partial holding.[94]

85.     Standards Rule 1-3(a) requires that "when necessary for credible assignment results in developing a market value opinion, an appraiser must identify and analyze the effect on use and value of existing land use regulations, reasonably probable modifications of such land use regulations, economic supply and demand, the physical adaptability of the real estate, and market area trends."[95]   Again, this standard makes no mention of the property's prior listing price.

86.     Standards Rule 2-2(a)(iii), which applies to Self-Contained Appraisal Reports, not Summary Appraisal Reports, states that "the appraisal must, at a minimum, describe information sufficient to identify the real estate involved in the appraisal, including the physical and

---

[92] DX-2726 (USPAP 2005), p. 21
[93] *Id.*, p. 17
[94] *Id.* Standards Rule 1-2(e), p. 17
[95] *Id.*, p. 19

economic property characteristics relevant to the assignment."[96]  This standard neither applies to the appraisals that are at issue in this matter—which are Summary Appraisal Reports—nor does it mention anything related to listing prices.

87.     It is not at all unusual for an appraisal to exceed a list price within the previous 12 months by more than 10%.  As noted above, sellers may list a home below market value for numerous reasons.  In addition, for example, a prior list price may reflect a distressed sale (such as a foreclosure), in which case an appraisal would likely be more than 10% greater.  A homeowner could also have made significant improvements to a property since the prior listing. Most significantly, it is not unusual in certain markets for real estate values to increase markedly (and by 10% or more within a given year), which would explain a difference between the appraisal and previous listing. This last factor was especially important in 2005 and 2006, when home prices were rising dramatically in many markets.

88.     In addition to all of these reasonable situations that would cause an appraisal to fail this question, Dr. Kilpatrick answered his own CAM question incorrectly for one of the seven appraisals that he claims failed Question 4.  For NHELI_2006_FM2_2002122939, the appraised value of the subject was $██████, which was 9.3% higher than the most recent listing price ($██████ on ██████), as confirmed by IMS.[97]  Thus, Dr. Kilpatrick incorrectly claims this appraisal does not satisfy Question 4 when it actually does.

---

[96] *Id.*, p. 23
[97] IMS Letter: NHELI_2006_FM2_2002122939

5. **CAM Question 5 – If the appraisal was for a purchase, did the appraiser report receipt of sales contract?**

89.     Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy Question 5 were given a score of 2.535.  In total, Dr. Kilpatrick found that 1 of the 205 appraisals at issue did not meet this criterion.

90.     CAM Question 5 is not based on a USPAP requirement.  Dr. Kilpatrick states that "a basic compliance element in a residential appraisal report where financing is associated with the purchase of a property is confirming receipt of the sales contract" and that "lack of the sales contract compromises the appraisal's completeness," which he asserts is a direct violation of Standards Rule 1-5.[98]

91.     But this is not what Standards Rule 1-5 says.  Standards Rule 1-5 requires that, if such information "is available to the appraiser in the <u>normal course of business</u>,"[99] the appraiser must analyze all agreements of sale that were current as of the effective date of the appraisal. The USPAP standard, as written, allows for the possibility that the sales contract may not have been available to the appraiser; Kilpatrick's appraisal review process makes no allowance for the possibility that a sales contract may not always be available to the appraiser for reasons that are beyond the appraiser's control.

92.     For the one appraisal that Dr. Kilpatrick found failed CAM Question 5, NHELI_2007_2_2002180362, that finding is meaningless with respect to credibility.  The appraiser indicated that he did not analyze the contract of sale for the subject purchase transaction, but provided the information he did have:  the date of the contract and the seller/owner of public record.  He then explained that the subject property "is understood to be

---

[98] Kilpatrick Adherence Report, p. 72
[99] DX-2726 (USPAP 2005), Standards Rule 1-5

under a lease/purchase agreement since January 2004 for an undisclosed sale price and monthly income," noting that "no contract was submitted to the appraiser."[100]  Here then is a clear example of an appraiser seeking to review the sales contract, but simply being unable to do so. It is contrary to Standards Rule 1-5 to fault an appraisal under such circumstances.

### 6.    CAM Question 6 – If appraiser reported a sales contract, did the appraiser analyze it?

93.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 2.535.  In total, Dr. Kilpatrick found that 55 of the 205 appraisals at issue did not meet this criterion.

94.    CAM Question 6 is not based on a USPAP requirement.  Dr. Kilpatrick states that, "[i]f the appraiser does not appropriately, carefully, and thoroughly analyze the sales contract, information that may be pertinent to the valuation analysis may not be sufficiently considered.  As analysis of the sales contract is a required part of the appraisal of single-family residences, failure to report that the contract is analyzed, consistent with those standards, indicates a lack of conscientiousness, thoroughness, and attentiveness."[101]  A deficiency of this nature, according to Dr. Kilpatrick, "would violate the scope, data collection, and data analysis categories of the appraisal process."[102]  He further states that this question is linked to Question 5, but that it is separate "because an appraiser's failure to both report and analyze the sales contract would be significantly more egregious than a simple failure to analyze."[103]  He

---

[100] DX-2719 (Appraisal Report: NHELI_2007_2_2002180362).
[101] Kilpatrick Adherence Report, p. 72
[102] *Id.*, p. 73
[103] *Id.*, pp. 72-73

writes that the same USPAP standard that he claims justifies Question 5—Standards Rule 1-5—is the basis for Question 6 as well.[104]

95.     USPAP contains no requirement that appraisers record their analysis of the sales contracts in the appraisal, and Dr. Kilpatrick identifies none.  Moreover, as previously noted, Standards Rule 1-5 requires that the appraiser analyze all agreements of sale that were current as of the effective date of the appraisal if such information is available to the appraiser in the normal course of business.[105]  The USPAP Standards, unlike Dr. Kilpatrick, thus recognize that the sales contract might not be available for the appraiser to analyze.[106]

96.     Dr. Kilpatrick fails appraisals for this question if they mention a sales contract but do not analyze the contract in detail.  Because USPAP does not require appraisers to record their analysis of sales contracts, an interview is the only reliable way to determine whether this step was performed in connection with an appraisal that does not record it.  Dr. Kilpatrick did not interview the appraisers that performed the original appraisals, and he therefore did not have sufficient information to determine whether the appraisers did or did not analyze the reported sales contracts.

97.     Further, the fact that an appraisal mentions a sales contract does not indicate that the appraiser had access to the final sales contract.  For instance, an appraiser may have only a preliminary version of a sales contract; it is not uncommon for contracts to be revised and ultimately finalized after the appraisal has been completed. Or, the appraiser may have learned information about the contract's existence or terms during the course of his or her assignment

---

[104] *Id.*, p. 72
[105] DX-2726 (USPAP 2005), Standards Rule 1-5, p. 21
[106] *Id.*

without having access to the actual contract. Because there are acceptable reasons why a contract is unavailable, a fail on this Question is meaningless with respect to credibility.

98.    For example, in the appraisal for NHELI_2006_FM1_2001902485, the appraiser explained that at the time the appraisal was completed, the property was available for sale, but there was no signed purchase agreement, and the terms of the purchase were to be determined after the appraisal was finished.[107]  Dr. Kilpatrick failed the appraisal on this standard even though there was no sales contract for the appraiser to analyze.  Likewise, for NHELI_2007_1_2002056810, the appraiser reported all available information about the contract—the contract price and date of the contract, the property seller/owner of public record, and the absence of financial assistance—but indicated that he did not analyze the pending sales contract because he "was not provided with the contract at this time."[108]

99.    In addition, the work of Dr. Kilpatrick's team in responding to Question 6 was unreliable in several instances, incorrectly failing appraisals that did analyze the sales contract. For example, in the appraisal for NAA_2005_AR6_1002171703, there is clear evidence that the appraiser analyzed the contract.  The appraiser indicated the sale price, listed the date of sale as pending, and noted concessions of $10,000.[109]  Similarly, for NHELI_2007_1_2001865492, the appraiser indicated that she analyzed the sales contract, noting: "Contract price $█████

██████.  Contingent upon financing, appraisal.  Included items refrigerator, built-in range and dishwasher.  $0 value given.  This appraisal is exclusive of personal property."[110]  The appraiser also noted that, "Seller is paying $5,000 of buyer's closing costs per contract." Here, too, Dr. Kilpatrick inexplicably failed the appraisal on this standard even though the sales contract had

---

[107] DX-2670 (Appraisal Report: NHELI_2006_FM1_2001902485).
[108] DX-2707 (Appraisal Report: NHELI_2007_1_2002056810).
[109] DX-2661 (Appraisal Report: NAA_2005_AR6_1002171703).
[110] DX-2702 (Appraisal Report: NHELI_2007_1_2001865492).

been analyzed.  Thus, despite clear evidence to the contrary, Dr. Kilpatrick unaccountably failed

appraisals on this Question.

### 7.    CAM Question 7 – Did the appraiser report supply/demand correctly?

100.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this

Question were given a score of 5.24.  In total, Dr. Kilpatrick found that 51 of the 205 appraisals

at issue did not meet this criterion.

101.    CAM Question 7 is not based on a USPAP requirement.  Dr. Kilpatrick states

that, "This question is derived directly from USPAP Standards Rules 1-2(e)(iv), 1-3(a), and 2-

2(b)(x)."[111]  But it is instructive to actually examine these Standards.  Standards Rules 1-2(e)(iv)

states, "In developing a real property appraisal, an appraiser must identify the characteristics of

the property that are relevant to the type and definition of value and intended use of the appraisal,

including any known easements, restrictions, encumbrances, leases, reservations, covenants,

contracts, declarations, special assessments, ordinances, or other items of a similar nature."[112]

There is no element of this standard that relates to the correct reporting of supply and demand.

102.    The same is true of Standards Rules 2-2(b), which states, "The content of a

Summary Appraisal Report must be consistent with the intended use of the appraisal and, at a

minimum clearly and conspicuously state all extraordinary assumptions and hypothetical

conditions; and state that their use might have affected the assignment results."[113]  This standard

also has no connection to the correct reporting of supply and demand.

103.    Standards Rules 1-3(a) states, "When necessary for credible assignment results in

developing a market value opinion, an appraiser must identify and analyze the effect on use and

---

[111] Kilpatrick Adherence Report, p. 73
[112] DX-2726 (USPAP 2005), p. 215
[113] DX-2726 (USPAP 2005), Standards Rule 2-2(b), pp. 26-27

value of existing land use regulations, reasonably probable modifications of such land use regulations, economic supply and demand, the physical adaptability of the real estate, and market area trends."[114]  This is the only standard cited by Dr. Kilpatrick that addresses the identification and analysis of the effect on use and value of supply and demand.

104.    The appraiser's analysis and conclusions with respect to supply/demand are generally reported in the Neighborhood section of the appraisal by checking one of three boxes, indicating that the market is either in shortage, balance or over-supply.  This same section includes information with respect to property value trends and marketing times.  No further analysis is required by USPAP and this is generally accepted industry practice.  Appraisers generally complete this section based on their knowledge of the local market at the appraisal date.  There is no other process that must be followed in order for an appraiser to have correctly reported supply and demand, as Dr. Kilpatrick erroneously indicates in his report.

105.    It appears that Dr. Kilpatrick sought to test the original appraisers' supply/demand conclusions by having two vendors, Forsythe Appraisals LLC and Valocity LLC, obtain information about "market conditions at the time of the subject properties' sales."[115]  Dr. Kilpatrick failed an appraisal for this Question if his post-hoc review did not agree with the original appraiser's. I obtained reviews from IMS of some of the supply/demand conclusions found incorrect by Dr. Kilpatrick's reviewers. My reviews disagreed with Dr. Kilpatrick's and agreed with the original appraisal, calling into question the reliability of Dr. Kilpatrick's review. For example:

- **NHELI_2006_FM1_2002152239 –** ▮▮▮▮▮▮▮:  In the Neighborhood section of the appraisal, the appraiser selected demand/supply is in balance

---

[114] DX-2726 (USPAP 2005), p. 19
[115] Kilpatrick Adherence Report, pp. 13-14

and further stated that "market conditions are favorable with property values stable in this market segment.  Demand and supply appear to be in balance with the typical marketing time being generally three months assuming competitive pricing and exposure to the market."[116]  IMS supports the supply/demand rating in the appraisal report.[117]

- **NHELI_2006_HE3_2002121884 –** ▉▉▉▉▉▉▉:  In the Neighborhood section of the appraisal, the appraiser selected demand/supply is in balance and further stated that "The real estate market has been increasing in value from 15-35% per year over the last three years."[118]  IMS supports the supply/demand rating in the appraisal report.[119]

### 8.   CAM Question 8 – Did the appraiser report property value trend correctly?

106.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy Question 8 were given a score of 5.24.  In total, Dr. Kilpatrick found that 90 of the 205 appraisals at issue did not meet this criterion.

107.    CAM Question 8 is not based on a USPAP requirement.  Dr. Kilpatrick indicates that this question has "much the same effect as Question 7," and indicates that "an appraiser's failure to understand or correctly analyze or report market value trends will inevitably lead to a failure to correctly analyze prior sales and listings, as required under Standards Rule 1-5,[120] as well as a failure to correctly analyze prior comparable sales as required on FNMA/FHLMC form appraisals."[121]  But he cites no specific standard that requires the reporting of property value trends, or requires that reporting be done in a particular way.

---

[116] DX-2675 (Appraisal Report: NHELI_2006_FM1_2002152239).
[117] IMS Letter: NHELI_2006_FM1_2002152239
[118] DX-2694 (Appraisal Report: NHELI_2006_HE3_2002121884).
[119] IMS Letter: NHELI_2006_HE3_2002121884
[120] USPAP Standards Rule 1-5 requires that "when the value opinion to be developed is market value, an appraiser must, if such information is available to the appraiser in the normal course of business: (a) analyze all agreements of sale, options, and listings of the subject property current as of the effective date of the appraisal; and (b) analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal." DX-2726 (USPAP 2005), p. 31
[121] Kilpatrick Adherence Report, p. 75

108.    In fact, as indicated above (in the discussion for Question 7), the appraiser's analysis and conclusions with respect to property value trends are generally reported in the Neighborhood section of the appraisal by checking one of three boxes, indicating that the property values are increasing, stable or declining.  No further analysis is required. Accordingly, appraisers report value trends based on their knowledge of the local market at the time of the appraisal.

109.    Dr. Kilpatrick employed a regression analysis based on four quarters (or fewer) of sales data for the calendar year preceding the effective date of the appraisal to analyze value trends.[122]  It is not standard practice for residential appraisers to rely on statistical models to report on property value trends.  Appraisers generally form their opinions based on data obtained from a number of sources, including their experience, MLS, conversations with market participants (*e.g.*, brokers, realtors, appraisers, etc.), prior appraisal reports and relevant newspaper reports, but not on sophisticated statistical models.  Furthermore, appraisers apply judgment, informed by their local market knowledge, in selecting the time periods to analyze – which may vary based on the specifics of each assignment.

110.    In the following example, IMS found that the original appraiser correctly reported property value trends. Dr. Kilpatrick, on the other hand, using his statistical model, failed this appraisal, directly contradicting the judgment of both an original appraiser with local market knowledge and IMS.

- **NHELI_2006_FM1_2001979532 –** ▮▮▮▮▮▮▮▮▮: The appraiser indicates that property values are increasing.    IMS concurs with the property value trend reported in the original appraisal.[124]

---

[122] Kilpatrick Adherence Report, p. 74
[123] DX-2671 (Appraisal Report: NHELI_2006_FM1_2001979532).
[124] IMS Letter: NHELI_2006_FM1_2001979532

### 9.   CAM Question 9 – Did the appraiser report marketing time correctly?

111.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 5.24.  In total, Dr. Kilpatrick found that 101 of the 205 appraisals at issue did not meet this criterion.

112.    CAM Question 9 is not based on a USPAP requirement.  USPAP Advisory Opinion 7 defines marketing time as "an opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal."[125]  According to USPAP, "The opinion may be a range and can be based on one or more of the following: statistical information about days on market, information gathered through sales verification, interviews of market participants, and anticipated changes in market conditions."[126]

113.    Dr. Kilpatrick concludes that an appraisal that received a negative response to Question 9 "violates the data collection and data analysis categories of the appraisal process," but cites no specific standard.[127]  USPAP does not define a data collection and analysis process with respect to marketing time.

114.    The appraiser's analysis and conclusions with respect to marketing time are generally reported in the Neighborhood section of the appraisal—the same section of the appraisal addressed by Questions 7 and 8—by checking one of three boxes, indicating the marketing time to be either under 3 months, 3 to 6 months or over 6 months.  No further analysis is required and the appraiser is not required to describe marketing time.  Appraisers report marketing times based on their knowledge of the local market at the time of the appraisal.

[125] DX-2726 (USPAP 2005), p. 139
[126] DX-2726 (USPAP 2005), p. 139
[127] Kilpatrick Adherence Report, pp. 75-76

115.     Despite this, Dr. Kilpatrick failed all appraisals that did not report an opinion of

marketing time that was the same as the one he calculated.  Dr. Kilpatrick's conclusions are

retrospective and based on information in various MLS databases that was used to calculate

average days on market.[128]  He fails to consider that the data available to him may not have been

consistent with the data available at the time the original appraisal was completed because, as

explained above, some MLS data may be updated with a time lag. Dr. Kilpatrick also fails to

consider that a statistically based analysis is only one of the many ways an appraiser can form an

opinion with respect to marketing time.

