UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY, etc.,

         Plaintiff,

  v.

NOMURA HOLDING AMERICA, INC., et al.,

         Defendants.

11 Civ. 6201 (DLC)

### AMENDED AFFIDAVIT OF NICHOLAS DANTE LAROCCA

STATE OF NEW YORK    )
                                ) ss.:
COUNTY OF NEW YORK   )

       Nicholas Dante LaRocca, being duly sworn, testifies and says:

       1.     I was employed by defendant Nomura Securities International, Inc. ("Nomura Securities") from February 2001 to October 2006, and from October 2006 to May 2008 I was employed by Nomura Credit & Capital, Inc. ("NCCI"). I may hereafter refer to Nomura Securities and NCCI collectively as "Nomura," unless otherwise noted. I submit this affidavit for use as my direct testimony at the trial of this action.

       Background

       2.     I graduated from Muhlenberg College in 1978 with a B.A. in Political Science. After college, I enrolled in the J.D./M.B.A. program at New York University. I graduated from the New York University School of Law and the New York University School of Business in 1982.

3. From 1982 to 1991, I was employed by the law firm Thacher Profitt & Wood, LLP ("Thacher Proffitt & Wood") as an associate. During my first two years at Thacher Profitt & Wood, I worked in the litigation department with a focus on bankruptcy matters. In 1984, I moved to the securitization transactions group, where I practiced until I left the firm in 1991. The securitization transactions group at Thacher Profitt & Wood worked on different types of securitizations, including residential mortgage-backed securitizations. The basic concept of a residential mortgage-backed securitization, which I describe further below, is that residential mortgage loans are pooled together, and the payments from those loans are then distributed in a defined order of priority to investors who purchased certificates issued by the trusts holding the mortgage loans.

4. After I left Thacher Profitt & Wood in 1991, I was employed by Donaldson, Lufkin & Jenrette ("DLJ") from 1991 to 2000 as a Vice President and Principal. DLJ purchased and securitized loans, and my role was to work with outside counsel to acquire loans and other receivables, originate commercial loans, and prepare related offering documents for securitizations. DLJ merged with Credit Suisse in 2000, and I was employed by Credit Suisse from 2000 to 2001 in the same capacity.

5. When I left Nomura in 2008, I was employed by Centerline Capital Group from 2008 to 2010 as a Managing Director. At Centerline I worked primarily on commercial loan securitizations, collateralized loan obligations, and fund management. I was then employed by Flat 801 Management Company LLC from 2010 to 2012 as a Partner, where I worked primarily on commercial asset sales and advising with respect to commercial loan repositionings. I then joined BCG Partners in 2012 as a Managing Director in the Real Estate Capital Markets Group where I worked in a similar capacity. Since early September 2013, I have been employed

by Credit Suisse Securities (USA) LLC in the commercial finance group in connection with the origination and securitization of commercial mortgage loans.

6. I am admitted to the bars of New York and New Jersey. I am not currently practicing law in either jurisdiction.

Employment at Nomura

7. I was hired in 2001 to serve as a Managing Director at Nomura Securities. I was one of many Managing Directors at Nomura Securities, and I had no power to control its management or operations. During my employment at Nomura, I served as the head of the Transaction Management Group, which was responsible for negotiating the documentation involved in purchasing and securitizing mortgage loans, including commercial and residential mortgage loans. My role was to oversee the securitization process and supervise the preparation of the legal documents associated with securitization transactions. I also directly supervised the members of the Residential Transaction Management Group and Commercial Transaction Management Group.[1] In or around October 2006, I became employed by a different Nomura entity, NCCI, but my titles and responsibilities did not change.

