# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,

                Plaintiff,

   -against-

NOMURA HOLDING AMERICA INC., et al.,

                Defendants.

No. 11-cv-6201 (DLC)

ECF Case

---

## DEFENDANTS' MEMORANDUM IN RESPONSE TO PLAINTIFF'S "PROPOSED CONCLUSIONS OF LAW" AND PLAINTIFF'S "OPPOSITION TO DEFENDANTS' PRETRIAL MEMORANDUM OF LAW"

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993

David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
Yavar A. Bathaee (bathaeey@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Thomas C. Rice (trice@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

March 9, 2015

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................1

ARGUMENT ...................................................................1

I.   PLAINTIFF'S ARGUMENTS CONCERNING THE FALSITY OF
     DEFENDANTS' REPRESENTATIONS LACK MERIT ..................1

     A.   Plaintiff Conflates Its Burden of Proof With Confidence Levels for
          Particular Expert Conclusions ........................................1

     B.   Plaintiff Cannot Prove the Falsity of Statements Concerning How the
          Loans Were Originated ...............................................2

          1.   Plaintiff Cannot Satisfy Its Burden of Proving the Reliability of
               Robert Hunter's Methodology .................................3

          2.   Defendants' Expert Michael Forester Fully Rebuts Hunter's
               Findings of Non-Compliance with Underwriting Guidelines ......4

          3.   Statements that Mortgage Loans "Generally" Complied With
               Guidelines and that Depositors "Believed" Certain Underwriting
               Guidelines Were Applied Are Statements of Opinion ............4

     C.   Plaintiff Has No Reliable Evidence—Direct or Circumstantial— That
          Appraisals Were Subjectively False ..................................6

          1.   Kilpatrick's CAM is Unreliable and Cannot Provide
               Circumstantial Evidence of Subjective Falsity ..................6

          2.   The Fact that a Purchase-Money Loan Had the Same Appraised
               Value and Sales Price Does Not Indicate A Violation of USPAP .....7

     D.   Plaintiff Cannot Meet Its Burden of Proving that Credit Rating
          Representations Were False ..........................................7

II.  PLAINTIFF MISCHARACTERIZES THE LEGAL STANDARD FOR
     PROVING MATERIALITY AND IMPERMISSIBLY SEEKS TO SHIFT ITS
     BURDEN OF PROOF TO DEFENDANTS ...............................9

     A.   The SEC's General Guidance With Respect to Assessing Materiality in the
          Context of Financial Statements Is Inapplicable and Irrelevant ...........9

     B.   Defendants Do Not Have the Burden of Proving the Magnitude of
          Disclosures that Would Have Mattered to the Credit Rating Agencies .......11

## TABLE OF CONTENTS
### (continued)

III.  PLAINTIFF ALSO CANNOT SATISFY ITS BURDEN TO PROVE CONTROL
      PERSON LIABILITY ...............................................................................................12

      A.    Plaintiff Misstates Defendants' Arguments as to Individual Defendants
            Gorin and McCarthy ...................................................................................13

      B.    Plaintiff Cannot Satisfy Its Burden of Providing Sufficient Evidence of
            Actual Control ............................................................................................14

      C.    Plaintiff Conflates the Affirmative Defenses Under Sections 11, 12 and 15 ........15

IV.   PLAINTIFF LACKS SUFFICIENT EVIDENCE CONCERNING THE
      LOCATION OF THE TRANSACTIONS AT ISSUE ......................................................17

      A.    Plaintiff Cannot Show That the "Sale" of the Certificates Occurred in the
            District of Columbia or Virginia ..............................................................17

      B.    Based on the Evidence To Which Plaintiff Refers, Any Application of the
            Blue Sky Laws to the Transactions at Issue Would Violate the Dormant
            Commerce Clause .......................................................................................18

V.    PLAINTIFF MISCONSTRUES THE LOSS CAUSATION STANDARD AND
      ATTEMPTS TO IMPERMISSIBLY LIMIT THE EVIDENCE THAT
      DEFENDANTS CAN OFFER TO SATISFY THEIR BURDEN OF PROOF ...............21

      A.    Plaintiff Mischaracterizes the "Subject" of the Alleged Misrepresentations
            and Omissions .............................................................................................21

      B.    Defendants Will Meet Their Burden on Loss Causation ......................................24

      C.    The Housing Crisis and Economic Recession Were Not Caused By, or
            Foreseeable Consequences of, the Alleged Misstatements .................................26

VI.   PLAINTIFF OVERSTATES THE AMOUNT RECOVERABLE UNDER
      SECTION 12 AND THE BLUE SKY LAWS ...............................................................27

CONCLUSION ...........................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.S. Goldmen & Co., Inc.* v. *N.J. Bureau of Secs.*,
163 F.3d 780 (3d Cir. 1999) ..................................................................19

*Absolute Activist Value Master Fund Ltd.* v. *Ficeto*,
677 F.3d 60 (2d Cir. 2012) ..............................................................19, 20

*Adair* v. *Kaye Kotts Associates, Inc.*,
1998 WL 142353 (S.D.N.Y. March 27, 1998) ...................................25

*Akerman* v. *Oryx Commc'ns, Inc.*,
810 F.2d 336 (2d Cir. 1987) ...............................................................25

*Amorgianos* v. *Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ..................................................................3

*In re Apple REIT Litig.*,
2013 WL 1386202 (E.D.N.Y. April 3, 2013) .....................................23

*Austin v. Loftsgaarden*,
768 F.2d 949 (8th Cir. 1985) ..............................................................29

*In re Bear Sterns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012) ...............................................8, 9

*Berckeley Inv. Grp.* v. *Colkitt*,
455 F.3d 195 (3d Cir. 2006) ...............................................................22

*Cable* v. *Hechler*,
532 F. Supp. 239 (E.D.N.Y. 1981) .....................................................26

*Capital Ventures Int'l* v. *J.P. Morgan Mortgage Acquisition Corp.*,
2013 WL 535320 (D. Mass. Feb. 13, 2013) ....................................8, 10

*Castellano* v. *Young & Rubicam, Inc.*,
257 F.3d 171 (2d Cir. 2001) ...............................................................23

*Charles Schwab Corp. v. Banc of Am. Sec. LLC.*,
No. CGC-10-501151 (Sup. Ct. Cal. Nov. 10, 2014) ..........................29

*City of Pontiac Gen. Employees' Ret. Sys.* v. *Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) .................................................10

## TABLE OF AUTHORITIES
### (continued)

*Daubert* v. *Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ................................................................................ 2

*In re Donald J. Trump Casino Sec. Litig.*,
793 F. Supp. 543 (D.N.J. 1992) ................................................................ 6

*Dura Pharm., Inc.* v. *Broudo*,
544 U.S. 336 (2005) .............................................................................. 23

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ............................................................ 10, 11

*Entergy Nuclear Vt. Yankee, LLC* v. *Shumlin*,
733 F.3d 393 (2d Cir. 2013) ................................................................ 18

*Eric M. Berman, P.C.* v. *City of N.Y.*,
895 F. Supp. 2d 453 (E.D.N.Y. 2012) .................................................... 19

*FHFA* v. *Nomura Holding Am. Inc.*
2015 WL 685159 (S.D.N.Y. Feb. 18, 2015) ............................................ 26

*FHFA* v. *Nomura Holding Am., Inc.*,
2015 WL 353929 (S.D.N.Y. Jan. 28, 2015) ........................................ 2, 6

*FHFA* v. *Nomura Holding Am., Inc.*,
2015 WL 568788 (S.D.N.Y. Feb. 11, 2015) ......................................... 3, 4

*FHFA* v. *Nomura Holding Am., Inc.*,
2015 WL 629316 (S.D.N.Y. Feb. 13, 2015) ........................................... 12

*FHFA* v. *Nomura Holding Am., Inc.*,
2015 WL 685153 (S.D.N.Y. Feb. 18, 2015) ........................................... 12

*FHFA* v. *SG Ams., Inc.*,
2012 WL 5931878 (S.D.N.Y. Nov. 27, 2012) ......................................... 4

*First Nationwide Bank* v. *Gelt Funding Corp.*,
27 F.3d 763 (2d Cir. 1994) ............................................................ *passim*

*Flanagan* v. *N. Star Concrete Const., Inc.*,
2014 WL 4954615 (E.D.N.Y. Oct. 2, 2014) ........................................... 30

*Ganino* v. *Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000) ................................................................. 10

# TABLE OF AUTHORITIES
## (continued)

*Haim* v. *Sec'y of Dep't of Health & Human Servs.*,
  1993 WL 346392 (Fed. Cl. Aug. 27, 1993) ........................................................2

*Harkabi* v. *SanDisk Corp.*,
  2012 WL 826892 (S.D.N.Y. Mar. 12, 2012) ........................................................3

*Houston* v. *Seward & Kissel, LLP*,
  2008 WL 818745 (S.D.N.Y. Mar. 27, 2008) ........................................................20

*Hutchison* v. *Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011) ........................................................10

*Iowa Pub. Employees' Ret. Sys.* v. *MF Global, Ltd.*,
  620 F.3d 137 (2d Cir. 2010) ........................................................21

*Iraola & CIA, S.A.* v. *Kimberly-Clark Corp.*,
  232 F.3d 854 (11th Cir. 2000) ........................................................16

*King Cnty., Wash.* v. *IKB Deutsche Industriebank AG*,
  708 F. Supp. 2d 334 (S.D.N.Y. 2010) ........................................................26

*Lattanzio* v. *Deloitte & Touche LLP*,
  476 F.3d 147 (2d Cir. 2007) ........................................................24

*In re Lehman Bros. Mortgage-Backed Secs. Litig.*,
  650 F.3d 167 (2d Cir. 2011) ........................................................15

