UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,

Plaintiff,

-against-

NOMURA HOLDING AMERICA INC., NOMURA ASSET ACCEPTANCE CORPORATION, NOMURA HOME EQUITY LOAN, INC., NOMURA CREDIT & CAPITAL, INC., NOMURA SECURITIES INTERNATIONAL, INC., RBS SECURITIES INC. (f/k/a GREENWICH CAPITAL MARKETS, INC.), DAVID FINDLAY, JOHN MCCARTHY, JOHN P. GRAHAM, NATHAN GORIN, and N. DANTE LAROCCA,

Defendants.

11 Civ. 6201 (DLC)

---

**CORRECTED DIRECT TESTIMONY OF STEVEN A. CAMPO**

March 20, 2015



EXHIBIT PX 01774

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION AND SUMMARY OF OPINIONS ...................................................1

II. THE ROLE OF INDEPENDENT ACCOUNTANTS IN REVIEWING DATA IN LOAN TAPES AND PROSPECTUS SUPPLEMENTS PRIOR TO SECURITIZATION..................................................................................................................3

    A. Validating That Mortgage Loan Data Was Correctly Recorded in the Loan Tape.....................................................................................................................4

    B. Computing and Comparing Prospectus Supplement Information ..........................5

    C. Issuance of the AUP Letter .......................................................................................6

III. THE DEFENDANTS' AUP REVIEWS DURING THE RELEVANT PERIOD WERE LIMITED IN SCOPE AND EFFICACY ................................................................6

    A. THE AUP REVIEWS DO NOT CONFIRM THAT THE PROSPECTUS SUPPLEMENTS ARE ACCURATE ..................................................................7

    B. APPARENT DEFICIENCIES IN THE DEFENDANTS' DATA INTEGRITY REVIEWS ..........................................................................................9

IV. CONCLUSIONS..................................................................................................................11

I, Steven A. Campo, declare as follows:

## I. INTRODUCTION AND SUMMARY OF OPINIONS

1. I have more than 30 years of experience in the securitization industry, with particular emphasis on the RMBS industry. I was a licensed Certified Public Accountant, registered at various times between 1982 and my retirement in 2009 in New York, New Jersey, and the District of Columbia. I am the founder and Principal of SeaView Advisors, LLC, which provides litigation and expert witness services in the securitization industry, including in connection with mortgage-backed securities.

2. From 1999 to 2009, I served as a Partner at Ernst & Young LLP ("E&Y"), and during most of that time I was Managing Partner for the Structured Finance Advisory Services practice. As Managing Partner, I managed a 200-plus member team providing clients with a range of services including "agreed-upon procedures" ("AUP") reviews, cash flow modeling, and operational and asset-based due diligence services related to the issuance of mortgage-backed securities and other financings. Prior to joining E&Y, I was Senior Managing Director and Head of the Structured Finance Group at MBIA Insurance Corporation, responsible for oversight of the financial guaranty business in the issuance of mortgage-backed and asset-backed securities.

3. My curriculum vitae, **Plaintiff's Exhibit 1323**, identifies my experience and professional accomplishments.

4. I have been retained by Quinn Emanuel Urquhart & Sullivan, LLP, on behalf of its client, the Federal Housing Finance Agency ("FHFA") in its capacity as Conservator of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (Fannie Mae and Freddie Mac together, the "GSEs"), to provide expert testimony and opinions regarding the AUP reviews (sometimes also referred to as "data

integrity" reviews) that Deloitte & Touche LLP ("Deloitte") conducted for one or more Defendants relating to seven residential mortgage-backed securities that the GSEs purchased between 2005 and 2007 (the "Offerings" or "Subject Offerings").

