UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

               Plaintiff,

       -against-

NOMURA HOLDING AMERICA INC.,
NOMURA ASSET ACCEPTANCE
CORPORATION, NOMURA HOME
EQUITY LOAN, INC., NOMURA CREDIT
& CAPITAL, INC., NOMURA SECURITIES
INTERNATIONAL, INC., RBS
SECURITIES INC. (f/k/a GREENWICH
CAPITAL MARKETS, INC.), DAVID
FINDLAY, JOHN MCCARTHY, JOHN P.
GRAHAM, NATHAN GORIN, AND N.
DANTE LAROCCA,

               Defendants.

11 Civ. 6201 (DLC)


**CORRECTED DIRECT TESTIMONY OF LEONARD A. BLUM**


**March 17, 2015**



EXHIBIT
ALL-STATE LEGAL®
PX 01778

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

I.     INTRODUCTION AND SUMMARY OF OPINIONS .......................................................1

II.    ANALYSIS OF AN UNDERWRITER'S ROLES IN BRINGING AN
       OFFERING TO MARKET...........................................................................................4

       A.     Informational Asymmetry and the Underwriter's Disclosure Role Make
              the Underwriter a Gatekeeper of Information Regarding the Collateral ................4

       B.     The Underwriter Confirms Accuracy of Disclosures Regarding Collateral...........6

       C.     The Underwriter Confirms Adherence to Underwriting Guidelines ......................7

       D.     The Underwriter Secures Credit Ratings Necessary to Facilitate Sale.................10

       E.     The Underwriter Structures and Prices the Transaction ........................................17

III.   RE-UNDERWRITING AND APPRAISAL VALUATIONS CONDUCTED
       REVEAL INACCURACIES IN COLLATERAL CHARACTERISTICS AND
       DEFECTS IN ORIGINATION PRACTICES ..................................................................18

       A.     Mr. Hunter's Identification of Underwriting Defects and Loan Level
              Inaccuracies...........................................................................................................19

       B.     Dr. Kilpatrick's Identification of Inflated Appraisals and Inaccurate LTVs .........20

       C.     Underwriting Defects in the SLGs Increased the Credit Risk of the Subject
              Offerings ...............................................................................................................22

IV.    THE TRUE NATURE OF THE SUBJECT LOANS WOULD HAVE
       REQUIRED THE DEFENDANTS TO HAVE PROCEEDED DIFFERENTLY
       AND LIKELY WOULD HAVE PRECLUDED ISSUANCE OF THE
       OFFERINGS..............................................................................................................24

       A.     Result of Eliminating Subject Loans That Did Not Comply with
              Disclosure Documents ..........................................................................................26

       B.     Result of Revising Disclosure Documents to Accurately Describe the
              Defective Subject Loans .......................................................................................27

I, Leonard A. Blum, declare as follows:

## I.   INTRODUCTION AND SUMMARY OF OPINIONS

1.   I have more than 27 years of experience in investment banking and capital markets.   Prior to founding Blum Capital Advisors, LLC, where I am a principal, my career included more than 11 years at Prudential Securities, Inc., its predecessors and affiliates, and more than 15 years at Westwood Capital, LLC.   I have been involved in well over 100 offerings of rated, residential mortgage backed securities ("RMBS"), and countless securities offerings backed by other collateral types, and have significant experience working with rating agencies on new issuances of RMBS and other securities.   Mortgage-backed securities and related activities have been a major focus of my career since 1988.   My curriculum vitae, **PX 1322**, identifies my publications and other professional accomplishments.

2.   I have been retained by Quinn Emanuel Urquhart & Sullivan, LLP on behalf of its client, the Federal Housing Finance Agency ("FHFA"), in its capacity as Conservator of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (Fannie Mae and Freddie Mac together, the "GSEs") to provide expert testimony and opinions regarding FHFA's claims against the Defendants in this Action relating to seven residential mortgage-backed securities that the GSEs purchased between 2005 and 2007 (the "Offerings" or "Subject Offerings").

3.   I have been asked to opine on the following general subjects:   How residential mortgage-backed securities are issued and underwritten and the impact on such issuance and underwriting where the loans underlying the securitizations have collateral characteristics that are inaccurately disclosed or were defectively originated.

4.   For purposes of providing my opinions, I have reviewed and relied, among other things, upon the proffered Direct Testimony of Mr. Robert W. Hunter, FHFA's loan file

underwriting expert, Dr. John Kilpatrick, FHFA's valuation expert, and Dr. Charles Cowan, FHFA's statistical expert who extrapolated the work of Mr. Hunter and Dr. Kilpatrick to arrive at pool-level findings for the seven Subject Offerings.

5.    I will first summarize my opinions, and then set forth my analysis and conclusions in more detail.

6.    A broker-dealer acting in the capacity of securities underwriter (as did Defendants in this case) conducts a reasonable investigation of representations in an offering's registration statement (and amendments thereto), prospectus, and any prospectus supplement (the "Disclosure Documents") to ensure that those representations are reasonably accurate and complete.   In my experience, this role includes identifying and investigating any "red flags" or "warning signs" that arise regarding the accuracy of such representations, so that the underwriter has reasonable grounds to believe that the Disclosure Documents do not misstate any material facts or omit a material fact necessary to make the statements made not misleading (I refer to this as "Requisite Due Diligence").   "Material" is a widely-used term in the securities industry, and I use and understand it to generally mean information that a reasonable investor would want to know when making a decision whether or not to buy the subject security, including whether the subject security complies with the investor's investment guidelines and whether to buy the subject security at a given price.

7.    According to the findings of Mr. Hunter and Dr. Kilpatrick, there were dramatic differences for each of the Subject Offerings between the actual loan pool composition and what the Defendants represented in the Disclosure Documents.   These include findings by Mr. Hunter that, as extrapolated to the supporting loan groups ("SLGs") as a whole, 84.51% of the loans underlying the SLGs (the "Subject Loans") were not originated in accordance with the

requirements of the relevant originator's underwriting guidelines, and 65.42% of the Subject Loans with this underwriting defect had increased credit risk.[1]   Dr. Kilpatrick also concluded that the appraisals for the Subject Loans had an average upward bias of 8.92%,[2] and, overall, when extrapolated across all SLGs, the appraisals were overstated by 11.1% on average.[3]

8.     The differences in loan pool composition between what was represented in the Disclosure Documents and what was actually determined by Mr. Hunter and Dr. Kilpatrick have significant implications for Defendants in their roles as securities underwriters.   Given an underwriter's role in conducting reasonable due diligence and ensuring accurate and complete disclosures, Defendants should have identified some, if not all, of the discrepancies identified by Mr. Hunter and Dr. Kilpatrick, and in my opinion should not have offered or distributed the Subject Offerings without requiring or taking the following actions:   (i) eliminating Subject Loans that did not comply with the representations in the Disclosure Documents; (ii) revising the Disclosure Documents to accurately describe the Subject Loans, including the extent of the deficiencies; or (iii) some combination of (i) and (ii).   In addition, given the change in reported loan pool composition, Defendants would have had to resubmit the final, corrected loan pool to the independent credit rating agencies to obtain new credit ratings.

