UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,

    Plaintiff,

-against-

NOMURA HOLDING AMERICA INC., *et al.*,

    Defendants.

No. 11-cv-6201 (DLC)

ECF Case

STATE OF FLORIDA    )
                           ) ss.:
COUNTY OF BREVARD  )

## AFFIDAVIT OF DAN PLATT

Dan Platt, being duly sworn, deposes and says:

1. My name is Dan Platt. I am 53 years old, am employed as a certified residential real estate appraiser in the State of Florida and provide this affidavit as my direct testimony at trial.

Background

2. I live at 805 W. Whitmire Drive, in Melbourne, Florida. I have been a certified appraiser in Florida for almost 9 years. As a certified appraiser in Florida, I take 30 hours of continuing education classes in my field, every two years.

3. I began my career as a "trainee" appraiser in 2003 in Florida, under the supervision of a licensed appraiser. I received my license in early 2006, before the appraisal for the property at issue in this lawsuit was completed.

4. My work focuses primarily on single-family properties located in ▇ ▇ Florida. I estimate that on average I conduct 200 appraisals in a year. In 2006, at the time of the appraisal at issue in this lawsuit, I was employed by Hanson Appraisals, a company based in Melbourne, Florida. I currently run my own appraisal company.

5. I always give appraisals that I believe are credible and supported by logic and evidence. I have never given an appraisal that I did not believe was correct.

6. The Uniform Standards of Professional Appraisal Practices ("USPAP") are a set of standards issued by the Appraisal Standards Board of the Appraisal Foundation. I am aware of USPAP requirements, and believe that my appraisals have always conformed to these requirements, including the fundamental requirement to issue a credible opinion of value. I believe that appraisals are just that—opinions of value, expressed by an appraiser using his or her professional judgment and experience.

Appraisal at Issue

7. It is my understanding that I performed an appraisal that is at issue in this lawsuit—the appraisal I submitted for the property located at 611 Washington Street, Cocoa, Florida. The report for this appraisal is attached hereto as Defense Exhibit 2705 ("DX-2705"), and my signature appears on page 7.

8. I appraised this property in September 2006 as having a value of $170,000. I believed at the time that $170,000 was accurate, and upon review of DX-2705, I believe today that the appraisal was accurate as of September 2006.

9. I followed my normal process in appraising a property when I conducted this appraisal. First, when given an appraisal assignment, I generally would do a preliminary review of the public records for the property, any active listings in the area, and the neighborhood and market conditions. Then, I would conduct the actual inspection of the

property—both interior and exterior of the home. I would review the Multiple Listing Services ("MLS") to identify comparable properties. The MLS is a database of information available to real estate professionals (including appraisers) about properties. I regularly used and still use the MLS to gather information about properties in the market. In order to identify appropriate comparables, I looked at various characteristics of a property. Some of the key characteristics include: geography, condition, living space, lot size, age, design, and amenities. Of course, none of these on their own are determinative in selecting a comparable—an appraiser uses their professional judgment in selecting the most comparable properties overall, after reviewing these (and other) characteristics, and considering their knowledge of the market. I would also conduct an in-person review of the exterior of the homes for the comparable properties. Once I had gathered all of this information, I would complete the appraisal form and come to my final opinion of value.

10. The subject property is in Cocoa, Florida, a town that is on the east coast of Florida, about 45 miles east of Orlando. In the years prior to 2006, the residential real estate market in this area experienced significant growth and appreciation. As I recall, prices in that area leveled off in 2006, before falling dramatically in 2007 and 2008.

11. Beginning on page 2 of DX-2705 is the Uniform Residential Appraisal Report ("URAR") that I completed for this property. The URAR is a standard form approved by Freddie Mac and Fannie Mae, and I always conduct appraisals using this form for re-finance transactions, like this transaction was. It is my understanding that almost all appraisers use these forms, at least for re-finance transactions, because they are accepted by Fannie Mae and Freddie Mac. The report contains and summarizes information I used to determine my opinion of value as to this property.

