DX
2980

### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION, | No. 11-cv-6201 (DLC)  ECF Case |
| Plaintiff, | |
| -against- | |
| NOMURA HOLDING AMERICA INC., *et al.*, | |
| Defendants. | |

STATE OF MARYLAND    )
                   )   ss.:
COUNTY OF WORCESTER  )

### AFFIDAVIT OF LEE CLAGETT

Lee Clagett, being duly sworn, deposes and says:

1.    My name is Lee Clagett.  I am 61 years old, and am employed as a certified residential real estate appraiser in the State of Maryland and provide this affidavit as my direct testimony at trial.

Background

2.    I live in Berlin, Maryland. I have been an appraiser in Virginia, Maryland, Delaware, and Washington, D.C. for the last 32 years.

3.    I began my career as an appraiser in 1983, in Maryland, and was first certified by the State of Maryland in 1992, which is when the licensing requirements were enacted.  I am currently certified as an appraiser in Maryland, Virginia (since 1996), and Delaware (since 2006).  I have also been licensed as an appraiser in Washington, D.C. since 1996.

4.      The focus of my work as an appraiser is, and has been for the last 32 years, single-family properties located in Virginia, Maryland, Delaware, and Washington, D.C.  I estimate that on average I conduct approximately 700 appraisals in a year.  I run an appraisal company located in Accokeek, Maryland, where I supervise three appraisers.

5.      I have always considered myself to be a conservative appraiser and have never submitted an appraisal that was anything other than my honest, good-faith judgment of the property's value.

6.      An appraisal is an opinion of value.  It should always be supported by analysis, but ultimately there is no "true" value.  An appraiser can only estimate what he or she believes the value is, in his or her professional judgment.

7.      The development and reporting of appraisals are governed by the Uniform Standards of Professional Appraisal Practices ("USPAP").  USPAP requires that appraisals be credible, which I understand to mean an appraisal that is worthy of belief and supported.  I am aware of USPAP and conduct my appraisals in accordance with USPAP.

Appraisal at Issue

8.      It is my understanding that I reviewed an appraisal that is at issue in this lawsuit—the appraisal submitted for the property located at ███████████████████████.  The relevant papers for this appraisal are attached hereto as Defense Exhibit 2708 ("DX-2708"), and my signature appears on page 4.

9.      I was what is called a "review appraiser" for this appraisal.  This means that a different appraiser conducted the original appraisal, and then the lender hired me to review the appraisal.  My understanding is that lenders select certain appraisals for random reviews, and that is likely what happened here.  However, at the time, I was not made aware of who the original appraiser was or why the appraisal was selected, in order to preserve objectivity.  I

reviewed the original appraisal and determined that the opinion of value was credible and a

reasonable estimate of value based on what the original appraiser recorded in the report (and

confirmed by my own research and observations).  As a review appraiser, my review was limited

to observing the exterior of the subject home and the comparables (as opposed to the original

appraiser, who conducted a full inspection of the interior of the subject property).  However, I

also checked the records and made sure that the information from public records matched what

the appraiser put on the form.

10.     I agreed with the appraisal value of $320,000 for the property in

September 2006.  I believed at the time I rendered this review appraisal that the value was

accurate, and upon review of DX-2708, I believe today that the appraisal was accurate as of

September 2006.

11.     The subject property of the appraisal at issue in this lawsuit is on ▮▮▮▮

▮▮▮▮▮▮▮▮, which is located on ▮▮▮▮▮▮▮▮.  In the years prior to 2006, the

▮▮▮▮▮▮ region was experiencing growth and home price appreciation.  Many properties on

▮▮▮▮▮ and the surrounding areas rose in value significantly prior to 2006.

12.     The Uniform Residential Appraisal Report ("URAR") is a standard form

approved by Freddie Mac and Fannie Mae, and which is frequently utilized by appraisers.  That

report contains and summarizes information used to determine an appraiser's opinion of value.

