DX
3017

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION, | No. 11-cv-6201 (DLC) <br><br> ECF Case |
| Plaintiff, | |
| -against- | |
| NOMURA HOLDING AMERICA INC., *et al.*, | |
| Defendants. | |

STATE OF FLORIDA )
                               ) ss.:
COUNTY OF MIAMI-DADE )

## AFFIDAVIT OF MICHELE MORRIS

Michele Morris, being duly sworn, deposes and says:

        1.      My name is Michele Morris. I am 50 years old, am employed as a certified residential real estate appraiser in the State of Florida, and provide this affidavit as my direct testimony at trial.

Background

        2.      I live at 1708 NW 20th St., in Homestead, Florida, which is about 35 miles from Miami. I have been an appraiser in Louisiana and then Florida for the last 27 years.

        3.      I began my career as an appraiser in 1988, in New Orleans, Louisiana. I moved to Florida in 1989, and was first certified by the State of Florida in 1993 (around the time it became required). I have worked as a certified real estate appraiser in Florida for the last 22 years. As a certified appraiser in Florida, I am required to take 30 hours of continuing education

courses every two years, including courses on Florida law and the Uniform Standards of Professional Appraisal Practices ("USPAP").  USPAP provides standards for the development and reporting of appraisals, and is issued by the Appraisal Standards Board of the Appraisal Foundation.

4.      The focus of my work as an appraiser is, and has been for the last 22 years, residential properties located in ▮▮▮▮▮ County and ▮▮▮▮ County, Florida.  I estimate that on average I conduct approximately 400 appraisals in a year.  I am self-employed.

5.      I have always considered myself to be a conservative appraiser and have never submitted an appraisal that was anything other than my honest, good-faith estimate of the property's value.

6.      An appraisal is an opinion of value.  As a real estate appraiser I typically estimate market value.  It should always be supported by data and analysis, but ultimately there is no absolute value.  An appraiser can only estimate what he or she believes the market value is, in his or her professional opinion, based on the available data.

7.      I have always conducted my appraisals in accordance with USPAP.  It is my understanding that the word "credible" as used in USPAP means worthy of belief and supported by market data, using practices acceptable in my profession.

Appraisal at Issue

8.      It is my understanding that one of the appraisals at issue in this lawsuit is the appraisal I performed for the property located at 8838 NW 108th Lane, Hialeah Gardens, Florida. The relevant papers for this appraisal are attached hereto as Defense Exhibit 2689 ("DX-2689"), and my signature appears on page 8.

9.      I appraised the property in March 2006 as having a market value of $305,000.  I believed at the time I performed this appraisal that the market value was supported

and, upon review of DX-2689, I believe today that the appraisal was supported as of March 2006.

10.     I followed typical procedures when I conducted this appraisal. The first step in this process is to collect information on the subject property, and to do research on the Multiple Listing Service ("MLS"), and other data sources, on the subject property and to find sales of properties with similar characteristics. Then, I visit the subject property and measure the exterior of the house, before going inside the house and doing a routine physical inspection. I take notes on the condition of the house, draw out the floor plan, and photograph the interior and exterior of the subject property. Then, I drive to the similar properties (as I've determined them from the MLS data), and photograph and inspect the exterior of those properties from the street. Once I have collected all of that information, I verify the sales information of the similar properties, and then choose a minimum of the three of the most comparable properties. I then complete the required appraisal report and give my estimate of market value of the subject property.

11.     The subject property of the appraisal at issue in this lawsuit is located in Hialeah Gardens, about 12 miles northwest of ███████████. In the years prior to 2006, this neighborhood experienced rapid growth and home price appreciation. Many properties in Hialeah Gardens appreciated in value significantly prior to 2006. As I recall, prices in that area leveled off in 2006. The market trend at that point would have been best described as "stable."

12.     The Uniform Residential Appraisal Report is a standard form approved by Freddie Mac and Fannie Mae, and is frequently utilized by appraisers. This form summarizes information used to estimate an appraiser's opinion of value—the full information is kept in the appraiser's complete work file. Appraisers are required to keep their work file for five years.

-3-

Because this appraisal was completed almost nine years ago, I no longer have the work file for my appraisal of 8838 NW 108th Lane, Hialeah Gardens.

