DX 3011

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,

Plaintiff,

v.

NOMURA HOLDING AMERICA INC., et al.,

Defendants.

No. 11-cv-6201 (DLC)

ECF Case

## AFFIDAVIT OF DERICK GREENE

STATE OF CONNECTICUT  )
                      )  ss.: Shelton
COUNTY OF FAIRFIELD   )

Derick Greene, being duly sworn, deposes and says:

1. I am employed by Clayton Services LLC (together with its predecessor and affiliates, "Clayton"), in Shelton, Connecticut, and provide this affidavit as my direct testimony at trial. From early 2006 to the end of 2007, I served as Clayton's Client Service Manager for Clayton's account with Nomura Credit & Capital, Inc. ("Nomura").

2. I graduated from the University of Southern California with a bachelor's degree in English in 1995. From 1996 to 2000, I worked as a real estate analyst at Dwyer-Curtlett & Co. in Los Angeles, California. From 2000 to 2004, I worked as a senior consultant at Oracle in Redwood City, California. I joined Clayton in April 2004, and have been there ever since.

## I. CLAYTON'S AND NOMURA'S DUE DILIGENCE.

3. Clayton is a firm that provides various mortgage-related services, including due diligence on mortgage loans. Based on my experience, I believe that Clayton was regarded as one of the leading due diligence firms for mortgage-related due diligence during the 2005-2007 time period, and still is so regarded. My personal experience while employed at Clayton was that Clayton has always taken the due diligence processes very seriously, and took great care to hire qualified individuals to perform due diligence.

4. In my role as the Client Service Manager for Nomura, I managed Clayton's business relationship with Nomura and served as Nomura's primary, day-to-day contact person for the due diligence Clayton performed for Nomura on "bulk" transactions—that is, transactions in which Nomura bought a pool of mortgage loans and requested that Clayton conduct due diligence for that pool. Another Clayton employee, Nicole Cofrancesco, was responsible for Clayton's business relationship with Nomura with respect to Nomura's conduit channel, in which Nomura bought loans individually. During 2004 through the early part of 2006, the Clayton Client Services Manager for Nomura's bulk channel was Brian Farrell. I began handling the day-to-day aspects of that relationship starting in late 2005, and took over as Nomura's Client Services Manager in early 2006 when Brian Farrell left Clayton.

5. During my time at Clayton, I interacted frequently with Nomura and came to be familiar with the Nomura due diligence group—that is, the team of Nomura employees who oversaw Nomura's due diligence of mortgage loans that Nomura was considering for purchase. During my tenure as its Client Services Manager, my contacts with Nomura's due diligence group initially consisted of Joseph Kohout, Jeffrey Hartnagel, and Mendy Sabo. Joseph Kohout had a wealth of experience in the due diligence industry and was well-respected among mortgage loan diligence professionals. Jeffrey Hartnagel was also very experienced and very

knowledgeable. Mendy Sabo was younger than Mr. Kohout and Mr. Hartnagel, but I recall that he too was very knowledgeable about due diligence. Neil Spagna replaced Joseph Kohout as head of Nomura's due diligence group in approximately mid-2006, and remained with Nomura until approximately late 2007, when Nomura stopped purchasing mortgage loan pools for securitization. Mr. Spagna was hired from Clayton and was very knowledgeable and professional. Chris Scampoli joined Nomura's due diligence team in or about August 2006. My impression of Mr. Scampoli was that he was very detail orientated and "on top of things," and was quite willing to hold originators' feet "to the fire," if necessary. I believed that all of Nomura's due diligence team took the due diligence process very seriously and were very knowledgeable about mortgage loan due diligence. They handled their responsibilities in a highly professional manner.

6. In my interactions with Nomura's due diligence team, I did not see any evidence that Nomura was simply attempting to purchase as many loans as possible, or that it would disregard underwriting issues in order to increase purchase volume. The Nomura personnel with whom I interacted seemed genuinely interested in the due diligence results Clayton produced, ~~questioned Clayton and the originators that sold loan pools to Nomura on the fine points and in detail about due diligence reports produced by Clayton,~~ and appeared interested in obtaining accurate and reliable data from Clayton concerning the loans Nomura was considering for purchase.

