**DX**

**3021**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION, | No. 11-cv-6201 (DLC) |
| Plaintiff, | ECF Case |
| v. | |
| NOMURA HOLDING AMERICA INC., *et al.*, | |
| Defendants. | |

## AFFIDAVIT OF NEIL SPAGNA

| STATE OF CONNECTICUT | ) | |
|---|---|---|
| | ) | ss.: |
| COUNTY OF FAIRFIELD | ) | |

Neil Spagna, being duly sworn, deposes and says:

1.      I was the head of Nomura Credit and Capital, Inc.'s Credit Group from July 2006 to November 2007 and provide this affidavit as my direct testimony at trial.

Background

2.      I graduated from the University of South Florida with a bachelor's degree in International Studies in 1987.  From 1987 to 1995, I was an officer in the United States Air Force Reserve.  From 1987 to 1990, I was employed by Sound Management, Inc. as an executive recruiter.

3.      From 1990 to 1993, I was employed by Beneficial Mortgage Corporation as a servicing manager, and from 1993 to 1997, I was a Vice President at Paine Webber/Kidder Peabody, working on mortgage loan due diligence.  From 1997 to 2006, I worked for The

Clayton Group ("Clayton"), a leading mortgage loan due diligence firm, as a senior vice president. Clayton is an independent firm that is not now, and has never been, affiliated with Nomura.

4. I was hired by Nomura Securities International, Inc. in July 2006. Starting in or about October 2006, I became an employee of Nomura Credit & Capital, Inc. I refer to these two entities collectively as "Nomura" throughout this affidavit. From July 2006 to November 2007, I was head of Nomura's Credit Group, also known as the due diligence group. As part of this role, I oversaw Nomura's pre-purchase review of mortgage loans.

5. I currently oversee due diligence and credit risk for The Palisades Group, a mortgage investment firm in Darien, Connecticut.

6. I am also a licensed realtor in the State of Connecticut.

## I. My Time at Clayton and Clayton's Due Diligence Process

7. Clayton is a firm that provides various mortgage-related services. One of those services is credit and compliance due diligence on mortgage loans. By credit and compliance due diligence, I mean the review of loan files to determine whether the loans (i) were originated in accordance with an originator's underwriting guidelines, (ii) complied with applicable laws and regulations, and (iii) met other criteria defined by Clayton's clients. From 1997 to 2004, I managed Clayton's due diligence services related to residential mortgages, and from 2004 to 2006, I was in a business development role as a Clayton relationship manager. During my time at Clayton, I became very familiar with Clayton's practices and procedures for performing due diligence on loan files. By loan files, I mean a set of documents relating to a mortgage loan, such as the note, the mortgage or deed of trust, the borrower's loan application, the appraisal, and various disclosure documents required under federal, state, or local law.

-2-

8.     Based on my experience, I believe that Clayton was regarded as one of the leading due diligence firms for mortgage-related due diligence during the time I was employed at Clayton and then Nomura, from 1997 to 2007. I know from first-hand experience that Clayton took its due diligence responsibilities very seriously, took great care in hiring qualified individuals to perform the loan file review, and consistently produced high quality due diligence reviews. This was true specifically for Clayton's due diligence reviews performed for Nomura during the time I worked at Clayton. I had first-hand experience with Clayton's work for Nomura because I oversaw the work of Clayton's client services manager for Nomura, the individual responsible for managing Clayton's business relationship with Nomura.

9.     In my roles at Clayton, I became very familiar with Clayton's credit and compliance due diligence practices. By credit due diligence, I mean a review of the loan file for a mortgage loan to assess compliance with the applicable underwriting guidelines and additional requirements imposed by Clayton clients such as Nomura. Underwriting guidelines are guidelines that set forth an originator's criteria for making a mortgage loan. The originator, which is the entity making the loan to the borrower, evaluates the characteristics of a borrower (or borrowers) and the subject property to determine whether to make a loan. For example, the underwriting guidelines might say that if a borrower has a FICO credit score below 660 and the loan amount is greater than $300,000, the borrower might not qualify for a particular loan, or that any loan would have to come with a higher interest rate. The guidelines were not strict rules, but rather true "guidelines" used to assist an underwriter in determining whether and what type of loan should be extended to the borrower. Clayton's role was to re-underwrite, or re-examine, the loans sent to Clayton by its clients.

10.     By compliance due diligence, I mean reviewing the documents in the loan file to determine whether the loan complied with all applicable laws and regulations. For example, there are federal laws such as the Truth in Lending Act ("TILA") that require that certain disclosures be made to the borrower before the loan is finalized. States, counties, and even some cities have laws and regulations in place regarding interest rates and fees charged to the borrower when taking out a mortgage. The compliance portion of the review assessed whether the loan in question complied with all such applicable laws and regulations.

11.     The practices I describe in this testimony were used in Clayton's credit and compliance due diligence reviews for Nomura, both during my time at Clayton and during the time I was employed by Nomura. I understand, based on my first-hand experience with other credit and compliance due diligence vendors that provided services to Nomura during the time I was employed by Nomura, that those vendors followed substantially similar practices.

Compliance with Underwriting Guidelines and Client Overlays

12.     As part of the credit and compliance review, Clayton hired individuals known as "underwriters" to review loan files for compliance with underwriting guidelines and with federal, state, and local laws and regulations. The underwriters used their independent judgment and experience to assess whether, based on the information in the loan file, the loan had been originated in accordance with the applicable guidelines.

13.     The underwriters also reviewed the loan files to determine whether the loans were consistent with additional client requirements called "overlays." These overlays typically imposed requirements beyond the criteria contained in the underwriting guidelines. For example, the underwriting guidelines might suggest that a loan could be extended even if the borrower had a FICO score of 450, but the client overlays instructed Clayton to flag all loans

with FICO scores below 500 for further review. Nomura employed overlays that were often stricter than the criteria in the applicable underwriting guidelines. This meant that Clayton was required to flag certain loans for further review even if they fully complied with the applicable guidelines.

14. Clayton received copies of the applicable originators' underwriting guidelines, which were written and published by the originator of the loan. The underwriters at Clayton then compared each loan file to its corresponding underwriting guidelines and made an independent assessment as to whether the loan fit within those guidelines. If a loan deviated from those guidelines, it was known as an "exception," and loans with deviations were referred to as "exception loans."

