UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

     Plaintiff,

    -against-

NOMURA HOLDING AMERICA, INC.;
NOMURA ASSET ACCEPTANCE
CORPORATION; NOMURA HOME EQUITY
LOAN, INC.; NOMURA CREDIT &
CAPITAL, INC.; NOMURA SECURITIES
INTERNATIONAL, INC.; RBS SECURITIES
INC. (f/k/a GREENWICH CAPITAL
MARKETS, INC.); DAVID FINDLAY; JOHN
MCCARTHY; JOHN P. GRAHAM; NATHAN
GORIN; and DANTE LAROCCA,

     Defendants.

**11 Civ. 6201 (DLC)**

---

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' PRETRIAL MEMORANDUM OF LAW

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Philippe Z. Selendy
Richard I. Werder, Jr.
Jonathan B. Oblak
Sascha N. Rand
Manisha M. Sheth
Andrew R. Dunlap
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

Richard A. Schirtzer
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017

Jon Corey
777 6th Street NW, 11th Floor
Washington, D.C. 20001

*Attorneys for Plaintiff Federal Housing
Finance Agency, as Conservator for Fannie
Mae and Freddie Mac*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

I.   DEFENDANTS' RELIANCE ON THE WRONG LEGAL STANDARDS
     CANNOT REBUT FHFA'S SHOWING THAT DEFENDANTS'
     REPRESENTATIONS WERE FALSE .................................................................................1

     A.   Defendants' Representations Regarding Compliance With Underwriting
          Guidelines Were False .........................................................................................1

     B.   Defendants' LTV Ratio Representations Were False ..................................................4

     C.   Defendants' Owner-Occupancy Representations Were False ..................................6

     D.   Defendants' Credit Ratings Representations Were False .........................................6

II.  DEFENDANTS BOLSTER FHFA'S ARGUMENTS REGARDING
     MATERIALITY ...................................................................................................................8

III. DEFENDANTS CONCEDE OR FAIL TO ADDRESS EVIDENCE
     DEMONSTRATING THE CONTROL PERSON LIABILITY OF NOMURA
     HOLDING, NCCI, AND THE INDIVIDUAL DEFENDANTS ........................................10

IV.  THE APPROPRIATE RATE OF PREJUDGMENT INTEREST IS THE IRS
     UNDERPAYMENT RATE ...............................................................................................12

V.   DEFENDANTS CONFIRM THAT THEY CANNOT SUSTAIN A LOSS
     CAUSATION DEFENSE ..................................................................................................14

VI.  DEFENDANTS' REFUSAL TO RECOGNIZE THAT THE SALES OF THE
     CERTIFICATES OCCURRED IN D.C. OR VIRGINIA IS UNJUSTIFIED ...................18

CONCLUSION ..........................................................................................................................18

# TABLE OF AUTHORITIES

**Page**

*Akerman v. Oryx Commc'ns, Inc.*,
  810 F.2d 336 (2d Cir. 1987) ...................................................................................9

*Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*,
  42 Misc. 3d 1220, 986 N.Y.S.2d 864 (Sup. Ct. 2014) ...........................................7

*Assured Guar. Mun. Corp. v. UBS Real Estate Sec., Inc.*,
  2012 WL 3525613 (S.D.N.Y. Aug. 15, 2012) ........................................................7

*Capital Ventures Int'l v. J.P. Morgan Mortgage Acquisition Corp.*,
  2013 WL 535320 (D. Mass. Feb. 13, 2013) ......................................................7, 10

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortgage Corp.*,
  543 F. App'x 72 (2d Cir. 2013) .............................................................................17

*Cromer Finance Ltd. v. Berger*,
  137 F. Supp. 2d 452 (S.D.N.Y. 2001) ...................................................................10

*FHFA v. Merrill Lynch & Co.*,
  903 F. Supp. 2d 274 (S.D.N.Y. 2012) ...............................................................7, 12

*FHFA v. Nomura Holding Am., Inc.*,
  2014 WL 7229361 (S.D.N.Y. Dec. 18, 2014) ........................................................9

*FHFA v. Nomura Holding Am., Inc.*,
  2014 WL 7232443 (S.D.N.Y. Dec. 18, 2014) ...................................................3, 12

*FHFA v. Nomura Holding Am., Inc.*,
  2015 WL 394072 (S.D.N.Y. Jan. 29, 2015) ........................................................... 6

*FHFA v. Nomura Holding Am., Inc.*,
  2015 WL 539489 (S.D.N.Y. Feb. 10, 2015) .....................................................14, 15

*FHFA v. Nomura Holding Am., Inc.*,
  2015 WL 568788 (S.D.N.Y. Feb. 11, 2015) ...............................................1, 2, 3, 4

*FHFA v. Nomura Holding Am., Inc.*,
  2015 WL 685159 (S.D.N.Y. Feb. 18, 2015) .....................................................16, 17

*FHFA v. Nomura Holding Am., Inc.*,
  2015 WL 714747 (S.D.N.Y. Feb. 19, 2015) ..........................................................17

*FHFA v. Nomura Holding Am., Inc.*,
  2015 WL 731197 (S.D.N.Y. Feb. 20, 2015) ..........................................................16

*FHFA v. Nomura Holding Am., Inc.*
  2015 WL 353929 (S.D.N.Y. Jan. 28, 2015) .......................................................4, 5

*FHFA v. UBS Ams., Inc.*,
  858 F. Supp. 2d 306 (S.D.N.Y. 2012) ...................................................................11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   352 F. Supp. 2d 429 (S.D.N.Y. 2005)....................................................................11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009)..........................................................................14, 17

*Flanagan v. N. Star Concrete Const., Inc.*,
   2014 WL 4954615 (E.D.N.Y. Oct. 2, 2014).........................................................14

*Folger Adam Co. v. PMI Indus., Inc.*,
   938 F.2d 1529 (2d Cir. 1991).............................................................................9

*Goldkrantz v. Griffin*,
   1999 WL 191540 (S.D.N.Y. Apr. 6, 1999) ...........................................................15

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)........................................................................................13

*In re IndyMac Mortg.-Backed Sec. Litig.*,
   718 F. Supp. 2d 495 (S.D.N.Y. 2010)....................................................................7

*Landesbank Baden-Wurttemberg v. RBS Holdings USA Inc.*,
   14 F. Supp. 3d 488 (S.D.N.Y. 2014)....................................................................7

