# Appendix B

# Table of Contents

**GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market** ...................................................................................................................2

**Risk of Subprime Loans and Other Non-Traditional Loan Products** ....................................21

**Loosening of Underwriting Guidelines** ........................................................42

**GSE Counterparty Reviews and Policies** ........................................................51

**PLS Pre-Purchase Process** ........................................................130

**Factors GSE PLS Traders Considered When Making the Decision to Purchase PLS** .......140

**PLS Traders' Review of Offering Documents** ........................................................147

**Approval Authority for GSE PLS Purchases** ........................................................155

**GSE Use of Models in Pre-Purchase Analysis** ........................................................160

**Policies for Purchasing PLS and Selecting Collateral Backing PLS** ....................................193

**Use of Credit Enhancement in PLS** ........................................................200

| | GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market |
|---|---|
| **Zhao Tr. at 658:2-660:12** | 658:2  Q.  (BY MR. SACCA)  Let me show you what we're<br>658:3  marking as Exhibit 3567, FHFA05693580 through 81.<br>658:4          The bottom e-mail on the first page is<br>658:5  from Fan Xu -- how do you pronounce it?<br>658:6    A.  Fan Xu, yes.<br>658:7    Q.  Xu.<br>658:8          -- to a group of people.<br>658:9          Do you know who those people are in the<br>658:10  "To" line?<br>658:11    A.  I know some of them.  Like Gordon is her<br>658:12  boss.  Luis is -- may be her direct boss, like as a<br>658:13  lower-level boss, or may be her colleague.  They're<br>658:14  all -- yeah, some of them are colleagues.  They're<br>658:15  all -- most of -- the names I know are researchers in<br>658:16  Credit Research Department.  Except Vanessa, actually.<br>658:17  Vanessa is in David Gussmann's organization.<br>658:18    Q.  Okay.  So these are colleagues of hers at<br>658:19  Fannie Mae?<br>658:20    A.  It looks like it, yeah.<br>658:21    Q.  And she's sending them an article from that<br>658:22  day's Wall Street Journal, October 30, 2008, titled<br>658:23  "Ex-Fannie Mae Chief Mudd: Should Have Said 'No' More<br>658:24  Often"?<br>658:25    A.  Yeah.<br><br>659:1    Q.  And you see the first line of the article is<br>659:2  "Daniel Mudd says he should have said 'no' more often<br>659:3  when he was chief executive officer of Fannie Mae"?<br>659:4    A.  Yeah, I saw that.<br>659:5    Q.  And then if you look on the second page of<br>659:6  the e-mail, the first reported question there from the<br>659:7  Wall Street Journal was "What were your main<br>659:8  mistakes?"<br>659:9          And Mr. Mudd's answer was, "I wish I'd<br>659:10  said 'no' to more of the things the company was asked<br>659:11  to do.  We were asked -- or required -- to expand<br>659:12  lending, to conserve capital while providing<br>659:13  liquidity, to meet housing goals for the underserved,<br>659:14  to serve shareholders and homeowners alike.  In a<br>659:15  crisis of these proportions, something had to give.  I<br>659:16  should have gone to the government and gotten a clear |

| **GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market** | | |
|---|---|---|
| | 659:17 | answer to the question:  What do you want -- more |
| | 659:18 | capital or more lending? |
| | 659:19 | "In 20/20 hindsight, I can go through |
| | 659:20 | and pick out loans I'd rather not have on the books." |
| | 659:21 | Ms. Xu sent you this e-mail also on |
| | 659:22 | October -- or this article also on October 30th, and |
| | 659:23 | she said "Have you seen this?  Exactly as what you |
| | 659:24 | said - the executives should have said 'No' which what |
| | 659:25 | they are paid for." |
| | | |
| | 660:1 | Had you been taking the position that |
| | 660:2 | Fannie Mae should have said no to having certain loans |
| | 660:3 | on its books? |
| | | |
| | 660:5 | A.   I don't remember the conversation I had |
| | 660:6 | with -- with Fan I guess.  Have I been taking the -- I |
| | 660:7 | mean, I don't remember the specific conversation she |
| | 660:8 | was referring to. |
| | 660:9 | In terms of if you ask me have I taken |
| | 660:10 | the position to say no, I -- I would say probably yes |
| | 660:11 | after the crisis, like in '09 time frame, or '08, '09 |
| | 660:12 | time frame. |
| **Syron Tr. at 255:6-261:24** | 255:6 | Q.   Mr. Syron, you have in front |
| | 255:7 | of you an exhibit we've marked as 34619, |
| | 255:8 | which I think you can see is an email |
| | 255:9 | from David Andrukonis to you among |
| | 255:10 | others, dated April 26, 2004? |
| | 255:11 | A.   Yes, it isn't to me, I'm cc'd. |
| | 255:12 | Q.   I stand corrected.  You're |
| | 255:13 | cc'd.  Do you recall this email? |
| | 255:14 | A.   I have to look at it.  I don't |
| | 255:15 | remember. |
| | 255:16 | Q.   Do you see at the beginning of |
| | 255:17 | the second paragraph he says "The first |
| | 255:18 | issue is the slippery slope issue we face |
| | 255:19 | constantly.  As I said in the meeting I |
| | 255:20 | would be interested in how we would |
| | 255:21 | answer the question of what wouldn't we |
| | 255:22 | do to achieve market share." |
| | 255:23 | Do you see that? |
| | 255:24 | A.   Yes. |
| | 255:25 | Q.   Do you remember having |

| GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market |
|---|

|  | 256:2    discussions with Mr. Andrukonis about<br>256:3    this topic?<br>256:4        A.    About the SISA issue I do.<br>256:5        Q.    SISA and NINA?<br>256:6        A.    NINA, yes.<br>256:7        Q.    Just for the record, what does<br>256:8    SISA and NINA stand for?<br>256:9        A.    SISA is, I remember mostly<br>256:10   about SISA, I don't remember much about<br>256:11   NINA.  SISA is stated income/stated<br>256:12   assets.  NINA is no income/no assets.<br>256:13        Q.    And those are documentation<br>256:14   types of subprime loans?<br><br>256:18        A.    I believe so.<br>256:19        Q.    So stated income/stated assets<br>256:20   is a type of program where a loan is<br>256:21   granted where the borrower simply states<br>256:22   where his or her income and assets are<br>256:23   and it's not verified, is that your<br>256:24   understanding?<br><br>257:1<br>257:2        A.    Yes.<br>257:3        Q.    And NINA would be a loan<br>257:4    program where the borrower doesn't even<br>257:5    have to say what his or her income and<br>257:6    assets are; is that right?<br><br>257:8        A.    That's my understanding.<br>257:9        Q.    And in this email near the<br>257:10   bottom of the first page Mr. Andrukonis<br>257:11   refers to NINA loans and says "I<br>257:12   recommend we pull out of this product<br>257:13   entirely if we can get the advocates to<br>257:14   support us."<br>257:15          Do you see that?<br>257:16        A.    No.  I'm sure it's here.<br>257:17        Q.    Right near the bottom of the<br>257:18   first page.  Do you see that?<br>257:19        A.    Yes. |

| | |
|---|---|
| **GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market** | |

257:23       A.   Yes.
257:24       Q.   And you remember having --
257:25   what do you remember about your

258:2   discussions with Mr. Andrukonis about
258:3   SISA and NINA loans?

258:5       A.   I don't remember the
258:6   specifics.  He was generally concerned
258:7   about them.
258:8       Q.   Okay.  Do you recall it being
258:9   his view that Freddie Mac should not be
258:10   purchasing NINA and SISA loans?
258:11       A.   Not at the time I first talked
258:12   to him about it.
258:13       Q.   At some point was that his
258:14   view as you understood it?
258:15       A.   Yes.
258:16       Q.   And did you agree with him on
258:17   that?

258:19       A.   We spent a lot of time talking
258:20   about this with the people from different
258:21   parts of the organization, and we had
258:22   been doing these loans.  So this is a
258:23   question, you can see, the memo is sent
258:24   in April 26th, I got there in January,
258:25   right, so this was, you know, we have a

259:2   new guy should we stop doing these.  And
259:3   after spending a lot of time talking
259:4   about it and getting different people's
259:5   views in writing, we decided to stay in
259:6   the market.
259:7       Q.   And as CEO that was your
259:8   decision to stay in that part of the
259:9   market, right?
259:10       A.   Well, it was a decision of the
259:11   group as a whole, but I could have
259:12   overridden the decision.
259:13       Q.   But you didn't override it,

| GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market |
|---|
| 259:14  you approved that decision, right?<br>259:15    A.  Yes.<br>259:16    Q.  Now, not too long after this<br>259:17  email Mr. Andrukonis was gone from<br>259:18  Freddie Mac; is that right?<br>259:19    A.  Not too long after.<br>259:20    Q.  Right.  And what were the<br>259:21  circumstances of his departure?<br><br>259:23    A.  Well, I think it was quite<br>259:24  awhile actually.  It was a number of<br>259:25  months.  Myself and Gene McQuade, who was<br><br>260:2  the chief operating officer, so it was<br>260:3  quite a few months before I hired him,<br>260:4  so, concluded that Dave as a member of<br>260:5  the senior executive team wasn't weighing<br>260:6  from both a broad mission standard,<br>260:7  mission perspective and shareholder<br>260:8  perspective all the varying<br>260:9  considerations we had to take while<br>260:10  making a loan, and that one of those<br>260:11  considerations was that, that we had to<br>260:12  be, we had to take all of these things<br>260:13  into consideration, not just credit<br>260:14  quality.<br>260:15    Q.  What do you mean by all of<br>260:16  these things?<br>260:17    A.  By all of these things I meant<br>260:18  liquidity, affordability, stability<br>260:19  mission objectives, our profitability<br>260:20  measures, and our fulfilling what the<br>260:21  Congress had mandated we had to do.<br>260:22    Q.  Housing goals, in other words?<br>260:23    A.  Well the Congress, no, the<br>260:24  Congress didn't -- the Congress didn't<br>260:25  just mandate housing goals, the Congress<br><br>261:2  mandated affordability, liquidity and<br>261:3  stability of the housing market.<br>261:4    Q.  Is it accurate to say that Mr.<br>261:5  Andrukonis, he was fired, right? |

| GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market | |
|---|---|
| | 261:6      A.    He resigned. |
| | 261:7      Q.    Well in fact -- |
| | 261:8      A.    I believe. |
| | 261:9      Q.    He was asked to leave, right? |
| | |
| | 261:11       A.    I don't remember the exact |
| | 261:12   specifics, but he -- we decided it wasn't |
| | 261:13   mutually advantageous to continue. |
| | 261:14        MR. STARK:  I'll mark as the |
| | 261:15     next exhibit a document with the |
| | 261:16     first Bates number FHFA 08468679. |
| | 261:17       (Syron Exhibit 34620 for |
| | 261:18     identification, Bates stamped FHFA |
| | 261:19     08468679 through 08468743.) |
| | 261:20      Q.    We've handed you, Mr. Syron, a |
| | 261:21   document marked as Exhibit 34620, which |
| | 261:22   is a transcript of your interview with |
| | 261:23   the Financial Crisis Inquiry Commission |
| | 261:24   on August 31, 2010.  Do you see that? |
| **Mudd Tr. at 209:25-211:15** | 209:25    Q.    The next exhibit is 35029.  I think |
| | |
| | 210:2    you'll recognize Exhibit 35029 as the transcript |
| | 210:3    of your testimony before the Financial Crisis |
| | 210:4    Inquiry Commission on April 9, 2010. |
| | 210:5       Do you see that? |
| | 210:6     A    Yes. |
| | 210:7      Q    Do you recall that you testified before |
| | 210:8    the Financial Crisis Inquiry Commission on or |
| | 210:9    about April 9, 2010? |
| | 210:10     A    Yes. |
| | 210:11      Q    And in that testimony, did you testify |
| | 210:12   under oath? |
| | 210:13     A    I assume so. |
| | 210:14      Q    And did you testify truthfully to the |
| | 210:15   best of your ability? |
| | 210:16     A    Yes. |
| | 210:17      Q    If you could turn to page 71, please. |
| | 210:18   And in the middle of the page there's a question |
| | 210:19   from Commissioner Giorgio:  Okay.  All right.  So |
| | 210:20   really there were double -- there were at least |
| | 210:21   two mandates that you were following here and a |
| | 210:22   lot of your acquisitions of subprime and Alt-A |

| | |
|---|---|
| **GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market** | |
| | 210:23   which was to -- was to increase your<br>210:24   profitability, increase your market share and<br>210:25   reach your housing goals -- reach your affordable<br><br>211:2   housing goals.  Would that be fair to say?<br>211:3        Mr. Levin says, Yes, sir.  Commissioner<br>211:4   Giorgio says, Mr. Levin -- Mr. Mudd, rather,<br>211:5   you're nodding your head as well.<br>211:6        Mr. Mudd:  I'm nodding my head because<br>211:7   I agree, yes.<br>211:8        Do you see that?<br>211:9     A    Yes.<br>211:10    Q    And was that truthful testimony?<br>211:11    A    Yes.<br>211:12    Q    And is this -- was it true of Fannie<br>211:13   Mae's purchases of PLS that they were made in part<br>211:14   to increase Fannie Mae's profitability?<br>211:15        A    Yes, in part. |
| **Mudd Tr. at 211:24-212:7** | 211:24   Q    And were purchases of PLS made to meet<br>211:25   housing goals?<br><br>212:2        A    Yes, under the context that every --<br>212:3   that the loan count was on a loan-by-loan basis to<br>212:4   meet the housing goals, so every single loan that<br>212:5   you put on the books, whether it came through a<br>212:6   guarantee or portfolio or PLS counted towards<br>212:7   housing goals. |
| **Niculescu Tr. at 104:12-105:17** | 104:12   Q.   Do you recall that after these<br>104:13   calls or criticisms by Congress, that Fannie<br>104:14   Mae began to increase its purchases of<br>104:15   non-prime loans through private label<br>104:16   securities?<br><br>104:18        A.   Well, I don't remember when<br>104:19   these -- as we've said -- when these calls or<br>104:20   criticisms were voiced, so it's hard for me to<br>104:21   draw that connection.<br>104:22        I think, though, that you are<br>104:23   attempting to find a causal link between the<br>104:24   one and the other, and I'm not sure whether<br>104:25   that link exists or not.  I would say that the |

| GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market | |
|---|---|
| | 105:2  housing goals the company faced, which were<br>105:3  increasing each year, were goals that did have<br>105:4  an effect of causing the company to acquire<br>105:5  subprime private label securities and other<br>105:6  low FICO loans through its single-family<br>105:7  business, which it needed to do in order to<br>105:8  meet housing goals.  So whether that was a<br>105:9  causal influence or another was a causal<br>105:10  influence, I really can't say.<br>105:11       Q.   Do you recall that Fannie Mae<br>105:12  increased its purchases of private label<br>105:13  securities containing subprime and Alt-A loans<br>105:14  in 2005-2007?<br>105:15       A.   I do recall that we increased<br>105:16  our purchases, but whether it was one year or<br>105:17  another I couldn't tell you at this point. |
| **D. Cook Tr. at 278:18-280:16** | 278:18   Q   Have you had a chance to take a look at<br>278:19  what's been marked as Exhibit 614?<br>278:20   A   Yes.<br>278:21       Q   Does this reflect that in pursuit of<br>278:22  increased purchases for subprime goals, Mr. Norris<br>278:23  listed ten items that Capital Markets should consider<br>278:24  that would alter their ordinary practices with respect<br>278:25  to PLS or other transactions?<br><br>279:3   A   As I read this, this only relates to housing<br>279:4  goals.  It doesn't talk about the fact that to also<br>279:5  increase -- actually, I don't see anything -- does it<br>279:6  talk about housing goals here?<br>279:7   Q   "Below is a list of possible exceptions that<br>279:8  we will need to increase our purchases for subprime<br>279:9  goals."<br>279:10       Do you understand that to be referring to<br>279:11  housing goals?<br>279:12   A   Not necessarily.<br>279:13   Q   What do you think "subprime goals" refers<br>279:14  to?<br>279:15   A   This could have been a desire to invest in<br>279:16  more subprime collateral and, hence, get a larger<br>279:17  return.  It could have been related to housing goals<br>279:18  also, but I don't read it that way.<br>279:19   Q   Had you heard that there was a goal to |

| | |
|---|---|
| **GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market** | |
| | 279:20  invest in more subprime?<br><br>279:22      A   I had heard, and I believe it might have<br>279:23  been in 2006, that Fannie Mae -- I hadn't heard this<br>279:24  goal specifically.<br>279:25      Q   You had not heard that there was a goal to<br><br>280:2  purchase more subprime?<br>280:3      A   I hadn't heard this goal specifically as<br>280:4  it's referring to.  I had heard, in this era of 2006,<br>280:5  and I'm not sure of the exact dates, there were goals<br>280:6  in Fannie Mae to increase subprime business, but<br>280:7  not -- not necessarily in PLS.  I think that was in<br>280:8  our whole loan purchases.<br>280:9      Q   The individuals on this e-mail are on the<br>280:10  Capital Markets PLS side, correct?<br>280:11      A   Paul Norris was the director.  Steve Shen<br>280:12  was his boss.  And Ramon de Castro was his boss --<br>280:13  manager.  And they all were related -- or worked in<br>280:14  PLS.  Andrew Bon Salle was not directly related to<br>280:15  PLS.  He was the SVP of Capital Markets Mortgage<br>280:16  Assets but not directly over PLS. |
| **D. Cook Tr. at 394:13-18** | 394:13      In addition to housing goals, sir, was<br>394:14  providing liquidity to the secondary market for<br>394:15  mortgage and mortgage products one of the missions of<br>394:16  Fannie Mae?<br><br>394:18      A   Yes, as far as I understand. |
| **Lockhart Tr. at 224:23-226:16** | 224:23  Q.      The bottom paragraph, "The<br>224:24  decisions of the board of directors and<br>224:25  senior management prior to 2007 to acquire<br><br>225:2  Alt-A loans and other high risk loan<br>225:3  products is a principal contributer to<br>225:4  Fannie Mae's current earnings losses and<br>225:5  deteriorated financial position.  Members<br>225:6  of the executive management team made<br>225:7  imprudent decisions to increase market<br>225:8  share and enter into higher risk products<br>225:9  with outdated models and without all the<br>225:10  necessary information or reports to<br>225:11  evaluate the risks of its decisions." |

| GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market | |
|---|---|
| | 225:12          Did that accurately reflect the<br>225:13  current state of Fannie Mae?<br>225:14    A.    Yes.<br>225:15    Q.    At that time.<br>225:16          And certainly by that time the<br>225:17  imprudent decisions that you were<br>225:18  referring to would have included decisions<br>225:19  to purchase private label securities?<br>225:20    A.    Yes.<br>225:21    Q.    Turn the page, 13, at the top,<br>225:22  the first full sentence says, "Senior<br>225:23  management and the board of directors made<br>225:24  these decisions to increase market share,<br>225:25  raise revenue and meet housing goals."<br><br>226:2          Do you see that?<br>226:3    A.    Yes.<br><br>226:10          These would have included the<br>226:11  reasons for Fannie Mae's purchases of<br>226:12  private label securities during the '05 to<br>226:13  '07 time period, namely to increase market<br>226:14  share, raise revenue and meet housing<br>226:15  goals?<br>226:16    A.    Yes. |
| **Lockhart Tr. at 237:23-239:19** | 237:23  Q.    Is that one?<br>237:24    A.    They did it for the same<br>237:25  reasons, yes.<br><br>238:2    Q.    They were concerned about<br>238:3  competing with Fannie Mae?<br>238:4    A.    Overall market share, but also<br>238:5  Fannie Mae, affordable housing goals and<br>238:6  profitability.<br>238:7    Q.    Concerned about their relevance<br>238:8  in the marketplace?<br><br>238:10    A.    I don't think they were<br>238:11  concerned about their relevance in the<br>238:12  marketplace, they were, you know, they<br>238:13  were -- Fannie was a 900-pound gorilla<br>238:14  and they were a 700-pound gorilla, they |

| GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market | |
|---|---|
| | 238:15  were relevant. |
| | 238:16    Q.    A little further down there is |
| | 238:17  discussion of governance, "FHFA has |
| | 238:18  repeatedly raised concerns with the |
| | 238:19  critical weaknesses in board of directors |
| | 238:20  and management oversight and conduct.  In |
| | 238:21  many instances, despite repeated warnings, |
| | 238:22  the board and management have failed to |
| | 238:23  correct the deficiencies.  The |
| | 238:24  enterprises' boards and management have |
| | 238:25  failed to insure the safety and soundness |
| | |
| | 239:2  of the enterprise, correct deficiencies |
| | 239:3  identified in ROEs, and other supervisory |
| | 239:4  correspondence and fully comply with the |
| | 239:5  2003 consent order.  The director met with |
| | 239:6  the board of directors on several |
| | 239:7  occasions during the last year to discuss |
| | 239:8  these issues.  Many of these and other |
| | 239:9  issues were discussed in the directors |
| | 239:10  monthly meetings with the chairman and the |
| | 239:11  board and chief executive officer, Richard |
| | 239:12  Syron." |
| | 239:13          Is that an accurate statement? |
| | 239:14    A.    Yes. |
| | 239:15    Q.    And you were the one who met |
| | 239:16  with the board of directors and Mr. Syron? |
| | 239:17    A.    I met with the board of |
| | 239:18  directors and Mr. Syron; other members of |
| | 239:19  our team also did, but I did, yes. |
| **Lockhart Tr. at 332:9-25** | 332:9  Q.    I know you gave some testimony |
| | 332:10  earlier today on the subject of why did |
| | 332:11  the GSEs, Fannie Mae and Freddie Mac, |
| | 332:12  invest in PLS backed by Alt-A and subprime |
| | 332:13  mortgages. |
| | 332:14    A.    Yes. |
| | 332:15    Q.    I believe one of the principal |
| | 332:16  reasons was to meet affordable housing |
| | 332:17  goals set by HUD, is that right? |
| | 332:18    A.    That was one of the three major |
| | 332:19  reasons; market share and profitability |
| | 332:20  were probably the other two, yes. |

| | |
|---|---|
| **GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market** | |
| | 332:21   Q.      So the three major reasons were<br>332:22  satisfying affordable housing goals,<br>332:23  achieving market share, and profitability,<br>332:24  is that right?<br>332:25   A.      Yes. |
| **Lockhart Tr. at 333:21-24** | 333:21   Q.      On a profit point, is it<br>333:22  accurate to say that Fannie Mae and<br>333:23  Freddie Mac made more money on PLS<br>333:24  investments than they would have made on<br>333:25  other investments?<br><br>334:3   A.      Their major other investment<br>334:4  was their own securities and certainly PLS<br>334:5  had higher yields than their own<br>334:6  securities.<br>334:7   Q.      Which is to say the return on<br>334:8  their investment that they expected to get<br>334:9  on PLS was better?<br>334:10   A.      They expected; obviously as it<br>334:11  turned out, they did not get a return,<br>334:12  but, yes, their expected return, yes.<br>334:13   Q.      In fact the GSEs, they really<br>334:14  wanted to buy the PLS that they were<br>334:15  buying, right?<br><br>334:17   A.      I am not sure what want means<br>334:18  in this, but they needed to do it to meet<br>334:19  their affordable housing goals and they<br>334:20  certainly wanted the added profitability<br>334:21  they expected from it.<br>334:22   Q.      And they also wanted to<br>334:23  increase their market share?<br>334:24   A.      Right. |
| **Lockhart Tr. at 236:18-238:15** | 236:18   Q.      The criticisms of Freddie Mac<br>236:19  were pretty similar, right, to the issues<br>236:20  that were confronting Fannie Mae in the<br>236:21  exhibit we just reviewed?<br>236:22   A.      That's correct.<br>236:23   Q.      Turn to page 6, first full<br>236:24  paragraph says, "Examinations in 2005,<br>236:25  2006, and 2007 highlighted the agency's |

13

| | |
|---|---|
| **GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market** | |
| | 237:2  continuing concerns with the board's and<br>237:3  management's oversight and operation of<br>237:4  the enterprise, serious deficiencies in<br>237:5  credit risk management at a time when the<br>237:6  enterprise was acquiring riskier assets<br>237:7  and capital and liquidity plans which<br>237:8  could, in the event of market turmoil,<br>237:9  become stressed."<br>237:10          Was that an accurate depiction<br>237:11  of what was highlighted in the 2005, 2006,<br>237:12  and 2007 examinations?<br>237:13    A.    That's correct.<br>237:14    Q.    Freddie Mac purchased far more<br>237:15  private label securities than Fannie Mae,<br>237:16  right, during that same time period?<br>237:17    A.    Yes.<br>237:18    Q.    And Freddie Mac also purchased<br>237:19  private label securities for the same<br>237:20  reasons that Fannie Mae did, right, for<br>237:21  competitive reasons?<br><br>237:23    Q.    Is that one?<br>237:24    A.    They did it for the same<br>237:25  reasons, yes.<br><br>238:2    Q.    They were concerned about<br>238:3  competing with Fannie Mae?<br>238:4    A.    Overall market share, but also<br>238:5  Fannie Mae, affordable housing goals and<br>238:6  profitability.<br>238:7    Q.    Concerned about their relevance<br>238:8  in the marketplace?<br><br>238:10    A.    I don't think they were<br>238:11  concerned about their relevance in the<br>238:12  marketplace, they were, you know, they<br>238:13  were -- Fannie was a 900-pound gorilla<br>238:14  and they were a 700-pound gorilla, they<br>238:15  were relevant. |
| **Niculescu Tr. at at 126:9 to 127:2** | 126:9          Q.   Do you recall -- you testified<br>126:10  in the last segment that we looked at that<br>126:11  there was an explicit mandate to buy a certain |

| GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market | |
|---|---|
| | 126:12  dollar volume of subprime loans; do you recall<br>126:13  we went over that?<br>126:14        A.   Yes.<br>126:15        Q.   What was that dollar volume; do<br>126:16  you recall?<br>126:17        A.   No.<br>126:18        Q.   But you do recall that in fact<br>126:19  Mr. Levin or others in senior management gave<br>126:20  an explicit mandate to buy a certain dollar<br>126:21  volume of subprime loans through PLS?<br><br>126:23        A.   I do recall the capital markets<br>126:24  division being instructed to buy a certain<br>126:25  dollar volume of private label securities<br><br>127:2  backed by subprime, Alt-A loans. |
| **Kain Tr. at 364:4-367:6** | 364:4        MR. BENNETT:  Let's mark as our next<br>364:5        exhibit, a document Bates-numbered FHFA<br>364:6        01205065.<br>364:7              (Deposition Exhibit No. 20426 was<br>364:8        marked for identification.)<br>364:9              BY MR. BENNETT:<br>364:10        Q.   It is 20426.  Do you recognize<br>364:11  20426?<br>364:12        A.   I recognize it now as an ICM all<br>364:13  staff meeting PowerPoint.<br>364:14        Q.   Do you recall this ICM all staff<br>364:15  meeting in February of 2006?<br>364:16        A.   I don't.<br>364:17        Q.   Was it frequent -- was it a frequent<br>364:18  occurrence to have ICM all staff meetings?<br>364:19        A.   I am guessing it was quarterly or<br>364:20  every six months or something like that.<br>364:21        Q.   Do you believe you were a presenter<br>364:22  at this all staff meeting?<br>364:23        A.   I probably was, yeah.<br>364:24        Q.   In looking through this PowerPoint,<br>364:25  are you able to direct me to the parts that you<br><br>365:2  may have presented?<br>365:3        A.   I probably -- |

| | |
|---|---|
| **GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market** | |

|  |  |
|---|---|
| 365:5 | THE WITNESS: Sorry. In looking at |
| 365:6 | it, there is a good chance I presented the |
| 365:7 | mortgage investment structuring page, but I |
| 365:8 | don't know that, you know, for a fact. But if |
| 365:9 | I presented some part of this, it would most |
| 365:10 | likely have been that page. I could have done |
| 365:11 | other pages. It's possible. |
| 365:12 | BY MR. BENNETT: |
| 365:13 | Q. So if you go to that page, the |
| 365:14 | mortgage investment structure page, I take it |
| 365:15 | you are referring to Page 14? |
| 365:16 | A. Yeah. |
| 365:17 | Q. There is a heading: "Support GSE |
| 365:18 | share in conforming market penetration |
| 365:19 | objectives." |
| 365:20 | What does that mean? |
| 365:21 | A. In looking at it today, it appears |
| 365:22 | to mean support Freddie Mac's share over Fannie |
| 365:23 | GSE share and our overall penetration into the |
| 365:24 | conforming market, which would mean other |
| 365:25 | conforming loans that are going somewhere other |
|  |  |
| 366:2 | than just the GSEs. That's the way I would |
| 366:3 | interpret that. |
| 366:4 | Q. So with respect to the GSE share, if |
| 366:5 | you look at the second bullet, nonprime: |
| 366:6 | "Achieve majority GSE share of nonprime |
| 366:7 | mortgage market, 60 percent market share of |
| 366:8 | Triple A rated subprime ABS." |
| 366:9 | Do you see that? |
| 366:10 | A. I see that. |
| 366:11 | Q. Was it the goal of Freddie Mac in |
| 366:12 | February of 2006 to achieve a 60 percent market |
| 366:13 | share of Triple A rated subprime ABS with |
| 366:14 | respect to its relationship with Fannie Mae? |
|  |  |
| 366:16 | THE WITNESS: Again, you know, I |
| 366:17 | don't remember that. In looking at it today, |
| 366:18 | that appears to be a goal, but Fannie Mae -- |
| 366:19 | Fannie Mae was not able to purchase things in |
| 366:20 | 2005, and I don't know when that changed, so |
| 366:21 | that may not have been very -- I don't know |

16

| GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market | |
|---|---|
| | 366:22   that that is a stretch number or it's not.<br>366:23        BY MR. BENNETT:<br>366:24        Q.   And by stretch number, you mean a<br>366:25   number that would be --<br><br>367:2        A.   Easily hit or not easily hit.  I<br>367:3   don't have any context to put that in, because<br>367:4   there were, you know, unique circumstances with<br>367:5   Fannie Mae, you know, and again, I'm looking at<br>367:6   it today. |
| **Kain Tr. at 367:18-368:6 re** | 367:18   Q.   In bold below that: "Increase Alt-A<br>367:19   market share and capabilities, purchase $20<br>367:20   billion in whole loans."<br>367:21        What does that mean?<br>367:22        A.   I think that relates to what we --<br>367:23   again, looking at it today, I think that<br>367:24   relates to what we talked about earlier where<br>367:25   the portfolio and the guarantee business would<br><br>368:2   bid together, and the hope was that that would<br>368:3   allow us to buy more Alt-A loans even if we<br>368:4   didn't have the best bid for credit.  So that<br>368:5   was an example.  And again, you know, so that<br>368:6   is the way I interpret that. |
| **Aneiro Tr. at 54:16-23** | 54:16   Q.   Setting aside your<br>54:17   expectation, was it your experience that<br>54:18   Freddie Mac's volume of purchases in the<br>54:19   AAA private label securitization space<br>54:20   did in fact increase in 2005, 2006<br>54:21   relative to the prior years that you'd<br>54:22   been at Freddie Mac?<br>54:23        A.   Yes. |
| **Kenneweg 30(b)(6) Tr. at 76:17-24** | 76:17        Q.   Let me ask you to take a look,<br>76:18   Ms. Kenneweg, at Exhibit 1827.  This appears<br>76:19   to be an operational review from AMO on<br>76:20   ResMAE.  Do you see that?<br>76:21        A.   Yes.<br>76:22        Q.   Do you understand ResMAE to be<br>76:23   a loan originator?<br>76:24        A.   I do. |
| **Kain Tr. at 476:4-13** | 476:4        Do you remember it being the case in<br>476:5   early 2007 that Freddie Mac was concerned about |

| GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market | |
|---|---|
| | 476:6   falling short of its long-term returns or |
| | 476:7   long-term returns? |
| | 476:8      A.   I don't remember that specific -- |
| | 476:9   you know, that specific time period and |
| | 476:10   discussion.  I think there were many times in |
| | 476:11   Freddie Mac's history where it was concerned |
| | 476:12   about, you know, not being able to meet its |
| | 476:13   kind of desired returns. |
| **Romano Tr. at 239:11-240:17** | 239:11   Q.   Freddie Mac's understanding of what |
| | 239:12   the products and practices in the mortgage |
| | 239:13   business at the time in your view, would have |
| | 239:14   been as good as or better than anyone else's? |
| | |
| | 239:16      MR. OBLAK:  Join. |
| | 239:17      THE WITNESS:  I believe Freddie |
| | 239:18   Mac's experience in the mortgage business is |
| | 239:19   they have tremendous insight and information |
| | 239:20   into the mortgage default probability of the |
| | 239:21   loans that contain risk characteristics such as |
| | 239:22   these or other loans. |
| | 239:23      BY MR. BREBNER: |
| | 239:24      Q.   And Freddie Mac's tremendous insight |
| | 239:25   into the mortgage business would have been in |
| | |
| | 240:2   your view as good as or better than other |
| | 240:3   market participants? |
| | |
| | 240:5      MR. MORVILLO:  Join. |
| | 240:6      THE WITNESS:  I believe Freddie Mac |
| | 240:7   has a long track record and has the information |
| | 240:8   and I think it is pretty good. |
| | 240:9      BY MR. BREBNER: |
| | 240:10      Q.   In the 2005 to 2007 time period, |
| | 240:11   that would have been true? |
| | |
| | 240:13      THE WITNESS:  Freddie Mac had |
| | 240:14   information in 2005 through 2007 that was very |
| | 240:15   instructive for understanding risk, but there |
| | 240:16   were still risks that were going on that not |
| | 240:17   even Freddie Mac had experienced in the past. |
| **Romano Tr. at 385:4 to 386:8** | 385:4      Q.   -- at the time you proposed that |
| | 385:5   conversation? |

18

| GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market | |
|---|---|
| | 385:6      A.   I believe there was a real |
| | 385:7    possibility that we were passed the point of |
| | 385:8    reasonableness, yes. |
| | 385:9      Q.    And you were past the point of |
| | 385:10    reasonableness not simply with respect to |
| | 385:11    lending to investors, but also more generally |
| | 385:12    with respect to some of the origination |
| | 385:13    practices in the marketplace that you were |
| | 385:14    concerned about? |
| | |
| | 385:16      THE WITNESS:  This was specific to |
| | 385:17    investors.  I would think my concerns relative |
| | 385:18    to market practices for untested products has |
| | 385:19    been outlined and articulated in the documents |
| | 385:20    you -- you've actually presented here. |
| | 385:21      BY MR. BREBNER: |
| | 385:22      Q.    And your concerns with the practices |
| | 385:23    with respect to untested products in the 2005 |
| | 385:24    time period were such that -- that you believed |
| | 385:25    that Freddie Mac should be getting out of |
| | 386:1      RAYMOND ROMANO |
| | 386:2    those, correct? |
| | |
| | 386:4      THE WITNESS:  My view of those |
| | 386:5    practices were that they were untested.  We |
| | 386:6    didn't have any sufficient experience in it. |
| | 386:7    We should limit the amount of exposure we took |
| | 386:8    to those products. |
| **Syron Tr.  at 129:14 to 130:12** | 129:14      Q.    And it says here, "As long as |
| | 129:15    some institutions operate under |
| | 129:16    different, or no, regulatory strictures, |
| | 129:17    potential for these sorts of excesses and |
| | 129:18    abuses will exist.  As previously stated, |
| | 129:19    Freddie Mac has a long history of |
| | 129:20    voluntarily setting standards of prudent |
| | 129:21    underwriting and of promoting greater |
| | 129:22    borrower protections in subprime." |
| | 129:23      Do you see that? |
| | 129:24      A.   Yes. |
| | 129:25      Q.    And was that a true statement? |
| | |
| | 130:2      A.   Yes. |

| GSEs' Entry Into, and Participation in, the Subprime or Non-Traditional Loan Market | |
|---|---|
| | 130:3      Q.    When you referred to prudent<br>130:4    underwriting, can you describe what you<br>130:5    meant there?<br>130:6      A.    Prudent underwriting would<br>130:7    mean that it was not predatory.<br>130:8      Q.    What do you mean by not<br>130:9    predatory?<br>130:10      A.    That in fact we expected the<br>130:11    person who took the loan would be able to<br>130:12    service it. |

| **Risk of Subprime Loans and Other Non-Traditional Loan Products** | |
|---|---|
| **Romano Tr. at 235:14-24** | 235:14   Q.   When you had concerns about untested<br>235:15      mortgage products in the time period 2005 to<br>235:16      2007, your concerns about those untested<br>235:17      products were in part because Freddie wasn't<br>235:18      able to fully and accurately model the default<br>235:19      risk, correct?<br><br>235:21         THE WITNESS:  I believe my concerns<br>235:22      were that we would not be able to model the<br>235:23      default risk in both expected and unexpected<br>235:24      events. |
| **Vetrano Tr. at 293:12-294:10** | 293:12      A.   I see that.<br>293:13      Q.   And then the paragraph below<br>293:14  that reads, "Even if we obtained the most<br>293:15  recent DEFCAP version, views on Alt-A are<br>293:16  changing almost daily.  Although we need a<br>293:17  more recent read than June 2005, it almost<br>293:18  doesn't make sense to develop a 'final' Alt-A<br>293:19  matrix until the dust clears and a consistent<br>293:20  corporate view of Alt-A risk emerges."<br>293:21         Do you see that?<br>293:22      A.   I see that.<br>293:23      Q.   At this time were there<br>293:24  different views within Freddie Mac about the<br>293:25  risks of Alt-A loans?<br><br>294:2      A.   Freddie Mac's DEFCAP model was<br>294:3  developed based on 30 years of history.  Any<br>294:4  time we had less than 30 years of history<br>294:5  there was debate.<br>294:6      Q.   At this time do you recall<br>294:7  debate about the risks of Alt-A loans?<br>294:8      A.   I remember debates about all<br>294:9  mortgage products for which we had less than<br>294:10  30 years of data. |
| **Vetrano Tr. at 422:17-429:15** | 422:17   Q.   The sentence then goes on to<br>422:18  say: "We need to remain wary of blind spots<br>422:19  in our models."<br>422:20         Do you see that?<br>422:21      A.   I see that.<br>422:22      Q.   Do you know what you mean by<br>422:23  "blind spots" in your models? |

21

| **Risk of Subprime Loans and Other Non-Traditional Loan Products** |
|---|

422:24        A.   I don't recall the context
422:25  within which this was written.

423:2         Q.   Okay.  Regardless of whether
423:3  you recall the context in which this is
423:4  written, is it fair to say that a blind spot
423:5  in a model is a place in the model where
423:6  you're making assumptions or making decisions,
423:7  but you don't know information that might
423:8  exist out in the real world?

423:10        A.   That's a possible result.
423:11        Q.   Is there any other definition
423:12  of a blind spot in the model that you would
423:13  have, sitting here today?

423:15        A.   As we did discuss yesterday,
423:16  the DEFCAP model was designed around 30 or 40
423:17  years of data, and we were using best
423:18  information available for this purpose for
423:19  which we did not have 30 or 40 years of data.
423:20  I would guess that one possibility is a
423:21  recognition that we did not have 30 or 40
423:22  years of data for this model, and therefore
423:23  needed to be cautious about what the results
423:24  said.
423:25        Q.   You said that DEFCAP used 30 to

424:2  40 years of data.  Do you know what 30 to 40
424:3  years it looked at?
424:4         A.   Freddie Mac's history of
424:5  single-family 30-year, 15-year data, is what
424:6  the model was honed on.
424:7         Q.   Sorry.  When you say 30-year
424:8  and 15-year data, those sound to me like
424:9  durations of mortgages.  Is that -- are you
424:10  saying that you based the DEFCAP model on
424:11  Freddie Mac's experience with 30-year mortgage
424:12  products?

424:14        A.   The original use of the DEFCAP
424:15  model was to evaluate the risk of its generic
424:16  business, which was comprised primarily of

| Risk of Subprime Loans and Other Non-Traditional Loan Products |
| --- |

424:17  30-year fixed-rate mortgages and 15-year
424:18  fixed-rate mortgages.  The calibrations of the
424:19  model incorporated experience from as far back
424:20  as Freddie Mac's data goes, and I am not sure
424:21  how far it goes back, hence my 30 to 40 years.
424:22  I am guessing.  And that was the origins and
424:23  the primary use of the model.
424:24        Q.   Do you know whether any of the
424:25  data used went -- in order to calibrate the

425:2  DEFCAP model, preceded the year 1970?
425:3        A.   I do not know.
425:4        Q.   If you turn in the document I
425:5  have just shown you to the page Bates-numbered
425:6  ending in 4651.  The paragraph number 3, the
425:7  last sentence there says:  "For AAA risk, we
425:8  want reasonable assurance that the credit
425:9  enhancement will protect our bond principal
425:10  even in the most disastrous economic
425:11  scenario."
425:12           Do you see that?
425:13        A.   I do see that.
425:14        Q.   Do you know what was assumed in
425:15  the model as the most disastrous economic
425:16  scenario?

425:18        A.   I do not.
425:19        Q.   Do you know if you knew at the
425:20  time what was assumed in the model as the
425:21  disastrous economic scenario?
425:22        A.   I do not.
425:23        Q.   How did you develop any
425:24  reasonable assurance then that the credit
425:25  enhancement would protect the bond principal

426:2  even in the most disastrous economic scenario?

426:5        A.   I don't recall writing this
426:6  memo, but the third paragraph, second
426:7  sentence, perhaps provides some guidance to
426:8  that question.
426:9        Q.   Sir, could you read it?
426:10        A.   I'll read the sentence

| | |
|---|---|
| **Risk of Subprime Loans and Other Non-Traditional Loan Products** | |
| | 426:11  preceding it also.<br>426:12        Q.    Sure.<br>426:13        A.    "Another approach would make<br>426:14  use of loss distributions, a direct credit<br>426:15  analogy to the use of multiple prepay paths in<br>426:16  OAS models.  This is the concept behind 300<br>426:17  credit paths generated by DEFCAP.  The least<br>426:18  probable extremes (e.g., 99th or 100th<br>426:19  percentile) could define a minimum by which<br>426:20  AAA credit enhancements could be compared,<br>426:21  similar to the '4 times' rule."<br>426:22        Q.    Okay.  And so can you tell me<br>426:23  then how that ensures that you will have<br>426:24  reasonable assurance that the credit<br>426:25  enhancement will protect the bond principal<br><br>427:2  even in the most disastrous economic<br>427:3  circumstances?<br><br>427:5        A.    The 300th path, which is<br>427:6  randomly generated, which is why I could not<br>427:7  tell you what the worst scenario is,<br>427:8  represents the worst combination of interest<br>427:9  rate and credit scenarios out of 300.  Nothing<br>427:10  is ensured, nothing is certain, but it<br>427:11  provides -- again, my reading as I sit here<br>427:12  today -- a reasonable comparison to a set of<br>427:13  metrics developed by what was considered at<br>427:14  that time another smart set of experts who<br>427:15  worked with this concept.<br>427:16        Q.    And so the 300 credit paths you<br>427:17  said was randomly developed, and this refers<br>427:18  to this model being similar to the prepay<br>427:19  paths in the OAS models, correct?<br>427:20        A.    That is what it says.<br>427:21        Q.    And I believe you testified<br>427:22  yesterday that the OAS models you were working<br>427:23  on used Monte Carlo simulations?<br>427:24        A.    That's correct.<br>427:25        Q.    And so these 300 paths are<br><br>428:2  essentially generated by Monte Carlo<br>428:3  simulations, is that right? |

| Risk of Subprime Loans and Other Non-Traditional Loan Products | |
|---|---|
| | 428:4        A.    That is correct.<br>428:5        Q.    When the computer generates the<br>428:6  Monte Carlo simulations, what data does it use<br>428:7  to determine the range of possible economic<br>428:8  effects or interest rates or credit?<br><br>428:10        A.    I don't recall.<br>428:11        Q.    Did you know at the time?<br>428:12        A.    Conceptually.<br>428:13        Q.    Well, what did you know<br>428:14  conceptually at the time?<br>428:15        A.    That part of looking back 30<br>428:16  and 40 years is understanding what the<br>428:17  volatility of interest rates were over that<br>428:18  time, what the volatility of house price<br>428:19  inflation was over that time, and based on<br>428:20  past volatilities as an input, and I don't<br>428:21  know what other inputs were put into the<br>428:22  model, that an expected volatility would be<br>428:23  one of the outputs.<br>428:24        Q.    So if I understand that<br>428:25  correctly, then, the data that was put in to<br><br>429:2  set the range of potential outputs was based<br>429:3  on historical experience in terms of<br>429:4  volatility, is that right?<br><br>429:6        A.    That is my guess.<br>429:7        Q.    And if an economic scenario<br>429:8  happened that was worse than any historical<br>429:9  experience that the model had used to generate<br>429:10  these volatility ranges, the model may not be<br>429:11  able to accurately predict the losses that<br>429:12  would be suffered, is that fair?<br><br>429:14        A.    What you have described is<br>429:15  always true, with any model. |
| **Lockhart Tr. at**<br>**324:22-330:19** | 324:22  Q.    But certainly by the first half<br>324:23  of 2007 credit quality in that sector was<br>324:24  rapidly deteriorating, is that right?<br>324:25  A.    Yes; although, again, that<br><br>325:2  rapid there would not compare to anything |

| Risk of Subprime Loans and Other Non-Traditional Loan Products |
|---|

325:3  that happened later.

325:4     Q.     It got more rapid?

325:5     A.     Yes.

325:6     Q.     And that deterioration, as it

325:7  says here, was widely reported, is that

325:8  right?

325:9     A.     Yes.

325:10     Q.     So folks at OFHEO and Fannie

325:11  Mae and Freddie Mac were all aware of that

325:12  deterioration in the time frame of the

325:13  first half of 2007, right?

325:14     A.     Yes.

325:15     Q.     I would like to turn back to

325:16  page 7, if you would, still in Exhibit

325:17  35919.

325:18          There is a section on page 7

325:19  that refers to models and you said Fannie

325:20  Mae, do you see that?

325:21     A.     Yes.

325:22     Q.     The second paragraph under that

325:23  heading says "Models are less dependable

325:24  and require adjustment when the economic

325:25  environment is outside of historical


326:2  experience," do you see that?

326:3     A.     Yes.

326:4     Q.     In the first half of 2007, was

326:5  the economic environment becoming outside

326:6  of historical experience?

326:7     A.     I can't necessarily say that; I

326:8  don't know, I mean, again, I said we had

326:9  the Texas oil patch and California and I

326:10  think housing prices actually in the first

326:11  part of 2007 hadn't deteriorated as badly

326:12  as some of those examples, it took longer

326:13  than the first half of 2007.

326:14     Q.     Ultimately did we in this

326:15  country experience an economic environment

326:16  that was outside of historical experience?

326:17     A.     Most definitely.

326:18     Q.     It goes on to say "Models are

326:19  estimated using selected historical

326:20  experience as a guide when circumstances

26

| | |
|---|---|
| **Risk of Subprime Loans and Other Non-Traditional Loan Products** | |

| | |
|---|---|
| | 326:21  are such that no historical experience can<br>326:22  provide insight for model builders, models<br>326:23  are very unlikely to produce accurate<br>326:24  projections."<br>326:25          Do you see that?<br><br>327:2   A.    Yes.<br>327:3   Q.     Did that become true of the<br>327:4  models that Fannie Mae and Freddie Mac<br>327:5  were using?<br>327:6   A.    Yes.<br><br>327:8   Q.    Did that issue affect others in<br>327:9  the mortgage industry, as far as you know?<br><br>327:11    A.    Pretty much everybody that held<br>327:12  mortgages during the 2007, 2008, 2009<br>327:13  period had massive losses, so, yes.<br>327:14  Q.     And that would include the<br>327:15  issuers and dealers in private label<br>327:16  securities backed by Alt-A and subprime<br>327:17  mortgages, would it not?<br><br>327:19    A.    I don't know what their<br>327:20  portfolios were like, what they held and<br>327:21  what they sold.<br>327:22          But certainly if they held<br>327:23  private label mortgage-backed securities,<br>327:24  they would have been hurt; if they held<br>327:25  Fannies and Freddies, they would not have<br><br>328:2  been hurt.<br>328:3   Q.    If you turn over to page 9 in<br>328:4  35919, first full paragraph at the top of<br>328:5  the page says that, "Mortgage market<br>328:6  turmoil has resulted in a significant<br>328:7  increase in the model risk within market<br>328:8  risk models.  Prepay models are challenged<br>328:9  by the sudden deterioration in mortgage<br>328:10  credit markets and falling home prices."<br>328:11          Do you see that?<br>328:12  A.    Yes.<br>328:13  Q.     Was that an accurate statement |

| Risk of Subprime Loans and Other Non-Traditional Loan Products |
|---|

|  | 328:14  at the time of an issue that Fannie Mae |
|  | 328:15  and Freddie Mac were facing? |
|  | 328:16      A.      Yes; I mean, this is an |
|  | 328:17  interest rate risk issue, not a credit |
|  | 328:18  risk issue, and because of what was going |
|  | 328:19  on, it was very hard to understand when |
|  | 328:20  people might prepay or one way to prepay |
|  | 328:21  is actually being foreclosed on. |
|  | 328:22          So that was going on and |
|  | 328:23  messed up the models as well. |
|  | 328:24          MR. STARK:  I would like to |
|  | 328:25  mark the next exhibit. |
|  |  |
|  | 329:2          This will be Exhibit 35920. |
|  | 329:3          ( Exhibit 35920, letter dated |
|  | 329:4  September 4, 2008, was marked for |
|  | 329:5  identification, as of this date.) |
|  | 329:6    Q.    Do you recognize Exhibit 35920? |
|  | 329:7    A.    Yes, this is a letter sent to |
|  | 329:8  Freddie that was similar to the one we |
|  | 329:9  just talked about at Fannie. |
|  | 329:10    Q.    This is a letter dated |
|  | 329:11  September 4, 2008, correct? |
|  | 329:12    A.    Yes, the letter is dated that. |
|  | 329:13    Q.    It is similar to 35919, this |
|  | 329:14  was signed by Mr. Dickerson, but you |
|  | 329:15  reviewed and approved this, right? |
|  | 329:16    A.    Yes, and as you can see, it is |
|  | 329:17  a draft letter and the idea was that the |
|  | 329:18  CEOs would have a chance to respond to it. |
|  | 329:19          Obviously events happened such |
|  | 329:20  that they never responded. |
|  | 329:21          MR. COREY:  And this also came |
|  | 329:22  from the FCIC website? |
|  | 329:23          MR. STARK:  Yes. |
|  | 329:24    Q.    Would it be accurate to say |
|  | 329:25  this letter is rather similar to the |
|  |  |
|  | 330:2  letter that went to Fannie Mae? |
|  | 330:3    A.    Very similar, yes. |
|  | 330:4    Q.    And raised similar concerns? |
|  | 330:5    A.    Yes. |
|  | 330:6    Q.    And includes the finding by |

28

| Risk of Subprime Loans and Other Non-Traditional Loan Products | |
|---|---|
| | 330:7  FHFA that Freddie Mac had been engaged in<br>330:8  unsafe and unsound practices, right?<br>330:9      A.      Yes.<br>330:10    Q.      In particular, Freddie Mac, as<br>330:11  with Fannie Mae, had been engaged in<br>330:12  unsafe and unsound practices in relation<br>330:13  to Alt-A and subprime mortgages throughout<br>330:14  the period 2006, 2007, correct?<br><br>330:16    A.      Yes; I mean, both enterprises<br>330:17  took on more risk and certainly as the<br>330:18  market deteriorated, it was showing up in<br>330:19  the results. |
| **P. Cook Tr. at<br>144:12-147:2** | 144:12    Q      Okay.  The first part of that paragraph<br>144:13  reads, Another dimension of risk to consider is<br>144:14  underwriting risk and process risk.  Freddie Mac<br>144:15  policies are designed to prevent us from taking on<br>144:16  unacceptable layers of risk, example, thresholds<br>144:17  on LTV and FICO.  However, how can we ensure that<br>144:18  a lender's property assessment process is, in<br>144:19  fact, providing us with LTVs we're comfortable<br>144:20  with?<br>144:21          Do you see that?<br>144:22    A    Yes.<br>144:23    Q    What's "LTV" as it's used there?<br>144:24    A    Loan to value.<br>144:25    Q    And was there a concern about ensuring<br><br>145:2  that a lender's property assessment process is<br>145:3  providing Freddie Mac with LTVs that it was<br>145:4  comfortable with?<br><br>145:6          THE WITNESS:  So this paragraph and<br>145:7  this discussion relates to the single family<br>145:8  business, and LTVs are important to Freddie Mac<br>145:9  because by charter we are able to ensure up to<br>145:10  80 percent of a loan's property without needing<br>145:11  mortgage insurance.<br>145:12          So, yes, LTVs and, therefore, the<br>145:13  associated valuation models are important to<br>145:14  Freddie Mac in that underwriting.<br>145:15    BY MR. FRANKEL:<br>145:16    Q    And was there some concern that based |

| Risk of Subprime Loans and Other Non-Traditional Loan Products | |
|---|---|
| | 145:17  on the lender's property assessment process<br>145:18  that -- that you might not be able to trust the<br>145:19  accuracy of LTVs that were being represented to<br>145:20  you?<br><br>145:22          THE WITNESS:  Actually, I think the<br>145:23  issue is well-described in the first sentence of<br>145:24  the prior paragraph where it says, Unlike the past<br>145:25  few years of rising house prices across most of<br><br>146:2   the country, there has been more regional<br>146:3   volatility in house prices recently.  And I think<br>146:4   that dynamic created less certainty around the<br>146:5   appraisal process than you might have had in prior<br>146:6   periods.<br>146:7       BY MR. FRANKEL:<br>146:8     Q    And how did the appraisal process<br>146:9   relate to the LTV -- LTV value?<br>146:10          LTV is based on an appraisal; right?<br>146:11    A    Yes.<br>146:12    Q    So if the -- if an appraisal was<br>146:13  unreliable or inaccurate, then the LTV would<br>146:14  necessarily be unreliable or inaccurate; right?<br><br>146:17          THE WITNESS:  Given the volatility in<br>146:18  house prices, it was more difficult to assess a<br>146:19  property value than it had been in the past.<br>146:20      BY MR. FRANKEL:<br>146:21    Q    And why was that a concern to Freddie<br>146:22  Mac?<br><br>146:24          THE WITNESS:  It would be a concern to<br>146:25  any lender because you're determining the amount<br><br>147:2   of the loan based on that appraisal value. |
| **Niculescu Tr. at**<br>**204:7-208:21** | 204:7    Q.   Let me hand you what's been<br>204:8   marked as Exhibit 35807, if I might.<br>204:9             ---<br>204:10          (Exhibit 35807, e-mail chain,<br>204:11  topmost e-mail dated September 18, 2006, from<br>204:12  Chuck Greener to Peter Niculescu, Bates<br>204:13  FHFA01260329 through 332 was marked for<br>204:14  identification) |

| Risk of Subprime Loans and Other Non-Traditional Loan Products |
| --- |

204:15                    ---
204:16  BY MR. BLATT:
204:17        Q.   Do you see that this is a copy
204:18  of an article that Otto Schultz sent to you on
204:19  September 18, 2006 and that you then forwarded
204:20  on to Chuck Greener, the article being
204:21  entitled "Fannie Mae Could Be Hit Hard By
204:22  Housing Bust"; do you see that?
204:23        A.   Yes.
204:24        Q.   Do you recall receiving this
204:25  article, and forwarding it on?

205:2        A.   Let me have a look at it.
205:3        Q.   Absolutely.
205:4                    ---
205:5        (Witness reviewing document.)
205:6                    ---
205:7        A.   Yes?
205:8        Q.   My question is:  Do you recall
205:9  receiving and forwarding this on?
205:10        A.   No.
205:11        Q.   Okay.  I would like to look at
205:12  page 331.  It's the second page of the
205:13  article, the third page of the exhibit.
205:14        A.   Yes.
205:15        Q.   In the middle there is a
205:16  paragraph or a sentence that begins:  "If a
205:17  housing slowdown causes subprime foreclosure
205:18  loss rates..."
205:19            Do you see that?
205:20        A.   No.
205:21        Q.   It's about halfway down.
205:22        A.   On 331?
205:23        Q.   Yes.  "If a housing slowdown
205:24  causes subprime" --
205:25        A.   Oh, yes.

206:2            MR. COREY:  Right in the middle
206:3  of the paragraph.
206:4        A.   Yes.
206:5        Q.   So there is a line in here that
206:6  states:  "If a housing slowdown causes
206:7  subprime foreclosure loss rates to rise to

| **Risk of Subprime Loans and Other Non-Traditional Loan Products** |
|---|
| 206:8  between 6 and 8%, Fannie could lose $22<br>206:9  billion to $29 billion, Berg estimated in his<br>206:10  letter.  That's more than half of the roughly<br>206:11  $40 billion in capital that Fannie had at the<br>206:12  end of March, according to OFHEO.  Foreclosure<br>206:13  loss rates on subprime mortgages are currently<br>206:14  lower than Berg's theoretical range, but some<br>206:15  experts are worried that foreclosure could<br>206:16  increase in coming years.  'There is a high<br>206:17  probability of a sharp increase in credit<br>206:18  losses in the second half of 2007 and into<br>206:19  2008,' said Robert Lacoursiere, an analyst at<br>206:20  Banc of America Securities.  'This will be<br>206:21  more pronounced in subprime and will hit<br>206:22  earlier in that area, too.'"<br>206:23          Do you see that?<br>206:24          A.   Yes.<br>206:25          Q.   Did you disagree in 2006 that<br><br>207:2  there was a high probability of a sharp<br>207:3  increase in credit losses on subprime loans in<br>207:4  2007?<br><br>207:6          A.   I think your question is not<br>207:7  specifically with reference to the numbers in<br>207:8  this article.  Is that correct?<br>207:9          Q.   No, I'm just asking about first<br>207:10  the prediction by the Banc of America<br>207:11  Securities analyst that there is a "high<br>207:12  probability of a sharp increase in credit<br>207:13  losses in the second half of 2007."<br>207:14          And my question -- and he<br>207:15  specifically then says it will be "more<br>207:16  pronounced in subprime," and it will actually<br>207:17  "hit earlier in that area, too."<br>207:18          My question is; did you agree<br>207:19  or disagree with that analysis by the Banc of<br>207:20  America analyst?<br>207:21          A.   I don't remember the analysis<br>207:22  by the Banc of America analyst.  If your<br>207:23  question is more general, I could answer it,<br>207:24  but this particular analysis, I don't<br>207:25  remember. |

| **Risk of Subprime Loans and Other Non-Traditional Loan Products** | |
|---|---|
| | 208:2       Q.   Did you appreciate in 2006 that<br>208:3   there was a high probability of an increase in<br>208:4   credit losses on subprime loans going forward?<br><br>208:6       A.   Well, insofar as home prices<br>208:7   had been appreciating up through some time in<br>208:8   2006, and at that point flattened out or<br>208:9   started to drop, it would be a matter of<br>208:10   course that you would expect an increase in<br>208:11   credit losses going forward from what had been<br>208:12   extraordinarily low levels previously.   And<br>208:13   the areas in mortgage credit that were most<br>208:14   sensitive were the areas with high LTV or low<br>208:15   credit scores, which tended to be more<br>208:16   pronounced in subprime than in the prime<br>208:17   areas.<br>208:18         Having said that, these are<br>208:19   simply matters of common record and common<br>208:20   sense. I can't comment on the specific<br>208:21   analysis. |
| **Salahuddin Tr. at 352:14-24** | 352:14       Q.   Were you aware that Fannie Mae<br>352:15    purchased PLS containing loans that had<br>352:16    credit risk layering?<br><br>352:18       A.   I'm aware that Fannie Mae<br>352:19    purchased private label securities that<br>352:20    had loans with layered credit risk, but<br>352:21    at the time I was also aware that all of<br>352:22    those loans were originated within the<br>352:23    guidelines that the originator, within<br>352:24    the originator's guidelines. |
| **Niculescu Tr. at 41:15-43:3** | 41:15       Q.   Okay. What risks did Fannie<br>41:16   Mae's purchase of subprime and Alt-A private<br>41:17   label securities pose to Fannie Mae?<br><br>41:19       A.   The -- I believe that at the<br>41:20   time that the purchases were made the obvious<br>41:21   risks were those of credit for the underlying<br>41:22   securities, although we believed at the time<br>41:23   that that credit risk was very substantially<br>41:24   mitigated by the subordination and credit<br>41:25   enhancement of those securities. |

| Risk of Subprime Loans and Other Non-Traditional Loan Products | |
|---|---|
| | 42:2　　　　And I suppose also there was a<br>42:3　risk that the company would deploy capital in<br>42:4　a form that presented a reasonable -- what<br>42:5　appeared to be at the time a reasonable<br>42:6　expected return, but that conceivably other<br>42:7　opportunities for higher returns might become<br>42:8　available later and might not be available to<br>42:9　the company as a result of its investments in<br>42:10　these securities.<br>42:11　　　　It subsequently turned out, I<br>42:12　want to acknowledge, that the market pricing<br>42:13　of the securities purchased dropped very<br>42:14　substantially, which ultimately resulted in a<br>42:15　significant loss to capital for the company.<br>42:16　It was not anticipated at the time of the<br>42:17　purchases.<br>42:18　　　Q.　What's credit risk?<br>42:19　　　A.　I think that a common<br>42:20　definition would be a loss in an investment<br>42:21　that arises as a result of declines in the<br>42:22　credit or creditworthiness of the individuals<br>42:23　or institutions that are paying the loans, or<br>42:24　that have the loans.<br>42:25　　　Q.　So does it include the risk<br><br>43:2　that a borrower won't make mortgage payments?<br>43:3　　　A.　Yes. |
| **Niculescu Tr. at 43:25-44:9** | 43:25　　　Q.　If enough borrowers on loans<br><br>44:2　underlying a private label security that<br>44:3　Fannie Mae bought failed to make mortgage<br>44:4　payments, can that result in Fannie Mae<br>44:5　incurring a loss?<br>44:6　　　A.　Yes, it could.<br>44:7　　　Q.　And did Fannie Mae understand<br>44:8　that when purchasing private label securities?<br>44:9　　　A.　Yes, they did. |
| **D. Cook Tr.  at 80:2-7** | 80:2　　A　The participants in the PLAT, including Risk<br>80:3　Management -- when I say Risk Management, Risk<br>80:4　Oversight -- including the Capital Markets Mortgage<br>80:5　Asset Management, all parties felt it would be<br>80:6　prudent, where possible, to add additional risk |

| | **Risk of Subprime Loans and Other Non-Traditional Loan Products** |
|---|---|
| | 80:7  management functions to the process. |
| **D. Cook Tr. at 80:14-81:3** | 80:14          You said that the participants in the PLAT<br>80:15  "felt it would be prudent, where possible, to add<br>80:16  additional risk management functions to the process."<br>80:17  And I'm asking you that they deemed it prudent to do<br>80:18  so because the members of the PLAT were having an<br>80:19  increasing awareness of the risks inherent in private<br>80:20  label securities, correct?<br><br>80:22      A    I wouldn't say they were having an<br>80:23  increasing awareness.  I would say people at Fannie<br>80:24  Mae, from when I was involved in 2004, they were<br>80:25  always aware of the risk and -- but the thinking<br><br>81:2  evolved over time that it would be prudent to add a<br>81:3  function presettlement and precommitment. |
| **D. Cook Tr. at 132:19-133:22** | 132:19      Q    Did that group conduct analysis to evaluate<br>132:20  whether PLS it were -- it was purchasing was backed by<br>132:21  loans that were likely to perform, by which I mean for<br>132:22  which the mortgagees were going to actually pay their<br>132:23  mortgage?<br><br>132:25      A    So PLS have credit risk.  There's risk<br><br>133:2  from -- from the loan -- from the loans not paying,<br>133:3  but there's also structure, and there's subordination<br>133:4  and --<br>133:5      Q    Sure.<br>133:6      A    So analyzing a PLS, it wasn't just about<br>133:7  analyzing the collateral, but analyzing the structure<br>133:8  and the rating agency rating of the bonds.<br>133:9      Q    Okay.  Did the Portfolio Transactions group<br>133:10  analyze credit risk?<br><br>133:12      A    Yes.<br>133:13      Q    And did the Portfolio Transactions group<br>133:14  also analyze structure risk?<br>133:15      A    Yes.<br><br>133:17      Q    And did I understand you to say that they<br>133:18  also analyzed subordination risk or enhancement risk? |

| | Risk of Subprime Loans and Other Non-Traditional Loan Products |
|---|---|
| | 133:19  Is that correct?<br><br>133:21      A   Yes, they analyzed those risks during their<br>133:22  assessment of the value of the deals. |
| **D. Cook Tr. at 237:6-14** | 237:6      Q   Mr. Cook, before we took a break, we were<br>237:7  still on that 2006 PLS risk policy.  I'm sure you rue<br>237:8  the day that you wrote it.  And we were talking about<br>237:9  section 5.1.  The question that I had asked was<br>237:10  whether the risks that are listed in section 5.1 are<br>237:11  an accurate -- is an accurate list of the risks that<br>237:12  Fannie Mae was concerned with managing with respect to<br>237:13  PLS.<br>237:14      A   Yes. |
| **D. Cook Tr. at 240:2-240:9** | 240:2          In assessing or monitoring the risk, and,<br>240:3  specifically, the credit risk associated with PLS, did<br>240:4  Fannie Mae analyze loan level characteristics?<br><br>240:6      A   To the extent that loan level information<br>240:7  was provided to any investor in a PLS, Fannie Mae<br>240:8  would use that loan level information in -- in the<br>240:9  process of its risk assessment of the bonds. |
| **D. Cook Tr. at 326:20-327:11** | 326:20      Q   Continuing into the "Next Steps" bullets,<br>326:21  the third of those reads, "Despite the authority<br>326:22  granted to the RPC, the size, strategic importance,<br>326:23  and risks of this portfolio (see risk summary in<br>326:24  attachment B) have caused me to conclude that the<br>326:25  strategy and any resulting limit changes be approved<br><br>327:2  at a level more senior than the risk policy committee,<br>327:3  RPC."<br>327:4          Is that correct?<br>327:5      A   Yes.<br>327:6      Q   Did Fannie view the size, strategic<br>327:7  importance, and risks of the PLS portfolio as<br>327:8  warranting an approval of any increase at a level more<br>327:9  senior than the RPC?<br><br>327:11      A   I think Adolfo Marzol concluded that. |
| **D. Cook Tr. at 337:6-17** | 337:6      Q   Is it correct that the position limit with<br>337:7  respect to the PLS portfolio at Fannie Mae reflected<br>337:8  particular concern about the risks associated with<br>337:9  that portfolio? |

| Risk of Subprime Loans and Other Non-Traditional Loan Products | |
|---|---|
| | 337:11    A    Risk may have been part of the reason for<br>337:12  the position limit. I'm not sure it was the only<br>337:13  reason.<br>337:14    Q   Was it an important part of the reason?<br><br>337:16    A   I don't know what other -- there were<br>337:17  probably other reasons. I don't know them. |
| **D. Cook Tr. at 337:23-338:11** | 337:23    Q    The first is "Reliance on external ratings,"<br>337:24  and within that bullet it reads, "Although we invest<br>337:25  almost exclusively in AAA-rated securities, there is a<br><br>338:2  concern that the rating agencies may not be properly<br>338:3  assessing the risk in these securities."<br>338:4        Do you see that?<br>338:5    A   Yes.<br>338:6    Q   Was there concern at Fannie Mae in 2005 that<br>338:7  even with AAA-rated securities, the rating agencies<br>338:8  may not be properly assessing the risk in PLS?<br><br>338:10    A   As stated here, it sounds like there was a<br>338:11  concern. |
| **Dallavecchia Tr. at 76:3-21** | 76:3       Q.   And when you refer to<br>76:4   instruments, Private Label Security is<br>76:5   one example of a financial instrument; is<br>76:6   that correct?<br>76:7    A.   Yes.<br>76:8    Q.   Okay. And so as the chief<br>76:9   risk officer at Fannie Mae, did you make<br>76:10   an effort to make sure that the senior<br>76:11   leadership of Fannie Mae had an<br>76:12   understanding -- excuse me, had a, quote,<br>76:13   proper understanding of the risks<br>76:14   associated with Private Label Securities?<br><br>76:16    A.   I think that in, in, in<br>76:17   general -- in general, yes, I wanted to<br>76:18   have, to ensure that we had an<br>76:19   understanding of the risks associated<br>76:20   with -- yes, an understanding of the risk<br>76:21   of Private Label Securities. |
| **Dallavecchia Tr. at 177:4-178:2** | 177:4       Q.   Do you have any reason to<br>177:5   believe that that kind of risk layering<br>177:6   did not also exist in Private Label |

| **Risk of Subprime Loans and Other Non-Traditional Loan Products** | |
|---|---|
| | 177:7    Securities? |
| | 177:9        A.    I think I can only rephrase |
| | 177:10   what I just said.  That the Private Label |
| | 177:11   Securities have a number of risks, of |
| | 177:12   which the combination of LTV, to the |
| | 177:13   borrower FICO, to the region where the |
| | 177:14   borrower is, to the structure of the |
| | 177:15   loan, to which tranche you are buying, to |
| | 177:16   which rep and warrants are provided with |
| | 177:17   the bond, who's guaranteeing the rep and |
| | 177:18   warrants, the counterparty risk, all of |
| | 177:19   those are risk factors. |
| | 177:20        So that, that would be my |
| | 177:21   statement, they are all risk factors that |
| | 177:22   need to be properly evaluated.  And I'm |
| | 177:23   not an expert in it, but I, I recognize |
| | 177:24   they are, the ones that I mentioned are |
| | 177:25   among the multiples of the ones that need |
| | 178:2   to be reviewed. |
| **D. Cook Tr. at 68:19 – 69:5** | 68:19      Q   What does it mean to size and price credit |
| | 68:20   risk in this context? |
| | 68:21      A    So sizing the deal was understanding the |
| | 68:22   risk associated with the deal and whether the |
| | 68:23   structure supported the senior tranches with -- that |
| | 68:24   we purchased.  And then pricing was, you know, if -- |
| | 68:25   if the credit of the deal was a AAA tranche, then they |
| | 69:2   could infer a price that they would -- they would want |
| | 69:3   to receive, in other words, a yield that they would |
| | 69:4   want to receive.  So if we paid par for a bond, we |
| | 69:5   would want to get a return above some benchmark. |
| **Cao Tr. at 283:14-284:5** | 283:14   Q.    What is risk layering? |
| | 283:15   A.    That's where we talk about the |
| | 283:16   correlations for this risk factors.  It is |
| | 283:17   correlation of what risk factor is like. |
| | 283:18   Basically following sentence give you example, |
| | 283:19   right? |
| | 283:20   So high LTV, low FICO.  Those are |
| | 283:21   the, you know, two risks, two risks, yeah, risk |
| | 283:22   factors, right, and then if the loan observed |
| | 283:23   both of them by loan, that is risk vary, so one |

| Risk of Subprime Loans and Other Non-Traditional Loan Products | |
|---|---|
| | 283:24  loan has high LTV and low FICO.  That's risk<br>283:25   layering.<br><br>284:2     Q.   So risk layering is more than one<br>284:3   risk factor together?<br>284:4     A.   Together, yes, for one particular<br>284:5   loan.. |
| **Zhao Tr. at 658:2-660:12** | Q.  (BY MR. SACCA)  Let me show you what we're<br>marking as Exhibit 3567, FHFA05693580 through 81.<br>          The bottom e-mail on the first page is<br>from Fan Xu -- how do you pronounce it?<br>    A.   Fan Xu, yes.<br>    Q.   Xu.<br>          -- to a group of people.<br>          Do you know who those people are in the<br>"To" line?<br>    A.   I know some of them.  Like Gordon is her<br>boss.  Luis is -- may be her direct boss, like as a<br>lower-level boss, or may be her colleague.  They're<br>all -- yeah, some of them are colleagues.  They're<br>all -- most of -- the names I know are researchers in<br>Credit Research Department.  Except Vanessa, actually.<br>Vanessa is in David Gussmann's organization.<br>    Q.   Okay.  So these are colleagues of hers at<br>Fannie Mae?<br>    A.   It looks like it, yeah.<br>    Q.   And she's sending them an article from that<br>day's Wall Street Journal, October 30, 2008, titled<br>"Ex-Fannie Mae Chief Mudd: Should Have Said 'No' More<br>Often"?<br>    A.   Yeah.<br>    Q.   And you see the first line of the article is<br>"Daniel Mudd says he should have said 'no' more often<br>when he was chief executive officer of Fannie Mae"?<br>    A.   Yeah, I saw that.<br>    Q.   And then if you look on the second page of<br>the e-mail, the first reported question there from the<br>Wall Street Journal was "What were your main<br>mistakes?"<br>          And Mr. Mudd's answer was, "I wish I'd<br>said 'no' to more of the things the company was asked<br>to do.  We were asked -- or required -- to expand<br>lending, to conserve capital while providing |

| | **Risk of Subprime Loans and Other Non-Traditional Loan Products** |
|---|---|
| | liquidity, to meet housing goals for the underserved, to serve shareholders and homeowners alike.  In a crisis of these proportions, something had to give.  I should have gone to the government and gotten a clear answer to the question:  What do you want -- more capital or more lending?<br>        "In 20/20 hindsight, I can go through and pick out loans I'd rather not have on the books."<br>        Ms. Xu sent you this e-mail also on October -- or this article also on October 30th, and she said "Have you seen this?  Exactly as what you said - the executives should have said 'No' which what they are paid for."<br>        Had you been taking the position that Fannie Mae should have said no to having certain loans on its books?<br>        A.  I don't remember the conversation I had with -- with Fan I guess.  Have I been taking the -- I mean, I don't remember the specific conversation she was referring to.<br>        In terms of if you ask me have I taken the position to say no, I -- I would say probably yes after the crisis, like in '09 time frame, or '08, '09 time frame. |
| **Kenneweg 30(b)(6) Tr. at 67:7 – 68:11** | 67:7        Q.    What is your understanding of<br>67:8  the sentence "First NLC's guidelines make<br>67:9  exceptions largely unnecessary"?<br><br>67:12        A.    That they might have had<br>67:13  broader -- or broad enough guidelines to where<br>67:14  a lot of loans would comply with our<br>67:15  guidelines.<br>67:16        Q.    Loans that other subprime<br>67:17  lenders would not make.  Right?<br>67:20        A.    That's what they've stated<br>67:21  here.<br>67:22        Q.    And do you see that they came<br>67:23  to that conclusion as a result of a loan-level<br>67:24  file review?<br><br>68:3        A.    Yes.<br>68:4        Q.    And do you see the |

| **Risk of Subprime Loans and Other Non-Traditional Loan Products** | |
|---|---|
| | 68:5  second-to-last sentence in that section says, |
| | 68:6  quote: "First NLC commented that they make |
| | 68:7  common sense underwriting decisions; we did |
| | 68:8  not see evidence of that in the file review"? |
| | |
| | 68:11      A.   I see that. |

| **Loosening of Underwriting Guidelines** | |
|---|---|
| **Cao Dep Tr. at 688:5-23** | 688:5      Q.   But it was originators themselves<br>688:6      that were responsible for originating the loans<br>688:7      in compliance with those standards, right?<br><br>688:9            THE WITNESS:  Exactly.  It was<br>688:10    someone else originate it, yes.<br>688:11            BY MR. HARSCH:<br>688:12      Q.   So Fannie Mae didn't underwrite the<br>688:13    loans, correct?  Fannie Mae set the standard by<br>688:14    which they were to be underwritten?<br><br>688:16            THE WITNESS:  We do have our<br>688:17    underwriting.  We don't originate.  Fannie Mae<br>688:18    never originate loans ourselves, so we do have<br>688:19    underwriting single-family, EU.  It is a whole,<br>688:20    you know, team of people.  They underwrite the<br>688:21    loans that we buy, so it doesn't matter, you<br>688:22    know, original or unoriginal or not, right, we<br>688:23    have our underwritten process, so that's... |
| **Lockhart Tr. at 313:8-317:19** | 313:8  Q.    One thing that changed between<br>313:9  2006 and summer of 2007, let's say, is the<br>313:10  performance of the economy, right?<br>313:11    A.     Performance of the economy,<br>313:12  housing prices started to go down, yes.<br>313:13    Q.    Is it correct to say it was<br>313:14  unknown in the 2006 time frame and early<br>313:15  2007 time frame how Alt-A mortgages would<br>313:16  perform in a significant downturn?<br><br>313:18    A.     There had been some modeling,<br>313:19  but probably the bigger issue was no one<br>313:20  knew how significant the downturn was<br>313:21  going to be.<br>313:22    Q.     And in fact a downturn of the<br>313:23  magnitude of what actually occurred was<br>313:24  not modeled, right?<br>313:25    A.     It was not modeled by Fannie<br><br>314:2  and Freddie; I think the worst one was<br>314:3  they looked at California and the Texas<br>314:4  oil patch as the two worst models, as I<br>314:5  remember. |

| Loosening of Underwriting Guidelines |
| --- |

314:6   Q.     To your knowledge, did anyone
314:7  predict how bad the downturn would
314:8  actually be?
314:9     A.     I mean, there is people in
314:10  retrospect that have said they did, but no
314:11  one told me at the time.
314:12   Q.     I take it no one told you at
314:13  the time how Alt-A mortgages would perform
314:14  in the face of the very substantial
314:15  downturn that we in fact had in the
314:16  economy?

314:18    A.     They were modeling, as I said,
314:19  the Texas oil patch and the California ups
314:20  and downs, and so they did modeling and
314:21  significant modeling with those kinds of
314:22  scenarios and certainly this showed there
314:23  would be losses, but not losses of the
314:24  magnitude as it turned out.
314:25   Q.     What caused the losses of the

315:2  magnitude as it turned out, as you
315:3  referred to?

315:5     A.     Well, as you just said, the
315:6  economy, people losing their jobs.
315:7           As I've said many times, poor
315:8  underwriting and selling products to
315:9  people that shouldn't have gotten those
315:10  products.
315:11   Q.     My last set of questions was
315:12  about the Alt-A mortgages.
315:13           Would it also be accurate to
315:14  say that the performance of subprime
315:15  mortgages in a significant economic
315:16  downturn was not known in the 2006, early
315:17  2007 time frame?

315:19    A.     I think you could say that
315:20  people knew that performance was going to
315:21  be poor if there was going to have a
315:22  significant downturn, but subprime
315:23  mortgages have been around for a while.

| **Loosening of Underwriting Guidelines** |
|---|

| | 315:24        What happened again is the<br>315:25  characteristics of subprime mortgages have<br><br>316:2  changed over the period of the 2000s and<br>316:3  they became more risky.<br>316:4        Again, the teaser mortgages and<br>316:5  some of the other things that were written<br>316:6  at that point, there wasn't enough<br>316:7  knowledge to know what would happen to<br>316:8  those mortgages.<br>316:9        Although you have to assume,<br>316:10  you know, if we had what we had, there<br>316:11  were going to be losses.<br>316:12    Q.    Did you at OFHEO in the 2006<br>316:13  through first half of 2007 time frame know<br>316:14  that the characteristics of subprime<br>316:15  mortgages had changed in the way you just<br>316:16  mentioned?<br><br>316:18    A.    We knew, I think we saw some<br>316:19  charts earlier that I used in some of my<br>316:20  presentations that there was less<br>316:21  documentation going on, we knew there was<br>316:22  more 228s and 327s and all those kinds of<br>316:23  securities being written, yes.<br>316:24    Q.    228s and 337s refer to types of<br>316:25  subprime mortgages, right?<br><br>317:2    A.    Yes, they are basically --<br>317:3  two-year had a real teaser mortgage rate<br>317:4  and then the next 28 had a much higher<br>317:5  rate and the problem was that oftentimes<br>317:6  people were only expecting to have the<br>317:7  mortgage for two years because they<br>317:8  thought housing prices were going to go up<br>317:9  and could refinance; all of a sudden when<br>317:10  housing prices didn't go up they couldn't<br>317:11  refinance and they ended up with these<br>317:12  much higher rates they couldn't afford.<br>317:13    Q.    Just to be clear on the record,<br>317:14  a 337 refers to a three-year teaser<br>317:15  rate --<br>317:16    A.    27. |

| Loosening of Underwriting Guidelines | |
| --- | --- |
| | 317:17   Q.     27.<br>317:18          Year period of a higher rate?<br>317:19   A.     Right |
| **Kenneweg Tr. at 315:20 – 316:12** | 315:20          Q.   The next paragraph reads: "Credit<br>315:21   trends.  The need for a 'affordability<br>315:22   products' (in response to rising home prices in<br>315:23   relation to income) in addition to the<br>315:24   favorable credit environment led to the<br>315:25   pervasive loosening of credit standards in<br><br>316:2   originator's underwriting guidelines.  Now, the<br>316:3   combination of lower HPA and aggressive<br>316:4   underwriting practices have begun to show up in<br>316:5   delinquency and EPD figures."<br>316:6          Do you see that?<br>316:7   A.   I do.<br>316:8          Q.   And do you recall that being the<br>316:9   state of things at the end of 2006?<br><br>316:11          THE WITNESS:  I recall these general<br>316:12   themes; yes. |
| **Bates Moss Tr. at 163:7 – 163:19** | 163:7          Q.   Are you aware of your group<br>163:8   ever disapproving or placing on caution<br>163:9   an originator because a substantial<br>163:10   portion of the loans they generated did<br>163:11   not meet their underwriting guidelines?<br><br>163:14          A.   I am not aware of a specific<br>163:15   instance.  Again, it should be documented<br>163:16   if that were the case.<br>163:17          Q.   And have you seen any such<br>163:18   documents?<br>163:19   A.   No, I have not. |
| **Bates Moss Tr. at 448:10 – 452:6** | 448:10          Q.   What did you mean that these<br>448:11   attempts by Ameriquest and New Century to<br>448:12   get market share will likely result in<br>448:13   deterioration of performance metrics?<br>448:14   A.   That based upon what<br>448:15   information we were receiving from<br>448:16   analyst reports and other documents, that<br>448:17   this was certainly something that was<br>448:18   raised in those reports.  So we were<br>448:19   using this as an opportunity to |

| Loosening of Underwriting Guidelines |
|---|

|  | 448:20   disseminate information on the whole loan<br>448:21   side regarding our subprime activity.<br>448:22      Q.   Did you have an understanding<br>448:23   about the substance of what you were<br>448:24   saying here, that the substance of how<br>448:25   attempts to get market share was linked<br><br>449:2   to deteriorating performance?<br>449:3      A.   Yes.<br>449:4      Q.   And how is it that trying to<br>449:5   get market share is linked to a<br>449:6   deterioration in performance metrics?<br>449:7      A.   One such example is that in an<br>449:8   effort to grow market share, companies<br>449:9   may become more aggressive in their<br>449:10   underwriting.<br>449:11      Q.   What do you mean by aggressive<br>449:12   in underwriting?<br>449:13      A.   That they may change their,<br>449:14   maybe loosen their standards potentially.<br>449:15   They could, you know, take other steps.<br>449:16   This was just an attempt to ensure that<br>449:17   in reviewing these whole loans, that<br>449:18   particularly given the fact that New<br>449:19   Century and Ameriquest at that time were<br>449:20   already on our watch list, that we paid<br>449:21   closer attention in monitoring.<br>449:22      Q.   What do you mean when you say<br>449:23   that underwriters or originators may<br>449:24   loosen their standards potentially?<br>449:25      A.   Every company that originates,<br><br>450:2   underwrites, sells, services assets<br>450:3   typically has a process in place and a<br>450:4   credit box where they have criteria for<br>450:5   how they will underwrite a transaction.<br>450:6      Q.   And you -- finish?<br>450:7      A.   Companies make, managements<br>450:8   make decisions about that credit box.<br>450:9      Q.   And you understood that to get<br>450:10   market share companies may decide to<br>450:11   loosen their underwriting criteria?<br>450:12      A.   Not all companies. |

| Loosening of Underwriting Guidelines |
| --- |

450:13     Q.   Some?
450:14     A.   Some.
450:15     Q.   Like New Century and
450:16  Ameriquest?
450:17    A.   Based upon information that
450:18  was coming in from the marketplace, yes.
450:19    Q.   And did you understand that
450:20  when these companies loosened their
450:21  credit box there's a risk that they will
450:22  issue lower quality loans?

450:25    A.   There is a risk that companies

451:2  will be willing to take on or to enter
451:3  into transactions that have higher risk
451:4  profiles, yes.
451:5    Q.   And here you indicate that
451:6  with respect to New Century and
451:7  Ameriquest, who are trying to get market
451:8  share, that it will likely result in
451:9  deterioration in performance metrics,
451:10  correct?
451:11    A.   That's correct.
451:12    Q.   Why did you think it would
451:13  likely result in deterioration of their
451:14  performance metrics?
451:15    A.   Because based upon our ongoing
451:16  monitoring of these particular credits,
451:17  we had already started to see
451:18  deterioration in their metrics.
451:19    Q.   And by metrics, what do you --
451:20  what are you referring to?
451:21    A.   I.e., FICOs, other financial
451:22  metrics related to leverage, debt to
451:23  service cover, all of those.
451:24    Q.   And would it also include the
451:25  metrics by which the risk of loans are

452:2  measured?

452:4    Q.   Such as FICO?
452:5    A.   Yes, we could look at that
452:6  information, yes.

| Loosening of Underwriting Guidelines | |
|---|---|
| **Bates Moss Tr. at 454:20 – 455:7** | 454:20      Q.    Can you identify any<br>454:21    originator that informed you or your<br>454:22    group that they always, universally,<br>454:23    absolutely issue loans consistent with<br>454:24    their underwriting guidelines?<br>455:2        form.<br>455:3      Q.   No exception?<br><br>455:6        A.   I don't recall having those<br>455:7    conversations, no. |
| **Bates Moss Tr. at 456:3 – 456:16** | 456:3      Q.    And what you write is "My<br>456:4    understanding is that credit standards<br>456:5    are loosening."  Do you see that?<br>456:6      A.    Yes.<br>456:7      Q.    And what did you mean when you<br>456:8    wrote to Mr. Grimes and these other<br>456:9    people including Mr. Norris that credit<br>456:10    standards are loosening?<br>456:11        A.    What I stated earlier is that<br>456:12    when -- sometimes companies make a<br>456:13    decision, management teams make a<br>456:14    decision to open up their credit box and<br>456:15    that means having a wider range of<br>456:16    criteria that they are comfortable with. |
| **Bates Moss Tr. at 456:18 – 456:22** | 456:18        Did you understand that<br>456:19    originators were issuing loans that<br>456:20    perhaps previously they would not have<br>456:21    issued when -- before they loosened their<br>456:22    standards? |
| **Bates Moss Tr. at 456:24 – 457:4** | 456:24        A.    Based on this statement, what<br>456:25    I was saying was that there was a shift.<br><br>457:2    I wasn't making a statement about any<br>457:3    specific originator, but this was a<br>457:4    trend. |
| **Bates Moss Tr. at 461:5 – 461:19** | 461:5      Q.    Did you find anything during<br>461:6    those onsite reviews or have anything<br>461:7    reported to you from those onsite reviews<br>461:8    that was inconsistent with your<br>461:9    understanding that credit standards were<br>461:10    loosening in March of 2006?<br><br>461:13        A.    I don't recall that being a |

| Loosening of Underwriting Guidelines | |
|---|---|
| | 461:14   specific issue.  As I stated before, |
| | 461:15   there was a ton of market research |
| | 461:16   available during this time because the |
| | 461:17   overall market was starting to report |
| | 461:18   more frequently on these topics.  So this |
| | 461:19   is pretty standard. |
| **Bates Moss Tr. at 467:15 – 468:3** | 467:15      Q.   And you were also in the email |
| | 467:16   above that able to communicate with Mr. |
| | 467:17   Norris and others within Fannie Mae your |
| | 467:18   understanding that credit standards are |
| | 467:19   loosening, correct? |
| | |
| | 467:22      A.   I made a general statement |
| | 467:23   around credit standards loosening, yes. |
| | 467:24      Q.   And that statement wasn't |
| | 467:25   limited to any particular originator, it |
| | |
| | 468:2   was a general statement about the -- |
| | 468:3      A.   The industry, yes. |
| **Bates Moss Tr. at 597:2 – 597:16** | 597:2      Q.   And would looser underwriting |
| | 597:3   criteria also be contributing factors to |
| | 597:4   increased early payment defaults? |
| | |
| | 597:6      A.   Less restrictive criteria |
| | 597:7   along with a number of other factors |
| | 597:8   could contribute to early payment |
| | 597:9   default.  I'm not sure exactly what your |
| | 597:10   point is. |
| | 597:11      Q.   Did you understand that at the |
| | 597:12   time when you were working at Fannie Mae? |
| | |
| | 597:15      A.   I understood that before I |
| | 597:16   joined Fannie Mae, so. |
| **Bates Moss Tr. at 649:12 – 650:6** | 649:12      Q.   Well your review team would go |
| | 649:13   around and go to originators and review |
| | 649:14   their practices, right? |
| | 649:15      A.   We would review those |
| | 649:16   practices, policies and procedures, and |
| | 649:17   as evidenced in the documents that you've |
| | 649:18   put in front of me, those processes were |
| | 649:19   described, yes. |
| | 649:20      Q.   And do you recall that among |
| | 649:21   the processes that were reported to you |

| Loosening of Underwriting Guidelines | |
|---|---|
| | 649:22   by your review team were that originators<br>649:23   from time to time were making loans that<br>649:24   did not strictly meet their underwriting<br>649:25   guidelines?<br><br>650:4        A.   What we observed in that<br>650:5   process is that they had built into their<br>650:6   process escalation and exceptions, yes. |
| **Feigles Tr. at 210:21 – 212:5** | 210:21        Q.   And then your final paragraph is:<br>210:22   "We will always look at and form our own<br>210:23   opinion about lender's guidelines and for very<br>210:24   liberal guidelines, we would expect to see<br>210:25   stricter processes or controls and we would<br><br>211:2   have a lower tolerance for deviations from<br>211:3   those processes."<br>211:4           Do you see that?<br>211:5       A.   I see that.<br>211:6       Q.   What did you mean by that?<br>211:7       A.   It appears to be fairly<br>211:8   straightforward that we are going to form our<br>211:9   own opinions about the lender's guidelines.<br>211:10   I'm not sure I can summarize that more.<br>211:11        Q.   Okay.  So when you refer to lower<br>211:12   tolerances for deviations from those processes,<br>211:13   are you referring to deviations from the<br>211:14   underwriting guidelines?<br>211:15       A.   Yeah, my -- what I would believe I<br>211:16   am saying there is we'd look for fewer<br>211:17   exceptions.<br>211:18        Q.   So is it fair to summarize this as<br>211:19   -- in a case where you would assess a<br>211:20   counterparty to have liberal guidelines, you<br>211:21   would expect more compliance with the<br>211:22   guidelines, and where there were stricter<br>211:23   guidelines in place, you might accept a -- have<br>211:24   a greater tolerance for deviation from the<br>211:25   underwriting guidelines?<br><br>212:3           THE WITNESS:  Well, again, I think<br>212:4   what we expect to see is fewer exceptions<br>212:5   utilized with more liberal guidelines. |

| GSE Counterparty Reviews and Policies | |
|---|---|
| **Aneiro Tr. at 257:1 - 258:25** | 257:1      Q.    Can you tell me what this is, <br> 257:2    please? <br> 257:3      A.    This is the nonagency mortgage <br> 257:4    ABS credit analysis procedure guide. <br> 257:5      Q.    What is it used for?  What was <br> 257:6    it used for? <br> 257:7      A.    It is the procedure for the <br> 257:8    credit group to analyze the credit of a <br> 257:9    nonagency mortgage security. <br> 257:10      Q.    And let's turn to page FHFA <br> 257:11    11625650, which is the second page of the <br> 257:12    document.  Do you see at the top of the <br> 257:13    page where it says "the MABS credit <br> 257:14    analysis process can be divided into <br> 257:15    three steps"? <br> 257:16      A.    Yes. <br> 257:17      Q.    And do you see where it says <br> 257:18    the three steps are costing, counterparty <br> 257:19    risk assessment and surveillance? <br> 257:20      A.    Yes. <br> 257:21      Q.    Are those the three steps into <br> 257:22    which the MABS credit analysis process <br> 257:23    could be divided? <br> 257:24      A.    It certainly says that here. <br> 257:25      Q.    Do you agree? <br> 258:1      A.    I have no reason to disagree. <br><br> 258:3  A.   It's not my guideline.  It was <br> 258:4    not my guideline. <br><br> 258:6  Q.   Are you aware of any other <br> 258:7    steps that go into the MABS credit <br> 258:8    analysis process? <br> 258:9      A.    Not that I recall. <br> 258:10      Q.    Looking at the counterparty <br> 258:11    risk assessment bullet point there, do <br> 258:12    you see where it says "counterparty risk <br> 258:13    assessment recognizes that financially <br> 258:14    and/or operationally distressed servicers <br> 258:15    and originators can adversely impact <br> 258:16    collateral performance and also expose <br> 258:17    Freddie Mac to reputational risk"? |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 258:18　　　　　Do you see that?<br>258:19　　　A.　I do see that.<br>258:20　　　Q.　Do you agree that financially<br>258:21　and/or operationally distressed servicers<br>258:22　and originators can adversely impact<br>258:23　collateral performance and also expose<br>258:24　Freddie Mac to reputational risk?<br>258:25　　　A.　I do. |
| **Kenneweg<br>30(b)(6) Tr. at<br>75:18 – 76:5** | 75:18　　　Q.　Would if have been your regular<br>75:19　practice, when receiving a review like this,<br>75:20　to advise Freddie Mac to stop buying PLS<br>75:21　backed by First NLC loans?<br>75:22　　　A.　Not necessarily.<br>75:23　　　Q.　Why not?<br>75:24　　　A.　There were policies and<br>75:25　procedures that set guidelines for how to<br><br>76:2　consume this information and how it should be<br>76:3　used, and within those guidelines it did not<br>76:4　say stop purchases for marginal reviews,<br>76:5　so ... |
| **Wood Tr. at<br>323:16-326:2** | 323:16　　　Q.　You can take 32214 off.  This has<br>323:17　already been marked as Exhibit 1826.  It's a<br>323:18　June 16th, 2006 e-mail and attachment from Mary<br>323:19　Jo Whipple to a number of people, including<br>323:20　you.  Subject is: "E-Store AMO Origination<br>323:21　Review, First NLC Financial Services."  Bates<br>323:22　number is FHFA 0348420.<br>323:23　　　　　Do you see that?<br>323:24　　　A.　203?<br>323:25　　　Q.　Yes, you're right.  I'm sorry.<br><br>324:2　　　A.　Uh-uh.<br>324:3　　　Q.　203.<br>324:4　　　A.　Yes, I see it.<br>324:5　　　Q.　Who is Mary Jo Whipple?<br>324:6　　　A.　Mary Jo Whipple provided, I believe,<br>324:7　administrative support in the AMO group.<br>324:8　　　Q.　Did she have any substantive role or<br>324:9　was it mostly administrative?<br>324:10　　　A.　Mostly administrative.<br>324:11　　　Q.　And do you see your name on the<br>324:12　first line of the "to" field? |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 324:13        A.   Yes.  Uh-huh. |
| | 324:14        Q.   And do you recall receiving this |
| | 324:15   document? |
| | 324:16        A.   No.  This, again, looks like a |
| | 324:17   standard distribution of an AMO report that I |
| | 324:18   would get from time to time.  So nothing -- no |
| | 324:19   earlier or memorable -- memorable about this |
| | 324:20   particular report. |
| | 324:21        Q.   And you stated that sometimes you |
| | 324:22   read these reports and sometimes you didn't? |
| | 324:23        A.   That's right. |
| | 324:24        Q.   And there was no rule you had as to |
| | 324:25   when to read them and when not to read them? |
| | |
| | 325:2        A.   No, not really.  Again, they didn't |
| | 325:3   impact my -- they didn't impact my job |
| | 325:4   responsibility as much for me. |
| | 325:5        Q.   Can you turn to the attachment? |
| | 325:6   It's the document ending 206.  And this has the |
| | 325:7   familiar review area and rating matrix at the |
| | 325:8   top. |
| | 325:9          Do you see that? |
| | 325:10        A.   Uh-huh. |
| | 325:11        Q.   And here, the reviews are credit, |
| | 325:12   marginal, do you see that? |
| | 325:13        A.   Yeah. |
| | 325:14        Q.   Appraisal, marginal? |
| | 325:15          Do you see that? |
| | 325:16        A.   Uh-huh. |
| | 325:17        Q.   Management, satisfactory, do you see |
| | 325:18   that? |
| | 325:19        A.   Yes. |
| | 325:20        Q.   And controls, marginal, do you see |
| | 325:21   that? |
| | 325:22        A.   Uh-huh. |
| | 325:23        Q.   And these are improvements over the |
| | 325:24   poor, poor satisfactory and poor rating from |
| | 325:25   the prior review, correct? |
| | |
| | 326:2        A.   It appears so, yeah. |
| **Palmer Tr. at** | 491:16        Q.   Assessing those was left to |
| **491:16 – 492:13;** | 491:17   the judgment of the credit approval team, |
| **492:22 -- 493:20** | 491:18   the MABS team that you were part of, |

53

| GSE Counterparty Reviews and Policies |
|---|

491:19   right?

491:21        A.   It was similar credit review.
491:22   Any AMO score below a certain level
491:23   required additional work.  Generally
491:24   speaking, marginals may cause us pause or
491:25   may cause us to read the AMO review to

492:2   understand why it was rated marginal.  I
492:3   don't remember specifically on this one
492:4   what it was or anything more specifics
492:5   about that.
492:6        Q.   Other than reading the AMO
492:7   review, was there any other additional
492:8   work that you would do in response to a
492:9   marginal or poor grade?
492:10        A.   We could call up Ron Feigles
492:11   or somebody in his group to better
492:12   understand the reason behind it being
492:13   marginal.

. . . .

492:22        Q.   Other than reading the AMO
492:23   review and perhaps speaking with Mr.
492:24   Feigles and his group, was there any
492:25   other additional work that you would do

493:2   in response to seeing a marginal or poor
493:3   grade?
493:4        A.   I believe some of these
493:5   counterparties were also rated by the
493:6   rating agencies and looking at what the
493:7   rating agencies' review were -- was for
493:8   those counterparties.
493:9        Q.   And how would you get that
493:10   information?
493:11        A.   We had access through a
493:12   subscription to the rating agencies'
493:13   websites and looking them up there.
493:14        Q.   Aside from reading the AMO
493:15   review, talking to Ron Feigles, perhaps,
493:16   and perhaps looking at rating agency

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 493:17   ratings on originators, was there<br>493:18   anything else you would do in response to<br>493:19   seeing a poor or marginal grade?<br>493:20       A.   Not that I remember. |
| **Palmer Tr. at 747:21 -- 748:16; 748:22 -- 749:2** | 747:21       Q.   Was it your practice to review<br>747:22   AMO reviews of the aggregators on deals<br>747:23   that you were approving credit for?<br>747:24       A.   On aggregators, I believe many<br>747:25   of them I did review.  I would especially<br><br>748:2   review those that were marginal or poor,<br>748:3   if there were any.<br>748:4       Q.   What was your understanding of<br>748:5   the purpose of these review?<br>748:6       A.   To assess the risk management<br>748:7   and control practices of the aggregator.<br>748:8       Q.   And to ensure that they had<br>748:9   good risk management and control<br>748:10   practices?<br>748:11       A.   To understand what those, what<br>748:12   those practices were.<br>748:13       Q.   And then to provide a rating<br>748:14   to those practices?<br>748:15       A.   Yes, they would assess the<br>748:16   rating relative to those practices.<br>. . . .<br><br>748:22       Q.   Were you aware that Freddie<br>748:23   Mac would send people to do onsite visit<br>748:24   at the aggregators and review their<br>748:25   policies and procedures?<br><br>749:2       A.   Yes. |
| **Kenneweg 30(b)(6) Tr. at 142:17-144:12** | 142:17   And then the second spreadsheet<br>142:18   in Exhibit 1828, Ms. Kenneweg, tracks Freddie<br>142:19   Mac's exposure in PLS by issuer, is that<br>142:20   correct?<br><br>142:24       A.   That's correct.<br>142:25       Q.   And is the information that<br><br>143:2   kind of is to the left of the grid also just<br>143:3   ID numbers? |

| **GSE Counterparty Reviews and Policies** | |
|---|---|
| | 143:4      A.   I believe so.<br>143:5      Q.   Is this a document that you,<br>143:6  yourself, tracked and maintained?<br>143:7      A.   Yes.<br>143:8      Q.   If you then turn to the first<br>143:9  page of Exhibit 1828, you'll see a chart<br>143:10 labeled "Non-Agency Mortgage ABS Portfolio<br>143:11 Concentrations," do you see that?<br>143:12      A.   I do.<br>143:13      Q.   And is this a chart that you<br>143:14 generated from the spreadsheets we just<br>143:15 referred to?<br>143:16      A.   I believe so.<br>143:17      Q.   And it shows Freddie Mac's top<br>143:18 ten originators, servicers, issuers and<br>143:19 trustees in the PLS space, is that right?<br>143:20      A.   It is.<br>143:21      Q.   And their corresponding metrix<br>143:22 scores, correct?<br>143:23      A.   Yes.<br>143:24      Q.   And did you circulate this<br>143:25 document on a monthly basis?<br><br>144:2      A.   I did.<br>144:3      Q.   And is it correct that this<br>144:4  document reflects that as of June 2007 Freddie<br>144:5  Mac's top five originators, in terms of their<br>144:6  exposure through PLS, all had ratings of<br>144:7  marginal from their operational reviews?<br>144:8      A.   According to this document,<br>144:9  that's correct.<br>144:10      Q.   And would you expect this<br>144:11 document would be correct?<br>144:12      A.   I would. |
| **Kenneweg<br>30(b)(6) Tr. at<br>42:23 – 43:22** | 42:23      Q.   We haven't been that<br>42:24 productive.  And could you identify the<br>42:25 document that I have just handed you?<br><br>43:2      A.   It looks like an e-mail.  The<br>43:3  subject is MABS Policies/Procedures.<br>43:4      Q.   Is this an e-mail from you?<br>43:5      A.   It is.<br>43:6      Q.   That you sent on or about |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 43:7  December 10, 2009?<br>43:8         A.   Yes.<br>43:9         Q.   And what are you attaching to<br>43:10  this e-mail?<br>43:11         A.   It looks like a procedure for<br>43:12  PLS counterparty.  Let's see what else.  And a<br>43:13  policy and procedure, um, also related to PLS,<br>43:14  owned by another area.<br>43:15         Q.   Okay.  So the document we have<br>43:16  attached is MABS Counterparty Procedure Number<br>43:17  123.  Right?<br>43:18         A.   Yes.<br>43:19         Q.   And is that what is attached to<br>43:20  this e-mail, the MABS Counterparty Procedure<br>43:21  123?<br>43:22         A.   It is. |
| **Kenneweg 30(b)(6) Tr. at 44:8 – 13** | 44:8         Q.   Do you recall this being in<br>44:9  effect during the period 2005 through 2007?<br>44:10         A.   Yes, it would have been<br>44:11  sometime after I was hired.<br>44:12         Q.   But before December 2007?<br>44:13         A.   Yes.  Yes. |
| **Kenneweg 30(b)(6) Tr. at 44:24 - 25** | 44:24  Q.   Who drafted this procedure?<br>44:25         A.   I did. |
| **Kenneweg Tr. 30(b)(6) at 45:5 – 8** | 45:5  Q.   And what was the purpose for<br>45:6  this being adopted?<br>45:7         A.   In order to have a framework<br>45:8  for me to operate. |
| **Kenneweg Tr. 30(b)(6) at 45:17 – 47:22** | 45:17  Q.   Well, what do you mean by, "for<br>45:18  me to operate"?<br>45:19         A.   This is an overview of the<br>45:20  processes that I would follow in order to<br>45:21  approve and monitor the PLS counterparties.<br>45:22         Q.   Is it still in effect?<br>45:23         A.   No.  Not this exact policy.<br>45:24  No.<br>45:25         Q.   Was it replaced?<br><br>46:2         A.   Or procedure, I mean.  Um, not<br>46:3  directly.<br>46:4         Q.   Was it just nullified? |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 46:7      A.  I'm -- I'm not sure what became<br>46:8  of -- of this exact procedure.<br>46:9      Q.  Do you recall why it was deemed<br>46:10  not to control any longer?<br>46:11      A.  There was a<br>46:12  no-purchase-directive in the portfolio.<br>46:13      Q.  And when did that occur?<br>46:14      A.  I don't recall the exact date.<br>46:15      Q.  Was that before or after the<br>46:16  conservatorship?<br>46:17      A.  I don't recall.<br>46:18      Q.  And simultaneous, or near the<br>46:19  time of the no-purchase-directive, I guess<br>46:20  there was no need to follow MABS 123 anymore?<br>46:21      A.  Yeah, not a need to do<br>46:22  everything that's outlined in the procedure.<br>46:23  That's right.<br>46:24      Q.  Now, if you look at the, kind<br>46:25  of near the bottom of the first page of the<br><br>47:2  procedure, there's a section that's called<br>47:3  Data Sources For Financial Analysis.<br>47:4      Do you see that?<br>47:5      A.  Yes.<br>47:6      Q.  And the last of the sources<br>47:7  mentioned are Alternative Markets, Operations,<br>47:8  Written Reviews.  Do you see that?<br>47:9      A.  Yes.<br>47:10      Q.  Now, is that a series of<br>47:11  reviews put out by the AMO department that you<br>47:12  spoke of earlier?<br>47:13      A.  It is, yes.<br>47:14      Q.  Mr. Feagle's group?<br>47:15      A.  Mm-hmm.<br>47:16      Q.  And where did Mr. --<br>47:17      MR. SECHLER:  Strike that.<br>47:18  BY MR. SECHLER:<br>47:19      Q.  Where did AMO fall within the<br>47:20  Freddie organizational structure?<br><br>47:22      A.  I don't know. |
| **Kenneweg<br>30(b)(6) Tr. at** | 48:16  Q.  How large was the department?<br>48:17      A.  Alternative markets operations? |

| GSE Counterparty Reviews and Policies | |
|---|---|
| 48:16 – 24 | 48:18      Q.    Yes.<br>48:19         A.    Probably about six or seven<br>48:20  people.<br>48:21         Q.    And were those people all<br>48:22  people who performed operational reviews?<br>48:23         A.    They had an admin at one point.<br>48:24  But yeah, for the most part.  Yes. |
| Kenneweg<br>30(b)(6) Tr. at<br>49:5 - 24 | 49:5 Q.   What policies and procedures<br>49:6  governed AMO?<br>49:7         A.   There was an overall policy, I<br>49:8  believe there was one from 2005, and a later<br>49:9  one from 2007, an overall policy that was<br>49:10  comprised of a lot of procedures, which I<br>49:11  believe is in the binder.<br>49:12         Q.   Okay.  You can go ahead and --<br>49:13  feel free to consult the binder.  And if you<br>49:14  could point out the policy you're referring<br>49:15  to, that would be great.<br>49:16         A.   Sure.  If you turn to Tab 4L.<br>49:17         Q.   Yes.<br>49:18         A.   So this is the overall policy<br>49:19  which I said is composed of several<br>49:20  procedures.<br>49:21         Q.   Now, the index indicates that<br>49:22  Tab 4L is dated December 17, 2007?<br>49:23         A.   Is that a question?  I'm sorry.<br>49:24         Q.   Yes.  Do you see that? |
| Kenneweg<br>30(b)(6) Tr. at<br>50:4 – 19 | 50:4 A.   Okay.  I see it.<br>50:5         Q.   So was there a -- a procedure<br>50:6  in place for AMO covering the same topics as<br>50:7  Tab 4L prior to December 2007?<br>50:8         A.   I thought there was, but -- let<br>50:9  me just flip through some of the other tabs in<br>50:10  here and see if I'm thinking of something<br>50:11  else.<br>50:12                ---<br>50:13         (Witness reviewing document.)<br>50:14                ---<br>50:15         A.   I mean, there's lots of<br>50:16  supporting documents that have been drafted,<br>50:17  giving an overview to their framework.<br>50:18  There's job checklists.  Here's the --<br>50:19  actually, here are the procedures. |

| | **GSE Counterparty Reviews and Policies** |
|---|---|
| **Kenneweg Tr. 30(b)(6) at 51:3 – 25** | 51:3 Q.    And is Tab 4A the set of<br>51:4  procedures that governed AMO in August 2005?<br>51:5        A.    That's my understanding.  I<br>51:6  mean, just from reading the document.<br>51:7        Q.    Well, your understanding is<br>51:8  you're here giving testimony on behalf of<br>51:9  Freddie Mac --<br>51:10        A.    Right.<br>51:11        Q.    -- as to the policies and<br>51:12  procedures of, among other things, AMO?<br>51:13        A.    Right, and --<br><br>51:15        A.    And from reading the document,<br>51:16  this seems consistent with my understanding of<br>51:17  their practices at that time period.<br>51:18        Q.    Did you notice that Tab L,<br>51:19  which you referred to earlier, is a red-lined<br>51:20  version?<br>51:21        A.    I did.<br>51:22        Q.    Is that the final set of<br>51:23  policies that were effective December 2007 for<br>51:24  AMO?<br>51:25        A.    To the best of my knowledge. |
| **Kenneweg Tr. 30(b)(6) at 52:22 - 55:19** | 52:22 Q.    Yes.  Were AMO reviews<br>52:23  conducted on originators whose loans backed<br>52:24  PLS securities?<br><br>53:2  form.<br>53:3        A.    Yes.<br>53:4        Q.    And in those reviews what<br>53:5  information was considered by AMO?<br>53:6        A.    Credit guidelines.  I mean,<br>53:7  there were a number of different categories,<br>53:8  but at a high level my recollection is credit<br>53:9  guidelines.  Quality control.  Compliance.<br>53:10  Overall controls at the company.  So, you<br>53:11  know, sometimes it probably varied, depending<br>53:12  on the exact business model of the<br>53:13  counterparty.  But at a high level those were<br>53:14  some of the topics.<br>53:15        Q.    When you say "credit<br>53:16  guidelines," do you mean underwriting<br>53:17  guidelines? |

| GSE Counterparty Reviews and Policies |
|:---:|

53:18        A.    Yes.
53:19        Q.    And did the AMO reviews involve
53:20  loan-level review?

53:22        A.    What type of AMO reviews?
53:23        Q.    Of originators.
53:24        A.    Yes.
53:25        Q.    And was the purpose of the

54:2  review, among other things, speaking again of
54:3  originators, to determine the originators'
54:4  compliance with their underwriting guidelines?

54:6        A.    My understanding was the
54:7  reviews were not to serve so much as an audit
54:8  on their compliance; it was more to get an
54:9  understanding of the riskiness of their
54:10  guidelines, and to get a sense for the types
54:11  of loans they were underwriting.
54:12        Q.    And whether or not those loans
54:13  were of poor credit quality?

54:15        A.    Um, not just of poor credit
54:16  quality, but to be able to provide an
54:17  assessment of the average loan quality.
54:18        Q.    And to determine whether or not
54:19  the documentation in the loan file was
54:20  consistent with what Freddie Mac expected?

54:22  BY MR. SECHLER:
54:23        Q.    Right?
54:24        A.    I am -- I'm not sure about that
54:25  specifically.

55:2        Q.    To identify concerns with the
55:3  originators' underwriting processes?

55:5        A.    That's, again, very specific.
55:6        Q.    What do you mean, that's very
55:7  specific?
55:8        A.    I didn't actually attend the
55:9  loan file reviews, so your questions are about
55:10  the loan file reviews.

| **GSE Counterparty Reviews and Policies** | |
|---|---|
| | 55:11     Q.   But you read the AMO<br>55:12  operational reviews, didn't you?<br>55:13        A.   I did.  And I attended one of<br>55:14  the onsite management meetings.  One of the<br>55:15  portions, yes.<br>55:16        Q.   How many AMO operational<br>55:17  reviews did you review between 2005 and 2007?<br><br>55:19        A.   I didn't count. |
| **Kenneweg**<br>**30(b)(6) Tr. at**<br>**56:5 -- 23** | 56:5 Q.   Did AMO indicate in the report<br>56:6  whether or not they conducted a loan-level<br>56:7  review?<br>56:8        A.   I believe they did.<br>56:9        Q.   Do you recall that AMO also<br>56:10  reviewed originators' appraisal practices?<br><br>56:12        A.   Are you talking about during<br>56:13  the loan file review, or just overall in<br>56:14  their --<br>56:15        Q.   In their operational review.<br>56:16        A.   Yes, that would have been part<br>56:17  of what they would review, yes.<br>56:18        Q.   Now, you mentioned that you<br>56:19  attended one meeting that was kind of related<br>56:20  to AMO's reviews?<br>. . . .<br>56:23        A.   Oh, I'm sorry.  Yes. |
| **Kenneweg**<br>**30(b)(6) Tr. at**<br>**40:23-41:12** | 40:23        Q.   Yes.  Please identify, if you<br>40:24  would, all departments or business units<br>40:25  within Freddie Mac who were involved in the<br><br>41:2  review or evaluation of PLS counterparties.<br><br>41:4        A.   What type of --<br><br>41:7        A.   What type of review and<br>41:8  evaluation?<br>41:9        Q.   Any review that involves<br>41:10  considering information concerning those<br>41:11  counterparties, forming an opinion, rendering<br>41:12  an evaluation, or issuing an approval. |
| **Kenneweg**<br>**30(b)(6) Tr. at** | 42:23        Q.   We haven't been that<br>42:24  productive.  And could you identify the |

| GSE Counterparty Reviews and Policies | |
|---|---|
| **42:23-43:22** | 42:25  document that I have just handed you?<br><br>43:2        A.   It looks like an e-mail.  The<br>43:3  subject is MABS Policies/Procedures.<br>43:4        Q.   Is this an e-mail from you?<br>43:5        A.   It is.<br>43:6        Q.   That you sent on or about<br>43:7  December 10, 2009?<br>43:8        A.   Yes.<br>43:9        Q.   And what are you attaching to<br>43:10  this e-mail?<br>43:11        A.   It looks like a procedure for<br>43:12  PLS counterparty.  Let's see what else.  And a<br>43:13  policy and procedure, um, also related to PLS,<br>43:14  owned by another area.<br>43:15        Q.   Okay.  So the document we have<br>43:16  attached is MABS Counterparty Procedure Number<br>43:17  123.  Right?<br>43:18        A.   Yes.<br>43:19        Q.   And is that what is attached to<br>43:20  this e-mail, the MABS Counterparty Procedure<br>43:21  123?<br>43:22        A.   It is. |
| **Kenneweg**<br>**30(b)(6) Tr. at**<br>**49:5-49:24** | 49:5        Q.   What policies and procedures<br>49:6  governed AMO?<br>49:7        A.   There was an overall policy, I<br>49:8  believe there was one from 2005, and a later<br>49:9  one from 2007, an overall policy that was<br>49:10  comprised of a lot of procedures, which I<br>49:11  believe is in the binder.<br>49:12        Q.   Okay.  You can go ahead and --<br>49:13  feel free to consult the binder.  And if you<br>49:14  could point out the policy you're referring<br>49:15  to, that would be great.<br>49:16        A.   Sure.  If you turn to Tab 4L.<br>49:17        Q.   Yes.<br>49:18        A.   So this is the overall policy<br>49:19  which I said is composed of several<br>49:20  procedures.<br>49:21        Q.   Now, the index indicates that<br>49:22  Tab 4L is dated December 17, 2007?<br>49:23        A.   Is that a question?  I'm sorry.<br>49:24        Q.   Yes.  Do you see that? |

| GSE Counterparty Reviews and Policies | |
|---|---|
| **Kenneweg**<br>**30(b)(6) Tr. at**<br>**52:22-55:19** | 52:22 Q.   Yes.  Were AMO reviews<br>52:23  conducted on originators whose loans backed<br>52:24  PLS securities?<br><br>53:3        A.   Yes.<br>53:4        Q.   And in those reviews what<br>53:5  information was considered by AMO?<br>53:6        A.   Credit guidelines.  I mean,<br>53:7  there were a number of different categories,<br>53:8  but at a high level my recollection is credit<br>53:9  guidelines.  Quality control.  Compliance.<br>53:10 Overall controls at the company.  So, you<br>53:11 know, sometimes it probably varied, depending<br>53:12 on the exact business model of the<br>53:13 counterparty.  But at a high level those were<br>53:14 some of the topics.<br>53:15        Q.   When you say "credit<br>53:16 guidelines," do you mean underwriting<br>53:17 guidelines?<br>53:18        A.   Yes.<br>53:19        Q.   And did the AMO reviews involve<br>53:20 loan-level review?<br><br>53:22        A.   What type of AMO reviews?<br>53:23        Q.   Of originators.<br>53:24        A.   Yes.<br>53:25        Q.   And was the purpose of the<br><br>54:2  review, among other things, speaking again of<br>54:3  originators, to determine the originators'<br>54:4  compliance with their underwriting guidelines?<br><br>54:6        A.   My understanding was the<br>54:7  reviews were not to serve so much as an audit<br>54:8  on their compliance; it was more to get an<br>54:9  understanding of the riskiness of their<br>54:10 guidelines, and to get a sense for the types<br>54:11 of loans they were underwriting.<br>54:12        Q.   And whether or not those loans<br>54:13 were of poor credit quality?<br><br>54:15        A.   Um, not just of poor credit<br>54:16 quality, but to be able to provide an |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 54:17  assessment of the average loan quality.<br>54:18        Q.    And to determine whether or not<br>54:19  the documentation in the loan file was<br>54:20  consistent with what Freddie Mac expected?<br><br>54:22  BY MR. SECHLER:<br>54:23        Q.    Right?<br>54:24        A.   I am -- I'm not sure about that<br>54:25  specifically.<br><br>55:2        Q.    To identify concerns with the<br>55:3  originators' underwriting processes?<br><br>55:5        A.    That's, again, very specific.<br>55:6        Q.    What do you mean, that's very<br>55:7  specific?<br>55:8        A.    I didn't actually attend the<br>55:9  loan file reviews, so your questions are about<br>55:10  the loan file reviews.<br>55:11        Q.    But you read the AMO<br>55:12  operational reviews, didn't you?<br>55:13        A.    I did.  And I attended one of<br>55:14  the onsite management meetings.  One of the<br>55:15  portions, yes.<br>55:16        Q.    How many AMO operational<br>55:17  reviews did you review between 2005 and 2007?<br><br>55:19        A.    I didn't count. |
| **Kenneweg**<br>**30(b)(6) Tr. at**<br>**58:16-59:6** | 58:16        A.    It's an origination operation<br>58:17  review of First NLC's Financial Services.<br>58:18        Q.    That's the attachment to the<br>58:19  e-mail?<br>58:20        A.    The attachment is the review<br>58:21  memo.<br>58:22        Q.    And the e-mail was sent out by<br>58:23  Mary Joe Whipple.  Is that right?<br>58:24        A.    Yes.<br>58:25        Q.    On or about June 16, 2006.<br><br>59:2            Right?<br>59:3        A.    Yes.<br>59:4        Q.    And you were one of the<br>59:5  recipients.  Correct? |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 59:6        A.   I was, mm-hmm. |
| **Kenneweg 30(b)(6) Tr. at 59:11-19** | 59:11        Q.   Is this review an example of 59:12  the kinds of reviews that AMO did of 59:13  originators whose loans backed PLS? <br><br> 59:16        A.   This looks consistent with the 59:17  type of review that AMO completed. 59:18        Q.   Now, do you see in this 59:19  distribution list the name Mike Aneiro? |
| **Kenneweg 30(b)(6) Tr. at 182:11-20** | 182:11            Ms. Kenneweg, can you tell me 182:12  what the second attachment to your e-mail is? 182:13        A.   This is the originators, 182:14  servicers and conduits scorecard. 182:15        Q.   And was this something that was 182:16  circulated on a monthly basis? 182:17        A.   I can't recall if it was 182:18  monthly or quarterly. 182:19        Q.   And who circulated this? 182:20        A.   I would have. |
| **Kenneweg 30(b)(6) Tr. at 183:4-19** | 183:4        Q.   And to whom did you distribute 183:5  these scorecards? 183:6        A.   I don't recall the entire 183:7  distribution list, but the portfolio managers 183:8  would have received it, and PM&P, and CCR 183:9  management. 183:10        Q.   And when you say the portfolio 183:11  managers, do you mean the traders? 183:12        A.   Yes. 183:13        Q.   And the PM&P group including 183:14  Mr. Palmer? 183:15        A.   Yes. 183:16        Q.   And these scorecards reflect 183:17  the metrix scores that CCRM has assigned to 183:18  originator counterparties, correct? 183:19        A.   That's correct. |
| **Kenneweg 30(b)(6) Tr. at 211:18 – 212:19** | 211:18        Q.   Yes.  Why did Freddie Mac have 211:19  the policy that an operational review was not 211:20  required for assigning a metrix score to an 211:21  originator at the AAA investment level? <br><br> 211:24        A.   Well, I mean, an overall 211:25  comment -- you know, it would be impractical |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 212:2  to assign an operational review to every<br>212:3  single originator on the list, so...<br>. . .<br>212:6        A.   No.  I was just going to say it<br>212:7  wouldn't be feasible to go onsite and do an<br>212:8  operational review of every single originator.<br>212:9        Q.   Well, wasn't approval only<br>212:10  required for originators whose loans<br>212:11  constituted more than 1 percent of the unpaid<br>212:12  principal balance?<br>212:13        A.   That's right.<br>212:14        Q.   And even within that subset of<br>212:15  originators whose loans constitute more than 1<br>212:16  percent of the unpaid principal balance, if<br>212:17  they were originators at the AAA investment<br>212:18  level you didn't need an operational review,<br>212:19  would you? |
| **Kenneweg<br>30(b)(6) Tr. at<br>212:24 – 214:10** | 212:24        Q.   You wouldn't need an<br>212:25  operational review of an originator whose<br><br>213:2  loans constituted more than 1 percent of the<br>213:3  unpaid principal balance under this policy,<br>213:4  would you?<br><br>213:7        A.   I don't think I agree with<br>213:8  that.<br>213:9        Q.   Okay.  Why don't you agree with<br>213:10  that?<br>213:11        A.   That an originator does not<br>213:12  need an operational review if they had above 1<br>213:13  percent.<br>213:14        Q.   Okay.  So an originator -- any<br>213:15  originator above 1 percent needed an<br>213:16  operational review?<br>213:17        A.   That's my -- yes.  That's my<br>213:18  understanding.<br>213:19        Q.   Okay.  And needed to be<br>213:20  approved by counterparty credit risk<br>213:21  management?<br>213:22        A.   Yes.<br>213:23        Q.   And would be assigned a metrix<br>213:24  score?<br>213:25        A.   Yes. |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 214:2      Q.   Under what circumstances would<br>214:3  counterparty credit risk management assign<br>214:4  metrix scores and approve originators whose<br>214:5  loans were less than 1 percent of the unpaid<br>214:6  principal balance?<br><br>214:9      A.   There were not particular<br>214:10  circumstances. |
| **Kenneweg**<br>**30(b)(6) Tr. at**<br>**214:18 – 216:17** | 214:18      Q.   Was there any requirement that<br>214:19  an originator whose loans constituted less<br>214:20  than 1 percent of the unpaid principal balance<br>214:21  be approved by CCRM?<br>214:22      A.   In the PLS space?<br>214:23      Q.   Yes.<br>214:24      A.   No.  If it was less than 1<br>214:25  percent, that was not a requirement.<br><br>215:2      Q.   And this policy relates to PLS,<br>215:3  doesn't it?<br>215:4      A.   It does.<br>215:5      Q.   Under what circumstances would<br>215:6  CCRM assign a metrix score to an originator<br>215:7  whose loans constituted less than 1 percent of<br>215:8  the unpaid principal balance of Freddie's<br>215:9  portfolio?<br>215:10      A.   If they were already doing<br>215:11  business with another part of Freddie Mac and<br>215:12  had a score assigned through that exposure,<br>215:13  then they would have already had a score<br>215:14  assigned.<br>215:15      Q.   Okay.  But apart from having a<br>215:16  score assigned by having done single-family<br>215:17  business, was there any requirement that CCRM<br>215:18  assign a metrix score to PLS counterparties<br>215:19  who were originators with less than 1 percent<br>215:20  UPB?<br><br>215:22      A.   I don't believe the MABS<br>215:23  procedure had any such requirement.<br>215:24      Q.   So then what is the relevance<br>215:25  and application of this sentence in the last |

| | GSE Counterparty Reviews and Policies |
|---|---|
| | 216:2  part of this paragraph here, that says, quote,<br>216:3  "An operational review is not required for<br>216:4  assigning a metrix score for an originator<br>216:5  pursuant to PM&P 101 at the AAA investment<br>216:6  level"?<br><br>216:9       A.   My interpretation of that is,<br>216:10  in contrast to the first sentence there where<br>216:11  it says "There must be an operational review<br>216:12  for any aggregator," that's required for an<br>216:13  aggregator.  In contrast, you don't need it<br>216:14  automatically to assign a metrix score to an<br>216:15  originator.  It's only once exposure to the<br>216:16  originator is above 1 percent that you would<br>216:17  need to conduct an operational review. |
| **Kenneweg**<br>**30(b)(6) Tr. at**<br>**217:17 – 218:20** | 217:17            Originators in the PLS space<br>217:18  would have to be re-reviewed on a periodic<br>217:19  basis under procedure 123?<br>217:20       A.   Correct.<br>217:21       Q.   How often?<br>217:22       A.   According to this procedure,<br>217:23  every 24 months.<br>217:24       Q.   And again, that only applies to<br>217:25  originators whose loans constitute more than 1<br><br>218:2  percent of the unpaid principal balance?<br>218:3       A.   Correct.<br>218:4       Q.    And then apart from the<br>218:5  above-1-percent gang you also had special<br>218:6  reviews of the top ten originators?<br>218:7       A.   Correct.<br>218:8       Q.    And were those a different kind<br>218:9  of review?<br>218:10       A.   Yes.  So those were a writeup,<br>218:11  more of a full analysis, versus the<br>218:12  seller/servicers just received an automatic --<br>218:13  an automated score, calculation.  So that the<br>218:14  top ten was a bit of a deeper dive.<br>218:15       Q.   And the deeper dive was called<br>218:16  a high profile counterparty review?<br>218:17       A.   Correct.<br>218:18       Q.    And there's an example of that<br>218:19  attached as Appendix D, is that correct? |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 218:20          A.    Yes. |
| **Kenneweg 30(b)(6) Tr. at 238:25 – 239:15** | 238:25          Q.    Do you have any reason to<br><br>239:2  believe this was not a monthly scorecard?<br><br>239:4          A.   I don't.<br>239:5          Q.    But as you sit here today as a<br>239:6  30(b)(6) designee you don't know with what<br>239:7  frequency these scorecards were generated by<br>239:8  AMO?<br><br>239:11          A.    We could refer to their<br>239:12  procedures to see if they specify in there.  I<br>239:13  mean, this is labeled August, but I don't<br>239:14  recall the exact frequency with which they<br>239:15  distributed a certain report. |
| **Kenneweg 30(b)(6) Tr. at 239:20 – 240:11** | 239:20          Q.    Which operational reviews would<br>239:21  be shown in the scorecard?<br>239:22          A.    I believe their format -- is it<br>239:23  back here?  I believe they had -- yeah, they<br>239:24  had different columns.  I mean, they'll show,<br>239:25  I believe, all the counterparties that they<br><br>240:2  might have reviewed -- that AMO might have<br>240:3  reviewed.<br>240:4          Q.    Over a given period, or ever?<br><br>240:7          A.    I don't know at what point they<br>240:8  might have removed counterparties.<br>240:9          Q.    Okay.<br>240:10          A.    I mean, certainly they -- they<br>240:11  noted if some were inactive.  But... |
| **Kenneweg 30(b)(6) Tr. at 240:15 – 242:9** | 240:15          What was the purpose of this<br>240:16  AMO scorecard?<br>240:17          A.    To summarize AMO's assessment<br>240:18  of a counterparty's business model and the<br>240:19  risks inherent in the business model.<br>240:20          Q.    And is it your understanding<br>240:21  that a score of 4 in the areas of credit<br>240:22  appraisal, management or controls is a poor<br>240:23  score?<br>240:24          A.    It's been so long since I have<br>240:25  looked -- you know, used -- used these to that |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 241:2  level of detail.  But, I mean, we could refer |
| | 241:3  to the bottom table on here. |
| | 241:4        Q.    Okay.  Do you see it says -- go |
| | 241:5  ahead. |
| | 241:6        A.    Yeah, that would indicate 3.8 |
| | 241:7  or greater. |
| | 241:8        Q.    And what does 3.8 or greater |
| | 241:9  mean? |
| | 241:10        A.    "Does not meet minimum |
| | 241:11  competencies or has critical control |
| | 241:12  weaknesses." |
| | 241:13        Q.    Do you see there are a number |
| | 241:14  of originators here in this scorecard |
| | 241:15  circulated in September of 2007 who, in the |
| | 241:16  credit area, did not meet minimum competencies |
| | 241:17  or had critical control weaknesses? |
| | |
| | 241:20        A.    It looks like there were a few |
| | 241:21  that were rated a 4 in that category. |
| | 241:22        Q.    And do you see there also are |
| | 241:23  originators indicated on this scorecard that |
| | 241:24  in the appraisal area did not meet minimum |
| | 241:25  competencies or had critical control |
| | |
| | 242:2  weaknesses? |
| | |
| | 242:4        A.    I do see there were a few that |
| | 242:5  received scores of 4. |
| | 242:6        Q.    And in fact if you look at |
| | 242:7  Argent, Argent received a score of 4 in both |
| | 242:8  the credit and appraisal areas, is that right? |
| | 242:9        A.    That's right. |
| **Kenneweg Tr. at** | 51:8        Q.    Okay.  When I refer to "AMO," I'm |
| **51:8 – 54:24** | 51:9      referring to the alternative markets |
| | 51:10      operations, right? |
| | 51:11        A.    Right. |
| | 51:12        Q.    Okay.  Is it fair to say that CCRM |
| | 51:13      would be more cautious of counterparties with |
| | 51:14      poor controls than it would be of |
| | 51:15      counterparties who had excellent controls? |
| | |
| | 51:17            THE WITNESS:  We had similar -- we |
| | 51:18      had a pretty consistent framework, pretty |

| GSE Counterparty Reviews and Policies |
|---|

|  | 51:19   consistent process, so I don't -- what did you |
|---|---|

51:19    consistent process, so I don't -- what did you
51:20    say, we would be more cautious of?
51:21         I would say it was a consideration
51:22    in our -- in our evaluation.
51:23         BY MR. COHEN:
51:24    Q.   Sure.
51:25         All right.  Let's move on to Page

52:2    6540, which is titled "Metrix Framework."
52:3         Do you see that?
52:4    A.   I do.
52:5    Q.   And this chart, essentially,
52:6    describes and explains the meaning of CCRM's
52:7    Metrix scores which were given to Freddie Mac's
52:8    various PLS counterparties, right?

52:10        THE WITNESS:  Right.
52:11        BY MR. COHEN:
52:12    Q.   And the Metrix scores represented
52:13    CCRM's analysis of a counterparty's financial
52:14    health, right?

52:16        THE WITNESS:  Yes.
52:17        BY MR. COHEN:
52:18    Q.   Okay.  And the Metrix risk grades
52:19    were on a 1 to 20 scale, right, which is in the
52:20    column -- which is indicated by the column
52:21    entitled "Risk Grade," right?
52:22    A.   Right.
52:23    Q.   Okay.  And then on the second column
52:24    from the left it says, "Risk Segment," and
52:25    the -- essentially, the Metrix scores were

53:2    further segmented on M1 through M7 scale,
53:3    right?

53:5        THE WITNESS:  Right.
53:6        BY MR. COHEN:
53:7    Q.   Okay.  And then the Metrix scores
53:8    were also tied to external rating agency
53:9    equivalence, right?
53:10   A.   Right.
53:11   Q.   Okay.  Let's turn to Page 6543,

| | |
|---|---|
| **GSE Counterparty Reviews and Policies** | |

| | |
|---|---|
| | 53:12   which at the top of the page states:  "CCRM<br>53:13   surveillance process."<br>53:14      Do you see that?<br>53:15    A.   I do.<br>53:16    Q.   Okay.  And then fourth bullet --<br>53:17   excuse me -- fourth bullet from the bottom, it<br>53:18   states:  "Mortgage ABS, review of major<br>53:19   issuers, originators, servicers annually."<br>53:20      Do you see that?<br>53:21    A.   I do.<br>53:22    Q.   So that was one of your job<br>53:23   functions during the 2005 to 2007 time period,<br>53:24   right?<br>53:25    A.   Right.<br><br>54:2    Q.   And CCRM performed annual reviews of<br>54:3   mortgage -- MABS counterparties, right?<br><br>54:5      THE WITNESS:  Right.<br>54:6      BY MR. COHEN:<br>54:7    Q.   But CCRM also performed ongoing<br>54:8   surveillance of MABS counterparties, right?  It<br>54:9   wasn't just that you look at them once a year<br>54:10   and then you don't look at them until a year<br>54:11   from then, right?<br>54:12    A.   That's right.<br>54:13    Q.   Okay.  How did CCRM perform ongoing<br>54:14   surveillance of Freddie Mac's MABS<br>54:15   counterparties?<br>54:16    A.   Well, there might have been ad hoc<br>54:17   requests.  There was exposure reporting where<br>54:18   we would constantly monitor the outstanding<br>54:19   exposure versus the limits that had been set.<br>54:20   Just staying abreast of news.<br>54:21    Q.   You also measured the concentration<br>54:22   of a given a counterparties' production and<br>54:23   Freddie Mac's MABS portfolio, too, right?<br>54:24    A.   That's right. |
| **Kenneweg Tr. at<br>55:9 – 55:25** | 55:9    Q.   Yeah.  Sorry about that.<br>55:10      Part of the ongoing surveillance<br>55:11   function also required you to basically stay up<br>55:12   on what was going on in the market, right?<br>55:13    A.   At a high level, yes. |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 55:14     Q.   Sure.<br>55:15        Is it fair to say that during the<br>55:16   2005 to 2007 time period, CCRM was primarily<br>55:17   responsible for surveillance of Freddie Mac's<br>55:18   counterparties and the CPPM organization was<br>55:19   responsible for surveillance of bonds that<br>55:20   Freddie Mac had purchased?<br><br>55:22      THE WITNESS:  I would say CCRM was<br>55:23   responsible for monitoring the counterparties.<br>55:24   I probably shouldn't speak to other<br>55:25   organizations' responsibilities. |
| **Kenneweg Tr. at 59:7 – 59:18** | 59:7     Q.   Okay.  Let's turn to Page 6551.<br>59:8   Reasons for termination -- and I'm going to --<br>59:9   not paraphrase, but not read all of them.<br>59:10   "Some of the primary reasons for terminations<br>59:11   are "Poor audit findings, EORM, poor loan<br>59:12   quality, QC, fraud, FIU."<br>59:13      Do you see that?<br>59:14    A.   I do.<br>59:15    Q.   The reference to EORM is a reference<br>59:16   to Freddie Mac's external operations risk<br>59:17   management organization, correct?<br>59:18    A.   Yes. |
| **Kenneweg Tr. at 60:3 – 61:5** | 60:3     Q.   Okay.  But did you understand that<br>60:4   EORM audited Freddie Mac's counterparties, as<br>60:5   it says here?<br><br>60:7      THE WITNESS:  They conducted<br>60:8   operational reviews.<br>60:9     BY MR. COHEN:<br>60:10    Q.   Okay.  And sometimes they found, as<br>60:11   it suggests here, that some of those -- that<br>60:12   some of Freddie Mac's counterparties had a poor<br>60:13   business practice, correct?<br><br>60:15      THE WITNESS:  I don't think this<br>60:16   document says that.  I think it says that's a<br>60:17   potential reason for termination.<br>60:18     BY MR. COHEN:<br>60:19    Q.   Okay.  And it similarly says that a<br>60:20   potential reason for termination is poor loan<br>60:21   qualities as determined by Freddie Mac's QC or |

| | GSE Counterparty Reviews and Policies | |
|---|---|---|
| | 60:22 | quality control organization, right? |
| | 60:23 | A.   I don't think the document says |
| | 60:24 | necessarily coming from that part of the |
| | 60:25 | organization.  It just says, "poor loan |
| | | |
| | 61:2 | quality." |
| | 61:3 | Q.   What do you understand the reference |
| | 61:4 | to QC to mean? |
| | 61:5 | A.   Quality control. |
| **Kenneweg Tr. at 66:15 – 67:11** | 66:15 | How did CCRM receive information |
| | 66:16 | from the PLS business units regarding the |
| | 66:17 | credit quality of Freddie Mac's PLS |
| | 66:18 | counterparties? |
| | | |
| | 66:20 | THE WITNESS:  The credit quality of |
| | 66:21 | our counterparties? |
| | 66:22 | BY MR. COHEN: |
| | 66:23 | Q.   Yes. |
| | 66:24 | A.   I was responsible for monitoring |
| | 66:25 | their financial statements, so I was |
| | | |
| | 67:2 | responsible for assessing credit quality of the |
| | 67:3 | counterparties. |
| | | |
| | 67:5 | And how did you get that information |
| | 67:6 | from the PLS business units? |
| | | |
| | 67:8 | THE WITNESS:  They did not supply me |
| | 67:9 | with counterparty financial information.  I was |
| | 67:10 | responsible for obtaining the financial |
| | 67:11 | statements, analyzing the financial statements. |
| **Kenneweg Tr. at 76:2 – 76:14** | 76:2 | Q.   Okay.  In the second -- strike that. |
| | 76:3 | In the bottom most bubble it states |
| | 76:4 | in the second bullet point that "CRCM's role is |
| | 76:5 | to ensure that I&CM 'transacts only with |
| | 76:6 | counterparties/issuers whose credit risks are |
| | 76:7 | understood and quantified.'" |
| | 76:8 | Do you see that? |
| | | |
| | 76:10 | THE WITNESS:  I do. |
| | 76:11 | BY MR. COHEN: |
| | 76:12 | Q.   That, too, was one of CCRM's |
| | 76:13 | responsibilities, right? |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 76:14          A.    Yes. |
| **Kenneweg Tr. at 76:21 – 79:2** | 76:21          Q.    Sure. |
| | 76:22                Well, in the fourth bullet point in |
| | 76:23          the top most bubble, it says:  "Issuer exposure |
| | 76:24          is the economic loss of a security or its |
| | 76:25          issuer are downgraded or defaults." |
| | |
| | 77:2                So issuer risk might include the |
| | 77:3          possibility of a security or issuer would be |
| | 77:4          downgraded or default, right? |
| | |
| | 77:6                THE WITNESS:  We monitor issuers and |
| | 77:7          their creditworthiness. |
| | 77:8                BY MR. COHEN: |
| | |
| | 77:10                And you monitored all other kinds of |
| | 77:11          counterparties, too, right? |
| | |
| | 77:13                THE WITNESS:  Not all other kinds, |
| | 77:14          but we monitored some other kinds. |
| | 77:15                BY MR. COHEN: |
| | |
| | 77:17                But the originators of subprime |
| | 77:18          loans, right? |
| | |
| | 77:20                THE WITNESS:  Our PLS originator |
| | 77:21          counterparties, yes. |
| | 77:22                BY MR. COHEN: |
| | . |
| | 77:25                How did you get information to |
| | |
| | 78:2          understand and quantify the credit risk of |
| | 78:3          Freddie Mac's PLS counterparties? |
| | |
| | 78:5                THE WITNESS:  Depended on the -- I |
| | 78:6          guess depended on the situation.  Sometimes |
| | 78:7          financials would be available through public |
| | 78:8          means like SEC's website.  Sometimes we would |
| | 78:9          have to reach out to the counterparty and ask |
| | 78:10           them if they didn't have public financials. |
| | 78:11                BY MR. COHEN: |
| | |
| | 78:13                Would AMO reports also provide you |

| | | **GSE Counterparty Reviews and Policies** |
|---|---|---|
| | 78:14 | information on the credit risk of |
| | 78:15 | counterparties? |
| | 78:17 | THE WITNESS:  Not the financial |
| | 78:18 | condition, necessarily.  It was just another |
| | 78:19 | piece of information. |
| | 78:20 | BY MR. COHEN: |
| | 78:21 | Q.   Which was relevant to the riskiness |
| | 78:22 | of the counterparty, right? |
| | 78:24 | THE WITNESS:  It would inform your |
| | 78:25 | overall assessment of the -- of the |
| | 79:2 | creditworthiness of the counterparty. |
| **Kenneweg Tr. at 80:9 – 81:16** | 80:9 | Q.   Okay.  Ms. Kenneweg, let me show you |
| | 80:10 | another document which is Bates No. FHFA |
| | 80:11 | 01485802.  And this has already been introduced |
| | 80:12 | as Exhibit 1834, I believe, at your 30(b)(6) |
| | 80:13 | deposition. |
| | 80:14 | Do you recognize this document? |
| | 80:15 | A.   Yes. |
| | 80:16 | Q.   Is it fair to say that this was the |
| | 80:17 | main departmental policy governing the |
| | 80:18 | activities of counterparty credit risk |
| | 80:19 | management within Freddie Mac's capital markets |
| | 80:20 | division? |
| | 80:21 | A.   Yes. |
| | 80:22 | Q.   Okay.  On the first page at -- which |
| | 80:23 | is No. 5802, the fifth bullet point from the |
| | 80:24 | bottom states that "One of CCRM's |
| | 80:25 | responsibilities was to 'provide for |
| | 81:2 | consistency with industry best practices and |
| | 81:3 | regulatory expectations.'" |
| | 81:4 | Do you see that? |
| | 81:5 | A.   Yes. |
| | 81:6 | Q.   What do you understand the term |
| | 81:7 | "industry best practices" to mean? |
| | 81:8 | A.   Well, I would say keeping up with -- |
| | 81:9 | I don't know how to rephrase that. |
| | 81:10 | Q.   The best practices in the PLS |
| | 81:11 | subprime? |
| | 81:12 | A.   As peers do and -- I'm trying to |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 81:13   define it without giving examples, but, you<br>81:14   know, just keeping up with -- I guess with<br>81:15   controls and processes that other people in the<br>81:16   industry might -- might have. |
| **Kenneweg Tr. at 97:12 – 99:13** | 97:12       Q.   Ms. Kenneweg, I would like to show<br>97:13   you another document which has previously been<br>97:14   marked as Exhibit 1825.  And that is Bates No.<br>97:15   FHFA 11950446.<br><br>97:19          The first page of this document is a<br>97:20   December 10, 2009 e-mail from you to Karen<br>97:21   Gifford, correct?<br>97:22     A.   It appears so.<br>97:23     Q.    And it appears that you attached<br>97:24   the: "MABS counterparty procedure," right?<br>97:25     A.   It looks like it.<br><br>98:2     Q.   Okay.  Let's turn to Page 0450.<br>98:3          Ms. Kenneweg, do you recognize this<br>98:4   document?<br>98:5     A.   Yes.<br><br>98:9          "This procedure outlines the process<br>98:10   for reviewing and approving new mortgage ABS<br>98:11   counterparties as well as ongoing monitoring of<br>98:12   existing counterparties."<br>98:13          Do you see that?<br>98:14     A.   I see it.<br>98:15     Q.    Is it fair to say this procedure<br>98:16   provided the framework for your approval of new<br>98:17   PLS counterparties?<br><br>98:19          THE WITNESS:  Well, you changed the<br>98:20   wording a little bit.  According to this<br>98:21   procedure, it outlines the process for<br>98:22   reviewing and approving.<br>98:23          BY MR. COHEN:<br>98:24     Q.    Okay.  And it's fair to say this<br>98:25   procedure also outlines a process for ongoing<br><br>99:2   monitoring of existing counterparties, right?<br>99:3     A.   That is what it says, yes.<br>99:4     Q.   Which ongoing monitoring could also |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 99:5      be called surveillance of existing PLS<br>99:6      counterparties, right?<br><br>99:8         THE WITNESS:  Yes.<br>99:9         BY MR. COHEN:<br>99:10     Q.   What other procedures did CCRM use<br>99:11    for this function?<br><br>99:13         THE WITNESS:  I don't know. |
| **Kenneweg Tr. at 107:4 – 107:10** | 107:4      Q.   Okay.  Let's turn back to the<br>107:5    procedure.<br>107:6         At the top of the page ending in<br>107:7    0451, potential new MABS counterparties:<br>107:8    "Counterparties will require approval pursuant<br>107:9    to the thresholds described in the counterparty<br>107:10    approval Metrix." |
| **Kenneweg Tr. at 107:19 – 108:2** | 107:19        A.   Okay.<br>107:20     Q.   And below that it says:  "For<br>107:21   issuers, the MABS trading desk or structured<br>107:22   credit notifies CCRM of potential applicant."<br>107:23        Do you see that?<br>107:24     A.  I do.<br>107:25     Q.   Is this consistent with your<br><br>108:2    experiencing during 2005, 2007? |
| **Kenneweg Tr. at 108:15 – 110:6** | 108:15        So CCRM was generally informed by<br>108:16   the PLS desk in Kevin Palmer and Frank<br>108:17   Vitrano's group about potential new issuers of<br>108:18   private label securities, right?<br><br>108:20        THE WITNESS:  That is what this<br>108:21   document says, yes.<br>108:22       BY MR. COHEN:<br>108:23     Q.   Is that consistent with your<br>108:24   recollection?<br>108:25     A.   Yes.<br><br>109:2     Q.   How was CCRM informed about other<br>109:3   potential new PLS counterparties, nonissuers?<br>109:4     A.   I think it depends on the situation.<br>109:5   I mean, sometimes it would be consistent with<br>109:6   that bullet where the traders or someone, you<br>109:7   know, Kevin's organization might approach us if |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 109:8   it was a counterparty that they didn't see on,<br>109:9   you know, one of our lists.<br>109:10      Or it is possible that exposure was<br>109:11   getting up to a certain point where it might<br>109:12   hit a threshold where we would start monitoring<br>109:13   so, you know, I guess there is a couple of<br>109:14   different ways they could appear on our radar.<br>109:15     Q.   Do you remember any other Freddie<br>109:16   Mac organizations informing CCRM about new<br>109:17   nonissuer counterparties?<br>109:18     A.   For the PLS sector, no.<br>109:19     Q.   Okay.  So it's fair to say you would<br>109:20   either be informed by the MABS desk, Kevin<br>109:21   Palmer's group, or they would come to your<br>109:22   attention because of Freddie Mac's increasing<br>109:23   exposure of concentrations to the counterparty,<br>109:24   right?<br><br>110:2      THE WITNESS:  Those are the ones<br>110:3   that I can recall right now.  I'm not saying it<br>110:4   is not possible.  There might have been some<br>110:5   other means, but that's what I remember right<br>110:6   now. |
| **Kenneweg Tr. at 111:22 – 112:5** | 111:22     Q.   The next bullet states that: "A<br>111:23   comprehensive review of the financial data is<br>111:24   performed with consideration given to" -- and<br>111:25   then it goes on to list a number of factors.<br>112:2   The bottom factors are:  "Delivery volume,<br>112:3   process controls and business models."<br>112:4     Do you see that?<br>112:5     A.   I do. |
| **Kenneweg Tr. at 117:11 – 117:15** | 117:11     It says here that CCRM performed a<br>117:12   comprehensive review of the financial data with<br>117:13   consideration given to, among other things,<br>117:14   process controls, right?<br>117:15     A.   Uh-huh.  Yes. |
| **Kenneweg Tr. at 117:18 – 118:2** | 117:18     You would have considered the<br>117:19   counterparty's process controls in determining<br>117:20   whether to approve a counterparty for business<br>117:21   with Freddie Mac, right?<br><br>117:23      THE WITNESS:  I don't know.  You're<br>117:24   focusing on two words within a procedure from |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 117:25    many years ago, so I am not going to be able to<br><br>118:2    give you detail about those two words. |
| **Kenneweg Tr. at 121:2 – 121:5** | 121:2    Q.  Do you remember preparing written<br>121:3    reviews of potential MABS counterparties?<br>121:4    A.  I prepared written reviews.  I don't<br>121:5    remember writing the reviews. |
| **Kenneweg Tr. at 122:17 – 125:4** | 122:17    Q.  It states: "Guidelines generally<br>122:18    applied that determine the approximate<br>122:19    creditworthiness of a counterparty are," and it<br>122:20    goes on to list a couple of things.<br>122:21        In the third bullet point, it states<br>122:22    that: "Poor operational review would be<br>122:23    considered."<br><br>123:2    Q.  Do you see that?<br>123:3    A.  I do.<br>123:4    Q.  Is that a reference to AMO reviews?<br>123:5    A.  The operational review --<br>123:6    Q.  Yes.<br>123:7    A.  -- words?  Yes.<br>. . .<br>123:9    So it is fair to say that CCRM would<br>123:10    consider AMO's reviews in assigning Metrix<br>123:11    scores, right?<br>123:12    A.  Yes.<br>123:13    Q.  Okay.  Next bullet point:  "These<br>123:14    guidelines are not absolute criteria for<br>123:15    assigning individual category scores as<br>123:16    subjective measures such as loan quality,<br>123:17    diversification, parental strength and other<br>123:18    factors are considered."<br>123:19    Do you see that?<br>123:20    A.  I do.<br>123:21    Q.  It says that:  "CCRM considered loan<br>123:22    quality in applying the Metrix framework,"<br>123:23    right?<br>123:24    A.  Yes.<br>123:25    Q.  How did CCRM determine loan quality<br><br>124:2    in assigning Metrix scores?<br>124:3    A.  I don't recall.<br>124:4    Q.  What sources of information might |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 124:5  CCRM have considered in determining loan |
| | 124:6  quality of Freddie Mac's PLS counterparties? |
| | 124:7      A.   A lot of the -- I believe that there |
| | 124:8  were certain high level, I guess, |
| | 124:9  stratification of either a portfolio the |
| | 124:10   company might have retained or their |
| | 124:11   origination practices a lot of times in the |
| | 124:12   10-Q or 10-K. |
| | 124:13           Also in some of the investor, you |
| | 124:14   know, the marketing materials, they would |
| | 124:15   present their, I guess, typical loan quality |
| | 124:16   Metrix. |
| | 124:17     Q.    AMO's reviews also discussed loan |
| | 124:18   quality, right? |
| | |
| | 124:20         THE WITNESS:  I don't know if I |
| | 124:21   would phrase it like that. |
| | 124:22         BY MR. COHEN: |
| | 124:23     Q.   How would you phrase it? |
| | |
| | 124:25         THE WITNESS:  I would say it was a |
| | |
| | 125:2  review of their operations and controls.  I |
| | 125:3  just don't know that I would be so specific to |
| | 125:4  say they reviewed loan quality. |
| **Kenneweg Tr. at 127:12 – 128:22** | 127:12       Q.   What was your understanding in 2005 |
| | 127:13   to 2007 of why AMO reviewed a sample of loans? |
| | 127:14     A.   I don't really want to speculate on |
| | 127:15   why AMO did what they did as part of their |
| | 127:16   process.  I was a user of the final report and |
| | 127:17   the final rating, but I don't want to |
| | 127:18   hypothesize on why they did what they did. |
| | 127:19     Q.   As a user of the report, what is |
| | 127:20   your understanding of the purpose of the |
| | 127:21   report? |
| | 127:22     A.   Just to help inform our overall |
| | 127:23   assessment of the counterparty. |
| | 127:24     Q.   And the sampling was part of that, |
| | 127:25   right? |
| | |
| | 128:3         THE WITNESS:  In some reviews, they |
| | 128:4  did do a sample of loan review, yes. |
| | 128:5         BY MR. COHEN: |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 128:6    Q.   And that helped inform your<br>128:7    subjective application of a measure like loan<br>128:8    quality, right?<br><br>128:10        THE WITNESS:  I wouldn't say their<br>128:11    specific loan review helped inform my decision.<br>128:12    I would say their overall assessment and their<br>128:13    rating helped inform.  It was one piece of<br>128:14    information I considered.<br>128:15        BY MR. COHEN:<br>128:16    Q.   So is it fair to say that you<br>128:17    reviewed AMO's review of loan quality in -- or<br>128:18    assessment of the counterparty's financial<br>128:19    health?<br><br>128:21        THE WITNESS:  I considered AMO's<br>128:22    overall report. |
| **Kenneweg Tr. at 130:14 – 131:21** | 130:14    Q.   In the next paragraph down, it<br>130:15    states that:  "Completion of an operational<br>130:16    review is required for all aggregators for<br>130:17    approval and to assign the Metrix score.<br>130:18    Because assessment of an aggregator's processes<br>130:19    and controls is essential to ensuring<br>130:20    appropriate loan quality, the operational<br>130:21    review is a key component in assessing<br>130:22    counterparty risk for this group."<br>130:23        Do you see that?<br>130:24    A.   I do.<br>130:25    Q.   What kind of things did CCRM look<br><br>131:2    for in reviewing an aggregator's processes?<br>131:3    A.   CCRM didn't necessarily assess all<br>131:4    the processes.  We would have relied on an<br>131:5    operational review for that purpose.<br>131:6    Q.   What kind of things did CCRM look<br>131:7    for in assessing an aggregator's controls?<br>131:8    A.   I don't recall.<br>131:9    Q.   The next sentence states:  "An<br>131:10    operational review is not required for<br>131:11    assigning a Metrix score for an originator<br>131:12    pursuant to PM&P 101, the Triple A investment<br>131:13    level."<br>131:14        Why was an operational review a key |

| | GSE Counterparty Reviews and Policies | |
|---|---|---|
| | 131:15   component for ensuring loan quality for<br>131:16   aggregators and not originators?<br><br>131:18        THE WITNESS:  Because we relied on<br>131:19   the aggregator to perform due diligence on the<br>131:20   loans that they were buying and putting into<br>131:21   deals.  They are an added layer of protection. | |
| **Kenneweg Tr. at<br>145:5 – 146:9** | 145:5        Q.    At Page 0453, next page, under the<br>145:6   second header, it states that:  "Periodic<br>145:7   meetings are held between all critical parties<br>145:8   involved in the MABS counterparty management<br>145:9   process.  These parties include CCRM, portfolio<br>145:10   management, structured credit, AMO and<br>145:11   single-family credit management.  These<br>145:12   meetings are extremely useful in terms of<br>145:13   sharing information, such as operational review<br>145:14   findings and current events, and also for<br>145:15   conveying business area priorities in terms of<br>145:16   counterparty activity and review requests.<br>145:17   Information gathered at these meetings may aid<br>145:18   CCRM in reviewing and rating a counterparty.<br>145:19   Additionally, CCRM conveys any recent<br>145:20   counterparty score changes at this meeting.<br>145:21   These meetings are generally held monthly."<br>145:22        Do you see that?<br>145:23     A.   I do.<br>145:24        Q.    Do you remember these counterparty<br>145:25   form meetings?<br><br>146:2     A.    I remember that we had several, yes.<br>146:3        Q.    Was CCRM responsible for arranging<br>146:4   the meetings?<br>146:5     A.   I believe so, yes.<br>146:6        Q.    Was it responsible for creating an<br>146:7   agenda?<br>146:8     A.   I believe I usually created the<br>146:9   agenda. | |
| **Kenneweg Tr. at<br>239:24 – 240:22** | 239:24        Q.    If you flip to the page ending in<br>239:25   Bates No. 451, there is a list of --<br>240:2   "Comprehensive review of financial data<br>240:3   performed with consideration to," and there is<br>240:4   a list of items.<br>240:5        Do you recall that? | |

84

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 240:6         And one of those items is "process<br>240:7    controls."<br>240:8         Do you see that?<br>240:9    A.   I do.<br>240:10    Q.   Did -- was the AMO review part of<br>240:11    Freddie Mac's procedure for monitoring process<br>240:12    controls at counterparties?<br><br>240:14         THE WITNESS:  It's -- like I said<br>240:15    before, I don't recall exactly the context<br>240:16    between these two words on this overall<br>240:17    procedure.<br>240:18         I can tell you the operational<br>240:19    review is something that we consumed as part of<br>240:20    our review, but, you know, the meaning behind<br>240:21    this one bullet point, I'm not sure at this<br>240:22    point. |
| **Kenneweg Tr. at**<br>**241:11 – 241:23** | 241:11         Q.   How did the operational reviews<br>241:12    affect your assessment of the financial<br>241:13    wherewithal of Freddie Mac counterparties?<br><br>241:15         THE WITNESS:  I would say they could<br>241:16    have impacted the overall rating.  I mean, they<br>241:17    wouldn't necessarily impact this -- how did you<br>241:18    put it, the financial view?<br>241:19         BY MR. BENNETT:<br>241:20    Q.   Financial wherewithal.<br>241:21    A.   I would say they could impact the<br>241:22    overall rating that we would assign a<br>241:23    counterparty. |
| **Kenneweg Tr. at**<br>**272:22 – 274:18** | 272:22         The purpose of sending the AMO team<br>272:23    out to review an originator was to assess the<br>272:24    risk that that originator posed to Freddie Mac,<br>272:25    correct?<br><br>273:3         THE WITNESS:  I guess one type of<br>273:4    risk, yeah, could pose to Freddie Mac.<br>273:5         BY MR. BENNETT:<br>273:6    Q.   Okay.  And the type of risk was the<br>273:7    risk relating to the relationship with that<br>273:8    originator and Freddie Mac's PLS business,<br>273:9    correct?<br>273:11         THE WITNESS:  The relationship of |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 273:12    that customer and our PLS business?<br>273:13        BY MR. BENNETT:<br>273:14    Q.   Yes.<br>273:15        The reason they were -- the<br>273:16    counterparties -- the originators were on the<br>273:17    counterparty list for review is because they<br>273:18    were selling loans into the PLS in which<br>273:19    Freddie was investing?<br>273:20    A.   That's correct.<br>273:21    Q.   So the goal of the AMO review was to<br>273:22    assess the ways in which that originator<br>273:23    touched the Freddie Mac PLS business?<br><br>273:25        THE WITNESS:  I don't think they<br><br>274:2    were able to only look at the Freddie Mac PLS<br>274:3    business.  It was to assess their overall<br>274:4    processes and controls.<br>274:5        BY MR. BENNETT:<br>274:6    Q.   Correct.  Correct.<br>274:7        Their overall processes and controls<br>274:8    with the goal of understanding the risk posed<br>274:9    to the Freddie Mac PLS business?<br><br>274:11        THE WITNESS:  That sounds<br>274:12    reasonable.<br>274:13        BY MR. BENNETT:<br>274:14    Q.   So they weren't going out, for<br>274:15    example, with the goal of testing policies and<br>274:16    procedures that had nothing to do with Freddie<br>274:17    Mac?<br>274:18    A.   Right. |
| **Bates Moss Tr. at 35:19 – 36:11** | 35:19    Q.   What type of counterparties<br>35:20    were reviewed in connection with the<br>35:21    purchase of PLS?<br><br>35:23    A.   Entities that were either<br>35:24    originating, selling or servicing<br>35:25    mortgage products.<br><br>36:2    Q.   What was the purpose of<br>36:3    counterparty reviews?<br>36:4    A.   To assess the overall |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 36:5   financial strength of the counterparty<br>36:6   and its ability to meet its requirements,<br>36:7   its rep and warrant requirements, and to<br>36:8   ensure that the counterparties had the<br>36:9   financial wherewithal and overall<br>36:10   creditworthiness to do business with<br>36:11   Fannie Mae. |
| **Bates Moss Tr. at 36:17 – 38:7** | 36:17       Q.    Were there different types of<br>36:18   counterparty reviews?<br>36:19       A.    Yes.<br>36:20       Q.    What types were there?<br>36:21       A.    There were desk reviews and<br>36:22   there were onsite reviews.<br>36:23       Q.    What did an onsite review<br>36:24   consist of?<br>36:25       A.    A team of operational review<br><br>37:2   analysts would review information --<br>37:3   review the underwriting, operations,<br>37:4   origination practices and processes on<br>37:5   the traditional side relative to the<br>37:6   seller/servicer guide.  They would spend<br>37:7   time with management to understand sort<br>37:8   of their entire sort of mortgage<br>37:9   origination and servicing processes and<br>37:10   policies.  And again, typically, that was<br>37:11   done relative to the seller/servicer<br>37:12   guide requirements, we wanted to ensure<br>37:13   that they were in compliance with such<br>37:14   requirements.<br>37:15       Q.    Would the same type of onsite<br>37:16   review occur in connection with<br>37:17   nontraditional counterparties?<br>37:18       A.    Yes.  I mean the focus again<br>37:19   was trying to ensure that we had a good<br>37:20   understanding of the overall financial<br>37:21   capacity and strength of that<br>37:22   counterparty, and so we would meet with<br>37:23   management and review with them their<br>37:24   policies and procedures and processes.<br>37:25       Q.    During your time at Fannie |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 38:2   Mae, can you give an estimate of<br>38:3   approximately how many counterparty<br>38:4   reviews occurred?<br>38:5       A.   I would say, while I cannot<br>38:6   recall the specific number, I would -- 70<br>38:7   to 80 such reviews. |
| **Bates Moss Tr. at 39:2 – 41:3** | 39:2       Q.   One of the counterparties<br>39:3   though that your group reviewed was<br>39:4   originators of loans?<br>39:5       A.   That's correct.<br>39:6       Q.   And how would you determine<br>39:7   which originators to review?<br>39:8       A.   Our practice was to review --<br>39:9   to develop a plan to review a certain<br>39:10   number of counterparties on an ongoing<br>39:11   basis.  Fannie Mae conducted business<br>39:12   with thousands of counterparties.  We set<br>39:13   -- we determined a prioritization review<br>39:14   schedule which included criteria such as<br>39:15   if the counterparty was on a watch list,<br>39:16   if a counterparty, if there was a pending<br>39:17   transaction with the counterparty.  If a<br>39:18   counterparty was applying for the first<br>39:19   time to deliver mortgages to Fannie Mae.<br>39:20       Q.   Was the volume of Fannie Mae<br>39:21   purchases from a counterparty also a<br>39:22   factor in determining whether to review a<br>39:23   counterparty?<br>39:24       A.   Not necessarily.<br>39:25       Q.   What type of information would<br><br>40:2   your counterparty review team obtain<br>40:3   about an originator's origination<br>40:4   processes?<br><br>40:6       A.   We would review their<br>40:7   procedures, their policies, their<br>40:8   processes.<br>40:9       Q.   What type of information would<br>40:10   you obtain in a review of a counterparty<br>40:11   with respect to their appraisal<br>40:12   processes? |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 40:15     A.   We then would review their<br>40:16   procurement process and their internal<br>40:17   procedures and processes and policies<br>40:18   with respect to selection of appraisers<br>40:19   and qualifications and such matters.<br>40:20     Q.   Would you undertake to review<br>40:21   the quality of their appraisal processes?<br><br>40:24     A.   Our focus was on compliance<br>40:25   relative to Fannie Mae's requirements.<br><br>41:2   So we focused on ensuring that those<br>41:3   criteria were in place. |
| **Bates Moss Tr. at 74:5 – 75:20** | 74:5     Q.   Did your group retain Clayton<br>74:6   to perform onsite operational reviews?<br>74:7     A.   Yes.<br>74:8     Q.   And did that include loan<br>74:9   level due diligence from time to time?<br>74:10     A.   That included some loan<br>74:11   sampling, yes.<br>74:12     Q.   And when your employee or<br>74:13   employees went on site with Clayton,<br>74:14   would they also be involved in performing<br>74:15   loan level due diligence of<br>74:16   counterparties?<br>74:17     A.   From time to time.<br>74:18     Q.   Including of originators?<br><br>74:20     A.   Yes.<br>74:21     Q.   Including originators of<br>74:22   subprime and Alt-A loans?<br><br>74:24     A.   For the purposes of ensuring<br>74:25   compliance with the seller/servicer<br><br>75:2   guide, yes.<br>75:3     Q.   And you were aware that those<br>75:4   originators also sold their subprime and<br>75:5   Alt-A loans into private label<br>75:6   securities? |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 75:8      A.    That could have been the case,<br>75:9   yes.<br>75:10      Q.    What was the operational<br>75:11   review and compliance group, the acronym<br>75:12   ORC seems to be associated with it, ORC?<br>75:13      A.    It's the group that was<br>75:14   responsible for going onsite and<br>75:15   conducting a review of the origination,<br>75:16   underwriting, servicing, selling,<br>75:17   policies, procedures, processes of any<br>75:18   one of those entities.<br>75:19      Q.   Were they part of your group?<br>75:20      A.   Yes. |
| **Bates Moss Tr. at 76:13 – 77:16** | 76:13      Q.    And you mentioned the legal<br>76:14   department a few minutes ago.  Were they<br>76:15   also involved in some way in reviewing<br>76:16   counterparties?<br>76:17      A.    Predatory lending.<br>76:18      Q.    Was that the sole scope of<br>76:19   their review, to the best of your<br>76:20   knowledge?<br>76:21      A.    Yes.<br><br>. . . .<br><br>77:11      Q.    Did you interact with the<br>77:12   legal department in connection with their<br>77:13   counterparty reviews?<br>77:14      A.    Yes.<br>77:15      Q.    And can you describe that<br>77:16   interaction? |
| **Bates Moss Tr. at 78:4 – 78:17** | 78:4      A.    Our discussions with, or<br>78:5   engagement or interaction with predatory<br>78:6   was really more from the perspective of,<br>78:7   again, if there were material findings or<br>78:8   information that could be a data input<br>78:9   into our overall review of that<br>78:10   counterparty to determine whether or not<br>78:11   that counterparty remained a financially<br>78:12   and operationally sound counterparty, |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 78:13   that at a -- we would speak with John and<br>78:14   Cindy as to sort of are there any issues<br>78:15   we need to be aware of as we consider the<br>78:16   overall financial and creditworthiness of<br>78:17   this institution. |
| **Bates Moss Tr. at 79:8 – 82:18** | 79:8      Q.   Did you become aware that in<br>79:9   conducting their anti-predatory lending<br>79:10   reviews the legal department actually<br>79:11   physically looked at loan files of an<br>79:12   originator?<br><br>79:14      A.   I was aware that that was a<br>79:15   part of their process.<br>79:16      Q.   And what did you understand in<br>79:17   that regard?<br>79:18      A.   That that was a part of their<br>79:19   process and that they performed such<br>79:20   reviews.<br>79:21      Q.   And did you appreciate that<br>79:22   they performed such reviews of<br>79:23   originators who both sold loans directly<br>79:24   to Fannie Mae and who placed loans into<br>79:25   private label securities?<br>80:2      A.   Yes.<br><br>82:8      Q.   And would you all, these<br>82:9   groups get together every once in awhile<br>82:10   to talk about the counterparties that you<br>82:11   were reviewing?<br><br>82:14      A.   We would meet for the purposes<br>82:15   of ensuring that we had a, an<br>82:16   enterprise-wide view of the exposures of<br>82:17   a particular counterparty that might be<br>82:18   doing business across Fannie Mae. |
| **Bates Moss Tr. at 107:2 – 108:10** | 107:2      Q.   Was this document something<br>107:3   that was an operative process or<br>107:4   procedure while you were at Fannie Mae?<br>107:5      A.   Yes.<br>107:6      Q.   Okay.  And what did<br>107:7   nontraditional mean here in this document<br>107:8   entitled nontraditional lending group?<br>107:9      A.   It meant PLS and other |

| | **GSE Counterparty Reviews and Policies** |
|---|---|
| | 107:10   nontraditional sellers and servicers.<br>107:11      Q.    Did it also mean, refer to as<br>107:12   subprime loans?<br><br>107:14      A.    Nontraditional included<br>107:15   subprime.<br>107:16      Q.    Did it also include Alt-A<br>107:17   loans?<br><br>107:19      A.    It primarily focused on<br>107:20   subprime.<br>107:21      Q.    Did it also --<br>107:22      A.    PLS.<br>107:23      Q.    Did it also include Alt-A<br>107:24   loans?<br><br>108:2      A.    I apologize, I'm trying to<br>108:3   determine at the -- when I arrived at the<br>108:4   organization.<br>108:5      Q.    At some point during your time<br>108:6   within Fannie Mae did nontraditional<br>108:7   lending also refer to Alt-A loans?<br>108:8      A.    It may have included Alt-A,<br>108:9   but the primary focus was on subprime<br>108:10   PLS, manufactured housing. |
| **Bates Moss Tr. at 109:14 – 112:19** | 109:14      Q.    Under desk review procedures<br>109:15   there's a heading below that entitled<br>109:16   desk review procedures, step 1, second<br>109:17   sentence states "The functional areas<br>109:18   that should be reviewed as part of the<br>109:19   desk review are as follows and do you see<br>109:20   it goes to list certain items, correct?<br>109:21      A.    Correct.<br>109:22      Q.    And the first item is<br>109:23   origination, correct?<br>109:24      A.    Correct.<br>109:25      Q.    And under origination it<br><br>110:2   identifies six areas, A through F, right?<br>110:3      A.    Yes.<br>110:4      Q.    And those include policies,<br>110:5   procedures, correct?  Yes?<br>110:6      A.    Yes. |

| GSE Counterparty Reviews and Policies |
|---|

|  | 110:7     Q.    TPOs, third party |
|---|---|
|  | 110:8    originations, correct? |
|  | 110:9     A.    Yes. |
|  | 110:10     Q.    Appraisal? |
|  | 110:11     A.    Yes. |
|  | 110:12     Q.    And underwriting? |
|  | 110:13     A.    Yes. |
|  | 110:14     Q.    All of these areas were |
|  | 110:15    reviewed as part of a desk review? |
|  | 110:16     A.    Depending on the specific |
|  | 110:17    situation, the desk review may have |
|  | 110:18    included some or all of these aspects. |
|  | 110:19     Q.    Can you recall any |
|  | 110:20    counterparty desk review relating to PLS |
|  | 110:21    where any of these areas were not |
|  | 110:22    reviewed? |
|  | 110:23     A.    No. |
|  | 110:24     Q.    If you could turn now, please, |
|  | 110:25    to page 546, Bates ending 546 and that's |
|  |  |
|  | 111:2    entitled "Nontraditional lending group |
|  | 111:3    onsite operational review process."   Do |
|  | 111:4    you see that? |
|  | 111:5     A.    Yes. |
|  | 111:6     Q.    And the second paragraph under |
|  | 111:7    that states "All issuers and servicers |
|  | 111:8    for whom total outstanding investment |
|  | 111:9    equals or exceeds $1 billion must be |
|  | 111:10    approved and monitored by the SFMB using |
|  | 111:11    established SFMB policies and |
|  | 111:12    procedures."   Do you see that? |
|  | 111:13     A.    Yes. |
|  | 111:14     Q.    Do you recall what established |
|  | 111:15    SFMB policies and procedures this is |
|  | 111:16    referring to? |
|  | 111:17     A.    Counterparty credit risk |
|  | 111:18    policies and procedures. |
|  |  |
|  | 111:24     Q.    In the next section it's |
|  | 111:25    entitled "Operational review procedures," |
|  |  |
|  | 112:2    do you see that? |
|  | 112:3     A.    Yes. |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 112:4     Q.    And under step 1 the first<br>112:5    paragraph indicates that the<br>112:6    nontraditional lending group will conduct<br>112:7    an onsite operational review and then<br>112:8    there are five items after that, do you<br>112:9    see that?<br>112:10     A.   Yes.<br>112:11     Q.    Are those five different<br>112:12    business units within Fannie Mae?<br>112:13     A.    Four different business units.<br>112:14     Q.    And which are the four<br>112:15    different business units, can you just<br>112:16    identify them?<br>112:17     A.    Single family marketing,<br>112:18    legal, credit finance, and nontraditional<br>112:19    and counterparty were consolidated. |
| **Bates Moss Tr. at**<br>**113:12 – 114:17** | 113:12     Q.    If you could turn, please, to<br>113:13    the next page, page 547.  Do you see that<br>113:14    there is a step 4?<br>113:15     A.   Yes.<br>113:16     Q.    And do you see it states<br>113:17    "Onsite operational review will consist<br>113:18    of a detailed analysis of the following<br>113:19    areas of operations"?  Do you see that?<br>113:20     A.   Yes.<br>113:21     Q.    And it then lists, among other<br>113:22    things, underwriting, policies, practices<br>113:23    and procedures, origination/acquisition,<br>113:24    policies, practices and procedures, and<br>113:25    aggregator review?  Do you see that?<br><br>114:2     A.   Yes.<br>114:3     Q.    Under this policy, the onsite<br>114:4    operational review included a detailed<br>114:5    analysis of each of those areas at a<br>114:6    nontraditional lender?<br><br>114:9     A.    Yes, focused on the<br>114:10    operations.<br>114:11     Q.    Are you aware of any onsite<br>114:12    review where any of these areas were not<br>114:13    analyzed in detail? |

| **GSE Counterparty Reviews and Policies** | |
|---|---|
| | 114:16     A.  I cannot recall a situation<br>114:17  where they would not be. |
| **Bates Moss Tr. at 117:12 – 121:3** | 117:12     Q.  Okay.  If you can turn,<br>117:13  please, to page 551.  Do you see that<br>117:14  this is entitled "Nontraditional lending<br>117:15  operational review template" and you see<br>117:16  that it continues on for pages and pages<br>117:17  through 564?<br>117:18     A.  Mm-hmm.<br>117:19     Q.  Yes.<br>117:20     A.  Yes, I see that.<br>117:21     Q.  Do you see it lays out<br>117:22  information that Fannie Mae reviewers<br>117:23  were to obtain during an onsite<br>117:24  operational review of a nontraditional<br>117:25  lender?<br><br>118:4     A.  No.  It is information that is<br>118:5  obtained either from onsite or from the<br>118:6  responsible parties as input into a final<br>118:7  report.<br>118:8     Q.  Okay.  On page 553 do you see<br>118:9  that among the areas that Fannie Mae<br>118:10  obtained information on in connection<br>118:11  with an onsite operational counterparty<br>118:12  review was the counterparty's<br>118:13  origination/underwriting?<br>118:14     A.  That's correct.<br>118:15     Q.  And loan originations?<br>118:16     A.  That's correct.<br>118:17     Q.  And onto the next page, you<br>118:18  see it also included information<br>118:19  concerning appraisal quality and<br>118:20  appraisal processes?<br>118:21     A.  Yes.<br>118:22     Q.  As well as underwriting?<br>118:23     A.  Yes.<br>118:24     Q.  And Fannie Mae would seek<br>118:25  information concerning these areas during<br><br>119:2  an operational review? |

| | |
|---|---|
| **GSE Counterparty Reviews and Policies** | |
| | 119:5      A.    These are questions that, yes, |
| | 119:6   could be -- would be asked. |
| | 119:7      Q.    And just to look at a couple |
| | 119:8   of them, on page 553, under |
| | 119:9   origination/underwriting review summary, |
| | 119:10   the objective is listed as "To obtain |
| | 119:11   information with regard to the lenders |
| | 119:12   origination processes and to become |
| | 119:13   familiar with how the lender originates |
| | 119:14   loans." Do you see that? |
| | 119:15      A.   Yes. |
| | 119:16      Q.   Are you aware of any |
| | 119:17   counterparty onsite operational review |
| | 119:18   where Fannie Mae did not become familiar |
| | 119:19   with how a lender originated loans? |
| | |
| | 119:22      A.   Analysts that were conducting |
| | 119:23   these reviews would interview to |
| | 119:24   understand the origination and |
| | 119:25   underwriting process for the purpose of |
| | |
| | 120:2   ensuring compliance with Fannie Mae's |
| | 120:3   requirements. |
| | |
| | 120:19      Q.   So an onsite counterparty |
| | 120:20   operational review, the reviewers would |
| | 120:21   either be relying on a prior review in |
| | 120:22   order to become familiar with how the |
| | 120:23   lender originated loans, or would review |
| | 120:24   that area themselves anew? |
| | |
| | 121:3      A.   That was an option. |
| **Bates Moss Tr. at 147:22 – 154:14** | 147:22      Q.   And on the last page of the |
| | 147:23   document, is that your signature on July |
| | 147:24   11th, 2006? |
| | 147:25      A.   Yes, it is. |
| | . . . . |
| | 148:2      Q.   Indicating that you approved |
| | 148:3   this review and the recommendations |
| | 148:4   contained in it? |
| | 148:5      A.   Yes. |
| | 148:6      Q.   Would you typically read a |
| | 148:7   review before signing it? |

| GSE Counterparty Reviews and Policies |
|---|

|  | 148:8     A.   Yes.<br>148:9     Q.   Do you happen to recall this<br>148:10   specific review of Fremont in 2006?<br>148:11     A.   I do now with the document in<br>148:12   front of me.<br>148:13     Q.   It refreshes your recollection<br>148:14   that in fact your group reviewed Fremont<br>148:15   Investment and Loan in May,<br>148:16   approximately, 2006?<br>148:17     A.   Yes.<br>148:18     Q.   On the second page do you see<br>148:19   the first paragraph indicates that single<br>148:20   family counterparty risk management team<br>148:21   conducted an onsite operational review of<br>148:22   Fremont on May 16th to 17th, 2006 at<br>148:23   Fremont's offices in California, correct?<br>148:24     A.   Yes.<br>148:25     Q.   And the next sentence states<br><br>149:2   "The review encompassed an in-depth<br>149:3   evaluation of the mortgage origination,<br>149:4   risk management operations, and servicing<br>149:5   operations of Fremont."  Do you see that?<br>149:6     A.   Yes.<br>149:7     Q.   And so Fannie Mae personnel,<br>149:8   Mr. Johnson, Mr. Vignato, were able to<br>149:9   conduct in-depth evaluations of subprime<br>149:10   originators' mortgage origination<br>149:11   processes?<br><br>149:14     Q.   Correct?<br>149:15     A.   I'm sorry?<br>149:16     Q.   Fannie personnel like Mr.<br>149:17   Johnson and Mr. Vignato, were able to<br>149:18   conduct in-depth evaluations of subprime<br>149:19   originators' mortgage origination<br>149:20   processes, correct?<br><br>149:23     A.   They conducted an assessment<br>149:24   and review, yes.<br>149:25     Q.   And in their terms it was an<br><br>150:2   in-depth evaluation, correct? |

**GSE Counterparty Reviews and Policies**

150:3      A.   Yes.

150:4      Q.   And in the first page when it
150:5   says nontraditional counterparty
150:6   operational review, you understood that
150:7   to include subprime loans and also PLS?

150:10      A.   This review was done
150:11   specifically, as it states in the
150:12   document, for Fannie Mae's subprime
150:13   initiative and risk transformation
150:14   facility, and that Fremont was currently
150:15   an approved PLS counterparty at the time
150:16   that this review was done.
150:17      Q.   So Fremont's an approved
150:18   counterparty for PLS transactions at the
150:19   time this review is done, correct?
150:20      A.   Correct.
150:21      Q.   And Fannie Mae personnel are
150:22   now going on site again to Fremont to
150:23   review its processes and procedures
150:24   further?

151:3      A.   They are going on site to
151:4   review this, the origination, operational
151:5   and servicing analysis for the purposes
151:6   of approving the counterparty as a
151:7   subprime counterparty.
151:8   Q.   Okay.
151:9      A.   Under this initiative.
151:10      Q.   And when Fannie Mae personnel
151:11   went on site to conduct this in-depth
151:12   review of an originator like Fremont,
151:13   were there any restrictions on what the
151:14   Fannie Mae reviewers could look at?

151:17      A.   As I stated previously, the
151:18   team conducting the review would review
151:19   all aspects of the origination,
151:20   underwriting, servicing process, which
151:21   would include policies, procedures,
151:22   processes, you know, loan sampling, etc.

152:9      Q.   So in this case, they were

| | |
|---|---|
| **GSE Counterparty Reviews and Policies** | |

| | |
|---|---|
| | 152:10    looking and did an in-depth evaluation of |
| | 152:11    mortgage origination and risk management |
| | 152:12    operations, among other things.  Were |
| | 152:13    there any restrictions on what your |
| | 152:14    reviewers could look at with respect to |
| | 152:15    mortgage origination or risk management |
| | 152:16    operations? |
| | |
| | 152:19        A.    There were no explicit |
| | 152:20    restrictions, but in this instance, they |
| | 152:21    were focused on whole loan collateral for |
| | 152:22    the purposes of becoming an approved |
| | 152:23    counterparty to sell subprime loans to |
| | 152:24    Fannie Mae. |
| | 152:25        Q.    In the second paragraph on the |
| | |
| | 153:2    page we're on it states, "Based on this |
| | 153:3    review, it's our recommendation that |
| | 153:4    Fremont Investment and Loan has |
| | 153:5    demonstrated appropriate business |
| | 153:6    practices to mitigate operational and |
| | 153:7    credit risk of both the origination and |
| | 153:8    servicing of subprime collateral as well |
| | 153:9    as financial stability to support the |
| | 153:10   risk associated with subprime collateral. |
| | 153:11   Fremont Investment and Loan is currently |
| | 153:12   an approved Fannie Mae private label |
| | 153:13   securities counterparty and in good |
| | 153:14   standing." |
| | 153:15        Do you see that? |
| | 153:16    A.    Yes. |
| | 153:17        Q.    What business practices did |
| | 153:18    Fremont use to mitigate operational and |
| | 153:19    credit risk for the origination of |
| | 153:20    subprime collateral? |
| | |
| | 153:23        A.    In this instance, the team |
| | 153:24    felt that the -- that Fremont had strong |
| | 153:25    risk management, fraud management, |
| | |
| | 154:2    collateral value review processes in |
| | 154:3    place to help mitigate some of the items |
| | 154:4    that they identified that could be |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 154:5    potential risk. |
| | 154:6        Q.   If you could turn, please, to |
| | 154:7    the page ending Bates 290.  Do you see |
| | 154:8    under the heading collateral performance, |
| | 154:9    statistics and trending" that the first |
| | 154:10   paragraph indicates that Fremont |
| | 154:11   collateral is in securities from its own |
| | 154:12   shelf and in securities from dealer |
| | 154:13   shelves, correct? |
| | 154:14       A.   Correct. |
| **Bates Moss Tr. at 154:24 – 156:3** | 154:24       Q.   But the reviewers obviously |
| | 154:25   understood that Fremont loans were being |
| | |
| | 155:2    placed into private label securities, |
| | 155:3    correct? |
| | 155:4        A.   That's correct. |
| | |
| | 155:8        If you could turn now, please, |
| | 155:9    to Bates number, it's 296 to 297.  Do you |
| | 155:10   see there's a heading on 296 called |
| | 155:11   "underwriting processes"? |
| | 155:12       A.   Yes. |
| | 155:13       Q.   And do you see that the review |
| | 155:14   team indicated that the underwriting |
| | 155:15   processes at Fremont were acceptable, |
| | 155:16   correct? |
| | 155:17       A.   Okay. |
| | 155:18       Q.   Do you see that?  Do you see |
| | 155:19   that the review team indicated that |
| | 155:20   Fremont's underwriting processes were |
| | 155:21   acceptable? |
| | 155:22       A.   Yes. |
| | 155:23       Q.   And the way we know that is |
| | 155:24   because the acceptable box is checked? |
| | 155:25       A.   Is checked. |
| | |
| | 156:2    Q.   Correct? |
| | 156:3    A.   Correct. |
| **Bates Moss Tr. at 165:13 – 167:15** | 165:13       Q.   Ms. Bates Moss, we were |
| | 165:14   looking at the Fremont nontraditional |
| | 165:15   counterparty operational review.  I'd |
| | 165:16   like to stay in there and ask if you |

| GSE Counterparty Reviews and Policies |
|---|

|  | 165:17 | could turn to page 299, Bates stamp 299. |
|---|---|---|

165:17   could turn to page 299, Bates stamp 299.
165:18      A.   Okay.
165:19      Q.   Do you see at the bottom
165:20   there's a heading called "loan level
165:21   credit review"?
165:22      A.   Yes.
165:23      Q.   And do you see that the
165:24   checked box there indicates that the
165:25   review team found that the loan level

166:2   credit review was acceptable?
166:3      A.   Yes.
166:4      Q.   And in the first paragraph it
166:5   states "The SF CPRM team," that's single
166:6   family counterparty risk management team?
166:7      A.   That's correct.
166:8      Q.   "Performed onsite level due
166:9   diligence, onsite loan level due
166:10   diligence.  The loan sample consisted of
166:11   the review of 17 loan files," and it
166:12   describes those, and it then says,
166:13   "Typically, a risk grade of 4 would not
166:14   be purchased and kicked from the pool of
166:15   loans.  The risk grade 4 sample
166:16   represents 12 percent of the population
166:17   reviewed.  Typically, a kickout
166:18   concentration of 15 percent or less is
166:19   acceptable.  Additional information on
166:20   each loan reviewed is available as
166:21   supporting documentation."
166:22      Do you see that?
166:23      A.   Yes.
166:24      Q.   What's a risk grade 4?
166:25      A.   A risk grade 4 according to

167:2   this document would be considered a high
167:3   risk loan.
167:4      Q.   Those are loans that Fannie
167:5   Mae typically would not purchase and
167:6   would be kicked from a pool of loans?
167:7      A.   According to this, yes.
167:8      Q.   And you see that this is
167:9   reporting that your review team found

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 167:10   that 12 percent of the loans in its<br>167:11   sample of Fremont loans were a risk grade<br>167:12   4?<br>167:13      A.   Yes, but it also states that a<br>167:14   kickout concentration of 15 percent or<br>167:15   less is acceptable. |
| **Bates Moss Tr. at 168:22 – 170:8** | 168:22      Q.   And you observed that the<br>168:23   review team reported that typically a<br>168:24   kickout concentration of 15 percent or<br>168:25   less is acceptable, do you see that?<br><br>169:2      A.   Yes.<br>169:3      Q.   And that's what you were<br>169:4   referring to in your prior answer?<br>169:5      A.   That that is, that is a rule<br>169:6   of thumb that, or a guideline that at the<br>169:7   time may have been in place, yes.<br>169:8      Q.   Whose rule of thumb was it?<br>169:9      A.   Or guideline.<br>169:10      Q.   Whose rule of thumb or<br>169:11   guideline was it?<br>169:12      A.   Not rule of thumb, guideline.<br>169:13      Q.   Sorry.  Whose guideline was it<br>169:14   that a kickout concentration of 15<br>169:15   percent or less was acceptable?<br>169:16      A.   This is handled in credit<br>169:17   risk.<br>169:18      Q.   So we're talking Fannie Mae's<br>169:19   guideline was that 15 percent or less of<br>169:20   kickout loans was acceptable?<br><br>169:22      A.   This does not clarify that<br>169:23   it's Fannie Mae versus the<br>169:24   counterparties.<br><br>170:2   mean when the review team reported that<br>170:3   typically a kickout concentration of 15<br>170:4   percent or less is acceptable?<br>170:5      A.   As we stated -- as I stated<br>170:6   before, this would -- we are doing this<br>170:7   evaluation relative to Fannie Mae's<br>170:8   guidelines. |

| GSE Counterparty Reviews and Policies | |
|---|---|
| **Bates Moss Tr. at 170:17 – 171:5** | 170:17      Q.    It was acceptable to Fannie<br>170:18    Mae if up to 15 percent of loans in a<br>170:19    sample were kicked out as risk grade 4?<br><br>170:22      A.    It was acceptable relative to<br>170:23    the number of loans that were randomly<br>170:24    sampled for the purposes of this review.<br>170:25      Q.    Why was a 15 percent kickout<br><br>171:2    concentration acceptable to Fannie Mae?<br><br>171:4      A.    I cannot speak to why that<br>171:5    would be acceptable. |
| **Bates Moss Tr. at 172:18 – 177:6** | 172:18      Q.    If you could turn, please, to<br>172:19    the next page, page 300.  Do you see that<br>172:20    there's a heading called "post-funding<br>172:21    and quality control process"?<br>172:22      A.    Yes.<br>172:23      Q.    And do you see that this was<br>172:24    also deemed acceptable to the Fannie<br>172:25    review team?<br><br>173:2      A.    Yes.<br>173:3      Q.    And to you, since you recall<br>173:4    you signed the back of this document as<br>173:5    well, correct?<br>173:6      A.    My approval is for the overall<br>173:7    process, a review.<br>173:8      Q.    Do you see in the second<br>173:9    paragraph underneath the post-funding and<br>173:10    quality control process it states<br>173:11    "Fremont's quality control department<br>173:12    conducts a monthly review of a 5 to 10<br>173:13    percent random sample of the company's<br>173:14    total loan production.  Additionally, a<br>173:15    targeted 30 percent sample is reviewed<br>173:16    monthly from each operation center on a<br>173:17    rotating basis"?<br>173:18        Do you see that?<br>173:19      A.    Yes.<br>173:20      Q.    And that type of sampling was<br>173:21    deemed acceptable to the counterparty<br>173:22    review team? |

| GSE Counterparty Reviews and Policies |
|---|

|  | 173:25      A.   If you read the prior |
|---|---|
|  | 174:2   paragraph, what is acceptable is the |
|  | 174:3   overall review of the process and in this |
|  | 174:4   -- which includes a number of factors, |
|  | 174:5   this being one of them. |
|  | 174:6      Q.   And this factor -- |
|  | 174:7      A.   Meaning the quality control |
|  | 174:8   department's review process was one of |
|  | 174:9   several factors that were considered in |
|  | 174:10  the post-funding and quality control |
|  | 174:11  process. |
|  | 174:12     Q.   Was there any indication here |
|  | 174:13  that your review team found this level or |
|  | 174:14  type of sampling to be inadequate in any |
|  | 174:15  way? |
|  | 174:16     A.   Again, if that was determined |
|  | 174:17  to be the case, and as I'm reading |
|  | 174:18  through it, it should have been |
|  | 174:19  documented here. |
|  | 174:20     Q.   There's no indication here of |
|  | 174:21  anyone at Fannie considering it to be |
|  | 174:22  inadequate, correct? |
|  | 174:23     A.   I can only speak to the |
|  | 174:24  document in front of me and the people |
|  | 174:25  that reviewed it.  I cannot speak to |
|  | 175:2   others outside of this review process. |
|  | 175:3      Q.   Your review of this document |
|  | 175:4   though indicates to you that the |
|  | 175:5   counterparty review team found that this |
|  | 175:6   type or level of sampling was adequate, |
|  | 175:7   correct? |
|  | 175:8      A.   This does not speak to the |
|  | 175:9   level and type of sampling as being |
|  | 175:10  adequate.  This speaks to the process, |
|  | 175:11  the post-funding and quality control |
|  | 175:12  process as being adequate and acceptable. |
|  | 175:13     Q.   Okay.  Did you have any reason |
|  | 175:14  to believe that the Fannie Mae review |
|  | 175:15  team chose loans to sample that it |
|  | 175:16  considered to be unrepresentative of |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 175:17    Fremont loans? |
| | |
| | 175:19      A.   The process and practice is to |
| | 175:20    have a random sampling. |
| | 175:21      Q.   Okay.  Are you aware of any |
| | 175:22    person or document that indicated that |
| | 175:23    Fremont's origination processes differed |
| | 175:24    as between loans it sold as whole loans |
| | 175:25    and loans it placed into PLS? |
| | |
| | 176:2      A.   No, I do not recall that to be |
| | 176:3    the case. |
| | 176:4      Q.   If you'd look, please, at page |
| | 176:5    298 to 299, do you see at the bottom of |
| | 176:6    298 there's a heading, "Appraisal quality |
| | 176:7    and review processes"?  Do you see that? |
| | 176:8      A.   Yes. |
| | 176:9      Q.   And do you see on 299 it |
| | 176:10    indicates that Fremont's appraisal |
| | 176:11    quality and review processes were |
| | 176:12    acceptable to Fannie Mae?  Strike that. |
| | 176:13        Do you see that on page 298, |
| | 176:14    actually, do you see at the bottom it |
| | 176:15    indicates that Fremont's appraisal |
| | 176:16    quality and review processes were |
| | 176:17    acceptable to Fannie Mae? |
| | 176:18      A.   Yes. |
| | 176:19      Q.   And on page 299 in the fifth |
| | 176:20    paragraph, in the last sentence do you |
| | 176:21    see that it states "Fremont allows an |
| | 176:22    appraisal variance of 15 percent for |
| | 176:23    loans with an LTV of 80 percent or less |
| | 176:24    and 5 percent for loans up to 95 |
| | 176:25    percent"? |
| | |
| | 177:2        Do you see that? |
| | 177:3    A.   Yes. |
| | 177:4      Q.   What did that mean? |
| | 177:5      A.   In Fremont's process it allows |
| | 177:6    for a variance. |
| **Bates Moss Tr. at 182:13 – 182:22** | 182:13      Q.   Sitting here, can you identify |
| | 182:14    any originator who had a different |
| | 182:15    allowance of appraisal variance than |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 182:16   Fremont? |
| | 182:17      A.   No, I cannot. |
| | 182:18      Q.   Obviously your review team |
| | 182:19   marked the appraisal quality and review |
| | 182:20   processes of Fremont acceptable, correct? |
| | 182:21      A.   That's what this document |
| | 182:22   says, yes |
| **Bates Moss Tr. at 184:4 - 185:4** | 184:4      Q.   With respect to the 15 percent |
| | 184:5   appraisal variance, is there any |
| | 184:6   indication here that your reviewers found |
| | 184:7   it to be a material issue or concern? |
| | 184:8      A.   If it was a material issue or |
| | 184:9   a concern it would have been reflected in |
| | 184:10   the overall assessment of the process. |
| | 184:11      Q.   And the overall assessment of |
| | 184:12   process here was that it was acceptable? |
| | |
| | 184:14      A.   Based on this report, it was |
| | 184:15   marked acceptable. |
| | 184:16      Q.   More broadly, can you recall |
| | 184:17   anyone at Fannie Mae ever indicating that |
| | 184:18   an originator having a 15 percent |
| | 184:19   appraisal variance raised a material |
| | 184:20   concern or issue? |
| | |
| | 184:22      A.   I do not recall that. |
| | 184:23      Q.   Are you aware of anyone ever |
| | 184:24   indicating that an originator having a 15 |
| | 184:25   percent appraisal variance in its |
| | |
| | 185:2   appraisal processes constituted a |
| | 185:3   departure from industry standards? |
| | 185:4      A.   No, I do not recall that. |
| **Bates Moss Tr. at 195:6 – 197:17** | 195:6      Q.   And your signature on each of |
| | 195:7   them is on the same day, July 11, 2006, |
| | 195:8   right, the Fremont signature and the |
| | 195:9   First Franklin signature on those two |
| | 195:10   reviews, correct?  You've signed both |
| | 195:11   reviews on July 11, 2006, correct?  Ms. |
| | 195:12   Bates Moss? |
| | 195:13      A.   Yes. |
| | 195:14      Q.   I'm just asking whether you've |
| | 195:15   signed this First Franklin review July |

| | |
|---|---|
| **GSE Counterparty Reviews and Policies** | |

| | |
|---|---|
| | 195:16   11th, 2006? |
| | 195:17      A.   Yes.  It looks like -- yes, my |
| | 195:18   signature is there. |
| | 195:19      Q.   If you can turn to the second |
| | 195:20   page of the review, it's on Bates page |
| | 195:21   ending 267, do you see that the first |
| | 195:22   paragraph indicates that the single |
| | 195:23   family counterparty risk management team |
| | 195:24   conducted an onsite operational review of |
| | 195:25   First Franklin on May 24 to 25, 2006 at |
| | |
| | 196:2   First Franklin's offices in California? |
| | 196:3   Do you see that? |
| | 196:4      A.   Yes. |
| | 196:5      Q.   And do you see the third |
| | 196:6   sentence states "The reviews encompassed |
| | 196:7   an in-depth evaluation of the mortgage |
| | 196:8   origination, risk management and |
| | 196:9   servicing operations of First Franklin," |
| | 196:10   correct? |
| | 196:11      A.   Yes. |
| | 196:12      Q.   And so this is another |
| | 196:13   subprime mortgage originator of whom |
| | 196:14   Fannie conducted an in-depth evaluation |
| | 196:15   of their mortgage origination operations, |
| | 196:16   correct? |
| | 196:17      A.   Correct. |
| | 196:18      Q.   And do you see starting at |
| | 196:19   Bates 274, let's skip over to 274, did |
| | 196:20   you see that the review by your team |
| | 196:21   included a review of collateral |
| | 196:22   performance statistics and trending, |
| | 196:23   correct? |
| | 196:24      A.   Correct. |
| | 196:25      Q.   And two pages later on 276, do |
| | |
| | 197:2   you see it also included a loan level |
| | 197:3   credit review by Clayton, correct? |
| | 197:4      A.   Yes. |
| | 197:5      Q.   And a page later do you see it |
| | 197:6   also included a review of First |
| | 197:7   Franklin's production and sourcing, |
| | 197:8   correct? |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 197:9     A.   Yes.<br>197:10     Q.   And would that be loan<br>197:11   production?<br>197:12     A.   That is correct.<br>197:13     Q.   And do you see that as part of<br>197:14   this in-depth evaluation of First<br>197:15   Franklin it also included a review of its<br>197:16   underwriting processes?<br>197:17     A.   Yes. |
| **Bates Moss Tr. at 216:15 – 217:9** | 216:15     Q.   And do you see on page 280, a<br>216:16   couple of pages later there's a heading<br>216:17   entitled "Post-funding and quality<br>216:18   control process"?<br>216:19     A.   Okay.<br>216:20     Q.   And do you see that Fannie Mae<br>216:21   reviewers also found that to be<br>216:22   acceptable?<br>216:23     A.   Yes, that's what it says.<br>216:24     Q.   In the second paragraph<br>216:25   underneath that heading do you see it<br><br>217:2   states "FF," First Franklin, "sets a 15<br>217:3   percent annual tolerance level for branch<br>217:4   underwriting errors.  Both clerical and<br>217:5   substantive errors uncovered through<br>217:6   sampling procedures are tallied against<br>217:7   the 15 percent benchmark."<br>217:8          Do you see that?<br>217:9     A.   Yes. |
| **Bates Moss Tr. at 217:17 – 219:14** | 217:17          Do you see that Fannie Mae's<br>217:18   review team is reporting that First<br>217:19   Franklin allowed for a 15 percent<br>217:20   underwriting error rate?<br>217:21     A.   Yes, that they are reporting<br>217:22   First Franklin's own internal guidelines.<br>217:23     Q.   And that includes substantive<br>217:24   underwriting errors, correct?<br>217:25     A.   As reported here.<br>218:1          LESIA BATES MOSS<br>218:2     Q.   Do you have any reason to<br>218:3   believe that that underwriting error rate<br>218:4   was not standard in the industry? |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 218:7      A.    This was a statement made in<br>218:8    -- by the author of what was communicated<br>218:9    to him.  This was not benchmarked against<br>218:10   the industry.<br>218:11      Q.    Well, as the head of<br>218:12   counterparty review, can you recall any<br>218:13   originator that had a lower underwriting<br>218:14   error rate than 15 percent?<br><br>218:17      A.    Again, I would have to look at<br>218:18   reviews to see if such information were<br>218:19   reported.<br>218:20      Q.    Sitting here today, can you<br>218:21   recall any originator that had a lower<br>218:22   underwriting error rate than 15 percent?<br><br>218:24      A.    Sitting here today I can't<br>218:25   even remember what I had for breakfast.<br><br>219:2    No.  I can't tell you at this point,<br>219:3    again, without having something in front<br>219:4    of me.<br>219:5      Q.    Have you seen any documents in<br>219:6    connection with your preparation for your<br>219:7    testimony, or can you recall any<br>219:8    documents indicating that any originator<br>219:9    of subprime loans had a lower<br>219:10   underwriting error rate than 15 percent?<br><br>219:13      A.    I don't recall seeing any<br>219:14   documents that had this language in it. |
| **Bates Moss Tr. at 222:2 – 222:9** | 222:2      Q.    Is there any indication in<br>222:3    this description of the post-funding and<br>222:4    quality control process at First Franklin<br>222:5    that your reviewers found a 15 percent<br>222:6    rate of underwriting errors to be<br>222:7    unacceptable?<br>222:8      A.    Again, if that were the case,<br>222:9    it would have been documented here. |
| **Bates Moss Tr. at 222:20 - 223:2** | 222:20      Are you aware of your<br>222:21   counterparty review group ever not<br>222:22   approving an originator for subprime<br>222:23   transactions because the originator |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 222:24   allowed for a 15 percent underwriting<br>222:25   error rate?<br><br>223:2       A.   I am not aware of that. |
| **Bates Moss Tr. at 225:24 – 226:20** | 225:24       Q.   Are you aware of any document<br>225:25   or person indicating that First<br><br>226:2   Franklin's tolerance of underwriting<br>226:3   errors differed as between loans sold as<br>226:4   whole loans and loans placed into PLS?<br><br>226:7       A.   I would have to look at each<br>226:8   individual review to see whether or not<br>226:9   that was documented.<br>226:10       Q.   Well, my question to you is do<br>226:11   you recall sitting here any person either<br>226:12   -- any person or document indicating that<br>226:13   First Franklin's tolerance of<br>226:14   underwriting errors at a level of 15<br>226:15   percent differed as between loans that<br>226:16   were sold as whole loans and loans that<br>226:17   were placed into PLS?<br><br>226:19       A.   No, I don't have that<br>226:20   recollection. |
| **Bates Moss Tr. at 227:7 – 227:21** | 227:7       Q.   If you could turn, please, to<br>227:8   the second page, Bates 987, do you see<br>227:9   that under recommendation the review team<br>227:10   approved of transactions with Saxon?<br>227:11       A.   Okay.<br>227:12       Q.   If you could turn, please, to<br>227:13   page 993, Bates stamp 993 there's a<br>227:14   heading on that page entitled "Loan level<br>227:15   credit review - Bohan," do you see that?<br>227:16       A.   Yes.<br>227:17       Q.   And do you see that here it's<br>227:18   a company called Bohan instead of Clayton<br>227:19   that's performing the loan level credit<br>227:20   review?<br>227:21       A.   Okay. |
| **Bates Moss Tr. at 228:6 – 229:20** | 228:6       Do you see that the review<br>228:7   team filled out the acceptable box?<br>228:8       A.   Okay. |

| | |
|---|---|
| **GSE Counterparty Reviews and Policies** | |
| | 228:9     Q.    With respect to loan level<br>228:10   credit review?<br>228:11     A.   Okay.<br>228:12     Q.    And the first sentence in this<br>228:13   paragraph states "Bohan performed loan<br>228:14   level due diligence on approximately 400<br>228:15   recently originated loan files"?  Do you<br>228:16   see that?<br>228:17     A.   Yes.<br>228:18     Q.    It continues out of the 400<br>228:19   loan files, or loans reviewed, only 61,<br>228:20   or 15.25 percent were classified as an<br>228:21   event level 3 finding.  Do you see that?<br>228:22     A.   Yes.<br>228:23     Q.   Do you have any reason to<br>228:24   believe that this 15 percent rate of<br>228:25   event level 3s in sampled loans was<br><br>229:2    unacceptable to Fannie Mae?<br>229:3     A.   Again, if it were unacceptable<br>229:4    it should be documented.<br>229:5     Q.    And what's documented here is<br>229:6    that in fact it was acceptable, correct?<br><br>229:9     A.    That's what that -- that's<br>229:10   what's documented, yes.<br>229:11     Q.   Are you -- strike that.<br>229:12          As the head of counterparty<br>229:13   risk management, were you aware of any<br>229:14   originator who had a better rate of event<br>229:15   level 3 loans, meaning better than 15<br>229:16   percent, less than 15 percent?<br><br>229:19     A.   I don't have a specific<br>229:20   example, no. |
| **Bates Moss Tr. at<br>230:25 – 231:12** | 230:25     Q.    Well we know what it is on the<br><br>231:2    sample, it was 15 percent?<br><br>231:4     A.    We know that it's 15 percent<br>231:5    on these particular loans that were<br>231:6    sampled.<br>231:7     Q.   And my question is did you |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 231:8   have any basis for believing that the<br>231:9   unsampled portion had a better rate?<br><br>231:12       A.   No. |
| **Bates Moss Tr. at 233:15 – 234:10** | 233:15       Q.   Oh, no, I'm sorry, I may have<br>233:16   misspoke.  Let me start again.  Do you<br>233:17   see that documentation accounted for<br>233:18   about half, 49.18 percent of the event<br>233:19   level 3 findings?<br>233:20       A.   Okay.<br>233:21       Q.   Do you see that debt ratio<br>233:22   accounted for about 11 percent of the<br>233:23   event level 3 findings, yes?<br>233:24       A.   Yes.<br>233:25       Q.   And LTV and guidelines<br><br>234:2   accounted for about 6 percent each for<br>234:3   the event level 3 findings?<br>234:4       A.   Yes.<br>234:5       Q.   And do you ever recall anyone<br>234:6   indicating within Fannie Mae that these<br>234:7   findings, these bases for findings of<br>234:8   event level 3 were unacceptable to Fannie<br>234:9   Mae?<br>234:10       A.   No. |
| **Bates Moss Tr. at 261:22 – 262:6** | 261:22       Q.   So are you aware of any way in<br>261:23   which the way that Clayton performed<br>261:24   services for Fannie Mae differed from the<br>261:25   way Clayton performed services for<br><br>262:2   issuers of PLS or originators of subprime<br>262:3   loans?<br><br>262:5       A.   I am not aware of those<br>262:6   differences. |
| **Bates Moss Tr. at 288:17 – 288:24** | 288:17   Q.  My question to you is do you<br>288:18   have any recollection of your team ever<br>288:19   finding that the process used by an<br>288:20   issuer of PLS in due diligence to sample<br>288:21   loans was inadequate?<br>288:22       A.   I don't recall any specific<br>288:23   example.  I'd have to look at the<br>288:24   reviews. |

| GSE Counterparty Reviews and Policies | |
|---|---|
| **Bates Moss Tr. at 289:7 – 289:12** | 289:7    Q.   Have you seen any document<br>289:8  indicating that your group ever found<br>289:9  that an issuer of PLS employed inadequate<br>289:10  processes when conducting due diligence<br>289:11  to sample loans?<br>289:12    A.  No. |
| **Bates Moss Tr. at 319:21 – 320:5** | 319:21    Q.   And in that context, can you<br>319:22  identify as the head of counterparty risk<br>319:23  management any originator that used a<br>319:24  different origination process when it<br>319:25  generated loans sold as whole loans as<br><br>320:2  opposed to loans placed in PLS?<br><br>320:5    A.  No. |
| **Bates Moss Tr. at 353:13 – 353:22** | 353:13    Q.   Are you aware of anyone at<br>353:14  Fannie Mae ever indicating to you that<br>353:15  your group should not approve a<br>353:16  counterparty for transactions because the<br>353:17  level of exceptions by which it issued<br>353:18  loans was too high?<br><br>353:21    A.  I never -- I am not aware of<br>353:22  that to be the case. |
| **Bates Moss Tr. at 412:25 -413:9** | 412:25    Q.   On the second to last page<br><br>413:2  it's Bates stamped 725.  Do you see that<br>413:3  you've approved this review?<br>413:4    A.  Yes.<br>413:5    Q.  And that's your signature?<br>413:6    A.  That is my signature.<br>413:7    Q.  And it indicates that Ms.<br>413:8  Johnson also approved it, your boss?<br>413:9    A.  That's correct. |
| **Bates Moss Tr. at 414:6 – 414:16** | 414:6    Q.   And in the third paragraph do<br>414:7  you see that it indicates that the<br>414:8  purpose of this review was to evaluate<br>414:9  Countrywide's non-prime wholesale lending<br>414:10  and servicing operations pursuant to the<br>414:11  PLS policy?<br>414:12    A.  That's correct.<br>414:13    Q.  And so now this is your<br>414:14  group's review of Countrywide in November |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 414:15   of 2005, correct? |
| | 414:16       A.   That's correct. |
| **Bates Moss Tr. at**<br>**416:22 – 420:13** | 416:22       Q.   In the paragraph that we were |
| | 416:23   in, that third paragraph, do you see that |
| | 416:24   it states "It is our recommendation that |
| | 416:25   portfolio continues to be able to |
| | |
| | 417:2    purchase asset-backed securities with |
| | 417:3    underlying collateral originated and/or |
| | 417:4    serviced by Countrywide"?  Do you see |
| | 417:5    that? |
| | 417:6       A.   Yes. |
| | 417:7       Q.   That was the recommendation of |
| | 417:8    your group based on their onsite |
| | 417:9    evaluation of Countrywide? |
| | 417:10      A.   That's correct. |
| | 417:11       Q.   And did you believe that the |
| | 417:12   people in your group were competent to |
| | 417:13   perform this evaluation? |
| | 417:14      A.   I believe they were competent |
| | 417:15   to perform the evaluation on the |
| | 417:16   counterparty strength and the ability to |
| | 417:17   continue to do business, yes. |
| | 417:18       Q.   If you could turn, please, to |
| | 417:19   -- did you have any doubts whatsoever in |
| | 417:20   the capabilities of the people who were |
| | 417:21   conducting counterparty reviews in your |
| | 417:22   group? |
| | |
| | 417:24      A.   No. |
| | 417:25       Q.   Did you find them to be |
| | |
| | 418:2    knowledgeable, professional, capable |
| | 418:3    people? |
| | |
| | 418:5       A.   Yes. |
| | 418:6       Q.   And did you give them |
| | 418:7    favorable performance reviews? |
| | 418:8       A.   Yes, for the most part. |
| | 418:9       Q.   Was there anyone who you |
| | 418:10   didn't give a favorable performance |
| | 418:11   review to? |
| | 418:12      A.   I recall one individual, but |

| | **GSE Counterparty Reviews and Policies** |
|---|---|
| | 418:13   that individual was not performing these |
| | 418:14   reviews. |
| | 418:15      Q.   All the people who were |
| | 418:16   performing these reviews you gave |
| | 418:17   favorable performance evaluations to? |
| | 418:18      A.   That's correct. |
| | 418:19      Q.   Okay.  Including Mr. Johnson |
| | 418:20   and Mr. Vignato? |
| | 418:21      A.   Correct. |
| | 418:22      Q.   If you could turn, please, to |
| | 418:23   Bates stamp ending 716, it's page 8 of 17 |
| | 418:24   of the document.  Do you see there's a |
| | 418:25   heading there in the middle of the page |
| | |
| | 419:2   called "Underwriting"? |
| | 419:3      A.   Yes. |
| | 419:4      Q.   And on the next page in that |
| | 419:5   section do you see that in the second |
| | 419:6   paragraph on the next page it states |
| | 419:7   "Underwriters have the ability to grant |
| | 419:8   guideline exceptions, e.g. FICO, 50 |
| | 419:9   percent DTI, if three compensating |
| | 419:10   factors exist.  Examples of compensating |
| | 419:11   factors include length of time borrower's |
| | 419:12   on the job or disposable income sources. |
| | 419:13   There's a 20 percent exception rate and |
| | 419:14   there are 18 levels of authority to sign |
| | 419:15   off on exceptions." |
| | 419:16         Do you see that? |
| | 419:17      A.   Yes. |
| | 419:18      Q.   What did you understand an |
| | 419:19   exception rate to be when reported here |
| | 419:20   by your review team? |
| | 419:21      A.   Again, these section writeups |
| | 419:22   are descriptions of the counterparty's |
| | 419:23   process.  So my understanding of what is |
| | 419:24   presented here is that Greg Johnson was |
| | 419:25   documenting the results of the interview |
| | |
| | 420:2   with the counterparty, and this is the |
| | 420:3   counterparty's explanation of the |
| | 420:4   counterparty's guidelines and process. |
| | 420:5      Q.   And what was your |

| | |
|---|---|
| **GSE Counterparty Reviews and Policies** | |
| | 420:6    understanding of what a 20 percent<br>420:7    exception rate was?<br>420:8        A.    As I stated yesterday, the<br>420:9    exception rate, pursuant to their<br>420:10   guidelines, is these are the loans that<br>420:11   they would, looking at those factors, may<br>420:12   kickout or approve for other compensating<br>420:13   factors. |
| **Bates Moss Tr. at 425:9 – 426:2** | 425:9        Q.    So is there any indication<br>425:10   here that your review team had any<br>425:11   objection to the fact that Countrywide<br>425:12   reported to it that it issued 20 percent<br>425:13   of the loans that it originated as<br>425:14   exceptions to Countrywide's underwriting<br>425:15   guidelines?<br><br>425:17       A.    I do not see any such language<br>425:18   in this document as presented that would<br>425:19   suggest that.  If it were the case, it<br>425:20   would have been documented.<br>425:21       Q.    And in fact, under the summary<br>425:22   up above you do see that the<br>425:23   recommendation of the relationship is to<br>425:24   continue the relationship with<br>425:25   Countrywide?<br><br>426:2        A.    That's correct. |
| **Bates Moss Tr. at 433:10 – 434:3** | 433:10       Q.    Okay.  Looking at page 717<br>433:11   under the heading "Post-closing and<br>433:12   quality control," do you see that?<br>433:13       A.    Yes.<br>433:14       Q.    If you can go on to the next<br>433:15   page, do you see that the first paragraph<br>433:16   states, "The QC staff also reviews those<br>433:17   loans where there's a 15 percent variance<br>433:18   between the BPO and appraisal."  Do you<br>433:19   know what a BPO is?<br>433:20       A.    A broker -- a broker price<br>433:21   opinion.<br>433:22       Q.    And so the reviewers here are<br>433:23   reporting that Countrywide's QC staff<br>433:24   reviews loans if there's a 15 percent<br>433:25   variance between the broker price opinion |

| | |
|---|---|
| | **GSE Counterparty Reviews and Policies** |
| | 434:2   and appraisal? |
| | 434:3      A.   Yes. |
| **Feigles Tr. at 142:2 – 142:13** | 142:2      Q.   So I take it your group was |
| | 142:3   responsible, then, for reviews of loan |
| | 142:4   originators whose product went into PLS in |
| | 142:5   which Freddie invested? |
| | 142:6      A.   Yes, to the best of my knowledge. |
| | 142:7      Q.   And reviews of loan aggregators |
| | 142:8   whose product -- who securitized those loans |
| | 142:9   and sold PLS to Freddie Mac? |
| | 142:10      A.   That's right. |
| | 142:11      Q.   And then also diligence for T deals, |
| | 142:12   correct? |
| | 142:13      A.   Yes. |
| **Feigles Tr. at 154:2 – 154:16** | 154:2      Q.   Were there different types of |
| | 154:3   reviews you would conduct? |
| | | |
| | 154:5         BY MR. BENNETT: |
| | 154:6      Q.   Different scopes? |
| | | |
| | 154:8         THE WITNESS:  Yeah.  We had |
| | 154:9   originators, servicer, and aggregator reviews. |
| | 154:10         BY MR. BENNETT: |
| | 154:11      Q.   And of the originators, were they |
| | 154:12   different scopes you would do with different |
| | 154:13   originators, or did they all get essentially |
| | 154:14   the same review? |
| | 154:15      A.   To the best of my knowledge, they |
| | 154:16   all got generally the same review. |
| **Feigles Tr. at 155:4 – 155:20** | 155:4      Q.   So from the subject of the review, |
| | 155:5   you would ask for performance data? |
| | 155:6      A.   Correct. |
| | 155:7      Q.   And what kind of performance data? |
| | 155:8      A.   We may get loans that they've |
| | 155:9   originated depending on the -- we may get |
| | 155:10   performance of the loans they originated.  We |
| | 155:11   may get their servicing data.  It's an |
| | 155:12   aggregator, pools that states, you know, what |
| | 155:13   they were rated, that they've securitized.  It |
| | 155:14   would be what they provided us. |
| | 155:15      Q.   So with respect to performance data |
| | 155:16   from an originator on how loans performed, |

| | GSE Counterparty Reviews and Policies | |
|---|---|---|
| | 155:17    would that be -- include things like the<br>155:18    default rate?<br><br>155:20       THE WITNESS:  It's possible. | |
| **Feigles Tr. at 156:6 – 21** | 156:6      Q.    Would you sometimes get diligence<br>156:7    results on previously processed pools?<br><br>156:9       THE WITNESS:  Possibly.  I don't<br>156:10    recall.<br>156:11       BY MR. BENNETT:<br>156:12      Q.    And then, I take it, you would look<br>156:13    at the -- the prior reviews of whoever --<br>156:14    whatever organization you were going to review?<br><br>156:16       THE WITNESS:  That's right.<br>156:17       BY MR. BENNETT:<br>156:18      Q.    And you have those in a file<br>156:19    someplace where you could go access them?<br>156:20      A.    We have the AMO reviews that we<br>156:21    could go access. | |
| **Feigles Tr. at 170:23 – 172:2** | 170:23      Q.    Okay.  So let's go back to the first<br>170:24    page, which is 617.  The first paragraph is<br>170:25    titled "Background," and it reads:  "The<br><br>171:2    primary function of the alternative market<br>171:3    operations unit, AMO, is conduct operational<br>171:4    reviews.  These reviews are used to help<br>171:5    Freddie Mac's internal business units make<br>171:6    decisions about which business partners to<br>171:7    pursue and where to set position limits."<br>171:8       Is that an accurate statement of<br>171:9    what the primary function of the AMO unit<br>171:10    was --<br><br>171:12       BY MR. BENNETT:<br>171:13      Q.    -- during your time?<br><br>171:15       THE WITNESS:  It probably was in<br>171:16    2005.  Specifically, I didn't have any insight<br>171:17    into position limits.  I didn't -- I don't know<br>171:18    how they were determined or -- or set.<br>171:19       BY MR. BENNETT:<br>171:20      Q.    Okay.  And you don't know how or | |

| | GSE Counterparty Reviews and Policies | |
|---|---|---|
| | 171:21 | whether they considered your reviews in setting |
| | 171:22 | position limits? |
| | 171:24 | THE WITNESS:  My understanding was |
| | 171:25 | they did certainly use our reviews in their |
| | 172:2 | analysis.  I don't understand how. |
| **Feigles Tr. at 172:20 – 173:15** | 172:20 | Q.   Was it a prerequisite to doing |
| | 172:21 | business with Freddie Mac as a sub -- subprime |
| | 172:22 | or Alt-A loan originator that you submit to an |
| | 172:23 | alternative markets operations review? |
| | 172:25 | THE WITNESS:  So, generally |
| | 173:2 | speaking, that's my understanding. |
| | 173:3 | BY MR. BENNETT: |
| | 173:4 | Q.   Do you know of any cases where a |
| | 173:5 | subprime or Alt-A originator was allowed to do |
| | 173:6 | business with Freddie Mac, who -- which had not |
| | 173:7 | submitted itself to an AMO review? |
| | 173:9 | THE WITNESS:  So I generally recall |
| | 173:10 | a conversation with either Mike Aneiro or Dave |
| | 173:11 | Hackney where they indicated that they could |
| | 173:12 | purchase some di minimus amount of -- of |
| | 173:13 | security backed by loans that we were -- that |
| | 173:14 | we had not done an AMO review without an AMO |
| | 173:15 | review. |
| **Feigles Tr. at 174:4 – 174:11** | 174:4 | Q.   Do you recall whether they actually |
| | 174:5 | did go ahead and purchase a PLS that was |
| | 174:6 | backed, at least, in part by an unreviewed |
| | 174:7 | originator? |
| | 174:9 | THE WITNESS:  I don't know what |
| | 174:10 | securities they bought or what was comprised in |
| | 174:11 | the securities they bought. |
| **Feigles Tr. at 174:18 – 175:6** | 174:18 | Q.   And did they give you a reason why |
| | 174:19 | it was okay for them to make those kinds of |
| | 174:20 | purchases? |
| | 174:22 | THE WITNESS:  I'm trying to recall |
| | 174:23 | the context and -- and how it came up.  To the |
| | 174:24 | best of my recollection, we had a counterparty |
| | 174:25 | that was up for review, I don't remember who it |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 175:2    was, and I think we asked them should we go see<br>175:3    this guy or this company.  My recollection is<br>175:4    they said, no, we occasionally see a handful of<br>175:5    their loans in -- in a security, but not enough<br>175:6    to warrant sending you out there. |
| **Feigles Tr. at 175:18 – 176:15** | 175:18        Q.    And the first sentence reads:  "The<br>175:19    base origination scope consists of a 50-loan<br>175:20    file review plus an interview with management."<br>175:21            Do you see that?<br>175:22    A.    I see that.<br>175:23        Q.    Was 50 the base number of loans that<br>175:24    were to be reviewed?<br><br>176:2            THE WITNESS:  That's what it says<br>176:3    here.<br>176:4        BY MR. BENNETT:<br>176:5        Q.    And did you, on occasion, review<br>176:6    more than 50 loans?<br>176:7        A.    My recollection is that occasionally<br>176:8    we might.<br>176:9        Q.    Under what circumstances might you<br>176:10    review more than 50 loans?<br>176:11        A.    I'm not sure what circumstances, but<br>176:12    my recollection is that I think there were some<br>176:13    instances where we did look at more than 50.<br>176:14        Q.    Would that be based on your<br>176:15    assessment of potential risks? |
| **Feigles Tr. at 177:22 – 178:4** | 177:22        Q.    This paragraph goes on to read:<br>177:23    "Files are selected for the review by the AMO<br>177:24    lead on a random basis from a tape of the<br>177:25    counterparty's most recent months' production;"<br>178:1                RONALD FEIGLES<br>178:2    is that accurate?<br><br>178:4            THE WITNESS:  I believe so. |
| **Feigles Tr. at 178:23 – 180:13** | 178:23        Q.    Did you then do a -- or not then,<br>178:24    but did you also do management interviews?<br>178:25        A.    Yes.<br><br>179:2        Q.    And the management interviews<br>179:3    touched on credit, appraisal, control and fair<br>179:4    lending and corporate governance? |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 179:6         THE WITNESS:  They did in 2005. |
| | 179:7        BY MR. BENNETT: |
| | 179:8    Q.   Did that change? |
| | 179:9    A.   Certainly the categories changed in |
| | 179:10   2006 at some point. |
| | 179:11   Q.   And what categories were added, to |
| | 179:12   your recollection? |
| | 179:13   A.   I think fair lending changed to |
| | 179:14   anti-predatory lending.  I don't know if we |
| | 179:15   changed underwriting or credit to underwriting, |
| | 179:16   corporate governance.  I don't think -- we |
| | 179:17   renamed that to be something corporate |
| | 179:18   structure, something like that. |
| | 179:19   Q.   Did it change the substance of what |
| | 179:20   you were doing? |
| | |
| | 179:22         THE WITNESS:  I think to some |
| | 179:23   respect we did. |
| | 179:24        BY MR. BENNETT: |
| | 179:25   Q.   And why was that change made? |
| | |
| | 180:3         THE WITNESS:  I don't recall |
| | 180:4   specifically why we made those changes. |
| | 180:5        BY MR. BENNETT: |
| | 180:6   Q.   Do you recall generally why you made |
| | 180:7   those changes? |
| | |
| | 180:9         THE WITNESS:  We were trying to |
| | 180:10   refine our -- our practice and, you know, we |
| | 180:11   were operating under trying to improve our |
| | 180:12   processes and our practices.  That's why we |
| | 180:13   made those changes. |
| **Feigles Tr. at 181:6 – 181:16** | 181:6   Q.   I think you might have misspoke. |
| | 181:7   You said you received a list of 50 loans from |
| | 181:8   the seller? |
| | 181:9   A.   I'm sorry.  We received a list of |
| | 181:10   the previous months' -- that's right.  Previous |
| | 181:11   months' originations and we selected 50 off of |
| | 181:12   that list. |
| | 181:13   Q.   But today you don't recall how you |
| | 181:14   made that selection? |
| | 181:15   A.   My -- best of my recollection it was |
| | 181:16   just a random selection. |

| GSE Counterparty Reviews and Policies | |
|---|---|
| **Feigles Tr. at 182:5 – 182:23** | 182:5        So you would -- you would select 50 <br> 182:6    loans and review those loans to check, among <br> 182:7    other things, compliance with guidelines, <br> 182:8    correct? <br> 182:9     A.   Right. <br> 182:10     Q.   And these were loans that were <br> 182:11    originated by originators who were feeding some <br> 182:12    production into the collateral pools underlying <br> 182:13    PLS in which Freddie was investing, correct? <br><br> 182:15       THE WITNESS:  Most likely, yes. <br> 182:16       BY MR. BENNETT: <br> 182:17     Q.   Was there any procedure in place to <br> 182:18    prevent you from reviewing loans from these <br> 182:19    originators where those loans might later end <br> 182:20    up in a collateral pool underlying a Freddie <br> 182:21    Mac security? <br><br> 182:23       THE WITNESS:  No. |
| **Feigles Tr. at 186:9 – 187:13** | 186:9     Q.   If you flip ahead to 1630, there's a <br> 186:10    subheading in the middle of the page, <br> 186:11    "Operational Review Components." <br> 186:12     A.   I see that. <br> 186:13     Q.   And the second sentence reads:  "The <br> 186:14    purpose of the operational review is to ensure <br> 186:15    a comprehensive understanding of the customers' <br> 186:16    processes and to assess alignment with Freddie <br> 186:17    Mac." <br> 186:18       Is that an accurate description of <br> 186:19    the purpose of the reviews during your tenure? <br><br> 186:21       THE WITNESS:  I would say in my <br> 186:22    tenure, alignment with Freddie Mac is very <br> 186:23    broad and I don't know that I could make that <br> 186:24    statement, but that's what we were assessing. <br> 186:25       BY MR. BENNETT: <br><br> 187:2     Q.   Okay.  So setting aside the second <br> 187:3    clause, then, fair statement that the purpose <br> 187:4    during your tenure was to ensure comprehensive <br> 187:5    understanding of the customers' processes? <br><br> 187:7       THE WITNESS:  As much as we could |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 187:8   understand in a one-day interview. |
| | 187:9        BY MR. BENNETT: |
| | 187:10    Q.   And also based on preparation? |
| | 187:11    A.   Our file review and our preparation. |
| | 187:12    Q.   And your file review, correct? |
| | 187:13    A.   Correct. |
| **Feigles Tr. at 187:17 – 187:22** | 187:17    Q.   So I take it you at least sought to |
| | 187:18 gain an understanding -- a comprehensive |
| | 187:19 understanding of their processes? |
| | |
| | 187:21        THE WITNESS:  We certainly wanted to |
| | 187:22 gain as much of an understanding as we could. |
| **Feigles Tr. at 188:20 – 191:12** | 188:20    Q.   Well, let me just jump through some |
| | 188:21 specific examples.  I just want to focus on |
| | 188:22 what you were looking at during your reviews. |
| | 188:23 If you like at the top of 1631 under "Credit |
| | 188:24 Quality," there are several bullets.  The first |
| | 188:25 one is "Credit Philosophy." |
| | |
| | 189:2     A.   Uh-huh. |
| | 189:3     Q.   Is that something you looked at? |
| | |
| | 189:5        THE WITNESS:  Yes. |
| | 189:6        BY MR. BENNETT: |
| | 189:7     Q.   What is -- what does credit |
| | 189:8 philosophy mean? |
| | 189:9     A.   So we would ask the management, you |
| | 189:10 know -- you know, ostensibly exactly what's |
| | 189:11 written here.  What's your credit philosophy, |
| | 189:12 like what -- what market are you going after? |
| | 189:13 What's -- you know, are -- are you a very |
| | 189:14 conservative lender?  Do you have maybe more |
| | 189:15 liberal guidelines, but very tight controls? |
| | 189:16 What's your philosophy.  How -- how do you |
| | 189:17 approach this business? |
| | 189:18    Q.   The second one is "Credit Guidelines |
| | 189:19 Policies and Procedures."  That's something you |
| | 189:20 looked at, I take it? |
| | |
| | 189:22        THE WITNESS:  Yes. |
| | 189:23        BY MR. BENNETT: |
| | 189:24    Q.   And you reviewed loan files to make |
| | 189:25 sure that they complied with the guidelines, |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 190:2   policies and procedures, correct? |
| | 190:4         THE WITNESS:  We reviewed the files<br>190:5   to get a sense of what they did.<br>190:6         BY MR. BENNETT:<br>190:7     Q.    And whether they complied with the<br>190:8   guidelines, correct? |
| | 190:10         THE WITNESS:  So I would say that<br>190:11   certainly, you know, we established that we<br>190:12   looked at 50 loans.  I don't know that that's a<br>190:13   sufficient sample of anybody's work to draw<br>190:14   stringent conclusions about whether they<br>190:15   adhered or didn't adhere to guidelines.  A<br>190:16   goal, certainly, to understand if they adhered<br>190:17   to credit guidelines.<br>190:18         BY MR. BENNETT:<br>190:19     Q.    And at least with respect to the 50<br>190:20   loans you looked at, you were looking to see<br>190:21   whether they adhered to guidelines, correct? |
| | 190:23         THE WITNESS:  Yes.<br>190:24         BY MR. BENNETT:<br>190:25     Q.    The next one is "Credit Exceptions." |
| | 191:2         What does that mean?<br>191:3     A.    So do they allow exceptions?  Could<br>191:4   be that.<br>191:5     Q.    Exceptions to their guidelines<br>191:6   regarding credit, is that what they're<br>191:7   referring to?<br>191:8     A.    Yes.<br>191:9     Q.    And did -- in your experience, did<br>191:10   originators on occasion grant exceptions to<br>191:11   their credit guidelines?<br>191:12     A.    Yes. |
| **Feigles Tr. at**<br>**191:19 – 191:22** | 191:19     Q.    Some originators granted many<br>191:20   exceptions, some granted fewer, correct?<br><br>191:22         THE WITNESS:  Correct. |
| **Feigles Tr. at**<br>**194:3 – 195:2** | 194:3     Q.    And what would be the utility to you<br>194:4   of receiving a delinquency report? |

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 194:6        THE WITNESS:  Well, depending on<br>194:7  what we received and -- and the format, it<br>194:8  could show loan quality trends.<br>194:9       BY MR. BENNETT:<br>194:10    Q.   And would that be useful to you in<br>194:11  understanding the quality of the underwriting<br>194:12  practices?<br><br>194:14       THE WITNESS:  To the extent that<br>194:15  they existed at that time, yes.<br>194:16       BY MR. BENNETT:<br>194:17    Q.   To the extent that the delinquency<br>194:18  report existed at that time?<br>194:19    A.   Well, to the extent that, you know,<br>194:20  had their policies and procedures changed over<br>194:21  time.<br>194:22    Q.   And I suppose that's something you<br>194:23  would ask them about in their interviews,<br>194:24  correct?<br><br>195:2       THE WITNESS:  Correct |
| **Feigles Tr. at<br>203:14 – 204:8** | 203:14    Q.   Do you remember something called a<br>203:15  counterparty forum?<br>203:16    A.   No, not off the top of my head, I<br>203:17  don't remember counterparty forum.<br>203:18    Q.   The next sentence reads:  "One<br>203:19  significant change will be the shifting of our<br>203:20  report focus from subjectively evaluating the<br>203:21  originator's credit guidelines to better gauge<br>203:22  how well they execute against their guidelines<br>203:23  and the adequacy of their processes to mitigate<br>203:24  areas of risk."<br>203:25       Do you see that?<br><br>204:2    A.   I see that.<br>204:3    Q.   First of all, do you recall<br>204:4  receiving feedback from anyone in 2006<br>204:5  regarding focusing on originator's compliance<br>204:6  with their underwriting guidelines?<br><br>204:8       THE WITNESS:  No. |
| **Feigles Tr. at** | 205:5    Q.   Sure.  Was something you had |

| GSE Counterparty Reviews and Policies | |
|---|---|
| 205:5 – 207:15 | 205:6   observed during your time at Freddie Mac the<br>205:7   need to focus your reviews more on<br>205:8   underwriter's compliance with their<br>205:9   underwriting guidelines?<br><br>205:11         THE WITNESS:  I don't recall if<br>205:12   there was anything we observed that had us<br>205:13   change the focus of our reviews.<br>205:14         BY MR. BENNETT:<br>205:15     Q.   Do you know why you changed the<br>205:16   focus of your reviews?<br>205:17     A.   Well, while I don't recall<br>205:18   specifically having conversations around the<br>205:19   focus of our reviews, it's my belief that we<br>205:20   did have conversations with capital markets and<br>205:21   customer credit management and maybe other<br>205:22   constituencies inside of Freddie Mac about the<br>205:23   scope of our reviews and how it can provide<br>205:24   more value.<br>205:25     Q.   And was there something about noting<br><br>206:2   compliance with underwriting guidelines that<br>206:3   would add more value to your reports to your<br>206:4   understanding?<br>206:5     A.   Since I don't remember the specifics<br>206:6   of the conversations, I can't really say.<br>206:7     Q.   Looking back on it now, and based on<br>206:8   your years of experience, what do you think the<br>206:9   value add would be from focusing on compliance<br>206:10     with underwriting guidelines?<br><br>206:12         THE WITNESS:  Well, certainly you<br>206:13   want to know if they adhere to the guidelines<br>206:14   for the credit parameters that are established.<br>206:15   I mean, that is something you would want to<br>206:16   understand.<br>206:17         BY MR. BENNETT:<br>206:18     Q.   You, being Freddie Mac, would want<br>206:19   to understand that?<br><br>206:21         THE WITNESS:  Yes, us being Freddie<br>206:22   Mac.<br>206:23         BY MR. BENNETT: |

| | |
|---|---|
| | **GSE Counterparty Reviews and Policies** |
| | 206:24    Q.    And why would Freddie Mac want to |
| | 206:25    understand that? |
| | |
| | 207:3         THE WITNESS:  Well, to the extent |
| | 207:4    that we are going to have some type of either |
| | 207:5    relationship or investment in something that is |
| | 207:6    backed by their originations, we want to be |
| | 207:7    informed. |
| | 207:8         BY MR. BENNETT: |
| | 207:9      Q.    And it was one of the goals of the |
| | 207:10   AMO process to collect that information to |
| | 207:11   allow Freddie Mac to be informed about that, |
| | 207:12   correct? |
| | |
| | 207:14        THE WITNESS:  It was one avenue of |
| | 207:15   providing information internally. |
| **Feigles Tr. at 213:12 – 214:9** | 213:12    Q.    What was the purpose of an AMO job |
| | 213:13   checklist in this time period? |
| | 213:14    A.    It was to provide consistency. |
| | 213:15    Q.    Provide consistency to the AMO |
| | 213:16   review process? |
| | 213:17    A.    Yes. |
| | 213:18    Q.    If you look in here, there are a |
| | 213:19   couple of major headings.  The first one is |
| | 213:20   "planning the on-site review," followed by |
| | 213:21   "contact the counterparty," followed by "after |
| | 213:22   the review has been confirmed, sampling in good |
| | 213:23   size, tracking requested items upon arrival and |
| | 213:24   while on site, review testing checklist and |
| | 213:25   upon returning from the site visit." |
| | |
| | 214:2        Was this document meant to be a |
| | 214:3    guide for the AMO review teams as they |
| | 214:4    completed every phase of the AMO review |
| | 214:5    process? |
| | |
| | 214:7        THE WITNESS:  Again, while I don't |
| | 214:8    recall specifically utilizing this, it appears |
| | 214:9    so, yes. |
| **Feigles Tr. at 219:16 – 221:13** | 219:16    Q.    Sure.  The resources listed here |
| | 219:17   under:  "Planning the on-site review," those |
| | 219:18   were to be drawn upon in plaining your on-site |
| | 219:19   AMO reviews? |

| GSE Counterparty Reviews and Policies |
| --- |

|  | 219:21         THE WITNESS:  Yes.<br>219:22         BY MR. BENNETT:<br>219:23    Q.   If you flip to the page ending in<br>219:24  Bates No. 1197, it is Page 3 of the document.<br>219:25  There is a section titled:  "After the review<br><br>220:2  has been confirmed."<br>220:3       And then there are several boxes.<br>220:4  If you go down, there is a box that begins with<br>220:5  the word "perform."  "Perform LexisNexis rating<br>220:6  agencies and/or Internet company website<br>220:7  searches."<br>220:8      Do you see that?<br>220:9    A.  I see that.<br>220:10    Q.   Do you recall searching LexisNexis<br>220:11  for information about AOM review<br>220:12  counterparties?<br>220:13    A.   Vaguely.<br>220:14    Q.   And you were also guided by this<br>220:15  form to check rating agency websites for<br>220:16  information about counterparties as well,<br>220:17  correct?<br><br>220:19        THE WITNESS:  That's correct.<br>220:20        BY MR. BENNETT:<br>220:21    Q.   Did you also conduct Internet<br>220:22  searches regarding counterparties?<br>220:23    A.   It appears we did.<br>220:24    Q.   Did you also look at regulatory and<br>220:25  SEC websites regarding counterparties?<br><br>221:2    A.   Again, it would appear so.<br>221:3    Q.   And did you look at -- inside B&C<br>221:4  Lending and Mortgage Servicing News and other<br>221:5  industry publications?<br><br>221:7        THE WITNESS:  I believe we did.<br>221:8        BY MR. BENNETT:<br>221:9    Q.   Now if you go to the bottom of the<br>221:10  page, there is a cell regarding prereview<br>221:11  conference calls.<br>221:12      Do you see that? |

128

| GSE Counterparty Reviews and Policies | |
|---|---|
| | 221:13          A.   I see that. |
| **Feigles Tr. at 252:25 – 254:9** | 252:25          Q.    Let's flip to the Bates number |
| | 253:2      ending in 194.  It's Page 10, where we were a |
| | 253:3      moment ago. |
| | 253:4            Are you there? |
| | 253:5      A.   I am. |
| | 253:6          Q.    In the purpose section, this is |
| | 253:7      going to look -- I think we read similar |
| | 253:8      language a while ago. |
| | 253:9            It reads:  "The primary function of |
| | 253:10     the AMO unit is to conduct operational reviews. |
| | 253:11     These reviews are used to help Freddie Mac's |
| | 253:12     internal business units make decisions about |
| | 253:13     which business partners to pursue and where to |
| | 253:14     set position limits." |
| | 253:15             Do you see that? |
| | 253:16     A.   I see that. |
| | 253:17         Q.    Does this refresh your recollection |
| | 253:18     at all about what you meant by setting position |
| | 253:19     limits? |
| | 253:20         A.    Again, we provided a tool that -- or |
| | 253:21     a work product that other parties used |
| | 253:22     internally at Freddie Mac, and I believe one of |
| | 253:23     those parties set position limits. |
| | 253:24         Q.    And position limits would be limits |
| | 253:25     on how much exposure Freddie Mac could take in |
| | 254:2      terms of investing in the loans originated by a |
| | 254:3      certain originator, for example? |
| | 254:5            THE WITNESS:  For example, yes. |
| | 254:6            BY MR. BENNETT: |
| | 254:7      Q.   Can you think of other examples of |
| | 254:8      position limits that this would affect? |
| | 254:9      A.    Not off the top of my head. |

| PLS Pre-Purchase Process | |
|---|---|
| **Gussman Tr. at 113:19-115:20** | 113:19     Q.  Do you remember if shortly<br>113:20  after you arrived you changed or modified<br>113:21  the collateral reports that the<br>113:22  surveillance team was putting together?<br>113:23     A.  I made a large number of<br>113:24  changes, so, but I can't point to a<br>113:25  specific one and when.<br><br>114:2     Q.  Do you recall changes that you<br>114:3  would have made early on when you were at<br>114:4  Fannie Mae?<br>114:5     A.  What I recall early on at<br>114:6  Fannie Mae was working more on this loan<br>114:7  level model with CJ than the surveillance<br>114:8  reports. I'm sure we were making changes<br>114:9  to everything, but that's -- I remember<br>114:10  my focus being on the analytics side.<br>114:11     Q.  So is there anything else you<br>114:12  can recall other than the loan level<br>114:13  model with CJ and the surveillance work<br>114:14  you talked about that you were doing in<br>114:15  the time period in, say, the first six<br>114:16  months after you joined Fannie Mae?<br><br>114:18     A.  Our main push at that time was<br>114:19  building this loan level model that CJ<br>114:20  was responsible for. I'm sure I was<br>114:21  presented with a large variety of<br>114:22  possibilities as a new boss and people<br>114:23  were looking to get their project<br>114:24  sponsored essentially, but my main push<br>114:25  when I got there was to work with CJ on<br><br>115:2  this loan level model.<br>115:3     Q.  And that was something she was<br>115:4  already working on before you joined?<br>115:5     A.  It was -- there were some<br>115:6  forms of the models that existed some<br>115:7  place else before I got there.<br>115:8     Q.  Do you recall in this time<br>115:9  period being involved in the pre-purchase<br>115:10  review of specific securitizations? |

| | **PLS Pre-Purchase Process** |
|---|---|
| | 115:11    A.   I recall that we instituted a<br>115:12   pre-purchase review process and we did<br>115:13   apply it to some deals.  I couldn't tell<br>115:14   you the exact dates of when those<br>115:15   happened, but that, that process took<br>115:16   place.<br>115:17    Q.   You applied the pre-purchase<br>115:18   review process to some RMBS deals that<br>115:19   Fannie Mae actually ended up purchasing?<br>115:20    A.   That's correct. |
| **Gonzalez-Rey Tr. at 30:8-25** | 30:8   Q   Let's turn to the second of the two analytic<br>30:9   systems that traders used when they were making<br>30:10   decisions to purchase PLS.  TAC, what was --<br>30:11     (Interruption by teleconference system.)<br>30:12    Q   How did they use TAC?<br>30:13    A   So that's an analytics they can access.<br>30:14  It's internal analytics, and I guess by how to use --<br>30:15  can you be more specific how they would use that?<br>30:16    Q   Why did they use it?  What did it tell them?<br>30:17    A   It would also produce some evaluation risk<br>30:18  metrics for the securities.<br>30:19   Q   Valuation risk metrics?<br>30:20    A   Uh-hmm.<br>30:21   Q   And what were those?<br>30:22    A   Some of the ones I mentioned before, OAS.  I<br>30:23  believe, also, OAD.<br>30:24   Q   And what is OAD?<br>30:25    A   Option-adjusted duration. |
| **Gonzalez-Rey Tr. at 31:10-24** | 31:10   Q   When traders were deciding what price to pay<br>31:11  for PLS, what tool, model, system, analytics did they<br>31:12  use?<br><br>31:14    A   They used the systems that I would describe,<br>31:15  and, also, at a certain period of time, they would --<br>31:16  they would -- do you mean systems?<br>31:17   Q   System, model, tool, analytics.<br>31:18    A   Okay.  So at a certain point in time, they<br>31:19  started using a recommendation from a group of<br>31:20  analysts in the Capital Markets Strategies group.<br>31:21   Q   Prior to the time they took recommendations<br>31:22  from CMS, what did they use to price bonds?<br>31:23    A   They would use the tools I mentioned, TAC<br>31:24  and Intex GUI. |

| PLS Pre-Purchase Process |
|---|
| **Kain Tr. at 188:21 -- 190:16** | 188:21  Q.  If you look down in the table below<br>188:22  there is -- there are a series of processes<br>188:23  listed, and the second one down reads: "Deal<br>188:24  analysis."<br>188:25      Do you see that?<br><br>189:2    A.  Uh-huh.  Yes, I do.<br>189:3    Q.  It reads: "PM," which is portfolio<br>189:4  managers, "must conduct a transaction viability<br>189:5  analysis to evaluate each trading opportunity."<br>189:6      What does that mean?<br>189:7    A.  It -- I am looking at it now and<br>189:8  interpreting that.  They have to decide whether<br>189:9  the transaction makes sense, is the way I read<br>189:10  that, and I think the next line is probably<br>189:11  more instructive which says the "PM calculates<br>189:12  the return on equity and evaluates other<br>189:13  important factors," and so generally the<br>189:14  attempt was or the mindset here is it had to<br>189:15  hit an ROE threshold, and that is what, you<br>189:16  know, that was kind of the -- if it hit the ROE<br>189:17  threshold then it was a viable investment,<br>189:18  assuming you looked at other factors and there<br>189:19  was no other factor why you didn't want to buy<br>189:20  it.<br>189:21    Q.  Do you recall what the ROE threshold<br>189:22  was during that time period?<br>189:23    A.  It varied.  It was at one point --<br>189:24  most of the time it was 15.  There were times<br>189:25  when we temporarily raised it and I think it<br><br>190:2  got lowered at some point, but 15 is the number<br>190:3  that comes to mind more often than not.<br>190:4    Q.  Do you remember it being nine for a<br>190:5  period of time?<br>190:6    A.  I think there were exceptions where<br>190:7  it was lowered, but nine seems low.<br>190:8    Q.  Is the ROE threshold different than<br>190:9  the hurdle?<br>190:10    A.  I don't believe so.<br>190:11    Q.  And where it mentions in the second<br>190:12  sentence: "Other important factors," is that a<br>190:13  reference to the housing goals? |

| PLS Pre-Purchase Process | |
|---|---|
| | 190:15          THE WITNESS:  I don't know.  That is<br>190:16     very possible. |
| **Norris Tr. at 64:3<br>-- 65:13** | 64:3   Q.   At the time you joined the<br>64:4   mortgage portfolio in mid to late 2005,<br>64:5   what was the process Fannie Mae went<br>64:6   through when it purchased a private label<br>64:7   security?<br><br>64:9     A.   A dealer, generically<br>64:10   speaking, there would be an offering from<br>64:11   a dealer.  There was an initial list of<br>64:12   collateral that was shown to us in an<br>64:13   offering memorandum and other numerous<br>64:14   documentations, like a prospectus<br>64:15   supplement, an initial prospectus<br>64:16   supplement, sales documents, offering<br>64:17   memorandum, etc., that we would look at<br>64:18   for statistics that we wanted to see,<br>64:19   meaning credit documentation.<br>64:20          Then if we were interested in<br>64:21   the deal based on price and credit, then<br>64:22   a data tape would be sent to Fannie Mae's<br>64:23   data warehouse, which was on the other<br>64:24   side of the business, and that would be<br>64:25   scrubbed of nonpublic information,<br><br>65:2   because there was a firewall between us<br>65:3   and single family.  And nonpublic<br>65:4   information would be scrubbed from, from<br>65:5   this tape and a CDI file would be sent to<br>65:6   us containing summarized data.<br>65:7          We would then take that data,<br>65:8   analyze it for structure, credit, price,<br>65:9   and determine if we wanted to participate<br>65:10   in the deal and what collateral we wanted<br>65:11   to keep or not keep.<br>65:12          I forgot one important point.<br>65:13   It was always scored for housing goals |
| **Norris Tr. at<br>114:2 -- 115:15** | 114:2   Q.   If you look at the next page<br>114:3   in the procedure manual that's part of<br>114:4   Exhibit 608, section 4.1 describes<br>114:5     process steps. |

| PLS Pre-Purchase Process | |
|---|---|
| | 114:6      A.   Mm-hmm. |
| | 114:7      Q.   The first one, 4.1.1, "A |
| | 114:8    nonagency mortgage trader is contacted by |
| | 114:9    a dealer for the purposes of facilitating |
| | 114:10    a private label MBS transaction." |
| | 114:11           Did you, Mr. Salahuddin and |
| | 114:12    Ms. Dyson divide among you different |
| | 114:13    dealers?  In other words, did you, did |
| | 114:14    you have certain dealers that you dealt |
| | 114:15    with, Mr. Salahuddin had certain other |
| | 114:16    dealers that he dealt with? |
| | 114:17      A.   No. |
| | 114:18      Q.   So when a dealer called to |
| | 114:19    offer a PLS, how did you determine whose |
| | 114:20    responsibility that deal would be? |
| | 114:21      A.   At that time it was simply |
| | 114:22    who, who had the work at the time, I |
| | 114:23    guess.  So there was always overlap |
| | 114:24    between one deal versus another.  So who |
| | 114:25    had the bandwidth to do a deal.  Not -- |
| | |
| | 115:2    or to analyze the deal or start the deal. |
| | 115:3      Q.   And was that a decision you |
| | 115:4    made? |
| | 115:5      A.   It was. |
| | 115:6      Q.   The next process step says |
| | 115:7    "The nonagency mortgage trader confers |
| | 115:8    with the director of the nonagency |
| | 115:9    mortgage desk to determine interest in |
| | 115:10    executing the trade." |
| | 115:11           Do you see that? |
| | 115:12      A.   Mm-hmm.  Yes. |
| | 115:13      Q.   Who's the director of the |
| | 115:14    nonagency mortgage desk? |
| | 115:15      A.   That would be me. |
| **Salahuddin Tr. at 520:20 -- 522:3** | 520:20      Q.   I believe you testified |
| | 520:21    earlier that you analyzed deals to |
| | 520:22    determine whether they made sense for |
| | 520:23    Fannie Mae from an economic perspective |
| | 520:24    and from a credit perspective, have I got |
| | 520:25    that right? |
| | |
| | 521:2      A.   I did do analysis related to |

| **PLS Pre-Purchase Process** | |
|---|---|
| | 521:3   both of those things, yes.<br>521:4        Q.   What other analysis did you do<br>521:5   in the course of determining whether to<br>521:6   buy a particular residential<br>521:7   mortgage-backed security?<br><br>521:9        A.   I can recall there being<br>521:10   instances where I would check to ensure<br>521:11   that the collateral that was being<br>521:12   provided in the -- and the information<br>521:13   about the deal that was being provided<br>521:14   complied to our list of stipulations.<br>521:15           In addition to economic and<br>521:16   credit analysis, we would also provide<br>521:17   analysis -- be recipient of analysis<br>521:18   around the goals -- how certain loans, or<br>521:19   how the loans of the population<br>521:20   contributed or did not contribute to<br>521:21   housing goals, and so some analysis would<br>521:22   have been done around that information as<br>521:23   well to determine the degree to which any<br>521:24   particular loan is accretive or<br>521:25   detrimental to housing goals.<br><br>522:2           And I believe that's, that's<br>522:3   all I can remember right now. |
| **Kenneweg**<br>**30(b)(6) Tr. at**<br>**40:23 -- 42:12** | 40:23        Q.   Yes.  Please identify, if you<br>40:24   would, all departments or business units<br>40:25   within Freddie Mac who were involved in the<br><br>41:2   review or evaluation of PLS counterparties.<br><br>41:4        A.   What type of --<br><br>41:7        A.   What type of review and<br>41:8   evaluation?<br>41:9        Q.   Any review that involves<br>41:10   considering information concerning those<br>41:11   counterparties, forming an opinion, rendering<br>41:12   an evaluation, or issuing an approval.<br><br>41:15   BY MR. SECHLER:<br>41:16        Q.   So it could include operational |

| PLS Pre-Purchase Process | |
|---|---|
| | 41:17  reviews, financial reviews.  Reviews of any<br>41:18  kind.<br><br>41:21       A.   I would say counterparty credit<br>41:22  risk, and the alternative markets operations<br>41:23  group.<br>41:24       Q.   Was there also a group known as<br>41:25  external operations risk management, or EORM?<br><br>42:2       A.   Yes.<br>42:3       Q.   Were they also involved in the<br>42:4  review of counterparties for PLS?<br>42:5       A.   No.<br>42:6       Q.   What was the nature of their<br>42:7  responsibilities?<br>42:8       A.   They reviewed counterparties --<br>42:9  their scope was the prime business that was<br>42:10  delivered to Freddie Mac for guaranty -- for<br>42:11  the guaranty side.  So seller/servicers,<br>42:12  originations that would be delivered into APC. |
| **Kenneweg<br>30(b)(6) Tr. at<br>42:23 -- 43:22** | Q.   We haven't been that<br>42:24  productive.  And could you identify the<br>42:25  document that I have just handed you?<br><br>43:2       A.   It looks like an e-mail.  The<br>43:3  subject is MABS Policies/Procedures.<br>43:4       Q.   Is this an e-mail from you?<br>43:5       A.   It is.<br>43:6       Q.   That you sent on or about<br>43:7  December 10, 2009?<br>43:8       A.   Yes.<br>43:9       Q.   And what are you attaching to<br>43:10  this e-mail?<br>43:11       A.   It looks like a procedure for<br>43:12  PLS counterparty.  Let's see what else.  And a<br>43:13  policy and procedure, um, also related to PLS,<br>43:14  owned by another area.<br>43:15       Q.   Okay.  So the document we have<br>43:16  attached is MABS Counterparty Procedure Number<br>43:17  123.  Right?<br>43:18       A.   Yes.<br>43:19       Q.   And is that what is attached to |

| | PLS Pre-Purchase Process |
|---|---|
| | 43:20  this e-mail, the MABS Counterparty Procedure<br>43:21  123?<br>43:22       A.   It is. |
| **Kenneweg Tr.**<br>**30(b)(6) at 88:17**<br>**-- 89:10** | 88:17        Q.    Sure.  These AMO written<br>88:18  reviews, they were used to determine whether<br>88:19  or not to approve a PLS counterparty?<br><br>88:22        A.   That wasn't the sole use, but<br>88:23  it was a consideration.<br>88:24        Q.    Well, that was a use?<br>88:25        A.    Right.  Right.<br><br>89:2        Q.    They were also used to develop<br>89:3  a metric score for PLS counterparties.  Right?<br>89:4        A.    Correct.<br>89:5        Q.    And they were used in<br>89:6  connection with the ongoing monitoring of PLS<br>89:7  counterparties.  Correct?<br><br>89:10        A.    Yes. |
| **Kenneweg**<br>**30(b)(6) Tr. at**<br>**88:17 -- 89:10** | 88:17        Q.    Sure.  These AMO written<br>88:18  reviews, they were used to determine whether<br>88:19  or not to approve a PLS counterparty?<br><br>88:22        A.   That wasn't the sole use, but<br>88:23  it was a consideration.<br>88:24        Q.    Well, that was a use?<br>88:25        A.    Right.  Right.<br><br>89:2        Q.    They were also used to develop<br>89:3  a metric score for PLS counterparties.  Right?<br>89:4        A.    Correct.<br>89:5        Q.    And they were used in<br>89:6  connection with the ongoing monitoring of PLS<br>89:7  counterparties.  Correct?<br><br>89:10        A.    Yes. |
| **Kenneweg**<br>**30(b)(6) Tr. at**<br>**242:17 – 244:25** | 242:17        Q.    Did Freddie Mac have any<br>242:18  policies or procedures that prevented it from<br>242:19  buying PLS whose loans came from originators<br>242:20  who scored 4 in the credit and appraisal<br>242:21  areas? |

| PLS Pre-Purchase Process |
| --- |

242:24        A.   There were lots of things that
242:25  were assessed in a PLS purchase, including

243:2  credit enhancement, guarantees, so, um, I
243:3  think it would be -- no, our policies did not
243:4  focus specifically on that one criteria.
243:5  Since there's -- there could be mitigating
243:6  circumstances.
243:7        Q.   Ultimately your policies with
243:8  respect to purchasing PLS depended on
243:9  application of that grid we looked at in PM&P
243:10  101, right?

243:13        A.   That's right.
243:14        Q.   And that depended on the M
243:15  score assigned to a particular counterparty
243:16  originator, right?

243:19        A.   Yes.  M score, right, was
243:20  referenced in the table.
243:21        Q.   And we saw on that table that
243:22  it didn't really matter what the M score was
243:23  for an originator if the aggregator was M-1 to
243:24  M-5, right?

244:2  form.  Scope and foundation.
244:3        A.   I think that's too broad of a
244:4  statement, to say it just doesn't matter what
244:5  the M score was.  People could still consider
244:6  it.  But as far as what the policy prescribed,
244:7  as far as being, um, preapproved, yes, as long
244:8  as you had an aggregator that was rated at a
244:9  certain rating, that's right, the deal could
244:10  be approved.
244:11        Q.   Regardless of what the M rating
244:12  was for the originator?

244:15        A.   That's right.
244:16        Q.   And regardless of what rating
244:17  AMO assigned in the credit and appraisal
244:18  sections of its AMO scorecard?

244:21  BY MR. SECHLER:

| | **PLS Pre-Purchase Process** |
|---|---|
| | 244:23        A.   Right.  In consideration of<br>244:24  other variables on the deal also.  That's<br>244:25  right. |
| **Aneiro Tr. at**<br>**239:17 -- 240:10** | 239:17  Q.    So is it fair to say that<br>239:18    before a PLS purchase occurred, the<br>239:19    following steps took place:  A dealer<br>239:20    provides strats for the Freddie loans and<br>239:21    for the aggregate loans to a trader; is<br>239:22    that right?<br>239:23        A.   Yes.<br>239:24      Q.    And Freddie Mac runs the deal<br>239:25    through Mortgage Pricer; is that right?<br>240:1      A.   Correct.<br>240:2      Q.    And runs the ROE calculator;<br>240:3    is that right?<br>240:4      A.   Correct.<br>240:5      Q.    And conducts a housing goals<br>240:6    analysis, right?<br>240:7      A.   Correct.<br>240:8      Q.    Determines which prepayment<br>240:9    models to use?<br>240:10        A.   I think that would be a step. |

| Factors GSE PLS Traders Considered When Making the Decision to Purchase PLS | |
|---|---|
| **Norris Tr. at 67:3 -- 25** | 67:3    Q.   If I understood you correctly,<br>67:4    you said if you were interested in the<br>67:5    deal based on price and credit, you would<br>67:6    ask for a loan tape?<br>67:7         A.   No, we would already have a<br>67:8    scrubbed loan tape.  We would -- that's<br>67:9    what a CDI file is.  CDI file contains<br>67:10   structure and the characteristics of the<br>67:11   pool.<br>67:12        Q.   So the CDI file would come at<br>67:13   the time you got the strats?<br>67:14        A.   Yeah, if we agreed that we<br>67:15   wanted to look at the deal, that's<br>67:16   correct.<br>67:17        Q.   So pausing there, what factors<br>67:18   did you consider to decide whether you<br>67:19   wanted to look at a deal?<br>67:20        A.   I would say the intersection<br>67:21   of housing goals, price, and collateral,<br>67:22   each one being fairly important.  By the<br>67:23   way, when I say price, I mean credit<br>67:24   enhancement as well as price of the<br>67:25   security. |
| **Norris Tr. at 71:7 -- 74:6** | 71:7    Q.   Did Fannie Mae have written<br>71:8    guidelines that you looked to when you<br>71:9    were assessing these various factors to<br>71:10   determine whether a deal did or didn't<br>71:11   meet your investment requirements?<br>71:12        A.   Can you explain that a little<br>71:13   further?  Do you mean Fannie Mae as the<br>71:14   entity, myself as Fannie Mae, like what,<br>71:15   what part of --<br>71:16        Q.   Was there any written policy<br>71:17   or procedure that set forth, for example,<br>71:18   required metrics?<br>71:19        A.   There were some metrics --<br><br>71:22            THE WITNESS:  Sorry, I keep<br>71:23      doing that.<br>71:24        A.   There were some metrics that<br>71:25   were provided by us as the private label |

| Factors GSE PLS Traders Considered When Making the Decision to Purchase PLS |
|---|

|  |  |
|---|---|
|  | 72:2   group as you've been describing us.  I |
|  | 72:3   don't recall any other metrics.  They |
|  | 72:4   were more guidelines other than, you |
|  | 72:5   know, certain things had to be done.  In |
|  | 72:6   other words, the reps and warrants |
|  | 72:7   provided to us, anti-predatory lending |
|  | 72:8   standards, HOEPA, I'm trying to think the |
|  | 72:9   other things that were out there, rep and |
|  | 72:10   warrants, the housing goals validity, and |
|  | 72:11   that they did the due diligence sampling. |
|  | 72:12       Q.   When you say that they did the |
|  | 72:13   due diligence sampling, you're talking |
|  | 72:14   about the dealer? |
|  | 72:15       A.   Correct. |
|  | 72:16       Q.   Did due diligence sampling for |
|  | 72:17   what purpose? |
|  |  |
|  | 72:19       A.   To make sure the loans were |
|  | 72:20   what they said they were. |
|  | 72:21       Q.   And was there a required |
|  | 72:22   percentage of loans that dealers had to |
|  | 72:23   sample? |
|  | 72:24       A.   I don't recall. |
|  | 72:25       Q.   And all of these factors you |
|  |  |
|  | 73:2   just mentioned, where were they written |
|  | 73:3   down? |
|  | 73:4       A.   I don't recall. |
|  | 73:5       Q.   Are these things that you |
|  | 73:6   provided to dealers in writing? |
|  |  |
|  | 73:8       A.   I don't recall.  I know that |
|  | 73:9   our lawyers were in contact with possibly |
|  | 73:10   the Street's lawyers and that there were |
|  | 73:11   things in place before I had gotten there |
|  | 73:12   regarding reps and warrants and validity |
|  | 73:13   of were these loans charter compliant. |
|  | 73:14   That's about the extent of my knowledge |
|  | 73:15   on that. |
|  | 73:16       Q.   Was it part of your |
|  | 73:17   responsibility to make sure that all of |
|  | 73:18   these reps and warrants were complied |
|  | 73:19   with before executing a trade? |

141

| **Factors GSE PLS Traders Considered When Making the Decision to Purchase PLS** | |
|---|---|
| | 73:20        A.   I'm trying to think that there |
| | 73:21    were some things that we would look at in |
| | 73:22    the documentation, but I don't think we |
| | 73:23    were looking at, we weren't reviewing all |
| | 73:24    the, all the reps and warrants.  I |
| | 73:25    believe there was another group that was |
| | |
| | 74:2    looking at those as well. |
| | 74:3        Q.   Do you know what group that |
| | 74:4    was? |
| | 74:5        A.   I thought it was one of the |
| | 74:6    legal teams. |
| **Norris Tr. at 115:16 -- 117:5** | 115:16        Q.   So what would you and a trader |
| | 115:17    discuss in determining Fannie Mae's |
| | 115:18    interest in executing a trade? |
| | |
| | 115:20        A.   I don't recall specifics, but |
| | 115:21    it would be, generally speaking, what is |
| | 115:22    the price, what is the collateral and |
| | 115:23    what is the housing goals. |
| | 115:24        Q.   And that's all something that |
| | 115:25    you would be able to determine at this |
| | |
| | 116:2    stage of the process? |
| | 116:3        A.   Not necessarily, no.  Most |
| | 116:4    times, no. |
| | 116:5        Q.   4.1.3 says "The dealer sorts |
| | 116:6    conforming collateral based on Fannie |
| | 116:7    Mae's stipulations." |
| | 116:8            What were Fannie Mae's |
| | 116:9    stipulations? |
| | 116:10        A.   I don't recall exactly, but I |
| | 116:11    know that we had a loosely put together |
| | 116:12    sheet that had our starting guidelines, |
| | 116:13    and I don't mean Fannie Mae guidelines, |
| | 116:14    but the private label desk guidelines, |
| | 116:15    meaning some of the things that we talked |
| | 116:16    loosely about before are -- and again, |
| | 116:17    this depends exactly on what time frame |
| | 116:18    we're talking about, because they were |
| | 116:19    constantly changing, but -- not |
| | 116:20    constantly changing, but changing.  As an |
| | 116:21    example, we may have at that time limited |

| Factors GSE PLS Traders Considered When Making the Decision to Purchase PLS | |
|---|---|
| | 116:22   the number of second liens that were |
| | 116:23   allowed in a pool.  We may have limited |
| | 116:24   the amount of LTV. |
| | 116:25            But it was always that one of |
| | |
| | 117:2   the stipulations were reps and warrants |
| | 117:3   to Fannie guidelines, housing goals, due |
| | 117:4   diligence, and -- I can't remember the |
| | 117:5   last part. |
| **Syron Tr. at 273:21 -- 274:12** | 273:21      Q.   It's the paragraph that begins |
| | 273:22   with "Syron offered a spirited defense." |
| | 273:23        A.   I don't know if I agreed -- I |
| | 273:24   don't know if I agreed to increase the |
| | 273:25   purchasing of risky mortgages early in |
| | 274:1 |
| | 274:2   this decade to fulfill the company's |
| | 274:3   mandate.  I think what we tried to do was |
| | 274:4   that we tried to find, as in with the AAA |
| | 274:5   rated mortgage-backed securities, ways of |
| | 274:6   meeting the housing goals to take that in |
| | 274:7   a way that was safe and sound. |
| | 274:8      Q.   I'd like to ask you to look at |
| | 274:9   Exhibit 34620, it's the transcript from |
| | 274:10   the Financial Crisis Inquiry Commission. |
| | 274:11   I think it's the top one on your stack |
| | 274:12   here. |
| **D. Cook Tr. at 278:18 -- 280:16** | 278:18   Q   Have you had a chance to take a look at |
| | 278:19   what's been marked as Exhibit 614? |
| | 278:20      A   Yes. |
| | 278:21      Q   Does this reflect that in pursuit of |
| | 278:22   increased purchases for subprime goals, Mr. Norris |
| | 278:23   listed ten items that Capital Markets should consider |
| | 278:24   that would alter their ordinary practices with respect |
| | 278:25   to PLS or other transactions? |
| | |
| | 279:3      A   As I read this, this only relates to housing |
| | 279:4   goals.  It doesn't talk about the fact that to also |
| | 279:5   increase -- actually, I don't see anything -- does it |
| | 279:6   talk about housing goals here? |
| | 279:7      Q   "Below is a list of possible exceptions that |
| | 279:8   we will need to increase our purchases for subprime |
| | 279:9   goals." |
| | 279:10            Do you understand that to be referring to |

| Factors GSE PLS Traders Considered When Making the Decision to Purchase PLS | |
|---|---|
| | 279:11  housing goals? |
| | 279:12     A   Not necessarily. |
| | 279:13     Q   What do you think "subprime goals" refers |
| | 279:14  to? |
| | 279:15     A   This could have been a desire to invest in |
| | 279:16  more subprime collateral and, hence, get a larger |
| | 279:17  return.  It could have been related to housing goals |
| | 279:18  also, but I don't read it that way. |
| | 279:19     Q   Had you heard that there was a goal to |
| | 279:20  invest in more subprime? |
| | |
| | 279:22     A   I had heard, and I believe it might have |
| | 279:23  been in 2006, that Fannie Mae -- I hadn't heard this |
| | 279:24  goal specifically. |
| | 279:25     Q   You had not heard that there was a goal to |
| | |
| | 280:2  purchase more subprime? |
| | 280:3     A   I hadn't heard this goal specifically as |
| | 280:4  it's referring to.  I had heard, in this era of 2006, |
| | 280:5  and I'm not sure of the exact dates, there were goals |
| | 280:6  in Fannie Mae to increase subprime business, but |
| | 280:7  not -- not necessarily in PLS.  I think that was in |
| | 280:8  our whole loan purchases. |
| | 280:9     Q   The individuals on this e-mail are on the |
| | 280:10  Capital Markets PLS side, correct? |
| | 280:11     A   Paul Norris was the director.  Steve Shen |
| | 280:12  was his boss.  And Ramon de Castro was his boss -- |
| | 280:13  manager.  And they all were related -- or worked in |
| | 280:14  PLS.  Andrew Bon Salle was not directly related to |
| | 280:15  PLS.  He was the SVP of Capital Markets Mortgage |
| | 280:16  Assets but not directly over PLS. |
| **D. Cook Tr. at 250:14 -- 16** | 250:14     A   The charter act has language in it that 250:15  requires -- I believe it requires Fannie Mae to meet 250:16  certain housing goals as set by HUD. |
| **D. Cook Tr.  at 252:16 -- 254:22** | 252:16     Q   What did it mean to engage in activities |
| | 252:17  that involved a reasonable economic return that may be |
| | 252:18  less than the return earned on other activities as you |
| | 252:19  understood it at Fannie Mae in the period 2005 to |
| | 252:20  2007? |
| | |
| | 252:22     A   As I understood this at Fannie Mae, Fannie |
| | 252:23  Mae was required to meet certain goals, to serve, as |
| | 252:24  it says, low- and moderate-income families and |

| Factors GSE PLS Traders Considered When Making the Decision to Purchase PLS |
|---|

252:25  underserved areas, and those goals were set by HUD,

253:2  and Fannie Mae was tracked in terms of its ability or,
253:3  rather, its meeting of those goals.
253:4      Q   Is it fair to say that those goals that you
253:5  described were referred to at Fannie Mae sometimes as
253:6  its mission?

253:8      A   I wouldn't interpret the mission as -- as
253:9  related -- rather, the mission was broader, to me,
253:10  than just these particular housing goals, and that's
253:11  the way it was communicated to me.  To me, the mission
253:12  involved all of the items, 1, 2, 3, 4, and 5.
253:13      Q   So Fannie Mae's mission involved the five
253:14  items that were set forth under the National Mortgage
253:15  Association's purposes act by Congress in Exhibit 602,
253:16  topic 9, tab 1; is that correct?

253:18      A   That's how I understood it.
253:19      Q   Was that how you understood Fannie Mae, the
253:20  institution, to regard its mission?

253:22      A   That's how I understood Fannie Mae, the
253:23  institution, to understand its mission.
253:24      Q   Did you hear that set of goals described as
253:25  the mission when you were at Fannie Mae, and as you

254:2  are at Fannie Mae, from 2005 to 2007?

254:4      A   I heard language very similar to this
254:5  language that described our goals.
254:6      Q   Did you hear it called the mission?

254:8      A   People at Fannie Mae talked about the
254:9  mission.
254:10      Q   What did you understand them to mean?

254:12      A   I understood the mission at Fannie Mae to be
254:13  to promote stability in the secondary market, to
254:14  promote liquidity, and to meet our housing goals,
254:15  which were tracking how well we served underserved
254:16  areas and low- to moderate-income families.
254:17          Fannie Mae also had a responsibility to its

| Factors GSE PLS Traders Considered When Making the Decision to Purchase PLS | |
|---|---|
| | 254:18  shareholders to provide a return.<br>254:19      Q   Did you understand that Fannie Mae regarded<br>254:20  the mission, as you've described it, as important?<br><br>254:22      A   Yes. |
| **Aneiro Tr. at<br>239:17 -- 240:10** | 239:17  Q.   So is it fair to say that<br>239:18    before a PLS purchase occurred, the<br>239:19    following steps took place:  A dealer<br>239:20    provides strats for the Freddie loans and<br>239:21    for the aggregate loans to a trader; is<br>239:22    that right?<br>239:23      A.   Yes.<br>239:24      Q.   And Freddie Mac runs the deal<br>239:25    through Mortgage Pricer; is that right?<br>240:1      A.   Correct.<br>240:2      Q.   And runs the ROE calculator;<br>240:3    is that right?<br>240:4      A.   Correct.<br>240:5      Q.   And conducts a housing goals<br>240:6    analysis, right?<br>240:7      A.   Correct.<br>240:8      Q.   Determines which prepayment<br>240:9    models to use?<br>240:10      A.   I think that would be a step. |

| | **PLS Traders' Review of Offering Documents** |
|---|---|
| **D. Cook Tr. at 68:19 – 69:5** | 68:19     Q    What does it mean to size and price credit<br>68:20  risk in this context?<br>68:21     A    So sizing the deal was understanding the<br>68:22  risk associated with the deal and whether the<br>68:23  structure supported the senior tranches with -- that<br>68:24  we purchased.  And then pricing was, you know, if --<br>68:25  if the credit of the deal was a AAA tranche, then they<br><br>69:2  could infer a price that they would -- they would want<br>69:3  to receive, in other words, a yield that they would<br>69:4  want to receive.  So if we paid par for a bond, we<br>69:5  would want to get a return above some benchmark. |
| **D. Cook Tr. at 69:23 – 71:8** | 69:23     Q    Do you know what factors went into that<br>69:24  determination?<br>69:25     A    Which -- what determination?<br><br>70:2     Q    The determination of price.<br>70:3     A    I know one of the main determinants was<br>70:4  whether or not the bond was AAA.  If -- if the bond<br>70:5  was AAA and the traders felt comfortable, through<br>70:6  their analysis, with the structure and the credit,<br>70:7  then they had the authority -- I mean, the traders had<br>70:8  the authority to purchase.<br>70:9     Q    Did they have the authority to determine<br>70:10  what price at -- at what price they would purchase a<br>70:11  bond?<br>70:12     A    The traders?<br>70:13     Q    Yes.<br>70:14     A    Did have that authority.<br>70:15     Q    And were there written procedures that<br>70:16  guided how they exercised that authority?<br>70:17     A    I don't know.<br>70:18     Q    Do you know what procedures they followed to<br>70:19  guide that authority?<br>70:20     A    Trade -- what procedure traders followed to<br>70:21  exercise their pricing authority?<br>70:22     Q    Yes.<br>70:23     A    I don't believe they had procedures to<br>70:24  exercise pricing authority.<br>70:25     Q    How did they come to a determination of |

147

| | **PLS Traders' Review of Offering Documents** |
|---|---|
| | 71:2  whether a price asked for a PLS was appropriate?<br>71:3      A   They used their judgment.  They looked in<br>71:4  the market to see what prevailing prices were.  They<br>71:5  analyzed the offering materials to ensure they were<br>71:6  comfortable with the deal.  And through that analysis<br>71:7  of the deal, they were able to determine what they<br>71:8  felt the right price would be. |
| **D. Cook Tr. at 77:8 – 78:14** | 77:8      Q   The change that gave Capital Markets<br>77:9  Strategy a role in the process is reflected in the<br>77:10  policies and the procedures, correct?<br>77:11      A   Yes.<br>77:12      Q   Were you a participant in the changes to<br>77:13  those policies and procedures?<br>77:14      A   Yes.<br>77:15      Q   As a participant in that process, do you<br>77:16  know what drove the changes?<br><br>77:18      A   I have some understanding of what drove the<br>77:19  change.<br>77:20      Q   What's your understanding?<br><br>77:22      A   One consideration was the traders, in<br>77:23  working with the dealers, there just was a set amount<br>77:24  of time that they had to accomplish the analysis<br>77:25  before we could commit to deals, and so there was some<br><br>78:2  reluctance to create a lengthy due diligence process<br>78:3  because we didn't want to necessarily slow down or --<br>78:4  slow down the process.  So at first -- but there was<br>78:5  also a desire to provide additional resources or<br>78:6  additional insight from a dedicated risk team.<br>78:7          So in weighing those -- those two competing<br>78:8  priorities of trying to get the deal done but also<br>78:9  making sure that there was independent risk view,<br>78:10  first the risk team started doing presettlement<br>78:11  reviews.  Then they started doing precommitment<br>78:12  reviews once they were able to implement a process<br>78:13  that was fast enough to accommodate the traders and<br>78:14  the, sort of, the deal flow. |
| **Aneiro Tr. at 239:17 – 241:17** | 239:17      Q.   So is it fair to say that<br>239:18   before a PLS purchase occurred, the<br>239:19    following steps took place:  A dealer |

| PLS Traders' Review of Offering Documents |
|---|
| 239:20    provides strats for the Freddie loans and<br>239:21    for the aggregate loans to a trader; is<br>239:22    that right?<br>239:23        A.    Yes.<br>239:24        Q.    And Freddie Mac runs the deal<br>239:25    through Mortgage Pricer; is that right?<br>240:1        A.    Correct.<br>240:2        Q.    And runs the ROE calculator;<br>240:3    is that right?<br>240:4        A.    Correct.<br>240:5        Q.    And conducts a housing goals<br>240:6    analysis, right?<br>240:7        A.    Correct.<br>240:8        Q.    Determines which prepayment<br>240:9    models to use?<br>240:10        A.    I think that would be a step.<br><br>240:12        A.    Before using Mortgage Pricer.<br>240:13        Q.    Conducts a credit analysis?<br>240:14        A.    Correct.<br>240:15        Q.    There has to be a credit<br>240:16    approval for the deal; is that correct?<br>240:17        A.    Correct.<br>240:18        Q.    And then the trade is<br>240:19    finalized on a trade ticket?  Well I<br>240:20    guess first the trade is communicated to<br>240:21    the dealer; is that right?<br>240:22        A.    Correct.<br>240:23        Q.    And then the trade is<br>240:24    finalized on a trade ticket?<br>240:25        A.    Correct.<br>241:1        Q.    And then Freddie Mac receives<br>241:2    a prospectus supplement; is that right?<br>241:3        A.    I don't recall the timing of<br>241:4    the supplement.<br>241:5        Q.    Okay.  Was anything else<br>241:6    required before a PLS trade could occur?<br><br>241:8        A.    I don't recall.<br>241:9        Q.    You don't recall whether<br>241:10    anything else was required?<br>241:11        A.    Correct.<br>241:12        Q.    Okay.  Can you sitting here |

| PLS Traders' Review of Offering Documents | |
|---|---|
| | 241:13   today, can you think of anything else |
| | 241:14   that was required before a PLS deal could |
| | 241:15   occur? |
| | |
| | 241:17      A.   I can't. |
| **Aneiro Tr. at 359:9 – 363:5** | 359:9      Q.   All right.  Now, during 2005 |
| | 359:10   to 2007 did Freddie Mac typically receive |
| | 359:11   a prospectus supplement for PLS that it |
| | 359:12   purchased? |
| | 359:13      A.   I believe so. |
| | 359:14      Q.   When? |
| | 359:15      A.   I don't recall. |
| | 359:16      Q.   Was it after the trade |
| | 359:17   commitment date? |
| | 359:18      A.   I don't recall. |
| | 359:19      Q.   What was your practice with |
| | 359:20   respect to prospectus supplements for |
| | 359:21   deals where you were the portfolio |
| | 359:22   manager in charge? |
| | |
| | 359:24      A.   I don't recall.  I don't |
| | 359:25   recall a policy for it. |
| | 360:1      Q.   Sorry, I wasn't asking a |
| | 360:2   policy.  Your practice for deals where |
| | 360:3   you were the trader, what did you do with |
| | 360:4   prospectus supplements? |
| | 360:5      A.   I don't -- |
| | |
| | 360:7      A.   I don't recall. |
| | 360:8      Q.   Did you generally read them? |
| | 360:9      A.   The whole prospectus |
| | 360:10   supplement? |
| | 360:11      Q.   Start there, the whole |
| | 360:12   prospectus supplement? |
| | 360:13      A.   No. |
| | 360:14      Q.   Did you generally read any |
| | 360:15   part of a prospectus supplement? |
| | 360:16      A.   I would look -- I would scan |
| | 360:17   through various supplements. |
| | 360:18      Q.   Various supplements meaning |
| | 360:19   you wouldn't scan through every |
| | 360:20   supplement you received? |
| | 360:21      A.   Correct. |

| PLS Traders' Review of Offering Documents |
|---|
| 360:22      Q.   But some of them you would<br>360:23   scan through?<br>360:24      A.   Correct.<br>360:25      Q.   For some deals?<br>361:1      A.   Correct.<br>361:2      Q.   When you scanned through a<br>361:3   prospectus supplement, which parts did<br>361:4   you look at?<br>361:5      A.   I don't recall.<br>361:6      Q.   Can you recall any parts that<br>361:7   you looked at?<br>361:8      A.   Not really, no.<br>361:9      Q.   Do you have any understanding<br>361:10   of what others in the nonagency group<br>361:11   did, what their practices were with<br>361:12   respect to prospectus supplements?<br>361:13      A.   I do not.<br><br>361:15      Q.   Did you expect that the people<br>361:16   working under you were reading the<br>361:17   prospectus supplement for every deal they<br>361:18   traded?<br>361:19      A.   No.<br>361:20      Q.   Did you expect that the people<br>361:21   who worked under you were reading any<br>361:22   part of the prospectus supplement for<br>361:23   every deal they traded?<br>361:24      A.   No.<br>361:25      Q.   Do you have an understanding<br>362:1   of the practice with respect to<br>362:2   prospectus supplements of those who<br>362:3   provided the credit approval?<br>362:4      A.   I'm sorry, one more time.<br>362:5      Q.   Do you have any understanding<br>362:6   of the practice with respect to<br>362:7   prospectus supplements of those who<br>362:8   provided credit approval for PLS deals?<br>362:10      A.   I don't.<br>362:11      Q.   You don't know if they read<br>362:12   the prospectus supplements or not?<br>362:13      A.   I don't believe they did.<br>362:14      Q.   Did anyone at Freddie Mac<br>362:15   other than a portfolio manager, somebody |

| **PLS Traders' Review of Offering Documents** | |
|---|---|
| | 362:16   on the nonagency desk or somebody<br>362:17   providing credit approval for a deal read<br>362:18   a prospectus supplement?<br>. . . .<br>362:21       Q.   Did anyone at Freddie Mac --<br>362:22   are you aware of anyone at Freddie Mac,<br>362:23   other than the portfolio managers or<br>362:24   those providing credit approval for<br>362:25   private label securities who read<br>363:1   prospectus supplements?<br>363:2       A.   The whole, the whole<br>363:3   supplement?<br>363:4       Q.   Yes.<br>363:5       A.   No. |
| **Hackney Tr. at<br>630:5 – 631:12** | 630:5       Q.   (BY MS. DAVIDOFF)  And my question was is<br>630:6   that your signature at the top of the trade ticket for<br>630:7   each of these trade tickets?<br>630:8       A.   It is my signature on all but one.<br>630:9       Q.   Which one is not your -- does not have your<br>630:10   signature?<br>630:11       A.   The FHFA16863753.<br>630:12       Q.   Okay.  For the trade tickets that contain<br>630:13   your signature, does that indicate you reviewed the<br>630:14   trade ticket?<br>630:15       A.   That -- that indicates that I was the trader.<br>630:16       Q.   Okay.  And do you recall anything<br>630:17   specifically about any of these deals?<br>630:18       A.   I don't.<br>630:19       Q.   Do you recall whether you reviewed the final<br>630:20   prospectus supplement?<br>630:21       A.   I don't recall.<br>630:22       Q.   Is there anything that would refresh your<br>630:23   recollection about that?<br>630:24       A.   Not -- no.<br>630:25       Q.   If your name is not on a trade ticket for a<br>631:1   deal, did you review or approve that trade?<br><br>631:3       A.   It's unknown.<br>631:4       Q.   (BY MS. DAVIDOFF)  And how would you figure<br>631:5   that out?<br>631:6       A.   You may not be able to.<br>631:7       Q.   Okay.  So it wouldn't necessarily appear<br>631:8   somewhere in the trade documentation if you had |

| **PLS Traders' Review of Offering Documents** | |
|---|---|
| | 631:9  reviewed the -- if you had reviewed or approved the<br>631:10  trade?<br>631:11    A.   It would appear if I had approved.  It would<br>631:12  not appear necessarily if I reviewed. |
| **Henderson Tr. at 107:23-108:17** | 107:23            Do you know what a prospectus<br>107:24  supplement is?<br>107:25        A.   I've heard of it.  I don't<br><br>108:2  really know what it has in it.<br>108:3        Q.   Okay.  Do you know any<br>108:4  information that it contains?<br>108:5        A.   Deal information.<br>108:6        Q.   Have you ever read a prospectus<br>108:7  supplement?<br>108:8        A.   No.<br>108:9        Q.   So you didn't use prospectus<br>108:10  supplements in evaluating the nonagency trades<br>108:11  that you entered into, right?<br><br>108:16        A.   As a trader, I personally<br>108:17  didn't read them. |
| **Norris Tr. at 121:24 – 123:2** | 121:24        Q.   4.1.4 says "The dealer sends<br>121:25    the resulting pool characteristics and<br><br>122:2    the free writing prospectus, containing<br>122:3    the structure, collateral, and credit<br>122:4    enhancement of the deal.  The dealer<br>122:5    sends a CDI file."<br>122:6            And then 4.1.5 says "The<br>122:7    nonagency mortgage trader verifies that<br>122:8    only approved issuers are in Fannie Mae's<br>122:9    class, referenced in the term sheet.  If<br>122:10    an issuer is included that is unapproved,<br>122:11    the trader will ask the dealer to remove<br>122:12    this issuer's collateral from Fannie<br>122:13    Mae's class."<br>122:14            That portion of the process<br>122:15    verifying that approved issuers are in<br>122:16    Fannie Mae's class, is that something<br>122:17    that was done using the information sent<br>122:18    by the dealer that's described in 4.1.4?<br>122:19        A.   Yes, this would be kind of as<br>122:20    we talked before, about the offering |

| PLS Traders' Review of Offering Documents |
| --- |

| | |
| --- | --- |
| | 122:21   memorandum documentation. |
| | 122:22       Q.    And when 4.1.5 describes |
| | 122:23   approved issuers being in Fannie Mae's |
| | 122:24   class, what is issuers referred to? |
| | 122:25       A.    Issuers at this point in time |
| | |
| | 123:2   I believe referred to originators. |

| Approval Authority for GSE PLS Purchases | |
|---|---|
| **Kenneweg 30(b)(6) at 90:23 – 92:13** | 90:23      Q.   Now, in this table, in Exhibit<br>90:24  1825, in Appendix A, there's reference to<br>90:25  approval authority.  Right?<br><br>91:2        A.   There is.<br>91:3        Q.   And it mentions the director of<br>91:4  institutional risk.  Do you see that?<br>91:5        A.   Mm-hmm.<br>91:6    Q.   Yes or no.<br>91:7        A.   Yes.  I'm sorry.<br>91:8        Q.   And who was the director of<br>91:9  institutional risk?<br>91:10      A.   Pam Williams.  I believe.  I<br>91:11  have to go back and look.<br>91:12              I believe that's who that was<br>91:13  referring to.<br>91:14      Q.   Okay.<br>91:15      A.   But that's not her exact title<br>91:16  on the org chart.<br>91:17      Q.   Okay.  And did you understand<br>91:18  Ms. Williams to have certain counterparty<br>91:19  approval authority between 2005 and 2007?<br>91:20      A.   That would be my understanding<br>91:21  from reading this chart.<br>91:22      Q.   And which counterparties would<br>91:23  require Ms. Williams' approval?<br>91:24      A.   Ones rated M-1 to M-3.<br>91:25      Q.   Those are the higher rated --<br><br>92:2      A.   Right, yes.<br>92:3      Q.   -- parties?<br>92:4              And then the director of CCRM,<br>92:5  was that Mr. Ratcliffe?<br>92:6      A.   That would have been -- I<br>92:7  believe that's referring to Melissa Crabtree.<br>92:8      Q.   And --<br>92:9      A.   Actually, at this time that<br>92:10  could have been -- at one point, at one point<br>92:11  he was director, and then he was vice<br>92:12  president.  So I'm not -- I'm not exactly sure<br>92:13  now, going back, if this was Ron or Melissa. |
| **Aneiro Tr. at** | 252:1    Q.   All right.  I'd like to talk a |

| Approval Authority for GSE PLS Purchases | |
|---|---|
| 252:1 to 255:24 | 252:2    little bit about the credit analysis and<br>252:3    credit approval we looked at earlier.  I<br>252:4    think that's in Exhibit 5206.  We<br>252:5    discussed that a credit approval was<br>252:6    required for a typical PLS purchase in<br>252:7    2005 to 2007?<br>252:8       A.   That's correct.<br><br>252:10       Q.    And who could provide a credit<br>252:11   approval?<br>252:12       A.    The authorized people within<br>252:13   the credit group.<br>252:14       Q.    Who were those?<br>252:15       A.    I don't recall the names, who<br>252:16   was on the list.<br>252:17       Q.    Why was a credit approval<br>252:18   required?<br>252:19       A.    Because there was credit risk<br>252:20   associated with anything that's not<br>252:21   considered a treasury bond and we needed<br>252:22   credit approval, you know, to buy them.<br>252:23       Q.    What do you mean by credit<br>252:24   risk?<br>252:25       A.    The risk of default.<br>253:1       Q.    And a credit approval was the<br>253:2    result, was the -- was a credit approval<br>253:3    the result of some kind of analysis?<br>253:4       A.    Correct.<br>253:5       Q.    And who conducted the credit<br>253:6    analysis?<br>253:7       A.    The credit group.<br>253:8       Q.    What did a credit analysis<br>253:9    entail?<br><br>253:11       A.    Counterparty risk including<br>253:12   originator and servicer.  Credit risk<br>253:13   within the loans on an aggregated basis<br>253:14   of the deal, level of subordination<br>253:15   underneath our bond on a deal.<br>253:16       Q.    Anything else?<br>253:17       A.    Not that I can recall.<br>253:18       Q.    What did the analysis of<br>253:19   counterparty risk -- what was the |

| Approval Authority for GSE PLS Purchases |
| --- |

| | |
| --- | --- |
| | 253:20   analysis of counterparty risk? |
| | 253:21      A.   We had a counterparty risk |
| | 253:22   group that would go out and review larger |
| | 253:23   counterparties, come up with various |
| | 253:24   ratings.  We had a person within, within |
| | 253:25   investments in capital markets that was |
| | 254:1   the counterparty risk person that would |
| | 254:2   utilize those reports and evaluate the |
| | 254:3   credit risk on the counterparties, decide |
| | 254:4   whether to do business or not. |
| | 254:5      Q.   Which counterparties were |
| | 254:6   reviewed for counterparty risk analysis? |
| | 254:7      A.   Originators and servicers. |
| | 254:8      Q.   Anybody else during 2005, |
| | 254:9   2006, 2007? |
| | 254:10      A.   Insurance companies. |
| | 254:11      Q.   Any other counterparties? |
| | 254:12      A.   Not that I can remember. |
| | 254:13      Q.   What did the -- what was the |
| | 254:14   process for providing a counterparty |
| | 254:15   analysis of originators in your |
| | 254:16   understanding? |
| | |
| | 254:19      A.   It would be the group that |
| | 254:20   would go out and evaluate the business, |
| | 254:21   go to, go to the counterparty, evaluate |
| | 254:22   the practice, review their practice, come |
| | 254:23   back, write a report, rank them in |
| | 254:24   various ways and then confer with, or at |
| | 254:25   least provide that information to the |
| | 255:1   retained portfolios -- not the retained |
| | 255:2   portfolios, but ICM's counterparty risk |
| | 255:3   person, and she, in this case Stacey, but |
| | 255:4   she would use that to make a decision. |
| | 255:5      Q.   Make a decision about what? |
| | 255:6      A.   About approving the |
| | 255:7   counterparty for a deal. |
| | 255:8      Q.   If a counterparty was |
| | 255:9   approved, what impact did that have? |
| | 255:10      A.   It -- it allowed us to |
| | 255:11   purchase the bonds. |
| | 255:12      Q.   So if an originator was an |
| | 255:13   approved counterparty, then a bond |

| Approval Authority for GSE PLS Purchases | |
|---|---|
| | 255:14   supported by collateral from that<br>255:15   originator could be purchased, correct?<br><br>255:17      A.   That's one of the steps in<br>255:18   credit evaluation.<br>255:19      Q.   Why was counterparty approval<br>255:20   required before a PLS purchase could<br>255:21   occur?<br>255:22      A.   Because the deals are<br>255:23   dependent upon the performance of<br>255:24   originators and servicers. |
| **Bates Moss Tr. at 88:3 – 88:10** | 88:3      Q.   Sure.  The approvals that<br>88:4   resulted from the counterparty reviews --<br>88:5      A.   Reviews.<br>88:6      Q.   -- that your group did, were<br>88:7   those approvals then used by the people<br>88:8   in trading to determine whether they<br>88:9   could purchase a PLS on behalf of Fannie<br>88:10   Mae? |
| **Bates Moss Tr. at 88:13 – 88:21** | 88:13      A.   Those approvals were used as a<br>88:14   factor in determining whether or not they<br>88:15   could move forward.<br>88:16      Q.   So the information that was<br>88:17   collected by your group during the<br>88:18   counterparty reviews was used in a<br>88:19   process at Fannie Mae that ultimately<br>88:20   resulted in the purchase of private label<br>88:21   securities? |
| **Bates Moss Tr. at 88:24 – 88:25** | 88:24      A.   It could have resulted in the<br>88:25   purchase. |
| **Bates Moss Tr. at 89:2 – 89:11** | 89:2      Q.   In fact, when traders bought<br>89:3   private label securities on behalf of<br>89:4   Fannie Mae, it was at the end of a<br>89:5   process where after which your group had<br>89:6   been involved in reviewing<br>89:7   counterparties, collecting information<br>89:8   about the counterparty and recommending<br>89:9   approval or non-approval of doing a<br>89:10   transaction with that counterparty,<br>89:11   correct? |
| **Bates Moss Tr. at 89:14 – 89:24** | 89:14      A.   No.<br>89:15      Q.   Okay.<br>89:16      A.   Our role was to evaluate and |

| | Approval Authority for GSE PLS Purchases |
|---|---|
| | 89:17    determine whether or not Fannie Mae could<br>89:18    do business with the counterparty.  It<br>89:19    does not determine whether or not the<br>89:20    actual transaction could be -- could move<br>89:21    forward.<br>89:22        Q.   And so your step was the first<br>89:23    step in the process by which Fannie Mae<br>89:24    determined whether to purchase a PLS? |
| **Bates Moss Tr. at 90:2 – 90:11** | 90:2        form.<br>90:3        A.   It is one step.  Whether it's<br>90:4    first or simultaneous, I don't know.<br>90:5        Q.   So your group's work in<br>90:6    collecting information about a<br>90:7    counterparty like an originator was one<br>90:8    of the steps in a multi-step process by<br>90:9    which Fannie Mae determined whether to<br>90:10   purchase private label securities?<br>90:11       A.   That is correct. |
| **Bates Moss Tr. at 739:7 – 739:16** | 739:7       Q.   Right.  And so if the<br>739:8   counterparty credit risk group, which was<br>739:9   your group --<br>739:10      A.   Yes.<br>739:11      Q.   -- did not approve an<br>739:12   originator, a PLS trader at Fannie could<br>739:13   not purchase from that originator unless<br>739:14   they had approval from their business<br>739:15   line, right?<br>739:16      A.   Yes. |

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| **Zhao Tr. at 74:2 - 75:20** | 74:2    Q.  And did you talk at all at these Monday<br>74:3  morning staff meetings prior to the third quarter of<br>74:4  2006 about what you were going to do once you freed up<br>74:5  from the restatement?<br>74:6      A.  I don't think I talked at the staff meeting.<br>74:7  I don't remember.  I might have mentioned.  But<br>74:8  usually I also have biweekly one-on-one with Bill as<br>74:9  his direct report.  Usually -- actually, it probably<br>74:10  only happen once a month because he was always too<br>74:11  busy.  So I would kind chat with him in terms of what<br>74:12  I want to do, and sometimes I write e-mails.<br>74:13    Q.  And what was it that you wanted to do?<br>74:14    A.  In a nutshell, it's build a tool that can<br>74:15  quan- -- use the base analytics that Fannie Mae<br>74:16  already has or is going to develop to have a tool to<br>74:17  quantify the credit risk of our PLS bonds.<br>74:18          THE REPORTER:  "Our PLS" --<br>74:19          THE WITNESS:  Bonds.<br>74:20    Q.  (BY MR. SACCA)  And that was something -- the<br>74:21  tool could be used in connection with the purchase of<br>74:22  PLS?<br>74:23    A.  Yes.<br><br>74:25    Q.  (BY MR. SACCA)  And could it also be used in<br>75:1  surveillance of PLS that Fannie owned?<br>75:2    A.  Yes.<br><br>75:4    Q.  (BY MR. SACCA)  You said that you wanted the<br>75:5  tool to use the base analytics that Fannie Mae already<br>75:6  had or was going to develop.<br>75:7          What were those base analytics?<br>75:8    A.  So Fannie, even at that point in late '05,<br>75:9  being part of credit research team, I knew they<br>75:10  actually already started estimating mod- -- default<br>75:11  severity models for non-agency collaterals.  And<br>75:12  meanwhile, we also have another team developing home<br>75:13  price forecast as well as a home price distribution.<br>75:14  Then we have another team who does prepayment and the<br>75:15  interest risk model, like term structure models.<br>75:16          So the idea is to put all of these<br>75:17  together.  And Francisco already had some code to do<br>75:18  Intext analysis.  So, you know, the first step for me |

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| | 75:19  was to put all these together so you truly have one<br>75:20  thing all in one tool. |
| **Zhao Tr. at 76:15 -- 24** | 76:15   Q.  (BY MR. SACCA)  And who was it at Fannie Mae<br>76:16  that developed the home price forecasts?<br>76:17    A.  The person I'm most familiar with -- again,<br>76:18  it's a legacy of model.  It goes through lots of<br>76:19  versions; lots of people work on that.  But the person<br>76:20  I'm most familiar with is Andre Gao.<br>76:21   Q.  A-n-d-r-e?<br>76:22   A.  Yeah.<br>76:23   Q.  G-a-o?<br>76:24   A.  Yeah. |
| **Zhao Tr. at 95:19 -- 96:9** | 95:19  Q.  Did you ever come to learn Fannie Mae's<br>95:20  corporate strategy with respect to PLS?<br>95:21    A.  Other --<br><br>95:23    A.  Other than I was told I need to hurry up and<br>95:24  finish building so that we can go buy some AA bonds.<br>95:25  That's kind of micro-level I know.  Everything else I<br>96:1  don't think I was clear.<br>96:2    Q.  (BY MR. SACCA)  Okay.  Who was it that told<br>96:3  you to hurry up and finish your model so Fannie Mae<br>96:4  could buy AA bonds?<br>96:5    A.  I say that in a joking way.  Nobody exactly<br>96:6  said those words --<br>96:7   Q.  Right.<br>96:8    A.  -- but that's the idea.  It's my boss,<br>96:9  Bill Quinn. |
| **Zhao Tr. at 165:7 -- 166:25** | 165:7  Q.  Item 1 under "Analytical Framework for PLS in<br>165:8  a nutshell" was to "Model underlying risk drivers:<br>165:9  home price and interest rate."<br>165:10          Were you proposing here to use the<br>165:11  Fannie Mae models or to do different modeling?<br><br>165:13    A.  There -- there is both.  I mean, most of the<br>165:14  stuff I want to use what's already there.  Like here,<br>165:15  I also mention unemployment rate as potential risk<br>165:16  driver.  At that point in Fannie Mae we didn't have a<br>165:17  model like that.  So...<br>165:18    Q.  (BY MR. SACCA)  Okay.  Were home price and<br>165:19  interest rate the two principal risk drivers for<br>165:20  private label securities? |

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| | 165:21     A.  In the model.<br><br>165:23     A.  Yes.<br>165:24     Q.  (BY MR. SACCA)  And then you mentioned local<br>165:25  unemployment rates.  That's something that<br>166:1  Fannie Mae's models did not capture at the time?<br>166:2     A.  That's correct.<br>166:3     Q.  And did there come a point in time when the<br>166:4  models did capture local unemployment rates?<br>166:5     A.  No.<br>166:6     Q.  Do you know why not?<br>166:7     A.  A couple reasons.  I rely on the research<br>166:8  team to deliver the model.  Nobody works -- worked on<br>166:9  unemployment rate at that point.  That's one.<br>166:10          The second one, research at one point or<br>166:11  another kind of showed me some chart to say once you<br>166:12  account for home price interest rate, unemployment<br>166:13  doesn't seem to be project -- and other -- other<br>166:14  things in the model.  Once you account -- whatever is<br>166:15  in the model already, unemployment didn't improve the<br>166:16  model fit or didn't add lots of explanatory power.  So<br>166:17  they didn't put on the priority list.<br>166:18     Q.  So research could test for what factors had<br>166:19  explanatory power?<br>166:20     A.  There's some ways to test, yes.<br>166:21     Q.  And they'd share the results of those tests<br>166:22  with you?<br><br>166:24     A.  At the one point or another it was definitely<br>166:25  shared, yeah. |
| **Zhao Tr. at 179:4 -- 181:4** | 179:4      (Deposition Exhibit 3508 marked.)<br>179:5          (Document tendered.)<br>179:6     Q.  (BY MR. SACCA)  3508 bears production numbers<br>179:7  FHFA01276322 through 44.<br>179:8          Do you recognize the e-mail and its<br>179:9  attachment?<br>179:10     A.  It's definitely my writing.  Yes, I did write<br>179:11  this.  I -- I need time to really remember everything<br>179:12  there, but I did write this.<br>179:13     Q.  Okay.  Looking at the e-mail you sent on<br>179:14  December 10th, 2006, at 10:15 p.m. to Mr. Quinn<br>179:15  attaching the paper --<br>179:16     A.  Yeah. |

| | **GSE Use of Models in Pre-Purchase Analysis** |
|---|---|
| | 179:17    Q.  -- you say, "First of all, it seems that our<br>179:18  AAA bonds are truly 'unbreakable', if we have any<br>179:19  confidence in our internal analytics.  What is my job<br>179:20  again?"<br>179:21          What did you mean by that?<br>179:22    A.  It's meant to be a joke.  That's why there's<br>179:23  smily face there.<br>179:24          Well, I was hired to measure -- measure<br>179:25  more credit risk of that portfolio.  If our internal<br>180:1  analytics always say the bond will never take a loss<br>180:2  in the worst case scenario, the home price model worst<br>180:3  case scenario, then they don't need me.  They're<br>180:4  wasting my time.<br>180:5    Q.  Recognizing that you were joking here, it was<br>180:6  true, though, right, that when you ran bonds through<br>180:7  the Fannie Mae housing price model you could not break<br>180:8  AAA bonds, right?<br><br>180:10    A.  True.  The bonds I ran -- and I don't know if<br>180:11  every single one passed every single test, but that's<br>180:12  the general conclusion.<br>180:13    Q.  (BY MR. SACCA)  Right.  Did any of the<br>180:14  Fannie Mae home price appreciation models you used in<br>180:15  2005, 2006, 2007 reflect what ultimately happened with<br>180:16  home price appreciation?<br>180:17    A.  Well, there was --<br><br>180:19    A.  There was definitely one or two prices like<br>180:20  that, but not -- not as our overall distribution.  I<br>180:21  wouldn't characterize it that way.<br>180:22    Q.  (BY MR. SACCA)  Okay.  The Fannie Mae models<br>180:23  were more optimistic than what ultimately happened?<br>180:24    A.  Yes.<br><br>181:1    Q.  (BY MR. SACCA)  And substantially so?<br><br>181:3    A.  Substantial?  That's a vague word, but I<br>181:4  think yes. |
| **Zhao Tr. at<br>181:24 -- 183:10** | 181:24  A.  At least that's the model view.<br>181:25    Q.  You have a line near the bottom that starts,<br>182:1  "Fifth, who do we trust, our internal research people,<br>182:2  or rating agencies, or hearsay?"<br>182:3          Do you see that? |

163

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| | 182:4    A.  Yeah.<br>182:5    Q.  Was -- was there a disconnect between what<br>182:6  Fannie Mae's internal research was concluding versus<br>182:7  what rating agencies were concluding or what you<br>182:8  describe as hearsay?<br><br>182:10    A.  I don't know the detail about rating<br>182:11  agencies.  So for me to make a statement like that, it<br>182:12  was almost like out of what I know.  So in a way,<br>182:13  it's -- it's not good sentiment on -- on my part.<br>182:14              Hearsay -- hearsay I actually kind of<br>182:15  remember.  There -- at that point of time, end of<br>182:16  2006, there were enough tracks in the news about a --<br>182:17  about home price being too bubbled; things are going<br>182:18  to turn south.<br>182:19    Q.  (BY MR. SACCA)  So what you were hearing in<br>182:20  the news was more pessimistic than Fannie Mae's<br>182:21  internal models about home price appreciation would<br>182:22  show?<br>182:23    A.  I don't think it's the mainstream news or<br>182:24  anything.  There were -- yes, there are some people<br>182:25  saying that.  So, you know, there are so many internet<br>183:1  news, you have to pick which one you believe.<br>183:2    Q.  And this hearsay that you became aware of,<br>183:3  was that something that you sought to incorporate into<br>183:4  your credit risk model?<br>183:5    A.  No.  It's not my job.<br>183:6    Q.  Okay.  That's the modeling folks' job?<br>183:7    A.  Yeah.<br>183:8    Q.  Okay.  Turning to your memo, would you -- is<br>183:9  this what you would describe as a white paper?<br>183:10    A.  Yeah. |
| **Zhao Tr. at 197:5 -- 16** | 197:5  Q.  (BY MR. SACCA)  So the stress scenarios you<br>197:6  got from CRO, that came from them at some point after<br>197:7  home prices started to decline?<br>197:8    A.  Definitely started to -- yeah.  After.<br>197:9    Q.  Do you know when it was that the corporate<br>197:10  approved Fannie Mae home price model caught up with<br>197:11  the reality of home price movements?<br>197:12    A.  I don't know the --<br><br>197:14    A.  Yeah.  I don't know the exact time.  I know<br>197:15  when things turned south they -- they worked much |

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| | 197:16  harder and faster.  It became much more priority. |
| **Zhao Tr. at 389:9 -- 390:5** | 389:9  Q.  (BY MR. BLUMENSTEIN)  Okay.  And what did 389:10  "CRO" stand for? 389:11     A.  Chief Risk Office. 389:12     Q.  So as of August 2007, Fannie was running 389:13  models using this stress scenario? 389:14     A.  Yeah.  Remember, this is a stress scenario. 389:15  Q.  Uh-huh. 389:16     A.  It's -- yeah. 389:17     Q.  And this stress scenario called for home 389:18  price appreciation to drop by 10 percent during the 389:19  following two years and then remain level, is that 389:20  right? 389:21     A.  Yeah. 389:22     Q.  And, in fact, home price appreciation dropped 389:23  by more than 10 percent during the next two years, 389:24  correct? 389:25     A.  It depends on the region.  It depends on the 390:1  region. 390:2     Q.  Do you know nationally, the national housing 390:3  price index? 390:4     A.  I don't remember exact number, but around 390:5  those numbers, yeah. |
| **Zhao Tr. at 390:15 -- 391:4** | 390:15  Q.  (BY MR. BLUMENSTEIN)  So under the CRO 390:16  scenario that we just described, almost all of Fannie 390:17  Mae's below AAA subprime bonds would be wiped out? 390:18     A.  Yeah. 390:19     Q.  Okay.  Which is to say -- which means that 390:20  Fannie Mae understood by August 2007 that its below 390:21  AAA subprime PLS would be wiped out if the housing 390:22  market declined more than 10 percent over the next two 390:23  to three years? 390:25     A.  When you say Fannie understood, it's -- it's 391:1  hard for me to agree to a general statement like that 391:2  because it's just what the model says.  Whether Fannie 391:3  as a company agree or not would go through lots of 391:4  approval, lots of decision point, right? |
| **Wood Tr. at 362:18 -- 363:2** | 362:18     Q.  What do you mean by a statistical 362:19     measure of confidence in the AVM? 362:20        A.  Again, it's an estimate.  So based 362:21     on the input data going into a model, they will 362:22     have a certain level of confidence in the value |

| | **GSE Use of Models in Pre-Purchase Analysis** |
|---|---|
| | 362:23     coming out of that model.  They will have been |
| | 362:24     -- most models -- for example, on our model |
| | 362:25     will indicate whether it's a high level or a |
| | |
| | 363:2     medial level of confidence. |
| **Wood Tr. at** | 363:7        Q.   And you said, "our model," I'm |
| **363:7 -- 15** | 363:8     assuming Freddie Mac had its own? |
| | 363:9        A.   I'm sorry.  Freddie Mac's |
| | 363:10     proprietary model. |
| | 363:11        Q.   And that was called home value |
| | 363:12     estimator? |
| | 363:13        A.   Yes. |
| | 363:14        Q.   It's also abbreviated HVE? |
| | 363:15        A.   Yes. |
| **Rosenblatt Tr. at** | 259:25     Q.   Mr. Rosenblatt, one of the -- as I |
| **259:25 -- 261:12** | |
| | 260:2     understood your testimony today, one of the |
| | 260:3     functions of your group was to do loss modeling |
| | 260:4     for loans on the single-family side; is that |
| | 260:5     right? |
| | 260:6        A.   Yes, at different points -- yes. |
| | 260:7     During many of these years, yes. |
| | 260:8        Q.   And in any of the -- and was one of |
| | 260:9     the goals of doing these loss modeling to |
| | 260:10     figure out what factors most influence the |
| | 260:11     performance of loans, delinquencies, defaults |
| | 260:12     and potential losses? |
| | |
| | 260:14          THE WITNESS:  Yes. |
| | 260:15          BY MR. HARSCH: |
| | 260:16        Q.   And Fannie Mae would do its best to |
| | 260:17     identify those factors that most affected loan |
| | 260:18     performance through the loss modeling that your |
| | 260:19     group would do? |
| | |
| | 260:21          THE WITNESS:  I mean, loss modeling |
| | 260:22     is about estimating losses.  It is not |
| | 260:23     primarily about factors, but -- we discussed |
| | 260:24     this before.  It falls -- one could interpret |
| | 260:25     from any of these models, sensitivities. |
| | |
| | 261:2          BY MR. HARSCH: |
| | 261:3        Q.   And in any of the models that Fannie |

| | **GSE Use of Models in Pre-Purchase Analysis** |
|---|---|
| | 261:4    Mae developed while you were there in your<br>261:5    career, was one of the factors -- as part of<br>261:6    the models, was one of the factors affecting<br>261:7    loan performance, the degree to which any<br>261:8    originator had adhered to its underwriting<br>261:9    guidelines in originating the loan?<br><br>261:11          THE WITNESS:  I don't know that.  I<br>261:12    don't think so |
| **Vetrano Tr. at 192:12 -- 193:4** | 192:12    Q.    And these were assumptions that<br>192:13    were built into DEFCAP.  Correct?<br><br>192:15          A.    That's what the words say.<br>192:16          Q.    What is DEFCAP?<br>192:17          A.    DEFCAP was, might still be,<br>192:18    don't know, a credit evaluation model that was<br>192:19    used by Freddie Mac.  It was designed for the<br>192:20    flow business.  That was its primary use.<br>192:21    Credit model designed for flow business.<br>192:22          Q.    So here Freddie Mac would<br>192:23    create some number of synthetic loans, apply<br>192:24    these assumptions, and then run them through<br>192:25    DEFCAP?<br><br>193:3          A.    That is apparently what the<br>193:4    words say. |
| **Vetrano Tr. at 291:21 -- 24** | 290:21    Q.    Do you see that the exceptions<br>290:22    for Alt-A are nearly seven times as high as<br>290:23    the exceptions for subprime?<br>290:24          A.    I do see that. |
| **Vetrano Tr. at 291:6 -- 23** | 291:6          Q.    Sitting here today, why do you<br>291:7    think there's a disparity there?<br><br>291:9          A.    Freddie Mac's -- a potential<br>291:10    reason would be that Freddie Mac's internal<br>291:11    models viewed risk differently than the rating<br>291:12    agencies did.<br>291:13          Q.    And that was more severe for<br>291:14    Alt-A than for subprime?<br><br>291:16          A.    There's more of a difference in<br>291:17    view as to what could be implied by that<br>291:18    statement. |

| | **GSE Use of Models in Pre-Purchase Analysis** |
|---|---|
| | 291:19      Q.    Anything else you can think of<br>291:20  that explains that disparity?<br><br>291:22        A.    We calibrated the process<br>291:23  incorrectly |
| **Vetrano Tr. at<br>296:6 -- 298:11** | 296:6        Q.    Did you feel that the model was<br>296:7  doing a good job, or did you feel that it was<br>296:8  off?<br><br>296:10        A.    A model is never accurate.<br>296:11  It's always providing a view.  And so the<br>296:12  strict answer is there's not a product,<br>296:13  including 30-year or 15-year product, where I<br>296:14  thought the model was right.<br>296:15        Q.    What was your view of the risks<br>296:16  inherent in Alt-A product in 2006?<br>296:17        A.    The key risk is the same as you<br>296:18  have with every product.  Maybe it's not 30<br>296:19  years, but at least to be able to see a<br>296:20  product through cycles, economic cycles.  And<br>296:21  if you have a product that hasn't, where you<br>296:22  don't have the data to see what happened<br>296:23  through different economic cycles, there's<br>296:24  always a risk, always a heightened concern.<br>296:25        Q.    How would you address your<br><br>297:2  heightened concern where you did not have<br>297:3  sufficient data to see how the collateral<br>297:4  would perform through economic cycles?<br><br>297:6        A.    That was pretty much the<br>297:7  description of the bulk process, and later the<br>297:8  PLS process.  Almost by definition, the<br>297:9  products you're dealing with did not have a<br>297:10  history, so we did the best with the data we<br>297:11  had and made sure we understood how the model<br>297:12  came out with its results, and where the<br>297:13  strengths and weaknesses of those results<br>297:14  were.<br>297:15        Q.    Do you recall what the<br>297:16  strengths and weaknesses of the results were<br>297:17  for Alt-A collateral?<br>297:18        A.    I remember general concerns |

| | **GSE Use of Models in Pre-Purchase Analysis** |
|---|---|
| | 297:19  that I had during that period, which pretty<br>297:20  much every risk person had during those<br>297:21  periods.<br>297:22      Q.   What were those?<br>297:23      A.   The sky is falling.<br>297:24      Q.   What do you mean by that?<br>297:25      A.   Every ABS conference we went to<br><br>298:2  we say, This can't continue, and in every ABS<br>298:3  conference we would go to they would say, You<br>298:4  said that last year.  That's the life of a<br>298:5  risk guy.<br>298:6      Q.   What do you mean when you say<br>298:7  "this can't continue"?<br>298:8      A.   Great performance.  The market<br>298:9  had a view that was different than the risk<br>298:10  view.  And pretty much the data substantiated<br>298:11  the market view. |
| **Romano Tr. at<br>493:23 -- 495:18** | 493:23      Q.   You were asked some questions<br>493:24      yesterday about the -- something called DEFCAP.<br>493:25          Do you recall that?<br><br>494:2      A.   Yes, I do.<br>494:3      Q.   Okay.  If you look through this<br>494:4      document, and I'll direct you to the second<br>494:5      paragraph on the second page, there is<br>494:6      mention -- and take a moment to look at it, but<br>494:7      there's mention of something called "subprime<br>494:8      DEFCAP model."<br>494:9          Do you see that?<br>494:10      A.   I do.<br>494:11      Q.   Okay.  Does that refresh your<br>494:12      recollection about the use of something called<br>494:13      subprime DEFCAP at Freddie Mac?<br>494:14      A.   I don't recall the details of how we<br>494:15      used that model.<br>494:16      Q.   But you do recall that it was used<br>494:17      now?<br>494:18      A.   I don't recall how it was used.<br>494:19      Q.   But you do recall that it was used,<br>494:20      correct?<br>494:21      A.   I recall that there was a model<br>494:22      called subprime DEFCAP, but I don't recall how |

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| | 494:23   it was used. |
| | 494:24     Q.   If you look at the last paragraph on |
| | 494:25   that page beginning with the word "first, |
| | |
| | 495:2    first, the subprime matrixes are derived from |
| | 495:3   the most up-to-date DEFCAP subprime model, |
| | 495:4   Version 7.4, while Alt-A matrixes are still |
| | 495:5   based on an outdated version. In the monthly |
| | 495:6   MABS meeting in May 2006, modeling group agreed |
| | 495:7   to deliver the updated Alt-A matrixes by the |
| | 495:8   end of June." |
| | 495:9     Do you see that? |
| | 495:10    A.   I do. |
| | 495:11     Q.   Does this refresh your recollection |
| | 495:12   that the subprime DEFCAP model was used with |
| | 495:13   respect to MABS or private label security |
| | 495:14   transactions? |
| | 495:15     A.   I can read what it says. I don't |
| | 495:16   recall exactly how we used that model. I have |
| | 495:17   no reason to believe this information is not -- |
| | 495:18   not accurate. |
| **Palmer Tr. at 160:14 -- 161:5** | 160:14    Q.   But that was not, I take it, |
| | 160:15   part of the DEFCAP analysis we've just |
| | 160:16   read about? |
| | |
| | 160:18     Q.   Or was it? |
| | |
| | 160:20     A.   DEFCAP did not have an |
| | 160:21   originator or aggregator issuer input |
| | 160:22   into that model. |
| | 160:23     Q.   And did it have an input that |
| | 160:24   was designed to capture Freddie Mac's |
| | 160:25   perception regarding whether the loans |
| | |
| | 161:2   had been underwritten according to the |
| | 161:3   originator's guidelines? |
| | |
| | 161:5    A.   No. |
| **Palmer Tr. at 646:17 -- 650:7** | 646:17   Q.   Yesterday you talked about |
| | 646:18   some of the inputs that went into the |
| | 646:19   subprime DEFCAP matrix and I want to just |
| | 646:20   clarify. Why don't we take a look at one |
| | 646:21   your credit approval letters. It was -- |

| GSE Use of Models in Pre-Purchase Analysis |
|---|

|  | 646:22 | or memos.  It was previously marked as |
|  | 646:23 | Exhibit 5203 and ask if you could take a |
|  | 646:24 | look at that. |
|  | 646:25 | If you turn to the second page |

|  | 647:2 | that has the credit approved on top and |
|  | 647:3 | then it has a series of collateral info |
|  | 647:4 | metrics, beginning with weighted average |
|  | 647:5 | FICO, if you could look at those, if you |
|  | 647:6 | could go through each one and tell me |
|  | 647:7 | whether or not each of those |
|  | 647:8 | characteristics were inputs in the |
|  | 647:9 | subprime DEFCAP model? |

|  | 647:11 | A.   The DEFCAP matrices or the |
|  | 647:12 | DEFCAP model? |
|  | 647:13 | Q.   The DEFCAP -- well, either. |
|  | 647:14 | A.   Okay. |

|  | 647:17 | DEFCAP model and the DEFCAP matrices. |
|  | 647:18 | That also covers FICO less than 600. |
|  | 647:19 | CLTV was an input into the DEFCAP model |
|  | 647:20 | and an input into the DEFCAP matrices, |
|  | 647:21 | which includes the next three rows all |
|  | 647:22 | the way down to greater than 80 CLTV. |
|  | 647:23 | Full doc was an input into the |
|  | 647:24 | DEFCAP model as well as the DEFCAP |
|  | 647:25 | matrices. |

|  | 648:2 | Owner occupied was an input |
|  | 648:3 | into the DEFCAP model.  It was not an |
|  | 648:4 | input directly into the DEFCAP matrices. |
|  | 648:5 | Two to four unit property was |
|  | 648:6 | an input into the DEFCAP model.  It was |
|  | 648:7 | not an input directly into the DEFCAP |
|  | 648:8 | matrices. |
|  | 648:9 | Cashout refinance was an input |
|  | 648:10 | into the DEFCAP model.  It was not an |
|  | 648:11 | input directly into the DEFCAP matrices. |
|  | 648:12 | IO/MTA, or interest only |
|  | 648:13 | option ARM loans, was an input into the |
|  | 648:14 | DEFCAP model.  It was also an input into |
|  | 648:15 | the DEFCAP matrices. |

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| | 648:16       California, or the state in<br>648:17  which the loan resided was an input into<br>648:18  the DEFCAP model.  It was not directly an<br>648:19  input into the DEFCAP matrices.<br>648:20     Q.  And you referred to, we saw<br>648:21  some documents that talked about the<br>648:22  output of the DEFCAP matrix referring to<br>648:23  the 300th path and whether or not there<br>648:24  would be costs associated with the 300th<br>648:25  path.  In layman's terms, can you just<br><br>649:2  explain what that is?  Is that like a, is<br>649:3  it fair to say that would be like a worst<br>649:4  case scenario would be represented by<br>649:5  300th path assuming the various inputs<br>649:6  like interest rates and the like?<br><br>649:8     A.  This is -- this is more of a<br>649:9  modeling question which is not my<br>649:10  background.  Each of the 300 paths<br>649:11  represented a different home price and<br>649:12  interest rate scenario that had an equal<br>649:13  probability of occurring.  And we would<br>649:14  look at, this was the same process, you<br>649:15  know, or practice that took place in<br>649:16  modeling other single family mortgages at<br>649:17  Freddie Mac, and we would use that to<br>649:18  estimate what the credit costs were on<br>649:19  single family loans and then as a<br>649:20  creation of the DEFCAP matrices,<br>649:21  estimating what the credit costs may be<br>649:22  on AAA purchases.<br>649:23     Q.  And I take it with the DEFCAP<br>649:24  matrices you wouldn't know whether there<br>649:25  would be a credit cost by looking at any<br><br>650:2  particular loan characteristic in<br>650:3  isolation, right, like FICO score, until<br>650:4  you ran the matrix?<br><br>650:6     A.  You needed to look at the<br>650:7  whole picture. |
| **Palmer Tr. at** | 654:24    Q.  Do you know whether the models |

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| **654:24 -- 655:18** | 654:25    that Freddie Mac used to determine credit |
| | 655:2    risk was any more or less sophisticated |
| | 655:3    than the models or tools that were |
| | 655:4    available to other investors in PLS in |
| | 655:5    the 2005 to 2007 time period? |
| | 655:6      A.   I don't know. |
| | 655:7      Q.   You don't have any views one |
| | 655:8    way or the other? |
| | 655:9      A.   No. |
| | 655:10      Q.   Were you aware that when |
| | 655:11    Freddie Mac was placed into |
| | 655:12    conservatorship in 2008 one of the |
| | 655:13    criticisms of the regulators was that |
| | 655:14    Freddie Mac had unsafe and unsound |
| | 655:15    practices concerning its use of models? |
| | 655:16    Were you aware of that? |
| | 655:17      A.   I believe, I believe I was |
| | 655:18    aware of that. |
| **Mudd Tr. at 245:21 -- 22; 246:2 -- 20** | 245:21    Q     Did you in Fannie Mae have models to |
| | 245:22      predict performance of the housing market? |
| | 246:2      A     Yes, there were mod- -- there were home |
| | 246:3    price models at Fannie Mae. |
| | 246:4      Q     And did the home price models at Fannie |
| | 246:5    Mae accurately predict the 30 percent |
| | 246:6    peak-to-trough decline that, in fact, came to |
| | 246:7    pass? |
| | 246:8      A     No. |
| | 246:9      Q     And would you agree that your -- that |
| | 246:10    everybody's models, including ours, Fannie Mae's, |
| | 246:11    undershot the severity of what occurred in the |
| | 246:12    marketplace? |
| | .  |
| | 246:15        THE WITNESS:  The models that I'm aware |
| | 246:16    of un-predict- -- under predicted. |
| | 246:17      BY MR. STARK:: |
| | 246:18      Q     Under predicted the severity of the |
| | 246:19    decline in house prices? |
| | 246:20      A     Yes. |
| **Corley 30(b)(6) Tr. at 380:2 -- 381:14** | 380:2    Q.   Who analyzes loans? |
| | 380:3      A.   The Freddie Mac single-family |
| | 380:4    costing team. |

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| | 380:5     Q.   And is that model used anywhere else<br>380:6   in Freddie Mac, or just in single-family?<br><br>380:8       THE WITNESS: It's referring to<br>380:9   DEFCAP, which I think we have talked about in<br>380:10   prior depositions. There are different areas<br>380:11   of the company that used DEFCAP for different<br>380:12   purposes, but it wouldn't have been in -- used<br>380:13   at the loan level for -- by the portfolio<br>380:14   managers.<br>380:15     BY MR. BATHAEE:<br>380:16     Q.   Do you recall DEFCAP being used in<br>380:17   conjunction with PLS?<br><br>380:20       THE WITNESS: That was part of my<br>380:21   prior deposition, but again, it wasn't used at<br>380:22   the loan-level basis. It was -- a modified<br>380:23   version of it was -- or tried to take<br>380:24   characteristics or general buckets of<br>380:25   characteristics that made up PLS securities to<br><br>381:2   try to approximate how much credit enhancement<br>381:3   we thought was adequate for PLS deals.<br>381:4     BY MR. BATHAEE:<br>381:5     Q.   And for PLS deals, DEFCAP would take<br>381:6   into account your cost of capital on a<br>381:7   risk-adjusted basis?<br><br>381:9       THE WITNESS: For PLS deals, did it<br>381:10   take into account?<br>381:11     I'm not sure if that element of<br>381:12   DEFCAP was used. PLS trades had their own ROE<br>381:13   and their own capital spreadsheet that was<br>381:14   used. |
| **Hackney Tr. at**<br>**68:11 -- 69:10** | 68:11   Q.   What -- what sort of analysis, if any, did<br>68:12   you run on the collateral stratifications you<br>68:13   received?<br><br>68:15   A.   Define what you mean by "analysis."<br>68:16   Q.   (BY MR. SACCA) Did you plug the<br>68:17   stratifications into any model or tool you used?<br>68:18   A.   Yes.<br>68:19   Q.   Okay. Which models or tools? |

| | **GSE Use of Models in Pre-Purchase Analysis** |
|---|---|
| | 68:20    A.   If they had produced a CDI, then I would plug<br>68:21  that into our proprietary Freddie Mac model.  I may<br>68:22  also have utilized Intex to look at the security.<br>68:23    Q.   And what's a CDI?<br>68:24    A.   It's a waterfall structure.<br>68:25    Q.   And is that something you would typically<br>69:1  receive from dealers at the time you received the<br>69:2  initial collateral stratifications?<br>69:3    A.   Not necessarily.  There could be many ongoing<br>69:4  conversations back and forth.  Some dealers felt that<br>69:5  they had a pretty good understanding of what it would<br>69:6  take to create a security that people would be<br>69:7  interested in.  Others wanted much more feedback, so<br>69:8  they do -- they get a pool of loans and without doing<br>69:9  anything start asking for some feedback, such as are<br>69:10  these loans charter eligible. |
| **Kain Tr. at 283:4 -- 12** | 283:4    Q.   And did you know that DEFCAP's<br>283:5      models are -- internal models are based on the<br>283:6      performance of loans on the single-family side?<br><br>283:8           THE WITNESS:  That is my<br>283:9    recollection, yes.<br>283:10         BY MR. BENNETT:<br>283:11      Q.    So is it your recollection then that<br>283:12    at some point, and I know you don't know<br>283:13    exactly the time, Freddie Mac was using models<br>283:14    based on the performance of loans on the<br>283:15    single-family side to assess the credit risk on<br>283:16    the PLS side of the business?<br><br>283:18           THE WITNESS:  Can you repeat the<br>283:19    question?<br>283:20         BY MR. BENNETT:<br>283:21      Q.   Sure.  So was it your understanding<br>283:22    that Freddie Mac used models based on the<br>283:23    performance of loans from the single-family<br>283:24    side to assess the credit in the PLS portfolio?<br><br>284:1           GARY KAIN<br>284:2           THE WITNESS:  It appears from<br>284:3    looking at this, that that seems to be the<br>284:4    case.  I don't know how often DEFCAP was used.<br>284:5    I know it wasn't the main tool for that |

| | |
|---|---|
| | **GSE Use of Models in Pre-Purchase Analysis** |
| | 284:6      analysis most of the time.<br>284:7          BY MR. BENNETT:<br>284:8      Q.   What was the main tool for that<br>284:9      analysis most of the time?<br>284:10        A.   I think there was more of a<br>284:11      spreadsheet-based approach, but I'm, you know,<br>284:12      not sure. |
| **P. Cook Tr. at 279:15 -- 21** | 279:15  Q     Were your models in February 2007<br>279:16  accurately predicting house price appreciation as<br>279:17  it would later come to pass?<br><br>279:19          THE WITNESS:  No, I don't think any<br>279:20  model was correctly predicting a single accurate<br>279:21  path for house prices. |
| **P. Cook Tr. at 297:15 -- 25** | 297:15   Q    I think you testified about this<br>297:16  earlier, but either through your models or<br>297:17  otherwise, Freddie Mac -- nobody at Freddie Mac,<br>297:18  as far as you're aware, predicted the magnitude of<br>297:19  the house price decline that actually came to pass<br>297:20  in the 2007 -- latter half of 2007 and 2008 time<br>297:21  period; right?<br><br>297:24          THE WITNESS:  I don't -- we didn't<br>297:25  predict the path for house prices. |
| **Cao Tr. at 686:15 -- 687:10** | 686:15        At that time, you didn't factor into<br>686:16      Fannie Mae's models any factors that had to do<br>686:17      with the degree to which Fannie Mae thought<br>686:18      that these originators adhered to underwriting<br>686:19      guidelines, correct?<br><br>686:21          THE WITNESS:  It's kind of -- it's a<br>686:22      work that is being done by another firm.  You<br>686:23      know, it is always like -- the whole thing, you<br>686:24      know, everybody has their roles to reform<br>686:25      liquidity.  You know, whatever some people<br><br>687:2      underwritten data, and then we bought them and<br>687:3      then you want us to re-underwrite everything.<br>687:4      That is not Fannie Mae's role, right, and then<br>687:5      this loan, actually, this nonperforming loans,<br>687:6      they are not PLS.  Actually, it's kind of<br>687:7      funny.<br>687:8          The nonperforming loans are the ones |

| GSE Use of Models in Pre-Purchase Analysis | | |
|---|---|---|
| | 687:9 | that Fannie Mae actually had bought and then |
| | 687:10 | become nonperforming. |
| **Cao Tr. at 689:4–690:12** | 689:4 | Q.   For the most part, when these loans |
| | 689:5 | were originated, it was the originators that |
| | 689:6 | was responsible for originating them in |
| | 689:7 | accordance with the guidelines that Fannie Mae |
| | 689:8 | set, correct? |
| | 689:10 | THE WITNESS:  I believe so. |
| | 689:11 | BY MR. HARSCH: |
| | 689:12 | Q.    So now in the models that you ran to |
| | 689:13 | determine the intrinsic value of these |
| | 689:14 | mortgages, did Fannie Mae incorporate any |
| | 689:15 | variables that reflected the degree to which |
| | 689:16 | Fannie Mae felt that these originators had |
| | 689:17 | adhered to the guidelines to which these loans |
| | 689:18 | were supposed to have been originated? |
| | 689:20 | THE WITNESS:  Not we ran |
| | 689:21 | underwriting it?  We underwrite it or -- we do |
| | 689:22 | have called, you know, getting to the model |
| | 689:23 | components, we have an ACI model which is kind |
| | 689:24 | of super-FICO kind of index we created, based |
| | 689:25 | on the borrower information that actually have |
| | 690:2 | all this borrower-specific information, FICOs, |
| | 690:3 | and all that information, income, TDI, LTV, all |
| | 690:4 | fits into it, and then we would come out with, |
| | 690:5 | like, we call them super-FICO.  So it's helped |
| | 690:6 | to identify the risk of the borrowers, so we |
| | 690:7 | never really -- I mean, under -- we ran -- the |
| | 690:8 | underwriting was not in the model, right. |
| | 690:9 | BY MR. HARSCH: |
| | 690:10 | Q.   The underwriting was not in the |
| | 690:11 | model? |
| | 690:12 | A.   No. |
| **Cao Tr. at 691:15 -- 21** | 691:15 | Q.   In those models, was there any |
| | 691:16 | variable that accounted for the degree to which |
| | 691:17 | Fannie Mae had concluded that the originators |
| | 691:18 | adhered to the underwriting guidelines that |
| | 691:19 | they were supposed to adhere to in originating |
| | 691:20 | these loans? |
| | 691:21 | A.    Not that I am aware of. |

177

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| Cao Tr. at 692:3 - 22 | 692:3    Q.   Did you apply any similar models in<br>692:4    evaluating PLS?<br><br>692:6        THE WITNESS:  Not the same model.<br>692:7        BY MR. HARSCH:<br>692:8    Q.   Similar model?<br>692:9    A.   Not the same model at the time.<br>692:10   There is totally different versions of models<br>692:11   right now.<br>692:12    Q.   Did you apply models that projected<br>692:13   the anticipated performance of loans that<br>692:14   underlie PLS?<br><br>692:16        THE WITNESS:  Yes.<br>692:17        BY MR. HARSCH:<br>692:18    Q.   Did any of those models take into<br>692:19   account any variables to reflect the degree<br>692:20   which Fannie Mae had concluded that originators<br>692:21   adhered to underwriting guidelines?<br>692:22    A.   Not that I'm aware of. |
| Bisenius Tr. at 44:8 -- 45:13 | 44:8        And you said you picked up responsibility<br>44:9  for the analytical models.  Do you know what models in<br>44:10  particular you picked up responsibility for?<br>44:11    A   As best I recall, it would have included<br>44:12  Loan Prospector.  I don't believe at that time it<br>44:13  included DEFCAP, which was the default costing model,<br>44:14  and there may have been others.  I just don't recall.<br>44:15    Q   What were your responsibilities with respect<br>44:16  to Loan Prospector?  Were you -- I take it you weren't<br>44:17  hands-on programming Loan Prospector, right?<br>44:18    A   That is correct.<br>44:19    Q   So what did you do with respect to Loan<br>44:20  Prospector in terms of your -- well, your<br>44:21  responsibilities at that time?<br>44:22    A   I would have been responsible for setting,<br>44:23  kind of, the overall direction for -- for the model,<br>44:24  both its development and its use within the business.<br>44:25    Q   When you say setting the overall<br><br>45:2  direction -- well, can you describe what Loan<br>45:3  Prospector does?<br>45:4    A   Sure, Loan Prospector is a statistical model<br>45:5  designed to, kind of, predict the probability -- |

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| | 45:6  actually, designed to create a relative rank ordering<br>45:7  of the risks of the mortgages that were being<br>45:8  evaluated.<br>45:9      Q    And is Loan Prospector a tool that loan<br>45:10  originators or sellers can use to determine whether a<br>45:11  loan will qualify for Freddie Mac's -- under Freddie<br>45:12  Mac's underwriting requirements?<br>45:13      A    Yes. |
| **Bisenius Tr. at**<br>**284:23 -- 287:11** | 284:23      Q    If you turn in your set of documents to<br>284:24  Exhibit 35603.<br>284:25      A    Yes.<br><br>285:2      Q    And this is a memo from Mr. Vetrano to<br>285:3  yourself concerning "proposed new process to analyze<br>285:4  MABS credit structure risk."<br>285:5      A    Okay.<br>285:6      Q    And do you recall looking at the org chart<br>285:7  earlier, at this time, Mr. Vetrano reported directly<br>285:8  to you?<br>285:9      A    If you give me a reference, I can confirm<br>285:10  that.<br>285:11      Q    Yes, sorry.  That is Exhibit 602, or it ends<br>285:12  in 602.  35602.<br>285:13      A    Yes, I see that, okay.  Yes.<br>285:14      Q    So the person who reports directly to you is<br>285:15  proposing a new process to analyze MABS credit<br>285:16  structure.  Regardless of whether you recall this<br>285:17  particular memo, what would be your practice with<br>285:18  respect to reviewing or commenting on such proposals<br>285:19  by a direct report to you?<br><br>285:21      A    It's a broad question.  I appreciate that.<br>285:22  As a general matter, if I was being asked to approve a<br>285:23  policy, I would review the policy, probably discuss it<br>285:24  with the person proposing it and either run it through<br>285:25  an approval process, which most policies required, and<br><br>286:2  get either approved or denied.<br>286:3      Q    So turning back to Exhibit 35603, do you<br>286:4  recall having a discussion with Mr. Vetrano about this<br>286:5  proposed new process?<br><br>286:7      A    I don't recall a conversation on it. |

| | |
|---|---|
| **GSE Use of Models in Pre-Purchase Analysis** | |
| | 286:8    Q   I think we discussed earlier Mr. Vetrano<br>286:9  testified that he recalled you asking him to develop a<br>286:10  process for analyzing MABS credit structures that<br>286:11  would create a process that would be consistent in<br>286:12  analyzing MABS in the same way that Freddie Mac<br>286:13  analyzed the bulk loans being bought through the bulk<br>286:14  process.<br>286:15          Do you have a recollection of giving him<br>286:16  that direction?<br>286:17    A   No, I don't.<br><br>286:19    Q   If you turn to the second page of the<br>286:20  document, Bates labeled 227.  This is of Exhibit<br>286:21  35603.<br>286:22    A   603, yes.<br>286:23    Q   Setting aside this particular memo, which<br>286:24  you may or may not recall, do you recall that<br>286:25  generally the credit review process for PLS purchases<br><br>287:2  used the DEFCAP model to try to estimate projected<br>287:3  losses from loans underlying the securitization?<br><br>287:5    A   What I recall in looking at this one,<br>287:6  actually helps refresh it, is I think they were trying<br>287:7  to figure out a way to use the DEFCAP model to<br>287:8  evaluate those portfolios, but I think it was -- my<br>287:9  recollection is that it wasn't designed specifically<br>287:10  to do that and so there was an attempt to see if it<br>287:11  could be used. |
| **Bisenius Tr. at<br>288:2 -- 290:15** | 288:2    Q   So having read the memo, does that refresh<br>288:3  your recollection about the process that was being<br>288:4  attempted to be used to use DEFCAP to help to value<br>288:5  the credit underlying MABS portfolio purposes?<br><br>288:7    A   As I look at this, I recall there being<br>288:8  conversations around doing this one, yes.<br>288:9    Q   Great.<br>288:10          Maybe let's just start with, what do you<br>288:11  recall about the conversations?<br>288:12    A   Pretty much what's summarized in the memo<br>288:13  itself, which was recognizing that DEFCAP was not<br>288:14  designed for pools, it was designed for loan-level<br>288:15  type analysis, was there a way that we could use |

| GSE Use of Models in Pre-Purchase Analysis |
|---|

288:16  pool-type stratifications and still capture them
288:17  within DEFCAP.  I also recall there being a discussion
288:18  about kind of a level of information that Freddie Mac
288:19  received prior to its purchase of private label
288:20  securities and whether that information needed to be
288:21  expanded to be able to allow them to use the DEFCAP
288:22  type model.
288:23      Q   So you recall that there was a proposal to
288:24  require dealers to provide breakdowns of their pool by
288:25  FICO/LTV buckets?

289:2      A   That's -- as this thing suggests, that's my
289:3  recollection.
289:4      Q   And then there would also be 12 FICO/LTV
289:5  grids which would be used to evaluate those pools; is
289:6  that correct?

289:8      A   Again, as the memo describes, I didn't
289:9  recall the 12, but it says 12, that makes sense.
289:10      Q   Right.
289:11          Do you recall then that those grids would be
289:12  populated in terms of expected loss by running the
289:13  DEFCAP model?

289:15      A   Again, that's my general recollection having
289:16  read this.  That's right.
289:17      Q   And do you recall that they would run the
289:18  DEFCAP model at different levels, at the 50 percent,
289:19  the 99 percent, the 100 percent, to see what losses
289:20  would be projected under each of the different
289:21  scenarios under DEFCAP?

289:23      A   I don't recall that specifically.  I know
289:24  there was some desire -- because, again, we're talking
289:25  about the investment in the retained portfolio.  It's

290:2  not as much about the loan level as it is about the
290:3  subordination level and the, kind of, risk of the
290:4  structure.  I think that's what they were trying to do
290:5  for the risk of the structure, but I don't have as
290:6  clear of a recollection on that.
290:7      Q   Right.  And so, generally, do you understand
290:8  the idea was to estimate the risk of potential losses

181

| | GSE Use of Models in Pre-Purchase Analysis |
|---|---|
| | 290:9  using the DEFCAP model and then figure out whether the<br>290:10  credit enhancements that were provided in the security<br>290:11  structure would be sufficient to protect against that<br>290:12  level of losses?<br><br>290:14      A   That's my understanding of what they were<br>290:15  trying to do, that's right. |
| **Bisenius Tr. at 299:6 -- 299:14** | 299:6      Q   When you say when you look at this<br>299:7  particular, would that be an area where you would have<br>299:8  some concern concerning the averages that were used as<br>299:9  the DEFCAP model?<br><br>299:11      A   My concern actually consists with how it's<br>299:12  articulated here, that is if the deal has<br>299:13  characteristics that are different or exceed what the<br>299:14  average assumptions were, it's going to be riskier. |
| **Bisenius Tr. at 304:12 -- 305:8** | 304:12      Q   On page 820, the first page, the last<br>304:13  paragraph of the summary, he says, "This exercise<br>304:14  suggests the new MABS credit process will reduce<br>304:15  operational risk but increase exposure to model risk."<br>304:16      Do you see that?<br>304:17      A   Uh-hmm.<br>304:18      Q   Did you have an understanding of what<br>304:19  Prospector Vetrano meant by model risk at the time?<br>304:20      A   I have an understanding of what model risk<br>304:21  is.  I don't know whether this is what Frank was<br>304:22  meaning when he wrote those words.  So I can describe<br>304:23  what my understanding of model risk is.<br>304:24      Q   Yes, if you would.<br>304:25      A   It's that the model -- the estimates of the<br><br>305:2  coefficients in the model are, for some reason, not<br>305:3  applicable to the population of loans that you're<br>305:4  applying it to.  So models are built off of a core<br>305:5  dataset.  If the pool of loans, the group of loans<br>305:6  that the model results are being applied to is<br>305:7  inconsistent with what the model was built on, you<br>305:8  could have model risk. |
| **Bisenius Tr. at 305:21 -- 306:16** | 305:21      Generally if the model assumed information<br>305:22  that was different from what was included in the<br>305:23  underlying pool, that's another example of model risk<br>305:24  where the model could project a set of losses that<br>305:25  would be different from what would actually happen |

| | |
|---|---|
| | **GSE Use of Models in Pre-Purchase Analysis** |
| | 306:2  with the underlying pool?<br><br>306:4      A    Yes, as you described that, I don't know if<br>306:5  I thought of that as model risk.  So it could be.  The<br>306:6  way I think about it is a model is being used on a<br>306:7  group of loans different than what it was built on, so<br>306:8  I think of model risk.<br>306:9      Q    But you would agree generally there's a risk<br>306:10  if the -- if the model is using a set of assumptions<br>306:11  that is inconsistent with what the underlying pool<br>306:12  actually contains, that the model might misestimate<br>306:13  the risk of loss?<br><br>306:15      A    I believe that's a risk.  I just don't know<br>306:16  whether I would label it a model risk. |
| **Vetrano Tr. at 422:17 -- 424:23** | 422:17  Q.    The sentence then goes on to<br>422:18  say: "We need to remain wary of blind spots<br>422:19  in our models."<br>422:20            Do you see that?<br>422:21      A.    I see that.<br>422:22        Q.    Do you know what you mean by<br>422:23  "blind spots" in your models?<br>422:24        A.    I don't recall the context<br>422:25  within which this was written.<br><br>423:2        Q.    Okay.  Regardless of whether<br>423:3  you recall the context in which this is<br>423:4  written, is it fair to say that a blind spot<br>423:5  in a model is a place in the model where<br>423:6  you're making assumptions or making decisions,<br>423:7  but you don't know information that might<br>423:8  exist out in the real world?<br><br>423:10        A.    That's a possible result.<br>423:11        Q.    Is there any other definition<br>423:12  of a blind spot in the model that you would<br>423:13  have, sitting here today?<br><br>423:15        A.    As we did discuss yesterday,<br>423:16  the DEFCAP model was designed around 30 or 40<br>423:17  years of data, and we were using best<br>423:18  information available for this purpose for |

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| | 423:19  which we did not have 30 or 40 years of data.<br>423:20  I would guess that one possibility is a<br>423:21  recognition that we did not have 30 or 40<br>423:22  years of data for this model, and therefore<br>423:23  needed to be cautious about what the results<br>423:24  said.<br>423:25          Q.   You said that DEFCAP used 30 to<br><br>424:2  40 years of data.  Do you know what 30 to 40<br>424:3  years it looked at?<br>424:4          A.   Freddie Mac's history of<br>424:5  single-family 30-year, 15-year data, is what<br>424:6  the model was honed on.<br>424:7          Q.   Sorry.  When you say 30-year<br>424:8  and 15-year data, those sound to me like<br>424:9  durations of mortgages.  Is that -- are you<br>424:10  saying that you based the DEFCAP model on<br>424:11  Freddie Mac's experience with 30-year mortgage<br>424:12  products?<br><br>424:14          A.   The original use of the DEFCAP<br>424:15  model was to evaluate the risk of its generic<br>424:16  business, which was comprised primarily of<br>424:17  30-year fixed-rate mortgages and 15-year<br>424:18  fixed-rate mortgages.  The calibrations of the<br>424:19  model incorporated experience from as far back<br>424:20  as Freddie Mac's data goes, and I am not sure<br>424:21  how far it goes back, hence my 30 to 40 years.<br>424:22  I am guessing.  And that was the origins and<br>424:23  the primary use of the model. |
| **Cao Tr. at 240:2 -<br>242:16; 243:9 --<br>24** | 240:2          Q.   At some point, Fannie Mae stopped<br>240:3      the pre-settlement checklist process in favor<br>240:4      of a different kind of analysis; is that<br>240:5      correct?<br>240:6          A.   Yes.<br>240:7          Q.   And that's what you described as CJ<br>240:8      Zhao's model?<br>240:9          A.   Correct.<br>240:10         Q.   And describe for me, please, the<br>240:11     difference between the two approaches?<br><br>240:13             THE WITNESS:  Pre-settlement, you<br>240:14     can say that it's just a very simple |

184

| | GSE Use of Models in Pre-Purchase Analysis |
|---|---|

240:15    spreadsheet, one page or two of, you know,
240:16    checking of the invention at the time, right.
240:17    CJ's model is a stochastic model and then used
240:18    on other data as input and then collect the
240:19    cash flow with deal structure throughout the
240:20    model.  So below that, all the information with
240:21    all the embedded risk factors requested by the
240:22    model and fit into the process, generally the
240:23    cash flow, by doing, you know, simulations
240:24    based on home price interest rates environment
240:25    and then generated cash flow based on that and

241:2    then run through the cash flow, you know,
241:3    through the INTEX, you know, the structure of
241:4    the deal and then estimate the credit risks and
241:5    estimate the loss of the bonds and the price of
241:6    the bonds based on the -- you know, per model.
241:7        Q.   What is a stochastic model?

241:9        THE WITNESS:  Basically using
241:10    simulation approach to simulate your
241:11    different -- the key inputs and then outputs
241:12    the -- you know, different kind of results.  So
241:13    it's kind of probably realistic -- real.
241:14        BY MR. SACCA:
241:15        Q.   And did you say inputs into the
241:16    model included loan level data?
241:17        A.   That's required.  Loan level, yes.
241:18        Q.   And the loan level data that Fannie
241:19    Mae put into the model was loan level data
241:20    specific to the particular deal you were
241:21    modeling?
241:22        A.   Yes.

241:24        BY MR. SACCA:
241:25        Q.   And from where did you get the data?

242:2        A.   From the issuer, the dealer.
242:3        Q.   And did that come from the loan tape
242:4    or the CDI file or --
242:5        A.   Low level data is from loan tape.
242:6    The structure is from CDI.
242:7        Q.   And what sort of loan level data

| | GSE Use of Models in Pre-Purchase Analysis |
|---|---|
| | 242:8　　　　went into the model? |
| | |
| | 242:10　　　　　　THE WITNESS:  Again, there are a lot |
| | 242:11　　　of fields that in the data table -- I think we |
| | 242:12　　　went through this this morning, so not remember |
| | 242:13　　　every single thing, but, you know, LTV, FICO, |
| | 242:14　　　coupon, you know, note rates, specifically, and |
| | 242:15　　　then seasoning, how long season, and then |
| | 242:16　　　geography.  That's, you know, the gist of it. |
| | |
| | . . . . |
| | |
| | 243:10　　　　　　Q.　　Why did the CMS group switch from |
| | 243:11　　　the pre-settlement checklist model to the CJ |
| | 243:12　　　Zhao model? |
| | 243:13　　　　　A.　　Because then this model give us |
| | 243:14　　　wholistic view of the risk and return. |
| | 243:15　　　　　Q.　　So you thought it would do a better |
| | 243:16　　　job of assessing risk? |
| | 243:17　　　　　A.　　Definitely. |
| | 243:18　　　　　Q.　　Did you perceive that the |
| | 243:19　　　pre-settlement checklist process didn't |
| | 243:20　　　accurately capture risk? |
| | |
| | 243:22　　　　　　THE WITNESS:  It's -- I wouldn't say |
| | 243:23　　　it's not accurate.  It's just limited compared |
| | 243:24　　　to this more extensive model. |
| **Cao Tr. at 89:16 - - 91:2** | 89:16　　　　　　THE WITNESS:  We have credit risk |
| | 89:17　　　policy and we have steps.  For my job, I relied |
| | 89:18　　　on what the model tells me, so we have internal |
| | 89:19　　　model and then we have Intex which are actually |
| | 89:20　　　linked to Intex in the internal model.  It's a |
| | 89:21　　　long level model.  It will basically rate |
| | 89:22　　　things at a level data and then process through |
| | 89:23　　　our simulation and, you know, 2000, pass, all |
| | 89:24　　　the probability and then predict numbers of OAS |
| | 89:25　　　and then, you know, tell us what the return is, |
| | |
| | 90:2　　　 you know, for this, and then, you know, credit |
| | 90:3　　　 enhancement levels and all those kinds of |
| | 90:4　　　things.  We can get all of them from the |
| | 90:5　　　analysis from the model. |
| | 90:6　　　　　　BY MR. SACCA: |

| | |
|---|---|
| **GSE Use of Models in Pre-Purchase Analysis** | |
| | 90:7          Q.    And this model you are referring to, |
| | 90:8     is this what you described earlier as the model |
| | 90:9     CJ Zhao finished in 2007? |
| | 90:10          A.    Yes. |
| | 90:11          Q.    Was there some name you used |
| | 90:12     internally for it? |
| | 90:13          A.    At the time, not sure there was a |
| | 90:14     name.  It was kind of a new product.  I know |
| | 90:15     the -- for now, they call them or before this |
| | 90:16     -- this thing is retired already.  ABS |
| | 90:17     analytics at certain time. |
| | 90:18          Q.    Apart from yourself, do you know if |
| | 90:19     there were others within Capital Markets |
| | 90:20     Strategy who negotiated with issuers about the |
| | 90:21     structure of bonds? |
| | 90:22          A.    Our team, so Francisco maybe, |
| | 90:23     definitely Francisco sometimes get involved |
| | 90:24     when, you know, there are certain things I |
| | 90:25     cannot even explain very clearly to the sell |
| | |
| | 91:2     side, but definitely traders for sure. |
| **Cao Tr. at 145:13 -- 146:2** | 145:13          Q.    The next bullet talks about a |
| | 145:14     prototype application built for timely |
| | 145:15     stochastic analysis of holdings. |
| | 145:16          Do you know what application that is |
| | 145:17     referring to? |
| | |
| | 145:19          THE WITNESS:  That's the CJ's model. |
| | 145:20          BY MR. SACCA: |
| | 145:21     Q.    And that model was built when? |
| | 145:22          A.    It was in -- she was building in |
| | 145:23     2006. |
| | 145:24     Q.    And when did Fannie Mae start using |
| | 145:25     that application? |
| | |
| | 146:2          A.    Early 2007, I would say. |
| **Cao Tr. at 146:13 -- 147:8** | 146:13          Q.    And, at the top, there is an open |
| | 146:14     position for a vice president of PLS asset |
| | 146:15     management. |
| | 146:16          Was that position ever filled during |
| | 146:17     the time you worked in CMS? |
| | 146:18          A.    Yes.  David Gussmann. |
| | 146:19          Q.    Okay.  And when did he take that |

187

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| | 146:20    job? |
| | 146:21        A.    I'm not sure it's the end of 2006 or |
| | 146:22    early 2007. |
| | 146:23        Q.    There are, under him, what appear to |
| | 146:24    be two direct reports, CJ Zhao and Kin Chung. |
| | 146:25    CJ Zhao is identified as the director of |
| | |
| | 147:2    analytics and modeling, is that what you |
| | 147:3    understood her role to be? |
| | 147:4        A.    Yes. |
| | 147:5        Q.    And what functions did analytics and |
| | 147:6    modeling serve? |
| | 147:7        A.    Build a model to evaluate the risk |
| | 147:8    and returns. |
| **Cao Tr. at 232:2 -** **- 233:6** | 232:2            THE WITNESS:  Yeah.  Like I say in |
| | 232:3    my comment, yeah, I have to -- the other one, I |
| | 232:4    have to look at it.  Yeah, there is a super |
| | 232:5    center structure for the Alt-A and option ARM |
| | 232:6    that actually is, you know -- if you look at |
| | 232:7    it, super senior/Mezz structure, that structure |
| | 232:8    is supposed to create additional buffer for |
| | 232:9    the -- you know, the top layer, the most senior |
| | 232:10    bound.  So looks like based on the contents of |
| | 232:11    the e-mail and then this documentation, I |
| | 232:12    believe at the time in 2007, we wanted to do |
| | 232:13    more in-depth analysis using, you know, CJ's |
| | 232:14    model because this checklist, as you can see, |
| | 232:15    is one dimension of checking the risk of one |
| | 232:16    that is high.  But they could be -- you know, |
| | 232:17    the risk could be outside the other factors in |
| | 232:18    the pool and all the other structure.  So it's |
| | 232:19    not connected like what the collateral is |
| | 232:20    doing.  I don't know, you know, what the |
| | 232:21    structure is doing.  You know, the creditor has |
| | 232:22    risk.  Structure could mitigate it, so they are |
| | 232:23    not necessarily connected. |
| | 232:24            So CJ's model is supposed to handle |
| | 232:25    that so we will be migrating to, you know, a |
| | | |
| | 233:2    more level in-depth analysis.  It's probably |
| | 233:3    for this kind of super center structure, which |
| | 233:4    we don't have very good understanding from just |
| | 233:5    the checklist to see what kind of risk we are |

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| | 233:6    exposed to. |
| **Cao Tr. at 240:2 - 243:24** | 240:2         Q.    At some point, Fannie Mae stopped<br>240:3    the pre-settlement checklist process in favor<br>240:4    of a different kind of analysis; is that<br>240:5    correct?<br>240:6         A.    Yes.<br>240:7         Q.    And that's what you described as CJ<br>240:8    Zhao's model?<br>240:9         A.    Correct.<br>240:10        Q.    And describe for me, please, the<br>240:11    difference between the two approaches?<br><br>240:13            THE WITNESS:  Pre-settlement, you<br>240:14    can say that it's just a very simple<br>240:15    spreadsheet, one page or two of, you know,<br>240:16    checking of the invention at the time, right.<br>240:17    CJ's model is a stochastic model and then used<br>240:18    on other data as input and then collect the<br>240:19    cash flow with deal structure throughout the<br>240:20    model.  So below that, all the information with<br>240:21    all the embedded risk factors requested by the<br>240:22    model and fit into the process, generally the<br>240:23    cash flow, by doing, you know, simulations<br>240:24    based on home price interest rates environment<br>240:25    and then generated cash flow based on that and<br><br>241:2     then run through the cash flow, you know,<br>241:3     through the INTEX, you know, the structure of<br>241:4     the deal and then estimate the credit risks and<br>241:5     estimate the loss of the bonds and the price of<br>241:6     the bonds based on the -- you know, per model.<br>241:7         Q.    What is a stochastic model?<br><br>241:9            THE WITNESS:  Basically using<br>241:10    simulation approach to simulate your<br>241:11    different -- the key inputs and then outputs<br>241:12    the -- you know, different kind of results.  So<br>241:13    it's kind of probably realistic -- real.<br>241:14            BY MR. SACCA:<br>241:15        Q.    And did you say inputs into the<br>241:16    model included loan level data?<br>241:17        A.    That's required.  Loan level, yes.<br>241:18        Q.    And the loan level data that Fannie |

| GSE Use of Models in Pre-Purchase Analysis |
|---|

| | |
|---|---|
| 241:19 | Mae put into the model was loan level data |
| 241:20 | specific to the particular deal you were |
| 241:21 | modeling? |
| 241:22 | A.   Yes. |
| | |
| 241:24 | BY MR. SACCA: |
| 241:25 | Q.   And from where did you get the data? |
| | |
| 242:2 | A.   From the issuer, the dealer. |
| 242:3 | Q.   And did that come from the loan tape |
| 242:4 | or the CDI file or -- |
| 242:5 | A.   Low level data is from loan tape. |
| 242:6 | The structure is from CDI. |
| 242:7 | Q.   And what sort of loan level data |
| 242:8 | went into the model? |
| | |
| 242:10 | THE WITNESS:  Again, there are a lot |
| 242:11 | of fields that in the data table -- I think we |
| 242:12 | went through this this morning, so not remember |
| 242:13 | every single thing, but, you know, LTV, FICO, |
| 242:14 | coupon, you know, note rates, specifically, and |
| 242:15 | then seasoning, how long season, and then |
| 242:16 | geography.  That's, you know, the gist of it. |
| 242:17 | BY MR. SACCA: |
| 242:18 | Q.   And when you were running the model, |
| 242:19 | you ran it through various scenarios? |
| 242:20 | A.   Correct, yes. |
| 242:21 | Q.   And in running those various |
| 242:22 | scenarios, did you ever alter any of the -- the |
| 242:23 | loan level data that you input to see if that |
| 242:24 | would make a difference in the outcome? |
| | |
| 243:2 | THE WITNESS:  I don't remember doing |
| 243:3 | that, no. |
| 243:4 | BY MR. SACCA: |
| 243:5 | Q.   So you -- you never said let's see |
| 243:6 | what it looks like if we use a different LTV or |
| 243:7 | different average FICO score? |
| 243:8 | A.   That's not the common practice in |
| 243:9 | industry to do analysis. |
| 243:10 | Q.   Why did the CMS group switch from |
| 243:11 | the pre-settlement checklist model to the CJ |
| 243:12 | Zhao model? |

| | GSE Use of Models in Pre-Purchase Analysis |
|---|---|
| | 243:13   A.   Because then this model give us<br>243:14   wholistic view of the risk and return.<br>243:15   Q.   So you thought it would do a better<br>243:16   job of assessing risk?<br>243:17   A.   Definitely.<br>243:18   Q.   Did you perceive that the<br>243:19   pre-settlement checklist process didn't<br>243:20   accurately capture risk?<br><br>243:22        THE WITNESS:  It's -- I wouldn't say<br>243:23   it's not accurate.  It's just limited compared<br>243:24   to this more extensive model. |
| **Cao Tr. at 689:4 -<br>690:12** | 689:4   Q.   For the most part, when these loans<br>689:5   were originated, it was the originators that<br>689:6   was responsible for originating them in<br>689:7   accordance with the guidelines that Fannie Mae<br>689:8   set, correct?<br><br>689:10        THE WITNESS:  I believe so.<br>689:11        BY MR. HARSCH:<br>689:12   Q.   So now in the models that you ran to<br>689:13   determine the intrinsic value of these<br>689:14   mortgages, did Fannie Mae incorporate any<br>689:15   variables that reflected the degree to which<br>689:16   Fannie Mae felt that these originators had<br>689:17   adhered to the guidelines to which these loans<br>689:18   were supposed to have been originated?<br><br>689:20        THE WITNESS:  Not we ran<br>689:21   underwriting it?  We underwrite it or -- we do<br>689:22   have called, you know, getting to the model<br>689:23   components, we have an ACI model which is kind<br>689:24   of super-FICO kind of index we created, based<br>689:25   on the borrower information that actually have<br><br>690:2   all this borrower-specific information, FICOs,<br>690:3   and all that information, income, TDI, LTV, all<br>690:4   fits into it, and then we would come out with,<br>690:5   like, we call them super-FICO.  So it's helped<br>690:6   to identify the risk of the borrowers, so we<br>690:7   never really -- I mean, under -- we ran -- the<br>690:8   underwriting was not in the model, right.<br>690:9        BY MR. HARSCH: |

| GSE Use of Models in Pre-Purchase Analysis | |
|---|---|
| | 690:10      Q.   The underwriting was not in the<br>690:11   model?<br>690:12      A.   No. |

| Policies for Purchasing PLS and Selecting Collateral Backing PLS | |
|---|---|
| **D. Cook Tr. at 385:23 -- 387:2** | 385:23   Q    The subject is "New process for submitting<br>385:24  loan tapes." It's from Shayan Salahuddin to Joe Haley<br>385:25  and Richard Perrelli, dated February 2 -- 22, 2007.<br><br>386:3          Is it correct that this document reflects a<br>386:4  process for "collateral selection in PLS<br>386:5  transactions"?<br>386:6    A   Yes.<br>386:7    Q    What is meant by "collateral selection"?<br>386:8    A    When the dealers were putting together a<br>386:9  deal, a PLS, depending on which collateral would be<br>386:10  included in the deal, it could yield higher goals<br>386:11  score value for housing goals purposes for Fannie Mae,<br>386:12  all else equal.<br>386:13    Q    What is the "selection" in "collateral<br>386:14  selection"?<br><br>386:16     A    Selecting which loans to include in the deal<br>386:17  that Fannie Mae purchases.<br>386:18     Q    Fannie Mae participated in that collateral<br>386:19  selection process in order to determine which loans to<br>386:20  include in the deal for housing goal purposes,<br>386:21  correct?<br><br>386:23    A   Yes.<br>386:24    Q    That was Fannie Mae's practice, correct?<br><br>387:2    A   Yes. |
| **D. Cook Tr. at 387:8 -- 12** | 387:8    Q    There were procedures written about Fannie<br>387:9  Mae's participation in the collateral selection<br>387:10  process for housing goal purposes, correct?<br><br>387:12     A   Yes |
| **D. Cook Tr. at 391:15 -- 392:7** | 391:15  Q    Did Fannie Mae have a practice of<br>391:16  participating in collateral selection for PLS<br>391:17  purchases during 2005 to 2007 other than the<br>391:18  collateral selection we've been discussing for<br>391:19  purposes of pursuing housing goals?<br><br>391:21     A    Yes.<br>391:22     Q    Can you describe what that collateral<br>391:23  selection consisted of at Fannie Mae in that period? |

| | |
|---|---|
| | 391:25   A   The traders, Ashley Dyson and Steve Shen, |
| | 392:2  told me that they would also opine -- rather, |
| | 392:3  separately, for purposes of housing goals, they would |
| | 392:4  ask for the collateral characteristics to be a certain |
| | 392:5  way, and they would work with the dealers to try to |
| | 392:6  meet their preferred collateral composition for a risk |
| | 392:7  and return standpoint. |
| **D. Cook Tr. at 392:15 -- 393:15** | 392:15   Q   Did anyone else participate with the traders |
| | 392:16  in collateral selection other than Housing Goals |
| | 392:17  people? |
| | 392:19   A   Yes. |
| | 392:20   Q   Who else? |
| | 392:21   A   The Capital Markets Strategy or Capital |
| | 392:22  Markets Risk team at some point during that period |
| | 392:23  also started to assist the traders in providing a |
| | 392:24  preferred collateral composition. |
| | 392:25   Q   Do you know at what point that began? |
| | 393:2   A   I believe it began during the 2006 year. |
| | 393:3  And I believe in the policy that was drafted in 2007, |
| | 393:4  it may refer to their role to do prepurchase reviews. |
| | 393:5   Q   So in -- starting in 2006 and carrying into |
| | 393:6  2007, personnel from Capital Markets Strategy or the |
| | 393:7  Risk team participated with the traders in collateral |
| | 393:8  selection in PLS, correct? |
| | 393:10   A   They did participate in reviewing the |
| | 393:11  collateral.  Depends on what you mean by collateral |
| | 393:12  selection.  I think the selection of loans to include |
| | 393:13  and exclude was primarily the responsibility of the |
| | 393:14  traders, but they had assistance from the Risk team |
| | 393:15  and the Housing Goals Scoring team. |
| **Palmer Tr. at 642:9 -- 642:23** | 642:9   Q   Okay, great.  I take it from |
| | 642:10  your testimony yesterday that you weren't |
| | 642:11  involved in the selection of loans that |
| | 642:12  went into the supporting loan groups for |
| | 642:13  PLS that Freddie purchased; is that |
| | 642:14  right? |
| | 642:15   A.   That's correct. |
| | 642:16   Q.   But were you aware that during |
| | 642:17  the 2005 to 2007 time period that there |
| | 642:18  were other people at Freddie Mac that |
| | 642:19  were involved in either removing or |

194

| | |
|---|---|
| | 642:20   adding loans into the pools for housing |
| | 642:21   goals purposes? |
| | |
| | 642:23      A.   I was aware. |
| **Wood Tr. at** **234:17 -- 235:17** | 234:17      Q.   Do you see the title of the |
| | 234:18   attachment is:  "Credit risk oversight mortgage |
| | 234:19   ABS summary?" |
| | 234:20      A.   Yes. |
| | 234:21      Q.   And if you go to the bottom of that |
| | 234:22   page, do you see a bullet that says:  "Mortgage |
| | 234:23   ABS buy strategy," it's bolded? |
| | 234:24      A.   Yes. |
| | 234:25      Q.   And then below that, it states: |
| | |
| | 235:2   "Currently, only Triple A investments |
| | 235:3   considered.  Two main drivers, growth and |
| | 235:4   affordable housing goals.  Purchases must meet |
| | 235:5   ROE threshold of 9 percent.  Majority of |
| | 235:6   purchases are over 20 percent ROE.  Deploy |
| | 235:7   capital.  Emphasis being placed on purchases |
| | 235:8   aimed to help meet 2005 HUD affordable housing |
| | 235:9   goals which have not been clearly defined to |
| | 235:10   date.  25 percent of the portfolio manager's |
| | 235:11   time is being dedicated to purchases that help |
| | 235:12   meet HUD goals." |
| | 235:13         Do you see that? |
| | 235:14      A.   Uh-huh. |
| | 235:15      Q.   What is ROE as used in this set of |
| | 235:16   bullets? |
| | 235:17      A.   Return on equity. |
| **Kenneweg** **30(b)(6) Tr. at** **71:22 – 72:7** | 71:22  Q.   Yes.  Did Freddie Mac have any |
| | 71:23  policy or procedure that would have prevented |
| | 71:24  it from purchasing PLS backed by loans from |
| | 71:25  originators whose guidelines made exceptions |
| | |
| | 72:2  largely unnecessary? |
| | |
| | 72:5      A.   I've never -- I've never seen |
| | 72:6  that wording in a policy or procedure, that |
| | 72:7  would prevent that type of purchase. |
| **Kenneweg** **30(b)(6) Tr. at** **73:2 – 73:12** | 73:2  Q.   Common sense underwriting |
| | 73:3  decisions.  Did Freddie Mac have any policy or |
| | 73:4  procedure that prevented it from purchasing |
| | 73:5  PLS backed by loans from originators whose |
| | 73:6  files did not evidence common sense |
| | 73:7  decision-making? |

| | |
|---|---|
| | 73:10       A.   I haven't seen explicitly<br>73:11  common sense referred to in our policies or<br>73:12  procedures. |
| **Kenneweg**<br>**30(b)(6) Tr. at**<br>**82:14 – 85:4** | 82:14  Q.   So under Freddie Mac's policies<br>82:15  and procedures, would these comments and<br>82:16  observations merit a rating of poor with<br>82:17  respect to credit?<br>82:20       A.   I don't know the specific<br>82:21  criteria that would cause a particular rating<br>82:22  on a subcategory.  I don't know.<br>82:23       Q.   Would comments like this under<br>82:24  Freddie's policies and procedures result in a<br>82:25  suspension of purchasing PLS backed by ResMAE<br><br>83:2  loans?<br><br>83:5       A.   Freddie Mac's purchase of PLS<br>83:6  securities would be governed by policies and<br>83:7  procedures that don't reference this level of<br>83:8  granular comments.<br>83:9       Q.   Right.  But you are familiar<br>83:10  with policies and procedures.  Right?<br><br>83:13       A.   I am.<br>83:14       Q.   You've been working with them<br>83:15  for a number of years now.  Right?<br><br>83:18       A.   Not all policies and<br>83:19  procedures, but yes.<br>83:20       Q.   Right.  The ones with respect<br>83:21  to the decision-making behind PLS.  Right?<br><br>83:24       A.   Yes.<br>83:25       Q.   And you were familiar with the<br><br>84:2  ones that were in effect in 2006 and 2007.<br>84:3       Right?<br><br>84:6       A.   Yes.<br>84:7       Q.   And based on your knowledge of<br>84:8  those procedures, would they have required<br>84:9  that Freddie Mac suspend purchases of PLS<br>84:10  backed by ResMAE loans in light of the<br>84:11  comments here? |

| | |
|---|---|
| | 84:14     A.   No. |
| | 84:15     Q.   Did Freddie Mac also review -- |
| | 84:16          MR. SECHLER:  Strike that. |
| | 84:17 BY MR. SECHLER: |
| | 84:18     Q.   Did AMO also perform |
| | 84:19 operational reviews of issuers and |
| | 84:20 aggregators? |
| | 84:21     A.   Yes. |
| | 84:22     Q.   What types of information did |
| | 84:23 AMO consider in those operational reviews? |
| | 84:24     A.   Due diligence processes. |
| | 84:25 Overall controls.  So a lot of the categories |
| | |
| | 85:2 would be similar to an originator review, |
| | 85:3 except there wouldn't be the credit, like |
| | 85:4 underwriting-type consideration. |
| **Kenneweg** **30(b)(6) Tr. at** **87:19 – 88:10** | 87:19  Q.   And what rate was given -- |
| | 87:20     A.   Reviews. |
| | 87:21     Q.   -- to AMO written reviews in |
| | 87:22 the assessment of PLS counterparties? |
| | |
| | 87:24     A.   I don't -- it wasn't an |
| | 87:25 explicit weight. |
| | |
| | 88:2     Q.   Was it a significant factor? |
| | |
| | 88:5     A.   It was.  It could be. |
| | 88:6     Q.   Was it more significant in the |
| | 88:7 process than external ratings? |
| | 88:8     A.   I think that probably depends |
| | 88:9 on the type of review that was being |
| | 88:10 completed. |
| **Kenneweg** **30(b)(6) Tr. at** **88:17 – 90:22** | 88:17  Q.   Sure.  These AMO written |
| | 88:18 reviews, they were used to determine whether |
| | 88:19 or not to approve a PLS counterparty? |
| | |
| | 88:22     A.   That wasn't the sole use, but |
| | 88:23 it was a consideration. |
| | 88:24     Q.   Well, that was a use? |
| | 88:25     A.   Right.  Right. |
| | |
| | 89:2     Q.   They were also used to develop |
| | 89:3 a metric score for PLS counterparties.  Right? |
| | 89:4     A.   Correct. |
| | 89:5     Q.   And they were used in |
| | 89:6 connection with the ongoing monitoring of PLS |

| | |
|---|---|
| | 89:7  counterparties.  Correct? |
| | |
| | 89:10          A.    Yes. |
| | 89:11          Q.    Now, which counterparties in |
| | 89:12  the PLS business -- |
| | 89:13            MR. SECHLER:  That's terrible. |
| | 89:14  Strike that. |
| | 89:15  BY MR. SECHLER: |
| | 89:16          Q.    Which PLS counterparties |
| | 89:17  required approval by counterparty credit risk |
| | 89:18  management? |
| | 89:19          A.    There is a chart within the |
| | 89:20  procedure.  So if you go to the procedure, |
| | 89:21  Appendix A. |
| | 89:22          Q.    Yes. |
| | 89:23          A.    Servicers and originators, once |
| | 89:24  they -- once they -- once we accumulated above |
| | 89:25  one percent of the portfolio, in terms of UPB, |
| | |
| | 90:2  with that counterparty, and then issuers would |
| | 90:3  be at time of first trade, they would require |
| | 90:4  approval. |
| | 90:5          Q.    And is that -- |
| | 90:6            MR. SECHLER:  Strike that. |
| | 90:7  BY MR. SECHLER: |
| | 90:8          Q.    Was that the practice |
| | 90:9  throughout the period from when you started in |
| | 90:10  counterparty credit risk management through |
| | 90:11  the end of 2007? |
| | 90:12          A.    I believe so.  And I should -- |
| | 90:13  you know what; can I clarify my statement? |
| | 90:14          Q.    Sure. |
| | 90:15          A.    I just said issuers require |
| | 90:16  approval at first trade.  It's caveated based |
| | 90:17  on the status of the originators within the |
| | 90:18  deal. |
| | 90:19          Q.    So if originators in the deal |
| | 90:20  were all rated between M-1 and M-5, an issuer |
| | 90:21  would not require counterparty approval? |
| | 90:22          A.    Right. |
| **Kenneweg** **30(b)(6) Tr. at** **71:22 -- 72:7** | 71:22          Q.    Yes.  Did Freddie Mac have any |
| | 71:23  policy or procedure that would have prevented |
| | 71:24  it from purchasing PLS backed by loans from |
| | 71:25  originators whose guidelines made exceptions |
| | |
| | 72:2  largely unnecessary? |

| | |
|---|---|
| | 72:5        A.   I've never -- I've never seen<br>72:6  that wording in a policy or procedure, that<br>72:7  would prevent that type of purchase. |
| **Kenneweg 30(b)(6) Tr. at 73:2 -- 12** | 73:2        Q.   Common sense underwriting<br>73:3  decisions.  Did Freddie Mac have any policy or<br>73:4  procedure that prevented it from purchasing<br>73:5  PLS backed by loans from originators whose<br>73:6  files did not evidence common sense<br>73:7  decision-making?<br><br>73:10        A.   I haven't seen explicitly<br>73:11  common sense referred to in our policies or<br>73:12  procedures. |
| **Syron Tr. at 129:14 -- 130:12** | 129:14       Q.   And it says here, "As long as<br>129:15    some institutions operate under<br>129:16    different, or no, regulatory strictures,<br>129:17    potential for these sorts of excesses and<br>129:18    abuses will exist.  As previously stated,<br>129:19    Freddie Mac has a long history of<br>129:20    voluntarily setting standards of prudent<br>129:21    underwriting and of promoting greater<br>129:22    borrower protections in subprime."<br>129:23            Do you see that?<br>129:24     A.   Yes.<br>129:25       Q.   And was that a true statement?<br>130:1<br>130:2     A.   Yes.<br>130:3       Q.   When you referred to prudent<br>130:4    underwriting, can you describe what you<br>130:5    meant there?<br>130:6       A.   Prudent underwriting would<br>130:7    mean that it was not predatory.<br>130:8       Q.   What do you mean by not<br>130:9    predatory?<br>130:10      A.   That in fact we expected the<br>130:11    person who took the loan would be able to<br>130:12    service it. |

| Use of Credit Enhancement in PLS | |
|---|---|
| **Bisenius Tr. at 155:25 -- 156:8** | 155:25  Q    In the PLS business, would a credit<br><br>156:2  enhancement include if you were buying, for example,<br>156:3  the AAA tranche, the portion of those losses that<br>156:4  would be absorbed by lower tranches in the PLS<br>156:5  securitization?<br><br>156:7     A   I would include that as, in my thoughts, a<br>156:8  definition of what a credit enhancement is, yes. |
| **Bisenius Tr. at 288:1 -- 290:15** | 288:2     Q    So having read the memo, does that refresh<br>288:3  your recollection about the process that was being<br>288:4  attempted to be used to use DEFCAP to help to value<br>288:5  the credit underlying MABS portfolio purposes?<br><br>288:7     A   As I look at this, I recall there being<br>288:8  conversations around doing this one, yes.<br>288:9   Q   Great.<br>288:10        Maybe let's just start with, what do you<br>288:11  recall about the conversations?<br>288:12     A    Pretty much what's summarized in the memo<br>288:13  itself, which was recognizing that DEFCAP was not<br>288:14  designed for pools, it was designed for loan-level<br>288:15  type analysis, was there a way that we could use<br>288:16  pool-type stratifications and still capture them<br>288:17  within DEFCAP.  I also recall there being a discussion<br>288:18  about kind of a level of information that Freddie Mac<br>288:19  received prior to its purchase of private label<br>288:20  securities and whether that information needed to be<br>288:21  expanded to be able to allow them to use the DEFCAP<br>288:22  type model.<br>288:23     Q    So you recall that there was a proposal to<br>288:24  require dealers to provide breakdowns of their pool by<br>288:25  FICO/LTV buckets?<br><br>289:2     A   That's -- as this thing suggests, that's my<br>289:3  recollection.<br>289:4     Q    And then there would also be 12 FICO/LTV<br>289:5  grids which would be used to evaluate those pools; is<br>289:6  that correct?<br><br>289:8     A   Again, as the memo describes, I didn't<br>289:9  recall the 12, but it says 12, that makes sense. |

| | **Use of Credit Enhancement in PLS** |
|---|---|
| | 289:10   Q   Right.<br>289:11         Do you recall then that those grids would be<br>289:12  populated in terms of expected loss by running the<br>289:13  DEFCAP model?<br><br>289:15     A   Again, that's my general recollection having<br>289:16  read this.  That's right.<br>289:17     Q   And do you recall that they would run the<br>289:18  DEFCAP model at different levels, at the 50 percent,<br>289:19  the 99 percent, the 100 percent, to see what losses<br>289:20  would be projected under each of the different<br>289:21  scenarios under DEFCAP?<br><br>289:23     A   I don't recall that specifically.  I know<br>289:24  there was some desire -- because, again, we're talking<br>289:25  about the investment in the retained portfolio.  It's<br><br>290:2  not as much about the loan level as it is about the<br>290:3  subordination level and the, kind of, risk of the<br>290:4  structure.  I think that's what they were trying to do<br>290:5  for the risk of the structure, but I don't have as<br>290:6  clear of a recollection on that.<br>290:7     Q   Right.  And so, generally, do you understand<br>290:8  the idea was to estimate the risk of potential losses<br>290:9  using the DEFCAP model and then figure out whether the<br>290:10  credit enhancements that were provided in the security<br>290:11  structure would be sufficient to protect against that<br>290:12  level of losses?<br><br>290:14     A   That's my understanding of what they were<br>290:15  trying to do, that's right |
| **Bisenius Tr. at 559:11 -- 559:22** | 559:11     Q   We saw some documents yesterday referring to<br>559:12  investing in AAA tranches of PLS to get protection<br>559:13  from the credit enhancement that that afforded.  Do<br>559:14  you remember that?<br><br>559:16     A   Protection from the credit risk.<br>559:17     Q   I should say by the credit enhancement from<br>559:18  the credit risk.<br>559:19     A   I recall looking at those documents, yes.<br>559:20     Q   Is that generally consistent with your<br>559:21  recollection of Freddie Mac's policy regarding<br>559:22  investment in PLS? |

| Use of Credit Enhancement in PLS | |
|---|---|
| **Aneiro Tr. at 274:5 -- 275:23** | 274:5     Q.    Now, how was the DEFCAP, how<br>274:6    were the DEFCAP results used for the<br>274:7    credit analysis?<br>274:8       A.    I don't remember specifically,<br>274:9    but in general it defined what the<br>274:10    various percentiles of the -- of the<br>274:11    various paths were in terms of the<br>274:12    quantifying total losses in the various<br>274:13    percentiles and then compared to what the<br>274:14    subordination level was underneath the<br>274:15    tranche that we were buying.<br>274:16       Q.    And when you said the<br>274:17    subordination level, you mean the credit<br>274:18    enhancement provided?<br>274:19       A.    Yes.<br>274:20       Q.    And if the credit enhancement<br>274:21    provided was greater than the -- well,<br>274:22    was there a need to compare the -- you<br>274:23    said there was a comparison of the credit<br>274:24    enhancement provided to the DEFCAP<br>274:25    results.  What happened if the credit<br>275:1    enhancement provided was greater than the<br>275:2    expected losses calculated by DEFCAP?<br>275:3       A.    That would be a positive.<br>275:4       Q.    What do you mean by positive?<br>275:5       A.    That means that we would have<br>275:6    more protection than what the various<br>275:7    percentiles of results of the DEFCAP<br>275:8    model predicted as losses.  So we would<br>275:9    have more protection than the expected<br>275:10    losses defined by DEFCAP.<br>275:11       Q.    How would that impact the<br>275:12    credit analysis of the deal?<br>275:13       A.    That would be a positive in<br>275:14    approving the credit analysis.<br>275:15       Q.    So the credit analysis would<br>275:16    be approved if the credit enhancement was<br>275:17    greater than the DEFCAP 100th percentile,<br>275:18    correct?<br>275:19       A.    I don't know if it's a hundred<br>275:20    percentile, I don't recall the policy.<br>275:21    It's not the only -- only thing that<br>275:22    would be evaluated, but it would be a |

| Use of Credit Enhancement in PLS | |
|---|---|
| | 275:23   positive in the evaluation of a deal. |
| **Aneiro Tr. at 280:22 -- 281:9** | 280:22       Q.   So that makes sense.  So then<br>280:23   if this statement is correct, if the<br>280:24   credit enhancement for a deal is greater<br>280:25   than the expected loss calculated by<br>281:1   DEFCAP, the credit enhancement for the<br>281:2   deal can be approved; is that correct?<br>281:3       A.   That's my understanding of<br>281:4   this.<br>281:5       Q.   And in order to obtain credit<br>281:6   approval, however, you would still need<br>281:7   the counterparty approval?<br>281:8       A.   That's what -- that's how I<br>281:9   recall the practice to be. |
| **Kain Tr. at 272:9 -- 275:13** | 272:9       Q.   Do you recognize 20418 as a trade<br>272:10   ticket for a transaction CWL 05 -- 2005 -- 4:<br>272:11   2AV1?<br><br>272:13           THE WITNESS:  Yes, I do. |
| **Kain Tr. at 272:22 – 273:14** | 272:22       Q.   If you flip into the package a<br>272:23   little bit, to the page with the Bates number<br>272:24   ending in 924, there are a couple of e-mails<br>272:25   here.<br><br>273:2           The bottom e-mail is a credit<br>273:3   approval from Scott Devine.  Do you remember<br>273:4   Mr. Devine?<br>273:5       A.   I remember him vaguely, yes.<br>273:6       Q.   Do you remember what organization he<br>273:7   worked in?<br>273:8       A.   I don't at that time.<br>273:9       Q.   And then he writes:  "Credit<br>273:10   approved," and way at the bottom:  "Credit<br>273:11   enhancement is adequate relative to expected<br>273:12   losses."<br>273:13           Do you see that?<br>273:14       A.   I see that. |
| **Kain Tr. at 273:20 – 275:13** | 273:20       Q.   And was that determination:  "The<br>273:21   credit enhancement is adequate relative to<br>273:22   expected losses," is that the credit approval<br>273:23   for this transaction?<br><br>273:25           THE WITNESS:  I am not sure. |

| | | |
|---|---|---|
| | **Use of Credit Enhancement in PLS** | |
| | 274:2 | BY MR. BENNETT: |
| | 274:3 | Q.   If you look above that, there is an |
| | 274:4 | e-mail from Frank Vetrano to Scott Devine that |
| | 274:5 | says: "Approved," and then below that: |
| | 274:6 | "Scott, is 30 percent credit enhancement or CE |
| | 274:7 | here a record for us.  Please highlight the |
| | 274:8 | risk characteristics that scared the rating |
| | 274:9 | agencies." |
| | 274:10 | Do you see that? |
| | 274:11 | A.   I see that, yeah. |
| | 274:12 | Q.   Do you understand what Mr. Vetrano |
| | 274:13 | meant by that? |
| | 274:14 | A.   I have no record of this e-mail from |
| | 274:15 | my memory, but there was -- it appears that |
| | 274:16 | this deal required 30 percent credit |
| | 274:17 | enhancement, and so Frank wanted -- seems to be |
| | 274:18 | asking the question, why was the credit |
| | 274:19 | enhancement required.  That was required that |
| | 274:20 | high.  I mean, that's my interpretation but I |
| | 274:21 | am looking at it like you are. |
| | 274:22 | Q.   And the credit enhancement is |
| | 274:23 | something that was set by the rating agencies |
| | 274:24 | to provide protection to the Triple A tranche? |
| | 274:25 | A.   Yes, generally, but there are times |
| | 275:2 | when we have asked for more credit enhancement |
| | 275:3 | on our own, I believe, so -- but in this case, |
| | 275:4 | it appears that Frank at least believed that |
| | 275:5 | the rating agencies were responsible for the |
| | 275:6 | higher credit enhancement. |
| | 275:7 | Q.   And as you pointed out, sometimes |
| | 275:8 | Freddie Mac's own assessment was that the deal |
| | 275:9 | was riskier than the rating agencies thought, |
| | 275:10 | so Freddie asked for more enhancement, didn't |
| | 275:11 | they? |
| | 275:12 | A.   I believe there were cases like |
| | 275:13 | that, yes. |
| **Cao Tr. at 87:16 - 89:9** | 87:16 | What were Fannie Mae's investment |
| | 87:17 | interests? |
| | 87:19 | THE WITNESS:  The credit enhancement |
| | 87:20 | levels we want to have to mitigate the risk and |
| | 87:21 | then the yield we want. |

| | |
|---|---|
| **Use of Credit Enhancement in PLS** | |
| | 87:22        BY MR. SACCA:<br>87:23    Q.   What is credit enhancement?<br>87:24    A.   It's the credit enhancement for --<br>87:25   in the structure, that -- you have a structure,<br><br>88:2    right, so the bonds you buy, anything below it,<br>88:3    it was supposed to take first loss and those<br>88:4    collaterals or those files are supposed to be<br>88:5    your credit enhancements, that's one type of<br>88:6    them, and you could have third-party insurance.<br>88:7    They could go out and get a wrap, which is<br>88:8    called wrap, and then so basically, have<br>88:9    insurance company guarantee that this bond is<br>88:10   not going to take a loss.<br>88:11        That is additionally enhancement,<br>88:12   and then there is other things like you could<br>88:13   have a reserve fund account set up that<br>88:14   actually has additional monies set aside, that<br>88:15   is another credit enhancement.<br>88:16    Q.   And you said another part of the<br>88:17   discussions you could have or -- sorry, another<br>88:18   one of Fannie Mae's investment interest was the<br>88:19   yield you wanted.  That's the return to Fannie<br>88:20   Mae on the bond?<br>88:21    A.   Yes.<br>88:22    Q.   And that was something that Fannie<br>88:23   Mae could and did negotiate with issuers of<br>88:24   bonds?<br>88:25    A.   Definitely.<br><br>89:2     Q.   And credit enhancement was something<br>89:3    Fannie Mae found it could and did negotiate<br>89:4    with issuers of bonds?<br>89:5    A.   Yes.<br>89:6    Q.   And there were times when you were<br>89:7    successful in getting issuers of bonds to<br>89:8    change the structure to meet your requirements?<br>89:9    A.   Yes. |
| **Cao Tr. at 90:2 – 91:2** | 90:2    you know, for this, and then, you know, credit<br>90:3    enhancement levels and all those kinds of<br>90:4    things.  We can get all of them from the<br>90:5    analysis from the model. |

| | | |
|---|---|---|
| **Use of Credit Enhancement in PLS** | | |
| | 90:7 | Q.   And this model you are referring to, |
| | 90:8 | is this what you described earlier as the model |
| | 90:9 | CJ Zhao finished in 2007? |
| | 90:10 | A.   Yes. |
| | 90:11 | Q.   Was there some name you used |
| | 90:12 | internally for it? |
| | 90:13 | A.   At the time, not sure there was a |
| | 90:14 | name.  It was kind of a new product.  I know |
| | 90:15 | the -- for now, they call them or before this |
| | 90:16 | -- this thing is retired already.  ABS |
| | 90:17 | analytics at certain time. |
| | 90:18 | Q.   Apart from yourself, do you know if |
| | 90:19 | there were others within Capital Markets |
| | 90:20 | Strategy who negotiated with issuers about the |
| | 90:21 | structure of bonds? |
| | 90:22 | A.   Our team, so Francisco maybe, |
| | 90:23 | definitely Francisco sometimes get involved |
| | 90:24 | when, you know, there are certain things I |
| | 90:25 | cannot even explain very clearly to the sell |
| | 91:2 | side, but definitely traders for sure. |
| **Cao Tr. at 183:22 - 184:21** | 183:22 | Q.   Did you have any understanding of |
| | 183:23 | the rationale for any of the tests on the |
| | 183:24 | checklist? |
| | | |
| | 184:2 | THE WITNESS:  I totally understand |
| | 184:3 | they are credit policy, credit risk-related |
| | 184:4 | issues, that we want to safeguard and -- yeah. |
| | 184:5 | BY MR. SACCA: |
| | 184:6 | Q.   For example, the one I just read to |
| | 184:7 | you about the difference in sizing levels, what |
| | 184:8 | was your understanding of why that was |
| | 184:9 | significant? |
| | 184:10 | A.   You mean credit enhancement levels |
| | 184:11 | or -- the DOW credit enhancement levels.  The |
| | 184:12 | first item? |
| | 184:13 | Q.   Yes. |
| | 184:14 | A.   This first item is talking about the |
| | 184:15 | difference of setting levels among all the |
| | 184:16 | rating agencies that we get rating from, so we |
| | 184:17 | don't want to see different opinion from |
| | 184:18 | different rating agencies so that indicates, |
| | 184:19 | you know, they observe different kind of risk |
| | 184:20 | embedded in the collateral, so that is what the |

206

| | | Use of Credit Enhancement in PLS |
|---|---|---|
| | 184:21 | language is. |
| **Cao Tr. at 185:19 -- 24** | 185:19<br>185:20<br>185:21<br>185:22<br>185:23<br>185:24 | Q.   Under Structure Analysis No. 4 is:<br>"CE percent," and then in parentheses,<br>"(subordination and over-collateralization) is<br>greater than or equal to 15 percent."<br>CE percent is credit enhancement?<br>A.   Yes. |
| **Cao Tr. at 186:8-14** | 186:8<br>186:9<br>186:10<br>186:11<br>186:12<br>186:13<br>186:14 | Q.   Do you know the rationale for the 15<br>percent?<br>A.   I -- actually, I don't know.  I can,<br>you know, I don't want to speculate, but it's<br>must be the minimum required, you know,<br>mitigation for the risk for this kind of<br>security.  This is for subprime. |
| **Cao Tr. at 208:19 -- 210:7** | 208:19<br>208:20<br>208:21<br>208:22<br>208:23<br>208:24<br>208:25<br><br>209:2<br>209:3<br>209:4<br>209:5<br>209:6<br>209:7<br>209:8<br>209:9<br>209:10<br>209:11<br>209:12<br>209:13<br>209:14<br>209:15<br>209:16<br>209:17<br>209:18<br>209:19<br>209:20<br>209:21<br>209:22 | Q.   Let me show you a document that has<br>been marked as Exhibit 4408.<br>The first page is an e-mail from you<br>to Kin Chung?<br>A.   Yes.<br>Q.   Saying:  "I've completed the<br>pre-settlement review for ABFC 2006-OPT3A1.<br><br>This bond is put on conditional retain due to<br>100 percent of collateral is with CLTV greater<br>than 80 percent."<br>And the next sentence says:  "It<br>seems bankers are making mistakes of inputting<br>CE percent as sizing level."<br>Do you see that?<br>A.   Yes.<br>Q.   Is that last sentence related in any<br>way to the sentence before it?<br>A.   Oh, definitely.<br>Q.   And can you explain that to me?<br>A.   Basically I observed really high<br>risk in the collateral, and I anticipate higher<br>credit enhancement with larger bond.<br>Obviously, the sizing level is far below than<br>what I wanted to see on the credit enhancement<br>level.  That is what I was trying to say, you<br>know.  Could be a mistake because.<br>Q.   So this -- you perceived to be a<br>very risky bond? |

| **Use of Credit Enhancement in PLS** | | |
|---|---|---|
| | 209:23 | A.   Well, yes. |
| | 209:24 | Q.   Okay. |
| | 209:25 | A.   Just basically, it is a mitigation |
| | 210:2 | of the risk.  And the reason we're buying |
| | 210:3 | Triple A is because we trying to mitigate a |
| | 210:4 | risk in the collateral.  So when you see |
| | 210:5 | collateral so risky, you anticipate seeing |
| | 210:6 | higher credit enhancements which I am not |
| | 210:7 | seeing in the mitigation of the risk. |
| **Cao Tr. at 217:13 – 218:15** | 217:13 | Q.   And what do you consider very good |
| | 217:14 | credit enhancement? |
| | 217:17 | THE WITNESS:  Sufficient to protect |
| | 217:18 | the Triple A bonds that we actually were in. |
| | 217:19 | BY MR. SACCA: |
| | 217:20 | Q.   And what would that be in this |
| | 217:21 | context? |
| | 217:23 | THE WITNESS:  So basically, like, I |
| | 217:24 | do analysis, I would do Intex or in our model |
| | 217:25 | to see anything break it, you know, just trying |
| | 218:2 | the different things that we try to break the |
| | 218:3 | bond and see if this is the conundrum that |
| | 218:4 | actually breaks that bond.  And then whether |
| | 218:5 | that is easy enough, right? |
| | 218:6 | BY MR. SACCA: |
| | 218:7 | Q.   By the time you had been through |
| | 218:8 | your pre-settlement review to make a |
| | 218:9 | recommendation on retain or conditional retain, |
| | 218:10 | you knew what the credit enhancement on the |
| | 218:11 | bond was, correct? |
| | 218:12 | A.   I should have that information, yes. |
| | 218:13 | Q.   Right.  That's an element of the |
| | 218:14 | pre-settlement review? |
| | 218:15 | A.   Yes.  It's in the checklist. |
| **Dyson Tr. at 471:23 – 473:5** | 471:23 | Q.   But one of the reasons why credit |
| | 471:24 | for a low-doc and no-doc loans is riskier than |
| | 471:25 | full-doc loans is because you don't have the |
| | 472:2 | borrower's substantiation, right? |

| | |
|---|---|
| | **Use of Credit Enhancement in PLS** |
| | 472:4        THE WITNESS:  Yes.  That's usually |
| | 472:5    reflected in the higher rate that they pay when |
| | 472:6    they obtain their loan. |
| | 472:7        BY MR. BREBNER: |
| | 472:8     Q.   And that is then -- that higher rate |
| | 472:9    is then passed on in the PLS pools of those |
| | 472:10    loans that Fannie purchases or purchased, |
| | 472:11    correct? |
| | 472:12     A.   Yes, for every loan that Fannie |
| | 472:13    purchases, that's passed on. |
| | 472:14     Q.   So when Fannie purchased pools of |
| | 472:15    subprime loans, there was collateral in the |
| | 472:16    pool and there was subordination and |
| | 472:17    overcollateralization, Fannie Mae as a |
| | 472:18    sophisticated player in the mortgage industry |
| | 472:19    fully understood that there were going to be |
| | 472:20    loans within those pools that would default, |
| | 472:21    correct? |
| | |
| | 472:23        THE WITNESS:  Of -- of course that |
| | 472:24    is always a possibility.  That's why credit |
| | 472:25    enhancement exists on the loans that we |
| | | |
| | 473:2    purchase is because those tranches are meant to |
| | 473:3    absorb any losses as a result of those defaults |
| | 473:4    and cushion our bonds from -- from taking |
| | 473:5    losses. |
| **Gussman Tr. at 124:23 -- 127:5** | 124:23     Q.   In general, did you have an |
| | 124:24    understanding in 2007 about the rating |
| | 124:25    agency methodologies with respect to PLS? |
| | |
| | 125:3     A.  Yes. |
| | 125:4     Q.   And what was that general |
| | 125:5    understanding? |
| | 125:6     A.   So it varied across rating |
| | 125:7    agency, but generally, they would size |
| | 125:8    bonds so that under different |
| | 125:9    hypothetical bad HPA -- sorry, bad house |
| | 125:10    price scenarios, different bonds would |
| | 125:11    take losses and other bonds wouldn't take |
| | 125:12    losses.  So, for instance, I forgot which |
| | 125:13    historical scenario most of them pointed |
| | 125:14    to, but like if you had a huge housing |

| | Use of Credit Enhancement in PLS |
|---|---|
| | 125:15   crash and housing prices went down a<br>125:16   bunch, the AAA bonds were supposed to<br>125:17   survive but subordinate bonds would get<br>125:18   wiped out.  They all had sort of<br>125:19   different nuances.<br>125:20       Q.   When you say they sized bonds,<br>125:21   are you referring to the credit<br>125:22   enhancement that was built into the<br>125:23   bonds?<br>125:24       A.   Sorry, yes, I'm referring to<br>125:25   the credit enhancement that's built into<br><br>126:2   the bonds.<br>126:3       Q.   And what form did the credit<br>126:4   enhancement built into the bonds take?<br><br>126:6       A.   The credit enhancement to the<br>126:7   bonds would be different for different,<br>126:8   different types of securities.  So the<br>126:9   most basic is just where you have<br>126:10   subordinate bonds that take losses first.<br>126:11   Other bonds could have<br>126:12   over-collateralization, and this means<br>126:13   that there could be more loans than<br>126:14   bonds, so some of the loans could take<br>126:15   losses before the bonds would take<br>126:16   losses.  There was also another form of<br>126:17   credit enhancement which is called XS<br>126:18   spread.  So if the coupon on the<br>126:19   securitization was one, for instance, and<br>126:20   the coupon on the loans was three, there<br>126:21   would be an extra 2 percent, and I'm<br>126:22   generalizing here, making simple.  But<br>126:23   there would be an extra 2 percent in<br>126:24   interest that would go -- that could be<br>126:25   used to absorb losses.  And then the<br><br>127:2   final form -- the final form of sort of<br>127:3   major credit enhancement could be if<br>127:4   there was a guarantee on the bond from a<br>127:5   financial guarantor. |
| **Niculescu Tr. at 40:14 to 41:9** | 40:14  Q.   Okay.  During the course of the<br>40:15  day I am going to be asking you questions and |

| Use of Credit Enhancement in PLS |
|---|
| 40:16  all of my questions, unless I otherwise<br>40:17  indicate, will be directed to the 2005 to 2007<br>40:18  time period.  Okay?<br>40:19      A.   Yes.<br>40:20         Q.   Why did Fannie Mae buy private<br>40:21  label securities backed by subprime and Alt-A<br>40:22  loans?<br>40:23         A.   For two reasons.  First, and I<br>40:24  think primarily, because those securities<br>40:25  contributed positively to the company's<br><br>41:2  housing goals, which I understand it was<br>41:3  required to meet as a matter of law.<br>41:4            And secondly, from time to<br>41:5  time, because we believed at the time given<br>41:6  the degree of credit enhancement in the<br>41:7  securities, that they would provide a<br>41:8  reasonable return to invested capital for the<br>41:9  company's shareholders. |