**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

                    Plaintiff,

        -against-

NOMURA HOLDING AMERICA, INC.;
NOMURA ASSET ACCEPTANCE
CORPORATION; NOMURA HOME EQUITY
LOAN, INC.; NOMURA CREDIT & CAPITAL,
INC.; NOMURA SECURITIES
INTERNATIONAL, INC.; RBS SECURITIES
INC. (f/k/a GREENWICH CAPITAL MARKETS,
INC.); DAVID FINDLAY; JOHN MCCARTHY;
JOHN P. GRAHAM; NATHAN GORIN; and
DANTE LAROCCA,

                  Defendants.

Case No. 11 Civ. 6201 (DLC)

---

## RBS SECURITIES INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' DUE DILIGENCE AND REASONABLE CARE DEFENSES

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

December 2, 2014

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .........................................................................................14

I.      RBSSI'S INVOLVEMENT IN THE SECURITIZATIONS..................................14

II.     THE REPRESENTATIONS AT ISSUE IN THE OFFERING MATERIALS.....15

        A.     The General Nature of the Representations ...............................................15

        B.     Representations Regarding Originator Guidelines .....................................16

        C.     Representations Regarding LTV Ratios .....................................................16

        D.     Representations Regarding Owner Occupancy .........................................17

III.    RBSSI'S DILIGENCE PROCESS .........................................................................17

        A.     RBSSI's Securitization Due Diligence Policies And Procedures
              Focused On Ensuring The Accuracy Of The Offering Documents ...........17

        B.     RBSSI Maintained A Reasonable Process To Ensure Accuracy In
              Offering Materials For RBSSI-Underwritten Securitizations...................18

        C.     RBSSI's Credit Group's Processes For Reviewing Loans Were
              Reasonable And Robust.............................................................................21

            1.     Sampling Methodology..................................................................21

            2.     Use And Oversight Of Due Diligence Vendors.............................23

IV.    RBSSI'S DILIGENCE OF THE RELEVANT SECURITIZATIONS .................26

        A.     NHELI 2006-HE3 ......................................................................................26

        B.     NHELI 2006-FM2 .....................................................................................29

        C.     NHELI 2007-1 And NHELI 2007-2 .........................................................32

            1.     Sample Selection............................................................................33

            2.     Reunderwriting ..............................................................................34

            3.     Additional Diligence......................................................................36

ARGUMENT ...........................................................................................................................37

I.    RBSSI PERFORMED REASONABLE AND APPROPRIATE DUE
      DILIGENCE ON EACH OF THE FOUR SECURITIZATIONS AT ISSUE ......38

      A.    Whether RBSSI Exercised The Care Required Of A Prudent Man
            In The Management Of His Own Property Presents Issues Of Fact..........39

      B.    As A Participating Underwriter, RBSSI's Reliance On Nomura's
            Due Diligence In NHELI 2006-HE3 Was Entirely Reasonable...............44

      C.    RBSSI's Investigation Of NHELI 2006-FM2 Was Reasonable...............48

      D.    RBSSI Conducted A Reasonable Investigation As Lead
            Underwriter of NHELI 2007-1 And NHELI 2007-2 ..................................51

            1.    RBSSI's Sampling Methodology Was Sound ................................51

                  (a)    RBSSI's Sampling Methodology Was Consistent
                         With Industry Custom And Practice.................................. 52

                  (b)    The Reasonableness Of RBSSI's Sampling
                         Methodology Is A Question Of Fact That Cannot
                         Be Resolved On This Motion ............................................ 55

                  (c)    RBSSI's Samples Were Statistically Sound ..................... 59

            2.    RBSSI's Samples Did Not Show "High Defect Rates" And,
                  At Most, The Results Present Factual Issues To Be
                  Resolved At Trial..........................................................................59

            3.    FHFA's Argument That RBSSI Was Required To Review
                  "Information Outside Of The Loan Origination File" Is
                  Wrong ............................................................................................62

      E.    FHFA's "Other Reasons" For Granting Summary Judgment Are
            Meritless...................................................................................................64

            1.    RBSSI's Use Of Third-Party Due Diligence Vendors Was
                  Reasonable ....................................................................................64

            2.    Whether "Red Flags" Concerning Originators Should Have
                  Impacted RBSSI's Diligence Presents Numerous Disputed
                  Issues Of Fact...............................................................................67

            3.    FHFA's Argument That RBSSI Concealed Information
                  Concerning The "Final Values" Of Certain Properties Is
                  Baseless.........................................................................................69

ii

II.     FHFA'S ARGUMENT THAT THE SAME STANDARD APPLIES UNDER
        SECTION 12 AND THE BLUE SKY LAWS AS UNDER SECTION 11
        FAILS .................................................................................................................70

CONCLUSION.............................................................................................................................72

## TABLE OF AUTHORITIES

<u>**Page(s)**</u>

### Cases

*Am. Trucking Ass'ns v. U.S. Dep't of Transp.*,
166 F.3d 374 (D.C. Cir. 1999) ...................................................................................... 57

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
920 F. Supp. 2d 475 (S.D.N.Y. 2013) ........................................................................... 54

*Brody v. Vill. of Port Chester*,
No. 00 Civ. 7481(HB), 2007 WL 735022 (S.D.N.Y. Mar. 12, 2007) ................... 1, 37

*Chen-Oster v. Goldman, Sachs & Co.*,
285 F.R.D. 294 (S.D.N.Y. 2012) .................................................................................. 54

*City of N.Y. v. Agni*,
522 F.3d 279 (2d Cir. 2008) ................................................................................... 52, 55

*Commonwealth, Dep't of Pub. Welfare v. U.S. Dep't of Health & Human Servs.*,
928 F.2d 1378 (3d Cir. 1991) ....................................................................................... 43

*Competitive Assocs. v. Int'l Health Scis., Inc.*,
No. 72 Civ. 1848-CLB, 1975 WL 349 (S.D.N.Y. Jan. 22, 1975) ................................. 45

*Endo v. Albertine*,
147 F.R.D. 164 (N.D. Ill. 1993) .................................................................................... 45

*Escott v. BarChris Constr. Corp.*,
283 F. Supp. 643 (S.D.N.Y. 1968) ........................................................................ passim

*Espenscheid v. DirectSat USA, LLC*,
705 F.3d 770 (7th Cir. 2013) ........................................................................................ 54

*FDIC v. Giammettei*,
34 F.3d 51 (2d Cir. 1994) ................................................................................................ 1

*Feinberg v. Katz*,
No. 01 Civ. 2739(CSH), 2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007) ...................... 4

*Feit v. Leasco Data Processing Equipment Corp.*,
332 F. Supp. 544 (E.D.N.Y. 1971) ......................................................................... 46, 50

*FHFA v. Bank of Am. Corp.*,
No. 11 Civ. 6195(DLC), 2012 WL 6592251 (S.D.N.Y. Dec. 18, 2012) .............. 38, 70

*FHFA v. HSBC N. Am. Holdings Inc.*,
--- F. Supp. 3d. ----, 2014 WL 3702587 (S.D.N.Y. July 25, 2014) ........................... 53

iv

*FHFA v. JPMorgan Chase & Co.*,
    11 Civ. 6188, 2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012)..................................................... 54

*FHFA v. Nomura Holding Am., Inc.*,
    No. 11 Civ. 6201(DLC), 2014 WL 4412388 (S.D.N.Y. Sept. 8, 2014) .................................... 6

*FHFA v. UBS Am., Inc.*,
    858 F. Supp. 2d 306 (S.D.N.Y. 2012)..................................................................................... 70

*Ford Motor Co. v. Zahn*,
    265 F.2d 729 (8th Cir. 1959) ................................................................................................. 55

*Franklin Savings Bank of N.Y. v. Levy*,
    551 F.2d 521 (2d Cir. 1977)................................................................................................... 71

*Freeman v. Package Mach. Co.*,
    865 F.2d 1331 (1st Cir. 1988)................................................................................................ 54

*Hall v. N. Bellmore Sch. Dist.*,
    No. 08-CV-1999 PKC, 2014 WL 4805004 (E.D.N.Y. Sept. 26, 2014)..................................... 1

*Hammond v. Hendrickson*,
    No. 85 Civ. 9289, 1986 WL 8437 (N.D. Ill. July 30, 1986)..................................................... 45

*Ideal Steel Supply Corp. v. Anza*,
    652 F.3d 310 (2d Cir. 2011)............................................................................................. 5, 37

*In re Conticommodity Servs. Sec. Litig.*,
    MDL No. 644, 1988 WL 56172 (N.D. Ill. May 25, 1988) ....................................................... 52

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................................... 4

*In re Dynegy, Inc. Sec. Litig.*,
    339 F. Supp. 2d 804 (S.D. Tex. 2004) ................................................................................... 43

*In re Gap Stores Secs. Litig.*,
    79 F.R.D. 283 (N.D. Cal. 1978)............................................................................................. 46

*In re Int'l Rectifier Sec. Litig.*,
    No. 91 Civ. 3357(RMT), 1997 WL 529600 (C.D. Cal. Mar. 31, 1997).................................. 52

*In re Livent, Inc. Noteholders Sec. Litig.*,
    355 F. Supp. 2d 722 (S.D.N.Y. 2005)................................................................... 4, 64, 65, 69

*In re MetLife Demutualization Litig.*,
    262 F.R.D. 217 (E.D.N.Y. 2009) ........................................................................................... 71

*In re Software Toolworks, Inc.*,
    50 F.3d 615 (9th Cir. 1994) ................................................................................. 69, 71

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004)..................................................................... passim

*In re WorldCom, Inc. Sec. Litig.*,
    352 F. Supp. 2d 472 (S.D.N.Y. 2005) ............................................................................ 52

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02 Civ. 3288(DLC), 2005 WL 638268 (S.D.N.Y. Mar. 21, 2005)........................... 1, 3, 64

*John Nuveen & Co. v. Sanders*,
    450 U.S. 1005 (1981)................................................................................................... 71

*Joseph S. v. Hogan*,
    No. 06 Civ. 1042(BMC)(SMG), 2011 WL 2848330 (E.D.N.Y. July 15, 2011) ................... 58

*Katsaros v. Cody*,
    568 F. Supp. 360 (E.D.N.Y. 1983) ................................................................................ 44

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.*,
    14 F. Supp. 2d 391 (S.D.N.Y. 1998)................................................................................ 4

*Quincy Co-op. Bank v. A.G. Edwards & Sons, Inc.*,
    655 F. Supp. 78 (D. Mass. 1986) .................................................................................... 4

*Rebenstock v. Deloitte & Touche*,
    907 F. Supp. 1059 (E.D. Mich. 1995)............................................................................ 52

*Sanders v. John Nuveen & Co., Inc.*,
    619 F.2d 1222 (7th Cir. 1980) ...................................................................................... 71

*SQP, Inc. v. Sirrom Sales, Inc.*,
    130 F. Supp. 2d 364 (N.D.N.Y. 2001) ...................................................................... 55, 59

*Teamsters v. U.S.*,
    431 U.S. 324 (1977)..................................................................................................... 54

*Tramp v. Associated Underwriters, Inc.*,
    768 F.3d 793 (8th Cir. 2014) ........................................................................................ 50

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)....................................................................................................... 4

*U.S. ex rel. Martin v. Life Care Centers of Am., Inc.*,
    Nos. 08 Civ. 251, 12 Civ. 64, 2014 WL 4816006 (E.D. Tenn. Sept. 29, 2014) .................... 54

*U.S. v. Archer*,
  671 F.3d 149 (2d Cir. 2011) ................................................................................. 54

*U.S. v. Martinez*,
  465 F.2d 79 (2d Cir. 1972) ................................................................................... 44

*U.S. v. Rivera-Maldonado*,
  194 F.3d 224 (1st Cir. 1999) .......................................................................... 54, 58

*Univ. Hill Found. v. Goldman, Sachs & Co.*,
  422 F. Supp. 879 (S.D.N.Y. 1976) ....................................................................... 68

*Vivenzio v. City of Syracuse*,
  611 F.3d 98 (2d Cir. 2010) .............................................................................. 37, 38

## Statutes and Rules

15 U.S.C. § 77g(d) ...................................................................................................... 53

15 U.S.C. § 77k ..................................................................................... 38, 70, 71

15 U.S.C. § 77k(b)(3)(A) .......................................................................................... 38

15 U.S.C. § 77k(c) .............................................................................................. 38, 43

15 U.S.C. § 77*l*(a)(2) ........................................................................... 38, 70, 71

17 C.F.R. § 229.1110 ......................................................................................... 47, 53

17 C.F.R. § 230.176 .................................................................................................... 3

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111–
  203, § 945, 124 Stat. 1376, 1898 (2010) ............................................................... 53

S.D.N.Y. L.R. 56.1 ....................................................................................................... 1

## Other Authorities

Adoption of Integrated Disclosure System, Securities Act Release No. 6383,
  Exchange Act Release No. 18524, Investment Company Act Release No.
  12264, 1982 WL 90370 (Mar. 3, 1982) ................................................................... 3

ADVISORY COMM. ON CORP. DISCLOSURE, H.R. COMM. ON INTERSTATE &
  FOREIGN COMMERCE, 95TH CONG., REP. TO SEC. & EXCH. COMM'N (Comm.
  Print 1977) ............................................................................................................... 3

Am. Bar Ass'n, Report of Task Force on Seller's Due Diligence and Similar
  Defenses Under the Federal Securities Laws, 991 PLI/Corp. 123, *reprinted in*
  48 BUS. L. 1185 (May 1993) .................................................................................... 3

Asset-Backed Securities, Securities Act Release 8518, Exchange Act Release
    50905, 2005 WL 24262 (Jan. 7, 2005) .................................................................... 51

Gary M. Lawrence, DUE DILIGENCE IN BUSINESS TRANSACTIONS (2014) ....................................... 3

Gary M. Lawrence, DUE DILIGENCE, A SCHOLARLY STUDY (2013) ............................. 3, 38, 39, 54

Issuer Review of Assets in Offerings of Asset-Backed Securities, Securities Act
    Release 9176, Exchange Act Release 63742, 2011 WL 202729 (Jan. 25, 2001) ................... 53

Letter from John A. Courson, President and CEO, Mortgage Bankers Association,
    to SEC (Nov. 12, 2010) ...................................................................................... 53

Nat'l Ass'n of Sec. Dealers, Inc., Notice to Members 73-17 (Mar. 14, 1973) ............................... 3

New High Risk Ventures, Securities Act Release No. 5275, Exchange Act
    Release No. 9671, 1972 WL 125474 (July 27, 1972) ............................................... 46, 47

Regulation of Securities Offerings, Securities Act Release No. 7606A, Exchange
    Act Release No. 40632A, Investment Company Act Release No. 23519A,
    1998 WL 792508 (November 17, 1998) ...................................................................... 3

Robert J. Haft & Barry J. Haft, DUE DILIGENCE IN SECURITIES TRANSACTIONS
    (2000) ..................................................................................................................... 3

Securities Offering Reform, Securities Act Release No. 8591, Exchange Act
    Release No. 52056, 2005 WL 1692642 (Aug. 3, 2005) ........................................... 70

Valerie Ford Jacob & Stephanie J. Goldstein, CONDUCTING DUE DILIGENCE IN A
    SECURITIES OFFERING (2009) ................................................................................. 3

RBS Securities Inc. ("RBSSI") respectfully submits this memorandum of law in opposition to the motion of Plaintiff, the Federal Housing Finance Agency ("FHFA") for partial summary judgment on RBSSI's due diligence and reasonable care defenses.

## PRELIMINARY STATEMENT

Assessing an underwriter's due diligence and reasonable care defenses "requires an exquisitely fact intensive inquiry into all of the circumstances surrounding the facts upon which [the securities claim] is premised," and "such fact-intensive inquiries do not lend themselves easily to resolution on summary judgment." *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2005 WL 638268, at *11 (S.D.N.Y. Mar. 21, 2005). FHFA does not, and cannot, demonstrate the sort of "complete failure of proof" with respect to RBSSI's due diligence and reasonable care defenses that would be necessary for it to prevail on its motion. *Brody v. Vill. of Port Chester*, No. 00 Civ. 7481(HB), 2007 WL 735022, at *5 n.12 (S.D.N.Y. Mar. 12, 2007) (quoting *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994)). Indeed, FHFA's motion—which is accompanied by 884 paragraphs of so-called "undisputed material facts" and 532 exhibits—itself makes clear that the opposite is true; a multitude of factual disputes exist as to whether the industry-standard due diligence conducted by RBSSI (and Nomura) on the securitizations at issue was reasonable. *See, e.g., Hall v. N. Bellmore Sch. Dist.*, No. 08-CV-1999 PKC, 2014 WL 4805004, at *1 (E.D.N.Y. Sept. 26, 2014) (movant's "'kitchen sink' style of briefing" itself suggests that the issues presented are not "summary judgment-worthy").[1] FHFA also ignores a vast amount of evidence that demonstrates the reasonableness of RBSSI's due diligence, and that

---

[1] As noted further in RBSSI's Responses to FHFA's Statement of Facts, RBSSI objects to FHFA's 300-page Statement of Facts as failing to provide a "short and concise statement of . . . the material facts as to which the moving party contends there is no genuine issue to be tried" as required by Local Rule 56.1. As set forth further in RBSSI's responses, a substantial portion of the allegations in FHFA's Rule 56.1 statement are immaterial and/or do not address issues that FHFA reasonably could have concluded are not in dispute.

FHFA's assertions to the contrary at most raise disputed material issues of fact precluding summary judgment, including:

- Contemporaneous documents and the testimony of RBSSI witnesses detailing how, in its role as lead underwriter, RBSSI conducted and/or reviewed loan-level due diligence by specialist loan reunderwriting firms, conducted data integrity checks, reviewed offering documents for accuracy with the involvement of in-house and outside counsel, engaged accountants to check loan data and the accuracy of computations in the offering documents, and, in sum, acted diligently to satisfy itself that the offering documents were "as accurate as possible."   RBS Securities Inc.'s Local Rule 56.1 Counterstatement of Material Facts and Reply to Plaintiff's Statement of Undisputed Material Facts ("CMF") ¶¶ 12, 98-137.  As William Gallagher, RBSSI's Chief Credit Officer during the relevant time period, testified, RBSSI's due diligence process was "at least as rigorous or more rigorous" than that of other industry participants. CMF ¶ 95.

- The opinions of an industry expert, Charles Grice, who analyzed RBSSI's general due diligence practices and its due diligence on the four securitizations at issue in this case, and found that RBSSI's due diligence was consistent with, or exceeded, industry practices. CMF ¶¶ 118, 119, 137.

- The opinions of Nomura's reunderwriting expert, Mark Forester, who analyzed the sample of loans selected by FHFA's expert from each of the four securitizations at issue and found that, in each case, at least 95% or more of the loans were originated in compliance with the applicable underwriting guidelines. CMF ¶¶ 118, 119, 137.

- Freddie Mac's own due diligence involved many of the same industry-standard practices FHFA now attacks, on its behalf, as unreasonable as a matter of law. CMF ¶¶ 154-177.

- Testimony of non-party witnesses confirming that the RBSSI personnel in charge of due diligence were "very professional" and "very knowledgeable in the industry," and that RBSSI took due diligence seriously. CMF ¶¶ 96-97.

In short, rather than establishing the absence of disputed material facts, FHFA mischaracterizes the record, invents new and unprecedented standards for due diligence, and asks this Court to draw numerous inferences impermissibly against RBSSI, the non-movant.  For all of these reasons, FHFA's motion must be denied.

