UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

    Plaintiff,

    -against-

NOMURA HOLDING AMERICA, INC.;
NOMURA ASSET ACCEPTANCE
CORPORATION; NOMURA HOME
EQUITY LOAN, INC.; NOMURA CREDIT
& CAPITAL, INC.; NOMURA SECURITIES
INTERNATIONAL, INC.; RBS
SECURITIES INC. (f/k/a GREENWICH
CAPITAL MARKETS, INC.); DAVID
FINDLAY; JOHN MCCARTHY; JOHN P.
GRAHAM; NATHAN GORIN; and DANTE
LAROCCA,

    Defendants.

No. 11 Civ. 6201 (DLC)

---

**PLAINTIFF'S PROPOSED FINDINGS OF FACT**

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................1

II.    THE PARTIES.............................................................................................................4

    A.    FHFA And The GSEs ....................................................................................4

    B.    Defendants .....................................................................................................4

        1.    Nomura Holding America Inc. ("Nomura Holding") ...................................4

        2.    Nomura Credit & Capital, Inc. ("NCCI")....................................................5

        3.    Nomura Asset Acceptance Corporation ("NAAC") ....................................6

        4.    Nomura Home Equity Loan, Inc. ("NHELI") .............................................7

        5.    Nomura Securities .........................................................................................8

        6.    RBS Securities, Inc. ("RBSSI")...................................................................8

        7.    The Individual Defendants............................................................................9

III.    BACKGROUND ........................................................................................................10

    A.    Residential Mortgage-Backed Securities ...................................................10

        1.    Overview Of RMBS ...................................................................................10

        2.    Credit Enhancement...................................................................................14

        3.    Credit Ratings ............................................................................................16

        4.    Marketing Of The Securities......................................................................20

    B.    The Certificates At Issue ............................................................................22

        1.    The NAA 2005-AR6 Certificate................................................................22

        2.    The NHELI 2006-FM1 Certificate ............................................................23

        3.    The NHELI 2006-FM2 Certificate ............................................................24

        4.    The NHELI 2006-HE3 Certificate.............................................................25

        5.    The NHELI 2007-1 Certificate ..................................................................26

        6.    The NHELI 2007-2 Certificate ..................................................................26

7. The NHELI 2007-3 Certificate ...................................................27

C. The Statements At Issue...................................................................28

1. Statements That The Loans Were Originated Or Acquired Generally In Accordance With Applicable Underwriting Guidelines ...........................................................................28

2. Statements Regarding LTV Ratios ........................................31

3. Statements Regarding Owner Occupancy ..............................33

4. Statements Regarding Credit Ratings ....................................33

IV. THE REPRESENTATIONS WERE FALSE ..................................................34

A. The Analyses Of FHFA's Experts Show That Large Percentages Of The SLG Loans Were Not Underwritten To Guidelines Or Had Inflated, Non-Credible Appraisals..........................................................................34

1. FHFA's Expert, Dr. Charles Cowan, Selected A Statistically Valid, Representative Sample From Each SLG That Allows The Findings Of FHFA's Appraisal And Reunderwriting Experts To Be Extrapolated To The SLGs As A Whole .........................................34

(a) Principles Of Statistical Sampling ................................35

(b) Dr. Cowan's Sample Design Was Sound And Reliable ...............36

2. The Re-Underwriting Review Conducted By FHFA's Re-Underwriting Expert, Robert Hunter, Shows That The Vast Majority Of The Sample Loans For Each Securitization Did Not Adhere To The Representations In The Prospectus Supplements...........41

(a) Overview..............................................................41

(b) Mr. Hunter Is Qualified In The Re-Underwriting Field And His Methodology Is Reliable .........................................42

(c) Mr. Hunter's Methodology For The Re-Underwriting Review Was Thorough And Reliable ...........................................42

(1) The Credit Review .........................................43

a. Underwriting Guidelines....................................43

b. Minimum Industry Standards ..............................44

(2) The Appraisal Review........................................46

ii

(3)    The Owner Occupancy Review ........................................47

(4)    The Compliance Review......................................................48

(5)    The Pre-Closing Loan Tape Review..................................48

(6)    Mr. Hunter's Use of Post Closing Documents Was
Appropriate And Reliable ................................................49

(7)    Mr. Hunter's Ultimate Loan Level Opinion ....................49

(d)    The Vast Majority Of The Sample Loans Were Not
Originated In Accordance With Applicable Guidelines Or
Minimum Standards Of Underwriting .........................................50

(1)    Over Fifteen Percent Of Sample Loans Had
Excessive DTI Ratios......................................................52

(2)    Almost One-Third Of The Stated Income Or No
Income Sample Loans Had Unreasonable Stated
Incomes ..........................................................................54

(3)    One Quarter Of The Sample Loans Lacked
Required Credit Information.............................................57

(4)    Over Ten Percent Of The Sample Loans Failed To
Satisfy Requirements To Investigate Red Flags ...............60

(5)    More Than Half Of The Sample Loans Failed To
Satisfy Requirement To Investigate Unexplained
Credit Inquiries ..............................................................62

(6)    One-Fifth Of The Sample Loans Had Excessive
LTV Or CLTV Ratios That Exceeded The
Maximum........................................................................64

(7)    Over Five Percent Of Sample Loans Were Not
Originated In Compliance With Federal And State
Laws...............................................................................66

(e)    The Occupancy Status Of A Material Percentage Of
Sample Loans Was Misrepresented In The Prospectus
Supplements.................................................................................68

(f)    Almost Half Of Sample Loans Had Inaccurate Credit
Characteristics Reflected On The Pre-Closing Loan Tapes ..........69

(g)    Incremental Effect Of Each Category Of Defect ..........................71

iii

3.     The Analysis Of FHFA's Expert, Dr. Kilpatrick, Shows That Large Numbers Of Sample Loans Had Appraisal Defects ...............................74

     (a)     The Original Appraisals For Nearly One-Third Of The Sample Loans Were Inflated......................................................74

          (1)     Appraisals And LTV Ratios..................................74

          (2)     Dr. Kilpatrick's Methods Of Evaluating The Accuracy Of The Appraisals Of The Samples Loans Were Sound......................................................76

               a.     The Use Of AVMs Is A Credible Method Of Reviewing A Large Number Of Appraisals...........76

               b.     The Greenfield AVM Is A Credible Method For Valuing The Nomura Sample Properties.........77

               c.     The Greenfield AVM Was Validated and Is Reliable ................................................79

          (3)     The Greenfield AVM Revealed That The Sample Loans' Appraised Values Were Inflated By An Average of 8.92% ............................................80

          (4)     Dr. Kilpatrick's Results Revealed Appraisal Inflation At or Above 95% Statistical Confidence ...........84

     (b)     The Inflated Loans Were Almost Uniformly Not "Credible" ..........................................................86

          (1)     USPAP Sets Professional Standards For The Credibility Of Appraisals...................................86

          (2)     Dr. Kilpatrick's Credibility Assessment Model Is Based On USPAP And Is Reliable ...................87

          (3)     92.20% of Inflated Appraisals Were Non-Credible...........90

          (4)     Dr. Kilpatrick's Findings Are Bolstered by Evidence That Appraisers Used Sales Amounts for Subject Properties as Predetermined Values for Establishing the Appraisal Value......................................93

          (5)     Dr. Kilpatrick's Findings Are Bolstered by Evidence That Appraisers Believe They Were Pressured To Inflate Appraisals During the Relevant Time Period........................................................94

4.      Dr. Cowan's Statistical Extrapolations Show That Substantial
        Portions Of The SLG Loans Had Underwriting Defects And
        Inflated, Non-Credible Appraisals ............................................................95

        (a)     Dr. Cowan's Extrapolation Of Mr. Hunter's Results Shows
                That Nearly 70% Of the SLG Loans Were Not
                Underwritten To Applicable Guidelines Or Criteria ....................95

        (b)     Dr. Cowan's Extrapolation Of Dr. Kilpatrick's Results
                Shows That Approximately 30% Of The SLG Loans Had
                Appraisal That Were Inflated And Not Credible..........................96

                (1)     Extrapolated To The SLGs, Appraisals Were
                        Inflated By An Average 11.1% And Significant
                        Numbers Of LTV Ratios Exceeded 80% And 100%.........96

        (c)     Dr. Cowan's Extrapolations Show That Each SLG
                Contained Large Numbers Of Loans That Breached The
                Representations ..........................................................................105

B.      Evidence Available To Or Known By Nomura And RBSSI Also
        Demonstrates That The Representations In The Offering Documents
        Concerning The Mortgage Loans And The Pool Characteristics Were
        False ...................................................................................................................109

        1.      Overview Of Nomura's And RBSSI's Securitization And
                Diligence Processes ...................................................................111

                (a)     Nomura's RMBS Business Groups ..............................111

                (b)     Nomura's Acquisition Diligence ..................................111

                        (1)     Credit And Compliance Diligence...................112

                        (2)     Valuation Diligence .......................................116

                (c)     RBSSI's RMBS Business Groups ................................121

                (d)     RBSSI's Securitization Diligence.................................122

        2.      Nomura's And RBSSI's Diligence Shows That Each Of The SLGs
                Contained Defective Loans.........................................................123

                (a)     The NAA 2005-AR6 SLG ..............................................123

                (b)     The NHELI 2006-FM1 SLG..........................................127

                (c)     The NHELI 2006-HE3 SLG ..........................................130

        (d)     The NHELI 2006-FM2 SLG ........................................................135

        (e)     The NHELI 2007-1 SLG ...........................................................140

        (f)     The NHELI 2007-2 SLG ...........................................................146

        (g)     The NHELI 2007-3 SLG ...........................................................153

V.     THE FALSE REPRESENTATIONS WERE MATERIAL ............................................156

     A.     Compliance With Underwriting Guidelines, LTV Ratios, And Owner Occupancy Status Were Material To Investors In Assessing Credit Risk Of Mortgage Loans And RMBS ......................................................................158

        1.     Whether Mortgage Loans Were Underwritten In Compliance With Underwriting Guidelines Was Important To Investors............................158

           (a)     Nomura Evaluated Compliance With Underwriting Guidelines In Purchasing The Mortgage Loans..........................159

           (b)     Representations That Loans Were Originated In Accordance With Applicable Underwriting Guidelines Were An Important Part Of RMBS Transactions .......................160

           (c)     Credit Rating Agencies Required Loans To Meet Applicable Underwriting Guidelines When Rating RMBS Transactions ...................................................................163

        2.     LTV Ratios Were Important To Investors ................................................164

           (a)     Nomura Considered LTV Ratios Important In Assessing The Credit Risk Of A Loan..........................................................164

           (b)     Representations Concerning LTV And CLTV Ratios, Including Those Addressing 80% And 100% Thresholds, Were An Important Part Of RMBS Transactions .......................166

           (c)     Credit Rating Agencies Considered LTV Ratios Important When Rating RMBS Transactions.................................169

        3.     The Occupancy Status Of A Property Was Important To Investors........170

           (a)     Nomura Considered Occupancy Status To Be An Important Factor In Evaluating Credit Risk .................................171

           (b)     Representations Concerning Owner-Occupancy Status Were An Important Part Of RMBS Transactions .......................172

       (c)     Rating Agencies Considered Owner-Occupancy Status To Be Important When Rating RMBS Transactions........................173

B.    The Number Of SLG Loans That Did Not Adhere To The Representations In The Prospectus Supplements Was Material To Investors In Assessing The Credit Risk Of The Certificates ....................................................174

C.    Credit Ratings Were Material To Investors .......................................176

    1.    Higher Credit Ratings Enhance Salability And Market Liquidity...........177

    2.    Nomura Recognized The Importance Of Higher Credit Ratings To RMBS Investors.....................................................................177

    3.    Nomura And RBSSI Worked With Credit Rating Agencies To Obtain Desired Credit Ratings For The Securities They Issued And Sold ..............................................................................178

    4.    The False Representations Regarding Compliance With Underwriting Guidelines, LTV Ratios, And Owner Occupancy Status Were Material To The Credit Ratings And Subordination Levels Of The Certificates .....................................................179

        (a)     Credit Ratings Based On Inaccurate Information May Not Accurately Reflect The Risk Of RMBS......................179

        (b)     Certificates Rated Based On True And Correct Data Regarding LTV Ratios And Owner Occupancy Status Would Not Have Received AAA Credit Ratings Without Additional Subordination............................................181

D.    Had The False Representations Regarding Compliance With Underwriting Guidelines, LTV Ratios, and Occupancy Status Not Been Corrected, The Certificates Could Not Have Been Issued Without Substantial Modifications ...................................................................................183

VI.   NOMURA HOLDING, NCCI, AND THE INDIVIDUAL DEFENDANTS DIRECTED THE AFFAIRS OF NOMURA SECURITIES, NAAC, AND NHELI ......185

    A.    Nomura Holding Directed The Affairs Of Nomura Securities, NAAC, And NHELI....................................................................................185

      1.    Nomura Holding And Nomura Securities Had Overlapping Directors and Officers...........................................................185

      2.    Nomura Holding Directed The RMBS Activities Of Nomura Securities....................................................................186

|   |   | (a) | Nomura Holding Decided From Which Originators Nomura Securities And NCCI Could Purchase Mortgage Loans | 187 |
|---|---|---|---|---|
|   |   | (b) | Nomura Holding Directed Which Originators Received Warehouse Lending Facilities | 191 |
|   |   | (c) | Nomura Holding Directed NCCI's And Nomura Securities' RMBS Position Limits | 191 |
|   |   | (d) | Nomura Holding Could Audit Nomura Securities And NCCI | 193 |
|   |   | (e) | Nomura Holding Directed The Back-Office Functions Of Nomura Securities And NCCI | 194 |
|   |   | (f) | Nomura Holding Directed Nomura Securities And NCCI's Public Relations Regarding The RMBS Business | 194 |
|   | 3. | | Nomura Holding Directed Or Caused The Direction Of The Management Of NAAC And NHELI | 195 |
| B. | | | NCCI Directed Or Caused The Direction Of The Management And Policies Of Nomura Securities, NAAC, And NHELI | 196 |
|   | 1. | | NCCI And Nomura Securities Had Overlapping Directors And Officers | 196 |
|   | 2. | | NCCI Directed The RMBS Activities Of Nomura Securities | 197 |
|   | 3. | | NCCI Directed The Management And Policies Of NAAC and NHELI | 197 |
| C. | | | The Individual Defendants Directed The Affairs Of Nomura Securities, NAAC, And NHELI | 198 |
|   | 1. | | Dante LaRocca | 198 |
|   |   | (a) | Mr. LaRocca Was Involved In Assessing Which Originators Nomura Would Purchase Loans From | 199 |
|   |   | (b) | Mr. LaRocca Oversaw The Diligence Group And Was Actively Involved In The Diligence That Nomura Performed On Mortgage Loans | 199 |
|   |   | (c) | Mr. LaRocca Reviewed And Edited The Prospectus Supplements And Other Offering Materials | 200 |

(d) Mr. LaRocca Was Involved With Post-Closing Issues Related To The Securitizations ....................................................200

(e) Mr. LaRocca Signed Registration Statements 333-126435 And 333-132109 And The Amendments Thereto ......................201

2. David Findlay ...........................................................................................201

(a) Mr. Findlay Was Involved In Setting Up Nomura's Diligence Process ........................................................................202

(b) Mr. Findlay Sat On Nomura's Risk And Credit Committee .......202

(c) Mr. Findlay Became Aware Of Problems In Nomura's RMBS Business Through A November 2006 Wall Street Journal Article ..............................................................................202

(d) Mr. Findlay Signed Each Of The Registration Statements And The Amendments Thereto ....................................................203

3. John Graham ...........................................................................................203

(a) Mr. Graham Was Responsible For Overseeing The "Papering" Of The Securitizations.................................................204

(b) Mr. Graham Oversaw The Diligence Group................................204

(c) Mr. Graham Had Additional RMBS Responsibilities, Including Interacting With Credit Ratings Agencies And Handling Repurchases ................................................................205

(d) Mr. Graham Signed Registration Statement 333-126812 And The Amendment Thereto ....................................................205

4. Nathan Gorin ...........................................................................................205

5. John McCarthy ........................................................................................206

VII.   FHFA'S RECOVERIES UNDER SECTION 12 AND THE BLUE SKY
       STATUTES ARE OVER $1 BILLION, AND DEFENDANTS HAVE FAILED
       TO DEMONSTRATE THAT ANY OF THIS AMOUNT IS ATTRIBUTABLE
       TO FACTORS OTHER THAN THE MISREPRESENTATIONS AT ISSUE IN
       THIS ACTION.................................................................................................207

       A.    Depending On The Date of Tender and Interest Rate Applied, FHFA's
             Recovery Upon Tender of the Certificates Ranges From $808,202,687 to
             $1,053,411,920..................................................................................207

       B.    Defendants Do Not Show That The GSEs' Losses Were Caused By
             Factors Other Than The Misrepresentations.........................................212

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and, together with Fannie Mae, the "GSEs")  brought this action ("Action") against Defendants Nomura Holding America, Inc. ("Nomura Holding"), Nomura Asset Acceptance Corporation ("NAAC"), Nomura Home Equity Loan, Inc. ("NHELI"), Nomura Credit & Capital, Inc. ("NCCI"), Nomura Securities International, Inc. ("Nomura Securities") (collectively, "Nomura" or the "Nomura Defendants"), RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.) ("RBSSI"), David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and Dante LaRocca (collectively, the "Individual Defendants") (together with Nomura and RBSSI, the "Defendants," and, all together with FHFA, the "Parties").   Pursuant to the Court's January 21, 2015 Stipulation and Pretrial Scheduling Order, Dkt. 1119, and Section 5(A) of the Court's Individual Practices, FHFA submits its Proposed Findings Of Fact.

# I.    INTRODUCTION

1.    As set forth in the following Proposed Findings of Fact and simultaneously-filed Conclusions Of Law, Defendants violated Section 12(a)(2) and Section 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77*l*(a)(2); 15 U.S.C. § 77*o*, and similar provisions of the D.C. and Virginia Blue Sky laws, D.C. Code § 31.5606.05(a)(1)(B); D.C. Code § 31.5606.05(c); Va. Code § 13.1–522(A)(ii) (the "Blue Sky Laws") in connection with the sales of residential mortgage-backed securities ("RMBS") that the GSEs purchased between 2005 and 2007.

2.    This Action concerns seven RMBS created by Nomura (the "Securitizations"), in each of which one of the GSEs bought a certificate (a "Certificate") that was backed by a pool of loans known as a supporting loan group ("SLG").  The Certificates entitled the GSEs to a stream of income and principal payments, derived from hundreds or thousands of homeowners' payments on the mortgage loans underlying the Certificates (the "Mortgage Loans").  The Certificates' values largely depended on the ability and willingness of mortgagors to repay the Mortgage Loans' principal and interest, and the adequacy of the collateral securing those loans in the event of default.

3.      The offering documents for the Securitizations (the "Offering Documents"), including the prospectus ("Prospectus") and prospectus supplement ("Prospectus Supplement") for each deal, made representations to investors about the Mortgage Loans.  Among other things, the Prospectus Supplements stated that the Mortgage Loans were generally originated in accordance with underwriting guidelines designed to ensure that borrowers were able and willing to repay their loans.  The Prospectus Supplements also provided precise descriptions of the loan-to-value ("LTV") ratios of the Mortgage Loans backing the Certificates, and the percentage of properties occupied by their owners.  The Prospectus Supplements further represented that each Certificate would be offered *only* if it received a AAA rating that was based on an assessment of the Mortgage Loans made by the credit ratings agencies Moody's Investors Service ("Moody's") and Standard and Poor's ("S&P").

4.      Those statements were materially false and misleading.

5.      The Mortgage Loans were not generally underwritten according to guidelines— over two-thirds of them had underwriting defects arising from the failure by the originators of those loans (the "Originators") to follow their stated origination processes or violation of substantive guideline requirements.  The LTV ratios of the loans were not as represented—over a third of them were based on appraisals that were both patently inaccurate and not believed by the appraisers who made them.  As a result, numerous loans with LTV ratios reported as being below the key threshold of 80% were actually over that level, and many loans had LTV ratios over 100%, meaning that the borrower had no equity in the property at all.  The occupancy representations were also false—numerous loans for properties represented as being owner-occupied, and thus with a lower credit risk than loans for investment properties or second homes, were backed by properties that were not occupied by their owners.   Defendants provided false data about the Mortgage Loans to the ratings agencies, which then issued AAA ratings for the Certificates that they would not have issued had Defendants provided accurate information.

6.      The falsity of Defendants' representations has been proved by overwhelming evidence.  FHFA's experts drew a representative sample of loans from each SLG (the "Sample

2

Loans"), reviewed those Sample Loans for underwriting defects and for false and non-credible valuations, and then extrapolated those results to the SLGs as a whole.  They found that the SLGs were laced with underwriting and valuation defects, rendering the SLGs wholly different than as represented to the investing public.  Their work was done using sound and well-established principles of sampling, underwriting, and valuation analysis, and Defendants' experts offer no credible rebuttal to FHFA's experts' findings.  Moreover, evidence obtained by Nomura and RBSSI during their diligence reviews of the Mortgage Loans, which this Court has already found were unreasonable as a matter of law, *FHFA v. Nomura Holding Am. Inc.* ("Diligence MSJ Op."), 2014 WL 7232443, at *1 (S.D.N.Y. Dec. 18, 2014), uncovered strong evidence that specific loans in the SLGs were defective, yet Defendants securitized those loans and other loans drawn from the same pools anyway.

7.     The true nature of the Mortgage Loans would have been material to any reasonable investor in asset-backed securities like the Certificates.  As the Securities Exchange Commission (the "SEC") has cautioned, "if the actual pool backing the investor's securities differs materially from that offered and described to the investor in the prospectus (and hence was to reflect the basis for the investor's investment decision), the investor is entitled to disclosure of the actual asset pool that the investor is primarily dependent on for repayment."  Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905,  84 SEC Docket 1624 (Dec. 22, 2004).  Here, undisputed evidence demonstrates that each of the false and misleading statements in the Prospectus Supplements related directly to the credit characteristics of the Mortgage Loans that investors were "primarily dependent on for repayment," and that the information conveyed was universally used by investors to evaluate RMBS for purchase.

8.     Because FHFA has made the showing necessary to establish Defendants' liability under Section 12(a)(2) and Section 15 of the 1933 Securities Act and the comparable provisions of the Virginia and D.C. Blue Sky laws, and because Defendants can prove no affirmative defense thereto, judgment for FHFA shall be entered.

## II.     THE PARTIES

### A.     FHFA And The GSEs

9.       The Federal Housing Finance Agency is a federal agency based in Washington, D.C.  FHFA was created on July 30, 2008 pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 4617), to oversee the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac")  and the Federal Home Loan Banks.  Parties' Stipulations Of Fact ("SOF") ¶ 54.

10.      On September 6, 2008, under HERA, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorship and appointed FHFA as conservator.  SOF ¶ 55.  In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs, including but not limited to, the authority to bring suits on behalf of and/or for the benefit of Fannie Mae and Freddie Mac.  12 U.S.C. § 4617(b)(12).

11.      Fannie Mae is based, and has its principal place of business, in Washington, D.C., which is where Fannie Mae's PLS traders worked in 2005.  Long Direct ¶¶ 3-4.  Freddie Mac is based, and has its principal place of business, in McLean, Virginia, which is where Freddie Mac's PLS traders worked between 2005 and 2007.  Johansen Direct ¶ 3.

### B.     Defendants

#### 1.     Nomura Holding America Inc. ("Nomura Holding")

12.      Nomura Holding America Inc. ("Nomura Holding") is a Delaware corporation, *FHFA v. Nomura Holding Am. Inc. et al.*, Nomura Defendants' Answer and Defenses to Plaintiff's Amended Complaint ("Nomura Answer"), Dkt. No. 201, ¶ 14, with its principal place of business in New York, New York.  Prahofer 30(b)(6) Dep. 243:14-243:24.

13.      Nomura Holding's wholly owned subsidiaries include Defendants Nomura Credit & Capital, Inc. ("Nomura Credit" or "NCCI"), Nomura Asset Acceptance Corporation ("NAAC"), Nomura Home Equity Loan, Inc. ("NHELI"), and Nomura Securities International, Inc. ("Nomura Securities").  Nomura Answer ¶ 14; Prahofer 30(b)(6) Dep. 208:19-25.  Nomura Holding was a

holding company that held the stock of its operating subsidiaries,  Prahofer 30(b)(6) Dep. 209:22-210:12, and earned its revenues from those companies, including NCCI and Nomura Securities. Prahofer 30(b)(6) Dep. 211:7-12, 216:10-22.

14.     From 2005 through 2007, Nomura Holding's Board of Directors included Individual Defendant David Findlay, Hiroshi Toda, Noriaki Nagai, Hideyuki Takahashi, Shigesuki Kashiwagi, and Joseph Schmuckler.  **PX 182** at 2; Prahofer 30(b)(6) Dep. 255:4-12.

### 2.    Nomura Credit & Capital, Inc. ("NCCI")

15.     Defendant Nomura Credit & Capital, Inc. ("Nomura Credit" or "NCCI") is a Delaware corporation, Nomura Answer ¶ 15, with its principal place of business in New York, New York.  Nomura Answer ¶ 15; Prahofer 30(b)(6) Dep. 243:14-243:24.  NCCI was created by Nomura Holding.  *Id.* at 255:20-256:7, 220:18-20, 258:10-16, and is a wholly owned subsidiary of Nomura Holding, Nomura Answer ¶ 15; Prahofer Dep. 30(b)(6) 207:19-24.

16.     NCCI was the sponsor of each of the Securitizations.  SOF ¶ 8; **PX O0059** at 6; **PX O0049** at 6; **PX O0045** at 6; **PX O0041** at 152; **PX O0072** at 1; **PX O0080** at 1; **PX O0051** at 1. As sponsor, NCCI purchased the mortgage loans backing the Securitizations from originators and held those loans on its books, Prahofer 30(b)(6) Dep. 249:9-17, 256:17-257:7, then sold the loans backing the Securitizations to the depositor, NAAC or NHELI.  SOF ¶ 16.  As sponsor, NCCI also responded to demands to repurchase defective loans out of securitization trusts and made demands to originators for the repurchase of defective loans.  Prahofer 30(b)(6) Dep. 269:15-19.

17.     NCCI's directors were appointed by Nomura Holding.  SOF ¶ 31.  From 2005 through 2007, NCCI's directors included Individual Defendant Dante LaRocca and Sam Herbstman.  **PX 182** at 2.  NCCI's directors elected its officers.  SOF ¶ 30.  All of NCCI's officers were also officers of Nomura Securities and employees of Nomura Securities.  Prahofer 30(b)(6) Dep. 222:14-223:10, 257:24-258:9.

18.     NCCI had no employees until October 2006.  SOF ¶ 22.  After October 2006, some former employees of Nomura Securities became employees of NCCI.  Prahofer 30(b)(6) Dep.

230:13-25.  There was no substantive change in any person's responsibilities when his or her employment switched from Nomura Securities to NCCI.  *Id.* at 230:13-25.

### 3.     Nomura Asset Acceptance Corporation ("NAAC")

19.     Defendant NAAC is a Delaware corporation, Nomura Answer ¶ 16; with its principal place of business in New York, New York.  Prahofer 30(b)(6) Dep. 243:14-244:7. NAAC was an indirect wholly owned subsidiary of Nomura Holding and an affiliate of Nomura Securities and NCCI during the 2005 to 2007 period.  SOF ¶ 9.  Until October 2006, NAAC was directly owned by Nomura Asset Capital Corporation ("NACC"); after that it was directly owned by Nomura American Mortgage Finance ("NAMF").  Prahofer 30(b)(6) Dep. 246:9-19.

20.     NAAC was a bankruptcy-remote, special purpose entity.  It was created by NACC to act as a depositor for mortgage-backed securities, *Id.* at 216:23-217:16, 218:11-21, 219:4-6, and had no business operations other than issuing mortgage-backed securities.  McCarthy Dep. 60:14-61:3.

21.     NAAC was the depositor for one Nomura Securitization: NAA 2005-AR6.  Nomura Answer ¶ 16; **PX O0059** at 1.  As depositor, NAAC purchased the Mortgage Loans backing NAA 2005-AR6 from NCCI, Prahofer 30(b)(6) Dep. 249:4-8, and then sold certificates in NAA 2005-AR6 to the underwriter, who in turn sold those certificates to investors, including by selling the NAA 2005-AR6 Certificates to Fannie Mae.  Prahofer 30(b)(6) Dep. 259:20-260:13; LaRocca Dep. 48:8-14.  As depositor, NAAC was also responsible for registering the Certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934.  **PX O0035**  at 1;  **PX O0036** at 1.

22.     NAAC's Directors were elected by its owner, which until October 2006 was NACC and thereafter was NAMF.  Prahofer 30(b)(6) Dep. 295:10-22.  Throughout 2005 to 2007, the members of NAAC's Board of Directors included Individual Defendants David Findlay and John McCarthy.  Prahofer 30(b)(6) Dep. 253:10-25.  There is no evidence that a meeting of NAAC's Board of Directors ever occurred.  McCarthy Dep. 66:4-16; *id.* at 160:6-14.

23.     NAAC's officers were elected by its Board of Directors.  SOF ¶ 26.  NAAC's officers during the 2005 to 2007 time period included Individual Defendant John Graham, Nathan Gorin, Juliet Buck, and Sam Herbtsman.  Prahofer 30(b)(6) Dep. 224:23-225:8.  NAAC did not have any employees during the 2005-2007 period.  SOF ¶ 18.

### 4.     Nomura Home Equity Loan, Inc. ("NHELI")

24.     Defendant Nomura Home Equity Loan, Inc. ("NHELI") is a Delaware corporation, Nomura Answer ¶ 17, with its principal place of business in New York, New York.  Prahofer 30(b)(6) Dep. 243:14-244:10.  NHELI was an indirect wholly owned subsidiary of Nomura Holding.  SOF ¶ 10.

25.     NHELI was a bankruptcy-remote, special purpose entity created by NACC to act as a depositor for RMBS securities.  Prahofer 30(b)(6) Dep. 216:23-217:16, 218:11-21; 228:18-229:4, It had no business operations other than issuing mortgage-backed securities.  McCarthy Dep. 60:14-61:3.

26.     NHELI was the depositor for six Securitizations: NHELI 2006-FM1, NHELI 2006-FM2, NHELI-2006-HE3, NHELI 2007-1, NHELI 2007-2, and NHELI 2007-3.  SOF ¶ 7.  As depositor, NHELI was responsible for registering the Certificates with the SEC and preparing and filing reports required under the Securities Exchange Act of 1934.  **PX O0033** at 1; **PX O0034** at 1.

27.     NHELI's Directors were elected by its owner, which until October 2006 was NACC and thereafter was NAMF.  Prahofer 30(b)(6) Dep. 295:10-22. Throughout 2005 to 2007, NHELI had the same Directors as NAAC.  *Id.* at 253:10-25.  There is no evidence that NHELI's Board of Directors ever met.  McCarthy Dep. 66:4-16; *id.* 160:6-14.

28.     NHELI had largely the same officers as NAAC: Individual Defendant Dante LaRocca, Individual Defendant Nathan Gorin, Juliet Buck, and Sam Herbtsman.  Prahofer 30(b)(6) Dep. 228:8-17.  NHELI's officers were elected by its Board of Directors.  *Id.* at 295:18-22. NHELI had no employees during the 2005-2007 period.  SOF ¶ 19.

### 5.    Nomura Securities

29.    Defendant Nomura Securities is a New York corporation, Nomura Answer ¶ 18, with its principal place of business in New York, New York.  Nomura Answer ¶ 18.  Nomura Securities was a wholly owned subsidiary of Nomura Holding and an affiliate of NAAC and NHELI. During the 2005-2007 period.  SOF ¶ 11.

30.    Nomura Securities is registered with the SEC as a broker-dealer, Nomura Answer ¶ 18, and was the lead or co-lead underwriter for three Securitizations: NAA 2005-AR6, NHELI 2006-FM1, and NHELI 2006-HE3.  Nomura Answer ¶¶ 18, 56.  As underwriter, Nomura Securities was responsible for marketing the Securitizations, including sending out the Offering Materials, such as the term sheets, free writing prospectuses, and Prospectus Supplements, as well as receiving indications of interest from potential investors.  Prahofer 30(b)(6) Dep. 259:20-260:13, 269:7-12.  As underwriter, Nomura Securities also purchased the Certificates from the depositor (either NAAC or NHELI) and sold them to investors, including Fannie Mae and Freddie Mac.  Prahofer 30(b)(6) Dep. 259:20-260:13; LaRocca Dep. 48:8-14.

31.    From 2005 through 2007, the Directors of Nomura Securities included Individual Defendant David Findlay.  **PX 182** at 2; Prahofer 30(b)(6) Dep. 254:2-6.  Nomura Securities' officers were elected by its Board of Directors.  SOF ¶ 28.  Prior to October 2006, Nomura Securities employed the majority of individuals with a role in Nomura's RMBS business.  Prahofer 30(b)(6) Dep. 229:13-22.  Before that date, Nomura Securities employees included, among others, John Graham, Dante LaRocca, Sam Herbstman, Nathan Gorin, Jeanne Leschak, and collateral analysts.  *Id.* at 223:13-24, 226:8-23, 226:8-25, 270:25-271:3, 271:4-7.

### 6.    RBS Securities, Inc. ("RBSSI")

32.    Defendant RBS Securities Inc. ("RBSSI") is a Delaware corporation, with its principal place of business in Stamford, Connecticut.  SOF ¶ 56.  Before April 2009, RBSSI was known as Greenwich Capital Markets, Inc. ("Greenwich").  SOF ¶ 57.

33.    RBSSI is registered with the SEC as a broker-dealer, SOF ¶ 56, and, operating as Greenwich at the time of the Securitizations, was the lead underwriter for (a) NHELI 2006-FM2,

**PX O0045** at 1; (b) NHELI 2007-1, **PX O0072** at 1; and (c) NHELI 2007-2, **PX O0080** at 1.
Along with Nomura Securities, RBSSI was the co-lead underwriter for NHELI 2006-HE3.  **PX
O0041** at 1.

**7.     The Individual Defendants**

34.     N. Dante LaRocca resides in ████████████.  LaRocca Dep. 11:18-
22.  From 2005 through 2007, Mr. LaRocca was a Managing Director at Nomura Securities, a
Managing Director and Director of NCCI, and the President and Chief Executive Officer ("CEO")
of NHELI.  *Id.* at 36:25-37:10; Prahofer 30(b)(6) Dep. 228:2-17;  **PX 182** at 2.  Functionally, Mr.
LaRocca was head of Nomura's Real Estate Finance Group.  Graham Dep. 22:3-13.  Mr. LaRocca
signed Registration Statements 333-126435 and 333-132109, and the amendments thereto
(together with 333-126812, the "Registration Statements" in this Action).  SOF ¶ 42.

35.     David Findlay resides in ████████████.  Findlay Dep. 11:12-15.  From
2005 through 2007, Mr. Findlay was a Director and the Chief Legal Officer ("CLO") of both
Nomura Holding and Nomura Securities, a Director of NAAC and NHELI, and the CLO of
NCCI.  Findlay Dep. 23:20:-24:4, 25:21-26:23; Prahofer 30(b)(6) Dep. 241:5-9; 252:22-253:19;
Findlay Dep. 83:24-84:4.  Mr. Findlay signed each of the Registration Statements and the
amendments thereto.  SOF ¶ 42.

36.     John P. Graham resides in ████████████.  Graham Dep. 11:13-18.  During
the 2005 to 2007 time period, Mr. Graham was a Managing Director at Nomura Securities, a
Managing Director at NCCI, and the President and CEO of NAAC.  Graham Tr. 20:2-12, 21:9-22,
25:20-26:5, 25:20-26:5; Prahofer 30(b)(6) Dep. 224:21-225:8.  Mr. Graham's functional role was
the Head of Residential Mortgage Finance for Nomura's RMBS business.  Graham Dep. 40:19-
41:10, 142:11-22.  Mr. Graham signed Registration Statement 333-126812 and the amendment
thereto.  SOF ¶ 42.

37.     Nathan Gorin resides in ████████████.  Gorin Dep. 10:18-22.  From 2005 to
2007, Mr. Gorin served as the Chief Financial Officer ("CFO") and Treasurer of NAAC, NHELI,
NCCI, and Nomura Securities.  SOF ¶ 39; Prahofer 30(b)(6) Dep. 248:14-25.  Mr. Gorin was

9

responsible for maintaining the financial accounts of NAAC, NHELI, and NCCI.  *Id.* at 248:15-25, 251:17-20, 258:19-23.  Mr. Gorin signed each of the Registration Statements and the amendments thereto.  SOF ¶ 42.

        38.    John McCarthy resides in ███████████.  McCarthy Dep. 10:5-9.  From 2005 to 2007, Mr. McCarthy was an Independent Director of NAAC and NHELI.  SOF ¶ 38; *see also* **PX 182** at 2.  Mr. McCarthy signed each of the Registration Statements and the amendments thereto.  SOF ¶ 42.

## III.    BACKGROUND

### A.    Residential Mortgage-Backed Securities

#### 1.    Overview Of RMBS

        39.    Securitization is the process of converting an asset or group of assets into a security in order to transform less liquid or illiquid assets into a more liquid form of ownership.  Rubinstein Direct ¶¶ 17-18.  Structured finance typically refers to the process of creating securities backed by pools of loans, leases, or other similar cash-flow producing assets, a product for which there is ordinarily a market.  These securities are called certificates and generally entitle their owner to payments of principal and/or interest.  Rubinstein Direct ¶¶ 17, 55; Finkel Direct ¶ 7.

        40.    Securitizations backed by residential mortgages are called residential mortgage-backed securities, or "RMBS."  A "mortgage" is a loan secured by real property.  The loan is documented by a promissory note in which the borrower acknowledges the debt and promises to pay it back over a defined period of time, typically with interest.  If the borrower does not repay the debt, the mortgage document allows the lender to force a sale of the property to satisfy the debt.  Rubinstein Direct ¶ 19; Finkel Direct ¶ 7.

        41.    In RMBS, a large number of mortgage loans are pooled into a single trust.  The overall pool is often subdivided into separate groups of loans with similar characteristics, including sometimes loan groups based on investor needs.  A certificate may either be backed by one group of loans, or backed by different groups of loans, such that an investor, i.e. a certificateholder, has rights to the flow of cash from a specific set of loans.  Rubinstein Direct ¶¶ 22, 54.

42.     The payments made to certificateholders are a function of the underlying payments of principal and interest by the individual borrowers on the underlying mortgage loans in the pool. Rubinstein Direct ¶ 55.  The payments also depend on the value of the properties collateralizing the loans in the pool because the remedy for defaulted loans that are not cured is to foreclose and then sell the property, using the sale proceeds to repay as much of the loan as possible.  Rubinstein Direct ¶ 55.  Payments to the certificateholders further depend on the securitization structure, commonly called the waterfall.  The waterfall causes the overall prepayment and credit risk in the pool to be differentially redistributed among the certificateholders, typically with the intent of protecting the senior certificates against losses at the expense of the junior (subordinated) certificates.  Rubinstein Direct ¶ 55.

43.     There are two distinct markets for RMBS:  the Agency RMBS market, where the RMBS are supported or otherwise guaranteed by the GSEs or government agencies, and the Non-Agency, or Private Label Securities ("PLS") market, where the securities consist of collateral types not eligible for inclusion in Agency RMBS.  Finkel Direct ¶ 8.  Any deal that is not securitized under an agency or GSE guarantee is considered to be a "private-label" securitization, as the issuing entity has no explicit or implicit connection to the U.S. government.  Schwert Direct ¶ 8.  PLS investors bear the credit risk associated with the underlying mortgage pools (subject to rights against sponsors, underwriters, or other entities).  Finkel Direct ¶ 8.

44.     Participants in the RMBS market include a loan originator, a sponsor, a depositor, a trust, a trustee, a securities underwriter, a servicer, and the rating agencies.  Rubinstein Direct ¶ 23.

45.     A *loan originator* originates loans to sell to a securitizer or other third party.  The originator should underwrite the loan pursuant to a set of underwriting guidelines, which set forth the policies and procedures for originating a loan. The originator's analysis of a borrower's capacity to pay, creditworthiness, and the collateral, as well as the ultimate decision to extend a loan, is typically governed by this set of formal, written underwriting guidelines.  Underwriting guidelines are intended to ensure that a lender originates loans in a consistent manner. They also

help the originator decide the terms on which to approve a loan to a borrower.  Rubinstein Direct ¶¶ 25, 49; Blum Direct ¶ 20; Hunter Direct ¶¶ 61-65.

46.     A *sponsor* purchases loans from one or more originators for the purpose of securitizing them, and holds title to the loans until they are transferred to the depositor.  The sponsor is the entity with responsibility for creating the securitization, including determining the other participants in the securitization process and the pool of loans to be included in the securitization. Rubinstein Direct ¶¶ 27-28. Many sponsors purchase pools of loans in bulk transactions, in which sponsors typically purchase a large pool of recently funded and similarly underwritten loans of the same product type from a single originator.  Rubinstein Direct ¶ 48. Sponsors may also engage in mini-bulk purchases, which are similar to bulk purchases but contain a smaller bundle of loans.  Small loan sellers sometimes lack the capital to assemble a bulk pool; in these cases, a sponsor may offer to buy the loans as they are originated, which is called buying on a "flow basis."  Rubinstein Direct ¶ 48.

47.     As part of the loan acquisition process, the originator generally issues a request for bid on a particular pool of loans which includes information about the bid deadline, settlement date, cut-off balance and date, servicing information, specifications for acquisition diligence, and delivery tolerance.  **PX 715**.  In addition, the originator may provide a loan tape to a prospective sponsor that contains information about the collateral characteristics of each of the loans in the pool, including FICO score, LTV or combined loan-to-value ("CLTV") ratio, debt-to-income ("DTI") ratio, occupancy status, documentation type, loan amount, and property type.  Rubinstein Direct ¶ 50; *see, e.g.*, **PX 149**.  As part of its bid to purchase the pool, the sponsor submits a proposed price based on the characteristics of the loans as reflected in the loan tape.  Katz Dep. 158:15-159:11.

48.     The purchase of the pool of loans by the sponsor from the seller is generally governed by a contract, entitled the Mortgage Loan Purchase Agreement ("MLPA"), that contains a variety of transaction-level and loan-level representations and warranties, including that the loans generally adhered to underwriting guidelines.  Rubinstein Direct ¶ 51; **PX 229**.  At the time of

purchase from the originator, the sponsor conducts a loan-level review that consists of a credit review, a compliance review, and a valuation review.  **PX 323**; **PX 326**; **PX 856**.

49.     The sponsor sells the loans that are to be included in the securitization to a special purpose, bankruptcy remote vehicle known as a *depositor*.  Rubinstein Direct ¶¶ 30, 52.  The depositor is a special purpose vehicle ("SPV") organized primarily for the purpose of establishing a true sale of the mortgage assets, which protects certificateholders against the risk of a subsequent bankruptcy by the sponsor.  As an SPV, the depositor has no assets, no employees, and no business operations or purpose other than to carry out the transfer of mortgage loans to implement the securitization.  Rubinstein Direct ¶ 30.

50.     The depositor sets up the *trust* and deposits the loans from the sponsor into the trust in exchange for the certificates, which represent the entire beneficial ownership interest in the trust.  The trust is an SPV created to own the mortgage loans and generally is administered by a trustee for the benefit of the certificate holders.  Rubinstein Direct ¶¶ 30, 31.  The depositor uses proceeds from the sale of the certificates to the underwriter to purchase the loans.  The depositor, on behalf of the trust, also issues registration statements and other offering materials.  Rubinstein Direct ¶¶ 30, 32.  The SPV authorizes the issuance of secured, limited recourse debt by entering into an indenture; the proceeds of this debt issuance, and the equity capital of the entity, are used to finance the purchase of loans.  Finkel Direct ¶ 9.

51.     *Securities underwriters* are entities that bring securities to market and sell them to investors, including by providing information to rating agencies to obtain credit ratings for the securities, and by structuring and pricing the securities.  Blum Direct ¶ 12; Rubinstein Direct ¶ 36.  There may be multiple underwriters on a securitization, including a lead underwriter, a co-lead underwriter, and an underwriter in the syndicate.  Rubinstein Direct ¶ 33.  The lead underwriter usually designs the  securitization and coordinates with the rating agencies to obtain credit ratings for the deal.  Rubinstein Direct ¶ 33.  Typically, a lead underwriter is an investment bank that is responsible for, among other things: (i) performing due diligence to ensure that the offering

documents are accurate and complete; (ii) purchasing the certificates from the depositor; and (iii) selling the certificates to investors.  Rubinstein Direct ¶ 33; Blum Direct ¶¶ 11-12.

52.     This diligence includes verifying the statements in the offering materials about: (i) the compliance of the underlying loans to underwriting guidelines; (ii) the accuracy of statistical data in the collateral tables, including information about LTV ratios, CLTV ratios, owner occupancy status, and DTI ratios; and (iii) verifying that the final rating issued on the certificate was as represented in the offering materials.  Rubinstein Direct ¶ 35; Blum Direct ¶ 18.  The diligence by the underwriter at the securitization stage tests the accuracy of the statements in the offering documents.  Rubinstein Direct ¶ 35.

53.     In structuring and pricing a securitization, the securities underwriter seeks to maximize its profits.  For the underwriter (and its affiliates), material profits (or losses) generally arise from underwriting fees as well as the difference between (a) the proceeds received by the bank (and affiliates) from sold securities, plus the value of any securities retained; and, (b) in the instance of an affiliated underwriter, what the bank paid for the loans plus all marginal expenses of the securitization (this difference is the "Net Trade Value").  Blum Direct ¶ 13.  The underwriter's profits are predominantly based on an underwriting fee, which is generally expressed as a percentage of the total securitization sold to investors.  Blum Direct ¶ 13; Rubinstein Direct ¶ 34.

54.     The underwriter(s) markets and sells the certificates to *investors*.  Rubinstein Direct ¶¶ 36, 77.

## 2.     Credit Enhancement

55.     Since PLS are not backed by the GSEs, alternative forms of credit enhancement are utilized to create highly-rated securities.  Schwert Direct ¶ 9; Rubinstein Direct ¶ 56. Credit enhancement refers to improving the credit profile of bonds in a securitization through internal features such as subordination, excess spread, and overcollateralization, or external features such as bond insurance or financial guarantees.  It improves the credit profile of a securitization despite the credit risk of the underlying assets.  Rubinstein Direct ¶¶ 56, 68.

56.     Credit rating agencies set rating levels on certificates according to how much credit enhancement is provided in relation to the risk they perceive in the pool of underlying assets. Rubinstein Direct ¶ 56.  While credit enhancements are necessary for RMBS to be acceptable to investors, they also impose costs and cut into sponsor, issuer, and, potentially, securities underwriter profit margins.  Rubinstein Direct ¶¶ 57, 68.

57.     One form of credit enhancement is subordination.  Subordination refers to a structure in which each class of bonds has a different right to the interest payments, principal payments, and losses generated by the underlying assets.  Rubinstein Direct ¶ 58; Schwert Direct ¶ 9.  The senior class of bonds is given a first claim on interest and principal cash flows, and a last position with regard to losses.  Rubinstein Direct ¶ 58.  All other bonds are subordinate to the senior class, but the subordinate bonds themselves have a similar arrangement in that one class of subordinate bonds is senior to all other subordinate bonds, another is senior to the remaining bonds, and so on until there is a last bond called a "first loss" bond that is subordinate to all other bonds.  Rubinstein Direct ¶ 58.  This so-called "first loss" tranche creates a buffer to absorb any losses in the credit portfolio, thereby enhancing the creditworthiness of the more senior issued debt.  Finkel Direct ¶ 9; Rubinstein Direct ¶¶ 59-60.  Rights to interest and principal are allocated in sequential order based on the level of seniority, and losses are assigned based on the reverse order of seniority.  Rubinstein Direct ¶ 58; Schwert Direct ¶ 9.

58.     Subordination is created at the inception of the deal and is established through the priority of payment waterfall and also by the rules for the allocation of loss.  These payment rules are contained in the Pooling and Servicing Agreement ("PSA").  Rubinstein Direct ¶ 59.  In senior/subordinated structures, the senior class typically receives more than its pro rata share of principal payments early on in the transaction.  Prepayments are allocated to the senior classes to ensure that the subordinate classes remain outstanding for a sufficiently long period of time (and increase as a percentage of the total certificates outstanding) to provide credit support to the senior tranches.  Rubinstein Direct ¶ 60.

59.     Overcollateralization is a type of subordination.  In overcollateralization, the principal value of the debt securities issued is smaller than the aggregate principal value of the underlying loans.  Schwert Direct ¶ 9; Rubinstein ¶ 63.

60.     Excess spread is another type of credit enhancement, in which the coupon payments on the certificates in the aggregate are lower than the interest generated by the underlying assets in the pool.  This feature generates excess interest—the difference between the interest paid to the certificates and the net interest collected from the underlying assets.  Excess spread generates excess interest cash flow, meaning more interest than is needed to pay the interest owed on all of the certificates.  Rubinstein ¶ 62.

61.     Credit support enables a structure to appeal to different investors with different risk appetites.  Investors in senior classes typically prefer safer investments, although they earn less in interest.  Rubinstein Direct ¶ 61; Blum Direct ¶ 30.  Arriving at the appropriate structure for the security requires the underwriter to interact with investors in determining for each tranche the yield demanded by the market, given an expected ratings level.  Blum Direct ¶ 47.

62.     Generally, in subprime securitizations during 2005-2007, the subordinate tranches were sized to absorb losses on the order of 20% to 30% of the underlying collateral, and in Alt-A transactions the subordinated tranches were sized so as to protect against losses of 5% to 10%.  Blum Direct ¶ 58.  More specifically, bonds backed by subprime mortgages issued in 2006 that were rated Aaa by Moody's were structured on average to withstand a total loss on the underlying mortgage pool of about 26% to 30% without defaulting.  Schwert Direct ¶ 10.

### 3.     Credit Ratings

63.     A *credit rating agency* typically grades the risk of a security by estimating the probability of any loss and/or the expected loss severity thereon.  Blum Direct ¶ 29; Rubinstein Direct ¶ 70.  Credit ratings are grades assigned to securities that reflect the expectation of the credit risk of owning that security.  The higher the rating, the less risky the bond.  Ratings are based on a scale from AAA to C, with AAA being the "safest."  Rubinstein Direct ¶ 70; Blum Direct ¶ 29.

64.     Senior classes are usually rated AAA, while junior classes have lower ratings.  A AAA rating is intended to reflect the same level of credit worthiness regardless of asset class.  A AAA RMBS backed by Alt-A or subprime loans should have the same credit risk as a AAA RMBS that is backed by prime loans (but will require more credit enhancement to do so).  Rubinstein Direct ¶ 70.  Higher-rated securities are generally expected, by investors and the rating agencies, to have (a) a lower probability of default, and/or (b) a lower expected loss on default.  Because of their lower perceived risk of loss, higher-rated securities typically pay lower yield or sell at higher prices.  Blum Direct ¶ 30; Rubinstein Direct ¶ 61.

65.     The spectrum of available ratings is divided between investment-grade securities and non-investment-grade securities, also known as "junk," "high-yield," or "speculative" securities.  An investment-grade security is defined as being rated between "Baa3" and "Aaa" (inclusive) from Moody's, between "BBB-" and "AAA" (inclusive) from S&P and/or between "BBB-" and "AAA" (inclusive) from Fitch.   Blum Direct ¶ 31.

66.     Investment-grade securities generally are expected to have higher credit quality, and they are also generally more liquid than non-investment-grade securities because a larger number of investors buy and sell high-rated securities, and underwriters have a greater capacity to make a market in them.  The market for RMBS during the 2005-2007 period was generally an investment-grade market.  Blum Direct ¶ 32.  Investment-grade bonds are predominantly held by institutional investors that tend to be averse to the risk of portfolio losses.  Many institutional investors have internal investment requirements and/or are subject to external regulations with minimum ratings requirements that either prohibit purchase of securities that are not rated or are not rated investment-grade, or that preclude them from holding more than a certain percentage of their portfolios in such securities.  Blum Direct ¶ 33.

67.     The higher the quality of a loan pool, the less credit enhancement is needed to achieve a given rating.  Typically, an issuer simply can sell more highly rated securities backed by a high-quality pool.  Lower-quality pools would generally produce less Net Trade Value.  Because credit enhancement is expensive, the less that is required, the greater the Net Trade Value.  Blum

17

Direct ¶ 46; *see* Rubinstein Direct ¶ 66-67.  If an underwriter's due diligence identifies loans that are of a lower quality than assumed, the structure will most likely change to reflect new (and higher) default and loss projections and securities will most likely be rated lower (absent increased credit enhancement).  This reduces Net Trade Value.  Blum Direct ¶ 48.

68.     The process of assigning credit ratings to RMBS depended significantly on risk assessments derived from modeled predictions, which each rating agency utilized to forecast foreclosure frequency, expected losses, and cash flows.  Blum Direct ¶ 34; Rubinstein Direct ¶ 71.  The subordination level necessary to achieve a AAA rating for the senior tranches and the relative size of the different subordinate tranches of a private-label RMBS is determined by the ratings agencies based on their assessment of the likelihood of losses, which, in turn, depended on the reported characteristics of the underlying loans.  Schwert Direct ¶ 11; Rubinstein Direct ¶¶ 71-72.

69.     The rating process was generally common to each of the rating agencies during the 2005-2007 period.  First, an underwriter or sponsor provided the rating agency a "loan tape," containing loan and borrower information, including, among other data elements, FICO scores, LTV and CLTV ratios, DTI ratios, and owner occupancy status.  Blum Direct ¶ 35; Rubinstein Direct ¶ 71.  A ratings analyst ran the data on the loan tape through a loss model, which "stressed" the pool through various economic scenarios and computed an expected loss statistic for each loan.  The expected loss for the pool was aggregated, and an analyst calculated credit enhancement requirements for various rating levels based on the expected loss.  Blum Direct ¶ 35; Rubinstein Direct ¶ 71.

70.     Separately, analysts used cash flow models to assess credit enhancement provided by excess spread (interest received in excess of the bond coupon obligations and expenses).  Blum Direct ¶ 35.  Analysts then utilized model-generated loss expectation and credit enhancement levels to assess loan-pool risk and formulate rating recommendations for each tranche.  Blum Direct ¶ 35.  Finally, analysts presented their recommendations and findings to a rating committee, which voted on and approved final credit ratings (and/or elements essential to assess the same; for example, expected loss).  Blum Direct ¶ 35.

71.     The rating agencies and the broader industry recognized that inaccurate data would undermine the integrity of the rating process, and rating agencies relied on sponsors or securities underwriters to provide accurate loan-level information.  Blum Direct ¶¶ 36-37, 41; Rubinstein Direct ¶ 71.  Indeed, the rating agencies, upon receiving a loan tape from an underwriter, verified only that data fields were complete and properly formatted, and did not conduct independent verification.  Blum Direct ¶ 36; Rubinstein Direct ¶ 72.

72.     The importance of accurate loan-level information to the rating process is shown, in part, by the fact that rating models assigned quantitative penalties or benefits to particular loan-level characteristics in arriving at an aggregate statistical risk assessment for a loan pool.  Blum Direct ¶ 37.  For instance, S&P estimated in its *RMBS: U.S. Residential Subprime Mortgage Criteria: Credit Analysis for Subprime Loan Transactions* that, for certain borrowers, "loans with LTVs of 90% have a 1.5 times (x) greater risk of being foreclosed than an LTV of 80%," and "[l]oans with an LTV of 100% are assumed to be 4.5x riskier than loans with an LTV of 80%." S&P similarly increased credit-model default assumptions "by a factor of 3.0x on second homes and investment properties" relative to owner occupied homes.  A tape misstating a loan's actual LTV or owner occupancy status would therefore cause the model to assess inaccurately the risk for both the loan and the pool.  Blum Direct ¶ 37; **PX 1318**; *see also* Schwert Direct ¶ 12.  This problem is captured by the axiom: "garbage in, garbage out."  Blum Direct ¶ 42.

73.     The rating agencies also relied on sponsors or the securities underwriter to ensure that loans complied with applicable underwriting guidelines because the rating agency models did not have inputs that model default or loss severity based on non-compliance with underwriting guidelines.  Blum Direct ¶ 65.  In other words, rating agency models assumed compliance with underwriting guidelines.  Blum Direct ¶ 65.  If issuers or underwriters submitted inaccurate information, the rating agencies reserved the right to withhold or withdraw credit ratings.  Blum Direct ¶ 40.

74.      To safeguard against inaccurate information, rating agencies adopted precautionary measures intended to protect the integrity of the rating process, although such measures still relied

on issuers and underwriters and did not seek to verify the accuracy of the third-party data provided to them.  Blum Direct ¶ 38.  For example, rating agency analysts reviewed transaction-specific documents to confirm that there were representations and warranties attesting to the accuracy of loan-level information and that the loans were originated in conformance with underwriting guidelines.  Analysts also reviewed the prospectus supplement to check consistency between the information provided during the rating process and the information marketed to investors, relying upon issuers and underwriters to provide the most current and up-to-date information upon which they would rely.  Blum Direct ¶ 38.  S&P also required issuers and underwriters to execute and submit a signed letter stating that the information provided was accurate.  Blum Direct ¶ 38.

75.     Finally, before issuing a formal rating letter, the rating agencies required issuers and underwriters to submit a final tape of collateral characteristics.  The agencies re-ran the tape through the credit rating models to confirm the absence of material discrepancies in loan data. Blum Direct ¶ 39.

### 4.      Marketing Of The Securities

76.     Publicly offered securities are issued pursuant to registration statements. Rubinstein Direct ¶ 73.

77.     A registration statement is a set of documents, including a base prospectus and a prospectus supplement, which a company must file with the SEC before it can proceed with a public offering.  Rubinstein Direct ¶ 73.  A registration statement can be filed as a "shelf" registration that allows for multiple securitizations to be issued based on the same registration statement.  Rubinstein Direct ¶ 74.

78.     The base prospectus is a disclosure document required by and filed with the SEC that provides investors with a generic description of information about the deal, including the types of participants in the securitization, the possible structures for the securitization, and the types of underlying mortgage loans.  It makes the required disclosures to render the shelf registration statement effective, and is generally filed with the registration statement.  The base prospectus is supplemented later on by a prospectus supplement.  Rubinstein Direct ¶¶ 75.

79.     A prospectus supplement is filed closer to the time of issuance (once a specific pool of collateral has been identified) and provides more detail relating to the specific offering.  The prospectus supplement discloses detailed pertinent information relating to the specific series of securities that are being issued, including information on the loans underlying those securities and the specific parties involved.  The prospectus and prospectus supplement together contain information about the securities offered for sale.  A prospectus and its supplement contain the facts that an investor needs to make an informed investment decision.  Rubinstein Direct ¶ 76.

80.     A prospectus supplement contains information about, among other things:  (i) the various participants in the securitization, including the names of the sellers, sponsor, depositor, trust, trustee, servicers, and master servicer; (ii) the specific structure of the securitization; (iii) the origination and underwriting practices of the originators of the underlying mortgage loans; and (iv) the underwriting guidelines applicable to such loans and the loan programs pursuant to which they were originated. Rubinstein Direct ¶ 78.

81.     A prospectus supplement generally contains the following quantitative information about the loans collateralizing the securities:  (i) the total number of loans in the pool; (ii) the total outstanding and original dollar balance of the loans; (iii) the average original loan size; (iv) the average current loan size; (v) the weighted average original LTV ratio; (vi) the weighted average current mortgage rate; (vii) the weighted average remaining term to maturity; (viii) the weighted average credit score; and (ix) aggregate data on various other collateral characteristics, including, loan product type, loan purpose, property type, income and asset documentation requirements, DTI ratios, occupancy status, credit grades, and the age of the loan.  Rubinstein Direct ¶ 79; Blum Direct ¶ 18.

82.     Data is also usually disclosed about the number and type of prepayment restrictions the loans carry (if any), the geographic characteristics of the pool, and the existence of any mortgage insurance on the loans.  If the pool is divided into SLGs, each of which primarily backs a different set of certificates, disclosure is made at both the total pool level and the collateral group or SLG level.  Rubinstein Direct ¶ 79.

83.     The information in the offering materials about the mortgage loans in the pool helps
investors make investment decisions.  The following language was prominently placed on the back
cover of the prospectus supplements of the Securitizations:  "You should rely only on the
information contained or incorporated by reference in this prospectus supplement and the
accompanying prospectus.  We have not authorized anyone to provide you with different
information."  Blum Direct ¶ 17; **PX O0059** (NAA 2005-AR6 Prospectus Supplement) at 313; **PX
O0041** (NHELI 2006-HE3 Prospectus Supplement) at 371; **PX O0045** (NHELI 2006-FM2
Prospectus Supplement) at 372; **PO0049** (NHELI 2006-FM1 Prospectus Supplement) at 335; **PX
O0072** (NHELI 2007-1 Prospectus Supplement) at 445; **PX O0080** (NHELI 2007-2 Prospectus
Supplement) at 398; **PX O0051** (NHELI 2007-3 Prospectus Supplement) at 389.

84.     The credit risk, prepayment risk, pricing, and performance of the certificates in an
RMBS can be accurately evaluated only if the information about the credit characteristics of the
mortgage loans that collateralize the certificate is accurately disclosed in the offering materials.
Rubinstein Direct ¶ 80.

**B.      The Certificates At Issue**

85.     The Certificates in this action were sold to the GSEs by underwriters including
Nomura Securities for two of the deals, and RBSSI, for another four of the deals.

**1.      The NAA 2005-AR6 Certificate**

86.     NAAC filed a Shelf Registration statement with the SEC on July 22, 2005 with file
number 333-126812 ("July 22, 2005 Registration Statement").  SOF ¶ 43.  On August 8, 2005,
NAAC filed an amendment to the July 22, 2005 Registration Statement.  *Id.*

87.     John Kistler of Nomura Securities, who was located in New York, sent Paul Norris
and Shayan Salahuddin, PLS traders at Fannie Mae who were located in the District of Columbia,
e-mails regarding NAA 2005-AR6, including (a) on November 10, 2005, a general email
announcement attaching "preliminary collateral information" regarding the deal, **PX O0001**; (b)
on November 15, 2005, targeted emails regarding details of that offering, **PX 1450** (Nov. 15, 2005
E-mail from Kistler to Norris), **PX 1451** (Nov. 15, 2005 E-mail from Kistler to Salahuddin); (c) on

November 17, 2005, an email attaching computational materials and stating that NAA 2005-AR6 would "launch at 1 pm +/- today.  See Bloomberg for offer levels … and availability[,]"  **PX 1452** (Nov. 17, 2005 E-mail and attachment from John Kistler); (d) on November 21, 2005, an email that Nomura was "now out with Subs from [NAA 2005-AR6]," **PX 1454** (Nov. 21, 2005 E-mail and attachment from Nomura's John Kistler); and (e) on November 22, 2005, an email providing an "additional strat" on NAA 2005-AR6 collateral and an offer to "have further conversations on the underwriting of these loans." **PX 1456** (E-mail and attachment from Nomura's John Kistler, FHFA16140570-71).

88.     On November 30, 2005, NAAC filed a prospectus and prospectus supplement for Nomura Asset Acceptance Corporation, Mortgage Pass-Through Certificates, Series 2005-AR6 ("2005-AR6") with the SEC pursuant to the July 22, 2005 Shelf Registration Statement and amendment thereto.  SOF ¶ 45.

89.     Fannie Mae purchased the IIIA1 certificate from 2005-AR6 (the "NAA 2005-AR6 Certificate").  SOF ¶ 1.  The trade date (the date on the trade ticket) was November 16, 2005.  *Id.* The settlement date (the date on which Fannie Mae formally transferred payment for the Certificate and title transferred to Fannie Mae) was November 30, 2005.  *Id.*  Nomura Securities' confirmation for the Certificate's purchase confirms the address of Fannie Mae to be "3900 Wisconsin Ave. NW Washington, DC 20016." **PX 951**.  Fannie Mae owned the NAA 2005-AR6 Certificate on September 2, 2011 and continues to own it.  Li Direct ¶ 5.

90.     The NAA 2005-AR6 Certificate was backed by an SLG containing 376 loans. **PX O0059** at 59.

## 2.     The NHELI 2006-FM1 Certificate

91.     Nomura Home Equity Loan, Inc. ("NHELI") filed a Shelf Registration statement with the SEC on July 7, 2005 with file number 333-126435 ("July 7, 2005 Shelf Registration Statement").  SOF ¶ 44.  On July 8, 2005, NHELI filed an amendment to the July 7, 2005 Registration Statement.  *Id.*

92.     On December 19, 2005, Cindy Ross of Nomura Securities, who was located in New York, emailed Xiang ("Sean") Xie, a PLS trader at Freddie Mac who was located in Virginia, to confirm pre-trade details of NHELI 2006-FM1 I-A-1.  **PX 1458**.  On January 23, 2006, Ms. Ross emailed Freddie Mac PLS traders Lori Geftic, who was located in Virginia, setting forth the tranche size of the Certificate that Freddie Mac eventually purchased.  **PX 1459**; *see generally* Hackney Dep. 52:18-25, 63:3-7, 64:1-13.  On December 19, 2005, Freddie Mac instructed Nomura Securities to provide it with final deal documents for NHELI 2006-FM2 via Freddie Mac's "abs_docs@freddiemac.com" e-mail address.  **PX 1482**.

93.     On January 31, 2006, NHELI filed a prospectus and prospectus supplement for Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2006-FM1 ("2006-FM1") with the SEC pursuant to the July 7, 2005 Shelf Registration Statement and amendment thereto. SOF ¶¶ 44-45.

94.     Freddie Mac purchased the IA certificate from NHELI 2006-FM1 (the "NHELI 2006-FM1 Certificate").  SOF ¶ 2.  The trade date was December 19, 2005.  *Id.*  The settlement date was January 31, 2006.  *Id.*  Freddie Mac owned the NHELI 2006-FM1 Certificate on September 2, 2011 and continues to own it.  Johansen Direct ¶¶ 4-5.

95.     The NHELI 2006-FM1 Certificate was backed by an SLG containing 2,532 loans. **PX O0049** at 39.

### 3.     The NHELI 2006-FM2 Certificate

96.     NHELI filed a Shelf Registration statement with the SEC on February 28, 2006 with file number 333-132109 ("February 28, 2006 Shelf Registration Statement").  SOF ¶ 44.  On April 6, 2006 and April 13, 2006, NHELI filed amendments to the February 28, 2006 Shelf Registration Statement.  *Id.*

97.     On September 27 and October 2, 2006, Nomura Securities' employees Randall Lee and Steven Katz, who were located in New York, emailed Freddie Mac PLS trader David Hackney, who was located in Virginia, to supply various documents and files, including a term sheet, relating to NHELI 2006-FM2.  **PX 1460** at 1; *see generally* Hackney Dep. 52:18-25, 63:3-7,

64:1-13 .   On October 18, 2006, Ryan Mullaney of Greenwich, who was based in Chicago, e-mailed Freddie Mac to confirm pre-trade details on NHELI 2006-FM2.  **PX 69** at 10.

98.      On October 31, 2006, NHELI filed a prospectus and prospectus supplement for Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2006-FM2 ("2006-FM2") with the SEC pursuant to the February 28, 2006 Shelf Registration Statement and amendments thereto. SOF ¶¶ 44-45.

99.      Freddie Mac purchased the IA1 certificate from NHELI 2006-FM2 (the "NHELI 2006-FM2 Certificate").  SOF ¶ 2.  The trade date was October 18, 2006.  *Id.*  The settlement date was October 31, 2006.  *Id.*  Freddie Mac owned the NHELI 2006-FM2 Certificate on September 2, 2011 and continues to own it.  Johansen Decl. ¶¶ 4-5.

100.     The NHELI 2006-FM2 Certificate was backed by an SLG containing 3,891 loans. **PX O0045** at 47.

### 4.      The NHELI 2006-HE3 Certificate

101.     On August 30, 2006, NHELI filed a prospectus and prospectus supplement for Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2006-HE3 ("2006-HE3") with the SEC pursuant to the February 28, 2006 Shelf Registration Statement and amendments thereto. SOF ¶¶ 44-45.

102.     On July 21, 2006, Steven Katz of Nomura Securities, who was located in New York, e-mailed David Hackney, a Freddie Mac PLS trader who was located in Virginia, to inform him that Nomura was "working on mini-f[ree ]w[riting ]p[rospectus]….."  **PX O0064**; *see generally* Hackney Dep. 52:18-25, 63:3-7 .  On July 24, 2006, Mr. Katz e-mailed Mr. Hackney to supply "revised strats."  **PX O0052**; *see generally* Hackney Dep. 64:1-13.  On August 11, 2006, Mr. Katz e-mailed Mr. Hackney to acknowledge Freddie Mac's Investment Requirements.  **PX 68** at 16.  On August 15, 2006, Ryan Mullaney of Greenwich, who was located in Chicago, e-mailed Freddie Mac to confirm pre-trade details on NHELI 2006-HE3.  **PX 67** at 9.  Mr. Mullaney also agreed to Freddie Mac's Investment Requirements by e-mail.  *Id.* at 11.

103.    Freddie Mac purchased the IA1 certificate from NHELI 2006-HE3 (the "NHELI 2006-HE3 Certificate").  SOF ¶ 2.  The trade date was August 15, 2006.  *Id.*  The settlement date was August 31, 2006.  *Id.*  Freddie Mac owned the NHELI 2006-HE3 Certificate on September 2, 2011 and continues to own it.  Johansen Decl. ¶¶ 4-5.

104.    The NHELI 2006-HE3 Certificate was backed by an SLG containing 3,618 loans.  **PX O0041** at 45.

### 5.    The NHELI 2007-1 Certificate

105.    On January 31, 2007, NHELI filed a prospectus and prospectus supplement for Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2007-1 ("2007-1") with the SEC pursuant to the February 28, 2006 Shelf Registration Statement and amendments thereto.  SOF ¶¶ 44-45.

106.    On January 17, 2007, Ryan Mullaney of Greenwich, who was located in Chicago, Illinois, e-mailed David Hackney, a Freddie Mac PLS trader who was located in McLean, Virginia, to communicate details of the trade.  **PX 71** at 15; *see generally* Hackney Dep. 52:18-25, 63:3-7, 64:1-13.  On January 23, 2007, Staci Gray of Greenwich, who was located in Chicago, Illinois, e-mailed Freddie Mac to confirm pre-trade details.  **PX 71** at 8.

107.    Freddie Mac purchased the II1A certificate from NHELI 2007-1 (the "NHELI 2007-1 Certificate").  SOF ¶ 2.  The trade date was January 23, 2007.  *Id.*  The settlement date was January 31, 2007.  *Id.*  Freddie Mac owned the NHELI 2007-1 Certificate on September 2, 2011 and continues to own it.  Johansen Decl. ¶¶ 4-5.

108.    The NHELI 2007-1 Certificate was backed by an SLG containing 474 loans.  **PX O0072** at 91.

### 6.    The NHELI 2007-2 Certificate

109.    On February 1, 2007, NHELI filed a prospectus and prospectus supplement for Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2007-2 ("2007-2") with the SEC pursuant to the February 28, 2006 Shelf Registration Statement and amendments thereto.  SOF ¶¶ 44-45.

110.     On December 26, 2006, Joseph Perrewe of Greenwich, who was located in Chicago, Illinois, e-mailed Michael Aneiro of Freddie Mac, who was based in McLean, Virginia, to confirm that NHELI and Greenwich had received Freddie Mac's Investment Requirements. **PX 123** at 18.  On December 26, 2006, Timothy Crowley of Nomura, who was based in New York, wrote and mailed to Freddie Mac at its "8200 Jones Branch Drive, McLain [sic], Virginia 22102" address to confirm that NHELI would comply with Freddie Mac's Investment Requirements.  *Id.* at 21.   Mr. Aneiro instructed Mr. Perrewe and Mr. Mullaney, and consequently, NHELI, to provide final deal documents for the NHELI 2007-3 deal to Freddie Mac's "abs_docs@freddiemac.com" email address.  *Id.* at 18-19.  On December 27, 2006, Mr. Perrewe e-mailed Freddie Mac to confirm pre-trade details.  *Id.* at 16.

111.     Freddie Mac purchased the IA1 certificate from NHELI 2007-2 (the "NHELI 2007-2 Certificate").  SOF ¶ 2.  The trade was December 27, 2006.  *Id*.  The settlement date was January 31, 2007.  *Id.*

112.     The NHELI 2007-2 Certificate was backed by an SLG containing 3,001 loans. **PX O0080** at 49.  Freddie Mac owned the NHELI 2007-2 Certificate on September 2, 2011 and continues to own it.  Johansen Decl. ¶¶ 4-5.

### 7.     The NHELI 2007-3 Certificate

113.     On May 1, 2007, NHELI filed a prospectus and prospectus supplement for Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2007-3 ("2007-3") with the SEC pursuant to the February 28, 2006 Shelf Registration Statement and amendments thereto. SOF ¶¶ 44-45.

114.     On March 23, 2007, Steven Mayer of Lehman Brothers, who was based in New York, emailed Freddie Mac PLS traders David Hackney and Chad Levrini, who were based in Virginia, to provide them with stratifications and details for the NHELI 2007-3 deal on NHELI's behalf.  **PX 70** at 25; *see generally* Hackney Dep. 52:18-25, 63:3-7, 64:1-13. On April 26, 2007, Mr. Mayer e-mailed Freddie Mac to confirm pre-trade details, **PX 70** at 26, and to confirm receipt of Freddie Mac's Investment Requirements with Mr. Hackney, *id.* at 28.   Mr. Hackney instructed

Mr. Mayer, and consequently, NHELI, to supply final deal documents for NHELI 2007-3 via e-mail to Freddie Mac's abs_docs@freddiemac.com email address.  *Id.*

115.    Freddie Mac purchased the IA1 certificate from NHELI 2007-3 (the "NHELI 2007-3 Certificate").  SOF ¶ 2.  The trade date was April 26, 2007.  *Id.*  The settlement date was April 30, 2007.  *Id.*  Freddie Mac owned the NHELI 2007-3 Certificate on September 2, 2011 and continues to own it.  Johansen Decl. ¶¶ 4-5.

116.    The NHELI 2007-3 Certificate was backed by an SLG containing 1,896 loans.
**PX O0051** at 51.

### C.    The Statements At Issue

117.    The Prospectus Supplements all contain representations about underwriting standards, the characteristics of the Mortgage Loans, including aggregate data in the collateral tables concerning owner occupancy and LTV ratios, and the expected credit ratings of the securities to be offered.  A list of these representations appears in Exhibit 1.  An overview follows.

### 1.    Statements That The Loans Were Originated Or Acquired Generally In Accordance With Applicable Underwriting Guidelines

118.    The Prospectus Supplements contained statements that the Mortgage Loans "were originated generally" in accordance with the applicable underwriting guidelines. Ex. 1 at 3-4.  For example, the Prospectus Supplement for NHELI 2006-FM1 states that "[t]he Mortgage Loans … were originated generally in accordance with the underwriting criteria described in this section," **PX O0059** at 93.  Materially identical language appears in all seven of the Prospectus Supplements.  Ex. 1 at 3-4.

119.    The level of detail at which a Prospectus Supplements describes an originator's guidelines varies with the percentage of Mortgage Loans, weighted by unpaid principal balance, made by that originator.  If an originator contributed 20% or more of the Mortgage Loans, the Prospectus Supplement identifies that originator, summarizes its applicable underwriting guidelines, and states that the Mortgage Loans were originated or acquired generally in accordance with those guidelines.  Ex. 1 at 1-4.  If an originator contributed between 10% and approximately

20% of the Mortgage Loans, by aggregate balance, the originator is in the Prospectus Supplement but its underwriting guidelines are not necessarily summarized. *See* Ex. 1 at 1-2. Finally, originators of fewer than 10% of the Mortgage Loans by aggregate principal balance were not necessarily identified in the Prospectus Supplements. Ex. 1 at 1-2.

120.     "The sections of each Prospectus Supplement addressed to underwriting describe both the process by which a borrower applies for a mortgage loan and the process through which the application is reviewed and approved." 2015 WL 568788, at *2. For example, the Prospectus Supplement for NAA 2005–AR6 describes the information the borrower must supply when applying for a loan:

> Generally, each borrower will have been required to … provide to the original lender pertinent credit information concerning the borrower. … [including] information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts.

**PX O0059** at 93; *see also* Ex. 1 at 10.

121.     The Prospectus Supplements also describe how the originator will evaluate the information provided, including an assessment of whether the borrower is willing and able to repay the loan. For example, the Prospectus Supplement for NAA 2005–AR6 states:

> Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.

**PXO0059** at 93; *see also* Ex. 1 at 5.

122.     While all of the Prospectus Supplements state that at least some Mortgage Loans were originated under "reduced documentation" or "no-documentation" programs, Ex. 1 at 16-20,

they make clear that loans made under these programs required indicia they would be repaid. Four Prospectus Supplements represent that, where originators' guidelines permit stated income loans, the borrower's stated income must be reasonable in light of the borrower's occupation or sources of income. Ex. 1 at 21-22. For example, the Prospectus Supplement for NAA 2005-AR6 states that, under Fremont's stated-income program, "the income stated must be reasonable and customary for the applicant's line of work." Ex. 1 at 21. The remaining Prospectus Supplements note that stated-income loans may be made only "[i]n the case of certain borrowers with acceptable compensating factors," such as relatively low LTV ratios or DTI ratios. **PX O0059** at 93; *see also* Ex. 1 at 10, 13-14.

123. The Prospectus Supplements also describe key credit characteristics that the originators' guidelines take into account when determining ability to repay, such as debt-to-income ratio. For example, the Prospectus Supplement for NAA 2005-AR6 states:

> Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months [must] equal no more than a specified percentage not in excess of 60% of the prospective borrower's gross income.

**PX O0059** at 93-94; *see also* Ex. 1 at 7-10.

124. Each Prospectus Supplement further "explains the process used to ensure that there is security for the issued loans, for instance by requiring some borrowers to obtain mortgage insurance or because an appraisal has shown that the mortgaged property itself provides adequate security." 2015 WL 568788, at *3. For example, the Prospectus Supplement for NAA 2005-AR6 states:

> The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae or Freddie Mac.

**PX O0059** at 94; *see also* Ex. 1 at 23-26.  The Prospectus Supplements all similarly represented that the appraisals underlying the Mortgage Loans conformed to the Uniform Standards of Professional Appraisal Practice ("USPAP").  Ex. 1 at 25.

125.    The Prospectus Supplements also contained assurances that the loans complied with all applicable laws.  For example, the Prospectus Supplement for NAA 2005-AR6 states "each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws," **PX O0059** at 148.  The Prospectus Supplements also contained representations that all necessary and applicable hazard and title insurance was obtained.  *See id.* at 215; *see also* Ex. 1 at 27-29.[1]

126.    Finally, the Prospectus Supplement represented that the originators permitted exceptions to their underwriting guidelines *if* there were compensating or mitigating factors determined by the underwriter to be sufficient to establish that the borrower had the ability and willingness to repay the loan.  **PX O0059** at 93; *see also* Ex. 1 at 31-33.

## 2.        Statements Regarding LTV Ratios

127.    The Prospectus Supplements disclosed the "Characteristics of the Mortgage Loans," including LTV ratios, in tables containing descriptive statistics (the "Collateral Tables").

128.    The Prospectus Supplement for each Securitization explained that for purposes of determining the LTV ratio, "[t]he 'Value' of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of that loan and (b) the sales price for that property."  Ex. 1 at 33-35.   The Prospectus Supplements also stated that: "[u]nless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in an appraisal obtained at the time of origination of the Refinance Loan."   Ex. 1 at 33-35.

---

[1]  With respect to both representations, materially identical language appears in each of the Prospectuses or Prospectus Supplements.  Ex. 1 at 27-31.  In cases where these representations appear in a Prospectus only, no Prospectus Supplement disclaims them.  Ex. 1 at 27-31.

129.     The Prospectus Supplements represented that *none* of the Mortgage Loans had LTV ratios over 100%.  Ex. 1 at 37.  The Prospectus Supplements for five Securitizations represented that none of the Mortgage Loans had CLTV ratios over 100%.  Ex. 1 at 37.  The Prospectus Supplements for the two remaining Securitizations made no representation about the CLTV ratios of the Mortgage Loans.

130.     The Prospectus Supplements represented that the majority of the Mortgage Loans had LTV ratios of 80% or less.  Ex. 1 at 36.  The Prospectus Supplements contained tables listing the number and percentage of Mortgage Loans (by aggregate principal balance as of the Cut-Off Date) with an LTV ratio less than or equal to 80%, as follows:

| SLG | Number of Loans with LTV <= 80% | Percentage of Loans (by aggregate cut-off date principal balance) with LTV <= 80% |
|---|---|---|
| NAA 2005-AR6 (3) | 372 | 99.09% |
| NHELI 2006-FM1 (1) | 1,392 | 63.00% |
| NHELI 2006-FM2 (1) | 2,238 | 68.40% |
| NHELI 2006-HE3 (1) | 1,973 | 58.82% |
| NHELI 2007-1 (2) | 435 | 93.04% |
| NHELI 2007-2 (1) | 1,584 | 56.59% |
| NHELI 2007-3 (1) | 1,109 | 59.31% |

Ex. 1 at 36.

131.     The Prospectus Supplements represented that, as of each Prospectus Supplement's "Cut-Off Date," the Collateral Tables were correct.  Ex. 1 at 36.  The Cut-Off Date was, in each instance, roughly a month before each Securitization became effective.  *See* 2015 WL 568788, at *4.  For each Securitization, the Prospectus or Prospectus Supplement also stated that:  "If, as of the Closing Date, any material pool characteristic differs by 5% or more from the description in this prospectus supplement, revised disclosure will be provided either in a supplement or in a Current Report on Form 8–K."  Ex. 1 at 39-40.

### 3.    Statements Regarding Owner Occupancy

132.    The Prospectus Supplements' Collateral Tables also made specific representations as to the number and percentage of loans (by aggregate principal balance as of the Cut-Off Dates) in each SLG that were owner-occupied.  These representations are summarized below:

| SLG | Number of Mortgage Loans Represented To Be Owner-Occupied | Percentage of Loans (by aggregate cut-off date principal balance) Represented To Be Owner-Occupied |
|---|---|---|
| NAA 2005-AR6 (3) | 188 | 56.59% |
| NHELI 2006-FM1 (1) | 2,248 | 88.63% |
| NHELI 2006-FM2 (1) | 3,628 | 93.05% |
| NHELI 2006-HE3 (1) | 3,239 | 89.59% |
| NHELI 2007-1 (2) | 217 | 53.07% |
| NHELI 2007-2 (1) | 2,731 | 90.86% |
| NHELI 2007-3 (1) | 1,707 | 89.21% |

Ex. 1 at 38.

133.    As shown, the Prospectus Supplements stated that, by aggregate principal balance as of the Cut-Off Date, at least half of the Mortgage Loans in the SLGs of all Certificates were owner-occupied, and that at least 75% of the Mortgage Loans in the SLGs of five Certificates were owner-occupied.  *Id.*

### 4.    Statements Regarding Credit Ratings

134.    The Prospectus Supplements represented that as of the Cut-Off Date, the Certificates would receive the highest credit rating of AAA or its equivalent by one of the major rating agencies.  For example, the Prospectus Supplement for NAA 2005-AR6 stated:

> The classes of certificates listed below will not be offered unless they receive ratings at least as high as those set forth below from Standard & Poor's, a division of The McGraw-Hill Companies, Inc., which we refer to as 'Standard & Poor's' and Moody's Investors Service, Inc., which we refer to as 'Moody's'.  … A rating is not a recommendation to buy, sell or hold securities and each rating agency can revise or withdraw such ratings at any time. In general, ratings address credit risk and do not address the likelihood of prepayments.

**PX O0059** at 12; *see also* Ex. 1 at 41-44.

135.    The Prospectus Supplement for NAA 2005-AR6 further stated:

> The ratings of each class of Offered Certificates will depend primarily on an assessment by the rating agencies of the related Mortgage Loans and the subordination afforded by certain classes of certificates.  The ratings by each of the rating agencies of the Offered Certificates are not recommendations to purchase, hold or sell the Offered Certificates because such ratings do not address the market prices of the certificates or suitability for a particular investor.

**PX O0059** at 24; *see also* Ex. 1 at 41-44.

136.    Each Certificate received a credit rating from S&P and Moody's of AAA or equivalent. Ex. 1 at 44.

## IV.    THE REPRESENTATIONS WERE FALSE

137.    The representations at issue were false, and the Prospectus Supplements omitted additional facts required to make certain representations not misleading.  This finding is supported by credible and reliable testimony offered by FHFA's expert witnesses as well as evidence uncovered (and ignored) by Nomura and RBSSI in the course of reviewing the Mortgage Loans for securitization.

### A.    The Analyses Of FHFA's Experts Show That Large Percentages Of The SLG Loans Were Not Underwritten To Guidelines Or Had Inflated, Non-Credible Appraisals

#### 1.    FHFA's Expert, Dr. Charles Cowan, Selected A Statistically Valid, Representative Sample From Each SLG That Allows The Findings Of FHFA's Appraisal And Reunderwriting Experts To Be Extrapolated To The SLGs As A Whole

138.    FHFA's sampling expert, Dr. Charles D. Cowan, Ph.D, who has over forty years of experience in statistical research and design, selected statistically valid random samples of loans from the each of the seven SLGs.  Cowan Direct ¶¶ 1-2.  These samples were analyzed by FHFA's re-underwriting expert, Robert Hunter, and FHFA's appraisal expert, Dr. John A. Kilpatrick, Ph.D.  Cowan Direct ¶ 2.  Dr. Cowan then extrapolated the results of Mr. Hunter's and Dr. Kilpatrick's analyses to the SLGs.  Cowan Direct ¶ 6.  The extrapolations of the results derived from the work

of Mr. Hunter and Dr. Kilpatrick on the samples are reliable and can be used to draw conclusions about the quality of the loans and quality of information used in the loan origination process. Cowan Direct ¶ 7.

(a)      <strong>Principles Of Statistical Sampling</strong>

139.     Statistical sampling is a scientifically valid and widely used tool.  Cowan Direct ¶¶ 17-21.  When a sample is randomly selected—that is, when each member of the population from which the sample is drawn has a known chance of being included in the sample—the sample provides an unbiased view of the population.  Cowan Direct ¶ 9.

140.     The precision—or reliability—of a sample is measured using the confidence level and the margin of error.  Cowan Direct ¶ 10.  The confidence level refers to the percentage of time that the actual value for the population will be within a specified range around the value for the sample.  The margin of error refers to that specified range around the estimated value from the sample.  For example, if the results of testing on the sample indicates that 50% of the mortgage loans were not originated in accordance with underwriting guidelines, then a confidence interval of 95% with a +/- 10% margin of error means that 95% of the time, the true percentage of loans not originated in accordance with underwriting guidelines in the population will be between 40% and 60%.  This range is known as the confidence interval.  Cowan Direct ¶ 11.

141.     When a sample is used to test a binary question (for example, whether a loan was originated outside of the guidelines, or whether the owner-occupancy status of the underlying property or the LTV of the loan was misrepresented), the margin of error depends on the sample value.  The margin of error is greatest when the sample value is at 50% (*i.e.,* for 50% of the loans in the sample, there were false statements or omissions in the Prospectus Supplements concerning owner occupancy, LTV ratio, or adherence to underwriting guidelines).  As the sample value deviates from 50%, in either direction, the margin of error for that sample value decreases.  Cowan Direct ¶ 12.

142.     Although a sample drawn purely at random from within a population is statistically valid, one can also draw a statistically valid sample using stratification.  Stratification is a process

35

where the population of loans is divided into mutually exclusive and exhaustive subgroups of loans. Stratification can only be carried out using variables known for the entire population prior to sampling. Cowan Direct ¶ 13.

143. Stratification can be used to increase the precision of the estimates from the sample. What is calculated from the sample is an estimate of the value in the population. The estimate has a margin of error due to sample-by-sample variability, which is directly related to the variability of the data being examined. When using a stratified sample, this variability is partitioned into two parts. The first part is the variability between the strata, and the second part is the variability within each of the strata. Variability between strata is eliminated by forcing the sample into these separate subgroups *a priori*, leaving only the second part of the variability. Stratification does not guarantee a diminution in the margin of error; it makes the diminution possible. Cowan Direct ¶ 14.

### (b)    Dr. Cowan's Sample Design Was Sound And Reliable

144. Dr. Cowan primarily used the loan tapes produced by Defendants in discovery to identify the loans in the relevant SLGs. Defendants produced several loan tapes with information about the Mortgage Loans underlying each Securitization, but did not produce information identifying the loan tapes that were provided to the rating agencies. Dr. Cowan performed equivalence testing between the loan tapes produced by Defendants and the Collateral Tables in the Prospectus Supplements to determine which of the loan tapes produced by Defendants bore the closest statistical resemblance to the information contained in the Prospectus Supplements, and used these to draw his samples. When the loan tapes contained insufficient data to identify the loans in the SLG, Dr. Cowan used data from CoreLogic, a widely recognized provider of mortgage-related financial data. Cowan Direct ¶ 26. Defendants do not criticize Dr. Cowan's use of CoreLogic data.

145. Dr. Cowan selected an initial sample of 100 loans from each of the seven SLGs. Cowan Direct ¶ 26. After selecting these initial samples, Dr. Cowan supplemented them for two reasons. First, in light of statements in the Court's order of December 3, 2012, concerning

36

sampling, Dkt. 177, Dr. Cowan retained the same sample design and expanded its focus, so that there were 100 loans per SLG (rather than 100 loans per Securitization, as in his original design). Second, to account for missing loan origination files and loan files that could not be re-underwritten, Dr. Cowan supplemented one sample.  These supplementations occurred in several iterations.  In neither case did Dr. Cowan remove any loans from the samples.  Cowan Direct ¶ 27. In both cases, Dr. Cowan supplemented the samples using the same methodology:  the same FICO quartiles, the same random number generator, and the same loan tapes.  Cowan Direct ¶ 28.

146.    The targeted sample size of 100 yields a 95% confidence level with a maximum margin of error of +/- 10% for binary questions.  Cowan Direct ¶ 28.  The sample size necessary to achieve these targeted results for a binomial outcome was 95.  Dr. Cowan rounded up to 100 out of an abundance of caution.  This "oversampling" created a cushion for his calculations and allowed for some flexibility should, for example, a loan in a sample lack a loan file.  Cowan Direct ¶ 29.

147.    A 95% confidence level with a maximum margin of error of +/- 10% is scientifically valid.  The confidence level of 95% is standard and well supported in statistics. Traditionally, scientists adopt the 95% level of confidence.  Cowan Direct ¶ 112.

148.    A target of a +/-10% margin of error, with a 95% confidence level, strikes the correct balance between cost and accuracy for two primary reasons.  The first reason that increasing sample size would generate only marginal benefits—without commensurate benefits in increased precision—is that the gain in reliability due to a larger sample size increases only as the square root of the sample size.  As the sample size increases from 1 to 100, there is a large increase in reliability (meaning smaller confidence intervals for 95% confidence).  As the sample size increases from 100 to 400, however, the increase in precision, and associated reduction in confidence interval, is halved for a quadrupling of the sample size.  To halve the margin of error again, from plus or minus five percent to plus or minus 2.5%, the sample size has to quadruple again, from 400 to 1,600.  Cowan Direct ¶ 113.

149.    The second reason that increasing sample size would generate only marginal benefits is that the +/- 10% is merely the maximum margin of error for this confidence level, and it

occurs only when the percentage of Defective Loans is 50%. Fifty percent is the scenario where variability is at its greatest: half Defective Loans and half not. When the variability decreases— that is, when the percentage deviates from 50% in either direction—the margin of error—and thus confidence interval—becomes smaller. As the intervals shrink, the marginal benefit of a larger sample size shrinks as well. Cowan Direct ¶ 115.

150.    As the estimated defect rate deviates from 50% in either direction, the difference in confidence interval for samples of 100 and 400 decreases. Quadrupling the sample size, from 100 to 400, does not yield a commensurate reduction in the 95% range across all possible percentages of Defective Loans. At 50%, or maximum variability, the range is +/- 10% for a sample size of 100 and +/- 5% for a sample size of 400. When the estimated rate is 20%, the 95% range for a sample size of 100 is +/- 5%, whereas for a sample size of 400 the 95% range is +/-2.5%. When the estimated defect rate is 10%, the 95 percent range for a sample size of 100 is +/- 4%, while for a sample size of 400 it is +/-2%. As the defect rate approaches zero, the 95% range must also approach zero, regardless of sample size. The same phenomenon occurs for the corresponding values above 50%. Cowan Direct ¶ 116.

151.    Finally, as shown in more detail below, in the small number of instances where the margin of error at 95% confidence was larger than 10%, the extrapolated values were so high that even taking the lower bound would yield a very high number. Cowan Direct ¶ 117.

152.    Dr. Cowan stratified the populations using a single variable—credit score, specifically the score as reported by the Fair Isaac Corporation Company (or "FICO" score), which generally is included on the loan tapes for each loan. Cowan Direct ¶ 30.

153.    A borrower's FICO score, which can range from 350 to 800, represents the borrower's creditworthiness or the likelihood that the borrower will pay his or her debts. It is also highly unlikely to be misstated on the loan tape. Cowan Direct ¶ 30.

154.    It was reasonable for Dr. Cowan to stratify the population using this one variable because there are diminishing returns in the reduction of the margin of error from adding each additional stratification variable. Cowan Direct ¶ 31.

155.    Dr. Cowan divided the population of loans in each SLG into four equal-size groups, or "strata," consisting of loans with very low, somewhat low, somewhat high, and high FICO scores.  Each stratum has roughly the same number of loans.  Because Dr. Cowan sampled each of the SLGs separately, the set of strata boundaries that define where one stratum ends and where the next begins (three strata boundaries define the four groups in each SLG) will differ from SLG to SLG.  This is not an issue for estimation from each sample, since the estimates are derived separately for each SLG, adding up across all the strata.  Cowan Direct ¶¶ 32-33.

156.    Each loan in each of the four strata for each SLG then received a randomly generated number in a manner that ensures that each loan has a nearly equal chance of being selected.  Cowan Direct ¶ 33.

157.    After the random numbers were assigned, the loans were reordered (sorted) from lowest to highest random number.  The first 25 loans in each stratum were selected to be in the sample, yielding 100 loans per SLG in each of the SLGs for the initial samples.  The same process was used when the samples were supplemented.  Cowan Direct ¶ 33.

158.    Dr. Cowan's method of selecting the samples from the SLGs ensured that each sample is random and not subject to manipulation.  Cowan Direct ¶ 34.

159.    To demonstrate that the initial samples selected are representative of the population, Dr. Cowan tested the sample against the population on eleven key variables (when available) from the loan tapes, including FICO score, debt-to-income ratio, LTV ratio, and occupancy type.  For continuous variables (those where the values are numeric and increasing or decreasing in value, like FICO score and LTV ratio), he compared the mean of the sample distribution to the mean of the population distribution using a z-test, which is a common statistical method for determining that a sample value could have come from the population.  For categorical variables (those where the values are categories, such as documentation type), he compared the distribution of the categories in the sample to the distribution of the categories in the population using a Chi-square test.  This is a common statistical method for determining that a sample distribution could have come from the population.  At a 5% or less level of significance, one would expect 1 in 20 (5%) of

39

the tests to fail by chance.  The results of these tests (set forth in Plaintiff's Ex. 1569) indicate a very high level of correspondence between the samples and their populations.  Cowan Direct ¶ 35.

160.    For six of the seven SLGs—all but the NAA 2005-AR6 Group 3 SLG—three or fewer loans had loan files that were either not available or were not complete, and thus could not be re-underwritten by FHFA's expert, Robert Hunter.  Hunter Direct ¶¶ 7, 237; Cowan Direct ¶ 39.

161.    Consequently, the number of loans with missing or incomplete loan files did not suggest that Dr. Cowan would be unable to achieve the targeted margin of error of +/- 10% at 95% confidence for these samples, and Dr. Cowan did not supplement those samples.  Cowan Direct ¶ 39.

162.    Defendants do not question Dr. Cowan's decision not to supplement these six samples, nor do they dispute that these samples, as re-underwritten by Mr. Hunter, were representative of the six SLGs.  Barnett Dep. 42:8-44:11; Cowan Direct ¶ 36, 40.

163.    For the NAA 2005-AR6 Group 3 SLG, there were 53 loans from the initial sample that had loan files that were either not available or were not complete, and thus could not be re-underwritten.  For this SLG, Dr. Cowan supplemented the sample with an additional 96 loans, selected via the same methodology described above, to achieve a sample size of 131 re-underwritten loans for that SLG.  Cowan Direct ¶ 39.

164.    While Defendants' expert, Dr. Arnold Barnett, criticized Dr. Cowan for not conducting representativeness testing on the NAA 2005-AR6 Group 3 re-underwriting sample that Mr. Hunter used, this criticism is unpersuasive for several reasons, including that Dr. Cowan performed representativeness tests on both the initial and supplemental samples, and that Dr. Barnett performed no measurements indicating any bias.  Cowan Direct ¶¶ 40-43.

2.　　**The Re-Underwriting Review Conducted By FHFA's Re-Underwriting Expert, Robert Hunter, Shows That The Vast Majority Of The Sample Loans For Each Securitization Did Not Adhere To The Representations In The Prospectus Supplements**

(a)　　**Overview**

165.　　FHFA's expert, Robert W. Hunter, re-underwrote 723 of the 796 Sample Loans selected by Dr. Cowan.[2]  These 723 Sample Loans consisted of:  (a) 131 loans from NAA 2005-AR6; (b) 100 loans from NHELI 2006-FM1; (c) 100 loans from NHELI 2006-FM2; (d) 99 loans from NHELI 2006-HE3; (e) 98 loans from NHELI 2007-1; (f) 98 loans from NHELI 2007-2; and (g) 97 loans from NHELI 2007-3.  Hunter Direct ¶ 7.

166.　　Mr. Hunter reviewed the Sample Loans to determine if the loans (i) were generally originated or acquired in accordance with the applicable underwriting guidelines; (ii) were properly evaluated to determine whether the borrower had the ability to repay the loan; (iii) had an appraisal that was performed by a qualified and licensed appraiser and that complied with USPAP; (iv) were properly evaluated to determine that the mortgaged property had sufficient value to adequately support the Sample Loan obligation; (v) to the extent they failed to adhere to the Originator's underwriting guidelines, had sufficient compensating factors that were properly documented and verifiable, and offset the credit risk arising from the exception from guidelines; and (vi) complied with the requirements of federal and state laws.  Hunter Direct ¶ 6.

167.　　Mr. Hunter also examined the Sample Loans to determine whether the loan-level data contained in the pre-closing loan tapes and the data relating to, among other characteristics, FICO scores, LTV and CLTV ratios, DTI ratios, and owner-occupancy status were accurate.  Hunter Direct ¶ 6.

168.　　For each loan that did not adhere to the representations in the Prospectus Supplements, Mr. Hunter conducted an analysis to determine whether the underwriting defects for a given Sample Loan, when viewed collectively, substantially increased the credit risk of the Loan.  Hunter Direct ¶ 6.

---

[2]  Mr. Hunter was not able to re-underwrite the remaining 73 Sample Loans because the loan files for those loans contained insufficient documentation.  Hunter Direct ¶¶ 5, 238, 241-244.

169.    Based on Mr. Hunter's re-underwriting review of the Sample Loans, he determined, to a reasonable degree of professional certainty, that 482 (or 66.67 %) of the 723 Sample Loans had substantially increased credit risk as a result of their failure to comply with the representations in the Prospectus Supplements.  Hunter Direct ¶ 7.  Mr. Hunter's findings for each of the Securitizations are set forth below in **Plaintiff's Exhibit 1625**:

| Securitization | Number of Sample Loans Reviewed | Number Of Sample Loans That Had Substantially Increased Credit Risk Due To Failure To Comply With Representations In Prospectus Supplements | Percentage Of Sample Loans That Had Substantially Increased Credit Risk Due To Failure To Comply With Representations In Prospectus Supplements |
|---|---|---|---|
| NAA 2005-AR6 | 131 | 79 | 60.31% |
| NHELI 2006-FM1 | 100 | 70 | 70.00% |
| NHELI 2006-FM2 | 100 | 72 | 72.00% |
| NHELI 2006-HE3 | 99 | 66 | 66.67% |
| NHELI 2007-1 | 98 | 65 | 66.33% |
| NHELI 2007-2 | 98 | 68 | 69.39% |
| NHELI 2007-3 | 97 | 62 | 63.92% |
| **Total** | **723** | **482** | **66.67%** |

**(b)    Mr. Hunter Is Qualified In The Re-Underwriting Field And His Methodology Is Reliable**

170.    Mr. Hunter is highly qualified in the field of mortgage underwriting and re-underwriting based on his over forty years of experience in residential mortgage lending.  Hunter Direct ¶¶ 8-10.  Based on his experience, Mr. Hunter is very knowledgeable about the basic principles of underwriting subprime and Alt-A residential mortgage loans that were in place during 2002 to 2007 (for purposes of Mr. Hunter's review, the "Relevant Period").  Hunter Direct ¶¶ 108-131.

**(c)    Mr. Hunter's Methodology For The Re-Underwriting Review Was Thorough And Reliable**

171.    Mr. Hunter first reviewed the Prospectus Supplements for each of the Securitizations and identified the specific representations that pertained to the underwriting of the loans in each Securitization.  Hunter Direct ¶¶ 11-14.  These representations included statements

that (i) the loans generally complied with underwriting guidelines, and to the extent there were exceptions to guidelines, there would be sufficient compensating factors; (ii) the originators assessed the borrowers' ability to repay the loans; (iii) certain credit information was obtained from the borrowers; (iv) verifications of the borrowers' income and/or employment were completed; (v) the originators assessed the adequacy of the mortgage collateral; (vi) the loans complied with USPAP; and (vii) the loans complied with federal and state law.  Hunter Direct ¶¶ 11-45.  Mr. Hunter also identified specific representations in the collateral tables that related to the LTV/CLTV ratios and occupancy statuses of the pool of loans in each SLG, as well as the credit rating for the certificates backing each SLG.  Hunter Direct ¶¶ 46-60.

172.    Mr. Hunter's re-underwriting review included five basic components:  (i) a credit review, (ii) a compliance review, (iii) an occupancy review, (iv) an appraisal review, and (v) a pre-closing loan tape review.  Hunter Direct ¶¶ 269, 278, 281, 287, 294.  Each of these components is summarized below.

### (1)    The Credit Review

#### a.    Underwriting Guidelines

173.    The first step in Mr. Hunter's review was to identify all documents relating to a given Sample Loan, and determine the applicable underwriting guideline.  Hunter Direct ¶¶ 236-242.

174.    In conducting his re-underwriting review, Mr. Hunter analyzed the Sample Loans to determine whether they adhered to both the process-based and substantive requirements of the specific underwriting guidelines that were applicable to the Sample Loans.  Hunter Direct ¶¶ 206, 270.  Of the 723 Sample Loans, 420 were originated by one of the following five originators identified in the Prospectus Supplements:  (i) Fremont Investment & Loan ("Fremont"); (ii) Ownit Mortgage Solutions, Inc. ("Ownit"); (iii) People's Choice Home Loan, Inc. ("People's Choice"); (iv) ResMAE Mortgage Corp. ("ResMAE"); and (v) Silver State Mortgage ("Silver State").  Hunter Direct ¶ [139].  Five additional originators—Aegis Mortgage Corp. ("Aegis"); Alliance

Mortgage Banking Corp. ("Alliance"); EquiFirst Corp. ("EquiFirst"); First NLC Financial Services, LLC ("First NLC"); and Pinnacle Financial Corp. ("Pinnacle")—originated 117 of the Sample Loans.  Hunter Direct ¶ 140.  Additionally, 37 of the Sample Loans were originated under Nomura's "loan-by-loan" channel and were underwritten to Nomura's correspondent underwriting guidelines.  Hunter Direct ¶ 141.  The underwriting guidelines of these ten originators and Nomura's correspondent lending channel (the "Guidelines") are applicable to 574 of the 723 Sample Loans (or 79.23% of the Sample Loans).  Hunter Direct ¶ 142.

175.    Where a Sample Loan did not comply with underwriting guidelines or minimum industry standards, Mr. Hunter considered whether any compensating factor(s) offset the credit risk presented by the exception to the underwriting guidelines or standards.  Hunter Direct ¶ 275. If he concluded the compensating factor(s), alone or in combination, did offset the increased credit risk presented by the exception, then Mr. Hunter did not make a defect finding.  Hunter Direct ¶ 275.

### b.    Minimum Industry Standards

176.    In addition to reviewing each Sample Loan against the applicable underwriting guideline, Mr. Hunter also reviewed each Sample Loan to determine if it complied with the most basic and fundamental practices of underwriting subprime and Alt-A residential mortgage loans during the Relevant Period, which he refers to as "minimum industry standards."  Hunter Direct ¶ 77.

177.    Mr. Hunter used a reliable process for distilling the minimum industry standards because he followed the same process that was used and generally accepted in the industry when developing underwriting guidelines.  Hunter Direct ¶¶ 244, 265-66; *see also* Jan. 29, 2015 Op. & Order re: Min. Indus. Stds., Dkt. 1188 at 11 (finding that "the process that Hunter employed to identify the minimum underwriting standards that prevailed in the industry during the relevant timeframe is sufficiently reliable to make his testimony admissible").  In addition, Mr. Hunter tested the accuracy of the minimum industry standards by comparing them to the guideline

requirements of New Century, WMC, Countrywide, and Long Beach, the originators who were responsible for originating the largest volumes of subprime and Alt A loans during the Relevant Period, and who were also generally known to have had very lenient origination requirements and practices during this period.  Hunter Direct ¶¶ 262-263.

178.    Generally, the minimum industry standards reflect the most basic requirements that even the most lenient originators of subprime and Alt-A loans followed in assessing a borrower's ability to repay the mortgage and the adequacy of the collateral underlying the mortgage.  Hunter Direct ¶ 244.  As such, every subprime or Alt-A residential mortgage loan originated during the Relevant Period, at a minimum, should have complied with these standards. Hunter Direct ¶ 244.

179.    Each of the minimum industry standards is listed on **Plaintiff's Exhibit 1618**.  Mr. Hunter divided these 59 minimum industry standards into the following seven categories:  (i) capacity of the borrower to repay the loan, (ii) misrepresentations by the borrower, (iii) creditworthiness of the borrower, (iv) collateral, (v) regulatory compliance, (vi) insurance, and (vii) other.  Hunter Direct ¶ 245.

180.    Based on Mr. Hunter's testimony, these standards reflect the most basic and fundamental steps in the underwriting process, and, as such, are part and parcel of underwriting a residential mortgage loan.  Hunter Direct ¶ 246.  For example, the first category of minimum industry standards can be categorized as relating to the borrower's capacity to repay the mortgage loan, and includes the requirements to:  (i) properly calculate the borrower's income; (ii) properly calculate the borrower's debts; (iii) verify the borrower's employment; (iv) assess whether the borrower had a reasonable ability to repay the mortgage, including by assessing the reasonableness of the borrower's stated income for a stated income loan; (v) verify that the borrower's other income (*e.g.*, bonuses) is sufficiently stable and likely to continue; (vi) verify that the borrower has sufficient and seasoned assets; (vii) evaluate the creditworthiness of the borrower, the borrower's ability to repay, and the adequacy of the collateral on the basis of a complete credit package containing critical documentation; and (viii) ensuring that the documentation type of the approved loan matches the confirmation in the file.  Hunter Direct ¶ 250.  Virtually all loan programs

45

required the underwriter to follow these requirements in determining whether the borrower had the ability and willingness to repay the mortgage loan.  Hunter Direct ¶ 250.

181.     Mr. Hunter's use of minimum industry standards for Sample Loans where the applicable underwriting guidelines were not available is appropriate because, in those instances, the minimum industry standards are useful in determining the contents of the applicable underwriting guidelines.  Jan. 29, 2015 Op. & Order re: Min. Indus. Stds., Dkt. 1188 at 11-12 (noting that "the minimum industry standards may provide circumstantial evidence of the content of the Originator's guidelines as of the time of origination").

182.     Mr. Hunter's use of minimum industry standards for Sample Loans where the applicable guideline is silent on a particular step in the origination process is also appropriate because the minimum industry standards reflect the most basic and fundamental practices that were expected to be followed by all loan underwriters, including the most lenient originators during the Relevant Period.  Hunter Direct ¶ 267.  Because the minimum industry standards reflect the lowest common denominator across all underwriting guidelines applicable to subprime and Alt A loans during the Relevant Period, they are implicit in the requirements of the applicable underwriting guidelines, and, as such, encompassed by the representations in each of the Prospectus Supplements relating to compliance with guidelines.  Hunter Direct ¶ 263.  In addition, the minimum industry standards are inherently encompassed in other representations in the Prospectus Supplements, including statements that (i) loan underwriter made a determination that the borrower had the ability to repay the loan; (ii) the loan underwriter assessed the adequacy of the mortgaged property as collateral; and (iii) the mortgage loans complied with federal, state, and local laws.  Hunter Direct ¶¶ 257, 259, 264.

### (2) The Appraisal Review

183.     The appraisal component of Mr. Hunter's review consisted of determining whether the appraisal was performed in accordance with the representations in the Prospectus Supplements, underwriting guidelines, USPAP, and minimum industry standards.  Hunter Direct ¶ 287.

184.     Mr. Hunter also recalculated the LTV/CLTV ratios of the Sample Loans to determine if they complied with the requirements set forth in the underwriting guidelines, and in instances where the applicable underwriting guideline was unavailable, the minimum industry standard of 100% LTV/CLTV for non-investment properties or 90% LTV/CLTV for investment properties, which was also contained in each of the Prospectus Supplements.  Hunter Direct ¶¶ 256, 288-89.

185.     Mr. Hunter's process of recalculating LTV/CLTV ratios was not only reliable, but conservative in Defendants' favor.  To recalculate the LTV/CLTV ratios, Mr. Hunter first used the information contained in the loan file, and divided the loan amount by the lower of the appraised value or the sale price of the property.  Hunter Direct ¶ 288.  Mr. Hunter then compared the recalculated LTV/CLTV ratio to the maximum allowed by the underwriting guidelines, or the minimum industry standard as reflected in the Prospectus Supplement.  Hunter Direct ¶ 288.  Mr. Hunter also recalculated the LTV/CLTV ratios of the Sample Loans using the valuations of the subject properties determined by Dr. Kilpatrick.  Hunter Direct ¶ 289.  To do so, Mr. Hunter divided the loan amount by the appraised value from Dr. Kilpatrick's Greenfield automated valuation model ("AVM").  Hunter Direct ¶ 291-92.  Mr. Hunter triggered an excessive LTV/CLTV finding if the resulting LTV/CLTV was at least 15% greater than both the origination LTV/CLTV ratio and the maximum LTV/CLTV ratio allowed by the applicable guideline or minimum industry standard.  Hunter Direct ¶¶ 293; *see also* Section IV.C, *infra* (further describing Dr. Kilpatrick's Greenfield AVM model).

### (3) The Owner Occupancy Review

186.     Mr. Hunter reviewed the owner occupancy status of the Sample Loans to assess whether the occupancy status reflected in the pre-closing loan tape was accurate.  Hunter Direct ¶ 281.  In his review, Mr. Hunter considered whether the borrower occupied the subject property for a period of twelve months after closing.  Hunter Direct ¶¶ 282-284.  Mr. Hunter used twelve months as the benchmark because most of the mortgage loan files contained agreements certifying that the borrower would occupy the mortgaged property for at least one year.  Hunter Direct ¶ 285.

187.    Mr. Hunter's process for the occupancy review was reliable because it included a review of the mortgage loan file for red flags indicating that the borrower did not occupy the subject property, and a review of post-origination documents, such as loan servicing records, borrower and property records, and public records, for indications that the borrower did not occupy the subject property after closing, for example, a different address associated with the borrower or a change of address within twelve months after origination of the mortgage loan.  Hunter Direct ¶¶ 282-84.

188.    Mr. Hunter then made a determination as to whether it was more likely than not that each Sample Loan was owner-occupied.  Hunter Direct ¶ 286.

### (4)  The Compliance Review

189.    Mr. Hunter's review also included a compliance component, which consisted of determining whether the loan adhered to the representations in the Prospectus Supplements relating to compliance, including whether each Sample Loan complied with federal and state law, those aspects of the underwriting guidelines relating to compliance with federal and state law, and requirements relating to title and hazard insurance.  Hunter Direct ¶¶ 278.

### (5)  The Pre-Closing Loan Tape Review

190.    Mr. Hunter also compared the corrected information relating to the credit characteristics of the Sample Loans that resulted from his re-underwriting review of the Sample Loans against the information contained in the pre-closing loan tapes.  Hunter Direct ¶ 294.

191.    Mr. Hunter's process was reliable because where there was a discrepancy, he instructed his team to document an additional finding noting that the pre-closing loan tape contained one or more inaccuracies concerning the credit characteristics of the loan at issue. Hunter Direct ¶¶ 29, 301.  Not all pre-closing loan tape defects were also counted as underwriting defects, because there were loans where the collateral characteristic on the loan tape was inaccurate, but the loan did not exceed the guideline limits.  Hunter Direct ¶¶ 371.

### (6) Mr. Hunter's Use of Post Closing Documents Was Appropriate And Reliable

192.     During his re-underwriting review, Mr. Hunter did not limit himself to documents in the loan file.  Hunter Direct ¶ 210.  Rather, he reviewed all available information, including public information and information such as audit credit reports; proprietary databases, such as DataVerify or LexisNexis Accurint; bankruptcy filings; servicing records; public databases such as 411.com and manta.com; internet salary engines; and the Mortgage Electronic Registration Systems ("MERS"), an electronic registry that tracked mortgage ownership and servicing rights. Hunter Direct ¶¶ 211-225.

193.     Mr. Hunter's use of post-origination evidence is probative of relevant characteristics of the Sample Loans at the time of origination, including determining whether the relevant originator followed its own underwriting guidelines or whether the loan qualified under the applicable guidelines.  *FHFA v. Nomura Holding Am., Inc.* ("Hunter-Forester Guidelines Op."), 2015 WL 568788, at *10 (S.D.N.Y. Feb. 11, 2015).

### (7) Mr. Hunter's Ultimate Loan Level Opinion

194.     Mr. Hunter's approach for assessing the overall credit risk of each of the Sample Loans was reliable.  First, he confirmed each and every defect for each of the Sample Loans by personally reviewing all of the mortgage loan files (either in whole or in part), the re-underwriting team's factual findings, the quality control team's comments, and the supporting documents for the individual findings.  Hunter Direct ¶ 298.  Second, he determined whether the defects for each Sample Loan, when viewed collectively, impacted the credit risk of that Loan.  Hunter Direct ¶¶ 299-300.

195.     Based on this approach, Mr. Hunter rendered one of the following conclusions for each Sample Loan:  (a) that the Sample Loan was originated with one or more underwriting defects that substantially increased the credit risk associated with the Loan; (b) that although the Sample Loan was originated with one or more underwriting defects, the underwriting defects did not substantially increase the credit risk associated with the Loan; or (c) that, based on the

documents provided to him, there were no underwriting defects in the origination of the Sample Loan.  Hunter Direct ¶ 301.

196.    Where Mr. Hunter did not find any underwriting defects, he did not offer the opinion that the Sample Loan did not have any defects, merely that he was unable to find any defects.  Moreover, based on the high percentage of loans with underwriting defects, Mr. Hunter opined that the origination and underwriting process was so flawed that it is unlikely that loans in this third category were free from defects.  Hunter Direct ¶ 302.

> ### (d)    The Vast Majority Of The Sample Loans Were Not Originated In Accordance With Applicable Guidelines Or Minimum Standards Of Underwriting

197.    Underwriting guidelines are the methodologies by which originators' underwriting policies are enforced.  Hunter Direct ¶ 132-33.  They provide standards by which lenders can make prudent lending determinations and manage its credit risk.  Hunter Direct ¶ 133-34.  A lender's adherence to underwriting guidelines is essential for the following reasons:  (i) they provide a consistent and reliable framework to evaluate the credit risk presented by a loan; (ii) they result in uniform loan underwriting determinations; (iii) they ensure compliance with regulatory and legal requirements; and (iv) they result in a loan with an ascertainable credit quality and value.  Hunter Direct ¶ 136.

198.    Each of the Prospectus Supplements represented that the Mortgage Loans in the SLG were generally originated in accordance with the applicable originator's underwriting guidelines.  Hunter Direct ¶ 11.

199.    Mr. Hunter's re-underwriting review revealed that the vast majority of the Sample Loans did not adhere to the representations in the Prospectus Supplements, particularly the representation that the loans were generally originated in accordance with the applicable underwriting guidelines.  Hunter Direct ¶ 305. Moreover, these loans were not documented as exception loans and did not otherwise contain compensating factors that offset the increased credit risk associated with the exception.  Hunter Direct ¶ 305.

200.    The following summary exhibit, **Plaintiff's Exhibit 1641**, reflects the number of Sample Loans in each Securitization where there was at least one defect based on a failure to comply with underwriting guidelines and a lack of sufficient compensating factors.  This chart also reflects the number of these loans that had substantially increased credit risk.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans With At Least One Guideline Defect | Percentage of Sample Loans with At Least One Guideline Defect | Number of Mortgage Sample Loans At Least One Guideline Defect & Substantially Increased Credit Risk | Percentage of Sample Loans At Least One Guideline Defect & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 91 | 69.46% | 69 | 52.67% |
| NHELI 2006-FM1 | 100 | 89 | 89.00% | 69 | 69.00% |
| NHELI 2006-FM2 | 100 | 94 | 94.00% | 71 | 71.00% |
| NHELI 2006-HE3 | 99 | 77 | 77.77% | 61 | 61.61% |
| NHELI 2007-1 | 98 | 67 | 68.36% | 59 | 60.20% |
| NHELI 2007-2 | 98 | 81 | 82.65% | 63 | 64.28% |
| NHELI 2007-3 | 97 | 79 | 81.44% | 60 | 61.85% |
| **Total** | **723** | **578** | **79.94%** | **452** | **62.52%** |

201.    Even if loans with (i) defects that are based on minimum industry standards, (ii) occupancy defects, or (iii) defects based on the Greenfield AVM are excluded, the vast majority of the Sample Loans in each SLG still had defects based only on a failure to comply with underwriting guidelines and/or a failure to adhere to the express underwriting representations in the Prospectus Supplements.  The following summary exhibit, **Plaintiff's Exhibit 1642**,  reflects the number of Sample Loans in each SLG that had defects that were based only on a failure to comply with underwriting guidelines and/or a failure to adhere to the express underwriting representations in the Prospectus Supplements.  This exhibit does not include any loans with (i) defects that are based on minimum industry standards, (ii) occupancy defects, or (iii) defects based on the Greenfield AVM.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Only Guideline or Prospectus Supplement Defects | Percentage of Sample Loans with Only Guideline or Prospectus Supplement Defects | Number of Sample Loans with Only Guideline or Prospectus Supplement Defects & Substantially Increased Credit Risk | Percentage of Sample Loans with Only Guideline or Prospectus Supplement Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 52 | 39.69% | 33 | 25.19% |
| NHELI 2006-FM1 | 100 | 58 | 58.00% | 38 | 38.00% |
| NHELI 2006-FM2 | 100 | 68 | 68.00% | 45 | 45.00% |
| NHELI 2006-HE3 | 99 | 46 | 46.46% | 30 | 30.30% |
| NHELI 2007-1 | 98 | 36 | 36.73% | 27 | 27.55% |
| NHELI 2007-2 | 98 | 43 | 43.88% | 27 | 27.55% |
| NHELI 2007-3 | 97 | 53 | 54.64% | 35 | 36.08% |
| **Total** | **723** | **356** | **49.24%** | **235** | **32.50%** |

202.     Across the Sample Loans, Mr. Hunter found approximately 100 different kinds of violations of underwriting guidelines.  Hunter Direct ¶ 305.  The details for these defects are included in **Plaintiff's Exhibit 1641**, which contains Mr. Hunter's loan level findings and conclusions for each of the Sample Loans.  The most significant defects for violations of guidelines, not including defects that are based on minimum industry standards, are summarized in Sections 1-7 below.

(1)     <b>Over Fifteen Percent Of Sample Loans Had Excessive DTI Ratios</b>

203.     The borrower's DTI ratio is an important factor in assessing the borrower's capacity to repay the loan.  Hunter Direct ¶ 16.  The borrower's DTI ratio demonstrates the amount of the borrower's monthly income required to pay monthly obligations, including the mortgage loan.  Hunter Direct ¶ 16.  To calculate the DTI ratio, the lender must determine all required monthly debt payments, including the subject loan's principal, interest, taxes and insurance/home owners association fee payments ("PITI"), installment and revolving debts, and any other required debt

payments (such as child support).  Hunter Direct ¶ 16.   The lender then divides the borrower's

total debt by the borrower's gross monthly income.  Hunter Direct ¶ 16.

204.    All else being equal, the higher the borrower's DTI ratio, the more difficult it is for

the borrower to meet his or her monthly mortgage payments, and the greater the credit risk

associated with the loan.  *See* DePalma Dep. 179:13-19; **PX 472** at NOM-FHFA_05071266.  In

addition, a lower DTI ratio provides a greater cushion against borrower default because the

borrower has more income to overcome temporary cash flow shortages.  Hunter Direct ¶ 18.

205.    Mr. Hunter found that in certain instances, the loan underwriter failed to properly

calculate the borrower's DTI ratio using information that was available at the time of origination,

and, in other instances, the borrower's debt obligations were misrepresented on the loan

application, which led to these debts not being included in the lender's debt calculation.  Hunter

Direct ¶¶ 308-309.  As a result of these errors, certain Sample Loans were given to borrowers with

DTI ratios in excess of the maximum permitted by the applicable underwriting guidelines without

sufficient compensating factors.  Hunter Direct ¶ 308-309.

206.    Virtually all of the Guidelines specified maximum debt to income ratios.  Hunter

Direct ¶ 19.

207.    The below summary exhibit, **Plaintiff's Exhibit 1644**, reflects the number of

Sample Loans in each Securitization where the DTI ratio exceeded the maximum DTI permissible

under the applicable guideline.  This does not include any loans where the DTI ratio defect is

based on minimum industry standards.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with DTI Guideline or Prospectus Supplement Defects | Percentage of Sample Loans with DTI Guideline or Prospectus Supplement Defects |
|---|---|---|---|
| NAA 2005-AR6 | 131 | 13 | 9.92% |
| NHELI 2006-FM1 | 100 | 16 | 16.00% |
| NHELI 2006-FM2 | 100 | 17 | 17.00% |
| NHELI 2006-HE3 | 99 | 24 | 24.24% |
| NHELI 2007-1 | 98 | 18 | 18.37% |

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with DTI Guideline or Prospectus Supplement Defects | Percentage of Sample Loans with DTI Guideline or Prospectus Supplement Defects |
|---|---|---|---|
| NHELI 2007-2 | 98 | 7 | 7.14% |
| NHELI 2007-3 | 97 | 19 | 19.59% |
| **Total** | **723** | **114** | **15.77%** |

208.    In addition, the Prospectus Supplements provided that the borrower's DTI ratio may not exceed 55% or 60% in certain circumstances.  Hunter Direct ¶ 19.  When the applicable underwriting guideline was not available, Mr. Hunter used a maximum DTI ratio of 55% as a proxy for the underwriting guideline requirement.  Hunter Direct ¶ 247.

209.    The following summary exhibit, **Plaintiff's Exhibit 1643**, summarizes the number of Sample Loans in each Securitization with DTI ratios exceeding the maximum under the applicable guideline or the minimum industry standard of 55%.  This chart also reflects the number of loans with DTI ratio defects that had substantially increased credit risk.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with DTI Defects | Percentage of Sample Loans with DTI Defects | Number of Sample Loans with DTI Defects & Substantially Increased Credit Risk | Percentage of Sample Loans with DTI Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 14 | 10.68% | 14 | 10.68% |
| NHELI 2006-FM1 | 100 | 16 | 16.00% | 16 | 16.00% |
| NHELI 2006-FM2 | 100 | 17 | 17.00% | 17 | 17.00% |
| NHELI 2006-HE3 | 99 | 25 | 25.25% | 25 | 25.25% |
| NHELI 2007-1 | 98 | 18 | 18.36% | 18 | 18.36% |
| NHELI 2007-2 | 98 | 9 | 9.18% | 8 | 8.16% |
| NHELI 2007-3 | 97 | 19 | 19.58% | 19 | 19.58% |
| **Total** | **723** | **118** | **16.32%** | **117** | **16.18%** |

### (2)    Almost One-Third Of The Stated Income Or No Income Sample Loans Had Unreasonable Stated Incomes

210.    Stated income loans required the underwriter to use heightened care to determine whether the income stated by the borrower was reasonable.  Hunter Direct ¶¶ 113.  Without such care, stated income loans were susceptible to overstatement of the borrower's income or outright

fraud in the origination process, which casts doubt on the borrower's capacity to repay the loan, the borrower's character and willingness to repay the loan, and the overall integrity of the loan file. Hunter Direct ¶¶ 113.

211.     Virtually all the Guidelines for stated income programs required an assessment of the reasonableness of the borrower's stated income.  Hunter Direct ¶ 167 (citing Guidelines).  This reasonableness assessment required a comparison of the borrower's stated income to other characteristics, such as the borrower's geographic location, occupation, length of experience, and assets.  Hunter Direct ¶ 168 (citing Guidelines).  Some Guidelines provided that audit and income verification tools could be used by the underwriter to assess the reasonableness of the borrower's stated income.  *See, e.g.*, **PX R6836** at JPMC-UWG-WAMU-000735645; **PX R6974** at UBS-FHFA-00287151 (recommending the underwriter consult Salary.com when determining whether stated income was unreasonable).

212.     The re-underwriting results show that the loan underwriter failed to assess the reasonableness of the borrower's stated income for many of the Sample Loans that were originated under stated income or no documentation programs.  Hunter Direct ¶¶ 313-14. The failure to follow guidelines to assess the reasonableness of stated income led to substantially increased credit risk for such loans by failing to reflect the negative impact on the borrower's ability to repay the loan.  Hunter Direct ¶ 313.

213.     The following summary exhibit, **Plaintiff's Exhibit 1646**, reflects the numbers of Sample Loans in each Securitization that were originated under stated income or no income programs where the income stated by or required of a borrower was not reasonable and was not investigated by the underwriter pursuant to an express requirement in the underwriting guidelines

and/or the Prospectus Supplement.  This chart includes all 332 of the Sample Loans that were identified as stated or no income loans in the loan file.

| Securitization | Number of Stated or No Income Sample Loans Reviewed | Number of Stated or No Income Sample Loans Unreasonable Income Defects | Percentage of Sample Loans with Unreasonable Income Defects |
|---|---|---|---|
| NAA 2005-AR6 | 95 | 20 | 21.05% |
| NHELI 2006-FM1 | 27 | 11 | 40.74% |
| NHELI 2006-FM2 | 40 | 13 | 32.50% |
| NHELI 2006-HE3 | 34 | 11 | 32.35% |
| NHELI 2007-1 | 80 | 18 | 22.50% |
| NHELI 2007-2 | 29 | 7 | 24.14% |
| NHELI 2007-3 | 27 | 3 | 11.11% |
| **Total** | **332** | **83** | **25.00%** |

214.    When the applicable underwriting guideline or the Prospectus Supplement did not expressly state that the loan underwriter should assess the reasonableness of income on a stated income or no income loan, Mr. Hunter applied such a requirement based on minimum industry standards on the ground that it was part and parcel of determining the borrower's ability to repay. Hunter Direct ¶ 246.  Each of the Prospectus Supplements contains a representation that the originators assessed the borrower's ability to repay pursuant to the applicable underwriting guidelines.  Hunter Direct ¶ 15.

215.    The following summary exhibit, **Plaintiff's Exhibit 1645**, reflects the number of Sample Loans in each Securitization that were originated under stated income or no income programs[3] where the income stated by or required of a borrower was not reasonable and was not investigated by the underwriter pursuant to an express requirement in the underwriting guidelines or the Prospectus Supplement, the minimum industry standards, or an implicit requirement in the Prospectus Supplement's representation regarding ability to repay.  The summary exhibit also

---

[3]   The chart below includes only the 256 loans specifically identified as stated or no income loans on the pre-closing loan tapes.

reflects the number of these loans that had substantially increased credit risk as a result of their failure to comply with the representations in the Offering Documents.

| Securitization | Number of Stated or No Income Sample Loans Reviewed | Number of Stated or No Income Sample Loans with Unreasonable Income Defects | Percentage of Stated or No Income Sample Loans with Unreasonable Income Defects | Number of Stated or No Income Sample Loans with Unreasonable Income Defects & Substantially Increased Credit Risk | Percentage of Stated Income Sample Loans with Unreasonable Income Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 38 | 9 | 23.68% | 9 | 23.68% |
| NHELI 2006-FM1 | 25 | 11 | 44.00% | 11 | 44.00% |
| NHELI 2006-FM2 | 40 | 13 | 32.50% | 13 | 32.50% |
| NHELI 2006-HE3 | 19 | 6 | 31.58% | 6 | 31.58% |
| NHELI 2007-1 | 74 | 23 | 31.08% | 23 | 31.08% |
| NHELI 2007-2 | 30 | 12 | 40.00% | 12 | 40.00% |
| NHELI 2007-3 | 30 | 3 | 10.00% | 3 | 10.00% |
| **Total** | **256** | **77** | **30.08%** | **77** | **30.08%** |

**(3)     One Quarter Of The Sample Loans Lacked Required Credit Information**

216.     Obtaining required credit documents and information is important to a loan underwriter, who must have these credit documents and key credit information in order to evaluate the borrower's ability and willingness to repay the loan.  Hunter Direct ¶ 15.

217.     The Guidelines contained directions and requirements for evaluating a borrower's ability and willingness to repay a loan.  Hunter Direct ¶ 147.  Conducting such an evaluation was important since a borrower's monthly payments are an originator's primary source of repayment for a loan.  Hunter Direct ¶ 147.  To establish a borrower's ability and willingness to repay a mortgage, all Guidelines required the underwriter to consider the borrower's credit profile.  Hunter Direct ¶ 148.  At a minimum, underwriters were required to obtain a copy of the borrower's credit report within a discrete period, generally between 60 and 120 days, prior to the loan's closing, funding, or note date.  Hunter Direct ¶ 148 (citing Guidelines).  In addition, almost half of the Guidelines explicitly required the loan origination file to include a final loan application, typically

in a form similar to Fannie Mae Form 1003, regardless of loan documentation type.  Hunter Direct ¶ 152.  The requirement to obtain a loan application was implicit in the requirement to include certain information on the loan application.  Hunter Direct ¶ 151 (citing Guidelines).  The vast majority of the Guidelines generally required the applications to be completed with the original borrowers' signatures.  Hunter Direct ¶ 152 (citing Guidelines).  Thus, virtually all of the Guidelines required certain critical credit documents.  Hunter Direct ¶ 148-49.

218.    In addition, the Prospectus Supplements contained representations about the specific types of credit information, such as a loan application, credit report/history, federal tax returns, and/or verifications of assets (or deposits), that underwriters should review to determine a borrower's ability to repay the mortgage loan.  Hunter Direct ¶ 20.  Indeed, the Prospectus Supplements for each Securitization represented that the underlying mortgage loans were supported by appropriate documentation of the borrower's credit profile, including a credit report, credit score, and documentation regarding income, employment, assets, and housing history.  Hunter Direct ¶ 20.  The Prospectus Supplements made clear that the purpose of obtaining such information was to evaluate the prospective borrower's ability to repay the loan.  Hunter Direct ¶ 20.

219.    Mr. Hunter's review revealed that many of the Sample Loans were missing critical information from the loan files, such as:  (1) a final loan application; (2) the borrower's credit report; (3) documentation verifying the borrower's employment; (4) documentation verifying the borrower's income; (5) documentation verifying the borrower's assets, and (6) a history of the borrower's mortgage or rent payments.  Hunter Direct ¶ 321.

220.     The following summary exhibit, **Plaintiff's Exhibit 1648**, reflects the number of

Sample Loans in each Securitization that had defects for missing credit information where the

defect was based on an express requirement in the applicable guidelines.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Missing Credit Information Guideline Defects | Percentage of Sample Loans with Missing Credit Information Guideline Defects |
|---|---|---|---|
| NAA 2005-AR6 | 131 | 26 | 19.85% |
| NHELI 2006-FM1 | 100 | 32 | 32.00% |
| NHELI 2006-FM2 | 100 | 34 | 34.00% |
| NHELI 2006-HE3 | 99 | 23 | 23.23% |
| NHELI 2007-1 | 98 | 12 | 12.24% |
| NHELI 2007-2 | 98 | 28 | 28.57% |
| NHELI 2007-3 | 97 | 27 | 27.84% |
| **Total** | **723** | **182** | **25.17%** |

221.     When the applicable underwriting guideline or the Prospectus Supplement did not

expressly state that the loan should contain certain required credit documentation, Mr. Hunter

applied such a requirement based on minimum industry standards on the ground that obtaining

such documentation was part and parcel of determining the borrower's ability to repay. Hunter

Direct ¶¶ 149-151.  In addition, obtaining the required credit documentation is implicit in the

representation in each of the Prospectus Supplements that the originator assessed the borrower's

ability to repay pursuant to the applicable underwriting guidelines.  Hunter Direct ¶ 20.

222.     The following summary exhibit, **Plaintiff's Exhibit 1647**, summarizes the number

of Sample Loans in each Securitization that failed to contain certain required credit information

pursuant to express requirements in the underwriting guidelines or implicit requirements based on

the representations in the Prospectus Supplements and minimum industry standards.  In many

instances, a failure to obtain information required under the governing underwriting guidelines

substantially increased the credit risk of the Sample Loan because the credit risk could not have been assessed properly.  Hunter Direct ¶ 321.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Missing Credit Information Defects | Percentage of Sample Loans with Missing Credit Information Defects | Number of Sample Loans with Missing Credit Information Defects & Substantially Increased Credit Risk | Percentage of Sample Loans with Missing Credit Information Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 28 | 21.37% | 23 | 17.55% |
| NHELI 2006-FM1 | 100 | 33 | 33.00% | 32 | 32.00% |
| NHELI 2006-FM2 | 100 | 34 | 34.00% | 30 | 30.00% |
| NHELI 2006-HE3 | 99 | 25 | 25.25% | 24 | 24.24% |
| NHELI 2007-1 | 98 | 13 | 13.26% | 12 | 12.24% |
| NHELI 2007-2 | 98 | 28 | 28.57% | 28 | 28.57% |
| NHELI 2007-3 | 97 | 27 | 27.83% | 26 | 26.80% |
| **Total** | **723** | **188** | **26.00%** | **175** | **24.20%** |

### (4)     Over Ten Percent Of The Sample Loans Failed To Satisfy Requirements To Investigate Red Flags

223.     Loan underwriters were responsible for reviewing the information contained in the initial and final loan applications—as well as any other loan application—against other information in the file to identify inconsistencies or other discrepancies that would be considered red flags requiring further investigation.  Hunter Direct ¶¶ 84-86.  Any misrepresentation would negatively affect the borrower's ability and willingness to repay the mortgage, including constituting an event of default, and, as such, adversely impacted the credit risk of the loan. Hunter Direct ¶¶ 85, 115.

224.     The vast majority of the Guidelines required the underwriter to follow up on red flags in the loan file, including those indicating potential misrepresentations of the borrower's income, employment, debt obligations, housing history, or occupancy status.  Hunter Direct ¶ 170.

225.     Mr. Hunter's re-underwriting review revealed that certain Sample Loans contained red flags, which indicated potential misrepresentations of employment, income, occupancy, or the

borrower's debt obligations, without any evidence in the file that the loan underwriter investigated, let alone considered, such red flags.  Hunter Direct ¶ 332.

226.    The following summary exhibit, **Plaintiff's Exhibit 1652**, reflects the number of Sample Loans in each Securitization that had defects for failure to investigate red flags where the defect was based on a requirement in the guidelines.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Red Flag Guideline Defects | Percentage of Sample Loans with Red Flag Guideline Defects |
|---|---|---|---|
| NAA 2005-AR6 | 131 | 4 | 3.05% |
| NHELI 2006-FM1 | 100 | 12 | 12.00% |
| NHELI 2006-FM2 | 100 | 12 | 12.00% |
| NHELI 2006-HE3 | 99 | 4 | 4.04% |
| NHELI 2007-1 | 98 | 2 | 2.04% |
| NHELI 2007-2 | 98 | 1 | 1.02% |
| NHELI 2007-3 | 97 | 7 | 7.22% |
| **Total** | **723** | **42** | **5.81%** |

227.    When the applicable underwriting guideline did not expressly state that the loan underwriter should investigate red flags, Mr. Hunter applied such a requirement based on minimum industry standards relating to misrepresentations, and the implicit requirement to investigate red flags encompassed by the Prospectus Supplements' representations relating to ability to repay.  Hunter Direct ¶ 252.

228.    The following summary exhibit, **Plaintiff's Exhibit 1651**, summarizes the number of Sample Loans in each Securitization where there was a failure to investigate red flags regarding potential misrepresentations of income, employment, debt obligations, housing history, or occupancy status, based on express requirements in the underwriting guidelines, the minimum

industry standards, or implicit requirements encompassed by the representations in the Prospectus Supplements.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Red Flag Defects | Percentage of Sample Loans with Red Flag Defects | Number of Sample Loans with Red Flag Defects & Substantially Increased Credit Risk | Percentage of Sample Loans with Red Flag Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 16 | 12.21% | 14 | 10.68% |
| NHELI 2006-FM1 | 100 | 13 | 13.00% | 11 | 11.00% |
| NHELI 2006-FM2 | 100 | 13 | 13.00% | 13 | 13.00% |
| NHELI 2006-HE3 | 99 | 11 | 11.11% | 11 | 11.11% |
| NHELI 2007-1 | 98 | 12 | 12.24% | 12 | 12.24% |
| NHELI 2007-2 | 98 | 11 | 11.22% | 10 | 10.20% |
| NHELI 2007-3 | 97 | 13 | 13.40% | 13 | 13.40% |
| **Total** | **723** | **89** | **12.31%** | **84** | **11.62%** |

**(5)     More Than Half Of The Sample Loans Failed To Satisfy Requirement To Investigate Unexplained Credit Inquiries**

229.     Failure to investigate unexplained credit inquires is a significant underwriting defect because an investigation of unexplained inquiries could result in the identification of undisclosed debts that may have impacted the borrower's overall debt and credit profile.  Hunter Direct ¶ 90, 327.  Such undisclosed debt obligations may materially alter the underwriter's ultimate credit risk determination by negatively impacting the underwriter's DTI ratio calculation. Hunter Direct ¶¶ 90, 327.

230.     Some Guidelines contained explicit requirements for the underwriter to review the borrower's credit report before closing, with a particular focus on any recent credit inquiries. Hunter Direct ¶ 150 (citing Guidelines).  Unexplained credit inquiries prior to a mortgage loan's origination were to be investigated because each inquiry could have been indicative of an undisclosed debt obligation.  Hunter Direct ¶ 150.

231.     The following summary exhibit, **Plaintiff's Exhibit 1650**, reflects the number of Sample Loans in each Securitization that had defects for failure to investigate recent credit

inquiries where the defect was based on a requirement in the guidelines to obtain a credit report or investigate credit inquiries.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Credit Inquiry Guideline Defects | Percentage of Sample Loans with Credit Inquiry Guideline Defects |
|---|---|---|---|
| NAA 2005-AR6 | 131 | 42 | 32.06% |
| NHELI 2006-FM1 | 100 | 71 | 71.00% |
| NHELI 2006-FM2 | 100 | 66 | 66.00% |
| NHELI 2006-HE3 | 99 | 58 | 58.59% |
| NHELI 2007-1 | 98 | 34 | 34.69% |
| NHELI 2007-2 | 98 | 59 | 60.20% |
| NHELI 2007-3 | 97 | 50 | 51.55% |
| **Total** | **723** | **380** | **52.56%** |

232.    When the guidelines did not contain a requirement to obtain a credit report or investigate credit inquiries, Mr. Hunter applied such a requirement based on minimum industry standards relating to credit, and the implicit requirement to investigate unexplained credit inquiries encompassed by the Prospectus Supplements' representations relating to ability to repay.  Hunter Direct ¶¶ 15, 252.

233.    The following summary exhibit, **Plaintiff's Exhibit 1649**, reflects the number of Sample Loans in each Securitization that had defects for failure to investigate recent credit inquiries where the defect was based on the applicable guideline, minimum industry standards, or implicit requirements encompassed by the representations in the Prospectus Supplements.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Credit Inquiries Defects | Percentage of Sample Loans with Credit Inquiries Defects | Number of Sample Loans with Credit Inquiries Defects & Substantially Increased Credit Risk | Percentage of Sample Loans with Credit Inquiries Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 57 | 43.51% | 38 | 29.00% |
| NHELI 2006-FM1 | 100 | 71 | 71.00% | 52 | 52.00% |
| NHELI 2006-FM2 | 100 | 66 | 66.00% | 48 | 48.00% |
| NHELI 2006-HE3 | 99 | 60 | 60.60% | 44 | 44.44% |

| | | | | | |
|---|---|---|---|---|---|
| NHELI 2007-1 | 98 | 38 | 38.77% | 30 | 30.61% |
| NHELI 2007-2 | 98 | 69 | 70.40% | 46 | 46.93% |
| NHELI 2007-3 | 97 | 56 | 57.73% | 36 | 37.11% |
| **Total** | **723** | **417** | **57.68%** | **294** | **40.66%** |

**(6)     One-Fifth Of The Sample Loans Had Excessive LTV Or CLTV Ratios That Exceeded The  Maximum**

234.     The LTV ratio compares the outstanding balance of a mortgage loan with the value of the mortgaged property at the time the loan was made, indicating how much equity a borrower has in a home, Hunter Direct ¶¶ 46-47, and CLTV ratio compares the combined balance of the first- and second-lien mortgages against the lesser of either the property's appraised value or purchase price.  Hunter Direct ¶ 48.  LTV and CLTV ratios are important factors in assessing the credit risk of a loan, as a borrower who has less equity is more likely to default on mortgage payments if he or she experiences financial distress.  Hunter Direct ¶¶ 46-48.

235.     Virtually all of the Guidelines included LTV/CLTV ratio requirements.  Hunter Direct ¶ 197 (citing Guidelines).

236.     Mr. Hunter's re-underwriting review shows that certain of the Sample Loans had LTV/CLTV ratios in excess of the maximum permitted by governing underwriting guidelines, even excluding the results of Dr. Kilpatrick's Greenfield AVM review.  Hunter Direct ¶ 336.  In particular, when a loan transaction occurred within six to twelve months of a purchase, there were instances when the original underwriter improperly used an appraised value rather than the sales price to calculate the LTV ratio, and when the LTV ratio was recalculated using the information required by the underwriting guidelines, it often exceeded the limits set by the guidelines.  Hunter Direct ¶ 336.

237.    The following summary exhibit, **Plaintiff's Exhibit 1653**, reflects the number of Sample Loans in each of the Securitizations where the recalculated LTV/CLTV ratios, using information contained in the loan file, exceeded guideline limits.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Excessive LTV Guideline Defects Based on the Loan File | Percentage of Sample Loans with Excessive LTV Guideline Defects Based on the Loan File |
|---|---|---|---|
| NAA 2005-AR6 | 131 | 3 | 2.29% |
| NHELI 2006-FM1 | 100 | 2 | 2.00% |
| NHELI 2006-FM2 | 100 | 2 | 2.00% |
| NHELI 2006-HE3 | 99 | 7 | 7.07% |
| NHELI 2007-1 | 98 | 5 | 5.10% |
| NHELI 2007-2 | 98 | 4 | 4.08% |
| NHELI 2007-3 | 97 | 6 | 6.19% |
| **Total** | **723** | **29** | **4.01%** |

238.    In addition to using the information in the loan file to determine whether the LTV/CLTV ratios exceeded the maximum allowable LTV/CLTV ratio under the underwriting guidelines, Mr. Hunter also recalculated the LTV/CLTV ratios using the values determined by Dr. Kilpatrick using the Greenfield AVM.  Hunter Direct ¶ 359.

239.    The following summary exhibit, **Plaintiff's Exhibit 1661**, reflects the number of Sample Loans in each of the Securitizations where the recalculated LTV/CLTV ratios based on the Greenfield AVM exceeded the guideline requirements.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Excessive LTV Defects Based on the Greenfield AVM | Percentage of Sample Loans with Excessive LTV Defects Based on the Greenfield AVM |
|---|---|---|---|
| NAA 2005-AR6 | 131 | 14 | 10.69% |
| NHELI 2006-FM1 | 100 | 22 | 22.00% |
| NHELI 2006-FM2 | 100 | 22 | 22.00% |
| NHELI 2006-HE3 | 99 | 20 | 20.20% |
| NHELI 2007-1 | 98 | 8 | 8.16% |
| NHELI 2007-2 | 98 | 23 | 23.47% |

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Excessive LTV Defects Based on the Greenfield AVM | Percentage of Sample Loans with Excessive LTV Defects Based on the Greenfield AVM |
|---|---|---|---|
| NHELI 2007-3 | 97 | 17 | 17.53% |
| **Total** | **723** | **126** | **17.43%** |

240.    The following summary exhibit, **Plaintiff's Exhibit 1662**, reflects the number of Sample Loans in each of the Securitizations where the recalculated LTV/CLTV ratios based on information in the loan file and the Greenfield AVM exceeded the guideline requirements.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Excessive LTV Defects | Percentage of Sample Loans with Excessive LTV Defects | Number of Sample Loans with Excessive LTV Defects & Substantially Increased Credit Risk | Percentage of Sample Loans with Excessive LTV Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 17 | 12.97% | 17 | 12.97% |
| NHELI 2006-FM1 | 100 | 22 | 22.00% | 22 | 22.00% |
| NHELI 2006-FM2 | 100 | 23 | 23.00% | 23 | 23.00% |
| NHELI 2006-HE3 | 99 | 24 | 24.24% | 24 | 24.24% |
| NHELI 2007-1 | 98 | 12 | 12.24% | 12 | 12.24% |
| NHELI 2007-2 | 98 | 25 | 25.51% | 25 | 25.51% |
| NHELI 2007-3 | 97 | 22 | 22.68% | 22 | 22.68% |
| **Total** | **723** | **145** | **20.06%** | **145** | **20.06%** |

241.    There were only three Sample Loans where the applicable guideline was not available, and Mr. Hunter applied the minimum industry standard relating to LTV/CLTV of 100%. Hunter Direct ¶ 255-256, 361.  The Prospectus Supplements for each of the Securitizations represent that the LTV/CLTV ratios of the Mortgage Loans did not exceed 100%.  Hunter Direct ¶¶ 49-50.

### (7)    Over Five Percent Of Sample Loans Were Not Originated In Compliance With Federal And State Laws

242.    The Prospectus Supplements expressly stated that each Mortgage Loan complied with federal and state laws regarding equal credit opportunities, mortgage recording procedures, and required lender disclosures to borrowers, among other legal requirements.  Hunter Direct ¶ 42.

66

243.    In addition, many of the Guidelines expressly stated that the loans must comply with law.  Hunter Direct ¶ 185 (citing Guidelines).  For example, some of the Guidelines recognized that the Truth-in-Lending Act ("TILA") obligated the lender to provide the borrower with a form notifying the borrower of the right of rescission.  Hunter Direct ¶ 186.  Moreover, some of the Guidelines recognized that TILA required an originator to notify the borrower of the true cost of the loan prior to the loan's closing by providing the borrower a truth-in-lending TIL disclosure.  Hunter Direct ¶ 187.  Additionally, the vast majority of the Guidelines recognized that RESPA required each mortgage loan file to contain a HUD-1 form, also called a "Settlement Statement" or "Closing Statement."  Hunter Direct ¶ 188.

244.    The failure to comply with these requirements could affect the credit risk of the mortgage loan by making it more difficult to foreclose on the property if the borrower defaulted. Hunter Direct ¶¶ 41, 280.

245.    The following summary exhibit, **Plaintiff's Exhibit 1654**, reflects the number of Sample Loans in each of the Securitizations where the required TILA, ROR or TIL disclosure was missing, incomplete, or insufficient; where the HUD-1 was missing, incomplete, or insufficient; or where another compliance defect existed.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Compliance Defects | Percentage of Sample Loans with Compliance Defects |
|---|---|---|---|
| NAA 2005-AR6 | 131 | 16 | 12.21% |
| NHELI 2006-FM1 | 100 | 5 | 5.00% |
| NHELI 2006-FM2 | 100 | 5 | 5.00% |
| NHELI 2006-HE3 | 99 | 2 | 2.02% |
| NHELI 2007-1 | 98 | 9 | 9.18% |
| NHELI 2007-2 | 98 | 4 | 4.08% |
| NHELI 2007-3 | 97 | 5 | 5.15% |
| **Total** | **723** | **46** | **6.36%** |

**(e)** **The Occupancy Status Of A Material Percentage Of Sample Loans Was Misrepresented In The Prospectus Supplements**

246.     Each of the Prospectus Supplements represented the percentages of properties underlying the mortgage loans in the SLGs that were owner-occupied homes.  Hunter Direct ¶ 58.

247.     Owner occupancy refers to the borrower's use of a property.  There are three categories of occupancy disclosed in the Prospectus Supplements:  (1) owner-occupied, (2) investor, meaning the borrower intended to use the mortgaged property to earn income, for example, through rental payments; and (3) second home, meaning the borrower intended to use the mortgaged property as a part-time or vacation home.  Hunter Direct ¶ 53.  When determining whether the occupancy status of a mortgage has been properly disclosed, it is the occupancy status of the property, not the borrower's intent, which is relevant.  *FHFA v. Nomura Holding Am., Inc.* ("Hunter Occupancy Op."), 2015 WL 394072, at *3 (S.D.N.Y. Jan. 29, 2015).

248.     In the residential mortgage industry, a property is considered to be owner occupied when the borrower uses the mortgaged property as his or her primary residence for a specified period of time.  Hunter Direct ¶ 54.  In the context of a refinanced owner-occupied loan, the borrower is already living in the property, and in the context of a purchase money loan, the borrower agrees to occupy the property as his or her primary residence within a certain number of days after closing and to continue living there for at least one year.  Hunter Direct ¶ 54.

249.     The occupancy status of a property is important because a borrower living in a mortgaged property has a greater incentive to make payments and care for the home than a borrower purchasing a second home or investment property.  Hunter Direct ¶ 57.

250.     The following summary exhibit, **Plaintiff's Exhibit 1664**, reflects the number of Sample Loans for each Securitization in which the subject properties were incorrectly represented as being owner occupied in the pre-closing loan tapes.

| Securitization | Number of Sample Loans Represented as Owner-Occupied on Closing Loan Tape | Number of Sample Loans Misrepresented as Owner-Occupied on Closing Loan Tape | Percentage of Sample Loans Misrepresented as Owner-Occupied on Closing Loan Tape |
|---|---|---|---|
| NAA 2005-AR6 | 63 | 7 | 11.11% |

68

| Securitization | Number of Sample Loans Represented as Owner-Occupied on Closing Loan Tape | Number of Sample Loans Misrepresented as Owner-Occupied on Closing Loan Tape | Percentage of Sample Loans Misrepresented as Owner-Occupied on Closing Loan Tape |
|---|---|---|---|
| NHELI 2006-FM1 | 91 | 8 | 8.79% |
| NHELI 2006-FM2 | 93 | 8 | 8.60% |
| NHELI 2006-HE3 | 89 | 3 | 3.37% |
| NHELI 2007-1 | 49 | 2 | 4.08% |
| NHELI 2007-2 | 91 | 8 | 8.79% |
| NHELI 2007-3 | 91 | 6 | 6.59% |
| **Total** | **567** | **42** | **7.41%** |

251.   The following summary exhibit, **Plaintiff's Exhibit 1665**, reflects the number of Sample Loans for each Securitization in which the subject properties were incorrectly represented as being owner occupied in the pre-closing loan tapes, after removing the 17 loans where the post-origination evidence reflects a new address for the borrower on a date after the Cut-Off date in the Prospectus Supplements.

| Securitization | Sample Loans Represented as Owner-Occupied on Closing Loan Tape | Sample Loans Misrepresented as Owner-Occupied on Closing Loan Tape | Sample Loans Misrepresented as Owner-Occupied on Closing Loan Tape |
|---|---|---|---|
| NAA 2005-AR6 | 63 | 1 | 1.59% |
| NHELI 2006-FM1 | 91 | 4 | 4.40% |
| NHELI 2006-FM2 | 93 | 6 | 6.45% |
| NHELI 2006-HE3 | 89 | 3 | 3.37% |
| NHELI 2007-1 | 49 | 1 | 2.04% |
| NHELI 2007-2 | 91 | 4 | 4.40% |
| NHELI 2007-3 | 91 | 6 | 6.59% |
| **Total** | **567** | **25** | **4.41%** |

### (f)   Almost Half Of Sample Loans Had Inaccurate Credit Characteristics Reflected On The Pre-Closing Loan Tapes

252.   Each of the Prospectus Supplements represented that the Certificate purchased by the GSEs was rated AAA by at least two of credit ratings agencies.  Hunter ¶ 60.

253.   The credit ratings agencies assigned ratings to a loan or pool of loans based on models they developed to predict foreclosure frequency, expected loss, and cash flows.  Blum

Direct ¶ 34; Mahdavian Dep. 90:24-92:22.  The collateral characteristics for the loans to be securitized were contained on pre-closing loan tapes that were provided to the rating agencies by Defendants and were used by the rating agency as inputs to their models.  Hunter ¶ 96.   The key drivers of the rating agency models included LTV/CLTV ratio, occupancy status, and credit score. **PX 1319** at 6-7 (LEVELS input fields); Mahdavian Dep. 271:8-21; Blum Direct ¶ 35.

254.    Consequently, the rating agencies' credit ratings for each of the Certificates depended on the accuracy of the data on the pre-closing loan tapes provided to the agencies by Defendants.  *See, e.g.*, Blum Direct ¶¶ 36-39;  Rubinstein Direct ¶¶ 70-72; **PX 1319** at 10, 21.  As Moody's corporate representative testified, "we depended on the data that was being presented to us and we expected the data to be accurate; and we were not in the business of performing any due diligence on the loans ourselves."  Chatterjee Dep. 212:18-212:23; *see also* Mahdavian Dep. 256:14-24, 365:13-18 (S&P 30(b)(6) witness) (same).   If the data presented on the loan was incorrect, that would cause the model to assess inaccurately the risk for both the loan and the loan pool.  Blum Direct ¶ 37.

255.    Based on Mr. Hunter's re-underwriting review of the Sample Loans, there are numerous instances where the information contained on the pre-closing loan tapes concerning the credit characteristics of those loans was not accurate.  The following summary exhibit, **Plaintiff's Exhibit 1667**, reflects the number of Sample Loans with discrepancies from the information contained in the pre-closing loan tapes.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Pre-Closing Loan Tape Defects | Percentage of Sample Loans with Pre-Closing Loan Tape Defects | Number of Sample Loans with Pre-Closing Loan Tape Defects & Substantially Increased Credit Risk | Percentage of Sample Loans with Pre-Closing Loan Tape Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 57 | 43.51% | 54 | 41.22% |
| NHELI 2006-FM1 | 100 | 47 | 47.00% | 47 | 47.00% |
| NHELI 2006-FM2 | 100 | 53 | 53.00% | 52 | 52.00% |
| NHELI 2006-HE3 | 99 | 51 | 51.51% | 47 | 47.47% |

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Pre-Closing Loan Tape Defects | Percentage of Sample Loans with Pre-Closing Loan Tape Defects | Number of Sample Loans with Pre-Closing Loan Tape Defects & Substantially Increased Credit Risk | Percentage of Sample Loans with Pre-Closing Loan Tape Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NHELI 2007-1 | 98 | 38 | 38.77% | 35 | 35.71% |
| NHELI 2007-2 | 98 | 51 | 52.04% | 46 | 46.93% |
| NHELI 2007-3 | 97 | 46 | 47.42% | 40 | 41.23% |
| **Total** | **723** | **343** | **47.44%** | **321** | **44.40%** |

### (g)    Incremental Effect Of Each Category Of Defect

256.    The following summary exhibit, **Plaintiff's Exhibit 1642**, reflects the number of Sample Loans in each Securitization that had defects that were based only on a failure to comply with underwriting guidelines and/or a failure to adhere to the express underwriting representations in the Prospectus Supplements.  This exhibit does not include any loans with (i) defects that are based on minimum industry standards, (ii) occupancy defects, or (iii) defects based on the Greenfield AVM.  This chart also reflects the number of these loans that had substantially increased credit risk.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Guideline or Prospectus Supplement Defects | Percentage of Sample Loans with Guideline or Prospectus Supplement Defects | Number of Sample Loans with Guideline or Prospectus Supplement Defects & Substantially Increased Credit Risk | Percentage of Sample Loans with Guideline or Prospectus Supplement Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 52 | 39.69% | 33 | 25.19% |
| NHELI 2006-FM1 | 100 | 58 | 58.00% | 38 | 38.00% |
| NHELI 2006-FM2 | 100 | 68 | 68.00% | 45 | 45.00% |
| NHELI 2006-HE3 | 99 | 46 | 46.46% | 30 | 30.30% |
| NHELI 2007-1 | 98 | 36 | 36.73% | 27 | 27.55% |
| NHELI 2007-2 | 98 | 43 | 43.88% | 27 | 27.55% |
| NHELI 2007-3 | 97 | 53 | 54.64% | 35 | 36.08% |
| **Total** | **723** | **356** | **49.24%** | **235** | **32.50%** |

257.     The following summary exhibit, **Plaintiff's Exhibit 1660,** reflects the number of Sample Loans in each Securitization that have defects only based on underwriting guidelines or minimum industry standards of underwriting, but does not include any occupancy defects or defects based on the Greenfield AVM.  This chart also reflects the number of these loans that had substantially increased credit risk.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Guideline or Minimum Industry Standard Defects | Percentage of Sample Loans with Guideline or Minimum Industry Standard Defects | Number of Sample Loans with Guideline or Minimum Industry Standard Defects & Substantially Increased Credit Risk | Percentage of Sample Loans with Guideline or Minimum Industry Standard Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 89 | 67.94% | 60 | 45.80% |
| NHELI 2006-FM1 | 100 | 62 | 62.00% | 42 | 42.00% |
| NHELI 2006-FM2 | 100 | 69 | 69.00% | 46 | 46.00% |
| NHELI 2006-HE3 | 99 | 59 | 59.60% | 42 | 42.42% |
| NHELI 2007-1 | 98 | 64 | 65.31% | 54 | 55.10% |
| NHELI 2007-2 | 98 | 64 | 65.31% | 41 | 41.84% |
| NHELI 2007-3 | 97 | 67 | 69.07% | 44 | 45.36% |
| **Total** | **723** | **474** | **65.56%** | **329** | **45.50%** |

258.     When defects based on the Greenfield AVM are combined with defects based on minimum industry standards of underwriting and defects based on a violation of underwriting guidelines, the number of loans with defects increases further.  The following summary exhibit, **Plaintiff's Exhibit 1663**, reflects the number of Sample Loans in each Securitization that have only these three categories of defects.  This chart does not include any occupancy defects.  This chart also reflects the number of these loans that had substantially increased credit risk.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Guideline, Minimum Industry Standard & Greenfield AVM Defects | Percentage of Sample Loans with Guideline, Minimum Industry Standard & Greenfield AVM Defects | Number of Sample Loans with Guideline, Minimum Industry Standard & Greenfield AVM Defects & Substantially Increased Credit Risk | Percentage of Sample Loans with Guideline, Minimum Industry Standard & Greenfield Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 102 | 77.86% | 73 | 55.73% |
| NHELI 2006-FM1 | 100 | 84 | 84.00% | 64 | 64.00% |
| NHELI 2006-FM2 | 100 | 88 | 88.00% | 65 | 65.00% |
| NHELI 2006-HE3 | 99 | 79 | 79.80% | 62 | 62.63% |
| NHELI 2007-1 | 98 | 72 | 73.47% | 62 | 63.27% |
| NHELI 2007-2 | 98 | 84 | 85.71% | 61 | 62.24% |
| NHELI 2007-3 | 97 | 82 | 84.54% | 59 | 60.82% |
| **Total** | **723** | **591** | **81.74%** | **446** | **61.69%** |

259.    When defects based on the owner occupancy review are combined with defects based on minimum industry standards of underwriting, defects based on a violation of underwriting guidelines, and defects based on the Greenfield AVM, the number of loans with defects continues to increase.  The following summary exhibit, **Plaintiff's Exhibit 1666**, reflects the number of Sample Loans in each Securitization that have all four categories of defects.  This chart also reflects the number of these loans that had substantially increased credit risk.

| Securitization | Number of Sample Loans Reviewed | Number of Sample Loans with Guideline, Minimum Industry Standard, Greenfield AVM & Owner Occupancy Defects | Percentage of Sample Loans with Guideline, Minimum Industry Standard, Greenfield AVM & Owner Occupancy Defects | Number of Sample Loans with Guideline, Minimum Industry Standard, Greenfield AVM & Owner Occupancy Defects & Substantially Increased Credit Risk | Percentage of Sample Loans with Guideline, Minimum Industry Standard, Greenfield AVM & Owner Occupancy Defects & Substantially Increased Credit Risk |
|---|---|---|---|---|---|
| NAA 2005-AR6 | 131 | 108 | 82.44% | 79 | 60.31% |
| NHELI 2006-FM1 | 100 | 90 | 90.00% | 70 | 70.00% |
| NHELI 2006-FM2 | 100 | 95 | 95.00% | 72 | 72.00% |
| NHELI 2006-HE3 | 99 | 82 | 82.83% | 65 | 65.66% |
| NHELI 2007-1 | 98 | 74 | 75.51% | 64 | 65.31% |
| NHELI 2007-2 | 98 | 91 | 92.86% | 68 | 69.39% |
| NHELI 2007-3 | 97 | 85 | 87.63% | 62 | 63.92% |
| **Total** | **723** | **625** | **86.45%** | **480** | **66.39%** |

**3.      The Analysis Of FHFA's Expert, Dr. Kilpatrick, Shows That Large Numbers Of Sample Loans Had Appraisal Defects**

260.    FHFA's appraisal expert, Dr. John A. Kilpatrick, Ph.D. analyzed the Sample Loans selected by Dr. Cowan to determine if the appraisals rendered for those loans were (a) accurate; and (b) "credible" as that term is used in USPAP and other applicable appraisal standards and practice.

**(a)      The Original Appraisals For Nearly One-Third Of The Sample Loans Were Inflated**

**(1)      Appraisals And LTV Ratios**

261.    An appraisal is meant to be an unbiased evaluation of a property's market value at a given date.  This value determines the amount of collateral available to satisfy the loan and is a central factor in evaluating the risk of residential mortgage loans.  Kilpatrick Direct ¶ 17; *see*, *e.g.*, **PX O0020**, FHFA02011252 at FHFA02011286-FHFA02011287 ("High loan-to-value ratios increase risk of loss- Mortgage loans with higher loan-to-value ratios may present a greater risk of loss than mortgage loans with loan-to-value ratios of 80% or below.").

262.    The loan-to-value ("LTV") ratio reflects the relationship between the amount of the loan and the market value of the property, and is expressed as a percentage.  The numerator in the LTV ratio is the principal balance of the mortgage loan (*i.e.*, the loan amount), and the denominator is the value of the mortgaged property.  Kilpatrick Direct ¶ 35.

263.    Where there is a preexisting mortgage on the property, the numerator includes the balance of the principal for the first and second lien mortgages, and the ratio is referred to as combined loan-to-value ("CLTV") ratio.  Kilpatrick Direct ¶¶ 89-91.

264.    Because an appraisal is an objective and unbiased estimate of a property's market value, it will not necessarily be consistent with the price at which a buyer may have been willing to purchase a property.  This is particularly true in an unstable or rapidly increasing market. Kilpatrick Direct ¶ 36; Kennedy 11/5 Tr. at 158:10-160:3.

265.    An appraiser is expressly prohibited by USPAP from backing into the appraised value by using the known purchase price as a predetermined value.  Kilpatrick Direct ¶ 22; Hausman 10/24 Tr. at 105:17-106:19; Hedden 11/21 Tr. at 240:18-241:9; **PX 01415** at 172 (USPAP 2006).

266.    To conservatively reflect the credit risk of a mortgage loan used to finance a purchase transaction, the denominator in the LTV ratio is, accordingly, the lesser of the appraised value or the sale price.  Kilpatrick Direct ¶ 35.

267.    For a mortgage refinance loan, the denominator in the LTV ratio is always the appraised market value because there is no sale price associated with the transaction.  Kilpatrick Direct ¶ 37.

268.    A central component of a residential appraisal is the selection of comparable properties—typically the closest properties geographically that have sold recently and have the most similar characteristics (*e.g.*, size, style, lot size, bathrooms).  The appraiser analyzes, among other things, the comparables and the market conditions, marketing time, and supply and demand in the property's neighborhood to arrive at a credible opinion of the subject property's market value.  Kilpatrick Direct ¶ 19.

269.     Appraisers document their work in an appraisal report, which for the single family residences at issue in the 2005 to 2007 time frame, generally took the form of a Fannie Mae 1004 Uniform Residential Appraisal Report ("URAR").  The URAR obligates the appraiser to set forth in this report relevant information and results of the investigation concerning the subject property, neighborhood, relevant market conditions, external obsolescence, the sale prices of comparable properties, and other factors that affect findings regarding the subject property's market value. Kilpatrick Direct ¶ 20.

### (2)     Dr. Kilpatrick's Methods Of Evaluating The Accuracy Of The Appraisals Of The Samples Loans Were Sound

270.     To test the accuracy of the appraisals performed on the properties that collateralized the Sample Loans, Dr. Kilpatrick predicted the market values for each property as of the original appraisal date using an automated valuation model ("Greenfield AVM") methodology.  Kilpatrick Direct ¶ 7.

### a.     The Use Of AVMs Is A Credible Method Of Reviewing A Large Number Of Appraisals

271.     Automated valuation models ("AVMs") use statistical models to reach objective and accurate predictions of the market value of real property as of a certain date.  Kilpatrick Direct ¶ 41.  The hedonic regression AVM methodology utilized by Dr. Kilpatrick predicts the market value of a property by utilizing the relationship between the characteristics of neighboring properties and their sales price and comparing the characteristics of those neighboring properties to the subject property's characteristics.  Kilpatrick Direct ¶ 48.

272.     AVMs draw from a larger pool of comparable property sales than traditional appraisal methods.  The typical URAR appraisal form requires an appraiser to select and analyze only three to six comparable properties.  In contrast, an AVM has the ability to analyze many hundreds of sales observations.  Kilpatrick Direct ¶ 45.

273.     AVMs have been used in the real estate industry since the early 1990s to value residential property.  When properly designed, validated, and applied, AVMs can provide a

statistically accurate measure of property value that is not subject to the idiosyncrasies, biases and external pressures that can impact on traditional appraisals.  Kilpatrick Direct ¶ 46.

> **b.**      **The Greenfield AVM Is A Credible Method For Valuing The Nomura Sample Properties**

274.    The Greenfield AVM consists of two valuation sub-models: (a) an ordinary least squares log-linear regression model ("OLS model"); and (b) a log-linear OLS model with an additional trend surface component ("OLSXY model").  Kilpatrick Direct ¶ 49.

275.    To value the Sample Loans, the OLS sub-model compares the actual sales price of comparable properties against up to six hedonic characteristics: (a) tax assessed value ("TAV"), (b) number of bathrooms, (c) year built, (d) lot size, (e) square footage, and (f) time adjustments (days and days squared).  Kilpatrick Direct ¶ 49.  The OLSXY model uses the same hedonic characteristics and adds four additional spatial characteristics: (g) latitude; (h) latitude squared; (i) longitude; and (j) longitude squared.  The use of the trend surface component allows the model to incorporate spatial effects (value impacts due to location).  Kilpatrick Direct ¶ 50.

276.    In developing the Greenfield AVM, Dr. Kilpatrick evaluated the use of additional explanatory hedonic characteristics, but concluded they were either correlated with characteristics he was already utilizing or would not improve the predictive power or accuracy of the Greenfield AVM.  Kilpatrick Direct ¶ 49.

277.    The sales observations data used by Dr. Kilpatrick in his AVM analysis were licensed from CoreLogic, a leading national aggregator and packager of such data.  CoreLogic is the top provider of such data and subjects its datasets to various quality checks.  Kilpatrick Direct ¶ 53.

278.    Before running the OLS and OLSXY sub-models for valuation, Dr. Kilpatrick implemented several data filters on the 25 million potential comparable properties received from CoreLogic.  These filters removed properties (a) with missing required data (*e.g.*, sales price, sale date, reliable tax assessed data, longitude and latitude information); (b) relating to sales other than those for single-family residences or condominiums; (c) relating to sales before 2003 or after 2007;

and (d) with sales coded as non-arm's-length or non-grant deed transactions.  Dr. Kilpatrick also filtered out comparable sales more than one year prior to the subject sale and sales that were not the same property type.  Kilpatrick Direct ¶ 54.

279.    Dr. Kilpatrick also implemented a Cross-Validation Filter ("CV Filter").  Kilpatrick Direct ¶ 58.  The CV filter removed sales observations from Dr. Kilpatrick's analysis if the predicted log value of a comparable property differed by 25% or more from (*i.e.*, was higher or lower than) the actual log sales price.  Dr. Kilpatrick concluded that the sales observations that were removed by CV Filter were either (a) not the subject of an arm's-length transaction; (b) not reported correctly (*i.e.*, was the product of errant data entry); or (c) a property with hedonic characteristics that significantly influenced the sales price that either (i) were not observable based on the data available and/or (ii) had characteristics that might potentially be observable but were not used by the OLS and OLSXY models.  Among the sales observations removed by the CV filter were properties with errant sales values in the $100s of millions.  Kilpatrick Direct ¶¶ 59-61.

280.    This use of the CV Filter is appropriate and well supported in AVM practice, and filters such as the CV Filter are routinely employed to eliminate outliers in econometric analysis.  Specifically, the CV filter is a recognized "leave one out" methodology that removes comparables whose values are not adequately explained by the hedonic characteristics being evaluated by the model being utilized.  Throughout all the prior FHFA cases pending in this Court, Dr. Kilpatrick utilized the same CV filter methodology and 25% threshold and did not adjust the CV filter at any point to influence his value estimates.  Kilpatrick Direct ¶¶ 61, 246; Hausman 7/30 Dep. Tr. at 284:3-25.

281.    Removing the CV Filter, as Defendants' experts suggest, would force Dr. Kilpatrick to bias his AVM results by using observations that contain data errors or hedonic characteristics that are not discernible to the Greenfield AVM, including errant sales values of over $1,000,000,000.  Hausman 7/30 Dep. Tr. at 204:8-18; Kilpatrick Direct ¶ 247.

282.    Each time the OLS or OLSXY sub-models were used to value a particular Nomura Sample Property, the sub-models each drew on between 100 to 2,000 comparable property

observations.  These comparable property observations were drawn from the county in which each Nomura subject sample property was located.  Kilpatrick Direct ¶ 54.

283.    When applied to a specific subject property, the OLS and OLSXY sub-models estimated market values that were very close to one another.  The values estimated by the OLS and OLSXY—which on average differ by no more than a couple percent—were averaged to yield the final predicted value of the subject property. Kilpatrick Direct ¶ 62.

284.    On the limited occasions when these value estimates differed by more than 10%, Dr. Kilpatrick reviewed and reconciled the estimates produced by each model.  If, alternatively, only one of the OLS or OLSXY sub-models yielded a value, that value was used as final predicted value for the subject property.  Kilpatrick Direct ¶ 54.

### c.    The Greenfield AVM Was Validated and Is Reliable

285.    Dr. Kilpatrick tested the accuracy of the Greenfield AVM in a number of ways. The Greenfield AVM was highly predictive of the inner 90th percentile of the sales prices for the Nomura Sample sales properties. Kilpatrick Direct ¶¶ 67-72.

286.    Specifically, the Greenfield AVM predicted the sales prices of the inner 90th percentile of the Nomura Sample sales properties to within approximately 1% on average, with a forecast standard deviation ("FSD") of 15%.  FSD, or forecast standard deviation, refers to the average difference between the Greenfield AVM prediction and the actual sales price, where the differences are squared to avoid offsetting positive and negative differences.  Kilpatrick Direct ¶ 71-72.

287.    The Greenfield AVM demonstrated similar levels of accuracy in prior Actions before the Court.  For example, the Greenfield AVM predicted the sales prices of all the Goldman Sachs Sample Loan sales transactions to within -1.9% on average with a 15% FSD, the Ally Sample Loan sales transactions to within 0.9% on average with a 14% FSD, and the HSBC Sample Loan sales transactions to within -2.3% with a 14% FSD.  Kilpatrick Direct ¶ 73.

288.     In addition, the data produced by Nomura's AVM expert, Lee Kennedy, confirmed the accuracy and reliability of the Greenfield AVM.  Compared to the four commercially available AVMs Mr. Kennedy utilized in his analysis, the Greenfield AVM is as accurate, if not more accurate, when applied to the Nomura Sample Properties.  Kilpatrick Direct ¶¶ 74-77.

289.     The appraisal inflation calculated by the AVMs that Nomura used to subject certain of the Sample Loans to valuation diligence is also consistent with the inflation predicted by the Greenfield AVM.  Kilpatrick Direct ¶ 78.

### (3)     The Greenfield AVM Revealed That The Sample Loans' Appraised Values Were Inflated By An Average of 8.92%

290.     Using the Greenfield AVM, Dr. Kilpatrick generated predicted values for 672 of the 796 Samples Loans selected by Dr. Cowan.  Kilpatrick Direct ¶ 7.

291.     While Dr. Kilpatrick did not have sufficient data to value the remaining 124 Sample Loans, his methodology and analysis provides a more than reasonable basis upon which to conclude that those properties would have produced similar results, and Defendants have produced no evidence to the contrary.  Kilpatrick Direct ¶ 9.

292.     Utilizing his Greenfield AVM methodology, Dr. Kilpatrick concluded that the original appraisals for the Nomura Sample Loans had an average inflation of 8.92%.  Kilpatrick Direct ¶ 82.

293.     Determining the relative inflation among sample properties, Dr. Kilpatrick divided the Greenfield AVM's predicted valuations for each loan into buckets based on the original appraisal relative to the standard deviation ("SD") of each run of the AVM and compared the number of properties falling into these buckets.  Kilpatrick Direct ¶ 85.

294.     The percentage of sample properties for which the Greenfield AVM produced a predicted valuation that was lower than appraised value by more than 1 standard deviation (written as "1 SD") was 38.1%, with an average inflation of 30.0%.  The percentage of sample properties for which the Greenfield AVM valuations was higher than appraised value by more than 1 standard deviation (written as -1 SD) was only 13.8%.  In other words, at 1 standard deviation, the

Greenfield AVM predicted that nearly three times as many appraisals were inflated as understated.  Kilpatrick Direct ¶ 86.

295.    The percentage of sample properties for which the Greenfield AVM produced a predicted valuation that was lower than appraised value by more than 2 standard deviations was 17.1%, with an average inflation of 45.2%, while the percentage of sample properties for which the Greenfield AVM produced predicted valuation higher than appraised value by more than 2 standard deviations was 5.6%.  In other words, at 2 standard deviations, the Greenfield AVM predicted that more than three times as many appraisals were inflated as understated.  Kilpatrick Direct ¶ 87.

296.    The large difference between the percentage of loans with inflated appraisals versus those with understated appraisals underscores the large upward bias among the Nomura Sample appraisals.  Kilpatrick Direct ¶ 87.

297.    Analyzing average inflation by SLG, Dr. Kilpatrick concluded that the average inflation in the seven at issue SLGs ranged from approximately 5% to over 15%:

| SLG | Average Inflation |
|---|---|
| NAA 2005-AR6 (3) | 5.49% |
| NHELI 2006-FM1 (1) | 7.58% |
| NHELI 2006-FM2 (1) | 15.35% |
| NHELI 2006-HE3 (1) | 11.40% |
| NHELI 2007-1 (2) | 4.54% |
| NHELI 2007-2 (1) | 12.27% |
| NHELI 2007-3 (1) | 7.18% |
| **Total** | **8.92%** |

Kilpatrick Direct ¶ 88.

298.    None of Defendants' four appraisal/valuation experts analyzed whether the appraisals supporting the Sample Loans were, or were not, inflated, and none of Defendants' appraisal experts was prepared or able to conclude that the original appraisals of the Sample Loans

were not systemically inflated.  Kennedy 7/25 Dep. Tr. at 108:6-109:9; Isakson 6/19 Dep. Tr. at 229:3-24; Hedden 11/21 Dep. Tr. at 71:11-23; Hausman 10/24 Dep. Tr. at 80:20-81:12.

299.    Dr. Kilpatrick calculated revised LTV ratios for the Sample Loans based on the results of his Greenfield AVM.  As is industry practice, for the numerator, he used the principal balance of the mortgage loan (*i.e.*, the loan amount) at origination (the "Original Balance").  For the denominator of non-refinance loans, Dr. Kilpatrick used the lesser of (a) the Greenfield AVM predicted value, (b) the original appraised value, or (c) the sale price of the mortgaged property.  For the denominator of refinance loans, which lack a sale price, Dr. Kilpatrick used the lesser of (a) the Greenfield AVM predicted value or (b) the original appraised value.  Kilpatrick Direct ¶¶ 89-91.

300.    Although the Offering Materials represented no loans had LTV ratios above 100, as set forth below, Dr. Kilpatrick concluded that 76.4% of the inflations above 95% confidence had LTV above 100.  Kilpatrick Direct ¶¶ 105-106.  Moreover, Dr. Kilpatrick concluded that the systemic appraisal inflation of 8.92% principally related to loans with higher LTV ratios, resulting in increases of LTV from below 80 to above 80, 90 and 100 LTV.  Kilpatrick Direct ¶¶ 104-105.

301.    Although Dr. Kilpatrick correctly calculated revised LTV ratios consistent with industry practice, utilizing only the value from the Greenfield AVM in the denominator of the LTV recalculation, instead of the lesser of the appraisal, the sales price or the Greenfield AVM value, would have no impact on his findings concerning sample loans with LTVs over 100 and have a minimal impact on loans he found to have LTVs in the high 80s and 90s.

302.    Dr. Kilpatrick calculated the difference between the average LTV ratios reported in the Offering Materials and the average LTV ratios calculated using the value predictions from the Greenfield AVM.  Dr. Kilpatrick concluded that the recalculated LTV ratios in each SLG were significantly higher than had been represented:

| SLG | Originally Represented Average LTV | Greenfield AVM Recalculation of LTV | Absolute Difference | Percent Difference |
|---|---|---|---|---|
| NAA 2005-AR6 (3) | 74.77% | 81.71% | 6.94% | 9.43% |
| NHELI 2006-FM1 (1) | 82.39% | 91.46% | 9.07% | 11.06% |
| NHELI 2006-FM2 (2) | 81.66% | 95.75% | 14.09% | 16.76% |
| NHELI 2006-HE3 (1) | 79.68% | 90.97% | 11.29% | 14.37% |
| NHELI 2007-1 (2) | 78.22% | 85.09% | 6.87% | 8.99% |
| NHELI 2007-2 (1) | 83.59% | 96.37% | 12.77% | 14.49% |
| NHELI 2007-3 (1) | 81.70% | 91.66% | 9.96% | 12.16% |

Kilpatrick Direct ¶ 92.

303.     Dr. Kilpatrick also calculated how these LTVs migrated into higher LTV ranges. To do so Dr. Kilpatrick divided the sample loans into three LTV ranges: (a) where the recalculated LTV ratio was less than or equal to 80; (b) where the recalculated LTV ratio was between 80 and 100; and (c) where the recalculated LTV ratio was greater than 100.  Comparing those results to the LTV ratios derived from the values set forth on the pre-closing loan tapes that were provided to the credit rating agencies (**PX 350** at NOM-FHFA_04886432) and used to calculate the values set forth in the Prospectus Supplements, Dr. Kilpatrick concluded that, as set forth below, many more Sample Loans had LTV ratios above 90 and 100 than were represented in the Offering Materials:

| SLG | LTV ≤ 80% | | LTV > 80% to LTV ≤ 100% | | LTV > 100% | |
|---|---|---|---|---|---|---|
| | Original | Recalculated | Original | Recalculated | Original | Recalculated |
| NAA 2005-AR6 (3) | 100.00% | 58.91% | 0.00% | 31.01% | 0.00% | 10.08% |
| NHELI 2006-FM1 (1) | 62.77% | 30.85% | 37.23% | 44.68% | 0.00% | 24.47% |
| NHELI 2006-FM2 (1) | 56.84% | 23.16% | 43.16% | 43.16% | 0.00% | 33.68% |
| NHELI 2006-HE3 (1) | 54.55% | 31.82% | 45.45% | 42.05% | 0.00% | 26.14% |
| NHELI 2007-1 (2) | 89.13% | 46.74% | 10.87% | 43.48% | 0.00% | 9.78% |
| NHELI 2007-2 (1) | 51.14% | 29.55% | 48.86% | 32.95% | 0.00% | 37.50% |
| NHELI 2007-3 (1) | 61.63% | 32.56% | 38.37% | 37.21% | 0.00% | 30.23% |

Kilpatrick Direct ¶ 95.

**(4)     Dr. Kilpatrick's Results Revealed Appraisal Inflation At or Above 95% Statistical Confidence**

304.     Whereas AVM results in the appraisal industry are typically provided at 68% statistical confidence, (Doty Dep. Tr. at 138:11-141:6), Dr. Kilpatrick confirmed the significant and systemic inflation of the original appraisals by assessing how many Nomura Sample Loans were inflated above a 95% statistical confidence level.  Kilpatrick Direct ¶¶ 99-103.  This work confirms the reliability of Dr. Kilpatrick's approach and results.

305.     The confidence interval provided a range within which Dr. Kilpatrick was 95% statistically confident that the actual value of the property fell, with his predicted value being the best estimate of that value.  The method of construction of the 95% confidence interval provides that, under certain assumptions, the value will fall entirely below the interval only 2.5% of the time and will fall entirely above the interval only 2.5% of the time.  In other words, there is a less than one-in-forty chance that the appraisal is not inflated if it falls outside the 95% confidence interval.  Kilpatrick Direct ¶ 64.

306.     To use property NHELI_2007_3_2001932287, located at ███████████ ████████████████ as an example, the original appraised market value of this Nomura Sample Property on █████████████████. Based on Dr. Kilpatrick's AVM methodology, he concluded that the value of that property on the same date was actually ████████.  In addition, he concluded that the 95% confidence interval for the property was between ████████ and ████████, with ████████ being the best, most accurate prediction of its value.  As described above this means that there is only a 2.5% chance that the upper value of ████████ does not include the true property value, giving Dr. Kilpatrick more than 97.5% confidence that the original appraisal of ████████ was inflated.  Kilpatrick Direct ¶ 65.

307.     Dr. Kilpatrick concluded that 18.3% (123) of the 672 original appraised values for the Nomura subject properties valued by the Greenfield AVM were inflated to at least a 95% statistical confidence level.  Kilpatrick Direct ¶ 103.

308.     Dr. Kilpatrick further concluded, as set forth in the below chart, that when these 123 properties were accurately valued, 94 resulted in LTV ratios at or over 100.  For the 123 appraisals

with predicted appraisal inflation at the 95% confidence level, the table below shows the ranges in which the accurate, recalculated, LTV ratios of 123 loans fall that Dr. Kilpatrick found to be inflated with 95% confidence.  The column at the left represents the LTV ranges reported in the Offering Materials.  The columns across the top represent the LTV ranges in which the 123 inflated loans fall.

| LTV Ranges | Percentage less than or equal to 70% Recalc. Based on GAVM Analysis | Greater than 70% to less than or equal to 80% Recalc. | Greater than 80% to less than or equal to 90% Recalc. | Greater than 90% to less than or equal to 100% Recalc. | Greater than 100% Recalc. |
|---|---|---|---|---|---|
| Less than or equal to 70% Reported | 19.0% | 0.0% | 38.1% | 14.3% | 28.6% |
| Greater than 70% to less than or equal to 80% Reported | 0.0% | 0.0% | 0.0% | 23.7% | 76.3% |
| Greater than 80% to less than or equal to 90% Reported | 0.0% | 0.0% | 0.0% | 0.0% | 100.0% |
| Greater than 90% to less than or equal to 100% Reported | 0.0% | 0.0% | 0.0% | 0.0% | 100.0% |
| **Total in Range** | **4 loans (3.3%)** | **0 loans** | **8 loans (6.5%)** | **17 loans (13.8%)** | **94 loans (76.4%)** |

Kilpatrick Direct ¶ 105.

309.     Dr. Kilpatrick next calculated the statistical confidence of the inflation of the remaining 85 Nomura sample loans of the 208 loans he concluded to be inflated.  Kilpatrick Direct ¶ 110.  Dr. Kilpatrick calculated that there was an average of approximately 88% statistical confidence that these 85 loans were inflated.  Kilpatrick Direct ¶ 111.  Dr. Kilptrick also concluded that on average these appraisals evidenced lower inflation rates, resulting in lower LTV ratio increases.  Kilpatrick Direct ¶¶ 112-114.

310.     These results further confirm that the original appraisals for the Sample Loans were systemically inflated.  Kilpatrick Direct ¶¶ 7-9.

**(b)      The Inflated Loans Were Almost Uniformly Not "Credible"**

311.    Dr. Kilpatrick assessed the degree to which 205 sample appraisals that he found to be inflated by at least 15.1% deviated from USPAP and applicable appraisal practice and standards.

**(1)      USPAP Sets Professional Standards For The Credibility Of Appraisals**

312.    To ensure that residential appraisals are accurate, independent, and objective, the Appraisal Foundation's Appraisal Standards Board has promulgated the Uniform Standards of Professional Appraisal Practice ("USPAP"), which establishes the ethical and practice obligations of appraisers through definitions, rules, standards, and statements reflecting the current standards of the appraisal profession.  **PX 1416** (USPAP 2014-2015) at U-5 (Preamble).  USPAP went into effect on January 30, 1989, and remains the standard of generally accepted professional appraisal practice.  Kilpatrick Direct ¶¶ 25, 43.

313.    USPAP standards are widely accepted.  Nearly every state has passed laws or regulations enforcing at least some portion of USPAP, and many states have adopted it in its entirety.  To meet state licensing and certification requirements, an appraiser must successfully pass an initial national USPAP education requirement and then maintain an ongoing updated education for USPAP for each license renewal period.  Kilpatrick Direct ¶ 26.

314.    USPAP Standard 1 requires the appraiser to develop a property appraisal in a clear and legitimate manner, with adequate support for analyses and opinions, taking careful steps not to mislead or misconstrue available data or the physical characteristics of the subject property.  The appraiser is required to follow the rules set forth by USPAP while applying a clear and supportable methodology.  The appraiser is also responsible for justifying the use and application of the data pertaining to the subject property, as well as market data influencing the value of the subject property.  Kilpatrick Direct ¶ 33.

315.    All appraisers of the sample properties were subject to USPAP as well as other longstanding appraisal practices and state licensing requirements.  Kilpatrick Direct ¶¶ 26-28.

                **(2)**    **Dr. Kilpatrick's Credibility Assessment Model Is Based On USPAP And Is Reliable**

316.     Due to data being unavailable, Dr. Kilpatrick subjected 205 Sample Loans whose properties he found to be inflated by at least 15.1% gating benchmark to his Credibility Assessment Model methodology ("CAM"). The CAM is a deterministic scoring model Dr. Kilpatrick used to evaluate whether and to what degree appraisals for those loans deviated from USPAP and other applicable appraisal standards. Kilpatrick Direct ¶¶ 128-130.

317.     Deterministic scoring methodologies such as the CAM are well recognized and accepted in the appraisal industry. Kilpatrick Direct ¶ 130.

318.     The CAM distills USPAP and other appraisal standards requirements into a series of 31 credibility assessment questions. These 31 questions evaluate whether the original appraised values for the Nomura sample properties comply with USPAP and other appraisal standards and practice. Kilpatrick Direct ¶ 131.

319.     Each of the 31 CAM questions was derived directly from USPAP and other professional guidance that were operative at the time the Nomura sample appraisals were prepared. The questions comprise the standards and review processes that any competent appraisal reviewer should follow when conducting a review under USPAP Standard 3. Kilpatrick Direct ¶ 132.

320.     Defendants' appraisal standards expert, Michael Hedden, confirmed at his deposition that the CAM questions relate to core appraisal practice and nearly all the CAM questions relate to express requirements set forth in the URAR form used by appraisers to prepare the Nomura Sample appraisals. Hedden 11/21 Tr. at 313:19-314:25; *id*. at 172:22-173:8, 310:5-20; *id*. at 192:23-193:16, 219:25-220:14; *id*. at 195:18-25, 196:2-15, 315:2-9; *id*. at 198:14-199:24; *id*. at 203:24-204:15; *id*. at 207:23-208:14; *id*. at 216:25-217:21, 323:20-323:16, 300:16-301:7; *id*. at 331:5-333:18; *id*. 221:22-222:24; *id*. 319:24-322:7; *id*. 242:13-20; *id*. at 244:12-24; *id*. at 245:22-247:5; *id*. at 322:20-323:16; *id*. at 322-8-19, 301:8-15.

321.     The CAM attaches a score to each question answered in the negative, which indicates that an appraisal standard or process was not properly followed. The score is a function of the importance of the question to an appraisal's credibility and of the degree to which the

negative answer to the question implicates deviations from appraisal standards.  Kilpatrick Direct ¶ 133.

322.    To score the questions, Dr. Kilpatrick divided appraisal standards and practice into five "aspects" of credibility:  Reasonable Appraiser Standard, Impact on Value, Appraisal Process, Appraisal Report Topics, and Magnitude of Impact on Value.  Each category contained various sub-categories.  Kilpatrick Direct ¶ 136.

323.    Based on his experience and informed by USPAP and other appraisals standards and practice, Dr. Kilpatrick ranked and weighted the five aspects in the order of their relative importance to the evaluation of an appraisal's credibility.  Dr. Kilpatrick assigned each aspect a weight of 1, 2, 3, 4, or 5.  The weighting of each category and aspect varied according to its impact upon the credibility of an appraisal.  Kilpatrick Direct ¶¶ 137-142.  Within each aspect Dr. Kilpatrick ranked and weighted various categories.  Kilpatrick Direct ¶¶ 142-143.

324.    The final static score applied to each CAM question is the sum of all the aspects and categories that the CAM question implicates.  The CAM questions, thus, provide a systematic, consistent, and reliable methodology to assess the credibility of numerous appraisals.  Kilpatrick Direct ¶ 146.

325.    The table below summarizes the 31 CAM questions and their assigned point values:

| No. | Credibility Assessment Questions | Score |
|-----|----------------------------------|-------|
| 1 | Are the legal address and parcel ID sufficient to identify the subject? | 4.435 |
| 2 | Did the appraiser report an accurate listing history for the subject? | 4.535 |
| 3 | If there was a prior subject listing, was appraised value lower than listing price? | 7.14 |
| 4 | Was the appraised value of the subject less than or equal to 10% higher than the most recent listing within the last year? | 7.125 |
| 5 | If the appraisal was for a purchase, did the appraiser report receipt of sales contract? | 2.535 |
| 6 | If appraiser reported a sales contract, did the appraiser analyze it? | 2.535 |
| 7 | Did the appraiser report supply/demand correctly? | 5.24 |

| No. | Credibility Assessment Questions | Score |
|---|---|---|
| 8 | Did the appraiser report property value trend correctly? | 5.24 |
| 9 | Did the appraiser report marketing time correctly? | 5.24 |
| 10 | Is the subject site description correct? | 4.615 |
| 11 | Did the appraiser report the sales history correctly? | 4.94 |
| 12 | Did the appraiser analyze all prior sales of the subject and comparables? | 3.94 |
| 13 | On an annualized basis, was the appraised value of the subject less than 10% higher than the prior sales price of the subject? | 8.125 |
| 14 | Is the land value ratio greater than 20% and less than 30%? | 8.6 |
| 15 | Did the appraiser use the cost approach for non-condominium properties? | 4.415 |
| 16 | Did the appraiser calculate the physical depreciation correctly? | 7.615 |
| 17 | Did the appraiser report external obsolescence correctly? | 7.615 |
| 18 | Did the appraiser confirm a broker/builder source for comparables using a disinterested thirdparty source? | 3.815 |
| 19 | For condominiums, was at least one of the comparables outside of the subject's condominium project? | 5.415 |
| 20 | Did the appraiser correctly report comparable sale transaction data? | 6.625 |
| 21 | If a previous sale of a comparable exists, is the current unadjusted price of that comparable less than 10% higher than the prior sale price on an annualized basis? | 8.825 |
| 22 | Is the appraised value of the subject within the range of the unadjusted comparable sales prices? | 7 |
| 23 | Is the appraised value of the subject within the range of the adjusted comparable sales prices? | 7 |
| 24 | If income approach, do the mix of units for the comps match the mix of units for the subject? | 9.2 |
| 25 | If income approach, does the gross rent multiplier ("GRM") used fall within the range of unadjusted GRMs for first 3 comps in the appraisal report? | 9.2 |
| 26 | If income approach is used, do the market rent estimates for each unit mix fall within the range of rents reported for each unit mix for the first three comps? | 6.625 |
| 27 | Did the appraiser use the most recent comps available? | 5.015 |
| 28 | Did the appraiser use the nearest comps available? | 5.015 |

| No. | Credibility Assessment Questions | Score |
|---|---|---|
| 29 | Was the average price per square foot ("PPSF") of the comps in the appraisal report less than or equal to the average PPSF of the comps available in the market at the time of the appraisal? | 8.825 |
| 30 | Was the average site square footage ("SSF") of the comps used in the appraisal report less than or equal to the average SSF of the comps available in the market at the time of the appraisal? | 5.015 |
| 31 | Was the average gross living area ("GLA") of the comps used in the appraisal report less than or equal to the average GLA of the comps available in the market at the time of the appraisal? | 4.64 |

Kilpatrick Direct ¶ 148.

326.    Defendants' appraisal expert, Mr. Hedden, did not review and did not challenge the aspects and categories underlying the CAM question weighting.  Hedden 11/21 Tr. at 268:7-276:21; *see id.* at 110:12-111:8.

327.    To be conservative, Dr. Kilpatrick set the threshold for non credible appraisals at 20.  He arrived at this threshold by requiring an appraisal to suffer from no less than three errors—one of the most egregious and two of additional errors—to be found to lack credibility.  Dr. Kilpatrick then rounded that sum to the next whole number, 20, as the final credibility threshold. Kilpatrick Direct ¶¶ 198-202.

### (3)    92.20% of Inflated Appraisals Were Non-Credible

328.    For 205 Sample Loans for which the Greenfield AVM predicted a valuation that was more than 15.1% below the original appraisal, Dr. Kilpatrick was able to gather data from the original appraisal reports, loan files, and other public information such as tax assessments, maps, and aerial and street-level photographs sufficient to apply the CAM.  Kilpatrick Direct ¶ 149-153.

329.    In addition, independent appraisers around the United States working under Dr. Kilpatrick's direction performed inspections of the appraisal properties for these 205 Sample Loans.  Among other things, they gathered local multiple listing service ("MLS") data regarding comparable sales at the time of the original appraisals.  Kilpatrick Direct ¶ 151.

330.     These data elements provided the basis of the answers to the 31 CAM questions that Dr. Kilpatrick used to evaluate the degree to which the sample appraisals deviated from USPAP and appraisal standards and practice.  Kilpatrick Direct ¶ 150.

331.     Dr. Kilpatrick concluded that the 205 inflated sample appraisals contained 1,428 total errors—6.97 errors per appraisal, on average.  The mean CAM score among the 205 appraisals was 43.67, with a median of 44.12.  Kilpatrick Direct ¶ 203.

332.     Dr. Kilpatrick concluded that 198 of the 205 inflated appraisals (96.59%) contained either a single egregious error or a series of smaller errors that would achieve a CAM score above 14.13, strongly suggesting, when coupled with the appraisal's inflated value, that the appraisal was not credible.  Dr. Kilpatrick further found that 189 of the 205 inflated appraisals (92.20%) contained at least two egregious errors or a combination of CAM question errors that resulted in a CAM score above 20.0.  Kilpatrick Direct ¶¶ 204-205.  Dr. Kilpatrick concluded that these appraisals, coupled with their inflated values, were not credible.

333.     As illustrated by the below table, the vast majority of these 189 non-credible appraisals received CAM scores above 30 and more than 60% received a CAM score over 40 points.

| CAM Score Range | Number of Appraisals | Percent of 189 Non-Credible |
|---|---|---|
| Between 20 and 30 | 33 | 17.46% |
| Between 30 and 40 | 42 | 22.22% |
| Between 40 and 50 | 38 | 20.11% |
| Between 50 and 60 | 38 | 20.11% |
| Between 60 and 70 | 27 | 14.29% |
| Between 70 and 80 | 6 | 3.17% |
| Greater than 80 | 5 | 2.65% |

Kilpatrick Direct ¶ 206.

334.     Even accepting all of the individual CAM criticism that Mr. Hedden identifies in his expert report, the number of appraisals that would receive a CAM score below 20 drops by only 12 to 177.  Kilpatrick Direct ¶ 208.

335.    By SLG, the percentage of inflated loans that are not credible, is set forth below:

| SLG | Non-Credible | Non-Credible After Deducting for All of Mr. Hedden's Specific CAM Criticisms |
|---|---|---|
| NAA 2005-AR6 (3) | 93% (27/29) | 90% (26/29) |
| NHELI 2006-FM1 (1) | 93% (27/29) | 90% (26/29) |
| NHELI 2006-FM2 (1) | 89% (34/38) | 87% (33/38) |
| NHELI 2006-HE3 (1) | 93% (28/30) | 90% (27/30) |
| NHELI 2007-1 (2) | 95% (18/19) | 84% (16/19) |
| NHELI 2007-2 (1) | 91% (31/34) | 79% (27/34) |
| NHELI 2007-3 (1) | 92% (24/26) | 85% (22/26) |
| **Total** | **92% (189/205)** | **86% (177/205)** |

Kilpatrick Direct ¶ 208.

336.    Coupled with their inflated values, these results establish (a) that the appraisals for the relevant 198 Sample Loans were not credible for purposes of USPAP, and thus did not comply with USPAP guidelines; and (b) that the appraisers that conducted the 189 appraisals with CAM scores above 20.0 did not subjectively believe in the truth of the appraisals when they made them.

337.    Dr. Kilpatrick also evaluated the impact of the non-credible loans with greater than 95% statistical confidence of appraisal inflation on the LTV distribution of the Sample Loans, as shown in the table below.  As set forth below, Dr. Kilpatrick concluded that the impact of the 95% confidence inflated, non-credible loans significantly altered the percentage of loans represented as having loans above 80 LTV and above 100 LTV in the Offering Materials.

| SLG | LTV of 80 or less | | LTV between 80 to100 | | LTV over 100 | |
|---|---|---|---|---|---|---|
| | Original | Recalculated | Original | Recalculated | Original | Recalculated |
| NAA 2005-AR6 (3) | 100.00% | 87.60% | 0.00% | 3.10% | 0.00% | 9.30% |
| NHELI 2006-FM1 (1) | 62.77% | 55.32% | 37.23% | 34.04% | 0.00% | 10.64% |
| NHELI 2006-FM2 (1) | 56.84% | 46.32% | 43.16% | 36.84% | 0.00% | 16.84% |
| NHELI 2006-HE3 (1) | 54.55% | 43.18% | 45.45% | 40.91% | 0.00% | 15.91% |
| NHELI 2007-1 (2) | 89.13% | 77.17% | 10.87% | 15.22% | 0.00% | 7.61% |
| NHELI 2007-2 (1) | 51.14% | 46.59% | 48.86% | 38.64% | 0.00% | 14.77% |

| SLG | LTV of 80 or less | | LTV between 80 to100 | | LTV over 100 | |
|---|---|---|---|---|---|---|
| | Original | Recalculated | Original | Recalculated | Original | Recalculated |
| NHELI 2007-3 (1) | 61.63% | 50.00% | 38.37% | 39.53% | 0.00% | 10.47% |
| **Total** | **69.94%** | **59.82%** | **30.06%** | **28.13%** | **0.00%** | **12.05%** |

Kilpatrick Direct ¶ 209.

> **(4)** **Dr. Kilpatrick's Findings Are Bolstered by Evidence That Appraisers Used Sales Amounts for Subject Properties as Predetermined Values for Establishing the Appraisal Value**

338.    An appraiser is obligated to provide an independent and objective estimate of market value for a property.  **PX 01415** at 13 (USPAP 2006) ("APPRAISER: one who is expected to perform valuation services competently and in a manner that is independent, impartial, and objective").

339.    During the 2005 to 2007 period appraisers of residential 1 to 4 unit properties were required to obtain and analyze the sales contract for sales transaction appraisals in arriving at their estimate of market value.  **PX 01413** at 1 (URAR).  Appraisers were, nonetheless, obligated to perform an objective and unbiased valuation of a property irrespective of the sales price and were not supposed to merely reach the same value as the sales price.  Hedden Dep. Tr. at 238:12-239:12 ("The appraiser is independent, unbiased, and a third party, and if the appraiser renders an opinion that is not consistent with a broker's opinion or the seller's opinion, or a buyer's opinion, don't kill the messenger for the delivery of bad news."); **PX 01415** at 184 (USPAP 2006) ("Note: A sale price (in a pending or a settled transaction) is part of the information an appraiser is required to ascertain in accordance with Standards Rules 1-5(a) and (b). Receiving this information with a request for service is appropriate, but accepting an assignment with the price in an agreement of sale, option, or listing or a sale price in a settled transaction as a predetermined value in the assignment violates USPAP.").

340.    For the at issue Nomura loans 71.66% of appraisals were the same, to the dollar, as the sales amount:  Cipione Direct at ¶ 91.

341.    The remarkably high proportion of appraisals matching identically with the predetermined sales amount is direct evidence that appraisers failed to provide true independent valuations, which supports the inference that in the aggregate appraisers did not subjectively believe a large fraction of the appraisals when made.

(5)    **Dr. Kilpatrick's Findings Are Bolstered by Evidence That Appraisers Believe They Were Pressured To Inflate Appraisals During the Relevant Time Period**

342.    In response to the widespread pressure they faced, in 2007 approximately 11,000 appraisers petitioned the Appraisal Subcommittee of the Federal Financial Institutions Examination Council (the "Appraiser Petition").  The Appraiser Petition stated that "lenders (meaning any and all of the following: banks, savings and loans, mortgage brokers, credit unions and loan officers in general; not to mention real estate agents) have individuals within their ranks, who, as a normal course of business, apply pressure on appraisers to hit or exceed a predetermined value."  The petitioners indicated that the pressure manifested itself in lenders withholding business for their refusal to inflate appraisals or guarantee a predetermined value, and even blacklisting honest appraisers.  Kilpatrick Direct ¶¶ 240-241.

343.    These concerns were echoed in the appraisal literature and appraiser surveys throughout the period which found that the vast majority of appraisers reported that they had been pressured to inflate appraisal values and that there were negative ramifications if they refused to cooperate and come in with a higher valuation.  Kilpatrick Direct ¶¶ 236-239.

344.    The Appraiser Petition constitutes direct evidence that appraisers across the industry believed that they were being pressured to inflate appraisals, which supports the reasonable inferences that (a) appraisers across the industry issued appraisals that they did not subjectively believe; and (b) that such subjectively false appraisals were made for SLG loans.

345.    Thirty-five appraisals of SLG loans were prepared by thirty-three appraisers who signed the Appraiser Petition .  In the course of his analyses, Dr. Kilpatrick subjected 11 of these appraisals to his CAM methodology.  He found that ten of the 11 appraisals were not credible. Kilpatrick Direct ¶ 242.  This evidence further bolsters Dr. Kilpatrick's findings regarding non-

credible appraisals in the SLGs and supports the inference that appraisers who performed the inflated appraisals of the sample loans did not believe the values in these appraisals to be accurate at the time they were prepared.

> ### 4. Dr. Cowan's Statistical Extrapolations Show That Substantial Portions Of The SLG Loans Had Underwriting Defects And Inflated, Non-Credible Appraisals

346.    After Mr. Hunter and Dr. Kilpatrick completed their respective reviews, Dr. Cowan extrapolated their loan-level findings to arrive at scientifically valid estimates of the percentage of defective and materially defective loans within the SLG populations as a whole.  Cowan Direct ¶ 37.

> #### (a) Dr. Cowan's Extrapolation Of Mr. Hunter's Results Shows That Nearly 70% Of the SLG Loans Were Not Underwritten To Applicable Guidelines Or Criteria

347.    To extrapolate the results of Mr. Hunter's reunderwriting, Dr. Cowan used a "classical estimator" based strictly on the counts of loans, which is the standard method of extrapolating results of binary questions.  Cowan Direct ¶¶ 46-47.

348.    As noted, the confidence level of 95% generated by Dr. Cowan's samples is standard and well supported in the statistical field.  Cowan Direct ¶ 112.  Increasing the sample size would have produced only marginal benefits, as the reliability of a sample size increases only as a square root of the sample size.  That is, for Dr. Cowan's samples, which had sample sizes of 100 and a +/ 10 percent margin of error, reducing the margin of error to +/-5 would require a sample size of 400, and to reduce that margin to +/-2.5% would require a sample size of 1,600. Cowan Direct ¶ 113.

349.    Also as noted, the +/- 10% margin of error generated by Dr. Cowan's samples is the *maximum* margin of error that would occur only if the rate of defect within a sample is 50%. When the variability deviates from 50% in either direction, the margin of error (and thus the confidence interval) decreases.  As the intervals decrease, the marginal benefit of a larger sample size also decreases.  Cowan Direct ¶ 115.

350.     Even in the small number of instances where the margin of error at 95% confidence was larger than 10%, the extrapolated values were so high that even taking the lower bound would yield a very high number.  Cowan Direct ¶ 117.

351.     For these reasons, Dr. Cowan's extrapolation results are sufficiently precise to make reliable estimates about each SLG and about the SLGs in the aggregate.

**(b)      Dr. Cowan's Extrapolation Of Dr. Kilpatrick's Results Shows That Approximately 30% Of The SLG Loans Had Appraisal That Were Inflated And Not Credible**

**(1)      Extrapolated To The SLGs, Appraisals Were Inflated By An Average 11.1% And Significant Numbers Of LTV Ratios Exceeded 80% And 100%**

352.     As with the samples as re-underwritten, Dr. Barnett takes issue with the samples for which Dr. Kilpatrick's Greenfield AVM produced results (the "AVM Samples").  He faults Dr. Cowan for not having run representativeness tests, but he did not run them himself.  Because Dr. Barnett did not measure the amount or direction of any bias, as he admitted during his deposition, he cannot say that the AVM Samples are biased.  Barnett Dep. at 88:11-89:15; Cowan Direct ¶ 63.

353.     Dr. Barnett also ignores important findings by Dr. Cowan.  Specifically, Dr. Cowan provides a table setting forth the loan tape LTV ratios and the AVM sample loan tape LTV ratios.  **PX 1561**. This table acts as a representativeness test for the loan tape LTV ratios.  The values for these two columns are very similar, indicating a high degree of similarity.  If one were to take the weighted average of the LTV ratios, the distributions would not demonstrate a material difference.  In other words, the sample would pass any representativeness test for loan tape LTV ratios.  Because this is all that Dr. Kilpatrick measures, and all that Dr. Cowan extrapolates, passing this test is sufficient to show that the samples can be properly extrapolated and that one can be secure in relying on the outcomes of the extrapolation.  This is further confirmed by **Plaintiff's Exhibit 1558**, which shows that the weighted average LTV in the sample is close to that in the population.  Cowan Direct ¶ 64.

354.     Dr. Cowan extrapolated the results of Dr. Kilpatrick's Greenfield AVM results to the SLGs as whole.  This extrapolation was performed in accordance with generally accepted

96

statistical methods and produced a reliable and unbiased estimate of the inflation of appraisals across all the Mortgage Loans in the SLGs.  Cowan Direct ¶¶ 65-75.

355.    In performing these extrapolations, Dr. Cowan had to take into account two sources of variability in AVM data:  "Sampling Variability" and "AVM Variability."  Sampling Variability arises whenever one uses a sample rather than an entire population.  It occurs because there can be differences between two samples of equal size drawn from the same population.  AVM Variability (or "model variability") is derived from the lower and upper confidence bounds reported for each loan with an AVM result.  Cowan Direct ¶¶ 66-67.

356.    Dr. Cowan used a Monte Carlo simulation to account for both Sampling Variability and AVM Variability.  A Monte Carlo simulation runs a scenario a large number of times with random inputs to the variables in the model to calculate the probabilities of certain outcomes.  A simple example is flipping a single coin many times—the distribution of heads and tails will provide the probability that the coin will land on heads or tails on any given flip.  A more complicated example involves randomly selecting the coin, prior to the flip, from a population of coins which may have different chances of coming up heads or tails.  This scenario contains two sources of variability—the variability of the "fairness" of the coin (its chances of coming up heads or tails) and the variability of the coin in coming up heads or tails.  Cowan Direct ¶ 70.

357.    Monte Carlo simulations have been used in statistics since the 1940s and are especially useful for obtaining numerical solutions to problems too complicated to solve analytically.  The method has been the subject of a wide body of peer-reviewed literature in the field of statistics, which attests to the utility of Monte Carlo simulations.  Cowan Direct ¶ 71.

358.    Dr. Cowan's Monte Carlo simulation had two steps.  First, Dr. Cowan randomly selected loans from each SLG to repeatedly re-create the sample for that particular SLG, which he called the "New Sample."  He did this using "replacement," which means that a loan could be selected in the sample multiple times.  Second, for each loan selected in the New Sample, Dr. Cowan randomly re-generated an AVM estimate, assuming a normal distribution with a mean of

the Greenfield AVM estimate and the standard deviation calculated from the confidence intervals reported in the loans with AVM results.  Cowan Direct ¶¶ 72-74.

359.    Dr. Cowan repeated this simulation 1,000 times for each SLG, creating a New Sample with each iteration.  He then took the average AVM for each loan in each SLG's recalculated AVM estimate, along with the standard deviation of the simulated values in order to encapsulate 95% of the simulated values.  This distribution allowed him to calculate the probabilities for each SLG.  Cowan Direct ¶ 75.

360.    Based on the average simulation results, Dr. Cowan concluded that the original appraisal valuations were higher than the Greenfield AVM valuations for 64.7% of loans in the SLG, and that the overall average inflation rate was 11.1%, with a lower bound of 8.5% and an upper bound of 13.7% at the 95% confidence level.  Kilpatrick Direct ¶ 115; Cowan Direct ¶ 76.

361.    Dr. Cowan's findings for each of the SLGs were as follows:

| SLG | Average Overstatement of Nomura Appraisals | 95% Lower Bound Overstatement of Nomura Appraisals | 95% Upper Bound Overstatement of Nomura Appraisals |
|---|---|---|---|
| NAA 2005-AR6 (3) | 6.0% | 2.0% | 10.0% |
| NHELI 2006-FM1 (1) | 6.6% | 1.6% | 11.7% |
| NHELI 2006-FM2 (1) | 14.9% | 8.4% | 21.3% |
| NHELI 2006-HE3 (1) | 12.0% | 6.1% | 17.8% |
| NHELI 2007-1 (2) | 5.1% | 0.7% | 9.4% |
| NHELI 2007-2 (1) | 12.6% | 7.0% | 18.3% |
| NHELI 2007-3 (1) | 7.8% | 2.5% | 13.1% |
| **Total** | **11.1%** | **8.5%** | **13.7%** |

Kilpatrick Direct 115; **PX 1559**.

362.    Defendants and their expert, Dr. Barnett, offer three criticisms of Dr. Cowan's extrapolation of the average LTV inflation rate, none of which has merit.

363.    First, Dr. Barnett asserted that there is "systematic upward bias" in Dr. Cowan's recalculated LTV because the AVM value is used in the denominator of the LTV ratio.  This

criticism, however, ignores that, in addition to recalculating the LTVs, Dr. Cowan calculated the confidence intervals around those recalculated LTV ratios based on the distribution generated by the Monte Carlo simulation.  This recalculated distribution—taking into account both Sampling and AVM Variability—is skewed (rather than normal, or bell-shaped, as the AVM distributions are), and the recalculated confidence intervals are asymmetric, because of the effect Dr. Barnett describes.  Because the weighted average LTV is calculated using the recalculated confidence intervals from this recalculated distribution, the results take into account exactly the asymmetry Dr. Barnett described.  In other words, the "systematic upward bias" Dr. Barnett described is already reflected in Dr. Cowan's calculations, not ignored as Dr. Barnett implied.  Cowan Direct ¶ 79.

364.    Dr. Barnett also asserts that the Monte Carlo simulation "compounds" the first issue because, in performing the extrapolations, Dr. Cowan selected at random from the 95% confidence interval.  But the confidence intervals Dr. Cowan recalculated take this asymmetry into account as well.  Cowan Direct ¶ 80.

365.    Next, Dr. Barnett criticized Dr. Cowan's LTV ratio calculations for using the minimum of the original appraisal, the actual sale price, and the simulated AVM.  This criticism misses the mark for several reasons: (a) Dr. Cowan followed Dr. Kilpatrick's method of calculating LTV ratios; (b) Defendants calculated LTV ratios in a similar fashion (using the minimum of the sale price or the appraised value) on their loan tapes, which provide the LTV ratio values reported in the Prospectus Supplements; and (c) Dr. Barnett has admitted he has no expertise in calculating LTV ratios.  Cowan Direct ¶ 81.

366.    Dr. Cowan then recalculated the LTV ratios for the 672 Sample Loans for which Dr. Kilpatrick produced Greenfield AVM valuations.  Relying on the average simulated Greenfield AVM value for each such Sample Loan, Dr. Cowan compared each recalculated value to LTV ratio in the loan tapes for the relevant SLGs, which were used to generate the LTV ratios reported in the Prospectus Supplements.  Cowan Direct ¶ 91.

367.    Dr. Cowan found that the reported LTV ratios were lower than the 95% lower bound of the recalculated LTV ratios for 40 of the 672 Sample Loans—or 6.0% of the population:

| SLG | Percentage of Understated LTV Ratios |
|---|---|
| NAA 2005-AR6 (3) | 5.4% |
| NHELI 2006-FM1 (1) | 3.2% |
| NHELI 2006-FM2 (1) | 7.4% |
| NHELI 2006-HE3 (1) | 10.2% |
| NHELI 2007-1 (2) | 2.2% |
| NHELI 2007-2 (1) | 8.0% |
| NHELI 2007-3 (1) | 5.8% |
| **Aggregate** | **6.0%** |

Cowan Direct ¶ 91, **PX 1560**.

368.    Dr. Cowan next tabulated the count of loans for specific recalculated LTV ranges or bounds as divided into three groups: (a) where the recalculated LTV ratio was less than or equal to 80%; (b) where the recalculated LTV ratio was between 80% and 100%; and (c) where the recalculated LTV ratio was greater than 100%.  He then compared those results to the LTV ratios reported on the loans tapes, which provide the values reported in the Prospectus Supplements within the same groups.  *See* ¶ 130, *supra* (listing LTV ratios as reported in the Prospectus Supplements).

| SLG | LTV ≤ 80% | | LTV > 80% to LTV ≤ 100% | | LTV > 100% | |
|---|---|---|---|---|---|---|
| | Original | Extrapolated | Original | Extrapolated | Original | Extrapolated |
| NAA 2005-AR6 (3) | 98.94% | 28.68% | 1.06% | 61.24% | 0.00% | 10.08% |
| NHELI 2006-FM1 (1) | 72.16% | 30.85% | 27.84% | 56.38% | 0.00% | 12.77% |
| NHELI 2006-FM2 (1) | 80.62% | 37.89% | 19.38% | 42.11% | 0.00% | 20.00% |
| NHELI 2006-HE3 (1) | 62.91% | 30.68% | 37.09% | 47.73% | 0.00% | 21.59% |
| NHELI 2007-1 (2) | 91.77% | 21.74% | 8.23% | 63.04% | 0.00% | 15.22% |

| SLG | LTV ≤ 80% | | LTV > 80% to LTV ≤ 100% | | LTV > 100% | |
|---|---|---|---|---|---|---|
| | Original | Extrapolated | Original | Extrapolated | Original | Extrapolated |
| NHELI 2007-2 (1) | 60.78% | 27.27% | 39.2% | 40.91% | 0.00% | 31.82% |
| NHELI 2007-3 (1) | 66.8% | 17.44% | 33.2% | 52.33% | 0.00% | 30.23% |
| **Total** | **70.5%** | **28.0%** | **29.5%** | **52.5%** | **0.0%** | **19.5%** |

Cowan Direct ¶ 92, **PX 1562**.

369.    In sum, Dr. Cowan's extrapolation of Dr. Kilpatrick's Greenfield AVM results shows that (a) many LTV ratios as reported in the loan tapes underlying the Prospectus Supplements were inaccurate; (b) many the LTV ratios reported in the Prospects Supplements were inaccurate; and (b) the Prospectus Supplements' statements about the number of LTV ratios below 80%, between 80% and 100%, and above 100%, were inaccurate.

### (2)    Extrapolated To The SLGs, At Least 31% of Appraisals Were Non-Credible

370.    Dr. Cowan extrapolated the results of Dr. Kilpatrick's CAM results to the SLGs as a whole.  Of the 199 inflated appraisals evaluated, which excluded non-representative loans for which the AVM value was not utilized, Dr. Kilpatrick concluded that 193 (or 96.98% of those appraisals) could not be considered credible under USPAP and other applicable professional standards applicable to residential appraisal in the 2005 to 2007 period.  Applying a more conservative threshold for determining credibility, he concluded that 184 (or 92.46%) of the inflated appraisals were not credible (*i.e.*, breach the appraisal standards).  Kilpatrick Direct ¶¶ 204-205.  The extrapolation of these results is based on the conservative threshold for determining credibility of appraisals in Dr. Kilpatrick's report—that is, 184 inflated appraisals in the set of 199 inflated appraisals were not credible.  Cowan Direct ¶ 97.

371.    Dr. Cowan extrapolated Dr. Kilpatrick's CAM using the classical estimator—the same method he used in extrapolating Mr. Hunter's re-underwriting findings.  Dr. Cowan did not stratify the results by FICO score, as there were instances in which a particular stratum within an SLG did not contain any loans.  Cowan Direct ¶ 99.

372.    Dr. Cowan found, at 95% confidence with a margin of error of 4.18%, that approximately 92.18% of the SLG loans with inflated appraisals had appraisals that were not credible:

| SLG | Non-Credible Rate | 95% Lower Bound | 95% Upper Bound | Margin of Error |
|---|---|---|---|---|
| NAA 2005-AR6 (3) | 92.59% | 76.31% | 98.86% | 11.28% |
| NHELI 2006-FM1 (1) | 92.86% | 76.58% | 99.09% | 11.25% |
| NHELI 2006-FM2 (1) | 89.47% | 75.26% | 97.02% | 10.88% |
| NHELI 2006-HE3 (1) | 93.10% | 77.30% | 99.13% | 10.92% |
| NHELI 2007-1 (2) | 94.44% | 73.10% | 99.76% | 13.33% |
| NHELI 2007-2 (1) | 91.18% | 76.40% | 98.10% | 10.85% |
| NHELI 2007-3 (1) | 96.00% | 79.75% | 99.87% | 10.06% |
| **Aggregate** | **92.18%** | **88.01%** | **96.36%** | **4.18%** |

Cowan Direct ¶ 100-01, **PX 1564**.  The actual non-credible rate would have been higher had Dr. Cowan used the 193 appraisals identified as not credible by Dr. Kilpatrick's Appraisal Accuracy Report, instead of the 184 resulting from the application of the more conservative test.  Cowan Direct ¶¶ 100-01.

373.    Dr. Cowan found, at 95% confidence with a margin of error of 4.16%, that approximately 31.35% of all SLG loans had inflated appraisals that were not credible:

| SLG | Non-Credible Rate | 95% Lower Bound | 95% Upper Bound | Margin of Error |
|---|---|---|---|---|
| NAA 2005-AR6 (3) | 19.4% | 14.2% | 25.8% | 5.8% |
| NHELI 2006-FM1 (1) | 27.7% | 19.1% | 37.7% | 9.3% |
| NHELI 2006-FM2 (1) | 35.8% | 26.3% | 46.2% | 9.9% |
| NHELI 2006-HE3 (1) | 30.7% | 21.4% | 41.3% | 9.9% |
| NHELI 2007-1 (2) | 18.5% | 11.9% | 27.0% | 7.5% |
| NHELI 2007-2 (1) | 35.2% | 25.5% | 46.0% | 10.2% |
| NHELI 2007-3 (1) | 27.9% | 19.0% | 38.4% | 9.7% |

| | | | | |
|---|---|---|---|---|
| **Aggregate** | **31.3%** | **27.2%** | **35.5%** | **4.2%** |

Cowan Direct ¶ 102, **PX 1565**.

374.    Dr. Cowan next reported his extrapolations of the recalculated LTV ratios for Sample Loans with appraisals that were both inaccurate and not credible as divided into three groups: (a) where the recalculated LTV ratio was less than or equal to 80%; (b) where the recalculated LTV ratio was between 80% and 100%; and (c) where the recalculated LTV ratio was greater than 100%.  He then compared those results to the LTV ratios reported on the loans tapes, which provide the values reported in the Prospectus Supplements within the same groups.  *See* ¶ 130, *supra* (listing LTV ratios as reported in the Prospectus Supplements).  He found significant differences for each SLG:

| SLG | LTV ≤ 80% | | LTV > 80% to LTV ≤ 100% | | LTV > 100% | |
|---|---|---|---|---|---|---|
| | Original | Extrapolated | Original | Extrapolated | Original | Extrapolated |
| NAA 2005-AR6 (3) | 100.0% | 82.2% | 0.0% | 8.5% | 0.0% | 9.3% |
| NHELI 2006-FM1 (1) | 79.8% | 61.7% | 20.2% | 28.7% | 0.0% | 9.6% |
| NHELI 2006-FM2 (1) | 80.0% | 62.1% | 20.0% | 25.3% | 0.0% | 12.6% |
| NHELI 2006-HE3 (1) | 62.5% | 46.6% | 37.5% | 36.4% | 0.0% | 17.0% |
| NHELI 2007-1 (2) | 89.1% | 73.9% | 10.9% | 16.3% | 0.0% | 9.8% |
| NHELI 2007-2 (1) | 61.4% | 50.0% | 38.6% | 29.5% | 0.0% | 20.5% |
| NHELI 2007-3 (1) | 66.3% | 51.2% | 33.7% | 33.7% | 0.0% | 15.1% |
| **Total** | **78.6%** | **62.5%** | **21.4%** | **24.4%** | **0.0%** | **13.1%** |

Cowan Direct ¶ 105, **PX 1567**.

375.    Dr. Barnett does not take issue with how Dr. Cowan extrapolated the results reflected in the table above, but makes various arguments in support of an assertion that many of the results could be the product of chance alone.  He is wrong.  Dr. Barnett initially asserted that one would expect 16% of the loan tape valuations would be "inflated" (using Dr. Kilpatrick's definition of at least one standard deviation greater than the AVM value) by chance if the loan tape

103

valuations were correct and the AVM were reliable.  At his deposition, however, Dr. Barnett admitted that, because the percentage of loan tape valuations that were "inflated" exceeded 16% (and was in fact 31%), the hypothesis that the loan tape valuations were correct and the AVM was reliable, was false.  Barnett Dep. 122:12-123:9.  One or both of those assumptions must be wrong. Cowan Direct ¶ 106.

376.    Dr. Barnett then fell back on an alternative calculation by which, he asserted, the number of false positives in "might be approximated as 90."  This is similarly wrong for several reasons.  Cowan Direct ¶ 107.

377.    First, there is the fundamental problem of defining a "false positive" in this context. A false positive is an indication by a test that a certain factor is present when, in fact, that factor is not present.  An example is a test for a disease that sometimes indicates that the patient has the disease when in fact the patient does not.  But that principle has no application in this context, because the AVM and CAM do not measure the same thing.  The AVM measures the value of the property, and the CAM assesses the validity of the underlying appraisal under USPAP.  Thus, the AVM does not act as a test on the CAM, and the CAM does not act as a test on the AVM.  It is therefore entirely possible that all of the appraisals are not credible under USPAP and all of them are inflated.  Cowan Direct ¶ 108.

378.    Second, the number of times that the combination of an appraisal that is a standard deviation or more greater than the AVM value and a finding using CAM that the appraisal is not credible occurs is essentially unknowable; that is why one must use a probabilistic assessment.  It is also an arbitrary inquiry, given that Dr. Kilpatrick used the one-standard-deviation cut-off purely as a way to decide which appraisals to assess using CAM, and specifically states that he does not believe that appraisals below that cut-off are necessarily credible under USPAP.  Cowan Direct ¶ 109.

379.    Third, Dr. Barnett admitted in his deposition that his equation (which he appears to have created himself, as he cites nothing in support of its use here) assumes that the number of false negatives (i.e., a failure to detect an "inflated" appraisal that is not credible using CAM) is

zero.  Barnett Dep. 142:22-143:6.  This is an unsupported – and unsupportable – assumption, and, as Dr. Barnett was further constrained to admit, if the number of false negatives goes up, the number of false positives goes down.  Barnett Dep. 143:19-146:7, 151:9-153:11.  It is also yet another indication that Dr. Barnett's calculation in reality merely assumes that there are "false positives" in order to demonstrate that there are "false positives."  In other words, Dr. Barnett assumes what he is trying to prove.  Cowan Direct ¶ 110.

380.    In sum, Dr. Cowan's extrapolation of Dr. Kilpatrick's Greenfield AVM results shows that (a) many LTV ratios as reported in the loan tapes underlying the Prospectus Supplements were non-credible; (b) many LTV ratios reported in the Prospects Supplements were non-credible; and (c) the Prospectus Supplements' statements about the number of LTV ratios below 80%, between 80% and 100%, and above 100%, were non-credible.

### (c)    Dr. Cowan's Extrapolations Show That Each SLG Contained Large Numbers Of Loans That Breached The Representations

381.    In total, Dr. Cowan's extrapolations of Mr. Hunter's and Dr. Kilpatrick's analyses show that the SLG contained the following levels of false statements:

| NAA 2005-AR6 | |
|---|---|
| **Representation** | **Actual SLG** |
| All loans originated generally in accordance with guidelines | 53.15% did not conform to guidelines and had significantly increased credit risk 60.92% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 98.94% of the loans had LTV ≤ 80% | 28.68% of the loans had LTV ≤ 80% |
| No loans had LTV > 100% | 10.08% of the loans had LTV > 100% |
| 50.00% of the loans were owner occupied | 11.09% of those were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's | AAA rating based on pre-closing loan tape where 42.04% of the loans did not match the actual credit characteristics; rating would not issue based on true data |

**PX 1711.  PX O0059** at 12, 60, 61, 93, 126; Cowan Direct ¶¶ 56, 58, 92, 57, 59; **PX 1525, PX 1534, PX 1562, PX 1526, PX 1533.**

| NHELI 2006-FM1 | |
| --- | --- |
| **Representation** | **Actual SLG** |
| All loans originated generally in accordance with guidelines | 69.00% did not conform to guidelines and had significantly increased credit risk 70.00% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 54.98% of the loans had LTV ≤ 80% | 30.85% of the loans had LTV ≤ 80% |
| No loans had LTV > 100% | 12.77% of the loans had LTV > 100% |
| 88.78% of the loans were owner occupied | 9.00% of those loans were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's | AAA rating based on pre-closing loan tape where 47.00% of the loans did not match the actual credit characteristics; rating would not issue based on true data. |

**PX 1712.  PX O0049** at 13, 41, 43, 70, 71, 112; Cowan Direct ¶¶ 56, 58, 92, 57, 59; **PX 1525, PX 1534, PX 1562, PX 1526, PX 1533.**

| NHELI 2006-FM2 | |
| --- | --- |
| **Representation** | **Actual SLG** |
| All loans originated generally in accordance with guidelines | 71.00% did not conform to guidelines and had significantly increased credit risk 72.00% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 57.52% of the loans had LTV ≤ 80% | Only 37.89% of the loans had LTV ≤ 80% |
| No loans had LTV > 100% | 20.00% of the loans had LTV > 100% |
| 93.24% of the loans were owner occupied | 8.55% of those loans were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's | AAA rating based on pre-closing loan tape where 52.00% of the loans did not match the actual credit characteristics; rating would not issue based on true data |

**PX 1713.  PX O0045** at 15, 49, 51, 81, 85, 137; Cowan Direct ¶¶ 56, 58, 92, 57, 59; **PX 1525, PX 1534, PX 1562, PX 1526, PX 1533.**

| NHELI 2006-HE3 | |
|---|---|
| **Representation** | **Actual SLG** |
| All loans originated generally in accordance with guidelines | 61.63% did not conform to guidelines and had significantly increased credit risk 65.63% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 54.53% of the loans had LTV ≤ 80% | 30.68% of the loans had LTV ≤ 80% |
| No loans had LTV > 100% | 21.59% of the loans had LTV > 100% |
| 89.52% of the loans were owner occupied | 3.21% of those loans were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's. | AAA rating based on pre-closing loan tape where 47.30% of the loans did not match the actual credit characteristics; rating would not issue based on true data |

**PX 1714.  PX O0041** at 14-15, 47, 49, 81, 88, 132; Cowan Direct ¶¶ 56, 58, 92, 57, 59; **PX 1525, PX 1534, PX 1562, PX 1526, PX 1533.**

| NHELI 2007-1 | |
|---|---|
| **Representation** | **Actual SLG** |
| All loans originated generally in accordance with guidelines | 60.31% did not conform to guidelines and had significantly increased credit risk 65.38% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 91.77% of the loans had LTV ≤ 80% | 21.74% of the loans had LTV ≤80% |
| No loans had LTV>100% | 15.22% of the loans had LTV >100% |
| 45.78% of the loans were owner occupied | 4.18% of those loans were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's | AAA rating based on pre-closing loan tape where 35.79% of the loans did not match the actual credit characteristics; rating would not issue based on true data |

**PX 1715.  PX O0072** at 25, 91, 109-110, 113, 114, 192-193; Cowan Direct ¶¶ 56, 58, 92, 57, 59; **PX 1525, PX 1534, PX 1562, PX 1526, PX 1533.**

| NHELI 2007-2 | |
|---|---|
| Representation | Actual SLG |
| All loans originated generally in accordance with guidelines | 64.42% did not conform to guidelines and had significantly increased credit risk 69.54% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 52.78% of the loans had LTV ≤ 80% | 27.27% of the loans had LTV ≤80% |
| No Loans Had LTV>100% | 31.82% of the loans had LTV >100% |
| 91.00% of the loans were owner occupied | 8.90% of those loans were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's | AAA rating based on pre-closing loan tape where 47.04% of the loans did not match the actual credit characteristics; rating would not issue based on true data |

**PX 1716.  PX O0080** at 17, 51, 54, 89, 91, 146; Cowan Direct ¶¶ 56, 58, 92, 57, 59; **PX 1525, PX 1534, PX 1562, PX 1526, PX 1533.**

| NHELI 2007-3 | |
|---|---|
| Representation | Actual SLG |
| All loans originated generally in accordance with guidelines | 61.79% did not conform to guidelines and had significantly increased credit risk 63.83% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 58.49% of the loans had LTV ≤ 80% | 17.44% of the loans had LTV ≤80% |
| No loans had LTV>100% | 30.23% of the loans had LTV >100% |
| 90.03% of the loans were owner occupied | 6.65% of those loans were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's | AAA rating based on pre-closing loan tape where 41.21% of the loans did not match the actual credit characteristics; rating would not issue based on true data |

**PX 1717.  PX O0051** at 17, 52, 54, 88, 92, 143; Cowan Direct ¶¶ 56, 58, 92, 57, 59; **PX 1525, PX 1534, PX 1562, PX 1526, PX 1533.**

| All SLGs | |
|---|---|
| **Representation** | **Actual SLGs** |
| All loans originated generally in accordance with guidelines. | 65.42% did not conform to guidelines and had significantly increased credit risk<br>68.30% did not conform to guidelines and minimum industry standards, and had significantly increased credit risk |
| 57.7% of the loans had LTV ≤ 80% | 28.0% of the loans had LTV ≤ 80%. |
| No loans had LTV > 100% | 19.5% of the loans had LTV > 100% |
| 88.4% of the loans were owner occupied | 7.19% of those were not owner occupied |
| Certificate will not issue without AAA (or equivalent) ratings from S&P and Moody's | AAA rating based on pre-closing loan tape where 47.15% of the loans did not match the actual credit characteristics; rating would not issue based on true data |

**PX 1718. PX O0059**, **PX O0049**, **PX O0045, PX O0041, PX O0072, PX O0080, PX O0051;**

Cowan Direct ¶¶ 56, 58, 92, 57, 59; **PX 1525, PX 1534, PX 1562, PX 1526, PX 1533.**

> **B.** **Evidence Available To Or Known By Nomura And RBSSI Also Demonstrates That The Representations In The Offering Documents Concerning The Mortgage Loans And The Pool Characteristics Were False**

382.    Nomura's pre-acquisition review of the loans that served as collateral, and any other reviews it conducted, were "not designed to ensure the accuracy of the descriptions in the Offering Documents of the SLGs that backed the Certificates."  *FHFA v. Nomura Holding Am., Inc.* ("Diligence MSJ Op."), --- F. Supp. 3d ----, 2014 WL 7232443, at *1 (S.D.N.Y. Dec. 18, 2014). Similarly, RBSSI "made little real effort to test the accuracy of the representations about the SLGs," *id.*, failing to perform any diligence on two of the deals it underwrote, and performing minimal diligence on the rest.  Moreover, the diligence that Nomura and RBSSI did conduct raised red flags that both Nomura and RBSSI ignored.  These red flags included evidence that a significant number of Mortgage Loans did not comply with underwriting guidelines; that a significant number of the appraisals used to calculate LTV in the Offering Documents were inflated; and that loans which were represented to be owner occupied were not.  As a result, the Offering Documents contain numerous false statements about the characteristics of the Supporting

109

Loan Groups and individual loans within the SLGs, and omit additional disclosures necessary in order to make the Offering Documents not misleading.

383.   Nomura and RBSSI each possessed evidence of systemic underwriting problems at some of the subject originators, yet Nomura elected not to conduct any credit or compliance diligence on approximately 60% of the loans that wound up in the SLGs, and it conducted no valuation diligence on over 50% of the loans.  Nomura entrusted the limited credit and compliance reviews it did conduct to third-party vendors, but never checked the underlying loan files to see if the vendors' loan reviews were accurate—even after an audit conducted by IngletBlair showed that a third of the loans the vendors had labeled as suitable for purchase were actually defective.  While Nomura "kicked out" large percentages of the loans from pools it bought based on these vendors findings, neither Nomura nor RBSSI "ever considered the implications of these kick-out rates for the quality of loans [they] would later place in the SLGs and describe in the Offering Documents." *Id*.  In fact, Nomura and RBSSI routinely overrode their vendors' determinations that a loan was not suitable for purchase and securitized these loans anyway.

384.   Both Nomura and RBSSI also determined through the limited valuation diligence they conducted that many of the appraisals underlying the Mortgage Loans were inflated, but they took no further action and did not disclose the results of these reviews to investors.  Neither Nomura nor RBSSI took any steps to confirm that the owner occupancy representations in the Offering Documents were accurate as of the Cut-Off Date, despite possessing evidence that some of the loans described as owner occupied were not.  Finally, Nomura provided loan tapes containing inaccurate data about the Mortgage Loans to the credit rating agencies, which relied on that data in assigning unjustified AAA credit ratings.

385.   A Certificate by Certificate review shows that the generally defective processes used by Nomura and RBSSI allowed, and indeed was designed to allow, the inclusion of large numbers of patently defective loans in each of the SLGs.[4]

---

[4]   A full discussion of Nomura's and RBSSI's purported diligence processes appears in this Court's opinion and order granting summary judgment on Defendants' due diligence and reasonable care defenses, the findings of which are adopted herein by reference.  Diligence MSJ Op., 2014 WL 7232443, at *5-19.

###### 1.   Overview Of Nomura's And RBSSI's Securitization And Diligence Processes

###### (a)   Nomura's RMBS Business Groups

386.   Several groups within Nomura were involved in purchasing, performing due diligence on, and/or securitizing loans in the at-issue SLGs.

387.   The <u>Trading Desk</u> purchased loans from originators and other sellers, and decided which loans to securitize.  Katz Dep. 82:17-25.  It was led by Brett Marvin, *Id*. 144:24-145:4, and included Steven Katz, the head of subprime trading, and Brian Murphy, the head of Alt-A trading.  Marvin Dep. 16:3-12.  These traders were supported by collateral analysts who examined and organized loan-tape data for their use.  Lee Dep. 39:21-40:7; Marvin Dep. 187:13-188:7.

388.   The <u>Residential Mortgage Finance Group</u> ("RFG"), sometimes referred to as the "Contract Finance" Group or the "Transaction Management" Group, Spagna Dep. 168:4-14, oversaw Nomura's contracts with different counterparties, vendors, sellers, trustees, and custodians.  *Id*. 168:14-169:2.  It also reviewed securitization-related documents drafted by outside counsel and provided comments.  Graham Dep. 29:9-13; LaRocca Dep. 41:2-42:6.  The RFG was "responsible for the papering of the acquisition of the whole loans, the due diligence, the collateral analysis through to the securitization."  Graham Dep. 40:19-41:10.

389.   The <u>Diligence Group</u>—sometimes known within Nomura as the "Credit Group," "Residential Credit" or "Due Diligence"—was responsible for conducting diligence reviews on loans or pools of loans being acquired by the Trading Desk.  Kohout Dep. 17:10-22; Graham Dep. at 164:5-17.  From 2005 to mid-2006, the Diligence Group was led by Joseph Kohout, assisted by Jeffrey Hartnagel and Menachem "Mendy" Sabo.  Kohout Dep. 24:10-22; *id.* 23:2-22.  From mid-2006 to 2007, the Diligence Group was led by Neil Spagna, assisted by Mr. Sabo and Christopher Scampoli.  Spagna Dep. 169:6-9; Kohout Dep. 440:5-17.

###### (b)   Nomura's Acquisition Diligence

390.   "Nomura's pre-acquisition review was poorly designed and not implemented in a way that could give reasonable assurance that the kinds of representations that Nomura included in its Offering Documents were accurate."  Diligence MSJ Op., 2014 WL 7232443, at *2.  "[T]here is

no evidence Nomura took any care to structure its processes … to ensure the accuracy of its representations about the SLGs in the Offering Documents."  *Id.*  In fact, the people who worked in Nomura's Diligence Group did nothing to ensure the disclosures in the Prospectus Supplements were accurate.  Spagna Dep. 318:9-319:14.

391.    The Diligence Group was responsible for conducting three types of diligence reviews: (a) <u>credit</u> review, in which a loan origination file was examined to determine if the loan complied with guidelines, Graham Dep. 203:21-204:2; Sabo Dep. 65:20-66:2; (b) a <u>compliance</u> review, in which the file was examined to determine if the loan complied with federal, state, and municipal regulations, Kohout Dep. 180:21-181:7; and (c) a <u>valuation</u> review (or "collateral review"), in which the loan's appraisal was reviewed to determine if was reasonable and accurate, Kohout Dep. 340:3-341:21; Lee Dep. 162:24-163:9; Sabo Dep. 251:12-252:3; *see also* Diligence MSJ Op., 2014 WL 7232443, at *5-6.

### (1)    Credit And Compliance Diligence

392.    In general, when Nomura bought a bulk acquisition pool, it had credit and compliance diligence performed on a sample of the loans in that pool.  Katz Dep. 197:8-12; Kohout Dep. 92:8-16; *id.* at 92:25-93:10; Hartnagel Dep. 794:7-17.  Thirty-one of the acquisition pools from which the SLGs were assembled were such sampled pools ("Sampled Acquisition Pools").[5]  If a loan was not in the sample, it was not reviewed.  Graham Dep. 167:16-20; Hartnagel Dep. 411:8-13; *id.* 794:7-17.

393.    Nomura did not draw its diligence samples at random, **PX 390** at 1; Sabo Dep. 173:7-11, and thus it could not—and did not attempt to—extrapolate the results of its diligence reviews to the unsampled portions of the Sampled Acquisition Pools.  Kohout Dep. 120:15-24; *id.* 288:11-289:20; Marvin Dep. 244:7-22.  Of the total 15,806 loans that comprised the SLGs, 9,491

---

[5]   The 31 Sampled Acquisitions Pools were: Alliance CA 04, Cameron SP04, Equifirst SP01, Equifirst SP02, Equifirst SP03, First NLC SP02, First NLC SP03, FNBN 21, Fremont SP02, Fremont SP03, Fremont SP04, Gateway 17A, Gateway 24A, Impac SP04, Mandalay SP03, Metro 10, Novastar SP02, Ownit SP02, People's Choice SP01, People's Choice SP02, Pinnacle Financial 07, Resmae SP01, Resmae SP02, Silver State 62, Silver State 63, Silver State 65, Silver State 66, SSM 58, SSM 60, Wells SP01 and WMC SP01.  Cipione Direct ¶ 78 tbl.6 & n.28 (**PX 1584**).

(60%) were from unsampled portions of Sampled Acquisition Pools and thus received no credit or compliance review.  Cipione Direct ¶ 9; **PX 1574.**

394.     For loans that Nomura did review, the Diligence Group did not itself directly review the loan files.  Instead, the Diligence Group hired third-party vendors American Mortgage Consultants ("AMC") and Clayton Holdings LLC ("Clayton") to perform credit and compliance diligence for bulk and mini-bulk transactions, and it hired Clayton and Lydian for purchases through the loan-by-loan channel.  Scampoli Dep. 127:22-128:8.  These vendors assigned grades to each loan—"Event Level 1" ("EV1"), "Event Level 2" ("EV2") or "Event Level 3" ("EV3") (sometimes referred to as "1," "2" and "3" or "CE1," "CE2" and "CE3") in descending order of compliance with underwriting guidelines.  *See* **PX 812** at 14.  A grade of EV1 indicated the loan complied with guidelines.  *Id.*; **PX 36** at 29; Hartnagel Dep. 309:18-20; Spagna Dep. 246:5-8.  A grade of EV2 indicated the loan did not comply with guidelines but there were adequate compensating factors.  **PX 36** at 29; Prahofer Dep. 82:17-83:5; Hartnagel Dep. 409:21-25.  A grade of EV3 indicated the loan did not comply with guidelines and lacked adequate compensating factors, and was, in the words of Mr. Spagna, "an unacceptable risk" or presented a regulatory compliance issue.  Spagna Dep. 246:14-18; *see also* **PX 36** at 29; Scampoli Dep. 352:14-353:10; **PX 812**.

395.     The Diligence Group performed only a "random quality control" review of findings for loans its vendors graded as EV 1,  Kohout Dep. 240:25-241:11; *see also id*. 241:20-243:22; Hartnagel Dep. at 653:13-24; Scampoli Dep. 425:21-426:5.  Nomura claimed to review all findings for loans graded as EV2, *see* Kohout Dep. 239:19-25, but in many cases did not require its vendors to identify the compensating factors that justified grading loans EV2 as opposed to EV3. *See, e.g.*, **PX 204** (of 61 loans graded EV2 for credit, 46 list no compensating factors).  Nomura had no policy for determining whether a compensating factor was sufficient, Hartnagel Dep. at 493:22-494:24, and did not require that a compensating factor directly offset the credit risk presented by a guideline exception.  Spagna Dep. 121:9-22.  As described below, Nomura also routinely altered the grades on loans its vendors had graded EV3s to EV2s or EV2Ws—reflecting

113

that Nomura had determined to accept a loan despite its underwriting defects.  Spagna Dep. 254:25-256:5; *id*. at 259:21-260:20; Kempf Dep. 158:10-23; Diligence MSJ Op., 2014 WL 7232443, at \*9.  In doing so, the Diligence Group did not look at the underlying loan files, Hartnagel Dep. 306:16-307:3; Spagna Dep. 261:20-262:19; *id*. at 263:18-264:5; Diligence MSJ Op., 2014 WL 7232443, at \*9, but only at the vendors' "exception detail reports," Sabo Dep. 109:15-21; Hartnagel Dep. 597:14-598:20, that generally provided no explanation for the re-gradings.  *Compare*, **PX E0430** (exception detail report identifying vendor EV3s) *with* **PX E0706** (final due diligence report including waived-in loans without indentifying compensating factors); *see also* **PX 968**.  Tellingly, there is no evidence that Nomura ever directed a vendor to re-grade as EV3 a loan the vendor had graded as EV1 or EV2.  Diligence MSJ Op., 2014 WL 7232443, at \*9.

396.    In July and August 2006, IngletBlair, LLC ("IngletBlair") reviewed 189 loans, including 39 Mortgage Loans, securitized by Nomura from the fifteen originators from which Nomura had purchased the most loans.  **PX 649** at 1; **PX 650**; **PX 657**; **PX 659**; Cipione Direct ¶ 73; **PX 1581**; Diligence MSJ Op., 2014 WL 7232443, at \*9.  Of these 189 loans, at least 109 had been previously reviewed by one of Nomura's vendors and received a final grade of EV1 or EV2.  **PX 659**; Cipione Direct ¶ 73; **PX 1581**;  Diligence MSJ Op., 2014 WL 7232443, at \*9.  IngletBlair graded seven of these loans as EV3, and another 29 loans as EV4, indicating that "[t]he loan is missing critical documentation to determine loan eligibility."  **PX 659**; **PX 884** at 2; Diligence MSJ Op., 2014 WL 7232443, at \*9.  That is, IngletBlair found that over 30% of the securitized loans graded by Nomura's vendors as EV1 or EV2 were misgraded.  **PX 659**; Diligence MSJ Op., 2014 WL 7232443, at \*9.  Nomura took no steps in response to this audit; nor did it change its use or supervision of its diligence vendors or discuss the audit results with.  *Id*.  Rather, Nomura continued to use and rely on the same credit and compliance diligence vendors in the four securitizations that were issued after this August 2006 audit.  *See id*.; **PX 659**; s*ee, e.g.*, **PX E1031**; **PX 1417**; **PX E1221**; **PX 1419**.

397.    The Diligence Group reviewed all loans graded by its vendors as EV3, Kohout Dep. 239:19-25; *id.* 243:2-22, and after doing so it frequently directed a vendor to re-grade such a loan

114

as EV2W—this was called a "client override" or "waiver."  Spagna Dep. 254:25-256:5; *id*. at
259:21-260:20; Kempf 30(b)(6) Dep. 158:10-23; Diligence MSJ Op., 2014 WL 7232443, at *9.
The Diligence Group often issued overrides without consulting the underlying loan files.  Spagna
Dep. 261:20-262:19; *id*. 263:18-264:5; Hartnagel Dep.306:16-307:3.

398.     A "Trending Report" generated by Clayton for 2006 shows that, on average,
Nomura "waived in" approximately 23% of all loans initially graded by Clayton as EV3, a rate
Clayton described as "substantially higher" than the industry average waiver rate of 9.5%.  **PX 15**
at 2.  A second "Trending Report" generated by Clayton in late 2007 shows that in 2006 and the
first half of 2007 Nomura waived in approximately 58% of loans initially graded by Clayton as
EV3, as compared to the industry average of 39%.  **PX 1304** at 9.

399.     Any loan graded EV3 that was not re-graded to EV2W following Nomura's review
of the vendor reports was supposed to be "kicked-out" of the trade pool.  Diligence MSJ Op., 2014
WL 7232443 at *9; *see also* Spagna Dep. 246:14-18; **PX 812**  at 14.  In practice, however,
Nomura bought and securitized into the SLGs at least 337 loans (5.47% of the Mortgage Loans
subject to credit and compliance diligence) that received a final grade of EV3 for credit or
compliance.  Cipione Direct ¶¶ 14, 69; **PX 1575**, **PX 1580**; Diligence MSJ Op., 2014 WL 7232443
at *9.

400.     Even after re-grading 407 loans that its vendors had graded as EV3s, and after
securitizing 337 EV3 loans without re-grading them, Nomura's kick-out rate on the subprime
acquisition pools was frequently in excess of 15%.  **PX 1575**; Diligence MSJ Op., 2014 WL
7232443, at *9; *id.* at 34.  Through their participation in the market, Nomura and RBSSI unearthed
compelling evidence that originators of the Mortgage Loans were systematically originating loans
in disregard of their guidelines.  These originators included Fremont, **PX 300**; **PX 1152** at 4; **PX
1132** at 3; **PX 1227** at 1; **PX 1167**; **PX 1171**; Marvin Dep. 161:3-162:25, which originated over
40% of the Mortgage Loans and all of the loans in the NHELI 2006-FM1 and NHELI 2006-FM2
SLGs, Cipione ¶ 5; **PX 1571**; **PX O0049** at 6; **PX O0045** at 80, People's Choice, **PX 1159** at 11;
**PX 1142** at 2; **PX 714**; **PX 713**, which originated 10.7% of the Mortgage Loans and nearly half of

the loans in the NHELI 2006-HE3 SLG, Cipione ¶ 5; **PX 1571**, ResMAE, **PX 708** at 1; which originated 10.5% of the Mortgage Loans and over 75% of the loans in the NHELI 2007-3 SLG, Cipione ¶ 5; **PX 1571**, Ownit, **PX 1062**; **PX 482**; **PX 1437** at 1, which originated 9.3% of the Mortgage Loans and nearly half of the loans in the NHELI 2007-2 SLG, Cipione ¶ 5; **PX 1571**, and First NLC, **PX 1231** at 3; **PX 1229** at 1, which originated 6.4% of the Mortgage Loans and 19.3% of the loans in the NHELI 2006-HE3 SLG, Cipione ¶ 5; **PX 1571**.  Yet Nomura continued to buy and securitize loans from the same originators, and make representations about their compliance with guidelines, without disclosing its kick-out rates, waiver rates, or the fact that it was securitizing loans that had been found by its vendors not to comply with guidelines.

### (2)   Valuation Diligence

401.    In acquiring a loan pool, Nomura sent the pool's loan tape to a vendor, either Hansen or CoreLogic.  Kohout Dep. 311:3-13; Diligence MSJ Op., 2014 WL 7232443, at *5. Tapes sent to CoreLogic were first reviewed by "HistoryPro," which measured each loan's risk of fraud or default and assigned it a corresponding "F-Score" between 0 and 25, with higher scores indicating a higher risk of default.  **PX 670** at 1; Diligence MSJ Op., 2014 WL 7232443 at *6.  If a loan received an F-Score of 0, no further valuation testing was done.  Kohout Dep. 311:9-13; *id.* 313:8-23; **PX 1518**; Diligence MSJ Op., 2014 WL 7232443 at *6.

402.    Data produced by Nomura shows that 8,209 of the 15,806 Mortgage Loans—51.9% of all Mortgage Loans and 59.6% of the 13,783 Mortgage Loans evaluated by CoreLogic— received an F-Score of 0, Cipione Direct ¶ 81; **PX 1587**, and thus did not receive any further valuation review.[6]  Overall, in combination with loans submitted for evaluation to Hansen for which an AVM could not be obtained, 9,007 of the Mortgage Loans—57.4% of all Mortgage Loans—obtained no valuation diligence whatsoever from either an AVM, BPO, or subsequent reconciliation review.

---

[6]  **PX 198** (providing AVM values for those loans processed through AVMSelect (column Y) but showing only F Scores and no AVM values generated by HistoryPro); **PX 894** (CoreLogic HistoryPro and AVM Results for Aegis 03A);**PX 457**(CoreLogic HistoryPro and AVM Results for ResMAE SP01); **PX 197** (CoreLogic HistoryPro and AVM Results for Fremont SP03); **PX 200**  (CoreLogic HistoryPro and AVM Results for People's Choice SP01).

116

| Securitization | All Mortgage Loans in DB | Loans for which No AVM, BPO, and Final Values[7] were Obtained | Percentage |
|---|---|---|---|
| NAA 2005-AR6 | 325 | 134 | 41.2% |
| NHELI 2006-FM1 | 2,532 | 1,604 | 63.3% |
| NHELI 2006-FM2 | 3,891 | 2,433 | 62.5% |
| NHELI 2006-HE3 | 3,617 | 1,942 | 53.7% |
| NHELI 2007-1 | 403 | 104 | 25.8% |
| NHELI 2007-2 | 3,001 | 1,603 | 53.4% |
| NHELI 2007-3 | 1,914 | 1,187 | 62.0% |
| Total: | **15,683** | **9,007** | **57.4%** |

Cipione Direct ¶ 80; **PX 1586**.

403.    HistoryPro did not produce estimated appraisal values, **PX 198**; **PX 894**; **PX 457**;

**PX 178**, and Defendants' valuation expert concedes that HistoryPro's F-Scores have "nothing" to

do with the variances of appraisal values.

> Q.   What does the F score have to do with the variance on appraisals value?

> A.   It doesn't. At least depending on the history pro product itself had some valuation components to it. So depending on how you purchased that product, and how you utilized the product, it could have a valuation variance tolerance built into it. But they are specifically talking about the F score here, which spoke to things outside of specific property valuation.

> Q.   And what does F score relate to, though?

> A.   It relates to a lot of different factors. Volatility factors and other factors surrounding the property. Is there a lot of foreclosure activity. Is this a high rate of turnover. You know, declines in value. Things along those lines that would indicate that this is, you know, a problematic valuation.

> Q.   So, I mean, it would be possible to have a low F score, even F score 0, but through the valuation process, to ultimately say, yeah, that loan is, that loan is out of variance; is that right?

> A.   That's why it's a step process.

_____
[7]   "Final Values" correspond to values in the column "Post Reviewed Value" in the Valuation Database (PX 1576).

Kennedy Dep. 197:21-199:3.

404.    If a loan received an F-Score of between 1 and 9, then CoreLogic ran it through an AVM.  **PX 737** at 1; Diligence MSJ Op., 2014 WL 7232443 at *6.  If the AVM valuation was within 10% of the originator's appraisal of a subprime loan, or 15% for an Alt-A loan, then CoreLogic performed no further valuation review.  **PX 770** at 4; **PX 771** at 1; Spagna Dep. 295:21-296:6; Diligence MSJ Op., 2014 WL 7232443, at *6.

405.    If the AVM valuation exceeded these thresholds, then Nomura generally ordered a broker price opinion ("BPO").  Loans rated an F-Score of 10 through 25 were to be submitted directly to BPO review.  Kilpatrick Direct at XI; *id*. XIV.  BPO is a valuation review generally offered by a realtor who visited the property, photographed it, and considered the price of recently-sold or listed "comparable" properties.  Spagna Dep.  298:14-19; Kohout Dep. 321:25-322:6; Diligence MSJ Op., 2014 WL 7232443 at *6.  Yet, Nomura failed to adhere to its policy for verifying the accuracy of the original appraisals in response to evidence of inflation from its AVM for 38.2% of subprime loans and 18.6% of Alt-A loans:

| Securitization | All AVM Values that fall below 10% Threshold, same pools | AVM Values that fall below 10% Threshold and No BPO | Percentage |
|---|---|---|---|
| NAA 2005-AR6 | n/a | n/a | n/a |
| NHELI 2006-FM1 | 329 | 161 | 48.9% |
| NHELI 2006-FM2 | 487 | 178 | 36.6% |
| NHELI 2006-HE3 | 470 | 178 | 37.9% |
| NHELI 2007-1 | n/a | n/a | n/a |
| NHELI 2007-2 | 344 | 115 | 33.4% |
| NHELI 2007-3 | 148 | 47 | 31.8% |
| **Total:** | **1,778** | **679** | **38.2%** |

Cipione Direct ¶ 30; **PX 1588**.

| Securitization | All AVM Values that fall below 15% Threshold, same pools | AVM Values that fall below 15% Threshold and No BPO | Percentage |
|---|---|---|---|
| NAA 2005-AR6 | 42 | 9 | 21.4% |
| NHELI 2006-FM1 | n/a | n/a | n/a |
| NHELI 2006-FM2 | n/a | n/a | n/a |
| NHELI 2006-HE3 | 1 | n/a | 0.0% |
| NHELI 2007-1 | 26 | 4 | 15.4% |
| NHELI 2007-2 | n/a | n/a | n/a |
| NHELI 2007-3 | 1 | n/a | 0.0% |
| **Total:** | **70** | **13** | **18.6%** |

Cipione Direct ¶ 84; **PX 1589**.

406.    After the BPO review, Nomura's BPO vendor would attempt to reconcile the BPO with the original appraisal value.  Kohout Dep. 325:7-326:3, *id.* 328:11-14; Diligence MSJ Op., 2014 WL 7232443, at *6.  The reconciliation process involved a comparison between the "value conclusions reached by the BPO versus the value of the appraisal."  Kohout 328:11-14.

407.    If a BPO valuation yielded less than a 10% variance from the origination appraisal for a subprime loan, or 15% for an Alt-A loan, then Nomura generally bought the loan.  **PX 516** at 33; **PX 770** at 4; Spagna Dep. 302:25-303:11; Kohout Dep. 339:18-24; Sabo Dep. 321:15-322:3. If the BPO valuation was above these thresholds, Nomura would submit the loan to the originator to "opine" on the valuation and produce a "rebuttal."  Kohout Dep. 331:4-14; Sabo Dep. 247:8-18; **PX 743** at 1; Marvin Dep. 260:18-261:19; Diligence MSJ Op., 2014 WL 7232443, at *6.  As Mr. Kohout agreed, it was "[f]air to say that each step in this process, if you passed, you passed for good. But if you failed, you just went to the next step of the process."  Kohout Dep. 339:18-24.

408.    No matter what appraisal values were returned by its AVM, BPO, or reconciliation reviews, Nomura did not use them to calculate the LTV ratios that were reported in the Prospectus Supplements, Graham Dep. 65:17-66:19, and it did not disclose the results of its valuation diligence to investors.  The Prospectus Supplements stated that Nomura would use the lesser of the appraised value or sale price in calculating the LTV ratios; however the Prospectus Supplements

omitted the fact that Nomura had obtained valuations of the Mortgage Loans which departed from those used in calculating the LTV ratios.

409.    In total 6.3% of loans for which Nomura calculated final values below what was represented on the loan tapes, had a LTV ratios above 100% when the LTVs were calculated using the final values rather than the original appraisal values:

| Securitization | Loans with Final Value | Final LTV Greater Than 100 | Percentage |
|---|---|---|---|
| NAA 2005-AR6 | 63 | - | 0.0% |
| NHELI 2006-FM1 | 303 | 8 | 2.6% |
| NHELI 2006-FM2 | 626 | 26 | 4.2% |
| NHELI 2006-HE3 | 613 | 43 | 7.0% |
| NHELI 2007-1 | 56 | 4 | 7.1% |
| NHELI 2007-2 | 452 | 46 | 10.2% |
| NHELI 2007-3 | 265 | 24 | 9.1% |
| **Total:** | **2,378** | **151** | **6.3%** |

Cipione Direct ¶ 85; **PX 1590**.

410.    At the 80% LTV ratio threshold, 30.5% of loans represented as having LTV ratios below 80 had final values that resulted in LTV ratios above 80:

| Securitization | Loans with Final Value and Original LTV At or Below 80 | Final LTV Above 80 | Percentage |
|---|---|---|---|
| NAA 2005-AR6 | 63 | 15 | 23.8% |
| NHELI 2006-FM1 | 187 | 51 | 27.3% |
| NHELI 2006-FM2 | 502 | 119 | 23.7% |
| NHELI 2006-HE3 | 309 | 113 | 36.6% |
| NHELI 2007-1 | 49 | 20 | 40.8% |
| NHELI 2007-2 | 235 | 90 | 38.3% |
| NHELI 2007-3 | 150 | 48 | 32.0% |
| **Total:** | **1495** | **456** | **30.5%** |

Cipione Direct ¶ 87; **PX 1592**.

411.    The Prospectus Supplements omitted any mention of the fact that Nomura's acquisition stage diligence developed final values for the Mortgage Loans, which, if used to calculate the LTV ratios, showed that many more loans had LTV ratios above 80% than reported in the Prospectus Supplements, and that several had LTV ratios above 100%, even though the Prospectus Supplement represented that no loans had an LTV ratio exceeding 100%:

| Securitization | LTV≤80 | | 80<LTV≤100 | | LTV>100 | |
|---|---|---|---|---|---|---|
| | Percent Based on Original LTV | Percent Based on Greater LTV | Percent Based on Original LTV | Percent Based on Greater LTV | Percent Based on Original LTV | Percent Based on Greater LTV |
| NAA 2005-AR6 | 98.95% | 91.10% | 1.05% | 8.90% | 0.00% | 0.00% |
| NHELI 2006-FM1 | 71.34% | 65.84% | 28.66% | 33.30% | 0.00% | 0.86% |
| NHELI 2006-FM2 | 78.60% | 70.44% | 21.40% | 27.78% | 0.00% | 1.78% |
| NHELI 2006-HE3 | 61.25% | 54.51% | 38.75% | 42.93% | 0.00% | 2.57% |
| NHELI 2007-1 | 89.30% | 82.61% | 10.70% | 16.05% | 0.00% | 1.34% |
| NHELI 2007-2 | 56.37% | 49.93% | 43.63% | 46.78% | 0.00% | 3.29% |
| NHELI 2007-3 | 65.75% | 59.15% | 34.25% | 37.55% | 0.00% | 3.30% |
| Totals: | **68.24%** | **61.41%** | **31.76%** | **36.32%** | **0.00%** | **2.26%** |

Cipione Direct ¶ 89; **PX 1594**; Kilpatrick Direct at XI; *id.* XIV.

### (c)    RBSSI's RMBS Business Groups

412.    Several groups within RBSSI were involved in underwriting third-party RMBS. These and other groups within RBSSI were also involved in RBS's purchase, diligence, and securitization of loans in other RMBS issued by RBS entities.

413.    The Asset-Backed Finance Group (the "ABF Group" or "ABF") was responsible, among other things, for securing underwriting mandates on third-party securitizations for RBSSI and managing RBSSI's relationship with third-party issuers.  See **PX 1278** at 9; *id.* at 13.  The ABF Group was headed by Joseph Walsh.  **PX 1280** at 31, and from 2005 to 2008 included Adam Smith, Smith Dep. 28:4-8, who managed RBSSI's relationship with Nomura.  Smith Dep. 19:8-20:6.

414.     The <u>Collateral Analytics Group</u>, which was located within the ABF Group, was responsible, among other things, for selecting samples of loans that would be subject to diligence reviews at the direction of the Credit Group.  Farrell Dep. 550:23-551:12.

415.     The <u>Credit Group</u> was responsible for conducting diligence on RMBS for which RBSSI was the lead underwriter.  **PX 1280** at 18.  From July 2006 to 2009, the Chief Underwriter was James Whittemore who had been a Credit Officer at RBS since 2003.  Whittemore Dep. 28:2-14.  Credit Officers in the Credit Group under Mr. Whittemore included Frank Camacho, Anne Shera, and Brian Farrell. *Id.* at 33:6-16; **PX 1519**.

### (d)     RBSSI's Securitization Diligence

416.     RBSSI conducted no meaningful credit or compliance diligence on two of the four transactions where it acted as lead or co-lead underwriter.  Diligence MSJ Op., 2014 WL 7232443, at *7.  On one of the two deals for which RBS did conduct diligence, RBSSI's Credit Group called the loans "crap" yet ultimately reviewed only 7.2% of the securitized loans.  **PX 1248**; *see infra* Part IV.B.2.f (regarding NHELI 2007-2 review).  When RBSSI did perform diligence, "[t]he number of files selected for review and the manner of selection" was based on "a number of factors, the most important of which is [RBS's] exposure to the transaction."  **PX 1279** at 37.  For third party securitizations in which RBSSI did not own the loans being securitized, it conducted less stringent diligence, as was the case for the at-issue Securitizations.[8]

417.     RBSSI retained Clayton to perform its credit and compliance reviews.  Clayton employed the same grading system for RBSSI as it did for Nomura and RBSSI could override Clayton's initial grades of EV3.  **PX 41** at 1; Farrell Dep. 43:16-44:23; Camacho Dep. 240:11-19; *id.* at 241:9-13.  In fact, without explanation or written justification, RBSSI overrode every EV3 credit grade that Clayton assigned on the samples loans that were ultimately securitized in the NHELI 2007-1 and 2007-2 transactions.  *See* **PX 1253**; **PX 1212**; Cipione Direct ¶ 41; **PX 1577**.

---

[8]   **PX 1175** at 1; **PX 1224** at 1; **PX 1241** at 1; **PX 1223** at 1; **PX 390** at **3**; **PX 1258** at 1.

418.     RBSSI selected a smaller group of loans on which it retained Nationwide Property & Appraisal Services ("Nationwide") to perform "drive by" appraisals to "figure out" whether the original appraisal was correct.  **PX 1128** at 3.  Nationwide routinely reported back appraisal values lower than the original appraisal values.  *See* **PX 1260**; **PX 1273**.  RBSSI appears to have ignored the results of these drive-by appraisals; none of these appraised values were used to calculate the LTV ratios in the Prospectus Supplements; and these appraisal results were not disclosed to investors.  *See, e.g.*, **PX O0072** at 91 (reflecting that none of the loans in Group II-1 had an LTV ratio greater than 100%); **PX 150** (loan tape reflecting LTV for Loan Number ███████ as ███); **PX 1260** (valuation diligence results reflecting LTV for Loan Number ██████ as ███).

### 2.     Nomura's And RBSSI's Diligence Shows That Each Of The SLGs Contained Defective Loans

419.     In the course of creating and monitoring the Certificates, Nomura and RBSSI uncovered both direct and circumstantial evidence that many of the Mortgage Loans were defective.

### (a)     The NAA 2005-AR6 SLG

420.     The NAA 2005-AR6 SLG contained 376 loans, which were drawn from loans acquired through the loan-by-loan channel and from 31 loan pools purchased from over 20 originators, including Aegis, Alliance, Cameron Financial, Gateway, Steward, and Silver State, between June 14, 2005 and October 12, 2005.  Cipione Direct ¶¶ 5, 9, 69; **PX 1571**; **PX 1574; PX 1580**.

421.     Before issuing the NAA 2005-AR6 Securitization[9] on November 30, 2005, Nomura became aware that Silver State, which originated 58 (15.43%) of the Mortgage Loans, Cipione Direct ¶ 9; **PX 1574**, was originating loans that did not comply with guidelines.  On May 25, 2005,

---

[9]   As Defendants have judicially admitted, NAAC and NHELI were the depositors for the seven Securitizations, each of which was structured as an unincorporated New York common law trust.  Dec. 2, 2014, Nomura Defs.' L.R. 56.1 Counterstatement of Material Facts, Dkt. 1126, ¶¶ 20-25; *see Setevage v. Dep't of Homeland Sec.*, 539 F. App'x 11, 13 (2d Cir. 2013) (facts "specifically admitted" in "counter-statement of material facts[] … submitted through counsel. … constitute judicial admissions to which [a party] remains bound[.]").

Mr. Hartnagel noted that Nomura "removed 14 loans attributed to 1 borrower for fraud indications" from two acquisition pools, and that Silver State "seem[ed] to have [a] large number of multi[ple] loans to [the] same borrowers sprinkled throughout all their trades." **PX 736**.  In July 2005, Mr. Kohout emailed Peter Kempf at AMC, saying  that he was "noticing abuses (greater than the norm) on transactions where income is stated," to which Mr. Kempf responded: "As an FYI, Silver State closes many fixed income borrowers as stated loans." **PX 734** at 1. Nevertheless, Nomura represented that the Silver State mortgage loans were originated generally in accordance with the underwriting criteria described in the Prospectus Supplement. **PX O0059** at 93.

422.    Nomura conducted credit and compliance diligence on 252 of the 376 loans in the NAA 2005-AR6 SLG.  Cipione Direct ¶ 69; **PX 1580**.  It retained Clayton, AMC, or Lydian to conduct its reviews of the 31 underlying pools and the loans acquired through the loan-by-loan channel.[10]  *See* **PX 1419**; **PX E1894**; **PX 705** at 39.  Despite its concerns about Silver State there is no evidence that Nomura provided AMC—which reviewed the Silver State 26A and Silver State 28A pools—**PX 1419**; **PX 1604**, with any instructions regarding Silver State's origination of defective loans.

423.    The "kick-out" rate for the underlying pools—the percentage of loans in the diligence sample for each acquisition pool that received final grades of EV3 for credit or compliance that Nomura did not include in the Securitizations—included 13% for the Pinnacle Financial 07 pool.  No increased diligence on the unsampled loans was conducted as a result of any these kick-out rates.  "[G]iven the high kick-out rate[s], the testing of a single set of loans based on adverse sampling provided no reliable basis to believe that all or most of the defective loans had been located and culled," Diligence MSJ Op.,  2014 WL 7232443, at *82; *id*. at *88, and thus no basis to represent that the Mortgage Loans generally complied with underwriting guidelines.

---

[10]   There is no evidence that Nomura performed any diligence on the 51 SLG loans that it acquired through its loan-by-loan channel.

424.   Of the 252 Mortgage Loans that Nomura's vendors reviewed, they graded at least 63 (25%) as EV3 for credit or compliance.  Cipione Direct ¶ 14; **PX 1575**.  The Diligence Group issued client overrides for 24 of these loans (8.7% of the SLG), Cipione Direct ¶ 14; **PX 1575**, instructing the vendors to re-grade them as EV2 or EV2W—*i.e.*, acceptable for purchase and securitization.

425.   These waived-in loans included loans that Nomura's vendors found to have LTVs that exceeded guidelines without compensating factors, FICO scores that did not meet the minimums established by guidelines, as well as loans that demonstrated a failure to properly verify employment, assets, credit history, housing history, or income.  **PX 1575**.

426.   Another 13 loans (5% of the Mortgage Loans subject to credit and compliance diligence) received final grades of EV3 for credit or compliance, Cipione Direct ¶ 14; **PX 1575**, meaning that the Diligence Group agreed the loans were not suitable for purchase or securitization. Despite receiving final EV3 grades, these loans were included in the NAA 2005-AR6 SLG, without any written explanation documenting compensating factors that justified securitizing them.

427.   These securitized EV3 loans included loans that Nomura and its vendors found to have LTVs that exceeded guidelines without compensating factors, FICO scores that did not meet the minimums established by guidelines, as well as loans that demonstrated a failure to properly verify credit history and housing history.  **PX 1575**.

428.   There is no evidence Nomura took any steps to confirm that loans in the NAA 2005-AR6 SLG that were represented as being owner occupied were actually occupied by their owners as of the Cut-Off Date.

429.   Of the 376 Mortgage Loans, there is no evidence that 134 (35.64%) received any meaningful valuation or appraisal review.  Cipione Direct ¶ 80; **PX 1586**.  Nomura submitted 246 Mortgage Loans (65.4%) to Hansen and 79 Mortgage Loans (21%) to CoreLogic, of which 47 (12.5% of the SLG) received an F-Score of 0, Cipione Direct ¶ 34; **PX 1576**, and hence no further review despite the fact that Defendants' valuation expert concedes that F-Scores have "nothing" to do with the variances of appraisal values.  Kennedy 11/5 Dep. 197:21-199:3.  Another 60 loans

received no F-Score, AVM value, BPO value, or final value.[11]  Cipione Direct ¶ 34; **PX 1576**.
Nomura ordered an AVM review for 164 Mortgage Loans, of which 42 (11.8% of the SLG)
received AVM values that were more than 15% lower than their appraised values.  *Id.*  Nomura
ordered BPO reviews for 62 Mortgage Loans, of which five produced values outside of the 15%
Alt-A thresholds.  *Id.*  Nomura engaged in a reconciliation process with the lenders in which its
reconciled value equaled the original appraisal value for two of the five loans, but not for the
remaining three, which nonetheless were included in the SLG.  *Id.*  "Nomura has provided no
documentation that reflects that it made an individualized assessment of the valuation
discrepancies for these [] loans or explains why they were not kicked out despite exceeding the
variance threshold." Diligence MSJ Op., 2014 WL 7232443, at *6.  Nomura securitized all five of
these loans, including the three loans whose appraisal value remained out of tolerance; but it did
not use its valuation results to recalculate the LTV ratios in the Prospectus Supplements and it did
not disclose the results of its reviews to investors.  *See* **PX O0059** at 60 (representing that none of
the SLG loans had an LTV ratio greater than 95%); **PX 1599** (loan tape showing LTV ratio of ▮▮▮
for loan number ▮▮▮▮▮▮); **PX E1578** (valuation diligence results showing LTV ratio of ▮▮▮
for loan number ▮▮▮▮▮▮).

430.    As discussed *supra*, Part III.C.4, the Prospectus Supplement for the NAA 2005-
AR6 Securitization represented that the Class III-A-1 Certificate would not be issued unless it
received an AAA (or equivalent) credit rating.  *See* **PX O0059** at 12.

431.    On November 16, 2005, Jeane Leschak of Nomura provided the loan tape for the
NAA 2005-AR6 Securitization to Moody's and S&P.  *See* **PX 348**; **PX 350**; **PX 351**; **PX 353**.  As
discussed above, that loan tape included inaccurate LTV, occupancy, and DTI information.  *See*
Part IV, *supra*.

432.    On November 30, 2005, Moody's and S&P sent their credit ratings for the NAA
2005-AR6 Certificates to Nomura.  **PX 136**; **PX 135**.  The S&P letter represented: "Standard &

---

[11]   The "final value" corresponds to values in the column "Post Reviewed Value" in the Valuation Database (PX
1576).

Poor's relies on the issuer and its counsel, accountants and other experts for the accuracy and completeness of the information submitted in connection with the rating and surveillance process." *Id*. The S&P letter also stated: "[Nomura] may disseminate these ratings as being assigned by Standard & Poor's in connection with [Nomura's] dissemination of information about the securities, provided that [Nomura does] not indicate that Standard & Poor's has consented to being an 'expert' under the federal securities laws. . ." *Id.*

433.    Based on the information provided by Nomura, S&P and Moody's both rated the NAA 2005-AR6 Certificate as AAA (or equivalent). **PX 136**; **PX** 135. Moody's downgraded the Certificate's credit rating to Aa3 on July 25, 2008, and then to B3 on February 4, 2009. **PX 1612**.

#### (b)    The NHELI 2006-FM1 SLG

434.    The NHELI 2006-FM1 SLG contained 2,532 loans, all of which were drawn solely from the Fremont SP02 loan pool, which Nomura bought from Fremont on November 8, 2005. Cipione Direct ¶¶ 5, 9; **PX1571; PX 1574**.

435.    Prior to issuing NHELI 2006-FM1, on January 30, 2006, Nomura became aware that Fremont was originating loans that did not comply with guidelines. Risk Management performed loss stress tests on the value of the residuals on Nomura's RMBS whole loan book. **PX 905** at 23; **PX 911** at 21-27. Risk Management often had a lower value for Nomura's RMBS positions because of "differen[t] default (both the timing and the level) and severity curves," **PX 300**, and in November 2006 came to the conclusion that 2005 and 2006 Fremont loans were performing poorly due to characteristics not reflected in their stated credit characteristics, and recommended reducing Nomura's valuation of the residual. Brett Marvin, the head of the Trading Desk, testified that Nomura's Credit Group eventually decided to stop buying loans from Fremont based on the "[h]istorical performance of loans that [Nomura] had purchased that were in securitizations" and incidents of "early pay defaults." Marvin Dep. 161:3-162:25. Throughout 2005 and 2006, RBSSI also uncovered evidence of Fremont's systemic origination of defective loans. *See* Part IV.B.2.d, *infra*. Nevertheless, Nomura represented that the Fremont mortgage

loans were originated generally in accordance with the underwriting criteria described in the Prospectus Supplement.  **PX O0049** at 70.

436.     Nomura conducted credit and compliance diligence on 669 of the 2,532 loans in the NHELI 2006-FM1 SLG, Cipione Direct ¶ 69; **PX 1580**, and retained Clayton to conduct this review of the Fremont SP02 pool.  **PX E0091**.  There is no evidence Nomura provided Clayton with any instructions regarding Nomura's concerns about Fremont's origination of defective loans.  Only 26% of the Fremont loans ultimately included in the SLG received any credit and compliance diligence.  Cipione Direct ¶ 9**; PX 1574**.  The rest were represented by Nomura to generally comply with underwriting criteria without review.

437.     The final "kick-out" rate for Fremont SP02 was 9.1%, Cipione Direct ¶ 14**; PX 1575**, but, Nomura did not perform any additional diligence on the unsampled portion of that pool.

438.     Of the 669 Mortgage Loans that Nomura's vendors did review, they graded 124 (18.5%) as EV3 for credit or compliance.  Cipione Direct ¶ 14**; PX 1575**.  The Diligence Group issued client overrides for 46 of these loans (6.88% of the loans in the SLG that had been sampled for diligence), instructing the vendors to re-grade them as EV2 or EV2W.  *Id.*  For 24 of those 46 loans, Nomura failed to document any compensating factors.

439.     The waived in loans included loans that Nomura's vendors found to have LTVs that exceeded guidelines without compensating factors, DTIs that exceeded guidelines without compensating factors, unreasonable stated incomes, FICO scores that did not meet the minimums established by guidelines, as well as loans that demonstrated a failure to properly verify assets, credit history, housing history, or income.

440.     There is no evidence Nomura took any steps to confirm that loans in the NHELI 2006-FM1 SLG that were represented as being owner occupied were actually occupied by their owners as of the Cut-Off Date.

441.     Of the 2,532 Mortgage Loans, there is no evidence that 1,604 (63.35%) received any meaningful valuation or appraisal review.  Cipione Direct ¶ 80; **PX 1586**.  Nomura submitted all of the Mortgage Loans to CoreLogic, only 2,377 of which (93.88% of the SLG) received an F-

Score, and 1,422 of which (56.10% of the SLG) received an F-Score of 0, and hence no further review.  Cipione Direct ¶ 34; **PX 1576**.  Another 72 loans received no F-Score, AVM value, BPO value, or final value.  *Id.*  Nomura ordered an AVM review for 796 Mortgage Loans, *id.*, of which 329 (13% of the SLG) received AVM values more than 10% lower than their appraised values, *id.* (column Y).  Nomura ordered BPO reviews for 302 Mortgage Loans, of which 112 (4.4% of the SLG) produced values outside the 10% subprime threshold.  *Id.*  Nomura engaged in a reconciliation process with the lenders in which its reconciled value equaled the original appraisal value for 29 of the 112 loans, but not for the remaining 83.  *Id.*   Nomura securitized all 112 of these loans, but it did not use its valuation results to calculate the LTV ratios in the Prospectus Supplements and it did not disclose the results of its reviews to investors.  *See* **PX O0049** at 41 (representing that none of the SLG loans had an LTV ratio greater than 100%); **PX 1600** (loan tape showing LTV ratio of ███ for loan number ████████); **PX E0347** (valuation diligence results showing LTV ratio of ██████ for loan number ████████).

442.    As discussed *supra*, Part III.C.4, the Prospectus Supplement for the NHELI 2006-FM1 Securitization represented that the Class I-A Certificate would not be issued unless it received an AAA (or equivalent) credit rating.  *See* **PX O0049** at 13.

443.    On January 17, 2006, Michael Orfe of Nomura provided the loan tape for the NHELI 2006-FM1 Securitization to Moody's and S&P.  *See* **PX 1444**; **PX 1445**; **PX 1441**; **PX 1442**.  As discussed above, that loan tape included inaccurate LTV, occupancy, and DTI information.  *See* Part IV, *supra*.

444.    On January 30, 2006, Moody's and S&P sent their credit ratings for the NHELI 2006-FM1 Certificate to Nomura.  **PX 137**; **PX 382**.  The S&P letter stated: "Standard & Poor's relies on the issuer and its counsel, accountants, and other experts for the accuracy and completeness of the information submitted in connection with the rating.  This rating is based on financial information and documents we received prior to the issuance of this letter.  Standard & Poor's assumes that the documents [Nomura has] provided to us are final."  *Id.* at 2.  The S&P letter also stated: "Standard & Poor's undertakes no duty of due diligence or independent

verification of the information provided by [Nomura] or [Nomura's] agents.  Standard & Poor's reserves the right to withdraw the rating if [Nomura] or [Nomura's] agents fails to provide Standard & Poor's with accurate, complete, timely, or reliable information."  *Id.* at 3.

445.    Based on the information provided by Nomura, S&P and Moody's both rated the NHELI 2006-FM1 Certificate as AAA (or equivalent).  **PX 137**; **PX 382**.  S&P downgraded the Certificate's credit rating to BBB- on September 25, 2009, **PX 1616**, and then to BB on September 23, 2011, **PX 1615**.

### (c)    The NHELI 2006-HE3 SLG

446.    The NHELI 2006-HE3 SLG contained 3,618 loans, which were drawn from 71 loan pools purchased from over 46 originators, including First NLC, Fund America, Mandalay, Novastar, and People's Choice, between August 19, 2005 and June 19, 2006.  Cipione Direct ¶¶ 5, 9; **PX 1571; PX 1574**.

447.    Prior to the August 31, 2006 issuance of NHELI 2006-HE3, Nomura and RBSSI became aware that People's Choice, which originated 1,672 (46.21%) of the Mortgage Loans, Cipione Direct ¶ 9; **PX 1574**, was originating loans that did not comply with guidelines.  By July 2005, RBSSI had determined that, when purchasing loans for its own portfolio and its own securitizations, the "only big whole loan seller [RBS would] not talk[] to is People[']s Choice." **PX. 1159** at 11.  RBSSI's position on buying loans from People's Choice remained the same in the Spring of 2006 when it decided to "pass" on purchasing loans from People's Choice.  **PX 1142** at 2.

448.    As for Nomura, on April 6, 2006 Mr. Kohout and Mr. Hartnagel discussed the "off the charts" number "of valuation issues" in the People's Choice SP02 pool (which contributed loans to the NHELI 2006-HE3 SLG).  **PX 714**; **PX 713**.  Nomura's valuation diligence on that pool resulted in 90 out of tolerance loans that were submitted to People's Choice for reconciliation. *Id.* at 2.  The in-house appraiser at People's Choice agreed with Nomura that over "90%" of the appraisals that had been submitted for reconciliation were inflated.  *Id.*  Nomura concluded that this admission from People's Choice, that a large number of appraisals were inflated by over 10%,

showed that "there [wa]s obviously an inherent flaw in their origination process," which provided "a firm reason to pass on their next offering." *Id.* Despite the admitted "valuation issues" in the People's Choice SP02 pool, Nomura declined to perform additional BPOs in order to "test more values" because "doing so,[] would likely place Nomura in a position where [it] w[ould] not be given consideration on future trades." *Id.* at 1. Nevertheless, Nomura and RBSSI represented that the People's Choice mortgage loans were originated generally in accordance with the underwriting criteria described in the Prospectus Supplement. **PX O0041** at 81.

449. Also before the NHELI 2006-HE3 Securitization was issued, RBSSI became aware that First NLC, which originated 700 (19.35%) of the Mortgage Loans, Cipione Direct ¶ 9; **PX 1574**, was using underwriting guidelines that were "outside [of] normal parameters." **PX 1231** at 3. When purchasing loans for its own portfolio and its own securitizations, RBSSI decided its "sample percentage [should] remain high until we are comfortable with the performance of this" First NLC collateral. *Id* RBSSI echoed the same conclusion after a subsequent First NLC diligence review in July of 2006. **PX 1229** at 1. Nevertheless, Nomura and RBSSI represented that the First NLC mortgage loans were originated generally in accordance with the underwriting criteria described in the Prospectus Supplement. **PX O0041** at 88.

450. RBSSI performed no due diligence prior to underwriting the NHELI 2006-HE3 Securitization, as RBSSI did not "review any of the loan files for the loans underlying the Securitization," Diligence MSJ Op., 2014 WL 7232443, at *15, and took no steps to ensure the quality of, or the accuracy of the representations regarding, the First NLC or People's Choice loans included in the SLG. RBSSI also did nothing to ensure that Nomura increased the sample size on First NLC loans, despite its own stated concerns, *see supra* Part IV.B.2.f. "RBS signed off on the representations concerning the loans in 2006-HE3, having seen only a one-page summary of Nomura's pre-acquisition review of all the Trade Pools that contributed loans to that Securitization and a list of those Originators who contributed more than 5% of the loans to the Securitization. The one-page summary included a disclaimer advising that '[t]he material contained herein is preliminary and based on sources which we believe to be reliable, but it is not complete, and we do

131

not represent that it is accurate.' RBS has identified no evidence that it followed up on this disclaimer and demanded a representation from Nomura that this summary of Nomura's review was complete and accurate."  Diligence MSJ Op., 2014 WL 7232443, at *36; *see* **PX 397**.

451.    Nomura conducted credit and compliance diligence on 1,967 of the 3,618 loans in the NHELI 2006-HE3 SLG at the time they were initially acquired.  Cipione Direct ¶ 69; **PX 1580**. It retained Clayton, AMC, and Lydian to conduct its reviews of the 71 underlying pools.  *See* **PX 1420**; **PX E0232**; **PX 705** at 39.  There is no evidence that Nomura provided AMC, which reviewed the People's Choice SP01, People's Choice SP02, First NLC SP01, and First NLC SP02 pools, **PX 1420**; **PX 1424**; **PX 1425**; **PX 1426**, with any instructions regarding Nomura's concerns about People's Choice's origination of defective loans.  Only 24.6% of the People's Choice and 65.9% of the First NLC loans ultimately included in the SLG received any credit and compliance diligence.  Cipione Direct ¶ 9; **PX 1574**.  The rest were represented to generally comply with underwriting criteria without review.

452.    The "kick-out" rate for some of the underlying pools were 9.2% for the Novastar SP02 pool, 10.6% for the People's Choice SP01 pool, and 11.3% for the People's Choice SP02 pool, Cipione Direct ¶ 14; **PX 1575**, but Nomura did not have any additional diligence performed on the unsampled portions of these pools.

453.    Of the 1,967 Mortgage Loans that Nomura's vendors did review, they graded at least 575 (29.23%) as EV3 for credit or compliance.  Cipione Direct ¶ 14; **PX 1575**.  The Diligence Group issued client overrides for 158 of these loans (8% of the SLG loans sampled for diligence), instructing the vendors to re-grade them as EV2 or EV2W—*i.e.*, acceptable for purchase and securitization.  Cipione Direct ¶ 14; **PX 1575**.

454.    These waived in loans included loans that Nomura's vendors found to have LTVs that exceeded guidelines without compensating factors, DTIs that exceeded guidelines without compensating factors, unreasonable stated incomes, FICO scores that did not meet the minimums established by guidelines, as well as loans that demonstrated a failure to properly verify employment, assets, credit history, housing history, or income.

455.     Another 168 loans (8.5% of the SLG loans sampled for diligence) received final grades of EV3 for credit or compliance, Cipione Ex. Direct ¶ 14; **PX 1575**, meaning that the Diligence Group agreed that the loans were not suitable for purchase or securitization.  Despite receiving final EV3 grades, these loans were included in the NHELI 2006-HE3 SLG, without any written explanation documenting compensating factors that justified securitizing them.

456.     These securitized EV3 loans included loans that Nomura and its vendors found to have LTVs that exceeded guidelines without compensating factors, DTIs that exceeded guidelines without compensating factors, unreasonable stated incomes, FICO scores that did not meet the minimums established by guidelines, as well as loans that demonstrated a failure to properly verify employment, assets, credit history, housing history, or income.

457.     There is no evidence that Nomura took any steps to confirm that loans in the NHELI 2006-HE3 SLG that were represented as being owner occupied were actually occupied by their owners as of the Cut-Off Date.

458.     Of the 3,618 Mortgage Loans, there is no evidence that 1,942 (53.7%) received any meaningful valuation or appraisal review.  Cipione Direct ¶ 80; **PX 1586**.  Nomura submitted 2,967 of the Mortgage Loans (82%) to CoreLogic, of which 1,696 (46.88% of the SLG) received an F-Score of 0 and hence no further review.  Cipione Direct ¶ 34; **PX 1576**.  Another 228 loans received no F-Score, AVM value, BPO value, or final value.  *Id*.  Nomura ordered an AVM review for 1,366 Mortgage Loans, *id*., of which 472 (13.05% of the SLG) received AVM values more than 10% lower than their appraised values, *id*. (column Y).  Nomura ordered BPO reviews for 592 Mortgage Loans, of which 267 (7.38% of the SLG) produced values outside the 10% subprime thresholds.  *Id*.  Nomura engaged in a reconciliation process with the lenders in which its reconciled value equaled the original appraisal value for 37 the 267 loans, but not for the remaining 230.  *Id*.   Nomura securitized all 267 of these loans, but it did not use its valuation results to recalculate the LTV ratios in the Prospectus Supplements and it did not disclose the results of its reviews to investors.  *See* **PX O0041** at 41 (representing that none of the SLG loans had an LTV ratio greater than 100%); **PX 147** (loan tape showing LTV ratio of ███ for loan

number ▇▇▇▇); **PX E1665** (valuation diligence results showing LTV ratio of ▇▇▇ for loan number ▇▇▇▇).

459.     As discussed *supra*, Part III.C.4, the Prospectus Supplement for NHELI 2006-HE3 represented that the Class I-A-1 Certificate would not be issued unless it received an AAA (or equivalent) credit rating.  *See* **PX O0041** at 14-15.

460.     On July 28, 2006, Michael Orfe of Nomura provided the loan tape for the NHELI 2006-HE3 Securitization to Moody's and S&P.  *See* **PX 225**; **PX 226**; **PX 686**; **PX 688**.  On August 4, 2006, Mr. Orfe provided the loan tape for the NHELI 2006-HE3 Securitization to Fitch. **PX 249**; **PX 250**.  As discussed above, that loan tape included inaccurate LTV, occupancy, and DTI information.  *See* Part IV, *supra*.

461.     On August 31, 2006, Moody's and S&P sent their credit ratings for the NHELI 2006-HE3 Certificates to Nomura.  **PX 138**; **PX 1296**.  The S&P letter represented: "The rating is based on information supplied to us by [Nomura] or by [Nomura's] agents but does not represent an audit.  We undertake no duty of due diligence or independent verification of any information. . . . We have not consented to and will not consent to being named an 'expert' under the applicable securities laws, including without limitation, Section 7 of the Securities Act of 1933."  *Id.* at 1. The S&P letter also stated: "Standard & Poor's relies on the issuer and its counsel, accountants, and other experts for the accuracy and completeness of the information submitted in connection with the rating.  This rating is based on financial information and documents we received prior to the issuance of this letter.  Standard & Poor's assumes that the documents [Nomura has] provided to us are final."  *Id.* at 3.  The S&P letter also stated: "Standard & Poor's undertakes no duty of due diligence or independent verification of the information provided by [Nomura] or [Nomura's] agents.  Standard & Poor's reserves the right to withdraw the rating if [Nomura] or [Nomura's] agents fails to provide Standard & Poor's with accurate, complete, timely, or reliable information." *Id.* at 4.

462.     Based on the information provided by Nomura, S&P and Moody's both rated the NHELI 2006-HE3 Certificate as AAA (or equivalent).  **PX 138**; **PX 1296**.  S&P downgraded the Certificate's credit rating to B on August 4, 2009.  **PX 1609**.

463.     By the end of February 2007, RBSSI had concluded that NHELI 2006-HE3 was the "worst performing deal" on its books and decided to "target [it] for a 'putback/fraud' review."  **PX 1250**.  RBSSI found that of the 263 loans submitted to this fraud review, 43 had indications of fraud, **PX 817** at 1, including "fraudulent misrepresentation of real estate owned and related indebtedness" as well as "fraudulently misrepresented income."  *See id.* at 5, 7.  Mr. Spagna, the head of Nomura's Diligence Group, who received these results from RBSSI in April 2007, *id.* at 1, could not recall Nomura doing anything in response to this fraud review.  Spagna Dep. 348:17-349:11.

### (d)     The NHELI 2006-FM2 SLG

464.     The NHELI 2006-FM2 SLG contained 3,891 loans, which were drawn from two loan pools each originated by Fremont—Fremont SP03 and Fremont SP04—and acquired by Nomura on June 29, 2006.  Cipione Direct ¶¶ 5,9; **PX 1571; PX 1574**.  RBBSI served as the lead underwriter for the NHELI 2006-FM2 Securitization.  **PX O0045** at 1.  Before the issuance of the NHELI 2006-FM2 Securitization on October 31, 2006, as discussed, RBSSI became aware that Fremont was originating loans that did not comply with guidelines.  *See* Part IV.B.2.c*, supra*.

465.     For instance, in January 2005, RBSSI rejected 33 loans from a Fremont pool, over 10% of the 316 loans that it reviewed; a rate which RBSSI noted was "quite high."  **PX 1152** at 4; **PX 1149**.  Overall, RBSSI rejected 227 loans from that pool, almost 10% of the 2,451 loans in the original pool.  *Id* (columns L, M).

466.     These problems continued into 2006 as RBSSI's diligence reviews of Fremont pools in January and April resulted in reject rates of 27.53% and 21.05% respectively.  **PX 1130** at 1; **PX 1132** at 3.  Moreover, 12% of an appraisal sample from the Fremont 2006-A pool "ha[d] variances of over 20%."  **PX 1130** at 2.  Mr. Whittemore, RBSSI's Chief Underwriter, noted that RBSSI should "try and hold [Fremont] more to their published guidelines."  **PX 1227** at 1.  On

135

December 6, 2006, Peter McMullin, an RBS trader, referred to Fremont as "FraudMont," **PX 1167**; *see also* **PX 1171** , and a July 2007 investigation into potentially fraudulent Fremont loans revealed a "fraud discovery rate" of 45%. **PX 1380** at 2. Nevertheless, RBSSI and Nomura represented that the Fremont mortgage loans were originated generally in accordance with the underwriting criteria described in the Prospectus Supplement. **PX O0045** at 81.

467. Despite being aware that it was underwriting Fremont loans, RBSSI did not conduct any diligence on the NHELI 2006-FM2 SLG. In February of 2007, "[Mr.] Farrell wrote, 'We did not perform actual diligence on this. Diligence was performed by another company for Nomura. We signed off on their results." Diligence MSJ Op., 2014 WL 7232443, at *16; *see* **PX 1243**.

468. Nomura conducted credit and compliance diligence on 837 of the 3,891 loans in the NHELI 2006-FM2 SLG. Cipione Direct ¶ 69; **PX 1580**. It retained AMC to conduct its reviews of the two underlying pools. *See* **PX 968** at 1. There is no evidence that Nomura provided AMC with any instructions regarding the concerns that RBSSI expressed relating to Fremont's origination of defective loans. Only 21.5% of the Fremont loans ultimately included in the SLG received any credit and compliance diligence. Cipione Direct ¶ 9; **PX 1574**. The rest were represented to generally comply with underwriting criteria without review. There is also no evidence Nomura took any steps to upgrade or further investigate its review practices or those of its vendors based on the results of the IngletBlair review that had occurred in July and August 2006. Diligence MSJ Op., 2014 WL 7232443, at *9; *id.* at *24 *See* Part IV.B.1, *supra*.

469. The "kick-out" rates for some of the underlying pools were 17.4% (198 loans) for the Fremont SP03 pool and 21.4% (141 loans) for the Fremont SP04 pool, Cipione Direct ¶14; **PX 1575**, but Nomura did not have any additional diligence performed on the unsampled portions of these pools.

470. Of the 837 Mortgage Loans that Nomura's vendors did review, they graded 116 (13.86% of the diligence sample) as EV3 for credit or compliance. Cipione Direct ¶ 14; **PX 1575**. The Diligence Group issued client overrides for 14 of these 116 loans, instructing the vendors to re-grade them as EV2 or EV2W—*i.e.*, acceptable for purchase and securitization. *Id.*

471.   These waived-in loans included loans that Nomura's vendors found to have LTVs that exceeded guidelines without compensating factors, DTIs that exceeded guidelines without compensating factors, unreasonable stated incomes, FICO scores that did not meet the minimums established by guidelines, as well as loans that demonstrated a failure to properly verify employment, assets, credit history, housing history, or income.

472.   Additionally, Mr. Spagna issued a client override for additional loans several months *after* Nomura bought them.  In September 2006, three months after Nomura bought the two pools, Mr. Spagna requested that 19 EV3 loans that Nomura purchased be re-graded by AMC without any justification, before forwarding those diligence results to RBSSI.  In a September 27, 2006 email with the subject line "Huge Favor--Fremont ASAP," Mr. Spagna wrote to Peter Kempf at AMC:

> We are securitizing Fremont 3 and Fremont 4.  RBS Greenwich Capital is acting as co-underwriter on this deal and have requested our standard due diligence reports that we receive from AMC.  To be on the safe side, we compared the loans that are in our securitization to the last set of exception reports you provided us.  The attached excel report shows that there are 12 loans in Fremont 3 and 7 loans in Fremont 4 that AMC had marked as CE3s but, for whatever reason, we decided to buy from Fremont.  Please mark these loans as client overrides Credit Event 2s for all 19 loans in question.  Then please forward to me the updated set of reports for these two deals.

**PX 968**.  Mr. Kempf responded: "Here you go.  Let me know if you need anything else."  He attached to his email a spreadsheet showing that AMC had changed the grade for the 19 loans from "3" to "2," as Mr. Spagna had requested.  Id.  Nomura has provided no other evidence to explain the change in the classification of these 19 loans."  Diligence MSJ Op., 2014 WL 7232443, at *15.  Furthermore, there is no evidence Nomura informed RBSSI of these waivers.  In fact, after Mr. Spagna participated in a conference call with RBSSI, during which questions about Nomura's diligence on the loans were raised, he acknowledged to his co-worker, Mr. Sabo: " I took the liberty to bullshit them.  I think it worked."  **PX 393** at 1; *see also* **PX 1188; PX 1189**.

473.     Another 21 loans (2.5% of the SLG loans sampled for diligence) received final grades of EV3 for credit or compliance, Cipione Direct ¶ 14; **PX 1575**, meaning the Diligence Group agreed the loans were not suitable for purchase or securitization.  Despite receiving final EV3 grades, these loans were included in the NHELI 2006-FM2 SLG, and there is no written explanation for why they were securitized.

474.     These securitized EV3 loans included loans that Nomura and its vendors found to have LTVs that exceeded guidelines without compensating factors, DTIs that exceeded guidelines without compensating factors, FICO scores that did not meet the minimums established by guidelines, as well as loans that demonstrated a failure to properly verify employment, assets, housing history, or income.

475.     There is no evidence Nomura took any steps to confirm that loans in the NHELI 2006-FM2 SLG that were represented as being owner occupied were actually occupied by their owners as of the Cut-Off Date.

476.     Of the 3,891 Mortgage Loans, there is no evidence that 2,433 (62.53%) received any meaningful valuation or appraisal review.  Cipione Direct ¶ 80; **PX 1586**.  Nomura submitted all 3,891 of the Mortgage Loans to CoreLogic, of which 2,384 (61.27% of the SLG) received an F-Score of 0 and hence no further review.  Cipione Direct ¶ 34; **PX 1576**.  Another 46 loans received no F-Score, AVM value, BPO value, or final value.  Nomura ordered an AVM review for 1,173 Mortgage Loans, of which 487 (12.52% of the SLG) received AVM values more than 10% lower than their appraised values, *id*. (column Y).  Nomura ordered BPO reviews for 629 Mortgage Loans, of which 232 (5.96% of the SLG) produced values outside the 10% subprime thresholds.  *Id*.  Nomura engaged in a reconciliation process with the lenders in which its reconciled value equaled the original appraisal value for 51 the 232 loans, but not for the remaining 181.  *Id*.  Nomura nevertheless securitized all 232 of these loans, *id*., but it did not use its valuation results to recalculate the LTV ratios in the Prospectus Supplements and it did not disclose the results of its reviews to investors.  *See* **PX O0045** at 49 (representing that none of the SLG loans had an LTV ratio greater than 100%); **PX 146** (loan tape showing LTV ratio of ▉▉▉ for loan number

138

█████████); **PX 197** (valuation diligence results showing LTV ratio of █████ for loan number

█████████). Yet, for 21 of the Mortgage Loans, the reconciliation process resulted in "final

values so far below Fremont's appraisals that, under Nomura's policy, Nomura should have

refused to purchase and securitize those loans." Diligence MSJ Op., 2014 WL 7232443, at *37.

477.    As an underwriter, RBSSI performed no diligence on the NHELI 2006-FM2

Securitization and took no steps to ensure the quality of, or the accuracy of the representations

regarding, the Fremont loans included in the SLG.  "Instead, it relied entirely on Nomura's (which

acted as issuer) pre-acquisition review of the Trade Pools.  It received three spreadsheets reflecting

kick-out rates for various kinds of reviews of the loans in the two Bulk Pools that contributed to

the Securitization, as well the results of AMC's review."  *Id.*, at *37; *see* **PX 391**; **PX 1234** at 2.

478.    After the Securitization was issued, Mr. Farrell was asked by another RBS

employee, Grace-Ann Didato, about RBSSI's diligence on this deal.  Mr. Farrell wrote, "We did

not perform actual diligence on this.  Diligence was performed by another company for Nomura.

We signed off on their results."  When Ms. Didato asked, "How frequently is this done?" Mr.

Farrell, who did not work on the NHELI 2006-HE3 Securitization for which RBSSI conducted no

diligence, *see* supra Part IV.B.2.c, replied, "Since being employed, this is the only review I was

involved in w[h]ere [due diligence] results were reviewed and a new diligence was not ordered."

**PX 1243**.

479.    As discussed *supra*, Part III.C.4, the Prospectus Supplement for the NHELI 2006-

FM2 Securitization represented that the Class I-A-1 Certificate would not be issued unless it

received an AAA (or equivalent) credit rating.  *See* **PX O0045** at 15.

480.    On September 22, 2006, Michael Orfe of Nomura provided the loan tape for the

NHELI 2006-FM2 Securitization to Moody's, S&P, and Fitch.  *See* **PX 234**; **PX 235**; **PX 237**; **PX

238**; **PX 240**; **PX 241**.  As discussed above, that loan tape included inaccurate LTV, occupancy,

and DTI information.  *See* Part IV, *supra*.

481.    On October 31, 2006, Moody's and S&P sent their credit ratings for the NHELI

2006-FM2 Certificates to Nomura.  **PX 134**; **PX 1293**.  RBSSI received copies of both rating

letters on that same day.  **PX 1438**.  The S&P letter represented: "The rating is based on information supplied to us by [Nomura] or by [Nomura's] agents but does not represent an audit. We undertake no duty of due diligence or independent verification of any information. . . . We have not consented to and will not consent to being named an 'expert' under the applicable securities laws, including without limitation, Section 7 of the Securities Act of 1933."  **PX 1293** at 1.  The S&P letter also stated: "Standard & Poor's relies on the issuer and its counsel, accountants, and other experts for the accuracy and completeness of the information submitted in connection with the rating.  This rating is based on financial information and documents we received prior to the issuance of this letter.  Standard & Poor's assumes that the documents [Nomura has] provided to us are final."  *Id.* at 2.  The S&P letter also stated: "Standard & Poor's undertakes no duty of due diligence or independent verification of the information provided by [Nomura] or [Nomura's] agents.  Standard & Poor's reserves the right to withdraw the rating if [Nomura] or [Nomura's] agents fails to provide Standard & Poor's with accurate, complete, timely, or reliable information."  *Id.* at 3.

482.    Based on the information provided by Nomura, S&P and Moody's both rated the NHELI 2006-FM2 Certificate as AAA (or equivalent).  S&P downgraded the Certificate's credit rating to BB on September 9, 2008, **PX 1614**, to B on February 19, 2009, **PX 1610**, and then to CCC on August 4, 2009, **PX 1609**.

**(e)     The NHELI 2007-1 SLG**

483.    The NHELI 2007-1 SLG contained 474 loans, which were drawn from loans acquired through the loan-by-loan channel and from 30 loan pools purchased from 18 originators, including, among others, Alliance CA, Allstate, Baltimore, First National Bank of Nevada, Loan Center, Loan City, Pinnacle Financial, and Silver State, between September 25, 2006 and January 12, 2007.  Cipione Direct ¶¶ 5, 9; **PX 1571**; **PX 1574**.

484.    Nearly a year before issuing the NHELI 2007-1 Securitization on January 31, 2007, Nomura reported in February 2006 that Alliance CA, which originated 29 loans in the relevant SLG from two loan pools (ABC18 and Alliance CA 17), Cipione Direct ¶ 9; **PX 1574**, was an

140

"[e]xtremely dysfunctional Originator" with "[c]redit characteristics [] getting more subprime on each subsequent trade."  **PX 738** at 3.  At that time, Nomura recommended that Alliance CA be removed from its approved sellers list.  *Id.*

485.    Also in February 2006, Nomura reported that Pinnacle Financial, which originated 55 loans in the NHELI 2007-1 SLG from three loan pools (PFC 28, PinnFinn 26, and Pinnacle Financial 29), Direct ¶ 9; **PX 1574**, was "yielding a decrease in pull through rates averaging 70% at best."  *Id.* at 4.  The 70% pull through rate for Pinnacle Financial, and, conversely, their 30% kick out rate is evidence of an unacceptable percentage of guideline breaches in loans Pinnacle Financial originated.

486.    Similarly, Nomura identified Allstate, which originated four Mortgage Loans from the Allstate 29 loan pool, Cipione Direct ¶ 9; **PX 1574**, as an "extremely dysfunctional originator" with "[t]rades [that] have been pushed out 2 weeks min due to their inability to address stips/issues till tie out date/ high level % of initial DD denies/ incorrect stips sent for loan clearance (missing flood cert/appraisal- HUD1 sent in)."  *Id.*

487.    Finally, as previously discussed, Nomura reported concerns with Silver State's origination practices and product.  *See* Part IV.B.2.a, *supra*.  Silver State originated 154 loans in the relevant SLG from eight loan pools.  Cipione Direct ¶ 9; **PX 1574**.  Nevertheless, Nomura and RBSSI represented that the Alliance CA, Pinnacle Financial, Allstate, and Silver State mortgage loans were originated generally in accordance with the underwriting criteria described in the Prospectus Supplement.  **PX O0072** at 114; *see also id.* at 113.

488.    Nomura conducted credit and compliance diligence on 335 of the 474 loans in the NHELI 2007-1 SLG.  Cipione Direct ¶ 69; **PX 1580**.  It retained Clayton, AMC, or Lydian to conduct its reviews of the 30 underlying pools and the loans acquired through the loan-by-loan channel.[12]  See **PX E0016**; **PX 1421**; Cipione Direct ¶ **5; PX 1571** (showing that there were loan-by-loan channel loans); **PX 705** at 39.  There is no evidence that Nomura provided these diligence

---

[12]   There is no evidence that Nomura performed any diligence on the 71 SLG loans that it acquired through its loan-by-loan channel.

vendors with any instructions regarding the review of loans originated by originators about which Nomura had expressed concern.  *See* Part IV.B.1, *supra*.

489.    The "kick-out" rate for the for the Silver State 66 pool was 19.35% , Cipione Direct ¶ 14; **PX 1575**, but Nomura did not have any additional diligence performed on the unsampled portions of this pools.

490.    Of the 335 Mortgage Loans that Clayton or AMC did review, they assigned at least 81 loans grades of EV3 for credit or compliance (24.18% of the SLG loans sampled for diligence), Cipione Direct ¶ 14; **PX 1575**.  Nomura issued overrides for six of these loans, instructing the vendors to re-grade them as EV2 or EV2W.  *Id.*

491.    These waived in loans included loans that Nomura's vendors found to have LTVs that exceeded guidelines without compensating factors, DTIs that exceeded guidelines without compensating factors, as well as loans that demonstrated a failure to properly verify employment, assets, or housing history.

492.    Another 45 loans (13.4% of the SLG loans sampled for diligence) received final grades of EV3 for credit or compliance, Cipione Direct ¶ 14; **PX 1575**, meaning that the loans contained unacceptable risk and were not suitable for purchase or securitization.  Despite receiving final EV3 grades, these loans were included in the NHELI 2007-1 SLG, and there is no written explanation for why they were securitized.

493.    These securitized EV3 loans included loans that Nomura and its vendors found to have LTVs that exceeded guidelines without compensating factors as well as loans that demonstrated a failure to properly verify employment, assets, credit history, housing history, or income.

494.    There is no evidence that Nomura took any steps to confirm that loans in the NHELI 2007-1 SLG that were represented as being owner occupied were actually occupied by their owners as of the Cut-Off Date.

495.    Of the 403 Mortgage Loans for which valuation data was available,[13] there is no evidence that 104 loans (25.8% of the SLG) received any meaningful valuation or appraisal review.  Cipione Direct. ¶ 80; **PX 1586**.  Nomura submitted 100 of the Mortgage Loans (21.1% of the SLG) to CoreLogic, of which 70 (14.8% of the SLG) received an F-Score of 0, and hence no further review was conducted.  Cipione Direct ¶ 34; **PX 1576**.  Another 31 loans received no F-Score, AVM value, BPO value, or final value.  *Id.*

496.    Nomura ordered an AVM review for 265 Mortgage Loans, of which 26 loans (5.5% of the SLG) returned AVM values more than 15% lower than the appraised values.[14]  Cipione Direct ¶ 34; **PX 1576**.  Nomura ordered a BPO review for 55 Mortgage Loans, of which eight loans (1.7% of the SLG) produced values below the 15% Alt-A threshold.  *Id.*  Nomura also engaged in a reconciliation process with the lenders in which its reconciled value equaled the original appraisal value  for one of the eight loans, but not for the remaining seven.  *Id.*  Nomura securitized all three of these loans, *id.*, but did not use its valuation results to recalculate the LTV ratios in the Prospectus Supplements and, it did not disclose the results of its reviews to investors.  *See* **PX O0072** at 91 (representing that none of the SLG loans had an LTV ratio greater than 100%); **PX 150** (showing LTV ratio of ▆▆▆ for loan number ▆▆▆▆▆▆▆); **PX 198** (showing LTV ratio of ▆▆▆ for loan number ▆▆▆▆▆).

497.    RBSSI retained Clayton to conduct credit and compliance due diligence related to the NHELI 2007-1 Securitization.  Parties' Stipulations of Law and Fact ("Stipulation") ¶ 58; *see* **PX E2185**.  RBSSI did not draw a diligence sample from the relevant NHELI 2007-1 SLG, but instead selected a sample from all loans in the NAAC 2007-AR1 pool, Stipulation ¶ 60, and which was later subdivided into two SLGs, including the one at issue.  *Id.*

498.    From the 1,751 loans in Group II of NHELI 2007-1, RBSSI drew an initial sample of 250 loans, which it reduced to 102 loans—or less than 6% of the loans in Group II—"[b]ecause

---

[13]   Valuation data was not available for the 71 loans acquired through Nomura's loan-by-loan channel.
[14]   The Group II1A loans for NHELI 2007-1 were Alt-A adjustable rate mortgage loans.

Nomura did not have imaged files for all the loans in [the] original samples" chosen by RBSSI. Stipulation ¶ 62; **PX 1247** at 1; **PX 1244**..

499.    Of the 102 loans in this sample, only 19 loans were from Group II-1, or 4% of the 474 loans in the relevant SLG.  See Cipione Direct ¶ 41; **PX 1577**; Stipulation ¶ 63.  Moreover, of the 102 loans that it reviewed, Clayton assigned a grade of EV3 to 41 of them—36 for credit reasons and an additional five for compliance reasons—or 40% of the loans in the sample. Cipione Direct ¶ 41; **PX 1577**.  Brian Farrell issued overrides for *all* loans that Clayton graded EV3 based on credit defects— in the space of a single hour.  *Compare* **PX 9** *with* **PX 13**; Diligence MSJ Op., 2014 WL 7232443, at *38.

500.    There is no evidence that RBSSI reviewed any of the loans that Clayton initially graded as EV1 or EV2.  This failure is compounded by the fact that RBSSI became aware in the spring of 2006 that a high percentage of loans that Clayton graded EV1 and EV2, in fact, failed to comply with underwriting guidelines.  In March of 2006, Ellington Management Group asked RMG Global to conduct a quality control review of a pool of loans that RBS had purchased from Meritage Mortgage Corporation using Clayton as its original diligence vendor.  **PX 1287** at 1. RMG Global's QC review determined that 40% "of the loans that Clayton had scored as [EV]1's" should have been graded EV3s.  *Id.* Yet there is no evidence that RBSSI changed its supervision of Clayton, or enhanced its review of Clayton's findings, on either the NHELI 2007-1 or 2007-2 transactions.

501.    RBSSI commissioned Nationwide Property & Appraisal Services ("Nationwide") to perform "drive by" appraisals on 50 of the 102 loans within its credit and compliance sample for the NHELI 2007-1 Securitization, of which 11 were in the relevant NHELI 2007-1 SLG—the remaining Mortgage Loans received no valuation review.  Cipione Direct ¶ 41; **PX 1577**; **PX 1260**.  Nationwide returned appraisal values for 41 of the 50 loans, including for nine loans in the NHELI 2007-1 SLG.  Cipione Direct ¶ 41; **PX 1578**.  For eight of these nine loans, Nationwide reported appraised values lower than those reflected in the LTV ratios reported in the Prospectus Supplements.  *Id.*; **PX 1260**.  Nationwide reported that five of the nine loans had appraisals that

144

would result in loans with reported LTV or CLTV ratios at or below 80% being over 80%, and one of those loans had an appraisal resulting in an LTV of 116%. Cipione Direct ¶ 41; **PX 1578**. The results of RBSSI's valuation reviews were not used to recalculate the LTV ratios reported in the Prospectus Supplements. *See e.g.,* **PX O0072** at 91 (reflecting that none of the loans in Group II-1 had an LTV ratio greater than 100%); **PX 150** (loan tape reflecting LTV for Loan Number ███████ as ████); **PX 1260** (valuation diligence results reflecting LTV for Loan Number ███████ as ████). In fact, "RBS appeared to ignore entirely the results of its valuation review[]" as it took "no action when a substantial portion of its sampled loans...appeared to have faulty appraisals." Diligence MSJ Op., 2014 WL 7232443, at *3. Brian Farrell, the RBSSI Credit Department employee who headed RBSSI's review of NHELI 2007-1, could not recall any circumstances where RBSSI changed its disclosures to investors or third parties on the basis of its due diligence results. Farrell In re Certain RBS RMBS Offerings Dep. 32:21-33:20.

502.    As discussed *supra*, Part III.C.4, the Prospectus Supplement for the NHELI 2007-1 Securitization represented that the Class II-A-1 Certificate would not be issued unless it received an AAA (or equivalent) credit rating. *See* **PX O0072** at 25.

503.    On January 10, 2007, Su Kim, a collateral analyst at Nomura, provided a loan tape for the NHELI 2007-1 Securitization to Moody's and S&P. **PX 164** ; **PX 168**. As discussed above, that loan tape included inaccurate LTV, occupancy, and DTI information. *See* Part IV, *supra*.

504.    On January 31, 2007 Moody's and S&P sent their credit ratings for the NHELI 2007-1 Certificate to Nomura. **PX 386**; **PX 195**. The S&P letter stated: "Standard & Poor's relies on the issuer and its counsel, accountants, and other experts for the accuracy and completeness of the information submitted in connection with the rating. This rating is based on financial information and documents we received prior to the issuance of this letter. Standard & Poor's assumes that the documents [Nomura has] provided to us are final." *Id.* at 1-2. The S&P letter also stated: "Standard & Poor's undertakes no duty of due diligence or independent verification of the information provided by [Nomura] or [Nomura's] agents. Standard & Poor's reserves the right

to withdraw the rating if [Nomura] or [Nomura's] agents fails to provide Standard & Poor's with accurate, complete, timely, or reliable information." *Id* at 3.

505.     Based on the information provided by Nomura, S&P and Moody's both rated the NHELI 2007-1 Certificate as AAA (or equivalent). **PX 386**; **PX 195**.  Moody's downgraded the Certificate's credit rating to B3 on July 25, 2008, and then to Ca on February 4, 2009.  **PX 1612**. S&P downgraded the Certificate's credit rating to B on October 6, 2008.  **PX 1613**.

506.     In July 2007, at the request of Mr. Spagna, Nomura conducted a post-closing fraud review on the loans underlying the NHELI 2007-1 Securitization, which involved reviews of the loan origination files, servicing comments, and pay histories.  **PX 818** at 4.  That review found that "19% of the pool reviewed exhibited a high probability of fraud for profit and/or fraud for property (Event 3)," and that "[l]oans with the highest fraud score also had (1) Higher FICOs; (2) Lower LTV's; (3) Higher balances; (4) Higher valued homes; [and] (5) Lower percentage sampled at acquisition."  *Id.* at 6-8; *see also* **PX 1373**; **PX 815**.  Two of the six loans identified as having a high probability of fraud (loan numbers ████████ and ████████) were included in the NHELI 2007-1 SLG.  Cipione Direct ¶ 77; **PX 1583**.

### (f)     The NHELI 2007-2 SLG

507.     The NHELI 2007-2 SLG contained 3,001 loans, which were drawn from 56 loan pools purchased from over 30 originators, including Ownit, First NLC, Equifirst, ResMAE, and Funding America, between March 1, 2006 and December 30, 2006.  Cipione Direct ¶¶ 5, 9; **PX 1571; PX 1574**.

508.     Before the NHELI 2007-2 Securitization was issued on January 31, 2007, Nomura became aware that OwnIt, which originated 1,438 (47.9%) of the Mortgage Loans, Cipione Direct ¶ 9; **PX 1574**, had been originating loans that did not comply with guidelines.  In November 2006, Nomura conducted diligence on a pool known as "OwnIt 03," and found that, although the loans in the pool were described as Alt-A, "the[ir] characteristics [were] more subprime.  100% CLTV on just about everything."  **PX 1062** at 1.  Christopher Scampoli, a contract employee who worked in Nomura's diligence group, noted that, within OwnIt 03, Nomura found "a significant number of

loans with recent bankruptcies and delinquencies after the bankruptcy." *Id*. at 2. Based on the results of this diligence, Neil Spagna, the director of Nomura's diligence group, stated that Nomura "need[ed] to upsize the due diligence on the [second lien loans]" in its contemporaneous diligence review of the OwnIt SP02 pool, which contributed 1,438 loans to the NHELI 2007-2 SLG . *Id*. But despite Mr. Spagna's request to upsize Nomura's diligence sample beyond the 25% originally agreed upon with OwnIt, **PX. 193** at 4, there is no evidence that Nomura ever did so. Diligence MSJ Op., 2014 WL 7232443, at *35.

509.    In January 2007, roughly one month after OwnIt went out of business, Nomura analyzed second-lien loans purchased from OwnIt that it had not reviewed before purchase. **PX 485** at 1. This review was referred to as the "OwnIt SP02 Part 2" review, even though the OwnIt SP02 pool was not one of the three pools that Nomura reviewed. *Compare* **PX 271** (showing list of loans in the OwnIt SP01, SP02, 01, 02, and 03 loan pools) *with* **PX 484** (listing all loans subject to diligence as part of the OwnIt SP02 Part 2 pool that did not include loans in the OwnIt SP02 pool, but did include loans in the not-at-issue OwnIt 01, 02 and 03 pools). On January 31, 2007, the same day that NHELI 2007-2 was issued, Mr. Spagna and Mr. Sabo discussed the results of this review, prompting Mr. Sabo to ask: "Is this getting worse or something??!!?" Mr. Spagna responded by asking: "These all seconds?", to which Mr. Sabo replied affirmatively. Mr. Spagna's response was: "What crap[.]" Less than two minutes later, Mr. Sabo agreed: "Yessir[.] **PX 482** at 1. On February 5th, Mr. Sabo provided a breakdown of the complete results from the review and issued a clear and strong warning about the results, with an arrow pointing to the astonishing 57.41% EV3 rate and the exhortation: "Danger Batman!!" **PX 1437** at 1. Nevertheless, Nomura and RBSSI represented that the OwnIt mortgage loans were originated generally in accordance with the underwriting criteria described in the Prospectus Supplement. **PX O0080** at 91; *see also id.* at 89.

510.    Nomura conducted credit and compliance diligence on 1,346 of the 3,001 loans in the NHELI 2007-2 SLG. Cipione Direct ¶ 69; **PX 1580**. RBSSI retained Clayton and AMC to conduct its reviews of the 56 underlying pools. *See*, *eg.*, **PX E1335**; **PX 1418**. There is no

147

evidence that Nomura provided AMC, which reviewed the OwnIt SP02 pools, *id.*, with any instructions regarding Nomura's concerns about OwnIt, or that Nomura considered conducting additional diligence on OwnIt loans in the SLGs based on its stated concerns of January 2007. Only 23.5% of the OwnIt loans ultimately included in the SLG received any credit and compliance diligence.  Cipione Direct ¶ 9; **PX 1574**.  The rest were represented to generally comply with underwriting criteria without review.  Furthermore there is no evidence that Nomura took any steps to upgrade or further investigate its review practices or those of its vendors based on the results of the IngletBlair review that had occurred in July and August 2006.  *See* Part IV.B.1, *supra*.

511.    The "kick-out" rate for some of the underlying pools were 12.27% for the OwnIt SP02 pool, 9.94% for the First NLC SP03 pool, and 16.06% for the Equifirst SP03 pool, Cipione Direct ¶ 9; **PX 1574**, but Nomura did not have any additional diligence performed on the unsampled portions of these pools.

512.    Of the 1,346 Mortgage Loans that Nomura's vendors did review, at least 332 (24.67% of the SLG loans sampled for diligence) were graded as EV3 for credit or compliance.  Cipione Direct ¶ 14; **PX 1575**.  The Diligence Group issued client overrides for 117 of these 332 loans (8.7 % of the SLG loans sampled for diligence), instructing the vendors to regard them as acceptable for purchase and securitization.  *Id.*

513.    These waived in loans included loans that Nomura's vendors found to have LTVs that exceeded guidelines without compensating factors, DTIs that exceeded guidelines without compensating factors, FICO scores that did not meet the minimums established by guidelines, as well as loans that demonstrated a failure to properly verify employment, assets, credit history, housing history, or income.

514.    Another 49 loans (3.64% of the SLG loans sampled for diligence) received final grades of EV3 for credit or compliance, Cipione Direct ¶ 14; **PX 1575**, meaning that the Diligence Group agreed that the loans were not suitable for purchase or securitization.  Despite receiving final EV3 grades, these 49 loans were included in the NHELI 2007-2 SLG, and there is no written explanation for why they were securitized.

515.    These securitized EV3 loans included loans that Nomura and its vendors found to have LTVs that exceeded guidelines without compensating factors, DTIs that exceeded guidelines without compensating factors, unreasonable stated incomes, FICO scores that did not meet the minimums established by guidelines, as well as loans that demonstrated a failure to properly verify employment, assets, credit history, housing history, or income.

516.    Of the 3,001 Mortgage Loans, there is no evidence that Nomura conducted any meaningful valuation or appraisal review for 1,603 loans (53.42%).  Cipione Direct ¶ 80; **PX 1586**.  Nomura submitted 2,368 of the Mortgage Loans (78.9%) to CoreLogic, Cipione Direct ¶ 34; **PX 1576**, of which 1,450 (48.3% of the SLG) received an F-Score of 0 and hence no further review.  *Id*.  Another 120 loans received no F-Score, AVM value, BPO value, or final value.  Nomura ordered an AVM review for 1,222 Mortgage Loans, of which 344 (11.5% of the SLG) received AVM values more than 10% lower than their appraised values.  *Id*.  Nomura ordered a BPO review for 426 Mortgage Loans, of which 172 (5.73% of the SLG) produced values outside the 10% subprime threshold.  *Id*.  Nomura engaged in a reconciliation process with the lenders for 170 of the loans in which its reconciled value equaled the original appraisal value for 26 loans, but not for the remaining 144.  *Id*.  Nomura securitized all 170 of these loans, but it did not use its valuation results to recalculate the LTV ratios in the Prospectus Supplements and it did not disclose the results of its reviews to investors.  *See* **PX O0080** at 51 (representing that none of the SLG loans had an LTV ratio greater than 100%); **PX 148** (loan tape showing LTV ratio of ▬ for loan number ▬); **PX E0413** (valuation diligence results showing LTV ratio of ▬ for loan number ▬).

517.    RBSSI served as the lead underwriter for the NHELI 2007-2 Securitization.  **PX O0080** at 1.  Prior to underwriting the NHELI 2007-2 Securitization, RBSSI became aware in the spring of 2006 that First NLC, which originated 312 (10.4%) of the Mortgage Loans, Cipione Direct ¶ 9; **PX 1574**, was originating loans that did not comply with guidelines.  *See, supra* Part IV.B.2.c.  In October 2006, when discussing repurchase requests for First NLC early payment defaults, Anthony Constantine at RBSSI noted that BPOs ordered on the loans "came back with

large value issues." **PX 1235**.  Peter McMullin replied that "[t]here are a couple of real nasty value declines here," and wondered whether "First NLC has an [appraisal] problem." *Id.*

518.    RBSSI retained Clayton to conduct credit and compliance due diligence related to the NHELI 2007-2 Securitization.  Stipulation ¶ 58; *see* **PX E2179**.  RBSSI did not draw a sample from the NHELI 2007-2 SLG, but rather a sample from all the loans in a pool known as "NHELI 2007-HE1," **PX 1262**; **PX 1617**, which was later subdivided into the two SLGs backing NHELI 2007-2, including the one at issue.  *See* **PX O0080** at 44.

519.    As Mr. Farrell was drawing the sample, he wrote to Mr. Whittemore, "[t]his one is crap.  I'm looking for a suggestion." **PX 1248**.  Mr. Farrell warned Mr. Smith that "[t]his [sample] will be larger than 250." **PX 1258** at 1.  When asked why, Mr. Farrell explained, "Because it's crap." *Id.*  Mr. Smith replied, "OK.  Do what you feel comfortable with." *Id.*  Mr. Farrell then told Mr. Smith, "I would like to review 25% of the total loan population," or 1,284 of the 5,136 loans in the NHEL 2007-HE1 pool.  *Id.*  Within one minute, Mr. Smith replied, "We don't own the pool.  Call me." *Id.*  When asked at his deposition "why Mr. Smith would want to take this conversation off line," Mr. Farrell said he did not know.  Farrell Dep. 731:22-732:5

520.    After Mr. Farrell's discussion with Mr. Smith, RBSSI selected a sample of only 368 loans from the pool (7.2% of the 5,120 loans), of which only 306 were actually reviewed, including 168 that were placed into the NHELI 2007-2 SLG.  **PX 1262** at 2; Cipione Direct ¶ 41; **PX 1577**.  There is no evidence that RBSSI provided Clayton with any instructions regarding RBSSI's concerns about First NLC's origination of loans "outside [of] normal parameters" and loans with "large value issues."  Nor is there any evidence that RBSSI requested that Clayton review the NHELI 2007-HE1 loans with added scrutiny in light of Mr. Farrell's initial impression of the collateral.

521.    Of the 168 Mortgage Loans that Clayton reviewed for RBSSI, 57 (33.93% of the SLG loans sampled for diligence) were graded as EV3.  Brian Farrell issued client overrides for 52 of these loans, instructing the vendors to regard them as acceptable for purchase and securitization.  Cipione Direct ¶ 41; **PX 1577**.

150

522.    There is no evidence that Nomura or RBSSI took any steps to confirm that loans in the NHELI 2007-2 SLG whose underlying properties were represented as being owner-occupied were actually occupied by their owners as of the Cut-Off Date.

523.    RBSSI commissioned Nationwide Property & Appraisal Services ("Nationwide") to perform "drive by" appraisals on 100 of the 306 loans within its credit and compliance sample for the NHELI 2007-2 Securitization.  Cipione Direct ¶ 41; **PX 1578**; **PX 1273**.  Of those 100 loans, 47 were in the NHELI 2007-2 SLG.  Cipione Direct ¶ 41; **PX 1578**.  Nationwide returned appraisal values for 44 of the 47 loans in the SLG, and for 31 of those 44 completed appraisals, Nationwide reported appraised values lower than those reflected in the LTV ratios reported in the Prospectus Supplements.  *Id.*; **PX 1273**.  Nationwide reported that for nine of the Mortgage Loans the drive by appraisals would result in LTV or CLTV ratios over 80%, even though those loans were represented as having LTV or CLTV ratios at or below 80%.  Cipione Direct ¶ 41; **PX 1578**. Nationwide also reported that for ten of the Mortgage Loans the drive by appraisals would result in LTV or CLTV ratios over 100%, even though those loans were represented as having LTV or CLTV ratios at or below 100%.  *Id*.  RBSSI did not drop any of the loans and did not use its valuation results to recalculate the LTV ratios in the Prospectus Supplements, nor did it disclose the results of its reviews to investors.  **PX O0080** at 51 (reflecting that no SLG loans had an LTV ratio greater than 100%); **PX 148** (loan tape reflecting the following loan level LTV: ███████ = ██████); **PX 1273** (valuation diligence results reflecting LTVs for Loan Number ██████, as being above ████).   In total, 14 of 92 loans subject to drive by appraisals by Nationwide had a negative variance exceeding 20%, s*ee id.*, and RBSSI has admitted that the weighted average variance of the 92 loans was -8.83%.  *See* RBSSI Counterstatement of Fact #740 in Opp. to FHFA Mtn. for Summary Judgment re: Due Diligence and Reasonable Care Defenses. In fact, "RBS appeared to ignore entirely the results of its valuation review[]" as it took "no action when a substantial portion of its sampled loans…appeared to have faulty appraisals."  Diligence MSJ Op., 2014 WL 7232443, at *3.  Brian Farrell could not recall any circumstances where

RBSSI changed its disclosures to investors or third parties on the basis of its due diligence results. Farrell In re Certain RBS RMBS Offerings Dep. 32:21-33:20.

524.     As discussed *supra*, Part II.C.4, the Prospectus Supplement for the NHELI 2007-2 Securitization represented that the Class I-A-1 Certificate would not be issued unless it received an AAA (or equivalent) credit rating.  *See* **PX O0080** at 17.  As discussed above, that loan tape included inaccurate LTV, occupancy, and DTI information.

525.     On January 26, 2007, Dana Pasternak of RBSSI provided the loan tape for the NHELI 2007-2 Securitization to Moody's and S&P.  *See* **PX 409**; **PX 411**; **PX 405**; **PX 407**.  As discussed above, that loan tape included inaccurate LTV, occupancy, and DTI information.  *See* Part IV, *supra*.

526.     On January 31, 2007, Moody's and S&P sent their credit ratings for the NHELI 2007-2 Certificates to Nomura.  **PX 140**; **PX 139**.  RBSSI received copies of both rating letters on that same day.  **PX 140** (addressed to both Timothy Crowley at Nomura and Adam Smith at RBSSI); **PX 1440**.  The S&P letter represented: "The rating is based on information supplied to us by [Nomura] or by [Nomura's] agents but does not represent an audit.  We undertake no duty of due diligence or independent verification of any information. . . . We have not consented to and will not consent to being named an 'expert' under the applicable securities laws, including without limitation, Section 7 of the Securities Act of 1933."  **PX 139** at 1.  The S&P letter also stated: "Standard & Poor's relies on the issuer and its counsel, accountants, and other experts for the accuracy and completeness of the information submitted in connection with the rating.  This rating is based on financial information and documents we received prior to the issuance of this letter. . . . Standard & Poor's assumes that the documents [Nomura has] provided to us are final."  *Id.* 1-2.  The S&P letter also stated: "Standard & Poor's undertakes no duty of due diligence or independent verification of the information provided by [Nomura] or [Nomura's] agents.  Standard & Poor's reserves the right to withdraw the rating if [Nomura] or [Nomura's] agents fails to provide Standard & Poor's with accurate, complete, timely, or reliable information."  *Id.*

527.     Based on the information provided by Nomura, S&P and Moody's both rated the NHELI 2007-2 Certificate as AAA (or equivalent).  **PX 140; PX 139**.  S&P downgraded the Certificate's credit rating to CCC on August 4, 2009.  **PX 1609**.

### (g)     The NHELI 2007-3 SLG

528.     The NHELI 2007-3 SLG contained 1,914 loans, which were drawn from 27 loan pools purchased from 18 originators including ResMae and WMC between May 31, 2006 and February 26, 2007.  Cipione Direct ¶¶ 5, 9; **PX 1571; PX 1574**.

529.     Before the NHELI 2007-1 Securitization was issued on May 1, 2007, Nomura became aware that ResMAE, which originated 1,483 (77.5%) of the Mortgage Loans, Cipione Direct ¶ 9; **PX 1574**, was originating loans that did not comply with guidelines.  For example, a December 7, 2006 email noted that Nomura's Risk and Credit Committee proposed to "reduce credit lines" for ResMAE and that "no additional purchases" should be made from ResMAE "until a final decision regarding" its credit limits.  **PX 708** at 1.  This email came several weeks before the ResMAE SP02 deal closed on December 29, 2006, and months before the NHELI 2007-3 Securitization was issued.  Nevertheless, Nomura represented that the ResMAE mortgage loans were originated generally in accordance with the underwriting criteria described in the Prospectus Supplement.  **PX O0051** at 92; ; *see also id.* at 88.

530.     Nomura conducted credit and compliance diligence on 756 of the 1,914 loans in the NHELI 2007-3 SLG.  Cipione Direct ¶ 69; **PX 1580**.  It retained AMC to conduct its reviews of the 27 underlying pools.  See, e.g., **PX 1423**.  There is no evidence that Nomura provided AMC, which reviewed the ResMAE SP01 and ResMAE SP02 pools, **PX 1422**; **PX 1423**, with any instructions regarding Nomura's concerns about ResMAE's origination of defective loans.  Only 31.56% of the ResMAE loans ultimately included in the SLG received any credit and compliance diligence.  Cipione Direct ¶ 9; **PX 1574**.  The rest were represented to generally comply with underwriting criteria without review.

531. The "kick-out" rate for some of the underlying pools were 6.4% for ResMAE SP01, 14.6% ResMAE SP02, and 39.9% for WMC SP01, Cipione Direct ¶ 14; **PX 1575**. Yet Nomura did not have any additional diligence performed on the unsampled portions of these pools.

532. Of the 756 Mortgage Loans that Nomura's vendors reviewed, they graded at least 129 (17.06%) as EV3 for credit or compliance. Cipione Direct ¶ 14; **PX 1575**. The Diligence Group issued client overrides for 35 of these loans (4.63% of the SLG loans sampled for diligence), instructing the vendors to re-grade them as EV2 or EV2W—*i.e.*, acceptable for purchase and securitization. *Id*.

533. These waived in loans included loans that Nomura's vendors found to have LTVs that exceeded guidelines without compensating factors, DTIs that exceeded guidelines without compensating factors, FICO scores that did not meet the minimums established by guidelines, as well as loans that demonstrated a failure to properly verify assets, credit history, housing history, or income.

534. Another 41 loans (5.42% of the SLG loans sampled for diligence) received final grades of EV3 for credit or compliance, Cipione Direct ¶ 14; **PX 1575**, meaning that the Diligence Group agreed that the loans were not suitable for purchase or securitization. Despite receiving final EV3 grades, these loans were included in the NHELI 2007-3 SLG, and there is no written explanation for why they were securitized.

535. These securitized EV3 loans included loans that Nomura and its vendors found to have LTVs that exceeded guidelines without compensating factors, FICO scores that did not meet the minimums established by guidelines, as well as loans that demonstrated a failure to properly verify assets, credit history, housing history, or income.

536. There is no evidence that Nomura took any steps to confirm that loans in the NHELI 2007-3 SLG that were represented as being owner occupied were actually occupied by their owners as of the Cut-Off Date.

537. Of the 1,914 Mortgage Loans, there is no evidence that 1,187 (62%) received any meaningful valuation or appraisal review. Cipione Direct ¶ 80; **PX 1586**. Nomura submitted 67

Mortgage Loans to Hansen and 1,846 of the SLG loans (96.45%) to CoreLogic, of which 1,140 (59.56% of the SLG) received an F-Score of 0, and hence no further review.  Cipione Direct ¶ 34; **PX 1576**.  Another 20 loans received no F-Score, AVM value, BPO value, or final value.  *Id.* Nomura ordered an AVM review for 573 Mortgage Loans, of which 149 (7.79% of the SLG) received AVM values more than 10% lower than their appraised values for subprime loans.  *Id*. Nomura ordered BPO reviews for 262 Mortgage Loans, of which 79 (4.13% of the SLG) produced values outside the 10% subprime thresholds.  *Id*.  Nomura engaged in a reconciliation process with the lenders in which its reconciled value equaled the original appraisal value  for 24 the 79 loans, but not for the remaining 55.  *Id*.  Nomura nonetheless securitized all 79 of these loans, but it did not use its valuation results to recalculate the LTV ratios in the Prospectus Supplements and it did not disclose the results of its reviews to investors.  *See* **PX O0051** at 52 (representing that none of the SLG loans had an LTV ratio greater than 100%); **PX 149** (loan tape showing LTV ratio of ████ for loan number █████████); **PX E0413** (valuation diligence results showing LTV ratio of ████ for loan number █████████).

538.    As discussed *supra*, Part III.C.4, the Prospectus Supplement for the NHELI 2007-3 Securitization represented that the Class I-A-1 Certificate would not be issued unless it received an AAA (or equivalent) credit rating.  *See* **PX O0051** at 17.

539.    On March 13, 2007, Michael Orfe of Nomura provided the loan tape for the NHELI 2007-3 Securitization to Moody's and S&P.  **PX 171** at 1; **PX 172**; **PX 173**; **PX 175** at 1; **PX 176**. As discussed above, that loan tape included inaccurate LTV, occupancy, and DTI information.  *See* Part IV, *supra*.

540.    On April 27, 2007, Moody's sent its credit ratings for the NHELI 2007-2 Certificates to Nomura.  **PX 141**.  On April 30, 2007, S&P sent its credit ratings for the NHELI 2007-3 Certificates to Nomura.  **PX 1295**.  The S&P letter represented: "The rating is based on information supplied to us by [Nomura] or by [Nomura's] agents but does not represent an audit. We undertake no duty of due diligence or independent verification of any information. . . . We have not consented to and will not consent to being named an 'expert' under the applicable

securities laws, including without limitation, Section 7 of the Securities Act of 1933." *Id*. at 1.
The S&P letter also stated: "Standard & Poor's relies on the issuer and its counsel, accountants,
and other experts for the accuracy and completeness of the information submitted in connection
with the rating.  This rating is based on financial information and documents we received prior to
the issuance of this letter.  Standard & Poor's assumes that the documents [Nomura has] provided
to us are final."  *Id*. at 2.  The S&P letter also stated: "Standard & Poor's undertakes no duty of due
diligence or independent verification of the information provided by [Nomura] or [Nomura's]
agents.  Standard & Poor's reserves the right to withdraw the rating if [Nomura] or [Nomura's]
agents fails to provide Standard & Poor's with accurate, complete, timely, or reliable information."
*Id*. at 3.

541.    Based on the information provided by Nomura, S&P and Moody's both rated the
NHELI 2007-3 Certificate as AAA (or equivalent).  S&P downgraded the Certificate's credit
rating to B on January 13, 2009.  **PX 1611**.

## V.    THE FALSE REPRESENTATIONS WERE MATERIAL

542.    Compliance with underwriting guidelines, LTV ratios, and occupancy status were
material to RMBS investors because these characteristics, if accurately represented, allowed
investors to assess the credit risk of the underlying loan pools supporting the Certificates.  See
Blum Direct ¶¶ 18, 21.  Defendants' representations regarding the credit ratings assigned to the
Certificates were also material to RMBS investors because the ratings provide important credit risk
assessments as to the securities.  The materiality of these characteristics and ratings is supported by
several types of evidence.

543.    *First*, purchasers of mortgage loans and RMBS considered compliance with the
applicable underwriting guidelines, the stated LTV ratio, and the owner occupancy status as key
pieces of information in the total mix of information used to evaluate credit risk.  *See* Part V(A),
*infra*.  Nomura evaluated these factors in purchasing loans intended for inclusion in Nomura
securitizations, and assessing the accuracy of these factors was a principal focus of the diligence
Defendants conducted with respect to securities disclosures provided to RMBS investors.  *See*

156

Parts V(A)(1)(a), (A)(2)(a), (A)(3)(a), *infra*.  Defendants' RMBS disclosures to investors also featured prominent representations regarding compliance with underwriting guidelines and representations regarding the accuracy of the loan and pool characteristic disclosures, including disclosures as to LTV ratio and owner occupancy status.  *See* Parts V(A)(1)(b), (A)(2)(b), (A)(3)(b), *infra*.  Indeed, regulations specifically applicable to RMBS disclosures identify loan characteristics such as LTV and owner occupancy status as "material," while regulatory obligations and Defendants' own securities disclosures to investors reflect the materiality of a 5% disclosure threshold for pool-level characteristics (which FHFA's experts found far exceeded here).  *See* Part V(B), *infra*.  The GSEs considered underwriting compliance, LTV ratios, and owner occupancy in making RMBS investment decisions.  *See* Parts V(A)(1)(b), (A)(2)(b), (A)(3)(b), *infra*.  The credit rating agencies, whose ratings were important to RMBS investors, also sought confirmation that loans were originated in compliance with guidelines and that loan characteristics such as LTV and owner occupancy status used in modeling credit risk were accurately represented.  *See* Part V(A)(1)(c), *infra*.

544.     *Second*, Defendants' representation regarding the credit ratings of the Certificates were also material to RMBS investors, including the GSEs.  The rating agencies required representations regarding underwriting compliance, and based their credit ratings of RMBS on credit characteristics including LTV ratios, occupancy status, and DTI ratios.  *See* Parts V(A)(1)(c), (A)(2)(c), (A)(3)(c), *infra.*  The accuracy of that data was material to the ratings agencies as a general matter in issuing their credit ratings.  *See* Part V(C)(4)(a), *infra*.  The correction of material inaccuracies in the data provided to rating agencies may have caused rating agencies to withhold or withdraw a rating, and required a securities underwriter to accept a lower rating from credit rating agencies, increase credit enhancements for the bonds, or remove defective loans from the collateral pool.  *See* Part V(C)(4)(a), *infra*.  FHFA's experts have specifically found that Defendants provided the rating agencies with inaccurate credit characteristics for nearly half of the SLG loans, *see* Part V(C)(4)(b), *infra*, and FHFA has shown that if Defendants had provided accurate credit information to the rating agencies, the Certificates could have been issued with

AAA ratings (or the equivalent), if at all, only if the subordination levels had been higher than actually present at issuance.

545.     *Finally*, based on evidence that the credit risk of the Mortgage Loans underlying the Certificates was significantly greater than represented in the Offering Documents, *see* Part V(D), *infra*, an underwriter seeking to offer similar certificates during the 2005-2007 period would have been required to remove the defective mortgage collateral, structure the transaction in a fundamentally different manner than how the Certificates were offered, if such securities could have been offered at all, and/or revise the securities disclosures to describe the actual collateral characteristics.

> ### A.   Compliance With Underwriting Guidelines, LTV Ratios, And Owner Occupancy Status Were Material To Investors In Assessing Credit Risk Of Mortgage Loans And RMBS
>
> #### 1.   Whether Mortgage Loans Were Underwritten In Compliance With Underwriting Guidelines Was Important To Investors

546.     Underwriting guidelines specify the parameters or benchmarks that are generally to be followed by underwriters when issuing a mortgage loan and setting its terms.  These parameters include required values for, among other things, credit scores, LTV ratios, and debt-to-income ratios, and may vary depending on occupancy type and other factors.  Barth Direct ¶ 15 (citing Defendants' expert, Professor Vandell).

547.     Underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the mortgage debt.  *See* Hunter Direct ¶ 135; Blum Direct ¶¶ 20-21; *see also, e.g.*, **PX O0049** at 71 (NHELI 2006-FM1 Prospectus Supplement); **PX O0072 at 111** (NHELI 2007-1 Prospectus Supplement).

548.     Compliance with such guidelines promotes consistency and objectivity in mortgage lending decisions and provides investors—whether purchasing loans or investing in RMBS—with an objective yardstick pursuant to which they can accurately assess the credit risk of the collateral. Blum Direct ¶ 20.  The risk of loan defaults directly affects the value of the Certificates supported by those loans, as a pool of mortgage loans has a finite amount of cash flow that is used to pay

expenses of the trust and principal and interest to investors.  Blum Direct ¶ 45.  Thus, compliance

with underwriting guidelines is important to RMBS investors because of the risk that non-

compliance will increase underlying collateral default and loss, and thus the credit risk of an

RMBS investment.  *See* Blum Direct ¶ 21.

549.     The importance of underwriting guidelines is shown by, among other things, the

fact that when underwriting guidelines are relaxed, more buyers qualify for loans.  Barth Direct

¶ 15 (citing Defendants' expert, Professor Vandell).  Approving loans that did not comply with

stated underwriting guidelines, and not disclosing this practice to investors, allowed additional,

unqualified borrowers to obtain loans and also facilitated the securitization of those loans.  Barth

Direct ¶ 16.

550.     As further detailed below, Nomura viewed compliance with underwriting

guidelines as a material factor in assessing the credit risk of the Mortgage Loans, representations

regarding underwriting compliance were important disclosures in RMBS transactions, and credit

rating agencies considered such representations a prerequisite to rating an RMBS transaction.

(a)     **Nomura Evaluated Compliance With Underwriting Guidelines
In Purchasing The Mortgage Loans**

551.     Nomura considered compliance with underwriting guidelines to be a material factor

in its decision to purchase a pool of loans.  *See* Kohout Dep. at 280:9-15; Marvin Dep. at 212:15-

213:12.  Nomura's loan-level review at acquisition included a credit review to determine whether

the loans adhered to applicable underwriting guidelines.  Sabo Dep. at 65:20-66:2 (agreeing that

that "the main part of the due diligence process was supposed to determine whether the loans

complied with underwriting guidelines"); *see also* Spagna Dep. at 28:3-10 (agreeing that "one of

[his] functions at Nomura in due diligence was to see whether a loan complied with an

underwriting guideline").

552.     Consistent with the testimony of FHFA's experts, Nomura viewed compliance with

underwriting guidelines as a means to determine the borrowers' ability to repay the loan.  *Compare*

Hartnagel Dep. at 57:20-58:3 (agreeing that underwriting guidelines were designed "to assist in

determining" whether the borrower has the ability to repay the mortgage loan) *with* Hunter Direct ¶¶ 15, 135; **PX 1627**; Blum Direct ¶¶ 20-22.

553.    Nomura retained third-party diligence vendors to determine if loans complied with underwriting guidelines, and directed those firms to use a grading system that reflected whether the loans complied or not. *See* Spagna Dep. 246:5-8, 246:14-18; Prahofer 30(b)(6) Dep. 82:17-83:5; Hartnagel Dep. 409:21-25.

554.    Moreover, Nomura required sellers to represent that loans were originated in compliance with applicable underwriting guidelines. In the Mortgage Loan Purchase Agreements for the Securitizations, NAAC or NHELI required Nomura Credit to represent that "[e]ach Mortgage Loan is and will be a mortgage loan arising out of the originator's practice in accordance with the originator's underwriting guidelines." **PX 229** at 13.[15]

555.    In its Mortgage Loan Purchase Agreements with originators with respect to acquisition loan pools, Nomura Credit required originators to represent that each "Mortgage Loan was underwritten in accordance with Underwriting Guidelines of the Seller in effect at the time the Mortgage Loan was originated." *See, e.g.*, **PX 1068** at 28.[16]

556.    That Nomura sought representations in these two types of agreements that it used to purchase loans for securitization provides further evidence that it considered compliance with underwriting guidelines to be a material factor, not only in its decision to purchase mortgage loans, but also in offering RMBS to investors.

>            **(b)    Representations That Loans Were Originated In Accordance With Applicable Underwriting Guidelines Were An Important Part Of RMBS Transactions**

557.    The importance of underwriting compliance is also demonstrated by the fact that RMBS disclosures typically provide investors descriptions of the underwriting guidelines used to originate the loans serving as collateral and provide representations that the collateral was

---

[15]    *See also* **PX 1483** at 13 (same); **PX 1484** at 13 (same); **PX 1485** at 14 (same).

[16]    *See also* **PX 1486** at 27 (same); **PX 1487** at 27 (same); **PX 1488** at 28 (same).

originated in general compliance with those guidelines.  Blum Direct ¶ 21; Rubinstein ¶ 78; Hunter Direct ¶ 11; **PX 1626**.

558.    Compliance with underwriting guidelines was important to RMBS investors because, as noted above, loans that do not comply with underwriting guidelines have increased credit risk, relative to compliant loans, and the higher default and loss rates would reduce the cash flow that is available to pay RMBS investors.  Blum Direct ¶¶ 21, 58; *see* Hunter Direct ¶ 135-36.

559.    Here, the Offering Documents for each of the Certificates at issue included descriptions of the underwriting guidelines used to originate the Mortgage Loans, and included prominent representations that the loans supporting the Certificates were originated generally in compliance with such guidelines.  *See generally* **PX O0059** at 93; Blum Direct ¶ 21; Hunter Direct ¶ 11; **PX 1626**.

560.    Nomura Securities and RBSSI also recognized that the disclosures regarding underwriting compliance were material to investors because a principal focus of the diligence process discussed above relied upon to support their disclosures focused on underwriting compliance.  *See* Part IV(B)(1), *supra*.  That diligence process also recognized that certain defect thresholds would be material.  RBSSI's Credit Procedures Manual noted that material exceptions in greater than 20% of a sample of a pool of loans typically warranted an increase in the due diligence sample for a prospective loan purchase.  **PX 1286** at 37 ("For each transaction type, when significant material exceptions are found (typically greater than 20%), the sample size should be expanded and may consist of additional random selections and/or discretionary samples focusing on the issues raised by the original random sample."); Whittemore Dep. 115:16-116:9 (Chief Underwriter at RBSSI agreeing that for a material exceptions rate of greater than 20%, it "would be brought to someone's attention.").

561.    While the Court has found the diligence process Defendants used to be insufficient to support an affirmative defense, 2014 WL 7232443, at *37, that a principal focus of the process was presented as assessing underwriting compliance confirms the importance of such information to RMBS investors.  Similarly, while RBSSI's 20% defect threshold for increasing its diligence

review on prospective purchases was not, as the Court has already held, sufficiently rigorous for the purposes of due diligence, 2014 WL 7232443, at *10, RBSSI's recognition of that threshold is evidence that underwriting or other material defects in greater than 20% of the underlying pool would certainly be material to RMBS investors.  FHFA's experts have shown that that threshold is well exceeded here.  *See* Part IV, *supra*.

562.     The GSEs considered adherence to underwriting guidelines in their RMBS investment invest decisions.[17]  *See* Aneiro Dep. 260:6-261:21 ("Q. If an originator does not follow its own guidelines and that originator's loans are backing nonagency PLS, would that have an impact on the nonagency PLS? A. Absolutely. Q. How? A. Well the guidelines are set for investors to understand what the parameters around, are around the credit characteristics of the general borrower. . . . If they've got a definition as to what the loans were underwritten to and what the guidelines are and we find out that those guidelines weren't upheld to and the loans are originated at much poorer quality than when our credit group is looking at aggregated loan data and trying to come up with an expected loss and expected bad scenario to understand what level of credit, or credit subordination should exist to make us feel secure at our AAA level, if the data is wrong and worse, then that implies that the subordination that would have been required to give us comfort at a AAA level ended up being much lower than what we would have determined, which means that our decision to purchase the deal would most likely have been much different than if the originator had followed those guidelines."); *id*. at 335:5-338:2 (similar); *see also* Palmer Direct

---

[17]   The GSEs also considered the loans' documentation program used to underwrite the Mortgage Loans as a factor in their PLS investment process.  Salahuddin Dep. 459:21-462:17 ("I remember there being a stip specifically related to documentation. . . Q. Why did you want to avoid too many low or no doc loans in your pools? A. Low or no doc loans are – there's less information by which to make an assessment on the profile of that particular borrower, and so, you know, in our business it's important to be able to make some predictions about what you think this borrower is going to do from a credit perspective, whether or not they will pay and how long you think they will pay for prior to not paying, and then also from a rate perspective, whether they will prepay their loan early or not.  Both things are impactful to, to valuations."); *see also* Palmer Direct ¶¶ 18-19  ("For each potential purchase, the dealer offering a certificate for purchase provided a spreadsheet containing information about each of the characteristics for the pool of loans in the securitization.  Dealers provided aggregated data (rather than loan-level data) because Freddie Mac policy prohibited me from viewing loan-level data (either loan files or loan tapes) on a potential PLS purchase. . . . The dealer-provided spreadsheet included the following aggregated credit characteristics of the securitization loans, which I used to project potential credit performance:  [ ] i. Documentation type, including full/alternative documentation, stated income or limited documentation, and no income-no asset.").

¶ 8 ("Freddie Mac sent dealers the Investment Requirements and dealers were responsible for ensuring the loans backing any PLS complied with the Investment Requirements. The Investments Requirements obligated PLS sellers to represent, among other things, the Certificate loans were made to borrowers who had the ability to repay the loans."); **PX 00304**; **PX 00672**; **PX 00673**; **PX 00728**; **PX 00729**; **PX 00106**; **PX 1061**; Palmer Direct ¶ 17 (explaining Freddie Mac PLS credit risk analysis procedures considered adherence to guidelines because "[u]nderwriting standards can have an [e]ffect on deal performance."); **PX 00118** at 3; **PX 00104**.

(c)     **Credit Rating Agencies Required Loans To Meet Applicable Underwriting Guidelines When Rating RMBS Transactions**

563.    The rating agencies also viewed compliance with underwriting guidelines to be important in assessing and rating RMBS transactions. In rating RMBS transactions, including the Securitizations, Standard & Poor's required RMBS issuers to represent that "[e]ach mortgage loan is and will be a mortgage loan arising out of the originator's practice in accordance with the seller/originator's underwriting guidelines," and that "[t]he seller has no knowledge of any fact that should have led it to expect at the time of the initial creation of an interest in the mortgage loan that such mortgage loan would not be paid in full when due." **PX 125** at 133; **PX 1320** at 23 (same).

564.    Similarly, in rating RMBS transactions, including the Securitizations, Moody's expected that loans in a given pool were originated "[a]ccording to the underwriting guidelines or . . . if there are exceptions, [the loans] would go through the exceptions process." Chatterjee 30(b)(6) Dep. 201:21-202:7 ("Q. And was Moody's expectation that the loans in the pool had been – would have been originated according to the underwriting guidelines? . . . A. According to the underwriting guidelines or as stated through the – if there are exceptions, they would go through the exceptions process.").

565.    This evidence provides a reasonable basis upon which to find that whether a loan was underwritten in accordance with applicable underwriting guidelines would be among the information material to an RMBS investor.

163

## 2.   LTV Ratios Were Important To Investors

566.   The LTV ratio is an important factor in assessing the credit risk of a loan because higher LTV loans have a greater likelihood of default, *see* Hunter Direct ¶ 47; Kilpatrick Direct ¶ 34, and thus it is also a key factor that investors typically consider in evaluating the risks associated with an RMBS, *see* Blum Direct ¶ 18.

567.   In addition, all else being equal, a higher LTV ratio represents a potentially higher loss severity because a smaller cushion exists between the estimated market value of the property and the unpaid principal balance of the loan, with the incumbent risk that the holder of the loan will not be able to recover the amount of the unpaid principal balance in a foreclosure sale.  *See* Hunter Direct ¶ 47; Schwert Direct ¶ 12; Kilpatrick Direct ¶ 38.

568.   As discussed below, Nomura considered LTV ratios to be one of the key factors in assessing the credit risk of a mortgage loan, LTV disclosures were important to RMBS investors, and rating agencies considered LTV ratios an important characteristic in modeling RMBS credit risk.

### (a)   Nomura Considered LTV Ratios Important In Assessing The Credit Risk Of A Loan

569.   In determining whether to buy a pool of loans, Nomura viewed LTV ratios as an "important factor" and "key component" when assessing the credit risk of mortgage loans.  *See* Kohout Dep. 35:5-16; *id.* at 36:15-36:22; Sabo Dep. 64:8-17; Spagna Dep. 19:17-25; Katz Dep. 17:10-18:6.  As Jeffrey Hartnagel, a member of Nomura's Credit Group, testified, "the more equity a borrower has in the property, the le[ss] likely he is to default" because the borrower would not "walk away from money."  Hartnagel Dep. 65:10-66:11.

570.   Accordingly, Nomura witnesses agreed that lower LTV ratios generally indicated lower levels of credit risk and higher LTV ratios generally indicated higher risk.  *See* McCarthy Dep. 179:17-24 (agreeing that all other things equal, "the lower the LTV or the CLTV, the less potential credit risk that a potential loan would present"); Sabo Dep. 174:8-15 ("Higher LTVs are always associated with high risk."); Spagna Dep. 96:8-13 (agreeing that generally, "the higher the LTV, the higher the risk of the loan"); DePalma Dep. 177:7-22 (agreeing that LTV or CLTV was

164

"a factor in modeling the loss projections or loan performance" and that "a higher CLTV, all things being equal, would raise the risk of delinquency in these products").

571.    Nomura recognized, consistent with FHFA's experts, that credit risks were particularly heightened for loans with LTVs and CLTVs exceeding 80% and 100%.

572.    For loans with LTV ratios above 80% ("High LTVs"), even a minor deficiency in the appraisal could put the loan "under water"—*i.e.*, the value of the property collateralizing the loan is less than the loan amount, which makes it almost certain that the loan will not be satisfied in full by a sale of the property in the event of a borrower's default.  *See* Kilpatrick Direct ¶ 38.

573.    As evidence of the importance of the 80% threshold in evaluating credit risk, when buying a loan pool from an originator, Nomura considered the percentage of loans with LTV or CLTV ratios over 80% to be relevant.  Lee Dep. 192:17-193:18.  Nomura recognized that loans with LTV or CLTV ratios over 80% posed a greater risk of loss than loans with LTV or CLTV ratios below that level.  Lee Dep. 93:6-12.

574.    Nomura also considered an LTV or CLTV ratio in excess of 100% to be a "problem" because "the buyer is immediately underwater"—that is, "he owes more than the house is worth"—hence "there is no equity built in," and it is "an inherent risk."  Hartnagel Dep. 812:19-813:16.  As Nomura witnesses acknowledged, a "100 percent LTV would have been the max[imum] that was acceptable in the market" from 2005 to 2007.  Graham Dep. 56:24-57:23.  Investors did not find loans with LTV or CLTV ratios over 100% to be acceptable, because the value of the property was insufficient to cover the amount of the loan.  Graham Dep. 57:24-58:6; *see also* **PX 1489** at 2 (Dep. Ex. 6501, email from John Graham to Michael Orfe, dated Dec. 13, 2006) (noting that loans with LTV ratios over 100% "will limit the investor base").

575.    When buying a loan pool from an originator, Nomura considered the percentage of loans with LTV or CLTV ratios over 100% to be relevant.  Lee Dep. 192:17-193:18.  Nomura's proffered valuation expert, Lee Kennedy, confirmed that whether a loan's LTV ratio exceeded 100% is "a piece of data that would be important to the acquisition of any loan."  Kennedy Dep. 191:22-192:17.

576.   In its Mortgage Loan Purchase Agreements, Nomura required originators to represent that "[n]o Mortgage Loan had an LTV or CLTV at origination in excess of 100%." *See, e.g.*, **PX 1068** at 30 (Master Mortgage Loan Purchase Agreement with Metrocities Mortgage, LLC, dated Apr. 1, 2005).[18]

577.   Finally, in conducting diligence on acquisition pools, Nomura included in its stipulations that any loans that had LTV or CLTV ratios in excess of 100% should be "kicked" from the pool. **PX 588** at 2-3; *see also* **PX 1492** (Standard Stips for Alt A 1st Liens, Alt A 2nd Liens, and Sub Prime dated Feb. 28, 2007) (listing as a standard stipulation of whole loan trades, "No LTV/CLTV > 100%"); **PX 1493** (Standard Stips for Alt A 1st Liens, Alt A 2nd Liens, and Sub Prime dated Aug. 14, 2006) (same).  Nomura directed its third-party diligence vendors, including Clayton, to grade loans with LTV or CLTV over 100% as an EV3. **PX 34** at 25.

### (b)   Representations Concerning LTV And CLTV Ratios, Including Those Addressing 80% And 100% Thresholds, Were An Important Part Of RMBS Transactions

578.   Because LTV ratios had significant impact on the default risk and loss severity of a loan, they played an important role in an investor's evaluation of the credit risk for RMBS transactions.  Regulation AB has, at all relevant times, required ABS issuers to "[d]escribe the material characteristics of the asset pool[,]" and noted specifically that "such [material characteristics] may include, among other things…[l]oan-to-value (LTV) ratios[.]"  17 C.F.R. § 229.1111(b), (b)(7)(iii), (b)(7)(iv) (Mar. 8, 2005); *see also* Rubinstein Direct ¶ 79-80; Blum Direct ¶ 68.  The Prospectus Supplements here disclosed the Weighted Average LTV for the

---

[18]   *See also* **PX 1486** at 28 (Master Mortgage Loan Purchase Agreement with Equifirst Corporation, dated Feb. 1, 2006) (same); **PX 1487** at 28 (Master Mortgage Loan Purchase Agreement with Fremont Investment & Loan, dated May 1, 2005) (same); **PX 185** at 3 (Pool Summary and Trade Confirmation with Fremont, dated Aug. 30, 2005) (requiring for Fremont SP02 that "No Mortgage Loan shall have a CLTV/LTV greater than 100%"); **PX 1490** at 3 (Pool Summary and Trade Confirmation with People's Choice Home Loan) (same requirement for Peoples Choice SP02); **PX 558** at 3 (Pool Summary and Trade Confirmation with Ownit Mortgage Solutions, Inc.) (same requirement for Ownit SP02); **PX 1491** (email from R. Lee to G. Williams dated Feb. 6, 2007, email from Randall Lee stating that Nomura usually required originators to represent that the pools did not contain any loans with LTV or CLTV ratios of over 100%).

Supporting Loan Groups.  *See* **PX O0059** at 13 (NAA 2005-AR6 Prospectus Supplement) (stating that the Weighted Average Original LTV for Group III loans is 74.68%).[19]

579.    In addition to disclosing Weighted Average LTV ratios, the Prospectus Supplements also made various disclosures reflecting the importance of the percentage of loans in the pools with LTV or CLTV ratios below 80% and the absence of loans with LTV or CLTV ratios of 100% or more.  These disclosures reflected the fact that LTV or CLTV ratios of 80% and 100% are important thresholds, not just for the purchase of loans, but also for RMBS investors in evaluating the credit risk of a mortgage loan.  Rubinstein Direct ¶ 79; Blum Direct ¶ 37.

580.    The importance of high LTV to RMBS investors is also reflected in the Prospectus Supplements at issue here, where Nomura represented to investors that "[m]ortgage loans with higher loan-to-value ratios may present a greater risk of loss than mortgage loans with loan-to-value ratios of 80% or below."  **PX O0059** at 28 (NAA 2005-AR6 Prospectus Supplement);[20] *see also* Lee Dep. 55:15-56:23 (testifying that "every bucket," including the over 80% LTV bucket in the prospectus supplements, "would be important for the accuracy of the investor.").  Similarly, the Prospectus Supplements specifically addressed the 100% threshold, representing that not a single loan with an LTV in excess of 100% was included in the loan in the loans underlying the Securitization.  *See* Part III(C)(2), *supra*; Kilpatrick Direct ¶ 40.  Loans with an LTV ratio over 100% are so risky that they were generally not acceptable for securitization, as confirmed by Nomura's witnesses.  *See* Graham Dep. 67:5-9 and 67:18-22 (testifying that loans that had an LTV greater than 100 percent were marked "unsourceable" so that "they could not inadvertently be

---

[19]    *See also* **PX O0049** at 14 (NHELI 2006-FM1 Prospectus Supplement)  (stating that the Weighted Average Original LTV for Group I loans is 81.07%); **PX O0045** at 17 (NHELI 2006-FM2 Prospectus Supplement) (stating that the Weighted Average Original LTV for Group I loans is 80.58%); **PX O0041** at 16 (NHELI 2006-HE3 Prospectus Supplement) (stating that the Weighted Average Original LTV for Group I loans is 78.97%); **PX O0072** at 28 (NHELI 2007-1 Prospectus Supplement) (stating that the Weighted Average Original LTV for Group II-1 loans 78.67%); **PX O0080** at 18 (NHELI 2007-2 Prospectus Supplement) (stating that the Weighted Average Original LTV for Group I loans is 81.86%); **PX O0051** at 18 (NHELI 2007-3 Prospectus Supplement) (stating that the Weighted Average Original LTV for Group I loans is 81.27%).

[20]    *See also* **O0049** at 13 (NHELI 2006-FM1 Prospectus Supplement) (same); **PX O0045** at 15 (NHELI 2006-FM2 Prospectus Supplement) (same); **PX O0041** at 14-15 (NHELI 2006-HE3 Prospectus Supplement) (same); **PX O0072** at 25 (NHELI 2007-1 Prospectus Supplement) (same); **PX O0080** at 17 (NHELI 2007-2 Prospectus Supplement) (same); **PX O0051** at 17 (NOMNHELI 2007-3 Prospectus Supplement) (same).

sourced for a securitization."); *see also* Sabo Dep. 62:8-12 ("Q. Can you think of any

circumstances when it was appropriate in mortgage loans to issue loans that had a loan-to-value

ratio over 100 percent? A. In general, no.").

      581.    The GSEs considered collateral LTV ratios in their RMBS investment decisions.[21]

Hackney Dep. 63:23-64:13 ("Q. What information did you have at this stage that allowed you to

look at what loans underlay the transaction? A. The only information that I would have would be

that stratification that the dealer gave me…. It would have different categories broken out. What

is the number of loans; what is the size of the loan, meaning the UPB broken out by different

buckets. They would have LTV broken out by buckets; states broken out by buckets."); *see also*

Palmer Direct ¶¶ 18, 19 ("For each potential purchase, the dealer offering a certificate for purchase

provided a spreadsheet containing information about each of the characteristics for the pool of

loans in the securitization. Dealers provided aggregated data (rather than loan-level data) because

Freddie Mac policy prohibited me from viewing loan-level data (either loan files or loan tapes) on

a potential PLS purchase. . . . The dealer-provided spreadsheet included the following aggregated

credit characteristics of the securitization loans, which I used to project potential credit

performance: [ ] a. Weighted-average CLTV ratio; b. Loans with CLTV ratio in excess of 80%,

90%, and 95%."); *id.* ¶¶ 20-27 (explaining the use of collateral characteristics, including LTV,

with Freddie Mac's RMBS credit risk model and RMBS credit risk analysis process); Salahuddin

Dep. 459:21-460:2 (testifying that Fannie Mae considered LTV as part of its PLS purchase

process); **PX 1436**; **PX 1061** (Fannie Mae's 2005 trade stipulations required mortgage insurance

for all loans backing Alt-A securitizations with LTV greater than 80%).

---

[21]  Defendants offered John Richard as an expert on "the residential mortgage back securities ('RMBS') industry. , *FHFA v. Nomura Holding Am., Inc.*, 11 Civ. 6201 (S.D.N.Y. Feb. 16, 2015) (Dkt. 1271 at 2). He opined "LTV ratios, owner occupancy, and originators' underwriting practices are factors that investors do take into consideration in evaluating whether to purchase RMBS or not." July 28, 2014 Richard Dep. 144:11-15; November 10, 2014 Report of John J. Richard ¶ 53 (opining that "LTV rations and owner occupancy" and "conformance o the loans with the underwriting guidelines of the originators" were among the "factors taken into account by sophisticated investors in evaluating RMBS"); *see* Feb. 16, 2015 Op. & Order, Dkt. 1271, at 10 (recognizing Richard's concession that "RMBS investors 'considered the characteristics of the loans backing a securitization in their investment decision-making processes'").

**(c)  Credit Rating Agencies Considered LTV Ratios Important When Rating RMBS Transactions**

582.     Credit rating agencies also considered the LTV ratio to be an important factor in assessing credit risk of a loan pool.  Standard & Poor's, for example, required RMBS issuers to represent that they had provided accurate data regarding the "[p]ercent of mortgage loans with loan to value's (LTV's) over 80% that have primary mortgage insurance, if applicable; Percent of mortgage loans with LTV's over 80% which do not have primary insurance, if applicable; The range of LTV's."  **PX 125** at 134 (S&P: U.S. Residential Subprime Mortgage Criteria, 1999) ; **PX 1320** at 24 (S&P: Legal Criteria for Subprime Loan Transactions, Sept. 1, 2004) at 24 (same); *see also* **PX 1497** at 3("Generally issuers/sponsors of securitized transactions represent and warrant as to the following with respect to the loans in the trust: . . . Disclosure on underwriting standards used for the loans."); Mahdavian 30(b)(6) Dep. 106:14-24 (testifying that S&P models assigned risk grades "[as] a function of all the things that you normally look at.  So if you had a very low FICO and a high LTV and a -- you would assume that this would receive a higher risk grade, so those were two primary drivers I should say.").

583.     Moody's and Fitch similarly considered LTV ratios in evaluating credit risk of loan pools.  *See* Chatterjee 30(b)(6) Dep. 78:8-24; **PX 1348** at 1 (Fitch: Good Grades Supplement LTVs and Credit Scores, dated Jan. 31, 2005) ("Fitch's RMBS rating model reflects Fitch's emphasis on loan-to-value ratios (LTVs) and credit scores as the primary indicators of default risk, with borrower grades, property types, occupancy, and loan purpose, among other attributes, as secondary predictors of default risk.").

584.     The reason credit rating agencies considered LTV ratio important is that it was a key predictor of default under their rating methodologies.  Standard & Poor's believed that "[t]he higher the LTV ratio, the greater the risk of mortgage foreclosure."  **PX 1318** at 4 (S&P: Credit Analysis for Subprime Loan Transactions, dated Sept. 1, 2004.).

585.     Similarly, the LTV ratio was "[k]ey" to Moody's, because "[b]orrower equity is an important buffer against default risk and a cushion against loss where a default occurs.  In a distress situation (death, divorce, or unemployment), a homeowner with a large equity stake will

typically sell the home (and pay off the loan) rather than face loss through a foreclosure proceeding." **PX 1316** at 6, 11 (Moody's Special Report:  Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools, dated Apr. 1, 2003)

586.    Specifically, the rating agencies quantified the increase in credit risk associated with higher LTV ratios.  Standard & Poor's "estimated that loans with LTVs of 90% have a 1.5 times (x) greater risk of being foreclosed than loans with a ratio of 80%. Loans with an LTV of 95% are assumed to be 3.0x riskier than loans with an LTV of 80%. Loans with an LTV of 100% are assumed to be 4.5x riskier than loans with an LTV of 80%." **PX 1318** at 4 (S&P: Credit Analysis for Subprime Loan Transactions, dated Sept. 1, 2004).

587.    Moody's estimated that, holding constant other "key characteristics," the credit support for a "Aaa" tranche would increase by 35 percent if the pool's LTV increased by 5 percent. **PX 1316** at 11 (Moody's Special Report:  Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools, dated Apr. 1, 2003); *see also id.* at 6 ("Appendix A illustrates the hypothetical impact shifting LTV levels would have on pool performance").

588.    This evidence provides a reasonable basis upon which to find that the LTV ratio of a loan would be material to an RMBS investor, including in particular what portion of the loans had LTV ratios that exceeded 80% and 100%.

### 3.    The Occupancy Status Of A Property Was Important To Investors

589.    The occupancy status of a mortgaged home is important in the evaluation of credit risk because borrowers living in a mortgaged property have more incentive to make payments and care for the home than borrowers purchasing second homes or investment properties.  As such, all else being equal, mortgages collateralized by for owner-occupied properties generally present less credit risk than those for non-owner-occupied properties.  *See* Hunter Direct ¶ 57; Schwert Direct ¶ 12.

590.    Nomura considered occupancy status to be a key factor in analyzing the credit risk of mortgage loans it purchased for securitization, and occupancy status was an important

disclosure to RMBS investors.  As with LTV, the rating agencies considered occupancy status and important characteristic in modeling credit risk of RMBS.

**(a)      Nomura Considered Occupancy Status To Be An Important Factor In Evaluating Credit Risk**

591.    Nomura considered occupancy status to be an important factor in measuring the credit risk of mortgage loans.  Katz Dep. 27:3-6 ("Q. And would you agree that owner occupancy is another tool to measure the riskiness of a loan?  A. Yes.").

592.    Nomura recognized that owner-occupied properties are considered less risky because "someone living in the home on which they are paying the mortgage might be more likely to remain current since it is their home."  Graham Dep. 82:24-83:25; *see also* Spagna Dep. 98:23-99:14; Marvin Dep. 144:20–23 ("My thought would be that when all else fails . . . you let your own home go last").  As Nomura's proffered re-underwriting expert, Michael Forester, put it, if a borrower found himself in "financial straits," he was "more likely to continue making payments on their primary residence as opposed to making payments on an investment property."  Forester Dep. 111:24-112:14.  Thus, loans backed by properties not occupied by the borrowers were considered to have "a heightened chance of delinquency or default," all things being equal.  *See* DePalma Dep. 180:10-14.

593.    The materiality of owner occupancy is also reflected in Defendants' conduct when seeking repurchases for loans supporting their securitizations.  When Nomura commissioned a post-securitization fraud review to identify loans that it could require originators to repurchase, Nomura sought to identify misrepresentations about owner occupancy status.  **PX 816** (███████ ████████████████████████████████████████████); **PX 818** at 5 (email from Scampoli to Murphy dated 7/9/07 re: "Fraud Review Pool Summary Draft").

594.    RBSSI conducted similar post-securitization fraud reviews that also looked for evidence of occupancy fraud to identify loans for putback.  Camacho Dep. 97:20-99:20 (testifying that he reviewed loans for putbacks, including misrepresentation of occupancy—*i.e.*, "whether or

171

not they would occupy a property as a primary residence versus as a secondary home or investment property").

              **(b)**      **Representations Concerning Owner-Occupancy Status Were An Important Part Of RMBS Transactions**

595.    Just as owner occupancy status impacts the credit risk of a loan, the percentage of owner occupied properties in a pool backing an RMBS is important to investors evaluating the risk of a security. Rubinstein Direct ¶ 79-80; Blum Direct ¶¶ 18, 37. Nomura itself recognized that representations about the owner occupancy status of the mortgage loans underlying RMBS securitizations could be material to investors. LaRocca Dep. 157:19-25 (Managing Director at NSI and NCCI, agreeing that owner occupancy status was at least "potentially material to investors.").

596.    Further, as noted above regarding LTV ratios, Regulation AB required ABS issuers to "[d]escribe the material characteristics of the asset pool[,]" identifying as one of the potential characteristics "occupancy type for residential mortgages[.]" 17 C.F.R. § 229.1111(b), (b)(7)(iii), (b)(7)(iv) (Mar. 8, 2005). Consistent with Regulation AB, each of the Certificates here disclosed owner occupancy statistics for the Mortgage Loans underlying the SLGs. *See* **PX O0059** at 13 (NOM-FHFA_04811802, NAA 2005-AR6 Prospectus Supplement) (stating that 188 out of 376 Group III loans are Owner-Occupied).[22]

597.    The GSEs considered owner occupancy in making RMBS investment decisions. Salahuddin 30(b)(6) Dep. at 571: 18-572:14 ("[O]wner occupancy was a collateral characteristic that was pertinent to pricing at the time…. It had perceived bearing on both the credit risk of a particular borrower and also the convexity that that particular loan might exhibit. And so I would

---

[22]   *See also* **PX O0049** at 14 (NHELI 2006-FM1 Prospectus Supplement stating that the Weighted Average Original LTV for Group I loans is 81.07%); *id.* at 43 (stating that 2248 out of 2532 Group I loans are Owner-Occupied) ; **PX O0045** at 17 (NHELI 2006-FM2 Prospectus Supplement stating that the Weighted Average Original LTV for Group I loans is 80.58% and that 93.05% of Group I loans are Owner-Occupied); **PX O0041** at 16 (NHELI 2006-HE3 Prospectus Supplement stating that the Weighted Average Original LTV for Group I loans is 78.97% and that 89.59% of Group I loans are Owner-Occupied); **PX O0072** at 28 (NHELI 2007-1 Prospectus Supplement stating that the Weighted Average Original LTV for Group II-1 loans 78.67%); *id.* at 91 (stating that 217 out of 474 Group II-1 loans are Owner-Occupied); **PX O0080** at 18 (NHELI 2007-2 Prospectus Supplement stating that the Weighted Average Original LTV for Group I loans is 81.86% and that 90.86% of Group I loans are Owner-Occupied); **PX O0051** at 18 (NHELI 2007-3 Prospectus Supplement stating that the Weighted Average Original LTV for Group I loans is 81.27% and that 89.21% of Group I loans are Owner-Occupied)..

say that it, it played a role.  I recall it being one of the aspects of the pool that we would memorialize in our trade deal summary worksheet I think it was called, and so I would say it's something that we did pay attention to. Q. Was it relevant to any of the analyses that you did? A. So I prepared on occasion on some deals that deal summary worksheet and that was one of the things that was included on that worksheet."); *see also* Palmer Direct ¶¶ 18-19 ("For each potential purchase, the dealer offering a certificate for purchase provided a spreadsheet containing information about each of the characteristics for the pool of loans in the securitization.  Dealers provided aggregated data (rather than loan-level data) because Freddie Mac policy prohibited me from viewing loan-level data (either loan files or loan tapes) on a potential PLS purchase. . . . The dealer-provided spreadsheet included the following aggregated credit characteristics of the securitization loans, which I used to project potential credit performance:  [ ] c. Occupancy status, including primary, second home, and investment property."); *id.* ¶¶ 20-27 (explaining the use of collateral characteristics, including owner occupancy, with Freddie Mac's RMBS credit risk model and RMBS credit risk analysis process); **PX 1436**.

**(c)      Rating Agencies Considered Owner-Occupancy Status To Be Important When Rating RMBS Transactions**

598.    The rating agencies also considered occupancy status to be an important factor in assessing and rating pools of mortgage loans.  Moody's considered owner occupancy status in evaluating the risk associated with an RMBS.  Chatterjee 30(b)(6) Dep. 78:8-16.  As Moody's confirmed, "[i]ntuitively, the primary residence provides a greater housing service to the owner than does a rental or second home and is therefore less likely to be subject to loss.  Investor or rental properties rely on cash flows from parties who may not have the credit profile of the borrower, increasing the risk of default.  Moreover, under financial stress, a borrower is likely to place retention and upkeep of the primary residence above that of other financial commitments, helping to limit the frequency of default and severity of loss in the event of default."  **PX 1316** at 9 (Moody's Special Report: Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools, Apr. 1, 2003).

173

599.    Moody's benchmarking process assessed a penalty on loans backed by non-owner occupied properties because they were deemed more risky than loans backed by owner-occupied properties, and used its loan-by-loan assessments to come up with an aggregate risk assessment for the relevant loan pool.  Chatterjee 30(b)(6) Dep. 74:23-75:19.

600.    Standard & Poor's confirmed that occupancy status was a "driver of foreclosure frequency" and that investment properties demonstrated "a higher probability that [the borrower] was going to default."  Mahdavian 30(b)(6) Dep. 120:19-121:8.

601.    Standard & Poor's generally required issuers to represent the percentage of loans backing an RMBS that were "second homes and investor properties."  **PX 125** at 135 (S&P: U.S. Residential Subprime Mortgage Criteria, 1999); **PX 1320** at 24 (S&P: Legal Criteria for Subprime Loan Transactions, Sept. 1, 2004) (same).

602.    Through LEVELS, its econometric model, Standard & Poor's quantified the risk attributable to owner occupancy by increasing the "prime foreclosure frequency assumptions . . . by a factor of 3.0x on second homes and investment properties."  **PX 125** at 37  (S&P: U.S. Residential Subprime Mortgage Criteria, 1999).

603.    This evidence provides a reasonable basis upon which to find that whether the property underlying a loan that was listed as owner-occupied actually was occupied by its owner would be material to an RMBS investor.

**B.    The Number Of SLG Loans That Did Not Adhere To The Representations In The Prospectus Supplements Was Material To Investors In Assessing The Credit Risk Of The Certificates**

604.    As shown above, the representations about compliance with underwriting guidelines, LTV ratios, and owner occupancy were material to the total the mix of information available to RMBS investors because they related directly to the ability of investors (and credit rating agencies who supplied ratings for investors to consider) to assess the credit risk of the loans in the mortgage pools backing RMBS, and thereby to evaluate the overall merits of investing in a particular RMBS.

605.    FHFA has shown that the Prospectus Supplements for the Certificates were infected with a variety of misstatements and omissions, all of which tended to understate the credit risk of the Mortgage Loans and pools of Mortgage Loans backing the Certificates, and therefore also to understate the riskiness of the Certificates themselves.  *See* Part IV.  Defendants falsely represented that the Mortgage Loans in the SLGs for the Certificates complied with stated underwriting guidelines that were intended to assess the creditworthiness of the borrowers, the ability of the borrowers to repay their mortgage loans, and the adequacy of the mortgaged properties as security for the loans, and also falsely represented specific important characteristics of the Mortgage Loans in the pools backing the Securitizations.  *Id.*

606.    The misstatements and omissions were not only important to assessing the credit risk of the Mortgage Loans individually, but, in the aggregate, they were also important to the credit risk profile of the SLGs.  For this reason, investors typically consider disclosures regarding the characteristics of the loan pool to evaluate the risks associated with an RMBS.  Among the key factors in any such evaluation are loan pool statistics regarding FICO scores, LTV ratios, CLTV ratios, borrower debt-to-income ratios, and borrower occupancy status.  Offering Documents typically include both pool-level descriptions, as well as stratifications identifying the distribution of certain characteristics within the pools. Blum Direct ¶ 18; *see also id.* ¶ 61.

607.    As one measure of the materiality of the false information provided in the Prospectus Supplements, it is notable that, for individual pieces of information relating to the important characteristics of the mortgage pool (*e.g.*, LTV ratios or owner-occupancy rates), pool-level deviations as low as 5% are considered material to the investor, warranting the need to revise the disclosures.  The SEC requires an S-3 registrant to issue revised disclosures when "any material pool characteristic of the actual asset pool at the time of issuance of the asset-backed securities differs by 5% or more . . . from the description of the asset pool in the prospectus filed for the offering[.]"  **PX 1498** at 21 (SEC Form 8-K Filing Instructions).

608.    The Prospectus for each of the Securitizations states that "[t]he characteristics of the loans included in a trust fund will not vary by more than five percent (by total principal balance as

of the Cut-off Date) from the characteristics of the loans that are described in the prospectus supplement." **PX O0059** at 176 (NAA 2005-AR6 Prospectus Supplement).[23]

609.    Similarly, the Prospectus Supplements for five Securitizations state that a "revised disclosure will be provided" when, "as of the closing date, any material pool characteristics differ[] by 5% or more from the description in this prospectus supplement." **PX O0045** at 42 (NHELI 2006-FM2 Prospectus Supplement).[24]

610.    As shown, *see* Part IV, *supra*, more than 5% of the loans backing each Certificate did not comply with the representations in the Prospectus Supplements, including compliance with applicable underwriting guidelines, LTV ratios, and/or owner occupancy status—all material factors among the mix considered by investors, individually and collectively, in making investment decisions concerning RMBS.

### C.    Credit Ratings Were Material To Investors

611.    The underwriter secures credit ratings from one or more rating agencies because those ratings play an essential role in the RMBS marketing and sales processes and in the buyer's purchase decision.  Blum Direct ¶ 27.

612.    Each of the Prospectus Supplements state that "[t]he classes of certificates listed [] will not be offered unless they receive ratings at least as high as" "AAA from Standard & Poor's and Aaa from Moody's.  *See, e.g.*, **O0059** at 12 (Prospectus Supplement for NAA 2005-AR6).[25]

613.    Nomura knew that the credit rating of a security—and specifically the fact that a certificate is AAA-rated—is a factor investors consider in their purchase decision.  *See* Lee Dep.

---

[23]    *See also* **PX O0049** at 193 (NHELI 2006-FM1 Prospectus Supplement)  (same); **PX O0045** at 230 (NHELI 2006-FM2 Prospectus Supplement)  (same); **PX O0041** at 229 (NHELI 2006-HE3 Prospectus Supplement)(same); **PX O0072** at 303 (NHELI 2007-1 Prospectus Supplement) (same); **PX O0080** at 256 ( NHELI 2007-2 Prospectus Supplement) (same); **PX O0051** at 247 (NHELI 2007-3 Prospectus Supplement) (same).

[24]    *See also* **PX O0041** at 40 (NHELI 2006-HE3 Prospectus Supplement) (same); **PX O0072** at 117-18 (NHELI 2007-1 Prospectus Supplement) (same); **PX O0080** at 256 (NHELI 2007-2 Prospectus Supplement) (same); **PX O0051** at 247 (NHELI 2007-3 Prospectus Supplement) (same).

[25]    **PX O0049** at 13 (Prospectus Supplement for NHELI 2006 FM1 same for Class I-A); **PX O0045** at 15 (Prospectus Supplement for NHELI 2006-FM2 same for Class I-A-1); **PX O0041** at 14-15 (Prospectus Supplement for NHELI 2006-HE3 same for Class I-A-1); **PX O0072** at 25 (Prospectus Supplement for NHELI 2007-1 same for Class II-1-A); **PX O0080** at 17 (Prospectus Supplement for NHELI 2007-2 same for Class I-A-1); **PX O0051** at 17 (Prospectus Supplement for NHELI 2007-3 same for Class I-A-1).

118:14-24 (agreeing that "one of the pieces of information that is relevant to investors in deciding whether to buy securities, the rating of the securities" and that "it [was] important to some investors that their securities, or the group or tranche they were in, had a AAA rating.").

### 1.     Higher Credit Ratings Enhance Salability And Market Liquidity

614.    An investment-grade security is defined as being rated between "Baa3" and "Aaa" (inclusive) from Moody's, between "BBB-" and "AAA" (inclusive) from S&P and/or between "BBB-" and "AAA" (inclusive) from Fitch.  Blum Direct ¶ 31.  The distinction between investment-grade and non-investment-grade securities is important.  Not only are investment-grade securities generally expected to have higher credit quality, but also they are generally more liquid than non-investment-grade securities because a larger number of investors buy and sell high rated securities, and underwriters have a greater capacity to make a market investment grade securities. *See* Blum Direct ¶ 31; *see also, e.g.,* **PX 382** at 3 (S&P Ratings Letter for NHELI 2006-FM1 dated Jan. 30, 2006) ("an issue rating reflects Standard & Poor's current opinion of the likelihood that payments of principal and interest will be made on a timely basis in accordance with the terms of the obligations.").

615.    Indeed, many institutional investors have internal investment requirements or guidelines and/or are subject to external regulations regarding minimum ratings requirements that either prohibit purchase of securities that are not rated or are not rated investment-grade, or that preclude such investors from holding more than a certain percentage of their portfolios in non-investment grade securities.  Blum Direct ¶ 33.

### 2.     Nomura Recognized The Importance Of Higher Credit Ratings To RMBS Investors

616.    In working with the rating agencies to rate its securitizations, Nomura's "objective was to create securities that appealed to the investors' appetite."  Lee Dep. 122:16-25.  To that end, Nomura wanted a "higher rating, where possible[.]"  *Id.* 120:23-121:7.

617.    Nomura recognized that the GSEs "were more interested" in purchasing AAA-rated securities.  Lee Dep. 123:2-10 ("Fannie and Freddie at the time were more interested in the AAA

ratings"); *see also id.* at 119:21-120:3 ("Q. Do you know whether Fannie and Freddie required that their certificates be rated AAA? A. I do, yes. Q. And was that a requirement of them? A. Yes."). The GSEs considered credit ratings as part of their investment analysis. *See* Palmer Direct ¶ 11 ("We took into account the ratings agencies' analyses of the Certificates' risk in our pre-purchase credit analysis. We did so in part because, as PM&P 100 explains, 'Rating Agencies are best positioned to complete loan level analysis of a potential pool & to appropriately size credit enhancement for expected losses.'"); **PX 104**.

618. The GSEs generally required their investments in RMBS to be rated AAA or the equivalent. *See* Palmer Direct ¶ 13 ("Each Certificate generally had to receive a AAA rating from at least two ratings agencies for the Certificate to be eligible for purchase."); **PX 104** at 2 (Freddie Mac's "PM&P – 100 Non-Agency Mortgage ABS Credit Analysis Policy", dated March 23, 2006) (noting that "[a]t this time, MABS investments are limited to AAA-rated risk" and that "[p]urchased securities must be rated by two of these rating agencies: Moody's, S&P, Fitch or DBRS" by the Portfolio Management and Pricing (PM&P) department); **PX 115** at 24-25 (""Fannie Mae Private Label Securities Risk Policy: Corporate Level Policy," dated August 16, 2006) (noting that "PLS purchased or wrapped by Fannie Mae must have a minimum rating at the time of purchase or wrap of AAA/Aaa," that "[s]ecurities must have a minimum number of ratings, and at least one of the ratings must be provided by Standard & Poor's or Moody's Investor Services[,]" and that the "AA-/Aa3" portfolio limit was 5%.). As noted, *see* Part III(C)(4), *supra*, all seven Certificates were rated AAA or its equivalent by two or more rating agencies.

### 3. Nomura And RBSSI Worked With Credit Rating Agencies To Obtain Desired Credit Ratings For The Securities They Issued And Sold

619. Nomura and RBSSI also obtained feedback on multiple proposed structures, at one point asking S&P to "[p]lease optimize ratings levels on each structure." **PX 1494** (Jan. 18, 2007 email from S. Curran to ResidentialPools (S&P) re: NHELI 2007-HE1 Proposed Structures) ("Attached is the SPIRE file for our proposed structures. Please optimize ratings levels on each structure."); **PX 369** (Jan. 6, 2006 email from R. Lee to L. Bigos re: NHELI 2006-FM1) ("Please

review this updated structure and let me know what are the highest Ratings possible for each bond class.").

620.    Nomura and RBSSI discussed and compared feedback provided by the rating agencies.  **PX 375** (Oct. 5, 2006 email from M. Jaeger to R. Lee attaching NHELI 2006-FM2_S&P_LEVELS.xls) ("We're going to run the Moody's sizes through SPIRE to see if S&P is going to drive anywhere").

621.    Nomura and RBSSI had access to and utilized rating agency products, such as S&P's LEVELs, to run potential loan pools and contest feedback from the rating agencies.  **PX 398** (Aug. 24, 2006 email from M. Orfe to R. Manasseh re: NHELI 2006-HE3) ("[A]ttached please find the results I get when running the tape previously sent through desktop levels.").

> **4.    The False Representations Regarding Compliance With Underwriting Guidelines, LTV Ratios, And Owner Occupancy Status Were Material To The Credit Ratings And Subordination Levels Of The Certificates**
>
> > **(a)    Credit Ratings Based On Inaccurate Information May Not Accurately Reflect The Risk Of RMBS**

622.    Accurate loan-level information was foundational in generating a reliable credit rating.  Blum Direct ¶37.  A loan tape that misstates a loan's actual LTV or owner occupancy status would cause the rating agency's model to assess inaccurately the risk for both the loan and the loan pool.  Chatterjee 30(b)(6) Dep. 110:14-21 ("[T]he results of the model will depend upon the numbers that [are] being fed into the model.  So to accurately reflect . . . the loss level or frequency of default or [loss] severity . . . on a loan will depend on the information . . . that the model is using."); *see also* Mahdavian 30(b)(6) Dep. at 142:20-143:17 (agreeing with published statements that "[a]ny departure from the current standards for accuracy of loan-level data jeopardizes the integrity of assigned ratings" because "the ratings and the loss estimates were extremely sensitive to . . . the loan level data."); *id*. at 141:14-142:3 (confirming that if loan characteristics like FICO, LTV and owner occupancy were misstated so as to understate risk that "rating estimates would have been not conservative enough").

623.     The accuracy of the data on the loan tape is particularly important because the rating agencies did not conduct an independent assessment of the accuracy of data provided to them for ratings purposes.  Instead, the rating agencies required representations from originators and the issuer attesting to the accuracy of the data provided.  Chatterjee 30(b)(6) Dep. 205:19-206:10 ("Q. And would Moody's look to see that there was a representation that loans had been originated according to underwriting guidelines in order to – to be comfortable that the information presented on the loan pool was accurate? . . .  A. We would look at the representations that the originator makes about the underwriting and also they make representations on the loan schedule that make us comfortable about the information that has been provided to us."); **PX 1319** at 20 (Data Quality Control Manual for Standard & Poor's LEVELS, Version 5.6(c)) ("S&P has not rated any prime or Alt A mortgage transactions without a comfort letter addressing the truth and accuracy of the data provided to S&P since November 2002. Beginning January 1, 2003 this requirement was rolled out to all non-prime transactions as well.").

624.     The rating agencies typically included a disclaimer in their ratings letters stating that the rating agencies "assume that the documents . . . provided to us are final" and that it was Nomura's responsibility to "notify us of such changes[.]"  *See, e.g.*, **PX 382** at 2 (S&P Ratings Letter for NHELI 2006-FM1 dated Jan. 30, 2006) ("This rating is based on financial information and documents we received prior to the issuance of this letter. Standard & Poor's assumes that the documents you have provided to us are final. If any subsequent changes were made in the final documents, you must notify us of such changes by sending us the revised final documents with the changes clearly marked.").[26]

625.     In its Mortgage Loan Purchase Agreements, Nomura Credit represented that "[i]nformation provided to the Rating Agencies, including the loan level detail, is true and correct

---

[26]  *See also* **PX 1293** at 2 (S&P Ratings Letter for NHELI 2006-FM2) (same); **PX 1296** at 3(S&P Ratings Letter for NHELI 2006-HE3) (same); **PX 195** (S&P Ratings Letter for NHELI 2007-1) at 1-2 (same); **PX 139** at 1-2 (S&P Ratings Letter for NHELI 2007-2) (same); **PX 1295** at 2 (S&P Ratings Letter for NHELI 2007-3) (same).

according to the Rating Agency requirements." **PX 229** at 8 (NOM-FHFA_04636755, Mortgage Loan Purchase Agreement for NHELI 2006-HE3).[27]

> **(b)   Certificates Rated Based On True And Correct Data Regarding LTV Ratios And Owner Occupancy Status Would Not Have Received AAA Credit Ratings Without Additional Subordination**

626.    The subordination level necessary to achieve an AAA rating for the senior tranches of a PLS, and the relative size of that PLS's different subordinate tranches, are determined by the ratings agencies, based on their assessment of the likelihood and severity of losses.  *See* Schwert Direct ¶ 11; Blum Direct ¶ 58.

627.    The issuers of the Securitizations had an economic incentive to maximize the size of the AAA-rated tranche(s) in any particular offering (which had lower required returns than other tranches) to maximize the proceeds from the offering.  Thus, it is reasonable to believe that the observed AAA subordination levels were near the AAA/AA margin.  *See* Schwert Direct ¶ 40.

628.    Furthermore, it is reasonable to believe that the most junior AAA-rated tranche would not have received a AAA rating if there was an increase in the perceived risk of the underlying loans that was not accompanied by an offsetting reduction in the subordination level of that tranche.  *See* Schwert Direct ¶ 37.

629.    FHFA's expert, Dr. G. William Schwert, conducted a regression analyses, based on data from 990 RMBS, to demonstrate the relationship between reported loan characteristics and subordination levels.  Schwert Direct ¶ 16.

630.    Dr. Schwert found a significant relation between AAA subordination levels and the reported characteristics of the underlying collateral, including LTV ratios and occupancy status, in securitizations that the GSEs participated in as purchasers.  Schwert Direct ¶ 5.

631.    Specifically, Dr. Schwert found a positive and statistically significant relation between the average LTV ratio and AAA subordination.  Schwert Direct ¶ 25.

---

[27]   *See also* **PX 1483** at 8 (Mortgage Loan Purchase Agreement for NHELI 2006-FM1) (same); **PX 1484** at 8 (Mortgage Loan Purchase Agreement for NHELI 2006-FM2) (same); **PX 1485** at 9 (Mortgage Loan Purchase Agreement for NHELI 2007-1) (similar); **PX 1496** at 8 (Draft Mortgage Loan Purchase Agreement for NAA 2005-AR6) (same); **PX 1495**  at 8 (Draft Mortgage Loan Purchase Agreement for NHELI 2007-2) (similar).

632.     Based on one of his regression analyses, for example, Dr. Schwert found that a 10 percent increase in the average LTV ratio of the primary supporting loan group (from, say, 80 percent to 90 percent) would be associated with a 2.94 percent increase in the AAA subordination level (from, say, 20 percent to 22.94 percent), on average.  Schwert Direct ¶ 25.

633.     Dr. Schwert also found a positive relation between the non-owner occupancy percentage and AAA subordination that is statistically significant in one of his regression analyses. Schwert Direct ¶ 26.

634.     He found that a 10 percent increase in the non-owner-occupied percentage of the primary supporting loan group (from, say 30 percent to 40 percent) would be associated with a 0.14 percent increase in the AAA subordination level (from, say, 20 percent to 20.14 percent), on average.  Schwert Direct ¶ 26.

635.     Dr. Schwert's analysis focused on alleged misrepresentations that are quantifiable, such as LTV ratios and owner occupancy.  LTV ratios that are far outside the range of data reported in prospectuses for the GSE Transactions and failures to comply with underwriting guidelines would have further increased the level of subordination required to achieve AAA ratings, if the securities could have been issued at all.  Schwert Direct ¶ 7.

636.     Dr. Schwert's findings show that if Nomura had used true and correct loan-level information in preparing the Prospectus Supplements, and had disclosed that information to the ratings agencies, the Certificates would have lacked the level of subordination necessary to be rated as AAA (or equivalent).  *See* Schwert Direct ¶ 36.

637.     As the GSEs were restricted to purchasing AAA-rated securities, the GSEs would have been able to purchase the Certificates only if the subordination levels for the Certificates had been higher than the levels at which the Certificates were in fact issued.  *See* Schwert Direct ¶ 6

**D.  Had The False Representations Regarding Compliance With Underwriting Guidelines, LTV Ratios, and Occupancy Status Not Been Corrected, The Certificates Could Not Have Been Issued Without Substantial Modifications**

638.    FHFA has also offered evidence of materiality through expert testimony regarding the types of steps that a securities underwriter would have undertaken, given the loan defects found by FHFA experts, before issuing the Certificates.

639.    As discussed in Part III(A)(1), *supra*, a securities underwriter confirms that the offering document disclosures accurately and completely describe the securities and the underlying collateral.  Blum Direct ¶ 11.

640.    Securities underwriters serve as "gatekeepers" of information because they have access to material non-public collateral information and are responsible for verifying the accuracy and completeness of disclosures in offering documents.  Blum Direct ¶ 14.

641.    Given these obligations, Defendants should have identified the types of defects identified by Mr. Hunter and Dr. Kilpatrick, and upon making such discoveries should not have offered or distributed the Certificates without taking substantially different actions.  These would include:  (i) eliminating those loans that would not comply with the representations in the their securities disclosures; and/or (ii) revising those disclosures to accurately describe the collateral that would ultimately back the securities, including the extent of any of the types of defects identified by Mr. Hunter or Dr. Kilpatrick that remained.  Blum Direct ¶ 8.

642.    Given the change in reported loan pool composition that would result from such actions—whether because defective loans were replaced or collateral characteristics where accurately described—Defendants would also have to have resubmitted the final, corrected loan pool to the independent credit rating agencies to obtain new credit ratings.  Blum Direct ¶ 8.

643.    Without correcting the defects identified by Mr. Hunter and Dr. Kilpatrick, Nomura and RBSSI could not ensure the accuracy of the ratings provided by the independent rating agencies, whose models relied on the accuracy of loan characteristic data provided by Defendants and did not independently model for credit risk based on non-compliance with underwriting guidance.  *See* Part III(A)(3), *supra*; Blum Direct ¶ 36, 65.

644.    Had Defendants removed the defective collateral, the resulting securities would have been dramatically smaller, with a different credit subordination structure, and Nomura would have been faced with having to put back or retain the defective collateral.  Blum Direct ¶ 9.

645.    Further, had Nomura Securities and RBSSI chosen to amend their disclosures to accurately describe the loan collateral, including by providing disclosures that a substantial portion of the loans did not comply with applicable underwriting guidelines, the securitizations would have more closely resembled so-called "scratch-and-dent" securitizations.  Blum Direct ¶ 72.

646.    Scratch-and-dent loans included those that violated underwriting guidelines, had missing documents, or had become delinquent, and they typically traded at discounts to par value during the 2005-2007 period.  Rated securities backed by such loans that were salable to institutional investors, generally required (a) more overcollateralization, (b) higher levels of subordination, or (c) additional credit support in the form of "arrearages" (amounts due on delinquent loans at securitization that if repaid will be applied to repayment of principal and interest post-securitization).  Blum Direct ¶¶ 24-25.

647.    Moreover, issuers or underwriters typically included express disclosures alerting investors to the increased credit risks associated with scratch-and-dent collateral, including disclosures that the underlying collateral may not comply with underwriting guidelines.  Blum Direct ¶ 26.

648.    Substantially altering disclosures to accurately describe the underlying collateral, as found by Mr. Hunter and Dr. Kilpatrick, would signal to investors that the securities were of a substantially different credit quality—more closely resembling a security backed by scratch-and-dent loans.  Blum Direct ¶ 72.

649.    Under any of these potential scenarios, the securities would have been issued—if at all—as a fundamentally different transaction, because the offering documents would require extensive modification to disclose to investors the true nature of the collateral and/or because the issuer or underwriter would have had to replace the defective collateral so that the offering documents were materially accurate and complete.  Blum Direct ¶ 10.

184

## VI.  NOMURA HOLDING, NCCI, AND THE INDIVIDUAL DEFENDANTS DIRECTED THE AFFAIRS OF NOMURA SECURITIES, NAAC, AND NHELI

### A.  Nomura Holding Directed The Affairs Of Nomura Securities, NAAC, And NHELI

650.    Nomura Holding directed or caused the direction of the affairs of Nomura Securities, NAAC, and NHELI through (a) wholly owning those entities; (b) directing their RMBS activities; and (c) directing their management.

#### 1.  Nomura Holding And Nomura Securities Had Overlapping Directors and Officers

651.    Nomura Holding wholly owned each of its subsidiaries involved in the RMBS business: (a) it wholly and directly owned Nomura Securities, Prahofer 30(b)(6) Dep. 207:19-208:4; (b) it wholly and directly owned NCCI until October 2006 and thereafter wholly and directly owned NCCI's new parent company, NAMF, SOF ¶ 13, , Prahofer 30(b)(6) Dep. 207:19-208:4; and (c) it wholly and directly owned the parent company of NAAC and NHELI, which was NACC until October 2006 and thereafter was NAMF, *id.* at 206:4-22-207:10; 219:23-220:3, thus indirectly wholly owning NAAC and NHELI, *id.* at 206:9-207:10, 207:11-18.  Nomura Holding, Nomura Securities, NCCI, NAAC, and NHELI all occupied the same headquarters at Two World Financial Center in New York City.  *Id.* at 243:14-244:10.

652.    Nomura Holding selected the directors of Nomura Securities, NACC and NAMF, and in turn NACC or NAMF selected the directors of NAAC and NHELI.  *See* Part II, *supra*.  All directors of Nomura Securities also served as directors of Nomura Holding: Individual Defendant David Findlay, Hideyuki Takahashi, Shigesuki Kashiwagi, and Joseph Schmuckler.  **PX 182** at 2; Prahofer 30(b)(6) Dep. 254:2-6.   Two of Nomura Holding's directors, Mr. Findlay and Mr. Schmuckler, also served as directors of NACC.  **PX 182** at 2.  Two of NACC's directors, Mr. Findlay and Shunichi Ito, also served as directors of both NAAC and NHELI.  *Id.*

653.    The directors of these entities appointed the entities' officers.  *See* Part II, *supra*.  Mr. Findlay served as the Chief Legal Officer of Nomura Holding, Nomura Securities, and NCCI from 2004 to 2007.  Prahofer 30(b)(6) Dep. 240:12-241:12; Findlay Dep. 23:20:-24:4, 25:21-26:23.  Juliet Buck was an officer and employee of Nomura Holding and also of other Nomura

RMBS-related entities, including NAAC and NHELI.  Prahofer 30(b)(6) Dep.  224:17-226:7, 234:8-24.  Sam Herbstman was an officer of Nomura Holding and also of other Nomura RMBS-related entities, including NAAC and NHELI, and was a Director of NCCI.  *Id.* at 224:17-226:25, 234:8-24; **PX 182** at 2.  Nathan Gorin was the Chief Financial Officer and/or Controller of Nomura Securities, NCCI, NAAC, NHELI, and, eventually, Nomura Holding.  Prahofer 30(b)(6) Dep. 248:15-25.

**2.     Nomura Holding Directed The RMBS Activities Of Nomura Securities**

654.     Nomura Holding was required to approve the originators from which Nomura's RMBS business could purchase mortgage loans, it approved warehouse lines of credit to originators, and it established the whole loan and residual position limits applicable to the RMBS business.  Nomura Holding took these actions primarily through its Credit Department (a/k/a the Credit Group or Corporate Credit), its Risk Management Group ("Risk Management"), and the Risk Credit Committee ("RCC").

655.     Risk Management provided services to every operating entity under the Nomura Holding umbrella, including NCCI and Nomura Securities.  Prahofer 30(b)(6) Dep. 238:2-7, 237:11-23.  It did not need to provide services to NAAC and NHELI, because they had no risk profile.  *Id.* at 238:2-7, 237:11-23.  Risk Management was initially housed in Nomura Securities before being moved to Nomura Holding, *id.* at 236:11-21, 239:3-15, 287:14-20, a move that took place no later than March 2005.  **PX 1107**.

656.     The Credit Department was responsible for approving transactions, approving credit limits up to the amount allowed by the Global Credit Policy, and advising the RCC with regards to credit issues.  **PX 1107** at 4-5.  The Credit Department received its authority from Nomura Holding's Board and senior management, subject to oversight by the RCC.  *Id.*  The Credit Department provided services to numerous entities, including NCCI and Nomura Securities.  Prahofer 30(b)(6) Dep. 268:12-24.  The Credit Department was initially housed in Nomura Securities and then moved to Nomura Holding, no later than March 2005.  *Id.*

186

657.   <u>The RCC</u> was charged with overseeing and managing the risks and credit issues of Nomura Holding's various subsidiaries, including the RMBS-related entities.  **PX 1107** at 5.  The RCC had the authority to approve and amend Nomura Holding's Credit Policy, so long as that policy was consistent with the Global Credit Policy, and to inform "Tokyo" of any issues that could not be resolved within a business unit to its satisfaction.  *Id.*  Members of the RCC from 2005 through 2007 included the co-Heads of Risk Management,  as well as other Nomura Holding officers and directors, including David Findlay.  **PX 711** at 2.

**(a)     Nomura Holding Decided From Which Originators Nomura Securities And NCCI Could Purchase Mortgage Loans**

658.   Nomura Holding set the credit policies applicable to Nomura's RMBS business in the NHA Corporate Credit Policies ("the Credit Policy").  **PX 1107** at 4.  Nomura Holding also adopted the procedures for approving residential loan sellers and counterparties set forth in a memorandum dated February 24, 2005 (the "Originator Approval Memorandum").  *Id.* at 29, 32.

659.   The Originator Approval Memorandum stated that, subject to certain limited exceptions described therein, "*only once a counterparty is approved pursuant hereto will it be in a position to do business with Nomura.*"  *Id.* at 32 (original emphasis).   The Originator Approval Memorandum identified a residential credit committee consisting of Don McCabe, Don MacKinnon, Individual Defendant Dante LaRocca, Michael Pierro (as a representative from the Credit Department), and Juliet Buck (as a representative from Legal),  *id.* at 32, but it was generally expected that there would be no physical credit committee meeting or formal approval required, unless a meeting was requested or there was an objection to the approval.  *Id.*

660.   Nomura Holding required three things to happen before an originator would become an approved counter-party: (a) the Credit Department would have to approve the originator and distribute its memorandum of approval; (b) the Legal Department would have to confirm that master agreements and other required documentation had been completed; (c) the residential sales group had to distribute an approval memorandum.  **PX 1107** at 33.

187

661.    The Credit Department had the ultimate authority to approve originators from
which Nomura could purchase mortgage loans, and Nomura could not buy loans from an
originator if the Credit Department had not given its approval.  Marvin Dep. 159:7-160:2; LaRocca
Dep. 155:3-18. Nomura Holding required that, before approving an originator, the Credit
Department conduct a review of the originator's financial and credit quality.  **PX 1107** at 33;
LaRocca Dep. 152:4-154:8.  Nomura Holding further required the Credit Department to
"periodically review the creditworthiness of each counterparty."  **PX 1107** at 12.

662.    As part of these reviews, the Credit Department, the Legal Department, and/or
representatives from the RMBS business unit might visit an originator, which would involve
looking at the originator's overall processes, including, *e.g.*, its practice and policy on stated
income loans, and "actually see[ing] people performing their origination functions, which was
taken into account when deciding whether to approve the originator for business."  LaRocca Dep.
152:4-154:8;  **PX 1107** at 44.

663.    Nomura Holding required that, after the review, the Credit Department generate a
memorandum summarizing the materials it reviewed, the financial wherewithal of the reviewed
entity, and the Credit Department's conclusion as to the classification as a tier I-IV seller or that
the seller was not approved.  *Id.* at 34.  The Credit Department used a tier I-IV rating classification
for mortgage loan sellers, which "primarily indicates whether or not Nomura can have any reliance
on the counterparties financial representations and warranties (including the obligation to
repurchase loans)," with net worth of the counterparty being a major determinant of that rating.  *Id.*
at 29-30.  The Originator Approval Memorandum stated that "*This review must be completed, and
credit department approval must be received, prior to conducting any Alt-A or sub-prime business
with any counterparty*."  *Id.* at 33-34 (original emphasis).

664.    Nomura Holding required the Legal Department to be "responsible for negotiating
and completing a master mortgage loan purchase agreement, and any necessary supporting
documents and agreements, prior to a counterparty being approved," among other counterparty
approval responsibilities.  Id. at 36-37 (original emphasis).

188

665.    The Originator Approval Memorandum directed Nomura's RMBS business to update its counterparty review after any initial purchase and periodically thereafter, including a review of the loan-level diligence results.  *Id.* at 38.  Nomura Holding mandated that it was the responsibility of all business units to highlight concerns or potential issues regarding counterparties or positions for the Credit Department.  *Id.* at 14.  Once it was made aware of an issue, the Credit Department was responsible for making a determination whether a "special situation" had arisen with regard to credit exposure, and for coordinating a meeting with required parties to determine whether a valuation adjustment or reserve was appropriate.  *Id.*  If the issue could not be resolved, it would be escalated to the Nomura Holding CEO who would be the final arbiter.  *Id.*

666.    Consistent with these requirements, the Credit Department participated in periodic meetings with the RMBS business unit to discuss the performance of specific originators, including discussing prior due diligence results of those originators, to determine whether Nomura should continue to purchase mortgage loans from that originator.  Marvin Dep. 168:13-170:25.  For example, the Credit Department participated in the decision to cease buying mortgage loans from Fremont, which was driven in part by the poor diligence results from previous Fremont whole loan purchases.  *Id.* at 161:24-164:2.

667.    The RCC and Risk Management were also involved in decisions to cease purchasing loans from originators.  For example, on December 7, 2006, Nomura Holding's co-Head of Risk Management, David Ye, emailed members of Nomura's RCC that Ownit had been forced to shut down "due to continued pressure from the softening of [the] subprime mortgage market."  **PX 708** at 1.  Mr. Ye noted that Ownit's position was "like many other originators" in that it was suffering decreasing profits from a "cooling housing market" and "mounting EPD claims."  *Id.*  Mr. Ye also noted that the RCC had previously been informed about EPDs, and described Nomura's current position in terms of the amount of Ownit loans owned and the amount in EPDs outstanding.  *Id.*

668.    Mr. Ye then listed five action items: (a) Mortgage Finance would temporarily stop purchases from all sellers with aged EPD claims, the RMBS Trading Desk would review all sellers, and Risk Management would discuss with the RMBS Trading Desk any revisions to position limits from that review; (b) Risk Management and the RMBS Trading Desk would contact all sellers to get additional color on their current position; (c) Risk Management proposed decreasing credit lines to Equifirst, ResMAE, and other large sellers whose volume had increased in 2006, subject to a review by the Trading Desk "in the next few days," and Risk Management ordered that "[i]n the meantime, no additional purchases from [Equifirst and ResMAE] should be made until a final decision regarding their limits is made"; (d) Finance, Risk Management, and Mortgage Finance were to meet to discuss profit and loss adjustments in light of Ownit's failure, particularly based on EPD and residual pricing adjustments; and (e) Risk Management would continue to refine its estimate of EPD exposure as it conducted its monthly Independent Price Verification. *Id.* at 1-2.

669.    On December 13, 2006, the RCC discussed problems in Nomura's RMBS business and recent events in the mortgage market, including the deteriorating credit performance of Fremont collateral and the shutdown of Ownit. **PX 711** at 2.  Mr. Ye and fellow co-Head of Risk Management, Taisuki Kimura, discussed the actions taken in response to these events, including discontinuing purchases from all originators with aged EPD claims and increased origination volumes in 2006; the Credit Group and Mortgage Finance working together to get additional color from other originators; Risk Management conducting a review of its credit policy for the Mortgage Finance business; and Finance, Risk Management and Mortgage Finance deciding on the appropriate finance treatment of aged EPD claims.  *Id.* at 3.  Mr. Wagner, Nomura Holding's CFO, also discussed actions taken by finance and accounting in response to aged EPD and Ownit EPD, including writing down Ownit EPD, meeting with the controllers and Mortgage Finance to determine an appropriate reserve or write-off, deriving a "practical policy" to deal with the issue, and reviewing accounting policy regarding residual valuation.  *Id.* at 2-3.

**(b)    Nomura Holding Directed Which Originators Received Warehouse Lending Facilities**

670.    Nomura Holding was required to approve any warehouse lending facilities to mortgage loan originators.  A warehouse lending facility is a credit line or loan made to an originator that provided financing to the originator to originate loans and that is secured by collateral.  LaRocca Dep. 195:22-197:16.  The purpose of Nomura's warehouse lines of credit was to "enhance Nomura's CMBS, RMBS, and ABS securitization pipeline."  **PX 1107** at 19.

671.    The Credit Department was responsible for analyzing warehouse lines of credit.  *Id.*  Each warehouse line required approval of both the head of the Credit Department and the head of the regional business line, *e.g.*, of the RMBS business unit.  *Id.* at 22.  In assessing whether to provide a warehouse line of credit, the Credit Department analyzed the underlying asset and collateral, the counterparty, and the facility structure.  *Id.* at 19-21.

672.    The RCC was also at times required to be notified of approval of credit lines to originators, in part due to "the inherent risk of subprime collateral."  **PX 719** at 1.  For example, the RCC was notified of a $350 million warehouse line of credit to Originator Quick Loan in 2006, which was Nomura's second largest originator and "rapidly growing."  *Id.*  Nomura viewed the warehouse line of credit to Quick Loan "as an opportunity to expand its securitization platform by increasing loan origination volume and providing additional services and products to existing customers," and sought to give Nomura the right to act as lead or co-lead underwriter on Quick Loan securitizations.  *Id.* at 2, 6.  Risk Management and the Credit Group recommended approving a "soft limit" on total Quick Loan inventory and a $600 million warehouse advance.  *Id.* at 1.

**(c)    Nomura Holding Directed NCCI's And Nomura Securities' RMBS Position Limits**

673.    Nomura Holding's credit policy provided that the Credit Department would be responsible for approving and allocating credit limits for all of Nomura Securities' businesses, *e.g.*, the amount of securities or loans that could be held at one time or from a given counter-party, explicitly including whole loans and MBS products.  **PX 1107** at 6-7.  Nomura Holding required that the Credit Department obtain specific information regarding counterparties in order to perform

its credit analysis and set credit limits; for wholesale mortgage sellers this information included, among other things, the NCCI seller application.  *Id.* at 11.  The Credit Department distributed the allocated counterparty limits and the amount used daily, and Nomura's business units had to stay within those limits.  *Id.* at 8.  The Credit Department had to approve any new limits or limit increases before the execution of a trade, or else the trade would be considered a violation of the limit.  *Id.*

674.    Nomura Holding decided whether it or Nomura Securities would be the holder of any RMBS residuals retained by Nomura.  *See* **PX 293**; **PX 341**; **PX 344**.  The RCC and Risk Management were involved in approving position limits as well.  *See* **PX 297** (July 2006 email chain discussing presentation to RCC on residual position limits and projected residual sizes in 2007).  For example, in June 2006, Risk Management recommended for the RCC's approval a $400 million RMBS residual position limit, which was part of the overall $7.5 billion RMBS position limit.  **PX 911** at 33.

675.    The Credit Department tracked violations of these limits, and repeated and serious violations were reported to the RCC for review "and possible disciplinary action."  **PX 1107** at 8. For example, in early 2007, Brett Marvin was terminated from his position as the Head of the RMBS Trading Desk after Brian Murphy purchased a pool of loans that exceeded the trade size limits set at that time.  Marvin Dep. 338:19-341:14.  The decision to terminate Mr. Marvin was made by management above the level of Mr. Marvin's superior, Don MacKinnon, particularly by Nomura Holding director Shigesuki Kashiwagi, and David Findlay was involved in the investigation and decision as well.  Marvin Dep. 341:15-342:23.

676.    Nomura Holding also influenced the valuations the RMBS business placed on its residual and whole loan positions.  Risk Management was responsible for conducting a monthly independent pricing verification ("IPV") of Nomura's RMBS and whole loan positions.  *See, e.g.*, **PX 861**.  In connection with the IPV, Risk Management developed a model for the credit and default risk for Nomura's RMBS and whole loan positions, which applied to all types of loans, including subprime and Alt A.  **PX 869**; **PX 906**.  As part of its modeling, Risk Management

monitored the delinquency performance of loans from different originators, as well as their average FICO scores and LTV ratios, **PX 908** at 23-31, and tracked residual positions on a daily basis, **PX 906** at 27.

677.    Risk Management also performed loss stress tests on the value of the residuals on Nomura's RMBS whole loan book.  **PX 905** at 23; **PX 911** at 21-27.  Risk Management often had a lower value for Nomura's RMBS positions because of "differen[t] default (both the timing and the level) and severity curves," **PX 300** at 7, and in November 2006 came to the conclusion that 2005 and 2006 Fremont loans were performing poorly due to characteristics not reflected in their stated credit characteristics, and recommended reducing Nomura's valuation of the residual.  *See* Part IV(B)*, supra*.

678.    Risk Management also regularly reviewed the Trading Desk's NCAT model, which was used to assign capital to a class of assets, for Nomura's RMBS whole loan and residual holdings.  **PX 903** at 1 (November 2006 memorandum memorializing review); *see also* Prahofer Dep. 290:15-291:9 (explaining NCAT model).  For example, in November 2006, Risk Management issued a memorandum recommending an adjustment to the RMBS Trading Desk's whole loan risk calculations, because the Trading Desk was using incorrect calculations to tranche loans, resulting in an over-valuation of their whole loan position.  **PX 903** at 2.  Moreover, Risk Management faulted the Trading Desk for using inconsistent parameters to calculate NCAT for residuals, explaining that the Trading Desk needed to refine their methodology for calculating credit risk for residuals, including by incorporating a more severe stress test scenario.  *Id.* at 3.

### (d)    Nomura Holding Could Audit Nomura Securities And NCCI

679.    In November 2005, Nomura Holding audited Nomura's RMBS business.  **PX 723** at 1-4.  As part of the audit, Nomura Holding examined the due diligence results from Nomura's whole loan purchases.  *Id.*  The audit also examined the RMBS group's quality control process and underwriting guidelines used by the originators from which Nomura purchased loans.  *Id.*  In this review, Nomura Holding Assistant Vice President Elizabeth Nicklas questioned why the RMBS Group had apparently purchased loans graded EV3 by a diligence vendor, as her understanding

was that any loans Nomura had cured from a EV3 to an EV2 would be reflected in the final diligence grades. *Id.*

> **(e)** **Nomura Holding Directed The Back-Office Functions Of Nomura Securities And NCCI**

680.    Nomura Holding and each of the RMBS-related entities at issue in this lawsuit, shared common back office support.  The Corporate Legal Group provided legal services to all of the RMBS-related entities, and was led by David Findlay.  Prahofer 30(b)(6) Dep. 240:5-11, 240:21-241:12.  The Accounting Group maintained the financial accounts of Nomura Holding and the RMBS-related entities, and was led at various times by Larry Wagner and Nathan Gorin, Prahofer 30(b)(6) Dep. 293:23-295:9, the latter of whom was responsible for maintaining the financial accounts of NAAC, NHELI, and NCCI.  *Id.* at 226:2-4, 248:15-25, 251:17-20, 258:19-23. The Tax Group, led by Sam Herbstman, provided tax services to Nomura Holding, NCCI, and Nomura Securities, and monitored the tax status of NAAC and NHELI.  *Id.* at 241:22-243:13, 226:5-7.  The Human Resources Group also provided services for Nomura Holding, NCCI, and Nomura Securities, though it did not need to provide services to NAAC or NHELI, which had no employees.  *Id.* at 292:8-293:6.

> **(f)** **Nomura Holding Directed Nomura Securities And NCCI's Public Relations Regarding The RMBS Business**

*681.*    In November 2006, Nomura Holding was notified of a pending Wall Street Journal article based on a UBS research presentation showing that Nomura's RMBS securitizations were performing third-worst out of 28 RMBS issuers.  **PX 706**.  The presentation asked whether "2006 [will] go down as the worst ever?"  *Id.* at 5.  The UBS presentation stated that defaults were "[c]om[ing] [e]arly and [o]ften," and "[p]oint[ed] [f]ingers" at "[w]eakening [c]redit underwriting," "[i]ncreased [r]isk [l]ayering," "[w]eakening HPA," and "[s]lower [p]repayments." *Id.*  It also stated that the performance issues were not limited to a few issuers or originators, but were widespread.  Despite the widespread problems, Nomura still ranked third-from last in performance according to UBS.  *Id* at 15.  The UBS presentation further stated that subprime profitability had declined, "[p]utting [p]ressure on [v]olume, and [r]esult[ing] in [l]ooser

[u]nderwriting"—a conclusion consistent with the one that Risk Management had drawn with regards to Fremont.  *Id.* at 21.

682.     David Findlay, a director and the Chief Legal Officer of Nomura Holding, noted that the research paper indicated that "poor underwriting" was the "key cause" of Nomura's performance, and questioned whether Nomura Holding CEO Hideyuki Takahashi and "Tokyo" needed to be informed of the response as well.  *Id.* at 1.  Nomura Holding director Shigesuki Kashiwagi was required to approve the RMBS group's response.  *Id.*

### 3.     Nomura Holding Directed Or Caused The Direction Of The Management Of NAAC And NHELI

683.     Nomura Holding selected the directors of NACC and NAMF.  *See* Part II, *supra*. Those directors then selected the directors of NAAC and NHELI.  *See* Part II, *supra*.  The Directors of NAAC and NHELI were responsible for managing and directing the "business and affairs" of NAAC and NHELI and appointing their officers, **PX 1351** at 17; **PX 1349** at 31; **PX 1351** at 20 (NHELI By-laws); **PX 1349** at 36, who included Nomura Holding officers Juliet Buck and Sam Herbstman.  Prahofer 30(b)(6) Dep. 224:17-226:7, 234:8-24.

684.     Nomura Holding officers and d directed NAAC and NHELI's RMBS business. Nomura Holding officer and director David Findlay signed each of the Registration Statements pursuant to which the Securitizations were issued, SOF ¶¶ 42, and as director of both NAAC and NHELI, he also signed an authorization allowing NAAC and NHELI to proceed with each of the Securitizations.  **PX 1351** at 5; **PX 1349** at 6; **PX 1350** at 6; **PX 1352** at 5; **PX 1353** at 5.

685.     Nomura Holding Chief Administrative Officer Shunichi Ito also signed each of the Registration Statements, as well as authorizations allowing each of the Securitizations to proceed, except for NHELI 2007-3.  **PX O0033** at 220; **PX O0035** at 493;  **PX O0037** at 554.  **PX 1351** at 5; **PX 1349** at 6; **PX 1350** at 6; **PX 1352** at 5.

686.     Nomura Holding officer Juliet Buck served as the Secretary and Legal Officer for NAAC and NHELI, Prahofer 30(b)(6) Dep. 227:7-21, 228:8-17, and was responsible for the legal functions of NAAC and NHELI.  *Id.*  As Secretary of NAAC and NHELI, she signed each of the

Registration Statements as well as a Secretary's Certificate in connection with the Board of Director's authorization for each of the Securitizations.  **PX 1351** at 2; **PX 1349** at 2; **PX 1350** at 2; **PX 1602** at 2; **PX 1603** at 2; **PX 1352** at 2; **PX 1353** at 2.  Ms. Buck was also granted the power of attorney to act on behalf of the signatories of the Registration Statements.  **PX O0033** at 220; **PX O0035** at 493;  **PX O0037** at 554.

687.    Ms. Buck was also actively involved many aspects of Nomura's RMBS business throughout the 2005 to 2007 time period, including by drafting many of the Offering Materials, *see e.g.*, **PX 217** at 1 (NHELI 2006-HE3); **PX 222** (NHELI 2006-FM2); **PX 281** at 1 (NHELI 2007-3); **PX 283** at 1, and participating in diligence tie-out with RBSSI regarding NHELI 2006-FM2. **PX 218** (NHELI 2006-FM2); **PX 285** (NHELI 2006-FM2).  Ms. Buck was also involved in setting policy regarding reporting and responding to EPD claims for ResMAE, **PX 566**; **PX 567**, and in decisions as to whether Nomura needed to make disclosures about Fremont and Ownit after they went into bankruptcy, **PX 279**.

### B.    NCCI Directed Or Caused The Direction Of The Management And Policies Of Nomura Securities, NAAC, And NHELI

688.    NCCI directed or caused the direction of the affairs of Nomura Securities, NAAC, and NHELI through (a) overlapping officers and directors; (b) directing their RMBS activities; and (c) directing their management.

#### 1.    NCCI And Nomura Securities Had Overlapping Directors And Officers

689.    NCCI's directors, Dante LaRocca and Sam Herbstman, were also officers of Nomura Securities, and until October 2006, Mr. LaRocca was an employee of Nomura Securities. LaRocca Dep. 36:25-37:10; Prahofer 30(b)(6) Dep. 226:8-23, 234:8-24.  When Nomura Securities employees like Mr. LaRocca became employees of NCCI in October 2006, it had no effect on their responsibilities.  Prahofer 30(b)(6) Dep. 230:13-25; LaRocca Dep. 33:16-35:8.  As Mr. LaRocca put it, the distinction between Nomura entities was "invisible" and "seamless."  LaRocca Dep. 35:25-36:10.

## 2.    NCCI Directed The RMBS Activities Of Nomura Securities

690.    NCCI was responsible for deciding which mortgage loans to purchase and which loans to securitize.  Prahofer 30(b)(6) Dep. 284:3-16.  It bought loans from originators, held them on its books, and then sold them to the depositor.  *Id.* at 249:9-17, 256:17-257:7, 256:8-16.  NCCI could prevent the issuance of a securitization by choosing not to sell the underlying loans to the depositor.  *Id.* at 256:17-257:7.

691.    NCCI, along with Nomura Securities, was responsible for conducting credit, compliance and valuation diligence on the Mortgage Loans.  *Id.* at 268:25-269:6.  It selected the loans to be reviewed, *id.* at 282:9-13, and retained the diligence vendors who conducted the reviews.  Prahofer 30(b)(6) Dep. 283:20-284:2.  After October 2006, NCCI also employed the Diligence Group's employees, except for Christopher Scampoli, a contractor.  Prahofer 30(b)(6) Dep. 284:17-285:3.

## 3.    NCCI Directed The Management And Policies Of NAAC and NHELI

692.    NAAC and NHELI were shell corporations without any independent operations or employees.  *See* Part II, *supra*.  Neither NAAC nor NHELI had any office space separate and apart from that of NCCI or Nomura Securities.  Prahofer 30(b)(6) Dep. 243:14-244:10

693.    NAAC and NHELI's officers were granted the authority and responsibility to oversee the "management and operation of the Corporation," including any duties delegated by NAAC or NHELI's board of directors.  **PX 1351** at 20 (NHELI by-laws); **PX 1349** at 37 (NAAC by-laws).  In particular, NAAC and NHELI's CEOs were responsible for the "general and active management, supervision, direction, and control of the business of the Corporation," including carrying out any resolutions or orders of the board of directors.  **PX 1349**  at 38 (NAAC By-laws); **PX 1351** at 21 (NHELI By-laws).

694.    All of NAAC and NHELI's officers were also officers of NCCI,  Nomura Securities, and/or Nomura Holding.  Prahofer 30(b)(6) Dep. 224:17-226:7, 234:8-24, 248:15-25; LaRocca Dep. 36:25-37:10; Graham Dep. 20:2-9, 25:20-26:5.  Two of the three directors of NAAC and NHELI were officers and directors of other Nomura entities, including, Nomura

197

Holding, Nomura Securities, and NACC.  **PX 182** at 2; Findlay Dep. 23:20:-24:4, 25:21-26:23; **PX 1470** at 10.

695.    These officers and directors (namely, Individual Defendant Mr. Graham, Mr. LaRocca, Individual Defendant Mr. Findlay, and Mr. Ito) signed the Registration Statements that allowed NAAC and NHELI to issue the Securitizations.  **PX O0033** at 220; **PX O0035** at 208; **PX O0037** at 248.  NCCI and Nomura Securities officers Mr. LaRocca and Mr. Graham, and Nomura Holding officer Ms. Buck, were given power of attorney on behalf of the other signatories of the Registration Statements as to matters related to those Registration Statements.  **PX O0033** at 224; **PX O0035** at 493; **PX O0037** at 247-48.   Mr. Findlay and Mr. Ito signed Board of Directors Authorizations allowing each of the Securitizations to proceed, and Mr. Graham and Ms. Buck signed the Secretary's Certificate certifying that the documentation of the Board of Directors Authorizations was true and correct.  **PX 1351** at 1-2, 5; **PX 1349** at 1-2, 6; **PX 1350** at 1-2, 6; **PX 1602** at 1-2, 5; **PX 1603** at 1-2, 6; **PX 1352** at 1-2, 5; **PX 1353** at 1-2, 5.

696.    NCCI and Nomura Securities were responsible for all of the key functions related to the issuance of the Securitizations, including:  deciding which mortgage loans to purchase and securitize; conducting due diligence on the Mortgage Loans, drafting the offering materials; including the Prospectus Supplements; and marketing and selling the Securitizations to investors. *See* Part II, *supra*.

### C.    The Individual Defendants Directed The Affairs Of Nomura Securities, NAAC, And NHELI

697.    The Individual Defendants controlled NAAC, NHELI, and Nomura Securities by signing the Registration Statements, through their positions as officers and/or directors of each of the controlled entities, and through their roles managing Nomura's RMBS business.

### 1.    Dante LaRocca

698.    From 2005 through 2007, Dante LaRocca was a Managing Director at Nomura Securities and NCCI, served as the President and CEO of NHELI, and served as a Director of NCCI. LaRocca Dep. 36:25-37:10; Prahofer 30(b)(6) Dep. 228:2-17;  **PX 182** at 2.  Functionally,

198

Mr. LaRocca was head of Nomura's Real Estate Finance Group, and oversaw the Residential Mortgage Finance Group, which was responsible for "papering" the securitization process as well as diligence on the Mortgage Loans.  LaRocca Dep. 36:25-37:10; Graham Dep. 22:3-13, 40:19-41:10.  As CEO of  NHELI, he was responsible for the "general and active management of the business of the Corporation," including carrying out any resolutions or orders of the board of directors.  **PX 1351** at 21.

**(a)**    **Mr. LaRocca Was Involved In Assessing Which Originators Nomura Would Purchase Loans From**

699.    Although the Credit Department was responsible for reviewing originators before approving them as counterparties, members of Mr. LaRocca's team accompanied the Credit Department on some of these reviews, LaRocca Dep. 152:4-154:8, and Mr. LaRocca discussed the results with Mr. Pierro, who led most of the reviews, LaRocca Dep. 154:17-155:18, and was aware that originators including Fremont, ResMAE, People's Choice, and First NLC were "more suspect sellers."  **PX 1512** at 1.  Similarly, even though the Credit Department was responsible for setting limits on the warehouse credit lines that Nomura extended to originators, Mr. LaRocca advised the Credit Department on that subject as well.  LaRocca Dep. 196:18-198:23.

**(b)**    **Mr. LaRocca Oversaw The Diligence Group And Was Actively Involved In The Diligence That Nomura Performed On Mortgage Loans**

700.    The Diligence Group reported to Mr. LaRocca.  LaRocca Dep. 48:22-49:25.  He was involved in setting diligence policy, *see, e.g.*, **PX 1472** at 1, and with Nomura's bid stipulations.  LaRocca Dep. 178:15-21; **PX 1472**  at 1.  Mr. LaRocca testified that Nomura conducted credit, compliance, and valuation diligence only when buying loans, not when securitizing them.  LaRocca Dep. 60:20-61:8.  He testified that Nomura conducted diligence only on samples of bulk pools, LaRocca Dep. 64:8-65:7, 67:3-7; 187:3-190:4, was sometimes involved in setting sample sizes, LaRocca Dep. 64:8-65:7, 67:3-7, and was involved in assessing whether red flags raised by the Diligence Group required adjustment of the samples, LaRocca Dep. 68:11-

199

69:21.  As Mr. LaRocca stated, "if the diligence guys had an issue, it would come up to me, we would talk it through and decide what to do or to handle it."  *Id*. at 69:13-21.

701.    Mr. LaRocca was informed of and understood Nomura's diligence results. LaRocca Dep. 190:5-191:8.  For example, in February 2007, he was advised that Nomura's overall pull-through rate had increased in January 2007 because Nomura had not purchased any loans from Ownit or ResMae, and that the pull-through rate was at its highest level since the summer of 2006.  **PX 1472** at 1.  As another example, in November 2006, he was advised that Nomura's typical kickout rate on subprime deals was 7-8%, and that the kickout rate on Nomura's Fremont SP02, SP03, and SP04 Acquisition Pools was "much higher" than this typical rate.  **PX 666** at 1. At the same time, he received  a summary of diligence results for the Fremont SP02, SP03, and SP04 Acquisition Pools, which provided information on the kickout rates for each pool and stated that the sample was "100% adverse."  **PX 666**.

### (c)    Mr. LaRocca Reviewed And Edited The Prospectus Supplements And Other Offering Materials

702.    Mr. LaRocca was actively involved with Nomura's PLS.  .  He reviewed and commented on "[p]retty much everything," including prospectus supplements, registration statements, term sheets, purchase agreements, legal opinions, and corporate documents.  *Id.* at 40:19-41; *id.* at 41:8-42:11, 138:2-139:16.  Mr. LaRocca read prospectus supplements in their entirety, including the Prospectus Supplements at issue, *id.* at 41:2-42:6, 42:12-19, 138:2-139:16, and was involved in determining whether Nomura would comply with Regulation AB's disclosure requirements for NHELI 2006-FM1.  **PX 1511** at 2.

### (d)    Mr. LaRocca Was Involved With Post-Closing Issues Related To The Securitizations

703.    Mr. LaRocca was involved in discussions about post-closing modeling, including meetings where Nomura's residual and whole positions were discussed.  LaRocca Dep. 217:2-6, 222:9-13.  He was also involved in responding to repurchase requests, Spagna Dep. 352:16-20, and in the sale of Nomura's RMBS residuals, LaRocca Dep. 210:3-211:4, including Nomura's attempt

to sell most or all of its RMBS residual and whole loan holdings beginning the summer of 2007. *Id.* at 209:7-9; *id.* at 232:12-233:2; **PX 1513** at 2-6.

**(e)     Mr. LaRocca Signed Registration Statements 333-126435 And 333-132109 And The Amendments Thereto**

704.    Mr. LaRocca signed Registration Statement 333-126435, which was filed on July 7, 2005, in his capacity as CEO of NHELI.  **PX O0033** at 219; LaRocca Dep. 118:23-119:15; *id.* at 119:21-24; *id.* at 120:18-24.  Mr. LaRocca read the Registration Statement in its entirety before signing it.  *Id.* at 122:12-17.  Juliet Buck signed the amendment to that Registration Statement, which was filed on July 8, 2005, on Mr. LaRocca's behalf.  *Id.* at 125:14-25.

705.    Mr. LaRocca also signed Registration Statement 333-132109, which was filed on February 28, 2006, in his capacity as CEO of NHELI.  **PX O0037** at 247; LaRocca Dep. 128:5-11. As with Registration Statement 333-126435, Mr. LaRocca, Juliet Buck, and John Graham were granted the power of attorney by the other signatories to the Registration Statement.  **PX O0037** at 247-248; LaRocca Dep. 128:21-129:21.  John Graham signed the first amendment to the Registration Statement, which was dated April 6, 2006, on Mr. LaRocca's behalf.  **PX O0038** at 389; LaRocca Dep. 131:21-132:7.  Ms. Buck signed the second amendment to the Registration Statement, which was dated April 13, 2006, on Mr. LaRocca's behalf.  **PX O0039** at 389; LaRocca Dep. 134:14-18.

**2.     David Findlay**

706.    David Findlay was a Director and the CLO of both Nomura Holding and Nomura Securities, also a Director of NAAC and NHELI, and the CLO of NCCI from 2005 through 2007. Findlay Dep. 23:20:-24:4; *id.* at 25:21-26:23; Prahofer 30(b)(6) Dep. at 241:5-9; *id.* at 252:22-253:19; Findlay Dep. at 83:24-84:4.  Mr. Findlay also served as an officer of "a lot of Nomura Group entities … and [he] wouldn't remember necessarily today all of the companies" and was the director of "quite a lot of [Nomura entities]" as well.  Findlay Dep. 22:24-24:4.  As CLO of Nomura Holding, Mr. Findlay reported to Nomura Holding's CEO.  **PX 1473** at 2-3; Findlay Dep.

201

159:21-23.  Mr. Findlay provided legal advice to Nomura Holding on "[a]nything [that] affect[ed] the group," *id.* at 34:2-11, including about the Registration Statements.  *Id.* at 85:3-86:3.

### (a)     Mr. Findlay Was Involved In Setting Up Nomura's Diligence Process

707.    Mr. Findlay was actively involved in setting up Nomura's RMBS business, Findlay Dep. 36:8-37:9; Prahofer 30(b)(6) Dep. 262:5-263:11, including by setting up its due diligence process, Findlay Dep. 40:19-21.  His role was to procure advice from outside counsel and consultants about how to set up that process, assess the advice he was given, and determine whether Nomura's securitization and diligence processes were "robust."  Findlay Dep. 36:8-38:24, 40:22-44:4, 49:11-50:2.

### (b)     Mr. Findlay Sat On Nomura's Risk And Credit Committee

708.    Mr. Findlay sat on the RCC.  Findlay Dep. 169:2-7; **PX 711** at 2.  As a member of the RCC, Mr. Findlay, was responsible for overseeing risk and credit issues for Nomura Holding's businesses, including its RMBS business, from 2005 to 2007, **PX 711** at 2; *see also* ¶ 657, *supra*, including by monitoring Nomura's exposure to early payment defaults, Findlay Dep. 171:7-14.  For example, on December 7, 2006, Mr. Findlay, along with other members of the RCC, was told by David Ye that Ownit had been forced to shut down "due to continued pressure from the softening of [the] subprime mortgage market."  **PX 708** at 1.  Mr. Ye noted that Ownit's position was "[l]ike many other originators" in that it was suffering decreasing profits from a "cooling housing market" and "mounting EPD claims,"  and directed actions related to Nomura's exposure to EPD claims.  *Id.* at 2.  On December 13, 2006,  Mr. Findlay attended another meeting at which the RCC discussed problems in Nomura's RMBS business, including a review of the actions that Nomura had taken in response to Ownit's closure.  **PX 711** at 2-3.

### (c)     Mr. Findlay Became Aware Of Problems In Nomura's RMBS Business Through A November 2006 Wall Street Journal Article

*709.*    In November 2006, Mr. Findlay was involved in coordinating Nomura's response to a forthcoming article showing that Nomura's RMBS securitizations were performing third-worst out of 28 RMBS issuers.  *See* ¶  681, *supra*.  Mr. Findlay commented that the article focused on

"poor underwriting" as the cause of Nomura's performance, and questioned whether Nomura Holding Director and CEO Hideyuki Takahashi and "Tokyo" needed to be informed of Nomura's response to the article.  **PX 706** at 1; *see also* Findlay Dep. 162:9-20.  At the time, Mr. Findlay knew "that the market was generally having problems."  Findlay Dep. 164:14-22.

**(d)  Mr. Findlay Signed Each Of The Registration Statements And The Amendments Thereto**

710.    Mr. Findlay signed each of the three Registration Statements at issue and the amendments thereto in his capacity as Director of NAAC and NHELI.  **PX O0033** at 220; **PX O0035** at 208; **PX O0037** at 248; Findlay Dep. 19-21, 77:20-78:11, 89:21-90:6, 125:7-126:20,130:22-131:9, at 133:19-134:4, 138:20-139:18, 142:10-22.  As a director of NAAC and NHELI, Mr. Findlay also signed a Resolution of the Board of Directors authorizing each of the Securitizations.  **PX 1349** at 6; **PX 1350** at 6; **PX 1351** at 5; **PX 1352** at 5; **PX 1353** at 5; **PX 1602** at 5; **PX 1603** at 5; Findlay Dep. 144:9-145:15, 149:24-150:16, 152:13-23, 156:8-157:15.  These resolutions "authorize[ed] the company to go forward" with the Securitizations.  Findlay Dep. 147:3-6; *see also id.* at 149:2-4. Mr. Findlay did not recall his roles at NAAC or NHELI, including being a Director of NAAC or NHELI, *id.* at 24:16-25:20, and he did not recall which Nomura entity performed which functions in the securitization process, *id.* at 71:4-72:12.

**3.    John Graham**

711.    During the 2005 to 2007 time period, John Graham was a Managing Director in Residential Mortgage Finance at Nomura Securities, a Managing Director at NCCI, the President and CEO of NAAC, and a Managing Director of NHELI.  Graham Dep. 20:2-9, 21:9-22, 25:20-26:5, 25:20-26:5; **PX 1349** at 1; **PX 1350** at 1; **PX 1351** at 1; **PX 1352** at 1; **PX 1353** at 1; **PX 1602** at 5; **PX 1603** at 5; Prahofer 30(b)(6) Dep. 224:21-225:8.  Employed by Nomura Securities until October 2006 and thereafter by NCCI, Prahofer 30(b)(6) Dep. 226:8-25, Mr. Graham functioned as the Head of Residential Mortgage Finance for Nomura's RMBS business, Graham Dep. 40:19-41:10, 142:11-22, and was responsible for overseeing all contracts with counterparties, including vendors, sellers, trustees, and custodians.  Spagna Dep. 168:13-169:2

203

### (a)    Mr. Graham Was Responsible For Overseeing The "Papering" Of The Securitizations

712.    The Residential Mortgage Finance Group that Mr. Graham oversaw was "responsible for the papering of the acquisition of the whole loans, the due diligence, the collateral analysis through to the securitization," including assembling the Offering Documents.  Graham Dep. 40:19-41:10.  Its role was "perform[ing] a number of functions in connection with preparing and closing the deals" and "coordinat[ing] various internal groups and outside entities." Declaration of John Graham, Nomura, dated Dec. 1, 2014 ("Graham Decl.") ¶¶ 2-3.  Mr. Graham generally reviewed offering materials, including prospectus supplements.  Graham Dep. 29:9-13. In doing so, he looked at certain "source materials," a review he described as similar to that undertaken by accounting firms, Graham Dep. 102:14-103:5, but he did not review any documents to determine the veracity of the representation that the Mortgage Loans complied with guidelines, Graham Dep. 121:24-122:7.  Instead, Mr. Graham relied on the Diligence Group's acquisition-stage review, Graham Dep. 100:10-101:15, 117:7-19, 124:4-18, although he spoke with that group only if there was some change in the language of the representations regarding compliance with underwriting guidelines, Graham Dep. 115:3-116:15, and there is no evidence that he had such discussions related to the Securitizations at issue.

### (b)    Mr. Graham Oversaw The Diligence Group

713.    The Diligence Group reported to Mr. Graham, Graham Dep. 24:9-15; Spagna Tr. 168:4-12; Kohout Dep. 22:3-11, and he "worked closely" with that group.  Graham Decl. ¶ 8.  Mr. Graham "frequently received due diligence results … showing the percentage of due diligence performed on, and number of loans kicked out from, pools contributing to those securitizations." Graham Decl. ¶ 9.  As he explained:

> I or someone in the Transaction Management Group received final due diligence summaries for at least 89 of the trade pools, including the sole trade pool that contributed loans to the NHELI 2006-FM1 securitization and the two trade pools that contributed loans to the NHELI 2006-FM2 securitization. Likewise, I or someone in the Transaction Management Group received summaries of the diligence performed on loans included in at least four of the seven securitizations that are at issue in this case before

the securitizations were issued, namely NHELI 2006-HE3, NHELI
2006-FM2, NHELI 2007-2, and NHELI 2007-3.

Graham Decl. ¶ 9.  These summaries allowed him "to see first-hand the results of the due diligence

process."  Graham Decl. ¶ 9.

714.    Mr. Graham was aware of the size of Nomura's credit and compliance diligence

samples, Graham Dep. 140:20-25, 168:8-18, 250:9-251:21, knew that if a loan was not included in

such a sample, it did not receive a credit and compliance review, Graham Dep. 167:16-20, and

knew that no one in the Diligence Group had the statistical background necessary to select a

statistically sufficient sample.  Graham Dep. 152:15-163:11.  Mr. Graham was also familiar with

Nomura's valuation diligence process, and knew that the Prospectus Supplements did not disclose

the results of that process.  Graham Dep. 66:8-66:19, 177:9-16.  Mr. Graham also knew that

Nomura performed diligence only when it acquired loans, Graham Dep. 210:6-23, and that

"[t]here's no due diligence performed for the securitizations."  Graham Dep. 218:13-17.

### (c)    Mr. Graham Had Additional RMBS Responsibilities, Including Interacting With Credit Ratings Agencies And Handling Repurchases

715.    Mr. Graham's responsibilities included "work[ing] closely with the credit ratings

agencies."  Graham Decl. ¶ 4.  He was also involved with repurchase requests.  Graham Dep.

248:19-249:6; Spagna Dep. 352:16-20; *see also* **PX 588**.

### (d)    Mr. Graham Signed Registration Statement 333-126812 And The Amendment Thereto

716.    Mr. Graham signed Registration Statement 333-126812, dated July 22, 2005, and

the amendment thereto, dated August 8, 2005, pursuant to which NAA 2005-AR6 was issued.  **PX**

**O0035**.  Mr. Graham  also signed a Secretary Certificate in connection with the Resolution of the

Board of Directors of NAAC or NHELI authorizing each of the Securitizations.  **PX O0039, PX**

**1349, PX 1350, PX 156, PX 157, PX 1352, PX 159**.

### 4.    Nathan Gorin

717.    Nathan Gorin served as the Chief Financial Officer and Treasurer of NAAC,

NHELI, NCCI, and Nomura Securities from 2005 and 2007.  SOF ¶ 39; Prahofer 30(b)(6) Dep.

248:14-25.  Mr. Gorin was responsible for maintaining the financial accounts of NAAC, NHELI, and NCCI.  Prahofer 30(b)(6) Dep. 248:15-25, 251:17-20, 258:19-23.  His role was to combine financial information for Nomura's activities in the United States and report that combined information to Tokyo.  Gorin Dep. 25:19-28:2.  Mr. Gorin reported to Larry Wagner, Nomura Holding's Chief Financial Officer.  Gorin Dep. 30:11-16.  Mr. Gorin did not recall his role at NAAC or NHELI, Gorin Dep. 43:7-14, 119:19-120:19, 162:10-22, 165:14-166:6, but he acknowledged "some level of familiarity" with Nomura's RMBS business.  Gorin Dep. 54:6-16.  Moreover, emails show that he was involved in discussions about Nomura's losses on the sale of two RMBS residuals October 2006, including NHELI 2006-HE3.  **PX 1606** at 1-2.

718.     Mr. Gorin signed each of the Registration Statements and the Amendments thereto.  SOF ¶ 42.  He received documents related to the Securitizations, but did not review them.  Gorin Dep. 115:8-18, 169:18-170:4.  Mr. Gorin was not involved with ensuring the accuracy of the representations in the Prospectus Supplements, and did not "have any belief about the accuracy of any representations in the prospectus supplements issued by Nomura during his tenure there."  Gorin Dep. 151:14-20, 170:18-171:12.

### 5.     John McCarthy

719.     Mr. McCarthy signed each of the Registration Statements and the amendments thereto.  SOF ¶ 42; *see also* McCarthy Dep. 121:24-122:6, 124:13-22.  Mr. McCarthy also signed a Resolution of the Board of Directors allowing each Securitization to go forward, by which point Mr. McCarthy "would have seen deal documents on [the Securitization] along the way."  **PX 1351**, **PX 1349**, **PX 1350**, **PX 156**, **PX 157**, **PX 1352, PX 159**; McCarthy Dep. 156:16-158:14.  Mr. McCarthy relied upon Nomura's RMBS business to verify the representations in the Prospectus Supplements and did not review any information that would have allowed him to verify those representations himself.  McCarthy Dep. 86:8-17, 99:10-100:9.

**VII.    FHFA'S RECOVERIES UNDER SECTION 12 AND THE BLUE SKY STATUTES ARE OVER $1 BILLION, AND DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT ANY OF THIS AMOUNT IS ATTRIBUTABLE TO FACTORS OTHER THAN THE MISREPRESENTATIONS AT ISSUE IN THIS ACTION**

      **A.    Depending On The Date of Tender and Interest Rate Applied, FHFA's Recovery Upon Tender of the Certificates Ranges From $808,202,687 to $1,053,411,920**

720.    The GSEs continue to own the Certificates.  Li Direct ¶ 5; Johansen Direct ¶ 5. Section 12 provides that, "upon tender of a security," a successful plaintiff is entitled to recover (a) "the consideration paid for such security;" (b) "with interest thereon;" (c) "less the amount of any income received thereon."  15 U.S.C. § 77*l*(a)(2).

721.    The consideration paid for a certificate may include accrued interest.  Accrued interest represents coupons that have accrued on an RMBS between the last coupon payment date and the settlement date of the security's transfer.  Finkel Direct ¶ 13 n.3.  Moreover, RMBS amortize over time, meaning that portions of the original consideration paid are expected to be returned as principal payments every month.  Finkel Direct ¶ 20.  When the purchaser of an RMBS receives a principal payment, the consideration paid by that purchaser may be viewed as declining by the amount of that payment.  *Id*.

722.    Therefore, to determine the consideration paid for a Certificate, one calculates the original consideration paid for the Certificate (including any accrued interest) less principal payments received by the purchaser through the measurement date.  Finkel Direct ¶ 20.  To account for prejudgment interest, the applicable prejudgment interest rate should be applied to the total consideration (including any accrued interest) paid less principal payments, as of each month, beginning on the date of purchase, and ending on the date of tender.  *Id*.  To determine the recovery upon tender of a Certificate under Section 12, one calculates (a) the total consideration paid by the GSE for the Certificate at the date of purchase (including any accrued interest); *plus* (b) prejudgment interest, calculated on the total consideration paid (including any accrued interest) less principal payments, as of each month, from the date of purchase through the date of tender;

*less* (c) the sum of all principal and coupon payments received by the GSE on the Certificate through the date of tender.  Finkel Direct ¶ 22.

723.    To determine the recovery upon tender of a Certificate under the D.C. and Virginia Blue Sky statutes, one calculates (a) the total consideration paid by the GSE for the Certificate at the date of purchase (including any accrued interest); *plus* (b) mandatory 6% prejudgment interest, calculated on the total consideration paid (including any accrued interest) less principal payments, as of each month, from the date of purchase through the date of tender; *less* (c) the sum of all principal and coupon payments received by the GSE on the Certificate through the date of tender; *plus* (d) costs and reasonable attorneys' fees.  Finkel Direct ¶¶ 29-30.

724.    FHFA's expert, Mr. James K. Finkel, performed these calculations as of two alternative tender dates:  (a) September 2, 2011 (the date the complaint in this Action was filed); and (b) January 31, 2015 (to be supplemented at the time of trial or judgment).  In his calculations, Mr. Finkel utilized three alternative "simple" interest rates (without compounding) for FHFA's recovery under Section 12:  (a) the IRS underpayment rate for large corporate underpayments, which is the Applicable Federal Rate ("AFR") plus 5% interest; (b) 3% interest; and (c) the respective monthly coupon rate of each Certificate.  Finkel Direct ¶ 21.  Mr. Finkel also performed these calculations using the mandatory 6% "simple" interest rate (without compounding) for FHFA's recoveries under the Blue Sky laws as to the four Certificates for which FHFA has asserted Blue Sky claims (the NAA 2005-AR6, NHELI 2006-FM2, NHELI 2007-1, and NHELI 2007-2 Certificates).  Finkel Direct ¶¶ 29-32.  Mr. Finkel did not include costs and reasonable attorneys' fees in his calculation of FHFA's Blue Sky recoveries, as those costs and fees will be the subject of post-judgment submissions by the Parties.  Finkel Direct ¶ 6.

725.    For each Certificate, the consideration paid at purchase, and the principal and coupon payments received by the GSEs as of the lawsuit date (September 2, 2011), are as follows (**PX 1721**):

| GSE | Certificate | Consideration Paid (including accrued interest)[28] | Principal Received as of 9/2/2011[29] | Coupons Received as of 9/2/2011[30] |
|---|---|---|---|---|
| FNM | NAA 2005-AR6 3A1 | $65,979,707 | $36,229,146 | $14,398,211 |
| FRE | NHELI 2006-FM1 1A | $309,591,187 | $272,500,264 | $23,268,559 |
| FRE | NHELI 2006-FM2 1A1 | $525,197,000 | $323,507,554 | $39,781,306 |
| FRE | NHELI 2006-HE3 1A1 | $441,739,000 | $291,248,182 | $32,931,715 |
| FRE | NHELI 2007-1 II1A | $100,548,000 | $39,573,074 | $8,287,240 |
| FRE | NHELI 2007-2 1A1 | $358,847,000 | $188,819,392 | $27,181,982 |
| FRE | NHELI 2007-3 1A1 | $245,105,000 | $104,530,123 | $17,324,141 |
| **Totals** | | **$2,047,006,894** | **$1,256,407,734** | **$163,173,153** |

---

[28]  SOF ¶¶ 49-50.

[29]  Li Direct ¶ 6 & Ex. B; Johansen Direct ¶ 7 & Ex. B.

[30]  Li Direct ¶ 6 & Ex. B; Johansen Direct ¶ 7 & Ex. B.

726.    For each Certificate, the consideration paid at purchase, and the principal and coupon payments received by the GSEs as of January 31, 2015, are as follows (**PX 1722**):

| GSE | Certificate | Consideration Paid (including accrued interest)[31] | Principal Received as of 1/31/2015[32] | Coupons Received as of 1/31/2015[33] |
|-----|-------------|-------------------------------------------|-------------------------------|------------------------------|
| FNM | NAA 2005-AR6 3A1 | $65,979,707 | $42,769,500 | $17,454,887 |
| FRE | NHELI 2006-FM1 1A | $309,591,187 | $282,292,777 | $23,747,498 |
| FRE | NHELI 2006-FM2 1A1 | $525,197,000 | $346,402,924 | $42,054,069 |
| FRE | NHELI 2006-HE3 1A1 | $441,739,000 | $330,943,871 | $34,529,748 |
| FRE | NHELI 2007-1 III1A | $100,548,000 | $52,195,457 | $8,694,906 |
| FRE | NHELI 2007-2 1A1 | $358,847,000 | $234,822,110 | $28,977,870 |
| FRE | NHELI 2007-3 1A1 | $245,105,000 | $127,554,796 | $19,310,598 |
| **Totals** | | **$2,047,006,894** | **$1,416,981,434** | **$174,769,575** |

727.    FHFA's recovery under Section 12 and the Blue Sky statutes for each interest rate scenario specified in Paragraph 724 above, treating the lawsuit date (September 2, 2011) as the tender date, is as follows (**PX 1723**):

| GSE | Certificate | Section 12 Recovery at IRS Underpayment Rate[34] | Section 12 Recovery at 3%[35] | Section 12 Recovery at Coupon Rate[36] | Blue Sky Recovery at 6%[37] |
|-----|-------------|------------------------------------------|----------------------|--------------------------------|-------------------------|
| FNM | NAA 2005-AR6 3A1 | $35,570,778 | $23,040,996 | $29,750,561 | $30,729,642 |
| FRE | NHELI 2006-FM1 1A | $62,873,953 | $30,923,925 | $37,090,924 | N/A |
| FRE | NHELI 2006-FM2 1A1 | $270,636,023 | $204,840,592 | $201,689,446 | $247,773,044 |
| FRE | NHELI 2006-HE3 1A1 | $203,417,649 | $150,727,658 | $150,490,818 | N/A |
| FRE | NHELI 2007-1 III1A | $79,033,190 | $63,717,692 | $60,974,926 | $74,747,698 |
| FRE | NHELI 2007-2 1A1 | $223,518,423 | $175,910,235 | $170,027,608 | $208,974,844 |
| FRE | NHELI 2007-3 1A1 | $178,361,904 | $146,790,864 | $140,574,877 | N/A |
| **Totals** | | **$1,053,411,920** | **$795,951,962** | **$790,599,160** | **$562,225,228** |

---

[31]   SOF ¶¶ 49-50.

[32]   Li Direct ¶ 6 & Ex. B; Johansen Direct ¶¶ 6-7 & Ex. B.

[33]   Li Direct ¶ 6 & Ex. B; Johansen Direct ¶¶ 6-7 & Ex. B.

[34]   **PX 1505**.

[35]   **PX 1506**.

[36]   **PX 1507**.

[37]   **PX 1505-1507**.

728.    FHFA's recovery under Section 12 and the Blue Sky statutes for each interest rate scenario for each Certificate, treating January 31, 2015, as the tender date, is as follows (**PX 1724**):

| GSE | Certificate | Section 12 Recovery at IRS Underpayment Rate[38] | Section 12 Recovery at 3%[39] | Section 12 Recovery at Coupon Rate[40] | Blue Sky Recovery at 6%[41] |
|---|---|---|---|---|---|
| FNM | NAA 2005-AR6 3A1 | $30,446,144 | $16,127,403 | $23,210,207 | $26,499,487 |
| FRE | NHELI 2006-FM1 1A | $58,046,661 | $23,918,968 | $27,298,410 | N/A |
| FRE | NHELI 2006-FM2 1A1 | $278,271,989 | $199,354,919 | $178,794,076 | $261,969,830 |
| FRE | NHELI 2006-HE3 1A1 | $184,383,844 | $122,789,887 | $110,795,129 | N/A |
| FRE | NHELI 2007-1 III1A | $75,294,442 | $56,262,424 | $48,352,543 | $72,867,210 |
| FRE | NHELI 2007-2 1A1 | $200,758,299 | $143,134,718 | $124,024,890 | $191,222,416 |
| FRE | NHELI 2007-3 1A1 | $175,485,014 | $135,060,278 | $117,550,204 | N/A |
|  | **Totals** | **$1,002,686,392** | **$696,648,597** | **$630,025,460** | **$552,558,943** |

729.    Presuming that FHFA would elect the remedy that provides it with the greatest recovery as to each Certificate, and fixing the prejudgment interest rate for FHFA's Blue Sky claims at 6% simple interest, FHFA's aggregate recovery across all seven Certificates, under each of the scenarios discussed above, is as follows (**PX 1725**):

| Tender Date | Prejudgment Interest Rate | Total Recovery[42] |
|---|---|---|
| 9/2/2011 | IRS Underpayment Rate for Section 12; 6% for Blue Sky | $1,053,411,920 |
| 9/2/2011 | 3% for Section 12; 6% for Blue Sky | $890,667,675 |
| 9/2/2011 | Coupon Rate for Section 12; 6% for Blue Sky | $890,381,847 |
| 1/31/2015 | IRS Underpayment Rate for Section 12; 6% for Blue Sky | $1,002,686,392 |
| 1/31/2015 | 3% for Section 12; 6% for Blue Sky | $834,328,076 |
| 1/31/2015 | Coupon Rate for Section 12; 6% for Blue Sky | $808,202,687 |

---

[38]  **PX 1508**.

[39]  **PX 1509**.

[40]  **PX 1510**.

[41]  **PX 1508-1510**.

[42]  **PX 1505-1510**.

**B.      Defendants Do Not Show That The GSEs' Losses Were Caused By Factors Other Than The Misrepresentations**

730.     Defendants' expert, Kerry D. Vandell, Ph.D., provided no admissible, quantitative analysis to support Defendants' negative loss causation defense.  Without such evidence and testimony, "[i]t will be difficult (if not impossible) for the defendants to sustain their burden of showing loss causation" because "to make out a successful defense a party must prove not the mere possibility that some other factor caused the plaintiff's loss but rather that all or an identified portion of plaintiff's loss was caused by that other factor."  See Feb. 18, 2015 Op. & Order re: Post-Settlement Evidence, Dkt. 1289 ("Post-Settlement Op.") at 10 (emphasis added).

731.     Here, Dr. Vandell described the factors that contributed to the housing and mortgage market boom of 2000 to 2006, as well as its subsequent decline, and to the impact of the nationwide decline in home prices and the subsequent deterioration in the economy on the incidence of mortgage default.  Dr. Vandell asserts that the change in macroeconomic conditions, including declines in house prices, increases in unemployment and reductions in market liquidity, were unrelated to the origination of the at-issue loans or any alleged misrepresentations about their characteristics.  See Barth Direct ¶ 6.

732.     However, as FHFA's expert, Dr. James R. Barth, shows, Dr. Vandell incorrectly assumes that the underwriting defects, misrepresentations and omissions of the types FHFA alleges (the "Alleged Underwriting Defects") were unrelated to the macroeconomic factors to which he attributes Plaintiff's losses.  See Barth Direct ¶¶ 8, 33.

733.     First, the Alleged Underwriting Defects contributed to the housing price bubble in the United States (1995 to 2006) by increasing the supply of credit to unqualified borrowers.  Increases in the supply of credit associated with securitization facilitated the unprecedented increases in mortgage lending, the homeownership rate, and housing prices that occurred during the housing boom.  See Barth Direct ¶¶ 8, 10-18.

734.     Specifically, the approval of loans which did not comply with stated underwriting guidelines and the failure to disclose this practice to investors further expanded the supply of credit by enabling more borrowers to qualify for loans.  See Barth Direct ¶ 16.  Thus, the Alleged

Underwriting Defects directly contributed to the housing price bubble by supplying credit to unqualified borrowers that would not have existed had the guidelines been followed.  Barth Direct ¶ 16.

735.    *Second*, the Alleged Underwriting Defects contributed to the unprecedented decline in housing prices that occurred when the housing bubble burst in 2006, not only by contributing to the unsustainable housing price bubble, but also by reducing the quality of loans originated during the housing boom, which exacerbated the resulting housing crisis.  *See* Barth Direct ¶¶ 19-20.

736.    *Finally*, the bursting of the housing price bubble triggered a financial crisis and an ensuing severe recession, which, in turn, further exacerbated the housing crisis.  *See* Barth Direct ¶ 8.  The increase in unemployment reduced the demand for housing (exacerbating the housing price decline) and increased the incidence of delinquencies and defaults.  Banks tightened their lending standards and the market for private-label mortgage-backed securities collapsed, reducing the supply of credit to borrowers, and thereby further reducing the demand for housing (further exacerbating the housing price decline).  *See* Barth Direct ¶ 32.

737.    As Dr. Barth's analysis shows, the declines in home prices, increases in unemployment rates, and reductions in market liquidity that occurred in the period after the issuance of the At-Issue Certificates were, to some extent, caused by the Alleged Underwriting Defects.  Barth Direct ¶ 33.  Thus, by failing to consider the contribution of the Alleged Underwriting Defects to the macroeconomic factors that affected the housing market, Dr. Vandell's remaining opinions relating to the losses on the At-Issue Certificates are wholly unreliable and speculative.

DATED:  New York, New York
        February 20, 2015

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By:  ___/s/ Philippe Z. Selendy_____
     Philippe Z. Selendy
     Richard I. Werder, Jr.
     Jonathan B. Oblak
     Sascha N. Rand
     Manisha M. Sheth
     Andrew R. Dunlap
     51 Madison Avenue, 22nd Floor
     New York, New York 10010

     Richard A. Schirtzer
     865 South Figueroa Street, 10th Floor
     Los Angeles, California 90017

     Jon Corey
     777 6th Street NW, 11th Floor
     Washington, D.C. 20001

     *Attorneys for Plaintiff Federal Housing
     Finance Agency*

EXHIBIT 1

## STATEMENTS IN THE PROSPECTUS SUPPLEMENTS

I. **Statements That Loans Were Originated Or Acquired Generally In Accordance With Applicable Underwriting Guidelines And Criteria**

    A. **Statements That Certain Mortgage Loan Sellers Originated Or Sold 20% Or More Of The Mortgage Loans In A Securitization**[43]

| | |
|---|---|
| NAA 2005-AR6 | The principal originators of the mortgage loans are (i) Alliance Bancorp with respect to approximately 20.60% of the Mortgage Loans by the aggregate principal balance as of the Cut-off Date, (ii) Silver State Mortgage ("Silver State") with respect to approximately 11.82% of the Mortgage Loans by the aggregate principal balance as of the Cut-off Date and (iii) Aegis Mortgage ("Aegis") with respect to approximately 11.21% of the Mortgage Loans by the aggregate principal balance as of the Cut-off Date.  The remainder of the Mortgage Loans were originated by various originators, none of which have originated more than 10% of the Mortgage Loans by aggregate outstanding principal balance as of the Cut-off Date. **PX O0059** at 142. |
| NHELI 2006-FM1 | All of the Mortgage Loans were originated by Fremont Investment & Loan ("Fremont").  **PX O0049** at 6. |
| NHELI 2006-FM2 | All of the Mortgage Loans were originated by Fremont Investment & Loan ("Fremont").  **PX O0045** at 80. |
| NHELI 2006-HE3 | The principal originators of the Mortgage Loans are: People's Choice Home Loan, Inc., with respect to approximately 38.19% of the Mortgage Loans, First NLC Financial Services, LLC, with respect to approximately 14.47% of the Mortgage Loans and Equifirst Corporation, with respect to approximately 10.77% of the Mortgage Loans.  The remainder of the Mortgage Loans were originated by various originators, none of which originated 10% or more of the Mortgage Loans.  **PX O0041** at 6-7. |

---

[43] For those originators that originated at least 20% of the loans in any securitization (the "Named Originators"), the Prospectus Supplements specifically stated that the mortgage loans originated by that originator were originated or acquired generally in accordance with the originator's underwriting guidelines.

EXHIBIT 1

### A.      Statements That Certain Mortgage Loan Sellers Originated Or Sold 20% Or More Of The Mortgage Loans In A Securitization[43]

NHELI 2007-1    The principal originator of the Group I Mortgage Loans is First National Bank of Nevada, which originated approximately 35.88% of the Group I Mortgage Loans, by aggregate principal balance as of the Cut-off Date. The remainder of the Group I Mortgage Loans were originated by various originators, none of which originated 10% or more of the Group I Mortgage Loans. . . . The principal originator of the Group II Mortgage Loans is Silver State Financial Services, Inc., d/b/a Silver State Mortgage which originated approximately 31.67% of the Group II Mortgage Loans by aggregate principal balance of the Group II Mortgage Loans as of the Cut-off Date.  The remainder of the Mortgage Loans were originated by various originators, none of which originated 10% or more of the Mortgage Loans. **PX O0072** at 9.

NHELI 2007-2    The principal originators of the Mortgage Loans are: Ownit Mortgage Solutions, Inc., with respect to approximately 42.38% of the Mortgage Loans, and First NLC Financial Services, LLC, with respect to approximately 11.56% of the Mortgage Loans.  The remainder of the Mortgage Loans were originated by various originators, none of which originated 10% or more of the Mortgage Loans.  **PX O0080** at 7.

NHELI 2007-3    The principal originator of the Mortgage Loans is ResMAE Mortgage Corporation, with respect to approximately 77.61% of the Mortgage Loans. The remainder of the Mortgage Loans were originated by various originators, none of which originated 10% or more of the Mortgage Loans. **PX O0051** at 8.

**B.   Statements That The Loans Were Originated In Accordance With Guidelines**

NAA 2005-AR6    The Mortgage Loans have been purchased by the seller from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section.  **PX O0059** at 93.

NHELI 2006-FM1   All of the mortgage loans were originated or acquired by Fremont, generally in accordance with the underwriting criteria described in this section.  The following is a summary of the underwriting guidelines believed by the Depositor to have been applied, with some variation, by Fremont.  **PX O0049** at 70.

NHELI 2006-FM2   All of the mortgage loans were originated or acquired by Fremont, generally in accordance with the underwriting criteria described in this section.  The following is a summary of the underwriting guidelines believed by the depositor to have been applied, with some variation, by Fremont.  **PX O0045** at 81.

NHELI 2006-HE3   All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section (with the exception of the Mortgage Loans originated by People's Choice Home Loan, Inc. which were originated in accordance with the People's Choice Home Loan, Inc. Underwriting Standards described above).  **PX O0041** at 88.

**People's Choice**
The Mortgage Loans were generally originated by People's Choice Home Loan, Inc., a Wyoming corporation ("PCHLI"), in accordance with the underwriting criteria described in this section and detailed in the print and on-line manuals that our underwriters use in making their credit decisions ("Underwriting Guidelines"); provided however that certain of the more seasoned Mortgage Loans included in the Mortgage Pool may have been originated under underwriting guidelines which are substantially similar to the Underwriting Guidelines described in this section but may have differences with respect to pricing, FICO scores and other program attributes.  **PX O0041** at 81.

EXHIBIT 1

**B.     Statements That The Loans Were Originated In Accordance With Guidelines**

NHELI 2007-1     All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section.  **PX O0072** at 114.

**First National Bank of Nevada**
The mortgage loans were originated or acquired through retail, wholesale and correspondent channels or from FNBN's affiliate, First National Bank of Arizona and, in every case, generally in accordance with FNBN's "alternative" underwriting guidelines.  **PX O0072** at 109-110.

**Silver State**
Silver State Mortgage's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed Mortgage Property as collateral.  **PX O0072** at 113.

NHELI 2007-2     All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section.  **PX O0080** at 91.

**Ownit**
Ownit provides loans to borrowers not only for the purpose of purchasing homes, but also for debt consolidation and refinancing existing mortgages in accordance with the RightLoan Underwriting Guidelines.  **PX O0080** at 89.

NHELI 2007-3     All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section.  **PX O0051** at 92.

**ResMAE**
The information set forth in the following paragraphs of this section contains a brief description of the underwriting guidelines used for Mortgage Loans originated by ResMAE Mortgage Corporation ("ResMAE").  **PX O0051** at 88.

EXHIBIT 1

**C.   Statements That Originators Had Evaluated The Borrowers' Ability To Repay The Loans**

| | |
|---|---|
| NAA 2005-AR6 | Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. **PX O0059** at 93. |

NHELI 2006-FM1   Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt . . . . **PX O0049** at 71.

NHELI 2006-FM2   Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt . . . . **PX O0045** at 81.

NHELI 2006-HE3   Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. **PX O0041** at 89.

**People's Choice**
PCHLI reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio ("DTI") to determine the applicant's ability to repay the loan . . . . **PX O0041** at 82.

NHELI 2007-1   Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. **PX O0072** at 115.

5

EXHIBIT 1

C. **Statements That Originators Had Evaluated The Borrowers' Ability To Repay The Loans**

**First National Bank of Nevada**
FNBN's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan . . . . **PX O0072** at 111.

**Silver State**
Silver State Mortgage's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan . . . . **PX O0072** at 113.

NHELI 2007-2    Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. **PX O0080** at 92.

**Ownit**
The Underwriting Guidelines and Credit Matrices of the RightLoan are designed to be used as a guide in determining the credit worthiness of the borrower and his/her ability to repay. **PX O0080** at 89.

NHELI 2007-3    Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. **PX O0051** at 93.

**ResMAE**
The underwriting standards of ResMAE are primarily intended to assess the ability and willingness of the borrower to repay the debt . . . . **PX O0051** at 88.

### D.       Statements Regarding Debt-To-Income Ratios

| | |
|---|---|
| NAA 2005-AR6 | Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.  Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage not in excess of 60% of the prospective borrower's gross income.  The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria, including, without limitation, the loan-to-value ratio of the mortgage loan.  **PX O0059** at 93-94. |

| | |
|---|---|
| NHELI 2006-FM1 | Fremont's underwriting guidelines under the Scored Programs with respect to each rating category generally require . . . debt to income ratios of 55% or less on mortgage loans with loan-to-value ratios of 90% or less, however, debt to income ratios of 50% or less are required on loan-to-value ratios greater than 90%.  **PX O0049** at 73. |

| | |
|---|---|
| NHELI 2006-FM2 | Fremont's underwriting guidelines under the Scored Programs with respect to each rating category generally require . . . debt to income ratios of 55% or less on mortgage loans with loan-to-value ratios of 90% or less, however, debt to income ratios of 50% or less are required on loan-to-value ratios greater than 90%.  **PX O0045** at 84. |

| | |
|---|---|
| NHELI 2006-HE3 | Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.  Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage not in excess of 60% of the prospective borrower's gross income.  The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria, including, without limitation, the loan-to-value ratio of the mortgage loan.  **PX O0041** at 89. |

**People's Choice**
Under each program, PCHLI reviews the applicant's source of income,

**EXHIBIT 1**

### D.      Statements Regarding Debt-To-Income Ratios

calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio ("DTI") to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property appraisal.  **PX O0041** at 82.

NHELI 2007-1      Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.  Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage not in excess of 60% of the prospective borrower's gross income.  The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria, including, without limitation, the loan-to-value ratio of the mortgage loan.  **PX O0072** at 115.

**First National Bank of Nevada**
Based on the data provided in the application and certain verifications (if required), a determination will have been made that the borrower's monthly income (if required to be stated or verified) should be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the Mortgaged Property (such as property taxes, standard hazard insurance and other fixed obligations other than housing expenses).  Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and other fixed obligations equal no more than a specified percentage of the prospective borrower's gross income.  The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria including, but not limited to, the loan-to-value ratio of the mortgage loan or the amount of liquid assets available to the borrower after origination.  **PX O0072** at 111.

**D.    Statements Regarding Debt-To-Income Ratios**

**Silver State**

Based on the data provided in the application and certain verifications (if required), a determination will have been made that the borrower's monthly income (if required to be stated or verified) should be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the Mortgaged Property (such as property taxes, standard hazard insurance and other fixed obligations other than housing expenses).  Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and other fixed obligations equal no more than a specified percentage of the prospective borrower's gross income.  The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria including, but not limited to, the loan-to-value ratio of the mortgage loan or the amount of liquid assets available to the borrower after origination.  **PX O0072** at 114.

NHELI 2007-2    Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.  Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage not in excess of 60% of the prospective borrower's gross income.  The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria, including, without limitation, the loan-to-value ratio of the mortgage loan.  **PX O0080** at 92.

**Ownit**

Several aspects are considered in determining the borrower's capacity or ability to repay the loan.  The key factors are employment documentation, history and amount of income used to derive the debt to income ratios. . . . Base debt to income ratios are set at 45% or 50% depending on credit score, LTV, documentation type and if the borrower is a first time home buyer.  In some cases the maximum debt ratio may increase to 55% based on meeting a minimum disposable income requirement.  **PX O0080** at 90.

NHELI 2007-3    Based on the data provided in the application and certain verifications (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet their monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than

### D.    Statements Regarding Debt-To-Income Ratios

housing expenses.  Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months equal no more than a specified percentage not in excess of 60% of the prospective borrower's gross income.  The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria, including, without limitation, the loan-to-value ratio of the mortgage loan.  **PX O0051** at 93.

**ResMAE**
The underwriting standards of ResMAE are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. ResMAE considers, among other things, a mortgagor's credit history, repayment ability and debt service-to income ratio (referred to herein as the Debt Ratio), as well as the value, type and use of the mortgaged property. **PX O0051** at 88.

EXHIBIT 1

### E.      Statements Regarding Verification Of Income And Employment

#### 1.      General Statements Regarding Verification Of Income And Employment

NAA 2005-AR6      Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources.  With respect to mortgaged properties consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes.  In the case of certain borrowers with acceptable compensating factors, income and/or assets may not be required to be stated (or verified) in connection with the loan application.  **PX O0059** at 93.

NHELI 2006-FM1      There are three documentation types, Full Documentation ("Full Documentation"), Easy Documentation ("Easy Documentation") and Stated Income ("Stated Income").  Fremont's underwriters verify the income of each applicant under various documentation types as follows: under Full Documentation, applicants are generally required to submit verification of stable income for the periods of one to two years preceding the application dependent on credit profile . . . .  **PX O0049** at 72.

NHELI 2006-FM2      There are three documentation types, Full Documentation ("**Full Documentation"),** Easy Documentation ("**Easy Documentation**") and Stated Income ("**Stated Income**").  Fremont's underwriters verify the income of each applicant under various documentation types as follows: under Full Documentation, applicants are generally required to submit verification of stable income for the periods of one to two years preceding the application dependent on credit profile . . . .  **PX O0045** at 82.

NHELI 2006-HE3      Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower generally will have furnished

EXHIBIT 1

1. **General Statements Regarding Verification Of Income And Employment**

certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources.  With respect to mortgaged properties consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes.  In the case of certain borrowers with acceptable compensating factors, income and/or assets may not be required to be stated (or verified) in connection with the loan application.  **PX O0041** at 89.

**People's Choice**
The Underwriting Guidelines specify which applicants may qualify for "full documentation," "lite documentation," and "stated income documentation" programs.  The specific income documentation required for PCHLI's various programs varies as follows: Under the full documentation program, applicants usually are required to submit one year's IRS Form W-2 and Form 1040 and a year-to-day paystub or 12 or 24 months personal or business bank statements. . . . All of these programs require, for salaried employees, a telephone verification of the applicant's employment.  For a self-employed borrower, there is a telephone verification, as well as additional documentation to verify the existence of the business owned by the borrower.  In evaluating the credit quality of borrowers, PCHLI utilizes Credit Scores (as defined below), mortgage or rent-payment history, job stability and income.  The Underwriting Guidelines require all borrowers to have demonstrated a willingness to pay.  **PX O0041** at 83.

**People's Choice**
PCHLI thoroughly reviews all credit, income, character and collateral information provided by the broker for completeness, accuracy and authenticity.  For example, PCHLI . . . verbally verifies employment, verifies income when appropriate . . . .  **PX O0041** at 82.

**People's Choice**
PCHLI thoroughly reviews all credit, income, character and collateral information provided by the PCHLI loan officer and makes a credit

1.      **General Statements Regarding Verification Of Income And Employment**

decision based on the borrower's application for a mortgage loan using the same processes and guidelines used in wholesale transactions.  **PX O0041** at 82.

NHELI 2007-1    Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources.  With respect to mortgaged properties consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes.  In the case of certain borrowers with acceptable compensating factors, income and/or assets may not be required to be stated (or verified) in connection with the loan application.  **PX O0072** at 115.

**First National Bank of Nevada**
A prospective borrower applying for a mortgage loan is required to complete an application, which elicits pertinent information about the prospective borrower including, depending upon the loan program, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired.  . . . If required by the underwriting guidelines, employment verification is obtained either from the prospective borrower's employer or through analysis of copies of [the] borrower's federal withholding (IRS W-2) forms and/or current payroll earnings statements.  . . . In the case of investment properties and two- to four-unit dwellings, income derived from the Mortgaged Property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources, if applicable. With respect to Mortgaged Property consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes.  **PX O0072** at 111.

Under the full/alternate documentation program, the prospective borrower's

**EXHIBIT 1**

1. **General Statements Regarding Verification Of Income And Employment**

employment, income and assets are verified through written or telephonic communication.  Alternative methods of employment and income verification generally include using copies of federal withholding forms (IRS W-2) or pay stubs.  Alternative methods of asset verification generally include using copies of the borrower's recent bank statements.  All loans may be submitted under the full/alternate documentation program.  **PX O0072** at 112.

**Silver State**
A prospective borrower applying for a mortgage loan is required to complete an application, which elicits pertinent information about the prospective borrower including, depending upon the loan program, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired.  If required by the underwriting guidelines, employment verification is obtained either from the prospective borrower's employer or through analysis of copies of [the] borrower's federal withholding (IRS W-2) forms and/or current payroll earnings statements. . . . In the case of investment properties and two- to four-unit dwellings, income derived from the Mortgaged Property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources, if applicable.  With respect to Mortgaged Property consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes.  **PX O0072** at 113-114.

NHELI 2007-2    Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources.  With respect to mortgaged properties consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes.  In the case of certain borrowers with acceptable compensating factors, income and/or assets may not be required to be

14

1.    **General Statements Regarding Verification Of Income And Employment**

stated (or verified) in connection with the loan application.  **PX O0080** at 91-92.

NHELI 2007-3    Generally, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower generally will have furnished certain information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the borrower from other sources.  With respect to mortgaged properties consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes.  In the case of certain borrowers with acceptable compensating factors, income and/or assets may not be required to be stated (or verified) in connection with the loan application.  **PX O0051** at 92-93.

**ResMAE**
ResMAE's underwriters verify the income of each applicant under the Full Documentation and Limited Documentation Programs.  Under Full Documentation, applicants are generally required to submit verification of stable year to date income and the preceding year's income . . . .  Under all programs, the income stated must be reasonable and customary for the applicant's line of work; also, a pre-closing audit is conducted to confirm that the borrower is employed as stated on the mortgage application.  Verification may be made through phone contact to the place of business, obtaining a valid business license or through Nexis On-Line Services.  **PX O0051** at 89.

15

EXHIBIT 1

### 2. Statements Regarding Verification Of Income And Employment Concerning Reduced Documentation Programs

| | |
|---|---|
| NAA 2005-AR6 | Certain of the Mortgage Loans have been originated under reduced documentation, no-documentation or no-ratio programs, which require less documentation and verification than do traditional full documentation programs.  Generally, under a reduced documentation program, verification of either a borrower's income or assets, but not both, is undertaken by the originator.  Under a no-ratio program, certain borrowers with acceptable compensating factors will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken.  Under a no-documentation program, no verification of a borrower's income or assets is undertaken by the originator.  The underwriting for such Mortgage Loans may be based primarily or entirely on an appraisal of the Mortgaged Property, the loan-to-value ratio at origination and/or the borrower's credit score.  **PX O0059** at 95. |
| NHELI 2006-FM1 | There are three documentation types, Full Documentation ("Full Documentation"), Easy Documentation ("Easy Documentation") and Stated Income ("Stated Income").  Fremont's underwriters verify the income of each applicant under various documentation types as follows: . . . under Easy Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements . . . . **PX O0049** at 72. |
| NHELI 2006-FM2 | There are three documentation types, Full Documentation ("**Full Documentation**"), Easy Documentation ("**Easy Documentation**") and Stated Income ("**Stated Income**").  Fremont's underwriters verify the income of each applicant under various documentation types as follows: . . . under Easy Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements . . . . **PX O0045** at 82. |
| NHELI 2006-HE3 | Certain of the Mortgage Loans have been originated under reduced documentation, no-documentation or no-ratio programs, which require less documentation and verification than do traditional full documentation programs.  Generally, under a reduced documentation program, verification of either a borrower's income or assets, but not both, is undertaken by the originator.  Under a no-ratio program, certain borrowers with acceptable compensating factors will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken.  Under a no-documentation program, no verification of a borrower's income or assets is undertaken by the |

16

2.      **Statements Regarding Verification Of Income And Employment Concerning Reduced Documentation Programs**

originator.  The underwriting for such Mortgage Loans may be based primarily or entirely on an appraisal of the Mortgaged Property, the loan-to-value ratio at origination and/or the borrower's credit score.  **PX O0041** at 90.

**People's Choice**
The Underwriting Guidelines specify which applicants may qualify for "full documentation," "lite documentation," and "stated income documentation" programs.  The specific income documentation required for PCHLI's various programs varies as follows: . . . Under the lite documentation program, applicants usually are required to submit verification of stable income for at least 6 months, such as 6 consecutive months of complete personal or business checking account bank statements or a current paycheck stub with at least 6 months' year-to-date information.  . . . All of these programs require, for salaried employees, a telephone verification of the applicant's employment.  For a self-employed borrower, there is a telephone verification, as well as additional documentation to verify the existence of the business owned by the borrower.  In evaluating the credit quality of borrowers, PCHLI utilizes Credit Scores (as defined below), mortgage or rent-payment history, job stability and income.  The Underwriting Guidelines require all borrowers to have demonstrated a willingness to pay.  **PX O0041** at 83.

NHELI 2007-1      Certain of the Mortgage Loans have been originated under reduced documentation, no-documentation or no-ratio programs, which require less documentation and verification than do traditional full documentation programs.  Generally, under a reduced documentation program, verification of either a borrower's income or assets, but not both, is undertaken by the originator.  Under a no-ratio program, certain borrowers with acceptable compensating factors will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken.  Under a no-documentation program, no verification of a borrower's income or assets is undertaken by the originator.  The underwriting for such Mortgage Loans may be based primarily or entirely on an appraisal of the Mortgaged Property, the loan-to-value ratio at origination and/or the borrower's credit score.  **PX O0072** at 116-117.

**First National Bank of Nevada**
In addition to the "full/alternate" underwriting guidelines, FNBN also originates or purchases loans that have been originated under certain limited documentation programs designed to streamline the loan underwriting process.  These "stated income," "no ratio," "no income/no

2.      **Statements Regarding Verification Of Income And Employment Concerning Reduced Documentation Programs**

assets," "stated income/stated assets," "no documentation with assets," "no documentation" and "lite documentation" programs may not require income, employment or asset verifications.  Generally, in order to be eligible for a limited or no documentation program, the Mortgaged Property must have a loan-to-value ratio that supports the amount of the mortgage loan and the prospective borrower must have a credit history that demonstrates an established ability to repay indebtedness in a timely fashion.  **PX O0072** at 112.

Under the stated income documentation and the no ratio programs, more emphasis is placed on a prospective borrower's credit score and on the value and adequacy of the Mortgaged Property as collateral and other assets of the prospective borrower rather than on income underwriting.  The stated income documentation program requires prospective borrowers to provide information regarding their assets and income.  Information regarding assets is verified through written communications or bank statements.  Information regarding income is not verified.  The no ratio program requires prospective borrowers to provide information regarding their assets, which is then verified through written communications or bank statements.  The no ratio program does not require prospective borrowers to provide information regarding their income.  In both the stated income and no ratio programs, the employment history is verified through written or telephonic communication.  **PX O0072** at 112.

Under the no income/no assets program, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the Mortgaged Property as collateral.  Income and assets are not stated on the prospective borrower's application.  Disclosure of employment is required and verified through written or telephonic communication.  **PX O0072** at 112.

Under the stated income/stated assets program, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the Mortgaged Property as collateral.  Income is stated on the prospective borrower's application but is not verified.  Assets are also stated on the application but are not verified.  Employment is verified through written or telephonic communication.  **PX O0072** at 112.

Under the no documentation with assets and no documentation programs, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the Mortgaged Property as collateral.  Under the no documentation with assets program, a prospective borrower's assets are

**EXHIBIT 1**

2.     **Statements Regarding Verification Of Income And Employment Concerning Reduced Documentation Programs**

stated and verified through written communication or bank statements.  A prospective borrower is not required to provide information regarding income or employment.  Under the no documentation with assets program, a prospective borrower's income and employment are not stated or verified but assets are verified.  Under the no documentation program, a prospective borrower's income, assets and employment are not stated or verified.  **PX O0072** at 112-113.

The lite documentation programs are loan programs for prospective borrowers to obtain mortgage loans that FNBN has determined to be of sub-prime quality.  Under these programs, prospective borrowers are generally qualified based on verification of adequate cash flows by means of personal or business bank statements for the previous twelve or twenty-four months.  **PX O0072** at 113.

NHELI 2007-2     Certain of the Mortgage Loans have been originated under reduced documentation, no-documentation or no-ratio programs, which require less documentation and verification than do traditional full documentation programs.  Generally, under a reduced documentation program, verification of either a borrower's income or assets, but not both, is undertaken by the originator.  Under a no-ratio program, certain borrowers with acceptable compensating factors will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken.  Under a no-documentation program, no verification of a borrower's income or assets is undertaken by the originator.  The underwriting for such Mortgage Loans may be based primarily or entirely on an appraisal of the Mortgaged Property, the loan-to-value ratio at origination and/or the borrower's credit score.  **PX O0080** at 93.

NHELI 2007-3     Certain of the Mortgage Loans have been originated under reduced documentation, no-documentation or no-ratio programs, which require less documentation and verification than do traditional full documentation programs.  Generally, under a reduced documentation program, verification of either a borrower's income or assets, but not both, is undertaken by the originator.  Under a no-ratio program, certain borrowers with acceptable compensating factors will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken.  Under a no-documentation program, no verification of a borrower's income or assets is undertaken by the originator.  The underwriting for such Mortgage Loans may be based primarily or entirely on an appraisal of the Mortgaged Property, the loan-to-value ratio at origination and/or the borrower's credit score.  **PX O0051**

**2.     Statements Regarding Verification Of Income And Employment Concerning Reduced Documentation Programs**

at 94.

**ResMAE**

ResMAE's underwriters verify the income of each applicant under the Full Documentation and Limited Documentation Programs. . . . under Limited Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements. . . .  Under all programs, the income stated must be reasonable and customary for the applicant's line of work; also, a pre-closing audit is conducted to confirm that the borrower is employed as stated on the mortgage application. Verification may be made through phone contact to the place of business, obtaining a valid business license or through Nexis On-Line Services.  **PX O0051** at 89.

EXHIBIT 1

3.      **Statements Regarding Verification Of Income And Employment Concerning Stated Income Programs**[44]

NHELI 2006-FM1   There are three documentation types, Full Documentation ("Full Documentation"), Easy Documentation ("Easy Documentation") and Stated Income ("Stated Income"). Fremont's underwriters verify the income of each applicant under various documentation types as follows: . . . under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application. The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work. **PX O0049** at 72.

NHELI 2006-FM2   There are three documentation types, Full Documentation ("**Full Documentation**"), Easy Documentation ("**Easy Documentation**") and Stated Income ("**Stated Income**"). Fremont's underwriters verify the income of each applicant under various documentation types as follows: . . . under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application. The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work. **PX O0045** at 82.

NHELI 2006-HE3   **People's Choice**
The Underwriting Guidelines specify which applicants may qualify for "full documentation," "lite documentation," and "stated income documentation" programs. The specific income documentation required for PCHLI's various programs varies as follows: . . . Under the stated income documentation program, an applicant will be qualified based upon monthly income as stated on the mortgage loan application, if the applicant meets certain criteria. The income stated must be reasonable for the job and credit profile. . . . All of these programs require, for salaried employees, a telephone verification of the applicant's employment. For a self-employed borrower, there is a telephone verification, as well as additional documentation to verify the existence of the business owned by the borrower. In evaluating the credit quality of borrowers, PCHLI utilizes Credit Scores (as defined below), mortgage or rent-payment history, job stability and income. The Underwriting Guidelines require all borrowers to have demonstrated a willingness to pay. **PX O0041** at 83.

NHELI 2007-3   **ResMAE**
ResMAE's underwriters verify the income of each applicant under the Full Documentation and Limited Documentation Programs. . . . Under Stated

---

[44]   Only four of the seven Prospectus Supplements contained explicit representations that the originators' guidelines required a borrower's stated income to be reasonable and/or consistent with the borrower's occupation.

**EXHIBIT 1**

3.     **Statements Regarding Verification Of Income And Employment Concerning Stated Income Programs**[44]

Income, applicants are qualified based on monthly income as stated on the mortgage application.  Under all programs, the income stated must be reasonable and customary for the applicant's line of work; also, a pre-closing audit is conducted to confirm that the borrower is employed as stated on the mortgage application.  Verification may be made through phone contact to the place of business, obtaining a valid business license or through Nexis On-Line Services.  **PX O0051** at 89.

### F.    Statements Regarding Adequacy Of Mortgaged Collateral

NAA 2005-AR6    The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator.  **PX O0059** at 94.

NHELI 2006-FM1   Fremont's underwriting guidelines are primarily intended . . . to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  **PX O0049** at 71.

Fremont's underwriting guidelines . . . require an appraisal of the mortgaged property, and if appropriate, a review appraisal.  **PX O0049** at 72.

NHELI 2006-FM2   Fremont's underwriting guidelines are primarily intended . . . to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  **PX O0045** at 81.

Fremont's underwriting guidelines . . . require an appraisal of the mortgaged property, and if appropriate, a review appraisal.  **PX O0045** at 83-84.

NHELI 2006-HE3   The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator.  **PX O0041** at 89.

**People's Choice**
The Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure and require the underwriters to be satisfied that the value of the property being financed, as reflected by an appraisal and a review of the appraisal, supports the outstanding loan balance at time of funding of the PCHLI loan.  **PX O0041** at 82-83.

NHELI 2007-1    The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator.  **PX O0072** at 116.

**First National Bank of Nevada**
FNBN's underwriting guidelines are primarily intended to evaluate . . . the value and adequacy of the proposed Mortgaged Property as collateral. . . . The adequacy of the Mortgaged Property as security for repayment of the related mortgage loan will generally have been determined by an appraisal

23

**F.      Statements Regarding Adequacy Of Mortgaged Collateral**

in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  **PX O0072** at 111.

**Silver State**
Silver State Mortgage's underwriting guidelines are primarily intended to evaluate . . . the value and adequacy of the proposed Mortgaged Property as collateral. . . . The adequacy of the Mortgaged Property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  **PX O0072** at 113-14.

NHELI 2007-2     The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator.  **PX O0080** at 92.

**Ownit**
Ownit will evaluate the property by reviewing uniform residential real estate appraisal reports, along with other data sources, to determine whether the collateral is sufficient to secure the mortgage.  **PX O0080** at 89.

NHELI 2007-3     The adequacy of the Mortgaged Property as security for repayment of the related Mortgage Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator.  **PX O0051** at 93.

**ResMAE**
The underwriting standards of ResMAE are primarily intended . . . to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan."  **PX O0051** at 88.

The underwriting guidelines of ResMAE . . . generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards, and if appropriate, a review appraisal.  **PX O0051** at 89.

EXHIBIT 1

### G.   Statements Regarding Compliance With Uniform Standards of Professional Appraisal Practice

| | |
|---|---|
| NAA 2005-AR6 | All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.  **PX O0059** at 94. |
| NHELI 2006-FM1 | Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  **PX O0049** at 72.[45] |
| NHELI 2006-FM2 | Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  **PX O0045** at 83. |
| NHELI 2006-HE3 | All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.  **PX O0041** at 89. |
| NHELI 2007-1 | All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.  **PX O0072** at 116. |

**First National Bank of Nevada**
All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.  **PX O0072** at 111.

**Silver State**
All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.  **PX O0072** at 114.

---

[45]   The Uniform Residential Appraisal Report (Freddie Mac Form 70/Fannie Mae Form 1004) includes an appraiser's certification, which states in pertinent part, "I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared."  *See* **PX 1414** (Fannie Mae Form 1004, Uniform Residential Appraisal Report, https://www.fanniemae.com/content/guide_form/1004.pdf).

EXHIBIT 1

### G.   Statements Regarding Compliance With Uniform Standards of Professional Appraisal Practice

NHELI 2007-2    All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.  **PX O0080** at 92.

**Ownit**

All appraisals should conform to the Uniform Standards of Professional Appraisal Practices.  **PX O0080** at 91.

NHELI 2007-3    All appraisals conform to the Uniform Standards of Professional Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.  **PX O0051** at 93.

**ResMAE**

The underwriting guidelines of ResMAE . . . generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards . . . .  Each Uniform Residential Appraisal Report . . . .  **PX O0051** at 89-90.

### H.   Statements Regarding Hazard And Title Insurance

NAA 2005-AR6

**Hazard Insurance**

Generally, each Agreement for a trust fund composed of mortgage loans will require the servicer to cause the borrower on each mortgage loan to maintain a hazard insurance policy (including flood insurance coverage, if obtainable, to the extent the property is located in a federally designated flood area, in an amount as is required under applicable guidelines) providing for the level of coverage that is required under the related Mortgage or, if any Mortgage permits its holder to dictate to the borrower the insurance coverage to be maintained on the related Mortgaged Property, then the level of coverage that is consistent with the Servicing Standard. **PX O0059** at 224.

**Title Insurance**

To the extent provided in the prospectus supplement the depositor will, for each Asset, assign representations and warranties, as of a specified date . . . covering, by way of example, the following types of matters: . . . in the case of a mortgage loan, the existence of title insurance insuring the lien priority of the mortgage loan and, in the case of a contract, that the contract creates a valid first security interest in or lien on the related manufactured home. **PX O0059** at 215.

NHELI 2006-FM1

Fremont requires title insurance on all first mortgage loans, which are secured by liens on real property.  Fremont also requires that fire and extended coverage casualty insurance be maintained on the secured property in an amount at least equal to the principal balance of the related loan or the replacement cost of the property, whichever is less.  **PX O0049** at 72.

NHELI 2006-FM2

Fremont requires title insurance on all first mortgage loans, which are secured by liens on real property.  Fremont also requires that fire and extended coverage casualty insurance be maintained on the secured property in an amount at least equal to the principal balance of the related loan or the replacement cost of the property, whichever is less.  **PX O0045** at 83.

NHELI 2006-HE3

**Hazard Insurance**

Generally, each Agreement for a trust fund composed of mortgage loans will require the servicer to cause the borrower on each mortgage loan to maintain a hazard insurance policy (including flood insurance coverage, if obtainable, to the extent the property is located in a federally designated flood area, in an amount as is required under applicable guidelines) providing for the level of coverage that is required under the related Mortgage or, if any Mortgage permits its holder to dictate to the borrower

27

EXHIBIT 1

**H.      Statements Regarding Hazard And Title Insurance**

the insurance coverage to be maintained on the related Mortgaged Property, then the level of coverage that is consistent with the Servicing Standard. **PX O0041** at 282.

**Title Insurance**

To the extent provided in the prospectus supplement the depositor will, for each Asset, assign representations and warranties, as of a specified date . . . covering, by way of example, the following types of matters: . . . in the case of a mortgage loan, the existence of title insurance insuring the lien priority of the mortgage loan and, in the case of a contract, that the contract creates a valid first security interest in or lien on the related manufactured home. **PX O0041** at 273.

NHELI 2007-1      **Hazard Insurance**

Generally, each Agreement for a trust fund composed of mortgage loans will require the servicer to cause the borrower on each mortgage loan to maintain a hazard insurance policy (including flood insurance coverage, if obtainable, to the extent the property is located in a federally designated flood area, in an amount as is required under applicable guidelines) providing for the level of coverage that is required under the related Mortgage or, if any Mortgage permits its holder to dictate to the borrower the insurance coverage to be maintained on the related Mortgaged Property, then the level of coverage that is consistent with the Servicing Standard. **PX O0072** at 356.

**Title Insurance**

To the extent provided in the prospectus supplement the depositor will, for each Asset, assign representations and warranties, as of a specified date . . . covering, by way of example, the following types of matters: . . . in the case of a mortgage loan, the existence of title insurance insuring the lien priority of the mortgage loan and, in the case of a contract, that the contract creates a valid first security interest in or lien on the related manufactured home. **PX O0072** at 347.

NHELI 2007-2      **Hazard Insurance**

Generally, each Agreement for a trust fund composed of mortgage loans will require the servicer to cause the borrower on each mortgage loan to maintain a hazard insurance policy (including flood insurance coverage, if obtainable, to the extent the property is located in a federally designated flood area, in an amount as is required under applicable guidelines) providing for the level of coverage that is required under the related Mortgage or, if any Mortgage permits its holder to dictate to the borrower the insurance coverage to be maintained on the related Mortgaged Property, then the level of coverage that is consistent with the Servicing Standard.

**EXHIBIT 1**

**H.     Statements Regarding Hazard And Title Insurance**

**PX O0080** at 309.

**Title Insurance**
To the extent provided in the prospectus supplement the depositor will, for
each Asset, assign representations and warranties, as of a specified date . . .
covering, by way of example, the following types of matters: . . . in the case
of a mortgage loan, the existence of title insurance insuring the lien priority
of the mortgage loan and, in the case of a contract, that the contract creates
a valid first security interest in or lien on the related manufactured home.
**PX O0080** at 300.

NHELI 2007-3    **Hazard Insurance**
Generally, each Agreement for a trust fund composed of mortgage loans
will require the servicer to cause the borrower on each mortgage loan to
maintain a hazard insurance policy (including flood insurance coverage, if
obtainable, to the extent the property is located in a federally designated
flood area, in an amount as is required under applicable guidelines)
providing for the level of coverage that is required under the related
Mortgage or, if any Mortgage permits its holder to dictate to the borrower
the insurance coverage to be maintained on the related Mortgaged Property,
then the level of coverage that is consistent with the Servicing Standard.
**PX O0051** at 300.

**Title Insurance**
To the extent provided in the prospectus supplement the depositor will, for
each Asset, assign representations and warranties, as of a specified date . . .
covering, by way of example, the following types of matters: . . . in the case
of a mortgage loan, the existence of title insurance insuring the lien priority
of the mortgage loan and, in the case of a contract, that the contract creates
a valid first security interest in or lien on the related manufactured home.
**PX O0051** at 291.

**ResMAE**
ResMAE requires title insurance on all first mortgage loans secured by
liens on real property.  ResMAE also requires that fire and extended
coverage casualty insurance be maintained on the secured property in an
amount at least equal to the principal balance of the related mortgage loan
or the replacement cost of the premises, whichever is less.  **PX O0051** at
90.

**EXHIBIT 1**

### I.     Statements Regarding Compliance With Federal And State Laws

NAA 2005-AR6     [T]he seller will represent and warrant, as of the Closing Date, that, among other things: . . . (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws[.] **PX O0059** at 148.

NHELI 2006-FM1   Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations . . . . **PX O0049** at 72.

[T]he seller will represent and warrant, as of the Closing Date, that, among other things: . . . (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws[.] **PX O0049** at 139.

NHELI 2006-FM2   Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations . . . . **PX O0045** at 82.

[T]he sponsor will represent and warrant, as of the Closing Date, that, among other things: . . . (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws[.] **PX O0045** at 171.

NHELI 2006-HE3   [T]he sponsor will represent and warrant, as of the Closing Date, that, among other things: . . . (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws[.] **PX O0041** at 169.

NHELI 2007-1     [T]he sponsor will represent and warrant, as of the Closing Date, that, among other things: . . . (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws[.] **PX O0072** at 238.

**First National Bank of Nevada**
FNBN's underwriting guidelines are applied in a standard procedure that is intended to comply with applicable federal and state laws and regulations. **PX O0072** at 111.

30

### I.      Statements Regarding Compliance With Federal And State Laws

NHELI 2007-2      [T]he sponsor will represent and warrant, as of the Closing Date, that, among other things: . . . (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws[.]  **PX O0080** at 196.

**Ownit**
The equal treatment of all credit applicants, without regard to race, sex, sexual orientation, color, national origin, religion, age, marital status, disability, or any other prohibited basis, is an integral part of the fundamental mission of providing quality financial services to existing and prospective customers.  Ownit is committed to the principle that every applicant for credit receives fair and equal treatment throughout the credit application and approval process.  This principle is embodied in the Equal Credit Opportunity Act and Fair Housing Act, and applies to every lending subsidiary of Ownit.  **PX O0080** at 90.

NHELI 2007-3      [T]he sponsor will represent and warrant, as of the Closing Date, that, among other things: . . . (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and federal laws including, but not limited to all applicable predatory and abusive lending laws[.]  **PX O0051** at 187.

**ResMAE**
The underwriting guidelines of ResMAE are applied in accordance with a procedure which complies with applicable federal and state laws and regulations . . . .  **PX O0051** at 89.

### J.      Statements Regarding Exceptions To Underwriting Guidelines

NAA 2005-AR6      [C]ertain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower.  **PX O0059** at 93.

NHELI 2006-FM1   On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.  **PX**

31

**J.    Statements Regarding Exceptions To Underwriting Guidelines**

    O0049 at 71-72.

NHELI 2006-FM2  On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.  **PX O0045** at 82.

NHELI 2006-HE3  [C]ertain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower.  **PX O0041** at 88.

    **People's Choice**
On a case-by-case basis, exceptions to the Underwriting Guidelines may be made where compensating factors exist. . . . PCHLI documents all exceptions in its loan files.  **PX O0041** at 82.

NHELI 2007-1  [C]ertain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower.  **PX O0072** at 115.

    **First National Bank of Nevada**
FNBN may make certain exceptions to the underwriting guidelines described herein if, in FNBN's discretion, compensating factors are demonstrated by a prospective borrower.  **PX O0072** at 110.

NHELI 2007-2  [C]ertain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower.  **PX O0080** at 91.

    **Ownit**
The guidelines, a reasonable loan amount and the RightLoan itself offer a solution that also facilitates making logical exceptions to those guides.  Exceptions to the guidelines will be made if the loan meets the primary criteria of the RightLoan and offers supported compensating factors when a deviation occurs.  In all cases, the exception(s) and compensating factor(s) are clearly documented in the file and require branch manager approval and a second signature from the corporate underwriter.  **PX O0080** at 89.

NHELI 2007-3  [C]ertain exceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are

EXHIBIT 1

**J.      Statements Regarding Exceptions To Underwriting Guidelines**

demonstrated by a prospective borrower.  **PX O0051** at 92.

**ResMAE**
On a case by case basis, ResMAE may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.  **PX O0051** at 89.

**II.      Statements Regarding Loan-To-Value Ratios**

NAA 2005-AR6      The "Loan-to-Value Ratio" of a mortgage loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan to the Value of the related Mortgaged Property.  The "Value" of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of that loan and (b) the sales price for that property. . . . Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in an appraisal obtained at the time of origination of the Refinance Loan.  The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market.  **PX O0059** at 175.

NHELI 2006-FM1      The "Loan-to-Value Ratio" of a loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the loan to the Value of the related Mortgaged Property.  The "Value" of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of that loan and (b) the sales price for that property. . . . Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in an appraisal obtained at the time of origination of the Refinance Loan.  The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market.

33

EXHIBIT 1

**II.      Statements Regarding Loan-To-Value Ratios**

> **PX O0049** at 191-92.

NHELI 2006-FM2   The "Loan-to-Value Ratio" of a loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the loan to the Value of the related Mortgaged Property.  The "Value" of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of that loan and (b) the sales price for that property. . . . Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in an appraisal obtained at the time of origination of the Refinance Loan.  The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market.  **PX O0045** at 229.

NHELI 2006-HE3   The "Loan-to-Value Ratio" of a loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the loan to the Value of the related Mortgaged Property.  The "Value" of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of that loan and (b) the sales price for that property. . . . Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in an appraisal obtained at the time of origination of the Refinance Loan.  The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market.  **PX O0041** at 228.

NHELI 2007-1   The "Loan-to-Value Ratio" of a loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the loan to the Value of the related Mortgaged Property.  The "Value" of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of that loan and (b) the sales price for that property. . . . Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in an appraisal obtained at the time of origination of the Refinance Loan.  The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to

34

**EXHIBIT 1**

## II.      Statements Regarding Loan-To-Value Ratios

time based upon changes in economic conditions and the real estate market. **PX O0072** at 302.

NHELI 2007-2    The "Loan-to-Value Ratio" of a loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the loan to the Value of the related Mortgaged Property.  The "Value" of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of that loan and (b) the sales price for that property. . . . Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in an appraisal obtained at the time of origination of the Refinance Loan.  The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market. **PX O0080** at 255.

NHELI 2007-3    The "Loan-to-Value Ratio" of a loan at any particular time is the ratio (expressed as a percentage) of the then outstanding principal balance of the loan to the Value of the related Mortgaged Property.  The "Value" of a Mortgaged Property, other than for Refinance Loans, is generally the lesser of (a) the appraised value determined in an appraisal obtained by the originator at origination of that loan and (b) the sales price for that property. . . . Unless otherwise specified in the prospectus supplement, the Value of the Mortgaged Property securing a Refinance Loan is the appraised value of the Mortgaged Property determined in an appraisal obtained at the time of origination of the Refinance Loan.  The value of a Mortgaged Property as of the date of initial issuance of the related series may be less than the Value at origination and will fluctuate from time to time based upon changes in economic conditions and the real estate market. **PX O0051** at 246.

EXHIBIT 1

| Majority Of Mortgage Loans Had LTV Ratios Of 80% Or Less | | |
|---|---|---|
| SLG | Number of Loans with LTV ≤ 80% | Percentage of Loans (by aggregate cut-off date principal balance) with LTV ≤ 80% |
| NAA 2005-AR6 (3) | 372 | 99.09% |
| NHELI 2006-FM1 (1) | 1,392 | 63.00% |
| NHELI 2006-FM2 (1) | 2,238 | 68.40% |
| NHELI 2006-HE3 (1) | 1,973 | 58.82% |
| NHELI 2007-1 (2) | 435 | 93.04% |
| NHELI 2007-2 (1) | 1,584 | 56.59% |
| NHELI 2007-3 (1) | 1,109 | 59.31% |

**PX 1638.  PX O0059** at 60; **PX O0049** at 41; **PX O0045** at 49; **PX O0041** at 47; **PX O0072** at 91; **PX O0080** at 51; **PX O0051** at 52.

| Distribution Of LTV Ratios | | | |
|---|---|---|---|
| SLG | Percentage Of Loans Reported with LTV ≤ 80% | Percentage Of Loans Reported with LTV > 80% to LTV ≤ 100% | Percentage Of Loans Reported with LTV > 100% |
| NAA 2005-AR6 (3) | 98.94% | 1.06% | 0.00% |
| NHELI 2006-FM1 (1) | 54.98% | 45.02% | 0.00% |
| NHELI 2006-FM2 (1) | 57.52% | 42.48% | 0.00% |
| NHELI 2006-HE3 (1) | 54.53% | 45.47% | 0.00% |
| NHELI 2007-1 (2) | 91.77% | 8.23% | 0.00% |
| NHELI 2007-2 (1) | 52.78% | 47.22% | 0.00% |
| NHELI 2007-3 (1) | 58.49% | 41.51% | 0.00% |

**PX 1719.  PX O0059** at 60; **PX O0049** at 41; **PX O0045** at 49; **PX O0041** at 47; **PX O0072** at 91; **PX O0080** at 51; **PX O0051** at 52.

| Distribution Of CLTV Ratios | | | |
|---|---|---|---|
| SLG | Percentage Of Loans Reported with CLTV ≤ 80% | Percentage Of Loans Reported with CLTV > 80% to CLTV ≤ 100% | Percentage Of Loans Reported with CLTV > 100% |
| NHELI 2006-FM1 (1) | 29.15% | 70.85% | 0.00% |
| NHELI 2006-FM2 (1) | 26.47% | 73.53% | 0.00% |
| NHELI 2006-HE3 (1) | 39.19% | 60.81% | 0.00% |
| NHELI 2007-2 (1) | 28.66% | 71.34% | 0.00% |
| NHELI 2007-3 (1) | 18.88% | 81.12% | 0.00% |

**PX 1720.  PX O0049** at 41; **PX O0045** at 49; **PX O0041** at 47; **PX O0080** at 52; **PX O0051** at 52.

EXHIBIT 1

### III.    Statements Regarding Owner Occupancy

| Number And Percentage Of Owner Occupied Loans In Each Supporting Loan Group | | |
|---|---|---|
| SLG | Number of Mortgage Loans Represented To Be Owner Occupied | Percentage of Mortgage Loans (by aggregate cut-off date principal balance) Represented To Be Owner Occupied |
| NAA 2005-AR6 Group III | 188 | 56.59% |
| NHELI 2006-FM1 Group I | 2,248 | 88.63% |
| NHELI 2006-FM2 Group I | 3,628 | 93.05% |
| NHELI 2006-HE3 Group I | 3,239 | 89.59% |
| NHELI 2007-1 Group II-I | 217 | 53.07% |
| NHELI 2007-2 Group I | 2,731 | 90.86% |
| NHELI 2007-3 Group I | 1,707 | 89.21% |

**PX 1639.  PX O0059** at 61; **PX O0049** at 43; **PX O0045** at 51; **PX O0041** at 49; **PX O0072** at 80; **PX O0080** at 54; **PX O0051** at 54.

EXHIBIT 1

**IV.     Statements Regarding Collateral Characteristics**

NAA 2005-AR6     The characteristics of the mortgage loans included in a trust fund will not vary by more than five percent (by total principal balance as of the Cut-Date) from the characteristics of the mortgage loans that are described in the prospectus supplement.  **PX O0059** at 176.

NHELI 2006-FM1     The characteristics of the loans included in a trust fund will not vary by more than five percent (by total principal balance as of the Cut-off Date) from the characteristics of the loans that are described in the prospectus supplement.  **PX O0049** at 193.

NHELI 2006-FM2     If, as of the closing date, any material pool characteristics  differs by 5% or more from the description in this prospectus supplement, revised disclosure will be provided either in a supplement to this prospectus supplement or in a current report on Form 8-K.  **PX O0045** at 42.

The characteristics of the loans included in a trust fund will not vary by more than five percent (by total principal balance as of the Cut-off Date) from the characteristics of the loans that are described in the prospectus supplement.  In the event that mortgage loans are added to or deleted from the trust fund after the date of the related prospectus supplement but on or before the date of issuance of the securities if any material pool characteristic differs by 5% or more from the description in the prospectus supplement, revised disclosure will be provided either in a supplement or in a Current Report on Form 8-K.  **PX O0045** at 230.

NHELI 2006-HE3     If, as of the closing date, any material pool characteristics differs by 5% or more from the description in this prospectus supplement, revised disclosure will be provided either in a supplement to this prospectus supplement or in a current report on Form 8-K.  **PX O0041** at 40.

The characteristics of the loans included in a trust fund will not vary by more than five percent (by total principal balance as of the Cut-off Date) from the characteristics of the loans that are described in the prospectus supplement.  In the event that mortgage loans are added to or deleted from the trust fund after the date of the related prospectus supplement but on or before the date of issuance of the securities if any material pool characteristic differs by 5% or more from the description in the prospectus supplement, revised disclosure will be provided either in a supplement or in a Current Report on Form 8-K.  **PX O0041** at 229.

NHELI 2007-1     If, as of the Closing Date, any material pool characteristic differs by 5% or more from the description in this prospectus supplement, revised disclosure will be provided either in a supplement or in a Current Report on Form 8-

**EXHIBIT 1**

**IV.    Statements Regarding Collateral Characteristics**

K.  **PX O0072** at 117-18.

The characteristics of the loans included in a trust fund will not vary by more than five percent (by total principal balance as of the Cut-Off Date) from the characteristics of the loans that are described in the prospectus supplement.  In the event that mortgage loans are added to or deleted from the trust fund after the date of the related prospectus supplement but on or before the date of issuance of the securities if any material pool characteristic differs by 5% or more from the description in the prospectus supplement, revised disclosure will be provided either in a supplement or in a Current Report on Form 8-K.  **PX O0072** at 303.

NHELI 2007-2      If, as of the Closing Date, any material pool characteristic differs by 5% or more from the description in this prospectus supplement, revised disclosure will be provided either in a supplement or in a Current Report on Form 8-K.  **PX O0080** at 94.

The characteristics of the loans included in a trust fund will not vary by more than five percent (by total principal balance as of the Cut-off Date) from the characteristics of the loans that are described in the prospectus supplement.  In the event that mortgage loans are added to or deleted from the trust fund after the date of the related prospectus supplement but on or before the date of issuance of the securities if any material pool characteristic differs by 5% or more from the description in the prospectus supplement, revised disclosure will be provided either in a supplement or in a Current Report on Form 8-K.  **PX O0080** at 256.

NHELI 2007-3      If, as of the Closing Date, any material pool characteristic differs by 5% or more from the description in this prospectus supplement, revised disclosure will be provided either in a supplement or in a Current Report on Form 8-K.  **PX O0051** at 95.

The characteristics of the loans included in a trust fund will not vary by more than five percent (by total principal balance as of the Cut-off Date) from the characteristics of the loans that are described in the prospectus supplement.  In the event that mortgage loans are added to or deleted from the trust fund after the date of the related prospectus supplement but on or before the date of issuance of the securities if any material pool characteristic differs by 5% or more from the description in the prospectus supplement, revised disclosure will be provided either in a supplement or in a Current Report on Form 8-K.  **PX O0051** at 247.

EXHIBIT 1

## V.   Statements Regarding Credit Ratings

NAA 2005-AR6    The classes of certificates listed below will not be offered unless they receive ratings at least as high as those set forth below from Standard & Poor's, a division of The McGraw-Hill Companies, Inc., which we refer to as 'Standard & Poor's' and Moody's Investors Service, Inc., which we refer to as 'Moody's'. . . . A rating is not a recommendation to buy, sell or hold securities and each rating agency can revise or withdraw such ratings at any time.  In general, ratings address credit risk and do not address the likelihood of prepayments.  **PX O0059** at 12.

The credit ratings listed for Class III-A-1 were AAA (S&P) and Aaa (Moody's).  **PX O0059** at 12.

The ratings of each class of Offered Certificates will depend primarily on an assessment by the rating agencies of the related Mortgage Loans and the subordination afforded by certain classes of certificates.  The ratings by each of the rating agencies of the Offered Certificates are not recommendations to purchase, hold or sell the Offered Certificates because such ratings do not address the market prices of the certificates or suitability for a particular investor.  **PX O0059** at 24.

NHELI 2006-FM1   The Offered Certificates will not be offered unless they receive ratings at least as high as those set forth below from Standard & Poor's, a division of The McGraw-Hill Companies, Inc., which we refer to as "Standard & Poor's", Moody's Investors Service, Inc., which we refer to as "Moody's" and Dominion Bond Rating Service, which we refer to as "DBRS". . . . A rating is not a recommendation to buy, sell or hold securities and each rating agency can revise or withdraw such ratings at any time.  In general, ratings address credit risk and do not address the likelihood of prepayments.  **PX O0049** at 13.

The credit ratings listed for Class I-A were AAA (S&P), Aaa (Moody's), and AAA (DBRS).  **PX O0049** at 13.

The ratings of each class of Offered Certificates will depend primarily on an assessment by the rating agencies of the related Mortgage Loans, the Interest Rate Swap Agreement and the subordination afforded by certain classes of certificates.  The ratings by each of the rating agencies of the Offered Certificates are not recommendations to purchase, hold or sell the Offered Certificates because such ratings do not address the market prices of the certificates or suitability for a particular investor.  **PX O0049** at 28.

NHELI 2006-FM2   The Offered Certificates will not be offered unless they receive ratings at

41

EXHIBIT 1

**V.      Statements Regarding Credit Ratings**

least as high as those set forth below from Standard & Poor's, a division of The McGraw-Hill Companies, Inc., which we refer to as "Standard & Poor's", Moody's Investors Service, Inc., which we refer to as "Moody's", Fitch Ratings, which we refer to as "Fitch" and Dominion Bond Rating Service, which we refer to as "DBRS". . . . A rating is not a recommendation to buy, sell or hold securities and each rating agency can revise or withdraw such ratings at any time.  In general, ratings address credit risk and do not address the likelihood of prepayments.  **PX O0045** at 15-16.

The credit ratings listed for Class I-A-1 were AAA (S&P), Aaa (Moody's), AAA (Fitch), and AAA (DBRS).  **PX O0045** at 15.

The ratings of each class of Offered Certificates will depend primarily on an assessment by the rating agencies of the related Mortgage Loans, the Interest Rate Swap Agreement, the Interest Rate Cap Agreement and the subordination afforded by certain classes of certificates.  The ratings by each of the rating agencies of the Offered Certificates are not recommendations to purchase, hold or sell the Offered Certificates because such ratings do not address the market prices of the certificates or suitability for a particular investor.  **PX O0045** at 35.

NHELI 2006-HE3      The Offered Certificates will not be offered unless they receive ratings at least as high as those set forth below from Standard & Poor's, a division of The McGraw-Hill Companies, Inc., which we refer to as "Standard & Poor's", Moody's Investors Service, Inc., which we refer to as "Moody's", Fitch Ratings, which we refer to as "Fitch" and Dominion Bond Rating Service, which we refer to as "DBRS". . . . A rating is not a recommendation to buy, sell or hold securities and each rating agency can revise or withdraw such ratings at any time.  In general, ratings address credit risk and do not address the likelihood of prepayments.  **PX O0041** at 14-15.

The credit ratings listed for Class I-A-1 were AAA (S&P), Aaa (Moody's), AAA (Fitch), and AAA (DBRS).  **PX O0041** at 15.

The ratings of each class of Offered Certificates will depend primarily on an assessment by the rating agencies of the related Mortgage Loans, the Interest Rate Swap Agreement and the subordination afforded by certain classes of certificates.  The ratings by each of the rating agencies of the Offered Certificates are not recommendations to purchase, hold or sell the Offered Certificates because such ratings do not address the market prices of the certificates or suitability for a particular investor.  **PX O0041** at 33.

EXHIBIT 1

## V.    Statements Regarding Credit Ratings

NHELI 2007-1    The classes of certificates listed below will not be offered unless they receive ratings at least as high as those set forth below from Standard & Poor's, a division of The McGraw-Hill Companies, Inc., which we refer to as "S&P" and Moody's Investors Service, Inc., which we refer to as "Moody's". . . . A rating is not a recommendation to buy, sell or hold securities and each rating agency can revise or withdraw such ratings at any time.  In general, ratings address credit risk and do not address the likelihood of prepayments.  **PX O0072** at 25.

The credit ratings listed for Class II-1-A were AAA (S&P) and Aaa (Moody's).  **PX O0072** at 25.

The ratings of each class of Offered Certificates will depend primarily on an assessment by the rating agencies of the related Mortgage Loans, the subordination afforded by certain classes of certificates and an assessment by the rating agencies of the related Interest Rate Swap Agreements.  The ratings by each of the rating agencies of the Offered Certificates are not recommendations to purchase, hold or sell the Offered Certificates because such ratings do not address the market prices of the certificates or suitability for a particular investor.  **PX O0072** at 52.

NHELI 2007-2    The Offered Certificates will not be offered unless they receive ratings at least as high as those set forth below from Standard & Poor's, a division of The McGraw-Hill Companies, Inc., which we refer to as "Standard & Poor's", Moody's Investors Service, Inc., which we refer to as "Moody's" and "DBRS"[.] . . . A rating is not a recommendation to buy, sell or hold securities and each rating agency can revise or withdraw such ratings at any time.  In general, ratings address credit risk and do not address the likelihood of prepayments.  **PX O0080** at 17.

The credit ratings listed for Class I-A-1 were AAA (S&P), Aaa (Moody's), and AAA (DBRS).  **PX O0080** at 17.

The ratings of each class of Offered Certificates will depend primarily on an assessment by the rating agencies of the related Mortgage Loans, the Interest Rate Swap Agreement, the Interest Rate Cap Agreement and the subordination afforded by certain classes of certificates.  The ratings by each of the rating agencies of the Offered Certificates are not recommendations to purchase, hold or sell the Offered Certificates because such ratings do not address the market prices of the certificates or suitability for a particular investor.  **PX O0080** at 36.

NHELI 2007-3    The Offered Certificates will not be offered unless they receive ratings at

43

**EXHIBIT 1**

**V.      Statements Regarding Credit Ratings**

least as high as those set forth below from Standard & Poor's, a division of
The McGraw-Hill Companies, Inc., which we refer to as "Standard &
Poor's", Moody's Investors Service, Inc., which we refer to as "Moody's"
and Dominion Bond Rating Service, Inc. (known as DBRS, Inc.), which we
refer to as "DBRS". . . . A rating is not a recommendation to buy, sell or
hold securities and each rating agency can revise or withdraw such ratings
at any time.  In general, ratings address credit risk and do not address the
likelihood of prepayments.  **PX O0051** at 17.

The credit ratings listed for Class I-A-1 were AAA (S&P), Aaa (Moody's)
and AAA (DBRS).  **PX O0051** at 17.

The ratings of each class of Offered Certificates will depend primarily on
an assessment by the rating agencies of the related Mortgage Loans, the
Interest Rate Swap Agreement, the Interest Rate Cap Agreement and the
subordination afforded by certain classes of certificates.  The ratings by
each of the rating agencies of the Offered Certificates are not
recommendations to purchase, hold or sell the Offered Certificates because
such ratings do not address the market prices of the certificates or
suitability for a particular investor.  **PX O0051** at 35.