- **NHELI_2006_FM1_2001979532 –** ███████████:  The appraiser checked the box indicating that marketing time was 3 to 6 months and stated that marketing time was stable and around 120 days.[129]  Dr. Kilpatrick disagrees, but IMS confirms the appraiser's opinion concerning marketing time.[130]

- **NHELI_2006_FM1_2001981699 –** ███████████:  The appraiser states that average marketing time for the subject is 3 to 6 months.[131]  IMS, which states that the market was stable to increasing and demand/supply was in balance with marketing time within 3 to 6 months in general (and under 6 months if priced correctly), confirms the appraiser's opinion concerning marketing time.[132]  Only Dr. Kilpatrick's review disagrees.

- **NHELI_2006_HE3_2001846452 –** ███████████:  The appraisal indicates marketing time of 3 to 6 months and states, "Homes in the area normally sell at 95% to 100% of listing price. The normal marketing time trend is stable with a sale time of less than 180 days.  I have considered relevant competitive listings/contract offerings in performing the appraisal, and any trend indicated by that data is supported by the

---

[128] In order to calculate marketing time, Dr. Kilpatrick purportedly gave the following instruction to his researchers: "For the Subject Neighborhood, please provide the quarterly, median (or average) sales price, number of sales, and average days on market. The median is preferred but if your MLS only calculates average (mean), please provide that.", Kilpatrick Adherence Report, Appendix 4-2 – Greenfield Advisors Residential Data Form Protocol, p. 2
[129] DX-2671 (Appraisal Report: NHELI_2006_FM1_2001979532).
[130] IMS Letter: NHELI_2006_FM1_2001979532
[131] DX-2672 (Appraisal Report: NHELI_2006_FM1_2001981699).
[132] IMS Letter: NHELI_2006_FM1_2001981699

listing/offering information included in this report."[133]  IMS confirms the appraiser's opinion concerning marketing time.[134]

- **NHELI_2006_HE3_2002173834 –** ▮▮▮▮▮▮▮: The appraisal indicates marketing time is less than 3 months and states, "MLS statistics currently indicate[s] a typical marketing time of less than 90 days, with values steadily increasing due to the limited supply of affordable housing."[135]  Here the appraiser specifically cites contemporaneous MLS data as a basis for his assessment of marketing time.  Dr. Kilpatrick provides no basis to conclude that his regression analysis provides a superior result.

- **NHELI_2007_1_2001856683 –** ▮▮▮▮▮▮▮: The appraiser indicates marketing time to be 3 to 6 months.      IMS indicates that the information in the neighborhood section is complete and accurate, adding that reasonable marketing time for the effective date of the original appraisal is 60 to 120 days.[137]  Thus, the evidence provided confirms the appraiser's opinion about marketing time.

### 10.   CAM Question 10 – Is the subject site description correct?

116.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 4.615.  In total, Dr. Kilpatrick found that 55 of the 205 appraisals at issue did not meet this criterion.

117.    CAM Question 10 is not based on a USPAP requirement.  Dr. Kilpatrick states that "[i]f the appraiser's description of the real estate— specifically, the land on which the improvements are located—is incorrect, then the resulting appraiser's analysis of that real estate would be based on incorrect information and therefore likely to be incorrect as well."[138]  He continues by saying, "[t]he consequences of an appraiser's incorrect site description are pervasive and can severely compromise the selection and evaluation of sales comps, leading to a

---

[133] DX-2690 (Appraisal Report: NHELI_2006_HE3_2001846452).
[134] IMS Letter: NHELI_2006_HE3_2001846452
[135] DX-2695 (Appraisal Report: NHELI_2006_HE3_2002173834).
[136] DX-2701 (Appraisal Report: NHELI_2007_1_2001856683).
[137] IMS Letter: NHELI_2007_1_2001856683
[138] Kilpatrick Adherence Report, p. 76

variety of analytical decisions that could impair the credibility of the appraisal."[139]  And he

concludes that, "[i]t would be very difficult, if not impossible, to correctly analyze the cost

approach or the various site adjustments (size, location, etc.) in the sales comparison approach

with an incorrect description of the site."[140]  "This question," he says, "is specifically a violation

of Standards Rules 1-2(e)(i), 2-2(b)(iii), potentially Standards Rule 1-2(e)(v), and for non-

condominium properties, Standards Rule 1-4(b)(i)."[141]

118.    USPAP Standards Rule 1-2(e)(i) states that, "In developing a real property

appraisal, an appraiser must identify the characteristics of the property that are relevant to the

type and definition of value and intended use of the appraisal, including its location and physical,

legal, and economic attributes."[142]  The standard does not provide a basis by which to determine

whether a site description is or is not correct.

119.    USPAP Standards Rule 2-2(b)(iii) states that the content of a Summary Appraisal

Report must, "at a minimum summarize information sufficient to identify the real estate involved

in the appraisal, including the physical and economic property characteristics relevant to the

assignment."[143]  This standard likewise makes no reference to the description of the subject

property.

120.    Dr. Kilpatrick does not explain how he determined the correctness of the subject

property's site description.  To carry out his research methodology, Dr. Kilpatrick's staff

"gathered data from both the original appraisal reports and loan files. . .[and] also gathered

information from public sources, such as tax assessment data, maps, aerial and street-level

---

[139] *Id.*
[140] *Id.*, pp. 76-77
[141] *Id.*, p. 76
[142] DX-2726 (USPAP 2005), p. 215
[143] DX-2726 (USPAP 2005), Standards Rule 2-2(b)(iii), p. 26

photographs, and other data typically considered by an appraiser or an appraisal reviewer."[144] However, his research methodology did not include a physical inspection of the properties at issue. Dr. Kilpatrick has not provided any support that his conclusion about the correctness of the site description is more reliable than the information reported in the original appraisal (which did include a physical inspection of the property).

121.    Moreover, in instances where there are discrepancies related to factual data, it is incumbent upon the review appraiser to speak with the appraiser to ascertain the reason for the discrepancies or, at a minimum, to understand the source of the information presented in the appraisal. There is no indication that Dr. Kilpatrick undertook this step for any appraisal.

122.    In addition, Dr. Kilpatrick's team incorrectly answered Question 10 in several instances, failing appraisals where the site description was in fact correct. For example, for NAA_2005_AR6_1002235660, IMS confirmed that the site description in the original appraisal is correct. "The subject is located on a ████████████ which is typical for the area. The zoning is R-M (Medium Density Residential) and a legal use. The flood map information in the original appraisal is correct, stating that it is not in a flood plain, based on the FEM A map dated ██████, on map ██████████ There are typical utility easements, and a public alley to the rear of the subject property. No other adverse easements, encroachments, or adverse conditions were noted in the original appraisal, and none observed by this reviewer."[145] Similarly, for NHELI_2006_FM1_2001981699, IMS confirmed that the information in the site improvement section of the original appraisal, such as utilities, off-site improvements, size, shape, zoning classification, FEMA flood zone, and map number are complete and accurate.[146]

---

[144] Kilpatrick Adherence Report, pp. 14-15
[145] IMS Letter: NAA_2005_AR6_1002235660
[146] IMS Letter: NHELI_2006_FM1_2001981699

### 11.    CAM Question 11 – Did the appraiser report the sales history correctly?

123.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 4.94.  In total, Dr. Kilpatrick found that 45 of the 205 appraisals at issue did not meet this criterion.

124.    CAM Question 11 is not based on a USPAP requirement.  Dr. Kilpatrick states that, "The sales history of property represents evidence of the market's judgment of the value of that property at a particular point in time.  If the appraiser incorrectly reports the sales history, any analysis of that sales history necessarily is similarly flawed, and conclusions that might be derived from it are correspondingly compromised."  Dr. Kilpatrick incorrectly asserts that, "Correctly reporting sales history is required under Standards Rule 1-5(a) and (b)."[147]  Standards Rule 1 addresses the development of an appraisal, not the reporting of an appraisal.  The reporting of an appraisal is addressed by Standards Rule 2.[148]

125.    In contrast to Dr. Kilpatrick's assertion, Standards Rule 1-5(a) and (b) do not require reporting of sales history.  This rule states that, "When the value opinion to be developed is market value, an appraiser must, if such information is available to the appraiser in the normal course of business: (a) analyze all agreements of sale, options, and listings of the subject property current as of the effective date of the appraisal; and (b) analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal."[149]  USPAP does not detail a correct manner in which a sale history must be reported, it only requires an analysis of the property's current and past sales history.

---

[147] Kilpatrick Adherence Report, p. 77
[148] DX-2726 (USPAP 2005), Standards Rule 2, pp. 22-32
[149] DX-2726 (USPAP 2005), Standards Rule 1-5(a)(b), p. 21

126.   USPAP Advisory Opinion 24 provides some additional guidance on what Standards Rule 1-5 entails.  It affords the appraiser more flexibility than does Dr. Kilpatrick:

> The analysis that is required in SR [Standards Rule] 1-5 and SR 7-5 promotes a certain degree of due diligence on the part of the appraiser…The availability of the data necessary to comply with the requirements in SR 1-5 and SR 7-5 varies greatly. In some situations, this data is available from multiple sources. In other instances, sales and listing data is not readily available…The "normal course of business" is controlled to a large degree by the scope of work in a specific assignment…[and the] "normal course of business" for one assignment might not be the "normal course of business" for a seemingly similar assignment."[150]

127.   In addition, the assertion that incorrectly reporting any information pertaining to a property's sales history automatically renders the analysis of that sale flawed is untrue.  This wide reaching assertion ignores the fact that a sale date could be off by a day or a sale price off by $100 without impacting the analysis of the sales history.  While it is incumbent upon the appraiser to report accurate information, Dr. Kilpatrick judges appraisals as flawed without any consideration for the degree of a potential error.

128.   Dr. Kilpatrick also ignores the possibility that, because MLS data is updated over time and there are lags when data is reported, the data that is currently in MLS for the time period in question may not have actually been available contemporaneously.  This is a well-known problem with MLS data, and Dr. Kilpatrick has made no attempt to account for it.

129.   In the examples below, Dr. Kilpatrick incorrectly applied his Question 11 criterion.

- **NAA_2005_AR6_1001904135 –** ███████████: Based on Dr. Kilpatrick's negative finding, he has claimed that the appraiser did not correctly report the sales history of the subject property. According to IMS, the original appraiser correctly reported the sales history of the

---

[150] *Id.,* Advisory Opinion 24 (AO-24), p. 219

subject (prior sales in April 2004 for $███████ and in August 2002 for $██████) and the comparable properties (no prior sales within 12 months).[151]

- **NHELI_2007_1_2002211714 –** ██████████: Although Dr. Kilpatrick again claims that the property's sales history was not correctly reported, this statement is false. The appraiser details the subject's sales history, which includes an ████████ sale for $███████ and no listings within 12 months of the appraisal date, within the report.[152]

### 12.    CAM Question 12 – Did the appraiser analyze all prior sales of the subject and comparables?

130.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 3.94.  In total, Dr. Kilpatrick has found that 80 of the 205 appraisals at issue did not meet this criterion.

131.    Dr. Kilpatrick derives Question 12 from Question 11 and indicates that "a core component of the property valuation process" is "[t]he analysis of prior transactions."  He also states that, "[i]f the prior sales of both the subject and comparables are not fully, consistently, and appropriately analyzed, then conclusions drawn from incomparable analysis are susceptible to being less than reliable."[153]

132.    CAM Question 12 is not based on a USPAP requirement.  Dr. Kilpatrick cites Standards Rule 1-5(a) and (b) and the FNMA/FHLMC appraisal form in support of his assertion, but neither requires what Question 12 requires.  In fact, USPAP does not require the appraiser to analyze prior sales of comparables.  USPAP 1-5(b) only requires that the appraiser "analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of

---

[151] IMS Letter: NAA_2005_AR6_1001904135
[152] DX-2709 (Appraisal Report: NHELI_2007_1_2002211714).
[153] Kilpatrick Adherence Report, p. 78

the appraisal" if such information is available to the appraiser "in the normal course of business."[154]

133.   In addition, Dr. Kilpatrick incorrectly answered Question 12 in several instances. The original appraisers of the following properties correctly reported the sales histories of the subject and comparable sale properties, yet the appraisals were nonetheless failed by Dr. Kilpatrick.

- **NAA_2005_AR6_1001904135** – ███████████████:  The appraiser reported an August 2002 sale for $██████ and an April 2004 sale for $██████. The property was appraised for $310,000 on ██████████. There were no prior sales of the comparables within 12 months of their respective sale dates.[155] This sales history was confirmed by IMS.[156]

- **NHELI_2006_FM1_2002232920** – ████████████████:  The appraiser reports that there was no sales activity related to the subject in the three years prior to the appraisal date and that only comparable 1 was sold within the last 12 months.[157]

**13.   CAM Question 13 – On an annualized basis, was the appraised value of the subject less than 10% higher than the prior sales price of the subject?**

134.   Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 8.125.  In total, Dr. Kilpatrick found that 72 of the 205 appraisals at issue did not meet this criterion.

135.   CAM Question 13 is not based on a USPAP requirement.  Dr. Kilpatrick asserts that, "[t]his is one of the most important assessment questions.  It captures violations of USPAP Standards Rule 1-5(b), which requires not just that prior sales be reported but also that they be

---

[154] DX-2726 (USPAP 2005), Standards Rule 1-5(a)(b), p. 21
[155] DX-2657 (Appraisal Report: NAA_2005_AR6_1001904135).
[156] IMS Letter: NAA_2005_AR6_1001904135
[157] DX-2679 (Appraisal Report: NHELI_2006_FM1_2002232920).

analyzed."[158]  But Standards Rule 1-5(b) does not have any 10% requirement.  This standard

specifically states that an appraiser must "analyze all sales of the subject property that occurred

within the three (3) years prior to the effective date of the appraisal."[159]  The standard makes no

reference to how an appraiser should specifically address changes in value between a prior sale

date and a current valuation date.  The 10% threshold has been created by Dr. Kilpatrick and is

not, as he claims, rooted in USPAP.

136.    This requirement also fails to consider specific local market conditions or changes

that may have taken place at the subject property between the date of its prior sale and the

effective valuation date.  As such, it is an inappropriate basis on which to judge the credibility of

an appraisal.  There are numerous reasons property values can increase more than 10% annually.

137.    One such reason is market appreciation, which regularly leads to home price

appreciation of more than 10% per year, especially during the time period 2005 to 2007.  Dr.

Kilpatrick failed loans without investigating whether appreciation greater than 10% per year had

occurred in a particular area.  For example, he failed NHELI_2006_FM2_2002174641, despite

the appraiser's comments in the Addendum to the appraisal that the subject's market area had

experienced rapid appreciation due to the limited number of re-sales on the market and the

extended time period for the completion of new construction.[160]  Dr. Kilpatrick presents no

evidence to the contrary.

138.    The building of a new home, or a significant renovation, also would be expected

to lead to home price appreciation of more than 10% per year.  For example, for

NAA_2005_AR6_1001918593 and NHELI_2006_HE3_2002172851, the prior recorded sales of

---

[158] Kilpatrick Adherence Report, p. 79
[159] DX-2726 (USPAP 2005), Standards Rule 1-5(a)(b), p. 21
[160] DX-2687 (Appraisal Report: NHELI_2006_FM2_2002174641).

these properties took place before the development of the houses that were the subjects of the appraisals under his review.  The fact that the prior sales occurred before construction of the respective homes could adequately explain a difference between the appraised values and prior sale prices of more than 10% on an annualized basis.  Dr. Kilpatrick presents no evidence that he took this fact into account in applying the CAM to these properties or any others. Similarly, while the value of the property securing loan NAA_2005_AR6_1001833854 increased significantly prior to the sale at issue, the appraisal report states that the increase in value was attributable to the combined effect of market appreciation and renovations performed at the subject property.[161] Dr. Kilpatrick presents no evidence to the contrary.

139.    Property prices also may increase substantially from sale to sale when the prior sale is not a normal market transaction, or is not arm's length.  For example, while the appraised value for NHELI_2007_1_2001856666 is significantly higher than the prior sales price, the appraiser notes the context of the prior sales price by stating that "[t]he subject was recently acquired in a Sheriff's sale for the sum of $▮▮▮▮ on ▮▮▮▮▮ (an undervalued sale at Sherriff's Sale) and has since had improvements and shown appreciation."[162]  It is not unusual for an appraisal to exceed the sale price in a distressed sale, a fact Dr. Kilpatrick failed to recognize.

### 14.    CAM Question 14 – Is the land value ratio greater than 20% and less than 30%?

140.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 8.6. In total, Dr. Kilpatrick has found that 135 of the 205 appraisals at issue did not meet this criterion.

---

[161] DX-2655 (Appraisal Report: NAA_2005_AR6_1001833854).
[162] DX-2700 (Appraisal Report: NHELI_2007_1_2001856666).

141.     CAM Question 14 is not based on a USPAP requirement.  Dr. Kilpatrick contends

a land value ratio outside the range of 20-30% is abnormal and damages the credibility of an

appraisal.  He asserts that this requirement is "tied to the requirements under Standards Rule 1-

4(b)(i) for all non-condominium properties."[163]   Yet this is not what Standards Rule 1-4(b)(i)

states.  The Rule states: "When a cost approach is applicable, an appraiser must develop an

opinion of site value by an appropriate appraisal method or technique."  The rule makes no

mention of land value ratios whatsoever.[164]

142.     Further, there is no other USPAP rule or standard that stipulates that the land-to-

value ratio of a property should fall within a pre-determined range (including the range of 20% to

30%), nor is there any USPAP opinion that a land value that falls outside the range cited by

Dr. Kilpatrick should be considered questionable.