8. Nomura's securitization business was small when I joined in 2001. We purchased and securitized a limited amount of residential loans at that time and my focus was primarily on origination and securitization of commercial mortgage loans. I recall that NCCI gradually made some effort to participate in the residential mortgage loan market in the period between 2001 and 2004, although we remained a small player. In 2004, Nomura directed more resources to the Residential Mortgage Group, and we began to hire dedicated employees with

---

[1] I understand that John Graham, who was the head of the Residential Transaction Management Group from April 2005 to October 2007, is submitting an affidavit as direct testimony in this action and will provide a more detailed account of the role and responsibilities of the Transaction Management Group.

experience in purchasing and securitizing residential mortgage loans. These employees included Brett Marvin, Steve Katz, Brian Murphy, and Randall Lee, who had experience with analyzing, purchasing, and securitizing residential mortgage loans; and Jeffrey Hartnagel, who had experience performing due diligence on residential mortgage loans. John Graham was hired in April 2005 and had experience working with residential mortgage-backed securities and led the Residential Transaction Management Group. I directly supervised Mr. Graham. The Residential Mortgage Group was headed by Mr. Marvin and Donald McCabe.

9. As the head of the Transaction Management Group, I assisted Nomura's outside counsel in preparing legal documents relating to the process of purchasing mortgage loans and securitizing them. We frequently worked with the law firm Thacher Proffit & Wood, which was one of the leading firms in the field of residential securitization and had significant experience working on mortgage backed-securities transactions. The lead lawyers from Thacher Proffitt & Wood working on our securitizations were most frequently Serena Mentor and Steve Kudenholdt, and others included Timothy Crowley (who then joined Nomura in mid-2006), Sarah Nelson, and Amy Lambert.

10. During the 2005 to 2007 time period, I was also the President and Chief Executive Officer of Nomura Home Equity Loan, Inc. ("NHELI"). NHELI was a special purpose bankruptcy-remote entity established for the sole purpose of acquiring mortgage loans and depositing them into trusts that were created for the purpose of issuing securities called mortgage pass-through certificates. I explain the role and function of NHELI in greater detail below.

The Residential Mortgage Loan Platform

11. Nomura's residential mortgage loan platform purchased and securitized primarily Alt-A and subprime loans. The term platform, as I use it, refers to the operation of purchasing mortgage loans and then creating securitizations backed by the mortgage loans. A mortgage loan is a loan that is secured by a property, meaning that if the borrower fails to repay the loan, the lender can sell the property to repay the remaining balance of the loan. A residential mortgage is a loan secured by residential property.

12. Mortgage loans were grouped into three main categories: prime, Alt-A and subprime. There was no precise industry definition of those terms or dividing lines between those three groups. A prominent factor in characterizing a loan as prime, Alt-A, or subprime was the FICO credit score of the borrower. Subprime loans are loans extended to borrowers who have lower FICO scores and therefore have a greater risk of defaulting on the loan than Alt-A and prime borrowers; Alt-A loans fall between subprime and prime. In addition, borrowers who took out Alt-A loans typically provided less supporting documentation regarding their income or assets than other types of borrowers. Alt-A and subprime loans often take into account other mitigating factors to offset variances from guidelines applicable to prime or other loans.

13. NCCI purchased residential mortgage loans from mortgage loan originators for the purpose of securitizing them. An originator is the company that provides loans to borrowers. The process of evaluating a potential borrower for a mortgage is called underwriting. Underwriters use "underwriting guidelines" to assist them in evaluating whether a borrower qualifies for a mortgage. An originator typically has its own set of underwriting guidelines.

14.     Originators offered to sell pools of mortgages that they had originated. These pools of mortgages varied greatly in size, as measured by the aggregate dollar amount of the outstanding principal balance of all the loans in the pool.  The Residential Mortgage Group classified pools of loans as either mini-bulk or bulk based on the size of the pool.  Mini-bulk typically referred to pools with under $25 million in unpaid principal balance, and bulk typically referred to pools with $25 million or more in unpaid principal balance.

15.     NCCI purchased loans only from originators that it had reviewed and approved.  Multiple groups at NCCI were involved in the review of an originator, including the Origination and Sales Desk, the Corporate Credit Department, the Trading Desk, and the Credit Group, also known as the Due Diligence Group.  The Corporate Credit Department took the lead on these reviews, which involved a review of the originator's processes, practices, management, assets, liabilities, and loan production.  In most instances, NCCI's review of an originator included an on-site visit to the originator where NCCI personnel assessed the originator's loan origination practices first-hand.