*Lentell* v. *Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ........................................................21, 23, 24, 27

*Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp.*,
  2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013) ........................................................11

*Litwin* v. *Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ........................................................10

*Lupo* v. *Human Affairs Int'l, Inc.*,
  28 F.3d 269 (2d Cir. 1994) ........................................................17

*Malin* v. *XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007) ........................................................5

*McLaughlin* v. *Cohen*,
  686 F. Supp. 454 (S.D.N.Y. 1988) ........................................................30

**TABLE OF AUTHORITIES**
**(continued)**

*In re MF Global Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013) ..................................................................5

*Moore* v. *Slonin*,
  426 F. Supp. 524 (D. Conn. 1977) ....................................................................27

*Morrison* v. *National Australia Bank Ltd.*,
  561 U.S. 247 (2010) ...........................................................................................19

*N.J. Carpenters Health Fund* v. *Residential Capital, LLC*,
  2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ....................................................12

*In re Nat'l Century Fin. Enters., Inc.*,
  755 F. Supp. 2d 857 (S.D. Oh. 2010) ................................................................20

*NECA-IBEW Health & Welfare Fund* v. *Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012) ..............................................................................23

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013) ........................................................................12, 13

*Nuveen Mun. High Income Opportunity Fund* v. *City of Alameda, Cal.*,
  730 F.3d 1111 (9th Cir. 2013) ...........................................................................24

*In re Omnicom Group, Inc. Secs. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008) ...............................................................24

*Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*,
  632 F.3d 762 (1st Cir. 2011) ...............................................................................8

*Powers* v. *British Vita P.L.C.*,
  57 F.3d 176 (2d Cir. 1995) ................................................................................24

*Dep't of Rev. of Ky.* v. *Davis*,
  553 U.S. 328 (2008) ...........................................................................................18

*Rice* v. *Karsch*,
  154 F. App'x 454 (6th Cir. 2005) ......................................................................18

*Robbins* v. *Koger Properties, Inc.*,
  116 F.3d 1441 (11th Cir. 1997) .........................................................................24

*Ross* v. *Bolton*,
  1989 WL 80428 (S.D.N.Y. Apr. 4, 1989) ..........................................................14

# TABLE OF AUTHORITIES
## (continued)

*Schott v. Maidsville Coal Min. P'ship*,
   1979 WL 1245 (S.D.N.Y. Sept. 7, 1979) ...............................................................29

*SEC* v. *Boock*,
   2012 WL 3133638 (S.D.N.Y. Aug. 2, 2012) ...........................................................27

*SEC* v. *First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996) ..........................................................................16, 27

*SEC* v. *Mgmt. Dynamics, Inc.*,
   515 F.2d 801 (2d Cir. 1975) ...................................................................................14

*SEC* v. *Rosenfeld*,
   1997 WL 400131 (S.D.N.Y. July 16, 1997) ......................................................27, 28

*Shrader* v. *Biddinger*,
   633 F.3d 1235 (10th Cir. 2011) ..............................................................................18

*In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*,
   774 F. Supp. 2d 584 (S.D.N.Y. 2011) ................................................................22, 27

*Suez Equity Investors, L.P.*, v. *Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001) .....................................................................................21

*In re Ultrafem Inc. Sec. Litig.*,
   91 F. Supp. 2d 678 (S.D.N.Y. 2000) .........................................................................5

*United States* v. *Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ..................................................................................11

*United States* v. *McDermott*,
   2014 WL 917267 (E.D.N.Y. Mar. 10, 2014) ...........................................................30

*In re Vivendi Universal, S.A. Sec. Litig.*,
   605 F. Supp. 2d 586 (S.D.N.Y. 2009) ......................................................................25

*Wallace* v. *Buttar*,
   239 F. Supp. 2d 388 (S.D.N.Y. 2003) ......................................................................15

*Watiti* v. *Walden Univ.*,
   2008 WL 2280932 (D.N.J. May 30, 2008) ...............................................................18

*In re Worldcom, Inc. Sec. Litig.*,
   346 F. Supp. 2d 628 (S.D.N.Y. 2004) ......................................................................16

## TABLE OF AUTHORITIES
### (continued)

*In re Worldcom, Inc. Secs. Litig.*,
  2005 WL 638268 (S.D.N.Y. 2005) ...............................................................15, 16

*In re WorldCom, Inc. Secs. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003) ................................................................26

**Statutes and Rule**

15 U.S.C. § 77*l*(b) ..................................................................................................21

15 U.S.C. § 77o .............................................................................................13, 15

26 U.S.C. § 6622 ...................................................................................................30

26 U.S.C. § 6622(a) ...............................................................................................30

Federal Rules of Evidence Rule 701 .....................................................................26

SEC Staff Accounting Bulletin No. 99,
  1999 WL 1123073 (Aug. 12, 1999) ...............................................................9, 10

**Other Authorities**

Statement on Auditing Standards No. 31 (Aug. 1980) ............................................9

U.S. Const. art. I, § 8, cl. 3 ....................................................................................18

## TABLE OF ABBREVIATIONS

| Action | *FHFA* v. *Nomura Holding America Inc., et al.*, No. 11 Civ. 6201 (DLC) |
|---|---|
| Barnett Test. | Direct Testimony of Arnold Barnett, dated February 20, 2015 |
| Certificates | The specific RMBS that Fannie Mae and Freddie Mac purchased from the seven Securitizations at issue in this Action, from November 16, 2005 to April 27, 2007 |
| Defs.' COL | Defendants' Proposed Conclusions of Law, dated February 20, 2015, as corrected on February 24, 2015 |
| Defs.' FOF | Defendants' Proposed Findings of Fact, dated February 20, 2015 |
| Defs.' Mem. | Defendants' Pretrial Memorandum of Law, dated February 20, 2015, as corrected on February 24, 2015 |
| Fannie Mae | Federal National Mortgage Association |
| Freddie Mac | Federal Home Loan Mortgage Corporation |
| Individual Defendants | David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |
| LTV or CLTV | Loan-to-value ratio or Combined loan-to-value ratio |
| NAAC | Nomura Asset Acceptance Corporation |
| NCCI | Nomura Credit & Capital, Inc. |
| NHELI | Nomura Home Equity Loans, Inc. |
| Nomura | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., and Nomura Securities International, Inc. |
| Nomura Defendants | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |
| Nomura Holding | Nomura Holding America Inc. |

## TABLE OF ABBREVIATIONS
### (continued)

| | |
|---|---|
| Nomura Securities | Nomura Securities International, Inc. |
| Opp. | Plaintiff's Opposition to Defendants' Pretrial Memorandum of Law, dated February 27, 2015 |
| Plaintiff | Federal Housing Finance Agency |
| Pl.'s COL | Plaintiff's Proposed Conclusions of Law, dated February 20, 2015, as corrected on February 26, 2015 |
| Pl.'s FOF | Plaintiff's Proposed Findings of Fact, dated February 20, 2015, as corrected on February 26, 2015 |
| RBSSI | RBS Securities, Inc. |
| Riddiough Test. | Direct Testimony of Timothy J. Riddiough, Ph.D., dated February 20, 2015 |
| RMBS | Residential mortgage-backed securities |
| SEC | Securities and Exchange Commission |
| Securities Act | The Securities Act of 1933, 15 U.S.C. 77a, *et seq*. |
| Securitizations | NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3 |
| SLG | Supporting Loan Groups |
| Vandell Test. | Direct Testimony of Kerry Vandell, Ph.D., dated February 20, 2015 |

Defendants respectfully submit this Response to Plaintiff's Proposed Conclusions of Law ("Pl.'s COL") and Plaintiff's Opposition to Defendants' Pretrial Memorandum of Law ("Opp.").[1]

## PRELIMINARY STATEMENT

Defendants here address several incorrect or misleading assertions made by plaintiff in its "Proposed Conclusions of Law" and "Opposition to Defendants' Pretrial Memorandum of Law."  In these submissions, plaintiff (i) mischaracterizes the Court's prior rulings, *see* pp. 3–5, *infra*, (ii) misstates—and in some instances, wholly manufactures—legal standards governing the remaining claims and defenses in this Action, *see* pp. 8–11, 15–18, 22, *infra*, (iii) seeks to assign its burden of proof to defendants, *see* pp. 4, 12, *infra*, and (iv) distorts some of the most basic facts of this Action, *see* pp. 14, 25, *infra*.

## ARGUMENT

## I.   PLAINTIFF'S ARGUMENTS CONCERNING THE ALLEGED FALSITY OF REPRESENTATIONS IN THE OFFERING DOCUMENTS LACK MERIT.

### A.   Plaintiff Conflates Its Burden of Proof With Confidence Levels for Particular Expert Conclusions.

Plaintiff notes that "[p]reponderance of the evidence does not anywhere near require 95% certainty"—and then asserts that "[c]onsequently" a conclusion drawn by one of its experts at a 95% confidence level is "more than sufficient in establishing Defendants' liability in this civil action."  Pl.'s COL ¶ 32; *see also id*. ¶ 58 (an expert conclusion at a statistical "confidence level of 95%  . . . [is] far higher than that necessary . . . to establish liability").  These assertions are incorrect.

---

[1]      This Response addresses only certain arguments and assertions made by plaintiff in its (i) Proposed Conclusions of Law, and (ii) Opposition to Defendants' Pretrial Memorandum of Law. Any failure to address other arguments or assertions should not be construed as acquiescence.