5. I will first summarize my opinions, and then set forth my analysis and opinions in more detail.

6. The data integrity reviews that Deloitte performed for a sample of loans, known as AUP reviews, served the limited purpose of comparing and/or recalculating certain data points on a loan tape with information in loan files, and recalculating certain aggregate data figures that would be disclosed in the prospectus supplement. AUP reviews assessed only corresponding data points in the loan tape and loan file: they did not verify the underlying accuracy of any information listed in the loan tape or assess the sufficiency of disclosures in the prospectus supplement.

7. In addition, there is no indication in the record I reviewed that (a) Deloitte itself selected the mortgage loan sample from the Subject Offerings or that the sample was randomly selected or that (b) the Defendants extrapolated data error findings identified during Deloitte's data reviews to determine whether data errors similarly existed in the non-sampled mortgage pool. Without evidence of random sampling and investigative and corrective actions, the correspondence of loan tape data points to loan file information is undetermined outside the sample, and, as a result, so is the accuracy of certain disclosures contained in the prospectus supplement.

8. In light of these findings, the data reviews that Deloitte conducted on a sample of the mortgage loans underlying the Subject Offerings could not support the accuracy of disclosures in prospectus supplements and, in fact, their results suggest that substantial data

2

errors likely existed in the non-sampled mortgage loans. It is my opinion, therefore, that Deloitte's data integrity reviews did nothing more than confirm that certain data errors were corrected with respect to the sample of loans reviewed, they did not verify the underlying accuracy of any information listed in the loan tape, and thus did nothing to confirm the underlying accuracy of data used in calculating prospectus supplement disclosures.

## II. THE ROLE OF INDEPENDENT ACCOUNTANTS IN REVIEWING DATA IN LOAN TAPES AND PROSPECTUS SUPPLEMENTS PRIOR TO SECURITIZATION

9. Investment banks and third-party issuers and underwriters (each individually a "Securitizing Entity") generally engaged and instructed accounting firms to conduct AUP reviews in connection with RMBS transactions. These AUP reviews validated that certain data points used to present information in prospectus supplements correctly reflected information as reported in the collateral data file and in loan files from which these data files were compiled. This process did not include a verification of the validity or truthfulness of the underlying information in the loan file itself. Accounting firms set forth the scope of their data reviews and their findings in AUP letters that generally were issued contemporaneous with a securities offering and provided to the engaging party.

10. During the relevant 2005-2007 period, AUP engagements in the RMBS space generally consisted of two separate reviews: (1) comparing and recalculating, for a sample of loans, that certain data on the loan tape accurately reflected the data in the loan file (without confirming whether or not such underlying data was correct), and (2) recomputing and/or comparing certain aggregate data calculations used for pool level disclosures in prospectus supplements. Accounting firms issued letters defining the scope of their reviews, and expressly disclaimed verifying the accuracy or completeness of underlying loan information.

3

### A. Validating That Mortgage Loan Data Was Correctly Recorded in the Loan Tape

11. An AUP review typically began weeks before a securities issuance when a Securitizing Entity provided an accounting firm with an initial data file containing loan characteristics for each loan collateralizing an RMBS transaction. The initial data file typically included data points for each loan such as borrower name, original principal and interest payment, interest rate, FICO score, appraised value, owner occupancy status, debt-to-income ("DTI") ratio, loan-to-value ("LTV") ratio, and combined loan-to-value ("CLTV") ratio.

12. An accounting firm typically selected a random sample of loans from the initial data file and compared an agreed-upon subset of data points to correlating information in loan-file documents obtained from the Securitizing Entity, such as the promissory note, credit report, appraisal report, residential mortgage application, or underwriting summary. During this review, the accounting firm validated whether the agreed-upon data points in the initial data file accurately reflected information stated in the relevant loan-file documents.

13. The accounting firm reported to a Securitizing Entity any discrepancies in data points between the initial data tape and the loan files, and typically identified any missing loan files or relevant documents missing from the loan file. The Securitizing Entity was responsible for correcting the loan tape to address data discrepancies identified and reported by the accounting firm and for locating any missing loan documents. The findings of the accounting firm could also suggest that similar data errors exist throughout the non-sampled mortgage loans on the initial data file.