9.     Taking these corrective actions would have resulted, in my opinion and to a reasonable degree of certainty, in one or more of the following:

i.     A greater portion of the Offerings would have received a lower rating from credit rating agencies, assuming such agencies even agreed to rate the Offerings at all, which one or more agencies may not have given the level of defects;

---

[1]   Cowan Direct ¶ 56 (**PX 1525**), 60 (**PX 1538**); *see* Hunter Direct ¶ 398(a).

[2]   Kilpatrick Direct ¶ 82.

[3]   Cowan Direct ¶ 76 (**PX 1559**).

    ii.      Additional forms of internal or external credit enhancement may have been required by the rating agencies;

    iii.     The weighted-average yield at which the Offerings were sold to investors would have been higher;

    iv.     The size of the Offerings would have diminished due to the removal of defective Subject Loans, and such Subject Loans would have been either:

         a.  Put back to the seller (if possible);

         b.  Sold in the secondary loan market, most likely at a loss; or

         c.  Retained on Defendants' balance sheet; and/or

    v.      One or more classes of securities may not have been salable.

10.    Taking any of the above corrective actions likely would have decreased the profitability of the transaction for Defendants—for example, because the size of the Offering would have been smaller or because of the transaction costs associated with obtaining replacement collateral—and, as a practical and economic matter, may have precluded issuance of the Subject Offerings.   Under any potential scenario, however, the Subject Offerings would have been issued—if at all—as fundamentally different transactions, because the Disclosure Documents would require extensive modification to disclose to investors the true nature of the collateral and/or because the defective collateral would have to be replaced so that it substantially conformed   to the descriptions in the Disclosure Documents.

## II.    ANALYSIS OF AN UNDERWRITER'S ROLES IN BRINGING AN OFFERING TO MARKET

### A.    Informational Asymmetry and the Underwriter's Disclosure Role Make the Underwriter a Gatekeeper of Information Regarding the Collateral

11.    An "underwriter" in the RMBS context is typically an investment bank that brings a securitization to market, and may be an affiliate of the sponsor (the entity that purchases the loans) and/or the depositor (the entity that deposits the loans in the RMBS trust for securitization).   The underwriter has a primary and essential role in any public securities

offering—to ensure that the Disclosure Documents are accurate and complete by conducting Requisite Due Diligence.   Nomura Securities International, Inc. and/or RBS Securities Inc. ("RBSSI") served as underwriters in connection with the Subject Offerings.

12.   Other functions performed by the underwriter may include:   (a) providing information to rating agencies to obtain credit ratings for securities; (b) structuring and pricing securities; and (c) marketing and distributing securities to investors.

13.   For the underwriter (and its affiliates), material profits (or losses) generally arise from underwriting fees, as well as the difference between (a) the proceeds received by the bank (and affiliates) from sold securities, plus the value of any securities retained; and, in the instance of an affiliated underwriter, (b) what the bank paid for the loans plus all marginal expenses of the securitization (this difference is the "Net Trade Value").   Where the underwriter is not affiliated with the sponsor or depositor in an RMBS transaction, such as RBSSI as to four of the Subject Offerings, profits are predominantly based on an underwriting fee, which is generally expressed as a percentage of the total securitization sold to investors.

14.   An underwriter acts as both a financial and an information intermediary between issuers and potential investors.   In essence, the underwriter is the gatekeeper—it has access to material non-public information that is unavailable to investors or rating agencies in public offerings.   The underwriter, in turn, conducts reasonable due diligence to ensure that disclosures to investors are accurate and not misleading.

15.   Consistent with the underwriter's unique role, investors and other market participants, including rating agencies, generally understand that an underwriter involved in a securities offering conducts Requisite Due Diligence.

16.     To the extent that defective loans are found during Requisite Due Diligence (*i.e.*, loans that do not conform to the description provided in the related Disclosure Documents), the underwriter is expected to cure, remove, or disclose such defects, as opposed to foisting such loans on investors.   Such undertakings may be costly to the enterprise as a whole (*i.e.*, an underwriter and its affiliates), thereby creating incentives for the entity not to undertake such corrective actions.   Defective loans are typically worth less than those that conform to underwriting guidelines because, among other reasons, a potential purchaser may not as readily securitize them.

### B.     The Underwriter Confirms Accuracy of Disclosures Regarding Collateral

17.     Disclosure Documents for an RMBS are the principal source of information upon which investors assess a given security and, ultimately, base their decision to invest in such security.   Disclosure Documents expressly instruct investors that the prospectus supplement, the prospectus, and all documents incorporated therein contain the only information that the investors should rely on in purchasing the securitizations.   For example, Defendants prominently placed the following language on the back cover of prospectus supplements:   "You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus.   We have not authorized anyone to provide you with different information."[4]

18.     Investors typically consider disclosures regarding the characteristics of the loan pool to evaluate the risks associated with an RMBS.   Among the key factors in any such

_____

[4]     *See, e.g.*, **PX O0059** (NAA 2005-AR6 Prospectus Supplement) at 313; **PX 220** (NHELI 2006-HE3 Prospectus Supplement) at 371; **PX 244** (NHELI 2006-FM2 Prospectus Supplement) at 372; **PX O0049** (NHELI 2006-FM1 Prospectus Supplement) at 335; **PX 532** (NHELI 2007-1 Prospectus Supplement) at 445; **PX 853** (NHELI 2007-2 Prospectus Supplement) at 398; **PX O0051** (NHELI 2007-3 Prospectus Supplement) at 389.

evaluation are loan pool statistics regarding FICO scores, loan-to-value ("LTV") ratios,

combined loan-to-value ("CLTV") ratios, borrower debt-to-income ("DTI") ratios, and borrower

occupancy status.   Disclosure Documents typically include both pool-level descriptions, as well

as stratifications identifying the distribution of certain characteristics within the pools.

   19. Disclosures regarding the composition of the loan pools backing an RMBS

provide investors a broad range of criteria—information concerning the characteristics of the

collateral underlying the RMBS—that investors use to evaluate risk.   In addition to the rating

assigned by one or more rating agencies, investors may choose to conduct their own assessment

of the riskiness of the underlying collateral to determine whether, in their view, there is sufficient

credit enhancement.   For example, investors may compare a subject transaction to comparable

securitizations previously issued by the same originator, and then observe how the loan pool

underlying the comparable transaction has performed to assess the loan pool for the subject

transaction.   Underscoring the importance of the underwriter's role in providing accurate

disclosures regarding collateral characteristics, investors cannot accurately evaluate the credit

risk if the Disclosure Documents are materially incorrect or incomplete.

  C. **The Underwriter Confirms Adherence to Underwriting Guidelines**

   20. Underwriting guidelines are designed and intended to ensure that loans generally

are originated based on objective criteria that are expected to assess reliably the borrower's

ability and willingness to repay and the adequacy of the collateral for the mortgage loan.[5]

---

[5] *See* **PX O0049** (NHELI 2006-FM1 Prospectus Supplement) at 71 ("Fremont's
underwriting guidelines are primarily intended to assess the ability and willingness of the
borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral
for the mortgage loan."); **PX 244** (NHELI 2006-FM2 Prospectus Supplement) at 81 (same); **PX
O0051** (NHELI 2007-3 Prospectus Supplement) at 88 (similar); **PX 853** (NHELI 2007-2
Prospectus Supplement) at 89 ("The Underwriting Guidelines and Credit Matrices of the
[originator] are designed to be used as a guide in determining the credit worthiness of the

Compliance with such guidelines promotes consistency and objectivity in the rendering of mortgage lending decisions and provides investors with objective yardsticks pursuant to which it can accurately assess the credit risk of the collateral.