12. The primary method that I, and most appraisers, use to come to an opinion of value is what is called the "sales comparison approach," which is reflected on page 3 of DX-2705. The sales comparison approach requires the use "comparables"—as described above, comparables are properties that are similar in a variety of ways to the subject property. I described above my method for selecting comparables.

13. As shown in the Uniform Residential Appraisal Report, I used three "comparables" in coming to my opinion as to the value of the subject property. The three comparables were located at: 972 Bouganvillea, Rockledge, Florida ("Comparable Sale #1"); 1319 Alsup Drive, Rockledge, Florida ("Comparable Sale #2); and 1410 W. Hillsdale Drive, Cocoa, Florida ("Comparable Sale #3). All three comparables had sold within six months prior to the effective date of the appraisal, for amounts of $166,000, $180,000, and $164,800, respectively. I appraised the subject property as having a value of $170,000. I set forth below the sales information (month/year and price) of the three comparables, and also the value I estimated for the subject property in my appraisal:

|  | Subject | Comparable Sale #1 | Comparable Sale #2 | Comparable Sale #3 |
| --- | --- | --- | --- | --- |
| Sale Date | September 2006 (date of appraisal) | July 2006 | March 2006 | April 2006 |
| Price | $170,000 (appraised value) | $166,000 | $180,000 | $164,800 |

14. The three comparable properties were similar to the subject property in several important ways. The similarities are shown in the following chart, which summarizes information that I included on page 3 of my report (DX-2705):

-4-

| Feature | Subject Property | Comparable Sale #1 | Comparable Sale #2 | Comparable Sale #3 |
|---|---|---|---|---|
| Proximity to Subject | -- | 0.61 miles | 0.78 miles | 1.84 miles |
| Gross Living Area | ■ Sq. Ft. | ■ Sq. Ft. | ■ Sq. Ft. | ■ Sq. Ft. |
| Site Size | ■ Acres | ■ Acres | ■ Acres | ■ Acres |
| Total Room Count | 6 | 6 | 6 | 5 |
| Bedrooms | 4 | 4 | 3 | 3 |
| Bathrooms | 2 | 2 | 2 | 2 |
| View | Similar Homes | Similar Homes | Similar Homes | Similar Homes |
| Design | 1-story | 1-story | 1-story | 1-story |
| Actual Age | ■ years | ■ years | ■ years | ■ years |
| Condition | Good | Average | Good | Good |
| Functional Utility | Typical | Typical | Typical | Typical |
| Heating/Cooling | FWA/CAC | FWA/CAC | FWA/CAC | FWA/CAC |
| Energy Efficient Items | Typical | Typical | Typical | Typical |
| Garage/Carport | 1 Car Carport | 2 Car Garage | 2 Car Carport | Open Parking |
| Porch/Patio/Deck | Wood Deck | None | Screen Porch | Screen Porch |

15. As shown above, most of the characteristics of these houses were similar. All are within two miles of the subject property. All of them are one-story homes with a "similar homes view." The phrase "similar homes view" was well understood in the mortgage industry to mean a residential property with no encumbered view, which is what I was referring to here. Each home had either five or six rooms, with two bathrooms. All had a similar lot size— between ■ and ■ acres. All had the same heating and cooling amenities, and had the same energy efficient items.

16. There were some minor differences between the subject property and the comparables. In order to account for these differences, I used what are called "adjustments."

Using adjustments, an appraiser can make a valid comparison in value between a recent sales price of a comparable property and the estimated value of the subject property.

17. Here, I made certain adjustments to the comparable properties. The largest adjustment I made was to add $20,000 to the value of Comparable Sale #1, because it was only in average condition, not in good condition. The difference in condition is a significant determinant of value, and after analysis, I concluded that the market supported an adjustment of $20,000 for a house of this size and style, which was in "good" condition, as opposed to "average" condition. I also adjusted Comparable Sale #1 by subtracting $12,200, because it had approximately 400 more square feet of living area than the subject property. I also made slight adjustments to each of the comparables based on the type of garage and type of porch, patio, or deck at the property. As I noted in the appraisal, the amount of the adjustments were made using "match-paired analysis." (p. 3 of DX-2705). "Match-paired analysis" involves looking at previous pairs of sales with similar characteristic differences, and isolating the value of that characteristic through the difference in those sales prices.