13.     The original appraiser completed the URAR for ▮▮▮▮▮▮▮▮,

▮▮▮▮, and it is part of DX-2708.  As shown in that report, the opinion of value as of

September 2006 was based largely on the comparison of the subject property with similar

properties ("comparables").  As the Appraiser's Certification contained in the Uniform

Residential Appraisal Report requires, an appraiser must use comparables "that are locationally,

physically, and functionally the most similar to the subject property." (p. 21 of DX-2708.)
Some of the key characteristics that determine if a property can be considered to be a
"comparable" are geography (a comparable should be in a similar location to the subject
property), condition (a comparable should be in similar condition to the subject property), living
space (a comparable should have a similar size living area to the subject property), room count (a
comparable should have a similar room count to the subject property, meaning total rooms,
bedrooms, and bathrooms), design (a comparable should be of a similar design or style as the
subject property), age (a comparable should be of similar age to the subject property), amenities
(a comparable should have similar amenities to the subject property, such as a garage, porch or
patio, utilities, etc.), and lot size (a comparable should be similar in overall property size to the
subject property).

      14.     The use of comparables in forming an opinion of value is known as the
"sales comparison approach," and is, in my judgment and experience, the preferred method for
rendering an appraisal.

      15.     As shown on pages 18 and 23 of DX-2708, the original appraiser used six
"comparables" in coming to the opinion as to the value of the subject property. I agreed with the
selection of these comparables. The six comparables were located at: ▇▇▇▇▇▇▇▇,
▇▇▇▇▇▇▇ ("Comparable Sale #1"); ▇▇▇▇▇▇▇▇▇▇ ("Comparable Sale
#2); ▇▇▇▇▇▇▇▇▇▇ ("Comparable Sale #3); ▇▇▇▇▇▇▇▇,
▇ ("Comparable Sale #4); ▇▇▇▇▇▇▇▇▇▇ ("Comparable Sale #5);
and ▇▇▇▇▇▇▇▇ (Comparable Sale #6). All six comparables had sold
within six months prior to the effective date of the appraisal, for amounts between $289,900 and
$349,000. The original appraiser appraised the subject property as having a value of $320,000.

The sale dates and prices of the subject property and comparables are shown in the following chart, which summarizes information found on pages 18 and 23 of DX-2708:

| | Subject | Comparable Sale #1 | Comparable Sale #2 | Comparable Sale #3 | Comparable Sale #4 | Comparable Sale #5 | Comparable Sale #6 |
|---|---|---|---|---|---|---|---|
| Sale Date | ███ | ███ | ███ | ███ | | ███ | [Active ███ |
| Price | $320,000 (appraised value) | $339,900 | $310,000 | $328,000 | $349,000 | $289,900 | $319,000 |

16.    In the summary of the "sales comparison approach," the original appraiser wrote: "Comparables sale #3 and #6 were given the most consideration as they were similar in size, style, design, quality, and functional utility; were recent; required fewer adjustments; and were closest in proximity to the subject. The sales chosen are considered the best available and any other sales would have required less desirable adjustments. The Sales Comparison Analysis grid is considered to be the most reliable indicator of current market value." (p. 18 of DX-2708.)

17.    I have highlighted the similarities between the subject property and Comparable Sale #3 and Comparable Sale #6, because they were given the most consideration in the original appraisal, in the following chart, which summarizes information found on pages 18 and 23 of DX-2708:

| Feature | Subject | Comparable Sale #3 | Comparable Sale #6 |
|---|---|---|---|
| Proximity to Subject | ▮ | ███ | ███ |
| ████████████ | ████ | ███ | ███ |
| ██████ | ████ | ███ | ███ |
| Total Room Count | 5 | 6 | 6 |
| Bedrooms | 2 | 3 | 3 |
| Bathrooms | 1 | 2 | 2 |
| Design | Rancher/Avg | Rancher/Avg | Rancher/Avg |
| Actual Age | ███ | ███ | ███ |
| Condition | Average | Average | Average |
| Functional Utility | Average | Average | Average |
| Heating/Cooling | Bsebrd/CAC | FWA/CAC | FWA/CAC |
| Garage/Carport | Dt.OvrGrge2Car | Detached 1-Car | OSP |
| Porch/Patio/Deck | Cvd Porch, Deck | Deck | None |

18.     While the properties were similar, they obviously were not identical.  The original appraiser therefore made "adjustments."  Adjustments are made, in the professional judgment of the appraiser, in order to account for the differences in certain characteristics between properties.  So, for instance, if a comparable has a larger gross living area than the subject property, that would have to be adjusted for.  Because the comparable likely would sell for more because of the larger living area, a negative adjustment would be made to the sales price of the comparable sale.  The amount of the adjustment is made in the professional judgment of the appraiser.