13.     I completed a Uniform Residential Appraisal Report for 8838 NW 108th Lane, Hialeah Gardens, and it is part of DX-2689.  As shown in that report, my estimate of market value as of March 2006 was based largely on the comparison of the subject property to similar properties ("comparables").  As the Appraiser's Certification contained in the Uniform Residential Appraisal Report requires, an appraiser must use comparables "that are locationally, physically, and functionally the most similar to the subject property."  (p. 7 of DX -2689.)  Some of the key characteristics that determine if a property should be considered to be a "comparable" are:

- **Geography**:  A comparable should be in a similar location to the subject property, in terms of proximity to subject, neighborhood characteristics, access to desired services, and market appeal, to name a few.

- **Living space**:  A comparable should have a similar living area to the subject property.  This is represented on the Uniform Residential Appraisal Report by the category "Gross Living Area," where the appraiser reports the living area in square footage.

- **Room count**:  It is desirable that a comparable have a similar room count to the subject property, meaning total rooms, bedrooms, and bathrooms.  This is represented on the Uniform Residential Appraisal Report by the category "Room Count," where the appraiser must list the total room count, number of bedrooms, and number of bathrooms for the subject property and each of the comparable properties.

- **Condition**:  A comparable should be in a similar condition as the subject property.  This is represented on the Uniform Residential Appraisal Report by the category "Condition," where an appraiser must note the condition (with responses such as "Average" or "Good") of the subject property and the comparable properties.

- **Design**:  A comparable should be of a similar "design" as the subject property.  This refers to the style of house—a colonial, a townhouse, a villa, etc.  This is represented on the Uniform Residential Appraisal Report by the category "Design (Style)," where the appraiser reports the applicable design of the subject property and the comparable properties.

-4-

- **Age**: A comparable should be of a similar age to the subject property. This is represented on the Uniform Residential Appraisal Report by the category "Actual Age."

- **Amenities**: A comparable should have similar amenities to the subject property. Amenities include features such as a garage, a porch or patio, energy efficient items, and central heating and cooling. These categories are all represented on the Uniform Residential Appraisal Report.

- **Lot size**: A comparable should be similar in overall property size to the subject property, as the size of the property can sometimes affect its value. This is represented on the Uniform Residential Appraisal Report by the category "Site," where the appraiser reports the lot size of the subject property and comparable properties.

14.    The use of comparables in developing an opinion of market value is known as the "sales comparison approach," and is, in my judgment and experience, the preferred method for rendering an appraisal of market value.

15.    As shown by the Uniform Residential Appraisal Report, I used three "comparables" in coming to my opinion as to the market value of the subject property. The three comparables were located at: 8701 NW 109th Terrace, Hialeah Gardens, Florida ("Comparable Sale #1"); 11495 NW 88th Court, Hialeah Gardens, Florida ("Comparable Sale #2"); and 8872 NW 111th Terrace, Hialeah Gardens, FL ("Comparable Sale #3"). All three comparables had sold within six months prior to the effective date of the appraisal, for amounts of $310,000, $305,000, and $305,000, respectively. I appraised the subject property as having a market value of $305,000. The sale dates and prices of the subject property and comparables are shown in the following chart, which summarizes information found on page 4 of DX-2689:

|  | Subject | Comparable Sale #1 | Comparable Sale #2 | Comparable Sale #3 |
|---|---|---|---|---|
| **Sale Date** | March 2006 (date of appraisal) | December 2005 | December 2005 | October 2005 |
| **Appraised Value/ Sale Price** | $305,000 (appraised value) | $310,000 | $305,000 | $305,000 |

16.     The three comparable properties were similar to the subject property in several important ways.  The similarities are shown in the following chart, which summarizes information found on page 4 of DX-2689:

| Feature | Subject | Comparable Sale #1 | Comparable Sale #2 | Comparable Sale #3 |
|---|---|---|---|---|
| Proximity to Subject | -- | 0.08 Miles | 0.40 miles | 0.17 miles |
| Gross Living Area | 1,316 Sq. Ft. | 1,412 Sq. Ft. | 1,125 Sq. Ft. | 1,378 Sq. Ft. |
| Site Size | 3,139 Sq. Ft. | 4,662 Sq. Ft. | 2,627 Sq. Ft. | 3,384 Sq. Ft. |
| Total Room Count | 6 | 6 | 6 | 6 |
| Bedrooms | 3 | 3 | 3 | 3 |
| Bathrooms | 2 | 2 | 2 | 2 |
| Design | Villa | Villa | Villa | Villa |
| Actual Age | 17 years | 12 years | 19 years | 13 years |
| Condition | Average | Average | Good | Average |
| Functional Utility | Average | Average | Average | Average |
| Heating/Cooling | Central | Central | Central | Central |
| Garage/Carport | None | None | None | None |
| Porch/Patio/Deck | Patio | Patio | Patio | Patio |