## II. CLAYTON'S DUE DILIGENCE PROCESSES.

7. Clayton performed what is called "credit and compliance" due diligence on loan files. By loan files, I mean the collection of documents that make up the record of a mortgage loan—documents such as the note, the deed, the borrower's loan application, the appraisal, and various disclosure documents required under federal, state, or local law. In the credit portion of

-3-

due diligence, Clayton reviewed loan files of mortgage loans to assess whether the loans complied with the applicable underwriting guidelines and any additional requirements imposed by Clayton clients such as Nomura. The underwriting guidelines were sets of guidelines issued by originators so that underwriters could make a judgment as to whether a borrower met the qualifications for the type of loan that was issued to the borrower. The entity issuing the loan to the borrower—an entity called an "originator"—used the guidelines to determine whether a loan should be extended to the borrower.

8. In conducting compliance due diligence, Clayton checked whether the loan complied with federal, state, and local laws and regulations. The compliance portion of the review ensured that the loan in question complied with all of the applicable laws and regulations.

9. In addition to the underwriting guidelines, Clayton reviewed the loan files for compliance with the additional client requirements sometimes referred to in the industry as "overlays." These overlays imposed additional client-specific criteria beyond those found in the originators' underwriting guidelines. These client-specific criteria were entered into a computer program called a "script," which had different fields in which Clayton input information about each loan when it reviewed loan files during due diligence. Once the computer program was run, it indicated whether the loan did or did not comply with the client requirements. Clayton maintained a default script of its own, which clients often customized. Nomura customized its script as to certain loan characteristics, including to make the loan file review more stringent in specific areas. The contents of the scripts utilized by Clayton during the credit due diligence review were memorialized in documents called "client credit profiles." DX-204 is a copy of a proposed client credit profile for Nomura, and is a record, made and kept in the course of a regularly conducted business activity of Clayton. It was the regular course of Clayton's business

to create these client credit profiles, and to send them via email to Clayton clients for further review and approval. I was fully familiar with these client credit profiles, and I received these profiles and sent them via email to Clayton clients in the regular course of business.[1]

10. DX-204 shows that Clayton's default credit script would not "flag" for further review, among other things, (i) loans with unsigned loan applications, (ii) loans from properties in a recent natural disaster zone that had not had a recertification of value, or (iii) loans for mobile homes. This proposed credit profile indicates that Nomura wanted to customize its script to have loans in all of those categories flagged for further review. Based on my experience at Clayton, I believe that Nomura's Clayton scripts were more rigorous than those used by certain firms in the industry during this time period.

11. To conduct a credit and compliance review, Clayton hired or engaged individuals known as "underwriters" to review loan files for compliance with underwriting guidelines, client overlays, and federal, state, and local laws and regulations. During 2006-2007, the underwriters who re-underwrote loan files for due diligence on Nomura's bulk transactions were located in Tampa, Florida, and supervised by Don Forgit, who was the team's lead underwriter, and later Heidi Welling. The underwriting team at Clayton that did work for Nomura was well respected at Clayton and consistent. Although we might have had to bring on additional help for larger loan pool reviews or if someone on Nomura's usual team was unavailable, we typically had a dedicated Nomura team staffed to Nomura's credit and compliance due diligence reviews.

---

[1] Other Clayton client profiles for Nomura include DX-137, which was Nomura's profile for the compliance portion of the due diligence review. DX-137 is a record, made and kept in the course of a regularly conducted business activity of Clayton. It was the regular course of Clayton's business to create these client credit profiles, and to send them via email to Clayton clients for further review and approval. I was fully familiar with these client credit profiles, and I received these profiles and sent them via email to Clayton clients in the regular course of business.

12. In order to check compliance with underwriting guidelines, Clayton was provided with copies of the applicable underwriting guidelines, which typically were written and issued by the originator of the loan. The Clayton underwriters then compared each loan file to these guidelines to determine whether the loan met the requirements of the guidelines. A deviation from the application guidelines was called an "exception," and loans with such deviations would sometimes be called "exception loans."