15. There were instances where a loan might not fit exactly within the criteria set forth in guidelines, but the loan had one or more "compensating factors" that justified the exception. A "compensating factor" was a loan characteristic that reduced the credit risk of the loan. For example, a compensating factor could be a relatively small amount of debt compared to the borrower's income or a large down payment that resulted in a mortgage with a lower loan-to-value ratio.[1] The compensating factor did not need to be tied directly to the guideline exception, but it had to be enough (in the judgment of the underwriter) to offset the risks posed by the exception. Typically, underwriting guidelines allowed exception loans to be made due to compensating factors, so loans with sufficient compensating factors still complied with the guidelines in that respect.

---

[1] A "loan-to-value" ratio is a ratio where the "value" of the property—either the appraisal value or the sales price—is the denominator, and the amount of the loan is the numerator.

16.     Compensating factors were not always documented by originators in loan files. In those cases, a Clayton underwriter reviewed the loan file and, using his or her independent judgment, could identify compensating factors that the originator had not documented. Compensating factors could also come from additional documents or other information provided by the originator that were not in the loan file initially (and may never have been added to the loan files).

### Owner Occupancy

17.     As part of its credit review, Clayton assessed the borrower's representations regarding owner occupancy. On the loan application, the borrower was required to state whether he intended to occupy the home as his primary residence for a certain length of time after purchasing the home, usually 12 months, or in the case of refinancing an existing mortgage, whether the borrower currently occupied the home as his primary residence and whether he intended to continue doing so. If the borrower answered affirmatively, the property was considered "owner occupied."

18.     It was widely understood in the industry that whether a property was considered "owner occupied" was determined by the borrower's statements of intent in the loan application, and not based on verification by an originator or a due diligence vendor. It was not (and is not) feasible for Clayton or other due diligence vendors to verify whether borrowers for every loan were eventually living in properties. The costs of doing so would be enormous and would prevent the efficient operation of a secondary market. Even if some kind of verification was feasible, it would have meant gaining access to the interior of a borrower's home, which would have invaded borrower privacy. Verification also would have been unreliable; in some cases, the borrower might have been renovating his new home or otherwise unable to relocate at the time

the loan was originated or subject to due diligence. Or his plans might have changed, and a job opportunity, divorce, or one of many life events might mean that he had stated his intent accurately at the time of origination, but that something had changed. Moreover, as I mentioned before, the Clayton underwriter's task was to exercise his or her independent judgment and ask "should this loan have been extended to the borrower in the first place?" The information available to the originator at the time the loan was extended was the information in the loan file. As such, Clayton and other due diligence providers assessed whether owner occupancy statements were reasonable by looking for "red flags"—warning signs warranting further review—in the loan file.

19.     For example, if the borrower owned another property down the street from the subject property, that could potentially be a red flag, or the fact that the borrower was moving into a property the value of which was significantly lower than the value of his current residence, although borrowers sometimes did downsize to a smaller residence, *e.g.*, moving into a smaller home after their children moved out. Another red flag might be the distance between the home and the borrower's place of employment, though this red flag could be misleading because of telecommuting and other non-traditional work arrangements. As those last two examples show, these red flags did not mean that the borrower lied about her intent to occupy the property—it just meant that further investigation might be warranted.

Clayton's Grading System and Quality Control

20.     Clayton assigned grades of 1, 2, or 3 to the loans it reviewed. A "1" grade meant that the loan fit within the criteria laid out in the applicable underwriting guidelines, complied with the relevant laws and regulations, and was also within the client's additional "overlay" requirements. A "2" grade meant that the loan was an exception to the guidelines, but the

exception was not important, or "material" as we put it—*e.g.*, a credit score one point below the credit score set forth in the guidelines—or the exception was justified because the loan had one or more sufficient compensating factors. A loan graded "3" meant the underwriter determined this loan departed from the underwriting guidelines and/or the client's overlays in a material way, or did not meet the requirements of relevant laws and regulations or, as shown below, for other reasons.

21.     A grade of "3" was not necessarily a statement by Clayton that the loan did not comply with underwriting guidelines. Often loans were graded "3s" because of missing documents, and those documents were often found and provided to Clayton or Nomura by the originator after the initial loan file review was completed. In addition, loans may have been graded "3s" because of client overlays that were stricter than the guideline criteria. There were also certain trade pools—such as trade pools from originators with whom Nomura had not previously done business or trade pools containing loan products that were unfamiliar to Nomura —where Nomura instructed Clayton to be more discerning with regard to compensating factors, in order to "escalate" loans for Nomura's review. Nomura could thereby gain a better understanding of the originator's general practices with respect to exceptions.

22.     Clayton had thorough internal quality control practices, which it utilized to ensure that the reports on each loan were accurate before sending them to clients such as Nomura. Clayton had automated checks built into its due diligence computer programs. For example, the Clayton computer program used for the due diligence review would warn the underwriter if information he had input about the loans was internally inconsistent. An experienced Clayton employee manually reviewed loan findings as another "quality control" check on Clayton's due diligence reports.

<u>Scripts and Bid Stipulations</u>

23.     Clayton conducted its due diligence review by entering information about each loan into a computer program called a "script." The computer program allowed the underwriter to input information about the loan, and then the computer processed those inputs and indicated whether the loan met the client's specific requirements. Clayton had a default setting for the computer program, but clients typically customized their scripts. Nomura customized its script to make the loan file review more stringent (DX-204). DX-204 is an example of a draft client credit profile for Nomura, which memorialized the contents of the script used for the credit due diligence portion of the review. I am very familiar with these types of documents from my time at Clayton. This document shows that, for example, Clayton's default was to grade loans where the loan file did not contain a signed loan application as "1s" if an unsigned application was permissible under the originator's underwriting guidelines, but Nomura customized its "script" to grade those loans as "3s." Nomura had a separate compliance due diligence script, an example of which is DX-137.

24.     Clayton scripts also incorporated additional criteria set forth by Nomura before it purchased particular loans, known as bid stipulations. In these bid stipulations, Nomura set forth loans that it was unwilling to purchase. These bid stipulations were sent to the originator before Nomura purchased any loans, and were also sent to Clayton so that the vendor could flag loans that did not meet the stipulations. DX-279 is an example of the standard bid stipulations Nomura used during the time I was at Nomura. Another example is the attachment to DX- 289. These documents pre-date my arrival at Nomura, but are similar in content and format to the bid stipulations used at Nomura during my tenure. As an example, Nomura required its vendors to grade as "3s" loans tied to log homes, loans from a particular ZIP code in Nevada, and

delinquent loans, even if the applicable originator underwriting guidelines allowed for those kinds of loans. Nomura often refused to buy loans that were barred by its overlays.