*In re Lehman Bros. Mortg.-Backed Sec. Litig.*,
   650 F.3d 167 (2d Cir. 2011)..............................................................................10

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
   2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010).......................................................11

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
   709 F.3d 109 (2d Cir. 2013)................................................................................8

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*,
   720 F. Supp. 2d 254 (S.D.N.Y. 2010)....................................................................7

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)........................................................................................17

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
   632 F.3d 762 (1st Cir. 2011)...............................................................................7

*In re ProShares Trust Sec. Litig.*,
   728 F.3d 96 (2d Cir. 2013)..................................................................................9

*Randall v. Loftsgaarden*,
   478 U.S. 647 (1986)........................................................................................13

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996)..................................................................10, 12, 14

*S.E.C. v. Mgmt. Dynamics, Inc.*,
   515 F.2d 801 (2d Cir. 1975)...................................................................10, 11

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*,
   314 F. Supp. 2d 201 (S.D.N.Y. 2003) ...................................................................13

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
   692 F. Supp. 2d 387 (S.D.N.Y.) ...........................................................................7

*United States v. McDermott*,
   2014 WL 917267 (E.D.N.Y. Mar. 10, 2014) .......................................................14

*In re Vivendi Universal, S.A. Sec. Litig.*,
   284 F.R.D. 144 (S.D.N.Y. 2012) ........................................................................13

*In re Worldcom, Inc. Sec. Litig.*,
   2005 WL 638268 (S.D.N.Y. Mar. 21, 2005) .................................................10, 12

## Statutes and Regulations

15 U.S.C. § 77*l*(b) ...............................................................................................15, 17

26 U.S.C. § 6622(a) ...................................................................................................14

17 C.F.R. § 240.12b-2 ................................................................................................10

Plaintiff Federal Housing Finance Agency ("FHFA"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and, together with Fannie Mae, the "GSEs"), respectfully submits this Opposition to Defendants' Pretrial Memorandum of Law ("Defs. Mem.").[1]

## PRELIMINARY STATEMENT

Defendants' Pretrial Memorandum confirms that Defendants do not intend to try this case by addressing the evidence relevant to the governing legal standards articulated by the Court. Instead, Defendants intend to address the legal standards as they wish them to be, regardless of whether the Court has explicitly rejected their view of the law, and will address only evidence that meets those imaginary standards.  By taking this approach, Defendants only confirm, now on a full evidentiary record, that the Court's rulings have been correct.  Defendants' apparent decision to try this case solely for an eventual appeal makes plain that they cannot rebut the clear proof of their liability nor establish any affirmative defense at trial.

## ARGUMENT

## I. DEFENDANTS' RELIANCE ON THE WRONG LEGAL STANDARDS CANNOT REBUT FHFA'S SHOWING THAT DEFENDANTS' REPRESENTATIONS WERE FALSE

### A. Defendants' Representations Regarding Compliance With Underwriting Guidelines Were False

Defendants' lead argument is that they did not represent that the Mortgage Loans complied with originators' actual guidelines, only with general descriptions of underwriting criteria in the Prospectus Supplements.  Defs. Mem. 44-47.  The Court has rejected this "strained reading of [the] Offering Documents," *FHFA v. Nomura Holding Am., Inc.*, 2015 WL 568788, at *12 (S.D.N.Y. Feb. 11, 2015), which "is at odds with the plain meaning of the Supplements and does not make sense as a matter of chronology," *id.* at *11.  As the Court explained:

---

[1]   As used herein, "FOF" refers to FHFA's Proposed Findings of Fact; "COL" refers to FHFA's Proposed Conclusions of Law; "Defs. FOF" refers to Defendants' Proposed Findings of Fact; and "Defs. COL" refers to Defendants' Proposed Conclusions of Law.  All other defined terms bear the same meanings as in FHFA's Proposed Findings of Fact.

> these passages are a statement by the defendants that they have re-
> viewed the Originators' processes and guidelines and confirmed that
> the loans within the Securitization were all originated in compliance
> with their Originators' standards and processes, and that those stand-
> ards and processes all contained the central elements summarized in
> the Supplement.

*Id.* at *12. The correctness of this conclusion is strongly confirmed by the evidence.

Reviewing the statements of guidelines compliance in the NAA 2005-AR6 Prospectus
Supplement, Defendant John Graham testified that "[t]his sort of language … is, given the
variety of sellers that are mentioned … intended to be inclusive of those underwriting guidelines
and reflect generally those standards." Ex. 1, Graham Dep. 111:13-19. The ratings agencies
required that aggregators like Nomura make such representations of compliance with guidelines,
FOF ¶¶ 73, 563-64, and Nomura in turn instructed its third-party diligence vendors to evaluate
loans acquired for securitization against originators' guidelines, not against general descriptions
of underwriting criteria that would appear in prospectus supplements that had not yet been
written, FOF ¶ 391; *see also* Spagna Aff. ¶¶ 7, 56; Kohout Aff. ¶ 12. Given these facts, it is not
surprising that Defendants have acknowledged that this "[c]redit due diligence involved
reviewing loans for compliance with *applicable underwriting guidelines of the originator*,
including whether sufficient compensating factors existed to support any exceptions that had
been made to the underwriting guidelines."[2] Thus, Defendants' tortured, made-for-litigation
reading of the Prospectus Supplements has no basis in fact as well as none in law.[3]

---

[2] *See* Nomura's Opp'n to Pl.'s Mot. for Partial Summ. J. on Defs' Due Diligence and Reasonable Care Defenses
41-42 (emphasis added); *see also* RBSSI's Opp'n to Pl.'s Mot. for Partial Summ. J. on Defs' Due Diligence and
Reasonable Care Defenses 24.

[3] Moreover, Defendants "took the position at the beginning of this litigation that it would be necessary to collect
every loan file and Originator guideline for every loan within each of the SLGs supporting FHFA's Certificates" in
order to evaluate whether the Mortgage Loans complied with the applicable guidelines. *Nomura Holding Am.*,
2015 WL 568788, at *12; *see also, e.g.*, Defs. June 6, 2012 Status Report, Dkt. 52, at 2-5 (arguing against sampling
approach); Defs. Submission for July 31, 2012 Hr'g, Dkt. 66, at 14 (Defendants proposed order to require the
production by each party of "all underwriting guidelines in its possession, custody or control that may apply to the
loans in Plaintiff's Sample"). Defendants subsequently "agreed to engage in a good-faith process" for loan file and
guideline matching for the "very burdensome, time-consuming, [and] complex" task of re-underwriting the Sample
Loans. Ex. 2, Feb. 7, 2013 Hr'g Tr. 74:18-74:25 (statement of counsel on behalf of all tranche 3 and 4 defendants,
including Nomura and RBSSI).