The statutory defenses on which FHFA seeks summary judgment turn on whether RBSSI acted with "reasonable care" or undertook a "reasonable investigation" with respect to each of

the four securitizations for which it served as underwriter. As courts,[2] the SEC,[3] FINRA,[4] the ABA Due Diligence Task Force,[5] and an abundance of scholarly literature[6] have each rightly concluded, "reasonableness is meaningless except in a specific factual context,"[7] and "[i]t is impossible to lay down a rigid rule suitable for every case defining the extent" of due diligence.[8] As the SEC has explained, in conducting due diligence, "each subject person should evaluate the surrounding facts . . . and utilize techniques of investigation appropriate to the circumstances of the offering."[9] Indeed, FHFA's own "due diligence" expert, Leonard Blum, agrees that in assessing an underwriter's due diligence, there is "no one-size fits-all checklist that would be appropriate in every case," and that "due diligence should not be evaluated with the benefit of hindsight." CMF ¶ 74.

Accordingly, "[f]or decades, courts have recognized that what constitutes both a reasonable investigation and a reasonable belief in the accuracy of a registration statement hinges on a fact-intensive inquiry." *WorldCom*, 2005 WL 638268, at *8. Courts have also consistently ruled that such fact-intensive questions of "reasonableness" are ill-suited for resolution before

---

[2] *See, e.g.*, *Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643, 697 (S.D.N.Y. 1968).

[3] *See, e.g.*, ADVISORY COMM. ON CORP. DISCLOSURE, H.R. COMM. ON INTERSTATE & FOREIGN COMMERCE, 95TH CONG., REP. TO SEC. & EXCH. COMM'N (Comm. Print 1977); Securities Act Rule 176, 17 C.F.R. § 230.176; Regulation of Securities Offerings, Securities Act Release No. 7606A, Exchange Act Release No. 40632A, Investment Company Act Release No. 23519A, 1998 WL 792508 (November 17, 1998).

[4] *See, e.g.*, Nat'l Ass'n of Sec. Dealers, Inc., Notice to Members 73-17, 2-3 (Mar. 14, 1973).

[5] *See generally* Am. Bar Ass'n, Report of Task Force on Seller's Due Diligence and Similar Defenses Under the Federal Securities Laws, 991 PLI/Corp. 123, *reprinted in* 48 BUS. L. 1185 (May 1993) ("ABA Task Force Report").

[6] *See, e.g.*, Valerie Ford Jacob & Stephanie J. Goldstein, CONDUCTING DUE DILIGENCE IN A SECURITIES OFFERING (2009); Robert J. Haft & Barry J. Haft, DUE DILIGENCE IN SECURITIES TRANSACTIONS (2000); Gary M. Lawrence, DUE DILIGENCE IN BUSINESS TRANSACTIONS (2014); Gary M. Lawrence, DUE DILIGENCE, A SCHOLARLY STUDY (2013).

[7] ABA Task Force Report, 991 PLI/Corp. at 172.

[8] *BarChris*, 283 F. Supp. at 697.

[9] Adoption of Integrated Disclosure System, Securities Act Release No. 6383, Exchange Act Release No. 18524, Investment Company Act Release No. 12264, 1982 WL 90370, at * 35 (Mar. 3, 1982).

3

trial, because "the jury's unique competence in applying the 'reasonable man' standard is thought ordinarily to preclude summary judgment." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 n.12 (1976); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1175 (C.D. Cal. 2008) ("Reasonableness is generally a fact issue, rarely suitable for summary judgment"); *Feinberg v. Katz*, No. 01 Civ. 2739(CSH), 2007 WL 4562930, *11 (S.D.N.Y. Dec. 21, 2007) ("Whether a party acted with objective reasonableness is a quintessential common law jury question.") (quoting *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.*, 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998)); *Quincy Co-op. Bank v. A.G. Edwards & Sons, Inc.*, 655 F. Supp. 78, 87 (D. Mass. 1986) ("Ordinarily, questions of reasonable care cannot be decided on a motion for summary judgment; they are, by their nature, fact-bound.").

The fact- and context-specific nature of the due diligence defense renders summary judgment all the more inappropriate when sought, as here, before FHFA has established its *prima facie* case against RBSSI or the Nomura Defendants. FHFA cites no case, and RBSSI is aware of none, in which a defendant was precluded from asserting at trial its statutory due diligence and reasonable care defenses before the plaintiff had even established the existence of a material misstatement or omission in the offering documents.[10] Nonetheless, FHFA asks this Court to find RBSSI's diligence unreasonable as a matter of law *regardless* of whether the offering documents contained *any* material misstatements or omissions and (*a fortiori*) *regardless* of the nature or content of those hypothetical misstatements or omissions or the scope of the disclosures

---

[10] The sole case cited by FHFA in which summary judgment was granted against a defendant on its due diligence defense is *In re Livent, Inc. Noteholders Sec. Litig.*, 355 F. Supp. 2d 722 (S.D.N.Y. 2005). In *Livent*, the court first found the inside director defendants liable for material misstatements and omissions in a registration statement, and then rejected their due diligence defense, finding that they had submitted minimal evidence beyond self-serving and largely inadmissible declarations, and that the record evidence demonstrated that they had conducted *no* due diligence and had in fact "actively facilitated [the] improper accounting treatment" at issue. *Id.* at 736. The instant case could not be more different.

to which they relate. Due diligence, however, cannot be assessed in a vacuum; to grant FHFA's

motion, the Court would either have to evaluate RBSSI's due diligence while assuming, without

deciding, that the misstatements and omissions alleged by FHFA are proven, or to somehow hold

that no reasonable juror could find in favor of RBSSI *even if* its diligence was completely

successful in eliminating, or confirming the absence of, material misstatements or omissions in

the offering documents. These approaches are utterly incompatible with the basic principle that

on summary judgment, the Court "*must draw all reasonable inferences in favor of [RBSSI].*"

*E.g., Ideal Steel Supply Corp. v. Anza,* 652 F.3d 310, 326 (2d Cir. 2011) (emphasis in original).

Moreover, all of FHFA's arguments as to why RBSSI's due diligence was, in FHFA's view,

insufficient as a matter of law, are factual arguments that FHFA can make to the jury to the

extent such arguments are supported by admissible evidence. FHFA's invitation to have this

Court commit reversible error by precluding the jury from assessing the reasonableness of

RBSSI's due diligence at trial should be rejected.

*       *       *

This Court "identified four issues" relevant to defendants' due diligence and reasonable

care defenses "which merited careful consideration":

> (1) whether a more exacting due diligence standard applies to an underwriter that controls a security's issuer;
>
> (2) whether, or under what circumstances, sampling that is not statistically sound may be relied upon in conducting due diligence;
>
> (3) whether diligence can be sufficient where a party encounters a relatively high percentage of defective loans in a sample yet fails to respond by, for example, culling more defective loans and then retesting with a new sample; and
>
> (4) whether, or under what circumstances, due diligence can be adequate where representations in offering documents concern the loans in a Supporting Loan Group but (a) a party never tests the rate of defective loans in the Supporting Loan Group at issue, but rather reviews only

5

> pools of loans as they are acquired, and (b) the aggregator does not
> randomly select loans from those pools to populate the Supporting
> Loan Group.

*FHFA v. Nomura Holding Am., Inc.*, No. 11 Civ. 6201(DLC), 2014 WL 4412388, at *5 (S.D.N.Y. Sept. 8, 2014). FHFA has failed to establish that any of these issues provides a basis for granting summary judgment against RBSSI on its due diligence and reasonable care defenses.

*First*, FHFA concedes that the first question "does not apply to RBSSI in this action, which acted as a third-party underwriter on four of the seven Securitizations" and was not affiliated with any issuer defendant. FHFA Br. 6.

*Second*, FHFA's argument that an underwriter must, as a matter of law, demonstrate that its sampling methodology satisfies certain statistical criteria in order to avoid summary judgment is both legally erroneous and factually flawed. FHFA ignores abundant evidence that both the "semi-random" and "adverse" components of the sampling methodology employed by RBSSI did, in fact, allow it to draw meaningful conclusions as to the characteristics of the securitizations at issue. This is particularly true with respect to the alleged misrepresentations concerning the originators' compliance with underwriting guidelines, because the prospectus supplements did not purport to identify any precise number of loans with exceptions to guidelines that would need to be verified with statistical precision, but rather stated that the loans were originated "generally" in accordance with guidelines. Accordingly, it must be left to the jury to decide whether the specific due diligence samples used in these deals—including the number of loans reviewed, the semi-random and adverse selection criteria, and the number and nature of any exceptions found—allowed RBSSI to reasonably verify the originators' general compliance with guidelines.

FHFA also ignores the fact that its proposed due diligence standards are inconsistent with the customs and practices of the industry and regulatory guidance available during the relevant

6

period, and even today, neither regulators nor industry groups have adopted such a standard; indeed, they have eschewed the very kind of rigid rules that FHFA asks the Court to establish here as a matter of law. Nor has any particular sampling methodology in due diligence generally been required of securities underwriters, let alone the random, Supporting Loan Group-specific sampling protocol that FHFA asks the Court to find was required here as a matter of law. FHFA's arguments concerning sampling also ask the Court to ignore other aspects of RBSSI's due diligence beyond the loan-level reviews, which the trier of fact is entitled to consider in context and in the totality of the facts and circumstances.

In any event, even if statistically significant sampling were required for an underwriter to prevail on its due diligence and reasonable care defenses as a matter of law (it is not), FHFA has not shown that RBSSI's samples were statistically unsound, and the statistical validity and reasonableness of RBSSI's sampling methodology thus remains a disputed issue of fact in this case for the jury to decide in view of all the relevant facts, not a matter that can be validly assessed and determined in isolation on summary judgment.

*Third*, FHFA claims that vendors RBSSI hired to review loans found rates of "material credit exceptions" in excess of 20%, yet "RBSSI conducted no further diligence, even though its own policies required it to do so." FHFA Br. 7. As explained in detail below and in RBSSI's supporting Rule 56.1 statement, the record demonstrates that RBSSI's due diligence on the loans backing the securitizations, whether relating to credit, compliance, or property valuation, did not find "material exception" rates in excess of 20% as FHFA asserts. FHFA's allegation of material exception rates above 20% arises from two faulty premises: first, FHFA's inflated exception rates improperly treat RBSSI's vendors' preliminary assessments as final determinations as to whether loans complied with underwriting guidelines, and second, FHFA ignores that many of

7

the preliminary exceptions identified by Clayton arose from missing documents, compliance issues, or other curable issues, not deviations from underwriting guidelines. For example, while FHFA contends that 32% of the loans reviewed as part of RBSSI's diligence of the NHELI 2007-1 securitization "had material credit exceptions," that figure included not only credit exceptions, but also compliance exceptions and exceptions expressly designated as "curable" or that solely concerned missing documents (which often could be located during the course of the diligence process.). Simply excluding that category of "exceptions" reduces the percentage of loans assigned an *initial* grade "3" for credit reasons from 32% as alleged by FHFA to 9%. Moreover, the record further demonstrates that all of these potential credit issues had been resolved by the conclusion of the review.

In any event, the question of what percentage of loans in the pool violated guidelines, and whether RBSSI's conclusions about the loans were appropriate, are purely factual questions that require detailed consideration of the loans at issue, the relevant Clayton reports, and expert testimony concerning the rates of noncompliance in the pools. FHFA bears the burden of proof as to the existence of "defective loans" and certainly cannot meet this burden on summary judgment merely by pointing to the *initial* grade assigned to a loan by a due diligence vendor, without demonstrating (because FHFA cannot demonstrate) that these initial grades meant that the loans violated applicable underwriting guidelines (they often did not), that missing documentation issues with particular loans were not cured (they often were), that there were not sufficient compensating factors to justify inclusion of loans (there typically were), or whether the "credit exceptions" identified by FHFA were material considering the relevant representations in the offering documents (they often were not). FHFA has not introduced any such evidence in support of its motion, or evidence even suggesting that RBSSI believed that the loans at issue

8

were defective.[11] These are all inherently factual issues that are hotly disputed and which preclude entry of summary judgment.

*Fourth*, FHFA contends that conducting diligence on the underlying loan pools at the acquisition stage, rather than on the loan pool that was ultimately securitized, is insufficient as a matter of law. FHFA Br. 4-5. Again, the practice FHFA attacks was a widespread, near-uniform industry practice, well-known to, and accepted by, both Fannie Mae and Freddie Mac as well as other industry participants during the relevant period.[12] Moreover, for two of the four securitizations, RBSSI conducted loan-level diligence at the time of securitization, not at the time the underlying loan pools were acquired (at which time Nomura had conducted its own due diligence). And while FHFA half-heartedly argues that RBSSI's diligence was nonetheless deficient because RBSSI did not "select samples from the relevant SLGs," FHFA Br. 6-7, this, again, is a requirement FHFA has created out of whole cloth, with no basis in industry custom, practice, or law. Even assuming that FHFA has established that such SLG-specific sampling would be necessary to draw certain conclusions about the SLGs on a statistically significant basis (and, for the reasons set forth in Section I.D, *infra*, FHFA has not done so), and even assuming such conclusions are relevant to FHFA's claims (despite the facts that, for instance, disclosures concerning compliance with underwriting guidelines and appraisal standards were made on a securitization-wide basis, and the securitizations were cross-collateralized), statistical significance or particular sampling methodologies, as noted above, are not dispositive, on a motion for summary judgment, of the reasonableness of a defendant's investigation or care.

---

[11] As discussed in Sections III.C.2 and I.D.2, *infra*, FHFA improperly treats preliminary exception grades by RBSSI's vendors as if they were final determinations by RBSSI of material credit exceptions. It was not RBSSI's policy or practice to upsize reviews based on preliminary vendor results, nor does FHFA explain why such a policy would be reasonable, let alone required.

[12] RBSSI adopts and incorporates by reference the Nomura Defendants' arguments concerning the adequacy of Nomura's acquisition-stage review of the loans in the securitizations.

9

FHFA's remaining arguments fare no better. FHFA suggests that the scope of RBSSI's due diligence was primarily dependent on RBSSI's financial "exposure" to the transaction, and that RBSSI conducted superior diligence when it acquired whole loan pools compared to when it underwrote third-party securitizations. FHFA Br. 6. But the testimony of the RBSSI Credit personnel responsible for conducting due diligence flatly contradicts FHFA's allegation. CMF ¶¶ 22-23.[13] Moreover, the evidence demonstrates that the "exposure" with which RBSSI was concerned included "legal and reputational exposure to its securities customers" that could arise from inaccurate offering documents. CMF ¶ 22. Indeed, RBSSI's Asset Backed Finance Policies and Procedures Manual ("ABFPM") confirms that RBSSI's "principal focus" in conducting diligence on securitizations "was to confirm that the offering document [was] complete and accurate in all material respects." *Id.* In view of the evidentiary record, FHFA's contention that there are no material issues of fact as to these issues is frivolous.

FHFA also argues that RBSSI's due diligence was unreasonable because employees in RBSSI's Credit group did not review the prospectus supplements. FHFA Br. 7. But FHFA once again misapprehends RBSSI's diligence process and repeatedly takes snippets of deposition testimony out of context. Although RBSSI's Credit group was responsible for "asset-level reviews," such as assessing the extent to which loans were originated in compliance with

---

[13] William Gallagher, RBSSI's chief credit officer, testified, for example, that RBSSI applied the same diligence procedures regardless of whether the diligence was done in support of a whole loan purchase or a third-party securitization. CMF ¶ 23 ("Q. In what ways, if any, did the diligence that RBS performed when it was an underwriter differ from the diligence RBS performed when it was acquiring whole loans intending to securitize them? . . . A. My understanding is it was the same basic diligence done for either type of transaction."). James Whittemore, who headed the loan reunderwriting group at the time the securitizations at issue were offered, also testified to this. CMF ¶ 23 ("Q. Do you know whether RBS's due diligence process varied depending upon whether it was the sponsor of the transaction as opposed to the underwriter of a transaction sponsored by other banks? A. I'm not – I don't believe that I was aware there was any difference."); CMF ¶ 22 ("Q. Did you ever consider RBS's financial exposure to a transaction in determining the size of the sample that you would draw for a given population? A. I don't remember that I did."). So did Brian Farrell, who was responsible for the loan level due diligence by RBSSI at issue in this case. CMF ¶ 23 ("Q. Would the decision on sample size change depending on whether RBS was diligencing a third party securitization as opposed to its own whole loan purchase? . . . A. Not that I can recall. Like I said earlier, sample sizes varied in general depending on, on the transaction.").

10

underwriting guidelines, it was not their job to review the prospectus supplements. Rather, Credit communicated the results of its reviews to other RBSSI personnel on the deal team, including the relevant members of the ABF group. In addition, any notable issues—including any systemic issues regarding compliance with guidelines—would be raised by the diligence group, both within the Credit department and to the ABF group, for further consideration and discussion. Using that information from Credit, along with other information, RBS's ABF group, in conjunction with counsel and other transaction participants, would "review the transaction documents to ensure . . . that the offering documents properly reflect[ed] the terms of the securities provided in the transaction documents." CMF ¶ 12. FHFA ignores these facts, even though they are spelled out in the same manuals and deposition testimony that FHFA itself disingenuously relies upon. Thus, evidence that individuals in the *Credit* group did not review the offering materials is not evidence that *RBSSI* did not conduct an adequate investigation into the accuracy of the prospectus supplements, making use of Credit's due diligence reviews.[14]

FHFA next asks this Court to rule that it is unreasonable, as a matter of law, for a participating underwriter to rely on the lead underwriter's diligence, as RBSSI did with respect to NHELI 2006-HE3. FHFA Br. 6; 41-43. Again, there is no support whatsoever for this argument, either in the law or as a matter of practice. Reliance on a lead underwriter's diligence is a standard practice, the legitimacy of which has repeatedly been recognized by the courts and the SEC, and a participating underwriter who relies on the lead underwriter's due diligence is

---

[14] Even FHFA's own expert, Mr. Blum, begrudgingly acknowledged that RBSSI's due diligence should be assessed by the investigation performed by RBSSI as a whole, and not necessarily by focusing on one group such as the Credit group. *See* CMF ¶ 12 ("Q. Is it your view that the Credit Department should have been responsible for reviewing the prospectus supplements in this case? . . . A. It's my view that RBS was responsible as an underwriter for having reasonable ground to believe that the offering documents were complete and correct, and RBS as an underwriter can task that out different ways as long as they're effective.").

entitled to benefit from the lead underwriter's due diligence defense.[15]  While the participating underwriter is not required to separately demonstrate the reasonableness of its reliance on the lead underwriter, in any event, as demonstrated in Section IV.A, *infra*, RBSSI's reliance on Nomura's diligence as lead underwriter was entirely reasonable, and at the very least presents questions of fact.

FHFA then incorrectly claims that RBSSI "failed to conduct any diligence" with respect to NHELI 2006-FM2. FHFA Br. 6; 41-44. This is simply not true. What FHFA means is simply that RBSSI, as lead underwriter, determined that it was appropriate for it to review the results of the loan file review that Nomura commissioned from AMC, an independent third-party due diligence vendor, rather than RBSSI itself commissioning a substantially similar additional review of the same loan pool from AMC or another vendor. RBSSI received the results of this loan file review directly from AMC, and thoroughly discussed the review process with Nomura. RBSSI also familiarized itself with Nomura's diligence practices, participated in diligence calls, reviewed offering materials, and received assurances of the accuracy of the offering documents from respected accounting and law firms.  FHFA's attempt to equate this with the sort of unquestioning reliance on management criticized in *BarChris* (FHFA Br. 6) is unpersuasive. RBSSI, contrary to FHFA's contention, did in fact "seek[ ] to ascertain from the records whether the answers are in fact true and complete," including by obtaining and reviewing AMC's independent loan-level reunderwriting results.    Ultimately, FHFA's objection here is disingenuous, as FHFA does not actually dispute the reasonableness of RBSSI's determination that the review commissioned by Nomura from AMC was substantially similar to any additional

---

[15] As explained by the Nomura Defendants, Nomura's diligence practices—both in general and with respect to the securitization for which RBSSI served as non-lead underwriter—were robust and were consistent with industry standards, and cannot be said to be unreasonable as a matter of law.