143.     Dr. Kilpatrick's requirement of a predetermined result in an appraisal also

conflicts with the Ethics Rule, which states that "[a]n appraiser must not accept an assignment

that includes the reporting of predetermined opinions and conclusions."[165]

144.     In my experience, I have often found land values to fall outside the range of 20%

to 30% of a property's total value.  The ratio of land value to the total value of a property is a

function of the property's location and the specific market conditions impacting values in that

location.  As a result, land value ratios can vary greatly from location to location.

145.     Lot prices are driven by several factors, including home prices, the supply of

existing lots available for development, the difficulty of obtaining entitlements and producing

new lots, the construction costs, competition for available lots, and the availability of capital

---

[163] Kilpatrick Adherence Report, p. 80
[164] DX-2726 (USPAP 2005), Standards Rule 1-4(b)(i), p. 19
[165] *Id.,* p. 7

targeting land investment.  Thus, high-priced markets where there is a cap on supply such as coastal California, desired areas of Washington D.C., and higher priced markets near job centers in areas such as New Jersey and New York often experience fluctuations in land value ratios, which can reach 50% of home price.  By contrast, in locations where there is a surplus of land supply and building is inexpensive, land value ratios are often much lower.

146.    Even where an appraiser made the precise point that land value ratios in the subject property area typically exceeded 30%, Dr. Kilpatrick failed the appraisal for reflecting that trend.  Thus, for NAA_2005_AR6_1002235662, the appraiser stated that "although land total value ratio exceeds 30% it is common in the are [sic] due to lack of vacant land."[166]  This is a reasonable conclusion, and Dr. Kilpatrick provides no evidence that contradicts the findings of this appraiser, yet he fails the appraisal on the basis of his invented standard.

147.    In addition, Dr. Kilpatrick does not address the fact that the sales comparison approach is the primary methodology used in the valuation of residential properties like the subject properties in this case.  The contributing underlying land value is not a specific consideration in the sales comparison approach, as it is inherent in the overall value of the subject and comparable sale properties considered in the valuation process.  Thus, the estimated land value, as a portion of the property's total value, would not impact the conclusion of value unless the cost approach were specifically noted to have been given significant weight in the development of an opinion of value.

148.    In addition, Dr. Kilpatrick incorrectly answers or unreliably applies Question 14 in several instances, as demonstrated in the following examples.

---

[166] DX-2665 (Appraisal Report: NAA_2005_AR6_1002235662).

- **NAA_2005_AR6_1001831518 –** ███████ :  Dr. Kilpatrick reported an adverse finding for this appraisal despite the fact that the land value is reported in the appraisal as representing 29.63% of the property's total value, which is within the range that he considers acceptable and appropriate.[167]

- **NHELI_2006_FM1_2002230853 –** ███████ :  The site value is 19.8% of the appraised value and the appraisal states that "[t]he estimated site value is derived from the assessed evaluation of and review of land sales."[168] This difference is minor even compared to the invented 20% threshold of Dr. Kilpatrick.

### 15.   CAM Question 15 – Did the appraiser use the cost approach for non-condominium properties?

149.   Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 4.415.  In total, Dr. Kilpatrick has found that 15 of the 205 appraisals at issue did not meet this criterion.

150.   CAM Question 15 is not based on a USPAP requirement.  Dr. Kilpatrick admits that "residential valuation assigns primary emphasis to the sales comparison method," but then states that the "failure to use the cost approach [when applicable] results in a limited appraisal even if the approach was not necessary."  He further states, "[a] value opinion reached absent consideration of all of the relevant information necessarily is less informed than a value opinion taking into account all such information, as required under Standards Rule 1-4(b)." Dr. Kilpatrick also asserts that "the appraiser is required to disclose the reasoning to support the decision to exclude the cost approach in the appraisal report."[169]

151.   Contrary to Dr. Kilpatrick's claims, Standards Rule 1-4(b) does not support a strict requirement that a cost approach be used.  Instead, for most of the timeframe at issue, USPAP Standard Rule 1-4(b) only required the completion of a cost approach when

---

[167] Kilpatrick Adherence Report, p. 80
[168] DX-2678 (Appraisal Report: NHELI_2006_FM1_2002230853).
[169] Kilpatrick Adherence Report, pp. 80-81

"applicable."[170]  Furthermore, the Departure Rule, which was in effect through June 30, 2006,

allowed the appraiser to forego using the cost approach even when applicable.  This rule

provides that, where the cost approach is applicable, but not necessary, "the appraiser must state

in the report that he or she is invoking departure and then identify and explain the departure and

the specific requirement involved—in this case, [Standards Rule] 1-4(b)."[171]  Pursuant to the

2006 edition of USPAP, which was effective as of July 1, 2006, the Departure Rule was removed

and replaced with the requirement stipulated by USPAP Standard Rule 1-4(b), which indicates

that a cost approach should be performed when applicable.[172]

152.    USPAP does not specify when the cost approach is "applicable."  It therefore does

not mandate the use of a cost approach under any specific conditions or for any properties; the

decision to complete or not complete a cost approach is to be made at the discretion of the

appraiser based on a determination of whether the cost approach applies, and there is no

requirement to document that decision.[173]  In my experience, the cost approach is often not

applicable.  It is given little weight as an indicator of the value of residential properties because

of difficulties in accurately estimating depreciation and the replacement cost of the

improvements, and for this reason is often not used in the valuation of older properties.  Further,

it often does not reflect the behavior of market participants.

153.    The fact that USPAP does not require the completion of a cost approach calls into

question the logic that led Dr. Kilpatrick to conclude that a cost approach is necessary for all

non-condominium properties.  Further, the requirement that he imposes contradicts his own

---

[170] DX-2726 (USPAP 2005), p. 19
[171] *Id.* at p. 114
[172] DX-2727 (USPAP 2006)
[173] DX-2727 (USPAP 2006), Standard Rule 1-4(b), p. 20

observation that the sales comparison approach is the primary method by which residential

properties are valued.

154.    In addition, Dr. Kilpatrick failed to account for instances where the cost approach

does not apply, failing appraisals for which the cost approach was not appropriate due to age:

- **NHELI_2007_1_2002019940 –** ███████████: Dr. Kilpatrick failed this appraisal on this question because it is not a condominium and no cost approach was performed. The appraiser comments that "The cost approach is not an applicable or reliable indicator of value due to age, therefore, it is not utilized in this appraisal."[174]  This property was constructed in 1935 and was 71 years old at the time the property was appraised. In my experience, the age of this property would likely have been an appropriate reason not to perform a cost approach.

- **NHELI_2007_2_2002010004 –** ███████████: Dr. Kilpatrick also failed this appraisal on this question because it is not a condominium and no cost approach was performed. The appraiser estimated the site value, but did not perform the full cost approach noting that, "The cost approach is deemed unreliable for dwellings of this age due to the need for an accurate assessment of affective [sic] age, depreciation and similar current building materials."[175]  This property was constructed in 1917 and was 89 years old at the time the property was appraised. Again, the age of the property is an appropriate reason not to perform a cost approach, for the reasons outlined above.

155.    Dr. Kilpatrick also incorrectly failed appraisals for this question when they

actually had used the cost approach:

- **NHELI_2007_1_2002011212 –** ███████████: Dr. Kilpatrick failed this appraisal for the exclusion of a cost approach. Contrary to Dr. Kilpatrick's findings, this appraisal in fact includes a cost approach, which the appraiser indicates has been given less weight than the sales comparison approach.[176]

---

[174] DX-2706 (Appraisal Report: NHELI_2007_1_2002019940).
[175] DX-2717 (Appraisal Report: NHELI_2007_2_2002010004).
[176] DX-2704 (Appraisal Report: NHELI_2007_1_2002011212).

- **NHELI_2007_2_2001855635 –** ▇▇▇▇▇ :  Dr. Kilpatrick also failed this appraisal for the exclusion of a cost approach.  Contrary to Dr. Kilpatrick's findings, this appraisal also includes a cost approach.[177]

**16.     CAM Question 16 – Did the appraiser calculate the physical depreciation correctly?**

156.     Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 7.615.  In total, Dr. Kilpatrick has found that 102 of the 205 appraisals at issue did not meet this criterion.

157.     CAM Question 16 is not based on a USPAP requirement.  Dr. Kilpatrick indicates that the intent of this question is to evaluate "whether there is a violation of Standards Rule 1-4(b)(iii)," which he says can lead to "a failure to correctly adjust for effective age and condition in the sales adjustment grid, as required under Standards Rule 1-4(a)."[178]  He further indicates that an error in the calculation of physical depreciation "has a direct, but only modest-magnitude, impact on value."[179]  However, Dr. Kilpatrick is unable to cite a "correct" method of calculating depreciation because there is no single accepted method.

158.     Neither standard cited by Dr. Kilpatrick specifies a method for calculating depreciation; hence they offer no basis for an evaluation for whether depreciation was calculated correctly.  Standards Rule 1-4(b)(iii) indicates that "when a cost approach is applicable, an appraiser must analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued depreciation)."[180]  In practice, accrued depreciation may be calculated in a variety of ways, including the economic age-life, modified economic age-life and breakdown methods, all of which include the application of the

---

[177] DX-2711 (Appraisal Report: NHELI_2007_2_2001855635).
[178] Kilpatrick Adherence Report, p. 82
[179] *Id.*
[180] DX-2726 (USPAP 2005), Standards Rule 1-4(b)(iii), p. 19

appraiser's judgment or may be based on cost manuals, such as the Marshall & Swift Cost Handbook.[181]

159.    The economic age-life method is a "method of estimating depreciation in which the ratio between the effective age of a building and its total economic life is applied to the current cost of the improvements to obtain a lump-sum deduction."[182]  The modified economic age-life method is a "method of estimating depreciation in which the ratio between the effective age of a building and its total economic life is applied to the current cost of the improvements after the costs to cure curable physical and functional items are deducted."[183]  The breakdown method is a "method of estimating depreciation in which the total loss in the value of a property is estimated by analyzing and measuring each cause of depreciation (physical, functional, and external) separately."[184]

160.    In several instances, Dr. Kilpatrick incorrectly or unreliably applied Question 16, failing loans without any basis for doing so.  For example, Dr. Kilpatrick failed the following appraisals where depreciation was reasonably estimated with techniques that are widely accepted by the industry.

- **NAA_2005_AR6_1002171703 –** ▮▮▮▮▮▮▮:  The appraiser states that physical depreciation is estimated based on the age-life method and applies a 15% deduction to the estimated cost new. Per the appraisal, the property's estimated effective age is 5 to 10 years and its estimated remaining economic life is 50 to 55 years.[185]  The ranges indicate that physical depreciation is expected to be in the range of 10% to 18%, which supports the appraiser's use of a 15% estimate.

- **NHELI_2007_1_2002211714 –** ▮▮▮▮▮▮▮:  The appraiser deducted $▮▮▮▮ for physical depreciation, noting that the property was not

[181] DX-2724 (Appraisal Institute, *The Appraisal of Real Estate* (13th ed.), p. 408)
[182] Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. (Chicago: Appraisal Institute, 2010)
[183] Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. (Chicago: Appraisal Institute, 2010), p. 127
[184] Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. (Chicago: Appraisal Institute, 2010), p. 22
[185] DX-2661 (Appraisal Report: NAA_2005_AR6_1002171703).

impacted by "functional obsolescence or external depreciation." The appraisal indicates that cost figures were derived from the Marshall & Swift cost manual, local market and appraiser's files.[186] The appraisal does not state what method was used by the appraiser to estimate physical depreciation, but this was not required by USPAP. As a result, there is no basis for Dr. Kilpatrick's claim that the appraiser incorrectly estimated the property's physical depreciation. In fact, considering the age of the property, which was built in 1960, the estimated effective age of 12 years and the estimated remaining economic life of 63 years, the 16% depreciation estimate appears to be a reasonable conclusion reached by the appraiser, and was accepted in a Residential Appraisal Final Review Report (prepared ███████).[187]

- **NHELI_2007_2_2001931628 –** ████████: The appraiser made a 12% deduction for physical depreciation, which equates to $█████; he indicated, "normal depreciation and cost figures by the use of the Marshall and Swift Residential Cost Handbook, and appraiser's judgment." The appraisal reported that the home was in average/good condition and was 17 years old with an estimated effective age of 10 years. There was no reported estimate of remaining economic life, but this was only required for Housing and Urban Development and Veterans Affairs appraisal assignments (*i.e.*, not this assignment) as clearly indicated on the form used by the appraiser (Fannie Mae Form 1004 – March 2005).[188] Dr. Kilpatrick had no basis to conclude that the appraiser incorrectly estimated the property's physical depreciation. In fact, given the age and condition of the property, the estimated depreciation is within the range of what an experienced appraiser would consider reasonable.

161. Dr. Kilpatrick also failed appraisals of recently constructed homes that would have suffered minimal or no physical depreciation because the appraisals properly reflected that fact:

- **NAA_2005_AR6_1002238436 –** ████████: The subject of this appraisal is "newly constructed", as are the comparables considered in the sales comparison approach. No deduction for physical depreciation was warranted; as such, there is no deduction indicated in the appraisal.[189] Dr. Kilpatrick had no basis to fail this appraisal for this question.

---

[186] DX-2709 (Appraisal Report: NHELI_2007_1_2002211714).
[187] *Id.*
[188] DX-2715 (Appraisal Report: NHELI_2007_2_2001931628).
[189] DX-2666 (Appraisal Report: NAA_2005_AR6_1002238436).

- **NAA_2005_AR6_1002238862 –** ▮▮▮▮▮▮: The subject of this appraisal was a year old, and a deduction of 1% was applied for physical depreciation, which is a reasonable exercise of the appraiser's judgment given the subject's age and condition.[190] Dr. Kilpatrick had no basis to fail this appraisal for this question.

### 17. CAM Question 17 – Did the appraiser report external obsolescence correctly?

162. Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 7.615. In total, Dr. Kilpatrick found that 46 of the 205 appraisals at issue did not meet this criterion.

163. External obsolescence is "an element of depreciation; a diminution in value caused by negative externalities and generally incurable on the part of the owner, landlord, or tenant."[191] It can be caused by a variety of factors, including neighborhood decline, a property's location (*e.g.*, proximity to a highway or rail line), market conditions or environmental conditions (*e.g.*, contamination, landfills, etc.) and may be temporary or permanent.

164. CAM Question 17 is not based on a USPAP requirement. Like Question 16, this question was derived by Dr. Kilpatrick "from a violation of Standards Rule 1-4(b)(iii)."[192] He states that if an appraisal does not include a "correct" discussion of external obsolescence that "the value opinion of that appraisal report is suspect."[193] But Standards Rule 1-4(b)(iii) states only that an appraiser must "analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued

---

[190] DX-2667 (Appraisal Report: NAA_2005_AR6_1002238862).
[191] Appraisal Institute, The Dictionary of Real Estate Appraisal, 5th ed. (Chicago: Appraisal Institute, 2010)
[192] Kilpatrick Adherence Report, pp. 82-83
[193] *Id.*, p. 83

depreciation)."[194]  Neither this standard nor any other section of USPAP describes a "correct" manner in which external obsolescence must be reported or calculated.

165.     With respect to the sales comparison approach, Dr. Kilpatrick states that this "question pertains to the failure to adjust correctly for location in the sales adjustment grid as required under Standards Rule 1-4(a), and it may also lead to failures under Standards Rule 1-3(a) and (b)."[195]  Dr. Kilpatrick ignores the fact that appraisers will, when possible, select comparables that are impacted by the same externalities as the subject property, negating the need for an adjustment on this basis.

166.     Standards Rule 1-4(a) states, "In developing a real property appraisal, an appraiser must collect, verify, and analyze all information applicable to the appraisal problem, given the scope of work identified in accordance with Standards Rule 1-2(f): when a sales comparison approach is applicable, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."[196]

167.     Standards Rules 1-3(a) and (b) state, "When the value opinion to be developed is market value, and given the scope of work identified in accordance with Standards Rule 1-2(f), an appraiser must (a) identify and analyze the effect on use and value of existing land use regulations, reasonably probable modifications of such land use regulations, economic supply and demand, the physical adaptability of the real estate, and market area trends; and develop an opinion of the highest and best use of the real estate."[197]  Standards Rule 1-2(f) states, "In

---

[194] DX-2726 (USPAP 2005), Standards Rule 1-4(b)(iii), p. 19
[195] Kilpatrick Adherence Report, pp. 82-83
[196] DX-2726 (USPAP 2005), Standards Rule 1-4(a), p. 19
[197] *Id.*, Standards Rules 1-3(a)(b), p. 19

developing a real property appraisal, an appraiser must identify the scope of work necessary to complete the assignment."[198]

168.    Appraisers typically report on market conditions and neighborhood characteristics, and note observed externalities that may have an adverse impact on a property's value; however, there is no prescribed manner in which an appraiser must report and consider any externalities that may impact the subject of their appraisal.  In order to properly identify and assess externalities that could have an adverse impact on a property, appraisers typically do one or more of the following: conduct site visits of the subject and comparables, conduct detailed analyses of local market conditions or interview market participants. Dr. Kilpatrick's team, which did not visit the subject or comparable properties, did not conduct the most basic and common level of diligence that would be expected of an appraiser; instead, his team appears to have been wholly reliant on aerial photographs that were not necessarily known to have been taken on or around the effective date of the appraisal.

169.    In my professional opinion, Dr. Kilpatrick did not review sufficient information to make a determination as to whether the appraiser addressed external obsolescence in a manner that would be considered compliant with USPAP.