16.     Nomura bought pools of loans through a competitive bidding process typically involving 10 – 20 competing programs sponsored by banks, investment banks, investment funds and others.  The process began when an originator contacted a salesperson working on the Origination and Sales Desk about a pool of loans it was offering for sale.  The Origination and Sales Desk (also sometimes called the Sales Coverage Desk or Sales Group) was a group within the Residential Mortgage Group that maintained relationships with originators.  The originator then sent the information about the offer and bidding process—for example, the date bids were due—with a loan tape, which was a spreadsheet that provided data on the characteristics of each loan in the offered loan pool.  Common data points included on the loan

tape were the loan type (fixed rate or adjustable rate), interest rate (and any adjustment features), original and unpaid principal balance, borrower's FICO score, the mortgaged property's appraised value, whether the borrower had stated in the application an intent to live in the property, the borrower's income, whether the loan had a pre-payment penalty (a fee charged for early payment of the mortgage), and the documentation type. The salesperson forwarded this information to the Trading Desk, which was the group responsible for working with employees called collateral analysts to analyze the data in the loan tape and deciding whether and how much to bid on the pool.

17. After Nomura received the loan tape, but before submitting its bid on the pool, collateral analysts conducted an extensive review of the data contained in a loan tape. The collateral analyst's review consisted of what we called "edit checks." This was a standard process to ensure that the data on a loan tape was complete and consistent. The edit checks included, among many other things, checking to make sure that the debt-to-income ratios ("DTI") and loan-to-value ("LTV") ratios were properly calculated. The collateral analysts used the information in the loan tapes to create reports to send to the traders on the Trading Desk. The reports—which we commonly called stratifications, or "strats," because they stratified the characteristics of the loans into tables—assisted the traders in understanding the characteristics of the loans in the trade pool they were bidding on. A collateral analyst also loaded the data from the loan tapes into a central database, which included information about each loan that Nomura considered for purchase. The database was updated as more information about each loan became available during the acquisition, due diligence and securitization process.

18. The traders used the information provided by the collateral analysts to evaluate and price pools of loans. The traders used models to predict how the loans in a pool

might fit into a securitization. Predicting how the loans might fit into a securitization allowed the traders to estimate what investors would be willing to pay for the loans when securitized. The traders were thus able to use the expected value of the pool in a securitization to formulate a proposed bid for the pool of loans.

19.     When the traders sent in their bid, it was Nomura's practice to also send originators a set of bid stipulations, which was a list of loan characteristics that NCCI did not want included in the pool even if the loan fully complied with the originator's underwriting guidelines.

20.     If NCCI won a pool of loans, the next step in the process was a due diligence review. NCCI's purchase of any loans in a pool was always contingent on the completion of due diligence to its satisfaction.

21.     Nomura's due diligence process was a multi-step process that included property valuation due diligence, credit and legal compliance due diligence, and collateral due diligence. I understand that my former colleagues Joseph Kohout, who served as head of the Nomura due diligence group, known as the Credit Group, from August 2002 to July 2006, and Neil Spagna, who served as head of the Credit Group from July 2006 to November 2007, are submitting affidavits as direct testimony in this action and will provide a more detailed account of the due diligence process. Because the Credit Group reported to me (first directly and later through Mr. Graham, who reported directly to me), I was aware of its practices and procedures and I regularly spoke with the Credit Group employees about how to best resolve issues or implement improvements. I regularly saw reports summarizing the work of our third party diligence vendors, as well as originator reviews, which Nomura employees prepared as part of the process for establishing new relationships with originators.

22. In brief, as part of the due diligence process Nomura reviewed the loans in a pool and checked whether certain characteristics of those loans were accurate as of the time of origination. After the due diligence process was complete, Nomura generally purchased certain loans from the pool, while declining to purchase other loans that had material issues identified during the due diligence process—for example, loans that did not fit within the originator's underwriting guidelines or loans that violated Nomura's bid stipulations.

23. Performing due diligence before the actual purchase of a pool of loans—the point at which NCCI actually paid for the loans—was standard practice in the mortgage loan securitization industry. I was in the mortgage securitization industry for many years before I joined Nomura, and the standard practice was always to perform due diligence prior to the purchase of loans—and for good reason. The originator selling the pool of loans had a much greater incentive to work with Nomura to try to resolve any solvable problems, like a missing document in the loan file, while the purchase was pending. The fact that the transaction had yet to close also meant that NCCI had the right to refuse to purchase loans—called "kick-outs"—that NCCI had identified as not complying with the originator's underwriting guidelines or Nomura's bid stipulations or raising issues concerning valuation of the collateral property. NCCI often exercised that right by "kicking out" loans that it did not want to purchase.