It is of course true that in order to prevail, plaintiff must establish each element of its claims by a preponderance of the evidence. None of plaintiff's experts purport to opine that any element of plaintiff's claims has been established at any statistical confidence level, nor could they. "The role of an expert is not to displace the [court] but rather to provide the groundwork to enable the [court] to make its own informed determination." *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 353929, at *3 (S.D.N.Y. Jan. 28, 2015). A court must evaluate the methodology employed by the expert in reaching his or her opinions—not merely the expert's confidence in the opinions. *Cf. Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) ("[E]videntiary relevance and reliability" depend upon "principles and methodology" underlying an expert submission.); *see also Haim* v. *Sec'y of Dep't of Health & Human Servs.*, 1993 WL 346392, at *11 n.9 (Fed. Cl. Aug. 27, 1993) ("That the percentage of certainty drops from 95% in science to 50.1% in litigation does not obviate the need for the court to examine the basis for the expert's testimony. Otherwise, experts become hired guns and expertise a sham.").

The probative value of an expert's opinion depends upon its relevance and reliability, which turn on the principles and methodology underlying an expert's analysis. Given the fundamental methodological errors that pervade plaintiff's experts' analyses, *see, e.g.*, pp. 6–7, *infra*; Defs.' Mem. at 65–66, the probative value of those conclusions is minimal.

### B. Plaintiff Cannot Prove the Falsity of Statements Concerning How the Loans Were Originated.

With respect to alleged falsity, plaintiff mischaracterizes the Court's prior rulings, plaintiff's burden of proof, and the testimony of expert witnesses Robert Hunter and Michael Forester.

### 1. Plaintiff Cannot Satisfy Its Burden of Proving the Reliability of Robert Hunter's Methodology.

In addressing Forester's critiques of Hunter's expert analysis, plaintiff advances two incorrect arguments: (i) that the Court's ruling on the admissibility of Hunter's report supports the proposition that "Mr. Forester's critiques of Mr. Hunter's methodology . . . carry little weight," and (ii) that defendants must offer "proof that [Mr. Hunter's] sources . . . actually *were* inaccurate" to "reduce the weight of Mr. Hunter's testimony."  Pl.'s COL ¶ 39.

*First*, the Court has not made any ruling concerning the weight that will be accorded to Forester's criticisms of Hunter's testimony.  Rather, the Court stated that "the actual presence or likelihood of errors in [Hunter's] data goes to the testimony's weight, not its admissibility." *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 568788, at *14 (S.D.N.Y. Feb. 11, 2015).  The Court continued, "Defendants may identify errors or likely errors in the documents in question at trial, and may argue that Hunter failed to corroborate a particular finding with more reliable information." *Id*.  Nothing in the Court's prior opinions suggests that Forester's critiques  of Hunter's analysis "carry little weight."

*Second*, plaintiff argues, inconsistent with the Court's February 11 Order, that defendants bear the burden of offering "proof that [Mr. Hunter's] sources . . . actually *were* inaccurate."  Pl.'s COL ¶ 39.  The Court has imposed no such standard, which would turn plaintiff's burden of proof on its head.  Plaintiff must prove its case by a preponderance of the evidence, and this includes proving that its experts' methods and sources are reliable.  "The party seeking to introduce expert testimony bears the burden of establishing its reliability," *Harkabi* v. *SanDisk Corp.*, 2012 WL 826892, at *3 (S.D.N.Y. Mar. 12, 2012), and "[i]t is critical that an expert's analysis be reliable *at every step*," *cf. Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (emphasis added).  Defendants, in contrast, may show that limited

-3-

or no weight should be given to Hunter's testimony based on the "*likelihood* of errors in []his data," especially where, as here, that showing has not been rebutted.  *Nomura*, 2015 WL 568788, at *14 (emphasis added).

>2.    **Defendants' Expert Michael Forester Fully Rebuts Hunter's Findings of Non-Compliance with Underwriting Guidelines.**

Plaintiff apparently concedes that defendants have identified errors in Hunter's findings of underwriting "defects."  *See* Opp. at 4 n.4.  Plaintiff asserts, however, that where defendants have identified an incorrect finding by Hunter, defendants must further analyze the loan to determine whether it was defective absent the single incorrect finding.  *See* Opp. at 4. This is backwards.  Hunter made the decision to evaluate "whether the underwriting defects for a given Sample Loan, *when viewed collectively*, substantially increased the credit risk of the Loan."  Pl.'s FOF ¶ 168 (emphasis added).  As a result, if any one of Hunter's findings is incorrect, his opinion concerning the "collective[]" effect of these findings no longer holds. Hunter did not, and cannot now, offer opinions about whether loans he reviewed would have been defective if some subset of his findings was rejected.

>3.    **Statements that Mortgage Loans "Generally" Complied With Guidelines and that Depositors "Believed" Certain Underwriting Guidelines Were Applied Are Statements of Opinion.**

Finally, plaintiff's assertion that "[e]ach statement that the Mortgage Loans generally complied with guidelines 'is a classic statement of fact'" is not correct.  Pl.'s COL ¶ 23 (quoting *FHFA* v. *SG Ams., Inc.*, 2012 WL 5931878, at *2 (S.D.N.Y. Nov. 27, 2012). Defendants recognize that the Court reached this conclusion at the motion to dismiss stage, *see SG Ams.*, 2012 WL 5931878, at *2, and, for the reasons set forth below, respectfully disagree and preserve all arguments for appeal.

*First*, the prospectus supplements signal the subjectivity of the statements concerning compliance with underwriting guidelines by using the term "generally."  *See* Defs.' FOF ¶¶ 285–309.)  The determination of how common a fact must be to qualify as "generally" true necessitates "a judgment call based on all available positive and negative evidence."  *Cf. In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 313 (S.D.N.Y. 2013).  This threshold may fall in any number of places on the spectrum between "never" and "always," depending upon the beliefs and opinions of the speaker.  Therefore, contrary to plaintiff's assertion, statements describing "general[]" compliance with applicable underwriting guidelines are properly characterized as statements of opinion, not fact.

*Second*, the prospectus supplements for two of the Certificates at issue expressly state that the underwriting guidelines were "believed by the depositor" to have been applied— making even more clear that, in those cases, the relevant statements are statements of opinion, not fact.  Specifically, the prospectus supplements for 2006-FM1 and 2006-FM2 provide "a summary of the underwriting guidelines *believed* by the depositor to have been applied, with some variation, by Fremont."  Defs.' FOF ¶ 285 (emphasis added).  Because these statements are *explicitly* cast as opinions, they "qualif[y] the statements and indicate[] their status as opinions, rather than as guarantees."  *Malin* v. *XL Capital Ltd.*, 499 F. Supp. 2d 117, 144 (D. Conn. 2007) (holding that statements concerning loan loss reserves "are statements of opinion" in part because of the "language used by Defendants—*e.g.*, XL '*believes*' the reserves are sufficient"); *see also In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 688, 697 (S.D.N.Y. 2000) (explaining that statement in prospectus prefaced by "[t]he Company believes" was a statement of opinion because it was "expressly stated to be the Company's beliefs").  "[P]laintiffs should not be permitted to distort the plain meaning of the prospectus in order to

state a claim," *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 568 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993), and plaintiff's attempt to characterize an express statement of "belie[f]" as a statement of fact does not withstand scrutiny.

###### C.   Plaintiff Has No Reliable Evidence—Direct or Circumstantial— That Appraisals Were Subjectively False.

As part of its burden to establish that LTV ratios were materially misstated in each of the prospectus supplements, plaintiff must "demonstrate[] subjective falsity by . . . the appraiser, as well as the objective falsity of the LTV representations." *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 353929, at *1 (S.D.N.Y. Jan. 28, 2015). To meet its burden, plaintiff must offer relevant and reliable "direct and circumstantial evidence that sheds light on the individual's state of mind." *Id.* at *5. Plaintiff has no such direct evidence and concedes as much. It argues instead that it "need not provide direct evidence of this mental state" but instead "can 'provide circumstantial evidence' that the appraiser's belief was not honestly held by . . . showing that the appraisal did not conform to [USPAP]." Pl.'s COL ¶ 63 (quoting *Nomura*, 2015 WL 353929, at *6); *cf. Nomura*, 2015 WL 353929, at *6 ("Evidence of the extent to which [appraisals] conformed to industry standards . . . may provide circumstantial evidence . . . ."). Plaintiff's proffered evidence—Kilpatrick's CAM—is wholly unreliable. As such, plaintiff has offered no reliable evidence of any kind that any appraisals of the subject properties were subjectively false.

###### 1.   Kilpatrick's CAM is Unreliable and Cannot Provide Circumstantial Evidence of Subjective Falsity.

Plaintiff purports to offer circumstantial evidence in the form of "credibility" determinations made by Kilpatrick through use of "his CAM." Pl.'s COL ¶ 66. As Dr. Barnett testified, however, about half of the appraisals determined by Kilpatrick to be accurate (using his Greenfield AVM) are nevertheless deemed not credible by the CAM. Barnett Test. ¶ 64.

Plaintiff responds to this inconsistency by asserting that the CAM and Greenfield AVM "measure different things," so that "[t]he CAM methodology does not act as a check on the AVM (and vice versa), but rather as an independent test of whether a given appraisal is credible." Pl.'s COL ¶ 70. If, as plaintiff now asserts, the Greenfield AVM and the CAM are entirely independent—so that an appraisal can be non-credible even if it is perfectly "accurate"—then a credibility finding by the CAM has no bearing (even as circumstantial evidence) on whether an appraiser subjectively disbelieved his or her appraisal.