14. Shortly before securitization, a Securitizing Entity provided the accounting firm with a final data file. The final data file generally contained data characteristics for the final pool of loans collateralizing the securitization at that time. For each sample loan included on the final

4

data file, the accounting firm compared the agreed-upon subset of data characteristics in the final data file to those characteristics as stated in the initial data file. Data discrepancies identified between the final and initial data files alerted the engaging party to potential inconsistencies between the final data file and the loan files for the sample loans. In other words, this comparison provided the Securitizing Entity with verification that the data file it utilized at the time of securitization contained information consistent with the data reported in the loan files for the sample loans. Accounting firms did not independently verify the accuracy and completeness of the information in the loan file documents that it used to validate data points on the initial or final loan tapes.

15. In concluding the AUP review, accounting firms would determine that data points between the final data file and the initial data file were "in agreement," except for any reported data discrepancies.

16. Finally, it is important to understand that the accounting standards applied in conducting an AUP review are very different from those that govern an "audit." In AUP reviews, the engaging party determines the tasks that an accounting firm will perform. The responsibility for the sufficiency of the tasks performed and the suitability of the findings achieved lie with the engaging party, not with the accounting firm. Further, unlike audits and opinions, an engaging party cannot incorporate AUP findings into public regulatory filings or even share the findings with parties outside of the engagement. The findings are intended solely for use by the engaging party.

> **B.  Computing and Comparing Prospectus Supplement Information**

17. Accounting firms also used data points in the data file and the assumptions listed in the prospectus supplement to recalculate and compare certain aggregated data figures disclosed in the prospectus supplement. For example, the accounting firm might be asked to

recalculate a mortgage pool's weighted average credit score, weighted average LTV ratio at origination, or weighted average DTI ratio, among other pool-wide data that would be disclosed. If the recalculations corresponded with information stated in the prospectus supplement, the accounting firm determined that the information was "in agreement." As with the process of validating mortgage loan information, this review did not involve verifying the accuracy and completeness of the underlying borrower and collateral information, as to which the accounting firm expressly disclaimed any opinion.

### C. Issuance of the AUP Letter

18. The AUP review generally culminated in an accounting firm's issuance of an AUP letter setting forth the scope of its review, defining the agreed-upon data fields it was asked to review and recalculate, and listing any data discrepancies, missing loan files, or other missing information identified during the course of its comparisons and recomputations. AUP letters expressly stated that accounting firms did not opine on the accuracy of the underlying information, but merely compared or recalculated information based on data points provided by the engaging party.

### III. THE DEFENDANTS' AUP REVIEWS DURING THE RELEVANT PERIOD WERE LIMITED IN SCOPE AND EFFICACY

19. Based on my review of the AUP letters issued in connection with each of the Subject Offerings, Deloitte's procedures generally were consistent with the practices outlined in Section II. Indeed, the AUP letters that Deloitte issued expressly disclaim undertaking any review as to the accuracy of underlying borrower and collateral information, the sufficiency of the disclosures in the prospectus supplement, or the validity of data points for non-sampled mortgage loans. The AUP reviews alone thus do not, and were not intended to, support the

position that data integrity reviews served to confirm the accuracy and completeness of prospectus supplement disclosures.

      A.      **THE AUP REVIEWS DO NOT CONFIRM THAT THE PROSPECTUS SUPPLEMENTS ARE ACCURATE**

20.      The AUP letters relating to the Subject Offerings confirm that Deloitte did not verify the accuracy of underlying borrower or collateral information or make any representations as to the sufficiency of the applicable prospectus supplement disclosures. The AUP letters are replete with disclaimers prominently cautioning against reaching conclusions about the accuracy of the underlying information. For example, Deloitte's AUP letters for each of the Subject Offerings include the following language (or nearly identical language) with respect to the data file review:

> We were not requested to, and we did not, perform any procedures with respect to the preparation or verification of any of the information set forth on the Loan Documents and make no representations concerning the accuracy or completeness of any of the information contained therein.[1]

Deloitte also included similar language in its AUP letters regarding prospectus supplement disclosures:

> We have addressed ourselves solely to the foregoing data as set forth in the Prospectus Supplement and make no representations as to the adequacy of disclosure or as to whether any material facts have been omitted. Further, the information set forth in the Prospectus Supplement

---

[1] *See, e.g.*, **PX 1432** (Deloitte Independent Accountants' Report for NHELI 2007-1, dated Jan. 26, 2007) at 6; **PX 1427** (Deloitte Independent Accountants' Report for NAA 2005-AR6, dated Nov. 29, 2005) at 5; **PX 1428** (Deloitte Independent Accountants' Report for NHELI 2006-FM1, dated Jan. 27, 2006) at 6; **PX 1430** (Deloitte Independent Accountants' Report for NHELI 2006-FM2, dated Oct. 30, 2006) at 6; **PX 1429** (Deloitte Independent Accountants' Report for NHELI 2006-HE3, dated Aug. 29, 2006) at 5; **PX 1431** (Deloitte Independent Accountants' Report for NHELI 2007-2, dated Jan. 30, 2007) at 4; **PX 1433** (Deloitte Independent Accountants' Report for NHELI 2007-3, dated Apr. 27, 2007) at 5.

and on the Data File is the responsibility of the Depositor.[2]

In my opinion, this evidence shows that AUP reviews, at best, serve only to confirm that the data points actually reviewed were accurately reported, and does not confirm that the underlying information for the loans in the sample population was accurate or that the characteristics of the overall loan population were accurately disclosed in the prospectus supplement.

21.     The record also does not indicate that Deloitte selected the mortgage loan sample for AUP review or that the sample was randomly selected.[3] Deloitte expressly stated in each of

---

[2] *See, e.g.*, **PX 1427** (Deloitte Independent Accountants' Report for NAA 2005-AR6, dated Nov. 29, 2005) at 7; **PX 1428** (Deloitte Independent Accountants' Report for NHELI 2006-FM1, dated Jan. 27, 2006) at 7; **PX 1429** (Deloitte Independent Accountants' Report for NHELI 2006-HE3, dated Aug. 29, 2006) at 6; **PX 1430** (Deloitte Independent Accountants' Report for NHELI 2006-FM2, dated Oct. 30, 2006) at 7; **PX 1432** (Deloitte Independent Accountants' Report for NHELI 2007-1, dated Jan. 26, 2007) at 8; **PX 1431** (Deloitte Independent Accountants' Report for NHELI 2007-2, dated Jan. 30, 2007) at 5; **PX 1433** (Deloitte Independent Accountants' Report for NHELI 2007-3, dated Apr. 27, 2007) at 6; *see also* Sindle 30(b)(6) Dep. 119:23-120:10 ("Q. Under any circumstances in the agreed-upon procedures process that we've been describing, would Deloitte ever do anything to confirm the accuracy of any of the information being provided to it by the specified user? . . . A. Other than the procedures that we are performing in our work, but we would not confirm the accuracy or the validity of the information."); LaRocca Dep. 111:12-18 ("Q. . . . What did Deloitte do in this deal? A. Deloitte provided a comfort letter which basically checked the numbers in the document to source documents and then checked calculations made in the document to make sure they were right; and they provided a comfort letter confirming that."); Katz Dep. 337:20-338:2 ("Q. What about Deloitte, what was the type of due diligence that Deloitte did? A. Deloitte would basically tick and tie and reproduce the numbers that we used in our offering memos and our prospectus supplement.").