21.   Disclosure Documents typically provide investors a description of the underwriting guidelines used to originate the underlying collateral and note that the guidelines were intended to evaluate a borrower's ability to repay a loan and the sufficiency of the collateral in the event of default.[6]   Whether an originator has complied with underwriting guidelines impacts investment decisions because non-compliance may substantially increase credit risk.

22.   The importance of compliance with underwriting guidelines may be observed by noting the uniform inclusion in typical RMBS Disclosure Documents of representations regarding such compliance.   In fact, the Disclosure Documents typically contained some statement to the effect that the Subject Loans were made in accordance with the respective originator's underwriting guidelines and that an exception only could be made to the underwriting guidelines if a compensating factor existed that offset the risk of such non-compliance.[7]

---

borrower and his/her ability to repay."); **PX 220** (NHELI 2006-HE3 Prospectus Supplement) at 83 ("The Underwriting Guidelines require all borrowers to have demonstrated a willingness to pay."); **PX 532** (NHELI 2007-1 Prospectus Supplement) at 111 ("[The originator's] underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed Mortgage Property as collateral.").

   [6]   *See* **PX O0049** (NHELI 2006-FM1 Prospectus Supplement) at 71; **PX 244** (NHELI 2006-FM2 Prospectus Supplement) at 81; **PX 853** (NHELI 2007-2 Prospectus Supplement) at 89; **PX O0051** (NHELI 2007-3 Prospectus Supplement) at 88; **PX 220** (NHELI 2006-HE3 Prospectus Supplement) at 83; **PX 532** (NHELI 2007-1 Prospectus Supplement) at 111.

   [7]   *See, e.g.*, **PX 220** (NHELI 2006-HE3 Prospectus Supplement) at 82 ("The Mortgage Loans are generally consistent with and conform to the Underwriting Guidelines.   On a case-by-case basis, exceptions to the Underwriting Guidelines may be made where compensating factors exist."); **PX 244** (NHELI 2006-FM2 Prospectus Supplement) at 81-82; *see also* **PX**

23.    The importance of truthfully representing the adherence to underwriting guidelines in the Disclosure Documents is also illustrated by the contrasting treatment given so called "scratch-and-dent" loans that do not conform to an originator's guidelines.    "Scratch-and-dent" loans have been described as having:    (a) violated the underwriting guidelines or program guidelines under which they were intended to have been originated; (b) document deficiencies; or (c) become delinquent.[8]

24.    Scratch-and-dent loans include loans that have been "put back" to sellers because they breached representations and warranties or were otherwise not suitable for typical securitizations.    During the subject time frame, scratch-and-dent loans typically traded at discounts to par value.

25.    Scratch-and-dent securitizations are structured and issued in a similar manner as other RMBS securitizations, but there are important differences.    While the most senior tranches are still rated AAA, the securitization may only have ratings from one rating agency,[9] and may require one or more of the following to be ratable in a manner that renders such tranches efficiently salable to institutional investors:    (a) more overcollateralization; (b) higher levels of subordination; or (c) additional credit support in the form of "arrearages" (amounts due

---

**O0049** (NHELI 2006-FM1 Prospectus Supplement) at 70-71 ("All of the mortgage loans were originated or acquired by Fremont, generally in accordance with the underwriting criteria described in this section. . . . On a case-by-case basis, Fremont may determine that, based on compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception.").

    [8]    **PX 1333** (Bear Stearns Asset Backed Securities 2006-SD1 Prospectus Supplement) at 44-45; **PX 1347** (GMAC RFC, *Principal Investment Activities: RAAC SP Program and Product Summary* (Sept. 2005)) at 7 (describing scratch-and-dent mortgage loans with "impaired loan documentation" and loans that have been "modified" or cured).

    [9]    **PX 1337** (GSAMP 2004-SEA1 Prospectus Supplement) at 13 (rated solely by S&P).

on delinquent loans at securitization that if repaid will be applied to repayment of principal and interest post-securitization).

26.    Because scratch-and-dent securitizations included some loans deemed ineligible for standard subprime RMBS due to their having been originated in violation of underwriting guidelines, issuers typically included express disclosures alerting investors to this fact.    For example, a scratch-and-dent securitization issued by Merrill Lynch (not at issue here) included the following disclosure:    "12.42% of the mortgage loans were originated with substantial deviations from the applicable underwriting guidelines of their respective originators."[10]    Thus, even in scratch-and-dent securitizations where there are recognized origination deficiencies, the Disclosure Documents quantified and disclosed those deviations.    Scratch-and-dent securitizations thus show both the alternative (less desirable) execution path for loans that do not comply with underwriting guidelines as well as the importance, even where deviations were expected, to quantify and disclose the degree of deviation from underwriting standards.

**D.    The Underwriter Secures Credit Ratings Necessary to Facilitate Sale**

27.    The underwriter secures credit ratings from one or more rating agencies because those ratings play an essential role in the RMBS marketing and sales processes and in the buyer's purchase decision.    The Disclosure Documents for each Offering include a description of ratings in its summary, and later in the document's body.    The prominence of ratings in

---

[10]    **PX 1334** (MLMI 2005-SD1 Prospectus Supplement) at 19.    *See also* **PX 1338** (Morgan Stanley ABS Capital I Inc. 2004-SD1) at 52 (Morgan Stanley scratch-and-dent securitization disclosing: "Notwithstanding the foregoing, although all of the [Bank of America/WAMU] mortgage loans were originated or intended to be originated in accordance with the [Bank of America/WAMU] Underwriting Guidelines described above, substantially all of the [Bank of America/WAMU] mortgage loans included in the Trust Estate either possess document deficiencies or have experienced one or more payment delinquencies or have failed to meet the [Bank of America/WAMU] Underwriting Guidelines described above.").

securities disclosures is reflected in their important role in determining pricing and salability of RMBS.

28.   Credit ratings served as independent assessments of the creditworthiness of RMBS, among other types of securities.   Three rating agencies were principally involved in rating the Subject Offerings:   Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's Ratings Services ("S&P"), and Fitch Ratings, Ltd. ("Fitch").

29.   Rating agencies provide each rated tranche of a securitization a specific rating that represents that agency's assessment of the credit worthiness of such security.   Ratings are based on a scale of letter grades from AAA to C, with AAA being the "safest."

30.   Depending on the rating agency, a rating may grade the risk of a security by estimating the probability of any loss and/or the expected loss severity thereon.   Higher-rated securities are generally expected, by investors and the rating agencies themselves, to have (a) a lower probability of default, and/or (b) a lower expected loss on default.   Because of their lower perceived risk of loss, higher-rated securities typically pay lower yield or sell at higher prices.