18. Once all adjustments were accounted for, the adjusted sales price of the comparables was as follows: $169,800 (Comparable Sale #1), $177,000 (Comparable Sale #2), and $166,800 (Comparable Sale #3). I appraised the subject property at $170,000.

19. I also reported in my appraisal (p. 2 of DX-2705) that neighborhood growth was stable, that property values were stable, that supply and demand were in balance, and that average marketing time was between 3-6 months. I described the market as follows: "Property values in the subject's market area are considered stable. Demand appears to be in balance when homes are properly priced. Existing homes, within the market as defined, typically sell within 3-6 months when competitively priced and professionally marketed.

Financing from various sources are easily available." (p. 2 of DX-2705.) This information was based on my own experience in the local market area and research I conducted on the Multiple Listing Service at the time. The description of the market in the appraisal fits with my recollection that the market had been rapidly appreciating in 2005 and early 2006, but by the time this appraisal was completed, in September 2006, the market had largely stabilized.

20. I also reviewed the prior sales of the subject property and the comparable properties. The subject property had sold in June 2006 for $70,000. This jump in value from $70,000 to $170,000 in just three months is attributable to the fact that the subject property had been completely remodeled since the sale in June. As I explained in the description of the condition of the property at page 2 of DX-2705, "the subject has had a complete renovation from the slab up . . . . The subject improvement was completely gutted and all original components were replaced. This is to include drywall, plumbing & electric fixtures, and electric panel, roof, A/C system, cabinets and countertops, appliances, ceramic tile flooring thru-out and interior & exterior paint." I referenced this renovation in the analysis section of the prior sale, stating that, in addition to appreciation in the market, the rise in value was because the "subject and sales had recent complete renovations." (p. 3 of DX-2705.)

21. I also analyzed the prior sales of the subject property. My review of the records at the time showed a transaction on ▉▉▉▉▉ for $12,500, and then another transaction on ▉▉▉▉▉ for $70,000. A recent review of records conducted for this testimony confirms that the house was purchased out of what appears to be an estate sale on ▉▉▉▉▉, and then title was transferred to the owner at the time of my appraisal (in September 2006) on ▉▉▉▉▉, for $70,000.

-7-

22. I also analyzed the prior sales of the comparables. I noted that there were no prior sales in the past 36 months for either Comparable Sale #1 or Comparable Sale #2. For Comparable Sale #3, I noted that the property had sold for $57,800 in May 2004, and for $110,000 in September 2005. This increase in value occurred because Comparable Sale #3 had been completely renovated and property values continued to rise since that time. As I explained in my report: "[t]he rise in value is attributed mostly to the rapid rise in value in the previous 24 months. This rise in value was due to limited offerings and very high demand thru-out Brevard County and the state. At the present time, property values have stabilized with a normal upwards progression of value. It is also noted the subject and sales had recent complete renovations."

23. In DX-2705, I summarized the sales comparison approach (as described above) as follows: "The subject and all sales are similar age, amenities, design and appeal located in the subject market area. All sales bracket the subject in most aspects and are good indicators of value. All sales bracket the subject and are in similar condition. The suggested 1 mile radius was exceeded in sale 3 to find homes in similar condition. The suggested GLA difference in sale 1 was exceeded due to the limited comparables sales in the market area. A condition adjustment was warranted in sale 1 due to inferior updates as related by the listing agent. All adjustments were made thru match-paired analysis and local realtor data. The adjustments are the appraisers attempt to compensate for dissimilar features or amenities. All sales were considered and weighted in final opinion of value." (p. 3 of DX-2705)

24. I also completed the "cost approach to value" section on page 4 of DX-2705. The cost approach method is based on an estimate of what it would cost to construct an equivalent house on the same property. This requires the appraiser to estimate both the cost of the house and the value of the land. In determining the cost of the house, the appraiser must

consider the cost of construction per square foot, the cost of appliances and other features, and physical depreciation.