19.     Once all adjustments to the comparable sales were accounted for, the adjusted sales price of the comparables were as follows:  $356,325 (Comparable Sale #1), $316,325 (Comparable Sale #2), $336,325 (Comparable Sale #3), $336,925 (Comparable

#4), $302,825 (Comparable Sale #5), and $331,225 (Comparable Sale #6). These prices support the appraised value of the subject property at $320,000. Looking at the adjusted sales prices, the appraised value of $320,000 was, if anything, conservative, when compared to Comparable Sales #3 and #6, which were the primary comparables relied upon by the original appraiser.

20.    The original appraiser also researched the prior sales of the subject property and the comparable properties. The appraiser noted that there were no prior sales of the subject property in the past three years, and that there were no prior sales of the comparables in the last year. I also checked the sales records for these properties in reviewing the appraisal, and came to the same conclusion. I always check the prior sales records for both the subject and the comparable sales.

21.    The original appraiser also completed the "cost approach to value" section on page 19 of DX 2708. The cost approach method is an estimate of value based on what it would cost to construct an equivalent property on the same piece of land. The cost approach method requires the appraiser to estimate both the cost of the house and the value of the land. I do not consider the cost approach to be as reliable at providing an estimate of market value as the sales comparison approach. In this case, the original appraiser noted that the cost approach is "not given any consideration in determining the estimated value" because it is "very subjective," and the sales comparison approach is the "most reliable indication of market value." (p. 18-19 of DX-2708.)

22.    In the section on the "cost approach to value" on page 19 of DX-2708, the original appraiser estimated the value of the land because there were no recent vacant land sales. The land value was estimated at $100,000, which I reviewed and determined was a reasonable estimate. The appraiser then calculated the cost of the home using standard cost approach

methodology. The appraiser estimated the cost of the square footage of the living area, coming to $230 per square foot, a reasonable estimate at the time. The original appraiser then accounted for appliances and extra features, adjusted for physical depreciation, and came to a final conclusion of value under cost approach of $319,016. The land to value ratio was therefore approximately 31%.

23. The cost approach value of $319,016, despite being less reliable than the sales comparison approach generally, in this case is virtually identical to the sales comparison value of $320,000, and fully supports the value rendered by the original appraiser, which I approved.

Dr. Kilpatrick's Criticisms

24. I understand that an expert witness for plaintiff, Dr. John A. Kilpatrick, has opined or will opine that my review of the original appraisal (and the original appraisal itself) (DX-2708) is not credible. I do not agree with the value Dr. Kilpatrick arrives at, nor do I agree with his criticisms of the appraisal.

25. I understand that Dr. Kilpatrick ran an automated valuation model ("AVM") on the subject property in 2013 or 2014 and arrived at a value of $238,936.

26. I do not believe that an AVM can provide a more accurate value than the opinion of a professional appraiser. I have worked with various AVMs in the past, and have never found them to be particularly reliable. On the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ where the appraisal at issue in this lawsuit took place, the homes are not homogenous and values largely depend on factors that an AVM cannot consider, like whether the property is ▇▇▇▇▇▇ ▇▇ I do not believe that an AVM can accurately assess the values of homes in this region.

27. As I stated earlier, appraisals are opinions of value. This appraisal, of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, is fully supported and I believed it at the time to be a

reasonable opinion of value, when I reviewed it and signed my name to it. I believe today that it was reasonable when made.

28.     I also understand that Dr. Kilpatrick's AVM uses tax assessed values. In my experience as an appraiser, tax assessed values do not reflect actual market value. My experience is that assessed values typically lag behind actual market value––and thus cannot reflect the market at the time the appraisal was rendered.