17.     An analysis of the "adjustments" made to Comparable Sale #1 and Comparable Sale #2 supports the estimate of market value of $305,000 for the subject property. An adjustment is made when a comparable has a difference in a characteristic that would affect the value of the property.  By adjusting for that difference, an appraiser, using his or her professional judgment and knowledge of the local market, can make a valid comparison in value between the comparable property's sale price and the subject property.  In this case, Comparable Sale #1 was slightly larger in gross living area (▮▮▮ square feet), while Comparable Sale #2

-6-

was slightly smaller (████ square feet) than the subject property, which had a gross living area

of ████ square feet. In order to account for the difference, I made a negative adjustment to

Comparable Sale #1 (*i.e.*, I lowered its value), and made a positive adjustment for Comparable

Sale #2 (*i.e.*, I raised its value). Upon reviewing DX-2689, it appears that I made a slight error in

my adjustment for Comparable Sale #2. The adjustment for the gross living area should have

been $6,685, not $6,885 (a difference of $200). This would bring the final adjusted sale price of

the comparable to $306,685, not $306,885, bringing it slightly closer to the estimated market

value of the subject property.

18.     I made two other adjustments. Comparable Sale #1 had "an oversized

corner site," which was reflected in its "Size" of ████ square feet (while the subject property

had a "Size" ████ square feet). I therefore made a negative adjustment to Comparable Sale

#1 to account for this difference in lot size. Comparable Sale #2 was in "Good" condition as

opposed to the "Average" condition of the subject property. The difference in condition was

due, as I noted in my summary of the sales comparison (p. 4 of DX-2689), to the updated kitchen

in Comparable Sale #2. I therefore made a negative adjustment to account for that difference.

Comparable Sale #3 did not require, in my professional opinion, any adjustments.

19.     Once all adjustments were accounted for, the adjusted sales price of the

comparables was as follows: $304,140 (Comparable Sale #1), $306,885 (Comparable Sale #2),

and $305,000 (Comparable Sale #3). As discussed above, the adjusted sales price for

Comparable Sale #2 should have been $306,685.

20.     I also reported in my appraisal (p. 3 of DX-2689) that neighborhood

growth was stable, that property values were stable, that supply and demand was in balance, and

that average marketing time was between 3-6 months. I described the market as "stable with

supply and demand in balance." This information was based on my own experience in the local

market area and research I conducted on the Multiple Listing Service at the time. The Multiple

Listing Service is a database of information available to real estate professionals (including

appraisers) about properties. Appraisers, including myself, regularly use the Multiple Listing

Service to gather information about properties in their market.

21.     I also analyzed the prior sales of the subject property and the comparable

properties. For the subject property, there was one prior sale, and it was an arm's-length

transaction for $165,000 in September 2003. As mentioned earlier, and as noted in the appraisal

(p. 4 of DX-2689), prices in this neighborhood had appreciated significantly in the time period

since the prior sale. I also noted that the prior sale of Comparable Sale #1 did not appear to be an

arm's-length transaction, which might explain why it was $129,900 in August of 2005. An

"arm's-length" transaction is a transaction between two independent parties acting freely—as

opposed to situations such as a sale between family members, an estate sale, or a foreclosure

sale, where a sale price might not reflect market value.

22.     Comparable Sale #2 had an arm's-length transaction sale that occurred in

February 2005, for $250,000. I noted in the appraisal that Comparable Sale #2 had received

updating since its prior sale. "Updating" refers to renovations and other work on a home that can

increase its market value. For instance, as was the case with Comparable Sale #2, an "updated"

kitchen would be a reason that a home might sell for more than a prior sale. There was nothing

unusual about the fact that the home sold for $250,000 in February 2005, and for $305,000 in

December 2005, because of the updated kitchen and the appreciation in prices in the market.