13. In some cases, a loan might not meet the exact letter of the guidelines, but would have one or more compensating factors that made up for the fact of the exception in that loan. A "compensating factor" was a loan characteristic that helped mitigate the risk that the borrower would not be able or willing to repay the loan. The compensating factors did not need to directly offset the guideline deviations in order to offset the exception, but needed to be sufficient to offset the credit risk posed by that loan. By "credit risk," I mean the risk that the borrower would be unable or unwilling to pay back the loan.

14. During a due diligence review, the underwriters entered their findings as well as other information about the loans into Clayton's computer system, called CLAS, which could generate reports about the loans under review. In my role as Client Services Manager, I generated such due diligence reports and sent them to Nomura, often on a daily basis. An example of such a report is DX-1394. DX-1394 and the attachments thereto are true and correct copies of an email and due diligence reports for a Nomura due diligence review and are records, made and kept in the course of a regularly conducted business activity of Clayton. It was the regular course of Clayton's business to make these records, during the progress of the due diligence, with a final report to issue at the time the due diligence review of the loans referenced therein was completed and the results had been subjected to a quality control review, or within a

reasonable time thereafter. It was the regular course of Clayton's business to email such records to Clayton clients. I was fully familiar with these due diligence reports, and I regularly received them and sent them via email to Clayton clients in the regular course of business.[2]

15. DX-1394 is an email I sent on February 15, 2006, attaching reports from the due diligence review of the Pinnacle Financial SP04 trade pool. The email attaches the standard reports we typically sent to Nomura as part of the credit and compliance review. The first is the "DD Upload," a spreadsheet showing all of the loans that Clayton was reviewing for Nomura including the key characteristics of the loans, such as street address, credit score, appraisal value, and loan amount. The second report is a spreadsheet called the "Event Status," which shows the grades Clayton assigned to each loan. I describe those grades further in ¶ 17, below. The third report is the "Exception Detail" report, which shows the loans that Clayton was flagging for further review by Nomura for possible non-compliance with underwriting guidelines, overlays, and/or applicable laws and regulations. The fourth is an "Individual Asset Summary," a PDF file giving 2-3 pages of detailed information about each loan that had been flagged on the "Exception Detail" report. Finally, the fifth report is the "Stip Tracking Worksheet," where the underwriters kept track of additional information provided by the originator to try and fix issues identified

---

[2] During the 2005-2007 time period, Clayton generated certain reports for its clients, including Nomura, such as Individual Asset Summary Reports, Exception Detail Reports, Exception Code Detail Reports, Underwriter Production Reports, Preliminary Frequency Reports, Preliminary Tape Comparison Frequency Reports, Loan Level Tape Comparison Reports, Loan Lists, Loan Review Status and Grade Event Summaries, Enhanced Stip Status Summary Reports and Portfolio Summary Reports (collectively, these specified reports are referred to herein as "Due Diligence Records"). I believe that these Due Diligence Records were made at or near the time of the due diligence reviews to which they pertain; were made by, or from information transmitted by, persons with knowledge of the acts, events, conditions or opinions recorded in them; were kept in the course of the regularly conducted activity of Clayton; and it was the regular practice of Clayton to make the Due Diligence Records.

during the due diligence review, *e.g.* missing documents. We referred to this as "clearing" or "curing" exceptions.

16. The process of "clearing" or "curing" exceptions was an important part of Clayton's due diligence review. If Clayton identified an exception to the applicable guidelines in the loans it reviewed, the originator was given the opportunity to "clear," "cure" or "rebut" the exception. For example, Clayton often found an exception to underwriting guidelines because a loan file was missing a document, such as a credit report or a verification of employment form. In the email to Joe Kohout and others at Nomura marked as DX-2627, I referenced this curing process when I wrote that "The sellers are usually quite aware that cures provided during an ongoing review take a secondary position behind the review itself and that a cure backlog often occurs." By this, I simply meant that Clayton prioritized its initial review of loan files over addressing originators' cures, so sometimes a backlog of cures would result. I also noted that "The last day of every review usually has time set aside to address all remaining cures provided during the week." During the due diligence process, originators had the chance to provide the missing document and thereby demonstrate that the loan had been underwritten correctly. It was very common for originators to provide missing documents.