25. Based on my experience at Clayton and at Nomura, I believe that Nomura's Clayton scripts were more conservative than was typical of Clayton's clients during this time period.

## II. My Interactions with Nomura While at Clayton

26. During my time at Clayton, I had interactions with Nomura and came to be familiar with the Nomura Credit Group during 2005 and early 2006. At the time, that group consisted of Joseph Kohout, Jeffrey Hartnagel, and Menachem "Mendy" Sabo. Mr. Hartnagel in particular I knew from his previous employment with Clayton, and I thought highly of his work. All three of them cared about due diligence and took the process and their jobs very seriously.

27. Also during my time at Clayton, I helped Clayton's client services manager for Nomura manage Clayton's relationship with Nomura. The client services manager managed Clayton's business relationship with certain clients—sending the due diligence reports to the client, answering the client's questions, and so forth. During 2004 through the early part of 2006, the Clayton client services manager for Nomura was Brian Farrell. Derick Greene began handling the day-to-day aspects of the relationship starting in late 2005, and took over as Nomura's client services manager in 2006. Both men were very capable at their jobs and performed their duties well.

## III. The Nomura Due Diligence Team

28. I served as head of the Nomura Credit Group from July 2006 to November 2007. I took over the Credit Group when Joseph Kohout moved to a position on the sales desk, the group that handled Nomura's business relationships with loan originators.

29.     During that time period, I oversaw the work of Mendy Sabo, also a Nomura employee, and Christopher Scampoli, who worked for Nomura on a full-time basis as a contractor. Mr. Scampoli worked at Clayton from 1998 to 1999 and again in 2004, and I had a very high opinion of his work and the rigor with which he approached mortgage loan due diligence. I also worked with Mr. Sabo during my time at Clayton, when Mr. Sabo was a member of the Nomura due diligence group. I thought well of him then and my respect for his abilities grew after I joined Nomura. Mr. Sabo had a keen eye for risk and I thought he was very talented when it came to assessing the credit risk of a loan. Both he and Mr. Scampoli took the due diligence process very seriously.

30.     The Nomura Credit Group was relatively small, but Nomura was a relatively small player in the residential mortgage-backed securities industry, and thus there was less need for a large due diligence team. We all worked closely with each other and supported each other to make sure Nomura performed due diligence effectively, accurately, and thoroughly. We also used vendors, as I explain in more detail below, which put us in the position of performing a second-level review or oversight function. Thus, we were able to shift some of the workload to large teams at our vendors, though we reviewed their work carefully and made the final decisions regarding the loans purchased or not purchased by Nomura. We also received assistance from other departments within Nomura—for example, the collateral analysts helped us sort or re-arrange data in Excel spreadsheets.

31.     I was supervised by John Graham, who I thought was capable and understood very well the importance of due diligence. He was very supportive of our work and was an excellent manager. Mr. Graham was the head of the contract finance group. In that role, Mr.

-11-

Graham and others in the contract finance group helped coordinate the various departments at Nomura that assisted in the issuance of a securitization.

32. My experience was that everyone in the Nomura residential mortgage-backed securities business took the due diligence process very seriously. The Nomura trading desk—the people who oversaw Nomura's purchase of mortgage loans and their securitization and sale to investors—was the lead department in terms of purchasing loans and putting them into mortgage-backed securities. Yet the trading desk deferred to the Credit Group's views about which loans Nomura should purchase and which loans should not be purchased, or should be "kicked out" as we put it. They trusted us and our expertise in this area.

## IV.   Nomura's Due Diligence Process

33. As head of the Credit Group, my role was to oversee the due diligence on loans that Nomura considered for purchase. That diligence included credit and compliance diligence, valuation diligence, data integrity diligence, and collateral reviews, among other things.

34. By valuation diligence, I mean a review of the appraisal contained in the loan file for a mortgage loan. An appraisal is an opinion of value by an individual who is licensed in that state to assess home values. The appraiser usually examines both the interior and exterior of the home and then uses his or her professional judgment to come up with an opinion of the property's value. In reaching that opinion, the appraiser usually accounts for comparable sales, the local real estate market, and other information that might go to the property's value. The appraisal reviewed during valuation diligence was the "origination appraisal," which was ordered by the originator around the time the originator made the loan. I am familiar with the appraisal process due to my work in due diligence, but also because I am a licensed realtor in the state of Connecticut and have dealt with appraisers in that capacity.

-12-

35.     By data integrity diligence, I mean an assessment to make sure that the data we had for each loan was internally consistent—*e.g.*, the value of the property divided by the loan amount actually equaled the loan-to-value reported for the loan—and to ensure that there were no typographical errors or mismatches between the information in the loan file and the information in the loan data tapes that Nomura used to track loan characteristics. The loan data tape, or the "loan tape" as we commonly called it, was an Excel spreadsheet listing each loan and key characteristics about the loan—the borrower's name, street address, FICO score, debt-to-income ratio (*i.e.*, the borrower's outstanding debts divided by all of his or her income), loan-to-value ratio, and so forth. By collateral diligence, I mean a review of the loan file to ensure that the key documents in the file were not missing.

36.     I have been informed that 194 trade pools[2] contributed loans to the residential mortgage-backed securities at issue in this case, and that these trade pools were purchased between June 2005 and February 2007, and I believe this to be true. I am also informed and believe that 122 loans purchased individually through Nomura's loan-by-loan channel were included in the securities at issue in this action. While I was not employed at Nomura when due diligence was performed on all of these loans, I was familiar with Nomura's due diligence process during my time at Clayton—a period that coincided with the due diligence performed on some of the trade pools at issue in this case—and also understood that the processes in place during my tenure at Nomura were substantially similar to the processes utilized by Nomura before I joined the firm. Thus, to the best of my knowledge, the process I describe below applied

---

[2]     A trade pool was a collection of loans grouped together by an originator and marketed as a package to financial institutions such as Nomura.

to all 194 trade pools that contributed loans to the residential mortgage-backed securities at issue in this case.