Next, Defendants argue that their representations, which say that the Mortgage Loans were originated "generally" in compliance with guidelines, are not false because they "do not say that every underwriter always followed perfect processes, or that every loan actually met every criteria of each underwriting guideline."  Defs. Mem. 51.  The Court has rejected this argument too, holding that the statement that "*all* of the loans 'generally' met guidelines indicated that certain immaterial exceptions might exist, not that a material number of the loans might substantially deviate from the guidelines, without compensating factors."  *FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7232443, at *39 (S.D.N.Y. Dec. 18, 2014) (emphasis in original).  This understanding is affirmed by the uncontested evidence that Nomura and RBSSI and their vendors graded loans as (1) complying with guidelines, (2) not complying with guidelines but having sufficient compensating factors, or (3) not complying with guidelines and lacking such factors.  FOF ¶ 394.  Conversely, there is no evidence that Defendants or any other market participant during the relevant time period believed that it would be acceptable to securitize a loan that did *not* comply with guidelines and lacked sufficient compensating factors because prospectus supplements spoke of 'general' compliance.

Finally, Defendants argue that the representations are not false because they "concern processes and describe general (but not perfect) adherence to those processes, including through the use of discretionary exceptions."  Defs. Mem. 51.  The Court has rejected this argument as well, holding that the Prospectus Supplements contained both a representation regarding "the origination process" and also "a representation that the loans actually did meet each of the criteria within an Originator's underwriting guidelines."  *Nomura Holding Am.*, 2015 WL 568788, at *13.  Once again, the Court's conclusion is bolstered by Defendants' diligence practices, in which they instructed third-party vendors to determine if loans complied with the substantive requirements of originators' guidelines, including limits for LTV ratios, DTI ratios, and credit scores.  *See, e.g.*, FOF ¶¶ 424-27 (Mortgage Loans included in the NAA 2005-AR6 SLG graded EV3, for, among other things, LTV ratios and FICO scores outside of guideline requirements).

Defendants' denial of the meaning of their representations, and of the contemporaneous understanding of those representations, leaves large swaths of FHFA's re–underwriting evidence unchallenged.  FHFA's expert, Robert Hunter, reviewed each Sample Loan for compliance with guidelines as well as the origination process, considered all available information (including post-origination evidence), and also considered adequate compensating factors; he found widespread, material underwriting defects.  FOF ¶¶ 166, 168, 175, 192-95, 200-233.  In contrast, Defendants' proffered expert, Michael Forester, did not consider all relevant evidence (deliberately ignoring post-origination evidence), Forester Aff. ¶ 104, and did not consider the layered risk of loans in evaluating the importance of underwriting breaches or the sufficiency of compensating factors.[4]  "As a result, Forester's opinions have only limited relevance here," *Nomura Holding Am.*, 2015 WL 568788, at *14, and cannot rebut Mr. Hunter's findings, which are further bolstered by contemporaneous evidence that Nomura and RBSSI placed defective loans in the SLGs, FOF Part IV.B.

**B.    Defendants' LTV Ratio Representations Were False**

Defendants acknowledge (Defs. Mem. 68-70) that FHFA can prove that their representations regarding LTV ratios were false by showing that the underlying appraisals were both objectively false and disbelieved when made, *FHFA v. Nomura Holding Am., Inc.*, 2015 WL 353929, at *6 (S.D.N.Y. Jan. 28, 2015).  Defendants also appear to recognize that FHFA has presented evidence of objective falsity though the Greenfield AVM employed by FHFA's expert, Dr. Kilpatrick.  Defs. Mem. 71.  Defendants' criticisms of the methodology for showing objective falsity, and of Dr. Cowan's extrapolations of Dr. Kilpatrick's results, Defs. Mem. 75-77, are meritless for the reasons discussed in FHFA's Proposed Findings of Fact, in Dr. Kilpatrick's testimony, and in Dr. Cowan's testimony.  *See* FOF ¶¶ 362-69; Kilpatrick Aff. ¶¶ 67-80; Cowan Aff. ¶¶ 63-64, 77-90.

---

[4]   For example, Defendants critique Mr. Hunter for finding a defect where a loan had an ▮▮▮▮▮▮▮▮ ratio, in excess of the 85% LTV maximum for the applicable guideline, Defs. Mem. 53-54, but fail to note that the loan had other underwriting defects, including that the borrower's FICO score fell below the guidelines' minimum requirement.  PX 01672 (Global Loan Number NHELI_2006_HE3_2002236168, rows 1237-42).

With respect to subjective falsity, Defendants are simply wrong to assert that "[t]he only evidence put forward by either party that bears on whether an appraiser subjectively believed his or her opinion" is the testimony of four appraisers that they have offered, Defs. Mem. 70. Defendants ignore this Court's holding that subjective falsity may be proved through circumstantial evidence. *Nomura Holding Am.*, 2015 WL 353929, at *5 (state of mind routinely proved by circumstantial evidence). Such evidence is abundant and compelling here.

The results of Dr. Kilpatrick's CAM analysis, as extrapolated by Dr. Cowan, show that approximately 92.2% of the Mortgage Loans with objectively false appraisals also were not credible under USPAP—which shows that *31.3% of all Mortgage Loans* were both objectively and subjectively false. Cowan Aff. ¶¶ 101-102. Further, for a full *71.66% of the purchase-money* mortgage Sample Loans, the appraised values matched to the last cent the sales price of the properties, FOF Part IV.A.3(b)(4). As even Defendants' own valuation expert, Dr. Hausman, acknowledged, a truly independent assessment would result in an appraised value that differed from the sales price, whether higher or lower, Kilpatrick Aff. ¶ 22. Finally, a petition signed by 11,000 appraisers that they were subjected to pressure to inflate their appraisals, FOF Part IV.A.3(b)(5), shows that appraisers across the industry believed they were subject to such pressure. *See* Feb. 18, 2015 Order re: Various Mots. in *Limine*, Dkt. 1291, at 2. In total, there is overwhelming circumstantial evidence that the 31% of Mortgage Loans identified by FHFA were both objectively and subjectively false, which more than satisfies FHFA's burden of proof.