12

review that RBSSI would have commissioned.

FHFA next faults RBSSI for having conducted loan-level diligence based on the information contained in loan origination files without supplementing it with unspecified post-origination materials that could, theoretically, provide further information. FHFA Br. 7. However, the representations at issue all relate to the characteristics of the loans at origination—whether the loan was *originated* in compliance with guidelines, whether the *original* LTV was accurate in light of the purchase price or the appraisal at *origination*, and whether the borrower stated at *origination* that he or she intended to occupy the property. Most of the information relevant to these alleged misstatements and omissions either by definition could not change (*e.g.*, compliance with underwriting guidelines) or was unlikely to change in the short period of time (overstated by FHFA) between the acquisition of the loans and the relevant "cut-off date" as of which the offering materials represented the information was accurate. Nor does FHFA offer anything more than speculation that additional information *could have* become available; it does not provide a single example of a loan in any of the relevant securitizations as to which it believes this is true. Summary judgment cannot be granted against RBSSI on such a record.

Finally, FHFA proffers a hodgepodge of cursory and highly fact-dependent arguments that clearly cannot be resolved against RBSSI on a motion for summary judgment: that RBSSI failed to adequately supervise the due diligence vendors it hired; that RBSSI had "concerns" about certain originators yet failed to conduct "additional diligence"; and the far-fetched and speculative theory that RBSSI believed that the results of a small number of exterior-only "drive-by" appraisals represented the "true value" of those properties, and concealed this information from investors. FHFA Br. 7. As discussed further below, none of these arguments remotely provides a basis for granting FHFA summary judgment.

**STATEMENT OF FACTS**

In late 2006 and early 2007, RBSSI underwrote four securitizations sponsored by Nomura Credit & Capital, Inc. ("NCCI") and issued by Nomura Home Equity Loan Inc. ("NHELI"). CMF ¶ 3. RBSSI served as lead underwriter for three of these—NHELI 2006-FM2, NHELI 2007-1, and NHELI 2007-2—and as participating underwriter for a fourth, NHELI 2006-HE3, for which Nomura Securities International, Inc. ("Nomura Securities") served as lead underwriter.[16] CMF ¶¶ 3, 60. Each of the certificates issued from these securitizations were offered and sold pursuant to a shelf registration statement and a prospectus supplement. Freddie Mac purchased certificates from each of these offerings. CMF ¶ 4.

## I.   RBSSI'S INVOLVEMENT IN THE SECURITIZATIONS

At the time it sponsored the securitizations, Nomura was an established financial institution. CMF ¶ 38 (Smith Tr.) (Nomura was a "highly rated global bank."). RBSSI was not retained as underwriter for its deal structuring capabilities, as it might have been when underwriting an offering sponsored by a mortgage originator. CMF ¶ 39 (Smith Tr.) ("Nomura's a little bit of a different type of relationship . . . . They had internal structuring capacity."); CMF ¶ 38 (Smith Tr.) (Nomura had a "senior management team that was known in the industry for a long time, they [had written] reps and warranties into the transaction, [and] [t]hey performed a fair amount of diligence when they acquired loans."). Instead, RBSSI was engaged because Nomura had a limited "sales force to sell mortgage and asset-backed bonds," CMF ¶ 39, and RBSSI had "a tier 1 sales force and a great trading desk" and could therefore "help [Nomura] distribute [its] bonds." *Id.*

---

[16] NHELI, NCCI, and Nomura Securities are referred to collectively as "Nomura." These defendants, together with defendants Nomura Holding America, Inc., Nomura Asset Acceptance Corporation, David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and Dante LaRocca, are referred to collectively as the "Nomura Defendants."

As sponsor of the securitizations, NCCI purchased loans from originators and performed due diligence on those loans at the time they were acquired to, among other things, assess whether the loans were originated generally in compliance with the originators' underwriting guidelines. CMF ¶ 61. None of the originators whose loans backed any of the securitizations was affiliated with any of the Nomura Defendants. CMF ¶ 138 n.11. As the Nomura Defendants explain in their opposition brief (the "Nomura Brief"), the due diligence NCCI conducted at the time it acquired the loans was robust, and consistent with industry standards. *See* Nomura Br. Stmt. of Facts § D, Arg. § III; Nomura L.R. Counterstmt. of Material Facts ("Nomura Stmt.") § X. As participating underwriter in NHELI 2006-HE3, RBSSI reasonably relied on the due diligence performed by Nomura as lead underwriter, while in the securitizations for which it served as lead underwriter, RBSSI conducted an additional layer of diligence that built on the acquisition-stage diligence conducted by NCCI.

At the closing of each securitization, NCCI sold the loans to the issuer, NHELI, which sold the loans to the issuing securitization trust. NHELI received certificates issued by the trust in compensation, and sold these to the underwriters, including RBSSI, who resold them to investors, including Freddie Mac.

## II.    THE REPRESENTATIONS AT ISSUE IN THE OFFERING MATERIALS

### A.    The General Nature of the Representations

The prospectus supplements for the securitizations disclosed that their descriptions of the loans backing the securitizations was as of a "Cut-Off Date" that predated the closing date by 30 days. CMF ¶ 150. Each prospectus supplement further disclosed that the mortgage-loan characteristics it contained were approximate and aggregate, and could vary by plus or minus five percent depending on changes to the final composition of the pool that occurred after the Cut-Off Date. *Id.*

15

### B.     Representations Regarding Originator Guidelines

The prospectus supplements for NHELI 2006-HE3, NHELI 2007-1 and NHELI 2007-2 contained descriptions of the underwriting guidelines used by originators that individually accounted for more than 20% of loans in the securitization.   CMF ¶ 138.   Similarly, the prospectus supplement for NHELI 2006-FM2 states that "[a]ll of the mortgage loans were originated or acquired by Fremont, generally in accordance with the [applicable] underwriting criteria," and provided a description of the "guidelines believed by the Depositor to have been applied, *with some variation*."  *Id.*  Each of these originator-specific descriptions emphasized the "general" nature of the description and/or application of their guidelines.  CMF ¶¶ 138-39.  The prospectus supplements also noted that the originators' underwriting guidelines themselves permitted exceptions to those guidelines, based on compensating factors associated with a particular loan.  CMF ¶ 141.   The descriptions of underwriting guidelines contained in the prospectus supplements pertained to each securitization as a whole, and were not specific to individual Supporting Loan Groups ("SLGs").  CMF ¶¶ 138-39, 141.

### C.     Representations Regarding LTV Ratios

The offering materials disclosed that the LTV and CLTV ratios were calculated using, as the denominator, "the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of that loan and (b) the sales price for that property," or in the case of loans made to refinance existing loans, "the appraised value of the Mortgaged Property determined in an appraisal obtained at the time of origination."  CMF ¶ 146.  The offering materials also cautioned that appraised values were determined at the time of origination, and that "[t]he value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market."  *Id.*

16

### D.     Representations Regarding Owner Occupancy

The prospectus supplements also contained tables showing aggregate data as to the occupancy status of the homes securing the mortgages backing the securitizations, based on representations made by each borrower as to their occupancy intentions at the time of their loan application.  CMF ¶ 148.  The table listed the distribution of properties in the pool that borrowers had represented were intended to be used as "Primary," "Investment" or "Second Home."  *Id.*

### III.     RBSSI'S DILIGENCE PROCESS

### A.     RBSSI's Securitization Due Diligence Policies And Procedures Focused On Ensuring The Accuracy Of The Offering Documents

The diligence conducted by RBSSI on each of the securitizations at issue focused on ensuring the accuracy of the offering documents.  As RBSSI's Asset Backed Finance Policies and Procedures Manual (the "ABF Manual") explained:

> The principal focus of a due diligence review for a mandate to act as lead securities underwriter for an originator or owner of assets is to confirm that the offering document is complete and accurate in all material respects. The reason for this is that RBSGC's exposure in a securitization is not to the credit of the assets or the originator, but rather legal and reputational exposure to our securities customers.  To ensure ourselves that we have minimized this exposure, RBSGC performs a due diligence review for all lead-managed and co-managed securitizations according to the following procedures.  The nature of the review and the extent of the involvement of each back-office group will depend upon a variety of factors, such as the credit quality of the assets to be securitized, the credit quality of the securities to be issued, the experience and track record and reputation of the issuer and originator, the size and complexity of the deal and the deal structure.

CMF ¶ 60.  RBSSI's Credit Procedures Manual similarly explained that one of "[t]he goals of due diligence [is] to determine that the assets conform to representations made to [RBSSI] or its clients," including "risk disclosures in securities transactions."  *Id.*; *see also id.* (Expert Report of Charles H. Grice) (concluding that RBSSI's due diligence was "intended primarily to determine whether the loans are generally consistent with the disclosures in the offering documents for the

17

related securitizations").

The ABF Manual further explained that an underwriter in a co-managed securitization "may rely on the due diligence of the lead manager if such reliance is reasonable" in light of "the level of experience and expertise of the lead underwriter and the experience and quality of the individuals working on the transaction," and that the "Finance Group, Credit and Legal personnel will discuss these matters as they arise to determine the appropriate due diligence review." CMF ¶ 63.

These policies and procedures were wholly in line with RBSSI's obligations to investors as an underwriter, and, as discussed further below, RBSSI's due diligence procedures were robust and well-designed to accomplish the policies' stated goals of ensuring accurate disclosures. For each of the securitizations at issue, RBSSI performed a reasonable investigation and acted with reasonable care. FHFA's arguments to the contrary ignore the extensive evidence demonstrating the reasonableness of RBSSI's diligence, a record that unquestionably establishes—at the very least—the existence of disputed material facts concerning RBSSI's due diligence and reasonable care defenses and precluding entry of summary judgment.

## B. RBSSI Maintained A Reasonable Process To Ensure Accuracy In Offering Materials For RBSSI-Underwritten Securitizations

The loan due diligence group within RBSSI's Credit department ("Credit") was responsible for loan level due diligence on securitizations and whole loan purchases. CMF ¶ 6. This group was comprised of experienced underwriters, most of whom had ten to twenty years' worth of prior experience in the mortgage industry at the time they joined RBSSI. CMF ¶ 8. During the relevant time period, James Whittemore was RBSSI's chief underwriter. He supervised credit officers Frank Camacho, Anne Shera, and Brian Farrell. Mr. Whittemore and Mr. Farrell oversaw the loan-level due diligence on the securitizations at issue.

18

Mr. Whittemore was preceded as Chief Underwriter by Donald Lawson, who joined RBSSI in December 1996 and managed the Consumer Loan Underwriting group for most of his tenure until he semi-retired in June 2006. Before joining RBSSI, Mr. Lawson had owned and operated a mortgage loan reunderwriting firm that provided loan-level due diligence services to investment banks, and before that he had held positions at both Credit Suisse, as a vice president in mortgage finance, and at Fannie Mae, where he was Director of Quality Control. CMF ¶ 9. Mr. Lawson designed most of RBSSI's diligence processes, including the methodology employed to select samples of loans for review by Credit personnel or third-party vendors operating under their supervision. CMF ¶ 79.

Credit worked in conjunction with Asset Banked Finance ("ABF"), which coordinated RBSSI's involvement as underwriter in the securitization process. As stated in the ABF Manual, Credit's role in the diligence process was to "coordinate an asset-level review," while the role of the ABF group, assisted by legal counsel, was to "review the transaction documents to ensure themselves that the offering documents properly reflect the terms of the securities provided in the transaction documents," utilizing, among other things, the results of Credit's loan-level due diligence, which would be circulated to the deal team at the conclusion of their review. CMF ¶¶ 11-12. As Adam Smith, a RBSSI employee in the ABF group who managed RBSSI's relationship with Nomura and worked on the securitizations at issue, RBSSI's securitization team "would include lawyers, accountants, internal collateral analysts, internal structuring people, other vice presidents, analysts, associates, reading the document .... some working on particular sections, and trying to make it as accurate as possible." CMF ¶¶ 11-12.

The Collateral Analytics group, which was responsible for managing loan-level collateral data that other groups at RBSSI used in their work, also played a role in the diligence process.

19

Bisaillon Decl. ¶ 2. At the start of the diligence process, collateral analysts would prepare a term sheet summarizing the characteristics of the loans backing the securitization, using loan-level data provided by the issuer, which the credit officer responsible for the particular transaction would then use to determine the sampling criteria for loan-level reviews. CMF ¶ 15. Once the credit officer determined the sample criteria, a collateral analyst would select loans that matched the criteria. *Id.*; Bisaillon Decl. ¶¶ 11-12.

Collateral analysts, along with third-party accounting firms, also contributed to verifying the accuracy of data that would ultimately be included in the prospectus supplements by performing logic and data integrity checks on the loan tape. CMF ¶ 14; Bisaillon Decl. ¶ 2. The accounting firms would also, for a sample of loans, verify the accuracy of loan tape data against data in the actual loan files, and re-calculate and verify loan-level data reported in the offering materials. CMF ¶ 13. In addition, the diligence process involved a review of collateral files to confirm that no critical legal documents, such as notes, mortgages, deeds of trust, and title policies, were missing. CMF ¶ 14.

Finally, RBSSI's diligence process was bolstered by the institutional knowledge RBSSI possessed of the counterparties that played a role in the securitizations it underwrote, including the originators Fremont, First NLC, Equifirst, and People's Choice, each of which originated loans that were included in the securitizations at issue. CMF ¶ 25. Before purchasing loans from or engaging in financing transactions with an originator, RBSSI typically conducted a counterparty review of that originator, involving a loan-level review by the Credit group, as well as an analysis of the originator's financial strength, operational structure, and internal controls. CMF ¶¶ 26-30. RBSSI also subjected the originators it approved to periodic renewal reviews, and retained the ability to rescind its approval of originators based on the results of these reviews

20

or other adverse developments. This review process was designed to give RBSSI "insight into the quality of the loans and the ability to identify any adverse origination or servicing trends at an early stage," and was bolstered by the further information RBSSI acquired when it diligenced loans in connection with whole loan purchases from these originators. CMF ¶¶ 30, 32. This reservoir of knowledge concerning its counterparties enabled RBSSI to conduct diligence more effectively and efficiently, and provided an additional basis for RBSSI's conclusion that the offering documents for the securitizations at issue described the underlying loan collateral in a complete and correct fashion. *See, e.g.*, CMF ¶ 31 (repeated reviews of Fremont demonstrated that it underwrote loans generally in accordance with its guidelines).

## C.    RBSSI's Credit Group's Processes For Reviewing Loans Were Reasonable And Robust

As discussed above, the Credit group's function in the securitization diligence process was to select a sample of loans for review, coordinate and supervise the review of those loans, and communicate the results of its review to the ABF group. These reviews entailed a thorough examination of the loan file to assess its credit characteristics, the reasonableness of the loan's appraised value, and the loan's compliance with applicable federal, state, and local laws. CMF ¶ 64.

### 1.    Sampling Methodology

Like most, if not all, industry participants (including Fannie Mae and Freddie Mac), RBSSI would typically review a subset of the loans in pools over a certain size when conducting due diligence. *Id.*; Farrell Decl. ¶ 4; *accord* CMF ¶ 172 (Feigles Tr.) ("[G]enerally speaking, [Freddie Mac] only looked at a sample of the [ ] loans that were being purchased"). As noted above, the general methodology RBSSI used during the relevant time period to select samples was developed by Donald Lawson, RBS's former chief underwriter. Bisaillon Decl. ¶ 6; CMF ¶

21

79 (William Gallagher Tr.) ("Don Lawson developed the sampling techniques that were used by RBS for the most part, although . . . it evolved over time as well."). In particular, Mr. Lawson developed a sampling methodology typically referred to as "semi-random" sampling. CMF ¶ 79. Semi-random sampling involved stratifying the relevant loan pool according to unpaid principal loan balance, in bands of $50,000 or $100,000, and then using a random number generator program to select loans within each stratification band. *Id.*; Bisaillon Decl. ¶ 7. The number of loans selected within each stratification band was a function of the total unpaid principal balance of loans in that band, as a percentage of the total unpaid principal balance of the pool as a whole. Bisaillon Decl. ¶ 8. The purpose of RBSSI's semi-random methodology was to avoid samples in which small-balance loans were overrepresented and thus to obtain a sample that better represented the economic characteristics of the pool. CMF ¶ 80 (James Whittemore Tr.) ("[W]e want to skew this random sample to a higher balanced loan."); Bisaillon Decl. ¶¶ 8-9. The Credit group employee responsible for selecting the sample would instruct a collateral analyst to select a certain number of loans using RBSSI's normal semi-random method, and as such, did not need to understand the mechanics of how the semi-random sample was drawn.

Like many other industry participants, RBSSI also employed "adverse" sampling. Bisaillon Decl. ¶ 10; *see also* CMF ¶¶ 82-83. Adverse sampling was aimed at creating a sample of loans for review based on characteristics that presented potentially higher risks to the pool, including, for example, potential credit issues, risks of non-compliance with guidelines, or risks of non-compliance with state laws. Criteria for selection of adverse samples could include, for example, (i) loan balances above a certain amount, (ii) FICO scores below a certain number, (iii) loan-to-value ratios above a certain percentage, and (iv) loans relating to properties in certain specific states. Farrell Decl. ¶¶ 5-6; *see also* CMF ¶ 83. To generate an adverse sample, a

22

member of the Credit group would instruct a collateral analyst to either select all of the loans having specific characteristics, or to randomly select a specified number of loans having such characteristics, again using a random number generator program.  Farrell Decl. ¶ 6; Bisaillon Decl. ¶ 11; CMF ¶ 83.  RBSSI often selected both adverse and semi-random samples from a loan pool, in which case the adverse sample would typically be selected first, so that the semi-random sample would be drawn from those loans that had not already been selected for inclusion in the adverse sample.  Farrell Decl. ¶ 4; Bisaillon Decl. ¶ 12; CMF ¶ 77.

Overall sample size for a particular transaction was ultimately determined by the Credit group, occasionally with input from other groups at RBSSI.  CMF ¶ 75.  The Credit group also had the ability to select additional samples during or after their review, if they believed additional review was warranted.  *See* CMF ¶ 76.

### 2.   Use And Oversight Of Due Diligence Vendors

Consistent with industry practice, RBSSI worked with third-party due diligence firms to conduct due diligence.  The GSEs, RBSSI, and countless others in the industry hired many of the same due diligence firms to conduct credit, compliance and valuation due diligence reviews.  CMF ¶ 64 & n.9.  Use of third-party consultants ensured an arms-length review, since vendors' compensation was based on the number of loans reviewed, not the results of the review.  CMF ¶ 64.  It also ensured that the reviews would be performed by personnel specialized in the fields of mortgage origination and underwriting.  *See id.*

RBSSI retained third-party due diligence vendor Clayton to perform the loan-level reviews for the NHELI 2007-1 and NHELI 2007-2 securitizations.  CMF ¶ 98.  Clayton was a well-established and reputable due diligence firm, with a 50-70% market share of the third-party RMBS due diligence market during the relevant period.  CMF ¶ 162.  Clayton was retained by numerous industry participants, including Fannie Mae and Freddie Mac.  *See, e.g., id.*  Indeed,

employees involved in Freddie Mac's due diligence processes have testified that Freddie Mac "always" engaged Clayton for third-party due diligence reviews, and that it was a "standard in the industry" to retain Clayton for loan-level due diligence. *Id.* RBSSI and Clayton had a similarly longstanding relationship. *See, e.g.*, CMF ¶ 85 (Brian Farrell Tr.) ("I thought [Clayton] did quality work.").