170.    In addition, his process resulted in the incorrect citation of numerous appraisals for not having "correctly" reported external obsolescence, as in the following example.

171.    First, Dr. Kilpatrick concludes that the appraiser for NHELI_2006_FM1_2002167725 did not correctly report external obsolescence.  The appraiser reported that "there are no unfavorable conditions" in the Neighborhood section of the appraisal and that there were "no apparent physical, functional, or external inadequacies" in the Comments

---

[198] *Id.,* Standards Rules 1-2(f), pp. 17-18

section on page 1 of the appraisal.[199]  Further, the appraiser reported that property values were increasing and there was a shortage of supply and marketing times under three months.  These factors indicate that there was no external obsolescence and none is reported in the cost approach. Dr. Kilpatrick's assertion that the appraiser incorrectly reported external obsolescence is therefore incorrect.

172.     In addition, the property was 58 years old at the time of the appraisal, which led the appraiser to place primary reliance on the sales comparison approach. The comparables considered in the sales comparison approach are 0.19, 0.26, 0.52, and 0.33 miles from the subject; they were not adjusted for location and would likely have been impacted by the same externalities as the subject property, if any externalities existed at the time.

### 18.   CAM Question 18 – Did the appraiser confirm a broker/builder source for comparables using a disinterested third party source?

173.     Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 3.815.  In total, Dr. Kilpatrick found that 1 of the 205 appraisals at issue did not meet this criterion.

174.     CAM Question 18 is not based on a USPAP requirement.  Dr. Kilpatrick states that "[a]n appraiser's failure to confirm comparables in an objective manner would be a clear violation" of USPAP Standards Rule 2-2(b)(vii), which "requires that the appraiser report the scope of work as developed under Standards Rule 1-2(f)."[200]

175.     Dr. Kilpatrick cites no professional standard or guideline that requires an appraiser to confirm data on comparable properties with a source other than MLS databases, assessor records, deeds or secondary reporting service, which, in accordance with industry

---

[199] DX-2676 (Appraisal Report: NHELI_2006_FM1_2002167725).
[200] Kilpatrick Adherence Report, p. 83

practice, are generally the sources relied upon in the appraisals that are at issue. USPAP has no requirement to confirm information from a broker/builder source with information from another third party. USPAP Standards Rule 2-2(b)(vii) requires that "the content of a Summary Appraisal Report must be consistent with the intended use of the appraisal and, at a minimum summarize sufficient information to disclose to the client and any intended users of the appraisal the scope of work used to develop the appraisal."[201]  This standard addresses requirements for the content of a summary appraisal, but does not address the means by which an appraiser is required to confirm the data that is relied upon within the appraisal.

176.    Standards Rule 1-2(f) requires that "in developing a real property appraisal, an appraiser must identify the scope of work necessary to complete the assignment."[202]  This standard makes the scope of work discretionary; it simply does not dictate that all data from brokers and builders must be confirmed by another source.

177.    Dr. Kilpatrick's single finding for this question is illogical.  For NHELI_2006_FM1_2002168258, the appraiser relies on three comparables: information pertaining to Sale 1 was based on the appraiser's office file, inspection and county records; information pertaining to Sale 2 was based on the realtor's records and the appraiser's observations; and information pertaining to Sale 3 was based on county records, the appraiser's observations and MLS data.[203]  Dr. Kilpatrick thus faults the appraiser for relying, with respect to a single comparable, on realtor records.  The appraiser's approach was entirely reasonable.  It is Dr. Kilpatrick who applies his invented standard in an unreasonable manner, as this appraisal clearly shows that the appraiser exercised proper diligence.

---

[201] DX-2726 (USPAP 2005), Standards Rule 2-2(b)(vii), pp. 22, 26
[202] DX-2726 (USPAP 2005), Standards Rule 1-2(f), pp. 17-18
[203] DX-2677 (Appraisal Report: NHELI_2006_FM1_2002168258).

### 19. CAM Question 19 – For condominiums, was at least one of the comparables outside of the subject's condominium project?

178.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this standard were given a score of 5.415. In total, Dr. Kilpatrick has found that 2 of the 205 appraisals at issue do not meet this criterion.

179.    CAM Question 19 is not based on a USPAP requirement.  Dr. Kilpatrick says this question is derived from USPAP Standards Rule 1-4(a), which requires that, "when a sales comparison approach is applicable, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."[204]   Again, this claim is false and overreaching. That standard provides no specific guidelines or requirements for the selection of comparables when appraising condominium units or any other type of property.

### 20. CAM Question 20 – Did the appraiser correctly report comparable sale transaction data?

180.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 6.625. In total, Dr. Kilpatrick found that 12 of the 205 appraisals at issue did not meet this criterion.

181.    CAM Question 20 is not based on a USPAP requirement.  Dr. Kilpatrick states that he derived this question "from requirements under FNMA/FHLMC guidelines, which are incorporated into USPAP under Statement 10 and the Supplemental Standards Rule."[205]   Neither the GSEs nor USPAP provide specific requirements that must be satisfied in order for a comparable sale transaction to have been reported correctly. Dr. Kilpatrick also offers no specifics as to what criterion must be satisfied in order for a sale to be judged to have been correctly reported.

---

[204] Kilpatrick Adherence Report, p. 84; DX-2726 (USPAP 2005), Standards Rule 1-4(a), p. 19
[205] Kilpatrick Adherence Report, p. 85

182.    In my experience, appraisers sometimes make unintentional errors in reporting comparable transaction data, such as closing date, loan amount, loan type, and seller concessions, without impacting the reliability of the appraisal. Dr. Kilpatrick opines, "If the comparable sales transaction data are incorrect, any analysis that may be implemented in reliance upon that incorrect data would be incorrect."[206]  This assertion gives no consideration to the type or magnitude of potential errors, all of which cannot and should not be considered equal. It is the responsibility of an appraisal reviewer to apply judgment and consider whether a single error may have impacted the credibility of an appraisal that is the subject of their review, and Dr. Kilpatrick's findings indicate that he has failed to do so.

183.    In addition, Dr. Kilpatrick unreliably applied Question 20 in several instances. Based on my review of the information reported in the following examples, I can find no justifiable basis for Dr. Kilpatrick to have failed the appraisals with respect to this question. Particularly egregious errors in Dr. Kilpatrick's CAM findings for this Question involve two separate appraisals with $500 discrepancies in the sale prices of comparables, where neither of these discrepancies have an impact on the respective values nor make the respective appraisals unreliable.

- **NHELI_2006_FM1_2001981699** – ███████████████  Based upon IMS review of tax records and data reported by the MLS,  the appraiser correctly reported comparable sale transaction data and information specific to the comparables, with the exception of the data reported for Sale 3, at █████████. This property was reported to have sold for $██████, but the appraiser reported the sale price at $██████.[208]  In my experience such a minor error, which was 0.3% off the recorded sale price, would not have an impact on the value conclusion reached by the appraiser.

---

[206] *Id.*, p. 86
[207] IMS Letter: NHELI_2006_FM1_2001981699
[208] DX-2672 (Appraisal Report: NHELI_2006_FM1_2001981699).

- **NHELI_2006_FM2_2002122939 –** ▮▮▮▮▮▮▮ :  Based upon IMS review of data reported by the MLS, the appraiser correctly reported comparable sale transaction data and information specific to the comparables.[209]

- **NHELI_2007_2_2001932613 –** ▮▮▮▮▮▮▮ :  Based upon IMS review of tax records and data reported by the MLS, I have noted inconsistencies between the two data sources, with respect to two sale dates being one and six days off for Sale 1 and 3, respectively, and the square footage of Sale 1 being different by 3 square feet.[210]  The appraiser consistently relied on the MLS data in reporting the comparable data.[211]

**21.    CAM Question 21 – If a previous sale of a comparable exists, is the current unadjusted price of that comparable less than 10% higher than the prior sale price on an annualized basis?**

184.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 8.825. In total, Dr. Kilpatrick has found that 62 of the 205 appraisals at issue did not meet this criterion.

185.    CAM Question 21 is not based on a USPAP requirement.  Dr. Kilpatrick considers this situation "another 'red flag' suggesting illegal flipping."[212]  He further states that, "using comparables with such a material increase in unadjusted price over a short time may lead to bias in the sales adjustment grid developed under Standards Rule 1-4(a)."[213]  He softens his statement by stating that, "at the very least, use of such a [comparable] would require a significant analysis and explanation to reconcile the very large increase in price with other market indicators."[214]  However, this does not stop him from failing appraisals without the benefit of the knowledge that would be necessary to judge the comparables unusable.

---

[209] IMS Letter: NHELI_2006_FM2_2002122939
[210] IMS Letter: NHELI_2007_2_2001932613
[211] DX-2716 (Appraisal Report: NHELI_2007_2_2001932613)
[212] Kilpatrick Adherence Report, p. 86
[213] *Id.*
[214] *Id.*

186.    Neither USPAP Standards Rule 1-4(a) nor any other USPAP standards require appraisers to limit their reliance to only comparables that, if previously sold, sold for an unadjusted price less than 10% higher than the prior sale on an annualized basis.  In fact, USPAP has no requirements with respect to the selection of comparables with the exception of requiring that "an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."[215]

187.    Dr. Kilpatrick states, "the presumption of property values increasing at substantially greater double-digit rates is not reasonable" versus the single-digit increases that he considers more reasonable.[216]  This is unfounded.  Dr. Kilpatrick ignores the fact that, at the time the appraisals in this matter were completed, there were markets experiencing double-digit appreciation, according to the Case-Shiller Home Price Index.[217]  One such market was Phoenix, Arizona, which experienced a 21% increase in home prices from December 2003 to December 2004 and a 45% increase from December 2004 to December 2005.[218]  In fact, 11 of the 20 metro areas covered by the Case-Shiller Index experienced appreciation of more than 10% per year during the same time period as indicated in this example.[219]  It would have been entirely reasonable to use and rely on comparables that do not satisfy the criterion imposed by this question. In fact, it would have been unreasonable, and not reflective of the relevant comparable sales data, to exclude comparable sales simply because they reflected the high rate of home price increases experienced in a particular market.  Thus, by complying with Dr. Kilpatrick's invented

---

[215] DX-2726 (USPAP 2005), Standards Rule 1-4(a), p. 19
[216] Kilpatrick Adherence Report, p. 87
[217] The S&P/Case-Shiller Home Price Indices are the leading measures of U.S. residential real estate prices, tracking changes in the value of residential real estate both nationally as well as in 20 metropolitan regions.
[218] FTI calculation based on Case-Shiller data, Additional Info – Home Price Tiered Index Levels (http://us.spindices.com/index-family/real-estate/sp-case-shiller)
[219] FTI calculation based on Case-Shiller data, Additional Info – Home Price Tiered Index Levels (http://us.spindices.com/index-family/real-estate/sp-case-shiller)

standard by using only comparables that had experienced no more than 10% annualized price increases, an appraiser could *violate* USPAP by failing to consider relevant market conditions.

188.    As indicated in my analysis of CAM Question 12, USPAP does not require the appraiser to analyze prior sales of comparables.  There is no requirement to report all prior sales of the comparables.

189.    The following examples show that Dr. Kilpatrick's one-size-fits-all approach ignored several reasons that would justify an annual appreciation rate of more than 10% for comparables. These reasons, some of which are exemplified below, include (1) the latest sale's reflection of improvements or renovations to the property, (2) the distressed nature of the prior sale (*e.g.*, foreclose, REO, quick sale, etc.), (3) the non-arm's length nature of the prior sale or (4) rapidly increasing market prices.

- **NHELI_2007_2_2001930630 –** ███████████:  On an annualized basis, the unadjusted price for sale comparable 4 is 13% higher than the prior sale price. The property sold for $█████ on ████████ and had previously sold for $██████ on ██████. The appraiser notes that property values are increasing and the "area is considered to have an above average overall appeal to the market."[220]  Dr. Kilpatrick provides no basis to reach a different conclusion.

- **NHELI_2006_FM2_2002233153 –** █████████████: The appraiser reported recent prior sales for Comparables 1 and 2, but no sales activity for Comparable 3. Comparable 1's recent prior sale (August 2005 for $██████ versus December 2005 for $██████) was reported to have not been an arm's length transaction; Comparable 2's December 2005 sale price of $██████ reflected an increase of 22% over its recent prior sale in February 2005 for $██████, which was reported by the appraiser to be the result of updates made to the property.[221] Moreover, according to the Case-Shiller Index, the ██████ metropolitan area experienced 24% appreciation from December 2003 to December 2004 and 32% appreciation from December 2004 to December 2005. Again, Dr. Kilpatrick ignores the appraiser's analysis of the comparables and

---

[220] DX-2714 (Appraisal Report: NHELI_2007_2_2001930630).
[221] DX-2689 (Appraisal Report: NHELI_2006_FM2_2002233153).

concluded, without evidence, that the appraisal did not satisfy his requirements.

**22.    CAM Question 22 – Is the appraised value of the subject within the range of the unadjusted comparable sales prices?**

190.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this question were given a score of 7.000. In total, Dr. Kilpatrick has found that 28 of the 205 appraisals at issue did not meet this criterion.[222]

191.    CAM Question 22 is not based on a USPAP requirement.  Dr. Kilpatrick indicates that "market comparison is the primary valuation tool employed" in a residential appraisal.[223] According to him, "market comparison involves evaluating the subject property in relationship to the sales of comparable properties" in order to value the subject property by "adjusting the attributes and features of the comparable sales properties."[224]  He further states, "Failure to do so properly constitutes a violation of Standards Rules 1-4(a) as well as 1-6(a)."[225]

192.    Standards Rule 1-4(a), which has been previously cited, requires that the appraiser analyze the sales available to indicate a value conclusion.[226]  This standard addresses the analysis of the comparables, but makes no mention and is not related to the appraiser's value reconciliation.

193.    Standards Rule 1-6(a) states, "In developing a real property appraisal, an appraiser must reconcile the quality and quantity of data available and analyzed within the approaches used."[227]  While this standard does address the appraiser's reconciliation process, it

---

[222] Kilpatrick Adherence Report, p. 87 and Appendix 5-1 – Credibility Modeling Data and Scoring
[223] *Id.*, p. 87
[224] *Id.*, pp. 87-88
[225] *Id.*, pp. 87-88
[226] DX-2726 (USPAP 2005), Standards Rule 1-4(a), p. 19
[227] *Id.* Standards Rule 1-6(a), at p. 21

includes no requirement that the appraiser reach an opinion of value that is bracketed by the unadjusted sale prices of the comparables.

194.    The use of comparables that, according to Dr. Kilpatrick, "are all skewed relative to the subject"[228] does not render an appraisal invalid. The purpose of the adjustment process is to equate the comparables to the subject. Dr. Kilpatrick ignores the fact that perfect comparables do not always exist or that some properties may be unique, which can affect the adjustment process. While it is the responsibility of the appraiser to select comparables that are located within the subject's competitive market and have similar characteristics, selecting comparables based purely on price is not acceptable.

195.    Several examples demonstrate the rigidity of the CAM and the failure of Question 22 to provide any meaningful information about credibility.

- Dr. Kilpatrick failed four appraisals on this question where the value opinion fell outside (above) the range of the comparables by less than 3.0%.  The appraised values reached in these appraisals were 2.5%, 1.0%, 0.7% and 0.2% above the highest comparables, respectively.[229]

- Dr. Kilpatrick failed two appraisals on this question where the value opinion fell outside (below) the range of the comparables by less than 3.0%.  These appraised values were 0.8% and 2.7%, below the lowest comparables, respectively.[230]

- All but one of the appraisals that failed this question concluded to a value that was within the range of 5.2% below the lowest comparable to 5.3% above the highest comparable.

196.    In addition, Dr. Kilpatrick failed one appraisal, NHELI_2006_HE3_2001846528, on this question even though the value opinion was within the unadjusted range of comparables.

---

[228] Kilpatrick Adherence Report, p. 88
[229] DX-2688, 2695, 2699, 2703 (Appraisal Reports: NHELI_2006_FM2_2002202724;
NHELI_2006_HE3_2002173834; NHELI_2006_HE3_2002235924; NHELI_2007_1_2001929177)
[230] DX-2664 – 2680 (Appraisal Reports: NAA_2005_AR6_1002235660; NHELI_2006_FM1_2002233784)

The subject property was appraised for $355,000 and the unadjusted range of the comparables was $ ▮▮▮▮ to $ ▮▮▮▮.[231]  This simply indicates another error by Dr. Kilpatrick's team.

### 23.    CAM Question 23 – Is the appraised value of the subject within the range of the adjusted comparable sales prices?

197.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 7.000. In total, Dr. Kilpatrick has found that 4 of the 205 appraisals at issue did not meet this criterion.

198.    CAM Question 23 is not based on a USPAP requirement.  Like Question 22, Dr. Kilpatrick states, "a negative answer to this question derives from violations of Standards Rules 1-4(a) and 1-6(a)."[232]  As with Question 22, there is no requirement that the appraiser reach an opinion of value that is bracketed by the adjusted sale prices of the comparables.

199.    There is no requirement that the appraised value of property be within the range of the adjusted comparable sales.  As with Question 22, Dr. Kilpatrick ignores the fact that perfect comparables rarely exist, and the fact that some properties may be unique. The selection and adjustment of comparables is not a science, and the appraiser has the latitude to reach an opinion of value that he or she believes to be credible.

### 24.    CAM Question 24 – If income approach, do the mix of units for the comparables match the mix of units for the subject?

200.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 9.200. In total, Dr. Kilpatrick has found that 11 of the 205 appraisals at issue did not meet this criterion.