24. In fact, it did not make sense to conduct more due diligence after purchasing a pool of loans, for several reasons. First, the due diligence process conducted prior to purchase to evaluate a pool covered the relevant areas to be considered. These characteristics did not change after origination or purchase (other than, possibly, delinquency, which we continued to monitor). Second, the process of evaluating a loan for purchase was retrospective—we were assessing whether the loans were properly underwritten by the originator. Therefore, to

perform the same diligence again would have been duplicative, as we were assessing primarily characteristics at origination. Third, we were confident that the pools of loans we purchased following the completion of the due diligence process were free of loans which were delinquent or unacceptable.

25.     Moreover, the due diligence NCCI conducted during the loan acquisition process evaluated the same loan characteristics that Nomura made representations about in the prospectus supplements. A prospectus supplement is a document prepared for investors that contains information about the securitization, including the deal participants, the certificates and collateral pool (*i.e.*, the underlying mortgage loans), as well as disclosures about risks involved with investing in the securitization. While there were some exceptions, such as a loan's unpaid principal balance and payment status as of the "Cut-off Date" for a securitization—in the case of the Nomura securitizations, 30 days prior to the date on which the securitization was finalized— much of the loan information disclosed in the prospectus supplements related to loan characteristics at the time of origination. Nomura's due diligence evaluated the information about the loans at the time of origination, and this information would not have changed between acquisition of the loans and securitization. To my knowledge, no one in the industry performed additional post-purchase due diligence during the period 2005 to 2007. Nor did Freddie Mac or Fannie Mae, who regularly invested in securitizations Nomura issued and understood that Nomura conducted pre-purchase due diligence, ever raise the timing of Nomura's due diligence process as an area of concern.

26.     In addition to due diligence on the loans, Nomura also had a thorough process in place for checking the numerical information in the prospectus supplements. Nomura's collateral analysts and the accounting firm Deloitte & Touche LLP ("Deloitte")

checked that the numerical information in the prospectus supplements matched the information in Nomura's central database, which was updated with the results of due diligence. I understand that the affidavit of Randall Lee, who was at one point a collateral analyst, explains the process for checking the collateral information in the offering documents.

Securitization of Residential Mortgage Loans

27. A securitization is a financial structure in which loans are grouped together, and the right to the payments of principal and interest from the mortgage borrowers are sold to investors. The cash coming in from the loans in the pool backing a securitization is distributed to investors based on relative payment priority. Certain investors would receive payments before other investors, depending on which portion or "tranche" of the securitization they purchased. I understand that the affidavit of my former colleague Randall Lee provides a more detailed explanation of how the securitizations at issue were structured and concepts such as subordination and credit enhancement.

28. I worked with outside counsel—typically Thacher Profitt & Wood—to prepare the legal documents for NCCI's securitizations. Each securitization required contracts and other legal documents setting out the rights and responsibilities of the parties involved in a securitization regarding the mortgage loans and the flow of money from the mortgage borrowers through to the investors. Two of the legal documents we helped prepare were the Purchase Agreement, which governs the transfer of mortgage loans from the sponsor to the depositor (the special purpose entity), and the Pooling and Servicing Agreement, which creates the trust and defines the rights and responsibilities with respect to the mortgage loans once they've been transferred to the mortgage trust.

29. Establishing a securitization is a multi-step process that involves various entities, including the sponsor, the depositor, and a trust created specifically for the securitization. The sponsor is the entity in a securitization that purchases the mortgage loans that back the securitization. NCCI served as the sponsor for the seven securitizations at issue in this action. The depositor is a special purpose entity that exists for the sole purpose of isolating mortgage loans from the claims of creditors other than certificate holders and depositing them into a securitization trust.[2] The securitization trust is an entity that is created specifically for a securitization—it is the legal owner of the mortgage loans once the securitization is established, and, through a trustee, distributes the payments from the mortgage loans to investors.