2.     **The Fact that a Purchase-Money Loan Had the Same Appraised Value and Sales Price Does Not Indicate A Violation of USPAP.**

Plaintiff asserts that it is "compelling" evidence of subjectively false appraisals that certain purchase-money loans had appraised values that matched the sales price. Plaintiff quotes in particular the Uniform Standards of Professional Appraisal Practice's ("USPAP") statement that "accepting an assignment with the price in an agreement of sale, option, or listing or a sale price in a settled transaction as a predetermined value in the assignment violates USPAP." Pl.'s COL ¶ 72. Plaintiff implies that if the two values were the same, the appraiser accepted a predetermined value in violation of USPAP. This is baseless. The fact that the appraised value of property is the same as the sales price does not prove or imply any wrongdoing by the appraiser—courts demand evidence, not conjecture or innuendo.

D.     **Plaintiff Cannot Meet Its Burden of Proving that Credit Rating Representations Were False.**

There is no dispute that the prospectus supplements accurately reported that it was a condition of the offerings that Certificates would receive specified credit ratings. To the extent that the prospectus supplements are deemed to have affirmatively represented what ratings were given, there is also no dispute that the ratings stated in the prospectus supplements were the ratings given by the rating agencies. Moreover, the credit ratings referred to in the prospectus

supplements were statements of opinion.  For example, in *Capital Ventures International* v. *J.P. Morgan Mortgage Acquisition Corp.*, 2013 WL 535320 (D. Mass. Feb. 13, 2013), plaintiff claimed that "the ratings were based on faulty data including the appraisal values and owner-occupancy statistics."  *Id*. at *5.  Similarly, in *Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011), plaintiff alleged that the reported credit ratings were misleading in part because they were based on "inaccurate loan information." *Id*. at 775 (internal quotation marks omitted); *see also In re Bear Sterns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 771 (S.D.N.Y. 2012) (same).  In all of these decisions, the courts concluded that the applicable standard was the standard for opinion liability. Plaintiff's attempt to distinguish these decisions is meritless.

Plaintiff also relies on this Court's prior characterization of its claims to argue that it is not claiming "'that the ratings themselves were false,' but rather 'that the ratings were inflated and did not in fact apply to that collateral, since the defendants provided the ratings agencies incorrect data regarding the loan population.'"  Opp. at 7 (quoting *FHFA* v. *Merrill Lynch & Co.*, 903 F. Supp. 2d 274, 276 n.2 (S.D.N.Y. 2012)).  This is a distinction without a difference.  Credit ratings represent the opinion of the relevant rating agency (in this case as to the credit strength of the Certificates purchased by Freddie Mac and Fannie Mae) and there is no dispute that the prospectus supplements accurately stated the ratings that were given.  A claim that a rating was "inflated" or "did not in fact apply" to the relevant Certificate is a claim that the opinion reflected in the rating was wrong.

## II.    PLAINTIFF MISCHARACTERIZES THE LEGAL STANDARD FOR PROVING MATERIALITY AND IMPERMISSIBLY SEEKS TO SHIFT ITS BURDEN OF PROOF TO DEFENDANTS.

### A.    The SEC's General Guidance With Respect to Assessing Materiality in the Context of Financial Statements Is Inapplicable and Irrelevant.

Plaintiff incorrectly asserts that SEC Staff Accounting Bulletin No. 99 ("SAB 99"), which provides guidance concerning the auditing of financial statements, sets the standard for assessing the materiality of the misstatements alleged here.  *See* Pl.'s COL ¶¶ 14–17, 91, 93, 107.  Plaintiff cites no authority for this proposition, and there is none.

SAB 99 "provides guidance in applying materiality thresholds to the preparation of financial statements filed with the [SEC] and the performance of audits of those financial statements."  SAB 99, 1999 WL 1123073, at *1.  Its purpose is "to provide guidance to financial management and independent auditors with respect to the evaluation of the materiality of misstatements that are identified in the audit process or preparation of the financial statements." *Id*. at *1 n.1.  As used in SAB 99, "'misstatement' or 'omission' refers to a financial statement assertion that would not be in conformity with GAAP."  *Id*. at *2 n.2.[2]  SAB 99 explicitly states that it is "not intended to provide definitive guidance for assessing 'materiality' in other contexts."  *Id*. at *1 n.1.  Plaintiff fails even to acknowledge this clear indication that SAB 99 does not apply to the issues here.

Moreover, by its own terms, SAB 99 does not apply here.  Plaintiff alleges misrepresentations in the prospectus supplements' descriptions of mortgage loans underlying certain asset-backed securities; it does not allege that any "financial statements" were not "in

---

[2]    "Financial statement assertion" is an auditor's term of art:  under the Auditing Standards Board's Statement on Auditing Standards ("SAS") No. 31, financial statement assertions refer to "representations by management that are embodied in financial statement components." Auditing Standards Board, Statement on Auditing Standards No. 31 (Aug. 1980).

conformity" with GAAP or any other accounting or auditing standards.  Furthermore, because SAB 99 expressly cabins its application to the accounting and auditing context, its "numerical threshold" for assessing materiality is not meaningful in the present context.  *Id.* at *1. Plaintiff's reliance on SAB 99 is misplaced, and contravenes the SEC's stated intent in promulgating that accounting bulletin.  *See id.* at *1 n.1.

Consistent with SAB 99's intended purpose, the authorities to which plaintiff points invoke SAB 99's "5% threshold," *id.* at *2, only for assessing the materiality of misstatements in financial statements.  *Litwin* v. *Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011), for example, involved allegations that Blackstone's IPO prospectus omitted information that, under Item 303 of SEC Regulation S-K, "the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations."  *Id.* at 716 (quoting 17 C.F.R. § 229.303(a)(3)(ii)).  The omissions at issue in *Litwin* thus involved the presentation and discussion of *financial statements*—the topic SAB 99 was meant to address— but not any matter at issue in this Action.  As a result, while some courts have applied SAB 99's "5% threshold" in evaluating disclosures in financial statements, no court has generalized the accounting standard to apply to other issues of materiality—which would be error.[3]

In all events, SAB 99 itself describes the 5% threshold as "only the beginning of an analysis" and explains that "an assessment of materiality requires that one views the facts in

---

[3]     *See, e.g., Hutchison* v. *Deutsche Bank Secs. Inc.*, 647 F.3d 479, 485, 487 (2d Cir. 2011) (applying SAB 99 to a registrant's accounting for asset impairments and loan loss reserves); *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) (applying SAB 99 to "[a]n accounting classification decision" affecting the disclosed valuation of certain assets); *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 163-65 (2d Cir. 2000) (applying SAB 99 to an incorrect recognition of revenue in earnings statements); *City of Pontiac Gen. Employees' Ret. Sys.* v. *Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 362, 368 (S.D.N.Y. 2012) (applying SAB 99 to disclosures of quarterly revenue and operating profit in press release announcing financial results).

the context of the 'surrounding circumstances' . . . or the 'total mix' of information."  SAB 99,

1999 WL 1123073, at *2.  Accordingly, courts routinely rely upon SAB 99 to explain the

*immateriality* of seemingly significant misstatements or omissions.  *See, e.g.*, *JP Morgan*, 553

F.3d at 204 (explaining that although a classification of "$2 billion" in assets "may sound

staggering, the number must be placed in context," including the total value of J.P. Morgan's

trading assets); *Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp., PLC*, 2013 WL 4405538,

at *6 (S.D.N.Y. Aug. 5, 2013) (explaining that RBS's alleged understatement of its exposure to

the U.S. subprime market "appears large at first blush" but was immaterial in light of "RBS's

total asset backed securities exposure" and "total assets").

 As defendants will show at trial, plaintiff cannot show the materiality of the

alleged misstatements in light of the "surrounding circumstances . . . or the total mix of

information" available to a reasonable investor in residential mortgage-backed securities.  *See*

Defs.' Mem. at 83–94.[4]

### B. Defendants Do Not Have the Burden of Proving the Magnitude of Disclosures that Would Have Mattered to the Credit Rating Agencies.

 Rather than showing that the alleged misstatements concerning credit ratings were

material, plaintiff seeks to transfer its own burden of proof to defendants.  Specifically, plaintiff

argues that alleged misstatements concerning ratings were material because "[d]efendants have

not offered any credible contradictory evidence . . . arguing that the defects of the magnitude

---

[4] Plaintiff also argues that the requirements in the then-applicable SEC regulations of asset-backed securities ("Regulation AB") to disclose some of the categories of information plaintiff alleges were misstated "is 'evidence of its materiality.'"  Pl.'s COL ¶ 94 (quoting *United States* v. *Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991)).  In *Bilzerian*, however, the Second Circuit flatly rejected the proposition that disclosure requirements can be equated with materiality:  "we decline to hold that the information required to be disclosed . . . is material *per se* . . . simply because such disclosure is required under the securities laws."  *Bilzerian*, 926 F.2d at 1298.

found by FHFA's experts, or any lesser magnitude, would not have mattered to the rating agencies." Pl.'s COL ¶ 106.  Defendants have no such obligation.  Rather, as the Court recently stated, "[a]t trial, FHFA will have the burden of proving that any misrepresentations in the Offering Documents were material."  *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 685153, at *6 (S.D.N.Y. Feb. 18, 2015).