[3] *See, e.g.*, **PX 1428** (Deloitte Independent Accountants' Report for NHELI 2006-FM1, dated Jan. 27, 2006) at 4 ("[T]he Depositor provided us [Deloitte] with a computer-generated mortgage loan data file (the 'Sample Data File') and related record layout with respect to 174 mortgage loans (the 'Provided Sample Loans'). At your instruction, for 150 of the 174 Provided Sample Loans (as selected by the Depositor and hereinafter referred to as the 'Sample Loans'), we performed certain comparisons and recomputations relating to the mortgage loan characteristics ('Characteristics') set forth on the Sample Data File and indicated below."); **PX 1430** (Deloitte Independent Accountants' Report for NHELI 2006-FM2, dated Oct. 30, 2006) at 4 (similar); **PX 1429** (Deloitte Independent Accountants' Report for NHELI 2006-HE3, dated Aug. 29, 2006) at 3 (similar); **PX 1432** (Deloitte Independent Accountants' Report for NHELI 2007-1, dated Jan. 26, 2007) at 4 (similar); **PX 1433** (Deloitte Independent Accountants' Report for NHELI 2007-3, dated Apr. 27, 2007) at 2 (similar); **PX 1427** (Deloitte Independent

8

the relevant AUP letters, "We make no representations with respect to the selection criteria used in determining the Sample Loans."[4] Although the engaging party dictates the terms of the AUP review, it is preferable in my opinion for an independent accounting firm to randomly select the loan sample during an AUP review because it keeps the selection process free from taint or bias and assures that the sample is likely to be drawn from the broadest cross section of the portfolio. In the absence of such sample selections by the accounting firm, any conclusions regarding the applicability of the AUP review's findings to the non-sampled portion of the pool are unfounded.

22. Based on the scope and the results of AUP reviews alone, data integrity reviews do not serve to confirm the accuracy and completeness of offering document disclosures.

### B. APPARENT DEFICIENCIES IN THE DEFENDANTS' DATA INTEGRITY REVIEWS

23. In my opinion, the AUP reviews conducted here are also incapable of confirming the accuracy of prospectus supplement disclosures because of Defendants' failure to extrapolate data-error rates across the broader mortgage pool and to investigate pool-wide issues.

24. Deloitte's findings were limited to the sampled loans that it reviewed and the mathematical computations performed in connection with information on the data file.[5] I saw no

---

Accountants' Report for NAA 2005-AR6, dated Nov. 29, 2005) at 4 (similar); *see also* **PX 1431** (Deloitte Independent Accountants' Report for NHELI 2007-2, dated Jan. 30, 2007) at 2 (similar).

[4] **PX 1430** (Deloitte Independent Accountants' Report for NHELI 2006-FM2, dated Oct. 30, 2006) at 4; **PX 1429** (Deloitte Independent Accountants' Report for NHELI 2006-HE3, dated Aug. 29, 2006) at 3 (same); **PX 1433** (Deloitte Independent Accountants' Report for NHELI 2007-3, dated Apr. 27, 2007) at 2 (same); **PX 1427** (Deloitte Independent Accountants' Report for NAA 2005-AR6, dated Nov. 29, 2005) at 4 (same); **PX 1428** (Deloitte Independent Accountants' Report for NHELI 2006-FM1, dated Jan. 27, 2006) at 4 (similar); **PX 1432** (Deloitte Independent Accountants' Report for NHELI 2007-1, dated Jan. 26, 2007) at 4 (similar); **PX 1431** (Deloitte Independent Accountants' Report for NHELI 2007-2, dated Jan. 30, 2007) at 2 (same).

[5] *See* **PX 1430** (Deloitte Independent Accountants' Report for NHELI 2006-FM2, dated Oct. 30, 2006) at 6 ("We provide no assurances with respect to the accuracy (other than the

evidence that the Defendants extrapolated error rates identified during AUP reviews in the sample loan populations across the larger mortgage pool to assess whether pool-wide discrepancies required corrective action, or even that Defendants conducted a representative sample that would enable them to do so.  Accordingly, Deloitte's review could not be said to confirm the accuracy of disclosures regarding the non-sampled portion of the loan pool or the accuracy of related disclosures contained in the prospectus supplement.