31.   The spectrum of available ratings is divided between investment-grade securities (such as the Subject Offerings) and non-investment-grade securities, also known as "junk," "high-yield," or "speculative" securities.   An investment-grade security is defined as being rated between "Baa3" and "Aaa" (inclusive) from Moody's, between "BBB-" and "AAA" (inclusive) from S&P and/or between "BBB-" and "AAA" (inclusive) from Fitch.   All three rating agencies follow ordinal scales.   S&P and Moody's rated all of the Subject Offerings purchased by the GSEs in the instant matter AAA and Aaa, respectively, while Fitch only rated two of the transactions, NHELI 2006-FM2 and NHELI 2006-HE3, assigning each a AAA rating.

11

32.     The distinction between investment-grade and non-investment-grade securities is important.   Not only are investment-grade securities generally expected to have higher credit quality, but also they are generally more liquid than non-investment-grade securities because a larger number of investors buy and sell high rated securities, and underwriters have a greater capacity to make a market in investment-grade securities.   By and large, the market for RMBS was an investment-grade market.

33.     Investment-grade securities are predominantly held by investors that tend to be averse to the risk of portfolio losses.   Many institutional investors have internal investment requirements or guidelines and/or are subject to external regulations regarding minimum ratings requirements that either prohibit purchase of securities that are not rated or are not rated investment-grade, or that preclude such investors from holding more than a certain percentage of their portfolios in non-investment-grade securities.

34.     During the relevant 2005-2007 period, the process of assigning credit ratings to RMBS depended significantly on risk assessments derived from modeled predictions.   Each rating agency utilized models generally to forecast foreclosure frequency, expected losses, and cash flows.   Although rating analysts sometimes considered information outside of such models, such as performance history for prior-rated RMBS (*i.e.*, an out-of-model adjustment),[11] an analyst's findings and recommendations significantly relied on model-generated results.

35.     While each rating agency had its own models and procedures, a basic workflow was generally common to all during the relevant period:   (a) an underwriter or sponsor provided the rating agency a "loan tape," containing loan and borrower information, including, among other data elements, FICO scores, LTV and CLTV ratios, DTI ratios, and owner occupancy

---

[11]     *See* Mahdavian 30(b)(6) Dep. 154:12-155:23, 225:10-226:24, 348:16-349:25; Chatterjee 30(b)(6) Dep. 82:10-83:5, 173:19-174:4, 180:11-182:10.

status; (b) the rating agency ran the data on the tape through a loss model; (c) the loss model

"stressed" the pool through various economic scenarios and computed an expected loss statistic

(or similar metric) for each loan; (d) the expected loss for the pool was aggregated, and analysts

calculated credit enhancement requirements for various rating levels based on the expected loss;

(e) separate cash flow models were used to assess credit enhancement provided by excess spread

generated by the nature of the transaction (interest received in excess of the bond coupon

obligations and expenses);[12]  (f) analysts utilized model-generated loss expectation and credit

enhancement levels to assess loan-pool risk and formulate rating recommendations for each

tranche; and (g) analysts presented their recommendations and findings to a rating committee,

which voted on and approved final credit ratings (and/or elements essential to assess the same;

for example, expected loss).[13]

      36.    The rating agencies, upon receiving a new loan tape from an underwriter, verified

only that data fields were complete and properly formatted—not the accuracy of their contents.[14]

The rating agencies do not conduct independent due diligence at any time during the rating

process, instead relying upon issuers and underwriters to ensure the accuracy of the information

---

[12]    Mahdavian 30(b)(6) Dep. 223:23-225:2; Hanson 30(b)(6) Dep. 136:11-137:24; Chatterjee 30(b)(6) Dep. 88:14-89:7.

[13]    *See generally* Mahdavian 30(b)(6) Dep. 34:13-35:8; Hanson 30(b)(6) Dep. 54:6-19; Chatterjee 30(b)(6) Dep. 43:16-45:20.

[14]    *See, e.g.*, **PX 1315** (Moody's, *Report on the Code of Professional Conduct* (Apr. 2006)) at 11 ("Most Issuers operate in good faith and provide reliable information to the securities markets and to us, and we rely on Issuers and their agents to do so.   We do not possess either the comprehensive or independent first-hand knowledge to verify or test the accuracy of information that debt issuers make available to the public or directly to Moody's.").

provided in the tape and that loans were originated in conformance with underwriting guidelines.[15]

37.    Accurate loan-level information was foundational in generating a reliable credit rating.   The rating agencies' models assigned a quantitative penalty or benefit to particular loan-level characteristics in arriving at an aggregate statistical risk assessment for a loan pool.   For instance, S&P estimated that, for certain borrowers, "loans with LTVs of 90% have a 1.5 times (x) greater risk of being foreclosed than an LTV of 80%," and "[l]oans with an LTV of 100% are assumed to be 4.5x riskier than loans with an LTV of 80%."[16]   S&P similarly increased credit-model default assumptions "by a factor of 3.0x on second homes and investment properties"

---

[15]    *See* Mahdavian 30(b)(6) Dep. 256:14-24, 365:13-18; Hanson 30(b)(6) Dep. 298:11-18, 306:7-9; Chatterjee 30(b)(6) Dep. 212:18-213:2 ("[W]e depended on the data that was being presented to us and we expected the data to be accurate; and we were not in the business of performing any due diligence on the loans ourselves."); **PX 1355** (Standard & Poor's, Rating Letter for NHELI 2006-FF1 (Oct. 31, 2006)) at 2 ("Standard & Poor's relies on the issuer and its counsel, accountants, and other experts for the accuracy and completeness of the information submitted in connection with the rating."); **PX 1317** (Moody's, *Code of Professional Conduct* (June 2005)) at 6 ("Moody's Credit Ratings are based on information obtained by Moody's from sources believed by Moody's to be accurate and reliable, including but not limited to Issuers and their agents and advisors (*e.g.*, accountants, legal counsel, and other experts).   Moody's relies on Issuers and their agents to provide accurate, timely, and complete information."); **PX 1447** (Standard & Poor's, *U.S. Residential Subprime Mortgage Criteria: The Rating Process For Subprime Mortgage Transactions* (Sept. 1, 2004)) at 2 ("While S&P has obtained information from sources it believes to be reliable, S&P does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives.").

[16]    **PX 1318** (Standard & Poor's, *RMBS: U.S. Residential Subprime Mortgage Criteria: Credit Analysis for Subprime Loan Transactions* (Sept. 1, 2004)) at 3-4 ("LTVs historically have proven to be key predictors of foreclosure rates. . . . The higher the LTV ratio, the greater the risk of mortgage foreclosure.").   Fitch considers LTV ratios and credit scores as the primary drivers of default risk.   **PX 1348** (Suzanne Mistretta, Fitch, *RMBS Model Series: Good Grades Supplement LTVs and Credit Scores* (Jan. 31, 2005)) at 1.   Moody's states that borrower equity as measured by the LTV "is an important buffer against default risk and a cushion against loss where a default occurs."   **PX 1316** (Moody's, *Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools* (Apr. 1, 2003)) at 6.

relative to owner occupied homes.[17]   A tape misstating a loan's actual LTV or owner occupancy status would therefore cause the model to assess inaccurately the risk for both the loan and the loan pool.[18]

38.   Although the rating agencies adopted precautionary measures intended to protect the integrity of the rating process, such measures still relied on issuers and underwriters and did not seek to verify the accuracy of the third-party data provided to the rating agencies.   For example, analysts at the rating agencies reviewed transaction-specific documents, among other reasons, to confirm they included representations and warranties attesting to the accuracy of loan-level information and to originating loans in conformance with underwriting guidelines.[19] Analysts also reviewed drafts of the prospectus supplement to check consistency between the information provided during the rating process and the information marketed to investors, relying upon issuers and underwriters to provide the most current and up-to-date information

---

[17]   **PX 1318** (Standard & Poor's, *Credit Analysis for Subprime Loan Transactions*) at 5 ("A homeowner is more likely to forfeit a second home or an investment property than their primary residence.").