25. In the "cost approach to value" section on page 4 of DX-2705, I noted that I estimated the land value based on "competing vacant land sales in similar markets and thru the extraction method." This means that I looked at comparable sales of vacant land sites, and I also looked at sales of properties and was able to "extract" the land value by subtracting out from the total price the estimated cost of the house (using the cost method described above). Using both of these methods, I came to the opinion of $48,000 as the land value of the property. I then calculated cost of the home using standard cost approach methodology. I estimated the cost of the square footage of the living area using comparable properties, coming to $85 per square foot, a reasonable estimate at the time for that area. I then accounted for appliances and extra features, adjusted for physical depreciation, and came to my final conclusion of value under cost approach as $169,274. The land to value ratio was therefore approximately 28%.

26. The cost approach value of $169,724 is virtually identical to the sales comparison value of $170,000. As I noted in the appraisal, the "sales comparison approach best reflects the actions of the typical buyers and sellers in the market; therefore given greater consideration." (p. 3 of DX-2705.) I also noted that the "cost approach to value . . . lends support." (p. 3 of DX-2705.)

27. In sum, my appraisal value of $170,000 was well supported at the time I rendered it, and it was my honest estimate, using my professional judgment, as of September 2006.

Dr. Kilpatrick's Criticisms

28. I understand that an expert witness for plaintiff, Dr. John A. Kilpatrick, has opined or will opine that my appraisal (DX -2705) is not credible. I do not agree with the value Dr. Kilpatrick arrives at, nor do I agree with his criticisms of my appraisal.

29. I was informed by counsel for Nomura that Dr. Kilpatrick ran an automated valuation model ("AVM") on the subject property in 2013 or 2014 and arrived at a value of $93,314.

30. In my experience, a certified appraiser will almost always deliver a more accurate value than an AVM conducted years later. For instance, the appraiser can inspect the interior of a property at the time of the appraisal, and can determine if a home has been remodeled, and can assess its condition.

31. As I stated earlier, appraisals are opinions of value—indeed, the Uniform Standards of Professional Appraisal Practices defines an appraisal as "an opinion of value." My September 2006 appraisal is fully supported and I believed it at the time to be accurate. I believe today that it was accurate when made.

32. I also understand that Dr. Kilpatrick's AVM uses tax assessed values. In my experience as an appraiser, assessed values are not a reliable indicator of market value. My understanding is that tax assessed values, for the areas in which I appraise properties, are based primarily on square footage and do not consider important factors affecting market value such as condition, amenities, and renovations, among others. My experience is that assessed values often vary significantly from appraised values and sales prices, and I as an appraiser would not consider them, as I do not understand them to reflect market value.

33. Here, I believe the AVM value produced by Dr. Kilpatrick is considerably below the market value of the subject property at the time, as shown by a comparison to

comparable sales. The three comparable properties were for sold for $166,000 (July 2006), $180,000 (March 2006), and $164,800 (April 2006). Yet Dr. Kilpatrick's AVM generated a "true value" for the subject property of $93,314 as of September 2006. As far as I know, that value is not supported by any analysis of comparable properties.

34. I have always followed USPAP standards in rendering an appraisal, and I did so for the 2006 appraisal of 611 Washington Avenue, Cocoa, Florida, as well.

35. I was shown by counsel for Nomura a series of questions which Dr. Kilpatrick claims that my appraisal "failed," based on the analysis he performed for this lawsuit.

36. I understand that Dr. Kilpatrick claims that I did not report "marketing time" correctly. However, as shown on the Uniform Residential Appraisal Report, I clearly marked that the marketing time for the property was "3-6 months," as was required by the form. (p. 2 of DX-2705.) My conclusion that marketing time was 3-6 months was based on my knowledge of the local market and my research of data in the Multiple Listing Service. I commented in the "Neighborhood Description" section that "[e]xisting homes, within the market as defined, typically sell within 3-6 months when competitively priced and professionally marketed." (p. 2 of DX-2705.)