29.     Here, I believe Dr. Kilpatrick's supposed "true value" is considerably below the market value of the subject property at the time, as shown by a comparison to comparable sales. The sales of the six comparable properties were for sold for $356,325, $316,325. $336,325, $336,925, $302,825, and $331,225. Yet Dr. Kilpatrick's AVM generated a "true value" for the subject property of $238,936 as of September 2006. That value, if rendered at the time, would have been completely unsupported by any comparable properties.

30.     I am well aware of USPAP standards, have always followed USPAP standards in rendering an appraisal or an appraisal review, and I did so for the 2006 appraisal of ████████████████████████ as well.

31.     I was shown by counsel for Nomura a series of questions which Dr. Kilpatrick claims that my appraisal "failed," based on the analysis he performed for this lawsuit.

32.     I understand that Dr. Kilpatrick has claimed that the property trend value was not reported correctly in my appraisal. However, as page 17 of DX-2708 shows, the appraisal described both the market conditions and the neighborhood. In describing the market conditions, the original appraiser noted that by reconciling "the historical data of the settled sales within the subject's neighborhood and the continually updated data base of active listings, it is the opinion of this appraiser that the neighborhood values are increasing due to the fact the

increase in demand for housing is presently exceeding the current available supply." (p. 17 of DX-2708.) I reviewed this and, because the appraiser based it on both recent sales and active listings, I had no reason to disagree with the property trend, and believe it to have been reported accurately. I also checked the MLS for the area myself, and reviewed all listings in the area at the time. Based on that, I determined that the property value trend was accurately stated.

33.    I also understand that Dr. Kilpatrick has criticized the appraisal on the grounds that the land value ratio was above 30%. Based on my knowledge and professional experience, this has never been a requirement in USPAP. My understanding is that it was common for the land value ratio to be between 20 and 30%, but it was by no means a strict requirement. The land value ratio in this instance was 31%. I can think of plenty of reasons for why the land value ratio would be higher than 30%. In this case, the house was ████████████ ████████████████████████████████████████████████. It was my judgment that the land value in this instance was accurate as the original appraiser determined it. In any event, the land value ratio was 31%, and Dr. Kilpatrick's requirement was that it be 30% or under. Even if I accepted Dr. Kilpatrick's question, which I do not, that difference would not be significant to me in light of the factors explained above. Further, the cost approach was not used as the primary determinant of value for this property—the sales comparison approach was. As the original appraiser noted, the sales comparison approach "is considered to be the most reliable indication of current market value." (p. 18 of DX-2708.)

34.    I also understand that Dr. Kilpatrick criticizes the appraisal because I did not use the most recent comparables available. When finding a comparable sale, an appraiser has to look at a variety of different features—living area, lot size, style, etc. Of course, appraisers try to get the most recent comparables, but the key is to find the best comparable

properties, not just the most recent. This is fully in line with USPAP. In this case, the original appraiser used six comparables, all of which sold within the last six months before the appraisal. As a review appraiser, reviewing this appraisal, I looked at whether the appraiser used recent comparables, and in this case I was satisfied that the original appraiser used the right comparables, and they were all relatively recent as well.

35.    Finally, I understand that Dr. Kilpatrick criticizes the appraisal based on his requirement that the average site square footage and average gross living area of the comparables must be less than or equal to those same metrics of the comparables available in the market at the time of the appraisal. Based on my knowledge and professional experience, no such requirements exist in USPAP or existed at the time. I reviewed this appraisal and believe that the original appraiser chose the best comparables he could at the time, and made the proper adjustments. I see no reason to believe that the choice of comparables was improper because of their lot size or gross living area.

Conclusion

36.     I believe that the review appraisal I performed of the property at ██████

████████████████████ was accurate and fully supported at the time I rendered it in

September 2006.  I believe that the original appraiser conducted a proper appraisal in line with

USPAP requirements, and I believe that I supervised and reviewed the appraisal correctly.  In

sum, I believe that the opinion of value expressed in the appraisal was accurate at the time and

honestly made based on both my professional judgment and experience and the professional

judgment and experience of the original appraiser.


_____
Lee Clagett

Sworn to before me this
8 day of February 2015.


_____
Notary Public

DEBORAH LARA BETH KISTLER
Notary Public
Worcester County
Maryland
My Commission Expires July 31, 2016