23.     In DX-2689, I summarized the sales comparison approach (as described

above) as follows:  "All comparables are similar homes located within the subject's immediate

-8-

market area.  Comparable #2 has an updated kitchen and requires an adjustment for condition.

Comparable #1 has an oversized, corner site and requires an adjustment.  All comparables are

similar to the subject in location, design & appeal, room count, effective age, and amenities."  (p.

4 of DX-2689.)

24.     I also completed the "cost approach to value" section on page 5 of DX-

2689.  The cost approach method is based on an estimate of the replacement cost of the subject

improvements less depreciation plus the estimated site value and "as is" site improvements.  In

estimating replacement cost of the house, the appraiser must consider the cost of construction per

square foot, the cost of appliances and other features, and physical depreciation.

25.     In the section on the "cost approach to value" on page 5 of DX-2689, I

noted that I estimated the land value using the land residual method.  The land residual method is

a method for determining the market value for property in the area using comparable sales.

When an appraiser knows of recent property sales, he or she can estimate the value of the land by

subtracting from the total price the estimated cost of the house (using the cost method described

above).  By analyzing recent site-to-total value ratios, as I noted in my appraisal, I came to the

opinion of $115,000 as the land value of the property.  I then calculated cost of the home using

standard cost approach methodology.  I estimated the cost of the square footage of the living area

using comparable properties, coming to $135 per square foot, a reasonable estimate at the time.  I

then accounted for appliances and extra features, adjusted for physical depreciation, and came to

my final estimate of value under cost approach as $301,611.  The land to value ratio was

therefore approximately 38%.

26.     The cost approach value of $301,611 is very close to the sales comparison value of $305,000. The sales comparison approach is typically given more weight than the cost approach when estimating market value of existing properties.

27.     I did not complete the "Income Approach to Value" section of the Uniform Residential Appraisal Report. The "Income Approach to Value" is a method for appraising the value of a property based on the estimated income it can generate. Such an approach was inapplicable here due to insufficient data.

28.     In sum, my appraisal value of $305,000 was well supported at the time I rendered it, and it was my honest estimate, using my professional judgment, as of March 2006.

Dr. Kilpatrick's Criticisms

29.     I understand that an expert witness for plaintiff, Dr. John A. Kilpatrick, has opined or will opine that my appraisal (DX-2689) is not credible. I do not agree with the value Dr. Kilpatrick arrives at, nor do I agree with his criticisms of my appraisal.

30.     I understand that Dr. Kilpatrick ran an automated valuation model ("AVM") on the subject property in 2013 or 2014 and arrived at a value of $217,952.

31.     In my experience, a licensed appraiser using his or her professional judgment will almost always deliver a more accurate value than an AVM conducted retrospectively. I do not believe that an AVM will accurately assess the state of the market at the time the appraisal is being conducted.

32.     As I stated earlier, appraisals are opinions of value—indeed, the Uniform Standards of Professional Appraisal Practices defines an appraisal as "an opinion of value." My ▮▮▮▮▮▮▮ appraisal is fully supported and I believed it at the time to be accurate. I believe today that it was accurate when made.

-10-

33.     Generally, an appraiser can consider factors that an AVM cannot. First, an appraiser physically inspects the property, and can consider qualitative details that an AVM usually does not. Second, the appraiser has knowledge of the local market and can exercise her professional judgment in selecting comparables.

34.     I also understand that Dr. Kilpatrick's AVM uses tax assessed values. In my experience as an appraiser, tax assessed values are not a reliable indicator of market value. My experience is that tax assessed values are typically significantly lower than market values in the greater Miami area.

35.     Here, I believe Dr. Kilpatrick's supposed "true value" is considerably below the market value of the subject property at the time, as shown by a comparison to comparable sales. The sale prices of the three comparable properties were $310,000 (December 2005), $305,000 (December 2005), and $305,000 (October 2005). Yet Dr. Kilpatrick's AVM generated a "true value" for the subject property of $217,952 as of March 2006. As far as I know, that value is not supported by any analysis of comparable properties.

36.     I have always complied with USPAP in rendering an appraisal, and I did so for the 2006 appraisal of 8838 NW 108th Lane, Hialeah Gardens, Florida, as well.