17. Clayton used a "1, 2, 3" grading system for its review of the loans. Clayton used this grading system as a way to identify loans that might need further client review in a relatively clear manner. A grade of "1" meant that the loan complied with the applicable underwriting guidelines, client "overlays," and any applicable laws and regulations. A grade of "2" meant that the loan had an immaterial deviation from the underwriting guidelines or the client's overlays, or had sufficient compensating factors to offset the credit risk of the loan in the view of Clayton's underwriters. A grade of "3" meant that the loan did not meet the applicable laws and

regulations, or the loan deviated from the underwriting guidelines and/or Nomura's overlays in a way that Clayton's underwriters deemed material. A loan graded "3" also could have compensating factors that Nomura may have considered sufficient to offset the credit risk posed by the loan, but which Clayton did not have discretion on its own to deem sufficient to offset such risk.

### III. NOMURA'S APPROACH TO DUE DILIGENCE.

18. In certain instances, Nomura instructed Clayton to be even more conservative in grading loans than usual, and to exercise relatively little discretion in deeming exceptions to loans immaterial or concluding that compensating factors offset exceptions. Thus, Clayton was sometimes instructed to bring exception loans to Nomura's attention so that Nomura could determine for itself whether an exception was material or whether compensating factors were sufficient. Mr. Kohout was especially keen to have Nomura, rather than Clayton, make any discretionary judgments about exceptions to loans. Nomura gave somewhat more discretion to Clayton when Neil Spagna took over from Mr. Kohout as head of the due diligence group in mid-2006. I referenced this decision in PX-54, when I wrote in an internal Clayton quarterly update that "they intend to loosen up their conservative approach and allow Clayton to exercise judgment when appropriate." Even under Mr. Spagna, however, Nomura maintained a conservative approach to due diligence and tended to want to make discretionary decisions itself, especially when Clayton reviewed loans from originators who were selling loans to Nomura for the first time.

19. An example of Nomura's conservative approach to due diligence is the email marked as PX-212, which contains a discussion of a due diligence review Clayton conducted for Nomura on a pool of loans from the originator OwnIt in January 2006. Clayton had identified exceptions to OwnIt loans which OwnIt was attempting to cure or rebut. OwnIt complained that

Clayton was "not accepting anything" even though "[t]hese are good quality loans that were originated to our guidelines using a common sense underwriting approach." (PX-212.) OwnIt also complained that Clayton was "merely allowing system edits and checklists to make decisions for them" rather than "utilizing common sense underwriting." (PX-212.)

20. In a subsequent email discussion with Joe Kohout, Mendy Sabo and Jeffrey Hartnagel that is part of PX-212, I explained on January 5, 2006 that we at Clayton "have often felt that our hands are somewhat tied when it comes to these reviews, as the process that has been established for Nomura reviews is to leave all but the smallest judgment calls for Nomura's review." (PX-212.) I noted that while I agreed with Nomura's approach, it was "often contrary to how many of these sellers are used to doing business with some of the investors out there, many of which are reviewed by us." (PX-212.) Mr. Kohout wrote back that "we have and will continue to make the final decisions on loans being purchased by NCCI." (PX-212.)

21. Another example of Nomura's conservative approach to due diligence is DX-2628, in which Barb Davis, an employee of the originator MLSG, asked on October 12, 2005 whether loans Clayton had marked as "pending client review" meant that "Nomura is still making the final decision on those files." I wrote back to Ms. Davis on the same day: "That is correct, unless you can provide greater evidence to us to clear the exceptions without requiring Nomura's judgment." My response to Ms. Davis shows that determinations that required judgment, for example about the materiality of an exception or whether compensating factors offset an exception, were to be made by Nomura rather than Clayton. As I described earlier, this approach was also reflected in Nomura's proposed due diligence script, which required Clayton to flag for additional review loans that, but for Nomura's script, Clayton would not grade as "3s." Thus, Nomura made it clear in several different ways that Clayton was to be even more

conservative than usual and to err on the side of caution in deciding how to grade loans during reviews for Nomura.