37.     An important purpose of that due diligence was to assess the loans to make sure we knew what we were buying.. In addition, we knew that Nomura's primary goal was to securitize the loans it purchased and would make representations about those loans to investors, and thus another important purpose of Nomura's due diligence was to ensure that these representations would be accurate. Further, we wanted to remove potentially defective loans from the pool—what we called "kicking out" loans—before Nomura purchased the pool. The loans we "kicked out" could include, among other things, loans that did not comply with the originator's underwriting guidelines, loans that did not comply with applicable federal, state, and local rules and regulations, or loans that did not comply with Nomura's additional overlay requirements.

38.     After Nomura won its bid on a trade pool, the trading desk would send us the loan tape for the pool in order to start the due diligence process. Loan pools were typically categorized as either "mini-bulk" or "bulk." "Mini-bulk" generally referred to trade pools where the aggregate balance of all the loans in the pool was less than $25 million, and "bulk" pools generally were any trade pool larger than that. Knowing whether the trade pool was "mini-bulk" or "bulk" was important because, as I describe at paragraph 57, below, this had an impact on the credit and compliance due diligence review.

39.     When we received this information from the trading desk, it was our practice to retain reputable, independent due diligence vendors to perform valuation and credit and compliance due diligence on the trade pool.

<u>Valuation Diligence</u>

40.     With respect to valuation diligence, Nomura utilized a two-step process, with an initial valuation review, using computer programs called "HistoryPro" and automated valuation models ("AVMs"), described more at paragraphs 41-45, below, and a secondary valuation review for certain loans that were flagged during the initial review, using a broker price opinion ("BPO"), an opinion of value rendered by a realtor and then reconciled against information in the appraisal, described more at paragraphs 48-51, below.

41.     For the first step, the initial valuation review, Nomura used two vendors—CoreLogic, Inc. ("CoreLogic") and Hansen Quality ("Hansen"). CoreLogic was a larger company that provided many mortgage-related services and was recognized as an industry leader during this time period. Hansen focused almost exclusively on valuation, and I believed that its valuation reviews were high quality.

42.     Our general practice was to submit every loan in a trade pool for initial valuation diligence. There may have been isolated instances where we did not submit every loan—for example, there may have been an error in sorting the loan tape sent to the vendor or the originator may have later added loans to the pool. I believe that we intended to submit 100% of the loans in every trade pool for initial valuation review, and that we actually did so in almost every case. We intended to seek initial valuation results for all the loans underlying the 194 trade pools that contributed loans to the securitizations at issue in this lawsuit, and I believe that we obtained these results for almost all of the pools that were acquired during my tenure.

43.     The initial valuation process varied somewhat depending on which vendor was used. Hansen put data for every loan through a computer program called an AVM. The AVM analyzed the characteristics of the loans and generated an estimated value for each one. We then

compared that AVM value to the origination appraisal value to determine whether additional valuation review was warranted.

44. CoreLogic handled this first step differently. First, it ran the loans through a program called "HistoryPro." HistoryPro analyzed the risk of fraud—including the risk of appraisal fraud—and the likelihood that a loan would default by using a scoring system, "F-Scores," which went from zero to 25 for each loan; zero meant that the risk of fraud was low, while 25 meant that there was a high risk of fraud. For loans with an F-Score of zero, there was very little chance of appraisal fraud and we could reasonably conclude that the appraiser's opinion was justified and was not fraudulently inflated. If a loan received an F-Score of 1-9, the loan also received a CoreLogic AVM, which generated an estimated value for that loan.

45. Typically, if the AVM value was not significantly lower than the origination appraisal value, we concluded that the origination appraisal was reasonable and did not perform any additional valuation review. By "significantly lower," I mean that the estimated value generated by the AVM was 10% or more below the origination appraisal value for subprime loans, or 15% or more below the origination value for Alt-A loans. We referred to these ranges as "tolerance thresholds." If the AVM value fell within those tolerance thresholds, the origination appraisal was considered reasonable. If the AVM value fell outside of these tolerance thresholds (i.e., was 10% or more lower than the origination appraisal for subprime loans or was 15% or more lower than the origination appraisal for Alt-A loans), we typically sent

the loan for the second step of valuation review, as I describe below.[3] We also escalated loans

that had F-scores of 10 or higher for this second step of valuation review.

46.    It was CoreLogic's and Hansen's practice to send us the results of their valuation

reviews. DX-1647 is a report generated by CoreLogic and sent to certain Nomura employees,

including me, attaching the CoreLogic valuation results for the FNBN 21 trade pool, which I

understand contributed loans to the NHELI 2007-1 securitization at issue in this action. The

report states that CoreLogic submitted 643 loans for HistoryPro review, and received F-Scores

for 623, or 96% of them. For a small minority of loans, CoreLogic's computer program could

not produce an F-Score, such as if the computer program lacked sufficient information about a

very rural real estate market to draw any conclusions. The report also shows that the loans that

received F-Scores of 1-9 were selected for an AVM review, which generated estimated values

for 175 of these 185 loans. Again, the AVM program sometimes lacked sufficient information to

produce an estimated value, but was able to generate a value for most of the loans.

47.    The spreadsheet attached to DX-1647 is an example of a CoreLogic report. For

each loan, Column X lists the F-Score and Column Y lists the AVM value (if an AVM was run).

In row 11, the borrower with loan number ▮▮▮▮▮ (Column A) had an F-Score of 25, so that

loan was escalated for further review. For all loans with an AVM value, the estimated value in

Column Y would be compared to the appraisal value (Column N) and any loans outside of the

tolerance previously described would be escalated for further review. For example, in row 10,

---

3    Generally speaking, a subprime loan is a loan where the borrower has poor credit
     characteristics—low FICO score, troubled credit history, and so forth. Alt-A loans were
     taken out by borrowers with somewhat better credit characteristics, but they were
     borrowers who usually provided only limited documentation to demonstrate their income
     or assets. The highest quality borrowers received loans known as "prime" loans; both
     Alt-A and subprime were of lesser credit quality than those highest quality borrowers.

loan number ████████ had an origination appraisal value of $670,000, but an AVM value of $449,192. That was more than 30% below the origination appraisal value, so it was outside of tolerance and was escalated for additional review. On rare occasions, we may not have sent out-of-tolerance loans for further review, possibly because we decided to include these loans in the credit and compliance due diligence sample (which I describe at 59-62, below).[4]

48.     The second step of the valuation process—a step that was taken with respect to loans that were escalated as a result of out-of-tolerance AVMs or relatively higher HistoryPro scores—was a BPO, or broker price opinion. In cases where this second step was necessary, Nomura hired Ocwen Realty Advisors or FiServ, Inc. to perform BPOs. I believe that Ocwen and FiServ both performed high quality BPO reviews during the 2005 to 2007 time period.