Defendants, by contrast, chose not to perform any SLG-wide analysis of credibility, and thus have no analysis to compete with that of Dr. Kilpatrick.[5] They also have no substantive response to the evidence of appraisals matching sales prices for over 70% of purchase-money loans, or to the inferences to be drawn from the appraiser petition. Instead, Defendants offer testimony from a sample of four appraisers, none previously disclosed, who were involved with

---

[5] Defendants' actual criticisms of Dr. Kilpatrick's CAM findings are both meritless and ultimately immaterial. FOF ¶¶ 326-27; PX 1699 (crediting Defendants' criticism reduces the number of non-credible appraisals only by 12—from 92% to 86%); Kilpatrick Aff. ¶ 208 (this reduction is immaterial).

appraising only four of the 15,788 Mortgage Loans.  None of these four witnesses purports to testify about whether the appraisers of the other 15,784 loans subjectively believed their appraisals to be true.  Defs. Mem. 70.  Defendants do not claim to have selected these four appraisers at random, and they do not offer any method (let alone a statistically valid or meaningful one) for extrapolating the testimony of these appraisers to the SLGs as a whole.  As a result, even if the appraisers' testimony were fully credited as to the four properties they appraised or supervised the appraisal of,[6]  Defendants offer no evidence that any of the appraisals for the other 15,784 Mortgage Loans were believed when made.

### C.  Defendants' Owner-Occupancy Representations Were False

Defendants' central argument concerning occupancy statistics in the Prospectus Supplements is that those statistics purportedly "reflect[ ] the borrowers' stated intent concerning occupancy at the time they applied for their loans."  Defs. Mem. 66.  The Court rejected this argument, holding that owner-occupancy representations are representations of fact, which "describe the percentage of the properties occupied by owners as of the Cut-Off Date for the Supplement."  *FHFA v. Nomura Holding Am., Inc.*, 2015 WL 394072, at *3 (S.D.N.Y. Jan. 29, 2015).  Defendants cite no new evidence in support of their assertion contradicting the plain language of the Prospectus Supplements, Defs. Mem. 25-26, instead pointing again to the same GSE witness testimony that the Court found "reflect[s] … that the employees expected any representation by borrowers to be verified by Originators and underwriters."  *Nomura Holding Am.*, 2015 WL 394072, at *3 n.6.

### D.  Defendants' Credit Ratings Representations Were False

Defendants main rebuttal argument on the Prospectus Supplements' representations regarding credit ratings is (once again) to deny the legal standard.  They assert that ratings are statements of opinions, and hence FHFA must prove that the ratings agencies subjectively did

---

[6]  One of the appraisers Nomura offers, William Schall, did not even render the appraisal on which he opines; rather, he expresses an opinion as to the original appraiser, a trainee named Seth Smith whom he supervised.  Schall Aff. ¶¶ 5-6.

not believe the ratings when issued.  Defs' Mem. 79-80.  The Court has rejected Defendants'

argument, recognizing that FHFA's claim "is not that the ratings themselves were false," but

rather "that the ratings were inflated and did not in fact apply to that collateral, since the

defendants provided the ratings agencies incorrect data regarding the loan population."  *FHFA v.

Merrill Lynch & Co.*, 903 F. Supp. 2d 274, 276 n.2 (S.D.N.Y. 2012); *see also Assured Guar.

Mun. Corp. v. UBS Real Estate Sec., Inc.*, 2012 WL 3525613, at *4-5 (S.D.N.Y. Aug. 15, 2012);

*Landesbank Baden-Wurttemberg v. RBS Holdings USA Inc.*, 14 F. Supp. 3d 488, 509-10

(S.D.N.Y. 2014).  The cases Defendants cite involve claims that the credit rating agencies'

models were deficient in some manner,[7] and several of those authorities explicitly recognize that

situations like this one, where the issuer provides inaccurate data to the ratings agencies, do not

fall into the category of opinion claims because "[d]efendants' representations about the process

by which credit ratings are generated may be actionable even if the opinion expressed by the

rating is not."  *Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.*, 2013 WL

535320, at *6 (D. Mass. Feb. 13, 2013); *Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*,

42 Misc. 3d 1220(A), 986 N.Y.S.2d 864, at *11 (N.Y. Sup. Ct. 2014); *cf. Tsereteli*, 692 F. Supp.

2d at 394 (noting that the credit ratings were based on "the factors [the credit rating agency]

considered"); *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d at 511-12 (stating that it

is a "factual assertion [that] … the ratings agencies would consider certain factors in"

determining their credit ratings).

---

[7]  *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*, 720 F. Supp. 2d 254, 270-71 (S.D.N.Y. 2010) (claim alleging that "the models relied on to rate the Certificates were outdated and unable to accurately assess their risk, and the credit enhancements added to protect investors were inadequate given high risk of defaults and delinquencies in the loan pools"); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 395 (S.D.N.Y.) (claim alleging "that [the ratings agencies] used out-of-date models, did not verify the loan information provided to them, and have since downgraded the Certificates' ratings"); *In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 511 (S.D.N.Y. 2010) (claim alleging "that (1) the ratings process relied on outdated models and data and (2) the ratings process was 'unreliable and highly compromised' because the rating agencies had conflicts of interest and did not verify the loan data provided to them"); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 775 (1st Cir. 2011) (claim alleging "that ratings were *misleading,* primarily because they were based on outdated models, lowered ratings criteria, and inaccurate loan information" (internal quotation marks omitted)).

## II.    DEFENDANTS BOLSTER FHFA'S ARGUMENTS REGARDING MATERIALITY

Defendants largely concede the legal standards governing materiality in this case, agreeing that materiality turns on "[w]hether the defendants' representations, taken together and in context, would have misled a reasonable investor," Defs. Mem. 83 (brackets in original) (quotation and citations omitted)), in particular whether "a complete and truthful disclosure would have been viewed by [a] reasonable investor as having significantly altered the total mix of information made available,'" Defs. Mem. 83 (quotation and citations omitted).  They also appear to agree that "a court must consider both quantitative and qualitative factors in assessing an item's materiality … and that consideration should be undertaken in an integrative manner." COL ¶ 14 (ellipses in original) (quotation and citations omitted).[8]

Quantitatively, Defendants acknowledge that, in the context of their disclosures in this case, misstatements regarding LTV and occupancy of 5% or more provide strong evidence of materiality, *see* Defs. Mem. 20, 67, 76, 89, 91-93; *see also* Defs. COL ¶¶ 36; 53, and they do nothing to dispel the conclusion that the pervasive, significant underwriting defects found by Mr. Hunter are substantially likely to have been important to a reasonable PLS trader, *see* Part I.A, *supra*; COL Parts II.A, II.E.[9]

Qualitatively, Defendants acknowledge the importance of LTV ratios and occupancy status to investors, *see* Defs. Mem. 85; *see also* Defs. FOF ¶¶ 652, 708, and they acknowledge further that many of the factors that made up the substantive content of the underwriting guidelines in this case were material to investors, Defs. Mem. 85 ("investors … took into

---

[8]  Defendants offer, for example, John Richard's testimony on the qualitative impact of the misrepresentations alleged by FHFA (Defs. Mem. 85), alongside various arguments on the quantitative impacts of their misrepresentations, *see* Defs. Mem. 42-44 (quantitative arguments regarding guidelines); *id.* at 88-90 (occupancy); *id.* at 90-93 (LTV).