Clayton typically performed full credit and compliance reviews for RBSSI. CMF ¶ 84. Clayton utilized a thorough quality control process, which subjected all loans to automated checks and further manual review by experienced underwriters. *Id.* Clayton believed that the results of the reviews it provided to RBSSI were reliable. CMF ¶ 85. Vicki Beal, Senior Vice President of Clayton, testified that RBSSI personnel, including Don Lawson, Brian Farrell and Jim Whittemore, were knowledgeable and well-regarded in the industry. CMF ¶ 97.

When conducting credit and compliance reviews, vendors such as Clayton would typically assign grades to the reviewed loans on a numerical scale of 1-3. A vendor generally would grade a loan as a "1" to indicate that the loan fully complied with whatever set of criteria against which the vendor was reviewing the loan. CMF ¶ 86. Typically, these criteria included both the applicable originator underwriting guidelines and additional instructions or "overlays" imposed by RBSSI. *Id.* A grade of "2" indicated that a loan "may have had a minor or informational issue" that "was deemed nonmaterial," or that deviated from applicable criteria but was determined to be acceptable because sufficient "compensating factors are present." *Id.*

A grade of "3" could be assigned for one or more of numerous reasons, including (i) the loan being originated outside the originator's underwriting guidelines and the vendor flagging the loan for RBSSI to determine the sufficiency of any compensating factors, (ii) the loan not meeting additional criteria provided by RBSSI as part of its standard due diligence script or

24

specific instructions from the RBSSI credit officer to the vendor to flag particular loans, (iii) missing documents that were necessary to complete the vendor's assessment of credit, compliance, or valuation aspects of the loan file, (iv) non-compliance with federal, state, or local laws or regulations, or (v) issues regarding the reasonableness of the original appraisal. CMF ¶ 87. As such, a vendor's decision to assign a grade of "3" to a particular loan did not, without more, mean that the loan did not comply with guidelines or represented a heightened credit risk. *See* CMF ¶ 89 (Beal FCIC Testimony) ("Simply stated, a Clayton grade of EV-1 does not mean a loan is good or is likely to perform. Nor does a Clayton grade of EV-3 mean that a loan is bad and is likely not to perform.").

Instead, the designation of grade 3 generally indicated that further review and follow-up was recommended before a determination could be made to include or exclude the loan from the pool. This follow-up was an iterative process in which RBSSI personnel were intimately involved. *See, e.g.*, CMF ¶¶ 67, 90. The follow-up process could involve working with RBSSI's counterparties to locate missing documents, considering rebuttals provided by the issuer or originator to the vendor, or curing potential legal compliance issues by, for instance, offering the borrower a chance to rescind his or her mortgage agreement, refunding money, or providing additional disclosures. *Id.* It could also involve reviewing the vendor's summary reports or, if necessary, the underlying loan files, to determine whether sufficient compensating factors existed to justify the acquisition or securitization of loans initially flagged as having exceptions—a matter as to which vendors typically were given only limited discretion, and which was largely reserved to the RBSSI personnel overseeing the review. CMF ¶¶ 91-94.[17] If

---

[17] *See also* CMF ¶ 94 (Anne Shera Tr.) ("Q. Did the underwriters themselves makes determinations about whether compensating factors sufficiently offset exceptions to the guidelines? A. Any exception came to me. . . . Q. And you would be the one to judge whether there were sufficient compensating to allow a loan with exceptions into the

*(footnote cont. next page)*

the issues identified by the vendors in their initial reports were resolved, it was common for the vendor to note this in subsequent reports by re-grading the loan from a "3" to a "2" or "1." CMF ¶ 90. However, such resolutions were not uniformly reflected in subsequent reports via re-grading, because the vendor was not always made aware that issues had been resolved. *Id.*

Thus, as a matter of policy and practice, RBSSI closely supervised its third-party vendors throughout the diligence process. CMF ¶ 91. Vendors provided RBSSI with reports on their findings, which RBSSI Credit personnel reviewed on a daily basis. For example, Clayton e-mailed the RBSSI credit officer supervising the review daily with progress updates, including detailed loan-level reports. *See, e.g.*, CMF ¶ 66. These reports detailed each loan's credit and compliance grade, and provided written explanations for the reviewers' findings of defects and/or compensating factors. *Id.* In addition, whether the RBSSI credit officer assigned to the matter was present on-site or not, he or she would regularly communicate with the vendor about the status of the review and issues that arose during the review process. CMF ¶¶ 91-94.

## IV. RBSSI'S DILIGENCE OF THE RELEVANT SECURITIZATIONS

### A. NHELI 2006-HE3

As a participating underwriter of NHELI 2006-HE3,[18] RBSSI played a role in due diligence commensurate with its position in the transaction. Rather than duplicate the diligence results of the lead underwriter, Nomura, who conducted due diligence on behalf of all underwriters on the transaction, RBSSI followed widely accepted industry practice and relied on

---

pool? A. Correct. . . . A. When you were reviewing a loan with an exception, how did you decide if the compensating factors sufficiently offset the exceptions such that you would allow the loan to be included? A. I re-underwrote the whole loan. I looked at every part of the loan to determine if there were enough strengths or compensating factors to offset . . . the exception.").

[18] Although RBSSI was identified in the offering materials as a "co-lead" underwriter, industry practice dictated that only one underwriter acted as the lead underwriter. CMF ¶ 62. For most deals involving co-underwriters during the relevant period, including NHELI 2006-HE3, the true lead underwriter was the underwriter listed on the left side of the prospectus supplement (sometimes referred to as the "lead left")—here, Nomura Securities. *Id.*

Nomura's diligence investigation. CMF ¶ 131 (Grice RBSSI Report) ("As was typical in the industry, when the lead underwriter is affiliated with the deal sponsor (in this case, Nomura Capital), additional loan-level due diligence beyond that performed at the time the loans were acquired by the sponsor is typically not performed."); *see also infra* Section I.B. In any event, RBSSI did not passively rely on Nomura. CMF ¶ 131. To the contrary, RBSSI maintained communication with Nomura and scrutinized its diligence investigation at every phase of the process.

In July 2006, RBSSI collateral analyst Dana Pasternak performed an initial review of the loan tape provided by Nomura, and compiled a report detailing potential data errors. CMF ¶ 132 (listing, among other things, "invalid current balance," "incorrect purchase price," and "invalid FICO score"). RBSSI sent the report to Nomura, which then provided responses to the data errors flagged by RBS. This data integrity diligence continued iteratively throughout the offering process. *See, e.g.*, CMF ¶ 132 (reflecting further RBSSI-Nomura data integrity correspondence on August 21, 2006).

Adam Smith, the lead RBSSI banker on the transaction, also requested a "summary of the due diligence done on [NHELI 2006-HE3] collateral," so that RBSSI's Credit personnel could assess Nomura's loan-level due diligence practices. *See* CMF ¶ 133. Nomura provided a detailed summary of its pre-purchase diligence of every loan pool from which the loans in the securitization were sourced, *id.*, "to give [RBSSI] an overall picture of [its] DD process." *Id.* The summary detailed (i) the total number of loans purchased across all originators (21,239), (ii) the total number of loans declined (1,552 or 7.5%), (iii) the number of loans declined as a result of credit issues (749 or 3.69%), (iv) the number of loans declined as a result of compliance issues (234 or 1.10%), and (v) the number of loans declined as a result of collateral issues (569 or

2.72%).  *Id.*

In addition to this summary, Nomura also provided RBSSI with loan-level diligence reports on the loans originated by the two originators whose identities were to be disclosed in the prospectus supplement, People's Choice and First NLC.  *Id.*  The evidence indicates that Nomura's diligence results were circulated to multiple individuals at RBSSI for review, CMF ¶ 134, and that Brian Farrell, the RBSSI underwriter who worked on this transaction, signed off on the results on behalf of RBSSI's Credit department after requesting and receiving additional information.  *Id.*

RBSSI's and Nomura's regular communications throughout the NHELI 2006-HE3 transaction enabled RBSSI to become familiar with Nomura's diligence practices.  For example, Adam Smith prepared a summary of Nomura's diligence, which detailed, among other things, Nomura's retention of Clayton as a diligence vendor; Nomura's sampling methodology; Nomura's valuation diligence practices (AVMs on 100% of loans, and BPOs "on loans with variances above related thresholds ranging from 15% to 5%"); and Nomura's counterparty diligence ("full review of originators' credit, appraisal, compliance and fraud detection policies with first diligence….sometimes pre-bid").  CMF ¶ 135.  Nomura received the narrative and confirmed to RBSSI that it was correct.  *Id.*  RBSSI and Nomura also participated in a due diligence conference call near the end of the process in which they reviewed the diligence results.  *Id.*  In addition, RBSSI had previously served as an underwriter on a Nomura-sponsored securitization that closed on July 28, 2006, which had also given RBSSI familiarity with Nomura's securitization business and its diligence practices.  *Id.*[19]

Finally, RBSSI received a negative assurance letter from Thacher Proffitt & Wood,

---

[19] This securitization is not at issue in this action.

counsel for Nomura, representing that, having participated as counsel for Nomura in NHELI 2006-HE3, it was unaware of any facts that would cause certain information provided in the offering materials to be materially incomplete or misleading. CMF ¶ 136. RBSSI also received assurances from Deloitte of the accuracy of the data tables in the offering documents. *Id.*

In sum, RBSSI took numerous measures to determine that there was a reasonable basis for it to rely on Nomura's due diligence, and in so doing faithfully and diligently performed its obligations as a participating underwriter. *See* CMF ¶ 137.

**B.    NHELI 2006-FM2**

As lead underwriter for NHELI 2006-FM2, RBSSI conducted a thorough investigation of the underlying mortgage loans and the accuracy of the disclosures in the offering documents.

RBSSI first obtained three due diligence reports concerning loan-level reviews conducted by an independent third-party diligence vendor called American Mortgage Consultants ("AMC"), at Nomura's direction, on the two pools of Fremont loans that would form the collateral underlying NHELI 2006-FM2. CMF ¶ 120. The first report was a "Seller Trade Breakout" for each of the two whole loan trades which specified, for each trade, (1) the number of loans in the trade, the number of loans purchased, and the loan balances; (2) the number of loans from each trade as to which credit and compliance reviews, AVMs, and BPOs were conducted; and (3) the number of loans dropped from each of the pools for credit, compliance, valuation, and collateral issues. CMF ¶ 121. The other two reports contained the loan-level results of these reviews for both of the relevant pools. *Id.*[20]

The "Seller Trade Breakout" report also provided an explanation of Nomura's loan-level

---

[20] FHFA's assertion that "[t]here is no evidence that RBSSI ever received or reviewed the results of Nomura Securities' valuation diligence" (FHFA Br. 43), is incorrect; as discussed, these materials plainly include valuation diligence results.

due diligence procedures for these two trades.  CMF ¶¶ 122-23.  The credit and compliance samples consisted of loans adversely selected for "High Risk Characteristics" and loans on properties located in "Compliance 'Issue' States."  *Id.*  Credit and compliance reviews were conducted on a sample of 1,136 loans (24.6%) from the first Fremont pool (referred to by Nomura as "SP03"), and on a sample of 660 loans (24.8%) from the second pool ("SP04").  For valuation diligence, 100% of the pools (4,616 and 2,666 loans respectively) were subject to an AVM review, and BPOs were obtained for any loan where the AVM differed by a certain percentage from the appraised value or where no AVM value was available—856 loans (18.5% of the pool) in the case of SP03, and 530 (19.9%) in the case of SP04.  *Id.*  Nomura declined to purchase approximately 4% of the loans in each respective pool as a result of valuation or credit issues.  *Id.*

These reports were subsequently provided by RBSSI's Adam Smith to a number of his colleagues across several different groups, including Bill Gallagher, Paul Goudie, Jim Whittemore and Brian Farrell of the Credit group, James Esposito of Legal, and Patrick Leo in the ABF group.  CMF ¶ 124.  In his cover email, Mr. Smith explained that AMC had been retained to perform the loan-level credit and compliance reviews and noted that, in addition to the materials received from Nomura "AMC will deliver all of the results directly to [RBSSI]."  He also asked the recipients to "review the results and sampling methods so that we can discuss the extent of our required due diligence as an underwriter."  *Id.*  To confirm that RBSSI was faithfully performing its diligence obligations by reviewing AMC's diligence results rather than commissioning another review, Mr. Smith specifically sought approval from both the Credit and Legal departments.  *Id.*

After receiving and reviewing the AMC diligence reports and Nomura's explanation of

its diligence procedures, RBSSI's Brian Farrell contacted Nomura's credit personnel (whom Mr. Farrell knew and had worked with in his time at Clayton) and asked them to "elaborate" on the adverse sample selection criteria that had been generally described as "high risk characteristics" in the "Seller Trade Breakout" report. Mendy Sabo of Nomura replied with a further description of Nomura's sampling criteria. CMF ¶ 125.

Upon review of the diligence results, both Brian Farrell and James Whittemore, RBSSI's chief underwriter, noted that the pools had a high number of compliance issues relating to payment stream disclosures for certain mortgages. After corresponding with Nomura, RBSSI confirmed that this was an issue RBSSI had itself had seen in contemporaneous Fremont loan pools that was confined to a specific set of loans and that Fremont had subsequently resolved the issue. Nomura confirmed that it had performed 100% diligence on the affected set of loans and had removed those loans exhibiting that compliance issue from the pool. CMF ¶ 126. Having resolved this concern, Mr. Farrell informed his RBSSI colleagues that the "pool looks good." *Id.* Mr. Whittemore also expressed his approval of the due diligence process and its results, noting that "the due diligence sample was sufficient for the size of the pool," that Nomura's "sample methodology and AVM/BPO processes appear to be sound," and that the "exception ratios…appear to be what we see when we do our due diligence at Fremont for whole loan trades." *Id.* Mr. Farrell reaffirmed his satisfaction after receiving the results directly from AMC (via Mr. Smith). CMF ¶ 127 ("Credit was ok with results and sampling methodol[og]y.").

RBSSI also requested that Nomura participate in an underwriters' due diligence call for NHELI 2006-FM2 in October 2006. CMF ¶ 128. The agenda for the call concerned both general corporate matters as well as credit and collateral quality issues, and included participants from Nomura, Nomura's outside counsel Thacher, Profitt & Wood, RBSSI, and RBSSI's outside

counsel, McKee Nelson.  *Id.*[21]  In addition, RBSSI received a negative assurance letter from Thacher Proffitt stating that it was unaware of any facts that would cause certain information provided in the Offering Materials to be materially incomplete or misleading  *See* CMF ¶ 130. Deloitte & Touche LLP was also retained to perform certain agreed-upon procedures, following which it provided a comfort letter (1) verifying the accuracy of the information recorded on the loan tape and (2) validating calculated values stated in the prospectus supplement.  CMF ¶ 129. The record also indicates that RBSSI reviewed sales memoranda and free writing prospectus in connection with the NHELI 2006-FM2 transaction.  CMF ¶ 128.

In sum, the due diligence performed by RBSSI in connection with NHELI 2006-FM2 was thorough and met or exceeded the industry standard for the relevant time period.  CMF ¶ 119.

## C.    **NHELI 2007-1 And NHELI 2007-2**

RBSSI's diligence as lead underwriter for NHELI 2007-1 and NHELI 2007-2 was rigorous and conformed with widely accepted industry standards.  *See* CMF ¶ 118.  RBSSI's diligence efforts were also enhanced by its understanding of Nomura's securitization process, having recently underwritten four other Nomura securitizations.  *See, e.g.*, CMF ¶ 135.

For its diligence on NHELI 2007-1 and NHELI 2007-2, RBSSI commissioned independent reviews of the loan pools that made up each securitization.  These reviews built on the diligence Nomura itself had performed when it acquired the underlying loans.  These reviews were managed by Brian Farrell of RBSSI, who communicated with Nomura's Mendy Sabo, Randall Lee, and Timothy Crowley during the process.  *See* CMF ¶ 98.

---

[21] FHFA's claim that "RBSSI did not even send its diligence personnel to attend" this call, see FHFA Br. at 77-78, is thus inaccurate and misleading.  Three members of the ABF group, in addition to outside counsel, were participants in the call.  CMF ¶ 128.

### 1.      Sample Selection

For the NHELI 2007-1 transaction, RBSSI selected two separate diligence samples for its loan-level review, one from the fixed rate loans that backed the deal's Group I certificates and one from the adjustable rate loans underlying the deal's Group II certificates.[22]  RBSSI reviewed 233 loans from the fixed rate pool.  CMF ¶ 99.  One portion of the sample (82 loans) was drawn according to RBSSI's standard semi-random sampling methodology (described in Section III.C.1, *supra*), while the remainder (151 loans) was selected based on "adverse" criteria aimed at capturing potentially higher risk loans, including loans with (relative to the characteristics of the pool as a whole) high debt-to-income ratios, low FICO scores, high loan balances, high initial interest rates, and potential state compliance issues.  CMF ¶ 99.  From the adjustable rate pool, RBSSI reviewed a sample of 102 loans, with 32 loans selected semi-randomly and 70 loans adversely selected based on criteria similar to that used for the fixed rate pool.  *Id.*  Combined, RBSSI's sample included 335 loans, approximately 9.6% of the securitization by loan count. CMF ¶ 100.

The sample for NHELI 2007-2 was constructed in a similar fashion.  RBSSI reviewed 138 loans selected semi-randomly and 168 adversely.  CMF ¶ 101.  Of the adversely-selected loans, 72 were selected based on the relatively stricter anti-predatory lending laws of the states in which they were originated; seven were selected because the loan balances were greater than $1 million; 24 were selected because the loans were seasoned for longer than 12 months; 31 were selected because they were originated under "No Ratio" or "No Documentation" programs; and 34 were selected because the borrowers' credit scores were under 620.  *Id.*  In total, the NHELI

---

[22] The fixed rate group was diligenced under the project name NHELI 2007-AF1 and the adjustable rate group was diligenced separately under the project name NAAC 2007-AR1.  The adjustable rate loans ultimately became the Group 2 loans underlying NHELI 2007-1.  Freddie Mac purchased certificates backed by Group 2 loans.  CMF ¶ 99.