201.    CAM Question 24 is not based on a USPAP requirement.  Dr. Kilpatrick claims that "this violation is so singularly substantial that a negative answer to this assessment question,

---

[231] DX-2691 (Appraisal Report: NHELI_2006_HE3_2001846528).
[232] Kilpatrick Adherence Report, p. 88

by itself, calls into question the credibility of an appraisal report."[233]  It is his opinion that "the 'core' of the appraisal report is the market rent estimate times the gross rent multiplier ('GRM'),"[234] which leads him to say that "to the extent that the mix of units is not compatible, this results in an 'apples-to-oranges,' dissimilar comparison, which undermines the foundational premise of comparability, and in turn, the reliability of the appraisal."[235]  He concludes that an appraisal will be in direct violation of Standards Rule 1-4(c)(i) and 1-6(a) if the "market rent estimate is not supported by an appropriate and comparable mix of units."[236]

202.    Standards Rule 1-6(a), which has already been touched on numerous times, addresses the reconciliation of the quality and quantity of data.[237]  It does not address any requirement for the mix of units of the comparables to match that of the subject.

203.    Standards Rule 1-4(c)(i) requires that, "When an income approach is applicable, an appraiser must analyze such comparable rental data as are available and/or the potential earnings capacity of the property to estimate the gross income potential of the property."[238] Here, Dr. Kilpatrick has again overreached. An analysis of the available data is required, but there is no requirement limiting what data must be relied on or indicating what guidelines an appraiser must follow in the selection of the data that is to be considered. The standard allows the appraiser to exercise best judgment in the selection of comparables, rather than establishing rigid guidelines. Further, Dr. Kilpatrick ignores the fact that appraisers can and do routinely make adjustments for dissimilarities between the comparables and the subject properties.

---

[233] Kilpatrick Adherence Report, p. 89
[234] *Id.*
[235] *Id.*
[236] *Id.*, p. 90
[237] DX-2726 (USPAP 2005), Standards Rule 1-6(a), p. 21
[238] *Id., Standards Rule 1-4(c)(i), at pp. 19-20*

204.    Generally, the income capitalization approach is reserved for investors looking for income generating residential property.  This approach assists investors in evaluating the income-generating ability of a property, and is often helpful when income is a motivating factor in their decision to make an investment.  "When the income approach is applicable, one of the accepted methods of valuation provides for "the appraiser [to] multiply the total gross estimated monthly market rent for the subject property by a reconciled gross monthly rent multiplier."[239]

205.    In addition, Dr. Kilpatrick incorrectly and unreliably applied Question 23 in several instances.  The following examples show that Dr. Kilpatrick scored appraisals incorrectly (failing appraisals that did satisfy the requirement of this question) and did not apply reasonable judgment in deciding to fail appraisals that did not meet his overly rigid criterion.

- **NHELI_2006_FM2_2001905263 –** ▮▮▮▮▮▮▮:  The subject property is comprised of two rental units, which are both 3 BR/1 Bath units.  All three of the comparables considered are two-family properties with unit mixes that are exactly the same (3 BR/1 Bath) as that of the subject.[240] This appraisal actually meets Dr. Kilpatrick's criterion, yet it was unexplainably failed on this question.

- **NAA_2005_AR6_1002008905 –** ▮▮▮▮▮▮▮:  The subject property is comprised of three rental units, which are all the same size (▮▮▮ square feet), but the layouts include one 3 BR/1 Bath unit and two 4 BR/1 Bath units.  Actual rents are month-to-month and are $▮▮▮ for one of the units and $▮▮▮ for the other two units.[241]  The three comparables include two, three and four bedroom units, are of a similar vintage and are all located within 0.27 miles of the subject; the rents of the comparables range from $▮▮▮ for a three-bedroom unit to $▮▮▮ for a four-bedroom unit, bracketing the rent conclusions ($▮▮▮, $▮▮▮ and $▮▮▮ for the subject's units.[242]  This property also meets Dr. Kilpatrick's criterion (because the comparables include rental units of the same size and layout of the subject property), but was failed on this question.

---

[239] *Id.*
[240] DX-2682 (Appraisal Report: NHELI_2006_FM2_2001905263).
[241] DX-2660 (Appraisal Report: NAA_2005_AR6_1002008905).
[242] DX-2660 (Appraisal Report: NAA_2005_AR6_1002008905).

- **NAA_2005_AR6_1001831518 –** ▮▮▮▮▮▮▮▮▮: The subject property is comprised of two rental units, which are the same size, ▮▮▮ square feet, but one is a 4 BR/1 Bath unit and the other is a 3 BR/1 Bath unit; the actual rents of these units are the same at $▮▮ per month.[243]  The three comparables include one, two and three bedroom units, are of a similar vintage and are all located within 0.52 miles of the subject; the rents of the comparables range from $▮▮ for one-bedroom units to $▮▮ for three-bedroom units, consistent with (though higher than) the rent conclusion ($▮▮ for the subject's units.[244]  Even though the judgment applied by the appraiser resulted in a supportable opinion of market rent, Dr. Kilpatrick's rigid and unjustified standard still caused the appraisal to fail this CAM Question.

25. **CAM Question 25 – If income approach, does the gross rent multiplier ("GRM") used fall within the range of unadjusted GRMs for first 3 comparables in the appraisal report?**

206.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 9.200.  In total, Dr. Kilpatrick has found that 7 of the 205 appraisals at issue did not meet this criterion.

207.    CAM Question 25 is not based on a USPAP requirement.  Dr. Kilpatrick gives no foundation for his claim that a GRM that is not within the range of unadjusted GRMs for the first three comparables cannot be supported or explained.  He states that this error would be a violation of Standards Rule 1-4(c)—specifically 1-4(c)(iii) and (iv)—as well as a violation of Standards Rule 1-6(a).[245]

208.    Standards Rules 1-4(c)(iii) and (iv) require that "when an income approach is applicable, an appraiser must analyze such comparable data as are available to estimate rates of capitalization and/or rates of discount and base projections of future rent and/or income potential and expenses on reasonably clear and appropriate evidence."[246]  Neither standard requires what

---

[243] DX-2654 (Appraisal Report: NAA_2005_AR6_1001831518).
[244] DX-2654 (Appraisal Report: NAA_2005_AR6_1001831518).
[245] *Id.*
[246] DX-2727 (USPAP 2006), Standards Rule 1-4(c)(iii)(iv), p. 20

Dr. Kilpatrick claims they require; rather, they only require that the appraiser analyze the available data and base projections on market evidence.

209.     Standards Rule 1-6(a), which Dr. Kilpatrick references again, does not require the GRM used to fall within the range of unadjusted GRMs for first three comparables in the appraisal report

210.     Dr. Kilpatrick, by applying his guidelines in a rigid manner, also fails to consider that the GRMs of the comparables may be impacted by factors that warrant their not being considered in the development of a GRM for the subject.  In some cases, rental units may have been owner occupied or leased to a related party, may have been vacant on the sale date or may have been subject to rent control guidelines.

211.     Dr. Kilpatrick's belief that GRMs must fall within the range of the unadjusted GRMs of the first three comparables in the appraisal report is misguided and is another example of his opposition to an appraiser exercising professional judgment within the constraints that are actually provided by USPAP.

212.     Moreover, Dr. Kilpatrick incorrectly applied Question 25 in several instances. The appraisals in the following examples all met the criterion established by Dr. Kilpatrick in Question 25, yet Dr. Kilpatrick fails them all.

- **NHELI_2006_FM2_2002202724 –** ▮▮▮▮▮▮:  The first three GRMs of the comparables ranged from 219 to 260 and the GRM of the subject was 235.[247]

- **NAA_2005_AR6_1002235651 –** ▮▮▮▮▮:  The first three GRMs of the comparables ranged from 80 to 135 and the GRM of the subject was 100.[248]

---

[247] DX-2688 (Appraisal Report: NHELI_2006_FM2_2002202724).
[248] DX-2663 (Appraisal Report: NAA_2005_AR6_1002235651).

- **NAA_2005_AR6_1002195590 –** ▮▮▮▮▮▮▮:  The first three GRMs of the comparables ranged from 96 to 158 and the GRM of the subject was 119.[249]

- **NAA_2005_AR6_1001976675 –** ▮▮▮▮▮▮▮:  The first three GRMs of the comparables ranged from 129 to 138 and the GRM of the subject was 134.[250]

- **NHELI_2006_HE3_2002205406 –** ▮▮▮▮▮▮▮  The first three GRMs of the comparables ranged from 261 to 492 and the GRM of the subject was 261.[251]

26.    **CAM Question 26 – If income approach is used, do the market rent estimates for each unit mix fall within the range of rents reported for each unit mix for the first three comparables?**

213.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 6.625. In total, Dr. Kilpatrick has found that 16 of the 205 appraisals at issue did not meet this criterion.

214.    CAM Question 26 is not based on a USPAP requirement.  Dr. Kilpatrick indicates that it is a violation of Standards Rules 1-4(c)(i) and 1-6(a) for the appraiser to skew the results in a biased direction,[252] but provides no support for the proposition that reaching a market rent estimate for each unit mix that falls outside the range of rents reported for each unit mix for the first three comparables is an indication of intent by the appraiser to skew the results of his or her analysis.

215.    Standards Rule 1-4(c)(i) requires that, "when an income approach is applicable, an appraiser must analyze such comparable rental data as are available and/or the potential earnings capacity of the property to estimate the gross income potential of the property."[253]  This

---

[249] DX-2662 (Appraisal Report: NAA_2005_AR6_1002195590).
[250] DX-2659 (Appraisal Report: NAA_2005_AR6_1001976675).
[251] DX-2698 (Appraisal Report: NHELI_2006_HE3_2002205406).
[252] Kilpatrick Adherence Report, p. 91
[253] DX-2726 (USPAP 2005), Standards Rule 1-4(c)(i), pp. 19-20

standard requires analysis, but does not address the appraiser's reconciled value estimate (market rent in his case) nor does it require that the market rent estimates for each unit mix fall within the range of rents reported for each unit mix for the first three comparables. What this standard does do is contradict Dr. Kilpatrick's requirement that the appraiser must consider only rental data from the first three comparables and limit his or her possible conclusions to the range set by those three properties. The appraiser is expected to apply professional judgment and to "analyze such comparable rental data as are available," not to limit his or her consideration to a small set of data when additional data warrants consideration.

216. Standards Rule 1-6(a), which Dr. Kilpatrick references again also does not address any requirement for the reconciled conclusions of market rent for the subject units to be within the range established by the comparables.[254]

217. According to Dr. Kilpatrick, "[t]he most fundamental economic relationship in an income property is the rent for space in that property," which leads him to opine that "properties that rent at a certain level should be compared to properties that rent at a similar level."[255]  He continues by stating that "[p]roperties that have spaces renting at different rent levels are considered less than similar and, therefore, less than comparable,"[256] and that "[i]f the market rents for the subject property do not fall within the range of the market rents for the sales comparables, then the sales comparables are deemed to be less than comparable."[257]  He finally observes that "an appraisal based on such non-standard market rents could be significantly

---

[254] *Id.,* Standards Rule 1-6(a), p. 21
[255] Kilpatrick Adherence Report, p. 91
[256] *Id.*
[257] *Id.*

misleading,"[258] but does not draw a link between this statement and the requirement established

by his question.  As a result, it is not clear what he means by the term non-standard market rents.

218.    In addition, Dr. Kilpatrick incorrectly or unreliably applied Question 26 in the

following examples.

- **NAA_2005_AR6_1002008905 –** ████████████:  The subject property is
  comprised of three rental units, which are all the same size (████ square
  feet), but the layouts include one 3 BR/1 Bath unit and two 4 BR/1 Bath
  units.  Actual rents are month-to-month and are $████ for one of the units
  and $███ for the other two units.  The rents of the comparables range
  from $███ to $███ for three-bedroom units and from $████ to $████
  for four-bedroom units.  The rent conclusions of the subject, which are
  $███ for three-bedroom units and $███ for four-bedroom units, are
  within the ranges of the comparables.      This meets Dr. Kilpatrick's
  criterion, but nonetheless was inexplicably failed on this question.

- **NAA_2005_AR6_1001831518 –** ████████████:  The subject property
  is comprised of two rental units, which are the same size, ████ square
  feet, but one is a 4 BR/1 Bath unit and the other is a 3 BR/1 Bath unit; the
  actual rents of these units are the same at $███ per month.[260]  The
  comparables, which include a mix of one-, two- and three-bedroom units,
  do not bracket the market rent conclusion of the subject units, which is
  $███.[261]  Dr. Kilpatrick applied his rigid standard, but failed to consider
  whether the market rent conclusion of the appraiser, which reflects the
  property's actual rent, was a reasonable opinion of market rent.

- **NHELI_2006_FM1_2002120383 –** ████████████:  The subject is a two-
  family dwelling with a two-bedroom unit (████ square feet) and three-
  bedroom unit (████ square feet); one of the units was owner occupied and
  the other generated a monthly rent of $████  The rents of the three-
  bedroom comparables range from $███ to $███ there is only one two-
  bedroom rent comparable, which is at $███  The rent conclusion for the
  three-bedroom unit is within the range of the comparables and the rent
  conclusion for the two-bedroom unit is $███ below the only two-bedroom
  comparable and within the range of the three-bedroom comparables.[262]
  Dr. Kilpatrick again applies his criterion in a rigid manner and ignores the
  fact that the subject apartments are essentially the same size.  Further, he

---

[258] *Id.*
[259] DX-2660 (Appraisal Report: NAA_2005_AR6_1002008905)
[260] DX-2654 (Appraisal Report: NAA_2005_AR6_1001831518)
[261] DX-2654 (Appraisal Report: NAA_2005_AR6_1001831518)
[262] DX-2673 (Appraisal Report: NHELI_2006_FM1_2002120383)

ignores the appraiser's comment, "It should be noted that properties similar to the subject property are typically purchased by owner/occupants as opposed to owner/investor for their income potential. As a result the income potential of the subject has been given minimal consideration in the final estimate of value."[263]   Both the sales comparison and income capitalization approaches came in with value conclusions of $510,000, which was the conclusion of value for the property.[264]

### 27.   CAM Question 27 – Did the appraiser use the most recent comparables available?

219.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 5.015. In total, Dr. Kilpatrick has found that 56 of the 205 appraisals at issue did not meet this criterion.

220.    CAM Question 27 is not based on a USPAP requirement.

221.    Dr. Kilpatrick concludes that "the objective of sales comparables analysis is to employ properties that are as similar to the subject as possible and which sold close in time to the appraisal date."[265]   He also states that "market conditions that affect property values can often shift dramatically over relatively short periods of time,"[266] which contradicts his already "established" criterion with respect to Questions 13 and 21.   (These questions reject the legitimacy of annualized changes of more than 10% between an appraised value and a prior sale price of the subject and annualized changes of more than 10% between the two sale dates of a comparable.)   I recognize that market conditions can shift rapidly, which is the reason that I have already disagreed with the foundation for Questions 13 and 21.   However, an appraiser has the option to apply an adjustment to a comparable sale to reflect changing market conditions, and I do not think that the appropriate use of an older comparable sale is misleading.

---

[263] Appraisal Report: NHELI_2006_FM1_2002120383
[264] Appraisal Report: NHELI_2006_FM1_2002120383
[265] *Id.*
[266] *Id.*

222.    Dr. Kilpatrick claims that "[t]he failure to use the most recent comparables is a violation of Standards Rules 1-4(a) and 1-6(a) and potentially the Ethics Rule."[267]  Neither of these standards nor the Ethics Rule has any requirements regarding the selection of the most recent comparable sales (including requirements with respect to the sale dates of the comparables). I recognize that the date of a sale is a consideration in the selection of comparables, but it is far from the only consideration.  Appraisers consider a variety of factors, including concessions, date of sale, location, site size, view, style, gross living area, age/condition/quality of improvements, room count, functional utility and amenities.

223.    Thus, Dr. Kilpatrick's assertion that choosing comparables that are not the most recent sales "suggests that the appraiser 'cherry picked' comparables in a less-than-objective manner to bias the results in favor of a pre-determined outcome"[268] is simply wrong.  Rather, the existence of bias must be evaluated on an appraisal-by-appraisal basis. It is inappropriate to take a broad view and judge appraisals as flawed or suspect without considering the specifics of each appraisal.  More importantly, the determination of which comparables are the "best" is a decision that is to be made by the appraiser based on professional judgment.  Contrary to what Dr. Kilpatrick seems to suggest, there is no checklist of items or requirements that must be met in the selection of comparables.

224.    The instructions that Dr. Kilpatrick provided to the Valocity/Forsythe researchers as part of Greenfield Advisors Residential Data Form Protocol required the researchers to search MLS databases for (single-family) comparables that met the following criteria:

- Are within 12 months of the effective date of value;

---

[267] *Id.*
[268] *Id.*, pp. 92-93

- Are ±15% of the Subject Property's GLA (above grade living area only);

- Are within ±15 years of the actual age as the Subject Property;

- Are of a similar style as the Subject Property (*i.e.* # of stories above grade);

- Are of a similar construction as the Subject Property (*i.e.* stick built, modular, manufactured);

- Are of a similar condition as the Subject Property –a reasonable buyer using common sense would consider this to be similar;

- Have the similar location amenities as the Subject Property–a reasonable buyer using common sense would consider these to be similar.