30. Pursuant to the Purchase Agreement and the Pooling and Servicing Agreement, the sponsor transfers the mortgage loans underlying the securitization to the depositor. The depositor then transfers the mortgage loans to the securitization trust in exchange for certificates issued by the trust, which are securities that entitle the holder to payments from the mortgage loans in the securitization trust. The depositor transfers the certificates to an underwriter to sell to investors. An underwriter is a financial institution or other company that is licensed to distribute securities to investors. Nomura Securities was the lead underwriter for NAA 2005-AR6 and NHELI 2006-FM1, and was the co-lead underwriter for NHELI 2006-HE3. Greenwich Capital Markets, Inc. was the lead underwriter for NHELI 2006-FM2, NHELI 2007-1, NHELI 2007-2, and was the co-lead underwriter for NHELI 2006-HE3. Lehman Brothers Inc. was the lead underwriter for NHELI 2007-3.

The Role of NCCI

---

[2] Nomura Asset Acceptance Corporation ("NAAC") was the depositor for NAA 2005-AR6 and NHELI was the depositor for NHELI 2006-FM1, NHELI 2006-HE3, NHELI 2006-FM2, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3.

31.     NCCI's primary roles in the securitization process were to purchase loans following due diligence; structure those loans into a securitization; and prepare offering materials describing the securitization.  NCCI had no involvement in the sale or marketing of the securitization certificates to investors, however; that was the role of Nomura Securities and third-party underwriters.  During the relevant period, NCCI was not the corporate parent of Nomura Securities, and it did not have the ability to direct or control the activities of Nomura Securities or its employees, including with respect to the sale of securitization certificates to investors.  NCCI also did not have the ability to direct or control the policies and procedures of Nomura Securities.

32.     Further, NCCI had no involvement in the issuance of the certificates that would be sold to investors, as this was a function of the securitization trusts, which were created by the depositor.  NCCI did not have the ability to direct or control the activities of Nomura's two special-purpose entities that served as the depositors for the seven securitizations at issue in this action: NAAC and NHELI.  Nor did NCCI direct or control the activities of the officers or boards of directors of those entities.  NCCI also did not have the ability to direct or control the policies and procedures of NAAC or NHELI.

### The Role of Nomura Home Equity Loan, Inc.

33.     As I stated above, I was the President and Chief Executive Officer of NHELI, one of the two special-purpose entities that served as a depositor for certain securitizations at issue in this case. We referred to NHELI as a special-purpose entity because NHELI existed for a single, limited purpose—to create securitizations. NHELI had a board of directors and officers, but it had no employees.

34.     In its role as depositor, NHELI received loans from NCCI, and then transferred the loans to a specially-created trust for the securitization. That trust would then issue certificates that were transferred to NHELI, which in turn transferred them to underwriters for sale to investors.

35.     NHELI had no involvement in the purchase of mortgage loans from loan originators, the structuring of those loans into securitizations, or the sale of the certificates from the securitizations to investors. In my role as the President and Chief Executive Officer of NHELI, I had no power to control or direct the actions of the Nomura employees who performed those activities. In my role as the President and Chief Executive Officer of NHELI, I also had no role in setting the policies and procedures of the Nomura entities involved in the purchase of loans, the creation of securitizations, or the sales of the certificates to investors, and had no ability to set or otherwise control the policies and procedures for those organizations.

### The Offering Documents for the At-Issue Securitizations

36.     In my capacity as President and Chief Executive Officer of NHELI, I signed two Registration Statements dated July 7, 2005 and February 28, 2006, Securities & Exchange Commission ("SEC") File Numbers 333-126435 and 333-132109. (DX-8, DX-12). A Registration Statement is a filing with the SEC that registers a securities offering. It is a type of

offering document that allows a financial institution to issue multiple securitizations up to a certain combined dollar amount before having to register again with the SEC.  For example, DX-14 is an Amended Registration Statement for NHELI dated April 13, 2006.  Page 2 shows that NHELI was registering $7 billion worth of future securitizations—in other words, after filing this Amended Registration Statement NHELI could issue as many securitizations as it wanted until the combined face value of those securitizations reached $7 billion, at which point NHELI would have to register with the SEC again.  The Registration Statements did not provide any details about the loans that would underlie future securitizations.  That information could only be disclosed later, when the securitizations were actually created; which loans would be included in a future securitization was not known at the time the Registration Statement was issued.  Detailed information about the loans underlying a securitization would later be disclosed in a prospectus supplement.  Prospectus supplements did not require signatures.  Neither I nor anyone else signed the prospectus supplements related to the at-issue securitizations.