With respect to the credit ratings representations in particular, "FHFA will be required . . . to prove that such misrepresentations [to the credit agencies] affected the ratings given by the agencies to these securities."  *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 629316, at *3 (S.D.N.Y. Feb. 13, 2015).  Plaintiff has no credible evidence establishing a causal connection between the alleged inaccuracies in the information defendants provided to the credit agencies and the ratings the securities ultimately received.  *See* Defs.' Mem. at 82 & n.23. Plaintiff thus will be unable to carry its burden of proving that the credit ratings representations were materially false or misleading.[5]

## III.    PLAINTIFF ALSO CANNOT SATISFY ITS BURDEN TO PROVE CONTROL PERSON LIABILITY.

Plaintiff cannot provide sufficient evidence of "control" under Section 15 to establish liability for any of the alleged control persons.  *See* Defs.' Mem. at 94-98.  Plaintiff instead refers to evidence indicating at best only control "status," such as evidence of corporate ownership.  But control in Section 15 means much more than "status," and "almost always means the practical ability to *direct* the actions of people who issue or sell securities."  *N.J.*

---

[5]    Plaintiff also mischaracterizes the Second Circuit's discussion of the materiality of "underwriting defects" in *New Jersey Carpenters Health Fund* v. *Royal Bank of Scotland Group, PLC*, 709 F.3d 109 (2d Cir. 2013).  *See* Pl.'s COL ¶ 97; Opp. at 8 n.9.  Contrary to plaintiff's assertion, the court in *New Jersey Carpenters* did not state or imply that "even slight departures" from underwriting guidelines "could greatly increase a loan's credit risk."  Pl.'s COL ¶ 97.

*Carpenters Health Fund* v. *Residential Capital, LLC*, 2010 WL 1257528, at *7 (S.D.N.Y. Mar. 31, 2010) (internal quotation marks omitted) (emphasis in original). Further, defendants have already offered (in the direct testimony of its witnesses) sufficient evidence that each control person "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which [liability] is alleged to exist," which provides an affirmative defense to Section 15 liability. *See* Defs.' Mem. at 98-102; 15 U.S.C. § 77o. Plaintiff's only meaningful response is to assert identity among the affirmative defenses of Sections 11, 12, and 15, an argument that has no basis in law and ignores the differences in relevant statutory language. In short, plaintiff cannot meet its affirmative burden, nor rebut defendants' affirmative defense, under Section 15.

**A.    Plaintiff Misstates Defendants' Arguments as to Individual Defendants Gorin and McCarthy.**

Plaintiff asserts that "Nomura Holding, NCCI, Mr. Findlay, and Mr. Graham assert the D.C. Code's reasonable care defense . . . to controlling-person liability for FHFA's D.C. Blue Sky claim arising from the NAA 2005-AR6 Certificate." Pl.'s COL ¶ 138. Individual Defendants Gorin and McCarthy have also asserted this defense. *See, e.g.*, Nomura Defs.' Mem. in Opp. to Pl.'s Motion for Partial Summary Judgment on Defs.' Due Diligence and Reasonable Care Defenses, Dec. 2, 2014, at 110 ("Plaintiff ignores the defenses of defendants other than Nomura Securities. Plaintiff has failed to establish as a matter of law that any Nomura Defendant is not entitled to its defenses under . . . the D.C. blue sky law . . . . These defenses will be front and center at trial . . . ."). As defendants stated in their Pretrial Memorandum of Law, Gorin and McCarthy "had no knowledge or reason to believe that the prospectus supplements contained any misstatements or omissions." Defs.' Mem. at 101 (listing additional facts for Gorin and McCarthy, and explaining that these "facts . . . demonstrate that the alleged control person defendants are not liable under the D.C. Blue Sky law").

**B.    Plaintiff Cannot Satisfy Its Burden of Providing Sufficient Evidence of Actual Control.**

Although plaintiff recognizes that under Section 15, it is "required to prove actual control, not merely control person status," Pl.'s COL ¶ 115 (quoting *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 352 (S.D.N.Y. 2003)), plaintiff nevertheless argues that its proffer of evidence of control status is sufficient to establish actual control.  For example, plaintiff asserts that the fact "Nomura Holding wholly owned . . . Nomura Securities directly, and NAAC and NHELI indirectly . . . [is] alone suffic[ient] to prove Nomura Holding controlled these primary violators." *Id.* at ¶ 122.  But naked ownership, particularly indirect ownership, is nothing more than "status" control.  Further, not even general control of an alleged primary violator—even if it includes the power to direct—is sufficient.  Plaintiff must show that defendant possessed control over the specific transaction at issue.  *See, e.g.*, *Ross* v. *Bolton*, 1989 WL 80428, at *3 (S.D.N.Y. Apr. 4, 1989), *vacated in part on other grounds*, 1989 WL 80425 (S.D.N.Y. Apr. 10, 1989).

Plaintiff next asserts that "control" in Section 15 "is read particularly broadly when applied to shell entities."  Pl.'s COL ¶ 117.  This "shell entity" principle, however, is not found in the case cited by plaintiff, *see SEC* v. *Mgmt. Dynamics, Inc.*, 515 F.2d 801, 812-13 (2d Cir. 1975), and has no basis in law.[6]

---

[6]    Plaintiff relies on *STMicroelectronics* v. *Credit Suisse Group*, 775 F. Supp. 2d 525, 536 (E.D.N.Y. 2011) and *Cromer Finance Ltd.* v. *Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001). Those cases, however, addressed the adequacy of Section 20(a) claims at the pleading stage and involved far different facts.  For example, in *Cromer Financial* the allegations included, among other things, that the defendant "owned and controlled [the entities] by exercising direct, daily supervision, oversight and control through common personnel and shared offices."  137 F. Supp. 2d at 484 (internal quotation marks omitted).  It is precisely this "direct, daily supervision, oversight and control" that are lacking here.  Similarly, in *STMicroelectronics*, the court found plaintiff had sufficiently pled "at least some direct involvement by [the allegedly controlling

*(footnote continued)*

-14-

Plaintiff also claims that "[e]very member of Nomura Securities' board of directors was a member of Nomura Holding's board of directors" and that this "g[ave] Nomura Holding unimpeded control over the management and policies of Nomura Securities."  Pl.'s COL ¶ 123 (citing Pl.'s FOF Part VI.B.1).  Plaintiff cites no legal authority for its "unimpeded control" theory; and even assuming the directors of each entity were the same, that does not demonstrate that one entity controlled the other.  Moreover, plaintiff's assertion is incorrect: Nomura Securities had at least one outside director not on the board of Nomura Holding, as is evident on the face of plaintiff's own exhibit.  *See* PX 182, at 2.  Section 15, moreover, requires evidence of transaction-specific actual control, Defs.' Mem. at 96, which plaintiff has not shown.[7]

### C.    Plaintiff Conflates the Affirmative Defenses Under Sections 11, 12 and 15.

Section 15 additionally provides an affirmative defense where a defendant "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which [liability] is alleged to exist."  15 U.S.C. § 77o.  As explained in defendants' Pretrial Memorandum of Law, none of the Section 15 defendants knew or had reasonable grounds to believe that any representations contained in the prospectus supplements might be materially

---

*(footnote continued)*

entity] in the underlying events."  775 F. Supp. at 536 (internal quotation marks omitted).  Again, direct involvement in the underlying events is lacking here.

[7]    Additionally, plaintiff has not shown culpable participation in the alleged wrongful conduct.  *See, e.g.*, *Wallace* v. *Buttar*, 239 F. Supp. 2d 388, 395 (S.D.N.Y. 2003) (requiring such a showing), *overruled on other grounds*, 378 F.3d 182 (2d Cir. 2004); *see also In re Lehman Bros. Mortg.-Backed Secs. Litig.*, 650 F.3d 167, 186 (2d Cir. 2011) (noting that whether "culpable participation" is required is an issue that has divided district courts in this Circuit and listing cases); *but cf. In re Worldcom, Inc. Secs. Litig.*, 2005 WL 638268, at *13 n.16 (S.D.N.Y. Mar. 21, 2005) (stating that courts that have imposed a "culpable participation" requirement for Section 15 claims are outliers).

false.  *See* Defs.' Mem. at 98-102.  Plaintiff's only response in its Opposition is to wrongly conflate the standards of Sections 11, 12, and 15.  Plaintiff asserts that "reasonableness under Section 15 is judged by the same standard as Sections 11 and 12."  Opp. at 12 (citing *Worldcom*, 2005 WL 638268, at *16).  But these three sections are not interchangeable, as this Court has held.  *In re Worldcom, Inc. Secs. Litig.*, 346 F. Supp. 2d 628, 663 (S.D.N.Y. 2004) ("Section 12(a)(2) has a defense of reasonable care that is less demanding than the duty of due diligence imposed under Section 11.").[8]

The language of Section 15 is different than that found in Sections 11 and 12, and the standards for establishing the affirmative defenses under each Section are likewise different.[9] *See Iraola & CIA, S.A.* v. *Kimberly-Clark Corp.*, 232 F.3d 854, 859 (11th Cir. 2000) ("[W]hen Congress uses different language in similar sections, it intends different meanings.") (citing *United States* v. *Gonzales*, 520 U.S. 1, 5 (1997)).  In particular, the text of Section 15—unlike Section 11—does not impose a duty to conduct an investigation, instead requiring only that the defendant had no knowledge of and no "reasonable ground to believe" in the existence of facts by which liability is alleged to exist.  *Worldcom*, 2005 WL 638268, at *16–*17.  As defendants have shown, Defs.' Mem. at 98-102, none of the Section 15 defendants had such knowledge or "reasonable ground to believe," and plaintiff has no evidence to the contrary.

---

[8]    The only other decision plaintiff cites (in a footnote) for its assertion that the defenses to the three sections is the same is *SEC* v. *First Jersey Securities, Inc.*, a case that did not involve any of Sections 11, 12, or 15.  *See* 101 F.3d 1450, 1473 (2d Cir. 1996) (discussing Section 20(a)'s good-faith defense).

[9]    In fact, even *within* the language of Section 11, "courts have distinguished between the due diligence obligations of inside and outside directors."  *WorldCom*, 2005 WL 638268, at *10.