25.    It has been my experience that discrepancies identified during data integrity reviews may be indicative of serious and systemic problems, such as a sponsor's inability to reliably maintain appropriate loan quality control measures.  Here, Deloitte identified data errors in the sample loan population indicating that similar data errors likely existed in the non-sampled loan population.  For example, the AUP letter issued in connection with NAA 2005-AR6 shows that Deloitte identified 39 data discrepancies in 29 loans, or 19.33% of the 150-loan sample.[6] Five sample loans were also missing loan file documents, which prevented Deloitte from reviewing key data fields.  Similarly, for the NHELI 2007-1 transaction Deloitte reported 36 data discrepancies in 24 loans for a 300-loan sample, and stated that missing loan file documents prevented its review of key data fields for an additional 18 loans.[7]  AUP letters issued in connection with most of the Subject Offerings also reported data discrepancies and missing loan file documents in 10% or more of the sampled loans.[8]

---

mathematical accuracy of any information derived from the Data File as described below) of any information relating to the non-Sample Loans on the Data File.").

[6] **PX 1427** (Deloitte Independent Accountants' Report for NAA 2005-AR6, dated Nov. 29, 2005) at 8.

[7] **PX 1432** (Deloitte Independent Accountants' Report for NHELI 2007-1, dated Jan. 26, 2007) at 9.

[8] *See, e.g.*, **PX 1428** (Deloitte Independent Accountants' Report for NHELI 2006-FM1, dated Jan. 27, 2006) at 8 (for a 150-loan sample from NHELI 2006-FM1, reporting 15 loans with

26.     I have seen no evidence that any of these findings led Defendants to investigate the reported data for the non-sampled population of loans.  A Securitizing Entity that fails to reasonably investigate and correct likely data errors in the non-sampled loan population assumes a substantial risk that prospectus supplements contain inaccurate information.  The Defendants' demonstrated failure to undertake such corrective action here undermines any assertion that AUP reviews served to confirm the accuracy or completeness of disclosures in offerings documents for the Subject Offerings.

## IV.    CONCLUSIONS

27.     The subject AUP reviews are limited to validating the reporting of data—not verifying the data's underlying accuracy.  This fact is reflected by express limitations stated in the AUP letters regarding the scope of AUP reviews.  Without taking reasonable steps to assure the accuracy and completeness of the underlying loan file information, the data integrity reviews that Deloitte conducted are wholly inadequate grounds to support the accuracy or completeness of disclosures in offering documents.  Further, evidence in the record supports the conclusion that the Defendants ignored the impact of reported data discrepancies on the information used in calculating certain prospectus supplement disclosures, including the Defendants' failure to determine whether similar errors existed in the non-sampled mortgage pool.

---

one or more data errors); **PX 1429** (Deloitte Independent Accountants' Report for NHELI 2006-HE3, dated Aug. 29, 2006) at 5, 7 (for 200-loan sample from NHELI 2006-HE3, reporting 19 loans with one or more data errors and four loans missing one or more documents necessary to Deloitte's review); **PX 1431** (Deloitte Independent Accountants' Report for NHELI 2007-2, dated Jan. 30, 2007) at 4, 6 (for 200-loan sample from NHELI 2007-2, reporting 19 loans with one or more data errors and four loans missing one or more documents necessary to Deloitte's review); **PX 1433** (Deloitte Independent Accountants' Report for NHELI 2007-3, dated Apr. 27, 2007) at 5, 7 (for 200-loan sample from NHELI 2007-3, reporting 18 loans with one or more data errors and three loans missing one or more documents necessary to Deloitte's review).

Pursuant to 28 U.S.C. § 1746, I declare under perjury that the foregoing is a true and correct statement of my opinions in this Action.

Executed on this 20th day of March, 2015 in New York, New York.

*Steven A. Campo*

Steven A. Campo