[18]   Chatterjee 30(b)(6) Dep. 110:14-21 ("[T]he results of the model will depend upon the numbers that [are] being fed into the model.   So to accurately reflect . . . the loss level or frequency of default or [loss] severity . . . on a loan will depend on the information . . . that the model is using."); *see also* Mahdavian 30(b)(6) Dep. 142:20-143:17 (agreeing with published statements that "[a]ny departure from the current standards for accuracy of loan-level data jeopardizes the integrity of assigned ratings" because "the ratings and loss estimates were extremely sensitive to . . . the loan level data."); *id*. at 141:14-142:3 (confirming that if loan characteristics like FICO, LTV and owner occupancy were misstated so as to understate risk that "rating estimates would have been not conservative enough").

[19]   Mahdavian 30(b)(6) Dep. 188:18-189:7; Chatterjee 30(b)(6) Dep. 206:4-10 ("We would look at the representations that the originator makes about the underwriting and also . . . representations on the loan schedule [to] make us comfortable about the information that has been provided to us.").

upon which they would rely.[20]   S&P further required issuers and underwriters to execute and

submit a signed letter stating that the information provided to the rating agency was accurate.[21]

39.   Prior to issuing final ratings for an offering, the rating agencies required issuers

and underwriters to submit a final tape of collateral characteristics.   The agencies re-ran the tape

through the credit rating models to confirm the absence of material discrepancies in loan data.[22]

40.   If issuers or underwriters submitted inaccurate information during the rating

process, the rating agencies reserved the right to withhold or withdraw credit ratings.[23]

41.   Indeed, the rating agencies and the broader industry recognized that inaccurate

data would undermine the integrity of the rating process.   For example, in a 2002 publication,

S&P stated:

> Standard and Poor's relies on the accuracy of the data provided by
> originators and issuers when analyzing pools of mortgages in the
> rating process. . . . The loan schedules disclosed in the pooling and
> servicing agreement and the prospectus are reviewed for
> consistency with the information provided for the rating analysis.

---

[20]   Mahdavian 30(b)(6) Dep. 57:22-59:10; Chatterjee 30(b)(6) Dep. 46:11-47:2; Hanson 30(b)(6) Dep. 157:16-158:5; **PX 1355** (Standard & Poor's, Rating Letter for NHELI 2006-FF1 (Oct. 31, 2006)) at 2 ("This rating is based on financial information and documents we received prior to the issuance of this letter.   Standard & Poor's assumes that the documents you have provided to us are final.   If any subsequent changes were made in the final documents, you must notify us of such changes by sending us the revised final documents with the changes clearly marked.").

[21]   Mahdavian 30(b)(6) Dep. 149:7-151:5, 152:5-17 (confirming that S&P required issuers or originators to sign letters regardless of collateral type during the 2005-2007 period); *see also* **PX 1319** (Standard & Poor's, *Data Quality Control Manual for Standard & Poor's Levels® VERSION 5.6(c)* (Aug. 1, 2005)) at 20-21.

[22]   Mahdavian 30(b)(6) Dep. 154:12-155:23; Chatterjee 30(b)(6) Dep. 180:11-182:10; Hanson 30(b)(6) Dep. 53:9-54:19.

[23]   Mahdavian 30(b)(6) Dep. 257:12-18, 196:11-197:7; Chatterjee 30(b)(6) Dep. 57:16-58:17.

Any departure from the current standards for accuracy of loan level data jeopardizes the integrity of assigned ratings.[24]

42.    This problem is captured by the axiom: "garbage in, garbage out."[25]

**E.    The Underwriter Structures and Prices the Transaction**

43.    A prominent element of the underwriter's role is to structure and price the offering.    ~~When an issuer brings an RMBS to market, the goal is to maximize Net Trade Value.~~[26]

44.    ~~One of the most common ways for an underwriter to maximize Net Trade Value is to sell securities with relatively more highly rated tranches, as investors demand less yield due to the perceived safety of such securities.~~

45.    A pool of mortgages simply has a finite amount of expected cash flow.    That cash flow is used to pay expenses of the trust and principal and interest to investors.    ~~If a tranche or tranches can be sold with less yield, less of the pool's expected cash flow is absorbed by that specific tranche; what is liberated can be sold elsewhere (for example, to another tranche) or retained, which, in either case, increases Net Trade Value.~~

46.    The higher the quality of a loan pool, the less credit enhancement is needed to achieve a given rating.    Typically, an issuer simply can sell more highly rated securities backed

---

[24]    **PX 1292** (Frank Raiter, Susan E. Barnes & Terry G. Osterweil, Standard & Poor's, *Mortgage Underwriting Models are not Always Created Equal* (Aug. 29, 2002)) at 2.

[25]    Mahdavian 30(b)(6) Dep. 135:9-24 ("if the data [inputted into the model] was wrong, the output would be wrong.").

[26]    **PX 1335** (Frank J. Fabozzi & Vinod Kothari, *Introduction to Securitization* (2008) (e-book edition)) at 28 ("[T]he sole economic goal of the structurer is to maximize the total proceeds received from the sale of all the bond classes that are backed by the asset pool.    (In market parlance, the goal is to obtain *best execution*.)    Or alternatively, for a given funding size, the goal is to attain the lowest weighted average cost.    In seeking to obtain the highest prices or the lowest cost, the structurer must take into account market conditions, demand for various structured products, and all the costs of creating such bond classes.").

by a high quality pool. ~~In contrast, lower-quality pools would generally produce less Net Trade Value.~~ This concept is easy to understand when one considers that the purpose of credit enhancement is to protect investors from loss. If a pool is expected to have a lower default frequency or loss severity, of which the net result is lower net losses, less credit enhancement is needed. ~~Because credit enhancement is expensive, the less that is required, the greater the Net Trade Value.~~

47.   Arriving at the appropriate structure for the security is a dynamic process, through which the underwriter interacts with investors and determines for each tranche the yield demanded by the market, given an expected ratings level.

48.   If loans are found during the course of Requisite Due Diligence that are of a lower quality than assumed, the structure will most likely change to reflect new (and higher) default and loss projections, and securities will most likely be rated lower (or subject to other negative repercussions as discussed in Section IV)~~, thereby reducing Net Trade Value~~.