37. I understand that Dr. Kilpatrick claims that the "subject site" was not described correctly. However, I listed the size of the site as ▓ acres (p. 3 of DX-2705), and a review I recently performed in preparation for this testimony of the Brevard County records website confirms that the size of the site is ▓ acres. I described the "view" as "similar homes" (p. 3 of DX-2705), which was understood in the appraisal industry to mean a residential property. I described the site correctly.

38. I understand that Dr. Kilpatrick claims that I did not report or analyze the sales history of the subject and comparables correctly in this appraisal. This is also incorrect, as shown on page 3 of DX-2705. I documented the prior sale of the subject property and Comparable Sale #3, explained the rise in value since the prior sales of those properties, and documented that the other two comparables had no prior sales in the past 36 months. (p. 3 of DX-2705.)

39. I understand that Dr. Kilpatrick claims that my appraisal was not credible because the appraised value of the subject property was not less than 10% higher, on an annualized basis, than the prior sales price of the subject property. To my knowledge, this is not a requirement for appraisals (under USPAP or any other standard) and it doesn't make sense to me, because it does not account for properties, such as the subject property here, that undergo complete renovations. As I noted in the analysis of the prior sale, the house underwent a "complete renovation" after its prior sale. (p. 2 of DX-2705.) It is not at all unusual—and certainly was not unusual back in 2006—for a house to appreciate in value by more than 10% when it undergoes a complete renovation.

40. I also understand that Dr. Kilpatrick claims that my appraisal was not credible because he claims I did not "report external obsolescence correctly." Although there is no specific requirement in USPAP as to how to record or report external obsolescence, I reported any and all data that would have an effect on value or marketability, and the lack of any adjustment for external obsolescence in my report means I found no external obsolescence that would affect value or marketability of the subject property. As described above, I concluded this after a full, in-person inspection of the property.

41. I also understand that Dr. Kilpatrick claims that my appraisal was not credible because of his requirement that the current unadjusted price of a comparable property must be less than 10% higher than the prior sale price on an annualized basis. To my knowledge, no such requirement exists in USPAP. It would not make sense for that requirement to apply here, for reasons I explicitly state in my appraisal. Comparable Sale #3 had sold in September 2005 for $110,000. It then sold in April 2006 for $164,800. This rise in value, as I wrote at the time, was attributable to both the "rapid rise in value" in the area during that time due to "high demand," and because the property had "recent complete renovation." It makes sense that in the rising market between September 2005 and April 2006, a completely renovated house would appreciate in value.

42. I also understand that Dr. Kilpatrick criticizes my appraisal because I did not use the most recent comparables available. It is my understanding that the date of sale is something to be considered when choosing a comparable, but it is not required that an appraiser always use only the most recent sales. I choose comparables based on which recent sales are most similar to the subject property, using my professional judgment and experience. That often includes the most recent sales, but it sometimes may not, if there are reasons why an earlier sale is more similar. That, to my knowledge, is fully consistent with USPAP's requirement to select the "most similar" properties.

43. Finally, I also understand that Dr. Kilpatrick criticizes my appraisal based on his requirement that the average price per square foot, average site square footage and average gross living area of the comparables must be less than or equal to those same metrics of the comparables available in the market at the time of the appraisal. To my knowledge, USPAP has no such requirement. Appraisers, including myself, look at properties on an individualized basis,

taking into consideration unique features. As I stated above, I choose comparables based on which recent sales are most similar to the subject property, using my professional judgment and experience, and I do not believe that anything requires the comparables to meet the criteria reflected in Dr. Kilpatrick's requirements.

Conclusion

44.     The opinion of value I rendered in my appraisal of 611 Washington Street, Cocoa, Florida in 2006 was my honest opinion based on my professional judgment and experience. The appraised value of $170,000 was fully supported and I believed then and believe now that the opinion I expressed in September 2006 was accurate.

_____
Dan Platt

Sworn to before me this
19th day of February 2015.

_____
Notary Public

Bonnie Sue Worthy
State-Certified General
Real Estate Appraiser
RZ-0002831

BONNIE SUE WORTHY
MY COMMISSION # EE 075964
EXPIRES: March 21, 2015
Bonded Thru Budget Notary Services