37.     I understand that the method by which Dr. Kilpatrick has attempted to determine the "credibility" of my appraisal is through what he calls a deterministic scoring model. In 27 years as a professional appraiser, I have never heard of such a model being used to determine the "credibility" of an appraisal. In my experience, the proper method to review an appraisal is a second in-person review, a desktop review, or a field review.

38.     I was shown by counsel for Nomura a series of questions which Dr. Kilpatrick claims that my appraisal "failed," based on the analysis he performed for this lawsuit.

-11-

39.    I understand that Dr. Kilpatrick has claimed that I did not report the property trend value correctly in my appraisal.  However, as DX-2689 shows, I checked the "stable" box in the Property Values row in the Neighborhood section of the appraisal form, which was based on results of research conducted at the time.  I also provided an analysis of the neighborhood in the "Neighborhood Description" section, and I described the "Market Conditions" as well, giving support for the conclusions as to the neighborhood property values being stable.  My conclusion that the property values were stable was based on my knowledge of the local market and my research of data in the Multiple Listing Service.

40.    I understand that Dr. Kilpatrick also claims that I did not report "marketing time" correctly.  However, as shown on the first page of the Uniform Residential Appraisal Report, I clearly marked that the marketing time for the property was "3-6 months," which was based on my knowledge of the local market and my research of data in the Multiple Listing Service. If anything, I took a conservative approach in reporting the "marketing time"— as the appraisal notes (p. 3 of DX-2689), the subject property was on the market for ▮ days before selling, or under three months.

41.    I understand that Dr. Kilpatrick has also claimed that my appraisal was not credible because the appraised value of the subject property was not less than 10% higher, on an annualized basis, than the prior sales price of a subject.  This is not required by USPAP, and it doesn't make sense to me, because in certain circumstances property values can easily appreciate by more than 10% in one year.  Reviewing DX-2689, the prior sale of the property was in 2003. By 2006, the market value of properties in Hialeah Gardens had appreciated by greater than 10% a year.  USPAP does not set forth requirements, formulas, limits or caps concerning rates of appreciation but rather requires an estimate of current market value.

-12-

42.     I also understand that Dr. Kilpatrick has criticized my appraisal on the grounds that the land value ratio was above 30%.  Based on my knowledge and professional experience, this has never been a requirement in USPAP.  I noted in the narrative addendum in DX-2689, under "cost approach," the subject's estimated land value of $115,000, which was approximately 38% in terms of land to value ratio.  (*See* p. 5 of DX-2689)  It was my opinion that the land value in this instance was accurate based on market data of comparable properties.  In fact, a land value ratio above 30% was not unusual in this area at the time.  Certainly there is nothing about this appraisal that makes me think the land value ratio was inappropriate, because the land value ratio as reported was entirely typical of the local market at that time.

43.     I also understand that Dr. Kilpatrick claims that my appraisal was not credible because of his requirement that the current unadjusted price of a comparable property must be less than 10% higher than the prior sale price, on an annualized basis.  Based on my knowledge and professional experience, no such requirement in USPAP exists now or existed at the time.  It also does not make sense for this appraisal.  The prior sale of the Comparable Sale #1 was not an arms-length transaction, which I noted in the appraisal file.  Therefore, it would not be unusual for Comparable Sale #1 to be more than 10% above its prior sale price.

44.     Finally, I understand that Dr. Kilpatrick criticizes my appraisal based on his requirement that the average price per square foot, average site square footage and average gross living area of the comparables must be less than or equal to those same metrics of the comparables available in the market at the time of the appraisal.  Based on my knowledge and professional experience, no such requirements exist in USPAP or existed at the time.  Appraisers look at properties on an individualized basis, taking into consideration unique features, and valid

-13-

comparable properties will not always meet the criteria reflected in Dr. Kilpatrick's requirements.

Conclusion

45.    I believe that my appraisal (my opinion of market value) of 8838 NW 108th Lane was accurate and fully supported as of the effective date in March 2006. I complied with USPAP, and the appraisal of $305,000 was my honest opinion, based on my experience and professional judgment.

_____
Michele Morris

Sworn before me this
20 day of February 2015.

_____
Notary Public

NANCY L. KERMODE
Notary Public - State of Florida
My Comm. Expires Jan 7, 2016
Commission # EE 148447

-14-