22.  As a consequence of Nomura's careful approach to due diligence, Clayton initially graded more loans as "3s" because Nomura wanted to make discretionary and judgment calls itself. For example, in PX-212, the January 5, 2006 email discussed above, I noted that "it is safer for us to have [the underwriters] err on the conservative side and give an[] Event 3 if they are unsure." Therefore, because of Nomura's conservative approach to due diligence, Clayton tended to initially grade more loans as "3s" because Clayton was instructed not to make the determination itself that a given exception was immaterial or that compensating factors offset the exception. Instead, that decision was for Nomura to make.

23.  A grade of "3" did not mean that Clayton was recommending that the loan should not be purchased, that Clayton believed guideline exceptions were material, or that Clayton believed that compensating factors were insufficient to offset exceptions to guidelines. In addition, a grade of "3" also did not mean that a loan did not comply with the originator's underwriting guidelines or that it lacked sufficient compensating factors to offset the credit risk of an exception. As I mentioned, the loan may have complied with the originator's guidelines perfectly and was only graded as a "3" due to the client's stricter overlays, which the client (here, Nomura) could then decide to waive. Sometimes a loan graded "3" had compensating factors that the underwriter would have deemed sufficient if the underwriter had been instructed to apply his or her discretion, but the underwriter flagged that loan for Nomura's review so that Nomura would make the ultimate decision about whether those compensating factors were sufficient. The idea was that a "3" grade would raise the loan to the client's attention, and a client such as Nomura would carefully consider all of those "3" loans and might accept the ones it believed had

sufficient compensating factors, and reject the ones that did not. Therefore, a grade of a "3" was not in any way a statement by Clayton that the loan necessarily did not comply with underwriting guidelines or lacked sufficient compensating factors.

24. In addition, many loans were graded a "3" but had exceptions that were curable. For example, often a loan was graded a "3" because the loan file was missing a document. Those missing documents were often later provided to the client or Clayton by the originator. In other instances, an originator might rebut an exception finding by showing Clayton's underwriters that the loan in fact complied with its guidelines. As originators cured or rebutted exceptions in the loans under review, those loans were re-graded in Clayton's due diligence reports from "3s" to "2s" or "1s." In addition, if Nomura decided that an exception to a loan was not material or was offset by compensating factors, the loan also would be re-graded in later versions of Clayton's due diligence reports.

25. However, Clayton did not necessarily reflect such decisions by Nomura, or a cure or rebuttal by an originator, as a re-grade in its final due diligence reports. After Clayton's review was complete, Nomura could receive additional information or documents from an originator after a deal, or could enter into side letters with an originator in which the originator agreed to supply a missing document, or Nomura could determine that exceptions to a given loan were not material or were offset by compensating factors. Clayton would not be aware of such developments and would not therefore reflect a re-grade in its final reports. Therefore, Nomura could have purchased loans that received grades of "3" in Clayton's final reports even though the loans had exceptions that were cured, deemed immaterial, or were offset by compensating factors.

26. Another consequence of Nomura's conservative approach to due diligence was the impact on "waiver" rates. The term "waiver" is sometimes used to refer to loans Clayton had graded as "3s" which a client had accepted for purchase. Because Nomura's conservative approach to due diligence led Clayton to grade more loans as "3s," Nomura tended to accept such loans even though the loans graded as "3s" sometimes had issues that other clients instructed Clayton to assign grades of "1" or "2."

27. I understand that 194 trade pools contributed loans to the residential mortgage-backed securities at issue in this case. Clayton conducted due diligence for Nomura on at least 67 bulk loan pools during the time I served as Client Services Manager for Nomura. To the best of my knowledge, the processes I describe above were applied to all trade pools that contributed loans to the residential mortgage-backed securities at issue in this case while I was Client Services Manager for Nomura.

_____
Derick Greene

Sworn to before me this
18th day of February 2015.

_____
Commissioner of the Connecticut Superior Court