49.     The BPO process began with the vendor hiring a realtor who worked in the real estate market where the subject property was located. The realtor viewed the exterior of the home, either in person (from the street) or through photographs, then considered publicly-available information about the home and the sales prices of similar homes in the same area. Based on this information, the realtor then offered an opinion about the value of the property in question. After the realtor rendered his or her opinion, the BPO vendor went through a process called "reconciliation," where the BPO vendor adjusted the realtor's value (where appropriate)

---

[4]     Other examples of CoreLogic and Hansen reports that were sent to the Nomura Credit Group during my time at Nomura include DX-1613, DX-1620, DX-1626, DX-1628, DX-1637, DX-1647, DX-1652, DX-1655, DX-1656, DX-1657, DX-1660, DX-1666, DX-1670, DX-1675, DX-1683, DX-1686, DX-1687, DX-1689, DX-1690, DX-1692, DX-1697, DX-1698, DX-1702, DX-1703, DX-1705, DX-1706, DX-1708, DX-1709, DX-1722, DX-1724, DX-1725, DX-1745, DX-1747, DX-1749, DX-1751, DX-1753, DX-1754, DX-1755, DX-1756, DX-1762, DX-1766, DX-1777, DX-1783, DX-1784, DX-1785, DX-1790, DX-1793, DX-1810, DX-1823, DX-1830, DX-1852, DX-1853, and DX-1858.

based on information in the origination appraisal that was not publicly available. For example, the realtor, who did not have access to the interior of the home, might not know that the property was recently renovated, but the origination appraiser accurately reflected this fact in the origination appraisal.

50. The BPO vendor then sent Nomura its broker price opinion, *i.e.*, the "reconciled" estimate of the property's value. It was Nomura's practice to evaluate the reasonableness of the origination appraisal according to the same variance standard we applied for AVM values: a BPO was "out of tolerance" if it was 10% lower than the origination appraisal value for subprime loans or 15% lower than the origination appraisal value for Alt-A loans. In other words, the broker price opinion was used as a check to see if the origination appraisal was reasonable. An appraisal is an opinion of value, and if the opinion appeared to be reasonable (*i.e.*, within the "tolerances" I mentioned), it was typically deemed acceptable.

51. If the difference between the BPO value and the origination appraisal value exceeded these thresholds, Nomura's typical practice was to kick out the loan unless the originator was able to provide additional information justifying the origination appraisal value. For example, an originator might demonstrate that the BPO vendor arrived at its value by comparing the value of properties that were not actually comparable—the properties may have been too far away from the subject property, or a different type of property, and so forth. The originator may have been able to identify properties that were more comparable, and whose sales prices supported the appraisal value.

52. It was FiServ's and Ocwen's regular practice to send us the results of their BPO reviews. DX-1664 attaches a FiServ BPO report for the FNBN 21 trade pool I referenced earlier. This report is a spreadsheet that contains the results of FiServ's review—the "BPO" tab of the

spreadsheet contains the "Post-Reviewed Value," *i.e.*, the reconciled BPO value (Column L); the variance from the origination appraisal value, expressed both as a dollar amount and as a percentage (Columns P and Q), and whether the loan was within the applicable tolerance, in this case 15% (Column R). The report also provides detailed notes from the vendor about why each loan received its BPO value (Column Z). As I noted, the originator provided additional evidence to show the origination appraisal value was reasonable, reflected in the "Rebuttal Notes" column (Column AA).[5]

53.     The first loan I described above, ███████ which was escalated for a BPO review due to its F-Score, was deemed to be outside of tolerance, because the BPO value was 16.98% below the origination appraisal value (row 17). The notes indicate the realtor's estimate of value was supported by nearby sales in the area—that is, the nearby sales supported the realtor's assertion that the value of this loan was more than 15% lower than the origination appraisal value. The other loan I discussed above, ███████ which was escalated due to the variance between the AVM value and the origination appraisal value, was found to be within tolerance—in fact, the BPO value was higher than the origination appraisal value by almost 4.5% (row 101).

54.     The valuation tools I described above were useful in determining whether an origination appraisal was reasonable. But HistoryPro, AVMs and BPOs were not substitutes for

---

[5]     Other examples of Ocwen and FiServ reports that were sent to the Nomura Credit Group during my time at Nomura include DX-1614, DX-1617, DX-1619, DX-1623, DX-1629, DX-1630, DX-1631, DX-1638, DX-1640, DX-1650, DX-1658, DX-1661, DX-1663, DX-1669, DX-1685, DX-1691, DX-1713, DX-1714, DX-1723, DX-1726, DX-1734, DX-1736, DX-1737, DX-1739, DX-1741, DX-1742, DX-1765, DX-1769, DX-1770, DX-1780, DX-1781, DX-1795, DX-1799, DX-1804, DX-1821, DX-1837, DX-1840, DX-1845, DX-1854, and DX-1855.

the thorough examination of a property by a licensed, experienced professional who could closely examine a property, including the interior and exterior of a home, to arrive at an estimated value of the property. The origination appraisal was therefore the most reliable estimate of value—aside from the sales price of the property, which in theory (where the transaction is at arm's-length) should reflect the market value of the home, since it shows what someone was willing to pay for the property. Because it was the most reliable estimate of value absent a sales price, the origination appraisal value was deemed unreasonable only if the difference between the AVM or BPO value and the origination appraisal value was significant.

55.     I believe that the valuation diligence practices I have described were generally followed for the trade pools that were reviewed during my tenure the 2005-2007 time period. I am informed and believe that these trade pools include the 194 trade pools at issue in this action. I also believe that those practices met or exceeded the practices used by others in the industry in the 2005 to 2007 time period.