[9]  Defendants' argument that their disclosures of risky underwriting programs rendered their representation that the Mortgage Loans complied with guidelines immaterial is precisely backwards.  As the Second Circuit held in rejecting this precise argument, "knowledge that the borrowers had low credit scores and that many of the mortgages had high loan-to-value ratios would make a reasonable investor *more*, rather than *less*, interested in whether [the originator] had adhered to its processes for evaluating the capacity and willingness of the borrower[s] to repay," *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127-28 (2d Cir. 2013) (emphasis added) (quotation marks omitted).

account, among many other things, documentation, loan product type, asset type (*i.e.* subprime or Alt-A), geography, FICO scores, [and] the identity of the originator[.]").  Defendants also admit that "[t]he structure of a security," including its "subordination and cross collateralization," "mattered a great deal to reasonable investors in PLS," Defs. Mem. 85,[10] supporting FHFA's showing that a reasonable investor would want to know if an AAA rating could not issue absent additional subordination or credit enhancement, FOF ¶¶ 67-68, 619-21.[11]

Finally, while Defendants agree that the representations in a prospectus must be "taken together and in context" (Defs. Mem. 83 (quotation marks omitted)) in assessing materiality, they fail to apply that rule to this case, never considering the impact of their false and misleading statements in the aggregate.  *See* Defs. Mem. 83-93.  Consequently, Defendants do not address the central question of whether their "representations, taken together and in context" were material.  Defs. Mem. 2 (quoting *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 105 (2d Cir. 2013)).  As such, it is unsurprising that Defendants are unable to rebut FHFA's overwhelming evidence that Defendants' misrepresentations were material.  COL ¶¶ 91-109.

---

[10]   Defendants' admission that credit ratings were material serves to further bolster FHFA's proof of materiality as to the other misrepresentations, as credit characteristics such as LTV ratios, owner occupancy, and compliance with underwriting guidelines were important drivers of the credit ratings.  FOF ¶¶ 72-73, 630-34; *see also* Richard Aff. ¶ 21 (testifying that "[e]xpected losses also depended in part on collateral characteristics, including those disclosed in the offering documents, such as loan-to-value ratio, owner occupancy status, FICO score, loan type, etc.").

[11]   Defendants urge a contrary result by once more attempting to inject reliance into this action.  *See* Defs. Mem. 94. The fact that PLS investors "conducted sophisticated pre-acquisition analyses that included modeling the performance of the underlying collateral in a variety of different market scenarios," *id.*, does not detract from a conclusion of materiality, as "it is well-established that a material fact need not be outcome-determinative," *Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1533 (2d Cir. 1991), and of course reliance is not at issue in this Action, *see Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 344 (2d Cir. 1987) (Section 12(a)(2) "is a broad anti-fraud measure and imposes liability whether or not the purchaser actually relied on the misstatement.").  Even more glaringly, Defendants offer evidence that that Fannie Mae and Freddie Mac "hand-pick[ed] the loans for inclusion in the supporting loan groups" which were "particularly susceptible to changes in the housing market and economic conditions," Defs. Mem. 17-18.  The Court has ordered the exclusion of this evidence, as it is irrelevant to materiality, yet improperly "threatens to insert consideration of the GSEs' reliance into this trial," *FHFA v. Nomura Holding Am., Inc.*, 2014 WL 7229361, at *3 (S.D.N.Y. Dec. 18, 2014).

III.   **DEFENDANTS CONCEDE OR FAIL TO ADDRESS EVIDENCE DEMONSTRATING THE CONTROL PERSON LIABILITY OF NOMURA HOLDING, NCCI, AND THE INDIVIDUAL DEFENDANTS**

In defending against FHFA's control person claims, Defendants acknowledge, Defs. Mem. 95, the Second Circuit's holding that "[c]ontrol over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *SEC* v. *First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2).  To the extent control must be over the transactions, FHFA satisfies that requirement through its evidence of the control exercised by Defendants' dominion over the RMBS activities of the primary violators.  COL Part III; *see also Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452, 484-85 (S.D.N.Y. 2001) (control over the transactions was adequately pled).  Contrary to Defendants' suggestion, Defs. Mem. 96, there is no requirement that the control person be a culpable participant, *In re Worldcom, Inc. Sec. Litig.*, 2005 WL 638268, at *16 n.20 (S.D.N.Y. Mar. 21, 2005), nor does the standard articulated by the Second Circuit require any other direct participation in the transaction, *First Jersey*, 101 F.3d at 1472-73. Defendants' crabbed interpretation to the contrary cannot be squared with the Second Circuit's guidance that Section 15 is "defined in a broad fashion, … to reach prospective wrongdoers, rather than to permit the escape of those who would otherwise be responsible for the acts of their employees," *S.E.C. v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 812-13 (2d Cir. 1975), such that it holds liable "every person" who controls a primary violator, *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 186 (2d Cir. 2011).