2007-2 sample included 306 loans, which accounted for roughly 6% of the total loans in the pools backing the certificates. *Id.*

### 2. Reunderwriting

RBSSI engaged Clayton to reunderwrite the NHELI 2007-1 and NHELI 2007-2 samples. CMF ¶ 103. RBSSI also asked Clayton to conduct a data integrity review that involved comparing the information included in the loan files to the data listed on the loan tape for the respective securitization. *Id.* Clayton conducted its review of the relevant loan files relating to both securitizations out of its Tampa, Florida Centralized Underwriting unit in January 2007. CMF ¶ 104. At the end of each day, Clayton provided RBSSI with a daily report detailing the initial grades it assigned to loans it reviewed, explaining potential issues and compensating factors, and providing further detail concerning the reviewed loans. *Id.* Separate summaries were also provided for any loans that had been given an initial credit or compliance grade of 3. *Id.*[23]

The initial reports prepared by Clayton were part of an iterative process through which potential issues with particular loans or the pool as a whole would be identified and, if possible, resolved by the transaction parties. For example, where loans reviewed by Clayton were assigned an initial grade of 3 because of missing documentation, RBSSI would work with Nomura and the originators to locate the missing documents and thereby potentially cure the issue. This is precisely what happened with NHELI 2007-2 loan number ▮▮▮▮▮▮ for example, a loan RBSSI's expert describes as "illustrative of this iterative process." CMF ¶ 106 (loan initially graded as "3" due to missing HUD-1 closing statement and truth in lending documentation re-graded by Clayton as "1" after RBSSI and Nomura worked to find the

---

[23] As discussed further herein, an initial "EV3" grade was only a starting point for assessment of the loan and did not signal that a loan was "bad" or "not likely to perform." CMF ¶ 89.

documentation).   RBSSI made the final decision as to whether additional information, documentation or compensating factors justified changing the initial grade assigned to the loan by Clayton.  CMF ¶¶ 105-106.  This "'curing' or 're-grading' of loans based on additional documentation, information, compensating factors, or action by the originator was a customary and routine part of the process and was consistent with industry practices." CMF ¶ 106.  Indeed, while Mr. Farrell, who supervised these reviews on behalf of RBSSI, does not recall their specific details at present (approximately eight years later), he recently re-reviewed a subset of these loans and reaffirmed that RBSSI's determination to re-grade each one was appropriate. *See generally* Farrell Decl. ¶¶ 19-25.

As noted above, the NHELI 2007-1 sample included 335 loans, 102 of which backed the Group II certificates that were ultimately purchased by Freddie Mac.  The results for the 102 loans underlying the Group II certificates indicates that the loans were originated generally in accordance with applicable underwriting guidelines:

> Credit: Clayton's initial reports identified 9 credit event "3" loans; 16 credit event "3C," loans; and 3 credit event "3D" loans.  A grade of "3C" reflected a curable exception, while a grade of "3D" indicated a missing document.  Thus, the initial population of loans actually flagged for potentially disqualifying credit issues was 9 loans, or 9% of the sample.  After reviewing the results of Clayton's review, RBSSI did not find any loans with unresolved material credit issues that did not have sufficient compensating factors to include the loan in the securitization.  CMF ¶ 108.  RBSSI was also informed that Clayton found that its review showed no evidence of "a pattern of imprudent lending practices," and that "the loans should perform similar to a typical Alt-A pool." *Id.*

> Compliance: Of the 102 loans backing the Group II certificates, only two loans received a compliance grade of 3 or 3C, which accounted for less than 2% of the sample.  One of the loans received a grade of 3C, meaning the finding would have been curable.  CMF ¶ 108.

> Data Integrity Review:  After comparing the information included in the loan files it reviewed against the corresponding data on the loan tape provided by Nomura, Clayton concluded that the integrity of the Nomura loan tape was "very good."  CMF ¶ 108.

The results of the due diligence review for NHELI 2007-2 similarly reflected that the loans were

originated generally in accordance with applicable underwriting guidelines:

> Credit: Clayton's initial reports identified 35 credit event "3" loans; 8 credit event "3C," loans; and 7 credit event "3D" loans. Thus, the initial population of loans actually flagged for potentially disqualifying credit issues represented 11% of the sample. After reviewing the results of Clayton's review, RBSSI did not find any loans with unresolved material credit issues that did not have sufficient compensating factors to include the loan in the securitization. CMF ¶ 110. Clayton further represented that it did not find anything to suggest a pattern of imprudent lending practices and believed that "the loans should perform similar to a typical Alt-A pool." *Id.*

> Compliance: Clayton reviewed the sample for compliance with federal, state, and local fair lending laws as well as fee and rate regulations. Of the 306 loans reviewed, only one loan received a compliance grade of 3, representing less than 0.33% of the sample. *Id.*

> Data Integrity: After comparing the information included in the loan files it reviewed against the corresponding data on the loan tape provided by Nomura. Clayton concluded that the integrity of the Nomura loan tape was "very good." *Id.*

Based on these due diligence results, no loans were required to be removed from the securitizations for credit reasons, and only one or two loans were removed for compliance reasons.

### 3.    Additional Diligence

In addition to the credit, compliance, and data integrity reviews discussed above, RBSSI managed and performed further diligence for the NHELI 2007-1 and NHELI 2007-2 transactions. First, with respect to valuation, Clayton conducted a review of the property appraisals contained in the original loan file. CMF ¶ 114. In addition, RBSSI commissioned drive-by appraisals performed by Nationwide Property & Appraisal Services for a subset of the samples drawn from the NHELI 2007-1 and NHELI 2007-2 deals. *Id.* RBSSI also reviewed draft offering documents for the NHELI 2007-1 and NHELI 2007-2 transactions, including sales memoranda and free writing prospectus that included collateral summaries, transaction overviews, and descriptions of offered certificates. CMF ¶ 116.

For the NHELI 2007-2 transaction, RBSSI also received a full summary of the due

diligence performed by Nomura when it acquired the underlying loans. The report indicated that Nomura used third party-vendors to review approximately 45% of the loans, and that Nomura conducted AVMs on the entire pool. CMF ¶ 113. Twelve percent of the loans received further valuation review via BPO. *Id.* The report also confirmed that Nomura had declined to purchase certain loans as a result of its due diligence. *Id.*

Finally, Deloitte reviewed the accuracy of the loan tapes and investigated the values in the prospectus supplements. CMF ¶ 115.[24] For both deals, Thacher Proffitt, as counsel for Nomura, also assured RBSSI that it was unaware of any material misstatements or omissions in the related disclosures. CMF ¶ 117.

## ARGUMENT

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (quotation omitted). A plaintiff seeking summary judgment on an affirmative defense must show a "complete failure of proof concerning an essential element of the defendant's affirmative defense." *Brody*, 2007 WL 735022, at *5 n.12 (quotation marks and alteration omitted). The district court "may not make credibility determinations or weigh the evidence," but instead "must draw all reasonable inferences in favor of the nonmoving party." *Ideal Steel*, 652 F.3d at 326 (emphasis and quotation omitted); *see also In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 655 (S.D.N.Y. 2004) (the court must view all facts "in the light most favorable to the non-moving party"). "[I]f there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is

---

[24] Documents produced in this case suggest that Deloitte conducted a similar review for NHELI 2007-2, but RBSSI has been unable to locate the letter provided by Deloitte for this offering in any party's production. CMF ¶ 115.

improper." *Vivenzio*, 611 F.3d at 106 (quotation marks and alteration omitted).

The due diligence defense set forth in Section 11 of the 1933 Act, 15 U.S.C. § 77k, provides that "no person, other than the issuer, shall be liable . . . who shall sustain the burden of proof" that, as to non-expertised portions of the offering documents, "he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3)(A). The standard of reasonableness that must be met is "that required of a prudent man in the management of his own property," 15 U.S.C. § 77k(c), and as such, "this defense is understood as a negligence standard." *WorldCom*, 346 F. Supp. 2d at 662 (internal quotations omitted). Section 12(a)(2) claims—and claims under the blue sky laws, which "are generally interpreted in accordance with Section 12(a)(2)," *FHFA v. Bank of Am. Corp.*, No. 11 Civ. 6195(DLC), 2012 WL 6592251, at *7 n.8 (S.D.N.Y. Dec. 18, 2012)—are subject to "a defense of reasonable care that is less demanding than the duty of due diligence imposed under Section 11." *WorldCom*, 346 F. Supp. 2d at 663. This defense provides that a defendant shall not be liable if it "did not know, and in the exercise of reasonable care could not have known" of the misrepresentation or omission contained in the offering documents. 15 U.S.C. § 77*l*(a)(2).

## I.  RBSSI PERFORMED REASONABLE AND APPROPRIATE DUE DILIGENCE ON EACH OF THE FOUR SECURITIZATIONS AT ISSUE

The standard for due diligence is reasonableness, not perfection, and in assessing reasonableness the finder of fact must consider the overall investigation without the benefit of hindsight. *See generally* Lawrence, DUE DILIGENCE, A SCHOLARLY STUDY, at 69-70. RBSSI's due diligence involved more than just loan file review and sampling, upon which FHFA focuses.

Rather, it also included consideration of the issuer and originators, data integrity reviews, consideration of negative-assurance letters, accountants' agreed upon procedures, participation in due diligence calls, and other facts and circumstances that must be taken into account in assessing the reasonableness of RBSSI's due diligence. By focusing on sampling and loan file review, and ignoring the overall facts that the jury ultimately will consider, FHFA is asking the Court to assess RBSSI's diligence myopically, unmoored in industry practice, regulatory guidance, established law, and with the benefit of hindsight. As Gary Lawrence, an acknowledged expert in due diligence, has observed:

> Notwithstanding these judicial statements [holding that courts cannot evaluate an underwriter's due diligence defense with the benefit of hindsight] plaintiffs undeniably have the benefit of hindsight in crafting their complaints and pursuing their lawsuits. Allegations of 'unreasonable' due diligence benefit from being cast in light of subsequent events. When an issue arises after the fact and damages are incurred, it often is quite easy to construct an argument (whether or not well founded) that the defendants due diligence must have been unreasonable because it did not uncover the very fact or circumstance that plaintiffs assert caused their damages.

*Id.* at 275. That is exactly what FHFA improperly seeks to do here.

### A.     Whether RBSSI Exercised The Care Required Of A Prudent Man In The Management Of His Own Property Presents Issues Of Fact

FHFA contends that RBSSI's diligence was inadequate as a matter of law because it "did not perform the same diligence on the four securitizations issued by NHELI than it did on loans that it acquired for securitization by RBS's own captive depositors." FHFA Br. 74. This blanket statement improperly lumps the four securitizations together, despite important distinctions between the securitizations and RBSSI's distinct roles as lead and non-lead underwriter. Even more fundamentally, FHFA's contention that RBSSI cannot, as a matter of law, establish a due diligence defense unless its diligence process for the Nomura securitizations was in all respects identical to the acquisition-stage diligence performed on "loans RBS purchased for itself" is

simply incorrect. FHFA Br. 75.

First, FHFA's argument centers on a mischaracterization that RBSSI's due diligence process was driven by "its potential [financial] exposure, without concern for how its underwriting might affect investors." FHFA Br. 41. While FHFA characterizes this as RBSSI's "express policy," RBSSI personnel responsible for loan-level due diligence, including the diligence conducted on the securitizations at issue, uniformly testified that they did not consider RBSSI's "exposure" when conducting diligence, much less tailor their diligence to it as a matter of policy.[25]   The Credit Procedures Manual, which FHFA selectively quotes (and mischaracterizes as setting forth RBSSI's "policies"[26]), in fact states that "[t]he goals of due diligence are to determine that the assets conform to representations made to [RBSSI] or its clients," including as to "risk disclosures in securities transactions."[27]  It also explains that "[t]he due diligence process includes review in four areas: originator's operations, servicer's operations, review of a sample of the specified asset files, and data integrity." The language FHFA quotes states that "[t]he number of files selected for review and the manner of selection

---

[25] See CMF ¶ 22 (James Whittemore Tr.) ("Q. In the next paragraph it states, 'The number of files selected for review and the manner of selection may vary due to a number of factors, the most important of which is Greenwich's exposure to the transaction.' Do you see that?  A.  Yes, I do. . . .  Q. Did you ever consider RBS's financial exposure to a transaction in determining the size of the sample that you would draw for a given population? . . . A. I don't remember that I did."); id. (Brian Farrell Tr.) ("Q. "And just above it there's a paragraph, it starts 'The number of files selected for review and the manner of selection may vary due to a number of factors, the most important of which is Greenwich's exposure to the transaction.' Do you see what I'm referring to?  A. I do. . . .  Q. Were you aware in 2006/2007 that was RBS's policy? . . . A. No.").

[26] As William Gallagher, the head of the Credit group, testified, the (undated) Credit Procedures Manual was "a procedures manual not a policy manual," and while it provided guidance, RBSSI Credit personnel also relied on, among other things, their experience and judgment, prior history with the counterparty and/or originator, and familiarity with the particular loan product, to inform their procedures on any given loan file diligence project. See CMF ¶ 75.

[27] As discussed in Section III.A supra, RBSSI's Asset Backed Finance Policies and Procedures Manual also provided that "[t]he principal focus of a due diligence review for a mandate to act as lead securities underwriter for an originator or owner of assets is to confirm that the offering document is complete and accurate in all material respects. The reason for this is that RBSGC's exposure in a securitization is not to the credit of the assets or the originator, but rather legal and reputational exposure to our securities customers." CMF ¶ 60.

40

may vary due to a number of factors, the most important of which, is [RBSSI's] exposure to the transaction," with the manual going on to explain that "[s]ample sizes can further vary based on the characteristics of the collateral and the client . . . [RBSSI's] past experience with the client and product, the financial strength of the client, and the presence of third party credit enhancement." CMF ¶ 75. FHFA infers that "exposure" here should be read narrowly to mean "financial exposure," but this is certainly neither the only, nor the most favorable, inference that can be drawn. *See* RSF ¶¶ 639, 641-45.

Second, FHFA's contention that RBSSI's diligence of third-party securitizations was inferior to its diligence of whole loan purchases by RBSSI affiliates ignores ample deposition testimony to the contrary. William Gallagher, RBSSI's head of Credit, testified, for example, that RBSSI applied the same diligence procedures regardless of whether the diligence was done in support of a whole loan purchase or a third-party securitization, such as those at issue in this case. CMF ¶ 23.[28] James Whittemore, who headed the loan reunderwriting group at the time the securitizations at issue were offered, testified the same way, *id.*,[29] as did Brian Farrell, who was responsible for the RBSSI's loan level due diligence in this case. CMF ¶¶ 22-23.[30] As these

---

[28] ("Q. In what ways, if any, did the diligence that RBS performed when it was an underwriter differ from the diligence RBS performed when it was acquiring whole loans intending to securitize them? . . . A. My understanding is it was the same basic diligence done for either type of transaction. Q. And to be clear, sir, is your answer the same whether we're referring to credit diligence or compliance diligence? A. That is my understanding.").

[29] ("Q. Do you know whether RBS's due diligence process varied depending upon whether it was the sponsor of the transaction as opposed to the underwriter of a transaction sponsored by other banks? A. I'm not – I don't believe that I was aware there was any difference."); *see also id.* at 107:19-110:15 ("Q. Did you ever consider RBS's financial exposure to a transaction in determining the size of the sample that you would draw for a given population? A. I don't remember that I did.").

[30] ("Q. When RBS performed diligence in connection with third party deals, third party securitizations by other banks, was there anything different in the way it went about its diligence function? . . . A. In respect to what? Q. In any respect? . . . A. I think they way that a loan was reviewed would not change regardless of securitization or whole loan or finance. Q. Would the decision on sample size change depending on whether RBS was diligencing a third party securitization as opposed to its own whole loan purchase? . . . A. Not that I can recall. Like I said earlier, sample sizes varied in general depending on, on the transaction."); ("Q. And just above it there's a paragraph, it starts 'The number of files selected for review and the manner of selection may vary due to a number

*(footnote cont. next page)*

individuals testified, sample sizes varied on a deal-by-deal basis, and in fact, in numerous instances RBSSI selected diligence sample sizes on third-party securitizations that were *larger* than many of its whole loan acquisition samples. CMF ¶ 24. Here, RBSSI's diligence was additive—it was not performed on pools purchased directly from an originator, but rather on pools that had already been subjected to due diligence by Nomura when it acquired the loans to assess, *inter alia*, whether those loans had been originated in compliance with underwriting guidelines. And Nomura was "known in the industry," including to RBSSI, "[for] perform[ing] a fair amount of diligence when they acquired loans." CMF ¶ 38. Whether the unfavorable inference FHFA impermissibly asks this Court to draw from the sizes of RBSSI's samples is sound, or whether other, more cogent conclusions can be drawn, is for the jury to decide.

Third, FHFA misleadingly focuses the Court's attention on evidence that members of RBSSI's Credit group, who conducted loan-level diligence, did not review the prospectus supplements. Credit's role was to coordinate the "asset-level review" for a given due diligence project. Rather than themselves reviewing the prospectus supplements, however, the Credit team would communicate the results of its review to other RBSSI personnel, and would flag any issues uncovered by the review for further analysis both within the Credit department and among the broader deal team. As the ABF Manual reflects—and FHFA in fact acknowledges, FHFA Br. 50; Rule 56.1 Statement of Facts ¶ 791—the ABF group, not Credit, was the division of RBSSI entrusted with reviewing offering documents, along with in-house and outside counsel and assisted by the results of Credit's asset-level review, "to ensure . . . that the offering documents properly reflect[ed] the terms of the securities provided in the transaction documents." CMF ¶ 12. Deposition testimony of Adam Smith, a member of the ABF group

---

of factors, the most important of which is Greenwich's exposure to the transaction.' Do you see what I'm referring to? A. I do. . . . Q. Were you aware in 2006/2007 that was RBS's policy? A. No.").

during the relevant period who was involved in each of the Nomura securitizations, confirms that ABF, together with "lawyers, accountants, internal collateral analysts, internal structuring people, other vice presidents, analysts, [and] associates," would review and revise offering documents to make them "as accurate as possible." *Id.* Thus, whether or not RBSSI's Credit team reviewed prospectus supplements is irrelevant; it was not the job of the Credit group to review prospectus supplements. And it has no bearing on whether the review and verification of the accuracy of offering materials, conducted by other RBSSI personnel with the assistance of outside counsel, was reasonable.

In any event, FHFA is simply wrong on the law when it contends that "RBSSI's failure to perform the same level of diligence on Nomura's securitizations than it did on loans RBS purchased for itself—alone—establishes that RBSSI's investigation was unreasonable as a matter of law." FHFA Br. 75. As FHFA recognizes, a "reasonable" investigation for purposes of the due diligence defense is one conducted with the "reasonableness . . . required of a prudent man in the management of his own property." 15 U.S.C. § 77k(c). This is not, however, as FHFA suggests, a subjective standard requiring an investigation into how an underwriter actually managed its own property in ostensibly analogous contexts. To the contrary, the "prudent man" standard of section 77k(c), like "prudent man" or "reasonable man" standards developed in other areas of the law, is an objective standard that sets a baseline for investigative conduct. *See Commonwealth, Dep't of Pub. Welfare v. U.S. Dep't of Health & Human Servs.*, 928 F.2d 1378, 1385 (3d Cir. 1991) ("In contrast to the subjective quality of 'good faith,' 'due diligence' is defined as 'such a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances.'") (alteration omitted); *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 871 (S.D. Tex. 2004)

43

(describing 15 U.S.C. § 77k(c)'s reasonableness standard as "objective").[31] Thus, the nature and extent of the loan file reviews performed by RBSSI or its affiliates on loan pool acquisitions is not dispositive in assessing the reasonableness of RBSSI's diligence on these Nomura-sponsored securitizations, and cannot form the basis for a grant of summary judgment against RBSSI.