- No REO, short sales, or potential short sales are allowed.[269]

225.    If more than nine sales were found, the researchers were directed to "report the sales that were closest in proximity to the subject property,"[270] not those sales that were the most recent.  The criteria Dr. Kilpatrick provided accounted for no relevant characteristics of the subject beyond the subject's age, size, style, and condition, thereby ignoring, in my experience, several important characteristics (*e.g.*, concessions, site size, view, room count and functional utility) that an appraiser would consider in the selection of comparables.

226.    The following examples show that the data relied upon by Dr. Kilpatrick to assess the quality of the comparables used in the original appraisals was flawed, as his process resulted in the selection of comparables that were not really comparable with respect to type or price point and that included numerous mistakes.

- **NHELI_2006_HE3_2002003797 –** ▇▇▇▇▇▇ :  The appraisal date is ▇▇▇▇▇▇▇▇▇ and the appraisal is based on comparables sales (1, 2 and 3) that closed in November 2005, September 2005 and March 2005.[271] Sales 1 and 2 both closed within 6 months of the valuation date and Sale 3

---

[269] *Id.*, Appendix 4-2 Greenfield Advisors Residential Data Inspection Protocol, p. 3
[270] *Id.*, p. 3
[271] DX-2693 (Appraisal Report: NHELI_2006_HE3_2002003797).

closed 11± months prior to the valuation date (within the 12-month range given to the Valocity/Forsythe team), but warranted a gross adjustment of 1.79% for site size and gross living area.[272] The appraiser reported that property values were increasing, but opted not to make an adjustment to Sale 3 for market conditions.[273] The adjusted range of the comparables was $███████ for Sale 3 to $███████ for Sale 2 and the concluded value was $175,000.[274] IMS confirmed that the comparables relied upon in the original appraisal were the best available.[275]

The nine comparables selected by Dr. Kilpatrick's team of researchers at Valocity/Forsythe, none of which were the same as the comparables used in the original appraisal, had closing dates ranging from August 2005 through January 2006. A closer look reveals that the supposedly "better comparables" presented by Dr. Kilpatrick had sale prices ranging from $███████ to $███████, averaging $134,917 and had a median price of $108,400.[276] My experience tells me that there must be a flaw in the selection process when the sale prices of the supposedly "better comparables" is so wide-ranging. Clearly, the more rigid process and lack of judgment with which it was used to select the "best comparables" resulted in a more variable and wide ranging measure of comparables.

- **NHELI_2006_HE3_2002174995 –** ███████████: The subject is a three-family dwelling, the appraisal date is ███████ and the appraisal is based on two comparable sales that closed in November 2005 (Sales 1 and 2) and one that closed in February 2006 (Sale 3).[277] All of the sales, all three-family dwellings, closed within 130 days of the valuation date (well within the 12-month range given to the Valocity/Forsythe team) and property value trends were reported by the appraiser to be stable.[278] The adjusted range of the comparables was $███████ for Sale 1 to $███████ for Sale 3 and the concluded value was $372,000. The gross adjustments to the comparables ranged from 0.8% to 6.5%.[279]

The nine comparables selected by Dr. Kilpatrick's team of researchers at Valocity/Forsythe, none of which were the same as the comparables used in the original appraisal, had closing dates ranging from April 2005 through February 2006. Despite his decision to fail this appraisal on this question, seven of the eight "supposedly better comparables" that Dr.

---

[272] Id.
[273] Id.
[274] Id.
[275] IMS Letter: NHELI_2006_HE3_2002003797
[276] Kilpatrick Adherence Report, Appendix 4-5a – Greenfield Advisors Residential Data Research Form
[277] DX-2697 (Appraisal Report: NHELI_2006_HE3_2002174995).
[278] DX-2697 (Appraisal Report: NHELI_2006_HE3_2002174995).
[279] DX-2697 (Appraisal Report: NHELI_2006_HE3_2002174995).

Kilpatrick's team used were older sales than all three of the comparables relied upon in the original appraisal. The one more recent "comparable" was a two-family dwelling that should not have been considered at all. Also, Dr. Kilpatrick's comparables had sale prices ranging from $███████ to $██████, averaging $423,113 and with a median price of $421,000. Dr. Kilpatrick's team therefore did not "bracket" the subject sale price contrary to Dr. Kilpatrick's invented philosophy in Question 27. Dr. Kilpatrick wrongly failed this appraisal for not meeting his criterion even though his own data did not identify "better" comparables.

- **NAA_2005_AR6_1001918585 – ███████████**:  The appraisal date is ████████ and the appraisal is based on comparable sales that closed in April 2005 (Sales 1 and 3) and June 2005 (Sale 2).[281]  All of the sales closed within 4 months of the valuation (well within the 12-month range given to the Valocity/Forsythe team).[282]  The appraiser reported that property values were increasing, but no sales required adjustments for market conditions.  The adjusted range of the comparables was $████████ for Sale 1 to $████████ for Sale 3 and the concluded value was $265,000.[283]  IMS confirmed that the comparables relied upon in the original appraisal were appropriate "locationally, physically, and functionally".[284]

The four comparables selected by Dr. Kilpatrick's team of researchers at Valocity/Forsythe, one of which was the same as one of the comparables used in the original appraisal, had closing dates ranging from July 2004 through June 2005. Despite his decision to fail this appraisal on this question, the June 2005 comparable identified by Dr. Kilpatrick was used in the original appraisal and the other "supposedly better comparables" that he used all closed more than six months prior to the appraisal date, which was earlier than the comparables selected by the appraiser.[285] Again, Dr. Kilpatrick wrongly failed this appraisal for not meeting his criterion even though the only sale that would have supported his argument for failing this appraisal was, in fact, used in the original appraisal.

---

[280] Kilpatrick Adherence Report, Appendix 4-5a – Greenfield Advisors Residential Data Research Form
[281] DX-2658 (Appraisal Report: NAA_2005_AR6_1001918585).
[282] DX-2658 (Appraisal Report: NAA_2005_AR6_1001918585).
[283] DX-2658 (Appraisal Report: NAA_2005_AR6_1001918585).
[284] IMS Letter: NAA_2005_AR6_1001918585
[285] Kilpatrick Adherence Report, Appendix 4-5a – Greenfield Advisors Residential Data Research Form

### 28.   CAM Question 28 – Did the appraiser use the nearest comparables available?

227.   Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 5.015. In total, Dr. Kilpatrick has found that 46 of the 205 appraisals at issue did not meet this criterion.

228.   CAM Question 28 is not based on a USPAP requirement.  Dr. Kilpatrick claims that this question evaluates whether there has been a violation of Standards Rules 1-4(a) and 1-6(a), and potentially the Ethics Rule.   Just as with Question 27, neither of these standards referenced by Dr. Kilpatrick, nor the Ethics Rule, imposes any requirements with respect to the selection of comparable sales (including requirements with respect to the locations of the comparables). In fact, an appraiser that selected only the nearest comparables would potentially be in violation of Standards Rule 1-4(a), as it requires an appraiser to analyze available comparable sales data to develop a value conclusion, not to limit their analysis to the closest comparables.[286]

229.   I recognize that location is a consideration in the selection of comparables, but it is not the only consideration. As I previously stated, appraisers consider a variety of factors.

230.   Dr. Kilpatrick has again taken a one-size-fits-all view that judges appraisals as flawed or suspect without considering the specifics of each appraisal.  More importantly, as I have previously stated, the determination of which comparables are the "best" comparables is a decision that is to be made by the appraiser based on their professional judgment. Contrary to what Dr. Kilpatrick seems to suggest, there is no checklist of items or requirements that must be met in the selection of comparables.

---

[286] DX-2726 (USPAP 2005), Standards Rule 1-4(a), p. 19

231.    I again reference the criteria (previously cited) that Dr. Kilpatrick provided to the

Valocity/Forsythe researchers as part of Greenfield Advisors Residential Data Form Protocol.[287]

These criteria ignored relevant characteristics of the subject property and directed researchers to

"report the sales that were closest in proximity to the subject property"[288] if there were more than

nine sales found. Thus, Dr. Kilpatrick's instructions elevated the proximity of the comparables to

the subject above other criteria that may have been more important. Further, his instructions

failed to recognize and make the distinction between proximity and location. Proximity is strictly

the distance from the subject property, whereas location takes into account other factors,

including neighborhood characteristics and external factors such as: shops, highways, schools

and non-residential areas.

232.    Three examples again show that the data relied upon by Dr. Kilpatrick to assess

the quality of the comparables used in the original appraisals was flawed, as his process resulted

in the selection of comparables that were not really comparable and included numerous mistakes.

- **NHELI_2006_FM1_2001979532 –** ▮▮▮▮▮▮▮▮: The subject is a
  two-story, single-family home and the appraisal is based on four
  comparables located within close proximity to the subject.[289]  Comparable
  1 is located 6 blocks from the subject, Comparables 2 and 3 are located 12
  blocks from the subject and Comparable 4 (listing) is located half a block
  from the subject.  All three comparable sales closed within 12 months of
  the effective date of value (▮▮▮▮▮▮▮▮).[290]  The appraiser reported the
  following:

  The three comparables analyzed are recent closed sales located in the
  subject market area.  They are the most similar and most recent sales
  available.  All three sales are considered good indicators of value for the
  subject property and were the most similar properties to the subject.  All
  three sales represent the appraiser's attempt to isolate and compensate for
  significantly dissimilar features or conditions.  The indicated value range

---

[287] Kilpatrick Adherence Report, Appendix 4-2 – Greenfield Advisors Residential Data Inspection Protocol
[288] Kilpatrick Adherence Report, Appendix 4-2 – Greenfield Advisors Residential Data Inspection Protocol, p. 3
[289] DX-2671 (Appraisal Report: NHELI_2006_FM1_2001979532).
[290] DX-2671 (Appraisal Report: NHELI_2006_FM1_2001979532).

supports the value of $300,000. Comparable 1 is of dissimilar style but is used for its close proximity to the subject and for its similar age. Comparables 2 & 3 are somewhat newer than the subject property, but the subject property is very well maintained and updated and no age or condition assessment is warranted.  Comparable 4 is an active listing in close proximity to the subject and is used as a supporting comparable for its similar overall characteristics.[291]

The appraiser clearly explains the rationale used for the selection of comparables. In addition, IMS confirmed that the comparables relied upon in the original appraisal were the best available.[292]

The research conducted by Dr. Kilpatrick's Valocity/Forsythe researchers only identified one comparable sale as an appropriate comparable. The one sale they did identify was used in the original appraisal as Sale 3 and was located the farthest of the three comparables from the subject.[293]  It is not standard practice for appraisers to conduct a sales comparison approach that is based on only one comparable sale, yet this is the data on which Dr. Kilpatrick based his decision to fail this appraisal.  Even ignoring the fact that this is not a valid question by which an appraisal should be judged, Dr. Kilpatrick has not presented data that supports his conclusion and instead presents a portion of the same data that was used in the original appraisal.

- **NHELI_2007_2_2001929854 –** ███████:  The appraisal report is based on two comparables that are located 0.07 miles from the subject and a third that is 0.18 miles from the subject.[294]  All of the comparables were sold within six months of the effective appraisal date, are the same size as the subject, and appear to be similar to the subject with respect to style, age, condition, and other factors.  Only minor adjustments needed to be made to account for differences in other features (*i.e.*, pool and fireplace) and the gross adjustments ranged from 0.0% to 4.1%.[295]  The adjusted range of the comparables was $███████ for Sale 2 to $███████ for Sale 1 and the final concluded value was $350,000.[296]  The appraiser states that all the, "comparables included herein are from the subject's ███████ subdivision and are viewed as among the most recent and relevant data available at this time."[297]  IMS confirmed that all three

---

[291] DX-2671 (Appraisal Report: NHELI_2006_FM1_2001979532).

[292] IMS Letter: NHELI_2006_FM1_2001979532

[293] Kilpatrick Adherence Report, Appendix 4-5a – Greenfield Advisors Residential Data Research Form

[294] DX-2712 (Appraisal Report: NHELI_2007_2_2001929854).

[295] DX-2712 (Appraisal Report: NHELI_2007_2_2001929854).

[296] DX-2712 (Appraisal Report: NHELI_2007_2_2001929854).

[297] DX-2712 (Appraisal Report: NHELI_2007_2_2001929854).

comparables are good and similar to the subject with respect to age, appeal, design, quality and gross living area.[298]

Dr. Kilpatrick's researchers identified eight comparable sales, two of which are included in the original appraisal as Sales 2 and 3, that range in location from 0.08 to 0.31 miles from the subject (excluding the two comparables in the original appraisal). None of the comparables identified by Dr. Kilpatrick are located closer to the subject than Sale 1 (0.07 miles from the subject). In fact, Dr. Kilpatrick identified comparables that are not closer to the subject and which are more dissimilar to the subject (with respect to site size, gross living area and bedroom count) than the comparables in the original appraisal. Sale 1, which the appraiser reported to have been sourced from MLS and public records, was inexplicably ignored by Dr. Kilpatrick's researchers. Yet, this sale is closer to the subject than the comparables introduced by Dr. Kilpatrick and also met all of his search criteria. Instead, Dr. Kilpatrick based his flawed conclusion on sales that were located farther from the subject than the original comparables and which were more dissimilar.

- **NHELI_2006_FM2_2001836190 –** ▮▮▮▮▮▮▮: The subject is a two-story, single-family dwelling with a valuation date of ▮▮▮▮ and appraised value of $300,000.[299] The appraisal is based on three comparable sales. Sales 1 and 3 are located 0.1 and 0.07 miles from the subject; Sale 2 is located 4.46 miles from the subject. The appraiser states, "Recent sales of similar houses in the same immediate subdivision are scarce. Sales 1 & 3 are located in the same subdivision as the subject and are similar in age to the subject. Sale 2 is located in a similar subdivision across town."[300] Based on my experience, it is standard practice for appraisers to expand their search if sales in close proximity to the subject are limited. As sufficiently explained in the original appraisal, this is exactly what the appraiser did.

The four comparables selected by Dr. Kilpatrick's team, which included one of the comparables from the original appraisal, were (excluding the original comparable) 0.19 to 2.14 miles from the subject. Sale 3 (from the original appraisal) was actually the closest of all of the comparables to the subject, but at ▮▮▮ square feet (81% of subject's gross living area), it did not meet Dr. Kilpatrick's arbitrary criterion that all comparables must be within 15% of the subject gross living area and was ignored. Instead, Dr. Kilpatrick selected comparables that ranged in price from $▮▮▮▮ to $▮▮▮. In my experience comparables with such wide ranging prices would not typically be used in the valuation of a home (or at least could

---

[298] IMS Letter: NHELI_2007_2_2001929854
[299] DX-2681 (Appraisal Report: NHELI_2006_FM2_2001836190).
[300] DX-2681 (Appraisal Report: NHELI_2006_FM2_2001836190).

not be used without substantial adjustments), as there would likely be significant differences accounting for the drastically different prices. Dr. Kilpatrick again relied on flawed data to arrive at an incorrect conclusion in his judgment of this appraisal.

29. **CAM Question 29 – Was the average price per square foot ("PPSF") of the comparables in the appraisal report less than or equal to the average PPSF of the comparables available in the market at the time of the appraisal?**

233.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 8.825.  In total, Dr. Kilpatrick has found that 116 of the 205 appraisals at issue did not meet this criterion.

234.    CAM Question 29 is not based on a USPAP requirement.  This question was purportedly used by Dr. Kilpatrick to evaluate appraisals for violations of Standards Rules 1-4(a) and 1-6(a) and to assess whether the appraiser violated the Ethics Rule by providing a misleading appraisal report.[301]  However, USPAP has no requirement that the average PPSF of the comparables in the appraisal report not exceed the average PPSF of the comparables available in the market at the time of the appraisal.  In fact, there is no mention of the term "average price per square foot" anywhere in USPAP.[302]

235.    It is not at all uncommon for a set of comparables in an appraisal to have a higher PPSF than other properties available in the market.  Comparables are selected because they resemble the subject property, which may itself exhibit qualities (*e.g.*, size, amenities, view, finishes) that make it more desirable than other homes of the market, some of which may be recent sales that Dr. Kilpatrick would consider potential comparables. By logical extension, Dr. Kilpatrick's standard assumes that no home can ever be better than average.  That is incorrect

---

[301] Kilpatrick Report p. 95
[302] DX-2726 (USPAP 2005); DX-2727 (USPAP 2006)

and inconsistent with USPAP, and the framework for this question is therefore invalid, as it is unrelated to assessing what an appraiser should have done to comply with USPAP.

236.    Even if Question 29 had some validity as a test of credibility (it does not not), my analysis of the 116 appraisals that Dr. Kilpatrick failed on this question reveals that they often failed based on insignificant differences.  For 36 of the appraisals (summarized below) the difference between the average PPSF of the comparables used in the appraisal and the comparables developed by his team is less than $10 per square foot.  A full 18 of the appraisals have differences of less than $5 per square foot. Dr. Kilpatrick even failed appraisals where the differences were $0.25, $0.43 and $0.49 per square foot.  In my experience, this is not a reasonable standard by which an appraisal should be judged non-credible.