        37. Six of the at-issue securitizations were issued pursuant to the Registration Statements that I signed.[3]  When I signed these two Registration Statements, I believed that the information contained in them was accurate, and I believe the same thing today.  I also believed that the information contained in the prospectus supplements for the at-issue securitizations was accurate at the time these prospectus supplements were issued, and I believe the same thing today.

        38. My belief about the accuracy of the statements was and is based on my knowledge and understanding of Nomura's loan acquisition, due diligence and securitization processes, and my experience and confidence in the capabilities of Nomura's personnel

---

[3] NHELI 2006-FM1, NHELI 2006-HE3, NHELI 2006-FM2, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3.

responsible for these processes, who collectively had prior experience working at rating agencies, due diligence vendors, originators, other investment banks, accounting firms, and law firms.  In addition it is based on the services provided by independent third parties such as Deloitte and the advice of experienced counsel thoroughly familiar with each such transaction such as Thacher Proffitt & Wood.

39.     Before they were filed, I read the offering documents in their entirety, and worked closely with outside counsel, Thacher Profitt & Wood, to ensure that the disclosures in the offering documents were accurate and complete.  Thacher Profitt & Wood, where I had worked from 1982 to 1991, was a leading and well-respected law firm in the field that had a tremendous amount of experience as counsel for parties in transactions and issuances of mortgage-backed securitizations.

### Nomura's Exit from the Residential Mortgage-Backed Securitization Business

40.     By mid-2007, the market for purchasing and securitizing mortgage loans had begun to turn south.  Several large originators had gone bankrupt, and there was broad concern about declining house prices across the country.  In light of these events, NCCI began an initiative to wind down the operations of its residential loan platform.  In the summer of 2007, NCCI was no longer purchasing residential mortgage loans, and it undertook a review of all of the mortgage loans and other positions held on its balance sheet to determine the value of NCCI's holdings.  In or around August 2007, a decision was made that NCCI should exit the business entirely.

41.     ~~As part of this decision to leave the residential mortgage business, NCCI organized an auction in August 2007 to sell its holdings of "residual" certificates from residential mortgage-backed securitizations.  The residual was the most junior tranche in the securitizations~~

~~we created, meaning its holder – in this case, Nomura – would receive payments only after all of the other tranches in the securitization had been paid. When the mortgages in a securitization were performing well, the residual was a profitable investment. The residual was the riskiest tranche in our securitizations, however, because it was also the first tranche to experience losses if the mortgages backing the securitizations began to default. By August 2007, the residuals were performing worse than expected, and they had significantly declined in value. We sold the residuals in early September, including the residuals for the at-issue securitizations.~~

42. At the time we closed the securitizations at issue in this litigation, we did not anticipate the magnitude of the financial crisis and the related decline in housing prices, or the impact on securities prices because of limited liquidity resulting from the financial crisis. ~~We invested in the residuals because we had a great amount of confidence in our due diligence process. The residual was a critical part of Nomura's business strategy because most of its profits on residential mortgage-backed securities were based on the value of the residuals Nomura held. Thus, like our investors, Nomura had a huge stake in the success of the mortgage-backed securities we issued. Our success was directly tied to the performance of the residual certificates, and we lost many millions of dollars when the housing market collapsed in 2007.~~

43. I helped oversee the sale of Nomura's remaining mortgage loans and other assets through early 2008. I left Nomura along with a dozen or so other employees who moved to Centerline when Nomura elected to exit the commercial mortgage business and, in connection with that exit, Centerline assumed management of most of Nomura's then remaining commercial assets.

_____
Nicholas Dante LaRocca

Sworn before me this
26 day of March 2015.

_____
Notary Public

MADELINE B. JENKS
Notary Public, State of New York
No. 01JE6067085
Qualified in New York County
Certificate Filed in New York County
Commission Expires July 21, 2018