## IV.   PLAINTIFF LACKS SUFFICIENT EVIDENCE CONCERNING THE LOCATION OF THE TRANSACTIONS AT ISSUE.

### A.   Plaintiff Cannot Show That the "Sale" of the Certificates Occurred in the District of Columbia or Virginia.

Plaintiff ignores the well-settled rule that "the party who seeks the exercise of jurisdiction in his favor . . . must carry throughout the litigation the burden of showing that he is properly in court." *Lupo* v. *Human Affairs Int'l, Inc.*, 28 F.3d 269, 273 (2d Cir. 1994) (quoting *McNutt* v. *General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)).  Plaintiff has refused to take this burden seriously and cannot meet it here.

Plaintiff acknowledges that the blue sky laws limit their application to "sales" that "took place, at least in part," in the regulating state.  Pl.'s COL ¶ 3.  Plaintiff has provided no evidence that "sales" of any of the Certificates occurred in D.C. or Virginia.  Rather, it tethers its Virginia and D.C. claims to a handful of pre-transaction e-mails, from Nomura Securities, RBS or Lehman to Freddie Mac or Fannie Mae traders, that provided information plaintiff says was linked to the "sales" at issue.  *See, e.g.*, Pl.'s FOF  ¶¶ 87, 92, 97, 102, 106, 110, 114.[10]

Even if these e-mail communications could be characterized as "sales" under the blue sky laws (and they cannot), plaintiff has failed to show that the Freddie Mac and Fannie Mae employees who sent or received these e-mails were, in fact, located in Virginia or D.C. at the time the communications were made.  Instead, plaintiff offers only general allegations that these individuals were, for example, "based in Virginia," Pl.'s FOF  ¶ 114, or "located in Virginia," Pl.'s FOF  ¶ 102.  These allegations are insufficient.  As courts have repeatedly recognized in evaluating jurisdictional facts, "[a]lthough email is directed to particular recipients,

---

[10]      For NHELI 2007-2, plaintiff has also asserted blue sky law jurisdiction on the basis of a letter from Timothy Crowley of Nomura to Freddie Mac.  *See* Pl.'s FOF  ¶ 110.

email addresses typically do not reveal anything about the geographic location of the addressee." *Shrader* v. *Biddinger*, 633 F.3d 1235, 1247-48 (10th Cir. 2011); *see also Rice* v. *Karsch*, 154 F. App'x 454, 462 (6th Cir. 2005). "Indeed, an email recipient can typically access his or her email messages from anywhere in the world with a computer (or other device) and an internet connection." *Watiti* v. *Walden Univ.*, 2008 WL 2280932, at *10 (D.N.J. May 30, 2008). Plaintiff cannot link the communications it has identified with the states whose laws it now invokes merely by asserting that the recipients "were based" or "located" in those states. Accordingly, plaintiff has failed to provide facts sufficient to prove its Virginia and D.C. claims.

**B.     Based on the Evidence To Which Plaintiff Refers, Any Application of the Blue Sky Laws to the Transactions at Issue Would Violate the Dormant Commerce Clause.**

Plaintiff's geographical evidence is also insufficient to justify, as a constitutional matter, application of the Virginia and D.C. blue sky laws. Plaintiff has not demonstrated that the at-issue transactions occurred in Virginia and D.C. and, as a result, application of Virginia's and D.C.'s blue sky laws would violate the dormant Commerce Clause.

The Commerce Clause authorizes Congress "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Although the clause is phrased as an affirmative grant of power, the Supreme Court has long construed it to contain an implied limitation on state authority to interfere with interstate commerce. *Dep't of Rev. of Ky.* v. *Davis*, 553 U.S. 328, 337 (2008). This negative aspect is known as the dormant Commerce Clause. As relevant here, "[w]hen a statute 'directly controls commerce occurring wholly outside the boundaries of a State,' it is invalid under the dormant Commerce Clause because it 'exceeds the inherent limits of the enacting State's authority.'" *Entergy Nuclear Vt. Yankee, LLC* v. *Shumlin*, 733 F.3d 393, 429 (2d Cir. 2013) (quoting *Healy* v. *Beer Inst.*, 491 U.S. 324, 336 (1989)). Courts "look[] to where the transaction being regulated was consummated to determine whether the application of

a law impermissibly regulates extraterritorial commerce." *Eric M. Berman, P.C.* v. *City of N.Y.*, 895 F. Supp. 2d 453, 483 (E.D.N.Y. 2012).

The location of the regulated conduct under the federal securities laws is determined according to the principles laid down in *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247 (2010), and its progeny. *Morrison* held that Section 10(b) of the Securities and Exchange Act of 1934 does not apply extraterritorially, a test that hinges on the location of the relevant transaction. *Id.* at 266–67.

*Morrison* in turn spawned a line of cases articulating precisely where a transaction occurs. In *Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, 677 F.3d 60 (2d Cir. 2012), the Second Circuit held that "transactions involving securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States." *Id.* at 67. The "irrevocable liability" prong depends on where "the purchaser incurred irrevocable liability" to buy or where "the seller incurred irrevocable liability" to sell. *Id.* at 68. This inquiry typically hinges on "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id.* at 70. Where title passes is, on its own, a significant factor. *Id.* at 67.

Prior to *Morrison*, courts upheld Blue Sky statutes on the ground that they regulate in-state conduct exclusively. *See, e.g.*, *A.S. Goldmen & Co., Inc.* v. *N.J. Bureau of Secs.*, 163 F.3d 780, 785 (3d Cir. 1999) ("The key to the laws' constitutionality, the Court held, was that '[t]he provisions of the law . . . apply to dispositions of securities within the state.") (quoting *Hall* v. *Geiger-Jones Co.*, 242 U.S. 539, 557 (1917)). *Morrison*, however, sets forth a new, federal definition of where a transaction occurs. To avoid running afoul of the dormant Commerce Clause, a plaintiff must establish that a transaction occurred within the regulating

-19-

state under *Morrison*'s standards.  *See, e.g.*, *In re Nat'l Century Fin. Enters., Inc.*, 755 F. Supp. 2d 857, 884 (S.D. Ohio 2010) (applying *Morrison*'s transactional test to Ohio blue sky law under the dormant Commerce Clause); *see also Houston* v. *Seward & Kissel, LLP*, 2008 WL 818745, at *5 (S.D.N.Y. Mar. 27, 2008) (stating that the Oregon blue sky law is "limited to the sale of securities in the state" and rejecting a dormant Commerce Clause challenge because the at-issue securities were purchased in the state).

Plaintiff cannot satisfy this burden.  The at-issue securities were not traded on any exchange.  As a result, the relevant transactions took place in Virginia or D.C.—and thus were subject to the reach of their blue sky laws—only if title passed or if irrevocable liability was incurred in Virginia or D.C.  Although plaintiff has asserted that certain communications were directed to these two jurisdictions, it apparently has no evidence that the actual contracts were formed in either.  Nor has it proffered evidence that title passed in Virginia or D.C.[11]  In consequence, application of the Virginia and D.C. Blue Sky laws would violate the dormant Commerce Clause.  *See In re Nat'l Century*, 755 F. Supp. 2d at 888 ("The court finds that under the transactional test, the conduct being regulated by the Ohio Securities Act is the sale and purchase of securities.  The sales between Credit Suisse and the Noteholders occurred wholly

---

[11]    The at-issue Certificates were transferred through the DTC clearinghouse, which is located in New York.  (*See* DX-1 (2005-AR6 Prospectus Supplement); DX-2 (2006-FM1 Prospectus Supplement); DX-3 (2006-HE3 Prospectus Supplement); DX-4 (2006-FM2 Prospectus Supplement); DX-5 (2007-1 Prospectus Supplement); DX-6 (2007-2 Prospectus Supplement); DX-7 (2007-3 Prospectus Supplement).)  As Judge Daniels explained on remand in *Absolute Activist*, the penny stock transactions at issue qualified as domestic because "[i]n the securities context, courts look at the place where a trade settles to determine where title is transferred," and "[h]ere, most of the penny stock trades were settled through the Depository Trust Company ('DTC'), which is located in New York."  2013 WL 1286170, at *17-18 (S.D.N.Y. Mar. 28, 2013).

-20-

outside of Ohio; thus, applying [the Ohio blue sky law] would violate the extraterritoriality principle of the Commerce Clause.").

## V. PLAINTIFF MISCONSTRUES THE LOSS CAUSATION STANDARD AND ATTEMPTS TO IMPERMISSIBLY LIMIT THE EVIDENCE THAT DEFENDANTS CAN OFFER TO SATISFY THEIR BURDEN OF PROOF.

As both parties recognize, the amount otherwise recoverable by plaintiff under Section 12 must be reduced in whole or in part if defendants show that any depreciation in value of the Certificates was caused by factors other than the alleged misstatements and omissions. *See* 15 U.S.C. § 77*l*(b); *Iowa Pub. Employees' Ret. Sys.* v. *MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010); Pl.'s COL ¶ 166; Defs.' COL ¶¶ 90–91.  Defendants' right to prove the lack of a causal connection between the alleged misstatement and the harm actually suffered "is predicated upon notions of equity" and involves questions of public policy.  *Suez Equity Investors, L.P.*, v. *Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001).  "No social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through [loan applications] with a fine-tooth comb in the hope of uncovering a misrepresentation."  *First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (quoting *Bastian* v. *Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir. 1990)).  Plaintiff's argument that defendants cannot show that any losses were caused by market-wide phenomena relies on an incorrect interpretation of the governing legal standards and a disregard of the facts.