## III.   RE-UNDERWRITING AND APPRAISAL VALUATIONS CONDUCTED REVEAL INACCURACIES IN COLLATERAL CHARACTERISTICS AND DEFECTS IN ORIGINATION PRACTICES

49.   As discussed earlier, I have reviewed and am relying on the proffered Direct Testimony of Mr. Hunter and Dr. Kilpatrick, as well as Dr. Cowan's extrapolation of their results. As those experts concluded, the data that was disclosed to investors in the Disclosure Documents and provided to the rating agencies did not accurately disclose the *actual* characteristics and qualities of the Subject Loans that were held by the trusts. I will now briefly discuss Mr. Hunter's and Dr. Kilpatrick's observations, and then I will turn to my opinions concerning what impact their conclusions would have had on the ability of Defendants to offer and sell the Subject Offerings.

A.   **Mr. Hunter's Identification of Underwriting Defects and Loan Level Inaccuracies**

50.   It is my understanding that Mr. Hunter directly supervised the re-underwriting review of a total of 723 Subject Loans randomly selected from the seven SLGs for the Subject Offerings (approximately 100 loans from each SLG).[27]   While described in more detail in Mr. Hunter's direct testimony, the re-underwriting process generally consisted of assessing loan files in light of the statements made in prospectus supplements and the criteria in originators' underwriting guidelines.[28]   In relevant parts, Mr. Hunter's findings (as extrapolated to the SLGs) revealed significant misstatements in the Disclosure Documents.[29]

51.   The extrapolation of Mr. Hunter's conclusions revealed the following regarding the SLGs at issue:

- 84.51% of the Subject Loans "did not conform to the originators' underwriting guidelines," and 65.42% of the Subject Loans with this underwriting defect had an increased credit risk;[30]

- 89.26% of the Subject Loans were "not properly evaluated to determine if they were at risk of not being repaid or not adequately supported by collateral," and 68.3% of the Subject Loans with this underwriting defect had an increased credit risk;[31]

- 23.47% of the Subject Loans included "LTV/CLTV values on the pre-closing loan tapes that were not accurate," and 22.96% of the Subject Loans with this underwriting defect had an increased credit risk;[32]

- 7.19% of the Subject Loans had "owner occupancy [that] was incorrectly reflected in the Prospectus Supplements' collateral tables," and 7.19% of the Subject Loans with this underwriting defect had an increased credit risk;[33]

---

[27]   Hunter Direct ¶ 5.

[28]   Hunter Direct ¶¶ 5-6.

[29]   Hunter Direct ¶ 7 (**PX 1625**); Cowan Direct ¶¶ 56-59.

[30]   Cowan Direct ¶¶ 56 (**PX 1525**), 60 (**PX 1538**); *see* Hunter Direct ¶ 391(a).

[31]   Cowan Direct ¶¶ 59 (**PX 1534**), 60 (**PX 1546**).

[32]   Cowan Direct ¶¶ 59 (**PX 1535**), 60 (**PX 1547**); *see* Hunter Direct ¶ 391(b).

- 50.19% of the Subject Loans "had characteristics such as FICO scores, owner-occupancy status, property types, or loan amounts that were inconsistent with the pre-closing loan tape," and 47.15% of the Subject Loans with this underwriting defect had an increased credit risk.[34]

52.    Based on Mr. Hunter's data, the below table shows that, across the seven Subject Offerings, 68.56% of loans had a substantially increased credit risk due to defects in the underwriting process.[35]

**Table 1. (PX 1523)**

| Securitization | Estimated Percentage of Subject Loans with Substantially Increased Credit Risk |
|---|---|
| NAA 2005-AR6 | 60.92% |
| NHELI 2006-FM1 | 70.00% |
| NHELI 2006-FM2 | 72.00% |
| NHELI 2006-HE3 | 66.63% |
| NHELI 2007-1 | 66.43% |
| NHELI 2007-2 | 69.54% |
| NHELI 2007-3 | 63.83% |
| **Aggregate** | **68.56%** |

**B.    Dr. Kilpatrick's Identification of Inflated Appraisals and Inaccurate LTVs**

53.    The Disclosure Documents also contained inaccurate disclosures concerning collateral appraisals and LTV calculations.    Dr. Kilpatrick tested the accuracy of original appraised values for 672 properties underlying Subject Loans in the seven SLGs by creating an automated valuation model to generate a credible valuation, and then recalculating the LTV ratio for each of the sampled loans.[36]    He found that, as a whole, "there was a systemic difference

---

[33]    Cowan Direct ¶ 57 (**PX 1526**); *see* Hunter Direct ¶ 391(c).

[34]    Cowan Direct ¶¶ 59 (**PX 1533**), 60 (**PX 1545**); *see* Hunter Direct ¶ 391(d).

[35]    Cowan Direct ¶ 49 (**PX 1523**).

[36]    Kilpatrick Direct ¶ 7.

between the Nomura sample appraisals and the true market values of those properties, leading to an understatement of the true LTV ratios."[37]

54.    Specifically, Dr. Kilpatrick concluded that the appraisals had an average upward bias of 8.92%,[38] and overall, the extrapolation set forth in the Cowan report reveals that the appraisals across all SLGs were overstated by 11.1% on average.[39]   Even at the lower bound of the 95% confidence level the appraisals were overstated by 8.5%.[40]

55.    The tables below provide the results of an extrapolation of Dr. Kilpatrick's results:

**Table 2 (PX 1559).   Extrapolated Average AVM Inflation Rate[41]**

| Securitization (SLG) | Average AVM Inflation Rate | 95% Lower Bound AVM Inflation Rate | 95% Upper Bound AVM Inflation Rate |
|---|---|---|---|
| NAA 2005-AR6 Group 3 | 6.0% | 2.0% | 10.0% |
| NHELI 2006-FM1 Group 1 | 6.6% | 1.6% | 11.7% |
| NHELI 2006-FM2 Group 1 | 14.9% | 8.4% | 21.3% |
| NHELI 2006-HE3 Group 1 | 12.0% | 6.1% | 17.8% |
| NHELI 2007-1 Group 2-1 | 5.1% | 0.7% | 9.4% |
| NHELI 2007-2 Group 1 | 12.6% | 7.0% | 18.3% |
| NHELI 2007-3 Group 1 | 7.8% | 2.5% | 13.1% |
| **Aggregate** | **11.1%** | **8.5%** | **13.7%** |

---

[37]    Kilpatrick Direct ¶ 83.

[38]    Kilpatrick Direct ¶ 82.

[39]    Cowan Direct ¶ 76 (**PX 1559**).

[40]    *Id.*

[41]    *Id.*; *see* Kilpatrick Direct ¶ 88.