### Credit and Compliance Due Diligence

56.     Nomura hired Clayton or American Mortgage Consultants ("AMC") to perform credit and compliance due diligence. The credit and compliance process began when Nomura emailed the vendor for a given review, and sent one of them a loan tape containing data on the loans that were included in the review. The vendor also received the loan files and the applicable underwriting guidelines, either from Nomura, the originator, or (in the case of loan files) the "collateral custodian," Wells Fargo Bank, N.A., which was hired to hold the loan files. As I stated, Clayton was one of the leading vendors in the industry. AMC was a relatively smaller due diligence firm, but AMC was also a highly professional firm, and its due diligence reviews were of excellent quality.

57.     For many trade pools—particularly the smaller mini-bulk trade pools—Nomura submitted every loan (100%) in the pool for credit and compliance diligence. This was not feasible for larger pools, and thus often a sample of the loans in larger mini-bulk pools and bulk pools were reviewed, rather than all the loans. That approach was typical in the industry in the 2005 to 2007 time period. I believed that Nomura's sample rates met or exceeded the sampling rates of our competitors.

58.     Nomura also purchased individual loans in some instances through its "loan-by-loan" program, rather than buying a whole trade pool of loans. Credit and compliance due diligence was performed on all loans purchased through the loan-by-loan program. We hired Clayton or Lydian Data Services, Inc. to perform the loan-by-loan reviews. For these single loan purchases, Clayton or Lydian reviewed the loans for compliance with Nomura's own underwriting guidelines.

59.     Where Nomura conducted credit and compliance due diligence on a sample of a loan pool, the sample size was typically set by the trading desk, though we in the Credit Group would have input into the process. We typically used larger samples or reviewed 100% of the loans in a pool if, for example, the originator was selling loans to Nomura for the first time. In certain instances, the trading desk and the originator stipulated to a sample size, but I understood that we had the ability to increase or "upsize" the sample as needed, based on any trends that emerged during the review of the initial sample. I recall occasions where we told the trading desk that we wanted to increase the sample size, and the trading desk deferred to our judgment and agreed to increase the sample size. I cannot recall any instance where the trading desk refused our request to increase the sample size. We also had the option to recommend to the

trading desk that a loan pool should not be pursued if we didn't like what we saw in the data or in any part of the due diligence we conducted.

60.    The primary sampling methodology we used was called "adverse sampling," because it involved the selection of loans that appeared to have high-risk characteristics. Nomura used the Standard & Poor's Financial Services LLC's LEVELS® software to choose at least some of the adverse sample. LEVELS® was useful for identifying risky loans because that program estimated the risk of loss on the loans over time. Based on my experience, I believe that LEVELS® was commonly used in the industry during this time period. At times, members of the Credit Group selected a portion of the sample manually as well, looking at the characteristics in the loan tape and using the loan data—along with their experience and judgment—to select the loans for the sample.

61.    Adverse sampling allowed the Credit Group to examine the riskiest loans, which included the loans most likely to have fraudulent appraisals or significant guideline exceptions. Based on my experience at Clayton and Nomura, I believe that adverse sampling was a very common form of sampling used in the industry for mortgage loan due diligence during this period, and my belief is that Nomura did a good job at utilizing adverse samples during my time as head of the Credit Group.

62.    Using the results from the adverse sample, we at Nomura inferred that the unsampled portion of the trade pool was likely to have fewer exception loans, *i.e.*, loans that deviated from the underwriting guidelines, than the sample did. The sample was designed to include the riskiest loans, meaning it was likely to contain more exception loans than the unsampled portion of the trade pool. Also, because Nomura typically reviewed large percentages of loans, it gave us good insight into the trade pool as a whole.

63. Clayton and AMC sent us reports as they conducted their credit and compliance reviews, usually with great frequency—and sometimes even on a daily basis. We reviewed these results and checked them for accuracy. I believe that Clayton and AMC provided Nomura with accurate information, including for the trade pools that contributed loans to the at-issue securitizations.

64. As I explained earlier, Clayton and AMC assigned "1," "2," and "3" grades to the loans. Sometimes when Nomura reviewed the results of the Clayton or AMC review, we concluded it was appropriate (for reasons mentioned below) to buy a loan that had been initially graded a "3."

65. The main reason why a loan initially assigned a "3" was subsequently purchased was that the loan was initially missing documentation. If the documentation later was provided and deemed suitable to clear the exception, we generally purchased the loan. Although we might occasionally decide that a "3" could be purchased due to compensating factors (*i.e.*, we thought the loan was really a "2" because of compensating factors), that was the exception, not the rule. We did not purchase "3" loans unless a missing document was provided, the loan had sufficient compensating factors, we decided that an exception identified by a vendor was non-material, or the "3" was the result of a Nomura overlay, *i.e.*, unrelated to compliance with underwriting guidelines, and we were comfortable waiving that overlay requirement based on the facts and circumstances. In those situations, the waiver of an overlay meant that we concluded the loan complied with the originator's underwriting guidelines and we were comfortable in waiving the extra requirement(s) that the Nomura overlay would otherwise have imposed.

66. DX-1665 is a credit and compliance report for the FNBN 21 trade pool discussed at paragraphs 46-47 and 52-53, above. The first attachment is an "Individual Asset Summary,"

-24-

which provided loan characteristics for each loan graded as a "3," and the reasons Clayton

graded the loan a "3." For example, on page 3, the report notes that a loan file was missing a

signed copy of the note, although this "3" could be fixed or "cured" if the originator provided a

copy of the signed note. The second attachment lists the characteristics for each loan Clayton

reviewed. The third attachment shows the credit and compliance grades for the loans Clayton

reviewed. The loans I discussed previously—█████████ and █████████—were graded as

"1s" by Clayton (rows 108-109). The fourth spreadsheet lists the loans graded "3," the reason

for the grade (columns M and N), and compensating factors where applicable (column Q). For

example, the first loan in this spreadsheet—loan number █████████ (row 6)—was graded "3"

because the Clayton underwriter found that the stated income given by the borrower was not

reasonable, but the report noted compensating factors for that loan—job stability (the borrower

had been at her job for ██ years) and home stability (the borrower lived in her current residence

for over █ years). However, the Clayton underwriter deemed these compensating factors to be

insufficient.[6] Based on a review of DX-1668, a document I describe further at paragraphs 69-70,

below, Nomura did not purchase this loan.