Based on the incorrect standard, Defendants argue that Nomura Holding did not have "actual control" of the primary violators (Nomura Securities, NAAC, and NHELI) because it was not the "direct corporate parent" of NAAC and NHELI and had "no direct participation" in buying or securitizing loans.  Defs. Mem. 97 (presenting no such argument regarding NCCI[12]);

---

[12]   Defendants effectively concede that NCCI was a control person, including by citing a case holding that control by an RMBS sponsor was sufficiently pled based on nearly identical facts to those involving NCCI.  *See* Defs. Mem. 96 (citing *Capital Ventures*, 2013 WL 535320, at *10 (sponsor acquired and selected loans to be securitized,

*see also id.* at 94 n.27 (acknowledging that the D.C. Blue Sky law "renders officers and directors liable … without regard to whether they possessed actual control").  Defendants do not address any of the extensive evidence of Nomura Holding's actual control of the primary violators' RMBS activities, FOF Part VI.[13]  Moreover, Defendants acknowledge the control of Nomura's RMBS businesses exercised by NCCI and three of the five Individual Defendants:  (a) NCCI "purchased and performed due diligence on whole loans"; (b) Mr. LaRocca "oversaw Nomura's diligence process"; (c) Mr. Graham "confirmed the general accuracy of the offering documents' representations," and headed a group that "received formal diligence summaries"; and (d) Mr. Findlay "personally helped to establish Nomura's due diligence program."  Defs. Mem. 99-101.[14]

Next, even if Defendants were correct that signing the Registration Statements is not sufficient to establish control, *see* Defs. Mem. 96-97, the fact remains that "the act of signing a registration statement, … is a manifestation of the signer's responsibility for the information contained in the document," *FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 333 (S.D.N.Y. 2012), and therefore constitutes strong evidence of control, COL ¶ 134 (collecting cases).

Finally, Defendants' arguments in support of an affirmative defense to control person liability all boil down to reliance on Nomura's diligence process, Defs. Mem.  99-102, which this

---

approved structure of securitizations, sold loans to depositor, and controlled disclosures made in connection with related securitization)).

[13]  The authorities that Defendants cite for the proposition that the mere power of persuasion is not sufficient are inapposite, and, in fact, support a finding of control here; in each case, the courts declined to dismiss claims against affiliated control persons *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 457-59 (S.D.N.Y. 2005) (declining to dismiss individual defendants who were directors of the primary violator, but dismissing unaffiliated corporation who only owned 30% of the voting stock and appointed three out of nine members to the board of directors of the primary violator); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 1257528, at *7 (S.D.N.Y. Mar. 31, 2010) (declining to dismiss as control persons the entities that were the affiliated primary issuers, sponsors, and sellers of the securities, but dismissing the "distinct, non-subsidiary" underwriting defendants).

[14]  Defendants only apparent argument against a finding of control for these defendants is that because boards of directors operated by majority vote, no single director or officer had complete control of any Nomura entity.  Defs. Mem. 98.  Defendants provide no citation for this remarkable argument, which would effectively insulate any director of any corporation from Section 15 liability under most if not all circumstances.  *Cf.  Mgmt. Dynamics*, 515 F.2d at 812-13 (Section 15 is designed "to reach prospective wrongdoers, rather than to permit the escape of those who would otherwise be responsible for the acts of their employees")

Court has already held was unreasonable as a matter of law, *Nomura Holding Am., Inc.*, 2014 WL 7232443, at *30-31.  Nowhere do Defendants explain how a process that turned up numerous red flags such that "[n]o reasonable jury could find that Nomura conducted a 'reasonable investigation' and reasonably believed that the representations in the Offering Documents were accurate," *id.*, could be sufficient to meet the "reasonable ground to believe" standard of Section 15, especially as reasonableness under Section 15 is judged by the same standard as Sections 11 and 12 of a "prudent man in the management of his own property," *In re Worldcom, Inc. Sec. Litig.*, 2005 WL 638268, at *16 (S.D.N.Y. Mar. 21, 2005); *see* Defs. Mem. 94 n.27 (acknowledging that affirmative defense under the D.C. Blue Sky law is a "reasonable care" defense).[15]

## IV.   THE APPROPRIATE RATE OF PREJUDGMENT INTEREST IS THE IRS UNDERPAYMENT RATE

In addressing FHFA's remedies, Defendants primary argument against application of the IRS underpayment rate is to say that they did not engage in "criminal behavior or fraud."  Defs. Mem. 114.  This blinks at the reality that Defendants wholly abandoned the standard of care required of them by the securities laws in underwriting the Certificates, *FHFA v. Nomura Holding Am. Inc.*, 2014 WL 7232443, at *30 (S.D.N.Y. Dec. 18, 2014), and that their misconduct contributed to the worst financial crisis since the Great Depression, FOF ¶¶ 731-737; *see Merrill Lynch*, 903 F. Supp. 2d at 282 (allegations that defendants "acted recklessly by seeking to profit from ever more risky mortgage lending while, at the same time, passing on the risk (and ultimately the losses) associated with these practices to the public via their sale of securities to Fannie Mae and Freddie Mac[,] [thereby] contribut[ing] to a housing crisis that

---

[15]   A control person cannot merely rely on the diligence conducted on representations in an offering document where that person is aware of red flags that call into question the accuracy of those representations.  *In re Worldcom*, 2005 WL 638268, *16-17 (red flags could have given control person "reasonable grounds to believe financial improprieties were afoot" despite the control person's reliance on "credible information" from the company's CFO, "clean, unqualified opinions" from the company's auditors, "high ratings" from independent analysts, and "no grounds [for] comment" from the SEC); *see First Jersey*, 101 F.3d at 1473 ("[T]he controlling person must prove that he exercised due care in his supervision of the violator's activities in that he maintained and enforced a reasonable and proper system of supervision and internal controls." (quotation marks and brackets omitted)); *see also* COL Part III.B.

spurred the most severe economic downturn this country has experienced since the Great Depression" are "more than sufficient to support … demand for punitive damages.").  Applying the IRS underpayment rate in these circumstances is soundly merited and well within the Court's broad discretion, and consistent with the "broad remedial purposes" of the securities laws, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 386 (1983); *see Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) ("Congress chose a rescissory remedy when it enacted § 12(2) in order to deter prospectus fraud and encourage full disclosure as well as to make investors whole.").