Finally, the efficacy of RBSSI's due diligence is confirmed by the findings of Michael Forester, an underwriting expert retained by the Nomura Defendants, who fully reunderwrote every loan FHFA's expert contends is defective, and determined that potential significant defects existed in only 3% of the loans in the NHELI 2006-FM2 sample, 4% of the loans in the NHELI 2006-HE3 sample, and 5% of the loans in the samples for NHELI 2007-1 and NHELI 2007-2. CMF ¶¶ 118, 119, 137. As discussed by the Nomura Defendants, Mr. Forester and his experienced team of underwriters conducted a highly credible and reliable review process involving multiple layers of quality control. *See* Nomura Br. Stmt. of Facts § C. These low loan "defect" rates corroborate RBSSI's findings, during the course of its due diligence reviews, that the loans underlying the securitizations at issue were originated generally in accordance with guidelines and that the offering documents were materially accurate. At a minimum, Mr. Forester's findings demonstrate that serious factual disputes remain and must be resolved at trial, if the reasonableness and efficacy of RBSSI's due diligence is to be fairly assessed.

**B. As A Participating Underwriter, RBSSI's Reliance On Nomura's Due Diligence In NHELI 2006-HE3 Was Entirely Reasonable**

It is well established that RBSSI, as a participating underwriter for NHELI 2006-HE3,

---

[31] *See also Katsaros v. Cody*, 568 F. Supp. 360, 366 (E.D.N.Y. 1983) ("The prudent man standard of care [required of trustees] is the objective standard of a man of ordinary prudence in dealing with his own property."), *aff'd*, 744 F.2d 270, 279 (2d Cir. 1984) ("Prudence [of an ERISA pension fund fiduciary] is measured according to the objective 'prudent person' standard developed in the common law of trusts."); *cf. U.S. v. Martinez*, 465 F.2d 79, 81 (2d Cir. 1972) (describing test for probable cause—which asks "whether the knowledge of the arresting officer at the time of arrest would be sufficient to warrant a prudent man in believing that the person arrested had committed or was committing an offense"—as an "objective rather than [] subjective standard") (emphasis omitted).

may establish its due diligence defense by rely ₌ on the diligence conducted by the lead underwriter, whose diligence was shared with RE ₃I. *See Endo v. Albertine*, 147 F.R.D. 164, 171 (N.D. Ill. 1993) ("due diligence of the lead un rwriters" was "common" issue because such diligence "would tend to exonerate the defenc ıt class [of underwriters]"); *Hammond v. Hendrickson*, No. 85 Civ. 9289, 1986 WL 8₋ 7, at *9 (N.D. Ill. July 30, 1986) ("The participating underwriters all benefit from a s ɔwing that the managing underwriter has exercised due diligence in preparation of the regist tion statement . . . ."); *Competitive Assocs. v. Int'l Health Scis., Inc.*, No. 72 Civ. 1848-CLB, 1 5 WL 349, at *19 (S.D.N.Y. Jan. 22, 1975) ("The activities of [the lead underwriter], which iı ıred to the benefit of all of the underwriters, indicate an exercise of due diligence throughoυ the offering."); CMF ¶ 62 (Grice RBBSI Report) ("[I]t was the industry practice during the ʔelevant Period for non-lead underwriters to rely on the diligence performed by the lead underv ·iter."). In the instant case, the record plainly reflects that RBSSI's reliance on Nomura's dilig₂nce investigation for the NHELI 2006-HE3 securitization was reasonable.

As an initial matter, FHFA misstates the law by asserting that RBSSI was required to "conduct an independent review of the NHELI 2006-HE3 Securitization," FHFA Br. 42, 76, or to "verify the 'data presented'" by the lead underwriter. *Id.* at 76, quoting *WorldCom*, 346 F. Supp. 2d at 675.[32] In fact, FHFA's own authoriυes establish that a participating underwriter "may relieve himself of the task of actually verifying the representations in the registration statements" once it has determined that "the managing underwriter makes the kind of investigation the participant would have performed if he were the manager." New High Risk Ventures, Securities Act Release No. 5275, Exchange Act Release No. 9671, 1972 WL 125474,

---

[32] To the extent FHFA asserts that RBSSI was required to perform the same level of diligence as participating underwriter for NHELI 2006-HE3 as on a loan pool acquisition (FHFA Br. 75), this is patently incorrect.

at *6 (July 27, 1972) ("SEC Release 9671").[33]  As discussed more fully below, this is precisely what RBSSI did.

Indeed, not one of FHFA's authorities has any bearing on whether RBSSI faithfully discharged its duties as a participating underwriter.  *BarChris* has nothing to do with whether a participating underwriter must perform its own due diligence, or independently verify the lead underwriter's diligence results; it concerned exclusively the responsibilities of a lead underwriter *vis-à-vis* the issuer.  Similarly, *Feit v. Leasco Data Processing Equipment Corp.*, 332 F. Supp. 544 (E.D.N.Y. 1971), does not, contrary to FHFA's contention, impose or recognize any "obligation" on the part of RBSSI, as a participating underwriter to "'assume an adverse role' with Nomura" (FHFA Br. 76, quoting *Feit*, 332 F. Supp. at 581) and, in suggesting that it does, FHFA conflates the relationship between two underwriters with the relationship of an underwriter to the issuer (the subject addressed by *Feit*).[34]  Here, too, SEC Release 9671 belies FHFA's claims, as it expressly contemplates a cooperative relationship between underwriters and specifies that, "in making a reasonable investigation, the participating underwriter . . . may delegate the performance of the investigation to the manager."  *Id.* at *6.[35]

FHFA is equally wrong on the facts, ignoring key evidence that does not fit its self-

---

[33] FHFA misleadingly implies that this SEC Release requires participants to both assess the reasonableness of the managing underwriter's "program of investigation," *and* to "take some steps to assure the accuracy of the statements in the registration statement." FHFA Br. 76, quoting SEC Rel. 9671, at *6. The Release, however, makes clear that the participant takes the requisite steps to ensure accuracy *by* determining that the managing underwriter made a reasonable investigation. SEC Rel. 9671, at *6.

[34] FHFA also mischaracterizes RBSSI's reliance on Nomura Securities, the lead underwriter as "tacit reliance on management," *i.e.*, the issuer. *See* Nomura Br. Arg. § I.B  (discussing separateness of issuer and underwriter).

[35] Even if Nomura's diligence is ultimately determined to be insufficient, RBSSI could still prevail on its diligence defense so long as it shows that its investigation of Nomura's practices was reasonable. *See, e.g.*, *In re Gap Stores Secs. Litig.*, 79 F.R.D. 283, 302 (N.D. Cal. 1978) ("The defense under §11 is a personal one and each participant is entitled to assert it for what it is worth. All the same, if the managing underwriter did not act with due diligence, the participant will be hard pressed to exonerate himself. Either he must show that he conducted a reasonable investigation of the registration statement (which he probably was not in a position to have done) or a reasonable investigation of the manager's methods.").

serving narrative. In contending that RBSSI lacked knowledge of Nomura as a securitization sponsor, FHFA ignores the testimony of Adam Smith—the RBSSI employee principally responsible for the Nomura relationship—that Nomura was a "highly rated global bank" and that Nomura's senior management team was "known in the industry . . . [for] perform[ing] a fair amount of diligence when they acquired loans." CMF ¶ 38.[36] FHFA also fails to acknowledge evidence that RBSSI built up a reservoir of knowledge about Nomura due to its prior service as underwriter on Nomura securitizations,[37] and that RBSSI took ample measures to verify the reliability of Nomura's diligence process and the accuracy of its results. *See supra* Section IV.A.

Similarly, in claiming that RBSSI's reliance on Nomura was unreasonable because it did not receive the identities of the originators who contributed less than 5% of the underlying loans ignores the fact that the identities of such originators were not disclosed (and were not required to be disclosed) in the offering documents. *See* SEC Reg. AB, 17 C.F.R. § 229.1110, *et seq.*[38] FHFA offers no explanation as to why the identities of these undisclosed originators was relevant to any challenged disclosure, much less how it was somehow so crucial that failure to receive it can be a basis for granting summary judgment against RBSSI. FHFA also ignores evidence that RBSSI *did*, in fact, receive a list of all originators, including originators who contributed less

---

[36] FHFA makes much of its contention that RBSSI did not formally approve Nomura as a counterparty prior to the NHELI 2006-HE3 deal, but the relevant inquiry is whether RBSSI obtained the requisite familiarity with Nomura such that it was justified in relying on Nomura's diligence investigation, *see* SEC Rel. 9671, at *6, an inquiry that must be resolved based on all the relevant facts and circumstances—not simply compliance with a formal internal approval process.

[37] As noted above, RBSSI previously served as underwriter for NAAC 2006-AF2, a securitization sponsored by Nomura that is not at issue in this action and that closed on July 28, 2006. CMF ¶ 135. In addition, in email exchanges predating these offerings, Nomura personnel described Nomura's diligence processes to RBSSI and transmitted a detailed presentation regarding Nomura's securitization business. *See, e.g., id.* (narrative by Adam Smith indicating knowledge of Nomura's diligence practices).

[38] SEC Regulation AB codifies the requirements for registration, disclosure, and reporting for all publicly registered asset-backed securities, including mortgage-backed securities. 17 C.F.R. § 229.1100, *et seq.* At the time this securitization was issued, prospectus supplements were only required to disclose the identity of originators that originated 10% or more of the asset pool, and, for any originator that originated 20% or more of the asset pool, additional information such as a description of its underwriting criteria and appraisal standards.

than 5% of the loans. *See* CMF ¶ 138 n.11.

FHFA's characterization of the diligence results RBSSI received as "limited" is also belied by the record. *See supra* Section IV.A (describing the detailed information received by RBSSI). In fact, the only additional information FHFA suggests that RBSSI should have received was the kick-out rates for pools feeding into the SLG, pool-level diligence results for originators contributing 34% of the loans in the SLGs, (and the identities of below-5% originators, which RBSSI actually did receive). FHFA does not explain how this information was needed for RBSSI to "ensure that Nomura's investigation was adequate," or to explain its significance with respect to any challenged disclosure. FHFA Br. 76. As FHFA's own expert confirmed, the significance of kick-out rates depends on the surrounding facts and circumstances, including the specific reasons for the kick-outs. CMF ¶ 30 (Leonard Blum Tr.). At best, FHFA has simply identified another fact question—the quantum of information needed to justify reliance—that is wholly unsuited for summary judgment.

In sum, RBSSI's practices and conduct with regard to this securitization "were consistent with, or exceeded, industry practices and provided reasonable grounds for RBS[SI] to believe that the Offering Materials did not contain any material misstatements or omissions." CMF ¶ 119.

## C. RBSSI's Investigation Of NHELI 2006-FM2 Was Reasonable

FHFA's assertion that RBSSI "conducted no diligence" on NHELI 2006-FM2 is flatly contradicted by the record. RBSSI conducted a rigorous review and evaluation of Nomura's due diligence process, the offering materials, and the loan-level review conducted by AMC. The adequacy of this diligence cannot be determined as a matter of law.

FHFA again claims that RBSSI's understanding of Nomura's overall diligence process was "minimal," FHFA Br. 43, and that RBSSI had no "reservoir of knowledge about Nomura it

48

could fall back on," *id.* at 76. For the reasons discussed above with respect to NHELI 2006-HE3, this is incorrect, or at most presents disputed questions of fact. FHFA's principal support for this contention is that Mendy Sabo of Nomura sent an email with a description of Nomura's sampling procedure to Brian Farrell which Mr. Sabo described as "ad hoc."[39] FHFA Br. 76. But FHFA fails to identify any information RBSSI supposedly lacked about Nomura's sampling process, and incorrectly suggests that this email was the only information RBSSI received, when in fact it was in response to a follow-up question concerning information previously provided by Nomura, and that Nomura personnel further supplemented Mr. Sabo's description of Nomura's diligence practices in a subsequent email to Adam Smith of RBSSI.[40] CMF ¶ 125 (describing diligence process as "very similar to our Clayton scope. Full re-underwrite to Fremont's guides with our standard stips (did you receive these last week as well?) overlayed. Full compliance is completed as well. In the case of these deals, we looked at every loan in one way, shape, or form.").

FHFA largely fails to address RBSSI's actual review of Nomura's diligence process, the offering materials, and the loan-level review conducted by AMC. Uncontroverted evidence demonstrates that RBSSI received a substantial volume of information relating to the loan-level diligence review and Nomura's sampling process, CMF ¶¶ 120-123, that reports were supplied to RBSSI directly by the vendor, AMC, and that diligence results were circulated to multiple

---

[39] FHFA also suggests that RBSSI lacked knowledge about Nomura's diligence process because NHELI 2006-FM2 "was the first Nomura deal for which RBSSI served as the only lead underwriter." FHFA Br, Br. 43. This fact, even if true, hardly seems relevant given that RBSSI, just two months earlier, had served as a participating underwriter in a Nomura deal, a role which entailed diligently reviewing the process by which Nomura conducted diligence. CMF ¶¶ 131-137.

[40] CMF ¶ 125 . FHFA further supports its claim that RBSSI did not fully comprehend RBSSI's diligence process by noting that RBSSI "knew that Nomura Securities performed no random sampling, and would not even submit Nomura for approval as an RBS counterparty until months later." FHFA Br. 76. FHFA's repetition of such arguments is equally meritless in the context of the NHELI 2006-FM2 transaction, as Nomura's use of "adverse" sampling and RBSSI's potential failure to formally approve Nomura as an issuer via a committee process do not demonstrate that RBSSI's diligence was unreasonable. *See supra* Argument, I.B; *infra* Argument, I.D.

49

individuals within RBSSI for their review, *see* CMF ¶¶ 124, 126-127. Furthermore, the evidence shows that numerous individuals signed off on the diligence results before RBSSI proceeded with the transaction. CMF ¶¶ 126-127 ("Credit was ok with results and sampling methodol[og]y."). The record also indicates that RBSSI reviewed sales memoranda and free writing prospectuses in connection with the NHELI 2006-FM2 transaction, CMF ¶ 128, and enlisted the help of third parties to verify the accuracy of the offering materials. CMF ¶ 130 (Negative Assurance letter for NHELI 2006-FM2); CMF ¶ 129 (Deloitte & Touche Comfort Letter for NHELI 2006-FM2).[41]

FHFA seeks support from *BarChris*'s admonition that underwriters may not blindly rely on a company's management. FHFA Br. 77. But the evidence is clear that RBSSI did not "blindly rely" on Nomura or its "management," and "[*BarChris*] makes it plain that a completely independent and duplicative investigation is not required." *Feit*, 332 F. Supp. at 577. FHFA appears to contend nonetheless that RBSSI's investigation was unreasonable because RBSSI relied on the results of a loan-level review by an independent third-party vendor commissioned by Nomura. FHFA does not, however, suggest that a separate review by a vendor commissioned by RBSSI would have yielded different results than the review conducted by AMC; to the contrary, FHFA levels the same (meritless) critiques against both Nomura's and RBSSI's loan-level reviews. FHFA's facile reliance on *BarChris* also elides important distinctions between

---

[41] FHFA's observations that nobody in RBSSI's Credit group attended the due diligence teleconference and that a Nomura employee claimed to be "bulls**ting" on the conference call, merit little attention. As discussed *supra*, the Credit group was not directly involved in the securitization process, but instead communicated the results of its reviews to ABF personnel, who were in attendance on the call. The email further makes clear that the subject matter of the call was primarily corporate due diligence, not loan-level due diligence as to which the Credit personnel from RBSSI and Nomura were separately in direct contact with each other. In any event, it would be inappropriate on summary judgment to draw inferences against RBSSI (or Nomura) based on the short, context-free email FHFA cites. *See, e.g., Tramp v. Associated Underwriters, Inc.*, 768 F.3d 793, 802 (8th Cir. 2014) ("The emails are open to interpretation and on a motion for summary judgment, they must be viewed in the light most favorable to [the non-moving party].").

corporate and asset-backed securities and the relationship between the different transaction participants in each. As the SEC has explained, "[a]sset-backed securities and ABS issuers differ from corporate securities and operating companies," most significantly in that the information relevant to asset-backed securities investors does not concern "the business or management of the issuer," but instead "the characteristics and quality of the asset pool." Asset-Backed Securities, Securities Act Release 8518, Exchange Act Release 50905, 2005 WL 24262, at *11 (Jan. 7, 2005). There is no reason to believe that *BarChris*'s statements about the skepticism that is appropriate with respect to an issuer's management's self-serving views as to its own performance should apply to a pre-purchase review commissioned by a securitization aggregator of assets originated by non-affiliated third-parties; to the contrary, as explained by the Nomura Defendants, Nomura was fully incentivized to conduct a robust, adversarial review of the loans it purchased from originators. *See* Nomura Br. Stmt. of Facts § B. In short, nothing in FHFA's motion papers suggests that the reasonableness of RBSSI's due diligence on this transaction can be taken away from the jury and resolved as a matter of law.

## D. RBSSI Conducted A Reasonable Investigation As Lead Underwriter of NHELI 2007-1 And NHELI 2007-2

### 1. RBSSI's Sampling Methodology Was Sound

FHFA contends that RBSSI's due diligence on the NHELI 2007-1 and NHELI 2007-2 securitizations was unreasonable as a matter of law because RBSSI allegedly employed "statistically unsound" methods to select samples for loan-level due diligence, and did not pick its samples specifically from the loan groups supporting the certificates Freddie Mac purchased. FHFA Br. 77. FHFA's argument misconstrues the applicable legal standard for due diligence, ignores extensive record evidence supporting the reasonableness and soundness of RBSSI's sampling methodologies, and ignores numerous disputed material issues of fact.

51

### (a)   RBSSI's Sampling Methodology Was Consistent With Industry Custom And Practice

The law requires that an underwriter's due diligence be reasonable in the circumstances, which is typically measured against custom or standard practice in the industry. "Custom or standard practice in the industry is a useful measure in assessing the standard of care." *City of N.Y. v. Agni*, 522 F.3d 279, 285 (2d Cir. 2008).[42] The evidence here shows that RBSSI's loan-level sampling methodology for the NHELI 2007-1 and NHELI 2007-2 securitizations, using a combination of semi-random and adverse selection criteria, was reasonable, rational, and was consistent with industry custom and practice.

RBSSI's semi-random sampling methodology was developed by a career underwriter with decades of experience who recognized that a purely random selection would bias the sample toward low-balance loans that represented a disproportionately low percentage of the economic value of the loan pool. Bisaillon Decl. ¶ 9. To ensure a random sample that better represented the economic value of the pool, RBSSI's semi-random methodology first stratified the pool by loan balance before randomly drawing loans, weighted by the unpaid balance of each strata to the pool as a whole. *Id.* ¶ 7. There is no basis for FHFA's assertion that this was an unreasonable or "unsound" sampling methodology; that is a question for the jury to decide.

In addition to its semi-random selection, RBSSI used adverse sampling, the purpose of

---

[42] *See also BarChris*, 283 F. Supp. at 703 (compliance with industrywide norms should ordinarily establish a due diligence defense); Hr'g Tr., 70:19-71:1, Dec. 17, 2012 (11 Civ. 6198) (DLC) (there is a "very strong argument to be made . . . that [the] standard upon a reasonable inquiry . . . would be informed to some extent by the practices of major player[s] in the industry"); *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 492 (S.D.N.Y. 2005) (noting that "good faith compliance" with professional industry standards establishes the due diligence defense); *In re Int'l Rectifier Sec. Litig.*, No. 91 Civ. 3357(RMT), 1997 WL 529600, at *11 (C.D. Cal. Mar. 31, 1997) (defendants were entitled to a due diligence defense under Sections 11 and 12 because they "have amply conformed with, if not exceeded, the industry standards"); *In re Conticommodity Servs. Sec. Litig.*, MDL No. 644, 1988 WL 56172, at *1 (N.D. Ill. May 25, 1988) (objective industry standards relevant to negligence claim); *Rebenstock v. Deloitte & Touche*, 907 F. Supp. 1059, 1068-69 (E.D. Mich. 1995) (denying summary judgment under the Exchange Act because there was a genuine issue of fact as to whether defendant had acted in accordance with industry standards).

which was to identify and review loans that were outliers and might potentially represent greater risk to the pool, including the risk of non-compliance with underwriting guidelines.  CMF ¶ 83. The use of adverse sampling was known to and accepted by Freddie Mac.  Ronald Feigles, who oversaw Freddie Mac's due diligence during the relevant time period, testified that "[o]ur sampling . . . was all adverse."  CMF ¶ 174.  Fannie Mae and Freddie Mac also reviewed and approved RMBS issuers' use of adverse sampling.  *See, e.g., FHFA v. HSBC N. Am. Holdings Inc.*, --- F. Supp. 3d. ----, 2014 WL 3702587, at *3 (S.D.N.Y. July 25, 2014).