**Table 2: Summary of Differences between Averages (PPSF)**

| Global Loan Number | Appraisal Comps PPSF | Valocity Comps PPSF | Δ PPSF |
|---|---|---|---|
| NHELI_2007_3_2002130431 | $127.08 | $126.83 | $0.25 |
| NHELI_2007_3_2002239228 | $462.18 | $461.76 | $0.43 |
| NHELI_2006_HE3_2001846452 | $74.29 | $73.79 | $0.49 |
| NHELI_2007_2_2002236011 | $88.67 | $86.72 | $1.96 |
| NHELI_2006_HE3_2002121884 | $180.62 | $178.65 | $1.97 |
| NHELI_2007_3_2002130300 | $100.23 | $98.19 | $2.04 |
| NHELI_2006_HE3_2001849587 | $166.17 | $163.26 | $2.90 |
| NHELI_2007_2_2002236013 | $68.38 | $65.45 | $2.94 |
| NHELI_2006_FM2_2002232209 | $221.62 | $218.65 | $2.97 |
| NHELI_2007_1_2002019140 | $130.40 | $127.39 | $3.01 |
| NHELI_2006_HE3_2001919867 | $115.94 | $112.61 | $3.33 |
| NHELI_2007_1_2001856666 | $84.18 | $80.69 | $3.49 |
| NAA_2005_AR6_1002123751 | $268.29 | $264.56 | $3.74 |
| NHELI_2006_HE3_2002002123 | $69.62 | $65.67 | $3.94 |
| NHELI_2006_HE3_2002235902 | $184.89 | $180.81 | $4.08 |
| NHELI_2007_3_2001934264 | $112.30 | $107.94 | $4.36 |
| NHELI_2007_2_2001855455 | $134.68 | $130.30 | $4.38 |
| NHELI_2007_2_2001929854 | $147.00 | $142.39 | $4.61 |
| NHELI_2006_FM2_2002011555 | $72.39 | $67.16 | $5.23 |
| NHELI_2007_2_2001930818 | $87.41 | $81.88 | $5.53 |

| Global Loan Number | Appraisal Comps PPSF | Valocity Comps PPSF | Δ PPSF |
|---|---|---|---|
| NHELI_2006_FM1_2001981699 | $164.71 | $159.08 | $5.63 |
| NHELI_2007_2_2002212505 | $104.07 | $97.23 | $6.84 |
| NHELI_2007_3_2002021913 | $85.68 | $78.46 | $7.23 |
| NHELI_2006_FM2_2001905120 | $82.62 | $75.28 | $7.34 |
| NHELI_2006_FM2_2001911867 | $62.26 | $54.67 | $7.59 |
| NHELI_2007_2_2002237108 | $165.90 | $158.31 | $7.59 |
| NHELI_2007_2_2002209146 | $113.91 | $106.21 | $7.70 |
| NHELI_2006_FM2_2001985635 | $88.87 | $81.17 | $7.70 |
| NHELI_2006_FM2_2001908585 | $155.97 | $147.88 | $8.09 |
| NHELI_2006_FM2_2002203715 | $272.29 | $263.88 | $8.41 |
| NHELI_2007_3_2002209763 | $191.26 | $182.75 | $8.51 |
| NHELI_2007_2_2002181250 | $74.90 | $66.19 | $8.71 |
| NHELI_2007_2_2002212716 | $121.98 | $113.16 | $8.81 |
| NHELI_2007_2_2002132009 | $103.73 | $94.33 | $9.40 |
| NHELI_2006_FM2_2001905905 | $119.29 | $109.60 | $9.69 |
| NHELI_2007_2_2001932613 | $105.84 | $96.10 | $9.75 |

237.    Dr. Kilpatrick failed appraisals with no regard to the concluded value.  In
addition, Dr. Kilpatrick's method results in illogical findings.  For example, if an appraisal was
based on the three best comparables and Dr. Kilpatrick selected those three comparables plus a
fourth, lower priced and less appropriate comparable that moved the average PPSF downward,
he would have failed the appraisal on this question.

- **NHELI_2006_FM2_2001911867 –** ▮▮▮▮▮▮▮▮▮:  The appraisal,
  which has an effective valuation date of ▮▮▮▮▮▮, is based on the
  analysis of three comparable sales that sold for prices ranging from $51 to
  $70 per square foot, averaging $61 per square foot; the sale dates of the
  comparables ranged from November 2005 to March 2006.  One of the
  comparables was not adjusted and two of the comparables required gross
  adjustments of no more than $1,000.  The concluded value reported in the
  appraisal is $61 per square foot.[303]

  The nine comparables researched by Dr. Kilpatrick's team, none of which
  were the same as those used in the original appraisal, ranged from $48 to
  $65 per square foot, averaged $55 per square foot and had prices ranging

---

[303] DX-2684 (Appraisal Report: NHELI_2006_FM2_2001911867).

from $████ to $████.[304]  But Dr. Kilpatrick provides no basis to conclude that those comparables are "better" than the three chosen by the appraiser, and thus no basis to criticize the appraiser's credibility for reaching a PPSF value estimate above the average of that for Dr. Kilpatrick's comparables.  Moreover, the comparables relied on by the appraiser appear to have been reasonable selections and resulted in a conclusion of value for the subject (including PPSF) that was within the range of the nine comparables produced by Dr. Kilpatrick.  The example shows that this question, which removes any judgment from the assessment of the original appraisal, results in Dr. Kilpatrick failing an appraisal without any basis to believe the appraiser deviated from USPAP.

- **NHELI_2006_FM2_2002122939 –** ████████:  The appraisal, which has an effective valuation date of ████████, is based on the analysis of five comparable sales that sold for prices ranging from $115 to $146 per square foot, averaging $129 per square foot.  The sale dates of the comparables ranged from May 2005 to November 2006.  Gross adjustments to the comparables ranged from 3% to 9%.  The concluded value reported in the appraisal is $128 per square foot.[305]

  The eight comparables researched by Dr. Kilpatrick's team, one of which was the same as one of the comparables used in the original appraisal, ranged from $99 to $149 per square foot, averaged $119 per square foot and had prices ranging from $████ to $████.[306]  Here again, Dr. Kilpatrick provides no basis to conclude that those comparables are "better" than the five chosen by the appraiser, and thus no basis to criticize the appraiser's credibility for reaching a PPSF value estimate above the average of that for Dr. Kilpatrick's comparables.

- **NAA_2005_AR6_1001902888 –** ████████:  The appraisal, which has an effective valuation date of ████████, is based on the analysis of three comparable sales that sold for prices ranging from $252 to $301 per square foot, averaging $284 per square foot.  The sale dates of the comparables ranged from December 2004 to April 2005.  Gross adjustments to the comparables ranged from 5% to 12%.  The concluded value reported in the appraisal is $219 per square foot.[307]

  The seven comparables researched by Dr. Kilpatrick's team, none of which were the same as those used in the original appraisal, ranged from $227 to $330 per square foot, averaged $258 per square foot and had

---

[304] Kilpatrick Adherence Report, Exhibit 4-5a – Completed Inspection Forms
[305] DX-2686 (Appraisal Report: NHELI_2006_FM2_2002122939).
[306] Kilpatrick Adherence Report, Exhibit 4-5a – Completed Inspection Forms
[307] DX-2656 (Appraisal Report: NAA_2005_AR6_1001902888).

prices ranging from $██████ to $██████.[308]  Here again, Dr. Kilpatrick provides no basis to conclude that those comparables are "better" than the three chosen by the appraiser, and thus no basis to criticize the appraiser's credibility for reaching a PPSF value estimate above the average of that for those "comparables."

    **30.**    **CAM Question 30 – Was the average site square footage ("SSF") of the comparables used in the appraisal report less than or equal to the average SSF of the comparables available in the market at the time of the appraisal?**

238.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 5.015. In total, Dr. Kilpatrick has found that 82 of the 205 appraisals at issue did not meet this criterion.

239.    CAM Question 30 is not based on a USPAP requirement.  This question was used by Dr. Kilpatrick to evaluate "violations of Standards Rules 1-4(a) and 1-6(a)."[309]  He states, "A negative answer to this assessment question also suggests bias in a manner that violates the Ethics Rule."[310]  As with Question 29, USPAP has no requirement that the average SSF of the comparables in the appraisal report not exceed the average SSF of the comparables available in the market at the time of the appraisal. In fact, there is no mention of the term "average site square footage" anywhere in USPAP.

240.    Appraisers consider a variety of factors in addition to site size when selecting comparables, which include location, sale date, style, home size, number of rooms, condition, and age, among other factors.  Although Dr. Kilpatrick considers site size "among the most important motivations," making it the subject of one of his 31 CAM questions, it is not among the eight criteria that he gave as part of his Greenfield Advisors Residential Data Form

---

[308] Kilpatrick Adherence Report, Exhibit 4-5a – Completed Inspection Forms
[309] *Id.*
[310] *Id.*

Protocol,[311] all of which are listed earlier in this Section.  Nor did Dr. Kilpatrick include site size among the criteria given to his research team to be considered in their research of comparables available in the market at the time of the appraisal.

241.    With this question, Dr. Kilpatrick gives no consideration to the SSF of the property that is the subject of the appraisal. In my experience, comparables are always selected based on their similarity to the subject, not based on their similarity to the comparables available in the market at the time of the appraisal. The framework for this question is therefore invalid because it is unrelated to assessing what an appraiser should have done to comply with USPAP.

242.    My analysis of the 82 appraisals that Dr. Kilpatrick failed on this question revealed that for 26 of the appraisals (summarized below) the difference between the average SSF of the comparables used in the appraisal and the comparables developed by his team was less than 500 square feet, with 13 of them having differences of less than 250 square feet.  Dr. Kilpatrick even failed appraisals where the differences were 2 square feet.  In addition, one of the appraisals was incorrectly failed, as the average SSF of the comparables in the appraisal was 4,269 square feet versus Dr. Kilpatrick's average of 4,572 square feet (303 square feet less).  In my experience, even if this metric were a meaningful way to assess appraisals (it is not), minor differences such as those described below would not be meaningful.

**Table 5: Summary of Differences between Averages (SSF)**

| Global Loan Number | Appraisal SSF | Valocity SSF | Δ SSF |
|---|---|---|---|
| NHELI_2006_HE3_2002174569 | 4,269 | 4,572 | -303 |
| NHELI_2006_FM1_2002238583 | 1,787 | 1,785 | 2 |
| NHELI_2007_3_2001858026 | 6,081 | 5,955 | 126 |
| NHELI_2007_1_2002202439 | 2,493 | 2,352 | 141 |
| NHELI_2007_2_2002209146 | 2,323 | 2,178 | 145 |

---

[311] *Id.*, Appendix 4-2 Greenfield Advisors Residential Data Inspection Protocol

| Global Loan Number | Appraisal SSF | Valocity SSF | Δ SSF |
|---|---|---|---|
| NHELI_2006_FM2_2002122939 | 10,890 | 10,727 | 163 |
| NHELI_2006_HE3_2002235924 | 4,211 | 4,045 | 166 |
| NHELI_2007_3_2002209763 | 5,953 | 5,769 | 184 |
| NHELI_2006_FM2_2002014208 | 10,655 | 10,454 | 200 |
| NHELI_2006_FM2_2001911867 | 1,127 | 920 | 207 |
| NAA_2005_AR6_1002171703 | 5,544 | 5,332 | 212 |
| NHELI_2006_FM1_2002167725 | 9,583 | 9,365 | 218 |
| NAA_2005_AR6_1001976406 | 6,389 | 6,161 | 228 |
| NHELI_2007_2_2002148962 | 4,288 | 4,000 | 288 |
| NHELI_2007_2_2002212289 | 12,503 | 12,197 | 307 |
| NHELI_2007_3_2001932287 | 9,431 | 9,111 | 320 |
| NHELI_2007_1_2002012241 | 7,391 | 7,061 | 331 |
| NAA_2005_AR6_1001904846 | 8,300 | 7,945 | 355 |
| NAA_2005_AR6_1001918585 | 4,583 | 4,172 | 412 |
| NHELI_2006_HE3_2002236172 | 7,978 | 7,560 | 419 |
| NHELI_2006_FM2_2002233153 | 3,558 | 3,139 | 419 |
| NHELI_2006_FM2_2001905120 | 8,488 | 8,069 | 419 |
| NAA_2005_AR6_1001904135 | 3,753 | 3,327 | 426 |
| NHELI_2006_FM1_2001902640 | 4,575 | 4,139 | 436 |
| NHELI_2007_2_2002131807 | 6,212 | 5,733 | 479 |
| NHELI_2006_FM1_2002169147 | 2,233 | 1,742 | 491 |

243.    In addition, Dr. Kilpatrick applied his method in an unreliable manner.  For example, for NHELI_2006_HE3_2002174569, the subject site is reported by the appraiser to be ▮ acre (▮ ± square feet) and the comparables relied on in the appraisal range from ▮ to ▮ (▮ ± square to ▮ ± square feet) acre and average 0.09 acre (4,269± square feet).[312] The comparables identified by Dr. Kilpatrick's research team range from ▮ to ▮ square feet and actually have an average SSF (4,572 square feet) that is higher than that of the comparables used in the original appraisal.  Thus, Dr. Kilpatrick wrongly failed this appraisal on this question.

---

[312] DX-2696 (Appraisal Report: NHELI_2006_HE3_2002174569).

244.    Finally, an example of a "failing" appraisal demonstrates the illogical nature of Question 30 as a test of credibility.  The appraisal for NHELI_2006_HE3_2001916016, which has an effective valuation date of ███████ and a site square footage of █████ square feet, is based on the analysis of six comparables with site square footages ranging from █████ square feet to █████ square feet, averaging 9,656 square feet.  The sale dates of the comparables ranged from April 2005 to July 2005.  Gross adjustments to the comparables ranged from 1% to 8%. The concluded value reported in the appraisal is $185,000.[313]

245.    The seven comparables researched by Dr. Kilpatrick's team, none of which were the same as those used in the original appraisal, ranged in site size from █████ to █████ square feet, averaging 6,098 square feet, and were priced from $██████ to $██████.[314]  Dr. Kilpatrick provides no basis to conclude that his comparables were "better" than the appraiser's comparables.  In fact, the subject site was more than 3,000 square feet larger than the largest comparable selected by Dr. Kilpatrick.  By contrast, the comparables relied on by the appraiser appear to have been reasonable selections and resulted in a conclusion of value for the subject that was actually at the low end of the range of the comparables produced by Dr. Kilpatrick.

**31.    CAM Question 31 – Was the average gross living area ("GLA") of the comparables used in the appraisal report less than or equal to the average GLA of the comparables available in the market at the time of the appraisal?**

246.    Based on Dr. Kilpatrick's CAM methodology, appraisals that did not satisfy this Question were given a score of 4.640.  In total, Dr. Kilpatrick has found that 76 of the 205 appraisals at issue did not meet this criterion.

---

[313] DX-2692 (Appraisal Report: NHELI_2006_HE3_2001916016).
[314] Kilpatrick Adherence Report, Exhibit 4-5a – Completed Inspection Forms

247.    CAM Question 31 is not based on a USPAP requirement.  This question was

purportedly "derived from Standards Rules 1-4(a) and 1-6(a)."[315]  He states, "A negative answer

to this assessment question has an indirect and modest-magnitude impact on value."[316]  As with

Questions 29 and 30, USPAP has no requirement that the average GLA of the comparables in the

appraisal report not exceed the average GLA of the comparables available in the market at the

time of the appraisal.  In fact, there is no mention of the term "gross living area" anywhere in

USPAP.

248.    My analysis of the 76 appraisals that Dr. Kilpatrick failed on this question

revealed that for 41 of the appraisals (summarized below) the difference between the average

GLA of the comparables used in the appraisal and the comparables developed by his team was

less than 100 square feet, with 21 of them having differences of less than 50 square feet.  Dr.

Kilpatrick even failed appraisals where the differences were 1, 10, 13, 18 and 19 square feet.  In

addition, one of the appraisals was incorrectly failed.  In my experience, even if this metric were

a meaningful way to assess the credibility of appraisals (it is not), minor differences such as

those described below would not be meaningful.