### A. Plaintiff Mischaracterizes the "Subject" of the Alleged Misrepresentations and Omissions.

The Section 12 loss causation defense requires defendants to demonstrate that some portion of Freddie Mac's and Fannie Mae's losses was caused by factors other than the "subject" of the alleged misrepresentations or omissions.  *See Lentell* v. *Merrill Lynch & Co.*,

396 F.3d 161, 173 (2d Cir. 2005).  In assessing whether a defendant has made the requisite

showing, courts consider "whether 'the *subject* of the fraudulent statement or omission was the

cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something

from the market that, when disclosed, negatively affected the value of the security.'"  *In re State*

*St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 590 (S.D.N.Y. 2011)

(quoting *Lentell*, 396 F.3d at 173).

            The "subject" of the alleged misrepresentations are the specific misstatements (if

any) that plaintiff is able to prove at trial, and the causal effects of these specific misstatements

on the value of the at-issue Certificates.  *See Berckeley Inv. Grp., Ltd.* v. *Colkitt*, 455 F.3d 195,

222 (3d Cir. 2006) (loss causation requires "that it was the very facts about which the defendant

lied which caused [plaintiff's] injuries") (internal citations omitted).  Contrary to plaintiff's

overbroad characterization, the "subject" of the alleged misrepresentations is not "the fact that

the SLG loans had a greater credit risk than was represented in the Prospectus Supplements."

Pl.'s COL ¶ 171.  Rather, it is the specific misrepresentations plaintiff has alleged concerning

underwriting, appraisals, owner occupancy and credit ratings, and the magnitude of those alleged

misstatements that is at issue.  *See First Nationwide Bank* v. *Gelt Funding Corp.,* 27 F.3d 763,

770 (2d Cir. 1994) ("In determining whether the required directness [to show proximate cause] is

present in the context of a fraudulently induced loan, important considerations" include "the

magnitude of the misrepresentations").  Here, as defendants have shown, *see* Defs.' Mem. at

103–10, the misrepresentations plaintiff has alleged did not conceal anything that caused

plaintiff's losses.  Rather, any diminishment in the value of the Certificates was caused by the

severe decline in house prices and macroeconomic factors that affected the entire market.

Plaintiff relies on one case—*NECA-IBEW Health & Welfare Fund* v. *Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012)—to argue that there is a "direct relationship" between the alleged misstatements and the Certificates' losses.  Pl.'s COL ¶ 171.  Plaintiff's reliance is misplaced.  *NECA-IBEW* concerned whether a plaintiff had alleged cognizable injury under Section 11 of the Securities Act, 15 U.S.C. § 77k.  *Id.* at 149, 155.  The court's finding that the alleged misrepresentations in the offering documents of the at-issue securities were sufficient to plead a "cognizable injury—a decline in value—under § 11," *id.* 166-67, did not suggest the existence of a "direct relationship" between the misstatements and any losses suffered by plaintiff.  *See Dura Pharm., Inc.* v. *Broudo,* 544 U.S. 336, 342 (2005) (noting that "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss").

On the other hand, numerous courts, including the Second Circuit, have recognized that market-wide phenomena, such as the housing crisis and economic recession the United States experienced from 2007 to 2009 "causing comparable losses to other investors," can be an intervening cause of investor losses and can be relied upon to show that such losses were not caused by any securities law violation.  *See, e.g.*, *Lentell*, 396 F.3d at 174; *Castellano* v. *Young & Rubicam, Inc.,* 257 F.3d 171, 189 (2d Cir. 2001) ("[W]hen factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions.") (internal quotation marks and citations omitted); *First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (real estate market crash was an intervening cause); *In re Apple REITs Litig.*, 2013 WL 1386202, at *18 (E.D.N.Y. April 3, 2013) (plaintiff could not overcome defendants' affirmative loss causation defense when plaintiff itself acknowledged the negative impact of the economy on

the hotel industry); *cf. Powers* v. *British Vita P.L.C.*, 57 F.3d 176, 189 (2d Cir. 1995) (recession was a direct intervening cause of plaintiff's loss in RICO context).

**B.      Defendants Will Meet Their Burden on Loss Causation.**

Defendants do not, as plaintiff misleadingly contends, rely on "the mere fact of the financial crisis" to support their loss causation defense.  Pl.'s COL ¶ 178.  Defendants have offered and will offer evidence, including both fact and expert testimony and statements by Freddie Mac and Fannie Mae themselves, proving that any loss suffered by Freddie Mac and Fannie Mae was caused by declining house prices and other macroeconomic factors—not the misstatements alleged by plaintiff.  *See* Defs.' FOF ¶¶ 199–283.  This evidence, and the fact that "plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors" demonstrates that plaintiff's losses were not caused by the alleged misrepresentations. *Lentell*, 396 F.3d at 174.

Contrary to plaintiff's assertion, Pl.'s COL ¶174, the standard of proof for loss causation in the securities law context does not demand a precise quantification; rather, the party with the burden need only ascribe "some rough proportion of the whole loss" to the alleged misstatements versus other factors.  *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (a party must offer some evidence "that would allow a factfinder to ascribe some rough proportion of the whole loss to [the misstatements]"); *cf. Robbins* v. *Koger Properties, Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997) ("To satisfy the loss causation element, a [Rule 10b-5] plaintiff need not show that a misrepresentation was the sole reason for the investment's decline in value.").[12]  Thus, to meet their burden of proving loss causation, defendants must

---

[12]      *Nuveen Municipal High Income Opportunity Fund* v. *City of Alameda*, 730 F.3d 1111 (9th Cir. 2013), cited by plaintiff, Pl.'s COL ¶ 172, is inapposite.  In that case, an expert's testimony was excluded where the expert advanced a corrective disclosure theory (expressly

*(footnote continued)*

"disaggregate the declines *or some rough percentage of the declines* from losses resulting from other, non-fraud related events."  *In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 586, 600 (S.D.N.Y. 2009) (emphasis added).

Plaintiff also asserts that "[d]efendants offer no expert analysis" and are thus "unable to sustain their burden of proving a loss causation defense."  Pl.'s COL ¶ 177 (internal quotation marks and citations omitted).  Not so.  Dr. Kerry Vandell, who evaluated whether loans in the SLGs deemed defective by plaintiff's expert Robert Hunter had higher default and delinquency rates than loans Hunter determined were not materially defective, has offered testimony that alone satisfies defendants' burden.  Vandell Test. ¶¶ 147–48.  Dr. Vandell's empirical analysis demonstrates that the defects Hunter purportedly identified had no impact on the performance of the loans in the SLGs—and thus, caused no losses to Freddie Mac or Fannie Mae.  *Id.* ¶¶ 153–55; Defs.' FOF ¶ 281.

Additionally, contrary to plaintiff's assertion, Pl.'s COL ¶ 180, defendants are entitled to offer non-expert evidence in support of their loss causation defense.  *See Adair* v. *Kaye Kotts Assocs., Inc.*, 1998 WL 142353, at *7 (S.D.N.Y. Mar. 27, 1998) ("[I]n the cases where defendants have successfully established an 11(e) defense on summary judgment, they have not only submitted expert testimony, but have provided and discussed evidence attributing the decline to factors other than their own disclosure of financial results."); *Akerman* v. *Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987) (granting summary judgment to defendants on loss causation based on both fact and expert evidence).  Plaintiff's argument that "lay witness

---

*(footnote continued)*

abandoned by plaintiff) and failed to quantify the value of the cable and internet system either when the bonds were issued or when the system was sold, or the extent to which any specific misrepresentation or revelation impacted value.  *See Nuveen*, 730 F.3d at 1120 n.2.

testimony . . . is inadmissible" on the issue of loss causation is baseless; this Court has already rejected plaintiff's argument that "loss causation must be proven by experts," not GSE documents and lay testimony. *FHFA* v. *Nomura Holding Am., Inc.*, 2015 WL 685159, at *1 (S.D.N.Y. Feb. 18, 2015).[13]

### C.    The Housing Crisis and Economic Recession Were Not Caused By, or Foreseeable Consequences of, the Alleged Misstatements.

Attempting to finesse the historical circumstances of its losses, plaintiff further suggests that the defendants' conduct caused the decline in house prices and financial crisis. *See* Pl.'s COL ¶ 178 (citing *King Cnty., Wash.* v. *IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343–44 (S.D.N.Y. 2010)). This pushes credulity to the breaking point. Plaintiff will not be able to show that any alleged misrepresentations in the seven securitizations at issue had anything to do with the severe decline in house prices and economic recession.[14]

Moreover, to be proximately caused by a misstatement, a loss must be a foreseeable consequence of the alleged misstatement. *In re WorldCom, Inc. Secs. Litig.*, 294 F. Supp. 2d 392, 413 (S.D.N.Y. 2003) ("[I]n order for the plaintiff to recover it must prove the damages it suffered were a foreseeable consequence of the misrepresentation.") (internal

---

[13]    Defendants respectfully disagree with the Court's ruling concerning Vandell's benchmarking analysis and reserve all rights for appeal. Defendants also respectfully disagree with the Court's ruling that the testimony of Freddie Mac and Fannie Mae witnesses and other non-expert witnesses on the issue of loss causation constitutes supposedly impermissible "lay opinion" testimony, or that such can only be offered pursuant to Rule 701 if the witness performed an "investigation during the course of her employment addressed to the issue of loss causation." *FHFA* v. *Nomura Holding Am. Inc.*, 2015 WL 685159, *4 (S.D.N.Y. Feb. 18, 2015). Defendants reserve all rights for appeal.