**Table 3 (PX 1702). Distribution of Extrapolated LTV and Percent of Non-Credible Loans[42]**

| SLG | LTV ≤ 80% | | LTV > 80% to LTV ≤ 100% | | LTV  > 100% | | Percent Non-Credible of Inflated by >15.1% |
|---|---|---|---|---|---|---|---|
| | Original | Extrapolated | Original | Extrapolated | Original | Extrapolated | |
| **NAA 2005-AR6 (3)** | 98.94% | 28.68% | 1.06% | 61.24% | 0.00% | 10.08% | 92.6% |
| **NHELI 2006-FM1 (1)** | 72.16% | 30.85% | 27.84% | 56.38% | 0.00% | 12.77% | 92.9% |
| **NHELI 2006-FM2 (1)** | 80.62% | 37.89% | 19.38% | 42.11% | 0.00% | 20.00% | 89.5% |
| **NHELI 2006-HE3 (1)** | 62.91% | 30.68% | 37.09% | 47.73% | 0.00% | 21.59% | 93.1% |
| **NHELI 2007-1 (2)** | 91.77% | 21.74% | 8.23% | 63.04% | 0.00% | 15.22% | 94.4% |
| **NHELI 2007-2 (1)** | 60.78% | 27.27% | 39.22% | 40.91% | 0.00% | 31.82% | 91.2% |
| **NHELI 2007-3 (1)** | 66.77% | 17.44% | 33.23% | 52.33% | 0.00% | 30.23% | 96.0% |
| **Total** | **70.5%** | **25.3%** | **29.5%** | **51.8%** | **0.0%** | **22.9%** | **92.2%** |

## C.   Underwriting Defects in the SLGs Increased the Credit Risk of the Subject Offerings

56.     According to Mr. Hunter and Dr. Cowan, between 64% and 72%[43] of the Subject Loans contained underwriting defects that substantially increased the credit risk associated with those loans.   Absent structural enhancements or other changes, such defects substantially increased the credit risk of the SLGs, and, as a result, the credit risk of the Subject Offerings.[44]

57.     The magnitude of the defects is so great that my opinion would be the same even if 20% of the Subject Loans contained underwriting defects at the time of securitization that substantially increased their credit risk (less than one-third of the lowest breach rate cited in Mr. Hunter's Direct Testimony).   Defects on that order of magnitude still would have had a significant impact on the credit risk of the SLGs, and thus the Subject Offerings, again absent structural enhancements or other changes.   The reasons for this are simple.

58.     RMBS investors are paid interest and principal from the cash flow generated by repayment of the underlying mortgage collateral.   An investment in AAA securities is typically

---

42     Kilpatrick Direct ¶ 13.

43     *See* Cowan Direct ¶ 49 (**PX 1523**); *see* Hunter Direct ¶ 7.

44     Hunter Direct ¶ 391; Cowan ¶¶ 56-60.

protected in part because losses are borne first by the subordinate tranches.    In sub-prime

securitizations during 2005-2007, the subordinate tranches were typically sized to absorb losses

on the order of 20% to 30% of the underlying collateral, and in Alt-A transactions the

subordinated tranches were generally sized so as to protect against 5% to 10% of losses.[45]    The

specific credit enhancement requirements set by the rating agencies assumed that the mortgage

collateral had been accurately described and originated in accordance with underlying guidelines.

Where a substantial percentage of the underlying collateral is defective so as to increase credit

risks, the ability of that collateral to generate cash flow and provide credit enhancement, and thus

protection against loss for investors, is compromised.    Put differently, a AAA investment in

subprime RMBS with credit enhancement protection of 20-30% (or far lower for an Alt-A bond)

would necessarily be viewed as significantly riskier if, instead of being supported by accurately

disclosed collateral, 20% of the underlying collateral was defective in a way that increased that

collateral's credit risk.    An investor should conclude that the defective collateral will not

generate the cash flow that the credit rating agency models assume and that the overall

investment will be riskier than is reflected in the credit rating—particularly where the magnitude

of such defective collateral (even assuming only 20%) would be comparable to or exceed the

effective credit enhancement protecting a AAA investor (assuming 20-30% credit enhancement).

59.    Note that, even if less than 20% of the total subordination was defective, such

defects, even if not necessarily sufficient to cause losses, may still cause a downgrade, causing a

deterioration of the market values of such securities.

60.    Finally, underwriting defects present at the time of issuance at the level found by

Mr. Hunter strongly suggest both to rating agencies and investors that Defendants' underwriting

---

[45]    Finkel Direct ¶ 15 (**PX 1502**).

and due diligence practices were wholly insufficient and meaningfully flawed, which also may result in the agencies requiring increased credit enhancement through out-of-model adjustments.

IV.    **THE TRUE NATURE OF THE SUBJECT LOANS WOULD HAVE REQUIRED THE DEFENDANTS TO HAVE PROCEEDED DIFFERENTLY AND LIKELY WOULD HAVE PRECLUDED ISSUANCE OF THE OFFERINGS**

61.    Given the dramatic contrast between the loan characteristics set forth in the Hunter and Kilpatrick Direct Testimony, and the descriptions of the Subject Loans that appeared in the Disclosure Documents, Defendants could not have offered and sold the Subject Offerings in the structure and manner they did, if at all.   The variables examined and found defective by Mr. Hunter and Dr. Kilpatrick, including LTV and CLTV ratios, owner-occupancy status, FICO scores, and DTI ratios, were highly relevant in assessing the credit risk underlying a securitization, and were utilized by the rating agencies in their estimation of expected default and loss rates, and also commonly considered by investors in making their own risk assessments. The disclosure of the true nature of the underlying collateral was thus essential to permit investors and the credit rating agencies to assess credit risk.   For example, where the pools in actuality had more risky characteristics than were disclosed (lower FICO scores, higher LTV or CLTV ratios, lower owner occupancy rates, etc.), the credit rating agencies typically would have required greater credit enhancement, such as, for example, through larger subordinate tranches.

62.    Faced with characteristics such as those presented by Mr. Hunter and Dr. Kilpatrick, an underwriter should identify those deficiencies and defects and (i) eliminate Subject Loans that did not comply with the representations in the Disclosure Documents; (ii) revise the Disclosure Documents to accurately describe the Subject Loans, including the extent of the deficiencies; or (iii) some combination of (i) and (ii).

63.    Had Defendants taken any of these actions, it would have had substantial consequences for the securitizations—impacting ~~Net Trade Value,~~ credit ratings, deal structure,

24

and other terms of issuance—such that, in the end, the securities may have been rendered

unsalable as a practical and economic matter.    Depending on the corrective action taken,

Defendants would have been faced with one or more of the following scenarios:

    i.    A greater portion of the Offerings would have received a lower rating from credit rating agencies, assuming such agencies even agreed to rate the Offerings at all, which one or more agencies may not have given the level of defects;

    ii.    Additional forms of internal or external credit enhancement may have been required by the rating agencies;

    iii.    The weighted-average yield at which the Offerings were sold to investors would have been higher;

    iv.    The size of the Offerings would have diminished due to the removal of defective Subject Loans, and such Subject Loans would have been either:

        (a)    Put back to the seller (if possible);

        (b)    Sold in the secondary loan market most likely at a loss; or

        (c)    Retained on Defendants' balance sheet; and/or

    v.    One or more classes of securities may not have been salable.

64.    ~~As explained in further detail below, any one of these outcomes would have diminished or rendered negative the Net Trade Value and potentially left Defendants unable to market and sell the Offerings.~~

65.    While I did not attempt to "recreate" each of these scenarios, either individually

or in combination, to arrive at precise sizing or credit enhancement requirements, the ultimate

result is the same:    the Subject Offerings would have to have been substantially modified to

account for the collateral defects.    In addition, many of the steps—restructuring the Subject

Offerings, determining additional credit enhancements requirements, and obtaining updated

credit ratings—could not be directly modeled given the nature of the collateral defects identified

by Mr. Hunter and Dr. Kilpatrick.    That is because the rating agency models that drive the

credit enhancement analysis do not have inputs that model default or loss severity based on non-

compliance with underwriting guidelines.    There can be no doubt, however, that the rating agency response to a request to model defective collateral would be either to require additional credit enhancement (and thus change the structure) or to refuse to rate the transaction.