IngletBlair Review

67. Around August 2006, Nomura engaged the vendor IngletBlair to conduct a

quality control check on loans from certain originators. The results of this review (PX-657)

---

[6]     Other examples of Clayton and AMC reports that were sent to the Nomura Credit Group
during my time at Nomura include DX-1610, DX-1611, DX-1615, DX-1622, DX-1627,
DX-1632, DX-1633, DX-1636, DX-1642, DX-1649, DX-1659, DX-1662, DX-1665, DX-
1673, DX-1676, DX-1677, DX-1688, DX-1696, DX-1707, DX-1710, DX-1715, DX-
1718, DX-1728, DX-1729, DX-1733, DX-1738, DX-1746, DX-1750, DX-1758, DX-
1760, DX-1761, DX-1767, DX-1771, DX-1788, DX-1791, DX-1796, DX-1798, DX-
1805, DX-1806, DX-1808, DX-1815, DX-1816, DX-1817, DX-1819, DX-1822, DX-
1833, DX-1834, DX-1843, DX-1847, DX-1849, DX-1850, DX-1856, and DX-1860.

were, I thought, positive. According to the attached report (PX-659), IngletBlair reviewed 120 loans that Clayton or AMC previously reviewed, and opined that seven of the loans Clayton or AMC graded "1" or "2" –fewer than 6% of the total—should have been graded "3s." In some cases that could be because IngletBlair viewed the compensating factors differently than the underwriters at Clayton or AMC had. IngletBlair also reviewed 65 loans that were not reviewed by Clayton or AMC, and stated that only five of these loans should have been graded "3." These results were not alarming—to the contrary, they reinforced the fact that our vendors did a good job, and that our adverse sampling methodology was effective for identifying potentially problematic loans. IngletBlair had every reason to identify as many errors (made by its competitors, Clayton or AMC) as possible—it was, after all, hoping to get additional business from Nomura. The fact that IngletBlair found so few "3s" despite that incentive reinforced the conclusion that our vendors were generally getting things right.

68.     IngletBlair also identified 29 loans previously reviewed by Clayton or AMC that IngletBlair graded as "4s", *i.e.*, missing documentation needed to make a determination. This is not surprising, because PX-649 indicates that IngletBlair was using loan files provided by the servicer, the entity Nomura hired to collect mortgage payments from the borrowers. I understand that servicing loan files often lacked documents that were in the original loan file, because the servicer only kept loan file documents that were necessary to service the loan, *i.e.*, necessary to enable the servicer to collect payments from the borrower. Further, missing documents were often provided directly to Nomura during the credit and compliance review, but were not necessarily ever added to the loan file. For example, if the loan file was missing a tax return, the originator may have emailed a PDF file of that tax return to Nomura, which would cure the "3" and allow us to purchase the loan, but that PDF was not necessarily added to the loan file.

Therefore, the fact that documents were missing from the loan file in the IngletBlair review does not necessarily indicate that the documents were not present in the origination loan file or that we did not have copies of the documents when performing credit and compliance due diligence.

Finalizing the Purchase Pool

69.     At the end of the due diligence process, Nomura created final summary spreadsheets for each trade pool, which showed the loans that Nomura would purchase and the loans it would kick out. We sent these spreadsheets to the originator to confirm our agreement about which loans Nomura would purchase and which loans it would not. DX-1668 is an example of a final summary spreadsheet for the FNBN 21 trade pool. It is a record, made and kept in the regular course of a regularly conducted business activity of Nomura. It was the regular course of Nomura's business to create these final due diligence summary spreadsheets, and to send them via email to originators and others at Nomura. I was fully familiar with these summary spreadsheets, and I received them in the regular course of business.[7]

70.     The first tab, "Eligible," lists the loans from the trade pool that Nomura intended to purchase. The second tab, "Eligible Marked," lists loans that were eligible for purchase and for sale to most investors, but could not be sold to Freddie Mac or Fannie Mae because they

---

[7]     Other examples of final summary spreadsheets from my time as head of the Nomura Credit Group, which are also Nomura business records, include DX-1624, DX-1625, DX-1634, DX-1635, DX-1643, DX-1644, DX-1648, DX-1651, DX-1664, DX-1667, DX-1668, DX-1671, DX-1672, DX-1674, DX-1678, DX-1679, DX-1680, DX-1681, DX-1682, DX-1693, DX-1694, DX-1700, DX-1704, DX-1711, DX-1712, DX-1717, DX-1719, DX-1720, DX-1721, DX-1727, DX-1730, DX-1732, DX-1735, DX-1740, DX-1752, DX-1759, DX-1764, DX-1768, DX-1782, DX-1786, DX-1787, DX-1789, DX-1794, DX-1797, DX-1800, DX-1801, DX-1802, DX-1803, DX-1807, DX-1809, DX-1812, DX-1813, DX-1814, DX-1818, DX-1820, DX-1824, DX-1825, DX-1826, DX-1827, DX-1828, DX-1829, DX-1831, DX-1835, DX-1836, DX-1838, DX-1839, DX-1844, DX-1846, DX-1848, DX-1851, DX-1857, DX-1859, DX-1862, DX-1864, and DX-1865.

violated Freddie Mac's or Fannie Mae's internal investment requirements. The "Ineligible" tab lists the loans that were kicked due to Clayton's findings during credit and compliance due diligence. "Collateral Drops" shows the loans that were kicked out due to missing loan file documents identified by the collateral custodian, Wells Fargo.[8] The "Removed By Seller—PIF" tab lists loans that dropped out of the trade pool because the originator removed them from the loan pool or the loan was already "PIF," *i.e.*, the mortgage was paid-in-full. The last tab is "Denied BPO"—loans that were kicked out due to BPO results.

71.     Sometimes the kick-out rates would be relatively high on these trade pools, but often this was because we were reviewing the riskiest loans due to the adverse sample, and we were identifying and kicking out the loans most likely to be defective. A high kick-out rate could also be the result of a fact-dependent anomaly. I understand that one of the trade pools at issue in this case, Silver State 58, had a kick-out rate of 66.7%. The final due diligence summary report for that trade pool, DX-1693, indicates that 81 of the loans were kicked out because of a technical problem with the "lookback" period on the Adjustable Rate Mortgage Rider, which did not match the note. This did not mean the loans were out of compliance with underwriting guidelines. Only ten loans without this "lookback" issue were kicked out, a kick-out rate of 7.5%.