Defendants next argue against the IRS penalty rate of interest on the basis that the Certificates were, in Defendants' telling, "risky investments," Defs. Mem. 113 (quoting *In re Vivendi Universal*, *S.A. Sec. Litig.*, 284 F.R.D. 144, 163 (S.D.N.Y. 2012)).  In *Vivendi*, however, the court's "primary concern" was that, had the omissions in that Section 10(b) case been corrected, the plaintiff class of risk-seeking investors "likely … would have pursued an equally risky investment," 284 F.R.D. at 164, and "would not have" profited from their shares even "[e]xcluding the effects of the fraud," *id.* at 162.  Here, by contrast, Defendants represented that the Certificates would not issue without the highest possible credit rating of AAA, FOF ¶¶ 134-136, and they present no evidence that the GSEs would have invested in such securities absent Defendants' false statements.[16]

Moreover, *Vivendi* acknowledges that the IRS underpayment rate is appropriate to "discourage" parties "from using the government as an involuntary banker," 284 F.R.D. at 163, which is what Defendants did by retaining funds that belong to the Treasury, COL ¶ 158.  An award of "the time value of money in the absence of market uncertainty" (Defs. Mem. 112-13) would not restore the status quo, as it would permit Defendants to retain their profits from funds they have withheld.  Accordingly, application of the IRS underpayment rate is appropriate, as it

---

16   Defendants' remaining cases are not in the securities context, and state only that "many courts use 'the federal postjudgment rate as a starting point in exercising the district court's discretion'" in awarding prejudgment interest. Defs. Mem. 111 (quoting *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 314 F. Supp. 2d 201, 204 (S.D.N.Y. 2003)).  As these authorities make clear, however, courts in the Second Circuit have "discretion to award interest at a higher rate."  *Old Dominion*, 314 F. Supp. 2d at 204.

"reflects what it would have cost to borrow the money from the government," *First Jersey*, 101 F.3d at 1476, and this Court has full discretion, consistent with 26 U.S.C. § 6622(a), to apply that rate with daily compounding. *See id.* ("In computing the amount of any interest required to be paid under this title … such interest and such amount shall be compounded daily."); *see also United States v. McDermott*, 2014 WL 917267, at *1 (E.D.N.Y. Mar. 10, 2014); *Flanagan v. N. Star Concrete Const., Inc.*, 2014 WL 4954615, at *9 (E.D.N.Y. Oct. 2, 2014).

## V.    DEFENDANTS CONFIRM THAT THEY CANNOT SUSTAIN A LOSS CAUSATION DEFENSE

Defendants' most substantial arguments in favor of a negative loss causation defense turn on the analysis of their proffered expert, Dr. Vandell. Defs. Mem. 109-110. The Court excluded as unreliable Dr. Vandell's proposed testimony based on his flawed "benchmarking" analysis, *FHFA v. Nomura Holding Am., Inc.*, 2015 WL 539489, at *11 (S.D.N.Y. Feb. 10, 2015) (Dr. Vandell "failed to demonstrate that [his] benchmarks are sufficiently clean to serve as reliable control groups"), leaving Defendants with no evidence capable of disaggregating the effects of their misrepresentations from other causes, as the loss causation defense requires, *see In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009). Defendants try to fill this void with a new opinion by Dr. Vandell, not contained in his report, that his unrelated analysis of the default rates of the Sample Loans evaluated by Mr. Hunter (the "Hunter Sample") supports a negative loss causation defense. *See* Vandell Aff. ¶ 154 (stating "[i]t is *also* my opinion, based on this analysis [of the Hunter Sample], that the alleged losses on the At-Issue Certificates are explained by factors other than any alleged misstatements in the Offering Documents[.]") (emphasis added)).

Dr. Vandell's new analysis repeats the errors that led the Court to exclude his previous analyses: specifically, it rests on the assumption that loans Mr. Hunter did not find defective are therefore "clean," Vandell Aff. ¶¶ 147, 154, even though Mr. Hunter explicitly testified that this was not so, Hunter Aff. ¶ 302 (testifying that failing to find a loan defective "does not mean that there were no defects[,] [i]t merely means that I was unable to find any defects based on my

review of the available loan file"; and that, "based on the high percentage of loans with underwriting defects, it is my opinion that the origination and underwriting process was so flawed that it is unlikely that" the loans Dr. Vandell relies upon "were free from defects.").  As the Court has held, one cannot equate loans that FHFA's experts did not grade as material breaches with materially compliant loans, because, "contrary to Vandell's assumption, the fact that a loan was not placed by a reunderwriting expert into the 'materially noncompliant' category does not, of necessity, mean that the reunderwriting expert concluded that the loan was 'materially compliant.'"  *Nomura Holding Am.*, 2015 WL 539489, at *9.  Dr. Vandell's opinion is thus unreliable and inadmissible.

Even were Dr. Vandell's new opinion admissible, its factual flaws sap it of any probative value.  As FHFA's expert, Dr. G. William Schwert, testifies, Dr. Vandell's new opinion is "fundamentally flawed" because, among other things,[17] it "ignores the relation between subordination and perceived credit risk" of the SLGs and "does not quantify the additional losses that have resulted from inappropriate subordination levels" given the Certificates due to Defendants' misrepresentations.  Schwert Am. Aff. ¶¶ 45, 54, 56.  Dr. Vandell's new opinion is therefore incapable of "reliably isolat[ing]" *Goldkrantz v. Griffin*, 1999 WL 191540, at *5 (S.D.N.Y. Apr. 6, 1999), *aff'd*, 201 F.3d 431 (2d Cir. 1999), and weighting the causes of "depreciation[s] in value of the subject [Certificates]," 15 U.S.C. § 77*l*(b), as the defense requires—and, indeed, Dr. Vandell does not even attempt to quantify the causes of loss in the actual diminution of the *market value of the Certificates*, as distinct from defaults in the underlying loans.  In sum, Defendants cannot sustain their burden of proof with Dr. Vandell's new and fundamentally invalid opinion.

---

[17]   As shown by Dr. Schwert, Dr. Vandell fundamentally misinterprets his own data.  Properly analyzed, Dr. Vandell's regression actually shows that the "probability of default is, on average, approximately *9.8 percent higher* for Hunter Defective Loans as compared with otherwise identical loans that are not Hunter Defective Loans, and that the difference in default rates is statistically significant."  Schwert Am. Aff. ¶ 48 (emphasis added).