There is no evidence that industry participants or regulators required adherence to FHFA's post-hoc standard that every sample be drawn in a purely random and "statistically sound" manner.  Neither the SEC's contemporaneous standards set forth in Regulation AB, 17 C.F.R. § 229.1100, *et seq.*, nor the post-financial crisis standards of Section 945 of the Dodd-Frank Act, require that due diligence samples be statistically valid or that underwriters conform to any particular sampling protocol.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111–203, § 945, 124 Stat. 1376, 1898 (2010), *codified at* 15 U.S.C. § 77g(d).  Indeed, in 2011 the SEC declined to adopt proposals that would have required underwriters of asset-backed securities to pick samples that are "statistically valid."  *See* Issuer Review of Assets in Offerings of Asset-Backed Securities, Securities Act Release 9176, Exchange Act Release 63742, 2011 WL 202729, *7-*11 (Jan. 25, 2001); *accord* Letter from John A. Courson, President and CEO, Mortgage Bankers Association, to SEC (Nov. 12, 2010), at 3 ("The sample can be randomly selected or adversely selected (such as where a certain loan characteristic might be of concern)."), *available at* http://www.sec.gov/comments/s7-26-10/s72610-12.pdf; CMF ¶ 74 (Grice RBSSI Report) ("There are no industry standards on sample selection.  Instead, sample selection depends on . . .several factors").

The broad and long-standing scholarly consensus is that the use of any particular sampling methodology or protocol (indeed, the entirety of the due diligence investigation) must be "reasonable" when measured against the systems and methods that would have been used by a reasonable person in the management of his or her own property in a similar context as it existed at the time in question, and without the benefit of hindsight. *See, e.g.*, Lawrence, DUE DILIGENCE, A SCHOLARLY STUDY, at 129. FHFA cites no authority to the contrary, instead relying on inapposite statistical manuals and cases that either address the use of sampling evidence as a method of proof in legal proceedings,[43] which is not the test by which the reasonableness of RBSSI's due diligence should be measured, or that simply describe the purpose of statistical random sampling.[44]

FHFA effectively argues that unless a particular sampling methodology satisfies *Daubert* and permits statistical extrapolation of the sample results to the general population, the methodology is so tainted that it renders the diligence based thereon unreasonable as a matter of law. FHFA once again fails to appreciate that the propriety of a given sampling methodology— like *every* other aspect of the diligence inquiry—is a fact-intensive question that cannot be answered by reference to one standard. *See, e.g.*, *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1342 n.5 (1st Cir. 1988) ("The usefulness of statistics 'depends on all of the surrounding facts and circumstances.'") (quoting *Teamsters v. U.S.*, 431 U.S. 324, 340 (1977)). Judged

---

[43] *See Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 502 (S.D.N.Y. 2013) (approving extrapolation by expert from sample to pool of mortgage loans); *FHFA v. JPMorgan Chase & Co.*, 11 Civ. 6188, 2012 WL 6000885, at *6 (S.D.N.Y. Dec. 3, 2012) (describing FHFA's expert's sampling methodology); *U.S. v. Archer*, 671 F.3d 149, 163 (2d Cir. 2011) (rejecting biased statistical evidence in criminal proceeding); *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013) (rejecting inference drawn from "evidence . . . of a small, unrepresentative sample").

[44] *See U.S. ex rel. Martin v. Life Care Centers of Am., Inc.*, Nos. 08 Civ. 251, 12 Civ. 64, 2014 WL 4816006, at *14 (E.D. Tenn. Sept. 29, 2014); *Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 304 (S.D.N.Y. 2012); *U.S. v. Rivera-Maldonado*, 194 F.3d 224, 231 n.8 (1st Cir. 1999).

against FHFA's standard, the Court would effectively have to find the entire industry's diligence practices to be unreasonable as a matter of law in order to rule against RBSSI, further underscoring that this question is not suitable for summary judgment. *See Agni*, 522 F.3d at 285 ("Courts will not lightly presume an entire industry negligent.").

(b)    The Reasonableness Of RBSSI's Sampling Methodology Is A<br>Question Of Fact That Cannot Be Resolved On This Motion

At the very least, the question of whether RBSSI's sample selection methodology for the NHELI 2007-1 and NHELI 2007-2 securitizations was reasonable raises a fact issue for the jury. *Ford Motor Co. v. Zahn*, 265 F.2d 729, 732-33 (8th Cir. 1959) (whether defendant's "sampling" protocol for inspecting products constituted "reasonable care" was "properly one for the jury to resolve"); *SQP, Inc. v. Sirrom Sales, Inc.*, 130 F. Supp. 2d 364, 368 (N.D.N.Y. 2001) ("reliability of [] sampling and testing methods . . . creates questions of fact"). Whether the size and composition of each sample used by RBSSI was sufficient for its purpose cannot be determined in a sterile vacuum, divorced from other factual determinations that the jury will make, including the meaning and scope of the statements in the offering materials that the due diligence was intended to test, and whether the results of the diligence provided reasonable comfort to RBSSI that those statements were accurate.

As an underwriter, the broad purpose of RBSSI's due diligence was to determine whether there were any material misstatements in the offering materials. The primary statements in the offering materials that FHFA alleges RBSSI did not take reasonable care to verify are that the loans were originated *generally* in accordance with the originator's underwriting guidelines. *See* Am. Compl. § IV. As Freddie Mac's witnesses acknowledged, the word "generally" meant that there *could and would* be loans in the pools that were outside the originator's guidelines. CMF ¶ 140 (Feigles Tr.) (agreeing that "generally" meant "for the most part, but not always"); (Norris

55

Tr.) (Fannie Mae employee acknowledging that such language meant that exceptions might be made to guidelines). The offering materials did not represent that there was a specific number or percentage of loans that were originated outside underwriting guidelines. Thus, to test *general compliance* with guidelines, RBSSI was not required to verify a particular number or percentage with any statistical certitude.

The RBSSI Credit employees who were responsible for conducting loan-level due diligence uniformly believed that the results of their diligence on semi-randomly and adversely selected samples enabled them to get a "general understanding" of the pool as a whole. Farrell Decl. ¶ 5; CMF ¶ 78.[45] Likewise, RBSSI's due diligence vendor, Clayton, the market leader in mortgage loan due diligence, drew conclusions about the pools as a whole when reporting its diligence results to RBSSI. *See, e.g.*, CMF ¶ 78 (Clayton concluding that the due diligence results "do[] not suggest a pattern of imprudent lending practices" and that "the loans should perform similar to a typical Alt-A pool.") The conclusions of these highly experienced mortgage loan reunderwriting specialists that RBSSI's samples *did* allow them to draw inferences concerning the loan pool as a whole are not to be lightly discounted, and at a minimum ought to be weighed by the jury.

It would not be unreasonable for a jury to conclude that the combination of adverse and semi-random sampling used by RBSSI for the NHELI 2007-1 and 2007-2 securitizations allowed RBSSI to draw meaningful inferences about each respective loan pool as a whole, sufficient to confirm with reasonable care that the loan pools were originated generally in accordance with applicable underwriting guidelines. There is nothing about an adverse sample that inherently

---

[45] Similarly, Mr. Gallagher testified that "the point of the random sample was to determine what the, you know, incidence of, or an exception rate might be in a pool and whether or not that was something that the, you could tolerate within, within the pool and that it, it wouldn't be material to the overall pool." CMF ¶ 78.

robs it of any value in drawing conclusions about the pool as a whole. Although inclusion of a loan in the adverse sample was based on particular loan characteristics, such as a high balance relative to the rest of the pool, all such loans were reunderwritten and evaluated by RBSSI in the same way as the semi-randomly selected loans, namely by assessing the full spectrum of potential credit, compliance, and valuation issues that any loan in the pool might have, not just issues that might relate to the high balance. And since the adverse criteria used by RBSSI for the NHELI 2007-1 and 2007-2 securitizations were mostly targeted toward outlier characteristics that might be more likely to correlate with departures from guidelines, such as high debt-to-income ratios, low FICO scores, and high initial interest rates, when RBSSI analyzed the due diligence results it could reasonably conclude, at the very least, that the loans in the remainder of the pool were no more likely to be "defective" (using FHFA's terminology), and probably were less "defective," than the sampled loans. *See Am. Trucking Ass'ns v. U.S. Dep't of Transp.*, 166 F.3d 374, 380 (D.C. Cir. 1999) (concluding that data yielded by agency's "focused sampling" technique, which targeted documents and vehicles more likely to exhibit safety violations, "ha[d] value"); *see also* Farrell Decl. ¶ 5 (explaining purpose of adverse samples). Thus, FHFA cannot reasonably contend that RBSSI was unable to draw *any* meaningful inferences from the due diligence results on its samples. RBSSI's sampling did, in fact, give RBS insight into the quality of the pool as a whole. To the extent FHFA may contend that that insight was not sufficient in its view, or could have been better had RBSSI employed some other type of sampling methodology or technique, that is an argument for the trier of fact, not an argument for resolution by the Court on summary judgment.

FHFA argues that no juror could conclude that RBSSI performed reasonable due diligence by drawing a loan sample from a securitization as a whole, rather than from a specific

SLG, relying solely on the argument that SLG-specific sampling represents best practices as a matter of statistics. FHFA Br. 77-78. Yet, there is no evidence that any regulator or industry participant, including the GSEs themselves, ever suggested that SLG-specific diligence was necessary or even desirable, nor has FHFA explained why reasonable conclusions about the loans in the SLGs could not be drawn from diligence conducted on the pool as a whole. Indeed, the representations on which FHFA is suing RBSSI—namely that loans were originated generally in accordance with originators' guidelines—were *not* made on an SLG-specific basis, but were represented on a pool-wide basis with respect to the loans for each originator whose guidelines and lending practices were disclosed in the prospectus supplements. CMF ¶¶ 138-139, 141. Typically the main distinguishing characteristic of the loans in the SLGs that the GSEs purchased was that the loan balances fell within the GSEs' respective "conforming balance" limits—a factor as to which there is no evidence of correlation with higher risk levels.

Finally, one cannot determine the sufficiency of RBSSI's samples without taking into consideration the due diligence results. It will be up to the jury to consider, for example, the significance of the fact that Clayton concluded that there were "*no credit issues*" out of the 102 loans it reviewed from the pool backing NHEL 2007-1 Group II, and the 306 loans it reviewed from the pool backing NHELI 2007-2. FHFA's contention that, as a matter of law, RBSSI could not reasonably conclude based on this due diligence that the loans in these pools were underwritten generally in accordance with originators' guidelines, is not grounded in reality.[46]

---

[46] Furthermore, the 100-loan samples from which FHFA draws most of its loan-level expert conclusions are less than one-third of the size of the samples taken by RBSSI for the NHELI 2007-1 and 2007-2 securitizations. CMF ¶¶ 100-101; *see Rivera-Maldonado*, 194 F.3d at 231 ("Generally speaking, the smaller the sampling, the less reliable the resulting probability estimate."). Statistically valid samples are hardly perfect, *see Joseph S. v. Hogan*, No. 06 Civ. 1042(BMC)(SMG), 2011 WL 2848330, at *7 (E.D.N.Y. July 15, 2011) ("But it is possible that even practical considerations can render statistical evidence completely unreliable . . . ."), and the difficulty of comparing a small statistically valid sample to a much larger sample comprised of randomly and adversely selected loans only
*(footnote cont. next page)*

 

          (c)     RBSSI's Samples Were Statistically Sound

      Even if the Court were to adopt FHFA's rigid rule that due diligence samples must be "statistically sound" to have any value, FHFA has not shown (and cannot show) that RBSSI's samples were statistically *unsound*. FHFA's statistics expert, Dr. Cowan, has opined that 100-loan random samples from each of the securitizations at issue here are sufficient to draw statistically significant conclusions concerning FHFA's reunderwriting expert's analysis of those loans. CMF ¶ 102. For the NHELI 2007-1 and 2007-2 securitizations, by comparison, RBSSI drew semi-random samples of 114 loans and 138 loans, respectively. Indeed, the 138-loan semi-random sample RBSSI drew for the NHELI 2007-2 securitization exceeds (by 4 loans) the number of loans determined by RBSSI's spreadsheet calculator to produce a 95% confidence level with a +/- 5 percentage point margin of error, which is *half* the maximum margin of error produced by Dr. Cowan's samples. *Id.* FHFA cannot seriously contend that such a sample was unreasonable or unsound as a matter of law.

      **2.    RBSSI's Samples Did Not Show "High Defect Rates" And, At Most, The Results Present Factual Issues To Be Resolved At Trial**

      FHFA contends that "RBSSI took no action when its vendor found that 32% of the loans in its NHELI 2007-1 sample and 24% of the loans in its NHELI 2007-2 sample had material credit exceptions, even though its own policies required it to upsize its sample 'when significant material credit exceptions are found (typically greater than 20%)'" and that "[t]his complete failure to follow up on red flags, as required by its own policies, prevents RBSSI from prevailing on a due diligence defense as a matter of law." FHFA Br. 78-79. This argument is premised on misstatements of fact, and is meritless.

---

underscores that the appropriateness of a particular sampling methodology is a fact question for the jury. *See SQP*, 130 F. Supp. 2d at 368.

59

RBSSI's final due diligence results did *not* show 32% or 24% material credit exceptions, or anything near those percentages. For the NHELI 2007-1 securitization, out of the 102 sampled loans in Group II that FHFA contends is the only relevant pool, RBSSI found zero unresolved material credit exceptions without sufficient compensating factors, and just two unresolved material compliance issues, one of which was curable. And for NHELI 2007-2, out of the 306 loans reviewed, RBSSI found zero unresolved material credit exceptions without sufficient compensating factors, and just one unresolved material compliance issue.

FHFA's reference to 32% or 24% "material credit exceptions" appears to be based not on the *final* due diligence results, but on Clayton's *preliminary* grades. As explained by RBSSI's witnesses and its due diligence expert, one cannot draw conclusions from preliminary results, because doing so would ignore how the reunderwriting and grading process works. *See* CMF ¶ 89 (Grice RBSSI Report) ("[I]nitial designation of a loan as a grade 3 was just the starting point of the analysis and did not mean that the loan failed to meet underwriting guidelines or fail to comply with regulatory requirements."); Farrell Decl. ¶ 9. As discussed in Section III.C.2, *supra*, loans could be assigned an initial grade of "3" by Clayton for one or more of numerous reasons, many of which had nothing to do with credit quality or guideline compliance, and initial "3" grades could, and frequently did, change before the due diligence project was completed. Missing documents were located and associated exceptions were cleared. Farrell Decl. ¶¶ 9-11. Certain regulatory compliance issues could be cured by, for example, the originator sending additional disclosures to the borrower and/or re-opening the borrower's right of rescission. CMF ¶ 67. Mortgage documentation discrepancies could be fixed by the originator executing corrected documents. Farrell Decl. ¶ 17. Rebuttals provided by the issuer or originator could result in loans being cleared if RBSSI agreed with them. Farrell Decl. ¶ 10. RBSSI could

determine in its professional judgment that a loan that represented an exception to guidelines had sufficient compensating factors to include the loan in the pool. Farrell Decl. ¶ 10. These and other reasons resulted in initial "3" grades becoming "2" or "1" grades prior to the pool being finalized. Thus, contrary to FHFA's assertion, an initial grade of "3" did not necessarily represent a determination that the loan contained a "material credit exception," let alone that it had been originated outside of guidelines, and FHFA's argument that initial "3" grades in each securitization were 32% or 24% is meaningless and irrelevant.

In any event, FHFA is flat wrong that the initial "material credit exception" rates were 32% or 24%. Those percentages included not only credit exceptions, but also compliance exceptions and documentation-related exceptions, many of which were designated as "3C" (meaning a curable exception) or "3D" (meaning a documentation exception, which itself was also often curable). In the NHELI 2007-1 Group II sample, 9 out of the 102 loans (9% of the sample) were assigned by Clayton an *initial* grade "3" for credit reasons (as opposed to "3C" or "3D"), and for the NHELI 2007-2 sample, 35 out of the 306 loans (11% of the sample) were assigned by Clayton an *initial* grade "3" for credit reasons. None of the initial "3," "3C", or "3D" credit grades remained uncleared when the pool was finalized.

FHFA's argument appears to boil down to its contention that *none* of the loans that was initially graded as a "3" (or "3C" or "3D") by Clayton should have been changed to a "2W." *E.g.*, FHFA Br. 30-34. But parsing through grading changes on individual loans is not something this Court can resolve on summary judgment. And the record evidence does not even support FHFA's argument. As explained by the RBSSI credit officer who managed these two due diligence projects, Brian Farrell, the loans FHFA cites demonstrate legitimate reasons for clearance of the initial "3" grades. Farrell Decl. ¶ 19. In fact, three of the loans that were

61

initially graded as "3" that became "2W" were included in Dr. Cowan's samples in this case, and *FHFA's own reunderwriting expert* found that, for two of the three loans, any "underwriting defects *did not substantially increase the credit risk associated with the loan*." CMF ¶ 107. Defendants' expert found all three loans to have been appropriately originated. *Id.* It cannot be determined on such a record that inclusion in the securitizations of loans preliminarily assigned a "3" grade by Clayton forecloses RBSSI from asserting a due diligence defense as a matter of law. Relatedly, questions as to whether RBSSI's due diligence identified "defects" in individual loans that should have caused RBSSI to question whether loans were originated generally in accordance with guidelines cannot be resolved without first determining that FHFA's alleged loan "defects" are in fact defects at all—a matter on which it bears the burden of proof, and which will not be resolved until trial.

### 3.    FHFA's Argument That RBSSI Was Required To Review "Information Outside Of The Loan Origination File" Is Wrong

FHFA argues that the Court should find, on summary judgment, that RBSSI's due diligence was legally inadequate because "RBSSI was also required to investigate the accuracy of the statements 'at the time [they] became effective,'" but "there is no evidence that RBSSI ever looked at contemporaneous credit information or other information outside of the loan origination files to determine if loans complied with guidelines or if the subject properties were owner occupied." FHFA Br. 80. In so arguing, FHFA asks this Court to impose a standard that is not grounded in any evidence as to industry custom and practice, and ignores that the relevant representations on which FHFA is suing were made *as of the date of origination of the loans*. FHFA's Amended Complaint primarily alleges that loans were not originated generally in accordance with underwriting guidelines, that LTV ratios were understated, and that owner-occupancy rates were overstated. *See* Am. Compl. § IV. The statements in the prospectus

supplements regarding these attributes of the loans expressly disclose that they are based on information at the time the loans were originated; they were not attributes that would change later and thus require the kind of additional due diligence FHFA asserts was necessary. Thus, whether a loan was originated generally in accordance with guidelines is, by definition, something that was determined at the time the loan was originated, and RBSSI's investigation into the accuracy of that representation based on the information in the loan file at the time of origination was reasonable. Likewise, the prospectus supplements expressly state that LTV ratios were calculated based on the *original* balance of the loan, divided by the lesser of either the *original* appraisal or the *purchase price* (in the case of a purchase mortgage). CMF ¶ 146. And with respect to owner occupancy information, the prospectus supplements made clear that the data provided was based on borrowers' stated occupancy intentions at the time of origination. CMF ¶ 148. Again, all of these data points were fixed by the date of origination of the loan and did not require further investigation of post-origination information that FHFA asserts might have existed in public records or other sources outside the loan file.