**Table 8: Summary of Differences between Averages (GLA)**

| Global Loan Number | Appraisal GLA | Valocity GLA | Δ GLA |
|---|---|---|---|
| NHELI_2006_FM2_2001905905 | 1,725 | 1,756 | -31 |
| NAA_2005_AR6_1002077915 | 3,098 | 3,097 | 1 |
| NHELI_2007_2_2001930340 | 1,118 | 1,108 | 10 |
| NHELI_2006_FM2_2001908585 | 1,330 | 1,317 | 13 |
| NAA_2005_AR6_1001904846 | 1,241 | 1,228 | 13 |
| NHELI_2006_HE3_2002235895 | 1,048 | 1,030 | 18 |
| NHELI_2006_FM2_2001985635 | 1,867 | 1,848 | 19 |
| NHELI_2006_FM2_2001911867 | 1,087 | 1,065 | 21 |

---

[315] *Id.*
[316] *Id.*

| Global Loan Number | Appraisal GLA | Valocity GLA | Δ GLA |
|---|---|---|---|
| NHELI_2007_2_2002131318 | 1,313 | 1,291 | 22 |
| NHELI_2006_FM2_2002232209 | 984 | 960 | 24 |
| NHELI_2007_2_2002182248 | 1,240 | 1,215 | 25 |
| NHELI_2007_2_2002010004 | 2,321 | 2,294 | 27 |
| NHELI_2007_3_2002131594 | 1,216 | 1,186 | 30 |
| NAA_2005_AR6_1001976362 | 1,095 | 1,062 | 33 |
| NHELI_2006_FM2_2001987014 | 1,282 | 1,247 | 35 |
| NAA_2005_AR6_1002111410 | 1,716 | 1,679 | 37 |
| NHELI_2006_FM2_2002122939 | 1,793 | 1,756 | 37 |
| NHELI_2006_FM2_2001905280 | 2,220 | 2,180 | 40 |
| NHELI_2006_HE3_2002236172 | 865 | 818 | 46 |
| NHELI_2006_FM1_2002233784 | 1,323 | 1,276 | 47 |
| NHELI_2006_HE3_2002235729 | 1,318 | 1,270 | 48 |
| NHELI_2007_2_2001855985 | 2,999 | 2,949 | 50 |
| NHELI_2006_HE3_2001846452 | 1,221 | 1,170 | 52 |
| NHELI_2006_FM2_2002174323 | 1,652 | 1,598 | 54 |
| NHELI_2006_HE3_2001846528 | 1,320 | 1,261 | 58 |
| NHELI_2007_3_2002239228 | 1,036 | 975 | 61 |
| NHELI_2007_3_2002021913 | 1,647 | 1,583 | 64 |
| NHELI_2007_1_2002019140 | 1,339 | 1,271 | 67 |
| NHELI_2007_1_2001856495 | 1,481 | 1,405 | 76 |
| NAA_2005_AR6_1002235651 | 3,534 | 3,454 | 80 |
| NHELI_2006_HE3_2002121884 | 1,067 | 987 | 80 |
| NAA_2005_AR6_1001831518 | 2,067 | 1,986 | 80 |
| NHELI_2006_HE3_2002003797 | 1,395 | 1,312 | 83 |
| NHELI_2007_3_2002015215 | 1,167 | 1,084 | 83 |
| NHELI_2006_HE3_2002002123 | 1,013 | 928 | 85 |
| NHELI_2007_1_2001929177 | 1,957 | 1,870 | 87 |
| NHELI_2007_1_2002011212 | 1,853 | 1,760 | 92 |
| NHELI_2007_1_2002012241 | 1,813 | 1,719 | 94 |
| NHELI_2006_HE3_2002173834 | 1,981 | 1,886 | 95 |
| NHELI_2007_2_2002131807 | 1,043 | 946 | 97 |
| NHELI_2006_FM1_2002194992 | 1,166 | 1,069 | 97 |

249.    Examples of how Dr. Kilpatrick applied Question 31 demonstrate that it is not a meaningful test of appraisal credibility.



- **NHELI_2006_FM2_2002122939 –** ▮▮▮▮▮: The appraisal, which has an effective valuation date of ▮▮▮▮, reports a gross living area of ▮▮▮ square feet and is based on the analysis of five comparable sales with gross living areas ranging from ▮▮▮ to ▮▮▮ square feet, averaging

1,793 square feet. The sale dates of the comparables ranged from May 2005 to February 2006. All five comparables were adjusted to equate them to the subject, but no gross adjustment exceeded 9%; and the adjusted range of the comparables was $███████ to $███████ The concluded value reported in the appraisal is $237,000 ($128 per square foot).[317]

The eight[318] comparables provided by Dr. Kilpatrick's team, only one of which was the same as those used in the original appraisal, ranged in gross living area from ██████ to ██████ square feet, averaged 1,755 square feet and ranged in price from $██████ to $██████.[319] Dr. Kilpatrick provides no basis to conclude that his comparables were "better" than the appraiser's. In fact, the comparables relied on by the appraiser appear to have been reasonable selections and resulted in a conclusion of value for the subject that was within the range of the comparables produced by Dr. Kilpatrick. Moreover, the average GLA of the appraiser's comparables was less than the GLA of the subject property. The example shows that this question, which removes any judgment from the assessment of the original appraisal, produces flawed results with respect to assessing credibility.

- **NHELI_2007_2_2001930340 –** ████████████:  The appraisal, which has an effective valuation date of ████████, reports a gross living area of ██████ square feet and is based on the analysis of three comparable sales with gross living areas ranging from ████ to ████ square feet, averaging 1,118 square feet.  The sale dates of the comparables ranged from September 2005 to March 2006.  All three comparables were adjusted to equate them to the subject, but no gross adjustment exceeded 4%. The concluded value reported in the appraisal is $████████ ($114 per square foot).[320]

The nine comparables provided by Dr. Kilpatrick's team, only one of which was the same as those used in the original appraisal, ranged in gross living area from ██████ to ██████ square feet, averaging 1,108 square feet and ranged in price from $██████ to $██████.[321]  Again, Dr. Kilpatrick provides no basis to conclude that his comparables were "better" than the appraiser's.  In fact, the comparables relied on by the appraiser appear to have been reasonable selections and resulted in a conclusion of value for the subject that was within the range of the comparables produced by Dr. Kilpatrick.  The example shows that this question, which removes any judgment from the assessment of the original appraisal, produces flawed

---

[317] DX-2686 (Appraisal Report: NHELI_2006_FM2_2002122939).
[318] The database file provided by Dr. Kilpatrick, which reflects the Greenfield Data Form research, reflects eight comparable sales, while the Greenfield Data Form reflects nine sales. My analysis is based on the average of the eight sales in the database.
[319] Kilpatrick Adherence Report, Exhibit 4-5a – Completed Inspection Forms
[320] DX-2713 (Appraisal Report: NHELI_2007_2_2001930340).
[321] Kilpatrick Adherence Report, Exhibit 4-5a – Completed Inspection Forms

results with respect to assessing credibility.  This example also demonstrates that Dr. Kilpatrick's methodology does not recognize and properly handle a small difference between the averages. In my experience, a size difference of 10 square feet (0.9%) between a subject and a comparable property is negligible and would not warrant an adjustment.  Such a slight difference is not a reasonable basis for concluding that a comparable is inappropriate for the valuation of the subject property.

250.    Finally, Dr. Kilpatrick's methods were again unreliable, in that for one appraisal, NHELI_2006_FM2_2001905905, he answered Question 31 incorrectly.  The subject's GLA is reported by the appraiser to be ▮ square feet and the comparables relied on in the appraisal range from ▮ to ▮ square feet and average 1,725 square feet.[322]  The comparables identified by Dr. Kilpatrick's research team range from ▮ to ▮ square feet and actually have an average GLA (1,756 square feet) that is higher than that of the comparables used in the original appraisal. Thus, Dr. Kilpatrick wrongly failed this appraisal on this question.

## VII.    THE APPRAISAL-RELATED FINDINGS IN MR. HUNTER'S REPORT ARE INACCURATE AND DO NOT DISCREDIT THE ORIGINAL APPRAISALS.

251.    Mr. Hunter's re-underwriting review included "a collateral review to determine whether the mortgaged property was appraised in accordance with the underwriting guidelines and minimum industry standards."[323]

252.    From his collateral review, Mr. Hunter concludes that several of the Nomura loans at issue contain appraisal-related defects.  I have examined 16 of the loans which Mr. Hunter's claims are associated with real estate appraisal practices.  I have reviewed Mr. Hunter's findings and have found that in all 16 instances, the supposed requirements that led to Mr. Hunter's conclusions were not real requirements with regard to industry practice and were not consistent with USPAP standards.  Most of Mr. Hunter's defect claims can be classified into two

---

[322] DX-2683 (Appraisal Report: NHELI_2006_FM2_2001905905).
[323] Hunter Report, pp. 98-99

categories—claims that the property value was not supported, and claims that the appraisal was not "qualified"—and I respond to those categories below.

### A.    Mr. Hunter's Claims That Appraisals Did Not Support the Property Value Conclusion

253.    I group into this category claims by Mr. Hunter that an appraisal failed to support the value conclusion in accordance with USPAP.  Out of the 16 appraisals I have reviewed with Mr. Hunter's claims, he identifies 9 appraisals in which he concludes that the appraiser failed to adequately support the value conclusion.  Mr. Hunter's reasons for criticizing appraisals vary from not including sufficient support and explanation regarding a prior sale (versus the subject's appraised value) to unsupported opinion of marketing time and a failure to report accurate market conditions.[324]

254.    Based on my review, all of Mr. Hunter's allegations are unsupported.  The following are examples of Mr. Hunter's unsupported claims.

- **NHELI_2006_FM1_2001902449 –** ▮▮▮▮▮▮:  Mr. Hunter claims that "[t]he guidelines state, the underwriter must address marketing time and supply and demand for the subject property. Properties with prolonged marketing time of over 6 months require additional information; the underwriters failed to request or obtain the necessary documentation."[325]

    From an appraisal perspective, there is no USPAP requirement that the appraiser specifically address marketing time at the time that the appraisal is completed. To the contrary, the form for appraisals merely contains a check box for likely marketing time, and no more is required.

    In any event, Mr. Hunter's finding is erroneous. The appraisal indicates a marketing time of three to six months. Further, the report indicates that the neighborhood is over 75% built up, property values are increasing, growth is stable, and vacancies are in the range of 0 to 5%. These indicators, along with the appraiser's statement that "general market conditions

---

[324] *Id.*
[325] Hunter Supplemental Report, Exhibit 2A.

appear good in the subject's neighborhood," are consistent with the appraiser's estimated marketing time of 3 to 6 months.[326]

- **NHELI_2006_FM2_2002013777 –** ████████:  Mr. Hunter claims the appraiser did not sufficiently document and support the improvements to the property and their impact on value because "There was no documentation to support the improvements such as work orders, receipts, photos or a detail of how the improvements specifically supported the increase in value of $████ from ████████ to ████████; just over 3 months."[327]

  Mr. Hunter claims that the appraiser provided only "general comments," but this is untrue. The appraiser indicates that the subject was remodeled and specifically provides a representative listing of the improvements stating that "the property was upgraded with new carpet, new interior paint, tile flooring, remodeled baths, new kitchen oven/range, ceiling fans and covered porch."[328]  Contrary to Mr. Hunter's claim, the appraiser has provided more than adequate detail.

  It is not standard practice, nor is it a USPAP requirement, that an appraiser request and obtain actual receipts and documentation specific to improvements that may have been made to a property. Further, it is also not typical for the individual completing the work to provide this documentation. The impact on value attributable to any improvement is typically considered by the appraiser in the formation of an opinion of value. It is important to note that the value contribution of an improvement to a property may or may not equal its cost; as such, the actual amount spent is actually less relevant than the appraiser's judgment of what a willing buyer might be willing to pay for an improvement.

  As part of the appraisal process, the current condition of the subject, including any improvements, relative to comparable properties, is considered in the sale comparison approach.

  Mr. Hunter's decision to judge the appraised value to be unsupportable based on the lack of documentation regarding the renovations does not follow standard USPAP practice and is an unreasonable standard by which to judge the appraisal; further, his observations are inconsistent with the information that is reported in the appraisal.

- **NHELI_2007_1_2002019140 –** ████████:  Mr. Hunter claims the final value in this appraisal was not accurately supported. He writes:

---

[326] DX-2669 (Appraisal Report: NHELI_2006_FM1_2001902449).
[327] Hunter Supplemental Report, Exhibit 2A
[328] DX-2685 Appraisal Report: NHELI_2006_FM2_2002013777

The origination appraisal reflected a final value of $▮ and was not accurately supported in the appraisal. The Borrower purchased the property 06/2006, 3 months prior to the subject closing, for $▮ or ▮ higher than the appraised value.[329] The appraiser commented on the renovations but there was no documented value of improvements.[330]

The appraiser reported a sale history for the subject property that includes a ▮ sale for $▮. Mr. Hunter takes issue with the fact that the property was valued at $170,000, ignoring the full renovation described in the report. All original components were replaced from the foundation up, as the property was completely gutted. The appraiser also completed a cost approach, in which the dwelling was valued at $▮, the appliances, fixtures and patio at $▮, and the garage/carport at $▮ for a total estimated new cost of $▮. Including the land, the total value indicated by the cost approach was slightly higher than the appraised value of $170,000.[331] Lastly, the appraised value appears to be well supported by the sale comparables provided.[332] Again, Mr. Hunter had no basis to judge the appraised value as unsupportable.

### B.   Mr. Hunter's Claims That Appraisals Were Not "Qualified Appraisals"

255.   Out of the 16 appraisals criticized by Mr. Hunter, he claims that the appraiser failed to obtain a qualified appraisal in 5.  He bases this type of claim on, for example, an appraiser's exclusion of the income approach or use of sale comparables that were more than six months old.[333]  Based on my review, however, all of these claims are also unfounded.

256.   In my experience, any approaches not used or relied upon by an appraiser are excluded because they are judged to be inapplicable.  An appraiser may state the reason for the exclusion of an approach to value, but the absence of an explanation does not, in and of itself, render a value unsupported or otherwise cast doubt on the credibility of an appraisal.

257.   Appraisers will ideally use the most recent comparables available; however, this is a general guideline, not a rule.  In some instances, the appraiser may need to extend the search

---

[329] I assume this percentage change has been calculated in error as $▮ is ▮ lower than $170,000.
[330] Hunter Supplemental Report, Exhibit 2A.
[331] DX-2705 (Appraisal Report: NHELI_2007_1_2002019140).
[332] DX-2705 (Appraisal Report: NHELI_2007_1_2002019140).
[333] Hunter Supplemental Report, Exhibit 2A.

beyond six months in order to capture comparable sales that reflect the major elements of
similarity to the subject (*i.e.*, location, age, style, etc.) that are considered most relevant in
developing an opinion of value.  In the event that there is a difference in market condition
between the valuation date and the date of a comparable sale, the appraiser will typically make
an adjustment to account for this difference.  In many cases, appraisers specifically indicate why
they selected a comparable that is more than six months old.  There is no USPAP requirement,
however, that a comparable must be less than six months old.[334]  The following examples
illustrate both the departure of Mr. Hunter's incorrect criterion from USPAP requirements and
the inconsistent and unfounded manner in which Mr. Hunter applies that criterion to the Nomura
appraisals.

- **NHELI_2007_1_2002237486 –** ▮▮▮▮▮▮▮: Mr. Hunter claims this
  appraisal lacks a required comparable rent schedule:

  For Non-Owner Occupied Properties a Single-Family Comparable Rent
  Schedule is required for all one-unit properties and an Operation Income
  Statement is required for all 1-4 unit properties. The appraisal provided
  was missing the Single-Family Comparable Rent Schedule and the
  Operating Income Statement.[335]

  The appraiser commented that, "The final reconciliation for this appraisal
  & it's intent have been completed within compliance of the Uniform
  Standards of Professional Appraisal Practice (USPAP) & the Office of the
  Controller of the Currency (OCC) minimum appraisal standards."[336]
  Additionally, the appraiser commented that, "The income approach is not
  applicable and, therefore, not used because single-family residences in the
  subject's neighborhood do not typically trade based upon their income
  generating ability."[337] The development of a rent schedule is not a USPAP
  requirement and is not reflective of standard appraisal practice.[338] Single-
  family properties are typically valued based on the sales comparison

---

[334] DX-2726 (USPAP 2005); DX-2727 (USPAP 2006).
[335] Hunter Supplemental Report, Exhibit 2A
[336] DX-2710 (Appraisal Report: NHELI_2007_1_2002237486).
[337] DX-2710 (Appraisal Report: NHELI_2007_1_2002237486).
[338] DX-2726 (USPAP 2005); DX-2727 (USPAP 2006).

approach because it is the most relevant indicator of value. For these reasons, Mr. Hunter's claim is incorrect.

- **NHELI_2007_2_2002180362 –** ███████████:  Mr. Hunter claims this appraisal did not meet USPAP requirements for selection of comparable sales:

  > The origination appraisal did not conform to USPAP and is therefore unacceptable to support the value conclusion. The USPAP required the comparable sales to have sale dates within the previous six months reflecting recent market activity. The appraisal, dated ████████, reflected a final value of $375,000, Comparable sale one sold on ████████, which was 18 months prior to the appraisal report date; however, the appraiser did not comment on the reasoning for exceeding the USPAP time of sale guideline of six months.[339]

  In fact, in this appraisal, the appraiser comments that, "After several market searches for similar homes, the appraiser has chosen the most appropriate & best home sales located within the Subject's same general market area. . .Sales 2 & 5 have closed around the past 6-7 months ago. Sales 1, 3, & 4 have closed over 1 year ago but deemed appropriate since the appraiser could not find very similar recently closed homes like the Subject-a remodeled older home, large garage/workshop, etc. . .The appraiser deemed it appropriate to consider time adjustments (based on a conservative 8% increase per annum) for all sales closing over 9 mos. ago."[340]

  In this situation, the lack of comparable data necessitated the appraiser's use of older comparable sales, which is detailed in the report, and the appraiser made adjustments to reflect changes in market conditions. It was not required under USPAP that the appraiser limit his or her search to 6 months, nor were comments or explanations required if the search was extended beyond 6 months. Even Dr. Kilpatrick's own protocols, which are detailed earlier in my report, provided his research team with a 12-month window to be used in their searches for neighborhood sales. The appraiser did not fail to comply with USPAP, as Mr. Hunter has alleged. Instead, the appraiser's comments indicate he exercised professional judgment in a manner consistent with USPAP requirements.

---

[339] Hunter Supplemental Report, Exhibit 2A.
[340] DX-2719 (Appraisal Report: NHELI_2007_2_2002180362).

## VIII.   CONCLUSION

258.   It is my opinion that the analysis documented in this testimony clearly establishes that the Credibility Assessment Model is flawed, unreliable, and has no basis in USPAP, and does not establish that the appraisals at issue in this Action were false or not believed by the appraisers at the time they were rendered.  The CAM also cannot be used to show that the appraisals did not conform to USPAP.  Finally, Mr. Hunter's findings as to appraisal issues are incorrect.

_____
Michael P. Hedden

SWORN to before me
this 20th day of February 2015

_____
Notary Public

MARION LINDA BLAU
MY COMMISSION EXPIRES
SEPT
24
2019
ID # 2229710
NOTARY PUBLIC, STATE OF NEW JERSEY

- 107 -