[14]    The *King County* decision cited by plaintiff involved the sufficiency of plaintiff's loss causation pleading under Section 10(b), which, under Rule 8(a), required plaintiff to allege only "something beyond the mere possibility of loss causation." 708 F. Supp. 2d at 339. The *King County* court did not hold that the defendants in that action caused the financial crisis.

citations and quotations omitted); *Lentell*, 396 F.3d at 173 (loss must be foreseeable).  The foreseeability inquiry hinges on whether "the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor."  *In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 590 (S.D.N.Y. 2011).  The housing market decline and economic recession that led to losses in the value of the securities was not "within the zone of risk concealed by the misrepresentations" allegedly made in the prospectus supplements for the at-issue securitizations.  *Id.*; *see also, e.g.*, *Cable* v. *Hechler*, 532 F. Supp. 239 (E.D.N.Y. 1981) (no proximate cause where although defendant's actions foreseeably caused inquiry by the American Stock Exchange, the outcome of the inquiry that caused plaintiff's losses was not foreseeable); *Moore* v. *Slonin*, 426 F. Supp. 524 (D. Conn. 1977) (not foreseeable that alleged fraud would force plaintiff to file for bankruptcy, which in turn harmed his credit and reputation).

## VI.    PLAINTIFF OVERSTATES THE AMOUNT RECOVERABLE UNDER SECTION 12 AND THE BLUE SKY LAWS.

Plaintiff continues to argue that the Court should apply the IRS underpayment rate—a rate used in cases involving "massive and coordinated system[s] of fraudulent practices," *SEC* v. *First Jersey Secs., Inc.*, 101 F.3d 1450, 1456 (2d Cir. 1996), and "illegal conduct" that is "flagrant and longstanding," *SEC* v. *Boock*, 2012 WL 3133638, at *5 (S.D.N.Y. Aug. 2, 2012) (Cote, J.).  Plaintiff contends that it is appropriate to apply the IRS underpayment rate here because that rate "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud."  Pl.'s COL ¶ 156 (internal quotation marks omitted).  This argument fails on several counts.

*First*, there is no allegation of fraud in this Action, which distinguishes it from every decision on which plaintiff relies.  In *SEC* v. *Rosenfeld*, for example, the defendant had

engaged in a fraudulent scheme that included "overstating the value of [a corporation's] assets in reports filed with the SEC, failing to disclose the related party nature of certain transactions to which [that corporation] was a party, engaging in the unregistered distribution of [that corporation's] common stock, making undisclosed cash and/or stock payments to [one of the individual defendants], a registered representative, falsifying the company's books and records, failing to disclose material information to [the corporation's] auditors, and various other material misrepresentations and omissions." *SEC* v. *Rosenfeld*, 1997 WL 400131, at *1 (S.D.N.Y. July 16, 1997).

*Second*, plaintiff has cited no support whatsoever for its newly minted—and meritless—argument that equates "criminal behavior and fraud" with allegedly inadequate due diligence.[15]   Plaintiff argues that the IRS penalty rate should be applied here because defendants "wholly abandoned the standard of care required of them."  Opp. at 12.[16]  Plaintiff, yet again, offers not a single case to support its argument—and improperly conflates a summary judgment ruling on a reasonable care defense with "misconduct" or "fraud."

*Third*, plaintiff argues in favor of the IRS penalty rate because it "is appropriate to discourage parties from using the government as an involuntary banker."  Opp. at p. 13 (internal

---

[15]   Despite the Court's due diligence ruling, defendants respectfully maintain that they conducted adequate due diligence that was not only reasonable, but consistent with, and in some instances superior to, standard industry practices at the time.  Nomura Defs.' Mem. in Opp. to Pl.'s Motion for Partial Summary Judgment on Defs.' Due Diligence and Reasonable Care Defenses, Dec. 2, 2014; RBS Securities Inc.'s Mem. of Law in Opp. to Pl.'s Motion for Partial Summary Judgment on Defs.' Due Diligence and Reasonable Care Defenses, Dec. 2, 2014. Defendants reserve all rights for appeal.

[16]   Moreover, aside from having no factual basis, plaintiff's unsupported speculation that defendants' alleged  "misconduct contributed to the worst financial crisis since the Great Depression," Pl.'s Opp. at 12, does not present a legally cognizable basis to apply the IRS penalty rate.

quotation marks omitted).  Freddie Mac and Fannie Mae are not the government.  Furthermore, there is no dispute that during the period from the dates the Certificates were purchased through February 25, 2015, Freddie and Fannie received about 98% of the principal due to be paid to them in that period— a total of more than $1.42 billion, out of about $1.45 billion.  In addition, Freddie and Fannie received approximately $175 million in interest payments.   The assertion that anybody has "borrowed" vast sums from the government is thus blatantly false.  In fact, as of February 25, 2015, Freddie and Fannie had received about $1.60 billion in principal and interest payments from the Certificates.

        Awards of prejudgment interest must not overcompensate the plaintiff.  Defs.' COL at ¶ 105 (citing *Wickham Contracting Co., Inc.* v. *Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992)).  Here, in light of the Court's February 16, 2015 ruling (Doc. No. 1272), Nomura will not be credited with prejudgment interest on the more than $174,769,573 that Freddie Mac and Fannie Mae will have received in coupon payments from the at-issue securities by the time recovery is calculated on the judgment date.  In other words, here, if plaintiff prevails, it is not "the government," as plaintiff contends, that has been the "involuntary banker," Opp. at 13, but rather Nomura that will have effectively lent $175 million to Freddie Mac and Fannie Mae interest free.[17]  As defendants' expert, Dr. Timothy J.

---

[17]     Defendants respectfully disagree with the Court's February 16, 2015 Order (Doc. No. 1272), and reserve all rights for appeal.  Other courts disagree with this Court's holding that interest payments are not "income received" under Section 12.  *See, e.g., Charles Schwab Corp.* v. *Banc of Am. Sec. LLC*, No. CGC-10-501151, slip op. at 6-7 (Cal. Super. Ct. Nov. 10, 2014) (holding that "interest payments" were "income received" even though such payments did not reduce the outstanding principal balance); *see also Austin* v. *Loftsgaarden*, 768 F.2d 949, 958 (8th Cir. 1985), *rev'd on other grounds*, 478 U.S. 647 (1986) ("The goal of prejudgment interest is to compensate plaintiffs for the loss of the use of their money."); *Schott* v. *Maidsville Coal Min. P'ship*, 1979 WL 1245, at *4 (S.D.N.Y. Sept. 7, 1979) (awarding the plaintiff consideration
*(footnote continued)*

Riddiough, testified, "[t]he non-payment of pre-judgment interest on coupon payments thus, in the context of the rescissory remedy, imposes an economic penalty on Nomura."  Riddiough Test. at ¶ 74.  In these circumstances, any rate of prejudgment interest in excess of the one-year constant maturity Treasury rate imposed on defendants would be unjust.

Plaintiff also argues for the first time in its Opposition that the Court should apply interest "with daily compounding" based on 26 U.S.C. § 6622(a).  Opp. at 14 (citing *United States* v. *McDermott*, 2014 WL 917267, at *1 (E.D.N.Y. Mar. 10, 2014); *Flanagan* v. *N. Star Concrete Const., Inc.*, 2014 WL 4954615, at *9 (E.D.N.Y. Oct. 2, 2014)).  However, "section 6622 applies expressly only to internal revenue tax cases and ***post***-judgment interest allowed on money judgments in civil cases in a district court."[18]  *McLaughlin* v. *Cohen*, 686 F. Supp. 454, 458 (S.D.N.Y. 1988) (emphasis added).  Section 12 does not require any rate of interest to be paid under Title 26 and, as such, Section 6622 would not be implicated.  Plaintiff's belated argument for daily compounding is nothing more than another request for an improper penalty.  Should plaintiff prevail, prejudgment interest should be applied as it was by both plaintiff's

---

*(footnote continued)*

paid "less any distributions made to him . . . "plus interest on the net amount so calculated.") (emphasis added).

[18]    Section 6622 provides:  "In computing the amount of any interest required to be paid under this title or sections 1961(c)(1) or 2411 of Title 28, United States Code, by the Secretary or by the taxpayer, or any other amount determined by reference to such amount of interest, such interest and such amount shall be compounded daily."  26 U.S.C. § 6622.  In *McDermott*, the government brought the action to recover unpaid taxes, and in accordance with Section 6622, interest awarded was compounded daily.  2014 WL 917267, at *1.  Similarly, in *Flanagan*, the plaintiff recovered under the Employee Retirement Income Security Act of 1974 ("ERISA"), which instructs that interest is required to be paid under "Title 26."  2014 WL 4954615, at *1, *9.

expert, James K. Finkel, and defendants' expert, Dr. Riddiough—using simple pre-judgment interest.

## CONCLUSION

Plaintiff's recent submissions, including its "Proposed Conclusions of Law" and "Opposition to Defendants' Pretrial Memorandum of Law," are full of misstatements and errors. Defendants make this submission to point out some of the more glaring of these.

Dated: New York, New York
       March 9, 2015

Respectfully submitted,

/s/ Thomas C. Rice
Thomas C. Rice (trice@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY  10017
Telephone:  212-455-2000
Facsimile:  212-455-2502
*Attorneys for Defendant RBS Securities Inc.*

/s/ David B. Tulchin
David B. Tulchin (tulchind@sullcrom.com)
Steven L. Holley (holleys@sullcrom.com)
Bruce E. Clark (clarkb@sullcrom.com)
Bradley A. Harsch (harschb@sullcrom.com)
Katherine J. Stoller (stollerk@sullcrom.com)
Yavar A Bathaee (bathaee@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000
Facsimile:  212-558-3588
*Attorneys for Nomura Defendants*

Amanda F. Davidoff
(davidoffa@sullcrom.com)
Elizabeth A. Cassady
(cassadye@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC  20006
Telephone:  202-956-7500
Facsimile:  202-956-6993
*Attorneys for Nomura Defendants*