**A.      Result of Eliminating Subject Loans That Did Not Comply with Disclosure Documents**

66.    Had Defendants eliminated loans that did not conform to statements in the Disclosure Documents, they would have been faced with two options:    (1) proceed with a smaller transaction; and/or (2) demand that the seller or issuer replace defective Subject Loans with loans that complied with the originators' guidelines and were consistent with the Disclosure Documents (including disclosed loan pool statistics).

67.    Either scenario (*i.e.*, removing or replacing Subject Loans) likely would have impacted the credit rating and undermined significantly the economics of the transactions. Because rating agencies sometimes made "out of model" adjustments for factors like underwriting and originator quality (Moody's did so as a general practice), Defendants would likely have had to disclose to the rating agencies the massive defects and submit a revised pool for rating.    The fact that a particular loan pool was found to contain very high percentages of loans that did not comply with underwriting guidelines—even if all such loans were removed or replaced with compliant loans—would likely have impacted the perceived riskiness of the loan originators at issue, and as a consequence the credit risk of the security, and possibly have led the credit rating agencies to require additional credit enhancement to obtain comparable ratings. Such requirements, in turn, would likely affect the sizing of the tranches, resulting in smaller highly rated tranches (in aggregate), payment of a higher net yield on the respective subordinate tranches, and a higher weighted-average yield on the transaction as a whole.    A smaller Subject

Loan pool resulting from the exclusion of defective loans would have resulted in smaller fees to the underwriters and eroded the economics of the transaction.

**B.    Result of Revising Disclosure Documents to Accurately Describe the Defective Subject Loans**

68.    Had Defendants opted to leave all or a portion of the defective Subject Loans in the pool, they would have had to provide the rating agencies with a corrected loan tape and Disclosure Documents, as opposed to what was supplied with respect to the Subject Offerings, which in turn likely would have produced a substantially different output from the rating agency risk models.    As noted previously, variables examined and found defective by Mr. Hunter and Dr. Kilpatrick were highly relevant in the calculation of expected default and loss rates by the rating agencies.    Had the rating agencies that rated the Subject Offerings been made aware of high defect rates found by Mr. Hunter, as well as the significant number of LTV and CLTV ratios exceeding 100% found by Dr. Kilpatrick, they likely would have questioned whether their models could accurately project loan performance (*i.e.*, loss severity and default frequency) and determine the required subordination levels for the Subject Offerings.

69.    Indeed, given the defective nature of the collateral, the rating agencies very likely may have refused to rate the transactions altogether and/or withdrawn any existing rating.[46] That is particularly true given Mr. Hunter's conclusion that 50.19% of the Subject Loans had characteristics such as FICO scores, owner-occupancy status, property types, or loan amounts that were inconsistent with the pre-closing loan tapes, such that the inputs used by the rating

---

[46]    Mahdavian 30(b)(6) Dep. 142:20-143:17 (confirming that "[a]ny departure from the current standards for accuracy of loan-level data jeopardizes the integrity of assigned ratings" because "the ratings and loss estimates were extremely sensitive to . . . the loan level data"); Chatterjee 30(b)(6) Dep. 110:14-24 ("[T]he results of the model will depend on the numbers that [are] being fed into the model, so to accurately reflect . . . the loss level or frequency of default or [loss] severity . . . on a loan will depend on the information . . . that the model is using.").

agencies in their models were substantially wrong.    In addition, the rating agency models lacked the functionality to adjust default or loss projections based on deviation from underwriting guidelines such as those observed by Mr. Hunter.

70.    Even assuming the rating agencies agreed to rate the transactions, the increased risk and any adjustments made by the rating agencies to account for the poor underwriting practices of originators would likely require meaningful alterations to the existing structure of the Subject Offerings to accommodate substantially greater credit enhancements.    Without such additional credit enhancements, rating agencies would likely have assigned lower ratings to the Subject Offerings (or at least assigned fewer AAA ratings) and may not have assigned investment-grade ratings at all, resulting in issuers paying a higher weighted-average yield on the issuance as a whole.    ~~In each such scenario, the economics of the transactions would be impacted significantly relative to the actual execution, with a lower or potentially negative Net Trade Value.~~

71.    Furthermore, Mr. Hunter's and Dr. Kilpatrick's analyses reveal that a majority of the Subject Loans in aggregate did not comply with underwriting guidelines or possess adequate compensating factors to warrant an exception to such guidelines.    These findings stand in stark contrast to statements such as are found in prospectus supplements associated with the Subject Offerings, *i.e.*:

> All of the mortgage loans were originated or acquired by Fremont,
> generally in accordance with the underwriting criteria described in
> this section. . . . On a case-by-case basis, Fremont may determine
> that, based upon compensating factors, a prospective mortgagor
> not strictly qualifying under the underwriting risk category

guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception.[47]

As such, to proceed with the Offerings backed by the Subject Loans would require corrected Disclosure Documents (which were otherwise inaccurate) to advise investors that certain Subject Loans violated underwriting guidelines, as well as disclose the quantity of such loans in the pools and the types of deviations.

72.    It is my opinion that disclosing the true characteristics of the Subject Loans in the Disclosure Documents (as identified in the Direct Testimony of Mr. Hunter and Dr. Kilpatrick) would, in all likelihood, have caused investors and rating agencies to question the integrity of the underwriting of the underlying mortgage pool.    In fact, the Subject Offerings more closely resemble scratch-and-dent securitizations in certain respects—namely that the underlying collateral included a substantial amount of defective loans, which was not how the collateral was described in the Disclosure Documents.    In addition to the express disclosure of underwriting defects, such scratch-and-dent transactions typically require greater credit enhancement than otherwise would be needed to obtain a AAA rating, and subordinate tranches may be lower rated or not rated at all.    Any of these scenarios could ~~significantly lessen or make negative the Net Trade Value of the transactions and~~ potentially result in securities that could not obtain AAA ratings or result in securities that could not have been marketed at all pursuant to the Disclosure Documents provided to the GSEs.

73.    In sum, given that the loans backing the Subject Offerings were, in the aggregate and in actuality, vastly different than what was represented in the Disclosure Documents (as

---

[47]    *See, e.g.*, **PX O0049** (NHELI 2006-FM1 Prospectus Supplement) at 70-71; *see also* **PX 244** (NHELI 2006-FM2 Prospectus Supplement) at 81-82 (identical language); **PX 220** (NHELI 2006-HE3 Prospectus Supplement) at 82 ("The Mortgage Loans are generally consistent with and conform to the Underwriting Guidelines. On a case-by-case basis, exceptions to the Underwriting Guidelines may be made where compensating factors exist.").

determined by Mr. Hunter and Dr. Kilpatrick), Defendants should not have offered, sold, or distributed the Subject Offerings without either removing the Subject Loans that did not comply with the representations in the Offering Documents or revising the Disclosure Documents to accurately describe the Subject Loans.

Pursuant to 28 U.S.C. § 1746, I declare under perjury that the foregoing is a true and correct statement of my opinions in this Action.

Executed on this 17th day of March 2015 in New York, New York.

Leonard A. Blum