72.     Nomura investigated all of the "lookback" issues with this pool. DX-2648 is a copy of a report sent to myself and others at Nomura, attaching the results of Wells Fargo's investigation of the "lookback" issue. The spreadsheet attached to DX-2648 shows that Wells

---

[8]     Loans would be kicked out of the trade pool if Wells Fargo, the collateral custodian, reviewed the loan file and found that critical documents were missing. Wells Fargo performed this review on all of the loans in each trade pool.

Fargo reviewed 137 loans from Silver State 58 for this look back issue. I am informed and believe that the Silver State 58 trade pool contained 137 loans, meaning that Wells Fargo reviewed every loan in the trade pool for this issue. This was an instance where Nomura saw a "red flag" and reviewed every single loan for that "red flag." This was not an issue related to underwriting guidelines, so there would have been no advantage to increasing the credit and compliance sample in this case. Instead, we addressed this "red flag" by checking every loan for the issue.

73. If a trade pool had a high kick-out rate based on the results of credit and compliance diligence, we could and did increase the size of the credit and compliance sample, or walk away from the trade altogether.

74. I understood that a key purpose of Nomura's due diligence process was to confirm information about loans that might later be sold to investors as part of mortgage-backed securities. Everyone in the Credit Group was aware that Nomura would make representations to investors about the loans, and that those representations had to be accurate. We kept this in mind when we were performing due diligence.

75. The due diligence I described above is known as "pre-purchase" due diligence, since it took place before Nomura actually purchased the trade pools. The Credit Group did not perform post-purchase due diligence reviews. I am not aware of any of Nomura's competitors or any other financial institutions that did post-purchase due diligence reviews, either. A second round of due diligence would have been duplicative and expensive, and also misunderstands the nature of mortgage loan due diligence. The due diligence process evaluated whether the originator should have extended the loan to the borrower, based on the facts that existed at the time the loan was originated. Therefore, we were checking past events that were not likely to

-29-

change between due diligence and securitization. For example, if a sports historian checked the evidence and determined that the New York Mets' first baseball game at Shea Stadium occurred on April 17, 1964, the Mets' first game at Shea Stadium will still have occurred on April 17, 1964 if he or she checks again several months later. Similarly, during the due diligence process, we checked, for example, whether the loan complied with underwriting guidelines or whether the appraisal value was reasonable *when the loan was originated*. Those were past events that were not going to change if we reviewed the loans again a few months later. The same is true when it comes to a borrower's statement of intent to occupy a home.

### Due Diligence and Nomura's Business Strategy

76.     Based on my experience, I believe that Nomura's due diligence process, while of very high quality before I joined Nomura, became even more rigorous during my tenure. This was partially because the market was changing during my tenure, and we wanted to make sure we were being appropriately conservative in order to avoid purchasing loans that had a greater risk of default than we wanted to buy. For example, I recall that the trading desk became less willing to waive bid stipulations and other overlays starting in the second half of 2006. I also recall that in early 2007, we tightened our standards with respect to loans purchased through our loan-by-loan program.

77.     During my tenure as head of the Credit Group, Nomura worked hard to improve the due diligence process and make it even more rigorous. For example, I recall that in late 2006, we began trying to work products from the due diligence vendor DataVerify into our system, including the IDVerify product, which helped identify potential borrower fraud in loans. Nomura stopped purchasing mortgage loans in early 2007, before we fully integrated DataVerify into our processes, but this is an example of Nomura trying to make its process even more

-30-

rigorous. The notion that Nomura failed to take the due diligence process seriously is false. To my knowledge, Nomura met or exceeded the due diligence standards of our competitors in all aspects of the process.

78.     I never believed that Nomura's sales or trading desk sought to buy more loans at the expense of doing quality due diligence. I also do not recall an instance where Nomura bought defective loans to preserve its business relationship with an originator. These were arm's-length transactions, and Nomura and the originator had different interests to protect.

79.     The goal of Nomura's business was to purchase loans and securitize them, and therefore the business did not want to purchase defective loans. Not only that, but Nomura bore significant credit risk when it purchased the loans, because it held the loans on its books for 30 days or more before securitizing them. If a loan defaulted during that time, Nomura might have to absorb that loss. In some cases, Nomura had contractual arrangements with originators that required the originator to repurchase loans that defaulted in the first few months, but if the originator went out of business or into bankruptcy or was otherwise unable to meet its contractual obligations, Nomura suffered the loss.

80.     This is illustrated quite clearly by Nomura's sale of whole loans in 2007. For the last six to eight months of my employment with Nomura, after Nomura decided to exit the residential mortgage business, I assisted Nomura in selling whole loans on its books. In such circumstances, Nomura sold the loans individually to various buyers. While I do not remember the exact figures, I recall that Nomura sold these loans at significant losses.

81.     Further, the idea that Nomura wanted to purchase as many loans as possible regardless of whether those loans might be defective is contradicted by my experiences and Nomura's practices. If Nomura wanted to buy as many loans as possible, it would not have

performed 100% valuation diligence on loans or performed credit and compliance diligence using sampling rates that were higher than the typical industry practice. If Nomura did not care about the quality of its due diligence process and the loans it was purchasing, it would not have hired IngletBlair to perform an audit of loans on Nomura's books in August 2006. It would not have attempted to add additional fraud checks to its process, such as the IDVerify product, in late 2006. It would not have tightened its standards for purchasing loans beginning in late 2006. The trading desk would not have deferred to the Credit Group's requests to increase credit and compliance sample sizes where we thought it was warranted. But we did all of these things because Nomura was serious about performing rigorous due diligence and purchasing quality loans.

82.    Finally, Nomura's business strategy, as I understood it, was to perform more due diligence than was the industry norm for that time period. Nomura was a relatively late entrant into the residential mortgage-backed securities market, and one way in which it wanted to distinguish itself was through high quality due diligence. Therefore, Nomura sought to go above and beyond what others were doing in the industry in order to build its reputation. I believe that Nomura performed due diligence that was particularly rigorous for the 2005-2007 time period and that this due diligence ensured that Nomura could later make accurate statements about the characteristics of the loans it purchased.

_____
                                Neil Spagna

Sworn to before me this
_20_ day of February 2015.

_Elizabeth McLean_.

Notary Public

ELIZABETH K. MCLEAN
NOTARY PUBLIC, State of New York
No. 01MC6290356
Qualified in New York County
Certificate filed in New York County
Commission Expires October 07 2017