Defendants also ignore the Court's limitation of lay loss causation opinion testimony to witnesses whom Defendants can show "performed an investigation during the course of her employment addressed to the issue of loss causation," *FHFA v. Nomura Holding Am., Inc.*, 2015 WL 685159, at *4 (S.D.N.Y. Feb. 18, 2015). Defendants cite conclusory testimony from former Freddie Mac employees Patti Cook and Raymond Romano, as well as former Fannie Mae employees Peter Niculescu, CJ Zhao, Lin Cao, and Enrico Dallavecchia, Defs. FOF ¶¶ 233, 257-63; Defs. Mem. 35-37, 105-108, but conspicuously absent is evidence that any of these individuals actually investigated the actual cause or causes of losses of the Certificates or of either GSE's PLS portfolio. Defendants offer no foundational facts for the testimony of Mr. Niculescu, Ms. Zhao, or Ms. Cao. Defs. Mem. 36 n.8, 108 n.31. For Ms. Cook, Mr. Romano, and Mr. Dallavecchia, Defendants rely on the generalized claim that each was involved in "considering or evaluating the risk" of the PLS business, *id.* at 36 n.8, which is inadequate. Moreover, the testimony of these witnesses is speculation about what *might* have caused the GSEs' losses, Defs. Mem. 35-37, which does not assist Defendants in proving their defense. *See Nomura Holding Am.*, 2015 WL 685159, at *4 ("After all, to make out a successful defense a party must prove not the mere possibility that some other factor caused the plaintiff's loss but rather that all or an identified portion of plaintiff's loss *was* caused by that other factor.") (emphasis in original).

Next, Defendants ignore the Court's guidance that documents that "speak more generally about the impact of economic conditions on the GSEs or parts of their businesses other than their PLS holdings," are irrelevant, *FHFA v. Nomura Holding Am., Inc.*, 2015 WL 731197, at *2 (S.D.N.Y. Feb. 20, 2015) (excluding from trial SEC filings to the extent they discuss the GSEs' non-PLS holdings), and point to GSE statements in regulatory disclosures and other litigations unrelated to the GSEs' PLS portfolios. *See* Defs. Mem. 27-35, 105-108.[18] The few statements

---

[18] Defendants' belief that the GSEs are judicially estopped from rebutting a loss causation defense is mistaken. *See* Defs. Mem. 106. To invoke that doctrine, "[f]irst, a party's later position must be clearly inconsistent with its earlier position." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotation marks omitted). However, there is nothing inconsistent about Freddie Mac's statement that "[i]n November 2007, the steepest decline in home values

cited by Defendants that do address the GSEs' PLS portfolios are also lacking, Defs. Mem. 32, as those statements do not "disaggregate those losses caused by changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, from" the effects of Defendants' misrepresentations.  *Flag Telecom*, 574 F.3d at 36 (quotation marks omitted).  Moreover, none of this evidence relates to the Certificates, much less to the causes of the Certificates' loss of value, and thus none of it is relevant.  *See FHFA v. Nomura Holding Am., Inc.*, 2015 WL 714747, at *1 (S.D.N.Y. Feb. 19, 2015) ("The further removed[ ] … that statements are from an explanation of the cause of any 'depreciation in value of the subject security,' the less likely it is that the statements are relevant.") (quoting 15 U.S.C. § 77*l*(b)).

This leaves Defendants with nothing but the assertion that the housing crisis coincided with the GSEs' losses, Defs. Mem. 103-04, which cannot satisfy their burden of proving "not the mere possibility that some other factor caused the plaintiff's loss but rather that all or an identified portion of plaintiff's loss *was* caused by that other factor," *Nomura Holding Am.*, 2015 WL 685159, at *4 (emphasis in original).  As a result, Defendants cannot meet their burden of proving negative loss causation.

---

in U.S. history led Freddie Mac to begin recognizing losses" (Defs. Mem. 106 (quotation marks omitted)) to disprove loss causation in a shareholder suit alleging "that Freddie's stock price plummeted after defendants' statements that Freddie was adequately capitalized and had sufficient internal controls were revealed to be false through a series of third-party news articles and analyst reports beginning in July 2008," *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortgage Corp.*, 543 F. App'x 72, 74 (2d Cir. 2013), and FHFA's position in this case that Defendants' misrepresentations caused the Certificates to decline in value.  This is so because that prior litigation statement: (a) was addressed to Freddie Mac's losses as a whole, not to the losses of the Certificates, or even PLS; (b) did not seek to disaggregate the effects of Defendants' misrepresentations from other causes of housing depreciation; and (c) was made in the context of a stock-drop case under a materialization of the risk theory, *id.*, and is therefore inapposite to this RMBS action.  The same logic applies to each of the prior litigations Defendants invoke, none of which involve the Certificates at issue, or even PLS in general.  *See* Defs. FOF ¶¶ 273-75 (citing statements from *In re Fannie Mae 2008 Sec. Litig.*, No. 08 Civ. 7831; *In re Fed. Home Loan Mortgage Corp. Derivative Litig.*, No. 08 Civ. 773; *Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortgage Corp.*, No. 08 Civ. 160)).  Accordingly, judicial estoppel does not apply.  *Maine*, 532 U.S. at 750.

**VI.    DEFENDANTS' REFUSAL TO RECOGNIZE THAT THE SALES OF THE CERTIFICATES OCCURRED IN D.C. OR VIRGINIA IS UNJUSTIFIED**

In perhaps their most extreme display of denial, Defendants argue that FHFA cannot show that the sale of NAA 2005-AR6 to Fannie Mae took place, in part, in the District of Columbia or that the sales of the remaining Certificates to Freddie Mac took place, in part, in Virginia.  Defs. Mem. 102-03.  In fact, Defendants have even refused to stipulate that Fannie Mae is located in the District of Columbia or that Freddie Mac is located in Virginia.  In reality, there is no doubt about where Fannie Mae and Freddie Mac are located, FOF ¶ 11, or that Defendants sent offering materials to them in the District of Columbia and Virginia, FOF Part III.B.  FHFA is fully prepared to show where the sales took place, and reserves its rights to seek fees and costs from Defendants for their waste of time of both the Court and FHFA.

## CONCLUSION

For the reasons stated above and in FHFA's Proposed Findings of Fact and Proposed Conclusions of Law, FHFA respectfully submits that the evidence at trial will show that FHFA has met its burden to prove each of its claims, that Defendants have failed to meet their burden of showing negative loss causation, and that application of the IRS underpayment rate is appropriate.

DATED:   New York, New York
           February 27, 2015          QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP


By: /s/ Philippe Z. Selendy

     Philippe Z. Selendy
     Richard I. Werder, Jr.
     Jonathan B. Oblak
     Sascha N. Rand
     Manisha M. Sheth
     Andrew R. Dunlap
     51 Madison Avenue, 22nd Floor
     New York, New York 10010

     Richard A. Schirtzer
     865 South Figueroa Street, 10th Floor
     Los Angeles, California 90017

     Jon Corey
     777 6th Street NW, 11th Floor
     Washington, D.C. 20001


     *Attorneys for Plaintiff Federal Housing*
       *Finance Agency*