FHFA fails to explain with any specificity how any post-origination information would be relevant to the actual disclosures in the offering materials, and nor does it identify any material changes to the disclosed information for any loans in the SLGs between the time of RBSSI's due diligence and the cut-off date for the securitizations.[47] FHFA also seriously overstates its case when it speculates that such changes *may* have occurred because "the vast majority of the loans" in the NHELI 2007-1 and NHELI 2007-2 securitizations "sat on Nomura's books for well over two months before they were securitized." *See* FHFA Br. 51, table at 25.

---

[47] With respect to RBSSI, FHFA only cites a single, highly general statement to the effect that undisclosed debts may not become apparent until after origination, and the only specific examples FHFA provides are of two loans from NHELI 2007-3, a securitization as to which RBSSI had no involvement. *See* FHFA Br. 24-25.

Even based on FHFA's calculations as to the seasoning of the loans at issue, 80% of the collateral for NHELI 2007-1 was seasoned less than 3 months, and 55% of the collateral for NHELI 2007-2 was seasoned less than 4 months. *Id.* But since FHFA's calculations incorrectly use the "filing dates of the prospectus supplements related to the Securitizations," rather than the data cut-off dates specified in the prospectus supplements, which are approximately one month earlier, FHFA's calculations are one month off, meaning, for example, that 80% of the collateral in the NHELI 2007-1 SLG was seasoned less than two months as of the cut-off date. Thus, even if one were to accept FHFA's faulty premise that seasoned loans must be reunderwritten using documents outside of the loan files, substantial fact issues exist as to whether, in this case, not referring to such materials was so unreasonable as to vitiate RBSSI's defense.[48]

### E.    FHFA's "Other Reasons" For Granting Summary Judgment Are Meritless

#### 1.    RBSSI's Use Of Third-Party Due Diligence Vendors Was Reasonable

FHFA states that RBSSI's engagement of third-party reunderwriting firms to conduct loan file reviews amounted to a "blind[ ] rel[iance] on others to ferret out inaccuracies," FHFA Br. 80, quoting *Livent*, 355 F. Supp. at 733, and, as such, was "unreasonable as a matter of law." FHFA Br. 81. *Livent*, however, concerned "inside directors, with intimate knowledge of corporate affairs and the transactions [at issue]," who, the court held, could not "blindly rely[ ] on outside counsel or auditors to ferret out inaccuracies, especially those that they were aware of

---

[48] Quoting *WorldCom*, FHFA asserts that because it did not review the supplemental materials FHFA asserts it should have, RBSSI failed "'to go behind' the data in the loan files and failed 'to conduct a searching inquiry' into whether the data presented by Nomura Securities was accurate," and therefore "has no due diligence defense as a matter of law." FHFA Br. 80, quoting *WorldCom*, 2005 WL 408137, at *3. *WorldCom*, however, simply stated that an underwriter had a duty "to go behind the publicly available information" concerning the issuer. *Id.* This is precisely what RBSSI did in reviewing a sample of the underlying loan files, which obviously are not "public information." Moreover, as this Court recognized in *WorldCom*, exactly what constitutes a "searching inquiry" is an inherently fact-intensive inquiry that *prevents* resolution of a defendants' diligence defense at summary judgment. *WorldCom*, 346 F. Supp. at 683.

or had even been responsible for introducing into the company's financials." *Id.*[49]  It certainly does not stand for the remarkable argument FHFA makes here, that engaging a specialist mortgage loan reunderwriting firm to assist in conducting due diligence is deficient as a matter of law "because otherwise, 'the inclusion of underwriters among those liable under Section 11 affords the investors no additional protection.'" FHFA Br. 80, quoting *WorldCom*, 346 F. Supp. 2d at 675 (quoting *BarChris*, 238 F. Supp. at 697).  FHFA, of course, is wildly off base; *BarChris* did not in any way hold that underwriters could not rely on independent experts or consultants; it simply reasoned that underwriter liability would afford investors no additional protection if the underwriters were entitled to "rely solely on the company's officers or the company's counsel." *BarChris*, 283 F. Supp. at 697.

Stripped of this hyperbole, FHFA's argument is actually that RBSSI's due diligence was deficient because RBSSI did not adequately re-review loans that its vendors found *not* to be defective, while at the same time "overturn[ing] its vendor's EV3 grades for credit defects," something FHFA improperly describes as "RBSSI 'actively facilitat[ing]' the introduction of loans that did not comply with underwriting guidelines into the SLGs." FHFA Br. 81, quoting *Livent*, 355 F. Supp. 2d at 736.[50]  This baseless allegation only illustrates the intractable problems FHFA faces in seeking summary judgment on RBSSI's due diligence defense before it has made its *prima facie* case, as this argument is predicated on resolving concededly *disputed* issues in *FHFA's* favor.  Specifically, FHFA contends, apparently based on nothing more than

---

[49] Similarly, *BarChris*, on which the *Livent* court relied, dealt with corporate insiders who were found to have "known that in part [the prospectus] was untrue," and "under th[o]se circumstances," were not "to sit back and place the blame on the lawyers for not advising [them] about it." *BarChris*, 283 F. Supp. at 685.

[50] In *Livent*, the court granted summary judgment against inside director defendants on liability and on their diligence defenses.  355 F. Supp. 2d at 739.  In so doing, it found that the defendants were at least partially responsible for introducing the misstatements into the offering documents.  RBSSI, a third-party underwriter, is hardly in the position to introduce misstatements into offering documents that the *Livent* inside director defendants were; at most, any failure of RBSSI's diligence would have left the offering documents no worse off.

the fact that they were initially graded as "EV3," that each of these loans "did not comply with underwriting guidelines"—a disputed issue of fact on which *FHFA* bears the burden of proof. FHFA also contends that the fact that these initial EV3 grades were revised following RBSSI's standard process (and the industry standard practice) of evaluating the exceptions and assessing compensating factors, obtaining missing documents, and considering the issuer's or originator's responses to specific exceptions, means that "[RBSSI] believed that Clayton could not be trusted to adequately grade loans," and/or that RBSSI aimed "to securitize as many loans as possible regardless of credit issues." FHFA Br. 81. Both are inferences impermissibly drawn in favor of the movant, FHFA, and against the non-movant, RBSSI. As discussed below, significant disputed issues of fact exist here, both as to whether any of these EV3 loans in fact failed to comply with underwriting guidelines, and as to RBSSI's reasonableness at the time it concluded that the loans could be re-graded and securitized. When inferences are properly drawn in favor of RBSSI and the record as a whole is considered—including, importantly, the fact that FHFA has not yet established the existence of any defects in these or any other loans—it is clear that summary judgment is inappropriate.

Indeed, as a factual matter, FHFA's basic contention—that RBSSI "blindly" relied on third-party vendors and delegated its responsibilities "wholesale"—is contradicted by the record. Although RBSSI did engage third-party vendors to assist in the diligence process—as every participant in the industry did during the relevant period, CMF ¶ 64 n.9 —the record manifests that RBSSI played an active role in monitoring and collaborating with its vendors. CMF ¶ 105 ("The RBS credit officer monitored the credit and compliance results continuously."); Farrell Decl. ¶ 11 (Mr. Farrell "was in frequent contact with Clayton employees, typically by telephone, discussing the types of exceptions the Clayton underwriters were identifying and informing the

Clayton Client Service Manager which loans [he] determined had sufficient compensating factors based on [his] professional judgment."); *id.* ¶ 18 ("[I]t appears that reviewing loans for this pool was an on-going process with Clayton" in which Mr. Farrell had likely "been in discussions with Clayton regarding [his] opinion on various types of exceptions they identified and the types of loans [he] would accept into the pool"). Specifically, RBSSI reviewed vendors' due diligence results and data reports on a daily basis, and requested and obtained information from the originators in order to resolve issues identified by its vendors. *See, e.g.*, CMF ¶ 90. In short, FHFA mischaracterizes the relationship between RBSSI and its vendors and ignores the substantial benefit to investors of obtaining an independent, review of the loans by a specialist reunderwriting vendor. CMF ¶ 64. (noting advantages of obtaining review from third-party experts in mortgage origination and underwriting whose compensation is based on the number of loans reviewed, not on the grades given). RBSSI's use of such specialist reunderwriting vendors made its due diligence *more* reasonable, not less.

### 2. Whether "Red Flags" Concerning Originators Should Have Impacted RBSSI's Diligence Presents Numerous Disputed Issues Of Fact

FHFA argues that RBSSI failed to conduct additional diligence on originators about which it had concerns, but does not even cite materials concerning these securitizations. Instead, it attempts to demonstrate the existence of "red flags" by piecing together snippets of emails concerning other transactions. FHFA quotes *WorldCom*, 346 F. Supp. 2d at 683, in which this Court agreed with the plaintiff that questions as to "the [underwriters'] failure to inquire into issues of particular prominence in [their] own internal evaluations," raised "issues of fact requir[ing] a jury trial." *Id.* So too here. As this Court also explained in *WorldCom*, "what constitutes a red flag depends on the facts and context of a particular case," and, like "the question of what a reasonably prudent man should have known," is "particularly suited to a jury

determination." *Id.* at 673-74; *see also id.* at 679 ("[W]hat constitutes an ordinary business event and what constitutes a red flag is an issue of fact. These are exquisitely fact intensive inquiries that depend on the circumstances surrounding a particular issuer and the alleged misstatement.").[51]   The jury must resolve whether RBSSI was on notice of "red flags" concerning any of the relevant originators, and if so, whether RBSSI's investigation, as to the affected securitization, in light of RBSSI's role, and all the other facts and circumstances of the particular transaction, was reasonable.

Indeed, the record is replete with evidence that, at a minimum, creates disputed issues of material fact concerning RBSSI's views of these originators, and precludes any finding of "red flags" as a matter of law. *First*, RBSSI reviewed Fremont loan pools on four separate occasions during the relevant period and found the loans to be of "acceptable quality" with exception rates to be "in line with other sub-prime lenders," CMF ¶ 31, and RBSSI's periodic counterparty reviews of Fremont indicated that Fremont loans were "representative of the industry." *Id.* ¶ 32. *Second*, as was true with Fremont, RBSSI concluded, in each of four contemporaneous reviews of Equifirst loans, that Equifirst's loans were "of average quality" and "eligible for a secondary market transaction." CMF ¶¶ 33-34. *Third*, RBSSI drew similar conclusions from its reviews of First NLC loans, which it found to be "average to above average" and suitable for purchase. CMF ¶35. *Finally*, while FHFA proffers evidence suggesting that RBSSI declined to purchase loans from People's Choice  in July 2005 and in March 2006 (FHFA SUF ¶ 883-84), this is not evidence of any concern by RBSSI regarding whether People's Choice generally originated loans in accordance with its guidelines.  FHFA adduces no such evidence, and the contrary inference FHFA seeks to draw from the fact that RBSSI decided, in two instances, not to purchase loans

---

[51] *Univ. Hill Found. v. Goldman, Sachs & Co.*, 422 F. Supp. 879 (S.D.N.Y. 1976), also cited by FHFA (FHFA Br. 82) was a ruling issued following a bench trial. *See id.* at 884.

from People's Choice, is improper on summary judgment.

### 3.    FHFA's Argument That RBSSI Concealed Information Concerning The "Final Values" Of Certain Properties Is Baseless

Plaintiff claims that RBSSI "knew the LTV ratios in the Prospectus Supplements were false yet failed to disclose the true 'final values,'" FHFA Br. 82, a meritless argument copied and pasted from its similarly flawed attack on Nomura's valuation diligence. As discussed in the Nomura Defendants' brief, a "final value" is a phrase used specifically by Nomura in its value reconciliation process (and opportunistically misconstrued by FHFA, *see* Nomura Br. Arg. § III.F). This term, however, is not used by RBSSI. There is absolutely no evidence in the record that RBSSI ever determined a "final value" for any property different from the purchase price or appraised value; FHFA simply asserts that RBSSI found six loans in NHELI 2007-1, and 14 loans in NHELI 2007-2, in which a "drive-by appraisal" commissioned by RBSSI "was less than the original appraisal value by more than 20%." FHFA Br. 47. FHFA does not offer evidence on this motion demonstrating the "true" value of any of these 20 properties, but nonetheless contends that the Court should resolve this disputed issue of fact in its favor, and make further inferences against RBSSI—that it "concluded" that drive-by appraisals, rather than the original appraisals, better represented the "actual appraised values" of properties, yet "concealed its true understanding." FHFA Br. 83. The record provides no support for this far-fetched argument.[52]

In any event, the offering documents disclosed to investors that the value denominator used to calculate the disclosed LTV ratios was the appraisal value or purchase price, not some

---

[52] FHFA cites *In re Software Toolworks, Inc.*, which found that "summary judgment . . . was *inappropriate*" where plaintiffs had offered evidence supporting a "reasonable inference" that a fraud had occurred and that "the Underwriters knew, or should have known, of this fraud." 50 F.3d 615, 626 (9th Cir. 1994). In *Livent*, as noted above, liability was proven before the inside directors' diligence defenses were taken away. 355 F. Supp. 2d at 736. FHFA's mischaracterizations of the record fail to raise even the sort of reasonable inference that RBSSI *actively concealed* information about the "true" value of securitized loans, but as *Software Toolworks* makes clear, this is grounds for proceeding to trial, not for granting summary judgment to the plaintiff.

supposed "final value" obtained through other means. The base prospectuses for the securitizations clearly explained that LTV ratios were based on "an appraisal obtained by the originator at origination of that loan," not some value assessed by the securitization's issuer or underwriters, and if values were found to be unsupported, loans were dropped, not included in securitizations subject to revised appraisal disclosures. CMF ¶ 146.[53] Thus, the issuer disclosed to investors that it was relying on the original appraisal and was justified in doing so absent some evidence that the appraisals were not believed by the appraisers at the time they were rendered. *See FHFA v. UBS Am., Inc.*, 858 F. Supp. 2d 306, 326, 328 (S.D.N.Y. 2012).

## II. FHFA'S ARGUMENT THAT THE SAME STANDARD APPLIES UNDER SECTION 12 AND THE BLUE SKY LAWS AS UNDER SECTION 11 FAILS

As this Court has already held, the standard applicable to the due diligence defenses under Section 12 and the blue sky laws is more lenient than the standard under Section 11.[54] FHFA, however, argues—in contravention of the plain language of the statute—that the analyses for the two standards typically are the same. FHFA Br. 83-84 & n.28. FHFA is incorrect. As this Court has recognized, it is well established that the Section 12 reasonable care defense is "less demanding than the duty of due diligence imposed under Section 11." *WorldCom*, 346 F. Supp. 2d at 663; *accord* Securities Offering Reform, Securities Act Release No. 8591, Exchange Act Release No. 52056, 2005 WL 1692642, at *79 (Aug. 3, 2005) ("SEC Rel. 52056").

FHFA relegates the bulk of its argument regarding the standards governing the Sections 11 and 12 due diligence defenses to a footnote. *See* FHFA Br. 84 n.28. According to FHFA, the

---

[53] The base prospectuses also disclosed that, for purchase money loans, *i.e.*, transactions where the borrower was buying a house rather than refinancing, the LTV ratio was based on the lower of the origination appraisal or "the sales price for that property." CMF ¶ 146. Therefore, in many cases, the disclosed LTV ratios would not be based on appraised values at all, and the appraised value, or any review of such appraisal by RBSSI, would be irrelevant.

[54] *See Bank of Am.*, 2012 WL 6592251, at *7 n.8 ("[T]he [ ] Virginia securities laws are generally interpreted in accordance with Section 12(a)(2).") (citations omitted).

standards governing Section 11 and Section 12 are only different when expertised portions of offering materials are at issue, a contention that stems from a distorted reading of Justice Powell's dissent from a denial of *certiorari* in *John Nuveen & Co. v. Sanders*, 450 U.S. 1005 (1981)—an opinion this Court referenced in *WorldCom* in finding that the Section 11 and 12 standards are *different. See WorldCom*, 346 F. Supp. 2d at 663. Justice Powell's opinion, joined by then-Justice Rehnquist, made clear that the standards of "reasonable care" and "reasonable investigation" are different in *all* contexts, in light of Congress's "use[] [of] different language" for the two sections. *John Nuveen*, 450 U.S. at 1008; s*ee also id.* at 1009 ("[I]t would be inconsistent with the statutory scheme to apply precisely the same standards . . . under Section 12[a](2) as the case law appropriately has applied to underwriters under Section 11.") (quotation omitted).[55]   Justice Powell's subsequent observations regarding expertised portions of offering materials merely acknowledged that holding defendants to the same standard under Sections 11 and 12 would be inequitable because Section 11 defendants can rely on expertised portions of offering materials whereas Section 12 defendants cannot. *Id.*[56]

---

[55] The SEC has subsequently confirmed that the standard of care under Section 12(a)(2) is less demanding than that prescribed by Section 11, or put another way, that Section 11 requires more diligent investigation than Section 12(a)(2). *See* SEC Rel. 52026, at *79.

[56] The other cases FHFA cites in support of its proposed reading of Section 12 are either inapposite or unpersuasive. *In re MetLife Demutualization Litig.*, 262 F.R.D. 217, 235 (E.D.N.Y. 2009), merely stated that "[a] defendant may show 'reasonable care' by introducing evidence that the allegedly fraudulent prospectus was the result of reasonable investigation," an assertion which is consistent with the idea that a defendant who satisfies the more strict reasonable investigation standard will also satisfy the reasonable care standard. *University Hill* did not even apply Section 11's due diligence defense at all, but instead discussed whether the defendant had made a misrepresentation under Section 12. 422 F. Supp. at 898, 900-01. *Franklin Savings Bank of N.Y. v. Levy*, 551 F.2d 521, 527 (2d Cir. 1977), simply recognized that "reasonable care" is the appropriate standard under Section 12, but it never compared "reasonable care" to the Section 11 standard or implied the two were the same. Finally, although *Software Toolworks*, 50 F.3d 615 and *Sanders v. John Nuveen & Co., Inc.*, 619 F.2d 1222 (7th Cir. 1980) can be read to suggest that the standards are similar, these cases are unpersuasive for the reasons set forth by Justice Powell in *John Nuveen* and, in any event, are not binding on this court.

71

## CONCLUSION

For all of the foregoing reasons, the Court should deny FHFA's motion for partial summary judgment on RBSSI's reasonable care and due diligence defenses.

Dated:  December 2, 2014
New York, New York

Respectfully submitted,

_____ /s/ Thomas C. Rice _____
Thomas C. Rice (trice@stblaw.com)
David J. Woll (dwoll@stblaw.com)
Andrew T. Frankel (afrankel@stblaw.com)
Alan Turner (aturner@stblaw.com)
Craig S. Waldman (cwaldman@stblaw.com)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Attorneys for Defendant RBS Securities Inc.*

72